# PX364



**Presenter:** Secretary of Defense Donald H. Rumsfeld                          Friday, March 28, 2003 - 1:15 p.m. EST

### DoD News Briefing - Secretary Rumsfeld and Gen. Myers

(Also participating was Gen. Richard B. Myers, Chairman, Joint Chiefs of Staff.)



PX364



Video footage of an F-16 delivering precision-guided munitions against enemy troops in western Iraq that were firing mortars at Special Operations forces
[387 Kb]

Video footage of an AV-8B Harrier dropping a precision- guided weapon on a tank in the open, south of al-Amarah
[355 Kb]

Video footage of a Predator firing a Hellfire missile at an Iraqi communication dish outside the Ministry of Information in Baghdad. The dish is in a parking lot at some distance from the ministry building
[1.1 Mb]

This imagery shows military equipment dispersed in residential areas. The red dots indicate location of military equipment in this neighborhood, and four of them have been highlighted in the yellow boxes. This neighborhood is located approximately 30 miles south of Baghdad, in the proximity of the Medina Republican Guard division. The images are of a tank on a transporter that's in the middle of a neighborhood; of some armored personnel carriers that are in

PX364

**neighborhood streets; of a tank on a residential street; and in the lower right of
armored vehicles in trees**

Rumsfeld: Good afternoon.

One week and a few minutes ago, the air war began in Iraq. So Operation Iraqi Freedom is now just a little over one week old. In that brief period of time, the coalition forces have made solid progress. And interestingly, in that short period of a week, we have seen mood swings in the media from highs to lows to highs and back again, sometimes in a single 24-hour period.

For some, the massive TV -- the massive volume of television -- and it is massive -- and the breathless reports can seem to be somewhat disorienting. Fortunately, my sense is that the American people have a very good center of gravity and can absorb and balance what they see and hear. Often when General Myers and I go from the building up to the Hill to brief, by the we get there, questions are posed about columns of things flying down someplace and something having happened, which is reported by a person who saw it on the ground, which has not even been reported back yet to the Pentagon. So it's -- it is a very different kind of a circumstance.

In less than a week, despite high wind gusts and sandstorms that can turn day into night, coalition forces have moved across more than 200 miles of Iraqi territory and are now just some 50 miles south of Baghdad. They've secured Iraq's southern oil fields, we believe successfully, and have completed the de-mining of the port. The British ship Sir Galahad docked there this morning and began off- loading some 200-plus tons of humanitarian aid. I'm told that in the southern oil fields they found a number of wells with wires and timers, the explosives having not yet been put in place, nor triggered off. Fortunately, the wells seem to have been protected.

The 173rd Airborne has been deploying into the North, and coalition forces have launched successful attacks on terrorist targets. In the West, they have had good success dealing with the regime's ability to threaten neighboring countries from that part of Iraq. Each day more coalition forces flow into the country. Each day more Iraqi forces surrender. The regime knows this. Already they have deployed death squads into Iraqi cities to terrorize civilians and to try to prevent them from welcoming coalition forces, to try to compel the regular army to fight by putting guns to their head, because they know that -- the only way to force them to fight for Saddam Hussein. I urge the Iraqi people being threatened in the cities to try to remember the faces and the names of the death squad enforcers. Their time will come, and we will need your help and your testimony.

These death squads report to the Hussein family directly. Their ranks are populated with criminals released from Iraqi prisons. They dress in civilian clothes and operate from private homes, confiscated from innocent people, and try to blend in with the civilian population. They conduct sadistic executions on sidewalks and public squares, cutting the tongues out of those accused of disloyalty and beheading people with swords. They put on American and British uniforms to try to fool regular Iraqi soldiers into surrendering to them, and then execute them as an example for others who might contemplate defection or capitulation.

Their name, Fedayeen Saddam, is a lie, because their purpose is certainly not to make martyrs of themselves, but to make martyrs of innocent Iraqis opposed to Saddam's rule. But we will take them at their word, and if their wish is to die for Saddam Hussein, they will be accommodated.

As the regime deploys death squads to slaughter its own citizens, coalition forces are working to save Iraqi lives. We do this because, unlike Saddam Hussein's regime, our nation and our people value human life. We want the Iraqi people to live in freedom so they can build a future where Iraq's leaders answer to the Iraqi people instead of killing the Iraqi people.

There are some who suggest that the U.S. and its coalition partners are not destroying Iraqi cities and are not destroying the Iraqi people, and that this somehow could reflect a lack of will or a lack of determination on the part of the coalition. The opposite is true. It is precisely because of our overwhelming power and our certainty of victory that we believe we can win this war and remove the regime while still striving to spare innocent lives. Our military capabilities are so devastating and precise that we can destroy an Iraqi tank under a bridge without damaging the bridge. We do not need to kill thousands of innocent Iraqis to remove Saddam Hussein from power. At least that's our belief. We believe we can destroy his institutions of power and oppression in an orderly manner.

The tactics employed by the Iraqi regime, by contrast, hiding behind women and children, murdering civilians, these are not signs of strength. They're sign of weakness and of desperation.

The outcome of this conflict is not in doubt. The regime will be removed. But for our coalition of free people, we believe it is important not just to win, but to win justly. The power of our coalition derives not simply from the vast overwhelming force at our disposal, but from the manner in which we employ that force. The Iraqi people will see how we employ our force and know that we are coming not to occupy your country, not to oppress them, but to liberate their country.

Finally, before I turn to General Myers, a few words of caution.

First, to the officials of the Iraqi regime: The defeat -- your defeat is inevitable and you will be held accountable for your conduct in this war. The coalition POWs that you are holding must be treated according to the Geneva Conventions. And any Iraqi officials involved in their mistreatment, humiliation or execution will pay a severe price.

And to Iraq's neighbor, Syria: We have information that shipments of military supplies have been crossing the border from Syria into Iraq, including night-vision goggles. These deliveries pose a direct threat to the lives of coalition forces. We consider such trafficking as hostile acts and will hold the Syrian government accountable for such shipments.

PX364

Last, the entrance into Iraq by military forces, intelligence personnel, or proxies not under the direct operational control of General Franks will be taken as a potential threat to coalition forces. This includes the Badr Corps, the military wing of the Supreme Council on Islamic Revolution in Iraq. The Badr Corps is trained, equipped and directed by Iran's Islamic Revolutionary Guard, and we will hold the Iranian government responsible for their actions, and will view Badr Corps activity inside Iraq as unhelpful. Armed Badr Corps members found in Iraq will have to be treated as combatants.

General Myers.

Myers: Thank you, Mr. Secretary.

Operation Iraqi Freedom continues. More than 270,000 coalition forces are deployed in support of combat operations, with approximately one-third of those already inside Iraq.

Our ground operations are continuing to push north with Marine, armored, and infantry forces poised near Baghdad.

The slide on the screen shows the now approximately 35 to 40 percent of Iraq, Iraqi territory, where Saddam's regime has lost control. In just eight days of operations, coalition forces are located throughout that entire shaded area that you see there on the screen. And while there will continue to be sporadic, even serious engagements in those areas, the regime does not control them. And they're, again, annotated by the highlighted color there.

The air campaign continues as well. We flew almost a thousand sorties over Iraq yesterday, mostly against Iraqi regime leadership and command and control targets, ballistic missile threats and major communication nodes.

As you'll see on the slide now, we have air supremacy over approximately 95 percent of Iraq. The area over Baghdad and just north we are not yet calling our skies. While we've been flying freely over Baghdad, we have some surface-to-air missiles system -- missile systems currently unlocated in that area.

That said, since the beginning of operations, our forces have fired more than 650 Tomahawk missiles and dropped more than 5,000 precision-guided munitions.

Overall, our plans are on track. We are degrading Iraqi forces, particularly the Republican Guard, by air, and that's fixed wing and rotary wing. And we will engage them with the full weight of our combat power at a time and place of our choosing.

As we've said before from up here, we're going to be engaged in a difficult fight ahead, but the outcome is certain. We will disarm Iraq and remove the current regime from power.

And finally today, I have three videos and one more picture slide.

The first video is of an F-16 delivering precision-guided munitions against enemy troops in western Iraq that were firing mortars at Special Operations forces.

The second video is of an AV-8B Harrier dropping a precision- guided weapon on a tank in the open, south of al-Amarah.

And the last video is of a Predator firing a Hellfire missile at an Iraqi communication dish outside the Ministry of Information yesterday in Baghdad. As you'll see when the tape ends and freezes, you'll see that the dish is in a parking lot actually some distance from the ministry building. The ministry building's there at the edge, off to the right, right lower edge.

Also in our last picture slide here, the image depicts military equipment dispersed in residential areas. The red dots indicate location of military equipment in this neighborhood, and we've highlighted just four of them in the yellow boxes. This neighborhood is located approximately 30 miles south of Baghdad, in the proximity of the Medina Republican Guard division. This image up here is a tank on a transporter that's in the middle of a neighborhood. They have some armored personnel carriers here that are in neighborhood streets. We have handouts, so you can see these better, probably when we give you the handouts. The upper right is a tank on a residential street. In the lower right are armored vehicles in trees.

And with that, we'll take your questions.

Q: General Myers, I'd like to ask about reports that the Republican Guard divisions, Medina south of Baghdad and the Hammurabi west of Baghdad, are perhaps physically realigning themselves for defensive or other reasons. And do you have any sign at all that these people are beginning to actually don chemical weapons suits? There's been a report to that effect.

Myers: The only thing that I have on the chemical suits are the over 3,000 or 3,000 suits, new suits that were found, I think, in An Nasiriyah, I think is where they were found by the Marines when they went in the Ba'ath Party headquarters. And that was also where they found weapons, and they found people, of course, I think 170 of them they rounded up, and they also found uniforms, Iraqi uniforms they had taken off. That's the only suits that I'm aware of at this time.

And we do have some indications that some of the Republican Guard divisions are relocating. And exactly where, we're just going to wait and see.

Q: Does it appear that it's because they have been hit too hard. Is this a defensive thing, or are they moving -- are they moving the Hammurabi down to support the Medina?

Myers: The Republican Guard has not gone on the offense yet. They are dug in, disbursed. That's quite possibly Republican Guard there in that neighborhood. I've got to be careful if I confirm that or not, but in that neighborhood. So they could be consolidating to make a defense. It doesn't make any difference. The outcome is going to be certain, as I said. They'll make - - we're making plans right now, and we'll attack when we're ready.

PX364

Yes.

Q: Mr. Secretary, I'd like to ask you about your statement about military supplies moving across the border from Syria. You described those as hostile acts. Are they subject to military action in response if that continues?

Rumsfeld: There's no question but that to the extent military supplies or equipment or people move across borders between Iraq and Syria, that it vastly complicates our situation. And that is why I said what I said.

Q: But so are you threatening military action against Syria?

Rumsfeld: I'm saying exactly what I said. It was carefully phrased.

Yes?

Q: Mr. Secretary, General Wallace was predominantly quoted today, saying that this may be a longer war than the commanders had thought and that this was not the enemy that we war-gamed against. It seems to contradict some of the statements that have been made from the podium here and the podium in Doha. Can you reconcile the two views?

Rumsfeld: Well, I didn't read the article; I saw the headline. And I've seen a lot of headlines that don't fit articles. Someone coming down here told me that he also said that we're about where we expected to be, which is generally what General Franks is saying. I suppose everyone can have their own view.

Q: Well, I wasn't there, of course, but the article quotes him as saying that this is going to be a longer war than had been anticipated.

Rumsfeld: Does it have quotes saying that?

Q: Yes. It says the enemy we're fighting is not the enemy we war-gamed -- "the enemy we're fighting is different from the one we war-gamed against."

Rumsfeld: Yeah, well, as far as I'm concerned, it seems to me a careful reading of Amnesty International or the record of Saddam Hussein, having used chemical weapons on his own people as well as his neighbors, and the viciousness of that regime, which is well known and documented by human rights organizations, ought not to be surprised.

Q: Can I follow up on that, sir?

Q: Mr. Secretary, as you know, there has been some criticism, some by retired senior officers, some by officers on background in this building, who claim that the war plan that is in effect is flawed and our number of troops on the ground is too light, supply lines are too long and stretched too thin. Would you give us a definitive statement, if you would, to the effect that you agree that the war plan is sound and that this criticism is unfounded, or that there's some substance to it?

Rumsfeld: Well, we're one week into this, and it seems to me it's a bit early for history to be written, one would think. The war plan is Tom Franks' war plan. It was carefully prepared over many months. It was washed through the tank with the chiefs on at least four or five occasions.

Myers: Exactly -- more, more.

Rumsfeld: It has been through the combatant commanders. It has been through the National Security Council process. General Myers and General Pace and others, including this individual, have seen it in a variety of different iterations. When asked by the president or by me, the military officers who've reviewed it have all said they thought it was an excellent plan. Indeed, adjectives that go beyond that have been used, quite complimentary.

Myers: Ivan --

Rumsfeld: Go ahead.

Myers: Ivan, you know, there's that old adage that you probably know as well, that no plan, no matter how perfect, survives first contact with the enemy. I think some of that was shown in the way we orchestrated the opening moments of this conflict. I don't think anybody expected it to come out -- be laid out the way it was. And that wasn't exactly according to the plan, but it had the flexibility inherent.

So I stand by this plan. I think General Franks put together a good plan. I'll give you a definitive statement: I think it's a brilliant plan. And there will be -- there's branches and sequels to everything that might possibly happen, but the plan is sound, it's being executed and it's on track. And that's essentially what General Wallace said, too. He said we're about where we expected to be. That's one of his quotes as well. So.

Q: Mr. Secretary?

Q: Mr. Secretary?

Rumsfeld: (Off mike) -- the people that you're talking to haven't seen the plan, for the most part.

Q: Mr. Secretary?

Q: General Myers?

Rumsfeld: Pam?

PX364

QCould you, General Myers, on that same subject, maybe narrate for us what we've seen in the last week from your perspective, particularly on the ground: with the fast punch up north, what the purpose of that was, and if it's shaken out the way you thought it would; stringing the Marines out behind to protect the lines of communication, how that's going; and then the effects-based air targeting. So if you could -- the problem I think we're all running up against is we talk to a lot of retired officers, who may be Gulf War focused or Kosovo focused, and this is very different. And can you explain to us why it's different and how it's different and how that's stacking up against what you expected to see at this point?

Myers: I guess I can try, and the secretary, please help me on this as we go through it. But in 36 hours, we're on the outskirts of Baghdad. You know, it took 38 days of air war before for the 100 hours of the ground war to take place last time. So it's a much different objective, much different way of addressing a much different problem.

Q: And why do you want to be on the outskirts of Baghdad so quickly?

Myers: Because we could. There has been -- (laughter). Well, and I don't mean that to sound flippant. Because we could, and it was necessary to try to bring down this regime as quickly as possible. I didn't say quick, I said as quickly as possible. You've heard us both stand up here and say this is going to take some time and the tough part is yet ahead of us.

Obviously, we can measure the miles between the Kuwaiti border and where the Medina division is right now and where the 1st Marine Division is. We know that's a long way. We know those lines of communication are important to our well-being and that they have to be protected. There has not been a militarily significant assault on those lines of communication since we began. We knew we were going to bypass Basra. We were not going to stop there and work the Basra problem; that was going to be for the British forces, who are in there now working with some of our SOF and some of our close air support, to work the Basra problem.

The air plan has gone as we thought it would, concentrating on regime command and control targets, and other targets that allow them to communicate either propaganda or with their military. And that continues in beating down the Republican Guard divisions.

Q: Are you able to give us a little bit more of the whys -- why you did it that way?

Myers: Well, not yet. I think some of that would give away the whole plan, and it just gets into the operational detail, I'd like to avoid.

Q: Did the intelligence revealed at the U.N. about the Iraqi weapons of mass destruction program, did that at all hinder the military operations now? Did that reveal sources and methods of intelligence that would have been useful in this campaign? Did it make it more difficult?

Rumsfeld: I don't think that I've seen specific pieces of information that would allow someone to come to that conclusion, although I can't say that it's not true.

Yes?

Q: Mr. Secretary, last time we met with you, you were asked if the supply lines were stretched or vulnerable, and actually you both said no. And you also said the Fedayeen Saddam were onesies and twosies. Do you still stand by both those statements?

Myers: I just said that I think the attacks on the lines of communication with our -- inside our forces have not been militarily significant, and we're dealing with the death squad attacks on those lines of communication. There have not been regular army forces, I don't think, attacking those lines, unless it's been close to one of the major population hubs. But they're being dealt with. There have been some battles that have been bravely fought by our folks, and they have dispatched the enemy, in many cases quite quickly.

Rumsfeld: I'd have to go back and see what we actually said, but --

Q: You said onesies and twosies --

Rumsfeld: Let me respond. I'd have to go back and see what we said and what the context was DoD News: DoD News Briefing - Secretary Rumsfeld and Gen. Myers. But my recollection is, we said that -- not that there were only onesies and twosies in terms of the Fedayeen Saddam. We know the numbers there; there's somewhere between 5,000 and 25,000 in the country, depending on how you characterize them. But what we said was the attacks outside of cities have been relatively small, as the general said. And I suspect that's what we actually said.

Q: Mr. Secretary, you've said that the military outcome of this is certain, and I'm sure that not too many people doubt that. But what does seem uncertain at the moment are the mood of the Iraqi people and whether or not -- despite whatever dislike they have for Saddam Hussein, whether they will welcome American and British forces as liberators. Is it possible that you've miscalculated the desire of the Iraqi people to be liberated by an outside force and that because of their patriotism or nationalism, that they'll continue to resist the Americans, even after you prevail militarily?

Rumsfeld: Jamie, don't you think it's a little premature -- the question? We'll know the answer to that. As portions of the country are liberated, we'll have people on the ground, embedded with our forces, who will have a chance to see what happens and see how they feel about it. Why do we want to guess?

What we do know is that people behave fairly rationally, and if they have a gun to their head, and they're told, "Don't surrender," and they're told, "Don't assist the coalition forces coming in, or we will kill you," and then they go and kill somebody and execute him in front of everybody else to make sure everyone really got the message, it's not surprising that people's behavior is one of caution.

PX364

Now the other part of the answer to your question, it seems to me, is also self-evident. And that is, there is not "an Iraqi people." There are Iraqi individual people, and they're going to be all across the spectrum! The ones who were close to Saddam Hussein and been getting the Mercedes cars and all the good food -- they're going to be unhappy, and they're not going to prefer that we're there. The people that he's repressed and threatened to kill and whose children have been killed by him -- they'll probably have a somewhat different view. Will there be people in the middle who are ambivalent? Sure. They'll be all across the spectrum. But we've -- we don't need to try to answer those questions. We have time. We'll see what happens.

(Cross talk.)

Q: Mr. Secretary, can I ask you a question about the Fedayeen Saddam? You mentioned that they were in touch with Saddam's family. Can you give us what the sense is of the Iraqi leadership. Is Saddam alive? Is Saddam's family giving orders to these irregulars?

Rumsfeld: I don't know. We do know that historically they've reported up through one of the sons. That is what I had reference to. Yes.

Q: And how about the status of Saddam? Do you know what --

Rumsfeld: Everyone has a different opinion.

(Cross talk.)

Q: Mr. Secretary, I wanted to clear up what you said earlier about the Syrian -- or the NBGs coming in through Syria. Are you suggesting or is there information that this in fact state-sponsored, these are state-sponsored shipments of military goods?

Rumsfeld: I don't think I want to get into it. It's an intelligence issue. They control their border, and we're hopeful that that type of thing doesn't happen. (Cross talk.)

Q: And I had one follow-up, sir. The casualty figures currently officially released by the U.S. military show 28 dead and 40 wounded. Now the proportion of wounded and dead would be -- would seem to be historically way out of skew, because the number of wounded is usually far more than the number killed in action. Is there -- can you explain why that would be, or -- and is there any effort to either unreport or underreport casualties from the battlefield?

Rumsfeld: Oh, my goodness! Now, you know that wouldn't be the case. There's no -- no one in this government, here or on the ground, is going to underreport what's happening. That's just terrible to think that. Even to suggest it is outrageous. Most certainly not! The facts are reported. (Pounds fist.) When people are killed, they're killed and we face it. When people are wounded, we say so. When people are missing and we know they're missing, we say so. And when we're wrong and they wander back into camp, as several have recently, having been lost or with other units, we say so. Absolutely not!

Myers: The only thing I would add to that is that there can be reporting lags. And with embedded media, you know, you can hear reports, but before the families are notified of either wounded or killed in action or missing, we don't release the figures. So, there could be some lag time. But we never -- we're never going to hide those numbers.

Q: Mr. Secretary -- (inaudible) -- was there a conversation with General Wallace between any of the high command or elsewhere to tell him that what he had said was not helpful? Or do you encourage your major combatant commanders to speak their mind as they see the tactical battlefield, even though it may be slightly different than perhaps it is seen in Washington as a more strategic battlefield?

Rumsfeld: I know of no one in Washington who's said anything to General Wallace.

Q: Or General Franks?

Rumsfeld: The other question, I don't have any idea what kind of guidance they get in terms of what they say, do you?

Myers: I don't know that they get any guidance, not from you or from --

Rumsfeld: Not from us. They may get guidance from Tom Franks, or -- (inaudible) -- the land component commander or somebody, but --

Q: So is this an endorsement of plain-spoken assessment of your battlefield commanders, when it may not necessarily agree with the perception that the administration has --

Rumsfeld: Look, the administration does not have a perception. I have a perception, General Myers has a perception, and we say what we think. There's not some coordinated perception that's being peddled. This is a -- people see what they see and say what they say. My personal view is that their tasks are to do what they've been asked by General Franks to do. And it's to fight a land war in Iraq. And to the extent that includes meeting with the media and saying things, then that's General Franks' and General Wallace's concern.

Q: So there's no problem with General Wallace as far as you're concerned?

Rumsfeld: I have not read the article. I don't know how I can be any clearer. I saw the headline, and I tend over the years to have developed a certain hesitancy about believing that headlines tell the whole story.

Q: General Myers?

PX364

Q: Mr. Secretary, you have not actually mentioned the humanitarian effort so far. Could you outline how that is going? There are reports of Iraqi civilians inside Iraq really beginning to get hungry. And what the latest is on the movement of the massive supply? And are you anxious to get that moving quicker?

Rumsfeld: We have not seen any accurate reports or intelligence that suggests there's a humanitarian crisis in Iraq. We have seen some reporters, and pictures of people hoping to get water or hoping to get food as food has been brought in. Whether that's anecdotal or representative of something is unclear. I suspect it's more anecdotal. There's no question there are people who are hungry and want water.

We do know that water mains were broken and that there was some fraction of the people down south who did not have good water for a period. We also know that the Brits have got a water line going in and people are bringing truckloads of water in. And one would hope that the people who are under our areas of responsibility are in fact receiving what they should receive.

We have said repeatedly that the forces going in brought food with them, they brought medicine and they brought water. So the people in those areas, presumably, are okay. We also know that the Iraqi people overall, we were told and estimated, have something like anywhere from two to six weeks of food that had been predistributed in doubled-up rations for the period preceding maybe couple of months, and that therefore the likelihood that they would run out is -- it seems not to be great. But I did mention the Galahad, Sir Galahad, had arrived and it had, I don't know, what, 2(00) or 300 tons of -- 200 tons of food or something.

Myers: (Cross talk) -- 300.

Rumsfeld: And there are other major efforts that are coming forward.

QMr. Secretary?

Myers: The World Food Program -- I'm sorry?

Q: Did you want to add to that?

Myers: The World Food Program as of two days ago, on the 26th of March, says that the food distribution system that had been running there, the oil-for-food, is still partially intact in southern Iraq, and while some of the rations being delivered are incomplete, they're still delivering rations to those folks that aren't in -- not affected by the fighting. And they said it's going to be close -- be the end of April before anybody runs out of food. By that time -- we're already providing some of that food, particularly in the areas where they're struggling.

Q: Sir, when you came out here last Friday, you described activity that was taking place almost as a psychological operation, in terms of the point being to impress on the Iraqis a certain idea or attitude, and that perhaps, the regime would tip. Yesterday, when you described the activity, it was in a much more traditional military sense, about the rings around Baghdad and the need to penetrate those. Have you shifted your thinking in the past week from emphasizing more of a psychological operation to more of a traditional military operation?

Rumsfeld: I don't think so. From the outset, our preference would have been that the diplomacy would work. Second preference would have been that the ultimatum would have worked and he would have left the country. When we came out at the beginning of the ground and the air war, our preference would have been that the Iraqi forces would have thrown in the towel and said, "Fair enough," or that Saddam Hussein would have left. That remains the case. The conflict has to be pursued. It's going to end, and it's going to end with Saddam Hussein losing. And my hope, from then and today, remains that it will be done with the least loss of life that's possible.

Q: Mr. Secretary.

Rumsfeld: I don't know that there's any -- I don't feel that there's any change in my perspective.

Yes?

Q: Mr. Secretary, for someone who's always advocating private channels of diplomacy, I'd like to go back to your statement about Syria and Iran. Be very precise. What message are you sending the governments of Syria and Iran from this podium? If the rules -- are the rules of the road for this conflict to other countries the same as they are for the war on terrorism: You are with or against us, which is the president's message? Is that what you are saying here, your message?

And for General Myers, if you don't know the mood of the Iraqi people yet, and you don't deem it important to know the mood of the Iraqi people, what are the military challenges of operating in the city of Baghdad of 5 million if you don't think it's important to know the mood of the people before you get there?

Rumsfeld: With respect to the first questions, the message is that General Franks has forces in that country. Some are losing their lives, coalition forces are. We don't like having our forces lose their lives. We don't want the conflict prolonged. And we don't want neighboring countries or anyone else for that matter to be in there assisting the Iraqi forces.

And specifically, with respect to Syria, I pointed out that we have seen military supplies and materials and equipment crossing the border, and we'd like it to stop. And to the extent it keeps on, we have to consider it a hostile act. We have seen Badr Corps people moving into Iraq, and they report up thorough the Revolutionary Guard, and they're armed, and there are some additional ones that are close to the border. And my statement, I believe and I hope, said something like this: that to the extent they interfere with General Franks' activities, they would have to be considered combatants, and therefore we're suggesting they not interfere.

PX364

We'll make this the last question. (Cross talk.) Oh, I'm sorry. I'm sorry. I forgot you had a triple.

Myers: Barbara, did I say we didn't care about the mood?

Q: I believe that Secretary -- well, either one of that cares to answer it -- the secretary said it wasn't important at this point to know the issue of the mood of the people, that it was something that we could wait to figure out.

Rumsfeld: You mean in answer to Jamie?

Q: That is correct, sir.

Rumsfeld: No, I didn't say it wasn't important to know. I said it wasn't knowable. I said -- my goodness! We will know. We will find out. That real estate will end up being occupied by the coalition forces --

Q: Here's what's confusing me --

Rumsfeld: Just a minute.

Q: I'm sorry.

Rumsfeld: Let me finish my thought. It seems to me that I said there are people all across the spectrum. You probably can find somebody who believes or feels or senses or prefers almost any place on a 360-degree curve.

Now why do we need to try to figure it out now? We'll know. We have people right in there, embedded, and as they go into a town, we'll find out what they think. And my guess is, they'll think things a lot more positive after they see that we have no intention to occupy their country, we have no intention to stay there for long periods, that we are bringing in food and water, that the sanctions will be lifted, that this is not a war against a country or a people or a religion, and in fact they might even feel a little different if the death squads are not standing next to them with guns to their heads. But why should I try to speculate as to what it will be, since we will soon know?

Q: General Myers --

Q: How does that complicate your effort to deal with Baghdad, though, cut off the head of the regime, if you don't have a good sense that there are any significant number of Iraqi people --

Rumsfeld: We do have a sense. We have people inside talking to people, dealing with people, arranging things. We have a good sense, not of everybody, because we don't have Gallup polls going on in there. (Laughter.) But in terms of the limited amount of contact we have with people inside that -- various cities -- and my guess is, it'll vary from city to city -- we're seeing some Muslim leaders issuing fatwas against the Saddam Hussein regime. Now we've seen some doing the opposite. So it's going to vary from city to city. Doesn't mean we're not interested. It just means it's not knowable.

Q: Do you have a sense of Baghdad?

Rumsfeld: I betcha that if I did, it wouldn't be very useful a day, a week or a month from now, because I suspect it tends to change the closer our forces get to Baghdad.

Q: General Myers --

Rumsfeld: This is the last question.

Q: Secretary, can you characterize how extensive the forces with allegiance to the Iranian government are inside Iraq, and whether it's affecting the battlefield?

Rumsfeld: Say that again.

Q: The Badr Corps members --

Rumsfeld: Start with a full sentence. I'm sorry, I'm --

Q: Can you characterize how extensive the forces with allegiance to the Iranian government may be inside Iraq and how it's affecting the battlefield?

Rumsfeld: How extensive the numbers?

Q: Yeah. And if --

Rumsfeld: We know the numbers.

Q: What are they?

Rumsfeld: You know.

Q: No, we don't. (Laughter.)

Q: No, we don't. Tens or --

THE PRESS: (In unison) Hundreds, thousands?

PX364

4/27/22, 11:36 PM                          DoD News: DoD News Briefing - Secretary Rumsfeld and Gen. Myers

Q: How many?

Q: Non-trivial? (Laughter.)

Rumsfeld: Hundreds.

Q: Hundreds armed. And what do you believe their motivation to be?

Rumsfeld: They are Iraqis. I am sure that they have been hostile to the regime of Saddam Hussein. They have been housed in Iran, they've been funded by Iran, they've been armed by Iran, and sponsored by Iran, and they report up through the Revolutionary Guard.

Again, I don't know each one of them -- nor do I know any of them. But how they would behave with a different regime is unclear. But the issue is not that. It seems to me the issue is that General Franks and the coalition countries are busy, they've got a complicated task. We would prefer it not be made more difficult by any of the neighbors.

Q: My point is, have they been hostile to coalition forces?

Rumsfeld: No, not yet.

Q: Which is the greater threat, Syria or Iran?

Rumsfeld: I thought that was the last question. (Laughter.)

Thanks.

Q: Well, it was the last answer, anyway. (Laughter.)

http://www.defenselink.mil/news/Mar2003/t03282003_t0328sd.html

PX364

PX365

TESTIMONY OF
AMBASSADOR JEFFREY D. FELTMAN
ASSISTANT SECRETARY OF STATE FOR NEAR EASTERN AFFAIRS
AND
AMBASSADOR DANIEL BENJAMIN
COORDINATOR FOR COUNTERTERRORISM
SENATE FOREIGN RELATIONS SUBCOMMITTEE ON NEAR EASTERN
AND SOUTH AND CENTRAL ASIAN AFFAIRS
June 8, 2010

Chairman Casey, Members of the Subcommittee, thank you for the invitation to appear before you today to discuss Hizballah. We share this Committee's deep concerns about the threats posed by this terrorist group, its activities, and the support and direction it receives from outside actors. We look forward to discussing Hizballah's position within Lebanon, its destabilizing role in the country and the wider region, and our ongoing efforts to promote the sovereignty and independence of the state of Lebanon, as well as peace and stability in the broader Middle East.

Hizballah's persistence as a well-armed terrorist group within Lebanon, as well as its robust relationships with Iran and Syria, and the transfer of increasingly sophisticated missiles and rockets to Hizballah, threaten the interests of the United States, Lebanon, and our partners in the region, especially Israel. Our ongoing efforts to counter those threats include cutting off terrorism financing and interdicting illicit arms shipments, as well as bilateral and multilateral diplomatic efforts aimed at ending those arms transfers and supporting the legitimate Government of Lebanon. We have warned Syria directly about the potential consequences of these destabilizing actions. Most importantly, we are working to achieve a comprehensive peace in the region, centered on a two-state solution to the Israeli-Palestinian conflict. To be successful, this comprehensive peace needs to include a solution to the problem of Hizballah's weapons and hostility. A comprehensive peace by definition must also include Lebanon and Syria as full partners.

A Threat to Lebanon's Interests

Lebanon is a state with a vibrant civil society; however, its people also have a history of relying on sectarian and community leaders. Over the years, this tradition of political decentralization has inhibited the rise of strong state institutions and a truly unifying sense of national citizenship. Hizballah has

1

PX365

exploited this environment and managed to attract popular support among segments of the population that have felt traditionally neglected by a weak state or particularly vulnerable to threats from within and outside the country.

Hizballah attempts to portray itself as a natural part of Lebanon's political system and a defender of Lebanese interests. But its actions demonstrate otherwise. Hizballah has demonstrated repeatedly its unwillingness to adhere to the rule of law and submit to the Government of Lebanon's legitimate authority. The group's maintenance of a large and potent militia; its repeated use of force, including against Lebanese civilians and civilians of other nationalities; its ongoing violation of United Nations Security Council Resolution (UNSCR) 1701; and its refusal to comply with the disarmament called for in both the Taif Accord and UNSCR 1559, render it a dangerous and destabilizing player in Lebanon and in the region. Hizballah continues to pursue its interests and those of its chief outside sponsor, Iran, by manipulating the Lebanese political system to protect its own power. Hizballah refuses any public oversight or accountability of its activities, which have plunged Lebanon into war in the past and could do so again, while at the same time Hizballah demands the right to veto decisions taken by the Lebanese government.

Hizballah remains the most technically-capable terrorist group in the world and a continued security threat to the United States. Hizballah is responsible for some of the deadliest terrorist attacks against Americans in history, and the United States has designated it as a Foreign Terrorist Organization since 1997. While we recognize that Hizballah is not directly targeting the United States and U.S. interests today, we are aware that could change if tensions increase with Iran over that country's nuclear program. The administration has also reiterated that it will not deal with or have any contact with the terrorist organization.

There has been much debate over the political identity of Hizballah, as well as the prospects for Hizballah to become a legitimate political party within Lebanon. Following Lebanon's bloody civil war, other militias disbanded or were integrated into Lebanon's legitimate defense force, the Lebanese Armed Forces (LAF). However, despite the group's rhetoric and political campaigning, there remains today no meaningful distinction between the military and political wings of Hizballah, as Hizballah's own leaders regularly acknowledge publicly.

Should Hizballah truly desire to join the ranks of Lebanon's other political groups in its democratic system, its path would be clear: it would fully disarm, like all other militias, renounce terrorism and political intimidation, and acknowledge the

PX365

authority of the Government of Lebanon (GOL) and that government's right, like other governments, to a monopoly on the use of force.  Under those circumstances we could reconsider the group's status.  Make no mistake, these are significant hurdles and we have seen no indication to date that Hizballah is ready to take these steps.  The fact that Hizballah is not willing to take these steps reveals its real motivations: since we have no doubt that Hizballah could remain a powerful political voice inside Lebanon even without maintaining arms that violate Security Council Resolutions and endanger Lebanon, its refusal to forswear violence and pursue its interests through political means demonstrates that its agenda is not purely Lebanese.

As we noted above, unlike other Lebanese groups that currently seek to play a productive role in Lebanon's political system, Hizballah is the lone militia that refused to disarm following the signing of the Taif Accord, which marked the end of Lebanon's tragic civil war.  Even following the "Cedar Revolution" of 2005, when the Lebanese people turned out in droves to reassert Lebanon's full independence and sovereignty, culminating in the withdrawal of Syrian forces, Hizballah has remained in open defiance of the legitimate authority of the Lebanese government, even when it has been part of the same government.  In March 2005, as other Lebanese were preparing for the massive March 14 Cedar Revolution in reaction to the shocking murder of Rafiq Hariri, Hizballah actually hosted a counter demonstration, in defiance of Lebanese public opinion, to thank and show its appreciation for Iran and Syria.  Hizballah's arsenal of illegal weapons poses a clear and present danger to the security of Lebanon and the region.  Its actions belie the "resistance" rhetoric that it is fond of repeating.

One need only look to the disastrous 2006 conflict, precipitated by Hizballah's kidnapping of Israeli soldiers from across the Blue Line in indisputably Israeli territory, to see that its arms and aggressive action are a source and motivator for violence in the immediate region.  Hizballah's maintenance of arms caches in Southern Lebanon, in clear violation of UNSCRs 1701 and 1559, demonstrates that Hizballah seeks to project its military power in destabilizing fashion.  In the 2006 case, Hizballah, without consultation or approval of even its electoral allies, unilaterally chose to take actions that dragged the country into an agonizing and destructive conflict.  Hizballah's actions highlighted the impotence of the words of its primary Christian ally, Michel Aoun, who struggled to justify his controversial February 2006 Memorandum of Understanding (MOU) with Hizballah by saying that, with this MOU, Hizballah accepted limits to its use of its arms.

PX365

Even more striking than the external conflict instigated by Hizballah are the events of May 2008.  In trying to mask its Iranian agenda, Hizballah had regularly insisted that its arms would never be used against the Lebanese people.  Yet in May 2008, Hizballah did exactly that, attacking Lebanese citizens -- the very people it claims to protect -- in order to protest decisions of the Lebanese government with which it disagreed.  Using force to settle domestic political disputes clearly distorts and perverts Lebanon's democracy.

Despite the devastating effects of its 2006 war with Israel and the 2008 domestic conflict in Lebanon, which Hizballah initiated, Hizballah remains today one of the best armed and most dangerous militias in the world.  Its capabilities exceed those of the legitimate Lebanese security services and the United Nations Interim Force in Lebanon (UNIFIL).  UNSCR 1701 called for the establishment of a weapons-free zone in South Lebanon that UNIFIL and the Lebanese Armed Forces (LAF) are actively working to implement.  However, we believe that, in addition to its increased activities outside of UNIFIL's area of operations, Hizballah continues to maintain weapons caches in the south and is actively seeking additional armaments.

Hizballah also claims publicly to have reconstituted and improved its arsenal since the 2006 war.  As Lebanon has no domestic arms industry, this would have undoubtedly been accomplished by means of smuggling activity via Syria and Iran.  In 2008 alone, Iran provided hundreds of millions of dollars to Hizballah and trained thousands of Hizballah fighters at camps in Iran.  Iran continues to assist Hizballah in rearming, violating Security Council resolution 1701.  Iran also has been found to be in violation of UNSCR 1747, which prohibits it from exporting arms and related materiel.  In 2009, UN member states reported to the UN's Iran Sanctions Committee three instances in which Iran was found to be transferring arms or related materiel to Syria, a regional hub for Iranian support to terrorist groups, such as Hizballah.  A number of media reports also have noted that Hizballah continues using weapons depots in Syria to store its arms before transferring them into Lebanon.  While Hizballah no longer maintains an overt militia presence in southern Lebanon -- the absence of an overt militia presence being a direct product of Security Council resolution 1701 -- it has strengthened its militia infrastructure immediately north of the Litani river and in the Biqa' Valley since 2006.

While Iran continues to provide a significant portion of Hizballah's funding, Hizballah has also broadened its sources of financial support in recent years.  Hizballah is now heavily involved in a wide range of criminal activity, including

PX365

the drug trade and smuggling.  It also receives funds from both legitimate and illicit businesses that its members operate, from NGOs under its control, and from donations from its supporters throughout the world. Hizballah also has established its own commercial and communications networks outside the Lebanese legal system that in essence rob the Lebanese treasury of the tax revenues that would come via legitimate licensing, registration, and tax reporting.

A Threat to the Region's Interests

Hizballah's destabilizing actions also have a global reach. The recent conviction of a Hizballah cell in Egypt for spying, plotting attacks on resorts frequented by tourists, and arms smuggling illustrates Hizballah's growing regional reach and ambitions.  In Iraq, we are also aware of Hizballah providing training and other support to Shia militant groups.  As of early 2007, an Iran-based individual by the name of Abu Mahdi al-Muhandis formed a militia group, employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi Special Groups for attacks against Coalition Forces in Iraq.

Hizballah's web also extends to Europe and diplomatic missions abroad, where Hizballah planned to attack the Israeli Embassy in Baku.  While this attack was foiled, and the perpetrators are now imprisoned in Azerbaijan, these actions illustrate the group's continued disregard for the rule of law, both inside Lebanon and outside its borders.

We must also recognize that the ever-evolving technology of war is making it harder to guarantee our partners' security.  Despite efforts at containment, rockets with better guidance systems, longer range, and more destructive power are spreading across the region, with many in the hands of non-state actors accountable to no one.  Reports that Syria transferred SCUD-class missiles to Hizballah are deeply troubling; these destabilizing developments increase the risks of miscalculation and the possibility of hostilities.

On May 25 this year, Hassan Nasrallah, Hizballah's leader, gave a speech proclaiming for the first time that Hizballah will target Israeli and Israel-bound military and commercial vessels if Israel initiates offensive action against Lebanese ports or undertakes a naval blockade of Lebanon in a future conflict. Hizballah also has made a number of threats and claims recently about the expanding range of its arsenal, with Nasrallah stating that Hizballah has the capability to hit Ben Gurion airport.

PX365

The Obama Administration is committed to ensuring Israel's security and helping Israel to defend itself. The United States and Israel cooperate closely on security issues. On an ongoing basis, both countries participate in joint military planning, combined exercises and training, and collaborate on military research and weapons development.

The United States also cooperates extensively with Israel on ballistic missile defense to ensure Israel is protected against missile threats. We are working with Israel to further develop the Arrow Weapons System, the David's Sling system to defend against short-range rocket and missile threats, and the X-Band radar to provide early warning and interceptor integration capabilities. Additionally, our biannual military exercise "Juniper Cobra" is the largest joint-military exercise on missile defense. The Obama Administration also committed to provide $205 million in additional funding to help Israel field the Iron Dome short-range missile defense system.

An Obstacle to Peace

Time and again, we have seen that Hizballah's weapons and Syria's support for its role as an independent armed force in Lebanon are a threat, both to Lebanon and Israel, as well as a major obstacle to achieving peace in the region.

Hizballah exploits the ongoing Arab-Israeli conflict to bolster its own interests and influence. The group claims to maintain arms in order to defend Lebanon from Israeli "aggression" and derives much of its popularity from its image as a "resistance" group. In truth, Hizballah is actively using the conflict with Israel in order to gain regional popularity and justify its vast arsenal, acting as a point of leverage in the region for Iran. One of Hizballah's rhetorical points regards Israeli overflights of Lebanese territory. The UN Secretary General has cited in his reports on UNSCRs 1559 and 1701 that these overflights are a violation of UNSCR 1701, a resolution which we are all committed to seeing fully implemented. Yet there is an unmistakable connection between these overflights and Hizballah's blatant and ongoing efforts to evade the arms embargo that is the essence of UNSCR 1701; Hizballah's activities create the very conditions that Hizballah then uses as a pretext to justify its own destabilizing behavior, putting Lebanon at severe risk.

The Obama Administration's efforts to defuse tensions and to achieve a comprehensive peace in the Middle East -- defined as peace between Israel and the

PX365

Palestinians, and between Israel and all its neighbor states -- would, if successful, deal a significant blow to Hizballah and its sponsor in Tehran.

Comprehensive regional peace has a special meaning in the context of Lebanon, where, for decades, the absence of peace has facilitated the operation of many organizations whose interests are not Lebanese. In the 1980s, Hizballah took root with the vital assistance of Iranian money, training, weaponry and political support. Although Israel's withdrawal from Lebanese territory in 2000 – withdrawal certified as complete by the United Nations – should have put an end to Hizballah's claims to be resisting foreign occupation, Hizballah has been able to manipulate weaknesses in Lebanon's domestic political structures to preserve the pretense of resistance. While the United States believes firmly that, in compliance with the territorial obligations of UNSCR 1701, Israel must withdraw its forces from northern Ghajjar, reoccupied during the 2006 conflict, the primary stumbling block to peace and stability between Israel and Lebanon is Hizballah's arsenal and proven willingness to use it.

We understand clearly that a comprehensive peace cannot come at the expense of Lebanese interests, and we understand fully the sensitivity of the issue of the Palestinian refugees in Lebanon who yearn for, and deserve, a viable state of Palestine that they can call home. But Hizballah's arms and defiance of the international community take us further away from, not closer to, the comprehensive peace that is envisioned in the groundbreaking Arab Peace Initiative, supported unanimously by the Arab League and announced in Beirut in 2002. By contrast, Iran and Hizballah have a very different vision and show no signs of accepting Israel's right to exist.

<u>The Path Forward</u>

Hizballah's insistence on remaining armed, aggressive, and unaccountable threatens important American interests and goals – especially our interests in Middle East peace and regional security, in containing the spread of destabilizing weapons and terror financing, and in a strong, democratic, and independent state of Lebanon.

The United States is committed to strengthening the Government of Lebanon and its institutions. Our support to the Lebanese Armed Forces (LAF) and Internal Security Force (ISF) is part of an international commitment to help bolster Lebanon's legitimate security services at the request of the Lebanese government. Since 2006, we have committed more than $600 million to the LAF and ISF out of

PX365

a conviction that the Lebanese army and police should provide protection for Lebanon's people.  As demonstrated through their successful domestic counter-terrorism operations, the operational improvements in the LAF and ISF as a result of U.S. military and security assistance have been significant thus far and have great potential for growth.  The Lebanese state must be prepared, in terms of its institutions and capabilities, for that day when comprehensive peace is achieved; our assistance to the LAF and ISF needs to be seen in terms of that long-term investment.  Moreover, the United States provides assistance and support in Lebanon that work to create alternatives to extremism, reduce Hizballah's appeal to Lebanon's youth, and empower people through greater respect for their rights and greater access to opportunity.  Through USAID and the Middle East Partnership Initiative (MEPI), we have contributed more than $500 million to this effort since 2006.  These robust assistance programs represent one facet of our unwavering support for the Lebanese people and a strong, sovereign, stable, and democratic Lebanon.  Since 2006, our total assistance to Lebanon has now exceeded $1 billion.  If we let down the millions of Lebanese who yearn for a state that represents the aspirations of all Lebanese, we would create the conditions by which Hizballah can, by filling a vacuum, grow even stronger.

The United States cooperates directly with international partners to constrict Hizballah's range of action and impede its ability receive and transfer funds. Hizballah's network of financial support knows no borders, with active operations in many places around the globe, including Africa, the Middle East, Europe, and Latin America.  In addition to the Department of State's designation of Hizballah as an FTO, the Department of the Treasury's Office of Foreign Assets Control (OFAC) has used Executive Order 13224, which was issued soon after the September 2001 attacks to bolster the US government's capability to target terrorists' financial networks, to target Hizballah's global financial support system. A wide range of individuals and entities that are controlled by or affiliated with Hizballah have been designated under the EO.  Financial institutions around the world pay close attention to these designations.  The entities that OFAC has targeted include banks and financial front companies operating in Lebanon and elsewhere, such as Bayt al-Mal and the Yousser Company; Hizballah-linked NGOs including The Goodwill Charitable Organization, a fundraising office established indirectly by the Martyrs Foundation in Lebanon; Hizballah's construction company Jihad al-Bina; and individuals like Abd Al Menem Qubaysi, a Hizballah supporter based in West Africa; Ghazi Nasr al Din and Fawzi Kan'an, two Venezuela-based supporters of Hizballah; and the Barakat network of 10 individuals in the tri-border region of Latin America.

PX365

The United States has also taken action against Iranian entities that are involved in funding and supporting Hizballah.  Perhaps most importantly, in 2007 the U.S. government designated Iran's Qods Force, the terrorist wing of Tehran's Islamic Revolutionary Guard Corps, which has provided extensive support, equipment and training for Hizballah.  The year prior, the United States designated one of the largest Iranian state-owned banks, Bank Saderat, for transferring funds to Hizballah and Palestinian rejectionist groups.  From 2001-2006, for example, Bank Saderat was used by the Iranian government to provide at least $50 million to Hizballah.  Hizballah has used Bank Saderat to transfer funds, sometimes in the millions of dollars, to support the activities of other terrorist organizations, such as Hamas in Gaza.

From his earliest days in office, President Obama has put the difficult work of pursuing a comprehensive peace in the region at the top of his administration's agenda.  The status quo strengthens rejectionists like Hizballah who claim peace is impossible, and it weakens those who would accept coexistence.  All of our regional challenges – confronting the threat posed by Iran, combating violent extremism, promoting human rights and economic opportunity – become harder if the rejectionists grow in power and influence.

Leading our efforts, Senator George Mitchell has been working diligently with the parties to build the atmosphere that can produce a negotiated resolution to the conflict.  We are encouraging Israel to continue building momentum toward a comprehensive peace by respecting the legitimate aspirations of the Palestinian people, stopping settlement activity, and addressing the humanitarian needs in Gaza.  We are encouraging the Palestinians to do their part by continuing to ensure security, reform their institutions of governance, and end incitement.  Regional states who must be concerned about the destabilizing impact of extremist groups like Hizballah and Hamas must do more to bolster the efforts of the Palestinian Authority (PA) under President Abbas and Prime Minister Fayyad.  The PA's institution-building plans deserve and require continued financial support, and the United States will continue to be a substantial donor.  It is also in the interest of Arab states to advance the Arab Peace Initiative with actions, not just rhetoric.

Our goal of a comprehensive peace also requires that we work to resolve the conflicts between Israel and Syria and Israel and Lebanon.  Through diplomacy and through Special Envoy Mitchell's efforts, we are actively seeking to restart peace negotiations between Israel and Syria, and to bring Syria to play a more positive role in the region.  We are determined to try to build a constructive relationship with Syria, one in which Syria and the United States can be partners in

PX365

support of that comprehensive peace.  Given the differences between Syria and the United States, this will not be an easy or quick process.  But, in light of our national interests in a comprehensive regional peace, we are working with the Syrians in a step-by-step process that we hope will build trust and create momentum.

We thank Members of this Committee for expeditiously voting Ambassador Ford out of Committee, as we now await his confirmation by the full Senate.  In addition to recent visits to Syria by administration officials, including Undersecretary of State Burns in February, restoring our Ambassador to Damascus will enable the administration to deliver strong, unfiltered messages readily, consistently, and directly to the highest levels of the Syrian government.  The Obama Administration has made clear that our diplomatic relations with Syria will never come at the expense of Lebanon, Israel, Iraq, or any of our other partners in the region, and our communications will continue to emphasize the need for Syria to end its support for Hizballah.

<u>Conclusion</u>

The United States continues to take the threats posed by Hizballah to the United States, to Lebanon, to Israel, and the region at large, with the utmost seriousness. We are mounting considerable diplomatic, as well as counterterrorism, and assistance efforts aimed at minimizing the threat and influence of Hizballah in the region, and promoting peace, stability, and prosperity across the Middle East.

PX365

PX371

S. Hrg. 111–746

# U.S. POLICY TOWARDS THE ISLAMIC REPUBLIC OF IRAN

# HEARING

BEFORE THE

## COMMITTEE ON ARMED SERVICES
## UNITED STATES SENATE

ONE HUNDRED ELEVENTH CONGRESS

SECOND SESSION

————

APRIL 14, 2010

————

Printed for the use of the Committee on Armed Services



U.S. GOVERNMENT PRINTING OFFICE

62–667 PDF                    WASHINGTON : 2010

For sale by the Superintendent of Documents, U.S. Government Printing Office,
http://bookstore.gpo.gov. For more information, contact the GPO Customer Contact Center,
U.S. Government Printing Office. Phone 202–512–1800, or 866–512–1800 (toll-free). E-mail, gpo@custhelp.com.

PX371

## COMMITTEE ON ARMED SERVICES

CARL LEVIN, Michigan, *Chairman*

ROBERT C. BYRD, West Virginia
JOSEPH I. LIEBERMAN, Connecticut
JACK REED, Rhode Island
DANIEL K. AKAKA, Hawaii
BILL NELSON, Florida
E. BENJAMIN NELSON, Nebraska
EVAN BAYH, Indiana
JIM WEBB, Virginia
CLAIRE McCASKILL, Missouri
MARK UDALL, Colorado
KAY R. HAGAN, North Carolina
MARK BEGICH, Alaska
ROLAND W. BURRIS, Illinois
JEFF BINGAMAN, New Mexico
EDWARD E. KAUFMAN, Delaware

JOHN McCAIN, Arizona
JAMES M. INHOFE, Oklahoma
JEFF SESSIONS, Alabama
SAXBY CHAMBLISS, Georgia
LINDSEY GRAHAM, South Carolina
JOHN THUNE, South Dakota
ROGER F. WICKER, Mississippi
GEORGE S. LeMIEUX, Florida
SCOTT P. BROWN, Massachusetts
RICHARD BURR, North Carolina
DAVID VITTER, Louisiana
SUSAN M. COLLINS, Maine

RICHARD D. DeBOBES, *Staff Director*
JOSEPH W. BOWAB, *Republican Staff Director*

(II)

PX371

# C O N T E N T S

————————

CHRONOLOGICAL LIST OF WITNESSES

U.S. POLICY TOWARDS THE ISLAMIC REPUBLIC OF IRAN

APRIL 14, 2010

Page

Flournoy, Hon. Michèle A., Under Secretary of Defense for Policy  ......................   6
Burns, Hon. William J., Under Secretary of State for Political Affairs  ..............   10
Cartwright, Gen. James E. USMC, Vice Chairman of the Joint Chiefs of
   Staff  ...........................................................................................................   14
Burgess, LTG Ronald L., USA, Director of the Defense Intelligence Agency  .....   15

(III)

PX371

PX371

# U.S. POLICY TOWARDS THE ISLAMIC REPUBLIC OF IRAN

————

## WEDNESDAY, APRIL 14, 2010

U.S. SENATE,
COMMITTEE ON ARMED SERVICES,
*Washington, DC.*

The committee met, pursuant to notice, at 10:32 a.m. in room SR–253, Russell Senate Office Building, Senator Carl Levin (chairman) presiding.

Committee members present: Senators Levin, Lieberman, Reed, Akaka, E. Benjamin Nelson, Udall, Hagan, Begich, Burris, Kaufman, McCain, Chambliss, Thune, Wicker, LeMieux, Brown, and Collins.

Committee staff members present: Richard D. DeBobes, staff director; and Leah C. Brewer, nominations and hearings clerk.

Majority staff members present: Madelyn R. Creedon, counsel; Jessica L. Kingston, research assistant; Michael J. Kuiken, professional staff member; William G.P. Monahan, counsel; and Russell L. Shaffer, counsel.

Minority staff members present: Joseph W. Bowab, Republican staff director; Christian D. Brose, professional staff member; and Daniel A. Lerner, professional staff member.

Staff assistants present: Paul J. Hubbard, Christine G. Lang, and Breon N. Wells.

Committee members' assistants present: James Tuite, assistant to Senator Byrd; Vance Serchuk, assistant to Senator Lieberman; Carolyn Chuhta, assistant to Senator Reed; Nick Ikeda, assistant to Senator Akaka; Greta Lundeberg, assistant to Senator Bill Nelson; Ann Premer, assistant to Senator Ben Nelson; Patrick Hayes, assistant to Senator Bayh; Gordon Peterson, assistant to Senator Webb; Tressa Guenov, assistant to Senator McCaskill; Jennifer Barrett, assistant to Senator Udall; Lindsay Kavanaugh, assistant to Senator Begich; Roosevelt Barfield, assistant to Senator Burris; Anthony Lazarski, assistant to Senator Inhofe; Sandra Luff, assistant to Senator Sessions; Clyde Taylor IV, assistant to Senator Chambliss; Jason Van Beek, assistant to Senator Thune; Brian Walsh, assistant to Senator LeMieux; Scott M. Clendaniel, assistant to Senator Brown; Kevin Kane, assistant to Senator Burr; and Ryan Kaldahl, assistant to Senator Collins.

## OPENING STATEMENT OF SENATOR CARL LEVIN, CHAIRMAN

Chairman LEVIN. Good morning, everybody.

The committee today will hear testimony from Michèle Flournoy, Under Secretary of Defense for Policy; Bill Burns, Under Secretary

(1)

PX371

2

of State for Political Affairs; General James Cartwright, Vice Chairman of the Joint Chiefs of Staff; and Lieutenant General Ronald Burgess, Director of the Defense Intelligence Agency (DIA), on one of the most difficult and important security challenges of our time, the Islamic Republic of Iran. Instead of acting in a way to become a respected member of the community of nations, Iran's leaders disregard international norms, abuse the rights of their own people, support terrorist groups, and threaten regional and global stability. Iran's refusal to be open and transparent about its nuclear program jeopardizes the security of its neighbors and other countries in the Middle East.

There is a strong, bipartisan determination on this committee and in this Congress to do all that we can to stop Iran from acquiring nuclear weapons. President Obama has focused considerable effort towards that goal because in his own words, the long-term consequences of a nuclear-armed Iran are unacceptable, and he said that he doesn't, "take any options off the table with respect to Iran." I support the view that, if Iran pursues a weapon, all options including military options should be on the table. The possession of a nuclear weapon by Iran would be a threat to the region and to world security.

The administration has sought, through a variety of means, to engage with the Government of Iran to make clear the benefits available to them and its people if it complies with international norms. It also makes clear the consequences if it seeks nuclear weapons. Through five United Nations (U.N.) Security Council resolutions and multiple U.S. laws and executive orders, the United States has sought to work both multilaterally and unilaterally to persuade Iran to abide by its obligations under the Nuclear Nonproliferation Treaty (NPT) and its safeguards agreements with the International Atomic Energy Agency (IAEA).

We have sought and continue to seek the support of the international community including Russia, China, and other countries that regularly trade with Iran. Concerted, coordinated international, diplomatic, and economic efforts will hopefully make Iran understand in practical terms the consequences of its actions. One of the issues that we will discuss today is what additional diplomatic and economic efforts could be effective in persuading Iran to forgo its uranium enrichment program and meet all of its obligation to the IAEA and the international community.

Iran's external activities in the region are also deeply troubling. It continues to provide material support to violent elements in both Iraq and Afghanistan that are responsible for the loss of American servicemembers' lives and those of countless Afghans and Iraqis. Iran also provides financial assistance, munitions, and other support to the terrorist organization Hezbollah in Lebanon and Hamas and other terrorist extremist elements in Gaza.

While neglecting its international obligations and playing a negative role in the region, Iran has also engaged in a deeply troubling pattern of behavior targeting its own citizens. In the wake of elections last June that were widely considered fraudulent, Iranians by the hundreds of thousands poured into the streets in nonviolent protest. The regime responded with brutality.

3

Internal security forces and government-affiliated groups set upon protesters with guns and clubs. There was widespread abuse and torture of Iranians detained without legitimate charges. Prominent voices for reform have been silenced, often brutally.

Illegitimate show trials aimed at intimidation, not justice, have resulted in harsh sentences including executions. The regime has cracked down on freedom of expression and interfered with the use of cellular, Internet, and other means of communication to block the free flow of information. This campaign of violence against its own people has further solidified an international consensus that Iranian leaders must not only fulfill their obligations to the global community but also respect the human and civil rights of their citizens.

The committee will hear today from representatives of the Department of Defense (DOD), the Department of State (DOS), and the Intelligence Community (IC). There are several issues on which the committee is eager to learn more:

- An updated assessment on Iran's intentions and capabilities regarding nuclear weapons;
- The status of ongoing diplomatic efforts aimed at securing tough, international sanctions against Iran;
- Iran's support to extremist elements in the region;
- Iran's campaign to stifle internal dissent and the free flow of information; and
- U.S. military contingency planning regarding Iran.

A closed session will follow this morning's public hearing. We thank the witnesses for their service and for the valuable information that they're going to provide to the committee as we consider these important issues. All of the witnesses' statements that have been submitted will be included in the record.

Senator McCain.

## STATEMENT OF SENATOR JOHN McCAIN

Senator McCAIN. Thank you, Mr. Chairman. I also thank our distinguished witnesses for joining us here this morning and for their many years of service to our country.

As the chairman has pointed out, and we all know, we meet here today to discuss U.S. policy toward Iran, which at present is focused foremost on the imperative of preventing that government from acquiring a nuclear weapons capability. The reasons for this are very clear. However, even as we focus on Iran's nuclear ambitions, we must not lose sight of the Iranian regime's broader pattern of threatening behavior.

This is a government that trains, equips, and funds extremist groups that are violently subverting many of Iran's neighbors. This is a government that is systematically violating the human rights of Iran's people. This is a government that is already working aggressively to overturn the balance of power in the Middle East. These, among other reasons, are precisely why Iran's rulers cannot be allowed to obtain nuclear weapons.

The question we are here to answer is: how do we stop one of the world's most dangerous regimes from acquiring the world's most dangerous weapons? I never thought a policy of engagement

PX371

4

with Iran's rulers would succeed. But I understand why the President pursued it.

Now after Iran's persistent intransigence, it is long past the time to put teeth into our policy. The administration declared last year that Iran would face consequences by September 2009. Then, that deadline slipped to the end of the year. Now it's April 2010. Iran still has not faced any consequences for its actions. This delay has harmed U.S. credibility.

Clearly, we and our partners will need to impose our own sanctions on Iran, above and beyond what is ultimately authorized by a new UN Security Council resolution. We should start immediately with the sanctions legislation that is now before Congress. The record of the past year is discouraging.

It's difficult to dispute that Iran is closer to possessing a nuclear weapons capability today than it was a year ago. If we remain on our current course, Iran will likely achieve a nuclear weapons capability. In short, over the past year, the balance of power in the Middle East has been shifting in favor of our enemies. We see the latest evidence of that today in reports that the Syrian government has transferred long-range Scud missiles to Hezbollah. This is a dramatically dangerous and destabilizing action.

Nevertheless, we already hear some assert that we can live with a nuclear Iran. This idea rests on a host of assumptions that are highly questionable.

To start, will the old rules of two-dimensional deterrence apply to a volatile region with multiple nuclear powers and possibly less rational actors?

How would Iran's possession of a nuclear weapons capability embolden its support for violent groups currently engaged in terrorism, assassination, and subversion in the Middle East?

Would the United States assume greater burdens of extended deterrence to prevent a cascade of proliferation?

Could we assume these responsibilities as we further reduce our nuclear arsenal?

Perhaps most importantly, would a U.S. policy of containing or deterring a nuclear Iran really be credible if it is backed by the same government that would be tolerating what it had formally insisted was intolerable?

I hope our witnesses can help us to answer these critical questions today.

Ultimately, we must remember one thing above all others. The question of whether the Iranian regime becomes a nuclear weapons power is less a question of capabilities than it is a test of wills, both Iran's and certainly ours. Iran is economically weak. It is militarily weak, as General Petraeus has observed. Following last year's election, the Iranian regime is more politically compromised than ever. Indeed, I said at the time, I believe that when the young woman, Neda Agha-Soltran, bled to death in the street last year, it was the beginning of the end of the Iranian regime.

The United States, for all of our challenges, still enjoys extraordinary power and influence in the Middle East with strong and capable friends and allies. We have the capabilities to prevent or delay Iran from getting these weapons if we choose to. What actors in the region currently question is our judgment and our resolve;

PX371

5

whether the United States is more determined to stop Iran from acquiring nuclear weapons than the Iranian regime is committed to acquiring these weapons.

We should have no illusions about the catastrophic consequences of Iran developing a nuclear weapons capability.

It would threaten the reliable supply of energy on which the global economy depends.

It would threaten the security of perhaps the very existence of close allies.

It would deal a potentially fatal blow to the NPT regime and the rules-based international order that the United States and our allies have spent more than 60 years building.

Worst of all, it would destroy the credibility of U.S. power, for it would show that our government could not achieve a major, national security goal set forth by three administrations of both parties.

After such a failure, it's hard to imagine that friends and enemies alike would put much stock in America's pronouncements. Make no mistake, if Iran achieves a nuclear weapons capability, it will not be because we couldn't stop it, but because we chose not to stop it. The stakes couldn't be higher. I look forward to hearing and learning from our witnesses.

Chairman LEVIN. Thank you very much, Senator McCain.

Senator MCCAIN. By the way, Mr. Chairman, I would ask to put in the record the various statements from the administration over the last year and a half or so that state time is running out; the deadline is near. Press Secretary Robert Gibbs stated on December 3: "We're going to have consequences if they don't turn around;" December 20, 2009; the list goes on and on of the threats that we have made against the Iranians. So far there has been no action.

George Schultz, my favorite Secretary of State in all the world, once said, as his Marine drill instructor told him, "never point a gun at somebody unless you're ready to pull the trigger." We keep pointing the gun. We haven't pulled a single trigger yet. It's about time that we did.

Chairman LEVIN. Those will be made a part of the record.

[The information referred to follows:]

PX371

6

Deadline: September 2009

"[ ]... We will reevaluate Iran's posture towards negotiating the cessation of a nuclear weapons policy. We'll evaluate that at the G20 meeting in September."

– *President Obama, July 10, 2009*

"I think, based on the information that's available to us, that the timetable that the president has laid out still seems to be viable and does not significantly increase the risks to anybody."

– *Defense Secretary Gates, July 27, 2009 (while in Israel)*

Deadline: December 31, 2009

"By the end of the year we should have some sense whether or not these discussions are starting to yield significant benefits."

– *President Obama, May 18, 2009*

"Time is running out. That deadline is the end of the year."

– *Robert Gibbs, December 3, 2009*

"That [December 31st deadline] is a very real deadline for the international community."

– *Robert Gibbs, December 22, 2009*

Deadline: TBD 2010

"Now, we've avoided using the term 'deadline' ourselves. That's not a term that we have used, because we want to keep the door to dialogue open."

– *Secretary of State Hillary Clinton, January 7, 2010*

"STEPHANOPOULOS: But bottom line is, if they don't turn it around by Dec. 31, sanctions will come?

AXELROD: Well, we're talking -- *plainly*, there are going to be consequences if they don't turn around."

– *David Axelrod, December 20, 2009*

Chairman LEVIN. Secretary Flournoy.

### STATEMENT OF HON. MICHÈLE A. FLOURNOY, UNDER SECRETARY OF DEFENSE FOR POLICY

Ms. FLOURNOY. Chairman Levin, Senator McCain, other distinguished members of the committee, I appreciate the opportunity to appear before you today to discuss our ongoing efforts related to Iran. The Obama administration considers the challenges posed by Iran to be one of our top national security priorities. To address those challenges, we have developed a strategy based on two central objectives.

PX371

7

First, we are working to prevent Iran from acquiring nuclear weapons.

Second, we are countering Iran's destabilizing activities and support for terrorism and extremists in the Middle East and around the world.

The focus of my testimony here today is to lay out for you the role of DOD in the strategy. The U.S. military is currently in a supporting role, helping quietly to build the confidence of our Middle Eastern partners by enhancing regional security cooperation, while supporting our broader diplomatic strategy. Our regional security cooperation efforts not only reassure anxious states in the region, but also send a clear signal to Iran that its pursuit of nuclear weapons will lead to its own isolation and will ultimately make it less, not more, secure.

Iran's nuclear and missile programs represent a significant threat to Israel. In the face of this threat, we continue our effort to ensure Israel's qualitative military edge. We are working closely with the Israelis to develop multi-layered ballistic missile defenses.

For a number of years, we have worked with the countries of the Arabian Peninsula as well as other partners in the region to develop a common architecture that includes bilateral and multilateral security initiatives. These include a regional network of air and missile defenses, shared early warning systems, counterterrorism and counterpiracy programs, programs to build partner capacity, and efforts to harden and protect our partners' critical infrastructure. In fact, we currently have substantial missile defense assets in a number of Gulf partner nations.

Our U.S. Central Command (CENTCOM) maintains a robust exercise schedule in the region and a sizable force presence which reaffirms our commitment to our partners. We also maintain a full schedule of bilateral and multilateral engagements going up to the highest levels. In the last 2 months alone, Secretary Gates and Chairman Mullen have both traveled to the region.

Strengthening the capacities of vulnerable states in the region is vital. It's a vital avenue for countering destabilizing Iranian activities. We believe we are seeing some results.

In Iraq and Lebanon, for instance, our efforts to develop the capacity of security forces and improve governance has helped to weaken Iran's proxies. Iraqi security forces have increased their capabilities and have showed continued willingness to combat terrorist and militant organizations, including Iranian backed groups. We also just witnessed a round of successful national elections, despite Iranian attempts to interfere in the process during the lead up to the vote.

Non-sectarian nationalist parties and coalitions won a significant share of the votes, while the parties Iran most preferred performed less well. Iraqis appear to have once again rejected candidates whom they saw as too closely aligned with Iran and its regional agenda as we also saw during the 2009 provincial elections. Overall, this suggests the growing sense of Iraqi nationalist identity that's becoming a significant counterweight to destabilizing Iranian interference.

In Lebanon, we are working with our partners to strengthen national institutions and support efforts to extend government au-

PX371

8

thority throughout the country, including into the south. Central to this work is the development of Lebanese armed forces as a national non-sectarian force that can effectively counter terrorism, secure Lebanon's borders, and implement all Lebanon related U.N. Security Council resolutions. Effectively implementing these resolutions requires ending Iranian support for Hezbollah and undermining Hezbollah's terrorist goals and militant presence in Southern Lebanon and beyond Lebanon's borders. Neither of these is attainable without strong Lebanese institutions, effective Lebanese armed forces, and a sovereign, stable Lebanese state.

While we certainly have much further to go towards achieving these twin goals of preventing Iranian acquisition of nuclear weapons and countering Iran's destabilizing activities in support for extremists, we believe that we are making progress on both fronts. The administration's diplomatic efforts have helped shore up the international consensus needed to effectively place pressure on Iran.

Meanwhile, our efforts in DOD have helped to shore up the ability of our regional partners to defend themselves and to counter destabilizing activities from Iran. We have also reassured our partners that the United States is fully committed to their security. Your support on this committee for these efforts has been critical over the past year. We look forward to continuing to work with you as we move forward.

Thank you very much.

[The joint prepared statement of Ms. Flournoy and General Cartwright follows:]

JOINT PREPARED STATEMENT BY HON. MICHÈLE A. FLOURNOY AND GEN. JAMES E. CARTWRIGHT, USMC

Chairman Levin, Ranking Member McCain, and members of the committee. We appreciate the opportunity to appear before you today to discuss our ongoing efforts involving Iran.

The Obama administration considers the challenges posed by Iran to be among the top national security priorities facing the United States. To address this concern we have developed a strategy based on two central objectives. First, we are working to prevent Iran from acquiring nuclear weapons. Second, we are countering Iran's destabilizing activities and support for extremists in the Middle East and around the world.

For the past year, the primary thrust of the administration's strategy has been focused on diplomacy and, specifically, the pursuit of a dual-track strategy of engagement and pressure. Unfortunately, despite the President's genuine and extensive efforts at engagement, Iran has so far failed to respond constructively. However, this approach has been successful in demonstrating to the international community that it is Iran and not the United States that is standing in the way of dialogue, and it has helped build greater international consensus as we use the pressure track to try to bring Iran to the negotiating table.

The focus of our testimony today is to lay out for you the part that the Department of Defense plays in the administration's strategy towards Iran. The Department's primary focus continues to be enhancing regional security cooperation with our Middle Eastern partners. This focus not only reassures anxious states in the region, but also sends a clear signal to Iran that pursuit of nuclear weapons will lead to its own isolation and in the end make it less—not more—secure.

DOD is also working actively to counter destabilizing Iranian activities by strengthening the capacities of vulnerable states in the region. In Iraq and Lebanon our efforts to develop the capacity of security forces and improve governance have weakened Iran's proxies. Meanwhile, we are working closely with the Iraqis on conducting counterterrorism operations, sharing intelligence, and interdicting arms shipments to counter Iran's influence in Iraq and throughout the region.

Finally, through prudent military planning we continue to refine options to protect U.S. and partner interests from Iranian aggression, deter Iran's destabilizing

PX371

9

behavior, and prepare for contingencies—all while reducing the risk of miscalculation.

## REASSURING OUR PARTNERS

In other words, for the present, the U.S. military is in a supporting role, helping quietly to build confidence with regional partners through normal military activity, while supporting the diplomatic strategy. Iran's nuclear and missile programs represent a significant threat to Israel. In the face of this threat, we continue our efforts to ensure Israel's Qualitative Military Edge, and are working closely with the Israelis to develop multi-layered ballistic missile defenses.

In the wider region, the cornerstone of our approach is USCENTCOM's Regional Security Architecture. For a number of years, we have worked with the countries of the Arabian Peninsula, as well as other partners in the region, to develop a common architecture that includes bilateral and multilateral security initiatives such as a regional network of air and ballistic missile defense systems, shared early warning, counter-terrorism, counter-piracy, building partner capacity, and hardening and protecting our partners' critical infrastructure. These efforts have gained greater traction with the region's growing concerns about Iranian activities. USCENTCOM also maintains a robust exercise schedule in the region and a sizeable force posture and presence, which reaffirm our commitment to our partners.

We also maintain a robust schedule of bilateral interactions beyond the purely military sphere. Through the Gulf Security Dialogue, the State Department and DOD in tandem are strengthening political-military relationships in the region and focusing on regional perspectives and common security interests while encouraging multilateral cooperation on counter-terrorism, counter-proliferation, and the regional reintegration of Iraq. We also conduct regular bilateral defense engagements during which security challenges of common interest are discussed and efforts to address these challenges are synchronized. Moreover, senior leader engagements highlight the valued relationships and common interests we share with partner nations. In the last 2 months alone, Secretary Gates, Chairman Mullen, and General Petraeus have all traveled to the region.

Ultimately, all of these defense activities continue to support U.S. diplomatic efforts by signaling to our partners the U.S. Government commitment to the region's security.

## COUNTERING IRANIAN DESTABILIZING ACTIVITIES

Beyond reassurance, we are also actively countering Iran's destabilizing activities throughout the region. We just witnessed a round of successful national elections in Iraq. Nationalist parties and coalitions won a significant share of votes while parties Iran most preferred performed less well. Early Iranian attempts to dictate the quick formation of the new Iraqi Government were rejected and the Iraqi public has made clear that they will not accept Iranian interference into their internal affairs and candidates whom they see as too closely aligned with Iran and its regional agenda. The growing capabilities of the Iraqi security forces, as well as their continued willingness to combat terrorist and militant organization, including groups backed by Iran, is another sign that Iraqi nationalist identity is a significant counter to destabilizing Iranian interference.

These elections are the latest in a series of strategic setbacks that Iran has suffered in its efforts to establish dominance over the Iraqi political system. Other successes include: the Iraqi-led "Charge of the Knights" operation in 2008 that drove Iranian-backed militias out of Basra; the U.S.-Iraq Security Agreement and Strategic Framework Agreement in November 2008 that embody the shared U.S. and Iraqi commitment to a long-term partnership between sovereign states; and the January 2009 provincial elections in which parties that were seen as too closely aligned with Iran suffered significant setbacks.

Going forward, we expect that Iran's ability to influence Iraqi domestic affairs will be constrained by a combination of four trends: enhancements in Iraq's security, governance, and economic capacities; Iraqi nationalism; recognition among the leading Iraqi political forces of the value of a strategic relationship with the United States; and progress in reintegrating Iraq into the broader region.

In Lebanon, we are working with our partners to strengthen national institutions and support efforts to extend government authority throughout Lebanon. Central to this work is the bolstering of the Lebanese Armed Forces as a national, non-sectarian force that can effectively counter terrorism, secure Lebanon's border, and implement all Lebanon-related United Nations Security Council Resolutions (1559, 1680, and 1701), and exert government control throughout Lebanon's territory. Effectively implementing these resolutions requires ending Iranian support for

10

Hezbollah and undermining Hezbollah's terrorist goals and militant presence in Southern Lebanon and beyond Lebanon's borders. Neither of these is attainable without strong Lebanese institutions, effective Lebanese armed forces, and a sovereign, stable Lebanese state.

In Afghanistan, Tehran's influence and activities have not been as obtrusive as in Iraq. Indeed, we and Iran share the stated goal of a strong, stable, prosperous Afghanistan, but Iran's actions do not necessarily match its rhetoric. Iran is playing a double game in Afghanistan. It combines rhetorical and material support for the Afghan Government with a continuing amount of material support to insurgents that impedes U.S. and Allied efforts to stabilize the country. Iran's historic, cultural, and economic ties with much of western Afghanistan, its religious affinity with Afghanistan's minority groups, and its extensive border result in Iran's having a critical stake in Afghanistan's future. Tehran generally sees the Taliban as an enemy and does not want to see them back in power, but nevertheless has provided limited lethal assistance to the Taliban to hedge against increased U.S./Western presence on its eastern border. As ISAF troop levels increase, and as the Afghan Government expands its capacity, we will be better positioned to protect against any substantial challenges from Iran in Afghanistan in the near term. However, we recognize that, going forward, Iran's interests will continue to play a significant role in the regional balance that affects Afghanistan's stability.

### PRUDENT PLANNING

It is the Department of Defense's responsibility to plan for all contingencies and provide the President a wide range of military options should they become necessary. As both the Secretary and the Chairman have stated, military options are not preferable. This adminstration is committed to a multifaceted diplomatic strategy to resolve all our issues with Iran. But as the President has stated we do not take any options off the table.

### CONCLUSION

Iran is a serious threat to U.S. national security both because of its nuclear program and its destabilizing activities across the Middle East. The administration remains committed to a diplomatic strategy of engagement and pressure. The Department of Defense is doing everything it can to support this policy, by reassuring our partners in the region, addressing Iranian destabilizing activities, and conducting prudent planning.

Chairman LEVIN. Thank you very much, Secretary Flournoy. Secretary Burns?

### STATEMENT OF HON. WILLIAM J. BURNS, UNDER SECRETARY OF STATE FOR POLITICAL AFFAIRS

Ambassador BURNS. Thank you very much, Chairman Levin, Senator McCain, and distinguished members of the committee. Thank you very much for inviting me to appear before you today.

Iran's defiance of its international obligations poses as profound and complicated a challenge as any we face in the world today. Iran's leadership continues to expand its nuclear program. A nuclear-armed Iran would severely threaten the security and stability of a part of the world crucial to our interests and to the health of the global economy. It would seriously undermine the credibility of the U.N. and other international institutions and seriously undercut the nuclear nonproliferation regime at precisely the moment we are seeking to strengthen it.

These risks are only reinforced by the wider actions of the Iranian leadership, particularly its longstanding support for terrorist groups; its opposition to Middle East peace; its repugnant rhetoric about Israel, the Holocaust, and so much else; its brutal repression of its own citizens; and its efforts to choke off the free flow of information, a universal right of all Iranians.

PX371

11

Our policy aims to prevent Iran from developing nuclear weapons and to counter its other destabilizing actions. President Obama has also made clear, including in his Nowruz message last month, that we will stand up for those rights that should be universal to all human beings and stand with those brave Iranians who seek only to express themselves freely and peacefully. We have pursued that policy through a combination of tough-minded diplomacy, including both engagement and pressure, and active security cooperation with our partners in the Gulf and elsewhere.

We have sought to sharpen the choices before the Iranian leadership.

We have sought to demonstrate what's possible, if Iran meets its international obligations and adheres to the same responsibilities that apply to other nations.

We've sought to intensify the costs of continued defiance and to show Iran that pursuit of a nuclear weapons program will make it less secure, not more secure.

Last year, we embarked upon an unprecedented effort at engagement with Iran. We did so without illusions about whom we were dealing with; where the scope of our differences over the past 30 years of engagement has been both a test of Iranian intentions and an investment in our partnership with the growing coalition of countries concerned about Iran's nuclear ambitions.

We sought to create early opportunities for Iran to build confidence in its intentions. In Geneva last October, we supported, along with Russia and France, a creative proposal by the IAEA to provide fuel for the production of medical isotopes at the Tehran research reactor that could have produced an opening for progress. Unfortunately, Iranian leaders spurned that offer. What appeared to be a constructive beginning in Geneva was ultimately repudiated by Tehran. Instead, Iran pursued a clandestine enrichment facility near Qom; refused to continue discussions with the U.N. Security Council Permanent Five Members plus Germany (P5+1) about international concerns over its nuclear program; provocatively expanded its enrichment operations even further in violation of U.N. Security Council resolutions; and drew new rebukes from the IAEA in the Director General's most recent report.

Iran's reckless intransigence has left us no choice but to employ a second tool of diplomacy, economic and political pressure. As the President emphasized in Prague last week, we must insist that Iran face consequences because it has continually failed to meet its obligations. We cannot and we will not tolerate actions that undermine the NPT, risk an arms race in a vital region, and threaten the credibility of the international community and our collective security.

Our efforts at engagement have made it much harder for Iran to deflect attention from the core of the problem, which is its nuclear ambitions and its unwillingness to meet its international obligations. It has put us in a much stronger position to mobilize effective international pressure. Already we have seen evidence of mounting international concern.

We've seen increases in international cooperation to stop arms shipments and financial transactions that aid terrorists, threaten Israel, and destabilize the region. We saw last November, for the

PX371

12

first time in 4 years, the tough new IAEA Board of Governors resolution sharply criticizing Iran. We saw a strong U.N. General Assembly Iran Human Rights Measure in December and a similarly strong European Council declaration later that same month.

Now, we are moving urgently toward a new U.N. Security Council Sanctions Resolution. Our purpose is to send a unified message of international resolve with a range of concrete measures that will affect Iran's strategic calculus. A year ago, neither Russia nor China would engage in such an effort and much of the rest of the international community was drifting on the Iran issue.

Today, Russia, which was our partner in the Tehran Research Reactor Proposal, is also our partner in pursuing a new resolution. President Medvedev reaffirmed in Prague last week his support for smart, targeted sanctions. President Obama had a constructive discussion 2 days ago on the margins of the Nuclear Security Summit with President Hu of China, and the Chinese Ambassador to the United Nations has joined formal negotiations of a new resolution in New York.

We continue to work closely with Britain, France, and Germany, our other partners in the P5+1. We seek the strongest possible resolution in the shortest possible time this spring. We will seek to use this as a platform to expand upon the existing sanctions regime. Equally evident to Iranians are the informal expressions of international censure including the voluntary departure of long-standing foreign investors and trade partners and the increasing isolation of a country that had only just begun to emerge from the self-imposed autarky of the early post-revolutionary era.

Neither our formal penalties nor the increasing ostracism Iran faces from the world will alter its agenda overnight. But, we believe that the mounting weight of political and financial pressures on its leadership will have an impact on Tehran. Together, with an increasing number of international partners, we are absolutely determined to ensure that Iran adheres to the same responsibilities that apply to other nations. Too much is at stake to accept anything less.

Thank you.

[The prepared statement of Ambassador Burns follows:]

PREPARED STATEMENT BY AMBASSADOR WILLIAM J. BURNS

Iran today presents a profound and complicated challenge. In defiance of its international obligations, Iran's leadership continues to expand and advance the most proliferation sensitive and provocative elements of its nuclear program. A nuclear armed Iran would threaten the security of our ally Israel, the Persian Gulf and the broader Middle East, the credibility of international institutions such as the United Nations, and the viability of the nuclear nonproliferation regime. The grave risks at stake with Iran's nuclear program are only amplified by its other deeply destabilizing policies and its treatment of its people. Iran ranks perennially as the world's leading state sponsor of terrorism, supporting Hizballah, Hamas, Palestinian Islamic Jihad, Iraqi militants, and the Taliban. As the international community works to restart a meaningful dialogue between Israel and the Palestinians, Iranian leaders foment hatred against Israel. At home, the government's brutal crackdown on peaceful protesters who went to the streets in the thousands to demand their universal rights has outraged the world.

For all these reasons, Iran represents a paramount priority for U.S. foreign policy. President Obama has been clear that Iran must not develop nuclear weapons. He has sought to strengthen our diplomatic options for dealing with the challenges posed by Iran, and offered Tehran a pathway toward resolving the concerns of the international community. From his earliest days in office, the President has made

PX371

13

clear that the United States is prepared to deal with the Islamic Republic of Iran on the basis of mutual interest and mutual respect. As part of this principled engagement, the United States has been a formal party to the P5+1 talks with Iran since April 2009. We have recognized Iran's right under the NPT to the peaceful uses of nuclear energy. With our partners in the international community, we have demonstrated our willingness to negotiate a diplomatic resolution to the deep differences between us. We embarked upon this effort to engage with the Islamic Republic with no illusions about our prospective interlocutors or the scope of our 30-year estrangement.

Together with our allies and international partners, we sought to create opportunities for Iran to build confidence in its nuclear intentions. These opportunities included the discussions last October in Geneva of the IAEA proposal to provide fresh fuel for the Tehran Research Reactor. We offered Iran a follow-on opportunity to meet with the P5+1 to discuss these issues further. We also called on Iran to grant the IAEA full and immediate access to its formerly undeclared enrichment facility near the city of Qom. These were opportunities for Iran to demonstrate its good faith and address the concerns of the international community. But we cautioned Iran that engagement was not sustainable without a constructive response demonstrating Iran's serious willingness to address international concerns about its nuclear program.

Unfortunately, Iranian leaders spurned serious negotiations, and what appeared to be a constructive beginning in Geneva was ultimately repudiated by Tehran. Instead, Iran revealed a clandestine enrichment facility near Qom, provocatively continues its enrichment operations in violation of UNSC resolutions, and refused to meet again with the P5+1 to discuss its nuclear program. Iran balked at the key elements of the IAEA's TRR proposal. While Iran allowed IAEA inspections of the Qom facility, it did not provide all the access the IAEA requested, nor answers to the IAEA's questions concerning the nature of the facility and Iran's intent in constructing it. Iran also failed to address fundamental questions about evidence suggesting it had sought to develop a nuclear warhead. These failures drew new rebukes from the IAEA in the Director General's most recent report.

While our overtures did not generate sustained negotiations with Iran, they have demonstrated our sincerity in seeking a peaceful resolution. As a result of our patient pursuit of direct negotiations—and the recalcitrance of Iran's response—we now see a broader international consensus about the urgency of the Iranian threat and new frustration among even some of Iran's friends and trade partners. This newfound multilateral understanding strengthens our diplomatic hand as we have intensified the second track of our dual-track diplomacy toward Tehran—utilizing pressure to convince Tehran to change its course. As the President said in Prague just last week, we must insist that Iran face consequences because it has continually failed to meet its obligations. We cannot, and will not, tolerate actions that undermine the NPT, risk an arms race in a vital region, and threaten the credibility of the international community and our collective security.

Already, the heightened concerns of the international community have manifested themselves in a variety of ways. They have generated increased cooperation on stopping arms shipments and financial transactions that aid terrorists, threaten Israel, and destabilize the region. This strengthened multilateral cooperation has also produced a series of new formal measures, including the critical November 2009 IAEA Board of Governors resolution, the U.N. General Assembly Iran Human Rights measure in December, and the European Council declaration on Iran. In this regard, we are moving with a sense of urgency toward a new U.N. Security Council Resolution. At the START signing ceremony last week in Prague, Russian President Medvedev reaffirmed the need for smart sanctions. Formal negotiations among the P5+1 on a new resolution also began last week in New York. While the process of getting consensus around a new UNSCR is always challenging, we are working aggressively to adopt concrete measures that will serve as a platform to strengthen and expand upon existing sanctions and target the power centers most likely to have an impact on Iran's strategic calculus.

Concerns about Iran's destabilizing activities are not limited to the P5+1 and our European partners. Many governments in the region have legitimate fears about Iran's policies and the advancement of its nuclear program. Iran's neighbors are working to counter and diminish Iran's negative influence. These states support the responsible and transparent development of civilian nuclear energy, but have publicly declared their opposition to the pursuit of nuclear weapons and emphasized their grave concerns about Iran's nuclear intentions. We continue to work with these regional partners as they develop mechanisms to better manage the political, diplomatic, and security challenges Iran poses. In addition, we have launched inten-

PX371

14

sive diplomatic outreach efforts to other key states to discuss the need for additional pressure to bring Iran back to the negotiating table.

Equally evident to Iranians are the informal expressions of international censure, including the voluntary departure of longstanding foreign investors and trade partners, and the growing isolation of a country that had only just begun to emerge from the self-imposed autarky of the early post-revolutionary era. Neither our formal penalties nor the increasing ostracism Iran faces from the world will alter its agenda overnight, but we believe that the mounting weight of political and financial pressures on its leadership can persuade Tehran to reassess its approach to the world.

Pressure cannot be an end in itself. The threat and implementation of sanctions is intended to underscore to Iran's leaders the costs and benefits of the alternatives before them. President Obama made clear in his Nowruz message last month that we remain committed to meaningful engagement. Together with our international partners, we acknowledge Iran's right to the peaceful uses of nuclear energy, but we must and we will seek to ensure that Iran fulfills the same responsibilities that apply to other nations and which it took upon itself freely. For this reason, we will continue to press Iranian leaders to take concrete steps to reassure the world that its nuclear program is intended for peaceful purposes. Our resolve to uphold and strengthen the rules of the international system reflects our core commitment to our own vital security and to shaping a better future for the world, commitments that are shared by our allies and partners.

Our interests with respect to Iran extend well beyond the nuclear issue. As the President said last month in his Nowruz message, our responsibility is, and will remain, to stand up for those rights that are universal to all human beings. That includes the right to speak freely, to assemble without fear, and the right to the equal administration of justice. The Iranian Government's use of unwarranted arrests, prolonged detentions, and violence against its citizens represent outrageous violations of the most fundamental duties of government. While this repression has quashed large-scale protests in recent months, deep rifts remain evident between the government and much of its citizenry, and among the power brokers who have long supported the Islamic system. These cleavages wrought by the post-election turmoil will continue to shape the political future of the Islamic Republic in ways that we cannot fully anticipate, and the United States will continue to speak out on behalf of those who are seeking merely to exercise their universal rights.

The Iranian Government has also pursued a policy to limit its citizens' access to information. In response, the United States continues to make available tools that create the space—on the Internet, in journalism, and in the arts—where free thought and expression can flourish. As part of that effort, the U.S. Government is pursuing ways to promote freedom of expression on the Internet and through other connection technologies. We are working around the world to help individuals silenced by oppressive governments, and have made Internet freedom a priority at the United Nations as well, including it as a component in the first resolution we introduced after returning to the U.N. Human Rights Council.

In conclusion, let me note our deep and continuing concern for the safety and well being of all American citizens currently detained or missing in Iran. We urge the Iranian Government to promptly release Shane Bauer, Sarah Shourd, and Josh Fattal, and all other unjustly detained American citizens so that they may return to their families. We also call upon Iran to use all of its facilities to determine the whereabouts and ensure the safe return of Robert Levinson.

Chairman LEVIN. Thank you very much, Secretary Burns. General Cartwright.

## STATEMENT OF GEN. JAMES E. CARTWRIGHT, USMC, VICE CHAIRMAN OF THE JOINT CHIEFS OF STAFF

General CARTWRIGHT. Mr. Chairman, my concerns were included in Secretary Flournoy's prepared and delivered comments. I will await your questions.

Chairman LEVIN. Thank you so much, General. General Burgess.

PX371

15

**STATEMENT OF LTG RONALD L. BURGESS, USA, DIRECTOR OF
THE DEFENSE INTELLIGENCE AGENCY**

General BURGESS. Chairman Levin, Senator McCain, and other members of the committee, thank you for this opportunity to testify on Iranian military capabilities and intentions. I've submitted my prepared statement for the record. I would like to briefly summarize the main points.

The Iranian leadership has four strategic objectives: the first is regime survival; the second is obtaining a pre-eminent, regional role; Iran's third strategic objective is to have a leading role in the Islamic world and beyond; and finally, Iran seeks to become a regional economic, scientific, and technological power house.

Iran seeks to achieve these objectives with an aggressive strategy that counters western influence in the region. One principle tool employed by Iran is the active sponsorship of terrorist and paramilitary groups to serve as a strategic deterrent and intimidate and pressure other nations. This includes the delivery of lethal aid to select Iraqi Shia militants in Iraq and the Taliban in Afghanistan.

In contrast to Iran's aggressive foreign policy is its conventional military posture, which is largely defensive. It is intended to protect the regime from external and internal threats. While DIA currently assesses that Iran is unlikely to initiate a conflict intentionally or launch a preemptive attack, it does have the capability to restrict access to the Straits of Hormuz with its naval forces temporarily and threaten U.S. forces in the region and our regional allies with ballistic missiles.

Iran continues to invest heavily in advanced air defenses and the potential acquisition of Russian SA–20 surface-to-air missiles is a major part of that effort. Coastal defense cruise missiles remain an important layer in Iran's strategy to defend the Persian Gulf and the Straits of Hormuz. Iran's unconventional military capabilities, which include paramilitary forces trained to conduct asymmetric warfare, would present a formidable force on Iranian territory. These forces would include commando and Special Forces units, smaller specially trained teams embedded within the conventional force units and selected militia and law enforcement personnel.

With regard to weapons of mass destruction and ballistic missile delivery systems, Iran is developing technological capabilities applicable to nuclear weapons. Uranium enrichment and heavy water nuclear water reactor activities continue in violation of U.N. Security Council resolutions. Iran has gone to great lengths to protect its nuclear infrastructure by locating facilities in buried, hardened facilities. It also seeks to protect them by acquiring sophisticated air defense systems.

Iran is continuing to develop ballistic missiles which could be adapted to carry nuclear weapons. Iran claims to have an extended range variant of the Shahab-3 missile and a 2,000-kilometer medium range ballistic missile called the Ashura. Beyond the steady growth in its missile and rocket inventories, Iran has boosted the lethality and effectiveness of existing systems by improving their accuracy and developing new submunition payloads.

In closing, DIA concurs with General Petraeus' testimony before this committee last month that the Iranian regime is the primary

16

state level threat to stability in the CENTCOM area of responsibility. The potential threats posed by Iran and evolving trends inside that nation remain a high priority for DIA collectors, analysts, and counterintelligence professionals. Thank you, sir.

[The prepared statement of General Burgess follows:]

PREPARED STATEMENT BY LTG RONALD L. BURGESS, JR., USA

Good morning, Chairman Levin, Ranking Member McCain, and members of the committee. Thank you for this opportunity to testify regarding Iran's military posture, and for your continued support to the dedicated men and women of the Defense Intelligence Agency (DIA), many of whom are forward-deployed directly supporting our military forces in Afghanistan, Iraq, and around the world.

IRAN'S STRATEGY AND DOCTRINE

The strategic objectives of Iran's leadership are first and foremost, regime survival; making Iran the preeminent regional power; attaining a leading role in the Islamic world and on the international stage; and turning Iran into an economic, scientific, and technological powerhouse.

Iranian leadership pursues a security strategy intended to deter an attack on its territory and increase its relative power in the region. For years, it has promulgated its "30-Million Man Army" and asymmetric warfare doctrine as deterrents to any would-be invader. Iran has also extended its outreach and support to governments and groups which oppose U.S. interests and threaten regional security. Diplomacy, economic leverage, and active sponsorship of terrorist and paramilitary groups are tools Iran uses to implement or further its aggressive foreign policy. In particular, Iran uses terrorism to pressure or intimidate other countries and more broadly to serve as a strategic deterrent.

Iran's military strategy is designed to defend against external threats, particularly from the United States and Israel. Its principles of military strategy include deterrence, asymmetrical retaliation, and attrition warfare. Iran can conduct limited offensive operations with its strategic ballistic missile program and naval forces.

IRAN'S REGIONAL INFLUENCE

Iran's 20-year outlook plan from the year 2005 seeks to make Iran a "top regional power". Among other objectives, its current 5-year plan seeks to expand bilateral, regional, and international relations, strengthen Iran's ties with friendly states, and enhance its defense and deterrent capabilities. Commensurate with that plan, Iran is seeking to increase its stature by countering U.S. influence and expanding ties with regional actors while advocating Islamic solidarity. It also seeks to demonstrate to the world its "resistance" to the west. Iran is attempting to secure influence in Iraq and Afghanistan while undermining U.S. efforts by furnishing lethal aid to Iraqi Shia militants and Afghan insurgents. It also provides weapons, training, and money to Lebanese Hizballah, its strategic proxy and partner.

The Iranian regime uses the Islamic Revolutionary Guard Corps-Quds Force (IRGC–QF) to clandestinely exert military, political, and economic power to advance Iranian national interests abroad. The Quds Force conducts activities globally, including gathering tactical intelligence; conducting covert diplomacy; providing training, arms, and financial support to surrogate groups and terrorist organizations; and facilitating some of Iran's provision of humanitarian and economic support to Islamic causes.

Iran also provides Lebanese Hizballah and Palestinian terrorist groups—notably, HAMAS, the Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP–GC)—with funding, weapons, and training to oppose Israel and disrupt prospects for Arab-Israeli peace. The Quds Force is Iran's primary vehicle for providing materiel and lethal support to Lebanese Hizballah, which Iran views as an essential mechanism for advancing its regional policy objectives.

Iran continues to drive a multi-pronged soft power strategy in Iraq, including continued support to select Iraqi surrogate groups. The Quds Force Ramazan Corps is responsible for carrying out Iran's policy in Iraq. To more effectively execute regime policy, the Quds Force posts officers in Iran's diplomatic missions throughout Iraq. Both outgoing Iranian Ambassador to Iraq, Hassan Kazemi-Qomi, and incoming Ambassador, Hassan Danafar, are Quds Force officers.

Iran also continues to provide money, weapons, and training to select Iraqi Shia militants and terrorists despite pledges by senior Iranian officials to cease such sup-

PX371

17

port. Iran offers strategic and operational guidance to militias and terrorist groups to target U.S. forces in Iraq. In addition to providing arms and support, the Quds Force is responsible for training Iraqi insurgents in Iran, sometimes using Lebanese Hizballah instructors. The Quds Force provides insurgents with the training, tactics, and technology to conduct kidnappings, small unit tactical operations, and employ sophisticated improvised explosive devices (IEDs). In addition to weapons and support, Iran continues training Iraqi Shia militants in the use of IEDs, particularly deadly IEDs known as explosively formed penetrators (EFPs), and the counter-measures designed to defeat these weapons.

Iran continues to influence events in Afghanistan through a multi-faceted approach involving support for the Karzai government while covertly supporting various insurgent and political opposition groups. Tehran's support for the Government of Afghanistan is reflected in its diplomatic presence and the numerous Iranian non-governmental organizations (NGOs) active in the country. Tehran has also pledged over a billion dollars in aid, but has actually paid only small fraction of that pledge. Iran has used the threat of repatriating the large Afghan refugee population residing in Iran as a lever to influence the Government of Afghanistan, especially during the harsh winter months. Iranian officials met with President Karzai and his main opponent Abdullah Abdullah throughout the presidential election campaign, and worked hard to appear as the consensus maker during the post election period. Tehran has also leveraged longstanding relationships with numerous Afghan leaders including Gulbuddin Hekmatyar and Ismail Khan, both of whom lived in Iran for a period of time.

Arms caches uncovered in Afghanistan over the last 3 years contained large amounts of Iranian manufactured weapons, including 107mm rockets, which we assess IRGC–QF delivered to Afghan militants.

Iran has been involved in Lebanon since the early days of the Islamic Republic, seeking to expand ties with the large Shia population. The IRGC played an instrumental role in the establishment of Lebanese Hizballah and has continued to be vital to the development of the organization.

### IRAN'S MILITARY FORCES

According to the Constitution of the Islamic Republic, the Supreme Leader is commander in chief of the armed forces, which consists of three main components: the regular military (sometimes referred to as the Artesh); the Islamic Revolutionary Guard Corps (IRGC) or Pasdaran, and the Law Enforcement Force (LEF). The regular military and IRGC come under the control of the Ministry of Defense and Armed Forces Logistics (MODAFL). These forces are responsible for defending Iran's borders and providing for internal security. The LEF is formally subordinate to the Ministry of Interior, and plays a key role in internal security and frontier security. Iran's defense spending as a share of GDP is relatively low compared to the rest of the region.

The Islamic Republic of Iran Ground Force (IRIGF) comprises armored, infantry, and commando divisions, as well as several independent armor, infantry, airborne, and commando brigades, and artillery groups. Additionally, the IRGC Ground Resistance Forces (IRGCGRF) includes Provincial Corps, which generally include armor and infantry brigades and artillery groups. Each brigade is allocated Basij battalions which support brigade combat operations.

DIA assesses the Islamic Republic of Iran Navy (IRIN) includes some 18,000 personnel. The IRIN is organized into four naval districts, which likely include submarine, missile boat, patrol boat, and auxiliary units; naval aviation units and naval riflemen and marine commando units. An additional 20,000 personnel comprise the Islamic Revolutionary Guard Corps Navy (IRGCN), which also includes missile, torpedo, and small patrol boat units, several anti-ship coastal defense missile batteries, and naval riflemen and commando units.

The Islamic Republic of Iran Air Force (IRIAF) is estimated to comprise 52,000 personnel, stationed at 10 fighter bases, 19 fighter/fighter bomber and trainer squadrons, 1 reconnaissance squadron, and 10 transport/tanker squadrons. While the exact force structure is unclear, the Islamic Revolutionary Guard Corps Air Force (IRGCAF) is estimated to include 5,000 additional personnel and possess some capability to support ground attack missions.

The IRIAF remains largely dependent on 1970's-era U.S. aircraft like the F–4 Phantom II, the F–14A Tomcat, and the F–5E Tiger II. Its most advanced fighter is the MiG–29 Fulcrum, and it has managed to keep a substantial portion of its fleet of U.S.-supplied aircraft flying. While Iran has not procured significant numbers of new aircraft in over 10 years, it has sought to meet some of its requirements by developing an indigenous combat aircraft, most of which is derived from its U.S.-

PX371

18

built F–5A Freedom Fighters and F–5E Tiger IIs. One noteworthy project is the twin-tailed Saeqeh (Thunderbolt), of which several examples have apparently been built.

Iran's military exercises and literature make it clear its air planners understand the value of airborne early warning and command, control, communications, computers, and intelligence systems, airborne intelligence, electronic warfare platforms, unmanned aerial vehicles (UAVs) and airborne refueling. Iran has an active program and two families of reconnaissance, target and lethal UAVs. However, the IRIAF has been unable to progress in other areas. For example, the IRIAF's lone airborne early warning and control system platform crashed in September 2009, killing all seven people on board. Iran is also building precision-guided munitions for the IRIAF, but recent large-scale exercises showed fighters delivering conventional unguided munitions.

The Air Defense Force includes a headquarters element and regional air defense sectors. Iran has a small, but growing, number of surface-air-missile (SAM) sites, and numerous anti-aircraft artillery (AAA) sites.

In 2009 Iran established a separate air defense force under the command of Brigadier General Ahmad Miqani, as a fourth force in the Artesh. The new service consolidates equipment and personnel under a single commander and has authority over both regular and IRGC air defense units. Publicly, Iranian officials gave a number of reasons for creating an air defense force, including the need to better defend its nuclear sites, improve the maneuverability and capability of its air defense forces, and consolidating information-gathering and air defense forces in a single service. Iran is unlikely to seek to develop a fully integrated nationwide air defense system. Instead, it seems to prefer a point defense strategy, with its strongest defenses located around key strategic centers.

Tehran continues to invest heavily in advanced air defenses, and the potential acquisition of the Russian SA–20 SAM remains a major part of its air defense modernization efforts. Iran's procurement of modern SAMs with automated command, control, and communications systems will be a significant upgrade to existing Iranian air defense capabilities and improve its ability to protect senior leadership and key nuclear and industrial facilities. Iran acquired modern SA–15 short-range surface-to-air missiles in 2007 and has displayed newly acquired and indigenously built radar systems at its Holy Defense Week parade.

Coastal defense cruise missiles (CDCMs) are an important layer in Iran's defense of the Persian Gulf and Strait of Hormuz. Iran can attack targeted ships with anti-ship cruise missiles (ASCMs) from its own shores, islands, and oil platforms using relatively small mobile launchers.

The C801/802 is Iran's primary CDCM, first imported from China in 1995. It is capable of engaging targets at a range of 6 nautical miles, and has greater accuracy, a lower cruising altitude, and a faster set-up time than the Seersucker missile Iran used during the Iran-Iraq War. The C801/802 allows Iran to target any point within the Strait of Hormuz and much of the Persian Gulf and the Gulf of Oman. Iran has worked with China to develop shorter range missiles, including the C701, for deployment in narrow geographic environments.

Iran can readily deploy its mobile CDCM launchers anywhere along its coast. These systems have auto control and radar homing guidance systems, and some can target using a remote air link. Iran's objective is to overwhelm enemy air defenses with mobile CDCMs, combined with multiple rocket launchers (MRLs), coastal artillery, and ballistic missiles.

Iran has historically placed the majority of its conventional force strength—to include armor, mechanized infantry, and infantry units—close to its borders with Iraq and Turkey. This reflects its defensive military doctrine, which is designed to slow an invasion and force a diplomatic solution to hostilities. Iranian military training and public statements echo this defensive doctrine. Iran continues to build its capability to counter more advanced adversaries, including the recent merger of the Basij Resistance Forces with IRGC ground forces.

Iran's unconventional forces, to include its paramilitary forces trained according to its asymmetric warfare doctrine, would present a formidable force on Iranian territory. These forces would include commando and special forces units, smaller specially trained teams embedded within the conventional force units, selected Basij forces, and combat patrols of the Law Enforcement Forces. Numbers of personnel could exceed 1 million.

THE IRGC-QUDS FORCE (IRGC–QF)

Iran established the Islamic Revolutionary Guard Corps-Quds Force in 1990 as an elite unit within the IRGC. Although its operations sometimes appear at odds

19

with the public voice of the Iranian regime, it is not a rogue element; it receives direction from the highest levels of government, and its leaders report directly, albeit informally, to Supreme Leader Ali Khamenei. The Quds Force employs complementary diplomatic and paramilitary strategies.

The Quds Force stations operatives in foreign embassies, charities, and religious/cultural institutions to foster relationships with people, often building on existing socio-economic ties with the well established Shia diaspora. At the same time, it engages in paramilitary operations to support extremists and destabilize unfriendly regimes. The IRGC and Quds Force are behind some of the deadliest terrorist attacks of the past three decades, including the 1983 and 1984 bombings of the U.S. Embassy and annex in Beirut, the 1983 bombing of the Marine barracks in Beirut, the 1994 attack on the AMIA Jewish Community Center in Buenos Aires, the 1996 Khobar Towers bombing in Saudi Arabia, and many of the insurgent attacks on coalition and Iraqi security forces in Iraq since 2003. Generally, it directs and supports groups actually executing the attacks, thereby maintaining plausible deniability within the international community.

Support for these extremists takes the form of providing arms, funding, and paramilitary training. In this, Quds Force is not constrained by ideology; many of the groups it supports do not share, and sometimes openly oppose, Iranian revolutionary principles, but Iran supports them because of common interests or enemies.

The Quds Force maintains operational capabilities around the world. It is well established in the Middle East and North Africa, and recent years have witnessed an increased presence in Latin America, particularly in Venezuela. As U.S. involvement in global conflicts deepens, contact with the Quds Force, directly or through extremist groups it supports, will be more frequent and consequential.

Each Provincial Corps in the Quds Force possesses a unit, called Saberin, which has limited special operations capabilities. These units rotate to northwest Iran to perform counter-insurgency operations against the Kurdish Free Life Party (PJAK) and to the southeast against Jundallah.

### IRAN'S SUPPORT TO TERRORISM

Over the last 3 decades, Iran has methodically cultivated a network of sponsored terrorist allies and surrogates capable of conducting effective, plausibly deniable attacks against the United States and Israel.

Through its longstanding relationship with Lebanese Hizballah, Iran maintains a capability to strike Israel and threaten Israeli and U.S. interests worldwide. With Iranian support, Lebanese Hizballah has exceeded 2006 Lebanon conflict armament levels. On November 4, 2009, Israel interdicted the merchant vessel FRANCOP, on which Iran was attempting to smuggle weapons probably destined for Lebanese Hizballah including large quantities of 122mm and 107mm surface-to-surface rockets, 106mm antitank shells, mortar shells, hand grenades, and small arms ammunition. The Quds Force operates training camps in Lebanon, training LH and other fighters. Iran also provides hundreds of millions of dollars per year in funding to support Lebanese Hizballah.

Iran provides Kata'ib Hizballah (KH)—an Iraqi Shia terrorist group—and other Iraqi militant groups with weapons and training. Inside Iran, the Quds Force or Lebanese Hizballah-led training includes: small arms, reconnaissance, small unit tactics, and communications. Selected individuals or groups receive more specialized training in assassinations, kidnappings, or explosives. Iranian materiel assistance and training increased the lethality of roadside Improvised Explosive Devices (IED) and improvised rockets, enhancing the capabilities of the supported groups in Iraq, Afghanistan, and the Levant.

Iran's support to Palestinian groups—including HAMAS, the Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command—produced improvements in their capabilities and increased the threat to Israeli and U.S. interests in the region. Iranian training and material support assisted HAMAS in the development of the Qassam rocket, extending its range to 40km. Iran also continues to smuggle weapons, money, and weapons components into the Gaza Strip through tunnels in the Philadelphi corridor.

The Quds Force has provided limited and measured lethal support to select Afghan insurgent and terrorist groups since at least 2006. Iranian supplied 107mm rockets, plastic explosives, and mortar rounds have been recovered in Taliban-affiliated cache locations.

### IRANIAN'S NUCLEAR AND BALLISTIC MISSILE WEAPONS CAPABILITIES

Iran is actively developing its nuclear program, including uranium enrichment and heavy water nuclear reactor activities in direct violation of multiple United Na-

PX371

20

tions Security Council resolutions. This includes construction of the secret enrichment facility located on an IRGC military base near Qom that was revealed in the fall 2009. Iran also continues to develop ballistic missiles which could be adapted to deliver nuclear weapons.

Tehran has refused to cooperate with the International Atomic Energy Agency, particularly by refusing full access to facilities, documents, and personnel as the IAEA investigates Iran's nuclear program. Iran's nuclear activities and related lack of openness with the international community raise serious questions about Iran's intent and pose a significant threat to the peace and stability of the Middle East.

Iran has gone to great lengths to protect its nuclear infrastructure from physical destruction. It has placed an emphasis on a number of factors to include locating facilities in buried sites, establishing hardened facilities and attempting to acquire sophisticated air defense systems.

Over the past two decades, Iran has placed a significant emphasis on developing and fielding ballistic missiles. Iran began ballistic missile acquisition and production programs in the 1980s during the Iran-Iraq War to address its inability to counter Iraqi missile attacks. Iran currently has the largest deployed ballistic missile force in the Middle East. Since 2006, Iran has demonstrated its missile capabilities in four highly-publicized exercises, nicknamed "Noble Prophet."

Iran continues to develop ballistic missiles capable of targeting Arab adversaries, Israel, and central Europe, including Iranian claims of an extended-range variant of the Shahab-3 and a 2,000-km medium range ballistic missile (MRBM), the Ashura. Beyond the steady growth in its missile and rocket inventories, Iran has boosted the lethality and effectiveness of existing systems with accuracy improvements and new sub-munition payloads.

Short-range ballistic missiles provide Tehran with an effective mobile capability to strike coalition forces in the region. Iran continues to improve the survivability of these systems through technological advances, such as solid-propellant and the use of anti-missile defense tactics.

Iran has also developed medium-range ballistic missiles, and continues to increase the range, lethality, and accuracy of these systems. The Shahab 3, based on the North Korean No Dong, can reach all of Israel. The Ashura or "Sejil" is an indigenous, two-stage missile under development, which uses solid-propellant technology, reducing the launch preparation and footprint.

DIA assesses that, with sufficient foreign assistance, Iran could develop and test an intercontinental ballistic missile (ICBM) capable of reaching the United States. In late 2008 and early 2009, Iran launched the Safir, a multi-stage space launch vehicle (SLV), demonstrating progress in some technologies relevant to ICBMs. Iran displayed its next-generation SLV, the Simorgh, in February 2010. The Simorgh is much larger than the Safir and shows progress in booster design that could be applicable to an ICBM design.

CONCLUSION

In summary, Iran seeks to increase its regional power by countering Western influence, expanding ties with its neighbors, and seeking a leadership role in the Islamic world. Diplomacy, economic leverage, and active sponsorship of terrorist and paramilitary groups are the tools Iran uses to drive its aggressive foreign policy. Nevertheless, internal security remains the regime's primary focus. While it is unlikely to initiate a conflict intentionally or launch a pre-emptive attack, Iran uses its military forces to defend against both external and internal threats. Iran does have the capability to restrict access to the Strait of Hormuz with its navy temporarily and threaten U.S. forces in the region and our regional allies with missiles. Iran assesses the benefits gained from its use of terrorist surrogates outweigh the costs. Tehran has gone to great lengths to protect its nuclear infrastructure from physical destruction. Iran presents a wide array of threats and challenges to the United States and its allies.

Let me conclude by saying the potential threats posed by and evolving trends in Iran are among the highest priorities for the Defense Intelligence Agency. As General Petraeus noted to this committee last month, "the Iranian regime is the primary state-level threat to stability" in the U.S. Central Command area of responsibility. It is a core responsibility of the DIA to ensure our Nation has the best available intelligence to protect deployed U.S. personnel and their families, our allies, and partners from the threats posed by Iran. DIA also retains a core responsibility to prevent strategic surprise on a larger scale from any quarter, including Iran. In my recent visits with DIA's military and civilian personnel deployed to the Middle East, I remain impressed by—and thankful for—their willingness to serve the Na-

21

tion. On their behalf, I thank this committee for your strong support and continuing confidence in the Defense Intelligence Agency and its mission.

Chairman LEVIN. Thank you very much, General Burgess. We're going to have a 7-minute first round.

Secretary Flournoy, the President said, "I've been very clear that I don't take any options off the table with respect to Iran." Now, that means to me that military options remain on the table, and my question is: does the President's statement about options on the table include military options, and in turn, do they include options of a maritime quarantine or blockade of Iran's oil exports or import of refined petroleum products?

Ms. FLOURNOY. Senator Levin, as the President said, all options are on the table. We see it as DOD's responsibility to plan for all contingencies and provide the President with a wide range of military options, should they become necessary. But, as both Secretary Gates and Chairman Mullen have stated, military options are not preferable. We continue to believe that the most effective approach at this point in time is a combination of diplomacy and pressure in terms of how best to change Iranian behavior.

The President has stated that no options are off the table. In terms of specific options or contingencies, I prefer to discuss those in a closed session.

Chairman LEVIN. Is it fair to say that the options that I described are included in the all-options comment?

Ms. FLOURNOY. I would rather address that in a closed session, sir.

Chairman LEVIN. Is your word all options? Is that your statement?

Ms. FLOURNOY. Yes, all options are on the table.

Chairman LEVIN. That's fine, including military options?

Ms. FLOURNOY. Yes.

Chairman LEVIN. I just want to say that I think that it's important that be the case. Secretary Flournoy, I support very much what you said because I think it's critical that Iran understand the seriousness of our purpose and the unity behind a strong message to them.

General Cartwright, I was going to ask you about the contingency plans being prepared. I assume your answer is the same as Secretary Flournoy on that question?

General CARTWRIGHT. It is, sir.

Chairman LEVIN. Alright. I know that's not the preferable option. It never is. But it also has to remain as an option.

Secretary Burns, can you tell us what additional specific sanctions are we seeking at the U.N. that are not already in U.N. Security Council resolutions?

Ambassador BURNS. Senator Levin, as I said, I think we built increasing momentum toward a strong U.N. Security Council resolution. Intensive negotiations on the text of that resolution have just begun. Russia and China are taking active part in that effort.

We want to build on the existing sanctions by looking at ways in which we can increase pressure, particularly with regard to the financial sources that Iran draws upon to finance its proliferation activities and its nuclear program. We want to look at ways in which we can, in particular, target the activities of the Islamic Rev-

PX371

22

olutionary Guard Corp (IRGC), which has been eminently involved in the nuclear program. It was an IRGC facility at which the Qom clandestine enrichment facility has been constructed.

The IRGC has also expanded its economic role and controls a number of companies in Iran, which also provide, I think, room for us to explore in a new U.N. Security Council resolution. It's going to be a difficult process in New York. It always is in trying to work toward a tough U.N. Security Council resolution.

But, we don't have a higher priority right now. We're going to work to try to make those measures as strong as we possibly can and to achieve them in as quick a time as we can.

Chairman LEVIN. We know that you're not able, in this setting, to describe the exact status of those discussions and negotiations. But, in general, let me ask you whether the administration would support the Senate-passed legislation known as the Dodd-Shelby Act, which would make sanctionable efforts by foreign firms to supply refined gasoline to Iran or supply equipment to Iran that could be used by Iran to expand or to construct the oil refineries.

Ambassador BURNS. Senator, I'd say a couple of things.

First, I think our efforts toward a new U.N. Security Council sanctions resolution are one element in the strategy which I described before. We think that a U.N. Security Council resolution helps send a strong, unified message of international resolve, which is important. We believe it will contain some significant measures to increase economic pressure.

We believe it can also provide a legal and political platform off of which the United States, the European Union (EU), and other countries can consider further measures consistent with our own laws to amplify the impact of whatever gets done in New York. We want to work with Congress with regard to the legislation that you mentioned. We share the sense of purpose, the goals, as well as the sense of urgency, that we know all of you feel about this issue. Our interest is in simply working with you to try to shape an approach which is going to have maximum impact and be as effective as possible.

What that means, I think, is that we want to aim for an approach which is going to encourage other governments and foreign companies to cut their ties with Iran, and is going to avoid penalizing countries and companies, which are actually beginning to cooperate in that effort. We look forward to working with you on that.

Chairman LEVIN. I hope you will be supportive of that bill that we passed, including the specific provision that we think is an important part of it and would add great pressure if they're aware of the fact that that type of action is under consideration.

General Burgess, let me ask you, my understanding is that the U.N. is satisfied that the centrifuges at Natanz are being used at the moment to produce low-enriched uranium (LEU), which is enriched to 5 percent or less, and that these centrifuges are not yet being used to produce highly-enriched uranium (HEU) at a level needed for nuclear weapons, which is above 80 percent enrichment. Is that correct?

PX371

23

General BURGESS. Sir, the open source reporting would corroborate that, but any further discussion of that would be better in closed session.

Chairman LEVIN. Alright. Now, if Iran decided to produce HEU for nuclear weapons, which is above 80 percent enrichment, with the installed centrifuges that they have, how long would it take, approximately, to produce enough HEU for one nuclear weapon?

General BURGESS. Sir, the general consensus, not discussing the exact number of centrifuges that we actually have visibility into, is we're talking 1 year.

Chairman LEVIN. To produce that much HEU for one nuclear weapon, should they begin to do that?

General BURGESS. Yes, sir, for one nuclear weapon. You characterized it correctly, Senator.

Chairman LEVIN. That's fine. Finally, has the IC determined whether Iran has decided to produce HEU?

General BURGESS. Sir, as we stated in the 2007 National Intelligence Estimate (NIE), that still stands that we do not have inside information that the regime has made the decision to move in that direction.

Chairman LEVIN. Thank you.

Senator Collins, I guess you are next. The last shall be first.

Senator COLLINS. Thank you, Mr. Chairman.

General Burgess, let me follow up on the question that the chairman just asked you. It's my understanding that there is a new NIE that has been completed on the very question that has just been raised, but not yet released. Is that accurate?

General BURGESS. Ma'am, I think it is accurate to say that there is an NIE currently underway. The decision on when it will be released and when it will be finished has not been determined yet.

Senator COLLINS. Do you expect that the findings in this NIE will be the same as the findings of the 2008 or 2009 review? It blurs together; the NIE that you just referenced?

General BURGESS. Ma'am, it would be better if we discussed that in closed session.

Senator COLLINS. Ok.

Secretary Burns, 2 weeks ago, I met with the Director General of the IAEA, Mr. Amano, and I was, first of all, very impressed with the contrast in his reporting on Iran versus his predecessor. He is much more willing to give an accurate, straightforward assessment of Iranian capabilities. He expressed frustration about the lack of compliance by Iran with the transparency measures, known as the Additional Protocol, that would allow for more intrusive inspections by the IAEA inspectors. To date, the Iranians have completely ignored the recommendations in the IAEA's February report.

We all know that the administration is working hard with the U.N. Security Council to try to produce an effective sanctions regime. Many of us, however, are concerned that the sanctions that come out of the U.N. Security Council may well be inadequate to accomplish the goal of increased transparency and getting the Iranians to halt the work that they are doing. What could be done by our country if the U.N. Security Council does not follow through with tough and effective sanctions?

PX371

24

Ambassador BURNS. Thank you very much, Senator.

What we've been doing is to try to use every lever that we already have at our disposal to encourage foreign companies and foreign entities to cut their ties with Iranian economy. Already, I think, we've seen a considerable amount of movement in that direction.

You've seen major energy companies like Total, ENI, and Statoil, who have said they're not going to do any new investment in Iran.

You've seen a number of companies stop gasoline sales to Iran including Reliance, Glencore, IPG, and Lukoil, most recently.

You've seen some major international banks—Deutsche Bank and HSBC—pull out of business with Iran.

Just today, I saw a story in the press that Daimler, the German carmaker, is pulling out of its business in Iran.

We're continuing to work very hard to use the existing legislation and existing U.S. law to encourage companies to move out of that kind of business. That is having an impact, I think, on the Iranian economy and on its calculations. As I said before, a U.N. Security Council resolution is one of a number of elements in our strategy. It does provide a platform for the EU and its members, as it has done in the past, to consider other kinds of measures that it can take to implement in a very tough way whatever it is that the U.N. Security Council is able to agree to.

I think, to answer your question, is that we have a number of other tools that we're using on which we can build.

Senator COLLINS. Madame Secretary, Secretary Gates on Sunday raised a very serious verification question publicly about the Iranian nuclear program. He said, "If their policy is to go to the threshold, but not assemble a nuclear weapon, how do you tell that they have not assembled? It becomes a serious verification question, and I don't actually know how you would verify that."

What assurances can you provide that we will know before it is too late that Iranian's nuclear program has gone from worrisome to the level that Vice President Biden has described as unacceptable? In other words, if Iran has compiled all the components for a nuclear weapon but stops short of actually assembling them, how will we know when that point is reached? What will be our response?

Ms. FLOURNOY. Senator Collins, I think that's actually, maybe, a question that's better for my intelligence colleagues. I think that what Secretary Gates was making clear is there are many pieces to this puzzle. There are many different things that go into a nuclear weapons capability. There are some that we have a very good sense of and we have fairly high confidence in.

But I think there's always a question of what you don't know. I would say if we want to get into the particulars of that, I would suggest we have that by bringing in our intelligence colleagues in a closed session.

Senator COLLINS. Secretary Burns, let me return to the issue of the U.N. Security Council resolution. How long will our country wait for the U.N. Security Council to act before moving onto other sanctions either unilaterally or with our allies?

Ambassador BURNS. Ma'am, as the President has made clear, what we seek is the strongest possible sanctions resolution in the

PX371

25

shortest possible time this spring. We approach this with a real sense of urgency. We are building momentum, most recently with the decision by China to engage in a serious negotiation in New York over the text and the content of a new resolution.

I think a new U.N. Security Council sanctions resolution is an important element of our strategy for intensifying pressure. We're going to do everything possible to try to achieve that in, as the President has said, a matter of coming weeks, this spring.

Senator COLLINS. Thank you, Mr. Chairman.

Chairman LEVIN. Thank you very much, Senator Collins.

Senator Lieberman.

Senator LIEBERMAN. Thanks, Mr. Chairman. Thanks to you and Senator McCain for convening this very important hearing. Thanks for this distinguished panel of witnesses. What we're dealing with here, today, is what I believe to be the most significant security threat to our country in the world. It has Armed Services Committee implications, obviously, and so, I think it's very appropriate that we're holding this hearing.

There was an important exchange, I think, between you, Mr. Chairman, and the witnesses about having all options on the table. I was very interested in the press conference that President Obama held yesterday at the conclusion of the Nuclear Security Summit. He said, I presume in response to a question, maybe not, in regard to sanctions, "sanctions are not a magic wand. What sanctions do accomplish is hopefully to change the calculus of a country like Iran, so they see there are more cost and fewer benefits to pursuing a nuclear weapons program."

Of course, I agree with that. It's why I think it's so urgent that we go to the strongest possible sanctions. I also agree with what the President said. It's, in a sense, a different language than we've used, that sanctions are not a magic wand. They're not a guarantee that we will achieve the objective we want to achieve.

As the witnesses all know, a succession of American administrations of both political parties have made clear over and over again. I would daresay every Member of Congress of any political party has made clear over and over again; it is unacceptable to us in terms of our security and our values that Iran obtain nuclear weapons. That, I assume, is why we continue to say, Secretary Burns and Secretary Flournoy, that all options, including the military, remain on the table. That is to guarantee that the unacceptable, which is that Iran obtain nuclear weapons, does not become reality. We have to keep all options, including the military option, on the table.

Am I reading that correctly? Am I hearing it correctly, Secretary Flournoy?

Secretary FLOURNOY. Yes, Senator. The President has said both that a nuclear Iran is unacceptable and that all options are on the table. We've also said that, at this moment in time, we believe there are other options that need to be pursued in their fullest. That's what we're doing with regard to both engagement and pressure, sanctions as well as other measures.

Senator LIEBERMAN. Of course, I agree with that. I have the same sense of urgency that Secretary Burns referred to about the sanctions, but I also feel that if the sanctions do not work, then we

26

have to be prepared to use military force to stop the unacceptable from happening, which is that Iran become a nuclear power.

I want to pursue a line of questioning here about why it's so justified that the bipartisan consensus over a period of time in our country has been that it is unacceptable for Iran to have nuclear weapons. In that regard, I would really urge everyone here, and everyone who can get their hands on it, to read the prepared testimony of General Burgess for this hearing today. It is very powerful.

General Burgess outlines the goals of the Iranian regime and makes clear that the IRGC and the Quds force, and I quote from his opening statement, "are not a rogue element," referring to the Quds force. It receives direction from the highest level of government. Its leaders report directly albeit informally to Supreme Leader Ayatollah Ali Khamenei.

General Burgess then goes on to describe a series of what he calls "deadly terrorist attacks" over the last 3 decades that the IRGC and Quds force have been involved in, going back to the bombings at the U.S. Embassy and annex in Beirut and the killing of over 240 marines in the bombing of the barracks in Beirut in 1983, coming right forward to the support that the Quds force and the IRGC have given to extremists and insurgents in Iraq that have been responsible for the killing of hundreds of Americans. It's very worrisome and compelling testimony.

General Burgess, is it fair to say, these are my words, but I ask you that there already is a lot of American blood on Iranian hands?

General BURGESS. Sir, that would be a fair statement.

Senator LIEBERMAN. So, when the Iranians, the leadership, the fanatical leadership, chant death to America, it's actually something they've already tragically made happen. It's something that we have to take seriously.

General, the other statement that you made, which I find very striking, and I quote here, "DIA assesses that with sufficient foreign assistance, Iran could develop and test an intercontinental ballistic missile (ICBM) capable of reaching the United States." Would you elaborate on that statement that's in your prepared testimony?

General BURGESS. Senator, what I would say in this setting, and we can have further discussion in closed session, is that the Iranians continue, as I said in my statement, to develop a capability in their missile system. They are improving not only their range, but their accuracy. They have certain capabilities. If others decide to assist them, they can leapfrog that technology as they have given indication of some testing that is of concern to us.

Senator LIEBERMAN. Ok. I appreciate that. In the closed session, I want to take up with you what your particular concerns are about the kinds of foreign assistance Iran might receive to achieve the capability to launch a ICBM, presumably at some point, carrying nuclear weapons against the United States.

Secretary Burns, I think sometimes to appreciate the urgency of the matter, it's important to look forward and ask what the world would look like if Iran achieved nuclear capacity. I want to ask you just to speak briefly for a few moments. Is it fair to conclude that a nuclear Iran would strengthen the hand of terrorist groups that

27

are proxies for Iran, such as Hamas, Hezbollah, and the extremists in Iraq, if Iran had nuclear weapons?

Ambassador BURNS. Yes, sir. That is fair to say. I think the consequences of a nuclear-armed Iran truly would be catastrophic. I think you could easily stimulate a regional arms race which could have enormous dangers and carry enormous risks for stability in a part of the world that matters greatly to us and to some of our closest friends.

I think it would also do enormous damage, not only to the credibility of the U.N. and international institutions, but to the nuclear nonproliferation regime at exactly the moment as we saw in the Nuclear Security Summit over the last couple of days when we're working hard to try to strengthen that regime. I don't think anyone should underestimate what's at stake.

Senator LIEBERMAN. I appreciate your answer. I agree totally on the last point that all the steps that are occurring now, the New START, the nonproliferation to terrorists that was a subject of the summit yesterday, all, in my opinion, will be decimated if Iran goes nuclear.

My time is up. Thank you, Mr. Chairman.

Chairman LEVIN. Thank you, Senator Lieberman.

Senator McCain.

Senator McCAIN. Thank you, Mr. Chairman.

General Cartwright, how long will it be until Iran could have a nuclear weapon capability?

General CARTWRIGHT. To go into detail of capability, in other words we talked earlier about a single weapon, just to give an example in an open forum. We talked at 1 year the potential to have a weapon capability.

Senator McCAIN. Just 1 year?

Secretary Burns, do you believe that Russia and China would agree to sanctions that included the cutoff of refined petroleum products into Iran?

Ambassador BURNS. I think that's going to be very difficult to achieve.

Senator McCAIN. Do you believe that China will agree to sanctions at all through the U.N. Security Council?

Ambassador BURNS. Yes, sir. I do.

Senator McCAIN. You do? You're on the record. You believe that China will agree to sanctions through the U.N. Security Council that would have meaningful affect?

Ambassador BURNS. Yes, sir. I think that it's, as you asked is that possible? I do believe that's possible, yes.

Senator McCAIN. Is it probable?

Ambassador BURNS. We'll have to see, sir. We're just beginning a serious negotiation in New York. As I mentioned before, President Obama and President Hu had a constructive conversation about this a couple of days ago.

I think we and the Chinese agree that we need to send a strong message to Iran. So, yes, sir, I do think it's possible.

Senator McCAIN. Probable.

Ambassador BURNS. Yes, sir, I think it is likely that we would be able to produce a U.N. Security Council resolution.

Senator McCAIN. When do we envision this taking place?

PX371

28

Ambassador BURNS. Sir?

Senator MCCAIN. Six months?

Ambassador BURNS. I hope very much in weeks. We're going to work very, very hard to try to achieve a new sanctions resolution that has meaning this spring in the shortest possible time.

Senator MCCAIN. Why doesn't the United States, with our allies, who have agreed that they would act with us—I'm talking about the French, British, and Germans—act unilaterally, at least to put some sanctions that could have some effect on the Iranian behavior rather than waiting for the U.N. Security Council, which we have been waiting now for about a year and a half, at least? Let me put it this way: the sanctions so far that have been enacted by the U.N. Security Council have been, in the view of most observers, ineffective.

Ambassador BURNS. Sir, I'd just say two quick things.

First, our closest European allies expressed strong support for trying to achieve a new U.N. Security Council resolution as a part of our strategy.

Senator MCCAIN. Haven't they also agreed to join with us in imposing sanctions right away?

Ambassador BURNS. Sir, their very strong preference, they can speak for themselves on this, is to try to achieve a U.N. Security Council resolution as a part of our strategy. As I mentioned before that a resolution can serve as a legal and political platform for the EU and some of our key European partners to take other steps as they have in the past.

My second comment, sir, very quickly is that we're continuing to work very hard to use existing legislation, existing U.S. law, to discourage companies from doing business with Iran. We've had some success in doing that. Major oil companies like Statoil, like ENI, like Total, major banks, insurance companies including Allianz from Germany, are pulling out of business in Iran. A number of major companies, as I mentioned before, have announced that they're not going to sell gasoline to Iran anymore, Reliance, Vitol, and Lukoil most recently from Russia.

We're going to continue to work that hard as well.

Senator MCCAIN. But none of these actions have had any perceptible affect on Iranian behavior.

Ambassador BURNS. I think the Iranians do notice when these things happen. I think they are concerned about it. I think one way of judging that is the considerable effort that the Iranians are putting into, right now, to discourage a new U.N. Security Council resolution and to work hard with members of the U.N. Security Council against that.

Senator MCCAIN. I'll be very interested to see if your prediction comes true; that meaningful sanctions will be agreed to by the Russians and the Chinese. They've been playing rope-a-dope with us for now over a year. I'll be very interested to see if your optimism comes true. I see no justification for it.

Ms. Flournoy, I noticed with interest that you talked about the importance of strengthening Lebanon and national security implements, U.N. Security Council resolutions, assert government control throughout Lebanon's territory. Have you seen any progress

PX371

29

there including implementing the U.N. Security Council resolution that calls for the disarmament of Hezbollah?

Ms. FLOURNOY. We have an extensive assistance program with the Lebanese armed forces.

Senator MCCAIN. I'm aware of the assistance program. I'm asking if you have seen any progress in disarming Hezbollah.

Ms. FLOURNOY. I think we have seen an increase in their political will to do this. We have not yet seen them accomplish that goal. This is a work in progress, and it's going to take some time.

Senator MCCAIN. Is it of some concern to you the reports are today that Syria has given Scud missiles to Hezbollah that are now in place in Southern Lebanon?

Ms. FLOURNOY. We are very concerned about those.

Senator MCCAIN. Is that a sign of progress?

Ms. FLOURNOY. Of course not, sir.

Senator MCCAIN. Of course not. But, you would never know it from the statement you made, saying that we're working with our partners to strengthen national institutions.

There has been no progress in disarming Hezbollah. There has been no progress in decreasing tensions there. As everybody knows, the Scud missile now in Southern Lebanon change the equation rather significantly if Hezbollah either decides to attack or decides to respond to some Israeli action.

Ms. FLOURNOY. Sir, if I could.

Senator MCCAIN. Yes.

Ms. FLOURNOY. We have seen the Lebanese armed forces exert control in areas that were previously dominated by Hezbollah. It is a work in progress.

Senator MCCAIN. I would be very interested in seeing that.

Ms. FLOURNOY. Have we got there? No, we have not gotten to where we want to go yet.

Senator MCCAIN. I would be very interested in seeing those areas of any significance that have been taken over by the Lebanese military. Obviously, Hezbollah controls the areas of Southern Lebanon that they want to. They now have veto power over any action that the Lebanese government might take. Both Prime Minister Hariri and Walid Jumblatt both said that they had to go to Damascus, both individuals whose fathers had been assassinated by Hafez al Assad.

So your rosy scenario is not corroborated by the facts on the ground, which is an indication of our weakening position throughout the region because of our failure to act.

I guess my time is expired.

Chairman LEVIN. Thank you, Senator McCain.

Senator Reed.

Senator REED. Thank you very much.

General Cartwright, we will all acknowledge that a sanctions approach is not a magic wand. Is a military approach a magic wand?

General CARTWRIGHT. No, Senator, it's not. When you look at the military side of the equation, we are working hard to support things like sanctions and other diplomatic activities in the region with the capabilities of strengthening the region's military, strengthening nation states to be able to defend themselves, and

PX371

30

improving capabilities in the area. But, military activity alone is not likely to be decisive either.

Senator REED. Let's just take it a step further; if you want to reserve comments at the closed session, that's fine. The usual proposal for a military action is some type of discreet strike to disrupt the nuclear facilities in Iran. I presume that would not be 100 percent effective in terms of knocking them out. It would probably delay them, but that if they're persistent enough, they could at some point succeed.

Is that a fair judgment from your position?

General CARTWRIGHT. That's a fair judgment.

Senator REED. So, the only absolutely dispositive way to end any potential weapons program would be to physically occupy their country and to disestablish their nuclear facilities. Is that a fair, logical conclusion?

General CARTWRIGHT. Absent some other unknown calculus that would go on, it's a fair conclusion.

Senator REED. After 7 years in Iraq and more years in Afghanistan, are military forces prepared to conduct such an operation?

General CARTWRIGHT. I think our military forces with high confidence could undertake such an operation. But, I think that there would be consequences to our readiness and to the challenges that we already face in this Nation economically to pay for a war, et cetera.

Senator REED. With consequences within Iraq and Afghanistan?

General CARTWRIGHT. With consequences in Iraq and Afghanistan.

Senator REED. How many forces do you think it would be necessary to conduct such an operation?

General CARTWRIGHT. I'd reserve that for a closed session, sir.

Senator REED. More than we have committed already into Afghanistan and Iraq?

General CARTWRIGHT. I'd prefer to reserve that for closed session.

Senator REED. General Burgess, I think Senator Lieberman's acknowledgement of your testimony is very accurate. It is very sobering and very appropriate. But, I just want to continue on the issue that the IRGC is not a rogue force.

Now, I'll ask a question which may be a very dumb question. Is that good or bad? If there is a connection to a political organization, does that limit their operations or does it in any way constrain their operations or is it something that empowers them more?

The other side of the equation would be, there are countries where there are truly rogue forces that are controlled by no one. I think of Pakistan, and entities which are not controlled by the government; but controlled by security agencies, like Lashkar-E-Tayyaba, who pose potentially even more destabilizing roles. One of the real dangerous points about the Mumbai attack was if the Pakistanis knew about it, that's bad; if they didn't know, it's much worse.

So can you comment upon that?

General BURGESS. Sir, I think what I would say in this setting is that, as I laid out in the testimony, the Quds force, the IRGC folks, that there is some control that is directed from on high. How much and within what bounds that is put on them is not some-

31

thing I'm prepared to go into detail on. So, when we say they are not a rogue force, they are not truly, totally independent operators. There is some cognizance on high.

Senator REED. Again, a question, I think, from your answer is something that we will consider in closed session or with more of a debate and a conclusion. Is political control an opportunity that we might exploit in terms that the political leadership constrains them or is that something that further empowers them? I think we will need to defer the debate to later.

General BURGESS. Yes, sir.

Senator REED. Secretary Flournoy, you mentioned that it was a successful election in Iraq. The election was successful, very much so. I just returned from there recently as so many of my colleagues did.

The Iranians spent a lot of effort trying to consolidate the Shia into a block that would effectively insist upon a Shia-controlled government. The election was, in many respects, a vindication of nationalism and secularism, which was a significant, I think, achievement. Now, we're into the formation of government.

I think the Iranians lost the election. They're trying to win the formation. All the parties have gone to Tehran to talk to the Iranian forces. Can you comment now about the process going forward, in terms of the Iranian influence in the formation of the Iraqi Government and the longer-term in Iraq?

Ms. FLOURNOY. The Iranians did seek to influence the election, and they were not very successful. The parties they backed most strongly did not do all that well. That was the same result we saw in the provincial elections last year.

I think the Iraqi people are pretty clear that they don't want a government that's made in Tehran. There were talks that began in Tehran since then. The parties have also traveled to Turkey, to Saudi Arabia, and to other neighbors in the region.

I think those who are most likely to be in a position to actually form a government have asserted their commitment for inclusion of all the blocks represented and so forth. I think Iran has had a history now, over the past several years, of overplaying its hand in Iraq. It tried to stop the Status of Forces Agreement and the Strategic Framework Agreement, and it didn't succeed. It was funding militants in Basra, yet a successful offensive was conducted against them. They tried to influence the last two elections, and their candidates and parties have not done so well.

So, yes, they're trying to influence the process. Yes, we have to watch their meddling very carefully. But, I don't think they're going to be successful because I think, ultimately, Iraqi nationalism will trump Iranian meddling.

Senator REED. Thank you, my time is expired.

Chairman LEVIN. Thank you, Senator Reed.

Senator Thune.

Senator THUNE. Thank you, Mr. Chairman. Thank you all for being with us today and for your service to our country.

Secretary Flournoy and Secretary Burns, does it remain U.S. policy to prevent Iran from achieving a nuclear weapons capability?

Ms. FLOURNOY. Yes, sir.

32

Senator THUNE. Would you say that, absent a credible military threat, Iran is less likely to come to the negotiating table and suspend its nuclear program?

Ms. FLOURNOY. I think the President has been very clear that all options are on the table. Right now, we believe the best combination is diplomatic engagement and pressure.

Senator THUNE. I want to come back to the discussion you were having with Senator McCain regarding U.N. Security Council resolutions. I think the President has said that he's not interested in waiting months for a new sanctions regime to be in place. I'm interested in seeing that regime in place in weeks.

With regard to the potential timing of that, I guess the question I would have is, how long will the United States seek a U.N. Security Council resolution on Iran before moving on to other sanctions?

Ambassador BURNS. Senator, the President has been very clear that we want to achieve the strongest possible sanctions resolution in the shortest possible time, this spring. We're working very hard toward that end. Formal negotiations on the new resolution have begun in New York now with the Russians and Chinese participating.

I can't give you an exact date. All I can tell you, sir, is we share the same sense of urgency about getting this done as quickly as we can and sending the strongest possible message to Iran.

Senator THUNE. If that doesn't come into place in the near future, is the United States willing to act with partners outside the U.N. context to impose the type of crippling and biting sanctions that you've been talking about for the past year?

Ambassador BURNS. Senator, I do believe it's possible to achieve that result in New York. As I said, I think it's also possible then to use that as a platform for taking some of the other kinds of measures that the EU, for example, has taken in the past. I think that's the most effective approach for us to take right now.

Senator THUNE. There was, Secretary Burns, a story in the Sunday, March 7, New York Times that the Federal Government has awarded billions of dollars in contracts to companies that are doing business in Iran or were at the time of the contract. According to the article, 49 companies that currently do business with the United States are doing business in Iran and show no signs of ceasing that activity. Many of these companies are subsidiaries of major U.S. corporations.

If the United States is to have any credibility as we seek international sanctions on Iran, shouldn't we start by barring subsidiaries of U.S. corporations from doing business with Iran?

Ambassador BURNS. Sir, we take very seriously the concerns that were raised in that article. I think it's worth noting that half of the companies that were mentioned in that New York Times article have already pulled out of business in Iran.

With regard to the question of subsidiaries, sir, American companies are already prohibited from doing business with Iran. If American companies seek to create subsidiaries simply for the purpose of evading U.S. law, the Treasury Department has legal basis to go after them, and does it. With regard to foreign subsidiaries of U.S. companies, we've already seen in recent weeks some movement in

PX371

33

the right direction; both Halliburton and Caterpillar's foreign subsidiaries have pulled out of their business connections in Iran. We took the basis for the article very seriously. We're continuing to push hard.

Senator THUNE. Are we doing enough to target the banks that are doing business in Iran or that are sanctioning companies that are doing business with the IRGC? It just seems like you continually hear these stories and those reports. We talk about targeting their dependence upon imported gasoline and cutting off financing through the banks that are supporting it.

I'm hard pressed to see where we're taking the steps that are necessary and effective, if we're serious about putting the pressure that you talk about on that regime.

Ambassador BURNS. Senator, a number of companies, foreign companies, and banks, if faced with the choice between doing business with the United States and doing business with Iran are making, what from our point of view, the right choice. The tally sheet, as you look at, has a number of major banks. I mentioned Deutsche Bank and HSBC. The number of companies that have ceased gasoline sales to Iran, including Reliance, Vitol, and Lukoil, the Russian company most recently, is increasing.

I think our efforts are having an impact and we continue to work very hard at that.

Senator THUNE. The clock is ticking.

Ms. Flournoy and General Cartwright, I wanted to get your views on another subject. That's the ongoing development of the air/sea battle concept that is being proposed and specifically how it's going to affect our military strategy toward Iran. The Quadrennial Defense Review (QDR) directs the Navy and the Air Force to develop this new joint air/sea battle concept for defeating adversaries with sophisticated anti-access and area denial capabilities.

Could you provide your views on the development of this new air/sea battle concept, and how does this concept fit into our overall strategy with regard to dealing with Iran?

General CARTWRIGHT. The concept, as it's articulated in the QDR, is to look at anti-access capabilities, particularly in those nations that are bordered by oceans, seas, et cetera. What kind of capabilities in the 21st century we do believe DOD will need in order to penetrate those types of sophisticated counters? As we look at Iran, probably the areas of greatest relevance, and I'll defer also to Ms. Flournoy, are those things that are associated with the straits and narrows. Areas that are difficult are defined by being more easily defended with shorter-range capabilities and less sophisticated capabilities because of the lack of strategic depth and our ability to either prevail directly in the face of those threats or to work around them. A lot of what we're trying to understand is how do you find the synergies between those things that come from the sea and those things that are inherently long-range or otherwise tactical air.

How do you find the synergy to work against those types of threats, detect them, and then find a kill chain that would allow you to penetrate the area?

PX371

34

Senator THUNE. Can I just ask you to follow up? In your view, how will long range strike capability fit into that, this new air/sea battle concept?

General CARTWRIGHT. One of the key issues of long-range strike or the attributes of long-range strike is that it can close generally with a target much quicker than a surface force. So, from the standpoint of wearing down the offenses or eliminating them before you actually have to close with them, it gives you that opportunity.

Senator THUNE. Anything to add, Ms. Flournoy? Ok. My time is up. Thank you, Mr. Chairman.

Chairman LEVIN. Thank you very much, Senator Thune.

Senator Hagan.

Senator HAGAN. Thank you, Mr. Chairman. I, too, want to thank the witnesses for coming and giving us your testimony today. I think it's important having DOS and DOD here discussing this issue.

We know that Iran's nuclear weapons program, along with its military assistance to groups such as Hamas, Hezbollah, and the insurgency in Iraq and Afghanistan, serves as a threat to our national security interest. The nature of this challenge requires a whole-of-government approach that employs all aspects of national power. Has the administration formulated plans that integrate the diplomatic, informational, military, and economic instruments of national power into a comprehensive strategy that addresses the threat that Iran presents? Secretary Flournoy and Secretary Burns, if you all can comment on that?

Ambassador BURNS. Yes, ma'am. I think the short answer is yes. We've described, I think, a number of the elements of that comprehensive strategy. It's an enormously difficult challenge. But, I can't think of a higher priority for the United States than addressing that challenge energetically and forcefully.

Those elements include what we're trying to do diplomatically, both the effort at engagement, but also economic and political pressure because they complement one another. They're both parts of diplomacy. Also, the efforts that Under Secretary Flournoy has already described are continuing quietly to strengthen our security cooperation with our partners in the region, particularly in the Gulf. There are a range of other efforts that we make with partners around the world on this issue.

Ms. FLOURNOY. I would say that complementing our efforts for diplomatic engagement and economic pressure is changing attitudes. What we see in the region is actually a number of countries who share a great concern and anxiety about Iran's behavior and their capabilities development. They are actually starting to cooperate much more closely with us and with each other. We see this in terms of the essence of our defense cooperation, in terms of ballistic missile defense cooperation, in terms of the bilateral and multilateral conversations, information sharing, and plans coordination that's going on.

I would contest the idea that the balance of power is shifting to our enemies. We actually see Iran's behavior driving a lot of our friends closer to us and closer to each other in the Gulf region.

Senator HAGAN. Thank you. During the 2006 Lebanon war between Hezbollah and Israel, as well as during the 2007–2008 Gaza

PX371

35

conflicts between Hamas and Israel, both Hamas and Hezbollah demonstrated weapons arsenals that were larger than many other small nations. Many of the weapons and munitions employed by Hamas and Hezbollah can be directly linked to supplies provided by Iran.

Secretary Flournoy and General Cartwright, what steps, if any, is DOD taking to disrupt the proliferation of Iranian weapons and weapons technology to non-state actors throughout the region?

Ms. FLOURNOY. We have increased our intelligence focus on this. We've increased our intelligence sharing with others in the region. We have been bolstering their anti-smuggling capabilities in a number of partner states, so they can be more effective interdicting and stopping some of these flows. We're also applying substantial pressure to those states that are facilitating this movement of goods.

I don't know if you want to add anything?

General CARTWRIGHT. I think all of those things are true. This is still a difficult problem. I wouldn't want to lead you to believe that we've effectively cut the stream off.

We are working very hard with every capability that we have, in addition to trying to improve the capabilities, particularly of the nations that have these borders that are somewhat porous. But, this is a difficult problem.

Senator HAGAN. Secretary Flournoy, when you mentioned our intelligence focus, and you're sharing smuggling information with the other nations, are they actually doing something and taking active steps with the intelligence?

Ms. FLOURNOY. We see a mixed record. We could go into the details in closed session. Some countries are and some are not doing everything we would hope.

Senator HAGAN. Thank you. Despite the fact that many Iranian reformists are now in prison, and there are many that believe that the Green challenge of the most recent election has significantly narrowed the base of the regime to hard-line purists that are backed by revolutionary security forces. I was wondering, Secretary Burns, do you believe that the Green challenge has weakened Ahmadinejad's regime, and how serious would you consider the unrest within Iran to be?

Ambassador BURNS. I think that the concerns you saw manifested on the streets of Tehran and other Iranian cities are very real. I don't think they've gone away. I think they reflect a deep discontent. I think we've seen fissures not only between the regime and much of the population, but also within the leadership itself.

It's very difficult to predict, but I think they're very real issues.

Senator HAGAN. Thank you. We've been talking a lot about the sanctions. To my knowledge, no firms have been sanctioned under the Iran Sanctions Act (ISA) since its enactment in 1996. The ISA was then expanded during the 110th Congress and additional provisions have been passed by the House and Senate that, I think, are currently in conference.

Secretary Burns, what has the administration determined during its investigation into investments of Iran for violations of ISA, and what steps does the administration plan to take to ensure that the penalties are imposed for violations of this act?

PX371

36

Ambassador BURNS. First, ma'am, as I mentioned before, we have tried to make very active use of ISA and of existing U.S. law to discourage firms from doing business with Iran. There have been some specific instances of that actually occurring. At the same time, we go through scores of reports of new business deals, particularly in the energy sector, being done with Iranians. We have a number that have been highlighted by Members of Congress and are primarily within this administration; our preliminary review of that shows that a number of those cases raised by Members of Congress are in fact, problematic.

We're trying to make sure that we get this right because it means sifting through a lot of different information, some of which turns out to be unfounded, but some of it real. We look forward to staying in very close touch with Congress as we work through the results of that effort. We'd also be glad to provide a briefing in closed session about some of the results of the efforts so far.

Senator HAGAN. Ok. Thank you, Mr. Chairman.

Chairman LEVIN. Thank you very much, Senator Hagan.

Senator Brown.

Senator BROWN. Thank you, Mr. Chairman. Thank you all for coming and participating. Mr. Chairman, thank you for your leadership.

I know I'm new here, but one of the things that's always concerned me long before I got here was the fact that I don't believe that Iran takes us seriously when it comes to demanding full disclosure with regard to their nuclear capabilities. Iranian unemployment is high. Their cash reserves are dwindling, if not depleted. Their citizens are anxious for change.

We had, I felt, an opportunity to help them at some point in recent memory to effectuate change. It's always been my feeling that the answer is not in the U.N., but it's in the EU, and us really implementing draconian sanctions to effectuate change. It really comes down to the money; without money and without the refining products that they need to survive, they're not going to do anything. They're going to continue to string us and the world communities along and continue to develop their nuclear program. It doesn't take a brain surgeon to figure it out.

I'm concerned that every day that we delay is another day that they have to get closer to the capability to export terrorism around the region and the world.

Once again, I'm new here. I don't want to be disrespectful. But, what is the administration's plan when it comes to either exerting pressure or trying to work with France, Russia, and the other countries that have substantial financial assets in this region? Without their assistance, quite frankly, and without pulling the plug on the finances, I don't think we're going to be getting anywhere.

I'd like either Secretary to respond to that.

Ambassador BURNS. Yes, sir. First we share, absolutely, your sense of urgency. You're absolutely right about the consequences of a nuclear-armed Iran.

What we're seeking to do is mobilize the strongest and widest possible international pressure. A U.N. Security Council resolution is an important part of that because for many of our European allies, in particular, that provides an extremely valuable platform for

PX371

37

them to consider further measures that the EU can take. We're going to push as hard as we can, as I've said before, to achieve that range of measures as quickly as we can, not only in the U.N. Security Council, but also in terms of what we can do with others.

Senator BROWN. I just got back from Afghanistan and Pakistan, and I obviously heard of the influence of Iran, obviously in Afghanistan. As I'm aware, and as you're aware, there are two economic sanctions bills, one in the Senate, one in the House. I may be missing something, but I know health care is important to the administration. I know that now we're talking about financial regulation reform, and we may be doing immigration reform. We're not focusing on jobs, number one, though every other country that I just visited, Afghanistan and Pakistan, is.

I would think that these two bills that are in conference committee would be one of the top priorities of the administration. I'd like to know what influence or what activity the administration is putting on something that I think is a vital national security, not only to us, but to the rest of the world. I don't know; maybe I'm not privy to the information, but what's being done trying to get these bills passed, so we can get some real teeth and stop fooling around with Iran?

Ambassador BURNS. Senator, we want to continue to work with Congress to try to shape that legislation, so it's going to have the most effective impact. What I mean by that, sir, is to use whatever measures that the United States takes in a way that's going to encourage more countries and more companies to move out of business with Iran and that's not going to penalize those countries that are actually with us and moving in the right direction. That's why we want to work with you and your colleagues very much to try to achieve.

Senator BROWN. One final question, Mr. Chairman. I recently got back from Afghanistan, and one of the major concerns of not only the Karzai government, but of our leaders there is the influence that Iran is having there. What are some of the lessons that you learned in Iraq in curtailing Iranian influence that we can use in Afghanistan?

This is probably best for Secretary Flournoy, I would believe.

Ms. FLOURNOY. Again, I think that Iran, when its efforts to influence have become widely known by the populations it's seeking to influence, such as in places like Iraq or Afghanistan, those efforts have tended to be rejected. Again in Iraq, the reaction has been fairly consistent and strong. I think in Afghanistan, they are playing a double game where they are providing some support to try to influence the government while they're also trying to support and influence elements in the insurgency there.

I think that the more that meddling is exposed, the more it is rejected by the population they're trying to win over. I think that is a common lesson that will apply in both places.

Senator BROWN. In conclusion, Mr. Chairman, and through the people here speaking in front of us, I would just encourage more action. Like I said, I hate to keep saying I'm new here, but the people in my State, the people in this Country, and the people who are directly affected by what's happening in Iran are very, very con-

38

cerned about what's happening there and the delay, the delay, the delay, the talking, and the delay.

At some point, I'm hopeful that the administration will make this one of its top priorities and start focusing on the security of that region because a nuclear Iran and its ability to export terrorism throughout that region and the world should make people very, very concerned. I would ask you to pass that message to the President, as I plan to do. Thank you.

Chairman LEVIN. Thank you, Senator Brown.

Senator Wicker.

Senator WICKER. Thank you, Mr. Chairman. There has been a general agreement with the statement of Secretary Gates that Iran will not have the capacity to build a nuclear weapon for at least another year. General Cartwright, I'll begin with you and then perhaps General Burgess might also participate in this line of questioning.

I think that the testimony today has been that a year from now, it is possible that Iran might have attained the capacity to build a nuclear weapon. Is that correct, General Cartwright?

General CARTWRIGHT. I think there are several caveats that are associated with that. When we discussed it earlier, it was in the context of the ability to produce sufficient fissile material for a weapon. It didn't include the assembly, the testing, and all the things that go into a weapon. We could get into that more in the closed sessions.

Senator WICKER. Let me try a little more in a public forum. Is there anything you can tell us about their ability actually to assemble and actually have in their possession a nuclear weapon, to be able to deliver that nuclear weapon, or would a test be necessary for them to have any confidence level that they actually had something there?

I think the ultimate question on the minds of not only our constituents, but of people around the world, is when, based on what the Secretary has said publicly, might they have the capacity to harm another people?

General BURGESS. Sir, I think, as we said in the earlier discussion, they have enough LEU now that, if they further process and enrich that that in a year, if they continue to take that, they would have enough material for one weapon. I think anything further than that in this forum would be too much.

Senator WICKER. Alright. We'll just wait for the closed session on that.

Secretary Burns, you mentioned this scenario in an answer to Senator Lieberman's question of actually a nuclear-armed Iran and the things we would have to worry about in that regard. You mentioned a nuclear arms race, the harm done to the credibility of the U.N., and the devastating effect it would have on our efforts to prevent terrorist groups. Did I miss your saying that there would be the actual possibility of the weapon being detonated and actually harming someone in the neighborhood? Is there a reason why you did not mention that?

Ambassador BURNS. No, sir. There are many dangers connected with a nuclear armed Iran. Obviously, one of those dangers is actu-

39

ally the use of a weapon, which would have catastrophic consequences.

Senator WICKER. Are you able in an unclassified setting, such as this, to say when you think that ultimate act might occur? When might Iran be capable of taking that ultimate act?

Ambassador BURNS. No, sir. I think that's probably better left to a closed session.

Senator WICKER. Ok. Let me ask you then we have had optimistic testimony today about a meaningful sanctions resolution this spring. It is now April 14. I'm told that Iran is not on the U.N. Security Council agenda for April. Is that correct? Do we take anything from that, or is it a matter of simply changing the agenda on a moment's notice?

Ambassador BURNS. No, sir. What has started in New York is a very intensive negotiation amongst the five Permanent Members as well as Germany, the so called P5+1, about a new resolution. That's very much on the agenda of all of those members right now.

We're going to work as hard and as fast as we can.

Senator WICKER. Would it mean anything if the matter were placed on the official agenda of the U.N.? Would it bring any pressure to bear?

Ambassador BURNS. Sir, I leave the tactics to my colleagues at our mission in New York. It's a complicated challenge, and it's been very difficult in the past because we're talking about, of course, not only the 5 Permanent Members, but also the 10 elected members.

We have a great deal of work to do, and I don't want to underestimate the challenge. All I can tell you is we have no higher priority right now than trying to achieve that.

Senator WICKER. When we're talking about spring, Mr. Chairman, we're talking about April or May. This is a very optimistic scenario that you've painted.

I noticed today in the Los Angeles Times, China insisted on Tuesday that it has not shifted its approach on Iran's nuclear programs, despite White House claims on Monday that Beijing had become more open to sanctions on Tehran. A spokeswoman for the Chinese Foreign Ministry, Jiang Yu, told reporters in Beijing that, "China has always believed that sanctions and pressure cannot fundamentally resolve the issue."

Would you care, Mr. Secretary, to respond to that? Is this something different from what you and administration officials heard in person from Chinese leaders during the meeting in Washington?

Ambassador BURNS. Sir, what I would say is first, the Chinese also made clear in that same statement their strong support for the dual-track approach, which is not only about engagement, but also about pressure.

Second, they have agreed, after months and months of resistance, to engage directly in the negotiation of the text of the new resolution.

Third, I do believe that China is increasingly aware of many of the risks that you mentioned before to the stability in a part of the world that matters greatly to China and to its own economic hopes and hopes for economic growth. China also has a stake in the credibility and integrity of the U.N. and the nonproliferation regime.

PX371

40

Senator WICKER. Do you feel that China has, in fact, shifted its approach as a result of the last 2 days?

Ambassador BURNS. I do. Simply because up until a few days ago, the Chinese were not prepared to engage directly in negotiations over a new resolution; now they're participating actively in that process.

Senator WICKER. Lastly, if I might, Mr. Chairman. I see there's no one waiting behind me, and there may be follow up questions.

Chairman LEVIN. There are, but I think Senator Chambliss may wish to speak shortly.

Senator WICKER. If I could ask one question about taking things off the table because the chairman began with this. Does this, Secretary Flournoy, Nuclear Posture Review take anything off the table with regard to our subject matter today?

Ms. FLOURNOY. No, it does not, sir.

Senator WICKER. So, the language on page viii about strengthening the longstanding negative security assurance and when and where we would use nuclear weapons against non-nuclear weapon states that are part of the NPT, do those pertain to any country in this region that we're discussing today?

Ms. FLOURNOY. The negative security assurance is for a pledge that we will not use or threaten to use nuclear weapons against a given country and applies to countries who are non-nuclear, signatories to the NPT, and are in full compliance with their NPT obligations. Those are the criteria. In this case, Iran does not fit those criteria at this point.

Senator WICKER. Thank you, sir.

Chairman LEVIN. Thank you, Senator Wicker.

Senator Chambliss.

Senator CHAMBLISS. Thank you, Mr. Chairman.

Secretary Flournoy, gentlemen, I think it's pretty obvious that there's frustration with respect to this issue. That frustration didn't just start with this administration. This issue has been ongoing for some time.

I certainly share the thoughts that Senator McCain expressed and Senator Brown obviously expressed also about the fact that, in the eyes of the American people, we seem to be treading water on this issue while Iran is just sitting back and doing their thing and, frankly, almost sticking their finger in our eye. It really is, as Senator McCain said in so many words, time to quit ratcheting up the rhetoric and start ratcheting up the activity.

If we don't, we're going to look back and all of a sudden they're going to have a weapon. I'm not certain with all that I've learned over the years that we can do anything to stop that now. But, I appreciate what you said, Secretary Burns, about the opportunity that may be there.

Several of us just got back from Vienna and meeting with Director General Amano and other folks at the IAEA. Frankly, the previous leadership at the IAEA, in my opinion, was no leadership at all. It was extremely weak under ElBaradei.

Director General Amano is really taking this issue on head first. It has seemed like he has accomplished more in a few weeks than ElBaradei accomplished in several years. I'm hopeful that with his help that your optimism may bear fruit.

PX371

41

Let me direct this to Secretary Flournoy, General Cartwright, and General Burgess. How concerned are you that Iran has now told us that they are enriching uranium to 20 percent?

Ms. FLOURNOY. I think any steps that Iran takes to go down the enrichment path are worrisome. We are concerned about that. Even though that is not a weapons grade level, we don't want to see them making progress.

The fact is, they have also been having some technical problems with their program, as well.

Senator CHAMBLISS. Do you think they have the capacity to turn that uranium into fuel?

Ms. FLOURNOY. Into fuel for power reactors or for weapons usable fuel?

Senator CHAMBLISS. Into weapons.

Ms. FLOURNOY. I think that is certainly their aspiration. I think if they went down that path we would, at this point in time, know about it.

Senator CHAMBLISS. The IAEA expressed concern to our group about military work and design. Certainly that may be somewhat explained by work on conventional weapons. But, when you look at the combination of this added enrichment, plus their obvious work on weapon systems, it seems so.

General Burgess, maybe I'll direct this to you. Is there anything you can tell us about what may be going on with the combination of those two factors now in public?

General BURGESS. Sir, that would be better in a closed hearing.

Senator CHAMBLISS. Ok. General Cartwright, could you comment on the capabilities of IRGC naval forces, particularly as it relates to their ability to deny us access to the Strait of Hormuz in-between the Persian Gulf and the Gulf of Oman? Several CENTCOM commanders have, in the past, discussed Iran's military hardware acquisitions, and the development tactics seem to indicate that they might be posturing themselves in a manner that would allow them to deny us access to that area.

General CARTWRIGHT. Senator, I think in general terms, they are fortifying their capabilities to either reduce or deny access or constrict it. The difficulty here is one of tactics and objectives. If they close the straits off, they're closing off their only supply lines also. This would be a pretty significant activity in their calculus. But, to have the physical capacity to attempt to do that, they are moving in that direction.

We believe that we would be able to maintain the straits. But, it would be a question of time, impact, and the implications from a global standpoint on the flow of energy, et cetera, would have ramifications probably beyond the military actions that would go on.

Senator CHAMBLISS. General Burgess, when General Petraeus was before the committee about 3 or 4 weeks ago, we discussed the, at least public, dwindling of influence by the Iranians in Iraq. With the election dispute ongoing between Prime Minister Malaki and former Prime Minister Allawi, have you determined that there may, again, be increased Iranian influence being undertaken with respect to the dispute that seems to be ongoing internally?

42

General BURGESS. Sir, we've seen no discernable change in the actions. The Iranian folks are still trying to play on the ground with the current situation. But, it's the stuff that they're doing day to day.

It would be unfair for me to characterize recent activity as if we've seen a change with this latest election piece going on.

Senator CHAMBLISS. How about from a weapon standpoint?

General BURGESS. Sir, there have been no discernable change from what we have seen in the past.

Senator CHAMBLISS. Any change in weapons going into Afghanistan that you've noticed out of Iran?

General BURGESS. No, sir. I would say what we have seen in the past has been the current tempo. Most recently, we found a cache there around Herat, that was found in 2009, with some movement of some stuff in Iranian C–4 explosives and some other items. I think the Chairman of the Joint Chiefs has talked about that up here before.

Of course, what is unknown is when did it go into the country of Afghanistan? We don't know.

Senator CHAMBLISS. Ok. Thank you, Mr. Chairman.

Chairman LEVIN. Thank you very much, Senator Chambliss. We're going to move to executive session, but I want to clarify something before we do that. This has to do with the testimony you've given us; should Iran make a decision to do so, it could produce enough HEU in a year for one weapon. You indicated that response to my question and other questions.

U.S. intelligence agencies, according to Reuters yesterday, believe that Iran won't be capable of producing nuclear weapons for at least a year. But, it would probably be technically able to do so, if it chooses, within 3 to 5 years. Now folks, we have to clarify this issue before we leave here today, if we can, in public.

In terms of the HEU, your answer is clear. It would take about a year should they decide to do that. To move to 80 percent or more enrichment, it would take a year or more, about a year, to produce enough for one weapon. Okay, we're there with the new fuel for a weapon.

Now, you indicated in terms of putting together a weapon, that assembling a weapon is a different issue. We need an open session to learn something about that, since intelligence officials apparently are indicating that's something more than a year now. I know a number of us tried to get this, but help us out. Otherwise, your headline tomorrow is Iran can get a weapon in a year. That's going to be what's reported, unless you clarify that the uranium part of a weapon could be highly enriched in a year for one weapon.

Take the other pieces; tell us what you can, General Cartwright, in terms of number one, capability. I'm not sure how that's different from what they have now, which is capability. But, tell us what you can, should they make a decision today to put together a weapon.

We know the uranium piece of it. Tell us about the weapon development piece or what you can, in open session.

General CARTWRIGHT. I think the way I would approach that, Senator, is to say there are assumptions we made and talked about with the enriched material and getting us out to a year. When we

PX371

43

look at other examples of development, there is a trend that would say that it would take, already having the uranium, another 2 to 3, potentially out to 5 years, to move from the idea of having the material to a deliverable weapon that is usable.

Chairman LEVIN. No, I didn't say deliverable. I said put a weapon together.

General CARTWRIGHT. Then let's say usable tactically. Something that can actually create a detonation, an explosion that would be considered a nuclear weapon.

Chairman LEVIN. Now, what if this happened simultaneously? What if the enrichment to 80 percent or more started tomorrow and the decision to assemble a weapon happened tomorrow? Give us, then, your estimate of how long it would be before they would have a weapon.

General CARTWRIGHT. Again, I can't put that on a particular country. In other words, I can't put that on Iran. What I can tell you is that experience says that it's going to take you 3 to 5 years.

Chairman LEVIN. Ok.

Senator MCCAIN. Mr. Chairman, I'd like to pursue that if I could. You're saying to this committee that before the Iranians would have a deliverable nuclear weapon, it could be as long as 5 years?

General CARTWRIGHT. Senator, I can't tell you what problems they will encounter. I am telling you that, historically, going from having sufficient fissile material to a weapon takes that time.

Senator MCCAIN. We're asking for your assessment as to when they will have a nuclear weapon that is deliverable because that is obviously a very critical point in this entire situation. If it's 2, to 3, to 5 years, then that's one thing; if it's 1 year, then that's another.

Also, we seem to uncover from time to time additional facilities that the Iranians either have or are constructing. I guess that contributes to this dramatic difference between 1 year and 2, to 3, to 5 years. Every report I've seen is a year to 18 months. That's why I'm somewhat astonished to hear you say it could be 2, to 3, to 5 years.

Now, I'm not sure. This doesn't clarify it to me.

Chairman LEVIN. We're going to stay here until we get a clear answer on this. We have to. Yesterday the headline, Reuters, read "U.S. officials see Iran nuclear bomb probable in 3 to 5 years."

We're going to go through it again. Leave the deliverable part off. That assumes a missile, I think.

General CARTWRIGHT. Right.

Chairman LEVIN. Leave that off. If the decision were made today, by Iran, to put together a nuclear weapon, we understand that it would take 1 year on the HEU. Again, we got it.

Now, that doesn't put together. That's not the whole weapon. They have to put the weapon together, right?

Should they decide today to do that simultaneously, in parallel, to work on the HEU as they work on the assembly, tell us what you can from the IC's assessment about how long would it take for them to assemble a weapon based on everything you know about?

General CARTWRIGHT. Senator, again, you're asking me to know things I can't know, but 3 to 5 years is what I would tell you.

Chairman LEVIN. That is your best assessment?

44

General CARTWRIGHT. Yes, sir.

Chairman LEVIN. Ok. Now in terms of the missile, that's a totally separate issue. That's the deliverable part.

I assume when you say deliverable, is that a different factor because they would have to marry a weapon to a missile? They'd have to have a missile, and then it depends long-range, medium-range, and short-range capability.

Tell us what you can about the deliverable part, assuming that there's a missile involved. Now, they can deliver a weapon without a missile tactically, right? You can detonate a weapon without a missile. So the 3 to 5 years is the weapon piece.

Now, adding on the missile piece, what can you tell us about that?

General CARTWRIGHT. Again, I would probably tell you, not knowing exactly where they are in their capability, that it would still take them another 3 years. That does not necessarily mean it would be sequential.

Chairman LEVIN. Ok. That could be done in parallel, theoretically, too. Is that correct?

General CARTWRIGHT. Yes, sir.

Senator MCCAIN. Ok. Could I just ask again?

Chairman LEVIN. Sure.

Senator MCCAIN. They could develop a nuclear weapon, and it's going to be 3 years or longer.

General CARTWRIGHT. A nuclear weapon for a country, historically, takes 3 to 5 years.

Senator MCCAIN. I'm not asking about a country historically. I'm asking about Iran.

General CARTWRIGHT. Again, I'd rather take that particular question, to get to the exact assumptions, into a closed session, Senator. I can tell you that, normally such that that is, that with the HEU, you're still dealing in 3 to 5 years to create a weapon.

Chairman LEVIN. Is that sequential or could that be done together?

General CARTWRIGHT. It could be done in parallel.

Chairman LEVIN. Which means the 3 to 5 could include the 1 year for the HEU?

General CARTWRIGHT. Potentially.

Chairman LEVIN. Ok. Senator Lieberman?

Senator LIEBERMAN. Thanks, Mr. Chairman. The obvious point to me, as I hear you, is the best we can ask you to do is make predictions based on history. Obviously, no one knows or can say the future with any certainty.

But, I just want to come back to something Senator Reed referred to, which was my reference quoting President Obama yesterday about sanctions not being a magic wand. Senator Reed went on to say that military action isn't a magic wand and raised the prospect and took you down a road, a hypothetical, of the only way we can be certain that we could stop Iran from having a nuclear weapon is if we occupied Iran.

I want to say first, from my point of view, that all options are on the table. That's not anything I've heard anyone really, seriously talk about. I think what anyone is talking about is, if it becomes necessary to use military force to stop the unacceptable, which is

PX371

45

an Iranian nuclear program, either covert action on the ground and/or limited strikes from the air, so that whatever might be necessary.

I just don't want to leave the impression because then Senator Reed asked you about what effect the ground invasion of Iran or occupation of Iran would have on our activities in Iraq and Afghanistan. I don't think anybody is thinking of that. I certainly am not.

I wanted to say one final word about General Burgess' prepared testimony. One of the things he also does here is to lay out, in very powerful form, how weak the conventional military of Iran is. That's very important for us to acknowledge.

General Cartwright, going back to what I just said, do you agree that the United States enjoys an overwhelming advantage of conventional warfare against Iran including particularly with regard to air and naval capability?

General CARTWRIGHT. I do.

Senator LIEBERMAN. In the event it is needed, and I'm not saying anybody is planning to do so, is it within the military power of the United States to establish air and naval dominance over Iran?

General CARTWRIGHT. It is.

Senator LIEBERMAN. In the event that we chose to do so, is it within the military power of the United States to strike the Iranian nuclear program in a way that would seriously disrupt and delay it?

General CARTWRIGHT. I'd like to take that to closed session.

Senator LIEBERMAN. Ok, because that's what we're talking about here. In the end, the one sure way for Iran to not go nuclear is for its people and government to decide not to go nuclear. That's where I come back to what President Obama said yesterday about sanctions. That's the whole aim of sanctions. I quote again, "what they're aimed at accomplishing is changing the calculus of a country like Iran, so they see there are more cost and fewer benefits to pursuing a nuclear weapons program." I might add, for myself, that I think there's a higher probability that that calculus will change if they think we're serious about all the options that are on the table including military. Do you agree with that?

General CARTWRIGHT. I do, Senator. The reason that we believe that the sanctions and other measures, short of military activity, are important is because they give us more time, more decision time, more opportunities to intervene in ways that are nonkinetic.

Senator LIEBERMAN. Understood. I appreciate that. I thank you very much.

Chairman LEVIN. Can you please describe nonkinetic for the layperson?

General CARTWRIGHT. Not requiring military attacks.

Chairman LEVIN. Thank you.

Senator Chambliss.

Senator CHAMBLISS. I'll direct this to Secretary Burns, but anybody else should feel free to respond. It looks to me like, Mr. Secretary, you've set your own time table and that is 12 months. That's the best guess, according to General Cartwright, that they could be weaponized.

If that's the issue that we're going to prevent, then we have to have sanctions put in place in time to stop the weaponization of

PX371

46

Iran within 12 months. Now, that means in my mind pretty significant sanctions are going to have to be put in place to work within a short period of time. Is there a plan in place to work within a short period of time? Is there a plan in place with respect to those sanctions that we can talk about in this setting?

Ambassador BURNS. Senator, first I'll defer to General Cartwright on this, but I don't think we're talking about weaponizing in 12 months. The conversations suggest a different kind of time-frame for that.

That does not, however, diminish the sense of urgency we feel about putting in place the strongest possible sanctions regime. That means using a U.N. Security Council resolution. That also means looking at measures we can employ and have employed in the past.

It involves us continuing to push foreign companies to sever their ties with Iran in a variety of sectors. We're going to keep pushing on all those fronts just as hard as we can and as fast as we can.

Senator CHAMBLISS. Secretary Flournoy, did you want to add something?

Ms. FLOURNOY. I just wanted to add with regard to the time that we have taken for engagement and to work the sanctions piece through the U.N. There are steps that we can take unilaterally and we have taken unilaterally. But, our judgment is that, if we really want to impose pressure on Iran that actually affects their calculus, the only way to be effective is to do that multilaterally, to have the international community with us.

I think the fact that we made a good-faith engagement with Iran has actually brought more of the international community with us now that we are moving on the pressure track. The fact that we're taking the time to try to get a U.N. Security Council resolution will provide the legal and political framework that will get us more effective measures by others, like the EU, down the road. I think that the timeframe is frustrating for all of us, but I think we will be much more effective having taken the time to bring the international community with us to apply coherent and cohesive pressure on Iran.

Senator CHAMBLISS. Let me go back to General Cartwright. I think Senator Levin is right. We need to walk away from here with clarity.

Now, I understood you to say that, in your opinion, Iran could have a nuclear weapon within 12 months and, within 3 to 5 years, they'd have the capability of delivering that. Now are you saying something different from that?

General CARTWRIGHT. I am, sir. I'm saying 3 to 5 years is an historical estimate of how long it takes a nation with a low enriching capability to move both through the high enrichment protocols and then to the things that would put it together to make it a weapon. That is 3 to 5 years. One year was the discussion about how long it would take to produce HEU.

Senator CHAMBLISS. Ok.

Chairman LEVIN. Since I think that's probably the clearest summary that we've had, we probably ought to stop and quit while we're ahead. [Laughter.]

This hearing has been very useful to us.

PX371

47

First of all, we thank you all for coming in, particularly Secretary Burns. We know it's not always the case that we have a DOS representative here. In this case, it was important. We very much appreciate it.

We hope we've not gone beyond what it is appropriate in our questions. We know you wouldn't in your answers for you to address. Hopefully the unity of this committee, and I think you've heard here how much strength and unity we feel and have about this issue, about stopping Iran from getting a nuclear weapon, came through today. We hope that that unity that you heard here, and the American people will hopefully hear from this committee and this Congress, will help you in your efforts to gain support internationally for what you're trying to do.

We hope that's one of the outcomes. We know that information is an important outcome for us and the American people. It's also important that Iran hear a very strong, unified message about Congress standing behind strong measures.

Hopefully, that will help you in gaining those strong measures that can be used without military force. The military option has to be there, we believe, but I think most of us, maybe all of us, hope for you to succeed in your diplomatic efforts as well. It's serious, and there's great unity of purpose.

We thank you all for your testimony. We'll see you right after we all run over and vote. There's a vote on the Senate floor. We'll see you over in the Office of Senate Security in the Capitol Visitor Center in a classified session. We stand adjourned in the open session.

[Questions for the record with answers supplied follow:]

QUESTIONS SUBMITTED BY SENATOR DANIEL K. AKAKA

SANCTIONS PLANNING

1. Senator AKAKA. Secretary Burns, President Obama recently stated that one of the greatest threats to U.S. and global security is nuclear proliferation. Despite previous rounds of sanctions and the threat of additional sanctions, Iran has declared that it will continue development of its nuclear program. What happens if this round of negotiations and sanctions fails to slow or stop Iran's program?

Secretary BURNS. The administration remains committed to its dual-track strategy, which ultimately presents Iran with two choices: It can rejoin the international community economically and politically by fulfilling its international obligations under the Nuclear Non-Proliferation Treaty and to the U.N. Security Council and International Atomic Energy Agency (IAEA), or it can face increasing pressure and condemnation for its non-compliance.

At the moment, we are focused on securing broad international support for a new U.N. Security Council resolution with meaningful sanctions followed by states' adopting additional national measures. We believe that these kinds of multilateral measures can most effectively underscore to the Iranian Government the cost of defying the international community. They are also the most difficult to evade.

Of course, we continue to work independently and with our allies to take measures to deny Iran access to the technology and know-how it needs to develop further its nuclear program, and are working with our partners to limit Iran's ability to use the international financial system to fund its proliferation activities.

Ultimately, as the administration has said before, all options are on the table.

2. Senator AKAKA. Secretary Flournoy, has the Department of Defense (DOD) considered how to stop Iran's nuclear program if negotiations for sanctions, or if sanctions, fail to stop Iran's nuclear program? Please explain what DOD is doing to address Iran's nuclear program and the long-term implications for U.S. national security.

Secretary FLOURNOY. DOD is committed to supporting the dual-track strategy of engagement and pressure and believes it is premature to talk about other options. The Department supports the current policy by focusing on enhancing regional secu-

PX371

48

rity cooperation with partners in the Middle East. This focus not only reassures anxious states in the region, but also sends a clear signal to Iran that pursuit of nuclear weapons will lead to its own isolation and in the end make it less—not more—secure. In addition, it is the Department's responsibility to conduct prudent military planning, but as the Secretary has made clear, while all options remain on the table, he does not view use of kinetic force as the preferable course of action.

3. Senator AKAKA. Secretary Burns, while U.S.-Iran economic relations are limited, the United States has a key interest in Iran's relations with other countries. As some European countries have curbed trade and investment dealings with Iran, other countries, such as China and Russia, have emerged as increasingly important economic partners. Iran also has focused more heavily on regional trade opportunities, such as with the United Arab Emirates. What courses of action can the United States take to encourage others to curb trade and investments with Iran with the goal of getting Iran to give up its nuclear weapons ambitions?

Secretary BURNS. The United States will continue to make clear to the international community—both to governments and private sector—that Iran is not a good place to do business. As part of our efforts to increase the pressure on Iran to change its leadership decisionmaking calculus, the U.S. Government has actively engaged with foreign governments and companies to urge them to avoid commercial activity with Iran. These efforts are bearing fruit, as we are seeing a positive trend of companies recognizing the increased risks of doing business in or with Iran and announcing that they are either discontinuing their operations there or committing not to engage in any new activity with Iran. So far this year, more international firms have announced they are leaving Iran or undertaking no new business, than in the last 5 years combined. These companies include Ernst & Young, Price Waterhouse Coopers, Lloyds, ABB Ltd., Caterpillar, Daimler AG, the Huntsman Corporation, Ingersoll Rand, Linde, Siemens, Allianz, Munich Re, Baker Hughes, ENI Spa, IPG, Glencore, Lukoil, Reliance Ltd., Smith International, Trafigura, Vitol, and Total. Repsol also recently informed us that they are abandoning their negotiations over a $10 billion project in the South Pars gas field.

4. Senator AKAKA. Secretary Burns, I understand that the administration is currently working with the United Nations Security Council (UNSC) Permanent Five Members Plus Germany (P–5+1) to establish sanctions against Iran in an attempt to compel Iran to abandon its nuclear weapons ambitions. However, P–5+1 countries maintain significant trade and financial interests with Iran. In today's challenged world economy, these interests are all the more significant. Given these significant trade and financial relationships, how can the United States ensure that potential UNSC sanctions have the best chance of success? Please describe any efforts the Department of State (DOS) is undertaking in this regard.

Secretary BURNS. The most effective sanctions are those that have the broadest international support. These can most effectively underscore to the Iranian Government the costs of defying the international community. They are also the hardest to evade.

We have been very clear in our message to both foreign governments and the international commercial sector that there are risks to doing business in Iran, especially as it continues to violate its international obligations on multiple fronts. We have seen that a number of companies are responding to the increased political risk of doing business in Iran. We will continue to be aggressive in our efforts on this front, as well as current efforts to impose additional accountability on Iran through expanded multilateral sanctions.

AMERICAN IMAGE

5. Senator AKAKA. Secretary Burns, public diplomacy is an important complement to traditional diplomacy in states like Iran, where large and youthful populations are frustrated by the government's failure to produce opportunities. What are your views on increasing the budget for U.S. radio, Internet, and video broadcasting to Iran and the possibility of cultural exchanges?

Secretary BURNS. With nearly three quarters of Iran's population under the age of 30, the vast majority of people living in the Islamic Republic were born after Ayatollah Khomeini's rise to power and most were only toddlers during the Iran-Iraq war. As a result, this new generation's perception of their place in the world is fundamentally different from that of their parents' generation. It is clear that the Internet and new media tools are playing an integral role in connecting Iranians to each

PX371

49

other and to the outside world, as well as providing a unique tool for Iranians to hold their government accountable.

The Department's Persian Digital Outreach Team is actively utilizing innovative approaches to reach Iranian youth through social networking and connective technologies. We post material on U.S. policy, Iran-U.S. relations, and American society on a wide variety of Persian-language web forums, blogs, and social media platforms such as Facebook, YouTube, Friendfeed, and Twitter that are widely used in Iran. Our social media presence reaches Iranian youth of various political views and ensures that the United States is represented in new media and conversation spaces. Additional resources would allow the State Department to broaden existing programs and explore innovative ways to leverage social networking tools and the traditional media to maximize the effectiveness of our diplomatic initiatives.

The Broadcasting Board of Governors (BBG) media programming for Iran, including the Voice of America's Persian News Network (PNN) and Radio Free Europe/ Radio Liberty's Radio Farda, are among the very few Persian-language media outlets where the Iranian people can receive uncensored, unbiased, and current news and information. After the June 2009 elections in Iran, additional broadcasts were added as a temporary surge. The administration's request for fiscal year 2011 fully supports the pre-surge funding levels for Radio Farda and the PNN. The BBG expects to evaluate the situation in Iran going forward in fiscal year 2011, and will prioritize programming accordingly.

6. Senator AKAKA. Secretary Burns, do you believe that additional media and exchange initiatives would help change the U.S. image presented to young Iranians by their government?

Secretary BURNS. Given the lack of diplomatic ties with Iran for more than 30 years and the Iranian Government firm grasp over all forms of media, we are currently limited in our ability to influence how the government of Iran portrays the United States to its citizens. In light of this, we must continue efforts to directly engage the Iranian people so that their image of the United States is based on engagement with us, rather than what they are told by their government. Continued and enhanced people-to-people exchanges help fight misinformation, build cooperation, and lay the foundation for improved relations between the United States and Iran. We also need to continue expanding the use of social networking and connective technologies to not only get our message out but to also engage with the Iranian people via digital platforms.

Allocating additional resources would allow us to respond more effectively to the demographic shift in Iran by ramping up our digital outreach efforts in Persian, expanding engagement with Iranian youth, and improving our ability to rapidly respond to Iranian misinformation campaigns using multiple media platforms.

MISSILE DEFENSE

7. Senator AKAKA. General Cartwright, the administration modified its missile defense plans in the fall of 2009 to now include the Phased Adaptive Approach. Please provide your thoughts on the potential utility of the systems developed for this new approach with respect to our Iran policy and the previous missile defense approach.

General CARTWRIGHT. One of the key factors in changing our approach to European missile defense was updated assessment of the threat, specifically from Iran. The Phased Adaptive Approach and the land-based SM–3, or "Aegis Ashore" systems being developed were chosen for their ability to better defend against threat missiles originating in Iran. The first envisioned role of Aegis Ashore is defense of our forces, allies, and partners in Europe, and this new system will do that with greater effectiveness than the previous approach of two-stage Ground-Based Interceptors stationed in Europe. This effectiveness will be measured in both the capacity of the Aegis system's larger quantity of interceptors to respond to more threat missiles, as well as the system's ability to defend against the medium-range ballistic missiles which comprise the most immediate threat to Europe. Additionally, these capabilities are scheduled to be available in the 2015 timeframe, 3 years earlier than in the previous approach. These capabilities will contribute to the overall effort to deter Iranian aggression.

PX371

50

8. Senator MCCASKILL. Secretary Burns, Iran has a history of projecting its regional influence by strong-arming weaker countries in the region or inserting itself into the political affairs of countries such as Iraq and Afghanistan to throw off the efforts of the United States. I am particularly concerned about its role with neighbors Afghanistan and Pakistan. How would you characterize the relationship between Pakistan and Iran at this time?

Secretary BURNS. While I cannot speak for other governments, as neighbors with economic, cultural, and religious ties, Iran and Pakistan both seem interested in maintaining a cordial relationship. Within the Pakistan-Afghanistan-Iran trilateral framework, both countries have exchanged views and agreed to coordinate their positions to support peace, stability, and development in Afghanistan. The Pakistan-Iran relationship, however, is strained by a number of competing interests. Ongoing differences over the future of Afghanistan cause tension, as does Pakistan's concern that Iran seeks to promote its sectarian Shiite socio-political model in Pakistan's Shia communities. Iran, for its part, fears Pakistan's relationship with elements of the Taliban. Iran is also troubled by Pakistan's ties with the West, particularly by the security relationship between our two nations.

9. Senator MCCASKILL. Secretary Burns, how would you characterize the relationship between Afghanistan and Iran at this time?

Secretary BURNS. Iran pursues multiple agendas in Afghanistan, where it has strong historical, cultural, and economic ties. The Iranian economy has long been intertwined with the northern and western Afghanistan economy, and Iran has engaged significantly in Afghan politics since the Bonn Conference of 2001, in which it played a constructive role in encouraging the formation of an interim government. Iran's overall role is ambiguous, however, as it also pursues policies that undermine U.S. and NATO efforts in Afghanistan. While it provides constructive development assistance, we continue to receive reports that indicate Iran may also be providing military assistance to some insurgents.

10. Senator MCCASKILL. Secretary Flournoy, Secretary Burns, General Cartwright, and General Burgess, is Iran exacerbating the difficulties the United States and its partners face on the Afghanistan-Pakistan border?

Secretary FLOURNOY. Iran is playing a double game in Afghanistan. It provides rhetorical and material support for the Afghan Government while also providing sustained material support to insurgents, thus impeding U.S. and allied efforts to stabilize the country. Tehran generally sees the Taliban as an enemy and does not want to see them back in power. Nevertheless, Iran has provided limited lethal assistance to the Taliban to hedge against increased U.S./Western presence on its eastern border.

Secretary BURNS. According to Afghanistan authorities, Iran has increased its cooperation with Afghan border guards to improve security on its border with Afghanistan. We, however, remain concerned that Iran has provided lethal support to elements of the Taliban, which is used against Afghan and NATO security forces, and international and Afghan civilians. Apart from these indications of support to the Taliban, we have no indications of significant Iranian activity along the Pakistan-Afghanistan border. We will continue to call on Iran to cease all such destabilizing support and work with Afghanistan forces to better deter, detect, and disrupt illicit border activities.

General CARTWRIGHT. Iran is playing a double game in Afghanistan. It combines rhetorical and material support for the Afghan government while providing a continuing amount of material support to insurgents thus impeding U.S. and allied efforts to stabilize the country. Tehran generally sees the Taliban as an enemy and does not want to see them back in power. Nevertheless, Iran has provided limited lethal assistance to the Taliban to hedge against increased U.S./Western presence on its eastern border.

General BURGESS. [Deleted.]

11. Senator MCCASKILL. Secretary Flournoy, Secretary Burns, General Cartwright, and General Burgess, how would you characterize Iran's relationship with the Afghan Taliban, so-called Pakistani Taliban, Haqqani network, and other Pakistan-based terrorist groups?

Secretary FLOURNOY. Iran continues to provide lethal assistance to the various elements of the Afghan insurgency. Tehran's support for these groups is inconsistent

51

with its historic enmity, but fits with Iran's overall strategy of backing many groups to ensure a positive relationship with potential leaders, and hedging against foreign presence. However, ultimately because it does not share the same historic ties and ideological goals Iran does not have the same type of relationship with Afghan insurgent groups as it does with surrogates such as Shia militants in Iraq or Hezbollah in Lebanon.

Secretary BURNS. As a predominantly Shia country, Iran has an ambivalent relationship with the militant Sunni Taliban. It also remembers the 1998 murder of eight Iranian diplomats by the Taliban in Mazar-i-Sharif as well as Taliban atrocities against the Shia Hazara population of Afghanistan. While Iran has no interest in seeing the Taliban insurgency succeed, they are also uneasy about the large U.S. and NATO military presence on Iran's eastern border and do provide tactical support to select Taliban as a means to make this presence costly for the United States and our allies.

Iran's primary instrument for providing lethal support to the Taliban is the Islamic Revolutionary Guards' Qods Force, an element of the Iranian Government. This same organization provides weapons and training to the terrorist Hizballah organization and to select groups of Shia militants in Iraq.

General CARTWRIGHT. [Deleted.]

General BURGESS. [Deleted.]

DRUG TRAFFICKING

12. Senator MCCASKILL. Secretary Flournoy and General Cartwright, Afghanistan's opium trade that emanates throughout Asia, Europe, and elsewhere is a significant problem that vexes the U.S. Government. Iran, too, is wrestling with its own serious illegal drug issue; the UN estimates it has over 2 million addicts. Moreover, Iran is also a major transit route for drugs emanating from Afghanistan, many of which are bound for use in Europe. Given our non-normalized state of relations with Iran, how does DOD factor Iran into our regional counter-narcotics strategy?

Secretary FLOURNOY. The current interdiction effort in Afghanistan should result in fewer opiates exporting through Iran. We have bolstered the border crossing point in Islam Qalah in the northwest region of Afghanistan bordering Iran. Iran has made significant efforts to counter the drug flow coming from Afghanistan and has strengthened its borders with Afghanistan to bolster their efforts. DOD looks to DOS for diplomatic engagement with Iran on these issues during Paris Pact and United Nation meetings.

General CARTWRIGHT. The current interdiction effort in Afghanistan should result in fewer opiates exporting through Iran. We have bolstered the border crossing point in Islam Qalah in the northwest region of Afghanistan bordering Iran. The Department looks for ways to coordinate counternarcotic efforts with Iran, but given the current relationship between our two countries, it is difficult. Iran has made significant efforts to counter the drug flow coming from Afghanistan and has strengthened its borders with Afghanistan to bolster their efforts.

13. Senator MCCASKILL. Secretary Flournoy and Secretary Burns, how are we addressing Iran's role as a transit point for opium emanating from Afghanistan?

Secretary FLOURNOY. DOD has not focused specifically on Iran as a transit zone for Afghan opiates. DOD is, however, working with bordering nations, including Turkmenistan, Pakistan, and Turkey, to curb the flow of Afghan opium entering Europe and Asia. A whole-of-government approach, focusing on diplomacy, needs to be taken to address this issue.

Secretary BURNS. We are working with Afghanistan to build a border security force that has the manpower and resources to enhance border monitoring, detection, and disruption capabilities. In addition, we work closely with Iran's other neighbors, particularly Turkey and the Central Asian states, on border security and narcotics interdiction.

14. Senator MCCASKILL. Secretary Flournoy and Secretary Burns, although Iran has an obvious national interest in fighting the flow of drugs, does the Iranian state profit in any way from the illicit drug trade?

Secretary FLOURNOY. [Deleted.]

Secretary BURNS. The Iranian Government has taken aggressive actions to interdict the flow of drugs on its border, and the Iranian Government does not, as a matter of policy, encourage or facilitate illicit production or distribution of narcotic or psychotropic drugs or other controlled substances, or the laundering of proceeds from illegal drug transactions. That said, we cannot rule out the possibility that cor-

PX371

52

rupt government officials may be taking advantage of the drug trade to line their pockets.

15. Senator McCASKILL. Secretary Flournoy and Secretary Burns, how are DOD and DOS working with other regional actors, such as Turkmenistan, to address the issue of drug trafficking through Iran?

Secretary FLOURNOY. The U.S. Embassy Ashgabat has an internal counternarcotics working group consisting of State International Narcotics and Law Enforcement, State Political/Economics, State Export Control and Border Security (EXBS), and DOD representatives. This working group provides the Deputy Chief of Mission recommendations for counternarcotics programs and projects. As a result of this working group's efforts, and DOD counternarcotics funding, construction was completed on a border crossing point at Altyn Nasir. Moreover, there is funding in fiscal year 2010 to construct a second border crossing point at Sarahs. Both border crossing points are on the Iranian border. DOD counternarcotics has also provided training, scanning equipment, and radio communications equipment. In fiscal year 2010 DOD will continue to provide training and additional communications equipment.

DOD counternarcotics also supports counternarcotic efforts in Pakistan, building naval forces capacity to detect, monitor, and interdict drug shipments along the Makron Coast, some of which are headed for Iran.

Secretary BURNS. The State Department's bilateral assistance programs in Central Asia foster border security, law enforcement, and counternarcotics efforts that contribute to a regional solution to the Afghanistan-origin drug trafficking problem. Implementing partners include the U.N. Office on Drugs and Crime (UNODC), the International Organization for Migration (IOM), and various U.S. Government agencies. The U.S. Government appropriated over $7 million toward counternarcotics programming in Turkmenistan in fiscal year 2009. DOS's EXBS program works to develop the capacities of border officials and facilities in Central Asian countries. The State Department Bureau of International Narcotics and Law Enforcement Affairs works to develop the capacity of law enforcement agencies in the region to interdict narcotics and investigate drug-related crime, in cooperation with national governments and the UNODC. On a multilateral level, the U.S. Government has provided $3.8 million over 10 years for the development of the Central Asian Regional Information and Coordination Center, an information-sharing and operational coordination body that targets drug trafficking in the region.

The State Department and DOD also work closely in Turkmenistan to improve the capabilities of Turkmenistan's border guard to interdict narcotics along the Turkmen-Iranian border. DOD funded the construction of the Altyn Asyr border checkpoint, a main commercial port-of-entry on the Turkmen-Iranian border. In addition, the State Department has funded UNODC to conduct training of border guards and customs officers at this port-of-entry. DOD and State have followed a similar construction/training model at ports-of-entry at the Turkmen/Afghan and Turkmen/Uzbek borders. Additionally, U.S. Central Command has provided $1.875 million in communications equipment toward counternarcotics efforts along Turkmenistan's borders.

16. Senator McCASKILL. Secretary Flournoy, Secretary Burns, and General Burgess, do we have effective drug detection and interdiction capabilities along the Afghan-Iranian border?

Secretary FLOURNOY. Drug detection and drug interdiction are primarily law enforcement missions. However, DOD requested funding in fiscal year 2010 for a border crossing facility at Zaranj on the border with Iran, and we recently expanded Afghan Border Police training to cover Afghan policemen from Regional Command West at a training site in the village of Shouz. That site will train up to 3,700 Afghan Border Police personnel per year, many of whom will be posted on the Afghan border with Iran. As the lead agency for drug interdiction, the Drug Enforcement Administration may be able to provide additional information on its interdiction operations along the Afghan-Iranian border.

Secretary BURNS. The State Department is working with the Afghan Government to improve its drug detection and interdiction capabilities along the Afghan-Iran border, including efforts to build a border security force that has the manpower and resources to enhance border monitoring, detection, and disruption capabilities. The Department also encourages regional and multilateral initiatives, such as the UNODC's Triangular Initiative, which is designed to strengthen border control cooperation between Afghanistan, Iran, and Pakistan. I would refer you to DOD for further specific information on their work in the area.

General BURGESS. [Deleted.]

53

17. Senator McCaskill. Secretary Flournoy and Secretary Burns, has there been any cooperation with Iran on the issue of drug interdiction, either through the Afghans or through other third-party actors?

Secretary Flournoy. Historically, Iran, Pakistan, and Afghanistan do not conduct coordinated counternarcotic operations, although these countries have recently formed a partnership called the Triangular Initiative to improve their efforts to combat narcotics trafficking. We support increased cooperation among these countries on counternarcotic efforts.

Secretary Burns. The United States does not have any direct, bilateral cooperation with Iran on drug interdiction in the Afghan border area. However, the U.S. Government has engaged Iran on drug interdiction efforts in multilateral forums such as the March 2010 meeting of the U.N. Commission on Narcotic Drugs, which was chaired by Iran. We also work on narcotics interdiction efforts directly with Iran's neighbors, such as Afghanistan, Turkey, and the Central Asian states, and in various regional forums like the Triangular Initiative, which in turn engage Iran directly on these issues. In Afghanistan, for example, we have worked with that nation's government to build a border security force that has the manpower and resources to enhance border monitoring, detection, and disruption capabilities.

IRAN SANCTIONS ACT

18. Senator McCaskill. Secretary Flournoy, the Iran Sanctions Act (ISA) was supposed to penalize companies doing business with the Iranian regime and supporting the Revolutionary Guard in particular. However, the U.S. Government has not enforced the ISA, in part due to concerns about reaction from allies. At the same time, DOD has spent millions on contracts with foreign and U.S. firms that violate the ISA. I realize that DOD and DOS are making some progress in dissuading some companies from doing business with Iran, but I feel like we have a long way to go for a robust enforcement of the ISA. Does DOD currently have contracts with companies who could be considered in violation of the ISA? If so, please provide a listing of these companies and reasoning as to why there is need for contracting with these companies.

Secretary Flournoy. We are concerned that the proposed Iran sanctions language in the fiscal year 2010 supplemental bill does not contain a presidential waiver provision for national security interests. As drafted this could seriously degrade DOD's ability to provide fuel support to military operations, including in Iraq and Afghanistan. DOD awards contracts to affiliates of BP, Shell, ENI, and Total, all of which are listed on the DOE/EIA website as doing business in Iran. Under the bill as currently written, these would become prohibited sources. While the contracts awarded to these firms represent less than 20 percent of the total contracts awarded by Defense Energy Support Center, they represent critical support in critical locations. For example, Shell is the supplier of JP–5 for the east gulf coast; Total holds 66 percent of the into-plane contracts for Africa and is the only source of aviation gasoline outside the United States. We are also concerned about the impact of Iran sanctions legislation on Turkish firms that truck fuel into Iraq, and on the Kuwaiti national oil company that supplies the majority of the fuel for operations in Iraq.

19. Senator McCaskill. Secretary Flournoy, does DOD have structures in place to vet companies for violations of ISA or other sanctions?

Secretary Flournoy. The Defense Logistics Agency, which is DOD's largest logistics combat support entity, and provides worldwide logistics support to the military services as well as several civilian agencies and foreign countries, uses Federal Acquisition Regulation 25.1103(a) to vet companies who violate the ISA or other sanctions. This regulation requires insertion of the following clause into every solicitation, contract, and subcontract: "(a) Except as authorized by the Office of Foreign Assets Control (OFAC) in the Department of the Treasury, the Contractor shall not acquire, for use in the performance of this contract, any supplies or services if any proclamation, Executive order, or statute administered by OFAC, or if OFAC's implementing regulations at 31 CFR chapter V, would prohibit such a transaction by a person subject to the jurisdiction of the United States. (b) Except as authorized by OFAC, most transactions involving Cuba, Iran, and Sudan are prohibited. . . . Lists of entities and individuals subject to economic sanctions are included in OFAC's List of Specially Designated Nationals and Blocked Persons. . ."

DLA contracting officers are required to check the list of Specifically Designated Nationals before awarding a contract in order to verify that the offeror and offeror's negotiators are not on the list.

54

QUESTIONS SUBMITTED BY SENATOR MARK BEGICH

COMPANIES OPERATING IN IRAN

20. Senator BEGICH. Secretary Burns, which energy companies and banks still do business in Iran?

Secretary BURNS. Given the large size of the global energy sector and our lack of an embassy presence in Iran, we do not have a comprehensive list of all of the energy companies that do business in Iran. Both the Government Accountability Office and the Congressional Research Service have published reports on companies doing business in certain parts of the energy sector. It is important to note, though, that these reports often rely on open source reporting, which we have found to be sometimes unreliable with respect to Iran. Furthermore, as you likely know, pursuant to our statutory obligations under the ISA, we track and monitor all of the major upstream development activities that could trigger sanctions under the act. The ISA has been a particularly useful tool which has been used to convince foreign companies to consider their interests in the United States when making decisions about participating in oil and gas development projects in Iran. We have convinced a significant number of companies to reduce or terminate their dealings with Iran in order to avoid additional scrutiny by our government. Partially as a result of our coordinated and comprehensive efforts, major international oil companies including Total, Statoil, ENI, Lukoil, and others have publicly committed not to undertake any new activities in Iran at this time. Repsol also recently informed us, but have not announced publicly, that they have taken the decision to discontinue their participation in the Persian LNG project. Other companies such as Shell, Reliance, Vitol, Trafigura, Glencore, and IPG have announced that they will no longer sell refined petroleum products to Iran.

With respect to the banks that are doing business in Iran we would refer you to the Department of Treasury, which is the agency that tracks this sector most closely.

21. Senator BEGICH. Secretary Burns, which companies have recently abandoned operations in Iran due to U.S. or international pressure?

Secretary BURNS. The United States is making clear that Iran is not a good place to do business. As part of our efforts to increase the pressure on Iran and change the Government of Iran's decisionmaking calculus, the U.S. Government has actively engaged with foreign governments and companies to urge them to avoid commercial activity with Iran. These efforts are bearing fruit, as we are seeing a positive trend of companies recognizing the increased risks of doing business in or with Iran and announcing that they are either discontinuing their operations there or committing not to engage in any new activity with Iran. So far this year, more international firms have announced they are leaving Iran or undertaking no new business, than in the last 5 years. These companies include Ernst & Young, Price Waterhouse Coopers, Lloyds, ABB Ltd., Caterpillar, Daimler AG, the Huntsman Corporation, Ingersoll Rand, Linde, Siemens, Allianz, Munich Re, Baker Hughes, ENI Spa, IPG, Glencore, Lukoil, Reliance Ltd., Smith International, Trafigura, Vitol, and Total. Repsol also recently informed us that they are abandoning their negotiations over a $10 billion project in the South Pars gas field.

IMPACT OF SANCTIONS

22. Senator BEGICH. Secretary Burns, what U.N. sanctions have been imposed on Iran?

Secretary BURNS. Since 2006, Iran has been under international sanctions for failing to comply with U.N. Security Council resolutions that require it, primarily but not exclusively, to suspend its enrichment of uranium. The process of imposing Security Council sanctions came after a 2006 "referral" of the issue to the Council by the IAEA.

U.N. Security Council Resolution 1737, adopted about 6 months after the formation of the P5+1 working group on Iran's nuclear program, was the first U.N. resolution to actually impose sanctions on Iran for its refusal to suspend the enrichment of uranium and to meet other Security Council demands. Most significantly, 1737 sets up a process whereby the Security Council designated Iranian entities and persons as involved in its weapons of mass destruction (WMD) programs, and mandates U.N. member states freeze the assets on their territories that are owned or controlled by these entities. This list of designated entities was expanded in subsequent U.N. Security Council resolutions.

55

U.N. Security Council Resolution 1747 was adopted to further tighten international sanctions on Iran because of its refusal to meet the demands of previous resolutions, particularly the requirement that Iran suspend enrichment of uranium. It added a large number of entities and Iranian persons, mostly Revolutionary Guard commanders, subjected to those sanctions specified in Resolution 1737. UNSCR 1747 is also significant in that, in Annex II, it presents an incentive package to Iran, agreed by the P5+1 to try to induce Iran to comply. That package of incentives was further enhanced in June 2008. In addition, this resolution expanded sanctions beyond those applying directly to the nuclear program by banning Iran's export of arms. U.N. Security Council Resolution 1803, adopted March 3, 2008, imposed additional new sanctions on Iran. Resolution 1803 was particularly significant for imposing a mandatory ban on travel by certain Iranian persons named in Annex II to the resolution, going beyond the purely voluntary ban on travel imposed in Resolution 1747. Resolution 1803 also gave U.N. member states the authority to inspect cargo carried by Iran Air Cargo or the Islamic Republic of Iran Shipping Line if there is reason to suspect the vehicles operated by these entities are carrying WMD or other prohibited technology to Iran. Other measures, such as restricting export credits to Iran and ending dealings with several Iranian banks, are stipulated in the resolution but are not mandatory.

A subsequent resolution, 1835, reiterated the international community's insistence on Iranian compliance, but did not add any new sanctions.

23. Senator BEGICH. Secretary Flournoy, Secretary Burns, General Cartwright, and General Burgess, has there been any notable changes to Iranian conduct after past enactment of sanctions?

Secretary FLOURNOY. Sanctions are an imperfect tool and by no means a silver bullet. However, they do have both a material and psychological effect, particularly when they have broad international support. As such, I believe that if effectively targeted and leveraged, sanctions will have a substantial effect on the Iranian leadership's calculus. Whether that effect will bring Iran back to the negotiating table or convince it to make material concessions on its nuclear program remains to be seen.

Secretary BURNS. We believe that our multilateral efforts over the past several years have had an impact on Iran, which we seek to amplify through additional pressure. Past IAEA and UNSC resolutions have been effective in restricting Iran's access to materials, equipment, and technology that would make a material contribution to its nuclear program. These sanctions have also underscored the danger of business dealings with a country that stands in serial violation of its international obligations. As a result, dozens of businesses over several years have withdrawn from business in Iran, increasing Iran's isolation from international financial centers and trade.

General CARTWRIGHT. I will have to defer to Secretary Burns to provide a competent answer on this point. I am unable to state if there have been changes in Iranian conduct after sanctions were enacted.

General BURGESS. [Deleted.]

SENATE VERSION OF NEW IRANIAN SANCTIONS

24. Senator BEGICH. Secretary Flournoy and Secretary Burns, does the administration support the Dodd-Shelby Comprehensive Iran Sanctions, Accountability, and Divestment Act (S. 2799)?

Secretary FLOURNOY. The administration does not support the legislation as currently drafted but shares Congress's concerns and sense of urgency, and welcomes tools that will increase the pressure on Iran to meet its international obligations. The administration has already shared a number of ideas with Congress on changes it would like to see to the legislation, and we look forward to continuing to work with Congress to craft an appropriate way to achieve these common objectives.

Secretary BURNS. We believe that Congress and the administration share the objective of achieving Iran's compliance with U.N. Security Council Resolutions and the NPT. Accordingly, we have been working with the appointed Senate and House conferees to craft an appropriate way to achieve these objectives as the legislation goes through conference. Our goals remain the same: to change Iran's decision-making on its nuclear program, to keep our international coalition together so that Iran sees clearly the unity it faces, and to maintain the President's flexibility to conduct foreign policy.

PX371

56

QUESTIONS SUBMITTED BY SENATOR GEORGE S. LeMIEUX

TERRORIST NETWORKS IN SOUTH AND CENTRAL AMERICA

25. Senator LeMIEUX. Secretary Burns, one of my great concerns is the partner-ship developing between Iran and Venezuela. In an indictment earlier this year, a Spanish judge accused the Basque separatist group Euskadi Ta Askatasuna (ETA) and the narco-terrorist organization based in Colombia, Revolutionary Armed Forces of Colombia (FARC), of plotting to kill Colombian politicians in Spain with Ven-ezuelan governmental cooperation. I am concerned that these terrorist groups could use the networks employed by organized crime organizations, drug traffickers, and narco-terrorists such as the FARC to smuggle terrorists or materials to support ter-rorism into the United States. What specific measures has the administration taken in the last 12 months to ensure Iranian ties with the Venezuelan Government do not facilitate operations by Hezbollah and Hamas in South and Central America?

Secretary BURNS. We are concerned with the increasing links between Iran and Venezuela and will continue to monitor this relationship closely. While we see a growing Iranian interest in and engagement with Venezuela, at this time, it appears to be largely diplomatic and commercial. As with any country, we fully expect Ven-ezuela to meet its own international responsibilities and obligations, such as the U.N. Security Council's strict prohibition on trade in certain goods with Iran.

Where merited, we have taken targeted actions including: In October 2008, the Treasury Department designated both the Export Development Bank of Iran and its wholly-owned subsidiary in Caracas, Banco Internacional de Desarrollo, CA, for pro-viding or attempting to provide financial services to Iran's Ministry of Defense and Armed Forces Logistics. This designation prohibits all transactions between the des-ignees and any U.S. person, and freezes any assets the designees may have under U.S. jurisdiction. In June 2008, Treasury froze the assets of two Venezuelans for providing financial and other support to Hezbollah.

GREEN REVOLUTION

26. Senator LeMIEUX. Secretary Burns, what assistance is the United States or relevant nongovernmental organizations providing the Green Revolution in Iran?

Secretary BURNS. In addition to the moral support we lend activists working for civil rights in Iran, we continue to quietly help Iranians acquire the tools to create the space—on the Internet, in journalism, and in the arts—where free thought and expression can flourish. Since 2004, the State Department has supported projects to help Iranian civil society make its voice heard in calling for greater freedoms, ac-countability, transparency, and rule of law from its government. However, we do not fund political parties, movements, or factions. As the President has said, we are not interfering in the debate Iranians are having about their election and its aftermath. This is a debate among Iranians, about Iran's future.

Respecting the sovereignty of Iran, however, does not mean our silence on issues of fundamental rights and freedoms, such as the right to peacefully protest.

27. Senator LeMIEUX. Secretary Burns, do you see the Green Revolution in Iran as a strategic opportunity for substantive change for the Iranian people?

Secretary BURNS. It is still too early to tell what lasting impact the Green Move-ment will have on Iran's internal political dynamics, but prospects for reform re-main uncertain. While we have not seen large-scale protests by the Green Move-ment in several months, deep rifts between the government and much of the public, and between various factions within the government, continue to persist. Unfortu-nately, we have not seen an end of the government's repressive tactics to stifle dis-sent or criticism.

IRANIAN MILITARY

28. Senator LeMIEUX. General Cartwright, Secretary Clinton recently commented that the Iranian military is probably playing a significant role in running Iran. "We see that the Government of Iran, the supreme leader, the president, the parliament, is being supplanted, and that Iran is moving toward a military dictatorship. Now, that is our view." What is your assessment of the role the Iranian Revolutionary Guard currently plays in governing the country?

General CARTWRIGHT. [Deleted.]

PX371

PURSUIT OF NUCLEAR WEAPONS TECHNOLOGY

29. Senator LeMieux. Secretary Flournoy, Secretary Burns, General Cartwright, and General Burgess, over the weekend, Secretary Gates said that it was the U.S. assessment that Iran was not yet nuclear capable. Last March, the CIA's Weapons Intelligence Nonproliferation and Arms Control Center (WINPAC) reported, "Iran continues to develop a range of capabilities that could be applied to producing nuclear weapons, if a decision is made to do so." How confident is the administration that the Iranian regime will not make the decision to produce nuclear weapons once they have the capability?

Secretary Flournoy. This answer is best given by the Intelligence Community (IC). I refer you to Lieutenant General Burgess's classified response.

Secretary Burns. A U.N. Security Council resolution alone is unlikely to bring about the change in Iran's policies that we seek. But, in combination with the implementation of pressure across a wide array of Iranian interests, we believe this is the best way to bring about a shift in Iran's strategic calculus.

General Cartwright. I will have to defer to Secretary Flournoy to provide a competent answer on this point.

General Burgess. [Deleted.]

30. Senator LeMieux. Secretary Flournoy, Secretary Burns, General Cartwright, and General Burgess, it seems the WINPAC report contradicts the 2007 National Intelligence Estimate assessing that Iran was "less determined to develop nuclear weapons than we have been judging since 2005." Do you agree?

Secretary Flournoy. Iranian nuclear intentions remain an issue of paramount interest and concern to the intelligence and the policy communities. As new information emerges, and as the Iranian nuclear program evolves, we evaluate and reassess Tehran's ultimate intentions. At this time, we continue to assess that Iran is keeping open the option to develop nuclear weapons in part by developing various nuclear capabilities that bring it closer to being able to produce such weapons, should it choose to do so. We continue to judge that Iran's nuclear decisionmaking is guided by a cost-benefit approach, which offers the international community opportunities to influence Tehran. Iranian leaders undoubtedly consider Iran's security, prestige, and influence, as well as the international political and security environment, when making decisions about its nuclear program.

Secretary Burns. I would refer you the IC for its assessment on the pace of Iran's nuclear weapons capabilities.

General Cartwright. [Deleted.]

General Burgess. [Deleted.]

31. Senator LeMieux. Secretary Flournoy, Secretary Burns, General Cartwright, and General Burgess, given the ever-changing nature of our intelligence assessments on the Iranian program, how long can we be certain that Iran is not nuclear capable?

Secretary Flournoy. The Iranian nuclear program and intentions remain issues of paramount interest and concern to the intelligence and the policy communities, and are matters that we continue to watch very closely. At this time, we continue to judge that Iran is not nuclear weapons capable. We assess that Iran is keeping open the option to develop nuclear weapons in part by developing various nuclear capabilities that bring it closer to being able to produce such weapons, should it choose to do so. As new information emerges and as the Iranian nuclear program evolves, we will continue to reevaluate and reassess Tehran's ultimate intentions and potential capabilities.

Secretary Burns. Iran's extensive attempts over the past several years to engage in clandestine and undeclared nuclear activities have contributed greatly to the lack of international confidence in the nature of its nuclear program.

I would refer you to the IC for any further assessments on the pace of Iran's nuclear capabilities.

General Cartwright. Since this question directly concerns intelligence assessments I will have to defer to General Burgess to provide an answer.

General Burgess. [Deleted.]

32. Senator LeMieux. Secretary Flournoy, what would be the effect on American forces in the Middle East if Iran were successful in developing a nuclear bomb?

Secretary Flournoy. The consequences of a nuclear-armed Iran would be highly destabilizing for the Middle East and could have significant implications for U.S. forces. However, no one can say with certainty how the situation might unfold. That is why we remain committed to preventing Iran from acquiring a nuclear weapon.

58

A nuclear armed Iran could cause other states in the Middle East to pursue nuclear programs. It could also embolden Iran in its actions throughout the region most notably by expanding its support for proxies. A nuclear-armed Iran could also cause strategic instability that could eventually lead to a regional conflict. Such consequences would increase the requirements on the U.S. military, put our forces at greater risk, and potentially draw us into conflict.

33. Senator LeMieux. Secretary Flournoy and Secretary Burns, is there a containment strategy for Iran in place and ready in the event they do acquire a nuclear weapon?

Secretary Flournoy. As the President has stated, our policy is to prevent Iran from acquiring nuclear weapons. Steps we take to build the capabilities of our partners to counter Iranian proxies and build an integrated air and missile defense architecture to contain and deter Iranian aggression support our diplomatic efforts to prevent nuclear proliferation in Iran.

Secretary Burns. As the President and other senior U.S. Government officials have stated repeatedly, we will not accept a nuclear-armed Iran and we are committed to a diplomatic resolution over the Iran nuclear challenge. We will continue to pursue the administration's dual-track approach—combining engagement with pressure—to reach a peaceful solution. But similar to the military, we—in coordination with the interagency—are constantly reviewing our foreign policy strategies and modifying them as appropriate.

SANCTIONS

34. Senator LeMieux. Secretary Burns, the administration has frequently talked about meaningful sanctions. What types of sanctions do you think would be meaningful enough for Iran to stop pursuing its goal of developing nuclear weapons?

Secretary Burns. The members of the P5+1 understand that we need to increase the pressure on Iran in order to bring it back to the negotiating table. While we cannot discuss the elements of a possible UNSCR, we can assure you that we are working intensively and very cooperatively with our partners in New York and in capitals on a broad range of proposals that we think will meet our common objective.

————

QUESTIONS SUBMITTED BY SENATOR DAVID VITTER

SECURITY COUNCIL AND CONGRESSIONAL SANCTIONS

35. Senator Vitter. Secretary Burns, the administration has seemingly put the Dodd-Shelby Comprehensive Iran Sanctions, Accountability, and Divestment Act (S. 2799) on hold in Congress, and instead is pursuing just the UNSC path. Presumably, a UNSC sanctions resolution will be weaker than what the United States could implement if they followed the direction of Congress. Therefore, I am afraid that the pursuit of a weaker sanctions resolution will simply delay stronger sanctions by the United States and will give the Iranians more time because both the process and the substance will further hold up action. If a UNSC resolution is ratified, do you think the United States should continue to aggressively pursue and implement S. 2799 that has been stalled in Congress?

Secretary Burns. The administration shares Congress's concerns with Iran's nuclear program, and we ultimately share its goal of getting Iran to respect its international obligations and resolve concerns about the intent of its nuclear program. At this moment we are focused on creating a broad international coalition that can sharpen the choices for Iran through action at the U.N. Security Council. The most effective sanctions are those that are broadly enforced by the international community, which is why adopting a new resolution at the U.N. Security Council is so important.

36. Senator Vitter. Secretary Burns, if a UNSC resolution is ratified, will the administration delay the implementation of a bill from Congress sanctioning additional Iranian activities?

Secretary Burns. We believe that Congress and the administration share the objective of achieving Iran's compliance with U.N. Security Council resolutions and the NPT. Accordingly, we have been working with the appointed Senate and House conferees to craft an appropriate way to achieve these objectives as the legislation goes through conference. Our goals remain the same: to change Iran's decisionmaking on its nuclear program, to keep our international coalition together so that Iran sees

PX371

59

clearly the unity it faces, and to maintain the President's flexibility to conduct foreign policy.

37. Senator VITTER. Secretary Burns, is the United States willing to act alone or in a smaller group of countries on sanctions if a UNSC resolution is not passed?

Secretary BURNS. At this moment we are focused on creating a broad international coalition that can sharpen the choices for Iran through action at the U.N. Security Council. We believe we will need to pressure Iran on multiple fronts in order to convince it to address international concerns over its nuclear program, and that pressure is most effective when it is applied by as broad a coalition as possible. We believe a new UNSCR can serve as a platform for additional national and multinational measures, and we are consulting with a wide range of partners on ways we can tighten existing sanctions.

38. Senator VITTER. Secretary Burns, how quickly can the United States act upon the possible voting down of a UNSC resolution?

Secretary BURNS. We are focused on creating a broad international coalition that can sharpen the choices for Iran through U.N. Security Council action. While diplomacy is obviously our first choice, we are also prudently preparing for the full range of contingencies on Iran, and the President has been clear that no options have been taken off the table.

[Whereupon, at 12:35 p.m., the committee adjourned.]

○

PX371

PX373

# - CURRENT AND PROJECTED NATIONAL SECURITY THREATS TO THE UNITED STATES

govinfo.gov/content/pkg/CHRG-109shrg22379/html/CHRG-109shrg22379.htm

PX373

[Senate Hearing 109-61]
[From the U.S. Government Publishing Office]

S. Hrg. 109-61

CURRENT AND PROJECTED NATIONAL SECURITY THREATS TO THE UNITED STATES

=======================================================================

HEARING

BEFORE THE

SELECT COMMITTEE ON INTELLIGENCE
UNITED STATES SENATE

ONE HUNDRED NINTH CONGRESS

FIRST SESSION

_____

FEBRUARY 16, 2005

_____

Printed for the use of the Select Committee on Intelligence

Available via the World Wide Web: http://www.access.gpo.gov/congress/
senate

_____

U.S. GOVERNMENT PRINTING OFFICE
22-379                    WASHINGTON : 2005

For Sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512-1800; (202) 512091800
Fax: (202) 512092250 Mail: Stop SSOP, Washington, DC 20402090001

SELECT COMMITTEE ON INTELLIGENCE

[Established by S. Res. 400, 94th Cong., 2d Sess.]

PAT ROBERTS, Kansas, Chairman
JOHN D. ROCKEFELLER IV, West Virginia, Vice Chairman

| | |
|---|---|
| ORRIN G. HATCH, Utah | CARL LEVIN, Michigan |
| MIKE DeWINE, Ohio | DIANNE FEINSTEIN, California |
| CHRISTOPHER S. BOND, Missouri | RON WYDEN, Oregon |
| TRENT LOTT, Mississippi | EVAN BAYH, Indiana |
| OLYMPIA J. SNOWE, Maine | BARBARA A. MIKULSKI, Maryland |

PX373

```
CHUCK HAGEL, Nebraska              JON S. CORZINE, New Jersey
SAXBY CHAMBLISS, Georgia
              BILL FRIST, Tennessee, Ex Officio
               HARRY REID, Nevada, Ex Officio
              JOHN WARNER, Virginia, Ex Officio
```

----------

```
         Bill Duhnke, Staff Director and Chief Counsel
          Andrew W. Johnson, Minority Staff Director
            Kathleen P. McGhee, Chief Clerk
```

CONTENTS

----------

Page

Hearing held in Washington, DC:
    February 16, 2005.............................................   1

Witness Statements:

    Goss, Hon. Porter J., Director of Central Intelligence.......   7
            Prepared statement.......................................  14
    Jacoby, Vice Admiral Lowell, USN, Director, Defense
       Intelligence Agency.........................................  45
            Prepared statement.......................................  46
    Loy, Admiral James, Deputy Secretary, Department of Homeland
       Security....................................................  36
            Prepared statement.......................................  39
    Mueller, Hon. Robert S. III, Director, Federal Bureau of
       Investigation...............................................  18
            Prepared statement.......................................  23
    Rodley, Carol, Principal Deputy Assistant Secretary of State
       for
       Intelligence and Research...................................  59

Supplemental Materials:

    Prepared Statement for the Record from Hon. Thomas Fingar,
       Assistant Secretary of State for Intelligence and Research.  59
    Prepared Statement for the Record from Senator Olympia J.
       Snowe......................................................  69

CURRENT AND PROJECTED NATIONAL SECURITY THREATS TO THE UNITED STATES

----------

PX373

WEDNESDAY, FEBRUARY 16, 2005

United States Senate,
Senate Select Committee on Intelligence,
Washington, DC.

The Committee met, pursuant to notice, at 10:03 a.m., in
room SH-216, Hart Senate Office Building, the Honorable Pat
Roberts, Chairman of the Committee, presiding.

Committee Members Present: Senators Roberts, Hatch, Bond,
Lot, Snowe, Chambliss, Warner, Rockefeller, Levin, Feinstein,
Wyden, Bayh, and Mikulski.

OPENING STATEMENT OF THE HONORABLE PAT ROBERTS,
CHAIRMAN

Chairman Roberts. The hearing will come to order.
Today, the Senate Committee on Intelligence meets in open
session to conduct its annual worldwide threat hearing. I would
like to inform Members that traditionally we have a closed
hearing in the afternoon, but Secretary of State Rice is coming
to the Senate to brief all Members this afternoon.

We will follow up with individuals at our weekly
intelligence hearings, and then, obviously, a hearing or
briefing at any Member's request. So we will see all of these
people back again in a classified session at another time.

The Committee traditionally begins its annual oversight of
the U.S. intelligence community with an open hearing, so that
the public will have the benefit of the intelligence
community's best assessment of the current and projected
national security threats to the United States.

Our witnesses today are Mr. Porter Goss, the Director of
Central Intelligence. Welcome back, Mr. Director.

Director Goss.  Thank you, Mr. Chairman.

Chairman Roberts. Mr. Robert Mueller, the Director of the
Federal Bureau of Investigation; Admiral James Loy, the Deputy
Secretary of the Department of Homeland Security; Vice Admiral
Lowell Jacoby, the Director of the Defense Intelligence Agency;
and Ms. Carol Rodley, the Principal Deputy Assistant Secretary
of State for Intelligence and Research. The acronym for that,
by the way, is INR.

The Committee thanks all of our distinguished witnesses for
being here today. We thank you for your commitment, for your
perseverance on your job, and for helping to keep America safe.

Before we begin the testimony, I would like to take this
opportunity to discuss an issue that has concerned and
frustrated me since I joined this Committee over 8 year ago,
and all Members of this Committee from time to time.

While we meet today in open session, the Members of this
Committee and our witnesses will be limited in what they can
say because the vast majority of the information with which
this Committee and our witnesses deal is classified. The issues
which we cover are not necessarily secret, but the details that
surround them generally are.

Our goal today is to have as open a discussion as possible,
recognizing that there are simply some things that we cannot

PX373

and must not discuss publicly. The dynamics surrounding what we can and cannot say represents one of the most frustrating aspects of membership on this Committee, especially when secret intelligence activities find their way into public discourse.

How do we as a Committee assure the American people that we are even aware of something when we cannot discuss it publicly? How, without confirming or denying a particular story, do we explain that concerns are misplaced, on point or off point? Where do we draw the line between the public's right to know and our Nation's security interests in keeping something secret? These remain very difficult questions.

In 1976, the U.S. Senate established this Committee to conduct vigorous oversight of the intelligence activities of the United States government. And that is exactly what we do, day in and day out--with, I might add--what the Vice Chairman and I consider to be an outstanding and most capable staff.

Unfortunately, but necessarily, the Members of this Committee are rarely at liberty to respond to public stories or to inquiries. This does not mean, however, that we are not aware of or deeply involved in the issue that is being discussed.

Much of this Committee's work gets done behind closed doors with little fanfare. And open public discussion about all of the issues on which our Committee works is just not possible. If we were to discuss some of the ingenious ways this Nation does collect intelligence and protects our citizens, our adversaries would and could develop simple countermeasures that would eliminate these advantages, which were developed at great cost or high risk. This secrecy does protect lives and helps us to keep safe.

The Vice Chairman and I will, however, continue to work together to keep the American people as informed as possible. And when we can, we will do our best to clarify any misconceptions that may exist. With that in mind, I will now briefly discuss some of our plans for this Committee's oversight in the coming months.

First, we look forward to the naming of a Director of National Intelligence. As soon as the President nominates this individual, we will schedule a confirmation hearing as soon as practicable.

Second, we will monitor closely the implementation of the Intelligence reform bill. We will focus a great deal of attention on how this Committee can support the new DNI in the exercise of his or her authorities. And, because no legislation is perfect, we will also look at whether any legislative fixes are necessary.

Third, in the area of oversight, we will focus on the intelligence community's collection and analytical capabilities, especially in regard to our capabilities. Do we have the adequate collection? Do we have the adequate analysis? Do we have the information access to make a consensus threat analysis that is both credible and helpful to the policymakers and the Congress?

This Committee learned from our Iraq WMD inquiry that we cannot and should not always take the intelligence community's

PX373

assessments at face value. The Vice Chairman and I have therefore decided to change the way the Senate Intelligence Committee does our work.

We haven't launched anything. We haven't really begun an investigation or an inquiry. Nor have we ruled them out. We have simply adjusted our approach based on the lessons we learned while reviewing the assessment by the community on Iraq's WMD programs.

Applying the methodologies that we used in that review, we will now look deeper into the intelligence community's work on the very critical threats that face our Nation. Instead of examining these issues after the fact, as we did on the Iraq WMD question and many other matters in the past, we are going to be more proactive, to try to identify our strengths and our weaknesses ahead of time. We have already begun to examine our intelligence capabilities with respect to nuclear terrorism and also the country of Iran.

In closing, I want to say something about the limitations of intelligence. Even the best intelligence will not be absolutely precise and tell us what to do. However, intelligence is a necessary and crucial tool used by policymakers to make very difficult decisions that do directly affect those who defend our freedoms and our national security.

With that said, I look forward to the testimony of our witnesses, and also the questions by our Members. I now turn to the distinguished Vice Chairman for any comment he may wish to make.

Senator Rockefeller.

## STATEMENT OF THE HONORABLE JOHN D. ROCKEFELLER IV, VICE CHAIRMAN

Vice Chairman Rockefeller. Thank you, Mr. Chairman.

It's customary at the beginning of our hearings to welcome everybody, and I certainly do so, and very much look forward to your testimony. I have to say, though, I think there is a significant absence or an empty spot at the table, at the witness table. And I want to talk about that.

There should be another chair before us. And the little sign in front of it should read Director of National Intelligence, DNI. Last summer, the Congress made reforming the intelligence community its top legislative priority. We worked through our August recess. We came back in a lame duck session after the election.

And we eventually passed landmark legislation fundamentally reforming the intelligence community for the first time in 50 years. The Congress made this extraordinary effort because it believed that our Nation was at risk, and we take that seriously.

More specifically, the Congress--eventually joined by the President--understood that without one individual in charge of the 15-agency intelligence community, America's war on terrorism would continue to be hampered by bureaucratic infighting and by budgetary tug-of-wars, that in turn inhibit the sharing of information--or, as we like to say, the access

to information--and limit our ability to bring all of our
resources to bear on what is a fairly ghastly threat on a
worldwide basis.

When the President signed the intelligence reform bill in
December, I really expected that when this hearing came the new
Director of National Intelligence would be here to talk about
threats.

It took 3 months for the Senate and the House to pass
separate intelligence bills--that's not really very much time--
and then resolve a multitude of differences in conference and
all kinds of back-and-forth in a way which was agreeable to the
Administration.

Two months have now passed since the bill-signing ceremony.
And the position of Director of National Intelligence remains
vacant--not even a person nominated. To me, this is
unacceptable. It's unacceptable that the Administration has not
shown the same urgency in dealing with that question that the
Congress took the trouble to create. Some agree, some don't
agree with the decision, but it was not a particularly close
vote in either house.

With absolutely no disrespect--and, in fact, a great deal
of respect to Director Goss--or any of our other witnesses, it
is unacceptable that we cannot hear from and question the one
person under the new law that is supposed to be responsible for
the overall management of how the intelligence community is
responding to the national security threats that we will be
discussing this morning.

There are other troubling consequences to the
Administration's lack of action. In recent weeks, I visited
most of the principal agencies that comprise our intelligence
community. The message I heard over and over, through words or
body language, was that the senior leadership at these agencies
was--that action on how best to carry out some key provisions
on the intelligence reform bill was being held up pending the
arrival of the new Director of National Intelligence. The delay
in appointing a DNI has kept implementation of the reform bill,
therefore, in my judgment, in idle.

So, what are the practical consequences of this delay, in
the context of today's threat hearing? I'll highlight three.

The first and most obvious is that delaying the appointment
of the DNI places that individual at a growing disadvantage in
establishing his or her team--the new directorate--and
selecting his or her supporting team of deputies within the 6
months prescribed by law, 2 months already having gone by, or
more. It's prescribed by law, has to have it done.

The second consequence of delay pertains to the
intelligence community's counterterrorism program. In addition
to establishing the position of DNI, the intelligence reform
bill mandated the creation of the National Counterterrorism
Center, or NCTC. Initially created by Executive Order, the NCTC
is chartered to be the primary organization in the U.S.
Government responsible for analyzing and integrating all
intelligence pertaining to terrorism and counterterrorism.

As is the case with the DNI, the head of the NCTC is a
Senate-confirmed position and the Administration has yet to

nominate a person to carry out those crucial tasks. One could say one has to do the DNI before the NCTC, but let's get going.

One of the primary missions of the NCTC--and I'm reading the law now--is to conduct strategic operational planning for counterterrorism activities, integrating all instruments of national power, including diplomatic, financial, military, intelligence activities, as well as homeland security and law enforcement activities, and to assign roles and responsibilities as part of its strategic operational planning.

My understanding is that the operational planning mission at NCTC is not being undertaken, pending confirmation of the new DNI. We can discuss that. So when we talk about going after terrorists, after their organizations, where they plot and where they train and where they keep their money, the question is, who is carrying out this strategic operational planning mission on this day?

In the wake of our war against the al-Qa'ida terrorist network and its operational bases in Afghanistan and Pakistan, the fundamentalist Islamic terrorist threat has splintered and decentralized its operations. We need a person in charge, we need an organization in place, that can coordinate counterterrorist operations across agencies against this multiplying terrorist threat.

The third immediate consequence of not having a DNI in place is the area of proliferation of weapons of mass destruction. The proliferation activity of North Korea and Iran, along with the damage done by Pakistani scientist A.Q. Khan, has reduced any confidence that the nuclear genie is contained.

The combination of these two threats--a decentralized, but determined terrorist threat and growing proliferation activity--present the intelligence community with a sobering challenge, now and for the foreseeable future.

The Congress recognized the importance of this challenge in crafting the intelligence reform bill, by authorizing the establishment of a National Counterproliferation Center. The new intelligence center would generally follow the blueprint of the National Counterterrorism Center. Again, I am told and troubled by the fact that the decision on whether or not to establish the National Counterproliferation Center and, if so, in what form, is being held up pending the DNI's appointment.

The proliferation activities of North Korea are a threat to our security and the security of our allies today, as well as down the road. And the same, of course, is true with Iran, and we discover others as we go along. Iran, as a nuclear aspirant and supporter of terrorism, is also center stage and very much needs to be pursued in this manner.

Policymakers and, most importantly, the President, but also the Congress, need the best intelligence possible on North Korea, Iran and other hotspots around the world--Africa being one which I may ask a question about.

The faulty intelligence used by the Administration to invade Iraq has harmed our credibility with our allies and has given Islamic jihadists a powerful recruiting tool around the world that is not to anybody's advantage. We must learn from

these mistakes, as the Chairman has indicated, and get better in how we produce timely, objective and accurate intelligence for U.S. policymakers.

The Chairman and I have directed that the Intelligence Committee undertake review of how intelligence on Iran is collected, analyzed and produced. The review will be similar to what we did before with weapons of mass destruction in Iraq. But it's going to be very proactive. The same sort of rigorous oversight ought to apply to North Korea also, and there are some other countries that come to mind.

I am hopeful that the Committee can also focus the efforts of its very talented staff on the growing controversy surrounding the collection of intelligence through the interrogation and rendition of detainees. We need to probe the fundamental legal, jurisdictional and operational questions, both retrospectively and prospectively, in my mind, at the heart of how the intelligence community collects such intelligence.

It's undeniable that the intelligence community has made enormous strides in the past 3 years and that some reform has occurred. The tireless efforts of hardworking men and women at the CIA, FBI and other intelligence agencies, like the work of those in uniform, have been a linchpin in the effort to protect every American against the murderous intentions of terrorists.

But there is an acknowledgement among the people I have spoken with that we can do better and that we must get better. The intelligence reform bill addressed that issue of authorities, resources and organization. But the promise of reform will not be realized without strong leadership and management acumen--the sort of skills the DNI must bring to the table.

Challenges abound, as the Chairman knows, for the current and future leadership of the intelligence community. There's a lot of work to be done on how we collect intelligence, particularly in the arena of human intelligence, analytical workforce problems, language problems. Our intelligence community needs to establish a global presence that is not only capable, but lithe, for our adversaries are increasingly mobile and use much more sophisticated technology as they do their work.

I know we're limited as to what we can discuss in an open hearing, but I hope to the extent possible that our witnesses will address some of the questions that I have raised.

I thank the witnesses and I thank you, Mr. Chairman.

Chairman Roberts. Before I recognize Director Goss, I would like to speak to the Vice Chairman's comments in regard to the appointment of a DNI. I think this is what we used to hear on ``Perry Mason,'' with extenuating circumstances.

The intelligence reform bill was passed on December 17. The bill says that a DNI will be appointed no later than 6 months-- that is, June 17. I think, or at least it is my opinion, that the Administration is also awaiting the report of the independent WMD commission, part of whose job or task is to take a look at the intelligence reform bill and make some recommendations.

In addition, while I share the Vice Chairman's frustration that we wish we had here the Director of National Intelligence and that he or she was well down the road to implementing the reform bill, it is, I think, crucially important, not only in terms of timing, but to get the right person. And that person should have managerial experience, obviously, expertise in intelligence, obviously, expertise and experience perhaps in the military. As the Vice Chairman has pointed out, we have certainly people in the Washington area or, for that matter, within the United States, that certainly fit that description.

So, I hope that the Administration will move in an expeditious fashion, but in a fashion that gets the right person for the job.

Director Goss, you may proceed, sir.

STATEMENT OF THE HONORABLE PORTER J. GOSS,
DIRECTOR OF CENTRAL INTELLIGENCE

Director Goss. Thank you very much, Mr. Chairman. Good morning, Mr. Vice Chairman and Members of the Committee, and thank you for the hospitable welcome here.

The challenges that you've mentioned in your opening remarks that face the United States of America and its citizens and our interests literally do span the globe. My intention today is to tell you what I believe are those challenges in terms of the most threatening and identify briefly where we think our service as intelligence professionals is needed most on behalf of the United States taxpayers.

We need to make some tough decisions about which haystacks deserve to be scrutinized for the needles that can hurt us most. And we know in this information age that there are literally endless haystacks everywhere. There's an awful lot of material out there.

I do want to make several things clear. Our officers are taking risks, and I will be asking them to take more risks--justifiable risks--because I would be much happier here explaining why we did something than why we did nothing.

I'm asking for more competitive analysis, more co-location of analysts and collectors--in fact, that's underway--and deeper collaboration with agencies throughout the intelligence community.

Above all, our analysts must be objective. Our credibility rests there, as you pointed out well in this Committee's report to the community issued on the WMD.

We do not make policy. We do not wage war. I am emphatic about that. I testified to that during my confirmation, and it is still true and it will always be. We do collect and analyze information. With respect to the CIA, I want to tell you that my first few months as Director have served only to confirm what I and, I think, Members of Congress have known about CIA for years. It is a special place. It's an organization of dedicated, patriotic people who are doing their best.

In addition to taking a thorough, hard look at our own capabilities, we're working to define CIA's place in the restructured intelligence community--a community that will be

PX373

led by a new DNI, as we've heard--to make the maximum possible contribution to American security at home and abroad that uniquely the CIA can make.

The CIA is and will remain the flagship agency, in my view, and each of the other 14 elements of the community will continue to make their unique contributions, as well. I say that as the DCI, not as the Director of Central Intelligence Agency.

I turn to threats. I will not attempt, obviously, to cover everything that could go wrong in the year ahead. We must and do concentrate our efforts, experience and expertise on the challenges that are most pressing. And they are, of course, defeating terrorism, protecting the homeland, stopping proliferation of weapons of mass destruction and drugs, fostering stability, freedom and peace in the most troubled regions of the world.

My comments today will focus on these duties. I know well from my 30 years in public service that you and your colleagues have an important responsibility with these open sessions to get information to the American people, as the Chairman has stated.

I also know too well, as the Chairman has stated, that as we are broadcasting to America, enemies are also tuning in. In open session, I feel that I will and must be very prudent in my remarks as DCI.

Mr. Chairman, on the subject of terrorism, defeating terrorism must remain one of our intelligence community's core objectives, and it will, as widely dispersed terrorist networks will present one of the most serious challenges to the U.S. national security interests at home and abroad in the coming year. That's not startling news, but it's important.

In the past year, aggressive measures by our intelligence, law enforcement, defense and homeland security communities, along with our key international partners, have, in fact, dealt serious blows to al-Qa'ida and other terrorist organizations and individuals.

Despite these successes, however, the terrorist threat to the U.S. in the homeland and abroad endures. I'd make four points.

Al-Qa'ida is intent on finding ways to circumvent U.S. security enhancements to strike Americans in the homeland, one.

Number two, it may be only a matter of time before al-Qa'ida or another group attempts to use chemical, biological, radiological or nuclear weapons. We must focus on that.

Three, al-Qa'ida is only one facet of the threat from a broader Sunni jihadist movement.

And four, the Iraq conflict, while not a cause of extremism, has become a cause for extremists.

We know from experience that al-Qa'ida is a patient, persistent, imaginative, adaptive and dangerous opponent. But it is vulnerable and displaced. We and other allies have hit it hard. Jihadist religious leaders preach millennial, aberrational visions of some kind of a fight for Islam's survival. Sometimes they argue that the struggle justifies the indiscriminate killing of civilians, even with chemical,

PX373

biological, radiological and nuclear weapons. And, fortunately, they have a small audience.

Our pursuit of al-Qa'ida and its most senior leaders, including bin Laden and his deputy, Ayman al-Zawahiri, is intense. However, their capture alone would not be enough to eliminate the terrorist threat to the U.S. homeland or interests overseas. Often influenced by al-Qa'ida's ideology, members of a broader movement have an ability to plan and conduct operations. We saw this last March in the railway attacks in Madrid, conducted by local Sunni extremists.

Other regional groups connected to al-Qa'ida or acting on their own also continue to pose a significant threat. In Pakistan, terrorist elements remain committed to attacking U.S. targets. In Saudi Arabia, remnants of the Saudi al-Qa'ida network continue to attack U.S. interests in the region.

In Central Asia, the Islamic Jihad Group, a splinter group of the Islamic Movement of Uzbekistan, has become a more virulent threat to U.S. interests and local governments there. Last spring, the group used female operatives in a series of bombings in Uzbekistan, as you know.

In Southeast Asia, the Jemaah Islamiyah continues to pose a threat to U.S. and Western interests in Indonesia and the Philippines, where JI is colluding with the Abu Sayyaf Group and possibly the MILF group, as well.

In Europe, Islamic extremists continue to plan and cause attacks against U.S. and local interests. Some of them may cause significant casualties. In 2004, British authorities dismantled an al-Qa'ida cell--much reported. And in the Netherlands, an extremist brutally killed a prominent Dutch citizen--not as widely reported.

Islamic extremists are exploiting the Iraqi conflict to recruit new, anti-U.S. jihadists. Those jihadists who survive will leave Iraq experienced and focused on acts of urban terrorism. They represent a potential pool of contacts to build transnational terrorist cells, groups and networks in Saudi Arabia, Jordan and other countries.

Zarqawi has sought to bring about the final victory of Islam over the West, in his version of it. And he hopes to establish a safe haven in Iraq from which his group could operate against the ``infidel Western nations, the apostate Muslim governments.''

Other groups spanning the globe also pose persistent and serious threats to U.S. and Western interests. Hizbollah's main focus remains Israel. But it could conduct lethal attacks against U.S. interests quickly upon a decision to do so. It has that capability, we estimate.

Palestinian terrorist organizations have apparently refrained from directly targeting U.S. or Western interests in their opposition to Middle East peace initiatives, but they do pose an ongoing risk to U.S. citizens that could be killed or wounded in attacks intended to strike Israeli interests.

Extremist groups in Latin America are still concerned with the FARC--the Revolutionary Armed Forces of Colombia-- possessing capability and clear intent to threaten U.S. interests in that region.

PX373

The Horn of Africa, the Sahel, the Mahgreb, the Levant and the Gulf States are all areas where pop-up terrorist activity can be expected and needs to be monitored and dealt with.

Afghanistan, Mr. Chairman, once the safe haven for Usama bin Ladin, has started on the road to recovery after decades of instability and civil war. Hamid Karzai's election to the presidency was a major milestone. Elections for a new national assembly and local district councils, tentatively scheduled for this spring--though that's an ambitious schedule--will complete the process of electing representatives this year, hopefully. President Karzai still faces a low-level insurgency, aimed at destabilizing his country and raising the cost of reconstruction, and ultimately forcing coalition forces to leave before the job is done. The development of the Afghan national army and the national police force is going well, although neither can yet stand on its own.

In Iraq, low voter turnout in some Sunni areas and the post-election resumption of insurgent attacks--most against Iraqi civilian and security forces--indicate that the insurgency achieved at least some of its election day goals and remains a serious threat to creating a stable, representative government in Iraq.

Self-determination for the Iraqi people will largely depend on the ability of the Iraq forces to provide their own security. Iraq's most capable security units have become more effective in recent months, contributing to several major operations, and helping to put an Iraqi face on security operations. Insurgents are determined and still trying to discourage new recruits and undermine the effectiveness of existing Iraqi security forces by grotesque intimidation tactics.

The prolonged lack of security would hurt Iraq's reconstruction efforts and economic development, causing overall economic growth to proceed at a slower pace than many analysts expected and, certainly that the Iraqi people deserve.

Alternatively, the larger, uncommitted moderate Sunni population and the Sunni political elite may seize the post-electoral moment to take part in creating Iraq's new political institutions, if victorious Shia and Kurdish parties include Sunnis in the new government and the drafting of the constitution. That is a hopeful opportunity.

On the subject of proliferation, Mr. Chairman, I will now turn to the worldwide challenge. Last year started with promise, as Libya had just renounced its WMD programs, North Korea was engaged in negotiations with regional states on its nuclear weapons program, and Iran was showing greater signs of openness regarding its nuclear program after concealing activity for nearly a decade.

Let me start with Libya, which is a bit of a good news story and one that reflects the patient perseverance with which the intelligence community--writ large--can tackle a tough intelligence problem.

In 2004, Tripoli followed through with a range of steps to disarm itself of WMD and ballistic missiles. Libya gave up key elements of its nuclear weapons program and opened itself to

PX373

the IAEA. Libya gave up some key CW assets, and opened its former CW program to international scrutiny.

After disclosing its Scud stockpile and extensive ballistic and cruise missile R&D efforts in 2003, Libya took the important step to abide by its commitment to limit its missiles to the 300-kilometer range threshold of the Missile Technology Control Regime.

Today, the U.S. continues to work with Libya to make sure that any discrepancies in the declarations they have made are clarified.

In North Korea, on the other hand, on 10 February 2005--not long ago--Pyongyang announced it was suspending participation in 6-party talks under way since 2003, declared it had nuclear weapons and affirmed it would seek to increase its nuclear arsenal. The North had been pushing for a freeze on its plutonium program in exchange for significant benefits rather than committing to the full dismantlement that we and our partners seek.

In 2003, the North claimed it had reprocessed the 8,000 fuel rods from the Yongbyon reactor, originally stored under the agreed framework, with the IAEA monitoring in 1994. The North claims to have made new weapons from its reprocessing effort.

We believe North Korea continues to pursue a uranium enrichment capability, drawing on the assistance it received from A.Q. Khan before his network was shut down.

North Korea continues to develop, produce, deploy and sell ballistic missiles of increasing range and sophistication, augmenting Pyongyang's large operational force of Scud and Nodong-class missiles. North Korea could resume flight testing at any time, including longer range missiles, such as the Taepo Dong-2 system. We assess the TD-2 is capable of reaching the United States with a nuclear weapon-size payload.

North Korea continues to market its ballistic missile technology, trying to find new clients now that some traditional customers--read Libya--have halted such trade.

We believe North Korea has active CW and BW programs, and probably has chemical and possibly biological weapons ready for use.

Iran. In early February, the spokesman of Iran's Supreme Council for National Security publicly announced that Iran would never scrap its nuclear program. This came in the midst of negotiations with EU-3 members--that would be Britain, Germany and France--seeking objective guarantees from Tehran that it would not use nuclear technology for nuclear weapons.

Previous comments by Iranian officials, including Iran's supreme leader and its foreign minister, indicated that Iran would not give up its ability to enrich uranium. Certainly, it would be right for Iran to have the capability to produce fuel for power reactors. But, we're more concerned about the dual-use nature of the technology that could also be used to achieve a nuclear weapon. We do not have transparency.

In parallel, Iran continues its pursuit of long-range ballistic missiles, such as an improved version of a 1,300-kilometer range Shahab-3 MRBM, to add to the hundreds of short-

PX373

range Scud missiles it already has.

Even since 9/11, Tehran continues to support terrorist groups in the region, such as Hizbollah--it is a state sponsor--and could encourage increased attacks in Israel and the Palestinian territories to derail progress toward peace there. Iran reportedly is supporting some anti-coalition activities in Iraq and seeking to influence the future character of the Iraqi state.

Conservatives are likely to consolidate their power in Iran's June 2005 presidential elections, further marginalizing the reform movement of last year. Iran continues to retain, in secret, important members of al-Qa'ida, causing further uncertainty about Iran's commitment to bring them to justice one way or another.

Moving to China, Beijing's military modernization and military buildup could tilt the balance of power in the Taiwan Strait. Improved Chinese capabilities threaten U.S. forces in the region. In 2004, China increased its ballistic missile forces deployed across from Taiwan and rolled out several new submarines. China continues to develop more robust, survivable, nuclear-armed missiles, as well as conventional capability for use in regional conflict.

Taiwan continues to promote constitutional reform and other attempts to strengthen local identity. Beijing judges these moves to be a ``timeline for independence.'' If Beijing decides that Taiwan is taking steps toward permanent separation that exceed Beijing's tolerance, we assess China is prepared to respond with varying levels of force.

China is increasingly confident and active on the international stage, trying to ensure it has a voice on major international issues, to secure access to natural resources, and to counter what it sees as United States efforts to contain or encircle it.

New leadership, under President Hu Jintao, is facing an array of domestic challenges in 2005, including the potential for a resurgence in inflation, increased dependence on exports, growing economic inequalities in the country, increased awareness of individual rights, and popular expectations for his new leadership.

In Russia, the attitudes and actions of the so-called ``siloviki''--the ex-KGB men that Putin has placed in positions of authority throughout the Russian government--may be critical determinates of the course Putin will pursue in the year ahead. Perceived setbacks in Ukraine are likely to lead Putin to redouble his efforts to defend Russian interests abroad, while balancing cooperation with the West.

Russia's most immediate security threat is terrorism. And counterterrorism cooperation undoubtedly will continue.

Putin publicly acknowledges a role for outside powers to play in the confederate states, but we believe he is nevertheless concerned about further encroachment by the U.S. and NATO into that region.

Moscow worries that separatism inside Russia and radical Islamic movements beyond their borders might threaten stability in southern Russia. Chechen extremists have increasingly turned

PX373

to terrorist operations in response to Moscow's successes in Chechnya, and it's reasonable to predict they will carry out attacks against civilian or military targets elsewhere in Russia in 2005.

Budget increases will help Russia create a professional military by replacing conscript with volunteer servicemen and focus on maintaining, modernizing and extending the operational life of strategic weapons systems, including the nuclear missile force.

Russia remains an important source of weapons technology, material and components for other nations. The vulnerability of Russian WMD materials and technology to theft or diversion is a continuing concern.

On other areas of potential instability, Mr. Chairman, I would briefly go to the Middle East.

The election of the Palestinian President, Mahmoud Abbas, marks an important step, and Abbas has made it clear that negotiating a peace deal with Israel is a very high priority. That's extraordinarily good news. Nevertheless, there are hurdles ahead.

Redlines must be resolved while the Palestinian leaders try to rebuild damaged PA infrastructure and governing institutions, especially the security forces, the legislature and the judiciary--those things that will help stability. Terrorist groups, some of whom benefit from funding from outside sources, could step up attacks to derail peace and progress and need close monitoring.

In Africa, chronic instability will continue to hamper counterterrorism efforts and impose heavy humanitarian and peacekeeping burdens on us.

In Nigeria, the military is struggling to contain militia groups in the oil-producing south and ethnic violence that frequently erupts throughout the country. Extremist groups are emerging from the country's Muslim population of about 65 million. Nigeria is a big oil producer for us.

In Sudan, the peace deal signed in January will result in de facto southern autonomy and may inspire rebels in provinces such as Darfur to press harder for a greater share of resource and power. Opportunities exist for Islamic extremists to reassert themselves in the north, unless the central government stays unified.

Unresolved disputes in the Horn of Africa--Africa's gateway to the Middle East--create vulnerability to foreign terrorists and extremist groups. Ethiopia and Eritrea still have a contested border. And armed factions in Somalia indicate they will fight the authority of a new transitional government.

In Latin America, the region is entering a major electoral cycle in 2006. Brazil, Colombia, Costa Rica, Ecuador, Mexico, Nicaragua, Peru and Venezuela hold presidential elections.

Several key countries in the hemisphere are potential flashpoints in 2005. In Venezuela, Chavez is consolidating his power by using technically legal tactics to target his opponents and meddling in the region, supported by Castro.

In Colombia, progress against counternarcotics and terrorism under President Uribe's successful leadership may be

PX373

affected by an election.

The outlook is very cloudy for legitimate, timely elections in November 2005 in Haiti, even with substantial international support.

Campaigning for the 2006 presidential election in Mexico is likely to stall progress on fiscal, labor and energy reform.

And in Cuba, Castro's hold on power remains firm. But a bad fall last October has rekindled speculation about his declining health and the succession scenarios.

In Southeast Asia, three countries bear close watching. In Indonesia, President Yudhoyono has moved swiftly to crack down on corruption. But reinvigorating the economy, burned by the cost of recovery in the tsunami-damaged area, will likely be affected by continuing, deep-seated ethnic and political turmoil exploitable by terrorists.

In the Philippines, Manila is struggling with prolonged Islamic and Communist rebellion. The presence of Jemaah Islamiyah, terrorists seeking safe haven and training bases in the south, adds volatility and capability to terrorist groups already in place.

And finally, Mr. Chairman, Thailand is plagued with an increasingly volatile Muslim separatist threat in the southeastern provinces and the risk of escalation remains very high.

I thank you very much for that opportunity to give a brief overview.

[The prepared statement of Director Goss follows:]

                    Prepared Statement of Hon. Porter Goss,
                         Director of Central Intelligence

Good morning, Mr. Chairman, Mr. Vice Chairman, Members of the Committee.

It is my honor to meet with you today to discuss the challenges I see facing America and its interests in the months ahead. These challenges literally span the globe. My intention is to tell you what I believe are the greatest challenges we face today and those where our service as intelligence professionals is needed most on behalf of the U.S. taxpayer.

We need to make tough decisions about which haystacks deserve to be scrutinized for the needles that can hurt us most. And we know in this information age that there are endless haystacks everywhere. I do want to make several things clear:

Our officers are taking risks, and I will be asking them to take more risks--justifiable risks--because I would much rather explain why we did something than why we did nothing,

I am asking for more competitive analysis, more collocation of analysts and collectors, and deeper collaboration with agencies throughout the Intelligence Community. Above all, our analysis must be objective. Our credibility rests there.

We do not make policy. We do not wage war. I am emphatic about that and always have been. We do collect and analyze information.

With respect to the CIA, I want to tell you that my first few months as Director have served only to confirm what I and Members of Congress have known about CIA for years. It is a special place--an

organization of dedicated, patriotic people. In addition to taking a
thorough, hard look at our own capabilities, we are working to define
CIA's place in the restructured Intelligence Community--a community
that will be led by a new Director of National Intelligence--to make
the maximum possible contribution to American security at home and
abroad. The CIA is and will remain the flagship agency, in my view. And
each of the other 14 elements in the community will continue to make
their unique contributions as well.

   Now, I turn to threats. I will not attempt to cover everything that
could go wrong in the year ahead. We must, and do, concentrate our
efforts, experience and expertise on the challenges that are most
pressing: defeating terrorism; protecting the homeland; stopping
proliferation of weapons of mass destruction and drugs; and fostering
stability, freedom and peace in the most troubled regions of the world.
Accordingly, my comments today will focus on these duties. I know well
from my 30 years in public service that you and your colleagues have an
important responsibility with these open sessions to get information to
the American people. But I also know all too well that as we are
broadcasting to America, enemies are also tuning in. In open session I
feel I must be very prudent in my remarks as DCI.

                              TERRORISM

   Mr. Chairman, defeating terrorism must remain one of our
intelligence community's core objectives, as widely dispersed terrorist
networks will present one of the most serious challenges to U.S.
national security interests at home and abroad in the coming year. In
the past year, aggressive measures by our intelligence, law
enforcement, defense and homeland security communities, along with our
key international partners have dealt serious blows to al-Qa'ida and
others. Despite these successes, however, the terrorist threat to the
U.S. in the Homeland and abroad endures.
   Al-Qa'ida is intent on finding ways to circumvent U.S.
security enhancements to strike Americans and the Homeland.
   It may be only a matter of time before al-Qa'ida or
another group attempts to use chemical, biological, radiological, and
nuclear weapons (CBRN).
   Al-Qa'ida is only one facet of the threat from a broader
Sunni jihadist movement.
   The Iraq conflict, while not a cause of extremism, has
become a cause for extremists.
   We know from experience that al-Qa'ida is a patient, persistent,
imaginative, adaptive and dangerous opponent. But it is vulnerable and
we and other allies have hit it hard.
   Jihadist religious leaders preach millennial aberrational
visions of a fight for Islam's survival. Sometimes they argue that the
struggle justifies the indiscriminate killing of civilians, even with
chemical, biological, radiological, or nuclear weapons.
   Our pursuit of Al-Qa'ida and its most senior leaders, including Bin
Ladin and his deputy, Ayman al-Zawahiri is intense. However, their
capture alone would not be enough to eliminate the terrorist threat to
the U.S. Homeland or U.S. interests overseas. Often influenced by al-
Qa'ida's ideology, members of a broader movement have an ability to
plan and conduct operations. We saw this last March in the railway
attacks in Madrid conducted by local Sunni extremists. Other regional

PX373

groups--connected to al-Qa'ida or acting on their own--also continue to pose a significant threat.

In Pakistan, terrorist elements remain committed to attacking U.S. targets. In Saudi Arabia, remnants of the Saudi al-Qa'ida network continue to attack U.S. interests in the region.

In Central Asia, the Islamic Jihad Group (IJG), a splinter group of the Islamic Movement of Uzbekistan, has become a more virulent threat to U.S. interests and local governments. Last spring the group used female operatives in a series of bombings in Uzbekistan.

In Southeast Asia, the Jemaah Islamiyah (JI) continues to pose a threat to U.S. and Western interests in Indonesia and the Philippines, where JI is colluding with the Abu Sayyaf Group and possibly the Mff.F.

In Europe, Islamic extremists continue to plan and cause attacks against U.S. and local interests, some that may cause significant casualties. In 2004 British authorities dismantled an al-Qa'ida cell and an extremist brutally killed a prominent Dutch citizen in the Netherlands.

Islamic extremists are exploiting the Iraqi conflict to recruit new anti-U.S. jihadists.

These jihadists who survive will leave Iraq experienced in and focused on acts of urban terrorism. They represent a potential pool of contacts to build transnational terrorist cells, groups, and networks in Saudi Arabia, Jordan and other countries.

Zarqawi has sought to bring about the final victory of Islam over the West, and he hopes to establish a safe haven in Iraq from which his group could operate against ``infidel'' Western nations and ``apostate'' Muslim governments.

Other terrorist groups spanning the globe also pose persistent and serious threats to U.S. and Western interests.

Hizballah's main focus remains Israel, but it could conduct lethal attacks against U.S. interests quickly upon a decision to do so.

Palestinian terrorist organizations have apparently refrained from directly targeting U.S. or Western interests in their opposition to Middle East peace initiatives, but pose an ongoing risk to U.S. citizens that could be killed or wounded in attacks intended to strike Israeli interests.

Extremist groups in Latin America are still a concern, with the FARC--the Revolutionary Armed Forces of Colombia--possessing the greatest capability and the clearest intent to threaten U.S. interests in the region.

Horn of Africa, the Sahel, the Mahgreb, the Levant, and the Gulf States are all areas where ``pop up'' terrorist activity can be expected.

                            AFGHANISTAN

Mr. Chairman, Afghanistan, once the safe haven for Usama bin Ladin, has started on the road to recovery after decades of instability and civil war. Hamid Karzai's election to the presidency was a major milestone. Elections for a new National Assembly and local district councils--tentatively scheduled for this spring--will complete the process of electing representatives.

President Karzai still faces a low-level insurgency aimed at

destabilizing the country, raising the cost of reconstruction and
ultimately forcing Coalition forces to leave.
     The development of the Afghan National Army and a national
police force is going well, although neither can yet stand on its own.

### IRAQ

     Low voter turnout in some Sunni areas and the post-election
resumption of insurgent attacks--most against Iraqi civilian and
security forces--indicate that the insurgency achieved at least some of
its election-day goals and remains a serious threat to creating a
stable representative government in Iraq.
     Self-determination for the Iraqi people will largely depend on the
ability of Iraqi forces to provide security. Iraq's most capable
security units have become more effective in recent months,
contributing to several major operations and helping to put an Iraqi
face on security operations. Insurgents are determined to discourage
new recruits and undermine the effectiveness of existing Iraqi security
forces.
     The lack of security is hurting Iraq's reconstruction efforts and
economic development, causing overall economic growth to proceed at a
much slower pace than many analysts expected a year ago.
     Alternatively, the larger uncommitted moderate Sunni
population and the Sunni political elite may seize the post electoral
moment to take part in creating Iraq's new political institutions if
victorious Shia and Kurdish parties include Sunnis in the new
government and the drafting of the constitution.

### PROLIFERATION

     Mr. Chairman, I will now turn to the worldwide challenge of
proliferation. Last year started with promise as Libya had just
renounced its WMD programs, North Korea was engaged in negotiations
with regional states on its nuclear weapons program, and Iran was
showing greater signs of openness regarding its nuclear program after
concealing activity for nearly a decade. Let me start with Libya, a
good news story, and one that reflects the patient perseverance with
which the Intelligence Community can tackle a tough intelligence
problem.

### LIBYA

     In 2004, Tripoli followed through with a range of steps to disarm
itself of WMD and ballistic missiles.
     Libya gave up key elements of its nuclear weapons program,
opened itself to the IAEA.
     Libya gave up some key CW assets and opened its former CW
program to international scrutiny.
     After disclosing its SCUD stockpile and extensive
ballistic and cruise missile R&D efforts in 2003, Libya took important
steps to abide by its commitment to limit its missiles to the 300-km
range threshold of the Missile Technology Control Regime (MTCR).
     The U.S. continues to work with Libya to clarify some discrepancies
in the declaration.

PX373

NORTH KOREA

On 10 February 2005, Pyongyang announced it was suspending participation in the six-party talks underway since 2003, declared it had nuclear weapons, and affirmed it would seek to increase its nuclear arsenal. The North had been pushing for a freeze on its plutonium program in exchange for significant benefits, rather than committing to the full dismantlement that we and are our partners sought.

In 2003, the North claimed it had reprocessed the 8,000 fuel rods from the Yongbyong reactor, originally stored under the Agreed Framework, with IAEA monitoring in 1994. The North claims to have made new weapons from its reprocessing effort.

We believe North Korea continues to pursue a uranium enrichment capability drawing on the assistance it received from A.Q. Khan before his network was shutdown.

North Korea continues to develop, produce, deploy, and sell ballistic missiles of increasing range and sophistication, augmenting Pyongyang's large operational force of Scud and No Dong class missiles. North Korea could resume flight-testing at any time, including of longer-range missiles, such as the Taepo Dong-2 system. We assess the TD 2 is capable of reaching the United States with a nuclear-weapon-sized payload.

North Korea continues to market its ballistic missile technology, trying to find new clients now that some traditional customers, such as Libya, have halted such trade.

We believe North Korea has active CW and BW programs and probably has chemical and possibly biological weapons ready for use.

IRAN

In early February, the spokesman of Iran's Supreme Council for National Security publicly announced that Iran would never scrap its nuclear program. This came in the midst of negotiations with EU-3 members (Britain, Germany and France) seeking objective guarantees from Tehran that it will not use nuclear technology for nuclear weapons.

Previous comments by Iranian officials, including Iran's Supreme Leader and its Foreign Minister, indicated that Iran would not give up its ability to enrich uranium. Certainly they can use it to produce fuel for power reactors. We are more concerned about the dual-use nature of the technology that could also be used to achieve a nuclear weapon.

In parallel, Iran continues its pursuit of long-range ballistic missiles, such as an improved version of its 1,300 km range Shahab-3 MRBM, to add to the hundreds of short-range SCUD missiles it already has.

Even since 9/11, Tehran continues to support terrorist groups in the region, such as Hizballah, and could encourage increased attacks in Israel and the Palestinian Territories to derail progress toward peace.

Iran reportedly is supporting some anti-Coalition activities in Iraq and seeking to influence the future character of the Iraqi state.

Conservatives are likely to consolidate their power in Iran's June 2005 presidential elections, further marginalizing the reform movement last year.

Iran continues to retain in secret important members of

PX373

Al-Qai'ida--the Management Council--causing further uncertainty about
Iran's commitment to bring them to justice.

## CHINA

Beijing's military modernization and military buildup is tilting
the balance of power in the Taiwan Strait. Improved Chinese
capabilities to threaten U.S. forces in the region.

In 2004, China increased its ballistic missile forces
deployed across from Taiwan and rolled out several new submarines.

China continues to develop more robust, survivable
nuclear-armed missiles as well as conventional capabilities for use in
a regional conflict.

Taiwan continues to promote constitutional reform and other
attempts to strengthen local identity. Beijing judges these moves to be
a ``timeline for independence''. If Beijing decides that Taiwan is
taking steps toward permanent separation that exceed Beijing's
tolerance, we believe China is prepared to respond with various levels
of force.

China is increasingly confident and active on the international
stage, trying to ensure it has a voice on major international issues,
secure access to natural resources, and counter what it sees as U.S.
efforts to contain or encircle China.

New leadership under President Hu Jintao is facing an array of
domestic challenges in 2005, such as the potential for a resurgence in
inflation, increased dependence on exports, growing economic
inequalities, increased awareness of individual rights, and popular
expectations for the new leadership.

## RUSSIA

The attitudes and actions of the so-called ``siloviki''--the ex-KGB
men that Putin has placed in positions of authority throughout the
Russian government may be critical determinants of the course Putin
will pursue in the year ahead.

Perceived setbacks in Ukraine are likely to lead Putin to
redouble his efforts to defend Russian interests abroad while balancing
cooperation with the West. Russia's most immediate security threat is
terrorism, and counterterrorism cooperation undoubtedly will continue.

Putin publicly acknowledges a role for outside powers to
play in the CIS, for example, but we believe he is nevertheless
concerned about further encroachment by the U.S. and NATO into the
region.

Moscow worries that separatism inside Russia and radical
Islamic movements beyond their borders might threaten stability in
Southern Russia. Chechen extremists have increasingly turned to
terrorist operations in response to Moscow's successes in Chechnya, and
it is reasonable to predict that they will carry out attacks against
civilian or military targets elsewhere in Russia in 2005.

Budget increases will help Russia create a professional military by
replacing conscripts with volunteer servicemen and focus on
maintaining, modernizing and extending the operational life of its
strategic weapons systems, including its nuclear missile force.

Russia remains an important source of weapons technology,
materials and components for other nations. The vulnerability of

PX373

Russian WMD materials and technology to theft or diversion is a
continuing concern.

### POTENTIAL AREAS FOR INSTABILITY

    Mr. Chairman, in the Middle East, the election of Palestinian
President Mahmud Abbas, nevertheless, marks an important step and Abbas
has made it clear that negotiating a peace deal with Israel is a high
priority. There nevertheless are hurdles ahead.
    Redlines must be resolved while Palestinian leaders try to
rebuild damaged PA infrastructure and governing institutions,
especially the security forces, the legislature, and the judiciary.
    Terrorist groups, some of who benefit from funding from
outside sources, could step up attacks to derail peace and progress.

### AFRICA

    In Africa, chronic instability will continue to hamper counter-
terrorism efforts and pose heavy humanitarian and peacekeeping burdens.
    In Nigeria, the military is struggling to contain militia
groups in the oil-producing south and ethnic violence that frequently
erupts throughout the country. Extremist groups are emerging from the
country's Muslim population of about 65 million.
    In Sudan, the peace deal signed in January will result in
de facto southern autonomy and may inspire rebels in provinces such as
Darfur to press harder for a greater share of resources and power.
Opportunities exist for Islamic extremists to reassert themselves in
the North unless the central government stays unified.
    Unresolved disputes in the Horn of Africa--Africa's
gateway to the Middle East--create vulnerability to foreign terrorist
and extremist groups. Ethiopia and Eritrea still have a contested
border, and armed factions in Somalia indicate they will fight the
authority of a new transitional government.

### LATIN AMERICA

    In Latin America, the region is entering a major electoral cycle in
2006, when Brazil, Colombia, Costa Rica, Ecuador, Mexico, Nicaragua,
Peru, and Venezuela hold presidential elections. Several key countries
in the hemisphere are potential flashpoints in 2005.
    In Venezuela, Chavez is consolidating his power by using
technically legal tactics to target his opponents and meddling in the
region supported by Castro.
    In Colombia, progress against counternarcotics and
terrorism under President Uribe's successful leadership, may be
affected by the election.
    The outlook is very cloudy for legitimate, timely
elections in November 2005 in Haiti--even with substantial
international support.
    Campaigning for the 2006 presidential election in Mexico
is likely to stall progress on fiscal, labor, and energy reforms.
    In Cuba, Castro's hold on power remains firm, but a bad fall last
October has rekindled speculation about his declining health and
succession scenarios.

PX373

SOUTHEAST ASIA

   In Southeast Asia, three countries bear close watching.
   In Indonesia, President Yudhoyono has moved swiftly to
crackdown on corruption. Reinvigorating the economy, burdened by the
costs of recovery in tsunami-damaged areas, will likely be affected by
continuing deep-seated ethnic and political turmoil exploitable by
terrorists.
   In the Philippines, Manila is struggling with prolonged
Islamic and Communist rebellions. The presence of Jemaah Islamiyah (JI)
terrorists seeking safe haven and training basses adds volatility and
capability to terrorist groups already in place.
   Thailand is plagued with an increasingly volatile Muslim.
separatist threat in its southeastern provinces, and the risk of
escalation remains high.

   Chairman Roberts. We thank you, Mr. Director, for a very
comprehensive statement.
   Director Mueller.

       STATEMENT OF THE HONORABLE ROBERT MUELLER,
         DIRECTOR, FEDERAL BUREAU OF INVESTIGATION

   Director Mueller. Good morning, Mr. Chairman. Thank you.
Thank you, Mr. Chairman and Senator Rockefeller and the Members
of the Committee. I appreciate this opportunity to discuss our
current view of threats to the United States and the FBI's
efforts to address these threats.
   Mr. Chairman, over the past year, through unprecedented
cooperation, particularly with our other Federal agencies, but
most particularly with State and local law enforcement, and
with enhanced intelligence capabilities, we have achieved
considerable victories against national security and criminal
threats facing the United States.
   However, at the same time, I must also report that these
threats continue to evolve and to pose new challenges to the
FBI and to our partners. It remains the FBI's overriding
priority to detect and prevent terrorist attacks. And the
threat posed by international terrorism, and in particular from
al-Qa'ida and from related groups, continues to be the gravest
threat that we face.
   In 2004, we learned that terrorist cell members had
conducted detailed surveillance of financial targets in New
York, Washington, DC and New Jersey. In response to this threat
and in coordination with the Department of Homeland Security,
the threat level was raised. And we mobilized a substantial
contingent of agents and analysts to review the massive amount
of information connected with the attack planning and to
uncover any additional information that would give us insight
into that plot.
   Later in the year, we received information suggesting that
there would be an attack. There was an attack being planned,
possibly timed to coincide with the period before the 2004
Presidential election.
   To counter that threat, the FBI created a task force in May

PX373

2004, and with thousands of FBI personnel working together with hundreds of individuals from other agencies--Federal, State and local--we brought to bear every possible resource in an effort to identify the operatives and to disrupt the attack plan.

As part of the initiatives of this task force, field offices conducted a thorough canvas of all of our counterterrorism investigations, as well as all of our sources--not only counterterrorism sources, but other sources-- in an effort to develop any further information that could help us find these individuals.

During the 7 months that the task force was up and running, we also checked every substantive lead provided in the threat intelligence. It was indeed an extraordinary effort, and while we may never know if an operation was indeed being planned, I am certain that our response to the threat played an integral role in disrupting any operational plans that may have been under way.

Mr. Chairman, since we last spoke, the FBI has identified various extremists located throughout the United States and is monitoring their activities. My prepared statement sets forth a number of instances in which we have taken legal action against individuals engaged in terrorism-related activities in Virginia, Minneapolis and New York. Although these efforts have made us safer, they are also a sobering reminder of the threat we continue to face.

There are three areas that cause us the greatest concern. First is the threat from covert al-Qa'ida operatives inside the United States who have the intention to facilitate or to conduct an attack. Finding them is the top priority for the FBI, but it is also one of our most difficult challenges. The very nature of a covert operative, trained not to raise suspicion and to appear benign, is what makes their detection so difficult.

Whether we are talking about a true sleeper operative who has been in place for years, waiting to be activated to conduct an attack, or a recently deployed operative who has entered the United States to facilitate or to conduct an attack, we are continuously adapting our methods to reflect newly received intelligence and to ensure we are as proactive and as targeted as we can be in detecting their presence.

Second, we are also extremely concerned with the growing body of sensitive reporting that continues to show al-Qa'ida's clear intention to obtain, and to ultimately use, some form of chemical, biological, radiological or nuclear material in its attacks against the United States.

While we still assess that a mass casualty attack using relatively low-tech methods will be their most likely approach, we are concerned that they are seeking weapons of mass destruction, including chemical weapons, so-called dirty bombs or some form of biological agent such as anthrax.

Third, we remain concerned about the potential for al-Qa'ida to leverage extremist groups with peripheral or historical connections to al-Qa'ida, and particularly its ability to exploit radical American converts and other indigenous extremists. While we still believe that the most

PX373

serious threat to the homeland originates from al-Qa'ida
members located overseas, the bombings in Madrid last March
have heightened our concern regarding the possible role that
indigenous Islamic extremists already in the United States may
play in future terrorist plots.

We are also concerned about the possible role that
peripheral groups with a significant presence in the United
States may play, if called upon by members of al-Qa'ida to
assist them with attack planning or logistical support. The
potential recruitment of radicalized American Muslim converts
continues to be a concern and poses an increasingly challenging
issue. The process of recruitment can be subtle, and many times
self-initiated. And radicalization tends to occur over a long
period of time and under very many different circumstances.

Efforts by extremists to obtain training inside the United
States is also an ongoing concern. Although there are multiple
reports and ongoing investigations associated with paramilitary
training activities, I would suspect that extremists
nationwide, the majority of these cases involve small groups of
like-minded individuals who are inspired by the jihadist
rhetoric found in radical mosques or in prison proselytizing or
on the Internet.

Fortunately, the recent amendment to Title 18 adding a
provision prohibiting individuals from receiving military-type
training from a designated foreign terrorist organization makes
it possible now to prosecute individuals who participate or
assist individuals in receiving this type of training.

Mr. Chairman, al-Qa'ida and the groups that support it are
still the most lethal threat we face today. However, other
terrorist groups that have a presence in the United States
require careful monitoring.

It is the FBI's assessment at this time that there is a
limited threat of a coordinated terrorist attack in the United
States from Palestinian terrorist organizations such as Hamas
and the Palestine Islamic Jihad, and the al-Aqsa Martyrs
Brigade. These groups have maintained a longstanding policy of
focusing their attacks on Israeli targets in Israel and the
Palestinian territories. We believe that the primary interest
of Palestinian terrorist groups in the United States remains
the raising of funds to support their regional goals.

We are committed to cutting off the flow of these funds
from the United States to Palestinian terrorist organizations.
As an example of this effort, the former leadership of the Holy
Land for Relief and Development, a Hamas front organization,
was indicted this past year. And in another case, the Elashi
brothers, who owned and ran InfoCom, another Hamas front
organization, were prosecuted and convicted.

Of all the Palestinian groups, Hamas has the largest
presence in the United States, with a strong infrastructure
primarily focused on fundraising, propaganda for the
Palestinian cause and proselytizing. Although it would be a
major strategic shift for Hamas, its United States network is
theoretically capable of facilitating acts of terrorism in the
United States.

And like Hamas, but on a much smaller scale, the United

PX373

States-based Palestine Islamic Jihad members and supporters are primarily engaged in fundraising, propaganda and proselytizing activities. In 2003, the Palestine Islamic Jihad, or PIJ, activities and capabilities in the United States were severely undercut by the arrests of the PIJ leader Sami al-Arian and his lieutenants. And there have been two additional arrests of suspected PIJ activists on charges unrelated to terrorism, which I believe are set forth in my accompanying statement.

Currently, the most likely threat of a terrorist attack from Palestinian groups in the United States--in the United States homeland--is from a lone-wolf scenario. In this scenario, a terrorist attack would be perpetrated by one or more individuals who may embrace the ideology of a Palestinian terrorist group, but act without assistance or approval of any established group.

And then, the Lebanese Hizbollah retains the capability to strike in the United States, although we have no credible information to indicate that United States-based Hizbollah members have plans to attack American interests within the United States or, for that matter, abroad.

I might add in 2004 we had successes in uncovering individuals providing material support to Hizbollah, many of those individuals involved in various criminal schemes to provide the monies that could be sent to Lebanon, to the coffers of Hizbollah.

Mr. Chairman, while the national attention is focused on the substantial threat posed by international terrorists to the homeland, the FBI must also dedicate resources to defeating a number of other threats, as detailed in my prepared statement-- for example, domestic terrorists, motivated by a number of political or social agendas, including white supremacists, black separatists, animal rights/environmental terrorists, anarchists, anti-abortion extremists and self-styled militia groups; foreign intelligence activity, often using non-traditional collectors such as students and business visitors, targeting WMD information and technology, penetration of the United States government and compromise of critical, national assets.

There is the cyber threat from foreign governments, from terrorist groups and from hackers with the ability and the desire to utilize computers for illegal and harmful purposes.

And finally, there are the continuing threats posed to the fabric of our society by organized crime, human smuggling and trafficking, violent gangs, public corruption, civil rights violations, crimes against children and corporate fraud.

Mr. Chairman, in combating all these threats, from international terrorists to child predators, the FBI must effectively collect, analyze and share intelligence. As a result, over the past year we have continued to strengthen the FBI's enterprise-wide intelligence program. It began in 2001, with a dedicated analysis section in the Counterterrorism Division.

In 2002, we created the Office of Intelligence in the Counterterrorism Division. That structure has enhanced our capability significantly for purposes of our counterterrorism

PX373

operations as well as the counterterrorism operations of our partners.

In 2003, we extended this concept across all FBI programs--criminal, cyber, counterterrorism and counterintelligence--and unified intelligence authorities under a new FBI Office of Intelligence, led by an Executive Assistant Director. The Office of Intelligence has adopted the intelligence community's best practices to direct all of our FBI intelligence activities. Congress and the 9/11 Commission reviewed these efforts, and provided recommendations to strengthen our capabilities.

In the last years, in intelligence reform legislation, alluded to by Senator Rockefeller, Congress directed us to create the Directorate of Intelligence--a dedicated national intelligence workforce within the FBI--and we are doing so. This workforce consists of intelligence analysts, language analysts, physical surveillance specialists and special agents who can pursue an entire career in intelligence.

This integrated intelligence service leverages the core strengths of the law enforcement community, such as reliability of sources and fact-based analysis, while ensuring that no walls exist between collectors, analysts and those who must act upon the intelligence information.

The Directorate also benefits from the strong FBI history of joint operations by unifying FBI intelligence professionals and integrating all partners, but most particularly, State, local and tribal law enforcement into our intelligence structures.

Mr. Chairman, my prepared statement provides additional information about the Directorate of Intelligence and the many steps that the Bureau has taken to expand and to strengthen its intelligence capabilities.

We continue to make progress, but there is still much work to do. We do not underestimate the challenges we face, but we are confident in our strategy and in our plans to protect the American people.

I again would like to thank you and the Committee for your support, and I look forward to working with you and the staff in the months--and hopefully the years--ahead. And I'm happy to answer any questions that you might have.

Thank you, sir.

[The prepared statement of Director Mueller follows:]

Prepared Statement of Hon. Robert S. Mueller, III, Director, Federal Bureau of Investigation

Good afternoon, Mr. Chairman, Senator Rockefeller, and Members of the Committee. I appreciate this opportunity to discuss our current view of threats to the United States and the FBI's efforts to address them.

Before I begin, I would like to take a moment to thank all of our partners in the Law Enforcement and Intelligence Communities. They have shared their information and expertise, and in many cases worked side-by-side with us, and together we made great progress over the past year to protect our Nation and our communities from terrorism and crime.

PX373

I would also like to thank the men and women of the FBI for continuing to embrace our changing mission, for working to enhance our intelligence capabilities, for adapting to new technologies and new ways of doing things, and for doing all of this without ever pausing in our forward push to protect this country from active threats.

Mr. Chairman, over the past year, through unprecedented cooperation, enhanced intelligence capabilities, and continued unwavering commitment to protect the American people, we have achieved considerable victories against national security and criminal threats facing the U.S. However, I must also report that these threats continue to evolve and to pose new challenges to the FBI and our partners.

It remains the FBI's overriding priority to predict and prevent terrorist attacks. The threat posed by international terrorism, and in particular from al Qa'ida and related groups, continues to be the gravest we face.

## AL-QA'IDA AND RELATED TERRORIST GROUPS

In 2004, our efforts in the War on Terrorism grew more intelligence-driven, more coordinated, and produced many tangible results.

In 2004 we learned that operatives had conducted detailed surveillance of financial targets in New York, Washington DC, and New Jersey. In response to this threat, in coordination with DHS, the threat level was raised from yellow to orange for the cities referenced in the threat and we mobilized a large contingent of analysts and agents to review the massive amount of information connected with the attack planning, and to uncover any additional information that would give us insight into the plot.

Previously, in the Spring of 2004, our allies in the United Kingdom arrested a group of terrorists who were plotting an imminent attack inside the UK. In response, we immediately formed a task force of analysts and agents to determine if there was a U.S. nexus to the plot or if any of the UK subjects had links to individuals in the U.S.

Later in the year, we received information suggesting that there was an attack being planned--possibly timed to coincide with the 2004 Presidential Election. To counter the threat, the FBI created the 2004 Threat Task Force in May 2004. With thousands of FBI personnel, supported by individuals from outside agencies, it was the largest task force created since 9/11, and it brought to bear every possible resource in an effort to identify the operatives and disrupt the attack plan.

As part of the Task Force's initiatives, field offices conducted a thorough canvass of all counterterrorism investigations and FBI sources to develop any further information that could help us find these individuals. During the 7 months the task force was up and running, we also checked every tangible lead provided in the threat intelligence. It was an extraordinary effort and while we may never know if an operation was indeed being planned, I am certain that the FBI's tremendous response to the threat played an integral role in disrupting any operational plans that may have been underway.

Mr. Chairman, since we last spoke, the FBI has identified various extremists located throughout the U.S. and is monitoring their activities. Although these efforts have made us safer, they are also a sobering reminder of the threat we continue to face.

PX373

In Virginia, Mohammed Ali al-Timimi, the spiritual leader
of the Virginia Jihad training group disrupted last year, was indicted
for his involvement in the recruitment of U.S. citizens for extremist
training and jihad preparation. Al-Timimi, the primary lecturer at a
northern Virginia Islamic center, preached jihad to a small core group
of followers, provided them paramilitary training and facilitated their
travel to Pakistan in the days after September 11th to attend Lashkar-
e-Taiba training camp in preparation to fight the United States in
Afghanistan.

In Minneapolis, we arrested Mohamad Kamal El-Zahabi, a
Lebanese citizen who admitted to serving in Afghanistan and Chechnya as
a sniper and to providing sniper training at Khalden camp in
Afghanistan and in Lebanon in the 1990s. We first learned of El-Zahabi
during our investigation of Boston-based Sunni extremists Ra'ed Hijazi,
convicted for his role in the Millennium plot in Jordan, and Bassain
Kanj, who was killed in a plot to overthrow the Lebanese government in
2000.

In New York, Yassin Muhiddin Aref was arrested on money
laundering charges connected to a possible terrorist plot to kill a
Pakistani diplomat.

Unfortunately, in spite of these accomplishments, al-Qa'ida
continues to adapt and move forward with its desire to attack the
United States using any means at its disposal. Their intent to attack
us at home remains--and their resolve to destroy America has never
faltered.

Al-Qa'ida's overall attack methodology has adapted and evolved to
address the changes to their operating environment. While we still
assess that a mass casualty attack using relatively low-tech methods
will be their most likely approach, we are concerned that they are
seeking weapons of mass destruction including chemical weapons, so-
called ``dirty bombs'' or some type of biological agent such as
anthrax.

Every day, personnel in our Counterterrorism Division and in 100
Joint Terrorism Task Forces around the country, work to determine
where, when, and how the next attack will occur. The fact remains--
America is awash in desirable targets--those that are symbolic like the
U.S. Capitol and the White House--as well as the many infrastructure
targets, like nuclear power plants, mass transit systems, bridges and
tunnels, shipping and port facilities, financial centers, and
airports--that if successfully hit, would cause both mass casualties
and a crippling effect on our economy.

We continue to be concerned that U.S. transportation systems remain
a key target. The attacks in Madrid last March show the devastation
that a simple, low-tech operation can achieve and the resulting impact
to the government and economy, which makes this type of attack in the
U.S. particularly attractive to al-Qa'ida.

Another area we consider vulnerable and target rich is the energy
sector, particularly nuclear power plants. Al-Qa'ida planner Khalid
Sheikh Mohammed had nuclear power plants as part of his target set and
we have no reason to believe that al-Qa'ida has reconsidered.

Looking ahead, there are three areas that cause us the greatest
concern.

First is the threat from covert operatives who may be inside the
U.S. who have the intention to facilitate or conduct an attack. Finding
them is a top priority for the FBI, but it is also one of the most

difficult challenges. The very nature of a covert operative--trained to not raise suspicion and to appear benign--is what makes their detection so difficult.

Mr. Chairman, while we are proud of our accomplishments this year and the additional insight we have gained into al-Qa'ida's activity, I remain very concerned about what we are not seeing.

Whether we are talking about a true sleeper operative who has been in place for years, waiting to be activated to conduct an attack or a recently deployed operative that has entered the U.S. to facilitate or conduct an attack, we are continuously adapting our methods to reflect newly-received intelligence and to ensure we are as proactive and as targeted as we can be in detecting their presence.

Second, because of al-Qa'ida's directed efforts this year to infiltrate covert operatives into the U.S., I am also very concerned with the growing body of sensitive reporting that continues to show al-Qa'ida's clear intention to obtain and ultimately use some form of chemical, biological, radiological, nuclear or high-energy explosives (CBRNE) material in its attacks against America.

Third, we remain concerned about the potential for al-Qa'ida to leverage extremist groups with peripheral or historical connections to al-Qa'ida, particularly its ability to exploit radical American converts and other indigenous extremists. While we still believe the most serious threat to the Homeland originates from al-Qa'ida members located overseas, the bombings in Madrid last March have heightened our concern regarding the possible role that indigenous Islamic extremists, already in the U.S., may play in future terrorist plots. Also of concern is the possible role that peripheral groups with a significant presence in the U.S. may play if called upon by members of al-Qa'ida to assist them with attack planning or logistical support.

The potential recruitment of radicalized American Muslim converts continues to be a concern and poses an increasingly challenging issue for the FBI because the process of recruitment is subtle and many times, self initiated and radicalization tends to occur over a long period of time and under many different circumstances.

As part of our continued efforts to identify populations that may be a target for extremist recruitment, the FBI has been involved in a coordinated effort between law enforcement and corrections personnel to combat the recruitment and radicalization of prison inmates. Prisons continue to be fertile ground for extremists who exploit both a prisoner's conversion to Islam while still in prison, as well as their socio-economic status and placement in the community upon their release.

Extremist recruitment at schools and universities inside the United States also poses a particularly difficult problem. Because the environment on campuses is so open and isolated, schools provide a particularly impressionable and captive audience for extremists to target.

Additionally, keeping in mind al-Qa'ida recruitment efforts occur primarily overseas, we are closely monitoring any possible methods for moving individuals to extremist-linked institutions overseas, specifically religious schools and mosques that have overt ties to al-Qa'ida or other terrorist organizations.

We are also concerned about the possibility that individuals who are members of groups previously considered to be peripheral to the current threat, could be convinced by more radical, external influences

to take on a facilitation or even worse--an operational role--with little or no warning. Individual members of legitimate organizations, such as Jama'at Tabligh, may be targeted by al-Qa'ida in an effort to exploit their networks and contacts here in the United States.

Efforts by extremists to obtain training inside the U.S. is also an ongoing concern. Although there are multiple reports and ongoing investigations associated with the paramilitary training activities of suspected extremists nationwide, the majority of these cases involve small groups of like-minded individuals who are inspired by the jihadist rhetoric experienced in radical mosques or prison proselytizing.

Fortunately, the recent amendment to Title 18 adding a provision whereby an individual knowingly receiving military-type training from a designated foreign terrorist organization is committing an offense, makes it possible to now prosecute individuals who participate or assist individuals in receiving this type of training.

Another area of concern is the recent merging of Iraqi jihadist leader Abu Mu'sab alZargawi with al-Qa'ida. Zarqawi has a demonstrated capability of directing external operations while maintaining his focus on Iraq as noted with the disrupted Jordan plot in April.

Another aspect of extremist activity in the U.S. is the extensive fundraising efforts by various terrorist groups. We continue to identify and block funding conduits, freeze assets of terrorists and those who support them, protect legitimate charities, and disrupt the movement of money through peripheral financial systems such as Hawalas.

As part of this effort, the FBI has engaged in extensive coordination with authorities of numerous foreign governments in terrorist financing matters, leading to joint investigative efforts throughout the world. The FBI's participation in a U.S.-Saudi Arabia Joint Terrorism Task Force, the U.S.-Swiss Terrorism Financing Task Force and the International Working Group on Terrorist Financing has enhanced cooperation between these agencies and the U.S. and allowed the FBI unprecedented access that has increased our understanding of these complex financing networks. Since 2002, we have provided terrorism financing training and technical assistance to liaison partners in almost 50 countries.

### THE THREAT FROM OTHER INTERNATIONAL TERRORIST GROUPS

Mr. Chairman, al-Qa'ida and the groups that support it are still the most lethal threat we face today. However, other terrorist groups that have a presence in the U.S. require careful monitoring.

It is the FBI's assessment, at this time, that there is a limited threat of a coordinated terrorist attack in the U.S. from Palestinian terrorist organizations, such as HAMAS, the Palestine Islamic Jihad, and the al-Agsa Martyr's Brigade. These groups have maintained a longstanding policy of focusing their attacks on Israeli targets in Israel and the Palestinian territories. We believe that the primary interest of Palestinian terrorist groups in the U.S. remains the raising of funds to support their regional goals.

The FBI is committed to staunching the flow of funds from the U.S. to Palestinian terrorist organizations. As an example of this effort, the former leadership of the Holy Land for Relief and Development, a HAMAS front organization, was indicted this past year and convictions were won against the Elashi brothers who owned and ran Infocom, another

PX373

HAMAS front organization.

Of all the Palestinian groups, HAMAS has the largest presence in the U.S. with a robust infrastructure, primarily focused on fundraising, propaganda for the Palestinian cause, and proselytizing. Although it would be a major strategic shift for HAMAS, its U.S. network is theoretically capable of facilitating acts of terrorism in the U.S.

Like HAMAS, but on a much smaller scale, U.S.-based Palestine Islamic Jihad members and supporters are primarily engaged in fundraising, propaganda and proselytizing activities. In 2003, the Palestine Islamic Jihad, or PIJ, activities and capabilities in the U.S. were severely undercut by the arrests of the U.S. PIJ leader, Sami al-Arian, and three of his top lieutenants. There have also been two additional arrests of suspected PIJ activists on charges unrelated to terrorism. There has been no indication of a new U.S. PIJ leadership since the arrest of al-Axian.

Currently, the most likely threat of terrorist attacks from Palestinian groups to the U.S. homeland is from a ``lone wolf 'scenario. In this scenario, a terrorist attack would be perpetrated by one or more individuals who may embrace the ideology of a Palestinian terrorist group, but act without assistance or approval of any established group.

Lebanese Hizballah retains the capability to strike in the U.S., although we have no credible information to indicate that US-based Hizballah members have plans to attack American interests within the U.S. or abroad. In 2004, we had some success in uncovering individuals providing material support to Hizballah.

In Detroit, Mahmoud Youssef Kourani was indicted in the Eastern District of Michigan on one count of Conspiracy to Provide Material Support to Hizballah. Kourani was already in custody for entering the country illegally through Mexico and was involved in fundraising activities on behalf of Hizballah.

Also in Detroit, Fawzi Assi was arrested in May of 2004 and was charged under the 1996 Antiterrorism and Effective Death Penalty Act for providing material support to Hizballah. Assi was initially arrested in 1998 after an outbound U.S. Customs search at the Detroit Metro Airport discovered night vision goggles, one thermal imaging scope and two Boeing Global Positioning System devices. Assi later fled the country after being released by the court on bail, but was later turned over to us in Lebanon to face U.S. criminal charges.

THE THREAT FROM DOMESTIC TERRORISM

While national attention is focused on the substantial threat posed by international terrorists to the homeland, law enforcement officials must also contend with an ongoing threat posed by domestic terrorists based and operating strictly within the U.S. Domestic terrorists motivated by a number of political or social agendas--including white supremacists, black separatists, animal rights/environmental terrorists, anarchists, anti-abortion extremists, and self-styled militia--continue to employ violence and criminal activity in furtherance of these agendas.

Animal rights and environmental extremists, operating under the umbrella of the Animal Liberation Front (ALF) and Earth Liberation Front (ELF) utilize a variety of tactics against their targets,

PX373

including arson, sabotage/vandalism, theft of research animals, and the occasional use of explosive devices.

Serious incidents of animal rights/eco-terrorism decreased in 2004, a fact we attribute to a series of law enforcement successes that are likely deterring large-scale arsons and property destruction. Following a rash of serious incidents of animal rights/eco-terrorism, including a $50 million arson in San Diego and two bombing incidents in the San Francisco area, law enforcement authorities achieved several significant successes which have likely deterred additional terrorist activity. Despite these successes, we anticipate that animal rights extremism and eco-terrorism will continue to threaten certain segments of government and private industry, specifically in the areas of animal research and residential/commercial development.

The potential for violence by anarchists and other emerging revolutionary groups, such as the Anarchist Black Cross Federation (ABCF), will continue to be an issue for law enforcement. The stated goals of the ABCF are ``the abolishment of prisons, the system of laws, and the Capitalist state.'' The ABCF believes in armed resistance to achieve a stateless and classless society. ABCF has continued to organize, recruit, and train anarchists in the tactical use of firearms.

U.S.-based black separatist groups follow radical variants of Islam, and in some cases express solidarity with al-Qa'ida and other international terrorist groups.

Incidents of organized white supremacist group violence decreased in 2004. This is due to several high profile law enforcement arrests over the last several years, as well as the continued fragmentation of white supremacist groups because of the deaths or the arrests of leaders. We judge that violence on the part of white supremacists remains an ongoing threat to government targets, Jewish individuals and establishments, and non-white ethnic groups.

However, the right-wing Patriot movement--consisting of militias, common law courts, tax protesters, and other anti-government extremists--remains a continuing threat in America today. Sporadic incidents resulting in direct clashes with law enforcement are possible and will most likely involve State and local law enforcement personnel, such as highway patrol officers and sheriff's deputies.

Potential violent anti-abortion extremists linked to terrorism ideologies or groups pose a current threat. The admiration of violent high-profile offenders by extremists highlight continued concerns relating to potential or similar anti-abortion threat activity.

WMD PROLIFERATION AND OTHER FOREIGN INTELLIGENCE THREATS

Although the impact of terrorism is more immediate and highly visible, espionage and foreign intelligence activity are no less a threat to the U.S. national security. Many countries consider the U.S. to be their primary intelligence target; so long as the U.S. maintains its position in world affairs, it will continue to be targeted. As part of its reinvigorated and refocused foreign counterintelligence (FCI) program, the FBI has applied a more rigorous methodology to its efforts to assess and articulate the current threat environment.

One of the key elements of the FBI's National Strategy for Counterintelligence (adopted in August 2002) is the threat assessment. Over the past 2 years, the FBI has produced comprehensive threat

PX373

assessments on several countries deemed to be of particular CI concern. The National Strategy for Counterintelligence identified five categories of foreign intelligence activity as being especially harmful to the U.S. national security. These five categories of activity are weighted in terms of importance, the in the following order:

Proliferation of chemical, biological, radiological, nuclear, and high-energy explosives (CBRNE) information and technology:

Penetration of the U.S. Intelligence Community (USIC)

Penetration of U.S. Government entities and contractors

Compromise of Critical National Assets (CNAs), defined as any information, policies, plans, technologies, or industries that, if stolen, modified, or manipulated by an adversary would seriously threaten U.S. national or economic security; and

Conduct of clandestine foreign intelligence activities in the U.S.

Several countries have traditionally considered the U.S. to be their primary intelligence target, as well as an adversary or threat. This prioritization is manifested through their continued large and active intelligence presence in the U.S. and their aggressive targeting of U.S. persons, information and technology. Other countries, while not necessarily viewing the U.S. as an adversary or threat, seek information to help them compete economically, militarily, and politically in world affairs. As the current leader in all three areas, the U.S. becomes their primary target. For still other countries, rather than being an intelligence target, the U.S. represents an operating environment in which to conduct intelligence-related activities focused on their domestic security.

Some foreign countries are becoming increasingly sophisticated in their CI awareness, training and capabilities. Also of growing concern is the asymmetrical threat posed by certain intelligence services that supplement their collection capabilities in the U.S. by using non-traditional collectors. These collectors include students, delegations, business visitors, emigres, and retired intelligence officers who are collecting against targets of opportunity or responding to ad hoc requests from the intelligence services. Such non-traditional collectors pose a potential threat across the US, requiring a coordinated response by all FBI field offices.

The FBI does not foresee any significant changes in the official foreign intelligence presence in the U.S. over the next two to 3 years. However, in addition to using non-traditional collectors, several countries appear to be exploiting their military liaison officers, who are in the U.S. on overt, legitimate intelligence-sharing missions, to target and collect sensitive defense information that is outside the scope of their official access. Most difficult to identify and assess is the intelligence collection activity being directed and/or conducted by non-intelligence organizations, such as other foreign government agencies and/or foreign companies. The FBI sees this type of activity most frequently in the targeting and collection of CBRNE information and technology.

Another challenge the FBI will face is the tendency of some foreign intelligence services to leverage liaison relationships for intelligence collection purposes. U.S. Government representatives participating in international conferences and exchanges, or whose duties include routine liaison with foreign intelligence representatives, frequently report that their contacts engage in

PX373

elicitation, sometimes to a surprisingly aggressive level.

The FBI expects to see a continued increase in the use of technology as an enabler for intelligence operations, such as contacting, tasking; and debriefing sources and agents in the US.

Over the near term, the priority collection targets for these countries will be:

The effects of the recent 2004 U.S. elections on U.S. foreign and domestic policies;

U.S. military actions in Iraq and Afghanistan;

U.S. counterterrorism policy;

U.S. dual use technologies; and

U.S. policy vis-a-vis particular countries or regions of the world.

The FBI expects to see continued lobbying, political influence, and/or perception management activities by countries hoping to affect U.S. policy.

Many foreign intelligence services will also continue to exploit their presence in the U.S. to target and collect against third countries. Most will also engage in defensive intelligence activities, targeting their own expatriate and ethnic communities in the US, especially those groups deemed to be a threat to the current regime.

The FBI's National Strategy for Counterintelligence sets forth national priorities and strategic objectives as well as changes in management and organizational culture intended to redirect and significantly enhance the overall performance of the FBI's FCI program. Program objectives and outcomes include:

Identify intelligence service objectives, officers, assets, and operations;

Disrupt the operations of intelligence services; and

Change the behavior of exploited institutions and individuals.

To that end, the FBI has identified five program strategies: Know the Domain; Understand the Threat; Engage in Strategic Partnerships; Conduct Sophisticated Operations; and Inform Policymakers.

During fiscal year 2004, the FBI FCI program accomplished the following:

Six foreign intelligence officers and/or agents were arrested;

67 requests for persona non grata actions and visa denials were issued;

1,667 Intelligence Information Reports were disseminated.

In addition, the Asset Validation Review process was implemented in July 2002, and the FBI began providing mandatory asset validation training for Asset Coordinators in the field regarding procedures and policies. The FBI also implemented the Agents in Laboratories Initiative (AILI) in February 2003, through which FBI agents have been placed in Department of Energy nuclear weapons and science laboratories.

The FBI has also developed several strategic partnerships, to include the Regional CI Working Group (RCIWG) Initiative, which was established in October 2003 to implement the National Strategy for Counterintelligence, leverage the RCIWGs in tasking our USIC partners, address intelligence gaps, identify CI trends and priorities in the operational arena among USIC agencies at the field level, and ensure that all CI operational initiatives and projects across agencies are

PX373

coordinated through the FBI.

Similarly, the National CI Working Group (NCIWG) was established and is led by the FBI and consists of other CI agency head-level representatives. The mission is to establish ongoing interagency planning discussions to better coordinate CI operations USIC-wide. Domain Task Forces are CI project level task forces led by the FBI, in vulnerabilities associated with at-risk national security projects, i.e., sensitive technologies, information, and research and development.

FBI field offices are developing ``business alliances'' to build executive-level relationships and foster threat and vulnerability information sharing, with private industries and academic institutions located within their territories having at-risk and sensitive national security and economic technologies, research and development projects.

Finally, the FBI has reinvigorated its CI training process. For example, field agents are trained in the key components of basic CI operations through an intensive 4-week Basic CI Operations course. Other advanced, highly specialized CI courses and seminars provide training to agents and analysts through a variety of innovative instructional methods and include inservices and conferences, the Interactive Multimedia Instruction and Simulation (IMIS) computer-based training program, and the FBI Intranet.

CYBER THREATS

The cyber-threat to the U.S. is serious and continues to expand rapidly the number of actors with both the ability and the desire to utilize computers for illegal and harmful purposes rises.

Cyber threats stems from both State actors, including foreign governments that use their vast resources to develop cyber technologies with which to attack our networks, and non-state actors such as terrorist groups and hackers that act independently of foreign governments. The increasing number of foreign governments and non-state actors exploiting U.S. computer networks is a major concern to the FBI and the Intelligence Community as a whole.

State actors continue to be a threat to both our national security as well as our economic security because they have the technical and financial resources to support advanced network exploitation and attack. The greatest cyber threat is posed by countries that continue to openly conduct computer network attacks and exploitations on American systems.

Terrorists show a growing understanding of the critical role that information technology plays in the day-to-day operations of our economy and national security. Their recruitment efforts have expanded to include young people studying mathematics, computer science and engineering in an effort to move from the limited physical attacks to attacks against our technical systems.

Fortunately, the large majority of hackers do not have the resources or motivation to attack the U.S. critical information infrastructures. Most targets of the hacker are viewed as ``challenges'' to break into a system. These individuals do not introduce malicious code to the system, but usually leave their ``cyber signature.'' Although a nuisance, the single hacker does not pose a great threat; however, the increasing volume of hacking activity worldwide does inadvertently disrupt networks, including that of the

PX373

U.S. information infrastructures. Hackers that plant malicious code or
upload bots that are designed to steal information are the main threats
in this group. These individuals have the ability to take down a system
or steal trade secrets, either of which can be devastating to a company
or agency.

The growing number of hackers motivated by money is a cause for
concern. If this pool of talent is utilized by terrorists, foreign
governments or criminal organizations, the potential for a successful
cyber attack on our critical infrastructures is greatly increased.

To combat these and other cyber threats, the FBI established a
national cyber program with a Cyber Division at FBI Headquarters and
dedicated cyber squads in the field offices. The program enables us to
coordinate and facilitate investigations of those Federal criminal
violations using the Internet, computer systems, or networks. It also
helps us to build and maintain public/private alliances to maximize
counterterrorism, counterintelligence, and law enforcement cyber
response capabilities. We are also working to aggregate the
technological and investigative expertise necessary to meet the
challenges that lie ahead. We are recruiting and hiring individuals who
possess degrees and experience in computer sciences, information
systems, or related disciplines. We are looking for specialists who
possess a bedrock of experience and a profound understanding of the
cyber world.

CONVERGING CRIMINAL THREATS

It is increasingly the case that counterterrorism,
counterintelligence, cyber, and criminal investigations are
interrelated. There are rarely clear dividing lines that distinguish
terrorist, counterintelligence, and criminal activity. Recognizing this
trend toward convergence, the first priority of the FBI's Criminal
Investigative Program is to leverage criminal investigative resources
to enhance the FBI's Counterterrorism, Counterintelligence Cyber
programs.

Terrorists use criminal enterprises and criminal activities to
support and fund terrorist organizations. The FBI's criminal
investigations of these crimes and criminal enterprises, often in task
forces in conjunction with other Federal, state, and local law
enforcement, continue to develop invaluable intelligence, as well as to
initiate investigations, which further identify the United States'
vulnerability to attack and directly support the FBI's and the
Intelligence Community's counterterrorism, counterintelligence, and
cyber crime efforts.

One of the FBI's first investigations to utilize the material
support of a terrorist organization statute evolved from a criminal
investigation of Hizballah operators utilizing credit card scams,
cigarette smuggling and loan fraud to support the purchase of dual use
equipment for Hizballah procurement leaders in Lebanon. The FBI used
the criminal RICO statute to fully neutralize this terrorist cell.

In combatting converging threats, the FBI's Criminal Program is
placing greater emphasis on the collection, analysis, dissemination and
effective use of intelligence, including intelligence derived from
criminal investigations, including intelligence derived from human
sources and the use of sophisticated investigative techniques. We are
using intelligence to identify crime problems and trends, to conduct

PX373

threat assessments, and to drive investigative efforts. Currently, we
are aggressively pursuing intelligence collection and threat
assessments on Organized Crime, Human Smuggling and Trafficking,
Violent Gangs, Public Corruption, Civil Rights, and Middle Eastern
Criminal Enterprises.
    After CT, CI, and Cyber, the Criminal Investigative Program's other
priorities in descending order are Criminal Intelligence, Public
Corruption, Civil Rights, Violent Gangs, Criminal Enterprises,
Corporate and Securities Fraud, Health Care Fraud, Mortgage Fraud,
Major Financial Institution Fraud, and Crimes Against Children and
other Violent Crimes.

Public Corruption
    Public Corruption continues to pose the greatest threat to the
integrity of all levels of government. Recent investigative efforts
have been intensified to identify and convict Immigration, Department
of State, and DMV officials illegally selling visas or other
citizenship documents and drivers licenses to anyone with enough money.
Their illegal activities potentially conceal the identity and purpose
of terrorists and other criminals, facilitating their entry, travel,
and operation without detection in the U.S. Other investigations have
convicted numerous law enforcement officers, including those who formed
criminal organizations involved in drug trafficking. Many major
metropolitan areas in the U.S. have witnessed the indictment and
conviction of corrupt public officials who betrayed the public trust
for profit or personal gain. Over the last 2 years alone, the FBI has
convicted more than 1050 corrupt government employees, including 177
Federal officials, 158 State officials, 360 local officials, and more
than 365 police officers. In addition to pursuing criminal
investigations against corrupt law enforcement officers, the FBI has
initiated awareness and training efforts to deter corruption, such as
``Project Integrity.''

Civil Rights
    During fiscal year 2004, the FBI initiated 1,744 civil rights
investigations and obtained 154 convictions, focusing its efforts on
Hate Crimes, Color of Law, and Involuntary Servitude and Slavery
matters. The FBI and the United States depend on the support,
cooperation and assistance of the Arab, Muslim and Sikh Communities in
the United States to fight terrorism and to fight crime. These
communities are entitled to the same civil rights of every citizen and
person in the United States. The FBI has worked with these communities
to ease their fears concerning the FBI's interest in securing their
help in the fight against terrorism and to address the backlash of hate
crimes directed against them following 9/11 and the war in Iraq. Since
9/11, more than 500 hate crime investigations have been initiated,
where the victims were Arab, Muslim, Sikh, or perceived to be as such,
resulting in more than 150 Federal and local prosecutions. During 2004,
the FBI initiated 53 hate crime investigations where the victims were
of Arab, Muslim, or Sikh descent or were perceived to be such. Thirteen
of those cases resulted in criminal charges being filed by either State
or Federal law enforcement authorities. Other groups also continue to
be the victims of Hate Crimes, including African American and Jewish
communities.
    Human trafficking and modern day slavery are a worldwide crime and

PX373

human rights problem, due to global, economic, and political factors.
Approximately 17,000 victims each year are lured to the United States
with false promises of good jobs and better lives and then forced to
work under brutal and inhumane conditions. Many trafficking victims,
including women and children, are forced to work in the sex industry,
prison like factories, and migrant agricultural work.

Violent Gangs

    Violent gangs are more organized, larger, more violent, and more
widespread than ever before, and they pose a growing threat to the
safety and security of Americans. The Department of Justice estimates
there are approximately 30,000 gangs with more than 800,000 members in
the U.S.

    Our communities continue to experience devastating incidences of
murder, drive-by shootings, and assaults by gangs mainly involved in
the sale and distribution of illicit drugs. However, gang activity
extends far beyond protection of turf. It impacts innocent citizens who
have no connection or involvement with gangs, and it increasingly
transcends municipal boundaries. Gang members travel from city to city,
between states and, on occasion, between countries to commit their
crimes.

    In response, the FBI is implementing a coordinated, intelligence-
driven National Gang Strategy to disrupt and dismantle gangs that pose
the greatest threats to America's communities. In the past year, we
have increased the number of Safe Street Task Forces from 78 to 107 and
we are seeking to increase the number by an additional 10 to 20 percent
in the coming year. We are also centralizing gang investigations at FBI
Headquarters with a new $10 million National Gang Intelligence Center
(NGIC). The NGIC will collect intelligence on gangs from across the
U.S., analyze this intelligence, and disseminate it to help law
enforcement authorities throughout the country plan and execute
strategies to prevent further gang activity and violence.

    The FBI has reclassified gang matters from ``violent criminal
offenders'' to ``criminal organizations and enterprises''--a higher
priority area. The new classification also allows the U.S. Department
of Justice to charge gang members under Federal racketeering statues
which can result in stiffer prison sentences for convicted subjects.
This approach is similar to the successful strategy used by the FBI to
dismantle traditional organized crime groups.

    Under the National Gang Strategy, priority is given to efforts to
disrupt and dismantle gangs that are national in their scope and
exhibit significant connectivity and internal alliances. Among the
first to be targeted is Mara Salvatrucha (MS-13), a violent gang which
originated in Los Angeles comprised primarily of Central American
immigrants. We have created a National Gang Task Force specifically to
address MS-13.

Criminal Enterprises

    Organized criminal enterprises operating in the U.S. and throughout
the world pose increasing concerns for the international law
enforcement and intelligence communities. Their skill in using
international monetary systems to conduct and conceal their criminal
activity, their use of State of the art communications encryption to
further safeguard their illegal activity, and their transnational
mobility increases the likelihood they will escape detection or

PX373

otherwise cover their illegal activities with a cloak of legitimacy.
Although the FBI prioritizes its efforts on criminal enterprises with
possible connections to terrorist and counterintelligence activities,
public corruption, human smuggling of Special Interest Aliens and women
and children, or violent and pervasive racketeering activity, the
impact from just one criminal activity alone, theft, is staggering.
Annual property losses from cargo/high tech/retail theft is estimated
at $30 billion, from vehicle theft $8 billion, from art/cultural
heritage artifact theft $500 million, and from jewelry and gem theft
$135 million. However, theft by criminal enterprises often represents a
multifaceted threat. For example, Middle Eastern Criminal Enterprises
involved in the organized theft and resale of infant formula pose not
only an economic threat, but a public health threat to infants, and a
potential source of material support to a terrorist organization.

   The FBI is increasing its intelligence collection and assessment
efforts on criminal enterprises, as well as its joint efforts with the
intelligence and law enforcement services of other nations, to combat
the criminal activities of the La Cosa Nostra, Italian, Russian,
Balkan, Albanian, Asian, African, Middle Eastern, Colombian/South
American and other criminal enterprises. The FBI/Hungarian National
Bureau of Investigation Organized Crime Task Force in Budapest,
Hungary, which is investigating a Russian Criminal Enterprise engaged
in murder, extortion, prostitution, and other significant racketeering
activity, represents an unprecedented cooperative effort between the
FBI and the Hungarians.

   Although new criminal enterprises continue to emerge, the LCN
remains a formidable and ever changing criminal threat. This year, in
just one criminal scheme, identified by the Federal Trade Commission as
the largest consumer fraud investigated in the history of the United
States, members of the Gambino LCN family were convicted for using
pornographic websites and adult entertainment 1 800 numbers to defraud
thousands of individuals of $750,000,000. Asian Criminal Enterprises
also pose a continued threat, as exemplified by one which was
dismantled earlier this year during a coordinated arrest operation with
Canada, which resulted in the arrest of 36 subjects in Canada and 102
subjects in the U.S. for drug trafficking and money laundering.
Millions of dollars and 21 firearms, including an AK 47 assault rifle
and a sawed off shotgun were seized during the operation.

Corporate/Securities Fraud
   Corporate fraud can cost Americans their jobs and rob them of hard-
earned savings. It shakes the public's confidence in corporate America
to its foundation. Since the initiation of the FBI Corporate Fraud Task
Force in December 2001, there have been 480 indictments and 305
convictions of corporate executives and their associates. The FBI's
efforts have also resulted in over $2 billion in restitutions,
recoveries and fines, in addition to over $30 million in seizures and
forfeitures. In the Enron, HealthSouth, Cendant Corporation, Credit
Suisse First Boston, Computer Associates International, Worldcom,
Imclone, Royal Ahold, Perigrine Systems, and America Online cases the
FBI obtained 119 indictments/informations and 79 convictions. The
former Chief Executive Officer (CEO) of Worldcom is on trial in New
York and the former CEO of HealthSouth is on trial in Alabama. Several
additional high profile trials are anticipated in the near future, to
include the trial of Enron's former CEOs and Chief Accounting Officer

PX373

anticipated to be scheduled for August or September 2005.
    The FBI is currently pursuing 334 Corporate Fraud cases throughout
the U.S. This is more than a 100 percent increase from fiscal year
2003. Eighteen of the pending cases involve losses to public investors
which each exceed $1 billion. Unfortunately, the volume of cases has
yet to reach a plateau, and the FBI continues to open three to six new
cases each month, each case averaging a loss exceeding $100 million.

Health Care Fraud
    Americans' health care expenditures continue to climb at rates
higher than inflation and will soon consume more than 17 percent of the
Gross Domestic Product. It is estimated that health care fraud costs
consumers, Medicare, Medicaid, and private insurers tens of billions of
dollars each year in blatant fraud schemes in every sector of the
industry. The FBI recently instituted the Out Patient Surgery and
Pharmaceutical Fraud Initiatives to combat blatant fraud identified in
those health care programs. During fiscal year 2004, the FBI had 2,468
pending health care fraud investigations, obtained 693 indictments and
informations, 564 convictions or pre trial diversions, $1.05 billion in
restitution, $543 million in fines, $28.8 million in seizures, $19.05
million in forfeitures and disrupted 186 and dismantled 105 criminal
organizations.

Mortgage Fraud
    The number of FBI mortgage fraud investigations, including major
undercover operations, rose from 102 in fiscal year 2001 to
approximately 550 in fiscal year 2004. This rise is expected to
continue. During FYs 2001-2004 the FBI received over 17,000 mortgage
fraud related Suspicious Activity Reports from federally insured
financial institutions alone. The FBI worked with the Mortgage Bankers'
Association (MBA), the National Notary Association (NNA), as well as
FINCEN, the Department of Housing and Urban Development, and major
mortgage lending institutions, to improve the reporting and detection
of potential mortgage fraud.

Crimes Against Children/Violent Incident Crime
    Of all violent crime, crimes against children and child
prostitution are of particular concern. Over 300,000 children per year
are forced into prostitution. The FBI's Lost Innocence, Child
Prostitution Initiative, has opened 13 cases in 11 field offices,
emphasizing the use of sophisticated investigative techniques, to
obtain 135 arrests/locates, 3 complaints, 13 indictments/informations,
11 convictions/pre trial diversions, and 4 child locates. Major violent
crime incidents, such as sniper murders, serial killings and child
abductions can paralyze whole communities and require the cooperative
efforts of the FBI and local, State and other Federal law enforcement
agencies. The FBI also continues to address the 6,218 bank robberies,
resulting in 153 injuries, and 15 deaths, that occurred within the
first 10 months of 2004, albeit with a greater reliance on other
agencies and a lesser use of its own resources where possible.

                    ENHANCING THE FBI'S CAPABILITIES

    Mr. Chairman, you will notice that our accomplishments over the
past year consistently have two things in common, the effective

PX373

collection and use of intelligence and inter-agency cooperation. The
improvements that made these accomplishments possible result from the
continued efforts of the men and women of the FBI to implement a plan
that fundamentally transforms our agency and enhances our ability to
predict and prevent terrorism.

Intelligence
     As set forth above, threat information crosses both internal and
external organizational boundaries. Counterterrorism efforts must draw
from, and contribute to, counterintelligence, cyber and criminal
programs. In order to most effectively address all threats, we are
continuing to strengthen the FBI's enterprise-wide intelligence
program.
     We began in 2001 with a dedicated analysis section in the
Counterterrorism Division and, in 2002, we created an Office of
Intelligence in the Counterterrorism Division. The structure and
capability significantly enhanced our CT operations and those of our
partners. In 2003, we extended this concept across all FBI programs--
Criminal Cyber, Counterterrorism and Counterintelligence--and unified
intelligence authorities under a new FBI Office of Intelligence led by
an Executive Assistant Director. The Office of Intelligence adopted
Intelligence Community best practices to direct all FBI intelligence
activities. Congress and the 9/11 Commission reviewed these efforts and
provided recommendations to further strengthen the FBI's intelligence
capability.
     The newly established Directorate of Intelligence is the dedicated
national security workforce that the Congress established within the
FBI. It comprises a dedicated Headquarters element and embedded
intelligence entities in each FBI field office called Field
Intelligence Groups (FIGs). The FIGs are central to the integration of
the intelligence cycle into field operations. The FIGS include Special
Agents, Intelligence Analysts, Language Specialists, and Surveillance
Specialists, as well as officers and analysts from other intelligence
and law enforcement agencies. They are responsible for coordinating,
managing, and executing all of the functions of the intelligence cycle
and have significantly improved the FBI's intelligence capability. This
integrated intelligence service leverages the core strengths of the law
enforcement culture--such as reliability of sources and fact-based
analysis--while ensuring that no walls exist between collectors,
analysts and those who must act upon intelligence information. The
Directorate also benefits from the strong FBI history of joint
operations by unifying FBI intelligence professional and integrating
all partners, particularly state, local, and tribal law enforcement,
into our intelligence structures.
     The central mission of the Directorate is to optimally position the
FBI to meet current and emerging national security and criminal threats
by: (1) assuring that the FBI proactively targets threats to the US,
inhibiting them and dissuading them before they become crimes; (2)
providing useful, appropriate and timely information and analysis to
the national security, homeland security, and law enforcement
communities; and (3) building and-sustaining FBI-wide intelligence
policies and capabilities.
     In 2004, we made substantial progress to expand and strengthen our
intelligence workforce. For the first time, the FBI offered recruitment
bonuses for Intelligence Analysts. As a result of these and other

PX373

efforts, the FBI received over 80,000 applications and hired over 650 Intelligence Analysts.

We built on the College of Analytic Studies, created in October 2001, with the addition of two new courses based on intelligence community best practices: ACES 1.0, a new basis intelligence analytic course, and ACES 1.5, a course for experienced, on-board analysts that provides information on the latest analytic resources and techniques. To ensure a consistent level of knowledge across the workforce on intelligence concepts and processes, ACES Training is now mandatory for all FBI Intelligence Analysts. We have increased our training expertise and capacity and are on track to deliver basic training to 1,000 Intelligence Analysts by December 2005. In addition, we have incorporated intelligence training into New Agents class, including a joint exercise with Intelligence Analysts and joint evening seminars.

The Intelligence Analyst career path, with multiple work roles and cross-training requirements not only provides career development opportunities, it also creates a workforce with the agility and flexibility needed to respond to the changing threat environment.

In addition, we implemented several initiatives to enhance the analyst career path and improve retention. We extended the promotion potential for analysts in the field from GS-12 to GS-14. We created an Intelligence Analyst Advisory Board, leveraging the strong FBI culture of creating advisory groups to provide advocacy for specific career fields. At the same time we worked with Congress and were granted pay flexibilities, such that FBI intelligence professionals now can be compensated at a rate equal to that of their Intelligence Community peers. These and other initiatives have helped us to stabilize our attrition rate between 8 percent and 9 percent and FY05 statistics to date look promising.

We have also taken steps to strengthen the Special Agent component of our intelligence workforce. In March 2004 we established a new career path for Special Agents with three objectives. First, the career path gives all Agents experience in intelligence collection, analysis and dissemination. Second, the career path will give Agents an opportunity to develop specialized skills, experience and aptitudes in one of four areas: 1) Intelligence, 2) Counterterrorism/ Counterintelligence, 3) Cyber or 4) Criminal. Third, it makes Intelligence Officer Certification a prerequisite for advancement to senior supervisory ranks. The Special Agent career path will produce a cadre of Agents who are proficient in both intelligence and law enforcement operations. This is key to achieving the full integration of law enforcement and intelligence operations.

To improve our foreign language capabilities, we have recruited and processed more than 50,000 translator applicants. These efforts have resulted in the addition of 778 new Contract Linguists (net gain of 493 after attrition) and 109 new Language Analysts (net gain of 34 after attrition). The FBI has increased its overall number of linguists by 67 percent, with the number of linguists in certain high priority languages increasing by 200 percent or more.

We have integrated management of the FBI's Foreign Language Program (FLP) into the Directorate of Intelligence. This integration fully aligns F13I foreign language and intelligence management activities and delivers a cross-cutting platform for future improvements across all program areas, including translation quality controls.

We also established the Language Services Translation Center

PX373

(LSTC), a command and control structure at FBI Headquarters to ensure that our finite translator resource base of over 1,300 translators, distributed across 52 field offices, is strategically aligned with priorities set by our operational divisions on a national level.

We have built a secure network that allows us to efficiently route FISA audio collection to any FBI field office. This technology allows us to more effectively utilize our national translator base.

We now possess sufficient translation capability to promptly address all of our highest priority counterterrorism intelligence, often within 12 hours. Of the several hundred thousand hours of audio materials and several million pages of text collected in connection with counterterrorism investigations over the last 2 years, a nominal level of backlog exists only because of obscure languages or dialects.

We have instituted a national translation quality assurance program. Countervailing operational pressures, however, limit our ability to fully comply with instituted translation review procedures in those languages for which demand continues to outpace supply. In those languages for which we have already achieved excess translation capacity, e.g., Farsi, Pashto, and Vietnamese, 100 percent quality assurance compliance is expected by April 2005.

Translation backlogs continue to exist within our counterintelligence program. To target these deficiencies, we have implemented a highly successful workforce planning model which links field-wide workload measurements, trend analysis, and geo-political indicators to our recruitment and applicant processing efforts.

In 2005, we plan to strengthen the integration of the entire intelligence cycle (requirements management; planning and direction; collection; processing and exploitation of collected information; analysis and production; and dissemination) into field office operations.

We will incorporate the recently developed new critical element entitled, ``Intelligence,'' into the performance plans of all Special Agents and Supervisory Special Agents; this new element emphasizes participation in intelligence cycle functions, in particular human source development and contributions to intelligence production.

We will also establish ``fly teams'' of Agents with intelligence experience, Intelligence Analysts, Language Specialists, and Surveillance Specialists to travel to five field offices and provide hands-on guidance and training for the full integration of the intelligence cycle within the office.


Partnerships

Our ability to coordinate and communicate with other members of the Intelligence Community has never been better. Our face-to-face interaction with the National Counterterrorism Center and members of the CIA and DHS has positively impacted our ability to come together on a common problem and the results of the cooperation are evident. Case in point--during the election threat, analysts were able to meet daily to discuss assessments and develop theories that were fundamental to understanding the threat, and from those meetings, online forums were created to facilitate continued sharing of ideas and new intelligence finds--all from the desktop.

The FBI's Information Sharing Policy Group, chaired by the FBI's EAD--Intelligence, brings together the FBI entities that generate and disseminate law enforcement information and intelligence to implement

PX373

the FBI's goal of sharing as much as possible consistent with security and privacy protections.

Within the Intelligence Community, the FBI has a two-level approach:

1. For those agencies that operate at the Top Secret-SCI level, we are investing in secure facilities for an FBI network (SCI On-Line, or SCION) that is linked to the DoD-based JWICS network used by CIA, NSA, and other national agencies.

2. For those agencies that operate at the Secret level, we have connected the FBI's internal electronic communications system to the DoD-based SIPRNET network that serves. As a result, all FBI Agents or analysts who need to communicate at the Secret-level with other agencies can do so from their desktop.

Within the law enforcement community, the FBI's National Information Sharing Strategy (HISS) is part of the DOJ Law Enforcement Information Sharing Program and builds upon the FBI Criminal Justice Information (CJIS) Services program.

1. The Law Enforcement National Data Exchange (N-DEx) will provide a nationwide capability to exchange data derived from incident and event reports. Data from incident and arrest reports--name, address, and non-specific crime characteristics--will be entered into a central repository to be queried against by future data submissions. The national scale of N-DEx will enable rapid coordination among all strata of law enforcement.

2. The Law Enforcement Regional Data Exchange (R-DEx) will enable the FBI to join participating Federal, state, tribal, and local law enforcement agencies in regional fulltext information sharing systems under standard technical procedures and policy agreements.

3. The FBI makes national intelligence more readily available to state, tribal, and local law enforcement agencies through the Law Enforcement Online (LEO) network.

4. The Terrorist Screening Center (TSC) also leverages the CJIS backbone to provide realtime actionable intelligence to State and local law enforcement.

Information Technology

Recognizing that the ability to assemble, analyze and disseminate information both internally and with other intelligence and law enforcement agencies is essential to our success in the war on terrorism, the FBI has made modernization of its information technology (IT) a priority.

Under the centralized leadership of the Chief Information Officer (CIO), the FBI is now taking a coordinated, strategic approach to IT. We have a Strategic IT Plan, a baseline Enterprise Architecture, and a system for managing IT projects at each stage of their ``life cycle'' from planning and investment, through development and deployment, operation and maintenance, and disposal. This involves regular technical reviews to see if milestones are met.

The first two phases of the Trilogy IT modernization program have been completed. The FBI is now modernized with:

1. Deployment of a high-speed, secure network that enables personnel in FBI offices around the country to share data, including audio, video and image files.

2. More than 30,000 new desktop computers with modern software applications 3,700 printers, 1600 scanners, 465 servers and 1400

PX373

routers.

3. An IT infrastructure that provides for secure communication with our Intelligence Community partners.

The third phase of Trilogy, which includes the Virtual Case File (VCF) has not yet been completed. Plans for VCF have changed both in response to identified technical problems and because the FBI's refocused mission created requirements that did not exist when VCF was originally envisioned, such as requirements related to information sharing. Last June, after we determined that the product delivered did not meet our needs, we decided to move forward with a two-track action plan for VCF.

1. In accordance with this plan, we asked a new contractor to examine the latest working version of the VCF as well as available off-the-shelf software applications and those designed for other agencies, to determine the best combination to meet the FBI's needs. In many ways, the pace of technological innovation has overtaken our original vision for VCF, and there are now existing products to suit our purposes that did not exist when Trilogy began.

2. As we move forward, we will apply all that we have learned and leverage what we have already developed, including a critical interface to our existing data systems that will be a key component of our final solution.

Separate from the Trilogy Program, we have successfully developed and deployed a number of new investigative and information sharing capabilities.

The Investigative Data Warehouse (IDW) offers Agents and analysts alike the technology to perform link analysis, while also providing enhanced search and analytical tools. IDW provides FBI users with a single access point to more than 47 sources of counterterrorism data, including information from FBI files, other government agency data, and open source news feeds, that were previously available only through separate, stove-piped systems. Most of these users are with the Directorate of Intelligence, Counterterrorism or Counterintelligence Divisions. These users provide search and analysis services using the IDW for personnel throughout the Bureau.

The FBI Automated Messaging System (FAMS) began operations in December and now provides more than 300 users with the capability to send and receive critical organizational message traffic to any of the 40,000+ addresses on the Defense Messaging System (DMS). The FBI is the first civilian agency to operate a classified DMS.

The FBI Intelligence Information Reports Dissemination System (FIDS) is a web-based software application that allows all FBI personnel with access to the FBI's Intranet to create and disseminate standardized Intelligence Information Reports (IIRs) quickly and efficiently. FIDS allows the Directorate of Intelligence to automate and standardize IIR creation and dissemination functions.

CONCLUSION

Looking forward, we expect certain trends to continue. Our adversaries will keep evolving, national security and criminal threats will further converge, and old jurisdictional boundaries will become less and less relevant. If we are to address these trends successfully, we must be willing and able to evolve ourselves. The FBI must continue to build our intelligence capabilities, including a strong intelligence

PX373

workforce. We must continue hiring and training personnel with technical expertise and foreign language skills. We must continue to seek new ways to share information and collaborate with partners in the Intelligence and Law Enforcement Communities. Above all, we must be agile, and encourage creativity, innovation, and strategic thinking. If we do all of these things, I am confident that we will out-network, out-think, and ultimately defeat our adversaries.

Mr. Chairman, I thank you again for this opportunity. I look forward to working with this Committee as we continue our efforts to address threats to the U.S. I would be happy to take any questions you might have.

Chairman Roberts. Mr. Mueller, we thank you for your statement as well and thank you for the job you're doing, in a very difficult challenge in changing the mission of the FBI and still keeping the mission in regards to crime and in regards to law enforcement.

I would say to all Members that Ms. Rodley and Admiral Jacoby are here to answer questions. And so, Admiral Loy will give the last prepared statement.

And I neglected to tell all of you that each and every word of your testimony will be in the record and preserved for all time. And so, feel free to summarize your statements.

I apologize. That's not an admonition, that's just a statement.

Admiral Loy. And I'm not trying to pick on you.

STATEMENT OF ADMIRAL JAMES LOY, U.S. COAST GUARD, RET., DEPUTY
SECRETARY, DEPARTMENT OF HOMELAND SECURITY

Admiral Loy. Thank you, Mr. Chairman. Good morning, Chairman Roberts and Vice Chairman Rockefeller and distinguished Members of the Committee. I'm pleased to have the chance to appear before you today to discuss the threats against the U.S. homeland, as well as some of the capabilities we've developed and must continue to develop to confront these threats.

That important link between the intelligence we process and the systems we develop in response cannot be understated. For every possible action we uncover, there must be an intentionally focused reaction designed to secure our homeland against that threat.

In so many areas of greatest concern, vulnerabilities we've identified, such as our transportation systems, particularly air travel, our border functions and our critical infrastructure, such as ports and energy facilities, we've made very real, measurable progress that has made our Nation more secure.

The topic of our hearing is very straightforward. What is the nature of the worldwide threat? And from the DHS perspective, I would make simply five, basic points.

First, the threat is unclear and complex, but enduring. The condition is not expected to change. We continue to note attempted entry into the U.S. by aliens who, according to intelligence, pose a threat to our homeland.

PX373

Second, we assess that al-Qa'ida continues to be the primary transnational threat group, although we are seeing the emergence of other threatening groups and gangs, like MS-13, that will also be destabilizing influences.

Third, we think we are most likely to be attacked with a vehicle-borne improvised explosive device, because that's the weapon of choice around the world. However, it remains very clear that our primary adversaries continue to seek weapons of mass effects with which they intend to strike us if they acquire them.

Fourth, at DHS we continue to make progress in acquiring analysts and improving our capabilities, just 2 years into our existence. However, we have not yet fully achieved the capability in people, facilities and technical capability we think is necessary to protect our homeland. We can, and we are doing the job, through extraordinary effort on the part of our intelligence professionals and through the collegial efforts of all of those at this table and many other agencies in the Federal sector.

And last, the intelligence community interaction with DHS has markedly improved over this past year and we continue to work toward full integration and interoperability. The aftermath of the Intelligence Reform Act is being treated as an opportunity to complete that work, to earn the respect of our colleagues as a full and deserving player in the intelligence community, and to allow that respect to serve as the foundation DHS needs to fulfill its responsibilities to secure our homeland.

Thankfully, we have not experienced another attack on our soil since September 11, 2001. But the rest of the world has not been so fortunate. If you ask the residents of Madrid or Beslan or Bali or Jakarta or many others, they will assure you that not only the threat, but also the harsh daily reality of terrorism is alive and well around the world.

We realize that an attack here could come in any form at any place on any timetable. Terrorist groups--even ones whose capabilities may have been weakened by arrests and interdictions worldwide--are patient, strategic and methodical in their operational planning. At home, we must prepare ourselves for any attack, from IEDs to weapons of mass destruction, from soft targets like malls to national icons.

Intelligence suggests that al-Qa'ida may have specific tendencies or certain intentions, both small- and large-scale. And our efforts must stay directed to this full range of threats. We must assume that they are assembling, or reassembling, the capabilities they don't currently have or those that have been taken from them. So our plan of action, like theirs, must be even more deliberate and even more enduring, and it is.

We have built new tools to help in each of the five strategic areas of operational emphasis in our department. Our charter runs from maximum domain awareness, if you will, through prevention and protection efforts to response and recovery planning. We have published an all-hazards, all-threats National Response Plan and its sister document, the

PX373

National Incident Management System.

We have dramatically improved our technical ability to share information. Tools such as the Homeland Security Operations Center, the Homeland Security Information Network and the Homeland Security Advisory System are steps toward full capacity and capability. We know the end state we want to reach and we are methodically designing the path to get there.

We have greatly improved systems to keep track of persons who cross the border and we have begun to apply technology to monitor the border where there is no human presence. We're operating the US-VISIT Program to verify the identity of travelers and stop criminals and terrorists before they can enter our society.

We have signed Smart Border accords with our neighbors to the north and south, Canada and Mexico, to help the highly trained customs officers, border agents, Coast Guardsmen and many others who monitor and patrol our Nation's nearly 7,500 miles of land border and 95,000 miles of coastline and waterways.

We now require unprecedented scrutiny of high-risk travelers and flights landing in or flying over the United States, including requiring volumetric information on visas and passports and agreeing to share passenger data with our European allies. These are important strides to keep the doors of our country open to legitimate visitors, but firmly shut to terrorists.

We know that al-Qa'ida would like to impact our economy with attacks on our financial systems, our cyber networks and the vital elements of our global supply chain. So we've taken measures to secure cargo and protect the infrastructure that supports the free and safe movement of goods and people and money around the world.

We launched the Container Security Initiative to target and screen high-risk cargo before it reaches our shores. And today we operate that program alongside our allies in 34 ports around the world in 22 different countries with a growth posture scheduled for 2005 and on into 2006. We are in the process of finalizing, with the input from private sector stakeholders as well as many others, a national cargo security strategy.

We included a special section on cyber security in the newly released National Response Plan to enhance governmentwide collaboration and coordination to prevent an attack on the backbone of our electronic economy.

And most important, we've been careful to consider the economic impacts and the privacy implications of any additional security efforts, and worked to ensure that added protections do not detract from our competitiveness or from our way of life.

In ways large and small, seen and unseen, with advanced technologies and additional vigilance, with the help of countless agencies and allies at every level of government, in the private sector and throughout the world, we have made it harder for terrorists to attack our country, more difficult for them to defeat our systems and reduce large gaps they once saw in our security posture.

As the President has said, we are safer than ever before, but we are still not safe enough. This experiment called DHS is astonishingly complex and some dimensions of the challenge are further along than others. That's the nature of culture and transformational change. I'm proud to hand over a 2-year-old department with a solid foundation and a solid sense of direction to our incoming leadership team.

I'm deeply appreciative of the support, constructive criticism and the resources that have come our way over the past 2 years from the Congress. This Committee's continued focus and review must remain our Nation's conscience until we get this work accomplished.

Last night, I spoke to a group of 400 young people--high school people--in a program geared to encouraging public service. I promised them that we would do all we could to lighten their burden when it's their turn on watch. And we can only meet that promise when our national intelligence capability is sound, inclusive, whole. Anything short of that is simply unsatisfactory.

Thank you, Mr. Chairman. I'll happily answer your questions.

[The prepared statement of Admiral Loy follows:]

Prepared Statement of Admiral James Loy, Deputy Secretary, U.S. Department of Homeland Security

Good morning Chairman Roberts, Vice Chairman Rockefeller, and distinguished Members of the Committee. I am privileged to appear before you today to discuss the primary threats currently facing the United States homeland, as well as their probability, immediacy, and severity.

Most current threats to the homeland continue to be directed by al-Qaida and its affiliated elements within the broader Sunni extremist movement. Despite the successes the United States and our coalition partners have had against al-Qaida and other extremists, al-Qaida leaders and operational planners continue to think about--if not actively plot--the next dramatic attack in the United States. We believe that attacking the homeland remains at the top of al-Qaida's operational priority list, despite the fact that more than 3 years have passed since September 11, 2001. We judge that al-Qaida continues to view the homeland as an attractive target for a variety reasons, and that the next dramatic attack will attempt to replicate the 9/11 ``model'' of multiple attacks against geographically distant and symbolic targets that cause unprecedented economic damage, mass casualties, and physical destruction. While al-Qaida and its affiliated elements currently appear more capable of attacking United States interests outside of the homeland, we believe that their intent remains strong for attempting another major operation here.

While there are other transnational terrorist groups that possess noteworthy capabilities to conduct attacks against United States interests, we currently do not believe these groups are ready for or oriented toward conducting attacks inside the homeland. However, there is a legitimate threat posed by groups and persons who are present in the country today (not necessarily connected to transnational terrorist groups), including multi-national gangs and domestic groups that engage

PX373

in violence to achieve political and economic goals. These groups range
from single-issue groups such as the Earth Liberation Front to violent
criminal gangs like MS-13 to right-wing or neo-Nazi groups to ``lone-
wolf' threats. Additionally, the threat from criminal groups and
persons who engage in criminal enterprise that supports or contributes
to terrorism and which has homeland security implications remains of
concern. Examples of such activity include narcotics trafficking, money
laundering, people smuggling, contraband smuggling, illegal arms
transfers, illegal technology transfers, currency counterfeiting,
document forgery, and false identity provision. However, none of these
threats currently rises to the level of threat posed by al-Qaida and
its affiliates.

While there is no single ``crystal ball'' that allows intelligence
analysts to perfectly determine which terrorist threats are the most
probable, we believe the al-Qaida and affiliated extremist threat
remains the most likely in the near term. The strategic intent of al-
Qaida's remaining leaders and planners to attempt another dramatic
homeland attack is clear. What is less clear are al-Qaida's current
operational capabilities to execute such an attack. Though al-Qaida's
current capabilities for dramatic attacks inside the United States
might seem reduced, we also assess, based on past activity, that a1-
Qaida is patient, deliberate, and methodical in operational planning
for major attacks. Al-Qaida operates on a very long timeline.

Thus, the probability of an attack in the United States is assessed
to be high, but very much conditional and circumstantial. We believe
that while several attacks may have been considered inside the U.S.
since 9/11, and some moved forward beyond initial planning, none of
these plots was ever successfully executed due to the attackers'
operational limitations and the heightened intelligence and security
measures employed since that time.

The cyber risk from various types of malicious actors is more
significant than previously understood, and could be used to increase
the impact of a physical attack by disrupting emergency communications.

The National Intelligence Council released last year its first
National Intelligence Estimate (NIE) for worldwide cyber security since
9/11, and the DHS/National Cyber Security Division's law enforcement
and intelligence branch participated in that assessment. It assessed
the cyber threat, and the result showed a significant capability and
threat from various actors.

Adding to our concern over the possibility of the next al-Qaida
attack is the potential threat of individuals inspired by al-Qaida and
its affiliates who are not in any way directly connected to the al-
Qaida core. In early 2004, several individuals in the United Kingdom
attempted to conduct attacks there, but none of these individuals was
considered an active al-Qaida member. This and other examples of
similar activity in Europe demonstrate how individuals or small groups,
who previously had provided only financial or logistical support to
Islamic extremist activities, themselves attempted to transition into
active operational roles.

The key locales that we currently judge as being at risk for attack
by al-Qaida and affiliated terrorist organizations include key person
and large group assemblages, major events as judged by the Department
of Homeland Security (DHS) and the United States Intelligence
Community, ports, depots, stations, and related infrastructure, and
stadiums, auditoriums, and large buildings. Additionally, critical

PX373

infrastructure of primary importance includes nuclear, chemical, biological, and other hazardous material facilities, bridges, tunnels, dams, and power generation/transfer stations, energy facilities including petroleum refining and related industries, and iconic cities and facilities, large buildings, and complex high-density infrastructure.

The possible means of attacking such national interests are far ranging. We know from operational activity around the world that al-Qaida can execute mass-casualty attacks using improvised explosive devices (IEDs) combined with suicide operatives. The capture of operatives overseas this past summer led to the identification of detailed casing reports prepared prior to 9/11. The specific tactics recommended in these reports highlights al-Qaida's ongoing interest and preference for using vehicle-borne improvised explosive devices (VBIEDs) to attack high-profile or symbolic targets.

Al-Qaida has demonstrated operational proficiency in using aircraft as weapons, in particular hijacking operations, and has explored the idea of bringing down aircraft in flight through the use of several different IED configurations. Al-Qaida has also demonstrated a capability to use man-portable air-defense systems (MANPADs) in operations against aircraft overseas, although there are no indications that it plans to use this capability for attacks inside the United States. .

Al-Qaida and its affiliated groups have demonstrated an operational capability to conduct dramatic, mass-casualty attacks against both hard and soft targets inside the United States and abroad. Within this broad operational spectrum, the most severe threats revolve around al-Qaida and its affiliates' long-standing intent to develop, procure, or acquire chemical, biological, radiological, and even nuclear, weapons for mass-casualty attacks. Al-Qaida and affiliated elements currently have the capability to produce small amounts of crude biological toxins and toxic chemical materials, and may have acquired small amounts of radioactive materials. However, we currently assess that al-Qaida has not been able to acquire or develop a functioning nuclear weapon (i.e., one that generates a nuclear yield).

Despite al-Qaida's intent to strike us with Weapons of Mass Effect (WME), we assess that the United States is a ``harder target'' for the terrorist and for the illegal migrant than it was in the past because of improvements in information sharing and security measures since 9/11. There remain, of course, difficulties in securing the over 95,000 miles of coastline and 7,000 miles of border shared with Canada and Mexico. Indeed, the efforts of DHS have been successful, and the determination of the 180,000 plus Department personnel working around the country and around the world day in and day out is strong and completely dedicated to securing our homeland.

There is much evidence to convince us that interdiction measures have improved; intelligence is working, technology has helped, and far fewer illegal immigrants are now able to enter our ports of entry or cross our borders than in the past. However, we still see persons using fraudulent documentation; many are already on our watch lists, attempting to enter the United States at the borders and at ports of entry. Thus, we assess that the threat of illegal and even covert entry is still present and likely will be for the foreseeable future.

On land, we now have greatly improved systems to keep track of persons who cross the border and we have begun to apply technology to

PX373

monitor the border where there is no direct border patrol presence. We also believe that fraudulent documentation is far more likely to be discovered than in the past--owing in part to improved technology, better training, more comprehensive data bases, the increased use of biometrics, and better coordination among agencies.

However, entrenched human smuggling networks and corruption in areas beyond our borders can be exploited by terrorist organizations. Recent information from ongoing investigations, detentions, and emerging threat streams strongly suggests that al-Qaida has considered using the Southwest Border to infiltrate the United States. Several al-Qaida leaders believe operatives can pay their way into the country through Mexico and also believe illegal entry is more advantageous than legal entry for operational security reasons. However, there is currently no conclusive evidence that indicates al-Qaida operatives have made successful penetrations into the United States via this method.

In addition to the problems posed by the southwestern border, the long United States-Canada border, often rugged and remote, includes a variety of terrain and waterways, some suitable for illicit border crossings. A host of unofficial border crossings can be utilized when employing the services of alien smugglers, especially those winding through mountain ranges and across the vast western prairie.

In addition to the threats posed at the extensive United States land border, we believe al-Qaida remains focused on targeting civil aviation. Since the creation of the Department in March 2003, DHS has led Federal Government effort to harden and protect the aviation infrastructure. The barriers and checks put in place since 9/11 at airports and the system of baggage and cargo checks for air transported materials have proven very effective in identification and interdiction of unauthorized items and in the identification of persons engaged in air travel. However, al-Qaida operatives have received flight training, and we believe al-Qaida continues to consider new and novel methods for planning and conducting attacks against civil aviation in the United States. Al-Qaida still views the hijacking of commercial passenger aircraft inside the United States as a primary objective.

Other aviation threats include the possible use of ultra-light aircraft or remotely piloted vehicles (RPVs), although we have no specific or credible information suggesting that terrorists have considered these platforms for attacks in the Homeland. Additionally, while al-Qaida has considered conducting an attack against United States interests overseas using helicopters packed with explosives, there is no specific or credible evidence supporting the use of helicopters in aerial attacks within the United States. There have been recent media reports about lasers being visible to pilots in commercial aircraft in the United States. Although no specific or credible information suggests terrorists plan to use high-powered lasers in the United States, groups overseas have expressed interest in using these devices against human sight.

At sea, we see positive changes and advances in the control system similar to those made in land border crossing and aviation. These advancements include improving vessel registration documentation and identification capabilities and better search technologies and procedures. While the complex problem with sea-transported cargo and the checking especially of containers and container vessels remains, significant improvements have been made since 9/11.

PX373

Al-Qaida remains the preeminent organization with both intent and capabilities to targets United States maritime assets. A variation of the familiar VBIED, the small, explosiveladen boat usually piloted by a suicide operative, remains al-Qaida's weapon of choice in the maritime environment. In addition to threats posed by terrorist attack, the smuggling of illegal migrants via maritime means continues to be a major concern for homeland security. This threat is expected to grow as organized criminal groups continue to expand their operations throughout the world. The huge profit potential in this trade will ensure that it will remain a lucrative venture for the foreseeable future. The inability of Central American nations to control their borders is also an important factor favoring the smugglers.

Additionally, a small but increasing threat to homeland security is represented by stowaways on merchant vessels and by crewmen jumping ship. Most of these individuals are economic migrants and account for a small fraction of illegal migration. However, their illegal activity highlights persistent border security vulnerabilities that may be exploited by contraband smugglers and terrorist organizations, as well as concerns for merchant vessel and crew safety. When acting alone, stowaways take advantage of poor security in foreign ports to simply walk on board vessels and attempt to stay hidden for the duration of the voyage. However, many stowaway incidents are part of criminally organized attempts to traffic people and require the complicity of merchant ship crewmembers. The threat posed by merchant seamen illegally entering the United States includes deserters who depart the ship legally, but do not return and absconders who illegally depart the ship once in port. The use of these methods by criminals or terrorists to enter the United States is probable.

The bottom line is that the best efforts of the DHS, of the United States Intelligence Community, and of the entire Federal Government are allied against terrorist efforts to stage attacks in the homeland. However, despite these efforts and innumerable advances in information sharing, technology, communication, and organization, any attack of any kind could occur at any time. While we have not seen a trend by any terrorist group to tie an act of terrorism to a particular date or time, or even place, beyond the obvious goal of striking a locale or transportation mode when a larger number of people might be present, we do not believe we can predict timing unless we are somehow inside the decisionmaking mechanism used by the terrorists.

An attack against the homeland with the most severe ramifications would include the use of a WME, especially nuclear. We also give due respect to the potential for some forms of biological attack to generate high casualty numbers. Beyond that, most attacks would be locally severe and would have larger implications psychologically, culturally, and economically even if their immediate destructive impact was very limited. While we have not seen such methods employed in the homeland to date, we do worry about the possibility of small attacks-- the grenade into the outdoor restaurant, the small bomb in the public place, the random shooting on the street--that would ostensibly be carried out to influence U.S. authorities to react strongly in the context of preventing such acts from occurring.

There is a risk of cyber or combined physical-cyber attacks from various malicious actors, though it is difficult to quantify that risk. However, the Intelligence Community believes there is sufficient risk, and while there is no known information that anyone is preparing a

PX373

significant cyber attack, there appears to be circumstantial evidence
that terrorists are using a variety of illegal Internet behaviors to
finance their activities.

Given the anecdotal and imprecise nature of information in this
regard, it is important to focus on the whole risk picture, including
threat, vulnerabilities, and potential consequences. Accordingly, the
government is enhancing its interagency coordination through the
National Cyber Response Coordination Group (NCRCG) formalized by the
Cyber Annex to the National Response Plan to prepare for and respond to
national level cyber attacks from any sources and in the Interagency
Security Plan (ISP) to reduce our vulnerability to attacks that might
cause a major Internet disruption.

Which is the largest of the potential threats to the homeland?
Which is the most severe? Which is the most probable? These are
questions that cannot realistically be answered beyond the information
provided here. We are hesitant to make an attempt to answer these
questions beyond stating that, conditionally and circumstantially, any
event and any terrorist action is worthy of, and will continue to
receive, our full attention and interest.

Chairman Roberts, Senator Rockefeller, and Members of the
Committee, this concludes my prepared statement. I would be happy to
answer any questions you may have at this time.

Chairman Roberts. Well, we thank you, Admiral, for a very
comprehensive statement.

I would tell the witnesses that we're having a closed
hearing on the threat of nuclear terrorism as of tomorrow. It's
my personal belief that if al-Qa'ida could obtain a nuclear
weapon or any material and could get it into the U.S., that
they would use it. The question is not whether al-Qa'ida would
use a nuclear weapon, but can they get one?

Pakistani scientist A.Q. Khan passed secrets and equipment
to a host of rogue nations. The Pakistani government has
cooperated in our efforts to stop this activity and Mr. Khan is
under house arrest in Pakistan.

This is for Director Goss, Admiral Loy. What is your
assessment of the current status of the Khan network? Does the
fact that he is in custody mean the network is shut down? Are
there any other non-state actors that are potential Khans?

And especially for Admiral Loy, what is the Department of
Homeland Security's assessment of that threat? You have touched
on it in your statement. And more particularly, if you could be
very succinct, what steps has your department taken to prevent
or to mitigate a terrorist attack utilizing any nuclear weapon?

Director Goss.

Director Goss. Mr. Chairman, thank you.

Actually, it's timely that you ask that question, because
we are further exploring our opportunities to learn about Mr.
Khan and what he has done. I am unable to give you the details
of that. They would be suitable for a closed hearing. But I can
assure you that, virtually as we speak, efforts--active,
appropriate direct efforts--are underway on that matter.

We have found, from a variety of sources, following the
leads of what we've known already, that we've uncovered many
new things. And we have found that in uncovering those things

PX373

we have not got to the end of the trail. Getting to the end of
that trail is extremely important for us.

   It is a serious proliferation question. I'm pleased you're
having a closed hearing. I'd be very happy to make available
those experts in our business who can contribute to your wisdom
in a closed session.

   Chairman Roberts. What about the non-state actors that are
potential Khans?

   Director Goss. The potential Khans are a very nervous worry
for us, obviously. If there were a way--and that's the big
question, how would they go about getting it--would we know and
could we stop it?

   In some cases, the regimes we have are good enough to
understand most of the issue and most of the stocks and where
things are supposed to be and how they're supposed to work. But
most isn't good enough. You need 100 percent to get to the
guarantee that you want.

   So, the answer for non-state actors being able to get these
kinds of materials, either nuclear, chem or bio, is a reality.

   Chairman Roberts. Admiral Loy, your assessment of the
nuclear terrorism threat? You touched on it in your statement.

   Admiral Loy. Briefly, sir, certainly there are three or
four that we would categorize as those concerns that keep us
awake nights the most. They certainly would include nuclear,
chemical, bio and cyber. With respect directly to nuclear,
Director Goss has the inside track. I would offer--to offering
the most insight to the worldwide nature, with respect to
proliferation--our concerns at DHS go more directly to the
ability to detect those materials as they might be coming in
our direction.

   In the President's budget for 2006, there is an initiative
that we're referring to as the National Nuclear Detection
Office, to be established inside the Department of Homeland
Security--not a DHS initiative, but literally a national
initiative--wherein the offices and the good capabilities of
DoD and DOJ and DOE and all others with equities in the issue
can be pooled, such that we can make some kind of an effort
that does two things--one, optimizes the deployment of current
capability in the areas of detection and, second, fences a
significant amount of money--almost a mini-Manhattan Project,
if you will--to offer us a chance to break through toward next-
generation capability of detection.

   Those are the efforts that we have underway, Mr. Chairman.
And, again, if there is a closed hearing, we'd be happy to
participate.

   Chairman Roberts. I'm going to change the subject. In the
last few years we've had the Joint Inquiry, the 9/11
Commission, this Committee's review in regards to WMD in Iraq--
all of which highlighted the failure to share intelligence
information across the intelligence community.

   For every intelligence failure, you hear another
recommendation for more information sharing. That's the
buzzword. For too many times, when we hear about a consensus
threat, we find out there's not a consensus. I believe,
however, that information sharing is a rather limited idea that

PX373

falsely implies that the intelligence collectors own the information that they collect.

The Vice Chairman and I also think that information sharing means that the collectors push information to the analysts they believe have a need to know.

I think we need to change our thinking on this issue. It's time to be working toward a more powerful concept. We call it information access. No one agency of the U.S. Government owns intelligence information and any cleared analyst with a need to know should be able to access it.

While sensitive information must still be managed--I know that--cleared analysts should be able to pull that information by searching all intelligence databases without having to wait for any one agency to push the information to them, as we do it today.

What do you think--and I'm addressing, basically, Director Goss here--about this idea of information access, as well as Director Mueller. Do we need to take the classification authority away from the collection agencies and put it in the hands of an authority, i.e., the DNI, who is neither a collector or an analyst, who can more honestly balance the need to know with the need to protect the sources and methods?

Director Goss. Thank you, Mr. Chairman.

The sources and methods question I am clear on. We do need to protect our sources and methods. The degree that some of our sources and methods are revealed in the media from time to time, through leaks and other matters, does not necessarily mean we shouldn't continue to protect them. Just because it's reported in the paper doesn't mean we're going to confirm it. Sometimes we are able to still get further utility out of sources and methods, even though they have been discussed, because not everybody may read that particular paper.

But it is harmful to us, in our efforts to broaden the product in the community, that not everybody is playing by exactly the same rules. We find that different people treat classifications different ways and have different reactions to it. So I do believe you would be right in focusing some attention on the classification and declassification process. It is clearly an area that needs attention, something we've talked about in the past. And it is still somewhat of a neglected stepchild.

In the area of getting the information to who needs to know, that's exactly on target. The trick is, who needs to know? It was always a question of sharing with who needs to know. The question of who makes that decision of who needs to know has always been the problem.

We find that the audience of who needs to know is, in fact, larger as we bring our community and its many, many elements together that are being asked to do things--more things--not only overseas, but particularly now at home.

Our domestic agencies--as Admiral Loy has just testified, and as Director Mueller has testified--clearly are doing things in the war on terrorism that require sharing of information. Well, the foreign intelligence program, which is where the intelligence program has always operated, is doing new business

PX373

with domestic agencies to deal with terrorism in a domestic
way, because, as you know, the foreign intelligence program is
prohibited from spying on Americans.

So, getting that piece just right has been part of the
effort, as we have gone along since 9/11. And I am pleased to
report we are doing exceedingly well, in my view, on that. And
I would hope that my colleagues would agree. There's still room
to go, but I believe we are sharing much better. I certainly
agree analysts should be driving collection and not the other
way around.

Chairman Roberts. I ask for the patience of my colleagues.
My time is up, but I would like for Director Mueller to address
this, and also Admiral Jacoby.

If you can be short and succinct, sir.

Director Mueller. I certainly agree with the premise that
those responsible for acting should have access to the
information in whatever database it resides, in whatever
agency.

I think TTIC, the Terrorist Threat Integration Center, and
the National Counterterrorism Center, when it comes to
terrorism information, has taken us well along that way to give
us access to the information, regardless of in which database
it resides. Co-location, as we've co-located out in Tyson, has
helped immeasurably to break down some of those barriers.

So, I agree with the premise. I also agree with, I think,
the second premise. And that is the importance of the analysts
having access to at least information relating to the
motivations of underlying sources, the access that the
underlying source may have to the information. Having more
clarity as to what moves the person to provide the information,
to whether it be the FBI, CIA or elsewhere. And that, I think,
is something we have to work on.

Last, in terms of moving the authority from the agency to
the DNI, I do think the agency, at the outset, needs the
authority to protect its sources and methods, but it should be
reviewed by the DNI. I don't think that moving it up to the DNI
would work all that well. But I do believe that the DNI ought
to review how we classify, how we describe our sources and
methods.

Chairman Roberts. Admiral Jacoby.

STATEMENT OF VICE ADMIRAL LOWELL JACOBY, USN,
DIRECTOR, DEFENSE INTELLIGENCE AGENCY

Admiral Jacoby. Sir, your ownership of information
statement is just right on the mark, sir. I think that's a
desperately important area for this Committee and for our
community to continue to work hard on.

Part of it that comes along with the need to know is, the
way we do business today, the collector decides who needs to
know in many cases. We need to swap that and have the analysts
who are charged with discovering information and generating
knowledge be the driver in the process.

The other part that's desperately important to this is
putting in place the Smart Network that is talked about so

PX373

concisely in the 9/11 Commission report, because applying
modern commercial information management kinds of tools will
help us to separate the content from neglected information
while still protecting the sourcing of the information. That's
a desperately important part of this whole discussion and needs
to be pursued very aggressively.
    [The prepared statement of Admiral Jacoby follows:]

           Prepared Statement of Vice Admiral Lowell E. Jacoby,
               U.S. Navy Director, Defense Intelligence Agency

    Good morning Mr. Chairman, Mr. Vice Chairman and Members of the
Committee. It is my honor and privilege to represent Defense
Intelligence and present what we know and believe to be the principal
threats and issues in today's world. The dedicated men and women of
Defense Intelligence work around the clock and around the world to
protect our country. Many of these active duty, reserve and civilian
intelligence professionals are working in remote and dangerous
conditions. Our mission is simple, but rarely easy. It is to discover
information and create knowledge to provide warning, identify
opportunities and deliver overwhelming advantage to our warfighters,
defense planners and national security policymakers.
    This is the third time I report to you that Defense Intelligence is
engaged in a war on a global scale. Most of the forces and issues
involved in this war were addressed in my testimony last year. Several
increased in severity or changed in composition. Few, unfortunately,
decreased.
    The traditional Defense Intelligence focus on military capabilities
is insufficient to identify and gauge the breadth of these threats. We
are working hard to access ``all'' information to better understand and
counter these threats. Defense Intelligence is engaged with foreign and
domestic counterparts to better integrate our capabilities. We remained
focused on information sharing and creating the ``smart networks''
described in the 9/11 Commission report. I am anxious to work with the
new Director of National Intelligence, my fellow intelligence agency
heads and others to forge a more cohesive and comprehensive
Intelligence Community.

                            GLOBAL WAR ON TERRORISM

    We continue to face a variety of threats from terrorist
organizations.
    Al-Qaida and Sunni Extremist Groups. The primary threat for the
foreseeable future is a network of Islamic extremists hostile to the
United States and our interests. The network is transnational and has a
broad range of capabilities, to include mass-casualty attacks. The most
dangerous and immediate threat is Sunni Islamic terrorists that form
the ``al-Qaida associated movement.''
    Usama bin Ladin and his senior leadership no longer exercise
centralized control and direction. We now face an ``al-Qaida associated
movement'' of like-minded groups who interact, share resources and work
to achieve shared goals. Some of the groups comprising this movement
include Jemaah Islamiyya, responsible for the 9 September bombing of
the Australian Embassy in Jakarta and Hezb-e-Islami-Gulbuddin. Some of
the groups in the movement provide safe haven and logistical support to

al-Qaida members, others operate directly with al-Qaida and still others fight with al-Qaida in the Afghanistan/Pakistan region.

Remnants of the senior leadership still present a threat. As is clear in their public statements, Bin Ladin and al-Zawahiri remain focused on their strategic objectives, including another major casualty-producing attack against the Homeland.

CBRN Terrorism. We judge terrorist groups, particularly al-Qaida, remain interested in Chemical, Biological, Radiological and Nuclear (CBRN) weapons. Al Qaida's stated intention to conduct an attack exceeding the destruction of 9/11 raises the possibility that planned attacks may involve unconventional weapons. There is little doubt it has contemplated using radiological or nuclear material. The question is whether al-Qaida has the capability. Because they are easier to employ, we believe terrorists are more likely to use biological agents such as ricin or botulinum toxin or toxic industrial chemicals to cause casualties and attack the psyche of the targeted populations.

Pressures in the Islamic World. Various factors coalesce to sustain, and even magnify the terrorist threat.

Islam is the world's second largest religion with over 1 billion adherents, representing 22 percent of the world's population. Due to high birth rates, it is also the world's fastest growing religion. Only twenty percent of Muslims are ethnic Arabs. The top four nations in terms of Muslim population, Indonesia, Pakistan, Bangladesh and India, are non-Arab. While the vast majority of Muslims do not advocate violence, there are deeply felt sentiments that cross Muslims sects and ethnic and racial groups.

Our policies in the Middle East fuel Islamic resentment. Multiple polls show favorable ratings for the United States in the Muslim world at all-time lows. A large majority of Jordanians oppose the War on Terrorism, and believe Iraqis will be ``worse off' in the long term. In Pakistan, a majority of the population holds a ``favorable'' view of Usama bin Ladin. Across the Middle East, surveys report suspicion over U.S. motivation for the War on Terrorism. Overwhelming majorities in Morocco, Jordan, and Saudi Arabia believe the U.S. has a negative policy toward the Arab world.

Usama bin Ladin has relied on Muslim resentment toward U.S. policies in his call for a defensive jihad to oppose an American assault on the Islamic faith and culture. He contends that all faithful Muslims are obliged to fight, or support the jihad financially if not physically capable of fighting. Another goal is the overthrow of ``apostate'' Muslim governments, defined as governments which do not promote Islamic values or support or are friendly to the U.S. and other Western countries. The goals also call for withdrawal of U.S. and other Coalition forces from Muslim countries, the destruction of Israel and restoration of a Palestinian State and recreation of the caliphate, a State based on Islamic fundamental tenets.

Underlying the rise of extremism are political and socio-economic conditions that leave many, mostly young male adults, alienated. There is a demographic explosion or youth bubble in many Muslim countries. The portion of the population under age 15 is 40 percent in Iraq, 49 percent in the Gaza Strip and 38 percent in Saudi Arabia. Unemployment rates in these countries are as high as 30 percent in Saudi Arabia and about 50 percent in the Gaza Strip.

Educational systems in many nations contribute to the appeal of Islamic extremism. Some schools, particularly the private ``madrasas,''

PX373

actively promote Islamic extremism. School textbooks in several Middle East states reflect a narrow interpretation of the Koran and contain anti-Western and anti-Israeli views. Many schools concentrate on Islamic studies focused on? memorization and recitation of the Koran and fail to prepare students for jobs in the global economy.

Groups like al-Qaida capitalize on the economic and political disenfranchisement to attract new recruits. Even historically local conflicts involving Muslim minorities or fundamentalist groups such as those in Indonesia, the Philippines and Thailand are generating new support for al-Qaida and present new al-Qaida-like threats.

Saudi-Arabia. Al Saud rule is under significant pressure. In 2004, 15 significant attacks occurred against the regime, U.S. and other Western targets in the Kingdom, an increase from 7 in 2003. Attacks in 2004 included the 6 December 2004 attack on the U.S. Consulate in Jeddah.

Attacks since May 2003 against housing compounds, an Interior Ministry facility, a petroleum facility and individual assassinations caused Riyadh to attempt to aggressively counter the threat. We expect continued assassinations, infrastructure attacks and operations directed at Westerners in the Kingdom to discredit the regime and discourage individuals and businesses, especially those affiliated with the Saudi military, from remaining in the Kingdom.

Last year Saudi security forces killed or captured many of their 26 most wanted militant extremists and discovered numerous arms caches. However, we believe there may be hundreds, if not thousands of extremists and extremist sympathizers in the Kingdom.

Pakistan. President Musharraf continues to be a key ally in the War on Terrorism and provides critical support against Al-Qaida and Taliban operating in Pakistan. The economy has displayed strong growth over the past 2 years. Indigenous and international terrorist groups have pledged to assassinate Musharraf and other senior Pakistan government officials and remain a significant threat. Unless Musharraf is assassinated, Pakistan will remain stable through the year; however, further political and economic reform is needed to continue positive trends beyond that time.

Pakistan significantly increased its military operations and pacification efforts in tribal areas along the Afghanistan border in 2004. These operations affected al-Qaida, Taliban, and other threat groups by disrupting safe-havens and, in some cases, forcing them back into Afghanistan where they are vulnerable to Coalition operations. Pakistan also secured agreements with several tribes by successfully balancing military action with negotiations and rewards to encourage cooperation and limit domestic backlash. Pakistan must maintain and expand these operations in order to permanently disrupt insurgent and terrorist activity.

We believe international and indigenous terrorist groups continue to pose a high threat to senior Pakistani government officials, military officers and U.S. interests. The Prime Minister and a corps commander have been the targets of assassination attempts since last summer. President Musharraf remains at high risk of assassination, although no known attempts on his life have occurred since December 2003. Investigations into the two December 2003 attempts revealed complicity among junior officers and enlisted personnel in the Pakistani Army and Air Force.

Our assessment remains unchanged from last year. If Musharraf were

PX373

assassinated or otherwise replaced, Pakistan's new leader would be less
pro-US. We are concerned that extremist Islamic politicians would gain
greater influence.

### CONFLICT IN IRAQ

The insurgency in Iraq has grown in size and complexity over the
past year. Attacks numbered approximately 25 per day 1 year ago. Today,
they average in the 60s. Insurgents have demonstrated their ability to
increase attacks around key events such as the Iraqi Interim Government
(IIG) transfer of power, Ramadan and the recent election. Attacks on
Iraq's election day reached approximately 300, double the previous 1
day high of approximately 150 reached during last year's Ramadan.

The pattern of attacks remains the same as last year. Approximately
80 percent of all attacks occur in Sunni-dominated central Iraq. The
Kurdish north and Shia south remain relatively calm. Coalition Forces
continue to be the primary targets. Iraqi Security Forces and Iraqi
Interim Government (IIG) officials are attacked to intimidate the Iraqi
people and undermine control and legitimacy. Attacks against foreign
nationals are intended to intimidate non-government organizations and
contractors and inhibit reconstruction and economic recovery. Attacks
against the country's infrastructure, especially electricity and the
oil industry, are intended to stall economic recovery, increase popular
discontent and further undermine support for the IIG and Coalition.

Recent polls show confidence in the Iraqi Interim Government
remains high in Shia and Kurdish communities and low in Sunni areas.
Large majorities across all groups opposed attacks on Iraqi Security
Forces and Iraqi and foreign civilians. Majorities of all groups placed
great importance in the election. Sunni concern over election security
likely explains the relatively poor showing by the Sunni electorate in
comparison with the Shia and Kurdish groups. Confidence in Coalition
Forces is low. Most Iraqis see them as occupiers and a major cause of
the insurgency.

We believe Sunni Arabs, dominated by Ba'athist and Former Regime
Elements (FRE), comprise the core of the insurgency. Ba'athist/FRE and
Sunni Arab networks are likely collaborating, providing funds and
guidance across family, tribal, religious and peer group lines. Some
coordination between Sunni and Shia groups is also likely.

Militant Shia elements, including those associated with Muqtada al
Sadr, have periodically fought the Coalition. Following the latest
round of fighting last August and September, we judge Sadr's forces are
re-arming, re-organizing and training. Sadr is keeping his options open
to either participate in the political process or employ his forces.
Shia militants will remain a significant threat to the political
process and fractures within the Shia community are a concern.

Jihadists, such as al-Qaida operative Abu Musab al Zarqawi, are
responsible for many high-profile attacks. While Jihadist activity
accounts for only a fraction of the overall violence, the strategic and
symbolic nature of their attacks, combined with effective Information
Operations, has a disproportionate impact.

Foreign fighters are a small component of the insurgency and
comprise a very small percentage of all detainees. Syrian, Saudi,
Egyptian, Jordanian and Iranian nationals make up the majority of
foreign fighters. Fighters, arms and other supplies continue to enter
Iraq from virtually all of its neighbors despite increased border

PX373

security.

Insurgent groups will continue to use violence to attempt to protect Sunni Arab interests and regain dominance. Subversion and infiltration of emerging government institutions, security and intelligence services will be a major problem for the new government. Jihadists will continue to attack in Iraq in pursuit of their long-term goals. Challenges to reconstruction, economic development and employment will continue. Keys to success remain improving security with an Iraqi lead, rebuilding the civil infrastructure and economy and creating a political process that all major ethnic and sectarian groups see as legitimate.

## CONFLICT IN AFGHANISTAN

The people of Afghanistan achieved a major milestone by electing Hamid Karzai president in October 2004 election. Approximately 70 percent or just over 8 million registered Afghans disregarded scattered attacks by the Taliban and al-Qaida and voted. Karzai garnered 55 percent of the vote in a field of 18 candidates. The election dealt a blow to insurgents and provides new momentum for reform, such as the demobilization of private militias and increased government accountability.

President Karzai has since assembled a cabinet of reform minded and competent ministers who are ethnically and politically diverse. Most significantly, he removed Afghanistan's most powerful warlord, Marshal Fahim Khan, as Defense Minister.

Despite the overwhelming voter turn-out, the election's results highlighted ethnic divisions. Karzai received a majority of the Pashtun vote, but failed to do so within any of the other ethnic groups. Continued ethnic divisions remain a challenge to political stability. National Assembly elections, scheduled for later this year, will provide the opportunity for non-Pashtuns to increase their participation in the government.

The security situation improved over the past year. Insurgent attacks precipitously dropped after Afghanistan's presidential election. The primary targets remain Coalition Forces and facilities in the southern and eastern provinces. Voter registration teams and polling sites were attacked in these areas, reflecting the Taliban's concern over legitimate elections. Similar attacks in the same geographic areas are expected for elections later this year, but are unlikely to have a significant impact.

We believe many Taliban leaders and fighters were demoralized by their inability to derail the election and have seen their base of support among Pashtun tribes decrease. Loss of support, plus continued Coalition and Pakistani military operations, have prompted some to express an interest in abandoning the insurgency and pursuing political alternatives. Nevertheless some factions will likely remain committed to the insurgency and seek funding to continue operations.

## WEAPONS OF MASS DESTRUCTION AND MISSILE PROLIFERATION

Nuclear Weapons. Immediately behind terrorism, nuclear proliferation remains the most significant threats to our Nation and international stability. We anticipate increases in the nuclear weapons inventories of a variety of countries to include China, India, Pakistan

PX373

and North Korea.

Iran is likely continuing nuclear weapon-related endeavors in an effort to become the dominant regional power and deter what it perceives as the potential for U.S. or Israeli attacks. We judge Iran is devoting significant resources to its weapons of mass destruction and ballistic missile programs. Unless constrained by a nuclear non-proliferation agreement, Tehran probably will have the ability to produce nuclear weapons early in the next decade.

With declining or stagnant conventional military capabilities, we believe North Korea considers nuclear weapons critical to deterring the U.S. and ROK. After expelling IAEA personnel in 2002, North Korea reactivated facilities at Yongbyon and claims it extracted and weaponized plutonium from the 8,000 spent fuel rods. Only last week, Pyongyang publicly claimed it had manufactured nuclear weapons. Kim Chong-il may eventually agree to negotiate away parts of his nuclear weapon stockpile and program and agree to some type of inspection regime, but we judge Kim is not likely to surrender all of his nuclear weapon capabilities. We do not know under what conditions North Korea would sell nuclear weapons or technology.

India and Pakistan continue to expand and modernize their nuclear weapon stockpiles. We remain concerned over the potential for extremists to gain control of Pakistani nuclear weapons. Both nations may develop boosted nuclear weapons, with increased yield.

Chemical and Biological Weapons. Chemical and biological weapons pose a significant threat to our deployed forces, international interests and homeland. Numerous states have chemical and biological warfare programs. Some have produced and weaponized agents. While we have no intelligence suggesting these states are planning to transfer weapons to terrorist groups, we remain concerned and alert to the possibility.

We anticipate the threat posed by biological and chemical agents will become more diverse and sophisticated over the next 10 years. Major advances in the biological sciences and information technology will enable BW agent--both anti-human and anti-agricultural-- development. The proliferation of dual use technology compounds the problem. Many states will remain focused on ``traditional'' BW or CW agent programs. Others are likely to develop non-traditional chemical agents or use advanced biotechnology to create agents that are more difficult to detect, easier to produce, and resistant to medical countermeasures.

Ballistic Missiles. Moscow likely views its strategic forces, especially its nuclear armed missiles, as a symbol of great power status and a key deterrent. Nevertheless, Russia's ballistic missile force will continue to decline in numbers. Russia is fielding the silo-variant of the SS-27 Intercontinental Ballistic Missile (ICBM) and is developing a road-mobile variant and may be developing another new ICBM and new Submarine Launched Ballistic Missile (SLBM). It recently developed and is marketing anew Short Range Ballistic Missile (SRBM). Russia also is trying to preserve and extend the lives of Soviet-era missile systems.

China is modernizing and expanding its ballistic missile forces to improve their survivability and war-fighting capabilities, enhance their coercion and deterrence value and overcome ballistic missile defense systems. This effort is commensurate with its growing power and more assertive policies, especially with respect to Taiwan. It

PX373

continues to develop three new solid-propellant strategic missile systems--the DF-31 and DF-31A road-mobile ICBMs and the JL-2 SLBM. By 2015, the number of warheads capable of targeting the continental United States will increase several fold.

China also is developing new SRBMs, Medium Range Ballistic Missile (MRBMs), and Intermediate Range Ballistic Missile (ICBMs). They are a key component of Beijing's military modernization program. Many of these systems will be fielded in military regions nearTaiwan. In 2004, it added numerous SRBMs to those already existing in brigades near Taiwan. In addition to key Taiwanese military and civilian facilities, Chinese missiles will be capable of targeting U.S. and allied military installations in the region to either deter outside intervention in a Taiwan crisis or attack those installations if deterrent efforts fail.

We judge Iran will have the technical capability to develop an ICBM by 2015. It is not clear whether Iran has decided to field such a missile. Iran continues to field 1300-km range Shahab III MRBMs capable of reaching Tel Aviv. Iranian officials have publicly claimed they are developing a new 2000-km-range variant of the Shahab III. Iranian engineers are also likely working to improve the accuracy of the country's SRBMs.

North Korea continues to invest in ballistic missiles to defend itself against attack, achieve diplomatic advantage and provide hard currency through foreign sales. Its Taepo Dong 2 intercontinental ballistic missile may be ready for testing. This missile could deliver a nuclear warhead to parts of the United States in a two stage variant and target all of North America with a three stage variant. North Korean also is developing new SRBM and IRBM missiles that will put U.S. and allied forces in the region at further risk.

Pakistan and India continue to develop new ballistic missiles, reflecting tension between those two countries and New Delhi's desire to become a greater regional power. Pakistan flighttested its new solid-propellant MRBM for the first time in 2004. The Indian military is preparing to field several new or updated SRBMs and an MRBM. India is developing a new IRBM, the Agni III.

Syria continues to improve its missile capabilities, which it likely considers essential compensation for conventional military weakness. Syria is fielding updated SRBMs to replace older and shorter-range variants.

Several nations are developing technologies to penetrate ballistic missile defenses.

Cruise Missiles. Land-Attack Cruise Missiles (LACMs) and Lethal Unmanned Aerodynamic Vehicles (LUAVs) are expected to pose an increased threat to deployed U.S. and allied forces in various regions. These capabilities are already emerging in Asia.

The numbers and capabilities of cruise missiles will increase, fueled by maturation of land-attack and Anti-Ship Cruise Missile (ASCM) programs in Europe, Russia, and China, sales of complete systems, and the spread of advanced dual-use technologies and materials. Countering today's ASCMs is a challenging problem and the difficulty in countering these systems will increase with the introduction of more advanced guidance and propulsion technologies. Several ASCMs will have a secondary land-attack role.

China continues developing LACMs. We judge by 2015, it will have hundreds of highly accurate air- and ground-launched LACMs. China is developing and purchasing ASCMs capable of being launched from

PX373

aircraft, surface ships, submarines, and land that will be more capable
of penetrating shipboard defenses. These systems will present
significant challenges in the event of a U.S. naval force response to a
Taiwan crisis.

In the next 10 years, we expect other countries to join Russia,
China, and France as major exporters of cruise missiles. Iran and
Pakistan, for instance, are expected to develop or import LACMs. India,
in partnership with Russia, will begin production of the PJ-10, an
advanced anti-ship and land attack cruise missile, this year.

Major Exporters. Russia, China and North Korea continue to sell WMD
and missile technologies for revenue and diplomatic influence. The
Russian government, or entities within Russia, continues to support
missile programs and civil nuclear projects in China, Iran, India and
Syria. Some of the civil nuclear projects can have weapons
applications. Chinese entities continue to supply key technologies to
countries with WMD and missile programs, especially Pakistan, North
Korea and Iran, although China appears to be living up to its 1997
pledge to limit nuclear cooperation with Iran. North Korea remains the
leading supplier of missiles and technologies. In recent years, some of
the states developing WMD or ballistic missile capabilities have become
producers and potential suppliers. Iran has supplied liquid-propellant
missile technology to Syria, and has marketed its new solid-propellant
SRBM.

We also are watching non-government entities and individual
entrepreneurs. The revelations regarding the A.Q. Khan nuclear
proliferation network show how a complex international network of
suppliers with the requisite expertise and access to the needed
technology, middlemen and front companies can successfully circumvent
international controls and support multiple nuclear weapons programs.

NATIONS OF INTEREST

Iran. Iran is important to the U.S. because of its size, location,
energy resources, military strength and antipathy to U.S. interests. It
will continue support for terrorism, aid insurgents in Iraq and work to
remove the U.S. from the Middle East. It will also continue its weapons
of mass destruction and ballistic missile programs. Iran's drive to
acquire nuclear weapons is a key test of international resolve and the
nuclear non-proliferation treaty.

Iran's long-term goal is to see the U.S. leave Iraq and the region.
Another Iranian goal is a weakened, decentralized and Shia-dominated
Iraq that is incapable of posing a threat to Iran. These goals and
policies most likely are endorsed by senior regime figures.

Tehran has the only military in the region that can threaten its
neighbors and Gulf stability. Its expanding ballistic missile inventory
presents a potential threat to states in the region. As new longer
range MRBMs are fielded Iran will have missiles with ranges to reach
many of our European allies. Although Iran maintains a sizable
conventional force, it has made limited progress in modernizing its
conventional capabilities. Air and air defense forces rely on out-of-
date US, Russian and Chinese equipment. Ground forces suffer from
personnel and equipment shortages. Ground forces equipment is also
poorly maintained.

We judge Iran can briefly close the Strait of Hormuz, relying on a
layered strategy using predominately naval, air, and some ground

PX373

forces. Last year it purchased North Korean torpedo and missile-armed fast attack craft and midget submarines, making marginal improvements to this capability.

The Iranian government is stable, exercising control through its security services. Few anti-government demonstrations occurred in 2004. President Khatami will leave office in June 2005 and his successor will almost certainly be more conservative. The political reform movement has lost its momentum. Pro-reform media outlets are being closed and leading reformists arrested.

Syria. Longstanding Syrian policies of supporting terrorism, relying on WMD for strategic deterrence, and occupying Lebanon remain largely unchanged. Damascus is providing intelligence on al-Qaida for the War on Terrorism. Its response to U.S. concerns on Iraq has been mixed. Men, material and money continue to cross the Syrian-Iraqi border likely with help from corrupt or sympathetic local officials.

Damascus likely sees opportunities and risks with an unstable Iraq. Syria sees the problems we face in Iraq as beneficial because our commitments in Iraq reduce the prospects for action against Syria. However, Damascus is probably concerned about potential spill-over of Iraqi problems, especially Sunni extremism, into Syria. We see little evidence of active regime support for the insurgency, but Syria offers safe-haven to Iraqi Baathists, some of whom have ties to insurgents.

Syria continues to support Lebanese Hizballah and several rejectionist Palestinian groups, which Damascus argues are legitimate resistance groups.

Syria is making minor improvements to its conventional forces. It is buying modern antitank guided missiles and overhauling some aircraft, but cannot afford major weapon systems acquisitions.

President Bashar al-Asad is Syria's primary decisionmaker. Since becoming President in 2000 upon the death of his father, Asad has gradually replaced long-serving officials. Potential domestic opposition to his rule--such as the Muslim Brotherhood--is weak and disorganized. We judge the Syrian regime is currently stable, but internal or external crises could rapidly threaten it.

China. We do not expect Communist Party Secretary and President Hu Jintao's succession to chairman of the Central Military Command (CMC) to significantly alter Beijing's strategic priorities or its approach to military modernization. The commanders of the People's Liberation Army (PLA) Air Force, Navy, and Second Artillery (Strategic Rocket Forces) joined the CMC in September, demonstrating an institutional change to make China's military more ``joint.'' The CMC traditionally was dominated by generals from PLA ground forces.

China remains keenly interested in Coalition military operations in Afghanistan and Iraq and is using lessons from those operations to guide PLA modernization and strategy. We believe several years will be needed before these lessons are incorporated into the armed forces. We judge Beijing remains concerned over U.S. presence in Iraq, Afghanistan and Central Asia. Beijing may also think it has an opportunity to improve diplomatic and economic relations, to include access to energy resources, with other countries distrustful or resentful of U.S. policy.

China continues to develop or import modern weapons. Their acquisition priorities appear unchanged from my testimony last year. Priorities include submarines, surface combatants, air defense, ballistic and anti-ship cruise missiles and modern fighters. China

recently launched a new conventional submarine and acquired its first
squadron of modern Su30/FLANKER aircraft for the naval air forces from
Russia. The PLA must overcome significant integration challenges to
turn these new, advanced and disparate weapon systems into improved
capabilities. Beijing also faces technical and operational difficulties
in numerous areas. The PLA continues with its plan to cut approximately
200,000 soldiers from the Army to free resources for further
modernization, an initiative it began in 2004.

Beijing was likely heartened by President Chen Shui-bian
coalition's failure to achieve a majority in the recent Legislative
Yuan elections. We believe China has adopted a more activist strategy
to deter Taiwan moves toward independence that will stress diplomatic
and economic instruments over military pressure. We believe China's
leaders prefer to avoid military coercion, at least through the 2008
Olympics, but would initiate military action if it felt that course of
action was necessary to prevent Taiwan independence.

Beijing remains committed to improving its forces across from
Taiwan. In 2004, it added numerous SRBMs to those already existing in
brigades near Taiwan. It is improving its air, naval and ground
capabilities necessary to coerce Taiwan unification with the mainland
and deter U.S. intervention. Last fall, for instance, a Chinese nuclear
submarine conducted a deployment that took it far into the western
Pacific Ocean, including an incursion into Japanese waters.

North Korea. After more than a decade of declining or stagnant
economic growth, Pyongyang's military capability has significantly
degraded. The North's declining capabilities are even more pronounced
when viewed in light of the significant improvements over the same
period of the ROK military and the US-ROK Combined Forces Command.
Nevertheless, the North maintains a large conventional force of over
one million soldiers, the majority of which we believe are deployed
south of Pyongyang.

North Korea continues to prioritize the military at the expense of
its economy. We judge this ``Military First Policy'' has several
purposes. It serves to deter US-ROK aggression. Nationwide conscription
is a critical tool for the regime to socialize its citizens to maintain
the Kim family in power. The large military allows Pyongyang to use
threats and bravado in order to limit US-ROK policy options.
Suggestions of sanctions, or military pressure by the U.S. or ROK are
countered by the North with threats that such actions are ``an act of
war'' or that it could ``turn Seoul into a sea of fire.'' Inertia,
leadership perceptions that military power equals national power and
the inability for the regime to change without threatening its
leadership also explains the continuing large military commitment.

The North Korean People's Army remains capable of attacking South
Korea with artillery and missile forces with limited warning. Such a
provocative act, absent an immediate threat, is highly unlikely,
counter to Pyongyang's political and economic objectives and would
prompt a South Korean-CFC response it could not effectively oppose.

Intemally, the regime in Pyongyang appears stable. Tight control
over the population is maintained by a uniquely thorough
indoctrination, pervasive security services and Party organizations,
and a loyal military.

Russia. Despite an improving economy, Russia continues to face
endemic challenges related to its post-Soviet military decline. Seeking
to portray itself as a great power, Moscow has made some improvements

PX373

to its armed forces, but has not addressed difficult domestic problems that will limit the scale and scope of military recovery.

Russian conventional forces have improved from their mid-1990s low point. Moscow nonetheless faces challenges if it is to move beyond these limited improvements. Significant procurement has been postponed until after 2010 and the Kremlin is not spending enough to modernize Russia's defense industrial base. Russia also faces increasingly negative demographic trends and military quality of life issues that will create military manning problems.

Moscow has been able to boost its defense spending in line with its recovering economy. Russia's Gross National Product averaged 6.7 percent growth over the past 5 years, predominately from increased energy prices and consumer demand. Defense should continue to receive modest real increases in funding, unless Russia suffers an economic setback.

Russia continues vigorous efforts to increase its sales of weapons and military technology. Russia's annual arms exports average several billion dollars. China and India account for the majority of Russia's sales, with both countries buying advanced conventional weapons, production licenses, weapon components and technical assistance to enhance their R&D programs. Efforts to increase its customer base last year resulted in increased sales to Southeast Asia. Russian sales are expected to remain several billion dollars annually for the next few years.

Russia's struggle with the Chechen insurgency continues with no end in sight. Chechen terrorists seized a North Ossetian primary school where over 330 people were killed and two Russian civilian airliners were bombed in flight last summer. Rebels continue targeting Russians in Chechnya and Chechen officials cooperating with Moscow. While Moscow is employing more pro-Russian Chechen security forces against the insurgents, the war taxes Russian ground forces. Although the Chechnya situation remains a minor issue to the average Russian, concerns over spreading violence prompted new government security initiatives and offered cover for imposition of authoritarian political measures.

Russian leaders continue to characterize Operation IRAQI FREEDOM and NATO enlargement as mistakes. They express concerns that U.S. operations in Iraq are creating instability and facilitating terrorism. Russian leaders want others to view the Chechen conflict as a struggle with international terrorism and accuse those who maintain contact with exiled Chechen leaders or criticize Moscow's policies toward Chechnya as pursuing a double standard. Russian officials are wary of potential U.S. and NATO force deployments near Russia or in the former Soviet states. Concern that Ukraine under a President Yushchenko would draw closer to NATO and the EU was a factor motivating Russia's involvement in Ukraine's presidential election.

## CLOSING THOUGHTS

This year my testimony focuses on what I believe to be the most immediate threats to our Nation and challenges to our interests. The threat from terrorism has not abated. While our strategic intelligence on terrorist groups is generally good, information on specific plots is vague, dated or sporadic. We can and must do better. Improved collection and analysis capabilities can make a significant difference. We are increasing our ability to provide that timely, relevant

PX373

intelligence.

The Intelligence Community as a whole needs to improve its collection and focus more analytic resources on pressures in the Islamic world so that we can better understand the drivers for extremism. We also need greater collection and more analytic resources devoted to certain key Islamic countries. We have taken steps to improve our collection and analysis, hiring more individuals with Arabic and Farsi language skills. Nevertheless, more needs to be done across the Intelligence Community, particularly in the area of meaningful, penetrating collection and making the content of that collection available to all who need it.

Proliferation of Weapons of Mass Destruction and Missiles is my second priority. Collection must be improved. Additionally, improving our analytic techniques, adoption of true ``all-source'' analysis approaches and greater information sharing will help us avoid problems similar to those in our pre-war analysis of Iraq's WMD program.

We also must not let our focus on numerous nations of interest wane. Traditional military intelligence disciplines must remain robust if we are to provide our national security policymakers, defense planners and warfighters the information they need to successfully execute their missions. We need improved collection so that we are stealing our true secrets. There are significant gaps in our understanding of several nations' leaderships' plans and intentions. Additionally, more collection and analysis is needed to provide adequate warning of attack and a more complete understanding of the military capability, doctrine and war plans of numerous countries. We are working to better target collection against these hard targets.

As I mentioned, the threats and challenges I briefed today are the most significant and immediate. They are certainly not the only ones. In previous years, I have spoken about the security situation in Africa, Latin America and South and Southeast Asia. I also addressed my concerns on information operations, international crime, problems associated with globalization, uneven economic development and ungoverned states. Those issues remain significant concerns and the focus of collection and analytic resources for defense intelligence. We will be requesting additional funding and billets to ensure we retain coverage and reporting on global coverage. We are reallocating our analytic capabilities, implementing the ``Master, Measure and Monitor'' concept in the Defense Intelligence Analysis Program to better address many of these threats and disturbing trends.

Let me conclude by making two points. First, DIA is focused on transforming its capabilities in all of its mission areas to operate in a true ``all-source'' environment. We are committed to incorporating all relevant information into our analyses, integrating analysts with collectors and precisely targeting our analytic and collection capabilities against complex threats and tough issues. More opportunity for ``discovery,'' greater penetration of hard targets and higher confidence in our judgments are our goals. Second, we are aggressively reengineering our information management approach and architecture. We are focused on harvesting non-traditional sources of data and positioning ourselves to exploit information from new and future sources. We are convinced commercial sector ``content management practices'' and data standards hold the key to upgrading our information management capability and providing the ``smart network'' we need. Much more work is required in the area if we are to realize

PX373

our potential and fundamentally improve our capabilities. These efforts
follow the Director of Central Intelligence and the Secretary of
Defense guidance and reflect the letter and spirit of the intelligence
reform act. Thank you. I look forward to your questions.

    Chairman Roberts. Admiral Loy and Ms. Rodley, I apologize
for not asking for your response in the interest of time. But I
would just say, from the INR aspect, I know the Vice Chairman
and I and Members of this Committee want to thank you. You're
one agency that got it right in regards to the WMD situation.
And both of you have a very strong interest in this.
    Senator Rockefeller and I apologize to my colleagues.
    Vice Chairman Rockefeller. Thank you, Mr. Chairman.
    I just second what the Chairman has indicated. I refer to
sharing and access. If you share, it's the decision to give.
It's a decision on the part of the holder. If it's access, then
it is the right of the receiver. So, sharing out/getting in.
And I think that will be worked out over the years.
    Director Goss, the National Intelligence Council recently
issued its annual report to Congress on the safety and the
security of Russian nuclear facilities and military forces. The
report is both classified and unclassified. One excerpt from
the unclassified version is as follows:
    ``Russian officials have reported that terrorists have
targeted Russian nuclear weapons storage sites. Security was
tightened in 2001, after Russian authorities twice thwarted
terrorist efforts to reconnoiter nuclear weapon storage sites.
    ``We find it''--this is a continuation of the report,
unclassified--``we find it highly unlikely that Russian
authorities would have been able to recover all the material
reportedly stolen. We assess that undetected smuggling has
occurred and we are concerned about the total amount of
material that could be diverted or stolen in the last 13
years.''
    Now, I'd ask you, sir, is the material missing from Russian
nuclear facilities sufficient to construct a nuclear weapon?
    Director Goss. Senator, the way I would prefer to answer
that question, is there is sufficient material unaccounted for,
so that it would be possible for those with know-how to
construct a nuclear weapon. I hope that's sufficiently clear.
    Vice Chairman Rockefeller. We'll wait for a closed session.
    On the same subject, the National Intelligence Council
assessment, can you assure the American people--and I think
this is a yes-or-no type thing--can you assure the American
people that the material missing from Russian nuclear sites has
not found its way into terrorist hands?
    Director Goss. No. I can't make that assurance. I can't
account for some of the material, so I can't make the assurance
about its whereabouts.
    Vice Chairman Rockefeller. Appreciate it, sir.
    Africa. Since the 1980s, a million people have died of
starvation, enormous dislocation, poverty, hopelessness,
despair, instability, a fertile breeding ground for terrorism,
both east and west, a large Islamic population. Instability in
the African continent has allowed us to intervene episodically

PX373

back and forth.

But the whole prospect of the concept that this is the next great threat, and that being something called a failed continent, General James Jones made that point to the Chairman and me three times in a presentation in London, when he was stationed there. He said, this is the continent that you in the intelligence world need to be looking at--a failed continent, because we are consumed by challenges in Iraq, necessarily, Afghanistan and other world hotspots.

Again, Director Goss, are we facing the possibility, do you think, of the collapse of civil society throughout much of Africa? Shouldn't we be addressing the problems in these countries now, rather than at a future date when our options will be more likely to be military?

Director Goss. Senator, thank you.

As you know, I've made the statement many times that I don't want to get into the Department of State's policy areas, and the question you've asked me gets into actually a much bigger question than just the intelligence community. But it's a great question. And you are right on the mark, that this is an over-neglected area that is under-resourced for American interests, from my perspective.

I can tell you that I have read Kaplan's piece about the resurgence of anarchy and I've read Friedman's pieces on this. We have have seen all kinds of very nasty people, Foday Sankoh, people like that in the past, who have taken advantage of exploitation of the processes there.

We find that we are going backwards in some areas where we should be going forwards. You heard me mention in my remarks a whole series of bands, of arcs, as it were, of different kinds of problems in Africa. I think it is a rich seabed for people who have a mission on their mind to go and try and recruit people. We have found that. And we are making efforts there.

And I would say we would be wise to solve problems sooner, before they get more troublesome later. I do think that that is an area that needs more attention in the intelligence community and all other efforts that we make.

Vice Chairman Rockefeller. Thank you, sir.

Admiral Jacoby, I can't imagine that you wouldn't have some comment.

Admiral Jacoby. Senator Rockefeller, you know in past conversations we've talked about sort of the global spread of issues. Certainly, there's a fertile ground in the Muslim populations in Africa for recruitment to extremist causes. Disaffected youth, the youth bulge, socioeconomic situation, education shortfalls, unemployment and so forth make inviting recruiting targets. And obviously, as we look at the Madrid bombing and some of the things that have happened, particularly the North African crescent is an area of concern.

Sir, we take the Africa situation seriously in the sense that we have plussed up our presence in our defense attache offices and will continue to do that with some new initiatives that go in place here in 2005 and 2006.

We view Africa as place that needs to be monitored carefully. Trends need to be carefully described and assessed

PX373

and that the intelligence assessments reach policymakers in that part of the world as a sense of urgency.

Vice Chairman Rockefeller. I would follow through to both of you that I think we all know that we have an enormous scarcity of resources, of facilities, of capabilities, simply because of what's going on elsewhere. And I hear what you both say. And I hear the sense of urgency behind what you say.

But I also would guess that there's some frustration on your part that we may not have the financial capability or the trained personnel capability to be able to get to those areas to get that intelligence. Those are difficult languages, and it takes, as Director Goss has often said, 5 years to train a good agent.

Director Goss. I think you've said it well, Senator.

Admiral Jacoby. I agree completely, sir. Absolutely.

Vice Chairman Rockefeller. Thank you, Mr. Chairman.

Chairman Roberts. Let me just say that, in reference to the Vice Chairman's concern about the situation in Russia in regards to loose nukes or loose bioweaponry or loose scientists or loose anything in terms of security, that we should give a lot of credit to the Armed Services Committee and its distinguished Chairman, who is sitting over here to my left and everybody's right--Senator Warner--for taking such a strong interest in the CTR program, the Nunn-Lugar program.

And knowing something about that on the Emerging Threats Subcommittee, we learned right away the most important thing is to provide the security. We want to eliminate the stockpiles and we want to safeguard the scientists and make sure they're not, you know, going somewhere else. But we have made some progress, and we have put some conditions and some of our allies need to step up. And the Russians have stepped up. So I'm very hopeful we'll continue to see additional funding and really address that security issue.

Senator Bond.

Senator Bond. Thank you, Mr. Chairman.

Director Mueller, you noted that the third concern was the recruitment of radical American converts. And this is something that I've become increasingly concerned about.

I don't know if you've seen it, but recently, the Freedom House put out a report on Saudi publications on hate ideologies filling American mosques. And as you read through it, you see the hate-filled language that is officially sponsored by the cultural offices of the embassy of Saudi Arabia.

And mosques supported by the king has admonitions: be dissociated from the infidels; hate them for their religion; leave them; never rely on them; do not admire them; and always oppose them in every way, according to Islamic law.

The list of documents and the list of publications goes on. And it appears that the bargain with the devil they made about 25 years ago, that the Saudi government would support Wahhabism if they stayed out of Saudi Arabia, is coming back to haunt us.

I would ask the question, number one, how serious a threat that is? And I would ask you and Admiral Loy to respond to it.

And also, it seems to me if our doctrine is that a country that harbors terrorists is guilty, what about a country that

PX373

fosters terrorists within our own country?

Director Mueller. Well, it certainly, as I think I indicated in my opening remarks, it is an issue--the radicalization of individuals within the United States. And it can be done any number of ways.

We are looking, for instance, at the prison systems, not just the Federal system but, through our 100 joint terrorism task forces, working with State and local law enforcement to address the possibility that radicalization can occur throughout our prison system, as it has in the past in a variety of ways.

Through our joint terrorism task forces, we also understand that persons absolutely have the right to practice religion in whichever way they want. But by the same token----

Senator Bond. That's not the question, Mr. Director. It's what they are----

Director Mueller. But I'm going to say, on the other hand, we have the obligation to determine and identify those persons who are becoming radicalized and become a threat to the United States.

And through our working with State and local law enforcement, building up our intelligence capacity, working through our joint terrorism task forces, we continuously seek sources and information and intelligence as to those individuals who may become radicalized in a variety of ways.

The last point I would make--and I think others would agree with me--is that there has been a shift in the attitude of Saudi Arabia in the wake of the May 2003 bombings--a substantial shift, and an understanding and a recognition of the threat not only to Saudi Arabia, but to Saudi Arabia's interests around the world from those elements who have been radicalized.

Senator Bond. Thank you, Mr. Director. They noted that these documents were still, as of December 2004, were still in the King Fahd mosque. They're still being handed out.

Admiral Loy, any thoughts about how, from the homeland security standpoint, how dangerous is Saudi Arabia's supplying of this literature?

Admiral Loy. Indeed, Senator Bond, there are three or four points that I would make.

Number one, regardless of the sponsorship, the notions that you are citing in the things that you read are dramatic evidence of the challenge in front of us here, whether it's pure Saudi from the implication of that particular set of materials, or what that line of logic is as a pervasive notion throughout not only Saudi Arabia, but the rest of the world.

I sit on a couple of joint contact groups with allies--with the Brits, with Canada. And there has been over the last year a growth of an agenda item referring to radicalization as a significant issue that we have to grapple with.

Senator Bond. Admiral Loy, if I may interrupt. I apologize; the light's on--I needed to ask Director Goss, Ms. Rodley and maybe Admiral Jacoby, I think that Southeast Asia is the second front of the war on terrorism.

Director Goss mentioned that. I've recently come back from

PX373

there. Jemaah Islamiyah, Moro Liberation Front, others, Abu
Sayyaf, are posing significant dangers. Singapore, Malaysia and
Indonesia have been aggressive.

Number one, I'd like to know whether you think these have
become a threat to the U.S. homeland and are our restrictions
on U.S. aid--IMET aid--to Indonesian military hurting our
ability to work cooperatively with that country?

Mr. Goss.

Director Goss. On the IMET question, there is no question
that--I can't speak specific to the particulars there. Maybe
Admiral Jacoby can.

But I will tell you that, in fact, we do have liaison
relationships in the war on terror, of course, on a global
basis. And they are affected by other matters such as that that
you have specifically mentioned.

In this case I can't answer your direct question, but I can
tell you there is a relationship, and it's important that we
understand that.

The second thing I would tell you is, I think you are right
to focus on Southeast Asia. It is an escalating area. We find
that the degree of capability to deal with the problem there is
the sophistication of dealing with the problem of terrorism
there by the governments, the states that are there, is not
adequate. Consequently, I would say it is a growth industry,
regrettably.

Yes, it is a threat.

Admiral Jacoby. Senator Bond, the key countries in the area
are the ones that Director Goss identified--Indonesia,
Philippines, Thailand. Two of those countries we've had very
longstanding IMET and other interactions and it makes it far
easier to work not only with their military forces, but also
with their military intelligence, with my counterparts.

The situation in Indonesia is quite different, where the
senior officers in that country, particularly in, again, my
case, the intelligence area, have not had those kinds of
interactions with the U.S. military.

It does create barriers for close interaction and
interoperation. And Southeast Asia in general is an area that
needs that kind of attention. And I'm going back to my days in
the Pacific command as a J-2 to say authoritatively that more
needs to be done there, sir.

        STATEMENT OF CAROL RODLEY, PRINCIPAL DEPUTY
   ASSISTANT SECRETARY OF STATE FOR INTELLIGENCE AND RESEARCH

Ms. Rodley. We really see it the same way as my colleagues
have outlined. Indonesia as the main problem.

Chairman Roberts. Speak right in the microphone.

Ms. Rodley. Indonesia has the most serious problem with
Jemaah Islamiyah and, to a lesser extent, the Philippines,
Thailand and some of the other nations in the region.

This is of particular concern because of Jemaah Islamiyah's
affiliation with al-Qa'ida. So the question of targeting U.S.
interests is one that we are very concerned about.

[The prepared statement of Hon. Thomas Fingar, Assistant

Secretary of State for Intelligence and Research follows:]

Prepared Statement of the Honorable Thomas Fingar,
Assistant Secretary of State for Intelligence and Research

Mister Chairman, Members of the Committee. It is an honor to be
asked to participate in this important review of threats to our Nation
and the challenges they present to the Intelligence Community. INR has
taken to heart your admonition to describe the spectrum of threats to
the United States and its interests, and to assess the probability,
immediacy, and severity of the dangers we face, but I will do so in a
way intended to complement the judgments presented by our colleagues in
other agencies by focusing on the way threats appear when viewed
through the lens of diplomacy.

The subject of this hearing is one on which there is broad
consensus in the Intelligence Community. INR concurs with the judgment
that terrorism is the single greatest threat to Americans, both at home
and abroad, and that the proliferation of weapons of mass destruction
(WMD), missiles, and certain types of advanced conventional weapons is
a close and dangerous second. We also share most of the other threat
judgments presented by our colleagues. But rather than merely echoing
their assessments, I will approach the subject reflecting INR's unique
perspective and responsibilities as the Secretary of State's in-house
intelligence unit.

As Secretary Rice has made clear in recent statements, diplomacy is
critical to U.S. efforts to contain, counter, and diminish the threats
we face. On February 8 she told her audience in Paris, ``We agree on
the interwoven threats we face today: terrorism, and proliferation of
weapons of mass destruction, and regional conflicts, and failed states,
and organized crime.'' She added that America stands ready to work with
other countries in ``building an even stronger partnership'' to address
these threats.

To combat the twin scourges of terrorism and proliferation requires
more than just the effective collection of hard to obtain intelligence.
At a minimum, it also requires deep understanding of the motivations
and objectives of those who resort to terrorism and/or pursue WMD. It
also takes sophisticated analysis of all-source information, informed
judgments about what we do not know, and detailed knowledge of other
countries, cultures, political systems, and the underlying causes of
discontent and radicalization. The prerequisites for meeting all these
requirements include global coverage, deep analytical expertise, and
Intelligence Community commitment to providing policymakers what they
need, when they need it, and in a form that they can use day in and day
out.

Why are terrorism and proliferation at the top of the threat list?
The short and conventional answer is that the normalization of
relations with China and demise of the Soviet Union dramatically
reduced the danger of nuclear war and eliminated or transformed
fundamentally a wide array of associated threats. But the end of the
cold war also brought many changes to other aspects of international
life, including the erosion of constraints on ``client'' states, the
re-emergence of long repressed political aspirations, and the rise of
ethnic and religious hatreds. Former DCI Jim Woolsey described the
change as the displacement of a few big dragons by lots of dangerous
snakes. But it was, and is, more than that. Globalization and the

PX373

information revolution have changed expectations and aspirations and
made it possible for nations and non-state actors, including
individuals, to do things that would have been unthinkable just a few
years ago.

One of the many resultant developments has been the emergence of
vast differences in coercive capabilities. This, in turn, has
exacerbated the dangers of both terrorism and proliferation. The
inability of all but a few nations to deter the most powerful countries
(including, but not limited to the United States) has reinforced the
determination of states that feel threatened (whether justifiably or
not) to seek asymmetric solutions to the disparity of power. For some,
this means pursuit of WMD and delivery capabilities because they know
they have no hope of deterring or defeating the attacks they fear with
conventional armaments. Perhaps the clearest illustration of this can
be found in DPRK public statements after Operation Iraqi Freedom
intended to reassure its public and warn potential adversaries that,
unlike Saddam, it had a (nuclear) deterrent; a claim reiterated
February 10. Pakistan pursued and obtained nuclear weapons and delivery
systems to compensate for India's vastly superior conventional military
power and nuclear weapons.

Terrorism is at the other end of the spectrum of asymmetric
responses. State sponsors, most notably Iran, seem implicitly to warn
potential enemies that the response to any attack will include resort
to terror. They seem to be saying, in effect, ``You may be able to
defeat us militarily, but you cannot protect all your people,
everywhere, all the time.'' Such a porcupine defense/deterrent posture
is an unfortunate, but not irrational response to wide disparities of
power. The situation is somewhat analogous for non-state actors
frustrated by their inability to achieve their (however reprehensible)
goals by other means. Terror and guerrilla warfare are long-standing
measures of choice (or last resort) for weak actors confronting a much
stronger adversary. The targets vary widely, from established
democracies to authoritarian regimes. However, in some cases,
terrorists also direct their attacks against those who are seen as
responsible for-by imposition or support the actions or existence of
the regime they oppose. That appears to be one of the reasons al-Qaida
has targeted the United States in Saudi Arabia and terrorists in Iraq
have used suicide bombers and improvised explosive devices to attack
Iraqis and others supportive of the Iraqi government. The use of terror
tactics in liberal democracies is especially problematic because in
open societies, self-restraint under the rule of law and commitment to
respect human rights and dignity complicate the challenges of mounting
an effective response.

Attacking a distant country is difficult, even in the era of
globalization, and would-be assailants must choose between difficult,
high profile attacks, like those on 9/11, and easier to accomplish, but
probably lower impact incidents (like sniper attacks on random
individuals or small explosions in crowded public places). We remain
vulnerable to both types of terror attack, but arguably we are now less
vulnerable to relatively largescale, high profile attacks than we were
before 9/11. Nevertheless, it is extremely difficult to penetrate the
tight knit groups that are most capable of carrying out such attacks on
our country and our people. We have achieved great success in
disrupting alQaida, but may be witnessing a repeat of the pattern found
in the wars on illegal drugs and organized crime, namely, that we are

PX373

fighting a ``hydra'' with robust capabilities of resurgence and replacement of lost operatives. The bottom line is that terrorism remains the most immediate, dangerous, and difficult security challenge facing our country and the international community and is likely to remain so for a long time. Despite the progress we have made, it would be imprudent to become complacent or to lower our guard.

The quest for WMD, missiles (or unmanned aerial vehicles), and advanced conventional arms has become more attractive to, and more feasible for, a small but significant set of State and non-state actors. This poses major challenges to the security of the United States and our friends and allies, but it is important to put this threat in perspective.

Nuclear Threats. The nuclear sword of Damocles that hung over our national existence during the cold war remains largely a concern from a different era. Russia and China still have nuclear weapons (the number is declining in Russia and increasing only modestly in China), but the hostility of the past is no longer a pressing concern and neither threatens to use them against our country. North Korea has produced sufficient fissile material to make a small number of nuclear weapons, but, despite its February 10 statement, there is no evidence that it has produced such weapons and mated them to a missile capable of delivering them to the United States. However, if it has made such weapons, it could reach U.S. allies, our armed forces, and large concentrations of American citizens in Northeast Asia. India and Pakistan have nuclear weapons and the capability to deliver them to targets in the region, but both nations are friends and neither threatens the territory of the United States. Iran seeks, but does not yet have nuclear weapons or missiles capable of reaching the United States. INR's net assessment of the threat to U.S. territory posed by nuclear weapons controlled by Nation states is that it is low and lacks immediacy. But this should not be grounds for complacency. The existence of such weapons and the means to deliver them constitutes a latent, but deadly threat. Ensuring that it remains latent is a key diplomatic priority.

The so-far theoretical possibility of nuclear weapons falling into the hands of terrorists constitutes a very different type of threat. We have seen no persuasive evidence that al-Qaida has obtained fissile material or ever has had a serious and sustained program to do so. At worst, the group possesses small amounts of radiological material that could be used to fabricate a radiological dispersion device (``dirty bomb''). The only practical way for non-state actors to obtain sufficient fissile material for a nuclear weapon (as opposed to material for a so-called dirty bomb) would be to acquire it on the black market or to steal it from one of the current, want-to-be, or used-to-be nuclear weapons states. The ``loose nukes'' problem in the former Soviet Union continues to exist but is less acute than it once was, thanks to the Nunn-Lugar cooperative threat reduction program and diligent efforts by Russia to consolidate and protect stockpiles. North Korea's possession of weapons-grade fissile material adds a new layer of danger and uncertainty. There is no convincing evidence that the DPRK has ever sold, given, or even offered to transfer such material to any State or non-state actor, but we cannot assume that it would never do so.

Chemical and Biological Weapons. Despite the diffusion of know-how and dual-use capabilities to an ever-increasing number of countries,

PX373

the number of states with known or suspected CW programs remains both small and stable. Most of those that possess such weapons or have the capability to produce quantities sufficient to constitute a genuine threat to the United States or Americans (civilian and military) outside our borders are not hostile to us, appreciate the significance of our nuclear and conventional arsenals, and are unlikely to transfer such weapons or capabilities to terrorists. There are nations that might use CW against invading troops, even American forces, on their own territory, but we judge it highly unlikely that Nation states would use CW against the American homeland or specifically target American citizens except as an act of desperation. Terrorists, by contrast, have or could acquire the capability to produce small quantities of chemical agents for use against selected targets or random individuals. We judge the chances of their doing so as moderate to high. One or a few disgruntled individuals or a small terrorist cell could do so in a manner analogous to the 1995 Aurn Shinrikyo sarin gas attack on a Tokyo subway. The severity of such an attack would be small in terms of lethality, but the psychological and political impact would be huge.

The risk posed by Nation states with biological weapons is similar to that for CW; many nations have the capability, but few have programs and even fewer would be tempted to use them against the United States. The danger of acquisition and use by terrorists, however, is far greater. Though hard to handle safely and even harder to deliver effectively, BW agents have the potential to overwhelm response capabilities in specific locations, induce widespread panic, and disrupt ordinary life for a protracted period, with resulting economic and social consequences o# uncertain magnitude.

Conventional Attack. INR considers the danger of a conventional military attack on the United States or American military, diplomatic, or business facilities abroad to be very low for the simple reason that no State hostile to the United States has the military capability to attack the U.S. with any hope of avoiding massive retaliation and ultimate, probably rapid, annihilation. The only way to reach a different conclusion, it seems to us, is to posit an irrational actor model in which either all key decisionmakers in a hostile country are irrational or there are no systemic constraints on a totally irrational dictator. We judge that such conditions exist nowhere at present and hence that U.S. military might is, and will be, able to deter any such suicidal adventure for the foreseeable future. Here again, ensuring that this situation continues is a major goal of American diplomacy.

A far more dangerous threat is the possibility, even the likelihood, that advanced conventional weapons will be obtained--and used--by terrorists. For example, the danger that groups or individuals antithetical to the United States will obtain MANPADs or advanced explosives is both high and immediate. The number of Americans likely to be killed or maimed in such an attack would be small in comparison with the casualties in a conventional war or nuclear attack, but would be unacceptably large no matter how small the number of casualties and could have a major economic and psychological impact. Attacks on American nationals, whether they are aimed at workers in an American city, American tourists abroad, U.S. diplomatic facilities, U.S. businesses at home or abroad, or U.S. military facilities at home or abroad, are possible and unacceptable. The fact that State Department personnel, family members, and facilities have been frequent targets of attack makes us acutely aware of this danger and determined to do

PX373

everything possible to thwart it. This determination is magnified
severalfold by the fact that it is an important part of the State
Department's mission, and the Secretary of State's responsibility, to
protect American citizens everywhere around the globe. We take this
responsibility very seriously, and an important part of INR's support
to diplomacy involves providing information and insights that
contribute directly to the success of this mission.

States of Concern. It has become something of a convention in
threat testimony to list a number of countries that, for one reason or
another, are judged to warrant special attention from the Intelligence
Community. A few countries on this list engage in activities that
directly or indirectly threaten American lives (e.g., North Korea's
deployment of massive military power close enough to Seoul to put at
risk our ally as well as American troops and tens of thousands of
American civilians). Most countries on the list do not threaten the
United States militarily, but are important to the success of policies
to protect and promote other American interests.

Rather than enumerate a long list of countries, I will simply
provide a series of generic examples to illustrate the kinds of
conditions and concerns germane to diplomatic efforts to protect and
advance American interests. The State Department needs good
intelligence on some countries primarily because their actions could
lead to internal instability that could, in turn, threaten other
American interests. Others belong on the list because they do not or
cannot prevent the growth and export of narcotics, harbor or assist
terrorist groups, have leaders who make anti-American pronouncements,
or have conditions conducive to the rise of extremist movements. Still
others illicitly traffic in persons, weapons, conflict diamonds, or
other commodities; control critical energy resources; or have fragile
political institutions, large and dynamic economies, or any of myriad
other attributes.

What states on this long and varied list have in common is the
capacity to affect American interests and the efficacy of U.S. foreign,
economic, and security policy. Most do not and will not ``threaten''
the United States in the way that we were once threatened by the Soviet
Union and the Warsaw Pact, but something, or many things, about them
pose challenges and/or opportunities for American diplomacy. The
problems of failing states and the tremendous drain on resources in
developing countries from AIDS and other pandemics, environmental
stress, and corruption affect our ability to partner with allies and
friends to meet humanitarian needs in the interest of promoting
stability and democracy. This, in turn, poses challenges and
requirements for the Intelligence Community that extend far beyond the
collection and analysis of information germane to the suppression of
terrorism and limiting the spread of WMD, delivery systems, and
advanced conventional weapons. Meeting these challenges requires global
coverage, deep expertise, extensive collaboration, and, above all,
acceptance of the idea that the mission of the Intelligence Community
demands and entails more than collecting and interpreting covertly
acquired information on a relatively small number of narrowly defined
threats. Focusing on known threats and concerns is necessary, but could
prove to be very dangerous if we are not equally vigilant in trying to
anticipate unknowns and surprises.

Intelligence is, or should be, about more than addressing
``threats.'' The Intelligence Community has been justifiably criticized

for serious failings and shortcomings, but we should not lose sight of what we do well and must continue to do well. For example, America's unrivaled military preeminence, demonstrated so dramatically in our elimination of the Taliban regime in Afghanistan and the destruction of Saddam's regime in Iraq, is inextricably linked to the capabilities and accomplishments of our Intelligence Community. Intelligence collection, analytic tradecraft, insights gained through years of experience, and close ties among collectors, analysts, weapons designers, military planners, and troops on the ground are all and equally critical to the military successes we have achieved, the predominance we enjoy, and the fact that conventional military threats to our Nation and our citizens are low and almost certain to remain so for many years. Preserving this State of affairs will be neither automatic nor easy, but our efforts and the allocation of resources to do so must not foreclose equally committed efforts to address other threats and challenges.

Terrorism and proliferation are at the top of every agency's list of threats, and the Intelligence Community is committing substantial effort and resources to provide the intelligence support required to contain and reduce those dangers. In part, this requires and involves penetration of highly restricted and suspicious organizations and secure systems of communication, including sophisticated measures to hide financial transactions, obscure relationships, and deceive human and technical collectors. But collection is only one of many essential factors in the equation. To place the intelligence we collect in context, to distinguish between what is true and useful and what is not, and to develop strategies to detect and disrupt activities inimical to American interests requires expert analysts and information on a very wide array of critical variables. Stated another way, it is not possible to identify, anticipate, understand, and disrupt terrorists and proliferatitios without broad and deep understanding of the countries, cultures, contexts, social networks, economic systems, and political arenas in which they spawn, develop, and operate. Without broad and deep expertise and information that goes far beyond what we can or should collect through clandestine means, we will not be able to judge accurately the information we collect, and will ultimately be reduced to reliance on lucky guesses and chance discoveries. That isn't good enough. We can and must do better.

Senator Bond. Thank you. Thank you, Mr. Chairman. I apologize to my colleagues.

Chairman Roberts. Senator Feinstein.

Senator Feinstein. Thank you very much, Mr. Chairman.

Let me begin by thanking each of you. I think those of you that particularly head large departments, it is a most difficult time to give your service. And I just want you to know how much I appreciate it. So, thank you very much.

I view a worldwide threat to be our borders. And I'd like to explain that a little bit. Let me begin by quoting the Homeland Security statement today, Admiral Loy. On page four of your statement: ``Recent information from ongoing investigations, detentions, and emerging threat streams strongly suggest that al-Qa'ida has considered using the southwest border to infiltrate the United States. Several al-Qa'ida leaders believe operatives can pay their way into the country through Mexico and also believe illegal entry is more

advantageous than legal entry for operational security
reasons.''

I think that is a very important statement, particularly
when you consider the fact that a half-a-million other-than-
Mexican intrusions have been made on our borders since 2000.
Specifically, with respect to the southwest border, in 2003
there were 30,147 other-than-Mexican intrusions. The next year,
2004, which is the latest year that we have figures for, there
were 44,617. That's a 48 percent increase.

Now, let me take you to a hearing--because I sit on the
Judiciary Immigration Subcommittee--and a response by Mr.
Hutchinson to Senator Grassley's questions in February 2004.
This was a hearing held about a year ago. And let me read an
answer.

``At present, DHS has no specific policy regarding OTMs
apprehended at the southern border. While OTMs, as well as
Mexicans, are permitted to withdraw their applications for
admission and can be returned voluntarily to their country of
nationality, as a practical matter this option is not readily
available for them, as it is for Mexicans, whose government
will accept them back into the Mexican territory. Thus, when
apprehended, OTMs are routinely placed in removal proceedings
under Immigration and Nationality Act 240. It is not practical
to detain all non-criminal OTMs during immigration proceedings.
And thus, most are released. A majority of OTMs later fail to
appear for their immigration proceedings and simply disappear
into the United States.

``DHS is reviewing the possibility of extending its
expedited removal authority and means of addressing this
problem. DHS is also considering a variety of alternatives to
detention, especially for asylum seekers.''

Now, I've looked at the statistics for each country. And
the so-called countries of concern--Syria, Iran, others--the
numbers are up of penetrations through our southwest border.
Clearly we are deficient in a mechanism to deal with these.

Could you please comment and could you please indicate what
actions are being taken? I view this as a very serious
situation.

Admiral Loy. Thank you, Senator Feinstein. And, indeed, we
view it in exactly the same way you do, as a very serious
situation.

There have been a number of initiatives over the course of
the last year, many of which I know you're familiar with. For
example, the opportunity for deep repatriation of people back
into--not just across the border where the recidivism rate is
that they'll be back, coming our direction that night or the
next night.

The whole notion of being able to take the repatriation
decision and take Mexican nationals, illegal aliens back to----

Senator Feinstein. I'm not talking about--none of these are
Mexican nationals. These are all OTMs--other-than-Mexicans--
44,000 OTMs came across the southwest border last year.

Admiral Loy. Yes, ma'am. I'm just trying to array a set of
tools that could be potentially of use, not only in Mexico, but
wherever the OTMs might be from.

PX373

The challenge here is a lengthy border, as you well know.
We are introducing technology along that border that'll
substitute for what has historically been a very human-
intensive effort along the border, to make a difference in
terms of comings and goings.

So, US-VISIT, the notion of using UAVs on the border as
plugs between those portals of entry that we have worked so
hard to harden, if you will. But the entry-exit system that has
been now deployed by the Department of Homeland Security after,
I would offer, 20 years or so of effort on the part of INS
beforehand in failed efforts to establish some kind of a
legitimate, biometrically based entry-exit system into the
country, that we have some confidence in in terms of our
abilities to say who is here and who is not, and what are we
going to do about those who we can track and find.

Senator Feinstein. Let me have a little discussion on this.
Because essentially, there is no detention for these people.
They don't show up for their hearings and they disappear. So we
really don't know who comes into this country illegally over
that southwest border.

I have two cases that the FBI was involved in, one actually
in Michigan, where the gentleman was clearly a terrorist. He
pled guilty. He got 6 months. This is a big problem in the
United States. And I really don't think that the mechanical
aspect of it is going to solve it. You're not detaining these
people. They're released, essentially.

Admiral Loy. Well, there certainly is a prioritization
process to those with any degree of a connection against the
national terrorism database that has now been forged for us to
be able to bounce names against. So, to the degree we are
releasing because of the resource implications attendant to
keeping them and bedding them and detaining them until
resolution can come of their individual cases.

Those without any apparent criminal and/or terrorist
connection are obviously those that are on the high end of the
release order and the low end of the detention order.

Senator Feinstein. Can you give us a number of how many are
being detained?

Admiral Loy. I don't have that with me at the moment, but
I'll be happy to provide it to you.

Senator Feinstein. I would appreciate it. Out of the 44,000
that came in in 2004, how many are detained. I appreciate that.

Admiral Loy. We'll provide that.

Senator Feinstein. Thank you, Mr. Chairman.

Chairman Roberts. Senator Chambliss.

Senator Chambliss. Thank you, Mr. Chairman.

Director Goss, because of our longstanding relationship
going back to our House days, you know how keen my interest has
been in this area of information sharing. I was very pleased to
hear you, as well as Director Mueller, say that things are
improving. But at the same time, you both recognize we still
have a long way to go.

Donnie Harrelson, the Sheriff of Criss County, Georgia,
happened to be in the back a little earlier, and I visited with
him for a minute. He was keenly interested in a number of

PX373

things that were being said. And I told him that we really
can't let this issue of information sharing rest until his
office and every other local law enforcement office has the
information in real time that they need to help us win this war
on terrorism domestically. So, I appreciate the continued
effort of everybody at the table on this issue, but obviously
especially you two.

Director Goss and Admiral Jacoby, there was a report on Fox
News this morning in which it stated that the Iranians have
alleged that an aerial vehicle of some sort fired a missile and
it did not explode, but it was fired in the area of a nuclear
facility owned by the Iranians.

Would either of you care to comment on the information that
has come out of Iran this morning relative to that issue?

Director Goss. Senator, thank you for your comments about
vertical integration of information and your patience on
letting us get the technology and our architecture, our
enterprise, together on that. There is progress since we last
talked, and that's good news.

On the subject of Iran, I know nothing in my official
position. What I do know is, I think, from press reports that
something did fall out of the sky and came down somewhat near
Bushehr, their ongoing building of their nuclear power plant in
that area.

I also heard a subsequent report--and I have no idea
whether I'm spreading a rumor or not--that it was a gas tank
that fell off an aircraft and exploded. And I have no idea
whether that's true or not. It just came into my ear.

Admiral Jacoby. Senator Chambliss, I have no knowledge of
the report or any incidents involving Iran.

Senator Chambliss. Director Mueller, I have had the
opportunity to visit with your joint terrorism task force folks
in Atlanta and intend to do so again in the very near future.
And I will tell you, I am very impressed by the work that's
ongoing with that operation.

Every time I meet with them, I am told by some of your FBI
agents in the field, as well as other local law enforcement
officers, of the importance of the PATRIOT Act, and their
ability to fight terrorism as well as fight crime with the
tools that they have under the PATRIOT Act.

Now, as you know, the PATRIOT Act, or certain provisions of
it, are going to be expiring at the end of this year. Would you
care to comment on what your thoughts are relative to the
reauthorization of those provisions that are set to expire, and
how useful the PATRIOT Act has been to your organization in
fighting crime and fighting terrorism?

Director Mueller. Let me just start off by saying that the
provisions of the PATRIOT Act are indispensable to the
protection of the American public against further terrorist
attacks.

And the heartland of the bill that is so important--and
it's not just important to the FBI, but it's important to the
CIA, the DIA and others in the intelligence community, as well
as State and local law enforcement--is the breaking down of
walls that inhibited our ability to share information across

PX373

our agencies and across our disciplines and across our
programs. And the safety of the United States depends on the
ability of all of us together to be able to accumulate the
information, share the information.

And I don't mean just in pushing, but having access, equal
access to the information, and having the opportunity to act on
that information and all the information, whether it be act
within the United States, in a city, in a town, in a State or
nationally, or overseas, by having access to information that
may have been collected within the United States or outside the
United States.

And the PATRIOT Act has been instrumental in breaking down
those walls and enabling us to do it. It has given us new
authorities. That has given us the ability to obtain
information that will allow us to identify persons who present
a threat against the United States with adequate predication of
their interest and motivation in so doing.

It has given us access to records that we previously did
not have, but often are instrumental pieces of a puzzle that'll
give us a broader vision, a broader view of the intentions of
an individual or of a group of individuals in the United
States.

And I know myself and others who live day in and day out
trying to prevent terrorist attacks will be here before
Congress on a number of occasions, asking Congress to please
continue to let us have those tools to protect the American
public.

    Senator Chambliss. Thank you. Thank you, Mr. Chairman.
    Chairman Roberts. Senator Levin.
    Senator Levin. Thank you, Mr. Chairman.
    Mr. Goss, we were given information on an unclassified
basis in January of 2002, as follows. This is a CIA assessment.
``We assess that North Korea has produced enough plutonium for
at least one, and possibly two, nuclear weapons.'' I'm
wondering, Director, if you could give us the current CIA
assessment.

    Director Goss. I'm honestly not sure whether or not the
assessment is classified that we have. But our assessment is
that they have a greater capability than that assessment. In
other words, it has increased since then.

    I would also point out there are other agencies that are
making assessments, and there is a range. And I think that the
range we're fairly comfortable on--and I know that is
classified. Be happy to share that with you in closed session.

    Senator Levin. If you also could tell us for the record if
there's any unclassified numbers you can give us--for the
record, if you can do that. I'm not asking----

    Director Goss. Senator, I will.

    Senator Levin. If you can give us numbers the way that
number was given. And also, Director Goss, this is for you.

    The 9/11 Commission included a number of recommendations
for realigning the Executive Branch, including the following.
``Lead responsibility for directing and executing paramilitary
operations, whether clandestine or covert, should shift to the
Defense Department.'' Do you agree?

Director Goss. I recall the issue very well.

Senator Levin. Just briefly, do you agree with that?

Director Goss. I do not agree with that conclusion. We have studied it, and the Secretary of Defense and I have a memo which I anticipate signing today.

Senator Levin. Is that going to be public?

Director Goss. Certainly the conclusion of it will be.

Senator Levin. I think as much public as you can make, obviously.

Director Goss. It's in everybody's interest to know, I think, how we are dividing up the responsibility.

Senator Levin. I think it is.

Director Goss. I can tell you we spent a lot of time looking at this. And the Secretary feels that he has capabilities that are important, and I agree. And I feel I have capabilities that are important, and he agrees. There's not a lot of disagreement on this. We just didn't come out the same place the 9/11 Commission did.

Senator Levin. Thank you, Director.

I understand that your CIA's Inspector General's report on treatment of detainees by members of the intelligence community is somewhere in the pipeline. Can you tell us where it is?

Director Goss. Yes, sir.

Senator Levin. When is it going to be available?

Director Goss. The IG, or the inspector general of the agency, has indeed got all of the complaints and the referral on that matter in hand. As you know, it's an independent position. I have checked.

There is one report that was ordered by my predecessor, which has come back, which had 10 recommendations or so in it. About, I think, eight of those have been done.

We are now into the process of looking at some of the specific cases that have been brought to the IG. I cannot tell you what his timetable is, but I'm sure he would be very happy to tell you. I am assured that the work is ongoing, as it should be appropriately.

Senator Levin. Well, if he'd be happy to tell us, wouldn't he be happy to tell you?

Director Goss. Sure.

Senator Levin. Well, what is the timetable? I mean, is there a time?

Director Goss. I haven't asked him what day he's going to finish all these cases.

Senator Levin. Or a month?

Director Goss. As soon as they are through. I know one case has been dismissed. I know one case has been prosecuted. You've read about it in the paper, in North Carolina. know there are still a bunch of other cases. What I can't tell you is how many more might come in the door.

Senator Levin. OK. Thank you.

Director Mueller, this is for you. It relates also to the interrogation question. The FBI documents which were released under a FOIA request include e-mails from FBI agents expressing their deep concerns, that during late 2002 and mid-2003, overly aggressive and coercive interrogation techniques were being

PX373

used by the Defense Department people at Guantanamo's detention
facility which ``differed drastically from the FBI's authorized
practices.''

   Those memos described the Department of Defense's methods
as, quote: ``Torture techniques,'' expressed disbelief over the
military's interviews, telling their colleagues back in
Washington--this is in the FBI--that ``you won't believe it.''

   The FBI agents also described heated exchanges and battles
with the commanding generals at Guantanamo over the Department
of Defense's interrogation techniques, which FBI agents ``not
only advised against, but questioned in terms of their
effectiveness.'' Incidents described included detainees being
chained hand and foot in fetal positions, no chair, food or
water for long periods, ended up defecating on themselves. One
detainee apparently had been literally pulling his own hair out
throughout the night.

   Another major concern of the FBI agents present at
Guantanamo was that the Defense Department interrogators were
impersonating FBI agents in order to gain intelligence. FBI
agents were deeply worried that should detainees ever publicly
report their treatment at Guantanamo the FBI would be left
``holding the bag,'' because it would be appear falsely that
``those torture techniques were done by FBI interrogators.''

   Those documents make clear that the FBI was so concerned
about the Department of Defense's interrogation techniques that
it issued guidance to FBI agents at Guantanamo to stand clear
and to keep away from those techniques when the DoD took
control of interrogation.

   I assume that because of the serious and extensive
objections that were lodged by FBI agents against those
techniques, and particularly given the heated discussions at
which your personnel were present and engaged in, that you or
your senior advisers were aware of the concerns of those
members of your staff.

   And I'm just wondering--this is my question--did you raise
those concerns with either senior officials at the Department
of Defense, the Attorney General or the head of the criminal
division at the Justice Department, or higher-ups in the
Administration, including the National Security Council?

   Director Mueller. Senator, I know that those concerns were
raised with the Department of Defense by persons within the
FBI. At least some of those were, at least three incidents
early-on.

   Certainly after the issues were raised about Abu Ghraib
there were additional memoranda that were generated as a result
of an inquiry to the field that you may have been alluding to
there. Those also have been brought to the attention of the
military.

   I will also say that our inspector general is doing a
review of when the information came in and what happened to
that information once it came into the FBI.

   Senator Levin. You personally did not raise those concerns
with senior officials at the Department of Defense or with the
Attorney General or the head of the criminal division?

   Director Mueller. I was not aware of those concerns until

May of 2004.
    Let me just be precise on that, Senator. I was not aware of
the concerns that you raised, that you allude to there, in
Guantanamo until May of 2004.
    Senator Levin. Thank you. Thank you, Mr. Chairman.
    Senator Levin. Thank you.
    Chairman Roberts. Senator Snowe.

        STATEMENT OF THE HONORABLE OLYMPIA J. SNOWE,
                U.S. SENATOR FROM MAINE

    Senator Snowe. Thank you, Mr. Chairman. I want to welcome
all of our panelists here today.
    Director Goss, just to follow up on one of the questions
that the Chairman raised with respect to A.Q. Khan, there's no
question that he masterminded a far-reaching, wide-ranging,
global in scope operation in dispersing nuclear information
activities and technology.
    Have we pressed the Pakistani government to allow a U.S.
representative to directly have access to A.Q. Khan for
questioning to determine the extent of his network of elicit
nuclear activities?

        Prepared Statement of the Honorable Olympia J. Snowe,
                U.S. Senator from Maine

    Mr. Chairman, thank you again for holding this vital hearing that
will give us an opportunity to examine the threats currently arrayed
against our Nation as well as a look at those threats that may endanger
our society in the future. Identifying these threats each year is
crucial to our ability to gauge our progress in defeating or mitigating
those threats and to understanding this Committee's role in providing
the oversight and resources required by the Intelligence Community to
help defeat those who wish us harm.
    This hearing will also give us an opportunity to examine the
progress of the changes initiated since passing the Intelligence
Community reform in the last Congress and the confirmation of the new
Director of Central Intelligence. But, in the end, it is the current
and emerging threats to the Nation that drives our investments in, and
the development of priorities for, the Intelligence Community's
collection and analytic capabilities. I intend to look at a wide
spectrum of these threat scenarios--from the threat posed by nuclear-
capable terrorists to the future emergence of a regional peer-
competitor, as well as to our abilities to protect the homeland.
    I also want to thank Mr. Goss, Director of Central Intelligence and
Mr. Mueller of the FBI for once again appearing before the Committee to
describe to us their view of the world and how their respective
agencies are facing the many challenges before them.
    I especially want to acknowledge Admiral James Loy's appearance
here today. Although he has announced his departure from public life
later this spring, he remains committed to the nation's defense, as he
has been for his entire career, and has come before us today to
describe the Department of Homeland Security's efforts to counter the
threats arrayed against the homeland. On a personal note, as Chair of

PX373

the Senate's Subcommittee on Oceans, Fisheries and Coast Guard, I was
able to work closely with Admiral Loy when he was Commandant of the
Coast Guard. His charge to protect the Nation has always been a part of
his personal code of honor and he has been unwavering in accomplishing
his mission. For that and his many years of public service, I thank
him--the Nation is not only grateful, but safer, for his loyalty and
dedication.

    I would be remiss if I didn't comment directly about the dedication
and professionalism of the thousands of Americans who make up our
Intelligence Community. Each day, across this country and around the
world, they labor, often without recognition, to keep this country safe
from harm. It is their vigilance upon which we rely to give us the
forewarning necessary to counter the many dangers present in our world.
Although it is impossible to directly express our deep appreciation for
their efforts, I charge our witnesses to relay our eternal gratitude to
those who serve America so well.

    It has been an extremely challenging year for the Intelligence
Community; one in which we saw two major reports detailing the actions
and failures of our collective intelligence community to provide
national decisionmakers with the timely and quality intelligence they
must have to prepare America for the threats faced by the Nation and
the need to go to war. On the heels of those reports, we in Congress
undertook the largest revamping of the intelligence community since its
inception with the 1947 National Security Act. This self-examination
and correction is a hallmark of our democracy and will serve to make us
stronger. It is my fervent hope that the professionals of the community
see this reorganization as an opportunity to renew their dedication and
take on the challenges to strengthen their craft. In these perilous
times, the Nation needs them now more than ever.

    We on this Committee have spent a great deal of the past 2 years
poring over the intelligence provided to decisionmakers before the
commencement of Operation Iraqi Freedom and, of course, we all learned
many things and reached many conclusions. In my analysis of that
information, I became more and more convinced that while Saddam's
nuclear programs may have been defunct, our Nation continues to face
the very real threat of nuclear terrorism.

    Terrorists are known to be seeking nuclear technologies and have
already displayed a proclivity for catastrophic destruction on a
massive scale. For terrorists, attacking a U.S. city with a nuclear
device would likely be their ``dream come true.'' In the February 6
Washington Post, Steve Coll, author of ``Ghost Wars,'' notes that Osama
bin Laden's inspiration, repeatedly cited in his writings and
interviews, is the American atomic bombing of Hiroshima and Nagasaki,
which he says shocked Japan's fading imperial government into a
surrender it might not otherwise have contemplated. Bin Laden has said
several times that he is seeking to acquire and use nuclear weapons not
only because it is ``God's will,'' but because he wants to do to
American foreign policy what the United States did to Japanese imperial
surrender policy.

    I intend to focus my work on the Committee on this specific threat
to the United States because I believe it is time for us to look
closely at how we can prevent and deter such a threat. I am also
acutely aware from my work on the Commerce Committee in the area of
transportation, maritime and port security that we must look to the
seas as a very likely path of introduction of such a weapon into the

PX373

United States. The 9/11 Commission found that ``Opportunities to do
harm are as great, or greater, in maritime or surface transportation
(compared to commercial aviation).''

Recognizing these vulnerabilities, I included a number of
provisions and acted as a conferee to the Maritime Transportation
Security Act signed into law in 2002. One of my provisions included a
requirement that foreign shippers send their cargo manifest before
arriving at a U.S. port so the Department of Homeland Security can more
efficiently evaluate individual container shipments for risks of
terrorism. I have also held several port security hearings at the
Subcommittee on Oceans, Fisheries and Coast Guard and will continue to
do so because I do not believe we are anywhere near finished with fully
securing our maritime borders.

That is why I was encouraged by the President's announcement in
December of his Maritime Security Policy National Security/Homeland
Security Presidential Directive, which outlined his vision for a fully
coordinated U.S. Government effort to protect U.S. interests in the
maritime domain. The directive charges the Department of Defense and
the Department of Homeland Security with the alignment of all U.S.
Government maritime security programs and initiatives into a
comprehensive and cohesive national effort involving appropriate
Federal, State, local and private sector entities.

This move comes at a critical time. As we sit here right now, the
Department of Defense is proceeding with the 2005 Base Realignment and
Closure (BRAC) process, which I continue to believe is the wrong thing
to do while we are engaged in a global war on terrorism. We must ensure
that in the DoD's drive to meet an arbitrary 25 percent reduction
figure in infrastructure, we do no harm. For example, Brunswick Naval
Air Station on the coast of my home State of Maine is home to one of
four remaining maritime patrol bases remaining in the Navy and, in
fact, possesses the only remaining fully capable active runways in the
entire Northeast.

While many say that the maritime patrol community, whose chief
mission is anti-submarine warfare, is not relevant in the post-cold war
world, the community has reinvented itself as the warfighting
commander's premiere manned, long-range intelligence, surveillance and
reconnaissance (ISR) platform and is performing admirably in direct
support of Operation Enduring Freedom and Operation Iraqi Freedom.

But this community also has a role in the President's maritime
security policy. We have been talking to the Coast Guard and it is
clear that if we want to be able to conduct ISR operations against
inbound maritime traffic farther than 200 miles from our shores, the
maritime patrol community offers a ready and proven capability. These
points are made eloquently in a white paper written by retired Navy
Captain Ralph Dean who concludes that optimum basing for maritime
interdiction assets is as important as the assets themselves. We must,
therefore, carefully factor in future requirements for maritime
interdiction before closing any of the maritime patrol bases, which are
located in the four corners of the continental U.S.--Maine, Florida,
Washington state, and California.

The use of conventional forces to interdict the asymmetric threats
facing the Nation leads me to my final point. The Nation cannot afford
to develop tunnel-vision when it comes to the threat we face. Just as
the U.S. failed to adequately counter the developing threat of
terrorism as we focused solely on the cold war threat, I am concerned

PX373

that we do not now focus solely on terrorism and ignore the growing
likelihood of a regional peer competitor in the Pacific region. Like
many, I am alarmed by the rapid and unprecedented buildup of naval
forces, particularly destroyers and submarines, by the Chinese People's
Liberation Army Navy.

Last month members of the House Armed Services Committee visited
China and came away deeply concerned. Representative Randy Forbes said,
``We're seeing China really make huge moves in the area of its navy. .
.There's no question our Navy is the best in the world. . .but at some
point, sheer numbers start to matter.''

So I am doubly concerned when the Navy sends Congress a budget that
radically cuts the number of next generation destroyers and submarines
to be built by the Navy. I believe that in the future we will need
conventional ``blue-water'' ships to maintain our global presence in
the Northern and Western Pacific. I look forward to hearing from VADM
Jacoby as to the Defense Intelligence Agency's assessment of the
Chinese naval threat and what we are doing now to counter that threat
before we wake up one morning to yet another ``new normalcy,'' just as
we did on September 12, 2001.

I look forward to hearing the testimony of our witnesses and
working with them as part of this Committee to ensure that our
intelligence community has the resources and structure it needs to meet
the national security challenges we face today and in the future.

Thank you.


Director Goss. Senator Snowe, I want to be very careful how
I answer your question. I think my definition of ``pressed''
and yours would be the same. And I would say yes.

I can tell you that there is continuous attention to this
matter. And I believe that is being done with the necessary
urgency and fortitude, to make sure our interests are
completely understood.

Senator Snowe. So, could you characterize the cooperation
on the part of the Pakistani government, sharing information?

Director Goss. Yes.

Senator Snowe. I think it is disconcerting. I'm sure you
saw the article in Time Magazine recently citing a source close
to the Khan research laboratories in Islamabad. And he's quoted
as saying, ``even though its head has been removed, Khan's
illicit network of supplies and middlemen is still out there.''

Director Goss. Senator, in about 2 minutes in a private
conversation, I think I could satisfy your answers to these
questions.

Let me just simply say, there is an understanding that A.Q.
Khan enjoyed a certain amount of celebrity status in his
country because he was the man who brought them the bomb, which
was very critical to that culture and their national pride and
so forth.

It has been a difficult prospect. And understanding the
problem there, have to dealing with it, is useful in
negotiating our interests, which are to get all the information
possible.

I think that those discussions are understood and
appropriate steps by the right people are taking place. I can
be more specific in private.

PX373

Senator Snowe. I appreciate that.

Admiral Loy, I'm sure you're familiar with this report from the inspector general of the Department of Homeland Security regarding the visa waiver program and the use of stolen passports from the visa waiver countries.

And it's pretty troubling and disconcerting the extent to which aliens have applied for admissions into the United States with stolen passports from these specific countries and have been admitted, even when information has been submitted to the lookout system, all the more disconcerting, I think, when you consider--and I think we all agree--the greatest threat to this country is having terrorists have access to nuclear weapons or the materials to manufacture them.

And this report indicates ``aliens applying for admission to the United States using stolen passports have little reason to fear being caught and are usually admitted. Our analysis showed that it only made a small difference whether the stolen passports were posted in the lookout system.''

They reviewed two groups. Of the first group, 79 of the 98 aliens attempting entry were admitted. The second group had lookouts posted for their stolen passports prior to their attempted entries. And from the second group, 57 out of the 78 aliens who attempted entry were admitted.

Thirty-three of these admissions occurred after September 11, 2001. And then 136 successful entries using stolen passports were allowed.

I mean, obviously, this is significant and disturbing, to say the least, that obviously we haven't made much headway with respect to this issue regarding stolen passports. And when you think that worldwide there are 10 million stolen passports, it only takes one to gain admission into the United States.

You know, when you think about the fact on June 6, 2001, according to this report, 708 blank passports were stolen from the visa waiver program. The IG reported that this was significant because the passports were stolen in a city that also was the location of the al-Qa'ida cell that played a significant role in providing financial and logistical support for the September 11th terrorists.

It's interesting as well because there is little attempt by law enforcement officials to follow up and to try to locate these individuals, even when they have learned--even when officials have learned--that they have come into this country illegally.

So, one, what are we doing to investigate these activities of these aliens that have used stolen passports? What are we doing to determine their whereabouts? And what are we doing to improve our ability to locate, investigate and remove these individuals from the United States, who have stolen passports to gain entry?

Admiral Loy. Thank you, Senator Snowe. It's a very serious issue. The ICE agency is following up dramatically as a result not just of the IG's investigation but, rather, of their recognition of this, I'll call it, chink in the armor, so to speak.

We must recall that, of course, over the course of a couple

PX373

of hundred years of our country's openness to people coming to
our borders, our exit-entry control system attendant to those
borders was, frankly, very weak.

The fact that the last year-and-a-half that we have
established US-VISIT as an entry-exit control system, that we
have engaged internationally to try to use Interpol as a
database storage for stolen passport information, so that
there's a database that can be used internationally, not just
by folks of concern coming to the United States, but crossing
any borders anywhere.

The visa waiver program in and of itself now is required--
any folks coming into our country from visa waiver countries go
through US-VISIT, and we begin to gain the biometric value of
the fingerprints and the facial imagery that we capture as they
come into our country each time they enter.

We are conducting reviews of the visa waiver countries as
we speak. There are 25 of the 27 countries being reviewed, as
the Congress biannually, with a report due back to provide you
a solid status report on the visa waiver countries as it
relates to the issue that you're describing.

Furthermore, that review process always has the opportunity
for sanctions attendant to it, as to whether or not one stays
in the visa waiver program at the other end of the day.

There have been rather dramatic, public reflections of both
Germany and France and other countries having this nightmarish
problem of not tens or twenties, but literally thousands of
their brand-new, machine-readable passport blanks finding their
way into the status that you were describing. So it is a
significant international issue that we're trying to fight on
all those fronts.

Senator Snowe. Well, it's clear that we need to do
something very expeditiously.

Admiral Loy. Including the enforcement.

Senator Snowe. I think it's a huge challenge and the
countries better be cooperating in that regard.

Admiral Loy. Exactly.

Senator Snowe. Thank you, Mr. Chairman.

Chairman Roberts. Senator Wyden.

Senator Wyden. Thank you, Mr. Chairman and gentlemen.
Sorry, we've got multiple hearings going on this morning and I
didn't get to hear all of your testimony.

But I did understand that several of you made the point
that information sharing is improving. And I will tell you that
I'm still concerned that the walls that have prevented
information sharing still have not been brought down. And to
some extent what has happened, the pre-9/11 walls that prevent
information sharing seem to have been replaced with a new set
of walls that prevent information sharing. And I want to give
you an example that revolves around the area that you all
talked about, the National Counterterrorism Center, NCTC, where
you all feel things have gotten better.

Now, our Committee has been told that, while information
can be shared among those who work at the center, an analyst
has to go out and seek approval before sharing information that
may be of value with the home agency, and the approval may or

may not be granted and it's sort of a bureaucratic shuffle to get it done.

My question would be to you, Director Goss. Are you aware of the problem? And if so, how do you believe it ought to be addressed?

This is something that our Committee has heard about now several times. And it sort of caught my attention when you all were talking about information sharing improving.

Director Goss, your response?

Director Goss. Yes, I'd be very happy to, Senator. Thank you.

I do believe that the across-the-board information sharing is improved. There are still areas--and this is one of them.

Senator Wyden. I want to make sure I got that you say this is an area that you will still be willing to work with us on.

Director Goss. Oh, absolutely. This is not finished business yet.

We have the question of how do you protect an individual agency's sources and methods? How do you get assurance for that agency when they are making a contribution?

And the question of how we use either TAGINTs or tearlines, or how we make this available, it's easier if you're just talking about a customer. But if you're talking about an analyst that wants to go further in and probe further and perhaps do tasking, then you come to the questions of some of the things we're trying to use, like co-location, getting the analysts and the collectors to talk together, changing things with agencies, setting up different rules.

Part of that is going to be the business of the new DNI. As you know, the NCTC reports to the DNI. And the NCTC is now run very, very effectively, I would say, but on an acting basis, by John Brennan.

They have absorbed the TTIC into the NCTC. And I think they've gone just about as far down the road as they can go without stepping on the prerogatives of a new DNI, whose main function, in my view, is going to have to be sorting out the authorities and the interface between the DNI's job and responsibilities and the individual agencies--and those interfaces between the 15 agencies in the community.

Because until you do that and make those lines clear, the question of sharing proprietary--and excuse me for using the word, but it does fit--information is going to be difficult, because everybody is charged with preserving their sources and methods.

Senator Wyden. I think what concerns me is that there are a finite number of people working the terrorism issue for the entire intelligence community. They all hold security clearances. They're all trained.

And it just seems to me that these analysts ought to have access to all the information that can help our side. And I would like to talk about this with you all further, talk about it more, perhaps, in a private session.

But it seemed to me, what we ought to have is the equivalent of a terrorism analyst program--a special terrorism analyst program--that would allow all of these analysts access

to all the same data.

And until we get there, we're still going to be trying to break down these walls. And time is short. We'll talk about it some more, but I think, Mr. Director, your answer is constructive. The acknowledgment that there is more work to do is what I was interested in hearing.

It just seems to me there's only so many people in this community. Let's make sure they all can get access to the same kind of information. And there's an awful lot of shuffling going on, just with NCTC. And I'm just not going to take this further, but I saw Bob Mueller nod, and I consider that constructive, as well.

The second area that I'd like to touch on involves accountability. If there's one thing my constituents are frustrated about as it relates to government is the absence of accountability. And still after 9/11, I keep looking for anybody who lost a job, was demoted, was reprimanded--any kind of consequences--and I can't find any. I can't find any anywhere.

And my question would be to you, Director Goss, in that you all apparently have a report from the Inspector General, as a result of input from this Committee, the Joint Inquiry on the terrorist attacks, where there was clear interest in the Inspector General conducting a review to determine if any CIA officials ought to actually be held accountable for the mistakes that led to the attacks. And I'm trying to figure out where this Inspector General report is. I gather there are just layers and layers of review.

But where are we on this Inspector General report? What can you tell us today? When are we going to get it on this Committee, so that we can get serious about some accountability?

Director Goss. Senator, thank you. You will get the IG report as soon as it is finished. I've made the same pledge yesterday to HPSCI. It was commissioned, I think, by Congress, and you'll get it. And the IG is independent.

Now, as for where is it right now, the IG came to me shortly after I came in and said that this matter was under review and he would be presenting it shortly to me, for the next step, because there is a process, apparently, in how this works.

And I asked him a very simple question. I said, if you are naming names, are you giving those names the opportunity to express their views? And it turned out that in the process he had not taken that option. I suggested to him that in the interest of what I would just simply call American fair play, if you're going to start bandying people's names about, you might let them know what it is you're saying about them. And he agreed. I did not instruct him to do that, please understand. We just had a discussion about how this process would unfold. This is somewhat new.

And so I understand that he has done that. And individuals have been advised of what this report says about them, on a confidential basis. I also understand that some of these individuals have hired attorneys because they wish to, for

whatever reason, have that kind of advice. When attorneys come
into the issue like this, I understand that the timing becomes
a little uncertain of when matters will be concluded.

I do not feel it appropriate for me to demand a deadline at
this point, since the process has elements of due process in
it. And I view that the IG is capable of making the decisions
of when he's ready to present that to me. That has not happened
at this point.

When he does, I have already got two staffers I've
selected, who are in the process or I suspect have probably
read the report. So we will be able, when it comes to my level,
as the Director of the Central Intelligence Agency, to decide
whether or not it is appropriate to convene boards in the
agency, in-house, to deal with accountability or not. And that
is apparently what my responsibility will be.

Either way, this Committee and the other Oversight
Committee--the House Oversight Committee--will get the IG's
report. And it is understood, it will be classified.

Senator Wyden. Do I have time for one additional question,
Mr. Chairman?

Chairman Roberts. I think Senator Mikulski has been waiting
very patiently throughout the whole hearing. And if we have
time for a second round, I would be delighted to recognize the
Senator. And I don't mean to pick on him, in that most Senators
have gone red.

I think I'll probably leave that comment alone.

The patient, but always accommodating, Senator from
Maryland.

Senator Mikulski. Patient. Yes, a signature characteristic
of myself, well known to all.

[Laughter.]

Senator Mikulski. Good morning, and thank you really for
what you do everyday. I think all of us appreciate the fact
that the job of everybody here is to prevent predatory attacks
against the homeland, against U.S. assets abroad, against our
troops, and even to help predatory attacks against allies.

I'm going to focus on the issue of terrorism and want to
come back to this whole issue of how we have gotten better at
connecting the dots and focus really on threats to our ports.

So these are really questions for Directors Mueller, Goss,
and Admiral Loy. There's considerable concern that sea-based or
ship-borne terrorist attacks are big concerns and big
possibilities. Many analysts are concerned about the security
of U.S. ports, foreign ports, but in my case, like Baltimore
and other coastal Senators.

So my question is: Of the various scenarios, which do we
fear attacks on our ports? Do we fear nuclear weapons being
smuggled in and detonated at a U.S. port? And what are we doing
about it? And how did the three of you work together?

And Admiral Loy, of course, we know you from your Coast
Guard days, and you've adapted to a new transportation mode
pretty quick. But you see where we are. So there's Goss, you
know, looking at the world. You know, Loy's got Mr. Homeland
Security. And there's Mueller, and he's got the domestic
whatever. So where are we on the threat to the ports, and what

PX373

are we doing to prevent the threat? And how do you all coordinate this information so that Governors, and mayors, and the people can feel pretty good about it?

Director Goss. Thank you, Senator. I'll start.

I will tell you that my normal day starts in the company of these two gentlemen. And matters of this urgency are discussed between us. But, not only that, we have close working relationships between our agencies. And it is well understood, the danger of which you speak, properly.

In terms of our part, from the national foreign intelligence program, obviously, leaning overseas and getting all the information we can to stop it over there and to get information before something's put on a ship, or to understand a plot, is very, very important. I would point out--somebody can correct the statistic--but it's a very high percentage of success, perhaps 95 percent, of all drug interdictions come from good tips from information, not from random searches.

But you have to do the gates-guns-guards approach domestically to take care of the ports. And you have to do the information approach. Am I satisfied they're as plugged in as they can be? Yes, under the circumstances that we have.

Now, with the DHS and with the FBI, law enforcement people, people with new responsibilities dealing with homeland security, and our very clear understand that this is part of the target for our operatives overseas, I think we have done as good as we can do, in terms of understanding information that's critical.

Senator Mikulski. I appreciate that the three of you meet, but I'm talking about all the way down, are we really communicating?

Director Goss. I think it goes pretty far down for us.

Director Mueller. For us, in every city that there's a port, there's a Joint Terrorism Task Force with a specific responsibility to work closely with the elements of the port to exchange information and provide what can be done to enhance the port security. In several of the ports around the country, we have--particularly where there's substantial ferry traffic, for instance--we have done intelligence analyses of vulnerabilities of the ferry services.

Each port has a little different mixture of the type of shipping that comes in. And consequently, the Joint Terrorism Task Forces, working with the Coast Guard and other elements, work closely with State and local law enforcement as well as the other Federal components, to come up with a plan to assure that we have the intelligence that's necessary to focus on the threat of a potential attack. And then, if there's an attack, how we are going to respond to it.

And perhaps I can turn that over to Admiral Loy to pick up on.

Admiral Loy. Thank you, Senator Mikulski.

The information flow into this challenge is as was just described by Director Goss and Director Mueller. At the other end, I would offer that the chair I was sitting in on 9/11 was still in uniform as the Commandant of the Coast Guard. And, frankly, we spent the rest of the time that I was in that great

PX373

service focusing on domestic maritime strategy--domestic
maritime security strategy.

We also recognized that it was enormously important to see
that this was an international challenge immediately, because
all of those 9 million containers a year, 20,000 a day, that
find their way to Baltimore and many other ports come from
overseas. And so one of the first things we did was literally
take a delegation to the International Maritime Organization to
start a process which has become a standard-setting effort for
international commerce as it relates to facilities, crews,
ships that ply the waters of the United States, to meet those
international standards.

Second, there have been excellent resource plus-ups
attendant to the Coast Guard's capability to shift gears from
emphasizing what it has always been able to emphasize as an
array of responsibilities it has for the Nation and focus on
port security in this particular time of need.

I think one of the greatest strengths of that service is
its agility to reshape its focus on what Nation needs it to
focus on now. And it certainly has done so over the course of
these last 3 years.

We have also recognized the legitimacy through port
security grants and Operation Safe Commerce. The requirements
that we have to look down the supply chain, literally from the
point of origin to the point of destination, with a sense of
transparency all the way through that, in order to see and be
able to apply the insights we gain from the intelligence
community as to what we should be doing operationally in those
various responsibilities.

The notion of pushing our borders out so that they don't
become the first portal that we look at things under concern
about, the Container Security Initiative, as I mentioned in my
opening comments, is now alive and well in 34 different ports
where customs agents, side by each with their host nation
counterparts, are watching the stuffing of those boxes, the
sealing of those boxes, as it relates to cargo security.

One of the most dramatic initiatives that we had already
underway for what then Vern Clark and I, as the Chief of Naval
Operations, viewed as an asymmetric array of threats, which
shifted focus to the terrorism piece of that asymmetric array
after 9/11, had already been underway in Suitland with a joint
effort, with respect to intelligence reviews that the two sea-
going services of this Nation jointly conduct there day after
day after day.

That has developed into two initiatives today. One of them
attended to something I termed maritime domain awareness and
has become almost a term of art in this look that the two
services take. With NORTHCOM's responsibility reaching 500
miles out to sea on the Pacific side and literally almost 1,700
miles to sea on the Atlantic side, we have joined forces, the
Navy and the Coast Guard, to truly understand what's going on
and how do we assure that we know what's going on in the domain
we're responsible for.

Senator Mikulski. Let me come back.

First of all, this was really, I think, very helpful, and I

PX373

hope enlightening to the Committee. I know my time's up. But
number one, how real is this threat?

And number two, Admiral Loy, homeland security is the
ultimate user of the intelligence, the ultimate customer, of
course, along with the FBI. But, you know, you're Coast Guard.
You're Customs. That's the battle line.

Admiral Loy. We hold the bag. Yes, ma'am.

Senator Mikulski. Yes. One, how real is this threat? And
number two, do you really feel that what has been described is
really working well?

Admiral Loy. The gathering and the sharing of the
information, this is, I think, working extraordinarily well in
this particular domain. I think, to go back to the Chairman's
commentary about information access as opposed to information
pushing and the comments that the Vice Chairman made attendant
to that, are absolutely right on point.

We discussed, though, there just two operatives. You talked
about the analyst and you talked about the collector. And I
would offer that the operator is the other absolutely crucial
ingredient to keep in that algorithm. The requirements that the
operator can express to the collector and the analyst go a long
way to figuring out the workload of those people on any given
day, any given week, for any given purpose or project.

So I would ask you to have the operators articulate their
requirements, those things that they're going to be able to use
properly to do the work they're required to do. Let the
analysts and the collectors then get about that business to
meet those operators' requirements.

Senator Mikulski. Threat?

Admiral Loy. The threat is as real here. We have the same
kind of exercise program to think our way through the nightmare
scenarios on the maritime sector, as in any other sector. Ports
represent that place where it all comes together. Ninety-five
percent of what comes and goes to this country comes and goes
by the water. So the port complexes are clearly a targeted area
for the terrorists.

Senator Mikulski. Mr. Chairman, I presumed my time was up.
That was a lengthy conversation, but I think really is crucial,
because that's where it all comes together.

Chairman Roberts. As usual, the Senator raised an important
point. Has the Senator finished her comments?

Senator Mikulski. My time is up.

Chairman Roberts. The distinguished Chairman of the Senate
Armed Services Committee.

Senator Warner. I thank you, Mr. Chairman and the Ranking
Member. We've had a good hearing. I'm sorry I had to step out
for a moment.

Sixty years ago this month, at age 17, I started my very
modest and inauspicious military career. And I had over a half
century of the privilege of being associated with the men and
women of the United States military. And this afternoon, like
so many of our colleagues, I go to Arlington for the burial of
a brave Marine who lost his life in Iraq.

As I sit through these ceremonies quietly, the thought
always occurred to me, ``Senator, have you failed to do

anything in your official capacity either to equip or train this individual or to provide him the intelligence, or his superiors the intelligence, which could have prevented this death?''

There is an issue here, I say to my distinguished Chairman and Ranking Member and colleagues on the Committee, which I think we've got to address, both in my Committee and in this Committee. And that is the manner in which we gain intelligence from those that are captured, either on the battlefield or in other areas.

There has been a good deal written, and I draw the attention of my colleagues to an article today in The New York Times entitled, ``CIA is Seen as Seeking New Role on Detainees.'' And so my question to you is as follows.

America has always been a Nation that follows the rule of law, and we must preserve that. And the Geneva Convention, as such, is a part of our body of law. But we recognize other nations have other laws, traditions, whatever. And there could well be means by which they gain intelligence which we can't, following the rule of law. And I'm not suggesting we deviate from the rule of law.

But when an individual is apprehended in Iraq, should we turn him over to the Iraqis, who may have a different system, and from that individual we gain information that not only preserves the opportunity to protect our coalition forces, but indeed the terrible and tragic killing of so many Iraqi citizens and their own security forces.

I think largely this issue has to be addressed in closed session. But I wonder, Mr. Director, to what extent you can talk about what your hope is in this area to gain the maximum intelligence that we need to not only bring to, hopefully, a successful conclusion of the Iraqi campaign, but other campaigns on other fronts and, at the same time, carefully preserve the traditions of this country by following the rule of law.

And most specifically, what should we do in dealing with other countries in terms of sharing the burdens of captivity and interrogation of a witness or a captive or whatever we may have in our possession? And then I'll ask the Department of State, Ms. Rodley, to give the views of State on that.

Director Goss. Thank you, Mr. Senator.

The subject is of critical importance to us. You are correct to point out that we are dealing in a life-and-death business, and you are correct to point out that interrogation is a mainstream of information. Having enough professional interrogators operating the proper way, that would be within the rule of law, and professional interrogators will tell you that torture is not something they would wish to have, because it doesn't work. There are better way to deal with captives.

So I don't think there is any inconsistency with the idea of professional interrogation of combatants, whether they're conventional or unconventional, taken off the field of hostility and brought into our captivity, being subject to a professional interrogation. I do not think that's an impossible job.

The question of who does it and under what circumstances does get us into some legalities. I'm not a lawyer, an attorney. And I will obviously be guided by what they say. But that is not going to be a deterrent to a professional program. It's just going to affect the mode a little bit.

Clearly, as Americans, we are concerned with legality, the rule of law. We are concerned with human rights because we are compassionate human beings, and what we stand for is what we're fighting for. And we're not going to abrogate that.

We have an immediacy of protection of forces and protection of innocent lives in the interrogation process. We do not want to forego that opportunity. Nor would we ask another country to do something that we would not do ourselves as a cute way of end-running our commitment to the law and decency.

I believe that we have most of that in hand. There are some parts of that that I cannot answer with you yet that are sort of down-the-road pieces of it that I need to talk to you about in closed session.

But if you asked me today, is interrogation vitally important to saving lives, and disrupting terrorists, and protecting our forces, the answer is unequivocal. Yes.

If you are asking me today if we are handling interrogation within the proper norms and bounds, the answer is yes. If you are asking me today if I would like to get more information from some of our captives that I still think have information we would like to have, the answer is yes. And if you asked me would I like to have more captives tomorrow to interrogate, the answer is yes.

Senator Warner. Let's take it to one last subject. When you're given the option that you could transfer this prisoner to another nation, recognizing that nation employs methods different than we do, how would deal with that?

Director Goss. I would require safeguards, if that captive were going back, either as a non-interrogee or as an interrogee. If that individual is being returned to a nation, a judgment should be made that nothing beyond, I would say, due process punishment, if that is deserved, would happen to that individual, even though they may not have the same standards in that nation.

As you know, many nations will claim their citizens back. And we have a responsibility of trying to ensure that they are properly treated. And we try and do the best we can to guarantee that. But, of course, once they're out of their control, there's only so much we can do. But we do have an accountability program for those situations.

Senator Warner. Thank you.

Chairman Roberts. Senator Bayh.

Senator Warner. I hadn't finished.

Chairman Roberts. I beg your pardon.

Senator Warner. Could the witness from the Department of State give their perspective from their department?

Chairman Roberts. Certainly.

Ms. Rodley. Thank you, Senator Warner.

One of our key policy goals in Iraq, obviously, has been to build and to build up institutions in Iraq--government

PX373

institutions, government services--that will adhere to the rule of law. This is a long-term process. Mr. Goss's agency has been involved in this project with us in the stand-up of the new Iraqi intelligence service.

It's a long-term process, obviously. But we are, of course, heartened by the results of the election in Iraq. And we are following closely the formation of the new government there. And we are hopeful that the new government in Iraq will be a government that respects the rule of law, and that the Iraqi people, who suffered horribly for a long time under a brutal dictatorship, won't be subject to the kind of abuses that routinely went on under Saddam Hussein.

So I wouldn't automatically assume that detainees turned over to the Iraqi services now would suffer the same fate that has been the case very commonly in the past.

Senator Warner. But, Mr. Chairman, if I could just ask a question for the record, such that they can, I guess, given my time's up, have to answer for the record.

But I'm following carefully initiatives by Secretary of Defense Rumsfeld as he begins to augment his gathering of intelligence which he deems essential. And, frankly, thus far, in my examination, he's acting within the guidelines of the law, including the newest law that passed the Congress, in establishing a greater ability to collect, I think, largely tactical intelligence.

And if the Director would provide for the record his views--because I'm sure you're following this--as to whether or not you're of the mind that he is acting within the bounds of the law and not in any way conflict with the objections of the new law in establishing these units.

The distinguished Chairman and Ranking Member have begun to look at this. We both, our Committees, have had hearings or briefings on this subject. And it's a matter of active consideration here in the Senate side.

Director Goss. If I'm permitted----

Senator Warner. You'll have to take it for the record, because I don't want to interfere.

Director Goss. I'm very happy to answer if the time is permitted.

Chairman Roberts. Let me just say that the distinguished Chairman has asked the question that I was going to ask in reference to the encroachment stories that we have been seeing, both in reference to the FBI and the Department of Defense, in augmenting their intelligence operations in cooperation with you. You don't look encroached upon as of this morning.

And that we have had a hearing with Admiral Jacoby and with Dr. Cambone in the Intelligence Committee about Title 10, Title 50, and the legalities involved. They have, in fact, kept the Committee informed through the staff and through this hearing, but I do think that if you could submit that answer to the record, you know, for the Chairman, I think it would be very helpful, because I think this is a subject we're all interested in.

Senator Warner. Thank you, Mr. Chairman.

Director Goss. Mr. Chairman, Mr. Chairman, I am completely

comfortable with where we are in terms of forward-leaning
efforts by all of the elements in the intelligence community to
do the best they can with the missions that we have been
assigned. It is quite clear to me that there has been a lot of
speculation and RUMINT and so forth, and comment in the paper,
which is unfounded or badly founded.

The truth is that I believe that the efforts that the
Department of Defense is trying to undertake are entirely
appropriate. They are looking forward to the best ways to get
the information they need to accomplish their objectives with
the maximum protection for their warfighters. I think that is
excellent.

What it involves is some coordination overseas and some
understanding about who's doing what where. I go to the analogy
that the leader of our country team in any overseas situation
is the Ambassador, the chief of mission, that the person who is
normally in charge of intelligence, all intelligence
activities, is the representative of the Central Intelligence
Agency.

That does mean there's no other intelligence going on
except under the Central Intelligence Agency's immediate
direction. It means it's coordinated there. And I believe that
we understand that. Those details, in some cases, yet to be
worked out, because there is forward-leaning, which we have not
seen forward, which is entirely appropriate.

I can say on the domestic front exactly the same thing.
There have been a lot of stories about who is doing what. There
is no question that the intelligence community has the
experience to do--it's the National Foreign Intelligence
Program overseas. There's also no question that occasionally
agencies like the FBI need to be overseas doing things that
they do very well in pursuit of their role in counterterrorism.
We ask that it be coordinated.

Equally, I think that the FBI wants to be assured, as do I,
that we are not usurping our authorities in the domestic
homeland. We all know Americans do not spy on Americans. And
that is our absolute pledge. It is equally true, however, we
need some support. And we do have a support base that we use in
the United States. It is critical that we keep that coordinated
with Director Mueller.

These are questions of working out details. Perhaps a DNI
would have done it faster than we are doing it. But I frankly
think we're doing it quite well, considering we've got 15
agencies doing very intense things that we haven't done before.

I realize that the DCI, which is one of my titles, is an
endangered species. But I will be handing off my thoughts to
the DNI. And my thoughts are forward-leaning by all agencies is
good, and we can coordinate it and make it work.

Senator Warner. Mr. Chairman, I'm very impressed by the
responses you've given to both of my questions. I wish you
well, and we're fortunate you've taken on this task.

Director Goss. Thank you, sir.

Senator Warner. You could have been basking in that sunny
clime of Florida.

Director Goss. Thank you, Senator.

Chairman Roberts. Senator Bayh.

Senator Bayh. Senator Warner, sometimes the heat in Washington is just as warm.

Thank you very much, all of you, for your service to our country. I really do appreciate it. These are issues of profound importance, the resolution to which is often not clear. I wouldn't be surprised if all of you didn't lose a significant amount of sleep over your service to our country and dealing with what you're dealing with, so I thank you for that.

I also apologize, Mr. Chairman, to you and the panel for having to shuttle back and forth. Alan Greenspan, Chairman Greenspan, was testifying before the Banking Committee today, so we are trying to simultaneously deal with our Nation's economic security and prosperity and our physical security here. So I apologize for my absence.

Let me begin by asking a question that involves credibility. And I want to make very clear that it doesn't involve personal credibility. No one would question any of your personal credibility. But I think we do have a national credibility problem.

And so what I want to ask specifically is, for the Americans watching us today and hearing about assessments involving Iran and North Korea and what is maybe going on there that could be threatening our country, what has improved over the last couple of years since the assessments about weapons of mass destruction in Iraq that would give greater assurance to the American people that what we're hearing today is accurate?

Without getting into obviously classified specifics, have our collection capabilities improved significantly? Have our analytical capabilities improved significantly? Why should people place, you know, credibility behind what we're saying here today, given the history with regard to WMD in Iraq?

Director Goss. That's actually the perfect question, and that's what we do. That's, I think, why we all go to work.

How do we take what we were using and make it better and more appropriate? And I think I can report back that we have more collectors, better technology being properly applied and more focused in the application, more analysts who understand the language, who understand the pitfalls of group-think, more systems that put this together to make the information come out more timely, more flexibility in our systems to deal with problems as they pop up--and the nature of our enemy is pop-up, quite often--and a greater understanding of each other's problems.

We have all walked a little in everybody else's shoes, and I think we see it a little differently. And I think that that's been a helpful exercise. We need to get on with the architecture of what the community is going to look like, and we need to make sure that each unique contribution of each of the elements of the community is provided for in a way that it is still unique and adding value to the total product.

I think that we are moving well.

Senator Bayh. Are we encouraging contrarian analysis? You mentioned group-think.

PX373

Director Goss. Indeed, we are. And we're publishing it, too, right on the same page.

Senator Bayh. Any of the rest of you care to comment about capabilities having improved? If not, that's OK, too.

Admiral Jacoby. I'd like to just echo the Director's words and talk about a couple of other things, processes, processes that you bring, you know, the different views together, processes that have made more sourcing of information available as we go to community products, and in my agency, a tremendous emphasis on training and retraining all the way through the senior levels to make sure that we are reinforcing good analytical, logical source utilization kinds of capabilities that are available to us.

Senator Bayh. Thank you.

Yes, Director Mueller.

Director Mueller. I would say our capabilities have dramatically increased. We had a little bit over 1,300 counterterrorism agents before September 11th. We now have 3,000-plus. We've established an intelligence directorate which has a total complement of 3,787. Of those, 438 are agents, 490 translators, 2,273 analysts.

We have, in each of our field offices, a field intelligence group that was not there before. Our ability to obtain the intelligence, analyze the intelligence, and getting the intelligence to the operators has improved dramatically since September 11th.

Senator Bayh. One of the things I think we've all realized is that in some of these areas there is just an irreducible level of ambiguity. And we try and minimize that, but in some of these areas it's still there. And so a certain level of humility in reaching conclusions is, I think, in order in all of our parts.

Let me ask you about North Korea and what you assess to be the likely reaction to our current strategy in North Korea and the role that China might play. But let me back up for a second. At least in 2000, with regard to their plutonium effort, it seemed to have been in stasis. Now they may have been cheating on the uranium side, but cameras were in place. Those have been removed. Inspectors were in place. Those have been removed.

There were published reports that plutonium has been reprocessed and possibly devices have been created. There are even published reports that perhaps in some other areas they may have proliferated. This is not a happy course of events over the last several years, and at least the initial strategy, which seemed to be threaten and ignore, does not seem to have worked too well.

Now we currently have a strategy of engagement through the 6-party talks, trying to encourage the neighbors to take charge of their own neighborhood. My question is: What do you assess the North Koreans' likely response to be to our current sort of sticks and carrots approach, number one? And number two, might a cynic not think that China, which is in a very good position to be helpful on this, that there might be an interest there in not resolving this problem, because as long as North Korea is

there and of concern to us, that gives them leverage over us in
a variety of other areas.

So, my question is, what do you assess the likely response
of North Korea to our current approach? And second, how do you
assess the role that China will play in trying to reach a
positive conclusion?

Director Goss. I'm going to try and avoid a policy comment.

My view is that we are seeing what is the traditional
bluster diplomacy by North Korea, trying to threaten something
terrible and get something concrete back. They're dealing with
nothing to get something, and they do it very effectively. And
this has been their MO, in my view.

As to their response, I think that their responses are
predictable. They are going to continue to do what they want to
do. Their number-one goal is survivability of the regime. And
that is where they are going to go. And whatever it takes,
that's what they'll do. How ridiculous they look on the world
stage does not seem to bother them.

Senator Bayh. Forgive me for interrupting, Director. Is
there anything, in your estimation, or anybody else's
estimation, that could convince them that the survival of their
regime--since that's their top priority--is inconsistent with
the creation and possession of nuclear weapons? They seem to
have concluded that those two things have to go hand-in-hand.
What, in your estimation, could lead them to a different point
of view?

Director Goss. I do not know the answer to that question. I
just simply don't have that information. I could make a guess
and say for them to be relevant, they feel that they have to be
in the nuclear club.

There is another aspect that's practical. That's the way
they make their money. Their bread-and-butter money is selling
this stuff, proliferating.

The Chinese response that you ask, I think the Chinese
understand they have got a very troublesome child right there
in the nest of the family, and they can't go anywhere. The real
estate's not going to change. They've got to deal with the
problem.

They have border problems, refugee problems, all kinds of
things. I think the Chinese are genuinely interested in not
having this be a worse problem. Now, I'm not going to practice
diplomacy. I'm going to yield to the Department of State. Much
of that was my personal view, not an informed intelligence
response.

Senator Bayh. Thank you, Director.

Ms. Rodley. I'm just going to pick up on that point about
the Chinese. We agree with that assessment, that the Chinese
are genuinely interested and have concluded that it is in their
interest to resolve the problem with North Korea. We don't see
any indications that they think it is somehow in their interest
in dealing with us to have North Korea continue to be a
problem.

Senator Bayh. But they seemed to be in denial for such a
long time, I'm glad they finally found religion on this issue.

Just two quick things, just very, very quickly.

Hizbollah, you report their capabilities in terms of
striking U.S. interests, if provoked. Should we assume that if
it was ever in our national--if we ever felt compelled to act
against Iran, that might be the sort of triggering event that
we would have to anticipate, Hizbollah taking some sort of
action against us?

Director Goss. I would certainly recommend that any
policymaker considering that take that calculation.

Senator Bayh. My final question is with regard to FARC,
kind of looking out beyond the horizon. Any assessment by any
of you about--obviously, they have capabilities of striking our
interests in Colombia. Are you at all concerned about their
potential for striking us here in the homeland?

Director Goss. Well, I used to represent southwest Florida.
And I have perhaps a different view than others. But I do feel
there is an immediacy to making sure we understand what is
going on there. There are, obviously, dialog and communications
going on between the countries. That means there can be between
the bad players. And I think it's very important for our law
enforcement people to be absolutely on top of that. And, as far
as I know, they are.

Senator Bayh. Director Mueller.

Director Mueller. We have not seen, I do not believe, any
indications or preparations for FARC to launch an attack in the
United States. However, there are ties between individuals
associated with FARC and persons in the United States. And
they're something we have to keep an eye on.

Senator Bayh. Thank you. Again, I appreciate your service.
Thank you all.

Chairman Roberts. Let me just say that, in reference to
Senator Bayh's comment, if Kim Jong-Il would suddenly get
religion, having been to North Korea and trying to deal with
that regime in regards to the famine--and they always have a
famine, but it was a more severe famine several years ago--he
is the religion. He is a deity in his own mind, and the people
believe that, as was his father. So it's a little difficult.

And I would agree with Director Goss. That's the only card
he has to play on the world stage, and they're going to play
it. And they're going to continue. I still think our best
opportunity is to do exactly what the Director said with China
in the 6-party talks. But I have no illusions of all of a
sudden him getting a light bulb to go off. They don't have any
light bulbs, by the way, in North Korea.

And following on your statement, I'd like to ask a question
about Iran. And by your statement, I mean Senator Bayh.

Admiral Jacoby, your written statement says that Iran is
likely continuing nuclear weapon-related endeavors, is devoting
significant resources to its WMD programs, and that, unless
constrained by a nuclear non-proliferation agreement, Tehran
will probably have the ability to produce a weapon early in the
next decade.

Director Goss, your statement notes that the CIA is
concerned about the dual-use nature of the technology that
could also be used to achieve a nuclear weapon.

Ms. Rodley, your statement notes that Iran seeks, but does

PX373

not yet have, any nuclear weapons.

It sounds like to me you all agree that, just like Iraq before 2004, Iran has troubling dual-use nuclear capabilities. What I'm interested in, and both the Vice Chairman and I want to get into capabilities and whether or not we have the capabilities to determine some intelligence analysis on intent. As far as Iran's intent to build a nuclear weapon, it sounds like there might be a difference of opinion between you three. I'm not suggesting that, but at least that might be the case.

I would ask all three of you to give us your assessment of Iran's intent, to characterize your confidence in that judgment, and if you feel that should be better handled in a classified section, I certainly appreciate it.

Director Goss. Mr. Chairman, I would limit my answer. I think there is something I would say that is obvious. There are other players in the neighborhood that are very concerned that also have views about what Iran is up to. And it's important that we understand what that might lead to.

I believe that, having watched the pride of some countries in acquiring the world-stage status of having nuclear weapons and what that has meant for nationalism and leadership, is that it becomes almost a piece of the holy grail for a small country that otherwise might be victimized living in a dangerous neighborhood to have a nuclear weapon.

So, in my view, there is an inclination, a very strong inclination, by the conservative leadership, present conservative leadership of Iran to make sure that they can live up to the same levels as some of their neighboring countries. And some of those neighboring countries--indeed, Pakistan comes to mind--have the bomb.

Chairman Roberts. Admiral Jacoby.

Admiral Jacoby. I would join Director Goss, in terms of the intent part. We did some work recently looking at the direction that threats were going. And they are going away from conventional force-on-force confrontation strategy with the United States toward terrorism on one end and nuclear weapons and not only the status, but the perceived deterrent value, that comes with them.

So I would join the Director, in terms of intent in Iran, and would also say that we're engaged in a hard look at sequentially nuclear programs or suspected nuclear programs in various countries. Iran is next on our agenda, and I believe that our look and the Committee's look will probably coincide. And we look forward to working that together.

Chairman Roberts. Ms. Rodley.

Ms. Rodley. I don't disagree with anything that's been said. I would merely add that another element that makes this harder to get at is the advantage of ambiguity when it comes to nuclear programs.

In a sense, the Iranians don't necessarily have to have a successful nuclear program in order to have the deterrent value. They merely have to convince us, others and their neighbors that they do. This is a lesson that hasn't been lost on them, and it merely complicates both the collection and the analysis on this issue.

PX373

Chairman Roberts. I thank all three of you for your comment.

I'm enjoying the red light--I'm now a member of the red light club. Have patience, Senator Wyden.

This is a parochial question, but it's really not. It's a national question. Tommy Thompson, the former secretary of HHS, left and said his was worried about the Nation's food supply. And all of us who are privileged to represent States who are involved in agriculture were asked time and time again--I just heard it again on the radio as of yesterday. I'm not sure why Tommy said that.

But, at any rate, Admiral Loy, can you tell me how the Department of Homeland Security views the threat of what we call agroterrorism. The Emerging Threats Subcommittee of the Armed Services Committee 4 or 5 years ago got into this subject area, knowing how serious it could be, but not many people were really thinking about it.

They had an exercise, or one of the many exercises that has been held, called Crimson Sky. Six States were infected by foot-and-mouth with an attack from Iraq. Devastating results happened, utter chaos. We lost our markets. The herds had to be destroyed. People panicked in urban areas. Our food supply was--and I'm not talking about 1 year. I'm talking several years.

So are those efforts now really being coordinated well with other agencies, specifically the Department of Agriculture? Are you getting the intelligence you need? What kind of a priority are you putting on this? This is sort of the Mikulski port/Roberts agriculture question.

Admiral Jacoby. Yes, sir, Mr. Chairman.

Without a doubt, the Homeland Security Presidential Directive 7 first of all directs the Secretary of Homeland Security to be the collaborate effort to pull together the critical infrastructure protection of our Nation writ large. One of the economic sectors cited in that directive is the food sector. And so that has caused the Secretary of Homeland Security to challenge that designated lead-sector agency in the Department of Agriculture to develop a plan attendant to becoming a piece of this puzzle that will be the additive piece for food, as it relates to the whole critical infrastructure protection of our Nation.

So there has been very good work undertaken with the Department of Agriculture in agricultural operations, the meat-poultry-eggs world, and in the HHS/FDA world responsible, if you will, for the rest of the food production and distribution chain that they're responsible for.

We're at a point where this critical national infrastructure protection plan, the base plan, has been completed and submitted to the White House. Each of these sector plans, we have taken stock--we at the Department have taken stock of how we felt their original plan submission met the specifications that were outlined in HSPD-7 and have offered that commentary back to, in this case, the Secretary of Agriculture, with a bit of a challenge to go back to the drawing boards a bit and resubmit such that the thresholds are

reached with what we think are the right concerns to allow not only that to be a free-standing sector and plan attended to food protection for our country.

Chairman Roberts. OK. When did you send that over?

Admiral Jacoby. That's back just before the holidays, sir.

Chairman Roberts. So that would be under the auspices of the new Secretary of Agriculture, obviously. How many people do you have on board in regards to homeland security that either are on loan from, or consulting with, or are a regular employee that are dealing with this? I know that's a tough question to ask you right here. I think I know the answer. There's one, at least that I know of.

Admiral Jacoby. There's one as a detailee, if you will, into the Department in this business.

Chairman Roberts. Yes.

Admiral Jacoby. And, of course, we've got those elements from Agriculture that came into the border portal validation process.

Chairman Roberts. Yes.

Admiral Jacoby. But the effort is to allow the Agriculture Secretary to take the lead with respect to developing these plans for our country and make sure that they fit well, because we could have 13 perfect plans, and I'm convinced that it's the interdependencies between and among them that are the real challenge.

Chairman Roberts. It's a very hard thing to develop a contingency plan to try to mitigate this. Well, OK, I'll stop at that point, because I've already gone way over my time. But I need to visit with you and the new Director about this as we can determine.

Chairman Roberts. Senator Rockefeller.

Vice Chairman Rockefeller. Director Goss, just a very specific and one short question. Before the election, we went up a color.

Director Goss. I'm sorry?

Vice Chairman Rockefeller. On imminent threat, we went up from yellow to orange, and nothing happened. And there has been no talk or consideration, at least that I'm aware of, of similar elevations since then. I'm wondering if, to the extent that you're involved with it, sir, to the extent that Homeland Security, FBI is involved with it, has there been attempt to go back and review the nature of that intelligence and whether or not it was a psychological move or whether--I don't mean by that political. I mean psychological simply as a warning to others--or whether it was, in fact, justified. Has there been an effort to go back and re-look at that intelligence?

Director Goss. Senator, in part, the answer's yes. I don't know all of the things that have been looked at. But part of that, and again, I'm not--that's not my decision area. We provide the information. Part of that, I think, was an assessment of the Usama bin Ladin statement that came out, that there was a question, was that trying to interfere, and some of the questions of propaganda began to really take shape. Exactly how that figured into the decisions that were made by others on raising the elevation, I don't know.

PX373

Have we gone back and taken a look? The answer is yes. And I'll tell you why. One of the things that Senator Bayh was pointing out--I should have answered and I neglected to--is that we have learned the difference between a worst-case scenario and a most-likely scenario. We need to be very careful how we need to present these things so people are hearing things not as worst-case scenarios, but as most-likely scenarios, if that's what we believe.

We find that, when the chatter level goes up--that's an expression we like to use because it sort of covers up what we're really talking about--but it means there's something to be tuned into. All of our sensors out there, the system is blinking red, all of those kinds of statements that we've heard. What it means is that we're getting a huge flow of information.

The problem is, how much of that is just wishful thinking and how much of it is real planning? That is a very hard question to make a judgment on. We are going back, as part of our process of how do we get our product better, how do we make sure our customer understands what we're saying.

And that process is very clearly part of the overall process that Senator Bayh was asking about. Are we attending to correcting not only the collection piece, but the analytical piece, including operators, incidentally, when they're available?

Director Mueller. I think there has been an effort to go back and look at the--well, we continuously review the threat posture day in and day out. And I convinced, given the information we had at the time, that we made the right decision, in terms of the actions we took, given the intelligence at the time.

Subsequent to that there has been further development in that intelligence that may call into question at least some of that intelligence. But you also have to reflect upon the fact that we had al-Hindi, we had the surveillance documents, the Prudential, the stock exchange, a number of things back in this time prior to the election, along with intelligence that indicated that we can expect a threat or an attack in that period before the election.

As I indicated in my opening statement remarks, we undertook substantial efforts to assure that such an attack did not take place. We will never know whether those efforts, our efforts, the efforts of the CIA, the efforts of DHS, the efforts of our counterparts overseas, were effective in reducing or removing that threat of an attack before the elections.

But in reflecting upon what we knew at the time, I believe that we took the right steps. That doesn't mean that we can't do it better the next time, but I'm comfortable with the decision that was made back then.

Admiral Loy. Sir, I think that's a very good capture of the time. One thing I would offer is that, over the last 2 years and certainly in the last year, where we are with respect to capability, where we are with respect to stature of an interagency security plan that we keep track of day after day

PX373

after day, I would offer that today's yellow is probably much
closer to yesterday's orange as it relates to the constancy of
capability that is there 24 by 7/365 around our country.

So we have simply grown and matured, both as a brand-new
department trying to coordinate and collaborate on many of
these things. And the absolute value of some of the
contributions that are being made by many yield an attitude, if
you will, that has the country sort of at a level significantly
stronger than it ever was before.

That offers us a chance to keep from the going up and down
road, so to speak, when the net evaluation of all the players
at a SVTC or a series of weekly and daily meetings that we
conduct, rates the flow going by as not being ``worthy'' of
adjusting the homeland security advisory system to a greater
level.

I think the country should take great assurance that the
level of capability attendant to these things is significantly
higher day after day after day. And that simply is a result of
us learning lessons going back from each of the experiences of
up-and-down that we've undertaken and then ratcheting up, as
appropriate, the prevention, the protection, and the response
capabilities of the Nation across the board.

Vice Chairman Rockefeller. I thank you.

Chairman Roberts. Let me just say--and Senator Wyden, I'll
have to buy you lunch or something or, for that matter,
probably all of you, but we don't need to get in any food
depravation here. And so I'll try to make this quick. I hope
there's a look-back on this.

Admiral Loy. Indeed, there is.

Chairman Roberts. The same people, same table, same threat,
no consensus before our Committee in regards to access to
information. That was the problem. Same representatives
testifying before us that you're in charge of, that do this on
a day-to-day basis. And then, 30 days later, a lot of questions
about the credibility of the sources.

Now, if you're going to err, you're going to err on the
side of safety, for goodness sakes. I know that. And if you
take certain steps, you can't come back. We even had one
Senator leave this place as a result of this. He did come back.
But I'm saying that the leadership and this Senate and this
House were informed in such a way with a very aggressive kind
of consensus that was not shared when we had them before the
Committee.

That's not been too long ago. And then, 30 days later,
because of detainee information that's been so highlighted
here, why, then we decided, well, you know, we just didn't have
a consensus. Now, damn, that's got to quit. Now I know that you
can't have every source and have a consensus threat analysis
that's perfect. I'm not asking that.

But at the time, when you had the same people at same
table, you know, one of my questions is, do you people know
each other? And again it was information access. Now I feel
very strongly about that. And I think it was a classic example
of why you have to go back--the Vice Chairman calls it red
teaming--and take a look at this, and say, well, what in the

PX373

heck went wrong? Because we panicked, the entire Congress, not to mention Washington, DC., so on and so forth.

Thank God it didn't happen. You know, maybe I'm wrong. Maybe there was an element there that we missed. But it certainly was not present in regards to the presentation that we received.

Senator Wyden.

Senator Wyden. Thank you, Mr. Chairman. As you know, I share your concerns about this whole question of how information is shared, and that's one of the reasons I raised the questions I did on the last round.

I'd like to go into another area, though, that goes to the heart of what I think the challenge is in America. I believe strongly in the proposition that our country has got to fight terrorism relentlessly and ferociously. And it's got to be done in a way that's consistent with protecting the privacy of law-abiding people, innocent people.

Now it's been 2 years since the Congress closed down the Operation Total Information Awareness program, but the Congress is still totally in the dark with respect to what kind of information your agencies collect on citizens and how it's used. And I want to be very specific and talk about data mining.

Data mining, by the way of shorthand, is essentially technology that your agencies use to sift through the records and information that involves millions and millions of American citizens. I can't find any rules on data mining anywhere.

And so what I'd like to ask each of you is, what do your agencies do with respect to data mining, A? B, are there any rules at all? And, C, how are the rules enforced? Because I've spent a lot of time on this. And I cannot find any rules at all on data mining.

So maybe if we just go right down the row.

Admiral Loy.

Admiral Loy. Sir, you and I have spoken about this a lot, as it's been perhaps 18 months or 2 years ago associated with, at that point, the Computer Assisted Passenger Pre-Screening second program, then known as CAPPS II. As you know, I have worked very, very hard to work with the privacy community and with many others attendant to recognizing what then became a list of eight absolutes that the GAO report initiated for CAPPS II and is now ten items that the Congress put in the appropriations bill last year for this department, attendant to, ``You're not going any further with CAPPS II--and it's now Secure Flight, the new program--until all ten of those concerns that we have as a Congress are taken care of.''

We have very diligently gone to great lengths to explore each and every one of the eight, each and every one of the now ten, and are right on the cusp, I believe, of satisfying the Congress and satisfying GAO that it is the right thing for us to press on with that particular program, because it has come to represent three things.

Senator Wyden. Admiral, are you saying that that's the only program that involves data mining at your agency? I appreciate what you've tried to do, and you've certainly been a

PX373

straightshooter on it.

What I'm concerned about is whether there are any rules with respect to data mining generally. I do know what happens when Congress picks up on one thing or another and suddenly the travel records get out on somebody. You all work with us. We try to get something to deal with that specific problem. But I don't see any rules with respect to data mining generally. And that's what troubles me.

Admiral Loy. I do not have a management directive in force, if you will, in the Department that I'm aware of covering data mining.

Senator Wyden. Are there plans to do that?

Admiral Loy. I'll be happy to take that on and work with you, sir.

Senator Wyden. All right. Let me just go right down the row. We've established at least one agency, other than the computer-assisted travel records, doesn't have it.

Yours, sir?

Admiral Jacoby. Senator, we have very clear, definitive restrictions on what the Department of Defense can do with respect to having any information having to do with U.S. persons in our files. And those are very conservative interpretations and they are regularly inspected by inspectors general at all levels inside the departments.

When we apply data mining tools against the information that we have available, there's no U.S. person's data in there to begin with. So it's a bit different situation than maybe some of the other departments.

Senator Wyden. So you get no data, for example, from non-governmental sources, sir?

Admiral Jacoby. We are not permitted to maintain information on U.S. persons, sir.

Senator Wyden. OK.

Director Goss.

Director Goss. As you know, the National Foreign Intelligence Program was specifically set up to make sure that Americans do not spy on Americans and our work is done overseas. And I think that the proposition you have given us is one that, when I left Congress, was still red-hot after a couple of years of debate, which I think will go on. And that is the crossroads between privacy and protection.

As far as I know, our agency is not a relevant agency to answer your question, because we don't do data mining on U.S. persons unless it's under some safeguarded procedure which is properly notified and so forth.

Senator Wyden. That's what I'm curious about. I know there are areas where you do it, and I'm wanting to know what the safeguards are. You're saying you don't do----

Director Goss. The safeguards are notification of this Committee, sir.

Senator Wyden. Director Mueller.

Director Mueller. Well, we have one entity in the counterterrorism area called the Foreign Terrorist Tracking Task Force that, accomplishes certain data--I wouldn't call it data mining, but requesting from sources outside the Bureau

information relating to possible locations of terrorists in the
United States. And that has been briefed to Congress on a
number of occasions. It's transparent. We're happy to have you
come over and brief on it.

Senator Wyden. That's the only set of rules you have with
respect to data mining?

Director Mueller. Well, it's not the only set of rules in
terms of data mining. You're definition of data mining----

Senator Wyden. That's what I'm asking.

Director Mueller. We have information that's brought into
the Bureau.

Senator Wyden. Right.

Director Mueller. When information is brought into the
Bureau, it's brought in on predication. We have some reason to
bring the data in. It may be telephone numbers. It may be
addresses of potential terrorists. Now, we data mine that data.
But it's data that we have a basis for bringing into our
databases, whether it comes from our cases or from the
collection of intelligence that is based on adequate
predication.

Senator Wyden. The reason I'm asking the question is that
there are a lot of people in this country who believe that a
lot of this information, you know, data mining, takes place
without predication. And that's why I'm trying to figure out
what the rules are. And I'm going to let Ms. Rodley answer the
question. Then I'm going to ask something of all of you, and
let my colleagues wrap up.

Ms. Rodley. Senator Wyden, as you know, the State
Department is not an intelligence collection agency. To my
knowledge, the only information that we collect and maintain on
American citizens is passport information. And passport
information is held very closely and has a very strict set of
rules regarding its use. I believe, but I will confirm to you
later, that that's restricted to use for notifying next-of-kin
when an American citizen is injured or dies abroad and
cooperation with law enforcement.

Senator Wyden. Thank you.

What I'd like from each of you is to confirm in writing
what policies exist with respect to the sifting of information
on Americans. And I would like it also to include how
information is used, if it's used at all--and I understood that
the Pentagon they had nothing--how it's used when it comes from
non-governmental agencies where there, I think, is really the
Wild West.

I mean, it's one thing if it comes from a Government
agency. It's quite another if it comes from a non-government
body. And having spent a fair amount of time digging into this
area, I can't find what the ground rules are for data mining.

Can I ask, then, that each one of you will get us the
ground rules you use for data mining within the next 30 days?

Director Goss. Absolutely, sir.

Senator Wyden. Thank you, Mr. Chairman.

Chairman Roberts. We thank you for your patience, your
perseverance and your commitment to our country. Thank you very
much.

This hearing is adjourned.
[Whereupon, at 1:17 p.m., the hearing adjourned.]

PX373

PX374

# Military

globalsecurity.org/military/library/news/2007/04/mil-070426-dod01.htm



U.S. Department of Defense
Office of the Assistant Secretary of Defense (Public Affairs)
News Transcript

---

**Presenter: Commander, Multinational Force-Iraq Gen. David Petraeus**                    April 26, 2007 10:00 AM EDT

---

### DoD News Briefing with Gen. Petraeus from the Pentagon

GEN. PETRAEUS: Well good morning. It's good to be with you all, and nice to see some familiar faces here this morning. My purpose this morning is to provide a short update on the situation in Iraq, including a brief description of the operational environment, the challenges Iraq faces, and the status of our operations, and then to take your questions. This is similar to my briefings to the House and Senate yesterday afternoon, but without the classified information that I provided to them, obviously.

The operational environment in Iraq is the most complex and challenging I have ever seen -- much more complex than it was when I left last in September 2005, and vastly more complex than what I recall in Central America, Haiti and the Balkans in previous tours in those locations.

The increase in sectarian violence in 2006 following the Samarra Mosque bombing did enormous damage, literally tearing the fabric of Iraqi society, changing the demographics of Baghdad neighborhoods, and displacing millions of Iraqis.

Today, members of al Qaeda, extremist militias and Sunni insurgent groups seek to destroy what Iraqi leaders are trying to build. Political parties with ethnosectarian interests, limited governmental capacity, and corruption add additional challenges, and exceedingly unhelpful activities by Iran and Syria, especially those by Iran, about which we have learned a great deal in the past month, compound the enormous problems facing the new Iraq.

PX374

The situation is, in short, exceedingly challenging, though as I will briefly explain, there has been progress in several areas in recent months despite the sensational attacks by al Qaeda, which have, of course, been significant blows to our effort and which cause psychological damage that is typically even greater than their physical damage.

Iraq is, in fact, the central front of al Qaeda's global campaign and we devote considerable resources to the fight against al Qaeda Iraq.

We have achieved some notable successes in the past two months, killing the security emir of eastern Anbar province, detaining a number of key network leaders, discovering how various elements of al Qaeda Iraq operate, taking apart a car bomb network that had killed 650 citizens of Baghdad, and destroying several significant car bomb factories. Nonetheless, al Qaeda Iraq remains a formidable foe with considerable resilience and a capability to produce horrific attacks, but a group whose ideology and methods have increasingly alienated many in Iraq.

This group's activities must be significantly disrupted, at the least, for the new Iraq to succeed, and it has been heartening to see Sunni Arabs in Anbar province and several other areas turning against al Qaeda and joining the Iraqi security forces to fight against it. That has been a very significant development.

The extremist militias in Iraq also are a substantial problem and must be significantly disrupted. There can be no sustainable outcome if militia death squads are allowed to lie low during the surge only to resurface later and resume killing and intimidation.

There have been some significant successes in this arena as well, including the detentions -- detention of the heads of the Sadr secret cell network, the Iraqi leader of an explosively formed projectile network from Iran, the former deputy minister of Health and his facility protection security force brigadier, who had effectively hijacked the Ministry of Health, and a national police officer accused of torture, with several of these detained by Iraqi forces.

Sunni insurgents and the so-called Sunni resistance are still forces that must be reckoned with, as well. However, while we continue to battle a number of such groups, we are seeing some others joining Sunni Arab tribes in turning against al Qaeda Iraq and helping transform Anbar province and other areas from being assessed as lost as little as six months ago to being relatively heartening. We will continue to engage with Sunni tribal sheikhs and former insurgent leaders to support the newfound opposition of some to al Qaeda, ensuring that their fighters join legitimate Iraqi security force elements to become part of the fight against extremists, just as we reach out to moderate members of all sects and ethnic groups to try to drive a wedge between the irreconcilables and the reconcilables, and help the latter become part of the solution instead of part of the problem.

PX374

There are also a number of challenges in the area of governance that the embassy and Multinational Force Iraq are helping the Iraqis to address. It is in fact important to recall that the government of Prime Minister Maliki is Iraq's fourth government in as many years. Moreover, it is not a government of national unity. Rather, it is one comprised of political leaders from different parties that often default to narrow agendas and a zero-sum approach to legislation.

That is one reason that progress on key laws has been slow, though there has been some progress. The budget law, the base hydrocarbon law approved by the Council of Ministers, the emergency powers law and so forth have all been noteworthy. And it is in fact just noteworthy to acknowledge, as Ambassador Negroponte did yesterday, just what Iraq has achieved since he served there as the ambassador in 2004, with respect to its elections, its constitution, its government and so forth. I believe Prime Minister Maliki and many other Iraqi leaders are committed to achieving more in this area in the months ahead.

Though its institutions are slowly developing, Iraq still suffers from a lack of the governmental capacity needed to put Iraq's oil revenues to work sufficiently for all its people. In view of this, we are working hard, together with the U.S. embassy again, to help strengthen institutions, doubling the number of Provincial Reconstruction Teams, establishing a law and order task force, developing an energy fusion cell, and increasing emphasis on ministerial mentorship.

The focus of Multinational Force Iraq is, of course, on working with our Iraqi counterparts to help improve security for the people of Iraq in order to give Iraqi leaders the time and space they need to come to grips with the tough political issues that must be resolved. Resolution of these issues is the key to the achievement of reconciliation among the various ethnic and sectarian groups, political parties and leaders in order to achieve a lasting solution to Iraq's problems.

We are still in the relatively early stages of our new effort, about two months into it, with three of five Army surge brigades and two additional Marine battalions on the ground, and the remainder of the additional combat forces scheduled to be operating in their areas by mid-June.

Baghdad is the main effort, and we continue to establish joint security stations and combat outposts in the city and in the belts around it. The presence of coalition and Iraqi forces and increased operational tempo, especially in areas where until recently we had no sustained presence, have begun to produce results. Most significantly, Iraqi and coalition forces have helped to bring about a substantial reduction in the rate of sectarian murders each month from January until now in Baghdad, a reduction of about two-thirds. There have also been increases in weapons caches seized and the number of actionable tips received.

In the Ramadi area, for example, U.S. and Iraqi forces have found nearly as many caches in the first four months of this year as they found in all of last year.

PX374

Beyond this, we are seeing a revival of markets, renewed commerce, the return of some displaced families and the slow resumption of services, though I want to be very clear that there is vastly more work to be done across the board and in many areas, and I again note that we are really just getting started with the new effort.

I am well aware that the sense of gradual progress and achievement we feel on the ground in many areas in Iraq is often eclipsed by the sensational attacks that overshadow our daily accomplishments. While the enemy's effectiveness in carrying out such attacks has been reduced by our operations to some degree, there clearly are still far too many of them, and we obviously are focusing heavily on actions to identify and dismantle the networks that carry out car bomb and suicide vest attacks and their supporting infrastructure.

Our achievements have not come without sacrifice. Our increase in operational tempo, location of our forces in the populations they are securing and conduct of operations in areas where we previously had no presence, as well as the enemy's greater use of certain types of explosive devices, have led to an increase in our losses. Our Iraqi partners have sacrificed heavily as well, with losses generally two to three times ours or even more.

Indeed, while some Iraqi forces remain a work in progress, there should be no question that Iraq's soldiers and police are fighting and dying for their country, and a number of them have impressively shouldered their part of the burden of the fight against al Qaeda and the other enemies of the new Iraq. To help them progress, we have steadily been increasing the number of transition teams, the train and equip effort, and steadily strengthening the partnership programs between our forces and Iraqi elements.

The situation in Iraq is, in sum, exceedingly complex and very tough. Success will take continued commitment, perseverance and sacrifice, all to make possible an opportunity for the all-important Iraqi political actions that are the key to long-term solutions to Iraq's many problems. Because we are operating in new areas and challenging elements in those areas, this effort may get harder before it gets easier.

Success, in the end, will depend on Iraqi actions. As I noted during my confirmation hearing, military action is necessary but not sufficient. We can provide the Iraqis an opportunity, but they will have to exploit it.

During Secretary Gates' recent visit to Iraq, we agreed that in early September, Ambassador Ryan Crocker and I would provide an assessment of the situation in Iraq with respect to our mission and offer recommendations on the way ahead. We will be forthright in that assessment, as I believe I have been with you today.

Finally, I'd like to take this opportunity to thank all Americans for their support of our soldiers, sailors, airmen, Marines, Coast Guardsmen, and civilians serving in Iraq. Our young men and women in uniform deserve the recognition that Tom Brokaw accorded them when

PX374

he described them as America's "new greatest generation." It's a privilege to serve with them again.

Thank you. And I look forward to your questions.

Q You say that Iraq is now the central focus of al Qaeda's worldwide effort. Are you saying that al Qaeda in Iraq is now the sort of principal enemy of the U.S. forces stationed there? Before it was Shi'a groups. And do you see that al Qaeda in Iraq -- do you see any evidence that it is linked internationally to bin Laden? How many foreign fighters are actually there?

GEN. PETRAEUS: First of all, we do definitely see links to the greater al Qaeda network. I think you know that we have at various times intercepted messages to and from. There is no question but that there is a network that supports the movement of foreign fighters through Syria into Iraq.

It is something we can, you know, keep some track of in a broad way. Obviously, when we can get the final 50 meters, if you will, we then take action against it.

It is clearly the element in Iraq that conducts the sensational attacks, these attacks that, as I mentioned, cause not just horrific physical damage -- and which, by the way, have been increasingly indiscriminate. Secretary Gates noted the other day that al Qaeda has declared war on all Iraqis, and I think that that is an accurate statement. They have killed and wounded and maimed countless Iraqi civilians in addition to, certainly, coalition and Iraqi security forces, and they have done that, again, without regard to ethnosectarian identity.

That significance of al Qaeda in the conduct of the sensational attacks, the huge car bomb attacks against which we have been hardening markets, hardening neighborhoods, trying to limit movement and so forth -- those attacks, again, are of extraordinary significance because they can literally drown out anything else that might be happening.

As I mentioned, we generally in many areas -- not all, but in many areas -- have a sense of sort of incremental progress. Again, that is not transmitted at all. Of course it will never break through the noise and the understandable coverage given to it in the press of a sensational attack that kills many Iraqis.

So this is a -- you know, it is a very significant enemy. I think it is probably public enemy number one. It is the enemy whose actions sparked the enormous increase in sectarian violence that did so much damage to Iraq in 2006, the bombing of the Al Askari mosque in Samarra, the gold-domed mosque there, the third holiest Shi'a shrine. And it is the organization that continues to try to reignite not just sectarian violence but ethnic violence, as well, going after Iraqi Kurds in Nineveh province and Kirkuk and areas such as that, as well. So again, I think a very, very significant enemy in that regard.

Q Number of foreign fighters?

PX374

GEN. PETRAEUS: I wouldn't hazard I guess. What I will say is that there are certainly dozens of foreign fighters who do come into the country on a monthly basis; again, sometimes more, sometimes less, depending on the state of the network.

It is obviously a network that we do focus on and try to disrupt very considerably.

Michael.

Q (Off mike.) What would be the -- in your assessment as a military man, what would be the consequences on the ground in Baghdad if the United States was to pull back from its security mission in the capital by the fall, withdraw its forces, say, to the forward- operating bases in the capital and maybe withdraw from Iraq by the summer of '08? I'm not asking you about congressional legislation, about timelines. I'm asking you for your military assessment of the effects on the ground if the U.S. were to end its security mission in Baghdad in the fall, in terms of insurgent activity, the vulnerability of the population and sectarian violence.

GEN. PETRAEUS: I have, as you know, in fact tried to stay clear of the political minefields of various legislative proposals and so forth. And I think, you know, the commander on the ground's job is to understand the mission he's given, make the request for the forces that are needed to accomplish that mission and then identify the risks, if you will, when all those forces may not be provided those resources. We are doing what we're doing, increasing our forces, in response to an increase in sectarian violence that took place in the year 2006. And it continued into January, when in fact sectarian murders were still very, very high in Baghdad. And that doesn't imply that they are at an acceptable level now, but they are about one-third what they were, say, as recently as January.

We believe that the presence of our forces and Iraqi forces in neighborhoods, the focus on the so-called extrajudicial killing, EJK, cells is at least in substantial part a reason for the reduction in these sectarian killings. So I think it's -- depending on where we are in September, of course, and I think that's a key question: How much progress can we make? My sense is that there would be an increase in sectarian violence, a resumption of sectarian violence, were the presence of our forces and Iraqi forces at that time to be reduced and not to be doing what it is that they are doing right now.

And I think again that carries through. In each case you have to make some assumptions about where you think you might be at that time. You could have some optimistic assumptions; you could have some pessimistic assumptions. And then that would determine, I think, what the result would be in terms of the resumption of insurgent activity, extremist activity in terms of the various death squads.

By the way, I'm not talking about the run-of-the-mill Jaish al- Mahdi, by the way. I'd like to distinguish between just sort of the young men with guns on the streets at various points in time and these extremist cells, which are the ones that cannot exist as they did in the past if Iraq is to have a sustainable situation at some point in time down the road.

6/23

PX374

Right here.

Q General, Lolita Baldor with AP. You said just now that things are likely to get -- may get worse before they get better. What kind of progress are you seeing or do you expect to see over the next couple of months that you think you'll be able to make this assessment in September? And if the Iraqi government does leave for a recess, which the secretary has asked them not to, will that postpone or impair your ability to make this assessment in September or just stall any improvements there?

GEN. PETRAEUS: Well, we're going to make the assessment in early September. That's a commitment that Ambassador Crocker and I have made. By the way, we are determined to continue to operate as Ambassador Khalilzad and General Casey did -- one team, one mission -- and to carry on the embassy and Multinational Force Iraq literally linked arms as we do that.

But we have committed to make that assessment in September. We think that's the appropriate time to make it. It will be a time at which we will have had our additional forces on the ground for several months, all of them operating in the areas in which we intend to deploy them. We will have seen additional Iraqi security forces -- I forget the exact number that is being trained just in the month of May that will graduate from this greatly expanded institutional training capacity of the Iraqis. I think it's in the order of 7,000 to 9,000 in the military alone. But we can get that to you later. So they will have been, you know, beefed up continually during this time. There's additional equipment continually flowing to them. I note, by the way, they have well over 2,500 up-armored humvees alone now, a mech division, a wheeled armored vehicle brigade, and so forth.

So again, all of this will have gone on. And then on the Iraqi governmental side, they will have had a number of additional days -- meetings of the Council of Representatives. Our additional Provincial Reconstruction Teams will have been at work, the budget execution focus, the Rule of Law Task Force, and so forth.

We'll have seen whether in fact our efforts in these areas have helped produce the kind of progress that they're designed in fact to produce and to see if there is an exploitation of the opportunity that we believe our soldiers and Iraqi soldiers and police will have provided to the Iraqi governmental leaders to come to grips, again, with some of these really tough legislative issues.

Secretary Gates made pretty clear, I think, about the expectations that -- you know, that -- given the hard work of our soldiers and the Iraqi soldiers, that one would certainly hope that the Iraqi legislators would match that with their own hard work. That's our expectation. They want their country to succeed, needless to say, and it's going to require them obviously coming together to make the kind of progress that we think is important.

Yes, Tom.

7/23

PX374

Q You talk about continued commitment and perseverance and sacrifice, and you also say, as we've heard for years now, success will depend on the Iraqis. And I'm just wondering, do you anticipate high levels of troops -- American troops in Iraq -- let's say, 100,000 or thereabouts -- for years to come?

GEN. PETRAEUS: I'm not -- I wouldn't try to truly -- to anticipate what levels would be some years down the road. I think that my predecessor at various times -- a number of people have noted the length of commitment that has been required, and historical cases are somewhat similar to this, although every case is absolutely unique, and the challenges here, as I mentioned, are enormous, with huge regional implications as well.

It is an endeavor, again, that clearly is going to require enormous commitment and commitment over time. But beyond that, Tom, I don't want to get in to try to postulate how many brigades or when we would start to do something like that, so --

Q (Off mike) -- U.S. troops?

GEN. PETRAEUS: Oh, I wouldn't even -- I'm not going to hazard that kind of thing, so -- hi, Barbara.

Q Hi. The car bombs that you talked about, the spectacular attacks -- number one, do you have any way to tell us how much they have increased, perhaps, since the first of the year? Do you have any evidence of Iranian involvement at this point in any of these networks that are doing these massive car bombs?

And you spoke about Iran being extremely unhelpful. You said you had new information in the last month. What you have learned about Iran's involvement?

GEN. PETRAEUS: The Iranian involvement has really become much clearer to us and brought into much more focus during the interrogation of the members -- the heads of the Qazali network and some of the key members of that network that have been in detention now for a month or more.

This is the head of the secret cell network, the extremist secret cells. They were provided substantial funding, training on Iranian soil, advanced explosive munitions and technologies as well as run of the mill arms and ammunition, in some cases advice and in some cases even a degree of direction.

When we captured these individuals -- the initial capture, and then there have been a number of others since then -- we discovered, for example, a 22-page memorandum on a computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala.

PX374

It also detailed -- there are numerous documents which detailed a number of different attacks on coalition forces, and our sense is that these records were kept so that they could be handed in to whoever it is that is financing them. And there's no question, again, that Iranian financing is taking place through the Quds force of the Iranian Republican Guards Corps.

As you know, there are seven Quds Force members in detention as well. This involvement, again, we learned more about with the detention of an individual named Sheibani, who is one of the heads of the Sheibani network, which brings explosively formed projectiles into Iraq from Iran. His brother is the Iranian connection. He is -- was in Iraq. And that has been the conduit that then distributes these among the extremist elements again of these secret cells and so forth.

Those munitions, as you know, have been particularly lethal against some of our armored vehicles and responsible for some of the casualties, the more tragic casualties in attacks on our vehicles.

So I think that's what has taken place.

Sure.

Q May I formally ask you: What is your assessment at this point? Do you believe that the central government of Iran, Ahmadinejad himself, perhaps, is, number one, aware of this, supporting it, directing it? What is the central government involvement? Could this level of activity possibly take place without the Iranian leadership knowing about it?

And just as another point, do you see any involvement beyond EFPs? Are they now involved in these spectacular suicide car-bomb attacks?

GEN. PETRAEUS: I don't think we have found a link to the spectacular car-bomb attacks, which we believe are generally al Qaeda and elements sort of connected to al Qaeda. Typically, in fact, still we believe that, oh, 80 to 90 percent of the suicide attacks are carried out by foreigners. That's a network, again, that typically brings them in through Syria and is again a major concern and certainly a hope that Syria will crack down on the ability of people to come through their airport and so forth and then be brought into Iraq.

With respect to how high does it go and, you know, what do they know and when did they know it, I honestly cannot -- that is such a sensitive issue that -- and that we do not -- at least I do not know of anything that specifically identifies how high it goes beyond the level of the Qods Force, Commander Suleiman. Beyond that, it is very difficult to tell -- we know where he is in the overall chain of command; he certainly reports to the very top -- but again, nothing that would absolutely indicate, again, how high the knowledge of this actually goes. So --

PX374

Q General Petraeus, you said that things may get worse before they get better in this effort. Can you expand a little on what the American and Iraqi public should be potentially braced for?

And are higher U.S. casualties inevitable as a result of your new approach? You mentioned that your losses have gone up since you moved into the neighborhoods. Is that likely to continue? Is that something they should also be braced for?

GEN. PETRAEUS: I mentioned this because as you move into areas that you've not operated in before, as you contend with elements that were in those areas that in some cases were not challenged -- I mean, there are some element -- areas that were -- that had become, to some degree, sanctuaries for certain extremist organizations.

As that takes place, I think there is a very real possibility that there's going to be more combat action and that, therefore, there could be more casualties, and that's really all that I am implying with that. I don't want that to become the central message of this by any means.

But I think that when you are expanding your forces, when you're expanding your forces' presence, when you are going into areas that have been very lightly populated with coalition forces in the past, that there is going to be more action. And as we take on elements again that in some cases were unchallenged, that that will take place. And certainly Iraqi forces will be our partners in all of that and have been all along so far.

Q General, a clarification and then a question. In regards to this 22-page memorandum that you said was seized in one raid, was that in reference to the number of American soldiers who were sort of ambushed and kidnapped and then killed?

GEN. PETRAEUS: Yes.

Q And were you saying that there was evidence of Iranian involvement in that operation? I just want to be clear.

GEN. PETRAEUS: No. No. No. That -- first of all, that was the operation that you mentioned, and we do not have a direct link to Iranian involvement in that particular case.

Q And then, my question, regarding the fact that you said any success depends largely on the Iraqi government. Yet when what appears to be a key part of the early surge strategy is the erection of this -- what you called the concrete caterpillar, the 12-foot wall, that separates Sunni and Shi'a --

GEN. PETRAEUS: Yeah, this is not to separate Sunni and Shi'a.

Q Okay.

PX374

GEN. PETRAEUS: Let me use my point of personal privilege here to interject that. Let me just explain, in fact, if I could, and then I'll actually give you a chance to finish that question, Nick, if I could.

The concrete caterpillar, the Arizona creeper, whatever you want to call it, there really are a number of these throughout Baghdad. It is part of an overall effort that is designed to make neighborhoods, markets, areas of congestion safer for the Iraqis who live in those areas, work in them, shop in them and so forth.

I think I mentioned that it includes Operation Safe Neighborhood, Operation Safe Market.

Safe Market is one that -- where we focused first on the two biggest markets in Iraq -- the Shorja market and the Jadriya market. These have tens of thousands of Iraqis in them during their peak hours on a daily basis, and they were subject to car bombs before the Baghdad security plan began. And so with the Iraqis we sat down, and they designed a way of putting barriers around it so that you could limit access to it by vehicle. And they actually shut it off to vehicles during the hours that the market is in full swing, and they can only go in during the early-morning hours to set up and then after the market's closed to tear down and take out the trash and so forth. That's been done now for a vast number of markets, not just in Baghdad but in other cities as well.

There are similar efforts ongoing to enable better control of vehicular movement, checkpoints all over Baghdad. There's a proliferation of checkpoints. They've become increasingly elaborate to provide better through-put, better protection for the Iraqi soldiers who typically are the ones that are manning these.

Another effort: There is a Safe Neighborhood Initiative. Again, a number of different neighborhoods, and you can actually focus on where they need to be. You can look at the density, the plots if you will, of where there are sectarian murders taking place. And you array that for a week, for a month, what have you, and you can identify the areas in which there are cells operating.

And so when you're going to then go into that neighborhood, clear it, and clearing takes a long time. It's taking us 19 days just to clear Mansour district alone, for example, one of the central districts in Baghdad. You then have to be able to hold it, or else it is -- the clearing operation was not of enduring value. You can't hold it if you cannot control access to and from that particular neighborhood.

In most cases, actually, the neighbors welcome that kind of barrier plan or walls or what have you. And in many cases this has given the confidence to people in those neighborhoods to return to them, because now they are actually walled off from bad guys, from extremists, and that is what it is that we are trying to wall off. In some cases the walls are indeed along

sectarian faultlines; in some cases they are just walling off neighborhoods that are mixed neighborhoods. Again, it depends on the geography of the neighborhood, not on the sectarian demographic breakdown.

The issue in this case, and the reason Adhamiya became a cause for concern is because it is a very old neighborhood, as many of you know who have been there, and it has one of the historic Sunni-Arab shrines in Iraq in it, a very old mosque. And that raised sensitivities that access to that was being walled off, and so forth. And so there was consideration given; our commanders with Iraqi commanders have looked hard, how can you achieve, again, population control without having some kind of obtrusive barrier, and so forth. And that is ongoing now.

So that's what it is that Iraqis and we are trying to do. By the way, a large number of the work is being done by Iraqis, Iraqi contractors and some Iraqi military engineer units, and then other is being done by U.S. engineer elements.

But go ahead --

Q Yet it also raised strong objections from Prime Minister Maliki. So how successful can U.S. military operations be if they are subject to being politically undercut by the Iraqi government?

GEN. PETRAEUS: Well, I think it would be worth -- I think that that's probably worth seeking clarification on because there's been a little bit more of a meeting of minds I think on that in recent days.

Right here.

Q General, you talked about a Baghdad clock and a Washington clock. Can you explain what you mean by that? And is it your assessment that this war can be won on anything close to that Washington clock, and how would you envision -- what would that victory look like?

GEN. PETRAEUS: Yeah, sure. You know, what I've said is that there's a Washington clock ticking -- and actually, to be fair to those in Washington, it's an American clock. And -- but that clock is moving and it's moving at a rapid rate of speed, and it reflects the frustration, impatience, disappointment, anger, and a variety of other emotions -- feel about the pace in Iraq and the situation in Iraq. And, you know, I am not immune to those emotions either, having given over two and a half years of my life to it, and watched a number of our soldiers give the last full measure of devotion to it. So we want to see faster progress, and again, that is understandable that that clock is moving pretty rapidly.

The Baghdad clock, for all the reasons that I mentioned, is not moving as rapidly. It is not enough, for example, to go to Prime Minister Maliki, who I do believe, as I mentioned, is someone who wants to lead and serve all Iraqis, but it's not enough to go to him.

PX374

He's not the Prime Minister Tony Blair of Iraq. He does not have a parliamentary majority. He does not have his ministers in all of the different ministries. They are from all kinds of different parties. They sometimes sound a bit discordant in their statements to the press and their statements to other countries. It's a very, very challenging situation in which to lead.

And so, as I mentioned to some of the congressional leaders yesterday in fact, we need to encourage and provide that -- those emotions to all Iraqi leaders, the key leaders of the key parties of the key blocs of the Shi'a, Sunni, Kurds and so forth, and again, the key elements within those blocs and leaders in the Council of Representatives, leaders of the presidency, leaders of the -- again, that is what is necessary. And they're all going to have to work together to make progress.

That's a tall order, but that is what does have to happen. They understand it. I think that a number of them are determined to do what is necessary to achieve resolution of these very difficult issues, but again, I make no bones about the challenges that are involved there.

Q You've mentioned a number of positive trends, most notably the reduction in sectarian violence, but there are negative trends.

GEN. PETRAEUS: And I mentioned those too, I think. Yup.

Q Could you give us some numbers to go with those that are an equivalent with the numbers you've given us for the reduction in sectarian violence?

GEN. PETRAEUS: Okay. No, but, actually, I think the level of violence has roughly been -- depending again on how you calculate these things -- but by our consistent method, the level of violence has generally been unchanged. There was a dip for a while --

Q (Off mike) --

GEN. PETRAEUS: Throughout the country -- that there was a dip for a while. It was coming down and that these sensational attacks of the past couple of weeks, and a couple of these chlorine bomb attacks, just because of the sheer number of people that end up going to a hospital, even though they may then immediately come out, in the case of the chlorine bomb attacks, tends to run those up.

So we have not seen a corresponding drop in the level of violence statistics that we have seen in the sectarian murder statistics.

The reason I focused on the latter, though, is because it is a very important metric for neighborhoods. I mean, if your neighborhood is subject to the kind of extrajudicial killing that plagued Baghdad as recently as January and still does plague some neighborhoods, obviously you cannot focus on much other than just survival. And of course that's what caused this displacement of, really, millions of Iraqis over the course of the last couple of

years. And it is something that again you have to drive down if again there's to be the degree of confidence that can help them gradually put a few stitches back into the fabric of a society that has been torn by sectarian violence.

Q What about car bombs? Can I ask you about car bombs?

GEN. PETRAEUS: Well, that -- I factored that in there. I don't know that there's been an appreciable change, actually, in that. Again, it tends to be quite fluctuating. You know, the last couple of days, for example -- the previous two days after the horrific attack on our 82nd Airborne Division soldiers -- actually, it was backed down somewhat -- but again, it just tends to go in cycles, and we have not seen a definitive trend that I could report to you in that regard.

Yeah, right here.

Q Thanks. Sir, you said that success ultimately depends on the Iraqi government, and there's a reasonable chance that they won't come through with what they need to do, given all the complexities that you've laid out. What can you tell the American people? Why is it worth the continued sacrifice on the chance that the Iraqi government won't hold up this end of the bargain? And one of the things that I hear from people who are for the withdrawal or the phased redeployment is, how much worse can it get than it has been -- in 2006, 34,000 civilian dead?

GEN. PETRAEUS: Well, I think again it does come down to the implications of various options. And it can get much, much worse than it was. Right now it is -- I think it's fair to say a good bit better, but again, I am not trying in any way, shape or form to indicate that this is a satisfactory situation whatsoever.

I did mention again one metric that I think is an important one, it's one that we happen to focus on literally with our forces. But there are others -- again, the car bombs, and I did in fact identify that as one that has shown an area in which we obviously have to focus even more effort, because it has inflicted horrific casualties on Iraqis in particular.

So again, I think you have to ask, you know, just as I responded to Michael Gordon's question, what are the implications of various options? What do you think would happen? Of course, that depends on some assumptions about the situation, when it is that you carry out the various options. And I think that that's hugely important as one, again, thinks of these different notions for the way ahead.

Yeah, in the back there.

Q

General, if sectarian killings are coming down, are you seeing any evidence of people moving back into their old districts and Sunnis and Shi'as starting to live together again?

PX374

And secondly, your recommendations in September, are you willing to countenance the idea that you may have to say to the president, this is not working, we should pull troops out, or are you more likely to say things are not going well, here are the adjustments and strategies we need to make?

GEN. PETRAEUS: Well, on the latter one, I mean, I have an obligation to some wonderful young men and women in uniform, and a lot of civilians, by the way, who are serving in Iraq and who deserve a forthright assessment from the folks at the top about the situation on the ground, and that's what I'm going to provide.

Now, with respect to returnees, we're seeing small numbers, and that's, I think, what you heard me say in the statement. Again, I don't know that you would yet call it a trend. We have seen, again, some neighborhoods that were really depopulated, in which there have been the early signs of returns.

We have seen -- I mean, you look at a place, for example, like Dura, the Dura market down in East Rashid in Baghdad, a real difficult area, perhaps one of the toughest in all of Baghdad. I went on a couple of patrols the day after I took command back in February, and candidly, I was sort of shocked at what I saw in terms of what sectarian violence had done to Baghdad. And the Dura area in particular struck me because there was not a single shop open at all; and there now are -- I think it's over 200 and literally climbing every day.

The reason is because Iraqi and coalition soldiers hardened that market, located Iraqi and U.S. combat outposts right in the center of the market, and then on its periphery. And in fact, I walked through that area with a CNN reporter, in fact, a few weeks ago, and it has continued to expand over time down there despite attacks.

So there's a degree of resilience there as well.

But that's what we are seeing. And again, too soon, I think, to call that a trend, too soon to say that what we've done in just the first couple of months has -- with our Iraqi partners, again, enabled them to stitch together the fabric of society that was so torn.

Right here. Right.

Q General, the commander of Camp Cropper has been relieved and imprisoned for allegedly aiding the enemy. One, can you provide any more information about this? And two, to what do you attribute the apparent continuing problems with detainee operations?

GEN. PETRAEUS: He actually, I think, gave up command actually last fall, as I understand it. And I'm aware of his charges. But he is actually in Kuwait, which is where the case is being carried out. And as with any case that is ongoing, a senior commander can't comment because of the concern over command influence. And that's really where I'd have to leave

that. I think that the command there has provided the details on the charges. Again, this is something that took place quite some time back, actually well before I came on the scene, and that's about all I know about that.

Q What can you say about --

GEN. PETRAEUS: With respect to the detainee operations, I think actually that we have learned an enormous amount the very hard way. I -- but I do think that we did make a number of corrections in the wake of Abu Ghraib and some of the other problems that we have had with detainee operations. We believe that those operations are quite humane. And obviously they're in somewhat marked contrast to those of al Qaeda and the extremists, who indiscriminately attack civilians and coalition and Iraqi security forces.

I saw the report by UNAMI, and we believe that there are numerous factual inaccuracies in that that actually need correct. And I'd actually welcome the opportunity to discuss this a little bit.

The administrative review process that MNF-I uses is really quite robust, and it has multiple checks and balances. The specific procedures that are followed by Multinational Force Iraq are based on those in the Fourth Geneva Convention, and they're well-rooted in generally accepted law of war principles, all of this supplemented and guided by the field manual that was published this past year, which governed the treatment of detainees, interrogation and so forth.

There is no 60-day period during which detainees are not allowed counsel, although normally there's a 30-day window before which visitors are allowed, although exceptions can be made in the case of an attorney.

After that, an individual can see his attorney. MNF-I maintains Detainee Assistance Center at its theater detention facilities, which again have come light years from where we were in the early days, but which, frankly, still need continued improvement, particularly in the sense that in some cases we have detainees who are truly maximum security type detainees, and we have to improve the facilities, in fact, to accommodate some of those individuals.

The Detainee Assistance Center facilities, the services are available to all detainees. We have the capability to refer a detainee to the Iraqi Bar Association, where he can obtain an attorney at the detainee's expense. Furthermore, the Iraqi government provides defense counsel to any detainee at no expense to the detainee at the time a detainee's case is referred to an investigative hearing at the Central Criminal Court of Iraq -- a process that, as you know, has been ongoing for some time. And additionally, a defense counsel will continue to be provided throughout all subsequent stages of that particular process.

Q General, last week -- you spoke about the progress in Anbar. Last week, Major General Olson, one of the leaders of the PRT efforts, raised a question about the Anbar effort, saying that the military has empowered tribal leaders potentially at the expense of democratic

governance. I wonder if you think that's the case, and whether you would say at this point achieving stability and security and safety in Anbar has to be a greater priority than, you know -- than democratic governance.

GEN. PETRAEUS: Yeah, first of all, I didn't see that statement. I'd be somewhat surprised if it's -- is it the Rick Olson who's the PRT -- or who is --

Q Yeah. He was just saying that bringing the tribes in obviously had its good effects, but it also potentially undercuts the -- you know, what will hopefully be the elected government of Anbar province.

GEN. PETRAEUS: Well, look, I think first of all that the tribal elements of Iraq are a fact of life, and that what Iraq eventually will have is some form of government that at least listens to and incorporates the views of tribes and sheikhs, particularly in an area like Anbar province. Now, it varies when you're in cities; the tribal influence is less.

But I think that, candidly, a mistake that we may have made in early days was not to pay enough attention to these very important elements of Iraqi society, which still play a very, very key role and are really, you know, a lot more than I think sort of the stereotypical view of tribes. I mean, each tribe generally has a construction company, an import-export business, and a trucking company as well. I mean these are entrepreneurs as well as tribes, and they provide a variety of services to the members of their tribes.

So I think, again, that what results in Anbar province will actually have the features of democratic governance representing the citizens of Anbar province and being responsive to them.

But among those elements to whom they are responsive will be certainly the sheikhs and the leaders of the major tribes in that area, because of the allegiance that the people give to them.

Anbar province made the progress that it did because of the courageous action of some sheikhs who said, enough, to the killing by al Qaeda of their brothers, sons, sheikhs and so forth. It started with Sheikh Sattar near Ramadi, working with Colonel Sean MacFarland. He came to Colonel MacFarland and said, I'd like to join the coalition in fighting against al Qaeda, and they made a pretty courageous choice. He volunteered some of his young men to be part of the Iraqi police structure, and it literally just started to ripple on out from there, with each sort of contiguous tribe joining in the same fashion. And what you have now is a very, very significant movement.

By the way, that tribal movement is now turning into a political movement. And Sheikh Sattar had a meeting with a number of the tribal leaders just, I think it was, last week, where they came together to discuss when provincial elections are held, as the process moves forward in Anbar province, should this effort that has been focused largely on helping the security forces be moved forward also as somewhat of a political movement? And in fact,

17/23

PX374

Prime Minister Maliki went out there, as I think you know, to Ramadi and met with not just the governor or the provincial council but also with the sheikhs and with the leaders of the Iraqi security forces.

Again, none of this would have been possible without these sheikhs, particularly the early ones, taking a very courageous stand at a time that was actually very, very dangerous, and has now enabled the Iraqi and coalition forces in partnership to largely clear Ramadi, which only two months or two-and-a-half months ago was largely al Qaeda central. And just to get to the governance center, you literally had to fight your way downtown.

Q Just to follow up, General, do you think the tribes are -- are they working with the U.S. military or are they working with the central Iraqi government? And if the U.S. was to reduce its presence in Anbar, would that -- would these gains erode, with the --

GEN. PETRAEUS: Well, again, we have been very careful to ensure that these individuals are incorporated in Iraqi security force formations. As you may know, just a few months back, six months certainly back, when the call went out for volunteers for the 7th Iraqi Army Division, a division from about Ramadi on out into Western Anbar, there were just -- I think it was less than the fingers on these two hands who volunteered that day. And then subsequent one, there were a few more. Well, most recently there were 2,000 young Anbari men who showed up to volunteer for that when they had a recruiting drive at Habbaniya, I think it was. So there has been an enormous shift.

By the way, I found the same enthusiasm in Western Nineveh province, an area that I knew from the first year there with the 101st Airborne Division, met with the sheikhs of the Shammar tribe up there.

And these are individuals who sadly in the period of the most intimidation by al Qaeda of Sunni Arabs in the fall of 2004 and well into 2005, the period when they boycotted the election and so forth, and really now know that they lost out -- we could not get volunteers from those particular tribes. Now they want to help form new battalions and so forth.

Now, this is not just because they want to fight against al Qaeda. It is also because of a very good and realistic appraisal of this situation, and that is that the Sunni Arabs lost out by not participating in the past. They lost influence in government. They lost influence, if you will, or participation, jobs in the Iraqi security forces, and I think they now recognize that they need to participate, they want to participate. And that is a very, very important development, again. And once again, this never could have -- the progress in Anbar would not have happened without that.

If you now trace down the Euphrates River Valley and start out at al Qaim and Husaybah and walk your way on in and Haditha, Hit, Ramadi, and then over towards the Fallujah area, you get all the way until past Ramadi. This is not to say al Qaeda's still not trying to blow up

newly in-place police stations in Ramadi, they did it the other day; nor that they are taking any of this lying down.

In fact, the areas around Fallujah are still quite problematic and are areas where the new Marine battalions -- this is an example of an area that I talked about, where we had not had a sustained presence in the past, where we are now able to have a sustained presence because of our additional forces and because of the expansion of Iraqi security forces in Anbar province. And we're going to expand in some other areas in that area here in the months ahead as well.

So that's the dynamic that's going on, and I suspect in truth that Rick probably did not mean quite the way that you may have characterized that, Julian.

Thanks.

Yes?

Q Sir, could you elaborate a little bit more on the benchmarks you'll be reviewing in your September assessment that even Joe Six-pack or armchair generals could understand? Is it possible that the number of spectacular attacks could continue throughout the summer, and yet you still see progress -- effort to buy time for the Iraqi government?

GEN. PETRAEUS: Yeah, I -- this is something we've actually been working on a good bit, and in fact, we gave to the chairman of the Joint Chiefs yesterday a set of what we are sort of thinking about. Now I need to do more coordination.

Ryan Crocker and I are proceeding on this. We need to do some more ciphering on this and do some more thinking on it. But, you know, we provide an enormous wealth of detail right now that goes into the 9010 Report, the quarterly report that goes into weekly joint staff metrics and a whole variety of other submissions.

And with respect to that, we will probably focus on four areas: security, economics, politics/governance and rule of law.

In the security arena, you're looking at, you know, what is it that would show you that you have been able to achieve, to help the Iraqis achieve greater population security? What about the influence of militias and what about the progress of the Iraqi security forces?

When you look at the -- sort of the economic arena, again, we're looking for things that show that the Iraqis are into this big-time, which we believe they are, but also show that our approach is having the effect that we hope that it will have. But in the economic arena, how are they doing spending their money?

PX374

As you know, last year, the Iraqis did not spend some $10 (billion) to $12 billion of their budget for -- a year in which the International Monetary Fund was going to allow them to run a 5 percent deficit, which is common for countries that are sort of coming out of the situation in Iraq -- which Iraq finds itself. So this is very important, that they in fact spend the money that they have for all Iraqis, for the good of them.

And as you know, much of what is done for Iraqis, the whole social safety network, which is very substantial but which is torn and frayed in a variety of different locations where the security situation's been tough, this is all done through the ministries. And so they've got to spend their money. So we'll look at how are they doing in spending the budget, in particularly what about the capital investment account? They're good at spending salaries; the question is, are they buying the equipment, making the improvements, the construction and so forth.

What about banks? How are the banks doing? Are they reopening? And an interesting phenomenon, by the way -- there is now private banking in Iraq for the first time, I believe, ever, or at least certainly in a few decades. And I noted -- I just saw where there's private banks in Kirkuk. There's, believe it or not, a private bank, I think, in Ramadi or in someplace in Anbar province, maybe Haditha.

So again, how are they doing -- how are the provinces doing in receiving their money and, again, in spending it? Is the government doing all that it can for all provinces and all Iraqis?

Politics and governance -- obviously there we're talking about progress on key legislation. I've talked about that. You're looking at what about if there are some malign actors in some places in government? I mentioned that the deputy minister of Health was detained with the -- at the direction of the prime minister, I believe -- certainly his support, the head of the facility protection security forces -- that kind of activity, again, is what we're looking on there, and then just sort of the progress in the development of governmental capacity, ministry development.

And then in the rule of law, how is progress on the development of the criminal justice system, their detention facilities and system -- which is a big, big challenge and they have had big problems in that, as you know, in the past, particularly during the period when sectarian -- where certain Iraqi security force elements really were hijacked by sectarian militias as well. How is the Rule of Law Green Zone coming along and other initiatives, the circuit rider judicial effort and some of these things? So again, that's roughly what we're looking at.

As I mentioned, we just first gave a first draft pre-decisional think piece to the chairman of the Joint Chiefs yesterday. The Joint Staff and everybody else will work it. Ambassador Ryan Crocker and I need to do some more work on it as well, and then we will move it forward.

Q (Off mike) -- progress are less than obvious to a person in the United States, much less Iraq or Europe. Is it possible that these things could improve while spectacular bombing attacks still occur in parallel?

PX374

GEN. PETRAEUS: Well, I think first of all -- look, I think you have to be realistic and acknowledge there is going to be a continuation of some level of sensational attacks. In an environment where to prevent those, you know, the Iraqi and coalition forces have to protect everything and they only have to attack one thing, some of that is going to happen. I used the analogy the other day of Northern Ireland, which some of you are very familiar with and in which for some decades there was a level of violence that actually the Northern Ireland citizens learned to live with, really.

And actually, to be fair to the Iraqis, I mean they're an exceedingly resilient people. I actually the other night was talking to one of your colleagues from The Washington Post and talked about this idea that there is -- you know, we feel this incremental progress; it's very difficult to demonstrate. In fact, the progress is interesting, because it's a negative. It means nothing happened, in most cases. In other words, there were not sectarian murders. Whether that is newsworthy before it goes on for several weeks is obviously arguable.

But anyway, so what I asked was, "Hey, come on, it's about dusk, let's go -- we'll fly around the city a little bit." And we flew around. And so -- I mean, it was unbelievable.

This is a day in which I think there was a car bomb in Iraq, some of Iraq's seven million citizens were affected by that, but you could not have told that from what we saw over the city. There were three big amusement parks operational. I'm talking about, you know, roller coaster kinds of -- these are not just a couple little merry-go-rounds in small neighborhood parks. Restaurants in some parts of the city were booming. Lots of markets were open. The people were on the street. There were -- there had to be a thousand soccer games ongoing. They're watering the grass in various professional soccer fields -- the soccer leagues.

You know, all of this is actually so foreign, I think, in the mind of most people who see the news and of course do see that day's explosion or something like that. And actually there is a city of seven million in which life goes on, and again, citizens are determined to carry on with their life.

Just one more, please.

Q General, I'm sorry. I have to try one more time on the 22- page memo, because it seems like the first time you mentioned it, you said you found it in the computer of the cell that was dealing with Iran.

GEN. PETRAEUS: Right.

Q And I thought you said that they were saving it in order to demonstrate to their Iranian patrons that they --

GEN. PETRAEUS: That's our speculation. Now, what I --

Q (Off mike.)

GEN. PETRAEUS: No, what I said to Mik was, we did not -- we have not seen evidence of direct Iranian involvement in that case. If you said -- I mean, in other words, coaching them on how to do it, telling them to do it or what have you. Again, we don't --

Q Or bragging, then, reporting back about an operation --

GEN. PETRAEUS: Yeah. We think -- again, this is speculation, but I think it is fairly logical speculation. We think that records are kept so that the individuals that carry out these attacks can demonstrate what they're doing to those who are providing the resources to them, providing the additional funding, training, arms, ammunition, advanced technologies and so forth. So --

Q Not necessarily involvement in that specific operation? From the Iranians, I mean.

GEN. PETRAEUS: Again, not direction, not -- again, we just can't confirm it. I can't say it wasn't there either, but we did not find, if you will, a direct fingerprint to it.

Thank you all very much.

Q But there is a connection between that group and the Iranians?

GEN. PETRAEUS: Oh, there's no question that the Qazali network is directly connected to the Iranian Qods Force, received money, training, arms, ammunition, and at some points in time even advice and assistance and direction. So --

Q And they're the ones who carried out the Karbala attack?

GEN. PETRAEUS: Yes. That network's members did carry out that.

Thanks. Great to see you all again.

Q Thank you.

Q Thank you, General.

http://www.defenselink.mil/Transcripts/Transcript.aspx?TranscriptID=3951

| NEWSLETTER |
| --- |
| **Join the GlobalSecurity.org mailing list** |
|  |

PX374

PX374

# PX378

(Video Will Be Submitted to the Court)

A

## Department Press Briefing - April 2, 2019 - United States Department of State

2:51 p.m. EDT

**MR PALLADINO:** Good afternoon. Sorry for the slightly later than expected start. Today we have a special guest with us, Special Representative for Iran and Senior Advisor to the Secretary of State Brian Hook. Brian has some remarks at the top that he'd like to make, and then will be able to take a few of your questions. Please.

**MR HOOK:** Thanks. Good afternoon. Today we are providing an update on the President's Iran strategy. I will highlight the effects we are seeing on the Iranian regime and its allies and proxies in the Middle East. This briefing comes at a time when Iran is facing severe flooding. At least 45 people have died in the past two weeks after heavy rains, with flooding affecting at least 23 of Iran's 31 provinces. The Secretary issued a statement earlier today extending his condolences and offering assistance, and I extend my condolences as well.

Since taking office, the administration has designated over 970 Iranian entities and individuals. The sanctions announced last week against front companies supporting the Islamic Revolutionary Guard Corps and Iran's ministry of defense were the 26th round of American sanctions. Our sanctions have targeted a range of threats, especially Iran's support of terrorism, missile proliferation, its nuclear program, human rights abuses, and others.

As part of this pressure, we have sanctioned more than 70 Iran-linked financial institutions and their foreign and domestic subsidiaries. The SWIFT financial messaging system matched many of these designations and disconnected every sanctioned bank in Iran. In November, SWIFT even disconnected the Central Bank of Iran from its system. We have targeted Iran's illicit oil shipping networks, which enrich the brutal Assad regime and terrorist partners like Hizballah. We are taking unprecedented steps to deepen our cooperation with allies and partners to confront Iranian-backed terrorism and aggression. Joint teams from the departments of State and Treasury have now visited more than 50 countries around the world to brief on

PX378

our new policy and warn of the dangers and reputational risks of doing business with Iran. Almost one year after the United States ended its participation in the Iran nuclear deal, and five months after the full reimposition of our sanctions, it is clear that our actions are restricting Iran's cash flow. They are constraining its ability to operate freely in the region.

Our oil sanctions have taken approximately 1.5 million barrels of Iranian oil exports off the market since May of 2018. This has denied the regime access to well over $10 billion in revenue. That is a loss of at least $30 million a day, and this is only with respect to the oil. Iran would otherwise use this money to support its destructive and destabilizing activities. Because of our efforts, the regime now has less money to spend on its support of terrorism, missile proliferation, and on its long list of proxies. In November, we granted eight waivers, oil waivers to avoid a spike in the price of oil. I can confirm today that three of those importers are now at zero. That brings us to a total of 23 importers that once were purchasers of Iranian crude that are now at zero. With oil prices actually lower than they were when we announced our sanctions, and global oil – and global production stable, we are on the fast track to zeroing out all purchases of Iranian crude.

More than 100 major corporations withdrew from business in Iran. Companies like Total and Siemens have exited the Iranian market, taking with them billions of dollars in investment. Since the IRGC controls up to half of Iran's economy, this lack of investment means less money for the Quds Force and Iran's network of proxies. Our sanctions are draining Iran's support to its proxies, and for the first time in a very long time, they have less access to revenue to spread terror and militancy. In March, Hassan Nasrallah, the leader of Lebanese Hizballah, publicly appealed for donations for the first time ever. He has been forced to undertake unprecedented austerity measures. There are reports that some Hizballah fighters are receiving half of their pay, and that others are only being paid $200 a month. Other Hizballah employees report receiving 60 percent of their normal monthly salaries.

A new analysis released last month by the Washington Institute corroborates these findings. Hizballah has closed almost a thousand offices and paused hiring of new personnel. The report further concludes that Hizballah itself attributes this belt-tightening to U.S.

PX378

sanctions on Iran, which has historically provided the group with $700 million annually. That is 70 percent of Hizballah's entire budget.

Hizballah is not alone in feeling the strain of American sanctions. Iranian proxies in Syria and elsewhere are experiencing a lack of funding from Tehran. Fighters are going unpaid, and the services they once relied upon are drying up. Last week *The New York Times* quoted a Shia fighter in Syria who said that, quote, "The golden days are gone and will never return. Iran doesn't have enough money to give us."

We are working with our allies and partners to make this the new norm. We have acted with them to disrupt Iran's illicit oil shipping operations. When we identified ships smuggling illicit Iranian oil for the Quds Force to support Hizballah and the Assad regime, Secretary Pompeo dispatched diplomatic teams to work with our allies and partners to help prevent it. We have been working with countries on almost every continent to identify vessels of concern and disrupt their operations. More than 75 vessels involved in illicit activity have been denied the flags that they need to sail.

Panama issued a presidential decree to pull registration and de-flag Iranian vessels. Countries like Singapore, Sri Lanka, and Sierra Leone have exercised great diligence to disrupt these schemes and deny criminal Iranian entities access to flag registries, insurance, and classification. We thank each of these nations for their work.

America has not acted alone to counter Iran's malign behavior. Our European partners pushed back against Iran after a foiled bomb plot in Paris, and thwarted an assassination attempt in Denmark. In January, the European Union sanctioned Iran's ministry of intelligence and security and two of its agents for their roles in these activities. The EU's recent Foreign Affairs Council passed conclusions in February that called out its ballistic – Iran's ballistic missile program. It also opposed Iran's malign activity in Europe, as well as its ongoing role in regional conflicts. Many European countries, including the United Kingdom, Germany, France, Denmark, the Netherlands, Albania, and Serbia have acted to address the threat of Iranian terrorism on their own soil, whether by recalling ambassadors, expelling Iranian diplomats, eliminating visa-free travel, or denying landing rights to Mahan Air, as Germany recently did. All of these activities were undertaken after the U.S. exited the Iran nuclear deal, undercutting the

PX378

narrative that the U.S. is alone in countering Iran's threats to international peace and security.

We are also working with our allies and partners to oppose Iran's ballistic missile program. The United States, the United Kingdom, France, and Germany have repeatedly highlighted Iran's defiance of UN Security Council Resolution 2231, which calls upon Iran not to undertake any activity related to ballistic missiles designed to be capable of delivering nuclear weapons. We relayed our strong concerns to the UN secretary-general following Iran's launch of a medium range ballistic missile in December, and its attempted satellite launches in January and February.

Just last week, the UK, France, and Germany wrote to the secretary-general again, underscoring their concerns with Iran's recent missile launches. We are confident that our shared assessment of the threat from Iran will continue to translate into even more shared action.

Our sanctions are laying bare this regime's mismanagement and lack of transparency. Shortly after the President exited the Iran nuclear deal, Foreign Minister Zarif bragged that Iran would, quote, "thrive" under U.S. sanctions. His optimism was misplaced. A few months later, the supreme leader said that the regime is under, quote, "unprecedented pressure," end quote. President Rouhani has since said Iran faces its, quote, "most severe economic crisis in 40 years."

This economic crisis is largely of the regime's own making, because it has prioritized expanding the revolution abroad over sound economics at home. Living conditions have barely rebounded to pre-revolution levels. For most Iranians, the promises of the revolution never materialized. This is why the hashtag #40yearsoffailure was a popular hashtag inside Iran during the regime's 40th anniversary. Today there are reports that indicate Iran's economy is in recession. The rial has lost two-thirds of its value, the IMF predicts Iran's economy will contract by as much as 3.6 percent in 2019, and inflation hit a record 40 percent in November, with inflation for goods at 60 percent. It is likely to be much higher than that today, but it is difficult to know because the Central Bank of Iran stopped publicly reporting inflation back in December. What is the CBI hiding?

More than 70 percent of the Iranian public see the economy as bad or very bad, and 60 percent say it is getting worse. The Iranian people know whom to blame for reduced wages, lost savings, and a

PX378

reduction in their purchasing power. A 2018 poll conducted by IranPoll found that nearly two-thirds of Iranians blamed the regime for mismanagement and corruption and for the country's economic woes. Less than a third blamed sanctions or international pressure for the current state of affairs.

This has not stopped Iran's leaders from deflecting blame for their own corruption and mismanagement, but the Iranian people know that their government's policies are the root cause of Iran's worsening economy. There are already whispers throughout the Iranian medical community that the regime is hoarding drugs and other medical products that they can then sell at marked-up prices for profit. The Iranian people view their government with such skepticism because the regime has lost all credibility.

I've discussed at length how our pressure is depriving the Iranian regime of the resources it needs to sustain its tactical operations. I want to close briefly by discussing the broader strategic implications this has for the region. As we increase pressure, we are creating new opportunities for peace and stability in the Middle East.

First, our pressure is aimed at reversing Iran's strategic gains. From roughly 2007 through 2016, Iran was able for a variety of reasons to deepen its support of proxies and entrench itself in regional conflicts without facing negative consequences. Iran does this by letting its proxies do the dying for them in regional wars. The proxies also give the regime plausible deniability, a 40-year fiction this administration refuses to honor. Since taking office, but especially in the last 11 months, this administration has countered Iran's grand strategy. We are imposing costs on the regime for behaving as an outlaw expansionist regime. The regime is weaker today than when we took office two years ago. Its proxies are also weaker. Unless the regime demonstrates a change in policy and behavior, the financial challenges facing Tehran will mount.

Second, as we expose the regime's corruption, economic mismanagement, human rights abuses, arbitrary detention of dual nationals, environmental destruction, and more, we are making the case to countries in the region that Iran is neither a model to emulate nor a partner to follow. Wherever it goes, conflict, misery, and suffering follow. Here are a few examples.

PX378

President Rouhani recently visited Iraq, where he seeks to bring –
which he seeks to bring under Iranian control. We ask the Iraqi people
to consider this: Given how Rouhani treats his own people, just
imagine how he will treat you.

The effects of Iran's meddling had been felt most sharply by the
region's innocent civilians. Men, women, and children are casualties
of Iran's dangerous expansionism almost every day. In Yemen, Iran
has helped fuel a humanitarian catastrophe by backing the Houthis.
Its support has prolonged the conflict well beyond what makes any
sense at all.

In Syria, Iran has (inaudible) and abetted Assad's brutal war machine
as that machine has killed hundreds of thousands and displaced
millions of civilians. Under the cover of the Syrian war, the IRGC is
now trying to plant military roots in Syria and establish a new
strategic base to threaten Syria's neighbors such as Israel.

In Lebanon, the Iranian regime's obsession with using Hizballah to
provoke conflict with Lebanon's neighbors threatens the safety of the
Lebanese people. IRGC backing enables Hizballah to use murder,
terrorism, and corruption to intimidate other Lebanese parties and
communities.

In Iraq, I can announce today, based on declassified U.S. military
reports, that Iran is responsible for the deaths of at least 608
American service members. This accounts for 17 percent of all
deaths of U.S. personnel in Iraq from 2003 to 2011. This death toll is
in addition to the many thousands of Iraqis killed by the IRGC's
proxies.

Third, rolling back Iran's power projection will make it easier to
address other regional challenges. Many intellectuals and diplomats
over the years have argued that without progress on the Israeli-
Palestinian conflict, there can be no progress on other conflicts. This
has been referred to by some as linkage – the idea that resolving
peace between Israel and the Palestinians was necessary to resolve
other flash points.

However, the Middle East of today challenges this theory of linkage. In
fact, what we are seeing more and more is a kind of reverse linkage;
addressing the threats posed by Iran is a precursor to helping resolve
other conflicts.

PX378

When we look at the challenges in the region, from the peace process to conflicts in Syria and Yemen, to violence in Bahrain and Iraq, Iran's operations lie at or very near the heart of the problem. It supports Palestinian terror groups like Hamas that undermine the aspirations of the Palestinian people. It exports missiles and terrorist know-how to the Houthis in Yemen, who in turn threaten neighboring countries. It threatens the war – it perpetuates the war in Syria by propping up the Assad regime. Nowhere in the region are peace and prosperity compatible with Iranian influence and support.

The Islamic Republic is linked to these crises in a way that compounds suffering and prevents peace and stability from getting a better footing. Iran can no longer be allowed to play the role of chief spoiler. Our pressure is making it harder than ever before for them to do that.

Secretary Pompeo will continue to use all the tools at our disposal to press the regime to change its destructive policies for the benefit of peace in the region and for the sake of its own people, who are the longest-suffering victims of this regime.

As we have done from the start, we will continue to call on all nations to join us in restoring the basic demands on Iran to behave like a peaceful nation. This include – this includes ending its pursuit of nuclear weapons, stop testing and proliferating ballistic missiles, stop sponsoring terrorist proxies, and halt the arbitrary detention of dual citizens.

As Secretary Pompeo has said, we are prepared to end the principal components of every one of our sanctions against the regime. We are happy to re-establish full diplomatic and commercial ties with Iran. If Iran makes a fundamental shift, as outlined in the Secretary's 12 demands, a lot of good things can happen between the people of Iran and the people of the United States. That includes supporting the modernization and reintegration of the Iranian economy into the international economic system.

Glad to take a few questions. Matt.

QUESTION: Thank you. Are you going to be making an abridged version of this available?

MR HOOK: There will be a fact sheet released after this.

PX378

QUESTION: Okay. Thanks. Two things real quick. One, on the money, the 10 billion denied for destructive activities, is it not also the case that no matter how small the amount that Iran might spend, that 10 billion that you've taken away from them could also have been used for things like infrastructure or for disaster relief if –

MR HOOK: Iran had that opportunity back in 2013.

QUESTION: Well, right. But it's 2019 now –

MR HOOK: Right. But —

QUESTION: — and they're suffering from floods. So that –

MR HOOK: They are suffering from floods because Iran has prioritized its expansionist foreign policy over things like emergency preparedness and water management. I released a video a few weeks ago, before the flooding occurred, talking about how Iran has destroyed its environment. The regime has destroyed its environment, and it has mismanaged its water resources, and it goes through these cycles of drought and flooding.

When this regime came to power, there were about seven ancient dams and 12 modern dams. Over the course of the last 40 years, this regime has built 600 dams. That is just water malpractice, water management malpractice.

QUESTION: Okay. But, I mean, natural disasters happen everywhere. They happen here too. It's not —

MR HOOK: And so they have prioritized all of this – they have prioritized this consistently. People are still recovering from the earthquake in 2017.

QUESTION: Can I – then just the last one briefly. You said on the oil waivers – so you said three of the eight that were – three of the eight are no longer necessary, the ones – the original ones?

MR HOOK: No, I said that three of the eight have gone to zero.

QUESTION: Right. Well, so they don't need waivers then, right? So there's five left?

MR HOOK: That's correct.

PX378

**QUESTION:** There is – there are some people, quite a few actually, who make the argument that you should not give any more waivers, that everything should go to zero, zero means zero, maximum pressure.

**MR HOOK:** Right.

**QUESTION:** That concerns about the market and the supply are compensated for or made up for by the Saudis willingness to expand production to cover any – so do you intend to not give any more – to extend – to not extend any of the waivers? Or is that still an open possibility?

**MR HOOK:** Well, we're still currently under the existing waivers that expire on May 2nd. There will be an announcement on that in due course. We are not looking to grant any exceptions to our campaign of maximum economic pressure. As I've said in my remarks and I've said in other forum, fora, that in 2018 we had a very tight and fragile oil market and the President did not want to lift the price of oil. We very, I think, carefully and correctly calibrated balancing our national security and economic objectives. 2019 is a much better picture in global oil markets. We forecast more supply than demand. And that creates much better conditions for us to accelerate our path to zero.

**QUESTION:** Thank you.

**MR HOOK:** Rich.

**QUESTION:** Thanks, Brian. So if you've taken off a million and a half a day, you're somewhere south of a million barrels a day? That's where –

**MR HOOK:** Yeah, approximately. Yeah.

**QUESTION:** Is there a point – and I know the intent is to get to zero, but is there a point that the administration sees as a real tipping point that – is it half a million barrels or somewhere in between that really begins to drive the economic ramifications?

**MR HOOK:** Well, we already are – we're doing that now at our current levels. So we have reached that goal of affecting Iran's – disrupting and making it harder for Iran to sustain its foreign policy. So we're – this briefing was to talk about the impact. I often get this question – what kind of impact are you seeing? – so I thought it'd be useful to

PX378

provide a comprehensive briefing on what we're seeing and what others are seeing. And we're just getting started.

Michele.

QUESTION: Thank you. Since Secretary Pompeo is hosting this event on captive Americans this afternoon, I wonder if you can tell us if there's been any new effort by the administration to open up a humanitarian dialogue with Iran on the cases of Americans held there in Iran or if you're considering anything punitive, specific sanctions to pressure Iran to release these people.

MR HOOK: Well, I'd refer you to – I don't want to get in Robert O'Brien's lane. I can tell you that when I did – this was back when the United States was in the Iran nuclear deal and I attended the last meeting of the joint commission that the United States participated in. I requested a meeting with Iran's deputy foreign minister Abbas Araghchi, and I presented him the names of all the Americans who are being arbitrarily detained. I asked for their release, asked for an update on their condition, and suggested that we do some sort of – that we start opening the channel. Robert O'Brien has picked that up, and so we are – he's going to be having some events this afternoon. I'm happy to put Robert in touch with you to give you a more detailed answer.

Nick.

QUESTION: Brian, just two quick ones, one on the oil waivers. So if conditions on May 2nd are what they are today, would you say that conditions are right to bring that to zero? And then second, on the 608 American service members you identified as Iran having been responsible for their deaths, is that – could you us give more detail on that? What was that classified information that was declassified? And you mentioned 2003 to 2011, so is that – that's the date frame, time frame for those Americans?

MR HOOK: Yes. That's a Department of Defense statistic. I'm happy to give you more details on it but wanted to release that number.

QUESTION: And on the waivers?

MR HOOK: I already answered the waiver question.

QUESTION: But not – I mean, if today, given the – what you mentioned about the oil market and the fact that it seems to be well supplied and

PX378

oil prices are relatively low, would you feel comfortable bringing waivers to zero?

**MR HOOK:** We – because 2019 we forecast more supply than demand, there are better market conditions for us to accelerate our path to zero. We are not looking to grant any waivers or exceptions to our sanctions regime.

Last question for Abbie.

**QUESTION:** Thank you. You went through a lot of the economic impact of what you're seeing one year after from the sanctions. But what changes in behavior have you seen from Iran as far as their malign activities throughout the world that you have been pointing out for the last year?

**MR HOOK:** Well, that's what we wanted to highlight today. To some extent I feel like don't take my word for it; the Iranian regime is admitting it at the supreme leader level, the presidential – the level of the president. You've seen the leader of Hizballah make a public appeal for donations. You're seeing reporting in the *New York Times* front page on Friday last week chronicling how the combination of Iran's financial mismanagement plus American sanctions are impeding Iran's ability to fund its proxies and allies at the levels that they are accustomed to. And since Iran does supply Hizballah with 70 percent of its revenue, it is quite significant when you have the leader of Hizballah making a public appeal for money. He's obviously not getting as much as he needs to execute his objectives because, as he's attributed to, American sanctions.

So we think it's very much interest – in the interest of the Iranian people to join this effort of pressure, because we are seeing the results. And there were a lot of people who, when we got out of the deal, who were saying, "Oh, America alone, can you do this? This is going to be very hard without everybody joining you." And I think that that has now been proven wrong. We're only five months into the re-imposition of our sanctions, and we are now already seeing these effects that are being reported by others, not by us.

And so we think, as I said, we share the same threat assessment with so many – with our – with countries in the Middle East, with our European partners. When we were in Warsaw, we saw there – one nice consequence of Iran's foreign policy is that it has brought together Arabs and Israelis in a way that we had not thought possible.

PX378

And so you saw they have this common threat of Iran's foreign policy, its revolutionary foreign policy, and it is a very urgent matter. And so I remember Prime Minister Netanyahu saying in Warsaw when you see the Arabs and the Israelis agreeing as strongly as they do, you need to pay attention to that. Something very important is happening, and we're seeing it. We've been seeing it for a while, and I just wanted to give you an update on what we're seeing on the ground. Thank you.

**MR PALLADINO:** All right. Thanks, Brian.

**MR HOOK:** Thanks.

**MR PALLADINO:** All right. Hi, everyone.

Something for the top: The United States is deeply concerned by the Government of Burundi's decision to extend indefinitely the suspension of broadcasts by the Voice of America and to revoke the operating license of the British Broadcasting Corporation. This decision raises serious concerns for the freedom of expression enshrined in article 31 of Burundi's constitution as well as for Burundi's international human rights obligations. We call on the government to rescind its decision, and we urge the Government of Burundi to allow all journalists to operate in an environment free from intimidation. A free and independent media is indispensable to a vibrant, functioning democracy and to free and fair elections in 2020.

With that, I'd be happy to take some questions.

**QUESTION:** You sound subdued for some reason.

**MR PALLADINO:** Ah, do you want me to sing more, maybe, perhaps?

**QUESTION:** No. No, you just seemed a little subdued. Can I ask you —

**MR PALLADINO:** No, I – don't read into my – okay, I'll be more casual. Go ahead, Matt, please. (Laughter.)

**QUESTION:** Can I ask you a – one logistical question before getting into – and that is – the logistical question is: Why is the Secretary not going to the G7 Foreign Ministers Meeting?

**MR PALLADINO:** The Secretary has full faith in Deputy Secretary of State John Sullivan and his ability to advance America's national security interests at the G7 Foreign Ministers Meeting. In fact, the deputy secretary has previously represented the United States at the

PX378

G7 Foreign Ministers Meeting, and as you know, beginning today, the Secretary will host all NATO allies for a two-day NATO ministerial. Transatlantic alliances are stronger than ever, and in that same spirit, he'll be sending the deputy secretary.

QUESTION: Right. Well, except that the time that Deputy Secretary Sullivan attended the G7, he was actually the acting secretary of state; he wasn't the – I mean he was the deputy but was also acting secretary of state. I'm just – I mean, was there some reason that – does he have some kind of a conflict? Why – what's the —

MR PALLADINO: I have nothing to announce on the Secretary's future schedule at this time.

QUESTION: Okay. Can I ask you about the decision – the President's decision on aid to the Northern Triangle countries, El Salvador, Guatemala, and Honduras? I'm curious to know what kind of decision-making process or planning went into this, and how much money is actually going to be affected. It seems to me – the President went on at length about this in his meeting with the NATO secretary general, and he said that he understood what the money was for. But this administration has made a big play – a big push for countries that receive U.S. assistance to agree with or vote with it at the United Nations, et cetera. Both Honduras and Guatemala have signed on to the Lima Group consensus on Interim President Guaido in Venezuela. Guatemala has moved its embassy in Israel to Jerusalem, following the U.S. lead. So what kind of message does this send if they do what you ask them to and then you go ahead and take away money that was supposed to be going to alieve the very problem that you say they're being punished for?

MR PALLADINO: Right. To answer your question on money, at the Secretary's instruction, we are carrying out the President's direction to end foreign assistance programs for the Northern Triangle. The President's direction to end foreign assistance programs impacts approximately $450 million in Fiscal Year 2018 allocations. And the State Department along with the United States Agency for International Development currently are evaluating the impact on Fiscal Year 2017 funds. When we have further details to provide on that process moving forward, we'll be sure to let you know.

Regarding the decision itself, the President has made clear that the decision is aimed at securing United States borders and protecting

PX378

American citizens, and that's something that the Secretary of State is now pursuing. The President has determined that these programs have not effectively prevented illegal immigration from coming to the United States, and they've not achieved the desired results. We – political will and strong partnership are critical to ensuring the success of any foreign assistance program, and that's something that is true in this regard as well.

QUESTION: How much of this money actually goes to the governments and how much is actually distributed by USAID to NGOs and other groups, civil society groups?

MR PALLADINO: Yeah, I don't have a line item breakdown on distribution. I have the top line Fiscal Year 2018 method. But —

QUESTION: I mean, I think the overwhelming majority of this goes to nongovernmental organizations that are involved in – that run programs designed to reduce the threat. So exactly how is not spending this money or not sending this money securing the U.S. border and protecting Americans?

MR PALLADINO: Well it's clearly – it's not succeeded in stemming this flow.

QUESTION: Okay, so we —

MR PALLADINO: And we have a crisis situation.

QUESTION: Right.

MR PALLADINO: As the Secretary said, the numbers don't lie.

QUESTION: Okay. But —

MR PALLADINO: That must be addressed.

QUESTION: Okay —

MR PALLADINO: And the President has been clear repeatedly that this was something that he was considering, and he's made it clear that foreign assistance should be in support of America's national interests. And our national interests here are quite prioritized, and that is the crisis that we are facing along our border is a national security issue, and that's what we're addressing.

PX378

QUESTION: So obviously the – there is some alternative plan in place, other than just taking this money away, right?

MR PALLADINO: I have nothing further to announce today on future United States Government actions.

QUESTION: So you're just telling us that there's no – there's no – you – no one has an idea about how it can be better done or what would work?

MR PALLADINO: I didn't say that. What I said is I have nothing to announce today on future actions. Please.

QUESTION: Follow-up on that?

MR PALLADINO: Go ahead, Lesley.

QUESTION: Robert, as far as I understand, the State Department has to notify Congress of its decision to suspend this aid. Have you done that? And then what happens? Is there a period of time in which you then move forward? Can you just run us through the process, please?

MR PALLADINO: Right. The State Department and U.S. Agency for International Development intend to consult with and notify the Congress regarding the planned reprogramming of funds, and that will be consistent with all applicable requirements.

QUESTION: When will that happen?

MR PALLADINO: We are engaging Congress.

QUESTION: You are engaging?

MR PALLADINO: We are engaging Congress.

QUESTION: So currently the State Department is talking about this plan with Congress?

MR PALLADINO: We are engaging the Congress, and we intend to pursue additional consultations with, and eventually the notification too.

QUESTION: And on the amount, you mentioned you have at least one number, because there have been a number of different amounts reported out there, because some of it might be Fiscal Year '17 money

PX378

that could have been spent or wasn't spent. Can you break it down as much as you can?

**MR PALLADINO:** I can't at this point. The process is complicated. And that said, when we have those numbers and further details, we will be able to provide them at that point.

**QUESTION:** But the number that you have is what? You said you have a —

**MR PALLADINO:** Fiscal Year 2018, we're able to provide a specific number and that's $450 million.

**QUESTION:** Robert?

**QUESTION:** Iran?

**QUESTION:** More on aid?

**QUESTION:** More on aid?

**QUESTION:** Aid?

**MR PALLADINO:** Let's go to CBS, please.

**QUESTION:** Thank you. Can you – more of explaining, but can you say – I understand it's reprogramming – but what the authority is that you're using to do this? Is it just reprogramming, or does it have to do with the clause in the appropriations bill that gives the Secretary oversight for foreign aid to these three countries specifically?

My other question is, obviously, most foreign aid goes through State and USAID but not all of it. There's over 20 government agencies that deal with foreign aid in some form. Will this apply to all that aid, and will this apply to programs for the Millennium Challenge Corporation, which have hundreds of millions of dollars' worth of programs in those three countries?

**MR PALLADINO:** I don't have any specifics on the second part of your question. Regarding the first part, the funds will be reprogrammed consistent with all applicable requirements regarding congressional consultation and notification. Beyond that, I don't have anything further.

**QUESTION:** Taiwan?

PX378

QUESTION: Turkey?

QUESTION: I have one more on —

MR PALLADINO: One more? Go ahead, Abbie, please.

QUESTION: As I understand it, the law works as such that Congress has to approve that reprogramming. Given the congressional reaction so far, it seems they're not supportive of withdrawing that foreign assistance generally. If Congress insists that the reprogramming that is suggested is not something they support, is the State Department willing to see that money go back to Congress and not be spent?

MR PALLADINO: I don't want to engage in a hypothetical, but what I would say is that the President's decision is clear, and the Secretary of State has ordered us to march forward. We're going to continue to do that, and we intend to consult with and notify Congress as appropriate.

QUESTION: On the breakdown?

MR PALLADINO: Last one. This is the last one on this subject. I don't have much more. Go ahead.

QUESTION: Can you please talk a little bit about what the President sees as the motivation for those three countries? Does he believe that those Northern Triangle countries are insufficiently committed to the idea of stopping these migrant flows, that they want to stop them, that they have – but have not been able to? And what do they say in their conversations when the U.S. Government asks why they've been unable to stop these migrant flows?

MR PALLADINO: I don't have anything to report on what they're saying to the White House, if I understand your question correctly here.

QUESTION: Well, I mean, I would assume that some of those conversations would happen through the State Department as well or through the embassies. Were you – when the President made that threat some time ago to stop aid, there would have then been some sort of conversation where they would say, listen – I mean, do you have a sense of their intent? Do you believe that they have shown insufficient commitment to the work of stopping these migrant flows?

MR PALLADINO: What I would say is we need these countries to continue making the tough reforms that are necessary. I'll stop there.

PX378

Let's move on.

Go ahead, Laurie. Please.

QUESTION: Venezuela's foreign minister visited Ankara yesterday, and he was – and he reiterated Turkey's support, quote, "in all fields for Venezuela," to quote the Turkish foreign minister. What is your comment on that?

MR PALLADINO: I don't actually have anything on that, Laurie, and I am going to have to get back to you. Go ahead.

QUESTION: Okay. I've got another – I have another one.

QUESTION: (Off-mike.)

MR PALLADINO: Go ahead, please.

QUESTION: Turkey's ruling party is contesting the elections that it —

MR PALLADINO: Yeah.

QUESTION: — lost, apparently, in Istanbul and Ankara. And do you have any concerns that that contest by the AKP, that challenge by the AKP to the election results, could undermine their integrity?

MR PALLADINO: We're aware of those reports. I would say that free and fair elections are essential for any democracy, and this means acceptance of legitimate election results are essential. And we expect nothing less from Turkey, which has a long, proud tradition in this respect.

QUESTION: Robert —

MR PALLADINO: And to go back to your first question, sometimes our organization is lacking, Laurie. I do have a response to your question, and I apologize.

Regarding the visit itself, I would say that we call on all other governments to recognize Interim President Juan Guaido and to take steps to prevent Maduro from further stealing Venezuela's wealth. Additionally, we urge the international community to hold Maduro and other corrupt actors accountable and to take appropriate actions to end the theft of Venezuela's assets and prevent the travel of Maduro's cronies. Thanks.

PX378

**QUESTION:** And that would include the roughly $2 billion that Turkey imported from – of gold that Turkey imported from Venezuela last year?

**MR PALLADINO:** I don't have anything specific on that specific transaction, but the general principle remains.

Go ahead, Said, please.

**QUESTION:** Yes, thank you, Robert. Ambassador Dennis Ross, a former official in many administrations, Republican and Democrat, along with his colleague, David Makovsky, wrote a lengthy article in *The Washington Post*, where they're saying that your Golan policy basically invites the Israeli right wing to annex the West Bank and that you ought to do – make a declaration. Will you make a declaration that the West Bank is occupied territory and is not to be tampered with by whoever – any group that may annex it?

**MR PALLADINO:** I —

**QUESTION:** Do you have any comment on his article?

**MR PALLADINO:** I haven't read his article, but I can say I'm not going to speak about hypotheticals, and our policy on the West Bank has not changed.

**QUESTION:** But Ambassador Ross was probably – was more involved with this process than probably any other official in town, has a long history. He knows what he's talking about. He's saying that next it will be the right-wing groups annexing part of the West Bank. Would you perhaps preemptively – I don't know, maybe you can say that you should not do this?

**MR PALLADINO:** Yeah, not going to speak about hypotheticals. I would just say this administration is firmly committed to pursuing a comprehensive peace between the Israelis and the Palestinians, and I have nothing further on this topic.

Go ahead, Shaun, please.

**QUESTION:** Can we move on to Iran for a bit?

**MR PALLADINO:** To Iran?

**QUESTION:** To Iran.

PX378

**MR PALLADINO:** Oh, there wasn't enough at the beginning.

**QUESTION:** There wasn't enough. (Inaudible.)

**MR PALLADINO:** Okay, please. (Inaudible.)

**QUESTION:** Well, one question —

**QUESTION:** (Inaudible.) (Laughter.) I didn't quite get what Brian was saying.

**QUESTION:** Well, one part specifically, regarding the Secretary's —

**MR PALLADINO:** Really? Okay. Okay. (Laughter.)

**QUESTION:** Regarding the Secretary's —

**QUESTION:** You don't like Iran, right? That's the —

**MR PALLADINO:** Please, go ahead, Shaun. Okay.

**QUESTION:** Regarding the Secretary's statement this morning about the aid – or about the floods —

**MR PALLADINO:** Right.

**QUESTION:** — he mentioned that the United States was willing to contribute via the Red Crescent. The head of the Iranian Red Crescent is saying that because of the U.S. sanctions, because of the regulations on SWIFT, that the Iranian Red Crescent side actually can't reach funding from the umbrella organization. Iran has also said that helicopters, spare parts in particular, that they don't have access to those. Is the U.S. willing to address those specific concerns in terms of aid? Does the U.S. have a concern that its sanctions overall could be hurting the relief effort?

**MR PALLADINO:** I guess I would echo what Special Representative Hook said earlier, that the floods demonstrate the level of Iranian regime's mismanagement in urban planning and in emergency preparedness. Furthermore, I would say the United States stands ready to assist and to contribute to the International Federation of the Red Cross and the Red Crescent Societies, which would then direct the money through the Iranian Red Crescent for relief. We stand ready to do that. And I'd point out that we remain the largest donor of humanitarian assistance in the world, and every sanctions regime that we have made makes exceptions for food, for medicine, and for

PX378

medical devices. I would also point out that the – this Iranian regime has a history of creating front companies to divert the distribution of humanitarian goods. And financial institutions around the world know of this track record, they know this history of deceiving banks when it comes – when it comes – regards to the sale of humanitarian goods.

So the burden is on Iran here to open up its dark economy so that banks around the world have more confidence that when they facilitate a humanitarian transaction, that the humanitarian goods will actually reach the people. And the regime makes it very difficult to facilitate humanitarian goods and services. I'll stop there.

**QUESTION:** NATO?

**QUESTION:** (Off-mike.)

**QUESTION:** Robert, is it the administration's position that all natural disasters everywhere are caused by that government's mismanagement of natural – of emergency preparedness and water management?

**MR PALLADINO:** Absolutely not. Brian Hook spoke earlier —

**QUESTION:** Only Iran.

**MR PALLADINO:** No, please. Brian Hook spoke specifically earlier about the environmental degradation that has been wreaked across the Iranian regime.

**QUESTION:** Right. No doubt, but natural disasters happen everywhere, including in this country.

**MR PALLADINO:** And of course. And our —

**QUESTION:** And it's not always the fault of mismanagement.

**MR PALLADINO:** And we would never insist that they are. And we have offered our condolences, because at the end of the day here we are extremely sympathetic for the victims of this recent flood. And I'll stop there. Please.

**QUESTION:** (Off-mike.)

**MR PALLADINO:** Let's – I'm going to go to CNN. Go ahead.

PX378

**QUESTION:** Okay. So since burden-sharing is on the agenda again, can we expect to hear the same kinds of statements from the administration strongly urging or hounding NATO allies to contribute more, or would you say that given the progress that has been made, the administration is now satisfied with who's on track and who's not?

**MR PALLADINO:** I don't want to get ahead of the ministerials that are coming, but burden-sharing is definitely a priority for this administration. And where we're on track, we're on track; where we're not on track, you can expect there to be further discussion encouraging more progress on this regard.

**QUESTION:** How many countries – in the State Department's view, how many countries meet the 2 percent GDP contribution to their defense?

**MR PALLADINO:** I don't have all the facts in front of me on the statistics in that regard, so I don't want to misspeak at this point.

**QUESTION:** (Off-mike.)

**MR PALLADINO:** Let me go to Cindy, please.

**QUESTION:** Thank you. With the summit about to get underway, how big an issue – the tensions with Turkey over their purchase of the missile defense system from Russia, and what are you hearing from other – do other countries, NATO allies, support the U.S. position on this?

**MR PALLADINO:** I guess I'd say at the top, if we're talking about NATO in general, this is an old organization that certainly has had challenges previously, things that we've had to work through. It's a pretty resilient organization, and we are – it's the most successful alliance probably in the history of the world, for that matter, and it's something that we continue to take – that remains at the core of our national security and it's something that's being prioritized – will continue to be a priority for the United States.

Regarding the specific sales that you're referencing in regards to Turkey, we've been – no surprise here – we've been pretty clear on these issues for some time right now, and specifically the procurement of the S-400 would put Turkey's continued participation in the 14-nation F-35 program at risk. So what you saw yesterday was the Department of Defense announcement that, as discussions on

PX378

this matter continue, it would be taking prudent steps to protect the shared investments made by the United States and our allies, including Turkey, in these critical defense technologies. And DOD announced that pending an unequivocal Turkish decision to forgo delivery of the S-400, deliveries and activities with the stand-up of the Turkey F-35 operational capability have been suspended and secondary sources of supply for Turkish produced parts are in development. That was the announcement that they made yesterday.

So again, this is not new. This is something we've spoken about a lot from this – from the State Department, and here we are.

QUESTION: Are you hearing from other NATO allies about what – how they see this – these – this dispute or —

MR PALLADINO: Nothing to disclose from the podium. We'll be taking a look at all kinds of issues that impact NATO's readiness this week.

QUESTION: (Off-mike.)

QUESTION: Robert, it's the same topic.

MR PALLADINO: Okay, let's stay on topic. Go ahead.

QUESTION: Thank you. So Turkish Foreign Minister Mevlut Cavusoglu is arriving in Washington for the summit, and he's expected to meet his American counterpart, Secretary Pompeo. Are they going to talk about this issue, F-35s, and do you know – can you say anything —

MR PALLADINO: I don't have any bilateral meetings to announce today to talk about, but – I'll leave it at that. Please, go ahead.

QUESTION: (Off-mike.)

MR PALLADINO: Janne, please.

QUESTION: Thank you. North Korea. North – yesterday, Secretary Pompeo mentioned optimistically about the U.S.-North Korea talks. Are there any signal that North Korea will resume its summit again?

MR PALLADINO: The Secretary yesterday was basically making clear again that the United States is ready to proceed and nothing further beyond that. I wouldn't read any more into it. Our efforts are ongoing. All right.

QUESTION: (Off-mike.)

PX378

QUESTION: One more. If South Korean Government suggested a top-down style for the U.S.-North Korea talk, will the U.S. accept it?

MR PALLADINO: We're in close coordination with our allies – Republic of Korea, as well as Japan – and all future actions are something that we do in close coordination.

Go ahead. Let's go to NHK. Ben, go ahead.

QUESTION: Thank you, Robert. I have two quick questions. The first one is: Could I get a reaction to these two Chinese jets that flew into Taiwan airspace? Taiwan characterized it as reckless and provocative. Do you agree with that characterization?

And then my second question is on Hong Kong. The Hong Kong Government is currently considering revising legislation to allow extradition of criminals to Chinese authorities. Do you have any comment or concern about that?

MR PALLADINO: I haven't seen that specific – or I'll say we're aware of that legislation, and we're going to follow related developments to it closely. I don't have anything further at this point.

Regarding Taiwan, we note Ambassador Bolton's tweet yesterday. And I would add to that that the United States opposes unilateral actions by any party that are aimed at altering the status quo, including anything related to force or coercion. And such unilateral efforts are harmful and do not contribute to regional stability, and they undermine the framework that has enabled peace and stability and development for decades. Beijing should stop its coercive efforts and resume dialogue with the democratically elected administration on Taiwan.

And I'll stop there. Please.

QUESTION: Wouldn't that – wouldn't you say that that policy extends beyond the Taiwan Strait to other places?

MR PALLADINO: I need more specifics. I don't understand the question.

QUESTION: Well, you said the U.S. opposes unilateral actions that affect the status quo. And I'm just wondering, that applies there in the – to the Taiwan Strait, but does it apply elsewhere, say, perhaps the Middle East, where this administration has taken numerous unilateral

PX378

steps that affect the status quo. And if you apply the same principle, you would, in fact, oppose the steps the administration has taken. Is that not correct?

**MR PALLADINO:** We – yeah, we've got different fact scenarios and we've got – that we're dealing with, different actors in the region, and we take – we take the world as we find it. We're not looking for – go ahead, Michel, please.

**QUESTION:** Do you have a comment on the resignation of the Algerian president after 20 years in power?

**MR PALLADINO:** Yeah, I saw that that was just – just broke. I mean, I'm aware of that. I don't have any specific reaction other than we continue – the United States – questions about how to navigate this transition in Algeria, that is for the Algerian people to decide. And beyond that I don't have anything further at this point.

**QUESTION:** Robert, India?

**MR PALLADINO:** Okay, let's go to India, please. Tejinder.

**QUESTION:** Yes. Do you have any official reaction to India's anti-satellite missile test? As the NASA chief has said, it has called it a terrible, terrible thing to create.

**MR PALLADINO:** Yeah, we – I think we spoke a little bit about this last week. But as we've said previously, we have a strong strategic partnership with India, and we will continue to pursue shared interests in space, in scientific and technical cooperation with India, and that includes collaboration on safety and security in space.

Now, the issue of space debris, that is an important concern for the United States, and I would say that we took note of the Indian Government's statements that the test was designed to address space debris issues. And I'll stop there. And —

**QUESTION:** Are you —

**MR PALLADINO:** Okay, go ahead, Tejinder, please. We need to wrap this up. Go ahead.

**QUESTION:** Are you sending any kind of any election monitors to the – this general elections in India from (inaudible)?

PX378

**MR PALLADINO:** I'm not aware of anything in that regard. Guys, I'm sorry, but we have to go. I gotta go, gotta go.

**QUESTION:** (Inaudible). Has Heather Nauert officially – has she ended her role in the State Department officially now?

**MR PALLADINO:** Heather no longer works for the State Department. She's been a great colleague. Thanks.

(The briefing was concluded at 3:50 p.m.)

Tags

PX378