# PX382



# U.S.-IRAN TENSIONS: IMPLICATIONS FOR HOMELAND SECURITY

## HEARING

BEFORE THE

## COMMITTEE ON HOMELAND SECURITY

## HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

SECOND SESSION

JANUARY 15, 2020

### Serial No. 116–57

Printed for the use of the Committee on Homeland Security



Available via the World Wide Web: http://www.govinfo.gov

U.S. GOVERNMENT PUBLISHING OFFICE

41–269 PDF                    WASHINGTON : 2020

PX382

## COMMITTEE ON HOMELAND SECURITY

BENNIE G. THOMPSON, Mississippi, *Chairman*

| | |
|---|---|
| SHEILA JACKSON LEE, Texas | MIKE ROGERS, Alabama |
| JAMES R. LANGEVIN, Rhode Island | PETER T. KING, New York |
| CEDRIC L. RICHMOND, Louisiana | MICHAEL T. McCAUL, Texas |
| DONALD M. PAYNE, JR., New Jersey | JOHN KATKO, New York |
| KATHLEEN M. RICE, New York | MARK WALKER, North Carolina |
| J. LUIS CORREA, California | CLAY HIGGINS, Louisiana |
| XOCHITL TORRES SMALL, New Mexico | DEBBIE LESKO, Arizona |
| MAX ROSE, New York | MARK GREEN, Tennessee |
| LAUREN UNDERWOOD, Illinois | VAN TAYLOR, Texas |
| ELISSA SLOTKIN, Michigan | JOHN JOYCE, Pennsylvania |
| EMANUEL CLEAVER, Missouri | DAN CRENSHAW, Texas |
| AL GREEN, Texas | MICHAEL GUEST, Mississippi |
| YVETTE D. CLARKE, New York | DAN BISHOP, North Carolina |
| DINA TITUS, Nevada | |
| BONNIE WATSON COLEMAN, New Jersey | |
| NANETTE DIAZ BARRAGÁN, California | |
| VAL BUTLER DEMINGS, Florida | |

HOPE GOINS, *Staff Director*
CHRIS VIESON, *Minority Staff Director*

(II)

PX382

# C O N T E N T S

——————

Page

STATEMENTS

The Honorable Bennie G. Thompson, a Representative in Congress From the State of Mississippi, and Chairman, Committee on Homeland Security:
Oral Statement ........................................................................................................... 1
Prepared Statement .................................................................................................. 2
The Honorable Mike Rogers, a Representative in Congress From the State of Alabama, and Ranking Member, Committee on Homeland Security:
Oral Statement ........................................................................................................... 3
Prepared Statement .................................................................................................. 4

WITNESSES

Ms. Barbara A. Leaf, Director, Geduld Program on Arab Politics, Washington Institute:
Oral Statement ........................................................................................................... 6
Prepared Statement .................................................................................................. 8
Mr. Vincent Stewart, Special Advisor and Chairman, Board of Advisors, Middle East Media Research Institute:
Oral Statement ........................................................................................................... 12
Prepared Statement .................................................................................................. 14
Mr. Thomas S. Warrick, Nonresident Senior Fellow, Atlantic Council:
Oral Statement ........................................................................................................... 22
Prepared Statement .................................................................................................. 24
Mr. Anthony J. Tata, CEO and President, Tata Leadership Group:
Oral Statement ........................................................................................................... 27
Prepared Statement .................................................................................................. 29

FOR THE RECORD

The Honorable Bennie G. Thompson, a Representative in Congress From the State of Mississippi, and Chairman, Committee on Homeland Security:
Letter From the Jewish Federations of North America ..................................... 63

(III)

PX382

PX382

# U.S.-IRAN TENSIONS: IMPLICATIONS FOR HOMELAND SECURITY

———

**Wednesday, January 15, 2020**

U.S. HOUSE OF REPRESENTATIVES,
COMMITTEE ON HOMELAND SECURITY,
*Washington, DC.*

The committee met, pursuant to notice, at 10:03 a.m., in room 310, Cannon House Office Building, Hon. Bennie G. Thompson [Chairman of the committee] presiding.

Present: Representatives Thompson, Jackson Lee, Langevin, Richmond, Correa, Torres Small, Underwood, Slotkin, Green of Texas, Titus, Barragán, Demings; Rogers, King, Katko, Higgins, Green of Tennessee, Joyce, Crenshaw, Guest, and Bishop.

Chairman THOMPSON. The Committee on Homeland Security will come to order.

The committee is meeting today to receive testimony on "U.S.-Iran Tensions: Implications for Homeland Security." Without objection, the Chair is authorized to declare the committee in recess at any point.

Good morning. Today the committee is meeting to examine the Homeland Security implications of the recent escalation in U.S.-Iran tensions in the wake of the killing of Qassem Soleimani. Iran and Iranian-linked terrorists have shown a capability and willingness to conduct terrorist attacks against the United States and our allies and interests abroad. Clearly the escalation of tensions between the United States and Iran could have dire consequences for the security of the homeland.

More broadly, the suspension of U.S.-led counterterrorism efforts against ISIS in the region ostensibly, in order to focus on the threat from Iran and its proxies may allow ISIS to reconstitute in unsecured areas of Iraq and Syria. This would dramatically undermine the fight against ISIS and make U.S. interests abroad and home less safe.

As Members of Congress we have an obligation to do everything in our power to protect our constituents by defending the Nation from physical attacks, cyber attacks and influence campaigns designed to undermine our democracy and sway public opinion in favor of Iran, or its friends.

I am deeply concerned that President Trump has no strategy and his administration has failed to plan adequately for addressing the Homeland Security consequences that might follow military actions in Iran. The administration must immediately put forward a measured comprehensive strategy that accounts for potential threats to the homeland from Iranian actors and their proxies.

PX382

2

As part of that strategy, the Department of Homeland Security must ensure it is prepared for all contingencies related to the escalation in U.S.-Iran tensions. I look forward to a frank discussion today about what the strategy should be. I am particularly interested in understanding how Iran could use its relatively sophisticated cyber capabilities against State and local governments and critical infrastructure to extract revenge for the death.

We need to understand whether potential targets are prepared to defend against Iranian cyber threats and what the Federal Government can do to help them if they are not. Although there have been no specific threats to the critical infrastructure, escalation of tensions with any adversary demands that we take stock of all the current measures we employ to defend ourselves. This is particularly true in the case of Iran, a country that is unpredictable in its responses and hide behind proxies and sympathizers to do its dirty work.

Toward that end I would be remiss if I did not note that the Chemical Facilities Anti-Terrorism Standards Program is set to expire in April. Although the House has begun work on reauthorizing this important antiterrorism program, the Senate has not. At this point it is unclear if the Senate intends to work with the House to reauthorize the program. I urge the Senate to begin work on this National security priority. It would be irresponsible to allow the program to lapse at this time.

Finally, in recent weeks we have seen an uptick in Iran's influence activity on social media. I do not need to tell anyone here that it is an election year and influence activity is bound to increase. Given the committee's election security work, I am concerned Iran might escalate its influence activities as we approach the election and what more the Federal Government and its private-sector partners should be doing to counter Iranian messaging.

We need to be prepared to confront and defend against Iran's influence efforts and ensure the integrity of our democracy and our most sacred institutions. We are fortunate to be joined by witnesses with vast experience with the Department of State, Defense, and Homeland Security as well as expertise in matters related to Iran.

I look forward to a productive discussion today and remain committed to ensuring this committee does its part to help secure the homeland from threats posed by Iran, its proxies, or any other who would seek to do to harm to Americans.

The Chair now recognizes the Ranking Member of the full committee, the gentlemen from Alabama, Mr. Rogers, for an opening statement.

[The statement of Chairman Thompson follows:]

STATEMENT OF CHAIRMAN BENNIE G. THOMPSON

JANUARY 15, 2020

Today, the committee is meeting to examine the homeland security implications of the recent escalation in U.S.-Iran tensions in the wake of the killing of Qasem Soleimani. Iran and Iranian-linked terrorists have shown a capability and willingness to conduct terrorist attacks against the United States and our allies and interests abroad. Clearly, the escalation of tensions between the United States and Iran could have dire consequences for the security of the homeland. More broadly, the suspension of U.S.-led counterterrorism efforts against ISIS in the region, ostensibly in order to focus on the threat from Iran and its proxies, may allow ISIS to reconsti-

PX382

3

tute in unsecured areas of Iraq and Syria. This would dramatically undermine the fight against ISIS and make U.S. interests abroad and home less safe.

As Members of Congress, we have an obligation to do everything in our power to protect our constituents by defending the Nation from physical attacks, cyber attacks, and influence campaigns designed to undermine our democracy and sway public opinion in favor of Iran or its friends. I am deeply concerned that President Trump had no strategy and his administration has failed to plan adequately for addressing the homeland security consequences that might follow military action in Iran. The administration must immediately put forward a measured, comprehensive strategy that accounts for potential threats to the Homeland from Iranian actors and their proxies.

As part of that strategy, the Department of Homeland Security must ensure it is prepared for all contingencies related to the escalation in U.S.-Iran tensions. I look forward to a frank discussion today about what that strategy should be. I am particularly interested in understanding how Iran could use its relatively sophisticated cyber capabilities against State and local governments and critical infrastructure to exact revenge for the death of Soleimani. We need to understand whether potential targets are prepared to defend against Iranian cyber threats, and what the Federal Government can do to help them if they are not. Although there have been no specific threats to critical infrastructure, escalation of tensions with any adversary demand that we take stock of all the current measures we employ to defend ourselves. This is particularly true in the case of Iran, a country that is unpredictable in its responses and hides behind proxies and sympathizers to do its dirty work.

Toward that end, I would be remiss if I did not note that the Chemical Facilities Anti-Terrorism Standards Program is set to expire in April. Although this House has begun work on reauthorizing this important anti-terrorism program, the Senate has not. At this point, it is unclear if the Senate intends to work with the House to reauthorize the program. I urge the Senate to begin work on this National security priority. It would be irresponsible to allow the program to lapse at this time.

Finally, in recent weeks, we have seen an uptick in Iran's influence activity on social media. I do not need to tell anyone here that it is an election year, and influence activity is bound to increase. Given this committee's election security work, I am concerned Iran might escalate its influence activities as we approach the election and what more the Federal Government and its private-sector partners should be doing to counter Iranian messaging. We need to be prepared to confront and defend against Iran's influence efforts and ensure the integrity of our democracy and our most sacred institutions.

We are fortunate to be joined by witnesses with vast experience with the Departments of State, Defense, and Homeland Security and expertise in matters related to Iran. I look forward to a productive discussion today and remain committed to ensuring this committee does its part to help secure the homeland from threats posed Iran, its proxies, or any others who would seek to do America harm.

Mr. ROGERS. Thank you, Mr. Chairman. Iran has been escalating tensions in the Middle East for decades. Since the Nuclear Deal was signed, Iran's malign activities have only increased.

The $100 billion in assets released by the Obama administration helped Iran enhance the manpower and capability of its terrorist proxies. It helped Iran to conduct vicious cyber attacks on private industry and allied nations. It enabled them to grow their missile stockpiles and improve their lethality.

Six months after it signed the JCPOA, Iran conducted ballistic missile test with missiles carrying the inscription, "Israel should be wiped off the Earth". It is clear that the Obama-era policies of appeasement did not work. The President was right to take the United States out of the JCPOA and reimpose sanctions.

The President understood that the JCPOA was not going to contain Iran. That flawed deal was doing nothing to end the very clear and direct threat the Iranian regime poses to the United States, Israel, and the rest of our allies. For over a decade, Iran has funneled money, terrorists, and advanced weapons to its proxies in Iraq, Syria, and Lebanon, who used them to attack U.S. troops and Israeli citizens.

PX382

4

In doing so, Iran is responsible for the deaths of over 600 Americans. The latest American murdered at the hands of Iran was a civilian contractor and father of 2 young children in California. Fortunately, the President took decisive action to eliminate the brutal terrorist primarily responsible for his death and the deaths of thousands of others.

Qassem Soleimani was sanctioned as a terrorist by the United Nations and the Obama administration. For over 20 years he lived at IRGC's Quds Force, a foreign terrorists' organization. Soleimani was not visiting Baghdad because it was a great holiday destination. He was there with—as some peace envoy—he was not there as some peace envoy. He was there to meet with a leader of a terrorist group to plan more attacks on Americans.

The President used the law and his Constitutional authority as commander-in-chief to eliminate this terrorist mastermind before he could kill again. For the first time in years Iran received the message that there will be no real consequences should they continue to threaten—that there will be real consequences should they continue to threaten the United States and our allies.

I hope Iran understands this message and finally ends their malicious and destabilizing actions in the Middle East. I also hope that the Iranian regime understands that the United States will not hesitate to defend our homeland against any threat that they advance.

For years the Department of Homeland Security, FBI, and other law enforcement partners have kept close watch on Iran's intentions and its capability to strike our homeland. The threat from Iran is real. We know they continue to shelter senior al-Qaeda leaders and allow them to conspire with other terrorists.

We have witnessed their cyber attacks on our industry and local government. We thwarted their plots to conduct assassinations in the United States and we have arrested their operatives for surveilling critical infrastructure and plotting attacks on our homeland. We must remain vigilant in the face of these threats. It is more important than ever for Americans to report suspicious activity to law enforcement at every level to share information and intelligence on threats to our security.

Nearly all committee Members attended the threat briefing with senior DHS officials last week to learn more about the Iranian threat and the Department's response. I want to commend the Acting Secretary Wolf for the actions the Department is taking to mitigate the threat from Iran. I look forward to continuing this committee's bipartisan efforts to ensure DHS has the authority and resources it needs to successfully counter the threat from Iran and other sponsors of terror.

I thank the witnesses for coming and I thank each of them for their service to our Nation. I look forward to a constructive hearing and good discussion on what actions the Government should take to counter the threat from Iran, and I yield back.

[The statement of Ranking Member Rogers follows:]

STATEMENT OF RANKING MEMBER MIKE ROGERS

JANUARY 15, 2020

Iran has been escalating tensions in the Middle East for decades.

PX382

5

Since the nuclear deal was signed, Iran's malign activities have only increased.

The $100 billion in assets released by the Obama administration helped Iran enhance the manpower and capability of its terrorist proxies.

It helped Iran to conduct vicious cyber attacks on private industry and allied nations.

It enabled them to grow their missile stockpiles and improve their lethality.

Six months after it signed the JCPOA, Iran conducted ballistic missile tests with missiles carrying the inscription "Israel should be wiped off the earth."

It is clear the Obama-era policies of appeasement did not work.

The President was right to take the United States out of the JCPOA and reimpose sanctions on Iran.

The President understood that the JCPOA was not going to contain Iran.

That flawed deal was doing nothing to end the very clear and direct threat the Iranian regime poses to the United States, Israel, and the rest of our allies.

For over a decade, Iran has funneled money, terrorists, and advanced weapons to its proxies in Iraq, Syria, and Lebanon, who used them to attack U.S. troops and Israeli citizens.

In so doing, Iran is responsible for the deaths of over 600 Americans.

The latest American murdered at the hands of Iran was civilian contractor and father of 2 young children in California.

Fortunately, the President took decisive action to eliminate the brutal terrorist primarily responsible for his death and the deaths of thousands of others.

Qussem Souleimani was sanctioned as a terrorist by the United Nations and the Obama administration.

For over 20 years, he led the IRGC's Quds Force, a foreign terrorist organization.

Souleimani was not visiting Baghdad because it's a great holiday destination.

He wasn't there as some peace envoy.

He was there to meet with the leader of a terrorist group to plan more attacks on Americans.

The President used the law and his Constitutional authority as commander-in-chief to eliminate this terrorist mastermind before he could kill again.

For the first time in years, Iran received the message that there will be real consequences should they continue to threaten the United States and our allies.

I hope Iran understands this message and finally ends their malicious and destabilizing actions in the Middle East.

I also hope the Iranian regime understands that the United States will not hesitate to defend our homeland against any threat they advance.

For years, the Department of Homeland Security, the FBI, and other law enforcement partners have kept close watch on Iran's intentions and its capability to strike our homeland.

The threat from Iran is real.

We know they continue to shelter senior al-Qaeda leaders and allow them to conspire with other terrorists.

We've witnessed their cyber attacks on our industry and local government.

We've thwarted their plots to conduct assassinations in the United States.

We've arrested their operatives for surveilling critical infrastructure and plotting attacks on the homeland.

We must remain vigilant in the face of these threats.

It is more important than ever for Americans to report suspicious activity and for law enforcement at every level to share information and intelligence on threats to our security.

Nearly all committee members attended a threat briefing with senior DHS officials last week to learn more about the Iranian threat and the Department's response.

I want to commend Acting Secretary Wolf for the actions the Department is taking to mitigate the threat from Iran.

I look forward to continuing this committee's bipartisan efforts to ensure DHS has the authority and resources it needs to successfully counter the threat from Iran and other sponsors of terror.

I thank the witnesses for coming and I thank each of them for their service to our Nation.

I look forward to a constructive hearing and a good discussion on what actions the Government should take to counter the threat from Iran.

Chairman THOMPSON. Thank you very much. Other Members of the committee are reminded that under the committee rules opening statements may be submitted for the record.

PX382

6

I welcome our panel of witnesses today. Our first witness, Ambassador Barbara A. Leaf is the Ruth and Sid Lapidus fellow and director of the Geduld Program of Arab Politics at the Washington Institute for the Near East policy. Ambassador Leaf served as U.S. Ambassador to the United Arab Emirates from 2014 to 2018.

Next we are joined by Lieutenant General Vincent R. Stewart who served as a special advisor and chairman of Middle East Media Research Institute Board of Advisors. Lieutenant General Stewart formally served as the deputy commander of the U.S. cyber command and director of the Defense Intelligence Agency.

We also are joined by Mr. Thomas Warrick, a non-resident senior fellow at the Atlantic Council. Mr. Warrick previously served as the deputy assistant secretary for counter-terrorism policy at the Department of Homeland Security from 2008 to 2019.

Finally, we are joined by Brigadier General Anthony Tata, the CEO and president of Tata Leadership Group. After retiring from a 28-year career in the United States Army, Brigadier General Tata recently served as North Carolina's Secretary of Transportation.

Without objections the witnesses' full statement will be inserted in the record.

I now ask each witness to summarize his or her statement for 5 minutes beginning with Ambassador Leaf.

## STATEMENT OF BARBARA A. LEAF, DIRECTOR, GEDULD PROGRAM ON ARAB POLITICS, WASHINGTON INSTITUTE

Ms. LEAF. Chairman Thompson, Ranking Member Rogers, distinguished Members of the committee, what comes next after the January 3 killing of Quds Force commander Qassem Soleimani and a senior Iraqi militia commander?

In my view we cannot take literally Foreign Minister Zarif's statement that with Iran's missile strikes on U.S. Forces in Iraq, Iran has concluded proportionate measures in self-defense. Rather, we are in a pause in an escalatory cycle. The factors driving this cycle are numerous, although Soleimani's quest to drive the United States from the region is long-standing.

The essential stalemate between Washington's maximum pressure campaign and Tehran's maximum resistance campaign: Tehran's view that it is already in a war, an economic war waged by the United States. Its leaders' conviction that they have staying power and tools that the United States lacks. Attacks on shipping, assassinations, terrorism, formidable regional proxies, providing Tehran myriad ways to continue countering U.S. pressure. Thus the impasse. Thus the continuing threats.

I will focus here on Iraq and the Persian Gulf where Tehran will almost certainly revert to a campaign of pressure. In Iraq, Tehran has long judged, enjoys a decisive advantage over the United States in influence and coercive tools. In the Gulf, Tehran has repeatedly demonstrated to Washington's closest allies their strategic role and abilities are acute, notwithstanding the presence of longstanding U.S. military facilities and thousands of U.S. service members.

In Iran, Soleimani leaves behind a well-oiled disciplined machine acting on behalf of a regionally powerful, if economically stressed, state. In Iraq, Iranian-affiliated militias are pushing hard to fulfill

PX382

7

his vision, forcing the departure of the 5,000 strong U.S. military training mission. The pressure is unrelenting within the government on Shia and Kurdish politicians and most brutally against Iraqi protestors who reject both Iranian interference and the recent threat-induced parliamentary vote.

The Iraq of 2020 aptly reflects Soleimani's efforts in Iraq, always weak vis-à-vis Iran and the government, itself, suborned and weakened by a set of proxy armed actors not under the state's control and largely pliant under Iranian direction. Today some 3 dozen such militias operate in Iraq commanding some 60,000 members.

They flout Iraqi law and the Constitution, operate training sites and arms depots that are no-go zones for the Iraqi security forces. They have repeatedly targeted U.S. military sites and U.S. diplomatic facilities over the past 18 months; participate in Iran's program to transfer advance missile technology to Lebanese Hezbollah and targeted the Saudi East West Pipeline.

Whether these militias will take on a future Hezbollah style role abroad, acting on Iran's behalf is as yet an open question. While fully half of the 70- to 80,000 U.S. forces deployed in the Middle East are ranged across the 6 GCC countries, these countries have felt extraordinarily exposed and vulnerable amidst escalating tensions between the United States and Iran, and Iranian attacks on Gulf energy infrastructure and oil tankers in 2019.

They are acutely vulnerable to Iran's full suite of asymmetrical tools, cyber in particular. A prolonged takedown of the electrical grids alone would be devastating. I will say that the administration's responses throughout that period of last year's attacks by Iran were contradictory and somewhat confusing.

This and the lack of U.S. response to the earlier attacks appear to have led Tehran to calculate that it bore little risk of reprisal, especially in September 2014. Why do these activities in the Gulf or in Iraq via proxies, matter for U.S. Homeland Security?

Number 1, oil. Notwithstanding the new U.S. role as an energy mega giant, oil remains a global commodity, its price affected directly by security or insecurity in the Persian Gulf, carrying a knock-on effect for economies including our own.

Number 2, counterterrorism. Our ability to pursue robust counter-terrorism efforts with dependable allies directly affects our security at home. Sustaining critical training for Iraqi security forces, intelligence sharing and acquisition leading the enduring defeat of ISIS in Iraq and Syria are now very much in question. ISIS cell attacks in Iraq alone last year numbered nearly 900.

If we are compelled to pull U.S. trainers from Iraq, sustaining them in Syria will be impossible in my view.

Finally, regional stability. In Karim Sadjadpour's words, Qassem Soleimani's sinister genius was marshalling both Sunni and Shia extremists to bring a wrecking ball earlier to the U.S. project in Iraq, then building out a foreign legion to expand Iran's influence far across the Arab Middle East.

This project of constructing parallel institutions to the state that suborn it and follow foreign direction is vividly on display in Iraq, Syria, and Lebanon. It's a recipe for chronic instability and insecurity across a widening arc of territory that is home to nearly 70 million people, the globe's fourth-largest oil producer, source of a

PX382

8

global extremist scourge and source of more than 8 million refugees.

Thank you.

[The prepared statement of Ms. Leaf follows:]

PREPARED STATEMENT OF BARBARA A. LEAF

JANUARY 15, 2020

Chairman Thompson, Ranking Member Rogers, distinguished Members of the committee, thank you for the opportunity to come before the committee today to discuss a set of issues which has gripped the U.S. Government, the Congress, and indeed, much of the American public for the last 2 weeks. The subject you have asked me and my fellow panelists to address is a critical one—the homeland security implications of rising U.S.-Iran tensions; specifically, what we might anticipate in the aftermath of the U.S. lethal targeting of Qassem Soleimani on January 3. I would like to acknowledge up front a debt I owe to the invaluable primary research and analysis on the Shia militias that form Qassem Soleimani's "foreign legion" of proxies, done by my colleagues at the Washington Institute, Phillip Smyth and Michael Knights, work which has been invaluable background for my discussion today.

Four days after Soleimani's death, Iran responded dramatically, with a volley of ballistic missiles directed at 2 bases hosting U.S. military trainers in Iraq. We cannot take FM Javad Zarif's statement immediately afterwards—that Iran has "concluded proportionate measures in self-defense"—as a signal that Tehran's missile strike definitively brings this matter to a close, however. Rather, we are in a pause in an escalatory cycle, one in which the United States and Iran are very likely to find themselves once again facing decisions on a kinetic response, sooner rather than later.

The factors driving this cycle are numerous, although Soleimani's vision to drive the United States from the region is long-standing—the essential stalemate between Washington's "maximum pressure campaign" and Tehran's "counter-pressure campaign" sets the more immediate context; Iran's move up the escalatory ladder was on vivid display last summer in the waters of the Persian Gulf, against Saudi Aramco, and in repeated attacks on U.S. military and civilian personnel in Iraq. Tehran's view is that it is already in a war, an economic war waged by the United States, but its leaders are equally convinced that they have staying power and tools that the United States lacks. Iran has developed doctrine, systems, and methods for operating in the "gray zone" rather than in head-on conventional conflicts, and its array of asymmetrical tools, which range from attacks on shipping, assassination, terrorism, to a formidable array of regional proxies provide it the way to continue countering U.S. pressure. While wreaking revenge. As Suzanne Maloney put it recently, "The regime's determination to end the American siege is magnified by an ideological and strategic zeal to settle scores for Soleimani's death, to preserve or even expand the footprint that he achieved for Iran across the broader Middle East, and ideally emerge from this crisis with some big strategic gain, such as durably eroding U.S. presence and influence in the broader Middle East."

I would like to focus in my remarks on the geo-political ramifications of Jan. 3, in particular in Iraq and the Persian Gulf, two arenas where Tehran is most likely to look for opportunities to avenge Soleimani's death. It is there that Tehran will almost certainly revert to a campaign of pressure and attacks. In Iraq, Tehran has long judged it enjoys a decisive advantage over the United States in influence and coercive tools. In the Gulf, Tehran has repeatedly demonstrated to Washington's closest allies that their strategic vulnerabilities are acute, notwithstanding the presence of long-established U.S. military facilities and thousands of U.S. service members.

If ever two adversaries of the United States brought on their own deaths, it was Iranian Quds Force Commander Qassem Soleimani and Jamal Jaafar Ibrahimi (AKA Abu Mahdi Al Muhandis), commander of the Iraqi militia Kata'ib Hezballah. Killed as they departed Baghdad airport together, Soleimani and Al Muhandis were long-time collaborators in a common project to target U.S. troops to drive them out of Iraq; their pioneering handiwork in the use of explosively-formed projectiles (EFP) killed hundreds of U.S. service members and maimed thousands more. More recently, KH's task from Soleimani—to harass and target U.S. military personnel with repeated shelling of training sites over much of 2019—finally resulted in the death of an American on Dec. 27; the U.S. response 2 days later, targeting 5 KH sites, was met with a violent assault by the militia and its supporters on the U.S. Embassy in Baghdad.

PX382

9

Both architect and orchestrator of Iran's destructive regional policies in Syria, Lebanon, Iraq, Yemen, and Bahrain, Soleimani had achieved a singular stature in Iran and in the wider Middle East by dint of his own extraordinary media profile and the multiple successes he claimed on behalf of Tehran: For turning the tide of Syria's civil war to Bashar Al Assad's favor; for being first on the battlefield in 2014 as ISIS forces surged across northern Iraq toward Erbil; for his small-investment-huge-payout decision to train and equip Yemen's Houthis with advanced missile technology, such that they could strike deep into Saudi territory, threaten the UAE and put international shipping in the Bab Al Madeb at risk; for his unmatched role as kingmaker or breaker in Iraq, in no small part through the network of militias he had created, groomed, trained, and resourced from the early months after the 2003 invasion of Iraq. As my colleague, Phillip Smyth, has neatly put it, "Iran's Shia militia network are their true nuclear program and one that has achieved measurably huge results for Tehran" in the region.

At the time of his death Soleimani thus appeared to be a Colossus bestride the region. He was a cult figure for Iran's legions of foreign Shia proxies, and an interlocutor respected and feared in equal measure by officials in Iran's near-beyond.

But if Soleimani's demise at U.S. hands has electrified both regional and foreign audiences, the operation's second major casualty—collateral damage or intended target, depending on the U.S. official asked—is potentially as impactful for Iraq, and therefore for U.S. interests. Al Muhandis was both head of the most powerful militia in Iraq, Kata'ib Hezballah, and as Deputy Commander of the PMF exerted far-reaching command and control over nearly 50 other organizations in the PMF network; his killing will have direct bearing on the future of the U.S. military presence in Iraq and our ability to counter terrorist threats to the U.S. homeland.

IRAQ

History shows us that removing a leader of violent movements—even one as supremely capable, influential, and charismatic as Soleimani—is rarely sufficient on its own to permanently disrupt the trajectory of events or even the organization itself. In Iran, Soleimani leaves behind a well-oiled, disciplined machine acting on behalf of a powerful, if economically stressed, state. Iran's Supreme Leader moved immediately to appoint Ismail Qaani, Soleimani's deputy in the Quds Force, as successor. This move reinforced the dual message of organizational continuity and Iran's relentless commitment to the Resistance cause. In the days to follow, IRGC leaders underlined the latter point in public messaging: With the commander of the IRGC flanked by the flags of member groups of regional resistance, including that of Iraq's Hashd al Shaabi, and with IRGC-Quds Force commander Qaani's meeting with individual commanders of Iraq's Shia militia community.

In Iraq, a hard push by Iranian-affiliated militias—through their representation at the highest levels of the Iraqi government and their political representation in the parliament—has resumed to affect the departure of the 5,000-strong U.S. military training mission. Qassem Soleimani's project for post-ISIS Iraq was to end the U.S. military presence in Iraq, and with its departure, to reduce to the degree possible U.S. influence there. An earlier effort in Iraq's Council of Representatives in the spring of 2019 was sidelined. But in the wake of Soleimani's death, the Council passed a non-binding resolution requesting the government begin the process for ending the foreign troop presence in Iraq; passed with a fraudulent quorum, the vote was obtained after overt threats by KH and its allies against MPs. Notwithstanding those threats, virtually all Kurdish and Sunni MPs stayed away from the vote. And notwithstanding the fraudulent nature of the parliamentary vote, Iraq's acting PM repeatedly announced his request of the United States to begin consultations on winding up the U.S. military mission.

The pressure by Iranian-backed militias is unrelenting—within the government, on the acting PM, on Shia and Kurdish politicians, and most brutally, against the throngs of Iraqi protestors across Baghdad and southern, Shia-dominated Iraq, who have rejected both Iranian interference and the recent threat-induced parliamentary vote.

Prominent Iraqi militia leaders like Asaiab Ahl Al Haq's Qais al Khazali have publicly declared that Tehran's missile strike, while honoring Soleimani, would not suffice as a response for Al Muhandis' death. Iraqi militia leaders have made overt threats to resume kinetic targeting of U.S. military personnel; indeed, there have been several instances of rockets falling in Baghdad since the Iranian missile strikes. For the moment, Iraq's Iranian-affiliated militia community appears to be following Tehran's direction to pause, but that is a pause likely to be short-lived.

PX382

10

### THE PMF PROBLEM

Iraq's evolution since 2003 has been as much shaped by Qassem Soleimani's vision for the country as by the energy, money, and lives spent under 3 successive U.S. administrations. Soleimani's focus on Iraq was unblinking and unsparing; his approach reflected the perspective of a war-time generation of leaders, that Iraq posed the foremost National security threat to Iran. Thus Soleimani worked methodically and largely successfully for a set of unvarying objectives there: An Iraq always weak vis-à-vis Iran, its Shia-majority political class reliant on and deferential to his "guidance," and above all, the government itself suborned and weakened by a set of proxy armed actors not under the State's control and largely responsive to Iranian direction. Today approximately 3 dozen such militias operate in Iraq, commanding some 60,000 members.

*The Iraq of 2020 aptly reflects Soleimani's efforts.* With the departure of U.S. troops in 2011, Iraqi militias were re-directed by Soleimani to Syria's civil war, where they gained critical battlefield experience, under IRGC–QF direction fighting on behalf of Bashar Al Assad. In the crisis of ISIS' surge across northern Iraq in 2014 and with Grand Ayatollah Sistani's exhortation to Iraqi youth to volunteer for the fight, Soleimani oversaw and shaped directly the explosion of Iraqi militias and took a role on the battlefield in directing their efforts. In 2016 the militias were folded formally into the Iraqi security forces and termed the Popular Mobilization Forces. Iraqi National Security Advisor Falah Fayyad is double-hatted as its commander, but the real power to the organization lay with its Deputy, KH Commander Abu Mahdi Al Muhandis—not with the PM, to whom, Commander-in-Chief, the PMF notionally reported. Securing the funding of the state, the member militias of the PMF from the outset retained a dual-key chain of command, retaining primary loyalty to their political commanders, many of whom in turn followed Iranian "guidance," if not direction.

These militias flout Iraqi law and the constitution in myriad ways; they did so in recruiting fighters for Syria, and they do so currently in operating training sites and arms depots that are no-go zones for the Iraqi security forces. But nowhere has that allegiance to a set of leaders outside the State—outside Iraq itself—been more evident than in the repeated targeting of U.S. military training sites and U.S. diplomatic facilities by KH, AAH and other militias for the past 18 months; their participation in Iran's program to transfer advanced missile technology to Lebanese Hezballah; and KH's targeting of the Saudi East-West pipeline.

Thus is born a militia state, or one at real risk of becoming so. With the fall of Mosul to Iraqi government forces in December 2017, the Iraqi government should have moved to complete the transformation or compulsory demobilization of the constituent members of the PMF into the ISF. It was unable to do so. As recently as September 2019 the Iraqi PM felt compelled to issue an ultimatum to the PMF to hand over weaponry to the state, permit ISF access to militia arms depots and bases, and to cease all unlicensed activities. The reason? Press reports identifying KH as the entity behind the May 2019 attack on Saudi Arabia, and months of apparent foreign airstrikes on KH arms depots that were supporting Iran's work to transfer advanced missile technology to Lebanon for Hezballah. But to no effect.

With Abu Mahdi Al Muhandis's death, and a successor still unnamed, the key Iraqi militias of significance, closest to Iran, remain in a state of uncertainty. They are maneuvering rapidly to try to shape the next government, however.

The most important of the militias closely affiliated with the Quds Force—the Badr Organization, Kata'ib Hezballah, Asaib Ahl Al Haq, Kata'ib Al Imam Ali, Kata'ib Sayyid Al Shuhada—also command the lion's share of the PMF rank and file, 18–25,000 for Badr alone, and the rest comprising somewhere in the range of 31,000 members. They have all deployed "in-theatre"—in Syria; several participate actively in Iran's "precision missile" project to move parts and technology from Iran through Iraq and Syria to Lebanon; several have engaged in lethal support and training for extremists in Bahrain, and 1—KH—to date has engaged in attacks outside Iraq/Syria, on Saudi Arabia. While smaller by far in numbers, the phenomenon of drawing foreign fighters into their ranks from Europe (generally dual-national citizens) to fight in militia ranks in Syria has been observed. One possible model for the future—the risk of reverse flows, establishment of cells abroad as Hezballah has done successfully—should certainly not be ruled out.

### THE GULF

The long-standing U.S. military presence in the Middle East ranges currently between 50–65,000 personnel, fully half of whom at any given time may be stationed in the 6 Gulf Cooperation countries. While the U.S. naval presence in Bahrain, now headquarters of the Fifth Fleet, dates back to the late 1940's, our operating presence

PX382

11

in the other Gulf countries largely date to immediately after the first Gulf War; U.S. forces in Saudi Arabia being a particularly sensitive issue internally, the United States has not had "permanent" stationing of troops there since 2003, although the administration has sent several thousand to the Kingdom in recent months in response to last year's attacks on Saudi energy infrastructure by Iran.

Yet despite that presence, there is no question that the GCC countries—with the possible exception of Oman—have felt extraordinarily exposed and vulnerable for the last 8 months, a period of sustained, escalating tensions between the United States and Iran and thinly-disguised attacks by the latter on Gulf energy infrastructure and oil tankers traversing the Gulf. Persian Gulf energy fuels the world economy, meeting nearly 20 percent of global demand. But these small and vulnerable states are also uniformly embarked on efforts to diversify their economies away from fossil fuel dependency, redefining themselves as hubs for tourism, transportation, finance and banking, and manufacturing—sectors which depend every bit as global oil markets do on a secure and stable environment.

Notwithstanding decades-long huge investments by the GCC countries in U.S. and European weapons systems, including missile defense, these 6 countries remain hugely vulnerable. With small populations, economies which have developed with a significant dependency on expatriate labor, the GCC countries are particularly vulnerable to Iran's full suite of asymmetrical tools, cyber in particular. For countries that rely on desalinization for 95 percent of their potable water supply, that import 90–95 percent of their foodstuffs, that have diversified their economies by making themselves hubs for global trade, air traffic, shipping and finance, a prolonged takedown of the electrical grid alone would be devastating.

U.S.-Iran tensions soared with the administration's announcement in April 2019 that it would aim to "drive to zero" Iran's oil exports; a stark U.S. warning to Iran followed on May 5—asserting intelligence indicated possible Iranian intentions to target American citizens or facilities in the Gulf and Iraq—that any Iranian attack on "U.S. interests or those of its partners (would) be met with unrelenting force." Iran responded exactly 1 week later with attacks on 4 tankers berthed off the UAE coastline; 2 days later, the Saudi East-West pipeline was hit by explosive-bearing drones, later determined to have been launched by one of Iran's closest proxies in Iraq, Kata'ib Hezballah. Thus ensued months of thinly-veiled attacks by Iran—on a U.S. drone, on Saudi oil pipelines, on foreign tankers, and most spectacularly on Sept 14, on the heart of the Saudi energy enterprise in Abqaiq.

The administration's responses throughout these months were contradictory and confusing. Secretary Pompeo made an early trip to Baghdad to warn Iraqi leaders—who we can be certain passed this message immediately to Tehran—that the United States would respond immediately, forcefully to any move against an American citizen. But this warning—and U.S. non-response to the series of Iranian attacks against Gulf partners, international shipping, even to the downing of a U.S. drone—had the ironic effect of so strictly de-limiting what would be "off limits" that it appears Tehran boldly calculated it could land a strategic strike on Saudi Arabia and bear little risk of reprisal. This calculation was borne out, in fact.

In the aftermath of Soleimani's death and Iran's for-now limited response, the question for Washington's Gulf partners remains unanswered—does the U.S. security umbrella extend to them? If Iran returns to attacks on shipping or energy infrastructure, will the United States respond—and if so, how? If Saudi Arabia suffers a further, more devastating attack, what then?

CONCLUSION

Americans are pressed by the events of the last 2 weeks to ask: Why do Iran's activities in the Gulf or in Iraq, via proxies or directly, matter for U.S. homeland security?

No. 1: Oil: notwithstanding the new U.S. role as an energy mega-producer, oil remains a global commodity, its price affected directly by security—or insecurity—in the Persian Gulf, carrying a knock-on effect on global economic health, including our own. The administration appears uncertain about how much longer the United States should wear the mantle of ensuring the free and unconstrained flow of energy and commerce in the Persian Gulf. Iran picked up on that ambivalence, as did our Gulf partners.

No. 2: Counter-terrorism: Our ability to pursue robust counter-terrorism efforts in concert with dependable allies goes directly to our security at home. Whether we will be able to sustain a critical capability-building mission for Iraqi security forces, benefit in intelligence-sharing and gathering from being there on the ground, and help direct efforts to drive toward an enduring defeat of ISIS in Iraq and Syria are now very much in question. ISIS cell attacks in Iraq alone numbered nearly 900

PX382

12

in 2019. And if we are compelled—or choose—to pull U.S. trainers from Iraq, sustaining them in Syria is likely to be impossible. In the same vein, the relations of trust and confidence and influence that we sustain with our Gulf partners are critical to CT efforts by/through/with their policy makers, intelligence, defense, and finance officials.

No. 3: Regional stability: Karim Sadjapour aptly noted this week Qassem Soleimani's "sinister genius" in marshalling both Sunni and Shia extremists to bring a wrecking ball early on to the U.S. project in Iraq, then building out "a foreign legion" to expand Iran's influence far across the Arab Middle East. Soleimani's terrible legacy—constructing parallel institutions to the state that suborn and overpower it, and follow foreign direction—is vividly on display in Iraq. It is a recipe for chronic instability and insecurity across a widening arc of territory that is home to nearly 70 million people; home to the globe's fourth-largest oil producer, source of a global extremist scourge, source of more than 8 million refugees.

*What should the United States do?* Navigating the turbulence besetting Iraq will be paramount, to ensure the critical U.S.-led Coalition counter-terrorism mission there can endure, and U.S. military trainers can operate safely. That will require more vigorous and more visible engagement from Washington, backstopping the tough work in which our Ambassador and diplomatic staff in Baghdad and Erbil are engaged. And to be most effective, that effort should be robustly multilateral, drawing on the Coalition and the United Nations. Much has been made this past week on the administration's support for Iran's protestors, but shockingly little attention has been spared for Iraqis who have suffered and died for more than 3 months to press many of the same demands. Washington should unequivocally signal support for the protestors across Iraq seeking a new government, via early, clean elections; those same protestors have been the victims of Soleimani's militia project, targeted for assassination and brutal repression in the streets. Washington should focus its pressure, with targeted sanctions on both the senior government officials and the militia commanders responsible for the repression.

While the administration has asserted that "deterrence has been restored" with Soleimani's death, it is fair to ask when it was lost. And deterrence, to be enduring and effective, cannot be built on a single action, however dramatic. The U.S. security umbrella for the Persian Gulf is well-tattered, and an honest discussion between the United States and its partners on how to restore it—including what that requires of our quarreling partners—is long overdue.

Finally, it goes without saying that the time for vigorous diplomatic work is also upon us, lest the United States and Iran simply return to what I think of as a 40-year-long frequently violent non-relationship. The asymmetrical threats to U.S. interests and security, to those of our friends in the region, that Qassem Soleimani constructed in more than 2 decades of dedicated work will not be undone through economic sanctions alone, nor do they lend themselves for the most part to a military response.

As Ariane Tabatabai wrote in 2019, "One thing the Iranians do not lack is options. The regime can use the (threat network) as a strike force to further its foreign policy goals in the region." The United States, too, has a range of options to contend with any of the threats to homeland security—indirect or otherwise—that Iran considers over the months ahead. One of the most important options for the administration to exercise now is diplomacy, even as we keep economic, cyber, covert, and conventional military tools at the ready to contain, deter, and disrupt Iranian resort to asymmetrical warfare. As the dust settles on the 2 matching "black swan" events of the last 2 weeks—the most consequential U.S. strike on a foreign government official in modern times, and the first conventional Iranian attack on U.S. forces since the Iran-Iraq war—it is time to turn swiftly to identify the channel and the pathway to negotiations.

Chairman THOMPSON. Thank you for your testimony.

I now recognize Lieutenant General Stewart to summarize his statement for 5 minutes.

## STATEMENT OF VINCENT STEWART, SPECIAL ADVISOR AND CHAIRMAN, BOARD OF ADVISORS, MIDDLE EAST MEDIA RESEARCH INSTITUTE

General STEWART. Good morning, Chairman Thompson, Ranking Rogers, and other distinguished Members of the committee.

I'm honored to be here as an advisor to the Middle East Media Research Institute, an organization for the last 20 years that

PX382

13

looked at the social and intellectual currents within Iran. I'd like to step back just a little bit as we talk about this situation in Iran as this continues to unfold.

I believe it is more important than ever that we pause and put whatever short-term actions Iran takes into longer-term context, via Iran's desired end-state. We should strive to remember during times of tension that the regime's tactical actions are ultimately a means to an end and not the ends themself.

With that I'd like to start with Iran's theory of victory or their desired end-state. Iran believes that it is the dominant regional and cultural power, and the United States and its allies in the region are impediments to Iran's desired end-state. The Iranian government believes they are the victim of U.S. actions, are, in fact, rational actors protecting the region and themselves from undue foreign influence.

Iran believes it will successfully force the United States to leave the region. But the question is since we are obviously stronger conventionally, how does Iran believe it can accomplish its end-state? Iran understands that its military capabilities will not deter the United States from conducting military actions and that they would eventually be overmatched by our armed forces.

Iran has built a capable force of an imposed cost on the United States, its allies, its forward staging basis and its interest in the region, but cannot militarily match U.S. capabilities in the long term. However, Iran views asymmetric activities as a viable cost means—low-cost means to eject the United States from the region. Iran's asymmetric warfare can be viewed as a three-legged stool comprising of support to malign actors and terrorists, information operations, and a range of cyber activities.

All of these components are part of a long-term campaign to make the U.S. cost of staying in the region untenable while eroding support for the United States and avoiding the threshold of an overt U.S. military response. Since Iranian military support to terrorists and malign actors is covered in the extensively and classified reporting, I'll focus on the second and third legs of the stool.

Iranian information operations, influence operations are not well-understood and target several audiences, but most important is their own domestic population, which the regime seeks to keep united around nationalism and a perceived victimhood. Like-minded terrorists, militants, and religious groups are also key constituencies.

Iran's fastest-growing audience are international, Russia and China, and increasingly U.S. allies in the region and abroad. Last, I want to highlight that with the rise of social media and the ease of transmitting messages, the Iranians increasingly see different factions inside the United States as information operation targets. That includes building upon the divide between Democrats and Republicans and convincing the American people that we have no interest in the region that the only thing we can expect from the region is enduring warfare, and therefore we should withdraw.

So what are some of the messages from the Iranians? Geography matters. Iran has no options of leaving the region. We have a population of 80 million people. They have a rich history of culture and heritage and we will be here when the Americans leave. In spite

14

of the propaganda, what they perceive as U.S. propaganda that they are destabilizing the region, that they are, in fact, rational actors on the international stage and conform to international norms of behavior. They go through this litany. "We have complied with the joint comprehensive plan of action. We have taken the responsible action to defend our country after the attack on Soleimani", and so they continue to emphasize those messages.

The bottom line on Iranian information operations is this: Anything that gives the regime narrative a boost is a victory on the path to Iran's theater victory. Their three-legged stool of asymmetric warfare is carefully calibrated.

The cost of U.S. presence is high while cultivating an image of being rational actors and victims. All actions and the reactions must be viewed through those lens. The third leg of their asymmetric warfare is cyber space and we will spend a good bit of time talking about that during this hearing. Since the Stuxnet event, Iran has embarked upon a comprehensive approach; developed both offensive and defensive cyber capabilities. We have seen them exercise those capabilities against nation-states, Saudi Aramco, against small companies, against our own financial system, and the Sands Casino in 2017.

In the interest of time, the Iranians are not as capable as the Russians or Chinese, but they have expressed their intent to develop both offensive and defensive capabilities. They are partnering with other countries to learn, share, and counter our interests. They have demonstrated an ability to conduct attacks, incurring costs to private U.S. companies, foreign entities in the multi-billion—million-dollar ranges. They will include cyber space operations as a key component of their asymmetric response to the killing of Soleimani. What makes this foreign threat so unique is that this is the one area where the U.S. Government is essentially telling the U.S. private sectors to fend for yourself. I'll stop there and I look forward to your questions.

[The prepared statement of General Stewart follows:]

PREPARED STATEMENT OF VINCENT STEWART

*"All men can see these tactics whereby I conquer, but what none can see is the strategy out of which victory is evolved." Sun Tsu*

Good morning Chairman Thompson, Ranking Member Rogers, and other distinguished Members of the committee. I'm honored to appear before you today as special advisor and chairman of the board of advisors of the Middle East Media Research Institute (MEMRI), to discuss U.S.-Iran tensions and implications for homeland security. I am proud to be a part of an independent institution which has for over 20 years been at the forefront of documenting and analyzing political, social, and intellectual currents in Iran.

As the situation with Iran continues to unfold, I believe it is more important than ever that we pause and put whatever short-term actions Iran takes into the longer-term context of Iran's desired end-state. We should strive to remember during times of tension that the regime's tactical actions are ultimately a means to an end, and not the ends themselves.

*"If you know the enemy and know yourself, you need not fear the result of a hundred battles. If you know yourself but not the enemy, for every victory gained you will also suffer a defeat. If you know neither the enemy nor yourself, you will succumb in every battle." Sun Tsu*

With that I'd like to start with Iran's "theory of victory" or desired end-state. Iran believes it is the rightful dominant regional and cultural power, and that the United States and its allies in the region are the impediments to Iran's desired end-state. The Iranian government believes they are the victims of U.S. actions and are in fact

PX382

15

the rational actor protecting the region and themselves from undue foreign influence. Iran believes it will successfully force the United States to leave the region. But the question is, since we're obviously stronger conventionally, how does Iran believe it will accomplish its end-state?

Iran understands that its military capabilities will not deter the United States from conducting military actions, and that they would certainly be overmatched by our armed forces. Iran has built a capable force that would impose costs on the United States, its allies, its forward-staging bases and its interest in the region but cannot militarily match United States' capabilities in the long term.

However, Iran views asymmetric activities as a viable, low-cost means to eject us from the region. Iran's asymmetric warfare can be viewed as a three-legged stool comprising support to malign actors and terrorists, information operations, and a range of cyber activities. All of these components are part of a long-term campaign to make the U.S. cost of staying in the region untenable while eroding support for the United States and avoiding the threshold for an overt U.S. military response. Since Iranian military support to terrorists and malign actors can best be viewed through the lens of Classified reporting, I'll focus on the second and third legs of the stool and their implications.

Iran's information operations are not well-understood and target several audiences. The most important is their own domestic population, which the regime seeks to keep united around nationalism and perceived victimhood. Like-minded terrorists, militants, and regional religious groups are also a key constituency. Iran's fastest-growing audiences are international: Russia and China, and increasingly U.S. allies in the region and abroad. Last, I want to highlight that with rise of social media and ease of transmitting messages, the Iranians increasingly see different factions inside the United States as information operations targets. That includes building upon the divide between Democrats and Republicans and convincing the American people that we have no interest in the region, that the only thing we can expect from the region is enduring warfare and therefore we should withdraw.

But if those are Iran's information operations targets, what are its messages? Their messages include the following and all support Iran's theory of victory:

- Geography matters, we Iran, have no options of leaving the region, we have a population of 80 million people with a rich 3,000+ year history, culture, and heritage—we will be here when the Americans leave.
- In spite of U.S. propaganda that suggests we are the most de-stabilizing force in the region, we are in fact, the rational actor on the international stage and we conform to international norms of behavior.
- We were abiding by the Joint Comprehensive Plan of Action (JCPOA) agreement, but the United States withdrew from the agreement and imposed economic sanctions to force renegotiations of an agreement that the other parties continue to support.
- Our most capable General was the subject of a targeted assassination while visiting a sovereign country with the attempt to provoke an escalation and drag us into war.
- In response to this targeted assassination, we responded in a proportional manner and launched missiles at U.S. bases in self-defense with the aim of de-escalating the situation.
- Because the missile attack would take place in the sovereign state of Iraq, we alerted the Iraqis, in advance of our missile strikes in compliance with international norms.
- We will ultimately prevail in ejecting the United States from the region because we have the moral high ground and you lack the will to persist in the region.

The bottom line on Iranian information operations is this: Anything that gives the regime's narratives a boost is a victory on the path toward Iran's theory of victory. Their three-legged stool of asymmetric warfare is carefully calibrated to make the costs of the U.S. presence high while cultivating an image of being the rational actor and victim. All actions and reactions must be viewed through that lens.

The third leg of Iran's asymmetric efforts are in cyber space. Iran views cyber space as a vital tool of statecraft and internal security that must be developed in order to undermine enemies and threats to the regime. Iranian doctrine calls for cyber operations as a low cost and often plausibly deniable way to collect information and retaliate against threats. For these reasons Iran often uses proxies to hide cyber operations.

Following the 2010 Stuxnet attack on Iran's uranium-enriching capabilities, Iran invested heavily in cyber defenses and capability. Since then it is thought to have carried out some major cyber attacks, including the 2017 attack on Saudi Aramco with the Shamoon virus, following which that network had to be almost completely rebuilt. Also, the 2018 attack on the Italian oil company Saipem, using a version

16

of Shamoon, impacted hundreds of the company's servers as well as personal computers in the UAE, Saudi Arabia, Scotland, and India. Also probed, and hit, were a small dam in update New York in 2016, and the Sands Casino in Las Vegas in 2014.[1] In 2018, the Department of Justice (DoJ) charged 9 Iranians in a wide-scale cyber-theft campaign, stealing more than 31 terabytes of documents and data from more than 140 American universities and 30 American companies. Previously in March 2016, the United States charged 7 Iranians for a coordinated campaign of DDoS attacks against 46 companies, mostly in the U.S. financial sector, from late 2011 through mid–2013. In November 2019, Iranian hackers were going after employees at major manufacturers and operators of industrial control systems used by power grids, manufacturing, and oil refineries.[2]

The U.S. intelligence community's World-wide Threat Assessment of January 2019 said that Iran was attempting to build cyber capabilities that would enable attacks against critical infrastructure in the United States and elsewhere. It stated that "Iran has been preparing for cyber attacks against the United States and our allies" and that it was capable of "localized, temporary disruptive effects"—including disrupting a large company's corporate networks for days to weeks.[3]

After the January 3 killing of IRGC Qods Force commander Qassem Soleimani, the Department of Homeland Security released on January 4, 2020 a bulletin warning about Iran's "robust cyber program," stating that "Iran is capable, at a minimum, of carrying out attacks with temporary disruptive effect against critical infrastructure in the Unites States" and that "an attack in the homeland may come with little or no warning."[4]

On January 8, Acting DHS Secretary Chad Wolf tweeted that he had "visited the team at Cybersecurity and Infrastructure Security Agency to discuss cyber threats, election security, Iranian cyber capabilities & the impressive work CISA does to protect critical infrastructure. They've been training for years & stand vigilant to respond to any threat against the homeland should one arise."[5] Later that day, the House Homeland Security Committee tweeted that "foreign cyber attacks could pose a serious threat to our Nation."[6]

### IRAN'S CYBER THREAT CAPABILITIES

On January 6, 2020, the Cybersecurity and Infrastructure Security Agency (CISA) described the Iranian cyber threat:[7]

"Iran and its proxies and sympathizers have a history of leveraging cyber and physical tactics to pursue National interests, both regionally and here in the United States, such as:

- Disruptive and destructive cyber operations against strategic targets, including finance, energy, and telecommunications organizations, and an increased interest in industrial control systems and operational technology.
- Cyber-enabled espionage and intellectual property theft targeting a variety of industries and organizations to enable a better understanding of our strategic direction and policy making.
- Disinformation campaigns promoting pro-Iranian narratives while pushing anti-U.S. sentiments.
- Attacks against U.S. citizens and interests abroad and similar attacks in the homeland.
- Unmanned aircraft system (UAS) attacks against hardened and soft targets."

### OFFICIAL U.S. STATEMENTS

An FBI spokesperson said: "While our standard practice is to not comment on intelligence products, the FBI is aware of the continued possibility that retaliatory actions could be taken against the United States and its interests abroad. [ . . . ] While there is no specific or credible threat to the homeland at this time, we urge the public to be vigilant and report any suspicious activity to law enforcement. As

---

[1] npr.org/2020/01/09/794816793/Federal-authorities-warn-of-irans-cyber-threat-capabilities, January 9, 2020.
[2] zdnet.com/article/hard-disk-wiping-malware-phishing-and-espionage-how-irans-cyber-capabilities-stack-up/, January 7, 2020; Forbes.com/sites/kateoflahertyuk/2020/01/06/the-iran-cyber-warfare-threat-everything-you-need-to-know/#29ba0b3015aa, January 6, 2020.
[3] https://www.dni.gov/files/ODNI/documents/2019-ATA-SFR__SSCI.pdf.
[4] dhs.gov/sites/default/files/ntas/alerts/20_0104_ntas_bulletin.pdf, January 4, 2020.
[5] twitter.com/DHS__Wolf/status/1214948930070482951, January 8, 2020.
[6] twitter.com/HomelandDems/status/1215018179828822018, January 8, 2020.
[7] cisa.gov/insights, January 6, 2020.

PX382

17

always, we will work with our intelligence and law enforcement partners to gather, share, and act upon threat information."[8]

A January 9 DHS press release about a meeting between Acting Secretary Wolf, CISA, and FEMA stated that "there are currently no specific, credible threats against our homeland." The press release also noted that "Iran has a history of leveraging asymmetric tactics to pursue national interests beyond its conventional capabilities, and its use of offensive cyber operations is an extension of that doctrine. CISA is urging all organizations to assess their cyber readiness and take steps to protect their networks and assets, including adopting a state of heightened awareness, increasing organizational vigilance, confirming reporting processes, and exercising incident response plans."[9]

ROUND-UP OF RECENT CYBER INCIDENTS WITH IRANIAN INVOLVEMENT[10]

- *January 6, 2020.*—The website of the Texas Department of Agriculture was hacked and its home page replaced with an image of Soleimani and the text "hacked by Iranian Hacker."[11] Texas Governor Greg Abbot tweeted: "Attempted cyber attacks from Iran against Texas agency website are occurring about 10,000 per minute."[12]
- *November 2019.*—Microsoft security researchers found that in the last year, an Iranian hacker group carried out "password-spraying attacks" on thousands of organizations, but since October, have focused on the employees of dozens of manufacturers, suppliers, or maintainers of industrial control system equipment and software.
- *October 2019.*—The NSA and GCHQ found that a Russian cyber espionage campaign had used an Iranian hacking group's tools and infrastructure to spy on Middle Eastern targets.
- *October 2019.*—Iranian hackers targeted more than 170 universities around the world between 2013 and 2017, stealing $3.4 billion worth of intellectual property and selling stolen data to Iranian customers.
- *October 2019.*—Iranian hackers conducted a series of attacks against the Trump campaign, as well as current and former U.S. Government officials, journalists, and Iranians living abroad.
- *September 2019.*—Iranian hackers targeted more than 60 universities in the United States, Australia, United Kingdom, Canada, Hong Kong, and Switzerland in an attempt to steal intellectual property.
- *July 2019.*—An Iranian hacking group targeted LinkedIn users associated with financial, energy, and government entities operating in the Middle East.
- *July 2019.*—U.S. Cybercommand issued an alert warning that Government networks were being targeted with malware associated with a known Iran-linked hacking group.
- *May 2019.*—Iran developed a network of websites and accounts used to spread false information about the United States, Israel, and Saudi Arabia.

STATEMENTS BY IRANIAN OFFICIALS ON CYBER ISSUES

*May 28, 2019.*—"The Dejfa ["Digital Fortress"] apparatuses include 10 separate interconnected apparatuses. They are an example of a strong fortress [dejfa in Farsi] that primarily guards the country in light of cyber attacks. These apparatuses were created domestically and launched under the command and direction of the MAHER Center [MAHER is the Farsi acronym for Center for Handling and Responding to Cyber Events]. Dejfa is a comprehensive security program that includes a range of security apparatuses. Dejfa identifies a huge part of the threats found on-line, particularly on the National information network, and neutralizes them. It should be noted that the apparatuses that make up Dejfa are not limited only to identifying and confronting threats on the National information network; they also identify threats in infrastructure, on the internet, on equipment networks, on cell phones, in industrial equipment and . . . neutralize them.

"Dejfa is used to discover damage done by malware on-line, such as bots, identifying the type of malware by anti-virus collection and neutralization. [Using Dejfa]

---

[8] *thehill.com/policy/cybersecurity/477434-fbi-dhs-issue-bulletin-warning-of-potential-iranian-cyberattacks,* January 8, 2020.
[9] *dhs.gov/news/2020/01/09/acting-secretary-wolf-receives-updates-fema-and-cisa-traveling-honduras,* January 9, 2020.
[10] *csis.org/programs/technology-policy-program/significant-cyber-incidents,* accessed January 9, 2020.
[11] *thehill.com/policy/cybersecurity/477408-texas-department-of-agriculture-website-featured-pro-iran-image-after,* January 8, 2020.
[12] *twitter.com/GregAbbott_TX/status/12149555296721903618,* January 2, 2020.

PX382

18

we identify DDoS attacks and neutralize them. Additionally, we analyze the damage that is reported according to international protocols, and confront it. Dejfa also exposes the threats and risks in the protocols of websites. Through Dejfa, users are taught to test the penetrability of software that operates on the internet, and to search for the level of the strikes against equipment that is used in the country and to confront them. With Dejfa, automatic security assessment is carried out in the apparatuses that operate in cyber space, and if they are found to be lacking the required security, alerts are issued."[13]

*December 13, 2019.*—Iranian Information and Communications Technology Minister Mohammad-Javad Azari Jahromi tweeted about the thwarting of a cyber attack on Iran: "An organized cyber attack against the Iranian government's electronic systems was identified and thwarted by the Dejfa cyber defense. The attack was carried out as part of the known APT27 attack and was aimed at spying on government data. Servers with the file of the data for spying were identified, and we identified the perpetrators of the attack."[14]

*December 9, 2019.*—Iranian Passive Defense Organization chairman Gen. Gholamreza Jalali said on the subject of a national internet for Iran: "It is true that this [government] support for a national internet [in Iran] came late, but in any event we should be glad that a positive discussion about a national intranet for Iran has found a place also among senior government officials. I personally thank [Iranian President Hassan] Rohani. In my opinion, now is the best time to require all the apparatuses to complete the national internet . . .

"The Majlis must require the government to complete all phases of the national internet by March 2021. One of the most important areas of the national internet that now has flaws is an Iranian search engine. Its lack was recently felt in the internet cutoff [during the November 2019 revolt].

"The second priority of the national internet services is an Iranian email [platform] . . . Likewise, the Majlis must determine the fate of the domestic CDN and DNS . . .

"This matter of a national internet and its urgency must be clearly explained to public opinion. The establishment of this network is not aimed at cutting off the international internet but is infrastructure that will allow the public to enjoy the fast, quality services of a national internet and at the same time will boost internet speed in the country. We are striving for independence in cyber space . . . "[15]

*December 9, 2019.*—"One of essential things for completing the national intranet is a national metadata [apparatus for searching, cycling, cataloging, and limiting access to data on the internet]. If we want to provide international-level service, this project must be carried out, because the foundation of most of the new services is in metadata."[16]

*December 8, 2019.*—Iranian President Rohani said at a Majlis session during the presentation of the 2020–2021 budget: "Since the beginning of the 11th government, broadband capability has been increased 20 times over. This process will continue until we succeed in strengthening the national intranet, such that the public will not need international intranet. Recently, Supreme Leader Khamenei issued an order in this matter. We will monitor the implementation of this order in the Supreme Council of Cyberspace, and our public will notice better conditions in this area . . . "[17]

*December 2, 2019.*—Iranian Passive Defense Organization Chairman Gen. Gholamreza Jalali said about the need for a national intranet that Iran is "striving for a model of implementing the regime in cyber space that will be based on our regime's principles and logic . . . Recent events have proven a number of things on the matter of the national intranet. One of them is that the need for a national network was strongly felt. This network is expected to be independent of a foreign network . . . "[18]

*November 26, 2019.*—Gen. Jalali said: "Today the area of war is not necessarily military, but is in the arena of culture, economy, cyber, and the creation of science—all are arenas of struggle and supreme effort. Therefore, now is a golden opportunity for the Basij members to enter the various arenas and create victory in all the realms . . . "[19]

---

[13] *YJC.ir/fa/news,* May 28, 2019.

[14] *https://twitter.com/azarijahromi/status/1206071513222467585.*

[15] *farsnews.com,* December 9, 2019.

[16] *farsnews.com,* December 9, 2019.

[17] President's website, *president.ir/fa/112698,* December 8, 2019.

[18] *https://www.memri.org/tv/irgc-general-gholamreza-jalali-head-iran-civil-defense-organization-waze-israeli-tools-demonstrations-need-intranet;  https://www.shahrekhabar.com/political/15753638401529.*

[19] IRNA, November 26, 2019.

19

*November 24, 2019.*—IRGC Deputy Commander Gen. Ali Fadavi said:" . . . The internet is a means by which America carries out its evil deeds. The Islamic Revolutionary Front will certainly enter into this matter in order to create an internet work for the internet, such that the enemy will not be able to do evil via the internet."[20]

*November 12, 2019.*—Gen. Jalali said, in response to a question about whether the reports about the cyber attack on Iran's oil infrastructure by America after Iran downed a U.S. drone were true, that these attacks had been carried out but that they had not impacted Iran's infrastructure.[21]

*November 5, 2019.*—In the Passive Defense Organization, Jalali said: "There is a need to act seriously to inoculate the infrastructure with cybersecurity. In this way, we must show our willingness to the public and to the enemy, to boost public morale and cause the enemy to despair."[22]

*October 30, 2019.*—Iranian Information and Communications Technology Minister Mohammad-Javad Azari Jahromi said at a cybersecurity work meeting at the Munich Security Conference: " . . . Iran, having been the target of cyber attacks, has increased its security using Dejfa. With this system, we successfully blocked 33 million cyber attacks last year. Unilaterality and the use of sanctions are threats to international cybersecurity. The solution for cybersecurity issues is the use of a multilateral apparatus . . . "[23]

*October 29, 2019.*—Passive Defense Organization Chairman Gen. Gholamreza Jalali said in an interview on Iran's Channel 2: "The Americans cannot hurt us on the cyber level because we have identified our own weaknesses by conducting 4 maneuvers in different sectors of energy, transportation, banking, etc . . . By having a powerful system of defense, we tricked them into our trap."

On the topic of Russian hackers attacking various countries: "We are indeed seeking cyber defense agreements with friendly countries like Russia, China, India, and Pakistan. The existence of a national intranet and internal social networks are imperative to our country's security, but the Communications Ministry states that it has not been assigned the specific task of creating a National cyber space.

"We have 5 SCADA [Supervisory Control and Data Acquisition] systems that we developed ourselves. We used one for a gas supply network, but there is no consensus about their use for social networks.

"We are fully competitive with foreign [countries] in developing anti-malware [software], and it is imperative that we use anti-malware software that is self-developed for our country's vital networks. We have developed about 200 Iranian cyber products, including switches, routers, and security devices, and if the government gives its support, these products will be superior in quality to foreign products. The country's scientific field has shown how powerful it is."[24]

*September 17, 2019.*—Expediency Council secretary Mohsen Rezaee said at the opening ceremony for the first class of a Basij cyber corps officer development program: "The Americans once fought the nations in the military arena. Now they are moving into cultural, economic, and cyber warfare. The people of the Ashura, with our enterprising and dedicated youth, have rendered American military equipment ineffective, and so the war has been drawn into new arenas."[25]

*September 11, 2017.*—Iranian Army deputy chief of staff Ahmad Reza Pourdastan said at an appreciation ceremony for outstanding communications and technology personnel: "We are facing a complex war. Our capacities in communications and electronic systems are good, and we have turned our ideas into products in a very short time. We have offensive and defensive capabilities in the cyber arena."[26]

*October 17, 2017.*—Iranian Information and Communications Technology Minister Mohammad-Javad Azari Jahromi said: "On October 17, 2017 several Iranian websites were defaced. Fortunately, we identified and contained the issue, which we need to take seriously. The more powerful we become, the more attacks there are. Now Iran is the victim of cyber attacks. Security in Iran's cyber network is very important. We plan to train 10,000 cybersecurity experts in the next 4 years."[27]

*July 2, 2019.*—Expediency Council chairman Amoli Larijani met with Song Tao, head of the Chinese International Liaison Department, and said that cooperation in cyber administration and human rights issues is possible between Iran and China.

---

[20] *ISNA.ir,* November 24, 2019.
[21] *ISNA.ir,* November 12, 2019.
[22] *farsnews.com,* November 11, 2019.
[23] *farsnews.com,* October 30, 2019.
[24] *ISNA.ir,* October 29, 2019.
[25] *tasnimnews.com,* October 17, 2019.
[26] *tasnimnews.com,* September 11, 2017.
[27] *tasnimnews.com,* 2017.

PX382

20

Song Tao said: "China considers Iran a strategic partner and a friend. Despite global developments, we will maintain these relations and they will grow stronger. China is always willing to become active in the region in cooperation with Iran in implementing JCPOA and ensuring peace in the region. We are willing to cooperate in the cyber arena. America's current steps violate international law, but in the future, time will be on the side of Iran and China."[28]

*July 23, 2019.*—Highlights of statements by Passive Defense Organization chairman Gholamreza Jalali: They [the Americans] are openly declaring that they have launched a cyber war against us; therefore it is imperative that we fortify our capacities for cyber deterrence as much as possible, even though the Americans themselves rate Iran highly in terms of its cyber defenses. The Americans are more vulnerable to cyber threats than other nations because of their high level of dependence on cyber infrastructure. This fact has caused some concern due to America's invasive behavior in cyber space.[29]

*July 15, 2019.*—Basij lieutenant commander Mohammad Hossein Sepehr said at the closing ceremony for the eighth assembly for cyber space admins: "Khamenei says that 'cyber space is as important as the Islamic revolution.' The cultural field is part of jihad. If we leave cyber space we will probably be hit. At this time, the Western faction is the most arrogant in its power in cyber space, due to its wealth, equipment, and other possibilities. At this time, the most powerful research is in cyber space . . . Some view cyber space as a threat, but it is in fact the greatest opportunity in the Muslim world. According to tradition, power, scope, and speed in communications are signs of the coming of Mahdi. It is therefore imperative that cyber space will be under the rule of Shi'ite followers of the 12 imams [Iranian Shi'ite]. Communication sciences must be under the authority of the Nation, which in turn is under the authority of Imam Mahdi . . . Today we must strengthen and bring about the wills through cyber space . . ."[30]

*July 7, 2019.*—IRGC commander Hossein Salami said at the unveiling of the Sepehr 110 Tactical Communications System and its handing over the relevant units: "We can announce that we are at the cutting edge of the following technologies: Communication, intelligence, command, and control. We want IRGC communications to be among the most advanced in the world. The cost of science and technology in the field of communications, intelligence, and cyber is very high. We are on the front lines of expanding this knowledge. We intend to act quickly in this field, using our young scientists and engineers. Gradually, our enemies are coming to understand out true power. Our enemies are focused on economic warfare, psychological maneuvers, and political pressure in an effort to shake the will of the Iranian people to continue on the path of honor."[31]

*June 27, 2019.*—An article by Abu Al-Fazel Nia, cultural advisor at the Iranian Embassy in Syria, stated: "At the height of the media coverage of the situation in the Gulf and the possibility of a U.S.-Iran war, Iran announced that it had successfully uncovered the CIA's espionage networks—in Iran and some countries of the region and the world, exposing American spies. It is possible that this news did not get much attention because the public was too occupied with Trump's changeable position toward Iran, and due to the American effort to draw attention away from its defeat in the cyber arena by Iran's cyber champions; this shows that Iranians are superior to Americans in the virtual arena. This Iranian accomplishment is a victory for the resistance—which is not only an armed resistance, but an array of resistance across all aspects of life; the world is trying to mislead the public about Iran's technological capabilities."[32]

*June 17, 2019.*—Supreme National Security Council secretary Ali Shamkhani said: "Alongside the economic war and the intelligence war, America is carrying out cyber attacks against Iran and many countries. We examine and look at these threats by cooperating and having close ties with our partners, and we have activated protective measures against them.

"A while ago, one of the CIA's most complex cyber networks was exposed and damaged by the Iranian intelligence apparatus. Due to the cooperative anti-espionage network Iran is part of, alongside many other world countries, we shared information about the American network with our partners, which led to the uncovering and collapse of a network of CIA intelligence outposts and the arrests of several

---

[28] *tasnimnews.com,* July 29, 2019.
[29] *ISNA.ir,* July 23, 2019.
[30] *farsnews.com,* July 15, 2019.
[31] *tasnimnews.com,* July 7, 2019.
[32] *alwatan.sy/archives/202919,* June 27, 2019.

21

spies, who were punished in different countries. The Americans called Iran's action an embarrassing failure."[33]

CONCLUSIONS/ASSESSMENTS

A June 25, 2019 assessment of Iran's cyber power by the Center for Strategic and International Studies Senior VP James Andrew stated that Iran's cyber operations are conducted primarily by the IRGC, the Basij, and Iran's Passive Defense Organization. According to the assessment, the IRGC is behind a series of incidents against American targets, Israeli critical infrastructure, Saudi Arabia, and other Gulf states. The Basij manages what its leaders say are 120,000 cyber war volunteers; while this number is probably exaggerated, the Basij uses its connections in universities and religious schools to recruit a proxy hacker force. The Passive Defense Organization is responsible for protecting Iran's infrastructure. There is also Iran's Supreme Council of Cyber Space, comprising senior military and intelligence officials.

The assessment adds that while Iran has probed U.S. critical infrastructure for targeting purposes, it is not clear how successful an attack would be. The kind of massive denial-of-service attacks it carried out against major banks in 2011–2013 would not be so effective today, while "the most sophisticated kinds of cyber attack (such as Stuxnet or the Russian actions in the Ukraine) are still beyond Iranian capabilities." However, poorly-defended targets in the United States, such as smaller banks or local power companies, or poorly-secured pipeline control systems, are vulnerable. "What stops Iranian action," he said, "is not a shortage of targets but rather questions about the utility of such attacks."[34]

Other past attacks that would not be as successful today involved using malicious software to wipe data, or potentially hijacking crucial machinery, as Iranian hackers attempted to do with the New York State dam in 2013.[35]

Immediately after Soleimani's killing, Jon Bateman, a former Defense Intelligence Agency analyst on Iran's cyber capabilities and now a cybersecurity fellow for the Carnegie Endowment for International Peace, said, "At this point, a cyber attack should be expected."[36] However, Hoover Institution at Stanford fellow Jaquelyn Schneider stated: "In an already dangerously volatile situation, the United States should not focus unwarranted attention on potential cyber attacks by Iran." Doing so, she added, "is a distraction from the real risk of escalation—highly alert military forces in the region inadvertently firing at one another or crossing redlines toward all-out war."[37]

IMPLICATIONS

The question is not whether the Iranians have the capability to attack our public and private-sector institutions, but when, where, and how we will respond?

The Iranians are not as capable as the Russians or the Chinese. But they have expressed their intent to develop both offensive and defensive capabilities. They are partnering with other countries to learn, share, and counter our interest. They have demonstrated an ability to conduct attacks incurring costs to private U.S. companies and foreign entities in the multi-million-dollar range. They will include cyber space operations as a key component of their asymmetric response to the killing of Soleimani. What makes this foreign threat so unique, is that it is the one area where the U.S. Government is essentially telling the U.S. private sector to "fend for yourselves." We need a National-level strategy on protection of U.S. companies from foreign cyber threats touching on everything from information sharing to insurance. Having spent the last 2 years in the private sector after decades in public service, I am consistently struck by how little our private-sector leaders understand the threat or what actions they should take in response. We need a common understanding of what an attack and war in cyber space looks like. We need increased emphasis on public-private partnership to achieve "collective defense", and we need

---

[33] *mehrnews.com,* June 17, 2019.

[34] *csis.org/analysis/iran-and-cyber-power,* June 25, 2019.

[35] *washingtonpost.com/technology/2020/01/03/cyber-attack-should-be-expected-us-strike-iranian-leader-sparks-fears-major-digital-disruption,* January 3, 2020; *washingtonpost.com/politics/2020/01/06/iran-can-use-cyberattacks-against-us-thats-not-nearly-bad-it-sounds,* January 6, 2020.

[36] *washingtonpost.com/technology/2020/01/03/cyber-attack-should-be-expected-us-strike-iranian-leader-sparks-fears-major-digital-disruption,* January 3, 2020.

[37] *washingtonpost.com/politics/2020/01/06/iran-can-use-cyberattacks-against-us-thats-not-nearly-bad-it-sounds,* January 6, 2020; *nytimes.com/2020/01/07/opinion/iran-cyber-attack-hacking.html,* January 7, 2020.

PX382

22

increased emphasis on educating the populace on the real threat from cyber space activities.

I look forward to your questions.

Chairman THOMPSON. Thank you for your testimony.

I now recognize Mr. Warrick to summarize his statement for 5 minutes.

### STATEMENT OF THOMAS S. WARRICK, NONRS. ESIDENT SENIOR FELLOW, ATLANTIC COUNCIL

Mr. WARRICK. Mr. Chairman, Ranking Member Rogers, Members of the committee, thank you for the opportunity to testify.

One week ago today, the IRGC fired 22 missiles at 2 Iraqi airbases. According to the *New York Times,* if the attack had killed Americans the options put in front of the President would have included cyber attacks to disable Iran's oil and gas sector. It is important this committee asks whether the United States oil and gas industry would have been ready for the Iranian cyber attack that would have followed.

Here is another question, not hypothetical. While Americans celebrated Thanksgiving, someone hit Iran with a massive cyber attack publicly disclosing 15 million Iranian debit card numbers on a social media site. The Iranians made the rare concession that this was, "very big". It is important this committee asks if our bank and credit card companies are ready if Iran tries to hack the card numbers of millions of Americans.

In my testimony I'm going to discuss the 4 ways Iran threatens the homeland. I want to make 3 preliminary points about Iranian cyber attacks and then focus on Iran's peculiar sense of symmetry as a means of understanding how they would carry out threats.

Mr. Chairman, Iran's 4 possible attack vectors are terrorism, cyber attacks, disinformation, and influence operations. Of these, terrorism is the least likely in the short term but it is still possible. The last state-sponsored attempted terrorist attack on U.S. soil was in 2011 when a group of IRGC Quds Force officers tried to assassinate the Saudi Ambassador in Washington, DC. Iran can also call on proxy groups like Lebanese Hezbollah.

No. 2, cyber threats, I'll come back to in a second.

No. 3, disinformation operations. Iran spreads false propaganda about the United States including the false idea that the United States actually supported ISIS, which obviously was not true.

Fourth, influence operations. As General Stewart said and as there was an outstanding exposé in *Wired* magazine in August 2018, I note more recently Facebook and Twitter have since found thousands of accounts linked to the Iranian government. Iran is getting better at influence ops.

Let me go back to cybersecurity and make 3 preliminary points. First, Iran and its allies considered the United States, Israel, and Saudi Arabia as responsible for each others' attacks. To be sure, we hold Iran responsible for the actions of its proxies.

Second, the Trump administration uses sanctions and cyber attacks as their go-to tools. U.S. officials have admitted twice on background to recent cyber attacks on Iran, and as I mentioned earlier, the option of a cyber attack after an American had been killed on January 8.

PX382

23

Third, the implication that it is safe for the United States to carry out cyber attacks against Iran is actually dangerous. Iran will retaliate but the cyber defenses of Iran's likely targets are uneven.

Mr. Chairman, this leads me to the most important point I would like you to take away from my testimony. Iran's government follows a peculiar sense of symmetry. When the United States does something to Iran, Iran tends to respond, not in exactly the same way but the symmetry is there. Some examples: After the January 2 strike against Soleimani, the Iranian Supreme Leader told his national security council to "strike America directly and in exact proportion to the attack".

More strategically, in May 2018, United States maximum pressure sanctions slashed Iran's oil exports. Iran tried to show that if the United States could cut Iran's oil exports, Iran could cut our allies' exports, in May and June with attacks on tankers and a Saudi pipeline, then with a September 14 Abqaiq attack that briefly cut Saudi oil exports in half.

Another symmetry: On July 4, Britain seized an Iranian tanker that was violating international sanctions. On July 19, Iran seized a British tanker. On August 15, the British authorities released the Iranian tanker. On September 27, Iran released the British tanker. There is symmetry in cyber space. After Stuxnet targeted Iran's industrial control systems in 2010, Iran developed a similar offensive capability and used it here in the United States in 2013. That took 3 years.

In August 2012, Iran's Shamoon malware deleted 35,000 hard drives at Saudi Aramco. What got less publicity is that 6 months earlier something called Wiper deleted data on national Iranian oil company computers. In July 2012, new U.S. sanctions targeted Iranian banks. Two months later Iran ramped up denial-of-service attacks whose main targets were U.S. banks. The symmetry goes in the other direction.

When the Iran Nuclear Deal was enforced, Iranian cyber attacks appeared to drop. More recently after the 2018 maximum pressure campaign, Iranian cyber attacks increased. Within 24 hours after the June cyber attacks against Iran, private U.S. businesses noted an increase in Iranian cyber attacks.

Mr. Chairman, let me briefly mention 3 points about what the United States should do to defend the homeland.

First, any time the U.S. Government thinks about cyber offense it needs to focus just as much on cyber defense. Over time, Iran has improved its cyber capabilities, reduced its response time and shown it is capable of strategic surprise. This is especially a problem with Iran because of their peculiar sense of symmetry. Anything we do to Iran, Iran is likely to do back at us.

Second, while most Federal Government computers are protected, U.S. civilian cyber defenses are uneven. DHS and the FBI both need more resources to work more closely with the private sector.

Third, it is very good that DHS has increased its efforts since January 3 by repeating earlier warnings, issuing new alerts, putting out a new in-task bulletin and jointly releasing a joint-intelligence bulletin with the FBI.

PX382

24

The Trump administration needs now to increase and elevate its efforts to educate the American people about what they and we need to do to protect ourselves. Iran is going to be a threat for the foreseeable future. I'd be happy to answer any questions.

[The prepared statement of Mr. Warrick follows:]

PREPARED STATEMENT OF THOMAS S. WARRICK

JANUARY 15, 2020

Mr. Chairman, Ranking Member Rogers, Members of the House Committee on Homeland Security, thank you for the opportunity to testify today on implications of current U.S.-Iran tensions on homeland security.

In the morning hours of Wednesday, January 8, 2020, Iraqi time, the Iranian Islamic Revolutionary Guards Corps (IRGC) fired 22 surface-to-surface missiles at 2 Iraqi airbases, Al-Asad and Irbil, killing no one. According to the *New York Times* this past Sunday, if that attack had killed any Americans, the Pentagon would have put in front of President Trump a set of retaliatory options that included strikes on an Iranian naval vessel and cyber attacks "to partly disable Iran's oil and gas sector."

Would the United States oil and gas industry have been ready for an Iranian cyber attack that would likely have followed?

That is a hypothetical question, but the next one is real. While Americans celebrated Thanksgiving, someone hit Iran with a massive cyber attack: Publicly disclosing 15 million Iranian bank debit card numbers on a social media site. On Wednesday, December 11, Iran's telecommunication minister—who previously shrugged off U.S. cyber retaliation for the September 14 Iranian attack on a Saudi oil facility—made the rare admission this was "very big."

After first saying the attack was an inside job, Iran said on December 11 that a nation-state carried it out.

Are we confident that all the banks and credit card companies in the United States are ready to defend themselves if Iran tries to hack into the names and card numbers of millions of Americans?

Since the December 27 killing of an American citizen at an Iraqi military base outside Kirkuk, a lot of attention has rightly been paid to the possibility of a shooting war between Iran and the United States. However, for more than a decade, Iran and the United States have been engaged in a campaign in cyber space that affects the U.S. homeland. That campaign is now expanding into other arenas as well. Iran's campaign deserves more attention from the American people and the U.S. Government because it requires us to look at possible strategic gaps in our defenses. For example, while most Federal Government computers are protected, U.S. civilian cyber defenses are uneven.

This campaign fits into a larger strategic picture that we can discuss during the question-and-answer session. Today I will go quickly through the 4 ways that Iran threatens the homeland. I would like to draw the committee's attention to 3 preliminary points about cyber attacks specifically. I will then focus on what I call Iran's peculiar sense of symmetry, which helps explain much of Iran's logic in its campaigns against us. Finally, I would like to respectfully suggest some areas where the committee may be able to help the United States better secure itself from Iran's efforts to target us, especially in cyber space.

FOUR WAYS IRAN THREATENS THE UNITED STATES

There are 4 possible attack vectors that Iran could use to target the United States: Terrorism, cyber attacks, disinformation, and influence operations.

*1. Terrorism is unlikely but possible, at least in the short term.*—The last state-sponsored attempted terrorist attack on U.S. soil was in 2011, when an extremely small number of IRGC Qods Force (IRGC–QF) officers, including Abdul Reza Shahlai, tried to assassinate the Saudi Arabian ambassador, Adel Al-Jubeir, in a Washington restaurant. The plot was worked through Mansour Arbabsiar, who was arrested by the FBI in 2011 when his flight between Mexico City and Amsterdam landed at New York's John F. Kennedy airport. Arbabsiar pled guilty and cooperated with authorities in helping obtain evidence against other IRGC officers involved in the plot. Arbabsiar is now serving a 25-year sentence in Federal prison in Marion, Illinois. U.S. law enforcement officials long tried to bring Abdul Reza Shahlai to justice, most recently on December 5, 2019, by offering a $15 million reward for information leading to the disruption of his fund-raising and spending networks. He was reportedly the target of a separate strike in Yemen the night of Jan-

PX382

25

uary 2–3. Although it is unlikely the Houthis in Yemen, who get resources and aid from Shahlai and the IRGC–QF, would turn him over, the United States should continue to bring him to justice.

Iran also can call on proxy groups like Lebanese Hizballah. On December 3, 2019, Ali Kourani was sentenced to 40 years in prison for being a sleeper operative for Hizballah's terrorist arm, the Islamic Jihad Organization.

*2. Cyber-threats from Iran are certain, and on-going.*—DHS's Cybersecurity and Infrastructure Security Agency (CISA) put out a statement by Director Chris Krebs in June and elevated it to an alert on January 6 after the January 2 strike on Qasim Soleimani. DHS released a National Terrorist Advisory System (NTAS) bulletin on January 4. DHS and the FBI have also released a Joint Intelligence Bulletin to State and local law enforcement. I will focus on Iran's cyber threats in a moment, but the extent to which the Iranians are improving in this area should be a concern.

*3. Disinformation operations.*—Iran has used disinformation operations against the United States, spreading false propaganda that has included the outrageous idea that the United States supported ISIS. A State Department Inspector General report said that in 2016, one-third of the Iraqi public held this view. Iranian disinformation was the chief reason.

*4. Influence operations.*—Facebook and Twitter have found thousands of social media accounts who looked liked regular users and independent organizations, but were in fact linked to the Iranian government.

### THREE PRELIMINARY POINTS ABOUT CYBER ATTACKS

Mr. Chairman, permit me to go back to cyber attacks.

First, when Iran retaliates for attacks against it, Iran and its allies consider the United States, Israel, and Saudi Arabia as responsible for each other's attacks. Iranian proxies held the United States responsible for a strike conducted by the Israelis. To be sure, the United States holds Iran responsible for the actions of Iran's proxies.

Second, in recent months, the Trump administration has decided that sanctions and cyber attacks are their go-to tools. After the September 14 kinetic attack on a Saudi oil facility, the Trump administration searched for a "cyber silver bullet." President Trump was reportedly "reluctant to widen the conflict in a region he has said the United States should leave." And, as I noted earlier, a cyber attack was one of the options if the Iranians had killed anyone at Al-Asad or Irbil on January 8.

This leads me to my third preliminary point. The implication that cyber attacks are somehow safer for the United States than kinetic attacks is dangerous. The cyber defenses of Iran's likely targets in the United States are uneven. More needs to be done to prepare the American people for Iranian cyber retaliation.

### IRAN'S PECULIAR SENSE OF SYMMETRY

This leads me to my most important point: When it comes to the United States, Iran's government follows a peculiar sense of symmetry. When the United States does something to Iran, Iran tends to respond—not exactly in the same way, but the symmetry is almost always there.

This applies across the board, in both kinetic attacks and in cyber space. Look at what Iran said and did after the January 2 strike against Islamic Revolutionary Guards Corps Qods Force (IRGC–QF) Major General Qasim Soleimani. The next day, Iranian Supreme Leader Khamenei made an unusual appearance at the Iranian Supreme National Security Council and gave them a written order that Iran "strike America directly and in exact proportion to the attack," as two sources told the *New York Times.*

Consider the September 14 Iranian attack on Saudi oil facilities at Abqaiq: Starting in May 2018, "maximum pressure" U.S. sanctions reduced Iran's oil exports. Iran thinks it is defending itself against economic warfare waged by the United States. After Iran tried for a year to get Europe to ease the pressure, Iran showed it could reduce U.S. allies' ability to export oil, first in May and June with attacks on tankers and a Saudi pipeline, then with the Abqaiq attack that halved Saudi oil exports.

Another symmetry: On July 4, Britain seized an Iranian tanker violating international sanctions. On July 19, Iran seized a British tanker. On August 15, Gibraltar authorities released the Iranian tanker. On September 27, Iran released the British tanker.

Iran's sense of symmetry is more pronounced in cyber space. In 2013, Iran developed a cyber attack capability after the "Stuxnet" malware that targeted Iran's Sie-

26

mens industrial control systems (ICS) came to light in June 2010. From Stuxnet's discovery until Iran's first ICS attack was 3 years.

On July 30, 2012, new U.S. sanctions targeted Iranian banks. Two months later, Iran ramped up denial-of-service attacks whose main targets were—U.S. banks.

In August 2012, Iran's surprise "Shamoon" attack deleted 35,000 Saudi Aramco hard drives and was described as "the biggest hack in history." What got less publicly is that in early 2012, malware later dubbed "Wiper" deleted data on Iranian Oil Ministry and National Iranian Oil Company computers.

The symmetry can be positive: When the Iran nuclear deal was in force, Iranian cyber attacks appeared to drop. This comes from anecdotal evidence, because U.S. companies are not required to report Iranian cyber attacks to the Department of Homeland Security.

When the Trump administration began its 2018 "maximum pressure" campaign, Iranian cyber attacks increased within 24 hours.

On June 20, 2019, after Iranian attacks on civilian tankers, President Trump retaliated by cyber attack. Private U.S. businesses noticed a further increase in Iranian cyber attacks.

This leads to 3 important points: Over time, Iran has both improved its cyber capabilities and reduced its response time. What took Iran 3 years to respond to in 2010, and 6 months to respond to now in 2012, is now down to days and hours.

Additionally, the United States also needs to recognize that Iran is capable of strategic surprise. Iran achieved strategic surprise with the precision of its kinetic attack against Abqaiq in September 2014, and the apparent precision in hitting targets on January 8 at Al-Asad and Irbil—all without killing anyone. Iran could achieve strategic surprise in cyber space, and we would not know it until they hit us.

Before I go on to discuss what we should do, I want to make one point clear. Iran's sense of symmetry doesn't mean that if we stopped what we're doing, Iran would stop being a threat to the United States and our allies. Iran would still continue to harbor its nuclear ambitions and, more importantly, it would continue its malign behavior that is de-stabilizing the region, including being a threat to Israel and other U.S. allies. We can discuss this more in the question-and-answer session, but Iran's strategic goals have never been more clear than they are now, after the January 2 strike that killed Qasim Soleimani.

WHAT U.S. POLICY MAKERS SHOULD DO

Mr. Chairman, let me turn to what the United States should do to address the threats to the homeland from Iran. I will focus here on Iran's most active threat to our the cyber defenses.

Most Federal Government computers are protected, but U.S. civilian cyber defenses are uneven. Iran's previous civilian targets included "aerospace, defense, and petrochemical companies," local government, universities, and a business owned by a prominent American supporter of Israel.

On June 22, Chris Krebs, the director of DHS cybersecurity warned of a "rise in malicious cyber activity . . . by Iranian regime actors and proxies." He warned of increasing Iranian use of "wiper" attacks and Iranian efforts "to steal data and money." He renewed this warning earlier this month.

Normally, when U.S. policy makers consider kinetic strikes, they activate plans to notify and protect military and civilian personnel and facilities. The same logic should apply for cyber attacks, but it doesn't.

First, responsibility for offense and defense is divided. Cyber Command and the National Security Agency handle military offense and defense, but the FBI, DHS, and—notably—the private sector handle civilian defense. While there is coordination, they don't all go to the same meetings or have access to the same information.

Second, notification of the private sector in advance of cyber attacks by the United States or our allies is not feasible because too many people would have to be notified. If Iran's retaliation is fast, decentralized, or has good opsec, the private sector will get no warning.

Normally, the threat of Iranian cyber retaliation would lead the President and his top officials to have a frank conversation with the American people about why cyber attacks against Iran are necessary and why Americans should increase their cyber defenses, roughly analogous to the 1950's "civil defense" campaign.

However, drawing attention to the risks of cyber attacks against Iran would undercut the President's goal not to be seen heading into another Mideast conflict. Yet the best defense is to say, publicly and in multiple channels, that the American people need to do more to defend themselves against cyber threats from Iran and elsewhere.

PX382

27

DHS's campaign since January 3 of repeating earlier warnings, issuing an NTAS bulletin, and issuing cybersecurity alerts are all welcome developments. My concern is that these warnings will reach cybersecurity experts and people like this panel who follow threats from Iran very closely, but that the American people and smaller American businesses will not. Cyber operators are looking for the unlocked door.

This starts with the basics: (1) Update your software. (2) Install anti-virus software. (3) Use two-factor authentication where you can. (4) Watch out for phishing emails. (5) And most importantly, educate yourself to resist efforts by our adversaries to sow division among Americans. Congress should give thought to how we educate both our young people in school and ourselves as adults. Cyber defense is a life-long enterprise.

Lower-level warnings, like the CISA director's January 4 statement, will not be enough to deter severe criticism from the American people if Iran achieves strategic surprise like Iran's 2012 Shamoon attack or the recent Abqaiq attack.

The United States and its allies should not "do nothing" in response to attacks like Abqaiq. Nor should we cease all measures that oppose Iran's destabilizing actions.

However, because of Iran's peculiar sense of symmetry, the Trump administration needs to do more to prepare the American people to defend against Iranian cyber retaliation. Whoever was behind the exposure of 15 million Iranians' debit card numbers, the Iranians will be motivated to retaliate in kind. A possible cyber attack to partially disable the Iranian oil and gas sector could put America's oil and gas sector at risk of a comparable attack.

Iran has shown us, twice, that the IRGC has improved its kinetic capabilities. It has shown us over the past 10 years it has improved its cyber capabilities. It's incumbent on the U.S. Government to work more closely with the public and the private sector to improve U.S. cyber defenses. Iran will continue to be a threat for the foreseeable future.

I would be happy to address any questions and to go into the strategic issues that we haven't been able to cover so far today.

*Thomas S. Warrick is a Nonresident Senior Fellow at the Atlantic Council. He worked Iraq and Iran issues for the State Department from 1997–2007 and was the Department of Homeland Security's senior Iran expert from 2007 until June 2019.**

Chairman THOMPSON. Thank you very much for your testimony.

I now recognize Brigadier General Tata to summarize your statement for 5 minutes, and I hope I didn't ambush your name too much.

## STATEMENT OF ANTHONY J. TATA, CEO AND PRESIDENT, TATA LEADERSHIP GROUP

General TATA. Chairman Thompson, Ranking Member Rogers, Members of the committee, thank you for inviting me here today for the privilege of providing comment on the important topics of homeland and National security.

Killing Qassem Soleimani and Abu Mahdi al Muhandis, both specially-designated terrorists, provides for a safer Middle East and a safer homeland in America. In strategy and in warfare, leadership networks and resourcing matter. Soleimani and Muhandis were experienced commanders overseeing a vast terror network that executed Iran's revolutionary strategy of exporting terror backed by Iran's $26 billion military budget.

Together they carried out 3 decades of terror against the United States and our vital interests and allies in the Middle East to include, but certainly not limited to, training, resourcing, and resupplying Shia militias in Iraq to disrupt U.S. operations, resourcing Hezbollah to attack Israel, planning and resourcing the thwarted attack on a Washington, DC restaurant a few miles from here, creating money-laundering schemes within the United States to fund

_____
*Attachment has been retained in committee files.

PX382

terrorism, protecting the bin Laden family, al-Qaeda leadership and Taliban members immediately after the 9/11 attacks, training, resourcing and transporting Abu Musab al Zarqawi and other al-Qaeda members to fight coalition forces in Iraq, resourcing the Houthi rebels in Yemen to attack Yemen and Saudi Arabia, and resourcing and commanding multiple recent attacks against U.S. interests in the region.

Just as Osama bin Laden orchestrated the attacks that killed nearly 3,000 Americans, Soleimani orchestrated attacks that killed and maimed over 6,500 Americans through improvised explosive devices alone. Just as bin Laden continued to pose a clear and present danger to American interests world-wide until his death, so did Soleimani. Soleimani, however, was more dangerous than bin Laden because he was flush with resources from Iran, a designated state sponsor of terror whose defense budget has risen 60 percent between 2015 and 2018, from $16 billion to $26 billion.

Soleimani developed, refined, and deployed explosively foreign penetrators, lethal roadside bombs made of Iranian milled 6-inch copper discs, PVC or steel pipe, urea nitrate, a blasting cap, and typically a passive infrared switch trigger. When a target crossed the beam on the passive infrared switch, it ignited the blasting cap which, in turn, detonated the explosives, propelling a molten copper disc at 8,000 feet per second through its mark, killing and maiming whoever might be in the projectile's path of destruction.

Frequently, the destruction from an EFP sealed the vehicle's doors shut, leaving American soldiers to burn alive. Often Soleimani's EFPs were deployed in multiple arrays where several copper discs would punch through Humvees and other fighting vehicles, ripping arms and legs from service men and women. Soleimani and his chief lieutenant, Muhandis, were the masterminds behind and suppliers of these EFPs. Just in the last 18 months, 2 U.S. Federal judges each separately found Iran liable for their role in killing and injuring Americans in Iraq by providing material support to Iran's proxy terrorist groups.

Those U.S. District Court cases are *Karcher* v. *the Islamic Republic of Iran* and *Fritz* v. *the Islamic Republic of Iran,* which I have included in my testimony. Evidence in both cases proved that Soleimani and Muhandis, both senior leaders in Iran's IRGC Quds Force, acted on behalf of Iran to ensure Americans would die. Just one quote from witness testimony in those cases, from General David Petraeus, the MNF–I press conference he spoke at in April 2007 said, "And there's no question, again, that Iranian financing is taking place through the Quds Force of the Iranian Republican Guards Corps to support opposition forces in Iraq."

As they were moving freely about the region coordinating terror with Hezbollah and Shia militias in Iraq, Soleimani and Muhandis presented themselves in a designated combat zone as the leaders of a designated terrorist organizations, the Quds Force and Kata'ib Hezbollah. President Trump responded appropriately under the same authorization of use of military force that President Obama used against state and non-state actors in Iraq, Syria, Afghanistan, Yemen, the northern tier of Africa, and other locations.

While serving as the deputy commanding general of U.S. forces in Afghanistan in 2006 and -7, I directed several combat missions

29

to include drone strikes, artillery strikes, air assaults, and other operations, some of which found me on the ground with the soldiers conducting those missions.

Everything I've seen, read, and understand regarding the strike underscores its legality, importance, and proportionate nature to reset the balance of power in the Middle East with respect to U.S. interests and Iranian influence. The Soleimani strike is consistent with U.S. National security strategy as it relates to Homeland Security.

I brought a copy of the strategy today that the President published in 2017, that mentions pursuing threats to their source and defeating jihadist terrorists, and dismantling transnational criminal organizations, both of which the Quds Force is.

Practically, in my roles as an education leader here in Washington, DC and in North Carolina as secretary of transportation, and now as a chief executive with Air Data Solutions, I have been steeped in analysis of threats and responsibility for specific homeland security infrastructure and citizens over the last 10 years. To include—I am concerned about, including cyber attacks on key infrastructure such as airport, air traffic systems, physical security of soft target such as schools and mass transit for shock value, attacks on seaports to impact commerce, smuggling weapons and other resources to enable attacks, and biological warfare against crops affecting our food supply.

Finally, with Soleimani and Muhandis removed from the equation, we have an opportunity to positively reshape the dynamic in the Middle East toward peace and enhance homeland security. As a young United States Military Academy cadet, in 1981 my classmates and I witnessed first-hand the return of U.S. hostages in Iran to American soil at West Point, where they spent their first weeks reintegrating. The cruelty of the Iranian Islamic Revolution is seared in my memory and I'm personally proud that we have begun to fight back.

Thank you, sir.

[The prepared statement of Mr. Tata follows:]

PREPARED STATEMENT OF ANTHONY J. TATA

JANUARY 15, 2020

Chairman Thompson, Ranking Member Rogers, Members of the committee—thank you for inviting me here today to provide comment on the important topics of homeland and National security.

Killing Qassem Soleimani and Abu Mahdi al Muhandis, both Specially Designated Terrorists, provides for a safer Middle East and a safer homeland in America.

SOLEIMANI'S LEGACY OF TERROR

In strategy and warfare, leadership, networks, and resourcing matter. Soleimani and Muhandis were experienced commanders overseeing a vast terror network. Backed by Iran's $26 billion military budget,[1] together they carried out 3 decades of terror against the United States and its vital interests and allies in the Middle East, to include (but are not limited to):[2]

 i. Training, resourcing, and resupplying Shi'a militias in Iraq to disrupt U.S. operations;

---

[1] Decoding Iran's Defence Spending, *International Institute for Strategic Studies,* November 13, 2018.
[2] *The Exile—The Stunning Story of Osama bin Laden and Al Qaeda in Flight,* Cathy Scott-Clark and Adrian Levy, Bloomsbury (2017).

PX382

30

ii. Resourcing Hezbollah to attack Israel;
iii. Planning and resourcing the thwarted attack on a Washington, DC restaurant;[3]
iv. Creating money-laundering schemes within the United States to fund terrorism;[4]
v. Protecting the bin Laden family, al-Qaeda leadership, and Taliban members immediately after the 9–11 attacks;
vi. Training, resourcing, and transporting Abu Musab al Zarqawi and other al-Qaeda members to fight coalition forces in Iraq;
vii. Resourcing the Houthi rebels in Yemen to attack Yemen and Saudi Arabia;
viii. Resourcing and commanding multiple recent attacks against U.S. interests:
- Shooting down 2 drones
- Seizing oil tankers
- Attacking Saudi oil fields
- Killing an interpreter and wounding 2 soldiers in Kirkuk
- Attacking the U.S. embassy in Baghdad.

Just as Osama bin Laden orchestrated the attacks that killed nearly 3,000 Americans, Soleimani orchestrated attacks that killed and maimed over 6,500 Americans through improvised explosive devices alone. Just as bin Laden continued to pose a clear and present danger to American interests world-wide until his death, so did Soleimani. Soleimani, however, was more dangerous than bin Laden because he was flush with resources from Iran, a designated state sponsor of terror, whose defense budget has risen over 60 percent between 2015 and 2018 from $16 billion to $26 billion.

Unlike bin Laden, who spent his final years as an isolated hermit, Soleimani was able to use his title and rank as a shield from prosecution and retribution. He skillfully used the Iranian-state apparatus as his "keys to the kingdom" of the Middle East. With approval from the highest-authority in Iran, the Supreme Leader, Soleimani used Iranian-state-owned businesses and banks as virtual cash machines to fund and support his terrorist activities, and those of proxy groups including Hamas, Hezbollah, and al-Qaeda. To think that Soleimani was not planning or actively trying to kill Americans at the time of his death is to deny or ignore everything he had done in Iraq for years preceding his death. Soleimani spent those years zealously targeting Americans and killing them—more so than any single individual terrorist in recent times.

IMPACT ON U.S. SERVICE MEMBERS, CONTRACTORS, AND THEIR FAMILIES

Indeed, Soleimani was an expert at death and destruction. In April 2007 I had just returned from a 13-month tour of duty as the deputy commanding general of U.S. Forces in Afghanistan and was appointed as the deputy director of the Joint Improvised Explosive Device Defeat Organization—responsible for training the force, defeating enemy IEDs, and attacking enemy IED networks. Accordingly, we had operations and intelligence cells State-side and in both the Iraq and Afghanistan theaters of operations.

Soleimani developed, refined, and deployed explosively-formed penetrators (EFPs)—lethal roadside bombs made of an Iranian-milled 6-inch copper disc, PVC/ steel pipe, urea nitrate, a blasting cap, and typically, a passive infrared switch trigger. When a target crossed the beam of the passive infrared switch it ignited the blasting cap which in turn detonated the explosives, propelling a molten copper disc at 8,000 feet per second through its mark, killing and maiming whoever might be in the projectile's (and its many fragment's) path of destruction. Frequently the destruction from an EFP sealed the vehicle doors shut, leaving American soldiers to burn alive. Often Soleimani's EFPs were deployed in multiple "arrays" where several copper discs would punch through Humvees and other fighting vehicles, ripping arms and legs from servicemen and women. Soleimani and his chief lieutenant Muhandis were the masterminds behind, and suppliers of, the EFPs. Soleimani and his terrorist proxies spearheaded Iran's efforts to inflict death and destruction on Americans in an attempt to disrupt American foreign policy objectives in the region, and to deny the Iraqi people a free and democratic Iraq.

---

[3] Iranian Charged in Terror Plot, *The Washington Post,* Jerry Markon & Karen DeYoung (October 12, 2011); and Iranian agents once plotted to kill the Saudi Ambassador in D.C.—The case reads like a spy thriller, *The Washington Post,* Reis Thebault (January 4, 2020).
[4] U.S. Attorney's Office SDNY Press Release: *Hizballah Related Money Laundering Scheme,* December 15, 2011; and U.S. Attorney's Office SDNY Press Release: *Manhattan U.S. Attorney Announces $102 Million Settlement of Civil Forfeiture and Money Laundering Claims Against Lebanese Canadian Bank,* June 25, 2013.

31

The Department of Defense reports that, at least, 602 brave Americans were killed by Soleimani's lethal IEDs. While accurate, that number is misleading. For every casualty there are historically ten-fold wounded. The math then suggests that Soleimani killed and wounded over 6,500 American servicemen and women. Even that number in no way captures the costs to tens of thousands of American spouses, children, parents, and communities all ripped apart as if they themselves were hit by these gruesome bombs.

### IRAN AND SOLEIMANI RESPONSIBLE

Just in the last 18 months, two U.S. Federal judges each separately found Iran liable for their role in killing and injuring Americans in Iraq by providing material support to Iran's proxy terrorist groups. Those U.S. District Court cases are *Karcher et al* v. *the Islamic Republic of Iran* and *Fritz et al* v. *the Islamic Republic of Iran* (attached).** Evidence in both cases proved that Soleimani and Muhandis, both senior leaders in Iran's IRGC Quds Force acted on behalf of Iran to ensure Americans would die. Both of these cases introduced expert witness testimony from combat veterans on the front lines in Iraq that describe Iran's role in supplying EFPs to Iraqi militias that were carrying out these brutal attacks. I submit these 2 Federal district court rulings and refer to just a few quotes of supporting expert witness testimony[5] buttressing each:

- Former CENTCOM commander General David Petraeus said at an MNF–I press conference in April 2007: "And there's no question, again, that Iranian financing is taking place through the Quds force of the Iranian Republican Guards Corps (to Iraqi fighters)."
- Former Division and JIEDDO commander Lieutenant General Mike Oates said: "In fact, one of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs."
- The State Department issued a country report that stated: "Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians."
- Dr. David Gartenstein-Ross, said of Muhandis: "Muhandis was given Iranian citizenship in the 1990's, and became an advisor to IRGC–QF commander Qasem Soleimani. Muhandis returned to Iraq in March 2003 and created Kata'ib Hizballah in 2007."

### AUTHORIZATION OF USE OF MILITARY FORCE

As they were moving freely about the region coordinating terror with Hezbollah and Shi'a militias in Iraq, Soleimani and Muhandis presented themselves in a designated combat zone[6] as the leaders of designated terrorist organizations, the Quds Force[7] and Kataib Hezbollah. President Trump responded appropriately under the same Authorization of Use of Military Force[8] that President Obama used against state and non-state actors in Iraq, Syria, Afghanistan, Yemen, the Northern Tier of Africa, and other locations. Indeed, Iran never stopped attacking U.S. interests in the Middle East even after the Iran nuclear deal. Given Soleimani's assistance to al-Qaeda in the immediate aftermath of the 9–11 attacks, the strike on Soleimani was especially consistent with the AUMF. Indeed, President Trump's strike was part of our National security strategy of pursuing terror "threats to their source."[9]

### IMMINENT THREAT

Commanders with combat experience leading servicemen and women in harm's way are required to make life-or-death threat assessments as part of their job. Threats requiring decisive action are usually kinetic and complex, derived from a vast array of information and intelligence that needs to be considered holistically, often times in a matter of moments. The forces loyal to and commanded by Soleimani and Muhandis had already attacked and killed an American interpreter and wounded 2 soldiers with rockets, and then subsequently attacked the U.S. Embassy in Baghdad. Whether larger successive attacks were minutes, days, or weeks

---

** Attachment A has been retained in committee files.
[5] *Karcher, et al.* v. *Islamic Republic of Iran* Case No. 1:16–cv–00232–CKK (Aug. 26, 2019); and *Fritz et al.* v. *Islamic Republic of Iran* Case No. 1:15:cv–00456–RDM (August 2, 2018).
[6] Executive Order 12744 (The Arabian Peninsula Areas).
[7] Executive Order 13224.
[8] AUMF, Pub. L. 107–40, codified at 115 Stat. 224 and passed as S.J.Res. 23 by the U.S. Congress on September 14, 2001.
[9] *National Security Strategy,* President Donald J. Trump, December 2017.

32

from happening, the fact that Soleimani/Muhandis-led terrorists had already attacked the United States twice in a matter of days, coupled with their Commanders' battlefield presence and their long and malevolent pasts, underscores the very imminence of a real and present threat. It would have been irresponsible for President Trump not to act. And he did so decisively and proportionally.

While serving as the deputy commanding general of U.S. Forces in Afghanistan in 2006 and 2007, I directed several combat missions to include drone strikes, artillery strikes, air assaults, and other operations, some of which found me on the ground with the soldiers conducting those missions. Everything I have seen, read, and understand regarding this strike underscores its legality, importance, and proportionate nature to reset the balance of power in the Middle East with respect to U.S. interests and Iranian influence.

REGIONAL STRATEGY

This administration's policy and strategy in the region is well-stated in the National Security Strategy document published in December 2017, and in multiple open-source commentaries. I will summarize by saying broadly the strategy is to:

- Stop Iran's drive to hegemony in the region;
- Prevent their development of nuclear weapons;
- Disrupt their exportation of terror around the region and world;
- Coerce the Iranian government to stop oppressing its people;
- Root out terrorism at its source; and
- Protect U.S. vital interests in the region.

ELIMINATING SOLEIMANI MAKES THE UNITED STATES SAFER

The Soleimani strike is consistent with U.S. National Security strategy as it relates to Homeland Security. Specifically, the 2017 National Security Strategy highlights the administration's plan to secure the homeland by:

    i. Secure U.S. Borders and Territory:
      a. Defend Against Weapons of Mass Destruction.
      b. Combat Biothreats and Pandemics.
      c. Strengthen Border and Immigration Policy.
    ii. Pursue Threats to Their Source:[10]
      a. Defeat Jihadist Terrorists.
      b. Dismantle Transnational Criminal Organizations.
    iii. Keep America Safe in the Cyber Era.
    iv. Promote American Resilience.

By definition, if we are concerned about Iran exporting terror either to the Middle East or to the United States, if we eliminate their chief exporter, Soleimani, then we have disrupted their operations, if not dismantled them in the near term. The Quds Force is tightly aligned with Hezbollah and its far-reaching terror tentacles around the world. They were a threat 40 years ago and they are a threat now. As has been our strategy for the last 2 decades, we must find these threats as near to their wellspring as possible and eliminate them.

Practically, in my roles as an education leader here in Washington, DC and in North Carolina, as Secretary of Transportation of North Carolina, and now as a chief executive with Air Data Solutions, an infrastructure and agriculture imaging company, I have been steeped in analysis of threats to and responsibility for specific homeland infrastructure and citizens over the last 10 years.

That Iranian sleeper cells exist in the United States is a matter of record.[11] Soleimani's death has created confusion in the Quds and Hezbollah terrorist command-and-control networks and impacts the resourcing of terrorist operations abroad. Similarly, when we kill a high-value target such as Soleimani or Muhandis, their fellow terrorists begin communicating and making mistakes. We most likely have new and actionable intelligence based upon the Soleimani strike. The idea is to keep the pressure on the enemy and never let up.

That notwithstanding, the Iranians have long persisted with "Death to America" chants and while I believe the Soleimani strike presents an opportunity for diplomatic opening, there undoubtedly will be Iranian hard-liners who wish to continue with the reign of terror. To that end, since prior to recent events, I have been and remain concerned about:

    i. Cyber attacks on key infrastructure such as airport air traffic systems;

---

[10] Emphasis added.
[11] Iranian Charged in Terror Plot, *The Washington Post,* Jerry Markon & Karen DeYoung (October 12, 2011).

ii. Physical security of soft targets such as schools and mass transit for shock value;
iii. Attacks against seaports to impact commerce;
iv. Smuggling of weapons and other resources to enable attacks;
v. Biological warfare against crops affecting our food supply.

These are persistent threats, which with Soleimani gone will be much harder for Iran to execute. The strategy now should be one of continuing to engage Iran with all elements of national power, diplomatic, informational, military, and economic, to dissuade Iran from its long-standing predilection to kill Americans.

With Soleimani and Muhandis removed from the equation, we have an opportunity to positively reshape the dynamic in the Middle East toward peace and enhance homeland security. As a young United States Military Academy cadet in 1981 my classmates and I witnessed first-hand the return of the U.S. hostages in Iran to American soil at West Point where they spent their first weeks reintegrating. The cruelty of the Iranian Islamic Revolution is seared in my memory, and I am personally proud that we have begun to fight back.

Chairman Thompson, Ranking Member Rogers, and Members of the committee—thank you again for this opportunity to discuss my experience and views on this important issue and with respect to countering terrorism and protecting the homeland. I look forward to answering any questions you might have.***

Chairman THOMPSON. I thank all the witnesses for their testimony. I'll remind each Member that he or she will have 5 minutes to question the panel. I will now recognize myself for questions.

This hearing, "U.S.-Iran Tensions: Implications for Homeland Security" is titled because a lot of concern has been expressed as to whether or not with the recent incident in Iran are we in a safer or are we safe, or what should we look out for? So the question that I'd ask all the witnesses is, with those events of recent time in Iran, what do you believe is the greatest threat emanating from Iran today to the homeland?

Ambassador Leaf.

Ms. LEAF. Mr. Chairman, I think in the immediate term my biggest concern is the future of the, or the status of the U.S. military mission in Iraq for the reasons that I cited and that I went into greater detail in my written testimony. That is—the fight against ISIS is not over. The caliphate is gone but the attacks happen daily across Iraq and certainly there are thousands of ISIS members who have access to several hundred million dollars of monies for their attacks. So to the degree that we don't navigate the turbulence in Iraq well, we're going to see that mission pushed out. That mission goes directly to Homeland Security.

Chairman THOMPSON. General.

General STEWART. The question really is, is the missile attack against al-Asad—sufficient to say that we have done something and we can de-escalate and have a conversation. I don't believe that's sufficient to show the magnitude of the attack against Qassem Soleimani. So I expect that while not a direct terrorist threat to the homeland, terrorist threat globally has increased. If nothing else Soleimani controlled, and I use that term advisedly, controlled militias and the malign actors.

I don't know who controls those actors now. I don't know which ones will now say we have got to take revenge as a result of this activity. So I suspect that there will be some terrorist activity globally, time and place of choosing that requires a good bit of planning, but not directly to the homeland. The direct threat to the homeland is if the rhetoric continues and we decide to do some-

_____
*** Attachments B–D have been retained in committee files.

34

thing in cyber space. There are vulnerable areas within our cyber environment both in the financial and the electrical power sector.

So if we're not doing everything to harden those positions, again, the uncontrolled, if not controlled or then the high-level activities by the Iranians, we could see activity in cyber space, and I'm very concerned about some vulnerabilities there.

Chairman THOMPSON. Mr. Warrick.

Mr. WARRICK. Mr. Chairman, the possibility of a terrorist attack by Iran here in the homeland is that: A possibility. But cyber attacks are a certainty. Equally certain is that Iran is going to continue its disinformation operations and, as well, that Iran is going to find ways to try to divide Americans, increase divisions and conflict within our society as Russia and China are already doing.

I also do want to agree with Ambassador Leaf and go more to the point that if Iran succeeds in forcing the United States to withdraw from Iraq on Iran's terms, rather than on our own, that will be a victory that we will be paying for for many, many years. Finally, I also agree that the possibility of ISIS staging a resurgence is also a certainty. The question is whether U.S. forces are going to be able to contribute to trying to prevent that from happening.

So that poses a long-term danger to the homeland that we have to take into account.

Chairman THOMPSON. General.

General TATA. Mr. Chairman, the revolution in Iran, they have been chanting death to America for 40 years. So I look at threats: Are they willing and are they able? Certainly, they are willing and they will remain willing as long as the theocracy rules Iran. So the motivation to harm Americans has not really changed in 40 years, and the motivation to export terror has not really changed in 40 years. What, what we have to look at is what is their capability, willing and able.

They're totally willing. Now, are they as able today as they were before January 2, and my contention is with Soleimani removed from the battlefield, and Muhandis—we don't mention him a lot but Muhandis was a critical player in Iraq—with those 2 people, the leadership matters. I'd liken it to removing the queen off the chessboard. He was somebody who moved around diagonally, straight forward, backward, to make—to ensure that Iran was enabling its campaign of terror to disrupt U.S. interests, vital interests in the region.

With him gone, we have an opportunity now and Iran knows how important he is, or was to their efforts. I believe that we have an opportunity. The individual who has replaced him was in the Afghan theater for Quds Force, not as familiar with ISIS, not as familiar with the Iraq theater of war, much less capable, doesn't have the elan that Soleimani had. I believe that we have got an opportunity now to have a diplomatic outreach.

Chairman THOMPSON. I now recognize the Ranking Member of the Full committee, the gentleman from Alabama, Mr. Rogers, for questions.

Mr. ROGERS. Thank you, Mr. Chairman. We have all seen over the last few days the massive protests in Iran and for the first time they are not chanting death to America and Israel. They are pointing the figure back at the government, in part because my under-

35

standing is the economic pressure they are under there, which they are just going to be exacerbated now by our European and other allies who are talking about implementing sanctions because of the shooting down of the airliner and then trying to aggressively cover it up.

Theocracies always care about self-preservation more than anything else. Given this new level of tumult in their country, do you think that is going to heighten the chances of them striking out at us, or striking out at those protestors? What consequences would that have to our homeland security here?

General TATA. Ranking Member Rogers, I, I think the fact that they are a theocracy, I think the fact that they are, as you mentioned, are concerned about self-preservation, primarily what they will try to do is preserve their regime. So as we look at what their capabilities are, as I mentioned they are willing, they want to—it is good for their business to chant death to America and try to eliminate Israel and have that as their stick, so to speak. It is good for their theocratic ideologs of—that, uhh, follow them, and how that translates into capability; they're very capable, particularly with the $26 billion defense budget that they've had this past year.

So what we need to do is understand that the threats remain because they are still willing to do it. We have to do an assessment of the threats and in light of the Soleimani strike. What is their capability? Command-and-control is a key fundamental factor on the battlefield, and it is a life-long key factor. You know, Sun Tzu talks about it all, the clause of which, et cetera, and this is something that we really must take into account, is what is the future of Iran's Quds Force going forward?

As we kill enemy leaders, they also light up the network and begin to talk, and make mistakes, and it provides new intelligence for us. So we need to have, right now, a massive intelligence-gathering operation, which I'm sure we do, that picks up on all of the dynamics going on in the Middle East between Iran and all of its proxies so that we can build target folders and continue to keep the pressure on the enemy.

Mr. ROGERS. Now, in response to the Chairman's question, which I think is the key question for this committee in this hearing is, you know, what vulnerability do we have to the homeland from Iran, and pretty much uniformly you all said cyber threats. Going back to my point about the economic pressure and the domestic political pressure that the Iranian threats have, do they really have the economic capability to put behind a serious cyber attack on our country?

Mr. WARRICK. Mr. Rogers, they do and that is because they choose to prioritize expenditures on things like the IRGC Quds Force instead of the things that would make investments that would help their own people.

Mr. ROGERS. You think that will continue even given the economic pressures they are having, and the protests in the streets. Now, it seems to me at some point to just preserve yourself, you have got to start shifting that money back to let them have services again and money to buy groceries and things to be able to keep your power.

PX382

36

General STEWART. The cost of entering the cyber space is pretty low.

Mr. ROGERS. Is that right?

General STEWART. If you can identify malware and you can—even if you get limited amount of help in dissecting malware, you can turn that into a tool that you can use.

So the entry into this space isn't high. We are not talking about millions and billions of dollars, but a fairly low-cost——

Mr. ROGERS. From what we have heard from other panels, the cost for defensive capabilities is pretty high. That is one of the reason—and you have talked in—Mr. Warrick talked about we need to put more money behind our defensive—more assets. So it sounds like the offensive threat is less expensive than the defensive capabilities.

General STEWART. Well, the risk to their networks, it is pretty expensive to defend that, but to develop a capability that could be deployed whether for intelligence gathering, for disruption or for decisive defeat action, that cost is not terribly high. Now, they made a commitment to building their own intranet, building their down defensive capability. That was their first priority, but in terms of delivering offensive capability, that cost isn't terribly high.

Ms. LEAF. Mr. Rogers, if I could just address another element of your question.

I mean, the monies require, the budget require—first of all there is the prioritization as Tom Warrick noted, the prioritization of these asymmetrical tools including cyber, but also the proxies. If you look at Iraq or you look at Yemen—well, look at Yemen. That was a very low, small investment, high return in terms of the pressure that it put on Saudi Arabia, and the pressure it put on us indirectly. In Iraq those militias are 6—some of them go back to the 1980's, the Badr organization.

The others came up on the battlefield after the 2003 invasion, and during the fight against ISIS. They are parasitical. They are much like the IRGC, moving into the economic space and praying on the Iraqi financial bodies. So that is, again, a way that Iran does things on the cheap.

Mr. ROGERS. Thank you, I yield back.

Chairman THOMPSON. Thank you very much. The Chair recognizes the young lady from Texas for 5 minutes, Ms. Jackson Lee.

Ms. JACKSON LEE. Let me thank the Chairman and Ranking Member.

A byline that was cited by a number of news stations after the attack in Iraq on the soldiers was from a soldier that said "I was 100 percent prepared to die". To think as we relate to the issue of the impact on the homeland, we must also recognize the human impact and the deliberative responsibility of this Congress and the Executive to make informed, intelligent, and deeply strategized decisions. We are now living with the false information of weapons of mass destruction.

In the act of war, before the inspectors were even allowed to determine whether they existed, we now call Iraq the endless war. So Ambassador Leaf, I want to ask some questions and I will appreciate your indulgence of quick answers. I want to get to all of the panelists. I'd like think that the American people, I'll declare, do

37

not intend to support going to war with Iran. But what do you foresee as the next direct military conflict between the United States and Iran?

Ms. LEAF. Given the way Iran goes at conflict, which is the so-called gray zone, not head-to-head conventional conflict, it will revert to form. So attacks on shipping, cyber, et cetera, against partners. I don't see the immediate quest to take a strike at the United States because they are outmatched, but they will put pressure, they are putting pressure through Iraqi militias. That is where the battlefield is. So I don't see a strike as such being the most likely prospect.

Ms. JACKSON LEE. Do you think in using proxies, such as the Shiite group and others, could provoke the United States, however?

Ms. LEAF. That's a question I really can't answer, but it appears that the administration has settled on a line that if an American is killed, that will elicit a response.

Ms. JACKSON LEE. So we have the potential for escalation?

Ms. LEAF. Yes, as I said earlier, I do believe we are at a pause, but we are still in an escalatory cycle.

Ms. JACKSON LEE. It is clear that the President made false statements about the Obama administration giving $250 billion or $150 billion when those were dollars that had been retained, and they were Iran's dollars. So it is important to have accurate information to the American people and in the process of deliberation.

Lieutenant General Stewart, you said Iran's fastest growing audience being Russia, China, and U.S. allies in the region. Can you please clarify how you see their potential involvement and also the detriment to those, particularly the allies, in the region including Israel, Kuwait, Jordan?

General STEWART. Congressman, I think probably more than anything else the idea that we are not acting rationally and that they are conforming to international norms, is the message and themes that they are trying to get to our allies, and some of our adversaries. That we, Iran, are more stable and more deliberative in our process. We won't escalate. We will conform to agreements. We want to reduce the violence. None of which are particularly true, but those are the messages and themes that they are pushing to our allies——

Ms. JACKSON LEE. That'll be part of the false narrative as well as saying we'll stand by you when the United States will not.

General STEWART. That——

Ms. JACKSON LEE. That one of——

General STEWART. That's certainly part of the messaging.

Ms. JACKSON LEE. That only promotes danger for our soldiers, for the United States. Mr. Warrick, we are all concerned about cyber attacks. I sit on the subcommittee dealing with that on this full committee, and so give us—you gave us really a good explanation, but give us a deep dive into how far into the cybersecurity system that can impact the average American if Iran chose to do so.

Mr. WARRICK. Representative Jackson Lee, the first thing to remember is that cyber attackers are looking for an open door. So in an open society like the United States, in effect, all of us who have a computer, who have a home network, who have a small business,

PX382

38

are now on the front lines and are subject to potential attack from a country like Iran.

What this means is an entirely new dynamic. It is no longer sufficient for us to guard our military bases, or our Government buildings. We now have to figure out an entirely new strategy to work with the entire American public to educate the American people on our collective responsibilities. This is going to take, I think, an entirely different and stronger approach that I would hope would be led from the White House, in a way that makes improving our cyber defenses a National goal, much like civil defense was a bipartisan National goal in the 1950's.

Chairman THOMPSON. The gentlelady's time has expired.

Ms. JACKSON LEE. I thank you. Yield back.

Chairman THOMPSON. The Chair recognizes the gentleman from North Carolina, Mr. Bishop for 5——

Mr. BISHOP. Thank you, Mr. Chairman. Thank you all for being here.

You know, specifically, focusing on the purpose of today's hearing, there have been a number of claims in public and even maybe implications in some of the statements by Members today that there was a lack of planning by the U.S. Government including, perhaps, DHS for the aftermath of what happened in Iran. I wonder is there anybody on this panel—we have heard a confidential briefing, but is there anybody on this panel who is intimately familiar with the details of the Department of Homeland Security's planning or lack thereof?

Mr. WARRICK. Well, I believe, Representative Bishop, that would be me, but I am not going to get into any discussion of any Classified matters at an open hearing. Obviously you would want to hear from the people at DHS who are currently working those matters, as I left several months ago.

But as I know you have been briefed and as DHS leadership has said, they are quite a few activities, operations that are under way now that the Department is engaged in to try to help protect the American people.

I have no quarrel at all with any of those. Quite the contrary, I think they are excellent. I just think that there needs to be more of them and better funding from the Congress.

Mr. BISHOP. So to follow that up, Mr. Warrick, are such efforts, as a general practice, of long-standing, that is to say they don't just—aren't brought up in a crisis, but they as a matter of fact are pursued on a regular programmatic basis?

Mr. WARRICK. The Department realized after the Arbabsiar attack in 2011 that DHS had more actions going on against Iran than almost anybody else in the Government realized. I do have to say that that attempted terrorist attack on U.S. soil met with a very vigorous response from the Secretary of Homeland Security at the time and the entire Department leadership. I was very proud of having been involved in that effort.

Mr. BISHOP. Thank you, sir. General Tata, you said in the course of your comments that you have to do an assessment of threats. Would it be your expectation that those assessments would be ongoing as a matter of course over a long period of time and not just started in response to a crisis?

PX382

39

General TATA. That is correct, Congressman. The threat assessment cycle is one that is continuous, and it happens for overseas threats and for homeland security threats. The planning is all nested with the National security strategy that the President and the National Security advisor put out 2 years ago, and it very clearly talks about pursuing threats to their source and defeating terrorists, and defeating transnational criminal networks. So that is where you see DOD and DHS in the joint planning collaboration that happens where they assess threats and develop plans to counter those threats.

Part of that planning is to fight the enemy on their 5-yard line and wherever they may be. Part of it is to defend our 5-yard line to use a football analogy.

Mr. BISHOP. Thank you, General. General Stewart, in your testimony you talked about Iran's objectives and its asymmetric activities. One was to avoid the threshold for an overt U.S. action. It would appear that Iran miscalculated in this particular case. Wouldn't you agree?

General STEWART. Specific to the missile strike on the bases?

Mr. BISHOP. Yes, sir.

General STEWART. I don't think that was a miscalculation. I don't think Iran views that as a miscalculation. I think they viewed that as a demonstration that they would strike back, an overt demonstration that hit targets that they could reasonably tell their audiences that "we have done something".

Mr. BISHOP. Well, I think what I am getting at, and I am not sure if I am following you General, I am talking about the strike on General Soleimani and the killing of him. Do you think—are you saying that you think Iran anticipated that the United States would do that or did they miscalculation——

General STEWART. Not at all.

Mr. BISHOP. OK. All right.

General STEWART. Not at all.

Mr. BISHOP. One other thing is that you said that the most important information operation they have is on their own domestic population, which the regime seeks to keep united. Based on events of the last days, would you say they miscalculated on that as well and in the interest of accurate information, you know, I heard one public figure say that the killing of Soleimani is like killing Princess Di, or Elvis. Would you agree with that equivalence and do you think they have miscalculated in terms of their own population's reaction?

General STEWART. Their population reaction actually switched from a support to the reaction to the Soleimani killing but switched as a result of the airplane strike. So there is no way that they could have calculated that if we make an accidental shoot down of a commercial aircraft that the population would rise up in the wake of the cry for—the outrage over Soleimani's killing.

Mr. BISHOP. Thank you.

General STEWART. I don't know if I would call it a miscalculation. They are not dealing with it well and that causes some stress internally, but I wouldn't call it a miscalculation.

Mr. BISHOP. Thank you, sir. My time has expired. I yield back.

PX382

40

Chairman THOMPSON. Thank you very much. The Chair recognizes the gentleman from California, Mr. Correa for 5——

Mr. CORREA. Thank you, Mr. Chairman. First of all let me thank you for holding this most important hearing, and I'd like to thank our witnesses for being here today. Again, a very critical issue.

I have a question for all of you on the panel here. As you know, Iranian General Soleimani built the world's largest terrorist network with international terrorists like Hezbollah. Now that he is out of the picture, how would you characterize the threats posed by Iran's proxies, Hezbollah, Hamas, other militias, toward the United States and abroad? Do they have cells in the United States?

Is this a threat, especially given as some of you have stated, now that he is out of the picture, is there a call for revenge, and are there cells in the United States that could pose an immediate threat to us? Ambassador Leaf?

Ms. LEAF. Sir, I know that Hezbollah has cellular networks all over the world and I think it is clear that they have them in the United States. To my knowledge, this does not extend to some of the other proxy actors, but I think it is important to note, going back to your original question, that the Quds Force will survive, has survived, will survive and continue on the mission that Soleimani—the vision that he defined for the region.

Certainly it was a decapitation and Esmail Ghaani, his successor, is a character of a different type, but I have no doubt that they will exercise the kind of command and control throughout their networks, whether it is Hamas, Hezbollah, and certainly in Iraq in such a way that our interests will be threatened.

Mr. CORREA. So Ambassador, are you saying that command and control, despite his elimination, is still there and therefore there is discipline in the ranks?

Ms. LEAF. Certainly in Iraq, yes.

Mr. CORREA. In the United States, the cells?

Ms. LEAF. These—well, I'm going to defer to Tom Warrick on the issue of Hezbollah.

Mr. CORREA. Thank you. General Stewart.

General STEWART. I don't know—I won't speak to cells here, but the estimates are 20- to 80,000 members make up this militia, 20- to 80,000. Some of them will remain under command and control of the IRGC Quds Force. My greater concern are which of the ones that will go rogue with the intent to avenge the death of Soleimani, the martyred Soleimani.

Mr. CORREA. That's a question mark?

General STEWART. That's a question mark. I don't know how many, but even if a small percentage——

Mr. CORREA. Mr. Warrick, I'm running out of time. Excuse me, General.

Mr. WARRICK. So there was the recent disruption of a Hezbollah group including one of their sleeper operatives. It would be foolish of us to assume that by taking one out that there aren't others that need to be addressed by the FBI at the proper time and place. I do agree though with General Stewart and with Ambassador Leaf, that the Iranians would regard it as a ruthless but "good at a trade" if United States were forced by Iran to leave Iraq, if all they thought they had to pay was the price of one of their generals, I'm

PX382

41

afraid the ruthlessness of the regime would make them think that was a good deal for them.

Mr. CORREA. General Tata.

General TATA. Yes, Congressman, it is well-documented by the FBI and Southern District of New York in open source, and other places that there are sleeper cells here in the United States both for the Quds Force and for Hezbollah financing. I referenced in my opening statement about the hundreds of millions of dollars that there were being laundered by Hezbollah in the United States, a case brought before the Southern District of New York, or by the Southern District of New York.

The FBI intercepting the plot by the Quds Force to attack a restaurant a few miles from here in Washington, DC. It would be naive of us to assume that there aren't other cells that we have not yet found. So they exist and as far as command-and-control networks of Quds Force, you know, you take out the—you destroy part of that network. Certainly they will regroup and reassemble, but you cannot overestimate the impact of killing Soleimani, in my opinion.

Mr. CORREA. General Stewart, we talked about the capabilities, cyber, offensive capabilities of Iran. Is there a possibility that they could team up with Russian experts and come up to a greater level of threat to the homeland if they were to do that?

General STEWART. In their own words, they have talked about partnering with a number of countries, to include the Russians, the Pakistanis. So in their own words they talk about sharing and collaborating. So if they do that they certainly can increase their capability.

Mr. CORREA. The Chair, thank you very much.

Chairman THOMPSON. Thank you very much. The Chair now recognizes the gentleman from Texas, Mr. Crenshaw for 5 minutes.

Mr. CRENSHAW. Mr. Chairman, thank you everybody for being here. I'll start with you, Ambassador Leaf.

You mentioned the importance of the mission in Iraq and that's a contentious issue across the political spectrum. Could you address directly why we have a mission in Iraq and address directly the, you know, the slogan of no more endless wars? Why are we there? What's the U.S. interest?

Ms. LEAF. The importance of the U.S. military training and advisory mission in Iraq goes precisely to a homeland security issue which is ISIS, which continues to regenerate in Iraq and of course across the border in Syria. So that is forthrightly the mission, and I think it is a critical one.

Now, the size, the shape, the duration and so forth is a question that we should have a very strong voice in. I agree firmly with what Tom Warrick said earlier. If we are seen to be pushed out by this collection of a militia-affiliated actors in Iraq, or the militias themselves, we are going to lose critical intelligence. The Iraqi security forces will lose critical training and assistance to be able to counter that threat that goes beyond their own homeland.

Mr. CRENSHAW. Related to that would be the question of Iranian influence in Iraq. If we were pushed out it would become an Iranian proxy state, if you will. Does that affect U.S. National security

PX382

42

and related to that question, do you see the PMFs becoming the next Hezbollah?

Ms. LEAF. So the way I look at it is Iraq is at real risk of becoming a militia state, and as such will again pose a threat to the security of not just the neighborhood, but more broadly in the region.

Mr. CRENSHAW. Mm-hmm.

Ms. LEAF. We don't want to return to Saddam's days when Iraq was a real threat all across the way. So there are a multiplicity of these militias. They are, as I said, predatory, parasitical. They are thuggishly repressing hundreds of thousands of Iraqis who turned out with a quest to turn Iraq into a normal state. Iraq is not fully normal yet and it is in our interests to stay the course and help them do that, not only through this military mission, but the military mission is a critical component of our reason for being there.

Mr. CRENSHAW. All right. I want to move on to General Stewart and information operations that you mentioned. You talked about the use of social media by the Iranian government to spread their misinformation campaigns. In the last couple of weeks, how have you seen any change in that and how have they used the hyper-divisive reaction to Soleimani's killing, and the media narratives out there, have they used that internally to spread their own misinformation campaigns?

General STEWART. I have not seen that yet but I anticipate that they are laying the foundations to use the divisiveness. They are laying the foundation for the divisions, the social divisions within our country. We have seen them talk about doing that.

Mr. CRENSHAW. Yes.

General STEWART. But in the last 10 days I have not seen an increase in that level of activity.

Mr. CRENSHAW. For both Mr. Warrick and General Stewart, as far as the symmetry that you talked about, does Iran currently have even close to symmetrical capabilities as far as offensive cyber warfare against the United States? Is there something you are worried about in the future? Are you worried about it now? Because it is not as if we don't receive attacks from Iran in the cyber realm every day.

Mr. WARRICK. But I—you are right on that, Representative Crenshaw, but it is a fact, as General Stewart said, that offensive cyber operations are cheap. Defensive cyber operations are very expensive.

Mr. CRENSHAW. I understand. I'm trying to get a sense of the capability as it stands now.

General STEWART. You don't have to have the same capability that the United States or Russia has. You only have to have one——

Mr. CRENSHAW. Yes.

General STEWART [continuing]. Can impact the electrical power grid on the east coast of the United States, and the cascading effects of that one device, and that is why it is asymmetrical.

Mr. CRENSHAW. I agree with that. I just—my question is it is not like they haven't tried, right? I mean in Texas we had 10,000 attacks. So are they not implementing their full capability yet? Is that your assessment?

General STEWART. Well, we call every event an attack.

PX382

43

Mr. CRENSHAW. Yes.

General STEWART. It might be reconnaissance.

Mr. CRENSHAW. Yes.

General STEWART. It might be simply probing. It might be an attempt to simply deface. All of those are precursors to "The Attack".

Mr. CRENSHAW. Right.

General STEWART. But generally, we are pretty cavalier about an event that occurs—an anomaly on a network and we can attribute it as an attack, and it doesn't mean that they don't have that capability and could, in fact, turn those probing events into a destructive event.

Mr. CRENSHAW. Mr. Warrick, you are very familiar with CISA and what they have been doing in the Department of Homeland Security. Is there anything they are not doing that you would suggest that they improve upon, because they have made quite a few steps in the last couple of years to improve upon cybersecurity in the homeland?

Mr. WARRICK. So if you look at the entire number of cybersecurity specialists that CISA has, that number would be dwarfed by putting 1 or 2 of our banks together with the number of cybersecurity people they have. So the staffing disparity of what is needed to protect the country is very different. This is one of the things that I would hope this committee and your colleagues on the Appropriations Committee would work together to address.

We have totally mismatched the idea of offense and defense, because in the military realm it means one thing. It is totally different in homeland security in cyber space.

Chairman THOMPSON. Gentlemen——

Mr. CRENSHAW. I am out of time. Thank you, Mr. Chairman.

Chairman THOMPSON [continuing]. From Texas' time has expired. The Chair recognizes the young lady from New Mexico, Ms. Torres Small.

Ms. TORRES SMALL. Thank you, Mr. Chair. Thank you, Mr. Ranking Member. Esteemed witnesses, I really appreciate you being here. I want to pick up on Congressman Crenshaw's questions about National security. I recognize that, you know, what is being said here is that that is the most likely attack we will continue to see. Mr. Warrick, you described it as a certainty at this point that we will continue to see it.

I am very interested in your conversation about a security gap that exists between Federal entities and some civilian entities. Most troubling of which are critical infrastructure and financial institutions. So my concern is, was you talked about opening a door and lots of attempts to open those doors, and such that all of us are now a threat. How do you see that impacting more rural utilities or smaller utilities, like water, wastewater, energy, and what can we do to address that threat?

Mr. WARRICK. So what the Iranians as other potential or actual cyber adversaries face is they literally try computer system after computer system until they find somebody that has not updated their software; that does not have antivirus software; that has failed to use two-factor authentication; that has failed to do all of the basic things that really need to be something that we start

PX382

44

teaching in America's schools. This needs to be done exactly in the way that we did the Civil Defense Campaign in the 1950's.

The difference then being that a nuclear attack was a horrifying possibility, but a cyber attack these days from our adversaries like Iran is an absolute certainty. So I would hope that this would get a lot more attention across the board and at all levels.

What would not be something that any of us as citizens would want to see is a very destructive cyber attack by an adversary that has achieved strategic surprise against us as the Iranians have shown that they can do, and that there would have to be something like another 9/11 committee, or dare I say it, even a Pearl Harbor committee that would look into how did we miss this.

I'm telling you right now Representative, that the mismatch between what CISA has in the way of resources and what the threat is, is a strategic vulnerability to the United States homeland.

Ms. TORRES SMALL. Mr. Warrick, thank you so much for that. I think looking long-term in terms of education, I think is very valuable. In terms of short-term and the staffing challenges that you described and the resources, again, I want to get back to rural and small utilities.

What kind of resources does CISA need? What types of expertise do we need to facilitate that type of outreach?

Mr. WARRICK. So the larger utilities, obviously, have more resources. The smaller utilities are more uniquely vulnerable but cover, as you know, large areas and therefore there is more at risk. This is very much a situation where ways have to be found, obviously, to do various risk-based measurements. CISA has a considerable amount of expertise in trying to do those risk-based assessments.

So I recognize there has to be prioritization, but I also recognize that our adversaries have very different prioritization and will look for the weakest target that they can find in a way of showing their dominance over us in cyber space.

Ms. TORRES SMALL. Thank you very much. Just shifting gears slightly, in the last time I have, in the event of a successful cyber attack against the United States, what is the likelihood of an attack being linked to the actual actor?

Mr. WARRICK. One of the challenges is that although the attacks take place in seconds, as General Stewart knows better than any of us, having been at CYBERCOM, it can take, you know, days, weeks, or months to try to sort out who is responsible. This is an asymmetry that we have to recognize and I don't think there is any substitute for.

I would defer to General Stewart.

General STEWART. Attribution remains a challenge, but we are seeing the actors who use certain techniques, certain tools, certain approaches. So it is getting a lot—I won't say a lot. It is getting easier to attribute, but it is still—I could give a tool to a proxy and that proxy could use that tool in multiple domains to get to the target which really makes it hard to define who does it.

Ms. TORRES SMALL. Are there specific resources that Department of Homeland Security could apply to increase the ability to correct attribution?

PX382

45

Mr. WARRICK. The least significant but most important is one that I know my colleagues have been asking for which is the ability to require American businesses who have been hit by a cyber attack to disclose relevant information to the Department so that they can begin understanding and assessing this.

General STEWART. The private sector believes that the Department has a lot more intelligence that can attribute to targets than we actually do. The reality is in the private sector there is tremendous amount of intelligence capability. How we share that data, and this is why it is so important as public-private partnership, the sharing of the data, the collaboration in real time, is critical if we are going to attribute and react in a timely manner.

Ms. TORRES SMALL. Thank you. My time is expired.

Chairman THOMPSON. Thank you very much. Just for the record, this committee led a bipartisan letter to the appropriators, got CISA $350 million more and we plan to go back again and say, based on some of the conversations today because we're still behind in terms of capacity. We can only get that capacity with investment. So——

Mr. WARRICK. Mr. Chairman, we want to thank as just private citizens, I thank the Members of the committee for doing that because that was hugely important.

Chairman THOMPSON. Absolutely. The Chair recognizes the gentleman from Louisiana, Mr. Higgins, for 5 minutes.

Mr. HIGGINS. Thank you, Mr. Chairman for holding this important hearing. I thank our witnesses for appearing today. I'd like to dive into the—some would say controversial killing of terrorists. I personally support the killing of terrorists in the battlefield, including President Trump's decision of order, precision, strike, to take out known and brutal terrorist Soleimani.

Iran is a threat to our homeland and continues to be the leading state sponsor of terrorists groups, and proxy terrorists groups across the world. They provide shelter and training for terrorists and intend us harm. They are no friend to the United States of America.

When I say, they, meaning an Iranian regime, not the Iranian people. One of my best friends, been my friend since 1984, is an Iranian citizen that was stuck in his country—he was going to college and when the Ayatollah Khomeini took over and the radicals took over Iran, he was stuck in the country. If he went back he will be shot. To this day, he can't go back.

So Iran, the Iranian regime is the issue and the threat they pose to our Nation, both our homeland and abroad, not the Iranian people. The Iranian people are beautiful people.

I have come to know their culture through my friend, but the Iranian regime is most certainly a terrible issue that we must confront. I think the—I am going to ask a question to Lieutenant General and the Brigadier General, both my generals. General Stewart, I'd like you to address, if you would, in your written statement you mention a divide between Democrats and Republicans with the narrative of how this thing is rolling, especially on social media.

You said that that is used by an Iranian as, "information operation targets". Can you explain in greater detail what that means, please?

PX382

46

General STEWART. Just like we have seen with other foreign governments who have taken every divisive issue, every divisive issue and then amplified it in a social media space so that long before we even cast a vote, we made a determination as to which side is telling the truth. We have seen this done by other nation states. We see this being done by the Iranians. Any—pick your socially divisive issue, any one of them.

Create an environment, and I won't call out any social media platform, create an environment, create the messages, drive people to those left and right lateral limits, and I have often said publicly and privately, I am not afraid of the Russians, the Chinese, the Iranians, or anyone else. I am concerned about the divide in our country and social media allows that divide to occur, and lots of us are amplifying those horrible——

Mr. HIGGINS. Well-stated and that division as it becomes manifest and publicly consumed on social media is a tool that Iran used to recruit, is it not?

General STEWART. I don't know how much recruiting they used that means, but they do cause disruption in our society and division in our society. It certainly could be used for recruiting.

Mr. HIGGINS. Thank you for that clarification. Brigadier General Tata, in your written statement you described that the world is a safer place because of President Trump's call to kill the known terrorist Soleimani. In your opinion, do you believe that we are prepared to counter any future attacks by his successors, although to some uncertainty as there should be? We shook them up regarding who that successor will be. Do you believe we are prepared?

General TATA. I do believe we are prepared. I think the intelligence and communications, and special forces, and combat force posture throughout the Middle East is appropriate and to defend U.S. vital interests which are defense of people, property, and the shipping lanes. Those are the key U.S. vital interests that we have, and of course to be able to root out terrorism at its source, to disrupt attacks on the homeland.

So as we in the days after, weeks, months after the strike on Soleimani, the key for us in my opinion is that we have to have an intelligence apparatus that can continue to collect information, so that we can make informed decisions about how to continue to disrupt the terrorists that want to do us harm. That to me is fundamental more than anything else going forward.

Mr. HIGGINS. Thank you for that answer and your clarification, and your service. Madam, gentlemen, thank you for appearing today. Mr. Chairman, I yield.

Chairman THOMPSON. Thank you very much. The Chair recognizes the gentleman from New York, Mr. Rose for 5 minutes.

Mr. ROSE. Thank you, Mr. Chairman for gathering this extraordinary panel. I must say as well whenever Mr. Higgins speaks, I always consider yielding all my time to him, but I will resist.

In the immediate aftermath of the killing of Qassem Soleimani, something that for the record I did support, there was a concern regarding reaching out to jurisdictions regarding a potential terrorist attack, cyber attack. As a New Yorker, we saw that there was a strong communication between the JTTF, NYPD, and DHS.

PX382

47

But what I'm concerned about is that we don't know what we don't know about our communications with other jurisdictions.

In your experience, does CISA, DHS, as a whole, do we have contacts with every locality? Have we built communications with every jurisdiction and do we have a means of at least grading whether they are up to a certain requirement, whether it be counterterrorism or cybersecurity? I'll begin with you Ms. Leaf.

Ms. LEAF. I think that really falls outside my bailiwick of expertise and I would defer to my——

Mr. ROSE. Of course, thank you.

General STEWART. I can't completely speak to this except for when I talk to industry partners who do not believe there is a great connection between their requirement at the, let's say a small or medium-sized bank, so the right connection within DHS to the right connection inside the IC. So from a commercial standpoint the sentiment is we are not well-connected. I don't know how the Homeland Security is connected to the municipalities and governments, but——

Mr. ROSE. OK.

General STEWART [continuing]. From a private-sector standpoint, they don't feel well-connected.

Mr. WARRICK. So to square the circle, Congressman, someone at DHS could show you a map that says that the entire country is covered by fusion centers; that the entire American economy is covered by sector groups that meet with specific sectors. That much is true, but the reality is how many people are there within those JTTFs and how many people are there within those sector groups to reach out to all of the American State and local law enforcement, private businesses, and others. That is what produces the gap, and General Stewart has correctly——

Mr. ROSE. Do you think that this gap is something that we should be trying to analyze and establish some type of metric?

Mr. WARRICK. I wouldn't spend a lot of time analyzing it. The gap has to be addressed in a very serious way and urgently, lest we find ourselves the victim of strategic surprise from somewhere.

General TATA. Congressman, as former secretary of transportation in North Carolina, I had a law enforcement agency. I worked very closely with emergency management in North Carolina. I worked very closely with the Department of Public Safety, the equivalent of DHS at North Carolina's level, the Department of Transportation's work with the Highway Patrol.

All of those entities have a fusion cell and emergency management, and we worked very closely with FEMA and DHS. What I saw a few years ago when I was in that position was close coordination between DHS, FEMA, and other law enforcement agencies such as the FBI.

Now, can everything been improved always? Yes. But at the time the infrastructure is there and so it may be time to rejuvenate that or to put some emphasis on that.

Mr. ROSE. Last thing, my last minute. Can you speak to the potential for, and I don't think this is considered nearly enough, the potential for a cyber attack combined with a lower-scale terrorist attack? Iran seems to have both capabilities, and do you see that on your threat landscape?

PX382

48

General STEWART. It is certainly in the realm of possibilities, but I don't see any indication of that and I think that would be highly escalatory which would be counterproductive for the Iranians.

Mr. WARRICK. It is also true that the people who do terrorist attacks, and the people who do cyber attacks from Iran don't talk to each other.

Mr. ROSE. Can you expand on that?

Mr. WARRICK. The way Hezbollah and the Quds Force have organized their terrorist activities is through very tightly-held stovepipes. This is a matter of public record. This isn't the least bit sensitive. If you look at the way the FBI and the Department of Justice detailed the actions of the Hezbollah sleeper operative who was recently convicted and sentenced to 40 years in prison, you can see how tightly-stovepiped Hezbollah kept its operatives.

Cyber attacks are done through totally different mechanisms. That is detailed in General Stewart's testimony and it is done through different mechanisms. It would be quite something if they could combine those. Let us hope they don't.

Mr. ROSE. Thank you. That's very helpful.

Chairman THOMPSON. Thank you. The Chair recognizes the gentleman from Pennsylvania, Mr. Joyce for 5 minutes.

Mr. JOYCE. Thank you, Mr. Chairman. Thank you for holding such an important hearing today.

It is no secret that the Iranian regime is no friend of the United States. If I could just briefly summarize the highlights from some of General Tata's comments today that we heard. General, you testified broadly that Soleimani was a specifically-designated terrorist, and his murder, his removal from our continent, from our world, from our lives, makes for a safer Middle East and a safer homeland here in the United States. I, for one, could not be in more agreement with this.

Soleimani was a terrorist who had the blood of hundreds of American soldiers on his hands. Weakness and appeasement of Iran by the previous administration left the United States in a weaker position in the region, and led to a deeply-flawed Iran deal. Under the current President, we have taken a different tack, pulling out and seeking to re-establish against this rogue Iranian regime.

General Tata, your testimony also highlights that Iran and its proxies have posed a threat for over 40 years. Why have the past strategies, including President Obama's nuclear deal, why have they failed to reign in Iran's hostile activities?

General TATA. Thank you, Congressman for that question. I think part of it lies in the fact that Iran is a theocracy and they will always, as long as they are a theocracy fueled by extremist—Islamic extremism, they will always want to annihilate and remove Israel from the face of the earth. They will always want to destroy America and Western values.

Fundamentally, they are in opposition with the West. So for my point of view, that will not change as long as they are a theocracy fueled by fundamentalist Islam. So the nuclear deal, you know, just this year we have the removal of the sanction to export arms that would come due and come out of the deal had it still been in effect.

PX382

49

In 3 years, they would be able to import centrifuges and ballistic missiles.

Five to 10 years to people in the Middle East is the bat of an eye, and it is something that they will provide a holding action while they continue to do things. The deal did not prevent them from conducting, obviously conducting terrorist attacks against the U.S. interests in the region. So it is this belief that we can conduct a deal with them, that will result in some kind of peace. What we can have is deterrence, detente, and, you know, establish a power to counter their power in the region.

Mr. JOYCE. General Tata, what additional steps—those deterrents that you bring to the table, what would you recommend that we utilize moving forward to secure our homeland and to mitigate additional threats from Iran?

General TATA. Thank you, Congressman. The additional steps I would recommend, I have mentioned a few, ensure that we have robust intelligence capabilities in the Middle East to be able to pick up on the movement of these proxy groups and to determine how Iran is going to try to conduct more influence operations, whether or not that is kinetic or cyber. Or, you know, and this administration is expert at pulling the levers of diplomatic information, military economic power and synchronizing them to achieve specific effects. So they need to continue to do that.

Where they struck with military precision, no collateral damage on a confirmed terrorist target and killed that target, removed him from the battlefield. Now we need to take a look at what lever of power can now be best applied to achieve our strategy that is well-stated in the National security strategy to achieve that strategy and move forward. Now that we have a deterrent effect in that region, maybe they will talk. Maybe they will come and achieve at least some sense of detente.

Mr. JOYCE. Thank you for your important information you brought to us today, and I yield my remaining time.

Chairman THOMPSON. Thank you very much. The Chair recognizes the gentlelady from Illinois, Ms. Underwood, for 5 minutes.

Ms. UNDERWOOD. Thank you, Mr. Chairman. Since the events in Iran I have been briefed by the Department of Homeland Security, the Department of Defense, the chairman of the Joint Chiefs, the Secretary of State, CIA director Haspel, and the acting director of National Intelligence. In the briefings I received information and intelligence regarding threats and the administration's efforts to keep us safe in the wake of the escalation.

As I have learned more about the administration's military escalations in Iran, the question for me is, are we safer? The answer after much listening, reading, studying, questioning, and listening some more is, no.

Americans and our allies are in greater danger. Our country is not safer in the wake of the Trump administration's recent actions. Without a doubt, General Soleimani got the fate he deserved and Iran remains an adversary. But after examining the facts, we are on less stable footing in the region.

The military has suspended counter-ISIS activities. More troops have been sent into a dangerous region. Iran is now closer to building a nuclear weapon than they were before the attack and we are

50

more isolated from our allies and partners. Ensuring the safety and security of Americans at home and abroad is my most important duty as a Member of Congress. In order to do that, I voted for the War Powers Resolution, and I pledged to work to keep our country safe from any counter attacks from Iran.

In response this administration's recent actions, we know that Iran is more likely to deploy asymmetrical operations on U.S. critical infrastructure and our allies. Because of this, the intelligence community continues to caution that a possible attack led by Iran, Iranian proxies would likely include a malicious cyber operation. Ambassador Leaf, General Stewart, and Mr. Warrick, as a nurse, I am concerned about how vulnerable our country's hospitals are as targets of cyber attacks.

What would a Wiper or ransomware attack look like if carried out on a hospital?

Mr. WARRICK. Representative, this would be one of the most serious attacks against any community, as we have seen from ransomware attacks that have been tried, including some that Iran has had its hand in. Any time you have a situation like that you are looking at the potential loss of patient records and ability to access medications, allergies, and other information that is necessary for the preservation of life and health. So this could be one of the most important types of targets an adversary might attack.

General STEWART. We continue to see adversaries look at the hospital system, and as Mr. Warrick pointed out earlier, we are all part of the attack surface because we all have a smart device of some sort. We plug into a Wi-Fi network that is unsecured. Almost every one of the devices in a hospital is on an unsecured network to allow folks to move laterally inside the network, steal data, disrupt systems. We are extremely vulnerable in the hospital and health care sector, and this is not just about stealing data. This is about impacting—we have hearing aids now that are Bluetooth-enabled.

Ms. UNDERWOOD. Right.

General STEWART. So all of our systems are connected and all of them create an attack surface from which you can move laterally and be disruptive. So I think this a really important area to focus on securing our health care infrastructure. It has been targeted. It is a high priority for all of our potential adversaries and criminals. So it is an area that I think we really need to invest in and set some standards for securing networks.

Ms. UNDERWOOD. Yes, sir. Ambassador Leaf, did you want to add anything?

Ms. LEAF. No, not on this topic.

Ms. UNDERWOOD. OK. What Federal resources are available for hospital administrators to proactively address cybersecurity vulnerabilities against a cyber attack from either foreign adversaries?

General STEWART. I can't speak to that.

Mr. WARRICK. Yes, there is advice that is available. There are tactics, techniques, and procedures.

Ms. UNDERWOOD. Mm-hmm.

Mr. WARRICK. But the problem is, of course, that implementing them is most often left to the communities that fund those hos-

PX382

51

pitals. It is not a subject of a massive Federal grant that somehow solves the problem. It has to be done at the State and local level in the communities.

Ms. UNDERWOOD. Right. So it sounds like it is an open vulnerability and, you know, General Stewart mentioned stealing data, but there is also interruptions in service delivery, threats to individuals' health and wellness. So this is something that I hope that this committee and our colleagues in Congress can address.

General Stewart, in your testimony you reiterate that the findings presented in the world-wide threats assessment of 2019 that, "Iran is also attempting to deploy cyber attack capabilities that would enable attacks against critical infrastructure in the United States and allied countries."

Can cyber attacks perpetrated by Iran and Iranian actors such as the ransomware attacks on Baltimore and Atlanta, provide insight into the potential scope and magnitude of future cyber threats from Iran?

General STEWART. So the ransomware attacks that we will see more of, by the way, it is a quick way to get funds. More and more companies are paying the ransom because they have seen the cost of Baltimore mitigating the ransomware attack. So these are criminal activities that could certainly be utilized by state actors to wipe data, to be disruptive and ultimately be disruptive on a network. So the techniques used for ransomware from the criminal standpoint are the same techniques that a nation-state could use to destroy data that they think is appropriate for disruption.

Ms. UNDERWOOD. Thank you. As I stated before, as a Member of Congress, it is my responsibility to ensure the safety and security of Americans at home and abroad. I am committed to working with my colleagues in the House and on this committee so that the United States is prepared for all contingencies related to U.S.-Iran tensions and I yield back. Thank you.

Chairman THOMPSON. Thank you very much.

The Chair recognizes the gentleman from New York for 5 minutes, Mr. Katko.

Mr. KATKO. Thank you, Mr. Chairman, and thank you panelists for being here. The discussion has been excellent and I think the testimony has been very well taken.

The situation in Iran has raised, what I think is the biggest vulnerability in our country, and I think—I just want to digress for a moment which I normally ask questions, I do want to make some observations then ask a question. I think the consensus is, is that the easiest and most, perhaps, effective way to fight back for state actors that are bad actors, or individuals across the globe that are bad actors, is cyber attacks.

I really do believe that we are having this discussion; we are talking about the things, talk about our concerns; we are talking about our vulnerabilities just like we did before 9/11, and we didn't do enough before 9/11 to stop what happened on 9/11. It is, to me, the biggest concern I have, is the vulnerability to this country from cyber attacks. I think since 9/11 we have done a very good job in the anti-terrorism field, not a perfect job but a much better job.

Look at the resources that we put into the post-9/11 era to make us safe from terrorist activities. Now we have this metastasizing

PX382

52

problem of cybersecurity. As I look at it, I do think it is the greatest threat to our country right now, for some of the reasons we discussed today. As I look at it, there is 4 areas I think we can focus on to really prioritize what we need to do. Then I want to ask a couple of questions on it.

First is cybersecurity proficiency is the smaller the business, the smaller the family, the less knowledge they have on the issue, the bigger the problem. Banks, of course, have whole departments like you know that—but, you know, a lot of businesses can't afford that. Therefore their vulnerability is amazing. Target's major security breach happened because of a heating and air conditioning contractor, gave the bad guys access into the system. That is what we have got to be thinking about. We are not thinking about it.

The emerging technology, some of us noticed. I think you noticed it. Lieutenant General with respect to, you know, Fitbits and the watches that we have. The internet of things is coming and the problems that that is going to pose for us. Every household in this country is going to have 20, 30, 40 devices that provide access to the internet and provide back doors to cyber attacks. So that is another thing we need to think about.

Even the supply chain issue with 5G technology and all of that. CISA and all CISA is doing. CISA is a young start-up company, basically, and they are doing a wonderful job under unbelievably difficult circumstances. The ISACs they develop Nation-wide have been wonderful, but it is not enough.

Then of course, you have on top of all that, you have let us beef this up. You already have a shortage of 330- to 400,000 employees, right now in this country for cybersecurity jobs. They project that with the next year or 2, or 3, there will be over a million-person shortage.

So how do you do that without drilling down and getting into the school curriculums like you suggested? So this is a huge problem and we have done, as a committee, I think a remarkably decent job of addressing and trying to get funding to CISA, but it is nowhere near enough and it takes much more than this committee.

So with setting the doomsday scenario—I don't mean to do that, but at the same token, we have got to acknowledge, tomorrow if a bad actor wanted to flick a switch they could take out a grid somewhere. They could affect our water supply systems.

They are not doing it probably because we can do it to them, but also they probably view—that we would view it as an act of war. So with all that being said, what should we be doing? I know we are talking about the problems. What should we be doing to try and look at this thing holistically much better than we have right now? Mr. Warrick, I'd ask you first.

Mr. WARRICK. So Representative Katko, there is a lot that you have said I would certainly associate myself with. I think where we are as a country is that we have built an enormous part of our economy around an internet that simply grew up out of a series of decisions originally as a defense program that turned into something that frankly, you know, from 50 years ago we would have thought as science fiction. Now we all carry around in our pockets more computing power than what it took to get Americans to the moon.

PX382

53

But there has been no sort-of equivalent security architecture——

Mr. KATKO. That is right.

Mr. WARRICK [continuing]. To make that safe. This is going to require DHS, and FBI, CYBERCOM, the entire technology-related security architecture of the United States to figure out how better to work with the private sector. We don't want the Federal Government dictating standard and reducing innovation. That comes from a combination of public and private measures that frankly have made our economy vibrant. But something more has to be done on security.

One of the things that concerns me is that at DHS over the past decade since the Department was founded, we have added missions, and added missions, but we have not had resources added to match the missions that have been added. This committee, I know Mr. Higgins—I heard him at a hearing yesterday—make some important statements about the need for an authorization bill and one of the things I'd ask you all to look at is, is the Department of Homeland Security adequately scoped for the missions that it now has, because they are different from what the Department had when it was stood up in 2003.

We are, I think, at a fundamental mismatch between the security needs and what is funded by the Department and others to do right now.

Mr. KATKO. Mr. Chairman, I am out of time, but this is something I just think we have to spend a lot more time on it going forward.

Chairman THOMPSON. Well, and there is no disagreement. I think you will see some legislation proposed by Mr. Richmond to kind-of close the loop on some of those unmet challenges that we face as a country. The Chair recognizes the gentlelady from Michigan, Ms. Slotkin, for 5 minutes.

Ms. SLOTKIN. Thank you all for being here, for your testimony and for the conversation.

I am concerned, separate from the events that went on in the past couple of weeks, I am concerned about looking forward and making sure we are doing everything we can to protect ourselves and particularly to protect ourselves in our States, and back home. I am hosting a big call this Friday, just called Enhancing Readiness on Cyber Threats for my State and local folks, for everything from election officials to town supervisors.

I wondered if you could, maybe General Stewart, walk us through very briefly just to give people back home an understanding of how Iran is organized on cyber threats. You know, what does it look like? Is it someone in a headquarters? Is it a non-associated group under special cover? Just give us the literally 30-second version of how they are organized and perpetrate attacks.

General STEWART. By their own words they have somewhere in the order of 2,000 or so folks organized from a strategic level, through tactical levels, designed to No. 1, defend their networks, and No. 2, develop capabilities to go after any targets, partnering with nation-states. In their own words, again, we are looking for friends and partners friendly to us. They cited Russia, China, Pakistan, as friendly partners. So they are organized at the strategic

PX382

54

level. They are organized at the tactical level. They have specialized teams that conduct operations, both research and preparation for follow-on ops.

So they are well-structured throughout. They made a commitment to this effort over the last 10 years.

Ms. SLOTKIN. We know that in sort-of modern-day cyber warfare everybody is on this front lines. It is not traditional military or intelligence targets. We have talked about, you know, and I think Representative Katko, who has now departed, is absolutely right that one day the other shoe is going to drop, and we are all going to have this issue right in our face in a much more serious way. I know just as being a former CIA officer, after 9/11 we made a lot of progress on getting different intelligence community agencies to speak to each other, and to have better communication.

Then from the Federal down to the State and local law enforcement. But what kind of things should we be doing if we are thinking about the future of CISA and DHS, Mr. Warrick? What kinds of things should we be looking for and pushing for to now take it to the next level, so that we can be helping our businesses, small and large, protect themselves, since they are on the front lines?

General STEWART. Let me frame it this way. Sixty percent of small and medium-sized business fail within 18 months of a breach in cybersecurity. That is the economic underpinning of our Nation. Sixty percent will fail within 18 months. Insider threats are the greatest threat. So go back to how do we educate the population, because insider—all of the companies that have reported a breach, generally these are from the inside. They all have firewalls. They all have antivirus and it is some unknown entity inside that kicks off the attack. So we have got to do much better at coordinating at the National intelligence level, and I have seen significant coordination over the last 18 months.

The piece that I think is still missing—and I have mentioned this before—how do we move that from the National intelligence agencies, down to DHS, who are overwhelmed? I got to tell you, DHS does not have the number of folks——

Ms. SLOTKIN. Right.

General STEWART [continuing]. In order to carry out all of the missions that we have given them.

Ms. SLOTKIN. Right. So then let me just push you a little bit, because I have only a little bit of time, and maybe Mr. Warrick, you can answer this. Give us a vision of what "right" looks like. We have talked about how on a bipartisan basis this committee is very supportive of enhancing the resources that CISA and DHS has generally. Structurally, if you are king for a day, how do we get from where we are to a better place?

Mr. WARRICK. Every American citizen needs to realize that they are a source of cyber vulnerability or cyber resilience and strength. They see the Department of Homeland Security providing a coordinating mechanism that shares and assimilates the information that we give back so that if an adversary starts to attack us we can defend ourselves in microseconds. That is what the future needs to look like and boy are we not there right now. You are absolutely right.

PX382

55

Ms. SLOTKIN. I would just offer in my remaining couple of seconds that similar to Representative Katko, I think we have an interesting opportunity to speak as a committee about what we want to see proactively and I think CISA would welcome this, right, the opportunity to tell us how they get to "right" since they are not resourced the way they need to be now. I would welcome the opportunity for the DHS officials to come up here and offer those thoughts so that as we go into planning for next cycle we can give them the resources they need to protect us, or help protect us.

Chairman THOMPSON. We will. We have gotten a confirmation. The Acting Secretary is scheduled to come on March 3 to defend the budget. We will look at that. The problem most often comes is when someone will ask the Secretary, do you have all the money you need to keep us safe? He will, or she will generally say, I am here to defend the numbers. We are here.

So we get there but just like we put the additional $350 million in the budget for CISA last time, it was not in the budget but we put it there. So—and that was all of us working together to make that happen. So what I'm hearing now is that in a similar fashion we will have to kind-of take it on ourselves to do the right thing. Thank you.

The Chair now recognizes the gentleman from Mississippi, Mr. Guest, for 5 minutes.

Mr. GUEST. Thank you, Mr. Chairman. To our distinguished panel, thank you for being here this morning. I thank you for what you do each and every day to keep our Nation safe.

General Tata, you provided to us a written statement that lists forth in that statement what you describe as Soleimani's legacy of terror. In there you list that Iran has a $26 billion military budget and that for 3 years Iran, under Soleimani's leadership, has carried out 3 decades of terror against the United States. You go on to say that those include resources that Hezbollah has been provided to attack our allied nation of Israel in the Middle East.

It talks about him creating money-laundering schemes to fund terrorism; that following 9/11 that he was responsible for protecting the bin Laden family as well as al-Qaeda leadership. More recently we have seen Iran and General Soleimani be involved in the shooting down of drones, the seizing of oil tankers in the Strait of Hormuz, the attacks on the Saudi oil fields, the killing of an American contractor, and the recent attacks on the United States Embassy in Baghdad.

You go on to state that General Soleimani has killed or maimed more than 6,500 Americans and that he posed a clear and present danger to Americans' interests across this globe. You go on to say more so that he was more dangerous that Osama bin Laden himself. Then finally you close by saying that Soleimani's years of zealously targeting Americans and killing them made him more dangerous than any other terrorist in recent times. Do you believe that President Trump acted responsibly in authorizing the strike that killed General Soleimani?

General TATA. I do believe he acted responsibly, quickly, boldly, and it would have been irresponsible for him not to act.

PX382

56

Mr. GUEST. A matter of fact, you go on in your report to say not only was—did he act responsibly, but you said he also acted decisively and proportionally. Would you expand on that very briefly?

General TATA. Yes, so it was—if you see the pictures, obviously there was no collateral damage. The 2 high-value targets were killed which, by definition makes the command and control of those militias and back to Iran much more challenging for that state actor and the non-state actor. So, yes, it was under the use of authorization of use of military force.

Soleimani was heavily involved in the transporting bin Laden family and Taliban, and other al-Qaeda members immediately after 9/11. That's very well-documented and he hosted them in Tehran for several years afterward. He also moved Zarqawi from Afghanistan to Iran and then moved him into Iraq and resourced him. So there is no question that the AUMF applied to Soleimani and to Muhandis, quite frankly.

Mr. GUEST. General Tata, finally, as you close out your written statement, you say with Soleimani removed from the equation we have an opportunity to positively reshape the dynamics in the Middle East toward peace and enhanced homeland security. Do you believe that our homeland is safer today following the death of General Soleimani?

General TATA. I do believe the homeland is safer today because Soleimani and his, you know, morale-building, vast reach that he has is no longer. Any time that you take out such a leader with flare and élan and networks, and capabilities, and resourcing, there is going to be an impact. It may be weeks, months, years, but there is an impact.

It gives us this opportunity to exploit that impact and say to Iran we were serious about this. We will deter. We will defend and do not do this again. Do not allow for these networks to resurge and become the threat that they once were.

I believe if we do that we may be able to get a discussion going. We are going to be able to contain them, I think, and deter them. You know, until the theocracy is gone, I don't have any illusions that much will change as far as their willingness to do us harm.

Mr. GUEST. Finally, General Tata, do you believe and you say in your report that with the death of General Soleimani that this will help move the peace process forward in the Middle East?

General TATA. No, he was totally counterproductive to the peace process. That was part of Iran's two-pronged strategy was to pretend like they were deliberating in good faith and then to undermine all of our efforts in the Middle East, whether it is our interests with Israel, whether it is the interest in the Persian Gulf, whether it is our interests throughout southwest Asia by using Soleimani to conduct strikes.

So with him gone, we are safer, Congressman, and to add to some of the previous discussion, I would just say that in the homeland here I would hope that as we are doing legislation to make homeland security more robust, Mr. Chairman, that we would take a look at airports, seaports, railroads, energy systems and their vulnerabilities with regard to cyber, because now with Soleimani and all of them gone, this give us a two-pronged opportunity to re-

PX382

57

shape in the Middle East and also to make more robust, as the discussion here has led to, our homeland security.

Mr. GUEST. Thank you, Mr. Chairman. I yield back.

Chairman THOMPSON. Thank you very much. The Chair recognizes the gentlelady from California, Ms. Barragán, for 5 minutes.

Ms. BARRAGÁN. Thank you. Ambassador Leaf and Mr. Warrick, what consequences may result from the suspension of counterterrorism operations against ISIS and how should the administration be preparing for contingencies at home and abroad?

Ms. LEAF. Well, Congresswoman, it really depends on how long this goes and it goes back—endures, and it goes back to the issue I mentioned at the outset, which is it is quite critical for us to be navigating the turbulent waters in Iraq right now and that is quite testing. There is a hard push to get our mission out. It is incumbent upon us to signal very clearly, very consistently to—both privately and publicly that the cost to Iraq of that question, not just to us. But the cost will be significant. We will lose intelligence. We will lose the ability to have eyes on the problem.

Mr. WARRICK. Representative, every counterterrorism expert that you could get to come before this panel in or out of Government will tell you ISIS is planning a resurgence. The most dangerous thing I would say, speaking for myself, is a terrorist safe haven from which they can plan attacks, recruit, train, build capacity, and thereby threaten the homeland. So the terrorist safe haven is the thing we most need to try to prevent.

ISIS would like to establish one in eastern Syria or western Iraq, and that is a mission that I think we would neglect at our peril. So I—that would be the most important thing I think we need to be focused on, is trying to help the Iraqi government build up the capabilities so that it can do that mission eventually by itself. But they are certainly not there yet.

Ms. BARRAGÁN. Great. One of my concerns has been we have seen over the last several years a focus by the administration on immigration. It has been such a focus that it feels as though they have been taking away focus and efforts in other parts of homeland security and other departments. We have also seen the President diverting funds from the military to build his border wall. He has been diverting billions of dollars.

In September there was a report that in Virginia the State's cyber operations facility at Joint Base Langley will lose $10 million, just to give you an example. So here we are talking about cyber threats and we are talking about the potential increase, and there is money that is being diverted away from places like the cyber operations facility.

Does anybody on this panel want to comment about whether the diversion of any funds from places like the cyber operations could pose an additional danger, given that they have less funding?

General STEWART. Maybe it is built into my intel DNA that I am hesitant to comment on policy decisions, but any time you strip away capabilities, personnel, from an area like cybersecurity, that increases our risk and our vulnerabilities and risk. It is probably not something I would do.

Ms. BARRAGÁN. OK. Anybody else? I mean, I think generally speaking if you are investing less money into cyber operations, that

PX382

58

is going to result in less information and preparation. Is that accurate?

Ms. LEAF. I am not an expert in this, Congresswoman, but what I want to go back to is this issue of are we safer today. I do not believe we are safer today, because I believe this is but a pause in this cycle that we are in that we have been in with the Iranians for decades. One of the Members of the committee asked words to the effect of why did deterrence fail, when did it fail?

It has failed over a period of time and when you have a combination of this long-running cycle between the United States and Iran and you have deterrence that shreds over time, and specifically, I am looking back at last summer when the Persian Gulf provided sort-of a testing theater for Iran.

So I have no doubt that there is still payback to come from Iran notwithstanding that Soleimani is gone. He was the national hero. He was "like this" with the supreme leader. The supreme leader has put himself on the record that that missile strike is not enough. So cyber is the logical arena.

Ms. BARRAGÁN. Well, thank you. Thank you for bringing that up. That was going to be one of my next questions. Is this the end of the revenge phase?

I happen to represent the port of Los Angeles which is the busiest port. It touches every Congressional district and they have had their own attacks on cyber operations, and this just increases that ability. They can't just fend for themselves. We need—the Government is helping create some of these situations and making it worse. We need to help them and invest. Thank you all for being here and for your testimony. I am out of time. I yield back.

Chairman THOMPSON. Thank you very much. The Chair recognizes the gentleman from Louisiana, Mr. Richmond, for 5 minutes.

Mr. RICHMOND. Thank you, Mr. Chairman. Brigadier General Tata, let me just go back, and I am not trying to argue but I think there is some inconsistencies. You said that we are safer today because Iran was in the position to start selling weapons in a couple of years. They would be able to buy and import centrifuges and all those things and that they would never live up to a deal.

Then you went on to say now because of the killing and sanctions, that you believe that now is the time that they will enter into discussions. Well, either they are untruthful and they are never going to abide by a deal, or either they will. It is not based on who crafts the deal, whether it is President Obama or President Trump. Either they are good-faith actors or they are not. I have no reason to believe that they are.

However, I think we had the entire international community on our side under the Joint Comprehensive Plan. But let me ask another question. This is not a "got you".

I have 20 years in elected office and there is some things I hear over and over again that is just plain foolishness that makes us less safe. So one of the mantras from the other side is we have to do more with less. Can we protect more airports with less TSA agents? Anyone think we can? Does anyone think we can protect our internet, our local governments and our cyber space with less money or less employees?

General TATA. Well, Congressman, since you——

PX382

Mr. RICHMOND. Less resources?

General TATA [continuing]. Address to me I'd like to clarify something you said that I said which I said we are more safe today because we have killed Iran's chief exporter of terror, Soleimani and Muhandis, his chief executor of terror. So the—I believe that leadership matters and decisions matter with regard to capabilities. They are willing and able. They are less able today because the command and control of their chief terror network is gone.

Mr. RICHMOND. I didn't bring that part up. I just brought up the openness, willingness to honor and do a deal, but I want to be clear because I want the American people to understand that Government has responsibilities. Part of those responsibilities, we are not just tax-and-spend Democrats.

We want to protect the homeland and you can't do it with less resources. So what I am asking you all, please, raise your hand if you think we can protect this space with less resources.

Mr. WARRICK. Representative Richmond, no, quite the contrary. Secretary John Kelly, General Kelly, four-star marine with whom I had worked when we were both in Iraq and I proudly served when he was the Secretary of Homeland Security, famously told us in public and in private that the idea of doing less with less, or doing more with less, rather, is in almost all cases a fantasy. I would agree with Secretary Kelly on that view. I think as stewards of the purse of the American public it is your duty as Members of Congress to make sure that money is spent wisely and well, and that officials are held accountable for providing results the way American citizens——

Mr. RICHMOND. Reclaiming some of the time, but the point is that in this critical space more resources are critical success in defending our cyber space. They only have to get lucky once, and we have to be successful 100 percent of the time.

Let me ask you another question. Do you think that the lack of stability in terms of leadership at DHS causes some potential for concern?

Mr. WARRICK. Yes, absolutely. I am very concerned as all of us who have served in the Department know there are enormous advantages and especially when you come to the kind of strategic rethinking of the Department that can really best be done by senior officials and including political appointees who are confirmed in their positions by the Senate.

I would hope that as—actually, I believe it was Representative Higgins made this point at a hearing yesterday that this is enormously important for the Department to have more leadership confirmed by the Senate.

Mr. RICHMOND. Very quickly, to the two generals, do you think it is important, and do you think it is lawful for there to be a clear policy that answering cyber attacks doesn't necessarily have to be responded to with a cyber attack? I mean, can a cyber attack be so damaging to the United States that physical force response becomes appropriate and lawful? With that I yield back, Mr. Chairman.

General STEWART. I do not believe that the signal should be a cyber attack will result in a counter cyber attack. That all options should be on the table depending on the severity of the cyber event.

Though kinetic action is certainly appropriate as a response to the cyber attack.

General TATA. I agree with General Stewart.

Chairman THOMPSON. Thank you, very much. The Chair recognizes the gentleman from Rhode Island, Mr. Langevin, for 5 minutes.

Mr. LANGEVIN. Thank you, Mr. Chairman. I want to thank our witnesses for your testimony today as well as your service to the country. Before I begin my questions, I will say this on the issue of Soleimani. I don't regret for a minute that he is gone from the face of the planet. He was a murderer, a terrorist and a significant danger to the National security of the United States. The one problem I do have is with the overall lack of strategy, a strategic view of a strategy from this administration. That is the problem. They too often confuse tactical victories or decisions with somehow achieving strategic success and it doesn't always add up that way.

I hope in the long run that we are safer as a result of Soleimani gone. I guess we are going to have to wait to see over time. General Stewart, good to see you again. It took me a minute to recognize you with the beard, but looking very distinguished. I think you for your service to the country and the many years that you and I have had interaction together.

To you and Mr. Warrick, I want to discuss the Iranian cyber threat and trying to better coordinate between U.S. Government activities and the private-sector owners and operators of our critical infrastructure has certainly been a major focus of the Cyber Solarium Commission which I am currently serving which is charged with creating an overall strategic framework guiding policy document to help better protect the country in cyber space.

Do you believe that there are clear lines between what companies should be doing to protect themselves? What additional steps should they be required to do through regulation or incentives and what direct steps should the U.S. Government be taking to protect National assets?

Mr. WARRICK. So Representative Langevin, I mean, I am certainly familiar with the work of the Cyber Solarium, not as much as you are. At this point I don't think that there is enough of a clear understanding among the American people as to what are the responsibilities of the private sector compared to the Federal Government. I think where we need to end up is a better understanding upon all citizens as to what their responsibilities are, because I think people need to do more.

I think the Government is going to have to be a shared partner in a lot of these activities so that it is not so much the Federal Government telling citizens what to do, but citizens and the Federal Government, and State and local governments all working together toward a shared aim. We did that before in the 1950's on civil defense. We need to do it now.

General STEWART. We would not tell any organization in the private sector if a missile was in-bound on their target that since it doesn't impact that Department of Defense or the broader Government, good luck, you are on your own. That is basically what we told them in terms of—in cyber space. Good luck, you are on your

61

own. Do the best you can. Harden your defenses. The cavalry is not coming.

Mr. WARRICK. Oh, but here's a brochure.

General STEWART. Here is a wonderful brochure. Call the following numbers in the event of a crisis. How do we get from point defense to what General Alexander calls collective defense? That requires a sharing arrangement, where we are protecting our Classified but they are also protecting their proprietary information.

In many cases they are unwilling to share because it is proprietary that translates to share value. So how do we create the environment where we can seamlessly share intelligence at a high enough classification level in a timely enough manner, and they can share proprietary information and we have an environment where we have a good give and take between the private sector and public sector.

There are models, international models that are trying to do this including sharing information to the private citizens when they are under attack. We need to accelerate how we do that and the task forces are not necessarily the answer. They are not well-developed enough and I'll stop there.

Mr. LANGEVIN. Well, on that point, let me ask you this for your time at U.S. CYBERCOM and then also work at DHS respectively, what is your assessment of the interagency coordination when surging proactive cyber defense activities in response to either a direct threat or a general time of heightened tensions?

General STEWART. I have actually seen that improve significantly, Congressman. Now, I have been away for almost a year but in some of these specific targets that we have had an interest, I have seen the interagency collaborate. I have seen them plan. I have seen the increased authorities that U.S. cybercommand receives. So that interagency coordination looked like it was on the right path when I left the pattern in April. I don't know where it is today, but I saw a significant progress over the previous year or so.

Mr. WARRICK. While I certainly won't dispute the General's statement that there is progress, I do have a somewhat different perspective. It starts out from the idea that when offensive cyber operations are planned, the defensive specialists are often not in the room, and that kind of thing, I think, will have to be changed in the future, but that is a long-term problem. It is—we have got to understand, especially in the case of Iran that anything we do to them they will do back at us in some unusual way.

What we need to recognize is that they know when they have been attacked, and they don't care who attacked them whether it is us or somebody that may not be us. They can still take it out on us. So we have to have much better coordination between our offensive cyber warriors and our defensive cyber specialists.

General STEWART. If I can just build on that and I concur about having—it is important as we think the question, are we safer, that we listen to what the Iranian leadership says. The artillery strikes are not enough. They can't defend everywhere. Americans are more vulnerable to cyber threats than any other Nation because of their high level of dependency on cyber infrastructure. It is important for us to listen to what their leaders say.

PX382

General TATA. I would just add that in this continuum of Iranian tax since 1979 that are we safer, we have never been truly safe and the question is did the Soleimani strike affect their ability to carry out certain types of attacks. My contention is that it has.

Mr. LANGEVIN. Thank you all. Thank you, my time has expired. I yield back.

Chairman THOMPSON. Thank you very much. The Chair recognizes the gentleman from Texas for 5 minutes, Mr. Green.

Mr. GREEN of Texas. Thank you, Mr. Chairman. I thank the Ranking Member as well. I especially thank the witnesses for appearing today. Has the extirpation of General Soleimani created any unintended consequences that are adverse to our best interest, Ambassador Leaf?

Ms. LEAF. Congressman, I think that will take time to assess. With all due respect to my co-panelists, I don't agree that the Quds Force has really been dealt a significant blow. They are very resilient. I think there is predictability and method, and rationality to the way Tehran comports itself. So I—but the unexpected, I think you have to look a bit longer down the road.

Mr. GREEN of Texas. Are the consequences of leaving Iraq on our own volition the same as being evicted, Ambassador Leaf?

Ms. LEAF. Absolutely not. Look, I think it is very important to recall that within Iraq itself, there is a wide body of support that did not exist in 2011. There is a wide body of public support for us to say they well recognize it is not just a question of the counter ISIS fight and Iraqis are aware that they do not have that capability yet.

It is also—when we leave, the coalition leaves. There is a shrinking of engagement with Iraq. Iraq becomes more isolated, more vulnerable to Iran's pressure. Again, going back to the issue of what it becomes for the region and I assure you that our, that our partners around the region are looking carefully at this question, are we going to get pushed out, are we going to let ourselves get pushed out?

Mr. GREEN of Texas. Mr. Warrick, Nasrallah has command and control capabilities. He has probably one of the largest armies in the area that is not associated with a State. Is Nasrallah one of the rogue actors that you would be concerned with?

Mr. WARRICK. He is one of the most dangerous actors that we should concern ourselves with. He is not a rogue, but as both General Stewart and Ambassador Leaf said, the mission on which Qassem Soleimani was engaged in when he was killed in a strike was to build parallel state structures outside of the control of any government. That is a hugely dangerous proposition for the United States. This is what is creating the conditions that create forever wars. It is ironically not the United States. It is what Qassem Soleimani and his colleagues in the IRGC have been working on, and that is what makes it so dangerous.

Mr. GREEN of Texas. The word on the street, to use a pedestrian term, is that Iran received US$150 billion; that we gave Iran US$150 billion. Is it true that the money Iran received was money that we were able to deny Iran for some number of years?

Mr. WARRICK. Yes.

Mr. GREEN of Texas. It was Iran's money?

63

Mr. WARRICK. Yes, that is legally what it was.

Mr. GREEN of Texas. Is it true that the $150 billion is generally perceived by many, including the Treasury of the United States of America, as an inflated number?

Mr. WARRICK. So Representative Green, you happen to have hit somebody whose wife was in the office of foreign assets control at Treasury and has worked on this issue for more than 20 years. Those were assets frozen by Presidential order and were returned after a negotiation. So that is a simple legal description of what the money was.

Mr. GREEN of Texas. Thank you. I happen to have intelligence indicating that $56 billion is the amount the Treasury has tagged, but continuing with my very last question. Well, my time is up, but if I had the time I'd ask you about the safety of American citizens with reference to lone wolves who tend to act on their own emotions inspired by things that we can rarely understand, but I will not.

Mr. WARRICK. I would say that you would be right in your concerns that lone wolves are one of the most difficult things for law enforcement and homeland security to try to prevent.

General TATA. I would just add Congressman, that one thing that we should really look at is, why did the Iranian military budget grow by over 60 percent between 2015 and 2018 to $26 billion dollars?

Mr. GREEN of Texas. Thank you, Mr. Chairman. You have been more than generous. I yield back.

Chairman THOMPSON. Thank you very much. Let me thank the witnesses for your excellent testimony. I think you have gotten the committee in a good position to make some strong arguments from a budgetary standpoint that would help shore up some known vulnerabilities. We plan to use your testimony wisely in that effort. But we absolutely thank you for your forbearance on the questions as well as your timely response from them. So thank you very much.

Ranking Member—well, I ask unanimous consent to submit a statement for the record from the Jewish Federation of North America about homeland security concerns related to Iranian proxies.

[The information follows:]

LETTER FROM THE JEWISH FEDERATIONS OF NORTH AMERICA

*January 15, 2020.*

The Honorable BENNIE G. THOMPSON, Chairman,
The Honorable MICHAEL ROGERS, Ranking Member,
*Committee on Homeland Security, U.S. House of Representatives, Washington, DC 20515.*

DEAR CHAIRMAN THOMPSON AND RANKING MEMBER ROGERS: Thank you for holding this morning's timely hearing on U.S.-Iran Tensions: Implications for Homeland Security. As a major stakeholder for Jewish communal security, we wanted to share the following for inclusion in the record of today's hearing.

We understand that the FBI, DHS, and National Counterterrorism Center released a joint intelligence bulletin[1] in response to the recent escalation of U.S.-Iran tensions that directly pertains to Jewish communal security, as summarized below.

---

[1] JIB: Escalating Tensions Between the United States and Iran Pose Potential Threats to the Homeland, 8 January 2020 (IA–41117–20).

PX382

64

If the government of Iran (GOI) were to perceive actions of the U.S. Government (USG) as acts of war or existential threats to the Iranian regime, the GOI could act directly or enlist the cooperation of proxies and partners, such as Lebanese Hizballah. Based on previously observed covert surveillance and possible pre-operational activity, the GOI or its violent extremist supporters could commit attacks in retribution, with little to no warning, against U.S.-based Jewish individuals and interests among likely targets.

In recent years, the USG has arrested several individuals acting on behalf of either the GOI or Lebanese Hizballah who have conducted surveillance indicative of contingency planning for lethal attacks in the United States against facilities and individuals. In one instance, an agent of the GOI arrested in 2018 had conducted surveillance of a Hillel Center and the Rohr Chabad Center, Jewish institutions located in Chicago, including photographing the security features surrounding the Chabad Center.

Given the tenor of this assessment, we look forward to continuing to work with you and the committee to prepare and respond to all manner of international and domestic threats to the Jewish community.

Sincerely,

ROBERT B. GOLDBERG,
*Senior Director, Legislative Affairs.*

Chairman THOMPSON. I thank the witnesses again for their valuable testimony and the Members for all their questions. The Members of the committee may have additional questions for the witnesses and we ask that you respond expeditiously in writing to those questions.

Without objection the committee record shall be kept open for 10 days. Hearing no further business, the committee stands adjourned.

[Whereupon, at 12:26 p.m., the committee was adjourned.]

○

PX382

PX383

# Multi-National Force - Iraq - Coalition forces strike blow to criminal network

web.archive.org/web/20081214203608/http://www.mnf-iraq.com/index.php

Coalition forces strike blow to criminal network    Print    Email

Saturday, 18 October 2008

**MULTI-NATIONAL FORCE-IRAQ
PRESS DESK
BAGHDAD, Iraq
http://www.mnf-iraq.com**

**703.343.8790**

**Press Release A081018a-105
Oct 18, 2008**

**Coalition forces strike blow to criminal network**

**BAGHDAD** – Coalition forces continue to degrade the Asa'ib Ahl al-Haq criminal network's ability to operate by seizing more than $205,000 U.S. dollars during a recent operation in Al Majarr al Kabir, approximately 30 km South of Amarah.

Acting on intelligence information, Coalition forces targeted a suspected high-level Iranian-backed manager responsible for financing militant operations against Iraqi and Coalition forces.

Forces moved in on the wanted man's residence but the alleged criminal was not at home.  During their search, Coalition forces discovered more than $205,000 U.S. Dollars, 126,000 Iranian Rial, and 8.5 million Iraqi Dinar.

Coalition forces also discovered several passports, Iranian visas, various IDs, and other items linking the suspect to the Asa'ib Ahl al-Haq criminal network.

Coalition forces have seized more than $400,000 U.S. dollars in funds from the Asa'ib Ahl al-Haq criminal network during the month of October.

"Iraqi and Coalition forces continue to work together to prevent Iranian lethal aid from endangering the citizens of Iraq," said Lt. Cdr. David Russell, MNF-I spokesman.

-30-

FOR MORE INFORMATION, PLEASE CONTACT THE MNF-I PRESS DESK AT:
MNFIPRESSDESK@IRAQ.CENTCOM.MIL.
FOR THIS PRESS RELEASE AND OTHERS VISIT WWW.MNF-IRAQ.COM.

1/2

PX383

**< Prev**     **Next >**

2/2

PX383

PX384

The Wayback Machine - https://web.archive.org/web/20081210210222/http://www.mnf-iraq.com/index.php?option=com_content&task=view&id=23928&Itemid=21



# Operation Iraqi Freedom
### Official Website of Multi-National Force – Iraq

English | العربية

search... **Search**

Home | News | The New Face of Iraq | Inside the Force | Fight for Freedom | For the Troops | For the Media | Video | CG's Messages | Unit News | MNF-I Newsletter | Site Map

Home ▸ News ▸ Press Releases ▸ Coalition forces continue to target Asa'ib Ahl al-Haq criminals (Baghdad)

## Coalition forces continue to target Asa'ib Ahl al-Haq criminals (Baghdad)

🖨 Print  ✉ Email

Sunday, 23 November 2008

**MULTI-NATIONAL FORCE-IRAQ**
**PRESS DESK**
**BAGHDAD, Iraq**
**http://www.mnf-iraq.com**
**703.343.8790**

Press Release A081123a-120
November 23, 2008

Coalition forces continue to target Asa'ib Ahl al-Haq criminals (Baghdad)

**BAGHDAD –** Coalition forces struck another blow to the Asa'ib Ahl al-Haq network early Sunday morning with the capture of eight suspected network criminals in Baghdad.

Acting on intelligence information, Coalition forces targeted alleged Asa'ib Ahl al-Haq criminals in two separate operations.

During the first operation, Coalition forces apprehended three suspected criminals without incident in the Adhamiyah district.  Five additional alleged Asa'ib Ahl al-Haq members were apprehended by Coalition forces at a second location in New Baghdad.

Asa'ib Ahl al-Haq is assessed to have engaged in numerous Explosively Formed Penetrator and Improvised Explosive Device attacks, as well as kidnappings, sectarian killings, and other heinous crimes that threaten Iraq's future.  Iraqi and Coalition forces are working together to prevent terrorists and criminals from endangering the Iraqi people.

-30-

FOR MORE INFORMATION, PLEASE CONTACT THE MNF-I PRESS DESK AT:
**MNFIPRESSDESK@IRAQ.CENTCOM.MIL**.
FOR THIS PRESS RELEASE AND OTHERS VISIT **WWW.MNF-IRAQ.COM**.

< Prev        Next >

---

### This Week In Iraq ::

**Sign up for our weekly newsletter**

E-mail address:  _____  Submit

### Special Report ::

Iraqi, U.S. Security Agreement/Strategic Framework, November 2008

Click here for Iraqi, U.S. **Security Agreement (PDF)/Strategic Framework (PDF)**

### Bookmark Us ::

🔖 Bookmark Website   📄 Bookmark Page

### Related Content ::

Coalition Forces stop terrorist IED emplacers
Pushing freight: ATOC moves cargo quickly
Two MND-B pilots killed in helicopter crash
Iraqi Army gain NCOs and new medical facilities
Saddam faces trial for attacks on Kurds
Terrorist leader captured
MND-B Soldiers capture murder suspects
Iraqis urged to form government; security forces diminish terrorists' supplies
Iraqi Freedom Day
Iraqi, Coalition Forces conduct Operation Bastogne
Zarqawi is a threat
Marines support Baghdadi police
Iraq's new ambassador reaches Washington
Bin Laden associate killed
Combined operations make country safer

### RSS ::

RSS Daily Stories
RSS Feature Stories
RSS Press Releases
RSS All Content

### Links To Related Sites ::

- DoD Video and Photos
- U. S. Embassy in Baghdad, Iraq
- The Pentagon Channel
- U.S. Department of Defense

More...

All content on MNF-Iraq.com is public domain and may be used freely. Please send questions and comments to: MNFI.Comments@GMail.com

PX384

# PX405


Interest in Electing Investment Partnership (EIP).

*Abstract:* The American Jobs Creation Act of 2004, Public Law 108–357, 118 Stat. 1418 (the Act), was enacted on October 22, 2004. The Treasury Department and the Internal Revenue Service intend to issue regulations implementing §§ 833 and 834 of the Act, which amended 704, 734, 743, and 6031 of the Internal Revenue Code. This notice provides interim procedures for partnerships and their partners to comply with the mandatory basis provisions of 734 and 743, as amended by the Act. This notice also provides interim procedures for electing investment partnerships (EIPs) and their partners to comply with §§ 743(e) and 6031(f), as provided in § 833(b) of the Act.

*Respondents:* Private Sector: Businesses or other for-profits.

*Estimated Total Burden Hours:* 552,100.

*OMB Number:* 1545–1940.

*Type of Review:* Extension without change of a currently approved collection.

*Title:* RP–2005–26—Revenue Procedure Regarding Extended Period of Limitations for Listed Transaction Situations.

*Abstract:* This revenue procedure provides procedures that taxpayers and material advisors may use to disclose a listed transaction that the taxpayer previously failed to disclose.

*Respondents:* Individuals and Households.

*Estimated Total Burden Hours:* 430.

*OMB Number:* 1545–2129.

*Type of Review:* Extension without change of a currently approved collection.

*Title:* Exercise of an Incentive Stock Option Under * * *; Transfer of Stock Acquired Through an * * *; REG–103146–08—Information Reporting Requirements Under Code Sec. 6039.

*Forms:* 3922, 3921.

*Abstract:* Form 3921 is a copy of the information return filed with the IRS which transferred shares of stock to a recipient through exercise of an incentive stock option under section 422(b). Form 3922 is used to record a transfer of the legal title of a share of stock acquired by the employee where the stock was acquired pursuant to the exercise of an option described in section 423(c). REG–103146–08— reflects the changes to section 6039 of the Internal Revenue Code made by section 403 of the Tax Relief and Health Care Act of 2006.

*Respondents:* Private Sector: Businesses or other for-profits.

*Estimated Total Burden Hours:* 25,205.

*Bureau Clearance Officer:* Yvette Lawrence, Internal Revenue Service, 1111 Constitution Avenue NW., Washington, DC 20224; (202) 927–4374.

*OMB Reviewer:* Shagufta Ahmed, Office of Management and Budget, New Executive Office Building, Room 10235, Washington, DC 20503; (202) 395–7873.

**Dawn D. Wolfgang,**

*Treasury PRA Clearance Officer.*

[FR Doc. 2011–30353 Filed 11–23–11; 8:45 am]

**BILLING CODE 4830–01–P**

---

## DEPARTMENT OF THE TREASURY

### Finding That the Islamic Republic of Iran Is a Jurisdiction of Primary Money Laundering Concern

**AGENCY:** The Financial Crimes Enforcement Network ("FinCEN"), Treasury.

**ACTION:** Notice of finding.

---

**SUMMARY:** Pursuant to the authority contained in 31 U.S.C. 5318A, the Secretary of the Treasury, through his delegate, the Director of FinCEN, finds that reasonable grounds exist for concluding that the Islamic Republic of Iran is a jurisdiction of primary money laundering concern.

**DATES:** The finding made in this notice is effective as of November 25, 2011.

**FOR FURTHER INFORMATION CONTACT:** Regulatory Policy and Programs Division, FinCEN, (800) 949–2732.

**SUPPLEMENTARY INFORMATION:**

### I. Background

#### A. Statutory Provisions

On October 26, 2001, the President signed into law the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act"), Public Law 107–56. Title III of the USA PATRIOT Act amends the anti-money laundering provisions of the Bank Secrecy Act ("BSA"), codified at 12 U.S.C. 1829b, 12 U.S.C 1951–1959, and 31 U.S.C. 5311– 5314 and 5316–5332, to promote prevention, detection, and prosecution of international money laundering and the financing of terrorism. Regulations implementing the BSA appear at 31 CFR Chapter X.

Section 311 of the USA PATRIOT Act ("section 311") added 31 U.S.C. section 5318A to the BSA, granting the Secretary of the Treasury (the "Secretary") the authority, upon finding that reasonable grounds exist for concluding that a foreign jurisdiction,

institution, class of transactions, or type of account is of "primary money laundering concern," to require domestic financial institutions and financial agencies to take certain "special measures" against the primary money laundering concern. Section 311 identifies factors for the Secretary to consider and requires Federal agencies to consult before the Secretary may conclude that a jurisdiction, institution, class of transaction, or type of account is of primary money laundering concern. The statute also provides similar procedures, *i.e.,* factors and consultation requirements, for selecting the specific special measures to be imposed against the primary money laundering concern. For purposes of the finding contained in this notice, the Secretary has delegated his authority under section 311 to the Director of FinCEN.[1]

Taken as a whole, section 311 provides the Secretary with a range of options that can be adapted to target specific money laundering and terrorist financing concerns most effectively. Through the imposition of various special measures, the Secretary can gain more information about the jurisdictions, institutions, transactions, or accounts of concern; can more effectively monitor the respective jurisdictions, institutions, transactions, or accounts; or can prohibit U.S. financial institutions from involvement with jurisdictions, institutions, transactions, or accounts that pose a money laundering concern.

Before making a finding that reasonable grounds exist for concluding that a jurisdiction is of primary money laundering concern, the Secretary is required to consult with both the Secretary of State and the Attorney General. The Secretary is also required by section 311, as amended,[2] to consider "such information as the Secretary determines to be relevant, including the following potentially relevant factors," which extend the Secretary's consideration beyond traditional money laundering concerns to issues involving, inter alia, terrorist financing and weapons proliferation:

• Evidence that organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction ("WMD") or missiles, have transacted business in that jurisdiction;

---

[1] Therefore, references to the authority and findings of the Secretary in this document apply equally to the Director of FinCEN.

[2] 31 U.S.C. 5318A was amended by section 501 of the Iran Freedom Support Act of 2006, Public Law 109–293.

PX405

**Federal Register** / Vol. 76, No. 227 / Friday, November 25, 2011 / Notices                72757

• The extent to which that jurisdiction or financial institutions operating in that jurisdiction offer bank secrecy or special regulatory advantages to nonresidents or nondomiciliaries of that jurisdiction;

• The substance and quality of administration of the bank supervisory and counter-money laundering laws of that jurisdiction;

• The relationship between the volume of financial transactions occurring in that jurisdiction and the size of the economy of the jurisdiction;

• The extent to which that jurisdiction is characterized as an offshore banking or secrecy haven by credible international organizations or multilateral expert groups;

• Whether the United States has a mutual legal assistance treaty with that jurisdiction, and the experience of U.S. law enforcement officials and regulatory officials in obtaining information about transactions originating in or routed through or to such jurisdiction; and

• The extent to which that jurisdiction is characterized by high levels of official or institutional corruption.

If the Secretary determines that reasonable grounds exist for concluding that a jurisdiction is of primary money laundering concern, the Secretary is authorized to impose one or more of the special measures in section 311 to address the specific money laundering risks. Section 311 provides a range of special measures that can be imposed individually, jointly, in any combination, and in any sequence.[3] Before imposing special measures, the statute requires the Secretary to consult with appropriate federal agencies and other interested parties[4] and to consider the following specific factors:

[3] Available special measures include requiring: (1) Recordkeeping and reporting of certain financial transactions; (2) collection of information relating to beneficial ownership; (3) collection of information relating to certain payable-through accounts; (4) collection of information relating to certain correspondent or payable-through accounts. 31 U.S.C. 5318A(b)(1)–(5). For a complete discussion of the range of possible countermeasures, *See* 68 FR 18917 (April 17, 2003) (proposing special measures against Nauru).

[4] Section 5318A(a)(4)(A) requires the Secretary to consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency, the Secretary of State, the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), the National Credit Union Administration ("NCUA"), and, in the sole discretion of the Secretary, "such other agencies and interested parties as the Secretary may find to be appropriate." The consultation process must also include the Attorney General if the Secretary is considering prohibiting or imposing conditions on domestic financial institutions opening or

• Whether similar action has been or is being taken by other nations or multilateral groups;

• Whether the imposition of any particular special measures would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

• The extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction; and

• The effect of the action on U.S. national security and foreign policy.

*B. Iran*

Iran's banking sector comprises Iranian state-owned commercial banks, specialized Iranian government banks, and privately owned Iranian financial institutions.[5] Some of these Iranian financial institutions[6] operate multiple overseas branches and subsidiaries in Asia, Europe, and the Middle East[7] and maintain relationships in key global financial centers.[8]

In recent years, many international financial institutions have severed ties with Iranian banks and entities because of a growing body of public information about their illicit and deceptive conduct designed to facilitate the Iranian government's support for terrorism and its pursuit of nuclear and ballistic missile capabilities. This illicit conduct by Iranian banks and companies has been highlighted in a series of United Nations Security Council ("UN Security Council") resolutions related to Iranian proliferation sensitive activities. The Financial Action Task Force[9] ("FATF") has also warned publicly of the risks that Iran's deficiencies in countering money laundering and, particularly, terrorism finance, pose to the international financial system and has

maintaining correspondent account relationships with the targeted entity.

[5] Central Bank of the Islamic Republic of Iran. (*http://www.cbi.ir/simplelist/1462.aspx*). At various points in this finding, FinCEN references public media sources to support statements of fact. FinCEN has utilized both public and non-public sources in reaching such conclusions.

[6] *Id.*

[7] The Bankers Almanac, September 2011.

[8] *Id.*

[9] The Financial Action Task Force is an inter-governmental body whose purpose is the development and promotion of national and international policies to combat money laundering and terrorist financing. The FATF is therefore a "policy-making body" that works to generate the necessary political will to bring about legislative and regulatory reforms in these areas. (*http://www.fatf-gafi.org*).

called on FATF members and all jurisdictions to implement counter measures to protect against these risks. Despite the resulting reduction in Iranian financial institutions' access to correspondent and other financial relationships with major financial institutions,[10] both designated and non-designated Iranian banks continue to maintain a presence in the international financial system.

**II. Analysis of Factors**

Based upon a review and analysis of the administrative record in this matter, consultations with relevant Federal agencies and departments, and after consideration of the factors enumerated in section 311, the Director of FinCEN has determined that reasonable grounds exist for concluding that Iran is a jurisdiction of primary money laundering concern. While FinCEN has considered all potentially relevant factors set forth in Section 5318A, a discussion of those most pertinent to this finding follows. FinCEN has reason to believe that Iran directly supports terrorism and is pursuing nuclear/ballistic missile capabilities, relies on state agencies or state-owned or controlled financial institutions to facilitate WMD proliferation and financing, and uses deceptive financial practices to facilitate illicit conduct and evade sanctions. All of these factors, when taken together, make the international financial system increasingly vulnerable to the risk that otherwise responsible financial institutions will unwittingly participate in Iran's illicit activities.

*A. Evidence That Organized Criminal Groups, International Terrorists, or Entities Involved in the Proliferation of Weapons of Mass Destruction or Missiles, Have Transacted Business in That Jurisdiction*

1. Iran's Support for Terrorism and Pursuit of Nuclear and Ballistic Missile Capabilities

*Support for Terrorism:* The Department of State designated Iran as a state sponsor of international terrorism in 1984,[11] and has reiterated this designation every year since 2000 in its annual Country Reports on Terrorism.[12] Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial

[10] "Sanctions Against Iran: A Promising Struggle," The Washington Quarterly, Summer 2008.

[11] *See* "State Sponsors of Terrorism," U.S. Department of State, August 18, 2011 (*http://www.state.gov/s/ct/rls/crt/2010/170260.htm*).

[12] *Id.*

PX405

**72758**   **Federal Register** / Vol. 76, No. 227 / Friday, November 25, 2011 / Notices

resources and guidance to multiple terrorist organizations.[13] Iran has provided extensive funding, training, and weaponry to Palestinian terrorist groups, including Hamas and the Palestinian Islamic Jihad ("PIJ").[14] In fact, Hamas,[15] PIJ,[16] and Hizballah[17] have maintained offices in Tehran to help coordinate Iranian financing and training of these groups.

Iran's Islamic Revolutionary Guard Corps ("IRGC") was founded in the aftermath of the 1979 Islamic Revolution to defend the government against internal and external threats.[18] Since then, it has expanded far beyond its original mandate and evolved into a social, military, political, and economic force with strong influence on Iran's power structure.[19] In addition, elements of the IRGC have been directly involved in the planning and support of terrorist acts throughout the Middle East region.[20]

In particular, Iran has used the IRGC–Qods Force[21] ("Qods Force") to cultivate and support terrorists and militant groups abroad. The Qods Force reportedly has been active in the Levant, where it has a long history of supporting Hizballah's military, paramilitary, and terrorist activities, and provides Hizballah with as much as $200 million in funding per year.[22] Additionally, the Qods Force provides the Taliban in Afghanistan with weapons, funding, logistics, and training in support of anti-U.S. and anti-coalition activity.[23] Information dating from at least 2006 indicates that Iran has arranged frequent shipments to the Taliban of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107 mm rockets, and plastic explosives.[24] Iran also has helped train Taliban fighters within Iran and Afghanistan.[25] Taliban commanders have stated that they were paid by Iran to attend three month training courses within Iran.[26] In August 2011, a Taliban commander claimed to have trained in Iran and been offered $50,000 by Iranian officials in return for destroying a dam in Afghanistan.[27] Most recently, on October 11, 2011, the Department of Justice charged two individuals for their alleged participation in a plot directed by the Qods Force to murder the Saudi ambassador to the United States with explosives while the Ambassador was in the United States.[28] On the same day, the Treasury Department announced the designation of five individuals, including the commander of the Qods Force and three other senior Qods Force officers connected to the assassination plot, as well as the individual responsible for arranging the assassination plot on behalf of the Qods Force.[29]

Iran has also permitted al-Qaida to funnel funds and operatives through its territory. In July 2011, the U.S. Department of the Treasury ("Treasury") designated an al-Qa'ida network headed by an individual living and operating in Iran under an agreement between al-Qa'ida and the Iranian government.[30] The designation of six members of this network illustrated Iran's role as a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan as this network serves as a pipeline through which al-Qa'ida moves money, facilitators, and operatives from across the Middle East to South Asia.[31]

Finally, Iran is known to have used state-owned banks to facilitate terrorist financing. In 2007, the Treasury designated Bank Saderat under E.O. 13224 for its financial support of terrorist organizations, noting that from 2001 to 2006 Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence.[32]

*Pursuit of nuclear/ballistic missile capabilities:* Iran also continues to defy the international community by pursuing nuclear capabilities and developing ballistic missiles in violation of seven UNSCRs.[33] Iran's failure to comply with these resolutions has resulted in the UN Security Council's imposition of sanctions against Iran. These have included specific provisions aimed at preventing Iran from accessing the international financial system in order to pursue nuclear capabilities and to develop ballistic missiles.[34] To date, Iran has not complied with the UN Security Council resolutions regarding its nuclear and missile activities,[35] and continues to assert that it will not abandon its program to create nuclear fuel and enrich uranium.[36] This summer, Iran announced that it would triple production of its most concentrated uranium fuel, which is enriched to near 20% purity, and that some of this production would be transferred to Iran's facility near Qom.[37] This is a significant development because the technical work required to produce 20% enriched uranium from 3.5% is more difficult than that required to advance from 20% to the 90% weapons-grade level.[38]

[13] *Id.*

[14] *Id.*

[15] "Ex-Iranian President Offers Mediation Between Hamas, Fatah, Kuwait KUNA," KUNA, June 30, 2007.

[16] "Palestine Islamic Jihad envoy to Tehran says moderate Arabs hamper victory," Tehran Jomhouri-ye Eslami. December 10, 2007.

[17] *See* "Hezbollah's hate, made in Iran," National Post, July 28, 2006.

[18] *See* "Iran's Revolutionary Guards," Council on Foreign Relations, June 22, 2009 (*http://www.cfr.org/publication/14324/irans_revolutionary_guards.html*).

[19] *Id.*

[20] *See* "Country Reports on Terrorism 2010," U.S. Department of State, August 18, 2011 (*http://www.state.gov/s/ct/rls/crt/2010/170260.htm*).

[21] IRGC–Qods Force was designated under E.O. 13224 for providing material support for the Taliban and other terrorist groups. *See* "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx*).

[22] "Islamic Revolutionary Guards Corps," Anti-Defamation League, May 26, 2010.

[23] *See* "Country Reports on Terrorism 2010," U.S. Department of State, August 18, 2011 (*http://www.state.gov/s/ct/rls/crt/2010/170260.htm*).

[24] *Id.*

[25] "Taliban Fighters Training in Iran, U.S. Officials Say," CNN, March 23, 2010 (*http://articles.cnn.com/2010-03-23/world/iran.taliban_1_taliban-fighters-afghan-taliban-iranian-official?_s=PM:WORLD*).

[26] "Iranians Train Taliban to Use Roadside Bombs," The Sunday Times, March 21, 2010.

[27] *See* "Captured Taliban Commander: 'I Received Iranian Training'," Radio Free Europe, August 23, 2011.

[28] *See* "Attorney General Holder Holds National Security Enforcement Press Conference," October 11, 2011 (*http://www.justice.gov/iso/opa/ag/speeches/2011/ag-speech-111011.html*).

[29] *See* "Treasury Sanctions Five Individuals Tied to Iranian Plot to Assassinate the Saudi Arabian Ambassador to the United States," October 11, 2011 (*http://www.treasury.gov/press-center/press-releases/pages/tg1320.aspx*).

[30] *See* "Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point," Press Release, July 28, 2011 (*http://www.treasury.gov/press-center/press-releases/Pages/tg1261.aspx*).

[31] *Id.*

[32] *See* Treasury's "Fact Sheet: Treasury Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," October 25, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx*).

[33] *See* UNSCRs 1696, 1737, 1747, 1803, 1835, 1887, and 1929 (*http://www.un.org/documents/scres.htm*).

[34] *Id.*

[35] "Iran's Nuclear Program," New York Times, June 8, 2011 (*http://topics.nytimes.com/top/news/international/countriesandterritories/iran/nuclear_program/index.html?scp=1-spot&sq=iran%20nuclear%20program&st=cse*).

[36] "Iran Claims Progress Speeding Nuclear Program" Wall Street Journal, August 4, 2011 (*http://online.wsj.com/article/SB10001424053111903454504576486663881270144.html?mod=googlenews_wsj*).

[37] "Iran's Uranium Enrichment Will Increase, It Says," New York Times, June 8, 2011 (*http://www.nytimes.com/2011/06/09/world/middleeast/09iran.html*).

[38] "Iran Claims Progress Speeding Nuclear Program" Wall Street Journal, August 4, 2011 (*http://online.wsj.com/article/SB10001424053111903454504576486663881270144.html?mod=googlenews_wsj*).

*Federal Register* / Vol. 76, No. 227 / Friday, November 25, 2011 / Notices

2. Use of government agencies and state-owned or controlled financial institutions to facilitate WMD proliferation and financing

Iran uses government agencies and state-owned or controlled financial institutions to advance its nuclear and ballistic missile ambitions. Specifically, the government agencies rely on state-owned Iranian financial institutions to help finance illicit procurement activities related to WMD proliferation.

*Government Agencies:* Iran has used the Atomic Energy Organization of Iran ("AEOI"), which was designated by Treasury as the main Iranian organization for research and development activities in the field of nuclear technology, including Iran's uranium enrichment program, to manage the country's overall nuclear program.[39] Additionally, Iran has relied on the Ministry of Defense and Armed Forces Logistics ("MODAFL"), which was designated by the State Department under Executive Order ("E.O.") 13382 for proliferation activities.[40] Iran also controls the Defense Industries Organization ("DIO"), which has been designated by the UN[41] and the United States,[42] and the Aerospace Industries Organization ("AIO"), which is identified in the Annex to E.O. 13382 for its role in overseeing Iran's missile industries.[43] AIO, the parent entity to Shahid Hemat Industrial Group (SHIG),[44] which is also listed in the Annex to E.O. 13382, was identified for its ballistic missile research, development, and production activities, in addition to overseeing all of Iran's missile industries.[45]

*State-owned or controlled banks:* Multiple Iranian financial institutions have been directly implicated in facilitating Iran's nuclear and ballistic missile activities. For example, Iranian state-owned Bank Sepah was designated by the Treasury Department under E.O.

13382 and designated in UNSCR 1747 for providing direct and extensive financial services to Iranian entities responsible for developing ballistic missiles, including AIO and SHIG.[46]

Iran's state-owned Bank Melli, which was identified in UNSCR 1803,[47] has also facilitated numerous purchases of sensitive materials for Iran's nuclear and missile programs on behalf of UN-designated entities.[48] Treasury found that Bank Melli has provided a range of financial services to known proliferators, including opening letters of credit and maintaining accounts.[49] Additionally, Treasury found, following the designation of Bank Sepah under UNSCR 1747 for its support for AIO and AIO's subordinates, Bank Melli took precautions not to identify Bank Sepah in transactions.[50] Treasury designated Bank Melli and associated subsidiaries and front companies under E.O. 13382 for its financial support to entities involved in the proliferation of weapons of mass destruction.[51] Multiple jurisdictions also have designated Bank Melli under their respective legal authorities.[52]

Treasury has also designated under E.O. 13382 Bank Mellat, another Iranian state-owned bank, for financially facilitating Iran's nuclear and proliferation activities by supporting AEOI and its main financial conduit,

Novin Energy Company ("Novin").[53] Specifically, the designation noted that as of October 2007, Bank Mellat had facilitated the movement of millions of dollars for Iran's nuclear program since at least 2003.[54] In November 2009, First East Export Bank was designated pursuant to E.O. 13382 as a subsidiary and for its support of Bank Mellat.[55] Furthermore, the international community has raised concerns and taken action against Bank Mellat. In October 2009, the United Kingdom's ("UK") HM Treasury issued an order to all of its financial and credit institutions to cease all business with Bank Mellat, based on its connection to Iran's proliferation activities and for being involved in transactions related to financing Iran's nuclear and ballistic missile program.[56] Noting that Bank Mellat itself has facilitated hundreds of millions of dollars in transactions for Iranian nuclear, missile, and defense entities, UNSCR 1929 designated First East Export Bank, a Bank Mellat subsidiary in Malaysia.[57] Since the adoption of UNSCR 1929, the European Union ("EU"), Japan, South Korea, Australia, Canada, Norway, and Switzerland have implemented measures against Bank Mellat.[58]

In October 2008, Treasury designated the Export Development Bank of Iran

[39] "Treasury Designates Iranian Nuclear and Missile Entities," August 12, 2008 (*http://www.treasury.gov/press-center/press-releases/Pages/hp1113.aspx*).

[40] "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (*http://www.treas.gov/press/releases/hp644.htm*).

[41] United Nations Security Council Resolution 1737, December 23, 2006 (*http://www.un.org/News/Press/docs/2006/sc8928.doc.htm*).

[42] "Iran's Defense Industries Organization Designated by State," U.S. Department of State, March 30, 2007 (*http://2001–2009.state.gov/r/pa/prs/ps/2007/mar/82487.htm*).

[43] Executive Order 13382 of June 28, 2005. (*http://www.fas.org/irp/offdocs/eo/eo-13382.htm*).

[44] *Id.*

[45] Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (*http://www.treas.gov/press/releases/hp644.htm*).

[46] *See* "Testimony of Stuart Levey, Under Secretary for Terrorism and Financial Intelligence, Before the Senate Committee on Banking, Housing and Urban Affairs," Treasury Press Release, March 21, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp325.aspx*); and, U.S. Treasury, "Iran's Bank Sepah Designated by Treasury Sepah Facilitating Iran's Weapons Program," January 9, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp219.aspx*).

[47] *See* UNSCR 1803. (*http://www.un.org/Docs/sc/unsc_resolutions08.htm*).

[48] "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (*http://www.treas.gov/press/releases/hp644.htm*).

[49] *Id.*

[50] *Id.*

[51] *See* "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (*http://www.treas.gov/press/releases/hp644.htm*); "Treasury Designates Iran-Controlled Bank for Proliferation Future Bank Controlled by Iran's Bank Melli," U.S. Treasury, March 12, 2008 (*http://www.treasury.gov/press-center/press-releases/Pages/hp869.aspx*); and "Treasury Designates Companies Tied to Iran's Bank Melli as Proliferators," U.S. Treasury, March 3, 2009 (*http://www.treasury.gov/press-center/press-releases/Pages/tg46.aspx*).

[52] *See e.g.,* "Media Release: Australia Imposes New Broad-Ranging Sanctions Against Iran," Australian Minister for Foreign Affairs and Trade, July 29, 2010 (*http://foreignminister.gov.au/releases/2010/fa-s100729.html*).

[53] *See* "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx*).

[54] *Id.*

[55] *See* "Treasury Designates Bank Mellat Subsidiary and Chairman Under Proliferation Authority," U.S. Treasury; November 5, 2009 (*http://www.treasury.gov/press-center/press-releases/Pages/tg355.aspx*).

[56] *Id.*

[57] *See* UNSCR 1929 (*http://www.un.org/Docs/sc/unsc_resolutions10.htm*).

[58] *See* "Council Implementing Regulation (EU) No 668/2010," European Union, July 26, 2010 (*http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2010:195:0025:0036:EN:PDF*); "Accompanying Measures Pursuant to United Nations Security Council Resolution 1929," Ministry of Foreign Affairs of Japan, September 3, 2010 (*http://www.mofa.go.jp/region/middle_e/iran/measures_unsc_1009.html*); "Government Regarding the Implementation of UNSCR 1929," Republic of Korea, September 8, 2010; "Charter of the United Nations (Sanctions—Iran) (Specified Entities) List 2010, Government of Australia, August 4, 2010 (*http://www.comlaw.gov.au/Details/F2010L02236*); Special Economic Measures (Iran) Regulations, Government of Canada, August 4, 2010 (*http://canadagazette.gc.ca/rp-pr/p2/2010/2010–08–04/html/sor-dors165-eng.html*); "Press Release," Government of Norway, Ministry of Foreign Affairs, January 14, 2011 (*http://www.regjeringen.no/mobil/en/dep/ud/press/news/2011/sanctions_iran_adopted.html?id=630820*); "Iran: Federal Council Takes Steps to Improve Legal Certainty and Prevent Possible Evasion," January 19, 2011, The Federal Authorities of the Swiss Federation (*http://www.admin.ch/aktuell/00089/index.html?lang=en&msg-id=37283*).

PX405

("EDBI") under E.O. 13382 for providing or attempting to provide financial services to MODAFL.[59] The designation further asserted that EDBI provides financial services to multiple MODAFL-subordinate entities and facilitated the ongoing procurement activities of various front companies associated with MODAFL-subordinate entities.[60] Treasury's designation also noted that, since Bank Sepah's designation by the United States and identification by the UN Security Council, EDBI has served as one of the leading intermediaries handling Bank Sepah's financing, including WMD-related payments, and has facilitated transactions for other sanctioned proliferation-related entities.[61]

As the Iranian banks described above have become increasingly isolated from the international financial system due to international sanctions, other Iranian banks have begun to play a larger role in Iran's illicit activities and efforts to circumvent sanctions.[62] The Treasury Department has continued to target Iranian banks that engage in illicit behavior and act on behalf of U.S.-designated, Iranian-linked banks. Treasury designated Post Bank for operating on behalf of Bank Sepah;[63] the Iranian-owned German bank EIH for providing financial services to Bank Mellat, Persia International Bank, EDBI, and Post Bank;[64] Bank Refah for providing financial services to MODAFL;[65] Bank of Industry and Mine for providing financial services to Bank Mellat and EIH;[66] and Ansar Bank and Mehr Bank for providing financial

services to the IRGC.[67] The EU and other jurisdictions have recognized the risks posed by the vast majority of these financial institutions and have imposed similar measures to prohibit banks in their jurisdictions from doing business with these entities.[68] As recently as May 2011, the EU designated EIH for playing a "key role in issuing a number of Iranian banks with alternative options for completing transactions disrupted by EU sanctions targeting Iran." [69]

3. The Iranian Government's Use of Deceptive Financial Practices

Since 1979, Iran long has been subject to a variety of U.S. sanctions that have significantly expanded over time, including prohibition of the importation of Iranian-origin goods and services, prohibitions on certain transactions with respect to the development of Iranian petroleum resources, and prohibitions on exports and re-exports to Iran. Today, most trade-related transactions with Iran are prohibited, and U.S. financial institutions are generally prohibited, with only limited exceptions, from doing business with Iranian financial institutions.[70]

To further amplify financial pressure on Iranian financial institutions involved in Iran's support for terrorism and weapons proliferation, President Obama signed into law the

Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA") on July 1, 2010, which includes a provision that authorizes the Secretary of the Treasury to impose sanctions on foreign financial institutions that knowingly facilitate certain activities related to Iran.[71] On August 16, 2010, Treasury's Office of Foreign Assets Control ("OFAC") published a final rule implementing certain aspects of CISADA,[72] and on October 5, 2011, FinCEN published a final rule to implement section 104(e) of CISADA to complement Treasury's ongoing efforts to protect the international financial system from abuse by Iran.[73]

As a result of the strengthened U.S. sanctions and similar measures taken by the United Nations and other members of the global community, Iran now faces significant barriers to conducting international transactions. In response, Iran has used deceptive financial practices to disguise both the nature of transactions and its involvement in them in an effort to circumvent sanctions. This conduct puts any financial institution involved with Iranian entities at risk of unwittingly facilitating transactions related to terrorism, proliferation, or the evasion of U.S. and multilateral sanctions. Iranian financial institutions, including the Central Bank of Iran ("CBI"), and other state-controlled entities, willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies around the world.

*Iranian financial institutions:* Iran employs numerous deceptive practices to disguise the Iranian origin of transactions in order to avoid scrutiny and evade international sanctions. These practices include the transfer of funds from Iran to exchange houses outside Iran and the use of back-to-back letters of credit. Iranian foreign bank branches transfer funds to local banks in the same jurisdiction for onward payments that may conceal the Iranian origin of funds.

In other examples, Bank Sepah has requested that its name be removed from transactions in order to make it

[59] "Export Development Bank of Iran Designated as a Proliferator," U.S. Treasury, October 22, 2008 (*http://www.treasury.gov/press-center/press-releases/Pages/hp1231.aspx*).

[60] *Id.*

[61] *Id.*

[62] *See* "Testimony of Stuart Levey, Under Secretary of Terrorism and Financial Intelligence, before the Senate Foreign Relations Committee," June 22, 2010. (*http://foreign.senate.gov/imo/media/doc/Levey,%20Stuart.pdf*).

[63] *See* "Fact Sheet: U.S. Treasury Department Targets Iran's Nuclear and Missile Programs," U.S. Treasury, June 16, 2010 (*http://www.treasury.gov/press-center/press-releases/Pages/tg747.aspx*).

[64] *See* "Treasury Department Targets Iranian-Owned Bank in Germany Facilitating Iran's Proliferation Activities," U.S. Treasury, September 7, 2010 (*http://www.treasury.gov/press-center/press-releases/Pages/tg847.aspx*).

[65] *See* "Treasury Targets Iranian Bank for Providing Financial Services to Designated Entities Connected to Iran's Proliferation Activities," U.S. Treasury, February 17, 2011 (*http://www.treasury.gov/press-center/press-releases/Pages/tg1067.aspx*).

[66] *See* "Treasury Designates Iranian State-Owned Bank for Facilitating Iran's Proliferation Activities," U.S. Treasury, May 17, 2011 (*http://www.treasury.gov/press-center/press-releases/Pages/tg1178.aspx*).

[67] *See* "Fact Sheet: Treasury Designated Iranian Entities Tied to the IRGC and IRISL," U.S. Treasury, December 21, 2010 (*http://www.treasury.gov/press-center/press-releases/pages/tg1010.aspx*).

[68] *See* "Council Implementing Regulation (EU) No 668/2010," European Union, July 26, 2010 (*http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2010:195:0025:0036:EN:PDF*); "Council Implementing Regulation (EU) No. 2011/301/CFSP," European Union, May 23, 2011 (*http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:136:0087:0090:EN:PDF*); "Charter of the United States (Sanctions—Iran) (Specified Entities) List 2010, Government of Australia, August 4, 2010 (*http://www.comlaw.gov.au/Details/F2010L02236*).

[69] *See* "Council Implementing Regulation (EU) No. 2011/299/CFSP," European Union, May 23, 2011 (*http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:136:0087:0090:EN:PDF*).

[70] On November 14, 1979, the President issued E.O. 12170 blocking Iranian government property. *See* (*http://www.archives.gov/federal-register/codification/executive-order/12170.html*). The Iranian Transactions Regulations ("ITR"), 31 CFR part 560, implement a series of Executive Orders that began with E.O. 12613 issued in 1987, which prohibit the importation of Iranian-origin goods and services. In response to Iran's continued support of international terrorism and active pursuit of weapons of mass destruction, U.S. sanctions have expanded to include E.O. 12957 (March 1997), which imposed prohibition on certain transactions with respect to the development of petroleum resources, and in May 1995, E.O. 12959, which imposed comprehensive trade and financial sanctions on Iran. In August 1997, E.O. 13059 was issued consolidating and clarifying the previous orders. *See* (*http://treasury.gov/resource-center/sanctions/Programs/Documents/iran.pdf*).

[71] For a full discussion of CISADA and its provisions, *See* the U.S. Department of the Treasury Web site (*http://www.treasury.gov/resource-center/sanctions/Documents/hr2194.pdf*).

[72] *See* OFAC CISADA regulations at 75 FR 49836 (August 16, 2010) or 31 CFR part 561 (*http://edocket.access.gpo.gov/2010/pdf/2010-20238.pdf*).

[73] See Fact Sheet "FinCEN Implements Provision of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010," October 5, 2011 (*http://www.fincen.gov/news_room/nr/html/20111005.html*).

PX405

**Federal Register** / Vol. 76, No. 227 / Friday, November 25, 2011 / Notices

72761

more difficult for intermediary financial institutions to determine the true parties to a transaction.[74] As noted in Treasury's designation, Bank Melli took precautions not to identify Bank Sepah in transactions following Bank Sepah's designation under UNSCR 1747 and employed similar deceptive banking practices to obscure its involvement from non-Iranian financial institutions when handling financial transactions on behalf of the IRGC.[75]

In June 2010, Post Bank of Iran was designated by the Treasury Department under E.O. 13382 [76] for facilitating transactions on behalf of Bank Sepah after Bank Sepah was designated by the UN and United States.[77] The designation further notes that, in 2009, Post Bank facilitated business on behalf of Bank Sepah between Iran's defense industries and overseas beneficiaries and transacted millions of dollars worth of business between U.S.-designated Hong Kong Electronics and other overseas beneficiaries.[78]

The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011. In mid-2011, the CBI transferred several billion dollars to designated banks, including Saderat, Mellat, EDBI and Melli, through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks. Additionally, the CBI transfers funds to designated Iranian bank branches outside Iran via non-Iranian foreign banks, often involving deliberate attempts on its part to conceal that the recipient is a designated Iranian bank. In some cases, this activity involves book-to-book transfers and the use of accounts at intermediary banks that hold accounts for the CBI and designated banks. Further, the CBI was believed to have provided financing to the UN-sanctioned Khatem al-Anbiya Constructions Headquarters for defense-related projects.

*Front companies:* Iran has a well-established history of using front companies and complex corporate ownership structures to disguise the involvement of government entities known to be involved in Iranian proliferation activity when conducting commercial transactions. These companies transact substantial business in Iran and elsewhere around the world. For example, Novin, an AEOI front company that operates as the financial arm of AEOI, has transferred millions of dollars on behalf of AEOI to entities associated with Iran's nuclear program.[79] Additionally, Mesbah Energy Company ("Mesbah"), was designated under EO 13382 for being controlled by, or acting or purporting to act for or on behalf of AEOI, and was cited in UNSCR 1737.[80] Mesbah has been used to procure products for Iran's heavy water project.[81] Heavy water is essential for Iran's heavy-water-moderated reactor, which will provide Iran with a potential source of plutonium that could be used for nuclear weapons.[82]

In some cases, the connection to Iran is not readily apparent, as Iranian entities have formed front companies outside of Iran in an attempt to obtain dual-use items for Iran that could be used in Iran's nuclear or missile programs and that otherwise could not legally be exported directly to Iran.[83] For example, Iranian companies and their fronts have also falsified end-user information on export forms to allow prohibited items to be exported into the country.[84] Iran has colluded with some exporters to enter fictitious end-user names in the importer section of export forms in order to evade international and national controls on shipments to

Iran.[85] For example, in May 2010, Balli Aviation Ltd., a UK subsidiary of Balli Group PLC, pled guilty in the U.S. District Court for the District of Columbia to exporting three Boeing 747 aircraft to Iran without obtaining the proper authorization from the United States.[86]

Iranian commercial entities deploy the above mentioned practices specifically to evade those controls put in place by the United States, international community, and responsible financial institutions, controls that are designed to enforce international sanctions, prevent the proliferation of nuclear weapons and their delivery systems, and protect the international financial sector from abuse by illicit actors. These practices by Iranian entities have allowed Iran to engage in illicit activities and operate undetected in the international economy.[87]

*The IRGC:* The IRGC, which was designated by the Department of State as a primary proliferator under E.O. 13382 in October 2007,[88] owns and/or controls multiple commercial entities across a wide range of sectors within the Iranian economy. For example, the IRGC established Khatam al-Anbiya,[89] the largest major Iranian construction conglomerate, to generate income and fund IRGC operations while presenting the company as a legitimate company

[74] "Testimony of Stuart Levey, Under Secretary for Terrorism and Financial Intelligence, Before the Senate Committee on Banking, Housing and Urban Affairs," March 21, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp325.aspx*).

[75] "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx*).

[76] "Fact Sheet: U.S. Treasury Department Targets Iran's Nuclear and Missile Programs," U.S. Treasury, June 16, 2010 (*http://www.treasury.gov/press-center/press-releases/Pages/tg747.aspx*).

[77] *Id.*

[78] *Id.*

[79] *See* UNSCR 1747 (*http://www.un.org/Docs/sc/unsc_resolutions07.htm*); and "Treasury Employs Financial Sanctions Against WMD Proliferation Supporters in Iran," U.S. Treasury, January 4, 2006 (*http://www.treasury.gov/press-center/press-releases/Pages/js3069.aspx*).

[80] *See* UNSCR 1737 (*http://www.un.org/Docs/sc/unsc_resolutions06.htm*) and "Treasury Employs Financial Sanctions Against WMD Proliferation Supporters in Iran," U.S. Treasury, January 4, 2006 (*http://www.treasury.gov/press-center/press-releases/Pages/js3069.aspx*).

[81] "Testimony of Robert W. Werner, Director Office of Foreign Assets Control," U.S. Treasury, February 16, 2006 (*http://www.treasury.gov/press-center/press-releases/Pages/js4053.aspx*).

[82] *Id.*

[83] "Testimony of Stuart Levey, Under Secretary for Terrorism and Financial Intelligence, Before the Senate Committee on Banking, Housing and Urban Affairs," March 21, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp325.aspx*).

[84] "German Report Details Smuggling of Nuclear Bomb, Missile Components to Iran," Hamburg Stem, July 16, 2009.

[85] "Kyodo: Mitutoyo Falsifies Iranian Recipient's Name to Get Export Permission," Tokyo Kyodo World Service, August 26, 2006 (*http://www.freerepublic.com/focus/f-news/1690388/posts*).

[86] *See* "U.K. Firm Fined $2 Million After Pleading Guilty to Illegally Exporting Boeing 747 Aircraft to Iran," U.S. Department of Justice, May 11, 2010 (*http://www.justice.gov/opa/pr/2010/May/10-nsd-551.html*).

[87] "Testimony of Stuart Levey, Under Secretary for Terrorism and Financial Intelligence, Before the Senate Committee on Banking, Housing and Urban Affairs," March 21, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp325.aspx*).

[88] *See* "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx*).

[89] In October 2007, the Treasury Department designated nine IRGC-affiliated companies and five IRGC-affiliated individuals for proliferation activity under E.O. 13382 as derivatives of the IRGC, including Khatam al-Anbiya Construction Headquarters, which secured deals worth at least $7 billion in the oil, gas and transportation sectors, among others, in 2006. *See Id.* The European Union also designated Khatam al-Anbiya for supporting the Iranian ballistic missile and nuclear programs. *See* "European Council Common Position 2008/479/CFSP," Official Journal of the European Union, June 23, 2008 (*http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2008:163:0043:0049:en:PDF*).

PX405

working on civilian projects.[90] Khatam al-Anbiya was designated by Treasury in 2007 pursuant to E.O. 13382.[91] U.S.-designated, Iranian-linked financial institutions have served as an important lifeline for Khatam al-Anbiya. The U.S. and EU-designated Iranian banks Melli, Mellat, and state-owned Iranian Bank Tejarat have provided financial support to Khatam al-Anbiya-related business before and after the UN designation of Khatam al-Anbiya and fourteen of its subsidiaries.

The IRGC has continued to expand its control over commercial enterprises within Iran. For example, Tidewater Middle East Company ("Tidewater"), a port operating company, was designated by Treasury under E.O. 13382 in June 2011 as a company that is owned by the IRGC. Tidewater operates at seven Iranian ports,[92] some of which the Iranian government has repeatedly used to export arms or related material in violation of UNSCRs.[93] Treasury also designated Iran Air under E.O. 13382 for providing material support to the IRGC and MODAFL, both of which used the commercial airline carrier to transport military-related equipment on passenger aircraft.[94] Similarly, as noted in Treasury's designation of the leadership within the IRGC–Qods Force ("IRGC–QF"), the IRGC and the IRGC–QF engage in seemingly legitimate activities that provide cover for intelligence operations and support terrorist groups such as Hizballah, Hamas and the Taliban.[95]

*Islamic Republic of Iran Shipping Lines ("IRISL")*: Treasury designated IRISL, Iran's national maritime carrier, and affiliated entities pursuant to E.O. 13382 for providing logistical services to MODAFL.[96] The concern over IRISL's role in Iran's illicit activities has grown significantly within the international community. In October 2009, the UK

and Bermuda also designated IRISL.[97] Three IRISL-related entities, Irano Hind Shipping Company, IRISL Benelux NV, and South Shipping Line Iran (SSL), were sanctioned by the UN in June 2010.[98] Subsequently, the EU, Australia, Canada, Japan, Norway, South Korea, and Switzerland adopted measures against IRISL.[99] Additionally, as IRISL became increasingly unable to maintain adequate hull and protection-and-indemnity (P&I) insurance because of international sanctions, IRISL was forced to turn to Tehran-based Moallem Insurance Company, which was not in the business of providing maritime insurance. Treasury designated Moallem in December 2010 for providing marine insurance to IRISL vessels.[100]

Iran's main shipping line has long relied upon deceptive techniques to conceal its behavior and to avoid international and U.S. sanctions.[101]

IRISL is increasingly employing deceptive practices to disguise its involvement in shipping operations and the designation of its cargo. Since being subjected to U.S. and international sanctions, IRISL has renamed as many as 80 of the ships in its fleet and changed ownership information and flag registries to evade sanctions.[102] IRISL also has renamed its offices in China, Singapore, Germany, and South Korea, has tried to mask its operations in the UAE by using a network of front companies,[103] and has moved its container operations to a subsidiary, HDS Lines.[104] Moreover, IRISL has also since stopped referring to HDS Lines in bills of lading from its shipping agent.[105]

These deceptive practices are designed to avoid scrutiny in financial transactions. As the U.S and other jurisdictions have prohibited financial institutions from processing transactions involving sanctioned entities, IRISL's deceptive practices seek to disguise IRISL's involvement in order to permit the financial transaction. In an advisory to U.S. financial institutions, FinCEN noted IRISL's efforts to rename vessels and adjust information associated with financial transactions and suggested that the International Maritime Organization ("IMO") registration number, which is a unique identifier assigned to each vessel, could provide a useful indication of whether an IRISL vessel is involved in a transaction.[106] In addition, OFAC issued an advisory to alert shippers, importers, exporters, and freight forwarders of IRISL's efforts to hide its involvement in transactions by using container prefixes registered to another carrier, omitting or listing invalid, incomplete or false container prefixes in shipping container numbers, and naming non-existent ocean vessels in shipping documents.[107]

[90] "Ex-Iranian Official Tells UK Daily About Likely IRGC Earnings, Activities," The Financial Times, March 16, 2007.

[91] "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (*http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx*).

[92] "*See* U.S. Treasury "Fact Sheet: Treasury Sanctions Major Iranian Commercial Entities," June 23, 2011. (*http://www.treasury.gov/press-center/press-releases/Pages/tg1217.aspx*).

[93] *Id.*

[94] *Id.*

[95] "Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism," U.S. Treasury Department, August 3, 2010 (*http://www.treasury.gov/press-center/press-releases/Pages/tg810.aspx*).

[96] "Major Iranian Shipping Company Designated for Proliferation Activity," U.S. Treasury, September 10, 2008 (*http://www.treasury.gov/press-center/press-releases/Pages/tg1067.aspx*).

[97] *See* "The Financial Restrictions (Iran) Order 2009," HM Treasury, October 12, 2009 (*http://www.hm-treasury.gov.uk/d/fin_crime_iran_order.pdf*) and "Anti-Terrorism (Financial Restrictions Iran) Order 2010," The Minister of Justice, January 15, 2010 (*http://www.bermudalaws.bm/Laws/Consolidated%20Laws/Anti-Terrorism%20(Financial%20Restrictions%20Iran)%20Order%202010.pdf*).

[98] *See* UN Security Resolution 1929 (*http://daccess-dds-ny.un.org/doc/UNDOC/GEN/N10/396/79/PDF/N1039679.pdf?OpenElement*).

[99] *See* "Council Implementing Regulation (EU) No 668/2010," European Union, July 26, 2010 (*http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2010:195:0025:0036:EN:PDF*); "Accompanying Measures Pursuant to United Nations Security Council Resolution 1929," Ministry of Foreign Affairs of Japan, September 3, 2010 (*http://www.mofa.go.jp/region/middle_e/iran/measures_unsc_1009.html*); "Government Regarding the Implementation of UNSCR 1929," Republic of Korea, September 8, 2010; "Charter of the United Nations (Sanctions—Iran) (Specified Entities) List 2010, Government of Australia, August 4, 2010 (*http://www.comlaw.gov.au/Details/F2010L02236*); Special Economic Measures (Iran) Regulations, Government of Canada, August 4, 2010 (*http://canadagazette.gc.ca/rp-pr/p2/2010/2010-08-04/html/sor-dors165-eng.html*); "Press Release," Government of Norway, Ministry of Foreign Affairs, January 14, 2011 (*http://www.regjeringen.no/mobil/en/dep/ud/press/news/2011/sanctions_iran_adopted.html?id=630820*); "Iran: Federal Council Takes Steps to Improve Legal Certainty and Prevent Possible Evasion," January 19, 2011, The Federal Authorities of the Swiss Federation (*http://www.admin.ch/aktuell/00089/index.html?lang=en&msg-id=37283*).

[100] *See* "Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL," December 21, 2010. (*http://www.treasury.gov/press-center/press-releases/Pages/tg1010.aspx*).

[101] For example, on June 20, 2011, the District Attorney of New York announced a 317-count indictment of eleven corporations and five individuals for their roles in a conspiracy involving IRISL, its regional offices, and its agents. The indictment alleged that the defendants evaded U.S. economic sanctions tied to bans on trade with countries that harbor foreign terrorist and proliferators of weapons of mass destruction. In doing so, the defendants repeatedly falsified the records of banks located in New York County to access illegally the U.S. financial system. The

defendants deceived Manhattan banks into processing more than $60 million worth of payments using aliases or corporate alter egos to hide their conduct. *See* "Iranian Company Charged With Tricking U.S. Banks," New York Times, June 20, 2011 (*http://www.nytimes.com/2011/06/20/nyregion/iranian-shipper-accused-of-sneaking-money-through-ny-banks.html*).

[102] "Iran Shipper Evades US Blacklist," Wall Street Journal, April 10, 2010.

[103] *See* (*http://www.treasury.gov/press-center/press-releases/Pages/tg1212.aspx*).

[104] "U.S. Keeps Watch on Iranian Shipping," Wall Street Journal, May 28, 2010.

[105] *Id.*

[106] *See* "Update on the Continuing Illicit Finance Threat Emanating from Iran," FIN–2010–A008, June 22, 2010 (*http://www.fincen.gov/statutes_regs/guidance/html/fin-2010-a008.html*).

[107] *See* OFAC Nonproliferation and Weapons of Mass Destruction Advisory, "Presentation of Fraudulent Shipping Documents," March 31, 2011. (*http://www.treasury.gov/resource-center/*

Case 1:18-cv-02248-CRC   Document 85-7   Filed 05/06/22   Page 83 of 178

*B. The Substance and Quality of Administration of the Bank Supervisory and Counter-Money Laundering Laws of That Jurisdiction*

Iran's serious deficiencies with respect to anti-money laundering/ countering the financing of terrorism ("AML/CFT") controls has long been highlighted by numerous international bodies and government agencies. Starting in October 2007, the FATF has issued a series of public statements expressing its concern that Iran's lack of a comprehensive AML/CFT regime represents a significant vulnerability within the international financial system. The statements further called upon Iran to address those deficiencies with urgency, and called upon FATF-member countries to advise their institutions to conduct enhanced due diligence with respect to the risks associated with Iran's deficiencies.[108]

The FATF has been particularly concerned with Iran's failure to address the risk of terrorist financing, and starting in February 2009, the FATF called upon its members and urged all jurisdictions to apply effective counter-measures to protect their financial sectors from the terrorist financing risks emanating from Iran.[109] In addition, the FATF advised jurisdictions to protect correspondent relationships from being used to bypass or evade counter-measures and risk mitigation practices, and to take into account money laundering and financing of terrorism risks when considering requests by Iranian financial institutions to open branches and subsidiaries in their jurisdictions.[110] The FATF also called on its members and other jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.[111] Over the past three years, the FATF has repeatedly reiterated these concerns and reaffirmed its call for FATF-member countries and all jurisdictions to implement countermeasures to protect the international financial system from the terrorist financing risk emanating from Iran. In response, numerous countries, including all G7 countries, have issued advisories to their financial institutions.[112]

The FATF's most recent statement in October 2011 reiterated, with a renewed urgency, its concern regarding Iran's failure to address the risk of terrorist financing and the serious threat this poses to the integrity to the international financial system.[113] The FATF reaffirmed its February 2009 call to apply effective countermeasures to protect their financial sectors from ML/ FT risks emanating from Iran, and further called upon its members to consider the steps already taken and possible additional safeguards or strengthen existing ones.[114] In addition, the FATF stated that, if Iran fails to take concrete steps to improve its AML/CFT regime, the FATF will consider calling on its members and urging all jurisdictions to strengthen countermeasures in February 2012.[115] The numerous calls by FATF for Iran to urgently address its terrorist financing vulnerability, coupled with the extensive record of Iranian entities using the financial system to finance terrorism, proliferation activities, and other illicit activity,[116] raises significant concern over the willingness or ability of Iran to establish adequate controls to counter terrorist financing.

*C. Whether the United States Has a Mutual Legal Assistance Treaty With That Jurisdiction, and the Experience of U.S. Law Enforcement Officials and Regulatory Officials in Obtaining Information About Transactions Originating in or Routed Through or to Such Jurisdiction*

Iran has not entered into any mutual legal assistance treaties. Additionally, U.S. law enforcement and regulatory officials have found Iran to be uncooperative regarding access to information about financial transactions. Accordingly, Iran remains a safe haven for those who would commit financial crimes against the United States.

**III. Finding**

Based on the foregoing factors, the Director of FinCEN hereby finds that the Islamic Republic of Iran is a jurisdiction of primary money laundering concern.

Dated: November 18, 2011

**James H. Freis, Jr.,**

*Director, Financial Crimes Enforcement Network.*

[FR Doc. 2011–30332 Filed 11–23–11; 8:45 am]

**BILLING CODE 4810–02–P**

---

**DEPARTMENT OF THE TREASURY**

**Office of the Comptroller of the Currency**

**Proposed Information Collection; Comment Request**

**AGENCY:** Office of the Comptroller of the Currency (OCC), Treasury.

**ACTION:** Notice and request for comment.

**SUMMARY:** The OCC, as part of its continuing effort to reduce paperwork and respondent burden, invites the general public and other Federal agencies to take this opportunity to comment on a continuing information collection, as required by the Paperwork Reduction Act of 1995. Currently, the OCC is soliciting comment concerning its extension, without change, of an information collection titled, "Release of Non-Public Information—12 CFR 4, Subpart C."

**DATES:** You should submit written comments by January 24, 2012.

*sanctions/Programs/Documents/ 20110331_advisory.pdf).*

[108] In response to concerns raised by these FATF and IMF reports, FinCEN issued an advisory on October 16, 2007 to financial institutions regarding the heightened risk of Iranian "money laundering, terrorist financing, and weapons of mass destruction proliferation financing." The advisory further cautioned institutions that there may be an increased effort by Iranian entities to circumvent international sanctions and related financial community scrutiny through the use of deceptive practices. *See* "Guidance to Financial Institutions on the Increasing Money Laundering Threat Involving Illicit Iranian Activity," FinCEN, October 16, 2007 (*http://www.fincen.gov/statutes_regs/ guidance/pdf/ guidance_fi_increasing_mlt_iranian.pdf).* The FATF simultaneously published guidance to assist countries with implementation of UNSCRs 1737 and 1747. *See* "Guidance Regarding the Implementation of Activity-Based Financial Prohibitions of United Nations Security Council Resolution 1737," (*http:// www.fatf-gafi.org/dataoecd/43/17/39494050.pdf)* and "Guidance Regarding the Implementation of Financial Provisions of the United Nations Security Council Resolutions to Counter the Proliferation of Weapons of Mass Destruction," September 5, 2007 (*http://www.fatf-gafi.org/dataoecd/23/16/ 39318680.pdf).*

[109] *See* "FATF Statement on Iran," The Financial Action Task Force, February 25, 2009 (*http:// www.fatf-gafi.org/dataoecd/18/28/42242615.pdf).*

[110] *Id.*

[111] *Id.*

[112] *See* "Circular 13/2008 (GW)—Statement of the FATF of 16 October 2008," November 7, 2008 (*http://www.bafin.de/cln_171/nn_721228/ SharedDocs/Veroeffentlichungen/EN/Service/ Circulars/rs_0813_gw.html?_nnn=true);* "February 27, 2009 FINTRAC Advisory," February 27, 2009 (*http://www.fintrac-canafe.gc.ca/ publications/avs/2009-02-27-eng.asp);* "HM Treasury warns businesses of serious threats posed to the international financial system," March 11, 2009 (*http://webarchive.nationalarchives.gov.uk/+/ http://www.hm-treasury.gov.uk/press_26_09.htm);* "Letter from French Minister of Economy," (*http:// www2.economie.gouv.fr/directions_services/dgtpe/ sanctions/sanctionsiran.php);* and "Bank of Italy Circular," (*http://www.dt.tesoro.it/it/prevenzione _reati_finanziari).*

[113] *See* "FATF Public Statement," The Financial Action Task Force, October 28, 2011 (*http:// www.fatf-gafi.org/document/55/ 0,3746,en_32250379_32236992_48966519_1_ 1_1_1,00.html).*

[114] *Id.*

[115] *Id.*

[116] "Update on the Continuing Illicit Finance Threat Emanating From Iran," FinCEN, June 22, 2010 (*http://www.fincen.gov/statutes_regs/ guidance/html/fin-2010-a008.html).*

PX405

PX407



AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

| 104TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPT. 104–523 Part 1 |
|---|---|---|

# IRAN OIL SANCTIONS ACT OF 1996

APRIL 17, 1996.—Ordered to be printed

Mr. GILMAN, from the Committee on International Relations, submitted the following

# R E P O R T

together with

## Additional Views

[To accompany H.R. 3107]

[Including cost estimate of the Congressional Budget Office]

The Committee on International Relations, to whom was referred the bill (H.R. 3107) to impose sanctions on persons exporting certain goods or technology that would enhance Iran's ability to explore for, extract, refine, or transport by pipeline petroleum resources, and for other purposes, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendments are as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Iran Oil Sanctions Act of 1996".

**SEC. 2. FINDINGS.**

The Congress makes the following findings:

(1) The efforts of the Government of Iran to acquire weapons of mass destruction and the means to deliver them and its support of international terrorism endanger potentially the national security and foreign policy interests of the United States and those countries with which the United States shares common strategic and foreign policy objectives.

(2) The objective of preventing the proliferation of weapons of mass destruction and international terrorism through existing multilateral and bilateral initiatives requires additional efforts to deny Iran the financial means to sustain its nuclear, chemical, biological, and missile weapons programs.

(3) The Government of Iran uses its diplomatic facilities and quasi-governmental institutions outside of Iran to promote acts of international terrorism and assist its nuclear, chemical, biological, and missile weapons programs.

29–006

PX407

2

### SEC. 3. DECLARATION OF POLICY.

The Congress declares that it is the policy of the United States to deny Iran the ability to support international terrorism and to fund the development and acquisition of weapons of mass destruction and the means to deliver them by limiting the development of Iran's ability to explore for, extract, refine, or transport by pipeline petroleum resources of Iran.

### SEC. 4. IMPOSITION OF SANCTIONS.

(a) IN GENERAL.—Except as provided in subsection (d), the President shall impose 2 or more of the sanctions described in paragraphs (1) through (5) of section 5 if the President determines that a person has, with actual knowledge or reason to know, on or after the date of the enactment of this Act—

(1) exported, transferred, or released to Iran, nationals of Iran, or entities owned or controlled by Iran or nationals of Iran any items included under subparagraph (A) or (B) of section 9(a)(1) on the List of Petroleum and Natural Gas-Related Goods and Technology established under section 9 (in this Act referred to as the "List") if the provision of such items would significantly and materially enhance Iran's ability to develop petroleum resources of Iran—

(A) whether or not the items are exported from the United States; and

(B) whether or not the items are subject to the jurisdiction of the United States; or

(2) made an investment of $40,000,000 or more (or any combination of investments of at least $10,000,000 each, which in the aggregate equals or exceeds $40,000,000 in any 12-month period), that directly contributed to the enhancement of Iran's ability to develop petroleum resources of Iran.

(b) PERSONS AGAINST WHICH THE SANCTIONS ARE TO BE IMPOSED.—The sanctions described in subsection (a) shall be imposed on—

(1) any person the President determines has carried out the activities described in subsection (a); and

(2) any person the President determines—

(A) is a successor entity to the person referred to in paragraph (1);

(B) is a wholly owned subsidiary of the person referred to in paragraph (1);

(C) is any other subsidiary of the person referred to in paragraph (1) if that subsidiary, with actual knowledge or reason to know, engaged in the activities referred to in paragraph (1);

(D) is a parent of the person referred to in paragraph (1) if that parent had actual knowledge or reason to know of the activities referred to in paragraph (1); or

(E) is an affiliate of the person referred to in paragraph (1) if that affiliate, with actual knowledge or reason to know, engaged in the activities referred to in paragraph (1).

For purposes of this Act, any person or entity described in this subsection shall be referred to as a "sanctioned person".

(c) PUBLICATION IN FEDERAL REGISTER.—The President shall cause to be published in the Federal Register a current list of sanctioned persons. The removal of persons from, and the addition of persons to, the list, shall also be so published.

(d) EXCEPTIONS.—The President shall not be required to apply or maintain the sanctions under subsection (a)—

(1) in the case of procurement of defense articles or defense services—

(A) under existing contracts or subcontracts, including the exercise of options for production quantities to satisfy requirements essential to the national security of the United States;

(B) if the President determines in writing that the person to which the sanctions would otherwise be applied is a sole source supplier of the defense articles or services, that the defense articles or services are essential, and that alternative sources are not readily or reasonably available; or

(C) if the President determines in writing that such articles or services are essential to the national security under defense coproduction agreements;

(2) to products or services provided under contracts entered into before the date on which the President publishes his intention to impose the sanctions;

(3) to—

(A) spare parts which are essential to United States products or production;

(B) component parts, but not finished products, essential to United States products or production; or

PX407

3

    (C) routine servicing and maintenance of products, to the extent that alternative sources are not readily or reasonably available;

    (4) to information and technology essential to United States products or production; or

    (5) to medicines, medical supplies, or other humanitarian items.

**SEC. 5. DESCRIPTION OF SANCTIONS.**

    The sanctions to be imposed on a sanctioned person under section 4(a) are as follows:

    (1) EXPORT-IMPORT BANK ASSISTANCE FOR EXPORTS TO SANCTIONED PERSONS.—The President shall direct the Export-Import Bank of the United States not to guarantee, insure, extend credit, or participate in the extension of credit in connection with the export of any goods or services to any sanctioned person.

    (2) TRADE SANCTION.—The President shall both—

        (A) order the United States Government not to issue any specific license and not to grant any other specific permission or authority to export any goods or technology to a sanctioned person under—

            (i) the Export Administration Act of 1979;

            (ii) the Arms Export Control Act;

            (iii) the Atomic Energy Act of 1954; or

            (iv) any other statute that requires the prior review and approval of the United States Government as a condition for the export or re-export of goods or services; and

        (B) prohibit the importation into the United States of products produced by any sanctioned person.

Subparagraph (B) includes application to the importation of any finished product or component part, whether shipped directly by the sanctioned person or by another entity.

    (3) LOANS FROM UNITED STATES FINANCIAL INSTITUTIONS.—The United States Government shall prohibit any United States financial institution from making loans or providing credits to any sanctioned person totaling more than $10,000,000 in any 12-month period unless such person is engaged in activities to relieve human suffering and the loans or credits are provided for such activities.

    (4) PROHIBITIONS ON FINANCIAL INSTITUTIONS.—The following prohibitions shall be imposed against a sanctioned person that is a financial institution:

        (A) DESIGNATION AS PRIMARY DEALER.—Neither the Board of Governors of the Federal Reserve System nor the Federal Reserve Bank of New York may designate, or permit the continuation of any prior designation of, such financial institution as a primary dealer in United States Government debt instruments.

        (B) GOVERNMENT FUNDS.—Such financial institution shall not serve as agent of the United States Government or serve as repository for United States Government funds.

    (5) PROCUREMENT SANCTION.—The United States Government shall not procure, or enter into any contract for the procurement of, any goods or services from a sanctioned person.

**SEC. 6. ADVISORY OPINIONS.**

    The Secretary of State may, upon the request of any person, issue an advisory opinion to that person as to whether a proposed activity by that person would subject that person to sanctions under this Act. Any person who relies in good faith on such an advisory opinion which states that the proposed activity would not subject a person to such sanctions, and any person who thereafter engages in such activity, may not be made subject to such sanctions on account of such activity.

**SEC. 7. TERMINATION OF SANCTIONS.**

    (a) IN GENERAL.—The requirement under section 4 to impose sanctions shall no longer have force or effect if the President determines and certifies to the appropriate congressional committees that Iran—

    (1) has ceased its efforts to design, develop, manufacture, or acquire—

        (A) a nuclear explosive device or related materials and technology;

        (B) chemical and biological weapons; and

        (C) ballistic missiles and ballistic missile launch technology; and

    (2) has been removed from the list of countries the governments of which have been determined, for purposes of section 6(j) of the Export Administration Act of 1979, to have repeatedly provided support for acts of international terrorism.

PX407

4

(b) ADDITIONAL REQUIREMENT WITH RESPECT TO LIBYA.—The requirement under section 4 to impose sanctions shall no longer have force and effect with respect to Libya only if the President, in addition to making the determination required by subsection (a), determines and certifies to the appropriate congressional committees that Libya has fulfilled the requirements of United Nations Security Council Resolution 731, adopted January 21, 1992.

SEC. 8. DURATION OF SANCTIONS; PRESIDENTIAL WAIVER.

(a) DELAY OF SANCTIONS.—

(1) CONSULTATIONS.—If the President makes a determination described in section 4(a) with respect to a foreign person, the Congress urges the President to initiate consultations immediately with the government with primary jurisdiction over that foreign person with respect to the imposition of sanctions under this Act.

(2) ACTIONS BY GOVERNMENT OF JURISDICTION.—In order to pursue consultations under paragraph (1) with the government concerned, the President may delay imposition of sanctions under this Act for up to 90 days. Following such consultations, the President shall immediately impose sanctions unless the President determines and certifies to the Congress that the government has taken specific and effective actions, including, as appropriate, the imposition of appropriate penalties, to terminate the involvement of the foreign person in the activities that resulted in the determination by the President under section 4(a) concerning such person.

(3) ADDITIONAL DELAY IN IMPOSITION OF SANCTIONS.—The President may delay the imposition of sanctions for up to an additional 90 days if the President determines and certifies to the Congress that the government with primary jurisdiction over the person concerned is in the process of taking the actions described in paragraph (2).

(4) REPORT TO CONGRESS.—Not later than 45 days after making a determination under section 4(a), the President shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on International Relations of the House of Representatives a report on the status of consultations with the appropriate foreign government under this subsection, and the basis for any determination under paragraph (3).

(b) DURATION OF SANCTIONS.—A sanction imposed under section 4(a) shall remain in effect for a period of not less than 2 years from the date on which it is imposed.

(c) PRESIDENTIAL WAIVER.—

(1) AUTHORITY.—The President may waive the requirement in section 4(a) to impose a sanction or sanctions on a person described in section 4(b), and may waive the continued imposition of a sanction or sanctions under subsection (b) of this section, 30 days or more after the President determines and so reports to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on International Relations of the House of Representatives that it is important to the national interest of the United States to exercise such waiver authority.

(2) CONTENTS OF REPORT.—Any report under paragraph (1) shall provide a specific and detailed rationale for the determination under paragraph (1), including—

(A) a description of the conduct that resulted in the determination;

(B) in the case of a foreign person, an explanation of the efforts to secure the cooperation of the government with primary jurisdiction over the sanctioned person to terminate or, as appropriate, penalize the activities that resulted in the determination;

(C) an estimate as to the significance of the provision of the items described in section 4(a)(1) or the investment described in section 4(a)(2), as the case may be, to Iran's ability to develop its petroleum resources; and

(D) a statement as to the response of the United States in the event that the person concerned engages in other activities that would be subject to section 4(a).

(3) EFFECT OF REPORT ON WAIVER.—If the President makes a report under paragraph (1) with respect to a waiver of sanctions on a person described in section 4(b), sanctions need not be imposed under section 4(a) on that person during the 30-day period referred to in paragraph (1).

SEC. 9. GOODS AND TECHNOLOGY SUBJECT TO EXPORT CONTROL RESTRICTIONS.

(a) CONTROL LIST.—

(1) CONTENTS OF LIST.—For purposes of the determinations to be made under section 4(a), the President, in consultation with the Secretary of State, the Secretary of Energy, and the heads of other appropriate departments and agencies,

PX407

5

shall establish and maintain the List of Petroleum and Natural Gas-Related Goods and Technology. The List shall consist of—

(A) all items listed in the Annex to Resolution 883 of the Security Council of the United Nations, adopted November 11, 1993, and all types of equipment, supplies, and grants of licenses prohibited by paragraph 5 of that resolution; and

(B) any other goods or technology (including software and technical data) that the President determines could significantly or materially contribute to Iran's ability to develop its petroleum resources, including goods and technology that are required for the development, production, or use of facilities (including the repair, maintenance, or operation of equipment) for the development of petroleum resources.

(2) PUBLICATION.—The President, within 60 days after the date of the enactment of this Act, shall cause the List to be published in the Federal Register, together with any regulations issued with respect thereto. Thereafter, any revisions to the List or amendments to the regulations shall be published in the same manner.

(3) ADVANCE NOTICE TO CONGRESS.—Not less than 30 days in advance of the publication of the List, it shall be provided to the Committee on Banking, Housing, and Urban Affairs of the Senate and to the Committee on International Relations of the House of Representatives. The President shall consult with each such Committee regarding the content of the List and shall respond to questions regarding the basis for the inclusion on, or exclusion from, the List of specified items.

(b) STATUTORY CONSTRUCTION.—Nothing in this section prevents the inclusion on the List of any items that may be produced in and traded internationally by persons or entities in countries other than the United States.

SEC. 10. REPORTS REQUIRED.

(a) REPORT ON CERTAIN INTERNATIONAL INITIATIVES.—Not later than 6 months after the date of the enactment of this Act, and every 6 months thereafter, the President shall transmit a report to the appropriate congressional committees describing—

(1) the efforts of the President to mount a multilateral campaign to persuade all countries to pressure Iran to cease its nuclear, chemical, biological, and missile weapons programs and its support of international terrorism;

(2) the efforts of the President to persuade other governments to ask Iran to reduce the presence of Iranian diplomats and representatives of other government and military or quasi-governmental institutions of Iran and to withdraw any such diplomats or representatives who participated in the takeover of the United States embassy in Tehran on November 4, 1979, or the subsequent holding of United States hostages for 444 days;

(3) the extent to which the International Atomic Energy Agency has established regular inspections of all nuclear facilities in Iran, including those presently under construction; and

(4) Iran's use of Iranian diplomats and representatives of other government and military or quasi-governmental institutions of Iran to promote acts of terrorism or to develop or sustain Iran's nuclear, chemical, biological, and missile weapons programs.

(b) OTHER REPORTS.—The President shall ensure the continued transmittal to the Congress of reports describing—

(1) the nuclear and other military capabilities of Iran, as required by section 601(a) of the Nuclear Non-Proliferation Act of 1978 and section 1607 of the National Defense Authorization Act for Fiscal Year 1993; and

(2) the support provided by Iran for acts of international terrorism, as part of the Department of State's annual report on international terrorism.

SEC. 11. APPLICATION OF THE ACT TO LIBYA.

(a) IN GENERAL.—The sanctions of this Act, including the terms and conditions for the imposition, duration, and termination of sanctions, shall apply to persons making investments with respect to the development of petroleum resources of Libya, or exporting, transferring, or releasing of certain items to Libya, nationals of Libya, or entities owned or controlled by Libya, in the same manner as those sanctions apply under this Act to persons making investments with respect to the development of petroleum resources of Iran, or exporting, transferring, or releasing of certain items to Iran, nationals of Iran, or entities owned or controlled by Iran.

(b) APPLICATION OF SPECIFIC PROVISIONS.—In applying the provisions of this Act with respect to Libya under subsection (a), each reference to "Iran" shall be deemed to be a reference to "Libya".

PX407

6

**SEC. 12. DETERMINATIONS NOT REVIEWABLE.**

A determination to impose sanctions under this Act shall not be reviewable in any court.

**SEC. 13. DEFINITIONS.**

As used in this Act:

(1) ACT OF INTERNATIONAL TERRORISM.—The term "act of international terrorism" means an act—

(A) which is violent or dangerous to human life and that is a violation of the criminal laws of the United States or of any State or that would be a criminal violation if committed within the jurisdiction of the United States or any State; and

(B) which appears to be intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by assassination or kidnapping.

(2) AFFILIATE.—For purposes of section 4(b), a person is an "affiliate" of another person if more than 50 percent of the outstanding capital stock or other beneficial interest in both persons is owned, directly or indirectly, by a third person or both persons are otherwise controlled by a third person.

(3) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means the Committee on Banking, Housing, and Urban Affairs and the Committee on Foreign Relations of the Senate and the Committee on International Relations of the House of Representatives.

(4) COMPONENT PART.—The term "component part" has the meaning given that term in section 11A(e)(1) of the Export Administration Act of 1979 (50 U.S.C. App. 2410a(e)(1)).

(5) DEVELOP AND DEVELOPMENT.—To "develop", or the "development" of, petroleum resources means the exploration for, or the extraction, refining, or transportation by pipeline of, petroleum resources.

(6) FINANCIAL INSTITUTION.—The term "financial institution" includes—

(A) a depository institution (as defined in section 3(c)(1) of the Federal Deposit Insurance Act), including a branch or agency of a foreign bank (as defined in section 1(b)(7) of the International Banking Act of 1978);

(B) a credit union;

(C) a securities firm, including a broker or dealer;

(D) an insurance company, including an agency or underwriter;

(E) any other company that provides financial services; and

(F) any subsidiary of an entity described in any of subparagraphs (A) through (E).

(7) FINISHED PRODUCT.—The term "finished product" has the meaning given that term in section 11A(e)(2) of the Export Administration Act of 1979 (50 U.S.C. App. 2410a(e)(2)).

(8) FOREIGN PERSON.—The term "foreign person" means—

(A) an individual who is not a United States person or an alien lawfully admitted for permanent residence into the United States; or

(B) a corporation, partnership, or other nongovernment entity which is not a United States person.

(9) GOODS AND TECHNOLOGY.—The terms "goods" and "technology" have the meanings given those terms in section 16 of the Export Administration Act of 1979 (50 U.S.C. app. 2415).

(10) INVESTMENT.—The term "investment" means—

(A) the entry into a contract that includes responsibility for the development of petroleum resources located in Iran or Libya (as the case may be), or the entry into a contract providing for the general supervision and guarantee of another person's performance of such a contract;

(B) the purchase of a share of ownership in that development;

(C) the entry into a contract providing for the participation in royalties, earnings, or profits in that development, without regard to the form of the participation; or

(D) the entry into or performance of—

(i) a contract for the financing of the development of petroleum resources located in Iran or Libya (as the case may be); or

(ii) a guaranty of another person's performance under such a contract.

(11) IRAN.—The term "Iran" includes any agency or instrumentality of Iran.

PX407

7

(12) IRANIAN DIPLOMATS AND REPRESENTATIVES OF OTHER GOVERNMENT AND MILITARY OR QUASI-GOVERNMENTAL INSTITUTIONS OF IRAN.—The term "Iranian diplomats and representatives of other government and military or quasi-governmental institutions of Iran" includes employees, representatives, or affiliates of Iran's—
  (A) Foreign Ministry;
  (B) Ministry of Intelligence and Security;
  (C) Revolutionary Guard Corps;
  (D) Crusade for Reconstruction;
  (E) Qods (Jerusalem) Forces;
  (F) Interior Ministry;
  (G) Foundation for the Oppressed and Disabled;
  (H) Prophet's Foundation;
  (I) June 5th Foundation;
  (J) Martyr's Foundation;
  (K) Islamic Propagation Organization; and
  (L) Ministry of Islamic Guidance.
(13) LIBYA.—The term "Libya" includes any agency or instrumentality of Libya.
(14) NUCLEAR EXPLOSIVE DEVICE.—The term "nuclear explosive device" means any device, whether assembled or disassembled, that is designed to produce an instantaneous release of an amount of nuclear energy from special nuclear material (as defined in section 11aa. of the Atomic Energy Act of 1954) that is greater than the amount of energy that would be released from the detonation of one pound of trinitrotoluene (TNT).
(15) PARENT.—For purposes of section 4(b), a person is a "parent" of another person if that person owns, directly or indirectly, more than 50 percent of the outstanding capital stock of or other beneficial interest in that other person, or otherwise controls that other person.
(16) PERSON.—The term "person" means—
  (A) a natural person;
  (B) a corporation, business association, partnership, society, trust, any other nongovernmental entity, organization, or group, and any governmental entity operating as a business enterprise; and
  (C) any successor to any entity described in subparagraph (B).
(18) PETROLEUM RESOURCES.—The term "petroleum resources" includes petroleum and natural gas resources.
(19) SUBSIDIARY.—(A) For purposes of section 4(b), and subject to subparagraph (B), a person is a "subsidiary" of another person if that other person owns, directly or indirectly, more than 50 percent of the outstanding capital stock of or other beneficial interest in that person, or otherwise controls that person.
(B) A person is a "wholly owned" subsidiary of another person if that other person owns all of the outstanding capital stock of or other beneficial interests in that person.
(20) UNITED STATES OR STATE.—The term "United States" or "State" means the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, the United States Virgin Islands, and any other territory or possession of the United States.
(21) UNITED STATES PERSON.—The term "United States person" means—
  (A) a natural person who is a citizen of the United States or who owes permanent allegiance to the United States; and
  (B) a corporation or other legal entity which is organized under the laws of the United States, any State or territory thereof, or the District of Columbia, if natural persons described in subparagraph (A) own, directly or indirectly, more than 50 percent of the outstanding capital stock or other beneficial interest in such legal entity.

## Amend the title so as to read:

A bill to impose sanctions on persons exporting certain items that would enhance Iran's ability to develop its petroleum resources and on persons making certain investments directly contributing to the enhancement of Iran's ability to develop its petroleum resources, and for other purposes.

PX407

8

BACKGROUND AND PURPOSE

The "Iran Oil Sanctions Act of 1996" imposes sanctions on persons exporting certain goods or technology or making investments that would enhance the ability of Iran or Libya to explore for, extract, refine, or transport by pipeline petroleum resources. The bill will help deter the two countries from supporting international terrorism or acquiring weapons of mass destruction and associated delivery vehicles.

The measure would require the President to impose two or more specified sanctions on persons that (1) export to Iran or Libya any goods or technology on a list of key petroleum technology items or (2) make investments to Iran or Libya of $40 million or more in one year to enhance the petroleum industries of these two countries.

The legislation directs the President to establish a list of petroleum-related goods and technologies comprised of the list of choke point technology already in force on Libya pursuant to the annex of UN Security Council Resolution 883, as well as other goods or technology that the President determines could significantly or materially contribute to Iran's ability to develop its petroleum resources. The sanctions are to be imposed on any successor, parent, subsidiary, or affiliate of the sanctioned person.

The legislation also requires the President to impose two or more of the following penalties on a sanctioned person: (1) denial of Eximbank assistance for any exports to the sanctioned person; (2) denial of specific licenses for exports of controlled technology to the sanctioned person and prohibition on imports from that company; (3) a prohibition on a sanctioned financial institution from serving as a primary dealer in U.S. Government bonds or as a repository for U.S. Government funds; (4) a prohibition on any U.S. financial institution from making any loan to a sanctioned person over $10 million per year; and (5) a ban on any U.S. Government procurement of any goods or services from a sanctioned person.

The legislation allows the President the flexibility to delay imposition of sanctions for 90 days to pursue consultations with the government of the sanctioned person to terminate the sanctionable activities. An additional 90-day delay is provided for if that government is in the process of terminating those activities. The President may waive any of the sanctions if he determines that doing so is in the national interest.

The Iran Oil Sanctions Act of 1996 requires the President to continue to report to Congress on Iran's nuclear and military capabilities, and on its support for international terrorism. To carry out the legislation, the President is given appropriate regulatory authority and exemption from judicial review in regard to the imposition of sanctions.

It is the view of the committee that enactment of this legislation will be a key element in United States policy of cutting off sources of funding to those rogue regimes such as Iran and Libya who continue to support acts of terrorism and develop weapons of mass destruction.

For Libya in particular, the Committee is convinced that there is an urgent need to increase pressure on Tripoli to gain compliance with the UN Security Council resolutions regarding the Pan

PX407

9

Am 103 bombing. In regard to Iran, our current policies limiting their revenues and petroleum resources must be continued and further strengthened.

In his remarks before the Senate in October of last year, Under Secretary of State Peter Tarnoff said "A straight line links Iran's oil income and its ability to sponsor terrorism, build weapons of mass destruction, and acquire sophisticated armaments". In his testimony before the Committee on International Relations on November 9, 1995, Under Secretary Tarnoff spelled out these concerns in detail: ". . . by pressuring Iran's economy, we seek to limit the government's finances and thereby constrict Tehran's ability to fund rogue activities. We launched an initiative to block Iran's access to international capital its economy needs. We have worked bilaterally and within international financial institutions to keep other governments from providing Iran with credit. On May 6, President Clinton issued Executive Order 12959, which imposed an embargo against Iran. The President's decision to sever American trade and investment with Iran signaled our commitment to exert the maximum efforts of this country to deny Iran financial resources. In particular, by barring American investment in Iran and prohibiting U.S. companies from buying Iranian oil, we have stopped the flow of money from the United States to Iran. We are now seeking to dissuade the international community from investing in Iran's petroleum sector. With these efforts, we are taking advantage of Iran's economic vulnerabilities, particularly its shortages in hard currency. We recognize that economic pressure takes time, but we are convinced that making Iran pay a price for its unacceptable activities is the best way to convince the Iranian leadership that it is in their country's best interest to abandon these policies."

Since the November 4, 1979 seizure of the U.S. hostages in Tehran, economic sanctions have formed a major part of U.S. policy toward Iran. Ten days after the seizure of the Embassy, President Carter declared a national emergency with respect to Iran, which the President has renewed every year since 1979. The United States broke diplomatic relations with Iran on April 7, 1980. After an Administration determination of Iran's involvement in the bombing of the Marine barracks in Beirut in October 1983, Iran was placed on the U.S. list of state sponsors of terrorism on January 19, 1984. This disqualified Iran from receiving U.S. foreign aid, sales of items on the U.S. munitions list, Eximbank credits, and U.S. support for foreign loans, and requires strict licensing requirements for any U.S. exports of controlled goods or technology.

On March 15, 1995, in response to reports that the U.S. firm Conoco, Inc. had initialed a contract with Iran to develop oil fields around Iran's Sirri Island, President Clinton issued Executive Order No. 12957 (60 Fed. Reg. 14615, March 17, 1995). The Executive order declared a national emergency with respect to Iran pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1703(c)(IEEPA) and prohibited the financing, management, or supervision by U.S. persons of the development of Iranian petroleum resources. Conoco, Inc., withdrew from its contract with Iran shortly thereafter.

PX407

10

Following the imposition of the new restrictions, the Administration determined that Iran continued to engage in activities that represent a threat to the peace and security of all nations, including support for international terrorism and for acts that undermine the Middle East peace process, and intensified efforts to acquire weapons of mass destruction. On May 6, 1995, President Clinton issued Executive Order No. 12959 (60 Fed. Reg. 24757, May 9, 1995) to further respond to the Iranian threat.

The May 6 Executive order prohibited U.S. goods, technology, and services to Iran and the reexport of certain U.S. goods and technology to Iran from third countries. It also prohibited new investments by U.S. persons in Iran and any brokering and other dealing by U.S. persons in goods and services of Iranian origin or owned or controlled by Iran. The order prohibited any U.S. persons or companies from approving, facilitating, or financing performance by any entity owned or controlled by a U.S. person of reexport, investment, and trade transactions that a U.S. person is prohibited from performing.

The Executive order thereby closed the loophole under which foreign affiliates of U.S. oil companies were purchasing approximately 25% of Iran's oil exports for overseas trade. (Under a 1987 Executive order, no Iranian goods could be imported into the United States; that prohibition was continued by the May 6, 1995 order.) As justification for issuing the trade and investment ban, the Administration had said that the trading of large amounts of Iranian oil by U.S. companies and their foreign affiliates, as well as continued exportation of U.S. products to Iran, had undermined U.S. efforts to persuade its allies to help isolate Iran.

The U.S. trade ban represented a major new step in U.S. policy toward Iran, and the Administration stressed that the trade ban had made Iran more isolated and that U.S. allies were not extending Iran any new credits. Japan suspended the second tranche of a development loan for construction of a hydroelectric dam over Iran's Karun River. However, U.S. allies did not join the trade and investment ban, or even substantially alter their policy of "critical dialogue" with Iran, an attempt to moderate Iranian behavior through engagement. Administration officials testified before both houses of Congress that Iran was able to find new buyers for almost all the oil previously purchased by affiliates of U.S. oil companies.

The most significant setback to U.S. efforts to multilateralize the isolation of Iran was the July 13, 1995 signing of a contract between Total SA and Iran to develop the Sirri islands—the same contract abandoned by Conoco, Inc. The French government said it would not provide official credits to finance the deal. Several months later, Iran opened up ten major petroleum development projects to foreign investment, each project exceeding $50 million. These projects and potential investments led the Administration and many in Congress to agree that new steps were needed to choke off foreign investment in Iran's oil industry. It is expected that doing so would, over the long term, deny Iran the revenues and resources to develop weapons of mass destruction and fund groups that commit international terrorism and acts designed to derail the Arab-Israeli peace process.

PX407

11

On September 8, 1995, Senator Alfonse D'Amato introduced S. 1228 sanctioning persons that assist in the development of Iran's petroleum resources. A subsequent version of S. 1228, including provisions relating to Libya, passed the Senate on December 20 of 1995. Approved without dissent, this measure has a shorter list of sanctions and requires the President to apply one of them on foreign companies only in the case of major investments in Iran or Libya.

The prospect for the enactment of a comprehensive sanctions regime in the House and Senate has already a strong deterrent effect on potential oil field investors and suppliers in Iran despite consistent efforts by the Government of Iran to attract foreign capital and expertise in the development of its off-shore petroleum resources.

The Committee would note that the prospect for the implementation of sanctions on Libya has also refocused the efforts of the administration to increase pressure on the Libyan regime to comply fully with all pending UN Security Resolutions, including the release of the two suspects in the Pan Am 103 bombing.

### COMMITTEE ACTION

On May 2, 1995, the Subcommittee on International Economic Relations held a hearing on U.S. Policy Toward Iran and how it can be made more effective. Witnesses included the Honorable Peter King; Assistant Secretary of State Robert H. Pelletreau; Patrick Clawson, Senior Fellow at the Institute for National Strategic Studies at the National Defense University; Geoffrey Kemp, Senior Associate at the Carnegie Endowment for International Peace; Jeffrey Schott, Senior Fellow at the Institute for International Economics; Arthur T. Downey, Vice President of Baker Hughes, Inc. on behalf of the National Foreign Trade Council, Inc.; and John H. Lichtblau, Chairman of the Petroleum Industry Research Foundation, Inc.

On October 12, 1995, Chairman Benjamin A. Gilman introduced H.R. 2458, a bill imposing sanctions on foreign persons providing oilfield equipment and technology to Iran.

On November 9, 1995, the Committee on International Relations held a hearing on U. S. Policy Toward Iran with witnesses from the administration and the private sector including: The Honorable Peter Tarnoff, Under Secretary of State for Political Affairs; Mr. Bruce Reidel, Deputy Assistant Secretary of Defense for Near East and South Asia; Mr. Patrick Clawson with the Institute for National Strategic Studies at the National Defense University; Mr. Geoffrey Kemp at the Nixon Center for Peace and Freedom; Mr. Michael Eisenstadt, Senior Fellow at the Washington Institute for Near East Policy; and Mr. Arthur Downey representing the National Foreign Trade Council.

On March 19, 1996, Chairman Benjamin A. Gilman introduced H.R. 3107, The Iran Oil Sanctions Act of 1996 requiring the President to impose two or more sanctions on any person annually providing $40 million or more of investments to Iran or Libya or exporting key oilfield goods and technology to these same countries. Original cosponsors of the legislation include Representatives Berman, Gejdenson, Burton, King, Shaw and Forbes. Additional cosponsors of the legislation include Representatives Lantos,

Torricelli, Royce, English, Zimmer, Filner, Fox, Bunn, Barcia, Diaz-Balart, Meehan, Ehrlich, Cunningham, Collins (MI), Lipinski, Engel, Frank, Sanford, Funderburk, Pryce, Kasich, Meek, McCollum, Traficant, Knollenberg, Stark, Porter, Paxon, Deutsch, Hall, Smith (NJ), Burton, Frazer, Metcalf, Evans, Bryant, Saxton, Houghton, Durbin, Kaptur, Souder, McHugh, Roybal-Allard, Wyden, Markey, Oberstar, Thurman, Sisisky, Lofgren, LoBiondo, Lowey, Shays, LaTourette, Cardin, Kleczka, Foley, Yates, Ackerman, Torres, Coyne, Towns, Cooley, Pelosi, DeFazio, Ward, Lewis (GA), Frelinghuysen, and Furse.

On March 21, 1996, the Committee on International Relations received testimony from Senator D'Amato strongly endorsing the provisions in H.R. 3107. The Committee subsequently debated the measure and reported out H.R. 3106 by a vote of 32 to 0.

### ROLLCALL VOTES AND AMENDMENTS AND FINAL PASSAGE

In compliance with clause (2)(l)(2)(B) of rule XI of the Rules of the House of Representatives, the record of committee rollcall votes taken on final passage or amendments during the committee's consideration of H.R. 3107, as amended, is set out on the following pages, as is a report of the committee's final action on the bill.

### DESCRIPTION OF AMENDMENT, MOTION, ORDER, OR OTHER PROPOSITION

By voice vote, the committee accepted several amendments including an en bloc amendment offered by Chairman Gilman clarifying certain definitions in the bill, specifying a two year time frame for the duration of sanctions and making other technical and conforming changes.

It also accepted an amendment offered by Mr. Torricelli requiring an additional condition for the lifting of sanctions on Libya, specifying that the two Libyan nationals indicted for their role in the destruction of Pan American Flight 103 be made available for prosecution pursuant United Nations Security Council Resolution 731 of January 21, 1992.

The Committee accepted an amendment offered by Mr. Campbell specifying that the requirement in the bill preventing a sanctioned person from receiving a loan or credit in an amount exceeding $10 million be modified to ensure that it is determined on an annual basis.

The Bereuter motion that the bill be reported to the House with the recommendation that the bill, as amended, do pass.

Totals: 32 yeas, 0 nays.

| Name and State | Yea | Nay | Name and State | Yea | Nay |
|---|---|---|---|---|---|
| Benjamin A. Gilman, NY., Chmn | X | | Lee H. Hamilton, IN | X | |
| William F. Goodling, PA | X | | Sam Gejdenson, CN | X | |
| James A. Leach, IA | | | Tom Lantos, CA | X | |
| Toby Roth, WI | X | | Robert G. Torricelli, NJ | X | |
| Henry J. Hyde, IL | | | Howard L. Berman, CA | X | |
| Doug Bereuter, NE | X | | Gary L. Ackerman, NY | | |
| Christopher H. Smith, NJ | | | Harry Johnston, FL | | |
| Dan Burton, IN | | | Eliot L. Engel, NY | X | |
| Jan Meyers, KS | X | | Eni F.H. Faleomavaega, Am. Samoa | | |

PX407

13

| Name and State | Yea | Nay | Name and State | Yea | Nay |
|---|---|---|---|---|---|
| Elton Gallegly, CA | | | Matthew G. Martinez, CA | X | |
| Ileana Ros-Lehtinen, FL | X | | Donald M. Payne, NJ | | |
| Cass Ballenger, NC | X | | Robert E. Andrews, NJ | X | |
| Dana Rohrabacher, CA | X | | Robert Menendez, NJ | X | |
| Donald A. Manzullo, IL | | | Sherrod Brown, OH | X | |
| Edward R. Royce, CA | X | | Cynthia A. McKinney, GA | X | |
| Peter T. King, NY | X | | Alcee L. Hastings, FL | | |
| Jay Kim, CA | X | | Albert Russell Wynn, MD | X | |
| Sam Brownback, KS | X | | James P. Moran, VA | X | |
| David Funderburk, NC | X | | Victor O. Frazer, VI | | |
| Steven J. Chabot, OH | X | | Charlie Rose, NC | | |
| Marshall "Mark" Sanford, SC | X | | Pat Danner, MO | X | |
| Matt Salmon, AZ | X | | | | |
| Amo Houghton, NY | X | | | | |
| Tom Campbell, CA | X | | | | |

The Committee notes that Messrs. Ackerman and Payne arrived in the Committee room shortly after the conclusion of the vote and after the Committee had adjourned and told the Chairman that had they been present they would have voted "aye."

The Committee notes the receipt of the following statement from Mr. Manzullo:

MARCH 21, 1996.

Hon. BEN GILMAN,
*Chairman, Committee on International Relations,*
*Washington, DC.*

DEAR BEN: I was unavoidably detained in a meeting with constituents from the 16th District of Illinois that prevented me from casting the only and final vote during the committee's mark-up of the Iranian sanctions legislation. If I were present, I would have voted "aye." I ask that my remarks appear in the committee record reflecting my vote preference on this legislation.

Thank you for your kind attention to my request.

Best wishes.

Sincerely,

DONALD A. MANZULLO,
*Member of Congress.*

SECTION-BY-SECTION ANALYSIS

*Section 1. Short title*

The title of the bill is the "Iran Oil Sanctions Act of 1996".

*Section 2. Findings*

This section states that the efforts of the Government of Iran to acquire weapons of mass destruction and the means to deliver them as well as its support for international terrorism endanger the interests of the United States and those countries sharing common strategic and foreign policy objectives.

Furthermore, additional bilateral and multilateral efforts are needed to deny Iran the financial means to develop its nuclear, chemical, biological and missile weapons programs. While multilateral efforts to reduce the flow of new credits, sensitive dual use technology and new weapons systems going to Iran are now under-

PX407

14

way, much more remains to be done by the United States to implement its containment policy and to ensure that Iran does not attract significant new investment from any foreign company.

This section also states that Iran uses its diplomatic facilities and quasi-governmental institutions outside that country to promote terrorism and the acquisition of materials and technology for its weapons of mass destruction programs.

*Section 3. Declaration of policy*

In this section, Congress declares that it is U.S. policy to deny Iran the means to threaten U.S. interests and those of our allies by limiting its ability to extract, refine, process, store, or transport petroleum resources.

*Section 4. Imposition of sanctions*

This section defines those persons to be subjected to sanctions as any person that the President determines has exported to Iran any goods on a List of Petroleum and Natural Gas-Related Goods and Technology. Also subject to sanctions would be any person that the President determines has with knowledge or reason to know made investments in Iran of at least $40 million in any one year that directly contributed to enhancement of Iran's ability to develop its petroleum resources. Any person determined by the President to be a successor or wholly owned subsidiary of the sanctioned person also would be subject to sanctions as would any parent that knew of the activity or affiliate that with knowledge or reason to know engaged in the activity.

The Committee would note that the intent of the legislation is not to apply sanctions on the transfer of all petroleum and natural gas-related products being acquired by Iran or Libya. The Administration is specifically given the discretion of deciding which goods and services would significantly and materially enhance Iran's ability to develop its petroleum resources. In the view of the Committee, the administration has the flexibility it needs in implementing this provision with a view toward denying Iran those key goods and technology items needed to develop its offshore oil resources.

In making a determination to impose the sanctions contained in this section, the administration must use this so-called "trade trigger" or the $40 million investment trigger, but it has broad latitude in making such a determination based on the circumstances of each discrete export to or investment in Iran. The Committee would note that the $40 million investment threshold in Section 4(A)(2) is intended as an absolute cap on each person's investment in any project or projects increasing the ability of Iran to develop its petroleum resources. The Committee does not intend that the sanctions provided in this section would extend to portfolio investments made by any other person in a sanctioned person.

*Section 5. Description of sanctions*

This section describes five specified sanctions, at least two of which shall be imposed on a person sanctioned under the provisions of the previous section:

      denial of Eximbank assistance for exports to a sanctioned person;

15

trade sanction, including denial of licenses for exports of controlled technology to the sanctioned person, and a prohibition on imports into the United States of products produced by the sanctioned person;

prohibition of loans by U.S. financial institutions totaling more than $10 million in one year to a sanctioned person unless such person is engaged in activities to relieve human suffering and the loans and credits are provided for such purpose;

prohibition of sanctioned financial institutions from serving as a primary dealer in U.S. Government debt instruments or as a repository of U.S. Government funds or an agent of the U.S. Government;

prohibition of U.S. government procurement from a sanctioned person.

*Section 6. Advisory opinions*

This section provides an opportunity for any person to request the Secretary of State to issue an advisory opinion as to whether a proposed activity by that person would subject that person to sanctions under the Act. Any person who relies in good faith on an advisory opinion stating that the activity would not lead to the imposition of sanctions would not be made subject to sanctions for that specific activity.

*Section 7. Termination of sanctions*

This section terminates sanctions imposed pursuant to the Act if the President determines and certifies to the appropriate congressional committees that Iran has ceased its efforts to acquire weapons of mass destruction and has been removed from the U.S. list of state sponsors of terrorism established pursuant to section 6(j) of the Export Administration Act of 1979. It also provides a further requirement with respect to Libya that the President certify to the appropriate congressional committees that Libya has fulfilled the requirements of United Nations Security Council Resolution 731 adopted on January 21, 1992.

*Section 8. Duration of sanctions; Presidential waiver*

This section urges the President to begin consultations with the government with primary jurisdiction over any foreign person sanctioned under the provisions of this Act. The President may delay imposition of sanctions under this Act for up to 90 days in order to pursue consultations with this government. He shall then immediately impose sanctions on this person unless he can certify to Congress that the government has taken very specific actions, including imposing appropriate penalties, to terminate the activities giving rise to the sanctions. The Committee would expect that certification to establish that these actions were fully implemented and were having a demonstrable impact on the sanctioned person.

An additional 90-day delay period is also provided if the President determines and certifies to Congress that the government with primary jurisdiction over the person is taking actions to terminate the sanctionable activities. The President is also directed to submit a report to the appropriate congressional committees 45 days after making a determination regarding sanctionable activi-

PX407

16

ties, on the status of his negotiations with the foreign government with primary jurisdiction. This report would also lay out in detail the circumstances leading to any delays in the implementation of sanctions.

Consistent with the sanctions provisions in previously-enacted proliferation-related statutes, including the Iran-Iraq Non-proliferation Act of 1992, sanctions shall be imposed for a period of at least two years.

The President may waive the requirement to impose sanctions 30 days after reporting to the appropriate congressional committees that doing so is important to the national interest of the United States. In the view of the Committee, this waiver standard and the provisions in this section permitting delay in the implementation of sanctions should give the administration enough flexibility and opportunity for negotiation sufficient to avoid the imposition of sanctions in nearly all circumstances.

*Section 9. Goods and technology subject to export control restrictions*

This section directs the President, in consultation with the appropriate departments and agencies, to establish and maintain a list of petroleum and natural gas-related goods and technology consisting of a United Nations-approved list contained in the Annex to resolution 883 of the UN Security Council of November 11, 1993, together with other equipment and supplies prohibited in other parts of that resolution, as well as any other goods and technology that the President determines could significantly and materially contribute to the ability of Iran to develop its petroleum resources. It is the intent of the Committee that the administration use the United Nations-approved list as a basis for the construction of a comprehensive and updated list of items that are essential to Iran's ability to further develop its petroleum development resources.

*Section 10. Report required*

The President is directed to continue to report to Congress on Iran's nuclear and other military capabilities, and its support for international terrorism.

The bill requires a new Administration report to Congress on efforts to isolate Iran and curb its ability to promote terrorism and Islamic revolution and clandestinely procure high technology components of weapons of mass destruction. The required report must describe Administration efforts to mount a multilateral campaign to isolate Iran; Administration efforts to persuade other governments to ask Iran to limit its diplomatic presence; Iran's use of its diplomats, diplomatic facilities, and quasi-governmental institutions to promote terrorism or sustain its weapons of mass destruction programs; and the extent to which the International Atomic Energy Agency has established regular inspections of Iran's nuclear facilities.

The Committee is requiring this new report because the annual report to Congress on terrorism addresses only a few of these issues. There is no mention in the annual terrorism report of U.S. efforts to persuade its allies in Europe to expel certain Iranian diplomats who were allegedly linked to the holding of the American hostages during 1979-81. Each of the past few annual terrorism re-

PX407

17

ports have addressed only a few Iranian diplomats, usually the most well-known, alleged to be involved in promoting terrorism. The list of Iranian ministries allegedly involved in such activity, which are to be reported on by the Administration, are defined in Section 13.

The annual terrorism report does not assess Iran's use of parastatal organizations, such as the foundation for the Oppressed, to support terrorist groups or procure technology. The Foundation is one of many Foundations, and controls billions of dollars in companies and financial assets. There are consistent reports, not cited in the annual terrorism report, that the Foundation, which is headed by the former Minister of the Revolutionary Guard, uses its funds to procure technology in Europe. Other such foundations, such as the June 5th Foundation that offers a $2 million reward for the killing of Salman Rushdie, are included in a comprehensive list in section 13 of Iranian Diplomats and Representatives of Other Government and Military or Quasi Governmental Institutions of Iran.

### Section 11. Application of the Act to Libya

This section applies all the terms and conditions of the Act with respect to the imposition, duration, and terminations of sanctions to persons making investments in the petroleum resources of Libya or exporting or transferring certain items to Libya. All the other provisions in the Act shall apply equally to Libya, with each reference in the Act to Iran considered to be a reference to Libya.

### Section 12. Determinations not reviewable

In light of the growing threats to U.S. national security interests posed by Iran and Libya, the Committee believes that once a determination is made to impose sanctions under this Act, the imposition of these sanctions should be carried out in a timely fashion and, as in the case of similar sanctions laws, should not be subject to judicial review. The Committee would also note that Section 8 of the legislation provides for delays in the imposition of sanctions and a careful and a deliberate review of their implementation by the administration in consultation with the Congress.

### Section 13. Definitions

This section defines the terms contained in the Act, including: act of international terrorism; appropriate congressional committees; component part; develop and development; financial institution; finished product; foreign person; goods and technology; investment; Iran; Iranian diplomats and representatives; Libya; nuclear explosive device; parent; person; petroleum resources; subsidiary; United States or State; and United States person.

#### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this re-

PX407

18

port. Among the principal oversight activities which were contributed to the Committee's formulation of H.R. 3107 were:

On May 2, and November 9, 1995 hearings were held on U.S. policy toward Iran, and numerous consultations and briefings took place on U.S.-Iran issues from January through March of 1996 between staff, Committee Members and Executive branch officials.

As a result of these oversight activities, the Committee recommends that the House approve H.R. 3107 as reported.

### COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Reform and Oversight were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

### NEW BUDGET AUTHORITY AND TAX EXPENDITURES

The Committee adopts the cost estimate of the Congressional Budget Office, set out below, as its submission of any required information on new budget authority, new spending authority, new credit authority, or an increase or decrease in the national debt required by clause 2(l)(3)(B) of rule XI of the House of Representatives.

### INFLATIONARY IMPACT STATEMENT

In compliance with clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 3107 will have no significant inflationary impact on prices and costs in the operation of the national economy.

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth with respect to H.R. 3107 the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Budget Act of 1974:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, March 27, 1996.*

Hon. BENJAMIN A. GILMAN,
*Chairman, Committee on International Relations,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 3107, Iran Oil Sanctions Act of 1996, as ordered reported by the House Committee on International Relations on March 21, 1996. The bill would require the President to impose sanctions on any person who he determines has enhanced the development of the petroleum resources of Iran or Libya through the export, transfer, or release of goods or technology or through direct investment.

The bill would not affect receipts or direct spending and would not be subject to pay-as-you-go procedures under section 252 of the

PX407

19

Balanced Budget and Emergency Deficit Control Act of 1985. The bill could increase spending subject to appropriations action to cover the cost of gathering and analyzing information, publishing lists of sanctioned persons, and providing advisory opinions. Based on information provided by the Administration, CBO estimates that such costs would total less than $1 million a year.

Section 4 of the Unfunded Mandates Reform Act of 1995, P.L. 104–4, excludes legislative provisions that are necessary for the national security from the application of that act. CBO has determined that all provisions of H.R. 3107 fit within that provision.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Joseph C. Whitehill for impacts on the federal budget, Pepper Santalucia for impacts on state, local, and tribal governments, and Eric Labs and Amy Downs for private sector impacts.

Sincerely,

JUNE E. O'NEILL, *Director.*

JURISDICTIONAL ISSUES

H.R. 3107, as ordered reported by the Committee on International Relations, contains several provisions which fall within the shared jurisdiction of other committees of the House, including the Committee on Ways and Means, Banking and Financial Services and Government Reform and Oversight.

PX407

## ADDITIONAL VIEWS OF THE HONORABLE LEE H. HAMILTON AND THE HONORABLE JAMES P. MORAN

We supported this bill because we agree with the sponsors that the United States should take steps to limit Iran's earnings from exports of oil and gas, which directly contribute to its ability to develop weapons of mass destruction and to promote terrorism.

We have several concerns about the bill as it was reported from the International Relations Committee, however, and we hope those concerns will receive further consideration as this bill moves forward.

### NO DISAGREEMENT ON OBJECTIVES

When it comes to Iran, Members of the International Relations Committee disagree neither on the problem, nor on the goal of U.S. policy.

Iran threatens vital U.S. national interests. It is actively pursuing weapons of mass destruction, it is a confirmed sponsor of terrorism, and it is working to undermine the Middle East peace process. In response to these threats, the President last year imposed a total embargo on U.S. trade with Iran, a step which all of us supported.

Members of the Committee agree that a key goal of U.S. policy should be to persuade Iran's major trading partners and creditors to take similar steps to isolate Iran and press for changes in its policies.

Where we sometimes disagree is not on strategy, but on the best tactics with which to pursue that strategy and our shared policy goals in Iran.

### CONCERNS ON THE BILL

We have three principal reservations about the bill in its current form.

First, we are concerned that the bill could be counterproductive to the goal of increasing multilateral economic and political pressure on Iran.

The sanctions in the bill will penalize foreign firms for commercial activity which, though objectionable to us, is legal in their home countries. We understand that other governments are likely to charge that the bill's import and government procurement sanctions, at a minimum, violate trade and other international agreements to which the United States is a party.

In official demarches, other governments have already notified us that they object to these measures on sovereignty grounds. Past experience suggests they will take blocking measures. Retaliatory measures against U.S. trade, perhaps authorized by international adjudicatory bodies, are also possible.

(20)

PX407

21

Our concern here is not that we may offend our allies, for we object to their unwillingness to adopt tougher measures to isolate Iran economically and politically. Our concern is more practical: The United States cannot adequately pressure Iran's economy alone. A strong adverse reaction by other governments to a U.S. effort to penalize their firms will put us at odds with some of our closest friends. That could ultimately reduce, rather than increase, multilateral cooperation on Iran.

We believe recent history is instructive. Western efforts to confront another dangerous country—the former Soviet Union—were set back in 1982 when the United States tried to sanction firms participating in the development of a Soviet gas pipeline.

The target of U.S. pressure in 1982 was subsidiaries of U.S. firms, yet the reaction in Europe was intense. And U.S. sanctions did not achieve their goal: the sanctions were not sustainable, and the United States ultimately had to lift them. The bill before us today would hit foreign firms. We can expect at least as strong a response.

We do not object in principle to pressuring foreign firms or their home governments to cease commercial activity that helps Iran increase its export earnings. But we hope that as this bill moves forward, an effort will be made to weigh likely international responses to it, because those responses will influence the effectiveness of our effort to change Iranian government behavior.

In this regard, we would also like more attention focused on the relative merits of sanctioning investment versus sanctioning trade. We believe investment is more critical to Iran's energy sector than trade. The marginal benefit of trying to cut off trade in this area would be relatively small when compared with the international diplomatic and economic costs of such efforts.

Our second concern about this bill relates to the costs it may impose on the U.S. economy.

We note that four of the five sanctions called for in this bill will—if imposed—result in lost sales or business for U.S. firms. That could cost jobs. Retaliation by other governments could cost more jobs.

We believe the United States must sometimes pay an economic price to ensure its security. But we also believe that successful U.S. sanctions must harm the target country more than they harm the United States. If they do not, they will not earn public support and will be difficult to sustain.

To ensure this result, the President needs sufficient flexibility to weigh the economic and security implications of different sanctions measures. It is not clear to us that the sanctions provisions of this bill give the President that flexibility.

The bill requires the President to impose two of five possible sanctions. But all of the sanctions won't be available in each case:

Some would only apply to foreign contractors.

Some would only apply to foreign financial services companies.

We are hopeful that Congress will be able to give the President the full range of policy tools he needs to do what only he can: balance U.S. foreign policy and economic interests.

PX407

22

Third, we would have preferred that this bill had treated Iran and Libya differently.

Members of the Committee agree that Libya and Iran each threaten U.S. national interests, but they do so in different ways, and the international response to each country has also been different.

There is already considerable multilateral cooperation on isolating Libya. UN sanctions are already in place. We are concerned that new unilateral U.S. sanctions could jeopardize current multilateral cooperation and could undercut current U.S. efforts to expand existing UN sanctions.

Furthermore, since there is already substantial foreign investment in Libya's energy sector, investment sanctions will not have much of a deterrent effect.

We believe the Administration has put forward a constructive proposal on Libya—one that treats it differently from Iran, but with equal firmness. Under the Administration's proposal, U.S. sanctions would be linked to compliance with existing UN sanctions. We think this proposal deserves serious consideration.

CONCLUSION

We voted for this bill because we agree with its fundamental objective—changing Iranian government behavior. We would like this bill to move forward.

We raise these concerns in an effort to be constructive. We want this legislation to be effective. It will not be effective if it generates excessive conflict with our allies and hurts American workers more than it hurts Iran. We do not know whether that would be the case if the bill were enacted in its current form, but we hope Congress and the Administration can carefully evaluate these issues as the bill moves forward.

LEE H. HAMILTON.
JAMES P. MORAN.

○

PX408



PUBLIC LAW 112–158—AUG. 10, 2012

IRAN THREAT REDUCTION AND SYRIA
HUMAN RIGHTS ACT OF 2012

PX408

126 STAT. 1214        PUBLIC LAW 112–158—AUG. 10, 2012

Public Law 112–158
112th Congress

## An Act

Aug. 10, 2012
[H.R. 1905]

To strengthen Iran sanctions laws for the purpose of compelling Iran to abandon its pursuit of nuclear weapons and other threatening activities, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Iran Threat Reduction and Syria Human Rights Act of 2012.
22 USC 8701 note.

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Iran Threat Reduction and Syria Human Rights Act of 2012".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.

TITLE I—EXPANSION OF MULTILATERAL SANCTIONS REGIME WITH
RESPECT TO IRAN

Sec. 101. Sense of Congress on enforcement of multilateral sanctions regime and expansion and implementation of sanctions laws.
Sec. 102. Diplomatic efforts to expand multilateral sanctions regime.

TITLE II—EXPANSION OF SANCTIONS RELATING TO THE ENERGY SECTOR
OF IRAN AND PROLIFERATION OF WEAPONS OF MASS DESTRUCTION BY
IRAN

Subtitle A—Expansion of the Iran Sanctions Act of 1996

Sec. 201. Expansion of sanctions with respect to the energy sector of Iran.
Sec. 202. Imposition of sanctions with respect to transportation of crude oil from Iran and evasion of sanctions by shipping companies.
Sec. 203. Expansion of sanctions with respect to development by Iran of weapons of mass destruction.
Sec. 204. Expansion of sanctions available under the Iran Sanctions Act of 1996.
Sec. 205. Modification of waiver standard under the Iran Sanctions Act of 1996.
Sec. 206. Briefings on implementation of the Iran Sanctions Act of 1996.
Sec. 207. Expansion of definitions under the Iran Sanctions Act of 1996.
Sec. 208. Sense of Congress on energy sector of Iran.

Subtitle B—Additional Measures Relating to Sanctions Against Iran

Sec. 211. Imposition of sanctions with respect to the provision of vessels or shipping services to transport certain goods related to proliferation or terrorism activities to Iran.
Sec. 212. Imposition of sanctions with respect to provision of underwriting services or insurance or reinsurance for the National Iranian Oil Company or the National Iranian Tanker Company.
Sec. 213. Imposition of sanctions with respect to purchase, subscription to, or facilitation of the issuance of Iranian sovereign debt.
Sec. 214. Imposition of sanctions with respect to subsidiaries and agents of persons sanctioned by United Nations Security Council resolutions.
Sec. 215. Imposition of sanctions with respect to transactions with persons sanctioned for certain activities relating to terrorism or proliferation of weapons of mass destruction.

Sec. 216. Expansion of, and reports on, mandatory sanctions with respect to finan-
          cial institutions that engage in certain activities relating to Iran.
Sec. 217. Continuation in effect of sanctions with respect to the Government of
          Iran, the Central Bank of Iran, and sanctions evaders.
Sec. 218. Liability of parent companies for violations of sanctions by foreign sub-
          sidiaries.
Sec. 219. Disclosures to the Securities and Exchange Commission relating to
          sanctionable activities.
Sec. 220. Reports on, and authorization of imposition of sanctions with respect to,
          the provision of specialized financial messaging services to the Central
          Bank of Iran and other sanctioned Iranian financial institutions.
Sec. 221. Identification of, and immigration restrictions on, senior officials of the
          Government of Iran and their family members.
Sec. 222. Sense of Congress and rule of construction relating to certain authorities
          of State and local governments.
Sec. 223. Government Accountability Office report on foreign entities that invest in
          the energy sector of Iran or export refined petroleum products to Iran.
Sec. 224. Reporting on the importation to and exportation from Iran of crude oil
          and refined petroleum products.

TITLE III—SANCTIONS WITH RESPECT TO IRAN'S REVOLUTIONARY GUARD
                              CORPS

Subtitle A—Identification of, and Sanctions With Respect to, Officials, Agents, Affili-
    ates, and Supporters of Iran's Revolutionary Guard Corps and Other Sanctioned
    Persons

Sec. 301. Identification of, and imposition of sanctions with respect to, officials,
          agents, and affiliates of Iran's Revolutionary Guard Corps.
Sec. 302. Identification of, and imposition of sanctions with respect to, persons that
          support or conduct certain transactions with Iran's Revolutionary Guard
          Corps or other sanctioned persons.
Sec. 303. Identification of, and imposition of measures with respect to, foreign gov-
          ernment agencies carrying out activities or transactions with certain
          Iran-affiliated persons.
Sec. 304. Rule of construction.

    Subtitle B—Additional Measures Relating to Iran's Revolutionary Guard Corps

Sec. 311. Expansion of procurement prohibition to foreign persons that engage in
          certain transactions with Iran's Revolutionary Guard Corps.
Sec. 312. Determinations of whether the National Iranian Oil Company and the
          National Iranian Tanker Company are agents or affiliates of Iran's Rev-
          olutionary Guard Corps.

     TITLE IV—MEASURES RELATING TO HUMAN RIGHTS ABUSES IN IRAN

    Subtitle A—Expansion of Sanctions Relating to Human Rights Abuses in Iran

Sec. 401. Imposition of sanctions on certain persons responsible for or complicit in
          human rights abuses committed against citizens of Iran or their family
          members after the June 12, 2009, elections in Iran.
Sec. 402. Imposition of sanctions with respect to the transfer of goods or tech-
          nologies to Iran that are likely to be used to commit human rights
          abuses.
Sec. 403. Imposition of sanctions with respect to persons who engage in censorship
          or other related activities against citizens of Iran.

             Subtitle B—Additional Measures to Promote Human Rights

Sec. 411. Codification of sanctions with respect to grave human rights abuses by
          the governments of Iran and Syria using information technology.
Sec. 412. Clarification of sensitive technologies for purposes of procurement ban
          under Comprehensive Iran Sanctions, Accountability, and Divestment
          Act of 2010.
Sec. 413. Expedited consideration of requests for authorization of certain human
          rights-, humanitarian-, and democracy-related activities with respect to
          Iran.
Sec. 414. Comprehensive strategy to promote Internet freedom and access to infor-
          mation in Iran.
Sec. 415. Statement of policy on political prisoners.

                          TITLE V—MISCELLANEOUS

Sec. 501. Exclusion of citizens of Iran seeking education relating to the nuclear and
          energy sectors of Iran.

126 STAT. 1216         PUBLIC LAW 112–158—AUG. 10, 2012

Sec. 502. Interests in certain financial assets of Iran.
Sec. 503. Technical correction to section 1245 of the National Defense Authoriza-
        tion Act for Fiscal Year 2012.
Sec. 504. Expansion of sanctions under section 1245 of the National Defense Au-
        thorization Act for Fiscal Year 2012.
Sec. 505. Reports on natural gas exports from Iran.
Sec. 506. Report on membership of Iran in international organizations.
Sec. 507. Sense of Congress on exportation of goods, services, and technologies for
        aircraft produced in the United States.

        TITLE VI—GENERAL PROVISIONS

Sec. 601. Implementation; penalties.
Sec. 602. Applicability to certain intelligence activities.
Sec. 603. Applicability to certain natural gas projects.
Sec. 604. Rule of construction with respect to use of force against Iran and Syria.
Sec. 605. Termination.

  TITLE VII—SANCTIONS WITH RESPECT TO HUMAN RIGHTS ABUSES IN
                             SYRIA

Sec. 701. Short title.
Sec. 702. Imposition of sanctions with respect to certain persons who are respon-
        sible for or complicit in human rights abuses committed against citizens
        of Syria or their family members.
Sec. 703. Imposition of sanctions with respect to the transfer of goods or tech-
        nologies to Syria that are likely to be used to commit human rights
        abuses.
Sec. 704. Imposition of sanctions with respect to persons who engage in censorship
        or other forms of repression in Syria.
Sec. 705. Waiver.
Sec. 706. Termination.

22 USC 8701.   **SEC. 2. DEFINITIONS.**

        Except as otherwise specifically provided, in this Act:
                (1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term
        "appropriate congressional committees" has the meaning given
        that term in section 14 of the Iran Sanctions Act of 1996
        (Public Law 104–172; 50 U.S.C. 1701 note).
                (2) FINANCIAL TRANSACTION.—The term "financial trans-
        action" means any transfer of value involving a financial
        institution, including the transfer of forwards, futures, options,
        swaps, or precious metals, including gold, silver, platinum,
        and palladium.
                (3) KNOWINGLY.—The term "knowingly" has the meaning
        given that term in section 14 of the Iran Sanctions Act of
        1996 (Public Law 104–172; 50 U.S.C. 1701 note).
                (4) UNITED STATES PERSON.—The term "United States per-
        son" has the meaning given that term in section 101 of the
        Comprehensive Iran Sanctions, Accountability, and Divestment
        Act of 2010 (22 U.S.C. 8511).

# TITLE I—EXPANSION OF MULTILAT-ERAL SANCTIONS REGIME WITH RE-SPECT TO IRAN

22 USC 8711.   **SEC. 101. SENSE OF CONGRESS ON ENFORCEMENT OF MULTILATERAL
              SANCTIONS REGIME AND EXPANSION AND IMPLEMENTA-
              TION OF SANCTIONS LAWS.**

        It is the sense of Congress that the goal of compelling Iran
to abandon efforts to acquire a nuclear weapons capability and
other threatening activities can be effectively achieved through
a comprehensive policy that includes economic sanctions, diplomacy,

PX408

PUBLIC LAW 112–158—AUG. 10, 2012      126 STAT. 1217

and military planning, capabilities and options, and that this objective is consistent with the one stated by President Barack Obama in the 2012 State of the Union Address: "Let there be no doubt: America is determined to prevent Iran from getting a nuclear weapon, and I will take no options off the table to achieve that goal". Among the economic measures to be taken are—

(1) prompt enforcement of the current multilateral sanctions regime with respect to Iran;

(2) full, timely, and vigorous implementation of all sanctions enacted into law, including sanctions imposed or expanded by this Act or amendments made by this Act, through—

(A) intensified monitoring by the President and the designees of the President, including the Secretary of the Treasury, the Secretary of State, and senior officials in the intelligence community (as defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)), as appropriate;

(B) more extensive use of extraordinary authorities provided for under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) and other sanctions laws;

(C) reallocation of resources to provide the personnel necessary, within the Department of the Treasury, the Department of State, and the Department of Commerce, and, where appropriate, the intelligence community, to apply and enforce sanctions; and

(D) expanded cooperation with international sanctions enforcement efforts;

(3) urgent consideration of the expansion of existing sanctions with respect to such areas as—

(A) the provision of energy-related services to Iran;

(B) the provision of insurance and reinsurance services to Iran;

(C) the provision of shipping services to Iran; and

(D) those Iranian financial institutions not yet designated for the imposition of sanctions that may be acting as intermediaries for Iranian financial institutions that are designated for the imposition of sanctions; and

(4) a focus on countering Iran's efforts to evade sanctions, including—

(A) the activities of telecommunications, Internet, and satellite service providers, in and outside of Iran, to ensure that such providers are not participating in or facilitating, directly or indirectly, the evasion of the sanctions regime with respect to Iran or violations of the human rights of the people of Iran;

(B) the activities of financial institutions or other businesses or government agencies, in or outside of Iran, not yet designated for the imposition of sanctions; and

(C) urgent and ongoing evaluation of Iran's energy, national security, financial, and telecommunications sectors, to gauge the effects of, and possible defects in, particular sanctions, with prompt efforts to correct any gaps in the existing sanctions regime with respect to Iran.

PX408

126 STAT. 1218          PUBLIC LAW 112–158—AUG. 10, 2012

22 USC 8712.

**SEC. 102. DIPLOMATIC EFFORTS TO EXPAND MULTILATERAL SANCTIONS REGIME.**

(a) MULTILATERAL NEGOTIATIONS.—Congress urges the President to intensify diplomatic efforts, both in appropriate international fora such as the United Nations and bilaterally with allies of the United States, for the purpose of—

(1) expanding the United Nations Security Council sanctions regime to include—

(A) a prohibition on the issuance of visas to any official of the Government of Iran who is involved in—

(i) human rights violations in or outside of Iran;

(ii) the development of a nuclear weapons program and a ballistic missile capability in Iran; or

(iii) support by the Government of Iran for terrorist organizations, including Hamas and Hezbollah; and

(B) a requirement that each member country of the United Nations—

(i) prohibit the Islamic Republic of Iran Shipping Lines from landing at seaports, and cargo flights of Iran Air from landing at airports, in that country because of the role of those organizations in proliferation and illegal arms sales; and

(ii) apply the prohibitions described in clause (i) to other Iranian entities designated for the imposition of sanctions on or after the date of the enactment of this Act;

(2) expanding the range of sanctions imposed with respect to Iran by allies of the United States;

(3) expanding efforts to limit the development of petroleum resources and the importation of refined petroleum products by Iran;

(4) developing additional initiatives to—

(A) increase the production of crude oil in countries other than Iran; and

(B) assist countries that purchase or otherwise obtain crude oil or petroleum products from Iran to eliminate their dependence on crude oil and petroleum products from Iran; and

(5) eliminating the revenue generated by the Government of Iran from the sale of petrochemical products produced in Iran to other countries.

President.

(b) REPORTS TO CONGRESS.—Not later than 180 days after the date of the enactment of this Act, and every 180 days thereafter, the President shall submit to the appropriate congressional committees a report on the extent to which diplomatic efforts described in subsection (a) have been successful that includes—

(1) an identification of the countries that have agreed to impose sanctions or take other measures to further the policy set forth in subsection (a);

(2) the extent of the implementation and enforcement of those sanctions or other measures by those countries;

(3) the criteria the President uses to determine whether a country has significantly reduced its crude oil purchases from Iran pursuant to section 1245(d)(4)(D) of the National Defense Authorization Act for Fiscal Year 2012, as amended by section 504, including considerations of reductions both in terms of volume and price;

(4) an identification of the countries that have not agreed to impose such sanctions or measures, including such countries granted exceptions for significant reductions in crude oil purchases pursuant to such section 1245(d)(4)(D);

(5) recommendations for additional measures that the United States could take to further diplomatic efforts described in subsection (a); and

(6) the disposition of any decision with respect to sanctions imposed with respect to Iran by the World Trade Organization or its predecessor organization.

# TITLE II—EXPANSION OF SANCTIONS RELATING TO THE ENERGY SECTOR OF IRAN AND PROLIFERATION OF WEAPONS OF MASS DESTRUCTION BY IRAN

President.
Determinations.

## Subtitle A—Expansion of the Iran Sanctions Act of 1996

**SEC. 201. EXPANSION OF SANCTIONS WITH RESPECT TO THE ENERGY SECTOR OF IRAN.**

50 USC 1701 note.

Section 5(a) of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note) is amended—

(1) in the subsection heading, by striking "WITH RESPECT TO" and all that follows through "TO IRAN" and inserting "RELATING TO THE ENERGY SECTOR OF IRAN";

(2) in paragraph (1)(A)—

(A) by striking "3 or more" and inserting "5 or more"; and

(B) by striking "the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010" and inserting "the Iran Threat Reduction and Syria Human Rights Act of 2012";

(3) in paragraph (2)—

(A) in subparagraph (A)—

(i) by striking "3 or more" and inserting "5 or more"; and

(ii) by striking "the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010" and inserting "the Iran Threat Reduction and Syria Human Rights Act of 2012"; and

(B) in subparagraph (B), by inserting before the period at the end the following: "or directly associated infrastructure, including construction of port facilities, railways, and roads, the primary use of which is to support the delivery of refined petroleum products";

(4) in paragraph (3)—

(A) in subparagraph (A)—

(i) by striking "3 or more" and inserting "5 or more"; and

(ii) by striking "the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010" and

PX408

inserting "the Iran Threat Reduction and Syria Human Rights Act of 2012"; and

(B) in subparagraph (B)—

(i) in clause (ii), by striking "; or" and inserting a semicolon;

(ii) in clause (iii), by striking the period at the end and inserting a semicolon; and

(iii) by adding at the end the following:

"(iv) bartering or contracting by which goods are exchanged for goods, including the insurance or reinsurance of such exchanges; or

"(v) purchasing, subscribing to, or facilitating the issuance of sovereign debt of the Government of Iran, including governmental bonds, issued on or after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012."; and

(5) by adding at the end the following:

"(4) JOINT VENTURES WITH IRAN RELATING TO DEVELOPING PETROLEUM RESOURCES.—

"(A) IN GENERAL.—Except as provided in subparagraph (B) or subsection (f), the President shall impose 5 or more of the sanctions described in section 6(a) with respect to a person if the President determines that the person knowingly participates, on or after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, in a joint venture with respect to the development of petroleum resources outside of Iran if—

"(i) the joint venture is established on or after January 1, 2002; and

"(ii)(I) the Government of Iran is a substantial partner or investor in the joint venture; or

"(II) Iran could, through a direct operational role in the joint venture or by other means, receive technological knowledge or equipment not previously available to Iran that could directly and significantly contribute to the enhancement of Iran's ability to develop petroleum resources in Iran.

Deadline.

"(B) APPLICABILITY.—Subparagraph (A) shall not apply with respect to participation in a joint venture established on or after January 1, 2002, and before the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, if the person participating in the joint venture terminates that participation not later than the date that is 180 days after such date of enactment.

"(5) SUPPORT FOR THE DEVELOPMENT OF PETROLEUM RESOURCES AND REFINED PETROLEUM PRODUCTS IN IRAN.—

"(A) IN GENERAL.—Except as provided in subsection (f), the President shall impose 5 or more of the sanctions described in section 6(a) with respect to a person if the President determines that the person knowingly, on or after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, sells, leases, or provides to Iran goods, services, technology, or support described in subparagraph (B)—

"(i) any of which has a fair market value of $1,000,000 or more; or

"(ii) that, during a 12-month period, have an aggregate fair market value of $5,000,000 or more.

"(B) GOODS, SERVICES, TECHNOLOGY, OR SUPPORT DESCRIBED.—Goods, services, technology, or support described in this subparagraph are goods, services, technology, or support that could directly and significantly contribute to the maintenance or enhancement of Iran's—

"(i) ability to develop petroleum resources located in Iran; or

"(ii) domestic production of refined petroleum products, including any direct and significant assistance with respect to the construction, modernization, or repair of petroleum refineries or directly associated infrastructure, including construction of port facilities, railways, and roads, the primary use of which is to support the delivery of refined petroleum products.

"(6) DEVELOPMENT AND PURCHASE OF PETROCHEMICAL PRODUCTS FROM IRAN.—

"(A) IN GENERAL.—Except as provided in subsection (f), the President shall impose 5 or more of the sanctions described in section 6(a) with respect to a person if the President determines that the person knowingly, on or after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, sells, leases, or provides to Iran goods, services, technology, or support described in subparagraph (B)—

"(i) any of which has a fair market value of $250,000 or more; or

"(ii) that, during a 12-month period, have an aggregate fair market value of $1,000,000 or more.

"(B) GOODS, SERVICES, TECHNOLOGY, OR SUPPORT DESCRIBED.—Goods, services, technology, or support described in this subparagraph are goods, services, technology, or support that could directly and significantly contribute to the maintenance or expansion of Iran's domestic production of petrochemical products.".

**SEC. 202. IMPOSITION OF SANCTIONS WITH RESPECT TO TRANSPORTATION OF CRUDE OIL FROM IRAN AND EVASION OF SANCTIONS BY SHIPPING COMPANIES.**

(a) IN GENERAL.—Section 5(a) of the Iran Sanctions Act of 1996, as amended by section 201, is further amended by adding at the end the following:

"(7) TRANSPORTATION OF CRUDE OIL FROM IRAN.—

"(A) IN GENERAL.—Except as provided in subsection (f), the President shall impose 5 or more of the sanctions described in section 6(a) with respect to a person if the President determines that—

"(i) the person is a controlling beneficial owner of, or otherwise owns, operates, or controls, or insures, a vessel that, on or after the date that is 90 days after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, was used to transport crude oil from Iran to another country; and

*Time period.* (margin note, top)

*Time period.* (margin note, middle)

126 STAT. 1222          PUBLIC LAW 112–158—AUG. 10, 2012

"(ii)(I) in the case of a person that is a controlling beneficial owner of the vessel, the person had actual knowledge the vessel was so used; or

"(II) in the case of a person that otherwise owns, operates, or controls, or insures, the vessel, the person knew or should have known the vessel was so used.

"(B) APPLICABILITY OF SANCTIONS.—

"(i) IN GENERAL.—Except as provided in clause (ii), subparagraph (A) shall apply with respect to the transportation of crude oil from Iran only if a determination of the President under section 1245(d)(4)(B) of the National Defense Authorization Act for Fiscal Year 2012 (22 U.S.C. 8513a(d)(4)(B)) that there is a sufficient supply of petroleum and petroleum products produced in countries other than Iran to permit purchasers of petroleum and petroleum products from Iran to reduce significantly their purchases from Iran is in effect at the time of the transportation of the crude oil.

"(ii) EXCEPTION FOR CERTAIN COUNTRIES.— Subparagraph (A) shall not apply with respect to the transportation of crude oil from Iran to a country to which the exception under paragraph (4)(D) of section 1245(d) of the National Defense Authorization Act for Fiscal Year 2012 (22 U.S.C. 8513a(d)) to the imposition of sanctions under paragraph (1) of that section applies at the time of the transportation of the crude oil.

"(8) CONCEALING IRANIAN ORIGIN OF CRUDE OIL AND REFINED PETROLEUM PRODUCTS.—

Time period.

"(A) IN GENERAL.—Except as provided in subsection (f), the President shall impose 5 or more of the sanctions described in section 6(a) with respect to a person if the President determines that the person is a controlling beneficial owner, or otherwise owns, operates, or controls, a vessel that, on or after the date that is 90 days after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, is used, with actual knowledge in the case of a person that is a controlling beneficial owner or knowingly in the case of a person that otherwise owns, operates, or controls the vessel, in a manner that conceals the Iranian origin of crude oil or refined petroleum products transported on the vessel, including by—

"(i) permitting the operator of the vessel to suspend the operation of the vessel's satellite tracking device; or

"(ii) obscuring or concealing the ownership, operation, or control of the vessel by—

"(I) the Government of Iran;

"(II) the National Iranian Tanker Company or the Islamic Republic of Iran Shipping Lines; or

"(III) any other entity determined by the President to be owned or controlled by the Government of Iran or an entity specified in subclause (II).

"(B) ADDITIONAL SANCTION.—Subject to such regulations as the President may prescribe and in addition to

PX408

the sanctions imposed under subparagraph (A), the President may prohibit a vessel owned, operated, or controlled by a person, including a controlling beneficial owner, with respect to which the President has imposed sanctions under that subparagraph and that was used for the activity for which the President imposed those sanctions from landing at a port in the United States for a period of not more than 2 years after the date on which the President imposed those sanctions.

"(C) VESSELS IDENTIFIED BY THE OFFICE OF FOREIGN ASSETS CONTROL.—For purposes of subparagraph (A)(ii), a person shall be deemed to have actual knowledge that a vessel is owned, operated, or controlled by the Government of Iran or an entity specified in subclause (II) or (III) of subparagraph (A)(ii) if the International Maritime Organization vessel registration identification for the vessel is—

"(i) included on a list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury for activities with respect to Iran; and

"(ii) identified by the Office of Foreign Assets Control as a vessel in which the Government of Iran or any entity specified in subclause (II) or (III) of subparagraph (A)(ii) has an interest.

"(D) DEFINITION OF IRANIAN ORIGIN.—For purposes of subparagraph (A), the term 'Iranian origin' means—

"(i) with respect to crude oil, that the crude oil was extracted in Iran; and

"(ii) with respect to a refined petroleum product, that the refined petroleum product was produced or refined in Iran.

"(9) EXCEPTION FOR PROVISION OF UNDERWRITING SERVICES AND INSURANCE AND REINSURANCE.—The President may not impose sanctions under paragraph (7) or (8) with respect to a person that provides underwriting services or insurance or reinsurance if the President determines that the person has exercised due diligence in establishing and enforcing official policies, procedures, and controls to ensure that the person does not provide underwriting services or insurance or reinsurance for the transportation of crude oil or refined petroleum products from Iran in a manner for which sanctions may be imposed under either such paragraph.".

(b) REGULATIONS AND GUIDELINES.—Not later than 90 days after the date of the enactment of this Act, the President shall prescribe such regulations or guidelines as are necessary to implement paragraphs (7), (8), and (9) of section 5(a) of the Iran Sanctions Act of 1996, as added by this section, including such regulations or guidelines as are necessary to implement subparagraph (B) of such paragraph (8).

Deadline.
50 USC 1701
note.

### SEC. 203. EXPANSION OF SANCTIONS WITH RESPECT TO DEVELOPMENT BY IRAN OF WEAPONS OF MASS DESTRUCTION.

(a) IN GENERAL.—Section 5(b) of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note) is amended—

(1) by redesignating paragraph (2) as paragraph (3); and

(2) by striking paragraph (1) and inserting the following:

"(1) EXPORTS, TRANSFERS, AND TRANSSHIPMENTS.—Except as provided in subsection (f), the President shall impose 5 or more of the sanctions described in section 6(a) with respect to a person if the President determines that the person—

"(A) on or after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, exported or transferred, or permitted or otherwise facilitated the transshipment of, any goods, services, technology, or other items to any other person; and

"(B) knew or should have known that—

"(i) the export, transfer, or transshipment of the goods, services, technology, or other items would likely result in another person exporting, transferring, transshipping, or otherwise providing the goods, services, technology, or other items to Iran; and

"(ii) the export, transfer, transshipment, or other provision of the goods, services, technology, or other items to Iran would contribute materially to the ability of Iran to—

"(I) acquire or develop chemical, biological, or nuclear weapons or related technologies; or

"(II) acquire or develop destabilizing numbers and types of advanced conventional weapons.

"(2) JOINT VENTURES RELATING TO THE MINING, PRODUCTION, OR TRANSPORTATION OF URANIUM.—

"(A) IN GENERAL.—Except as provided in subparagraph (B) or subsection (f), the President shall impose 5 or more of the sanctions described in section 6(a) with respect to a person if the President determines that the person knowingly participated, on or after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, in a joint venture that involves any activity relating to the mining, production, or transportation of uranium—

"(i)(I) established on or after February 2, 2012; and

"(II) with—

"(aa) the Government of Iran;

"(bb) an entity incorporated in Iran or subject to the jurisdiction of the Government of Iran; or

"(cc) a person acting on behalf of or at the direction of, or owned or controlled by, the Government of Iran or an entity described in item (bb); or

"(ii)(I) established before February 2, 2012;

"(II) with the Government of Iran, an entity described in item (bb) of clause (i)(II), or a person described in item (cc) of that clause; and

"(III) through which—

"(aa) uranium is transferred directly to Iran or indirectly to Iran through a third country;

"(bb) the Government of Iran receives significant revenue; or

"(cc) Iran could, through a direct operational role or by other means, receive technological knowledge or equipment not previously available to Iran that could contribute materially to the

PUBLIC LAW 112–158—AUG. 10, 2012        126 STAT. 1225

ability of Iran to develop nuclear weapons or related technologies.

"(B) APPLICABILITY OF SANCTIONS.—Subparagraph (A) shall not apply with respect to participation in a joint venture established before the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012 if the person participating in the joint venture terminates that participation not later than the date that is 180 days after such date of enactment.".

*Deadline.*

(b) CONFORMING AMENDMENTS.—The Iran Sanctions Act of 1996, as amended by this section and sections 201 and 202, is further amended—

(1) in section 5—

(A) in paragraph (3) of subsection (b), as redesignated by subsection (a)(1) of this section—

(i) by striking "paragraph (1)" each place it appears and inserting "paragraph (1) or (2)"; and

(ii) in subparagraph (F)—

(I) by striking "that paragraph" and inserting "paragraph (1) or (2), as the case may be"; and

(II) by striking "the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010" and inserting "the Iran Threat Reduction and Syria Human Rights Act of 2012";

(B) in subsection (c)—

(i) in the matter preceding paragraph (1), by striking "subsections (a) and (b)(1)" and inserting "subsection (a) and paragraphs (1) and (2) of subsection (b)"; and

(ii) in paragraph (1), by striking "subsection (a) or (b)(1)" and inserting "subsection (a) or paragraph (1) or (2) of subsection (b)"; and

(C) in subsection (f)—

(i) in the matter preceding paragraph (1), by striking "subsection (a) or (b)(1)" and inserting "subsection (a) or paragraph (1) or (2) of subsection (b)"; and

(ii) by redesignating paragraphs (6) and (7) as paragraphs (5) and (6), respectively; and

(2) in section 9, by striking "section 5(a) or 5(b)(1)" each place it appears and inserting "subsection (a) or paragraph (1) or (2) of subsection (b) of section 5".

**SEC. 204. EXPANSION OF SANCTIONS AVAILABLE UNDER THE IRAN SANCTIONS ACT OF 1996.**

(a) IN GENERAL.—Section 6(a) of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note) is amended—

(1) by redesignating paragraph (9) as paragraph (12); and

(2) by inserting after paragraph (8) the following:

"(9) BAN ON INVESTMENT IN EQUITY OR DEBT OF SANCTIONED PERSON.—The President may, pursuant to such regulations or guidelines as the President may prescribe, prohibit any United States person from investing in or purchasing significant amounts of equity or debt instruments of a sanctioned person.

"(10) EXCLUSION OF CORPORATE OFFICERS.—The President may direct the Secretary of State to deny a visa to, and the Secretary of Homeland Security to exclude from the United

PX408

126 STAT. 1226        PUBLIC LAW 112–158—AUG. 10, 2012

States, any alien that the President determines is a corporate officer or principal of, or a shareholder with a controlling interest in, a sanctioned person.

"(11) SANCTIONS ON PRINCIPAL EXECUTIVE OFFICERS.—The President may impose on the principal executive officer or officers of any sanctioned person, or on persons performing similar functions and with similar authorities as such officer or officers, any of the sanctions under this subsection.".

Applicability.
50 USC 1701
note.

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect on the date of the enactment of this Act and apply with respect to activities described in subsections (a) and (b) of section 5 of the Iran Sanctions Act of 1996, as amended by this title, commenced on or after such date of enactment.

**SEC. 205. MODIFICATION OF WAIVER STANDARD UNDER THE IRAN SANCTIONS ACT OF 1996.**

Section 9(c) of the Iran Sanctions Act of 1996, as amended by section 203, is further amended by striking paragraph (1) and inserting the following:

Reports.

"(1) AUTHORITY.—

"(A) SANCTIONS RELATING TO THE ENERGY SECTOR OF IRAN.—The President may waive, on a case-by-case basis and for a period of not more than one year, the requirement in section 5(a) to impose a sanction or sanctions on a person described in section 5(c), and may waive the continued imposition of a sanction or sanctions under subsection (b) of this section, 30 days or more after the President determines and so reports to the appropriate congressional committees that it is essential to the national security interests of the United States to exercise such waiver authority.

"(B) SANCTIONS RELATING TO DEVELOPMENT OF WEAPONS OF MASS DESTRUCTION OR OTHER MILITARY CAPABILITIES.—The President may waive, on a case-by-case basis and for a period of not more than one year, the requirement in paragraph (1) or (2) of section 5(b) to impose a sanction or sanctions on a person described in section 5(c), and may waive the continued imposition of a sanction or sanctions under subsection (b) of this section, 30 days or more after the President determines and so reports to the appropriate congressional committees that it is vital to the national security interests of the United States to exercise such waiver authority.

"(C) RENEWAL OF WAIVERS.—The President may renew, on a case-by-case basis, a waiver with respect to a person under subparagraph (A) or (B) for additional one-year periods if, not later than 30 days before the waiver expires, the President makes the determination and submits to the appropriate congressional committees the report described in subparagraph (A) or (B), as applicable.".

**SEC. 206. BRIEFINGS ON IMPLEMENTATION OF THE IRAN SANCTIONS ACT OF 1996.**

Section 4 of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note) is amended by adding at the end the following:

Deadlines.

"(f) BRIEFINGS ON IMPLEMENTATION.—Not later than 90 days after the date of the enactment of the Iran Threat Reduction and

PX408

PUBLIC LAW 112–158—AUG. 10, 2012          126 STAT. 1227

Syria Human Rights Act of 2012, and every 120 days thereafter, the President, acting through the Secretary of State, shall provide to the appropriate congressional committees a comprehensive briefing on efforts to implement this Act.".

**SEC. 207. EXPANSION OF DEFINITIONS UNDER THE IRAN SANCTIONS ACT OF 1996.**

(a) IN GENERAL.—Section 14 of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note) is amended—

(1) by redesignating paragraphs (17) and (18) as paragraphs (20) and (21), respectively;

(2) by redesignating paragraphs (15) and (16) as paragraphs (17) and (18), respectively;

(3) by redesignating paragraphs (4) through (14) as paragraphs (5) through (15), respectively;

(4) by inserting after paragraph (3) the following:

"(4) CREDIBLE INFORMATION.—The term 'credible information', with respect to a person— <span style="float:right">Definition.</span>

"(A) includes—

"(i) a public announcement by the person that the person has engaged in an activity described in subsection (a) or (b) of section 5; and

"(ii) information set forth in a report to stockholders of the person indicating that the person has engaged in such an activity; and

"(B) may include, in the discretion of the President—

"(i) an announcement by the Government of Iran that the person has engaged in such an activity; or

"(ii) information indicating that the person has engaged in such an activity that is set forth in—

"(I) a report of the Government Accountability Office, the Energy Information Administration, or the Congressional Research Service; or

"(II) a report or publication of a similarly reputable governmental organization or trade or industry organization.";

(5) by inserting after paragraph (15), as redesignated by paragraph (3), the following:

"(16) PETROCHEMICAL PRODUCT.—The term 'petrochemical product' includes any aromatic, olefin, or synthesis gas, and any derivative of such a gas, including ethylene, propylene, butadiene, benzene, toluene, xylene, ammonia, methanol, and urea."; and <span style="float:right">Definition.</span>

(6) by inserting after paragraph (18), as redesignated by paragraph (2), the following:

"(19) SERVICES.—The term 'services' includes software, hardware, financial, professional consulting, engineering, and specialized energy information services, energy-related technical assistance, and maintenance and repairs.". <span style="float:right">Definition.</span>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect on the date of the enactment of this Act and apply with respect to activities described in subsections (a) and (b) of section 5 of the Iran Sanctions Act of 1996, as amended by this title, commenced on or after such date of enactment. <span style="float:right">Applicability.<br>50 USC 1701<br>note.</span>

**SEC. 208. SENSE OF CONGRESS ON ENERGY SECTOR OF IRAN.**

It is the sense of Congress that—

PX408

(1) the energy sector of Iran remains a zone of proliferation concern since the Government of Iran continues to divert substantial revenues derived from sales of petroleum resources to finance its illicit nuclear and missile activities; and

(2) the President should apply the full range of sanctions under the Iran Sanctions Act of 1996, as amended by this Act, to address the threat posed by the Government of Iran.

## Subtitle B—Additional Measures Relating to Sanctions Against Iran

22 USC 8721.

**SEC. 211. IMPOSITION OF SANCTIONS WITH RESPECT TO THE PROVISION OF VESSELS OR SHIPPING SERVICES TO TRANSPORT CERTAIN GOODS RELATED TO PROLIFERATION OR TERRORISM ACTIVITIES TO IRAN.**

(a) IN GENERAL.—Except as provided in subsection (c), if the President determines that a person, on or after the date of the enactment of this Act, knowingly sells, leases, or provides a vessel or provides insurance or reinsurance or any other shipping service for the transportation to or from Iran of goods that could materially contribute to the activities of the Government of Iran with respect to the proliferation of weapons of mass destruction or support for acts of international terrorism, the President shall, pursuant to Executive Order No. 13382 (70 Fed. Reg. 38567; relating to blocking of property of weapons of mass destruction proliferators and their supporters) or Executive Order No. 13224 (66 Fed. Reg. 49079; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism), or otherwise pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), block and prohibit all transactions in all property and interests in property of the persons specified in subsection (b) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(b) PERSONS SPECIFIED.—The persons specified in this subsection are—

(1) the person that sold, leased, or provided a vessel or provided insurance or reinsurance or another shipping service described in subsection (a); and

(2) any person that—

(A) is a successor entity to the person referred to in paragraph (1);

(B) owns or controls the person referred to in paragraph (1), if the person that owns or controls the person referred to in paragraph (1) had actual knowledge or should have known that the person referred to in paragraph (1) sold, leased, or provided the vessel or provided the insurance or reinsurance or other shipping service; or

(C) is owned or controlled by, or under common ownership or control with, the person referred to in paragraph (1), if the person owned or controlled by, or under common ownership or control with (as the case may be), the person referred to in paragraph (1) knowingly engaged in the sale, lease, or provision of the vessel or the provision of the insurance or reinsurance or other shipping service.

PX408

PUBLIC LAW 112–158—AUG. 10, 2012     126 STAT. 1229

(c) WAIVER.—The President may waive the requirement to impose sanctions with respect to a person under subsection (a) on or after the date that is 30 days after the President—

Time period.
Reports.

(1) determines that such a waiver is vital to the national security interests of the United States; and

(2) submits to the appropriate congressional committees a report that contains the reasons for that determination.

(d) REPORT REQUIRED.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and every 90 days thereafter, the Secretary of the Treasury, in coordination with the Secretary of State, shall submit to the appropriate congressional committees a report identifying operators of vessels and other persons that conduct or facilitate significant financial transactions with persons that manage ports in Iran that have been designated for the imposition of sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).

(2) FORM OF REPORT.—A report submitted under paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

(e) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to limit the authority of the President to designate persons for the imposition of sanctions pursuant to Executive Order No. 13382 (70 Fed. Reg. 38567; relating to the blocking of property of weapons of mass destruction proliferators and their supporters) or Executive Order No. 13224 (66 Fed. Reg. 49079; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism), or otherwise pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).

**SEC. 212. IMPOSITION OF SANCTIONS WITH RESPECT TO PROVISION OF UNDERWRITING SERVICES OR INSURANCE OR REINSURANCE FOR THE NATIONAL IRANIAN OIL COMPANY OR THE NATIONAL IRANIAN TANKER COMPANY.**

22 USC 8722.

(a) IN GENERAL.—Except as provided in subsection (b), not later than 60 days after the date of the enactment of this Act, the President shall impose 5 or more of the sanctions described in section 6(a) of the Iran Sanctions Act of 1996, as amended by section 204, with respect to a person if the President determines that the person knowingly, on or after such date of enactment, provides underwriting services or insurance or reinsurance for the National Iranian Oil Company, the National Iranian Tanker Company, or a successor entity to either such company.

Deadline.

(b) EXCEPTIONS.—

(1) UNDERWRITERS AND INSURANCE PROVIDERS EXERCISING DUE DILIGENCE.—The President is authorized not to impose sanctions under subsection (a) with respect to a person that provides underwriting services or insurance or reinsurance if the President determines that the person has exercised due diligence in establishing and enforcing official policies, procedures, and controls to ensure that the person does not provide underwriting services or insurance or reinsurance for the National Iranian Oil Company, the National Iranian Tanker Company, or a successor entity to either such company.

PX408

(2) FOOD; MEDICINE; HUMANITARIAN ASSISTANCE.—The President may not impose sanctions under subsection (a) for the provision of underwriting services or insurance or reinsurance for any activity relating solely to—

(A) the provision of agricultural commodities, food, medicine, or medical devices to Iran; or

(B) the provision of humanitarian assistance to the people of Iran.

(3) TERMINATION PERIOD.—The President is authorized not to impose sanctions under subsection (a) with respect to a person if the President receives reliable assurances that the person will terminate the provision of underwriting services or insurance or reinsurance for the National Iranian Oil Company, the National Iranian Tanker Company, and any successor entity to either such company, not later than the date that is 120 days after the date of the enactment of this Act.

(c) DEFINITIONS.—In this section:

(1) AGRICULTURAL COMMODITY.—The term "agricultural commodity" has the meaning given that term in section 102 of the Agricultural Trade Act of 1978 (7 U.S.C. 5602).

(2) MEDICAL DEVICE.—The term "medical device" has the meaning given the term "device" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

(3) MEDICINE.—The term "medicine" has the meaning given the term "drug" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

(d) APPLICATION OF PROVISIONS OF IRAN SANCTIONS ACT OF 1996.—The following provisions of the Iran Sanctions Act of 1996, as amended by this Act, apply with respect to the imposition of sanctions under subsection (a) to the same extent that such provisions apply with respect to the imposition of sanctions under section 5(a) of the Iran Sanctions Act of 1996:

(1) Subsection (c) of section 4.

(2) Subsections (c), (d), and (f) of section 5.

(3) Section 8.

(4) Section 9.

(5) Section 11.

(6) Section 12.

(7) Subsection (b) of section 13.

(8) Section 14.

(e) RULE OF CONSTRUCTION AND IMPLEMENTATION.—Nothing in this section shall be construed to limit the authority of the President to impose sanctions pursuant to the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note), the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8501 et seq.), the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), section 1245 of the National Defense Authorization Act for Fiscal Year 2012 (22 U.S.C. 8513a), or any other provision of this Act.

22 USC 8723.

**SEC. 213. IMPOSITION OF SANCTIONS WITH RESPECT TO PURCHASE, SUBSCRIPTION TO, OR FACILITATION OF THE ISSUANCE OF IRANIAN SOVEREIGN DEBT.**

(a) IN GENERAL.—The President shall impose 5 or more of the sanctions described in section 6(a) of the Iran Sanctions Act of 1996, as amended by section 204, with respect to a person if the President determines that the person knowingly, on or after

the date of the enactment of this Act, purchases, subscribes to, or facilitates the issuance of—

(1) sovereign debt of the Government of Iran issued on or after such date of enactment, including governmental bonds; or

(2) debt of any entity owned or controlled by the Government of Iran issued on or after such date of enactment, including bonds.

(b) APPLICATION OF PROVISIONS OF IRAN SANCTIONS ACT OF 1996.—The following provisions of the Iran Sanctions Act of 1996, as amended by this Act, apply with respect to the imposition of sanctions under subsection (a) to the same extent that such provisions apply with respect to the imposition of sanctions under section 5(a) of the Iran Sanctions Act of 1996:

(1) Subsection (c) of section 4.

(2) Subsections (c), (d), and (f) of section 5.

(3) Section 8.

(4) Section 9.

(5) Section 11.

(6) Section 12.

(7) Subsection (b) of section 13.

(8) Section 14.

**SEC. 214. IMPOSITION OF SANCTIONS WITH RESPECT TO SUBSIDIARIES AND AGENTS OF PERSONS SANCTIONED BY UNITED NATIONS SECURITY COUNCIL RESOLUTIONS.**

(a) IN GENERAL.—Section 104(c)(2)(B) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513(c)(2)(B)) is amended—

(1) by striking "of a person subject" and inserting the following: "of—

"(i) a person subject";

(2) in clause (i), as designated by paragraph (1), by striking the semicolon and inserting "; or"; and

(3) by adding at the end the following:

"(ii) a person acting on behalf of or at the direction of, or owned or controlled by, a person described in clause (i);".

(b) REGULATIONS.—Not later than 90 days after the date of the enactment of this Act, the Secretary of the Treasury shall make such revisions to the regulations prescribed under section 104 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513) as are necessary to carry out the amendments made by subsection (a). *[Deadline. 22 USC 8513 note.]*

**SEC. 215. IMPOSITION OF SANCTIONS WITH RESPECT TO TRANSACTIONS WITH PERSONS SANCTIONED FOR CERTAIN ACTIVITIES RELATING TO TERRORISM OR PROLIFERATION OF WEAPONS OF MASS DESTRUCTION.**

(a) IN GENERAL.—Section 104(c)(2)(E)(ii) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513(c)(2)(E)(ii)) is amended in the matter preceding subclause (I) by striking "financial institution" and inserting "person".

(b) REGULATIONS.—Not later than 90 days after the date of the enactment of this Act, the Secretary of the Treasury shall make such revisions to the regulations prescribed under section 104 of the Comprehensive Iran Sanctions, Accountability, and *[Deadline. 22 USC 8513 note.]*

Divestment Act of 2010 (22 U.S.C. 8513) as are necessary to carry out the amendment made by subsection (a).

**SEC. 216. EXPANSION OF, AND REPORTS ON, MANDATORY SANCTIONS WITH RESPECT TO FINANCIAL INSTITUTIONS THAT ENGAGE IN CERTAIN ACTIVITIES RELATING TO IRAN.**

(a) IN GENERAL.—The Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8501 et seq.) is amended by inserting after section 104 the following:

22 USC 8513b.

**"SEC. 104A. EXPANSION OF, AND REPORTS ON, MANDATORY SANCTIONS WITH RESPECT TO FINANCIAL INSTITUTIONS THAT ENGAGE IN CERTAIN ACTIVITIES.**

Regulations.
Applicability.

"(a) IN GENERAL.—Not later than 90 days after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, the Secretary of the Treasury shall revise the regulations prescribed under section 104(c)(1) to apply to a foreign financial institution described in subsection (b) to the same extent and in the same manner as those regulations apply to a foreign financial institution that the Secretary of the Treasury finds knowingly engages in an activity described in section 104(c)(2).

"(b) FOREIGN FINANCIAL INSTITUTIONS DESCRIBED.—A foreign financial institution described in this subsection is a foreign financial institution, including an Iranian financial institution, that the Secretary of the Treasury finds—

"(1) knowingly facilitates, or participates or assists in, an activity described in section 104(c)(2), including by acting on behalf of, at the direction of, or as an intermediary for, or otherwise assisting, another person with respect to the activity;

"(2) attempts or conspires to facilitate or participate in such an activity; or

"(3) is owned or controlled by a foreign financial institution that the Secretary finds knowingly engages in such an activity.

"(c) REPORTS REQUIRED.—

"(1) IN GENERAL.—Not later than 180 days after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, and every 180 days thereafter, the Secretary of the Treasury shall submit to the appropriate congressional committees a report that contains a detailed description of—

"(A) the effect of the regulations prescribed under section 104(c)(1) on the financial system and economy of Iran and capital flows to and from Iran; and

"(B) the ways in which funds move into and out of financial institutions described in section 104(c)(2)(E)(ii), with specific attention to the use of other Iranian financial institutions and other foreign financial institutions to receive and transfer funds for financial institutions described in that section.

"(2) FORM OF REPORT.—Each report submitted under paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

"(d) DEFINITIONS.—In this section:

"(1) FINANCIAL INSTITUTION.—The term 'financial institution' means a financial institution specified in subparagraph (A), (B), (C), (D), (E), (F), (G), (H), (I), (J), (K), (M), (N), (R), or (Y) of section 5312(a)(2) of title 31, United States Code.

PX408

"(2) FOREIGN FINANCIAL INSTITUTION.—The term 'foreign financial institution' has the meaning of that term as determined by the Secretary of the Treasury pursuant to section 104(i).

"(3) IRANIAN FINANCIAL INSTITUTION.—The term 'Iranian financial institution' means—

"(A) a financial institution organized under the laws of Iran or any jurisdiction within Iran, including a foreign branch of such an institution;

"(B) a financial institution located in Iran;

"(C) a financial institution, wherever located, owned or controlled by the Government of Iran; and

"(D) a financial institution, wherever located, owned or controlled by a financial institution described in subparagraph (A), (B), or (C).".

(b) CLERICAL AMENDMENT.—The table of contents for the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 is amended by inserting after the item relating to section 104 the following:

"Sec. 104A. Expansion of, and reports on, mandatory sanctions with respect to financial institutions that engage in certain activities.".

**SEC. 217. CONTINUATION IN EFFECT OF SANCTIONS WITH RESPECT TO THE GOVERNMENT OF IRAN, THE CENTRAL BANK OF IRAN, AND SANCTIONS EVADERS.**

22 USC 8724.

(a) SANCTIONS RELATING TO BLOCKING OF PROPERTY OF THE GOVERNMENT OF IRAN AND IRANIAN FINANCIAL INSTITUTIONS.— United States sanctions with respect to Iran provided for in Executive Order No. 13599 (77 Fed. Reg. 6659), as in effect on the day before the date of the enactment of this Act, shall remain in effect until the date that is 90 days after the date on which the President submits to the appropriate congressional committees the certification described in subsection (d).

Deadline.

(b) SANCTIONS RELATING TO FOREIGN SANCTIONS EVADERS.— United States sanctions with respect to Iran provided for in Executive Order No. 13608 (77 Fed. Reg. 26409), as in effect on the day before the date of the enactment of this Act, shall remain in effect until the date that is 30 days after the date on which the President submits to the appropriate congressional committees the certification described in section 401(a) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8551(a)).

Certification.

(c) CONTINUATION OF SANCTIONS WITH RESPECT TO THE CENTRAL BANK OF IRAN.—In addition to the sanctions referred to in subsection (a), the President shall continue to apply to the Central Bank of Iran sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), including blocking of property and restrictions or prohibitions on financial transactions and the exportation of property, until the date that is 90 days after the date on which the President submits to Congress the certification described in subsection (d).

Deadline.

(d) CERTIFICATION DESCRIBED.—

(1) IN GENERAL.—The certification described in this subsection is the certification of the President to Congress that the Central Bank of Iran is not—

(A) providing financial services in support of, or otherwise facilitating, the ability of Iran to—

PX408

126 STAT. 1234          PUBLIC LAW 112–158—AUG. 10, 2012

(i) acquire or develop chemical, biological, or nuclear weapons, or related technologies;

(ii) construct, equip, operate, or maintain nuclear facilities that could aid Iran's effort to acquire a nuclear capability; or

(iii) acquire or develop ballistic missiles, cruise missiles, or destabilizing types and amounts of conventional weapons; or

(B) facilitating transactions or providing financial services for—

(i) Iran's Revolutionary Guard Corps; or

(ii) financial institutions the property or interests in property of which are blocked pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) in connection with—

(I) Iran's proliferation of weapons of mass destruction or delivery systems for weapons of mass destruction; or

(II) Iran's support for international terrorism.

(2) SUBMISSION TO CONGRESS.—

(A) IN GENERAL.—The President shall submit the certification described in paragraph (1) to the appropriate congressional committees in writing and shall include a justification for the certification.

(B) FORM OF CERTIFICATION.—The certification described in paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

(e) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to limit the authority of the President pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8501 et seq.).

22 USC 8725.   **SEC. 218. LIABILITY OF PARENT COMPANIES FOR VIOLATIONS OF SANCTIONS BY FOREIGN SUBSIDIARIES.**

(a) DEFINITIONS.—In this section:

(1) ENTITY.—The term "entity" means a partnership, association, trust, joint venture, corporation, or other organization.

(2) OWN OR CONTROL.—The term "own or control" means, with respect to an entity—

(A) to hold more than 50 percent of the equity interest by vote or value in the entity;

(B) to hold a majority of seats on the board of directors of the entity; or

(C) to otherwise control the actions, policies, or personnel decisions of the entity.

Deadline.   (b) PROHIBITION.—Not later than 60 days after the date of the enactment of this Act, the President shall prohibit an entity owned or controlled by a United States person and established or maintained outside the United States from knowingly engaging in any transaction directly or indirectly with the Government of Iran or any person subject to the jurisdiction of the Government of Iran that would be prohibited by an order or regulation issued pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) if the transaction were engaged in by a United States person or in the United States.

PX408

(c) CIVIL PENALTY.—The civil penalties provided for in section 206(b) of the International Emergency Economic Powers Act (50 U.S.C. 1705(b)) shall apply to a United States person to the same extent that such penalties apply to a person that commits an unlawful act described in section 206(a) of that Act if an entity owned or controlled by the United States person and established or maintained outside the United States violates, attempts to violate, conspires to violate, or causes a violation of any order or regulation issued to implement subsection (b).

Applicability.

(d) APPLICABILITY.—Subsection (c) shall not apply with respect to a transaction described in subsection (b) by an entity owned or controlled by a United States person and established or maintained outside the United States if the United States person divests or terminates its business with the entity not later than the date that is 180 days after the date of the enactment of this Act.

**SEC. 219. DISCLOSURES TO THE SECURITIES AND EXCHANGE COMMIS- SION RELATING TO SANCTIONABLE ACTIVITIES.**

(a) IN GENERAL.—Section 13 of the Securities Exchange Act of 1934 (15 U.S.C. 78m) is amended by adding at the end the following new subsection:

"(r) DISCLOSURE OF CERTAIN ACTIVITIES RELATING TO IRAN.—

"(1) IN GENERAL.—Each issuer required to file an annual or quarterly report under subsection (a) shall disclose in that report the information required by paragraph (2) if, during the period covered by the report, the issuer or any affiliate of the issuer—

"(A) knowingly engaged in an activity described in subsection (a) or (b) of section 5 of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note);

"(B) knowingly engaged in an activity described in subsection (c)(2) of section 104 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513) or a transaction described in subsection (d)(1) of that section;

"(C) knowingly engaged in an activity described in section 105A(b)(2) of that Act; or

"(D) knowingly conducted any transaction or dealing with—

"(i) any person the property and interests in property of which are blocked pursuant to Executive Order No. 13224 (66 Fed. Reg. 49079; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism);

"(ii) any person the property and interests in property of which are blocked pursuant to Executive Order No. 13382 (70 Fed. Reg. 38567; relating to blocking of property of weapons of mass destruction proliferators and their supporters); or

"(iii) any person or entity identified under section 560.304 of title 31, Code of Federal Regulations (relating to the definition of the Government of Iran) without the specific authorization of a Federal department or agency.

"(2) INFORMATION REQUIRED.—If an issuer or an affiliate of the issuer has engaged in any activity described in paragraph

(1), the issuer shall disclose a detailed description of each such activity, including—

"(A) the nature and extent of the activity;

"(B) the gross revenues and net profits, if any, attributable to the activity; and

"(C) whether the issuer or the affiliate of the issuer (as the case may be) intends to continue the activity.

"(3) NOTICE OF DISCLOSURES.—If an issuer reports under paragraph (1) that the issuer or an affiliate of the issuer has knowingly engaged in any activity described in that paragraph, the issuer shall separately file with the Commission, concurrently with the annual or quarterly report under subsection (a), a notice that the disclosure of that activity has been included in that annual or quarterly report that identifies the issuer and contains the information required by paragraph (2).

"(4) PUBLIC DISCLOSURE OF INFORMATION.—Upon receiving a notice under paragraph (3) that an annual or quarterly report includes a disclosure of an activity described in paragraph (1), the Commission shall promptly—

"(A) transmit the report to—

"(i) the President;

"(ii) the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives; and

"(iii) the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate; and

Web posting.

"(B) make the information provided in the disclosure and the notice available to the public by posting the information on the Internet website of the Commission.

"(5) INVESTIGATIONS.—Upon receiving a report under paragraph (4) that includes a disclosure of an activity described in paragraph (1) (other than an activity described in subparagraph (D)(iii) of that paragraph), the President shall—

"(A) initiate an investigation into the possible imposition of sanctions under the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note), section 104 or 105A of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, an Executive order specified in clause (i) or (ii) of paragraph (1)(D), or any other provision of law relating to the imposition of sanctions with respect to Iran, as applicable; and

Deadline.

"(B) not later than 180 days after initiating such an investigation, make a determination with respect to whether sanctions should be imposed with respect to the issuer or the affiliate of the issuer (as the case may be).

"(6) SUNSET.—The provisions of this subsection shall terminate on the date that is 30 days after the date on which the President makes the certification described in section 401(a) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8551(a)).".

15 USC 78m note.

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect with respect to reports required to be filed with the Securities and Exchange Commission after the date that is 180 days after the date of the enactment of this Act.

PX408

PUBLIC LAW 112–158—AUG. 10, 2012          126 STAT. 1237

**SEC. 220. REPORTS ON, AND AUTHORIZATION OF IMPOSITION OF SANC-
TIONS WITH RESPECT TO, THE PROVISION OF SPECIAL-
IZED FINANCIAL MESSAGING SERVICES TO THE CENTRAL
BANK OF IRAN AND OTHER SANCTIONED IRANIAN FINAN-
CIAL INSTITUTIONS.**

(a) SENSE OF CONGRESS.—It is the sense of Congress that—    22 USC 8726.
(1) providers of specialized financial messaging services
are a critical link to the international financial system;
(2) the European Union is to be commended for strength-
ening the multilateral sanctions regime against Iran by
deciding that specialized financial messaging services may not
be provided to the Central Bank of Iran and other sanctioned
Iranian financial institutions by persons subject to the jurisdic-
tion of the European Union; and
(3) the loss of access by sanctioned Iranian financial institu-
tions to specialized financial messaging services must be main-
tained.

(b) REPORTS REQUIRED.—
(1) IN GENERAL.—Not later than 60 days after the date
of the enactment of this Act, and every 90 days thereafter,
the Secretary of the Treasury shall submit to the appropriate
congressional committees a report that contains—
(A) a list of all persons that the Secretary has identified
that directly provide specialized financial messaging serv-
ices to, or enable or facilitate direct or indirect access
to such messaging services for, the Central Bank of Iran
or a financial institution described in section 104(c)(2)(E)(ii)
of the Comprehensive Iran Sanctions, Accountability, and
Divestment Act of 2010 (22 U.S.C. 8513(c)(2)(E)(ii)); and
(B) a detailed assessment of the status of efforts by
the Secretary to end the direct provision of such messaging
services to, and the enabling or facilitation of direct or
indirect access to such messaging services for, the Central
Bank of Iran or a financial institution described in that
section.
(2) ENABLING OR FACILITATION OF ACCESS TO SPECIALIZED
FINANCIAL MESSAGING SERVICES THROUGH INTERMEDIARY FINAN-
CIAL INSTITUTIONS.—For purposes of paragraph (1) and sub-
section (c), enabling or facilitating direct or indirect access
to specialized financial messaging services for the Central Bank
of Iran or a financial institution described in section
104(c)(2)(E)(ii) of the Comprehensive Iran Sanctions, Account-
ability, and Divestment Act of 2010 (22 U.S.C. 8513(c)(2)(E)(ii))
includes doing so by serving as an intermediary financial
institution with access to such messaging services.
(3) FORM OF REPORT.—A report submitted under paragraph
(1) shall be submitted in unclassified form but may contain
a classified annex.

(c) AUTHORIZATION OF IMPOSITION OF SANCTIONS.—
(1) IN GENERAL.—Except as provided in paragraph (2), if,
on or after the date that is 90 days after the date of the
enactment of this Act, a person continues to knowingly and
directly provide specialized financial messaging services to, or
knowingly enable or facilitate direct or indirect access to such
messaging services for, the Central Bank of Iran or a financial
institution described in paragraph (2)(E)(ii) of section 104(c)
of the Comprehensive Iran Sanctions, Accountability, and

PX408

126 STAT. 1238        PUBLIC LAW 112–158—AUG. 10, 2012

Divestment Act of 2010 (22 U.S.C. 8513(c)), the President may impose sanctions pursuant to that section or the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) with respect to the person.

(2) EXCEPTION.—The President may not impose sanctions pursuant to paragraph (1) with respect to a person for directly providing specialized financial messaging services to, or enabling or facilitating direct or indirect access to such messaging services for, the Central Bank of Iran or a financial institution described in section 104(c)(2)(E)(ii) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513(c)(2)(E)(ii)) if—

(A) the person is subject to a sanctions regime under its governing foreign law that requires it to eliminate the knowing provision of such messaging services to, and the knowing enabling and facilitation of direct or indirect access to such messaging services for—

(i) the Central Bank of Iran; and

(ii) a group of Iranian financial institutions identified under such governing foreign law for purposes of that sanctions regime if the President determines that—

(I) the group is substantially similar to the group of financial institutions described in section 104(c)(2)(E)(ii) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513(c)(2)(E)(ii)); and

(II) the differences between those groups of financial institutions do not adversely affect the national interest of the United States; and

(B) the person has, pursuant to that sanctions regime, terminated the knowing provision of such messaging services to, and the knowing enabling and facilitation of direct or indirect access to such messaging services for, the Central Bank of Iran and each Iranian financial institution identified under such governing foreign law for purposes of that sanctions regime.

(d) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to limit the authority of the President pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8501 et seq.).

22 USC 8727.

**SEC. 221. IDENTIFICATION OF, AND IMMIGRATION RESTRICTIONS ON, SENIOR OFFICIALS OF THE GOVERNMENT OF IRAN AND THEIR FAMILY MEMBERS.**

Deadline.
Publication.
Lists.

(a) IDENTIFICATION.—Not later than 180 days after the date of the enactment of this Act, and annually thereafter, the President shall publish a list of each individual the President determines is—

(1) a senior official of the Government of Iran described in subsection (b) that is involved in Iran's—

(A) illicit nuclear activities or proliferation of weapons of mass destruction or delivery systems for weapons of mass destruction;

(B) support for international terrorism; or

PX408

(C) commission of serious human rights abuses against citizens of Iran or their family members; or

(2) a family member of such an official.

(b) SENIOR OFFICIALS OF THE GOVERNMENT OF IRAN DESCRIBED.—A senior official of the Government of Iran described in this subsection is any senior official of that Government, including—

(1) the Supreme Leader of Iran;

(2) the President of Iran;

(3) a member of the Cabinet of the Government of Iran;

(4) a member of the Assembly of Experts;

(5) a senior member of the Intelligence Ministry of Iran; or

(6) a senior member of Iran's Revolutionary Guard Corps, including a senior member of a paramilitary organization such as Ansar-e-Hezbollah or Basij-e Motaz'afin.

(c) EXCLUSION FROM UNITED STATES.—Except as provided in subsection (d), the Secretary of State shall deny a visa to, and the Secretary of Homeland Security shall exclude from the United States, any alien who is on the list required by subsection (a).

(d) EXCEPTION TO COMPLY WITH UNITED NATIONS HEADQUARTERS AGREEMENT.—Subsection (c) shall not apply to an individual if admitting the individual to the United States is necessary to permit the United States to comply with the Agreement between the United Nations and the United States of America regarding the Headquarters of the United Nations, signed June 26, 1947, and entered into force November 21, 1947, and other applicable international obligations.

(e) WAIVER.—The President may waive the application of subsection (a) or (c) with respect to an individual if the President—

(1) determines that such a waiver is essential to the national interests of the United States; and

(2) not less than 7 days before the waiver takes effect, notifies Congress of the waiver and the reason for the waiver.

Deadline.
Notification.

## SEC. 222. SENSE OF CONGRESS AND RULE OF CONSTRUCTION RELATING TO CERTAIN AUTHORITIES OF STATE AND LOCAL GOVERNMENTS.

(a) SENSE OF CONGRESS.—It is the sense of Congress that the United States should support actions by States or local governments that are within their authority, including determining how investment assets are valued for purposes of safety and soundness of financial institutions and insurers, that are consistent with and in furtherance of the purposes of this Act and other Acts that are amended by this Act.

(b) RULE OF CONSTRUCTION.—Section 202 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8532) is amended by adding at the end the following:

"(j) RULE OF CONSTRUCTION.—Nothing in this Act or any other provision of law authorizing sanctions with respect to Iran shall be construed to abridge the authority of a State to issue and enforce rules governing the safety, soundness, and solvency of a financial institution subject to its jurisdiction or the business of insurance pursuant to the Act of March 9, 1945 (15 U.S.C. 1011 et seq.) (commonly known as the 'McCarran-Ferguson Act').".

PX408

**SEC. 223. GOVERNMENT ACCOUNTABILITY OFFICE REPORT ON FOREIGN ENTITIES THAT INVEST IN THE ENERGY SECTOR OF IRAN OR EXPORT REFINED PETROLEUM PRODUCTS TO IRAN.**

(a) INITIAL REPORT.—

(1) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, the Comptroller General of the United States shall submit to the appropriate congressional committees a report—

(A) listing all foreign investors in the energy sector of Iran during the period specified in paragraph (2), including—

(i) entities that exported gasoline and other refined petroleum products to Iran;

(ii) entities involved in providing refined petroleum products to Iran, including—

(I) entities that provided ships to transport refined petroleum products to Iran; and

(II) entities that provided insurance or reinsurance for shipments of refined petroleum products to Iran; and

(iii) entities involved in commercial transactions of any kind, including joint ventures anywhere in the world, with Iranian energy companies; and

(B) identifying the countries in which gasoline and other refined petroleum products exported to Iran during the period specified in paragraph (2) were produced or refined.

(2) PERIOD SPECIFIED.—The period specified in this paragraph is the period beginning on January 1, 2009, and ending on the date that is 150 days after the date of the enactment of this Act.

Time period.

(b) UPDATED REPORT.—Not later than one year after submitting the report required by subsection (a), the Comptroller General of the United States shall submit to the appropriate congressional committees a report containing the matters required in the report under subsection (a)(1) for the one-year period beginning on the date that is 30 days before the date on which the preceding report was required to be submitted by this section.

**SEC. 224. REPORTING ON THE IMPORTATION TO AND EXPORTATION FROM IRAN OF CRUDE OIL AND REFINED PETROLEUM PRODUCTS.**

Section 110(b) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8518(b)) is amended by striking "a report containing the matters" and all that follows through the period at the end and inserting the following: "a report, covering the 180-day period beginning on the date that is 30 days before the date on which the preceding report was required to be submitted by this section, that—

"(1) contains the matters required in the report under subsection (a)(1); and

"(2) identifies—

"(A) the volume of crude oil and refined petroleum products imported to and exported from Iran (including through swaps and similar arrangements);

"(B) the persons selling and transporting crude oil and refined petroleum products described in subparagraph (A), the countries with primary jurisdiction over those persons, and the countries in which those products were refined;

"(C) the sources of financing for imports to Iran of crude oil and refined petroleum products described in subparagraph (A); and

"(D) the involvement of foreign persons in efforts to assist Iran in—

"(i) developing upstream oil and gas production capacity;

"(ii) importing advanced technology to upgrade existing Iranian refineries;

"(iii) converting existing chemical plants to petroleum refineries; or

"(iv) maintaining, upgrading, or expanding existing refineries or constructing new refineries.".

# TITLE III—SANCTIONS WITH RESPECT TO IRAN'S REVOLUTIONARY GUARD CORPS

President.
Determinations.

## Subtitle A—Identification of, and Sanctions With Respect to, Officials, Agents, Affiliates, and Supporters of Iran's Revolutionary Guard Corps and Other Sanctioned Persons

**SEC. 301. IDENTIFICATION OF, AND IMPOSITION OF SANCTIONS WITH RESPECT TO, OFFICIALS, AGENTS, AND AFFILIATES OF IRAN'S REVOLUTIONARY GUARD CORPS.**

22 USC 8741.

(a) In General.—Not later than 90 days after the date of the enactment of this Act, and as appropriate thereafter, the President shall—

Deadline.

(1) identify foreign persons that are officials, agents, or affiliates of Iran's Revolutionary Guard Corps; and

(2) for each foreign person identified under paragraph (1) that is not already designated for the imposition of sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)—

(A) designate that foreign person for the imposition of sanctions pursuant to that Act; and

(B) block and prohibit all transactions in all property and interests in property of that foreign person if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(b) Priority for Investigation.—In identifying foreign persons pursuant to subsection (a)(1) as officials, agents, or affiliates of Iran's Revolutionary Guard Corps, the President shall give priority to investigating—

126 STAT. 1242        PUBLIC LAW 112–158—AUG. 10, 2012

(1) foreign persons or entities identified under section 560.304 of title 31, Code of Federal Regulations (relating to the definition of the Government of Iran); and

(2) foreign persons for which there is a reasonable basis to find that the person has conducted or attempted to conduct one or more sensitive transactions or activities described in subsection (c).

(c) SENSITIVE TRANSACTIONS AND ACTIVITIES DESCRIBED.—A sensitive transaction or activity described in this subsection is—

(1) a financial transaction or series of transactions valued at more than $1,000,000 in the aggregate in any 12-month period involving a non-Iranian financial institution;

(2) a transaction to facilitate the manufacture, importation, exportation, or transfer of items needed for the development by Iran of nuclear, chemical, biological, or advanced conventional weapons, including ballistic missiles;

(3) a transaction relating to the manufacture, procurement, or sale of goods, services, and technology relating to Iran's energy sector, including a transaction relating to the development of the energy resources of Iran, the exportation of petroleum products from Iran, the importation of refined petroleum to Iran, or the development of refining capacity available to Iran;

(4) a transaction relating to the manufacture, procurement, or sale of goods, services, and technology relating to Iran's petrochemical sector; or

(5) a transaction relating to the procurement of sensitive technologies (as defined in section 106(c) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8515(c))).

(d) EXCLUSION FROM UNITED STATES.—

(1) IN GENERAL.—Subject to paragraph (2), the Secretary of State shall deny a visa to, and the Secretary of Homeland Security shall exclude from the United States, any alien who, on or after the date of the enactment of this Act, is a foreign person designated pursuant to subsection (a) for the imposition of sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).

(2) REGULATORY EXCEPTIONS TO COMPLY WITH INTERNATIONAL OBLIGATIONS.—The requirement to deny visas to and exclude aliens from the United States pursuant to paragraph (1) shall be subject to such regulations as the President may prescribe, including regulatory exceptions to permit the United States to comply with the Agreement between the United Nations and the United States of America regarding the Headquarters of the United Nations, signed June 26, 1947, and entered into force November 21, 1947, and other applicable international obligations.

(e) WAIVER OF IMPOSITION OF SANCTIONS.—

(1) IN GENERAL.—The President may waive the application of subsection (a) or (d) with respect to a foreign person if the President—

(A) determines that it is vital to the national security interests of the United States to do so; and

(B) submits to the appropriate congressional committees a report that—

Reports.

(i) identifies the foreign person with respect to which the waiver applies; and

(ii) sets forth the reasons for the determination.

(2) FORM OF REPORT.—A report submitted under paragraph (1)(B) shall be submitted in unclassified form but may contain a classified annex.

(f) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to remove any sanction of the United States in force with respect to Iran's Revolutionary Guard Corps as of the date of the enactment of this Act.

**SEC. 302. IDENTIFICATION OF, AND IMPOSITION OF SANCTIONS WITH RESPECT TO, PERSONS THAT SUPPORT OR CONDUCT CERTAIN TRANSACTIONS WITH IRAN'S REVOLUTIONARY GUARD CORPS OR OTHER SANCTIONED PERSONS.**

22 USC 8742.

(a) IDENTIFICATION.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and every 180 days thereafter, the President shall submit to the appropriate congressional committees a report identifying foreign persons that the President determines, on or after the date of the enactment of this Act, knowingly—

Deadlines.

(A) materially assist, sponsor, or provide financial, material, or technological support for, or goods or services in support of, Iran's Revolutionary Guard Corps or any of its officials, agents, or affiliates the property and interests in property of which are blocked pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.);

(B) engage in a significant transaction or transactions with Iran's Revolutionary Guard Corps or any of its officials, agents, or affiliates—

(i) the property and interests in property of which are blocked pursuant to that Act; or

(ii) that are identified under section 301(a)(1) or pursuant to paragraph (4)(A) of section 104(c) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as added by section 312; or

(C) engage in a significant transaction or transactions with—

(i) a person subject to financial sanctions pursuant to United Nations Security Council Resolution 1737 (2006), 1747 (2007), 1803 (2008), or 1929 (2010), or any other resolution that is adopted by the Security Council and imposes sanctions with respect to Iran or modifies such sanctions; or

(ii) a person acting on behalf of or at the direction of, or owned or controlled by, a person described in clause (i).

(2) FORM OF REPORT.—A report submitted under paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

(3) BARTER TRANSACTIONS.—For purposes of paragraph (1), the term "transaction" includes a barter transaction.

(b) IMPOSITION OF SANCTIONS.—If the President determines under subsection (a)(1) that a foreign person has knowingly engaged in an activity described in that subsection, the President—

(1) shall impose 5 or more of the sanctions described in section 6(a) of the Iran Sanctions Act of 1996, as amended by section 204; and

(2) may impose additional sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) with respect to the person.

(c) TERMINATION.—The President may terminate a sanction imposed with respect to a foreign person pursuant to subsection (b) if the President determines that the person—

(1) no longer engages in the activity for which the sanction was imposed; and

(2) has provided assurances to the President that the person will not engage in any activity described in subsection (a)(1) in the future.

(d) WAIVER OF IMPOSITION OF SANCTIONS.—

(1) IN GENERAL.—The President may waive the imposition of sanctions under subsection (b) with respect to a foreign person if the President—

(A)(i) determines that the person has ceased the activity for which sanctions would otherwise be imposed and has taken measures to prevent a recurrence of the activity; or

(ii) determines that it is essential to the national security interests of the United States to do so; and

Reports.

(B) submits to the appropriate congressional committees a report that—

(i) identifies the foreign person with respect to which the waiver applies;

(ii) describes the activity that would otherwise subject the foreign person to the imposition of sanctions under subsection (b); and

(iii) sets forth the reasons for the determination.

(2) FORM OF REPORT.—A report submitted under paragraph (1)(B) shall be submitted in unclassified form but may contain a classified annex.

(e) WAIVER OF IDENTIFICATIONS AND DESIGNATIONS.—Notwithstanding any other provision of this subtitle and subject to paragraph (2), the President shall not be required to make any identification of a foreign person under subsection (a) or any identification or designation of a foreign person under section 301(a) if the President—

(1) determines that doing so would cause damage to the national security of the United States; and

Notification.

(2) notifies the appropriate congressional committees of the exercise of the authority provided under this subsection.

(f) APPLICATION OF PROVISIONS OF IRAN SANCTIONS ACT OF 1996.—The following provisions of the Iran Sanctions Act of 1996, as amended by this Act, apply with respect to the imposition under subsection (b)(1) of sanctions relating to activities described in subsection (a)(1) to the same extent that such provisions apply with respect to the imposition of sanctions under section 5(a) of the Iran Sanctions Act of 1996:

(1) Subsections (c) and (e) of section 4.

(2) Subsections (c), (d), and (f) of section 5.

(3) Section 8.

(4) Section 9.

(5) Section 11.

PX408

PUBLIC LAW 112–158—AUG. 10, 2012          126 STAT. 1245

(6) Section 12.
(7) Subsection (b) of section 13.
(8) Section 14.

**SEC. 303. IDENTIFICATION OF, AND IMPOSITION OF MEASURES WITH RESPECT TO, FOREIGN GOVERNMENT AGENCIES CARRYING OUT ACTIVITIES OR TRANSACTIONS WITH CERTAIN IRAN-AFFILIATED PERSONS.**

22 USC 8743.

(a) IDENTIFICATION.—

(1) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, and every 180 days thereafter, the President shall submit to the appropriate congressional committees a report that identifies each agency of the government of a foreign country (other than Iran) that the President determines knowingly and materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, or knowingly and materially engaged in a significant transaction with, any person described in paragraph (2).

Deadlines.
Reports.

(2) PERSON DESCRIBED.—A person described in this paragraph is—

(A) a foreign person that is an official, agent, or affiliate of Iran's Revolutionary Guard Corps that is designated for the imposition of sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.);

(B) a foreign person that is designated and subject to financial sanctions pursuant to—

(i) the Annex of United Nations Security Council Resolution 1737 (2006);

(ii) Annex I of United Nations Security Council Resolution 1747 (2007);

(iii) Annex I, II, or III of United Nations Security Council Resolution 1803 (2008);

(iv) Annex I, II, or III of United Nations Security Council Resolution 1929 (2010); or

(v) any subsequent and related United Nations Security Council resolution, or any annex thereto, that imposes new sanctions with respect to Iran or modifies existing sanctions with respect to Iran; or

(C) a foreign person that the agency knows is acting on behalf of or at the direction of, or owned or controlled by, a person described in subparagraph (A) or (B).

(3) FORM OF REPORT.—Each report submitted under paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

(b) IMPOSITION OF MEASURES.—

(1) IN GENERAL.—The President may impose any of the following measures with respect to an agency identified pursuant to subsection (a) if the President determines that the assistance, exports, or other support to be prohibited by reason of the imposition of the measures have contributed and would otherwise directly or indirectly contribute to the agency's capability to continue the activities or transactions for which the agency has been identified pursuant to subsection (a):

(A) No assistance may be provided to the agency under the Foreign Assistance Act of 1961 (22 U.S.C. 2151 et

PX408

126 STAT. 1246        PUBLIC LAW 112–158—AUG. 10, 2012

seq.) or the Arms Export Control Act (22 U.S.C. 2751 et seq.) other than humanitarian assistance or the provision of food or other agricultural commodities.

(B) No sales of any defense articles, defense services, or design and construction services under the Arms Export Control Act (22 U.S.C. 2751 et seq.) may be made to the agency.

(C) No licenses for export of any item on the United States Munitions List that include the agency as a party to the license may be granted.

(D) No exports may be permitted to the agency of any goods or technologies controlled for national security reasons under the Export Administration Regulations, except that such prohibition shall not apply to any transaction subject to the reporting requirements of title V of the National Security Act of 1947 (50 U.S.C. 413 et seq.; relating to congressional oversight of intelligence activities).

(E) The United States shall oppose any loan or financial or technical assistance to the agency by international financial institutions in accordance with section 701 of the International Financial Institutions Act (22 U.S.C. 262d).

(F) The United States shall deny to the agency any credit or financial assistance by any department, agency, or instrumentality of the United States Government, except that this paragraph shall not apply—

(i) to any transaction subject to the reporting requirements of title V of the National Security Act of 1947 (50 U.S.C. 413 et seq.; relating to congressional oversight of intelligence activities);

(ii) to the provision of medicines, medical equipment, and humanitarian assistance; or

(iii) to any credit, credit guarantee, or financial assistance provided by the Department of Agriculture to support the purchase of food or other agricultural commodities.

(G) Additional restrictions as may be imposed pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).

(2) RULE OF CONSTRUCTION.—Nothing in this subsection shall be construed to impose measures with respect to programs under section 1501 of the National Defense Authorization Act for Fiscal Year 1997 (50 U.S.C. 2632 note) and programs under the Atomic Energy Defense Act (50 U.S.C. 2501 et seq.).

Notification.

(c) TERMINATION.—The President may terminate any measures imposed with respect to an agency pursuant to subsection (b) if the President determines and notifies the appropriate congressional committees that—

(1)(A) a person described in subparagraph (A) or (B) of subsection (a)(2) with respect to which the agency is carrying out activities or transactions is no longer designated pursuant to subparagraph (A) or (B) of subsection (a)(2); or

(B) any person described in subparagraph (C) of subsection (a)(2) with respect to which the agency is carrying out activities or transactions is no longer acting on behalf of or at the direction of, or owned or controlled by, any person described in subparagraph (A) or (B) of subsection (a)(2);

PUBLIC LAW 112–158—AUG. 10, 2012        126 STAT. 1247

(2) the agency is no longer carrying out activities or transactions for which the measures were imposed and has provided assurances to the United States Government that the agency will not carry out the activities or transactions in the future; or

(3) it is essential to the national security interest of the United States to terminate such measures.

(d) WAIVER.—If the President does not impose one or more measures described in subsection (b) with respect to an agency identified in the report required by subsection (a), the President shall include in the subsequent report an explanation as to why the President did not impose such measures.

(e) DEFINITION.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Relations, the Committee on Appropriations, the Committee on Armed Services, the Committee on Banking, Housing, and Urban Affairs, the Committee on Finance, and the Select Committee on Intelligence of the Senate; and

(2) the Committee on Foreign Affairs, the Committee on Appropriations, the Committee on Armed Services, the Committee on Financial Services, the Committee on Ways and Means, and the Permanent Select Committee on Intelligence of the House of Representatives.

(f) EFFECTIVE DATE.—This section shall take effect on the date of the enactment of this Act and apply with respect to activities and transactions described in subsection (a) that are carried out on or after the later of— *Applicability.*

(1) the date that is 45 days after such date of enactment; or

(2) the date that is 45 days after a person is designated as described in subparagraph (A) or (B) of subsection (a)(2).

**SEC. 304. RULE OF CONSTRUCTION.**                          *22 USC 8744.*

Nothing in this subtitle shall be construed to limit the authority of the President to designate foreign persons for the imposition of sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).

# Subtitle B—Additional Measures Relating to Iran's Revolutionary Guard Corps

**SEC. 311. EXPANSION OF PROCUREMENT PROHIBITION TO FOREIGN PERSONS THAT ENGAGE IN CERTAIN TRANSACTIONS WITH IRAN'S REVOLUTIONARY GUARD CORPS.**

(a) IN GENERAL.—Section 6(b)(1) of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note) is amended—

(1) by striking "Not later than 90 days" and inserting the following:

"(A) CERTIFICATIONS RELATING TO ACTIVITIES DESCRIBED IN SECTION 5.—Not later than 90 days"; and

(2) by adding at the end the following:

"(B) CERTIFICATIONS RELATING TO TRANSACTIONS WITH IRAN'S REVOLUTIONARY GUARD CORPS.—Not later than 120 days after the date of the enactment of the Iran Threat        *Deadline.*

Reduction and Syria Human Rights Act of 2012, the Federal Acquisition Regulation shall be revised to require a certification from each person that is a prospective contractor that the person, and any person owned or controlled by the person, does not knowingly engage in a significant transaction or transactions with Iran's Revolutionary Guard Corps or any of its officials, agents, or affiliates the property and interests in property of which are blocked pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).".

(b) TECHNICAL AND CONFORMING AMENDMENTS.—

(1) Section 6(b) of the Iran Sanctions Act of 1996, as amended by subsection (a), is further amended—

(A) in subparagraph (A) of paragraph (1), as designated by subsection (a)(1), by striking "issued pursuant to section 25 of the Office of Federal Procurement Policy Act (41 U.S.C. 421)";

(B) in paragraph (2)—

(i) in subparagraph (A)—

(I) by striking "the revision" and inserting "the applicable revision"; and

(II) by striking "not more than 3 years" and inserting "not less than 2 years"; and

(ii) in subparagraph (B), by striking "issued pursuant to section 25 of the Office of Federal Procurement Policy Act (41 U.S.C. 421)";

(C) in paragraph (5), by striking "in the national interest" and inserting "essential to the national security interests";

(D) by striking paragraph (6) and inserting the following:

"(6) DEFINITIONS.—In this subsection:

"(A) EXECUTIVE AGENCY.—The term 'executive agency' has the meaning given that term in section 133 of title 41, United States Code.

"(B) FEDERAL ACQUISITION REGULATION.—The term 'Federal Acquisition Regulation' means the regulation issued pursuant to section 1303(a)(1) of title 41, United States Code."; and

(E) in paragraph (7)—

(i) by striking "The revisions to the Federal Acquisition Regulation required under paragraph (1)" and inserting the following:

"(A) CERTIFICATIONS RELATING TO ACTIVITIES DESCRIBED IN SECTION 5.—The revisions to the Federal Acquisition Regulation required under paragraph (1)(A)"; and

Applicability.
Effective date.

(ii) by adding at the end the following:

"(B) CERTIFICATIONS RELATING TO TRANSACTIONS WITH IRAN'S REVOLUTIONARY GUARD CORPS.—The revisions to the Federal Acquisition Regulation required under paragraph (1)(B) shall apply with respect to contracts for which solicitations are issued on or after the date that is 120 days after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012.".

(2) Section 101(3) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8511(3))

PX408

is amended by striking "section 4 of the Office of Federal Procurement Policy Act (41 U.S.C. 403)" and inserting "section 133 of title 41, United States Code".

**SEC. 312. DETERMINATIONS OF WHETHER THE NATIONAL IRANIAN OIL COMPANY AND THE NATIONAL IRANIAN TANKER COMPANY ARE AGENTS OR AFFILIATES OF IRAN'S REVOLUTIONARY GUARD CORPS.**

(a) SENSE OF CONGRESS.—It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.

(b) DETERMINATIONS.—Section 104(c) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513(c)) is amended by adding at the end the following:

"(4) DETERMINATIONS REGARDING NIOC AND NITC.—

"(A) DETERMINATIONS.—For purposes of paragraph (2)(E), the Secretary of the Treasury shall, not later than 45 days after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012— <span style="float:right">Deadline.</span>

"(i) determine whether the NIOC or the NITC is an agent or affiliate of Iran's Revolutionary Guard Corps; and

"(ii) submit to the appropriate congressional committees a report on the determinations made under clause (i), together with the reasons for those determinations.

"(B) FORM OF REPORT.—A report submitted under subparagraph (A)(ii) shall be submitted in unclassified form but may contain a classified annex.

"(C) APPLICABILITY WITH RESPECT TO PETROLEUM TRANSACTIONS.—

"(i) APPLICATION OF SANCTIONS.—Except as provided in clause (ii), if the Secretary of the Treasury determines that the NIOC or the NITC is a person described in clause (i) or (ii) of paragraph (2)(E), the regulations prescribed under paragraph (1) shall apply with respect to a significant transaction or transactions or significant financial services knowingly facilitated or provided by a foreign financial institution for the NIOC or the NITC, as applicable, for the purchase of petroleum or petroleum products from Iran, only if a determination of the President under section 1245(d)(4)(B) of the National Defense Authorization Act for Fiscal Year 2012 (22 U.S.C. 8513a(d)(4)(B)) that there is a sufficient supply of petroleum and petroleum products produced in countries other than Iran to permit purchasers of petroleum and petroleum products from Iran to reduce significantly their purchases from Iran is in effect at the time of the transaction or the provision of the service.

"(ii) EXCEPTION FOR CERTAIN COUNTRIES.—If the Secretary of the Treasury determines that the NIOC or the NITC is a person described in clause (i) or (ii) of paragraph (2)(E), the regulations prescribed under paragraph (1) shall not apply to a significant

transaction or transactions or significant financial services knowingly facilitated or provided by a foreign financial institution for the NIOC or the NITC, as applicable, for the purchase of petroleum or petroleum products from Iran if an exception under paragraph (4)(D) of section 1245(d) of the National Defense Authorization Act for Fiscal Year 2012 (22 U.S.C. 8513a(d)) applies to the country with primary jurisdiction over the foreign financial institution at the time of the transaction or the provision of the service.

"(iii) RULE OF CONSTRUCTION.—The exceptions in clauses (i) and (ii) shall not be construed to limit the authority of the Secretary of the Treasury to impose sanctions pursuant to the regulations prescribed under paragraph (1) for an activity described in paragraph (2) to the extent the activity would meet the criteria described in that paragraph in the absence of the involvement of the NIOC or the NITC.

"(D) DEFINITIONS.—In this paragraph:

"(i) NIOC.—The term 'NIOC' means the National Iranian Oil Company.

"(ii) NITC.—The term 'NITC' means the National Iranian Tanker Company.".

(c) CONFORMING AMENDMENTS.—

(1) WAIVER.—Section 104(f) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513(f)) is amended by inserting "or section 104A" after "subsection (c)".

(2) CLASSIFIED INFORMATION.—Section 104(g) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513(g)) is amended by striking "subsection (c)(1)" and inserting "paragraph (1) or (4) of subsection (c) or section 104A" both places it appears.

(d) APPLICABILITY.—

22 USC 8513 note.

(1) IN GENERAL.—If an exception to sanctions described in clause (i) or (ii) of paragraph (4)(C) of section 104(c) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as added by subsection (b), applies to a person that engages in a transaction described in paragraph (2) at the time of the transaction, the President is authorized not to impose sanctions with respect to the transaction under—

(A) section 302(b)(1);

(B) section 104A of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as added by section 216; or

(C) any other applicable provision of law authorizing the imposition of sanctions with respect to Iran.

(2) TRANSACTION DESCRIBED.—A transaction described in this paragraph is a transaction—

(A) solely for the purchase of petroleum or petroleum products from Iran; and

(B) for which sanctions may be imposed solely as a result of the involvement of the National Iranian Oil Company or the National Iranian Tanker Company in the transaction under—

(i) section 302(b)(1);

PUBLIC LAW 112–158—AUG. 10, 2012      126 STAT. 1251

(ii) section 104A of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as added by section 216; or
(iii) any other applicable provision of law authorizing the imposition of sanctions with respect to Iran.

# TITLE IV—MEASURES RELATING TO HUMAN RIGHTS ABUSES IN IRAN

## Subtitle A—Expansion of Sanctions Relating to Human Rights Abuses in Iran

### SEC. 401. IMPOSITION OF SANCTIONS ON CERTAIN PERSONS RESPONSIBLE FOR OR COMPLICIT IN HUMAN RIGHTS ABUSES COMMITTED AGAINST CITIZENS OF IRAN OR THEIR FAMILY MEMBERS AFTER THE JUNE 12, 2009, ELECTIONS IN IRAN.

(a) SENSE OF CONGRESS.—It is the sense of Congress that the Supreme Leader of Iran, the President of Iran, senior members of the Intelligence Ministry of Iran, senior members of Iran's Revolutionary Guard Corps, Ansar-e-Hezbollah and Basij-e-Mostaz'afin, and the Ministers of Defense, Interior, Justice, and Telecommunications are ultimately responsible for ordering, controlling, or otherwise directing a pattern and practice of serious human rights abuses against the Iranian people, and thus the President should include such persons on the list of persons who are responsible for or complicit in committing serious human rights abuses and subject to sanctions pursuant to section 105 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8514).

(b) REPORT.—
(1) REPORT REQUIRED.—Not later than 180 days after the date of the enactment of this Act, the Secretary of State shall submit to the appropriate congressional committees a detailed report with respect to whether each person described in subsection (a) is responsible for or complicit in, or responsible for ordering, controlling, or otherwise directing the commission of serious human rights abuses against citizens of Iran or their family members on or after June 12, 2009, regardless of whether such abuses occurred in Iran. For any such person who is not included in such report, the Secretary of State should describe in the report the reasons why the person was not included, including information on whether sufficient credible evidence of responsibility for such abuses was found.

(2) FORM.—The report required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

(3) DEFINITION.—In this subsection, the term "appropriate congressional committees" means—
(A) the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate; and
(B) the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives.

PX408

126 STAT. 1252          PUBLIC LAW 112–158—AUG. 10, 2012

President.

**SEC. 402. IMPOSITION OF SANCTIONS WITH RESPECT TO THE TRANSFER OF GOODS OR TECHNOLOGIES TO IRAN THAT ARE LIKELY TO BE USED TO COMMIT HUMAN RIGHTS ABUSES.**

(a) IN GENERAL.—The Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8501 et seq.) is amended by inserting after section 105 the following:

22 USC 8514a.

**"SEC. 105A. IMPOSITION OF SANCTIONS WITH RESPECT TO THE TRANSFER OF GOODS OR TECHNOLOGIES TO IRAN THAT ARE LIKELY TO BE USED TO COMMIT HUMAN RIGHTS ABUSES.**

"(a) IN GENERAL.—The President shall impose sanctions in accordance with subsection (c) with respect to each person on the list required by subsection (b).

"(b) LIST.—

"(1) IN GENERAL.—Not later than 90 days after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, the President shall submit to the appropriate congressional committees a list of persons that the President determines have knowingly engaged in an activity described in paragraph (2) on or after such date of enactment.

"(2) ACTIVITY DESCRIBED.—

"(A) IN GENERAL.—A person engages in an activity described in this paragraph if the person—

"(i) transfers, or facilitates the transfer of, goods or technologies described in subparagraph (C) to Iran, any entity organized under the laws of Iran or otherwise subject to the jurisdiction of the Government of Iran, or any national of Iran, for use in or with respect to Iran; or

"(ii) provides services (including services relating to hardware, software, and specialized information, and professional consulting, engineering, and support services) with respect to goods or technologies described in subparagraph (C) after such goods or technologies are transferred to Iran.

"(B) APPLICABILITY TO CONTRACTS AND OTHER AGREEMENTS.—A person engages in an activity described in subparagraph (A) without regard to whether the activity is carried out pursuant to a contract or other agreement entered into before, on, or after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012.

"(C) GOODS OR TECHNOLOGIES DESCRIBED.—Goods or technologies described in this subparagraph are goods or technologies that the President determines are likely to be used by the Government of Iran or any of its agencies or instrumentalities (or by any other person on behalf of the Government of Iran or any of such agencies or instrumentalities) to commit serious human rights abuses against the people of Iran, including—

"(i) firearms or ammunition (as those terms are defined in section 921 of title 18, United States Code), rubber bullets, police batons, pepper or chemical sprays, stun grenades, electroshock weapons, tear gas, water cannons, or surveillance technology; or

PX408

"(ii) sensitive technology (as defined in section 106(c)).

"(3) SPECIAL RULE TO ALLOW FOR TERMINATION OF SANCTIONABLE ACTIVITY.—The President shall not be required to include a person on the list required by paragraph (1) if the President certifies in writing to the appropriate congressional committees that—

"(A) the person is no longer engaging in, or has taken significant verifiable steps toward stopping, the activity described in paragraph (2) for which the President would otherwise have included the person on the list; and

"(B) the President has received reliable assurances that the person will not knowingly engage in any activity described in paragraph (2) in the future.

"(4) UPDATES OF LIST.—The President shall submit to the appropriate congressional committees an updated list under paragraph (1)—

"(A) each time the President is required to submit an updated list to those committees under section 105(b)(2)(A); and

"(B) as new information becomes available.

"(5) FORM OF REPORT; PUBLIC AVAILABILITY.—

"(A) FORM.—The list required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

"(B) PUBLIC AVAILABILITY.—The unclassified portion of the list required by paragraph (1) shall be made available to the public and posted on the websites of the Department of the Treasury and the Department of State.

"(c) APPLICATION OF SANCTIONS.—

"(1) IN GENERAL.—Subject to paragraph (2), the President shall impose sanctions described in section 105(c) with respect to a person on the list required by subsection (b).

"(2) TRANSFERS TO IRAN'S REVOLUTIONARY GUARD CORPS.— In the case of a person on the list required by subsection (b) for transferring, or facilitating the transfer of, goods or technologies described in subsection (b)(2)(C) to Iran's Revolutionary Guard Corps, or providing services with respect to such goods or technologies after such goods or technologies are transferred to Iran's Revolutionary Guard Corps, the President shall—

"(A) impose sanctions described in section 105(c) with respect to the person; and

"(B) impose such other sanctions from among the sanctions described in section 6(a) of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note) as the President determines appropriate.".

(b) CLERICAL AMENDMENT.—The table of contents for the Comprehensive Iran Sanctions, Accountability, and Divestment Act of

PX408

126 STAT. 1254          PUBLIC LAW 112–158—AUG. 10, 2012

2010 is amended by inserting after the item relating to section 105 the following:

"Sec. 105A. Imposition of sanctions with respect to the transfer of goods or technologies to Iran that are likely to be used to commit human rights abuses.".

President.

**SEC. 403. IMPOSITION OF SANCTIONS WITH RESPECT TO PERSONS WHO ENGAGE IN CENSORSHIP OR OTHER RELATED ACTIVITIES AGAINST CITIZENS OF IRAN.**

(a) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) satellite service providers and other entities that have direct contractual arrangements to provide satellite services to the Government of Iran or entities owned or controlled by that Government should cease providing broadcast services to that Government and those entities unless that Government ceases activities intended to jam or restrict satellite signals; and

(2) the United States should address the illegal jamming of satellite signals by the Government of Iran through the voice and vote of the United States in the United Nations International Telecommunications Union.

(b) IMPOSITION OF SANCTIONS.—The Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8501 et seq.), as amended by section 402, is further amended by inserting after section 105A the following:

22 USC 8514b.

**"SEC. 105B. IMPOSITION OF SANCTIONS WITH RESPECT TO PERSONS WHO ENGAGE IN CENSORSHIP OR OTHER RELATED ACTIVITIES AGAINST CITIZENS OF IRAN.**

"(a) IN GENERAL.—The President shall impose sanctions described in section 105(c) with respect to each person on the list required by subsection (b).

"(b) LIST OF PERSONS WHO ENGAGE IN CENSORSHIP.—

Deadline.
Determination.

"(1) IN GENERAL.—Not later than 90 days after the date of the enactment of the Iran Threat Reduction and Syria Human Rights Act of 2012, the President shall submit to the appropriate congressional committees a list of persons that the President determines have, on or after June 12, 2009, engaged in censorship or other activities with respect to Iran that—

"(A) prohibit, limit, or penalize the exercise of freedom of expression or assembly by citizens of Iran; or

"(B) limit access to print or broadcast media, including the facilitation or support of intentional frequency manipulation by the Government of Iran or an entity owned or controlled by that Government that would jam or restrict an international signal.

"(2) UPDATES OF LIST.—The President shall submit to the appropriate congressional committees an updated list under paragraph (1)—

"(A) each time the President is required to submit an updated list to those committees under section 105(b)(2)(A); and

"(B) as new information becomes available.

"(3) FORM OF REPORT; PUBLIC AVAILABILITY.—

PX408

PUBLIC LAW 112–158—AUG. 10, 2012          126 STAT. 1255

"(A) FORM.—The list required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

"(B) PUBLIC AVAILABILITY.—The unclassified portion of the list required by paragraph (1) shall be made available to the public and posted on the websites of the Department of the Treasury and the Department of State.".

*Web posting.*

(c) CLERICAL AMENDMENT.—The table of contents for the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as amended by section 402, is further amended by inserting after the item relating to section 105A the following:

"Sec. 105B. Imposition of sanctions with respect to persons who engage in censorship or other related activities against citizens of Iran.".

(d) CONFORMING AMENDMENTS.—Section 401(b)(1) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8551(b)(1)) is amended—
(1) by inserting ", 105A(a), or 105B(a)" after "105(a)"; and
(2) by inserting ", 105A(b), or 105B(b)" after "105(b)".

## Subtitle B—Additional Measures to Promote Human Rights

**SEC. 411. CODIFICATION OF SANCTIONS WITH RESPECT TO GRAVE HUMAN RIGHTS ABUSES BY THE GOVERNMENTS OF IRAN AND SYRIA USING INFORMATION TECHNOLOGY.**

*22 USC 8751.*

United States sanctions with respect to Iran and Syria provided for in Executive Order No. 13606 (77 Fed. Reg. 24571), as in effect on the day before the date of the enactment of this Act, shall remain in effect—

*Deadlines.*

(1) with respect to Iran, until the date that is 30 days after the date on which the President submits to Congress the certification described in section 401(a) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8551(a)); and

*President. Certification.*

(2) with respect to Syria, until the date on which the provisions of and sanctions imposed pursuant to title VII terminate pursuant to section 706.

**SEC. 412. CLARIFICATION OF SENSITIVE TECHNOLOGIES FOR PURPOSES OF PROCUREMENT BAN UNDER COMPREHENSIVE IRAN SANCTIONS, ACCOUNTABILITY, AND DIVESTMENT ACT OF 2010.**

*22 USC 8752.*

The Secretary of State shall—

(1) not later than 90 days after the date of the enactment of this Act, issue guidelines to further describe the technologies that may be considered "sensitive technology" for purposes of section 106 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8515), with special attention to new forms of sophisticated jamming, monitoring, and surveillance technology relating to mobile telecommunications and the Internet, and publish those guidelines in the Federal Register;

*Deadline. Guidelines. Federal Register, publication.*

(2) determine the types of technologies that enable any indigenous capabilities that Iran has to disrupt and monitor

*Determination.*

PX408

126 STAT. 1256          PUBLIC LAW 112–158—AUG. 10, 2012

information and communications in that country, and consider adding descriptions of those items to the guidelines; and

Review.

(3) periodically review, but in no case less than once each year, the guidelines and, if necessary, amend the guidelines on the basis of technological developments and new information regarding transfers of technologies to Iran and the development of Iran's indigenous capabilities to disrupt and monitor information and communications in Iran.

22 USC 8753.

**SEC. 413. EXPEDITED CONSIDERATION OF REQUESTS FOR AUTHORIZATION OF CERTAIN HUMAN RIGHTS-, HUMANITARIAN-, AND DEMOCRACY-RELATED ACTIVITIES WITH RESPECT TO IRAN.**

Process.

(a) REQUIREMENT.—The Office of Foreign Assets Control, in consultation with the Department of State, shall establish an expedited process for the consideration of complete requests for authorization to engage in human rights-, humanitarian-, or democracy-related activities relating to Iran that are submitted by—

(1) entities receiving funds from the Department of State to engage in the proposed activity;

(2) the Broadcasting Board of Governors; and

(3) other appropriate agencies of the United States Government.

(b) PROCEDURES.—Requests for authorization under subsection (a) shall be submitted to the Office of Foreign Assets Control in conformance with the Office's regulations, including section 501.801 of title 31, Code of Federal Regulations (commonly known as the Reporting, Procedures and Penalties Regulations). Applicants

Disclosure.
Records.

shall fully disclose the parties to the transactions as well as describe the activities to be undertaken. License applications involving the exportation or reexportation of goods, technology, or software to Iran shall include a copy of an official Commodity Classification issued by the Department of Commerce, Bureau of Industry and Security, as part of the license application.

Deadline.

(c) FOREIGN POLICY REVIEW.—The Department of State shall complete a foreign policy review of a request for authorization under subsection (a) not later than 30 days after the request is referred to the Department by the Office of Foreign Assets Control.

Deadline.

(d) LICENSE DETERMINATIONS.—License determinations for complete requests for authorization under subsection (a) shall be made not later than 90 days after receipt by the Office of Foreign Assets Control, with the following exceptions:

(1) Any requests involving the exportation or reexportation to Iran of goods, technology, or software listed on the Commerce Control List maintained pursuant to part 774 of title 15, Code of Federal Regulations, shall be processed in a manner consistent with the Iran-Iraq Arms Non-Proliferation Act of 1992 (title XVI of Public Law 102–484) and other applicable provisions of law.

(2) Any other requests presenting unusual or extraordinary circumstances.

(e) REGULATIONS.—The Secretary of the Treasury may prescribe such regulations as are appropriate to carry out this section.

22 USC 8754.

**SEC. 414. COMPREHENSIVE STRATEGY TO PROMOTE INTERNET FREEDOM AND ACCESS TO INFORMATION IN IRAN.**

Deadline.

Not later than 90 days after the date of the enactment of this Act, the Secretary of State, in consultation with the Secretary

PX408

of the Treasury and the heads of other Federal agencies, as appropriate, shall submit to the appropriate congressional committees a comprehensive strategy to—

(1) assist the people of Iran to produce, access, and share information freely and safely via the Internet, including in Farsi and regional languages;

(2) support the development of counter-censorship technologies that enable the citizens of Iran to undertake Internet activities without interference from the Government of Iran;

(3) increase the capabilities and availability of secure mobile and other communications through connective technology among human rights and democracy activists in Iran;

(4) provide resources for digital safety training for media and academic and civil society organizations in Iran;

(5) provide accurate and substantive Internet content in local languages in Iran;

(6) increase emergency resources for the most vulnerable human rights advocates seeking to organize, share information, and support human rights in Iran;

(7) expand surrogate radio, television, live stream, and social network communications inside Iran, including—

(A) by expanding Voice of America's Persian News Network and Radio Free Europe/Radio Liberty's Radio Farda to provide hourly live news update programming and breaking news coverage capability 24 hours a day and 7 days a week; and

(B) by assisting telecommunications and software companies that are United States persons to comply with the export licensing requirements of the United States for the purpose of expanding such communications inside Iran;

(8) expand activities to safely assist and train human rights, civil society, and democracy activists in Iran to operate effectively and securely;

(9) identify and utilize all available resources to overcome attempts by the Government of Iran to jam or otherwise deny international satellite broadcasting signals;

(10) expand worldwide United States embassy and consulate programming for and outreach to Iranian dissident communities;

(11) expand access to proxy servers for democracy activists in Iran; and

(12) discourage telecommunications and software companies from facilitating Internet censorship by the Government of Iran.

**SEC. 415. STATEMENT OF POLICY ON POLITICAL PRISONERS.**                                22 USC 8755.

It shall be the policy of the United States—

(1) to support efforts to research and identify prisoners of conscience and cases of human rights abuses in Iran;

(2) to offer refugee status or political asylum in the United States to political dissidents in Iran if requested and consistent with the laws and national security interests of the United States;

(3) to offer to assist, through the United Nations High Commissioner for Refugees, with the relocation of such political prisoners to other countries if requested, as appropriate and

PX408

with appropriate consideration for the national security interests of the United States; and

(4) to publicly call for the release of Iranian dissidents by name and raise awareness with respect to individual cases of Iranian dissidents and prisoners of conscience, as appropriate and if requested by the dissidents or prisoners themselves or their families.

# TITLE V—MISCELLANEOUS

22 USC 8771.

**SEC. 501. EXCLUSION OF CITIZENS OF IRAN SEEKING EDUCATION RELATING TO THE NUCLEAR AND ENERGY SECTORS OF IRAN.**

Determination.

(a) IN GENERAL.—The Secretary of State shall deny a visa to, and the Secretary of Homeland Security shall exclude from the United States, any alien who is a citizen of Iran that the Secretary of State determines seeks to enter the United States to participate in coursework at an institution of higher education (as defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a))) to prepare the alien for a career in the energy sector of Iran or in nuclear science or nuclear engineering or a related field in Iran.

(b) APPLICABILITY.—Subsection (a) applies with respect to visa applications filed on or after the date of the enactment of this Act.

22 USC 8772.

**SEC. 502. INTERESTS IN CERTAIN FINANCIAL ASSETS OF IRAN.**

(a) INTERESTS IN BLOCKED ASSETS.—

(1) IN GENERAL.—Subject to paragraph (2), notwithstanding any other provision of law, including any provision of law relating to sovereign immunity, and preempting any inconsistent provision of State law, a financial asset that is—

(A) held in the United States for a foreign securities intermediary doing business in the United States;

(B) a blocked asset (whether or not subsequently unblocked) that is property described in subsection (b); and

(C) equal in value to a financial asset of Iran, including an asset of the central bank or monetary authority of the Government of Iran or any agency or instrumentality of that Government, that such foreign securities intermediary or a related intermediary holds abroad,

shall be subject to execution or attachment in aid of execution in order to satisfy any judgment to the extent of any compensatory damages awarded against Iran for damages for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, or hostage-taking, or the provision of material support or resources for such an act.

(2) COURT DETERMINATION REQUIRED.—In order to ensure that Iran is held accountable for paying the judgments described in paragraph (1) and in furtherance of the broader goals of this Act to sanction Iran, prior to an award turning over any asset pursuant to execution or attachment in aid of execution with respect to any judgments against Iran described in paragraph (1), the court shall determine whether Iran holds equitable title to, or the beneficial interest in, the

PX408

PUBLIC LAW 112–158—AUG. 10, 2012        126 STAT. 1259

assets described in subsection (b) and that no other person possesses a constitutionally protected interest in the assets described in subsection (b) under the Fifth Amendment to the Constitution of the United States. To the extent the court determines that a person other than Iran holds—

(A) equitable title to, or a beneficial interest in, the assets described in subsection (b) (excluding a custodial interest of a foreign securities intermediary or a related intermediary that holds the assets abroad for the benefit of Iran); or

(B) a constitutionally protected interest in the assets described in subsection (b),

such assets shall be available only for execution or attachment in aid of execution to the extent of Iran's equitable title or beneficial interest therein and to the extent such execution or attachment does not infringe upon such constitutionally protected interest.

(b) FINANCIAL ASSETS DESCRIBED.—The financial assets described in this section are the financial assets that are identified in and the subject of proceedings in the United States District Court for the Southern District of New York in Peterson et al. v. Islamic Republic of Iran et al., Case No. 10 Civ. 4518 (BSJ) (GWG), that were restrained by restraining notices and levies secured by the plaintiffs in those proceedings, as modified by court order dated June 27, 2008, and extended by court orders dated June 23, 2009, May 10, 2010, and June 11, 2010, so long as such assets remain restrained by court order.

(c) RULES OF CONSTRUCTION.—Nothing in this section shall be construed—

(1) to affect the availability, or lack thereof, of a right to satisfy a judgment in any other action against a terrorist party in any proceedings other than those proceedings referred to in subsection (b); or

(2) to apply to assets other than the assets described in subsection (b), or to preempt State law, including the Uniform Commercial Code, except as expressly provided in subsection (a)(1).

(d) DEFINITIONS.—In this section:

(1) BLOCKED ASSET.—The term "blocked asset"—

(A) means any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under section 202 or 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701 and 1702); and

(B) does not include property that—

(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of the license has been specifically required by a provision of law other than the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.); or

(ii) is property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges

and immunities under the laws of the United States, and is being used exclusively for diplomatic or consular purposes.

(2) FINANCIAL ASSET; SECURITIES INTERMEDIARY.—The terms "financial asset" and "securities intermediary" have the meanings given those terms in the Uniform Commercial Code, but the former includes cash.

(3) IRAN.—The term "Iran" means the Government of Iran, including the central bank or monetary authority of that Government and any agency or instrumentality of that Government.

(4) PERSON.—

(A) IN GENERAL.—The term "person" means an individual or entity.

(B) ENTITY.—The term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization.

(5) TERRORIST PARTY.—The term "terrorist party" has the meaning given that term in section 201(d) of the Terrorism Risk Insurance Act of 2002 (28 U.S.C. 1610 note).

(6) UNITED STATES.—The term "United States" includes all territory and waters, continental, or insular, subject to the jurisdiction of the United States.

(e) TECHNICAL CHANGES TO THE FOREIGN SOVEREIGN IMMUNITIES ACT.—

(1) TITLE 28, UNITED STATES CODE.—Section 1610 of title 28, United States Code, is amended—

(A) in subsection (a)(7), by inserting after "section 1605A" the following: "or section 1605(a)(7) (as such section was in effect on January 27, 2008)"; and

(B) in subsection (b)—

(i) in paragraph (2)—

(I) by striking "(5), 1605(b), or 1605A" and inserting "(5) or 1605(b)"; and

(II) by striking the period at the end and inserting ", or"; and

(ii) by adding after paragraph (2) the following: "(3) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved in the act upon which the claim is based.".

(2) TERRORISM RISK INSURANCE ACT OF 2002.—Section 201(a) of the Terrorism Risk Insurance Act of 2002 (28 U.S.C. 1610 note) is amended by striking "section 1605(a)(7)" and inserting "section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008)".

**SEC. 503. TECHNICAL CORRECTIONS TO SECTION 1245 OF THE NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2012.**

(a) EXCEPTION FOR SALES OF AGRICULTURAL COMMODITIES.—

(1) IN GENERAL.—Section 1245(d)(2) of the National Defense Authorization Act for Fiscal Year 2012 (22 U.S.C. 8513a(d)(2)) is amended—

PX408

(A) in the paragraph heading, by inserting "AGRICUL-TURAL COMMODITIES," after "SALES OF"; and

(B) in the text, by inserting "agricultural commodities," after "sale of".

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall take effect as if included in the National Defense Authorization Act for Fiscal Year 2012 (Public Law 112–81; 125 Stat. 1298).

22 USC 8513a note.

(b) REPORT OF ENERGY INFORMATION ADMINISTRATION.—

(1) IN GENERAL.—Section 1245(d)(4)(A) of the National Defense Authorization Act for Fiscal Year 2012 (22 U.S.C. 8513a(d)(4)(A)) is amended—

(A) by striking "60 days after the date of the enactment of this Act, and every 60 days thereafter" and inserting "October 25, 2012, and the last Thursday of every other month thereafter"; and

(B) by striking "60-day period" and inserting "2-month period".

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall take effect on September 1, 2012.

22 USC 8513a note.

## SEC. 504. EXPANSION OF SANCTIONS UNDER SECTION 1245 OF THE NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2012.

(a) IN GENERAL.—Section 1245 of the National Defense Authorization Act for Fiscal Year 2012 (22 U.S.C. 8513a), as amended by section 503, is further amended—

(1) in subsection (d)—

(A) in paragraph (3), by striking "a foreign financial institution owned or controlled by the government of a foreign country, including"; and

(B) in paragraph (4)(D)—

(i) by striking "Sanctions imposed" and inserting the following:

"(i) IN GENERAL.—Sanctions imposed";

(ii) in clause (i), as designated by clause (i) of this subparagraph—

(I) by striking "a foreign financial institution" and inserting "a financial transaction described in clause (ii) conducted or facilitated by a foreign financial institution";

(II) by striking "institution has significantly" and inserting "institution—

"(I) has significantly reduced";

(III) by striking the period at the end and inserting "; or"; and

(IV) by adding at the end the following:

"(II) in the case of a country that has pre-viously received an exception under this subpara-graph, has, after receiving the exception, reduced its crude oil purchases from Iran to zero."; and

(iii) by adding at the end the following:

"(ii) FINANCIAL TRANSACTIONS DESCRIBED.—A financial transaction conducted or facilitated by a for-eign financial institution is described in this clause if—

126 STAT. 1262        PUBLIC LAW 112–158—AUG. 10, 2012

"(I) the financial transaction is only for trade in goods or services between the country with primary jurisdiction over the foreign financial institution and Iran; and

"(II) any funds owed to Iran as a result of such trade are credited to an account located in the country with primary jurisdiction over the foreign financial institution.";

(2) in subsection (h)—

(A) by redesignating paragraph (3) as paragraph (4); and

(B) by inserting after paragraph (2) the following:

Definition.

"(3) SIGNIFICANT REDUCTIONS.—The terms 'reduce significantly', 'significant reduction', and 'significantly reduced', with respect to purchases from Iran of petroleum and petroleum products, include a reduction in such purchases in terms of price or volume toward a complete cessation of such purchases."; and

(3) by adding at the end the following:

"(i) TERMINATION.—The provisions of this section shall terminate on the date that is 30 days after the date on which the President submits to Congress the certification described in section 401(a) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8551(a)).".

Applicability.
22 USC 8513a
note.

(b) EFFECTIVE DATE.—The amendments made by paragraphs (1) and (2) of subsection (a) shall apply with respect to financial transactions conducted or facilitated on or after the date that is 180 days after the date of the enactment of this Act.

**SEC. 505. REPORTS ON NATURAL GAS EXPORTS FROM IRAN.**

(a) REPORT BY ENERGY INFORMATION ADMINISTRATION.—Not later than 60 days after the date of the enactment of this Act, the Administrator of the Energy Information Administration shall submit to the President and the appropriate congressional committees a report on the natural gas sector of Iran that includes—

(1) an assessment of exports of natural gas from Iran;

(2) an identification of the countries that purchase the most natural gas from Iran;

(3) an assessment of alternative supplies of natural gas available to those countries;

(4) an assessment of the impact a reduction in exports of natural gas from Iran would have on global natural gas supplies and the price of natural gas, especially in countries identified under paragraph (2); and

(5) such other information as the Administrator considers appropriate.

(b) REPORT BY PRESIDENT.—

(1) IN GENERAL.—Not later than 60 days after receiving the report required by subsection (a), the President shall, relying on information in that report, submit to the appropriate congressional committees a report that includes—

(A) an assessment of—

(i) the extent to which revenues from exports of natural gas from Iran are still enriching the Government of Iran;

(ii) whether a sanctions regime similar to the sanctions regime imposed with respect to purchases of

PX408

petroleum and petroleum products from Iran pursuant to section 1245 of the National Defense Authorization Act for Fiscal Year 2012, as amended by sections 503 and 504, or other measures could be applied effectively to exports of natural gas from Iran;

(iii) the geostrategic implications of a reduction in exports of natural gas from Iran, including the impact of such a reduction on the countries identified under subsection (a)(2);

(iv) alternative supplies of natural gas available to those countries; and

(v) the impact a reduction in exports of natural gas from Iran would have on global natural gas supplies and the price of natural gas and the impact, if any, on swap arrangements for natural gas in place between Iran and neighboring countries; and

(B) specific recommendations with respect to measures designed to limit the revenue received by the Government of Iran from exports of natural gas; and

(C) any other information the President considers appropriate.

(2) FORM OF REPORT.—Each report required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

**SEC. 506. REPORT ON MEMBERSHIP OF IRAN IN INTERNATIONAL ORGANIZATIONS.**

22 USC 8773.

Not later than 180 days after the date of the enactment of this Act, and not later than September 1 of each year thereafter, the Secretary of State shall submit to the appropriate congressional committees a report listing the international organizations of which Iran is a member and detailing the amount that the United States contributes to each such organization on an annual basis.

**SEC. 507. SENSE OF CONGRESS ON EXPORTATION OF GOODS, SERVICES, AND TECHNOLOGIES FOR AIRCRAFT PRODUCED IN THE UNITED STATES.**

It is the sense of Congress that licenses to export or reexport goods, services, or technologies for aircraft produced in the United States should be provided only in situations in which such licenses are truly essential and in a manner consistent with the laws and foreign policy goals of the United States.

# TITLE VI—GENERAL PROVISIONS

**SEC. 601. IMPLEMENTATION; PENALTIES.**

22 USC 8781.

(a) IMPLEMENTATION.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) to carry out—

(1) sections 211, 212, 213, 217, 218, 220, 312, and 411, subtitle A of title III, and title VII;

(2) section 104A of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as added by section 312; and

PX408

126 STAT. 1264          PUBLIC LAW 112–158—AUG. 10, 2012

(3) sections 105A and 105B of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as added by subtitle A of title IV.

(b) PENALTIES.—

(1) IN GENERAL.—The penalties provided for in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) shall apply to a person that violates, attempts to violate, conspires to violate, or causes a violation of a provision specified in paragraph (2) of this subsection, or an order or regulation prescribed under such a provision, to the same extent that such penalties apply to a person that commits an unlawful act described in section 206(a) of that Act.

(2) PROVISIONS SPECIFIED.—The provisions specified in this paragraph are the following:

(A) Sections 211, 212, 213, and 220, subtitle A of title III, and title VII.

(B) Sections 105A and 105B of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as added by subtitle A of title IV.

22 USC 8782.    **SEC. 602. APPLICABILITY TO CERTAIN INTELLIGENCE ACTIVITIES.**

Nothing in this Act or the amendments made by this Act shall apply to the authorized intelligence activities of the United States.

22 USC 8783.    **SEC. 603. APPLICABILITY TO CERTAIN NATURAL GAS PROJECTS.**

(a) EXCEPTION FOR CERTAIN NATURAL GAS PROJECTS.—Nothing in this Act or the amendments made by this Act shall apply to any activity relating to a project—

(1) for the development of natural gas and the construction and operation of a pipeline to transport natural gas from Azerbaijan to Turkey and Europe;

(2) that provides to Turkey and countries in Europe energy security and energy independence from the Government of the Russian Federation and other governments with jurisdiction over persons subject to sanctions imposed under this Act or amendments made by this Act; and

(3) that was initiated before the date of the enactment of this Act pursuant to a production-sharing agreement, or an ancillary agreement necessary to further a production-sharing agreement, entered into with, or a license granted by, the government of a country other than Iran before such date of enactment.

(b) TERMINATION OF EXCEPTION.—

Certification.    (1) IN GENERAL.—The exception under subsection (a) shall not apply with respect to a project described in that subsection on or after the date on which the President certifies to the appropriate congressional committees that—

(A) the percentage of the equity interest in the project held by or on behalf of an entity described in paragraph (2) has increased relative to the percentage of the equity interest in the project held by or on behalf of such an entity on January 1, 2002; or

(B) an entity described in paragraph (2) has assumed an operational role in the project.

(2) ENTITY DESCRIBED.—An entity described in this paragraph is—

(A) an entity—
    (i) owned or controlled by the Government of Iran or identified under section 560.304 of title 31, Code of Federal Regulations (relating to the definition of the Government of Iran); or
    (ii) organized under the laws of Iran or with the participation or approval of the Government of Iran;
(B) an entity owned or controlled by an entity described in subparagraph (A); or
(C) a successor entity to an entity described in subparagraph (A).

**SEC. 604. RULE OF CONSTRUCTION WITH RESPECT TO USE OF FORCE AGAINST IRAN AND SYRIA.**

22 USC 8784.

Nothing in this Act or the amendments made by this Act shall be construed as a declaration of war or an authorization of the use of force against Iran or Syria.

**SEC. 605. TERMINATION.**

22 USC 8785.

(a) IN GENERAL.—The provisions of sections 211, 212, 213, 218, 220, 221, and 501, title I, and subtitle A of title III shall terminate on the date that is 30 days after the date on which the President makes the certification described in section 401(a) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8551(a)).

(b) AMENDMENT TO TERMINATION DATE OF COMPREHENSIVE IRAN SANCTIONS, ACCOUNTABILITY, AND DIVESTMENT ACT OF 2010.— Section 401(a)(2) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8551(a)(2)) is amended by inserting ", and verifiably dismantled its," after "development of".

# TITLE VII—SANCTIONS WITH RESPECT TO HUMAN RIGHTS ABUSES IN SYRIA

Syria Human Rights Accountability Act of 2012. President. Determinations. 22 USC 8701 note.

**SEC. 701. SHORT TITLE.**

This title may be cited as the "Syria Human Rights Accountability Act of 2012".

**SEC. 702. IMPOSITION OF SANCTIONS WITH RESPECT TO CERTAIN PERSONS WHO ARE RESPONSIBLE FOR OR COMPLICIT IN HUMAN RIGHTS ABUSES COMMITTED AGAINST CITIZENS OF SYRIA OR THEIR FAMILY MEMBERS.**

22 USC 8791.

(a) IN GENERAL.—The President shall impose sanctions described in subsection (c) with respect to each person on the list required by subsection (b).

(b) LIST OF PERSONS WHO ARE RESPONSIBLE FOR OR COMPLICIT IN CERTAIN HUMAN RIGHTS ABUSES.—

(1) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, the President shall submit to the appropriate congressional committees a list of persons who are officials of the Government of Syria or persons acting on behalf of that Government that the President determines, based on credible evidence, are responsible for or complicit in, or responsible for ordering, controlling, or otherwise directing, the commission of serious human rights abuses against citizens

Deadline.

126 STAT. 1266        PUBLIC LAW 112–158—AUG. 10, 2012

of Syria or their family members, regardless of whether such abuses occurred in Syria.

(2) UPDATES OF LIST.—The President shall submit to the appropriate congressional committees an updated list under paragraph (1)—

Deadlines.

(A) not later than 300 days after the date of the enactment of this Act and every 180 days thereafter; and

(B) as new information becomes available.

(3) FORM OF REPORT; PUBLIC AVAILABILITY.—

(A) FORM.—The list required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

Web posting.

(B) PUBLIC AVAILABILITY.—The unclassified portion of the list required by paragraph (1) shall be made available to the public and posted on the websites of the Department of the Treasury and the Department of State.

(4) CONSIDERATION OF DATA FROM OTHER COUNTRIES AND NONGOVERNMENTAL ORGANIZATIONS.—In preparing the list required by paragraph (1), the President shall consider credible data already obtained by other countries and nongovernmental organizations, including organizations in Syria, that monitor the human rights abuses of the Government of Syria.

(c) SANCTIONS DESCRIBED.—The sanctions described in this subsection are sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), including blocking of property and restrictions or prohibitions on financial transactions and the exportation of property, subject to such regulations as the President may prescribe.

22 USC 8792.

**SEC. 703. IMPOSITION OF SANCTIONS WITH RESPECT TO THE TRANSFER OF GOODS OR TECHNOLOGIES TO SYRIA THAT ARE LIKELY TO BE USED TO COMMIT HUMAN RIGHTS ABUSES.**

(a) IN GENERAL.—The President shall impose sanctions described in section 702(c) with respect to—

(1) each person on the list required by subsection (b); and

(2) any person that—

(A) is a successor entity to a person on the list;

(B) owns or controls a person on the list, if the person that owns or controls the person on the list had actual knowledge or should have known that the person on the list engaged in the activity described in subsection (b)(2) for which the person was included in the list; or

(C) is owned or controlled by, or under common ownership or control with, the person on the list, if the person owned or controlled by, or under common ownership or control with (as the case may be), the person on the list knowingly engaged in the activity described in subsection (b)(2) for which the person was included in the list.

(b) LIST.—

Deadline.

(1) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, the President shall submit to the appropriate congressional committees a list of persons that the President determines have knowingly engaged in an activity described in paragraph (2) on or after such date of enactment.

(2) ACTIVITY DESCRIBED.—

PX408

PUBLIC LAW 112–158—AUG. 10, 2012        126 STAT. 1267

(A) IN GENERAL.—A person engages in an activity described in this paragraph if the person—

(i) transfers, or facilitates the transfer of, goods or technologies described in subparagraph (C) to Syria; or

(ii) provides services with respect to goods or technologies described in subparagraph (C) after such goods or technologies are transferred to Syria.

(B) APPLICABILITY TO CONTRACTS AND OTHER AGREEMENTS.—A person engages in an activity described in subparagraph (A) without regard to whether the activity is carried out pursuant to a contract or other agreement entered into before, on, or after the date of the enactment of this Act.

(C) GOODS OR TECHNOLOGIES DESCRIBED.—Goods or technologies described in this subparagraph are goods or technologies that the President determines are likely to be used by the Government of Syria or any of its agencies or instrumentalities to commit human rights abuses against the people of Syria, including—

(i) firearms or ammunition (as those terms are defined in section 921 of title 18, United States Code), rubber bullets, police batons, pepper or chemical sprays, stun grenades, electroshock weapons, tear gas, water cannons, or surveillance technology; or

(ii) sensitive technology.

(D) SENSITIVE TECHNOLOGY DEFINED.—

(i) IN GENERAL.—For purposes of subparagraph (C), the term "sensitive technology" means hardware, software, telecommunications equipment, or any other technology, that the President determines is to be used specifically—

(I) to restrict the free flow of unbiased information in Syria; or

(II) to disrupt, monitor, or otherwise restrict speech of the people of Syria.

(ii) EXCEPTION.—The term "sensitive technology" does not include information or informational materials the exportation of which the President does not have the authority to regulate or prohibit pursuant to section 203(b)(3) of the International Emergency Economic Powers Act (50 U.S.C. 1702(b)(3)).

(3) SPECIAL RULE TO ALLOW FOR TERMINATION OF SANCTIONABLE ACTIVITY.—The President shall not be required to include a person on the list required by paragraph (1) if the President certifies in writing to the appropriate congressional committees that—

Certification.

(A) the person is no longer engaging in, or has taken significant verifiable steps toward stopping, the activity described in paragraph (2) for which the President would otherwise have included the person on the list; and

(B) the President has received reliable assurances that the person will not knowingly engage in any activity described in paragraph (2) in the future.

(4) UPDATES OF LIST.—The President shall submit to the appropriate congressional committees an updated list under paragraph (1)—

126 STAT. 1268          PUBLIC LAW 112–158—AUG. 10, 2012

Deadlines.

(A) not later than 300 days after the date of the enactment of this Act and every 180 days thereafter; and

(B) as new information becomes available.

(5) FORM OF REPORT; PUBLIC AVAILABILITY.—

(A) FORM.—The list required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

Web posting.

(B) PUBLIC AVAILABILITY.—The unclassified portion of the list required by paragraph (1) shall be made available to the public and posted on the websites of the Department of the Treasury and the Department of State.

22 USC 8793.

**SEC. 704. IMPOSITION OF SANCTIONS WITH RESPECT TO PERSONS WHO ENGAGE IN CENSORSHIP OR OTHER FORMS OF REPRESSION IN SYRIA.**

(a) IN GENERAL.—The President shall impose sanctions described in section 702(c) with respect to each person on the list required by subsection (b).

(b) LIST OF PERSONS WHO ENGAGE IN CENSORSHIP.—

Deadline.

(1) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, the President shall submit to the appropriate congressional committees a list of persons that the President determines have engaged in censorship, or activities relating to censorship, in a manner that prohibits, limits, or penalizes the legitimate exercise of freedom of expression by citizens of Syria.

(2) UPDATES OF LIST.—The President shall submit to the appropriate congressional committees an updated list under paragraph (1)—

Deadlines.

(A) not later than 300 days after the date of the enactment of this Act and every 180 days thereafter; and

(B) as new information becomes available.

(3) FORM OF REPORT; PUBLIC AVAILABILITY.—

(A) FORM.—The list required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

Web posting.

(B) PUBLIC AVAILABILITY.—The unclassified portion of the list required by paragraph (1) shall be made available to the public and posted on the websites of the Department of the Treasury and the Department of State.

22 USC 8794.

**SEC. 705. WAIVER.**

The President may waive the requirement to include a person on a list required by section 702, 703, or 704 or to impose sanctions pursuant to any such section if the President—

(1) determines that such a waiver is in the national security interests of the United States; and

Reports.

(2) submits to the appropriate congressional committees a report on the reasons for that determination.

22 USC 8795.

**SEC. 706. TERMINATION.**

(a) IN GENERAL.—The provisions of this title and any sanctions imposed pursuant to this title shall terminate on the date on which the President submits to the appropriate congressional committees—

(1) the certification described in subsection (b); and

Certification.

(2) a certification that—

(A) the Government of Syria is democratically elected and representative of the people of Syria; or

(B) a legitimate transitional government of Syria is in place.

(b) CERTIFICATION DESCRIBED.—A certification described in this subsection is a certification by the President that the Government of Syria—

(1) has unconditionally released all political prisoners;

(2) has ceased its practices of violence, unlawful detention, torture, and abuse of citizens of Syria engaged in peaceful political activity;

(3) has ceased its practice of procuring sensitive technology designed to restrict the free flow of unbiased information in Syria, or to disrupt, monitor, or otherwise restrict the right of citizens of Syria to freedom of expression;

(4) has ceased providing support for foreign terrorist organizations and no longer allows such organizations, including Hamas, Hezbollah, and Palestinian Islamic Jihad, to maintain facilities in territory under the control of the Government of Syria; and

(5) has ceased the development and deployment of medium- and long-range surface-to-surface ballistic missiles;

(6) is not pursuing or engaged in the research, development, acquisition, production, transfer, or deployment of biological, chemical, or nuclear weapons, and has provided credible assurances that it will not engage in such activities in the future; and

(7) has agreed to allow the United Nations and other international observers to verify that the Government of Syria is not engaging in such activities and to assess the credibility of the assurances provided by that Government.

(c) SUSPENSION OF SANCTIONS AFTER ELECTION OF DEMOCRATIC GOVERNMENT.—If the President submits to the appropriate congressional committees the certification described in subsection (a)(2), the President may suspend the provisions of this title and any sanctions imposed under this title for not more than 180 days to allow time for a certification described in subsection (b) to be submitted.

Approved August 10, 2012.

---

LEGISLATIVE HISTORY—H.R. 1905:
CONGRESSIONAL RECORD:
    Vol. 157 (2011): Dec. 13, 14, considered and passed House.
    Vol. 158 (2012): May 21, considered and passed Senate, amended.
        Aug. 1, House concurred in Senate amendment with an
        amendment. Senate concurred in House amendment.

○

PX408

PX409



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

MUL-615225

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made by and between the U.S. Department of the Treasury's Office of Foreign Assets Control and HSBC Holdings plc ("HSBC Holdings").

### I.    PARTIES

1.    The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic sanctions against targeted foreign countries, regimes, terrorists, international narcotics traffickers, and persons engaged in activities related to the proliferation of weapons of mass destruction, among others. OFAC acts under Presidential national emergency authorities, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction.

2.    HSBC Holdings is a public limited company organized under the laws of the United Kingdom and directly or indirectly owns, inter alia, HSBC Bank plc ("HBEU"), a financial institution registered under the laws of England and Wales; HSBC Bank Middle East Limited ("HBME"), a financial institution registered under the laws of the Jersey Channel Islands; The Hongkong and Shanghai Banking Corporation Ltd ("HBAP"), a financial institution organized under the laws of Hong Kong; and HSBC Bank USA, N.A. ("HBUS"), a national bank chartered under the laws of the United States (collectively, HSBC Holdings and its subsidiaries, including HBEU, HBME, HBAP, and HBUS, are referred to herein as "HSBC Group").

### II.    FACTUAL STATEMENT

3.    In January 2001, HBEU approached HBUS with a proposal to clear U.S. dollar transactions for Bank Melli London ("Bank Melli") through HBEU's correspondent account with HBUS by utilizing Society for Worldwide Interbank Financial Telecommunication ("SWIFT") MT 202 cover payments that would not reference Bank Melli. In February 2001, HBUS concluded that the proposed transactions appeared to comply with OFAC regulations that authorized U.S. depository institutions to process certain transactions for the direct or indirect benefit of persons in Iran or the Government of Iran where the transactions involved transfers from one third country's account at a domestic bank to another third country's account at a domestic bank ("U-turn" transactions). A June 2001 email from an HBEU relationship manager to members of HBUS Compliance stated:

> Once the proposition goes live we have instructed Bank Melli to alter the format of [its] payments to achieve straight through [processing]… we have further asked them to only put 'One of our clients' in field 52, thus removing the chance of them inputting an 'Iranian referenced' customer name, that causes fall out of the cover payment sent to HBUS and a breach of OFAC regulations.

**PX409**

4.      In a letter drafted in April 2001, an HBEU Business Development Manager explained to Bank Melli how to send payments to HBEU in a manner that would allow HBEU to process its payments successfully through HBUS.

> The key is to always populate field 52… this means that the outgoing payment instruction from HSBC will not quote "Bank Melli" as sender – just HSBC London and whatever is in field 52.  This then negates the need to quote "DO NOT MENTION OUR NAME IN NEW YORK" in field 72 (emphasis in original).

5.      By July 2001, several HBUS compliance, payments, and business managers, as well as HSBC Group's Compliance head,[1] were aware that HBEU was discussing with Bank Melli how to structure Iranian-related payments to be processed through HBUS.  Although HBUS' head of Compliance warned HSBC Group's head of Compliance that OFAC might view HBEU's formatting instructions to Bank Melli as a willful disregard or evasion of U.S. sanctions, and that the non-transparent nature of the payment messages could make it impossible for either HBEU or HBUS to confirm that any payment would be permissible, neither HSBC Group nor HBEU implemented processes to ensure the Bank Melli payments processed to or through HBUS were authorized or exempt pursuant to U.S. sanctions regulations.  HBUS proposed that HBEU address these compliance concerns by only processing Bank Melli payments as serial MT 103 messages.

6.      In August 2003, the head of HSBC Group Audit sent an email informing the head of HSBC Group Compliance about HBEU's processing of Iranian transactions to HBUS with 'selves' noted as the ordering party so the payments would not be stopped for review.  The head of HSBC Group Compliance ordered an investigation into the practice and, in October 2003, a senior Group Compliance official found that HBEU was offering U.S. dollar clearing services to six Iranian banks, and that it had "been manually intervening in the processing of Iranian bank payment instructions … to prevent … the subsequent declaration to OFAC (and possible freezing) of the funds."  In an email sent the next day, a senior payments official objected to the notion that HBEU's non-transparent practices were not known within HBEU, writing:  "I have been alarmed by recent inferences that Payment Services have been amending the Iranian banks' payments without the knowledge or consent of [HBEU] Compliance."  He further stated that, although HBEU Risk Management Services would be controlling HBEU's then-new interdiction software, the Payments Department had "been requested to find ways to circumnavigate our own and other institutions' compliance filters."

7.      By September 2004, the HBEU Chief Executive Officer and HSBC Group Compliance management had approved a proposal to send all Iranian payments as serial payments – as HBUS had previously proposed in 2001 with respect to Bank Melli – allowing for due diligence to be conducted by HBUS to prevent violations of U.S. sanctions regulations.  In December 2004, HBUS agreed to the proposal provided, *inter alia*, that all transactions would be fully transparent serial payments, and HBEU would agree not to alter any payment instructions.  Despite agreement to this proposal by HSBC Group Compliance, HBEU, and HBUS, this directive was not carried out.

---

[1] Head Office functions reside at HSBC Holdings and are described herein as functions of "HSBC Group."

8.    In July 2005, HSBC Group Compliance issued a group-wide policy for the first time prohibiting all HSBC Group affiliates from processing U.S. dollar payments that would be prohibited by OFAC regulations. However, the policy allowed the continued use of cover payments, including for Iranian U-turn transactions which were to be processed by a specialized compliance review team that checked payments for compliance with U.S. sanctions. The policy failed to stop all occurrences of OFAC violations. In August 2006 the head of Group Compliance noted, "I have to say that a number of potential payments resulting from trade transactions from other Group offices that [HSBC Group senior compliance official] and I have looked at since the issuance of the GCL [Group Compliance Letter] are not in our view U-turn compliant."

9.    In April 2006, HSBC Group Compliance issued a GCL prohibiting the use of cover payments to process OFAC-sensitive payments through the United States, and requiring all commercial U.S. dollar transactions sent through HBUS to be executed as fully transparent serial payment messages, with full disclosure of all originators and beneficiaries. The GCL made an exception to this policy, however, which allowed the use of cover payments for Iranian transactions, provided such payments complied with the U-turn authorization and were processed by the specialized compliance review team. Several HSBC Group affiliates requested and received dispensation from the April 2006 effective date, with the understanding that any Iran-related payments would be sent to the specialized review team to check for U-turn compliance consistent with the GCL. HSBC Group Compliance first provided dispensation to HBEU until October 31, 2006; the dispensation was ultimately extended until November 2007.

10.    On October 25, 2006, HSBC Group issued a GCL directing all HSBC Group affiliates to immediately stop processing Iranian U.S. dollar payments, with an exception for permissible U-turn payments made in connection with any existing legally binding contractual obligations. This GCL provided that, outside of the exception for those obligations, HSBC Group affiliates could no longer use the U-turn exception for Iranian payments, two years before OFAC's elimination of the U-turn exception. HSBC Group affiliates, however, continued to maintain several existing Iranian relationships despite the implementation of the GCL. In June 2007, as a result of a meeting between a senior U.S. Department of the Treasury official and the HSBC Group Compliance head, the HBME Deputy Chairman and HSBC head of Group Compliance agreed that HSBC Group should immediately end its Iranian relationships. On September 24, 2007, HSBC Group Compliance issued another GCL announcing that the bank would exit all Iranian business, and directed all account relationships for Iranian banks to be closed as soon as possible, with a hard deadline of November 30, 2007.

11.    HSBC Group affiliates also processed transactions involving Burma, Cuba, Libya, and Sudan through the United States during the review period. Information provided to OFAC indicates that HSBC Group affiliates sent Sudanese payments through the United States without disclosing the sanctioned person or location in payment messages in a similar manner to the Iranian payments described above. In addition, although multiple HSBC Group affiliate locations utilized cover payments as the default method of payment processing during this time period, several managers appear to have been aware that the use of these message types would result in the omission of references to U.S.-sanctioned persons or locations that would otherwise cause payments to be stopped by financial institutions in the United States.

12.     While the July 2005 GCL appears to have been effective at slowing the number of transactions processed to or through the United States in apparent violation of the Burmese, Cuban, and Sudanese sanctions programs, HSBC Group affiliates continued to use non-transparent cover payments on a periodic basis.  In September 2005, an HBEU senior payments official completed an analysis of transactions involving Burma, Cuba, or Sudan over a 10-day period that stopped in HBEU's OFAC interdiction software and were subsequently processed through the United States as bank-to-bank transfers in support of underlying MT-103s.  In a September 23, 2005, email to an HSBC Group Money Laundering Control Officer and HSBC Group senior compliance official, the HBEU senior compliance official stated:

> The issues surrounding Iran have overshadowed other OFAC payments recently, however, I can advise that we have not so far physically returned any USD payments involving Sudan, Cuba or Burma [since the issuance of the GCL].

13.     The HBEU senior payments official went on to seek guidance on two alternative responses to transactions stopped by HBEU's interdiction software.  The first alternative was to continue processing the transactions by routing the payments in a manner "that they are not frozen in the U.S."  The senior payments official stated:

> This will involve intelligent usage of the routing system but may perpetuate similar scenarios to those encountered with Iran (customer instructions saying Do no mention [sic] Sudan or routing which does not make it apparent that these are Sudanese payments).

The second alternative was to strictly apply the GCL and "return the payments unprocessed."  The HBEU senior payments official indicated his instinct was to use the second alternative and sought confirmation from HSBC Group Compliance before taking action.  HSBC, however, did not provide OFAC with any documentation indicating that the senior payments official received a response from HSBC Group Compliance.  By October 2005, HSBC Group affiliates appear to have informed the Sudanese, Cuban and Burmese banks that held correspondent accounts with HSBC Group affiliates of the new policy set forth in the July 2005 GCL.

14.     As recently as August 2007, payment processing audit trails indicate that HSBC Group employees may have facilitated, or were at least aware of, the re-submission of cancelled payments in U.S. dollars which initially contained references implicating U.S. sanctions.  For example, after a 2007 payment was cancelled because it contained a reference to Burma in the beneficiary field of the payment instructions, the remitter informed HBAP that it intended to make separate payment arrangements.  The payment was resubmitted and successfully processed 10 days later without the Burmese reference.  In another instance, also in 2007, an HBAP employee asked another employee to advise a client to cancel a payment that referenced "Myanmar" and remit the payment in another currency.  This payment was also subsequently resubmitted in U.S. dollars without the reference to "Myanmar."  In both instances HBAP managers were copied on the emails between the HBAP business and operations employees referencing the communication with customers.

PX409

15.     In November 2008, the head of HBUS Compliance completed an analysis of transactions from 2003 to 2008 that included, *inter alia*, payments HBUS processed due to the omission or obfuscation of U.S.-sanctions targets in Cuba and Sudan that should have been blocked pursuant to OFAC regulations.  The analysis revealed payments processed subsequent to, and in contradiction of, the July 2005 GCL.  In a November 6, 2008, email to the head of HSBC Group Compliance, the head of HBUS Compliance stated: "we have nonetheless received a fairly notable number of payments that suggest HSBC banks have not been consistently applying the [July 2005] GCL."

16.     OFAC has reason to believe that HSBC Group affiliates processed transactions in violation of Executive Orders and/or regulations promulgated pursuant to, *inter alia*, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, and the Trading With the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-44.

17.     From on or about March 18, 2004, to on or about December 7, 2007, HSBC Group affiliates processed 40 electronic funds transfers and trade finance transactions in which Cuba or a Cuban national had an interest, in the aggregate amount of $18,817,452, through financial institutions located in the United States in apparent violation of the prohibition against "[a] transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States,"  31 C.F.R. § 515.201.

18.     From on or about March 15, 2004, to on or about May 31, 2006, HSBC Group affiliates processed a combined 1,031 electronic funds transfers and trade finance transactions, in the aggregate amount of $136,736,510, through financial institutions located in the United States, in apparent violation of the prohibitions against (i) "the exportation or re-exportation of financial services to Burma, directly or indirectly, from the United States…," 31 C.F.R. § 537.202, and/or (ii) dealing in property and interests in property that "come within the United States" of persons listed in the Annex to Executive Order 13310, 31 C.F.R. § 537.201.

19.     From on or about March 15, 2004, to on or about August 21, 2007, HSBC Group affiliates processed a combined 1,036 electronic funds transfers and trade finance transactions, in the aggregate amount of $109,042,996, to the benefit of the Government of Sudan and/or persons in Sudan, through financial institutions located in the United States in apparent violation of the prohibitions against (i) the "exportation or re-exportation, directly or indirectly, to Sudan of…services from the United States," 31 C.F.R. § 538.205, and/or (ii) dealing in property and interests in property of the Government of Sudan that "come within the United States," 31 C.F.R. § 538.201.

20.     From on or about March 15, 2004, to on or about April 27, 2004, HSBC Group affiliates processed a combined 25 electronic funds transfers in the aggregate amount of $1,172,363, to the benefit of the Government of Libya and/or persons in Libya, through financial institutions located in the United States in apparent violation of the now-repealed prohibition against the exportation of "…goods, technology … or services … to Libya from the United States…," 31 C.F.R. § 550.202.

PX409

21.     From on or about March 19, 2004, to on or about June 15, 2010, HSBC Group affiliates processed a combined 203 electronic funds transfers and trade finance transactions in the aggregate amount of $164,308,904, for the benefit of the Government of Iran and/or persons in Iran, through a financial institution located in the United States in apparent violation of the prohibition against the "exportation ..., directly or indirectly, from the United States ... of any ... services to Iran or the Government of Iran," 31 C.F.R. § 560.204.   This does not include the transactions covered by authorizations and exemptions (including the u-turn exemption) under 31 CFR Part 560.

22.     Separately and unrelated to the above matters, on May 24, 2006, the London branch of HBUS acted as a clearing bank in a book entry transfer of 32,000 ounces of gold bullion, valued at $20,560,000, for the ultimate benefit of Bank Markazi, Iran, in apparent violation of the prohibition against the "exportation ..., directly or indirectly, from the United States, ... of any ... services to Iran or the Government of Iran," 31 C.F.R. § 560.204.

23.     Separately and unrelated to the above matters, between July 30, 2008, and October 10, 2008, HBUS processed six electronic funds transfers in the aggregate amount of $35,418, in apparent violation of the prohibition against dealing in property and interests in property that "come within the United States" of any person designated pursuant to the Zimbabwe Sanctions Regulations, 31 C.F.R. § 542.201, and Executive Order 13469 of July 25, 2008.

24.     Separately and unrelated to the above matters, between August 3, 2007, and April 3, 2008, HBUS processed two electronic funds transfers in the aggregate amount of $15,610, in apparent violation of the prohibitions against (i) "the exportation or re-exportation of financial services to Burma, directly or indirectly, from the United States...," 31 C.F.R. § 537.202, and/or (ii) dealing in property and interests in property that "come within the United States" of persons listed in the Annex to Executive Order 13310, 31 C.F.R. § 537.201.

25.     Separately and unrelated to the above matters, on September 1, 2006, HBUS processed a $1,175,000 electronic funds transfer in apparent violation of the prohibitions against the "exportation or re-exportation, directly or indirectly, to Sudan of...services from the United States," 31 C.F.R. § 538.205.

26.     None of the alleged violations described above were voluntarily self-disclosed to OFAC within the meaning of OFAC's Economic Sanctions Enforcement Guidelines (the "Guidelines"), except for the May 24, 2006, alleged violation of the Iranian Transaction Regulations involving the transfer of 32,000 ounces of gold bullion described in paragraph 22, which was voluntarily self-disclosed to OFAC within the meaning of the Guidelines. *See* 31 C.F.R. part 501, App A.

27.     The apparent violations by HSBC Group affiliates described above undermined U.S. national security, foreign policy, and other objectives of U.S. sanctions programs.

28.     HSBC Group has taken remedial action including closing U.S. dollar accounts held by HSBC Group affiliates for Burmese, Cuban, and Sudanese banks; terminating all business and prohibiting new business with Iranian customers; closing its representative office in

Tehran; implementing new training programs; hiring a number of new compliance personnel; and enhancing filtering technology.

29.     HSBC Group provided substantial cooperation to OFAC by conducting an historic transaction review and providing a written admission that relevant transactions identified as a result appear to constitute violations; providing substantial, well organized information for OFAC's assessment; signing a tolling agreement with OFAC and subsequently agreeing to extend the agreement on multiple occasions; and, responding to multiple inquiries and requests for information.

30.     OFAC had not issued a penalty notice or Finding of Violation against HSBC Group in the five years preceding the alleged violations.

### III.     TERMS OF SETTLEMENT

IT IS HEREBY AGREED by OFAC and HSBC Holdings that:

31.     HSBC Group has terminated the conduct described in paragraphs 3 through 15 above and HSBC Group has put in place, and agreed to maintain, policies and procedures that prohibit, and are designed to minimize the risk of the recurrence of, similar conduct in the future.

32.     HSBC Group has also addressed the conduct described in paragraphs 22 through 25 above.

33.     HSBC Holdings agrees to provide OFAC with copies of all submissions to the Federal Reserve Bank of Chicago ("Reserve Bank"), in the same form provided to the Reserve Bank, pursuant to the Order to Cease and Desist Issued Upon Consent to HSBC Holdings on December 11, 2012, by the Board of Governors of the Federal Reserve System (Docket No. 12-062-B-FB) relating to the OFAC compliance review related thereto.  It is understood that the United Kingdom's Financial Services Authority ("FSA"), as the home country supervisor of HSBC Holdings, is assisting the Board of Governors in the supervision of its Order as permitted by the FSA's functions under the Financial Services and Markets Act 2000.

34.     Without this Agreement constituting an admission or denial by HSBC Group of any allegation made or implied by OFAC in connection with this matter, and solely for the purpose of settling this matter without a final agency finding that a violation has occurred, HSBC Holdings agrees to a settlement in the amount of $375,000,000 arising out of the alleged violations by HSBC Group of IEEPA, TWEA, the Executive Orders, and the Regulations referenced in this Agreement.  HSBC Holdings' obligation to pay such settlement amount to OFAC shall be satisfied by its payment of an equal amount in satisfaction of penalties assessed by U.S. federal or county agencies or regulators arising out of the same pattern of conduct.

35.     Should OFAC determine, in the reasonable exercise of its discretion, that HSBC Holdings has willfully and materially breached its obligations under paragraphs 33 or 34 of this Agreement, OFAC shall provide written notice to HSBC Holdings of the alleged breach and provide HSBC Holdings with 30 days from the date of HSBC Holdings' receipt of such notice,

PX409

or longer as determined by OFAC, to demonstrate that no willful and material breach has
occurred or that any breach has been cured.  In the event that OFAC determines that a willful and
material breach of this Agreement has occurred, OFAC will provide notice to HSBC Holdings of
its determination, and this Agreement shall be null and void, and the statute of limitations
applying to activity occurring on or after October 19, 2002, shall be deemed tolled until a date
180 days following HSBC Holdings' receipt of notice of OFAC's determination that a breach of
the Agreement has occurred.

36.     OFAC agrees that, as of the date that HSBC Holdings satisfies the obligations set
forth in paragraphs 33 through 34 above, OFAC will release and forever discharge HSBC Group
from any and all civil liability under the legal authorities that OFAC administers, in connection
with any and all violations arising from or related to the conduct disclosed during the course of
the investigation, including that described in paragraphs 3 through 15 above and the alleged
violations described in paragraphs 17 through 25 above.

37.     HSBC Holdings waives any claim by or on behalf of HSBC Holdings or HSBC
Group, whether asserted or unasserted, against OFAC, the U.S. Department of the Treasury,
and/or its officials and employees arising out of the facts giving rise to this Agreement, including
but not limited to OFAC's investigation of the alleged violations and any possible legal objection
to this Agreement at any future date.

## IV.     MISCELLANEOUS PROVISIONS

38.     The provisions of this Agreement shall not bar, estop, or otherwise prevent OFAC
from taking any other action affecting HSBC Group with respect to any and all violations not
arising from or related to the conduct described in paragraphs 3 through 15 above or violations
occurring after the dates of that conduct.  The provisions of this Agreement shall not bar, estop,
or otherwise prevent other U.S. federal, state, or county officials from taking any other action
affecting HSBC Group.

39.     Each provision of this Agreement shall remain effective and enforceable
according to the laws of the United States of America until stayed, modified, terminated, or
suspended by OFAC.

40.     No amendment to the provisions of this Agreement shall be effective unless
executed in writing by OFAC and by HSBC Holdings.

41.     The provisions of this Agreement shall be binding on HSBC Holdings and its
successors and assigns.  To the extent HSBC Holdings' compliance with this Agreement requires
it, HSBC Holdings agrees to use best efforts to ensure that all entities within HSBC Group
comply with the requirements and obligations set forth in this Agreement, to the full extent
permissible under locally applicable laws and regulations, and the instructions of local regulatory
agencies.

42.     No representations, either oral or written, except those provisions as set forth
herein, were made to induce any of the parties to agree to the provisions as set forth herein.

PX409

**MUL-615225**                                                                                     **Page 9 of 9**
**HSBC Holdings plc**

43.     This Agreement consists of 9 pages and expresses the complete understanding of
OFAC and HSBC Holdings regarding resolution of the alleged violations arising from or related
to the conduct described in paragraphs 3 through 15 above. No other agreements, oral or written,
exist between OFAC and HSBC Holdings regarding resolution of this matter.

44.     OFAC, in its sole discretion, may post on OFAC's website this entire Agreement
or the facts set forth in paragraphs 3 through 30 of this Agreement, including the identity of any
entity involved, the satisfied settlement amount, and a brief description of the alleged violations.
OFAC also may issue a press release including this information, and any other information it
deems appropriate in its sole discretion.

45.     Use of facsimile signatures shall not delay the approval and implementation of the
terms of this Agreement. In the event any party to this Agreement provides a facsimile
signature, the party shall substitute the facsimile with an original signature. The Agreement may
be signed in multiple counterparts, which together shall constitute the Agreement. The effective
date of the Agreement shall be the latest date of execution.

All communications regarding this Agreement shall be addressed to:

HSBC Holdings plc                           Office of Foreign Assets Control
8 Canada Square                             U.S. Department of the Treasury
London, E14 5HQ                             Attn. Sanctions Compliance & Evaluation
United Kingdom                              1500 Pennsylvania Avenue, N.W., Annex
                                            Washington, DC 20220

**AGREED:**

_M. M. Moses_
Signature                                   Adam J. Szubin
                                            Director
_MARC MOSES_                                Office of Foreign Assets Control
Printed name of HSBC Holdings'
Duly Authorized Representative

_GROUP CHIEF RISK OFFICER_                  DATED: _December 11, 2012_
Printed title of HSBC Holdings'
Duly Authorized Representative

DATED: _10 DECEMBER 2012_

PX409

PX412


Federal Register

Vol. 60, No. 16

Wednesday, January 25, 1995

# Presidential Documents

Title 3—

The President

Executive Order 12947 of January 23, 1995

## Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq*.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq*.), and section 301 of title 3, United States Code,

I, WILLIAM J. CLINTON, President of the United States of America, find that grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and hereby declare a national emergency to deal with that threat.

I hereby order:

**Section 1.** Except to the extent provided in section 203(b)(3) and (4) of IEEPA (50 U.S.C. 1702(b)(3) and (4)) and in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date: (a) all property and interests in property of:

(i) the persons listed in the Annex to this order;

(ii) foreign persons designated by the Secretary of State, in coordination with the Secretary of the Treasury and the Attorney General, because they are found:

(A) to have committed, or to pose a significant risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East peace process, or

(B) to assist in, sponsor, or provide financial, material, or technological support for, or services in support of, such acts of violence; and

(iii) persons determined by the Secretary of the Treasury, in coordination with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of, any of the foregoing persons, that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of United States persons, are blocked;

(b) any transaction or dealing by United States persons or within the United States in property or interests in property of the persons designated in or pursuant to this order is prohibited, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of such persons;

(c) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order, is prohibited.

**Sec. 2.** For the purposes of this order: (a) the term ''person'' means an individual or entity;

(b) the term ''entity'' means a partnership, association, corporation, or other organization, group, or subgroup;

PX412

(c) the term ''United States person'' means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States; and

(d) the term ''foreign person'' means any citizen or national of a foreign state (including any such individual who is also a citizen or national of the United States) or any entity not organized solely under the laws of the United States or existing solely in the United States, but does not include a foreign state.

**Sec. 3.** I hereby determine that the making of donations of the type specified in section 203(b)(2)(A) of IEEPA (50 U.S.C. 1702(b)(2)(A)) by United States persons to persons designated in or pursuant to this order would seriously impair my ability to deal with the national emergency declared in this order, and hereby prohibit such donations as provided by section 1 of this order.

**Sec. 4.** (a) The Secretary of the Treasury, in consultation with the Secretary of State and, as appropriate, the Attorney General, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

(b) Any investigation emanating from a possible violation of this order, or of any license, order, or regulation issued pursuant to this order, shall first be coordinated with the Federal Bureau of Investigation (FBI), and any matter involving evidence of a criminal violation shall be referred to the FBI for further investigation. The FBI shall timely notify the Department of the Treasury of any action it takes on such referrals.

**Sec. 5.** Nothing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**Sec. 6.** (a) This order is effective at 12:01 a.m., eastern standard time on January 24, 1995.

(b) This order shall be transmitted to the Congress and published in the **Federal Register**.

THE WHITE HOUSE,
*January 23, 1995.*

Billing code 3195–01–P

PX412

ANNEX

TERRORIST ORGANIZATIONS WHICH THREATEN TO DISRUPT THE MIDDLE EAST PEACE PROCESS

Abu Nidal Organization (ANO)
Democratic Front for the Liberation of Palestine (DFLP)
Hizballah
Islamic Gama'at (IG)
Islamic Resistance Movement (HAMAS)
Jihad
Kach
Kahane Chai
Palestinian Islamic Jihad-Shiqaqi faction (PIJ)
Palestine Liberation Front-Abu Abbas faction (PLF-Abu Abbas)
Popular Front for the Liberation of Palestine (PFLP)
Popular Front for the Liberation of Palestine-General Command (PFLP–GC)

[FR Doc. 95–2040
Filed 1–24–95; 10:10 am]
Billing code 4810–31–P

PX412