PX503

The Parliament of the Commonwealth of Australia

# Review of the re-listing of Ansar al-Sunna, JeM, LeJ, EIJ, IAA, AAA and IMU as terrorist organisations

**Parliamentary Joint Committee on Intelligence and Security**

June 2007
Canberra

PX503

© Commonwealth of Australia 2007

ISBN:

978-0-642-78932-7 (Printed version)

978-0-642-78933-4 (HTML version)

PX503

# **Contents**

Membership of the Committee ..................................................................................................... vii

Terms of reference .................................................................................................................... viii

List of recommendations ............................................................................................................. ix

**1   Introduction** ........................................................................................................ 1

**The Government's procedures** ............................................................................. 3

    **Procedural concerns** ......................................................................................... 3

    The nature of the information supplied to the Committee ............................................ 4

    Consultation within government ................................................................................... 5

    Community consultation .............................................................................................. 6

**2   The Listing** ......................................................................................................... 7

    **The criteria for listing an organisation** ................................................................. 7

    **The re-listing of Ansar al-Sunna (previously Ansar al-Islam)** ............................. 8

    Engagement in terrorism ............................................................................................ 8

    Ideology and links to other terrorist groups/networks .................................................. 9

    Links to Australia ...................................................................................................... 10

    Threat to Australian interests .................................................................................... 10

    Proscription by the UN or like-minded countries ....................................................... 10

    Engagement in peace/mediation processes ............................................................... 11

    **Jaish-e-Mohammad (JeM)** ................................................................................. 11

    Engagement in terrorism .......................................................................................... 11

PX503

Ideology and links to other terrorist groups/networks ................................................................ 12

Links to Australia ................................................................................................................................. 13

Threat to Australian interests ......................................................................................................... 13

Proscription by the UN or like-minded countries ...................................................................... 14

Engagement in peace/mediation processes................................................................................ 14

**Lashkar-e-Jhangvi (LeJ)**................................................................................................................ **14**

Engagement in terrorism.................................................................................................................. 14

Ideology and links to other terrorist groups/networks ............................................................ 15

Links to Australia ................................................................................................................................. 16

Threat to Australian interests ......................................................................................................... 16

Proscription by the UN or like-minded countries ...................................................................... 16

Engagement in peace/mediation processes................................................................................ 16

**Egyptian Islamic Jihad (EIJ)**......................................................................................................... **17**

Engagement in terrorism.................................................................................................................. 17

Ideology and links to other terrorist groups/networks ............................................................ 18

Links to Australia ................................................................................................................................. 19

Threat to Australian interests ......................................................................................................... 19

Proscription by the UN or like-minded countries ...................................................................... 20

Engagement in peace/mediation processes................................................................................ 20

**Islamic Army of Aden (IAA)**.......................................................................................................... **20**

Engagement in terrorism.................................................................................................................. 20

Ideology and links to other terrorist groups/networks ............................................................ 21

Links to Australia ................................................................................................................................. 21

Threat to Australian interests ......................................................................................................... 21

Proscription by the UN or like-minded countries ...................................................................... 21

Engagement in peace/mediation processes................................................................................ 22

**Asbat al-Ansar (AAA)**...................................................................................................................... **22**

Engagement in terrorism.................................................................................................................. 22

Ideology and links to other terrorist groups/networks ............................................................ 23

Links to Australia ................................................................................................................................. 24

Threat to Australian interests ......................................................................................................... 24

Proscription by the UN or like-minded countries ...................................................................... 24

Engagement in peace/mediation processes................................................................................ 24

PX503

**Islamic Movement of Uzbekistan (IMU)** ..................................................................... **24**

Engagement in terrorism ................................................................................................. 25

Ideology and links to other terrorist groups/networks .................................................... 26

Links to Australia ............................................................................................................. 28

Threat to Australian interests ......................................................................................... 28

Proscription by the UN or like-minded countries ........................................................... 28

Engagement in peace/mediation processes .................................................................. 28

Conclusion ...................................................................................................................... 28

**A    Appendix A – List of Submissions** ...................................................... **31**

**B    Appendix B – Statement of Reasons – Ansar al-Sunna** ................................. **33**

**C    Appendix C – Statement of Reasons – Jaish-e-Mohammad (JeM)** .............. **39**

**D    Appendix D – Statement of Reasons – Lashkar-e Jhangvi (LeJ)** .................. **45**

**E    Appendix E – Statement of Reasons – Egyptian Islamic Jihad (EIJ)** ........... **49**

**F    Appendix F – Statement of Reasons – Islamic Army of Aden (IAA)** ............. **53**

**G    Appendix G – Statement of Reasons – Asbat al Ansar (AAA)** ...................... **57**

**H    Appendix H – Statement of Reasons – Islamic Movement of Uzbekistan (IMU)** .................................................................................................................... **61**

PX503

*vi*

PX503

# Membership of the Committee

| | |
|---|---|
| **Chair** | The Hon David Jull MP |

| **Members** | Mr Anthony Byrne MP | Senator the Hon John Faulkner |
|---|---|---|
| | Mr Steven Ciobo MP | Senator Alan Ferguson |
| | The Hon Duncan Kerr SC MP | Senator Fiona Nash |
| | Mr Stewart McArthur MP | Senator the Hon Robert Ray |

# Committee Secretariat

| | |
|---|---|
| **Committee Secretary** | Ms Margaret Swieringa |
| **Administration Officer** | Mrs Donna Quintus-Bosz |

PX503

# Terms of reference

This inquiry and report is conducted under the following powers:

*Criminal Code Act 1995*

**Section 102.1A  Reviews by Parliamentary Joint Committee on Intelligence and Security**

*Review of listing regulation*

    (1) If a regulation made after the commencement of this section specifies an organisation for the purposes of paragraph (b) of the definition of terrorist organisation in section 102.1, the Parliamentary Joint Committee on Intelligence and Security may:

        (a) review the regulation as soon as possible after the making of the regulation; and

        (b) report the Committee's comments and recommendations to each House of the Parliament before the end of the applicable disallowance period.

And

*Criminal Code Amendment Regulations 2005 (No 1)*

Select Legislative Instrument 2007 No.3

Registered: 23 March 2007 - Ansar al-Sunna (No FRLI No. given)
               30 March 2007 - JeM (FRLI Ref No. F2007L00712)
               30 March 2007 - LeJ (FRLI Ref No. F2007L00713)
               30 March 2007 – EIJ (FRLI Ref No. F2007L00851)
               30 March 2007 – IAA (FRLI Ref No. F2007L00848)
               30 March 2007 – AAA (FRLI Ref No. F2007L00847)
               30 March 2007 – IMU (FRLI Ref No. F2007L00850)

PX503

# List of recommendations

## 2   The Listing

### Recommendation 1

The Committee does not recommend the disallowance of the regulations made to proscribe the following organisations: Ansar al-Sunna, Jaish-e-Mohammad, Lashkar-e-Jhangvi, Egyptian Islamic Jihad, Islamic Army of Aden, Asbat al-Ansar, Islamic Movement of Uzbekistan.

*x*

PX503

PX503

**1**

# Introduction

1.1   This review is conducted under section 102.1A of the *Criminal Code Act 1995* (the Criminal Code).  Section 102.1A provides that the Parliamentary Joint Committee on Intelligence and Security (the Committee) may review a regulation specifying an organisation as a terrorist organisation for the purposes of paragraph (b) of the definition of terrorist organisation in section 102.1 of the Criminal Code and report the Committee's comments to each house of the Parliament before the end of the applicable disallowance period.

1.2   The Committee is currently conducting a full review of the operations, effectiveness and implications of the proscription powers and expects to report on this matter later in the year.  A number of approaches to the proscription process are being examined in the course of this review and it is hoped that procedures may be refined as a result of this review.  In particular, the criteria and the way in which they are applied will be addressed.  This will no doubt affect the Committee's reports on individual listings.  In the mean time, in this review, for the sake of consistency, the Committee has used the criteria and assessment methods which it has used throughout its consideration of listings and re-listings over the last three years.

1.3   Under section 102(3) of the Criminal Code regulations, the listing of organisations as terrorist organisations ceases to have effect on the second anniversary of the day on which they took effect.  The organisations must, therefore, be re-listed.

1.4   This review covers the re-listing of seven organisations.  The seven were originally listed in 2003 under legislative arrangements which required that organisations to be listed had to be on the United

Nations list of terrorist organisations.  The seven organisations came up for review under new legislative arrangements, which had been passed by the Parliament in 2004.  The Committee, therefore, reviewed the first re-listing of these organisations and reported to Parliament in August 2005.  This review is of the second re-listing.

1.5    The organisations under consideration are:

- Ansar al-Sunna (formerly Ansar al-Islam);

- Jaish-e-Mohammad (JeM);

- Lashkar-e-Jhangvi (LeJ);

- Egyptian Islamic Jihad (EIJ);

- Islamic Army of Aden (IAA);

- Asbat al-Ansar (AAA);

- Islamic Movement of Uzbekistan (IMU).

1.6    The Attorney-General wrote to the Chairman on 2 March 2007 advising that he had decided to re-list Ansar al-Sunna as a terrorist organisation for the purposes of section 102.1 of the *Criminal Code Act 1995*.  Further letters were received on 15 March 2007 with similar advice in relation to Jaish-e-Mohammad and Lashkar-e-Jhangvi and on 22 March 2007 with advice on Egyptian Islamic Jihad, the Islamic Army of Aden, Asbat al-Ansar and the Islamic Movement of Uzbekistan.

1.7    The regulation in relation to Ansar al-Sunna was tabled in the House of Representatives and the Senate on 26 March 2007.  The disallowance period of 15 sitting days for the Committee's review of the listing began from the date of the tabling.  Therefore, the Committee is required to report to the Parliament by 12 June 2007.  The remaining regulations were not tabled until 8 May 2007 making the end of the disallowance period for these organisations 19 June 2007.  However, the Committee resolved to deal with all seven organisations together.

1.8    The Committee advertised the inquiry in *The Australian* on 18 April 2007.  Notice of the inquiry was also placed on the Committee's website.  No submissions were received from the public.

1.9    In the absence of submissions and given that these are second re-listings of organisations, which do not raise controversial issues, the

Committee resolved to assess the merits of the re-listings on the papers without holding a hearing.

1.10    In past reports the Committee has expressed concern about the value of ASIO's criteria in judging the case for listing or re-listing. This debate is now being considered in an overall review of the proscription power. The Committee does not believe that these criteria are either clear or consistently applied. Nevertheless, in the absence of any other criteria, the Committee will continue to use ASIO's criteria as the basis for its judgements on each organisation. This chapter will examine the Government's procedures in listing the seven organisations and chapter 2 will consider the merits of the listings.

# The Government's procedures

1.11    In a letter sent to the Committee on 4 April 2007, the Attorney-General's Department informed the Committee of its procedures in relation to the re-listing of Ansar al-Sunna. Further letters were received on 3 May 2007 regarding the procedures used for the making of the other six regulations. The statement of procedures for each organisation is attached in the appendix containing the statement of reasons for that organisation.

## Procedural concerns

1.12    The Committee is conscious that a broad review is currently being conducted into the operations, effectiveness and implications of the proscription power. It is also aware that, compared to other jurisdictions which ban terrorist organisations, the procedures adopted in Australia, involving parliamentary review, have a number of merits.

1.13    Nevertheless, the Committee remains critical of the Government's procedures for the listing of organisations for the same reasons which have been detailed in numerous reports. These criticisms also apply to the current review. These general criticisms relate to clarity, consistency and coherence of the procedures and the decision making and specifically include:

PX503

- The nature of the information supplied to the committee.  In the case of re-listings whether the information is current;

- The organisation of the information according to the criteria established by ASIO;

- The extent of consultation with state and territory governments;

- The extent of consultation with the Department of Foreign Affairs;

- The extent and nature of an information program with the community.

## The nature of the information supplied to the Committee

1.14    Many of the regulations which currently come to the Committee are for the re-listing of organisations, previously listed and fully reviewed.  The Committee has asked that the information presented to justify this 'fresh exercise of executive discretion' contain a 'sufficient degree of currency in the evidence to warrant the use of the power'[1]  Therefore, the Committee has asked that the emphasis in the material be on the activities of the organisation in the period <u>since</u> the last listing/review.  The statements of reasons for these current reviews do, for the most part, include, under the heading 'Terrorist activities', those activities that have taken place since the last review.

1.15    However, it is disappointing that the information in the statements of reasons does not as yet address the criteria which ASIO says it uses to 'select' and organisation for listing, namely:

- Engagement in terrorism;

- Ideology and links to other terrorist groups or networks;

- Links to Australia;

- Threats to Australian interests;

- Proscription by the UN or like minded countries; and

- Engagement in peace/mediation processes.[2]

1.16    The use of these criteria in the statement of reasons would not preclude the Attorney-General from applying the definition of a

---

1    Parliamentary Joint Committee on Intelligence and Security, *Review of the re-listing of ASG, JuA, GIA and GSPC,* February 2007, p. 6.

2    Criteria given at a hearing on 1 February 2005.  The last factor was seen as an exclusionary factor.

terrorist organisation from within the act, as this definition is very broad.  However, the Committee reiterates that:

> a clearer exposition of the criteria would strengthen the Government's arguments, provide greater clarity and consistency in the evidence and therefore increase public confidence in the regime as a whole.  Therefore, … it would greatly facilitate the Committee's review process if the [statement of reasons addressed these criteria.][3]

## Consultation within government

1.17    Consultation with the States and Territories is still short.  There were twelve working days between the time when the Attorney-General sent letters to the Prime Minister, the Leader of the Opposition, the Attorneys of the States and Territories and the Chairman of the Parliamentary Joint Committee on Intelligence and Security (2 March 2007) and when the Governor General made the regulation (22 March 2007).  In relation to the other six organisations the timing was even shorter, four days in the case of one group and eight days in relation to the second.[4]

1.18    The Leader of the Opposition did not seek a briefing on the matter and no State or Territory government replied.

1.19    The Committee notes that letters were addressed to Attorneys in the States and Territories rather than the Premiers and Chief Ministers as agreed under subclause 3.4(6) of the *Inter –Governmental Agreement on Counter-terrorism Laws*.  This subclause states that the Commonwealth will provide the States and Territories with the 'text of the proposed regulation and will use its best endeavours to give the other parties reasonable time to consider and to comment on the proposed regulation'.

1.20    The Department of Foreign Affairs was consulted at the initial stage of developing the statement of reasons.[5]  The nature and extent of this consultation is not clear from the statement of reasons.

---

3    Parliamentary Joint Committee on Intelligence and Security, *Review of the re-listing of ASG, JuA, GIA and GSPC,* February 2007, p.8.

4    The first groups was JeM and LeJ, the second EIJ, IAA, AAA and IMU.

5    See Statement of Reasons in Appendix B.

## Community consultation

1.21   Submission number five[6] of 4 April 2007 from the Attorney-General provides no information on the means which the government used to inform the community beyond paragraph 12.

- A press release was issued on 26 March 2007 and the Attorney-General's Department's National Security web site has been updated.

1.22   At previous hearings and in response to recommendations going back to the Committee's second review in March 2005, the Attorney-General's Department has advised that 'they are developing a response to the Committee's recommendation on community consultation.[7]  Not only has this not happened, but the level of communication with the public has been diminished by the removal of the statement of reasons from the Attorney-General's media release and web site.

1.23   It remains the Committee's view that it would be most beneficial if a community information program occurred prior to the listing of an organisation under the Criminal Code.  This question will be addressed more fully in the current review of the proscription power.

---

6   This is the procedural on Ansar al-Sunna.  See Appendix B.
7   Transcript, Private hearing 2 May 2005, p. 5.

PX503

PX503

**2**

# The Listing

## The criteria for listing an organisation

2.1     To be specified as a terrorist organisation for the purposes of paragraph (b) of the definition of terrorist organisation in section 102.1 of the Criminal Code, the Minister:

   ■ must be satisfied on reasonable grounds that the organisation is directly or indirectly engaged in, preparing, planing, assisting in or fostering the doing of a terrorist act (whether or not the terrorist act has occurred or will occur); or

   ■ advocates the doing of a terrorist act (whether or not a terrorist act has occurred or will occur).[1]

2.2     In previous reports, the Committee has commented on the breadth of this definition.[2]  The definition does not explain why certain organisations who engage in, prepare, plan, assist in or foster the doing of a terrorist act have not been proscribed under the Criminal Code, whereas other have.

2.3     In order to understand the process of selecting organisations for listing, the Committee sought guidance from ASIO.  At the hearing on 1 February 2005 for the *Review of the listing of six terrorist organisations*, the Director-General of ASIO advised the Committee of ASIO's evaluation process in selecting entities for proscription under the Criminal Code.  Factors included:

---

[1]   Paragraphs 102.1(2) (a) and (b) of the Criminal Code.

[2]   See: Joint Parliamentary Committee on ASIO, ASIS and DSD, *Review of the listing of the Palestinian Islamic Jihad,* June 2004, p. 18 and Joint Parliamentary Committee on ASIO, ASIS and DSD, *Review of the listing of six terrorist organisations,* March 2005, Chapter 2.

- engagement in terrorism;

- ideology and links to other terrorist groups/networks;

- links to Australia;

- threat to Australian interests;

- proscription by the UN or like-minded countries; and

- engagement in peace/mediation processes.[3]

2.4    The Committee accepted these criteria as useful and has used them as the basis of its reviews over the last three years.  However, matching information within the statements of reasons with the criteria has proved to be elusive.  Therefore, the Committee has asked the Attorney-General to use the criteria as the basis of statements of reasons.  This has not yet occurred.

## The re-listing of Ansar al-Sunna (previously Ansar al-Islam)

2.5    The Attorney-General informed the Committee of the proposed listing by letter dated 2 March 2007 with an attached statement of reasons.  On 26 March 2007, the Attorney-General issued a media release announcing the decision to re-list Ansar al-Sunna.  The media release provided some comments about the organisation but did not attach, as was formerly the practice, the statement of reasons.[4]

2.6    The Attorney-General's statement of reasons is attached at Appendix B.

2.7    On the basis of the statement of reasons and other open sources, Ansar al-Sunna has been measured against ASIO's stated evaluation process.

## Engagement in terrorism

2.8    All sources state that Ansar al-Sunna proclaims itself as a significant part of the insurgency in Iraq.  It is estimated to be between 500 and 1000 strong, although precise numbers are unknown.  Despite its origins in the organisations known as Jund al-Islam and Ansar al-

---

3    Confidential exhibit, ASIO, tabled 1 February 2005.

4    The practice appears to have ceased with the re-listing of TQJBR in February 2007.

PX503

Islam, both the US State Department and Janes' list Ansar al-Sunna's beginning as an internet proclamation in September 2003, 'calling for all extremists in Iraq to unite under the new name.'[5]  The statement of reasons states that the organisation, which had been scattered from its bases in northern Iraq during the invasion of March 2003, regrouped and 'returned to Iraq, where they sought, in cooperation with other foreign and Iraqi militants, to create an umbrella organisation for Sunni jihadi resistance to the Coalition presence in Iraq.'[6]

2.9     Since its formation, it has taken responsibility for a large number of serious attacks within Iraq, not only against Coalition forces, but also against local authorities, both military and political, and local citizens.  The statement of reasons lists nine attacks in the period under review, since May 2005.  The deaths of 134 people are detailed in these attacks; however, the statement also says that unspecified numbers of people were killed in some of the attacks.[7]

## Ideology and links to other terrorist groups/networks

### Ideology

2.10    Ansar al-Sunna's objectives are to overthrow the Iraqi Government, expel coalition forces from the country and establish an Islamic state under Sharia law.[8]  Insofar as it employs violence in pursuit of these objectives, it fits the definition of a terrorist organisation.

2.11    However, the Committee wishes to reiterate its concerns with this category of the criteria, which appears to confuse political ideology with methods of operation.[9]  Ideology *per se* has not been addressed in the statement of reasons, nor has the relation between ideology and terrorist acts been spelt out.

---

5    US State Department, Annual Country Reports on Terrorism, 2005.
6    See the statement of reasons, Submission 1 in Appendix B.
7    See the statement of reasons, Submission 1 in Appendix B.
8    See the statement of reasons, Submission 1 in Appendix B.
9    This was raised in the Committee's last report, *Review of the re-listing of Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (TQJBR),* May 2007, p. 17.  The Committee will consider the question of the suitability of ASIO's criteria in its broader review of the proscription power currently being undertaken.

PX503

**Links to other terrorist groups**

2.12    Ansar al-Sunna is linked to al Qa'ida in Iraq and to al-Qa'ida itself. The US State Department says that some of the members of al-Sunna 'were trained in al-Qa'ida camps in Afghanistan'[10]. Janes' says that 'most of the group's members have fought in Afghanistan [and] some are also believed to have fought in Chechnya.[11] It is closely associated with the al-Zarqawi network, or al-Qa'ida in Iraq.

2.13    Janes' concludes that:

> As the insurgency in Iraq developed momentum over the course of 2004, the name Ansar al-Islam remained closely associated with the terrorism plaguing the country. There were even reports suggesting that Ansar al-Islam was extending its reach into Europe as well as throughout Iraq.
>
> It is unlikely that an essentially parochial group of Kurdish mountain guerrillas represented a significant threat to Europe or had the ability to operate effectively outside Iraqi Kurdistan. It is more likely that, through their Arab/Afghan connections, the most ardent Ansar al-Islam fanatics were incorporated into the ranks of the jihadist volunteers that have moved into Iraq in the wake of the invasion.[12]

## Links to Australia

2.14    The statement of reasons gives no information about links to Australia for this organisation.

## Threat to Australian interests

2.15     The statement of reasons gives no information about threats to Australian interests. The Committee notes, however, that Australian troops operate in Iraq.

## Proscription by the UN or like-minded countries

2.16    Ansar al-Sunna is listed as Ansar al-Islam in the United Nations 1267 Committee's consolidated list. In addition, Canada, the United

---

10   US State Department, Annual Country Reports on Terrorism, 2005.
11   http://jtic.janes.com, *Ansar al-Islam*
12   http://jtic.janes.com, *Ansar al-Islam,* p. 4.

PX503

Case 1:18-cv-02248-CRC   Document 85-8   Filed 05/06/22   Page 25 of 169

States and the United Kingdom also list Ansar al-Islam.  The United Kingdom also separately lists Ansar al-Sunna.

## Engagement in peace/mediation processes

2.17    There was no evidence from any source of the involvement of this organisation in a peace process, although the statement of reasons is silent on the matter.

# Jaish-e-Mohammad (JeM)

2.18    The Attorney-General informed the Committee of the proposed re-listing by letter dated 15 March 2007 with an attached statement of reasons.  On 2 April 2007, the Attorney-General issued a media release announcing the decision to re-list Jaish-e-Mohammad (JeM) and five other organisations.  The media release provided a short paragraph on each of the organisations.  However, the more detailed arguments for re-listings, the statements of reasons, were not linked to the media release.

2.19    The Attorney-General's statement of reasons is attached at Appendix C.

2.20    On the basis of the statement of reasons and other open sources, Jaish-e-Mohammad (JeM) has been measured against ASIO's stated evaluation process.

## Engagement in terrorism

2.21    JeM is a Pakistani based organisation, established in 2000.[13]  It provides religious and military training and conducts operations in the disputed territories on Indian Administered Kashmir (IAK).  It is described by all sources as active, well resourced, well trained and motivated.  It is said by Janes' to pose a major terrorist threat to India and Pakistan and to Western targets in both these countries.'  The US State Department says it has 'tens of thousands of followers … [and] 'at least several hundred armed supporters.'[14]  Most of its

---

13   The announcement of its establishment was made in January 2000, although Janes' notes that 'the date of its founding is usually given as December 1999 following the release of its founder from prison in India.' http://jtic.janes.com, *Jaish-e-Mohammad*.

14   US State Department, Annual Country Reports on Terrorism, 2005.

PX503

membership comes from Pakistan and Kashmir; however it attracts Arabs, Afghans, veterans from the Afghan war, as well as other jihadists who come to train.  The statement of reasons notes that:

> Reporting also indicates that JeM may be helping to facilitate the activities of international jihadists intending to conduct terrorist operations outside Kashmir or India, including the United Kingdom.  The British National, Rashid Rauf, arrested in Pakistan as one of the main coordinating figures allegedly responsible for the disputed British trans-Atlantic planes bombing plot in August 2006, is strongly suspected of having links with JeM.

> Investigators have also uncovered possible connections between JeM and the British-born suicide bombers responsible for the London subway attacks.[15]

2.22    Seven attacks are listed for the period since the last review.  Most of these attacks were directed at officials, particularly police, but included the deaths of civilians as well.  In the past, the organisation is accused of the attempted assassination of the President of Pakistan, General Musharraf (twice in December 2003), an attack on the Indian Parliament (2001) and an attack on the legislative assembly of Jammu and Kashmir (2001).[16]

## Ideology and links to other terrorist groups/networks

### Ideology

2.23     The objective of JeM is to reunite the IAK with Pakistan.[17]  This objective is combined with a domestic agenda of establishing an Islamic state in Pakistan and opposition to the presence of Shias, Christians, Hindus and Jews in Pakistan.[18]  Its violence in support of these aims is what designates it as a terrorist organisation under the Criminal Code.

---

15   See the statement of reasons Appendix C.

16   US State Department, Annual Country Reports on Terrorism, 2005

17   This is a long-running dispute dating from Indian independence in 1948.  It is notable that many of the organisations designated as terrorist organisations emerge out of long-running, intractable and unresolved territorial or political disputes. In the case of JeM, India has accused Pakistan's ISI of encouraging the development of this and other organisations related to this dispute.

18   http://jtic.janes.com, *Jaish-e-Mohammed*.

## Links to other terrorist groups

2.24    JeM is one of a number of organisations that have grown up around the conflict over Jammu/Kashmir.  Not all of these organisations are allies, many resulting from disputes and the subsequent splintering of groups as they come under pressure.  Such groups include: Khuddam ul-Islam(KuL), Jamaat ul-Furqan (JuF).  The statement of reasons asserts that 'despite these factions, the group is commonly regarded as a single entity and referred to as JeM.[19]'

2.25    However, more significantly, Janes' says that JeM has allied itself to Lashkar e-Taibyya (LeT) and Lashkar e-Jhangvi (LeJ) and that these organisations form the United Jihad Council.[20]  The US State Department claims that JeM shares its cadre with Harakat ul-Mujahedin (HuM) and Harakat ul-Jihad-i-Islami (HuJI) and has close ties to Afghan Arabs, the Taliban and to LeT, LeJ and Sipahi-e-Sahaba Pakistan (SSP).

2.26    The State Department claims that 'there are suspicions that Osama Bin Laden has provided funds to JeM'.[21]  The statement of reasons goes further and states that 'JeM is closely associated with Al Qa'ida and reports suggest that Azhar (the JeM leader) may have assisted Al Qa'ida fight US forces in Somalia and helped to establish Al Qa'ida training camps in Yemen.'[22]  Janes' is more circumspect and notes that 'from open source material, it is impossible to assess the validity of [statements about the close links of JeM to the Taliban and Al Qa'ida.]'[23]

## Links to Australia

2.27    No information is provided on links between JeM and Australia.

## Threat to Australian interests

2.28    No information is provided about threats to Australian interests.

---

19    See the statement of reasons, Appendix C.
20    http://jtic.janes.com, *Jaish-e-Mohammad*.  In addition to JeJ and LeT, the Council also includes HuM, Hizb-ul-Mujahideen (HM) and Al Badar.
21    US State Department, Annual Country Reports on Terrorism, 2005.
22    See the statement of reasons, Appendix C.
23    http://jtic.janes.com, *Jaish-e-Mohammad*.

## Proscription by the UN or like-minded countries

2.29    JeM is listed in the UN 1267 Committee's consolidated list and by the governments of Canada, the United Kingdom, the United States, Pakistan and India.

## Engagement in peace/mediation processes

2.30    No information is provided about whether JeM has been involved in any peace or mediation process.

# Lashkar-e-Jhangvi (LeJ)

2.31    The Attorney-General informed the Committee of the proposed re-listing by letter dated 15 March 2007 with an attached statement of reasons.  On 2 April 2007, the Attorney-General issued a media release announcing the decision to re-list Lashkar-e-Jhangvi (LeJ) and five other organisations.  The media release provided a short paragraph on each of the organisations.  However, the more detailed arguments for re-listing, the statements of reasons, were not linked to the media release.

2.32    The Attorney-General's statement of reasons is attached at Appendix D.

2.33    On the basis of the statement of reasons and other open sources, Lashkar-e-Jhangvi (LeJ) has been measured against ASIO's stated evaluation process.

## Engagement in terrorism

2.34    The statement of reasons says that the LeJ is estimated to have about 300 active members.  The US State Department says 'probably fewer that 100'.[24]  Since the last review of this organisation, the statement of reasons lists four attacks, all against Shiite religious leaders or places of worship.

2.35    The details of these attacks are in the statement of reasons at Appendix D.

---

24    US State Department, Annual Country Reports on Terrorism, 2005.

PX503

Case 1:18-cv-02248-CRC   Document 85-8   Filed 05/06/22   Page 29 of 169

# Ideology and links to other terrorist groups/networks

## Ideology

2.36    The statement of reasons states that the objective of LeJ is 'the establishment of an Islamic state in Pakistan'.  However, the evidence provided from all sources points to an organisation that emerged from sectarian disputes between Sunnis and Shias in the 1980s and these disputes appear still to be an influence on the aims and activities of the organisation.  The support base of LeJ is religious and sectarian.  The religious divisions are complicated by economic and social differences in Pakistani society between Sunnis and Shia, which in turn have been exacerbated by external interventions.  This history is detailed in the Committee's last review of this organisation in August 2005.  It is broadly repeated here as it appears to continue to drive the nature of the terrorist attacks committed by the group.

2.37    After the Iranian revolution in 1979, bitter sectarian division increased in Pakistan between the majority, but economically poorer, Sunnis and the minority, but wealthy, landowning class of Shias.  With the Russian invasion of Afghanistan, the rise of the Shia organisation, Hizbullah, in Lebanon and rumours of Iranian funding for radical Shia mosques throughout the region, the Sunnis in Pakistan and elsewhere were alarmed.  This fear and resentment was further fuelled by Saudi and US intervention:

> The government of Saudi Arabia, encouraged by the United States, undertook a programme to counter the Iranian initiative.  Saudi money (from government and charitable foundations) was poured into Sunni mosques and religious institutions across the Middle East and Asia.  This promoted radical strands of Sunni Islam and Deobandism, at the expense of the often much more tolerant local traditions, which in southeast Asia and Kashmir had been influenced by Sufism or Hindu and Buddhist traditions.[25]

2.38    The rise of organisations such as the SSP and, in the 1990s, the LeJ, and other Sunni militant parties was encouraged.  Sectarian violence, directed at first at Iranian diplomats and then at the

---

25   http://jtic.janes.com, *Lashkar-e-Jhangvi*.

Pakistani Shia community, spread.  By 1998, it was, according to Janes', spiralling out of control.[26]

2.39    It would appear that since 2001, when the organisation was banned by President Musharraf and members sought refuge in Afghanistan, LeJ has become more integrated to the broader jihadist struggle. The agenda of the organisation has broadened to include hostility towards all Westerners and non-believers.  Attacks have occurred on Christians (in 2001) and on French technical workers (in 2002), on the US Consulate (in 2002) and, allegedly, Daniel Pearl, (in 2002). Nevertheless, all the attacks listed by the statement of reasons, the most recent activities of LeJ, have involved attacks on Shias.

### Links to other terrorist groups

2.40    Lashkar-e-Jhangvi (LeJ) is a splinter group which broke away from the Sipah-e-Sahaba (SSP) in the mid 1990s.  It is now part of the web of Pakistani based extremist groups as detailed in the previous assessment of JeM.[27]  Janes' says that, in 2002, the list of suspects in the attacks on Western targets suggests contact between LeJ and Al Qa'ida.

## Links to Australia

2.41    No information was provided on this matter.

## Threat to Australian interests

2.42    No information was provided on this matter.

## Proscription by the UN or like-minded countries

2.43    LeJ is listed in the UN 1267 Committee's consolidated list and as a proscribed terrorist organisation by the governments of the United Kingdom, the United States, Canada and Pakistan.

## Engagement in peace/mediation processes

2.44    No information was provided on this in the statement of reasons.

---

26    http://jtic.janes.com, *Lashkar-e-Jhangvi*.

27    Note in particular paragraphs 2.24-2.26 above.

Case 1:18-cv-02248-CRC   Document 85-8   Filed 05/06/22   Page 31 of 169

# Egyptian Islamic Jihad (EIJ)

2.45    The Attorney-General informed the Committee of the proposed re-listing by letter dated 22 March 2007 with an attached statement of reasons.  On 2 April 2007, the Attorney-General issued a media release announcing the decision to re-list Egyptian Islamic Jihad (EIJ) and five other organisations.  The media release provided a short paragraph on each of the organisations.  However, the more detailed arguments for re-listing, the statements of reasons, were not linked to the media release.

2.46    The Attorney-General's statement of reasons is attached at Appendix D.

2.47    On the basis of the statement of reasons and other open sources, Egyptian Islamic Jihad (EIJ) has been measured against ASIO's stated evaluation process.

## Engagement in terrorism

2.48    The statement of reasons for the EIJ provides no evidence of contemporary terrorist activity for this organisation.  The last cited incident is 1995, a truck bomb attack against the Egyptian embassy in Pakistan.[28]  The statement explains that the 'domestic faction is mostly inactive due to successful, sustained actions by Egyptian authorities' and 'the international faction, led by al-Qa'ida deputy, Ayman al-Zawahiri, is largely subsumed within al-Qa'ida. … Terrorist activities by the international faction are likely credited to al-Qa'ida rather than the EIJ.'[29]  The statement also notes that both the domestic leader and the spiritual leader are in prison.  The US State Department says that the EIJ merged with al-Qa'ida in 2001.  It also notes no activities in Egypt after 1993 and no international acts after the disrupted attack in 1998.  Given these arguments and al-Zawahiri's position, it would appear that the EIJ has in fact given way to al-Qa'ida and its separate existence must be questionable.

2.49    However, Janes' sees the EIJ as the 'backbone of al-Qa'ida'.  It says that the group has been scattered, both forced out of Afghanistan after US attacks in November 2001, and operating in places as geographically dispersed as: Albania, Azerbaijan, Bulgaria, the

---

28   See statement of reasons, Appendix E.  The list of terrorist activities does include a disrupted attack in 1998 in Albania.

29   See statement of reasons, Appendix E.

PX503

United Arab Emirates, Kashmir, Chechnya, the Philippines, Indonesia, Somalia and with networks in the United Kingdom, Yemen, Lebanon and the Sudan.  Jane's argues that:

> Although the group's base and communications have been greatly disrupted, the EIJ's leader remains a potent symbol of resistance to thousands of sympathisers across the world.  The group's ability to act as a whole has been compromised by the US led War on Terrorism, but it is believed to have despatched numerous cells, many of which are believed to remain at large, that are fully self sufficient and capable of future terrorist activities.

> [Within Egypt] the roots of Islamist opposition remain, and it is likely that these extremists will restart their campaign against the Egyptian government as and when the opportunity arises.  Escalating popular opposition to the government's pro-Western alliance has been of particular concern since the invasion of Iraq in early 2003, despite Mubarak's avowed opposition to this US policy.[30]

2.50    Janes' lists a number of activities since 1995 which have tentative connections with the EIJ.  These include attacks in Nairobi and Dar es Salaam in 1998, in Kushh in 2000, the USS Cole in 2000 and a shooting in Los Angeles airport in 2002.  In 2004 it says that 15 men were charged in Egypt with membership of the EIJ.[31]

2.51    The statement of reasons estimates EIJ's strength at several hundred with several thousand supporters.  The US State Department says that the strength of the organisation is 'unknown, but probably has several hundred hard-core members inside and outside Egypt.'[32]  Janes' says that its strength is unknown but notes that, when it was in Afghanistan, it was believed to have numbered 200 loyalists.'[33]

## Ideology and links to other terrorist groups/networks

### Ideology

2.52    From the beginning, the purpose of the EIJ was the overthrow of the secular government in Egypt.  With its merging with al-Qa'ida, the

30  http://jtic.janes.com, *El-Gihad.*
31  http://jtic.janes.com, *El-Gihad.*
32  US State Department, Annual Country Reports on Terrorism, 2005.
33  http://jtic.janes.com, *El-Gihad.*

PX503

EIJ agenda has assumed the objectives of al-Qa'ida: the establishment of a Caliphate.

