# EXHIBIT A

2021 WL 2914036
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

Judah Herzel HENKIN, et al., Plaintiffs,
v.
ISLAMIC REPUBLIC OF IRAN, et al., Defendants.
Estate of Eitam Henkin, et al., Plaintiffs,
v.
Islamic Republic of Iran, et al., Defendants.

Case No. 1:18-cv-1273-RCL,
Case No. 1:19-cv-1184-RCL
|
Signed 07/12/2021

**Attorneys and Law Firms**

[Michael A. Petrino](), [Jonathan E. Missner](), Stein Mitchell Beato & Missner LLP, Washington, DC, Adora Sauer, Pro Hac Vice, [Gavriel Mairone](), Pro Hac Vice, MM-Law LLC, Chicago, IL, for Plaintiffs.

## MEMORANDUM OPINION

[Royce C. Lamberth](), United States District Judge

**\*1** This case arises out of a terrorist attack in 2015 on the Henkin family—an attack in which Eitam and Na'ama Henkin were killed in front of their four minor children. Plaintiffs allege that not only were the terrorists responsible operatives of Hamas, but that the Defendants in both cases enabled the attack by materially supporting Hamas.

In 2018, one set of Plaintiffs—the parents and siblings of Eitam Henkin—sued Iran and Syria on the theory that they had sponsored the attack. A year later, a different set of Plaintiffs—the Estate of Eitam Henkin, the Estate of Na'ama Henkin, and their four minor children—separately sued Iran and Syria and several of Iran's agencies, instrumentalities, and political subdivisions. All of the named Defendants have defaulted. *See* Findings of Fact ¶¶ 17, 21, 25, 30, 35, 40, 45, 50, 54. Therefore, Plaintiffs have filed two separate motions for default judgment. The Court held an evidentiary hearing on both of these motions in January.

The Court has separately set out its findings of facts and conclusions of law on the Plaintiff's claims. But because this case involves complicated questions of choice of law, subject-matter jurisdiction, and venue, the Court now further explains several of its legal conclusions in the following pages. First, the Court will explain why plaintiffs' non-§ 1605A(c) claims are actually governed by Israeli law, not District of Columbia law or California law. Second, having established that the Plaintiffs' non-§ 1605A(c) claims shall be construed as Israeli-law claims, the Court then explains why it has subject-matter jurisdiction over those claims. And third, the Court explains why venue is improper for the defendant agencies and instrumentalities, but why that fact is not fatal to the suit. Thus, for the reasons set forth in the findings of fact and conclusions of law and in this Memorandum Opinion, the Court will **GRANT IN PART** and **DENY IN PART** both motions for default judgment against all Defendants.

## I. Background

### *A. Factual Background*

On October 1, 2015, Hamas, a designated Foreign Terrorist Organization ("FTO"), committed a terrorist attack, murdering Eitam Henkin and his wife, Na'ama Henkin. Findings of Fact ¶ 78. The attack unfolded as follows. Eitam Henkin was driving his family home through the West Bank along Route 555 when a car passing in the opposite direction made a U-turn, sped up, and overtook the car by firing bursts from a fully automatic machine gun. *Id.* at ¶¶ 82–85. It turned out that the attackers were Hamas operatives who originally planned to kidnap the Henkins as pawns to negotiate the release of imprisoned Hamas members. *Id.* at ¶ 88. Their plan was disrupted when Eitam and Na'ama began to resist. *Id.* Eventually, one of the terrorists shot and killed Eitam in front of his wife and children with an M16. *Id.* But this also injured one of the attackers. *Id.* Na'ama continued to fight back. So they shot her too and then retreated quickly to transport their injured operative to a hospital. *Id.* at ¶ 91. The four Henkin children—a nine-year-old, seven-year-old, four-year-old, and ten-month-old—witnessed the attack. Eight of the nine terror operatives have been convicted by an Israeli military court for their role in the attack and for their membership in Hamas. *Id.* at ¶ 95. After the attack, Hamas claimed responsibility for the attack on multiple platforms. *See Id.* at ¶¶ 116–33.

**\*2** It is also evident that the named Defendants provided material support to Hamas in the years leading up to the attack. Starting with Iran, it has provided significant support to Hamas in the form of financial support,

weapons, and military training. *See id.* at ¶¶ 156–68. The Islamic Revolutionary Guard Corps ("IRGC") is a military organization within the Iranian government that has been providing financial resources, training, weapons, and other material support to Hamas for years prior to the attack. *See id.* at ¶¶ 169–81. The Ministry of Intelligence and Security ("MOIS") has similarly been providing material, particularly financial, support to Hamas. *See id.* at ¶¶ 183–93. Syria has also been supporting Hamas. *See id.* at ¶ 284. Hamas was able to use Syria as a safe haven for years before the attack, including situating its main office in Damascus. *See id.* at ¶ 290. In addition to serving as a safe haven, Syria also provided Hamas with funding and training. *See id.* at ¶¶ 284–303.

Plaintiffs from Case 1184 also pleaded causes of action against three banks—Bank Markazi, Bank Melli, and Bank Saderat. Compl. at 2, ECF No. 1. Based on the evidence provided, the Court found that the Iranian government owns and controls the majority of these three banks. *See* Findings of Fact ¶¶ 207, 242, 273. These banks also materially supported Hamas in the time leading up to the attack. *See id.* at ¶¶ 228, 258, 282. The Iranian government passed millions of dollars of funding to Hamas through all three of these banks. *See id.* at ¶¶ 209-83. Here, Plaintiffs are not asserting claims against the specific Hamas operatives who carried out the attack. Plaintiffs are asserting these claims against the named Defendants who facilitated the attack by providing material support to the Hamas organization.

*B. Procedural History*

This Memorandum Opinion addresses two distinct civil actions, since the court did not order that these cases be consolidated. But the Court is adjudicating them simultaneously because they arise out of the same terrorist attack on the Henkins. Case 1273 was filed first, and the Plaintiffs are the parents and siblings of Eitam Henkin. Compl. at 4–5, ECF No. 1. In Case 1273, Plaintiffs are all U.S. nationals. Findings of Fact ¶¶ 6–7. The Defendants in Case 1273 are Iran and Syria. Compl. at 2, ECF No. 1; Findings of Fact ¶ 11. On December 19, 2018, Plaintiffs officially served Iran through the diplomatic assistance of Switzerland. Return of Service, ECF No. 14; Findings of Fact ¶ 15. Using a similar process with Syria, on January 22, 2019, Plaintiffs effectuated service through the diplomatic assistance of the Czech Republic. Return of Service, ECF No. 15; Findings of Fact ¶ 18.

The 1273 Plaintiffs—Rabbi Judah Herzl Henkin (Eitam's father), Anne Chana Henkin (Eitam's mother), Aderet Rivka Henkin (Eitam's sister), Eliashir Elijah Henkin (Eitam's brother), Jacob Bechor-Shalom Henkin (Eitam's brother), Joseph Gil Henkin (Eitam's brother), and Taama Frieda Henkin Yaakovson (Eitam's sister)—are all U.S. nationals, were at the time of the attack, and have all suffered personal injury as a result of the attack. Findings of Fact ¶¶ 6–7, 324, 329, 333, 338, 344, 349, 355. Thus, they are entitled to assert claims under the federal statutory cause of action at 28 U.S.C. § 1605A(c). The 1273 Plaintiffs have also asserted claims under the laws of the District of Columbia and California. *See* Compl. at 21, ECF No. 1. Specifically, the complaint lists the following counts: (1) Under 28 U.S.C. § 1605A(c) (on behalf of all of the Plaintiffs), (2) Loss of Solatium (under § 1605A(c) and D.C. or California law on behalf of all of the Plaintiffs), (3) Intentional Infliction of Emotional Distress (under § 1605A(c) or D.C. law on behalf of all of the Plaintiffs), and (4) Punitive Damages (under 28 U.S.C. § 1605A(c) on behalf of all the Plaintiffs). Compl. at 20–24, ECF No. 1.