## Links to other terrorist groups

2.53    Apart from its connections with al-Qa'ida, the statement of reasons provides no information about EIJ linkages to other terrorist organisations.

2.54    Janes' describes possible linkages, asserted by the Egyptian government, with the Iranian Revolutionary Guards Corps (IRGC) largely through Sudan.[34]  In addition, because of the close/integral relationship with al-Qa'ida, the EIJ then is part of the al-Qa'ida network involving the Islamic Group, the Abu Sayyaf Group (ASG), the Armed Islamic Group (GIA),  the Salafist Group for Call and Combat (GSPC), Harakat-ul-Mujahideen (HuM),  Islamic Movement of Uzbekistan (IMU), Islamic Union, Islamic Army of Aden (IAA), Uighur Separatists, Chechen Guerillas, Hamas and the Palestinian Islamic Jihad (PIJ).  In addition, despite EIJ's radical Sunni philosophy, Janes' says that Ayman al-Zawahiri is believed to have links with the international wing of Hizballah.[35]

## Links to Australia

2.55    The statement of reasons provides no information about links to Australia.

## Threat to Australian interests

2.56    The statement of reasons argues that the threat to Australian interests is contained in a video statement by Ayman al-Zawahiri on 27 July 2006 calling on Muslims to target the interests 'of all countries' who participated in the 'assault against the Muslims' in countries including Afghanistan and Iraq, a reference taken to include Australia.[36]

---

34   http://jtic.janes.com, *El-Gihad.*
35   http://jtic.janes.com, *El-Gihad.*
36   See statement of reasons, Appendix E.

PX503

## Proscription by the UN or like-minded countries

2.57   The EIJ is listed by the United Nations 1267 Committee's consolidated list, by the governments of Canada, the United Kingdom and the United States.

## Engagement in peace/mediation processes

2.58   No information is provided on this matter.

# Islamic Army of Aden (IAA)

2.59   The Attorney-General informed the Committee of the proposed re-listing by letter dated 22 March 2007 with an attached statement of reasons.  On 2 April 2007, the Attorney-General issued a media release announcing the decision to re-list Islamic Army of Aden (IAA) and five other organisations.  The media release provided a short paragraph on each of the organisations.  However, the more detailed arguments for re-listing, the statements of reasons, were not linked to the media release.

2.60   The Attorney-General's statement of reasons is attached at Appendix F.

2.61   On the basis of the statement of reasons and other open sources, the Islamic Army of Aden (IAA) has been measured against ASIO's stated evaluation process.

## Engagement in terrorism

2.62   The only 'new' 'terrorist activity' attributed to this group since it was last reviewed is the following dot point:

   ■  Mar/Apr 2006:  The arrest of IAA members suspected of planning to travel to Iraq to fight foreign forces.'

2.63   The statement of reasons states that the strength of the IAA is 'unknown, but likely to be between 30 and 100'.[37]  Janes' describes the membership of the organisation as 'small and says that it has 'limited organisational and operational capacities' and therefore its

---

37   See statement of reasons, Appendix F.

'firm rhetoric has not been translated into a corresponding level of action.'[38]

## Ideology and links to other terrorist groups/networks

### Ideology

2.64    Like the EIJ, the IAA has sought the overthrow of the national government and the establishment of an Islamic state, and, like the EIJ, has widened its aims to support al-Qa'ida's goals for global jihad.  Janes' suggests further aims of 'the removal of Westerners, particularly Americans and British citizens from the Middle East and the release of prisoners from Yemeni jails and avenging the death of Abu Hassan, the group's former leader.[39]  In the past the IAA has used kidnapping and bombing in pursuit of its aims.

2.65    Its leaders have been arrested, although the leader arrested in 2003, Khalid Abd al-Nabi, cooperated with authorities and was given a presidential pardon.[40]

### Links to other terrorist groups

2.66    The statement of reasons says that IAA is associated with al-Qa'ida and has made public statements in support of Osama Bin Laden.  It is also claimed that the IAA 'may have received some funding through al-Qa'ida.

## Links to Australia

2.67    No information has been given on this matter.

## Threat to Australian interests

2.68    No information has been given on this matter.

## Proscription by the UN or like-minded countries

2.69    The Islamic Army of Aden (IAA) is listed in the United Nations 1267 Committee's consolidated list and as a proscribed terrorist

---

38   http://jtic.janes.com, *Aden-Abyan Islamic Army (AAIA).*
39   http://jtic.janes.com, *Aden-Abyan Islamic Army (AAIA).*
40   http://jtic.janes.com, *Aden-Abyan Islamic Army (AAIA).*

PX503

organisation by the governments of the United Kingdom and Canada.  The United States has designated the IAA as a terrorist organisation on the Terrorist Exclusion List

## Engagement in peace/mediation processes

2.70    Apart from the pardon given to the leader arrested in 2003, there is no information on this matter.

# Asbat al-Ansar (AAA)

2.71    The Attorney-General informed the Committee of the proposed re-listing by letter dated 22 March 2007 with an attached statement of reasons.  On 2 April 2007, the Attorney-General issued a media release announcing the decision to re-list Asbat al-Ansar and five other organisations.  The media release provided a short paragraph on each of the organisations.  However, the more detailed arguments for re-listing, the statements of reasons, were not linked to the media release.

2.72    The Attorney-General's statement of reasons is attached at Appendix G.

2.73    On the basis of the statement of reasons and other open sources, Asbat al-Ansar (AAA) has been measured against ASIO's stated evaluation process.

## Engagement in terrorism

2.74    Various open sources put the strength of Asbat al-Ansar at between 100 and 300 fighters, mostly Palestinians from the refugee camps in southern Lebanon.  The statement of reasons lists two terrorist activities in the period since the last review.  They both involve announcements made by the organisations itself, one in July 2005 and one in March 2006, that its members were killed during operations in Iraq.  The statement of reasons says that Asbat al-Ansar has broadened its area of operations from southern Lebanon, and, in 2005 and 2006, 'sent fighters in support of the insurgency in collaboration with al-Qa'ida.'[41]

---

41   See the statement of reasons Appendix G.

2.75    However, the US State Department also notes that 'since 2003, the
        Lebanese government has monitored Asbat al-Ansar and the
        group's activities have been less successful.'[42]  This statement from a
        2005 report, however, predates the organisation's claims of
        involvement in Iraq.

## Ideology and links to other terrorist groups/networks

### Ideology

2.76    Asbat al-Ansar aims to establish a radical Islamic state in Lebanon.
        It is anti-Christian and anti-Shia, opposed to the influence of Syria in
        Lebanon and seeks the elimination of the state of Israel.  Its method
        of operating is through violence and Janes' suggests that the
        organisation might be 'a catalyst for provoking civil unrest in
        Lebanon'.[43]

### Links to other terrorist groups

2.77    The organisation has attracted people who have fought in
        Afghanistan, Chechnya, Kashmir and the Balkans.  Although Janes'
        says that the financing of the organisation is 'unclear', it reports the
        suspicion that it receives funds from al-Qa'ida, having 'benefited
        from the charitable and financial networks associated with al-
        Qa'ida'.[44]  The State Department is more emphatic, saying that
        Asbat al-Ansar has links to al-Qa'ida.[45]

2.78    Janes' says there are 'reports indicating that al-Qa'ida funding
        transformed the movement from a parochial Islamist vigilante
        group into a much more capable organisation, with over 100
        salaried gun men.'[46]

2.79    It is notable, however, that Janes' also draws attention to the rivalry
        that exists between various Palestinian groups.

        The Salafi radicals can be considered distinct from the well
        established Palestinian Islamic groups on the basis that they
        reject the pragmatic focus on the Palestinian nationalist
        agenda in favour of more radical ideological objectives.  They

---

42   US State Department, Annual Country Reports on Terrorism, 2005
43   http://jtic.janes.com, *Asbat al-Ansar.*
44   http://jtic.janes.com, *Asbat al-Ansar.*
45   US State Department, Annual Country Reports on Terrorism, 2005.
46   http://jtic.janes.com, *Asbat al-Ansar.*

PX503

can also be distinguished on the basis of their relationship with Syria.  While Hamas and Islamic Jihad have enjoyed Syrian recognition, the new wave of Salafi radicals are considered to be a threat to the Syrian regime.[47]

## Links to Australia

2.80    No information is supplied on this matter.

## Threat to Australian interests

2.81    No information is supplied on this matter.

## Proscription by the UN or like-minded countries

2.82    The statement of reasons states that AAA is listed in the United Nations 1267 Committee's consolidated list and as a proscribed organisation by the governments of Canada, Russia, the United Kingdom and the United States.

## Engagement in peace/mediation processes

2.83    There is no information on this matter.

# Islamic Movement of Uzbekistan (IMU)

2.84    The Attorney-General informed the Committee of the proposed re-listing by letter dated 22 March 2007 with an attached statement of reasons.  On 2 April 2007, the Attorney-General issued a media release announcing the decision to re-list Islamic Movement of Uzbekistan (IMU) and five other organisations.  The media release provided a short paragraph on each of the organisations.  However, the more detailed arguments for re-listing, the statements of reasons, were not linked to the media release.

2.85    The Attorney-General's statement of reasons is attached at Appendix H.

---

47   http://jtic.janes.com, *Asbat al-Ansar*.

2.86    On the basis of the statement of reasons and other open sources, Islamic Movement of Uzbekistan (IMU) has been measured against ASIO's stated evaluation process.

## Engagement in terrorism

2.87    The statement of reasons lists four incidents under the heading *Terrorist activities:* two, in 2005, were attacks against the Ministry of Emergency Situations in Tajikistan; one, in 2006, an attack on a prison in an attempt to free a prisoner; and one an attack on a border post in 2006. All of these attacks are 'local' to the traditional area of operations of this group.

2.88    However, all sources describe members of the IMU as having participated in the fighting against the Northern Alliance in Afghanistan in the 1990s. The US State Department says that since 2001, with the attacks by the US on Taliban and al-Qa'ida forces in Afghanistan, 'the IMU has been predominantly occupied with attack[ing] US and Coalition soldiers in Afghanistan and Pakistan.'[48] They say that 'Pakistani security forces continue to arrest probable IMU operatives in the Federally Administered Tribal Areas.'[49]

2.89    Janes' gives the most comprehensive account of this organisation. It notes that, with the pressure brought to bear on the organisation by the war on terrorism in 2001, its members dispersed back to Tajikistan or into Northern Pakistan. It sees the IMU operatives in Pakistan as the 'remnants of the IMU'.[50] Some sources saw a split in the organisation with its 'forced relocation from Afghanistan'. There were also reports of the likely death of its leader, Juma Namangani, and the significant degradation of its operational capability.[51]

2.90    Janes' further argues that, although the IMU has a past history of working with international terrorist organisations, can conduct cross border incursions and may well arise again if there is mounting political instability in the region:

> [Its] losses suffered during the US campaigns in Afghanistan appear to have hampered its ability to mount large scale operations within the region. While Uzbek authorities have

---

48    US State Department, Annual Country Reports on Terrorism, 2005.
49    US State Department, Annual Country Reports on Terrorism, 2005.
50    http://jtic.janes.com, *Islamic Movement of Uzbekistan.*
51    http://jtic.janes.com, *Islamic Movement of Uzbekistan.*

PX503

suggested IMU involvement in violence in Uzbekistan in 2004 and 2005, they have not presented convincing proof.[52]

2.91    The statement of reasons estimates the membership to be between 200 and 2,000.[53]  The US State Department puts the figure at approximately 500.[54]  Janes' says that before the US attacks in 2001, the estimate was 5,000[55]; however, while 'the intelligence estimates from Kyrgyzstan – which may have reason to exaggerate the threat – put the IMU's strength at around 1,500 battle ready guerrillas, … assessments of them in the post Taliban period have generally put the number of fighters in the hundreds.[56]

## Ideology and links to other terrorist groups/networks

### Ideology

2.92    This group, as with many of the groups that have been listed, began with limited and local grievances and ambitions.  The IMU initially sought the overthrow of the regime of President Karimov and its replacement with a fundamentalist Islamic government.

2.93    The political struggle has been violent on all sides.  Janes' reports that the murder of Uzbek government officials in 1997 led to mass detentions, torture and secret trials.  In 2005, there was an alleged massacre of hundreds of political demonstrators in Andijan. Complaints about widespread and systematic torture have been made by the UN Special Rapporteur on Torture and Human Rights Watch.[57]  There were, in 2005, said to be 6,000 political prisoners in Uzbekistan, opposition parties were banned, religious practice was severely restricted, there was no press freedom, the internet was censored and terrorism trials were considered to be unfair.[58] The ambassador for the United Kingdom in 2005, Craig Murray, argued

---

52   http://jtic.janes.com, *Islamic Movement of Uzbekistan.*
53   In the last statement of reasons, in 2005, it was estimated to be 2000.
54   US State Department, Annual Country Reports on Terrorism, 2005.
55   Possibly exaggerated by the inclusion of Taliban and al-Qa'ida forces.
56   http://jtic.janes.com, *Islamic Movement of Uzbekistan.*
57   UN Special Rapporteur on Torture, Professor Theo van Boven, 2002 report and Human Rights Watch, *Creating Enemies of the State,* 2004.
58   Craig Murray, *What drives support for this torturer?,* Guardian, 16 May 2005 and Jonathan Freedland, *He's our sonofabitch,* 18 May 2005 and Amnesty International, *Responsibilities have no borders, 26 May 2005,* p. 6..

that, based on the way in which evidence was collected, the label of terrorism was unsound.[59]

2.94   Many of the demands that are made by this organisation and the attacks that are conducted appear to be directed at gaining the release of prisoners or attacking either the President or ministries involved in policing.

2.95   Further uncertainty about the motivation of the group is raised by Janes' who continue to argue, as they did in 2005, that although the organisation is active and violent, it is unclear whether it is 'a coherent, well coordinated guerrilla organisation or an effective but loosely organised group of bandits, drug runners and opportunists.'[60]

2.96   In past reviews, an argument has been put often to the Committee that where the activities of groups are clearly criminal actions – murder, assault and torture - the criminal law should deal with them.  Jane's view that it is difficult to decide whether the IMU is a gang of drug running and murderous criminals or an ideologically motivated terrorist organisation is an issue that was raised by the Committee in its last review and remains a legitimate concern.

2.97   Janes' also notes that:

> The IMU's apparent ease in recruiting young volunteers had much to do with poverty and economic decline in Uzbekistan and elsewhere in the region.  It is estimated that some 60 per cent of the unemployed in Uzbekistan are between 16 and 30 years old, while over a quarter of the population live on less than $US3 dollars a day. The figures are worse of the Ferghana Valley (the main base of the IMU) which has an estimated 70 to 80 per cent unemployment rate.[61]

2.98   Nevertheless, it should be noted that the experience of the IMU fighters in Afghanistan and Pakistan has seen a broadening of its aims to encompass the aims of al-Qa'ida for a regional caliphate.

## Links to other terrorist groups

2.99   The participation of IMU fighters in Afghanistan has led to linkages to a variety of other Islamic groups which have collected in the

---

59   Craig Murray, *What drives support for this torturer?*, Guardian, 16 May 2005.
60   http://jtic.janes.com, *Islamic Movement of Uzbekistan.*
61   http://jtic.janes.com, *Islamic Movement of Uzbekistan.*

PX503

region as a result of the war on terrorism.  Janes' lists these linkages as including: the Abu Sayyaf Group, the Armed Islamic Group, Harakat ul-Mujahideen and Harakat ul-Ansar as well as a bond with Uighur guerrillas from Xianjiang, Western China.[62]

## Links to Australia

2.100    No information is provided on this matter.

## Threat to Australian interests

2.101    No information is provided on this matter.

## Proscription by the UN or like-minded countries

2.102    The IMU is listed in the United Nations 1267 consolidated list and as a proscribed terrorist organisation by the governments of the United Kingdom, the United States and Canada.

## Engagement in peace/mediation processes

2.103    No information is provided on this matter.

## Conclusion

2.104    It is notable that all of these organisations have been localised groups growing out of specific grievances or particular conflicts. For most, it has been the advent of the war on terrorism that has extended their reach and their objectives – to the establishment of a regional caliphate, to providing fighters into other fields of battle, to cross funding through the al-Qa'ida network.  Individual conflicts are now seen as part of a larger conflict and they appear to feed on and re-enforce each other, bringing experience and skill learned in one place to other disputes.  And, with wars in Iraq and Afghanistan, the focus has broadened from opposition to local 'apostate' governments to a larger enemy in the West.

2.105    Nevertheless, the circumstances in which many of these groups operate are often complex and decisions to proscribe an organisation should not be made in an historical vacuum or without a rigorous testing of the evidence.  It seems to the Committee that

---

62    http://jtic.janes.com, *Islamic Movement of Uzbekistan*.

PX503

the solutions to some issues still lie, not so much in the outlawing of particular groups, but in undermining support for violence by addressing local problems at the political or economic level or dealing with disputes as part of peace processes, especially settling longstanding disputes in places like Kashmir, Chechyna, and Palestine and negotiating solutions in Iraq and Afghanistan.

2.106    However, the Committee recognises that, in terms of the legal basis of the proscription power, these seven organisations fit the broad definition of terrorist organisations as set out in the Criminal Code, even if their proscription has not been established clearly according to ASIO's criteria.  The statements of reasons provided to the Committee do not sufficiently address the criteria which ASIO has advised is the basis of its selection.  The criteria themselves and their relationship to terrorism are not clear or consistently applied and therefore do not inspire confidence that the process is a rational one best directed at containing terrorism either in this country or internationally.  The Committee hopes that these matters will be considered as a result of the review of the proscription power currently taking place.

## Recommendation 1

**The Committee does not recommend the disallowance of the regulations made to proscribe the following organisations: Ansar al-Sunna, Jaish-e-Mohammad, Lashkar-e-Jhangvi, Egyptian Islamic Jihad, Islamic Army of Aden, Asbat al-Ansar, Islamic Movement of Uzbekistan.**

**Hon David Jull, MP**

Chairman

PX503

PX503



# Appendix A – List of Submissions

1.      The Hon Philip Ruddock MP, Attorney-General
        (Ansar al-Sunna)

2.      The Hon Philip Ruddock MP, Attorney-General
        (Jaish-e-Mohammad (JeM) and Lashkar-e Jhangvi (LeJ))

3.      The Hon Philip Ruddock MP, Attorney-General
        (Egyptian Islamic Jihad (EIJ) and Islamic Army of Aden (IAA))

4.      The Hon Philip Ruddock MP, Attorney-General
        (Asbat al Ansar (AAA) and Islamic Movement of Uzbekistan (IMU))

5.      The Hon Philip Ruddock MP, Attorney-General
        (Process – Ansar al-Sunna)

6.      The Hon Philip Ruddock MP, Attorney-General
        (Process – Jaish-e-Mohammad (JeM) and Lashkar-e Jhangvi (LeJ))

7.      The Hon Philip Ruddock MP, Attorney-General
        (Process – Egyptian Islamic Jihad (EIJ), Islamic Army of Aden (IAA),
        Asbat al Ansar (AAA) and the Islamic Movement of Uzbekistan (IMU))

PX503

PX503

PX503



# Appendix B – Statement of Reasons – Ansar al-Sunna

**Ansar al-Sunna**

**(Also known as Ansar al-Islam, Partisans of Islam, Protectors of Islam, Supporters of Islam, Devotees of Islam,, Jaish Ansar al-Sunna, Ansar al-Sunna Army, Army of Ansar al-Sunna, Jund al-Islam, Soldiers of Islam, Protectors of the Sunna Faith)**

The following information is based on publicly available details about Ansar al-Sunna (including the alias Ansar al-Islam). These details have been corroborated by material from intelligence investigations into the activities of Ansar al-Sunna. ASIO assesses that the details set out below are accurate and reliable.

Ansar al-Sunna is listed as Ansar al-Islam in the United Nations 1267 Committee's consolidated list and by the governments of Canada, the United Kingdom and the United States. Ansar al-Sunna is listed separately by the UK government.

*Current status of Ansar al-Sunna*

Ansar al-Sunna was initially formed as Ansar al-Islam, a merger of several smaller Kurdish-based Sunni extremist groups within the Kurdish Autonomous Zone (KAZ) of northern Iraq in late 2001. At this stage, Ansar al-Islam focused on the defeat of the secular Kurdish leadership to establish an independent Islamic state in the KAZ.

In March 2003, successful joint Patriotic Union of Kurdistan (PUK) and United States military operations against Ansar al-Islam strongholds forced many in the

PX503

group to disperse to other locations, including Iran. Ansar al-Islam members regrouped shortly after and returned to Iraq, where they sought, in cooperation with other foreign and Iraqi militants, to create an umbrella organisation for Sunni jihadi resistance to the Coalition presence in Iraq.

As a result, Ansar al-Islam evolved into Ansar al-Sunna with the formation of the group announced in an internet statement on 20 September 2003 calling all jihadists in Iraq to unite under the name Ansar al-Sunna. Following the release of the statement, attacks conducted by Ansar al-Islam operatives have been claimed under the name Ansar al-Sunna. However, many operatives abroad, particularly in the Kurdish immigrant communities in Europe, retain their Ansar al-Islam identity but continue to provide support to Ansar al-Sunna.

Ansar al-Sunna has strong links with al-Qa'ida and historical links to Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (TQJBR), a proscribed terrorist organisation also known as al-Qa'ida in Iraq. Former TQJBR leader Abu Musab al-Zarqawi operated one of the Ansar al-Islam training camps prior to the operations against the group in 2003.

Funding is supplied through radicalised Kurdish communities abroad, al-Qa'ida, criminal hostage taking and a degree of self-sufficiency in extracting funding from local sources in northern Iraq.

*Objectives*

Ansar al-Sunna supports the global militant Sunni jihadist ideology that is espoused by al-Qa'ida, including the re-establishment of the historical Islamic caliphate.

Ansar al-Sunna's objectives within Iraq are to overthrow the Iraqi Government, expel Coalition forces from the country and establish a Sunni Islamic state administered under Sharia law.

*Leadership and membership*

Ansar al-Sunna is organised into small, highly mobile cells. The reported leader of Ansar al-Sunna is Abu Abdullah al Hasan bin Mahmud. Members are recruited from Sunni based foreign and local sources. Ansar al-Sunna is believed to be divided into six divisions including a military and information division. The precise size of the group is unknown but estimates indicate numbers to be between 500-1000 members.

*Ansar al-Sunna ʃs engagement in terrorist activities*

Ansar al-Sunna undertakes terrorist attacks each week in Iraq. Ansar al-Sunna's operational focus includes targeting Coalition Forces; Western interests; Iraqi

security forces; Iraqi government structures; Iraqis seen as cooperating with Coalition forces; secular Kurdish officials; and increasingly sectarian Shia targets.

Ansar al-Sunna's terrorist activities include suicide attacks, car bombs, emplaced improvised explosive devices (IEDs), kidnappings, executions, assassinations and conventional military attacks. It has also been involved in plans to conduct assassinations in Germany against Iraqi government interests.

Recent significant terrorist attacks for which responsibility has been claimed by, or reliably attributed to, Ansar al-Sunna include:

- 4 May 2005: Suicide bombing at KDP office in Erbil, killing 60 and wounding 150;

- 8 May 2005: Ambush of security contractors, killing 16. Japanese national Akihiko Saito was kidnapped and later died;

- 11 May 2005: Suicide bombing in Tikrit killing 33 labourers;

- 14 June 2005: Suicide attack in Kirkuk, killing 22 and wounding over 85;

- 16 June 2005: Senior Iraqi judge, Salem Mahmoud al-Haj Ali, assassinated in Mosul;

- 22 August 2005: Three military attacks against Iraqi security forces in Mosul and Kirkuk killing an unknown number of security personnel;

- 23 July 2006: Assassinating a Shia political figure in Diyali, sniping two US soldiers in Meet and detonating an IED in al-Miqdadiya damaging a US armoured vehicle;

- 29 September 2006: Suicide bombing assassination of Director of Police in Kirkuk which also killed a number of other Iraqi officials; and

- 5 December 2006: Rocket launchers and automatic gunfire killed several US service personnel on foot patrol in the al-Haqlaniyah market west of Baghdad.

*Conclusion*

The Criminal Code provides that for an organisation to be listed as a terrorist organisation, the Attorney-General must be satisfied that:

(i) the organisation is directly or indirectly engaged in, preparing, planning, assisting in or fostering the doing of a  terrorist act (whether or not a terrorist act has occurred or will occur); or

(ii) the organisation advocates the doing of a terrorist act (whether or not a terrorist act has occurred or will occur).

On the basis of the above information, ASIO assesses that Ansar al-Sunna is directly engaged in preparing, planning, assisting in or fostering the doing of terrorist acts. It is considered that the acts attributable to Ansar al-Sunna are terrorist acts as they:

(i) are done with the intention of advancing a political cause, namely, creating an Islamic caliphate in Iraq;

(ii) are intended to coerce or influence by intimidation the governments of foreign countries, including Iraq and Coalition countries, and/or intimidate a section of the public; and

(iii) constitute acts which cause serious physical harm to persons, including death, as well as serious damage to property.

This assessment is corroborated by information provided by reliable and credible intelligence sources.

PX503

**Process for the 2007 re-listing of Ansar al-Sunna as a terrorist organisation under the *Criminal Code Act 1995***

The following process was undertaken for the purpose of re-listing Ansar al-Sunna as a terrorist organisation:

1. A separate unclassified Statement of Reasons for Ansar al-Sunna was prepared by the Australian Security Intelligence Organisation (ASIO), in consultation with the Department of Foreign Affairs and Trade, detailing the case for re-listing Ansar al-Sunna.

2. Mr Henry Burmester QC, Chief General Counsel of the Australian Government Solicitor, provided written confirmation on 24 January 2007 that the Statement of Reasons prepared by ASIO was sufficient for the Attorney-General to be satisfied on reasonable grounds that Ansar al-Sunna meets the requirements to be proscribed as a terrorist organisation under s 102.1 of the Criminal Code Act 1995 (the Criminal Code).

3. The Director-General of Security, Mr Paul 0'Sullivan wrote to the Attorney-General on 31 January 2007 outlining the background, leadership, membership, leadership and membership of Ansar al-Sunna and attached a Statement of Reasons in respect of the organisation.

4. A submission was provided to the Attorney-General on 28 February 2007 attaching:

a. A copy of the Statement of Reasons prepared by ASIO in respect of Ansar al-Sunna;

b. Advice from the Chief General Counsel in respect of Ansar al-Sunna; and

c. Regulations and Federal Executive Council documentation in respect of Ansar

al-Sunna.

5. Having considered the information provided in the submission, the Attorney-General signed a statement confirming he is satisfied on reasonable grounds that Ansar al-Sunna is directly or indirectly engaged in preparing, planning, assisting in or fostering the doing of a terrorist act, whether or not the act has occurred or will occur.

The Attorney-General also signed regulations with respect to Ansar al-Sunna and approved associated Federal Executive Council documentation including Explanatory Memorandum, Executive Council Minute and Explanatory Statement.

PX503

6. A letter dated 2 March 2007 from the Attorney-General was sent to the Prime Minister advising of the Attorney-General's intention to re-list Ansar al-Sunna as a terrorist oganisation under the Criminal Code.

7. The Attorney-General advised the Leader of the Opposition by letter dated 2 March 2007 of the proposed re-listing ofAnsar al-Sunna as a terrorist organisation under me Criminal Code. The Leader of the Opposition was offered a briefing in relation to the re-listing of the organisation, however he has not taken up this offer.

8. The Attorney-General wrote to the Attorneys-General of the States and Territories on 2 March 2007 advising them of the decision to re-list Ansar al-Sunna as a terrorist organisation under the Criminal Code. A copy of the Statement of Reasons re-listing Ansar al-Sunna as a terrorist organisation was attached to the letters. To date, no correspondence from the States or Territories has been received in relation to this re-listing.

9. The Attorney-General wrote to the Chairman of the Parliamentary Joint Committee on Intelligence and Security on 2 March 2007 advising of his decision to re-list Ansar al-Sunna as a terrorist organisation under the Criminal Code.

10. The Governor-General made the regulation on 22 March 2007.

11. The regulation was registered with the Federal Register of Legislative Instruments on 23 March 2007 and commenced on 24 March 2007.

12. A press release was issued on 26 March 2007 and the Attorney-General's Department's National Security web site has been updated.

PX503



# Appendix C – Statement of Reasons – Jaish-e-Mohammad (JeM)

**Jaish-e-Mohammad (JeM)**

**(Also known as Army of Mohammed, Army of the Prophet, Jaish-e-Mohammad Mujahideen E-Tanzeem, Jaish-e-Mohammed, Jaish-e-Muhammad, Jaish-e-Mtthammed, Jaish-i-Mohammad, Jaish-i-Mohammed, Jaish-i-Muhammad, Jaishi- Muhammed, Jamaat ul-Furqan (JuF), Jesh-e-Mohammadi, Khudamul Islam, Khuddam ul-Islam (KuI), Kuddam e Islami, Mohammed's Army, National Movement for the Restoration of Pakistani Sovereignty and Army of the Prophet, Tehrik al-Furgan and Tehrik Ul-Furqaan).**

The following information is based on publicly available details about Jaish-e-Mohammad (JeM). These details have been corroborated by material from intelligence investigations into the activities of JeM and from official reporting. ASIO assesses that the details set out below are accurate and reliable.

JeM is listed in the United Nations 1267 Committee's consolidated list and by the governments of Canada, the United Kingdom, the United States, Pakistan and India.

*Current status of JeM*

JeM is a Sunni Islamic extremist organisation based in Pakistan that operates primarily in Indian Administered Kashmir (IAK). Established in 2000, JeM was founded by the

radical Islamic scholar and jihadist leader, Maulana Masood Azhar, following his release from an Indian jail in exchange for 155 hostages hijacked aboard an Indian Airlines aircraft on New Years Eve 1999. With support from Usama bin Laden, the Taliban, and several other Sunni extremist organisations in Pakistan, Azhar did not return to his former group, the proscribed Islamic militant group Harakat ul-Mujahideen (HuM), but formed JeM as a new group with almost identical aims to HuM.

JeM is aligned politically with Jamiat-e-Ulema-e-Islam Fazul Rehman faction (JUI-F), a prominent radical Islamic party in Pakistan and Kashmir. Funding for JeM is derived from both legitimate business interests, including commodity trading and property, and through Islamic charitable foundations including the al-Rashid Trust (whose accounts were ordered to be frozen by the UN Security Council for suspected links to al-Qai'da). JeM has conducted joint operations with Lashkar e-Tayyiba (LeT), and cooperates closely with other Islamic militant groups operating in Afghanistan, Kashmir and Pakistan such as HuM, the Hizb-ul-Mujahideen (HM), and the Lashkar e-Jhangvi (LeJ). JeM is also closely associated with al-Qa'ida (AQ), and reports suggest Azhar may have assisted AQ fight US forces in Somalia and helped to establish AQ training camps in Yemen.

JeM was banned by the Pakistan government in January 2002. Following the ban, JeM appears to have split into two factions, Khuddam ul-Islam (KuI) headed by Azhar and Jamaat ul-Furqan (JuF) headed by Maulana Abdul Jabbar (alias Umar Farooq). Both KuI and JuF were also subsequently banned by Pakistan in November 2003. Despite these factions, the group is commonly regarded as a single entity and referred to as JeM.

JeM has concentrated its efforts on the disputed territories of IAK, where it has conducted numerous attacks against Indian security forces (military and police), government installations and civilians. While Indian and Pakistani initiatives to resolve the Kashmir situation have led to an overall reduction in the level of infiltration and insurgent activity since 2002, JeM continues to be one of the most active terrorist groups in IAK. For example, JeM claimed responsibility for the 2 November 2005 suicide car bomb attack in Srinagar that killed seven civilians, including a 10 year-old boy and three police officers. JeM operatives were among those responsible for a string of attacks in Srinagar on 14 April 2006, including a grenade attack on a crowd of civilians which killed three and injured eleven others. JeM members were responsible for a grenade attack on a police vehicle escorting a Human Rigjits Commission vehicle on 30 May 2006, and for a series of firearm attacks on police targets on 17 August 2006.

While IAK remains JeM's primary focus, elements within JeM have broadened the group's focus to include the targeting of members of the Pakistani state and the Western presence in Pakistan. As members of a previously unknown group

"Jundallah," JeM trained members were among a number of militants drawn from several Pakistani extremist groups responsible for the twin car-bomb attack near the US Consulate in Karachi on 26 May 2004. On 9 June 2004, the same terrorist cell was involved in a terrorist attack against a heavily-armed military convoy carrying Karachi's military commander resulting in seven deaths. In August 2006, the Pakistan government ordered a crackdown on the JeM faction JuF following intelligence its members were planning to target Western interests in Pakistan. Members of JeM are also reported to have been involved in two assassination attempts against Pakistan's President Pervez Musharraf in December 2003.

JeM operates a number of camps in Pakistan which provide both religious instruction and military style guerrilla training and support. Since being proscribed by the Pakistan government in 2002, some JeM training facilities are now smaller in scale and focused on preparing jihadists for either low intensity, hit and run type operations or suicide attacks. Training and support is provided, not only to JeM members from Kashmir and Pakistan, but also to individual jihadists from other parts of the world. Suicide bomber Mohammad Bilal, a British national, travelled to Pakistan to volunteer for the JeMdirected suicide attack in IAK on 25 December 2000 which killed six Indian soldiers and three Kashmiri students. Reporting also indicates JeM may be helping to facilitate the activities of international jihadists intending to conduct terrorist operations outside Kashmir or India, including the United Kingdom. The British national, Rashid Rauf,

arrested in Pakistan as one of the main coordinating figures allegedly responsible for the disrupted British trans-Atlantic plane bombing plot in August 2006, is strongly suspected of having links with JeM. Investigators have also uncovered possible connections between JeM and the British-born suicide bombers responsible for the 7 July 2005 London subway attacks.

*Objectives*

JeM is a group that uses violence in pursuit of its stated objective of uniting IAK with Pakistan under a radical interpretation of Islamic law, as well as the "destruction" of America and India.

*Leadership and membership*

JeM's founder, Maulana Masood Azhar, remains the group's Amir. Reporting indicates that JeM has a strength of several hundred armed volunteers, but exact membership numbers cannot be accurately determined. The majority of JeM's membership consists of jihadists from Pakistan and Kashmir, but also includes some Arabs and Afghans. JeM has also attracted several recruits from South Asian communities in the United Kingdom.

PX503

*JeM engagement in terrorist activities*

JeM has been involved in a number of terrorist activities, including hijacking, bombings abductions and training. Terrorist activities, for which responsibility has been claimed by, or reliably attributed to JeM over the past three years, include:

- December 2003: Attempted assassination of Pakistani President Musharraf by car bomb

- 25 October 2004: Joint responsibility with HuM for a firearm attack on the motorcade of the Divisional Commissioner for the Muslim-Majority Kashmir Valley that injured one security guard

- 2 November 2005: Suicide car bomb attack outside the home of outgoing Chief Minister Mufti Mohammad Sayeed on the outskirts of Srinagar that killed seven civilians, including a 10 year-old boy, and three police officers

- 14 April 2006: Series of grenade attacks on police targets in Srinagar that killed five civilians and injured 41

- 22 May 2006: Three separate grenade attacks on police targets in Srinagar injuring a total of 34 people

- 30 May 2006: Grenade attack on police vehicle escorting a Human Rights Commission vehicle through the Iqbal Park area of Srinagar killing one policeman and injuring six other people

- 19 July 2006: Three separate firearm attacks on police targets in Srinagar killing two police and injuring one other

- 17 August 2006: Three separate firearm attacks on police officials resulting in four dead and three injuries; and

- November 2006: Indian police arrested two reported JeM members in Delhi and recovered 2 kgs of explosives and a sum of money.