The Estate of Eitam Henkin, the Estate of Na'ama Henkin, and the four minor Henkin children brought forth Case 1184. Compl. at 2, ECF No. 1; Findings of Fact ¶ 2. In addition to Iran and Syria, they are also suing the IRGC, the MOIS, Bank Markazi, Bank Melli, and Bank Saderat. Compl. at 2, ECF No. 1; Findings of Fact ¶¶ 8, 10. Plaintiffs properly served Iran, the IRGC, and the MOIS under § 1608(a)(4) through Switzerland's diplomatic assistance on September 23, 2019. Affidavit, ECF No. 28; Findings of Fact ¶ 20. Plaintiffs officially served Bank Markazi and Bank Saderat under § 1608(b)(3)(B) on June 19, 2019, via USPS Registered Mail. Return of Service, ECF No. 14; Return of Service, ECF No. 16; Findings of Fact ¶ 21. On June 20, 2019, Plaintiffs properly served Bank Melli, also under § 1608(b)(3)(B), through USPS Registered Mail. Return of Service, ECF No. 15; Findings of Fact ¶ 21. And finally, Plaintiffs successfully served Syria under § 1608(a)(4) through the diplomatic assistance of the Czech Republic on January 12, 2020. Return of Service, ECF No. 32; Findings of Fact ¶ 22.

**\*3** By contrast to the 1273 case, the 1184 suit presents a couple of complications, since Eitam was a U.S. national at the time of the attack but Na'ama and the children were not. Thus, Case 1184 asserts claims under both § 1605A(c)(4) and either D.C. or Israeli law on behalf of Eitam's estate. But it asserts only D.C. or Israeli law claims on behalf of Na'ama's estate and on behalf of the children. Specifically,

the complaint lists the following counts: (1) Wrongful Death (under 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of Columbia or Israel), (2) Survival Damages on Behalf of the Estate of Eitam Henkin (under 28 U.S.C. § 1605A(c) or, in the alternative, the laws of the District of Columbia or Israel), (3) Loss of Solatium (under 28 U.S.C. § 1605A(c) or, in the alternative, the laws of the District of Columbia or Israel), (4) Intentional Infliction of Emotional Distress (under the laws of the District of Columbia or Israel), (5) Negligent Infliction of Emotional Distress (under the laws of the District of Columbia or Israel), (6) Civil Conspiracy (under the laws of the District of Columbia or Israel), (7) Aiding and Abetting (under the laws of the District of Columbia or Israel), and (8) Vicarious Liability/Respondeat Superior Against the Iranian Defendants (under 28 U.S.C. § 1605A(c) or, in the alternative, the laws of the District of Columbia or Israel). Compl. at 30–37, ECF No. 1.

Hence this case presents three important questions: (1) Which law—that of the District of Columbia, California, or Israel—governs the plaintiffs' non-§ 1605A(c) claims? (2) Does this Court have subject-matter jurisdiction over those claims? and (3) Because Case 1184 implicates not only foreign sovereigns, but also agencies and instrumentalities of Iran, is the District of Columbia a proper venue? The Court addresses these issues in the analysis that follows, but it first discusses the relevant legal standards.

## II. Legal Standards

This case is brought under the Foreign Sovereign Immunities Act (FSIA) and raises complex choice-of-law, subject-matter jurisdiction, and venue issues. Beginning with choice-of-law, Plaintiffs assert claims under D.C. law or, in the alternative, Israeli or California law. The Court must decide the proper body of law among the three to govern these claims. Under D.C. Circuit precedent, this Court must apply the choice-of-law rules of the forum. *See Oveissi v. Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009) (holding that the forum's choice-of-law principles apply, "rather than constructing a set of federal common law principles"). Thus, District of Columbia choice-of-law principles govern. D.C. choice-of-law doctrine comprises governmental-interest analysis and factors from the Restatement (Second) of Conflicts of Law (hereinafter "the Second Restatement"), which determine the jurisdiction with the most significant relationship to the dispute. *See Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 556 A.3d 31, 40–41 (D.C. 1989). For reasons discussed below, Israeli law governs Plaintiffs' non-§ 1605A(c) claims for both Cases 1273 and 1184.

Next, subject-matter jurisdiction in an FSIA case is analyzed on a claim-by-claim basis. *See* 28 U.S.C. § 1605A(a)(2). Under the FSIA's terrorism exception clause, § 1605A sets out three requirements for the Court to hear a claim:

> [1] The foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section. [2] The claimant or the victim was, at the time the act described in paragraph (1) occurred– (I) a national of the United States; (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment. [3] In a case in which the act occurred in the foreign state against which the claim has been brought the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration.

**\*4** 28 U.S.C. § 1605A(a)(2)(A). Thus, for the Court to have subject-matter jurisdiction over the claims, (1) the foreign state must be designated a state sponsor of terrorism at the time of the act or as a result of the act, and (2) the claimant or the victim at the time of the attack must be a U.S. national, or a member of the armed forces, or a U.S. government employee acting within the scope of her employment. *See id.* The third requirement is not pertinent to this case, because the attack did not occur in Iran or Syria. Most relevant to the case before the Court is the citizenship requirement, because some of the claimants are not U.S. nationals. Despite certain claimants lacking U.S. citizenship, the Court has subject-

matter jurisdiction over all the claims in both suits under § 1605A for reasons detailed below.

Turning to venue, 28 U.S.C. § 1391(f) governs venue for civil actions against a foreign state. *See* 28 U.S.C. § 1391(f). For agencies or instrumentalities—such as the banks—venue is proper "in any judicial district in which the agency or instrumentality is licensed to do business or is doing business." 28 U.S.C. § 1391(f)(3). And relevant to Iran, Syria, the IRGC, and the MOIS, venue is proper "in the United States District Court of the District of Columbia if the action is brought against a foreign state or political subdivision thereof." 28 U.S.C. § 1391(f)(4). As the Court later explains, the District Court of the District of Columbia is a proper venue for the foreign states and political subdivisions under § 1391(f)(4). But this Court is not a proper venue for the banks. Regardless, Defendants forfeited any objection to improper venue by defaulting. Thus, venue is not dispositive of Case 1184's claims against the banks.

### III. Discussion

The Foreign Sovereign Immunities Act ("FSIA") specifies that "the court shall hear a *claim*" if certain statutory conditions are met. 28 U.S.C. § 1605A(a)(2) (emphasis added). Because the FSIA mandates a claim-by-claim jurisdictional analysis, the Court addresses the following issues in a slightly abnormal order. *See id.* The Court must first establish which law governs each claim to determine which claims the Plaintiffs are actually asserting. Only then can the Court determine whether the claimants or victims were, at the time of the attack, U.S. nationals—a subject-matter jurisdictional prerequisite. Thus, the Court will first conduct a choice-of-law analysis to explain why Plaintiffs' non-§ 1605A(c) claims shall be construed as Israeli-law claims. Second, having established that Plaintiffs' non-§ 1605A(c) claims shall be construed as Israeli-law claims, the Court will explain why it has subject-matter jurisdiction over those claims. And third, the Court will discuss how Plaintiffs from Case 1184 did not show that the District of Columbia is the proper venue for some of that case's Defendants, but why that does not preclude entry of judgment against those Defendants.

*A. Plaintiffs' Non-§ 1605A(c) Claims
Shall Be Construed as Israeli-Law Claims*

Beginning with choice-of-law analysis, Plaintiffs from both cases have asserted a variety of claims with ambiguity as to what source of law the parties are pleading the claims under. The claims they are asserting depend on a choice-of-law analysis that neither party fully explained. In Case 1273, the parents and siblings of Eitam Henkin purport to bring their non-§ 1605A(c) claims under either California law or D.C. law. In the 1184 case, Plaintiffs purport to bring their non-§ 1605A(c) claims under either D.C. law or Israeli law. However, as the Court will explain, all non-§ 1605A(c) claims must be construed as Israeli-law claims. The Court will first explain why Israeli law governs these claims. Then it will address how Israeli law functions, based on the declaration of Professor Israel Gilead. Gilead Decl., ECF No. 56. And finally, the Court will clearly define the claims each Plaintiff is actually asserting.

*(1) Choice-of-Law Analysis*

**\*5** In addition to § 1605A(c) claims, Plaintiffs also assert non-§ 1605A(c) claims. The FSIA does not have an express choice-of-law provision for the latter types of claims. But under § 1606, once "a foreign state is not entitled to immunity under section 1605 ... the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Courts have held § 1606 to mean that "plaintiffs may bring state law claims that they could have brought if the defendant were a private individual." *Oveissi,* 573 F.3d at 841; *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983). In this way, "the FSIA ... operates as a 'pass-through' to state law principles." *Oveissi,* 573 F.3d at 841 (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996)). Based on these principles, the Court must apply the law of the forum. *See Oveissi,* 573 F.3d at 841. Indeed, in the FSIA context, the D.C. Circuit has held that the relevant choice-of-law law is that of the forum, "rather than a set of federal common law principles." *Oveissi,* 573 F.3d at 841. Here, D.C. is the forum. So the Court will apply D.C. choice-of-law principles.