*Conclusion*

The Criminal Code provides that for an organisation to be listed as a terrorist organisation, the Attorney-General must be satisfied that:

(i) the organisation is directly or indirectly engaged in, preparing, planning, assisting in or fostering the doing of a terrorist act (whether or not a terrorist act has occurred or will occur); or

(ii) the organisation advocates the doing of a terrorist act (whether or not a terrorist act has occurred or will occur).

PX503

On the basis of the above information, ASIO assesses JeM is directly preparing, planning, assisting in or fostering the doing of terrorist acts. It is submitted that the acts attributable to JeM are terrorist acts as they:

(i) are done with the intention of advancing a political cause, namely, (creating a radical Islamic state in Pakistan and an Indian-controlled Kashmir with Pakistan)

(ii) are intended to coerce or influence by intimidation the governments of foreign countries, including Pakistan, and/or intimidate sections of the public; and

(iii) constitute acts which cause serious physical harm to persons, including death, as well as serious damage to property.

This assessment is corroborated by information provided by reliable and credible intelligence sources.

PX503

PX503

PX503



# Appendix D – Statement of Reasons – Lashkar-e Jhangvi (LeJ)

**Lashkar-e Jhangvi (LeJ)**

**(Also known as Jhangvi Army, Lashkar e Jhangvi, Lashkar Jangvi, Lashkar Jhangvi, Lashkar-e Jhangvi, Lashkare Jhangvi, Lashkar-e-Jhangvie, Lashkar-e-Jhangwi, Lashkar-e-Jhanvi, Lashkar-i-Jangvi, Lashkar-i-Jhangvi, Lashkar-i-Jhangwi, Laskar e Jahangvi and Laskar-e-Jhangvi).**

The following information is based on publicly available details about Lashkar-e Jhangvi (LeJ). These details have been corroborated by material from intelligence investigations into the activities of the LeJ. ASIO assesses that the details set out below are accurate and reliable.

LeJ is listed in the UN 1267 Committee's consolidated list and as a proscribed terrorist organisation by the governments of the United Kingdom, the United States, Canada and Pakistan.

*Current status of LeJ*

Lashkar-e Jhangvi (LeJ) is a Sunni Islamic terrorist group based in Pakistan. The group was formed in 1996 as a more militant splinter group of the radical sectarian organisation, the Sipah-e-Sahaba Pakistan (SSP) and follows the Deobandi tradition of Sunni Islam. Under the leadership of Riaz Basra, the LeJ quickly distinguished itself as the most violent and radical sectarian force in Pakistan.

PX503

LeJ is based primarily in the Punjab and Balochistan regions of Pakistan, and the port city of Karachi. It is responsible for numerous targeted killings and massacres. The group has targeted for assassination, not only opposing Shiite activists, but prominent Shiite officials, professionals and businessmen. It has assassinated Iranian nationals in Pakistan and was involved, along with the Jaish e-Moharnmad (JeM), in the abduction and murder of US journalist Daniel Pearl in January 2002. It has also instigated attacks, including small-arms attacks and suicide bombings, on Shiite mosques and processions, and Christian churches resulting in the random killing of hundreds of people.

While sectarian attacks remain LeJ's primary driving force, elements within LeJ have broadened the group's focus to include the targeting of members of the Pakistani State and the Western presence in Pakistan. As members of a previously unknown group "Jundallah," LeJ trained members were among a number of militants drawn from several Pakistani extremist groups responsible for the twin car-bomb attack near the US Consulate in Karachi on 26 May 2004. On 9 June 2004, the same terrorist cell was involved in a terrorist attack against a heavily-armed military convoy carrying Karachi's military commander resulting in seven deaths. More recently the LeJ was linked to the 2 March 2006 suicide car bombing on the US Consulate in Karachi that killed a US diplomat.

LeJ derive a considerable portion of funding from wealthy benefactors in Karachi. Extortion from Shia banks and businesses is another significant means by which the LeJ raises finances for terrorist operations.

Pakistani government security crackdowns since late 2001 have had some success, but the group continues to recruit new members to replace those arrested or killed.

Over half of Pakistan's madrassas (religious schools) are Deobandi run and they provide a fertile pool of manpower susceptible to LeJ recruitment. The present status of LeJ training facilities is not known. LeJ training camps in Afghanistan were destroyed by the United States and their training facilities in Pakistan have been disrupted by local police. Being part of a broader Deobandi movement, however, the LeJ can rely on the assistance of other militant Deobandi groups including its parent the SSP, JeM, the Jamiat ul-Ansar (JuA - also known as Harakat ul-Mujahideen or HuM) and Harakat ul-Jihad al-Islami (HuJI).

The LeJ has an extremely close relationship with the Taliban and confirmed links with al-Qa'ida. LeJ operatives are thought to have received training from al-Qa'ida.

*Objectives*

The LeJ's ultimate objective is the establishment of an Islamic state in Pakistan based on a radical interpretation of Sharia law, through the use of violence. Part of

PX503

a broader Sunni extremist movement, LeJ's membership harbour an intense hatred of all foreign, or non-Islamic influences. The group is also fervently anti-Shia and aim to have them declared a non-Muslim minority.

*Leadership and membership*

Muhammad Ajmal (aka Akram Lahori) is reportedly the present leader of the LeJ. Ajmal succeeded Riaz Basra following Basra's death in May 2002 as a result of a shootout with Pakistani police. Ajmal is himself in custody following his arrest in June 2002 for his alleged involvement in 38 cases of sectarian killings. Although Ajmal is officially considered the head of LeJ, Mufti Bid Mohammed is now believed to lead the organisation and operational command is understood to have passed to minor figures.

LeJ is estimated to have 300 active members. The LeJ maintains a multi-cellular structure, made up of loosely co-ordinated regional sub-units further divided into several small cells that operate independently of one another.

*LeJ engagement in terrorist activities*

The LeJ has been involved in a number of terrorist attacks, including targeted assassinations and suicide bombings against, Shia, Christian, Western and government targets.

Recent terrorist attacks for which responsibility has been claimed by, or reliably attributed to, the LeJ have included:

- January 2005: the attack on Shiite religious leader, Syed Agha Ziauddin Rizvi, in Gilgit, resulting in three deaths

- 28 September 2005: Two LeJ leaders arrested for planning the 27 and 30 May 2005 suicide bomb attacks on a Shiite mosque in Karachi and the Ban Imam shrine in Islamabad which killed a total of twenty-four people

- 2 March 2006: suicide car bombing on the US Consulate in Karachi killing a US Diplomat

- 11 April 2006: suspected involvement in the bomb attack on Shiite worshippers at Nishtar Park in Karachi killing more than sixty people

- 14 July 2006: suicide bomb attack on Shiite cleric, Allama Hassan Turabi, in Karachi which also killed Turabi's nephew, and injured three security guards; and

- 1 January 2007: Pakistani Intelligence agencies claim uncovered documentary evidence indicates LeJ plan to accelerate their targeting of Shiite mosques and prominent Shiite leaders and scholars.

PX503

*Conclusion*

The Criminal Code provides that for an organisation to be listed as a terrorist organisation, the Attorney-General must be satisfied that:

(i)   the organisation is directly or indirectly engaged in, preparing, planning, assisting in or fostering the doing of a terrorist act (whether or not a terrorist act has occurred or will occur); or

(ii)  (ii) the organisation advocates the doing of a terrorist act (whether or not a terrorist act has occurred or will occur).

On the basis of the above information, ASIO assesses that LeJ is directly preparing, planning, assisting in or fostering the doing of terrorist acts. It is submitted that the acts attributable to LeJ are terrorist acts as they:

(i) are done with the intention of advancing a political cause, namely, the establishment of a Islamic state in Pakistan

(ii) are intended to coerce or influence by intimidation the government of foreign countries, including Pakistan and/or intimidate sections of the public; and

(iii) constitute acts which cause serious physical harm to persons, including death, as well as serious damage to property.

This assessment is corroborated by information provided by reliable and credible intelligence sources.

PX503

PX503



# Appendix E – Statement of Reasons – Egyptian Islamic Jihad (EIJ)

**(Also known as; EI-Gihad; al-Jihad; Jihad Group; Islamic Jihad; AI-Jihad al-Islami; New Jihad Group; Qaeda al-Jihad; Talaa'al al-Fateh; Vanguards of Conquest; al-Takfir; World Justice Group; International Justice Group, Islamic Group).**

The following information is based on publicly available details about Egyptian Islamic Jihad (EIJ). These details have been corroborated by material from intelligence investigations into the activities of the Egyptian Islamic Jihad and by official reporting. ASIO assesses that the details set out below are accurate and reliable.

The EIJ is listed in the United Nation's 1267 Committee's consolidated list and as a proscribed terrorist organisation by the governments of Canada, the United Kingdom, and the United States.

*Current status of EIJ*

The EIJ emerged as a coalition of Sunni Islamic radical groups that split from the Muslim Brotherhood, an Egyptian Islamic political movement, in the late 1970s. Following the EIJ's assassination of Egyptian President Anwar Sadat in 1981, actions by the Egyptian authorities constrained its capability within Egypt

During the 1990s, the domestic EIJ faction continued to carry out attacks against targets in Egypt. Meanwhile, senior EIJ member (now al-Qa'ida deputy) Dr Ayman al-Zawahiri and the international faction of EIJ forged links with al-Qa'ida and affiliated groups. In February 1 998 the EIJ joined al-Qa'ida and other

PX503

extremist organisations in issuing a declaration under the banner of the 'World Islamic Front announcing a jihad against 'Jews' and 'Crusaders' and stating the US and its allies need to be expelled from the Middle East.

The EIJ exists as two factions - the international and the domestic. The international faction, led by al-Qa'ida deputy, Ayman al-Zawahiri, is largely subsumed within al-Qa'ida and has the same goals as that group. Terrorist activities by the EIJ international faction are likely credited to al-Qa'ida rather than the EIJ. The domestic faction is mostly inactive due to successful, sustained actions by Egyptian authorities. There is no evidence that this has led to the creation of two separate organisations.

The EIJ aims to overthrow of the Egyptian Government and the establishment of an Islamic state. More broadly, the international branch has adopted the global jihadist goals of al-Qa'ida.

*Leadership and Membership*

The leader of the domestic faction of EIJ is Abbud al-Zumar. Al-Zumar is currently in prison in Egypt. EIJ's spiritual leader is Omar Ahmed Abdul Rahman, an Egyptian cleric currently in prison in the US for his role in the 1993 World Trade Centre bombing.

Estimates of the size of the EIJ membership vary. It is estimated to have a core membership of several hundred, with several thousand supporters.

*EIJ engagement in terrorist activities*;

Consistent with its primary goals, the EIJ initially conducted armed attacks against high level Egyptian government personnel and Egyptian facilities. As the EIJ's goals became intertwined with those of al-Qa'ida and the EIJ became frustrated with its inability to overthrow the Egyptian Government, the EIJ concentrated on attacks against Egyptian targets outside Egypt and US interests.

The Egyptian security and police services have been effective in reducing the operational capability of the EU in Egypt and attacks that can be reliably attributed to the group have declined. However, despite the reported merger of EIJ with al-Qa'ida, there is no indication the EIJ has retreated from its objectives or has ceased terrorist activities. In October 2005 the US Government identified a several Egyptian nationals as EIJ members who had provided training and material support to al-Qa'ida. A statement in March 2006 attributed to the EIJ's spiritual leader, Omar Ahmed Abdul Rahman expressed the anti- Egypt sentiment of the EIJ and called for jihad in seeking his release from US custody. Ayman al-Zawahiri remains a significant symbol and leader of global jihad and is still considered the leader of the international EIJ faction. On 27 July 2006, al-Zawahiri

issued a video statement calling on Muslims to target the interests of "all the countries' who participated in the "assault against the Muslims" in countries including Afghanistan and Iraq, a reference taken to include Australia.  In June 2006, EIJ member Abu Hamza al-Muhajir (also known as Abu Ayyub al-Masri), who had a senior position in al-Qa'ida, was appointed as leader of Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (commonly known as al-Qa'ida in Iraq), following the death of Abu Musab al-Zarqawi.

Based on this information, it is reasonable to conclude that the EIJ, including EIJ members active in the al-Qa'ida network, continue to have the capability and intent to conduct further terrorist attacks. It is assessed the EIJ is active internationally and it is likely EIJ will undertake attacks if and when the opportunity arises.  The group's close association with al-Qa'ida means it could draw on significant resources for future activities.

Terrorist attacks and activities which have been claimed by or reliably attributed to EIJ include:

- Oct 1981; assassination of Egyptian President Anwar Sadat;

- Aug 1993: attempted assassination of the Egyptian Interior Minister Hassan al-Alfi using a VBIED;

- Nov 1993: attempted assassination of the Egyptian Prime Minister Atef Sikdi by vehicle borne improvised explosive device (VBIED);

- Nov 1995: assassination of an Egyptian diplomat in Geneva;

- Nov 1995: suicide truck-bomb attack against the Egyptian embassy in Pakistan, killing 17 people; and

- 1998; an attack against the US Embassy in Albania was disrupted.

*Conclusion*

The Criminal Code provides that for an organisation to be listed as a terrorist organisation, the Attorney-General must be satisfied that:

(i) the organisation is directly or indirectly engaged in, preparing, planning, assisting in or fostering the doing of a terrorist act (whether or not a terrorist act has occurred or will occur); or

(ii) the organisation advocates the doing of a terrorist act (whether or not a terrorist act has occurred or will occur).

On the basis of the above information, ASIO assesses that members of the EIJ remain active and are directly or indirectly engaged in preparing, planning, assisting in or fostering the doing of terrorist acts.  It is considered that the acts attributable to EIJ are terrorist acts as they:

(i) are done with the intention of advancing a political cause, namely, the establishment of a radical Sunni Islamic state in Egypt;

(ii) are intended to coerce or influence by intimidation the governments of foreign countries, including Egypt, and/or intimidate sections of the public; and

(iii) constitute acts which cause serious physical harm to persons, including death, as well as serious damage to property.

This assessment is corroborated by information provided by reliable and credible intelligence sources.

PX503

PX503



# Appendix F – Statement of Reasons – Islamic Army of Aden (IAA)

**Islamic Army of Aden (IAA)**

**(Also known as; Aden Abyan Islamic Army (AAIA); Islamic Army of Aden Abayan; Aden Islamic Army; Muhammed's Army/Army of Mohammed; Jaish Adan al Islami)**

The following information is based on publicly available details about the Islamic Army of Aden (IAA). These details have been corroborated by material from intelligence investigations into die activities of the IAA. ASIO assesses that the details set out below are accurate and reliable.

The Islamic Army of Aden (IAA) is listed in the United Nations 1267 Committee's consolidated list and as a proscribed terrorist organisation by the governments of the United Kingdom and Canada.  The United States has designated the IAA as a terrorist organisation on the Terrorist Exclusion List

*Current status of the IAA*

The IAA is a Sunni Islamic extremist group and was formed in 1996 as a splinter group of the Yemeni Islamic Jihad.  The IAA first came to public prominence in 1998 when it issued statements detailing its intention to overthrow the Yemeni government and implement Sharia law; and called for operations against US and other Western interests in Yemen.

The IAA predominantly operates in the southern governates of Yemen—particularly Aden and Abyan.  The IAA has been involved in a number of terrorist

attacks against the Yemeni and Western interests.  It has used bombings and kidnappings as a means of furthering its goals.  In 1998, the IAA kidnapped 16 Western tourists. Four of the tourists, including an Australian, were killed in a rescue attempt.  The IAA also claimed responsibility for the suicide bomb attack against the USS Cole on 12 October 2000.

The IAA is associated with al-Qa'ida and has made public statements in support of Usama bin Laden, al-Qa'ida and its terrorist activities.

Although current specific funding arrangements for the group are unknown, the IAA is believed to conduct criminal activities such as kidnapping as a means of raising money through ransom and to apply pressure to the Yemeni government It may also have received some funding through al-Qa'ida.  Counter-terrorism operations by Yemeni authorities over the last few years have reduced the size of the group and limited its operational effectiveness.  However, the IAA has not been deterred and there is no indication the intent of the IAA has changed. IAA members have continued to be arrested, including the reported arrest of IAA members suspected of involvement in terrorist activities in Iraq.  The involvement of the IAA in Iraq, and the possible return of IAA operatives to Yemen, as well as the group's association with al-Qa'ida from which the IAA could draw on significant resources for future activities means that IAA could undertake terrorist activities if and when the opportunity arises.

*Objectives*

The IAA aims to overthrow the current Yemeni government and establish an Islamic state.  More broadly, the IAA is committed to support al-Qa'ida's global jihad.

*Leadership and membership*

The IAA's founder and former leader Zain al-Abidin al-Mihdar (aka Abu al-Hassan) was executed in 1999 for his role in the 1998 kidnapping and 16 Western tourists in Yemen.  Al-Mihdar and other founding members were veterans of the struggle in Afghanistan against the Soviets.  Khaled Abdennabi assumed leadership of the IAA before surrendering to authorities in June 2003.  In return for his cooperation Abdennabi received a Presidential pardon that same year. Abdennabi has since made statements on behalf of the group but it is unclear whether he is the current leader.

The current strength of the IAA is unknown, but is likely to be between 30 to 100 core members divided into a number of small groups or cells.

*IAA engagement in terrorist activities*

Security operations by the Yemeni authorities have restricted the IAA's capabilities within Yemen.  However, on the basis of available information, it is

assessed that IAA operatives still exist in Yemen.  It is assessed that the IAA will undertake terrorist activities if and when the opportunity arises.  The group's association with al-Qa'ida means the IAA could draw on significant resources for future activities.

Terrorist attacks and plans for terrorist attacks for which responsibility has been claimed by, or reliably attributed to, the IAA, have included:

Aug 2002: three Yemenis belonging to the IAA were convicted of carrying out bombing attacks in the southern port of Aden on 1 January 2001;

21 Jun 2002: attack on a military medical convoy, injuring 7 soldiers;

Jun 2003: arrest of four alleged IAA members and seizure of a car packed with hand grenades, explosives and rocket-propelled grenades that had been used in the attack on a military medical convoy on 21 June 2003;

25 Jun 2003; clash between IAA members and government troops at the group's hideout in Harat - captured IAA members revealed they were waiting for orders to carry out terrorist operations;

Oct 2003; a planned car bomb attack against the US, UK and German embassies in Sana'a allegedly involving the IAA was disrupted;

Mar/Apr 2006: arrest of IAA members suspected of planning to travel to Iraq to fight foreign forces.

*Conclusion*

The Criminal Code provides that for an organisation to be listed as a terrorist organisation, the Attorney-General must be satisfied that:

(i) the organisation is directly or indirectly engaged in, preparing, planning, assisting in or fostering the doing of a terrorist act (whether or not a terrorist act has occurred or will occur); or

(it) the organisation advocates the doing of a terrorist act (whether or not a terrorist act has occurred or will occur).

On the basis of the above information, ASIO assesses that the incidence of terrorist activity by the IAA has declined since 2003.  However, ASIO assess that members of the IAA remain active and are directly or indirectly preparing, planning, assisting in or fostering the doing of terrorist acts.  It is submitted that the acts attributable to the IAA are terrorist acts as they:

(i) are done with the intention of advancing a political cause, namely, the replacement of the Yemeni government with an Islamic state;

(ii) are intended to coerce or influence by intimidation the governments of foreign countries, including Yemen, and/or intimidate sections of the public; and

(iii) constitute acts which cause serious physical harm to persons, including death, as well as serious damage to property.

This assessment is corroborated by information provided by reliable and credible intelligence sources.

PX503

PX503



# Appendix G – Statement of Reasons – Asbat al Ansar (AAA)

**Asbat al Ansar (AAA)**

**(Also known as: League of Partisans; Band of Partisans, Band of Helpers, League of the Followers, Partisans' League, Usbat al-Ansar, Usbat nl-Ansar, Osbat aS-Ansar, Isbat al-Ansar, Esbat al-Ansar).**

The following information is based on publicly available details about Asbat al-Ansar (AAA). These details have been corroborated by material from intelligence investigations into the activities of the Asbat al-Ansar and by official reporting. ASIO assesses that the details set out below are accurate and reliable.

AAA is listed in the United Nation's 1267 Committee's consolidated list and as a proscribed terrorist organisation by the governments of Canada, Russia, the United Kingdom, and the United States.

*Current status of AAA*

AAA is a Sunni Muslim extremist group, largely based in the Ayn al-Hilwah Palestinian refugee camp near Sidon in southern Lebanon. He group has a smaller presence in the Nahr al-Bared camp outside Tripoli in northern Lebanon, and is also active in Sidon, Beirut and the Dinniyeh plateau in northern Lebanon.

AAA's origins can be traced back to the late 1980s. The group became more widely known in the early 1990s following a series of attacks on nightclubs, theatres and liquor stores.

PX503

Initially, AAA limited its operations to Lebanon and engaged in a number of low-level attacks against 'un-Islamic' targets. These have included bombings against churches, bars, theatres and casinos, as well Lebanese forces, elements of the Lebanese government and foreign nationals. AAA has widened its operations to conduct attacks against foreign interests in Lebanon and assassinations of significant religious leaders. AAA's attack methods include rocket-propelled grenades, explosive charges, rockets and car bombs.

AAA maintains links to a number of terrorist organisations, including al-QaMda and Taozim Qa'idat al-Jihad fi Bilad al Rafidayn (TQJBR), There is a view mat AAA subscribes to bin Laden's ideal of global jihad and is planning to extend its operations into Syria and Israel

AAA remains active and has shifted its focus to Iraq, sending fighters in support of the insurgency in collaboration with al-Qa'ida. In 2005 and 2006, AAA announced the death or martyrdom of AAA members fighting the 'crusader' forces in Iraq. Due to the activities of AAA and like-minded groups, Lebanon has increasingly become a known transport node and recruitment hub for extremists travelling to Iraq.

AAA leadership continues to make statements supporting attacks conducted by other groups and advocating violent jihad against me West, such as the April 2004 announcement urging Iraqi insurgents to kill Western hostages to avenge the death of Hamas leaders Abdul Aziz Rantisi and Sheikh Ahmed Yassin, and the February 2006 statement praising attacks by angry mobs against the Banish consulates in Beirut and Damascus in response to the Danish cartoons controversy.

AAA primarily receives funding from other terrorist organisations, such as al-Qa'ida.

*Objectives*

AAA's objectives are to establish a Sunnj Islamic state in Lebanon by overthrowing the Lebanese government, eliminating Israel and thwarting anti-Islamic and pro-Western influences in Lebanon.

*Leadership and Membership*

AAA is led by Abu Muhjin (aka Ahmed Abd al-Karim al-Saadi). Abu Muhjin allegedly fled Lebanon in 1999 to continue his activities in secret after being sentenced to death for the 1994 assassination of Sheikh Nizar al-Halabi, the leader of a rival Islamic extremist group. In his absence, Abu Muhjin's brother, Haytham Abd Al-Karim Al Sa'di (aka Abu Tariq), has been nominally leading the group.

PX503

AAA membership is primarily Palestinian. AAA's membership is estimated to be 100-300 members. AAA members have previously fought in Afghanistan, Chechnya, Kashmir and the Balkans.

*AAA engagement in terrorist activities*

AAA continues to undertake attacks but is also assisting the doing of terrorist acts. On the basis of available information it is assessed AAA operatives are active in Lebanon and it is likely AAA will undertake attacks if and when the opportunity arises. His group's close association with al-Qa'ida means it could draw on significant resources for future activities,

Terrorist attacks and activities which have been claimed by or reliably attributed to AAA include:

- March 2004: two members of AAA were jailed in a Lebanese military court for membership of AAA. One of the men was also found responsible for a 1999 grenade attack on a vegetable market in Ayn al-Hilwah;

- September 2004: AAA operatives were linked to a planned terrorist operation targeting the Italian Embassy, Ukrainian Consulate General and Lebanese Government offices. The plot was disrupted by Italian, Lebanese and Syrian authorities;

- My 2005: AAA announced one of its members was a martyr In Iraq facing the 'crusaders' forces'; and

- March 2006: AAA announced fighters from South Lebanon were killed during recent al-Qa'ida operations in Iraq.

*Conclusion*

The Criminal Code provides mat for an organisation to be listed as a terrorist organisation, the Attorney-General must be satisfied that:

(i) the organisation is directly or indirectly engaged in, preparing, planning, assisting in or fostering the doing of a terrorist act (whether or not a terrorist act has occurred or will occur); or

(ii) the organisation advocates the doing of a terrorist act (whether or not a terrorist act has occurred or will occur).

On the basis of the above information, ASIO assesses hat AAA is directly engaged in preparing, planning, assisting in or fostering the doing of terrorist acts. It is considered that the acts attributable to AAA are terrorist acts as they:

(i) are done with the intention of advancing a political cause, namely, the establishment of a radical Sunni Islamic state in Lebanon;

PX503

(ii) are intended to coerce or influence by intimidation the governments of a foreign country, including Lebanon, and/or intimidate sections of the public; and

(iii) constitute acts which cause serious physical harm to persons, including death, as well as serious damage to property.

This assessment is corroborated by information provided by reliable and credible intelligence sources.

PX503



# Appendix H – Statement of Reasons – Islamic Movement of Uzbekistan (IMU)

**Islamic Movement of Uzbekistan (IMU)**

**(Also known as the Islamic Party of Turkestan, Islamic Movement of Turkestan)**

The following information is based on publicly available details about the Islamic J Movement of Uzbekistan (IMU).  These details have been corroborated by material from intelligence investigations into the activities of the IMU and by official reporting.  ASIO assesses mat the details set out below are accurate and reliable.

The IMU is listed in the United Nations 1267 Committee's consolidated list and as a proscribed terrorist organisation by the governments of the United Kingdom, United States and Canada. i

*Current status of the IMU*

The IMU formed in the late 1990s and is composed of Islamic extremists from Uzbekistan and other Central Asian states.  It opposes the current Uzbek regime. The IMU's area of operation includes Uzbekistan, Afghanistan, Tajikistan, Pakistan, Kyrgyzstan and Iran. j

In 2001, the group announced that it had changed its name to the Islamic Party of Turkestan.  The motivation for this is unclear, although it is probably intended to| signal a change in emphasis from anti-Uzbek government activities to a wider radical Islamic agenda.  The organisation has, however, continued to be known as the IMU.  On 11 September 2006 the fifth anniversary of the coordinated attacks in

PX503

the US the IMU leadership renewed their commitment to attack the governments of Central Asia and issued personal threats against the Uzbek, Tajik and Kyrgyz Presidents.  The statement reinforced the IMU leadership's commitment to al-Qa'ida's ideology of global jihad and continued anti-Western rhetoric.  The IMU has conducted terrorist attacks against civilian, government and foreign targets in Central Asia. The group's tactics include hostage-taking (including foreigners), firearms attack and car bombings.  The IMU conducted a bomb attack in June 2005 and in early 2006 was involved in armed attacks against a detention centre and customs and border posts.  Kyrgyz and Tajik police operations in April, August and November 2006 discovered numerous weapons and supplies which were attributed to the IMU.

The IMU has close ties with al-Qa'ida and the former Taliban government.  Senior IMU leaders have held positions in the al-Qa'ida hierarchy.  The IMU receives funding from criminal activities such as drug trafficking, donations from sympathisers and from al-Qa'ida.

The IMU continue to recruit fighters and IMU members fight alongside the Taliban and al-Qa'ida against coalition and Pakistani forces in Afghanistan and northern Pakistan.  The Ferghana Valley, where the Uzbek, Kyrgyz and Tajik borders converge, is a fertile recruiting ground for the IMU and the IMU has successfully exploited widespread poverty in its recruitment strategy.

IMU members have received training in camps in Afghanistan, some controlled by al- Qa'ida or the Taliban.  IMU training camps continue to exist in Pakistan and Afghanistan.  IMU members have been trained in the use of small arms, poisons, explosives (including land mines) and religious ideology.

Despite the IMU's losses in Afghanistan during me US intervention and the movement of fighters from the IMU to the Islamic Jihad Group (IJG) - an IMU splinter group — the group remains active and continues to have the capability and intent to conduct terrorist attacks.

*Objectives*

 The IMU's initial objective was to overthrow the Uzbek regime and replace it with an Islamic state.  However, the IMU's goals have broadened to include the establishment of a radical Islamic caliphate in Turkestan, an area stretching from the Caspian region to Xinjiang in western China.

*Leadership and membership*

The IMU was founded by Tohir Yuldashev and Juma Namangani.  Tahir Yoldashev is the IMU's political and ideological leader.  Military strategist Juma Namangani probably died fighting the US-led coalition in Afghanistan in 2001.

The IMU attracts support from a variety of ethnic backgrounds, principally Uzbeks, Kyrgyz, Tajiks, Kazakhs, Chechens and Uighurs from western China. Estimates of the membership of the IMU vary from 200 to 2000.

*Terrorist activities*

Recent terrorist attacks and activities for which the IMU has claimed responsibility or for which responsibility has been reliably attributed include:

- 31 January 2005:  car bomb attack against the Ministry of Emergency Situations in the centre of Dushanbe, Tajikistan;

- 12 June 2005;  bomb attack against the Ministry of Emergency Situations in Dushanbe, Tajikistan wounding twelve people;

- 25 January 2006:  armed attack on prison in an attempt to free a prisoner resulting I in the death of the chief of the detention centre in Kairakum Tajikistan; and

- 12 May 2006:  IMU members were involved in armed attacks on. border and customs posts in Kyrgyzstan and Tajikistan.

*Conclusion*

ASIO assesses that the IMU is continuing to prepare, plan and foster the commission of acts involving threats to human life and serious damage to property.  Although the organisation suffered significant loses during the Afghanistan conflict, it has attracted recruits from a variety of countries within the region, and has a history of working with other international terrorist organisations from which it may draw support.

The Criminal Code provides that for an organisation to be listed as a terrorist organisation, the Attorney-General must be satisfied that :

(i) the organisation is directly or indirectly engaged in, preparing, planning, assisting in or fostering the doing of a terrorist act (whether or not a terrorist act has occurred or will occur); or

(ii) the organisation advocates the doing of a terrorist act (whether or not a terrorist act has occurred or will occur).

On the basis of the above information, ASIO assesses that the IMU remains active: and is directly preparing, planning, assisting in or fostering the doing of terrorist acts.

It is submitted that the acts attributable to the IMU are terrorist acts as they:

(i) are done with the intention of advancing a political cause, namely, the

objective of establishing a radical Islamist caliphate in Turkestan;

PX503

(ii) are intended to coerce or influence by intimidation the government of a foreign country, namely the states of Central Asia and/or intimidate sections of the public; and

(iii) constitute acts which cause serious physical harm to persons, including death, as well as serious damage to property.

This assessment is corroborated by information provided by reliable and credible intelligence sources.

PX503

PX503

PX505

**Hizballah's External Security Organisation**

**(Also known as: ESO, Islamic Jihad Organisation, Hizballah International and Special Operations Branch)**

The following information is based on publicly available details about Hizballah's External Security Organisation (ESO).  The United Kingdom has listed Hizballah's External Security Organisation as a terrorist organisation under 'Hizballah's Military Wing'.  Hizballah (including ESO) has been listed as a terrorist organisation by the governments of the United States, Canada and Israel.

*Current status of Hizballah's ESO*

Formed in Lebanon in 1982 in the wake of the Israeli occupation of southern Lebanon, Hizballah ('Party of God') emerged as a splinter group of former Amal clerics inspired by the Iranian Revolution.  By the end of 1984, Hizballah had become an umbrella group covering several smaller organisations including the Lebanese al-Dawa Party, Islamic Amal and the Islamic Students Union   Hizballah evolved into a multi-faceted organisation including political, social and military components supported by Iran and Syria.  Hizballah operates as a recognised political party and sanctioned 'resistance group' in Lebanon with representation in parliament and the Lebanese Cabinet.

After senior member Imad Mughniyah fled to Iran after the 1983 attack on the US military in Beirut, the 'international wing' grew out of the military wing to become a separate branch.  This is thought to be the genesis of Hizballah's 'international wing', or 'External Security Organisation (ESO)'.

ESO constitutes a distinct terrorist wing within Hizballah's structure.  Since entering the Lebanese Parliament in 1992 and the Government in 1995, Hizballah has sought to strengthen its public image as a respected resistance movement and lessen its reputation as a terrorist group.  This has encouraged the terrorist network to operate independently of the parent organisation and become among the best organised terrorist networks in the world.  While Mughniyah was considered one of the world's most capable and dangerous terrorists, his death in February 2008 is unlikely to reduce ESO's effectiveness in the long term.  ESO's current leader, Talal Hamiyah was a long-time associate of Mughniyah and he will continue ESO's activities with minimal disruption.

Hizballah, including ESO, receives substantial support from Iran, in the form of financial, training, weapons, political and military assistance.  Syria is also a significant supporter, particularly in the provision of political and military assistance.

In the 2006 conflict with Israel, Hizballah utilised Iranian-supplied military resources including Unmanned Aerial Vehicles (UAV) and a wide variety of short to long range rockets.  As part of Hizballah, and given ESO's direct contact with Iran, these or similar resources would be available to ESO.

PX505

ESO is based in Lebanon.  Hizballah has an international infrastructure including cells; charitable organisations; and business enterprises (both legal and illegal) in the Middle East, Asia, Africa, Europe and North and South America, from which it derives significant financial support.  In the Tri-Border area of South America alone it is estimated Hizballah has raised millions of dollars through activities such as drug and arms smuggling and product piracy.  ESO is likely to have access to this funding.

Since the attack against US Marines in Beirut in 1983, and two attacks against Israeli interests in Argentina in 1992 and 1994 (discussed in more detail below) Hizballah has established an insurgent capability in Iraq with support from Iran.  ESO continues to operate on a global basis gathering intelligence to be used in terrorist attack planning, collecting money by both legal and illegal methods, recruiting and training terrorists and acquiring weapons.  There is reporting to indicate ESO is planning attacks against Israeli or Jewish targets outside Israel to avenge the death of Mughniyah.

Hizballah provides training, operational support and material to Palestinian extremist groups, including the Palestinian Islamic Jihad, Hamas' Izz al-Din al-Qassam Brigades, both of which are currently proscribed entities, and Shia militia elements in Iraq. Elements of ESO are likely involved in these activities.

### Objectives

Hizballah is committed to armed resistance to the state of Israel and aims to 'liberate' all Palestinian territories and Jerusalem from Israeli 'occupation'.  Hizballah actively promotes terrorist attacks in the Palestinian arena to reduce the possibility of agreements or accords between Palestinians and Israel.   Ultimately, Hizballah aims to create a Shia Islamic state in Lebanon and remove all Western and Israeli influences in the region. ESO has undertaken terrorist acts against Israeli and other interests in support of these objectives.

### Leadership and membership

Little is known about ESO.  It is a covert and highly secretive organisation and it has been successful in restricting information about its organisational structure and membership.  Its leader is Talal Hamiyah.

### Hizballah ESO engagement in terrorist activities

The attack against the US Marine barracks in Beirut in October 1983 which killed 241 US servicemen gave Hizballah world wide attention for the first time.  Further violent attacks in Lebanon and around the world in the 1980's demonstrated Hizballah's capacity for violence.  The 1992 bombing of the Israeli Embassy and the 1994 bombing of a Jewish cultural centre in Buenos Aires are the most well known of the attacks conducted outside of Lebanon.  These attacks are widely accepted as being planned and executed by Mughniyah and ESO .