The District's doctrine is a "constructive blending" of the governmental-interest and most-significant-relationship analyses, as well as principles from the Second Restatement. *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995); *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 556 A.3d 31, 40–41 (D.C. 1989); Restatement (Second) of Conflict of Laws §§ 6, 145. The Court will analyze these

choice-of-law issues separately for Cases 1184 and 1273, since each asserts distinct claims.

### a. Case 1184

#### i. Governmental-Interest Analysis

Starting with governmental-interest analysis, the Court must "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its laws applied to the facts of the case under review." *Hercules*, 556 A.2d at 41 (internal citations and quotation marks omitted).

Plaintiffs in Case 1184 allege that their non-§ 1605A(c) claims arise under either D.C. or Israeli law. Compl. 30, ECF No. 1. Between D.C. and Israel, Israel clearly has the stronger governmental interest. Israel has multiple identifiable interests in this case, including those policy-interest factors from Restatement §§ 6(b), (c), and (e). First—combating terrorism. Whether it be protecting Israeli citizens or protecting visitors, the Israeli government has a strong interest in deterring and compensating for terrorism. Protecting tourists also creates an economic interest. If individuals traveling through Israel are at risk of terrorist attacks, people may avoid passing through or visiting the country. Losing tourists will in turn, have a negative impact on the economy. Not only does Israel have an interest in protecting its individual citizens, but it also has an interest in punishing those committing crimes on Israeli territory. Awarding damages to those harmed, via Israeli law, will show Israel's disapproval of the attack, and specifically its disapproval towards Iran and Syria's support for these behaviors. Undoubtedly Israel's governmental interest is convincing.

As to D.C. law, the only relationship this Court is aware of between D.C. and the attack is that this jurisdiction happens to be a proper venue under the FSIA venue statute. *See* 28 U.S.C. § 1391(f)(4). If Plaintiffs had been residing in D.C. at some point prior to the attack, or if Eitam used to be a resident of D.C., or if the children moved to D.C. after the attack, there might be some governmental interest. But that is not the case here. Plaintiffs did not provide any evidence connecting this case to D.C. besides the venue provision. Thus, it is clear that between D.C. and Israeli law, Israeli law would prevail under a pure governmental-interest analysis.

#### ii. Most-Significant-Relationship Test

**\*6** The most-significant-relationship test leads us to the same conclusion—that Israeli law governs. Section 145 of the Second Restatement contains tort-specific choice-of-law doctrine. *See* Restatement (Second) of Conflict of Laws § 145. Under § 145, the presumption is one of lex loci delicti—the law of the place where the tort was committed is the law that should govern. *See id.* We then look to § 6 of the Second Restatement to see if there are any factors that displace the lex-loci-delicti presumption. *See id.* at § 6. Section 6(a) relates to the need to prevent forum shopping in the national and international systems. *See id.* at § 6(a). Here, applying D.C. law would be conducive to forum shopping. Allowing Plaintiffs to bring claims in a forum with no connection to the transaction just because that forum may have favorable substantive law is the epitome of forum shopping. Sections 6(b), (c), and (e) concern weighing the policy interests of the different jurisdictions. Israel has a strong interest in protecting its citizens, as well as other governmental interests discussed above. *See id.* at §§ 6(b), (c), and (e). By contrast, D.C. might have those interests if Eitam, Na'ama, or the children had resided here, but Plaintiffs provided no evidence along those lines. From what the Court can gather, D.C. is only relevant because of the venue provision of the FSIA. Thus, as previously established, Israel has the stronger policy interest.

Sections 6(d), (f), and (g) concern creating an element of predictability in determining which law will govern. *See id.* at §§ 6(d), (f), and (g). The Court finds it instructive to look to the Restatement § 145 factors as indicators of predictability. These four factors are "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered." *Id.* at § 145. All of these factors unambiguously point to Israeli law. The injury—witnessing the murder of Eitam—occurred in Israel. Findings of Fact ¶¶ 78–90. The actual murder happened in Israel. *Id.* Prior to the attack, Eitam, Na'ama, and their children were all domiciled in Israel. Strous Decl. 20, ECF No. 56; Findings of Fact ¶¶ 4–5. Eitam was a dual Israeli and United States citizen at the time of his death, but he lived in Israel his entire life. Strous Decl. 28, ECF No. 56; Findings of Fact ¶ 3. The relationship between the parties was also centered in Israel. Because all of these § 145 factors are so Israel-centric, the most-significant-relationship test dictates that the Court apply Israeli law.

### iii. Restatement-Specific Principles

The District's choice-of-law doctrine also factors in additional principles from the Second Restatement when applicable. *See Hercules*, 556 A.3d at 43. Here, those sections are § 146 (Personal Injuries) and § 175 (Right of Action for Death). *See* Restatement (Second) of Conflict of Laws §§ 146, 175. Section 146 states that "in an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6." *Id.* at § 146. As an initial matter, these sections reinforce the exact conclusions that the Court has already come to in applying the other tests —that the law of the place of the injury (Israel) governs. Therefore, the Plaintiffs would have had to make some very strong showing under Restatement Section 6 as to why D.C. law should apply. Clearly, based on the discussion above, they did not make that showing. As mentioned, Plaintiffs have no apparent connection to D.C. besides venue. Section 175 also requires Plaintiffs to overcome exactly the same presumption against the jurisdiction where the injury occurred. *See id.* at § 175. Again, Plaintiffs did not overcome that presumption. After conducting multiple analyses, all results point to the same conclusion: Israeli law governs the non-§ 1605A(c) claims in Case 1184.

### a. Case 1273

### iv. Governmental-Interest Analysis

In addition to their § 1605A(c) claims, Plaintiffs in Case 1273 purport to bring claims under either D.C. or California law. Compl. 20, ECF No. 1. They do not assert Israeli-law claims. But as discussed in the above analysis, Israel has a clear governmental interest. The analysis of Israel's interest remains the same in this case because both cases revolve around the same terrorist attack. Similarly, in Case 1273, Plaintiffs' only connection to D.C. is through the venue statute. Like the Plaintiffs in 1184, the 1273 Plaintiffs also did not provide any additional evidence in support of a connection to D.C. As a result, D.C. still does not have any governmental interest in the case at hand.

**\*7** What's California's interest? Essentially, there isn't one. It is not clear why Plaintiffs from Case 1273 asserted claims under California law. It appears that these Plaintiffs are citizens of Israel, primarily reside in Israel, learned about the attack in Israel, and the actual attack occurred in Israel. Findings of Fact ¶¶ 6–7, 323, 328, 343, 348, 354. Even if California had some theoretical nexus to these claims, those ties are strongly outweighed by Israel's connection to the attack. So though these Plaintiffs did not assert Israeli law as an option, Israel's governmental interests clearly outweigh those of D.C. or California.

### v. Most-Significant-Relationship Test

As discussed above, the most-significant-relationship test employs the factors from Restatement §§ 6 and 145 to determine which jurisdiction has the most significant relationship to this case. *See* Restatement (Second) of Conflict of Laws §§ 6, 145. Section 6(a) first looks to whether applying that jurisdiction's laws would be conducive to forum shopping. *See id.* at § 6(a). As mentioned, applying D.C. law would encourage forum shopping, given Case 1273's similar lack of D.C. contacts. Likewise, California has no apparent connection to this case. In terms of §§ 6(b), (c), and (e), neither D.C. nor California has a policy interest that outweighs those of Israel. *See id.* at §§ 6(b), (c), and (e). Plaintiffs did not put forth any evidence that they had ties to D.C. or California. Thus, those jurisdictions have no policy interests in applying their law to this case.

The predictability factors from §§ 6(d), (f), and (g) and those from § 145 also all point to applying Israeli law. *See id.* at §§ 6(d), (f), (g), 145. For the wrongful death claims, the injury was the terrorist attack that killed Eitam, which happened in Israel. Findings of Fact ¶¶ 78–90. Another injury, emotional distress, also occurred in Israel when Plaintiffs found out about Eitam's death. *See* Ex. A–H, *ECF* No. 21; Findings of Fact ¶¶ 323–24, 328–29, 333, 336–38, 343–44, 348–49, 354–55. This distress theoretically could have followed the family members anywhere they traveled after the attack. But Plaintiffs did not provide any evidence showing that they suffered distress outside of Israel. Accordingly, all potential injuries took place in Israel. The conduct causing the injury was clearly the terrorist attack in Israel. While some of the 1273 Plaintiffs are U.S. nationals or dual U.S. and Israeli nationals, they are all domiciled in Israel. *See* Ex. A–H, *ECF* No. 21; Findings of Fact ¶ 6–7. And finally, Israel is clearly the place where the relationship between the parties

is centered, given the attack there. This analysis further tips the scale towards Israeli law governing Case 1273's non-§ 1605A(c) claims.