PX505

The Hizballah ESO had a record of regular terrorist attacks against mainly Israeli and US targets up until the early 1990's.  As a result of the Israeli withdrawal from southern Lebanon in 2000, Hizballah concentrated on targets in Israel and the Palestinian Territories.  Even after the 2006 military confrontation with Israel, Hizballah's ability to launch terrorist attacks was not completely destroyed.  It has since built up a significant rocket and anti-aircraft capability with the assistance of Iran.  Its rockets can now reach deep into Israel.

Hizballah has established an insurgent capability in Iraq, engaging in assassinations, kidnappings and bombings.  The Hizballah units have been set up with the encouragement and resources of Iran's Revolutionary Guards al Qods Brigades. Hizballah has also established a special training cell known as Unit 3800 (previously known as Unit 2800) specifically to train Shia fighters prior to action in Iraq. .  Available reporting does not specifically identify these terrorist units as ESO entities.  However, as ESO's primary role is international terrorism, it is likely to be heavily involved in the activities of Unit 3800 and the attacks against the Iraqi Government and Coalition forces.

Given the clandestine nature of the group, ESO's activities do not have a high profile and it does not claim responsibility for terrorist attacks.  However, there is no indication the intent of ESO has changed or its capability has diminished.  ESO is active internationally and it is likely it will continue to undertake attacks or contribute to attack planning if and when the opportunity arises, in accordance with the strategic priorities of ESO's parent organisation, Hizballah, or its state sponsors.  ESO's close association with Syria and Iran means it could draw on significant resources for future activities.

At the funeral of former ESO head Imad Mughniyah, assassinated in February 2008, Hizballah Secretary-General said he welcomed open war with Israel as a means of avenging the death of Mughniyah.

Due to the secretive nature of ESO, it is difficult to gather information on its role and activities.  However, ESO still exists as a discrete organisation under the umbrella of Hizballah but with a separate leadership and direct links to Iran.  ESO has a history of terrorist activity and as terrorism is such a fundamental part of its *raison d'être,* there is nothing to suggest its terrorist purposes have changed.  Given its close links to Iran and Syria, ESO has the capability to execute its terrorist objectives.  Hizballah uses a separate terrorist arm to conduct attacks and accordingly recent terrorist activity generally attributed to Hizballah is likely to have been conducted by ESO, either wholly or as a major contributor. On this basis and previous evidence of terrorist activity, it is assessed ESO is still directly preparing, planning, assisting in or fostering the doing of terrorist acts.

PX505

PX519



# The UK Government's decision to proscribe the military wing of Hezbollah

Standard Note: SN/IA/4791

Last updated: 10 July 2008

Author: Stephen Jones

International Affairs and Defence Section (Ext 6765)

This note provides background information on Hezbollah, its aims, and sources of funding, and information on the Order, laid before Parliament by the Home Secretary on 3 July 2008, proposing the proscription of the organisation's entire military wing under the *Terrorism Act 2000*. Before the Order can come into force, it must be approved by Parliament. A motion on the proscription of Hezbollah's military wing is due to be considered on the floor of the House of Commons on Tuesday 15 July and by the House of Lords on Thursday 17 July.

## Contents

1   **Background**                                  **2**

2   **The position of the UK Government**           **2**

3   **Further reading**                             **3**

Standard Notes are compiled for the benefit of Members of Parliament and their personal staff. Authors are available to discuss the contents of these papers with Members and their staff but cannot advise others.

PX519

# 1    Background

Hezbollah – or the Party of God – is a powerful political and military organisation of Shia Muslims in Lebanon. The group was formed, with financial backing from Iran, in response to the Israeli invasion of Lebanon in 1982. It has become the most powerful military force in Lebanon, but also has a parliamentary party with MPs, and has held seats in the cabinet. The group's military wing – the Islamic Resistance – is believed to have between 500 and 600 full-time, highly trained and motivated fighters. Some estimates put the number as high as 1,200, with the ability to call on several thousand less experienced "reserves".  During the 2006 conflict in Lebanon, Hezbollah showed that they are armed with rockets that can reach deep into northern Israel.

The organisation was formed to offer military resistance to the Israeli occupation and it initially proposed an Iranian-style Islamic state, although this was later abandoned in favour of a more inclusive approach. The group calls for the destruction of the state of Israel. It regards the whole of Palestine as occupied Muslim land and argues that Israel has no right to exist. It also demands the release of prisoners from Lebanon who are being held in Israeli jails.

The Israeli withdrawal from southern Lebanon in May 2000 won Hezbollah the respect of many Lebanese. It has built support by providing social services and health care. The group also has an influential television station, al-Manar.

Hezbollah is believed to receive military training, weapons and explosives, as well as diplomatic and financial support from Iran. Syria provides diplomatic, political and logistical support.

The United States and Israel regard Hezbollah as a terrorist group. Its members were involved in kidnapping westerners and in attacks on foreign troops who were based in Lebanon during the civil war. The UK says that the military wing of Hezbollah is a terrorist group, but not the political side of the organisation. UN Security Council resolutions call for armed militia groups like Hezbollah to disarm.

# 2    The position of the UK Government

The UK Government has long held the view that Hezbollah's military wing has been involved in conducting and supporting terrorism. In March 2001, the Hezbollah External Security Organisation (ESO), part of the broader military wing of Hezbollah, was added to the list of proscribed organisations under the *Terrorism Act 2000*. Under the Act, the Home Secretary can, by Order, add an organisation to the list of proscribed organisations. Similar Orders dealing with other organisations were laid in 2002, 2005, 2006, 2008 and 2008. All such Orders must be approved by Parliament before they can come into force. A total of 45 international terrorist organisations are proscribed under the Act.

On 2 July 2008, the Government laid before Parliament an Order proscribing the military wing of Hezbollah in its entirety, including the Jihad Council and all units reporting to it including the Hizballah External Security Organisation.[1] If approved by Parliament, it will be a criminal offence to belong to, fundraise and encourage support for the military wing of the organisation.

---

[1]    Home Office press release, "Government to proscribe Hizballah's military wing", 2 July 2008

PX519

The Explanatory Memorandum to the Order states that:

> Hizballah is actively involved in terrorist related activities. These activities include, but are not limited to, the provision of training and logistical and financial support to terrorist groups in Iraq and Palestine. The military wing of Hizballah is involved in supporting Shia insurgent groups in Iraq to carry out attacks, including against Coalition forces. In particular it has carried out training and support for Jaish Al-Mahdi (JAM), including in the use of explosively formed projectiles. The military wing of Hizballah has also provided support for Palestinian terrorist organisations such as the Hamas Izz al-Din al-Qassem Brigades and Palestinian Islamic Jihad.[2]

During Prime Minister's Questions, on 2 July, Gordon Brown told the House:

> To help bring about more general peace in the Middle East, we have been considering what we can do. We have today laid an order before Parliament extending proscription to cover Hezbollah's entire military wing, solely on the grounds of new evidence of its involvement in terrorism in Iraq and the occupied Palestinian territories. Proscription will not affect Hezbollah's legitimate political and social wings, but we continue to call on Hezbollah to end its status as an armed group, to participate in the Lebanese democratic process, and to do so on the same terms as other political parties.[3]

The Government, however, has emphasised that this will not affect Hezbollah's political, social and humanitarian activities. Introducing the Order, Home Office Minister Tony McNulty said:

> Proscription of Hizballah's military wing will not affect the legitimate political, social and humanitarian role Hizballah plays in Lebanon, but it sends out a clear message that we condemn Hizballah's violence and support for terrorism.[4]

Before the Order proscribing Hezbollah's military wing can come into force it must be approved by Parliament. According to a Business Statement by the Leader of the House on 3 July 2008, the House of Commons will consider a motion to approve the Order on Tuesday 15 July. A motion to approve the Order will be considered by the House of Lords on Thursday 17 July.

## 3    Further reading

The draft Statutory Instrument and Explanatory Memorandum:

http://www.opsi.gov.uk/si/si2008/draft/pdf/ukdsi_9780110819525_en.pdf

http://www.opsi.gov.uk/si/si2008/draft/em/ukdsiem_9780110819525_en.pdf

"Lebanon: the vote for the presidency", Library Standard Note SN/IA/4523, December 2007



snia-04523.pdf (58 KB)

---

[2]  Explanatory memorandum to the Terrorism Act 2000 (Proscribed Organisations) (Amendment) (No.2) Order 2008
[3]  HC Deb, 2 July 2008, Col 860
[4]  Home Office press release, "Government to proscribe Hizballah's military wing", 2 July 2008

PX519

"Lebanon: Hizbollah's Weapons Turn Inward", Policy briefing, International Crisis Group, 15 May 2008



ICG Report on Hizbollah (May 2...

"Hezbollah's Shadow War", Greg Bruno, Council on Foreign Relations, 30 May 2008: http://www.cfr.org/publication/16382/hezbollahs_shadow_war.html

Profile of Hassan Nasrallah, leader of Hezbollah, Council on Foreign Relations, 30 May 2008: http://www.cfr.org/publication/11132/

PX519

PX521

United Nations $S$/RES/1929 (2010)



# Security Council

Distr.: General
9 June 2010

---

## Resolution 1929 (2010)

### Adopted by the Security Council at its 6335th meeting, on 9 June 2010

*The Security Council*,

*Recalling* the Statement of its President, S/PRST/2006/15, and its resolutions 1696 (2006), 1737 (2006), 1747 (2007), 1803 (2008), 1835 (2008), and 1887 (2009) and *reaffirming* their provisions,

*Reaffirming* its commitment to the Treaty on the Non-Proliferation of Nuclear Weapons, the need for all States Party to that Treaty to comply fully with all their obligations, and *recalling* the right of States Party, in conformity with Articles I and II of that Treaty, to develop research, production and use of nuclear energy for peaceful purposes without discrimination,

*Recalling* the resolution of the IAEA Board of Governors (GOV/2006/14), which states that a solution to the Iranian nuclear issue would contribute to global non-proliferation efforts and to realizing the objective of a Middle East free of weapons of mass destruction, including their means of delivery,

*Noting* with serious concern that, as confirmed by the reports of 27 February 2006 (GOV/2006/15), 8 June 2006 (GOV/2006/38), 31 August 2006 (GOV/2006/53), 14 November 2006 (GOV/2006/64), 22 February 2007 (GOV/2007/8), 23 May 2007 (GOV/2007/122), 30 August 2007 (GOV/2007/48), 15 November 2007 (GOV/2007/58), 22 February 2008 (GOV/2008/4), 26 May 2008 (GOV/2008/115), 15 September 2008 (GOV/2008/38), 19 November 2008 (GOV/2008/59), 19 February 2009 (GOV/2009/8), 5 June 2009 (GOV/2009/35), 28 August 2009 (GOV/2009/55), 16 November 2009 (GOV/2009/74), 18 February 2010 (GOV/2010/10) and 31 May 2010 (GOV/2010/28) of the Director General of the International Atomic Energy Agency (IAEA), Iran has not established full and sustained suspension of all enrichment-related and reprocessing activities and heavy water-related projects as set out in resolutions 1696 (2006), 1737 (2006), 1747 (2007) and 1803 (2008) nor resumed its cooperation with the IAEA under the Additional Protocol, nor cooperated with the IAEA in connection with the remaining issues of concern, which need to be clarified to exclude the possibility of military dimensions of Iran's nuclear programme, nor taken the other steps required by the IAEA Board of Governors, nor complied with the provisions of Security Council

10-39679 (E)

Please recycle 

PX521

resolutions 1696 (2006), 1737 (2006), 1747 (2007) and 1803 (2008) and which are essential to build confidence, and *deploring* Iran's refusal to take these steps,

*Reaffirming* that outstanding issues can be best resolved and confidence built in the exclusively peaceful nature of Iran's nuclear programme by Iran responding positively to all the calls which the Council and the IAEA Board of Governors have made on Iran,

*Noting* with serious concern the role of elements of the Islamic Revolutionary Guard Corps (IRGC, also known as "Army of the Guardians of the Islamic Revolution"), including those specified in Annex D and E of resolution 1737 (2006), Annex I of resolution 1747 (2007) and Annex II of this resolution, in Iran's proliferation sensitive nuclear activities and the development of nuclear weapon delivery systems,

*Noting* with serious concern that Iran has constructed an enrichment facility at Qom in breach of its obligations to suspend all enrichment-related activities, and that Iran failed to notify it to the IAEA until September 2009, which is inconsistent with its obligations under the Subsidiary Arrangements to its Safeguards Agreement,

*Also noting* the resolution of the IAEA Board of Governors (GOV/2009/82), which urges Iran to suspend immediately construction at Qom, and to clarify the facility's purpose, chronology of design and construction, and calls upon Iran to confirm, as requested by the IAEA, that it has not taken a decision to construct, or authorize construction of, any other nuclear facility which has as yet not been declared to the IAEA,

*Noting* with serious concern that Iran has enriched uranium to 20 per cent, and did so without notifying the IAEA with sufficient time for it to adjust the existing safeguards procedures,

*Noting* with concern that Iran has taken issue with the IAEA's right to verify design information which had been provided by Iran pursuant to the modified Code 3.1, and *emphasizing* that in accordance with Article 39 of Iran's Safeguards Agreement Code 3.1 cannot be modified nor suspended unilaterally and that the IAEA's right to verify design information provided to it is a continuing right, which is not dependent on the stage of construction of, or the presence of nuclear material at, a facility,

*Reiterating* its determination to reinforce the authority of the IAEA, strongly supporting the role of the IAEA Board of Governors, and *commending* the IAEA for its efforts to resolve outstanding issues relating to Iran's nuclear programme,

*Expressing* the conviction that the suspension set out in paragraph 2 of resolution 1737 (2006) as well as full, verified Iranian compliance with the requirements set out by the IAEA Board of Governors would contribute to a diplomatic, negotiated solution that guarantees Iran's nuclear programme is for exclusively peaceful purposes,

*Emphasizing* the importance of political and diplomatic efforts to find a negotiated solution guaranteeing that Iran's nuclear programme is exclusively for peaceful purposes and *noting* in this regard the efforts of Turkey and Brazil towards an agreement with Iran on the Tehran Research Reactor that could serve as a confidence-building measure,

2

PX521

*Emphasizing also*, however, in the context of these efforts, the importance of Iran addressing the core issues related to its nuclear programme,

*Stressing* that China, France, Germany, the Russian Federation, the United Kingdom and the United States are willing to take further concrete measures on exploring an overall strategy of resolving the Iranian nuclear issue through negotiation on the basis of their June 2006 proposals (S/2006/521) and their June 2008 proposals (INFCIRC/730), and *noting* the confirmation by these countries that once the confidence of the international community in the exclusively peaceful nature of Iran's nuclear programme is restored it will be treated in the same manner as that of any Non-Nuclear Weapon State Party to the Treaty on the Non-Proliferation of Nuclear Weapons,

*Welcoming* the guidance issued by the Financial Action Task Force (FATF) to assist States in implementing their financial obligations under resolutions 1737 (2006) and 1803 (2008), and *recalling* in particular the need to exercise vigilance over transactions involving Iranian banks, including the Central Bank of Iran, so as to prevent such transactions contributing to proliferation-sensitive nuclear activities, or to the development of nuclear weapon delivery systems,

*Recognizing* that access to diverse, reliable energy is critical for sustainable growth and development, while noting the potential connection between Iran's revenues derived from its energy sector and the funding of Iran's proliferation-sensitive nuclear activities, and *further noting* that chemical process equipment and materials required for the petrochemical industry have much in common with those required for certain sensitive nuclear fuel cycle activities,

*Having regard* to States' rights and obligations relating to international trade,

*Recalling* that the law of the sea, as reflected in the United Nations Convention on the Law of the Sea (1982), sets out the legal framework applicable to ocean activities,

*Calling* for the ratification of the Comprehensive Nuclear-Test-Ban Treaty by Iran at an early date,

*Determined* to give effect to its decisions by adopting appropriate measures to persuade Iran to comply with resolutions 1696 (2006), 1737 (2006), 1747 (2007) and 1803 (2008) and with the requirements of the IAEA, and also to constrain Iran's development of sensitive technologies in support of its nuclear and missile programmes, until such time as the Security Council determines that the objectives of these resolutions have been met,

*Concerned* by the proliferation risks presented by the Iranian nuclear programme and mindful of its primary responsibility under the Charter of the United Nations for the maintenance of international peace and security,

*Stressing* that nothing in this resolution compels States to take measures or actions exceeding the scope of this resolution, including the use of force or the threat of force,

*Acting* under Article 41 of Chapter VII of the Charter of the United Nations,

1.    *Affirms* that Iran has so far failed to meet the requirements of the IAEA Board of Governors and to comply with resolutions 1696 (2006), 1737 (2006), 1747 (2007) and 1803 (2008);

PX521

2.    *Affirms* that Iran shall without further delay take the steps required by the IAEA Board of Governors in its resolutions GOV/2006/14 and GOV/2009/82, which are essential to build confidence in the exclusively peaceful purpose of its nuclear programme, to resolve outstanding questions and to address the serious concerns raised by the construction of an enrichment facility at Qom in breach of its obligations to suspend all enrichment-related activities, and, in this context, *further affirms* its decision that Iran shall without delay take the steps required in paragraph 2 of resolution 1737 (2006);

3.    *Reaffirms* that Iran shall cooperate fully with the IAEA on all outstanding issues, particularly those which give rise to concerns about the possible military dimensions of the Iranian nuclear programme, including by providing access without delay to all sites, equipment, persons and documents requested by the IAEA, and *stresses* the importance of ensuring that the IAEA have all necessary resources and authority for the fulfilment of its work in Iran;

4.    *Requests* the Director General of the IAEA to communicate to the Security Council all his reports on the application of safeguards in Iran;

5.    *Decides* that Iran shall without delay comply fully and without qualification with its IAEA Safeguards Agreement, including through the application of modified Code 3.1 of the Subsidiary Arrangement to its Safeguards Agreement, *calls upon* Iran to act strictly in accordance with the provisions of the Additional Protocol to its IAEA Safeguards Agreement that it signed on 18 December 2003, *calls upon* Iran to ratify promptly the Additional Protocol, and *reaffirms* that, in accordance with Articles 24 and 39 of Iran's Safeguards Agreement, Iran's Safeguards Agreement and its Subsidiary Arrangement, including modified Code 3.1, cannot be amended or changed unilaterally by Iran, and *notes* that there is no mechanism in the Agreement for the suspension of any of the provisions in the Subsidiary Arrangement;

6.    *Reaffirms* that, in accordance with Iran's obligations under previous resolutions to suspend all reprocessing, heavy water-related and enrichment-related activities, Iran shall not begin construction on any new uranium-enrichment, reprocessing, or heavy water-related facility and shall discontinue any ongoing construction of any uranium-enrichment, reprocessing, or heavy water-related facility;

7.    *Decides* that Iran shall not acquire an interest in any commercial activity in another State involving uranium mining, production or use of nuclear materials and technology as listed in INFCIRC/254/Rev.9/Part 1, in particular uranium-enrichment and reprocessing activities, all heavy-water activities or technology-related to ballistic missiles capable of delivering nuclear weapons, and *further decides* that all States shall prohibit such investment in territories under their jurisdiction by Iran, its nationals, and entities incorporated in Iran or subject to its jurisdiction, or by persons or entities acting on their behalf or at their direction, or by entities owned or controlled by them;

8.    *Decides* that all States shall prevent the direct or indirect supply, sale or transfer to Iran, from or through their territories or by their nationals or individuals subject to their jurisdiction, or using their flag vessels or aircraft, and whether or not originating in their territories, of any battle tanks, armoured combat vehicles, large calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or

4

PX521

missile systems as defined for the purpose of the United Nations Register of Conventional Arms, or related materiel, including spare parts, or items as determined by the Security Council or the Committee established pursuant to resolution 1737 (2006) ("the Committee"), *decides* further that all States shall prevent the provision to Iran by their nationals or from or through their territories of technical training, financial resources or services, advice, other services or assistance related to the supply, sale, transfer, provision, manufacture, maintenance or use of such arms and related materiel, and, in this context, *calls upon* all States to exercise vigilance and restraint over the supply, sale, transfer, provision, manufacture and use of all other arms and related materiel;

9. *Decides* that Iran shall not undertake any activity related to ballistic missiles capable of delivering nuclear weapons, including launches using ballistic missile technology, and that States shall take all necessary measures to prevent the transfer of technology or technical assistance to Iran related to such activities;

10. *Decides* that all States shall take the necessary measures to prevent the entry into or transit through their territories of individuals designated in Annex C, D and E of resolution 1737 (2006), Annex I of resolution 1747 (2007), Annex I of resolution 1803 (2008) and Annexes I and II of this resolution, or by the Security Council or the Committee pursuant to paragraph 10 of resolution 1737 (2006), except where such entry or transit is for activities directly related to the provision to Iran of items in subparagraphs 3(b)(i) and (ii) of resolution 1737 (2006) in accordance with paragraph 3 of resolution 1737 (2006), *underlines* that nothing in this paragraph shall oblige a State to refuse its own nationals entry into its territory, and *decides* that the measures imposed in this paragraph shall not apply when the Committee determines on a case-by-case basis that such travel is justified on the grounds of humanitarian need, including religious obligations, or where the Committee concludes that an exemption would otherwise further the objectives of this resolution, including where Article XV of the IAEA Statute is engaged;

11. *Decides* that the measures specified in paragraphs 12, 13, 14 and 15 of resolution 1737 (2006) shall apply also to the individuals and entities listed in Annex I of this resolution and to any individuals or entities acting on their behalf or at their direction, and to entities owned or controlled by them, including through illicit means, and to any individuals and entities determined by the Council or the Committee to have assisted designated individuals or entities in evading sanctions of, or in violating the provisions of, resolutions 1737 (2006), 1747 (2007), 1803 (2008) or this resolution;

12. *Decides* that the measures specified in paragraphs 12, 13, 14 and 15 of resolution 1737 (2006) shall apply also to the Islamic Revolutionary Guard Corps (IRGC, also known as "Army of the Guardians of the Islamic Revolution") individuals and entities specified in Annex II, and to any individuals or entities acting on their behalf or at their direction, and to entities owned or controlled by them, including through illicit means, and *calls upon* all States to exercise vigilance over those transactions involving the IRGC that could contribute to Iran's proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems;

13. *Decides* that for the purposes of the measures specified in paragraphs 3, 4, 5, 6 and 7 of resolution 1737 (2006), the list of items in S/2006/814 shall be superseded by the list of items in INFCIRC/254/Rev.9/Part 1 and

5

PX521

INFCIRC/254/Rev.7/Part 2, and any further items if the State determines that they could contribute to enrichment-related, reprocessing or heavy water-related activities or to the development of nuclear weapon delivery systems, and further *decides* that for the purposes of the measures specified in paragraphs 3, 4, 5, 6 and 7 of resolution 1737 (2006), the list of items contained in S/2006/815 shall be superseded by the list of items contained in S/2010/263;

14.  *Calls upon* all States to inspect, in accordance with their national authorities and legislation and consistent with international law, in particular the law of the sea and relevant international civil aviation agreements, all cargo to and from Iran, in their territory, including seaports and airports, if the State concerned has information that provides reasonable grounds to believe the cargo contains items the supply, sale, transfer, or export of which is prohibited by paragraphs 3, 4 or 7 of resolution 1737 (2006), paragraph 5 of resolution 1747 (2007), paragraph 8 of resolution 1803 (2008) or paragraphs 8 or 9 of this resolution, for the purpose of ensuring strict implementation of those provisions;

15.  *Notes* that States, consistent with international law, in particular the law of the sea, may request inspections of vessels on the high seas with the consent of the flag State, and *calls upon* all States to cooperate in such inspections if there is information that provides reasonable grounds to believe the vessel is carrying items the supply, sale, transfer, or export of which is prohibited by paragraphs 3, 4 or 7 of resolution 1737 (2006), paragraph 5 of resolution 1747 (2007), paragraph 8 of resolution 1803 (2008) or paragraphs 8 or 9 of this resolution, for the purpose of ensuring strict implementation of those provisions;

16.  *Decides* to authorize all States to, and that all States shall, seize and dispose of (such as through destruction, rendering inoperable, storage or transferring to a State other than the originating or destination States for disposal) items the supply, sale, transfer, or export of which is prohibited by paragraphs 3, 4 or 7 of resolution 1737 (2006), paragraph 5 of resolution 1747 (2007), paragraph 8 of resolution 1803 (2008) or paragraphs 8 or 9 of this resolution that are identified in inspections pursuant to paragraphs 14 or 15 of this resolution, in a manner that is not inconsistent with their obligations under applicable Security Council resolutions, including resolution 1540 (2004), as well as any obligations of parties to the NPT, and *decides* further that all States shall cooperate in such efforts;

17.  *Requires* any State, when it undertakes an inspection pursuant to paragraphs 14 or 15 above to submit to the Committee within five working days an initial written report containing, in particular, explanation of the grounds for the inspections, the results of such inspections and whether or not cooperation was provided, and, if items prohibited for transfer are found, *further requires* such States to submit to the Committee, at a later stage, a subsequent written report containing relevant details on the inspection, seizure and disposal, and relevant details of the transfer, including a description of the items, their origin and intended destination, if this information is not in the initial report;

18.  *Decides* that all States shall prohibit the provision by their nationals or from their territory of bunkering services, such as provision of fuel or supplies, or other servicing of vessels, to Iranian-owned or -contracted vessels, including chartered vessels, if they have information that provides reasonable grounds to believe they are carrying items the supply, sale, transfer, or export of which is prohibited by paragraphs 3, 4 or 7 of resolution 1737 (2006), paragraph 5 of

PX521

resolution 1747 (2007), paragraph 8 of resolution 1803 (2008) or paragraphs 8 or 9 of this resolution, unless provision of such services is necessary for humanitarian purposes or until such time as the cargo has been inspected, and seized and disposed of if necessary, and *underlines* that this paragraph is not intended to affect legal economic activities;

19. *Decides* that the measures specified in paragraphs 12, 13, 14 and 15 of resolution 1737 (2006) shall also apply to the entities of the Islamic Republic of Iran Shipping Lines (IRISL) as specified in Annex III and to any person or entity acting on their behalf or at their direction, and to entities owned or controlled by them, including through illicit means, or determined by the Council or the Committee to have assisted them in evading the sanctions of, or in violating the provisions of, resolutions 1737 (2006), 1747 (2007), 1803 (2008) or this resolution;

20. *Requests* all Member States to communicate to the Committee any information available on transfers or activity by Iran Air's cargo division or vessels owned or operated by the Islamic Republic of Iran Shipping Lines (IRISL) to other companies that may have been undertaken in order to evade the sanctions of, or in violation of the provisions of, resolutions 1737 (2006), 1747 (2007), 1803 (2008) or this resolution, including renaming or re-registering of aircraft, vessels or ships, and requests the Committee to make that information widely available;

21. *Calls upon* all States, in addition to implementing their obligations pursuant to resolutions 1737 (2006), 1747 (2007), 1803 (2008) and this resolution, to prevent the provision of financial services, including insurance or re-insurance, or the transfer to, through, or from their territory, or to or by their nationals or entities organized under their laws (including branches abroad), or persons or financial institutions in their territory, of any financial or other assets or resources if they have information that provides reasonable grounds to believe that such services, assets or resources could contribute to Iran's proliferation-sensitive nuclear activities, or the development of nuclear weapon delivery systems, including by freezing any financial or other assets or resources on their territories or that hereafter come within their territories, or that are subject to their jurisdiction or that hereafter become subject to their jurisdiction, that are related to such programmes or activities and applying enhanced monitoring to prevent all such transactions in accordance with their national authorities and legislation;

22. *Decides* that all States shall require their nationals, persons subject to their jurisdiction and firms incorporated in their territory or subject to their jurisdiction to exercise vigilance when doing business with entities incorporated in Iran or subject to Iran's jurisdiction, including those of the IRGC and IRISL, and any individuals or entities acting on their behalf or at their direction, and entities owned or controlled by them, including through illicit means, if they have information that provides reasonable grounds to believe that such business could contribute to Iran's proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems or to violations of resolutions 1737 (2006), 1747 (2007), 1803 (2008) or this resolution;

23. *Calls upon* States to take appropriate measures that prohibit in their territories the opening of new branches, subsidiaries, or representative offices of Iranian banks, and also that prohibit Iranian banks from establishing new joint ventures, taking an ownership interest in or establishing or maintaining correspondent relationships with banks in their jurisdiction to prevent the provision

PX521

of financial services if they have information that provides reasonable grounds to believe that these activities could contribute to Iran's proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems;

24.   *Calls upon* States to take appropriate measures that prohibit financial institutions within their territories or under their jurisdiction from opening representative offices or subsidiaries or banking accounts in Iran if they have information that provides reasonable grounds to believe that such financial services could contribute to Iran's proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems;

25.   *Deplores* the violations of the prohibitions of paragraph 5 of resolution 1747 (2007) that have been reported to the Committee since the adoption of resolution 1747 (2007), and *commends* States that have taken action to respond to these violations and report them to the Committee;

26.   *Directs* the Committee to respond effectively to violations of the measures decided in resolutions 1737 (2006), 1747 (2007), 1803 (2008) and this resolution, and *recalls* that the Committee may designate individuals and entities who have assisted designated persons or entities in evading sanctions of, or in violating the provisions of, these resolutions;

27.   *Decides* that the Committee shall intensify its efforts to promote the full implementation of resolutions 1737 (2006), 1747 (2007), 1803 (2008) and this resolution, including through a work programme covering compliance, investigations, outreach, dialogue, assistance and cooperation, to be submitted to the Council within forty-five days of the adoption of this resolution;

28.   *Decides* that the mandate of the Committee as set out in paragraph 18 of resolution 1737 (2006), as amended by paragraph 14 of resolution 1803 (2008), shall also apply to the measures decided in this resolution, including to receive reports from States submitted pursuant to paragraph 17 above;

29.   *Requests* the Secretary-General to create for an initial period of one year, in consultation with the Committee, a group of up to eight experts ("Panel of Experts"), under the direction of the Committee, to carry out the following tasks: (a) assist the Committee in carrying out its mandate as specified in paragraph 18 of resolution 1737 (2006) and paragraph 28 of this resolution; (b) gather, examine and analyse information from States, relevant United Nations bodies and other interested parties regarding the implementation of the measures decided in resolutions 1737 (2006), 1747 (2007), 1803 (2008) and this resolution, in particular incidents of non-compliance; (c) make recommendations on actions the Council, or the Committee or State, may consider to improve implementation of the relevant measures; and (d) provide to the Council an interim report on its work no later than 90 days after the Panel's appointment, and a final report to the Council no later than 30 days prior to the termination of its mandate with its findings and recommendations;

30.   *Urges* all States, relevant United Nations bodies and other interested parties, to cooperate fully with the Committee and the Panel of Experts, in particular by supplying any information at their disposal on the implementation of the measures decided in resolutions 1737 (2006), 1747 (2007), 1803 (2008) and this resolution, in particular incidents of non-compliance;

8

PX521

31.   *Calls upon* all States to report to the Committee within 60 days of the adoption of this resolution on the steps they have taken with a view to implementing effectively paragraphs 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 21, 22, 23 and 24;

32.   *Stresses* the willingness of China, France, Germany, the Russian Federation, the United Kingdom and the United States to further enhance diplomatic efforts to promote dialogue and consultations, including to resume dialogue with Iran on the nuclear issue without preconditions, most recently in their meeting with Iran in Geneva on 1 October 2009, with a view to seeking a comprehensive, long-term and proper solution of this issue on the basis of the proposal made by China, France, Germany, the Russian Federation, the United Kingdom and the United States on 14 June 2008, which would allow for the development of relations and wider cooperation with Iran based on mutual respect and the establishment of international confidence in the exclusively peaceful nature of Iran's nuclear programme and, inter alia, starting formal negotiations with Iran on the basis of the June 2008 proposal, and *acknowledges with appreciation* that the June 2008 proposal, as attached in Annex IV to this resolution, remains on the table;

33.   *Encourages* the High Representative of the European Union for Foreign Affairs and Security Policy to continue communication with Iran in support of political and diplomatic efforts to find a negotiated solution, including relevant proposals by China, France, Germany, the Russian Federation, the United Kingdom and the United States with a view to create necessary conditions for resuming talks, and *encourages* Iran to respond positively to such proposals;

34.   *Commends* the Director General of the IAEA for his 21 October 2009 proposal of a draft Agreement between the IAEA and the Governments of the Republic of France, the Islamic Republic of Iran and the Russian Federation for Assistance in Securing Nuclear Fuel for a Research Reactor in Iran for the Supply of Nuclear Fuel to the Tehran Research Reactor, *regrets* that Iran has not responded constructively to the 21 October 2009 proposal, and *encourages* the IAEA to continue exploring such measures to build confidence consistent with and in furtherance of the Council's resolutions;

35.   *Emphasizes* the importance of all States, including Iran, taking the necessary measures to ensure that no claim shall lie at the instance of the Government of Iran, or of any person or entity in Iran, or of persons or entities designated pursuant to resolution 1737 (2006) and related resolutions, or any person claiming through or for the benefit of any such person or entity, in connection with any contract or other transaction where its performance was prevented by reason of the measures imposed by resolutions 1737 (2006), 1747 (2007), 1803 (2008) and this resolution;

36.   *Requests* within 90 days a report from the Director General of the IAEA on whether Iran has established full and sustained suspension of all activities mentioned in resolution 1737 (2006), as well as on the process of Iranian compliance with all the steps required by the IAEA Board of Governors and with other provisions of resolutions 1737 (2006), 1747 (2007), 1803 (2008) and of this resolution, to the IAEA Board of Governors and in parallel to the Security Council for its consideration;

PX521

37.  *Affirms* that it shall review Iran's actions in light of the report referred to in paragraph 36 above, to be submitted within 90 days, and: (a) that it shall suspend the implementation of measures if and for so long as Iran suspends all enrichment-related and reprocessing activities, including research and development, as verified by the IAEA, to allow for negotiations in good faith in order to reach an early and mutually acceptable outcome; (b) that it shall terminate the measures specified in paragraphs 3, 4, 5, 6, 7 and 12 of resolution 1737 (2006), as well as in paragraphs 2, 4, 5, 6 and 7 of resolution 1747 (2007), paragraphs 3, 5, 7, 8, 9, 10 and 11 of resolution 1803 (2008), and in paragraphs 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 21, 22, 23 and 24 above, as soon as it determines, following receipt of the report referred to in the paragraph above, that Iran has fully complied with its obligations under the relevant resolutions of the Security Council and met the requirements of the IAEA Board of Governors, as confirmed by the IAEA Board of Governors; (c) that it shall, in the event that the report shows that Iran has not complied with resolutions 1737 (2006), 1747 (2007), 1803 (2008) and this resolution, adopt further appropriate measures under Article 41 of Chapter VII of the Charter of the United Nations to persuade Iran to comply with these resolutions and the requirements of the IAEA, and *underlines* that further decisions will be required should such additional measures be necessary;

38.  *Decides* to remain seized of the matter.

10

PX521

## Annex I

### Individuals and entities involved in nuclear or ballistic missile activities

**Entities**

1. **Amin Industrial Complex**: Amin Industrial Complex sought temperature controllers which may be used in nuclear research and operational/production facilities. Amin Industrial Complex is owned or controlled by, or acts on behalf of, the Defense Industries Organization (DIO), which was designated in resolution 1737 (2006).

> Location: P.O. Box 91735-549, Mashad, Iran; Amin Industrial Estate, Khalage Rd., Seyedi District, Mashad, Iran; Kaveh Complex, Khalaj Rd., Seyedi St., Mashad, Iran

> A.K.A.: Amin Industrial Compound and Amin Industrial Company

2. **Armament Industries Group**: Armament Industries Group (AIG) manufacturers and services a variety of small arms and light weapons, including large- and medium-calibre guns and related technology. AIG conducts the majority of its procurement activity through Hadid Industries Complex.