### vi. Restatement-Specific Principles

As for Restatement-specific principles, once again, the Court looks to § 146 (Personal Injuries) and § 175 (Right of Action for Death). *See* Restatement (Second) of Conflict of Laws §§ 146, 175. Just like Plaintiffs in Case 1184, Plaintiffs here would have had to overcome the presumption against "the state of the injury" to have either D.C. or California law apply. *Id.* at §§ 146, 175. And once again, Plaintiffs did not overcome this presumption. They did not provide any information about why they asserted claims under California law. As to D.C., the only connection the Court is aware of is that D.C. is a proper venue. Thus, under all of the analyses conducted, Israeli law should govern the non-§ 1605A(c) claims in Case 1273.

However, the 1273 Plaintiffs did not assert Israeli law as an alternative choice-of-law to govern their non-§ 1605A(c) claims. As discussed in more detail below, the Court cannot re-construe Plaintiffs' claims as arising under Israeli law, since this case is in a default posture. Under Rule 54, "a default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). As a result, the Court must follow the pleadings word-for-word, meaning that the 1273 Plaintiffs have not stated claims as to their non-§ 1605A(c) causes of action.

### (2) Israeli Law Explanation

**\*8** Unlike the Plaintiffs in Case 1273, the Case 1184 Plaintiffs do assert Israeli-law claims. When bringing claims under foreign law in U.S. courts, the party seeking to apply foreign law bears the burden of establishing the substance of that foreign law. *See* McKesson Corp. v. Islamic Republic of Iran, 753 F.3d 239, 243 (D.C. Cir. 2014). Here, the 1184 Plaintiffs introduced Professor Israel Gilead's declaration to explain how Israeli law functions. Gilead Decl., ECF No. 56. Professor Gilead explains that Plaintiffs would have causes of actions under both Israeli common-law and Israeli statutes. He describes how Israeli law is derived from English tort law and is governed by the Civil Wrong Ordinance ("CWO"). *Id.* at 5. Specifically, he first discusses the relevant types of Israeli torts. *Id.* Next, he discusses potential theories of liability. *Id.* at 8. And finally, he explains Plaintiffs' potential theories of recovery. *Id.* at 20.

#### a. Types of Torts

Relevant to the cases at hand, Israeli tort law operates similarly to common-law torts in the United States and includes concepts of battery, assault, and negligence. Under Israeli law, assault and battery are governed by Article 23 of the CWO. *Id.* at 5. Though Israeli law refers to each concept by the term "assault," it actually allows Plaintiffs to recover under two distinct theories of "assault." *Id.* One theory is analogous to American common-law assault and the other is analogous to American common-law battery. Like common-law assault in the United States, one definition of Israeli assault requires (1) an attempt or (2) a threat by any act or gesture, (3) to use force against the person of another, (4) if the other reasonably believes that the assailant has the intention and ability to carry out his scheme. *Id.* Similar to American common-law battery, the other definition of Israeli assault requires (1) intentional application of force, (2) to the person of another, (3) without his consent. *Id* at 6.

Israeli law also has a concept of "negligence," which really consists of two distinct types of harms under Articles 35–36 of the CWO. *Id.* The first type of harm is careless or negligent conduct, which consists of failure to act as a reasonable, prudent person would under the circumstances. Second, "negligence" also includes harms caused knowingly, *intentionally*, and maliciously. *Id.* at 6–8. Israeli law thus groups under the term "negligence" what American common-law would consider an intentional tort. *See id.* at 8. Either genre of "negligence" also requires that (1) the action violates the duty of care, and (2) causes a harm. *Id.* Under that causation requirement, negligent conduct must pass both the "but-for" and proximate-cause tests.

#### b. Theories of Liability

Professor Gilead next describes three theories of liability that the Defendants could potentially be held liable under: primary liability, secondary liability, and vicarious liability. Two of those theories—primary liability and secondary liability —hinge on Defendants committing their own, personal torts. *Id.* at 10–18. Primary liability is a common-law, judicially created theory of liability established in the Israeli case *Mantin Estate v. PLO. Id.* at 16–17. Under primary

liability, the relevant Israeli tort is called "Negligent Support of Terrorism." *Id.* In *Mantin Estate v. PLO*, the Israeli Supreme Court recognized that establishing an infrastructure for assisting and encouraging terrorist acts is in itself a negligent act. *Id.* at 17; *see also* CivA 2144/13 *Mantin Estate v. PLO* (6.12.2017). To satisfy the three negligence elements discussed above, the 1184 Plaintiffs must show (and, indeed, have shown) that (1) support for terrorism constitutes knowingly, intentionally, and maliciously doing something that causes an unreasonable risk of harm, (2) Defendants had a duty of care not to support terrorism or create an unreasonable risk of harm from terrorism, and they breached this duty by supporting terrorism, and (3) Defendants' support was both the but-for cause and proximate cause of the Henkin attack. While the Plaintiffs might not have successfully shown the third element for all Defendants, they rely on the *Mantin* court's burden-shifting move. *See* Gilead Decl. 18, ECF No. 56; *see also Mantin v. PLO*. In *Mantin*, the court held that once the plaintiff has shown that the defendants supported terrorism and has asserted but-for and proximate causation, the burden shifts to the defendant to persuade the court that there wasn't causation. *Id.* But since the Defendants here defaulted, they haven't met their burden of persuasion. *See* Gilead Decl. 18, ECF No. 56. Thus, all of the Defendants will be liable under primary liability for "Negligent Support of Terrorism." *See* Conclusions of Law ¶¶ 71, 76.

**\*9** Secondary liability, by contrast, is a positive-law, legislature-made theory of liability under Article 12 of the CWO. Defendants here could be held secondarily liable for aiding and abetting the Hamas terrorists in the commission of their torts. Gilead Decl. 10–16, ECF No. 56. Secondary liability hinges on there having been underlying torts committed by primary tortfeasors (i.e., the Hamas attackers). *Id* at 12. So the first element is contingent on Plaintiffs stating a prima facie case of either assault or negligence against the Hamas attackers themselves. *Id.* at 16. The Plaintiffs have plainly made such a case as to Eitam, Na'ama, and the children for assault and negligence. *Id.* at 12; Findings of Fact ¶¶ 78–90. Second, Defendants must have had "actual knowledge" of the Hamas attack. *Id.* All "actual knowledge" means is that Defendants materially contributed to Hamas's ability to commit terrorist attacks, Gilead Decl. 12–14, ECF No. 56, and that in so doing, Defendants could have reasonably foreseen that terrorist attacks of this type might arise from their material contribution. *Id.* at 12–14. The Court previously found that Defendants materially contributed to Hamas and that this type of attack was a common Hamas behavior. *See* Findings of Fact ¶¶ 54, 168, 181, 192, 228, 258, 282, 303.

Third, Plaintiffs must show that Defendants materially and significantly contributed to the attack. Gilead Decl. 14–16, ECF No. 56. Under the third element, Defendants just must have played *some* causal role in the attack, even if this role was not the but-for cause of the attack. *Id.* Defendants here were a significant part of the chain of events leading to the attack. *Id.* at 15; *see also* Findings of Fact ¶¶ 54, 168, 181, 192, 228, 258, 282, 303. So Defendants will be held liable under secondary liability for aiding and abetting the Hamas terrorists' torts. *See* Conclusions of Law ¶¶ 72, 77.