> Location: Sepah Islam Road, Karaj Special Road Km 10, Iran; Pasdaran Ave., P.O. Box 19585/777, Tehran, Iran

3. **Defense Technology and Science Research Center**: Defense Technology and Science Research Center (DTSRC) is owned or controlled by, or acts on behalf of, Iran's Ministry of Defense and Armed Forces Logistics (MODAFL), which oversees Iran's defence R&D, production, maintenance, exports, and procurement.

> Location: Pasdaran Ave, PO Box 19585/777, Tehran, Iran

4. **Doostan International Company**: Doostan International Company (DICO) supplies elements to Iran's ballistic missile program.

5. **Farasakht Industries**: Farasakht Industries is owned or controlled by, or act on behalf of, the Iran Aircraft Manufacturing Company, which in turn is owned or controlled by MODAFL.

> Location: P.O. Box 83145-311, Kilometer 28, Esfahan-Tehran Freeway, Shahin Shahr, Esfahan, Iran

6. **First East Export Bank, P.L.C.**: First East Export Bank, PLC is owned or controlled by, or acts on behalf of, Bank Mellat. Over the last seven years, Bank Mellat has facilitated hundreds of millions of dollars in transactions for Iranian nuclear, missile, and defense entities.

> Location: Unit Level 10 (B1), Main Office Tower, Financial Park Labuan, Jalan Merdeka, 87000 WP Labuan, Malaysia; Business Registration Number LL06889 (Malaysia)

7. **Kaveh Cutting Tools Company**: Kaveh Cutting Tools Company is owned or controlled by, or acts on behalf of, the DIO.

PX521

Location: 3rd Km of Khalaj Road, Seyyedi Street, Mashad 91638, Iran; Km 4 of Khalaj Road, End of Seyedi Street, Mashad, Iran; P.O. Box 91735-549, Mashad, Iran; Khalaj Rd., End of Seyyedi Alley, Mashad, Iran; Moqan St., Pasdaran St., Pasdaran Cross Rd., Tehran, Iran

8.   **M. Babaie Industries**: M. Babaie Industries is subordinate to Shahid Ahmad Kazemi Industries Group (formally the Air Defense Missile Industries Group) of Iran's Aerospace Industries Organization (AIO). AIO controls the missile organizations Shahid Hemmat Industrial Group (SHIG) and the Shahid Bakeri Industrial Group (SBIG), both of which were designated in resolution 1737 (2006).

Location: P.O. Box 16535-76, Tehran, 16548, Iran

9.   **Malek Ashtar University**: A subordinate of the DTRSC within MODAFL. This includes research groups previously falling under the Physics Research Center (PHRC). IAEA inspectors have not been allowed to interview staff or see documents under the control of this organization to resolve the outstanding issue of the possible military dimension to Iran's nuclear program.

Location: Corner of Imam Ali Highway and Babaei Highway, Tehran, Iran

10.   **Ministry of Defense Logistics Export**: Ministry of Defense Logistics Export (MODLEX) sells Iranian-produced arms to customers around the world in contravention of resolution 1747 (2007), which prohibits Iran from selling arms or related materiel.

Location: PO Box 16315-189, Tehran, Iran; located on the west side of Dabestan Street, Abbas Abad District, Tehran, Iran

11.   **Mizan Machinery Manufacturing**: Mizan Machinery Manufacturing (3M) is owned or controlled by, or acts on behalf of, SHIG.

Location: P.O. Box 16595-365, Tehran, Iran

A.K.A.: 3MG

12.   **Modern Industries Technique Company**: Modern Industries Technique Company (MITEC) is responsible for design and construction of the IR-40 heavy water reactor in Arak. MITEC has spearheaded procurement for the construction of the IR-40 heavy water reactor.

Location: Arak, Iran

A.K.A.: Rahkar Company, Rahkar Industries, Rahkar Sanaye Company, Rahkar Sanaye Novin

13.   **Nuclear Research Center for Agriculture and Medicine**: The Nuclear Research Center for Agriculture and Medicine (NFRPC) is a large research component of the Atomic Energy Organization of Iran (AEOI), which was designated in resolution 1737 (2006). The NFRPC is AEOI's center for the development of nuclear fuel and is involved in enrichment-related activities.

Location: P.O. Box 31585-4395, Karaj, Iran

A.K.A.: Center for Agricultural Research and Nuclear Medicine; Karaji Agricultural and Medical Research Center

12

PX521

14. **Pejman Industrial Services Corporation**: Pejman Industrial Services Corporation is owned or controlled by, or acts on behalf of, SBIG.

   Location: P.O. Box 16785-195, Tehran, Iran

15. **Sabalan Company**: Sabalan is a cover name for SHIG.

   Location: Damavand Tehran Highway, Tehran, Iran

16. **Sahand Aluminum Parts Industrial Company (SAPICO)**: SAPICO is a cover name for SHIG.

   Location: Damavand Tehran Highway, Tehran, Iran

17. **Shahid Karrazi Industries**: Shahid Karrazi Industries is owned or controlled by, or act on behalf of, SBIG.

   Location: Tehran, Iran

18. **Shahid Satarri Industries**: Shahid Sattari Industries is owned or controlled by, or acts on behalf of, SBIG.

   Location: Southeast Tehran, Iran

   A.K.A.: Shahid Sattari Group Equipment Industries

19. **Shahid Sayyade Shirazi Industries**: Shahid Sayyade Shirazi Industries (SSSI) is owned or controlled by, or acts on behalf of, the DIO.

   Location: Next To Nirou Battery Mfg. Co, Shahid Babaii Expressway, Nobonyad Square, Tehran, Iran; Pasdaran St., P.O. Box 16765, Tehran 1835, Iran; Babaei Highway — Next to Niru M.F.G, Tehran, Iran

20. **Special Industries Group**: Special Industries Group (SIG) is a subordinate of DIO.

   Location: Pasdaran Avenue, PO Box 19585/777, Tehran, Iran

21. **Tiz Pars**: Tiz Pars is a cover name for SHIG. Between April and July 2007, Tiz Pars attempted to procure a five axis laser welding and cutting machine, which could make a material contribution to Iran's missile program, on behalf of SHIG.

   Location: Damavand Tehran Highway, Tehran, Iran

22. **Yazd Metallurgy Industries**: Yazd Metallurgy Industries (YMI) is a subordinate of DIO.

   Location: Pasdaran Avenue, Next To Telecommunication Industry, Tehran 16588, Iran; Postal Box 89195/878, Yazd, Iran; P.O. Box 89195-678, Yazd, Iran; Km 5 of Taft Road, Yazd, Iran

   A.K.A.: Yazd Ammunition Manufacturing and Metallurgy Industries, Directorate of Yazd Ammunition and Metallurgy Industries

**Individuals**

**Javad Rahiqi**: Head of the Atomic Energy Organization of Iran (AEOI) Esfahan Nuclear Technology Center (additional information: DOB: 24 April 1954; POB: Marshad).

PX521

**Annex II**

## Entities owned, controlled, or acting on behalf of the Islamic Revolutionary Guard Corps

1.   **Fater (or Faater) Institute**: Khatam al-Anbiya (KAA) subsidiary. Fater has worked with foreign suppliers, likely on behalf of other KAA companies on IRGC projects in Iran.

2.   **Gharagahe Sazandegi Ghaem**: Gharagahe Sazandegi Ghaem is owned or controlled by KAA.

3.   **Ghorb Karbala**: Ghorb Karbala is owned or controlled by KAA.

4.   **Ghorb Nooh**: Ghorb Nooh is owned or controlled by KAA

5.   **Hara Company**: Owned or controlled by Ghorb Nooh.

6.   **Imensazan Consultant Engineers Institute**: Owned or controlled by, or acts on behalf of, KAA.

7.   **Khatam al-Anbiya Construction Headquarters**: Khatam al-Anbiya Construction Headquarters (KAA) is an IRGC-owned company involved in large scale civil and military construction projects and other engineering activities. It undertakes a significant amount of work on Passive Defense Organization projects. In particular, KAA subsidiaries were heavily involved in the construction of the uranium enrichment site at Qom/Fordow.

8.   **Makin**: Makin is owned or controlled by or acting on behalf of KAA, and is a subsidiary of KAA.

9.   **Omran Sahel**: Owned or controlled by Ghorb Nooh.

10.   **Oriental Oil Kish**: Oriental Oil Kish is owned or controlled by or acting on behalf of KAA.

11.   **Rah Sahel**: Rah Sahel is owned or controlled by or acting on behalf of KAA.

12.   **Rahab Engineering Institute**: Rahab is owned or controlled by or acting on behalf of KAA, and is a subsidiary of KAA.

13.   **Sahel Consultant Engineers**: Owned or controlled by Ghorb Nooh.

14.   **Sepanir**: Sepanir is owned or controlled by or acting on behalf of KAA.

15.   **Sepasad Engineering Company**: Sepasad Engineering Company is owned or controlled by or acting on behalf of KAA.

14

PX521

**Annex III**

### Entities owned, controlled, or acting on behalf of the Islamic Republic of Iran Shipping Lines (IRISL)

1. **Irano Hind Shipping Company**

   <u>Location</u>: 18 Mehrshad Street, Sadaghat Street, Opposite of Park Mellat, Vali-e-Asr Ave., Tehran, Iran; 265, Next to Mehrshad, Sedaghat St., Opposite of Mellat Park, Vali Asr Ave., Tehran 1A001, Iran

2. **IRISL Benelux NV**

   <u>Location</u>: Noorderlaan 139, B-2030, Antwerp, Belgium; V.A.T. Number BE480224531 (Belgium)

3. **South Shipping Line Iran** (SSL)

   <u>Location</u>: Apt. No. 7, 3rd Floor, No. 2, 4th Alley, Gandi Ave., Tehran, Iran; Qaem Magham Farahani St., Tehran, Iran

PX521

**Annex IV**

### Proposal to the Islamic Republic of Iran by China, France, Germany, the Russian Federation, the United Kingdom of Great Britain and Northern Ireland, the United States of America and the European Union

*Presented to the Iranian authorities on 14 June 2008 Teheran*

**Possible Areas of Cooperation with Iran**

In order to seek a comprehensive, long-term and proper solution of the Iranian nuclear issue consistent with relevant UN Security Council resolutions and building further upon the proposal presented to Iran in June 2006, which remains on the table, the elements below are proposed as topics for negotiations between China, France, Germany, Iran, Russia, the United Kingdom, and the United States, joined by the High Representative of the European Union, as long as Iran verifiably suspends its enrichment-related and reprocessing activities, pursuant to OP 15 and OP 19(a) of UNSCR 1803. In the perspective of such negotiations, we also expect Iran to heed the requirements of the UNSC and the IAEA. For their part, China, France, Germany, Russia, the United Kingdom, the United States and the European Union High Representative state their readiness:

to recognize Iran's right to develop research, production and use of nuclear energy for peaceful purposes in conformity with its NPT obligations;

to treat Iran's nuclear programme in the same manner as that of any Non-nuclear Weapon State Party to the NPT once international confidence in the exclusively peaceful nature of Iran's nuclear programme is restored.

**Nuclear Energy**

– Reaffirmation of Iran's right to nuclear energy for exclusively peaceful purposes in conformity with its obligations under the NPT.

– Provision of technological and financial assistance necessary for Iran's peaceful use of nuclear energy, support for the resumption of technical cooperation projects in Iran by the IAEA.

– Support for construction of LWR based on state-of-the-art technology.

– Support for R&D in nuclear energy as international confidence is gradually restored.

– Provision of legally binding nuclear fuel supply guarantees.

– Cooperation with regard to management of spent fuel and radioactive waste.

**Political**

– Improving the six countries' and the EU's relations with Iran and building up mutual trust.

– Encouragement of direct contact and dialogue with Iran.

– Support Iran in playing an important and constructive role in international affairs.

PX521

– Promotion of dialogue and cooperation on non-proliferation, regional security and stabilization issues.

– Work with Iran and others in the region to encourage confidence-building measures and regional security.

– Establishment of appropriate consultation and cooperation mechanisms.

– Support for a conference on regional security issues.

– Reaffirmation that a solution to the Iranian nuclear issue would contribute to non-proliferation efforts and to realizing the objective of a Middle East free of weapons of mass destruction, including their means of delivery.

– Reaffirmation of the obligation under the UN Charter to refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any State or in any other manner inconsistent with the Charter of the United Nations.

– Cooperation on Afghanistan, including on intensified cooperation in the fight against drug trafficking, support for programmes on the return of Afghan refugees to Afghanistan; cooperation on reconstruction of Afghanistan; cooperation on guarding the Iran-Afghan border.

**Economic**

Steps towards the normalization of trade and economic relations, such as improving Iran's access to the international economy, markets and capital through practical support for full integration into international structures, including the World Trade Organization, and to create the framework for increased direct investment in Iran and trade with Iran.

**Energy Partnership**

Steps towards the normalization of cooperation with Iran in the area of energy: establishment of a long-term and wide-ranging strategic energy partnership between Iran and the European Union and other willing partners, with concrete and practical applications/measures.

**Agriculture**

– Support for agricultural development in Iran.

Facilitation of Iran's complete self-sufficiency in food through cooperation in modern technology.

**Environment, Infrastructure**

– Civilian Projects in the field of environmental protection, infrastructure, science and technology, and high-tech:

– Development of transport infrastructure, including international transport corridors.

– Support for modernization of Iran's telecommunication infrastructure, including by possible removal of relevant export restrictions.

17

PX521

**Civil Aviation**

– Civil aviation cooperation, including the possible removal of restrictions on manufacturers exporting aircraft to Iran:

    – Enabling Iran to renew its civil aviation fleet;

    – Assisting Iran to ensure that Iranian aircraft meet international safety standards.

**Economic, social and human development/humanitarian issues**

– Provide, as necessary, assistance to Iran's economic and social development and humanitarian need.

– Cooperation/technical support in education in areas of benefit to Iran:

    – Supporting Iranians to take courses, placements or degrees in areas such as civil engineering, agriculture and environmental studies;

    – Supporting partnerships between Higher Education Institutions e.g. public health, rural livelihoods, joint scientific projects, public administration, history and philosophy.

– Cooperation in the field of development of effective emergency response capabilities (e.g. seismology, earthquake research, disaster control etc.).

– Cooperation within the framework of a "dialogue among civilizations".

**Implementation mechanism**

– Constitution of joint monitoring groups for the implementation of a future agreement.

———————

18

PX521

# PX606

# Iran allegedly using Ansar al-Islam, Al-Qa'idah to interfere in Iraqi Kurdistan

**Publication info:** BBC Monitoring Middle East ; London [London]. 28 Apr 2007: 1.

ProQuest document link

## ABSTRACT (ABSTRACT)

We contacted a reliable and well-informed source in the district of Kurdistan and we asked him about the opinions of stands of those with whom we had met. After stressing emphatically to keep his name anonymous, he said: "In fact, there is an organized campaign to recruit young Iranian Kurds in 'ideological and military' training courses during which the recruit is paid a [monthly] salary of $1,500. During this course, the trainee is given specific ideological lessons that steer him in a certain direction. Along with these training courses, the recruit goes through other military activities most of which are of a terrorist nature. These courses are held in Iranian camps spread out in various regions of Iran". When we asked him about claims that there is a kind of connection between the Iranian Islamic Republic and the Al-Qa'idah organization, the source confirmed this to Elaph and said: "Yes, there is a relationship. It is real and not imaginary. There is a camp near the city of Marivan that is devoted to training Al-Qa'idah elements. This camp was indeed infiltrated by intelligence quarters (he declined to name them or identify them). He said that the recruits in this camp are given lessons in the most dangerous kinds of terrorism. He referred to decapitation and said that the trainees are given lessons on how to slaughter a chicken and end up with cutting off the heads of human dummies. They are also trained on how to make cocktail Molotov bombs, planting mines, using all kinds of light weapons, ways to lure elements that are to be liquidated or arrested, and ways to wrest information from them before liquidating them". When we asked where these trainees are sent, he said "To Iraq and Kurdistan just as they sent some time ago four of their elements to Kurdistan in order to assassinate a prominent security figure in the city of Al-Sulaymaniyah. However, the attempt was foiled and the four were seized". When asked about the border points from which these trainees infiltrate, he answered, "First of all, I wish to refer to an important point and that is that the issue of infiltration has been exaggerated and given an importance more than it deserves. For instance, in the region of Halalawa [place name as transliterated] across from the town of Panjawin, there is an Iranian hill that is partly in Iraqi territory.

## FULL TEXT

Excerpt from report by London-based, Saudi-owned Elaph website on 27 April

[Report by Nizar Jaf in Bonn: "Ansar al-Islam: An Iranian card in Kurdistan; the war of terrorism and alcoholic beverages across the border"]

When the power of the Ansar al-Islam group that is known for its extremism was at its peak in 2002 and 2003, the reports and stories flowed from their border area that amounted to a narrow border strip made up of a few villages most important of which were the Bayarah and the Tawilah regions. In those days, they used to recount how the Islamic inquisition courts used to impose their power on the powerless people with for the force of arms and the specter of death. They recounted how this group used to issue fatwas [Muslim religious edicts] and various opinions tailored to their special visions. Things like satellite stations, music, song, and even clothes and many other aspects of the freedoms of individuals and of society became something of the past.

The border villages of Bayarah and Tawilah were the best witnesses to this dark period during which this terrorist band tyrannized these regions. In every corner and in every place one hears about a story or an incident that



PX606

recounts a dark and ugly part of the black deeds of that deviant cabal. Hamah Rashid from the village of Tawilah says: "They were good at two things: banning everything and threatening to kill. They allowed themselves and their weird programme that was alien to us to ban anything they wanted. Death waited for anyone that refused to obey their will". This band -that had split off from the Kurdistan Islamic movement - perpetrated acts and misdeeds that the inhabitants of the two regions still remember. Their misdeeds did not stop at mutilating the sacred graves of ordinary people but went beyond that to attack the most basic individual liberties that are guaranteed by divine as well as man-made laws. Hamah Rashid told us that the return of this "satanic band," as he called it, arouses the anxiety and fears of the inhabitants of the Biyarah and Tawilah regions since they had suffered a lot from their unlimited injustice and tyranny. Sabah A. [initial as published] from Biyarah now lives in the city of Al-Sulaymaniyah. He said, "I escaped with my family with our skin. Although this band has been removed from the region, this removal is temporary. They are like a cancer where the only cure is death. We were sure that they would return sooner or later, particularly since everyone knows that they fled in the direction of the Iranian border. But for various different reasons, this fact is overlooked or ignored. They have returned and there are two possible reasons for their return. The first one is that they wish to play the game of "life or death" which would mean more destruction and more disasters to the inhabitants of these regions that have absolutely nothing to do with what is happening. The second possibility is to prepare for the big confrontation between Iran and the United States during which this group will be used as a pressure tool in the confrontation against Washington and its allies from the two principal Kurdish parties".

We contacted the Iranian Kurdish writer N.D. [initials as published] on the current situation in the border regions and the veracity of reports about a strong Iranian support for the radical Islamic organizations. He answered, "At first, I had a limited view of the extent and specific level of Iranian involvement in this field. However, I was shocked when I discovered extremely dangerous facts but that was after a relatively long time. I have heard from several sources in the towns of "Paneh, Marivan, Sakkez, Pavah, Kermanshah, and Jaravand" [place names as transliterated] an organized campaign is under way to recruit young Kurds in order to send them to Iraq, Lebanon, and even to other areas if required". [passage omitted]

We contacted a reliable and well-informed source in the district of Kurdistan and we asked him about the opinions of stands of those with whom we had met. After stressing emphatically to keep his name anonymous, he said: "In fact, there is an organized campaign to recruit young Iranian Kurds in 'ideological and military' training courses during which the recruit is paid a [monthly] salary of $1,500. During this course, the trainee is given specific ideological lessons that steer him in a certain direction. Along with these training courses, the recruit goes through other military activities most of which are of a terrorist nature. These courses are held in Iranian camps spread out in various regions of Iran". When we asked him about claims that there is a kind of connection between the Iranian Islamic Republic and the Al-Qa'idah organization, the source confirmed this to Elaph and said: "Yes, there is a relationship. It is real and not imaginary. There is a camp near the city of Marivan that is devoted to training Al-Qa'idah elements. This camp was indeed infiltrated by intelligence quarters (he declined to name them or identify them). He said that the recruits in this camp are given lessons in the most dangerous kinds of terrorism. He referred to decapitation and said that the trainees are given lessons on how to slaughter a chicken and end up with cutting off the heads of human dummies. They are also trained on how to make cocktail Molotov bombs, planting mines, using all kinds of light weapons, ways to lure elements that are to be liquidated or arrested, and ways to wrest information from them before liquidating them". When we asked where these trainees are sent, he said "To Iraq and Kurdistan just as they sent some time ago four of their elements to Kurdistan in order to assassinate a prominent security figure in the city of Al-Sulaymaniyah. However, the attempt was foiled and the four were seized". When asked about the border points from which these trainees infiltrate, he answered, "First of all, I wish to refer to an important point and that is that the issue of infiltration has been exaggerated and given an importance more than it deserves. For instance, in the region of Halalawa [place name as transliterated] across



PX606

from the town of Panjawin, there is an Iranian hill that is partly in Iraqi territory. The hill is called Jalah Tarkhinah [place name as transliterated] and there the Ansar al-Islam units gather and are distributed. But the more important points that are used to infiltrate the Iraqi hinterland are those near the two towns of Kilar and Khanaqin [place names as transliterated]. It can be said that this area is the principal vein that feeds the organized terrorism against the political process in Iraq". Answering a question on why Al-Qa'idah elements or Ansar al-Islam infiltrate the district of Kurdistan, he said, "They are using that as a pressure card against the Kurds. They tell us frankly and in very clear messages: As long as the Kurdish authorities have not banned PEJAK (Party for a free Life in Kurdistan, the Iranian wing of the Kurdistan Workers' Party [PKK] and have not banned alcoholic beverages, we shall infiltrate Ansar al-Islam and Al-Qa'idah elements to you".

Credit: Elaph website, London, in Arabic 27 Apr 07

## DETAILS

| | |
|---|---|
| Subject: | Bans; Islam; Terrorism; Alcoholic beverages; Kurdish people |
| Publication title: | BBC Monitoring Middle East; London |
| First page: | 1 |
| Number of pages: | 0 |
| Publication year: | 2007 |
| Publication date: | Apr 28, 2007 |
| Dateline: | IRAQ |
| Publisher: | BBC Worldwide Limited |
| Place of publication: | London |
| Country of publication: | United Kingdom, London |
| Publication subject: | Business And Economics, Political Science |
| Source type: | Wire Feed |
| Language of publication: | English |
| Document type: | WIRE FEED |
| ProQuest document ID: | 458815323 |
| Document URL: | https://www.proquest.com/wire-feeds/iran-allegedly-using-ansar-al-islam-qaidah/docview/458815323/se-2?accountid=8289 |
| Copyright: | Elaph website, London, in Arabic 27 Apr 07/BBC Monitoring/(c) BBC |



PX606

| Last updated: | 2021-12-09 |
|---|---|
| **Database:** | ProQuest Central |

## LINKS

Check for full text in other resources

Database copyright © 2022 ProQuest LLC. All rights reserved.

Terms and Conditions   Contact ProQuest



PX606

PX611

# Text of President Bush's Speech on Troop Levels

**npr.org**/templates/story/story.php

**Hear Sen. Dick Durbin's Response**

**Responses to the President's Plan**

To download NPR coverage of President Bush's speech, click above.
*The complete text of President Bush's Jan. 10 speech on the U.S. mission in Iraq and his policies in the Middle East. The president's speech, delivered from the the White House, began just after 9 p.m. ET.*



**Special Coverage: Speech, Analysis**

THE PRESIDENT: Good evening. Tonight in Iraq, the Armed Forces of the United States are engaged in a struggle that will determine the direction of the global war on terror — and our safety here at home. The new strategy I outline tonight will change America's course in Iraq, and help us succeed in the fight against terror.

When I addressed you just over a year ago, nearly 12 million Iraqis had cast their ballots for a unified and democratic nation. The elections of 2005 were a stunning achievement. We thought that these elections would bring the Iraqis together, and that as we trained Iraqi security forces we could accomplish our mission with fewer American troops.

But in 2006, the opposite happened. The violence in Iraq — particularly in Baghdad — overwhelmed the political gains the Iraqis had made. Al Qaeda terrorists and Sunni insurgents recognized the mortal danger that Iraq's elections posed for their cause, and they responded with outrageous acts of murder aimed at innocent Iraqis. They blew up one of the holiest shrines in Shia Islam — the Golden Mosque of Samarra — in a calculated effort to provoke Iraq's Shia population to retaliate. Their strategy worked. Radical Shia elements, some supported by Iran, formed death squads. And the result was a vicious cycle of sectarian violence that continues today.

The situation in Iraq is unacceptable to the American people — and it is unacceptable to me. Our troops in Iraq have fought bravely. They have done everything we have asked them to do. Where mistakes have been made, the responsibility rests with me.

It is clear that we need to change our strategy in Iraq. So my national security team, military commanders, and diplomats conducted a comprehensive review. We consulted members of Congress from both parties, our allies abroad, and distinguished outside experts. We benefitted from the thoughtful recommendations of the Iraq Study Group, a bipartisan panel led by former Secretary of State James Baker and former Congressman Lee Hamilton. In our

PX611

discussions, we all agreed that there is no magic formula for success in Iraq. And one message came through loud and clear: Failure in Iraq would be a disaster for the United States.

The consequences of failure are clear: Radical Islamic extremists would grow in strength and gain new recruits. They would be in a better position to topple moderate governments, create chaos in the region, and use oil revenues to fund their ambitions. Iran would be emboldened in its pursuit of nuclear weapons. Our enemies would have a safe haven from which to plan and launch attacks on the American people. On September the 11th, 2001, we saw what a refuge for extremists on the other side of the world could bring to the streets of our own cities. For the safety of our people, America must succeed in Iraq.

The most urgent priority for success in Iraq is security, especially in Baghdad. Eighty percent of Iraq's sectarian violence occurs within 30 miles of the capital. This violence is splitting Baghdad into sectarian enclaves, and shaking the confidence of all Iraqis. Only Iraqis can end the sectarian violence and secure their people. And their government has put forward an aggressive plan to do it.

Our past efforts to secure Baghdad failed for two principal reasons: There were not enough Iraqi and American troops to secure neighborhoods that had been cleared of terrorists and insurgents. And there were too many restrictions on the troops we did have. Our military commanders reviewed the new Iraqi plan to ensure that it addressed these mistakes. They report that it does. They also report that this plan can work.

Now let me explain the main elements of this effort: The Iraqi government will appoint a military commander and two deputy commanders for their capital. The Iraqi government will deploy Iraqi Army and National Police brigades across Baghdad's nine districts. When these forces are fully deployed, there will be 18 Iraqi Army and National Police brigades committed to this effort, along with local police. These Iraqi forces will operate from local police stations — conducting patrols and setting up checkpoints, and going door-to-door to gain the trust of Baghdad residents.

This is a strong commitment. But for it to succeed, our commanders say the Iraqis will need our help. So America will change our strategy to help the Iraqis carry out their campaign to put down sectarian violence and bring security to the people of Baghdad. This will require increasing American force levels. So I've committed more than 20,000 additional American troops to Iraq. The vast majority of them — five brigades — will be deployed to Baghdad. These troops will work alongside Iraqi units and be embedded in their formations. Our troops will have a well-defined mission: to help Iraqis clear and secure neighborhoods, to help them protect the local population, and to help ensure that the Iraqi forces left behind are capable of providing the security that Baghdad needs.

PX611

Many listening tonight will ask why this effort will succeed when previous operations to secure Baghdad did not. Well, here are the differences: In earlier operations, Iraqi and American forces cleared many neighborhoods of terrorists and insurgents, but when our forces moved on to other targets, the killers returned. This time, we'll have the force levels we need to hold the areas that have been cleared. In earlier operations, political and sectarian interference prevented Iraqi and American forces from going into neighborhoods that are home to those fueling the sectarian violence. This time, Iraqi and American forces will have a green light to enter those neighborhoods — and Prime Minister Maliki has pledged that political or sectarian interference will not be tolerated.

I've made it clear to the Prime Minister and Iraq's other leaders that America's commitment is not open-ended. If the Iraqi government does not follow through on its promises, it will lose the support of the American people

-- and it will lose the support of the Iraqi people. Now is the time to act. The Prime Minister understands this. Here is what he told his people just last week: "The Baghdad security plan will not provide a safe haven for any outlaws, regardless of [their] sectarian or political affiliation."

This new strategy will not yield an immediate end to suicide bombings, assassinations, or IED attacks. Our enemies in Iraq will make every effort to ensure that our television screens are filled with images of death and suffering. Yet over time, we can expect to see Iraqi troops chasing down murderers, fewer brazen acts of terror, and growing trust and cooperation from Baghdad's residents. When this happens, daily life will improve, Iraqis will gain confidence in their leaders, and the government will have the breathing space it needs to make progress in other critical areas. Most of Iraq's Sunni and Shia want to live together in peace — and reducing the violence in Baghdad will help make reconciliation possible.

A successful strategy for Iraq goes beyond military operations. Ordinary Iraqi citizens must see that military operations are accompanied by visible improvements in their neighborhoods and communities. So America will hold the Iraqi government to the benchmarks it has announced.

To establish its authority, the Iraqi government plans to take responsibility for security in all of Iraq's provinces by November. To give every Iraqi citizen a stake in the country's economy, Iraq will pass legislation to share oil revenues among all Iraqis. To show that it is committed to delivering a better life, the Iraqi government will spend $10 billion of its own money on reconstruction and infrastructure projects that will create new jobs. To empower local leaders, Iraqis plan to hold provincial elections later this year. And to allow more Iraqis to re-enter their nation's political life, the government will reform de-Baathification laws, and establish a fair process for considering amendments to Iraq's constitution.

PX611

America will change our approach to help the Iraqi government as it works to meet these benchmarks. In keeping with the recommendations of the Iraq Study Group, we will increase the embedding of American advisers in Iraqi Army units, and partner a coalition brigade with every Iraqi Army division. We will help the Iraqis build a larger and better-equipped army, and we will accelerate the training of Iraqi forces, which remains the essential U.S. security mission in Iraq. We will give our commanders and civilians greater flexibility to spend funds for economic assistance. We will double the number of provincial reconstruction teams. These teams bring together military and civilian experts to help local Iraqi communities pursue reconciliation, strengthen the moderates, and speed the transition to Iraqi self-reliance. And Secretary Rice will soon appoint a reconstruction coordinator in Baghdad to ensure better results for economic assistance being spent in Iraq.

As we make these changes, we will continue to pursue al Qaeda and foreign fighters. Al Qaeda is still active in Iraq. Its home base is Anbar Province. Al Qaeda has helped make Anbar the most violent area of Iraq outside the capital. A captured al Qaeda document describes the terrorists' plan to infiltrate and seize control of the province. This would bring al Qaeda closer to its goals of taking down Iraq's democracy, building a radical Islamic empire, and launching new attacks on the United States at home and abroad.

Our military forces in Anbar are killing and capturing al Qaeda leaders, and they are protecting the local population. Recently, local tribal leaders have begun to show their willingness to take on al Qaeda. And as a result, our commanders believe we have an opportunity to deal a serious blow to the terrorists. So I have given orders to increase American forces in Anbar Province by 4,000 troops. These troops will work with Iraqi and tribal forces to keep up the pressure on the terrorists. America's men and women in uniform took away al Qaeda's safe haven in Afghanistan — and we will not allow them to re-establish it in Iraq.

Succeeding in Iraq also requires defending its territorial integrity and stabilizing the region in the face of extremist challenges. This begins with addressing Iran and Syria. These two regimes are allowing terrorists and insurgents to use their territory to move in and out of Iraq. Iran is providing material support for attacks on American troops. We will disrupt the attacks on our forces. We'll interrupt the flow of support from Iran and Syria. And we will seek out and destroy the networks providing advanced weaponry and training to our enemies in Iraq.

We're also taking other steps to bolster the security of Iraq and protect American interests in the Middle East. I recently ordered the deployment of an additional carrier strike group to the region. We will expand intelligence-sharing and deploy Patriot air defense systems to reassure our friends and allies. We will work with the governments of Turkey and Iraq to help them resolve problems along their border. And we will work with others to prevent Iran from gaining nuclear weapons and dominating the region.

PX611

We will use America's full diplomatic resources to rally support for Iraq from nations throughout the Middle East. Countries like Saudi Arabia, Egypt, Jordan, and the Gulf States need to understand that an American defeat in Iraq would create a new sanctuary for extremists and a strategic threat to their survival. These nations have a stake in a successful Iraq that is at peace with its neighbors, and they must step up their support for Iraq's unity government. We endorse the Iraqi government's call to finalize an International Compact that will bring new economic assistance in exchange for greater economic reform. And on Friday, Secretary Rice will leave for the region, to build support for Iraq and continue the urgent diplomacy required to help bring peace to the Middle East.

The challenge playing out across the broader Middle East is more than a military conflict. It is the decisive ideological struggle of our time. On one side are those who believe in freedom and moderation. On the other side are extremists who kill the innocent, and have declared their intention to destroy our way of life. In the long run, the most realistic way to protect the American people is to provide a hopeful alternative to the hateful ideology of the enemy, by advancing liberty across a troubled region. It is in the interests of the United States to stand with the brave men and women who are risking their lives to claim their freedom, and to help them as they work to raise up just and hopeful societies across the Middle East.

From Afghanistan to Lebanon to the Palestinian Territories, millions of ordinary people are sick of the violence, and want a future of peace and opportunity for their children. And they are looking at Iraq. They want to know: Will America withdraw and yield the future of that country to the extremists, or will we stand with the Iraqis who have made the choice for freedom?

The changes I have outlined tonight are aimed at ensuring the survival of a young democracy that is fighting for its life in a part of the world of enormous importance to American security. Let me be clear: The terrorists and insurgents in Iraq are without conscience, and they will make the year ahead bloody and violent. Even if our new strategy works exactly as planned, deadly acts of violence will continue — and we must expect more Iraqi and American casualties. The question is whether our new strategy will bring us closer to success. I believe that it will.

Victory will not look like the ones our fathers and grandfathers achieved. There will be no surrender ceremony on the deck of a battleship. But victory in Iraq will bring something new in the Arab world — a functioning democracy that polices its territory, upholds the rule of law, respects fundamental human liberties, and answers to its people. A democratic Iraq will not be perfect. But it will be a country that fights terrorists instead of harboring them — and it will help bring a future of peace and security for our children and our grandchildren.

This new approach comes after consultations with Congress about the different courses we could take in Iraq. Many are concerned that the Iraqis are becoming too dependent on the United States, and therefore, our policy should focus on protecting Iraq's borders and hunting down al Qaeda. Their solution is to scale back America's efforts in Baghdad — or

PX611

announce the phased withdrawal of our combat forces. We carefully considered these proposals. And we concluded that to step back now would force a collapse of the Iraqi government, tear the country apart, and result in mass killings on an unimaginable scale. Such a scenario would result in our troops being forced to stay in Iraq even longer, and confront an enemy that is even more lethal. If we increase our support at this crucial moment, and help the Iraqis break the current cycle of violence, we can hasten the day our troops begin coming home.

In the days ahead, my national security team will fully brief Congress on our new strategy. If members have improvements that can be made, we will make them. If circumstances change, we will adjust. Honorable people have different views, and they will voice their criticisms. It is fair to hold our views up to scrutiny. And all involved have a responsibility to explain how the path they propose would be more likely to succeed.

Acting on the good advice of Senator Joe Lieberman and other key members of Congress, we will form a new, bipartisan working group that will help us come together across party lines to win the war on terror. This group will meet regularly with me and my administration; it will help strengthen our relationship with Congress. We can begin by working together to increase the size of the active Army and Marine Corps, so that America has the Armed Forces we need for the 21st century. We also need to examine ways to mobilize talented American civilians to deploy overseas, where they can help build democratic institutions in communities and nations recovering from war and tyranny.