The final potential theory of liability is vicarious liability, which like secondary liability is also a positive-law theory of liability. Here, Defendants are not personally liable for their own torts, but they are liable for torts committed by their agents (i.e., the Hamas terrorists). *Id.* at 18. Vicarious liability revolves around the agency relationship between Hamas and the Defendants. *Id.* at 19. It is akin to the concept of *respondeat superior* in the U.S. law of agency. *Id.* Article 14 of the CWO provides that "any person who employs an agent, not being his employee, to do any act or class of acts on his behalf shall be liable for anything done by such agent in the performance of, and for the manner in which such agent does such act or class of acts." *Id.* A person who committed the tort is considered "an agent" of the principal if they act as a "surrogate" or "long arm" of the defendant. *Id.* Because the terrorist act serves the Defendants' interests and Hamas's, the question used to determine whether Hamas qualifies as an agent is "the degree by which [Hamas's] activity is integrated into [the Defendants'] activity." *Id.* Thus, Plaintiffs' argument is contingent on stating a prima facie case against the Hamas terrorists and then showing that the Defendants "employed" the Hamas terrorists, on behalf of the Defendants themselves, to perpetrate the attack. The Israeli Supreme Court has not specifically recognized a theory of agency relationship in terms of employing terrorists. But the Civil Wrong Ordinance does not preclude this type of relationship. Plaintiffs have stated a prima facie case against Hamas for assault and negligence. *See supra* pp. 16–17. And the Court has found that the degree of integration of the Defendants in Hamas's terror policies is high. *See* Findings of Fact ¶¶ 154, 177, 189, 229, 259, 283, 301. Thus, the Defendants will be held liable under vicarious liability for the torts of their agents (i.e., the Hamas operatives). Conclusions of Law ¶¶ 73, 78.

*c. Theories of Recovery*

Next, Professor Gilead discusses four distinct measures of damages the Plaintiffs can recover if they win on any of those three theories of the named Defendants' liability. *Id.* at 20. (Plaintiffs from Case 1273 however, cannot recover under any Israeli theory of law for reasons analyzed below.) First, the children, as dependents, may recover for loss of pecuniary support. *Id.* In other words, they can recover for the financial support they would have received from Eitam's income had he not been killed in the attack. *Id.* Had Na'ama survived the attack, she too would be entitled to these pecuniary losses. Second, all of the Plaintiffs can recover for the emotional harm directly inflicted upon the Plaintiffs by the attack. Under Israeli law, this is called the "Alsucha" rule. *Id.* at 21. This is reserved for those close family members who suffered severe mental harm. *Id.* Unsurprisingly, the Court previously found (based on the declaration of Dr. Strous) that the children and Na'ama all suffered severe emotional injury as a result of the terrorist attack. *See* Findings of Fact ¶¶ 313, 319. Thus, they may recover emotional-harm damages.

**\*10** The third theory of recovery, bereavement compensation, is a newer theory in Israeli law. Gilead Decl. 21, ECF No. 56. It is equivalent to solatium damages in U.S. law. *Id.* But it is important to note that under Israeli law, this is a theory of recovery, not a cause of action. The Court held in a recent Israeli court case that family members of victims of terrorist attacks who were killed are entitled to compensation, as indirect victims, for their non-pecuniary harm. *Id* (citing Civil File 4333-02 (Jerusalem) *Shemesh v. PLO* (2.11.2020)). So even if the Court had not found that Na'ama and the children suffered severe mental harm, they could still recover under this theory of bereavement. Gilead Decl. 21, ECF No. 56.

Lastly, Plaintiffs may also recover punitive damages under Israeli law. *Id.* at 22. This is, of course, not to compensate, but to punish for "immoral and outrageous act[s]." *Id.* Stemming from the American rule of punitive damages, an Israeli court in *Shemesh v. PLO* held, "specifically in cases of terrorists attack, punitive damages should be triple the amount of compensatory damages." *Id.* (citing Civil File 4333-02 (Jerusalem) *Shemesh v. PLO* (2.11.2020)). Because the attack was an "immoral and outrageous act," Plaintiffs may recover treble punitive damages. Having a better understanding of the potential Israeli law involved in these cases, the Court devotes a full section below to how it shall construe Plaintiffs' claims.

*(3) Claim Assertion Analysis*

All of the claims asserted (in both cases) arise out of the same October 1, 2015 terrorist attack. But there was ambiguity as to what source of law the parties are pleading under and what claims the parties are actually asserting. As a result, Plaintiffs pleaded their claims at a somewhat higher level of generality than normal. Having determined that Israeli law governs, the Court must determine how to construe the Plaintiffs' claims under Israeli law. Because Defendants defaulted, under Rule 54, "a default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Thus, the Court will adhere strictly to the claims in the pleadings, without filling in any missed opportunities to recover.

*a. Case 1273*

Plaintiffs from Case 1273 generally assert two types of claims: those governed by § 1605A(c) and those governed by non-§ 1605A(c) common law and positive law. Their § 1605A(c) causes of action are valid because they are all U.S. nationals and were at the time of the attack. *See* 28 U.S.C. § 1605A(c)(1). Further, the 1273 Plaintiffs were all personally injured by the extrajudicial killing of Eitam Henkin, which resulted from Defendants' material support of Hamas. *See* § 1605A(c); Findings of Fact ¶¶ 324, 329, 333, 338, 344, 349, 355; Conclusions of Law ¶ 59. Because the Defendants materially supported Hamas to effect the common goal of inflicting terrorism, were integrated in Hamas's terror policies, and deployed Hamas as agents, the Court will hold Defendants Iran and Syria jointly and severally liable to Plaintiffs for these claims. *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 116 (D.D.C. 2015); *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 30, 34 (D.D.C. 2012); *see also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 59 (D.D.C. 2012). Conversely, Plaintiffs from Case 1273 failed to plead their claims under Israeli law. They brought claims under D.C. and California law. But as previously discussed, the proper law for these non-§ 1605A(c) claims is Israeli law. *See supra* pp. 13–16. Because this is a default judgment, Plaintiffs cannot recover under any theory that they did not assert in their pleading. *See* Fed. R. Civ. P. 54(c).

**\*11** Thus, to summarize, Plaintiffs have properly asserted Count I, wrongful death, under § 1605A(c), because the

requisites are that the victim or claimant be a U.S. national and have suffered personal injury. Here, all of the Plaintiffs in Case 1273 are U.S. nationals and suffered personal injury. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii); Compl. 20, ECF No. 1. Thus, all plaintiffs in Case 1273 have properly asserted claims under § 1605A(c).

Plaintiffs pleaded Count II, loss of solatium, under § 1605A(c). Compl. 21, ECF No. 1. But loss of solatium is merely a theory of recovery, not a distinct cause of action. *See* 28 U.S.C. § 1605A(c). Plaintiffs cannot alternatively assert this claim under D.C. or California law as requested, due to the above choice-of-law analysis. Thus, there is no claim to analyze for jurisdictional matters under Count II.

Plaintiffs properly pleaded Count III, Intentional Infliction of Emotional Distress ("IIED"), under § 1605A(c). Compl. 22, ECF No. 1. But Count III merges with Count I, because Count I's § 1605A(c) action already allows for intentionally inflicted emotional distress either as a cause of action or as a measure of recovery. Once again, their alternative plea of D.C. law is not valid due to the above choice-of-law analysis. Thus, Plaintiffs have only asserted a valid IIED claim under § 1605A(c), which merges with Count I.

Count IV, punitive damages, is a valid theory of recovery under § 1605A(c), but not a distinct cause of action. *See* 28 U.S.C. § 1605A(c)(4); Compl. 22–23, ECF No. 1. Thus, there is no claim to analyze for jurisdictional matters under Count IV.

The Court is cognizant that both parties agreed that there is no problem with cross-citing evidence as an evidentiary matter. *See* Day 1 Tr. 5:20–25. There would not be a bar in an ordinary case to re-construing Case 1273's non-§ 1605A(c) claims as Israeli-law claims. However, this case is in a default posture. Here, Rule 54 applies and, therefore, the Court is not at liberty to construe non-§ 1605A(c) claims as claims asserted under Israeli law. *See* Fed. R. Civ. P. 54(c).

### a. Case 1184

The Court now turns to Case 1184, which involves as plaintiffs the Estate of Eitam, the Estate of Na'ama, and the Henkin children. Eitam was a U.S. citizen at the time of the attack, but Na'ama and the children were not. Findings of Fact ¶¶ 3–5. Thus, the Estate of Eitam properly brought claims under § 1605A(c)(4), but the children and Na'ama must rely on non-§ 1605A(c) claims to recover. Plaintiffs purport to assert non-§ 1605A(c) claims under Israeli law and D.C. law. While D.C. law is not proper, Israeli law is, based on the above choice-of-law analysis. *See supra* pp. 10–13. Because the Defendants materially supported Hamas to effect the common goal of inflicting terrorism, were integrated in Hamas's terror policies, and deployed Hamas as agents, the Court may hold Defendants Iran, the IRGC, the MOIS, Bank Markazi, Bank Melli, Bank Saderat, and Syria jointly and severally liable to the Estate of Eitam Henkin for his § 1605A(c)(4) claims. *See Flanagan*, 87 F. Supp. 3d at 116; *see also Wultz*, 864 F. Supp. 2d at 30, 34; *see also Oveissi*, 879 F. Supp. 2d at 59. As to Plaintiffs' non-§ 1605A(c) claims, Professor Gilead likewise explained that Defendants' "liability would be considered 'joint and several' under Articles 11 and/or 84 of the CWO." Gilead Decl. 5, ECF No. 56. Plaintiffs' claims are summarized below.