In these dangerous times, the United States is blessed to have extraordinary and selfless men and women willing to step forward and defend us. These young Americans understand that our cause in Iraq is noble and necessary — and that the advance of freedom is the calling of our time. They serve far from their families, who make the quiet sacrifices of lonely holidays and empty chairs at the dinner table. They have watched their comrades give their lives to ensure our liberty. We mourn the loss of every fallen American — and we owe it to them to build a future worthy of their sacrifice.

Fellow citizens: The year ahead will demand more patience, sacrifice, and resolve. It can be tempting to think that America can put aside the burdens of freedom. Yet times of testing reveal the character of a nation. And throughout our history, Americans have always defied the pessimists and seen our faith in freedom redeemed. Now America is engaged in a new struggle that will set the course for a new century. We can, and we will, prevail.

We go forward with trust that the Author of Liberty will guide us through these trying hours. Thank you and good night.

END

6/6

PX611

PX612



*American Enterprise Institute for Public Policy Research*

**No. 4 • July 2011**

# Iran's Most Dangerous General

## By Ali Alfoneh

*This is the third in a series of* Middle Eastern Outlooks *about Qassem Suleimani.[1]*

*On May 18, President Barack Obama imposed sanctions against Major General Qassem Suleimani, chief of the Quds Force of the Islamic Revolutionary Guards Corps (IRGC), who is identified as "the conduit for Iranian material support" to the Syrian General Intelligence Directorate. To counter Suleimani and the Quds Force, US strategists need to understand his history of overconfident behavior and military successes. A survey of the open-source literature pertaining to Suleimani reveals a man who became a successful general without much formal training. Though a shrewd tactical leader, Suleimani is not a strategist.*

Addressing students at the Haqqani Theological Seminary in Qom on May 22, 2011, Suleimani declared that the social revolutions in the Middle East and North Africa "provide our revolution with the greatest opportunities." He continued, "Today, Iran's victory or defeat no longer takes place in Mehran and Khorramshahr. Our boundaries have expanded and we must witness victory in Egypt, Iraq, Lebanon, and Syria. This is the fruit of the Islamic revolution."[2]

Suleimani's statements confirm earlier press reports that the Islamic Republic has actively supported its ally Syria in deadly crackdowns on protesters and, more specifically, charges that Suleimani's Quds Force has been exploiting the Arab Spring in Tehran's favor.[3] This is also why, on May 18, Obama imposed sanctions not only against Syrian president Bashar al-Assad and six senior aides, but also Suleimani, who is identified as "the conduit for Iranian material support" to the Syrian General Intelligence Directorate.[4]

Despite Suleimani's prominence, little is known about him personally; he remains something of an enigma. This *Outlook* addresses this problem by analyzing open-source Persian-language materials to help provide some insight into Suleimani's leadership style, his military career, and his recent ideological rhetoric in support of exporting the Iranian revolution. These sources include

> **Key points in this *Outlook*:**
>
> - In May, President Barack Obama issued sanctions against Major General Qassem Suleimani, chief of the Islamic Revolutionary Guards Corps (IRGC) Quds Force, for providing Iranian material support to Syria.
>
> - To counter Suleimani and the Quds Force in Iraq, Afghanistan, and elsewhere, US strategists need to understand his history of overconfident behavior and military successes.
>
> - Suleimani's military record shows that he is an accomplished tactical leader, but not an adept strategist.
>
> - Suleimani's strategic deficiencies not only affected military operations, but also earned him powerful enemies in the politics of the IRGC in the past.

Ali Alfoneh (ali.alfoneh@aei.org) is a resident fellow at AEI.

PX612

- 2 -

Suleimani's speeches, references to Suleimani's war record in the Tehran-based IRGC Center of War Research and Studies' *Iran/Iraq War Chronology*, and biographical materials from Suleimani's fellow war veterans.

Admittedly, the IRGC and Quds Force operations that must be dealt with today differ considerably from the operations conducted during the 1980–88 Iran/Iraq war. However, as the generation of war-era IRGC commanders such as Suleimani rises to prominence in Iran, a study of their past behavior can provide valuable insights into their behavior today. This is especially true for Suleimani, whose familiarity with contemporary military literature was minimal preceding the war,[5] and whose leadership style was shaped by formative battlefield experiences and military staff deliberations.

## Personal Motives

Suleimani is a war hero and a genuine patriot who joined the IRGC following the revolution, as Iran grappled with the likelihood of civil war and the challenges of Iraq's invasion.[6] During the war, Suleimani risked his own life on reconnaissance missions to minimize casualties among his men. At least one credible report describes an event on July 2, 1986, when Suleimani was nearly taken prisoner by Iraqi forces.[7] The incident illustrates both Suleimani's valor and his inclination toward risky behavior.

The young Suleimani's bravery, however, also exposed his division to considerable risk. On August 8, 1985, the impatient Suleimani brought "three loaders, three bulldozers, three trucks, and three Nissan vans to the al-Faw operation zone to engage in engineering activities" in broad daylight.[8] Suleimani was attempting to build a road that would expedite Iranian advances toward Iraqi positions, while the IRGC was preparing a surprise attack against Iraqi forces. The Khatam al-Anbia Base criticized Suleimani heavily for his brazen initiative.[9]

## Values, Ideology, and Charismatic Leadership

Open-source materials depict Suleimani as a man with a warrior ethos (*javanmard*), but not an altogether politically savvy character. As a construction worker in Kerman, Suleimani spent most of his leisure time at the Ataei and Jahan *zourkhanehs* (gymnasiums),[10] which, in addition to teaching physical education, seek to instill Iranian youth with a warrior ethos.[11]

While shaping Suleimani's values and ideology, the Iran/Iraq war also gave him the opportunity to display the warrior ethos he had acquired from the *zourkhaneh*. This wartime environment doubtless helped Suleimani develop into a charismatic leader. Footage of Suleimani's speeches before and after wartime offensives shows him motivating men under his command by praising martyred comrades, crying, and requesting the martyrs' forgiveness for not having been martyred himself.[12] Before each offensive, Suleimani embraced his men one by one and bid them farewell while weeping.[13] Consciously or subconsciously, he used emotions to boost morale. However, the fact that most IRGC members whom Suleimani embraced ultimately died in battle must have had a significant impact on him. Since the end of the war, almost all of his public appearances have commemorated the martyrs.[14]

More recently, however, Suleimani's speeches have emphasized abstract ideological issues such as "Islamic unity," "unification of the community of the believers [in one state]," and the issue of the "liberation of Palestine,"[15] which stand in marked contrast to Suleimani's wartime patriotic persona that revolved around defending Iran in the face of Iraqi aggression. He has also begun making broad statements about the Iran/Iraq war as an "inexpensive war,"[16] and about Israel being within reach of Iranian missiles.[17]

Given the paucity of information on Suleimani, determining whether and to what extent there has been a genuine shift in his thinking remains problematic. In the past, he may not have been in a position to express such viewpoints or, alternately, his broad ideological statements may have gone unnoticed. In any case, his recent use of ideological platitudes may reveal that Suleimani the tactical leader has not managed to develop strategic thinking since his appointment as IRGC Quds Force chief. In this context, ideology would serve as a cover for deficient strategic thought.

## Early Tactical Insights

Suleimani is a practical man with proven problem-solving skills characteristic of a tactical leader. Open-source materials also depict him as a commander who developed tactical military skills early based on his own experiences, which he seems to place more faith in than the orders of his superiors. On July 17, 1985, Suleimani opposed the IRGC leadership's plan to deploy forces to two islands in western Arvandrud (*Shatt al-Arab*).[18] Suleimani argued, "Taking the islands would be easy,

PX612

but remaining there would be impossible. In addition to this, during retreat we will be leaving large troops behind."[19] While other equally critical commanders retracted their positions,[20] Suleimani maintained his stance and the plan was abandoned. This incident may have been a formative moment in his career, which reinforced his stubbornness and nurtured an unwillingness to take others' views into consideration.

---

"We must witness victory in Egypt, Iraq, Lebanon, and Syria. This is the fruit of the Islamic revolution." –Suleimani

---

Suleimani is not a cautious commander. He believes that offense is the best defense.[21] On June 26, 1987, Iraqi forces had almost succeeded in encircling the Forty-First Tharallah Division.[22] Despite constant Iraqi advances and pressure, Suleimani proposed a counteroffensive, which was ultimately rejected by the higher command.[23] Iran was defeated, which, at least in part, can be attributed to the unwillingness of the IRGC leadership to implement Suleimani's advice.[24]

On June 21, 1987, Suleimani participated in the Nasr IV operation, aimed at wresting several strategically important heights from Iraqi forces.[25] Interestingly, Suleimani seems to have acted against his personal inclination and instead followed the orders of the Najaf Base.[26] When the Hamzeh Battalion of the Twenty-Fifth Karbala Division experienced problems and could not take positions as planned, Suleimani, to the disbelief of the IRGC leadership,[27] swiftly directed the Forty-First Tharallah Division to take these positions in its place.[28] On the same day, Suleimani's unit and other units present were attacked with chemical mortars that wounded 110 of his men.[29] Discussing setbacks in the war and international support for Iraq on October 16, 1987, Suleimani aggressively called for better planning, cohesion, and deployment of investigative groups to examine previous tactical blunders and lessons learned.[30] Later that month, he also complained of the lack of cadres to train the draftees, as well as the lack of cooperation between IRGC headquarters and frontline IRGC regiments.[31]

Suleimani understands the benefit of deception and knows how to deceive effectively on the battlefield. While planning the battles of Shalamcheh on October 5, 1987, for example, he asserted, "Deception is impossible without skirmishes. We must engage and fight for two to three nights before the enemy believes it."[32] On October 28, 1987, Suleimani further stressed the need for deception, declaring, "Our training of the expedited forces reveals our maneuvers. We must instruct the forces in various fields so no one finds out what our maneuver is and where our operational area will be."[33] He made these suggestions at a time when the political leadership in Tehran was placing ever-greater pressure on Iranian forces to repel Iraq's advances and little attention was paid to deception.

As Iran's fortunes were turning from bad to worse, the political leadership in Tehran, especially Ayatollah Ali-Akbar Hashemi Rafsanjani, parliamentary speaker and deputy commander-in-chief, demanded a tactical victory from IRGC chief Mohsen Rezai that would create the conditions for Iran to negotiate peace with Iraq.[34] With his back against the wall, on December 6, 1987, Rezai proposed a plan to take the al-Faw Peninsula. Suleimani voiced his opposition to Rezai's proposal, which ignited a clash between him and the IRGC leadership. According to the IRGC's *Iran/Iraq War Chronology*, Suleimani argued that the al-Faw offensive, in addition to resulting in considerable casualties, was further away from the strategically important city of Basra than Shalamcheh. He maintained that the IRGC should attempt to take Shalamcheh instead. Facing criticism from Suleimani, Rezai emphasized that victory in al-Faw could be achieved through a rapid surprise attack. An operation in Shalamcheh, Rezai argued, would be difficult to execute because the Iraqi enemy was expecting Iranian advances in the area.[35]

According to Rafsanjani's memoirs, he and Suleimani discussed "future operations" on December 3, 1987, when Suleimani probably expressed opposition to Rezai's al-Faw invasion plans.[36] This may explain why Rafsanjani, during his December 17, 1987, meeting with IRGC commanders, asked for alternatives to al-Faw. "You know the aim and strategy of the war. Are you aware of a more valuable and better soil in the southern region than al-Faw?" Rafsanjani asked. "We want to know if you have other things on your mind."[37]

By raising the issue, Rafsanjani was likely inviting Suleimani to voice his criticism of Rezai's plan. But Suleimani, contrary to his earlier pattern of behavior, did not do so in the presence of the highest civilian authority in the day-to-day affairs of the war.[38] The meeting concluded with a clash between the IRGC

- 4 -

commanders and Rafsanjani, while Suleimani kept silent. Open-source materials fail to provide any insight into why Suleimani opted not to support Rafsanjani. Several possibilities exist: Suleimani may have had an easy time criticizing the plan but difficulties defending his suggested alternative; he may have wanted to avoid a confrontation with his fellow guardsmen in the presence of the civilian leadership; he may have found it contrary to the ethos of the IRGC to have civilians meddling in its decision making; or he may have feared for his career within the IRGC. At any rate, Suleimani's failure to support Rafsanjani at this meeting may explain why Suleimani disappeared from the limelight during Rafsanjani's presidency (1989–97).

---

Persuading the IRGC leadership to change its tactic in July 1985 reinforced Suleimani's stubbornness and nurtured an unwillingness to take others' views into consideration.

---

Remarkably, following his failure to support Rafsanjani, Suleimani continued his criticism of Rezai, which likely made him an enemy of both. Suleimani participated in the reconnaissance mission before the al-Faw offensive on December 26, 1987,[39] and on January 1, 1988, Suleimani and Rezai argued about the proposed operation. "We don't have any plan for the war! After [the] Karbala V [operation], I really did not know what the purpose was and what we wanted to do in the future. We don't have a clear plan for the next six months,"[40] Suleimani said. He also suggested that the IRGC units attack as soon as possible before the arrival of Iraqi reinforcements, which in Suleimani's view would complete the stalemate in the southern front preceding the Valfajr X operation.[41] Suleimani's statements must have made a deep impression on other commanders because they prompted IRGC ground forces deputy Yahya-Rahim Safavi to say, "God forbid, Satan must not infiltrate you! There is nowhere else than here [al-Faw] in which one can conduct operations."[42] Safavi must have considered Suleimani's statements deeply demoralizing.

Frequent clashes between Suleimani and his superiors—especially Rezai—inevitably made him powerful enemies within the IRGC, and among the civilian leadership. This may explain why Suleimani was appointed Quds Force chief immediately after Rezai's fall from grace in 1997,

which coincided with Rafsanjani's last year in office as president. In sum, Suleimani's experiences during the Iran/Iraq war most certainly made him into a tactical general, but he has never managed to become a strategist.

## Opposition to Meaningless Death

Suleimani's conduct has endeared him to his men. On August 2, 1986, during a rare visit to his native Kerman, Suleimani accused the local health authorities of not saving the lives of his wounded soldiers who were returning there for medical treatment.[43] There is also evidence that Suleimani—despite his praise for martyrdom and martyrs—was reluctant to send men under his command to meaningless death, and that he was prepared to openly oppose his military superiors if he thought their plans would cause needless casualties.

As noted above, Suleimani vigorously resisted Rezai's plans to take the al-Faw Peninsula on the grounds that it would produce considerable casualties with few gains.[44] More broadly, Suleimani was likely expressing his opposition to the "human wave" tactics that entailed sending thousands of guardsmen—including Suleimani's own men—to certain death. These tactics were employed by the IRGC to overcome the technological and organizational superiority of the Iraqi army. Suleimani was doubtless distraught knowing that his soldiers were dying meaninglessly.

## Conclusion

A survey of open-source materials shows Suleimani's strengths but also reveals his weaknesses. His skills, both rhetorical and military, have brought him fame. But he has also made enemies along the way within the IRGC and among the political leadership, which, at least for a time, delayed his promotion. More recently, his use of ideological platitudes in major speeches may indicate that he remains a tactical leader and not a strategist—a quality that undermines his effectiveness as head of the IRGC Quds Force.

*The author thanks his colleagues Frederick W. Kagan and Gary J. Schmitt for their valuable comments.*

## Notes

1. For the previous *Outlooks* in this series, see Ali Alfoneh, "Brigadier General Qassem Suleimani: A Biography," AEI *Middle*

PX612

*Eastern Outlook* (January 2011), www.aei.org/outlook/101020; and Ali Alfoneh: "Iran's Secret Network: Major General Qassem Suleimani's Inner Circle," AEI *Middle Eastern Outlook* (March 2011),  www.aei.org/outlook/101032.

2. "Pirouzi-ye Hezbollah Dar Jang-e 33 Rouzeh Samareh-ye Khoun-ha-ye Rikhteh-shodeh Dar 8 Sal Defa-e Moqaddas Boud" [Hezbollah's Victory at the Thirty-Three-Day War Was the Result of Blood Sacrificed during Eight Years of Sacred Defense], Rasa News (Tehran), May 23, 2011, www.rasanews.ir/Nsite /FullStory/?Id=105241 (accessed May 31, 2011). Suleimani's words were reminiscent of the late Hojjat al-Eslam Mohammad Montazeri, former chief of the Office of the Liberation Movements of the IRGC, who believed that "keeping the enemy busy abroad" by means of "exporting the revolution" was the most effective method for "keeping the enemy away from Iran's borders." While Suleimani and Montazeri shared a common outlook on the need to export Iran's revolution, both on ideological and pragmatic grounds, there is no evidence to suggest a relationship between the two men. See "Emam Va Sepah Az Badv-e Tashkil Ta Hal. Mosahebeh Ba Seyyed Ahmad Khomeini" [The Imam and the Guards from Establishment to Now: Interview with Seyyed Ahmad Khomeini], *Payam-e Enqelab* (Tehran), May 29, 1982, 10.

3. "Syria Pledges End to 'Emergency' Law . . . after 48 Years," *Sunday Times* (London), April 17, 2011.

4. US Department of the Treasury, "Administration Takes Additional Steps to Hold the Government of Syria Accountable for Violent Repression against the Syrian People," news release, May 18, 2011.

5. Majid Malek, "Aya Ostoureh-ye Ma Bar Bad Rafteh?" [Is Our Myth Busted?] Inja Kerman blog, October 15, 2009, http://injakerman3.persianblog.ir/tag/%D8%AA%D8%A7%D8% B1%DB%8C%D8%AE_%D8%A7%D8%AC%D8%AA%D9% 85%D8%A7%D8%B9%DB%8C_%DA%A9%D8%B1%D9%85 5%D8%A7%D9%86 (accessed June 20, 2011); and "Khaterat-e Shahid Ali-Reza Mohammad-Hosseini Az Avvalin Hozourash Dar Mahabad" [Martyr Ali-Reza Mohammad-Hosseini's Memoirs from His First Time in Mahabad], Akbar 313 blog, December 31, 2007, http://akbar313.ir/post-116.aspx (accessed June 20, 2011).

6. Majid Malek, "Aya Ostoureh-ye Ma Bar Bad Rafteh?" [Is Our Myth Busted?]

7. Ali-Akbar Hashemi Rafsanjani, *Karnameh va Khaterat-e Hashemi Rafsanjani Sal-e 1365* [Record and Memoirs of Hashemi Rafsanjani 1986–87] (Tehran: Daftar-e Nashr-e Maaref-e Enghelab, 2009), 453.

8. Hadi Nokhi and Hamidreza Farahani, *Rouzshomar-e Jang-e Iran va Eragh* [Iran/Iraq War Chronology], vol. 37, 2d ed. (Tehran: Sepah-e Pasdaran-e Enghelab-e Eslami, 2008), 443, 649.

9. Ibid., 649.

10. Elahe Beheshti, *Del-e Daryaei. Khaterat-e Zendegi-ye Sardar-e Shahid Mohammad Gerami, Janeshin-e Reis-e Setad-e Lashkar-e 41 Sarallah* [A Heart as Wide as the Sea: Memoirs of the Martyred Commander Mohammad Gerami, Forty-First Tharallah Division Headquarters Deputy] (Kerman: Lashkar-e 41 Sarallah, 1997), 23.

11. Encyclopaedia Iranica, s.v. "ZUR-KANA," by Houshang E. Chehabi, last modified August 15, 2006, accessed May 31, 2011, www.iranica.com/articles/zur-kana.

12. Morteza Aviny, "Amaliat-e Karbala-ye V" [Karbala V Operation], 4shared video, 14:54, posted by "omidhosseini80," January 25, 2011, www.4shared.com/video/D1AKK9Zr/1_2.html (accessed June 5, 2011).

13. Photo is available at  http://bit.ly/l4a3xI (accessed June 5, 2011).

14. For Suleimani's latest speech commemorating the martyrs, see "Sarlashgar Suleimani: Shahed-e Zohour-e Sokhanan-e Emam Khomeini Dar Sath-e Donya Hastim" [Major General Suleimani: We Are Witnessing the Realization of the Words of Imam Khomeini at a Global Level], Fars News (Tehran), March 4, 2011,  www.farsnews.com/newstext.php?nn=8912130380 (accessed July 2, 2011).

15. "Mardom-e Felestin Joz-e Ideh-ha-ye Emam Dar Zaman-e Tab'id Boud" [A Palestinian Nation Was among the Imam's Ideas during His Exile], ISCA News (Tehran), September 27, 2008, http://iscanews.ir/fa/ShowNewsItem.aspx?NewsItemID=246330 (accessed June 20, 2011).

16. "Jang-e Ma Yeki Az Arzan-Tarin Jangha-ye Donya Boud" [Our War Was among the Most Inexpensive Wars of the World], Sobh-e Sadeq (Tehran), November 22, 2010, www.sobhesadegh .ir/1389/0476/M05.HTM (accessed June 14, 2011).

17. "Sardar Suleimani: Esraeil Dar Hal-e Ejra-ye Holocaust-e Vaqei Ast" [Commander Suleimani: Israel Is Engaged in Conducting the Real Holocaust], Basirat website (Tehran), September 27, 2008, www.basirat.ir/news.aspx?newsid=47968 (accessed June 20, 2011).

18. "Entesab-e Riasat-e Markaz-e Tahghighat-e Rahbordi-ye Defaei va Moaven-e Bazresi-ye Setad-e Koll-e Nirou-ha-ye Mossallah" [Appointment of the Heads of the Strategic Defense Studies Center and Deputy Inspector at the Armed Forces General Staff], Daftar-e Hefz va Nashr-e Asar-e Hazrat-e Ayatollah al-Ozma Khamenei website (Tehran), September 26, 2005, http://farsi.khamenei.ir/message-content?id=187 (accessed December 20, 2010).

19. Hadi Nokhi and Hamidreza Farahani, *Rouzshomar-e Jang-e Iran va Eragh* [Iran/Iraq War Chronology], vol. 37, 443.

20. Ibid., 444.

21. Yahya Fowzi and Ali-Reza Lotfollahzadegan, *Rouzshomar-e Jang-e Iran va Eragh* [Iran/Iraq War Chronology], vol. 43, 2d ed. (Tehran: Sepah-e Pasdaran-e Enghelab-e Eslami, 2008), 216.

PX612

- 6 -

22. Ali-Reza Lotfollahzadegan, *Rouzshomar-e Jang-e Iran va Eragh* [Iran/Iraq War Chronology], vol. 49 (Tehran: Sepah-e Pasdaran-e Enghelab-e Eslami, 2008), 324.

23. Ibid., 326.

24. Ibid., 340.

25. Ibid., 262–63.

26. Ibid.

27. Ibid., 272.

28. Ibid., 264.

29. Ibid., 276.

30. Mehdi Ansari and Mahmoud Yazdanfam, *Rouzshomar-e Jang-e Iran va Eragh* [Iran/Iraq War Chronology], vol. 51 (Tehran: Sepah-e Pasdaran-e Enghelab-e Eslami, 2008), 256.

31. Ibid., 607.

32. Ibid., 236.

33. Ibid., 644.

34. Sadegh Zibakalam and Fereshteh Sadat Ettefaghfar, *Hashemi Bedoun-e Routoush* [Hashemi without Alteration] (Tehran: Rowzaneh, 2008), 289.

35. Hossein Ardestani, *Rouzshomar-e Jang-e Iran va Eragh* [Iran/Iraq War Chronology], vol. 52 (Tehran: Sepah-e Pasdaran-e Enghelab-e Eslami, 2003), 257.

36. Ali-Akbar Hashemi Rafsanjani, *Defae va Siasat: Karnameh va Khaterat-e Hashemi Rafsanjani Sal-e 1366* [Defense and Politics: Record and Memoirs of Hashemi Rafsanjani 1987–88], ed. Alireza Hashemi (Tehran: Daftar-e Nashr-e Maaref-e Enghelab, 2009), 383.

37. Hossein Ardestani, *Rouzshomar-e Jang-e Iran va Eragh* [Iran/Iraq War Chronology], vol. 52, 358.

38. Ibid.

39. Ibid., 449.

40. Ibid., 507.

41. Ali-Akbar Hashemi Rafsanjani, *Defae va Siasat-Karnameh va Khaterat-e Hashemi Rafsanjani Sal-e 1366* [Defense and Politics: Record and Memoirs of Hashemi Rafsanjani 1987–88], 552.

42. Ibid., 434.

43. Yahya Fowzi and Ali-Reza Lotfollahzadegan, *Rouzshomar-e Jang-e Iran va Eragh* [Iran/Iraq War Chronology], vol. 43, 284.

44. Hossein Ardestani, *Rouzshomar-e Jang-e Iran va Eragh* [Iran/Iraq War Chronology], vol. 52, 257.

PX612

PX613





طباعة 🖶          بريد ✉

**Thursday Jumada Al-Awwal 02 1429 AH May 8, 2008 Issue 10754**

# Former Revolutionary Guards official: Hundreds of Mahdi Army trained in missiles and diving in Iran

**He told Asharq Al-Awsat that Tehran used Hezbollah to train Iraqis because of the language problem**

London: Ali Nourizadeh, the problem of the faithful translator to convey the instructions of the Shiite youths arriving at the Revolutionary Guard camps in Ahvas, Elam, Qom and Tehran, from Iraq, was one of the most important reasons for the decision of the leadership of the "Quds Force" tasked with training Shiite militias in Iraq, and educating them ideologically, to seek the assistance of party cadres. May God bless those who previously received military training in Iran and at the hands of the Revolutionary Guards, in order to help the guards' trainers train the Iraqi Shiite fighters.

In these terms, the former brigadier general of the Revolutionary Guards, Hajj Rida, who demanded that his real name not be disclosed, revealed the details of Hezbollah's relations with the "Mahdi Army," Hezbollah, and the revolution of God in Iraq, the way the members of the "Mahdi Army" and other organizations travel to Iran, and the type of training they receive. As well as the dimensions of Iranian support, not only to the Lebanese Hezbollah.

After Muqtada al-Sadr's participation in the ceremonies commemorating Khomeini's death and his meeting with the country's senior leaders and security and military leaders, the "Mahdi Army" was received by hundreds. Unattended. Then, since early 2007, high training for the Mahdi Army fighters began, which includded the use of guided missiles and shoulder-fired anti-air missiles, and the manufacture of explosives and bombs. The Naval Guards also trained elements of the Mahdi Army in naval arts, diving and marine operations.

Regarding the training of the Mahdi Army, the Iraqi Hezbollah and the Revolution of God by Hezbollah officers, Brigadier General Hajj Rida said, "The Lebanese Hezbollah is part of the Revolutionary

PX613

Guards Institution, and the party was formed by the guards' officers, and there is a common ideology linking the Islamic Republic to the party, which is not There is any difference between its men and the guards, and if you take into account the amount of Iranian funding to the party (more than 800 million dollars in 2007) and the quantities of Iranian weapons available to the party, then the party's relationship with Iran and its dimensions may become clear, and based on this reality, the participation of party officers God in training the Iraqi Shiite fighters, is not strange, and instead of the trainer of the guard relying on translators to convey his instructions to the Shiite trainees from Iraq, the brothers in Hezbollah, whom we taught the arts of war from A to Z, have taken over and are still training Iraqis, especially in advanced stages.Informed sources said that the camps where Hezbollah trainers are located are the Lavisan camp, north of Tehran, the Manzhariyya and Salihabad camp on the Tehran-Qom road, as well as the Kaveh Air Base of the Guards Air Force in Mashhad, where Hezbollah pilots received introductions to pilots. The training of the Iraqi elements takes place in the camps of Feyzan and Salihabad by Hezbollah officers, while the training of the new fighters of the Mahdi Army is usually done in camps close to the border with Iraq, such as Khatam al-Anbiya and the camps of Elam and Kermanshah.

According to the hadith of Brigadier General Hajj Rida, the arrest of Musa Daqduq, a high-ranking officer in Hezbollah in Iraq, who was responsible for examining and investigating the history of Shiite volunteers in Basra and the south, before sending them to Iran, in March 2007 by US forces "was a blow that did not happen." It is less effective than the arrest strike of Brigadier General Farhadi, the operations commander of the Quds Force in Sulaymaniyah, which forced us to withdraw Hezbollah men from Iraq for some time".

Brigadier General Hajj Rida explained that he decided to leave the ranks of the guard, which he spent 25 years of his life in, because of the role played by the "Quds Force" in Iraq and Lebanon, noting that "dozens of speedboats were transferred to the Syrian port of Latakia, where they were handed over to Hezbollah for its major battle." Which will be close," he said. It is noteworthy that Brigadier General Hajj Rida, who demanded asylum in a country he refused to reveal its name, confirmed that he will reveal dangerous secrets, after moving to the mentioned country, and will reveal his full identity.

Like 0          Tweet          Share

## Comments

### Kamal Al-Amin, «Iran», 08/05/2008

It is very natural that the series of distortion of the nature of the resistance exercised by the free people of our Iraqi people against the American occupier, who established for himself the legitimacy of killing Iraqis in the west, center and south, destroying Iraq and sabotaging its infrastructure in the name of eliminating weapons of mass destruction whose existence was false, the occupier resorted to inventing allegations Others justify his survival, and the series of distortions of the resistance movement in the West, the South, and the

PX613

Center came to perpetuate the occupation, and Mahaj Rida and others who are trying to challenge the identity of the national resistance are nothing but trumpets blown with an American exhale paid in advance.

**Jassem Aldulaimi, «Australia», 08/05/2008**
This party is responsible for killing 10,000 Sunnis in Iraq.

**Amer Ammar, "Jordan", 08/05/2008**
It became clear to everyone that the hostility that these countries have towards Iraq is not temporary or a problem of the system or anything else, but rather it is a hostility that is rooted in souls and assets... Whoever goes to the hell of Iran only learns how to burn and how to burn.

 طبـاعة           بريـد

PX613

PX615

Placeholder

PX620

## U.S.: Top Iran officials ordering bombs to Iraq

nbcnews.com/id/wbna17097658

February 11, 2007



U.S. military officials on Sunday accused the highest levels of the Iranian leadership of arming Shiite militants in Iraq with sophisticated armor-piercing roadside bombs that have killed more than 170 American forces.

The military command in Baghdad denied, however, that any newly smuggled Iranian weapons were behind the five U.S. military helicopter crashes since Jan. 20 — four that were shot out of the sky by insurgent gunfire.

A fifth crash has tentatively been blamed on mechanical failure. In the same period, two private security company helicopters also have crashed but the cause was unclear.

The deadly and highly sophisticated weapons the U.S. military said it traced to Iran are known as "explosively formed penetrators," or EFPs.

The presentation was the result of weeks of preparation and revisions as U.S. officials put together a package of material to support the Bush administration's claims of Iranian intercession on behalf of militant Iraqis fighting American forces.

PX620

Senior U.S. military officials in Baghdad said the display was prompted by the military's concern for "force protection," which, they said, was guaranteed under the United Nations resolution that authorizes American soldiers to be in Iraq.

**'Machining process' laid to Iran**

Three senior military officials who explained the display said the "machining process" used in the construction of the deadly bombs had been traced to Iran.

The experts, who spoke to a large gathering of reporters on condition that they not be further identified, said the supply trail began with Iran's Revolutionary Guards Quds Force, which also is accused of arming the Hezbollah guerrilla army in Lebanon. The officials said the EFP weapon was first tested there.

The officials said the Revolutionary Guard and its Quds force report directly to Iran's supreme leader, Ayatollah Ali Khamenei.

The briefing on Iran was revised heavily after officials decided it was not ready for release as planned last month.

Senior U.S. officials in Washington — cautious after the drubbing the administration took for the faulty intelligence leading to the 2003 Iraq invasion — had held back because they were unhappy with the original presentation.

The display appeared to be part of the White House drive that has empowered U.S. forces in Iraq to use all means to curb Iranian influence in the country, including killing Iranian agents.

It included a PowerPoint slide program and a handful of mortar shells and rocket-propelled grenades which the military officials said were made in Iran.

**Anatomy of a weapon**

The centerpiece of the display, however, was a gray metal pipe about 10 inches long and 6 inches in diameter, the exterior casing of what the military said was an EFP, the roadside bomb that shoots out fist-sized wads of nearly molten copper that can penetrate the armor on an Abrams tank.

"A normal roadside bomb is like a shotgun blast. But these are like a rifle. They're focused and they're aimed. ... It's going to take anything out in its way, go in one side and out the other," said 1st Lt. Zane Galvach, 25, of Dayton, Ohio, a soldier with the Army's 2nd Division, based in Baghdad.

Skeptical congressional Democrats said the Bush administration should move cautiously before accusing Iran of fomenting a campaign of violence against U.S. troops in Iraq.

Get the Morning Rundown

PX620

Get a head start on the morning's top stories.

Senate Intelligence Committee member Ron Wyden, D-Ore., said "the administration is engaged in a drumbeat with Iran that is much like the drumbeat that they did with Iraq. We're going to insist on accountability."

## Recommended

### Lott against Iran incursion
On the Republican side, Sen. Trent Lott of Mississippi said he did not think the United States was trying to make a case for attacking Iran. Lott said the U.S. should try to stop the flow of munitions through Iran to Iraq but that "you do that by interdiction … you don't do it by invasion."

The EFPs, as well as Iranian-made mortar shells and rocket-propelled grenades, have been supplied to what the military officials termed "rogue elements" of the Mahdi Army militia of anti-American Shiite cleric Muqtada al-Sadr. He is a key backer of Shiite Prime Minister Nouri al-Maliki.

The U.S. officials glossed over armaments having reached the other major Shiite militia organization, the Badr Brigade. It is the military wing of Iraq's most powerful Shiite political organization, the Supreme Council for the Islamic Revolution in Iraq, whose leaders also have close ties to the U.S.

Many key government figures and members of the Shiite political establishment have deep ties to Iran, having spent decades there in exile during Saddam Hussein's rule. The Badr Brigade was formed and trained by Iran's Revolutionary Guard.

An intelligence analyst in the group said Iran was working through "multiple surrogates" — mainly in the Mahdi Army — to smuggle the EFPs into Iraq. He said most of the components are entering the country at crossing points near Amarah, the Iranian border city of Meran and the Basra area of southern Iraq.

### 'We know more than we can show'
The analyst said Iraq's Shiite-led government had been briefed on Iran's involvement and Iraqi officials had asked the Iranians to stop. Al-Maliki has said he told both the U.S. and Iran that he does not want his country turned into a proxy battlefield.

"We know more than we can show," said one of the senior officials, when pressed for tangible evidence that the EFPs were made in Iran.

U.S. officials have alleged for years that weapons were entering the country from Iran but had until Sunday stopped short of alleging involvement by top Iranian leaders.

PX620



This handout photo released by the US military, 11 February 2007 shows an Explosive Formed Projectile (EFP) attack on Iraqi police in Hilla, 10 June 2006. Sophisticated Iranian-built bombs smuggled into Iraq have killed at least 170 US and allied soldiers since June 2004 and wounded 620 more, senior US defence officials said today. AFP PHOTO/HO (Photo credit should read -/AFP/Getty Images)AFP

During the briefing, a senior defense official said that one of the six Iranians imprisoned in January in the northern city of Irbil was the operational commander of the Quds Force.

He was identified as Mohsin Chizari, who was apprehended after slipping back into Iraq after a 10-month absence, the officer said.

The Iranians were caught trying to flush documents down the toilet, he said. They had also tried to change their appearance by shaving their heads. Bags of their hair were found during the raid, he said.

The dates of manufacture on weapons found so far indicate they were made after fall of Saddam Hussein — mostly in 2006, the officials said.

PX620

**Official: Copters are targets 100 times a month**

In a separate briefing, Maj. Gen. Jim Simmons, deputy commander of Multinational Corps-Iraq, said that since December 2004, U.S. helicopter pilots have been shot at on average about 100 times a month and been hit on an average of 17 times in the same period.