**\*12** Plaintiffs have properly asserted Count I, wrongful death, under § 1605A(c)(4) for the Estate of Eitam. Compl. 30, ECF No. 1. The Estate of Eitam, the Estate of Na'ama, and the children can also recover for Eitam's negligently inflicted wrongful death under Israeli law. Defendants will be held liable under Israeli law through primary liability for negligently supporting a terrorist organization, secondary liability for aiding and abetting Hamas's negligence, and vicarious liability based on Hamas's negligence (as agents). But Plaintiffs cannot recover via D.C. law. Thus, Eitam will recover under § 1605A(c)(4) and Israeli law, and Na'ama and the children will recover for Eitam's wrongful death under Israeli law, but not under § 1605A(c).

Plaintiffs properly pleaded Count II, survival damages, solely on behalf of the Estate of Eitam Henkin, under § 1605A(c)(4). Compl. 32, ECF No. 1. Because Eitam was a U.S. national, Eitam's Estate may recover under § 1605A(c)(4). However, Count II merges with Count I, because Count I already allows the Estate of Eitam to recover survival damages as a measure of recovery under § 1605A(c)(4). His Estate will also recover under Israeli law, but not D.C. law. Under Israeli law, Eitam could have asserted the torts of assault and negligence. *Id.* at 4. Thus, Defendants in this case are secondarily liable for aiding and abetting those torts and vicariously liable for enlisting Hamas as agents. *Id.* at 4–5. Defendants are also liable under primary liability for negligently supporting the terrorists' infliction of those torts. *Id.*

Count III, loss of solatium, is merely a theory of recovery under both § 1605A(c) and Israeli law, not a distinct cause

of action. 28 U.S.C. § 1605A(c); Gilead Decl. 21, ECF No. 56. Thus, Eitam, Na'ama, and the children cannot assert loss of solatium as a claim, but they can recover loss of solatium damages through other causes of action. Accordingly, there is no claim to analyze for jurisdictional matters under Count III.

Plaintiffs properly pleaded Count IV, Intentional Infliction of Emotional Distress, under Israeli law. Compl. 34, ECF No. 1. As Professor Gilead discussed, IIED would be considered Israeli "negligence" because intentional torts blend with the tort of negligence under Israeli law. Gilead Decl. 6–7, ECF No. 56. Defendants are liable under primary liability for negligently supporting a terrorist organization that inflicted severe emotional distress through Eitam's wrongful death, secondary liability for aiding and abetting Hamas's negligence in doing so, and vicarious liability based on Hamas's negligence. *Id.* at 10–16. Thus, Plaintiffs will prevail on their IIED claims under Israeli law.

Plaintiffs also properly brought Count V, Negligent Infliction of Emotional Distress ("NIED"), under Israeli law. Plaintiffs have shown primary liability for negligently supporting a terrorist organization that inflicted severe emotional distress though Eitam's wrongful death, secondary liability for aiding and abetting Hamas's negligence in doing so, and vicarious liability for Hamas's negligence. Compl. 35, ECF No. 1; Gilead Decl. 10–16, ECF No. 56. Thus, Plaintiffs will prevail on their NIED claims under Israeli law.

Plaintiffs brought Count VI, Civil Conspiracy, under Israeli or D.C. law. Compl. 35, ECF No. 1. Again, D.C. law is not proper. As opposed to Plaintiffs' other Israeli causes of action, Professor Gilead did not discuss Civil Conspiracy under Israeli law. As mentioned, Plaintiffs proposing the use of foreign law bear the burden of establishing the substance of that foreign law. *See McKesson*, 753 F.3d at 243. Plaintiffs did not present any additional evidence about Israeli Civil Conspiracy. Thus, they did not meet their burden. Consequently, there is no claim to analyze for jurisdictional matters under Count VI. *See id.*

 **\*13**  Plaintiffs brought Count VII, aiding and abetting, under Israeli or D.C. law. Compl. 36, ECF No. 1. Since D.C. law is not proper, Plaintiffs could only recover under Israeli law. Under Israeli law, however, aiding and abetting is a theory of liability, not a distinct cause of action. Gilead Decl. 10–16, ECF No. 56. Thus, Count VII merges with Counts I, II, IV, and V. So there is no claim to analyze for jurisdictional matters under Count VII.

Plaintiffs brought Count VIII, vicarious liability/respondeat superior, against the Iranian defendants under § 1605A(c) or, in the alternative, D.C. or Israeli law. D.C. law is improper. As to Israeli law, vicarious liability would merge into Counts I, II, IV, and V as a theory of liability, not an independent cause of action. Under § 1605(A)(c), a "vicarious liability" claim is redundant because § 1605A(c) already allows Plaintiffs to hold Defendants "vicariously liable for the acts of its official employees or agents." *See* 28 U.S.C. § 1605A(c). Thus, Count VIII does not state an independent cause of action. So there is no claim to analyze for jurisdictional matters under Count VIII.

As a result of the above choice-of-law analysis, Plaintiffs from 1184 will recover under Israeli law for the majority of their non-§ 1605A(c) claims. But Plaintiffs may not recover under D.C. or California state law. The Estate of Eitam (in Case 1184) will recover under § 1605A(c)(4) as the legal representative of a U.S. national, and Eitam's siblings and parents (in Case 1273) will recover under § 1605A(c)(1) as U.S. nationals.

### B. Subject-Matter Jurisdiction

Having detailed what claims the Plaintiffs in each case are actually asserting, the Court now explains why it has subject-matter jurisdiction over those claims. As noted above, the FSIA's § 1605A(a)(1) imposes several requirements that the Plaintiffs must satisfy to demonstrate that the Defendants may not assert sovereign immunity. And because sovereign immunity is a jurisdictional bar, the Court has an independent obligation to inspect *sua sponte* whether that test has been satisfied. *See Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). Its elements are, again, as follows. First, the plaintiffs must show that "[t]he foreign state was designated as a state sponsor of terrorism at the time the [terrorist attack] occurred, or was so designated as a result of such act." 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Here, the plaintiffs have shown that Syria was designated a state-sponsor of terror in 1979 and that Iran was designated a state-sponsor of terror in 1984. Findings of Fact ¶¶ 151, 285. Further, both of these designations were in effect at the time of the attack on the Henkins. So both sets of Plaintiffs have satisfied the first element. Second, the Plaintiffs must show that the terrorism designations remained in effect "when the claim [was] filed [or] was so designated within the 6-month period before the claim [was] filed." 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Here, the Plaintiffs have

shown that the terrorism designations remained in effect at the time they filed their claims. Findings of Fact ¶¶ 151, 285. So they have also satisfied the second element.

The more complicated element in this case is the last. It requires that the plaintiffs additionally show that "[t]he claimant or the victim was, at the time the [terrorist attack] occurred—

(I) A national of the United States;

(II) A member of the armed forces; or

(III) Otherwise an employee of the government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment.

**\*14** 28 U.S.C. § 1605A(a)(2)(A)(i)(ii). Here, the plaintiffs have made no showing that any "claimant or victim" in this case was "a member of the armed forces" or "otherwise an employee of the government" or "performing a contract awarded by the United States Government." So whether the Court has subject-matter jurisdiction over each claim hinges on whether "[t]he claimant or the victim was, at the time the [terrorist attack] occurred ... a national of the United States." § 1605A(a)(2)(A)(i)(ii)(I). The Court analyzes that question for each of the respective suits below.

a. *Case 1273*

The jurisdictional determination for Case 1273 under this element is relatively straightforward. At the time of the attack, all plaintiffs in Case 1273 were "national[s] of the United States." Findings of Fact ¶¶ 6–7. So the only remaining question is whether they are either "victims" or "claimants." Though they were no doubt "victims" in a colloquial sense of the word, given their terrible loss in the attack, they may not have been "victims" within the meaning of § 1605A(a)(2)(A)(ii), at least as the D.C. Circuit has previously construed that term. *See Owens v. Republic of Sudan*, 864 F.3d 751, 807 (D.C. Cir. 2017) *vacated on other grounds by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) (construing the term "victim" as limited to those injured while physically present at the scene of a terrorist attack). In any event, though, the Plaintiffs in Case 1273 quite obviously are all "claimant[s]." *See id.* (noting that a "claimant" is "simply someone who brings a claim for relief"). As the Court explained above, they have all validly invoked the private right of action at § 1605A(c) to vindicate the personal injuries they suffered as a result of the attack. Thus, the Court has jurisdiction over each claim asserted under § 1605A(c) by the plaintiffs in Case 1273.