He disclosed a previously unknown shootdown, a Blackhawk helicopter hit by small arms fire near the western city of Hit. The craft crash-landed but there were no casualties. Simmons was on board.

The major general said Iraqi militants are known to have SA-7, SA-14 and SA-16 shoulder-fired anti-aircraft missiles but none of the most recent five military crashes were caused by those weapons. He said some previous crashes had been a result of such missiles but would not elaborate.

North of Baghdad, a suicide truck bomber crashed into a police station, killing at least 30 policemen. A total of 76 people were killed or found dead across Iraq. The U.S. military said Sunday a soldier was shot and killed the day before in volatile Diyala province northeast of the capital. A second soldier was reported killed Sunday in western Baghdad.

PX620

PX622

**IranSource**   August 16, 2018

# Badr Brigade: Among Most Consequential Outcomes of the Iran-Iraq War

By Borzou Daragahi



PX622



The burly, graying men in the mismatched camouflage arrived in the late winter of 2003, setting up camp within the green hilly folds of northern Iraq. They were members of the Badr Brigade, a Shia fighting force that had been sheltering in exile inside Iran during the reign of Iraqi dictator Saddam Hussein. They told visitors that they were Iraqi patriots returning to their country to help take on Saddam at the invitation of the Iraqi Kurds.

But the stickers on the Badr militamen's outdated equipment immediately gave their origins away: "Property of the Islamic Revolutionary Guard Corps," the major branch of the Iranian armed forces. Their history as a veritable Iraqi unit of the IRGC during the war between the two countries was known to all Iraqis.
Named after a key seventh century battle during the time of the Prophet Mohammed—and formed at the same period and under the same model of military discipline as Lebanese Hezbollah—the rise, growth and eventual political flowering of the Badr Brigade and its leader, Hadi al-Amiri, is one of the most consequential outcomes of the 1980 – 1988 Iran-Iraq War. After the launch of Hezbollah, the Badr organization is arguably the Islamic Republic's second most successful foreign policy intervention to date.

For the first few years of its decades-long existence, Badr was largely seen as a failure. It was formed in late 1982, assembled from defecting officers of Iraq's army and other Shia men, including POWs pressed into joining. It eventually became the military branch of the Supreme Council for the Islamic Revolution in Iraq, the Shia opposition political party led by the Hakim clan of clerics. The Badr Brigade fought Saddam alongside Iranian troops during the gruelling eight-year conflict. But by many accounts, it was an ineffective ally, led by men trained in conventional battlefield tactics and heavy weaponry instead of clandestine, guerilla war.

"The Badr Brigade was basically set up as a sort of a group of Iraqi exiles," said Ali Ansari, an Iran scholar at the University of St Andrews. "They would eventually be used when the regime fell, which is what happened."

After the inconclusive end of the war in 1988, Badr returned to Iran and settled into exile. Its men took part in the 1991 uprising against Saddam in the south, during the US-led war to push Iraqi troops out of Kuwait, only to be easily **crushed** by the Iraqi dictator's armed forces.

PX622

The 2003 US invasion and occupation of Iraq drastically changed the Badr Organization's fortunes. Within weeks of returning to Iraqi soil after a years-long absence, Badr set up offices in central Baghdad, taking over a quaint but dilapidated villa in the city center. It was a defining period in Iraq, when political space was up for grabs as various neighborhoods and towns in the chaos that followed the 2003 invasion.

Badr, led by Amiri, remained bound to the Supreme Council, but sought to **reinvent** itself as a charitable group. Charming and collegial, the Persian-speaking Amiri served as an intermediary between the US occupiers and Tehran. Visiting American officials—including neoconservatives such as John Hannah, Vice President Dick Cheney's National Security Adviser—**sounded** him out on security matters.

A slow parting of ways between Amiri and the Hakim clan began after the shocking 2003 **assassination** of Ayatollah Mohammed Baqir al-Hakim, and continued to erode after the **death** of his brother Abdel-Aziz Hakim in 2009, when the young Ammar Hakim took over the the Supreme Council.

Amiri reinvented himself as a political power in its own right, **building** alliances with other ethnic and sectarian groups. Even as the Hakim clan's **influence** waxed and waned, Badr managed to maintain hard political power. Badr veterans and allies headed up crucial Iraq instruments of state—including the interior and transport ministries.

Aging Badr fighters and new recruits burrowed deep into the security apparatuses, and were accused of horrific crimes in the sectarian bloodshed that engulfed Iraq a decade ago. One leaked US diplomatic cable cited sources accusing Amiri of personally ordering attacks on Sunnis. "One of his preferred methods of killing allegedly involved using a power drill to pierce the skulls of his adversaries," said the **leaked** cable.

Iraq was in chaos, with Shia militias, Sunni insurgents, and American soldiers killing each other in the streets of cities and the farmlands along the country's river valleys. But the top-down discipline that made Badr an ineffective force against Saddam, made it a powerful network to take power within the new Iraqi state.

"Badr was formed as a cohesive unit, whereas other militias like the Mahdi Army were a bunch of teenagers and people in their twenties trying to put something together really quickly," said Zaid Ali, author of *The Struggle for Iraq's Future*.

Amiri served as minister of transportation from 2010 to 2014. But it was the three-year war against the Islamic State of Iraq and al-Sham (ISIS) that begin in 2014 which elevated Amiri's national stature and gave yet another opportunity for Badr to reinvent itself. It's close ties to Tehran made it a crucial conduit for rebuilding armed forces to take on ISIS.

By early 2015, Hezbollah field commanders were seen on the ground, **training** Badr militiamen at a base in Diyala province Amiri had seized from the Mujahedin-e Khalq, the Iranian dissident group once hosted by Saddam. The Badr Brigade fought side-by-side with the Iraqi army and national police forces battling ISIS until it lost all its territory inside the country late last year.

PX622

This year, Amiri sought to turn his battlefield successes into even more political power, reinventing himself again this year as a power unto himself as head of a multi-confessional political coalition which beat out Prime Minister Haidar al-Abadi's coalition and placed second only to the list formed by Shia cleric Muqtada al-Sadr in last May's general elections.

A new government has yet to be formed, but with a large bloc in parliament, Amiri is sure to remain a force to be reckoned with. Amiri maintains excellent ties with Iran, but he also continues to meet with US officials who view Badr as a relatively moderate unit in Iraq's constellation of rogues. Even Iraqi Sunnis in places like Anbar province grudgingly admit that Badr played a valuable role in ridding their towns and cities of the Islamic State and helping restore civilian life.

"There are lots of cases that I've heard that they have played a positive role," said Ali. "You could say they're just interested in good press. But the people who received the assistance were pretty grateful."

Like Hezbollah and its leader Hassan Nasrallah, the Badr Brigade and Amiri have become Iranian startups that successfully embedded themselves within the Iraqi state and into political life—so successfully that they no longer need Tehran's guidance or direction.

*Borzou Daragahi is a journalist who has covered the Middle East and North Africa for more than sixteen years. He is also a nonresident fellow with the Atlantic Council's Middle East Security Initiative.Follow him on Twitter: @borzou.*

Related Experts:

 

Image: Fighters from the Shia Badr Brigade militia stand near their flag as they guard at a checkpoint along a highway recently taken from militants of the Islamic State, outside the town of Sulaiman Pek during September 5, 2014. (REUTERS/Ahmed Jadallah)

PX626



CSIS BRIEFS

# War by Proxy
## Iran's Growing Footprint in the Middle East

By Seth G. Jones

**MARCH 2019**

## THE ISSUE

*There is growing Iranian activism in the Middle East despite U.S. and allied efforts to weaken Iran's economy and politically isolate Tehran. There has been an increase in the size and capabilities of militias supported by the Islamic Revolutionary Guards Corps-Quds Force in Iraq, Syria, Lebanon, and Yemen collectively. Iran is also working to establish a land bridge across the region. Nevertheless, Iran has weaknesses and vulnerabilities that can be exploited by the United States and its partners.*

## INTRODUCTION

Tehran wields influence in the Middle East through its use of non-state partners, despite renewed U.S. sanctions against Iran and a U.S. withdrawal from the nuclear deal. Iran's economic woes have not contributed to declining activism in the region—at least not yet. If anything, Iranian leaders appear just as committed as ever to engagement across the Middle East using irregular methods. According to data collected and analyzed in this brief, there has been an increase in the overall size and capability of foreign forces that are partnered with the Islamic Revolutionary Guards Corps-Quds Force (IRGC-QF), Iran's paramilitary organization responsible for foreign operations. The IRGC-QF's partners are in countries like Syria, Iraq, Lebanon, Yemen, and Afghanistan. Iran is also attempting to establish land corridors across the region and increase its ability to move fighters and material from one theater to another.

More broadly, there is a growing regional conflict with Iran, which consists of a war in Yemen (including the Houthi use of ballistic missiles against Saudi Arabia), an escalating conflict with Israel in Syria, a growth of Shia militia forces in Iraq, targeted assassinations, and cyberattacks. Iran's expanding presence in Syria, for example, has led to concerns

*Tehran wields influence in the Middle East through its use of non-state partners, despite renewed U.S. sanctions against Iran and a U.S. withdrawal from the nuclear deal.*

among Israeli leaders, who have authorized hundreds of military strikes against missile and other targets over the past few years. Based in part on IRGC-QF assistance, Iran's partners have improved their capabilities in such areas as missiles and drones. These developments are significant because Iranian leaders have assessed that irregular warfare—including support to non-state partners—is a critical element to competing with the United States in the region.

Yet Iran—and the IRGC-QF in particular—have vulnerabilities and weaknesses that may be exploitable, such as possible long-term overextension with an already weak economy and continuing divisions among Iraq's Shia community about Iran and its doctrine of velayat-e faqih (the Islamic system of clerical rule). Overall, Iranian actions have also created growing regional concerns about Tehran's attempt to expand

PX626

its power and influence, which can be leveraged for more effective balancing.

This brief analyzes IRGC-QF activities in several ways. It compiles a data base of Iranian proxy groups over time—including their capabilities and size—in order to gauge trends. It also analyzes satellite imagery of bases in countries like Syria, Lebanon, and Iran used by the IRGC-QF to better understand Iranian force posture and activities.[1] Finally, it compiles and analyzes a data base of Israeli attacks against targets in Syria, which provides a useful indicator of Iranian activity.

The rest of this brief is divided into four sections. The first provides an overview of the IRGC-QF's creation, activities, and organizational structure. The second section analyzes trends in IRGC-QF activity, including patterns in the size of Iranian state and non-state partners. The third assesses IRGC-QF actions in Iraq, Syria, Yemen, Lebanon, and other countries. The fourth analyzes weaknesses, vulnerabilities, and opportunities.

## BORN OF THE REVOLUTION

The IRGC, or *sepah-e pasdaran-e enqelab-e eslami*, was founded in 1979 shortly after the Islamic Revolution. Ayatollah Khomenei envisioned the IRGC as a force to protect the revolution against internal and external threats. As he remarked, IRGC soldiers were to be "the guardians of the revolution and the fighting sons of Islam."[2] Since Khomeini was suspicious of the loyalty of some officers in Iran's regular military, whom he worried still had ties with Mohammad Reza Pahlavi, he created the IRGC to defend Iran and—more importantly—safeguard Iran's theocratic system. Since Khomeini's conception of velayat-e faqih emphasized the importance of the clergy (ulama) in national decisionmaking, the IRGC's link to the supreme leader was critical. In Khomenei's view, a legitimate Islamic government needs to be run by a senior cleric (marja al-taqlid) or by a body of high-ranking clergy (fuqaha).[3] Pro-clerical militants had been helpful in bringing down the Pahlavi regime, and Khomeini pulled them together under a single banner in the IRGC. The organization's proximity and devotion to Khomeini gave it immense power and legitimacy. The IRGC, then, would be the vanguard of the revolution.[4]

The IRGC eventually included an air force, land force, navy, IRGC-QF, and Basij (or mobilization). The Basij is an auxiliary militia that is engaged in activities such as conducting internal security, enforcing state control over society, policing morals, and suppressing dissidents. The IRGC manages large domestic commercial elements and,

## The IRGC-QF is Iran's primary irregular force and is instrumental in helping expand its influence in the region.

along with the Office of the Supreme Leader, controls a substantial portion of the Iranian economy.[5]

Shortly after the IRGC's creation, its leaders established a paramilitary organization, which became the IRGC-QF (*sepah-e quds*). Over time, the IRGC-QF, which reports directly to the Supreme Leader of Iran, became active in supporting state and sub-state allies outside of the country through units like Department 400 (or the Misaq Unit), which is in charge of special operations.[6] The IRGC-QF is Iran's primary irregular force and is instrumental in helping expand its influence in the region. It engages in a wide range of activity, such as gathering intelligence; training, equipping, and funding state and non-state partner forces; conducting assassinations and bombings; perpetrating cyberattacks; and providing humanitarian and economic aid.[7]

The IRGC-QF includes sections devoted to specific countries and regions, such as the Ramazan Corps (Iraq), Levant Corps (Syria, Lebanon, Jordan, and Israel), Rasulallah Corps (Arabian Peninsula), and Ansar Corps (Afghanistan).[8] These forces help Iran counter its state adversaries in a broad "Axis of Resistance" that extends from the Persian Gulf through Lebanon, Syria, and Iraq to the eastern parts of the Mediterranean Sea.[9] The IRGC-QF also has active and growing cyber capabilities.[10] While the IRGC as a whole has over 125,000 forces, there are more than 15,000 IRGC-QF soldiers.[11]

Figure 1 shows satellite imagery of the Imam Ali facility west of Tehran, which has been used by the IRGC-QF for training.[12] CSIS's review of satellite imagery of the facility indicates that the base was a minor facility from 2000 to 2003, and then went through a major infrastructure development phase beginning around 2003. The approximately 222-acre facility is surrounded by a security wall and fence with guard towers and includes a comprehensive collection of training and support components. Functionally, it can be divided into several areas: warehouse and storage, housing and support, headquarters administration and classrooms, mosque and religious education, the original base, and combat training facilities. The combat facilities include a 100-meter firing range; a second 100-meter open range that could be used for rocket launcher, improvised explosives and other weapons training; a driver training course; an obstacle course; and a combat course consisting of a dispersed collection of small walls, miscellaneous objects and likely small vehicles used to train troops for combat in urban areas.[13] Locations like Imam

PX626



Figure 1: Satellite Imagery of Imam Ali Facility, Outside of Tehran, Iran

Ali have allowed Iran to train and advise partner forces from across the region.

The IRGC-QF has its roots in irregular warfare. The Iran-Iraq War (1980-1988) was a major turning point in Iran's military doctrine, since Iranian conventional units performed poorly against a much smaller Iraqi force.[14] Instead, Iran's comparative advantage became its ability to work with state and non-state actors—an irregular approach led by the IRGC, including the IRGC-QF, rather than conventional Iranian military forces (artesh). During the Iran-Iraq War, for example, Iran aided Iraqi Shia militant groups. Some of this training was done inside Iran, which allowed Tehran to develop a system and infrastructure within its borders to train and equip foreign fighters. Among the most important of the Iraqi Shia groups trained by Iran was the Badr Brigade, the armed wing of Ayatollah Mohammad Baqir Hakim's Supreme Council for the Islamic Revolution in Iraq (SCIRI). Overall, nearly 5,000 foreign Shia militants wearing IRGC uniforms were killed in the war.[15]

Outside of Iraq, the IRGC established a relationship with the Amal Movement in Lebanon and then Lebanese Hezbollah. Iran provided money, equipment, training, and ideological inspiration to Lebanese Hezbollah. As the IRGC commander in

*Locations like Imam Ali have allowed Iran to train and advise partner forces from across the region.*

Lebanon noted in 1985, "The Muslims of Lebanon, especially the Shiites of Lebanese Hezbollah, consider themselves the offspring of the Islamic revolution and therefore know that they have a duty to imitate [taba'iyyat kardan] the Islamic revolution."[16] Over the next several decades, the IRGC-QF and other Iranian agencies like the Ministry of Intelligence (MOIS) established relationships with state and non-state actors in the Middle East and South Asia.[17] Not all were Shia groups. The Taliban in Afghanistan and Palestinian Islamic Jihad in Palestinian territory, for example, were Sunni organizations.[18]

## IRANIAN EXPANSION

Today, the IRGC-QF is active in building, funding, training, and partnering with a growing number of actors in the region—a testament to Iran's commitment to irregular warfare. The IRGC-QF's relationship with these actors varies considerably, and in many cases is more of a partnership than a malleable patron-client relationship.[19]

PX626

To get an estimate of the number of fighters in IRGC-QF partner forces, we compiled a data set of fighters from 2011 to 2018 and then totaled the number operating each year. We did not attempt to estimate the broader number of supporters, since we could find no reliable estimates of individuals that provided part-time logistical help, funding, intelligence, or other aid. Calculating the number of fighters is still challenging. Groups generally do not provide public estimates of their numbers, and their numbers can vary considerably over the course of a group's existence. Consequently, we included high and low estimates for the number of fighters by year. We attempted to reconcile differences in estimates by examining the sources of data and interviewing government and non-government experts. We used high and low estimates with the assumption that the actual numbers each year were somewhere between the extremes.

Figure 2 shows trends in the size of IRGC-QF partners in Iraq, Yemen, Syria, Afghanistan, Pakistan, and Lebanon. While the IRGC-QF's relationship with these groups varies dramatically, aggregating them together provides a useful indicator of trends. The data and figure suggest several developments. First, there has been an increase in the number of Shia fighters. The war in Syria contributed to a significant rise, particularly by 2014, as Lebanese Hezbollah deployed fighters and Iran

*Today, the IRGC-QF is active in building, funding, training, and partnering with a growing number of actors in the region—a testament to Iran's commitment to irregular warfare.*

trained, equipped, and funded Shia militias from across the region to support the struggling Assad regime. Today, examples of forces supported by the IRGC-QF include Lebanese Hezbollah; the Hashd al-Sha'abi in Iraq (including groups like the Badr Organization, Kata'ib Hezbollah, and Asaib Ahl al-Haq); militia forces in Syria, including Lebanese Hezbollah; the Houthis in Yemen; Liwa Fatemiyoun from Afghanistan; Liwa Zainabyoun from Pakistan; and several groups in Palestinian territory like Hamas and Palestinian Islamic Jihad. Second, there has been an expansion in locations where IRGC-QF forces have been active. The IRGC-QF has worked to broaden its areas of operation to include traditional countries like Lebanon and Iraq (where the IRGC-QF has long had partners) to countries like Yemen and Syria.[20]

The 2003 U.S. invasion of Iraq, the inability of the United States and its partners to prevent Iran from filling the

## Size of IRGC-QF Partner Forces, 2011-2018



Figure 2: Number of Fighters From IRGC-QF Partner Forces, 2011-2018[21]

PX626

vacuum, and the establishment of a Shia-dominated government in Baghdad contributed to a rise in Iranian influence and an increase in IRGC-QF-supported militias. By 2011, the Arab Spring created opportunities for Iran with the weakening of regimes and the onset or expansion of insurgencies in countries like Syria, Yemen, and Iraq. In Iraq, the 2011 withdrawal of U.S. forces was helpful to Iran, particularly with an Iraqi government that welcomed Iranian help. In Syria, the Assad regime was in dire need of help following a civil war that began in 2011. Iran supported Syrian military advances and Russian airstrikes by aiding local militias, including Lebanese Hezbollah. In Yemen, Houthi security forces seized the capital, Sana'a, in 2014. In addition, the IRGC-QF and its leader, Qassem Soleimani, took advantage of these opportunities to provide money, weapons, and other assistance to partners in the absence of significant balancing by the United States and other countries.

Iran has used its partners and activities in an attempt to establish a land bridge across the region, as highlighted in Figure 3. Some Lebanese Hezbollah fighters have referred to this land bridge as Wilayat Imam Ali (the state or province of Imam Ali), in honor of Ali ibn Abi Talib, the cousin and son-in-law of the Prophet Muhammad.[22] These routes, which remain partly aspirational, include: a northern route through Iran, Iraq's Kurdish region, the Iraqi city of Sinjar, northeastern Syria cities like Al-Hasakah, and into Lebanon; a central route through Iran, central Iraq, the Iraqi border town of Al-Qaim, Syria's Abu Kamal and Dayr az Zawr, and into Lebanon; and a southern route through Iran, the Iraqi border town of Al-Walid, Al-Tanf in Syria, Damascus, and into Lebanon. These corridors resemble the Royal Road, the ancient land bridge built by Persian King Darius the Great in the fifth century BC.[23] A U.S. withdrawal from Syria could facilitate the expansion of these corridors, particularly a departure of U.S. troops from bases like Al-Tanf in southeastern Syria.



Figure 3: Potential Iran Land Bridge

## Iran has used its partners and activities in an attempt to establish a land bridge across the region.

Iran's growing influence has been particularly concerning in Syria. Figure 4 uses CSIS research and analysis to plot the location of Israeli attacks against Iranian and other targets in Syria. The darker shades of blue in the heat map indicate a higher concentration of Israeli strikes. Most of Israel's attacks were in southwestern Syria, near the Israeli border. But a few operations were against major bases used by Hezbollah, Iran, and other proxy militias, such as T-4 Tiyas Airbase in Homs, the airbase north of al-Qusayr, and Damascus International Airport. Both Israeli government public statements and the rising number of strikes over the past two years indicate that Israel has been increasingly concerned about the encroachment and growing capabilities of Iran and its partner forces. As Israeli Prime Minister Benjamin Netanyahu remarked, "We will continue to aggressively act against Iran's efforts to entrench in Syria."[24]

The Israeli military has conducted strikes—and dropped 2,000 bombs alone in 2018—to retaliate against Iranian actions like rocket launches; move Hezbollah and Iranian positions further from the Israeli border near the Golan Heights; and degrade the number of rockets and missiles from Iran,

PX626

*The IRGC-QF is particularly active in such countries as Lebanon, Yemen, Iraq, and Syria.*

Lebanese Hezbollah, and other groups that could hit Israel.[25] There are indications that Iran may move some of its missiles and missile parts to Iraq after coming under Israeli pressure in Lebanon and Syria.[26] An interactive version of this map is available on the CSIS website.

**PROXY WARS**

The IRGC-QF is particularly active in such countries as Lebanon, Yemen, Iraq, and Syria. It has provided military and non-military aid to partners, boosting their capabilities and increasing Tehran's influence.

*In Lebanon, the IRGC-QF's chief partner, Hezbollah, has improved its military capabilities and become more involved in the government.*

**Lebanon:** In Lebanon, the IRGC-QF's chief partner, Hezbollah, has improved its military capabilities and become more involved in the government. Among the most important activities is the "Precision Project": the effort to expand and upgrade Hezbollah's inventory of rockets, missiles, and drones.[27] With Iran's help, Hezbollah has amassed a range of weapons and systems, such as the Fateh-110/M-600 short-range ballistic missile, Shahab-1 and Shahab-2 short-range ballistic missiles, Toophan anti-tank guided missiles, Kornet man-portable anti-tank guided missiles, M113 armored personnel carriers, T-72 main battle tanks, Karrar unmanned combat aerial vehicles, and Katyusha rocket launchers.[28] Hezbollah's armed drone capabilities are among the most advanced of any terrorist group in the world, and it has used Karrar armed drones to destroy Islamic State targets in Syria.[29] In addition, Hezbollah may have stockpiled chemical weapons in Syria, including chlorine.[30]



Figure 4: Israeli Strikes in Syria

The IRGC-QF has been critical to these developments. Hassan Nasrallah, the group's secretary general, said in June 2016: "Hezbollah's budget, salaries, expenses, arms and missiles are coming from the Islamic Republic of Iran. Is this clear? This is no one's business. As long as Iran has money, we have money. Can we be any more frank about that?"[31]

Figure 5 highlights satellite imagery of a Hezbollah training camp in southern Lebanon located southeast of the town of Beit Moubarak, on the eastern and southern slopes of El Boqaa.[32] A CSIS analysis of satellite imagery suggests that the El Boqaa facility is dispersed within an area encompassing approximately 4.5 square kilometers and consists of at least six general components:

- *Firing ranges:* There are three firing ranges. The largest two are located in a small valley on the west side of the training facility. These appear to be designed for use by armored personnel carriers and improvised armored fighting vehicles. The third firing range is located 800 meters east of the first two. It consists of five small pistol and rifle ranges varying in length from 8 to 100-meters-long.

- *Housing and storage area:* Located just north of the firing ranges is an area that appears to be used for both housing and storage with approximately 35 small structures and a single large storage building.

PX626



Figure 5: Satellite Imagery of Hezbollah Training Camp Near El Boqaa, Southern Lebanon

- *Driver training facility:* Immediately east of the housing and storage area is a serpentine one-kilometer-long driver training course that is capable of handling armored fighting vehicles, trucks, and smaller vehicles.

- *Two urban combat facilities:* Located on the east of the driver training course are two different urban combat courses. The first is approximately 115-meters by 35-meters and consists of six interconnected lanes. Each lane is bordered by a low wall. Numerous dispersed objects within these lanes strongly suggest that it is also used as an obstacle course. The second urban combat course is located a further 160 meters to the east.

- *Quarries:* There are numerous small quarrying-type activities throughout the area encompassing the combat training facilities. These quarries could be used for improvised explosives and rocket launcher training.

- *Probable headquarters and support areas:* Located on the northern and northeastern sides of the training facility are small areas that consist of approximately 20 larger storage, maintenance, office, and housing structures.[33]

Hezbollah also became more directly involved in Lebanese politics after the group and its allies expanded their share of seats in Lebanon's May 2018 parliamentary elections. In 2019, Hezbollah continued to increase its influence in the government, particularly through positions like the Ministry of Health. The U.S. government warned Hezbollah that if it tried to "exploit these ministries to funnel money or undertake other activities in support of their terrorist agenda, then we will have significant concerns."[34]

**Yemen:** The IRGC-QF also has provided aid to the Houthis (officially called Ansar Allah). Of particular concern are Iranian weapons and parts, including ballistic missiles and drones, that have been used by the Houthis to threaten shipping near the Bab el Mandeb Strait and conduct attacks against land-based targets in Saudi Arabia and the United Arab Emirates (UAE).[35] The Bab el Mandeb Strait, located at the southern end of the Red Sea between Yemen and Djibouti, is important because roughly 5 million barrels of oil pass through it every day.[36] Iran's objectives in Yemen include retaining—and perhaps increasing—Iran's influence along the Red Sea as well as weakening Saudi Arabia and the UAE.[37]

PX626

## The Houthi threat has increased because of Iran's proliferation of missiles, missile technology, and missile parts.

Around 2016, as the war in Yemen intensified due to the growing involvement of Saudi Arabia and the UAE, Iran began increasing its aid to the Houthis. It provided anti-tank guided missiles, sea mines, aerial drones, 122-millimeter Katyusha rockets, Misagh-2 man-portable air defense systems (MANPADS), RDX high explosives, ballistic missiles, unmanned explosive boats, radar systems, and mining equipment.[38] The IRGC-QF and Lebanese Hezbollah also provided training in Yemen and Iran.[39]

The Houthi threat has increased because of Iran's proliferation of missiles, missile technology, and missile parts. One example is the use of Borkan-2H mobile, short-range ballistic missiles, which the Houthis used to strike Riyadh and other targets in Saudi Arabia. A United Nations panel of experts concluded that the missiles were "a derived lighter version" of Iran's Qiam-1 missile and that Iran provided key missile parts to the Houthis.[40] Analysis from the wreckage of 10 Borkan-2H missiles indicates that they were likely smuggled into Yemen in parts and then put together. Iranian components were also integrated into Yemeni SA-2 surface-to-air missiles to construct the Qaher series of surface-to-surface rockets.[41] Iran may have used a number of routes to transport the material to Yemen, including ship-to-shore transfers through the Yemen ports of Nishtun and Al-Ghaydah in Al-Mahrah governorate.[42]

**Iraq:** The IRGC-QF remains active in Iraq and has enhanced Iran's political, military, and economic power. Iran has helped Shia militia forces in Iraq build their missile production capabilities. According to some reporting, there have been factories used to develop missiles in such Iraqi locations as Jurf al-Sakhar (north of Kerbala) and Al-Zafaraniya (east of Baghdad).[43]

There are three main groups that comprise the Hashd al-Sha'abi, an umbrella organization of Shia militias. First are those groups loyal to Iran's Supreme Leader, Ayatollah Ali Khamenei, which have a particularly close relationship with the IRGC-QF. Examples include the Badr Organization, Asaib Ahl al-Haq, Kata'ib Hezbollah, Kataeb Sayed al-Shuhada, and Harakat Hizbollah al-Nujaba. Second are the groups loyal to Grand Aytatollah Ali al-Sistani, such as Sarayat al-Ataba al-Abbasiya, Sarayat al-Ataba al-Huseiniya, Sarayat al-Ataba al-Alawiya, and Liwa Ali al-Akbar. Sistani urged fighters

to join the Iraqi government's security organizations—not paramilitary groups tied to Iran—in his June 2014 fatwa. Third are groups loyal to Muqtada al-Sadr. The primary organization is Sarayat al-Salam (Peace Brigades), which includes two Hashd brigades (Brigades 313 and 314).[44]

The IRGC-QF has provided some Iraqi militias with short-range ballistic missiles, anti-tank guided missiles (ATGMs), tanks, armored personnel carriers, artillery, unmanned aerial vehicles, and MANPADS. In addition, several Iraqi militias worked with the IRGC-QF and Iraqi forces to help liberate Tikrit, Fallujah, Ramadi, Tal Afar, Mosul, and other Iraqi cities from Islamic State control.[45] As one assessment of the 2017 Mosul campaign concluded, "The Quds Force-led Shia militia forces had some 10,000 troops in the battlespace, with many of these fighters embedded in the [Iraqi Security Forces] and FedPol."[46]

## Iran has provided substantial assistance to the Assad regime by helping organize, train, and fund over 100,000 Shia fighters.

**Syria:** Iran has provided substantial assistance to the Assad regime by helping organize, train, and fund over 100,000 Shia fighters. Following the onset of Syria's civil war in 2011, Iranian leaders became alarmed at both the rise of Sunni extremist groups like the Islamic State as well as U.S., European, and Gulf support to rebel groups.[47] In addition to providing light and heavy weapons to the Syrian regime and militias, up to 3,000 IRGC-QF helped plan and execute specific military operations like Dawn of Victory (the 2016 military operation to retake Aleppo).[48] The IRGC-QF worked closely with the Assad regime and the Russian military, which conducted strikes from Russian combat aircraft and naval vessels in the Mediterranean Sea. Syrian forces and militias, which were supported by the IRGC-QF, shelled rebel positions in Aleppo while Russian close air support and Kalibr cruise missile strikes reduced entire neighborhoods to rubble. By December 2016, ground forces routed rebel forces, who departed under an agreement brokered by Russia, Turkey, and Iran.[49]

Figure 6 shows the results of an Israeli strike against a munitions storage area at a Syrian military base in Haqlat aş Şafrah, Syria, which has been allegedly utilized by the IRGC-QF.[50] The precise nature of the Israeli attack strongly suggests accurate intelligence and a desire to limit damage to both infrastructure and personnel.[51]

PX626

Pre-Strike: Satellite Imagery, December 9, 2018



Post-Strike: Satellite Imagery, December 27, 2018



Figure 6: Satellite Imagery of Israeli Strike at a Munitions Storage Area, Haqlat aş Şafrah, Syria

PX626

In addition, Lebanese Hezbollah deployed up to 8,000 fighters to Syria and, as previously noted, increased its arsenal with greater numbers and ranges of rockets and missiles from Syrian territory.[52] Hezbollah also trained, advised, and assisted Shia and other non-state groups in Syria. Collectively known as Al-Muqawama al-Islamiyah fi Suria (the Islamic Resistance in Syria), examples of those groups included: Quwat al Ridha (or Ridha Forces), which have operated in such Syrian governorates as Homs; Al-Ghaliboun: Saraya al-Muqawama al-Islamiyah fi Suria (or The Victors: The Companies of the Islamic Resistance in Syria), which have been active in governorates like Daraa and Quneitra; and Liwa al-Imam al-Baqir (or Baqir Brigade), which has deployed to such governorates as Aleppo.[53]

Today, the IRGC-QF works with thousands of trained fighters in Syria who are operating in local militias. Many of these groups, like Lebanese Hezbollah, have advanced stand-off weapons, improved cyber capabilities, more recruits, and more expansive forces in Syria capable of striking Israeli targets. The 2006 Israel-Hezbollah War demonstrated Israel's difficulty of rooting out Hezbollah sites in Lebanon's heavily urbanized environment. Time has only expanded the nature of this problem for Israel's military to include Syria and Iraq.

**Other Countries:** The IRGC-QF has aided other non-state groups across the region and used them in battlefields like Syria. For example, the IRGC-QF organized between 10,000 and 15,000 Afghan militants under the Fatemiyoun Brigade (named after Fatima, daughter of the Prophet Muhammad) and deployed them to Syria to fight alongside pro-Assad forces. Fatemiyoun fighters were used in such battles as Aleppo, Daraa, Damascus, Hama, Homs, Latakia, Palmyra, and Dayr az Zawr. The IRGC-QF also trained and equipped roughly 2,000 Pakistan fighters under the Zaynabiyoun Brigade (named after Zaynab, Fatima's daughter).[54] Iran has also utilized Bahraini fighters in Syria. More broadly, the IRGC-QF has attempted to overthrow the Bahrain government several times and trained (along with Lebanese Hezbollah and Kata'ib Hezbollah trainers) Bahraini proxies.[55] The IRGC-QF has aided other forces, such as the Afghan Taliban, Palestinian Islamic Jihad, and Hamas—though Iran's relationship with these organizations has been complicated. There is an ongoing internal debate within Hamas, for example, about the group's relationship with Iran. The IRGC-QF also has operatives in other regions, such as Africa, Latin America, and Asia.

*The IRGC-QF organized between 10,000 and 15,000 Afghan militants under the Fatemiyoun Brigade (named after Fatima, daughter of the Prophet Muhammad) and deployed them to Syria to fight alongside pro-Assad forces.*

## WEAKNESSES, VULNERABILITIES, AND OPPORTUNITIES

Despite IRGC-QF activism, there are several potential Iranian weaknesses and vulnerabilities, as well as opportunities for the United States and its partners.

First, Iran's economy remains fragile. The regime's willingness to continue to resource the IRGC-QF at significant levels and remain heavily engaged across the region may eventually increase political costs at home. According to International Monetary Fund estimates, the Iranian economy is expected to contract by 3.6 percent in 2019 because of U.S. sanctions and reduced oil production.[56] Some economists predict an inflation rate of up to 50 percent in the coming year because of high unemployment and a currency that has lost nearly 70 percent over the past 12 months.[57] The World Bank also estimates that Iran will be negatively impacted by falling exports on the demand side and a contracting industry sector on the supply side.[58] The IRGC is particularly vulnerable to an economic slowdown because it owns a vast empire of businesses and foundations, from construction companies to petrochemical and cement companies.[59]

But the activity of the IRGC-QF and partners like Lebanese Hezbollah may have long-term costs and risks in blood and treasure. According to some estimates, Iran spent up to $16 billion in Syria between 2012 and 2018.[60] The Lebanese Hezbollah presence in Syria has been controversial among some of its members and supporters because of the high number of casualties and, perhaps more importantly, the support of the Assad regime.[61] It is one thing for Lebanese Hezbollah supporters to fight Israel or even the Islamic State. But aiding the Assad regime has been contentious. "We are a resistance [movement], and you don't do resistance by going to war in Syria," said one former Hezbollah fighter, "I will gladly go to fight Israel. But I won't send my sons to die in Syria."[62] Some protesters in Iran have expressed outrage at Iran's interventions abroad, including in Syria.[63]

Iranian media periodically has announced memorial services for fallen Quds Force officers and other military personnel in Syria, including in newspaper obituaries. Iran

PX626

suffered substantial casualties during offensive operations in cities like Aleppo. According to some accounts, over 30 IRGC-QF operatives were killed in the first two weeks of the Aleppo campaign alone, including Brigadier General Hossein Hamadani, a former commander of Iranian forces in Syria. IRGC-QF personnel of virtually all ranks were killed in action, from general officers to colonels, lieutenant colonels, and majors.[64] Iran's state-backed Martyrs Foundation financially supported thousands of families of Iran-backed forces killed in Syria.[65] The Iranian people need to be reminded of the costs and risks in money and casualties that their government has incurred to fight wars in countries like Yemen and Syria, particularly with their weak economy.