b. *Case 1184*

By contrast, the jurisdictional determination for Case 1184 is more complicated. As to the Count I wrongful-death claim, three distinct jurisdictional principles are in play. First, Eitam's estate seeks to vindicate his death under the private right of action at § 1605A(c)(4). The Court has jurisdiction over this claim because Eitam (the "victim") was "a national of the United States" at the time of the attack. Findings of Fact ¶ 3. Second, Eitam's estate seeks to vindicate his death under the Israeli-law torts discussed above. The Court has jurisdiction over this claim because Eitam was, again, both the "victim" and was "a national of the United States" at the time of the attack. *Id.* Third, both Na'ama and the couple's children assert wrongful-death claims under Israeli law. The Court also has jurisdiction over these claims. The key point is that Na'ama and the children do not here seek to vindicate harms inflicted purely upon themselves. For instance, if Na'ama's estate had sued under an Israeli theory of assault for the personal injuries she alone suffered, the Court likely would not have jurisdiction over such a claim. For there, Na'ama—the "victim" in that hypothetical—was not "a national of the United States" at the time of the attack. Findings of Fact ¶ 4. But a wrongful-death claim is different, since the relevant "victim" the 1184 Plaintiffs seek to vindicate is actually Eitam. Their theory is that Israeli law permits *them* to recover for harms inflicted *upon Eitam*, when he was wrongfully killed by Hamas with the support of Defendants. Thus, because Eitam is the "victim" for purposes of his, his wife's, and his children's wrongful death claims, and was a U.S. national at the time of his death, the Court has jurisdiction over the remaining 1184 Plaintiffs' Israeli-law wrongful-death causes of action. *See Owens*, 864 F.3d at 768, 806–07; *see also Abedini v. Islamic Republic of Iran, et al.*, 422 F. Supp. 3d 118, 126, 131–36 (D.D.C. 2019); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 6, 11–13 (D.D.C. 2011).

**\*15** Turning to Count II, the jurisdictional analysis is simple. Count II was brought solely on behalf of Eitam's estate, seeking to recover survival damages under either § 1605A(c)(4) or Israeli law. As the Court has already explained above, it plainly has jurisdiction over Eitam's § 1605A(c)(4) claims,

since he was the "victim" and "a national of the United States." The Israeli-law analysis is likewise straightforward. Had Eitam lived, he could have asserted theories of assault and "negligence" (including intentionally inflicted harms) under Israeli law. As Eitam would be the "victim" under any of those Israeli-law theories, § 1605A(a)(2)(A)(i)(ii) imbues the Court with jurisdiction to adjudicate them.

Count III does not present a jurisdictional issue, since it refers to a type of recovery—solatium damages—rather than a distinct "claim" under § 1605A(a)(2)(A). Section 1605A(c) explicitly recognizes this distinction, stating that those who prevail under the private right of action may recover damages including "economic damages, *solatium*, pain and suffering, and punitive damages." § 1605A(c) (emphasis added). Likewise, Professor Gilead noted that Israeli law treats solatium as a type of recovery, rather than a distinct cause of action. *See* Gilead Decl. 21, ECF No. 56. So to the extent that the 1184 plaintiffs have asserted any other claims on which they can recover, they may recover, as a measure of compensation for those claims, damages for loss of solatium.

Count IV presents a claim for intentional infliction of emotional distress under, in relevant part, Israeli law, brought on behalf of all 1184 plaintiffs. There is no jurisdictional hurdle to the Court's adjudication of Eitam's Israeli-law IIED claim (though this claim merges with Count II, since IIED is simply a claim he could have pursued had he survived the attack). Eitam was obviously the "victim" of extreme emotional distress incurred as a result of the attack, and because of his U.S.-national status, the Court has jurisdiction to adjudicate the corresponding IIED claim. The jurisdictional analysis is more complicated, however, regarding Na'ama and the children. If the Court were to construe Na'ama and the children as the relevant "victim[s]" for purposes of this claim, then the Court wouldn't have jurisdiction. That is so because neither Na'ama nor the children were U.S. nationals at the time of the attack. Findings of Fact ¶ 4. But the tort of IIED is somewhat unique in that, unlike assault or battery, it allows a claimant to vindicate emotional injuries incurred from witnessing a harm perpetrated *on some other victim*. Gilead Decl. 20–21, ECF No. 56. *See Owens*, 864 F.3d at 768, 806–07; *see also Abedini*, 422 F. Supp. 3d at 126, 131–36; *Estate of Doe*, 808 F. Supp. 2d at 6, 11–13. The 1184 plaintiffs' complaint appears to explicitly recognize this point. It pleads that Na'ama was injured by seeing the "pain inflicted on her husband." Compl. ¶ 137, ECF No. 1. Likewise, the complaint pleads that the children were injured by "witnessing the sight of their father's suffering from critical injuries and subsequent death." *Id.* at ¶ 138. So here, the relevant "victim" is actually Eitam. Thus, because Eitam was himself a U.S. national at the time of the attack, the Court has jurisdiction as to Na'ama and the childrens' IIED claims, which are predicated upon the harms inflicted upon Eitam.

Count V, which states a claim for *negligent* infliction of emotional distress, involves precisely the same jurisdictional analysis as Count IV. The only relevant difference is, of course, that Count V pleads a different form of scienter from Count IV. (As noted above, the plaintiffs established through Dr. Gilead that Israeli law would permit them to recover for either intentionally inflicted or negligently inflicted harms). Because here, too, the relevant "victim" is actually Eitam, since it was the harms inflicted upon him that subsequently harmed Na'ama and the children when they witnessed his suffering, the Court has jurisdiction to adjudicate their NIED claims. *See Owens*, 864 F.3d at 768, 806–07; *see also Abedini*, 422 F. Supp. 3d at 126, 131–36; *Estate of Doe*, 808 F. Supp. 2d at 6, 11–13. And because Eitam himself was a U.S. national at the time of the attack, his estate plainly can recover for his own NIED harms.

**\*16** Count VI (civil conspiracy under Israeli law) does not present a jurisdictional issue, since the plaintiffs failed to state a claim under Israeli law. Thus, there is no "claim" for § 1605A purposes for the Court to analyze.

Count VII (aiding and abetting under Israeli law) likewise does not present a jurisdictional issue, since it does not constitute a distinct cause of action under Israeli law. Rather, as Dr. Gilead explained, it actually constitutes a theory of liability under which a secondary actor may be held liable for the torts inflicted by a primary actor. *See* Gilead Decl. 8–10, ECF No. 56. So aiding and abetting does not constitute a distinct "claim" for jurisdictional purposes, but is an Israeli-law mechanism to hold the Defendants liable to the extent the plaintiffs have validly stated claims for other Israeli torts.

The jurisdictional analysis is the same for Count VIII, which asserts "vicarious liability/respondeat superior against the Iranian defendants" under, in relevant part, § 1605A(c) and Israeli law. As both § 1605A(c) (in the American-law context) and Dr. Gilead (in the Israeli-law context) explain, vicarious liability is not actually a distinct tort claim, but is instead a theory of liability. *See* § 1605A(c) ("In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents); *see also* Gilead Decl. 18–

19, ECF No. 56. In other words, once the plaintiffs have stated some *other*, predicate claim, vicarious liability then permits the Defendants to be held liable for their sponsorship or facilitation of the harms being vindicated through the predicate claim. So "vicarious liability" does not constitute a distinct "claim" for jurisdictional purposes under § 1605A(a)(2).

In sum, then, the Court has jurisdiction over the claims that the 1184 Plaintiffs properly asserted under § 1605A(c) and the law of Israel. Said differently, the Defendants do not enjoy sovereign immunity as to the properly asserted claims in the 1184 case. Thus, the Court may proceed to enter default judgment on each such claim against the various defendants.