Second, there is wide variation in Iraqi views of Iran, including among the Shia community. Najaf's Grand Ayatollah Ali al-Sistani and his "quietist" school of Iraqi Shiism shun direct clerical participation in politics. Sistani's stance is an implicit rebuke of Islamic Republic founder Ayatollah Khomeini's doctrine of velayat-e faqih.[66] In addition, Iraqi nationalism and anti-Iranian sentiments among Iraqis continues to linger from the Iran-Iraq War. Some public opinion polls indicate that many Iraqis are highly critical of Iran's role in the country.[67] In Sunni areas like Al-Anbar Province, locals bitterly complain about the proliferation of Shia militias, feel alienated from a government in Baghdad they believe is too closely aligned with Shia, and protest the slow pace of reconstruction following the collapse of the Islamic State's so-called caliphate. As one Iraqi intelligence official acknowledged, "This is not just revenge on ISIS. This is revenge on Sunnis."[68]

Muqtada al-Sadr's relations with the IRGC-QF has been mixed. His father was an ardent Shia Arab activist, and his teachings on the importance of Arabism run counter to Khomeini's pan-Shia, anti-nationalist ideology. Muqtada also does not believe in Khomeini's velayat-e faqih.[69] Iran is now stuck attempting to mediate between the fractious Iraqi Shia groups in an environment where a single Lebanese Hezbollah-style structure is not possible. In September 2018, Iraqi protesters stormed the Iranian consulate in the southern Iraqi city of Basra and set it on fire.[70] These fissures create opportunities for the United States and its partners—including Gulf countries—to continue to engage with Iraq's Shia communities. Riyadh, for example, has established a political and economic relationship with Muqtada al-Sadr. There may be opportunities for Iraq to work with Gulf countries like Saudi Arabia and Kuwait to further develop economic ties—

*Iranian activism and the proliferation of Iranian-backed non-state actors has alarmed most governments in the region—such as Israel, Jordan, Saudi Arabia, UAE, Bahrain, and Morocco—making it possible to conduct broader balancing. Iran is largely isolated in the region.*

including rail, road, and electricity links—with southern Iraqi cities like Basra.[71]

Third, Iranian activism and the proliferation of Iranian-backed non-state actors has alarmed most governments in the region—such as Israel, Jordan, Saudi Arabia, UAE, Bahrain, and Morocco—making it possible to conduct broader balancing. Iran is largely isolated in the region. Some public opinion polls suggest that support for Iran across the Middle East—including in Iraq—has declined.[72] These countries can play an important role in helping the United States balance against Iran and IRGC-QF activities.[73]

Israeli actions have limited Iranian activity in Syria, including near the Golan Heights. But this pressure needs to continue, and the United States and other allies need to coordinate with each other in intelligence collection, diplomatic engagement, and limited military action to prevent an Iranian missile build-up in Syria. Houthi expansion has stalled in Yemen because of Saudi and UAE support to local actors and aggressive interdiction. But further political and intelligence efforts will be required to: encourage a settlement that provides sufficient guarantees that Iran will not have the same access it has enjoyed in Lebanon following the 1989 Taif Agreement; protect Saudi Arabia and other Gulf States from further missile attacks, including through improvements in air defense systems; and punish Iran for the further proliferation of missiles and missile parts.

While the situation with Iran is tense, there has not been a major conventional war with Iran. And, as U.S. intelligence agencies recently noted, Iran is not producing a nuclear weapon despite the U.S. withdrawal from the Joint Comprehensive Plan of Action.[74] Still, there is a steady drumbeat of irregular conflict. The Houthis have launched ballistic missiles against Saudi Arabia. The Israelis have conducted airstrikes against fixed and mobile positions in Syria that are storing or transporting Iranian missiles and missile parts. There has been a rise in the number and capabilities of

PX626

*U.S. engagement is critical to deal with these issues and prevent the outbreak of a wider war with Iran that risks further instability in the region.*

militia forces working with the IRGC-QF. And all sides have used irregular tactics like assassinations and cyberattacks.

Yet Iran's continuing activism across the region—including by the IRGC-QF and its leader, Qassem Soleimani—requires more effective U.S. cooperation with governments in Europe and across the region to balance against Tehran. The results thus far have been mixed.

**Seth G. Jones** *is the Harold Brown Chair and Director of the Transnational Threats Project at the Center for Strategic and International Studies in Washington, D.C., as well as the author most recently of A Covert Action: Reagan, the CIA, and the Cold War Struggle in Poland (W.W. Norton) and Waging Insurgent Warfare (Oxford).*

*The author gives particular thanks to* **Nicholas Harrington** *and* **Jacob Ware** *for their assistance with data collection and analysis;* **Joseph S. Bermudez** *with satellite imagery and analysis; and* **Norman Roule, Jon Alterman, Steve Kappes**, *and* **Haim Malka** *for their helpful comments.*

---

**CSIS BRIEFS** are produced by the Center for Strategic and International Studies (CSIS), a private, tax-exempt institution focusing on international public policy issues. Its research is nonpartisan and nonproprietary. CSIS does not take specific policy positions. Accordingly, all views, positions, and conclusions expressed in this publication should be understood to be solely those of the author(s). © 2019 by the Center for Strategic and International Studies. All rights reserved.

Cover Photo: MAHMOUD ZAYYAT/AFP/Getty Images

PX626

# ENDNOTES

1  The imagery analysis in this report is by Joseph S. Bermudez, Senior Fellow for Imagery Analysis at CSIS.

2  "Khomeyni Calls on Soldiers," *Tehran Domestic Service in Persian, in FBIS-MEA*, February 21, 1979.

3  Afshon Ostovar, *Vanguard of the Imam: Religion, Politics, and Iran's Revolutionary Guards* (New York: Oxford University Press, 2016), 38.

4  On the history of the IRGC see, for example, Ostovar, *Vanguard of the Imam*; Nader Uskowi, *Temperature Rising: Iran's Revolutionary Guards and Wars in the Middle East* (Lanham, MD: Rowman and Littlefield, 2019).

5  Some sources have estimated that the IRGC and Office of the Supreme Leader have controlled up to 50 percent of the Iranian economy. See Uskowi, *Temperature Rising*, 154.

6  On Department 400 see, for example, Anthony H. Cordesman, *The Gulf Military Balance: Vol. 1: The Conventional and Asymmetric Dimensions* (Lanham, MD: Rowman and Littlefield, 2014), 149; Ostovar, *Vanguard of the Imam*, 203; Uskowi, *Temperature Rising*, 139.

7  Defense Intelligence Agency, *Unclassified Report on Military Power of Iran*, April 2010, 2.

8  Uskowi, *Temperature Rising*, 158-159.

9  Ali Soufan, "Qassem Soleimani and Iran's Unique Regional Strategy," *CTC Sentinel* 11, no. 10 (November 2018): 1-12, https://ctc.usma.edu/qassem-soleimani-irans-unique-regional-strategy/.

10  See, for example, U.S. Department of Treasury, "Treasury Sanctions Iranian Organizations and Individuals Supporting Intelligence and Cyber Targeting of U.S. Persons," press release, February 13, 2019, https://home.treasury.gov/news/press-releases/sm611.

11  On IRGC numbers see International Institute for Strategic Studies, *Military Balance 2019* (London: International Institute for Strategic Studies, 2019), 341. On IRGC-QF number see Uskowi, *Temperature Rising*, 129.

12  Author estimates and interviews; Callum Paton, "Iran Trains Thousands of Mercenaries Each Year to Fight in Syria and Iraq Wars Claims PMOI," *International Business Times*, February 14, 2017, https://www.ibtimes.co.uk/iran-trains-thousands-mercenaries-each-year-fight-syria-iraq-wars-claims-pmoi-1606591; Ambassador Dore Gold, "Inside the Octopus: Unraveling Iran's Terrorist Quds Force," *Jerusalem Center for Public Affairs*, March 16, 2012, http://jcpa.org/article/inside-the-octopus-unraveling-irans-terrorist-quds-force/; Matthew Levitt, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad* (New Haven, CT: Yale University Press, 2007).

13  Imagery analysis by Joseph S. Bermudez.

14  Williamson Murray and Kevin M. Woods, *The Iran-Iraq War: A Military and Strategic History* (New York: Cambridge University Press, 2014); Pierre Razoux, *The Iran-Iraq War*, trans. Nicholas Elliott (Cambridge, MA: Harvard University Press, 2015).

15  Alfoneh Ali, *Tehran's Shia Foreign Legion* (Washington, DC: Carnegie Endowment for International Peace, January 31, 2018).

16  Interview with Brother Mosleh, *Payam-e Enqelab*, no. 138 (June 8, 1985): 73; Ostovar, *Vanguard of the Imam*, 117.

17  Iran's Ministry of Intelligence (MOIS) has been involved in assassination plots overseas. In 2018, Belgian and German intelligence and law enforcement agencies foiled a possible MOIS plot to use an explosive device at an Iranian opposition group gathering in Paris, France. Daniel R. Coats, *Worldwide Threat Assessment of the U.S. Intelligence Community* (Washington, DC: Office of the Director of National Assessment, January 2019), 12.

18  Uskowi, *Temperature Rising*, 30.

19  See, for example, Brian Katz, *Axis Rising: Iran's Evolving Regional Strategy and Non-State Partnerships in the Middle East* (Washington, DC: Center for Strategic and International Studies, October 2018).

20  Uskowi, *Temperature Rising*.

21  The data come from the CSIS Transnational Threats Project Iranian Proxy and Partner Forces database. CSIS estimates include a low of 140,300 fighters and a high of 183,500 fighters for 2018. Note that we included estimates for the following groups: Asaib Ahl al-Haq, Badr Organization, Kata'ib Hezbollah, Lebanese Hezbollah, the Houthis, Liwa Fatemiyoun, Liwa Zainabyoun, Al-Aqsa Brigade, Hamas, and Palestinian Islamic Jihad. The sources include: author estimates; Ahmed Majidyar, "Afghan Official in Deep Water After Praising Role of Soleimani and Shiite Militias in Syria," *The Middle East Institute*, November 29, 2017, https://www.mei.edu/publications/afghan-official-deep-water-after-praising-role-soleimani-and-shiite-militias-syria; Alain Rodier, "Iraq-Iran: Shiite Militias," *Centre Français de Recherche sur le Renseignement*, June, 2015, https://www.cf2r.org/actualite/irak-iran-les-milices-chiites/; Alireza Nader, "Iran's Role in Iraq: Room for Cooperation?" *RAND Corporation*, 2015, https://www.rand.org/pubs/perspectives/PE151.html. Amir Toumaj, "IRGC Commander Discusses Afghan Militia, 'Shia Liberation Army,' and Syria," *Foundation for Defense of Democracies*, August 24, 2016, https://www.longwarjournal.org/archives/2016/08/irgc-commander-discusses-afghan-militia-shia-liberation-army-and-syria.php?utm_source=Sailthru&utm_medium=email&utm_campaign=Defense%20EBB%2008-24-16&utm_term=Editorial%20-%20Early%20Bird%20Brief; Amir Toumaj, "The Badr Organization," *Foundation for Defense of Democracies*, February 28, 2018, https://s3.us-east-2.amazonaws.com/defenddemocracy/uploads/documents/Badr.pdf; Amos Harel and Gili Cohen, "Hezbollah: From Terror Group to Army," *Haaretz*, December 07, 2016, https://www.haaretz.com/st/c/prod/eng/2016/07/lebanon2/. Author estimates; Babak Deghanpisheh, "Iran Recruits Pakistani Shi'ite for Combat in Syria," *Reuters*, December 10, 2015, https://www.reuters.com/article/us-mideast-crisis-syria-pakistan-iran/iran-recruits-pakistani-shiites-for-combat-in-syria-idUSKBN0TT22S20151210; Babak Dehghanpisheh, "Iran's Men in Baghdad," *Reuters*, Special Report, November 12, 2014, http://graphics.thomsonreuters.com/14/11/MIDDLEEAST-CRISIS-IRAN.pdf. Garret Nada and Mattisan Rowan, "Part 2: Pro-Iran Militias in Iraq," *The Wilson Center*, April 27, 2018, https://www.wilsoncenter.org/article/part-2-pro-iran-militias-iraq; "Hamas," Counter Extremism Project, accessed February 15, 2019, https://www.counterextremism.com/threat/hamas; "Hezbollah's Armoury is Growing," *The Economist*, August 12, 2017, https://www.economist.com/middle-east-and-africa/2017/08/12/hizbullahs-armoury-is-growing; Jeremy Bender, "Hamas' Armed Wing Numbers in the Tens of Thousands, And It's Ready for a Long Conflict," *Business Insider*, July 31, 2014, https://www.businessinsider.com/hamas-armed-wing-in-tens-of-thousands-2014-7; Kenneth Katzman and Carla E. Humud, "Iraq: Politics and Governance," *Congressional Research Service*, November 13, 2015, https://www.everycrsreport.com/files/20151113_RS21968_7d7fa99d42147ad-435099b815969861a91c90be1.pdf; Loveday Morris, "Shiite Militias in Iraq Begin to Remobilize," *Washington Post*, February 9, 2014, https://www.washingtonpost.com/world/middle_east/shiite-militias-in-iraq-begin-to-remobilize/2014/02/09/183816c6-8f59-11e3-878e-d76656564a01_story.html?utm_term=.0d1d0ee02ccf; Mapping Militant Organization, "Asa'ib Ahl al-Haq," *Stanford University*, March 24, 2017, http://web.stanford.edu/group/mappingmilitants/cgi-bin/groups/view/143; Matthew Hilburn, "One-Time US Prisoner Now Key in Battling IS," *Voice of America*, March 15, 2015, https://www.voanews.com/a/qais-khazali-onetime-us-prisoner-now-key-in-battling-islamic-state/2679431.html; Matthew McInnis, "Big Questions in Iran's Great Iraq Game," *American Enterprise Institute*, September 21, 2016, http://www.aei.org/publication/big-questions-in-irans-great-iraq-

PX626

game/; Matthew McInnis, "Iranian Deterrence Strategy and Use of Proxies," Statement before the Senate Committee on Foreign Relations, United States Senate, November 29, 2016, https://www.foreign.senate.gov/imo/media/doc/112916_McInnis_Testimony.pdf; Michael Knights, "How to Contain and Roll Back Iranian-Backed Militias," Testimony submitted to the Subcommittee on Terrorism, Nonproliferation and Trade, House Committee on Foreign Affairs, United State House of Representatives, October 4, 2017, https://docs.house.gov/meetings/FA/FA18/20171004/106468/HHRG-115-FA18-Wstate-KnightsM-20171004.pdf; Michael Knights, "Iran's Foreign Legion: The Role of Iraqi Shiite Militias in Syria," *The Washington Institute for Near East Policy*, June 27, 2013, https://www.washingtoninstitute.org/policy-analysis/view/irans-foreign-legion-the-role-of-iraqi-shiite-militias-in-syria; Mohammed Omer, "Hamas Growing in Military Stature, say Analysts," *Middle East Eye*, July 17, 2014, https://www.middleeasteye.net/news/hamas-growing-military-stature-say-analysts; Nicholas Blanford, "Hezbollah's Evolution: From Lebanese Militia to Regional Player," *The Middle East Institute*, Policy Paper 4, November 2017, https://www.mei.edu/sites/default/files/publications/PP4_Blanford_Hezbollah.pdf; Nicholas Blanford and Jonathan Spyer, "Israel Raises Alarm Over Advances by Hizbullah and Iran," *Jane's Military and Security Assessments Intelligence Centre*, 2017, https://www.janes.com/images/assets/560/76560/Israel_raises_alarm_over_advances_by_Hizbullah_and_Iran.pdf; Panel of Experts on Yemen, "Final report of the Panel of Experts on Yemen Established Pursuant to Security Council Committee Resolution 2140." United Nations Security Council, February 20, 2015, https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2015_125.pdf; Phillip Smyth, "Iranian Militias in Iraq's Parliament: Political Outcomes and U.S. Response," *The Washington Institute for Near East Policy*, June 11, 2018, https://www.washingtoninstitute.org/policy-analysis/view/iranian-militias-in-iraqs-parliament-political-outcomes-and-u.s.-response; Susannah George, "Breaking Badr," *Foreign Policy*, November 6, 2014, https://foreignpolicy.com/2014/11/06/breaking-badr/; Tobias Schneider, "The Fatemiyoun Division," *The Middle East Institute*, October 2018, https://www.mei.edu/sites/default/files/2018-11/PP11_Schneider.pdf; U.S. Department of State, "Country Reports on Terrorism 2013," https://www.state.gov/j/ct/rls/crt/2013/; U.S. Department of State, "Country Reports on Terrorism 2017," https://www.state.gov/j/ct/rls/crt/2017/282850.htm; Yaakov Lappin, "Palestinian Islamic Jihad, Iran's 'Preferred Proxy,' Arming in Gaza," *The Algemeiner*, June 8, 2017, https://www.algemeiner.com/2017/06/08/palestinian-islamic-jihad-irans-preferred-proxy-arming-in-gaza/; Zubair Azam and Khuram Iqbal, "Shiite Mobilization and the Transformation of Sectarian Militancy in Pakistan," *The Middle East Institute*, March 29, 2017, https://www.mei.edu/publications/shiite-mobilization-and-transformation-sectarian-militancy-pakistan.

22  Hanin Ghaddar and Phillip Smyth, "Rolling Back Iran's Foreign Legion," *Policywatch 2926*, February 6, 2018, https://www.washingtoninstitute.org/policy-analysis/view/rolling-back-irans-foreign-legion.

23  On Iranian corridors and routes see, for example, U.S. Secretary of State Rex W. Tillerson, "Remarks on the Way Forward for the United States Regarding Syria" (Remarks at the Hoover Institute at Stanford University, Stanford, CA, January 17, 2018), https://www.state.gov/secretary/20172018tillerson/remarks/2018/01/277493.htm; Uskowi, *Temperature Rising*, 88.

24  Quoted in Judah Ari Gross, "Netanyahu: We Will Step Up Our Efforts Against Iran in Syria after US Pullout," *Times of Israel*, December 20, 2018, https://www.timesofisrael.com/netanyahu-we-will-step-up-our-efforts-against-iran-in-syria-after-us-pullout/.

25  The numbers come from Gadi Eisenkot, former chief of staff of the Israel Defense Forces, who was interviewed in Bret Stephens, "The Man Who Humbled Qassim Suleimani," *New York Times*, January 12, 2019, https://www.nytimes.com/2019/01/11/opinion/gadi-eisenkot-israel-iran-syria.html.

26  See, for example, the comments of Gadi Eisenkot, former chief of staff of the Israel Defense Forces, in Stephens, "The Man Who Humbled Qassim Suleimani."

27  On Iranian efforts to improve its rocket and missile inventory see, for example, International Crisis Group, *Iran's Priorities in a Turbulent Middle East* (Brussels: International Crisis Group, April 2018), https://www.crisisgroup.org/middle-east-north-africa/gulf-and-arabian-peninsula/iran/184-irans-priorities-turbulent-middle-east; Uskowi, *Temperature Rising*, 13.

28  CSIS Transnational Threats Project estimates; David Daoud, "Hezbollah Is Preparing Syria as Second Battlefield against Israel," *Long War Journal*, March 16, 2017, https://www.longwarjournal.org/archives/2017/03/hezbollah-is-preparing-syria-as-second-battlefield-against-israel.php; Reuters Staff, "Hezbollah Uses Drones against Islamic State in Syria: Hezbollah-run Media," *Reuters*, August 21, 2017, https://ca.reuters.com/article/topNews/idCAKCN1B11H4-OCATP; Thomas Gibbons-Neff, "Hezbollah Has U.S. Armored Personnel Carriers," *Washington Post*, November 16, 2016, https://www.washingtonpost.com/news/checkpoint/wp/2016/11/16/hezbollah-has-u-s-armored-personnel-carriers-but-how-did-they-get-them/?noredirect=on&utm_term=.32c1d4f2924b.

29  See the alleged video footage of a Hezbollah drone strike in Reuters, "Hezbollah Uses Drones against Islamic State in Syria: Hezbollah-run Media," *Reuters*, August 21, 2017, https://ca.reuters.com/article/topNews/idCAKCN1B11H4-OCATP.

30  See, for example, Gideon Kouts, "Former Syrian General: Hezbollah Is in Possession of Chemical Weapons," *Jerusalem Post*, March 8, 2018, https://www.jpost.com/Middle-East/Former-Syrian-official-to-Maariv-Hezbollah-has-chemical-weapons-544567.

31  Soufan, "Qassem Soleimani and Iran's Unique Regional Strategy"; Uskowi, *Temperature Rising*, 61.

32  Author estimates and interviews; Nicholas Blanford, "Look Who's Training: Hezbollah Prepares for War," *Christian Science Monitor*, December 4, 2013, https://www.csmonitor.com/World/Middle-East/2013/1204/Look-who-s-training-Hezbollah-prepares-for-war; Ilan Ben Zion, "Israeli Jets Reportedly Strike Arms Shipment En Route to Hezbollah," *Times of Israel*, February 24, 2014, https://www.timesofisrael.com/israeli-jets-reportedly-strike-targets-near-lebanon-syria-border/.

33  Imagery analysis by Joseph S. Bermudez.

34  Vivian Yee and Hwaida Saad, "As Hezbollah Rises in Lebanon's Government, Fears About U.S. Response Follow," *New York Times*, February 2, 2019, https://www.nytimes.com/2019/02/01/world/middleeast/hezbollah-lebanon.html.

35  Coats, *World Threat Assessment of the U.S. Intelligence Community*, 30.

36  See, for example, Keith Johnson, "Iran's Yemeni Proxies Put Oil Shipments in Crosshairs," *Foreign Policy*, July 26, 2018, https://foreignpolicy.com/2018/07/26/irans-yemeni-proxies-put-oil-shipments-in-crosshairs-saudi-bab-el-mandeb-hormuz-houthi/.

37  International Crisis Group, *Iran's Priorities in a Turbulent Middle East*.

38  United Nations Security Council, *Letter Dated 26 January 2018 from the Panel of Experts on Yemen Mandated by Security Council Resolution 2342 (2017) Addressed to the President of the Security Council, S/2018/68* (New York: United Nations, January 16, 2018); Uskowi, *Temperature Rising*, 118-119; and International Crisis Group, *Iran's Priorities in a Turbulent Middle East*; Michael Knights, "The Houthi War Machine: From Guerrilla War to State Capture," *CTC Sentinel* 11, no. 8 (September 2018): 15-23, https://ctc.usma.edu/houthi-war-machine-guerrilla-war-state-capture/.

39  Soufan, "Qassem Soleimani and Iran's Unique Regional Strategy."

40  United Nations Security Council, *Letter Dated 26 January 2018 from the Panel of Experts on Yemen Mandated by Security Council Resolution 2342 (2017) Addressed to the President of the Security Council*, 29.

41  Michael Knights, "The Houthi War Machine: From Guerrilla War to State Capture," *CTC Sentinel* 11, no. 8 (September 2018): 15-23, https://ctc.usma.edu/houthi-war-machine-guerrilla-war-state-capture/.

PX626

42  United Nations Security Council, *Letter Dated 26 January 2018 from the Panel of Experts on Yemen Mandated by Security Council Resolution 2342 (2017) Addressed to the President of the Security Council*, 18.

43  See, for example, John Irish and Ahmed Rasheed, "Exclusive: Iran Moves Missiles to Iraq in Warning to Enemies," *Reuters*, August 31, 2018, https://www.reuters.com/article/us-iran-iraq-missiles-exclusive/ex-clusive-iran-moves-missiles-to-iraq-in-warning-to-enemies-idUSKCN-1LG0WB; "Iran Said to Give Iraqi Militias Ballistic Missiles Capable of Hitting Israel," *Times of Israel*, August 31, 2018, https://www.timesofis-rael.com/iran-said-to-provide-iraqi-militias-with-missiles-capable-of-hitting-israel/.

44  International Crisis Group, *Iraq's Paramilitary Groups: The Challenge of Rebuilding a Functioning State* (Brussels: International Crisis Group, July 2018), https://www.crisisgroup.org/middle-east-north-africa/gulf-and-arabian-peninsula/iraq/188-iraqs-paramilitary-groups-challenge-rebuilding-functioning-state.

45  Uskowi, *Temperature Rising*, 20-21, 72, 208, 111.

46  Uskowi, *Temperature Rising*, 20-21, 72, 208, 111.

47  International Crisis Group, *Iran's Priorities in a Turbulent Middle East*.

48  On the number of IRGC-QF in Syria see, for example, See, for example, the data from Gadi Eisenkot, former chief of staff of the Israel Defense Forces, in Stephens, "The Man Who Humbled Qassim Suleimani."

49  On IRGC-QF support to combat operations in Syria see Michael Kofman and Matthew Rojansky, "What Kind of Victory for Russia in Syria?" *Military Review*, March-April 2018, 6-23; Sanu Kainikara, *In the Bear's Shadow: Russian Intervention in Syria* (Canberra: Air Power Development Centre, 2018); John W. Parker, *Putin's Syrian Gambit: Sharper Elbows, Bigger Footprint, Stickier Wicket* (Washington, DC: Institute for National Strategic Studies, National Defense University, 2017); Uskowi, *Temperature Rising*, 77-96; Ostovar, *Vanguard of the Imam*, 204-229.

50  Ruth Eglash and Erin Cunningham, "Israeli Airstrike near Syria's Capital Endangered Civilian Airliners, Russia Says," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/world/israeli-strikes-hit-arms-depot-in-damascus-syria-says/2018/12/26/87066c86-08e6-11e9-a3f0-71c95106d96a_story.html?noredirect=on&utm_term=.11ecfbabbbdc; "Photos Said to Show Iranian Warehouse Flattened by Israeli Strike in Syria," *Times of Israel*, December 27, 2018,  https://www.timesofisrael.com/photos-said-to-show-iranian-warehouse-flattened-by-israeli-strike-in-syria/.

51  Imagery analysis by Joseph S. Bermudez.

52  Uskowi, *Temperature Rising*, 82.

53  Phillip Smyth, *Lebanese Hezbollah's Islamic Resistance in Syria* (Washington, DC: Washington Institute for Near East Policy, April 26, 2018), http://www.washingtoninstitute.org/policy-analysis/view/lebanese-hezbollahs-islamic-resistance-in-syria.

54  Soufan, "Qassem Soleimani and Iran's Unique Regional Strategy"; Uskowi, *Temperature Rising*, 27, 135.

55  Michael Knights and Matthew Levitt, "The Evolution of Shia Insurgency in Bahrain." *CTC Sentinel* 11, no. 1 (January 2018), https://ctc.usma.edu/evolution-shia-insurgency-bahrain/; Shane Harris, Souad Mekhennet, and Missy Ryan, "In Bahrain, a simmering insurgency reveals the resilience of Iran's proxy war," *Washington Post*, May 18, 2018, https://www.washingtonpost.com/world/national-security/in-bahrain-a-smoldering-insurgency-reveals-the-resilience-of-irans-proxy-war/2018/05/17/f107d684-4c7f-11e8-84a0-458a1aa9ac0a_story. html?utm_term=.75e817025c38; Uskowi, *Temperature Rising*, 29.

56  International Monetary Fund, *World Economic Outlook: Challenges to Steady Growth* (Washington, DC: International Monetary Fund, October 2018), 41.

57  Thomas Erdbrink, "For Iran, A Grand Occasion to Bash the U.S.," *New York Times*, February 11, 2019, https://www.nytimes.com/2019/02/11/world/middleeast/iran-40-anniversary-rally.html.

58  "Iran's Economic Outlook," *World Bank*, October 2018, http://www.world-bank.org/en/country/iran/publication/economic-outlook-october-2018.

59  Uskowi, *Temperature Rising*, 147-154.

60  On Iranian spending in Syria see, for example, Stephens, "The Man Who Humbled Qassim Suleimani"; Uskowi, *Temperature Rising*, 146; "Iran Spending $6 Billion Annually to Support Assad Regime: Report," *Al Arabiya*, June 10, 2015, http://english.alarabiya.net/en/News/middle-east/2015/06/10/Iran-spending-6-bln-annually-to-support-Assad-regime-report.html; Eli Lake, "Iran Spends Billions to Prop Up Assad," *Bloomberg*, June 9, 2015, https://www.bloomberg.com/opinion/articles/2015-06-09/iran-spends-billions-to-prop-up-assad.

61  See, for example, Sune Engel Rasmussen and Nazih Osseiran, "Hezbollah Faces Rising Discontent in Heartland Ahead of Election," *Wall Street Journal*, May 3, 2018, https://www.wsj.com/articles/hezbollah-faces-rising-discontent-in-heartland-ahead-of-election-1525348801; Majid Rafizadeh, "Iran's Fighters Are Dying in Syria—Will it Change Anything?" *Huffington Post*, December 6, 2017, https://www.huffingtonpost.com/majid-rafizadeh/irans-fighters-dying-in-s_b_8735658.html; Jesse Rosenfeld, "Hezbollah Fighters Are Fed Up with Fighting Syria's War," *The Daily Beast*, December 30, 2015, https://www.thedailybeast.com/hezbollah-fighters-are-fed-up-with-fighting-syrias-war.

62  Rasmussen and Osseiran, "Hezbollah Faces Rising Ill Will in Lebanon."

63  See, for example, "Iranian Protests: World Is Watching Response, U.S. Warns," *BBC*, December 30, 2017, https://www.bbc.com/news/world-middle-east-42519054.

64  Uskowi, *Temperature Rising*, 65, 87.

65  Ali Latifi, "How Iran recruited Afghan refugees to fight Assad's war," *New York Times*, June 30, 2017, https://www.nytimes.com/2017/06/30/opinion/sunday/iran-afghanistan-refugees-assad-syria.html; "Iran: Afghan children recruited to fight in Syria," *Human Rights Watch*, October 1, 2017, https://www.hrw.org/news/2017/10/01/iran-afghan-children-recruited-fight-syria; "How Does Iran Justify Its Role in Syria?" *IranWire*, September 18, 2017, https://iranwire.com/en/features/4823.

66  Linda Robinson, et al., *Modern Political Warfare: Current Practices and Possible Responses* (Santa Monica, CA: RAND, 2018), 125-170.

67  James Zogby, et al., *Public Opinion 2017* (Washington, DC: Zogby Research Services, 2017), https://static1.squarespace.com/static/52750d-d3e4b08c252c723404/t/5a1b10689140b7c306258b2e/1511723112971/SBY2017+Final.pdf.

68  Ben Taub, "Iraq's Post-ISS Campaign of Revenge," *New Yorker*, December 24 and 31, 2018, https://www.newyorker.com/magazine/2018/12/24/iraqs-post-isis-campaign-of-revenge

69  Uskowi, *Temperature Rising*, 53.

70  Aref Mohammed and Raya Jalabi, "Unrest Intensifies in Iraq as Iranian Consulate and Oil Facility Stormed," *Reuters*, September 7, 2018, https://www.reuters.com/article/us-iraq-protests/unrest-intensifies-in-iraq-as-ira-nian-consulate-and-oil-facility-stormed-idUSKCN1LN1M9.

71  On media reports on possible commercial links between southern Iraq and Gulf States, see Evan Langenhahn, "For Saudi Arabia, an Elite Opportunity in Iraq," *War on the Rocks*, August 30, 2018, https://warontherocks.com/2018/08/for-saudi-arabia-an-electric-opportunity-in-iraq/; "Saudi Arabia's Use of Soft Power in Iraq Is Making Iran Nervous," *Economist*, March 8, 2018, https://www.economist.com/middle-east-and-africa/2018/03/08/saudi-arabias-use-of-soft-power-in-iraq-is-making-iran-nervous; Erika Solomon, "Sunni Saudi Arabia Courts an Ally in Iraq's Shia," *Financial Times*, April 1, 2018, https://www.ft.com/content/b4cb47b4-2d1c-11e8-9b4b-bc4b9f08f381.

PX626

**72**  Vali Nasr, "Iran Among the Ruins: Tehran's Advantage in a Turbulent Middle East," *Foreign Affairs* 97, no. 2 (March / April 2018): 108-118.

**73**  On balance-of-power competition, see Hans J. Morgenthau, *Politics Among Nations: The Struggle for Power and Peace*, 7th ed. (New York: McGraw-Hill, 2005); Kenneth N. Waltz, *Theory of International Politics* (New York: McGraw-Hill, 1979); John J. Mearsheimer, *The Tragedy of Great Power Politics* (New York: W.W. Norton, 2001).

**74**  Coats, *Worldwide Threat Assessment of the U.S. Intelligence Community*, 10.

PX626

PX628

# Iran receives al Qaeda praise for role in terrorist attacks

Fresh links between Iran's Revolutionary Guards and al-Qaeda have been uncovered following interception of a letter from the terrorist leadership that hails Tehran's support for a recent attack on the American embassy in Yemen, which killed 16 people.

By Con Coughlin

2:10PM GMT 23 Nov 2008

Delivery of the letter exposed the rising role of Saad bin Laden, son of the al-Qaeda leader, Osama as an intermediary between the organisation and Iran. Saad bin Laden has been living in Iran since the fall of the Taliban in Afghanistan in 2001, apparently under house arrest.

The letter, which was signed by Ayman al-Zawahiri, al-Qaeda's second in command, was written after the American embassy in Yemen was attacked by simultaneous suicide car bombs in September.

Western security officials said the missive thanked the leadership of Iran's Revolutionary Guards for providing assistance to al-Qaeda to set up its terrorist network in Yemen, which has suffered ten al-Qaeda-related terror attacks in the past year, including two bomb attacks against the American embassy.

In the letter al-Qaeda's leadership pays tribute to Iran's generosity, stating that without its "monetary and infrastructure assistance" it would have not been possible for the group to carry out the terror attacks. It also thanked Iran for having the "vision" to help the terror organisation establish new bases in Yemen after al-Qaeda was forced to abandon much of its terrorist infrastructure in Iraq and Saudi Arabia.

There has been intense speculation about the level of Iranian support for al-Qaeda since the 9/11 Commission report into al-Qaeda's terror attacks against the U.S. in 2001 concluded that Iran had provided safe passage for many of the 9/11 hijackers travelling between Afghanistan and Saudi Arabia prior to the attacks.

Scores of senior al Qaeda activists - including Saad bin Laden - sought sanctuary in Iran following the overthrow of the Taliban, and have remained in Tehran ever since. The activities of Saad bin Laden, 29, have been a source of Western concern despite Tehran's assurances that he is under official confinement.

But Iran was a key transit route for al Qaeda loyalists moving between battlefields in the Middle East and Asia. Western security officials have also concluded Iran's Revolutionary Guards have supported al-Qaeda terror cells, despite religious divisions between Iran's Shia Muslim revolutionaries and the Sunni Muslim terrorists.

Iran is active in Yemen, Osama bin Laden's ancestral homeland. The country has been a focal point for al-Qaeda, which has found relatively easy targets in its lawless environment. "Yemen is now a key strategic base for al-Qaeda's operations, as well as being fertile recruitment territory," said a senior Western security official. "Iran's Revolutionary Guards have provided important support in helping al-Qaeda to turn Yemen into a major centre of operations."

PX628

4/21/22, 3:56 PM                                    Iran receives al Qaeda praise for role in terrorist attacks - Telegraph

Apart from the terror attacks against the US embassy al-Qaeda has also threatened to attack the British and Saudi Arabian embassies in Yemen.

PX628