*C. D.C. is a proper venue only for some Defendants, but Defendants forfeited their right to contest venue.*

In the FSIA context, venue is governed by § 1391(f). *See* 28 U.S.C. § 1391(f). Section 1391(f) creates a special provision for establishing venue in civil actions against a foreign state. But it distinguishes between "agencies or instrumentalities" and "foreign states or political subdivisions." *See* 28 U.S.C. § 1391(f). For agencies or instrumentalities, venue is proper "in any judicial district in which the agency or instrumentality is licensed to do business or is doing business." 28 U.S.C. § 1391(f)(3). By contrast, if the action is brought against a foreign state or political subdivision, venue is proper "in the United States District Court for the District of Columbia." 28 U.S.C. 1391(f)(4). Plaintiffs must be able to "demonstrate proper venue with respect to each cause of action and each [defendant]." *Lamont v. Haig*, 590 F.2d 1124, 1135 (D.C. Cir. 1978). Plaintiffs in both Case 1184 and Case 1273 brought claims against the foreign states of Syria and Iran. Case 1184 also brought claims against the MOIS and the IRGC, along with Bank Markazi, Bank Saderat, and Bank Melli. Venue is clearly proper for Iran and Syria under § 1391(f)(4) because they are foreign states. However, the Court must assess whether the additional Defendants from Case 1184 are "political subdivisions" or, instead, "agencies and instrumentalities," to determine whether D.C. is the proper venue.

**\*17** The D.C. Circuit has adopted a categorical approach to determine whether a foreign entity is a "political subdivision" or an "agency or instrumentality" under Section 1608. *See Transaero, Inc v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151–53 (D.C. Cir. 1994). Section 1603 describes "an agency or instrumentality of a foreign state as any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country." 28 U.S.C. § 1603(b). To best effectuate the text of the statute, the categorical approach adopted by this Circuit hinges on whether the core functions of the foreign entity are predominantly *governmental* or, instead, predominantly *commercial. See Transaero*, 30 F.3d at 151.

The distinction between governmental and commercial functions corresponds to the "restrictive" theory of sovereign immunity. *Id.* The restrictive theory encompasses the idea that "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Id.* (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 487 (1983)). So this categorical test creates "two categories of actors that correspond to the restrictive theory's two categories of acts." *Transaero*, 330 F.3d at 152. If the foreign entities are predominantly governmental, then the entity is considered a political subdivision and thus the foreign state itself. *See id.* Conversely, if the entity's functions are commercial, then it is considered a separate agency or instrumentality of the state. *See id.*

The MOIS and the IRGC are political subdivisions, not agencies and instrumentalities, because their core functions are governmental. *See Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 59 (D.D.C. 2019) (applying *Transaero*, 30 F.3d at 151–53 (D.C. Cir. 1994)); *see also* Findings of Fact ¶¶ 182, 193. "A nation's armed forces" or its "Ministry of Foreign Affairs" are examples "clearly on the governmental side." *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003). As part of Iran's foreign and domestic intelligence service, the MOIS's functions are inherently governmental. Findings of Fact ¶ 193; *see also Roeder*, 333 F.3d at 234 (finding that MOIS must be treated as the state of Iran rather than an agency because its functions are "an important and 'indispensable' governmental function"). Similarly, as a military organization within the Iranian government, the IRGC's functions are inherently governmental. Findings of Fact ¶ 182; *see Holladay*, 406 F. Supp. at 59; *see also Transaero*, 30 F.3d at 153 (finding that armed forces are "so closely bound up with the structure

of the state that they must in all cases be considered as the 'foreign state' itself"). Because the MOIS and the IRGC are thus political subdivisions of Iran, the U.S. District Court for the District of Columbia is a proper venue under § 1391(f)(4). *See* 28 U.S.C. § 1391(f)(4).

By contrast, Bank Markazi, Bank Saderat, and Bank Melli's core functions are commercial, not governmental, so they are agencies or instrumentalities of Iran. *See* Findings of Fact ¶¶ 208, 243, 274; *see also Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 957 (9th Cir. 2016) ("[I]t is undisputed that Bank Melli qualifies as an instrumentality of Iran under the FSIA[.]"); *see also Shoham v. Islamic Republic of Iran*, 922 F. Supp. 2d 44, 49 (D.D.C. 2013) (holding that Bank Melli and Bank Saderat's "core functions are commercial ... so they qualify as agencies or instrumentalities") *appeal dismissed*, 2019 WL 1270405 (D.C. Cir. Feb. 25, 2019); *see also In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *7 (S.D.N.Y. Dec. 22, 2011); (holding that Bank Markazi is an agency or instrumentality of Iran).

**\*18** An agency or instrumentality is an entity the structure and functions of which are predominantly commercial. *See Transaero*, 330 F.3d at 151. Bank Markazi is the central bank of Iran, the principal regulator of other banks, and issues currency. *See* Findings of Fact ¶ 194. Further, all of the Iranian government's revenue is supposed to be channeled into Bank Markazi, and the bank raises funding when the government needs to borrow money. Findings of Fact ¶ 194. So clearly Bank Markazi's core functions are commercial, making it an agency or instrumentality of Iran. *See Terrorist Attacks*, 2011 WL 13244047 at *7; Findings of Fact ¶ 208. Similarly, Bank Saderat is a commercial bank that, as of 2013, had approximately 3,200 branches worldwide. Findings of Fact ¶ 260; *see also Shoham*, 2017 WL 2399454 at *8. Bank Saderat's functions are inherently commercial, categorizing it as an agency or instrumentality. *See Shoham*, 922 F. Supp. 2d at 49; Findings of Fact ¶ 274. Finally, Bank Melli is Iran's oldest and largest commercial bank, provides more banking services to the Iranian government than other commercial banks, and has an active presence overseas. *See* Findings of Fact ¶¶ 230–36. Bank Melli's functions are undisputedly commercial, making it an agency or instrumentality of Iran. *See Shoham*, 922 F. Supp. 2d at 49; Findings of Fact ¶ 243. Thus, Plaintiffs should have used § 1391(f)(3) to determine the proper venue for the banks.

The explicit language of § 1391(f)(3) explains that a proper venue for an agency or instrumentality is "any judicial district in which the agency or instrumentality is licensed to do business or is doing business." Contrary to the statutory requirements, Plaintiffs did not put forth evidence to carry their burden to show as a matter of fact that these banks are licensed to or do business in D.C. Thus, venue is not proper in D.C. for the banks. However, this does not require dismissal of the agency-or-instrumentality claims.

Unlike subject-matter jurisdiction, venue is forfeitable and waivable. *See Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939); *see also Hoffman v. Blaski*, 363 U.S. 335, 343 (1960). The purpose of the venue requirement is to establish a location that is convenient for all of the litigants. *See id.* By contrast, subject-matter jurisdiction stems from the Court's power to adjudicate, which is an authority granted to the Court by Congress. *See id.* at 167. Thus, it makes sense that defendants may assert or waive their personal privilege regarding venue, but not subject-matter jurisdiction. *See id.* at 168. In addition to waiver, which is the "intentional relinquishment or abandonment of a known right," it is also possible for defendants to forfeit their right to venue. *See United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Forfeiture is "the failure to make the timely assertion of a right." *Olano*, 507 U.S. at 731. While the Banks here did not explicitly waive their right to venue, they forfeited their right to contest venue by defaulting. *See Hoffman*, 363 U.S. at 343.[1] Thus, despite D.C. being an improper venue for the agencies and instrumentalities, the Court can still grant default judgment because the Defendants forfeited their right to challenge venue.

### IV. Conclusion

**\*19** For the above reasons, and for those set forth in the accompanying Findings of Fact & Conclusions of Law, the Court will **GRANT IN PART** and **DENY IN PART** Plaintiffs' motions for default judgment as to all Defendants in separate findings of liability issued this date.

**All Citations**

Slip Copy, 2021 WL 2914036

**Footnotes**

| | |
|---|---|
| 1 | While the Supreme Court in *Hoffman* held that a defendant *waives* venue by defaulting, defaulting actually leads to forfeiture. But courts often use the terms waiver and forfeiture interchangeably. *See United States v. Montgomery*, 998 F.3d 693, 697 (6th Cir. 2021). In a default judgment situation, a defendant couldn't have waived its rights to venue because waiver is the "intentional relinquishment or abandonment of a known right." *Id.* There is a sense of "active abandon[ment]" required to waive a right. *Id.* Conversely, forfeiture is "the passive failure to make a timely assertion of a right." *Id.* at 698. When a defendant is in a default-judgment posture, is has not made any active movements. In fact, it is quite the opposite. It has passively ignored the lawsuit. Thus, it seems to be somewhat of a contradiction to say that a defendant defaulted but also waived their right to venue. In the case at hand, then, the Defendants have *forfeited* their right to challenge venue, not waived it. |

End of Document   © 2022 Thomson Reuters. No claim to original U.S. Government Works.