PX285

# November, 2004 - Into the hot zone at the Second Battle of Fallujah

By Pablo Villa    June 7, 2019



[https://api.army.mil/e2/c/images/2016/11/21/457807/original.jpg]

SHOW CAPTION +                                                                                    1 / 2

Staff Sgt. David Bellavia was bleary eyed. He had been awake nearly 48 hours, denied sleep by a cacophony of sporadic gunfire aimed at him and his platoon as they made their way through the streets of Fallujah, Iraq. He had already seen his sergeant major, company commander and executive officer cut down by enemy fire, forcing him to assume command of A Company, Task Force 2-2, 1st Infantry Division.

Now he was feet away from the front door of a house along an abandoned block in the city of 350,000. His Soldiers had searched nine houses along the street looking for six to eight insurgents that intelligence reports suggested were in the area. It was Nov. 10, 2004, Bellavia's 29th birthday. What he unwrapped upon opening the doors to that 10th house would etch his name into history as a recipient of the Silver Star, the nation's third highest decoration for valor in combat.

"I have had better birthdays, for sure," Bellavia told the Military Channel in 2009.

PX285

Bellavia's men were mired in the opening stages of the Second Battle of Fallujah. Also known as Operation Phantom Fury, the operation was a joint effort by American, Iraqi and British forces to drive out the Iraqi insurgency in the city. It began Nov. 7, 2004, and ended more than six weeks later on Dec. 23. The effort was led by the U.S. Marine Corps and was the bloodiest battle of the Iraq war.

The impetus for the battle began in March when four American private military contractors from Blackwater USA were ambushed and killed in Fallujah. U.S. Marine forces launched Operation Vigilant Resolve to take the city back from insurgents. The operation ended in late April with the formation of the Fallujah Brigade, a unit composed of Iraqis, which was charged with keeping insurgents out of the city. But insurgent strength did not wane. On Sept. 24, 2004, a senior U.S. official told ABC News that catching Abu Musab al-Zarqawi, who was said to be operating in the city, was "the highest priority."

The insurgents holding Fallujah were formidable. They had interpreters, combat cameramen and were well-trained. But Bellavia's unit was battle-hardened, too. By the time they arrived on the city's outskirts, the 1st ID had been in Iraq for 10 months and had been involved in every major battle in the war up to that point. The pair of hard-nosed contingents clashed immediately when the door of that 10th house opened.

"They just opened up on us with belt-fed machine guns," Bellavia said.

The insurgents were entrenched in a makeshift pillbox under a set of stairs. Bellavia seethed when he heard the anguished screams of his fellow Soldiers as they were wounded.

"I wanted that revenge. I wanted to be that leader that I promised I would be," he said. "A light switch went off."

According to his Silver Star citation, Bellavia, armed with an M249 Squad Automatic Weapon gun, entered the room where the insurgents were holed up and sprayed it with gunfire, forcing the enemy to take cover and allowing the squad to move into the street. While the Americans took fire from various vantage points inside the house, Bellavia called in a Bradley Fighting Vehicle to shell the houses.

During a lull in the fire, Bellavia approached the house again and observed an insurgent loading a rocket-propelled grenade launcher. Bellavia promptly shot him and charged into the house. A second insurgent fired at him, and Bellavia wounded him in the shoulder. When he entered a bedroom, the wounded insurgent followed, forcing Bellavia to shoot him. When another insurgent began firing from a floor above, Bellavia returned fire and killed him. A fourth insurgent then emerged from a closet in the bedroom, yelling and firing his weapon as he leaped over a bed trying to reach Bellavia. The insurgent tripped and Bellavia wounded him. Bellavia chased the insurgent as he ran upstairs.

He followed the wounded insurgent's bloody footprints to a room on the landing and threw in a fragmentation grenade. Upon entering the room, Bellavia discovered it was filled with propane tanks and plastic explosives. He did not fire his weapon for fear of setting off an explosion and instead engaged in hand-to-hand combat with the insurgent, fatally stabbing him in the neck.

At this point, five members of the platoon entered the house and took control of the first floor. Before they could go room by room clearing the structure, however, they were ordered to move out of the area because close air support had been called in by a nearby unit.

Years later, Bellavia recalled his actions as reactionary.

PX285

"It was survivability," he said. "This is what we were destined to do. In the moment that's very much rational."

Bellavia left the service after six years in 2005 as a staff sergeant. He co-founded Vets for Freedom and served as vice chairman. He attended the 2006 State of the Union address as an honored guest. He currently is president of EMPact America, an American energy resiliency organization based in Elma, New York. He is married and has three children.

In 2007, he published a memoir, "House to House: An Epic Memoir of War," co-written with John R. Bruning. In September 2010, the book was selected as one of the top five best Iraq War memoirs by journalist Thomas Ricks (author of "Fiasco"). In 2012, Bellavia signed an agreement with 2012 Oscar-winning producer Rich Middlemas to make his memoir into a major motion picture. Along with the Silver Star, Bellavia also was awarded the Bronze Star, three Army Commendation Medals, two Army Achievement Medals and the New York State Conspicuous Service Cross. He was also nominated for the Medal of Honor.

Most of the fighting in the Second Battle of Fallujah subsided by Nov. 13. U.S. Marines continued to face isolated resistance from insurgents hidden throughout the city. By Nov. 16, after nine days of fighting, the Marine command described the action as mopping up pockets of resistance. Sporadic fighting continued until Dec. 23. By late January 2005, news reports indicated U.S. combat units were leaving the area, and were assisting the local population in returning to the now heavily-damaged city.

## Related Links:

NCO Journal [http://ncojournal.dodlive.mil/2016/11/17/this-month-in-nco-history-nov-10-2004-into-the-hot-zone-at-the-second-battle-of-fallujah/]

Army.mil: Worldwide News [http://www.army.mil/news]

PX285

# PX286



Visit our website for other free publication downloads
http://www.StrategicStudiesInstitute.army.mil/

To rate this publication click here.

# GOVERNANCE, IDENTITY, AND COUNTERINSURGENCY:
# EVIDENCE FROM RAMADI AND TAL AFAR

Michael Fitzsimmons



PX286

# STRATEGIC STUDIES INSTITUTE



The Strategic Studies Institute (SSI) is part of the U.S. Army War College and is the strategic-level study agent for issues related to national security and military strategy with emphasis on geostrategic analysis.

The mission of SSI is to use independent analysis to conduct strategic studies that develop policy recommendations on:

- Strategy, planning, and policy for joint and combined employment of military forces;

- Regional strategic appraisals;

- The nature of land warfare;

- Matters affecting the Army's future;

- The concepts, philosophy, and theory of strategy; and

- Other issues of importance to the leadership of the Army.

Studies produced by civilian and military analysts concern topics having strategic implications for the Army, the Department of Defense, and the larger national security community.

In addition to its studies, SSI publishes special reports on topics of special or immediate interest. These include edited proceedings of conferences and topically-oriented roundtables, expanded trip reports, and quick-reaction responses to senior Army leaders.

The Institute provides a valuable analytical capability within the Army to address strategic and other issues in support of Army participation in national security policy formulation.

PX286

**Strategic Studies Institute**
**and**
**U.S. Army War College Press**

# GOVERNANCE, IDENTITY, AND COUNTERINSURGENCY: EVIDENCE FROM RAMADI AND TAL AFAR

**Michael Fitzsimmons**

**March 2013**

The views expressed in this report are those of the author and do not necessarily reflect the official policy or position of the Department of the Army, the Department of Defense, or the U.S. Government. Authors of Strategic Studies Institute (SSI) and U.S. Army War College (USAWC) Press publications enjoy full academic freedom, provided they do not disclose classified information, jeopardize operations security, or misrepresent official U.S. policy. Such academic freedom empowers them to offer new and sometimes controversial perspectives in the interest of furthering debate on key issues. This report is cleared for public release; distribution is unlimited.

*****

This publication is subject to Title 17, United States Code, Sections 101 and 105. It is in the public domain and may not be copyrighted.

PX286

*****

Comments pertaining to this report are invited and should be forwarded to: Director, Strategic Studies Institute and U.S. Army War College Press, U.S. Army War College, 47 Ashburn Drive, Carlisle, PA 17013-5010.

*****

All Strategic Studies Institute (SSI) and U.S. Army War College (USAWC) Press publications may be downloaded free of charge from the SSI website. Hard copies of this report may also be obtained free of charge while supplies last by placing an order on the SSI website. SSI publications may be quoted or reprinted in part or in full with permission and appropriate credit given to the U.S. Army Strategic Studies Institute and USAWC Press, U.S. Army War College, Carlisle Barracks, PA. Contact SSI by visiting our website at the following address: *www.StrategicStudiesInstitute.army.mil.*

*****

I am grateful to everyone I interviewed for the case studies in this monograph. Without exception, the interviewees were generous with their time and candid in their descriptions of their experiences in Iraq.

This work was completed as part of a doctoral dissertation at the University of Maryland. Thanks go to the Center for International and Security Studies at Maryland for its support of this work, especially the Center's director, Dr. John Steinbruner, who served as the chairman of my committee. This project would not have been possible without his steady guidance, nor without that of the other members of my committee, Drs. Michael O'Hanlon, George Quester, Robert Sprinkle, and Peter Wien.

I also thank the Institute for Defense Analyses, which provided not only financial support for my research, but also extraordinary flexibility in enabling me to balance professional and academic pursuits. The views presented in this monograph are my own and should not be attributed to IDA or its sponsors.

Finally, I thank my family and friends, especially my wife Caitlin. I dedicate this work to my parents, Ed and Colleen

PX286

Fitzsimmons, on whose shoulders I stand every day. I owe much of what made this work possible to them: a love of learning, a concern for the public interest, and the fortitude to see a difficult task through.

*****

The Strategic Studies Institute and USAWC Press publishes a monthly e-mail newsletter to update the national security community on the research of our analysts, recent and forthcoming publications, and upcoming conferences sponsored by the Institute. Each newsletter also provides a strategic commentary by one of our research analysts. If you are interested in receiving this newsletter, please subscribe on the SSI website at *www.StrategicStudiesInstitute.army.mil/newsletter/.*

ISBN 1-58487-567-4

PX286

# CONTENTS

Foreword ....................................................................vii

About the Author ........................................................ ix

Summary ..................................................................... xi

1. Analyzing Governance and Identity
   Politics in Counterinsurgency ............................... 1

2. Ramadi (September 2004 to July 2005) ............... 21

3. Tal Afar (May 2005 to February 2006) ................ 77

4. Conclusions and Implications ........................... 123

References................................................................. 137

Appendix: Interview List ....................................... 163

PX286

# FOREWORD

With the last departure of U.S. combat forces from Iraq in 2011 and a drawdown in Afghanistan already underway, the current era of American counterinsurgency may be coming to a close. At the same time, irregular threats to U.S. national interests remain, and the future may hold yet more encounters with insurgents for the U.S. military. Accordingly, the latest Defense strategic guidance has called on the Department of Defense (DoD) to "retain and continue to refine the lessons learned, expertise, and specialized capabilities" from the wars in Iraq and Afghanistan.

This monograph is a contribution to this ongoing effort to institutionalize the military's understanding of counterinsurgency, building on its hard-won recent experience. Michael Fitzsimmons examines two case studies drawn from some of the darkest months of conflict in Iraq to illuminate an important refinement of traditional counterinsurgency theory and doctrine: that when it comes to building legitimacy, "good governance" may take a back seat to the politics of ethnic and religious identity. Dr. Fitzsimmons's use of comparative case studies and a simple framework for systematically reviewing evidence accumulated through first-hand accounts of strategy, operations, and tactics, should serve as a compelling model for what will likely be many studies in the years to come of the U.S. military's experiences in Iraq and Afghanistan.

DOUGLAS C. LOVELACE, JR.
Director
Strategic Studies Institute and
  U.S. Army War College Press

PX286

# ABOUT THE AUTHOR

MICHAEL FITZSIMMONS is an analyst in the Strategy, Forces, and Resources Division at the Institute for Defense Analyses, where he works on multidisciplinary studies for sponsors in the Office of the Secretary of Defense (OSD) and the Joint Staff, with a focus on defense strategy and force planning. From 2010-12, he served in OSD as an advisor to the Deputy Assistant Secretary of Defense for Strategy. Dr. Fitzsimmons has also worked extensively on issues related to counterinsurgency and Iraq, and spent several months as an advisor to operational and strategic headquarters staffs in Iraq during 2007-08. He has been an Adjunct Professor of Public Policy at the University of Maryland, and previously worked as a management consultant at Bain & Company in the United States, Russia, and the United Kingdom. Dr. Fitzsimmons has published articles in *Survival*, the *Journal of Strategic Studies*, *Joint Force Quarterly*, and *Defense and Security Analysis*. He has advanced degrees in international affairs and business administration from Columbia University and holds a Ph.D. in international security policy from the University of Maryland.

PX286

# SUMMARY

The premise of most Western thinking on counter-insurgency is that success depends on establishing a perception of legitimacy among local populations. The path to legitimacy is often seen as the improvement of governance in the form of effective and efficient administration of government and public services. However, good governance is not the only possible basis for claims to legitimacy. This monograph considers whether, in insurgencies where ethno-religious identities are politically salient, claims to legitimacy may rest more on the identity of who governs, rather than on how those people govern. Building on a synthesis of scholarship and policy regarding insurgencies and counterinsurgencies, the politics of ethnic identity, governance, and legitimacy, the author presents an analytic framework for examining these issues and then applies that framework to two detailed local case studies of American counterinsurgency operations in Iraq: Ramadi from 2004-05; and Tal Afar from 2005-06. These case studies are based on primary research, including dozens of interviews with participants and eyewitnesses.

In Ramadi, identity politics clearly trumped quality of governance in shaping the course of events. The grievances that fueled the insurgency had far more to do with a deep sense of disenfranchisement within Iraq's Sunni community and the related fear of sectarian persecution than it did with any failure in the government's performance. As a result, the evidence from this case points toward major limits to how much popular loyalty and legitimacy could be won through the improvement of governance. Other factors—namely security itself and identity-based concepts of legiti-

PX286

mate rule (both tribal and sectarian)—appeared more decisive during the time of the case study. Moreover, the tribal "Awakening" movement that took hold in Ramadi the following year strongly supports this interpretation of events. The Awakening seems to have stemmed from two key changes in Ramadi and its surrounding Anbar province. First was the exhaustion of the population with violence and terror at the hands of Islamic extremists in their midst. Second was a new willingness of the Coalition to recognize the legitimacy of local tribal rule in spite of the sectarian tension this rule introduced between local and national sovereignty.

Tal Afar's story is quite different, but suggests a similar conclusion. While the quality of governance mattered in the way both the population and the counterinsurgents perceived legitimacy, improvements in governance in Tal Afar were more a consequence than a cause of successful counterinsurgency. Without both the U.S. Army's dense presence in the city and its intensive focus on brokering compromises among the city's largely sectarian tribal conflicts, improvements in governance likely would never have taken root. Governance and political compromise between sectarian groups clearly reinforced each other there, but interviews with participants in the counterinsurgency in Tal Afar suggest that improvements in governance were of secondary importance in reducing violence in the city.

The cases examined here yield ample evidence that ethno-religious identity politics do shape counterinsurgency outcomes in important ways, and also offer qualified support for the argument that addressing identity politics may be more critical than good governance to counterinsurgent success. However, the

PX286

cases do not discredit the utility to counterinsurgents of providing good governance, and they corroborate the traditional view that population security is the most important element of successful counterinsurgency strategy. Key policy implications include the importance of making strategy development as sensitive as possible to the dynamics of identity politics, and to local variations and the complexity in causal relationships among popular loyalties, grievances, and political violence.

PX286

PX286

*If you're not confused, then you don't know how complex the situation is.*

> Lieutenant General Jim Mattis
> United States Marine Corps,
> Anbar Province, April 2004[1]

*It is so damn complex. If you ever think you have the solution to this, you're wrong, and you're dangerous.*

> Colonel H. R. McMaster
> U.S. Army,
> Tal Afar, February 2006[2]

1. Thomas E. Ricks, *Fiasco: The American Military Adventure in Iraq,* New York: Penguin Press, 2006, p. 343.

2. George Packer, "Letter from Iraq: The Lessons of Tal Afar," *The New Yorker*, April 10, 2006, p. 57.

PX286

# CHAPTER 1

## ANALYZING GOVERNANCE AND IDENTITY POLITICS IN COUNTERINSURGENCY

### INTRODUCTION

This monograph[1] was born of an attempt to make sense of two strong but somewhat contradictory intuitions about counterinsurgency. The first intuition is captured by an Iraqi Sunni tribal leader's comment that Iraq's Shi'a Muslims "cannot take charge of Iraq in the same manner as the Sunnis. The [Shi'a] are backwards. They are barbarian savages. . . ."[2] From this perspective, in civil conflict it matters who is in charge, and the ability of any party to succeed—insurgent or counterinsurgent—is at least partly a function of who they are, not just how they behave. Clearly, conflict is often rooted deeply in the politics of group identities and in such cases, the principal objective of the insurgents may be to overturn rule by some "other" group. In such a case, settling the conflict over identity politics would become one of the keys to resolving the broader conflict.

But the second intuition is that what most people want overwhelmingly is just a peaceful life where they can work, raise their children, provide for their families and have a society that functions and provides them the security and essential services that they need. Again, an example from Iraq illustrates the point. A woman in Baghdad told a reporter, "We want security and we want stability. Anyone who comes along is fine as long as he brings security and stability."[3] Or as an American Soldier put it, "He who is able to fix the public utilities holds the keys to the kingdom in

PX286

terms of winning the support of the Iraqi people and ultimately ending this conflict."[4] By this way of thinking, resolving the conflict in insurgencies is all about establishing good governance. If the counterinsurgent can manage to give people a good life, they will have a stake in the status quo and will abandon their support for the insurgents who threaten that status quo.

Each of these two intuitions implies a priority for counterinsurgency strategy. If people fight over ethnic or religious identity, then counterinsurgents must get the incumbent political system to deal effectively with the distribution of power across those groups. If people fight over provision of basic governance, then counterinsurgents must ensure that they are capable of "outgoverning" their insurgent opponents. While both of these intuitions can be valid to some degree, they are also not entirely compatible with each other. If different groups of people under a common system really oppose each other for who they are, or conceive of their political interests within ethnically-defined boundaries, then how much should a counterinsurgent expect to achieve by making the electricity and the sewers work, and by providing employment? Conversely, if all people want is a peaceful, comfortable life, why have ethnic and religious group loyalties seemed so often to have subverted counterinsurgents' attempts to improve governance in conflict-stricken lands?

The recent wars in Iraq and Afghanistan have made the tension between these intuitions increasingly evident in American counterinsurgency policy and military doctrine. The counterinsurgency field manual published by the U.S. Army and Marine Corps in December 2006 states that "The primary objective of any counterinsurgent is to foster the development of ef-

PX286

fective governance by a legitimate government."[5] This judgment is in keeping with a conventional wisdom about counterinsurgency strategy that has accumulated over several decades of war and scholarship. Its premise, like that of most Western thinking on counterinsurgency, is that success depends on establishing a perception of legitimacy for the ruling regime in some critical portion of the local population. Among the mechanisms available to counterinsurgents for establishing that legitimacy, the most prominent in both practice and doctrine has been the improvement of governance in the form of effective and efficient administration of government and public services. Good governance, by this logic, is the key to "winning hearts and minds."[6]

Beginning in 2003, the U.S. struggle to manage expanding sectarian civil conflict in Iraq began to call this traditional logic into question. As Central Intelligence Agency (CIA) Director Michael Hayden told the Iraq Study Group in December 2006:

> The current situation, with regard to governance in Iraq, was probably irreversible in the short term, because of the world views of many of the [Iraqi] government leaders, which were shaped by a sectarian filter and a government that was organized for its ethnic and religious balance rather than competence or capacity. . . . The Iraqi identity is muted. The Sunni or Shi'a identity is foremost.[7]

What the Iraqi experience was suggesting was that good governance is not the only plausible basis for claims to legitimacy among contending political factions, especially in environments where ethnic or religious identities are politically salient. Instead, perhaps in such conflicts, claims to legitimacy may rest

PX286

primarily on the identity of *who* governs, rather than on *how* they govern.

In this light, is good governance even necessary to defeat insurgencies in cases like Iraq? Or, to formulate the question more precisely: *In the presence of major ethno-religious cleavages, does good governance contribute much less to counterinsurgent success than efforts toward reaching political agreements that directly address those cleavages?*

This is the question this monograph will address. Its focus in marshalling evidence to help answer the question is on two detailed local cases of American counterinsurgency operations in Iraq: in Ramadi from 2004-05; and in Tal Afar from 2005-06. This introductory chapter provides some context for analysis in three dimensions:

- A summary of scholarship and policy regarding governance, identity politics and counterinsurgency;
- An analytic framework for organizing case study evidence, and a discussion of methodological challenges inherent in the subject;
- An explanation for the choice of case studies.

**Conceptual and Historical Perspectives on Governance, Identity, Politics, and Counterinsurgency.**

Understanding the roots of modern counterinsurgency strategy as practiced by the United States and its allies requires careful synthesis of ideas and empirical insights from a wide range of academic disciplines and historical experiences that bear on the complex interactions among concepts of legitimacy, governance, and political violence. The central ques-

PX286

tion posed by this analysis demands the addition of theories and history related to ethno-religious identity and conflict to the list.

An earlier article attempted to provide just such a synthesis of prior analysis and experience, and so this monograph will not devote much space to a detailed examination of these conceptual foundations.[8] That article established a few important premises, which can be summarized as follows.

Recent policy and strategy for counterinsurgency in the United States strongly reflect conventional wisdom forged in the 1950s and 1960s in response to formative experiences in that era, the heyday of Maoist people's wars, modernization theory, and Cold War great power competition. In particular, conception of counterinsurgency as a competition of governance between insurgents and counterinsurgents is based on materialistic views of social welfare, justice, and legitimate authority from that era that are not universally held. The resulting prescription for counterinsurgents of winning hearts and minds, while rhetorically flexible enough to transcend narrow interpretation, is, historically speaking, firmly rooted in the mid-20th century intellectual tradition of the Cold War and decolonization.

It is also important to note that both the competing liberal and the communist sides of this intellectual tradition are relatively insensitive to the divisive potential of ethnic and religious identity politics in civil conflicts. This is true partly for diametrically opposed reasons: a normative emphasis on political pluralism in the liberal case, and a dedication to a singular cosmopolitan set of values in the communist case. But it is also partly true for a common reason: the materialist conception of legitimacy noted above, which

PX286

leaves little room for consideration of differing ethno-religious claims to legitimate political authority.

Nevertheless, despite the marginal role that identity politics have played in shaping ideas about counterinsurgency, a substantial body of scholarship from the past few decades establishes that conflicts where ethnic and religious identities are politically salient have different dynamics than other conflicts. Experiences in Iraq and Afghanistan have prompted a fresh appreciation for the importance of this factor in counterinsurgency, thus making it ripe for systematic evaluation, especially given the new wealth of empirical evidence emerging from recent battlefields.

## Methodological Considerations and an Analytic Framework.

Counterinsurgency and the politics of ethnic identity clearly pose formidable analytical challenges. Relevant variables are legion, their interactions are complex, their descriptions subjective, and their associated data messy. As with other complex phenomena, great simplifications are sometimes necessary to make a given problem analytically tractable. The trick is to create a depiction of the world that is simple enough to make data available, questions coherent, and answers comprehensible, but no simpler than that.

The first step in this direction is to examine the basic causal logic usually hypothesized between counterinsurgency strategies and the ultimate defeat of insurgents. In the most general sense, counterinsurgency strategy can be divided into two classes of activities: improving governance and providing security. The U.S. Government's *Counterinsurgency Guide* frames the problem of counterinsurgency strategy

PX286

this way: "Effective COIN [counterinsurgency] . . . involves a careful balance between constructive dimensions (building effective and legitimate government) and destructive dimensions (destroying the insurgent movements)."[9] As political scientist D. Michael Shafer describes this logic, "[American counterinsurgency] doctrine emphasizes development *and* security. . . . Without security, so the argument goes, development is impossible; without good government and economic progress, efforts to maintain it will be bootless."[10]

Figure 1-1 outlines this logic, with events labeled A-H and causal processes labeled 1-9. In event A, counterinsurgents attempt to improve governance through the variety of mechanisms discussed in the definition above. At the same time, they also conduct traditional security operations, including both police and military operations (event C). If improvements in governance occur (event B via processes 1 and 2), then this should win popular loyalty and support for the government and thereby decrease popular support for the insurgency (event D). This should then cause the insurgency to decline (event G) both directly, as it is denied safe havens and recruits (process 5), and indirectly, as the population grows more cooperative with counterinsurgent security operations (events E and F and processes 6-8). Finally, the declining insurgency eventually results in a stable peace (process 9 and event H). This, in essence, is the conventional explanation offered by much of the academic literature and operational doctrine on counterinsurgency for an observed correlation between events A (attempts to improve governance) and H (a resulting stable peace).

PX286



**Figure 1-1. Basic Causal Logic of Counterinsurgency Strategy.**

If, however, we observe A but do not observe any evidence of H over time, we can infer that one or more of the causal processes in this chain has not operated as hypothesized. Specifically, what might those breakdowns be? Possibilities could be found in any one of the processes depicted in Figure 1-1, but this study focuses particular attention on process number 3: the mechanism that translates improved governance into shifting loyalties among the affected population. For it is here that legitimacy is widely believed to reside and to operate as a key instrument of the counterinsurgent. It is here that conflicts involving identity may subvert the intended effects of improvements in governance on popular support for the insurgency.

One of the principal problems with legitimacy as an analytic construct, of course, is that it is an abstraction, and therefore very difficult to observe. A little like dark matter in astrophysics, it is recognizable primarily through its imputed effects. In the model depicted here, these effects would be visible in events E, G, and ultimately H. But this indirect inference of the causal role of legitimacy is problematic because each of these signal events (E, G, and H) can also be caused

PX286

by events C, E, and F. Moreover, events C, E, and F can plausibly operate without significant contribution from the chain of legitimacy building, events A, B, and D. For this reason, we cannot necessarily infer a causal relationship between events A and H, even when they correlate.

In fact, the conceptual challenge here is even thornier than this problem with legitimacy implies. An additional complication arises from the fact that security is both an important input and an important output of any counterinsurgency strategy. This has two troublesome logical implications.

First, "Stable peace" (event H) may sometimes be difficult to distinguish from the security operations depicted here as event C. Sharp reductions in the magnitude and frequency of insurgent violence represent probably the clearest available indicator of the overall success of a counterinsurgent effort. But such reductions can often be provided fairly readily, if only temporarily, with sufficient quantities of patrols by police or military forces. This kind of militarized security could hardly be described as a successful counterinsurgency, however. The real measure of success would have to be the relative absence of violence coupled with much smaller levels of force. Political scientist Jeffrey Race refers to these two different types of security as tactical and strategic security, respectively.[11] Distinguishing between the two empirically is certainly feasible, but it requires both explicit collection and interpretation of the data in these terms, and a considerable degree of subjectivity in the interpretation of the events.

The second logical implication, following from the first, concerns process number 2 in Figure 1-1. This reflects the fact that improvements in security are likely

PX286

to help allow improvements in governance in addition to, or instead of, the other way around. If an observed improvement in security could, in fact, be either event C or event H, then we cannot be sure whether event B is actually a cause of improved security or an effect. This potential for confusion about cause and effect is not simply a methodological problem. It is an operational problem that strikes at the heart of strategy and decisionmaking. As one reporter described this problem in relating the struggles of an American provincial reconstruction team in Baqubah, ". . . officials seemed unable to agree on whether poor security was preventing reconstruction or whether reconstruction failures had caused security to erode."[12] In such an environment, what is the strategist or the analyst to do?

The key to better understanding of complex phenomena such as these is in examining the detailed course of events in which the relevant variables interacted. A focus on this level of detail offers the only hope of being able to reliably navigate the ambiguities outlined above. An empirical focus on the national level, on simply establishing correlations among variables, or on achieving a large sample size for statistical analysis could not accommodate the interpretive burden demanded by the dynamics under examination.[13]

Moreover, measurement of abstract phenomena such as governance, identity, and counterinsurgent success is inherently difficult. While no methodological panacea for this challenge exists, it is possible to achieve some degree of reliability in such measurement through the collection of perspectives from direct observers of and participants in the events. This kind of first-hand data is available in a few different forms: government and military archival resources such as after-action reports, lessons learned, and

PX286

unit histories; extensive reporting by journalists of a diverse range of nationalities and perspectives; and interviews with military and civilian personnel who have worked in Iraq. This study draws on all three of these forms.

With all of these considerations in mind, the case studies presented are organized around a simple analytic framework consisting of five questions:

1. Were ethno-religious identity-based cleavages significant?

2. Was good governance provided?

3. Were political agreements addressing ethno-religious cleavages pursued?

4. Were good security operations conducted?

5. Was the counterinsurgency successful?

Specifically, what does each of these terms mean, and what information is required to answer the questions?

*Ethno-religious Identity-Based Cleavages:* Identities of interest here are those that are group-based, related to ethnic or religious affiliations, and manifest in political behavior. Hence, the term "ethno-religious" describes group identity and behavior associated with either ethnicity, religion, or both together.

Ethno-religious identities are present everywhere, but they are not equally politically salient everywhere. The term "cleavage" describes the presence of multiple politically salient ethno-religious identities within a single political unit. The term is rooted in theories of political sociology that distinguish societies with dominant "segmental cleavages" from those with dominant "cross-cutting cleavages."[14] With segmental cleavages, individuals' interests across multiple domains such as ethnicity, religion, class, profession,

PX286

region, etc., tend to align in discrete social segments. With cross-cutting cleavages, interests which cross multiple domains do not align particularly well, thus preventing strong linkages between group identity and political cohesiveness. The ethno-religious identity-based cleavages of interest here are segmental cleavages, and thus of high political salience.

*Good Governance:* "Good governance" is effective and efficient administration of public services and allocation of public resources. As such, assessment of the quality of governance will focus on issues such as economic organization, public health, education, the justice system, sanitation, power, and water. The definition used here is broader than some definitions of governance, notably the one offered by the U.S. military's latest manual on counterinsurgency. There, governance is defined as one of six separate "lines of operation," which "relates to the host nation's ability to gather and distribute resources while providing direction and control for society." While the activities that the counterinsurgency manual identifies with governance are included in the definition used here, so are activities that the manual identifies with two other lines of operation: "essential services," dealing with the operation of power, water, sanitation, education, medical systems and the like; and "economic development," dealing with the supervision and regulation of a functioning economy that provides employment and creates and allocates resources.[15]

*Political Agreements Directly Addressing Cleavages:* Such agreements may take many different forms. These might include the establishment of consociational power-sharing mechanisms, arrangements of ethno-religious group autonomy, or perhaps electoral arrangements designed to foster greater cross-group

PX286

cooperation. The key qualifying criterion is that the political agreement expressly recognizes the extant cleavage in trying to resolve conflict.

*Good Security Operations and Success:* As described above, distinguishing security operations as an input to counterinsurgency from the enduring condition of security that results from successful counterinsurgency is a delicate but crucial part of any strategic analysis of this topic. In looking for metrics that might define success, security is the most obvious candidate. Event H in Figure 1-1, "Stable peace prevails," represents the essence of this metric. But to reiterate the earlier point, security is both an input and an output of counterinsurgency operations. Hence, simply using security to define success introduces a serious so-called "endogeneity" problem into the research design. The hazard here is the potential for mistaking the direction of causation between the effectiveness of governance-related activities and the intensity of the insurgency. If success in the counterinsurgency is defined only according to the prevailing level of security, and some threshold level of security is necessary to execute governance-type measures, then there is some level of violence at which it is impossible to test any hypotheses about the effects of governance on levels of violence.

One possible response to this is to analyze only cases where the level of violence remains below this notional threshold. But this is impractical for the Iraq cases and would also have the drawback of excluding a significant portion of the problem from consideration. Another response would be to treat security as a trailing indicator, i.e., by comparing governance-related initiatives in month X to security in month X+1 or X+2. This avoids confusion regarding the direction of causation and also probably better represents the nature of any expected effects.[16]

PX286

Ultimately, distinguishing between the short-term security provided directly by military and police operations from more sustainable, stable security requires either retrospect through significant passage of time, or the judgment of people intimately familiar with the evolving situation. For the case studies, this monograph will emphasize the latter, identifying success and failure in instances where explicit or imputed counterinsurgent objectives, commensurate with the geographic and temporal scope under consideration, are either demonstrable and/or judged to be met by key parties to the conflict.

In summary, the methodological challenges presented by this research are formidable. Even the most careful research design will yield conclusions that are tentative and suggestive rather than decisive. Nevertheless, the importance of the subject matter compels the work. It is worth emphasizing that the methodological challenges facing questions such as those posed here have parallels in the operational world. For example, the complexities of constructing a reliable measure for success in counterinsurgency are more than academic. The counterinsurgent must wrestle with similar questions about defining success in order to build a rational, coherent strategy.[17]

**Case Study Selection.**

A common theme of first-hand accounts of counterinsurgency in Iraq has been the primacy of local conditions in explaining the course of events. Coalition Provisional Authority official Rory Stewart found that:

. . . [W]hat mattered most were local details, daily encounters with men of which we knew little and of

PX286

whom Iraqis knew little more. . . . We prefer the universal and the theoretical: the historical analogy and the statistics. But politics is local, the catastrophe of Iraq is discovered best through individual interactions.[18]

As outlined above, the need to examine the issues in a fair amount of detail also drives the focus of this paper to local level case studies. The two cases considered are the experiences of the U.S. Army's 2nd Brigade Combat Team, 2nd Infantry Division, in and around Ramadi, from September 2004 to July 2005, and the experiences of the U.S. Army's 3rd Armored Cavalry Regiment, in and around Tal Afar, from April 2005 to February 2006.

Of all the potential case studies to choose from, why do these two rise to the top? Together, six factors constitute the rationale for these selections.

1. The choice to examine two cases rather than three or 10 is driven by time constraints. More cases are always desirable, but trading depth for breadth would defeat the purpose of this analysis, so two comparative cases will suffice to shed light on the monograph's main question.

2. A superficial examination of these two cases suggests that they share a positive value on the framework's key conditional variable—the significance of ethno-religious cleavages—while having differing values for the outcome of counterinsurgent success. This combination is analytically desirable in seeking to explain which of the other variables (security, governance, or political agreements) may help to explain the differing outcomes.[19]

3. There is value in comparing cases from similar time frames.

PX286

4. There is value in comparing cases with similar insurgent threats.

5. The time frame covered by these cases—late 2004 to early 2006—has some analytically useful properties. The Iraqi government became sovereign in June 2004, so this period avoids crossing over the transition of control between Coalition and Iraqi authority. At the same time, this period precedes a couple of key environmental shifts: the February 2006 Samarra mosque bombing and the 2007 "surge" of increased U.S. forces and changed tactics. During this time, the insurgency in the western and northern parts of Iraq was somewhat mature. Most of the large set-piece battles, such as those in Najaf, Sadr City, and the first assault on Fallujah were past, and U.S. operations had settled into a focus on counterinsurgency.

6. Ramadi has an additional attractive property, which is that it underwent a famous reversal of fortunes in late 2006 and 2007 in the form of the so-called Tribal Awakening. This research will not include a separate case study on this development, but a simple comparison between the 2004-05 case and the subsequent dramatic turn-around is relevant to the questions examined by this analysis.

## ENDNOTES - CHAPTER 1

1. This monograph was adapted from a doctoral dissertation by Michael F. Fitzsimmons, *Governance, Identity, and Counterinsurgency Strategy*, unpublished dissertation, University of Maryland, 2009. Portions of that dissertation, including a few paragraphs included in this monograph were published previously in Michael Fitzsimmons, "Hard Hearts and Open Minds? Governance, Identity, and the Intellectual Foundations of Counterinsurgency Strategy," *Journal of Strategic Studies*, Vol. 31, No. 3, June 2008.

PX286

2. Ahmed Hashim, *Insurgency and Counterinsurgency in Iraq,* Ithaca, NY: Cornell University Press, 2006, pp. 71-72.

3. Anthony Shadid, *Night Draws Near: Iraq's People in the Shadow of America's War,* New York: Henry Holt and Company, 2005, p. 149.

4. Michael R. Gordon, "In Baghdad, Struggle Ties Security to Basic Services," *New York Times*, April 22, 2008, p. 1.

5. *Field Manual (FM) 3-24/Marine Corps Warfighting Publication 3-33.5, Counterinsurgency,* Washington, DC: Headquarters, Department of the Army; Headquarters, Marine Corps Combat Development Command, Department of the Navy, December 2006, p. 1-21. Hereafter, this document will be referred to as FM 3-24/MCWP 3-33.5.

6. The first use of the phrase "hearts and minds" in the context of revolutionary warfare is often attributed to the British administrator during part of the 1948–60 Malayan Emergency, Lieutenant-General (later Field Marshal) Sir Gerald Templer, who argued in 1952 that "the answer lies not in pouring more troops into the jungle, but in the hearts and minds of the people." See Richard L. Clutterbuck, T*he Long, Long War; Counterinsurgency in Malaya and Vietnam*, New York: Praeger 1966, p. 3; and Richard Stubbs, *Hearts and Minds in Guerrilla Warfare: The Malayan Emergency 1948-1960*, Oxford, UK: OUP, 1989, pp. 1–2.

7. Quoted in Bob Woodward, "CIA Said Instability Seemed 'Irreversible,'" *Washington Post*, July 12, 2007, p. 1.

8. See Fitzsimmons, "Hard Hearts and Open Minds?"

9. *U.S. Government Counterinsurgency Guide,* Washington, DC: U.S. Government Interagency Counterinsurgency Initiative, January 2009, p. 14.

10. D. Michael Shafer, *Deadly Paradigms: The Failure of U.S. Counterinsurgency Policy,* Princeton, NJ: Princeton University Press, 1988, p. 79 (emphasis in original). Other analyses employing two similar categories to describe counterinsurgency strategy include Jim Baker, "Systems Thinking and Counterinsurgencies,"

PX286

*Parameters*, Vol. 36, No. 4, Winter 2006-07, pp. 26-43; Alice Hills, "Hearts and Minds or Search and Destroy? Controlling Civilians in Urban Operations," *Small Wars and Insurgencies*, Vol. 13, No. 2, Spring 2002, p. 6; and William J. Hurley, Joel Resnick, and Alec Wahlman, *Improving Capabilities for Irregular Warfare, Vol. I: Main Text,* Alexandria, VA: Institute for Defense Analyses, 2007, p. II-3, and Appendix A.

11.  Jeffrey Race, *War Comes to Long An: Revolutionary Conflict in a Vietnamese Province*, Berkeley, CA: University of California Press, 1972, p. 146.

12.  Solomon Moore, "A Promising Iraqi Province is Now a Tinderbox," *Los Angeles Times*, January 3, 2007, p. 1.

13.  This methodological judgment is one basis for the growing body of literature on "microlevel research" on social phenomena. For example, see Stathis N. Kalyvas, *The Logic of Violence in Civil War,* Cambridge, UK: Cambridge University Press, 2006.

14.  See Seymour M. Lipset, *Political Man,* Garden City, NY: Anchor Books, 1963; Arendt Lijphart, *Democracy in Plural Societies: A Comparative Exploration,* New Haven, CT: Yale University Press, 1977.

15.  FM 3-24/MCWP 3-33.5, pp. 5-14 to 5-17.

16.  Stathis Kalyvas and Matthew Kocher recommend this approach in their own work on civil conflict. See Stathis N. Kalyvas and Matthew Kocher, "Violence and Control in Civil War: An Analysis of the Hamlet Evaluation System (HES)," unpublished manuscript presented at the annual meeting of the American Political Science Association, Philadelphia, August 27, 2003.

17.  The author took part in such efforts while on the staff of the Strategy, Plans, and Assessments directorate of the Multi-National Forces—Iraq headquarters in Baghdad from May to September 2008. Consensus on an appropriate framework for defining success proved impossible to achieve.

18.  Rory Stewart, *The Prince of the Marshes (And Other Occupational Hazards of a Year in Iraq),* Orlando, FL: Harcourt Inc., 2006, pp. 46, 405.

PX286

19. Note that this choice violates a typical rule of thumb for case selection—avoiding selection based on the value of the dependent variable. However, this research does not purport to be drawing a random or representative sample from the full population of cases, nor will it draw deterministic conclusions based on the results of these case studies. As a result, for the purposes of this research, the need to observe variation in the dependent variable trumps the usual rationales for avoiding selection on the dependent variable.

PX286

# CHAPTER 2

## RAMADI (SEPTEMBER 2004 to JULY 2005)

This chapter presents a case study of U.S. operations in and around the city of Ramadi from September 2004 to July 2005. Its focus is on the U.S. Army's 2nd Brigade Combat Team of the 2nd Infantry Division (2/2ID) and its subordinate units during that time period. The case is presented in seven parts covering the following topics: 1) an overview of the background and major events of the case; 2) the role of ethnic and religious identity politics in the case; 3) counterinsurgent actions with respect to providing security; 4) counterinsurgent actions with respect to improving governance; 5) any efforts toward political agreements that address ethno-religious cleavages; 6) an assessment of the outcome of the counterinsurgency; and 7) a concluding discussion and evaluation of the case in the context of this monograph's questions and analytical framework.

## CASE BACKGROUND

### Ramadi and the Insurgency.

Ramadi is the capital and the largest city of Iraq's western Anbar province. It is located in the upper Euphrates river valley, situated mostly on the southern banks of the river, about 70 miles west of Baghdad. In 2004, the World Food Program estimated its population to be 456,853,[1] though the total likely declined from that level during the course of the violence that occurred during the time period of this case study. Ramadi's population is ethnically and religiously homo-

PX286

geneous, with Sunni Muslim Arabs comprising more than 90 percent of the population.

Founded in 1869, the city sits along the primary road and rail lines connecting Baghdad and the heart of Iraq with Jordan and points westward (see Figure 2-1). This location has long given Ramadi an important commercial role, in both legitimate and illicit economic activity, and it also became a major transit point for foreign insurgents entering Iraq to fight U.S. and Iraqi security forces.



**Figure 2-1. Ramadi and Surrounding Area.[2]**

In part due to its role as a hub for international trade and transit, Ramadi has been a somewhat more cosmopolitan and secular city than its Anbar neighbors, such as Fallujah. It is the home of Anbar University, and has been a relatively liberal center for intellectual and cultural life.[3] Ramadi witnessed large scale demonstrations against Saddam Hussein in 1995, a phenomenon virtually unheard of in other Sunni Arab portions of Iraq.

PX286

At the same time, however, Ramadi was also home to many Ba'ath party officials, and the local and provincial government hierarchies in Ramadi were closely tied to Saddam Hussein's regime. The city served as the hub of Saddam's turbulent but largely successful program of co-opting the support of Anbar's tribal leaders,[4] and was also home to the Iraqi Army's combat engineers,[5] its special forces,[6] and a large number of active and retired senior officers. Consequently, the Coalition Provisional Authority's (CPA) Orders, numbers 1 and 2, banishing all Ba'ath party officials from office and disbanding the Iraqi Army, hit Ramadi especially hard.[7] Formerly powerful people in Ramadi had both the motivation and the tactical and technical expertise to mount an effective military opposition to the U.S. presence.

The insurgency in Ramadi was multifaceted and evolved over time, but generally comprised three overlapping groups. One U.S. battalion staff described the groups this way, using the labels most commonly used by the local population (and written in inimitable PowerPoint syntax):

- "Resistance - fighters who are resisting occupation by a foreign army; they fight the United States, and this is seen as an honorable endeavor; no central control of resistance groups.
- Terrorists - foreigners who are not from Ramadi, Al Anbar, or Iraq. There are locals who support Islamic extremist (global Salafi jihad/ Wahabbist) groups.
- Criminals - primary motivation is money, organized crime support both Terrorists and Resistance fighters."[8]

PX286

The staff also estimated that 25 percent of "resistance" fighters worked with the "terrorists." According to a civilian analyst working in Anbar during this period who conducted extensive interviews with insurgency supporters, "People always distinguished between the foreign jihadists and the Sunni nationalists, even though they tolerated the common cause that had been made between them."[9] However, the relative importance of the "resistance" and the "terrorists" shifted over time; specifically, al-Qaeda in Iraq (AQI) and its Islamic extremist compatriots gradually evolved from being the less important insurgent element of the two, to being the clearly predominant one.[10]

By September 2004, Ramadi was one of the hot spots of the insurgency, forming the southwestern corner of the so-called "Sunni Triangle" that extended to Baghdad in the east and Tikrit in the north. Though Fallujah was considered the center of the insurgency in Anbar, Ramadi was not far behind it in operational and strategic significance and in the intensity of combat. To cite just one indicator of this intensity, the brigade that 2/2ID replaced (the 1st Brigade Combat Team, 1st Infantry Division [1/1ID]) suffered more than 500 casualties, including 50 fatalities, during its tour from September 2003 to September 2004.[11] In just the 6 months prior to 2/2ID's arrival, the Marine battalion operating under 1/1ID that had the lone responsibility for the city of Ramadi (the 2nd Battalion, 4th Marine Regiment) suffered more than half of those casualties.[12]

PX286

**The Counterinsurgents.**

During the period of this case study, the U.S. operational military headquarters in Iraq was known as Multi-National Corps-Iraq (MNC-I). Operations in Anbar province were overseen by Marine headquarters units, the 1st Marine Expeditionary Force (I MEF) and 1st Marine Division (1 MARDIV) until March 2005, then subsequently the 2nd Marine Expeditionary Force (II MEF) and 2nd Marine Division (2 MARDIV).

The 2/2ID, somewhat unusually, was an Army brigade operating under a Marine division-level headquarters. The brigade commanded 5,560 Soldiers, Marines, Airmen, and Sailors. Its main combat forces were three organic infantry battalions, one attached Marine infantry battalion, and an artillery battalion.[13]

The 2/2ID arrived in Ramadi at the end of August 2004 and officially took over responsibility for the battle space known as "AO [Area of Operations] Topeka" from 1/1ID on September 12. AO Topeka covered approximately 6,500 square kilometers of Ramadi and its surroundings, up to Lake Thar Thar in the north, Fallujah in the east, Hit in the west, and Lake Razazah in the south.[14]

The brigade deployed to Iraq (via Kuwait) directly from its home near the Korean Peninsula's demilitarized zone, where its mission and training had entirely focused on deterring and waging high-intensity conventional war against North Korea's armed forces. Apropos of this long-standing mission, the brigade's nickname was "Strike Force" and its motto was "Kill the Enemy!" (see Figure 2-2).

PX286



**Figure 2-2. 2/2ID Unit Insignia.[15]**

Like so many other Army units deploying to Iraq in the same period, 2/2ID had to prepare to deploy and re-orient its training and operating mindset on short notice, having received its deployment orders less than 3 months prior to its departure from Korea. After 11 months in Iraq, 2/2ID was relieved in place at the end of July 2005 by the 2nd Brigade Combat Team, 28th Infantry Division, from the Pennsylvania National Guard.

### What Happened (September 2004 to July 2005).

Anbar province, after initially seeming ready to co-operate with Coalition forces immediately following the 2003 invasion, rapidly evolved into the main home of the Sunni insurgency. In the early days, U.S. forces in Ramadi, especially the Marine Corps, believed in the promise of showing a friendly face to the local population as a means of winning its loyalty.[16] As one reporter described:

> Commanders worked to instill sympathy for the local population through sensitivity training and exhortations from higher officers. Marines were ordered to

PX286

show friendliness through 'wave tactics,' including waving at people on the street.[17]

These attitudes proved short-lived, however, as attacks against U.S. forces quickly escalated in frequency and sophistication. In one particularly well-publicized and deeply felt incident in April 2004, a dozen Marines were killed in a single ambush in the city. Naturally, this environment hardened the attitudes of many U.S. forces, even those whose original intent had been to do what was necessary to win the hearts and minds of Ramadi residents. In the words of one Marine noncommissioned officer (NCO) who was deployed to Ramadi in the spring and summer of 2004, "My whole opinion of the people here has changed. There aren't any good people."[18] U.S. forces developed a strong sense that the general population was largely complicit in many insurgent attacks against them. Another Marine NCO relates the story of a rocket-propelled grenade attack on his platoon:

> When the Marines responded, the attacker fled, but they found that he had established a comfortable and obvious position to lie in wait. There, in an alleyway beside the shops was a seat and ammunition for the grenade launcher—along with a pitcher of water and a half-eaten bowl of grapes. . . . 'You could tell the guy had been hanging out all day. It was out in the open. Every single one of the guys in the shops could tell the guy was set up to attack us.'[19]

By the summer of 2004, U.S. forces were taking measures to reduce their disruptive effects on normal life in Ramadi, based on the premise that U.S. presence was an irritant and stoked some of the violence in the city. The Marine battalion there ceased patrolling the city almost entirely and instead set up observation

PX286

posts throughout the city. But the change generated little improvement in the violence.[20] Indeed, the security situation had deteriorated to the point that the U.S. command was not confident it would be able to hold the planned January elections safely in the city.[21]

This period also witnessed the disintegration of what semblance of governmental authority had remained in the city. In August and September alone, Anbar's governor resigned after his sons were kidnapped and his own life was threatened,[22] the deputy governor was kidnapped and murdered,[23] and Ramadi's police chief was arrested by U.S. forces for having begun working with the insurgency. By late September, Anbar's beleaguered acting governor, who doubled as Ramadi's acting mayor, could only lament that, "We do not know who the attackers are or who is backing them. Are they backed from outside? Nobody knows."[24]

This was the environment in which 2/2ID took command of Ramadi in September. Commanders determined not to let Ramadi "become another Fallujah," where insurgents operated with impunity. Accordingly, 2/2ID took an aggressive early approach, launching three separate brigade-level offensive operations in its first 3 weeks in command.[25] These operations, according to a brigade press release, were designed to "deny anti-U.S. forces safe haven, round up suspected anti-U.S. leaders and exploit weapons caches used against legitimate forces in the area."[26] The tactics employed were mainly large-scale cordon-and-search operations.

These operations produced some results in terms of detained suspects and confiscated weapons, and yet seemed to have little effect on the level or intensity of attacks against U.S. forces. On a day-to-day basis,

PX286

U.S. forces in Ramadi had their hands full simply securing the city's main east-west road, known to the Americans as Route Michigan, and maintaining safe resupply of their own bases.[27]

By late October, 2/2ID had already suffered 12 Soldiers killed in action,[28] and the leader of Anbar's dominant Dulaym tribe declared that "the city is chaotic. There's no presence of the Allawi [federal] government." A Marine civil affairs NCO said: "We hit the deck one and a half months ago, and the area has changed for the downhill very quickly."[29]

In the face of this deteriorating situation, 2/2ID commander, Colonel Gary Patton, decided to realign his forces. Up until that point, only one of the brigade's four attached infantry battalions, the 2nd Battalion, 5th Marine Regiment (2/5 Marines), was based inside Ramadi. The other battalions were based in the areas immediately surrounding the city, including two full battalions in Ramadi's eastern suburbs. With approval from the division headquarters, Patton moved one of those two battalions, 1st Battalion, 503rd Infantry (1/503rd), from the east into the city, effectively doubling the number of U.S. combat forces inside Ramadi.

Before the increased troop levels could show much of an effect on security in Ramadi, however, operations in the city were overshadowed by the preparation and execution of the Coalition's major November assault on nearby Fallujah. Ramadi saw an increase in attacks as insurgents pulling back from Fallujah sought refuge or transit there. U.S. operations focused on shielding the city from these collateral effects, with only partial success. An Al Jazirah reporter described the situation in Ramadi on November 17 this way:

PX286

Life inside the city has completely stopped, and shops are closed. For several weeks now, students have not gone to schools and colleges. Electricity has been out for eight days. The U.S. forces entered the city from the western side trying to reach the eastern neighborhoods; they, however, were confronted by the fierce resistance of gunmen. Eyewitnesses said that fires blazed in several parts of the city due to the shootout, and warplanes are flying over.[30]

In the aftermath of the so-called "second battle of Fallujah," security conditions actually improved in Ramadi, and in December and January, the city began to show some signs of a return to normal life. By this time, the focus of U.S. operations had shifted to ensuring the relatively peaceful implementation of national elections at the end of January 2005. Much was at stake strategically with the elections as evidence of Iraq's democratic transition, and the participation of Anbar province's Sunni Arab population seemed particularly important. "From a symbolic and a political standpoint, conducting a successful election in Ramadi, the provincial capital, is critical," remarked Brigadier General Joseph Dunford, the assistant commander of the 1st Marine Division.[31]

Ultimately, election day in Ramadi produced both good and bad news for the United States. No major attacks occurred, which was both a surprise and a major victory for the security forces in the city. Turnout, however, was extremely paltry. Province-wide, turnout was only 2 percent, and early unofficial figures in Ramadi showed that only 1,700 of the city's 400,000 residents voted.[32] Intimidation by insurgents was a major factor in the low turnout, as was grave suspicion of the legitimacy and reliability of the process.

PX286

Even the Ramadi director of the Independent Electoral Commission of Iraq resigned, together with his staff, a few days before the elections due to death threats.[33]

In the wake of the elections, U.S. forces launched a new offensive throughout the upper Euphrates river valley, known as Operation RIVER BLITZ. In Ramadi, this effort was marked by the establishment of checkpoints at the main entrances to the city, as well as a curfew from 8 p.m. to 6 a.m.[34] The checkpoints helped to limit insurgents' freedom of movement,[35] though they were also manpower intensive[36] and drew some complaints from local residents for impeding commerce and daily life.[37] By April, 2/2ID was claiming some success for these measures, crediting them with "a drastic decline in the amount of insurgent activity."[38]

The late winter and spring of 2005 also saw a growing role for Iraqi security forces in Ramadi. Up to this point, efforts to shift responsibility for security to local forces had been almost entirely fruitless. The local police force mostly disintegrated in the fall, the Iraqi Army was not present, and a unit of the Iraqi National Guard, recruited largely from the local population, had disbanded in November due to its being completely ineffectual and compromised by the insurgents. But by the spring, some Iraqi Army units had deployed to Ramadi. In most cases, these units were a double-edged sword in terms of working with the local population. Most of the Army units were majority Shi'a Arab. Most of the soldiers were not happy to be in Anbar, and many Ramadi residents resented their presence, even interpreting it as a validation of their suspicions about American complicity in a Shi'a takeover of Iraq. These concerns were exacerbated further with the appointment in 2005 of Bayan Jabr Sulagh as the Minister of the Interior. Jabr was widely thought

PX286

to be affiliated with the sectarian Badr Corps militia and soon gained a reputation for using elements of the national police to conduct ethnic cleansing.[39]

On the other hand, many of the Iraqi Army units, especially over time, proved capable of professionalism and avoidance of overtly sectarian behavior.[40] Their effectiveness in understanding the local environment, developing intelligence, and identifying insurgents was naturally far superior to that of the Americans.[41]

Importantly, the early months of 2005 also brought the first signs of an emerging rift between Ramadi's tribal leaders and the Islamist insurgents operating in the area, especially AQI. Some of the earliest evidence of a split came in the execution of seven foreign AQI members in retaliation for the assassination of a Dulaimi clan leader and Iraqi National Guard commander, Lieutenant Colonel Sulaiman Ahmed Dulaimi.[42] This was near the same time that reports surfaced of U.S. military officials as well as the Iraqi Defense Minister holding secret meetings with elements of the insurgency.[43] Unnamed sources told Al Jazirah that as a result of some of these meetings, "a military unit will be formed in the city of Al-Ramadi to preserve security. The unit will consist of former Iraqi army personnel and commanders and will not take orders from the U.S. forces or the Iraqi Defense Ministry. . . ."[44] At the same time, U.S. forces in the far western deserts of Anbar had just begun working with the Albu Mahal Desert Protectors, a tribally-based militia formed to combat AQI.[45]

Notwithstanding these developments, however, the United States faced a major obstacle in attempting to exploit the emerging hostility between groups of erstwhile insurgent allies—namely, its own policy.

PX286

As a rule, the United States remained extremely leery of creating local militias with no formal ties to the Iraqi government. After all, this was essentially the model that was attempted in handing off authority to the "Fallujah Brigade" in April 2004, an experiment generally viewed inside and outside the Coalition as a disastrous failure.[46] Instead, the United States was still hoping to marry up the local legitimacy enjoyed by Anbar's tribal leaders with the formal institutions of the Iraqi government, in particular the Iraqi Army. Bing West, a writer, former Marine, and former Pentagon official who spent many months in Anbar province during this period provides a stark illustration of this policy in action:

> The sheikhs offered a deal in March of 2005. They wanted arms and ammunition, plus vehicles. They would protect their turfs with a tribal force of roughly 5,000 men. They would agree to boundaries and point out the takfiris [Islamic extremists]. That would stop the IED attacks along the main roads. [Assistant commander of 1 MARDIV, Brigadier General Joseph] Dunford refused. You have an elected national government, he said, with a new army. Send your tribal sons to [the Army training center in] Taji. . . . Asked if he could promise they would return to their tribal areas, Dunford said no. There was an elected government and no need for another militia. The days of the tribes were over.[47]

Dunford went on to explain:

> In the spring of 2005, I met with dozens of sheikhs. They were shaken up by what we had done in Fallujah. They said they'd fight on our side, but refused to go through the government in Baghdad. In 2005, we weren't willing to accept that deal.[48]

PX286

In part because of this gap between the tribes and the United States, relationships between U.S. forces and the local population in Ramadi continued to develop slowly. 2/2ID did begin to make progress in identifying some local leaders in and around the city who were willing to work with them in trying to re-establish governance in the city, and the U.S.'s local intelligence networks slowly expanded.[49] At the same time, though, the local population continued to bristle at the restrictions imposed by U.S. forces. AQI attacks and intimidation continued to undermine efforts to stabilize the city. In May, the new Anbar governor was kidnapped in Ramadi and found dead a few weeks later.[50] AQI also aggressively targeted the growing number of sheikhs who appeared willing to challenge its strong influence. A new city council was just formed as 2/2ID prepared to depart the country in July 2005.

Unclassified statistics on overall attack trends in Ramadi during this period are not yet available. Anecdotal evidence is mixed, with some participants identifying reduced violence between the beginning and the end of 2/2ID's tour and some identifying roughly similar levels at the beginning and end of the period. Estimates of casualties suffered by 2/2ID and its subordinate units range from 68 to 98 killed in action with approximately 700 more wounded.[51]

What does seem clear, however, is a sharp deterioration in security in Ramadi subsequent to 2/2ID's departure. A few journalistic accounts chart the city's downward spiral. From August 2005:

> Insurgents in Anbar province . . . are fighting the U.S. military to a standstill. After repeated major offensives in Fallujah and Ramadi, . . . many U.S. officers and enlisted men have stopped talking about winning a

PX286

military victory in Iraq's Sunni Muslim heartland. . . Today, the street [in Ramadi] is pocked with holes left by bombs intended for U.S. convoys, storefronts are ripped by shrapnel, bullet holes tattoo walls, buildings have been blown to rubble by U.S. missile strikes and insurgent mortar volleys, and roofs are caved in by U.S. bombing. At the main U.S. base in Ramadi, artillery booms every night, sending more shells to pound insurgent positions in and around the city.[52]

From October 2005:

[In Ramadi,] Sunni Arab insurgents are waging their fiercest war against American troops, attacking with relative impunity just blocks from Marine-controlled territory. Every day, the Americans fight to hold their turf in a war against an enemy who seems to be everywhere but is not often seen. The cost has been high: in the last 6 weeks, 21 Americans have been killed here, far more than in any other city in Iraq and double the number of deaths in Baghdad . . . more than 2 years after the American invasion, this city of 400,000 people is just barely within American control. The deputy governor of Anbar was shot to death on Tuesday; the day before, the governor's car was fired on. There is no police force. A Baghdad cellphone company has refused to put up towers here. American bases are regularly pelted with rockets and mortar shells, and when troops here get out of their vehicles to patrol, they are almost always running.[53]

From December 2005:

It is clear that the U.S. forces are not present inside the city . . . there are no Iraqi forces either. Gunmen have assumed full control of the city. There is intensive shelling of the governorate building, the citizenship affairs building, which the U.S. forces use as their headquarters, and the main headquarters west of the city . . .[54]

PX286

It was only in late 2006 that Ramadi became the focal point of the Tribal Awakening that transformed the counterinsurgency in Anbar.

## Were Ethno-Religious Identity-Based Cleavages Significant?

Having experienced many generations in power, Iraq's Sunni Arab community has come to view political power as an important element of its identity. As one recent study of Anbar's tribes reported:

> The modern Sunni Arabs of Iraq take a great deal of pride in their religious and political history. They tend to regard themselves as the descendents and heirs to a long history of intellectual development, wealth, and political rule over the massive Islamic empire. They regard other ethnic and religious groups throughout the history of Iraq as less worthy of political power and influence.[55]

One commonly noted manifestation of this sense of political identity is that so many Sunni Arab Iraqis dispute the generally accepted population estimates that show Shi'a Arabs with a clear majority of Iraq's population. This view is not limited to the poor and uneducated, but is shared by many Sunnis who are wealthy, educated, well-traveled, and even pro-Western.[56]

Given this context, it is difficult to overstate the sense of disenfranchisement felt by many Sunni Arabs following the U.S. invasion in 2003. Even Sunni opponents of Saddam Hussein who welcomed the invasion and the change of regime were extremely upset by the influence granted to Shi'a exiles—pro-Western and pro-Iranian alike—in the Iraqi Governing Coun-

PX286

cil and subsequently the Iraqi Interim Government.[57] Beyond the chagrin of coming up short in the division of spoils, Iraq's Sunni Arabs found the new political arrangement to be unnatural and a transgression of cultural norms. As noted at the beginning of this paper, a Sunni tribal leader captured this feeling well in his assertion that, Shi'a "cannot take charge of Iraq in the same manner as the Sunnis. The [Shi'a] are backwards. They are barbarian savages, they do not know true religion, theirs is twisted, it is not the true religion of Muhammad."[58]

In Ramadi, this sense of sectarian disenfranchisement was not the only driver of the insurgency, of course, but it was clearly one of the most important factors. While Ramadi, itself, is very homogeneous, one of its people's primary grievances was a view of the new Iraqi federal government as a sectarian Shi'a force, with the Iraqi Army and the Coalition serving as agents of that sectarian force. As a home to many Ba'athists and military officers, Ramadi in particular struggled to come to terms with the idea of an Iraq where its influence was weak.

The counterinsurgency expert John Nagl, who was a brigade operations officer in AO Topeka during 2003-04, just prior to 2/2ID's deployment, recalled:

> [We] came to realize that a very high percentage of the population—almost exclusively Sunni in our AO—did support the objectives of the insurgency, which was a restoration of Sunni ascendancy over the Shi'a. The Sunnis saw the American occupation as propping up the Shi'a and therefore targeted us. We couldn't win this fight at the local level. Success demanded national-level reconciliation between the Sunnis and the Shi'a. . . .[59]

PX286

According to Lieutenant Colonel Justin Gubler, battalion commander of the 1/503rd Infantry:

> Ramadi residents' biggest fear was being repressed and abused by the Shi'a government, and that was the biggest obstacle toward their working with us. We heard that from the sheikhs and from professionals and from former military officers. We were the ones that installed the Shi'a government, which they knew would mistreat them the way the Ba'ath party mistreated the Shi'a.[60]

Gubler's executive officer, Major Greg Sierra, said simply, "the Sunnis just weren't ready to play in the new Iraq—they hadn't accepted that things were going to be different."[61]

One commonly cited Sunni complaint was a belief that Iraq was being handed over to Iran. Just prior to the national elections in January 2005, the 1st Marine Division's commander, Major General Richard Natonski, toured polling stations. A group of Iraqi men gathered to describe their views to the general. One man told him "the election will only create a Shiite Muslim-dominated government in Baghdad that will ignore Sunni Muslim cities like Ramadi."[62] On election day, a professor told an American reporter that he was boycotting the election because he believed that it would be manipulated by pro-Iranian Shiite politicians. "Iraq will become part of Iran after this. I want no part of it."[63] Another Ramadi resident pleaded with a Marine intelligence officer at one point, "Don't leave us with this Iranian army."[64] Shortly after the elections, insurgent leaders told U.S. representatives in secret meetings that they saw the Shi'a-dominated government as being controlled by Iran and that their "aim was to establish a political identity that can represent disenfranchised Sunnis."[65]

PX286

It is telling that Ramadi remained among the most obstinate of the Sunni-dominated areas in coming to terms with participation in the national government. In the fall of 2005, the U.S. headquarters in Baghdad was claiming progress in bringing Sunnis into the political process. They cited public opinion survey results from June 2005 showing that majorities of Sunnis in most areas, including approximately 80 percent of Sunnis in Baghdad, believed that boycotting the January elections had been a "bad idea." But in Ramadi, only 40 percent believed the boycott had been a bad idea, while 46 percent still described the boycott as a "good idea."[66]

Other evidence of significant sectarian cleavages can be found in the reactions of Ramadi residents in the first half of 2005 to the increased deployment of largely Shi'a security forces to the area. One Shi'a Iraqi soldier in Ramadi commented, "Of course they don't like us. They don't like people from the south, so when we search them, they make faces at us." Another called Ramadi hostile territory, complaining that "it is a problem that we are Shiite. [The local people] think we are all spies." Naturally, insurgents exploited these tensions to maximum effect, distributing literature and graffiti referring to the Shi'a Army units as "rapists," "Jews," and "dogs of the Americans."[67]

For all the importance of sectarian Sunni identity in Ramadi, it is important to note that the salience of this identity was to some degree eclipsed by tribal identities. These identities overlapped heavily due to the city's homogeneity, but political identification and loyalties in Ramadi did tend to adhere more to tribal hierarchies than to religious ones, per se. As one intelligence officer described it, "the tribal identity trumped everything. It gives the leaders legitimacy."[68]

PX286

The strength of tribal identities and loyalties tended to be more pronounced in the surrounding areas than in the city, itself, where tribes intermixed.[69]

It is also important to note the weakness of Iraqi national identity that might otherwise have mitigated some of the divisive effects of strong tribal and sectarian identification. Several interviewees noted the absence of any Iraqi nationalism in Ramadi, except of the sort tied to Saddam Hussein's regime. For example, Colonel David Clark, the commander of the 1st Battalion, 506th Infantry Regiment (1/506th), commented that "The Iraqis that we knew and worked with were three or four things before they were Iraqis—clan, tribe, religion, all before they were Iraqis. Those interests came first, all above the national interest."[70]

In sum, it is clear that despite the absence of much sectarian violence in Ramadi, conflict between Iraq's Sunni and Shi'a Arabs was quite central to the origins and evolution of the insurgency there.

## Were Good Security Operations Conducted?

Evaluating the quality of U.S. security operations during this period is not simple. The record is mixed and complex. Several interviewees felt that a "conventional" mindset prevailed in the brigade for too long. This mindset manifested itself in 2/2ID's planning and operations in an emphasis on targeting of insurgents rather than population security. "We were too kinetic, too focused on offensive operations," said one officer. "There was a tendency toward focusing on raids, killing and capturing bad guys, etc."[71] A reporter embedded with the brigade commented that "U.S. forces were still in Cold War mode—they were all about fighting and killing . . . there were a lot of raids, detentions and the like that alienated the populace."[72]

PX286

This view, though not universal among the interviewees, was common up and down the chain of command. Marine Corporal Peder Ell did not see great value in large offensive sweep operations, saying, "We'd pick up bad guys and disrupt their operations, but it only worked for a while. They would just come back in after the operation had ended."[73] Colonel Patton, the brigade commander, agreed: "We did a lot of those brigade-level and battalion-level ops and it never got us much of anything important. They were fruitless, and they pissed people off."[74] Besides alienating the local population, operations that involved raiding a lot of houses, arresting a lot of people, and taking away people's guns, also served to confirm some Anbaris' suspicions that the United States was making war on the whole community of Sunnis on behalf of the sectarian federal government.[75]

According to 2/2ID's artillery battalion commander, Lieutenant Colonel John Fant:

> It took us a long time to understand that this was not a brigade fight, it was a platoon and squad fight. I think our conventional training clouded our approach to the problem. . . . The brigade's role should be political and resource provision. . . .[76]

Yet these brigade roles were not consistently pursued. Another officer summarized the problem this way:

> What I ranked as important were developing governance and developing the Iraqi police and military. If you just looked at our resource allocation, though, you might assume that the main priority was killing bad guys. There was a lot of variation across different operating units and staff in terms of their relative focus on governance vs. kinetic operations. I don't think

PX286

we ever had a common picture across the AO of the center of gravity, whether it was the population or the enemy.[77]

Two other officers interviewed argued that the brigade leadership may have underestimated the importance of cultivating relationships with local leaders. One recalled an incident early in the brigade's deployment in which the commander cancelled consecutive meetings with a local leader who had had a relationship with the previous brigade commander, and then sent a lieutenant colonel to meet with him. In a culture that places a high value on seniority and respect, this officer believed, this approach "was an affront to [the leader] that set the tone for the whole time we were there." Like other interviewees, he attributed such mistakes in part to a "conventional mindset."[78] Another interviewee believed that the brigade commander "did not embrace his role as the person to lead engagement with the local leaders" until the latter half of the brigade's deployment.[79]

On the other hand, the brigade's focus on conventional combat operations was at least partly a result of the level of threat it faced nearly immediately upon its arrival in Ramadi. The fall of 2004 was "brutal, just really violent," said one officer.[80] In the words of Colonel Clark, the 1/506th commander, "We were up to our eyeballs fighting those guys, so we weren't able to concentrate on the political and social and economic aspects."[81] In this environment, traditional counterinsurgency approaches had difficulty taking root. Another officer offered this example:

In the fall, we planned to set up a 'place of hope' in one neighborhood, where we were going to try to concentrate some security and reconstruction efforts. It was

PX286

essentially an ink spot approach, classic clear, hold, and build. We wrote the plan, but then as we were getting ready to execute the plan, one of our battalions got engaged in pretty heavy fighting and the decision got made that we're not going to implement the 'place of hope'. And I felt like this was a turning point when we turned away from the idea of focusing on securing the population.[82]

The serious challenges posed by the high threat level led some interviewees to reject the charge that the brigade had been "too kinetic."[83]

Another major limitation 2/2ID faced in establishing security for Ramadi's population was its relatively small number of troops. AO Topeka had over half a million people, and 2/2ID totaled only around 5,500 personnel. As with any modern military unit, a substantial number of those personnel were engaged in support functions and were not combat troops. Colonel Patton estimated that even after he moved an additional battalion into the city—a choice he called one of the best decisions he made during the deployment—there were only about 1,800 U.S. combat forces in Ramadi proper.[84] This means the United States had approximately one Soldier in the city for every 222 residents, a ratio more than four times smaller than the ratio the 2006 counterinsurgency field manual notes as a commonly-recommended "minimum force density" for effective counterinsurgency.[85] Representative of the many comments from interviewees on the subject of troop numbers is this assessment from a 2/5 Marines company commander, Captain Eric Dougherty:

The biggest problem was that we were so undermanned, that we couldn't give the people confidence that we'd be around. As soon as you're gone, the

PX286

people could count on the insurgents to show up and intimidate them or punish them in retribution for their cooperation with the Coalition. That puts the population in a precarious position—they were waiting to see who would win before they picked a side.[86]

The natural solution to the problem of inadequate forces is augmentation with indigenous forces. Indeed, the development of Iraqi security forces was a key component of 2/2ID's operations. However, this proved to be problematic on two related levels. First, for most or all of 2/2ID's tenure in Ramadi, Iraqi security forces there were totally inadequate to the task of providing security. In the first half of the brigade's deployment, Iraqi security forces were virtually nonexistent. The police force was heavily infiltrated, unreliable, ill-equipped, and eventually quit en masse.[87] A local Iraqi National Guard brigade was entirely ineffective, partly due to a lack of training, but also due to systematic insurgents' intimidation of Guard soldiers' families. U.S. forces disbanded the brigade altogether in the fall of 2004.[88] There was some improvement over time, especially among Iraqi Army units deployed to Ramadi from other parts of Iraq during the spring of 2005.[89] But these units remained a weak supplement to the U.S. combat forces in the area.

The second related problem was that Coalition policy at the strategic level emphasized the importance of transition of authority and control to Iraqi forces, not population security. In the words of the Corps commander who took charge at MNC-I in January 2005, Lieutenant General John Vines, the goal was "rapid progress in training and preparing Iraqis to assume responsibility for security in every province."[90] Thus any U.S. officers advocating a greater focus on population security had not only the inadequacy of avail-

PX286

able resources to contend with, but also a policy that pointed in the opposite direction.

Perhaps inevitably in this environment, the approaches employed by U.S. forces in Ramadi varied by subordinate unit and in general improved over time. Brigade-level sweeps were eventually replaced by more small-unit patrolling, and the establishment of checkpoints, which provided a modicum of consistent presence in at least a few locations in the city.[91] This enabled units to improve their ability to collect intelligence and to build relationships with the local population to some degree. Even these adaptations were hamstrung, though, by the limited numbers of troops available. And it was only near the very end of 2/2ID's deployment that units began to refocus their intelligence collection efforts away from targeting and toward understanding the socio-political dynamics of the local population.[92]

Overall, this record returns a somewhat ambiguous answer to the question, "Were good security operations conducted?" From a strategic perspective, even allowing for variation and improvement over time described above, the variety of problems outlined here point to an answer closer to "no" than "yes."

## Was Good Governance Provided?

One of the distinguishing characteristics of Ramadi during this period was the thoroughgoing dysfunction of the government. Leaders of the provincial and local government and of the police were routinely targeted by insurgents for intimidation and assassination. Those who chose to continue to serve in the face of threats against them were often killed. Mayors, provincial governors, and police chiefs in Ramadi tended

PX286

to have short tenures in office that ended in death, resignation, or arrest for participation in the insurgency.

Hence governance of any sort, good or otherwise, was a scarce commodity in Ramadi during 2004-05. Most interviewees stressed the severe limitations on reconstruction efforts that prevailed due to the violence and intimidation. Reconstruction projects were regularly attacked, and Iraqis who were seen or suspected of working with the United States or taking funding from them were threatened and murdered.[93] One interviewee, who did not want this story attributed, related the following illustration of the severity of this problem:

> One time, we detained a guy for two weeks, just so he could then go back out into the city and profess to have a major grievance against the U.S. as a cover for taking U.S. money and starting a sewer renovation project. That's how reluctant people were to be seen to take American money.

This dynamic was particularly damaging because it subverted not only U.S. reconstruction efforts and attempts to improve governance, but also efforts to provide jobs for Ramadi's thousands of unemployed military-age males. Interviewees differed on the extent to which unemployment was a cause of the insurgency, but there is no question that it facilitated recruitment for the insurgents.[94]

Insurgents also occasionally targeted civilian infrastructure, further suggesting a deliberate attempt to make the city ungovernable. For example, just in 2/2ID's first month in Ramadi, insurgents blew up an agricultural center and the Red Crescent office, and then blamed the attacks on U.S. forces.[95] Another obstacle to improving governance was corruption and a

PX286

certain lack of civic culture. Colonel David Clark offered one of many examples:

> We spent a lot of money getting the water purification system rebuilt and operational, and we got that all set up—should have been a tremendous victory for the people. But before long, it shut down, why? Because the guards were stealing the gasoline for the engine and selling it on the black market. And all the people along the line were tapping into it and contaminated it.[96]

Shortcomings in the U.S.'s own capacity and planning also hampered governance-related initiatives. One Marine officer complained that:

> [T]here was very little done in the way of working with the government. . . . I never felt that there was a State Department presence or a [provincial reconstruction team]. . . . We had a civil affairs reservist in our battalion—his job was to coordinate the civil reconstruction efforts—it was totally ineffective, we couldn't get anything done because there was no supporting bureaucracy and no unified vision.[97]

The training of the brigade's staff and leadership was also quite limited regarding execution of infrastructure and civil planning projects.[98]

In spite of all these difficulties, there were some governance improvement successes, mostly on a relatively small scale. For example, 2/2ID ran a number of missions aimed at rebuilding infrastructure and providing humanitarian aid to the city's residents.[99] Projects included building medical clinics, soccer fields, refurbishing schools and Anbar University, expanding police stations, and restoring a badly damaged mosque.[100] A Marine company commander recalls an attempt to set up a model city in their area:

PX286

We never quite got there. But the idea was, how do we get to the future of Ramadi, so we envisioned a model city where everything was working the way it should be, with sanitation, education, security. . . . And we were also able to run some humanitarian aid . . . on the western side of the city. The local people in those areas loved it. They appreciated the help.[101]

Of the projects pursued, improving electrical power generation and distribution was prominent, and some slow progress was made in this area. Anbar province was receiving less than 8 hours per day of electric power as of May 2004, which was down from its pre-war standards of 9-15 hours per day.[102] By March 2006, Anbar had gone up to 12-16 hours per day.[103]

One measure of the U.S. level of activity in attempting to improve the quality of life in Ramadi can be found in the records of the Commander's Emergency Response Program (CERP). This program provides money that brigade commanders and their subordinate commanders can use at their discretion to meet local needs in their areas of operation. CERP spending typically, though not exclusively, goes to relatively small, relatively short-term projects, and is also used to pay reparations for property damaged in combat or to family members of killed and wounded civilians. In Ramadi, estimated CERP spending increased significantly over the months of this case study (see Figure 2-4). Estimated spending by quarter rose from $1.1 million (August-October) to $2.0 million (November-January) to $2.1 million (February-April) to $2.4 million (May-July).[104] This represents an increase from beginning to end of a factor of 2.2.

Some commanders in Iraq claim to have noted a pattern of declining violence in the wake of CERP

PX286

spending, including Lieutenant General Peter Chiarelli, the MNC-I commander during 2006, and Colonel John Charlton, who commanded U.S. forces in the Ramadi area during 2007.[105] Charlton, who spent $87 million in CERP funds during 15 months in his area of operations, claimed that "We did more to win counterinsurgency with our CERP dollars than we did with our weapons."[106] However, there is reason to question the causal link between CERP spending and violence.



**Figure 2-3. Estimated Monthly CERP Spending in Ramadi.**

In the first multivariate statistical analysis conducted on district-level Iraq data,[107] Eli Berman, Jacob Shapiro, and Joseph Felter found no significant relationship at all between CERP spending and insurgent violence through 2006. They do find some correlation between the two factors starting in 2007, so their work

49

PX286

perhaps qualifies Charlton's statement rather than contradicts it.

One specific example that suggests a complicated causal relationship between spending and security is one of Charlton's own reconstruction success stories, a glass and ceramics factory that Charlton's forces invested in heavily and got up and running in Ramadi in 2007. CERP was clearly not the decisive factor in this success story, because the United States spent over half a million dollars in CERP funds across 11 different contracts on that same glass factory during 2005 without it ever opening.[108] Only after Anbar's Tribal Awakening began in the fall of 2006 did the spending begin to have its intended effect.

Charlton's comments, themselves, also reveal a certain degree of ambivalence about the direction of causation with regard to CERP spending and changes in violence levels. On the one hand, he asserted that ". . . the results [of CERP] were clearly evident on the ground. Attacks in my area went from 30-35 per day down to essentially zero." But he also argued that "The key to any type of reconstruction or stabilization project is to establish a secure environment first. . . . Once we had [that], we were then able to work with the Iraqis to rebuild."[109]

This kind of confusion is common, and reflects one of counterinsurgency's classic recurring dilemmas discussed in the first chapter—that security is a pre-requisite for good governance while good governance is a pre-requisite for security. For some interviewees, this dilemma resonated with their experience in Ramadi.

Other interviewees questioned whether this dilemma was, in fact, at work in Ramadi. Without exception, they believed in the dependency of good

PX286

governance on some threshold level of security. But some doubted the necessary causal link in the opposite direction, suggesting that Ramadi residents' attitude toward U.S. forces and the local government was far more linked to security than to any other aspect of governance. In fact, some interviewees reported indifference among the population about demonstrations of good governance—the people were far more interested in reliable security.[110] 2/2ID's commander commented that:

> Security was first and foremost what people wanted. That was the feedback we always got. . . . We gave the hospital medical supplies, conducted road repair, installed trash receptacles. But basically, this stuff couldn't take root while we were there—it didn't do any good coming from us—it had to come from the government. So for us, these things didn't end up making critical contributions to the fight.[111]

This observation came not only from U.S. forces, but also from local leaders. For example, the acting governor of Anbar and mayor of Ramadi in October complained, "The marines are not protecting us. It's true that they've helped us with some projects such as improving the water supply and sewage disposal and rebuilding schools. But people think all that is worthless. They need security."[112]

Moreover, even measures that were having some positive effects on security were viewed with hostility by some of the local population. In May 2005, some Ramadi residents staged a "sit-in" to highlight their grievances against U.S. forces. According to Al-Sharqiyah television news, Ramadi "looked completely empty and paralyzed this morning with the start of a 2-day sit-in in protest against the U.S. forces' practices

PX286

against its residents." Protesters "called for ending the siege imposed on the city for 2 months, the departure of the U.S. forces from the city, the release of prisoners, stopping the acts of harassment against the residents of Al-Ramadi, putting an end to raid operations against citizens' houses, and stopping indiscriminate shooting."[113] Whatever the validity of these particular complaints, it was clear that the United States had a very high bar to clear in establishing any modicum of legitimacy for its governance activities in the city. Overall, it appears that good governance generally remained beyond the reach of the counterinsurgents in Ramadi during this time period.

## Were Political Agreements Addressing Ethno-Religious Cleavages Pursued?

Two major cleavages defined the insurgency in Anbar and Ramadi during 2004-05. The first was between the Sunni Arabs and the new government of Iraq. The second was between those Sunni Arabs and the U.S.-led Coalition. These two cleavages were closely related since, as noted above, many Anbaris saw the U.S. forces as working in concert with a Shi'a-led federal government. To a significant degree, this perception was correct—the United States was very clearly in concert with the new Iraqi federal government. The United States would have categorically rejected the characterization of that government as "Shi'a-led" or as sectarian in any other way. Nevertheless, the U.S. policies were based on a fundamental premise that the institutions of the new Iraqi government were the sole instruments of legitimate political power in the new Iraq.

Proceeding from this premise, U.S. policy from the establishment of the CPA at least through the pe-

PX286

riod of this case study was to insist that U.S. cooperation with tribal sheikhs and other nongovernmental power brokers was contingent on the integration of these groups into the security and governance mechanisms of the federal government. In 2003, Anbar CPA representative Keith Mines lobbied to create a *loya jirga*, or tribal council, to negotiate the distribution of political power in the new Iraq or, failing this, to at least empower the sheikhs who came forward to support the United States. But the CPA leadership had no interest in this, being ever fearful of empowering nongovernmental militias and hence undermining the larger state-building effort.[114] As one intelligence officer working in Iraq in 2003 put it, "the standard answer we got from Bremer's people was that tribes are a vestige of the past, that they have no place in the new democratic Iraq."[115]

This policy then served as a major stumbling block to negotiating any sort of political compromise with local leaders in Ramadi. Colonel Clark acknowledged that, "it would have been way outside the box for us to accept [tribal overtures for creation of militias] at that time. It was against the policy, and it would have been difficult to predict how large the phenomenon was going to be."[116] General Joseph Dunford's comments cited earlier in this chapter neatly summarize the situation: "[The sheikhs] said they'd fight on our side, but refused to go through the government in Baghdad. In 2005, we weren't willing to accept that deal."[117] The 1st Marine Division commander concurred and defended this view: "The problem we had with local militias was that they did not work. The Fallujah Brigade is an example. So I don't think this kind of initiative would have succeeded in 2005. It wasn't a missed opportunity at all."[118] This same reluctance continued to

PX286

prevail under II MEF, which took over control of U.S. operations in Anbar province in March 2005. The limitations of this policy were certainly not mitigated by the 2/2ID leadership's previously noted slowness in embracing its role in engaging local leaders.

This is not to suggest that U.S. leaders were unaware of or unwilling to address the sectarian grievances of the Anbari Sunnis more generally. MEF commanders did pursue several initiatives to try to bridge the gap between Anbar and the federal government, such as achieving better Sunni representation in Baghdad, moderating de-Ba'athification, and advocating a greater role for Sunni officers in the Iraqi Army.[119] But the effects of such efforts were hampered so long as the United States held the tribes' claims to having their own legitimacy at arm's length. This attitude tended to reinforce the common cause between the local resistance and the Islamist extremists. The 1/503rd commander, Lieutenant Colonel Gubler, explained the problem this way:

> For Sunnis, the fledgling Iraqi government can be seen to rely on illegitimate security forces—the U.S. and/or Shi'a militias. Hence, as the [Iraqi Army] becomes larger and more effective as a security force, the less likely it is that the Shi'a government will negotiate a power-sharing deal with the Sunnis.[120]

For the first several months of 2/2ID's tenure in Ramadi, seeking local leaders who were willing to work with the Coalition and were also not working with the insurgents was a challenge. A Marine company commander who left Ramadi in March lamented that, "We never really nailed down who the real power brokers were. We dealt with the provincial government, but they weren't the guys who were pulling the strings."[121]

PX286

As the split between AQI and the tribes began to open, however, opportunities to work with tribal leaders began to present themselves to the United States during the spring and summer of 2005. Effective response to these opportunities was slow, given the difficulty of even distinguishing real leaders from charlatans and profit-seekers (so-called "fake sheikhs"[122]). But over time, beginning at company and battalion levels, the United States began to build some relationships with sheikhs who showed promise as potential allies. As it became clear that the U.S. forces were not leaving the city, even some sheikhs who had been working with the insurgency seemed interested in seeking some accommodation with the U.S. Colonel Patton described the evolution of his own thinking on this point:

> The real power base in Ramadi was in the tribes, so if we were going to make any inroads in governance, we figured out that we would have to work through the sheikhs and the tribes. That wasn't something that we understood on day one, it took us time to figure that out. . . Why did it take so long to get to this realization? Because we were trying to work through the government and were not enthusiastic about propping up centers of power outside government channels.[123]

By the summer, 2/2ID units had developed a sheikh security council comprising two dozen sheikhs.[124] Still, these relationships proceeded fitfully, with a few steps forward often matched by a few steps back. For example, some tribal leaders in the 1/503rd's AO requested that the United States lift its checkpoints and extend the evening curfew by a couple hours. The United States forces complied, but that resulted in violence immediately rising again. The battalion's executive officer reports:

PX286

At that point, in June, several of the tribal leaders planned a major meeting when they were going to get everyone together to discuss and coordinate their actions as part of a new effort to oppose the insurgents. We were prohibited from attending this meeting because they were going to great lengths to avoid their efforts being seen as associated with us. But al Qaeda knew what they were doing, they assassinated guys, and scared them away, so the meeting didn't even happen.[125]

Carter Malkasian, a civilian analyst at the I MEF headquarters, cited such setbacks in tribal organization against AQI as evidence that in 2005, the environment was not yet ready for a major shift. He suggests, "Maybe what was happening was that the leadership had started to change its views, but the majority of the insurgents—the foot soldiers—were still committed to the cause."[126]

In parallel with trying to cultivate tribal allies, development of a city council became a key focus for the 2/2ID brigade staff beginning in the spring of 2005. One of the principal challenges of this effort was simply identifying who would be amenable to gathering to discuss issues. Eventually, this effort did bear fruit, and a city council had just formed when the brigade turned over control of the city to its successor.[127] Even so, there remained a critical gap between the authority exercised by the official government and by the tribal leaders. Colonel Patton explains:

The provincial and city governments that were just starting to function were not especially pleased with the tribal leaders' influence. We knew that bridging this gap was the end game, but basically, the sheikhs controlled a lot more people and resources than the nearly absent government did.[128]

PX286

Some interviewees viewed these early in-roads into tribal alliance building as the earliest roots of what would become the Tribal Awakening movements the following year.[129]

On balance, though, in spite of these early instances of building relationships with the city's tribal leaders, the evidence suggests that during the period of this case study, the United States was not able to pursue any serious political agreements that would address the fundamental sectarian cleavage between the disenfranchised Sunnis of Ramadi and the new Iraqi government. U.S. policy at the strategic level resisted the avenues of political compromise that were most salient to that cleavage, and the need to move in this direction only became clear gradually to counterinsurgents at the operational and tactical levels.

## Was the Counterinsurgency Successful?

The outcomes of the counterinsurgency over the course of 2/2ID's deployment are mixed. If success is measured only by attack statistics over the course of the brigade's 10 ½ months in command in Ramadi, then some degree of success is discernible. Unclassified attack data is sparse, though the 1/503rd's executive officer reported that attacks in the eastern half of the city went from 10 per day to 2-3 per day over those 10 ½ months.[130]

After returning to the United States, that battalion's leadership noted a variety of improvements in their area of operations, as shown in Table 2-1.[131]

PX286

| September 2004 | July 2005 |
|---|---|
| • Enemy contact everyday—Direct fire (RPG, RPK, PKM) and indirect fire (rocket and mortar)<br>• People did not go into the street, to work, school, or market<br>• People scared and refused to talk to or support U.S. forces<br>• No ISF; IPs worked with the enemy<br>• Electricity was intermittent<br>• No running water in half the city<br>• Sewers clogged and trash was piled in the city | • Enemy contact less than once per week—IED/SVBIED or indirect fire<br>• Main supply route (MSR) Michigan remained 'BLACK'<br>• Life normalized—People drove and walked on the streets; children played, schools, markets, and businesses were open<br>• People felt safer and tolerated or supported CF<br>• ISF present; IP units were forming.<br>• Electricity restored to the city; Power outages 2-3 times per week<br>• Running water to all the city<br>• Sewers were unclogged and trash was picked up routinely |

**Table 2-1. Changes in Eastern Ramadi, September 2004-July 2005.**

The brigade reported a somewhat more modest list of 10 "Brigade Achievements" in the unclassified portion of its own After Action Report:[132]

1. Executed a historic deployment from Korea into a combat zone.

2. No serious heat casualties during the entire deployment.

3. Supported and participated in combat operations in Fallujah, preventing Ramadi from becoming a second insurgent stronghold.

4. Provided a secure voting environment in Ramadi for the January 30 national elections.

5. Local leader engagement facilitated the formation of a Ramadi city council and multi-agency security council.

6. Re-enlisted over 800 Soldiers in combat.

PX286

7.  Enabled 99 percent of 2BCT [2nd Brigade Combat Team] Soldiers to participate in the R&R [rest and relaxation] leave program.

8.  Developed and employed five new Iraqi Army battalions, and built/renovated six new Iraqi Army compounds.

9.  Captured or killed over 2,100 insurgents.

10. Captured a brigade-equivalent amount of weapons and resources.

The only achievement on the list that resembles something like strategic success—the claim of preventing Ramadi from becoming a "second insurgent stronghold"—was always a close-run thing, and proved to be quite fragile in the months following the brigade's departure.

Interviewees expressed a wide range of views on how successful their mission had been. Of 16 interviewees who answered a question about the success or failure of the mission, five characterized it as success. Interestingly, four of those five were Marines who left Ramadi in March 2005. One called the mission a failure. Ten interviewees felt that 2/2ID had achieved something in between success and failure. The following two quotes are representative of that view. From 1/503rd executive officer Major Greg Sierra:

> Was this success in counterinsurgency or just success in combat ops? Even though we had multiple lines of effort, it was almost all combat ops. So even though we didn't manage to build much in terms of political and economic development, we did start to set the conditions, and helped lay the foundation for what happened later, in terms of working with the sheikhs.[133]

And from 2/2ID's artillery battalion commander, Lieutenant Colonel John Fant:

PX286

> I've come to the conclusion that we just held the place in check. We may not have won, but we did prevent it from getting so out of control that it would require another Fallujah type operation. We resisted the overall collapse, and in some ways set the conditions for the brigades that followed to help develop the Awakening.[134]

Whatever degree of success the brigade achieved during its time in Ramadi, there is little doubt that it was short-lived. As shown earlier in the chapter, reports from Ramadi in fall of 2005 were relentlessly grim, depicting an environment as bad or worse as the one that had greeted 2/2ID upon its arrival in 2004. By March 2006, a Provincial Stability Assessment conducted jointly by the U.S. Embassy and Multi-National Force-Iraq (MNF-I) rated Anbar province as "critical" on a scale of stable, moderate, serious, and critical. This designation meant to signify the following characteristics:

- a government that is not functioning or has not formed, or that is only be [sic] represented by a single strong leader;
- an economy that does not have the infrastructure or government leadership to develop and is a significant contributor to instability; and,
- a security situation marked by high levels of [insurgent] activity, assassinations and extremism.[135]

Clearly, 2/2ID cannot be held responsible for the deterioration in Ramadi's security environment following its departure from the city. Without much more investigation, it is impossible to estimate how much of that deterioration resulted from changes in

PX286

the environment or the insurgency itself, as opposed to changes in the U.S. policy or operations. Still, it seems fair to conclude, based on both the modesty and the evident fragility of the progress achieved by the United States during the period of this case study that the counterinsurgency mission was not successful in a strategic sense.

**Evaluation.**

Table 2-2 summarizes simple answers for the study's framework questions suggested by the evidence presented in this chapter. It is clear that identity-based cleavages were at the heart of the insurgency in Ramadi and Anbar province. Fundamental disagreement over the legitimacy of Sunni versus Shi'a Arab rule in Iraq and in Anbar was not the only source of conflict, but it was the most important among insurgents other than the religious extremists who flocked to the banner of al-Qaeda in Iraq. This problem was evident from the beginning of the conflict, and the evidence presented here confirms that this dynamic, while evolving, continued to prevail throughout the time period of this case study.

| Cases | Identity Cleavages | Good Security | Good Governance | Political Agreement | Success |
|---|---|---|---|---|---|
| Ramadi 2004-2005 | Yes | Ambiguous | No | No | No |

**Table 2-2. Case Study Variable Summary for Ramadi.**

It is also clear that as of mid-2005, the United States was not yet prepared to pursue political strategies that

PX286

would directly address these cleavages. More precisely, the United States had staked everything on achieving a grand political bargain at the national level that should have addressed the grievances of Sunnis in Anbar. But as national-level reconciliation efforts remained bogged down, counterinsurgents in Anbar were left to fight their inherently political war with little discretion for addressing political grievances.

To say this is not necessarily to indict the policy choices made. U.S. leaders in Washington and Baghdad were loath to undermine the fragile sovereignty of the new Iraqi government by empowering tribal leaders in Anbar province. Moreover, as noted above, there were good reasons to doubt the viability of Sunni tribal groups fighting AQI effectively. The failed experiment with the Fallujah Brigade loomed large over proposals for arming tribal militias. In retrospect, the advantage of empowering the tribes is evident, but the risks of this strategy to the stability of the Iraqi state were significant.[136] Even so, should this case count as evidence in support of the general argument on the greater importance of identity politics relative to good governance?

Whatever support the case does provide must be qualified by the fact that the U.S. counterinsurgents do not score very highly on security operations or good governance in this case. With security, there is substantial evidence that 2/2ID's initial approach to fighting the insurgency through large cordon and search operations was unproductive at best and counterproductive at worst. The decision at strategic levels to allocate a single brigade combat team to a population center with around a half million people did not set 2/2ID up to succeed in its security mission. On the other hand, these negative factors were partially miti-

PX286

gated over time, first by 2/2ID's gradual adaptation to smaller scale operations with a growing focus on securing the population; and second, by the deployment of Iraqi security forces into the city. While these improvements appear to have been incremental and uneven, they belie an easy negative categorization of the quality of security operations for the case.

The coding of the good governance variable is more clear. Good governance cannot be said to have failed in this case, exactly; perhaps it is more accurate to say that it was barely attempted. By most accounts, U.S. forces believed in the potential value of improving governance in Ramadi, as signified, for example, by the growing CERP expenditures over time. But they were unable to make significant and sustained investments in this objective due to the persistent levels of insurgent violence and intimidation in the city.

So together, the weak contributions of security and governance in this case make the marginal impact of the political agreement variable on the outcome harder to isolate. Still, the causal link between U.S. policy in 2004 and 2005 of discouraging the legitimation of local Sunni tribes and the persistence of the insurgency in Ramadi during this period seems strong. Fundamentally, what institutions of governance existed in Ramadi at that time—principally the United States and, to a lesser degree, the Iraqi security forces—were perceived as illegitimate. This perception was not based on failures of performance, but rather on presumptions of inherent legitimacy tied to ethno-religious identity. So in this sense, this case does provide some evidence of the relative importance to counterinsurgency of political agreements addressing ethno-religious cleavages.

A relevant counterfactual question here would be, if the United States had managed to stand up a local

PX286

government and provide a greater amount of infra-structure improvements, basic service provision, and economic development, would the insurgency have retained the strength that it did? The question is impossible to answer, though as described above, some interviewees were skeptical that more success in improving the quality of governance in the city would have had a great impact on the insurgency. In any case, the conditions that would probably have been necessary to allow for such a scenario seem almost categorically precluded by the prevailing political situation.

Perhaps the most compelling evidence of this interpretation of causal factors in Ramadi can be found in the Tribal Awakening developments there and elsewhere in Anbar in 2006-07. A more detailed investigation of the Awakening using this analytic lens awaits future research, but even its basic storyline is instructive for these purposes. In early 2006, the Coalition was already reporting some positive effects of the expanding split between Sunni rejectionists and jihadists among the insurgents.[137] AQI had continued to alienate Sunni Iraqis with its intolerance and intimidation. At the same time, the first instances of cooperation between U.S. forces and tribal groups were bearing fruit in al Qaim in the Western Anbar desert. Former insurgents began openly fighting each other. In February 2006, six insurgent groups, including the 1920s Brigades and the Islamic Movement for Iraq's Mujahideen, released a statement announcing a cooperative effort to form a people's cell to oppose AQI and to provide security in Anbar.[138]

Over the course of the next 1½ years, Ramadi transformed from "the blackest rat-hole in the dark insurgent sewer of the upper Euphrates valley," as David Kilcullen memorably called it, to a model for

PX286

effective cooperation between the United States and the local Iraqi population. Attacks dropped from 100 a day to only a few.[139] The reasons for this transformation, of course, are numerous and complex. But improvements in the quality of governance in Ramadi or Anbar are conspicuously absent from the explanations offered by analysts and participants, alike.[140] Bing West dismisses the importance of such factors explicitly: "The Awakening wasn't attributable to economic development; Anbar was starved for funds. It wasn't due to enlightened governance; [Awakening leader Sheikh] Sattar referred to the Baghdad government as 'those Persians'."[141]

Instead, what appears to have been decisive in the Awakening was the popular rejection of AQI's brutality and the newfound U.S. willingness to partner directly with and empower local tribes as agents of security and governance. U.S. Army Colonel Sean MacFarland, who took over AO Topeka in the summer of 2006, lists as one of the most important lessons from his experience the realization that:

> The tribes represent the people of Iraq. . . . No matter how imperfect the tribal system appeared to us, it was capable of providing social order and control through culturally appropriate means where governmental control was weak.[142]

The often-used short hand that the United States bought off the insurgents or paid them to switch sides, therefore, is extremely misleading. No doubt some individual insurgents may have had their loyalties manipulated by money. But for the insurgency in general, U.S. payments to former insurgents cum tribal militias is more accurately described as a consequence of the change in loyalties than as a cause of the change.

PX286

In Ramadi, who governed appears to have been much more important than how those people governed.

## ENDNOTES - CHAPTER 2

1. *Baseline Food Security Analysis in Iraq,* World Food Program, September 2004, p. 78.

2. Lieutenant Colonel Justin C. Gubler and Command Sergeant Major Dennis P. Bergmann, Jr., "Task Force Rock Introduction to Ar Ramadi: Its People and the Enemy," undated briefing, p. 3.

3. Lieutenant Colonel Justin C. Gubler and Command Sergeant Major Dennis P. Bergmann, Jr., "Task Force Rock Operating Guidance," undated annotated briefing, p. 8, Interview 19 (Major Greg Sierra). All interviews will be referred to by their number and the name of the interviewee. For more detail on interview dates and interviewee positions, see Appendix I.

4. Interview 7 (Captain Sean Kuehl).

5. Interview 29 (Colonel Gary Patton).

6. Pamela Hess, "Ramadi Posts Seen As 'Symbol of Occupation'," *Washington Times*, September 7, 2004, p. 11.

7. "Introduction," *Al-Anbar Awakening, Volume I, American Perspectives: U.S. Marines and Counterinsurgency in Iraq, 2004-2009*, Chief Warrant Officer-4 Timothy S. McWilliams and Lieutenant Colonel Kurtis P. Wheeler, eds., Quantico, VA: Marine Corps University Press, 2009, p. 2.

8. Gubler and Bergmann, "Task Force Rock Operating Guidance," p. 5.

9. Interview 1 (Andrea Jackson).

10. Interview 6 (Corporal Peder Ell); Interview 23 (Carter Malkasian); Interview 36 (anonymous Army officer).

PX286

11. Seth Robson, "2nd BCT Settles Into Iraqi Home," *European Stars and Stripes*, September 11, 2004.

12. F. J. Bing West, "Iraqification, Part II," *Wall Street Journal*, August 2, 2004, p. 10.

13. 2nd Brigade Combat Team, 2nd Infantry Division, *After Action Review: Operation Iraqi Freedom 04-06, August 2004-August 2005*.

14. *Ibid.*

15. *Ibid.*

16. Hashim, p. 327.

17. Mike Dorning, "Marines Grow Weary of Even Friendly Faces," *Chicago Tribune*, September 16, 2004.

18. *Ibid.*

19. *Ibid.*

20. Anne Barnard, "US Forces, Hit By Raids, Fault Their Iraqi Allies," *Boston Globe*, August 1, 2004, p. 1; Hess, "Ramadi Posts Seen As 'Symbol of Occupation'."

21. John F. Burns and Erik Eckholm, "Western Iraq, Fundamentalists Hold U.S. at Bay," *New York Times*, August 29, 2004, p. 1.

22. "Highlights: Iraqi Press 2 Aug 04," August 2, 2004, FBIS Report GMP20040802000241, "Highlights: Iraqi Press 29 Aug 04," August 29, 2004, FBIS Report GMP20040829000187.

23. Alissa J. Rubin, "Iraqi City On Edge Of Chaos," *Los Angeles Times*, September 28, 2004, p. 1.

24. *Ibid.*

25. Seth Robson, "2nd BCT Hopes to Keep Ramadi From Turning Into Another Fallujah," *Pacific Stars and Stripes*, September 20, 2004.

PX286

26. Seth Robson, "2nd Brigade Combat Team Roundup Has Yielded 75 Suspects in Iraq," *Pacific Stars and Stripes*, October 8, 2004.

27. Interview 27 (Captain Eric Dougherty); Interview 29 (Colonel Gary Patton).

28. Joseph Giordono, "2nd Brigade Combat Team Soldiers Round Up Suspected Insurgents in Iraq," *Pacific Stars and Stripes*, October 24, 2004.

29. Edward Wong, "Provincial Capital Near Falluja Is Rapidly Slipping Into Chaos," *New York Times*, October 28, 2004, p. 1.

30. "Al Jazirah Interviews Journalist on Situation in Al-Ramadi," *Al-Jazirah Satellite Channel Television*, November 17, 2004, FBIS Report GMP20041117000050.

31. Tony Perry, "Ramadi At Heart Of Iraq Election Hopes," *Los Angeles Times*, January 22, 2005.

32. Tony Perry, "Polls Stand Empty In Sunni Stronghold," *Los Angeles Times*, January 31, 2005. One officer estimated that only 65 people voted in his battalion's area of operations, which covered approximately half the city. Interview 19 (Major Greg Sierra).

33. "IECI Head, Members in Al-Ramadi Tender Resignation," *Al-Sharqiyah*, January 28, 2005, FBIS Report GMP20050128000194.

34. Jackie Spinner, "Marines, Iraqi Forces Launch Offensive in Ramadi," *Washington Post*, February 21, 2005.

35. Joseph Giordono, "A Year On the Edge: 2nd BCT Bound for Colorado After Grueling Tour in Ramadi," *Stars and Stripes*, July 31, 2005.

36. Interview 15 (anonymous Army officer).

37. Ann Scott Tyson, "To The Dismay Of Local Sunnis, Shiites Arrive To Police Ramadi," *Washington Post*, May 7, 2005, p. 13.

38. Tom Roeder, "Carson Unit Says Tide Is Turning," *Colorado Springs Gazette*, April 18, 2005.

PX286

39. Interview 1 (Andrea Jackson).

40. Interview 3 (anonymous Army officer); Interview 36 (anonymous Army officer).

41. Interview 13 (Colonel David Clark); Interview 15 (anonymous Army officer); Interview 19 (Major Greg Sierra).

42. John Ward Anderson, "A Gruesome Find, With A Difference," *Washington Post*, March 19, 2005.

43. "U.S. Holds Secret Talks With Insurgents in Iraq," *Washington Post*, February 21, 2005; "Behind the News," *Al-Jazirah Satellite Channel Television*, June 27, 2005, FBIS Report GMP20050627535004.

44. Hamid Abdallah, "With the Americans' knowledge and consent, the Iraqi defense minister holds negotiations with the Iraqi resistance," *Al-Jazirah*, April 4, 2005, FBIS Report GMP20050404000175.

45. John A. McCary, "The Anbar Awakening: An Alliance of Incentives," *The Washington Quarterly*, Vol. 32, No. 1, January 2009, p. 48; Austin Long, "War Comes to Al Anbar: Political Conflict in an Iraqi Province," unpublished paper presented at the International Studies Association conference, February 2009, p. 11.

46. Interview 23 (Carter Malkasian); Interview 33 (Major General Richard Natonski).

47. Bing West, *The Strongest Tribe: War, Politics, and the Endgame in Iraq,* New York: Random House, 2008, p. 75.

48. *Ibid.*, p. 96.

49. Interview 32 (Lieutenant Colonel Justin Gubler); Interview 34 (Staff Sergeant Brian Fennema).

50. Nancy A. Youssef and Yasser Salihee, "Gunmen Kidnap A Governor In Iraq," *Philadelphia Inquirer*, May 11, 2005, p. 1, Ellen Knickmeyer and Othman Mohammed, "Governor In Iraq Is Found Dead," *Washington Post*, June 1, 2005, p. 16.

PX286

51. Joseph Giordono, "A Year On the Edge: 2nd BCT Bound for Colorado After Grueling Tour in Ramadi," Interview 3 (anonymous Army officer).

52. Tom Lasseter, "Insurgents Have Changed U.S. Ideas About Winning," *Philadelphia Inquirer*, August 28, 2005, p. 1.

53. Sabrina Tavernise, "Unseen Enemy Is at Its Fiercest in a Sunni City," *New York Times*, October 23, 2005, p. 1.

54. May al-Shirbini, interview with correspondent Ammar Ali, *Al-Arabiyah Television*, December 1, 2005, FBIS Report GMP20051201546007.

55. Lin Todd *et al*., *Iraq Tribal Study—Al-Anbar Governorate,* Stockbridge, GA: Global Resources Group, June 2006, pp. 2-24.

56. Patrick Graham, "The Message From The Sunni Heartland," *New York Times*, May 22, 2005.

57. Carter Malkasian, "The Role of Perceptions and Political Reform in Counterinsurgency: The Case of Western Iraq, 2004-05," *Journal of Strategic Studies*, Vol. 17, No. 3, September 2006, pp. 371-373.

58. Hashim, pp. 71-72.

59. Christopher K. Ives, "Interview with Lieutenant Colonel John A. Nagl," from the collection *Operational Leadership Experiences in the Global War on Terrorism,* Ft. Leavenworth, KS: Combat Studies Institute, January 9, 2007.

60. Interview 32 (Lieutenant Colonel Justin Gubler).

61. Interview 19 (Major Greg Sierra).

62. Tony Perry, "U.S. General Gets Earful From Men In Sunni City Who May Forgo Polls," *Los Angeles Times*, January 30, 2005.

63. Perry, "Polls Stand Empty In Sunni Stronghold."

64. Interview 7 (Captain Sean Kuehl); a very similar comment was made in Interview 15 (anonymous Army officer).

PX286

65. "U.S. Holds Secret Talks with Insurgents in Iraq," *Washington Post*, February 21, 2005.

66. *Measuring Stability and Security in Iraq,* Washington, DC: U.S. Department of Defense, October 2005, p. 7.

67. Tyson, "To the Dismay of Local Sunnis, Shiites Arrive to Police Ramadi."

68. Interview 7 (Captain Sean Kuehl).

69. Interview 23 (Carter Malkasian); Interview 32 (Lieutenant Colonel Justin Gubler).

70. Interview 13 (Colonel David Clark).

71. Interview 3 (anonymous Army officer).

72. Interview 4 (Seth Robson).

73. Interview 6 (Corporal Peder Ell).

74. Interview 29 (Colonel Gary Patton).

75. Interview 1 (Andrea Jackson).

76. Interview 35 (Lieutenant Colonel John Fant).

77. Interview 15 (anonymous Army officer).

78. Interview 36 (anonymous Army officer).

79. Not for attribution comment from interviewee.

80. Interview 36 (anonymous Army officer).

81. Interview 13 (Colonel David Clark).

82. Interview 36 (anonymous Army officer).

83. For example, Interview 6 (Corporal Peder Ell); Interview 7 (Captain Sean Kuehl); Interview 31 (Lance Corporal Jamie Sutton).

PX286

84. Interview 29 (Colonel Gary Patton).

85. *Field Manual (FM) 3-24/Marine Corps Warfighting Publication 3-33.5, Counterinsurgency* (FM 3-24/MCWP 3-33.5), p. 1-13. The manual does also note that, "as with any fixed ratio, such calculations remain very dependent on the situation." Based on more recent analyses, even these recommended ratios may be unreliable benchmarks for successful counterinsurgency. See R. Royce Kneece Jr. *et al.*, *Force Sizing for Stability Operations*, Alexandria, VA: Institute for Defense Analyses, March 2010; and Jeffrey A. Friedman, "Manpower and Counterinsurgency: Empirical Foundations for Theory and Doctrine," *Security Studies*, Vol. 20, No. 4, 2011.

86. Interview 27 (Captain Eric Dougherty). For a broader treatment of this subject see Carter Malkasian, "Did the U.S. Need More Forces in Iraq? Evidence from Al Anbar," *Joint Force Quarterly*, Issue 46, 3rd Quarter 2007, pp. 120-126.

87. Interview 29 (Colonel Gary Patton).

88. Interview 13 (Colonel David Clark).

89. Interview 3 (anonymous Army officer).

90. West, *The Strongest Tribe*, p. 71.

91. Interview 5 (Captain Ed Rapisarda).

92. Interview 32 (Lieutenant Colonel Justin Gubler); Interview 36 (anonymous Army officer).

93. Interview 4 (Seth Robson); Interview 6 (Corporal Peder Ell); Interview 27 (Captain Eric Dougherty); Sheikh Ahmad Bezia Fteikhan al-Rishawi; Interview 3 (anonymous Army officer); Colonel Gary W. Montgomery and Chief Warrant Officer-4 Timothy S. McWilliams, eds., *Al-Anbar Awakening, Volume II, Iraqi Perspectives: From Insurgency to Counterinsurgency in Iraq, 2004-2009*, Quantico, VA: Marine Corps University Press, 2009, p. 50.

94. John Hendren, "U.S. Troops Still Dying In Ramadi Amid 'Relative Peace, Tranquility,'" *Los Angeles Times*, December 1, 2004; Interview 35 (Lieutenant Colonel John Fant).

PX286

95. "US Military Says 'Insurgents' Blew Up Red Crescent Offices in Al-Ramadi," *Agent France Press*, October 8, 2004, FBIS Report EUP20041008000429.

96. Interview 13 (Colonel David Clark).

97. Interview 7 (Captain Sean Kuehl).

98. Interview 35 (Lieutenant Colonel John Fant).

99. Giordono, "2nd Brigade Combat Team Soldiers Round Up Suspected Insurgents in Iraq."

100. Rubin, "Iraqi City On Edge Of Chaos."

101. Interview 5 (Captain Ed Rapisarda).

102. *Rebuilding Iraq: Resource, Security, Governance, Essential Services, and Oversight Issues,* GAO-04-902R, Washington, DC: U.S. General Accounting Office, June 2004, p. 90.

103. *Measuring Stability and Security in Iraq,* Washington, DC: U.S. Department of Defense, May 2006, p. 25.

104. Iraqi Reconstruction Management System, U.S. Army Corps of Engineers, Gulf Region Division, June 2008. Available data on CERP spending totals include total funds distributed and project start dates and end dates. The author has estimated monthly and quarterly spending totals based on equal division of total funds spent over the number of active months per project. Project lengths in the database range from 1 to 40 months, but the average length is 4 months. As a result, aggregate quarterly spending summaries (as reported in the text above) are less likely to be distorted by this estimation technique than the monthly spending estimates (as shown in the figure).

105. Dana Hedgpeth and Sarah Cohen, "Money as a Weapon," *Washington Post*, August 11, 2008 (see both article and the transcript of the online discussion: *www.washingtonpost. com/wp-dyn/content/discussion/2008/08/10/DI2008081001774. html?sid=ST2008081002653&s_pos=list*).

PX286

106. Dana Hedgpeth and Sarah Cohen, "In Ramadi, a Counterinsurgency in Cash," *Washington Post*, August 11, 2008.

107. Eli Berman, Jacob N. Shapiro, and Joseph H Felter, "Can Hearts and Minds Be Bought? The Economics of Counterinsurgency in Iraq," *Journal of Political Economy*, Vol. 119, No. 4, August 2011.

108. Hedgpeth and Cohen, "In Ramadi, a Counterinsurgency in Cash."

109. Hedgpeth and Cohen, "Money as a Weapon."

110. Interview 13 (Colonel David Clark); Interview 32 (Lieutenant Colonel Justin Gubler).

111. Interview 29 (Colonel Gary Patton).

112. Wong, "Provincial Capital Near Falluja Is Rapidly Slipping Into Chaos."

113. "Al-Ramadi Residents Begin 2-day Sit-in in Protest of US Forces' Practices," *Al-Sharqiyah Television*, May 7, 2005, FBIS Report GMP20050507542005.

114. West, *The Strongest Tribe*, p. 24.

115. Joe Klein, "Saddam's Revenge," *Time*, September 18, 2005.

116. Interview 13 (Colonel David Clark).

117. West, *The Strongest Tribe*, p. 96.

118. Interview 33 (Major General Richard Natonski).

119. Malkasian,"The Role of Perceptions and Political Reform in Counterinsurgency: The Case of Western Iraq, 2004-05," pp. 373-374.

120. Lieutenant Colonel Justin C. Gubler, "Reconciling Counterinsurgency with Civil War: A Strategy for Stabilizing Iraq," unpublished paper, March 26, 2007, p. 7.

PX286

121. Interview 5 (Captain Ed Rapisarda).

122. Interview 26 (Tony Perry).

123. Interview 29 (Colonel Gary Patton).

124. Interview 32 (Lieutenant Colonel Justin Gubler).

125. Interview 19 (Major Greg Sierra).

126. Interview 23 (Carter Malkasian).

127. Interview 15 (anonymous Army officer).

128. Interview 29 (Colonel Gary Patton).

129. Interview 19 (Major Greg Sierra); Interview 29 (Colonel Gary Patton); Interview 32 (Lieutenant Colonel Justin Gubler).

130. Interview 19 (Major Greg Sierra).

131. Gubler and Bergmann, "Task Force Rock Introduction to Ar Ramadi: Its People and the Enemy," p. 41. (RPG=Rocket Propelled Grenade, RPK=assault rifle, PKM=machine gun, ISF=Iraqi Security Forces, IP=Iraqi Police, IED=Improvised Explosive Device, SVBIED=Suicide Vehicle-Borne IED, MSR=Main Supply Route, BLACK=unsafe, CF=Coalition Forces.)

132. 2nd Brigade Combat Team, 2nd Infantry Division, *After Action Review: Operation Iraqi Freedom 04-06, August 2004 – August 2005*.

133. Interview 19 (Major Greg Sierra).

134. Interview 35 (Lieutenant Colonel John Fant).

135. Statement of David M. Walker before the Subcommittee on National Security, Emerging Threats, and International Relations, Committee on Government Reform, House of Representatives, *Rebuilding Iraq: Governance, Security, Reconstruction, and Financing Challenges,* GAO-06-697T, Washington, DC: U.S. Government Accountability Office, April 25, 2006, p. 11.

PX286

136. For one expression of such concern, see Austin Long, "The Anbar Awakening," *Survival*, Vol. 50, No. 2, April-May 2008, pp. 67-68, 83.

137. *Measuring Stability and Security in Iraq,* Washington, DC: U.S. Department of Defense, February 2006, pp. 24-25.

138. Oliver Poole, "Insurgents Turning Against Al-Qa'ida in Iraq," *The Daily Telegraph*, February 6, 2006.

139. David Kilcullen, "Religion and Insurgency," *Small Wars Journal Blog*, May 12, 2007.

140. See Major Niel Smith and Colonel Sean MacFarland, "Anbar Awakens: The Tipping Point," *Military Review*, March-April 2008, pp. 41-52; Long (2008); Long (2009); McCary.

141. Bing West, "Counterinsurgency Lessons From Iraq," *Military Review*, March-April 2009, pp. 10-11.

142. Smith and MacFarland, p. 52.

PX286

# CHAPTER 3

## TAL AFAR (MAY 2005 to FEBRUARY 2006)

This chapter presents a case study of U.S. operations in and around the city of Tal Afar from May 2005 to February 2006. Its focus is on the U.S. Army's 3rd Armored Cavalry Regiment (3ACR) and its subordinate units during that time period. Like the case in Chapter 2, this case is presented in seven parts covering the following topics: 1) an overview of the background and major events of the case; 2) the role of ethnic and religious identity politics in the case; 3) counterinsurgent actions with respect to providing security; 4) counterinsurgent actions with respect to improving governance; 5) any efforts toward political agreements that address ethno-religious cleavages; 6) an assessment of the outcome of the counterinsurgency; and 7) a concluding discussion and evaluation of the case in the context of this study's questions and analytic framework.

## CASE BACKGROUND

### Tal Afar and the Insurgency.

The commander of the U.S. Army's 3rd Armored Cavalry Regiment, Colonel H. R. McMaster, commented that "If you take all the complexities of Iraq and compressed [sic] it into one city, it is Tal Afar."[1] Tal Afar is a small city in Iraq's northern Ninewah province. It is located roughly equidistant (50-60 miles) between Ninewah's capital city of Mosul to the east and the Syrian border to the west. Though population estimates for Tal Afar are as high as 300,000,[2] most estimates are closer to 200,000, and some interviewees

PX286

were convinced that the city's population by 2005 was much lower, perhaps only 100,000 people or fewer.[3] Tal Afar's population is distinct for being less than 10 percent Arab; 90 percent of the population is ethnic Turkmen. Tal Afar's Turkmen are Muslims, but split between about 75 percent Sunni and 25 percent Shi'a.

In spite of its somewhat remote and isolated position, Tal Afar has been a strategically important city throughout Iraq's history, including during the most recent war. Like Ramadi, it has served as something of a gateway for travelers, merchants, and smugglers, as well as being a pathway for oil pipelines transiting in and out of Iraq. It also straddles the boundary among Turkish, Kurdish, and Arab ethnic communities and bears the imprint of each of those rival groups. Though predominantly Turkmen, it had a heavily Arab culture during Saddam Hussein's rule, and its strategic location is coveted by the nearby Kurds.[4] (See Figure 3-1.)



**Figure 3-1. Tal Afar and Western Ninewah Province.[5]**

PX286

In recent decades, Tal Afar's economy was primarily based on four sectors: agriculture, trucking, smuggling, and government.[6] This latter sector became particularly important in the aftermath of the U.S. invasion. Many of Tal Afar's Turkmen were very loyal Ba'athists and had been strong supporters of Saddam Hussein. And, again like Ramadi, many current and former soldiers of Iraq's Army resided in Tal Afar, creating a solid basis for technical and tactical expertise in organizing armed opposition to the new forces in power.[7] Tal Afar was disproportionately represented in Saddam Hussein's secret police, so much so that the idiomatic expression, "watch out for him, he's from Tal Afar," meant he was a person with connections to Saddam Hussein's ruthless internal security institutions.[8]

Partly as a result of these relationships, and partly because of its location, the city fairly quickly became a focal point of insurgent activity in 2003-04. It was both a strategic transit point for foreign insurgents entering Iraq, and a home to many local Sunnis who were strongly opposed to the U.S. presence and the installation of a new government in Baghdad that was friendly with Iran and that equated Ba'athists with terrorists. As in Ramadi, this common cause became the basis for an early alliance between Islamic radicals and more secular Iraqis opposed to the new order. In the summer of 2004, this alliance of insurgents routed the local police force and all but took control of the city.[9] One report referred to the city at the time as a "guerrilla bastion where the U.S.-backed interim Iraqi government exerts only limited control."[10]

In September 2004, the U.S.-led Coalition initiated a major offensive against Tal Afar, known as Operation BLACK TYPHOON, in an attempt to dislodge the

PX286

insurgents from their stronghold in the city. Coalition forces conducted what amounted to a siege of the city for 2 weeks. Then on September 12, two U.S. battalions and an Iraqi National Guard battalion moved into the city in a major assault. As it turned out, they encountered little resistance from insurgents, as most had apparently fled.[11]

American officials at the time were not committed to conducting a counterinsurgency in the city. Instead, in keeping with the Coalition's larger strategy of transition, as well as with the economy of force levels of resources available, they wanted to get out of the city quickly. The senior U.S. officer in the area, Brigadier General Carter Ham, said:

> Having us stay there is exactly the wrong thing. First of all, we don't have enough forces to stay in the city. But it also sends a message to those that oppose us. It lets them say, 'See, we told you, they really are occupiers. They've taken over a city.'[12]

The aftermath of Operation BLACK TYPHOON was very difficult for the people of Tal Afar. Essential services were nonfunctional, and many of the city's residents were denied the freedom to return to their homes. Half or more of the city's residents were temporarily displaced. The resulting humanitarian problems generated grave protests against the United States from the Turkish government.[13] Insurgents fairly quickly reasserted their freedom of action and control in the city.

The Army unit that took over responsibility for Tal Afar in the spring of 2005 divided the insurgency there into two groups, borrowing locally-used terms that echoed the threat assessment in Ramadi: "Resistance" and "Takfiri." According to that unit's reports:

PX286

The 'Resistance' was made up of primarily Sunni Turkoman, supported by internal and external Islamic Extremist elements, whose fundamental goal was to prevent the Iraqi Transitional Government from succeeding, stall the growing power of the Shia local leaders throughout the AO [Area of Operations], and prevent the re-establishment of security forces which were not representative of the Sunni Turkoman population or its long term desires. The 'Takfiri' consisted of Islamic Extremist elements . . . [that] sought to end the occupation of the area by Coalition Forces, force the failure of the Iraqi Transitional Government (ITG), and establish a Muslim Rule of Law based largely upon the ideology adopted by Al-Qaida and the Taliban in Afghanistan.[14]

As in Anbar, these two groups were somewhat distinct but operated in concert against their common enemies, the Coalition and the Iraqi government.

The "Takfiri" elements within the insurgency in Tal Afar received a great deal of attention, partly due to the U.S. Government's public emphasis on fighting al-Qaeda, and partly due to their truly grisly acts of terrorism in the city, which featured suicide bombings and leaving beheaded bodies lying in the streets. Colonel McMaster described the enemy in Tal Afar as "the worst of the worst . . . people in the world."[15] Nevertheless, the available evidence, including the interviews conducted for this research, shows that most of the insurgents in the city were local Sunni Turkmen, not foreigners.[16] For example, one cavalry troop detained over 350 people during the course of its time in the city, 90-95 percent of whom were local Sunni Turkmen.[17] As the regiment's operations officer, Major Michael Simmering, indicated:

PX286

Everyone talks about Tal Afar being an important logistical hub for the foreign fighters coming into the country from Syria, but we didn't really see a lot of that. . . . [C]ertainly AQI was present and definitely fed the fire, but the insurgency was primarily locally-funded, locally-led, locally-focused.[18]

## The Counterinsurgents.

Like the 2nd Brigade Combat Team, 2nd Infantry Division (2/2ID) in Ramadi, 3ACR operated under a divisional headquarters (known at the time as Multi-National Forces–Northwest) and a corps headquarters (Multi-National Corps-Iraq [MNC-I]) in Baghdad. 3ACR, a unit slightly larger than, but roughly equivalent to, a brigade combat team, was composed of five squadrons, each the rough equivalent of a battalion: three cavalry squadrons, one aviation squadron, and one support squadron. The design and training of a cavalry regiment features elements potentially both advantageous and disadvantageous to conducting counterinsurgency operations. In conventional, high-intensity armored warfare, the role of cavalry units is primarily as scouts, performing reconnaissance and screening missions in support of larger armored formations. These missions put a premium on both mobility and collection and processing of intelligence. The former requirement means that cavalry units tend to be very dependent on the armored vehicles around which their units are built. This tactical culture is perhaps an obstacle to adapting to counterinsurgency operations that involve foot patrols and extensive interaction with the local population. On the other hand, the focus and force structure that a cavalry unit normally dedicates to intelligence does provide a solid foundation for adapting to counterinsurgency, a traditionally intelligence-driven mission.

PX286

3ACR was originally designated to operate in an area just outside Baghdad, but as U.S. commanders grew more concerned about Tal Afar's deterioration, four of its five squadrons were reassigned to western Ninewah province shortly after arriving in Iraq. First Squadron ("Tiger Squadron") moved into the expansive Syrian border area and western desert, while Second Squadron ("Sabre Squadron") took responsibility for Tal Afar, itself. The aviation and support squadrons also moved with Tiger and Sabre. The regiment's units began arriving in Ninewah in April, with about 4,000 troops having settled in by the middle of May. Sabre Squadron, with around 1,300 troops, officially assumed responsibility for the city of Tal Afar on May 1, 2005. 3ACR transferred authority to its successor on February 19, 2006.[19]

**What Happened (May 2005 to February 2006).**

In the months after Operation BLACK TYPHOON, western Ninewah province had received only the thinnest coverage by U.S. forces. When 3ACR took control of the area, it approximately quadrupled the number of troops in the area of operations. With so few forces in the area, the United States and the still very weak Iraqi security forces had not been able to resist a gradual takeover of Tal Afar by insurgents. Soldiers described the city as a ghost town[20] where economic activity had all but ceased,[21] families feared leaving their homes, and U.S. forces were attacked every time they ventured out from their bases.[22] A Sabre Squadron platoon leader reported that "the first 3 months were essentially an extended armed reconnaissance."[23]

The city's neighborhoods had become tribal and sectarian enclaves where, for example, Sunni Farhats

PX286

rarely ventured into Shi'a Jolaq areas and vice versa.[24] Tal Afar's mayor, a Sunni, was widely known to be working with the insurgents. The police force, meanwhile, or at least what remained of it, was entirely Shi'a. Described by some interviewees as little more than a sectarian death squad,[25] the police tended to stay holed up at the city's Ottoman-era hilltop castle in a Shi'a neighborhood, only venturing out to conduct attacks on rival tribal groups.

3ACR's first moves were to try to clear some key locations in the city, such as around the hospital, to secure the main east-west highway and to attempt to start reconstituting the police force. After initial unsuccessful attacks against the U.S. forces, insurgents began targeting civilians more. One local tribal leader complained, "Anyone not helping the terrorists can't leave their homes because they will be kidnapped and the terrorists will demand money or weapons or make them join them to kill people. If they refuse they will chop their heads off." A flier posted at a school read, "If you love your children, you won't send them to school here because we will kill them."[26] This trend was punctuated by a pivotal attack on May 23 when Sunni insurgents detonated two large suicide car bombs in the neighborhood of the Jolaq tribe, one of the city's largest Shi'a tribes, killing or injuring more than 40 people. Sabre Squadron commander Lieutenant Colonel Chris Hickey called this incident a turning point for the Jolaq tribe, who turned to the United States for help and "created the opening needed to allow our Soldiers and leaders to finally begin understanding the city."[27]

On June 4, in what was to be the beginning of one of Sabre Squadron's main efforts in Tal Afar, Hickey hosted a summit of tribal sheikhs to discuss how to

PX286

solve the security situation in the city. More than 60 local leaders attended, and to the Americans' surprise, amid a great deal of tension, argument, and raised voices, many of the sheikhs in attendance advocated a major military assault on the city.[28] In large part, however, this reflected a deep sectarian split among Tal Afar's tribes. Shi'a tribal leaders were much readier for a military solution than were Sunni tribal leaders, and they each lobbied the provincial and federal governments to this effect.[29] The minority Shi'a saw the United States as a potential ally in protecting them from their Sunni rivals and were quite ready to paint those groups with a broad insurgent brush. As one Sabre trooper put it, "These guys weren't interested in fighting insurgency. They were interested in using an armored cavalry regiment to carry out their tribal vendettas."[30]

For the first half of the blazing hot summer, 3ACR resisted entreaties for a major assault on the city, continuing to try to identify and target known insurgents while trying to build relationships with the complex network of competing sheikhs in the city. In spite of tactical successes, however, the city remained gripped by fear and violence. By late July, the regiment had decided that a major offensive would be necessary to clear some parts of the city of the worst of the insurgents there. Thus began an elaborate, multiweek preparation for an attack focused on Tal Afar's eastern Sarai neighborhood, an attack that would be known as Operation RESTORING RIGHTS.

Key features of these preparations included marshalling several Iraqi Army and police commando units, together with their U.S. Special Forces advisors, building a dirt berm around the city to limit movement in and out of the city, and constructing a large facility

PX286

outside the city for residents to take shelter away from the combat.[31] The regiment also brought more than half of Tiger Squadron into the western half of the city from its posts in the desert and along the border, and arranged for a battalion of the 82nd Airborne Division (2nd Battalion, 325th Airborne Infantry Regiment [2-325th]) to move into the targeted Sarai neighborhood immediately following the assault.

In some respects, these preparations and the plans for the operation, itself, bore the hallmarks of a very conventional combat operation. Its intent, however, aligned with the regiment's understanding of the political dynamics in the city, as Lieutenant Colonel Hickey explains:

> The overarching purpose of Operation RESTORING RIGHTS (ORR) was to set the conditions in which political and economic development could proceed. More specifically, by attacking the Takfirists and guarding against the tendency to attack the population directly, the Sunni could be reintegrated into the mainstream political process once the veil of terror was lifted from their ranks. Meanwhile, maintaining the support of the Shiites could eventually bring unity to the city and establish an environment that finally allowed for reconstruction operations and reconciliation of tribal conflicts.[32]

With this objective in mind, U.S. and Iraqi security forces kicked off the operation on September 2. For nearly 2 weeks, U.S. and Iraqi forces cordoned off and then moved through the Sarai district and other eastern portions of the city, facilitating civilian evacuation, targeting known insurgent strongholds, and clearing city blocks. Resistance to the assault force was much lighter than anticipated, in part because of the Iraqi government's insistence on a 7-day pause for ci-

PX286

vilian evacuation, which some believe allowed many insurgents to escape.[33]

By September 15, the operation had concluded, with U.S. and Iraqi forces having killed around 150 insurgents and captured another 850.[34] Crucially, U.S. forces opted to remain stationed inside the city for the first time, with the newly arrived 2-325th battalion taking over the Sarai neighborhood and Sabre Squadron taking up headquarters in the northern and central areas of the city. This began a period of major reconstruction and political activism on the part of 3ACR. In October, Sabre Squadron established the following goals for its operations in the city:[35]

- Quickly establish security forces throughout the depth of the city to secure the population prior to the return of the majority of the civilians.
- Establish [traffic control points] and obstacles throughout the city to control the ability of the [anti-Iraqi forces] to maneuver freely throughout the city.
- Recruit, train, equip, and employ a police force representative of the population.
- Immediately address any claims of damages made by the citizens and pay compensation.
- Begin large scale reconstruction operations to immediately begin altering perceptions of security.
- Target anti-Iraqi forces operating within the city to prevent them from reinitiating their campaign of intimidation on the population.
- Immediately establish new operational police stations throughout the city to begin the process of transitioning security responsibilities to local forces.

PX286

- Conduct information operations to emphasize the legitimacy of the government, the necessity of ORR [Operation RESTORING RIGHTS], and the return of peace and security to Tal Afar.
- Ensure each citizen of Tal Afar [is] afforded the opportunity to vote in the October Referendum.

Three of these goals stood out in importance. First was the establishment of new security stations throughout the city, jointly manned by U.S. and Iraqi forces. The idea behind this initiative was to establish a ubiquitous presence in the city and thus raise the confidence of the population while expanding intelligence collection and limiting insurgents' freedom of movement.

Second was the recruitment of a new police force. In particular, U.S. forces aimed to create a police force that was representative of the sectarian demographics of the city, as opposed to being dominated by the Shi'a minority as had been the case previously. As Lieutenant Colonel Hickey explained:

> Prior to ORR [Operation RESTORING RIGHTS], Sabre attempted to recruit police from throughout the city. Because of the enemy's campaign of intimidation, Sunni citizens did not volunteer in significant numbers. The police recruiting process began upon the completion of ORR and became an immediate success. In the first 2 days of police recruiting, over 300 people arrived at the castle to volunteer to become [Iraqi police]; the more important part of the number was that 60-70% of the people that arrived were Sunni.[36]

Third was the preparation for the fall elections, the constitutional referendum in October and national

PX286

elections in December. Substantial popular participation in these elections was seen as a critical measure of political development in the fledgling state. Sabre Squadron counted the elections as a significant success in Tal Afar. There were no major attacks and an estimated 17,000 people voted in October, and 40,000 in December, a great improvement over 1,000 estimated voters in the January 2005 election.[37]

These efforts accompanied a significant push to reestablish the basic functioning of the city's infrastructure and services, especially provision of clean water and food. And 3ACR commanders continued their attempts to bring Tal Afar's tribal sheikhs into a political process that might eventually form the foundation for a new city government.

Violence in Tal Afar plummeted over the fall of 2005. Figure 3-2 shows the average number of daily attacks in each of the 10 months from April 2005 to January 2006.[38] These numbers include attacks by multiple methods against U.S. forces, Iraqi security forces, as well as civilian targets in the city. Attacks declined over this period from an average of six per day in June 2005 to about one per day in December. At the end of that month, the 2-385th battalion left the city, leaving Sabre Squadron as the main U.S. unit in the city. Nevertheless, violence continued its decline into January, when Tal Afar experienced only 18 insurgent attacks all month.

PX286



**Figure 3-2. Average Attacks Per Day in Tal Afar.**

In February 2006, shortly before 3ACR turned Tal Afar over to its successors, the 1st Brigade of the 1st Armored Division, the city's sheikhs held a tribal reconciliation meeting. Leading sheikhs from both Sunni and Shi'a tribes held civil discussions about the future administration of the city and proclaimed themselves to be not just Sunni or Shi'a, but "Iraqian."[39]

In the months after 3ACR's departure, Tal Afar was not free from insurgent activity or from sectarian violence. Some of the same tensions that had plagued the city before persisted,[40] not least because of the sectarian violence that swept much of Iraq in the wake of the bombing of the al Askariya Mosque in Samarra, only 3 days after 3ACR left Ninewah. But the city did not regress back into the ungovernable war zone that it had been.

The transformation of Tal Afar from insurgent stronghold to a moderately functional city quickly

PX286

became a touchstone for policymakers in conceiving of a shift in U.S. strategy in Iraq toward the concept deemed to have been practiced there: "clear, hold, and build." In October 2005 Senate testimony, Secretary of State Condoleeza Rice cited Tal Afar as a successful example of this approach.[41] President George W. Bush dedicated an entire speech to 3ACR's experiences in Tal Afar as an illustration of what was possible for the United States to achieve in Iraq.[42] Subsequently, it featured in the Army's and Marine Corps's new counterinsurgency manual, again as a successful example of "clear, hold, and build."[43]

## Were Ethno-Religious Identity-Based Cleavages Significant?

There is no question that Sunni-Shi'a identity-based conflict was central to the insurgency in Tal Afar. The conflict was manifest in two mutually reinforcing dimensions: the national conflict between Sunnis who were increasingly afraid of disenfranchisement at the hands of the allegedly sectarian central government; and local conflict among tribes who were predominantly Sunni or Shi'a.

This sectarian cleavage is something of a historical curiosity because it had not been a significant problem among Tal Afar's Turkmen population prior to the overthrow of Saddam Hussein.[44] To the contrary, Tal Afar's Sunni and Shi'a were united to some degree by pride in the distinctness of their Turkmen culture and language in a majority-Arab country. But in the aftermath of the Coalition invasion of Iraq, the Turkmen were experiencing what one scholar called an identity crisis.[45] Their political mobilization had been almost entirely based in the Ba'ath party, which was now not

PX286

only out of power but illegal, a problem one interviewee likened to "pulling the spinal column out of Iraq."[46] What would replace Ba'athism was uncertain, but to the extent Tal Afar's Sunnis could discern the intentions of the new Iraqi government, they feared sectarian discrimination. One interviewee characterized the views of the Sunni Turkmen elite as nationalist, but with "almost a colonial mentality; 'our Shi'a' are OK, we can handle them. But the 'other Shi'a', they are compromised, they have come under the sway of the Iranians."[47]

Additionally, with the collapse of the state that had provided virtually everything to the city, from security to food, the people of Tal Afar increasingly looked to their tribes for sources of support. While Tal Afar's tribes do not share an entirely homogeneous religion, they do tend to be predominantly Sunni or Shi'a.[48] Soon these emerging tribal—and increasingly sectarian—grievances were being stoked by the Islamist extremists who were taking up residence in the city in growing numbers, thanks in part to its strategic location as a transit point between Syria and Mosul and then Baghdad. This was the environment that became fertile ground for an alliance of convenience between nationalist local resistance insurgents and the Islamist radicals of al-Qaeda in Iraq (AQI) and Ansar al Sunna. Very quickly, then, the city descended into a nightmare of tribal feuds and terror imposed by the insurgents. In this sense, as one interviewee put it, the conflict in Tal Afar was "sectarian-fueled" but not "sectarian-based."[49]

The sectarian cleavage was further exacerbated by the behavior of many of the Iraqi security forces that operated in and around the city. The police were taken over by a Shi'a chief who quickly purged the lead-

PX286

ing Sunni officers from the force, prompting rumors of the growing local influence of the Iranian-backed Badr Corps militia.[50] The Iraqi Army also tended to reinforce the fears the Sunnis had of being marginalized, or worse. In Operation BLACK TYPHOON, the Army's Scorpion Brigade, a heavily Shi'a commando unit, was deployed to Tal Afar from Baghdad, inciting loud protests from Tal Afar's Sunnis. Voicing a common complaint, one resident complained that all the official security forces "are from the Badr Organization and the [Kurdish] Pesh Merga. They wear the military uniform for disguise. Their treatment is very bad. They were taking people to detention prisons just because they are Sunnis since the start of the military campaign." Another resident agreed, saying: "The Iraqi army are the real terrorists. Even what they write on our walls is evidence, like 'Long live Pesh Merga' or 'Long live Badr.'"[51] Just as Tal Afar's Sunnis had begun to see Badr behind every Shi'a, Shi'a were quick to label any Sunni as a terrorist.[52]

Another measure of the division and animosity that had developed in the city was the reaction of Sunnis in the Sarai district when told that they needed to evacuate through a Shi'a neighborhood. The majority of them refused to do so, having been warned that Shi'a residents and police in that neighborhood would attack them if they left in that direction. One man explained, "I would rather die from American bombs in my home with my family than walk south. People are saying the Shiites will kill you or kidnap you." Another resident of the Sarai neighborhood commented: "There are no bad people in Sarai. If you come with me, I will take you to all the houses and you can see. The bad people are the Shiites in the south [of the city]."[53]

PX286

Tal Afar's appearance as something of a microcosm of a brewing civil war was not lost on Iraqi leaders in Baghdad. As Operation RESTORING RIGHTS went forward in September 2005, debates raged over it in Baghdad, with Sunni and Shi'a politicians leveling accusations of sectarianism with equal gusto. Shi'a politicians cast the operations as a legitimate government intervention aimed at ceasing Sunni oppression of the city's Shi'a minority. For example Ali Al-Dabbagh claimed that "we support [what the government is doing] 100 percent. Tal Afar has been a bleeding wound in Iraq's heart for a year now. There was a clear case of racial and ethnic cleansing in the city." Others contended that the conflict was not originally a sectarian one, but that the government response was making it one. Sunni lawmaker Salih al-Mutlaq, for example, said, "The tension is between the people and the government, not between the Sunnis and Shiites. [In Tal Afar, the government is waging] a very ugly ethnic war."[54] Another Sunni politician, Fakhri al-Qaysi, argued that accusations of terrorism were only a pretext for marginalizing the political participation of Sunni communities. "The ruling political parties and the U.S. forces are trying to provoke the Sunni Arabs . . . and press to harp on the tune of sectarianism as they have been doing since the first day of occupation."[55]

## Were Good Security Operations Conducted?

A description of security operations in Tal Afar usefully divide into the periods before and after Operation RESTORING RIGHTS. Before the operation, U.S. forces mostly lived on forward operating bases outside the city and would move into and around the

PX286

city in their armored vehicles. Dismounted patrols were conducted regularly as well, but the commute to work was an important feature of operations. Frequently, operations took on the character of movement to contact, where the patrol's agenda would be set by responding to enemy engagements.

3ACR forces also conducted a good deal of targeted operations—raids and strikes—against insurgent suspects or facilities. However, the quality of the intelligence it used for targeting was significantly hampered by two closely related factors. First, because of their sporadic presence in the city, they had to rely on informants to generate much of what intelligence could not be gathered electronically. But in the regiment's first couple months in the area, members of Shi'a tribes were the only local residents willing to work with the U.S. forces. Over time, 3ACR learned that many of these allies were not only unreliable, but counterproductive. Interviewees report incidents where informants had identified individuals, or even just groupings of houses tied to the insurgency, when in fact, they were simply pursuing tribal rivals.[56] As a result, until U.S. forces recognized that they were being manipulated, they "actually exacerbated the problem to some extent, by rolling up Sunnis, not all of whom were bad guys," said Major Simmering.[57] One troop commander lamented that "our increased cooperation with the Shi'a tribes confirmed the Sunni population's worst fears."[58] Another said simply, "up until Operation RESTORING RIGHTS, we were pretty much fighting a losing battle."[59]

After Operation RESTORING RIGHTS, however, the situation changed dramatically. Many factors changed in that period, including some of those described in the next two sections. But one of the most important initiatives of this time was the movement of

PX286

U.S. forces (specifically Sabre Squadron and 2-325th) into the city and into small, neighborhood outposts that were jointly manned by U.S. and Iraqi forces.

It was only at this point that U.S. forces were really able to start providing a strong, constant presence, which in turn allowed them to develop the relationships with the people that generated good intelligence. Troop commanders reported that staying in the city was a tough sell to their troops at first, but that the visible changes their presence brought were eventually very good for morale.[60] More patrolling occurred, both by U.S. and Iraqi forces, at section and squad level rather than platoon level, because the improved security environment allowed it. As a result, Lieutenant Colonel Hickey said, "the perception of the amount of coalition forces operating within the city changed significantly as more and more units became visible to the populace on a daily basis."[61]

U.S. security operations in Tal Afar were also aided significantly by the availability and generally good performance of Iraqi security forces. Through most of its tenure in Ninewah, 3ACR partnered with the 1st Brigade of the 3rd Iraqi Army Division. The brigade was predominantly Kurdish and Shi'a, which did sometimes generate friction with Tal Afar's Sunni majority, as noted above. However, the unit received praise from many interviewees for its skill, professionalism, and leadership, especially the commander of the 3rd Iraqi Army Division, Major General Khorsheed Saleem al-Dosekey.[62] In Colonel McMaster's judgment, "the most important aspect of building local legitimacy was the legitimacy of the [Iraqi security forces]."[63]

Another key factor in security operations was the sheer number of forces that the Coalition was able to

PX286

bring to bear on the fight for Tal Afar. Precise counts are difficult, and the forces focused on the city varied considerably over time. But by virtually any measure, the military presence in Tal Afar was quite large relative to the size of the city and its population. At its peak during Operation RESTORING RIGHTS, the force presence in the city included 2,000-4,000 U.S. troops and 3,000-6,000 Iraqi troops, including Army, police, and commando units. As noted, population estimates for this time also vary greatly, but even the most conservative estimate of the force-to-population ratio would be 1:40, and it could have gone as high as 1:10.[64] Anywhere in this range would qualify as a relatively high troop density, especially considering that the city of Tal Afar only covers approximately nine square kilometers. Interestingly, McMaster initially wanted even more troops for the assault.[65] His judgment on the importance of troop density was that success "could have been possible with a smaller number of troops, but it would have taken a lot longer."[66] Of course, fewer forces were present for most of the period of the case study, but during the critical months of September to December, both Sabre Squadron and 2-325th Battalion, as well as large portions of the Iraqi Army's 1st Brigade, 3rd Division exclusively focused on the city.

The combination of troop density and persistent presence throughout the city clearly played a major role in reducing the violence in Tal Afar and setting the city back on a path toward a semblance of normalcy. On balance, this record suggests that good security operations were conducted in Tal Afar.

PX286

## Was Good Governance Provided?

As with security operations, the 3ACR's efforts to improve governance in Tal Afar were quite different before and after Operation RESTORING RIGHTS. When the regiment arrived, Tal Afar's city government was all but abandoned, and basic services had drastically deteriorated. Responsibility for taking care of the city's people had largely devolved to the city's many tribal leaders,[67] but economic activity had largely ceased, creating an epidemic of unemployment for many of those who did not leave the city. In some cases, infrastructure failures fell disproportionately on the Shi'a tribes. One prominent grievance was the collection of the raw sewage that drained into a wooded area next to one of the city's mainly Shi'a neighborhoods—a site that 3ACR Soldiers dubbed the "Shitwood Forest."

Echoing 2/2ID's experience in Ramadi, most of 3ACR's efforts to re-establish good governance in its first few months in the city were frustrated by the persistent violence and the absence of many reliable Iraqi partners willing to work with them. First Lieutenant Brian Tinklepaugh described an example of the difficulties facing projects aimed to improve governance during this time. His troop established a program to deliver water in trucks to a predominantly Sunni neighborhood that was suffering from unreliable water pressure and electricity. They hired Sunni truck drivers and sent along police to provide security for the trucks. The Shi'a police soon told the U.S. Soldiers that they were hiring insurgents. When the United States then arrested the truck drivers, they alienated those drivers' tribes, whose leadership stopped supporting the Coalition's reconstruction operations.[68]

PX286

Rebuilding the city and reestablishing the basic functions of governance beyond security were central to the planning behind Operation RESTORING RIGHTS. Lieutenant Colonel Hickey called reconstruction the most important phase of the operation. He explains:

> Regardless of how many people Sabre captured or killed, if the people didn't feel secure, essential services were not re-established, and viable alternatives to engaging in terrorist activities were not made available, Tal Afar would fall back into the trap of being a home for terrorist activities. Immediately upon completion of combat operations, water trucks, food & water drops, and other humanitarian assistance missions became the standard throughout Tal Afar.[69]

Over the course of October and November, the Coalition initiated projects worth millions of dollars focused especially on the restoration of water, electricity, schools, and medical services. Sabre Squadron created a civil military operations center in the city that became a focal point for interacting with the local population on a wide variety of issues. Similarly, Sabre Squadron Soldiers were active in rejuvenating the city council and several other municipal institutions.[70]

The Coalition's spending in Tal Afar via the Commander's Emergency Response Program (CERP) also rose dramatically in the fall of 2005. As outlined in the previous chapter, this program provides money that brigade commanders and their subordinate commanders can use to meet local needs in their areas of operation. CERP funds typically go to relatively small, relatively short-term projects, and also pay reparations for property damaged in combat or to family members of killed and wounded civilians. Estimated CERP spending in Tal Afar increased significantly

PX286

over the period of the case study. Estimated spending by quarter rose from $399,000 (May-July) to $418,000 (August-October) to $1.1 million (November-January) to $1.3 million (February-April).[71] This represents an increase from beginning to end of a factor of 3.3. See Figure 3-3.



**Figure 3-3. Estimated Monthly CERP Spending in Tal Afar.**

The results of these large investments, not only CERP, but other investments made by the Coalition and the Iraqi government, were evident in relatively short order. Tal Afar's markets and schools re-opened, and basic services were gradually restored to some level of working order. A British reporter visiting Tal Afar in December 2005 reported that:

PX286

the streets are full of building sites. New sewers have been dug and the fronts of shops, destroyed in the U.S. assault, were replaced within weeks. Sunni police have been hired and 2,000 goats were even distributed to farmers. More remarkably, the approach of an American military convoy brings people out to wave and even clap.[72]

Some interviewees noted the importance of improvements in governance in building the legitimacy of the Coalition and the local government in the eyes of the local population. One U.S. squad leader called the difference made "night and day—people really appreciated it."[73] A troop commander said, "The population continuously gave us praise for what we did there. They were very appreciative and looked on us favorably."[74] An engineering platoon leader believed that, "Improving those kinds of quality-of-life conditions was one of the most important things that swayed the population over to supporting the Coalition."[75]

At the same time, as in Ramadi, some interviewees noted serious limitations to the effects of some of the reconstruction projects pursued, and believed that the local population was far more interested in and appreciative of the security provided by the Coalition. A regimental staff officer commented that "We dumped a ton of money into construction projects that they weren't interested in—schools, parks, etc."[76] A reporter who spent a few months in Tal Afar during this period commented that "People would always complain about water and electricity. . . [But] that whole argument about basic services – the main public utility is security. This is more important than anything else."[77] Another interviewee, Lieutenant Tinklepaugh, stated plainly that:

PX286

the reconstruction activities that we engaged in were a consequence of our success in marginalizing the insurgency, not a cause of it. The population was appreciative, but they rarely commented on it. What they were much more appreciative of was the security . . . They were real upset about the lack of electricity and the lack of water pressure (and these problems exacerbated each other). And this created a problem with the sewage system, which was also exacerbated by all of the drainage issues created by the problems in the streets – caused by our vehicles as well as by the combat. But these problems didn't cause people to want to become insurgents, it caused people to become apathetic.[78]

3ACR's commander, Colonel McMaster, seemed to share this perspective, arguing that:

The most important thing is securing the population. And you can't do much positive until you've established this. . . . Governance projects were important factors in our progress, but they came at a different time—it was more of a reward for cooperation. It happened in areas that were already secured.[79]

## Were Political Agreements Addressing Ethno-Religious Cleavages Pursued?

From fairly early in 3ACR's deployment, its leaders focused on the importance of reaching a political accommodation among Tal Afar's tribal groups, whose increasingly sectarian loyalties were pushing the city toward something like civil war. Lieutenant Colonel Hickey was the regiment's point person in this effort, and by all accounts he focused tirelessly on building relationships with Tal Afar's sheikhs and on attempting to bridge the divides between them.

PX286

Initially, as noted, only the Shi'a sheikhs were willing to talk seriously with U.S. leaders about the future of the city. Hickey began spending 40 or 50 hours a week with the Sunni sheikhs, working to convince them of the U.S. commitment to securing their people. Then just as Hickey began to make inroads with Sunni sheikhs, "the Shia freaked out," as Hickey told journalist George Packer. They questioned the purpose of, as they viewed it, consorting with the enemy. "Because I'm trying to be balanced," Hickey recalled telling the Shi'a leaders. "I'm trying to stabilize your city. If I just talk to you, I'm not going to stabilize your city." [80]

This shift toward cultivating relationships among the Sunnis was not necessarily an intuitive choice on the U.S. side either. "At the troop level," Captain Jesse Sellars said, "this was unpopular, because this means we have to go make friends with the guys who are blowing us up instead of with the guys who are feeding us fried chicken. But [Hickey] was absolutely right."[81]

Whenever possible, Hickey tried to arrange and moderate meetings among sheikhs where they could air grievances with each other and with U.S. forces and discuss potential resolutions. In time, one theme Hickey came to stress in such meetings and that the regiment tried to impress more broadly upon the city's residents, was the common cause Tal Afar's Sunnis and Shi'a ought to share against the terrorism perpetrated against them by the "Takfiris." As Hickey described, "the 'Resistance' had the potential to be quelled through involvement in the ongoing political process *IF* they could escape the intimidation campaign of the [insurgents] living among them."[82] In Major Simmering's view, the real purpose of Operation RESTORING RIGHTS was not "to clear the town of insurgents . . . it was to protect the Sunni

PX286

population who were willing to participate in the political process."[83]

After Operation RESTORING RIGHTS, rebuilding the police force also became one of 3ACR's most important tools for addressing the sectarian conflicts in the city. Abuses by the Shi'a police force had been a major contributing factor to Tal Afar's downward spiral, and as a result, U.S. forces believed that "the first step toward reconciliation among the populace meant recreating a police force that was representative of the population."[84] Police recruiting focused heavily on the city's Sunni population.

The insurgents may well have recognized the strategic importance of this development and tried to counter it. In the first several weeks after the end of Operation RESTORING RIGHTS, Tal Afar was rocked by three major suicide bombing attacks, which together killed around 70 people and injured more than 130 others.[85] Two of these three attacks were directed specifically at police recruits. Nevertheless, the police recruiting efforts remained a focus of the regiment's strategy, and ultimately saw a great deal of success. By the end of its deployment in Tal Afar, 1,400 new police officers had been recruited, 60 percent of whom were Sunnis.[86]

The rebalancing of the police force was part of a broader attempt by the 3ACR's leadership to rebuild a sense of national identity in the city. As the regiment's executive officer, Major Chris Kennedy, told a reporter, "What we're working toward is a national army, a national security force, not a Shiite or a Kurdish force, and anyone who thinks otherwise doesn't know the situation."[87] George Packer describes seeing Lieutenant Colonel Hickey "ask a group of police trainees at a new station whether they were Sunni or Shiite, and when they started to answer, he said, 'No—Iraqi!'"[88]

PX286

In combination with all of the Coalition's other operations, these political overtures aimed at reducing sectarian antagonism did appear to pay off over time as the city's sheikhs began to take steps toward aligning their own activities with those of the nascent city government, as well as with the counterinsurgency goals of the U.S. and Iraqi security forces. A 3ACR intelligence officer described the progress he saw over the fall of 2005:

> The real difference since ORR has been in the reporting and cooperation from the locals, both Shia and Sunni, to turn in anyone who is causing problems and there have even been fights reported between Sunni groups as the previously-intimated are fighting back, even against members of their own tribe or sect. The long-simmering feud in Tal Afar between the Shia Jolaqs and the Sunni Farhats . . . has cooled down significantly after several weeks of sheikh meetings to iron out their long-running disputes.[89]

In describing the evolution of the meeting with the city's sheikhs, Major Simmering said, "Where we got to wasn't perfect, but what was a screaming match in June was a civil conversation in January."[90]

None of this means to imply that the sectarian conflicts that had created so much strife had been solved. Indeed, the wounds of the tribal feuding ran deep, even though they were young in historical terms. Those tensions and grievances persisted. Sectarian murders continued, and discrimination on the basis of sect and tribal affiliation was rampant. In December, a self-appointed council of sheikhs and clerics published a formal statement complaining about the persecution of the Sunni population in Tal Afar.[91]

Tal Afar's reformed police were not necessarily a picture of professionalism or blind justice. George

PX286

Packer had this exchange with an officer named Hassan once during his visit in early 2006. Hassan told Packer:

> If the Americans weren't here, we could get more out of our interrogations.
> You mean torture?
> Only the terrorists.
> How many terrorists and sympathizers are there in Tal Afar?
> Hassan considered it for a moment. "A hundred and fifty thousand." This was approximately the number of Sunnis in the city.[92]

What the record does demonstrate, however, is that the U.S. forces fighting the counterinsurgency in Tal Afar were keenly aware of the sectarian roots of some of the insurgency they were facing and took deliberate and extensive measures to reach accommodation between competing sectarian parties. As journalist Louise Roug observed, "the military leadership had a very sophisticated understanding of the groups in the city, and who was aggrieved and why. They did try to prop up the groups who felt disenfranchised."[93]

## Was The Counterinsurgency Successful?

According to journalist Tom Ricks, "When U.S. military experts conducted an internal review of the three dozen major U.S. brigades, battalions, and similar units operating in Iraq in 2005, they concluded that of all those units, the 3rd ACR had done the best at counterinsurgency."[94] There is no doubt that 3ACR's operations in Tal Afar have been widely perceived by policymakers and the press as a model of successful counterinsurgency. As noted above, the experience

PX286

was cited in this vein by, among others, the military's counterinsurgency manual, Secretary of State Condoleezza Rice, and President George Bush.

This view was not exclusive to Americans. During Operation RESTORING RIGHTS, Iraqi Defense Minister, Sa'dun al-Dulaymi (a Sunni Arab) told the press that Iraq's leaders "consider what is going on there an example and a model to be followed in other areas . . . in Iraq."[95]

During 3ACR's deployment, Tal Afar mayor Najim Abdullah al-Jabouri asked for the regiment's tour to be extended and wrote a letter of glowing tribute to the unit. He credited the regiment with liberating the city, transforming it "from a ghost town, in which terrorists spread death and destruction, to a secure city flourishing with life." He said, "This military operation was clean, with little collateral damage, despite the ferocity of the enemy. With the skill and precision of surgeons, they dealt with the terrorist cancers in the city without causing unnecessary damage." He called the American Soldiers "not only courageous men and women, but avenging angels sent by The God Himself. . . ."[96] Even allowing for some inevitable public relations spin[97] and Arabic hyperbole, this registers as high praise.

Sabre Squadron summed up its own performance as follows:

> . . . the 1,300 cavalrymen of Sabre Squadron decisively defeated the insurgents, re-established legitimate security forces at nearly 41 locations throughout the area and revived a local government and economy on the brink of annihilation. . . the citizens of Tal Afar and the surrounding areas. . . acknowledge that participation in the political process is the primary avenue to a future peace in Iraq.[98]

PX286

The regiment listed the following comparisons of the "enemy situation" in its area of operations near the beginning and the end of its deployment.[99] See Table 3-1.

| June 2005 | January 2006 |
|---|---|
| • Enemy retained the initiative, capable of complex attacks and defensive operations<br>• Western Ninewah avenue for insurgents and access to external support<br>• Tal Afar safe haven for leadership and "Title 10" functions<br>• HUMINT access limited<br>• Organization was cohesive and militarily structured<br>• Multiple cells in urban areas<br>• Tribal violence pervasive | • Enemy reactive, only capable of IED and IDF attacks<br>• Western Ninewah difficult to traverse with reduced external support<br>• Tal Afar now a non-permissive environment<br>• HUMINT unlimited<br>• Leadership disrupted and displaced<br>• Few cells operating in small communities outside urban areas<br>• Tribal tensions exist, no open violence |

**Table 3-1. Changes in Western Ninewah, June 2005 – January 2006.**

These assessments are supported by the striking drop in insurgent attacks experienced in this time period and shown in Figure 3-2. Interviewees universally, albeit with varying degrees of qualification, described Tal Afar as a counterinsurgency success story.

As with any celebrated event, a certain mythology has developed around the 3ACR's experience in Tal Afar, and in fact, the success the regiment enjoyed there was not as "decisive" as the paeans above suggest. There were troubling signs just a month after the regiment left Iraq. One resident told a reporter, "the armed men are fewer, but the assassinations between

PX286

Sunni and Shiites have increased." Another resident said, "Al-Qaeda has started to come back again. They have started to kill Shiites and Sunnis who cooperate with the Americans."[100] Another report suggested that "Fear is palpable in the streets. . . . Residents complain that the city is increasingly divided as tribal violence sharpens the boundaries between Sunni and and Shiite Muslim neighborhoods." Even with a large Iraqi and U.S. troop presence, "families complain of no-go areas in the city, boundaries drawn up by sectarian violence or intimidation by rebels."[101] The insurgency continued in western Ninewah province, and U.S. forces continued to fight there for months and years after the period of this case study.

Moreover, interviewees fully acknowledged the fragility of the stability that Tal Afar had attained on their watch. In one platoon leader's judgment,

> We defeated the insurgency, but we weren't really able to rebuild the government—there wasn't enough time for that. . . . When I first saw the city on April 21 or so, it was just an absolute ghost town. That day seven IEDs went off, people were shooting, everybody in the city was hiding from us, but watching us. Compare that to the last patrol I did on February 13, the market was open, the place was mobbed, there was garbage pick-up, we were talking to people . . . That said, for the most part, people still tended to stick to their areas. The neighborhoods remained somewhat segregated, like Route Barracuda, everything south was Shi'a, everything north was Sunni, and many people were not comfortable crossing that line.[102]

A regimental staff officer concluded:

I certainly won't say we solved or defeated the insurgency throughout the province. I will say, though,

PX286

that with the help of very effective Iraqi leaders . . . we were able to establish security conditions that allowed progress in security force development and essential services.[103]

Tal Afar never fell back into the terrorized state of dysfunction that it had suffered through during 2004-05. The alliance that had formed between the Sunni tribes and the Islamist extremists of AQI was radically diminished. A reporter visiting Tal Afar in April 2006 was told by a Soldier in the city's operations center that there were then three to five sectarian murders a week in the city. The Coalition did not seem especially concerned about it, and the reporter said, "At that time, this sounded like success to me too, not only compared to other places in the country, but also compared to Tal Afar the previous year."[104]

This is where the difference between "victory" and "success" becomes analytically important. Counterinsurgency operations in Tal Afar during this period did not result in victory in the sense that they ended the insurgency. But it is more than fair to call the 3ACR's achievements there a success on the basis of the significant and lasting gains in security made there.

**Evaluation.**

Table 3-2 summarizes the simple answers for the study's framework questions that are suggested by the evidence presented in this chapter. Conditions for positive answers for all five variables were present in this case. Sunni-Shi'a conflict was very clearly central to the insurgency, not only along the local-national axis as in Ramadi, but also along local tribal axes. On balance, counterinsurgents conducted good se-

PX286

curity operations. Following Operation RESTORING RIGHTS, the Coalition committed a large number of troops to security, kept them living among the people to focus better on population security, and worked closely with relatively professional indigenous security forces. And the counterinsurgents dedicated significant resources, manpower, and leadership focus both to improving governance in the city and to working toward political agreements among the city's warring groups that would address their sectarian and tribal grievances.

| Cases | Identity Cleavages | Good Security | Good Governance | Political Agreement | Success |
|-------|--------------------|---------------|-----------------|---------------------|---------|
| Tal Afar 2005-2006 | Yes | Yes | Yes | Yes | Yes |

**Table 3-2. Case Study Variable Summary for Tal Afar.**

From an analytic perspective, success in the Tal Afar case was overdetermined, thereby clouding any effort to parse the relative contributions to success of different factors. This is where the opinions of participants on causation must be given special weight.

Even here, though, the evidence is mixed. Some interviewees emphasized the dominant role of the force density that the United States was able to bring to bear in Tal Afar. Tiger Squadron's commander, Lieutenant Colonel Greg Reilly, argued that "saturating the area with forces is guaranteed to have a major effect. Up until the regiment left, it still had a pretty sizable footprint in the city, and this accounts for a lot of the improvement in security and stability. But there was still a high level of sectarian tension."[105]

PX286

Other 3ACR Soldiers certainly saw some causal connection between their initiatives to improve governance and the marginalization of the insurgents in Tal Afar. Sabre Squadron troop commander Captain Sellars laid out the case for this logic succinctly: "Getting people back to a more normal life, giving them something to lose, provides the foundation for getting more to the political processes, and addressing tribal and sectarian differences."[106] Lieutenant Colonel Chris Gibson, who commanded 2-325 in the Sarai neighborhood, later wrote, "The nascent governing entity must provide basic services to bolster its legitimacy with the people. . . . The water and electricity departments were key—they must be effective and impartial in the distribution of service."[107] Lieutenant Colonel Hickey, in many ways the principal architect of the Tal Afar success, concluded that "the ability of the Squadron to enable the Iraqi Government to meet the needs of the population served to strengthen relations between the local government and the populace as well as establish a path toward reconciliation."[108] Here the implied causal chain goes from government performance to political reconciliation among competing groups.

But in the very same document, in explaining the strategic logic behind Operation RESTORING RIGHTS, Hickey also says:

> . . . by [the Coalition] attacking the Takfirists and guarding against the tendency to attack the population directly, the Sunni could be reintegrated into the mainstream political process once the veil of terror was lifted from their ranks. Meanwhile, maintaining the support of the Shiites could eventually bring unity to the city and establish an environment that finally allowed for reconstruction operations and reconciliation of tribal conflicts.[109]

PX286

In this description, the apparent causal chain runs from political reconciliation to improved government performance, not the other way around. This logic matches two of the comments cited earlier in the chapter: Lieutenant Tinklepaugh's assertion that "the reconstruction activities that we engaged in were a consequence of our success in marginalizing the insurgency, not a cause of it"[110]; and Colonel McMaster's observation that "Governance projects were important factors in our progress, but they came at a different time—it was more of a reward for cooperation. It happened in areas that were already secured."[111]

Of course, some indeterminate degree of security must precede both of those other factors. Lieutenant Colonel Gibson, while lauding the importance of "basic services," also argues that "No amount of money or kindness, and no number of infrastructure programs, will facilitate winning over the populace if COIN forces cannot provide security to the population."[112]

Are these counterinsurgents contradicting each other and themselves? That is one plausible interpretation of the evidence. Equally plausible, however, is that these perspectives on causal relationships are compatible with each other. By this logic, because the variables are at least somewhat mutually dependent, different causal directions among the variables may predominate at different times. The implication of this explanation would be that it may not be possible to draw a more precise conclusion than that a positive value for each of the variables may be necessary but not sufficient by itself for success in counterinsurgency. In his own summation of what accounted for his squadron's success, Hickey takes just this approach and does not discriminate among factors:

PX286

The cumulative effect of Sunni participation in the political process, establishment of security throughout the city, reconstruction, money distribution, positioning of [2-325] in Sarai, and the establishment of a comprehensive reconnaissance and surveillance plan resulted in a dramatic drop in attacks during the period following [Operation RESTORING RIGHTS].[113]

McMaster seemed to be of a similar mind, observing near the end of 3ACR's tour, "It is so damn complex. If you ever think you have the solution to this, you're wrong, and you're dangerous."[114]

## ENDNOTES - CHAPTER 3

1. Richard A. Oppel, Jr., "Magnet For Iraq Insurgents Is A Crucial Test Of New U.S. Strategy," *New York Times*, June 16, 2005, p. 1.

2. *Baseline Food Security Analysis in Iraq,* p. 105.

3. Interview 12 (First Lieutenant Brian Tinklepaugh); Interview 17 (First Lieutenant Gavin Schwan); Interview 30 (Lieutenant Colonel Greg Reilly).

4. Zeynep Gurcanli, "Why Tall Afar?" *Istanbul Star*, September 17, 2004, FBIS Report GMP20040917000111; Hashim, p. 370.

5. 3rd Armored Cavalry Regiment, "Operation Restoring Rights O&I Update," unpublished briefing, August 27, 2005.

6. Hashim, p. 373.

7. Interview 14 (Colonel H. R. McMaster); Interview 17 (First Lieutenant Gavin Schwan); "Interview with Lieutenant Colonel Paul Yingling," from the collection *Operational Leadership Experiences in the Global War on Terrorism,* Ft. Leavenworth, KS: Combat Studies Institute, September 22, 2006, p. 5.

PX286

8. Interview 12 (First Lieutenant Brian Tinklepaugh).

9. Steve Fainaru, "U.S.-Led Forces Retake Northern Iraqi City," *Washington Post*, September 13, 2004, p. 17.

10. Patrick J. McDonnell, "U.S. Targets 3 Iraqi Cities," *Los Angeles Times*, September 10, 2004, p. 1.

11. Fainaru, "U.S.-Led Forces Retake Northern Iraqi City."

12. *Ibid.*

13. "Turks Angry at U.S. Over Killings in Iraq," *New York Daily News*, September 14, 2004.

14. Lieutenant Colonel Christopher M. Hickey, "Memorandum for Record, 2/3 ACR Actions During Operation Iraqi Freedom (OIF) 04-06," January 30, 2006, p. 5.

15. "3rd ACR Chief: Rebels 'Worst of the Worst,'" *Colorado Springs Gazette*, September 14, 2005.

16. Hashim, p. 379; Borzou Daragahi, "Nationalism Drives Many Insurgents As They Fight U.S.," *San Francisco Chronicle*, October 26, 2004, p. 9; Captain Travis Patriquin, "Using Occam's Razor to Connect the Dots: The Ba'ath Party and the Insurgency in Tal Afar," *Military Review*, January-February 2007, p. 21.

17. Interview 12 (First Lieutenant Brian Tinklepaugh).

18. Interview 10 (Major Michael Simmering).

19. Ricardo A. Herrera, "Brave Rifles at Tall Afar, September 2005," in William G. Robertson, ed., *In Contact! Case Studies from the Long War, Volume I,* Ft. Leavenworth, KS: Combat Studies Institute Press, 2006, pp. 125-152.

20. Interview 17 (First Lieutenant Gavin Schwan).

21. Interview 16 (Second Lieutenant Andrew Shealy).

22. Interview 28 (Captain Alan Blackburn).

PX286

23. Interview 12 (First Lieutenant Brian Tinklepaugh).

24. Interview 25 (Colonel Joel Armstrong).

25. Interview 9 (Captain James Dayhoff); Interview 14 (Colonel H. R. McMaster).

26. Oppel.

27. Hickey, p. 12.

28. Oppel.

29. Hickey, p. 30.

30. Interview 12 (First Lieutenant Brian Tinklepaugh).

31. Hickey, pp. 24-25.

32. *Ibid.*, p. 32.

33. Interview 12 (First Lieutenant Brian Tinklepaugh); Interview 30 (Lieutenant Colonel Greg Reilly); Herrera, p. 142.

34. President George W. Bush, Remarks to the City Club of Cleveland, Ohio, March 20, 2006.

35. Hickey, p. 40.

36. *Ibid.*, p. 41.

37. *Ibid.*, pp. 44, 51.

38. *Ibid.*

39. *Ibid.*, p. 51.

40. Peter Baker, "An Iraq Success Story's Sad New Chapter," *Washington Post*, March 21, 2006, p. 1; Louise Roug, "Fear Casts A Shadow On 'Free City' Touted By Bush," *Los Angeles Times*, March 26, 2006.

PX286

41. Secretary of State Condoleezza Rice, "Iraq and U.S. Policy," Testimony before the U.S. Senate Committee on Foreign Relations, October 19, 2005.

42. Bush.

43. *Field Manual (FM) 3-24/Marine Corps Warfighting Publication 3-33.5, Counterinsurgency* (FM 3-24/MCWP 3-33.5), pp. 5-22 – 5-23.

44. Hashim, pp. 371-372; Patriquin, p. 17.

45. Hashim, p. 374.

46. Interview 30 ((Lieutenant Colonel Greg Reilly).

47. Interview 24 (anonymous regional specialist).

48. Interview 2 (Louise Roug); Interview 10 (Major Michael Simmering); Interview 11 (Monte Morin); Interview 28 (Captain Alan Blackburn).

49. Interview 21 (Captain Jesse Sellars).

50. Hashim, pp. 374-375, Hickey, p. 3.

51. Jonathan Finer, "Iraqi Forces Show Signs Of Progress In Offensive," *Washington Post*, September 22, 2005, p. 1.

52. Hickey, p. 3.

53. Jonathan Finer, "With Death At Their Door, Few Leave Iraqi City," *Washington Post*, September 7, 2005, p. 20, Interview 2 (Louise Roug).

54. "Defense Minister Discusses Tall Afar, Urges Iraqis To 'Drive Out Terrorists'," *Al-Arabiyah Television*, September 12, 2005, FBIS Report GMP200509125380002.

55. "The Iraqi Scene," *Al-Jazirah Satellite Channel Television*, September 18, 2005, FBIS Report GMP20050918564001.

PX286

56. Interview 12 (First Lieutenant Brian Tinklepaugh); Interview 30 (Lieutenant Colonel Greg Reilly).

57. Interview 10 (Major Michael Simmering).

58. Interview 21 (Captain Jesse Sellars).

59. Interview 28 (Captain Alan Blackburn).

60. *Ibid.*, Interview 21 (Captain Jesse Sellars).

61. Hickey, p. 41.

62. Interview 8 (Second Lieutenant Dan Driscoll); Interview 9 (Captain James Dayhoff); Interview 18 (Sergeant Chad Stapp), "Interview with Lieutenant Colonel Paul Yingling," p. 6.

63. Interview 14 (Colonel H. R. McMaster).

64. Interview 17 (First Lieutenant Gavin Schwan); Interview 25 (Colonel Joel Armstrong); Interview 28 (Captain Alan Blackburn); Interview 30 (Lieutenant Colonel Greg Reilly); Herrera, pp. 140-141.

65. Interview 9 (Captain James Dayhoff).

66. Interview 14 (Colonel H. R. McMaster).

67. Oppel.

68. First Lieutenant Brian Tinklepaugh, personal correspondence with the author, April 10, 2009.

69. Hickey, p. 39.

70. *Ibid.*, p. 42.

71. Iraqi Reconstruction Management System, U. S. Army Corps of Engineers, Gulf Region Division, June 2008. Available data on Commander's Emergency Response Program (CERP) spending totals include total funds distributed and project start dates and end dates. The author has estimated monthly

PX286

and quarterly spending totals based on equal division of total funds spent over the number of active months per project. Project lengths in the database range from 1 to 40 months, but the average length is 4 months. As a result, aggregate quarterly spending summaries (as reported in the text above) are less likely to be distorted by this estimation technique than the monthly spending estimates (as shown in the figure).

72. Oliver Poole, "Iraqis In Former Rebel Stronghold Now Cheer American Soldiers," *The Daily Telegraph*, December 19, 2005.

73. Interview 18 (Sergeant Chad Stapp).

74. Interview 28 (Captain Alan Blackburn).

75. Interview 20 (Second Lieutenant Jared Leinart).

76. Interview 9 (Captain James Dayhoff).

77. Interview 11 (Monte Morin).

78.  Interview 12 (First Lieutenant Brian Tinklepaugh).

79. Interview 14 (Colonel H. R. McMaster).

80. Packer, p. 53.

81. Interview 21 (Captain Jesse Sellars).

82. Hickey, p. 23 (emphasis in original).

83. Interview 10 (Major Michael Simmering).

84. Hickey, p. 41.

85. Sabrina Tavernise, "Suicide Blast by Woman in Iraq Kills 8 Others; 57 Are Hurt," *New York Times*, September 29, 2005; Associated Press, "More Than 50 Dead Following Series of Attacks," *USA Today*, October 12, 2005, p. 13; Louise Roug, "Suicide Attack Kills 30 in Northern Iraq," *Los Angeles Times*, October 13, 2005.

PX286

86. Thomas E. Ricks, "The Lessons of Counterinsurgency," *Washington Post*, February 16, 2006, p. 14.

87. Finer, "Iraqi Forces Show Signs of Progress In Offensive."

88. Packer, p. 54.

89. Craig T. Olson, *So This Is War: A 3rd U.S. Cavalry Intelligence Officer's Memoirs of the Triumphs, Sorrows, Laughter, and Tears During a Year in Iraq*, Bloomington, IN: AuthorHouse, 2007, p. 132.

90. Interview 10 (Major Michael Simmering).

91. Ferry Biedermann, "Tel Afar's Ethnic Tug of War Puts Iraq Army to the Test," *Financial Times*, January 18, 2006.

92. Packer, p. 56.

93. Interview 2 (Louise Roug).

94. Ricks, *Fiasco: The American Military Adventure in Iraq*, p. 420.

95. "Iraqi Defense Minister Says 18 Arms Caches Found in Tall Afar, Gives Update," *Al-Sharqiyah Television*, September 11, 2005, FBIS Report, GMP20050911538001.

96. Quoted in Olson, pp. 193-194. The letter recalls a similar letter sent from an Algerian town mayor to French Army Captain David Galula where the future counterinsurgency theorist had led French efforts to improve both security and governance. See David Galula, *Pacification in Algeria (1956-1958),* Santa Monica, CA: RAND Corporation, 1963, p. 232.

97. As one interviewee pointed out, Mayor Najim was not from Tal Afar and may have owed his position to the Coalition. Interview 22 (Jon Finer).

98. Hickey, pp. 1-2.

99. 3rd Armored Cavalry Regiment, "Operations and Intelligence Brief," undated briefing, p. 5. ("Title 10"=training and

PX286

equipping, HUMINT=human intelligence, IED=Improvised Explosive Device, IDF=Indirect Fire.)

100. Baker.

101. Roug, "Fear Casts A Shadow On 'Free City' Touted By Bush."

102. Interview 17 (First Lieutenant Gavin Schwan).

103. "Interview with Lieutenant Colonel Paul Yingling," p. 6.

104. Interview 11 (Monte Morin).

105. Interview 30 (Lieutenant Colonel Greg Reilly).

106. Interview 21 (Captain Jesse Sellars).

107. Lieutenant Colonel Chris Gibson, "Battlefield Victories and Strategic Success: The Path Forward in Iraq," *Military Review*, September-October 2006, p. 54.

108. Hickey, p. 42.

109. *Ibid.*, p. 32.

110. Interview 12 (First Lieutenant Brian Tinklepaugh).

111. Interview 14 (Colonel H. R. McMaster).

112. Gibson, p. 49.

113. Hickey, p. 46.

114. Packer, p. 57.

PX286

# CHAPTER 4

## CONCLUSIONS AND IMPLICATIONS

This final chapter sums up the preceding analysis in four sections: a comparison of the case studies, conclusions, policy implications, and an overview of potential priorities for further research.

## COMPARISON OF THE CASES

Table 4-1 summarizes the answers to each of the analytic framework's questions for the two case studies. The table also includes answers for the Awakening movement in Ramadi and elsewhere in Anbar province during 2006 and 2007. Clearly, as this case was not addressed formally in the analysis, these answers are tentative. But they are included as potentially useful discussion points.

| Cases | Identity Cleavages | Good Security | Good Governance | Political Agreement | Success |
|---|---|---|---|---|---|
| Ramadi 2004-2005 | Yes | Ambiguous | No | No | No |
| Tal Afar | Yes | Yes | Yes | Yes | Yes |
| Ramadi Awakening (notional) | Yes | Ambiguous | Ambiguous | Yes | Yes |

**Table 4-1. Summary for Iraq Case Studies.**

Given these answers, what do the cases say about the primary question of the study: *In the presence of major ethno-religious cleavages, does good governance contribute much less to counterinsurgent success than efforts*

PX286

*toward reaching political agreements that directly address those cleavages?*

In Ramadi, the grievances that fueled the insurgency had far more to do with a deep sense of disenfranchisement within Iraq's Sunni community and the related fear of sectarian persecution than it did with any failure in the government's performance. The causal links between variations in the quality of governance and the fortunes of the counterinsurgents are difficult to establish precisely given the simultaneous weaknesses of the security and political lines of operation in Ramadi. Nevertheless, the evidence from the interviews in this case points toward major limitations to how much popular loyalty and legitimacy could be won through the improvement of governance. Other factors—namely security, itself, and identity-based concepts of legitimate rule (both tribal and sectarian)—appeared more decisive. This interpretation is strongly supported by the dramatic shift that eventually occurred in Ramadi, which seems to have roots in two key changes: the exhaustion of the population with violence and terror; and a new willingness of the Coalition to decouple the legitimacy of local rule from the legitimacy of national rule.

Tal Afar's story is quite different, but suggests a similar conclusion. There is no doubt that the quality of governance mattered in the way both the population and the counterinsurgents conceived of legitimacy. At the same time, however, it appears that what improvements in governance occurred in Tal Afar were at least as much a consequence as a cause of successful counterinsurgency. Without both the 3ACR's dense presence in the city and its intensive focus on brokering compromises among the city's largely sectarian tribal conflicts, improvements in governance

PX286

likely would never have taken root. Even recognizing some degree of mutual reinforcement, the dependency of the factors probably did not run in the opposite direction.

Further evidence in support of the general form of the hypothesis can be found in one of the few quantitative analyses of the Iraq war published to date that uses official Department of Defense time-series, district-level data.[1] Authors Eli Berman, Jacob N. Shapiro, and Joseph H. Felter use multivariate econometric techniques to assess the relative importance of, among other things, economic factors and provision of basic services in affecting levels of violence across 104 districts (the sub-provincial administrative level) in Iraq. At first glance, the results of their analysis, which show a correlation between at least the economic dimensions of good governance and subsequent improvements in violence, appear at odds with this monograph's general argument.

However, their conclusions are qualified by two critical factors that actually bring them closer into alignment with the arguments presented here. First, the authors make the following explicit assumption in their model:

> [N]oncombatants decide [about sharing information] on the basis of a rational calculation of self-interest rather than an overwhelming ideological commitment to one side or another. This is not to say that ideological commitment is irrational or unusual, just that on the margin governments can influence noncombatants' decisions by providing services.[2]

This assumption is plausible, but it bypasses the central question at issue regarding the sources of legitimacy. It is difficult to rebut the idea that the

PX286

mechanisms of loyalty would work as assumed, "on the margin;" but for those marginal effects to be representative of the main dynamics of the system, the noncombatants would need to be basically indifferent between rule by the insurgents and rule by the government apart from the factors of service or retaliation. This premise is not consistent with observed group solidarity of various kinds, including ethno-religious.

The other critical caveat to this analysis is that it shows that up until 2007, Commander's Emergency Response Program (CERP) spending, the model's proxy for service provision, had essentially no effect in reducing violence. Only beginning in 2007—a very different environment from previous years due to the Awakening and the Coalition troop "surge"—does the beneficial effect of CERP spending become evident.[3] The authors attribute this change to the military's improved ability to garner intelligence in part because of its better integration with the population, but mainly because tribes were willing to share information. This explanation is fine as far as it goes, but what accounts for the shift, itself?

The Ramadi case here suggests that the shift had much to do with a change in the Coalition's political strategy as it related to Iraq's sectarian rivalries. Specifically, in 2004-05, U.S. policy was to insist that Coalition cooperation with the Sunni tribal groups in Anbar was contingent on their integration into the security mechanisms of the federal government. This was a deal breaker for the tribes because they viewed the federal government as a tool of Shi'a sectarian interests. Those political institutions were illegitimate by virtue of their perceived identity. Cooperation became possible only when the Coalition decoupled its own support from the requirement to integrate

PX286

with Baghdad. By this logic, it was not primarily better intelligence that allowed CERP to have its natural salutary effect. Instead, what made the difference was the establishment of an authority, in the form of tribal leaders, who had both capacity and local legitimacy, both of which had been lacking theretofore. So the service provision improvements followed the legitimacy, not the other way around.

## CONCLUSIONS

1. Identity politics shape counterinsurgency outcomes. The case studies presented here demonstrate the importance of ethno-religious identity politics in shaping the outcomes of insurgencies and counterinsurgencies. In both cases, direct causal relationships are evident between the counterinsurgents' attentiveness to the politics of ethno-religious identity and the subsequent course of the insurgencies.

In Ramadi and Tal Afar, competition between insurgents and counterinsurgents over the quality of governance was a clearly less important factor in determining the conflict outcomes than the disposition of political agreements related to ethno-religious cleavages. Furthermore, though the evidence is not conclusive, it is even plausible that providing good governance was neither necessary nor sufficient for achieving counterinsurgent success.

This is not to say, however, that providing good governance was irrelevant. Even if good governance is evidently less important than cross-cleavage political agreements, it still is shown in the case studies to be a contributor to counterinsurgent success, and its absence an impediment to success. The policy implication of this conclusion about the relative importance of

PX286

providing good governance is not that counterinsurgents should ignore the quality of governance in the places they are fighting. Rather, it is that they should not invest all their hope of establishing legitimacy through activities focused on improving governance.

2. Identity politics are local. One implication of the first conclusion is the need for a subtle shift in analytic and planning emphasis away from considering individual loyalties and preferences toward considering group loyalties and preferences. However, this shift in emphasis should not be extended to its logical extreme, which would be an assumption that ethno-religious groups will be reliably similar across wide swaths of geography, time, and circumstance. That assumption is not valid. Iraq demonstrates that national-level observations of identity-group politics in the midst of counterinsurgency are relevant but inadequate guides to explaining and affecting local behavior.

Tal Afar's sectarian conflict certainly mirrored Iraq's national sectarian conflict in some ways. But both the conflict's escalation and its subsequent moderation in 2005-06 were driven primarily by local grievances, local conditions, and local compromises. The connection between Tal Afar's Sunni-Shi'a political rivalries and those in Baghdad were much more symbolic than causal. Even in Ramadi, where sectarian conflict existed primarily in relation to Baghdad, not locally, the fortunes of the counterinsurgents turned at least as much on local manifestations of those identity politics as on national ones. Specifically, the tribal Awakening movement that did so much to undermine the insurgency in Anbar province did not result from the successful resolution of national issues that were dividing Sunni and Shi'a, such as constitutional provisions for power sharing, federalism, allocation of oil revenues,

PX286

or control of federal ministries. To the contrary, the Awakening occurred in spite of ongoing rancor over these issues in Baghdad. Instead, the transformation in Anbar was based, in combination with mounting popular frustration with al-Qaeda, on the Coalition's willingness to expand tribal and other local leaders' degree of control over their own territory and people.

It seems clear that local legitimacy and loyalty develop with a significant degree of independence from national identity group dynamics and institutions. A cavalry troop commander summed it up this way:

> Ninety percent of the population does not look at the situation from a strategic standpoint. They think of it as 'how does this affect me on my block.' They're not just neutral, waiting to be influenced — they're leaning. But they will be strongly influenced by what happens on their own blocks.[4]

3. Population security is still the most important factor in shaping counterinsurgency outcomes. Recognizing the importance of ethno-religious identity politics should do nothing to take away from the fundamental primacy of population security in counterinsurgency strategy. This conclusion is not new, but the case studies clearly underscore the point, so it bears repeating here. Almost all of the counterinsurgents interviewed for this research emphasized the criticality of establishing people's confidence in their own physical security as a prerequisite for accomplishing anything else in a counterinsurgency environment. Civilian analyst Andrea Jackson, who conducted hundreds of interviews with Iraqis during 2003-06, reported that "I asked every person I interviewed . . . what's the biggest concern for you and your family? They all said security, uniformly."[5]

PX286

These conclusions do not overturn any of the traditional tenets of counterinsurgency, but instead should help to sharpen some of them. Based on this research the conventional wisdom that successful counterinsurgency depends on establishing legitimacy, which in turn demands coordinated political and military programs, remains valid. To the extent that "winning hearts and minds" describes this principle, that phrase remains applicable.

What this research adds to our understanding of counterinsurgency is an appreciation for identity-based sources of legitimacy which can rival and even eclipse the legitimacy that flows from good governance. Accordingly, the political component of a counterinsurgency strategy must be political not only in the sense of being focused on government and how government exercises power. It must also be sensitive to the distribution of that power across key identity groups.

## POLICY IMPLICATIONS

Moving from description and analytic inference to prescription is an inevitably treacherous step on the scholarly path. Few single studies of complex social phenomena can hope to be comprehensive or definitive enough to produce unambiguous policy recommendations with much confidence.

On the other hand, the applicability of the work's insights to real world problems is, in the end, one of the most important measures of its quality. While this study's results are far from the final word on its subject, they do suggest several important implications for policymakers and counterinsurgent leaders.

PX286

1. Counterinsurgency strategy must account for the role of traditional social hierarchies and forms of legitimacy. The intermediation of relationships between people and their government by tribes or clerics or other nongovernmental group leaders is a strategically important factor in counterinsurgency. Iraq is a clear illustration that these traditional hierarchies can be relevant even in societies that appear in many respects to be quite modern or developed according to the Western model. This creates an imperative for counterinsurgents, at a minimum, to understand what power hierarchies exist among the people where they are fighting, and to explicitly examine the role of group loyalty and identity politics in their assessments of their operational environment. In instances where these factors appear salient, they must become integral to strategy development as well. These traditional hierarchies and identity-based loyalties may be potential assets for the counterinsurgents, or they may be obstacles to their larger strategic goals.

Or, as with the tribes of Anbar province, they may be assets and obstacles simultaneously. Empowering those tribes was a step backward in the Coalition's effort to create a strong, unified central government, but at the same time was critically important in undermining the worst elements of the insurgency. Even participants in the counterinsurgency during that time may continue to differ about whether the proper trade-off was made in that case.[6] All the same, it is not necessary to settle this point in order to simply recognize the utility of anticipating the importance of such trade-offs in advance rather than stumbling upon them a few months or years into a conflict. That is what makes this factor a critical element of the initial assessment and strategy development phase for any prospective counterinsurgency.

PX286

2. Counterinsurgents should always prepare to employ the full range of tools addressing security, governance and identity. David Galula believed that each military, political, judicial, and other line of operation in counterinsurgency is indispensible, arguing that "if one is nil, the product will be zero."[7] This may not always be the case, but it remains a valid, conservative guide to planning.

Notwithstanding the emphasis on the potentially high importance of addressing ethno-religious cleavages, the dynamics of identity politics and group loyalties are likely to be so fluid, opaque, and variable across localities that counterinsurgents cannot afford to neglect any element of its legitimacy-building tool kit. They should prepare to build political stability on foundations of both identity and quality of governance simultaneously. This is not to say that it is impossible to make distinctions about where certain tools may be more or less effective. Rather, it is saying that the complexity and uncertainty associated with the problem recommends a conservative approach that does not exclude any potentially valuable contributor to building support of the people for the counterinsurgent's control.

To reiterate the point made under the first conclusion above, the policy implication of recognizing the limitations of providing good governance is not that counterinsurgents should ignore the quality of governance in the places they are fighting. Rather, it is just that counterinsurgents should adopt a heightened sense of caution regarding what can be achieved through improving governance alone in the absence of the larger political strategy that addresses power distributions among identity groups.

3. Local, specialized knowledge trumps doctrine and theory. Because the dynamics of insurgency and

PX286

counterinsurgency are so sensitive to variations in local conditions and events, strategies should be based to the maximum extent possible on local, specialized knowledge and relationships. Counterinsurgency doctrine and theory are useful for providing frameworks and guidelines for strategy development, but in developing strategies for particular conflicts, as David Kilcullen said:

> There is simply no substitute for what we might call 'conflict ethnography': a deep, situation-specific understanding of the human, social, and cultural dimensions of a conflict, understood not by analogy with some other conflict, but in its own terms.[8]

4. Do not economize on force size. No matter how sophisticated the counterinsurgency strategy, it is unlikely to succeed without the allocation of enough security forces to create a visible and ubiquitous presence where the insurgency is active. Case study interviewees consistently reported that some degree of physical population security was a pre-requisite for gaining traction on any other element of the counterinsurgency strategy. The contrast between the two case studies illustrates the value of large densities of troops in urban counterinsurgency as well as the challenges of spreading troops thinly. Stalin's famous dictum on conventional war applies to irregular warfare just as well: quantity has a quality all its own.

5. Avoid getting involved in counterinsurgency. One final implication of this research is simply a reinforcement of the enduring and yet apparently unpersuasive point that winning counterinsurgencies is extremely difficult, especially for foreign powers. In important respects, the issues at stake in insurgencies are not especially amenable to change through

PX286

the instruments of foreign governments and militaries. For governments under attack, of course, this is a moot point. However, for governments making commitments beyond their borders to fight this kind of warfare, it is quite salient. While the track record of counterinsurgency is not entirely one of failure, it is universally one of costs and complications that far exceeded initial expectations.

## PRIORITIES FOR FURTHER RESEARCH

An almost unavoidable hazard of research is raising as many or more questions as one has answered. This research is no exception. Additionally, there are many ways in which the analysis could be strengthened. Some of the most potentially valuable priorities for further research on this subject are as follows.

A key limitation of the analysis presented here is the absence of significant input from Iraqi sources. Practical considerations prevented collection of much of this kind of data, but clearly, a fuller examination of how Iraqis think about legitimacy and the politics of ethno-religious identity would include the results of direct discussions with Iraqis, themselves. If this research inspires further work on Iraq or any other cases of counterinsurgency or civil conflict, investigators should certainly seek opportunities where possible to draw in perspectives of the people whose loyalty and security is being contested.

Future research on this topic may also benefit from employing an analytic framework somewhat more complex than the one used in this study. Complex frameworks have clear drawbacks, and the relative simplicity of the five-variable framework employed here was adopted purposefully, in part so as to cap-

PX286

ture the kinds of intuitive categories of decision variables that actually prevail in real policymaking. However, there is a price to pay for this strategy in terms of precise specification and explicit inclusion of some variables. Accordingly, the analytic strategy adopted herein would be well-complemented by research using a more detailed framework with a larger number of more specific variables.

This analysis would also certainly benefit from inclusion of a larger number of case studies. Small numbers of case studies inevitably constrain the process of generalizing insights to draw conclusions and derive recommendations for policy and strategy.

Finally, though further analysis of these topics would not be limited to recent American experiences with counterinsurgency, it is worth noting that more detailed analysis of more local cases should become increasingly feasible as data from Coalition operations in Iraq and Afghanistan becomes more available, in both classified and unclassified contexts. Those experiences will provide a rich basis for comparative case analysis of counterinsurgency for the next generation of scholars and analysts and beyond.

## CONCLUDING THOUGHTS

A U.S. Army veteran of both Iraq and Afghanistan wrote that "The problem with war narratives isn't lying. The problem is there's too much truth. . . . The enterprise is so vast that almost everything is true, and writers can choose whichever truths support a particular thesis."[9] Even as an analyst armed with data and the time to think long and hard about the problem, it is difficult to avoid drawing the same conclusion as this veteran does. Few hypotheses about insur-

PX286

gency and counterinsurgency seem to be completely without evidence, and even fewer seem immune to counterexamples.

But if this research has done nothing else, it has highlighted one truth about counterinsurgency to place alongside the others: that who governs can be even more important than how they govern.

## ENDNOTES - CHAPTER 4

1. Eli Berman, Jacob N. Shapiro, and Joseph H Felter, "Can Hearts and Minds Be Bought? The Economics of Counterinsurgency in Iraq," *Journal of Political Economy*, Vol. 119, No. 4, August 2011.

2. *Ibid.*, p. 776.

3. *Ibid.*, p. 801.

4. Interview 21 (Captain Jesse Sellars).

5. Interview 1 (Andrea Jackson).

6. For example, contrast David Kilcullen, "Anatomy of a Tribal Revolt," *Small Wars Journal Blog*, August 29, 2007; with Austin Long, "The Anbar Awakening," *Survival*, Vol. 50, No. 2, April-May 2008. Both Kilcullen and Long were advisors to Coalition forces during that time.

7. David Galula, *Counterinsurgency Warfare: Theory and Practice,* New York: Frederick A. Praeger, 1964, p. 87.

8. David Kilcullen, "Religion and Insurgency," *Small Wars Journal Blog*, May 12, 2007.

9. Roman Skaskiw, "E-Mail From Afghanistan," *The Atlantic*, October 2008.

PX286

# REFERENCES

## Books.

Allawi, Ali A. *The Occupation of Iraq: Winning the War, Losing the Peace,* New Haven, CT: Yale University Press, 2007.

Anderson, Benedict. *Imagined Communities: Reflections on the Origins and Spread of Nationalism,* London, UK: Verso Press, 1991.

Anderson, Lisa. *Pursuing Truth, Exercising Power: Social Science and Public Policy in the Twenty-First Century,* New York: Columbia University Press, 2003.

Apter, David. *The Politics of Modernization,* Chicago, IL: University of Chicago Press, 1965.

Asprey, Robert. *War in the Shadows: The Guerrilla in History,* Garden City, NY: Doubleday and Company, 1975.

Barnett, Thomas P. M. *The Pentagon's New Map: War and Peace in the 21st Century,* New York: Putnam, 2004.

Batatu, Hanna. *The Old Social Classes and the Revolutionary Movement in Iraq,* London, UK: Saqi Books, 1978.

Black, Cyril E. *The Dynamics of Modernization: A Study in Comparative History,* New York: Harper and Row, 1966.

Blaufarb, Douglas S. *The Counterinsurgency Era: U.S. Doctrine and Performance, 1950 to the Present,* New York: Free Press, 1977.

Beckett, Ian F. W. *Modern Insurgencies and Counterinsurgencies: Guerrillas and Their Opponents Since 1750,* London and New York: Routledge, 2001.

Callwell, Charles E. *Small Wars: Their Principles and Practice, 3rd Ed.,* Lincoln, NE: University of Nebraska Press, 1996 (originally published in 1906).

Cassidy, Robert. *Counterinsurgency and the Global War on Terror: Military Culture and Irregular Warfare,* Westport, CT: Praeger Security International, 2006.

PX286

Chandrasekaran, Rajiv. *Imperial Life in the Emerald City: Inside Iraq's Green Zone,* New York: Knopf, 2006.

Connor, Walker. *Ethnonationalism: The Quest for Understanding,* Princeton, NJ: Princeton University Press, 1994.

Diamond, Larry. *Squandered Victory: The American Occupation and the Bungled Effort to Bring Democracy to Iraq,* New York: Henry Holt & Company, 2005.

Dodge, Toby. *Inventing Iraq: The Failure of Nation Building and a History Denied,* New York: Columbia University Press, 2003.

Esman, Milton J. *Introduction to Ethnic Conflict,* Cambridge, UK: Polity Press, 2004.

Fischer, David Hackett. *Historians' Fallacies: Toward a Logic of Historical Thought,* New York: Harper Perennial, 1970.

Forouk-Sluglett, Marion, and Peter Sluglett. *Iraq Since 1958: From Revolution to Dictatorship, 3rd Ed.,* London, New York: I. B. Tauris, 2001.

Galbraith, Peter W. *The End of Iraq: How American Incompetence Created a War Without End,* New York: Simon and Schuster, 2006.

Galula, David. *Counterinsurgency Warfare: Theory and Practice,* New York: Frederick A. Praeger, 1964.

Gellner, Ernest. *Nations and Nationalism (New Perspectives on the Past),* Ithaca, NY: Cornell University Press, 1983.

Gellner, Ernest. *Nationalism,* New York: New York University Press, 1997.

George, Alexander L., and Andrew Bennett. *Case Studies and Theory Development in the Social Sciences,* Cambridge and London, UK: MIT Press, 2005.

Gilman, Nils. *Mandarins of the Future: Modernization Theory in Cold War America,* Baltimore, MD: Johns Hopkins University Press, 2003.

138

PX286

Nathan Glazer and Daniel P. Moynihan. *Ethnicity: Theory and Experience,* Cambridge, MA: Harvard University Press, 1975.

Gurr, Ted Robert. *Why Men Rebel,* Princeton, NJ: Princeton University Press, 1970.

Gurr, Ted Robert. *Minorities at Risk: A Global View of Ethnopolitical Conflicts,* Washington, DC: U.S. Institute of Peace, 1993.

Hammes, Thomas X. *The Sling and the Stone: On War in the 21st Century,* St. Paul, MN: Zenith Press, 2004.

Harff, Barbara. and Ted Robert Gurr. *Ethnic Conflict in World Politics 2nd Ed.,* Boulder, CO: Westview Press, 2004.

Hashim, Ahmed. *Insurgency and Counterinsurgency in Iraq,* Ithaca, NY: Cornell University Press, 2006.

Horowitz, Donald. *Ethnic Groups in Conflict,* Berkeley, CA: University of California Press, 1985.

Huntington, Samuel. *Political Order in Changing Societies,* New Haven, CT: Yale University Press, 1968.

Joes, Anthony James. *Resisting Rebellion: The History and Politics of Counterinsurgency,* Lexington, KY: The University Press of Kentucky, 2004.

Kalyvas, Stathis N. *The Logic of Violence in Civil War,* Cambridge, UK: Cambridge University Press, 2006.

Kaplan, Robert D. *The Coming Anarchy: Shattering the Dreams of the Post Cold War,* New York: Random House, 2000.

King, Gary, Robert O. Keohane, and Sidney Verba. *Designing Social Inquiry: Scientific Inference in Qualitative Research,* Princeton, NJ: Princeton University Press, 1994.

Lawrence, T. E. *Seven Pillars of Wisdom,* New York: G. H. Doran, 1926.

PX286

Leites, Nathan, and Charles Wolf, Jr. *Rebellion and Authority: An Analytic Essay on Insurgent Conflicts,* Chicago, IL: Markham, 1970.

Lijphart, Arend. *Democracy in Plural Societies,* New Haven, CT: Yale University Press, 1977.

Lipset, Seymour M. *Political Man,* Garden City, NY: Anchor Books, 1963.

Lukitz, Liora. *Iraq: The Search for National Identity,* London, UK: Frank Cass, 1995.

Mao Tse-tung. *On Guerilla Warfare*, translated by Samuel B. Griffith, New York: Praeger, 1961.

Marks, Thomas A. *Maoist Insurgency Since Vietnam,* London, UK: Routledge, 1996.

Marr, Phebe. *The Modern History of Iraq, 2nd Ed.,* Boulder, CO: Westview Press, 2004.

Mockaitis, Thomas R. *British Counterinsurgency 1919-1960,* New York: St. Martin's Press, 1990.

Nagl, John A. *Learning to Eat Soup With a Knife: Counterinsurgency Lessons from Malaya and Vietnam,* Chicago, IL: University of Chicago Press, 2005.

Olson, Craig T. *So This Is War: A 3rd U.S. Cavalry Intelligence Officer's Memoirs of the Triumphs, Sorrows, Laughter, and Tears During a Year in Iraq,* Bloomington, IN: AuthorHouse, 2007.

O'Neill, Bard. *Insurgency and Terrorism: From Revolution to Apocalypse, 2nd Ed.,* Washington, DC: Potomac Books, 2005.

Packer, George. *The Assassins' Gate: America in Iraq,* New York: Farrar, Straus and Giroux, 2005.

Paige, Jeffery. *Agrarian Revolution: Social Movements and Export Agriculture in the Underdeveloped World,* New York: The Free Press, 1975.

PX286

Popkin, Samuel. *The Rational Peasant: The Political Economy of Rural Society in Vietnam,* Berkeley, CA: University of California Press, 1979.

Rabe, Stephen G. *The Most Dangerous Area in the World: John F. Kennedy Confronts Communist Revolution in Latin America,* Chapel Hill, NC, and London, UK: University of North Carolina Press, 1999.

Race, Jeffrey. *War Comes to Long An: Revolutionary Conflict in a Vietnamese Province,* Berkeley, CA: University of California Press, 1972.

Ricks, Thomas E. *Fiasco: The American Military Adventure in Iraq,* New York: Penguin Press, 2006.

Rostow, Walt. *The Stages of Economic Growth: A Non-Communist Manifesto,* Cambridge, MA: Cambridge University Press, 1960.

Sarkesian, Sam. *Unconventional Conflicts in a New Security Era: Lessons from Malaya and Vietnam,* Westport, CT: Greenwood Press, 1993.

Scott, James C. *The Moral Economy of the Peasant,* New Haven, CT: Yale University Press, 1976.

Sen, Amartya. *Identity and Violence: The Illusion of Destiny,* New York: W. W. Norton & Company, 2006.

Shadid, Anthony. *Night Draws Near: Iraq's People in the Shadow of America's War,* New York: Henry Holt and Company, 2005.

Shafer, D. Michael. *Deadly Paradigms: The Failure of U.S. Counterinsurgency Policy,* Princeton, NJ: Princeton University Press, 1988.

Shils, Edward. *Political Development in the New States,* The Hague, The Netherlands: Mouton, 1962.

Smith, Anthony D. *National Identity,* Reno, NV: University of Nevada Press, 1991.

141

PX286

Stewart, Rory. *The Prince of the Marshes (And Other Occupational Hazards of a Year in Iraq),* Orlando, FL: Harcourt Inc., 2006.

Tripp, Charles. *A History of Iraq, 2nd Ed.,* Cambridge, MA: Cambridge University Press, 2002.

Van Evera, Stephen. *Guide to Methods for Students of Political Science,* Ithaca, NY, and London, UK: Cornell University Press, 1997.

Weber, Max. *Economy and Society,* Guenther Roth and Claus Wittich, eds., Ephraim Fischof, trans., Berkeley, CA: University of California Press, 1978.

West, Bing. *No True Glory: A Frontline Account of the Battle for Fallujah,* New York: Bantam, 2005.

West, Bing. *The Strongest Tribe: War, Politics, and the Endgame in Iraq,* New York: Random House, 2008.

Wickham-Crowley, Timothy. *Guerillas and Revolution in Latin America: A Comparative Study of Insurgents and Regimes Since 1956,* Princeton, NJ: Princeton University Press, 1992.

Wolf, Eric R. *Peasant Wars of the Twentieth Century,* New York: Harper and Row, 1969.

Woodward, Bob. *Plan of Attack,* New York: Simon & Schuster, 2004.

## Journal Articles, Monographs, Book Chapters, Reports, Opinion Editorials.

Abdelal, Rawi, Yoshiko M. Herrera, Alastair Iain Johnston, and Rose McDermott. "Identity as a Variable," *Perspectives on Politics*, Vol 4, No. 4, December 2006.

Abdul-Jabar, Faleh. "Sheikhs and Ideologues: Deconstruction and Reconstruction of Tribes under Patrimonial Totalitarianism in Iraq, 1968-1998," in Faleh Abdul-Jabar and Hosham Dawod, eds., *Tribes and Power: Nationalism and Ethnicity in the Middle East,* London, UK: Saqi Books, 2003.

PX286

Aylwin-Foster, Nigel. "Changing the Army for Counterinsurgency Operations," *Military Review*, November-December 2005, pp. 2-15.

Baker III, James A., Lee H. Hamilton *et al*. *The Iraq Study Group Report*, December 2006.

Baker, Jim. "Systems Thinking and Counterinsurgencies," *Parameters*, Vol. 36, No. 4, Winter 2006-07.

Baram, Amatzia. "Neo-Tribalism in Iraq: Saddam Hussein's Tribal Policies, 1991-1996," *International Journal of Middle East Studies*, Vol. 29, No. 1, February 1997.

Beckett, Ian F. W. *Insurgency in Iraq: An Historical Perspective,* Carlisle, PA: Strategic Studies Institute, U.S. Army War College, January 2005.

Beckett, Ian. "The Future of Insurgency," *Small Wars and Insurgencies*, Vol. 16, No. 1, March 2005.

Berman, Eli, Jacob N. Shapiro, and Joseph H. Felter. "Can Hearts and Minds Be Bought? The Economics of Counterinsurgency in Iraq," *Journal of Political Economy*, Vol. 119, No. 4, August 2011.

Betts, Richard. "Blowtorch Bob in Baghdad," *The American Interest*, Vol. 1, No. 4, Summer 2006.

Biddle, Stephen. "Seeing Baghdad, Thinking Saigon," *Foreign Affairs*, March/April 2006.

Brad, Henry E., and Cynthia S. Kaplan, "Categorically Wrong? Nominal Versus Graded Measures of Ethnic Identity," *Studies in Comparative International Development*, Vol. 35, No. 3, 2000.

Brubaker, Rogers, and Frederick Cooper. "Beyond 'Identity,'" *Theory and Society*, Vol. 29, No. 1, February 2000.

Cassidy, Robert M. "Back to the Street Without Joy: Counterinsurgency Lessons from Vietnam and Other Small Wars," *Parameters*, Summer 2004.

PX286

Cederman, Lars-Erik, and Luc Girardin. "Beyond Fractionalization: Mapping Ethnicity onto Nationalist Insurgencies," *American Political Science Review*, Vol. 101, No. 1, February 2007.

Cohen, Eliot, Conrad Crane, Jan Horvath, and John Nagl. "Principles, Imperatives, and Paradoxes of Counterinsurgency," *Military Review*, March-April 2006.

Cole, Juan R. I. "The Rise of Religious and Ethnic Mass Politics in Iraq," in David Little and Donald K. Swearer, eds., *Religion and Nationalism in Iraq: A Comparative Perspective,* Cambridge, MA: Harvard University Press, 2006.

Collier, Paul, and Anke Hoeffler. "Greed and Grievance in Civil War," Washington, DC: World Bank Policy Research Working Paper No. 28126, October 21, 2001.

Cordesman, Anthony. "Rethinking the Challenge of Counter-insurgency Warfare," Working Notes, Washington, DC: Center for Strategic and International Studies, November 7, 2005.

Crighton, Elizabeth, and Martha Abele MacIver. "The Evolution of Protracted Ethnic Conflict: Group Dominance and Political Underdevelopment in Northern Ireland and Lebanon," *Comparative Politics*, Vol. 23, No. 2, January 1991.

Davies, James C. "Toward a Theory of Revolution," *American Sociological Review*, Vol. 27, No. 1, February 1962.

Dawod, Hosham. "The 'State-ization' of the Tribe and the Tribalization of the State: the Case of Iraq," in Faleh Abdul-Jabar and Hosham Dawod, eds., *Tribes and Power: Nationalism and Ethnicity in the Middle East,* London, UK: Saqi Books, 2003.

Eisenstadt, Michael, and Jeffrey White. *Assessing Iraq's Sunni Arab Insurgency,* Policy Focus #50, Washington, DC: Institute for Near East Policy, December 2005.

Elbadawi, Ibrahim, and Nicholas Sambanis. "How Much War Will We See? Explaining the Prevalence of Civil War," *The Journal of Conflict Resolution*, Vol. 46, No. 3, June 2002.

PX286

Fearon, James D., and David D. Laitin. "Ethnicity, Insurgency, and Civil War," *American Political Science Review*, Vol. 97, No. 2, February 2003.

Fitzsimmons, Michael. "Hard Hearts and Open Minds? Governance, Identity, and the Intellectual Foundations of Counterinsurgency Strategy," *Journal of Strategic Studies*, Vol. 31, No. 3, June 2008.

Fitzsimmons, Michael F. *Governance, Identity, and Counterinsurgency Strategy*, unpublished dissertation, University of Maryland, 2009.

Freedman, Lawrence. *The Transformation of Strategic Affairs*, London, UK: International Institute for Strategic Studies, Adelphi Paper No. 379, 2006.

Friedman, Jeffrey A. "Manpower and Counterinsurgency: Empirical Foundations for Theory and Doctrine," *Security Studies*, Vol. 20, No. 4, 2011.

Galula, David. *Pacification in Algeria (1956-1958)*, Santa Monica, CA: RAND Corporation, 1963.

Gates, Robert M. "A Balanced Strategy: Reprogramming the Pentagon for a New Age," *Foreign Affairs*, January/February 2009.

Gibson, Lieutenant Colonel Chris. "Battlefield Victories and Strategic Success: The Path Forward in Iraq," *Military Review*, September-October 2006.

Graham, Patrick. "The Message From The Sunni Heartland," *New York Times*, May 22, 2005.

Gubler, Lieutenant Colonel Justin C. "Reconciling Counterinsurgency with Civil War: A Strategy for Stabilizing Iraq," unpublished paper, March 26, 2007.

Hale, Henry. "Divided We Stand: Institutional Sources of Ethnofederal State Survival and Collapse," *World Politics*, Vol. 56, No. 2, January 2004.

PX286

Hammes, Thomas X. "Countering Evolved Insurgent Networks," *Military Review*, July-August 2006.

Hashim, Ahmed. "Iraq's Chaos: Why the Insurgency Won't Go Away," *Boston Review*, May 2005.

Herrera, Ricardo A. "Brave Rifles at Tal Afar, September 2005," in William G. Robertson, ed., *In Contact! Case Studies from the Long War, Volume I,* Ft. Leavenworth, KS: Combat Studies Institute Press, 2006, pp. 125-152.

Heuser, Beatrice. "The Cultural Revolution in Counter-Insurgency," *Journal of Strategic Studies*, Vol. 30, No. 1, February 2007.

Hewstone, Miles, and Ed Cairns. "Social Psychology and Intergroup Conflict" in Daniel Chirot and Martin Seligman, eds., *Ethnopolitical Warfare: Causes, Consequences, and Possible Solutions,* Washington, DC: American Psychological Association, 2001.

Hills, Alice. "Hearts and Minds or Search and Destroy? Controlling Civilians in Urban Operations," *Small Wars and Insurgencies*, Vol. 13, No. 2, Spring 2002.

Hoffman, Frank. "Neo-Classical Counterinsurgency?" *Parameters*, Summer 2007.

Horowitz, Donald. "The Sunni Moment," *Wall Street Journal*, December 14, 2005.

Hurley, William J., Joel Resnick, and Alec Wahlman. *Improving Capabilities for Irregular Warfare, Volume I: Main Text,* Alexandria, VA: Institute for Defense Analyses, 2007.

*In Their Own Words: Reading the Iraqi Insurgency*, Report No. 50, Brussels, Belgium: International Crisis Group, February 15, 2006.

"Introduction," Faleh Abdul-Jabar and Hosham Dawod, eds., *Tribes and Power: Nationalism and Ethnicity in the Middle East,* London, UK: Saqi Books, 2003.

PX286

Johnson, Wray R. *From Counterinsurgency to Stability and Support Operations: The Evolution of U.S. Military Doctrine for Foreign Internal Conflict, 1961-1996*, unpublished dissertation, The Florida State University, 1997.

Kalyvas, Stathis N. "The Ontology of 'Political Violence': Action and Identity in Civil Wars," *Perspectives in Politics*, Vol. 1, No. 3, September 2003.

Kalyvas, Stathis N., and Matthew Kocher. "Violence and Control in Civil War: An Analysis of the Hamlet Evaluation System (HES)," unpublished manuscript presented at the annual meeting of the American Political Science Association, Philadelphia, PA, August 27, 2003.

Kalyvas, Stathis N., and Matthew Adam Kocher. "Ethnic Cleavages and Irregular War: Iraq and Vietnam," *Politics and Society*, Vol. 35, No. 2, June 2007.

Karim, Thair. "Tribes and Nationalism: Tribal Political Culture and Behaviour in Iraq, 1914-20," in Faleh Abdul-Jabar and Hosham Dawod, eds., *Tribes and Power: Nationalism and Ethnicity in the Middle East,* London, UK: Saqi Books, 2003.

Kaufmann, Chaim. "Possible and Impossible Solutions to Ethnic Civil War," *International Security*, Vol. 20, No. 4, Spring 1996.

Kaufmann, Daniel, Aart Kraay, and Massimo Mastruzzi. "Governance Matters VII: Aggregate and Individual Governance Indicators, 1996-2007," Research Working Policy Paper 4654, Washington, DC: World Bank, June 2008.

Khalilzad, Zalmay, and George W. Casey, Jr. "A Path to Success in Iraq," *Los Angeles Times*, April 11, 2006.

Kilcullen, David. "Counterinsurgency *Redux*," *Survival*, Vol. 48, No. 4, Winter 2006-07.

Kilcullen, David. "Religion and Insurgency," *Small Wars Journal Blog*, May 12, 2007.

Kilcullen, David. "Anatomy of a Tribal Revolt," *Small Wars Journal Blog*, August 29, 2007.

147

PX286

Kneece, Jr., R. Royce, David A. Adesnik, Jason A. Dechant, Michael F. Fitzsimmons, Arthur Fries, and Mark Tillman. *Force Sizing for Stability Operations*, Alexandria, VA: Institute for Defense Analyses, March 2010.

Krepinevich, Andrew. "How to Win in Iraq," *Foreign Affairs*, September/October 2005.

Laird, Melvin. "Iraq: Learning the Lessons of Vietnam," *Foreign Affairs*, November/December 2005.

Lake, David A., and Donald Rothchild. "Containing Fear: The Origins and Management of Ethnic Conflict," *International Security*, Vol. 21, No. 2, Fall 1996.

Lijphart, Arend. "Consociational Democracy," *World Politics*, Vol. 21, No. 2, January 1969.

Little, David, and Donald K. Swearer. "Introduction," in David Little and Donald K. Swearer, eds., *Religion and Nationalism in Iraq: A Comparative Perspective,* Cambridge, MA: Harvard University Press, 2006.

Long, Austin. *On "Other War": Lessons from Five Decades of RAND Counterinsurgency Research,* Santa Monica, CA: RAND Corporation, 2006.

Long, Austin. "The Anbar Awakening," *Survival*, Vol. 50, No. 2, April-May 2008.

Long, Austin. "War Comes to Al Anbar: Political Conflict in an Iraqi Province," unpublished paper presented at the International Studies Association conference, February 2009.

Lowry, Richard. "What Went Right," *National Review*, May 9, 2005.

Luttwak, Edward. "Dead End: Counterinsurgency Warfare as Military Malpractice," *Harper's*, February 2007.

Lyall, Jason, and Isaiah Wilson III. "Rage Against the Machines: Explaining Outcomes in Counterinsurgency Wars," *International Organization*, Vol. 63, No. 1, Winter 2009.

PX286

Makiya, Kanan. "A Model for Post-Saddam Iraq," *Journal of Democracy*, Vol. 14, No. 3, July 2003.

Makiya, Kanan. "Present at the Disintegration," *New York Times*, December 11, 2005.

Malkasian, Carter. "The Role of Perceptions and Political Reform in Counterinsurgency: The Case of Western Iraq, 2004-05," *Journal of Strategic Studies*, Vol. 17, No. 3, September 2006.

Malkasian, Carter. "Did the U.S. Need More Forces in Iraq? Evidence from Al Anbar," *Joint Force Quarterly*, Issue 46, 3rd Quarter 2007.

Marks, Thomas A. "Ideology of Insurgency: New Ethnic Focus or Old Cold War Distortions," *Small Wars and Insurgencies*, Vol. 15, No. 1, Spring 2004.

McCary, John A. "The Anbar Awakening: An Alliance of Incentives," *The Washington Quarterly*, Vol. 32, No. 1, January 2009.

McCauley, Clark. "The Psychology of Group Identification and the Power of Ethnic Nationalism" in Daniel Chirot and Martin Seligman, eds., *Ethnopolitical Warfare: Causes, Consequences, and Possible Solutions,* Washington, DC: American Psychological Association, 2001.

McGarry, John, and Brendan O'Leary. "Iraq's Constitution of 2005: Liberal Consociation as Political Prescription," *International Journal of Constitutional Law*, Vol. 5, No. 4, October 2007.

McGarry, John, Brendan O'Leary, and Richard Simeon. "Integration or Accommodation? The Enduring Debate in Conflict Regulation," in Sujit Choudhry, ed., *Constitutional Design for Divided Societies: Integration or Accommodation?* Oxford: Oxford University Press, 2008.

Metz, Steven. *The Future of Insurgency,* Carlisle, PA: Strategic Studies Institute, U.S. Army War College, 1993.

PX286

Metz, Steven. *Rethinking Insurgency,* Carlisle, PA: Strategic Studies Institute, U.S. Army War College, June 2007.

Metz, Steven, and Raymond Millen. *Insurgency and Counterinsurgency in the 21st Century: Reconceptualizing Threat and Response,* Carlisle, PA: Strategic Studies Institute, U.S. Army War College, November 2004.

Mines, Keith. "Economic Tools in Counterinsurgency and Post-conflict Stabilization: Lessons Learned (and Relearned) in al Anbar, Iraq, 2003-04," E-Notes, Philadelphia, PA: Foreign Policy Research Institute, September 29, 2006.

Mockaitis, Thomas. "Winning Hearts and Minds in the 'War on Terrorism,'" *Small Wars and Insurgencies*, Vol. 14, No. 2, March 2003.

O'Leary, Brendan. "Nationalism and Ethnicity: Research Agendas on Theories of Their Sources and Their Regulation," in Daniel Chirot and Martin Seligman, eds., *Ethnopolitical Warfare: Causes, Consequences, and_Possible Solutions,* Washington, DC: American Psychological Association, 2001.

Patriquin, Captain Travis. "Using Occam's Razor to Connect the Dots: The Ba'ath Party and the Insurgency in Tal Afar," *Military Review*, January-February 2007.

Peck, Commander Randall *et al.*, *Voices of the Enemy: Quotations from Al-Qaida and Associated Movements,* Alexandria, VA: Institute for Defense Analyses, March 2007.

Peters, Ralph. "The Hearts-and-Minds Myth," *Armed Forces Journal*, September 2006.

Pirnie, Bruce R., and Edward O'Connell. *Counterinsurgency in Iraq (2003-2006),* Santa Monica, CA: RAND Corporation, 2008.

Posen, Barry. "The Security Dilemma and Ethnic Conflict," *Survival*, Vol. 35, No. 1, Spring 1993.

Rittel, Horst W. J., and Melvin M. Webber. "Dilemmas in a General Theory of Planning," *Policy Sciences*, Vol. 4, 1973.

PX286

Rotberg, Robert I., and Deborah L. West. "The Good Governance Problem: Doing Something About It," World Peace Foundation Report #39, 2004.

Sambanis, Nicholas. "Do Ethnic and Non-Ethnic Civil Wars Have the Same Causes? A Theoretical and Empirical Inquiry (Part I)," *The Journal of Conflict Resolution*, Vol. 45, No. 3, June 2001.

Shy, John, and Thomas W. Collier. "Revolutionary War," in Peter Paret, ed., *Makers of Modern Strategy: From Machiavelli to the Nuclear Age,* Princeton, NJ: Princeton University Press, 1986.

Simonsen, Sven Gunnar. "Addressing Ethnic Divisions in Post-Conflict Institution-Building: Lessons from Recent Cases," *Security Dialogue*, Vol. 36, No. 3, September 2005.

Sircar, Indraneel. *Transnational Consociation in Northern Ireland and Bosnia-Hercegovina: The Role of Reference States in Post-Settlement Power Sharing*, unpublished dissertation, London, UK: School of Economics and Political Science, 2006.

Skaskiw, Roman. "E-Mail From Afghanistan," *The Atlantic*, October 2008.

Smith, Major Niel, and Colonel Sean MacFarland. "Anbar Awakens: The Tipping Point," *Military Review*, March-April 2008.

Stein, Jeff. "Can You Tell a Sunni from a Shiite?" *New York Times*, October 17, 2006.

Tilly, Charles. "Does Modernization Breed Revolution?" *Comparative Politics*, Vol. 5, No. 3, April 1973.

Todd, Lin *et al*. *Iraq Tribal Study—Al-Anbar Governorate,* Stockbridge, GA: Global Resources Group, June 2006.

*Understanding Islamism*, International Crisis Group, Middle East/North Africa Report No. 37, March 2, 2005.

Visser, Reidar. "Introduction," in Reidar Visser and Gareth Stansfield, eds., *An Iraq of Its Regions: Cornerstones of a Federal Democracy?* New York: Columbia University Press, 2008.

PX286

Vlahos, Michael. "Fighting Identity: Why We Are Losing Our Wars," *Military Review*, November-December 2007.

Voelkel, Tyson. "Counterinsurgency Doctrine FM 3-24 and Operation Iraqi Freedom: A Bottom Up Review," in Jay W. Boggs and Joseph R. Cerami, eds., *The Interagency and Counterinsurgency Warfare: Aligning and Integrating Military and Civilian Roles in Stability, Security, Transition and Reconstruction Operations,* Carlisle, PA: Strategic Studies Institute, U.S. Army War College, 2008.

Weber, Max. "The Types of Legitimate Domination," in Michael Hechter, ed. *Theories of Social Order,* Berkeley, CA: University of California Press, 1978.

Welch, Gita, and Zahra Nuru, ed., *Governance for the Future: Democracy and Development in the Least Developed Countries*, United Nations Development Programme, 2006.

West, F. J. Bing. "Iraqification, Part II," *Wall Street Journal*, August 2, 2004, p. 10.

West, Bing. "Counterinsurgency Lessons From Iraq," *Military Review*, March-April 2009.

Wimmer, Andreas. "Democracy and Ethno-religious Conflict in Iraq," *Survival*, Vol. 45, No. 4, Winter 2003-4.

## Newspapers, Magazines, Radio, Television.

"3rd ACR Chief: Rebels 'Worst of the Worst,'" *Colorado Springs Gazette*, September 14, 2005.

Abdallah, Hamid. "With the Americans' Knowledge and Consent, the Iraqi Defense Minister Holds Negotiations With the Iraqi Resistance," *Al-Jazirah*, April 4, 2005, FBIS Report GMP20050404000175.

"Al Jazirah Interviews Journalist on Situation in Al-Ramadi," *Al-Jazirah Satellite Channel Television*, November 17, 2004, FBIS Report GMP20041117000050.

PX286

"Al-Ramadi Residents Begin 2-day Sit-in in Protest of US Forces' Practices," *Al-Sharqiyah Television*, May 7, 2005, FBIS Report GMP20050507542005.

Al-Shirbini, May, interview with correspondent Ammar Ali, *Al-Arabiyah Television*, December 1, 2005, FBIS Report GMP20051201546007.

Anderson, John Ward. "A Gruesome Find, With A Difference," *Washington Post*, March 19, 2005.

Associated Press, "More Than 50 Dead Following Series of Attacks," *USA Today*, October 12, 2005, p. 13.

Badkhen, Anna. "Balancing Act," *San Francisco Chronicle*, October 13, 2005.

Baker, Peter. "An Iraq Success Story's Sad New Chapter," *Washington Post*, March 21, 2006.

Barnard, Anne. "US Forces, Hit By Raids, Fault Their Iraqi Allies," *Boston Globe*, August 1, 2004.

Becatoros, Elena. "Top U.S. General: Iraq Conflict Shifting to Internal Struggle," *Philadelphia Inquirer*, September 22, 2006.

"Behind the News," *Al-Jazirah Satellite Channel Television*, June 27, 2005, FBIS Report GMP20050627535004.

Biedermann, Ferry. "Tel Afar's Ethnic Tug Of War Puts Iraq Army To The Test," *Financial Times*, January 18, 2006.

Burns, John F., and Erik Eckholm. "In Western Iraq, Fundamentalists Hold U.S. at Bay," *New York Times*, August 29, 2004, p. 1.

Daragahi, Borzou. "Nationalism Drives Many Insurgents As They Fight U.S.," *San Francisco Chronicle*, October 26, 2004, p. 9.

"Defense Minister Discusses Tall Afar, Urges Iraqis To 'Drive Out Terrorists,'" *Al-Arabiyah Television*, September 12, 2005, FBIS Report GMP200509125380002.

PX286

Dorning, Mike. "Marines Grow Weary of Even Friendly Faces," *Chicago Tribune*, September 16, 2004.

Fainaru, Steve. "U.S.-Led Forces Retake Northern Iraqi City," *Washington Post*, September 13, 2004, p. 17.

Finer, Jonathan. "Iraqi Forces Show Signs Of Progress In Offensive," *Washington Post*, September 22, 2005, p. 1.

Finer, Jonathan. "With Death At Their Door, Few Leave Iraqi City," *Washington Post*, September 7, 2005, p. 20.

Giordono, Joseph. "2nd Brigade Combat Team Soldiers Round Up Suspected Insurgents in Iraq," *Pacific Stars and Stripes*, October 24, 2004.

Giordono, Joseph. "A Year On the Edge: 2nd BCT Bound for Colorado After Grueling Tour in Ramadi," *Stars and Stripes*, July 31, 2005.

Gordon, Michael R. "In Baghdad, Struggle Ties Security to Basic Services," *New York Times*, April 22, 2008, p. 1.

Gordon, Michael R., and David S. Cloud. "Rumsfeld's Memo on Iraq Proposed Major Change," *New York Times*, December 3, 2006.

Gurcanli, Zeynep. "Why Tall Afar?" *Istanbul Star*, September 17, 2004, FBIS Report GMP20040917000111.

Hedgpeth, Dana, and Sarah Cohen. "Money as a Weapon," *Washington Post*, August 11, 2008.

Hedgpeth, Dana, and Sarah Cohen. "In Ramadi, a Counterinsurgency in Cash," *Washington Post*, August 11, 2008.

Hendren, John. "U.S. Troops Still Dying In Ramadi Amid 'Relative Peace, Tranquility'," *Los Angeles Times*, December 1, 2004.

Hess, Pamela. "Ramadi Posts Seen As 'Symbol of Occupation'," *Washington Times*, September 7, 2004, p. 11.

PX286

"Highlights: Iraqi Press 2 Aug 04," August 2, 2004, FBIS Report GMP20040802000241.

"Highlights: Iraqi Press 29 Aug 04," August 29, 2004, FBIS Report GMP20040829000187.

"IECI Head, Members in Al-Ramadi Tender Resignation," *Al-Sharqiyah*, January 28, 2005, FBIS Report GMP20050128000194.

"Iraqi Defense Minister Says 18 Arms Caches Found in Tal Afar, Gives Update," *Al-Sharqiyah Television*, September 11, 2005, FBIS Report, GMP20050911538001.

Klein, Joe. "Saddam's Revenge," *Time*, September 18, 2005.

Knickmeyer, Ellen, and Othman Mohammed. "Governor in Iraq is Found Dead," *Washington Post*, June 1, 2005, p. 16.

Langer, Gary. "Security Gains Reverse Iraq's Spiral Though Serious Problems Remain," ABC News/BBC/NHK/ARD National Survey of Iraq, March 17, 2008.

Lasseter, Tom. "Insurgents Have Changed U.S. Ideas About Winning," *Philadelphia Inquirer*, August 28, 2005, p. 1.

Lloyd, Anthony. "Bungling Raids by U.S. Troops Fuel Iraqi Anger," *Times (London)*, December 11, 2004.

Mazzetti, Mark, and Solomon Moore. "Insurgents Flourish In Iraq's Wild West," *Los Angeles Times*, May 24, 2005.

McDonnell, Patrick J. "U.S. Targets 3 Iraqi Cities," *Los Angeles Times*, September 10, 2004.

Moore, Solomon. "A Promising Iraqi Province is Now a Tinderbox," *Los Angeles Times*, January 3, 2007, p. 1.

Oppel, Jr., Richard A. "Magnet For Iraq Insurgents is a Crucial Test of New U.S. Strategy," *New York Times*, June 16, 2005, p. 1.

Packer, George. "Letter from Iraq: The Lessons of Tal Afar," *The New Yorker*, April 10, 2006.

PX286

Perry, Tony. "Ramadi at Heart of Iraq Election Hopes," *Los Angeles Times*, January 22, 2005.

Perry, Tony. "U.S. General Gets Earful From Men in Sunni City who May Forgo Polls," *Los Angeles Times*, January 30, 2005.

Perry, Tony. "Polls Stand Empty in Sunni Stronghold," *Los Angeles Times*, January 31, 2005.

Poole, Oliver. "Iraqis in Former Rebel Stronghold Now Cheer American Soldiers," *The Daily Telegraph*, December 19, 2005.

Poole, Oliver. "Insurgents Turning Against Al-Qa'ida in Iraq," *The Daily Telegraph*, February 6, 2006.

Raghavan, Sudarsan, and Ellen Knickmeyer. "Sadr, a Question Mark Etched in Black," *Washington Post*, September 11, 2006, p. 10

Rainey, James. "Aiming for a More Subtle Fighting Force," *Los Angeles Times*, May 9, 2006.

Rayment, Sean. "U.S. Tactics Condemned by British Officers," *The Daily Telegraph*, April 11, 2004.

Ricks, Thomas E. "The Lessons of Counterinsurgency," *Washington Post*, February 16, 2006.

Robson, Seth. "2nd BCT Settles Into Iraqi Home," *European Stars and Stripes*, September 11, 2004.

Robson, Seth. "2nd BCT Hopes to Keep Ramadi From Turning Into Another Fallujah," *Pacific Stars and Stripes*, September 20, 2004.

Robson, Seth. "2nd Brigade Combat Team Roundup Has Yielded 75 Suspects in Iraq," *Pacific Stars and Stripes*, October 8, 2004.

Roeder, Tom. "Carson Unit Says Tide is Turning," *Colorado Springs Gazette*, April 18, 2005.

PX286

Roug, Louise. "Suicide Attack Kills 30 in Northern Iraq," *Los Angeles Times*, October 13, 2005.

Roug, Louise. "Fear Casts a Shadow on 'Free City' Touted by Bush," *Los Angeles Times*, March 26, 2006.

Rubin, Alissa J. "Iraqi City on Edge of Chaos," *Los Angeles Times*, September 28, 2004, p. 1.

Spinner, Jackie. "Marines, Iraqi Forces Launch Offensive in Ramadi," *Washington Post*, February 21, 2005.

Tavernise, Sabrina. "Suicide Blast by Woman in Iraq Kills 8 Others; 57 Are Hurt," *New York Times*, September 29, 2005

Tavernise, Sabrina. "Unseen Enemy is at its Fiercest in a Sunni City," *New York Times*, October 23, 2005, p. 1.

"The Iraqi Scene," *Al-Jazirah Satellite Channel Television*, September 18, 2005, FBIS Report GMP20050918564001.

"Turks Angry at U.S. Over Killings in Iraq," *New York Daily News*, September 14, 2004.

Tuzlu, Jasim Muhammad. "The Demographic Map, Elections, and Forecast Figures of Social Components," FBIS Report in Arabic (GMP20041210000187), December 8, 2004.

Tyson, Ann Scott. "To The Dismay of Local Sunnis, Shiites Arrive to Police Ramadi," *Washington Post*, May 7, 2005, p. 13.

"U.S. Holds Secret Talks With Insurgents in Iraq," *Washington Post*, February 21, 2005.

"US Military Says 'Insurgents' Blew Up Red Crescent Offices in Al-Ramadi," *Agent France Press*, October 8, 2004, FBIS Report EUP20041008000429.

Wong, Edward. "In Anger, Ordinary Iraqis Are Joining the Insurgency," *New York Times*, June 28, 2004.

Wong, Edward. "Provincial Capital Near Falluja Is Rapidly Slipping Into Chaos," *New York Times*, October 28, 2004, p. 1.

PX286

Woodward, Bob. "CIA Said Instability Seemed 'Irreversible,'" *Washington Post*, July 12, 2007.

Wright, Lawrence. "The Master Plan: For the New Theorists of Jihad, Al Qaeda is Just the Beginning," *The New Yorker*, September 11, 2006.

Youssef, Nancy A., and Yasser Salihee. "Gunmen Kidnap a Governor in Iraq," *Philadelphia Inquirer*, May 11, 2005, p. 1

## U.S. Government Publications.

*Al-Anbar Awakening, Volume I, American Perspectives: U.S. Marines and Counterinsurgency in Iraq, 2004-2009*, Chief Warrant Officer-4 Timothy S. McWilliams and Lieutenant Colonel Kurtis P. Wheeler, eds., Quantico, VA: Marine Corps University Press, 2009.

*Al-Anbar Awakening, Volume II, Iraqi Perspectives: From Insurgency to Counterinsurgency in Iraq, 2004-2009*, Colonel Gary W. Montgomery and Chief Warrant Officer-4 Timothy S. McWilliams, eds., Quantico, VA: Marine Corps University Press, 2009.

*Capstone Concept for Joint Operations, Version 3.0*, Washington, DC: Department of Defense, January 15, 2009.

Central Intelligence Agency, *Guide to the Analysis of Insurgency*, Washington, DC: Central Intelligence Agency, undated.

*Field Manual 3-24/Marine Corps Warfighting Publication 3-33.5, Counterinsurgency,* Washington, DC: Headquarters, Department of the Army/Headquarters, Marine Corps Combat Development Command, Department of the Navy, December 2006.

*Field Manual 100-20, Low Intensity Conflict,* Washington, DC: U.S. Department of the Army, January 1981.

*Hard Lessons: The Iraq Reconstruction Experience,* Washington, DC: Special Inspector General for Iraqi Reconstruction, 2009.

PX286

Iraqi Reconstruction Management System, Baghdad, Iraq: U.S. Army Corps of Engineers, Gulf Region Division, June 2008.

*Irregular Warfare Joint Operating Concept (Version 1.0),* Washington, DC: U.S. Department of Defense, September 11, 2007.

*Measuring Stability and Security in Iraq,* Washington, DC: Department of Defense, quarterly reports, July 2005-March 2009.

*National Strategy for Victory in Iraq,* Washington, DC: Executive Office of the President, November 2005.

*Section 2207 Report on Iraq Relief and Reconstruction,* Washington, DC: Department of State, quarterly reports, October 2004-July 2008.

*U.S. Government Counterinsurgency Guide,* Washington, DC: United States Government Interagency Counterinsurgency Initiative, January 2009.

U.S. Agency for International Development, *Iraq Provincial Reconstruction Teams*, Washington, DC: U.S. Agency for International Development, Fall 2007.

U.S. Department of State, Future of Iraq Project, Democratic Principles and Procedures Working Group Report, "Final Report on the Transition to Democracy in Iraq," Washington, DC: United States Department of State, November 2002.

U.S. General Accounting Office, *Rebuilding Iraq: Resource, Security, Governance, Essential Services, and Oversight Issues,* GAO-04-902R, Washington, DC: U.S. General Accounting Office, June 2004.

U.S. Government Accountability Office, Statement of David M. Walker before the Subcommittee on National Security, Emerging Threats, and International Relations, Committee on Government Reform, House of Representatives, *Rebuilding Iraq: Governance, Security, Reconstruction, and Financing Challenges,* GAO-06-697T, Washington, DC: U.S. Government Accountability Office, April 25, 2006.

PX286

*Words That Work and Words That Don't: A Guide for Counterterrorism Communication*, Washington, DC: Counterterrorism Communications Center, Vol. 2, Issue 10, March 14, 2008.

## Other Primary Documents.

2nd Brigade Combat Team, 2nd Infantry Division, *After Action Review: Operation Iraqi Freedom 04-06, August 2004-August 2005*.

3rd Armored Cavalry Regiment, "Operation Restoring Rights O&I Update," unpublished briefing, August 27, 2005.

3rd Armored Cavalry Regiment, "Operations and Intelligence Brief," undated briefing.

*Baseline Food Security Analysis in Iraq*, World Food Program, September 2004.

President George W. Bush, Remarks to the City Club of Cleveland, Ohio, March 20, 2006.

Constitution, Republic of Iraq.

Gubler, Lieutenant Colonel Justin C., and Command Sergeant Major Dennis P. Bergmann, Jr. "Task Force Rock Operating Guidance," undated annotated briefing.

Gubler, Lieutenant Colonel Justin C., and Command Sergeant Major Dennis P. Bergmann, Jr. "Task Force Rock Introduction to Ar Ramadi: Its People and the Enemy," undated briefing.

Hickey, Lieutenant Colonel Christopher M. "Memorandum for Record, 2/3 ACR Actions During Operation Iraqi Freedom (OIF) 04-06," January 30, 2006.

"Interview with LTC Paul Yingling," from the collection *Operational Leadership Experiences in the Global War on Terrorism*, Ft. Leavenworth, KS: Combat Studies Institute, September 22, 2006.

Ives, Christopher K. "Interview with LTC John A. Nagl," from the collection *Operational Leadership Experiences in the Global*

*War on Terrorism,* Ft. Leavenworth, KS: Combat Studies Institute, January 9, 2007.

Secretary of State Condoleezza Rice, "Iraq and U.S. Policy," Testimony before the U.S. Senate Committee on Foreign Relations, October 19, 2005.

Walt W. Rostow, "Guerrilla Warfare in the Underdeveloped Areas," Speech at the U.S. Army Special Warfare School, Ft. Bragg, North Carolina, June 28, 1961.

*Survey of Iraqi Public Opinion*, International Republican Institute, April 11-20, 2005.

*Survey of Iraqi Public Opinion*, International Republican Institute, March 23-31, 2006.

PX286

## APPENDIX

## INTERVIEW LIST

I conducted 37 interviews in support of the case studies detailed in Chapters 2 and 3 during the period of March 29 to May 13, 2009. Four interviews were conducted in person, the rest by telephone. Interviews ranged in duration from 40 minutes to 140 minutes, and averaged around 70 minutes.

The single criterion for invitation to be interviewed was having first-hand knowledge of events at the times and places addressed in the case studies. I identified interviewee candidates when their names appeared in contemporary news coverage or in other primary source documents or through recommendations by other interviewees. I made initial contact via e-mail, and all interviewees reviewed and agreed to the terms of the Informed Consent Form required and approved by the Institutional Review Board for the purposes of conducting this research. In all cases, I honored requests for attribution to be withheld. In most cases, this applied to a small number of the interviewees' comments, if any. However, four interviewees requested that none of their comments be attributed, so these interviewees are identified in the lists below only by their interview number, date of interview, and general professional background.

**Legend for Abbreviations in Tables.**

1/3 ACR: 1st Squadron (Tiger), 3rd Armored Cavalry Regiment (U.S. Army)
1/503rd Infantry: 1st Battalion, 503rd Infantry Regiment (U.S. Army)

PX286

1/506th Infantry:  1st Battalion, 506th Infantry Regiment (U.S. Army)

2/2ID:  2nd Brigade Combat Team, 2nd Infantry Division (U.S. Army)

2/3 ACR: 2nd Squadron (Sabre), 3rd Armored Cavalry Regiment (U.S. Army)

2/5 Marines:  2nd Battalion, 5th Marine Infantry Regiment (U.S. Marine Corps)

2/17th Field Artillery:  2nd Battalion, 17th Field Artillery (U.S. Army)

3ACR:  3rd Armored Cavalry Regiment (U.S. Army)

4/3 ACR: 4th Squadron (Longknife), 3rd Armored Cavalry Regiment (U.S. Army)

I/II MEF:  1st/2nd Marine Expeditionary Force (U.S. Marine Corps)

CNA:  Center for Naval Analyses

MNC-I:  Multi-National Corps–Iraq

PX286

| Number | Date (2009) | Name | Rank (at time of case study) | Organization | Job/Title | Interview Mode |
|---|---|---|---|---|---|---|
| 1 | March 29 | Andrea Jackson | Civilian | II MEF, MNC-I | researcher | in person |
| 3 | April 1 | anonymous Army officer | | | | |
| 4 | April 2 | Seth Robson | Civilian | Stars and Stripes | reporter | phone |
| 5 | April 5 | Ed Rapisarda | Captain (Capt) | 2/5 Marines | company commander | phone |
| 6 | April 6 | Peder Ell | Corporal (Cpl) | 2/5 Marines | combat engineer | phone |
| 7 | April 8 | Sean Kuehl | Captain (Capt) | 2/5 Marines | battalion intelligence officer | phone |
| 13 | April 11 | David Clark | Colonel (COL) | 1/506th Infantry | battalion commander | phone |
| 15 | April 13 | anonymous Army officer | | | | |
| 19 | April 15 | Greg Sierra | Major (MAJ) | 1/503rd Infantry | battalion executive officer | phone |
| 23 | April 21 | Carter Malkasian | Civilian | I MEF, CNA | analyst | in person |
| 26 | April 22 | Tony Perry | Civilian | Los Angeles Times | reporter | phone |
| 27 | April 22 | Eric Dougherty | Captain (Capt) | 2/5 Marines | company commander | phone |
| 29 | April 23 | Gary Patton | Colonel (COL) | 2/2ID | brigade commander | in person |
| 31 | April 26 | Jaime Sutton | Lance Corporal (LCpl) | 2/5 Marines | weapons platoon marine | phone |
| 32 | April 27 | Justin Gubler | Lieutenant Colonel (LTC) | 1/503rd Infantry | battalion commander | phone |
| 33 | April 28 | Richard Natonski | Major General (MajGen) | First Marine Division | division commander | phone |
| 34 | April 29 | Brian Fennema | Staff Sergeant (SSG) | 2/2ID | tactical HUMINT team member | phone |
| 35 | May 1 | John Fant | Lieutenant Colonel (LTC) | 2/17th Field Artillery | battalion commander | phone |
| 36 | May 8 | anonymous Army officer | | | | |
| 37 | May 13 | Jamie Braddock | Sergeant (SGT) | 2/2ID | tactical HUMINT team member | phone |

**Table A-1.  Interviews for Ramadi Case Study.**

PX286

| Number | Date (2009) | Name | Rank (at time of case study) | Organization | Job/Title | Interview Mode |
|--------|-------------|------|------------------------------|--------------|-----------|----------------|
| 2 | April 1 | Louise Roug | Civilian | Los Angeles Times | reporter | phone |
| 8 | April 9 | Dan Driscoll | Second Lieutenant (2LT | 2/3 ACR | platoon leader | phone |
| 9 | April 10 | James Dayhoff | Captain (CPT) | 2/3 ACR | battery cmdr/ regimental ops officer | phone |
| 10 | April 10 | Michael Simmering | Major (MAJ) | 2/3 ACR | squadron operations officer | phone |
| 11 | April 10 | Monte Morin | Civilian | Stars and Stripes | reporter | phone |
| 12 | April 10 | Brian Tinklepaugh | First Lieutenant (1LT) | 2/3 ACR | platoon leader | phone |
| 14 | April 13 | H.R. McMaster | Colonel (COL) | 3ACR | regimental commander | phone |
| 16 | April 13 | Andrew Shealy | Second Lieutenant (2LT | 4/3 ACR | air defense officer | phone |
| 17 | April 14 | Gavin Schwan | First Lieutenant (1LT) | 2/3 ACR | platoon leader | phone |
| 18 | April 14 | Chad Stapp | Sergeant (SGT) | 2/3 ACR | squad leader | phone |
| 20 | April 17 | Jared Leinert | Second Lieutenant (2LT) | 113th Engineers | platoon leader | phone |
| 21 | April 17 | Jesse Sellars | Captain (CPT) | 2/3 ACR | troop commander | phone |
| 22 | April 17 | Jon Finer | Civilian | Washington Post | reporter | phone |
| 24 | April 22 | anonymous regional expert | | | | |
| 25 | April 22 | Joel Armstrong | Lieutenant Colonel (LTC) | 3ACR | deputy regimental commander | phone |
| 28 | April 23 | Alan Blackburn | Captain (CPT) | 2/3 ACR | troop commander | phone |
| 30 | April 25 | Greg Reilly | Lieutenant Colonel (LTC) | 1/3 ACR | squadron commander | phone |

**Table A-2. Interviews for Tal Afar Case Study.**

PX286

**U.S. ARMY WAR COLLEGE**

**Major General Anthony A. Cucolo III**
**Commandant**

**\*\*\*\*\***

**STRATEGIC STUDIES INSTITUTE**
**and**
**U.S. ARMY WAR COLLEGE PRESS**

**Director**
**Professor Douglas C. Lovelace, Jr.**

**Director of Research**
**Dr. Steven K. Metz**

**Author**
**Dr. Michael Fitzsimmons**

**Editor for Production**
**Dr. James G. Pierce**

**Publications Assistant**
**Ms. Rita A. Rummel**

**\*\*\*\*\***

**Composition**
**Mrs. Jennifer E. Nevil**

PX286













FOR THIS AND OTHER PUBLICATIONS, VISIT US AT

**http://www.carlisle.army.mil/**

ISBN 1-58487-567-4

90000>



9 781584 875673



This Publication


SSI Website


USAWC Website

PX286

PX358

PRESS CONFERENCE WITH GENERAL DAVID PETRAEUS, COMMANDER, MULTINATIONAL FORCE-
IRAQ; RYAN CROCKER, U.S. AMBASSADOR TO IRAQ MODERATOR: JERRY ZREMSKI LOCATION:
NATIONAL PRESS CLUB, WASHINGTON, D.C. TIME: 9:03 A.M. EDT DATE: WEDNESDAY,
SEPTEMBER 12, 2007

----------------------------------------------------------------
Copyright (c) 2007 by Federal News Service, Inc., Ste. 500 1000 Vermont Avenue,
NW, Washington, DC 20005, USA. Federal News  Service is a private firm not
affiliated with the federal government. No portion of this transcript may be
copied, sold or retransmitted  without the written authority of Federal News
Service, Inc. Copyright  is not claimed as to any part of the original work
prepared by a  United States government officer or employee as a part of that
person's official duties. For information on subscribing to the FNS Internet
Service, please visit http://www.fednews.com or call(202)347-1400
----------------------------------------------------------------

MR. ZREMSKI:  Good morning and welcome to the National Press Club.  My
name is Jerry Zremski, and I'm president of the Press Club and Washington Bureau
Chief of the Buffalo News.  I'm pleased to be here today to welcome General
David Petraeus and Ambassador Ryan Crocker to this National Press Club Newsmaker
event.

General Petraeus and Ambassador have spent the last two days testifying
on Capitol Hill, and today they are here to answer questions from the media
about the Iraq war.

General Petraeus?

GEN. PETRAEUS:  Well, good morning and thanks for the invitation to be
here with you at the National Press Club.  It's good to see some familiar faces.
As you all know, again, Ambassador Crocker and I have had two pretty full days
on Capitol Hill with a number of good exchanges with members of both houses of
Congress, and we look forward to similar exchanges with you this morning.

I'd thought I'd begin this morning with a summary of the report I
delivered to the House and Senate committees reviewing the nature of the
conflict in Iraq, recalling the situation before the surge, describing the
current situation and explaining the recommendations I've provided to my chain
of command.  And I've worked very hard to get my statement down to about 25
minutes, which should leave plenty of time for questions.  And you thought I was
serious.  (Laughter.) Actually, I'm not sure if even I can bear giving my
opening -- the shortened version -- (laughter) -- of my opening statement for a
fourth time, and I know that you don't want to hear it for a fourth time.
Ambassador Crocker, my great diplomatic wingman, and I have already agreed we'd
just like to move right into questions.

And the first question.

Q     Good morning.  John Donnelly with Congressional Quarterly and
vice president of the Press Club.  Among President Bush's explanations for why
the United States is fighting in Iraq -- he said we need to fight the terrorists
over there so we do not have to fight them over here.

This week you all didn't say much about that, and appeared even to
minimize that threat, on occasion.  To what extent does that remain a threat?
What are we fighting for in Iraq?  Is it peace in Iraq and greater stability in

PX358

the Middle East?  In other words, what do you tell the parents of children who gave their lives in Iraq was the cause for which they fought?

GEN. PETRAEUS:  Well, it is peace in Iraq, a stable Iraq that can defend itself and its people from internal and external threats, provide basic services to them, has a government that is representative of and responsive to all Iraqis.

I did spend a fair amount of time the past few days talking about the consequences of an al Qaeda-Iraq sanctuary in that country, about the fact that we believe that al Qaeda-Iraq is off-balance; certainly remains very dangerous and has demonstrated that repeatedly; and is, as I termed it, the wolf closest to the sled, because they are the organization that has carried out the most horrific attacks in Iraq and in particular those that have sparked the much greater ethno- sectarian violence, in particular, of course, following the bombing of the golden dome mosque in Samarra on February 22nd last year, when the incidents just took off and the result of which was a true -- enormous damage to Iraqi society, as it was termed, actually tearing the fabric of Iraqi society.

What I said in answer to questions yesterday a couple of times, I believe, was that we don't know what would happen if al Qaeda had a sanctuary in Iraq from which they could presumably export violence, perhaps train others.  We just don't know.  Would it be focused in the Levant, in the Maghreb, in -- back in Afghanistan, Western Europe, the United States?  I don't know that.  And that was my forthright answer to that particular question.

AMB. CROCKER:  If I could just add to that, I've spent three and a half of the six years since 9/11 in Pakistan, Afghanistan and Iraq.

Those are all fronts in the fight against al Qaeda.  We've seen the linkages between Iraq and the Pakistan-Afghanistan areas where al Qaeda operates.  The letter a year or so ago from Ayman Zawahiri to AQI -- we have to assume that anywhere al Qaeda can find operating room, space, ability to organize, consolidate they're going to use that to come after us.

GEN. PETRAEUS:  Actually, let me make one other point, if I could, because, as I mentioned yesterday, it has been pretty clear to a number of us -- and this includes General McChrystal, the head of the Joint Special Operations Command, and the director of the CIA -- that, in their view and my view, the central front of al Qaeda's global war of terror is in Iraq.  That's the sense from seeing the communications back and forth between AQFL, the AQ senior leadership, over in the Pakistan-Afghanistan area and the amount of resources that they appear to have devoted to that.

Now, it is hard to say what will happen as they -- and if they sense that they are losing momentum in Iraq.  As I mentioned yesterday, again, their freedom of maneuver, their sanctuaries are considerably in Iraq.  They still have some, there's no question, but they're much more on the run than they have been at any time that I can recall since they really established themselves in Iraq.  And the Euphrates River Valley, by and large, is not friendly to them, in Anbar province.  Ramadi is no longer a capital of al Qaeda.  Baqubah has been cleared.  Much of Diyala province -- there's still work going on in there, certainly, and then several neighborhoods in Baghdad and in the so-called Baghdad belts.

Now, again, don't get me wrong, a lot of hard to do.  They continue to try to open up new fronts.  We know they're trying to do that in the Mosul-northern Iraq area, and we have literally with Iraqi security forces gone after them up there.  And as I mentioned, it was actually Iraqi forces that actually located and killed the previous senior of Mosul several weeks back.

Right there.

Q     Thank you very much. This is Arshad with the National Press Club Speakers Committee.  General, thank you very much for doing a wonderful and a magnificent job for the nation.  And Ambassador Crocker, this question is for you, since you are our point person and normally we like to interact with the political questions.  And once again, thank you General.

And the reason I'm asking this -- the reconciliation, a political reconciliation -- Ambassador Crocker, since you have got a wide- ranging experience and you have been one of our outstanding diplomats that we have at the State Department, on your own view -- on your own view -- how would you like to see the reconciliation taking into a place in Iraq and in the Middle East, because that has got a tremendous implication there.  So what is the political reconciliation that is going on there?  Are there any back channel moving that you -- are you involving the rest of the Middle Eastern countries, including the state of Israel, on this process?  What is your answer?

AMB. CROCKER:  Well, the issue of reconciliation in Iraq, I think, pretty obviously has to be managed by Iraqis reconciling with each other. We've spent a lot of time over the last two days talking about these issues.  It's hard.  It's hard because of Iraq's history under Ba'athi rule for 35 years, in which Saddam Hussein basically deconstructed society down to most basic identities.  It's hard because of the sectarian violence that has spread through Iraq from early '06 to early '07.  It is going to be a long, difficult, painful process.

But we are seeing indications not only do -- that Iraqis have the will, they have got the ability to take these important steps.  Just before I got on the plane to come back here, for example, I was in Anbar province with the two vice presidents of Iraq and the deputy prime minister.  That's Sunni, Shi'a, Kurd.  They had all come to Ramadi to announce a considerable increase in the provincial annual budget for capital expenditures, an additional $70 million plus 50 million (dollars) for compensation from damages suffered in the fight against al Qaeda.  That's important for provincial development.  It's also important for linkages between the central government and the provincial government in Anbar.  And it's important as a step in reconciliation from a Shi'a-led central government to a Sunni province.

So there are a lot of things going on: this so-called bottoms-up efforts, top-down efforts, the agreement of Iraq's five principal leaders at the end of August in principle on language for de- Ba'athification reform -- that's top down -- and then the efforts to link top to bottom.  So there are efforts underway.  There is a long way to go.  And as I tried to emphasize repeatedly in the hearings over the last two days, there are no magic switches to flip in Iraq, not on reconciliation and not on services, not on the other hard issues. This is going to take time.  It's going to take a lot of effort.  It's going to take enormous resolve on the part of the Iraqis and on the part of Americans to get this done.

Q    (Off mike) -- against al Qaeda, what's the harm in laying down a timeline to getting down to 80,000 or 100,000 troops?  And does -- wouldn't a timeline provide an incentive for Shi'ite militias to lay down arms against the United States or help jumpstart some reconciliation?

GEN. PETRAEUS:  I'm not at all sure that it would actually. Again, you know, there's this conflicting tension, if you will, between okay, if we put a timeline then everybody will be satisfied with that, and then they can plan toward that.  Others will be worried by it and perhaps harden their attitudes, start loading the magazines for their weapons and so forth.

So I think that what we have laid out is a prudent -- and again reflects my military judgment of what can be done to reduce our forces without jeopardizing the gains that we have fought so hard to achieve. But to look out beyond that is something that's just very, very difficult for me to do and not something that I feel comfortable doing.

I mentioned in the longer version of the opening statement, just in the past six months really, the events that we would not have predicted.  I don't think, even though you can say, yes, the tribal activity started last October. Certainly it did and it built towards -- it was not until mid-March that we started the operation that truly cleared Ramadi with the soldiers and the Marines with the headquarters from the 3rd Infantry Division Brigade.

Again, even when I was there when I first took over, I would not have predicted that at that time. I wouldn't have predicted the flipping of heat, the fact that we might have all these police precincts in Fallujah.  So there are areas where we've been surprised by the rapidity of activity.

There are other areas, frankly, where, you know, we've been surprised by something that's unsettling, and that would include the revelations about the extent of Iranian support for these militia extremists, the so-called special groups and all the rest of that. And frankly, we just learned a great deal about them in the wake of the capture of the head of the special groups, Qais Khazali, and his brother Laith, and capturing the deputy commander of the Lebanese Hezbollah department that had apparently been established to support them.  That was a real revelation.

And so I think it is prudent to avoid predicting, getting locked into something that carries you way out beyond which you cannot with confidence see. So.

Right here.

Q    General, good morning.  Dave Wood with The Baltimore Sun.

GEN. PETRAEUS:  Yeah, good to see you, Dave.

Q    The counterinsurgency manual 3.4, you quote General Chang, I believe, as saying that a counterinsurgency fight is 20 percent military and 80 percent non-military.

GEN. PETRAEUS:  Yeah.

Q    But I think you yourself have said that the war in Iraq can't be won on a purely military basis.

GEN. PETRAEUS:  Right.

Q    In your conversations with the chain of command and your briefings with President Bush in particular, I wonder if each of you could in turn describe what of that 80 percent of the non-military counterinsurgency fight is yet to be done.  What are the most critical tasks here that the United States is not doing?  And have you won the president's assurances that the full weight and resources of the government will be mobilized against those challenges?  AMB. CROCKER:  I think that's exactly right.  And that is why General Petraeus and I developed shortly -- started developing shortly after we were both on the ground in Iraq a joint campaign plan that clearly spells out that the political line of operations is the predominant one, but also economic, regional.

There clearly is a lot to do.  The most fundamental issue is the one I was just talking about, achieving a level of political reconciliation that moves the dynamic in Iraq from violence as a means of asserting claims to power and resources into a political debate, because that argument, that struggle, if you will, is going to go on for a very long time.  The challenge is for Iraqis to move it from violence in the streets into parliament and other forms of debate.  So, clearly a lot to do there.

It's why the surge is so important, though.  Violence clearly has got to be brought down to a level where a political debate can take place, where people are not literally fighting for their lives on a daily basis.

And I think as the surge reached its full height in mid-June, we're now seeing that effect, and that gives --

Q    With respect, sir, that's the military part.  I'm talking about the resources the federal government is putting into the 80 percent (of the fight ?) which is the non-military part.

AMB. CROCKER:  Yeah, I'm -- actually, I understood the question to be both what is the 80 percent and then what are we bringing to the effort?  As security starts to take hold -- it's kind of interesting. If you're out in the streets, where maybe a couple of months ago the first thing people would tell you about is we got to have security -- they now maybe take that as something of a given and are saying, so where are the services?  And that clearly is something the government has to deliver on, and that's where we've got a role to help as well.

As you know, the administration has moved from major -- an emphasis on major infrastructure projects that we build into capacity building, and we're going at that really at two levels.

One is through a significant increase in our Provincial Reconstruction Teams.  We started this year at 10; now we've got 25, and we're increasing the staffing on those to be fully capable of assisting Iraqis not only at the national level but at the provincial and district levels in Baghdad and elsewhere.  That's important, because Iraq's got the money; what it has to be able to do is execute budgets.  And a major emphasis on the part of both civilians and military from the United States is helping them develop those kinds of capacities, to develop and execute budgets.

And we're seeing improvements.  The provinces, for example, are doing about two and a half times better in 2007 on budget execution than in 2006, and

PX358

that ties to obviously reconciliation.  If your government is delivering services for you, you're going to feel a lot better about your government.  It also works in Baltimore, I'm told.

     GEN. PETRAEUS:  David -- I'm sorry.  If I could just build on that. You know, the ambassador mentioned something that is fairly unique, and that is we -- of course, we have this Joint Strategic Assessment Team that came together, all the big brains and so forth, and they provided us input.  They spent at least a month at it, and most of them were individuals that had experience in Iraq, some very lengthy experience.  And what came out of that, the Joint Campaign Plan, is a unified effort.  It is the embassy and actually other embassies as well -- the British and the Australians participated also -- and the Multinational Force unified campaign plan, and in that, there are these lines of operations.  And interestingly, the line that -- you know, in military significance, the line that has two little arrowheads on it, if you will -- that's the main effort.  And in this case, on the diagram that sort of tries to capture this effort, the political line of operations has!
  that designation.

     It -- and it does reflect, obviously, the enormous importance about politics, and this 20-80 percent -- whether the mix is right or not is debatable, but certainly.

     And in fact I mentioned yesterday that what happened in Anbar province, in effect, is political.  That's what we're trying to do, is you get the locals to oppose the extremists.  And that is what made possible the sustainable security, so far, that's been achieved out there and on which we continue to build in Anbar province.

     Now, having said that, that 20 percent of the military was awfully important.  And as Senator Webb mentioned yesterday about one of the Marine battalions that had been banging away in Ramadi and the soldiers out there and so forth -- I mean, that cleared Ramadi in the end.  And in the end, in mid-March, we launched an enormous offensive. We'd made some inroads up to that time, but it was mid-March that we launched that.  It took about a month, in fact, to truly clear Ramadi, get the combat outposts, the patrol bases and all the rest of that in place.  Fighting was a couple of weeks.  And then that has been sustained since then, with enormous amount of support from not just Iraqis, who are volunteering now in a way they certainly didn't for several years -- as you'll recall, we had to close the police academy out there.  There was no military basic training facility out there. Now both of those are functioning again, and there are volunteers -- really more volunteers!
  now than there are slots.

     Let me address the other piece of your statement as well, though, and you know, they have that statement that we heard on the Hill in the last two days about associating oneself with a colleague.  And I actually want to associate myself with the comments of the chairman of the Joint Chiefs, in a spirit of forthrightness.  And he is on the record as saying that not all elements of the government are on the same kind of war footing, needless to say, as the military and the State Department and AID.  And I think we need to continue to look at that.  There have been, in a sense, you know, that while we would love to help but we can't, because the security situation is inadequate -- well, we need to take a new look at that, I think, and to see if there are some areas in which additional expertise could be brought to bear now.  And that is one of the things that we will do, in fact, when we get back to Baghdad.

So -- yes, sir?

Q    General, as you know, General, the situation -- the security situation in Basra and in the south has become quite  complicated, with a violent power struggle going on between two Shi'ite factions and the British in the process of drawing back.  Can you foresee a situation where American troops may have to be committed to that area?  And if so, if that were to come to pass, would that affect your ability to carry out the kinds of U.S. drawdowns that you laid out in your congressional --

GEN. PETRAEUS:  Yeah, I don't envision that.  I could envision, perhaps, some small Special Forces participation, along with the Iraqi special operations forces, which we have actually built up down there recently.  And they've operated in and out of there at various times all along, together with British special forces as well.

There clearly is a competition ongoing in Basra between the Fadhila Party, the Supreme Council and the Sadr parties and militia. But interestingly, there is an accommodation down there right now that is the kind of Iraqi solution to problems in the south that, you know, is mildly heartening, I guess, is the way to put it.  Occasionally folks have said that this is -- I don't know -- a little like the Italian city-states in Machiavelli's day or something like that.  But there's an awful lot of to-ing and fro-ing, some violence, certainly. And of course in some other provinces there have been -- there's been terrible incidents where governors were assassinated by elements linked with the militia.

But there -- right now there is actually quite a very low level of attacks and so forth, and it has been that way, I think, for about a month now. The handoff of the palace actually was quite orderly. There was a force that was trained and equipped and certified in fact by the British and the Iraqis together.  They handed that off.  There was nothing dramatic in the wake of that, and they continue to secure that area.  And I believe that it will, over time, become used by Iraqi security forces.  There was the installation of a senior Iraqi general down there, a four-star general, who had been working directly for the minister of Defense, quite a forceful individual I knew from the past, by the way; a new police chief some months back.

Again, lots of challenges, don't get me wrong.  There's militia infiltration, there's political party -- all these different parties have elements and different structures in Iraq, but they have come to accommodations that are allowing the functioning of activities down there.  And certainly the oil has been flowing, and the ports have been moving and all the rest of that.

So I think we -- we're in a wait-and-see approach with Basra, but we have every expectation that Basra will be resolved by Iraqis.  In fact, we are actually helping them move right now elements of a mechanized battalion down there.  They're doing a swap of some army brigades; there's the establishment of a full-time Iraqi special operations force battalion down there as well, so that General Mohan will have some reliable forces if needed.  And in many cases in that area, the presence of those forces, again, when it comes to intra- Shi'a rivalries, can sometimes be enough to keep the situation one in which they're shouting rather than shooting.

Q    (Off mike.)  You blamed Iran for a good deal of what's gone wrong in Iraq.  Can you clarify what your evidence is for that?  And could your testimony be viewed as part of a campaign to build towards an attack on Iran?

GEN. PETRAEUS:  Yeah, no, I --

Q     And to --

GEN. PETRAEUS:  Certainly not.

Q     -- to Ambassador Crocker, if I could.

GEN. PETRAEUS:  Well, let me answer that first, please.  Sorry.

Q     Of course.

GEN. PETRAEUS:  I'm not blaming Iran for all that's going wrong in Iraq.  What I stated is, in fact, what we have learned about Iranian activity, and it certainly has contributed to a sophistication of attacks that would be no means be possible without Iranian support when it comes to the explosively formed projectiles, a signature item provided by the Iranians; rockets, again, very -- particularly 240-mm that, again, there's no question where they have come from.  And the evidence is very, very clear.  We captured it when we captured Qais Khazali, the Lebanese Hezbollah deputy commander, and others, and it's in black and white.  And by the way, it includes items from the wallet of a U.S. soldier that were digitized on this computer as part of the evidence that they had in fact actually carried out the attack that killed five of our soldiers in Karbala back in January.  And we subsequently killed the overall leader of that operation later on in Baghdad.

We interrogated these individuals.  We have on tape -- we have shown it to senior Iraqi leaders -- Qais Khazali himself.  When asked, could you have done what you have done without Iranian support, he literally throws up his hands and laughs and says, of course not.  And again we have shown that to Iraqi leaders, several of whom then went to Iran and made their case quite forcefully about their concern of Iranian involvement.

So they told us about the amounts of money that they have received.  They told us about the training that they received.  They told us about the ammunition and sophisticated weaponry and all of that that they received.

And so this is evidentiary.  It is not just intelligence.  It rises to the level of evidence, particularly what we captured when we got the hard drives of the computers from the individuals that we picked up in Basra.  So there's no question about that.

Right here.  No, one question per customer, please.

Q     (Off mike) -- generally came only with the full complement of forces in June and July.  How will those forces be able to do the same or more with less when the surge ends next year?

GEN. PETRAEUS:  Well, in some cases, the progress has been aided enormously again by the changes in popular support for what's going on.  That's particularly true in some of the Sunni Arab areas, in which again al Qaeda had sanctuaries.  And so where you have now the local volunteers, especially once they've been integrated into the ministry of interior or ministry of defense forces, that gives you a solution that is sustainable in a way that we have not had in the past frankly.

Nowhere is this illustrated better than Anbar.  I hate to keep coming back to Anbar, but it is such an important example.  You know, we banged away in Anbar for years and disrupted and disrupted and disrupted, cleared and then were not able to hold.  And we now are able to hold, because the Iraqis have rejected al Qaeda.   They made the political statement -- their leaders, their tribal leaders and their governmental leaders.  And then because their young men, now emboldened by the public opposition to al Qaeda, are not just willing but volunteering to serve in the security forces to keep al Qaeda out of their river valley and to try to get the -- you know, look.  They have come to accept, we believe, that they are not going to run Iraq again.  And that's an enormous evolution, if you will, from the initial feelings of disposition, disrespect and other perceived sentiments, perceptions.  They now want their seat at the table.  They want their share of the oil reven!
 ue in particular.

     And that's why it was so significant when Ambassador Crocker and the others were all out there the other day, for Anbar forum summit number two, to see some of this oil revenue as supplemental if you will.  I mean, they've learned now about supplemental funding and they got one.

     And others now, of course, want -- I mean this, again -- as I mentioned yesterday, this is an ethnosectarian competition for power and resources.  What we are trying to do is facilitate the resolution of that competition by more political than military or violent means, and that's the case where politics are taking place.  And they'll shout at one another, perhaps, or have direct conversations or levy requests and all the rest, but at the end of the day, they're not shooting at each other, and in the end of day, also, they sit down and talk and have been able to resolve situations -- not to say that all their expectations have been realized, nor all their requests met, but.

     So that process, again, gives you a sense that that's an area in which you can start to thin out -- in fact, we already moved a battalion from southeastern Anbar province to another area, an army battalion.  We are going to, if approved, bring out the Marine Expeditionary Unit, some 2,000 plus, here later this month without replacing it, and then over time we will gradually do that.  And that's what we want to do in other areas as well, having, again, cleared them of, say, al Qaeda or of other extremists  There's still Sunni-Arab insurgents, don't get me wrong, out there, although a number of them have actually raised their hand and come over to oppose al Qaeda.

     The ambassador mentioned Abu Ghraib.  That's an enormously significant case, in some respects more significant than Anbar.  I mean Anbar, at least, is out there, it's all Sunni Arab.  Okay, just -- let the Sunni Arabs deal with al Qaeda out there, that's a good thing, and just keep them, you know, away from Baghdad.  Well, Abu Ghraib is on the doorstep of Baghdad, and the prime minister approved some 1,700 men from Abu Ghraib, some of whom are certainly former Jaish al-Islami insurgents, and they are going to graduate from the police academy.  In fact, I think some graduated on the 10th and others will graduate in several days, and they will help police their area.

     Tied into a national chain of command, there'll be local police policing their locality, not someone else's, and again, tied in and paid for by the national government, which is of considerable significance, needless to say, because you cut the salaries off if they are not living up to the bargain.  But that's what enables, that's what thickens, if you will, our capabilities and the capabilities of the Iraqi security forces, and they become Iraqi security

PX358

forces.  And that's what we're trying to do throughout those areas.  Ryan, why
don't you call on --

        AMB. CROCKER:  Try over here.

        Q     A question for General Petraeus, and Ambassador Crocker, you can
answer, too.  What is wrong if the U.S. recommends a federal state, soft-
partition solution to end the war in Iraq?

        AMB. CROCKER:  Well, Iraq is a federal state.  The constitution
says so.  One of the challenges the Iraqis face right now is trying to work out
what that actually means translated beyond the constitution into law and into
practice.  That's why such a piece of benchmark legislation as provincial powers
is tough to get, because provincial powers is states' rights.  That's what the
debate is about in Iraq.

        And this is a whole new concept for them.  Iraq has always been run
tightly from the center; well, now it's not.  You've got governors with powers,
you have provincial councils with powers and with budgets that they're
executing.  So again, Iraq is -- the new Iraq is established as a federal state.
What Iraqis now have to do is translate that into practice.

        For example, I saw one pretty heated exchange at very senior levels
over the issue of whether an Iraqi governor can command federal forces in a
state of emergency.

        And opinions are pretty sharply divided over that and it's a pretty
fundamental issue.

        I think Iraqis will work their way through these things.  They've come
a substantial distance already by according provinces their independent budgets
and the ability to spend them as provinces see fit.  But exactly how federalism
is going to be translated on the ground is something Iraqis have to work
through.

        One encouraging thing I've seen over the last month or two is kind of a
reenergized debate on just this issue, what will a federal state look like in
practice.  And for the first time, Sunni Arab Iraqis are very much a part of
that discussion as they see in, say, Anbar or Salahuddin that actually it's a
good thing for provinces to have more authority and maybe a little less
authority for the center. But it's a work in progress.

        Q     Mr. Ambassador and General Petraeus.  Yesterday, General, you
were asked a very direct question, "Will the course of action you have outlined
make America safer?"  You said, "I don't know."  So what I'd like to ask now is,
to both of you, first of all, is that still your answer here today?  And
secondly, if not, why --

        GEN. PETRAEUS:  Thanks.  Yeah.  Well, thanks for actually giving me an
opportunity.  I did actually address that several times yesterday.  What I was
trying hard to do yesterday was to avoid being more than the MNF-I commander.
And so when I was asked about the global war on terrorism, I thought that that
perhaps is a question for those who are carrying out the global war on
terrorism.  I'm carrying out one piece of that, which is the part that is
prosecuted inside Iraq.  When asked about the impact on, say, the military, I
obviously said that certainly I understand completely the strains and the

stresses of extended deployments and the strains that that has placed and the sacrifices that our families have made.

And it was in that context that I was answering that question. I'm not the national security adviser, don't write the national security strategy nor the national military strategy.

As I mentioned afterward, however, achieving our national interests in Iraq is very important, and those national interests do, obviously, link to the overall strategy for our country, or an important component in it, and therefore do, yes, make our country safer because that is what our national security strategy is intended to do.  Q     General?

Q     Ambassador?

GEN. PETRAEUS:  In the back.  Yes, ma'am.

Q     General, (Anna Mulrine ?) with U.S. News and World Report. Senator -- thank you -- Senator Lieberman asked you, General, yesterday whether maybe it was time to give you authority of pursuit in your mission in Iraq to go after Qods Force operatives in Iranian territory.  And when he asked you that question, you demurred; you basically said that any sorts of operations like that should be rightly overseen by MNF-I, or by combatant command.  But what I'm curious about is, you know, how would that affect you as commander of forces in Iraq?  You know, would that be helpful, not so helpful?

GEN. PETRAEUS:  Well, I think he also asked, or at least several asked, do you have the authorities you need inside Iraq?  And I answered that yes.

And, look, again, I -- see, that really was where this came from.  I'm trying to stay the MNF-I commander; again, not be more than that. There is a regional combatant commander, Admiral "Fox" Fallon, and that is his province. Outside Iraq would be his area, and so I'm literally trying to avoid starting to talk about something that would extend beyond the borders of Iraq.

Now, having said that, I also explained on a number of occasions yesterday the challenges that are posed for Iraq by very lethal activity carried out by Iran in terms of the training, the arming in particular, the funding and in some cases directing of elements through the use of the Qods Force and also what happens in terms of foreign fighters coming into the country from the other side through Syria.

So this has an enormous impact on Iran.  The ambassador and I have, as we mentioned yesterday, on several occasions said you can't win in Iraq, you can't succeed in Iraq just in Iraq; it does require greater involvement with respect to some of the neighboring countries, some of the source countries for foreign fighters, and it certainly involves Iran.  And again, the Iraqi leaders have developed much greater concern about Iran's activities, about the activities of the Qods Force with respect to the militia extremists that in many respects appear to be trying to create a Hezbollah-like force that they could use to gain influence in Iraq.

So it's a huge concern to Iraqis, not to mention the Multinational Force and our effort to achieve the objectives outlined by Iraq and in our Joint Campaign Plan.  But that doesn't mean that it's something for which I should have the authority to pursue any more than we should have that with respect to Syria or elsewhere.

Right here.

Q    General?

GEN. PETRAEUS:  Right there.

Q    (Off mike) -- with Al-Arabiya Television.  General, is your commitment to Iraq militarily open-ended, or at least in years from now as the Democrats were saying yesterday?  And secondly, Mowaffak al-Rubaie, the national security adviser, was saying that they have 500,000 men, which is almost to Saddam Hussein's army.  And there's many conflicting reports about the readiness of the Iraqi army.  Can you comment on that?

GEN. PETRAEUS:  I -- I couldn't hear the last part of that.

Q    Mowaffak al-Rubaie --

GEN. PETRAEUS:  I heard to 500,000.

Q    Okay.  And he was saying -- it's almost Saddam Hussein's army. He's saying that these men are ready.  And there've be many (reflecting ?) reports about the readiness of the Iraqi army --

GEN. PETRAEUS:  I don't -- I'm not sure he did say that.  I think that he said that they are growing, they are getting better equipped, they are gradually taking over.  I think it was a bit more measured than that.  That certainly he chairs, in fact, a committee of Iraqi security force leaders and coalition leaders and diplomats.  And he's keenly aware of both the strengths and very -- even more, the limitations, if you will, because that's where the focus is, to try to fix equipment shortcomings, personnel shortcomings, especially leader shortcomings, because those are the growing -- have been very challenged to have the right number and qualified commissioned and noncommissioned officers.

They just aren't -- you just don't train those in a 12-or-18-week basic training regime.

And with respect, I don't believe I ever said that there -- I did not say that there is an open-ended commitment.  What I outlined was recommendations that will take us to mid-July.  I outlined a -- the concept that we have for the gradual drawdown of our forces over time and how gradual or rapid it is, depending on conditions.  And I think that's what a responsible military commander -- frankly if any of you were in my shoes, I think you would probably recommend the same thing.

Yes, sir.

Q    Thank you, sir.  My name is Ron Baygents.  I work for Kuwait News Agency.

The question is, we hear a lot about the cross-border activity in the surrounding countries.  Can you tell us how Kuwait is handling its border vis-a-vis Iraq?  And related to that, what is your minimum realistic expectation for the Istanbul Iraq neighbors conference in October?

GEN. PETRAEUS: Well, having actually done a tour as what in those days was called the General of the Month Club in Kuwait, back when we were rotating generals through Kuwait every month prior to the operations, and then having sat in the Kuwaiti desert for a while before we went through the berm, the Kuwaiti border is very substantial. I don't know if you -- you may not have -- I guess you've never seen it. But I mean, it took us, I think, 24 hours just to cut the holes, maybe a bit longer, in the wire, in the berms, fill in the tank ditches and all the rest of that. It is -- it's got three complex obstacles: fences, towers guardposts and everything else, and a lot of that of course created in the years after the Iraqi invasion of Kuwait and for a long time monitored by a U.N. force. I just don't recall whether they're still -- what their involvement is now.

But I don't have any sense that that is an area of Iraq's border across which foreign fighters might be flowing. There are very active ports of entry, and we do need to keep an eye on those. But again that's not really the area of Iraq through which a Sunni Arab extremist would want to travel, I wouldn't think. Because it means moving through the Shi'a South quite some distance before you would get to an area where you might be able to link up with those with whom foreign fighters normally link up. And normally, in fact, they're in a sense carried the entire way along there.

AMB. CROCKER: The neighbors conference in Istanbul at the end of October is of course the second convening of the neighbors at the ministerial level. The P-5 and the G-8 will also be there. This is part of an expanding kind of regional and international effort, I think, to support Iraq, and it's something we encourage. The ambassadors of the neighboring states just met in Baghdad a few days ago, and one of the things they discussed was the idea of setting up a permanent secretariat so that there would be a body in place that issues involving Iraq and its neighbors can be addressed. I think that would be a positive step if the conference decides to adopt that.

I also think it's an important venue for Iraq's neighbors to consider how they can help the effort under way in Iraq to achieve security and stability for the Iraqi people. We've seen some encouraging signs. The Saudis are preparing to reopen their embassy in Baghdad for the first time since 2003. This would be a good opportunity for other Arab states, I think, to follow suit. Kuwait and Iraq are nearing conclusion on a commercial agreement for Kuwait to supply Iraq with a significant quantity of diesel fuel, which is critical for power generation. It's these kinds of initiatives and endeavors on the part of the neighbors that are going to be important in bringing about a stable Iraq, and it's also an opportunity, I think, for the neighbors to bring some focused pressure on states like Iran and Syria who have been part of the problem more than part of the solution.

Q    As you both know, retired Marine General Jim Jones recently came out with a report on the Iraqi security forces estimating it would take about 12 months to 18 months before they could stand on their own. Do you both agree with that?

And also, do you envision tens of thousands of U.S. troops in Iraq for at least the next five years?

GEN. PETRAEUS: Tom, first of all, General Jones, I think, is addressing the fact of the institutional structures, if you will, the logistical structures, and that is, I think, an accurate assessment. That has been the most challenging part of this effort, frankly. We've discovered that it is certainly

very doable to train infantry men, infantry companies, infantry battalions and especially if you can find some of the former leaders, and they have. And those battalions can operate with reasonable ability and success. The challenging piece has been creating the logistical structures, the administrative structures of all things just to make sure they get paid on time, just track personnel strengths to do replacement, how do you deal with the wounded -- there are just a host of these that we just completely take for granted. I mean, to give you one example that I remember, in the fall of '04 or early '05 when we were trying to establish a logistical training center !
 for the Iraqis, we were already training battalions, and what we're now trying to do is to get the other -- the underpinnings of them going.

        And the Australians were great; they sent in a team of commissioned and noncommissioned officers in very rapid and very short notice. And they came in and they said, well, General, you can show me the logistical doctrine that we're going to teach. Well, there just wasn't any logistical doctrine. I mean, the entire structure had gone away, including even the buildings of the Ministry of Defense much less any other infrastructure and so forth. So you know, you literally have to sort out, okay, what we are we going to do? Is it going to be first, second, third echelon the way we have it, or is it going to be -- I mean, these sound very, very arcane, but they're hugely important. And if you're going to use a fixed-base security system -- logistical system rather than an expeditionary-based one -- we're relatively expeditionary in our capabilities; the Iraqis are not. They really have to go from fixed bases, and they can do that because they're generally operating!
  near them, they're not trying to go long distances away from those. But it's that kind of challenge.

        You know, and then they came in and said, well, do you have the parts system, the parts numbering system? Well, no. So literally, I mean, for thousands of line items of parts for all the myriad vehicles -- and of course, they never turned down a donation so you had a huge mixed fleet. This is the kind of challenge with which they've been grappling. They have put a lot of stock in the foreign military sales system, and frankly, it is incumbent on us to deliver.

        And Chairman Levin and Senator Warner, in fact, came back from their visit determined to try to help the -- encourage the speed up of the acceleration of the process because the FMS system is a bit of a peacetime process, candidly. And the ambassador chimed in; you know, he's got experience in I don't know how many different countries as the chief of mission alone and said the same thing to them that day. They've put about $1.6 billion into FMS just in the last year or so, and there's potentially as much more going in to it. But we've got to come through and deliver as rapidly as we can so that they have replacement vehicles, because they get battle damage and all the rest of this.

        So that's what General Jones was talking about.

        Now, having said that, there's numerous places in the country, entire provinces which are under provincial Iraqi control -- and not just the three Kurdish provinces but other places like Muthanna province, Maysan -- Karbala will be; they're going to go provincial Iraqi control here in about a month or so -- where we have either no forces at all, so they -- and they may not be operational readiness assessment 1. In fact, it's unlikely that they will be, particularly because of shortage of leaders, which is the big challenge right now, and then the second would be shortage of equipment. The third would be

maintaining the equipment that they have, because, again, what you're talking about is creating a warehouse system, depot system, maintenance facilities, training the mechanics, getting the tools, the spare parts -- it's an enormous challenge when you are literally standing it up from scratch. So that's what he's talking about.

But again, as I said, there are lots of units that are operating independently, even though they might be ORA-2 or some cases even ORA- 3. They're just doing it. And depending on the situation, they can be okay.

Q      (Off mike) -- of logistics, and as you talked about yesterday, the long-term security agreement with the Iraqis -- does that mean at least tens of thousands of U.S. troops in Iraq for at least five years --

GEN. PETRAEUS: I -- you know, I wouldn't hazard a guess on that. I mean, again, you saw the stairstep. We would like obviously to go as quickly as we can along that. But I'm not going to try to sit here -- again, you know, one of the cases I tried to make yesterday was it is very, very difficult to project out much farther beyond the horizon at this point in time, even just to mid-July of next year and as I cited earlier just a few of the examples of the kinds of reasons that that can be very, very difficult.

(Cross talk.)

GEN. PETRAEUS: Yeah.

AMB. CROCKER: No, the lady.

Q      Jacqueline Benoit (sp) with Agence France-Presse. Mr. Ambassador, I have a question for you. What do you think about the      French diplomatic switch towards Iraq since Mr. Sarkozy's election? You saw Mr. Kouchner in Baghdad recently; how do you see France play a role in the stabilization in Iraq?

AMB. CROCKER: Actually, there were two important European visits to Iraq in the last half of August -- the visit of course of the French foreign minister, Mr. Kouchner, and also the visit of Carl Bildt, the foreign minister of Sweden. I had the chance to speak to both of them, and it seems to me that some major European countries are now taking another look, a new look, at Iraq, and recognizing that four and a half years after the fall of Saddam that they have long- term interests in how things turn out in Iraq.

So I think this expanded European engagement is a very positive thing. And it comes at a particularly good time, with the international initiative on Iraq under way that parallels the neighbors' initiative. And of course France plays in both of them.

In about 10 days' time, the International Compact with Iraq will convene a ministerial meeting in New York, jointly chaired by the secretary-general of the U.N. and the prime minister of Iraq. That will actually look at the international compact. Seventy-four member states are part of that effort to support Iraq's economic endeavors. And it will look at the new Security Council resolution for the United Nations Assistance Mission in Iraq. That resolution gives UNAMI a considerably expanded mandate that allows the mission, at the request of the Iraqi government, to be involved in efforts in national reconciliation, for example, at working on internal boundary disputes between provinces, this sort of thing.

So at the same time that we see more positive activity on the part of the neighbors, a stronger, more expanded mandate for the U.N., it is a good thing to see as well a renewed European interest in working to further positive change in Iraq.

GEN. PETRAEUS: Let me just take advantage of this brief break here to set the record straight on something. There's this mythology out there and apparently an unnamed intelligence source who said that we only count executions if they're shot in one part of the head and the other. That is just not true.

As only the military can, we have a three-page document on ethno-sectarian violence methodology. And it is fairly comprehensive, and it's pretty logical and rational.

And in the execution category, it says civilians that show signs of torture, being bound, blindfolded, or shot anywhere in the head and so forth. So if I could just put that one to rest and then let me go ahead and call one right here.

Q     Well, General, welcome home. John Key (sp) of the Hughes Sullivan Show. I found your testimony to be most clear, concise and honest, and I thank you for that. My question is this: building on Mr. Wood, it is clear to me that some of our elected officials have no conceptual understanding of fighting an insurgency. Should we, the American public, mandate that our policymakers read and comprehend the COIN Manual 3-24, and would the rest of this be academic if they had?

GEN. PETRAEUS: Well, I mean, I'm not going to -- I don't want to try to follow up on that. (Laughter.) I would say --

Q     Aw, come on. (Chuckles.)

GEN. PETRAEUS: You know, the line about -- I've tried to spend the last 33 years going around minefields instead of through them.

But I actually took -- before my confirmation hearings back in January, I took the counterinsurgency manual in fact and delivered a copy to every member of the Senate Armed Services Committee. And in fact, you saw, I think, Senator Kennedy had a copy of it yesterday. And we stand by it. For what it's worth, I think it has been generally validated by what we have seen.

I would -- as I explained yesterday, by the way, the concept of counterinsurgency sort of in modern times is really more than counterinsurgency. What it is, is what you might normally in the past have called counterterrorist operations, very targeted raids, based on precise, actionable intelligence. It is what you might have called traditional counterinsurgency, real operations against insurgents. It may be a form of peace enforcement in certain areas; in some other areas, peacekeeping. You know, again, as we -- for those who are the aficionados of these definitions, nation-building, capacity-building on and on. All of those are encompassed by the activities that we are -- our soldiers and our partners from the embassy and all the different interagency elements that are over there are conducting.

And I did recommend, when I handed out that manual, the reading, I think it was, of pages 119 to 127, I believe is what it was. They sort of capture the

PX358

essence of what it is that our great troopers over there are trying to do in partnership with the civilians.

It is exceedingly hard. In the manual, it says somewhere that this is sort of the graduate form of warfare, and there's nothing easy about it. But we do think that yes, we have learned a lot of lessons the hard way and we've made our share of mistakes. And I had, I forget, three of four pages worth of them that I laid out for the confirmation hearing submission.

But I think that there have been enormous changes made in the institutional parts of our own services. The Army and the Marine Corps in particular, because a lot of this is ground. But also, you know, very heavy involvement of air, and even our naval components have contributed enormously in certain areas, including electronic warfare and a variety of other areas.

But we changed our doctrine, you know, our field manuals. That's -- those are the big ideas, if you will. If you think about an engine of change for an institution, it consists of big ideas. That's one cog that drives this, and they're codified in our field manuals. The detainee field manual -- hugely important -- by the way, it works. With respect to those who contributed to that, to Capitol Hill, that has worked.

So you have that. Then you have to of course educate your leaders. And that is the various schools and colleges, if you will, for the commissioned, non-commissioned and warrant officer leaders of our Army, of our Marine Corps, of the other services. And we changed all that. In fact, I was privileged to be in charge of some of that in my previous job.

Then you have to get the preparation, the training of that. So the leaders now, with their soldiers, have to train in a different way. And we completely revamped, for example, the National Training Center out in Fort Irwin, California. It used to be the clash of the titans, big tank armies colliding out there in the desert. Now it is continuous, complex, challenging counterinsurgency operations, with hundreds of native Iraqi speakers out there playing different roles, with anywhere -- as many as up to 14 (hundred), 1,500 soldiers who will strap on simulated suicide vests, drive suicide bomb vehicles, plant improvised explosive devices, all of the rest of that, to try to   get as realistic a situation -- and our soldiers, again, with villages all over the desert floor.

And for the Afghanistan-bound soldiers, we go up into the mountains out there. We've made similar changes, as much as we can in Central Louisiana, given the terrain differences, and in the training center in Germany.

And then you have to collect lessons learned. And they have to continually help you define your doctrine, your education, your training. And it's all now enabled by communications technology, knowledge applications that we've never had before as well. So you can literally virtually look over the shoulder of those downrange on a secure Internet. That has helped us, I think, to get to a point where our leaders -- also building on the experience that many of us have had in Iraqi or Afghanistan.

Our leaders, I believe, get it about this and our troopers get it about this kind of very complex endeavor more than we have in the past.

Right here.

PX358

Q    Yes.  Charlie Sennet from the Boston Globe. Counterinsurgency --
effective counterinsurgency also has to occur within a political context that
will accept it, and quite often the slower clock of counterinsurgency runs up
against the quickening clock of politics.  I'm wondering if you could talk,
General Petraeus and Ambassador Crocker, about coming back from Iraq and
confronting that politics here at home in the United States.

We've gone through these two grueling days of hearing.  There's the
sense that the emotions of the politics around Iraq are heightening, and some of
it was very personally to you, General Petraeus. I wonder if you can comment on
the MoveOn.org ad.  And in a more general sense, what do you take away from your
experience here in the two days before Congress?  Do you sense patience running
out?  Do you see that political clock ticking in a way that's going to affect
your ability to carry it out, to carry out the goals of the mission in Iraq?

GEN. PETRAEUS:  Let me just briefly say that I was sent a poem, by
Rudyard Kipling -- actually the morning that the ad came out -- from my
hometown, an old friend.  And it's the poem "If."  And I have it here.  I  won't
read it to you -- (laughter) -- much as I'd like to.  But it might be worth
looking at, because I took some strength, I think, from that.

Needless to say -- I mean, to state the obvious -- I disagree with the
message of those who are exercising the 1st Amendment right that generations of
soldiers have sought to preserve for Americans. Some of it was just flat
completely wrong, and the rest is at least more than arguable.

But with that, I'd be happy to hand off to Ambassador Crocker.

AMB. CROCKER:  (Laughs.)  Well, listening to the questions in the
course of the last two days, clearly there are deep divisions.  That's hardly a
secret.  There's a lot of frustration, and that's, of course, frustration that
we who are serving in Iraq feel every day, and it's a frustration that the
Iraqis share, including the Iraqis in the government.  I was -- I really come
away from these two days, though, somewhat encouraged.  Amidst the frustration,
there were -- there were a number of thoughtful and probing questions, and I
sensed a willingness to listen to -- listen to our explanations, our
assessments.  Obviously, I have no idea where the debate will go from here in
the U.S.  I'm -- I've got to get back to my day job -- and I'm actually looking
forward to it -- (laughter) -- and will have my hands full with that.

But I feel pleased and privileged that I did have the opportunity, as
did General Petraeus, to lay out our unvarnished views on what Iraqi reality is
now and where it looks to us like it's going. And I certainly felt I had a fair
hearing.

Q    General Petraeus, over here.

GEN. PETRAEUS:  Right there.

Q    General, Mr. Ambassador, you've talked a lot about how your
plan needs more time for the Iraqis to reconcile, and I'd like to know what is
the criteria for determining when that time runs out if they do not make any
serious moves towards reconciliation.

AMB. CROCKER:  Well, the way I framed it in my assessment that I
delivered over the past few days is that as I look at the trends in political,
economic and diplomatic developments, it's my judgment that the trajectory is

moving upwards, but the slope is not very great. And as I'm sure you heard repeatedly, I cited the reasons for that assessment. What we're seeing at ground level, what we're seeing from the top, particularly the effort over the summer by the leaders to come to terms on some key issues with some success, and then the linkages between them, I think that as long as that process is continuing, as long as the slope is up, even if the gradient is not step, then Iraq is moving in the right direction. And we need to demonstrate some, you know, strategic patience, resolve and commitment, because this will be a long process. There are no shortcuts. I said over the last couple of days. I said it again this morning. There's just no switch to flip that's ! going to automatically move Iraq overnight into a situation of security and stability. It will be a long, hard grind. Right now I think that grind is making progress.

      Q    A question --

      GEN. PETRAEUS: Right there.

      Q    Let's say that --

      GEN. PETRAEUS: I'm sorry. It was the one next to you. But we'll come to you next. Sorry.

      Q    Colonel Dattar (sp), Foreign Policy Association, former aide to the president of India. General, I congratulate you on your very, very successful accomplishment of the very difficult mission in Iraq. But what is the military or political answer to suicide bombing? Does it require, necessitate a change in the military doctrine?

      GEN. PETRAEUS: Well, what it requires is intelligence above all else, gathering as much intelligence as we can to take down every aspect of the network. And if you work your way back from point of detonation, you literally harden markets so you make it difficult for suicide bombers to get in there. You may recall that just before the start of the Baghdad Security Plan, there were some horrific suicide bombings in the two largest markets in Baghdad, the Shorja market and the so-called new Baghdad market, and in fact those were subsequently hardened. Literally, vehicles are not allowed in there during the day, and these are enormous markets, with tens of thousands of people in them, and they have completely revived and are very, very vibrant.

      Now, the same in the former book market, Mutanabi Street, and so forth -- so you work your way back, and then you have to get to those who conduct the reconnaissance for these, because -- and there's a very clear pattern. And we are trying constantly to get inside the networks. We know who the South Karkh VBIED -- vehicle-bomb (sic/vehicle-borne) improvised explosive device -- network cell leaders are, and we took them down, in fact, about three weeks ago. And it was the result of an operation that employed conventional; foreign special forces, not Iraqi or U.S.; interagency assets; and some very specialized intelligence capabilities that we have just been provided for our conventional forces as well.

      And it's about getting the final five meters, if you will. It's not just the final hundred meters or kilometer. You know, it's all well and good to say there's a bad guy in this particular muhalla in Baghdad, but that muhalla may have 10,000 people in there or 5,000 or even just hundreds; it's still not sufficiently precise.

You then keep going back in that network, if you will.  You have to take down the people that are mixing up -- they're more and more now using HME, homemade explosives, who are constructing the car bombs, and they're getting much more simplistic of late because of the pressure on their networks, particularly in Baghdad and in the areas around Baghdad.  And I showed you, you know, some of the slides that show overall civilian casualties in Baghdad coming down, in addition to the ethnosectarian violence, and -- but not as much outside Baghdad, because they have continued to go after, in some cases, just literally defenseless villages of poor Yazidis, Turkmen and so forth.

By the way, the data, you know, the methodology, again, is quite rigorous.  I just showed you the definition for just one element of that, and it's been consistent.  We've actually looked at other data as well.  We even have unconfirmed data.  They're all -- the trends are the same.  So I mean, that's -- what you're looking for is trends. And then you're trying to act and to reinforce and to help the trends continue in the right direction.

You keep working your way back in that network to the leaders, to the financiers.  And then when you get into the suicide bombers that are coming from outside Iraq, in this case, most of them through Syria, you're working your way literally all the way into, you know, what is the intelligence telling us about what's going on over there? How can we bring various assets to bear?  How can we operate in all different ways, even diplomatically, going to the source countries, to Syria certainly?

So that -- you're trying to attack this in as many different ways as you possibly can, but it still is an exceedingly difficult task. And I mean, your own country has been afflicted with this.  And as you know, you can have complete control, and all it takes is one person with a suicide vest in a crowded area to cause horrific damage.

There will continue -- I mean, there's just no question.  We know.  We can hear or listen to the intelligence, if you will, that -- what our sources are telling us is that they are trying to do more of this.

We believe that we actually pre-empted, interdicted a great number of car bombs and suicide attacks that were planned for the past several weeks.  I mean, there's been no secret that the ambassador and I were coming back.  And there was also no secret that they were going to try to create horrific attacks, did several weeks ago, but have not in the last couple of weeks really had a truly horrific one.  So it takes a very holistic approach, and that's the best way to describe that.  And again you have -- sadly your country has more than a bit of experience with that as well.

Now right there.

Q     But your projection of drawing down approximately 30,000 troops by next March is exactly the same projection the military personnel manifest dictates you --

GEN. PETRAEUS:  That's not true.  I would take issue with that.

Q     Secondly --

GEN. PETRAEUS:  I could have -- let me just answer that first one first.

Q     (Off mike) --

GEN. PETRAEUS:  I could -- let me answer that, please.  If I could just answer that first question.

I could very easily have requested -- just for starters, in September we need a replacement for the Marine Expeditionary Unit.  We can request replacements for the other forces.  Again, I could have put demands on the services had we felt the absolute imperative to do that, but I did very much have in mind the strain and stress that has been placed on our ground forces, in particular, as one of the considerations that was factored into the calculations.  So -- and in fact, actually, we are coming out quicker than we had to.  Again, we could have run this -- if you ran every brigade in Iraq all the way to the 15-month mark, we would not have had to take one out without replacement until about April because that's when the first of the surge brigades would hit that mark.

Now, for a variety of reasons, including the battlefield geometry of looking at where do we want to be in mid-July, we have decided that we want to take that first one out in mid-December without replacement.  That's actually not a surge brigade.  That is another brigade that was in the mix, but that's where we believe we can best remove a brigade and compensate, mitigate any risk from that because of the situation in that area with respect to the enemy, the local, political and security force situation.

So again, yes, the surge forces were scheduled to go home between April and mid-July.  That is absolutely right.  But you know, again, I could have requested more surge forces, and we certainly could have run it much longer, again, than as I said I've requested.  There is another MEU coming into the area.  I mean, we could have requested that, as well.  So I think it's a little bit -- I (don't want ?) to say unfair, but it's just inaccurate to say that all we're doing is just letting this thing run out.

But go ahead, please.

Q     What conditions -- and maybe, Ambassador, you can also comment on -- do you see to gauge that decision on those numbers, if it's not coincidental or, as you describe, part of your natural process?  What conditions dictate that you gauge that level of troop withdrawal?  And if possible, why aren't those conditions conducive to drawing down what the Congress and most of the American people want to see?

AMB. CROCKER:  Well, General Petraeus has referred to a battlefield geometry in making these determinations.  From my perspective, it actually becomes a political-military trigonometry.  Again, the surge was ordered by the president because of the really horrific deterioration of security in the course of 2006, to take on the mission of population security to bring down violence to allow a political process to move forward, because as you know, what we had by the end of 2006 was a country that was dangerously close to unraveling completely.

It's therefore extremely important that we approach redeployments with great care and ensure that the -- that conditions are right for this.  We do not want to see the gains that have been achieved with so much effort and blood on the part of coalition forces and Iraqis -- we don't want to see those dissipated because we moved too quick.  So, you know, we're going to be looking at a whole range of conditions in deciding how we move ahead.

PX358

GEN. PETRAEUS:  If I could build on that just a little bit.  In the long version of the statement that I made to the House committees, I actually quoted from an assessment that was made in December 2006 by Ambassador Khalilzad and General Casey.

They also had a joint campaign plan, and they did what is called the periodic campaign plan review, something we do every several months. In fact, we just did one before coming out here.  And that was quite stark.  I've gone back to reread that a couple of times, but you know, the word "failing" is in that assessment, and that is a pretty grim assessment in every line of operations.  And it then stated that what was necessary to reverse that situation was to get the sectarian violence under control, particularly in Baghdad, and that to do that you had to have sufficient reliable forces to retain control of an area once it had been cleared.  And that was the basis for the -- General Odierno, the Corps commander, at that time had just taken over, put together a concept, requested additional forces, went up through General Casey, and that was the cause, if you will, the catalyst for the surge in forces.

And again, I think it's very, very important to keep coming back to that situation.  That is not a situation, needless to say, that we want to repeat.

And I think we better come over to the last question.

Right here.  I'm sorry.

MR. ZREMSKI:  (Off mike.)

GEN. PETRAEUS:  Sorry.

MR. ZREMSKI:  Before we do that, I just want to thank a few people.  I wanted to thank Bill McCarren, the general manager of the Press Club, and our staff.  I want to thank the general and the ambassador for joining us today.  I especially want to thank John Donnelly from CQ, our vice president at the Press Club, for making this event happen.

And also, please, if you could all stay in your seats while the general and the ambassador leave, they have other pressing engagements, and they're going to have to leave immediately after our event here.

So with that, let me ask a question that kind of alludes to something you mentioned yesterday and the day before, General Petraeus, and ask you to be just a little bit more specific.

Presumably, your plan stands -- in terms of the troop deployments, what would you recommend regarding our military effort in  Iraq if next summer there is no political progress and there's little change in the security situation?

GEN. PETRAEUS:  John, I'm afraid I'm not going to get any more specific this morning than I did yesterday, when I think as far as I went was to say that it would be very, very hard indeed to recommend continuing in the current form.  There are -- as the ambassador mentioned, there are so many factors in assessing the situation at that time, and many, many more than just where you are in a specific set of areas.  You sort of have to ask, well, okay, but has there been progress, has there been this, has there been that; what about this other area, what are we doing here?

I mean, as we have mentioned, one of the reasons that we have a degree of hope is that, although there is not an oil revenue sharing law agreed, there is oil revenue sharing ongoing. And provinces in fact actually have budgets, which is something, I believe, unique to Iraq in the last two years of its existence. And they're spending them, this year, which is even better. Last year, they really did not spend them very effectively. Nor did the ministry spend their capital budget accounts effectively. And again, this year they are doing a much better job. That's relative, still, and last year was pretty abysmal, this year is better; still certainly big room for improvement.

There is not a general amnesty law, correct, but there's this -- whatever you want to call it -- conditional immunity or what have you that is essentially, tacitly, taking place when the prime minister's National Reconciliation Committee approves the Ministry of Interior hiring again 1,700 men from Abu Ghraib. And again, that's not the only one, but that's a pretty big one, given its proximity to some Sunni-Shi'a fault lines right around the capital, given the history of that particular area and given the fact that those individuals -- we know some of them, again, were part of the Jaish al-Islami.

There is not a de-Ba'athification reform bill, although I think that's gone now to the Council of Representatives as of yesterday, I believe. But there is, again, a reaching out to former military who were dismissed. I think there are over 50,000 now that have responded, and 5,000-plus have actually been hired by the various security services; another -- I think it's 7,000 were offered other government employment, and the rest will be allowed to receive retirement benefits.

So it's that type of activity that is ongoing, and that is what does give us, again, some degree of hope, that if you have the willingness to take actions like that, then perhaps there is a willingness to truly codify that in the form of legislation.

But with that, let me just thank you all very much, and we'll go on. Thank you.

Q       Thank you.  (Applause.)

END.

PX358

PX360




# PRESS CONFERENCE: Al-Qaeda in Iraq Update: Rear Adm. Smith, Jan. 20, 2008

Multi-National Force-Iraq

Sunday, 20 January 2008

Rear Adm. Gregory Smith, Multi-National Force -Iraq's Communication Division, provides a detailed brief on Coalition Force efforts against al-Qaeda in Iraq over the past year.

[Briefing Slides [PDF]](#)

PX360


























PRESS CONFERENCE:

Rear Admiral Gregory Smith, Director of Communications, Deputy Spokesman, Multi-National Corps – Iraq

DATE: January 20, 2008

TRANSCRIBED BY: SOS INTERNATIONAL, LTD.

PARTICIPANTS:
Rear Admiral Greg Smith

REPORTERS:
Bruno Roper from ABC
Charles Levins from USA Today
Ahmed Jessem from Arabiya Newspaper
Ned Parker from The Los Angeles Times
Gina Chung, The Wall Street Journal
Phil Ittner from CBS
Huta Delhamin from Al Jazeera English
Kian Sadick from NBC News
Kim Gamel from The Associated Press

REPORTERS 1-21

*REP1 = REPORTER 1
*INT = INTERPRETER

RDML SMITH: Good afternoon and A'Salaam A'layQoom.

We have provided several briefings over the past year focused on operations against al-Qaeda Iraq, and while considerable progress has been made we still have much work to do. Operation Phantom Phoenix, an Iraq-wide operation targeting al-Qaeda, has been underway for two weeks and the effects of these combined coalition and Iraqi Security Force operations has been substantial.

Since January 1, Operation Phantom Phoenix has conducted 18 battalion-level operations, detained 1023 terrorists and killed 121 terrorists. Among those captured or killed were 92 high-value targets. Coalition and Iraqi forces have also found and cleared 351 caches, 410 IEDs, 3 VBIED and IED factories, and 4 tunnel complexes.

I thought it would be helpful to spend some time today discussing what still remains as Iraq's most lethal enemy and its greatest threat to peace … al-Qaeda Iraq.

What is al-Qaeda Iraq? Who are its leaders and who makes up their rank and file? How are they organized, funded and how do they operate? What are they hoping to achieve in Iraq? And finally, what effect have they had on the people living here? These are questions I hope to be able to provide some perspective on by summarizing the fight against al-Qaeda Iraq over the past year.

SHOW SLIDE

Al-Qaeda came to Iraq after the fall of Saddam for what it claimed was the purging of the infidels, namely the forces of the coalition that freed the Iraqi people from decades of tyranny. Al-Qaeda senior leadership, who by that time had been driven into Northwestern Pakistan, saw Iraq as its caliphate, its center of struggle and dominance for establishing its Taliban-like ideology in the heart of the Arab world.

Al-Qaeda Iraq is foreign led, with its current leader an Egyptian named Abu Ayyub al-Masri, having replaced the previous leader Abu Musab al-Zarqawi, a Jordanian who was killed in June 2006. The vast majority of the senior leadership are all foreigners. The most senior Iraqi, Khalid al-Mashadani, was captured in July 2007 and provided considerable insight into how al-Qaeda Iraq was organized.

Of course the vast majority of the fighters are Iraqis, many whom were loyal to Saddam and who fought not because they believed in the twisted ideology of al-Qaeda, but to avenge the loss of their former leader. Some of course had little choice as the insurgency destroyed the economy and pride drove their allegiance to al-Qaeda in order to put food on their family's tables.

Al-Qaeda Iraq used the most barbaric of tactics, which I will discuss in more detail shortly, to intimidate Shi'a, Sunni, Kurds and Christians. They executed young and old, men and women. They beheaded fathers in front of their children. They extorted, kidnapped and murdered for little or no reason. To even the most casual observer, it appeared that all of Iraq was the enemy of al-Qaeda, no Iraqi was spared from their wrath.

A major weapon of al-Qaeda has been the suicide bomber, ninety percent who were foreigners. The suicide bomber became the spark that ignited ethno-sectarian violence and drew all of Iraq into a near civil war. So let me now turn to how the picture looked at the start of 2007.

SHOW SLIDE

This map represents al-Qaeda Iraq's presence in December of 2006. Dark red represents what we assessed at that time as their operating areas … areas where they had some level of freedom of movement and sanctuary to conduct their operations from … and the lighter red represents areas of population influence. The image on the bottom right is a hand drawn map captured early last year, outlining al-Qaeda's strategy to overtake Baghdad by controlling first the outer belts then Baghdad itself.

SHOW SLIDE

PX360

This map was captured from al-Qaeda Iraq and represents their operations and areas of control as they perceived themselves in early March 2006. The red represents areas they felt were under their full or partial control, with the south of Iraq as the obvious exception, with those living in the south labeled as 'rejectionists.' The differences in the two maps is a striking example of al-Qaeda's use of propaganda to distort reality, in this case lying to their own fighters.

SHOW SLIDE

There are countless examples of the barbaric tactics, fueled by their extreme Taliban-like ideology to justify the indiscriminate use of violence against mostly innocent Iraqi civilians, many of whom were unknowingly labeled 'apostates' for their refusal to take up arms against Coalition and Iraqi forces or aid the terrorists. Two such examples are the Tall Afar attack last March which killed and injured 223 Iraqis, and an attack in August of the Yazidi people who were targeted by multiple car bombs that killed and injured 796 civilians.

SHOW SLIDE

These bombings were just two of the more than 4,500 attacks by al-Qaeda Iraq in 2007 that targeted civilians. Al-Qaeda murdered 3,870 Iraqis, injuring nearly 18,000 additional innocent civilians. The violence peaked in March and April and as the surge of operations pressed through the summer, the number of high profile explosions slowly began to decrease, however the numbers still remain alarmingly high.

SHOW SLIDE

As Coalition and Iraqi forces have cleared al-Qaeda sanctuaries, numerous torture houses and mass graves were found. These images were taken from an al Qaeda torture manual, and show the brutal methods they used to torture Iraqis for something as simple as smoking cigarettes or being related to someone in the Iraqi Security Forces. They tortured and murdered men, women, and children, and through the use of terror and intimidation controlled the populations where they were present.

Before I highlight some of the major operations and progress to rid Iraq of al-Qaeda, I think it's important to note the role played by the Iraqi security forces and the Iraqi people.

SHOW SLIDE

Iraqi Security Forces continue to grow, to develop their capabilities, and to shoulder more of the burden of providing security for their country. In 2007, the Iraqi Security Forces grew by more than 106,000 personnel. a surge over three times that of the coalition. The total force now stands at over 567,000. The Ministry's of Defense and Interior invested nearly $3 billion dollars in foreign military sales in 2007 to purchase equipment and supplies.

By years end, some 140 battalions of Iraqi Army, National Police, & Special Operations units were in the fight … about 122 of those battalions capable of taking the lead in operations. All Iraqi battalions are heavily involved in combat operations and have been increasingly the first line of defense, with losses 2-3 times that of the Coalition.

SHOW SLIDE

Beyond the increased capacity and capability of the Iraqi Security Forces to take on al-Qaeda, perhaps even more important was the formation of Awakening groups across Iraq.

What began in Anbar Province in early 2007 as the original "Awakening" by Sunni tribes rising up against al-Qaeda Iraq, they worked with and increase the capacity of Iraqi and Coalition Security Forces to improve security in areas threatened by al-Qaeda Iraq and other militant groups.

Today, more than 130 different Concerned Local Citizen groups are providing neighborhood security throughout Iraq, with over 80,000 active members … 80% of whom are Sunni; 20% Shi'a.

Under the control of local Iraqi Security or Coalition Forces, these brave Iraqis have turned the tide against al-Qaeda and are no longer afraid to fight against their ideology and violence. We have all witnessed the courageous acts of the concerned local citizens and while al-Qaeda has made them their enemy, they continue to stand up for their neighborhoods and are making a tremendous difference in restoring peace and normalcy.

SHOW SLIDE

Progress depends on squeezing al-Qaeda Iraq from every direction and with every possible means.

Much more than just kinetics, it's a multi-dimensional approach, using all elements of combat power, integrated with "soft" power. Progress made in security must be followed quickly by improved economic security, with employment being foremost. The government of Iraq is acutely aware of this challenge and has worked side by side with the provincial leadership to address many of their needs and concerns. All of this will need to be worked in order to continue squeezing al-Qaeda out of their safe havens and operating bases and into the open where they can be killed or captured.

With that as a backdrop, let me turn to discussing a few of the high-profile terrorists that were either killed or captured during operations by coalition and Iraqi security forces, supported by the Iraqi people.

SHOW SLIDE

Haythem Sabah Shaker Mahmud al-Badri was the Emir of Greater Samarra and was the mastermind behind the destruction of the Samarra Mosque in February 2006.

• Operated Samarra terrorist network responsible for improvised explosive devices and vehicle bomb attacks

• Orchestrated the Kirkuk courthouse bombing June 23, 2006 (20 Killed, 100+ injured)

• Masterminded a vehicle bomb attack against an Iraqi Army checkpoint in Samarra on August 28, 2006 (29 Iraqi Security Force Killed/66 injured; 51 Iraqi civilians injured)

• He was killed in a targeted raid last August

Khalid al Mashadani was the senior Iraqi in the al-Qaeda Iraq network.

• Principal intermediary between al- Qaeda senior leaders and Abu Ayyub al-Masri

• Created fictional al-Qaeda Iraq leader -- Abu Umar al Baghdadi to mask foreign leadership of AQI

• Prior to capture, issued order for all al-Qaeda Iraq Emirs (city and provincial) to start wearing suicide belts

• Confirmed al-Qaeda Iraq lost al-Anbar safe haven due to Coalition Force operations and tribal engagement

• He was captured last July and sentenced to death by an Iraqi court in December

SHOW SLIDE

Muharib Abdul Latif al Juburi was the minister of information and primary spokesperson for al-Qaeda Iraq.

• Involved in kidnap and murder

• Participated in the kidnapping of journalist Jill Carroll

• He was killed last May

PX360

Abu Maysara was a senior advisor to al-Masri and a Syrian national.

• Responsible for interpreting Koran to legitimize the killing of innocent Iraqi citizens to include women and children

• Provided logistical support to operations and key leader in their media network

• Escaped from the Badush Prison in March 2007, and was killed last November

SHOW SLIDE

Abu Usama al-Tunisi was the Emir of the Southern Baghdad Belts and a Tunisian national.

• Foreign terrorist facilitator with strong connections in Levant and Syria

• Responsible for multiple vehicle bomb attacks in the Baghdad area

• Participated in the Baghdad Sheraton Hotel Bombing

• Key communications link to foreign facilitators and senior al-Qaeda leadership

• He was killed in a targeted operation last September

Muthanna was the Emir of the Iraq/Syria border

• Foreign terrorist facilitator

• Responsible for the movement of personnel from Syrian border into Iraq

• Direct contact with Abu Ayyub al-Masri

• Captured material provides insight into the foreign terrorist network spread across the Middle East, North Africa, and Europe

• He was killed last September

I want to spend a few moments discussing the material we found at the site of his Muthanna's death.

SHOW SLIDE

I mentioned earlier that the majority of al-Qaeda's leadership and many of its fighters are foreign born. During operations against Muthanna, Coalition Forces captured over five terabytes of data detailing more than 750 foreign terrorists, from 22 countries that entered Iraq from August 2006 to August 2007. From this we learned that the majority of foreign terrorists enter Iraq to carry out suicide attacks, signing a pledge that formally commits them to that duty. Over 90% of suicide bombers are foreign terrorists, and these high profile attacks account for a large majority of the Iraqi losses inflicted by al-Qaeda.

SHOW SLIDE

Abu Yaqub al Masri was a member of the original leadership of al-Qaeda Iraq and an Egyptian national.

• Previously a military and spiritual leader in al-Anbar, then emir in Taji

• Responsible for a series of attacks and car bombs in Iraq, including bombings that killed 200 people in Baghdad

• Provided guidance and direction for attack planning, coordination and execution

• Direct access to senior al-Qaeda leadership

• He was killed last August

Wamid was the Emir of Baghdad

• Iraqi national with extensive al-Qaeda Iraq history dating back to 2003

• Operated in the Baghdad area and had been reportedly in charge of both a security cell and a separate intelligence cell

• Identified by multiple sources as a direct link to Abu Ayyoub al-Masri and could have served as his gatekeeper

• He was detained during a raid last May

SHOW SLIDE

Umar Wahdallah Dod al-Zangana was the Baghdad Military Emir

• Ran al-Qaeda Iraq network responsible for hundreds of civilian murders within Baghdad

• Planned and directed vehicle bomb, suicide bombs, improvised explosive devices and sniper operations

• Used foreign terrorists in vehicle bomb attacks throughout the Baghdad area

• Planned and directed Baghdad chlorine attacks

• Personally beheaded two Russian Diplomats

• Had direct contact with Abu Ayyub al-Masri

• He was sentenced in December to death by an Iraqi court.

And, Muhammad Sulayman Fizza al-Zobai, the regional Emir of Kharma, Abu Ghuraib, Zaidon, and Radwaniyah

• Led an al-Qaeda Iraq foreign terrorist facilitation network

• Provided foreigners to act as suicide vehicle bomb drivers

• Involved in Abu Ghuraib prison attack on April 2, 2005

• Involved in complex attack on Kharma police station, December 24, 2005

• Organized intimidation squads against Iraqi civilian

SHOW SLIDE

Overall, operations against al-Qaeda Iraq in 2007 resulted in the capture of 8,800 terrorists while an additional 2,400 were killed. Of those, we captured or killed 52 Emirs, 32 Improvised Explosive Device leaders, 24 cell leaders, and 92 facilitators.

SHOW SLIDE

The combined efforts of the Coalition and the Iraqis led to a much different outlook for al-Qaeda Iraq at the conclusion of 2007, as shown in this map. Their areas of control and influence were diminished significantly. We have reduced their vehicle born improvised explosive device networks … disrupted the flow of foreign terrorists, weapons and logistical materials … kept

constant pressure on al-Qaeda, forcing their leadership to be on the run. Al-Qaeda has alienated the very people it needed for support … citizens have "awakened" to defend their neighborhoods and their way of life … and finally, the Iraqi security forces have surged and are on the front lines of the fight.

As Operation Phantom Phoenix continues, we know that this remains a tough fight and one that has had and will continue to have dark and difficult days and weeks. The way ahead will not be easy. Inevitably, there will be unforeseen challenges that will emerge. Nevertheless, we remain committed to pursuing al-Qaeda in order to ensure security and stability for all Iraq. And with that, I'd be happy to take your questions. We'll take it on any other subject you'd like as well. Please go ahead.

REP1: I am Bruno Roper, ABC. I'm just wondering, of all the people you've talked about who were detained and killed, who do you see as the most significant of those as characters?

RDML SMITH: Well, if you consider that Muthanna and as a foreign terrorist facilitator, as an individual, the network they ran, very significant. But I guess as significant is the material that was found that really gave the insights into that network and to understand how foreign fighters were employed inside Iraq. But as importantly, how they were brought into Iraq. What was the network that fed that? And that gave us great insight. The details of those individual 750 Iraq… foreigners that had come in gave us a great deal of information about routes, origins, financing, and so forth, and it has made a big difference in our ability to bring down—by about 50 percent—the number of foreign fighters currently coming into the country. Yes, sir.

REP2: Charles Levins from USA Today. Can you talk about how you used those records you found and specifically what you learned about the routes and the countries where they're coming from to try to not just fight them here in Iraq but try to stop the flow from, you know, whether it is North Africa or Saudi? And how, you know what I'm saying, how that was applied to…?

RDML SMITH: This became, really, a partnership not only between bilateral relations with countries in the region and around the world but also, from a law enforcement point of view, there has been an opportunity to exploit the knowledge there of who the handlers were in key countries, to work with the governments in those regions to make them understand—if they didn't already know—the level of throughput that was coming from those countries of terrorists, and then working very closely with some of the more significant players in the region, like Syria and Saudi Arabia, has made a tremendous difference, again, at reducing the flow of foreign fighters. So it really became an ability to work from an interagency point of view as well as bilaterally with nations to ensure that they understood how they could support reducing the flow of foreign fighters and reduce the violence here in Iraq and elsewhere.

REP2: You said you are working very closely with Syria now? I mean will you qualify it as very closely?

RDML SMITH: Yeah. The connections with Syria obviously are not directly from Multi-National Force – Iraq. But from an interagency point of view, obviously there's relationships there that can work through the diplomatic channels and law enforcement channels that have paid some dividends. Yes, sir.

REP3: Asks question in Arabic.

INT: Ahmed Jessem from al Arabiya Newspaper. You mentioned…you said that the majority of the al-Qaeda leaders are from the…are foreigners. So what is the number that have been foreigners that have been killed and…through your intelligence? And how many do you think are still there?

RDML SMITH: Well, it's a good question. I don't have the specific number on the number of foreigners that have been killed inside Iraq. A significant number of the suicide bombers have been successful in their operations, and then clearly they died as a result of the conduct of those. And they were assessed to be about 90 percent to be foreigner. We have a small population of foreigners in detention. And again, a large part of our operations are targeting al-Qaeda's rank and file as well. So I don't have a specific number for you. But we assess that the individuals that are coming into the country— around 50 percent of those— 50 to 60 percent—end up being suicide bombers and the other 40 to 50 percent conduct other operations in support of al-Qaeda here. And our operations have been very successful. Sir.

REP4: Thanks. Ned Parker with the L.A. Times. Just wondering, what are Syria and Saudi Arabia doing specifically that's different now from, let's say in the summer period, to stop this flow?

RDML SMITH: Again, specifically, the countries have taken steps, I think, in a couple of key areas. One, I think, is a greater understanding on their part of the impact as a regional partner in emboldening al-Qaeda here in Iraq and the impact it could have on their country long-term. As a regional partner in providing secure border, it prevents the flow back and forth of terrorism. So, from a long-term point of view, Syria and Saudi's interests are for their own security of their own borders and their own security within their countries. But specifically, they worked to identify profiles of individuals. In the case of Saudi Arabia, they've reduced…made it more difficult for single males, for instance, to obtain visas without more questioning and determining what their real intents are as they board an airplane for Syria as an example. Syria has taken steps on the border; they've increased the number of border patrols and checkpoints. And so, various steps have been taken that have been constructive and very helpful to reduce the foreign fighter flow. But it's still a concern as the numbers coming across the borders continue, but at reduced levels.

REP5: Gina Chung, Wall Street Journal. Can you also comment on the recent violence in the south and the security prospects there given the coalition doesn't have a big force there? And I also had another question regarding al-Qaeda being squeezed here in Iraq. Do you—in terms of intelligence you've gotten from other parts of the world—have a sense that some of those people than are going to other parts of the world in Afghanistan or other places given sort of the pressure that they're facing here?

RDML SMITH: I think the last couple of days you've witnessed, certainly, a very heightened level of security in the Basra and Nasiriyah area that has been dealt with very professionally by, in the case of Basra, Major General Jalil and Major General Mohan, through both the Army and police force of Basra, dealt with that situation very professionally. And although there was results…there was loss of life on both the police and Army side, as well as innocent civilians, they now have that area under control and have done a tremendous job of quelling that violence. I think what you're seeing though is an increased capacity in the case…part of the Iraqi security forces to handle security in their provinces. Basra, as you know, was turned over to Iraqi control in December. A long transition took place between…leading up to that point with British forces having been supporting the Basra Province for the last several years. They remain in a strategic over watch. We were in very close contact with the Iraqi security forces throughout that period of time. They had the situation well under hand and dealt with it very professionally. On the second issue, yes. When you consider that al-Qaeda itself, the senior leadership of al-Qaeda, has a much larger footprint of activity across the world. Whether or not foreign fighters that are…would be destined for Iraq are going elsewhere is hard to know. But clearly the…dealing with the foreign fighter population here inside Iraq has been very critical to reducing al-Qaeda's threats to Iraqis and that's our main mission here. Sir.

REP6: Asks question in Arabic.

INT: Question. There has been certain operations in Basra and Nasiriyah and also there has been an [unintelligible] operation in Najaf. Do you think the Iraqi forces will handle the situation in Najaf if something similar happened, or will the coalition forces give support as well?

RDML SMITH: Again, I think it's purely up to the Iraqi security forces that are in the area to make those determinations of whether or not they need coalition support. And to date, they've addressed the concerns locally. A training force is present in those areas. And they've had an opportunity over the last several years to build up their capability; not only in the way they are trained and equipped, but also in their command and control. And much of their leadership now has had a seasoned amount of activity to be able to deal with crises like that. So I suspect in Najaf, as an example, if there is a situation in Najaf that the local leadership there will make a decision whether or not coalition support is needed. But if it is needed, we'll be there to support it. In the back, please.

REP7: [Unintelligible], Japanese Daily Newspaper. During your war against al-Qaeda in Iraq from…sorry. During your war with the…against al-Qaeda in Iraq, do you get any Iraqi help from other Sunni militias like [unintelligible] or the Sahwa, the "waking up"? Have you get any…help?

RDML SMITH: Yes. The tremendous amount of support comes from the Awakening Groups. And what, again, what was witnessed in Anbar and the ability of the Iraqi people to make a decision to turn against al-Qaeda has been the single biggest component to the changed environment here inside Iraq. Al-Qaeda no longer has free sanctuary to operate thinking that the local people will take care of them—won't, in fact, turn them over to Iraqi security forces. And what we're seeing in Diyala is an example of that; whereas forces operate in the area for a period of time, people begin to build up confidence that the security forces will protect them, and they begin to provide intelligence and tips to lead you to the remaining elements of al-Qaeda. So, yes; the Iraqi people, through the Awakening Groups and others, have made a tremendous difference. Do you have a follow up?

REP7: Yes. But we hear from the people that many of al-Qaeda fighters became against al-Qaeda now. They became with Sahwa or the "waking up," what you call them. They are fighting al-Qaeda. What do you think about that? Most of them are killers.

RDML SMITH: Well, again, as my remarks pointed out, much of the rank and file of al-Qaeda, in the early days especially, was Iraqis who really had
no other choice and were deprived of any way to make a living. The economy was destroyed by al-Qaeda's presence. They were intimidated. Their families were tortured. And they chose to survive by joining al-Qaeda's ranks. And once they were given the opportunity to make a decision to oppose al-Qaeda, they have turned away from that ideology and that hatred and that violence, and are now working with the coalition and the Government of Iraq to root out those remaining elements of al-Qaeda. So, that's a very positive step and we welcome it. Yes, sir.

REP8: Admiral, Phil Ittner from CBS. The other big bug-bear that the U.S. military's been talking about for years is, of course, Iran. There's been a lot of talk about an up tick in attacks being sourced or connected to Iran and I wonder if you could touch on that?

RDML SMITH: The discussion recently was on the up tick or the increase in the number of explosively-formed penetrators that we saw in early January, both those we were finding before they exploded and those that did explode. For a period of about two weeks there was a rate of two to three times the normal…what we had seen sort of leveling out as the normal rate at the end of 2007. But in that subsequent week, the third week now of January, we've seen those numbers come back to normal levels. So there was an increase; we don't know why precisely. Whether that was a focused use of the improvised explosive device, this EFP, during that period of time and whether those were directed by Iran, in this case, if that leads to your question. But there was an increase clearly of the use of that weapon and now they've returned to normal levels. In a broader sense, just to discuss the issue of Iran's influence here in Iraq, we continue to see a negative influence by Iran in the training and financing of Iraq's activities here. The special groups that we've discussed in the past which are trained inside Iran continue to be trained in Iran as late as last fall, after the pledge made by the Iranian government to the Iraqi government that it would support a more peaceful transition here in Iraq. So there's a mixed signal, a mixed set of circumstances associated with Iran's involvement here in Iraq. And while we don't have direct evidence of the use of weapons or of the direction of the use of weapons by Iran, we clearly see their intent of training and financing continues today. Yes, sir.

REP8: On Iran, what's the latest on the bilateral talks between Iran and you guys? It seems like in December there was one that was supposed to be was canceled and we haven't heard much since. What's going on there?

RDML SMITH: Well, the U.S. has stated its intent to support sitting down with Iraq, on Iraq's invitation, with Iran for these discussions and they have yet to be scheduled. Yes, ma'am.

REP9: Huta[ph] Delhamin[ph] from Al Jazeera English. I was wondering, did you…when all these weapons you found with al-Qaeda fighters, were any made in Iran? Did you find any EFPs with al-Qaeda?

RDML SMITH: I don't think that we're seeing any of the Iranian-made weapons found in areas where we know precisely were controlled by al-Qaeda. We have no evidence of that. That's a good question though. But we have, as you know, in 2007 uncovered twice the number of caches we found in all of 2006. I just mentioned the numbers found in Diyala. And so it's a good question. But no, we're not seeing a direct link between al-Qaeda control. Now that said, al-Qaeda clearly can get access

to weapons through other means besides directly from Iran, for instance, because they'll sweep up munitions as it goes along with its operations. But we're not seeing the evidence of Iran providing weapons to al-Qaeda. Yes, please.

REP10: Hi. I'm Kian Sadick, NBC News. I wanted to ask about the Shi'a groups who have been speaking out on their frustrations of the situation and various threats about them, you know, joining up and fighting back again. Because various areas in Iraq which have been called success stories are fully Sunni, whereas the Shi'a and the Christians who used to live in those areas are still displaced in other areas. And have you had any sort of communications with them? Is there anything being done about that?

RDML SMITH: I think if I understand your question, we do see a frustration by the Shi'a of the same kind of violence that, really, al-Qaeda had placed on the Sunni populations—in a different way, in a sense. In the case here, we're talking about Shi'a populations that are having to deal with basic gang-like activity, criminal activity, which makes any sort of normal life very difficult for the average Shi'a family. And what they want—just like the Sunni want—is a way to live a peaceful life; for the children to go to school and get a decent job and so forth. And I believe you're seeing individuals…and that's why we're seeing an increased number of these Concerned Local Citizens coming from Shi'a neighborhoods—20 percent now are Shi'a. And while those are in the neighborhoods just to the south of Baghdad, there are no Concerned Local Citizens in the deep, deep south of Bagh…of Iraq.

REP10: [unintelligible] Muqtada al-Sadr coming out and saying he's going to, you know, he's going to stop…he's going to start fighting again. He's not going to continue the ceasefire, the six-month ceasefire that he had called because he's, you know, because his group is getting more frustrated. They are quite a big group and if the Mahdi Army begins to act up again, what sort of plan did you have to combat such a thing?

RDML SMITH: First of all, I've seen those reports but I'm not certain that I've got the level of confidence you may have on the accuracy of that kind of reporting. But I do believe that Muqtada al-Sadr understands as well as anyone the dangers of going back to a level of violence that really tarnished the Sadr trend movement and began to, again, erode the confidence of the people as to what they stood for, which was a political, peaceful process for Iraq. And so the pledge of Muqtada al-Sadr to have a ceasefire—to have his forces stand down from any violent activity—has been a very, very positive influence here in Iraq. And I believe the Shi'a people understand that, and he understands that. And so we're hopeful that that long-term objective of peace and security in Iraq is fulfilled by Sadr and others who can make a big difference in Iraq. I'll take your question.

REP11: Asks question in Arabic.

INT: Is there any statistics regarding the flow of the foreign fighters…of the Arab fighters or foreigns from the borders? And also, do you have statistics of the newly…those who joined al-Qaeda inside Iraq?

RDML SMITH: We had historically…late summer we were seeing as many as 110 foreigners come into Iraq on a monthly basis, and the vast majority of those came through Syria. We're now, in late 2007, seeing numbers around 40 to 50 a month. Again, still a dominant number coming through Syria. So, around a 50 percent reduction in the number of foreign fighters coming into Iraq.

REP11: Speaks in Arabic.

INT: What are the statistics concerning the Iraqis that work inside al-Qaeda? Do you have any recent statistics of the Iraqis that work inside al-Qaeda?

RDML SMITH: Really, to quantify the size of al-Qaeda inside Iraq in terms of who, on any given day, is aligning themselves with al-Qaeda is a very difficult metric to come up with, and so I would hazard trying to give you a number of Iraqis who are fighting alongside—today—al-Qaeda. Again, we're seeing a transition over the last year in which individuals who, clearly, once were, are no longer. And so…and it's very difficult to quantify that situation. But the positive trend is that more Iraqis are choosing not to align with al-Qaeda, and that's a very, very encouraging sign. Sure.

PX360

REP12: I was just wondering if you could actually give us a breakdown on the nationalities in terms of which group is the largest coming in and, you know, break it down.

RDML SMITH: Okay. I think I've got some statistics I'll be able to…. The largest group has always been coming from Saudi Arabia, just below 50 percent of the foreign fighters historically have come through Saudi Arabia…from Saudi Arabia. The next largest group was Libya. Yemen. Syria. Tunisia. And Morocco. There's some from Central Europe.

REP12: Where in Central Europe?

RDML SMITH: France. I should mention Algeria as well. Egypt, as an example, is…very few come from Egypt. Jordan very few, two percent.

REP12: How many from France?

RDML SMITH: Very small numbers; just a couple. So the distribution…what we learned through the Muthanna captured documents was the
role…numbers of foreign fighters coming out of Libya was a number higher than we originally assessed. We also assessed a higher percentage that had actually come in through Syria than we originally had thought. And the rest of our information that we historically had developed our understanding on was fairly accurate and reinforced by the Muthanna papers in Sinjar.

REP12: Sir, in Libya and Saudi Arabia, the security forces there have arrested people based on the information the United States has submitted to the authorities?

RDML SMITH: I don't know specifically whether individuals that…. Again, the information we had was on historically who had already come into the country and who had already…and, therefore, had been fighting here during the August, 2006, to August, 2007, timeframe. We weren't providing information directly on individuals who now were in their country that could be dealt with from a law enforcement point of view. But the trends and the numbers was what we shared for them to deal with. Sir. Front row, please. I guess, back to…

REP13: Asks question in Arabic.

INT: Question from Al-Babalia TV. Do you think that Operation Fardh al-Qanoon in Baghdad…do you think that Operation Fardh al-Qanoon that has been conducted by the Iraqi armed forces, do you think that it contributed in eliminating al-Qaeda or reducing al-Qaeda's effect in Baghdad?

RDML SMITH: Fardh al-Qanoon, which is a joint operation between coalition forces and Iraqi security forces, has been extremely successful in removing al-Qaeda from Baghdad. It has not completely removed al-Qaeda from every neighborhood in Baghdad, but it certainly has reduced their influence in Baghdad. More specifically, our operations worked to target al-Qaeda in the belts around Baghdad which is where al-Qaeda traditionally had built up its vehicle bomb factories, much of its training, and where the al-Qaeda spent their hours planning to attack areas inside Baghdad. Because we've had success in the Baghdad belts, you're seeing a reduced influence of al-Qaeda here in Baghdad. That's made the major impact to the security here inside the capitol. Sir.

REP14: Can you go over where you think the main safe havens of al-Qaeda are right now? And also how all the operations for the past three weeks may have rearranged what existed right before that in terms of safe havens and concentrations of al-Qaeda?

RDML SMITH: Yeah. It's…the number of safe havens now has been dramatically reduced. Our operations have put enough force on the ground with Iraqi security forces, coalition operating in areas south of Baghdad, up through Diyala into the Diyala River Valley, and then into the provinces north into Mosul in such a way that the al-Qaeda leadership and much of its rank and file are on the run. So, to say that they've got a true sanctuary where they have impunity from our forces is becoming less of a metric for them and more of a benefit to us because they are on the run. But they do remain, clearly, in concentrated areas in Diyala, to the north in the Diyala River Valley. There certainly are concentrations of al-Qaeda, in small numbers, to the south of

Baghdad. But as they push forward out of the major cities, what al-Qaeda is…the greatest handicap to al-Qaeda is they begin to lose its main influence on population centers. Its main source of funding dries up because it no longer can intimidate and extort funds from businessmen and so forth. Kidnapping and extortion becomes less profitable because you're in more rural areas. And in that sense, al-Qaeda is having a very difficult time financing and maintaining its operational base. And if they're on the run, they're less likely to be doing planning—deliberative planning—against civilian targets. And that's…I think that's where you're seeing the increased levels of violence…the decreasing levels of violence associated with their instability and their moving around.

REP14: How often…can you be a little more specific about is Diyala right now the largest concentration, largest presence of al-Qaeda? Can you talk a little bit how Mosul figures into that? And then specifically what parts south of Baghdad?

RDML SMITH: I think if we throw up the last map we had….can you put that up on the screen, please? The last map there gave you exactly the answer to your question. I mean we…in a general sense, you're seeing the dark red areas to the southeast of Baghdad. And that slice to the northeast of Baquba, up into the western province of Kirkuk areas, and then, of course, surrounding Mosul. And you can see some red pockets there in the eastern corridors of Anbar. That's where we assess today al-Qaeda is operating from and has forces that are conducting training and conducting planning and building of bombs and so forth. And that's why in the last few weeks we've seen a large number of caches found in, for instance, where they had been storing and making up these large bomb factories in the Baquba area…north of the Baquba area. So that's again, that's the [unintelligible] to answer your question.

REP14: Which is the largest would you say?

RDML SMITH: Well, largest; I think the real issue is where is the greatest influence being exerted from. And Mosul will continue to be a center of influence for…center of gravity for al-Qaeda because of its key network facilitation there; both financing and foreign fighters, the flow through Mosul is critical for al-Qaeda in Iraq. But from an operational point of view, the closer reaches to Baghdad which has been their principal target, would make the areas of Diyala and to the south of Baghdad their most critical in terms of their operating capacity. So it's a different answer from numbers, but it's really on what their intent is. Yes, sir.

REP15: Asks question in Arabic.

INT: The experience of JAM or the freezing, do you think that the…you can release the members of JAM so that you can reach further democracy in Iraq?

RDML SMITH: These are decisions for the Iraqi government to make regarding the detention of former Sadr trend members, JAM members. The individuals that are out today conducting criminal activity clearly are no longer associated with Muqtada al-Sadr, because Muqtada al-Sadr has told those individuals to cease their operations. And he himself has said they are criminals and they must be dealt with legally; and they are being dealt with legally. As to individuals in detention, again, that's a Government of Iraq issue dealing with long term…this reconciliation issue of making decisions about how to deal with that. But criminals are being dealt with as outside the Sadr trend, outside Jaish al-Mahdi because they're conducting activities which clearly go against the rule of law here in Iraq. I think all the way in the back.

REP16: Asks question in Arabic.

INT: Question from al Watan TV. When al-Qaeda was eliminated in Anbar Province, they found a safe haven in Diyala. Do you think the leaders of MNF think…do you think that there is another safe haven or will there be another safe haven for al-Qaeda in case al-Qaeda has been eliminated in Diyala?

RDML SMITH: Our goal is to not provide any safe haven in Iraq for al-Qaeda. And it's the Iraqi people's goal to not provide that safe haven. And that's where this…really this whole partnership between the Iraqi people and its security forces and the coalition has made the difference as it made in Anbar, and it is now making in areas like Diyala. Safe havens can really only be achieved by al-Qaeda if the Iraqi people themselves feel so intimidated and so unsure about whether or not they can turn over…turn in these individuals because they don't have the confidence in their security forces. That has changed over the last year. And I think what's happening in Diyala is a good example of the slow, slow grind of building up a relationship with the Iraqi

people in those neighborhoods and villages for the trust and confidence that they need to have in order to make those tough calls about turning people in. Because it's very dangerous to them to make those decisions and we understand that. But they have not—just to be clear—al-Qaeda has not completely left the Anbar Province, as an example. Again, that map shows you there's still pockets of al-Qaeda. There was explosions yesterday in Ramadi. So we're reminded that al-Qaeda continues to be a threat. The good news is they're out of all the major population centers, except for Mosul, where they still retain some capability. And that has been a big impact on reducing the violence here. Yes, ma'am.

REP17: Do you think they heard from their Awakening Council? Some of them say that they have been infiltrated by al-Qaeda. And even though these guys say they are "repentants," what actually they are doing is providing intelligence to al-Qaeda and then in turn, targeting these local concerned citizens. So, how can you vet really who is part of these local concerned citizens? And then, isn't there a risk here of having an inter-Sunni fight in the sense that al-Qaeda could start attacking more and more of these Awakening Councils as they spread more and more in the streets and in other provinces?

RDML SMITH: Well, there's a couple of checks and balances as to who is part of an Awakening Group. First of all, it's built around a tribal relationship. And the tribal leaders, I think, know better than anyone who they can trust and who they cannot. Secondarily, they all go through the screening, so we have some sense not—we have more than some—we have a good sense of whether or not the individuals have had a criminal…or have had other information in the past that would link them to criminal activity. That's not to say that al-Qaeda has not found a way to infiltrate some members, some groups; that clearly could be the case. But I do believe that the Awakening leadership understands that responsibility to police up within their own ranks who is and who is not part of the group. And to the degree that we can vet that through our process of screening, I think has been fairly well done. Up in the Diyala area, for instance, in…before a commander there left last December, he mentioned that there was internal policing and there had been individuals who had been let go because of the, really, the lack of confidence in their loyalty. But yes, it is a concern. It is something that must be addressed. And al-Qaeda clearly has an interest in trying to intimidate, perhaps even through infiltration of the Awakening Groups because of the power that that represents for the Iraqi people. Yes, sir. The front row, please. Front row, please.

REP18: Asks question in Arabic.

INT: There are some documents at the Ministry of Interior that convict some of the Awakening leaders or the commanders that actually inside al-Qaeda. Is that true?

RDML SMITH: I'm not aware there's specific…you're saying there's specific documents that would indict current leaders of Awakening Groups. Is that correct?

REP18: Speaks in Arabic.

INT: There are some documents at the Ministry of Interior that convict some of the Awakening groups or the commanders that they are also involved in terrorist acts and also part of Al-Qaeda. Is that true?

RDML SMITH: I'm not aware of any specific individuals currently part of the Awakening Groups which the Government of Iraq has identified to us as individuals for which they have issued warrants for their arrests. You used the word convicted, so it sounds like it went through a court. I think you mean there are individuals that they are concerned about. We are not aware of any list per se. Straight back. In the corner. All the way in the corner, please. We'll come back. In the third row, please. Okay.

REP19: Asks question in Arabic.

INT: Question from Radio Sawa. All that you have mentioned concerning the details about al-Qaeda and also especially what's going on in Iraq, we still witness some deterioration considering… regarding the economical situation. We'd like to know your stance regarding the security situation that witnessed a stability in the few months…the past few months. Do you have some concern…do you have some fear that this could collapse at any minute? The other question concerning the importance in the Iraqi media recently, concerning the intelligence… I'm sorry, I didn't get the second question.

RDML SMITH: I'll come back to your second question but...

INT: Yes, sir.

RDML SMITH: We've said for quite some time, and I said that in remarks today, the importance of following behind security with economic and other programs of development is very, very critical. We understand that, again, much of the insurgency has been fueled by a lack of opportunities and a lack of opportunity to make a solid wage doing an honest job…an honest day's work. And unfortunately, that led many to participate in activities which were really against the better…the future of Iraq. And the good side of this, of course, is that people have changed, and they have made a decision to participate in a more positive way. But you're exactly right. The steps that need to be taken now, today, by the Government of Iraq and by other partners to participate in this process are ongoing and are very much the commitment of the Government of Iraq to do that. And I think that in 2008, we'll continue to see steady progress in areas of economic development. I would argue that there has been significant steps taken to rebuild infrastructure. If you go to cities like Fallujah and Ramadi, you're seeing a rebirth of major cities. If you visit many of the neighborhoods in Iraq, you're seeing a rebirth of many of those neighborhoods. So, there is economic development. There are people who are returned from being displaced or refugees to open up businesses and shops. That's a positive step. The encouragement here has to be that security will remain and that the investments these people are making are going to be long term…are able to be sustained in the long term. And I know there's great concern and anxiety over that. But the assurances we can give is that the coalition will partner with the Government of Iraq to maintain that security for as long as it's needed. Third row, please.

REP20: Hi. Kim Gamel with AP. There was a reported mortar attack against the Green Zone yesterday and one earlier this year, I think, as well. Are you seeing…can you confirm the one yesterday? And are you seeing an up tick in those? And I have a second question as well. I wonder if you could comment on…going back to the clashes in Nasiriyah and Basra, can you comment on if the military…how concerned it is with the Soldiers of Heaven group?

RDML SMITH: First of all, we don't typically comment from the podium on indirect fire and whether or not rounds impacted certain areas of the Green Zone. I will say that the level of violence across Baghdad has been similarly witnessed inside the Green Zone. And I'll just leave it at that, that the numbers are dramatically off of what they were last summer, certainly. As far as the group that identifies themself as the Soldiers of Heaven, at least that's the English version of their group, no. I think the concern is not more widespread than need be and that's in the areas of the south where they are being dealt with. And again, the Government of Iraq understands that. There was significant numbers of the leadership of that group that were killed and detained as a part of these operations the last 24 hours. So we'll see how that plays out over time. You all know that this is a group that has historically attacked around the period of Ashura. Last year it was a much more violent period of violence than it was this particular year. Again, still too many injured and killed this past week. But a positive sign of that is the Iraq security forces took immediate steps to keep it from getting out of control. I think if we have one more question.

REP21: Just more specifically, this map shows a significant decrease in al-Qaeda activity. How would you categorize the activity that comes from Iran? Is it equally as bad? Is it the same? Or, you know, how would we judge the situation? This looks much less but is that the same amount or is it the same thing or…?

RDML SMITH: Yeah. That's a good question. The influence of Iran inside Iraq— because it takes on so many different dimensions, whether it's financial support to the militias here, whether it's actual movement of arms and weapons and equipment into Iraq…smuggled into Iraq, whether it's actual leadership through the Quds Force as we outlined for you early this past year, whether Lebanese Hezbollah are in the country as proxies for the Quds Force—all those questions are very critical questions that we still need to understand ourselves. We do believe that the number of signature weapons that have come from Iran and have been used against coalition and Iraqi security forces are down dramatically except for this short up tick, as I mentioned, in explosively-formed penetrators in the early part of January. We do not think that the levels of training have been reduced at all. We don't believe the levels of financing have been reduced. But it's uncertain, again, what is happening inside of Iran that's leading to that occurrence. We do know that the Iranian government has given its pledge to the Iraqi government—publicly and privately—to participate in the peaceful transition. It's a mixed message; it really is. And we continue to watch it very, very closely. And with that, I think we'll wrap up today's press briefing. I appreciate your time. Thank you so much.

**NEWS**LETTER

Join the GlobalSecurity.org mailing list

**Enter Your Email Address**

Sign Up Now!

Advertise with Us    |    About Us    |    GlobalSecurity.org In the News    |    Site Map    |    Privacy

Copyright © 2000-2022 GlobalSecurity.org All rights reserved.
Site maintained by: John Pike

PX360

# *Al-Qaeda Iraq*



**Abu Ayyub al-Masri
AQI Leader—Egyptian**

- Al-Qaeda senior leaders envision Iraq as first step towards Islamic Caliphate

- Leaders are mainly foreign born

- Fighters are mainly Iraqi

- 90 percent of suicide bombers are foreign terrorists

- Ideology describes Taliban vision for Iraq

- Strategy:  Indiscriminate violence to re-ignite ethno-sectarian conflict

- Tactics:  car bombs, suicide attacks, executions, torture, beheadings, and amputations



# *Captured AQI Map*

**AQI operations during the period 2-8 March 2007 as reflected in captured document**



| | | |
|---|---|---|
| **1** Crusaders Killed |  Sniper ops |  Martyr ops |
| **1** Gov't Supporters Killed | Centers & hideouts | Firefights & traps |
| **1** Shia Militia Killed | Rocket/RPG launch | Downing of aircraft |
| **1** Number of OPs | Tanks & carriers | Destruction of equipment |


Under control of ISI
Partially controlled by ISI
Areas of Turks and Rejectionists
Prominent OP of the week

PX360

# *Patterns of Barbaric Violence*



Tall Afar Attack – 223 Killed Injured



Yazidi Attack - 796 killed/injured



Letter from AQI 'court' authorizes killing of Iraqi citizens as 'apostates'



Numerous mass graves discovered in former al-Qaeda operating areas

# *Violence Against the Iraqi People*



Survivors of al-Qaeda's bombing of the Kirkuk Girls' Primary School, April 2, 2007 **(5 killed and 87 injured, most of whom were civilians)**

**In 2007...**
- **4,552 enemy attacks targeted civilians**
- **3,870 civilians were murdered**
- **17,815 civilians injured due to violence**



2007 High Profile Explosions

PX360

# *Patterns of Barbaric Violence*

## Al-Qaeda Torture Manual Captured in May

   

## Torture and Murder

  

# Iraqi Security Forces

*Iraqi Security Forces continue to grow, to develop their capabilities, and to shoulder more of the*
*burden of providing security for their country.*

**Currently, 567,668 Iraqi's under arms** in the Ministries of Interior and Defense
  • Grew by more than 106,000
  • $2.85 billion worth of equipment supplies through Foreign Military Sales

**Some 140 Iraqi Security Force Battalions in the fight**
  • About 122 battalions capable of leading operations
  • All Iraqi battalions involved in combat operations
  • Increasingly the first line of defense
  • Losses 3 times those of the Coalition

**Iraq spent more on its security than it received** in
security assistance from the United States in 2007



# Concerned Local Citizens

➢ Grassroots volunteer movement by Iraqi citizens and tribes to reject extremists

➢ Organized to support Iraqi and Coalition Security Forces – bridges current gaps

➢ More than 130 separate Concerned Local Citizen groups throughout Iraq



➢ Over 80,000 active members

➢ All screened and vetted, majority are paid volunteers

➢ Under full control of local Iraqi Security or Coalition Forces

➢ Some 25-30% want to become full time members of the uniformed Iraqi Security Forces, remainder will be offered job skill training, education and employment placement in public and private sector

# The Main Focus

**Progress depends on squeezing al-Qaeda Iraq from every direction and with every possible means.**





*Killed*



*Convicted by Iraqi Court and Sentenced to Death*

Haythem Sabah Shaker Mahmud al-Badri

**Emir of Greater Samarra**



Khalid al Mashadani

Senior Iraqi in the al-Qaeda Iraq Network





Abu Usama al-Tunisi

**Emir of the Southern Belt**

*Killed*



Muthanna

**Emir of Iraq/Syrian border**

*Killed*

# Role of Foreign Terrorists: The Sinjar Papers







Foreign Terrorist Bio

Lists of Terrorists

Suicide Pledge



Abu Yaqub al Masri

**Member of Original Leadership of Al-Qaeda Iraq**

*Killed*

Umar Wahdallah Dod al-Zangana

**Baghdad Military Emir**



*Convicted by Iraqi Court and Sentenced to Death*



PX375



U.S. Department of Defense
Office of the Assistant Secretary of Defense (Public Affairs)
News Transcript

**Presenter:** Principal Deputy Assistant Secretary of Defense for Public Affairs Lawrence Di Rita

Friday, December 3, 2004 3:08 p.m. EST

# Department of Defense Briefing

(Also participating was Deputy Director for Regional Operations, Joint Staff Operations Directorate, Brig. Gen. David Rodriguez)



To view the complete slide presentation click  here. [PPT 4.27 MB]

PX375

MR. DIRITA: We wanted to just get together and just go over a handful of items. We've obviously had a typically busy week here at the Pentagon. We made the announcement regarding the additional capability in Iraq that General Casey sought and will receive to sustain the momentum post-Fallujah and to prepare for the elections, get ready for the Iraqi elections, which are moving forward. So we thought it would be useful to kind of pull together some additional information and put out what we can and take your questions. And with that, I'm going to ask General Rodriguez to give sort of a summary, and then we'll take your questions.

GEN. RODRIGUEZ: Thank you, Mr. DiRita, and good afternoon. Iraqi and multinational forces conducted a series of successful operations against anti-Iraqi forces in Najaf, Tall Afar, Samarra, Thawra and Fallujah. Specifically, Operation Al-Fajr struck a serious blow to the insurgency in Fallujah by denying them the use of the city as a safe haven; and Fallujah is no longer a terrorist center for command and control, supply, weapons storage, nor is it a base of operations.

Today we would like to share with you some of the things the coalition found as they cleared Fallujah. We found evidence of an enemy who fully intended to fight the Iraqi and coalition forces and disrupt the process for a future free Iraq. They were heavily armed and dug in, and by that I mean there was food, water, ammunition, weapons stashed in the buildings they occupied, and they were prepared to fight.

The insurgency used several hospitals, cemeteries, and about 25 of the mosques as fighting positions, clearly in violation of international law. Coalition forces also found more than 350 weapons and ammunition cache sites, a number of torture sites, improvised explosive device factories, and videos of beheadings.

The coalition continues to analyze the vast amount of information that we collected in Fallujah. And here we're going to share with you some of the preliminary photographs that demonstrate what we found there.

First slide. To better visualize how the mosques in Fallujah were exploited by the insurgents, note the colored dots on this slide. Out of the 26 mosques that I discussed earlier, the blue dots are mosques from where Iraqi and coalition forces encountered small-arms fire and rocket- propelled grenade fire. The yellow represents a location that was determined to be a command and control center. Insurgent snipers engaged our forces from mosques identified by the red dots -- and you can see the number and the spread throughout the width and breadth of the city.

Next slide. Improvised explosive device materials were also found inside the mosque, to include a reel of detonation cord that was hidden inside a bag of rice that was disguised, of course, as humanitarian aid.

Next slide. This slide depicts the city of Fallujah with red dots that indicate where Iraqi and multinational forces found IED-making factories. And the green dot marks the location of the vehicle-borne improvised explosive devices.

Next slide. On the right side, a box containing an improved thermal battery for a surface-to-air, shoulder-fired missile, as well as two additional hand-held radios. And on the left you can see several different types of radios used as the remote triggering devices for IEDs.

Next slide. The red dots on this slide depict the atrocities discovered across Fallujah, and again, across the entire depth and breadth of the city. The combined forces found eight hostage locations and other atrocity sites; such atrocities including human corpses rigged as IEDs, hostages found chained to a wall, and a mutilated body, as well as executed Iraqi.

Next slide. And here, although it's hard to see, you can see bloodstains in the upper left, and the sandbags they used to try to soak up the blood in one of the hostage sites.

Next slide. This slide depicts the locations of the weapons and ammunition caches. Basically, the description was there were one of these every three city blocks. And you can see the number there on the slide.

Next slide.

Q What's the definition of a cache? Obviously, they're allowed to keep a weapon, a personal weapon -

GEN. RODRIGUEZ: It's above and beyond that, ma'am.

Q Anything beyond one?

GEN. RODRIGUEZ: Yes. Groups of them that were, you know, beyond the self-protection. This slide, here's an example of weapons caches in central Fallujah, in which you can see a pile of mortars and rockets. And this is just an example. Like I said, some of them are smaller, some of them are larger, but this is the type of cache we're describing here.

Next slide. This location was a chemical lab, which is obviously in the southern part of the city there. Some of the chemicals found in the site included hydrochloric acid, also ammonium nitrate and hydrogen cyanide, which potentially can be

PX375

used to produce a blood agent.

Next slide.  Also found at the chemical lab was a Mujaheddin chemical and biological book outlining instructions and formulas for anthrax, chemical blood agents and other explosive materials.

Now that we have driven the insurgents from Fallujah, we still have more work to do. Iraqi and coalition forces continue to take the fight to the enemy.  And with that, we'll take your questions.

MR. DIRITA: Charlie?

Q Larry, just two quick things. I'd like to tell us as much as you can, if you will, about the Jacoby report. There have been some reports about that.  And number two, to raise a housekeeping issue. You call this a get-together. The problem is we only have these get-togethers very occasionally, and I'd like to pressure the demand on behalf of the press corps that you start having regular briefings. You know, for years they've had two regular briefings every week on issues from everything from Boeing to a routine -- I'm not talking about just war briefings. I'd like to get some kind of promise from you that we'll start having regular briefings here so that we -

MR. DIRITA: Yeah. No, it's a fair enough point.

Q I mean, you've said before that you'll have a briefing when you have something to tell us. Well, it would seem to me that the way it should work is that we should be able to ask you things regularly and -

MR. DIRITA: Sure. No, that's a fair point.

Q I mean, it's a matter of accountability to the public.

MR. DIRITA: Yeah. I would certainly not ascribe to any interpretation that we've been anything other than accountable to the public. I mean, we've put out an enormous amount of information. We have had god knows how many briefings down here. The secretary himself comes down fairly often. But I take the point. I take the point.

Q (Off mike.)

MR. DIRITA: And we'll -- we'll be as regular as we need to be.

Q (Off mike) -

MR. DIRITA: I mean, I think during the Fallujah operations -- hold on, Charlie. You've made your point. I appreciate it. I think during the Fallujah operations we had a coalition commander out every single day. I mean, and that's important, and they were to talk to the Pentagon press. The technology doesn't always make it as good as you'd like it to be and as we think it can be. But I take the point.  We'll be -

Q You've taken the point before. My point is that there are issues other than war here.

MR. DIRITA: Sure.

Q And while Christmas is a difficult time because traditionally you don't have many briefings, I'd like you to maybe promise us that sometime quickly after the new year starts we start having regularly scheduled, twice-a-week briefings here -

MR. DIRITA: Is that right?

Q -- so that the press can come and ask you questions on issues. I'd like you to consider that, if you would.

MR. DIRITA: I'll take it under advisement.

Q All right, thanks.

MR. DIRITA: Thank you, Charlie.

Q And anyway on the Jacoby -

MR. DIRITA: Next question?

Q -- on the Jacoby report.

PX375

MR. DIRITA: The Jacoby report. Let me talk a little bit about these reports. We've gotten, I think, nine or so reports that have been completed having to do with the Abu Ghraib investigations. We've provided an awful lot of information on those briefs, perhaps not as much as you'd like, pertaining to your previous question, but we have provided an awful lot of information on all of the reports that have come out.

The Jacoby report is nearing completion. It's being reviewed by -- I believe this accurate -- the commander of the Central Command. General Jacoby was asked to review prison conditions inside of Afghanistan. General Barno, the commander of the task force there asked him to do that. It consisted of a kind of snapshot of training, of conditions inside of prisons. It did not look back to incidents that may have occurred inside of Afghanistan. We will have more to talk about when the report is complete. It has leaked. I would caution, though, against sort of episodic reporting on leaked reports, and I'll give you an example why.

We've had another report that allegedly leaked this week that was reported in one of the papers known as the Herrington report. The Herrington report, by the way, was a component of the Kern/Fay/Jones report; it was an annex to that report. That Kern/Fay/Jones report was briefed extensively here, extensively on the Hill. In fact, General Kern has done extensive public briefings around the country on it. The Herrington report was a component of that investigation.

The reporting on it this week in The Washington Post suggested as though it were some kind of a new and previously undisclosed report, when in fact it's part of -- it's certainly part of what we provided to the Congress. We provided all of the annexes to the Kern/Fay/Jones report.

Of note in the Herrington report, Colonel Herrington -- he's a retired Army colonel -- made the specific comment that "We neither saw nor learned of any evidence that detainees are being illegal[[y] or improperly treated at Abu Ghraib."

Now that's a finding in his report. He found a lot of other things in the report, but the story that was sort of episodically attracted to this Herrington report failed to mention that, what I would consider to be a fairly key finding in the Herrington report.

And the only reason I make that comment is because we have been providing these reports when they're finished. Indeed, we provided the Herrington report as part of the Kern/Fay/Jones. We didn't release every annex. I'm told we didn't release every annex, but we provided all that to the Congress two months ago or something.

Q Well, but it wasn't released to us.

MR. DIRITA: Apparently not, and I'm not sure about that, but I've been told that. But the point I'm making is that it's -- the way it's being reported this week, it's being reported in a context that sounds rather different from the fact that -- the fact that it was -- generated a follow-on report by -- initiated by General Fast, to whom the Herrington Report was delivered. She initiated a follow-on report that was itself extensively documented and included in the previous reports.

We're providing this stuff when we get it and we're putting it out, and when it's -- when things are episodically reported on through leaks or through somebody discovering an annex that's part of a broader report, I think that does a disservice to the public. So we're going to -- when the Jacoby report's complete and it's under review by the commander at Central Command, we'll put it out the way we have, consistent with classification and everything like that.

Q Of course, it points to the fact that the quicker -

MR. DIRITA: Sure.

Q -- the quicker the better on getting these things out.

MR. DIRITA: I will also note the Jacoby report does not take into account what we also know has occurred in Afghanistan. There have been reports of prisoner abuse in Afghanistan. There are investigations under way that predate the -- we have the two cases of the deaths of detainees at the Bagram facility. There are -- there's criminal proceedings that have begun on that.

So the Jacoby report all by itself, without the context in the briefing, having been leaked to the press I'm not sure -- again, I caution about the episodic reporting off of reports of leaked reports because it's not serving the public particularly well.

And I would again draw your attention to the key finding in -- and I'm not trying to disparage Colonel Herrington's report. I've read the report. It's a serious report. He took it seriously. It generated additional investigations. But he did happen to make a finding as of December of 2003 that they found no evidence of abuse at Abu Ghraib at the very time when this abuse was probably occurring. And I'm not -- again, I'm not disparaging the report; I'm simply saying that's a relatively key finding that somehow missed the reportage. So -

Q Are you going to release it, then, as -

PX375

MR. DIRITA: I'm not sure that's being considered. You know, again, it was provided to the Congress, and I'm not sure what the policy has been on all these annexes. Eventually we provided -- I think we ended up posting the Taguba report with all of its annexes, so we may do the same thing here.

Bob?

Q I would like to second Charlie's point about the usefulness of regular briefings. You know, the briefings you have given us -- the Fallujah ones, for example, and others related to the war -- have been useful and appreciated.

MR. DIRITA: Good.

Q But the point is about regular briefings that are about any subject we'd like to bring up, you know. So I'd just mention that.

MR. DIRITA: Sure, absolutely.

Q My question is for, I think, General Rodriguez, probably, on your discussion about what was found in Fallujah.

MR. DIRITA: And by the way, you're free to bring up any subjects here today, too. We may not answer the question, but you're free to bring it -

Q Like, that's what I'm talking about, is -

MR. DIRITA: Oh, I see what you're saying.

Q We could do this twice a week, and that would probably -

MR. DIRITA: Gotcha.

Go ahead. Go ahead.

Q Fallujah, going forward from here -- is there indications, either based on what you saw in Fallujah, what you've learned since, that Zarqawi has moved to set up cells in Mosul and other particular locations outside of Fallujah?

GEN. RODRIGUEZ: Well, the insurgency and the -- without the base that they had in Fallujah, what, you know, is -- looks like is happening in watching very closely is that the people move to other places, obviously to try to set up the same type of support base as others, because that's how they adapt to losing their base. So there's several operations going on right now to prevent that from happening. And this is part of the pressure that we need to keep up on the insurgency.

So for example, down there in Plymouth Rock, you know, just south of that, that has been going on since actually during the fighting and continuing. And it's like that throughout all the areas of Iraq because as these people lose this base of operation, they move to other places, which opens up intelligence opportunities for us, as well as to build up the things -- the capabilities that they lost in Fallujah. You know, you just can't do that without taking some risks and providing some intelligence opportunities. So those are ongoing, and we're continuing to -

Q Zarqawi himself and -

GEN. RODRIGUEZ: No, we don't know anything specifically about Zarqawi himself and the situation.

Q Mosul connection that you know of?

GEN. RODRIGUEZ: There's some evidence of Mosul connection at this point, but we don't have any solid evidence that that's where Zarqawi is moving his main base or anything like that yet.

Q Okay.

GEN. RODRIGUEZ: All that's being determined as it goes through.

Q Not to sound like a broken MP3 file -- (laughter) -- to use the vernacular of the day, but I'd like to just underscore the importance of -

MR. DIRITA: Are you seconding or thirding -

Q I think it's thirding.

PX375

Q This is third -

MR. DIRITA: Would this be thirding? Okay. Gotcha. (Cross talk, laughter.) Actually, Charlie seconded his own suggestion. So Bob was actually -

Q (Off mike) -- all-subject briefings, as has been the tradition for years and years and years.  My question, General, is -

MR. DIRITA: We're trying to be more transformational here and do things a little differently.

Q But we'd like it transformed for the better, not -

MR. DIRITA: Check. Go ahead.

Q My question is about the additional forces in Iraq, both the deployments and the extensions -

GEN. RODRIGUEZ: Yes.

Q -- and the force levels that that provides you. You said the other day that was for security for the elections and to keep the pressure on the insurgents. Can you tell us a little bit about what the troops -- the additional troops will be doing to achieve those goals? And can you tell us -- you showed us a lot of things that were found in Fallujah.

GEN. RODRIGUEZ: Yes.

Q Did you find things in Fallujah that are going to help you keep the pressure on the insurgents? Can you talk at all about that?

GEN. RODRIGUEZ: Well, certainly any time you destroy a safe haven, a base and everything -- we showed you some of the things that we've begun the site exploitations on, but that's still in the infantile stage, because we have not fully looked at all the sites yet that we've secured.

So yes, all that information that we gained out of there, we believe, will help us in the future and what is happening with the insurgency and how they operate.  On the second part, the forces, the additional force level that we discussed the other day is for both the security of the elections and keeping the pressure.

But the operations type, which will be determined, obviously, by the tactical commanders on the ground there, are mainly to keep the pressure on the operational -- or the insurgency by offensive operations to continue to exploit the things that we're going to discover in the wake of Fallujah by them moving, trying to set up safe havens, and such. And that's the type of operations. And really, that's all I'm going to get into specifics at this point because that's really a decision that's made on the ground over there.

Q I mean, is the idea to keep the insurgents essentially on the run -

GEN. RODRIGUEZ: It is, it's to keep them on the run, to pressure and prevent them from putting safe havens up in other places. So both the movement that they are doing and have to do, and the building up of safe havens and the support structure that they lost in Fallujah, to keep the pressure on that.

MR. DIRITA: I think another consideration, Jamie, is that part of what was happening in Fallujah prior to this operation was a very aggressive campaign of intimidation by the sort of insurgents and foreign elements. And what this demonstrated was the will of the coalition and the will of the Iraqi forces. And it has -- a campaign of intimidation is essentially a campaign of wills, and what commanders have reported is additional -- is better and more refined intelligence coming forward because people feel less intimidated. In other words, they now have a better feel inside of Fallujah that this small number that was holding them hostage has been dealt with, and so they're more willing to come forward. Now, that hasn't led to any great findings, but it does over time; that's how you get more -- better.

Q Could I just follow-up to that? Are you seeing a change in tactics, a shift toward -- as you get closer to the elections -- more attempt to intimidate, particularly the Iraqi security forces, such as today's attack?

MR. DIRITA: Well, it's been going on for a while. I mean, intimidation of the Iraqi security forces is clearly one of the tactics that the other side is using, and we've seen that.

Q But is that one of the reasons you had to send more U.S. troops, that the Iraqi -

PX375

MR. DIRITA: I wouldn't tie it to one single thing. I mean, what General Casey wanted was what he described, which was what General Rodriguez described, was the ability to sustain offensive operations where necessary, and to provide a better security environment with troops that have been through an awful lot. And given that the rotation has been spread out the way it has, some of the troops that have got the best experience would be leaving, and he thought it was better not to do that.

So I wouldn't tie it to any specific tactic by the enemy. But one of the principal objectives was to go after the intimidation campaign and to show the people of Fallujah, who largely did not want to be living under the circumstances they were living, that it's okay to come forward.

Q General, The New York Times reported today that there were cell phones found, lists of foreign fighters' families to be paid -- specific intelligence. Is that leading to other operations to take these cells down?

GEN. RODRIGUEZ: All that right now is being analyzed right now and will be used as best we possibly can to take those cells down. And any time you find things like that and do the analysis, it takes a little while to do that.

But all that is being done. Like I said, we have done many site exploitations already. We still have more to do in that area, but yes, there's phone books, there's lists, there's -- all those things were found as part of the operation.

Q Can you characterize the quality of the intelligence you've seen so far, even though you're not done sifting through everything? I mean -

GEN. RODRIGUEZ: No, I can't. But the bottom line is we believe it will help us in the future, in the near future here.

MR. DIRITA: Jim?

Q Larry, has Secretary Rumsfeld talked to the president yet about what -- about his future, whether he's going to stay or whether he's going to go?

MR. DIRITA: You know, Jim, I just have nothing for you on that. And what he has said is what's going to have to do, which is when he's got -- when he's ready to talk about it, he'll talk about it. It's just not something I'm going to be able to provide any insight into.

Q It just seems kind of odd after all this time -

MR. DIRITA: Does it? (Laughter.)

Q -- for there to be no indication at all whether he's still going to be in office.

MR. DIRITA: I just have nothing for you. When he's ready to say something, he'll say something.

Q Have you talked to him, or you just don't want to comment -

MR. DIRITA: I'm saying I got nothing for you on it, Charlie.

Q Larry?

MR. DIRITA: Yeah?

Q Could you -- General Rodriguez, describe for us the situation in Mosul, what your understanding is of what's going on there, and particular attention to these bodies that keep getting found. Are they innocent bystanders? Are they Iraqi security forces? Or are they maybe insurgents who have been killed and are just getting discovered? What's the -

GEN. RODRIGUEZ: Most of that is part of the intimidation campaign. Most of that has been focused on the Iraqi security forces and the Iraqi people who are trying to run the city. As you know, during the Fallujah operation there was a -- there was a lot of challenges at the police stations, and we have an operation going up there that is reestablishing the security in the city, turning over the Iraqi police stations back to the police, and building back the law of, you know, free countries or free cities up there. So that was part of the result of this Fallujah piece, and you know, so there were some links there. And we're -- they're working very hard to clean up that situation right now.

Q And how many police stations have been turned back over, and how many police or security forces were killed -

GEN. RODRIGUEZ: I don't have the specific numbers of police that are back on the beat or those specific numbers, but we can get you -- get those. But the majority of the stations were taken back, and there's calm in the city at this point in time, relatively speaking.

PX375

MR. DIRITA: Will?

Q Larry -

MR. DIRITA: Now wait a minute. Hold on. You're not going to second Charlie, are you? (Laughter.) Okay.

Q Can you tell me, what was the U.S. military fatality count in Iraq in November?

MR. DIRITA: I don't think we have the most refined -- I mean, what we know is our general -- is our -- is our updated tally, but I'm not sure by month we've got the data.

GEN. RODRIGUEZ: Right. And of course, you know, it'll take us a couple days after the thing to get the final thing exactly because what happens is everybody wants to make sure they got the right number because some people, of course, leave the theater and are en route, you know, of course -- die en route or up in -- up in Germany, for example, where they take many of the injuries. So it'll take us a day or two to get that, but -

Q But we're a few days into December already.

GEN. RODRIGUEZ: Yes. It -

MR. DIRITA: We'll get it out as soon as we've got it, I suppose.

GEN. RODRIGUEZ: Right, but we don't have that right now.

MR. DIRITA: Yeah?

Q On the tanker issue, Secretary Wolfowitz signed a memo to the SASC on August 11th saying in roughly 30 days they should have these tier one, tier two, tier three e-mails sent over and supporting documents for the tanker issue. Can you tell us why all of them haven't been sent over yet and when they will go over?

MR. DIRITA: Yeah. No, I can't tell you when, that's for sure. I think the last number I saw is something on the order of 800,000 documents.

Q My understanding is only six out of, like, 36 people -

MR. DIRITA: Let me get into it. We've established -- it is the secretary's desire to provide as much information as is being sought that's appropriate to send. I mean, there are executive privilege issues, so therefore the White House properly has a role to evaluate these things. So we've developed a process by which that can be done. At some point along the way, we've determined that the inspector general is in the best position to kind of compile these documents and do the screening and the initial evaluation as to whether they're responsive to the request and to work with the general counsel -- general counsels in the administration to then address the executive privilege issues, et cetera.

It is a time-consuming process. There are an enormous number of documents. It involves getting people at the White House that have responsibilities to evaluate them as well, and of course they're busy with a variety of tasks as well. If it were simply the kind of thing where you could print them up and cart them across to the United States Congress, the task would have been accomplished, because the secretary's clear desire is to provide -- to be as responsive as appropriate given that there's a handful of considerations -- for example, it's not anybody's desire that e-mails, for example, that have members of Congress's name in it to be -- so there is redacting that goes on and then the Congress can decide how it wishes to treat those. It's not our -- so it's a very time-consuming process.

Q I understand what you're saying. But why, then, knowing the process -- I mean, this whole process has taken over a year. Knowing the difficulties, why did Secretary Wolfowitz send a memo saying you'll get what you want in 30 days?

MR. DIRITA: Well, you always hope for the best, and then you get into the document collection and it takes time. We've got -- we've devoted an enormous number of resources to being responsive to this request.

As I said, we were developing a process to provide documents relating to a small number of officials. Somewhere along the way I think the number was 26 or 27 additional officials' documents were sought. So it hasn't exactly been -- and this is understandable, but it hasn't exactly been "Here's a list of things we'd like; go to work on it." The list itself has been evolving.

And we're dealing with complicated issues of privacy. We're dealing with complicated issues of executive privilege and complicated issues of sort of propriety when it comes to the names of people who aren't -- you know, you may have an e-mail, and we've all seen e-mail strings, that could I have three responsive lines in an e-mail that has a string of 27 different back

PX375

and forths. And so somebody's got to go through and analyze that and say, "Well, these three lines are responsive and the following 24 are not, so they have to be redacted." It is not simply push the "send" button and it goes over to the Senate.

Q But Larry, there are also those who are saying you might be dealing with comprehensive issues of embarrassment, too; for instance, Secretary Roche's e-mails that were finally sent over to Congress and Senator McCain -

MR. DIRITA: It's certainly nobody's interest -- look, those e- mails say what they say. And the secretary of Defense's position all along has been we're going to be responsive to the request.

And it's not -

Q That's not the reason that was reported -

MR. DIRITA: -- and it's not a consideration. I mean, it is a fact that there will be e-mails that out of context will seem to be -- there was an article in one of the papers yesterday that obviously was a colorful exchange. We've all exchanged e-mails. So that's what you get when you look at e-mails. It's raw documentation.

It's also important -- this is kind of a new thing. I mean, this is -- you know, the treatment of e-mails is a sort of new branch of privacy that we're all wanting to make sure we do proper and right. But it is not -- has nothing to do with whether anybody's going to be embarrassed. We're going to do the right thing, and the right thing is to be as responsive as possible to this request. And being responsive is just taking time.

Q Why would you redact the names of members of Congress from e-mails or -

MR. DIRITA: It's our view that if some -- it's third-hand, Charlie. So you've got an official here talking to an official at a company, and they mention some senator's name. Now is that fair? It's not our job to say this secondhand conversation in which the member had no idea he was even being discussed is going to -- we're going to dump those e-mails, because we know those e-mails are going to become public.
So it's up -- that's something we're deferring to the chairman of the committee on how he wants to handle it, but it's our druther that we're not going to do that. It's not -- it's just not right. It's thirdhand, secondhand stuff.

Yeah?

Q General, that short stretch of road between central Baghdad and the airport comes under almost daily attack, as you know, and British and U.S. embassies have barred their employees from using it. Why can't the U.S. military do a better job of securing that route? Are there any plans, without getting into operational details, for the military to do more to protect that road? For many Iraqis, it's become a symbol of the lack of security.

GEN. RODRIGUEZ: Yes. As you know, we've had continuous operations along that road to do that, and we'll continue to do that. But I don't have any specifics on those operations or how we're going to do that.

Q Yeah. I'm curious -- the campaign of intimidation you're talking about -- against the security forces in Iraq.

GEN. RODRIGUEZ: Yes.

Q What effect is that having on the effort to recruit and train these people who are so critical to the long-term stability of the country?

GEN. RODRIGUEZ: Yeah. The -- we continue to have sufficient people signing up to be -- at the recruiting thing. We continue to get the people over there who are ready to fight for a future Iraq, and of course many of them have sacrificed their lives in pursuit of that. And we're happy that -- on the way the development of the Iraqi security force is coming along.

Q Can I follow up on that?

Q It has not cut into -

GEN. RODRIGUEZ: It has not cut into the recruiting problem (sic). That's correct.

Q Can I follow up on -

MR. DIRITA: And it's worth noting the fact -- and not -- we don't have the precise numbers, and we'll get right over to you, but the -- a large number of Iraqi security forces have been killed. They've been killed in action. They've been killed through the intimidation campaign. They've been -- there have been execution- style assassinations. And yet, thus far, Iraqis are coming forward to serve.

PX375

It's -- as the president said, it's time for Iraqis to go to the polls because they are trying to take control of that country, and Iraqi security forces are really in the front of that effort.

Q We were told repeatedly during the Fallujah assault that the Iraqi security forces were performing well, in tandem with coalition forces. But reports coming from Iraq increasingly seem to suggest that they're not, that they're not up to the job, they can't perform, there's not discipline, there's not leadership. Where does that exactly stand? Who's right?

GEN. RODRIGUEZ: You know, you got a full range of effectiveness over time. And you understand a lot of the training that's going on, for example -- and you got to remember, we're building this army from scratch. So as they go through their initial training and work through those pieces, and then they go out for operations, there's a growth period between the time that they graduate from the training, the initial training in the school, until they can do a tough operation like a military operation in urban terrain in concert with coalition forces. So that higher-level coordination and everything is at the higher range of what we're talking about doing, in which some of the Iraqi units were able to participate in - in Fallujah, back to the ones that have just graduated from the school and are still working the leadership development, the mentoring that's so critical to them, moving from the training to the level of a proficient unit enough to move forward until they are really a unit that can do a tough operation in an urbanized -- urban terrain in concert with coalition forces. So there is a full range of that out there and that's part of the reason why it depends on what time and what units you're asking, based on where they are in that developmental process.

Q Well, how many are at the more complete end of it than at the beginning? You know, you say it depends on the situation, but where does the bulk of it lie?

GEN. RODRIGUEZ: I don't have the exact figures on that and everything. But like I said, it has been a continual improvement from the last seven months. And as you know, last April we had some huge challenges with trying to push the people too far too fast, and we had some setbacks. So they have taken a -- they relooked that and they continue to grow that Iraqi security forces over time, and that's been moving forward, constantly improving. And the commanders on the ground are happy with their -- the ability of the units that are that good to interact with coalition forces.

MR. DIRITA: Yeah?

Q Yeah, Larry, the Herrington report, we're told, was passed to General Fast who passed it to General Sanchez, who launched an investigation into the activities of this Task Force 121. Can you tell us what the status of that investigation is? I mean, was it rolled into the Formica investigation, or a separate one?

MR. DIRITA: Well, I'm going to do my best on this one, but the Herrington report generated something that became what they call this 15-6 inquiry by, I think, a Captain Cox, and that generated itself a large number of sort of findings and recommended improvements. And that occurred about the time that the abuses were coming to light. I think it was in late January of '03 when that report was completed and provided, and at that point is when a host of other investigations began. And ultimately the General Formica investigation on special operations forces, which will undoubtedly find some of the same things -- I mean, we've got special operations forces that are already involved in courts-martial based on -- and that was, I think, reflected in The Washington Post story.

Q Right.

MR. DIRITA: So I'm not sure that I'm able to parse exactly the lineage of the Herrington to Cox to Formica, but I know that it all happened almost contemporaneously with the disclosure of the -- the first public disclosure of what we learned in mid-January, and at that point a number of investigations began.

And I would also say, looking back, there had already been some reviews. General Miller had already gone over and found a lot of the same things, to some extent, that Colonel Herrington found; in other words, a prison system that needed attention in terms of resources, and their doctrine needed a review, and that sort of thing. And a lot of that's already, obviously, been provided. So -

Q New subject?

MR. DIRITA: Yes.

Q By the way, that's how we used to do it. We used to say "new subject," and then all the reporters would get to ask about that subject, nobody got cut off, and went to the next subject.

MR. DIRITA: Okay. I should do this more often. I could learn that. (Laughter.)

Q But my subject is -

Q You're getting it!

PX375

Q I second that! (Laughter.)

Q General Myers said yesterday that his -

MR. DIRITA: You're not going to have me to kick around much longer! Go ahead. (Laughter.)

Q New subject?

MR. DIRITA: (Chuckles.) New subject?

Yes, sir.

Q General Myers said yesterday that his concerns with the intelligence reform bill appear to have been addressed in the conference committee on the Hill, but Congressman Hunter's staff suggests that there's still significant disagreement about the chain of command issue. Can you just tell us what your understanding is of whether the concerns about the chain of command and getting intelligence to troops on the field has been resolved in the conference report?

Q New subject? (Laughter.)

MR. DIRITA: I have absolutely nothing to add to what General Myers said yesterday. And you know, the negotiations on that legislation are being intensely engaged by -- with the White House and the committees, and we're just going to -- I just have nothing to add to what -- I have nothing to add to what the chairman said yesterday.

Q Can you say whether General Myers was under any pressure from either the White House or Secretary Rumsfeld to change his position?

MR. DIRITA: Absolutely not. Absolutely not.

Q And the last subject is your nomination to be assistant secretary of Defense for Public Affairs has been withdrawn by the White House.

MR. DIRITA: I asked that it be withdrawn. But let me correct something first, and then if anybody really cares about that last one I'll be happy to talk about it. I said Captain Cox. I've just been corrected. Lieutenant Colonel Natalie Lee (sp) did the 15-6 investigation.

(As an aside.) Is that right?

I don't know where I got Cox. There's a lot of these reports that I've -

Q Natalie Lee (sp)?

MR. DIRITA: Natalie Lee (sp) did an investigation as the result of the Herrington report. And I think my timing remains the same. It came out about the end of January and other things.

Q Where is that report?

MR. DIRITA: I don't know. And I'll see if we can learn. I don't know what became of it, if it just got rolled into Taguba at that point, or I'm not sure what. As I said, a lot of other investigations began around that exact same time.

Q And why did you ask for your nomination be withdrawn?

MR. DIRITA: It just seemed as though -- the 108th Congress was coming to a close. I thought there was a possibility that -- I had been nominated a year ago, more than a year ago now. The Senate had taken no action on my nomination, and it just seemed like during a period of transition, to be confirmed at that point, were I to be confirmed, when there's a transition going on, I just thought it would be better to have a clean slate, start over. There's a new Congress coming. You know, it gives everybody an opportunity to take another look at everything. So as a result, I'll just continue what I'm doing, inadequately but -- (laughter).

(Cross-talk and laughter.)

MR. DIRITA: Thank you folks.

http://www.defenselink.mil/transcripts/2004/tr20041203-1721.html

PX375

PX375

# PX385



U.S. Department of Defense
Office of the Assistant Secretary of Defense (Public Affairs)
News Transcript

| | |
|---|---|
| **Presenter: Commander, Multinational Division Center and 3rd Infantry Division Maj. Gen. Rick Lynch** | **July 06, 2007** |

## DoD News Briefing with Maj. Gen. Lynch from Iraq

(Note: General Lynch appears via teleconference from Iraq.)

MODERATOR: Today's briefer: Major General Rick Lynch, commander of Multinational Division Center and the 3rd Infantry Division. His command took responsibility for operations in this sector in April, and he last spoke with us in May of this year. And today he's coming to us from the division's media center at Camp Victory. General Lynch has some opening statements and then will take some questions.

So with that, General, let's go straight to you.

GEN. LYNCH: Thanks.

And hey, folks. It's good to be back with you again today. It's important to do this. I know you're busy. Candidly, I'm kind of busy as well. But we got to make this time routinely to talk, so you better understand what we're doing over here.

This morning I want to cover several topics with you. I want to talk about Operation Marne Torch. I want to talk about post-combat operations. I want to talk about the support we're receiving from Iraqi citizens, and I want to give you an insight into upcoming operations.

As you know, I'm blessed to command Multinational Division Center and Task Force Marne, composed of elements of my 3rd Infantry Division, the 25th Infantry Division out of Alaska, and the 10th Mountain Division and many other magnificent organizations.

Our operating environment is the southern belt of Baghdad, both the Mahmudiyah and the Madain qadhas, and four of the southern provinces: Babil, Najaf, Karbala and, as of the 20th of June, Wasit province.

Our task and purpose is clear: block accelerants of violence into Baghdad, secure the population and defeat sectarian violence.

Let me give you a sense of how I think things are going.

First, let's talk about Operation Marne Torch. As you know, Operation Marne Torch is part of the Corps offensive Operation Phantom Thunder, and it's been going on now for about three weeks. And it's designed to eliminate enemy sanctuary areas in the Tigris River Valley area of Arab Jabour, which is essentially the southeast quadrant of the Baghdad province.

During this operation, we focus on reducing the flow of accelerants of violence into Baghdad. Accelerants are defined as anything -- insurgents, weapons, materiel, IEDs, VBIEDs, ideology, anything -- that, left uncontrolled, would affect the security in Baghdad.

Operation Marne Torch has evolved into having three primary characteristics. We move fast and we strike hard, both on the ground and in the air. We engage with the local population and solicit their cooperation. And we exploit all forms of intelligence. All of our operations in Marne Torch are intelligence-driven.

Together with the Iraqi army and the Iraqi national police, we have discovered and destroyed weapons caches, we've interdicted boat transportation used by the enemy, and we've detained or killed numerous insurgents.

We are having an impact on the enemy, and we're experiencing some operational success.

But we're still in the early stage of the operation, way too early to see dramatic changes in the security situation in Baghdad.

Let me give you one example of that success. During Operation Stampede 3, which was conducted by our 3rd Brigade Combat Team, we uncovered two large caches of ordnance that could have been used to make a number of IEDs. We found more than 80 mortar rounds, 10 rockets, 15 pounds of plastic explosives, several artillery rounds, fuses, blasting caps and other components to be used to make IEDs. Obviously taking these munitions out of the hands of the enemy has made the area safer for both Iraqis and coalition forces. That was one big weapons cache but just one of the 41 caches we've found so far during Marne Torch over the past three weeks. We've also found 54 IEDs, getting them before they can get us or Iraqi civilians or Iraqi security forces, and we

destroyed 45 boats -- boats that were being used by the enemy to transport insurgents and munitions.

During the operation, we've run nearly 500 patrols, many of them jointly with Iraqi security forces. We've conducted at least 22 raids, 32 cordon and search operations and 70 airstrikes. We've made extensive use of airpower -- B-1 bombers, F-16s and F-18s. We've cleared more than a thousand buildings and detained more than 230 insurgents, including 28 that we classify as high-value individuals, among them three of our Division 15 high-value targets.

We have taken real estate from the insurgents, and will now hold on to this terrain until competent, capable Iraqi security forces can provide the sustained security presence that'll keep the extremists away from the people of Iraq and from the government.

We have seen cooperation from the people that live in Arab Jabour; candidly, as many of you know, much more than I saw the last time I was here, which was only about a year ago, and that's indeed an encouraging sign of support. This support has come in the form of openness to us, peaceful coexistence with us and importantly in the form of information. In Multinational Division-Center now, we occupy 29 patrol bases out with the Iraqi population, and we're finding this openness with them to exchange information and help us with security.

What I sense is a growing discontent amongst the local communities, the tribes and their leaders, and we've benefitted from this discontent. Just as it happened in Ramadi, volunteers in an operational environment have emerged, and they say enough; enough of the violence, enough of the killing by al Qaeda; let us be part of the security forces.

What I believe is al Qaeda has worn out its welcome. They've overplayed their hand, and their tactics have indeed backfired.

Here's an example just on Wednesday. An Iraqi man out in Madain qadha of the Baghdad province -- that's just east of the Tigris River -- gave us information that led to the discovery and destruction of a massive weapons cache. We know this reduced the number of IED attacks on the Iraqi population, on the Iraqi security forces and on the coalition forces that are operating in that area.

Now we're entering another phase of our operation in Marne Torch, and it's entitled post-combat operations. Candidly, while we do post- combat operations, we're continuing to do combat operations in other portions of our battle space. We're reaching out to the Iraqi people with reconstruction efforts and humanitarian assistance.

Let me give you some examples. Task Force Marne has significantly improved the water infrastructure in Arab Jabour. Reconstruction of pumping stations and pipelines, repair of canals have had a positive impact on the lives of more than 2.2 million Iraqis. The bowery (ph) pump plant has been repaired by the Madain qadha government with financial assistance from us, and water is now flowing through the canals for the first time in several months. The Madain qadha's economy is agrarian based, so as you well know, this will indeed allow the farmers to prepare for the fall growing season, and as a result of that, they're very happy that coalition forces are there.

As part of our economic engagement strategy, we've identified six state-owned enterprises that will receive funding to improve their capacity. Improving their capacity will create a lot of new job opportunities for local people, especially military-age males, the kind of guys who want to get off the streets and into jobs so they can support their families and restore their dignity. You know, with the state-owned enterprises that we're dealing with, between now and October we believe we can employ 2,800 Iraqis, military-age males. Now, you might say that's not a big number, but that's 2,800 people who aren't going to be planting IEDs, because they got proper employment.

We're piloting a scrap metal initiative. There's lots of scrap metal in Iraq, and this initiative has the potential of creating a significant number of jobs and boosting economic development in North Babil. We're also advancing a government engagement strategy. The focus of this is to create stronger links between the provincial governments and the national government. Task Force Marne is acting as a conduit to the central government, and this month we'll host our first governors conference down in Hillah.

We chair bi-weekly security meetings with the Iraqi security forces and the local government. Just this last week, my 3rd Brigade Combat Team hosted the Madain qadha bi-weekly security meeting at their forward operating base. And these meetings develop combined Iraqi and coalition security plans for the coming week. Both sides share intelligence and develop future operations.

Even though we're working post-combat operations, intensive combat operations are still necessary.

As I've said before, in Multinational Division Center area, I believe there are four enemy sanctuaries, and Marne Torch is attacking one of those sanctuaries. And that's a Sunni extremist area, but there are others. There are additional enemy sanctuaries in our battlespace and they must be disrupted, just like Arab Jabour with Marne Torch.

Of note, the enemy is not just Sunni extremist networks. Shi'a extremists remain disruptive and unhelpful antagonists, and we find that they're often unfortunately foreign-supported. For the people of Iraq to live in peace and prosperity, these elements must be defeated as well. Upcoming operations will target both Shi'a and Sunni extremists.

We can't do this all by ourselves. We need the assistance of the Iraqi people, and I'm seeing more and more of that. I'm seeing more of the local population saying, we're tired of the violence; let us be part of the security; let us be part of the solution.

We also need the best effort of the Iraqi security forces. By the way, I sense that they're getting better every day. In my battlespace, I deal with two Iraqi army divisions: the 6th Iraqi Army Division and the 8th Iraqi Army Division. And those division commanders are competent, capable military professionals who are Iraqis. They're not Shi'a; they're not Sunni. They're Iraqis, and their enemy is

anybody that's against Iraq. And they've got competent subordinate commanders as well.

Working with the Iraqi army, we have caught and detained several individuals that we classify as high-value targets: the baddest of the bad guys. And taking these folks off the streets give new hope to the communities where they were hiding. You've heard me say before that there aren't enough Iraqi security forces in my battlespace. That remains the case, but I have room for optimism. There is a significant effort by the Iraqi government to build security forces that are multi-ethnic, non-secular and that can bear the weight of Iraqi security responsibility.

Now recently we had a graduation down in North Babil of 1,000 recruits for Iraqi police, and those recruits are both Sunni and Shi'a, and they'll be used across North Babil. They'll provide security. In Yusufiya, in the center of my battlespace, we just had a recruiting drive for the Iraqi army, and 900 people enlisted in the Iraqi army.

So there is indeed room for optimism. I see progress, but there needs to be more. And with that, I'm happy to take whatever questions you might have.

MODERATOR: Thank you, sir.

Let's start off with Kristin.

Q Sir, it's Kristin Roberts with Reuters.

I want to follow up on the statements you made about the progress you're seeing in Iraqi security forces. We've heard from you on many occasions about the lack of competent and capable Iraqi security forces throughout many areas of your area of responsibility. Can you please characterize for us the pace of improvement that you're seeing and give us more detail about the about the type of progress they've been able to notch over recent weeks?

GEN. LYNCH: Oh, that's a great question. What I've said is across Multinational Division-Center's battlespace, which is about the size of the state of West Virginia, there is a significant shortage of Iraqi security forces. The ones that I deal with, particularly the Iraqi army, I find to be competent and capable. I go out every day four hours worth of battlefield circulation and where I go I normally run into coalition forces side by side with Iraqi army forces. So I went to a patrol base just yesterday and I found a great Iraqi army captain, and he was so very proud of what he's doing at that patrol base and proud of the security he's providing for the local population. The issue that I got in my battlespace has been the Iraqi police. Either it doesn't exist or in some cases the Iraqi police throughout there are either not competent or corrupt, and that's a problem. But that's working to be improved.

In north Babil, where they just had that graduation of a thousand police recruits, the fact that they are both Shi'a and Sunni is room for optimism. When I talked to the provincial director of police in Babil, he tells me where he's going to place these forces, and it is exactly the right place to ensure security.

So the issue comes down to number of Iraqi security forces. We can debate all the time about quality, but the issue is not just quality, it's also quantity. You know, Arab Jabour, which has become an enemy sanctuary -- and that's why we're doing Marne Torch -- had a total void of any Iraqi security forces, and that's how it became an enemy sanctuary. That's what we have to preclude.

So we just got to work with the Iraqi government to continue to build more Iraqi security forces, and I see improvement in terms of the numbers of recruits.

MODERATOR: Pauline.

Q Pauline Jelinek of the Associated Press. If I could just follow on with the Iraqi security forces subject, you mentioned terrain has been taken and that potentially you'll like to hand it off to them. Can you talk about how that's going to work, how soon that could happen in some areas, and just generally describe when you think that can happen?

GEN. LYNCH: Yeah, you know, the time issue and the time question is always the most difficult question. Everything takes time and everything takes longer than you think it's going to take. Some of the patrol bases -- the 29 patrol bases we have, we've already turned over to the Iraqi security forces. Remember, it's clear, then hold and then build, and what we do is we work through Marne Torch -- is we work aggressively with the Iraqi security forces, force to clear, and then there's got to be somebody to hold. And we're not going to go any deeper in Arab Jabour than we can hold, either coalition forces have to stay there or competent Iraqi security forces have to stand up to the plate and say, "I got this one. Go ahead and move south."

And that's happened now in some of the patrol bases. In other places, there just aren't any Iraqi security forces, so there's nobody to hand the security off to, so we have to stay there. And that's why I'm excited about the locals. I'm seeing more and more of the local population saying, "Hey, let us be part of the security. Let us be part of the security." They're not asking for weapons, they're not asking for ammunition. All they're asking for is recognition and some legitimacy, but that gives me some room for optimism.

MODERATOR: Dave.

Q General, Dave Wood from The Baltimore Sun. We've heard over and over during the past couple of years that the critical part of this whole U.S. effort in Iraq is not the military part, it's the economic and political part of it. In your AOR, is the United States government doing enough projects like the 2,800 jobs you mentioned you hope to get secured before October -- is there enough of that happening or are you disappointed that not more is happening?

GEN. LYNCH: Well, again, I was here for an entire year with General Casey as his deputy for Strategic Effects, and I worked the political and the military and the economic lines with the U.S. embassy. And what I see now when I come back is I see marked improvement with these things that we call embedded PRTs, Provincial Reconstruction Teams. And all of my brigades will soon have embedded PRTs, and they focus on capacity building at the local level, at the nahiya level, at the city level, and we're seeing progress.

For example, in one of my brigade combat teams working their EPRT, they've identified eight model communities, and they're working to enhance not just the security but the economic situation in those model communities, and I see great progress there.

Where I'm disappointed and where we got a lot of work to do is at the provincial level. We have to build capacity in my battlespace at the provincial level. We've got four provinces -- Babil, Karbala, Najaf and Wasit -- and there has to be competent, capable governors and provincial councils and folks inside the government that really focus on the needs of the Iraqis in their province and not on Shi'a or Sunni kind of lines. That's what's most important. So I think we got to work harder to ensure we get capacity at the provincial level, and PRTs are designed to do that.

MODERATOR: Courtney.

Q Hi, General. This is Courtney Kube from NBC News. You mentioned that the Shi'a extremists in your area you're seeing are forward-supported. Can you elaborate on that? I mean, who specifically is supporting them, and what's the evidence that you have that they are being supported?

GEN. LYNCH: Yeah, thanks, Courtney. I appreciate the question. You know, across Multinational Division Center, there are three groups of enemy: It's Sunni extremists, it's Shi'a extremists and then it's those supported by Iranian influence. And what I have is just indicators of Iranian influence, and it's causing us great concern.

Since we've been here, the 4th of April, we've had 29 EFP attacks; 18 of those were effective attacks, and it killed nine of our soldiers. EFP technology has traced directly back to Iran, so those things that are coming from Iran, they're causing a great concern.

Over the last three months, we've found weapons caches -- four specific weapons caches, whereas we worked our way through those caches, we found Iranian munitions. We found Iranian rockets, we found Iranian mortars clearly marked with Iranian markings, and that is just unacceptable. So what's happening is these bad things are coming from Iran into Iraq, they're finding themselves in the hands of the extremists in our battlespace, and they're being used against coalition forces, against Iraqi security forces and against innocent Iraqis, and that just has to stop.

MODERATOR: Mike.

Q General, it's Mike Mount with CNN. My understanding is there's about 1,200 MRAPs now operating inside Iraq. Do you have any MRAPs in your AOR? And if you do, how are they performing against IEDs? And can you say whether, if you do have any, how are they performing against EFPs?

GEN. LYNCH: Yeah, Mike, I have none of the MRAPs, and I'm not sure when they're coming in. I know there's a plan on the part of the Army and the theater here to get us the MRAPs; we have none now.

What I'm working with are the up-armored humvees. And now we're using the additional capability to enhance the protection on Bradleys. So for example, yesterday we had a deeply buried IED attack on one of our Bradleys. And when I look at their Bradley now, it's unrecognizable. It looks like two sets of tracks. But the soldiers in that Bradley were able to walk away from that attack. None of them were killed. One was pretty severely injured. But the up-armoring of their Bradleys helped a lot.

We're all excited about getting the MRAPs. Anything that improved the force protection of our soldiers, we're all excited about it.

Q General Lynch, this is Guy Raz from NPR. I was hoping that you could put your area of operation within the overall context of the strategy in Iraq -- the clear, hold, retain strategy. So for example, last week -- earlier this week, General Fil explained that in Baghdad, since mid-February, his troops have managed to clear or retain about 48 percent of the neighborhoods in Baghdad. And he divides Baghdad into about 470 neighborhoods.

In your area of operation, in your battlespace, could you sort of quantify what percentage of it is now in the clear or now in the hold and retain phase for us?

GEN. LYNCH: That's a good question, Guy. And it's -- you know, Joe -- Joe's one of my best friends, and we've grown up together, and we call -- we talk all the time. But his battlespace is really different than mine. He's fighting inside the city of Baghdad, and -- but the majority of our area, this battlespace the size of West Virginia, is a rural area.

But to get to your question, I'd say there's about 70 percent of our battlespace that has competent security forces occupying that battlespace. And there's still about 30 percent where there's not the security force it needs to be, and that's why these surge brigades were so very important. And that's why these operations, the one that we're doing now with Marne Torch and the ones that are fixing to come up to take away the enemy's sanctuary, are so very important.

PX385

So your question's a good question. I'd say about 70 percent we're in the clear and hold piece, and then there's about 30 percent that we're just taking the fight to the enemy right now.

Q (Off mike) -- you say is in the hold and retain phase?

GEN. LYNCH: Yeah, in the retain phase, you know, we have significant pieces of our area where we're doing major construction operations with the Iraqi government, the local government, the provincial government. And I cited some out in the Madain qadha. So there is indeed a portion of my battlespace that's transitioned from clear to hold to retain. And again, it's about 70 percent where I'm comfortable that we've got security forces there, and we're working with the local government, the local people to maintain a persistent security presence. But there's about 30 percent that's still out there, that's enemy territory, and we have to take the fight to the enemy.

What the surge brigades allow me to do is have sufficient forces to take the fight to the enemy. That's what you're seeing now in Marne Torch and you'll see in upcoming operations over the next couple of months.

MODERATOR: Pam?

Q Sir, this is Pam Hess with United Press International. I know that you just got there in April, but could you explain to us how this area got to be an enemy sanctuary? You mentioned that the Iraqi security forces weren't good, but who turned over that battlespace to them? Who was watching it to make sure that it didn't go bad?

And once you get done with your work, looking forward, how long do you need to keep up this intense pace of operations and presence to prevent it from going back to being an enemy sanctuary?

GEN. LYNCH: Yeah, Pam, thanks for the question. You always ask great questions.

The reason it became an enemy sanctuary is because nobody was there. You know, if you look back over the last four years in Arab Jabour, there's been a coalition operation there, but it never stayed there. And what happens with the enemy forces is, they fill the void. As soon as the security forces leave, the enemy comes back.

He's got to have a place where he can store munitions, build IEDs, conduct training, and places closer to Baghdad is what he's looking for, and that's what happened. So the idea of going there and then leaving doesn't work. You have to go there and you have to stay with a sustained security presence, and that's what we're trying to do now.

And again, you go back to the timing issue. I see these aggressive offensive operations that deny the enemy the four sanctuaries we have taking us through July, August and into September. But by then, based on our calculations, we will have denied the enemy those sanctuaries and we can transition into the hold and retain phase in those sanctuaries.

Q Sir, it's Jennifer Griffin from Fox News.

You talked about the Iranian influence. And Senator Joe Lieberman had an editorial in the Wall Street Journal this morning where he quoted General Bergner from Monday, talking about Hezbollah's influence. He called Iraq, Iran's proxy war.

Have you captured anybody who has come across from Iran? Do you have any high-value detainees that prove that Iranian influence? And can you give us more details about what you're seeing in terms of Iranian influence?

GEN. LYNCH: Now thanks, Jennifer.

We haven't captured anybody that we can directly tie back to Iran. What's concerning to me is the soldiers that we're losing to EFPs and, without a doubt, the EFPs are traced back to Iran. Their capability to manufacture those EFPs, the technology behind them, they all come from Iran. And to have the significant rocket attacks and the mortar attacks we have and then to find these weapons caches with Iranian rockets and mortars are of great cause for concern.

And then we study the enemy in our sector all the time, and there are indeed JAM special groups that are going into Iran, conducting training, refitting and then coming back to attack coalition soldiers and Iraqi security force soldiers. So I'm not into the politics of what's going on. I just tell you. We've got Iranian munitions. We've got EFPs attacking our soldiers and we've got training being conducted in Iran, all of which we're concerned about and we're working against.

Q Sir, it's Peter Spiegel with the Los Angeles Times. I just wanted to follow up on Pam's question. It's another timing one. I know you're not usually excited about that.

But you mentioned in your opening remarks that it was way too early to see positive effects yet really at all in Baghdad. You may have noticed, in the last few days, we've had a bit of a speeding up of what General Petraeus calls the Washington clock here -- a lot of moderate Republicans saying, we don't think the surge is working and whatnot and we've got to switch to a new strategy.

I'm just curious, as a division commander, to what extent you follow that debate and to what extent that affects your strategic thinking as you look forward over the next few months in terms of what amount of time you're going to have with these extra surge forces to do what you need to do.

PX385

GEN. LYNCH: Yeah, I spend no time thinking about the political clock. I spend all my time focused on killing or capturing the enemy forces to do what we can do to build capacity and government and economic development in my battlespace.

That's my focus. And that, indeed, takes time.

So we didn't get the surge brigades here until ready for combat operations on the 15th of June. We've been working through this now for about three weeks, and as I showed you, significant progress. When you take away that many caches and that many IEDs, you kill about 50 of them, you detain a couple hundred more, that indeed is going to have an effect on the security situation in Baghdad. The problem is you're not going to see an instantaneous measurable effect, it's going to take a while. And when we start our next operation that's focused on both Sunni extremists and Shi'a extremists, you'll see effect, but it's not going to be an instantaneous effect, it's going to take some time.

So we keep getting the time questions, I don't worry about the political clock. I'm focused on killing or capturing the enemy in our battlespace. I'm focused on helping the Iraqi people to get some kind of a sustained security presence. That's what I focus on, and it's going to take a while. It's going to take a while.

Like I asked Pam, I think we're going to be doing detailed kinetic operations to deny the enemy sanctuary. It's going to take me July, August and end of September to do that, and then we'll be able to work the build and retain piece with more fidelity.

Q In answer to Guy's question, you said there's about 30 percent of your AOR that still does not seem to -- you haven't sort of poked around there yet. It would seem that with all the surge -- as you said, all the surge brigades in place now for about three weeks, in theory you should have all the forces you need to do that kind of stuff. Is that because there's extra forces moved up to Diyala to deal with that unexpected contingency up there, or it's just a matter of flow on of forces and flow on of operations?

GEN. LYNCH: Yeah, what you've heard before from all of the commanders here in Iraq is we never have enough forces, and we could use even more forces. It doesn't have to be coalition forces, but for sure Iraqi security forces to reach out.

So in my battlespace, there's 30 percent of the area that we still have to get to. Now, candidly, with the surge forces I've got the formations now that enable me to do that.

Q General, it's Jamie McIntyre from CNN. Just again to follow up on the same theme, if -- as you're no doubt aware, the mood in Washington is increasingly toward bringing those extra surge forces home sooner rather than later, in fact, some time in the next couple of months. How would that affect your ability to carry out your mission, given that you've said it's those surge forces that have given you the ability to go into these places?

GEN. LYNCH: It would be a mess, Jamie. It'd be a mess. Those surge forces are giving us the capability we have now to take the fight to the enemy, and the enemy only responds to force and we now have that force. You know, we can conduct detailed kinetic strikes, we can do cordon and searches, and we can deny the enemy the sanctuaries. If those surge forces go away, that capability goes away, and the Iraqi security forces aren't ready yet to do that.

So now what you're going to find if you did that, is you'd find the enemy regaining ground, re-establishing a sanctuary, building more IEDs, carrying those IEDs in Baghdad, and the violence would escalate. It would be a mess.

Q (Off mike.)

MODERATOR: Al, one more.

Q General, it's Al Pessin from Voice of America. A follow-up on Jamie's question. What can you say to the members of Congress, who seem to be increasingly impatient? What can you say to them to convince them to let you keep the surge forces to the end of the year or beyond or whenever you think you need to?

GEN. LYNCH: You know, people ask me all the time why I have so much confidence. I've got great confidence because I got great soldiers. And they're here fighting because they want to fight terrorists here so they don't have to fight terrorists back home. That sounds like a bumper sticker, but that's what they believe. They believe that if they don't do what our forefathers did, our children and their children won't enjoy the freedoms that we enjoyed coming up. So they're continuing to fight the good fight.

And candidly, if we don't fight the good fight here, I believe we're going to have to fight the fight back home, and none of us want that to happen. None of us want to experience 9/11 again. None of us want to have attacks on the American soil. So we got to fight the fight here.

And we need these surge forces. They came in for a reason. They're being used for the reason they came in. It's going to take some time to mature the situation. Over time we can turn the area over to Iraqi security forces, and then we'll be ready to do something that looks like a withdrawal. But that's not going to happen any time soon.

Q When you say any time soon, if not September, which many in the United States would like to see, can you say maybe we'll be ready to do that in January, maybe in March? I mean, what kind of hope can you provide?

GEN. LYNCH: Yeah, I wish I had some crystal ball. You know, over the last 30 years of my service to our nation, I've developed "Lynch's rules of warfighting," and one of the rules is, everything takes -- everything is timing, and the second rule is, everything

takes longer than you think it's going to take. So it's silly for military professionals to say, "Let me predict the future." There are so many conditions over here that are variable, there are so many unknowns -- in how the enemy's going to respond, how the Iraqi security forces are going to respond, how the government of Iraq is going to do in building these Iraqi security forces. There are unknowns. So to say here's the date it's going to be okay would just be silly.

MODERATOR: The absolute last one.

Q General Lynch, it's Guy Raz again from NPR. Just a sort of a follow-up on some of the previous questions. As you know, the overall counterinsurgency strategy, time and troop numbers are your lifeblood. It's what you need to succeed. So I'm wondering -- I mean, you have to plan in the future. You're looking at what's going to happen in six months, what's going to happen in nine months, where you're going to be, what kind of time you're going to have, what kind of numbers you're going to have. And clearly, with the debate taking place in Washington, time and numbers are commodities you may not have. So, I mean, you have to be worried about that to some extent, aren't you?

GEN. LYNCH: Well, the advantage of being a division commander is I got clearly defined battlespace and I got a clearly defined task and purpose, and I now have the forces I need to conduct that mission. What I can't tell you is how long it's going to take to secure the population, defeat sectarian violence. It's going to take however long it takes, and you just have to be sensitive to that.

What you don't want to do is have military commanders who arbitrarily pick dates and those dates may not be able to be substantiated on the ground based on changing conditions.

So I know you want to -- you want some kind of definitive answer to the time question, but we can't give that to you. What we can give you, in fact, is we've got the forces we need right now, we're working with the Iraqi security forces to have sustained security presence, and we'll continue doing what our nation needs us to do.

MODERATOR: Well, sir, we appreciate it. We have come to the end of our time. We are certainly glad you shared some thoughts with us today. We'd like to give it back to you for any closing remarks.

GEN. LYNCH: Yeah, first, just like I started, thank you for taking the time. Thank you for what you do, and what you do is very important to the American public. And just know that the commanders over here appreciate what you do.

You know, on the 4th of July, I had the great opportunity to be involved in the re-enlistment ceremony and the citizenship ceremony for about 600 great Americans; 500-plus soldiers re-enlisted, almost 200 soldiers became American citizens, and by golly, I was so very proud to be part of that. And every day when I'm out and about wearing 60 pounds of body armor in 111 degree temperature, I re-enlist soldiers, and they raise their right hand and say, "I'll support and defend the Constitution of the United States against all enemies, foreign and domestic." And they're doing that between attacks, between memorial services, between mortar rounds coming in, so I just take such confidence in the fact that we got great Americans who have committed themselves to service to our nation, and I'd like you to have that same encouragement.

You know, it bothers me when people say the Army is on the verge of breaking. We'll never break because we've got great soldiers.

Thanks for what you do, and thanks for spending time with me this morning. Thank you.

MODERATOR: Thank you again, sir.

http://www.defenselink.mil/Transcripts/Transcript.aspx?TranscriptID=4007


**NEWSLETTER**

Join the GlobalSecurity.org mailing list

**Enter Your Email Address**

Sign Up Now!

PX385

PX528

Home (/securitycouncil/) » ANSAR AL-ISLAM

🏠 Welcome to the United Nations (http://www.un.org/en)

Language:

# ANSAR AL-ISLAM

accordance with paragraph 13 of resolution 1822 (2008) and subsequent related resolutions,  the ISIL (Da'esh) and Al-Qaida Sanctio mmittee makes accessible a narrative summary of reasons for the listing for individuals, groups, undertakings and entities included e ISIL (Da'esh) and Al-Qaida Sanctions List.

e.098

ISAR AL-ISLAM

**te on which the narrative summary became available on the Committee's website:** 19 November 2010

**te(s) on which the narrative summary was updated:** 18 January 2018
19 July 2019
14 November 2019
23 April 2021

**ason for listing:**

sar al-Islam was listed **on 24 February 2003** pursuant to paragraphs 1 and 2 of resolution 1390 (2002) being associated with Al-
ida, Usama bin Laden or the Taliban for "participating in the financing, planning, facilitating, preparing or perpetrating of acts or
ivities by, in conjunction with, under the name of, on behalf or in support of", "supplying, selling or transferring arms and related
teriel to" or "otherwise supporting acts or activities of" Al-Qaida (QDe.004) and Usama bin Laden.

**ditional information:**

sar al-Islam, formerly known as Jund al-Islam, is a terrorist group operating in northeastern Iraq with close links to and support from
Qaida (QDe.004). Al-Qaida and Usama bin Laden (deceased) participated in the formation and funding of Ansar al-Islam, and Ansar
am has provided safe haven to Al-Qaida in northeastern Iraq. Ansar al-Islam's predecessor, Jund al-Islam, was formed in September
01. Ansar al-Islam came into being with the blessing of Bin Laden after its leaders visited Al-Qaida in Afghanistan in 2000 and 2001.
Laden provided Ansar al-Islam with an estimated USD 300,000 to USD 600,000 in seed money.

sar al-Islam has received training and logistical assistance from Al-Qaida. Members of Ansar al-Islam have traveled to Afghanistan t
in with the organization, while Ansar al-Islam's non-Iraqi members are believed to be Al-Qaida trained veterans of conflicts in
ghanistan and Chechnya, the Russian Federation.

sar al-Islam also cooperated closely with senior Al-Qaida operative Ahmad Fadil Nazal al-Khalayleh (deceased), also known as Abu
usab al-Zarqawi, whose network established a poisons and explosives training center in northeastern Iraq controlled by Ansar al-Isla
rqawi's lieutenants helped run this camp, which has taught operatives how to produce ricin and other poisons.

sar al-Islam has conducted attacks in northeastern Iraq. This organization has been located and primarily active in northern Iraq, but
o maintained a presence in western and central Iraq.

**lated listed individuals and entities:**

Qaida (QDe.004), listed on 6 October 2001

nar Mahmoud Uthman (QDi.031), listed on 17 October 2001

ad ben Mekki Zarkaoui (QDi.139), listed on 12 November 2003

mal ben Maoeldi ben Hassan al-Hamraoui (QDi.140), listed on 12 November 2003

axamed Cabdullaah Ciise (QDi.141), listed on 12 November 2003

di Abd el Samie Abou el Yazid el Ayashi (QDi.142), listed on 12 November 2003

madi ben Abdul Aziz ben Ali Bouyehia (QDi.143), listed on 12 November 2003

ohammad Tahir Hammid (QDi.144), listed on 12 November 2003

ohamed Amin Mostafa (QDi.147), listed on 12 November 2003

oureddine ben Ali ben Belkassem al-Drissi (QDi.149), listed on 12 November 2003

PX528

Azhar ben Khalifa ben Ahmed Rouine (QDi.150), listed on 12 November 2003
🏠  Welcome to the United Nations (http://www.un.org/en)                    Language:
d al-Majid Aziz al-Zindani (QDi.156), listed on 27 February 2004

ycal Boughanemi (QDi.188), listed on 29 July 2005

delkader Laagoub (QDi.190), listed on 29 July 2005

rhad Kanabi Ahmad (QDi.203), listed on 6 December 2005

ssim ben Romdhane Sahraoui (QDi.222), listed on 2 August 2006

erai Abdefattah Khalil Zoghbai (QDi.223), listed on 2 August 2006

jmuddin Faraj Ahmad (QDi.226), listed on 7 December 2006

ber Abdallah Jaber Ahmad al-Jalahmah (QDi.237), listed on 16 January 2008

ubarak Mushakhas Sanad Mubarak al-Bathali (QDi. 238), listed on 16 January 2008

# UNITED NATIONS (HTTP://WWW.UN.ORG/EN)

A-Z Site Index (http://www.un.org/en/sections/about-website/z-site-index/) │Contact (http://www.un.org/en/contact-us/) │
Copyright (http://www.un.org/en/sections/about-website/copyright/) │
FAQ (http://www.un.org/en/sections/about-un/frequently-asked-questions/) │
Fraud Alert (http://www.un.org/en/sections/about-website/fraud-alert/) │
Privacy Notice (http://www.un.org/en/sections/about-website/privacy-notice/) │
Terms of Use (http://www.un.org/en/sections/about-website/terms-use/)

PX528

PX643

# Iranian Influence in the Levant, Iraq, and Afghanistan

—⚬⚬—

Frederick W. Kagan

Kimberly Kagan

Danielle Pletka

A Report of the American Enterprise Institute

PX643

# Contents

INTRODUCTION     1

1. SYRIA, LEBANON, AND THE WEST BANK/GAZA     3

    Syria  *3*

    Lebanon and Hezbollah  *6*

    West Bank/Gaza and Hamas  *9*

    West Bank/Gaza and Palestinian Islamic Jihad  *11*

    Conclusions  *11*

2. IRAQ     17

    Background  *17*

    Iranian Support for al Qaeda  *22*

    Undermining the Iraqi Government: Special Group
       Activities in 2006  *23*

    U.S. Forces Capture Qais Khazali, Laith Kazali,
       and Ali Mussa Daqduq  *25*

    Arming the Secret Cells with EFPs and Other Weapons  *26*

    The Quds Force in Diyala  *27*

    Special Groups in Baghdad: Mortaring the Green Zone  *29*

    The Relationship between the Secret Cells and the
       Jaysh al Mahdi in 2007  *30*

    Conclusions  *30*

3. AFGHANISTAN     37

    Economic, Social, and Cultural Assistance  *37*

    Refugees and Migrant Workers  *39*

    Support for Insurgents  *41*

    Analysis  *46*

CONCLUSIONS     57

    Intentions and Realities  *57*

    Iranian Military Activities  *58*

    Economics  *62*

    Politics  *64*

    Religious Activities  *64*

    The Hezbollah Model  *64*

    Recommendations  *65*

PX643

# Introduction

The conflict between Iran and the United States began in 1979 with the Iranian Revolution and the seizure of the American Embassy in Tehran. Born partly of ideological differences and partly of real and perceived differing national interests, it has continued, alternately hot and cold, for almost three decades and seems unlikely to end soon. Like most previous conflicts, its conclusion cannot be foreseen. Many such struggles, like the Anglo-German tensions between 1871 and 1945 and the centuries-long tensions between Britain and France, lead to full-scale war. Others, like the Anglo-Russian or Russian-Ottoman tensions throughout the nineteenth century, lead to more limited conflict. And some, like the U.S.-Soviet Cold War, are resolved without direct armed confrontation. One key to resolving any such conflict is understanding both the nature of the enemy and the scope of the conflict—insights that have eluded most Americans and, indeed, many Iranians. This report addresses this lack of understanding and argues that while neither Americans nor Iranians desire full-scale military confrontation, Iranian activism and American passivity are contributing to a drift toward war.

Iran has been in the headlines on and off since 1979, but its significance for the United States increased dramatically after the attacks of September 11, 2001, and the subsequent invasions of Afghanistan and Iraq. Iran had long been recognized as the premier state sponsor of terrorism, but following 9/11, Americans were less willing than they had been to tolerate Iranian attacks, such as the 1983 U.S. Marine barracks bombing that killed 241 U.S. troops and the 1996 bombing of the Khobar Towers in Saudi Arabia, and Iranian support for groups—like Hamas and Palestinian Islamic Jihad in the West Bank and Gaza—with a history of killing Americans.

After Saddam Hussein was overthrown, it immediately became clear that Iran would have significant influence in post-Saddam Iraq. Indeed, mounting evidence of Iranian support for Shia and Sunni groups fighting American troops in Iraq generated deep concern in the United States, and sporadic reports of similar Iranian support to the Taliban in Afghanistan have received short bursts of attention. But Tehran ensured its place in the spotlight as it rapidly moved toward an escalation of tensions over its nuclear program.

The policy debate in the United States has generally centered around a single issue: will (or should) the Bush administration launch military strikes against Iran? Most have seen the Iranian nuclear program as the likeliest trigger for a U.S. attack. Those in the United States and Europe who oppose such a reaction have attempted to design a program of sanctions and diplomacy aimed at resolving the "nuclear issue." Fear that other points of conflict, particularly Iranian support of insurgents and terrorists in Iraq and Afghanistan, might become another trigger has also led to controversy over and even obfuscation of events in those two important theaters. And Iran's continued support for Hezbollah, Hamas, Palestinian Islamic Jihad, and other terrorist groups, while undisputed, is rarely mentioned—most likely out of fear that "war hawks" will use any evidence of Iranian wrongdoing to press for immediate military strikes.

The desire of the Bush administration—and even most of the supposed hawks—to attack Iran has always been overstated. Although some writers have advocated using military means to promote regime change in Tehran, few—if any—serious Iran analysts or defense specialists have recommended using force in the first instance. There has been no concerted effort within the administration—and very little pressure from the outside—for an attack. There is no comparison, for instance, between the bipartisan efforts to condemn, contain, or remove Saddam Hussein in the 1990s and again in 2003 and isolated

PX643

attempts to promote military strikes against Iran since the start of the Iraq war. The reason is simple: Iran is more than three times as large as Iraq in every dimension, with daunting physical terrain, even more daunting human terrain, and a global terrorist network. The prospect of full-scale war has never been appealing, and the waning of enthusiasm for precision-strike regime change after 2003 has made that option relatively unattractive as well.

This is not to say that the Bush administration or its successors will not launch either limited or full-scale military operations against Iran. Unattractive as the prospect of military conflict is, the prospect of an Iranian nuclear arsenal is at least equally unappealing. Much as Americans might desire to avoid war with Iran, continued Iranian intervention in Iraq, Afghanistan, and throughout the Middle East might ultimately make that option less repulsive than the alternatives. Western democracies do not go to war because they want to—they go to war when they determine that they have no other choice. The challenge in managing any cold war lies in ensuring that neither side ever feels that hot war is the lesser evil. And the key to that challenge is finding a modus vivendi, rather than insisting one side surrender to the other. This platitude is normally taken to mean that the United States should make sufficient concessions to Iran to mollify the mullahs. But the often-ignored converse is also true: stability will not result any more from an American surrender to Iran than from an Iranian surrender to America.

Sadly, there is very little prospect of success in this or any other endeavor unless the policy debate moves beyond the compartmentalization and hysteria that have characterized the discussion thus far. We must be able to recognize openly, fully, and objectively Iran's activities in the region that affect our interests without fearing that such recognition will lead to a foolish war. And we must also recognize that our conflict with Iran is regionwide, complex, and broad-based—it is not a simple misunderstanding over the nature of Iran's nuclear program or the threat Tehran feels from having U.S. troops deployed to its east and west. This report aims to present empirical evidence of Iran's actions in three critical areas: Iraq, Afghanistan, and the Levant (Syria, Lebanon, and the West Bank and Gaza). It does not address Iran's nuclear program, which is relatively familiar to most people who follow the issue, nor does it address Iranian activities beyond the broader Middle East and South Asia, although these are also worthy of study. Above all, it makes few claims about Iran's intentions.

The debate about the aims and even the nature and power of the Iranian regime is charged. The regime is unusually opaque. The combination of openness, rhetorical diversity, apparent internal schism, plausible and implausible deniability, and American neuralgia about Iranian intentions has made drawing firm conclusions about Iranian president Mahmoud Ahmadinejad's government or its possible successors almost hopeless. In the end, the United States is not likely to achieve any important goals vis-à-vis Iran without addressing better than we have thus far the issue of who controls the levers of power in Tehran and what they intend to do. But the American debate has thus far been so short on facts and so compartmentalized that establishing a ground-truth of Iran's activities in its immediate environs, whatever their goals and whoever ordered them, is an important undertaking.

PX643

# 1

# Syria, Lebanon, and the West Bank/Gaza

Iranian policy in Syria, Lebanon, and the West Bank and Gaza is a microcosm of Tehran's broader foreign policy strategy. Although it is possible to view Iran's actions in each of these areas as indicative of separate bilateral relationships, a step back reveals a larger pattern. In each instance, Iran began with significant investment in allies—in the case of Syria, the regime; in Lebanon, the Shiite "militia" Hezbollah; and in the Palestinian areas, rejectionist groups opposed to Fatah, including Hamas and Palestinian Islamic Jihad. Many in the United States and in other governments—particularly in the intelligence community—are keen to identify a clear operational relationship between the Iranian regime and its regional allies. This, however, misses the point of the Iranian model: proxies are ideological and political fellow travelers who serve their own interests as well as Iran's. Only rarely do observers see Tehran giving direct operational instructions to these groups. That said, it is questionable whether Iran's allies could survive without the cash, arms, and diplomatic support the Islamic Republic regularly provides.

## Syria

**Military Relations.** In July 2007, Syrian president Bashar al-Assad and Iranian president Mahmoud Ahmadinejad declared that "Iran and Syria were, are, and shall be brothers and allies."[1] Under Hafez al-Assad, Bashar's father, Syria and Iran were indeed allies rather than master and subordinate. Since Hafez al-Hassad's death in June 2006, however, the weak son has been incapable of earning respect in the region or at home. Instead, he is widely rumored to lean on the power behind his throne—his brother-in-law and head of Syrian military intelligence, Assef Shawqat.[2] (Shawqat and Bashar's younger brother, Maher

al-Assad, have been fingered in the assassination of former Lebanese prime minister Rafiq Hariri.[3]) Bashar's weakness at home, his precarious position in a "dictatorship without a dictator,"[4] and a changing international scene have led him to rely on an ever closer relationship with Tehran for both guidance and security.

Notable examples of this shift include several reported weapons transfers between the two states, possible cooperation on weaponization of chemical weapons, joint training on newly supplied air defense systems from Russia, and Iran's likely financing of Syrian weapons acquisitions.[5] In addition, Iran has achieved an important presence in Syria in recent years. While some might argue that this presence merely serves to enhance Syrian security, Syrian parliamentary speaker Mahmoud al-Abrash was more honest in November 2006 when he stated that "Damascus considers consultations and cooperation with the Islamic Republic of Iran as a major rule and principle of its foreign policy."[6]

Under Hafez al-Assad, the Iranian ambassador to Damascus wielded considerable clout, but Iranian military forces were not active in Syria. They confined their activities to the Hezbollah stronghold in the Bekaa Valley in Lebanon and Lebanon's southern Shiite redoubt. That is no longer the case. Syria's evolution from partner to enabler to inferior has been visible. In 2005, the two states agreed to cooperate on defense matters, including the construction of joint Iranian-Syrian signals intelligence stations (completed in 2006) in the Al-Jazira region in northern Syria and on the Golan Heights[7] and a Syrian commitment to "allow Iran to safely store weapons, sensitive equipment, or even hazardous materials on Syrian soil should Iran need such help in a time of crisis."[8]

By December 2006, *Al-Hayat*, a daily pan-Arab UK-based newspaper, reported that an Iranian Revolutionary Guard base was established in Damascus.

PX643

While many Iranian-funded Palestinian rejectionist groups such as Hamas, Palestinian Islamic Jihad, and others have found a home in Damascus, it is unclear why the Assad regime would give a headquarters in its capital to the most potent and subversive terror apparatus in the Middle East. Yet the deepening ties do not stop there.

In a March 2007 visit to Damascus, Iranian defense minister Mostafa Mohammad-Najjar placed Iran's defense capabilities at Syria's disposal and underscored the two nations' weapons manufacturing cooperation.[9] While such declarations have been regular features in past meetings, there is substantial evidence that this time the promised cooperation is real. Recent reports indicate that Iran will acquire at least ten 96K6 Pantsyr-S1E short-range gun and missile air defense systems from Syria (which acquired them from Russia), with delivery scheduled for late 2008.[10] In addition, Iranian Air Force specialists are slated to train with the Syrians on the Pantsyr system.[11] Reports suggest that in addition to its work on conventional weapons, the Iranian military is also cooperating on Syrian weapons of mass destruction. In 2005, Tehran reportedly committed to assisting Syria with its already well-developed chemical weapons program, including the establishment of "four or five" new production plants for VX and Sarin nerve agents and a mustard blister agent.[12] In July 2007, intelligence agencies detected an explosion at a joint Iranian-Syrian site in Syria, and officials surmise that something went awry in efforts to fit chemical warheads to short-range ballistic missiles.[13]

Assad and Ahmadinejad reportedly signed a new and secret military cooperation agreement in July as well.[14] According to the report, the seven articles of the agreement include new financing for Syrian weapons purchases from Russia, Belarus, and North Korea; $1 billion to acquire four hundred Russian T-72 tanks, eighteen MiG-31 jets, eight Sukhoi-24 bombers, and a number of Mi-8 helicopters; new Iranian facilities in Syria to produce medium-range missiles and launchers; new Iranian-made sea-launched missiles for the Syrian navy; and technical support for nuclear research and chemical weapons.

In exchange for this package, Syria pledged not to enter into peace negotiations with Israel.[15]

This agreement follows on a June 2006 cooperation agreement signed by Najjar and his Syrian counterpart General Hassan Turkmani embracing roughly similar outlines—with a reported price tag of $800 million.[16] Whether these generous agreements are part and parcel of the new satellite relationship or a response to possible Iranian fears about ongoing Syria-Israel secret talks is unclear. It is also unclear whether the Syrian military could function at this point without continued Iranian support.

**Economic Support.** In the economic realm, the Syria-Iran relationship is undergoing the same deepening and broadening. The Syrian economy is becoming increasingly dependent on Iranian joint ventures, financing, and support in key sectors such as energy, telecommunications, agriculture, and transportation, as well as anticipated oil refineries, wheat silos, cement plants, and a renovated oil pipeline from Iraq's northern oil fields to Syria's Mediterranean coast. This economic cooperation, reaching record levels over the past few years, represents bilateral trade estimated at $200 million per year and direct Iranian investments in Syria totaling more than $2 billion.[17]

In January 2007, the Syrian government reported that Iran was the top investor in Syria among non-Arab countries in 2006, with $400 million.[18] Iranian investment in Syria in 2006 was two-thirds that of total Arab investment and half that of all non-Arab investment in the country.[19] In addition, in late 2006, Iranian and Syrian officials estimated that the volume of Iranian projects in Syria was around $750 million, compared with $100 million the year before.[20] For its part, Iran sees few bounds to its relationship with Syria, particularly in energy, even including sharing nuclear technology. In March 2007, Ahmadinejad adviser Parviz Davoudi explained that "Iran's intentions [are] to establish a suitable framework for conducting [joint] oil and gas activity. . . . Iran possesses innovative and significant technologies, including nuclear technology for peacefulpurposes . . . which it is inclined to transfer to its friend and sister Syria."[21]

PX643

The most important sectors in which Iranian investment, finance, and cooperation are key to the Syrian economy are as follows.

*Transportation.* SIAMCO is a $60 million joint venture in automotive production in which Iranian automotive giant Iran Khodro Company has a 40 percent stake, the Syrian government 35 percent, and a private Syrian company called Al Sultan the remaining 25 percent.[22] In December 2007, the Syriab Arab News Agency (SANA) reported that, under a $50 million joint venture, the International Syrian-Iranian Factory for Cars will produce up to fifteen thousand SABA cars a year and anticipates reaching a capacity of thirty-five thousand cars annually in its final stage.[23] In March 2007, the Samand automotive production line was inaugurated by Assad and Iranian vice president Parviz Davoudi. Iran plans to allocate 40 percent of the Syrian car market to itself and is estimated to bring in $220 million for its industry.[24]

*Natural Resources.* In September 2007, Iran's acting mines and industry minister Ali-Akbar Mehrabian announced $10 billion worth of Iranian investments in Syria within the next five years. The two countries are currently cooperating on sixteen projects valued at $1 billion.[25]

*Cement.* A new cement plant was inaugurated in Syria's northern city of Hama, SANA reported. The $250 million plant has a production capacity of 1.1 million tons annually and is expected to create four hundred jobs.[26]

*Water.* Iran has undertaken a water supply project in the Syrian city of Aleppo; in addition, several Iranian companies, including Sabir and Satkab, are involved in the construction of ten dams in Syria.[27]

*Education.* In a July 2007 meeting, Iranian science, research, and technology minister Mohammad Mehdi Zahedi announced the establishment of an Iranian university in Syria, which will be an international branch of Tehran's Tarbiat Modares University.[28]

*Culture.* In July 2007, Zahedi, Damascus University chancellor Wail Mu'alla, and Iranian ambassador to Syria Mohammad-Hassan Akhtari discussed Iranian financial and spiritual support for Persian-language faculty at Damascus University.[29]

*Electricity.* The first phase of the Banias power plant in Syria was inaugurated in June 2007. The Export Development Bank of Iran financed $11 million of the $18 million power plant, and the rest was provided by Syria.[30] Iranian energy minister Parviz Fattah and his Syrian counterpart commissioned two power plants in Syria in May 2007. The Iranian company Azar Ab engaged in overhauling the 170-megawatt power plant at a cost of around $62 million.[31] The Iranian cabinet approved a $230 million payment to establish a combined cycle power plant in Syria in April 2007.[32] Fattah agreed with Syrian minister of electricity Ahamad Khalid al-Ali in November 2006 to connect the power network of the two countries via Turkey and Iraq.[33]

*Oil.* Iran's deputy oil minister Mohammad-Reza Nematzadeh, Syria's deputy oil minister Hassan Zeinab, and Venezuela's director general of refinery affairs Roberto Delgado agreed in October 2006 to construct a refinery with a capacity of 140,000 barrels per day of oil. The projected cost is $1.5 billion.[34] In October 2007, Iran's oil minister Golamhossein Nozari and Syrian oil minister Sufiyan al-Alaw signed an agreement, expected to take effect by 2009, whereby Iran will export 3 billion cubic meters of gas to Syria through Turkey.[35]

*New Construction.* An Iranian private-sector mission to Syria offered to build an industrial city in Syria, including a steel mill with a production capacity of eight hundred thousand tons a year, an eight-hundred-megawatt power plant, and a housing complex with fifty thousand housing units. The total cost was estimated at $8 billion, to be funded by the Iranian private sector.[36]

*Mining.* In May 2006, Syrian minister of the economy and trade Amir Husni Lutfi met in Tehran with

5

PX643

Iran's minister of industries and mines Ali-Rez Tahmasbi. Tahmasbi stated that the current volume of trade exchange in industry and mining sectors amounted to over $1 billion. The Iranian minister stated that Iran is currently involved in some sixteen industrial and mining projects in Syria.[37]

*Banking.* In March 2006, the Bank Saderat of Iran and the Commercial Bank of Syria announced they will form a jointly run bank.[38]

*Trade.* In February 2006, Davoudi discussed with Assad, Syrian vice president Farouq al-Shara, and prime minister Muhammad Naji al-Utri possibilities for opening joint ventures in the petrochemical, gas, and oil sectors; installing production facilities, including agricultural units and machinery, irrigation, roads, and housing; transferring Iranian oil and gas to Syria; and constructing a railway connecting Iran, Iraq, and Syria. Bilateral cooperation has been placed at about $750 million. Trade exchanges between the two countries stood at $100 million in 2005. Over 350,000 Iranian pilgrims visit holy sites in Syria annually.[39]

Though Syria and Iran are independent states and may freely contract any bilateral agreements they choose, it is worth noting that Tehran has not only contributed to building nearly one thousand megawatts of electrical production capacity in Syria—while maintaining that it needs a civilian nuclear power program to supplement its own energy needs—but has also been working to integrate the Syrian and Iranian economies through constructing roads, railways, and oil and gas pipelines and linking power grids. This growing economic interdependence (with Iran at the center of a dependency network) and the increase in military aid from Iran to Syria risk reducing Damascus to a vassal state that is so tied economically and militarily to its more powerful patron that disobedience may become unthinkable. Whether this was Tehran's goal is not important. What matters is that it is increasingly the reality in Syria.

## Lebanon and Hezbollah

Hezbollah is a topic unto itself, a sophisticated political-military-social organization—a key player in the Lebanese government, a dominant force in southern Lebanon, a potent militia, itself a trainer for regional terror groups, an exporter of terror, and more. Hezbollah is a force to be reckoned with. For our purposes, however, it is Hezbollah's tie to Iran that demands attention. Formed in 1982 by Iranian seminarians, its links to Tehran have only strengthened as it has grown into a semi-autonomous power of its own.

**Weapons Transfers.** At this point, there is little doubt that Hezbollah has recovered from any setbacks suffered in its 2006 confrontation with Israel. The group has rearmed and regrouped, and Iran has been an important part of that recovery. In a February 2007 interview, Hezbollah leader Hassan Nasrallah openly stated that Iran is supplying his group with monetary aid and weapons.[40] Weapons shipments come by land, sea, and air from Iran, often via Damascus. Shipments are frequent and large. For example, Israel's Intelligence and Terrorism Information Center reported that at least nine times between December 2003 and January 2004, the Iranian Revolutionary Guard Corps (IRGC) Quds Force "used Iranian and Syrian cargo planes flying humanitarian aid in to the earthquake victims . . . in Southeastern Iran . . . to take large quantities of weapons for Hezbollah on their return flights."[41]

Over the years, Iran has gone from supplying rudimentary weapons to providing more sophisticated long-range missiles and other higher-end weaponry destined to escalate tensions on Lebanon's southern border. In mid-2004, IRGC officers reportedly unloaded 220 missiles with a 250–350-kilometer range for Hezbollah at an airfield near Damascus.[42] Indeed, according to calculations reported by the Middle East Media Research Institute (MEMRI), between 1992 and 2005, Hezbollah received approximately 11,500 missiles and rockets; four hundred short- and medium-range pieces of artillery; and Aresh, Nuri, and Hadid rockets and transporters/launchers from Iran.[43] In 2005, Iran sent Hezbollah a

PX643

shipment of large Uqab missiles with 333-millimeter warheads and an enormous supply of SA-7 and C-802 missiles, two of which were used in an attack on an Israeli ship.[44]

During Hezbollah's summer 2006 conflict with Israel, Iran resupplied the group's depleted weapons stocks. In July of that year, secret IRGC airlifts from bases in Bandar Abbas transported supplies for Hezbollah to the Dumeir Syrian military airfield near Homs.[45] A month later, Iran sent more advanced surface-to-air missiles, including Strela-2/2M, Strela-3, Igla-1E, and the Mithaq-1. The same missiles were reported to have been used to target Israeli helicopters.[46] Iran does not restrict its equipment support of Hezbollah to heavy arms: British-made night-vision goggles found in a Hezbollah bunker during the war apparently also came from Iran.[47]

**Military Training.** Hezbollah's performance in 2006 stunned Israelis who had long assumed that they could devastate the terrorist group in any serious confrontation. Far from it—in addition to hunkering down in sophisticated tunnels built with North Korean assistance,[48] Hezbollah fighters had benefited from serious, in-depth training from IRGC on the ground in Lebanon and Iran.

Hezbollah reportedly had hundreds of Iranian engineers who, with North Korean experts brought into Lebanon by Iranian diplomats, built a twenty-five-kilometer underground tunnel to move fighters. The IRGC also constructed underground storerooms in the Bekaa Valley to hold missiles and ammunition.[49]

It should not be assumed, however, that Hezbollah cannot operate without IRGC guidance or planning. To the contrary, reports indicate that most IRGC troops left Lebanon at the end of the 1980s and were replaced by thousands of Hezbollahis who had fought and trained with Iranians inside Iran.[50] Instead, IRGC troops appear to be in Lebanon to help with specialized activities such as tunnel-building and weapons-training. For example, Israel Defense Forces (IDF) naval and ground forces reported separately that IRGC officers were key to coordinating C-802 missile attacks against their ships and missile fire against Israeli helicopters.[51]

Other sources note that the IRGC established twenty missile bases on the Israeli border in Lebanon.[52] In July 2006, a senior Iranian army officer reported that the IRGC had established dozens of advanced rocket and missile bases in the Lebanon Valley and along the border with Israel.[53]

Other vignettes detail the depth and breadth of Iranian training of Hezbollah, which often trickles down to other groups trained in Lebanon. MEMRI (among others) does an excellent job collecting examples of Iranian support for Hezbollah's military capabilities:

- Two Hezbollah terrorists who were captured by the IDF during the 2006 war confessed they had been trained by IRGC operatives at a camp near Karaj, north of Tehran. They said they were part of a group of forty to fifty Hezbollah operatives trained in Iran.[54]

- In the last three years, fifty Hezbollah pilots have been trained. In Lebanon, there are seventy Iranian trainers and technicians as well as sixty Faylaq Quds intelligence agents. There is a secret IRGC unit in Lebanon of twenty officers who track Israeli movements and select targets in Israel.[55]

- Hundreds of Hezbollah fighters took special training courses at IRGC bases in Tehran, Esfahan, Mashhad, and Havaz. Hezbollah's missile unit includes two hundred technicians and experts trained in Iran.[56]

- Colonel Ali Reza Tamiz of the Quds Force is responsible for training Hezbollah members in the use of advanced equipment and weaponry, including Ra'ad missiles, Shahin launchers, and surface-to-air missiles.[57]

We need not belabor the question of Iranian intentions, but it is worth noting the series of events preceding the Hezbollah-Israel confrontation. On April 28,

PX643

2006, director general of the International Atomic Energy Agency (IAEA) Mohamed ElBaradei submitted a report to the IAEA board of governors and the United Nations (UN) Security Council. The report noted "gaps" in the IAEA's knowledge about "the role of the military in Iran's nuclear programme" and concluded that "the Agency is unable to make progress in its efforts to provide assurance about the absence of undeclared nuclear material and activities in Iran."[58] On June 8, ElBaradei released another report to the IAEA board of governors, noting that Iran continued to refuse to provide the requested information about its nuclear program.[59] On July 12, Lebanese Hezbollah forces crossed the Israeli border and seized two Israeli soldiers, prompting an Israeli invasion of southern Lebanon that immediately grabbed public attention.

Iran certainly had an interest in distracting attention from the escalating investigation of its illegal nuclear weapons program in the summer of 2006. And once the Hezbollah-Israel war began, Iran had an interest in seeing Hezbollah emerge unscathed from its confrontation with Israel (hence Iran's risky attempt to resupply Hezbollah with critical weapons in July).[60] In this instance, it seems appropriate to think of Iran as Hezbollah's enabler and of Hezbollah as a willing handmaiden in times of Iranian need. Whether wreaking havoc on the rest of Lebanon served Hezbollah's long-term interests remains unclear. It is also unclear if Tehran ordered Hezbollah to launch the attack that started the war or if the timing of the Lebanese crisis had nothing to do with the timing of the IAEA reports and the prospect of UN sanctions. Regardless, the timing coincided rather nicely for Iran, and Tehran appears to have acted rapidly to support its proxy and benefit from the distraction.

**Economic Support.** Because Hezbollah represents the historically poor Shiite community of Lebanon, money from Iran has been vital for buying and maintaining political support within the country. Estimates of Iran's annual support to Hezbollah are in the range of $100 million or more per year.[61] Iran's total investment in Hezbollah has topped $1 billion and may be as high as $2 billion.[62]

The mechanism for transferring money should not be complicated: Hezbollah is a legitimate user of the Lebanese national banking system. Iran has also been reported to transfer large sums of money to Hezbollah using the Syrian and Palestinian banking systems, and Arab Bank has been identified as a main conduit for channeling money to Hezbollah and other terrorist organizations.[63] That said, there have been occasional reports of suitcase-style cash transfers as well. Following the 2006 Israel-Lebanon war, Hezbollah was seen doling out hundreds of hundred-dollar bills procured from a suitcase to Lebanese seeking compensation for Israeli bomb damage to their homes.[64] An October 2006 report describing diplomatic bags stuffed with cash being trundled to Lebanon states that the money originated from the religious center in the city of Mashhad as well as from other organizations in Qom, Shiraz, Gorgan, Kerman, Esfahan, and Zahedan. The money is mainly earmarked for reconstruction work—some sources claim it could be as much as $2 billion—and is managed in Lebanon by Hezbollah's treasurer, Nasrallah's brother-in-law.[65]

Iran has been key to Hezbollah's regaining its reputation, its social networks, and its political clout in the months since the 2006 conflict. While it seems clear that Hezbollah scored a major victory and dented seriously Israel's deterrent for the first time in many decades, from a Lebanese perspective, things look different. Nasrallah was forced to apologize to the Lebanese people for bringing massive destruction upon the country.[66] Many in Lebanon blamed Hezbollah for initiating a war that Lebanon's elected government had not chosen.

Extricating Hezbollah from Lebanese recriminations was an expensive task: Iran made $150 million available for Hezbollah to distribute to Lebanese citizens.[67] Fuel and generators were delivered to war-torn villages after the conflict, and families who lost homes were granted $12,000 each—all at Iran's expense.[68] In July 2007, the head of Iranian reconstruction efforts in Lebanon, Hessham Koshnevis, reported that out of the twenty-five bridges Iran had pledged to rebuild, reconstruction of twelve was complete; forty-three out of sixty-three villages had

PX643

been rebuilt; and one hundred forty-nine schools and fifty mosques had been rebuilt. Overall, Iran had finished 704 out of 1,032 reconstruction projects it pledged to carry out in Lebanon.[69]

**Politics.** Unlike proxies in Syria and even the Palestinian territories, which remain nominally independent, Hezbollah is an important Iranian instrument over which Tehran exerts significant, though not always clear, control. According to former Hezbollah secretary general Sheik Subhi Al-Tufeili (who broke with Iran and Hezbollah), "Hezbollah is a tool, and it is an integral part of the Iranian intelligence apparatus. . . . Iran is the main nerve in the activity today in Lebanon. All Hezbollah activity [is financed] by Iranian funds. Syria has an important role, but Iran is the main and primary support of [the Lebanese opposition]."[70] Iranian officials agree: Ali Akbar Mohtashemi, one of the founders of Hezbollah, former Iranian ambassador to Syria and Lebanon, and former Iranian interior minister, has said that "Hezbollah is part of the Iranian rulership; Hezbollah is a central component of the Iranian military and security establishment; the ties between Iran and Hezbollah are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."[71]

More recently, Hezbollah's second-in-command, Sheik Naim al Qassem, explained in an interview on Iranian television that Hezbollah yields to Iranian authority for all military issues, including suicide bombings, rocket launches, and other terrorist operations. Qassem references "'al-wali al-faqih' (the ruling jurisprudent), a title formerly used by Ayatollah Ruhollah Khomeini and presently used by his successor, leader Ali Khamenei . . . to describe Hezbollah's source of authority."[72]

Qassem also explained that terrorist operations against Israel require Iranian permission.[73] Whether Qassem's interview is part of an ongoing power struggle between the deputy and Nasrallah (recent reports suggest Nasrallah was demoted in favor of Qassem by an Iranian leadership furious over the fallout from the war with Israel)[74] or a recitation of facts, keen observers agree that Hezbollah has a

degree of latitude in operations but lacks complete independence from Iran. Whether or not Iran dictates or merely advises how Hezbollah's "political" wing should behave inside Lebanon is less clear. It is also evident that recent events have increased Hezbollah's dependence on Iran even further. Both Hezbollah's loss of weapons and fighters in the conflict with Israel and the resulting damage to its reputation and position within Lebanon weakened Hezbollah's burgeoning independence and made it more reliant upon Iran.

## West Bank/Gaza and Hamas

**Military Training.** The rhetoric of the Palestinian struggle has been central to Arab and postrevolutionary Iranian foreign policy for decades. But a balance sheet of Arab rhetoric and pledges of support to Palestinians adds up to very little in reality, particularly compared with Iran's very real, practical economic and military support for rejectionist Palestinian groups (including, until very recently, the Palestine Liberation Organization and Fatah). The 2006 U.S. State Department report on terrorism accused Iran of providing "extensive" funding, weapons, and training to Hamas, Palestinian Islamic Jihad, the al-Aqsa Martyrs' Brigades, and the Popular Front for the Liberation of Palestine–General Command.[75]

A review of the history of Iranian support for Hamas and other rejectionist Palestinian groups since Iran took the reins of the movement in 1992 is not practical in the context of this report. An examination of the last two years of relations, however, shows a pattern similar to that of Iranian relations with Syria and Hezbollah: financial support, weapons supplies, diplomatic coordination, and what might be called the "Hezbollah-ization" of Iran's relationships with political/military terror groups. Notably, however, Hamas has refused to accept money from Iran through Hezbollah and instead demanded its own separate bilateral relationship. From a Palestinian standpoint, this desire seems natural, and for the Iranians, too, there would be little strategic reason to give more control to Hezbollah.

PX643

Past suggestions that a sectarian divide limits the common cause between Iran and Sunni groups such as Hamas are based on a misreading of Iranian pragmatism—Iranian support for Sunni as well as Shiite insurgents inside Iraq is well documented (see Chapter 2). Some see the Damascus location of the leadership of groups such as Hamas and Palestinian Islamic Jihad as a sign that there are two centers of power among these groups. But while Palestinian Islamic Jihad—despite its localized mission to destroy Israel and establish an extremist Islamic Palestinian state—is "almost completely dependent on Syria, which permits its leadership, under the direction of [Secretary General] Ramadan Shalah, to operate from its territory and from Lebanon, from where it directs its anti-Israeli terrorist activities in the Palestinian Authority–administered territories," the real boss remains "Iran, its most important patron, which provides it with massive financial support."[76] Just as Syria has fallen under the Iranian shadow, so, too, have these groups become proxies and fellow travelers of the Tehran regime.

In early 2007, the head of the Israeli Shin Bet, the domestic security service, reported that Iran had become Hamas's main supplier of weapons and training.[77] Earlier reports indicated that Iran was supplying Hamas with vehicles and aircraft, although there is no evidence that Hamas received the aircraft.[78] Iran has also taken advantage of the relative proximity of Hamas to Hezbollah to enable IRGC training for Hamas (and, reportedly, Fatah) in the use of SA-7 (Strela) anti-aircraft missiles at the Janta Base in the Bekaa Valley in Lebanon. Graduates of this course reportedly transition to training in Iran near Qom.[79] Others have benefited from training by IRGC officers inside Gaza, and Israeli officials have testified that they believe there are a large number of Iranian experts in Gaza.[80] In a raid on a Hamas-linked Islamic university in Gaza City in February 2007, national security forces affiliated with Palestinian president Mahmoud Abbas seized hundreds of weapons and arrested several Iranian citizens who had purportedly been sent to the university by Iran to train Hamas affiliates.[81]

While Iran has proven itself willing to escalate the quality, reach, and sophistication of the weapons it supplies to its terror proxies, a newer and potentially more troubling trend is the quality of Iranian—particularly IRGC—military training. As Israel learned to its detriment in the summer 2006 conflict with Hezbollah, IRGC/Quds Force training has made terrorists much more effective against and lethal to an Israeli military that had once been dominant.

Although Hamas operatives have been trained by Iran for some years—likely since the early 1990s[82]—Hamas representatives reportedly traveled to Tehran in 2006 to discuss the issue and, according to the Islamic Republic News Agency, were warmly received by Ahmadinejad, who offered anew to transfer Iranian "experience and achievements" to Hamas.[83] Since then, large contingents of Hamas operatives have been training inside Iran for significant periods of time.[84] A pro-Fatah news site, Intifadat Filastin, recently noted that 150 members of Hamas filtered back into Gaza after spending over three months training in Iran.[85] In addition, Iran reportedly sent advisers into Gaza to work with Hamas.[86]

Although a report about a Hamas-Iran pact to train 6,500 men cannot be confirmed with other sources, it seems credible that Tehran committed to training a Hamas "rapid deployment force of 6,500 men in Hezbollah combat tactics." The report goes on to detail IRGC training and Iran's agreement to foot the bill for arming as well as training Hamas operatives at IRGC installations in southern Iran.[87]

**Economic Support.** Since Hamas's electoral victory in January 2006, Iran has reportedly smuggled hundreds of millions of dollars to the Hamas leadership. According to the former security chief of Hamas rival and Palestinian governing party Fatah, the group has received $400 million from Iran.[88] This money was not simply to buy arms or pay for training; rather, as in Lebanon, Iran appears to be insinuating itself into the social and economic fabric of the Palestinian areas, making itself an indispensable ally. Accordingly, in December 2006, Iran allegedly promised Hamas prime minister Ismail Haniya $250 million in aid, including $100 million for 2007 salaries of

PX643

employees working for the ministries of welfare, labor, and culture; $45 million for allowances for Hamas prisoners in Israeli jails; and aid for three thousand Palestinian fisherman and one hundred thousand unemployed workers.[89] Because much of the assistance comes to the Palestinians illicitly, numbers are difficult to track. Hamas officials visiting Tehran in 2006 returned hauling cash, and the International Monetary Fund estimates that in 2006 some $70 million in cash was carried into the territories, largely from Iran.[90] And Haniya was famously nabbed carrying a suitcase with $35 million from Iran.[91]

Iran did not create Hamas and does not control it. But Tehran has clearly seized opportunities to establish a patron-client relationship with this Sunni terrorist group. As is often the case with Iran's external activities, the relationship provides many benefits: It supports a key terrorist enemy of Israel, and anti-Zionism is a core element—at least rhetorically—of the present Iranian regime. It diversifies Tehran's portfolio in the Levant beyond Hezbollah and even beyond the limited Shia community there, providing a wedge into the Sunni extremist community on the basis of need and common enemies. It opens the possibility of multiple "western fronts" in Iran's struggle against the United States and Israel and multiple opportunities to generate distractions from events elsewhere without having to sacrifice the same proxy continuously. And, operationally, it establishes a potential Iranian proxy on another of Israel's borders. Again, the question of Tehran's intentions is unimportant for the moment. What matters is that Iran benefits in all of these ways from intensifying the support to its ally.

## West Bank/Gaza and Palestinian Islamic Jihad

In February 2003, *Asharq Al-Awsat*, a pan-Arab daily newspaper, and Voice of America published interviews with Hamid Reza Zakeri, a supervisor and director of intelligence for the IRGC who defected to the West. Zakeri claimed that as supervisor of the intelligence apparatus's secretariat, he was aware of joint operations between the Revolutionary Guards and Iranian intelligence groups with revolutionary forces in the region, including al Qaeda, Hezbollah, and the Palestinian and Egyptian jihad organizations.[92]

According to Shalah, "Palestinian Islamic Jihad is one of Khomeini's numerous creations."[93] Unlike Hamas, which can credibly claim to have some Palestinian roots, Palestinian Islamic Jihad appears to be a wholly owned proxy organization. According to the authoritative Intelligence and Terrorism Information Center, Palestinian Islamic Jihad is "almost totally dependent upon Iran."[94]

Iran is likely the sole source of the organization's financing, providing the group with an estimated $2 million in annual funding.[95] Interestingly, even Palestinian Islamic Jihad, which is far less potent and broad-based than Hamas, also demanded to be distinct from Hezbollah. In 2002, Supreme Leader Ayatollah Khamenei promised to separate Palestinian Islamic Jihad from the Hezbollah budget and expand its budget by 70 percent to cover suicide bomber recruiting.[96]

In addition, Iran has provided Palestinian Islamic Jihad with weaponry—Grad rocket components—smuggled into the Gaza Strip from Iran via the border with Egypt.[97] Palestinian Islamic Jihad fighters have also been among the hundreds of Palestinians that have trained with IRGC and Quds forces in Iran.[98]

## Conclusions

Iran has nurtured four separate but interconnected proxy organizations in the Levant—the Syrian government, Hezbollah, Hamas, and Palestinian Islamic Jihad. The first two have allowed or facilitated the positioning of Iranian headquarters, intelligence bases, training camps, and weapons depots in Syria and Lebanon. Iranian support to each has ranged from high-end weapons to trainers to economic assistance programs aimed at enhancing the stature of each organization among its own target population. The past two years have seen a significant expansion of Iranian support for all four groups and

PX643

concerted efforts to increase the dependency of these groups on Tehran. In at least one case—Hezbollah in Lebanon—a proxy has taken actions to its own apparent detriment to assist Tehran, and Iran responded by increasing its assistance. Each proxy has demanded and received its own direct relationship with Tehran—though there is still coordination among them—which places Iran at the center of a network that spans the Levant and is increasingly linked directly with the Iranian military and economy. Whatever Tehran's intentions might have been, this is the reality Iranian actions are creating on the ground and the situation that America and its allies will have to confront in the years to come.

*Danielle Pletka is vice president for foreign and defense policy studies at AEI.*

# Notes

1. "Iran, Syria Reaffirm Strategic Alliance," Mehr News Agency (Iran), July 20, 2007, available at www.mehrnews.com/en/NewsDetail.aspx?NewsID=521098 (accessed January 28, 2008).

2. Anthony Shadid and Robin Wright, "Inner Circle in Syria Holds Power, and Perhaps Peril," *Washington Post*, October 28, 2005.

3. Reuters, "Syria Denies Plotting Young Hariri Assassination," October 31, 2007, available at www.reuters.com/article/worldNews/idUSOWE13527020071031 (accessed January 29, 2008).

4. Adel Darwish, "Dictatorship without a Dictator," Mideastnews, March 9, 2005, available at www.mideastnews.com/syrria9mar2005.html (accessed January 29, 2008).

5. Ali Nouri Zadeh, "Ahmadinejad's Visit to Damascus Results in Agreement to Finance Weapons Deals for Syria and Support Its Position in Lebanon," *Asharq Al-Awsat* (London), July 21, 2007, available in Arabic at www.aawsat.com/details.asp?section=4&issue=10462&article=429019&search=%C7%D3%E1%CD%C9&state=true (accessed February 6, 2008). See also Y. Mansharof and O. Winter, "The Strategic Alliance between Iran and Syria—Military and Economic Aspects," Middle East

Media Research Institute (MEMRI), Inquiry and Analysis Series no. 380, available at www.memri.org/bin/articles.cgi?Page=countries&Area=iran&ID=IA38007 (accessed January 29, 2008).

6. "Syria Stresses Strategic Consultation with Iran," Fars News Agency (Iran), November 14, 2006, available at www.farsnews.com/English/newstext.php?nn=8508230566 (accessed January 28, 2008).

7. Robin Hughes, "Iran and Syria Advance SIGINT Co-operation," *Jane's Defence Weekly*, October 4, 2006, available at www.janes.com/defence/news/jdw/jdw061004_1_n.shtml (accessed January 29, 2008).

8. Robin Hughes, "Iran, Syria Sign a Further Defence Co-operation Agreement," *Jane's Defence Weekly*, June 27, 2006, available at www.janes.com/defence/news/jdw/jdw060627_1_n.shtml (accessed January 29, 2008).

9. Islamic Republic News Agency (IRNA) (Iran), March 12, 2007; and "Assad Discusses Cooperation between the Iranian and Syrian Militaries with Iran's Minister of Defense," *Asharq Al-Awsat*, March 12, 2007, available in Arabic at www.asharqalawsat.com/details.asp?section=4&issue=10331&article=410224 (accessed February 6, 2008).

10. "Iran to Acquire Advanced Air Defence System via Syria," *Jane's Defence Weekly*, May 18, 2007, available at www.janes.com/press/features/pr070518_1.shtml (accessed January 29, 2008).

11. Ibid.

12. Robin Hughes, "Iran Aids Syria's CW Programme," *Jane's Defence Weekly*, October 24, 2005, available at www.janes.com/defence/news/jdw/jdw051024_3_n.shtml (accessed January 29, 2008).

13. "Report: July Explosion in Syria Was Chemical Weapon Being Developed with Iranian Engineers," Associated Press, September 19, 2007.

14. Y. Mansharof and O. Winter, "The Strategic Alliance between Iran and Syria—Military and Economic Aspects."

15. Sheera Claire Frenkel, "Lieberman Calls for Emergency Gov't," *Jerusalem Post*, July 22, 2007, available at www.jpost.com/servlet/Satellite?pagename=JPost/JPArticle/ShowFull&cid=1184766024966 (accessed February 5, 2008).

16. "Syria and Iran Sign Military Cooperation Agreement to 'Confront Threats," *Asharq Al-Awsat*, June 16, 2006; and "Iran's Revolutionary Guards on Israel's Golan Border by Summer's End," DEBKAfile (Jerusalem), June 19, 2006.

PX643

17. "Syria's President: Alliance with Iran Won't Be Shaken," Associated Press, December 13, 2007.

18. "Iran, Syria Discuss Joint Investment," IRNA, January 25, 2007, available at www.irna.ir/en/news/view/line-22/0701253668143835.htm (accessed February 1, 2008).

19. Andrew Tabler, "Getting Down to Business," *International Herald Tribune*, September 14, 2007.

20. "Iran-Syria Economic Cooperation Commission Concluded Issuing Communique," IRNA, November 21, 2006, available at www2.irna.ir/en/news/view/menu-234/0611213812010209.htm (accessed February 1, 2008).

21. Mehr News Agency, March 15, 2007.

22. "Auto Industry Main Field for Strong Iran-Syria Ties," Mehr News Agency, September 11, 2007, available at www.mehrnews.com/en/NewsDetail.aspx?NewsID=550569 (accessed February 1, 2008).

23. "Syria's President: Alliance with Iran Won't Be Shaken," Associated Press.

24. "Iran's Samand Production Line Launched in Syria," Iranian Students News Agency (Tehran), March 10, 2007.

25. "Iran to Invest $10b in Syria by 2012," *Tehran Times*, September 15, 2007.

26. "Syria's President: Alliance with Iran Won't Be Shaken," Associated Press.

27. "Iran, Syria to Boost Cooperation in Water, Power Industries," Mehr News Agency, September 4, 2007, available at www.mehrnews.com/en/NewsDetail.aspx?NewsID=546368 (accessed February 1, 2008).

28. "Scientific and Cultural Cooperation between Syria and Iran," Syrian Arab News Agency (SANA), November 15, 2007, available in Arabic at http://sana.org/ara/9/2007/11/15/148873.htm (accessed February 6, 2008).

29. "Iran, Syria to Develop Academic Cooperation," IRNA, July 11, 2007, available at www2.irna.ir/en/news/view/menu-239/0707114831155118.htm (accessed February 2, 2008).

30. "Iran-backed Banias Power Plan 1st Phase Inaugurated in Syria," Mehr News Agency, June 19, 2007, available at www.mehrnews.com/en/NewsDetail.aspx?NewsID=504716 (accessed February 1, 2008).

31. "Iran Commissions Electricity Power Plant in Syria," IRNA, May 3, 2007, available at www2.irna.ir/en/news/view/menu-234/0705037715161426.htm (accessed February 2, 2008).

32. "Iran to Allot £230M for Power Plant in Syria," Mehr News Agency, April 8, 2007, available at www.mehrnews.com/en/NewsDetail.aspx?NewsID=467376 (accessed February 1, 2008).

33. "Iran, Syria Agree on Quadripartite Power Network in Western Iran," IRNA, November 29, 2006, available at www2.irna.ir/en/news/view/line-18/0611297077194141.htm (accessed February 2, 2008).

34. "Iran, Venezeula, Syria Sign MoU on Syrian Oil Refinery Project," IRNA, October 31, 2006, available at www2.irna.ir/en/news/view/line-18/0610319290195959.htm (accessed February 2, 2008).

35. "Iran, Syria Ink Gas Transfer Deal," Fars News Agency, October 4, 2007, available at http://english.farsnews.com/newstext.php?nn=8607120267 (accessed February 2, 2007).

36. "Joint Syrian-Iranian Project to Produce Iron [Mill] with Capacity of 800,000 Tons of Energy per Year," *Al-Thawra* (Damascus), September 29, 2006, available in Arabic at www.arabsteel.info/total/long_news_Total.asp?ID=588 (accessed February 6, 2008).

37. "Industrial, Mining Exports to Syria Exceed dlrs 1 bn," IRNA, May 29, 2006, available at www2.irna.ir/en/news/view/line-18/0605293530194814.htm (accessed February 2, 2008).

38. "Iran, Syria to Establish Joint Bank," IRNA, March 6, 2006.

39. "Iran: 1st VP Terms Outcome of Syria Visit 'Useful,'" IRNA, February 25, 2006.

40. The Israel Project, "Hezbollah, Hamas Rearm as Israel Works to Resume Peace Process," press release, February 22, 2007, available at www.theisraelproject.org/site/apps/nl/content2.asp?c=hsJPK0PIJpH&b=689705&ct=3601455 (accessed February 6, 2008).

41. Intelligence and Terrorism Information Center (ITIC), "Using the Quds Force of the Revolutionary Guards as the Main Tool to Export the Revolution beyond the Borders of Iran," April 2, 2007, available at www.terrorisminfo.org.il/malam_multimedia/English/eng_n/pdf/iran_e0307.pdf (accessed February 2, 2008).

42. *Al-Siyassa* (Kuwait), August 17, 2004.

43. MEMRI, "Iran and the Recent Escalation on Israel's Borders (4): Reaction in Iran, Lebanon, and Syria," Special Dispatch Series no. 1207, July 17, 2006, available at www.memri.org/bin/articles.cgi?Page=archives&Area=sd&ID=SP120706 (accessed February 2, 2008).

PX643

44. Ali Nouri Zadeh, "130 Officers from the Iranian Revolutionary Guard Corps and Quds Force Aid Hezbollah: 11,500 Missiles and Rocket-Propelled Grenades Sent from Tehran to Hezbollah," *Asharq Al-Awsat*, July 16, 2006, available in Arabic at www.aawsat.com/details.asp?section=4&issue=10092&article=373305&search=C802&state=true (accessed February 6, 2008).

45. "Iran Takes 'Direct Command' of Hizballah War against Israel July 20," DEBKAfile, July 21, 2006.

46. Robin Hughes, "Iran Answers Hizbullah Call for SAM Systems," *Jane's Defence Weekly*, August 7, 2006, available at www.janes.com/defence/news/jdw/jdw060807_1_n.shtml (accessed February 2, 2008).

47. George Conger, "London Probes How UK-Made Goggles Got to Hizbullah," *Jerusalem Post*, August 22, 2006, available at www.jpost.com/servlet/Satellite?cid=1154525919212&pagename=JPost/JPArticle/ShowFull (accessed February 2, 2008).

48. Larry Niksch and Raphael Perl, *North Korea: Terrorism List Removal*, Congressional Research Service, updated January 14, 2008, available at www.fas.org/sgp/crs/row/RL30613.pdf (accessed (February 6, 2008).

49. Ali Nouri Zadeh, "Iranian Officer: Hezbollah Has Commando Naval Unit," *Asharq Al-Awsat*, July 29, 2006, available in Arabic at www.asharqalawsat.com/print/default.asp?did=375420 (accessed February 2, 2008).

50. Ibid.

51. Robin Hughes, "Iran Answers Hizbullah Call for SAM Systems."

52. Ali Nouri Zadeh, "130 Officers from the Iranian Revolutionary Guard Corps and Quds Force Aid Hezbollah: 11,500 Missiles and Rocket-Propelled Grenades Sent from Tehran to Hezbollah."

53. GlobalSecurity.org, "Operation Change of Direction," available at www.globalsecurity.org/military/world/war/lebanon-change-of-direction.htm (accessed February 2, 2008).

54. ITIC, "Using the Quds Force of the Revolutionary Guards as the Main Tool to Export the Revolution beyond the Borders of Iran."

55. Ali Nouri Zadeh, "130 Officers from the Iranian Revolutionary Guard Corps and Quds Force Aid Hezbollah: 11,500 Missiles and Rocket-Propelled Grenades Sent from Tehran to Hezbollah."

56. "Iranian Officer: Hezbollah Has Commando Naval Unit," *Asharq Al-Awsat*.

57. MEMRI, "Iran Increases Funding and Training for Suicide Bombings Islamic Jihad Leader: The Intifada Foiled the American Plots against Iraq. A Hizbullah Leader on the Iranian-Syrian-Lebanese-Palestinian Axis," Special Dispatch Series no. 387, June 11, 2002, available at http://memri.org/bin/articles.cgi?Page=archives&Area=sd&ID=SP38702 (accessed February 6, 2008).

58. International Atomic Energy Agency (IAEA), *Implementation of NPT Safeguards Agreement in the Islamic Republic of Iran*, report by the director general, April 28, 2006, available at www.iaea.org/Publications/Documents/Board/2006/gov2006-27.pdf (accessed January 29, 2008).

59. IAEA, *Implementation of NPT Safeguards Agreement in the Islamic Republic of Iran*, report by the director general, June 8, 2006, available at www.iaea.org/Publications/Documents/Board/2006/gov2006-38.pdf (accessed January 29, 2008).

60. CNN Saturday Morning News, August 12, 2006, available at http://transcripts.cnn.com/TRANSCRIPTS/0608/12/smn.05.html (accessed February 5, 2008).

61. Kenneth Katzman, *Iran: U.S. Concerns and Policy Responses*, Congressional Research Service, updated December 5, 2007, available at http://fas.org/sgp/crs/mideast/RL32048.pdf (accessed February 6, 2008); and Brian Murphy, "Iran Seeks to Become Major Mideast Player," Associated Press, July 20, 2006.

62. Yaakov Amidror, "Lebanon II—the Fallout," *Jerusalem Post*, January 17, 2007, available at www.jpost.com/servlet/Satellite?cid=1167467749510&pagename=JPost/JPArticle/ShowFull (accessed February 2, 2008).

63. Roddy Boyd, "Arab Bank Terror Financing Case to Go Forward," *New York Post*, January 31, 2007.

64. Katherine Shrader, "U.S.: Hezbollah Recovers, and Iran Helps," *Associated Press*, December 18, 2006.

65. "How Hezbollah Is Financed," Intelligence Online (Paris), October 6, 2006. For more on Iran using this system elsewhere, see Jay Solomon and Evan Perez, "U.S. Uses Probe to Pressure Iran," *Wall Street Journal*, January 15, 2008.

66. "Nasrallah Regrets War in Hindsight," *Daily Star* (Lebanon), August 28, 2006, available at www.dailystar.com.lb/article.asp?edition_id=1&categ_id=2&article_id=75069 (accessed February 2, 2008).

67. Kenneth Katzman, *Iran: U.S. Concerns and Policy Responses*.

PX643

68. Michael Slackman, "Iran's Strong Ties with Syria Complicate U.S. Overtures," *New York Times*, December 28, 2006.

69. "Iran Starts Road Reconstruction Project in Lebanon," IRNA, July 29, 2007, available at www2.irna.com/en/news/view/line-16/0707298373193402.htm (accessed February 2, 2008).

70. *Al-Siyassa* (Kuwait), December 14, 2006.

71. Eitan Azani, "Hezbollah's Global Reach" (testimony, House Committee on International Relations Subcommittee on International Terrorism and Nonproliferation, September 28, 2006), available at www.ictconference.org/var/119/15436-Hezbollah's%20Global%20Reach.pdf (accessed February 2, 2008).

72. ITIC, "In an Interview Granted to an Iranian TV Channel, Sheikh Naim Qassem, Hassan Nasrallah's Deputy, Stresses That Hezbollah's Policy of Terrorist Operations against Israel (Including Suicide Bombings and Rocket Fire) Requires Jurisprudent Permission of the Iranian Leadership," April 29, 2007, available at www.terrorism-info.org.il/malam_multimedia/English/eng_n/pdf/hezbollah_e0407.pdf (accessed February 2, 2008).

73. Ibid.

74. "Report: Nasrallah Demoted by Khamenei," *Jerusalem Post*, December 13, 2007, available at www.jpost.com/servlet/Satellite?pagename=JPost%2FJPArticle%2FShowFull&cid=1196847333700 (accessed February 2, 2008).

75. Kenneth Katzman, *Iran: U.S. Concerns and Policy Responses*.

76. ITIC, "Profile of the Palestinian Islamic Jihad, Perpetrator of a Suicide Bombing Attack in Tel Aviv, February 25, 2005," special information bulletin, February 28, 2008, available at www.intelligence.org.il/eng/sib/3_05/pji.htm (accessed February 2, 2008).

77. "Israel's Diskin: Hizballah, Iran Have Increased Their Hold on the Gaza Strip," Voice of Israel Network B (Jerusalem), February 5, 2007.

78. "Hamas Says Aid from Iran Is Forthcoming," *Jerusalem Post*, October 12, 2006, available at www.jpost.com/servlet/Satellite?cid=1159193428310&pagename=JPost%2FJPArticle%2FShowFull (accessed February 6, 2008); "Iran Vehicle Consignment Aims to Seize Control of Gaza Infrastructure," DEBKAfile, May 22, 2006; and "Iran Donates 300 New Cars to Palestinian Government,

Promises More Aid," *Al-Hayat Al-Jadidah* (Ramallah), May 19, 2006.

79. ITIC, "Iranian Aid to Palestinian Terror," available at http://terrorism-info.org.il/malam_multimedia/html/final/eng/bu/iran/chapt_c.htm (accessed February 2, 2008).

80. Paul Morro, *The Palestinian Territories: Background and U.S. Relations*, Congressional Research Service, July 5, 2007, available at http://assets.opencrs.com/rpts/RL34074_20070705.pdf (accessed February 2, 2008).

81. Ali Waked, "Iranian General Supervised Hamas Arms, Source Says," Ynetnews.com, February 2, 2007, available at www.ynetnews.com/articles/0,7340,L-3360122,00.html (accessed February 2, 2008).

82. Hassan Salameh, a Hamas member who is in prison for life for murdering fifty-six Israelis, stated that he arrived in Iran in 1993, where he underwent training in weapons, bombs, espionage, and ambushes. (ITIC, "Iranian Aid to Palestinian Terror.")

83. Julie Stahl, "Iran Offers to Share Experience and Achievements with Hamas," CNSNews.com, October 13, 2006, available at www.cnsnews.com/ViewForeignBureaus.asp?Page=/ForeignBureaus/archive/200610/INT20061013c.html (accessed February 2, 2008).

84. "Israel: 'Serious Concern' at 'Massive' Iranian Aid, Military Training for HAMAS," *Ma'ariv* (Tel Aviv), January 18, 2006.

85. "Al-Qassam Brigades Mem Reportedly Undergo 'Intensive Military Training' in Iran," Open Source Center summary, June 19, 2007.

86. "Iran Vehicle Consignment Aims to Seize Control of Gaza Infrastructure," DEBKAfile.

87. "Hamas to Become Iran's Military Arm after 12 Oct Pact Signed in Tehran," DEBKAfile, October 14, 2006.

88. Khaled Abu Toameh, "Dahlan: Iran, Qatar Backed Hamas Coup," *Jerusalem Post*, June 28, 2007, available at www.jpost.com/servlet/Satellite?cid=1182951029596&pagename=JPost/JPArticle/ShowFull (accessed February 2, 2008).

89. ITIC, "Anti-Israeli Terrorism, 2006: Data, Analysis and Trends," March 2007, available at www.terrorism-info.org.il/malam_multimedia/English/eng_n/pdf/terrorism_2006e.pdf (accessed February 6, 2008).

90. Paul Morro, *The Palestinian Territories: Background and U.S. Relations.*

PX643

91. "Israel: 'Serious Concern' at 'Massive' Iranian Aid, Military Training for HAMAS," *Ma'ariv*.

92. MEMRI, "Sunni Islamists Websites in Iraq Claim Iranian Top-Secret Document Reveals Iran/Al-Qaeda Contacts Months before 9/11," Special Dispatch Series no. 1347, November 7, 2006, available at http://memri.org/bin/articles.cgi?Page=archives&Area=sd&ID=SP134706 (accessed February 2, 2008).

93. IRNA, May 22, 2002.

94. *Asharq Al-Awsat*, February 18, 2003.

95. The Israel Project, "Hezbollah, Hamas Rearm as Israel Works to Resume Peace Process"; and Paul Morro, *The Palestinian Territories: Background and U.S. Relations*.

96. Ali Nouri Zadeh, "Iran Increases Budget for Islamic Jihad and Allocates Aid for Veteran Militants," *Asharq Al-Awsat*, June 8, 2002, available in Arabic at www.aawsat.com/details.asp?section=4&issue=8593&article=107359&search=%C7%E1%CC%E5%C7%CF%20%C7%E1%C5%D3%E1%C7%E3%ED&state=true (accessed February 6, 2008).

97. "Israel: Parts for Grad Rockets Smuggled into Gaza Strip from Iran via Egypt," *Hatzofe* (Tel Aviv), May 18, 2006.

98. Yaakov Katz and Herb Keinon, "Top Officer Urges Major Assault against Hamas in Gaza before It's Too Late," *Jerusalem Post*, July 20, 2007; and "Iran Increases Budget for Islamic Jihad and Allocates Aid for Veteran Militants,"*Asharq Al-Awsat*, June 8, 2002.

PX643

# 2

# Iraq

Iran and its Lebanese proxy Hezbollah have been actively involved in supporting Shia militias and encouraging sectarian violence in Iraq since the 2003 invasion—and Iranian planning and preparation for that effort began as early as 2002. The precise purpose of this support is unclear and may have changed over time. But one thing is very clear: Iran has consistently supplied weapons, its own advisers, and Lebanese Hezbollah advisers to multiple resistance groups in Iraq—both Sunni and Shia—and has supported these groups as they have targeted Sunni Arabs, Coalition forces, Iraqi security forces, and the Iraqi government itself. Their influence runs from Kurdistan to Basra, and Coalition sources report that by August 2007, Iranian-backed violence accounted for roughly half the attacks on Coalition forces—a dramatic change from previous periods in which the overwhelming majority of attacks came from the Sunni Arab insurgency and al Qaeda.[1]

## Background

The Iranian Revolutionary Guard Corps (IRGC) Quds Force has been organizing, training, funding, and equipping Iraqis to fight against Coalition and Iraqi security forces.[2] Lebanon's Hezbollah has assisted the Quds Force in training and organizing Shia resistance groups since 2003 and also served as the Quds Force's proxy in its advisory effort. The Iranian government provided substantial financial and technical support to militias in the second half of 2006 and increased its support in 2007.

The U.S. military has catalogued large quantities of enemy weapons in Iraq with imprints showing they were recently manufactured in Iran. In particular, highly lethal explosively formed penetrators (EFP), which are made from special copper disks

manufactured with highly calibrated machine tools, have been used by Hezbollah in Lebanon with Iranian military assistance. Many of the EFPs found in Iraq have markings that indicate that they were manufactured in Iran as recently as 2007.[3] EFPs have accounted for an increasing number of U.S. casualties since October 2006.

The Iranian government has also exported rockets, sniper rifles, and mortars to enemy groups in Iraq and has provided them with trainers and advisers who answer to Quds Force commanders. Tehran's efforts have made certain Shia militia groups more effective and lethal than they had previously been. The evidence for Iran's extensive involvement in training "secret cells" of Shia militias has only surfaced publicly in recent months, even though senior U.S. officials have stated publicly since November 2006 that the Iranian government has fueled violence in Iraq by providing funds and weapons, and media reports have suggested it since 2004.[4]

The Quds Force and Hezbollah have worked together since 2003 to support Shia extremists in Iraq and to develop these groups into an organization modeled after Hezbollah. Shia groups were responsible for about half of the violence in Iraq in July 2007.[5] U.S. military officials estimate that the Quds Force provides between $750,000 and $3 million worth of equipment and funding to these groups every month. In spring 2007, U.S. and Iraqi forces launched special operations within Iraq to capture the leaders of the Iranian-funded movement. The campaign aimed to reduce the ability of Shia extremists to destabilize the government and security of Iraq. These special operations supplemented the counteroffensive against al Qaeda extremists in central Iraq. U.S. and Iraqi forces have captured numerous suspects with links to Iran and evidence documenting how the Iranian government supported violence in Iraq. U.S.

PX643

forces have publicly released some of this material, which forms part of the basis for this chapter.

**The Origins of Iranian-Backed Special Groups in Iraq.** Iran began preparing to confront American forces in Iraq even before the invasion of 2003. According to an August 2005 article by Michael Ware based on classified intelligence documents, Supreme Leader Ayatollah Ali Khamenei convened a council of war in Tehran in 2002 that concluded: "It is necessary to adopt an active policy in order to prevent long-term and short-term dangers to Iran." As a result, Iranian intelligence services organized the various Iraqi resistance groups they had been sheltering under Brigadier General Qassim Sullaimani, the current head of the Quds Force.[6]

Immediately after the U.S. invasion, thousands of members of these resistance groups, primarily from the Badr Corps, moved into Iraq and attempted to seize control of various key locations in the Shiite areas. Ware cited an IRGC intelligence report of April 10, 2003, that "logs U.S. troops backed by armor moving through the city of Kut. But, it asserts, 'we are in control of the city.' Another, with the same date . . . claims 'forces attached to us' had control of the city of Amarah."[7] Other reports confirm this view:

> In a sermon on May 2 [2003], Ayatollah Ahmad Jannati, secretary general of Iran's powerful Council of Guardians, called on Iraqis to stage suicide attacks to drive U.S.-led forces from [Iraq]. . . . Two months later . . . coalition forces uncovered a document describing a fatwa, or religious edict, that had reportedly been issued in Iran for its Shiite supporters in Iraq. The fatwa urged "holy fighters" in Iraq to get close to the enemy—the U.S.-led troops. These fighters, the fatwa said, should "maintain good relations with the coalition forces" but at the same time create "a secret group that would conduct attacks against American troops."[8]

The Badr Corps and Iranian agents were not the only ones involved in training and arming an anti-American Iraqi resistance under Iranian auspices.

Hezbollah also sent agents into Iraq in 2003.[9] By August 2005, Abu Mustafa al-Sheibani had developed an extensive "network of insurgents created by the Iranian Revolutionary Guard Corps with the express purpose of committing violence against U.S. and coalition forces in Iraq."[10] Sheibani's group introduced into Iraq "'shaped' explosive charges"—used to target U.S. military armored vehicles—based on a model used by Hezbollah against the Israelis, and its fighters trained in Lebanon as well as Sadr City and "another country," according to U.S. intelligence sources.[11] An American military official in Baghdad explained that "the U.S. believes that Iran has brokered a partnership between Iraqi Shiite militants and Hizbollah and facilitated the import of sophisticated weapons that are killing and wounding U.S. and British troops."[12] An American Special Operations Task Force report claimed "the Lebanese Hezbollah leadership believes that the struggle in Iraq is the new battleground in the fight against the U.S."[13] Sheibani's group was estimated to include 280 fighters organized into seventeen bomb-making teams and death squads.[14]

Tehran had a natural Shiite proxy in the Badr Corps and the Supreme Council for the Islamic Revolution in Iraq—now the Supreme Islamic Iraqi Council (SIIC)—but it hedged its bets from the beginning by backing Moqtada al-Sadr as well. Sadr visited Tehran in June 2003 and was apparently receiving funds from Grand Ayatollah Kazem al-Haeri until October of that year when Haeri started to cut his ties to Sadr.[15] Sadr and three advisers traveled by road from Najaf to Ilam, "where Iranian authorities had a 10-seat private plane waiting for them."[16] In Tehran, the group met with Supreme Leader Ayatollah Ali Khamenei, former president Ali Akbar Hashemi Rafsanjani, and Ayatollah Mahmoud Hashemi Shahroudi. The invitation to Sadr apparently angered Iraqi clerical leaders in Najaf.

> "The *marjas* [the holy city's highest leaders] found it offensive that Moqtada would be officially invited to Iran," says Sheik Ali al-Rubai, spokesman for one of the holy city's four top clerics, Grand Ayatollah Ishaq Fayadh. "When

PX643

Khamenei's representative came to Najaf [in August 2003], the *marjas* spoke to him in a rough way and demanded to know why they invited Moqtada." The lavish reception was a particular slap to Ayatollah Mohammad Baqir al Hakim, a major beneficiary of Iranian support for two decades. Hakim threatened to cut ties with Tehran in protest.[17]

Hezbollah also established a long-term relationship with Sadr, which they apparently began trying to do in July 2003 and succeeded by August. At the end of that month, according to a U.S. intelligence report, "Hezbollah had established 'a team of 30 to 40 operatives' in Najaf in support of Moqtada Sadr's Shi'a paramilitary group." The report added that "Hezbollah was recruiting and training members of Sadr's militia. A later report . . . said that Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."[18] Unconfirmed reports suggested that Hezbollah's secretary general Hassan Nasrallah had sent a senior adviser to deliver funds to Sadr in Najaf.[19] In October 2005, a British government official "alleged that Iran had supplied explosive devices to Sadr's Mahdi Army."[20] Prime Minister Tony Blair subsequently supported that assertion and "attributed the shipments to 'Iranian elements' or Iran's ally, Lebanese Hezbollah, acting on Iran's behalf."[21]

The covert nature of Iranian support for its proxies was clear and disturbing from the outset. Iranian intelligence services penetrated Iraq rapidly and thoroughly, and the thrust of their collection efforts was "finding out what weapons U.S. troops were carrying and what kind of body armor they were wearing. Iranian agents also sought information on the location of U.S. Army and intelligence bases; on the routes traveled by U.S. convoys; on the operations of the Special Forces' elite Delta Force; and on the plans of the U.S. military and intelligence inside Iraq."[22] The Iranians preferred not to be directly implicated in attacks on U.S. forces but instead offered bounties to Iraqis for killing Americans, shooting down U.S. helicopters, and destroying American tanks.[23] Iran's proxies in Iraq also undertook a campaign of targeted assassinations. Reports suggest that in fall 2003, "a senior Iranian cleric in Tehran set up a special 100-member army, known as al Saqar, which means eagle in Arabic, to assassinate [Coalition Provisional Authority director L. Paul] Bremer and carry out other terrorist attacks." This "eagle army" apparently "had trained for 30 days at an Iranian terrorist camp."[24]

In August 2005, Michael Ware reported:

> More sinister are signs of death squads charged with eliminating potential opponents and former Baathists. U.S. intelligence sources confirm that early targets included former members of the Iran section of Saddam's intelligence services. In southern cities, Thar-Allah (Vengeance of God) is one of a number of militant groups suspected of assassinations. . . . The chief of the Iraqi National Intelligence Service, General Mohammed Abdullah al-Shahwani, has publicly accused Iranian-backed cells of hunting down and killing his officers.[25]

One former Iraqi army officer reported "that he was recruited by an Iranian intelligence agent in 2004 to compile the names and addresses of Ministry of Interior officials in close contact with American military officers and liaisons." The Iranians wanted to know "'who the Americans trusted and where they were, and pestered [the former officer] to find out if [he], using his membership in the Iraqi National Accord political party, could get someone inside the office of then Prime Minister Iyad Allawi without being searched." The Iranian agent "also demanded information on U.S. troop concentrations in a particular area of Baghdad and details of U.S. weaponry, armor, routes and reaction times."[26]

**Hezbollah Trains Iraqis in Iran.** The number and quality of special groups increased in 2005 as the Iranian government allowed Hezbollah to train Iraqi militias in Iran. The three small camps used for training Iraqi militias were, as of summer 2007, located near Tehran. Twenty to sixty Iraqis can be trained at once in these facilities, and the training courses last from four to six weeks.[27]

PX643

The recruits were generally members of militias, including, but not exclusively, Jaysh al Mahdi.[28] They crossed the border at Zurbatiya-Mehran, usually unarmed and in pairs, sometimes in buses.[29] Recent arrests by Iraqi army soldiers reveal one recruiting technique used by special groups in Najaf, the Shia holy city where the Office of the Martyr Sadr and other political and religious organizations are well established. The director of a charity, the Amin Allah Cultural and Humanitarian Establishment, funneled funds designated for humanitarian use through the charity for the purpose of recruiting foreign fighters, training rogue Jaysh al Mahdi operatives in lethal attack tactics, and trafficking illegal weapons from Iran.[30] Two employees at the charity took advantage of their positions to offer $500 to those who would emplace improvised explosive devices (IED). These same recruiters also facilitated the training of Iraqis in Iran and received money and weapons from Iran.[31]

The Quds Force and Hezbollah trained Iraqis in groups of twenty to sixty so that they functioned as a unit—a secret cell or special group. The Iraqis returned to Iraq after their training, maintaining their group's organization and knowing how "to use EFPs, mortars, rockets, as well as intelligence, sniper and kidnapping operations."[32] These special groups could be combined into larger organizations. The director of the Amin Allah charity coordinated "more than 200 rogue [Jaysh al Mahdi] members" and "ordered them to conduct assassinations on local citizens and government officials who oppose the group's illegal activities."[33]

Hezbollah oversaw the special groups training effort by sending one of its members, Yussef Hashim, to serve as the organization's head of special operations in Iraq.[34] The trainer leading this effort in 2005 was a Lebanese Hezbollah operative named Ali Mussa Daqduq, who had an impressive military career in that organization. He joined Hezbollah in 1983 and commanded a Hezbollah special operations unit. He coordinated both the personal security of Nasrallah and operations in large sectors of Lebanon before he came to Iran.[35]

**Reorganization of Special Groups with Hezbollah as Proxy.** Though the Hezbollah training of special groups in Iran began in 2005, the Iranian government decided to adjust the way these groups were organized. A joint Quds Force–Hezbollah effort to organize these trained opposition groups into a Hezbollah-style structure began in May 2006. The Iranian Quds Force leadership sponsored the reorganization effort by holding a meeting with Hezbollah leaders Hashim and Daqduq, who traveled to Tehran for that purpose. In Tehran, they met with Hajji Yusif, the deputy commander of the Quds Force who heads its Department of External Special Operations. They also met with the commander.[36]

The Quds Force instructed Daqduq "to make trips in and out of Iraq and report on the training and operations of the Iraqi special groups. In the year prior to his capture, Ali Mussa Daqduq made four such trips to Iraq. He monitored and reported on the training and arming of special groups in mortars and rockets, on the manufacturing and employment of improvised explosive devices, and on kidnapping operations. Most significantly, he was tasked to organize the special groups in ways that mirrored how Hezbollah was organized in Lebanon."[37]

The Quds Force sponsored, or at least accepted, another significant personnel change at the same time. In June 2006, just a month after the Tehran meeting, Qais Khazali became the head of special groups in Iraq (Daqduq remained chief adviser).[38] Khazali is an Iraqi who once supported the Sadrist movement. According to a Sadrist spokesman, Sadr expelled Khazali from his organization in 2004 because the latter gave "unauthorized orders" during the battle for Najaf.[39] Khazali thus had a reputation for working with but undercutting Sadr. It is not clear from the open sources what relationship existed between Khazali and Sadr during Khazali's tenure as head of special groups. Khazali's relationship to Iran, however, is clear: he reported to Yusif just as Daqduq did.[40]

Some members of Iraqi special groups observed or participated in the Hezbollah-Israel war in July 2006. They traveled from Iraq to Syria to Lebanon and worked alongside Hezbollah in groups of twenty to forty fighters.[41]

PX643

**Possible Aims of the Quds Force.** Initially, the Quds Force's goal might have been pinning U.S. forces in Iraq rather than ejecting them. According to Ware, "Intelligence sources claim that Brigadier General Sullaimani ordained in a meeting of his militia proxies in the spring of last year [2004] that 'any move that would wear out the U.S. forces in Iraq should be done. Every possible means should be used to keep the U.S. forces engaged in Iraq.'"[42]

In 2005 and 2006, the Quds Force's "goal was to develop the Iraqi special groups into a network similar to the Lebanese Hezbollah. Special groups would be unable to conduct their terrorist attacks in Iraq without Iranian-supplied weapons and other support," according to a U.S. military spokesman.[43] The purpose of the Quds force effort, then, was to create a highly lethal network that relied upon the Iranian government to survive. Presumably, this reorganization would increase Tehran's ability to control and influence operations in Iraq.

Iran and Hezbollah made these changes as the current government of Iraq was being established. Parliamentary factions selected Nuri al-Maliki as prime minister on April 21, 2006.[44] His cabinet took power on May 20, 2006. The Quds Force reorganization of the special groups into a Hezbollah-like structure seems likely to have been either a deliberate Iranian response to the creation of an Iraqi government or, more specifically, to Maliki's premiership. The Quds Force certainly took these steps as Maliki's government was forming.

The Quds Force might have intended to reorganize the Iraqi secret cells into a Hezbollah-style organization because that military advising effort has succeeded well, but it might also have intended to achieve goals in Iraq similar to those Hezbollah has pursued in Lebanon. The primary goal of Hezbollah before 2005 was to expel Israeli forces from territory in southern Lebanon. By extension, it seems possible that Hezbollah and the Quds Force viewed the special groups as an organization well-suited to drive Coalition forces from Iraq. That would represent a change from the 2007 Quds Force strategy articulated by Sullaimani, if Ware reported it correctly.

The Quds Force and Hezbollah might have reorganized their efforts in 2006 to achieve broader political aims in Iraq and for the effect it would have on American policy. Hezbollah in Lebanon exists despite the presence of an elected government there. Hezbollah uses existing government structures and personnel to accomplish some of its goals, so the reorganization of Iraqi special groups into a Hezbollah-like model implies that the Quds Force might have intended the special groups to operate under the umbrella of Iraqi government institutions in order to compete with (or, indeed, effectively replace) Iraq's elected government, as Hezbollah does in parts of Lebanon.

Ryan Crocker, the U.S. ambassador to Iraq, suggested that the Quds Force might have the goal of assuring that southern Iraq remains beyond the control of the central government of Iraq and Iraqi security forces. In this scenario, the Quds Force might desire an end-state in which those who receive their funding, weapons, and military training provide security and services in southern Iraq and hold political offices there. Crocker stated:

> The fact that we have arrested the Lebanese Hizbollah trainer and have had many long conversations with the head of the secret cells, so called of the Jaish al Mahdi, who has gone on at length about Iranian connections, has to leave you with the issue out there, is Iran intending a Lebanonization or a Hezbollahzation of parts of the south. So in addition to . . . criminally driven violence, you cannot rule out the possibility of an overlay of not just politically directed violence but politically directed violence with outside support.[45]

**The Quds Force Advisers in Iraq.** Most members of special groups are Iraqis, like Khazali, but there are Iranian operatives in Iraq assisting the special groups. Iranians tied to the Quds Force operated in Iraq at the end of 2006 and the beginning of 2007. U.S. Special Forces detained Mohsin Chizari, the third-ranking official in the Quds Force, at the Baghdad compound of Abd al-Aziz al-Hakim on December 29, 2006. He and his captured colleague

PX643

had detailed weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information. Officials were particularly concerned by the fact that the Iranians had information about importing modern, specially shaped explosive charges into Iraq, weapons that have been used in roadside bombs to target U.S. military armored vehicles.[46]

These two men claimed they had diplomatic passports, but U.S. officials argued that they did not have diplomatic immunity, as they were using aliases. The Iraqi government disagreed with the U.S. officials and decided to expel them.[47] On January 11, 2007, Coalition forces detained five Iranians, without proper diplomatic credentials, with links to the Quds Force in Irbil, in the Kurdish region in northeastern Iraq.[48] These five Iranians have remained in detention since then. The Quds Force had ties with Ansar al Islam terrorists in the Kurdish region before and after the fall of Saddam Hussein.

There are a significant number of Iranian advisers in Iraq. Iraqis functioned as liaisons for Iranian intelligence officers in the cities of Amarah and Majjar al-Kabir, known havens for weapons smugglers.[49] Major General Rick Lynch, commander of the Multinational Forces Center, estimated in August 2007 that the center had about fifty high-value targets related to the special groups. Roughly thirty of them are "IRGC surrogates, people that have been trained by the IRGC in Iran who've come back in Iraq to conduct acts of violence." In addition, he said, "I believe I got some members of the IRGC, some Iranians, who are working in our battlespace." He believes that there were about twenty Iranian IRGC advisers "either training Iraqis to conduct acts of violence or conducting those acts of violence themselves. . . . And what they do is they transit the battlespace. They don't come in and they stay, but they're going back and forth."[50] These Quds Force operatives seem to fill an important advisory niche, perhaps in the wake of the capture of Daqduq.

## Iranian Support for al Qaeda

From the beginning, Iran did not confine its support of anti-American fighters to Shia groups. It also supported Ansar al-Islam, a radical Sunni terrorist group with close ties to al Qaeda. U.S. and British intelligence reports in 2004

concluded that Ansar al-Islam was working closely with Iran, and also al Qaeda, in its terrorist attacks against coalition forces. . . . [O]ne British defense report noted pointedly: "Some elements [of Ansar al-Islam] remain in Iran. Intelligence indicates that elements" of Iran's Islamic Revolutionary Guard Corps "are providing safe haven and basic training to Iran-based [Ansar al-Islam] cadres."[51]

A report by the Iraq Survey Group noted that a source had reported "approximately 320 Ansar al-Islam terrorists being trained in Iran . . . for various attack scenarios including suicide bombings, assassinations, and general subversion against U.S. forces in Iraq."[52] Another British intelligence source "said that Iranian government agencies were also secretly helping Ansar al-Islam members cross into Iraq from Iran, as part of a plan to mount sniper attacks against coalition forces."[53] American sources confirmed this information, adding that "an Iranian was aiding Ansar al-Islam 'on how to build and set up' . . . IEDs. An analyst for the U.S. Central Command offered this assessment: '[Ansar al-Islam] is actively attempting to improve IED effectiveness and sophistication.'"[54]

Iranian arms also reached Sunni insurgents west of Baghdad. For example, U.S. and Iraqi forces found a cache containing 250 eighty-one-millimeter mortar rounds north of Abu Ghraib (west of Baghdad) on February 3.[55] Iran exports eighty-one-millimeter mortars, whereas other states in the region use and export eighty-two-millimeter tubes and shells.[56] Sunni insurgents held the area west of Baghdad, so it is reasonable to suppose that Sunni insurgents had acquired Iranian arms no later than early February.

More recently, Iranian arms dealers have supplied new weapons to al Qaeda in Iraq. A supply of arms

PX643

flowed from Iran into al Qaeda strongholds in Salman Pak and Arab Jabour, presumably from the Iranian border to the south and east. From there, al Qaeda transported the munitions to Baghdad.[57]

Iranian arms became an important part of al Qaeda's arsenal. In May 2007, both Lynch and Colonel Ricky Gibbs, commander of the 4th Brigade Combat Team, 1st Infantry Division, briefed on the use of EFPs by Sunni extremists south of Baghdad.[58] Moreover, al Qaeda promoted an expert—whom U.S. forces killed on May 25, 2007[59]—who knew how to obtain and use EFPs, showing the value that the group places on that technology.

In June and July 2007, U.S. forces conducted targeted raids on insurgent safe houses in Arab Jabour during Operation Marne Torch, discovering caches of new weapons with Iranian markings. The weapons had been imported recently rather than buried or stockpiled.[60] Weapons were being stored in Arab Jabour, indicating that it was a way station of sorts.

From Arab Jabour, al Qaeda smuggled these new Iranian weapons, along with the fighters that would use them, into Baghdad.[61] The Tigris River was their primary supply route.[62] Lynch explained, "as we engage with the local population, they tell us that the only people on the Tigris River are extremists, insurgents. So what we've chosen to do is to take out all boats."[63] Colonel Wayne Grigsby Jr., commander of 3rd Brigade, 3rd Infantry Division, reported that his forces had targeted and destroyed twenty-one boats during the first ten days of Operation Marne Torch.[64] Bombing the boats often generated secondary explosions, indicating that the river craft were transporting munitions.[65]

Evidence suggests that fighters and weapons moved from Arab Jabour into the capital's Rashid district, in particular.[66] Arab Jabour is an easy commute to al Qaeda–held areas of Rashid, such as Doura, suggesting a connection between them. Gibbs reported in late May that some enemy fighters in Rashid came into the district from outside of Baghdad and, indeed, from other areas of Iraq. More importantly, Gibbs estimated that 15 or 20 percent of the IEDs his troops encountered were EFPs. He stated that the EFPs were being used in terrain controlled by al Qaeda, not by

Shiite militias.[67] It is logical to conclude that the EFPs were flowing into Doura from Arab Jabour and other points south along the Tigris.

In early October 2007, U.S. forces conducted an operation in Kirkuk province, targeting a suspected al Qaeda emir of foreign terrorists involved in EFP attacks on Coalition Forces.[68] A few weeks prior to this operation, a Quds Force officer involved in EFP trafficking was detained in Sulaymaniyah, a city in northern Iraq without a large Shia presence.[69] These incidents suggest that Iranian support is not limited to special groups but rather reaches Sunni insurgents across Iraq. Whatever Tehran's intent might be, it is clear that Sunni insurgents, including al Qaeda terrorists, have received Iranian aid in the form of sanctuary within Iran and advanced Iranian-supplied weapons. It is reported that some of them also received training in Iran.

## Undermining the Iraqi Government: Special Group Activities in 2006

The special groups' operations contributed directly to turmoil in Iraq's central and provincial governments in 2006 and 2007. The special groups are not solely responsible for the political turmoil in Iraq, but they have actively undermined the Maliki government from its inception.

The special groups contributed vigorously to the sectarian violence plaguing Iraq in 2006. Leaders of secret cells organized and facilitated death squad activities by militia groups and government employees. They organized kidnappings of Iraqi government officials and workers from their ministries. They diverted Iraqi government funds to support their operations. Many used their official positions within the government of Iraq to fund, organize, staff, and execute these secret cell operations.

The special groups also directly caused some of the personnel turmoil within the Maliki government that prevented it from functioning in the second half of 2006. Some of the targeted kidnappings of Iraqi officials in spring and summer 2006 are directly linked to secret cell leaders whom U.S. forces captured and

PX643

interrogated in 2007. These kidnappings removed mid-level functionaries—often but not exclusively Sunni—from the central government of Iraq and from the provincial governments.

**Hakim al Zamili, Special Groups, Deputy Minister of Health.** In June 2006, Diyala's provincial director of health was the Sunni nominee for one of the deputy minister positions in the Maliki government.[70] He traveled to Baghdad that month for a meeting at the Ministry of Health with the minister and was kidnapped while inside the building. His kidnapping was organized by Hakim al Zamili, the deputy minister of health, whom U.S. and Iraqi forces apprehended on February 9, 2007.[71] The allegations against the ministry had provoked previous operations by U.S. and Iraqi forces. For example, they had attempted to locate kidnap victims in the Ministry of Health in August 2006, but they failed to find their targets.[72]

In November 2006, officials in the Ministry of Health were targets of kidnappings and assassinations. Men in police uniforms abducted Ammar al-Safir, another deputy minister of health, on November 19, 2006.[73] Two days later, roadside bombs in eastern Baghdad wounded two guards in the convoy for Minister of State Mohammed Abbas Auraibi. And on that same day, gunmen fired on Zamili's convoy in Baghdad, killing two of his security guards.[74] All three men were Shia officials in the Iraqi government. The U.S. military has not indicated whether Zamili and his secret cell were complicit in the November kidnapping of his colleague. Nor have they indicated whether the assassination attempt against him was a reprisal for that or any other action. Zamili used resources of the Ministry of Health—such as ambulances—to transport weapons, death squads, and their victims between Sadr City and other locations in Baghdad. Zamili allegedly paid the death squad members by including them on the payroll of the Ministry of Health.[75]

As part of the parliamentary compromise that brought Maliki to power, the minister of health has been appointed by the Sadrist bloc. Many employees in that ministry have ties to the Office of the

Martyr Sadr or to its military wing, the Jaysh al Mahdi. It is not possible from the evidence presented to conclude firmly whether Sadr personally directed Zamili's activities in 2006 or whether Zamili acted independently. Zamili was one of the first officials arrested after Sadr left Iraq in late January 2007. His arrest preceded the beginning of Operation Fardh al Qanoon, or Enforcing the Law (commonly known as the Baghdad Security Plan).

**Mass Kidnappings in June and July 2006.** It is not clear from open sources which organizations—government forces, militia groups, secret cells, or private citizens—organized and perpetrated the mass kidnappings that plagued Iraq in June and July 2006. Many of these attacks were conducted by men wearing Iraqi police uniforms, but the kidnappers were probably militia members who also worked in the Iraqi security forces—or, indeed, in special groups. Many of these June and July kidnappings targeted government officials rather than randomly selected civilians and deserve consideration as part of the destabilization of the Maliki government, whether or not special groups were involved. Gunmen in camouflage uniforms seized three busloads of factory workers on their way home from a government-owned industrial plant in Taji on June 22, 2006.[76] In early July, gunmen kidnapped individuals working for the government of Iraq, including the minister of electricity (who was released) and his bodyguards; a female Sunni legislator and her bodyguards; and a consular official who was on leave in Baghdad from his routine diplomatic assignment in the Iranian city of Kermanshah.[77] On July 16, gunmen in police uniforms and using official vehicles kidnapped the head of Iraq's olympic committee and approximately thirty other sports officials while they attended a conference in the Karrada neighborhood in eastern Baghdad.[78]

**Azhar Dulaymi, Special Groups, and the Kidnappings of Iraqi Officials and U.S. Soldiers.** On November 15, 2006, a secret cell organization kidnapped numerous employees of the Iraqi Ministry of Higher Education from its headquarters in Karrada. The kidnapping garnered major public attention

PX643

because of its scale and its contribution to unrest within the Iraqi government, culminating in the withdrawal of Sadrist members from the Iraqi Council of Representatives on November 29, 2006.[79] Secret cell operative Azhar Dulaymi, whom U.S. forces killed during a raid on May 20, 2007, coordinated this operation.[80] Differing reports suggest that between fifty and eighty gunmen, all in police uniforms, stormed past security guards within the ministry compound. The gunmen separated male and female employees, locked the latter in a room, and loaded the former into roughly thirty Interior Ministry trucks without license plates.[81] U.S. officials estimated that fifty-five people had been kidnapped; they believed that the abductors took their victims to the Belidiyat neighborhood on the southeastern fringe of Sadr City.[82] Approximately forty of the hostages were released by the kidnappers or rescued by the Iraqi Army within twenty-four hours.[83] In addition, Maliki immediately ordered the arrest of several police officials in Karrada, presumably for complicity in the plot (or, alternatively, for incompetence).[84]

Dulaymi organized other high-profile kidnappings executed by members of special groups. He participated in the January kidnapping of U.S. soldiers from the Provincial Joint Coordination Center in Karbala, where a small U.S. team worked with Iraqi security forces. Operatives entered the center unopposed in a convoy of civilian vehicles, wearing components of American military uniforms, and stormed into rooms where the U.S. soldiers were working. They ultimately killed the five American soldiers whom they attempted to kidnap.[85]

## U.S. Forces Capture Qais Khazali, Laith Khazali, and Ali Mussa Daqduq

U.S. forces captured Qais Khazali, Laith Khazali, and Daqduq in a single operation on March 20, 2007, in Basra, Iraq's southernmost city. The three obviously worked together on occasion. U.S. forces also confiscated a computer, false identification cards, and diaries in the raid. From these documents and separate interviews, U.S. forces confirmed that Qais

Khazali, Laith Khazali, and Daqduq were leaders of a network deliberately developed by the Iranian government to foment violence in Iraq. The U.S. military spokesman in Baghdad released a file early in July reproducing some of these documents.[86]

The Multi-National Force–Iraq reported:

When Qais [Khazali] was captured, we found an in-depth planning and lessons learned document. It was about the attack the special groups coordinated against the Karbala Provincial Joint Coordination Center on January 20th. This 22-page document provides a unique window into the planning and execution of special group operations here in Iraq. . . . Ali Musa Daqduq and Qais Khazali state that senior leadership within the Qods Force knew of and supported planning for the eventual Karbala attack that killed five coalition soldiers. Ali Musa Daqduq contends that the Iraqi special groups could not have conducted this complex operation without the support and direction of the Qods Force. Daqduq and Khazali both confirm that Qais Khazali authorized the operation, and Azhar al-Dulaimi, who we killed in an operation earlier this year, executed the operation.

The document that we captured showed the following. It showed that the group that attacked the Provincial Joint Coordination Center in Karbala had conducted extensive preparation and drills prior to the attack. Qods Force had developed detailed information regarding our soldiers' activities, shift changes and fences, and this information was shared with the attackers. They had American-looking uniforms, vehicles and identification cards that enabled the attackers to more easily penetrate the Provincial Joint Coordination Center and achieve surprise. [It] reported that the captured soldiers were killed when the attackers' dispersal from the site was interrupted.[87]

U.S. forces exploited the intelligence gained in these documents and from interviews with the captives to identify significant secret cell leaders and

PX643

members of the weapons smuggling network. The affiliated kills and captures included secret cell leader Abu Zaki; Dulaymi, the executor of the Ministry of Health and Karbala attacks; Abu Tiba, one of Dulaymi's gang members;[88] Al Hilfi, the head of secret cells in Baghdad;[89] Sheik (Ahmed) Mohammad Hassan Sbahi Al Khafaji, who supplied weapons to Baghdad;[90] and many others.[91]

## Arming the Secret Cells with EFPs and Other Weapons

A variety of Iranian weapons flowed into Iraq through direct purchases from the government of Iran. Coalition forces first noticed that enemy groups were using EFPs in Iraq in the middle of 2004. The number of EFPs used against Coalition and Iraqi forces rose "at a rate of 150 percent" between January 2006 and December 2006 and increased every month from November 2006 through January 2007.[92] Weapons were typically smuggled from Iran to Iraq, and the Quds Force played a role in that process.[93]

The training alliance between Hezbollah, Iran, and Shiite militias corresponds, temporally, with the increased use of EFPs in Iraq. The timing is probably not coincidental. As discussed in Chapter 1, Iran originally manufactured EFPs for Hezbollah. Copper EFPs require a great deal of metallurgical and technological precision to manufacture. Consequently, they cannot be made without specific machinery, access to which the Iranians have controlled. Sheibani has supplied EFPs to Iraq since 2005, if not earlier.[94] His relative, Abu Yasier al-Sheibani, served as "the deputy, the key logistician and financier for this group in Iraq."[95] The Sheibanis relied on a network within Iraq to distribute EFPs to special groups and other extremists, concentrating on Baghdad. Some smugglers in these distribution networks had direct connections to the Quds Force.[96]

Other weapons smuggled from Iran to Iraq in 2007 included: eighty-one-millimeter mortars (again, the remainder of the region uses eight-two-millimeter mortars), repainted 107-millimeter rockets imported into Iran from China and marked for sale in the open markets, RPG-7s, sixty-millimeter canisters filled with Iranian-manufactured mortar rounds, and 240-millimeter rockets.[97]

In addition, earlier in 2007, American troops discovered over one hundred Austrian-made Steyr HS50 .50 caliber sniper rifles in Iraq.[98] These high-powered sniper rifles, which fire Iranian rounds, "can pierce all body armor from up to a mile and penetrate armored Humvee troop carriers."[99] The rifles were part of a larger shipment legally purchased from the Austrian manufacturer by Iran a year before under the justification that they would be used by the Iranian police to combat drug smugglers.[100] Although eyebrows were raised in both Washington and London at the time, the sale went through, and the weapons were shipped to Iran.[101] The presence of these weapons shows a high level of sophistication in the Iranian arms flow into Iraq, as the purchase was made officially by the Iranian government.

**The Special Groups Network Transit Routes for EFPs and Other Weapons from Iran.** The network of special groups transports EFPs along the major highways to Baghdad via Iranian border crossings in Diyala and Wasit provinces. Most of these routes were not patrolled by Coalition forces in 2006, and the mission of Coalition forces in 2006 did not regularly include interdiction operations but rather focused on training Iraqi security forces for these and other missions.

In Wasit province, EFPs, weapons, recruits for special groups, and smuggled goods flowed through the major border crossing between Mehran, Iran, and Zurbatiya, Iraq.[102] Iranian trucks did not transport weapons into Iraq through Zurbatiya. Rather, goods and weapons were transloaded from Iranian to Iraqi trucks near the border.[103] Legitimate commercial traffic also crosses the border at Zurbatiya, as do religious pilgrims and political figures—such as Amar al-Hakim, now head of the SIIC, a major political party in the Maliki government—with ties to Iran.[104] The city of Kut, just to the west along the highway, has strong ties with the SIIC and its military wing, the Badr Corps.[105] Kut is also the hub of the road and smuggling network from the Iranian border

PX643

to Baghdad.[106] The road from Mehran runs through Kut, as does the road from Amarah. U.S. forces conducted a series of operations this summer to interdict the smuggling of Iranian weapons from Amarah to Sadr City.[107] And Iraqi security forces, with the help of Coalition troops, conducted operations in Kut against rogue elements of the Jaysh al Mahdi.[108]

Basra might be another point of entry for Iranian arms and weapons. Certainly, there is evidence of the trafficking of weapons along the roads out of Basra to Amarah and Nasiriyah.[109] In mid-June, Nasiriyah was the site of a firefight between Iraqi forces and the Mahdi Army.[110] On June 27, 2007, Iraqi special forces destroyed a weapons cache belonging to rogue Jaysh al Mahdi militiamen.[111] Among the weapons destroyed were thirty sixty-millimeter mortar rounds, a weapon known to be Iranian in origin.[112] A day later, Iraqi special forces captured "a rogue Jaysh al-Mahdi insurgent leader during an operation in Nasiriyah."[113] The man captured, later identified as Khafaji, is suspected of having "provide[d] financial support to weapons trafficking networks which supply Iranian affiliated Special Groups units in the Baghdad area."[114]

Cities like Majjar al-Kabir and Amarah in Maysan province—places known to be "smuggling routes for Secret Cell terrorists who facilitate Iranian lethal aid" as well as safe havens for "liaisons for Iranian intelligence operatives into Iraq"—were the target of disruption operations in mid-June.[115] Weapons and aid entering these towns near the Iranian border must still travel through the heavily Shia central five-city region before reaching Baghdad, increasing the violence in the south.

Kut, Diwaniyah, Hilla, Karbala, Najaf, Musayyib, Mahmudiyah, Iskandaria, Mahawil, and numerous other sites of sectarian violence or Shiite militia bases all lie between Nasiriyah and Baghdad. The fight for these cities is likely the fight for control of main Jaysh al Mahdi supply routes and bases of operation.

Iranian weapons and trained terrorists enter Iraq at key border crossings. Although the exact mechanism of supply remains unclear, Iranian arms are moved via extensive networks, and often the so-called secret cells are responsible for facilitating their transfer.

### The Quds Force in Diyala

The Quds Force responded to the surge of U.S. troops in Iraq by escalating its support for special groups in central and southern Iraq. Daqduq recorded information about attacks in Basra, Amarah, Karbala, the Rusafa neighborhood of Baghdad, and Diyala.[116] The special groups also increased attacks in other neighborhoods of Baghdad. It is not possible to detail every such incident, but Diyala province, northeast of Baghdad, is an interesting case study of the special groups' reaction to the American troop increase in both February and August 2007.

Jaysh al Mahdi operated in Diyala in 2006 because of the mixture of sectarian and ethnic groups there; the al Qaeda stronghold that emerged in Baqubah, the capital of Diyala; and the region's proximity to Baghdad. Diyala suffered from sectarian cleansing and terrorism in 2006. The targeting of Shiite militia elements during the Baghdad Security Plan did not push Jaysh al Mahdi fighters into Diyala. Rather, they were already active in the province, and the special groups actively targeted Coalition and Iraqi forces in Diyala province in March, April, and May by reinforcing the area and supplying it with weapons.

The special groups in Diyala received direct attention from the Quds Force proxies in Iraq. Some time before March 20, 2007, Daqduq met with leaders of special groups who conducted small arms and IED attacks against troops in Diyala, presumably to review their activities.[117] His visit shows the importance of Diyala to the special groups.

This spring, the conflict in Diyala consisted of a struggle between the Jaysh al Mahdi, al Qaeda, and U.S. forces to control the lines of communication to Baghdad. Special groups and rogue Jaysh al Mahdi moved into areas of Diyala as al Qaeda receded from its stronghold in Turki Village and reconcentrated in Baqubah, Tarmiyah, and the Diyala River Valley.[118]

Iranian weapons were smuggled into and through Diyala Province in the first quarter of 2007. U.S. and Iraqi forces worked to discover the pattern by which they were smuggled, interdict the flow of weapons, and identify the smugglers who were responsible for this activity.[119]

PX643

Two insurgent supply lines traversed Diyala in February, March, and April 2007. One ran from Iran through Muqdadiyah into northern Baqubah (a predominantly Shiite area) and another through Mandali to southern Baqubah or Buhriz (which Sunni insurgents have controlled). Rogue Jaysh al Mahdi or other Shiite extremists might have controlled both supply lines. Alternatively, one sectarian group (perhaps the Jaysh al Mahdi) controlled the supply line from Muqdadiyah to northern Baqubah, and another controlled the supply line from Mandali to Buhriz. Sunni extremists established bases and training camps about halfway along both of these supply routes, suggesting that they aimed either to cut them or facilitate the movement of weapons along them.

Facilitators from Iran and northern Iraq supplied weapons and men to the province from February through April 2007. When the Baghdad Security Plan began on February 14, U.S. and Iraqi forces closed certain border crossings into the country for seventy-two hours.[120] On February 17, Iraqi border enforcement officials discovered an unattended donkey with a cache of weapons near the Iranian border.[121] Presumably, smugglers had used the animal to carry weapons to that location or were intending to use the animal to carry weapons from that location. On February 21, Iraqi border police found a large cache of weapons east of Balad Ruz in Mandali, a town that sits on the secondary road that follows the mountains dividing Iran and Iraq and is an obvious point on a smuggling route from the legitimate border crossing to its north at Khanaqin. The cache contained antipersonnel mines, mortar rounds, ammunition, and a rocket-propelled grenade.[122] Iraqi forces, supported by U.S. forces, discovered another cache near Mandali on April 4.[123]

In the early morning hours of April 4, Iraqi forces, with U.S. support, conducted a sweep of a site in Imam al-Hajj Yusuf Village, a town 5.25 miles southwest of Mandali, on the eastern edge of the well-irrigated Diyala plain. The village is not far from the mountains near the Iranian border. A small road connects the village with Mandali and another route leads back toward the main east-west road toward Balad Ruz. This operation detained four suspects and captured a large ammunitions cache.[124] These types of operations generally signal the presence of U.S. Special Forces in the area. And all of these factors suggest that this operation aimed to interdict weapons-smuggling across the Iranian border.

Because al Qaeda had been the primary enemy in Balad Ruz in January 2006, the *Iraq Report* previously speculated that Iran was supplying these weapons to al Qaeda.[125] But U.S. forces subsequently stated that they suspected these were linked to Shiite extremists rather than to al Qaeda.[126] We now know that secret cell networks in Diyala were being reviewed by the Quds Force proxy before March.[127] The Mandali caches seem, therefore, to have been brought by the special groups network for its own use, in order to escalate the fight against Coalition forces in Diyala or in Baghdad in February.

Indeed, the special groups in Baghdad did rely on weapons stored in and distributed from Diyala province. This became clear in August when Coalition forces captured an important facilitator near Qasarin, on the Tigris River in Diyala, whose responsibilities included distributing EFPs and other "weapons to Special Groups operating throughout the Baghdad area." This weapons smuggler made "numerous" trips to Iran, where he apparently had "ties to the Iranian Revolutionary Guards Corps–Quds Force."[128]

The Khalis corridor, in western Diyala province, also served as a main supply route and safe haven for Iranian-backed special groups. U.S. forces found a huge cache in Al Jadidah on February 24, 2007, that contained 130 copper disks for the fabrication of EFPs, a hallmark of Iranian-backed groups.[129] This town is conveniently located on the east bank of the Tigris River along the highway from northeastern Baghdad to Khalis—convenient to both lines of supply.[130] In addition to the 130 EFP disks, the cache contained improvised mines in various states of production, containers for making IEDs, five anti-aircraft rounds, six rocket launchers, IED-making materials, twenty-four mortar rounds, and fifteen rockets.[131]

In late July, U.S. and Iraqi forces pursued special

PX643

groups members through the Khalis and Qasarin areas.[132] Coalition forces engaged in a firefight with twenty-five men west of Baqubah on October 5 while attempting to apprehend a special groups leader who facilitated the transportation of weapons from Iran into Iraq. That particular group was sufficiently well organized and trained to remain in defensive positions as U.S. forces arrived, then maneuver from the positions to attack, supported by anti-aircraft weapons that were used against Coalition air support.[133]

Special groups interacted with criminal networks in Khalis and Qasarin.[134] East of the Diyala River, individuals with close ties to the Quds Force facilitated the movement of weapons in Kharnabat, just north of Baqubah, in July.[135] U.S. forces also found several large EFP caches south of Baqubah in October and November.[136] Between February and November, special groups might regularly have transported weapons from Iran and stored them in depots along the banks of the Tigris and Diyala rivers. Alternatively, special groups emplaced weapons there in February and reactivated the supply lines and headquarters through southern Diyala as Operation Arrowhead Ripper and its successors dislodged al Qaeda from the area.

As U.S. and Iraqi forces pushed northeastward along the Diyala River in late 2007, other units targeted the special groups and other Shiite extremists in the southern portion of the province. In late September, U.S. forces arrested the special groups leader linked to the large cache found in Khan Bani Saad in February. The suspect was responsible for the smuggling network north of Baghdad, including facilitating foreign fighters and training militants in bomb-making.[137] U.S. forces arrested special groups members in Qasarin—including a facilitator who made multiple trips to Iran—who smuggled weapons and aided rogue elements of the Jaysh al Mahdi.[138] A large firefight erupted between U.S. forces and a special groups cell west of Baqubah, terrain that lies in the Khalis corridor.[139] The arrest of extremist militia members and special groups members throughout October also mitigated the tensions.

## Special Groups in Baghdad: Mortaring the Green Zone

Special groups, trained and equipped by Iran, escalated the number of mortar and rocket attacks against targets in the Green Zone throughout the spring of 2007. The accuracy of this indirect fire improved as a result of the training they received in Iran and the quality of weapons with which they were supplied. Lieutenant General Ray Odierno reported in June, "We have found a few people that were Shi'a extremists that . . . had some training in Iran—those mostly being the mortar and rocket teams inside of Baghdad. . . . [T]hey were trained in Iran and came in here to conduct attacks against not only Coalition and Iraqi security forces, but government of Iraq targets inside of the Green Zone."[140]

Major General Joseph Fil, commander of Coalition forces in Baghdad, elaborated further, explaining that most of the rocket and mortar attacks originate from Sadr City or its environs, and most of the rockets and mortars are recently made Iranian weapons:

> [M]uch of the indirect fire that we receive, especially that which is pointed at the International Zone, the Green Zone, is in fact Iranian. And when we check the tail fins of the mortars, when we find the rockets—and frequently we're able to find them preemptively, before they actually launch . . . there's no doubt that they're coming out of Iran. Most of them are made fairly recently, in the past several years, and they have lot numbers that we can . . . trace later on. I'll also say that most of these are coming from the eastern side of the river, by far the majority, in and around the Sadr City area. And so we focused our efforts very strongly into discovering where these areas are that they're frequently shooting from and denying those [areas to the enemy].[141]

Odierno said, "I do concern myself, over time, about the Iranian influence on Shi'a extremist groups and what that means in the future. And we cannot allow this rogue Iranian influence to continue to

PX643

influence, in my mind, and in many ways attack the government of Iraq. Many of these indirect fire attacks that these groups have done are directly against the government of Iraq in the Green Zone. So they're clearly challenging the government. . . . We cannot allow that to continue."[142]

### The Relationship between the Secret Cells and the Jaysh al Mahdi in 2007

The secret cells function alongside the Jaysh al Mahdi and other militia groups in Iraq. They are not identical but are overlapping groups. "They come from militia groups, and they are generally the more extreme members of those militia groups. Some of them have come from Jaysh al-Mahdi. Some have come from other militia groups as well," said Brigadier General Kevin Bergner, a U.S. military spokesman.[143] Bergner stressed, "While some of these people may have come from or been affiliated with Jaish al-Mahdi at one point—and these special groups were an outgrowth, perhaps, of relationships with Jaish al-Mahdi—they have in fact broken away from Jaish al-Mahdi." Furthermore, "they are cellular in nature. . . . We believe that these [special groups] are operating outside his [Sadr's] control and that he shares our . . . concern in the seriousness that they represent."[144]

The Jaysh al Mahdi fractured this spring. Sadr publicly ordered his militias not to fight Iraqi security forces during the Baghdad Security Plan. As a result, the Maliki government declared that all militia groups that fought the Iraqi security forces were "rogue elements" and therefore were subject to military targeting. Clashes between Iraqi security forces and rogue militia elements occurred in Diwaniyah in March and Amarah in June.

When Sadr left Iraq for Iran in late January, it further undermined the leadership structure of the militia. In May, the Golden Mahdi Army, a Najaf-based group that claimed to be dispatched by Sadr, attempted to cleanse the Jaysh al Mahdi of rogue elements not responsive to Najaf.[145] Local groups, calling themselves the Noble Mahdi Army, emerged

in Hurriyah in Baghdad to rebuff the attempt of the Golden Mahdi Army.[146] The results of these conflicts are not clear.

General David Petraeus emphasized that secret cells are "different" from Jaysh al Mahdi—unlike the standard militiaman in the Mahdi Army, the secret cells "have had extra training and selection," the training being conducted by the Quds Force.[147] These secret cells function as enablers, facilitating Iranian support for the Jaysh al Mahdi and coordinating continued attacks. Sadr City is the support base for secret cells, Jaysh al Mahdi, and many rogue Jaysh al Mahdi militias within Baghdad. These networks overlap extensively.

A militia commander seized in Najaf illustrates a common relationship between the current special groups and the Jaysh al Mahdi organization. "The former commander's Jaysh al-Mahdi cell is suspected of conducting aggressive insurgent attacks using explosively formed penetrators throughout southern Iraq during late 2005 and early 2006. After leaving Jaysh al-Mahdi, he allegedly formed an independent cell of more than 150 Shi'a extremists that is believed to have conducted attacks on Iraqi and Coalition Forces."[148] U.S. forces captured another extremist in Sadr City who broke from Jaysh al Mahdi, ran his own cell, and had ties to weapons provided by special groups.[149]

### Conclusions

There can be no question that Iran is actively supporting multiple insurgent and terrorist groups in Iraq, that its efforts began even before the American invasion, that Iranian elements have included the provision of direct support in the form of weapons and advisers, and that they have involved facilitating the growth of a solid relationship between Lebanese Hezbollah and Iraqi Shiite militias, particularly the Jaysh al Mahdi. Iranian agents and proxies in Iraq have attacked Iraqi government officials in Baghdad and in the provinces, suggesting that their aims do not include supporting or solidifying the democratically elected, Shiite-dominated government of Maliki.

PX643

They have been lavish with their support to all groups engaged in violence against the Coalition—including Sunni groups with ties to al Qaeda—and they have supported a number of different Shiite groups even when they are in competition with one another.

Kimberly Kagan is president of the Institute for the Study of War.

## Notes

1. Lieutenant General Raymond T. Odierno (Department of Defense press briefing, Arlington, VA, August 17, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=4023 (accessed February 3, 2008).

2. Rear Admiral Mark Fox and Philip Reeker (press briefing, Combined Press Information Center, Baghdad, Iraq, August 26, 2007), available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13615&Itemid=131 (accessed February 5, 2008).

3. Michael R. Gordon, "Deadliest Bomb In Iraq Is Made by Iran, U.S. Says," *New York Times*, February 10, 2007; and author's discussions with American officers in Iraq.

4. Michael R. Gordon and Dexter Filkins, "Hezbollah Said to Help Shiite Army in Iraq," *New York Times*, November 28, 2006. The senior U.S. officials who publicly confirmed Iranian involvement with Shiite militias in November were General Michael V. Hayden (director of the Central Intelligence Agency) and Lieutenant General Michael D. Maples (director of the Defense Intelligence Agency). General John P. Abizaid (then-commander of U.S. Central Command) stated that Hezbollah was training operatives in Iran, some of whom would operate in Lebanon and others (from Iraqi Shiite militia groups) who might operate in Iraq, but he did not specify what those links were or how they functioned.

5. Lieutenant General Raymond T. Odierno (Department of Defense press briefing).

6. Michael Ware, "Inside Iran's Secret War for Iraq," *Time*, August 15 2005, available at www.time.com/time/magazine/article/0,9171,1093747,00.html (accessed February 3, 2008).

7. Ibid.

8. Edward T. Pound, "Special Report: The Iran Connection," *U.S. News & World Report*, November 14, 2004, available at www.usnews.com/usnews/news/articles/041122/22iran.htm (accessed January 31, 2008). The article notes that U.S. intelligence sources could not confirm that the fatwa had come from Iranian clerics, "but they believe it was credible."

9. Ibid.

10. Michael Ware, "Inside Iran's Secret War for Iraq."

11. Ibid. Ware did not use the term explosively formed penetrator (EFP), which was not yet common currency, but the weapon he described was probably what is now known as an EFP.

12. Ibid.

13. As quoted in Edward T. Pound, "Special Report: The Iran Connection."

14. Michael Ware, "Inside Iran's Secret War for Iraq."

15. Ibid.

16. Babak Dehghanpisheh, Melinda Liu, and Rod Norland, "We Are Your Martyrs,'" *Newsweek*, April 19, 2004, available at www.newsweek.com/id/53724 (accessed February 3, 2008).

17. Ibid. Mohammad Baqir al-Hakim was the older brother of Abd al-Aziz al-Hakim, the current head of the Supreme Islamic Iraqi Council.

18. Edward T. Pound, "Special Report: The Iran Connection."

19. Ibid.

20. Kenneth Katzman, *Iran's Influence in Iraq*, Congressional Research Service, November 15, 2005, available at http://assets.opencrs.com/rpts/RS22323_20051115.pdf (accessed February 5, 2008).

21. Ibid.

22. Edward T. Pound, "Special Report: The Iran Connection."

23. Ibid.

24. Ibid.

25. Michael Ware, "Inside Iran's Secret War for Iraq."

26. Ibid.

27. Babak Dehghanpisheh, "Iraq's New Guns for Hire," *Newsweek*, May 7, 2007.

28. Brigadier General Kevin Bergner (press briefing, Combined Press Information Center, Baghdad, Iraq, July 2, 2007) available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12641&Itemid=131 (accessed February 3, 2008).

29. Babak Dehghanpisheh, "Iraq's New Guns for Hire."

PX643

30. Multi-National Corps–Iraq, "Iraqi Army, U.S. Special Forces Detain High-Value Rogue JAM Special Groups Leader," press release 20070814-07, August 14, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13343&Itemid=128 (accessed February 3, 2008).

31. Multi-National Corps–Iraq, "Iraqi Army, U.S. Special Forces Detain Suspected Rogue JAM Recruiter; ISOF Detain Suspected Al-Qaeda Emir," press release 20070807-14, August 7, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13227&Itemid=128 (accessed February 5, 2008); and Multi-National Corps–Iraq, "Iraqi Army, Coalition Forces Detain Insurgent Linked to Iranian IEDs," press release 20070716-17, July 16, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12876&Itemid=21target=_blank (accessed February 3, 2008).

32. Brigadier General Kevin Bergner (press briefing).

33. Multi-National Corps–Iraq, "Iraqi Army, U.S. Special Forces Detain High-Value Rogue JAM Special Groups Leader."

34. Brigadier General Kevin Bergner (press briefing).

35. Ibid.

36. Ibid. Hajji Yusif presumably works directly for the Quds Force commander, General Qassim Sulleimani, but their precise relationship is not specified in the U.S. military's documentation.

37. Ibid.

38. Ibid.

39. Karin Brulliard, "Ex-Sadr Aide Held in American Deaths," *Washington Post*, March 23, 2007.

40. Brigadier General Kevin Bergner (press briefing).

41. Michael R. Gordon and Dexter Filkins, "Hezbollah Said to Help Shiite Army in Iraq."

42. Michael Ware, "Inside Iran's Secret War for Iraq."

43. Brigadier General Kevin Bergner (press briefing).

44. Nelson Hernandez and K. I. Ibrahim, "Top Shiites Nominate a Premier for Iraq," *Washington Post*, April 22, 2006; and Sabrina Tavernise, "Jawad al-Maliki: A Novice, but Outspoken," *New York Times*, April 23, 2006.

45. Ryan Crocker (press briefing, Combined Press Information Center, Baghdad, Iraq, August 21, 2007), available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13542&Itemid=131 (accessed February 3, 2008).

46. Sudarsan Raghavan and Robin Wright, "Iraq Expels 2 Iranians Detained by U.S.," *Washington Post*, December 30, 2006.

47. Ibid.

48. Multi-National Force–Iraq, "Coalition Targets Iranian Influence in Northern Iraq," press release A070114a, January 14, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=9063&Itemid=21 (accessed February 3, 2008).

49. Multi-National Force–Iraq, "Coalition Forces Disrupt Secret Cell Terrorist Network," press release A070618a, June 18, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12378&Itemid=128 (accessed February 3, 2008).

50. Major General Rick Lynch (Department of Defense news briefing on Operation Marne Husky, Arlington, VA, August 24, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=4028 (accessed February 3, 2008).

51. Edward T. Pound, "Special Report: The Iran Connection."

52. Ibid.

53. Ibid.

54. Ibid.

55. Multi-National Corps–Iraq, "Iraqi Soldiers, U.S. Troops Find Weapons Cache near Abu Ghuraib," press release 20070207-10, February 7, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=9762&Itemid=21 (accessed February 3, 2008).

56. Major General William Caldwell IV and Major Marty Weber (media roundtable, Baghdad, Iraq, April 11, 2007), available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=11361&Itemid=1 (accessed February 3, 2008).

57. Major General Rick Lynch (press briefing on Operation Marne Torch, Combined Press Information Center, Baghdad, Iraq, June 24, 2007), available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12552&Itemid=131 (accessed February 3, 2008).

58. "US General Says Iranian-Origin Weapons Turning Up in Sunni Insurgent Hands," Associated Press, May 6, 2007; and Colonel Ricky Gibbs (news briefing, Pentagon, May 25, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3970 (accessed February 3, 2008).

PX643

59. Multi-National Force–Iraq, "Coalition Forces Nab 20 Suspected Al-Qaeda Terrorists," press release A070525b, May 25, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12012&Itemid=128 (accessed February 3, 2008).

60. Major General Rick Lynch (press briefing on Operation Marne Torch).

61. "2nd Brigade Soldiers have the mission of defeating insurgent activity, denying the enemy sanctuary and preventing terrorist elements from moving accelerants from the Arab Jabour area into Baghdad." (Multi-National Corps–Iraq, "Marne Torch Commences in Areas South of Baghdad," press release 20070618-03, June 18, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12384&Itemid=128 [accessed February 3, 2008].) See also Multi-National Force–Iraq, "Six Terrorist Killed, 26 Detained in Coalition Force Raids," press release A070523b, May 23, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=11986&Itemid=128 (accessed February 5, 2008); and Multi-National Force–Iraq, "VBIED Networks Disrupted; 4 Terrorists Killed, 9 Suspects Detained," press release A070511b, May 11, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=11840&Itemid=128 (accessed February 5, 2008).

62. Major General Rick Lynch (press briefing on Operation Marne Torch).

63. Ibid.

64. Kim Gamel, "U.S. Troops Destroy Boats and Target Roadside Bomb Routes South of Baghdad," Associated Press, June 26, 2007.

65. Ibid.

66. Colonel Terry R. Ferrell (Department of Defense news briefing, Baghdad, Iraq, December 3, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=4099 (accessed February 3, 2008).

67. Colonel Ricky Gibbs (news briefing).

68. Multi-National Force–Iraq, "Coalition Forces Disrupt al-Qaeda Network: One Killed, 10 Detained," press release A071002a, October 2, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=14383&Itemid=128 (accessed February 3, 2008).

69. Multi-National Force–Iraq, "Coalition Forces Arrest Iranian Quds Force Officer," press release A070920b, September 20, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=14129&Itemid=21 (accessed February 3, 2008).

70. Bureau of Democracy, Human Rights, and Labor, "Iraq," in 2006 Country Reports on Human Rights Practices (U.S. Department of State, March 6, 2007) available at www.state.gov/g/drl/rls/hrrpt/2006/78853.htm (accessed February 3, 2008).

71. Kim Gamel, "Iraq Official Is Accused of Aiding Massacres," Newark Star-Ledger, February 9 2007.

72. Multi-National Corps–Iraq, "IA, MND-B Soldiers Look for Kidnap Victims," press release 20060813-02, August 13, 2006, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=2093&Itemid=21 (accessed February 3, 2008).

73. Thomas Wagner, "Political Humorist Slain as Iraqi Death Toll Soars," Newark Star-Ledger, November 21, 2006.

74. Ibid.

75. Bassem Mroue and Qassim Abdul-Zahra, "Iraq Loses $8 Billion through Corruption," Associated Press, April 4, 2007; and Damien Cave, "Iraq Raid Attempts to Cut Mahdi Army Link," International Herald Tribune, February 9, 2007.

76. Joshua Partlow and Bassam Sebti, "Gunmen Kidnap Scores of Iraqis; Hussein Lawyer Slain," Washington Post, June 22, 2006.

77. "Gunmen Release Iraq Electricity Official," Associated Press, July 4, 2006; and "Gunmen in Baghdad Kidnap Iraqi Diplomat," Associated Press, July 11, 2006.

78. Ryan Lenz, "Iraqi Games Chief Part of Mass Kidnap," Sunday Mail (Australia), July 16, 2006.

79. Rick Jervis, "Cleric al-Sadr May Hold Iraq's Future in His Hands," USA Today, November 13, 2006; Edward Wong and Kirk Semple, "Sadr Bloc Threatens to Leave the Government," International Herald Tribune, November 25, 2006; and Ammar Karim, "Sadr Boycotts Government as Iraq PM to Meet Bush," Agence France-Presse, November 29, 2006.

80. "U.S. Military: Architect of U.S. Troop Abductions Killed," CNN, May 21, 2007.

81. Sudarsan Raghavan, "In Iraqi Colleges, Fear for an Already Shrunken Realm," Washington Post, November 16, 2006.

82. John F. Burns and Michael Luo, "Dozens Abducted in Brazen Raid on Iraq Ministry," New York Times, November 15, 2006.

PX643

83. Sudarsan Raghavan, "In Iraqi Colleges, Fear for an Already Shrunken Realm."

84. John F. Burns and Michael Luo, "Dozens Abducted in Brazen Raid on Iraq Ministry."

85. Mark Kukis, "An Ambush in Karbala," *Time*, July 26, 2007, available at www.time.com/time/printout/0,8816,1647454,00.html (accessed February 3, 2008).

86. Brigadier General Kevin Bergner (press briefing).

87. Ibid.

88. Robert Gates, Ryan Crocker, and General David Petraeus, (joint press conference, Baghdad, Iraq, June 16, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3992 (accessed February 3, 2008).

89. Ibid.

90. Multi-National Corps–Iraq, "Update: Detainee Captured June 28 Identified," press release 20070718-16, July 18, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12912&Itemid=128 (accessed February 3, 2008).

91. Brigadier General Kevin Bergner (press briefing), slide 4, available at www.mnf-iraq.com/images/stories/Press_briefings/2007/070702_briefing_slides.pdf (accessed February 3, 2008).

92. Major General William Caldwell IV and Major Marty Webber (press briefing, "Iraq Operational Update," Combined Press Information Center, Baghdad, Iraq, February 14, 2007), available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=9920&Itemid=131 (accessed February 4, 2008).

93. Ibid.

94. Michael Ware, "Inside Iran's Secret War for Iraq."

95. Brigadier General Kevin Bergner (press briefing).

96. For example, Multi-National Force–Iraq, "Coalition Forces Kill Three, Detain Six, Capturing a High-Priority Special Groups Weapons Smuggler," press release A070816b, August 16, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13381&Itemid=128 (accessed February 4, 2008).

97. Major General William Caldwell IV and Major Marty Weber (media roundtable); and Robin Wright, "U.S. vs. Iran: Cold War, Too," *Washington Post*, July 29, 2007.

98. Thomas Harding, "Iraqi Insurgents Using Austrian Rifles from Iran," *Daily Telegraph*, February 13, 2007.

99. Ibid.

100. Ibid.

101. Ibid.

102. Babak Dehghanpisheh, "Iraq's New Guns for Hire"; and Major General Rick Lynch (Department of Defense news briefing on Operation Marne Husky).

103. Brigadier General Edward Cardon (Department of Defense civilian defense experts conference call, July 19, 2007).

104. Ibid.; Babak Dehghanpisheh, "Iraq's New Guns for Hire"; and "Iran Sealing Iraq Border Site after Detention of 2 Al-Qaida Suspects," Associated Press, February 7, 2007.

105. "Protests after US Troops Detain Iraq Shiite Leader," Agence France-Presse, February 24, 2007.

106. Multi-National Force–Iraq, "Iraqi Army Detains Two Wasit Provincial Officials on Suspicion of Smuggling IEDs," press release A070119a, January 19, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=9252&Itemid=21&lang=english (accessed February 4, 2008). Kut has also been an area in which rogue Jaysh al Mahdi have operated against Iraqi security forces. (Multi-National Corps–Iraq, "Ambush Disrupted; Two Extremists Killed," press release 20070716-17, July 16, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12868&Itemid=21 target=_blank [accessed February 4, 2008].)

107. Multi-National Force–Iraq, "Coalition Forces Kill 30 Special Groups Cell Terrorists, Detain 12," press release A070808b, August 8, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13240&Itemid=128 (accessed February 4, 2008). The roads from Kut also extend southeast to Diwaniyah—the capital of Qadisiyah—and east to the major Shiite cities of Hillah, Karbala, and Najaf.

108. Ravi Nessman, "U.S. Military Frees 42 Captives Kidnapped by Al-Qaida in Raid on Hide-out in Iraq's Northeast," Associated Press, May 27, 2007.

109. Hamid Ahmed, "Iraqi Police: Clashes Continue between Iraqi Forces and Mahdi Army Fighters in South," Associated Press, June 19, 2007; Multi-National Corps–Iraq, "Iraqi Army Destroys Weapons Cache near Nasiriyah," press release 20070627-13, June 27, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12571&Itemid=128 (accessed February 4, 2008); Major General William Caldwell IV

PX643

and Major Marty Weber (media roundtable); and Multi-National Force–Iraq, "Iraqi Forces Capture Suspected Weapons Smuggler in Basra," press release A070304c, March 4, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=10354&Itemid=21 (accessed February 5, 2008).

110. Hamid Ahmed, "Iraqi Police: Clashes Continue between Iraqi Forces and Mahdi Army Fighters in South."

111. Multi-National Corps–Iraq, "Iraqi Army Destroys Weapons Cache near Nasiriyah."

112. Major General William Caldwell IV and Major Marty Weber (media roundtable).

113. Multi-National Corps–Iraq, "Iraqi Special Operation Forces Detain Insurgent Leader," press release 20070630-04, June 30, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12607&Itemid=128 (accessed February 4, 2008).

114. Ibid.; and Multi-National Corps–Iraq, "Update: Detainee Captured June 28 Identified."

115. Multi-National Force–Iraq, "Coalition Forces Disrupt Secret Cell Terrorist Network."

116. Brigadier General Kevin Bergner (press briefing).

117. The exact date of his meeting in Diyala has not been published. He was captured on March 20, 2007, had recorded the meeting in the twenty-two-page personal diary that U.S. forces found when they captured him, and was on his fourth trip to Iraq since May 2006.

118. To review the operations in Balad Ruz and Turki Village, see Kimberly Kagan, "From 'New Way Forward' to New Commander," *Iraq Report* 1, March 1, 2007, available at www.understandingwar.org/report/new-way-forward-new-commander (accessed February 4, 2008); and Kimberly Kagan, "The Battle for Diyala," *Iraq Report* 4, May 7, 2007, available at www.understandingwar.org/report/battle-diyala (accessed February 4, 2008).

119. Multi-National Corps–Iraq, "Iraqi Police, Coalition Forces Discover Large EFP Cache," press release 20070226-01, February 26, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=10201&Itemid=21 (accessed February 4, 2008).

120. Borzou Daragahi, "Iraq Unveils Baghdad Security Moves," *Los Angeles Times*, February 14, 2007.

121. Multi-National Corps–Iraq, "Donkey Leads Border Patrol to Cache, Suspect," press release 200702017-03, February 17, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=9966&Itemid=128 (accessed February 4, 2008).

122. "Five Insurgents Killed, 12 Suspects Caught in Iraq Operations," American Forces Press Service, February 23, 2007, available at www.globalsecurity.org/military/library/news/2007/02/mil-070223-afps01.htm (accessed February 4, 2008).

123. Multi-National Corps–Iraq, "Iraqi Security Forces Discover Weapons Cache," press release 20070404-16, April 4, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=11136&Itemid=21 (accessed February 4, 2008).

124. Ibid.

125. Kimberly Kagan, "The Battle for Diyala."

126. Major General Benjamin Mixon and Colonel James Trogdon (Department of Defense news briefing, March 9, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3901 (accessed February 4, 2008).

127. Brigadier General Kevin Bergner (press briefing).

128. Multi-National Force–Iraq, "Coalition Forces Kill Eight, Detain Three, Capturing a Special Groups Leader and Smuggler of Iranian Weapons," press release A070820a, August 20, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13434&Itemid=21 (accessed February 4, 2008).

129. Multi-National Corps–Iraq, "Iraqi Police, Coalition Forces Discover Large EFP Cache."

130. Multi-National Corps–Iraq, "EFP Cache Footage Available on DVIDS," press release 20070226-05, February 26, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=10202&Itemid=21&lang=arabic (accessed February 4, 2008).

131. Multi-National Corps–Iraq, "Iraqi Police, Coalition Forces Discover Large EFP Cache."

132. Multi-National Force–Iraq, "Coalition Forces Detain Four Suspected Special Groups Terrorists," press release A070727a, July 27, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13053&Itemid=128 (accessed February 4, 2008); and Multi-National Force–Iraq, "Coalition Forces Detain Seven Suspected Weapons Facilitators," press release A070902a, September 2, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13711&Itemid=21 (accessed February 4, 2008).

PX643

133. Multi-National Force–Iraq, "Coalition Forces Target Special Groups Member, Kill 25 Terrorists," press release A071005a, October 5, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=14431&Itemid=128 (accessed February 4, 2008).

134. Multi-National Corps–Iraq, "Iraqi Special Operations Forces, U.S. Special Forces Detain Extremist Company Commander," press release 20071006-01, October 6, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=14456&Itemid=128 (accessed February 4, 2008).

135. Multi-National Force–Iraq, "Coalition Forces Capture High Value Terrorist with Ties to IRGC-QF," press release A070720a, July 20, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=12939&Itemid=128 (accessed February 4, 2008).

136. Staff Sargeant Russell Bassett, "CLC Tip Leads to Massive EFP, Explosives Cache," *Stryker Brigade News*, October 25, 2007; and Multi-National Corps–Iraq, "Tip from Concerned Iraqi Citizen Leads to Large EFP, Explosives Cache," press release 20071024-09, October 24, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=14836&Itemid=128 (accessed February 4, 2008).

137. Multi-National Force–Iraq, "Coalition Forces Kill One Terrorist, Detain 7 Suspects," press release A070919b, September 19, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=14109&Itemid=21 (accessed February 4, 2008); and Multi-National Corps–Iraq, "Coalition Forces Detain Terrorist Leaders Responsible for IED/EFP Attacks in Diyala," press release 20071002-10, October 2, 2007, available at www.mnfiraq.com/index.php?option=com_content&task=view&id=14394&Itemid=128 (accessed February 4, 2008).

138. Multi-National Force–Iraq, "Coalition Forces Detain Four Suspected Special Groups Terrorists"; Multi-National Force–Iraq, "Coalition Forces Kill Four Suspected Secret Cell Terrorists, Detain Eighteen," press release A070804b, August 4, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13167&Itemid=21 (accessed on February 4, 2008); Multi-National

Force–Iraq, "Coalition Forces Kill Eight, Detain Three, Capturing a Special Groups Leader and Smuggler of Iranian Weapons"; and Multi-National Force–Iraq, "Coalition Forces Detain Seven Suspected Weapons Facilitators."

139. Multi-National Force–Iraq, "Coalition Forces Target Special Groups Member, Kill 25 Terrorists."

140. Lieutenant General Raymond T. Odierno (Department of Defense special briefing, Arlington, VA, June 22, 2007), available atwww.globalsecurity.org/military/library/news/2007/06/mil-070622-dod01.htm (accessed February 4, 2008).

141. Major General Joseph Fil Jr., (Department of Defense press briefing, Arlington, VA, June 29, 2007), available at www.globalsecurity.org/military/library/news/2007/06/mil-070629-dod03.htm (accessed February 4, 2008).

142. Lieutenant General Raymond T. Odierno (Department of Defense press briefing).

143. Brigadier General Kevin Bergner (press briefing).

144. Ibid.

145. Lauren Frayer, "U.S. Soldiers Find Tips Flowing from Rifts within Powerful Shiite Militia Run by Young Cleric," Associated Press, May 15, 2007; and Babak Dehghanpisheh, "Iraq's New Guns for Hire."

146. Lauren Frayer, "U.S. Soldiers Find Tips Flowing from Rifts within Powerful Shiite Militia Run by Young Cleric."

147. As quoted in Sean D. Naylor, "Iran Deeply Involved in Iraq, Petraeus Says," *Army Times*, May 25, 2007. It is in this context that Petraeus stated that the Quds Force reports to the Iranian supreme leader Ayatollah Ali Khamenei.

148. Multi-National Corps–Iraq, "Iraqi Army, U.S. Special Forces Detain Shi'a Extremist Leader," press release 20070815-08, August 15, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13366&Itemid=21 (accessed February 4, 2008).

149. Multi-National Force–Iraq, "Coalition Forces Kill Four Terrorists, Detain Eight in Search for Militant Extremist Leader," press release A070814b, August 14, 2007, available at www.mnf-iraq.com/index.php?option=com_content&task=view&id=13346&Itemid=128 (accessed February 4, 2008).

PX643

# 3

# Afghanistan

In 2007, Iran offered economic, social, and cultural assistance to Afghanistan; pressured Kabul over Afghan refugees and migrant workers in Iran; lent limited military support to the Taliban and possibly other insurgent groups; tried to develop a deep bilateral relationship between Tehran and Kabul; attempted to create a gap between Kabul and the West; and possibly tried to destabilize the government of Hamid Karzai.[1] Taken together, these activities constitute what might be a deliberate strategy on Afghanistan for Tehran, although there is no direct evidence to prove that Iran is following such a strategy. Whatever Iran's purposes might be, however, the effects of its various undertakings in Afghanistan are clear: the creation of a buffer zone of the three western provinces of Herat, Farah, and Nimruz, which are tied increasingly to Tehran rather than to Kabul; the intimidation of Afghanistan's government in confrontations with Iran; and the hindrance of Coalition efforts (which are halting in any event) to develop and implement a coherent country-wide strategy.

## Economic, Social, and Cultural Assistance

Iran's assistance to Afghanistan is unquestionably significant. Since it is natural for a large and wealthier state to assist and develop an impoverished and war-torn state on its border, or for any state to try to expand commercial relations with its neighbors, Iran's activities in these areas have aroused little comment and even some praise. Nor is it possible to draw a line between normal economic activity and an economic strategy intended to affect power relations. In the broader context of Iran's activities in Afghanistan, however, its economic efforts are creating a set of incentives and disincentives that operate powerfully on the Afghan government and that are changing power relations within Afghanistan and between Iran and Afghanistan in important ways.

Iran had been hostile toward the Taliban regime, just as it had been toward the Soviet-installed and backed Afghan governments of the 1980s and early 1990s. Iran had accepted millions of Afghan refugees but had supported insurgent groups in Afghanistan and avoided any serious effort to establish or expand economic ties with regimes it saw as its foes. The collapse of the Taliban regime in fall 2001 changed Tehran's attitude profoundly. It appears that Iran actively assisted the United States in bringing down that regime and was initially helpful in the creation of a new government in Afghanistan.[2] Then-president Mohammad Khatami visited Kabul in August 2002—the first such high-level visit in forty years. Trade agreements followed in January 2003, including efforts to replace Karachi with the Iranian port of Chabahar as Afghanistan's principal trade outlet. Iran offered Afghanistan a 90 percent discount on duties and tariffs for goods exported through the Chabahar free trade zone.[3] Iranian-Afghan trade grew from less than $10 million in 2001 to $500 million in 2006.[4] By mid-2007, Iran had extended more than $500 million in credits to Afghanistan, at least half of which were in grants.[5]

Some of Iran's assistance was general support to Afghan reconstruction. In June 2006, Tehran promised to build two fifty-megawatt electrical power stations to supplement Kabul's electrical supply (then around 150 megawatts) at a cost of around $80 million.[6] Iran provided nearly $2 million to assist the Afghan Independent Administrative Reforms and Civil Service Commission to train government officials in Kandahar, Herat, and Kabul in 2006 and 2007.[7] Iranian support helped build a communications institute; provide training for postal employees; rebuild the medical department at Kabul University;

PX643

establish "the first national teacher training centre, construction of a centre for religious affairs, provision of education scholarships, construction of a vocational training centre," and a program to "send experts to train Afghan teachers"; and help "Afghan teachers from religious seminaries and schoolteachers . . . [to] be sent to Iran to get training."[8] The Iranian company Shaheedi Qandi joined forces with an Indian firm to add 150,000 telephone lines in Kabul, Kandahar, Mazar-e Sharif, Jalalabad, and Kunduz.[9] Iran also signed a number of memoranda of understanding and formal trade agreements with Afghanistan, and both countries hoped that trade would double to $1 billion in 2008.[10] The combined $1 billion in Iranian trade and aid are extremely significant for a country whose 2006 GDP was a little over $8 billion.[11]

In addition to this general aid, Iran has also provided targeted assistance to the border provinces of Herat, Farah, and Nimruz. The most visible forms of aid have been in electricity and transportation infrastructure, with many projects seemingly intended to draw Afghanistan's western border areas closer to the Iranian economy. Thus Iran, Afghanistan, and sometimes international partners have been hard at work on road and rail links between the two countries. In early 2006, the construction of a highway between Dilaram and Zaranj (the capital of Nimruz) was announced.[12] A year later, Iran and Afghanistan unveiled a project to link Mashhad (a major city in northeastern Iran) with Herat city by rail. Iran promised to pay 60 percent of the project's cost.[13] Shortly thereafter, Iran announced its intention to build customs offices and warehouses in Farah city, along with ninety kilometers of paved road connecting the facilities to the city.[14] In August 2007, Iranian president Mahmoud Ahmadinejad announced on a visit to Kabul that Tehran would build a 110-kilometer road from Farah city to the Iranian border area of Mailak.[15]

Although a few hundred kilometers of road and rail does not seem very significant, it is to a country nearly the size of Texas that had only around 8,300 kilometers of paved roads in 2004.[16] The net result of this construction will be to link the provincial capitals (which are also the major cities) of Afghanistan's three western provinces more closely to Iran than to

Kabul. An October 2007 report noted that the average transit time for cargo from Kabul to the Pakistani and Uzbek borders is around nineteen days but that it takes nearly one hundred days for passage from Kabul to the Iranian border.[17] And it goes without saying that modern road and rail links between Herat, Farah, and Zaranj and the Iranian border cities will be much faster—it is nearly 650 miles from Kabul to Herat along the "ring road," while Herat is 75 miles and Farah 120 miles from the Iranian border. Zaranj is right on the border. When the relative security of travel between Afghanistan's western provinces and Iran compared to travel on Afghanistan's ring road is considered, the difference is even greater. A relatively small amount of highly targeted infrastructure aid is binding Afghanistan's west closer to Iran than to Kabul.

Tehran has also been helping to link western Afghanistan to the Iranian power grid and to upgrade the electrical capacity of the western provincial capitals generally. In 2004–2005, Iran gave Afghanistan $13 million to install an electric substation in Herat. In January 2007, an Iranian-funded thirty-megawatt transformer began operating in the Ghurian district of Herat province (at a cost of $2 million), and Tehran has promised another such plant in the area soon.[18] In May 2007, Tehran constructed a power line between Herat and Iran and promised to begin supplying electricity to Farah province.[19] Again, the scale of the effort is relatively small, but the effects on the western part of an impoverished and war-devastated country are not to be discounted.

All of these efforts are in line with Afghanistan's National Development Strategy[20] and parallel efforts by Afghanistan's other neighbors to improve transportation and electrical links with Afghanistan. The Afghan railway development strategy, in fact, prioritizes "linking major border provincial capitals to the neighboring countries" ahead of "linking major Afghan cities, with a focus on improving transit time" and "facilitating the connection between European, Central Asian and South Asian railway networks."[21] The Iranian efforts are more advanced than those of most of Afghanistan's other neighbors. Work has already begun, for example, on the Mashhad-Herat

PX643

railway even though the remaining 40 percent of the funding has not yet been identified.[22]

The purpose of this discussion is not to question the economic wisdom of Afghanistan's planners or the international community, or even to ascribe motives to the Iranian regime. Iran is a larger and wealthier country than any of Afghanistan's other neighbors, and the Afghan-Iranian border region has been generally more secure than the Afghan-Pakistani border and even than some of Afghanistan's northern frontiers. The result, however, is that Iran is absorbing western Afghanistan into its economic orbit far faster than Pakistan, Tajikistan, Uzbekistan, Turkmenistan, and China are integrating the Afghan provinces on their borders—faster even than Afghanistan is integrating its own regions and cities into an economic unit.

Iran's support for Afghanistan's religious and educational programs suggests that this outcome might not be entirely unintended. Not only has Iran offered to send Iranian teachers to Afghanistan and bring Afghan teachers and clerics to Iran for training, but Tehran has also initiated a program to encourage the teaching and learning of Farsi in Afghanistan—even in areas beyond the western border provinces.[23] Iranian leaders and media frequently refer to the close cultural ties between the two states, and Afghan leaders sometimes reciprocate.[24] This posture is natural for the Perso-centric, Farsi-speaking Iranians as well as for many of the Afghan elite who speak Dari (the Afghan dialect of Farsi). It is less natural for a neighbor that wishes to help stabilize Afghanistan's government in the face of the primarily Sunni and Pashtun Taliban insurgency that is fueled by resentment of the Dari-speaking elite and its members' supposedly Shiite proclivities. An Iranian emphasis on pan-Persianism or pan-Shiism may have interesting and unpredictable long-term effects within Afghanistan and on Afghanistan's relationship with Iran.

## Refugees and Migrant Workers

Over the past three decades, Afghans have fled their country in staggering numbers. Millions of Afghans fled the country after the Soviet invasion of 1979.

War against the Soviets throughout the 1980s created more refugees. Civil war and the Taliban during the 1990s created still more. The great majority of these refugees fled to Pakistan and Iran, where many have remained for decades. The collapse of the Taliban and the rise of an internationally supported and protected representative government have reversed this flow. Reports suggest that as many as 4 million Afghans may have returned from abroad already.[25] There are still nearly a million Afghan refugees in Iran, however, and slightly more in Pakistan.[26]

In principle, the refugees themselves are not a problem in Iranian-Afghan relations. The problem stems from the perhaps 1.5 million Afghan migrant workers in Iran, many if not most of whom lack work or residence permits.[27] Iranian officials at many levels have identified the usual litany of problems caused by illegal immigrants: strains on the Iranian school system, migrant workers taking scarce jobs away from Iranians, violence and insecurity, and narcotics trafficking, among others.[28] Although these problems are most prevalent in the Iranian provinces bordering Afghanistan (Sistan and Baluchistan, South Khorasan, Razavi Khorasan, and North Khorasan), Iranian officials in Tehran, Esfahan, and elsewhere have complained about Afghan migrant populations.[29] Since Iran has allowed many registered Afghan refugees relatively free movement, rather than confining them all to camps, it is not always easy to distinguish between legal Afghan refugees, legal Afghan migrant workers, and illegal migrant workers or immigrants.

After gaining power in 2005, the Ahmadinejad administration wasted little time in highlighting its concerns about Afghan migrant workers. In February 2006, the Iranian ambassador in Kabul announced that "all Afghan refugees living in Iran illegally" would be expelled by September 2006.[30] Those who failed to comply would be arrested and detained in camps. It would have been impossible for Afghanistan to absorb more than a million returning refugees and migrants within seven months, and the Iranians apparently abandoned the notion.[31] Ahmadinejad resumed deportations a year later, prompting a humanitarian and political crisis in Afghanistan that persisted throughout 2007.

PX643

On April 15, 2007, Afghan foreign minister Rangin Dadfar Spanta announced that the Iranians were going to start expelling illegal Afghan immigrants.[32] On April 21, the Iranian interior ministry, working with the affected provinces, began rounding up Afghans in Iran illegally, concentrating them in newly constructed camps on the border, and deporting them to Afghanistan. Iranian interior minister Mostafa Pour-Mohammadi described the effort as a two-phase plan aimed at expelling "one m[illion] resident aliens" by March 2008.[33] By early May 2007, tens of thousands of Afghans had been repatriated.

Afghan officials, including speaker of the Wolesi Jirga (the lower house of the Afghan parliament) Yunus Qanuni, negotiated with their counterparts in Tehran.[34] Qanuni's intervention was the prelude to a serious political crisis in Kabul. Spanta said that the mass expulsion was unexpected. President Hamid Karzai announced that he had instructed the minister for refugee affairs to address the problem and said that he intended to call Ahmadinejad. Allegations of violence and misconduct by Iranian officials began to circulate as the refugees arrived in Afghanistan.[35] In response to the growing tension, Tehran escalated its rhetoric. Pour-Mohammadi announced that the surge of Afghan refugees in Iran was the result of the "heavy American military presence" in Afghanistan. He claimed that the number of Afghans in Iran had been swelling since the deployment of NATO troops and claimed, "I have visited Afghan refugee camps and noticed that most of those expelled following their arrests have re-entered into Iran over the last three years."[36] The next day, refugees minister Mohammad Akbar Akbar lost a no-confidence vote in the Wolesi Jirga—the first minister ever to do so.[37] Spanta followed two days later.[38]

By mid-June, humanitarian organizations were in an uproar over the Iranian deportation. The International Organization for Migration (IOM) called for a mobilization of international resources to "avert a humanitarian crisis," noting that "the forced removals are taking place at a time when Afghanistan still faces serious internal challenges. The security situation remains volatile; unemployment in general and among the youth and unskilled laborers in particular is reaching alarming levels; and there is a desperate shortage of urban and rural housing."[39] Human Rights Watch (HRW) declared on June 19 that "Iran should immediately halt the mass deportations of Afghan nationals and investigate allegations that its authorities have abused numerous deportees." Noting that Iran had expelled one hundred thousand Afghans since April 21, HRW asserted that "Iranian officials have also expelled Afghans who have been registered with the authorities, many of whom have been regarded as refugees (*panahandegan*) for many years."[40]

Iranian deputy foreign minister for Asia-Pacific and Commonwealth countries Mehdi Safari arrived in Kabul on May 13 for talks with Karzai. The two "stressed gradual and regular repatriation of Afghan refugees living in Iran who have no legal documents. Safari said Iranian President Mahmoud Ahmadinejad has agreed with gradual and regular return of Afghan refugees to their homeland."[41] Karzai and Safari agreed that an Afghan team would go to Tehran to discuss the issue further. Karzai once again invited Ahmadinejad to visit Kabul—a visit that was apparently already scheduled for mid-June. Safari also met with Qanuni and called for the "consolidation of mutual relations and establishment of Iran-Afghanistan Parliamentary Friendship Group." Qanuni was invited to visit Iran soon.[42] Two weeks later, Karzai spokesman Karim Rahimi announced that "Iranian officials had agreed to halt the process [of involuntary repatriations] for three months."[43]

If Tehran actually agreed to suspend the deportations at the end of May, the news was slow to reach the relevant provincial officials. Police and the Fath Operational Base in Sistan and Baluchistan announced that they had driven out 74,597 "foreigners" since April 21 and urged remaining "illegal foreign nationals" to register with the authorities "as soon as possible in order to take part in creation of their homeland's future."[44] The governor of Zabol (on the Afghan border, a few miles from Zaranj), boasted of clearing 165 villages of "foreign nationals" and expelling over 45,000 foreigners since April. He added that "from the outset of the project, most of the foreigners did not believe that the project would

PX643

be launched effectively and some hostile groups were trying to halt the plan, but thanks to God's favors and our officials' vigilance, the problems were resolved and plots of enemies were foiled."[45] The Esfahan provincial governor's deputy for alien and immigration affairs complained in mid-June that forty thousand Afghans still lived in his province without permits. He warned that anyone employing illegal residents would be fined and punished.[46] A Friday prayer leader of Saravan (in Sistan-Baluchistan province) declared that Karzai's objections to the repatriation program are "because of American domination and orders in Afghanistan." He added that "the project to round up and deport illegal immigrants must be carried out at full stretch. He also said that security bodies, intelligence agencies, and the public must coordinate their work in order to send foreigners back to their countries."[47] And on June 21, the governor of Zahedan—the capital of Sistan and Baluchistan—"announced the beginning of the second phase of the project to expel foreign nationals from Sistan-Baluchestan." He declared, "Everything is ready to start the second phase of the project to expel illegal foreign nationals from Zahedan that will begin tomorrow 1 Tir (22 July)."[48]

It is not entirely clear what has become of the plan to evict a million Afghans from Iran by March 2008. By early July, the IOM reported that Iran had deported some 130,000 Afghans since April 21, but Iranian news reports suggest that most of the deportations occurred within the first month or six weeks after the order. Thereafter, the actual movement of Afghan refugees across the border appears to have slowed, although it is possible that the Iranians continued to arrest and concentrate Afghans in camps near the border.[49] One fact, however, is inescapable: the Iranian government has Kabul on the defensive.

## Support for Insurgents

Iran's economic involvement in Afghanistan and its role in the refugee crisis are indisputable, but they are almost totally ignored by the Western media. Even the expulsion of more than 130,000 Afghans,

accompanied by the complaints of international organizations, generated hardly any notice. The seizure of two or three truckloads worth of military supplies for the Taliban, however, was widely reported and highly controversial and has served, quite improperly, as a litmus test for Iranian intentions in Afghanistan. The weapons shipments themselves were small—at least those that NATO and Afghan forces seized. The significance of these shipments can only be understood within the larger context of Iranian involvement in Afghanistan and the security situation within Afghanistan.

The first significant report of Iranian weapons in Afghanistan in 2007 came from a press conference with then-chairman of the Joint Chiefs of Staff General Peter Pace on April 17. Pace announced: "We have intercepted weapons in Afghanistan headed for the Taliban that were made in Iran. It's not clear in Afghanistan which Iranian entity is responsible." The shipment included mortars and plastic explosives and was seized near Kandahar within the previous week. Pace was careful to obfuscate the question of Iranian government control over the shipment: "We know that there are munitions that were made in Iran that are in Iraq and in Afghanistan. And we know that the Quds Force works for the IRGC [Iranian Revolutionary Guard Corps]. We then surmise from that one or two things. Either the leadership of the country knows what their armed forces are doing, or that they don't know. And in either case that's a problem."[50] The next day, Brigadier General Joseph Votel, deputy commanding general for operations of Combined Joint Task Force-82 (CJTF-82), was asked about Pace's statement in a press conference at Bagram Air Base. He explained that the caches Pace was referring to were found outside of his area of operations, "so I don't know all the particulars of those finds." Pressed further, he said, "I'm not sure I really have the visibility to address that particular problem. . . . Being in Regional Command East, you know, our focus is more over on the Pakistan border, so we certainly don't see [any] direct influence from Iran. . . . Right now it's not having an impact here in Regional Command East."[51]

PX643

FIGURE 1
COMMAND STRUCTURE IN AFGHANISTAN



SOURCE: AEI, 2008.

This exchange highlights an important problem in the command arrangements in Afghanistan that has seriously hindered the Coalition's ability to comprehend—or at least articulate—the scale and intentions of Iranian intervention in Afghanistan. The 2006 transition in the Afghan mission from American leadership to NATO leadership created at least two major problems in the command structure of the mission (see Figure 1). It shifted operational control of American forces in Afghanistan from U.S. Central Command (CENTCOM)—the four-star headquarters now under Admiral William Fallon that has responsibility for the area from Pakistan to Morocco—to a NATO headquarters—Joint Forces Command–Brunssum (JFC Brunssum), commanded by German General Egon Ramms. JFC-Brunssum reports to the Supreme Headquarters Allied Powers Europe, commanded by the Supreme Allied Commander Europe, General Bantz Craddock, who is also the commander of U.S. European Command (EUCOM). But CENTCOM retains responsibility for counterterrorism operations in Afghanistan, both through the Combined Joint Special Operations Task Force, which operates both in Iraq and Afghanistan, and through Operation Enduring Freedom. The force executing Enduring Freedom is CJTF-82, based around the headquarters of the 82nd Airborne Division, commanded by Major General David Rodriguez. But CJTF-82 is also the headquarters and force responsible for executing the NATO–International Security Assistance Force (ISAF) mission in Regional Command (RC) East. It is therefore nominally under the control both of the CENTCOM commander, Fallon, and of the EUCOM commander, Craddock, via an American headquarters in Bagram, Afghanistan, and a German-commanded headquarters in Brunssum. The rest of Afghanistan is the responsibility of four other ISAF headquarters: RC West (Italian command), RC South (British command), RC North (German command), and RC Capital (Turkish command).

The result of this byzantine command arrangement is that it is very difficult for anyone to develop a coherent, detailed understanding of what is actually going on in Afghanistan. ISAF commander General Daniel McNeill theoretically holds the position

PX643

in Afghanistan equivalent to the one General David Petraeus holds in Baghdad, but not in reality. McNeill operates within a NATO framework overseeing the soldiers of twenty-six NATO and twelve non-NATO countries, many of them deployed with national caveats that restrict the operations they can undertake. His immediate subordinates, apart from Rodriguez, are NATO commanders, not American commanders, and they are accountable to and take orders from their own national governments as well as from McNeill. Even the media suffers from this arrangement. American reporters regularly interview American commanders, from McNeill to individual brigade commanders, but rarely interview even the British commanders of neighboring RC South, let alone the Turkish, German, or Italian commanders of the other sectors. Following the details of a complex story like the movement of a few truckloads of Iranian weapons from Iran through Herat and Farah provinces (in RC West) into Nimruz, Helmand, and Kandahar provinces (in RC South) and possibly into the areas in which U.S. forces regularly operate is extraordinarily difficult. This difficulty is one of the reasons for the confusion surrounding the story of Iranian weapons moving around Afghanistan and helps explain why the American division commander in eastern Afghanistan can reasonably claim to have no real idea of the scope or purpose of Iranian arms shipments captured to his immediate west.

The command confusion is only part of the problem, however. Another, perhaps greater, issue is the determination of military officials at all levels from early on to distinguish between the presence of Iranian weapons in Afghanistan and the implication that the Iranian government was deliberately sending them there. Thus, the commander of American forces in the westernmost sections of RC East explained on April 24, 2007, that "there may be an Iranian presence throughout the battle space. But is it state-sponsored? Is it state-sanctioned? I have absolutely no ability to link that together at this time."[52] Even Dutch Major General Ton van Loon, then-commander of RC South—where the weapons were found—refused to clear up the confusion when he was asked about "the latest report that weapons

from Iran have been found in Afghanistan." Instead he replied: "It's very hard to say something about that. We, of course, received the information that this might be the case. We cannot deny or confirm it. We know that there are some high-end weapons like the AGS-17, which has shown up in Helmand. Whether this weapon has been brought into Iran [*sic*] is for us very hard to actually be very firm about."[53] At a Kabul press conference ten days later, ISAF spokeswoman Lieutenant Colonel Maria Carl was more specific: "The weapons seized included RPG-7 launchers, light guns, and explosive devises. The arms bore the distinct hallmarks of Iran, she claimed."[54] Carl stopped short of addressing the question of the involvement of the Iranian government.

The issue surfaced more dramatically following the seizure of another shipment in early June. Colonel Rahmatullah Safi, commander of the Afghan Sixth Border Brigade, told Afghan media that his forces had seized Iranian "high-intensity anti-tank bombs" from a mountain cave in western Herat province. Major General Kiramuddin Yawar, the border police commander for the western zone, showed the Pajhwok Afghan News Agency six bombs that bore "all the Iranian hallmarks." An anonymous "intelligence official" (nationality not specified) "revealed around 10 Iranian-made bombs had been seized so far in Herat's Shindand district alone."[55] It is not clear if these are one or two caches—the Ghurian district in which Safi says his forces had found six bombs is not that close to the Shindand district, which has no border with Iran. It is quite possible that there were two separate caches, as McNeill announced on June 5:

> We have intercepted at least two convoys that have contained munitions or weapons. Some of those munitions and weapons clearly of— are Iranian origin. . . . We do have two events in which we have recovered explosively formed penetrators [EFP]. . . . In one case, it was not highly sophisticated in terms of giving it a technology-type measurement; in the other case, it was fairly sophisticated. In both cases, they had characteristics of EFPs that I had read about that have been found and indeed used in

PX643

Iraq and are said to have originated from Iran. . . . We intercepted those convoys. . . inside of Afghanistan. We intercepted them out west. In the case of one of them, there were mortar rounds that were clearly of Iranian origin. There were also explosives, plastic explosives, packaged to make it look like U.S.-made C-4, which is an up-scale version of plastic explosives. It's my understanding that similar types of explosives have been found in Iraq, and once again, the information says they originate from Iran. . . . The convoys were intercepted inside of the Afghan border with Iran—in one case, well inside; in the other case, inside.[56]

McNeill took pains, however, to emphasize that

[w]e don't have conclusive evidence to say that this was something officially sanctioned by the government of Iran. But I might point out that in the experience I've had in Afghanistan, which is going on for almost a year and a half, over two tours now, it's not uncommon to find weapons or munitions from lots of countries. . . . I just stand by what I said. I haven't seen conclusive evidence there's anything in the way of formal sanctioning by the Iranian government for what we have found in the way of weapons and munitions that have come into this country.[57]

Pace was similarly positive in a June 3 press conference that Iranian weapons—including EFPs—had been seized in Afghanistan and that he did not know whether or not the Iranian government was intentionally sending them there.[58] Secretary of Defense Robert Gates took a similarly ambivalent stance in a June 5 joint press conference with Karzai, but the Afghan president was less ambivalent: "We don't have any such evidence so far of involvement of the Iranian government in the supplying [sic] the Taliban. We have a very good relationship with the Iranian government. Iran and Afghanistan have never been as friendly as they are today. In the past five years, Afghanistan have [sic] been Iran's very close friend. . . ."[59]

Clarity briefly emerged on June 13 when Under Secretary of State Nicholas Burns said, "There's irrefutable evidence the Iranians are now" transferring arms to Taliban fighters in Afghanistan. He added, "It's certainly coming from the government of Iran. It's coming from the Iranian Revolutionary Guard Corps command, which is a basic unit of the Iranian government."[60] The Afghan and American governments almost immediately began to walk it back, however. The same day, Gates said:

I think it's been a couple of weeks or so since I was asked about the Iranian supply of weapons to Afghanistan. I have seen additional analysis in the interval that makes it pretty clear there's a fairly substantial flow of weapons. I would say, I haven't seen any intelligence specifically to the effect—to this effect, but I would say, given the quantities that we're seeing, it is difficult to believe that it's associated with smuggling or the drug business or that it's taking place without the knowledge of the Iranian government. . . . My impression is that the weapons are intended for the Taliban. I don't know that we have seen any evidence of Qods Force in Afghanistan.[61]

State Department spokesman Sean McCormack added that he could not establish a "hard link . . . between an Iranian government–approved program and the transfer of those arms," but that it is "hard to believe that they're not" involved. "And if they don't know about it, then that raises other troubling questions, that they don't fully control what's going on inside their own country."[62] Asked about Burns's statement, McCormack said, "I think what Nick was doing was giving voice to all of these concerns and suspicions that all of us have."[63] Burns himself revised the statement a little the next day:

What I meant to say was that there is irrefutable, clear evidence that Iranian-origin weapons have found their way into Afghanistan, and they have been intercepted by allied forces, and those weapons, we believe, were destined for the Taliban. Secretary of Defense

PX643

Gates said yesterday that he finds it very difficult to believe that the Iranian Government is not aware of these or connected to these, so this is a change in Iranian government policy. For a long time, we assumed that the Iranians were the foe of the Taliban and were going to give constructive support to the Afghan government. But now we have a situation where there is this very disturbing evidence that Iranian-origin weapons have been conveyed across the border into Afghanistan for the Taliban.[64]

Safi, however, continued to stoke the fire, announcing on June 18 that "more than 20 armed men crossed the border from Iran into Afghanistan and entered a town. . . . [A]ccording to intelligence information, the group of armed militants crossed the border into the Anardara District of Farah Province on 18 June." He added, "Two pickup trucks with over 20 armed people onboard crossed the border from Iran to Afghanistan." Safi explained that according to intelligence, "the men were heading toward the Zirkoh area in Farah province, which has been the site of escalating militant activity in recent months." A few days later, he said, "We had some reports that two vehicles entered our country from the border areas. . . . There were only some reports. We have not seen them personally. We have ordered our forces to control such movements. However, we did not find any other incidents."[65] According to Radio Free Europe/Radio Liberty (RFE/RL), "Safi also has told Western and Afghan journalists that remnants of Iranian ammunition were discovered on the ground in Herat Province after fierce clashes last weekend between Taliban and Afghan police. He said five antitank mines with Iranian markings were also seized at the border two weeks ago."[66]

But even Safi was careful to distinguish between Iranian weapons and Iranian intentions, telling RFE/RL, "So far we don't have any evidence which would satisfy our government and the international community that our neighboring countries have been undermining our country's [laws]. . . . We would need evidence to prove it. We have ordered our military units to check the reports. We will see what results we are getting after the investigation and assessments in the area."[67] The following month, an ISAF officer and "expert on explosive devices," Thomas Kelly, told Afghan media "that they had found no evidence regarding arms supply to the opponents from other countries. . . . Last month, intelligence officials announced that a landmine defused near the Polytechnic University in Kabul was similar to ones used by insurgents in Iraq. However, Kelly said tests had proved that the explosive device was different from those used in Iraq."[68]

But three days later another story broke. Pajhwok Afghan News reported: "The government of Iran has converted the military camps of former mujahedeen into training camps for the opponents of the current Afghan government." An anonymous parliamentarian from Herat,

> [q]uoting residents of Herat and Farah provinces, who had freshly returned from the neighboring country, said the former mujahedeen training camps in Turbat Jam, Birjand, Taibat and Haji Abad areas had now been converted into training camps for Taliban.
>
> He said people who had returned from Iran claimed that high ranking Taliban were also freely visiting those "training facilities."
>
> He added Yahya Khurdturk, a former commander of Islamic Movement of Sheikh Asif Mohsini and currently a member of the Islamic United Front of Ustad Akbari, leader of the Shi'a community, had also got training along with his colleagues at . . . those camps.
>
> The MP said Yahya was directly linked to the Revolutionary Guards known as Sipah-i-Pasdaran [the IRGC]. . . .
>
> Ahmad Behzad, another MP from Herat province, said: "We have information that Sepahi Qudus (sacred force) [the Quds Force], a wing of the Pasdaran, is organizing and equipping opposition inside Afghanistan as well as train[ing] them at the centers in Iran."
>
> He termed the alleged training facilities for Taliban as an open intervention in the internal

PX643

affairs of Afghanistan by the neighboring country.

Behzad added: "We have information that such centers are existing not only in the border areas, but also in remote provinces."[69]

Safi repeated the accusations in an interview with the *Gulf Times*, saying

that he had intelligence information that militants including former *mujahedin*, who fought Soviet forces in Afghanistan and later plunged the country into a bloody civil war, ousted members of the Taliban and foreign fighters were trained in Iranian military bases.

"I have information that 45 fighters led by Yahya Khortarak, who was a mujahedeen commander in Herat province in the past, are now under training in the border town of Turbat Jam in Iran and they want to enter Herat from the Kamana area of the border to carry out some terrorist acts like planting mines, or even maybe suicide attacks," Safi said.

The brigade that Safi commands comprises 1,652 agents, but he says the actual number of men patrolling the 1186km border is barely 900.

"We don't even have one guard per kilometer, but the Iranians have thousands, so it's impossible that they are unaware of these movements," he admitted. . . .

"I am not talking for any one, neither for Karzai nor for the Americans—whatever I see I say it. I have seen the Iranian-made mines and armed people entering Afghanistan and I know that the militants are trained there," he stressed.[70]

The next day, however, Safi twice denied on Afghan radio stations that he had said that Iran was involved in training terrorists.[71]

The back-and-forth about Iranian weapons and the possible involvement of Tehran in shipping them continued for the rest of the year. In mid-August, officials in Balkh province in north-central Afghanistan claimed that they had seized a hundred

"YM-type landmines" of Iranian manufacture on the way from Uzbekistan into Afghanistan.[72] Three weeks later, an interior ministry spokesman denied that any Iranian-made mines had been seized.[73] The next day, Safi and Afghan deputy interior minister General Munir Mangal announced that large caches of Chinese, Iranian, and Russian weapons had been seized in the Ghurian district of Herat province.[74] Five days later, U.S. director of national intelligence John Negroponte "rejected any direct supply from China to the militants. However, he said the Chinese officials had told them they had sold such weapons to Iran some time back."[75] In October, Afghan defense minister Abdul Rahim Wardak noted that evidence was piling up that Iranian weapons, including EFPs, were going to the Taliban. He said that he had taken the matter up with the Iranians, who had completely denied it. He added: "There is no doubt that there is something coming from our western border. There are weapons and maybe some financial supports [*sic*] and others. But to be really completely clear about it, I think it will take a little bit of time to come up with the final conclusion."[76] At the end of the month, Safi coyly explained his apparently shifting views on the matter to a German magazine: "The Interior Ministry has forbidden me to talk with journalists anymore," he said. "I have never seen weapons from Iran. . . . There are many things that I am not supposed to say."[77]

## Analysis

There are three key questions to be answered about Iranian activities in Afghanistan: Are the Iranians pursuing a coherent strategy? If so, what is it? And irrespective of Tehran's intentions, what is happening on the ground? The first two questions cannot be answered based on available open-source information. Since neither Afghan nor Coalition forces have captured senior Iranian advisers in Afghanistan—as American and Iraqi forces have done in Iraq—there is no indisputable proof that Tehran or its agents are pursuing any particular strategy. Internal dynamics in the eastern provinces of Iran, moreover, suggest

PX643

plausible explanations for some of the important events described above, although even these internal dynamics could also be part of a larger strategy. In the absence of solid evidence, however, the discussion of Iranian intentions is difficult to resolve. It is much easier and helpful, however, to describe the effects of Iranian actions in Afghanistan. At the end of the day, whatever Tehran's intentions might be, Iranian agents—up to the presidential level—have set in motion a chain of events in Afghanistan that is hindering NATO's efforts to stabilize that country.

**Iranian Intentions.** The Ahmadinejad government has been preoccupied with three things in 2007: improving the Iranian economy, escalating tensions with the United States, and defeating its political opponents in the March 2008 parliamentary elections. Ahmadinejad has made much of his repeated tours of every province in Iran, during which he meets local leaders and local people and accepts petitions, promises improvements, exhorts, and generally behaves like a politician. He has emphasized efforts to improve the lives of the Iranian people, although he has become perhaps more shrill as sanctions, Iran's international isolation, and government mismanagement have driven perceptions of quality of life downward.[78] He and his political allies have also made much of the steadily rising tensions with the United States over Iran's nuclear program and its activities in Iraq. There was significant public rhetorical defiance by Iranian military officials over the course of 2007, accompanied by the announcement of a number of undertakings supposedly aimed at preparing the Islamic Republic to defend itself against American attack. All of these activities can help to explain Iranian interference in Afghanistan.

The presence of more than a million Afghan migrant workers is seen by many Iranians as a drag on the economy.[79] Iranian officials frequently point out that, unlike Pakistan and most other countries, Iran has not confined Afghan refugees in camps but rather has allowed them to live among the Iranian population and more or less enjoy the benefits of Iranian citizenship. Poor Afghan migrant workers are presumed to take jobs away from Iranians. Since Afghanistan is the world's largest supplier of opium and Iran a major consumer, Iranians connect Afghans—especially illegal migrant workers—with the drug trade. For all of these reasons, a canny politician in Tehran could well calculate the domestic benefits of an ostentatious effort to round up and deport illegal aliens.

Iranian officials have worked to take political advantage of the expulsion of Afghans, whatever its true motivations were. A senior official at the Iranian Ministry of Labor and Social Affairs announced three days before the start of the operation that Iranian workers had replaced 107,700 Afghans in 2006 and that they aimed to replace at least 210,000 more in 2007.[80] As the operation began, officials in Sistan and Baluchistan claimed that the deportation was improving the situation in the province almost immediately. Less than a week after the operation's beginning, several senior officials reported reductions in traffic, the price of fuel, and lines outside of bakeries, as well as a falloff in human trafficking.[81] The claims are possibly accurate—removing tens of thousands of people rapidly from an area tends to depress prices and eliminate lines, at least for a time.

The mass expulsion of Afghans could also dovetail with Iranian security developments in several ways. Tehran seems concerned about the possibility of U.S. attacks coming from Afghanistan or Pakistan.[82] It is difficult otherwise to explain the opening of a new Iranian air base at Birjand in South Khorasan in the middle of Iran's eastern frontier. At the inaugural ceremony in October 2007, the base's commander said that "with the inauguration of this base, from now on, all the military movements of the regional and world powers based in Afghanistan and the Persian Gulf would be under the observation of the air force."[83] The Iranian police established a new base called Rasul-e Akram (Most Noble Prophet) near Zahedan in Sistan and Baluchistan to control the borders and deal with "the problem of the refugees and illegal immigrants in the region."[84] A provincial official explained that "it was only in Sistan-Baluchestan Province where the police forces were given the responsibility to observe the security

PX643

issues, and the Rasul-e Akram Operational Base was established to that end." He added:

> For the first time in the military history of the country and based on a project approved by his eminence the great leader (Seyyed Ali Khamenei), some units of the Iranian army, units of the Air Force of the Islamic Republic of Iran, some parts of the Intelligence Ministry, and units coming from the Iranian Revolutionary Guards Corps and Basij were sent to be at the service of the Law Enforcement Force (police) in Sistan-Baluchestan.[85]

The IRGC also recently announced the construction of one hundred new posts for the IRGC volunteer paramilitary force known as the Basij in the "border areas" of South Khorasan,[86] coinciding with an increased role for the Basij in defending Iran against internal and external threats.[87] In this context, the regime's determination to drive Afghans out of the provinces bordering their own homeland may be part of an effort to remove potential fifth columnists or at least sources of information from strategically important areas prior to an anticipated attack. The "compromise" that Tehran seems to have worked out with Kabul over the refugee issue suggests that such strategic concerns play a role. Iran has insisted that it will clear Afghans from Sistan and Baluchistan, however many it ultimately repatriates.[88] Even as Tehran promised to issue more work permits to Afghans, it reaffirmed its decision to ban Afghans from eleven cities.[89]

There is certainly some connection between Iranian internal economic issues, security concerns (both internal and external), and the expulsion of Afghan refugees in 2007. Available evidence does not support a conclusion about causal relationships, however. The overall decision to expel the refugees may have been aimed primarily at threatening the Karzai government—demonstrating Iran's virtually limitless ability to cripple Afghanistan's reconstruction at any time by dumping hundreds of thousands of destitute refugees and migrant workers into Herat, Nimruz, and Farah. The economic and internal security

benefits Iranian officials have claimed for this action may have been secondary benefits. They may also have been the primary purposes, with the intimidation of Kabul a secondary benefit or, less plausibly, an unanticipated consequence. As shown below, it is not necessary to resolve the question of intentions to understand the actual effects of the action. The same is true of Iranian economic assistance to Afghanistan.

The issue of Iranian military support for the Taliban requires a little more examination before turning to the effects on the ground in Afghanistan, however. Two arguments are commonly adduced to show that the Iranian government is probably not actively aiding the Afghan insurgents. First, the mutual antipathy of the Islamic Republic of Iran and the Taliban is well-known and long-standing. Iranian rhetoric continues to demonize the Taliban, and the Taliban returns the favor. It is difficult to imagine a basis for any long-term relationship between these two groups or any desire in Tehran to see the Taliban return to power in Kabul. Second, as almost everyone in Kabul and Washington has been at pains to point out, there is no direct evidence that the government in Tehran—that is, Ahmadinejad and his immediate subordinates—ordered the shipments of weapons that Coalition forces captured in Afghanistan. Instead, both Afghan and U.S. officials have labored to create the possibility that rogue elements within the Iranian military have been smuggling advanced weapons to the Taliban without the knowledge of the senior leadership in Tehran.

The second argument is difficult to take seriously. The movement of several truckloads of weapons, including EFPs and advanced explosives, from arsenals in operational bases to the border, through border checkpoints, and then to Taliban operatives is not something that a handful of low-ranking officers and soldiers could undertake without anyone above them knowing about it. If such a scenario is really feasible, then Iran is an incredibly dangerous state, because its military lacks any meaningful controls on the export of military technology. But that is not the case. The IRGC is a disciplined and professional force, its operational bases are closely guarded and watched, and Iran is sufficiently open that any such

PX643

rogue cabal would be rapidly revealed, arrested, and punished. The fact that Tehran has instead simply denied sending any weapons to Afghanistan rather than punishing scapegoats to maintain plausible deniability renders this argument unsustainable.

The first argument is superficially stronger—since it cannot possibly be in Tehran's interest for the Taliban to return to power, it makes no sense for the IRGC to support the Taliban. In reality, this argument is also rather weak. There is very little question of the Taliban returning to power at this stage. Whatever the flaws and weaknesses of the NATO effort and the Karzai government, the Taliban is nowhere close to overturning the political order in Kabul. It is barely able to maintain safe havens in its own heartland for more than weeks at a time. A few truckloads of Iranian weapons are not going to turn the tables on NATO and Karzai. The Iranians need not fear that military support at the level they appear to be providing will bring their nemesis back to power. If the IRGC is sending weapons to the Taliban at the levels observed in 2007, the purpose is much more subtle and the aim more limited. A plausible strategy can be seen in the confluence of Iranian economic support, the location and nature of the major Taliban fights in 2007, and the role a small number of advanced weapons could play in those fights. This confluence will be examined further in the next section.

The most mysterious accusation against Tehran is that the IRGC is using former *mujahedin* bases to train Taliban insurgents. Reports of this activity coincided with the flow of involuntarily repatriated refugees and migrant workers into Herat in the spring. These reports are exactly what irritated Afghans might invent to discredit the Iranian government—the bases cited are all along the major road from Herat to Mashhad, were well-known locations of *mujahedin* training camps, and in some cases are now Iranian police and IRGC operational bases engaged in collecting and deporting Afghan migrant workers and refugees. It is possible that these reports are no more than angry conspiracy-mongering.

It is also possible that there is some truth to them. Afghan officials described the establishment of a new IRGC base on the Mashhad-Herat road called Mohammad Rasulullah (Prophet of God). The name of the base is unremarkable but, similar to that of the Rasul-e Akram base, known from the Iranian press to have been established at the same time near Zahedan for the purpose of rounding up Afghan refugees. Zahedan is hundreds of miles south of the location the Afghans offered for the Mohammad Rasulullah base, along a different road leading from a different Iranian province to a different Afghan province. Refugees in Herat, indeed, are extremely unlikely to have come via Zahedan, since we know from the Iranian press that refugees in Sistan and Baluchistan were sent to the much closer Afghan provinces of Nimruz and Farah, rather than Herat. On the other hand, it is quite plausible that the Iranians established a new operational base in Khorasan Razavi, parallel to the Rasul-e Akram base in Sistan and Baluchistan, for many of the same reasons: to improve security, oversee the expulsion of Afghan refugees, and improve border monitoring. It so happens that the Iranian media made much of the Sistan and Baluchistan base and has not apparently done so with the one in Khorasan Razavi, but that may be a matter of provincial media or government priorities. Of course, if the Mohammad Rasulullah operational base were really being used to train Taliban or non-Taliban Shiite insurgents in Afghanistan, then the Iranian media would be unlikely to report on it. Fallon recently said: "To the best of my knowledge we have not intercepted any arms shipments in recent months. . . . But we know that there were some shipments from Iran that certainly came into Afghanistan earlier this year. And we have lots of anecdotal evidence that indicates that they have been training some of these insurgents for Afghan."[90] Based on open-source information, we can only conclude that the story of Iranian training of Afghan rebels told by various Afghan officials is plausible but not confirmable.

**Effects.** The difficulty of determining—let alone proving—Iranian intentions in Afghanistan is great, as the evaluation above shows. Observing the effects of Iranian actions and the relationship between them and events in Afghanistan is much more

PX643

straightforward and enlightening—and also more important. At the end of the day, the United States, Afghanistan, and their allies must concern themselves with what is actually occurring, regardless of Tehran's actual intentions, and they must deal with the situation the Iranians are helping to create, even if the allies cannot tell whether or not Tehran is actively trying to create it.

To see the full effect of Iranian activities in Afghanistan, we must briefly consider the major Coalition and Taliban military operations in the western areas in 2007. Since the beginning of the year, the efforts of RC South focused on clearing the Helmand River Valley from Garmsir to Kajaki. By the end of the year, ISAF reported that it had finally cleared Musa Qala, the last Taliban stronghold in the area, northwest of Kajaki. The fighting peaked in early May, when the Taliban launched a significant counteroffensive against British forces operating north of the ring road near Sangin. According to multiple reports, there were several battles that lasted for ten hours or more and involved hundreds of Taliban fighters. During these battles, Taliban reinforcements arrived and attempted to set up secondary and tertiary defensive positions and ambushes. In at least one case, British sources reported reinforcements arriving from Shindand district of Herat province, another known Taliban stronghold. ISAF and the Afghan security forces defeated these counterattacks and continued clearing operations, but violence and disorder were prevalent in Helmand for much of the spring and summer.[91]

One interesting consequence of this disorder was that insurgents were able to attack food convoys moving along the ring road from Pakistan to Nimruz, Farah, and Herat with desperately needed supplies. The United Nations called for a halt on such attacks in May 2007.[92] The World Food Programme (WFP) announced that its convoys had suffered twenty attacks in the year preceding May 25, 2007, of which eight had occurred since April 2007.[93] The violence disrupted movement along the ring road generally, creating shortages in Herat, Farah, Badghis, and Ghor provinces and preventing the movement of supplies sent from Iran out of the western areas of Afghanistan.[94] These disruptions coincided with the mass expulsion of Afghan migrant workers and refugees into Herat, Farah, and Nimruz. On June 22, the WFP "warned that continuing security problems are hampering operations in some parts of Afghanistan, especially in the west of the country where food stocks are running short and thousands of the most vulnerable people may soon see critical food supplies curtailed or interrupted."[95] Insecurity and attacks on convoys—including twenty-five incidents since June 2006—had prevented the WFP from moving food to western Afghanistan for four weeks.[96] According to news reports, WFP Afghanistan country director Rick Corsino said that the disruptions had had a significant impact on relief operations for the involuntary returnees. Corsino particularly referred to "the western region, where WFP had been unable to distribute promised food to tens of thousands. . . . Some 100,000 very poor Afghans have been waiting weeks for food."[97] Deliveries resumed in early July, following the defeat of the Taliban counteroffensive, although attacks on food convoys—which move in unmarked trucks—continued.

Coincidentally, Iran appears to have scaled back the involuntary repatriation program in June. Also coincidentally, Coalition forces reported seizing Iranian weapons moving to the Taliban in mid-April—during the first major British clearing operations in Helmand and three days before the start of the involuntary repatriation program—and in late May to early June, a few weeks into the major Taliban counterattack against RC South. Reports of Iranian training camps for Taliban fighters surfaced in late July, a few weeks after movement resumed along the ring road.

The net result of these activities was to cut Afghanistan's western provinces off from the rest of the country—including their principal non-Iranian sources of aid—through Taliban-inspired violence aided by Iranian weapons. This isolation occurred exactly as Iran flooded Herat, Farah, and Nimruz provinces with destitute refugees. It coincided with the announcements that work on the Mashhad-Herat railway had begun (April 15), that work had started on the Iranian-funded and overseen construction of warehouses and roads in Farah (May 28), that an Iranian company would help provide 150,000

PX643

more telephone lines to Afghanistan (June 10), and that Iran and Afghanistan were close to signing a preferential trade agreement aimed at doubling the volume of trade and establishing a railroad system between the two countries (June 18). In September, the WFP director announced that his organization was purchasing wheat in Herat for the first time, noting that "[i]nsecurity on the southern ring road means we have been unable to move food for well over two months. With seriously depleted stocks, poor and hungry people in the west of the country have been suffering." The WFP release added that it had purchased wheat for the first time from Iran.[98]

The combination of violence and economic investment created a powerful synergy in 2007 that drove Afghanistan's western provinces further from Kabul and closer to Tehran. The overall Iranian aid program, combined with the threat of more mass expulsions, muzzled the Karzai government on the issue of Iranian support to the Taliban. Pressed on that question, Wardak and Karzai always prefaced comments by referring to the positive role Iran was playing with its economic assistance; highlighting the good relations Tehran and Kabul enjoyed; and casting doubt on the question of the weapons shipments, even when both Afghan and Coalition officers were unequivocal that they were occurring. The Iranian management of the refugee crisis itself destabilized the Karzai government, prompting the Wolesi Jirga to fire two ministers and miring the government in needless controversy for half the year.

Whatever the Iranians intended to do in Afghanistan in 2007, the following things occurred:

- Tehran demonstrated its ability and willingness to destabilize western Afghanistan at will, using Afghan refugees and migrant workers as bargaining chips with Kabul.

- The Afghans have clearly perceived a carrot-and-stick strategy from Iran—mass expulsions of refugees are the stick, and $1 billion in trade and aid is the carrot.

- Tehran demonstrated a limited ability to destabilize the Afghan government by taking actions that pit different factions against one another.

- The combination of Iranian actions and Taliban activities tied western Afghanistan ever more tightly to Iran economically and politically.

- Afghan fears of Iranian retaliation and confusion in the ISAF command structure, among other things, hindered Coalition efforts to identify the scope and scale of Iranian intervention and seriously confused Afghan and American public statements about it.

- Iran continued to blame publicly all of Afghanistan's problems on the presence of American and NATO forces and met accusations of Iranian support to the Taliban with accusations of American support to al Qaeda.[99]

- It became obvious and undeniable that there is no NATO, U.S., or Afghan strategy for controlling—or even recognizing—and reacting to Iranian influence in Afghanistan and that the United States and NATO are not interested in developing such a strategy.

- Therefore, the Karzai government appears to have drawn the conclusion that it is on its own with regard to Iran and must make the best of the situation.

The sum total of Iran's activities in Afghanistan in 2007 is a coherent and intelligent program to "Finlandize" Afghanistan (that is, neutralize its role in international affairs), create a strategic buffer along the Iranian-Afghan border, and finely calibrate military support to insurgents to produce small but strategically important results in support of that

PX643

effort. Iran evinces a willingness to deploy all resources—military, diplomatic, political, economic, social, and religious—in support of this effort. The likeliest explanation is that Tehran meant to do this. If not, then we must conclude that achieving these goals is so self-evidently in Iran's interest that the various organs of the Iranian government at every level are operating seamlessly and toward a common goal without being guided by a common strategy.

The question of Iranian intentions need not occupy the United States any further. The question now is: how will we respond?

Frederick W. Kagan is a resident scholar at AEI.

## Notes

1. Kenneth Katzman, *Afghanistan: Post-War Governance, Security, and U.S. Policy*, Congressional Research Service, updated January 14, 2008, available at www.fas.org/sgp/crs/row/RL30588.pdf (accessed February 6, 2008); Alastair Leithead, "Iranian Influence in Afghanistan," BBC News, June 11, 2007; "Iran Steps Up Drive to Expel Afghan Refugees," Agence France-Presse, April 30, 2007; and Peter Baker, "Bush Urges Karzai to Be More Wary of Iran," *Washington Post*, August 7, 2007.

2. James Dobbins, "Ending Afghanistan's Civil War," (testimony, House Committee on Armed Services, January 30, 2007), available at www.rand.org/pubs/testimonies/2007/RAND_CT271.pdf (accessed February 7, 2008).

3. Afzal Khan, "Trade between Afghanistan and Iran Reaches Record Levels," *Eurasia Daily Monitor*, July 9, 2004.

4. Robert Gates and Hamid Karzai (Department of Defense press briefing, Kabul, Afghanistan, June 5, 2007, available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3978 (accessed February 6, 2008); and "Karzai, Gates See No Proof of Iran Moving Arms to Taliban," Pajhwok Afghan News, June 4, 2007.

5. "Iran-Afghan Defense Cooperation Inevitable, Afghan Minister," Islamic Republic News Agency (IRNA) (Iran), July 17, 2007; "Herat Provincial Council Members Leave for Iran," Pajhwok Afghan News, November 19, 2007; and Major General Robert Cone and General Abdul Rahim Wardak (Department of Defense press briefing, Arlington, VA, October 18, 2007, available at www.

defenselink.mil/transcripts/transcript.aspx?transcriptid=4065 (accessed February 6, 2008).

6. "Iran Pledges Help in Power Sector," Pajhwok Afghan News, June 25, 2006.

7. "Iran Pledges $0.7m for Training of Govt Employees," Pajhwok Afghan News, January 24, 2007.

8. "Iran Pledges Cooperation in Education Sector," Pajhwok Afghan News, March 1, 2007; and "MoC Highlights Major Achievements," Pajhwok Afghan News, March 25, 2007.

9. "150,000 Telephone Lines to Be Provided in One Year," Pajhwok Afghan News, June 10, 2007.

10. "Afghan, Iranian Officials Upbeat on Trade Agreement," Pajhwok Afghan News, June 18, 2007; and "Iran-Afghan Defense Cooperation Inevitable, Afghan Minister," IRNA.

11. Afghan GDP from World Development Indicators Database, April 2007, available at www.worldbank.org.

12. "Nimroz Register Manifold Increase in Customs Revenues," Pajhwok Afghan News, April 30, 2006.

13. "Work on Afghanistan-Iran Railway Line Soon," Pajhwok Afghan News, April 15, 2007.

14. "Work on Custom Offices, Warehouses Launched in Farah," Pajhwok Afghan News, May 28, 2007.

15. "Tehran, Kabul Sign Six Cooperation Agreements," Pajhwok Afghan News, August 14, 2007.

16. "Afghanistan" in *The 2008 World Factbook* (Central Intelligence Agency), available at www.cia.gov/library/publications/the-world-factbook/geos/af.html (accessed February 6, 2008).

17. Islamic Republic of Afghanistan, Afghanistan National Development Strategy (ANDS), *Draft Regional Cooperation Strategy for Afghanistan National Development Strategy (with Focus on Prioritization)* (October 1, 2007), 4, available at www.ands.gov.af/ands/jcmb/site/src/Meeting%20and%20Documents/Sixth%20%20JCMB/pdfs/Eng/11-Draft%20II%20Regional%20Cooperation%20Strategy%20-%20English%20-%2002%20Oct%207.23pm.pdf (accessed February 6, 2008).

18. "Ghoryan Dist Gets Power Facility," Pajhwok Afghan News, January 21, 2007.

19. "Foundation Stone of Township Scheme Laid in Gardez," Pajhwok Afghan News, May 24, 2007; and "Work on Custom Offices, Warehouses Launched in Farah," Pajhwok Afghan News.

PX643

20. See the ANDS website at www.ands.gov.af/.

21. Islamic Republic of Afghanistan, ANDS, *Draft Regional Cooperation Strategy for Afghanistan National Development Strategy (with Focus on Prioritization)*, 24.

22. Ibid, 35.

23. "Iran Pledges Cooperation in Education Sector," Pajhwok Afghan News.

24. "Ahmadinejad Makes First Visit to Afghanistan," *Guardian* (UK), August 14, 2007; and "Afghanistan/Iran: Presidents Tout Strong Historical Ties," Radio Free Europe/Radio Liberty (RFE/RL), May 28, 2006, available at www.rferl.org/featuresarticle/2006/05/36ac30b4-ce70-4fb4-863f-2646ff8814b9.html (accessed February 7, 2008).

25. Vivian Tan and Mohammed Nader Farhad. "Over 350,000 Afghans Repatriate from Pakistan before Winter," United Nations High Commissioner for Refugees (UNHCR), November 2, 2007, available at www.unhcr.org/cgi-bin/texis/vtx/afghan?page=news&id=472b27e94 (accessed February 7, 2008).

26. UNHCR, Statistical Yearbook 2005 (April 2007), available at www.unhcr.org/statistics/STATISTICS/z464478a72.html (accessed February 6, 2008); "Iran Says Illegal Refugees to Be Expelled by September," Pajhwok Afghan News, February 25, 2006; and "Dubai Moot to Discuss Refugees Problems in Pakistan," Pajhwok Afghan News, June 5, 2007.

27. The number of undocumented Afghan migrant workers in Iran is naturally subject to considerable confusion. The Iranian ambassador in Kabul stated that 900,000 of the "two million" Afghans living in Iran had been granted "licences," although it was not clear if he meant that Tehran saw them as legitimate refugees or simply as legal migrant workers. ("Iran Says Illegal Refugees to Be Expelled by September," Pajhwok Afghan News.) Ahmadinejad subsequently said that there were a total of 2.5 million Afghans in Iran but did not specify how many of them were illegals. ("Iran Not Aiding Miscreants in Afghanistan: Ahmadinejad," Pajhwok Afghan News, August 14, 2007.) Tehran's expulsion program has generally focused on driving out "one to two million" illegal Afghan workers. ("Iran Says Illegal Refugees to Be Expelled by September," Pajhwok Afghan News.)

28. Najmeh Bozorgmehr, "Iran Slows Deportation of Afghans," *Financial Times*, July 26, 2007; "Southwest Asia: Afghan Refugees Allege Abuse from Iran Repatriation,"

RFE/RL, May 3, 2007; and Nazila Fathi, "Iran Will Force Many Afghan Refugees to Leave by Month's End," *New York Times*, August 15, 2002.

29. "Afghan's Have Captured 1,300,000 Jobs in Iran," Fars News Agency (Iran), September 26, 2006.

30. "Iran Says Illegal Refugees to Be Expelled by September," Pajhwok Afghan News.

31. The UNHCR subsequently announced that only five thousand Afghan refugees had returned from Iran in 2006, although such statements do not necessarily reflect the movement of illegal migrant workers, whom the UNHCR does not track. ("Pakistan Gives UN $5m to Help Refugees Return Home," Pajhwok Afghan News, May 9, 2007.)

32. "Work on Afghanistan-Iran Railway Line Soon," Pajhwok Afghan News.

33. "Iran Steps Up Drive to Expel Afghan Refugees," Fars News Agency, May 1, 2007; and "Iran Repatriates 17,000 Afghan Nationals from Sistan Va Baluchestan Province," IRNA, April 27, 2007.

34. "Afghan, Iranian FMs Discuss Expulsion of Refugees," Pajhwok Afghan News, May 8, 2007.

35. "Kabul Resents Wave of Refugees Evicted by Iran," Pajhwok Afghan News, May 8, 2007.

36. "Iran Links Surge in Refugees to Foreign Military Presence," Pajhwok Afghan News, May 10, 2007.

37. "Akbar Loses Trust Vote; Spanta's Fate Hangs in Balance," Pajhwok Afghan News, May 10, 2007.

38. "Foreign Minister Spanta Loses Trust Vote—and His Job," Pajhwok Afghan News, May 12, 2007.

39. International Organization for Migration (IOM), "IOM Helps Afghan Forced Returnees from Iran," press briefing notes, May 29, 2007, available at www.iom.int/jahia/Jahia/pbnAS/cache/offonce?entryId=14233 (accessed February 6, 2008).

40. Human Rights Watch, "Iran: Halt Mass Deportation of Afghans," June 19, 2007, available at hrw.org/english/docs/2007/06/18/iran16206.htm (accessed February 6, 2008).

41. "Iran, Afghanistan Stress Expansion of Bilateral Ties," IRNA, May 14, 2007, available at www2.irna.ir/en/news/view/line-17/0705142652112323.htm (accessed February 6, 2008).

42. Ibid.

43. "Miscreants behind Jawzjan Violence to Be Punished," Pajhwok Afghan News, May 29, 2007.

PX643

44. "Iran's Sistan-Baluchestan Accelerates Ousting of Immigrants," May 30, 2007, Vision of the Islamic Republic of Iran Sistan-Baluchestan Provincial TV.

45. "Governor Says Repatriation of Foreigners in Iran's Sistan Successful," IRNA, June 1, 2007.

46. "Iranian Province Home to 40,000 Illegal Afghans," June 21, 2007, Vision of the Islamic Republic of Iran Esfahan Provincial TV.

47. "Fuel Supplies to Al-Qa'ida 'Religiously Forbidden'—Iranian Provincial Cleric," Fars News Agency, June 22, 2007.

48. "Iran Begins Second Stage of Foreign Nationals' Repatriation," June 22, 2007, Vision of the Islamic Republic of Iran Sistan-Baluchestan Provincial TV.

49. IOM, "IOM Scales Up Emergency Assistance for Afghan Returnees from Iran," July 3, 2007, available at www.iom.int/jahia/Jahia/pbnAS/cache/offonce/lang/en?entryId=14555 (accessed February 6, 2008).

50. Michael R. Gordon, "U.S. Says Iranian Arms Seized in Afghanistan," New York Times, April 17, 2007.

51. Brigadier General Joseph Votel (Department of Defense news briefing, Bagram, Afghanistan, April 18, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3934 (accessed February 6, 2008).

52. Colonel Martin Schweitzer, (Department of Defense news briefing, Afghanistan, April 24, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3944 (accessed February 6, 2008).

53. Major General Ton van Loon, Royal Netherlands Army (Department of Defense press briefing, Afghanistan, April 30, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3952 (accessed February 6, 2008).

54. "Iran-Made Weapons Recovered in Operations: ISAF," Pajhwok Afghan News, May 9, 2007.

55. "Officials Claim Seizure of Iranian-Made Bombs," Pajhwok Afghan News, June 2, 2007.

56. General Daniel McNeill (Department of Defense news briefing, Afghanistan, June 5, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3980 (accessed February 6, 2008).

57. Ibid.

58. Robert Gates, General Peter Pace, and Admiral Timothy Keating (press conference, Shangri-La International Security Conference, Republic of Singapore, June 3, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3976 (accessed February 6, 2008).

59. Robert Gates and Hamid Karzai (Department of Defense press briefing).

60. "Iran Arming Taliban, U.S. Claims," CNN.com, June 13, 2007.

61. Robert Gates (media availability, Ramstein Air Force Base, Germany, June 13, 2007), available at www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3987 (accessed February 6, 2008).

62. Stephen Kaufman, "Apparent Shift in Iran's Afghanistan Policy 'Troubling,'" U.S. State Department, available at http://usinfo.state.gov/xarchives/display.html?p=washfile-english&y=2007&m=June&x=20070613173811esnamfuak0.7447626 (accessed February 6, 2008).

63. U.S. State Department (daily press briefing, Washington, DC, June 13, 2007), available at www.state.gov/r/pa/prs/dpb/2007/jun/86365.htm (accessed February 6, 2008).

64. R. Nicholas Burns (interview, Kastiljis TV Show, Reykjavik, Iceland, June 14, 2007).

65. "Armed Men Crossed into Afghanistan from Iran: Police," Indo-Asian News Service, June 19, 2007.

66. Ron Synovitz, "Kabul Investigates Reported Militant Movement from Iran," Afghanistan Report 6 no. 11, RFE/RL, June 22, 2007, available at http://rferl.com/reports/FullReport.aspx?report=562&id=2007/06/562-06-11 (accessed February 6, 2008).

67. Ibid.

68. "No Evidence of Arms Supply from Other Countries: ISAF," Pajhwok Afghan News, July 18, 2007.

69. "Taliban Being Trained on Iranian Soil: MPs," Pajhwok Afghan News, July 21, 2007.

70. "Iran Accused of Training Taliban to Fight America," Gulf Times, July 21, 2007.

71. "Afghan Official Confirms Drug Smugglers Active on Iranian Border," Radio Sahar, Herat, in Dari, July 22, 2007; and "Highlights: Iran-Afghanistan Developments," Ariana TV, July 21, 2007.

72. "100 Iran-Made Bombs Seized, Claim Afghan Officials," Pajhwok Afghan News, August 14, 2007.

73. "227 Civilians Killed in IED Blasts in 9 Months: Bashari," Pajhwok Afghan News, September 5, 2007.

74. "Dumps of Iranian, Russian and Chinese Arms Found in Herat," Pajhwok Afghan News, September 6, 2007.

PX643

75. "Talks with Taliban Should Not Affect Gains: US Official," Pajhwok Afghan News, September 11, 2007.

76. Major General Robert Cone and General Abdul Rahim Wardak (Department of Defense press briefing).

77. "Bücher und Licht," *Die Tageszeitung*, October 31, 2007, available at www.taz.de/1/politik/nahost/artikel/1/buecher-und-licht/?src=SZ&cHash=82b07c4b6d (accessed February 6, 2008).

78. See, for example, "Iran Seeks to Enhance Security in Border Province," Fars News Agency, August 28, 2007.

79. Kimia Sanati, "Iran: Tehran Blames Washington for Influx of Afghan Refugees," Interpress Service, May 15, 2007; and Arne Strand, Astri Suhrke, and Kristian Berg Harpviken, "Afghan Refugees in Iran: From Refugee Emergency to Migration Management," International Peace Research Institute, Oslo and Chr. Michelsen Institute, June 16, 2004, available at www.cmi.no/pdf/?file=/afghanistan/doc/CMI-PRIO-AfghanRefugeesInIran.pdf (accessed February 6, 2008).

80. "Iran: A Clamp Down on Illegal Migrant Workers," Keyhan, April 18, 2007.

81. "Iran Repatriates 17,000 Afghan Nationals from Sistan va Baluchestan Province," IRNA.

82. Kenneth Katzman, *Iran: U.S. Concerns and Policy Responses*, Congressional Research Service, updated December 5, 2007, available at http://fas.org/sgp/crs/mideast/RL32048.pdf (accessed February 6, 2008).

83. "Air Force Commander Inaugurates Fighter Base in Eastern Iran," October 9, 2007, Islamic Republic of Iran News Network.

84. "Security Situation Improves in Southeast Regions," Zahedan, Iran, May 5, 2007.

85. "Iranian Sistan-Baluchestan TV Airs Special Programme on Military Base," Sistan-Baluchestan Provincial TV, Hamun TV, October 18, 2007.

86. "Construction of 100 Basij Bases in the Border Regions of Southern Khorasan," *Sobh-e Sadegh*, November 26, 2007.

87. See the Open Source Center's summaries of Iranian military developments in October–November 2007 for details. The role of the Basij, particularly in internal affairs, has been a matter of some controversy between the ninth government and its political opponents, but Iranian Revolutionary Guard Corps and other officials have consistently stressed its importance in defending the revolution against external threats.

88. "Iran to Forbid Foreigners from Province Bordering Afghanistan," Javan, November 12, 2007.

89. "Iran to Issue 300,000 Afghan Refugees Work Permits," Pajhwok Afghan News, November 22, 2007.

90. Al Pessin, "US Commander Asks Iran to Stop Bomb Supplies to Iraq, Afghanistan," VOA News, December 21, 2007.

91. "UK-led Operation Helps ISAF Take Control in Northern Helmand," Defence News (UK Ministry of Defence), May 31, 2007, available at www.mod.uk/DefenceInternet/DefenceNews/MilitaryOperations/UkledOperationHelpsIsafTakeControlInNorthernHelmandvideo.htm (accessed February 6, 2008); "Taliban Feel the Pressure in Northern Helmand," Defence News, June 2, 2007, available at www.mod.uk/DefenceInternet/DefenceNews/MilitaryOperations/TalibanFeelThePressureInNorthernHelmand.htm (accessed February 6, 2008); "'Vikings' Lead the Way in Sangin Clearance Operation," Defence News, July 5, 2007, available at www.mod.uk/DefenceInternet/DefenceNews/MilitaryOperations/vikingsLeadTheWayInSanginClearanceOperation.htm (accessed February 6, 2008); and "UK and Afghan Artillery Teams Help Keep the Taliban at Bay," Defence News, July 17, 2007, available at www.mod.uk/DefenceInternet/DefenceNews/MilitaryOperations/UkAndAfghanArtilleryTeamsHelpKeepTheTalibanAtBayvideo.htm (accessed February 6, 2008).

92. "UN Appeals for Halt to Attacks on Food Convoys," Pajhwok Afghan News, May 22, 2007.

93. World Food Programme (WFP), "WFP Condemns Attacks on Food Convoys in Afghanistan," press release, May 25, 2007, available at www.wfp.org/english/?ModuleID=137&Key=2493 (accessed February 6, 2008). See also "UN Appeals for Halt to Attacks on Food Convoys," Pajhwok Afghan News.

94. "WFP Hails Resumption of Food Aid to Western Afghanistan," Pajhwok Afghan News, July 11, 2007.

95. WFP, "Insecurity Jeopardizing WFP Food Aid Deliveries in Western Afghanistan," June 22, 2007, available at www.wfp.org/english/?ModuleID=137&Key=2543 (accessed February 6, 2008).

96. Ibid.

97. WFP, "WFP Welcomes Resumption of Food Deliveries to Western Afghanistan," press release, July 11,

PX643

2007, available at www.wfp.org/english/?ModuleID= 137&Key=2558 (accessed February 6, 2008). See also "WFP Hails Resumption of Food Aid to Western Afghanistan," Pajhwok Afghan News.

98. "WFP Purchases 4,000 Metric Tons of Wheat in Herat," Pajhwok Afghan News, September 18, 2007.

99. "US Supports Taliban, Al-Qa'ida—Iran MP," IRNA, August 30, 2007.

PX643

# Conclusions

Iran is the principal source of weapons, funding, training, and on-site advisers for a number of Sunni and Shiite insurgent and terrorist groups in Iraq, Syria, Lebanon, and the West Bank and Gaza, and it is almost certainly providing some military support to the Taliban in Afghanistan. Iran has projected its economic power—sometimes even at the expense of the prosperity of its own people—throughout the region using grants, loans, joint ventures, and private enterprises. Many of its major economic projects have had the effect (and sometimes the stated goal) of making Iran the vital economic nexus of the area from Kabul to the Mediterranean, particularly in the realms of electricity, hydrocarbons, and road and rail networks. Iran has developed and used significant political and diplomatic influence throughout the region with a variety of tools: overt and secret treaties and agreements, preferential support for some political parties against others, the use of economic and migratory leverage, and occasional targeted assassination campaigns. Iranian officials have also worked to advance Iran's cultural and religious sway throughout the region through Persian-language programs, cultural and religious exchange programs, and subsidized pilgrimages to Shia holy sites.

## Intentions and Realities

The notion that Iranian officials and individuals have unconsciously, independently, or unintentionally deployed all of the resources of Iranian national power coherently in such a way as to move Iran toward military, economic, political, and socio-religious hegemony of its region is absurd. As the contents of this report manifest, Tehran pursues a coherent, integrated, and often transparent strategy. Officials openly involved in these efforts have included defense and interior ministers; commanders of the Iranian Revolutionary Guard Corps (IRGC); ambassadors and envoys in several states; numerous deputy ministers; police, regular army, air force, and naval officers; and so on. One may question the level of involvement of any particular individual in any particular decision, but the control of the Iranian government as a whole over the activities of its agents in all fields is not in question. The effort to identify some "rogue element" within the Iranian regime causing problems in spite of (or, at least, without the knowledge of) Iran's government is a folly that can persist only so long as we continue to compartmentalize activities that reveal a very clear and coherent pattern when viewed as a whole.

The question of Tehran's goals and intentions need not detain us. Taking an Olympian view, one might note that Iran is, with a few exceptions, simply behaving like a normal powerful state: using its economic power to derive political leverage; supporting some factions and opposing others in regional politics; training, equipping, and advising favored military organizations against their enemies; and so on. Yet explaining Tehran's behavior as natural realpolitik or, more disingenuously, as a response to the surrounding American menace, does not diminish the reality of the Iranian threat to the United States and its allies. Nor does it account for the fact that the Islamic Republic is not a status quo power and, regardless of how many ordinary Iranians may feel, often seeks to promote an ideology that is, at its root, hostile to the fundamentals that underpin U.S. society.

It is for this reason that the Islamic Republic's pursuit of its interests conflicts directly with that of the United States. The political and military proxies Tehran supports throughout the region are almost invariably U.S. enemies. The economic power Iran has deployed in Iraq and Afghanistan has had the

PX643

effect of weakening the control of Baghdad and Kabul over outlying regions as the United States has been trying to strengthen that control. Iran's political leverage has served to boost Moqtada al-Sadr—an avowed enemy of the United States—while Iranian agents attempted to assassinate Iraqi prime minister (and wayward Iranian ally) Nuri al-Maliki; to force a confrontation between Afghan president Hamid Karzai and speaker of the lower house of the Afghan parliament Yunus Qanuni as we were working to solidify Karzai's government; to strengthen the power of Hamas while we sought to broker some kind of reconciliation in the West Bank and Gaza; and so on. And it is certainly not in America's interest for Khomeini-style politically activist Shiism to prevail over Sistani-type politically quietist Shiism.

These facts may reflect Iran's reflexive fear or resentment of America or a genuine desire to achieve Iranian hegemony throughout the Middle East—or both. Either way, the Islamic Republic is not a status quo power, and there is nothing Washington can do to reverse Tehran's strategic calculus. More importantly, were it possible, as some insist, to assuage Tehran's fear or satisfy its appetites, the forces Iran has unleashed can no longer be reinserted into the genie's bottle. It is perfectly reasonable to debate the merits of higher-level negotiations with Iran or airstrikes against some set of targets, but neither the one nor the other will make the problem disappear.

The United States must therefore develop a more comprehensive strategy to address the manifold challenges Iranian policy in the region poses to our interests. Concurrently, Washington must consider the nature of the regime and the wisdom of various measures to change Tehran's behavior or to change the regime itself. The United States has an abiding interest in stabilizing Lebanon and the West Bank and Gaza (and therefore weakening or moderating Hezbollah and Hamas); in ensuring that Syria does not remain a vassal of Tehran and a staging area for Iranian involvement in the Levant; in keeping violence down in Iraq and Afghanistan and helping both Baghdad and Kabul develop independent and mature political processes and regain control over all of their territory; and in preventing Iran from turning itself into an indispensable nation economically, politically, and militarily in the Middle East. Pursuing these interests requires understanding the scope and scale of Iranian activities as they are now.

### Iranian Military Activities

Iran's military involvement in the Middle East over the past few years has been sophisticated, coordinated, skillful, and nuanced. Iran has recognized the power differential between it and the United States and has developed innovative methods of asymmetric warfare. Iranian external military policies in general have relied on leveraging technologies and capabilities to achieve maximum effect with minimum cost and exposure. They are a skillful blend of equipping, training, organizing, funding, and advising, appropriately variegated depending on the specific circumstances in each theater. Iran has been willing to escalate both the quality of the weaponry and the training it provides, but it has not to our knowledge been willing to share chemical or biological weapons or more sophisticated systems. However, this policy could change without notice.

Tehran rarely aims at or presupposes the subordination of local proxies to its control or interests but generally works instead to support and encourage proxies whose interests more or less align with its own. Like the Soviet Union in the Cold War, the Iranians are often content to help "fellow travelers." They have proven patient with divergences and even incompetence on the part of some of their proxies, apparently taking the long view that misguided leaders can ultimately be corrected or replaced, but useful proxies are hard to find or create.

**Equipment.** The most visible and tangible and verifiable aspects of Iranian military activities outside Iran's borders are in the realm of military equipment. Iran's efforts in this area have ranged from the more or less obvious, as in the case of support for Syria and Hezbollah, to the almost entirely opaque, as in the case of Afghanistan. It is difficult to track closely how much low-level military equipment the Iranians have

PX643

been sending their proxies, though Israel has made an art of tracking Hezbollah's resupply chains. But for our purposes, the details and range of various missiles, the component parts of shaped charges, and the make of light arms is less important than Tehran's willingness and ability to provide proxies with niche capabilities that can give them key advantages over their adversaries.

The deployment of Iranian explosively formed penetrators (EFP) in Iraq is a classic example. Iranian agents have supported the efforts of both Sunni and Shia insurgents and terrorists to make and deploy regular improvised explosive devices and conduct ordinary guerrilla attacks, but insurgents of both sects have also developed these capabilities without Iranian help. The three most significant types of attack in Iraq over the past few years—the kinds of attacks that get widespread media coverage and contribute to negative trends in key indicators that affect the debate in Washington—have been car- and truck-bombs, EFP attacks, and rocket and mortar attacks on Coalition bases and especially the Green Zone in Baghdad. It appears that Sunni terrorists, particularly al Qaeda, pioneered the car- and truck-bomb style of attacks, and these became their signature (although it is now clear that some Iranian-backed groups have also adopted this technique). But EFPs come only from Iran, and the rockets and mortars with which specially trained Shia groups have been hitting the Green Zone and other Coalition bases are Iranian-made 107-millimeter or 240-millimeter rockets and 81-millimeter mortars. These niche capabilities allowed small groups of highly trained terrorists to have disproportionate effects on the situation and perceptions in Iraq and the United States. Tellingly, the Iranians appear to have refrained from sending their Iraqi proxies significant numbers of advanced man-portable surface-to-air missiles (MANPADs). Although such weapons could have had an even more disproportionate effect on the situation, they have also been an American "red-line."[1] Sending advanced MANPADs into Iraq in quantity might have triggered a direct U.S. attack on Iran. Whether for that reason or for some other, the Iranians appear to have held back from such an escalation, at least so far.

In Lebanon, Iranian support has been overt and broader. Even so, the provision of Chinese-model antishipping and surface-to-surface missiles allowed Hezbollah to generate spectacular attacks against Israeli naval targets and in the towns of northern Israel, and the provision of advanced antitank and anti-aircraft weapons caused the Israeli Defense Forces considerable trouble during the 2006 war. These attacks, and their deterrent and terror effects, were more important than any number of AK-47s or regular rocket-propelled grenades the Iranians might have given Hezbollah.

The Taliban are openly scornful of the notion that they need Iran's help to arm themselves, and, for the most part, they are right—there are more than enough AK-47s and other such weapons available on the open market for a group with access to narcodollars. But the International Security Assistance Force (ISAF) has intercepted two or three shipments of higher-end weapons with Iranian markings, including rockets and EFPs, intended for the Taliban in the past year. These interceptions have been the source of significant controversy, partly because of the widespread reluctance to believe that Tehran would arm a group that has been as inveterate an enemy and as dangerous a threat as the Taliban. In truth, this reluctance is farcical. Three or four or ten truckloads of such weapons would not make the Taliban a threat to Iran. But, delivered during intense operations against NATO forces in critical areas (as these were apparently intended to be), they could provide the Taliban with niche capabilities necessary to disrupt communications in Afghanistan in ways that benefit Iran. The sorts of weapons shipments ISAF and Afghan forces have seized track perfectly with the general pattern of Iranian support—key systems delivered in just enough quantity at the right moment to create maximum effect without posing a danger to Iran or its other allies.

And the level of capability seems calibrated not only to the needs of the local proxies but also to the probability of undesired escalation. In Lebanon and Syria, where Iran can be reasonably confident that virtually nothing it does will lead to a direct attack on Iranian soil, Tehran has been open-handed. In

PX643

Iraq, the level of support appears to have been calibrated to a reasonably well-publicized U.S. red-line. In Afghanistan, where Tehran clearly seeks to play the part of helper to and ally with Kabul, plausible deniability has been the key, and the nature and quantity of weapons sent to the Taliban have been kept in check accordingly. And the skill with which this equipment strategy has been conducted has achieved at least one of its likely aims: very few outside observers have detected a pattern and drawn the relevant conclusions for each theater.

**Training and Advising.** The Iranian penchant for leveraging assets and capabilities carries over into training and advisory efforts, which focus on developing and maintaining a relatively small cadre of highly trained leaders, advisers, and indigenous trainers that can operate relatively independently but very effectively. The presence of training camps within Iran is well-documented. We know from numerous open sources, including information derived from captured Iranian agents, that the IRGC Quds Force maintains training camps near Tehran. Slightly less reliable reports suggest that the Quds Force also maintains camps near Mashhad and elsewhere on the Afghan border and along the Iraqi border as well. Iranian training camps house Iranians, Lebanese, Syrians, Iraqis, and probably Afghans and Palestinians as well. It is clear that Lebanese Hezbollahis are involved in training Iraqi fighters, and Lebanese Hezbollahis have been reported as far east as Mashhad, although it is not clear what role, if any, they play in training Afghans nearby. Nor is it possible to establish from open sources whether there are other links or interactions between Afghan, Lebanese, Syrian, Iraqi, and Palestinian fighters training in Iran—only that they are all there. Iranian training camps thus have the potential to be the sort of terrorist nexus that Afghanistan was for so long, although it is not clear from open sources whether or not they are actually functioning in that way at the moment.

Iranians and Lebanese Hezbollahis have trained thousands of Iraqi fighters for almost twenty-five years—going back to the IRGC's training of Iraqis in the Badr Corps for fighting in the Iran-Iraq war. They have trained hundreds of Lebanese. It is unknown how many Afghans or Palestinians have passed through the camps. But the effort is sophisticated. There are initial training courses, and then some cadres are brought back for more advanced courses. The Iranians also conduct "train-the-trainer" (TTT) exercises in which they instruct advanced insurgent cadres how to set up and run their own training programs. TTT exercises are evidence of a calculated, long-term approach to the problem of creating and maintaining reliable and effective proxies in difficult situations. They are also an indication that Tehran is willing for its proxies to develop some independence—TTT exercises are essential to setting up self-maintaining autonomous military organizations, which is why they have been a core component of the U.S. advisory efforts in Iraq and Afghanistan.

The Iranians do not simply throw their trained proxies into the fight without any additional guidance. They also provide on-scene advisers in some theaters. Apart from the overt effort in Syria and the slightly less overt effort in Lebanon, the Iranian advisory effort in Iraq was probably the most sophisticated and well-developed. It includes Iranian Quds Force operatives, Lebanese Hezbollahis, and Iraqis given advanced training in Iran and then sent back. The Iranian advisory effort in Iraq was designed to allow the Iraqis a fair amount of autonomy while providing objective reporting on their actions. Thus the Iraqi leader of the secret cell network, Qais Khazali, reported directly to his Quds Force overseer in Iran in parallel with the Lebanese Hezbollahi Ali Mussa Daqduq who was assisting him.

In places where Iranian activities can be more open, their advisory efforts are more obvious. Iranian advisers in the Bekaa Valley, for instance, have been key to Lebanese terrorist training, and the Iranians have naturally maintained a more-or-less overt advisory presence on Syrian territory. There are no open-source reports of Iranian advisers in Afghanistan. It is quite possible that there are few or none—the Taliban has been a well-organized and determined fighting force for decades and hardly needs outside overseers. But there are many Iranians in Afghanistan, particularly in the western border

PX643

regions, and the paucity of reporting on the question of Iranian involvement in Afghanistan is such that we can draw no real conclusions about this question. One thing is clear: the scale and nature of the advisory effort, like that of the military equipment effort, seems to be calibrated both to the needs of the proxies and to the likely effect of its revelation.

**Organizing.** Iranian efforts at organizing proxies have also varied depending on the requirements of a given situation. In the 1980s, Tehran organized two proxies virtually from scratch—Lebanese Hezbollah and the Badr Corps. More recently, the Quds Force developed the secret cell structure in Iraq in a weird symbiosis with Sadr's Jaysh al Mahdi—which Tehran did not invent or organize. It is not clear if recent reports that Tehran has been trying to help Sadr reorganize the Jaysh al Mahdi are correct. Tehran certainly did not organize or reorganize either the Taliban or Hamas but worked instead through structures that were already highly developed.

Tehran has shown remarkable willingness to work with whatever organizations suit local circumstances and to allow these organizations to evolve as the situation changes. Hezbollah went from being a terrorist/insurgent group to being a mini-government and semi-legitimate party (albeit still with a terrorist/insurgent wing), and Iranian agents have facilitated every step of the process. Iran supports Hamas—a relatively well-organized fighting force now attempting to act as a governing partner (or political rival) to Fatah—but it also supports the Taliban, which has no real political legitimacy in Afghanistan, very little popular support outside of a few localities, and very little probability of regaining any real share of political power. In Iraq, Iranian agents and money have supported the well-organized and relatively disciplined Badr Corps and the ill-organized and undisciplined Jaysh al Mahdi, even while creating the most highly organized and disciplined Shia force of all in the secret cell network.

This flexibility in organization contrasts with the Soviet approach to its revolutionary proxies during the Cold War, which followed a doctrinaire and largely predictable model. Anti-Americanism, anti-Westernism,

and antisecularism are all popular themes for Iranian proxies, but, then, they are popular themes for many groups throughout the Middle East. Tehran is far more comfortable with at least superficially nationalistic or local proxies than the Soviets were. The Jaysh al Mahdi has always claimed to be an Iraqi nationalist army, not the vanguard of any pan-Shiite front. Hezbollah manipulates the concept of pan-Shiite identity, but remains at heart a Lebanese party and militia. Hamas and the Taliban, both Sunni groups, naturally make no attempt to claim participation in any pan-Shiite effort. Hamas—Palestinian Arabs—and the Taliban—Pashtuns—likewise make no more effort to identify themselves as pro-Persian than do Iraqi Arabs. In this sense, there is no "Iranian bloc" similar to the Soviet bloc with parallel objectives and a distinct shared ideological identity.

This heterogeneity is tactically advantageous for Tehran—it allows Iran to support whatever tools are most readily at hand throughout the region without signing on to any particular ideological or even practical regionwide (let alone global) program. But it does raise an intriguing question: what would Iranian hegemony actually look like? The aims of Tehran's various proxies are not necessarily consonant with one another (as evidenced by the fact that they are actively fighting each other in Iraq). Anti-Americanism (and anti-Zionism) does not distinguish Tehran's proxies from other Muslim groups, but it is almost the only common feature they all share (and it is not even clear that all elements within the Badr Corps continue to share it). This fact suggests that Iran's grand strategy is reactive—Tehran supports anyone who will help it defeat America and Israel.

Iran's flexibility on basic questions of mission and ideology calls into question Tehran's commitment to stability in the region. Not only are its proxies working against stability in some areas, but the discord among their various agendas and objectives creates greater instability. In this respect, again, Iran differs profoundly from the Soviet Union. By requiring their proxies to accept a common set of goals and values, the Soviets thereby made them intellectually interoperable. By forcing their proxies to renounce nationalism and localism, they (theoretically)

PX643

ensured that their own hegemony would be stable and internally consistent. Ascendant Iranian proxies will not be as interoperable. Whatever idea guides Iranian actions, a coherent and stable vision for the Middle East is not part of it.

**Funding.** Iran provides a great deal of cash to its favored clients. Iranian money supports Hezbollah, Sadr, the rival Iraqi Shia bloc of Abd al-Aziz al-Hakim, perhaps the major Kurdish parties, virtually every other major political grouping in Iraq, Palestinian Islamic Jihad, Hamas, and so on. Much has been made of the difficulty of confronting non-state actors such as al Qaeda. While it is certainly more difficult in some respects, it is easier in others. Iran appears to have the best of both worlds. It harnesses the resources of a large and wealthy state and puts them at the disposal of various asymmetric proxies. As long as Tehran has the will to support these groups and oil prices remain high, Iran's proxies need never lack for funds.

It is worth noting in this regard a special feature of Islamist asymmetric groups resulting from a peculiarity of Islam: the *zakat*, or religious alms. Repeated Quranic injunctions to pay the *zakat*, which can range from the standard 2 to 20 percent of disposable income (in the Shiite *Khums* tradition), are ingrained in the Muslim consciousness. The relatively flat hierarchy of Sunni Islam allows extremists who control local clergies (or establish local "emirates" that claim to have political legitimacy) to lay claim to this revenue stream. The Shiite sect has a more hierarchical structure, which has complicated matters for the Tehran regime, since the most influential single Shiite religious figure now is Grand Ayatollah Ali al Sistani in Najaf. But many expatriate Lebanese, for example, identify Hezbollah (or at least its spiritual leader, Hassan Fadlallah) as the legitimate beneficiary of their religious dues, providing Hezbollah with an important source of additional funding. And much of the fighting in Iraq's holy cities of Karbala and Najaf has centered around which faction would control the lucrative pilgrimage trade—another source of income for Islamist groups. Insurgencies generally find ways to raise money—very few insurgencies

have ever "gone out of business" for lack of cash. But these peculiarities of Islam offer Islamist insurgencies additional revenue streams with which to supplement the largesse of key donors like Iran.

They also allow some proxies to effectively develop independent revenue bases. It is widely reported (although there is very little hard evidence) that Hakim's Supreme Iraqi Islamic Council (SIIC), the party formerly known as the Supreme Council for the Islamic Revolution in Iraq, continues to receive Iranian subsidies. It may, but it would almost certainly survive without them, since SIIC partisans control the Imam Ali and Imam Hussein Shrines in Najaf and Karbala, are the most powerful Shiite party in the Iraqi government and therefore control most local government in southern Iraq, and benefit from Iraq's oil resources. The Sadrists, by contrast, are probably more dependent on Iranian cash. They control the Kadhimiya Shrine in Baghdad but little else of financial value. When Iranian money to the Sadrists dried up, the movement's ability to finance its activities suffered. When examining Iranian proxies, therefore, it is important to keep in mind not only the fact that Tehran does not attempt to impose any rigid ideological unanimity, but also that some proxies can emancipate themselves from Iranian support more readily than others. It is too soon to tell how exactly Iran will react to this development in Iraq.

## Economics

Iran is a large state with massive oil reserves. In an age of high oil prices, the Tehran regime will invariably have a lot of cash, even if mismanagement has led to unemployment, underemployment, and inflation. And while Iran's economic integration into the region has been limited by the incompetence of the regime's policies, Iranian cash remains a vital lever in influencing the Middle East and beyond. Fundamentally, the cost of support for terror is minimal, and even the hundreds of millions extended to groups such as Hezbollah are more than recouped by the IRGC's increasingly lucrative business activities. More interesting, perhaps, is Iran's effort to

PX643

carve out economic spheres of influence that jibe with its political goals—hence, the buildup of trade and infrastructure in Syria, Afghanistan, and Iraq.

**Electricity.** Iran's electrical production and consumption have become a significant issue because Tehran has claimed that it needs nuclear power to make up its production deficiencies. Tehran's great efforts to export electrical generating capacity to neighboring countries, to put neighboring areas on the Iranian power grid, and to use Iranian cash to subsidize the construction and improvement of transmission lines and transformers in neighboring states are somewhat puzzling in this regard. According to the CIA *2008 World Factbook*, Iran exported nearly 2.8 billion kilowatt-hours (kWh) in 2005 while importing slightly over 2 billion. By comparison, of the states from India to Libya, only Turkey and Egypt exported significant amounts of electricity—Turkey around 1.7 billion kWh, and Egypt slightly less than 1 billion. Ayatollah Ali Khamenei recently said that he expected Iran's nuclear program to produce 20 million kilowatts of power over the next twenty years.[2]

But Iran has constructed generating capacity in excess of 1 million kWh in Syria, Lebanon, Afghanistan, and Iraq in the past few years. It has built transmission lines and transformers in Afghanistan's western provinces, linking them to the Iranian power grid. It has linked large areas of Iraq's border provinces to its power grid. It has proposed building generators in Najaf and then linking that province to the Iranian power grid, as well as joining the Iranian, Syrian, Turkish, and Iraqi grids.

There are a variety of reasons why Iran might want to adopt this policy, and we need not speculate about its aims. Three things, however, are worth noting. First, the Iranian nuclear power program will not primarily compensate for inadequate generating capacity in Iran but will rather subsidize a deliberate state policy of exporting electricity and generating capacity throughout the region. Second, the effect of this policy will be to make Iran's near neighbors, including Syria and Turkey, increasingly interdependent with Tehran and the Iranian economy. Third, Iran is making itself the nexus of a power grid that stretches from Afghanistan to Lebanon and in which it is by far the most important player—Iran's 170 billion kWh of production is rivaled only by Turkey's 154 billion. It dwarfs the 33 billion or so that Iraq and Syria produce annually, to say nothing of Afghanistan's 754 million.

Does it matter? Depending on how the grid is designed, Tehran might or might not be able to turn the lights off when its neighbors displease it. There are indications that it has done so in Iraq already. Even without that threat, the scale of Iran's generating capacity and consumption compared to those of its neighbors can give it a disproportionate say in how the entire grid is run, providing significant economic leverage throughout the region. And the very fact of an interconnected power grid running through and dependent on Iran is also a step toward an interconnected regional economy centered around Iran.

**Transportation and Energy Infrastructure.** Iran has been following a parallel path in the areas of regional transportation and energy infrastructure. Over the past two years, Tehran has initiated programs to link Afghanistan's border regions more closely with their Iranian neighbors than with Kabul and to divert Afghan and ultimately Central Asian trade through Iranian ports instead of Karachi. Iranian officials and private firms have been working to extend rail and road links through Iraq and Turkey into Syria. Tehran has also been working to build gas and oil pipelines from Iran into Syria and from Iraq into Iran (the Abadan pipeline project). This last is the hardest to explain. Iraq already has a perfectly good port and outlet for its own oil exports. Building a pipeline to Abadan makes little sense from an economic standpoint—states interested in helping Iraq rebuild its oil industry would do better to invest directly in Iraq. But it does (needlessly) tie Iraq to the Iranian oil industry and create an additional and unnecessary dependency for Baghdad on Tehran.

If the United States and Iran did not have so many interests in conflict, and if Iran were not so reliably supporting America's enemies throughout the region and working against American efforts to reestablish central and independent control in Baghdad and Kabul, these economic efforts would be unremarkable

PX643

except as a sign that Tehran appears to be seeking to consolidate its position at the center of a region that runs from Central Asia to the West Bank and Gaza. But in the context of the American-Iranian competition, American policymakers have to ask themselves if it is in our interest for Iran to be consolidating such a position. In all events, it is past time to start closely tracking Iranian economic activities not for signs of illegal or nefarious intent but for indications that even overt and ostensibly harmless economic interactions might be creating a reality on the ground that will endanger American interests in the region.

## Politics

The Iranian regime interferes in the politics of states and groups throughout the region. Iranian activity in Iraqi politics is apparent: Sadr's long stays in Tehran, Iranian support for the Badr Corps re-invasion of 2003, continued Iranian support to various Iraqi political parties, and so on. Iran has also attempted to involve itself in the internal politics of Hezbollah. It is harder to say that Iran is interfering in Syrian politics, except in the sense that Tehran is clearly working to stabilize and consolidate the rule of a weak Alawite dictator. And, although there is evidence that Iran is meddling in Afghan politics—most notably through the apparent manipulation of the involuntary refugee repatriation crisis—it is more difficult to demonstrate the extent of that interference from open sources.

All states have an interest in the success or failure of parties and leaders in their neighbors. What matters in this instance is that Iranian efforts to create dependency relationships between Tehran's proxies and Iran are rapidly increasing Tehran's leverage in regional political dynamics. Iranian leaders may not give direct orders to their proxies, but states and organizations that require continued military, financial, organizational, and training assistance from Iran in order to survive are not independent of Tehran. As we can see most vividly in Afghanistan, it is often not necessary for Tehran to give orders for others to know what the Iranians desire and what the consequences of refusing them would be.

## Religious Activities

The Islamic Republic's religious activities in the region are more readily apparent and more inherently troubling. The struggle within Shiism between Khomeini-style proponents of clerical rule and traditional quietism is as fierce as any sectarian struggle between Sunnis and Shiites. Iraq's liberation accentuates the struggle, as any utterance from Iraqi religious authorities that contradicts the Iranian supreme leader necessarily undercuts the Islamic Republic's legitimacy. The Iranian embrace of lower-ranking clerics like Sadr and Islamist laymen like Maliki and Ibrahim Jaafari represents Iran's desire for Iraq to be a compliant follower that poses no challenge to the Iranian clerical leadership. Iranian efforts to bring Afghans and others for clerical training in Iran is, on the one hand, natural and, on the other hand, distressing. One would expect Iran, as a center of Shiism, to be a source of emulation and education for other Shiite clerics—and we must note that by no means do all of Iran's leading Shiite clerics actually accept the Khomeini ideals of political Shiism. On the other hand, when the government that explicitly embraces those ideas sends missionaries and brings foreign clerics to study, one must assume until it is demonstrated otherwise that part of the purpose is to spread the ideas of the Iranian revolution. It is certainly not in America's interest for that to occur.

## The Hezbollah Model

Finally, there have been many discussions of the adoption of the "Hezbollah model" by Iranian proxies and other groups. That model is usually taken to mean a political group dominated by a militia/terrorist organization that provides social services to populations it claims to govern in competition with the sovereign government. Iraq's Sadrists have clearly followed this model, as have other groups in the region, such as Hamas.

But Western discussions of this model often ignore what is perhaps its most important characteristic: a particular kind of dependency relationship

PX643

with Tehran. We have noted that Iran rarely gives direct orders to its proxies; conversely, it allows them a fair degree of local independence. But it also retains control over the most important components of its support. Most EFPs are built in Iran, and it does not appear that Tehran has been willing to "license" the technique to its allies. Doing so would create a much greater degree of plausible deniability for the regime, but Tehran has preferred to keep control of the dispersion of this technology. Tehran has likewise preferred to send Iranian trainers or to bring local end-users to Iran for training in advanced systems and has remained the principal conduit for supply even of Russian and Chinese systems, again at the expense of plausible deniability. Regime proxies must know that they would suffer terribly if Tehran ever cut them off—some would probably perish. The Hezbollah model is thus not simply a model for legitimizing terrorist groups in their communities, but it is also a model that allows Iran to retain overall control over its proxies without having to command them directly.

## Recommendations

The purpose of this report has been to identify and describe Iranian activities in several key areas. It is not exhaustive. The depth of Iranian economic and political involvement in Iraq, for example, would require a report as long as this. Fully cataloguing Iranian activities in Syria and Lebanon is as large a task. Nor can we offer a set of recommendations that is in any way complete or firm. What follows are a few fairly obvious corollaries from the facts we have established.

- **The United States must begin to look holistically at Iranian activities across the spectrum, from economic aid to military support.** The primary aim of this report has been to show that there are overarching patterns in Iran's activities in its region, patterns that become clear when the customary compartmentalization of the study of Iranian issues is broken down. Recognizing

that the United States has been engaged in conflict with Iran for three decades is the starting point for an analytical effort to understand fully what that conflict has looked like from Tehran's vantage point. We have started with what is easily demonstrable. The next steps of this effort involve greater work on the internal dynamics of the Iranian regime and more intense study of Iranian activities on a regional basis.

- **We must recognize that American and Iranian interests conflict beyond the issue of the nuclear crisis.** For too long, discussions of "containment" have addressed means of hammering the Iranians into submitting to their international obligations on the nuclear issue. Resolving that issue is a pressing priority, but its resolution will not end hostilities. The Islamic Republic and the United States have too many other interests in conflict in a region that is key to both sides.

- **Containment.** The containment strategy the United States adopted in the 1940s was infinitely more comprehensive than the strategies currently under consideration toward Iran. The United States imposed sanctions on the Soviet Union and its allies periodically, maintained a strong military deterrent, fought a rhetorical and informational campaign, and occasionally used force on smaller or larger scales against Soviet proxies. But the United States also competed with the Soviet Union in the fields of soft power more directly. The Marshall Plan aimed to restore European economies as a way of shoring up European confidence to resist the Soviet Union. Throughout the Cold War, the United States tracked Soviet efforts to create economic and military dependency in third states and competed with them intentionally. The current crisis

PX643

requires no less comprehensive a strategy. Iran cannot compete directly against the United States in much of the region; where the regime prospers, it is because the United States neither perceives nor engages in competition. Roads and railways are built by Iran because the United States is not in the game; southern Lebanon is beholden because America's interest has waned. Washington and its allies in the region and beyond should work with Iraq, Lebanon, Turkey, Afghanistan, Pakistan, and the Central Asian states to develop decentralized transportation networks that obviate dependency on Iran. Aid programs should contemplate how to avoid regional dependence on Iranian power. And regional oil and gas distribution networks should be incentivized to work around Tehran. American focus has thus far been on denial rather than on redirecting Tehran's allies. That must change.

- **Proxy Conflict.** The likelihood of any encounter between Iranian proxies and U.S. forces escalating into a major conflict between Iran and the United States is small. Outside Iraq, however, the United States has been reluctant to either combat these proxies (in Afghanistan) or empower their opponents in any significant fashion. (Those who might argue that U.S. assistance to Israel constitutes just such empowerment need only review Washington's view of Israeli military action against the Palestinians to realize this claim is false.) Military

challenges by Iranian proxies—such as the murder of 241 U.S. Marines in Lebanon, the attack on Khobar Towers in Saudi Arabia that left nineteen U.S. troops dead, and continuous attacks on the American military in Iraq and increasingly in Afghanistan—have too often gone unanswered by the United States. Recognizing how enmeshed those proxies actually are in an overarching struggle, we should consider at what point we might have to get involved directly in those proxy struggles and, if so, on what terms.

- **Mobilization.** The United States is not now mobilized on any dimension appropriate for the necessary struggle. Our military is too small, our foreign aid programs ill-designed, our intelligence systems dysfunctional, and our decision-making apparatus poorly designed and conditioned to take a holistic view of the challenges we face in a key region. Mobilization and reorganization to face the new threat were key components of the Cold War containment strategy. They are no less important or urgent now.

## Notes

1. Authors' interviews with commanders and diplomats in Iraq.

2. "Khamenei Says Iran Ties with US Possible," Associated Press, January 3, 2008.

PX643

PX715

The Wayback Machine - https://web.archive.org/web/20081015200447/http://www.longwarjournal.org/archiv…

## The Long War Journal: Iran and al Qaeda in Iraq

Written by Bill Roggio on January 6, 2007 12:50 PM to The Long War Journal

## Available online at:
## http://www.longwarjournal.org/archives/2007/01/iran_and_alqaeda_in.php



Qods Force
logo. Click
image to view.

Further evidence of Iran's support of the Shia death squads and Sunni al Qaeda has emerged. At the end of December, two Iranian agents of the Qods force were arrested in a SCIRI compound in Baghdad. The Iraqi government was angry over the arrests, as the Iranians were part of a diplomatic delegation, and the agents were later released and deported.

But the *Washington Post* reported the two Iranian intelligence agents captured in Baghdad possessed "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information... [and] information about importing modern, specially shaped explosive charges into Iraq." One was "the third-highest-ranking official of the Iranian Revolutionary Guards' al-Qods Brigade."

The *New York Sun* described the documents as "the equivalent of Iran's Iraq Study Group" which "show how the Qods Force — the arm of Iran's revolutionary guard that supports Shiite Hezbollah, Sunni Hamas, and Shiite death squads — is working with individuals affiliated with Al Qaeda in Iraq and Ansar al-Sunna." "We found plans for attacks, phone numbers affiliated with Sunni bad guys, a lot of things that filled in the blanks on what these guys are up to," an intelligence official told the *New York Sun*.



Qassem
Soleimani, the
commander of
Qods Force.
Click image to
view.

PX715

Iranian involvement with al Qaeda and other Sunni jihadis groups is nothing new, however the conventional wisdom in media and some intelligence circles is Shia Iran could never cooperate with Sunni al Qaeda due to ideological differences. This ignores a mountain of evidence to the contrary, such as Iran's sheltering of over 100 al Qaeda leaders, including Said bin Laden, Osama's son, and Saif al-Adel, al Qaeda's strategic planner, or Iranian support of Somalia's Sunni Islamic Courts by providing arms and training.

The 9-11 Commission Report was explicit about Iran's connections with al Qaeda. "The relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations." Contacts between Iran, Hezbollah
and al Qaeda were established in Sudan in the early 1990s. "Al Qaeda members received advice and training from Hezbollah," according the the 9-11 Commission report. Many of al Qaeda's 9-11 hijackers transited through Iran. "After 9/11, Iran and Hezbollah wished to conceal any past evidence of cooperation with Sunni terrorists associated with al Qaeda."

Iranian involvement in Iraq with the Sunni terrorists has been an open secret in military and intelligence circles since the Fallujah uprising in March of 2004. Iranian mines and weapons were funneled to Zarqawi's terrorists in Fallujah and elsewhere throughout Sunni dominated Anbar province.



Imad Mugniyah, Iranian operative and leader of Hezbollah's military. Click image to view.

Iran's influence in Iraq must be countered for the U.S. and Iraqi governments to succeed in restoring order in Baghdad. For starters, the United States should seal the Iranian border and mount an information campaign exposing Iranian support for the murder of numerous fellow Shia, as well as for backing the group that is responsible for the destruction of the Golden Dome of the Al Askaria mosque, the holiest site in Shia Islam.

The United State has proven incapable of mounting a serious information campaign, let alone sustaining one, which is why Iran has operated with such success. The Iran Syria Policy and Operations Group, a grouping of State, Defense and Administration officials, is working to subvert Iran's rise in the Persian Gulf and beyond, but at some point Iran must be countered outside of working groups.


Site Meter

PX715

# PX716



# NATIONAL DEFENSE
# RESEARCH INSTITUTE

CHILDREN AND FAMILIES

EDUCATION AND THE ARTS

ENERGY AND ENVIRONMENT

HEALTH AND HEALTH CARE

INFRASTRUCTURE AND
TRANSPORTATION

INTERNATIONAL AFFAIRS

LAW AND BUSINESS

NATIONAL SECURITY

POPULATION AND AGING

PUBLIC SAFETY

SCIENCE AND TECHNOLOGY

TERRORISM AND
HOMELAND SECURITY

The RAND Corporation is a nonprofit institution that helps improve policy and decisionmaking through research and analysis.

This electronic document was made available from www.rand.org as a public service of the RAND Corporation.

Skip all front matter: <u>Jump to Page 1</u> ▼

## Support RAND

Purchase this document

Browse Reports & Bookstore

Make a charitable contribution

## For More Information

Visit RAND at www.rand.org

Explore the RAND National Defense
Research Institute

View document details

### Limited Electronic Distribution Rights

This document and trademark(s) contained herein are protected by law as indicated in a notice appearing later in this work. This electronic representation of RAND intellectual property is provided for non-commercial use only. Unauthorized posting of RAND electronic documents to a non-RAND website is prohibited. RAND electronic documents are protected under copyright law. Permission is required from RAND to reproduce, or reuse in another form, any of our research documents for commercial use. For information on reprint and linking permissions, please see RAND Permissions.

PX716

This product is part of the RAND Corporation monograph series. RAND monographs present major research findings that address the challenges facing the public and private sectors. All RAND monographs undergo rigorous peer review to ensure high standards for research quality and objectivity.

PX716

# From Insurgency to Stability

## Volume II: Insights from Selected Case Studies

Angel Rabasa, John Gordon IV, Peter Chalk, Audra K. Grant,
K. Scott McMahon, Stephanie Pezard, Caroline Reilly,
David Ucko, S. Rebecca Zimmerman

Prepared for the Office of the Secretary of Defense

Approved for public release; distribution unlimited



NATIONAL DEFENSE RESEARCH INSTITUTE

PX716

The research described in this report was prepared for the Office of the Secretary of Defense (OSD). The research was conducted within the RAND National Defense Research Institute, a federally funded research and development center sponsored by OSD, the Joint Staff, the Unified Combatant Commands, the Navy, the Marine Corps, the defense agencies, and the defense Intelligence Community under Contract W74V8H-06-C-0002.

**Library of Congress Cataloging-in-Publication Data**

From insurgency to stability / Angel Rabasa ... [et al.].
    p. cm.
 Includes bibliographical references.
 ISBN 978-0-8330-5299-5 (pbk. : v. 1 : alk. paper) — ISBN 978-0-8330-5314-5
(pbk. : v. 2 : alk. paper)
 1. Counterinsurgency. 2. Counterinsurgency—Case studies. 3. Peace-building—
Case studies. 4. United States—Armed Forces—Stability operations—Case studies.  I.
Rabasa, Angel. II. Rand Corporation.

 U241.F76 2011
 355.4'25—dc23

                                                              2011029543

The RAND Corporation is a nonprofit institution that helps improve policy and decisionmaking through research and analysis. RAND's publications do not necessarily reflect the opinions of its research clients and sponsors.

**RAND®** is a registered trademark.

*Cover image: UN photo by Martine Perret*

© Copyright 2011 RAND Corporation

Permission is given to duplicate this document for personal use only, as long as it is unaltered and complete. Copies may not be duplicated for commercial purposes. Unauthorized posting of RAND documents to a non-RAND website is prohibited. RAND documents are protected under copyright law. For information on reprint and linking permissions, please visit the RAND permissions page (http://www.rand.org/publications/permissions.html).

Published 2011 by the RAND Corporation
1776 Main Street, P.O. Box 2138, Santa Monica, CA 90407-2138
1200 South Hayes Street, Arlington, VA 22202-5050
4570 Fifth Avenue, Suite 600, Pittsburgh, PA 15213-2665
RAND URL: http://www.rand.org
To order RAND documents or to obtain additional information, contact
Distribution Services: Telephone: (310) 451-7002;
Fax: (310) 451-6915; Email: order@rand.org

PX716

## Preface

This monograph is the second of two volumes that examine how insurgencies transition from a high level of violence to a more stable situation. It examines a number of case studies to determine the key factors necessary for a successful transition. The monograph should be of interest to the U.S. Department of Defense, other agencies of the U.S. government, as well as government and nongovernmental organizations in other countries that are concerned with insurgency and counterinsurgency.

This research was sponsored by the Office of the Secretary of Defense and conducted within the International Security and Defense Policy Center of the RAND National Defense Research Institute, a federally funded research and development center sponsored by the Office of the Secretary of Defense, the Joint Staff, the Unified Combatant Commands, the Navy, the Marine Corps, the defense agencies, and the defense Intelligence Community.

For more information on the RAND International Security and Defense Policy Center, see http://www.rand.org/nsrd/about/isdp.html or contact the director (contact information is provided on the web page).

PX716

# Contents

**Preface** ................................................................. iii
**Figures and Maps** ................................................. xi
**Tables** .............................................................. xiii
**Summary** ............................................................ xv
**Acknowledgments** .............................................. xxix
**Abbreviations** .................................................. xxxi

CHAPTER ONE
**Introduction** ........................................................ 1
Background ............................................................. 1
The Transition from Counterinsurgency to Stability ........................ 2
The Case Studies ........................................................ 4

CHAPTER TWO
**The Philippines** ..................................................... 9
Introduction: Background of the Communist Conflict in the
    Philippines ...................................................... 10
  Counterinsurgency Under Marcos ...................................... 12
  The Post-Marcos Period .............................................. 15
Strategy ................................................................ 17
  CPP/NPA .............................................................. 17
The Philippine State .................................................... 22
  Self-Defense Militias ............................................... 27
AFP COIN Progress ....................................................... 28
Transition? ............................................................. 32
Conclusion: Lessons for the United States ................................ 38

PX716

CHAPTER THREE
**Counterinsurgency Transition Case Study: Colombia** ....................41
Nature and Scope of the Conflict................................................41
International and Transnational Actors ...................................... 44
Strategy (Pre-Transition) ........................................................45
   Colombian Government Strategy..............................................45
   Insurgent Strategy ...........................................................47
   External Powers Supporting Belligerents.................................. 50
   Key Strengths and Weaknesses of the Strategies...........................51
   How the Parties Define "Victory" ....................................... 54
The Transition Period..............................................................55
   Managing the Transition......................................................57
   Institutional Framework: Theory and Practice.............................58
   Stages of Transition..........................................................61
   Implementation: What Is the Actual Experience of the Colombian
      Transition?................................................................65
Gaps ...............................................................................70
Conclusions.........................................................................71
   Assessment of Colombian Transition Plan..................................71
   Prospects for the Future ...................................................72
What Capabilities Does the United States Need to Have or Need to
   Develop?..........................................................................73

CHAPTER FOUR
**Counterinsurgency Transition Case Study:**
   **El Salvador** .................................................................75
Introduction .......................................................................75
Strategy (Pre-Transition) .........................................................79
The Transition Period.............................................................. 84
   Domestic Factors ........................................................... 87
   The United States' Role .....................................................89
   The Role of the International Community ................................. 92
Managing the Transition........................................................... 94
   Ceasefire and Demobilization .............................................. 94
   Public Security and Security-Sector Reform ............................... 96
   ESAF Reform................................................................. 96

Police Reform .................................................................. 98
Human Rights, Truth and Reconciliation ............................. 101
Addressing the Factors Contributing to the Insurgency ................ 104
Conclusions ..................................................................... 110
A Successful Transition? ................................................... 110
Lessons Learned .............................................................. 113

**CHAPTER FIVE**
**The Tuareg Insurgency in Mali, 2006–2009** ............................ 117
Introduction ................................................................... 117
Background: Mali's North-South Divide ................................. 117
A History of Contestation .................................................. 120
Phase 1: The ADC Rebellion, May–July 2006 ............................ 124
Introduction: Brief History of the Conflict Leading Up to the
    Period of Transition ..................................................... 124
Strategy (Pre-Transition) .................................................. 125
The Transition Period ...................................................... 129
Managing the Transition .................................................... 130
Phase 2: The ATNM Rebellion (May 2007–February 2009) ............ 133
Introduction: Brief History of the Conflict Leading Up to the
    Period of Transition ..................................................... 133
Strategy (Pre-Transition) .................................................. 133
The Transition Period ...................................................... 144
Managing the Transition .................................................... 147
Conclusions ..................................................................... 151

**CHAPTER SIX**
**The Transition in Al-Anbar, Iraq** ......................................... 157
Introduction ................................................................... 157
A Brief History of the Conflict in Al-Anbar Province ..................... 159
Pre-Transition Strategy, 2005–2006 ...................................... 162
Insurgent Strategies in the Pre-Transition Period ....................... 163
External Powers Supporting the Anbar Insurgents ...................... 164
Counterinsurgency and Transition, 2006–2008 .......................... 168
The Transition in Anbar: Contributing Factors ......................... 168
False Starts and Missed Opportunities on the Road to Transition ..... 171

PX716

External Actors' Understanding of the Changing Conflict
      Dynamics ................................................................. 174
Setting the Stage for and Managing the Transition ......................... 174
  Transition Process Components .......................................... 175
  Signs the Coalition Forces Were "Winning" ............................. 191
  The Transition Outcome in Al-Anbar .................................... 195
  Major Gaps in Transition Capabilities ................................. 196
Conclusions ................................................................ 200

CHAPTER SEVEN
**Afghanistan** .............................................................. 205
Introduction ............................................................... 205
  Key Domestic, International, and Transnational Actors ................. 208
Stabilization Attempt ...................................................... 210
  Incumbent Strategy ...................................................... 210
  Anti-Coalition Militant Strategy ...................................... 220
  External Powers ......................................................... 222
  Strengths and Weaknesses of the Initial Stabilization Attempt ........ 225
  Defining Victory ........................................................ 228
Reasons the Initial Attempt to Transition Toward Stability Failed ....... 229
  Factors That Resulted in Failure ...................................... 229
Recommended Strategy for the Future ...................................... 234

CHAPTER EIGHT
**Conclusion** .............................................................. 241
Overarching Insights ...................................................... 242
Insights and Implications for U.S. Policy in Iraq, Afghanistan,
      and Beyond .......................................................... 253
  Intelligence Support to the Host Nation .............................. 253
  Managing Militias Toward the End Game ................................ 255
  Providing the Resources and Management Structure for a
      Protracted Transition Phase ........................................ 257

APPENDIX
**Indicators of Transition** .............................................. 259

PX716

**References** ................................................................. 261
Summary and Chapter One ................................................ 261
Chapter Two................................................................. 262
Chapter Three .............................................................. 265
Chapter Four ............................................................... 268
Chapter Five ............................................................... 272
Chapter Six ................................................................. 277
Chapter Seven .............................................................. 279
Chapter Eight............................................................... 283

# Figures and Maps

**Figures**

S.1. Moving from COIN Toward Stability ........................ xviii
1.1. Moving from COIN Toward Stability ........................... 4
3.1. Membership of the CCAI ..................................... 59
3.2. Structure of the CCAI ....................................... 60
3.3. Composition of State Efforts in the Three Phases of the
     Transition Process............................................ 62
3.4. Consolidation Regions ....................................... 69
4.1. U.S. Economic and Military Aid to El Salvador,
     1988–1993 .................................................. 91
6.1. Map of Iraq Featuring Al-Anbar Province..................... 161
6.2. Launching and Advancing the Transition in Anbar
     Province .................................................... 189
6.3. Anbar Attack Trend, June 2006 to August 2007 .............. 192

**Maps**

The Philippines ................................................. 9
Colombia ...................................................... 41
El Salvador .................................................... 75
Mali .......................................................... 117
Iraq .......................................................... 157
Afghanistan ................................................... 205

PX716

# Tables

2.1.  The Kalayan Barangay Program .................................. 26
2.2.  Barangays Affected by the CPP and NPA ........................37
6.1.  MNF-W Roles and Missions Emphasis During COIN and
      Recovery Periods.................................................. 201

PX716

# Summary

The Office of the Secretary of Defense asked RAND to examine how conflicts transition from intensive counterinsurgency (where the level of violence might be very high) toward stability. The ultimate goal of the research was to identify good—and bad— practices that the United States military in particular, and the U.S. government in general, can implement in the insurgencies that it faces today as well as in possible future interventions.

The research was divided into two phases. The first phase, which took place from March to September 2009, examined a series of case studies of past and ongoing insurgencies to identify the key policy decisions, techniques, and technologies that helped facilitate the transition to a more stable situation. This document is the result of that research. After the second phase of the research had been completed, it was decided that the case studies contained in this document would be presented as Volume II.

The other phase of the research, *From Insurgency to Stability,* Volume I: *Key Capabilities and Practices*, MG-1111/1, OSD, is an examination of the U.S. capabilities required to successfully transition an insurgency toward stability. That portion of the research focused on the Department of Defense but included insights on other elements of the U.S. government that are also involved in the transition process.

PX716

## The Transition from Counterinsurgency to Stability

Insurgencies tend to last a considerable amount of time. The post–World War II average has been roughly 12 years; some insurgencies last much longer than that.[1] The counterinsurgency (COIN) effort may have been conducted exclusively by the threatened nation, or that country may have received various levels of assistance from third-party nations such as the United States. For the indigenous government, the COIN campaign can end in success, which involves a transition to complete peace or some less intensive, perhaps police-led, stability operation. Ideally, the transition away from COIN will result in a stable, lasting peace. If the government does not achieve a clear-cut win against the insurgents, the transition could include some type of accommodation with the insurgents, for example, a political compromise to allow more autonomy to a particular region or ethnic or religious group.

If, on the other hand, the government fails to defeat the insurgents, there will not be a transition period. In that case, the insurgents will have achieved all or a major portion of their goals. There are also cases where the government threatened by an insurgency initially thought it had reached the transition phase, only to see the situation worsen. Instead of moving forward toward a more stable situation (the goal of transition) the government was forced to revert to COIN. Such "false transitions" are often the result of a government's incorrectly assessing the strength of the insurgents or reverting to bad internal policies that cause the insurgency to reignite.

There is no universally accepted criterion for how, when, and under what circumstances an insurgency can be said to have entered a transition phase toward stability. For purposes of this document, we define a COIN transition as having started when the following are taking place:

---

[1]   David C. Gompert, John Gordon, Adam Grissom, David R. Frelinger, Seth G. Jones, Martin C. Libicki, Edward O'Connell, Brooke Stearns Lawson, and Robert E. Hunter, *War by Other Means: Building Complete and Balanced Capabilities for Counterinsurgency, Final Report,* Santa Monica, Calif.: RAND Corporation, MG-595/2-OSD, 2008, pp. 373–396; Ben Connable and Martin Libicki, *How Insurgencies End*, Santa Monica, Calif.: RAND Corporation, MG-965-MCIA, 2010, pp. 27–29.

PX716

- The level of violence has been declining in the contested region for at least 12 to 24 months. The number of insurgents and insurgent attacks has been declining and there have been significant defections or demobilization of combatants.
- Reforms are being pursued. These include government programs to improve the political process, establish an impartial and credible judicial system, reduce corruption, invigorate the economy, address religious or cultural discrimination, or remove other sources of dissatisfaction that resulted in part of the population siding with the insurgents.
- The population interacts with and supports the security forces and government representatives and assistance workers.
- The police forces of the government combating the insurgency are taking over responsibility for internal security from indigenous (and any foreign) military forces.

How the indicators listed above are assessed or measured can be difficult. In many ways, each insurgency is unique, even if the underlying motivation of the insurgents may be based on a universalistic ideology such as Communism or Islamism. The aim of post-COIN operations is to ensure that the these conditions are followed by lasting peace and stability rather than a relapse into violence. The COIN transition can be said to be complete when the insurgency has been reduced to a level at which the state is able to provide security to the population and perform its basic functions. Figure S.1 depicts the concept of COIN transition.

During the transition from COIN, which tends to have a large military-security component, to less violent stability operations, a change normally occurs in the nature of support provided by third-party nations. In this transition period, there will probably be significant changes in the relationship between various U.S. government agencies that have been assisting the threatened nation. For example, the role of the Defense Department will probably decline while that of other agencies, such as the State Department and the U.S. Agency for International Development (USAID), will increase.

PX716

**Figure S.1**
**Moving from COIN Toward Stability**



**COIN phase**
• Fighting is still taking place
• Some recovery may be in progress

**Transition phase**
• The level of violence has been declining in the contested region for at least 12 months
• Reforms are being actively pursued, including government programs to improve the political process, judicial system, and the economy, together with efforts to address the sources of the grievances that led to the insurgency in the first place
• The number of insurgents has been declining and there have been significant defections or demobilization of combatants
• A shift in roles between the army (both local and foreign troops) and the police is underway where the police are assuming most of the normal security and law enforcement functions

The changes between phases can take considerable time and be fraught with ambiguity and the possibility of "regression" back to higher levels of instability and violence. "Clean breaks" between phases are rare

**Stability phase**
• Fighting is essentially over—although "stability" may actually be a protracted, but lower, level of violence
• A treaty or some other accommodation has been reached with most or all of the former insurgents
• The local government is functioning, although it may require multi-year assistance from outsiders
• This phase will, hopefully, last years into the future

**RAND** *MG1111/2-S.1*

For each of the cases included in this study, we review the cause and key players in the insurgency. We emphasize what the threatened government (often referred to as "the incumbent" because that term is frequently used in COIN literature) did right—or wrong—to bring the insurgency to an end and its actions in transitioning from COIN to a more stable situation. As will be seen, in some of the cases we examined the transition process was successful; in others, it was not.

## The Case Studies

In selecting the cases, RAND decided to include situations where the United States was (or still is) deeply involved, as well as insurgencies where there was little or no American participation. Some of the cases are large insurgencies; others are small. Most are still under way to one

PX716

extent or another, while in some cases the insurgency has been resolved and a successful transition has taken place. As mentioned above, we purposely did not choose "success stories" only, since we felt that important lessons could be learned from insurgencies where the COIN transition has not yet been successful. Below, we list the cases included in the study. They are presented in generally chronological order, from oldest to newest in terms of when they started.

**The Communist Insurgency in the Philippines.** This is a long-running (since the 1940s) effort to suppress the New People's Army that has seen several "false transitions": The Philippine government thought the insurgents were defeated, but policy errors and other factors led to a reignition of the insurgency. There has been some American involvement in the Philippines in the form of assistance to the Philippine government. Today, despite some serious challenges, the Philippine government is probably better positioned to transition from COIN to stability than at any point in the past 30 years.

**Colombia from the 1960s to 2009.** In one of the longest-lasting insurgencies in the world, it appeared at times that the Colombian government would be defeated by the FARC (the Revolutionary Armed Forces of Colombia). Today, however, the Colombian government is clearly in the transition phase in many parts of the country that were controlled by the FARC until a few years ago. As with the Philippines, the United States has provided support and assistance to the local government.

**El Salvador from 1980 to 1992.** This was a relatively small insurgency that has ended. Again, the United States provided assistance to the local government. Although the formal insurgency is over, the mismanagement of the "end game" (i.e., the transition phase) resulted in a major spike in lawlessness in El Salvador; there are important lessons to be learned from this case.

**Mali from 1990 to 2007.** This former French colony was threatened by an insurgency in the northern part of the country by a portion of an ethnic minority. Despite a few false starts, this insurgency is also now generally in a transition phase. This is a case with little American involvement.

PX716

**Iraq's Anbar Province from 2005 to 2008.** This is a large insurgency with considerable American involvement. Between 2006 and 2008, the difficult and dangerous situation in Anbar Province clearly transitioned from COIN to a more stable situation.

**Afghanistan from 2001 to the present.** At the time of this writing, a major insurgency is still under way in Afghanistan, and it has not reached the transition stage. This case was included because of Afghanistan's great importance to the United States. Important lessons can be learned from this case because the United States initially thought it was going directly from a successful regime-toppling invasion to stability, only to see a serious insurgency develop that has not yet transitioned toward stability.

## Conclusions from the Case Studies

Volume I of the project focused primarily on identifying capability gaps and possible policy changes on the part of the United States. This volume provides insights from the case studies that helped guide the determination of what capabilities are required to ensure a successful transition from COIN to stability. It should be noted that although there are some similarities in the cases, there are also important differences. It is therefore difficult to assess whether a "more military" or more "economic/political" approach was the most significant reason why a particular insurgency started to transition toward stability. It is, however, safe to say that in each case we examined there was a need for an approach that balanced security needs with making important reforms in other areas. Important, overarching insights from this phase of the work include the following:

1. *Successfully transitioning from COIN to relative stability requires an interagency approach.* Counterinsurgency requires security measures to protect the population and maintain pressure on the insurgents as well as simultaneous efforts to reform political, economic, and other sources of real or perceived grievance that the insurgents are capitalizing on. Only by addressing

PX716

both problems will the legitimacy of the local government be enhanced in the eyes of its people. Almost by definition, this requires an interagency approach. COIN is not exclusively the responsibility of security forces (police, military, and intelligence). An explicit effort to coordinate the security and civil aspects of COIN, starting at a very high level of government, is a strong indicator that there will be a successful transition toward stability. Important insights on interagency approaches were derived from the Philippine and Colombian case studies, both of which we describe in detail in this volume.

2. *It is important to develop an in-depth understanding of the participants in the insurgency, including what issues are driving a portion of the population into the hands of the insurgents.* Unless and until this is accomplished, moving toward a successful transition period is virtually impossible. Only when those involved in the counterinsurgent effort (the local government as well as that of any external participants such as the United States) become well versed in the issues that the insurgency is attempting to exploit, the key personalities that are involved, and the grievances and needs of the local population, will meaningful efforts at reform become possible. The longer the process of learning the nature of the insurgency takes, the greater the risk that support for the insurgents will increase, possibly to unmanageable levels.

3. *There is a clear need to manage the demobilization of the various militia groups, which may number many thousands of armed men.* Militia groups (either pro-insurgent or pro-government) almost always arise during an insurgency. Successful transitions include explicit efforts to "find a home" for former militia members by integrating some of them into the police and/or military of the country or providing job opportunities for them. If this is not managed properly, the insurgency could either restart (a fear in Anbar Province today) or the presence of large numbers of unemployed, armed, former militia members could lead to a rise in criminal violence (as in El Salvador).

4. *Gaining some degree of cooperation from nearby nations to end or minimize support for the insurgents is essential.* Most studies

PX716

of insurgencies acknowledge the key role of nearby countries. Combating the insurgency is a much more difficult proposition when insurgent groups can obtain sanctuary and support from neighboring countries. Therefore, the cooperation of nearby states is essential. In some cases, this could be as simple as their neutrality (including denial of sanctuary for the insurgents); in other cases, overt assistance from nearby nations might be required, such as helping to monitor border areas, sharing the burden of dealing with refugees, or providing economic assistance to the neighbor that is in the process of transitioning from an insurgency toward stability.

5. *There must be sufficient resources and time for meaningful transition efforts.* Even when an insurgency enters the transition phase, it could still be years before the country reaches a sustainable degree of stability. During this possibly years-long transition phase, there will be a need to continue to address the issues that contributed to the insurgency in the first place. Economic and political reforms, job creation, and reforming the security forces, for example, are resource- and time-consuming undertakings. If sufficient resources to complete the key goals of the transition phase are not available, the insurgency could restart, albeit in a somewhat modified form. To a large extent, this is the problem the Philippine government has faced since the 1940s. Periodically, the communist insurgents have apparently been "defeated," but inadequate follow-through in the transition phase allowed dissatisfaction among elements of the population to reemerge and thus reinvigorate the insurgency.

## Insights and Implications for U.S. Policy in Iraq, Afghanistan, and Beyond

The issues raised above can apply to the host nation, other countries (such as the United States or the United Kingdom) that are attempting to assist the host nation's transition effort, or both. There are,

however, some insights derived from the cases that are of particular importance to "external participants" such as the United States. Ideally, a counterinsurgency effort—and the post-COIN transition period—should be overwhelmingly in the control of the host nation that is threatened by the insurgency. Although other countries can offer important help, ultimately it is the effectiveness and legitimacy of their own governments that will cause the local population either to side with that government or with the insurgents. In situations where the host nation's government and its security forces are so weak that considerable direct involvement by foreign forces is needed, the goal should be to strengthen the COIN capacity of the host nation as rapidly as possible and pass most of the effort to them as soon as they are capable of performing adequately.

That said, some issues apply primarily to the "outside" parties, such as the United States. Several of them are highlighted below.

**Providing Intelligence Support to the Host Nation**

In several of the cases, intelligence support to the host nation was a key capability provided by outside, external powers. In the broadest terms, modes of intelligence collection fall into two categories. Technical collection includes the interception of electronic communications, telemetry from missile tests, and the electromagnetic emanations from military equipment, such as radar transmitters (known collectively as signals intelligence, or SIGINT), and the gathering of photographic imagery. Human intelligence collection (HUMINT) is in essence the use of agents by an intelligence organization to collect information. As demonstrated in the cases of El Salvador, Iraq, Afghanistan, and Colombia the United States provided important technical intelligence to the host nation government and its security forces, intelligence that often gave them significant advantages over the insurgents. This can, of course, help improve the security situation, thus facilitating the transition from COIN to a more stable, less violent situation.

In general terms, HUMINT should be an area where the host nation's security forces have the advantage over foreign forces, at least in theory. After all, the incumbent's security forces are operating among their own people, and it seems unlikely that foreign forces would ever

PX716

be able to develop the same degree of knowledge and detailed cultural insights as the local forces. That said, it is certainly the case that in many instances the incumbent power badly misreads the nature, scope, and motivations of armed opposition groups. Typically, insurgents (particularly in the early stages of a given conflict) are dismissed as mere "bandits," "criminals," or "terrorists." At a political level, this may make good sense, since labeling the armed opposition as something other than criminal may provide them with a measure of legitimacy.[2] But such labeling is seldom the result of a prudent political calculation. More often, it reflects a profound lack of understanding of the insurgent challenge. Indeed, the emergence of a full-blown insurgency is in part a product of the incumbent's inability and unwillingness to understand and take appropriate steps to thwart its growth and development.[3] This appears to have been the case in Iraq in 2003–2004, when the incumbent regime (effectively the United States, in this instance) branded the insurgents as mere malcontents and Baathist "dead-enders."[4]

Paradoxically, some of the most threatened regimes are often in a state of self-denial. Acknowledging the full scope of an insurgent challenge would be a tacit (or perhaps even explicit) acknowledgment that the regime in question is facing a profound crisis that it was unable or unwilling to prevent and for which it may be deemed responsible. Such an admission could further erode whatever little standing and legitimacy the incumbent regime possesses.

All of this suggests that threatened "host nations" may not always be the most competent or reliable intelligence partners. The U.S. government is likely to be tempted to rely heavily on intelligence provided by the so-called "liaison services" of threatened regimes. Politically,

---

[2]    For more on this point, see Philip Deery, "The Terminology of Terrorism: Malaya, 1948–52," *Journal of Southeast Asian Studies,* Vol. 34, No. 2, June 2003, pp. 231–247.

[3]    For more on thwarting "proto-insurgencies," see Daniel Byman, *Understanding Proto-Insurgencies*, *RAND Counterinsurgency Study–Paper 3*, Santa Monica, Calif.: RAND Corporation, OP-178-OSD, 2007, particularly pp. 21–30.

[4]    See for example remarks delivered by Secretary of Defense Donald H. Rumsfeld, Veterans of Foreign Wars, San Antonio, Tex., Monday, August 25, 2003.

PX716

such reliance can help reinforce the notion that the threatened government is a full counterinsurgency partner; in economic terms, depending on the host nation for intelligence on the insurgency is likely to be far cheaper than mounting "unilateral" U.S. collection operations. But for the reasons suggested above, such dependency can have potentially dangerous consequences for U.S. policy. Of course, the United States can ill afford to ignore intelligence provided by a supported government. However, such intelligence (as with any intelligence provided by another government) must be evaluated and considered along with other sources of information, including U.S. sources.

**Managing Militias and Government Forces Toward the End Game**

American policymakers need to be alert to the challenges surrounding the use of militia forces. Self-defense units "clearly need support, or else the guerrillas will overwhelm them one village at a time," as Anthony James Jones concludes.[5] But in many instances, host nations underequip, undertrain, and underpay—and fail to protect—auxiliary forces such as militia groups. The incumbent government is often reluctant to provide modern arms to villagers, fearing that such weapons will "bleed out" and find their way into insurgent hands. Conventional military forces typically view self-defense militia forces with disdain and as a distraction from the "real business" of fighting guerrillas. Conventional forces also tend to regard militias as potential "little soldiers" and as low-cost light infantry who should be deployed to fight insurgents rather than guard villages.[6] Recognizing their potential utility as a counterinsurgency instrument, insurgents will typically make major efforts to infiltrate and otherwise disrupt auxiliary units. Insurgents are often successful in this regard, and this success serves to reinforce suspicions that surrogate forces are unreliable.

---

[5] Anthony James Jones, *Resisting Rebellion; The History and Politics of Counterinsurgency* Lexington Ky.: The University Press of Kentucky, 2004, p. 121.

[6] William Rosenau, *"Low-Cost Trigger Pullers": The Politics of Policing in the Context of Contemporary "State Building" and Counterinsurgency,* Santa Monica, Calif.: RAND Corporation, WR-620-USCA, October 2008, pp. 9–13.

PX716

In addition to understanding how self-defense forces can be neglected and misused by the host nation, U.S. policymakers need to ask three questions before beginning any program of support to militias and home guards: (1) How will these forces contribute to broader political and military objectives? (2) How will they be organized, trained, equipped, and resourced, and by whom? (3) As the insurgency starts to transition toward stability, what is the "end game" plan for militia groups (i.e. will they be integrated into the host nation's police and military, will they be "paid off" with money or jobs, etc). The answers to these questions are not usually self-evident early in an insurgency. Local conditions, culture, resources, and the nature of the insurgency should play a major part in determining the roles, missions, and functions of the auxiliaries. These factors should also shape the program for raising, training, and sustaining these forces. Additionally, U.S. policymakers need to consider how such forces might upset local power balances in ways that undercut wider counterinsurgency objectives. For example, "[i]n states whose societies are divided by ethnic, racial, tribal or confessional strife, the use of surrogates from one particular group . . . can exacerbate internal tensions and encourage civil war," as Hughes and Tripodi have observed.[7] Iraq and Afghanistan clearly fit these criteria, so any program of support to auxiliary forces in those countries should be carefully crafted to avoid aggravating communal tensions and grievances.

Finally, the issue of the role of government forces after the conflict requires careful consideration, ideally during early stages of transition planning and execution. As cases such as El Salvador demonstrate, the failure to properly plan and implement disarmament, demobilization, and reintegration (DDR) of government forces (including local self-defense units) can undercut the prospects for long-term peace and security. Given the prominent role played by auxiliaries in many counterinsurgency campaigns, it is essential that these forces be included in any comprehensive program of DDR.

---

[7] Geraint Hughes and Christian Tripodi, "Anatomy of a Surrogate: Historical Precedents and Implications for Contemporary Counter-Insurgency and Counter-Terrorism," *Small Wars & Insurgencies,* Vol. 20, No. 1, 2009, p. 25.

**Providing the Resources and Management Structure for What Might Be a Protracted Transition Phase**

It was noted in all of the cases that had either successfully transitioned from COIN to stability (El Salvador) or were apparently well along in that process (Colombia, Iraq, the Philippines) that the transition period lasted years. The local government's resources might be greatly strained following a multiyear COIN effort. For the transition period to be truly successful, economic, political, and other reforms will usually need to be carried through to completion. A considerable portion of these resources may have to come from the external power(s) that are assisting the incumbent government during the COIN phase.

Not only is the sheer level of resources an issue, the management of their delivery is also critical for the external power. As COIN transitions toward stability, there will probably be a change in the roles and responsibility between, for example, the Department of Defense and the Department of State. This highlights the reality that other agencies of the U.S. government, which will probably assume a leading role from the Department of Defense (DoD) as the insurgency transitions toward stability, must have sufficient financial resources and enough personnel (either on staff as government employees and/or contractors) to accommodate what might be a multiyear effort to complete the transition process.

# Acknowledgments

The authors wish to thank Benjamin Riley, Director, Rapid Reaction Technology Office OSD-AT&L/DDR&E, for sponsoring this research. Numerous persons outside RAND assisted by providing materials and participating in interviews.

We would especially like to thank the Colombian Ministry of Defense and the U.S. Southern Command (SOUTHCOM), cosponsors of the March 2009 conference on "Contemporary Counter-Terrorism and Counter-Insurgency in Colombia"; the staff of the Acción Social and the Centro de Coordinación de Acción Integral (CCAI), in particular, Diego Fernando Bustamante López; Juan Carlos Vargas Morales; Pablo Ariel Gómez Martínez; Alvaro Barcárcel; Vice Minister of Defense Sergio Jaramillo; Admiral Alvaro Echandía Durán, Commander, Colombian Navy; Rear Admiral Roberto Sáchica Mejía, Chief of Joint Integrated Action, General Command of the Armed Forces; Captain Guillermo Laverde Rendón, Director of Integrated Action, Colombian Navy; and others who prefer to remain anonymous. Without their assistance it would not have been possible to write the chapter on Colombia.

Helpful reviews were provided by Jack Goldstone of George Mason University and Michael Shurkin of RAND.

The authors also wish to thank Andrew Brown and Lauren Varga, administrative assistants at RAND, for compiling this document.

PX716

# Abbreviations

| | |
|---|---|
| ADC | May 23, 2006 Democratic Alliance for Change |
| AFP | Armed Forces of the Philippines |
| ANA | Afghan National Army |
| ANP | Afghan National Police |
| ANSF | Afghanistan National Security Forces |
| AOG | all of government |
| APPF | Afghan Public Protection Force |
| AQI | al Qaeda in Iraq |
| AQIM | al Qaeda in the Islamic Maghreb |
| AQP | Arabian Peninsula |
| ARENA | Alianza Republicana Nacionalista |
| ARLA | Azawad Liberation Revolutionary Army |
| ATNM | Niger-Mali Tuareg Alliance |
| AUC | United Self-Defense Forces of Colombia |
| BBFI | Bantay Bayan Foundation Incorporated |
| BDS | Barangay Defense System |
| CAFGU | Citizen Armed Force Geographical Unit |

PX716

| | |
|---|---|
| CARHRIHL | Comprehensive Agreement on the Respect for Human Rights and International Humanitarian Law |
| CCAI | Center for Coordinated Integrated Action |
| CERP | Commander's Emergency Response Program |
| CF | coalition forces |
| CHCD | clear, hold, consolidate, develop |
| CIDENAL | Colombian Higher War College National Security Course |
| CIVAC | Civic Actions in Insurgency Affected Areas |
| CMO | civilian military operation |
| CODEM | ESAF training and doctrine command |
| COIN | counterinsurgency |
| COPAZ | National Commission for the Consolidation of Peace |
| CPP | Communist Party of the Philippines |
| CVO | Civilian Volunteer Organization |
| DDR | disarmament, demobilization, and reintegration |
| ELN | National Liberation Army |
| ENCAPS | engineering civic action programs |
| EPIC | Economic and Political Intelligence Cell |
| ESAF | armed forces of El Salvador |
| EU | European Union |
| FARC | Revolutionary Armed Forces of Colombia |
| FATA | Federally Administered Tribal Areas |
| FFT | Fact Finding Team |

PX716

| FIAA | Arab Islamic Front of Azawad |
|------|------------------------------|
| FMLN | Salvadoran Farabundo Martí National Liberation Front |
| FPLA | Popular Liberation Front of Azawad |
| FTO | foreign terrorist organization |
| FY | fiscal year |
| GIRoA | Government of the Islamic Republic of Afghanistan |
| GSPC | Salafist Group for Preaching and Combat |
| IA | Iraqi Army |
| IED | improvised explosive device |
| ILPS | International League of People Solidarity |
| IMEF | First Marine Expeditionary Force |
| ISAF | International Security Assistance Force |
| ISF | Iraqi Security Forces |
| JPEC | Joint Prosecution and Exploitation Center |
| KBP | Kalayaan Barangay Projects |
| LE | law enforcement |
| LPSA | Local Peace and Security Assembly |
| MEDCAPS | medical civic action programs |
| MiTT | Military Transition Team |
| MNF-W | Multi-National Force–West |
| MNJ | Niger Movement for Justice |
| MPA | Popular Movement for Azawad |
| MPLA | Popular Movement for the Liberation of Azawad |

PX716

| | |
|---|---|
| MTA | Military Technical Agreement |
| NATO | North Atlantic Treaty Organization |
| NDF | National Democratic Front |
| NGO | nongovernmental organization |
| NISP | Philippine National Internal Security Plan |
| NPA | New People's Army |
| NRP | National Reconstruction Plan |
| OIE | State Intelligence Office (El Salvador) |
| OIF | Operation Iraqi Freedom |
| ONUSAL | UN Observer Mission in El Salvador |
| OPATT | U.S. Brigade Operational Planning and Assistance Training Teams |
| OTI | Office of Transition Initiatives |
| PAT | Auxiliary Transitory Police |
| PCS | Communist Party of El Salvador |
| PCSD | Policy for the Consolidation of Democratic Security |
| PHIC | Philippine Human Rights Information Center |
| PKP | Partido Komunista ng Pilipinas |
| PN | National Police |
| PNC | National Civilian Police |
| PNP | Philippine National Police |
| POC | Peace and Order Council |
| PRT | provincial reconstruction team |
| PSI | Pan-Sahel Initiative |

PX716

| | |
|---|---|
| RP | Republic of the Philippines |
| SEC | Securities and Exchange Commission |
| SHA | Strategy of Holistic Approach |
| SO | stability operations |
| SOT | Special Operations Team |
| SYP | Sandata Yunit Proganda |
| TransCo | National Transmission Corporation |
| TSCTP | Trans-Saharan Counterterrorism Partnership |
| TSE | Supreme Electoral Tribunal |
| UNAMA | UN Assistance Mission in Afghanistan |
| USAID | U.S. Agency for International Development |
| USMC | U.S. Marine Corps |

PX716

# Introduction

## Background

The Office of the Secretary of Defense asked RAND to examine how conflicts transition from intensive counterinsurgency (where the level of violence might be very high) toward stability. The ultimate goal of the research was to identify good—and bad—practices that the U.S. military, in particular, and the U.S. government, in general, can implement in the insurgencies that it faces today as well as possible future interventions.

The research was divided into two phases. The first phase, from March to September 2009, was a series of case studies of past and still-ongoing insurgencies to identify key policy decisions, techniques, and possibly technologies that helped facilitate the transition to a more stable situation. This volume is the result of that research.

The second phase of the research concentrated on identifying current capability gaps and possible policy changes within the Department of Defense, and to a lesser extent the broader U.S. government, that should be addressed in order for the United States to be better able to transition an insurgency toward stability. The second phase of the research drew on the insights derived from the initial case studies, together with other RAND research on insurgencies.

After the second phase of the research had been completed, it was decided that the case studies contained in this document would be presented as Volume II, while the insights gained from the second phase would be presented in Volume I. The two volumes are designed to complement each other.

PX716

## The Transition from Counterinsurgency to Stability

Insurgencies tend to last a considerable amount of time. The post–World War II average has been roughly 12 years; some insurgencies last much longer than that.[1] The counterinsurgency (COIN) effort may have been conducted exclusively by the threatened nation, or that country may have received various levels of assistance from third-party nations, such as the United States. For the indigenous government, the COIN campaign may end in success, involving a transition to a less intensive, perhaps police-led, operation—resulting, ideally, in a stable, lasting peace. If the government does not achieve a clear-cut win against the insurgents, the transition could include some type of accommodation with the insurgents—for example, a political compromise to allow more autonomy to a particular region or ethnic/religious group.

If, on the other hand, the government fails to defeat the insurgents, there will not be a transition period. In that case, the insurgents will have achieved all or a major portion of their goals. There are also cases in which the government threatened by an insurgency initially thought it had reached the transition phase, only to see the situation worsen. Instead of moving forward toward a more stable situation (the goal of transition), the government is forced to revert to COIN. Such "false transitions" often result when a government incorrectly assesses the strength of the insurgents and/or reverts to bad internal policies, causing the insurgency to reignite.

There is no universally accepted criterion for how, when, and under what circumstances an insurgency can be said to have entered a transition phase toward stability. For purposes of this document, we define a *COIN transition* as having started when the following are taking place:

- The level of violence between the government and the insurgents has been declining in the contested region over the previous 12 to 24 months. The number of insurgents and insurgent attacks

---

[1]   Gompert et al., *War by Other Means,* pp. 373–396; Ben Connable and Martin Libicki, *How Insurgencies End*, Santa Monica, Calif.: RAND Corporation, MG-965-MCIA, 2010, pp. 27–29.

PX716

has been declining and there have been significant defections or demobilization of combatants.

- Reforms are being pursued. These include government programs to improve the political process, establish an impartial and credible judicial system, reduce corruption, invigorate the economy, address religious or cultural discrimination, or remove other sources of dissatisfaction that resulted in part of the population siding with the insurgents.
- The population interacts with and supports the security forces and government representatives and assistance workers.
- The police forces of the government combating the insurgency are taking over responsibility for internal security from indigenous (and any foreign) military forces.

How the indicators listed above are assessed or measured can be difficult. In many ways each insurgency is unique, even if the underlying motivation of the insurgents may be based on a universalistic ideology, such as Communism or Islamism. The aim of post-COIN operations is to ensure that these conditions are followed by lasting peace and stability rather than a relapse into violence. The COIN transition can be said to be complete when the insurgency has been reduced to a level where the state is able to provide security to the population and perform its basic functions. Figure 1.1 depicts the concept of COIN transition.

During the transition from COIN, which tends to have a large military-security component, to less violent stability operations, a change normally occurs in the nature of support provided by third-party nations. In this transition period, there will probably be significant changes in the relationship between various U.S. government agencies that have been assisting the threatened nation. For example, during the transition period, the role of the Defense Department will probably decline while that of other agencies, such as the State Department and the U.S. Agency for International Development (USAID), will increase.

PX716

**Figure 1.1**
**Moving from COIN Toward Stability**



**COIN phase**
• Fighting is still taking place
• Some recovery may be in progress

**Transition phase**
• The level of violence has been declining in the contested region for at least 12 months
• Reforms are being actively pursued, including government programs to improve the political process, judicial system, and the economy, together with efforts to address the sources of the grievances that led to the insurgency in the first place
• The number of insurgents has been declining and there have been significant defections or demobilization of combatants
• A shift in roles between the army (both local and foreign troops) and the police is underway where the police are assuming most of the normal security and law enforcement functions

The changes between phases can take considerable time and be fraught with ambiguity and the possibility of "regression" back to higher levels of instability and violence. "Clean breaks" between phases are rare

**Stability phase**
• Fighting is essentially over—although "stability" may actually be a protracted, but lower, level of violence
• A treaty or some other accommodation has been reached with most or all of the former insurgents
• The local government is functioning, although it may require multi-year assistance from outsiders
• This phase will, hopefully, last years into the future

**RAND** *MG1111/2-1.1*

## The Case Studies

In selecting the cases, RAND decided to include both situations in which the United States was (or still is) deeply involved and insurgencies in which there was little or no American participation. Some of the cases are large insurgencies; others are small. Most are still under way to one extent or another, although in some cases the insurgency has been resolved and a successful transition has taken place. As mentioned above, all the cases are "success stories," since we felt that important lessons could be learned from insurgencies where the efforts to transition from COIN have not yet been successful. Below, we list the cases included in the study, from the oldest start point to the newest.

**The Communist Insurgency in the Philippines.** This is a long-running (since the 1940s) effort to suppress the New People's Army that has seen several "false transitions": The Philippine government

thought the insurgents were defeated, but policy errors and other factors led to a reignition of the insurgency. There has been some American involvement in the Philippines in the form of assistance to the Philippine government. Today, despite some serious challenges, the Philippine government is probably better positioned to transition from COIN to stability than at any point in the past 30 years.

**Colombia from the 1960s to 2009.** In one of the longest-lasting insurgencies in the world, it appeared at times that the Colombian government would be defeated by the FARC (Revolutionary Armed Forces of Colombia). Today, however, the Colombian government is clearly in the transition phase in many parts of the country that were controlled by the FARC until a few years ago. As with the Philippines, the United States has provided support and assistance to the local government.

**El Salvador from 1980 to 1992.** This was a relatively small insurgency that has ended. Again, the United States provided assistance to the local government. Although the formal insurgency is over, the mismanagement of the "end game" (i.e., the transition phase) resulted in a major spike in lawlessness in El Salvador; there are important lessons to be learned from this case.

**Mali from 1990 to 2007.** This former French colony was threatened by an insurgency in the northern part of the country by a portion of an ethnic minority. Despite a few false starts, this insurgency is also now generally in a transition phase. This is a case with little American involvement.

**Iraq's Anbar Province from 2005 to 2008.** This is a large insurgency with considerable American involvement. Between 2006 and 2008, the difficult and dangerous situation in Anbar Province clearly transitioned form COIN to a more stable situation.

**Afghanistan from 2001 to the Present.** At the time of this writing, a major insurgency is still under way in Afghanistan, and it has not reached the transition stage. This case was included because of Afghanistan's great importance to the United States. Important lessons can be learned from this case because the United States initially thought it was going directly from a successful regime-toppling invasion to stability, only to see a serious insurgency develop that has not yet transitioned toward stability.

PX716

It can be seen from this list that the insurgencies vary considerably. Some are large; others small. Some had considerable American involvement; others had none. Most are still under way today. As mentioned previously, we wanted to examine a variety of insurgencies to see what practices, both successful and unsuccessful, governments had used as they tried to transition from COIN to stability.

Although the nature of the cases varied, we developed a common analytical template for examining the insurgencies, to facilitate comparisons among them. The elements of this template were the following:

A. Introduction: Brief history of the conflict leading up to the period of transition.

- What was the nature and scope of the conflict?
- Who were the key domestic, international, and transnational actors?
- Who were the insurgents?
- What external powers (if there was one or more) supported the belligerents?
- What were the key strengths and weaknesses of these strategies?
- What factors brought about the transition?
- How did the incumbent power know it was "winning"?
- Were there previous "false starts"?
- What was the insurgents' "end game"? How did they recognize they were "losing"?
- Did key external actors understand the changing conflict dynamics? What role did they play?
- What were the key phases?
- What were the central components of the incumbent's transition process?
- What were the major gaps in the transition capabilities of the incumbent and any outside supporting states?
- Did the role of external actors change in significant ways?
- How did the insurgents manage the transition?
- What followed the transition period? Was there a permanent peace, a lesser form of instability (i.e., widespread criminality

and disorder), or an eventual reemergence of sustained armed opposition?
- How long and to what degree did external actors remain engaged?

B. Strategy (pre-transition)
- What was the nature of the incumbent (the local government threatened by the insurgency)?

C. The transition period

D. Managing the transition

E. Conclusions
- What does this case say about the kinds of capabilities the United States should have to assist nations in the transition process?

PX716

# The Philippines

## Map of the Philippines



SOURCE: CIA World Factbook.

**RAND** *MG1111/2-2.1*

9

PX716

This chapter examines the main parameters of the Philippine counter-insurgency against the Communist Party of the Philippines (CPP) and its armed wing, the New People's Army (NPA). After briefly describing the background to the conflict, we discuss the strategy pursued by both protagonists and examine the strengths and weaknesses of the approach adopted by the incumbent state. The chapter argues that while some significant gains have been made against the CPP/NPA, Manila has yet to reach a decisive transition point in its campaign against the rebel communist movement, reflecting some key weaknesses in overall Filipino COIN capabilities and policies. These shortfalls can usefully inform U.S. military planners as they seek to refine their own techniques and procedures for waging this type of unconventional war in the contemporary era.

## Introduction: Background of the Communist Conflict in the Philippines

Communist insurgent violence in the Republic of the Philippines (RP) dates back to the 1940s when the Partido Komunista ng Pilipinas (PKP) allied with the Hobo ng Bayan Laban sa Hapon (the hukbala-haps or Huks) to overthrow the central government in Manila. The Huks, who were led by Louis Taroc, constituted a peasant-based army that had fought with great skill against the Japanese occupation during World War Two. Although the group participated in the independence elections of 1946, it was defeated by the victorious Liberal Party and subsequently retreated to the jungles to act as the vanguard of an anti-western Filipino communist revolution. Full-scale rebellion broke out in February 1950 when the Huks changed their name to Hukbong Mapagpalaya ng Bayan (People's Liberation Army) and called for the overthrow of the central government in Manila. Pledging to liberate the peasantry from the "tyrannical hold of the landed elite," communist rebels subsequently commenced operations with widespread grass-roots support. By the end of 1950, the Huks had grown to a sizable force of 3,000 armed insurgents and had managed to take temporary

control of several provincial capitals in Luzon—both of which gave the impression of imminent revolutionary success.[1]

The communists failed to secure ultimate victory, however. Their appeal among the poor faded as a result of a failure to bring about any meaningful change in land distribution. Moreover, the Secretary for National Defense, Ramon Magsaysay, was able to progressively steer popular support away from the Huks through personal charisma and a skillful public relations campaign that the insurgent leadership could not match. Just as important, he was able to revive the spirits of a demoralized army and, with U.S. backing, significantly enhance the effectiveness of military offensive drives. After Magsaysay was elected president in 1953, he bolstered the general COIN effort with a vigorous agrarian reform agenda that was instrumental in further diminishing the communist appeal. By 1954 what remained of the People's Liberation Army had been reduced to desultory banditry, representing little if any threat to the stability of the Philippine state.[2]

Despite this victory, the government failed to capitalize on the post-Huk peace dividend. Magsaysay's successor, Diosdado Macapagal (in office from 1961 to 1965), did little to extend government benefaction in the rural areas—reflecting a basic problem of programmatic discontinuity that continues to beset the polity to this day—while pervasive corruption continued to extend throughout the country's ruling, military and administrative structures. These conditions bred discontent among the masses and, in so doing, gave succor to a deflated PKP.

---

[1]  Michael Leifer, *Dictionary of the Modern Politics of Southeast Asia*, London: Routledge, 1996, p. 122.

[2]  George Rosie, *The Directory of International Terrorism*, Edinburgh: Mainstream Publishing, 1986, p. 145; Armed Conflict Events Database, "The Huk Rebellion in the Philippines 1946–1954," December 16, 2000; Leifer, *Dictionary of the Modern Politics of Southeast Asia,* p. 122; Derek McDougall, *Studies in International Relations: The Asian-Pacific, the Superpowers, Australia*, Melbourne: Edward Arnold, 1991, p. 69. See also Manuel Bautista, *The Hukbalahap Movement in the Philippines, 1942–1952*, Los Angeles: University of California, 1952; and Laurence Greenberg, *The Hukbalahap Insurrection: A Case Study of a Successful Anti-Insurgency Operation in the Philippines, 1946–1955,* Washington, D.C.: U.S. Army Center of Military History, Analysis Branch, 1987.

PX716

## Counterinsurgency Under Marcos

The communist insurgency gathered strength after 1972, when President Ferdinand Marcos, barred by the Philippine constitution from seeking a third term, declared martial law. Counterinsurgency under Marcos relied heavily on search-and-destroy operations. Insurgents were able to evade contact with government forces and to choose engagements when conditions were in their favor. These operations often entailed harassment of the local population in an attempt to gain intelligence. In some cases, heavy-handed tactics alienated the population and increased local support for the insurgency.[3] Corruption in the armed forces contributed to a decline in professionalism. Marcos centralized the military, police, and intelligence agencies under the control of his cousin, General Fabian Ver, and placed relatives and cronies at all levels of the government. Senior officers were allowed to run private businesses and extortion rackets. This created the conditions for the growth of the insurgency and the formation of groups of reform-minded junior officers, such as the Reform of the Armed Forces movement.[4]

Calculating that popular sentiment could once again be shifting decisively in their favor, the communists reconstituted their political and military structures. Under the leadership of Jose Maria Sison, the party quickly declared its adherence to the Maoist precept of "people's war" and announced a new offensive that would be executed through dedicated military and political wings, to be known, respectively, as the New People's Army (NPA)[5] and the National Democratic Front (NDF). The CPP specifically identified its cause as rooted in liberation theology, seeing its main objective as the creation of a more just and

---

[3]   Mike Fowler, "Philippine Counterinsurgency Strategy: Then and Now," *Small Wars Journal*, January 18, 2011.

[4]   Douglas J. Macdonald, "Ethical and Moral Issues in Intelligence Reform: The Philippines," in Thomas Bruneau and Steven C. Boraz, eds., *Reforming Intelligence: Obstacles to Democratic Control and Effectiveness,* Austin: University of Texas Press, 2007, p. 306.

[5]   The NPA was originally created under the leadership of a former Huk commander, Bernabe Buscayno (aka "Commander Dante").

PX716

humane Philippine society free from what it referred to as the "tyrannical" influence of U.S. imperialism.[6]

The NPA commenced its armed campaign in the rural areas of central and northern Luzon, progressively expanding its operational presence during the early 1970s to Samar, Negros, and Panay in the Visayas and the eastern part of Mindanao in the south.[7] Although Sison and other senior CPP leaders were captured in 1977, the communist resistance continued to draw sustenance from economic stagnation, poor governance, cronyism, corruption, and human rights abuses.[8] Just as important, the rebels benefited positively from Manila's gradual scaling back of land redistribution, which itself reflected a prevailing (and mistaken) attitude among policymakers that there was no causal connection between peasant unrest, agrarian reform, and political stability. Evidence provided by the Ministry of Agriculture shows that the real income of small farmers declined by nearly 40 percent between 1974 and 1979 and that fewer than a quarter of peasant tenants had acquired land ownership by 1984.[9] The resulting situation fostered a general perception that the Marcos regime was neither interested in protecting and furthering the interests of the average citizen nor willing to abrogate the holdings of large-scale rice and corn production conglomerates.

---

[6] "25 Years of the New People's Army," *Liberation International*, March/April 1994. See also David Wurfel, "Government Responses to Armed Communism and Secessionist Rebellion in the Philippines," in Chandran Jeshurun, ed., *Governments and Rebellions in Southeast Asia*, Singapore: Institute for Southeast Asia Studies, 1985, pp. 227–228; Thomas Marks, *Maoist Insurgency Since Vietnam*, London: Frank Cass, 1996, pp. 85–96; Richard J. Kessler, *Repression and Rebellion in the Philippines*, New Haven: Yale University Press, 1989, pp. 83–84; and McDougall, *Studies in International Relations*, pp. 77–79.

[7] David Wurfel, *Filipino Politics: Development and Decay*, Ithaca, N.Y.: Cornell University Press, 1988, p. 227.

[8] The decision to declare marshal law reflected a prevailing concern that the CPP-NPA was receiving material and financial support from Communist China and, therefore, had to be crushed as quickly as possible. See Wurfel, "Government Responses," p. 299; and Purifiacion Quisumbing, *Beijing-Manila Détente: Major Issues*, Quezon City: University of the Philippines Law and Foreign Service Institute, 1983, p. 147.

[9] Wurfel, "Government Responses," p. 229.

PX716

The growing sense of CPP/NPA confidence culminated in 1985, when the NDF announced a 12-point agenda that gave concrete expression to the communist movement's long-term objectives:

1.  To unite the Filipino people to overthrow the tyrannical rule of U.S. imperialism and local reactionaries
2.  To wage a people's war to win total, nationwide victory
3.  To establish a democratic coalition government and a people's democratic republic
4.  To integrate the revolutionary armed forces into a single national revolutionary army
5.  To uphold and promote the free exercise of the people's democratic right
6.  To terminate all unequal relations with the United States and other foreign entities
7.  To complete the process of genuine land reform, raise rural production through cooperation, and modernize production
8.  To carry out national industrialization as the leading factor in economic development
9.  To guarantee the right to employment, raise the people's living standards, and expand social services
10. To promote a patriotic, scientific and popular culture and ensure free public education
11. To respect and foster the self-determination of the Moro and Cordillera people and all ethnic minorities
12.  To adopt and practice a revolutionary, independent, and peace-loving foreign policy.[10]

This platform struck a chord among the Philippines' aggrieved and increasingly disenfranchised rural and urban masses. It also directly correlated with the foreign policy priorities of Libya's Muammar al-Qhaddafi, who was actively seeking to expand his country's influence across the Asia-Pacific on the back of revolutionary anti-western proxy forces. Benefiting from a groundswell of grass-roots support

---

[10]  Kessler, *Repression and Rebellion*, 83–84.

and boosted by the financial largesse of Tripoli, the CPP/NPA had reached a peak strength of 22,000 self-proclaimed "Red Fighters" by 1988. With influence in some 20 percent of the country's barangays (the smallest administrative unit), the communists appeared set to move against the existing levers of state power.[11]

The civilian opposition to Marcos was united and energized by the assassination of Benigno (Ninoy) Aquino at the Manila International Airport as he was returning from exile in the United States in August 1983. The February 1986 presidential election, contested by Ninoy's widow Corazon (Cory) Aquino, was the catalyst of the "People's Power Revolution" against Marcos. Defense Minister Juan Ponce Enrile and the head of the Philippine Constabulary, General Fidel Ramos, joined in a military revolt that was instrumental in driving Marcos from power in 1986 and ushering in a period of democratic rule.[12]

**The Post-Marcos Period**

After the downfall of the Marcos regime, Corazon Aquino assumed the presidency, with Ramos as chief of staff of the armed forces. Post-1986 counterinsurgency strategy continued offensive operations while incorporating a concept of providing security to the population. Popular support for the communists was further eroded by the Aquino administration's promise of agrarian reform. However, the Aquino administration, beset by constant coup attempts and the opposition of elite sectors, was not able to make good on much of its reform agenda.[13]

The presidency of Fidel Ramos, who succeeded Aquino in 1992, was a period of unprecedented political stability and economic growth. The Ramos administration repealed the Anti-Subversion Law of 1981, which declared the CPP to be "an organized conspiracy for the purpose of overthrowing the Government of the Philippines," amnestied military mutineers and rebels, and reached out to the CPP/NPA, offering

---

[11] Author interviews, Manila, June 2009. See also McDougall, *Studies in International Relations*, p. 79; Kessler, *Repression and Rebellion*, p. 56; Bayani Cruz, "Qadhaffi Aids NPA, MNLF," *Manila Times*, June 16, 1987.

[12] Macdonald, "Ethical and Moral Issues," p. 308.

[13] Fowler, "Philippine Counterinsurgency Strategy."

PX716

it opportunities for genuine political participation.[14] Ramos's successors, Jose Ejercito (Erap) Estrada and Gloria Macapagal-Arroyo, did not live up to the standard of governance that Ramos had set during his term; their inability to deliver competent and honest government or economic growth has contributed to the persistence of insurgency.

The momentum of the CPP/NPA/NDF insurgency suffered as a result of the democratization of Philippine political life and of a major split between those who insisted on the continued relevance of Maoist rural guerrilla war and those who advocated a more explicit reorientation to urban-based activities (violent and nonviolent). The subsequent internal struggle, which pitched longtime CPP Secretary Sison (whom the Cory Aquino government had released from jail in 1986 and who remained an ardent supporter of Maoist principles) against so-called "insurrectionist-line" cadres who believed it was possible to shortcut the process of popular revolution by projecting communist rural influence directly into the cities. Resultant in-fighting and splintering led to a purge of armed cells and the effective collapse of their wider supporting political infrastructure.[15]

The communists have never been able to recover from this period, and they certainly do not represent the threat they did in the 1980s.[16] That said, the NPA remains intact, with an overall armed membership of 4,874 and access to some 5,390 firearms. Moreover, the CPP/NDF continues to operate across the country (including metropolitan Manila), affecting an estimated 1,381 barangays as of the end of 2008.[17] It is this national influence combined with the residual but sizable force quotient that continues to stem from the NPA that accounts

---

[14]  Fidel V. Ramos, *The Continuing Revolution*, Manila, 2001, pp. 88–89.

[15]  Author interviews, Manila, January 2008. Sison and "orthodox" Maoists preferred a strategy of encircling the cities from the countryside, while the opposing faction favored a combination of rural and urban struggle, modeled on the Sandinista campaign in Nicaragua. For further details see Antonio Abaya, "Jose Maria Stalin," *Manila Standard Today*, July 6, 2006.

[16]  Author interview, Manila, June 2009.

[17]  Author interviews, Manila, June 2009. See also "Current NPA's Strength Down to Lowest Level Since the '80s," *Philippine Star,* June 28, 2009.

PX716

for the Armed Forces of the Philippines' (AFP's) current view of the communist insurgency as the number-one internal security threat confronting the Philippine state.[18]

As mentioned previously, the Philippines have been confronted with a communist insurgency since the 1940s. At times, the communists appeared to be getting the upper hand; at others, the government seemed to be on the verge of defeating the insurgency.

Of considerable importance for the longevity of the insurgency are the deep, systemic problems that have contributed to the insurgency and undermined the legitimacy of the government in the eyes of much of the population. These problems include poverty, inequity in wealth distribution, corruption at all levels of government, and sometimes inappropriate, brutal tactics employed by the government's security forces. Without question, the failure to address these issues has helped keep the communist insurgency alive for so long. It is also important to note, however, that recent reforms in the Philippines have gone far toward undermining the case of the communists, as explained below.

## Strategy

### CPP/NPA

In its attempt to accomplish its goals, the communist movement has employed all tactical means at its disposal: military struggle; mass mobilization; political lobbying, including "buying" elected representatives as well as actual participation in elections through its legitimate arm, the NDF; international solidarity work; and pursuit of peace negotiations.

The NPA remains at the forefront of the communist militant agenda. In theory, the group remains under the direct control of the 26-member CPP Central Committee with authority exercised through

---

[18] Author interviews, Manila and Zamboanga, January 2008. See also "Philippines: Communists Say Guerrillas Have Not Been Dismantled," *Adnkronos International,* January 8, 2009.

PX716

the eight-member Politburo headed by Sison (who is presently exiled in Utrecht, the Netherlands). In practice, however, the armed wing enjoys considerable autonomy due to the fragmented nature of the Philippine archipelago and the considerable difficulty this has engendered in terms of day-to-day communications. The NPA itself is currently organized into 62 guerrilla fronts that are scattered across the country; prior to their abduction by a suspected undercover military unit in 2007, the two main operational chiefs were thought to be Pedro Calubid and Leo Valesco.[19] The group's principal areas of current strength include the traditional areas of Samar in the Visayas and eastern Mindanao as well as parts of the Compostela and Surigao Valleys, Davao Oriental, Davao del Norte, Misamis and Zamboanga del Norte.[20]

The NPA's armed campaign has been primarily based on the Maoist theory of protracted guerrilla warfare. This strategic tactic assumes that, in order to launch a successful people's revolution in the major metropolitan centers of power, it is first necessary to win the active support of the peasantry in the countryside.[21] In line with this precept, most NPA insurgents are organized into armed mobile propaganda units known as Sandata Yunit Proganda (SYP), which reportedly reflect the CPP's focus on ideology and indoctrination as the best means for rebuilding its mass peasant base. Typically, a SYP will use family connections to establish a primary foothold in a targeted barangay. This provides a base from which to, first, assess local socioeconomic conditions and second, create relevant functional civic organizations as vehicles for entrenching "white areas"[22] that receive critical support from activist sections of the population, such as peasants,

---

[19] Author interviews, Manila, June 2009. See also Glenda Gloria, "War Without End: The Military Is Treading on Dangerous Ground with Its Counterinsurgency Experiments," Newsbreak, December 2007/February 2008, p. 34.

[20] Author interviews, Manila and Zamboanga, January 2008.

[21] According to Mao, the peasants were the "sea" in which the guerrillas needed to "swim" and without their continuous and active support any revolution would be doomed to failure. For more on Mao's concept of people's war see Michael Handel, *Masters of War: Classical Strategic Thought*, London: Frank Cass, 2003, Chapter 4.

[22] The term *white area* was coined by communist insurgents themselves and is used to refer to a region where government agencies are present but unable to meet the basic needs of the

PX716

youths, women, and students. SYPs can also be tasked with killing police and bureaucratic officials deemed to be corrupt, those who are suspected of acting as government spies, and anyone engaged in what is loosely defined as "anti-people activities" (such as criminals and drug traffickers). In addition, they can be used to settle simple blood debts or as the "muscle" to collect revolutionary taxes and other coerced forms of payment (see below).[23]

Operationally, SYPs can be brought together to form guerrilla companies of between 50 and 100 armed cadres who are typically deployed for assassinations, tactical offensives against municipal buildings, and attacks on businesses that have refused extortion demands and on police/military outposts.[24] Some of the assaults perpetrated by these combined units have exhibited a high degree of discipline and tactical sophistication. Between January and May 2008, for instance, communists bombed no less than 23 high-voltage power towers of the government-owned National Transmission Corporation (TransCo), succeeding on a number of occasions to trigger blackouts in Mindanao that lasted for several hours.[25] More recently in March 2009, an NPA team ambushed a local defense patrol base in Malaybay City, killing 17 part-time soldiers; the incident marked one of the AFP's costliest encounters with the Maoist rebels since 2001.[26]

Beyond guerrilla strikes and propaganda, fundraising constitutes a critical component of the NPA's operational activities. Money is pro-

---

local population or prevent guerrillas from receiving vital logistical and political support from the indigenous community. See Gloria, "War Without End," p. 39.

[23] Author interviews, Manila and Zamboanga, January 2008; Anthony Davis, "NPA Rebels Complicate Manila's Counterinsurgency Strategy," *Jane's Intelligence Review,* June 2003, p. 16.

[24] Author interview, Manila, June 2009. See also Davis, "NPA Rebels Complicate Manila's Counterinsurgency Strategy," p. 16.

[25] "Transco Towers Bombed, Half of Mindanao in Darkness," *Philippine Daily Inquirer,* May 31, 2008; and John Paul Jubelag, "Insurgents Blast 2 TransCo Towers," *Philippine Star,* May 31, 2008.

[26] Jem Strikar, "NPA Attacks CAFGU Patrol Base in Malaybalay City," *Mindanao Magazine,* April 1, 2009.

PX716

cured mostly from extortion,[27] which typically takes the form of a "revolutionary tax" that businesses are obliged to pay in order to operate in areas under communist control. Sums vary but are usually determined as a set premium of the respective firm's annual profits. Logging, agricultural, telecommunications, mining, transportation, commercial, quarrying, and construction companies have been especially favored targets, collectively handing over 32 million pesos in 2008.[28] The NPA has additionally extorted wealthy private individuals, demanding that they pay a percentage of their annual earnings to support the communist struggle; in 2008, this particular source yielded an estimated 12.7 million pesos.[29] During elections, pressure has also been exerted on politicians to pay so-called "permit to campaign" fees. In 2004, for example, congressional candidates were forced to contribute up to 500,000 pesos (approximately US $12,500) for the right to access CPP/NDF strongholds.[30] A largely similar pattern of financial compulsion characterized the 2010 presidential run-off.[31]

In terms of its current military aspirations, much of the NPA's focus has been directed toward recruiting more members, expanding the number of fronts and combat platoons across the country, intensifying military training, and launching more tactical strikes (including, where necessary, acts of sabotage and terrorism in major metropolitan centers). Although many of these operational facets continue to remain salient, the relative emphasis on violent modalities has been increas-

---

[27] In 2008, extortion yielded ps62 million in revenue for the communist insurgency. Additional sources of financing included support from left-wing sympathizers in Europe and the United States (the NPA is known to have received at least some American money channeled through the International League of People Solidarity, or ILPS) as well as remittances from overseas Filipino workers (OFWs).

[28] Author interviews, Manila and Zamboanga, January 2008 and June 2009. See also Davis, "NPA Rebels Complicate Manila's Counterinsurgency Strategy," pp. 17–18.

[29] Author interviews, Manila, June 2009.

[30] Author interviews, Manila, January 2008. See also Immigration and Refugee Board of Canada, "Philippines: Reports of Extortion and Kidnapping of Civilians by the New People's Army (NPA) or Other Armed Groups; State Response to Extortion and Kidnapping; Extent of Recruitment Efforts by the NPA (2003–2006)," October 18, 2006.

[31] Author interviews, Manila, June 2009.

PX716

ingly sidelined over the past several years by a more concerted focus on political struggle, which now accounts for as much as 90 percent of the communist struggle. In broad terms, the main priorities appear to be participating in elections (through the NDF), solidifying popular support, generating income, and delegitimizing the Philippine state.[32] According to AFP officials, this agenda is being pursued by encouraging public sector groups/individuals to join local branches of left-leaning political parties; organizing mass street protests of the sort that were emphasized as part of the "oust Arroyo" campaign;[33] sensationalizing extrajudicial killings, graft and corruption, and internal security laws as a threat to the people; strengthening the political machinery of the CPP/NDF; de-designating the NPA as a foreign terrorist organization (FTO) in the United States and European Union (EU); and mobilizing left-wing supporters and potential funders in America, Europe, Australia, and Hong Kong.[34]

The communists have also been prepared to supplement their political struggle by engaging in peace talks with the Philippine government. This particular tactic was suspended in 2005, however, after the CPP broke off contact with Manila in protest at the NPA's inclusion the U.S. and EU lists of proscribed FTOs. Sison, who, as noted, currently lives in self-imposed exile in the Netherlands, has categorically stated that his organization will not resume any form of bilateral interaction with the government until its designation in America and Europe is lifted—a decision that the Arroyo administration has little ability (or, indeed, inclination) to influence.[35]

---

[32] Author interviews, Manila, January 2008 and June 2009.

[33] During the latter stages of the Arroyo administration, there was substantial pressure for the president to step down over revelations of bureaucratic mismanagement and endemic corruption within her government. Attempts to reform the constitution to allow Arroyo to stand for an additional term were especially unpopular and a major source of popular criticism and disenchantment between 2009 and 2010. (Author interviews, June 2009.)

[34] Author interviews, Manila, January 2008.

[35] Author interviews, Manila, January 2008. See also Republic of the Philippines, Office of the Presidential Advisor on the Peace Process, CPP-NPA-NDF, October 24, 2007. The NPA was designated a foreign terrorist organization by the United States in August 2002 and by the European Union in November 2005.

PX716

## The Philippine State

Reflecting the military-political nature of the CPP/NPA's current strategy, the AFP has sought to institute a "left hand, right hand" approach to COIN that includes both hard and soft, less combat-intensive, approaches. The dual aim is to neutralize existing NPA guerrilla fronts while simultaneously moving to blunt the underlying political and socioeconomic infrastructure on which the communist insurgency currently relies.[36]

The Philippine National Internal Security Plan (NISP), formulated by the now defunct Cabinet Oversight Committee on Internal Security, lists the country's domestic security priorities in the following order: (1) counterinsurgency, primarily directed against the NPA (referred to as the Local Communist Movement, or LCM); (2) counterseparatism, directed primarily against Islamic Moro groups on Mindanao (collectively referred to as the Southern Philippines Secessionist Group/SPSG); (3) counterterrorism, directed against both local and international organizations (al-Qaeda, Jemaah Islamyya, and the Abu Sayyaf Group); and (4) counter-destabilization, which is primarily aimed at neutralizing efforts to overthrow the government.[37] The insurgent challenge emanating from the CPP/NPA is viewed as the country's number one domestic threat—absorbing roughly 60 percent of the government's resources devoted to internal security[38]—largely because the group operates nationally, has the stated objective of overthrowing the central government, and because the CPP/NDF has penetrated a wide range of civil sector interests and organizations.[39] As one AFP official observed, whereas terrorists and separatists are generally confined to the south of the country and aim only for autonomy or

---

[36] Author interviews, Manila, June 2009.

[37] Rommel Banalaoi, "Identity Politics and Philippine National Security in an Age of Terror," unpublished paper provided to author, June 2009, p. 10. An earlier version of the paper, titled "Identity Politics and National Security in the Philippines," can be found in *Pilipinas: A Journal of Philippine Studies,* Vol. 42, March 2005, pp. 25–45.

[38] This is compared to 15 percent devoted to counter-terrorism and counter-separatism and 10 percent to counter-destabilization. See Gloria, "War Without End," p. 35.

[39] Author interviews, Manila, January 2008.

secession, the NPA operates across the whole country and sees itself as the main vehicle for implementing people's war through a sustained campaign of sabotage and disruption.[40]

In instituting its COIN strategy against the communist insurgency, Manila has sought to develop a holistic "all of government" (AOG) approach[41] that involves all key stakeholders in the civilian, governing, and security force sectors. The input of these parties is coordinated through Peace and Order Councils (POCs),[42] which operate at the national, regional, provincial, city, and municipal levels and have the following four core functions and responsibilities: (1) to formulate plans and recommend measures that will serve to improve or enhance peace and order; (2) to monitor the implementation of peace and order programs at all levels and audit their performance in terms of COIN programs and activities; (3) to receive, hear, and adjudicate on complaints made against government personnel—either civilian or military; and (4) to make determinations as to when prevailing conditions are suitable for the transfer of security responsibility from the military to civilian authorities and associated paramilitary/self-defense forces (see below).[43]

The POCs are also the main mechanism for the formation of Local Peace and Security Assemblies (LPSAs). These gatherings bring together local government officials, civil society leaders, and military and police officials to discuss the problems of insurgency and to craft

---

[40]  Author interview, Manila, January 2008.

[41]  Manila adopted the terminology of AOG in 2006. Prior to this, the COIN effort was based on the "Strategy of Holistic Approach" (SHA). The concepts behind the two are largely the same, although the AOG places greater emphasis on civilian outreach, development, and general military operations of a nonlethal manner. Banalaoi, "Identity Politics," p. 17.

[42]  Author interviews, Manila, June 2009. POCs were originally signed into law by then-President Corazon Aquino through Executive Order Number 320 (1988). The National POC is made up of officials from executive cabinet departments, other executive agencies, the security forces, and the private sector representing academic, civil, religious, youth, labor, legal, business and media organizations; membership on local POCs reflect that of their national counterparts.

[43]  Author interviews, Manila, June 2009.

PX716

action agendas for particular areas. The central government regards the LPSA as a useful mechanism to begin the process of normalization in regions affected by communist guerrillas as a well as a means through which to reach out to NPA militants who have indicated an interest in laying down their arms and reintegrating into mainstream society. Five LPSAs were held in 2007, and they apparently have contributed to the government's growing success against the communists since then.[44]

In terms of actual strategy, an enhanced version of the NISP (e-NISP) outlines five offensives and three programs. Together, these efforts are intended to increase confidence in the legitimacy of the Philippine government and undermine the agenda and effectiveness of the communists. The five offensives include

- a military offensive, aimed at degrading the operational capabilities of the NPA
- a legal offensive, aimed at securing convictions of violent militants by educating the AFP on appropriate procedures for securing crime scenes and ensuring the sanctity of forensic evidence
- an economic offensive, focused on cutting the flow of funds to the NPA from sympathizers abroad and upgrading the effectiveness of anti-money laundering operations
- a political offensive, directed at weaning local community organizations away from the CPP/NDF
- a strategic communications/psyops (psychological operations) offensive, aimed at countering CPP/NDF propaganda and promoting the Philippine state as a socially caring polity.

The three programs include

- an amnesty program, which applies only to the NPA and is currently being debated in the Philippine Congress
- a social reintegration program, which focuses on the demobilization, disarmament, and reintegration of "repentant" NPA cadres

---

[44] Author interview, Manila, January 2008.

PX716

and falls under the responsibility of the Office of the Advisor for the Peace Process

- a human rights program, which is basically directed toward the Philippine National Police (PNP) and AFP and is intended to boost the proficiency of police and army human rights awareness and understanding.[45]

Combined, the five offensives and three programs are aimed at instituting the "left hand, right hand" approach against the LCM. The overall objective is based on the principle of "clear, hold, consolidate, develop" (CHCD), which is designed to neutralize and dismantle the communist political and militant machinery in insurgent "white" areas and gradually normalize these regions to allow a transfer of security from the military—which remains the lead agency in Philippine COIN efforts—to civilian forces.[46] Integral to the Philippine CHCD methodology are Special Operations Teams (SOTs). These units are embedded in each of the divisional commands of the AFP (the specific number varies according to the situation on the ground) and are composed of nine intelligence, civil affairs, and psyops specialists, accompanied by a security detachment of around 20 troops. A SOT will be inserted into an insurgent "hot zone" for up to nine months with the twin goals of sapping active or latent popular support for the communist cause and encouraging the local populace to work with the authorities in dampening militant activities. Before the SOT is dispatched, a thorough survey of the critical needs of the respective community is undertaken and used to inform the content and direction of any socioeconomic and/or confidence building measures that are subsequently

---

[45] Author interviews, Manila, January 2008.

[46] Banalaoi, "Identity Politics and Philippine National Security in an Age of Terror," p. 16. Then-President Arroyo explained the "left hand, right hand approach" in the following terms: "How do we address this problem (of) insurgency? Through the right-hand and left-hand approach. (The) right hand is the full force of the law and the left hand is the hand of reconciliation and the hand of giving support to our poorest brothers so that they won't be encouraged to join the rebels." Cited in Marichu Villanueva, "Palace Announces RP-CPP Peace Talks Resume in Oslo February 10–13," *Philippine Star*, February 6, 2004.

PX716

instituted.[47] SOTs play a critical role in defining the parameters of and executing the implementation of so-called Kalayaan Freedom Barangay Projects (KBPs), which are designed to win the people's hearts and minds through the construction of schools, houses, and hospitals and the provision of basic services, such as potable water, health care, and electricity (See Table 2.1).[48]

As noted, Manila has also sought to harness the totality of municipal resources in countering urban-based insurgent threats by instituting a "multistakeholder co-ownership" approach to COIN. Perhaps the clearest example of this stratagem was on the island of Bohol. Here POCs were established to bring together local government agencies, church representatives, nongovernmental organizations (NGOs), academics, civil society organizations, and the business sector to formulate plans on how best to restore normalcy in rebel-infested areas.[49]

Finally a number of specific pilot schemes have also been developed for particular areas. One notable scheme is the Barangay Defense System (BDS), which was initially set up to cover the remote towns of Nueva Ecija province in Central Luzon. The idea of Colonel Gregory Cayteno, the BDS is composed of local residents who act as key informants for the military. Members are not armed; rather, they are equipped with cell phones that they use to access a dedicated hotline

**Table 2.1**
**The Kalayan Barangay Program**

| Projects | Completed | Ongoing | To Be Started |
|---|---|---|---|
| Water supply | 37 | 19 | 94 |
| Building schools | 89 | 20 | 150 |
| Farm-to-market roads | 0 | 2 | 94 |
| Total | 126 | 41 | 338 |

SOURCE: Briefing Paper, J3, AFP, 2007.

---

[47] Author interviews, Manila, June 2009. The roots of SOTs go back 20 years and stem from techniques that were first introduced to deal with the Muslim insurgency in Mindanao.

[48] Author interviews, Manila, January 2008. See also Gloria, "War Without End," p. 39.

[49] Author interviews, Manila, June and September 2009.

PX716

whenever they spot a suspected rebel(s) or sense an impending incursion. Apart from acting as a real-time intelligence source for the AFP, the BDS concept is also employed as means of preventing petty crimes (such as cattle rustling) and helping with the protection of livelihood projects for local residents.[50]

### Self-Defense Militias

Self-defense paramilitaries constitute an important component of the AFP's overall COIN effort. These entities are regarded as a relatively cheap and effective means of augmenting the police security presence in areas considered at or approaching a state of normalization.[51] Two main types of militia exist: First are the Citizen Armed Force Geographical Units (CAFGUs), which are fully integrated into the army's chain of command and are subject to all applicable military law, rules, and regulations.[52] CAFGUs are trained by the AFP in the fundamentals of village protection and local community organization and persuasion, have a legal basis in the constitution, and are paid a nominal monthly allowance. There are currently around 60,000 CAFGUs deployed in 13,400 villages—up from 41,979 in 2001. Seventy percent of these units are stationed in Central Mindanao; the remaining 30 percent are scattered across other designated priority areas.[53]

Complementing the CAFGUs are Civilian Volunteer Organizations (CVOs). Members of these groups are unarmed[54] and work with

---

[50]  Gloria, "War Without End," p. 35.

[51]   The annual cost of maintaining a regular soldier (private) in the AFP is around 120,000 pesos, compared to just 33,000 pesos for a paramilitary member.

[52]  Rommel Banlaoi, "CAFGU, CVOs and Vigilante Groups in the Philippines," paper prepared for the South-South Network (SSN) Philippine Armed Groups Political Mapping Research Project, 2006, p. 2. It should be noted that because CAFGUs are fully integrated in the military chain of command, the AFP denies that they are either a paramilitary or militia unit.

[53]  Author interviews, Manila, June 2009. See also Banlaoi, "CAFGU, CVOs and Vigilante Groups in the Philippines," p. 6; and Office of the Assistant Chief of Staff for Operations, *CAFGU Primer*, Makati City: Headquarters of the Philippine Army, 2006.

[54]  Although they are not legally mandated to carry arms, there have been reports of CVOs engaged in skirmishes with NPA and Moro Islamic Liberation Front militants during which

the police in supporting local peace, order and security development projects.[55] They also act as a form of neighborhood watch and periodically engage in intelligence and undercover work for the military and police in their respective localities. Training and education to CVOs is provided by the Bantay Bayan Foundation Incorporated (BBFI), which was registered with the Securities and Exchange Commission (SEC) in 1984. According to the BBFI, some 9,018 CVO chapters have been formed nationwide, with a combined strength of 4,509,000. These personnel play a pivotal role in the implementation of the AFP's COIN operation known as Bantay Laya (see below).[56]

## AFP COIN Progress

The stated goal of the AFP was to achieve a strategic victory over the CPP/NPA by the end of 2010—the year that was supposed to mark the termination of President Arroyo's presidency.[57] Orchestrated under "Bantay Laya I and II" ("Guard Freedom" I and II), this objective had as its aim a 75 percent reduction in present CPP-NPA strength, capability, and influence by meeting the following self-imposed annual benchmarks: (1) The collapse of 65 guerrilla fronts; (2) the completion of 500 KBPs (126 had been finished by the end of 2007— see Table 2.1); (3) the implementation of at least four major highway initiatives

---

M1 Garand, M-14 and M-16 assaults rifles, as well as rocket propelled grenades (RPGs) have been used.

[55]  A CVO can be formed by any group of interested and law-abiding citizens (over the age of 18) to promote community self-defense and safety against criminals and other lawless elements." See *Consideration of Reports Submitted by States Parties Under Article 40 of the Covenant: The Philippines,* Geneva: United Nations (UN) Covenant on Civil and Political Rights (CCPR), August 2002, p. 119.

[56]  Banlaoi, "CAFGU, CVO and Vigilante Groups in the Philippines," pp. 6–7.

[57]  Under the terms of the Philippine Constitution, an individual can only serve as president for a maximum of two terms. As noted previously, however, Arroyo moved to introduce changes that would allow for a third tenure in office. The issue remains highly contentious and is currently one of the main sources of political uncertainty and tension in the country. Author interviews, Manila, June 2009.

PX716

on the island of Mindanao;[58] and (4) the systematic intensification of white area cleansing operations to neutralize the CPP-NDF urban command structure.[59]

The AFP has made steady progress toward meeting some of these objectives, chalking up a number of notable successes against the CPP/NPA. By the end of 2007, 13 guerrilla fronts had been totally cleared and consolidated; an additional 17 were in the advanced stages of degradation; 13 key CPP leaders had been either detained or killed; and a further 191 communist members had been arrested and prosecuted for rebellion (representing 34 percent of all intended targets). In 2009, the government declared the NPA's combined strength to be 4,874 cadres organized in 75 fronts—the lowest level since the 1980s.[60]

Arguably more important, a number of formerly "hot" guerrilla zones have not only been normalized but are now in the stages of advanced popular development. A case in point is the island of Bohol in Region VI of the Visayas. A hotbed of communist insurgency in 2000, the AFP had managed to clear out all CPP and NPA influence by 2006. One of the main reasons for this success was the input of Governor Erico Aumentatdo, who was instrumental in establishing a consultative process that allowed for the effective pairing of civilian and military power to confront and defeat the insurgent threat.[61]

---

[58] The four planned projects include a circumferential road for Basilan, a triple S-B coastal road for Zamboanga del Norte; three circumferential highways for Cotabato City; and a Lapinig-to-Jipadad road in Sampar.

[59] Author interviews, Manila, January 2008.

[60] "Current NPA's Strength Down to the Lowest Level Since the 1980s," *Philippine Star*, June 28, 2009.

[61] Author interviews, Manila, January 2008 and June 2009; "Linking Security Sector Reform and Peace-Building: The Case of Bohol," unpublished paper provided to author, n.d., p. 2. Some of the resulting mechanisms that appear to have borne particular dividends included the formation/implementation of: (i) Quick Response Teams (QRTs) to address the immediate needs of victims of NPA attacks; (ii) Fact Finding Teams (FFTs) to gather pertinent information on any matter related to provincial internal security; (iii) Civic Actions in Insurgency Affected Areas (CIVAC) aimed at winning the hearts and minds of the local population; and (iv) local Monitoring Mechanism for the Comprehensive Agreement on the Respect for Human Rights and International Humanitarian Law (CARHRIHL) to ensure the rights of both combatants and noncombatants are fully respected.

PX716

To a certain degree, the AFP's successes against the CPP and NPA are due to internal schisms within the rebel ranks that were first triggered by the decision to switch from rural to urban operations (see above). These splits worked to the specific advantage of the military, which was able to exploit internal doctrinal disagreements among the communist leadership to confuse and divide the movement's wider membership.[62] As Lieutenant Colonel Noel Patajo of the Philippine Air Force (PAF) commented: "[T]he AFP gained the upper-hand and a so-called "strategic victory" when [elements] of the CPP-NPA opted for the immediate seizure of power while post-insurgency problems, as secondary preoccupations, were shelved for the time being."[63]

However, just as important in accounting for the armed forces' progress is the holistic COIN approach outlined above. In an attempt to replicate Magsaysay's success against the Huks, a considerable component of this stratagem has focused on nonkinetic, "hearts and minds" initiatives that are directed toward weaning popular support away from the NPA while simultaneously enhancing the military's perceived standing in the local community. Indicative of this approach are the joint U.S.-Philippine *Balikatan* (literally, "shoulder-to-shoulder") exercises, held each year to enhance the AFP's general counterinsurgency and counterterrorism modalities in areas of endemic political violence. The 2008 round of these drills was oriented exclusively to civilian military operations (CMOs) in Basilan, Tawi-Tawi, and Sulu and involved eight medical civic action programs (MEDCAPS) and four engineering civic action programs (ENCAPS).[64] The most recent exercises, which were held April 16–30, 2009, were similarly devoted to CMOs, this time emphasizing relief and assistance efforts in the event of natural disasters and other crises that endanger public health and safety. In addition, AFP personnel conducted comprehensive humani-

---

[62]  Author interviews, Manila, September 2009.

[63]  Noel Patajo, "An Alternative Approach to Counterinsurgency," *Air Force Review,* Vol. 6, No. 3, October 2006, p. 4.

[64]  Author interviews, Zamboanga, January 2008. See also Eric Schmitt, "Gains Seen in Asian Terror Fight," *New York Times,* June 9, 2008. MEDCAPS involved fifteen AFP personnel/project, ENCAPS twenty personnel/project.

PX716

tarian assistance projects in Zamboanga, Bico, and Central and Southern Luzon, offering free medical, dental, and veterinarian care as well as building and repairing community infrastructure in areas deemed to be in most need of assistance.[65]

The *Balikitan* exercises have had an important effect on AFP thinking concerning COIN and counterterrorism. In particular, the annual drills have underscored to participating officers that development assistance often goes hand in hand with military operations, especially in terms of the favorable impact that can be elicited on the attitudes of the local population through road-building and other construction work. Opening a dialogue with local stakeholders also appears to have exposed the AFP to an alternative means of at least trying to change local perceptions on the ground.[66]

The "hearts and minds" approach has gained increased currency at the highest levels of the AFP. According to the head of a nongovernmental organization (NGO) in the southern Philippines, this is now the preferred approach of several commanders deployed to Mindanao.[67] Moreover, the military has now created a new, nonlethal division that is specifically dedicated to CMO efforts—the National Development Support Command. The rationale behind the unit is that the best way to defeat a terrorist insurgency is by giving people what the rebels cannot: roads, bridges, businesses, houses, schools, electricity, medical centers, and medicines—in short, better governance.[68]

Besides appreciating the potential utility of CMOs, AFP commanders have become increasingly cognizant that inappropriate involvement of national-level security forces in local disputes can act as a trigger for violence. As one AFP commander explained it: "A party to a land or political dispute could call on associates in the local police or government-sanctioned militias to support him while a [local rebel]

---

[65] See "RP, US Announce Balikatan Exercises 2009 in Bicol," philstar.com, January 8, 2009; Robert Clowney, "Airmen Spread Goodwill During Balikatan 2009," U.S. Air Force, April 29, 2009.

[66] Author interviews, Zamboanga, January 2008, and Manila, June 2009.

[67] RAND interview, Cotabato City, January 2008.

[68] Author interviews, Manila, January 2008 and September 2009.

PX716

commander might support or lend arms to the other party; very quickly what began as a local dispute escalates into a national-level conflict."[69] To prevent entanglement in local disputes and their ensuing negative effects, the Philippine security forces have reached out to NGOs to organize and conduct conflict management seminars. These sessions are aimed at helping military personnel understand the local environment to which they are to be deployed and providing techniques and procedures to minimize the danger of their becoming involved in conflict-prone situations.[70] In addition AFP officers have worked closely with development NGOs, participating in programs that are designed to resolve societal divides by including legitimate stakeholders in negotiating and mediation processes. One such course is the Bridging Leadership Fellowship that is funded and run by the Asian Institute of Management .[71]

## Transition?

Notwithstanding these operational successes and the wider conceptual breakthroughs that have been registered in the military's thinking about COIN over the past two to three years, Manila—by its own admission—continues to confront a significant communist challenge. More specifically, while the government has made undoubted progress in overhauling and refining its overall counterinsurgency strategy, the government has yet to reach a decisive turning point in the campaign against the CPP-NPA. Indeed, the supposed strategic victory over the communist movement by 2010 is now questioned by a number of senior officials, many of whom concede that the timetable should be revised by at least one year and possibly as many two years.[72] This reassessment bears testimony to several important gaps that continue to

---

[69] RAND interview, Cotabato City, January 2008.

[70] RAND interview, Cotabato City, January 2008.

[71] For more on this see AIM TeaM Energy Center, "The Bridging Leadership Fellows Program," n.d.`

[72] Author interviews, Manila, June 2009.

hamper the AFP's capabilities and policies, which have so far prevented a "real" transition from occurring, at least on a national basis.

First, the integrated approach to stabilization that underscores the strategic campaign against the NPA assumes that the army will take and hold a given area and that the civilian agencies will then go in to reestablish an effective state presence. In reality, however, cleared zones are frequently reinfiltrated by militants, largely because civil authorities fail to discharge their responsibilities in a meaningful and decisive manner. This has generated particular consternation on the part of the AFP, which repeatedly charges that inadequate follow-on consolidation by local bureaucrats and administrators merely serves to create governance vacuums that insurgents and terrorists have been quick to capitalize on.[73] In the words of one AFP officer with extensive experience of battling the NPA:

> One of the main weaknesses of the government's COIN strategy is the inability to consolidate control over held areas. Typically once a region is cleared, the army will depart and hand over responsibility to local civilian agencies and bureaucrats. In most cases, however, these personnel have been incapable of preventing re-infiltration by Communist operatives. Indeed in a number of cases, guerrillas are known to have tactically withdrawn from base fronts knowing that once they do so the military will leave, effectively leaving them free to re-establish control.[74]

Second, efforts to implement a consistent national security strategy have been impeded by severe policy discontinuities, reflecting the highly adversarial nature of the Philippine political and administrative system. New officials and politicians are seldom willing to endorse and build on the initiatives of their predecessors—even if they are working—because they want to leave their own personal stamp on the office.[75] Compounding matters is a mandatory retirement age of

---

[73] Author interviews, Manila, January 2008 and June 2009.

[74] Author interview, Manila, January 2008.

[75] Author interview, Manila, September 2009.

PX716

56, which applies to all three branches of the armed forces. This has resulted in an extremely high turnover of personnel in the senior ranks, which has in turn precluded the opportunity to introduce programs and ensure that they are followed through and sustained. This disjuncture has been particularly apparent in the area of social reinsertion for demobilized and/or surrendered NPA cadres. Not only do these schemes remain in a constant state of flux, they also tend to be highly ad hoc in nature. Such inconsistency in terms of content and duration has, not surprisingly, impeded their ability to ensure the long-term rehabilitation of former combatants, many of whom simply return to arms.[76]

Third, although there has been a significant shift in AFP culture toward greater recognition of nonviolent, "effects-based" COIN operations, the overall tempo of security reform continues to be held hostage by a degree of organizational inflexibility. Reflecting this has been a general failure either to integrate peace-building modules into the military curriculum or incorporate and validate metrics into the promotion system that explicitly reward these types of activities.[77]

Fourth (and to a degree the product of the above), while the AFP has certainly been prepared to emphasize hearts and minds efforts in its overall COIN strategy, the relative emphasis on countering the political dimension of the CPP-NPA campaign has been somewhat lacking. In many ways, the army continues to confront the communist insurgency in military terms, even though the bulk of rebel activity (90 percent) is now focused on penetrating and subverting formal state and civic institutions, such as labor unions, the Catholic Church, schools, universities, student bodies, and business cooperatives.[78] This is something that the AFP itself admits. As Colonel Ricardo Visaya, a former battalion commander stationed in Pampanga in Central Luzon, remarked: "We admit there was a problem . . .We [have been] too focused on the armed group, even though we [know] that 70 percent of the enemy's

---

[76] Author interviews, Manila, January 2008 and September 2009.

[77] Author interview, Cotabato City, January 2008.

[78] Author interviews, Manila, January 2008 and June 2009.

PX716

effort is [focused] on political struggle and that only 30 percent [is on] military struggle."[79]

Fifth, the AFP frequently fails to work and communicate effectively with the PNP, especially with regard to preserving forensic evidence. Generally, the military is the first to arrive at an urban guerrilla incident, given their resources and ability to rapidly deploy. Problematically, however, the AFP often fails to coordinate its response with the that of the PNP—resulting in a situation where the lead responsibility for cordoning off a crime scene falls to an organization that is neither trained in law enforcement nor attuned to protocols for collecting information that can be used for judicial purposes (the AFP priority is on garnering tactical and strategic intelligence). The PNP have, as a result, defaulted to relying on witness testimonies when prosecuting alleged offenders, many of which have been thrown out of court for their unreliable nature.[80] Not surprisingly, the conviction rate has not been as high as it might otherwise have been and, until recently, tended to be less than a third of all cases brought forward for prosecution.[81]

Sixth, the Philippine military continues to suffer from varying degrees of politicization, cronyism, and nepotism—both on an individual and institutional level. Within the AFP, people are typically promoted on the basis of who they know and their graduating class at the military academy—not on talent. This has hampered the army's ability to fully capitalize on organizational reform and prevented the institutionalization of a modern, merit-based system of performance review.[82] Corruption also remains a lingering problem. It has both encouraged

---

[79] Colonel Visaya, cited in Gloria, "War Without End," 35.

[80] Author interviews, Manila, June 2009. Defense teams are often able to dismiss the reliability of witness testimony by arguing that it was given under duress or otherwise extracted under "questionable" circumstances.

[81] Author interviews, Manila, January 2008 and June 2009. Exacerbating the situation is the PNP's continuing reliance on witness statements in bringing cases against suspects. Because these are often given under questionable circumstances, they are invariably thrown out of court as inadmissible.

[82] Author interviews, Manila, September 2009.

PX716

adventurism on the part of junior officers[83] and allowed the military to exert a dangerous degree of influence over the country's political establishment.[84]

Finally, although the AFP has made steadfast progress in its professionalism, human rights transgressions continue to undermine the record of paramilitary forces trained under its auspices. According to the Philippine Human Rights Information Center (PHIC), CAFGU members have been implicated in a broad range of abuses, including salvaging, harassment, forced evacuation, and even reported cases of cannibalism. CVOs have also been linked to various human rights violations, allegedly becoming more violent in tandem with a growing involvement in the illegal drug trade and increased (unsanctioned) access to small arms.[85]

These various shortfalls are reflected in the overall record of the AFP's struggle against the NPA. As noted above, although certain successes have been achieved, the military has yet to reach a decisive transition point in its COIN effort. Complete stabilization remains more the exception than the rule and has been achieved in only a few notable places, such as the island of Bohol. In most cases, the counterinsurgency strategy remains in either a fully offensive or mixed offensive/

---

[83] There have been numerous cases involving senior members of the AFP taking bribes from companies with interests to protect and/or simply falsely declaring their assets and outside business holdings. In one notable incident that broke on 2004, an army general was court-martialed for amassing in excess of $2 million in cash and real estate on a $600/month salary. See Heda Bayron, "Philippine Military Corruption Trial Starts," newsVOA.com, November 16, 2004.

[84] Author interviews, Manila, January 2008. See also Carlos Conde, "Corruption Troubles Philippine Military," *International Herald Tribune*, May 26, 2005. Corruption has always been part of the AFP culture and was in fact institutionalized during the Marcos era. When the former dictator was removed from power, members of the armed forces became politicized themselves, appropriating the role of "guardians of the constitution" and assuming the self-defined right to intervene against governments that were not deemed to be functioning adequately. Numerous analysts have blamed the weakness of civilian administrations in the Philippines on this messianic mindset in the military.

[85] Banaloi, "CAFGU, CVOs and Vigilante Groups in the Philippines," p. 7. See also Agnes Camacho, Zenaida Marco, P. Puzon, and Yasmin Patrice Ortiga, *Children and Youth in Organized Armed Violence in the Philippines: Contextualisation, Personal Histories and Policy Options*, Quezon City: UP Center for Integrative and Development Studies, 2003.

PX716

normalization mode with security responsibilities left squarely in the hands of the AFP, as opposed to civilian authorities.[86]

Moreover, while the NPA's operational capabilities have been blunted, the CPP's ability to infiltrate at the local level has been far from curtailed. Although the number of *barangays* infiltrated by the communists is much less than the 8,059 reported in 1987, the figures have been steadily climbing since 1995 and by 2006 (the latest year for which accurate data are available) amounted to at least 5 percent of the country's total (see Table 2.2). As Gloria commented: "And then a new landscape emerged in 2001: [the AF] was suddenly faced with a guerrilla unit that was emaciated on the battlefield but whose political stock—through its control of leftwing political parties and a popular anti-government stance—has risen to levels never before seen since the height of the anti-Marcos years."[87]

**Table 2.2**
**Barangays Affected by the CPP and NPA**

| Year | Number of Affected Barangays |
|------|------------------------------|
| 1987 | 8,059 |
| 1991 | 4,841 |
| 1995 | 445 |
| 1996 | 534 |
| 1998 | 772 |
| 2000 | 1,279 |
| 2001 | 1,969 |
| 2004 | 2,510 |
| 2005 | 2,178 |
| 2006 | 2,121 |

SOURCE: National Intelligence Coordinating Agency, Manila, 2007.

---

[86] Author interviews, Manila, January 2008.

[87] Gloria, "War Without End," p. 35.

PX716

## Conclusion: Lessons for the United States

The Philippine experience highlights a number of notable lessons. On the positive side, it illustrates the worth of balancing hard kinetic COIN approaches with softer "hearts and minds" initiatives that are relevant and respond to the needs of local communities. Not only do such strategies engender greater trust and confidence in the security forces, they also increase the scope for active popular involvement in rebel mitigation efforts.[88] These approaches have a dual effect: First, they deprive insurgents of crucial pools of civil passive support; second, they serve to greatly expand the potential scope of military and police surveillance on the ground. They were certainly a major factor in the defeat of the Huks and, through KBPs, they have generated dividends in several regions with regard to the struggle against the CPP/NPA.

No less significantly, the campaign against the CPP/NPA highlights the importance of involving all key stakeholders in a conflict at the earliest possible stage. Bohol stands as testimony to how effective such an approach can be in fully normalizing a former conflict zone. Indeed, in her 2006 State of the Nation Address, President Arroyo specifically cited the province- and city-based POCs as an exemplary case of innovative peace-building that was understood by everyone from the highest official to the ordinary citizen.[89]

On the negative side, the campaign against the CPP/NPA highlights the problems that can arise when the armed forces leave a nominally cleared area before full consolidation has been attained. As noted, one of the main reasons why many insurgent zones remain in a state of only partial normalization is that there is no effective security presence to prevent rebel reinfiltration once the military has left. Indeed,

---

[88] In the words of the Stanley Foundation, "It is this kind of goodwill support—not the provision of "hard" combat equipment and training—that has been especially welcomed by indigenous communities in conflict-ridden regions and, hence, most successful in alienating latent militant sympathies and tendencies." Cited in International Crisis Group, "The Philippines: Counter-Insurgency vs. Counter-Terrorism in Mindanao," Asia Briefing No. 152, May 14, 2008, p. 22.

[89] Author interviews, Manila, June 2009; "Linking Security Sector Reform and Peace-Building: The Case of Bohol," p. 2.

PX716

in many cases communist guerrillas are thought to have deliberately withdrawn from base fronts precisely because they know that once they do, the army will depart—giving them ample opportunity to reestablish control at will.[90]

On a wider level, the chapter bears witness to the criticality of programmatic continuity in ensuring the COIN effort. Manila failed to win the peace over the Huks largely because it squandered the progress that had been made in land reform. The current campaign against the CPP/NPA appears to be faltering, at least in part, because the demobilization and social reintegration programs are in a constant state of flux. As one well-informed and well-placed official with the Philippine National Security Council (NSC) lamented: "The Philippines suffers from a critical disease: policy, program and leadership discontinuity. No attempt is made to build on past strengths and achievements. This is not healthy for a young democracy as it causes severe strategic disjunctures, removes critical stock knowledge and essentially forces each new government to start from scratch."[91]

The Philippine example also shows how corruption, nepotism, and cronyism can impede the development of an effective and professional military fighting force that is able to definitively address the range of internal threats arrayed against it. Although progress has certainly been made in boosting the proficiency of the AFP's lower and middle ranks as part of a broader process of defense reform and rationalization,[92] in many ways the senior leadership continues to operate as an "old boy network" that is more interested in protecting and advancing the vested interests of its own members. This has stymied the growth of what might otherwise have been a fully flexible and for-

---

[90]  Author interviews, Manila, Jaunuary 2008.

[91]  Author interview, Manila, September 2009.

[92]  Manila's Department of National Defense is currently looking across doctrine, force structure, training and equipment to redirect financing and mapping in accordance with a multiyear capabilities planning system – a long-range scheme developed with U.S. assistance and divided into six three-year segments. Information presented to the author at an AFP intelligence briefing, Manila, January 2008.

PX716

ward-looking organizational culture that is ready, able, and willing to embrace and validate innovative, "out-of-the-box" thinking.[93]

The Philippine case additionally underscores the danger of relying on inadequately trained and controlled local self-defense militias. Although the AFP has made significant progress regarding its own professionalism, CAFGUs and CVOs operating under military auspices continue at times to be implicated in serious human rights abuses and transgressions. This has tarnished the army's reputation, provided the CPP/NPA with useful recruiting propaganda, and transformed what could potentially constitute a cheap and viable security "force multiplier" into one that risks driving a permanent wedge into the wider population. As the PHIC elaborates, "the CAFGUs are fighting not as part of a nation united against an external aggressor but in a nation divided against itself, where one part of the population is [an] enemy very often broadly defined, thus lending itself to abuse."[94]

Finally, this chapter illustrates the importance of the political context of COIN. One of the main factors accounting for the NDF's success in penetrating a wide array of Philippine civic, student, and labor bodies has been Manila's failure to recognize and respond to an insurgent threat is now predominantly nonmilitary in nature. While the AFP has certainly moved to incorporate a "soft" hearts and minds component in its campaign against the CPP/NPA, far less emphasis has been placed on developing "smart" initiatives aimed at countering and discrediting the movement's propaganda. To a large extent, this reflects the prevailing view in the government that the root causes of militancy are poverty and underdevelopment rather than ideology. The Philippine case suggests that *both* are pertinent (especially in societies beset by chronic and endemic problems of corruption); thus, they need to be factored equally into overall policy, planning, and decisionmaking.

---

[93]  Author interviews, Manila, January 2008 and June 2009.

[94]  Philippine Human Rights Information Center (PHIC), *The Militarization of the Philippine Society: CAFGUs Against Human Rights,* Quezon City: PHIC, 1993; Banaloi, "CAFGU, CVOs and Vigilante Groups in the Philippines," p. 5. See also Rene Sarmiento, "The Legality of Vigilante Groups," paper prepared for the Eight House Annual Convention of the Integrated Bar of the Philippines. Manila: Hilton Hotel, June 7, 1987.

PX716

# Counterinsurgency Transition Case Study: Colombia

**Map of Colombia**



SOURCE: CIA World Factbook.

RAND *MG1111/2-3.1*

## Nature and Scope of the Conflict

The origins of the current Colombian insurgency go back to the period of extreme violence between adherents of the Liberal and Conservative parties in the late 1940s and early 1950s that is known as *La Violencia*, during which an estimated 200,000 persons lost their lives. The Cuban revolution and the beginning of Soviet support for national liberation movements in Latin America encouraged the advocates of revolution-

PX716

ary change in Colombia to challenge the government through armed struggle. Colombia's two main guerrilla organizations, the Havana-line National Liberation Army (ELN) and the Moscow-line Revolutionary Armed Forces of Colombia (FARC), as well as other smaller groups, were established in the initial wave of Cuban-inspired effort to export the revolution to the Latin American mainland in the 1960s. This history makes the FARC and the ELN two of the oldest guerrilla groups in the world.[1]

The ability of these groups, particularly the FARC, to challenge the central government increased significantly in the 1980s and 1990s, as revenue from the drug trade, kidnapping, and extortion enabled the group to expand its military capabilities and area of operation. The FARC established a presence in two-thirds of the country's territorial jurisdictions,[2] and developed an extensive infrastructure to move drugs, arms, supplies, and personnel across Colombia's permeable borders with Venezuela, Panama, and Ecuador.[3] The ELN had its strongest presence in the oil region of northeastern Colombia, attacking the oil infrastructure and deriving income from extortion of the oil companies. The stature of the ELN has been reduced over the past decade because of military losses to Colombian forces, the FARC, and the *Autodefensas Unidas de Colombia* or AUC (United Self-Defense Forces of Colombia) and its limited involvement with the drug trade. The ELN no longer represents a significant threat to the Colombian state.

---

[1]   See Angel Rabasa and Peter Chalk, Colombian Labyrinth: The Synergy of Drugs and Insurgency and Its Implications for Regional Stability, Santa Monica, Calif.: RAND Corporation, MR-1339-AF, 2001; Richard Maullin, Soldiers, Guerrillas, and Politics in Colombia, Santa Monica, Calif.: RAND Corporation, R-0630-ARPA, 1971; Paul Oquist, Conflict and Politics in Colombia, New York: Academic Press, 1980; Rafael Pardo, La Historia de Las Guerras, Bogotá, 2004.

[2]   Known as *municipios* (municipalities or townships). According to a statistical data base on violence in Colombia, by 1995 the FARC presence had spread to 622 of Colombia's 1,050 *municipios.* Camilo Echandía Castillo, *El Conflicto Armado y las Manifestaciones de la Violencia en las Regiones de Colombia*, Bogotá: Presidencia de la República, Oficina del Alto Comisionado para la Paz, 1999, p. 60.

[3]   Rabasa and Chalk, *Colombian Labyrinth*, pp. 85–91; Alfredo Rangel Suárez, *Colombia, Guerra en el Fin de Siglo*, Bogotá: TM Editores, 1998.

PX716

At the same time, so-called paramilitaries, organized under the umbrella of the AUC, established themselves as another force in the Colombian conflict. The AUC came about largely because of the inability of the state to provide security to the population. The paramilitaries mirrored the FARC in that they had links to the drug trade as well as political objectives. The paramilitaries were able to displace the FARC and the ELN from a number of contested areas, and their activities contributed to the overall decay of the state and a condition of generalized violence.[4]

Until the 1980s, the FARC engaged in small-scale attacks on military and police units in remote areas of Colombia. In the late 1990s, the FARC attempted to make a qualitative jump to a higher stage of military operations by engaging and defeating battalion-sized units of the Colombian army (Las Delicias in August 1996 and El Billar in March 1998). However, the sequence of successful large-scale attacks on isolated army units was broken toward the end of the decade when the Colombian military learned to combine air power with land forces to defeat FARC attempts to overwhelm local garrisons. Since then, the Colombians have used air-land synergies to prevent guerrilla concentrations. The ELN has never attained the capabilities to mount large-scale operations. Over the past several years, the organization came under pressure by FARC and paramilitary forces, which drove it from some of its strongholds; it is now concerned largely with survival.[5]

Since 2002, the strategic environment in Colombia has changed significantly as the result of two key developments. One was the successful counterinsurgency campaign of President Álvaro Uribe's government, which significantly weakened the FARC; the other was the demobilization of paramilitary formations. These trends have made possible the shift in Colombian government strategy from counterin-

---

[4] Rabasa and Chalk, *Colombian Labyrinth*, pp. 53–60; Rangel Suárez, *Colombia,* pp. 49–50.

[5] Angel Rabasa, Lesley Anne Warner, Peter Chalk, Ivan Khilko, and Paraag Shukla, *Money in the Bank—Lessons Learned from Past Counterinsurgency (COIN) Operations: RAND Counterinsurgency Study—Paper 4*, Santa Monica, Calif.: RAND Corporation, OP-185-OSD, 2007, pp. 63–64.

PX716

surgency to the consolidation of state functions in areas recovered from armed nonstate actors.

## International and Transnational Actors

The Colombian conflict has, of course, an important international dimension. The contraction of the Colombian government's authority facilitated the spread of the activities of guerrillas, paramilitaries, and drug traffickers to neighboring states. The border regions of Panama, Ecuador, Venezuela, and the Putumayo and Caquetá river systems of southern Colombia, which flow into the Amazon, are critical nodes in the Colombian narcotraffickers' and guerrillas' support structure.

The most important international actors are the United States, which has provided critical assistance to the Colombian government; Venezuela; and, to a lesser extent Ecuador, Panama, and Brazil. Cuba has facilitated discussions between the Colombian government and the ELN, and some European countries have extended economic assistance to Colombia. Spain, France and Switzerland have engaged in diplomatic efforts to secure the release of hostages held by the FARC. The FARC has international connections with sympathetic governments and political actors and with other violent groups.[6]

From fiscal year (FY) 2000, when Plan Colombia was inaugurated, to 2008, the United States provided over $6 billion in support of Plan Colombia, the Colombian government's plan to reduce illicit drug production and reclaim control of areas held by illegal armed groups. Of this amount, nearly $4.9 billion went to the Colombian military and police.[7] In the stabilization area, USAID's Office of Tran-

---

[6]    For instance, the FARC reportedly received assistance in bombmaking from IRA specialists. One of the IRA members arrested in Colombia in 2001, Neil Connolly, was the representative in Cuba of the Sinn Fein, IRA's political wing. Connolly was believed to have initiated contact with FARC through the Spanish terrorist group ETA. (Mark Burgess, "Globalizing Terrorism: The FARC-IRA Connection," CDI Terrorism Project, June 5, 2002. )

[7]    U.S. Government Accountability Office (GAO), "Plan Colombia: Drug Reduction Goals Were Not Fully Met, but Security Has Improved; U.S. Agencies Need More Detailed Plans for Reducing Assistance," GAO-09-71, October 6, 2008.

PX716

sition Initiatives (OTI) plays a critical role in supporting Colombian government agencies involved in the consolidation of the state's presence in areas recovered from illegal nonstate actors.[8]

Venezuela has provided covert assistance to the FARC and its continued involvement may be critical to the FARC's survival. Venezuela's involvement with the FARC is discussed in the section entitled "External Powers Supporting Belligerents." The FARC also uses Ecuador's territory for logistics and support purposes. The FARC maintained logistical support bases in Panama in the 1990s and early 2000s, until the group was displaced from the Panamanian border region by the AUC. The FARC has also moved drugs through Brazil. Brazil, however, has cooperated with Colombia in maintaining border security. Recently, both countries signed an air border control agreement that in principle allows each party to go 50 miles into each other's airspace.[9]

## Strategy (Pre-Transition)

### Colombian Government Strategy

The Colombian government's Policy for the Consolidation of Democratic Security (PCSD) seeks to reestablish state control over the areas affected by the activities of illegal armed groups and drug traffickers. The policy has five strategic objectives broken down into 28 plans.[10] The core aim of the policy is to generate a virtuous cycle in which increased security produces confidence and stability, which in turn

---

[8]   USAID/OTI Colombia Field Report, October–December 2008.

[9]   Raymond Colitt, "Brazil, Colombia Agree on Anti-Drug Border Defense," *Reuters*, March 12, 2009.

[10]  The five strategic objectives are: (1) to consolidate territorial control and strengthen the rule of law across the entire national territory; (2) to protect the public and hold on to the strategic initiative against all threats to citizen security; (3) to drastically raise the cost of trafficking drugs in Colombia; (4) to keep the public security forces modern and effective, with a high level of legitimacy based on public confidence and support; and (5) to maintain the downward trend in all crime rates in the country's urban centers. Republic of Colombia, Ministry of National Defense, "PCSD: Policy for the Consolidation of Democratic Security," 2007, pp. 29–45.

PX716

creates an environment favorable to private investment and economic growth. Economic growth generates greater tax revenues, which permit investment in social development programs and meet the population's needs.[11]

To accomplish the goals of the PCSD, the Uribe government intensified the process of expanding and strengthening the Colombian security forces, which increased from 158,000 military and 104,000 police personnel in 2002 to 267,000 military and 137,000 police personnel in 2009, representing an overall increase of almost 50 percent. Largely through U.S. assistance, the Colombian armed forces were provided with enhanced mobility and intelligence capabilities. As a result, the Colombian armed forces have developed the capability to conduct operations in remote areas in a sustained manner and to hold areas previously controlled by the guerrillas. By 2004, the Colombian government was able to meet its goal of establishing a presence in every one of the country's 1,098 municipalities, a critical component of the territorial recovery strategy.[12]

At the same time, through a combination of pressure and incentives, the AUC agreed to participate in a process of demobilization that has led to the deactivation of some 32,000 members of its armed formations and their support networks. (The legal framework for the demobilization of paramilitaries is the Peace and Justice Act, which sets eight-year ceilings on the prison terms of individuals found guilty of criminal offenses and provides for rehabilitation programs for the rank-and-file and restitution to victims.)[13] The process has been criticized as too lenient, but proponents of the program point out that a

---

[11] "PSCD: Policy for the Consolidation of Democratic Security," pp. 17–18.

[12] República de Colombia, Ministerio de Defense Nacional, "Todos los municipios del país tienen Policía," February 13, 2004.

[13] Olga Martin-Ortega, "Human Rights, Demobilisation and the Paramilitaries: The Ley de Justicia y Paz in Colombia," paper prepared for the Annual Convention of the international Studies Association, San Francisco, March 26–29 2008.

PX716

harsher regime would not create incentives for members of paramilitary groups to lay down their arms.[14]

The weakening of the FARC and the demobilization of the AUC generated, in the Colombian government's view, a new strategic scenario that requires a different strategy than the COIN-oriented strategy implemented under the first Uribe administration (2002–2006). As the threat posed by the FARC and other armed groups outside of the state's control receded, new security problems arose, in particular, the emergence of criminal bands linked to narcotraffickers in areas previously influenced by the paramilitaries. The Colombian government's initial goal of territorial control has now given way to what the Colombians call the "social recovery of territory." This refers to the reestablishment of the presence of state institutions through integrated state action in areas recovered from illegal armed actors.[15]

**Insurgent Strategy**

Since its inception in the 1960s, the FARC has pursued a strategy of "protracted people's war," which was reaffirmed at the group's landmark Seventh Conference in 1982. The strategy, based on Maoist, Vietnamese, and Cuban precepts, involved gradually extending the organization's presence and control in the countryside and eventually isolating the government forces in the major cities. The final stage in the FARC's strategy was to be a move to large-scale offensive operations, culminating in a general uprising.[16] This strategy of territorial control is linked to the FARC's involvement in the cocaine drug trade, which generates

---

[14] Proponents of the AUC demobilization program also note that critics do not demand equally harsh treatment of former militants with regard to demobilization of the FARC. This is because some critics consider the FARC to be a "political" group while the AUC is regarded as a purely criminal group. This is, of course, a very questionable distinction.

[15] Discussions with Colombian officials, Bogotá, March 2009.

[16] The Salvadoran Farabundo Martí National Liberation Front (FMLN) pursued a similar three-stage strategy, culminating in the failed "Final Offensive" of November 1989. After the failure of the offensive, the FMLN concluded that there was no viable alternative to a political settlement.

PX716

much of the revenues that fund the organization's operations (the other main sources of funds are extortion and kidnappings).[17]

This strategy achieved its greatest successes in the second half of the 1990s, when the FARC was able to engage and defeat battalion-sized Colombian military forces, as mentioned above. In an interview published in *El Tiempo* on March 2, 1999, FARC leader Manuel Marulanda observed that, as the result of the FARC's military advances, the struggle had reached a new stage in which the Colombian government had been forced to agree to negotiations. Marulanda stated that the FARC would continue the struggle "until victory."[18]

Throughout the administration of Andrés Pastrana (1998–2002), the FARC pursued a dual approach of combining peace negotiations with offensive military operations. The FARC used the negotiations to consolidate and expand the territory under its control or influence and to seek to secure domestic and international legitimacy. The negotiation process also created real strategic and operational advantages for the FARC—particularly the FARC's ability to operate freely in the Switzerland-size "demilitarized zone" conceded by the government in southern Colombia to conduct the talks.[19] In the end, however, the FARC overplayed its hand. Through a combination of dilatory tactics in the negotiations and provocations—most notably the hijacking of an aircraft with Senator Jorge Gechem Turbay onboard in mid-February 2002, the FARC left the Pastrana government with no choice but to declare an end to the negotiations and reoccupy the demilitarized zone.[20]

The FARC also attempted, without success, to leverage a "humanitarian exchange" of hostages that it held to recreate a new "demilita-

---

[17]  The drug-insurgency link in Colombia has been well established. See the study by Ian Bannon and Paul Collier, eds., *Natural Resources and Violent Conflict: Options and Actions,* The World Bank, 2003.

[18]  "Pastrana Desconoce Cómo Marchar Hacia Adelante," *El Tiempo,* Bogotá, March 1, 1999.

[19]  See discussion of the history of Colombian peace negotiations in Rabasa and Chalk, *Colombian Labyrinth,* pp. 71–78.

[20]  Camilo González Posso, "Negotiations with the FARC," Conciliation Resources, 2004.

PX716

rized zone." In discussions in 2006 and 2007 pursuant to a proposal advanced by the governments of Spain, France, and Switzerland, the FARC demanded the temporary demilitarization of the municipalities of Florida and Pradera in the department of Valle de Cauca in southwestern Colombia for the purpose of exchanging a group of political hostages for approximately 500 imprisoned FARC fighters. However, the two sides did not agree on conditions for the release of the hostages. In August 2007, the Colombian government accepted Venezuelan President Hugo Chávez's offer to mediate but terminated Chávez's mediation three months later, when he ignored the rules set by the Colombian government.[21] The rescue or escape of many high-profile hostages over the past year has deprived the FARC of much of its leverage.[22]

The FARC is increasingly using Venezuela as a sanctuary. According to well-informed Colombian sources, 60 percent of the personnel of the Caribbean Bloc of the FARC are currently stationed in Venezuela. On the Venezuelan side of the border, the FARC maintains permanent camps with field hospitals.[23] Venezuelan sources say that FARC fighters move freely in the Venezuelan states of Barines and Apure, where there has been a significant increase in kidnappings and other criminal activities.[24]

---

[21] IKV Pax Christi, "Kidnapping Is a Booming Business," July 2008, p. 35.

[22] Most prominently, the rescue of former presidential candidate Ingrid Betancourt and 14 others, including three Americans and 11 Colombian policemen and soldiers on July 2, 2008. Betancourt was the FARC's most valuable hostage.

[23] Discussions with well-informed Colombian sources, Bogotá, March 2009. Arturo Rodríguez Ataya, a pilot captured by Colombian authorities in 2005, worked for the Ríos drug cartel and the FARC, transporting drugs and wounded guerrillas between Colombia and Venezuela. Rodríguez Ataya gave the coordinates of FARC bases in Venezuela and photographs of contacts with Venezuelan National Guard officers who provided arms to the FARC on instructions from Venezuelan military intelligence chief Hugo Armando Carvajal Barrios. **"Contactos de Chávez y Correa con las Farc no se limitan a los que figuran en computador de Reyes,"** *Cambio,* Bogotá, August 9, 2009.

[24] Discussions with well-informed Venezuelan sources, Caracas, March 2005; Giovanni Moreno Castro, "El conflicto colombiano: Expansión de sus protagonistas hacia las fronteras," *Revista Arcanos*, No. 10.

PX716

**External Powers Supporting Belligerents**

There is compelling evidence that individuals in Chávez's inner circle had been providing support to the FARC—ammunition, safe houses, documentation, and weapons, as well as political support. Until his capture by Colombian agents (or "kidnapping," according to the Venezuelan authorities, by bounty hunters who stuffed him into the trunk of a car and drove across the border to Colombia) in February 2005, FARC "foreign minister" Rodrigo Granda was living openly in Caracas with Venezuelan identity papers. Several members of the FARC Secretariat are believed to be living in Venezuela, including Ivan Márquez, who is charged of the FARC's relations with Chávez, and Timoleón Jiménez, aka "Timochenko." In addition, Chávez is believed to have provided thousands of Colombians, including many FARC members, with Venezuelan identity papers.[25]

Documents recovered from the laptops of Raul Reyes, the FARC's second in command, killed in a Colombian raid on his camp on the Ecuadoran side of the border on March 1, 2008, reveal close strategic coordination between Chávez and the FARC. There are references in the captured documents to the "300," also called the "dossier," which appears to refer to a $300 million donation by Chávez to the FARC, and discussion of business deals to be undertaken with the money.[26]

One message from Ivan Márquez found in Reyes's computer files describes the FARC's plan to buy surface-to-air missiles, sniper rifles, and radios in Venezuela. Márquez wrote that the effort was facilitated by General Henry Rangel Silva, the head of DISIP, the Venezuelan intelligence service until July 2009, and Ramón Rodríguez Chacín, a former interior minister who served as Chávez's emissary to the FARC

---

[25]  Jens Glüsing, "How Hugo Chavez Courted FARC," *Spiegel Online International*, June 4, 2008.

[26]  One of the deals discussed was an oil allotment from Venezuela to the FARC to sell outside the country. Another was the sale of gasoline in Venezuela or Colombia, or setting up a company in Venezuela with the possibility of obtaining government contracts. "A letter from commanders Iván and Ricardo to the Secretariat dated February 8, 2008," cited in Douglas Farah, "What the FARC Papers Show Us About Latin American Terrorism," NEFA Foundation, April 1, 2008.

PX716

in the negotiations to gain the release of hostages.[27] In July 2009, the Colombian military captured five Swedish Saab AB AT-4 85mm anti-tank weapons, which had been sold to the Venezuelan army, in a FARC camp.[28]

The captured FARC documents also reveal close contacts between the FARC and senior officials in the government of Ecuadoran president Rafael Correa, including a meeting between Reyes and Ecuador's then Internal Security Minister Gustavo Larrea.[29] In a videotape captured by the Colombian army in a FARC camp, Jorge Briceño, aka "Mono Jojoy," the commander of the FARC's Eastern Bloc and the most important FARC field commander, confirmed that the FARC contributed to Correa's electoral campaign.[30]  (Mono Jojoy was killed in a strike on his camp by Colombian forces in September 2010.) Documents found in the computer captured from another FARC figure, Gustavo Arbeláez, alias "Santiago" indicate that the Sandinista government of Nicaragua was involved in providing arms and explosives to the FARC.[31]

**Key Strengths and Weaknesses of the Strategies**

The FARC is one of the longest-lasting insurgencies in the world. Over a period of 40 years, the FARC and the smaller Marxist guerrilla group ELN have survived efforts by the Colombian military to eradicate them. The FARC's longevity is due to a variety of factors, including stable leadership (the FARC's commander Marulanda led the group

---

[27]  Simon Romero, "Venezuela Still Aids Colombia Rebels, New Material Shows," *New York Times*, August 3, 2009. The U.S. Treasury froze the assets of Rangel Silva and Rodríguez Chacín, as well as those of a third Chávez associate, Director of Military Intelligence Hugo Armando Carvajal Barrios, for materially assisting the FARC's narcotics trafficking. U.S. Department of the Treasury, "Treasury Targets Venezuelan Government Officials Supporting the FARC," HP-1132, September 12, 2008.

[28]  Maite Rico, "Turbulencias en la región andina," *El Pais* (Madrid), August 3, 2009.

[29]  "A letter from Raul Reyes to Secretariat dated January 18, 2008," cited in Farah, "What the FARC Papers Show Us."

[30]  The tape is at www.youtube.com/watch?v=n_dCRhwhsvk. It was made available by the Colombian government to the Organization of American States and Interpol.

[31]  José Adán Silva, "Ejército manipulado," *El Nuevo Diario* (Managua), November 9, 2008.

PX716

in various capacities from its founding in the 1960s until his death in March 2008); strategic flexibility; exploitation of Colombia's poorly controlled borders; and, more important, its linkage to the illegal drug trade, which provides it with an estimated annual income of between $200 million and $400 million.[32]

Although income from the drug trade was a critical factor in the FARC's ability to carry out and expand its operations in the 1980s and 1990s, the linkage with the drug trade was also a significant weakness. Involvement in the drug trade produced a loss of ideological cohesion, as some of the commanders became more interested in profits from the drug trade than in advancing the organization's politico-military agenda. This connection, in fact, led many to consider the FARC as largely a criminal, rather than political organization. It also resulted in a loss of domestic and international support and probably doomed the FARC's efforts to gain international recognition as a legitimate party to a civil conflict.

From a strategic perspective, the FARC's inability to execute the transition called for in the group's strategy from small-unit to large-scale (battalion-size) operations or to sustain attacks on strategic centers in Colombia's populated heartland signaled the failure of its grand strategy.[33] Nevertheless, despite strategic failure and (from the FARC's perspective) a deteriorating politico-military environment, the FARC derives strength, as noted above, from its connections to Venezuela and to other governments that share Chávez's regional agenda and hostility to the Colombian government. The ability of these governments to support the FARC has been compromised by the revelations in the

---

[32] The FARC's involvement in the illegal drug trade has been extensively documented and includes the participation of high-level FARC leaders. According to the captured Reyes documents, Reyes negotiated directly with an associate of the notorious drug lord Juan Carlos Ramírez Abadía, aka "Chupeta," who was arrested in Sao Paulo, Brazil in August 2007. Reyes wrote that Chupeta pocketed $15,000 (€9,680) per kilo of cocaine smuggled to Europe, where the market price is $30,000 (€19,360) per kilo, Glüsing, "How Hugo Chavez Courted FARC," 2008.

[33] The strengths and weaknesses of the Colombian government and FARC strategies are analyzed in the section on Colombia in the RAND study *Money in the Bank: Lessons Learned from Past Counterinsurgency (COIN) Operations,* 2007.

PX716

captured Reyes documents, but covert support for the FARC on the part of these governments is likely to continue. Such support could enable the FARC to survive, but it is unlikely to transform the balance of forces in Colombia, in view of the impressive strengths displayed by the Colombian government.

The main strength of the Colombian government is its democratic character and popular and competent leadership. Despite imperfections, Colombia has one of the longest records of elected civilian governance on the continent. Colombia has managed free and competitive elections and peaceful transfers of power despite chronic political violence and an escalating insurgency in the 1990s. President Uribe was regarded as a strong and competent leader and has enjoyed unprecedented approval rates of over 70 percent for sustained periods of time. A poll released in February 2011 indicated that Uribe's successor, Juan Manuel Santos, had an approval rate of 86 percent after six months in office.[34]

Another factor was sustained U.S. support. U.S military assistance was extended with a minimal footprint and, of course, without the involvement of U.S. military personnel in combat operations. The United States provided critical equipment, training, and logistical and intelligence support to the Colombian forces.

A key strength is the Colombian government's successful adjustment to the FARC's strategy and tactics. New operational and tactical approaches have enabled the Colombian armed forces to take the strategic initiative away from the FARC, while the seize-and-hold strategy has substantially increased the territory under government control and driven the FARC away from the country's populated heartland.

Despite notable advances over the past several years, there are weaknesses in the Colombian institutional and military structures that could be exploited by the FARC if the Colombian government's current efforts falter. One potential risk is the transition from the Uribe to the Santos presidency. Uribe's leadership was instrumental in energizing the Colombian government's response to the FARC threat and in reestablishing government control over much of Colombia's disputed

---

[34] "Santos' Approval Rating at 86%," *Colombia Reports*, February 8, 2011.

PX716

areas. As minister of defense, Santos was a key player in the Colombian counterinsurgency effort and has continued the Uribe administration's consolidation strategy, but it is too soon to know whether the effort will be sustained. Second, despite the impressive progress made by government forces in reducing the FARC's military strength and command and control capabilities, the FARC remains a threat. Moreover, the FARC is likely to remain a viable organization as long as it maintains a significant presence and influence in the border regions as well as its sanctuaries in Venezuela. Third, the persistence of criminal networks constitutes a major and growing security challenge to the Colombian government. Finally, it is too early to tell what will be the impact of the reduction in U.S. assistance under Plan Colombia on the Colombian government's ability to maintain the tempo of its counterinsurgency campaign.

**How the Parties Define "Victory"**

For the FARC, the definition of victory historically has meant the overthrow of the established political order in Colombia and its replacement with a socialist state. Realistically, the FARC leadership is aware that near-term military victory is not possible. In fact, at this stage the organization's main concern is survival. The FARC near-term political goal is to achieve international legitimacy and recognition as a belligerent party in a civil conflict with the Colombian government.[35] This is why the FARC has always insisted on international participation in so-called "humanitarian exchanges" of prisoners. A return to the level of recognition that the FARC enjoyed during the negotiations with the Pastrana government is probably the best that the FARC could realistically attain under current circumstances.

From the Colombian government's perspective, as stated by a senior Colombian commander at a conference in Bogotá in March 2009, victory should be irreversible, sustainable, and unquestioned, in

---

[35] In international law, belligerency is the status of parties legally at war. Belligerency prescribes rights and obligations in accordance with the laws of war. The Colombian state has always refused to acknowledge the FARC's belligerency.

PX716

terms of both means and ends.[36] For Colombian governments, going back to the first negotiations with the FARC in the 1980s, an acceptable end to the conflict is defined in terms of the FARC's agreement to disarm and to participate as a normal political actor in the Colombian political process.[37]

## The Transition Period

The transition period in Colombia, defined as the transition from counterinsurgency to securing stability, has begun to occur in certain parts of the country since about 2007. The beginning of this transition came about as the result of a change in the strategic environment in Colombia that began in 2002, when the outgoing Pastrana administration declared an end to the demilitarized zone in southern Colombia that the FARC has been allowed to occupy during three years of peace negotiations. It should be noted, as described later in this report that the Colombians consider that counterinsurgency and stability operations need to occur simultaneously in different regions, depending on the conditions in each region.

President Uribe, elected in May 2002, inaugurated a more aggressive counterinsurgency strategy—the Democratic Defense and Security Policy and its military component, Plan Patriota—that sought to expand the presence of the state throughout the country and protect the population. Since then, the Colombian military has made significant headway in increasing the scope and pace of counterinsurgency operations, improving training, tactics, and interservice cooperation, and disrupting the guerrillas' infrastructure and support networks. Because of this progress, the Democratic Defense and Security Policy

---

[36] Discussion at Conference on Contemporary Counter-Terrorism and Counter-Insurgency: The Colombian Experience, Bogotá, Colombia, March 30–April 2, 2009.

[37] A precedent could be the agreement that the government of President Virgilio Barco reached with an armed Marxist group, the M-19, in 1989. At the time the M-19 was the second largest guerrilla group in Colombia, after the FARC. The M-19 renounced armed struggle in exchange for an amnesty and guarantees of participation in the political process and became a political party, the *Allianza Democrática M-19* or AD/M-19.

PX716

was superseded by the Policy for the Consolidation of Democratic Security.

Since March 2008 there are indications that the FARC may be headed for strategic defeat. March 2008 witnessed the demise of three of the seven members of the Secretariat, the FARC's highest decision-making body: Luis Edgar Devia Silva, alias Raúl Reyes, the organization's second in command, was killed in a March 1 Colombian raid on his camp on the Ecuadoran side of the border. Iván Ríos was killed by one of his own bodyguard in order to collect a reward from the Colombian government. On March 26, 2008, the FARC confirmed the death of its leader, Manuel Marulanda Vélez, aka "Tirofijo." According to the FARC, Marulanda died of a heart attack, although Colombian officials have suggested a connection between Marulanda's demise and heavy bombing raids in the area where he was located about the time that he died.[38] On September 23, 2010, the FARC's leading strategist, Jorge Briceño, known by his nickname "Mono Jojoy," commander of the FARC's largest force, the Eastern Bloc, was killed in a large-scale military operation that targeted his camp in eastern Colombia.[39]

In addition, a record number of FARC combatants have been captured or have deserted, including some senior commanders. Among these was Nelly Avila Moreno, the one-eyed female commander known as Katrina, who had been with the FARC for 24 years and was the commander of the 47th front of the FARC in Antioquia when she surrendered in May 2008. Gustavo Arbeláez, alias Santiago, said to be the commander of the Manuel Cepeda Vargas urban front, was captured in the Pacific coast port of Buenaventura. José Márvel Zamora, also known as "Chucho" or "The Professor," a member of the inner circle of Jorge Briceño, was captured in the central department of Tolima in October 2008.

The overall strength of the organization has declined from between 15,000–20,000 fighters in 2000 to an estimated 7,000–9,000

---

[38] Interview with Defense Minister Juan Manuel Santos, in "Tirofijo está muerto," *Semana* (Colombia), May 24, 2008.

[39] "Santos Congratulates Armed Forces on Death of 'Mono Jojoy,'" *Colombia Reports*, September 23, 2010.

PX716

today. At its peak the FARC was organized in some 70 fronts. Over the past two years, several of the most important fronts have been severely weakened or dismantled. The morale problems in the FARC are illustrated by the fact that in order to maintain discipline, some FARC commanders have resorted to large-scale executions.[40]

From a counterinsurgency perspective, the most significant development has been the collapse of the FARC's command and control structure. This was manifested in Operación Jaque (Operation Check), the rescue of Ingrid Betancourt and fourteen other hostages in July 2008. The operation succeeded entirely through deception. No violence was employed. The Colombian military personnel that impersonated an international NGO squad were unarmed. The operation succeeded only because the commanders of the group that was holding the hostages were unable to verify the presumed instruction from the FARC central command to transport the hostages to a meeting with Alfonso Cano, the new FARC commander.[41]

More than anything else, this dramatic episode illustrates the inability of the FARC Secretariat to communicate with its units in the field. And this has very profound consequences. If the central leadership cannot exercise command and control, it cannot pursue a coherent strategy. Moreover, loss of command and control accelerates centrifugal tendencies within the FARC. The FARC has never been a monolithic organization, because of the difficulties, even in the best of circumstances, to communicate and control operations across the vast expanses of Colombia's territory. Now with the selection of Alfonso Cano, a man who falls far short of Marulanda's prestige and authority, as head of the Secretariat, the FARC is likely to become more factionalized, with local commanders pursuing their own agenda.

**Managing the Transition**

The Colombian government's focus has shifted from COIN to what the Colombians call "social recovery of territory," which means the coordination and reestablishment of a state presence in areas that have

---

[40] Discussions with Colombian defense officials, Bogotá, March 2009.

[41] See Juan Carlos Torres, *Operación Jaque: La Verdadera Historia,* Bogotá: Planeta, 2009.

PX716

been, or are being cleared of guerrillas. The central elements of the analysis underlying the new strategy include: threats to democracy, the adaptation of irregular armed actors to the new strategic scenario, how the civil population is affected and the institutional capacity of the Colombian state. The goal is a coordinated, progressive, and irreversible process, which guarantees a sustainable environment of peace and security, allowing for the strengthening of democratic institutions and the free exercise of civil rights and human development for all of Colombia's citizens.[42]

The challenges in implementing this effort are in some ways more complex than the COIN campaign itself. The effort requires identifying priority areas, assessing costs and benefits, defining common purposes in the interagency process, and establishing a structure of coordination and mechanisms of control and accountability.

The concept for the Colombian post-COIN approach was developed as a course project by the members the Colombian Higher War College (*Escuela Superior de Guerra*) 2003 National Security Course (CIDENAL). The project responded to a concern of the military about how to extend the reach of the state to territories that the state had never reached before. The concept was to create a structure to coordinate state action in prioritized conflict areas where the military was advancing. When President Uribe received the proposal from the Ministry of Defense, he asked the U.S. Southern Command (USSOUTHCOM) for help in mounting a strategy. As a result, the Center for Coordinated Integrated Action (CCAI) was established on May 10, 2004.[43]

### Institutional Framework: Theory and Practice

The CCAI was organized as a matrix of delegates of ministries and state agencies linked to the initiative. Each agency appointed a delegate who was the liaison with the delegate's home ministry or agency,

---

[42] República de Colombia, Presidencia, Centro de Coordinación de Acción Integral (CCAI) Briefing, Sustainable Consolidation, 2009.

[43] Discussions with Colombian officials involved in implementation of the Colombian government's stabilization plan, Bogotá, March/April 2009. One of the discussants was a participant in the 2003 CIDENAL course.

PX716

to ensure responsiveness by the ministry or agency.[44] The permanent members of the CCAI are shown in Figure 3.1.

In the Colombian government structure, the CCAI was placed under the Presidential Agency for Social Action and International Cooperation (*Agencia Presidencial para la Acción Social y la Cooperación Internacional*), known for short as Acción Social.[45] This agency is located in the Office of the Presidency and is responsible for coordinating domestic and international social development programs. Figure 3.2 shows the structure of the CCAI.

In addition, a number of state agencies are linked to, but not institutionally part of, the CCAI. These include the High Council for Reintegration, the Agricultural Bank, the Colombian Institute for Rural Development (INCODER), The Higher Council of the Judiciary, the National Ombudsman, the National Department of Planning, the Administrative Department of Security (DAS), the Energy Solutions Planning Institute (IPSE), the Department of Environment, Dwelling and Territorial Development, the Department of Communications, the Department of Commerce, Industry and Tourism, the Department of

**Figure 3.1**
**Membership of the CCAI**

| | |
|---|---|
| • Acción Social (Office of the Presidency) | • Department of National Education |
| • Colombian Institute for Sports (Coldeportes) | • Department of Social Protection |
| • General Command of Military Forces | • Department of the Interior and Justice |
| • Office of the Attorney General | • Office of the High Commissioner for Peace |
| • Colombian Family Welfare Institute (ICBF) | • National Police |
| • Department of Agriculture and Rural Development | • National Registry of Civil Status |
| • Department of National Defense | • National Service for Learning (SENA) |

RAND *MG1111/2-3.2*

---

[44] Discussions with Colombian officials involved in implementation of the Colombian government's stabilization plan, Bogotá, March/April 2009.

[45] See Acción Social web site.

PX716

**Figure 3.2**
**Structure of the CCAI**



Culture, and the Department of Mines and Energy.[46] In summary, the concept involves integrating and institutionalizing the activities of all relevant government agencies to support the stabilization effort.

At the ground level, in every CCAI zone there is a *padrino* (literally, godfather), a person appointed to coordinate all state activities in the zone and to generate responses. The *padrino* can be a delegate of a state agency or a contractor. In theory, each *padrino* is expected to have a strategic plan for his zone. In practice, according to an informed observer, one person in charge of a region with a complex set of problems cannot do everything. To develop a strategic plan, a team of specialists is needed, as well as operational support. In the view of this observer, the CCAI ended up as a facilitator for specific activities that did not reach the level of strategic plans. For instance, the *jornadas médicas*, where medical personnel were brought in for a day or two to

---

[46] Republic of Colombia, Acción Social, "Contemporary Anti-Terrorism: The Colombian Experience," briefing, April 1, 2009.

PX716

provide services to the local population, have been very successful, but they represent a transitory presence of the state in the consolidation areas, while what is needed is a permanent presence.[47]

Also, while in theory the delegates to the CCAI should be high-ranking officials in their agencies, in practice, these agencies have delegated the responsibilities to individuals who do not have the authority to commit their agencies to support the CCAI's work. In short, the theoretical framework for integrated action is good, but there were failures of implementation of the concept of *padrinos* and at the level of the delegates of state entities to the CCAI central body.[48]

## Stages of Transition

According to the Colombian strategic plan, the transition process is to be implemented sequentially: (1) territorial control; (2) stabilization or transition; and (3) consolidation. In each of these phases there is an effort to coordinate the work of state agencies to achieve the desired result, but with a different mix of efforts.[49] As Figure 3.3 shows, in the phase of military operations, the main effort is by the military (blue line) and is focused on establishing territorial security. As the process moves to the second stage, transition, the military effort lessens, and the police and judicial system effort (green line), focused on providing protection to citizens and the economic, social and institutional development effort (orange line) increase. In the last phase, consolidation, the police and development efforts predominate.

The first phase involves establishing territorial control over security recovery zones. These are areas where illegal armed groups are still present. The priority in these areas is to neutralize the threat posed by these groups, regain control of territory, and protect the population. In the absence of basic security, measures to promote economic, social, and

---

[47] Discussions with Colombian officials involved in implementation of the Colombian government's stabilization plan, Bogotá, March/April 2009.

[48] Discussions with U.S. and Colombian officials, Bogotá, March 2009.

[49] Republic of Colombia, "PCSD," 2007.

PX716

**Figure 3.3**
**Composition of State Efforts in the Three Phases of the Transition Process**



SOURCE: Centro de Coordinación de Acción Integral (CCAI), "Plan de Consolidación Integral de la Macarena," Bogotá, August 2008.
RAND MG1111/2-3.4

institutional development are not effective and could even be counter-productive if insurgents or criminals are able to capture the resources allocated by the government to economic and social programs. As the FARC fronts are pushed out, however, and the FARC's militia structure (through which the FARC enforces day-to-day control) dissolves, people become more willing to cooperate with the authorities. At this point, the transition stage begins.[50]

Transition zones are those where the security forces have been able to neutralize the operational capability of illegal armed groups but where these groups maintain logistical support and information networks. To consolidate control of these areas, the government needs to gain the support of the population. Consequently, the priorities are to reestablish law enforcement institutions, primarily the police and the judicial system, and to meet the basic needs of the population in the transition from an illicit, drug-based economy to a legal economy. In

_____
[50] Briefing, Fusion Center, Vista Hermosa, Colombia, March 2009.

this stage, the government begins to create the conditions for economic and social development with infrastructure projects (roads and communications), technical support and access to credit, and basic social services (education, health, and sanitation).[51]

A major challenge is responding rapidly to the economic dislocation generated by the eradication of coca crops. When coca disappears, there is a need to make up the income that farmers previously received from coca. Colombian officials decry the "mistaken view" of thinking about counterdrug operations only in terms of crops eradicated. Something needs to be done for those previously engaged in coca cultivation. The Colombian response is in three parts:

In the short term, emergency food aid is provided. Packages of basic commodities are distributed to families every 15 days over a 3–4 month period. The government tries to deliver the aid as soon as possible after the coca crops are eradicated.

In the medium term, the government provides help to farmers to grow subsistence crops, with a yield expected in 3–4 months. The government provides seeds, fertilizers, technical assistance for production and marketing of corn and beans, and for improvement of pastures.

Over the long term, the government's expectation is that farmers will move to a credit-based commercial agriculture, producing crops such as cocoa, rubber, sugar cane and soybeans.[52]

Consolidation zones are areas that have been cleared of antistate actors. In these areas, the main task is to reestablish the presence of state institutions and create the conditions for sustained economic, social, and institutional development. Priorities for state action include the following:

- *Strengthening local governance and encouraging citizen participation.* One of the preconditions of successful consolidation is to

---

[51] Briefing, Fusion Center.

[52] Republic of Colombia, "PCSD"; Centro de Coordinación de Acción Integral (CCAI), "Plan de Consolidación Integral de la Macarena," 2008; discussions with Colombian officials involved in implementation of the Colombian government's stabilization plan, Bogotá, Colombia, March/April 2009.

PX716

enable municipal authorities to govern effectively and provide services to the citizenry.

- *Clarifying property rights.* This is a significant problem in areas that have experienced large population displacement, such as Montes de María (see below). In a strategic consolidation zone, La Macarena, there is the additional problem that over half the area encompasses three national parks of high environmental value that were invaded by squatters during the period of FARC predominance. One of the goals of the consolidation effort in La Macarena is to return these areas to their original condition as national parks by relocating the illegal settlers in lands appropriate for cultivation.

- *Building basic infrastructure, especially secondary and tertiary roads.* This will help farmers bring their crops to market, as well as electricity and telecommunications. Many of the territories recovered from the FARC and other illegal actors were isolated from the rest of the country. Connecting them to the national infrastructure network is key both to consolidating state control and to generating economic and social development.

- *Providing education, health and social security services.* The education, health and social security levels in consolidation areas are generally much lower than those of the country at large. The goal of the consolidation effort is to bring these areas to the national average or to narrow the gap as much as possible.

- *Promoting economic development.* In promoting economic development, the government takes a market-oriented approach. Emphasis is placed on giving small and medium-sized producers access to credit and technical support so that they can benefit from the opportunities created by the process of institutional consolidation in these areas.[53]

---

[53]  CCAI, "Plan de Consolidación Integral de la Macarena."

PX716

**Implementation: What Is the Actual Experience of the Colombian Transition?**

The Colombian post-COIN plan has been implemented or is being implemented in three areas: (1) the Sierra Nevada de Santa Marta, a mountain range along Colombia's northeastern coast inhabited by indigenous peoples—the Kogi, Arhuaco, and Wiwa; (2) La Macarena, an area that was formerly part of the demilitarized zone controlled by the FARC; and (3) Montes de María, an area near Colombia's Caribbean coast that was heavily contested by the FARC and paramilitaries. There are also plans to extend the plan to other regions such as eastern Antioquia, the Pacific coast, the central cordillera of the Andes (southern Tolima and Valle de Cauca) and the Caguán river basin.[54]

**Sierra Nevada de Santa Marta.** This is the most successful CCAI project. First, the problem was correctly identified: The local indigenous people were vulnerable to penetration by illegal armed groups into their lands. Together with the indigenous communities, the government formulated a plan to establish townships on strategic points that controlled access to the zone. The government financed the construction of the housing in the townships (which followed traditional forms, but with better conveniences), clinics, and other facilities. The indigenous people preferred not to have police stationed in their townships. Rather, they rely on social pressure to keep the illegal armed groups out.[55]

Two other factors contributed to security in the absence of state security forces: (1) the eradication of coca cultivation, which removed an incentive for illegal armed groups to move in; and (2) increased military pressure on illegal armed groups in the surrounding region, which has significantly reduced the threat from these groups. So far the system has worked well. However, it remains to be seen whether

---

[54] Republic of Colombia, Acción Social, briefing.

[55] Discussions with Colombian officials involved in the implementation of the Colombian government's stabilization plan, Bogotá, March 2009.

PX716

the social control structure is strong enough to keep out illegal armed groups permanently, especially if there is a return to coca cultivation.[56]

**La Macarena.** What happens in La Macarena could determine the future of Colombia's post-COIN experiment. From the point of view of the FARC, La Macarena has high strategic and operational value. The La Macarena region is composed of five *municipios* in the departments of Meta and Caquetá in southern Colombia (La Macarena, Mesetas, San La Uribe, Vista Hermosa, San Juan de Arama, and Puerto Rico). The region sits astride what in the FARC's heyday were the group's main logistic and mobility corridors and produced a large part of the coca that funded the FARC's operations. In addition, La Macarena has symbolic importance as a historic stronghold of the FARC (some 100,000 people were under FARC control at one point) and, as the headquarters of the FARC's Eastern Bloc, is its strongest military component.[57]

The Colombian government's decision to focus its efforts on recovery of La Macarena was informed by a number of considerations: the weakening of the FARC, the good prospects for consolidation within a reasonable period of time, and the availability of reconstruction funding from a variety of sources (Plan Colombia, the Colombian government's Acción Social funding, and international donors). In addition, the Colombian government sees La Macarena as a template for other social recovery efforts in other regions.[58]

The consolidation plan for La Macarena differed from the CCAI template in that it was decided that that the *padrino* was not adequate. Instead, a coordination team was established to manage the transition, composed of a civilian manager (*gerente civil*), a military coordinator, and a police coordinator. These officials operate out of a Fusion Center (*Centro de Fusión Integral*) established in the town of Vista Hermosa. The civilian manager has a team of coordinators responsible for six functional areas: property rights, institutional development,

---

[56] Discussions with Colombian officials involved in the implementation of the Colombian government's stabilization plan, Bogotá, March 2009.

[57] Briefing, Fusion Center.

[58] Briefing, Fusion Center.

infrastructure and connectivity, social development, economic development, and transition initiatives (which refer to facilitating the transition from a drug economy to a legal economy). The military coordinator interacts with local military units to provide security for civilian teams and logistics (transportation of personnel and materials). The police coordinator is the liaison with the police. The plan is that the police should be phased in gradually, as the military clear the area of guerrillas. There are police contingents in the main towns of all six *municipios* that together constitute the zone of La Macarena.[59]

**Montes de María.** Unlike the zone of La Macarena, Montes de María was never a significant coca producing area, but in previous years it had strategic importance as a corridor for the transport of drugs to the Caribbean coast. In addition, the important Caño Limon–Coveñas oil pipeline and two major highways from Bogotá to the coast traverse the region, which allowed irregulars in the area to extort payments. In the 1990s and early 2000s, two FARC fronts, ELN guerrillas, and paramilitary forces heavily contested the area. There were some notorious paramilitary massacres of civilians in the villages of Chengue and El Salado, which caused significant population displacements.

The killing of Martín Caballero, the FARC kingpin in northern Colombia, in an air strike in October 2007, and the subsequent disbanding of his forces, together with the demobilization of the paramilitaries, marked an end to the violence in the region. The government priority now is to facilitate the return of displaced persons and to consolidate the post-violence environment. The initial strategy was to establish control of territory by permanently stationing troops and police in all of the *municipios*. Civilian agencies are to be gradually introduced.[60]

An indicator of the improvements in security and in the economic prospects of the area is that a hectare of land in the locality of Chengue,

---

[59] Discussions with Colombian officials involved in the implementation of the Colombian government's stabilization plan, Bogotá, March 2009.

[60] The author visited the town of Chengue in March 2009. Now that security has been established, the population is gradually returning, but it has not yet reached the pre-massacre level.

PX716

which was going for 100,000–200,000 pesos (US $52–$104)[61] in June 2007, was selling at 2 to 3 million pesos (US $780–$1170) as of March 2009, over a tenfold increase in price.[62] This, in turn, has created a potential social problem, because of the temptation for small landholders to sell their land rights to outsiders for ready cash.[63]

From the military's perspective, gaining the trust and support of the population is the key to the transition process. This requires providing social services to the community. However, in Montes de María the civilian agencies have not been adequate to the task. The military does not want to do the work of the civil authorities, but it is clear from observations made during a trip to the region in the spring of 2009 that the military, the Colombian Navy and Marines in particular (the First Marine Brigade has responsibility for the area) are doing the heavy lifting in trying to bring economic and social development to the region. For instance, the Colombian Navy has flown in executives from Colombian food processing and distribution industries to arrange for planting and marketing of cocoa and avocados, and military engineers are improving roads to bring agricultural products to market. From an institution-building standpoint, the Marines have promoted community organizing and arranged workshops for community leaders.[64]

The Colombian strategic consolidation plan contemplates extending the process to other priority areas, as shown in Figure 3.4. Aside from (1) the Sierra Nevada de Santa Marta, (2) La Macarena, and (3) Montes de María, discussed above, the Colombian government has consolidation projects under way or in the planning stage in the following priority areas: (4) the Caguán river basin, (5) the Zona Sur in western Guaviare, and (6) Putumayo. These are areas in the south of

---

[61] The exchange rate was 1,925.5 pesos per dollar in June 2007.

[62] The exchange rate was 2,561.21 pesos per dollar in March 2009.

[63] Clarification of property rights is a major challenge in consolidation. Usually, small landholders do not have titles to the land. What they have is a legal document that certifies that they have been in possession of the land, which confers certain rights. Without titles, however, they cannot gain access to credit.

[64] This discussion of Montes de María is based on a field trip to the region and discussions with Colombian military officials involved in the transition process there, March 2009.

PX716

**Figure 3.4**
**Consolidation Regions**



SOURCE: Based on República de Colombia, Presidencia, Centro de
Coordinación de Acción Integral (CCAI) Briefing, Sustainable
Consolidation, 2009.

**RAND** *MG1111/2-3.5*

Colombia that in the past were FARC strongholds and now constitute the focus of the Colombian government's counterinsurgency and stabilization efforts. On the Pacific coast, the priority areas are (7) Nariño, (8) Cauca and Valle de Cauca, (10) the lower and middle Atrato river basin, and (11) the south of Chocó. These areas play an important role in the smuggling of illegal drugs via the Pacific route. (9) The central cordillera in the south of Tolima and Valle de Cauca, and (12) the south of Córdoba, and (13) eastern Antioquia are also priority areas, as are (14) Catacumbo and (15) Arauca, near the Venezuelan border.

## Gaps

The main gaps in the transition capabilities of both the Colombian government and its principal supporting state, the United States, relate to resources. The CCAI does not have its own budget and relies on other government agencies and international aid for funding and personnel. Moreover, the consolidation project is resource-intensive and some officials involved in the project are pessimistic that the Colombian government can muster enough resources to replicate the Macarena experiment in other regions. The same is true on the U.S. side. USAID's Office of Transition Initiatives has played a critical role in assisting the Colombian government's consolidation initiatives by hiring key staff to manage logistics for the civilian elements of the consolidation plan and helping to develop a communications strategy for the consolidation effort. OTI funds small-scale community-infrastructure projects and quick-impact, small-scale income-generating activities to increase citizen confidence in the state's commitment and ability to resolve pressing needs. OTI activities in Colombia, however, were scheduled to be terminated in mid-2010.[65]

---

[65]  USAID/OTI Colombia Field Report, October–December 2008.

## Conclusions

### Assessment of Colombian Transition Plan

The effectiveness of the Colombian government's program of social recovery of territory is measured in terms of four indicators:

1. Indicators of violence. The extent to which these indicators (for instance, number of homicides, kidnappings, and terrorist attacks) decrease to the national average.
2. Social indicators rise to the national average.
3. Economic development strengthens.
4. Governance strengthens.
5. With regard to the last two indicators, the Colombian authorities do not believe that it is reasonable to expect that previously "ungoverned territories" can rapidly reach the level of economic development and governance of the rest of the country, but the expectation is that there can be measurable improvements in these areas.[66]

From an outside perspective, the Colombian transition plan is very solid. It has been successfully implemented in La Macarena. The military has been successful in clearing and holding the ground. There is a police presence in the towns. Illegal crop eradication is proceeding. Civilian agencies are providing services to the population, although their presence is not as robust as it could be. Some agencies are very strongly committed: for instance, the National Institute of Roads (INVIAS), the Electric Power Enterprise (ENSA), and some offices in the Ministry of Agriculture. On the other hand, according to well-informed sources, the ministries of Education, Health, and Justice are not seriously engaged.[67]

The plan is working in La Macarena because of two factors: the permanent presence of the security forces and the population's belief

---

[66] Discussion at Conference on Contemporary Counter-Terrorism and Counter-Insurgency: The Colombian Experience, Bogotá, Colombia, March 30–April 2, 2009.

[67] Discussions with U.S. and Colombian officials, Bogotá, March 2009.

PX716

that the civilian agencies will respond to its needs (and these agencies are indeed responding to some extent). The strong support of the Ministry of Defense and the military for the consolidation plan has been key to its success. In theory, civilians should be in charge of the process once security has been established, but the military have assumed the leadership of this effort by default. The challenge in La Macarena—and elsewhere in Colombia—is to motivate some of the civilian agencies to become more actively engaged.[68]

### Prospects for the Future

The success of the Colombian state consolidation project—and the future post-COIN environment—will be affected by a variety of factors. One is the change of leadership in Colombia from President Uribe to President Santos. As noted above, the success of the Colombian counterinsurgency effort was due to a large extent to Uribe's leadership and the high levels of support that he enjoyed throughout his presidency. President Santos' challenge is to maintain political support and commitment to the state consolidation effort.

External support will also likely continue to diminish. U.S. assistance to the Colombian military and police has been declining from $591.1 million in FY 2007 to $268.055 million in FY 2010 (Administration request) and is expected to continue to decline. The decline in U.S. military and police assistance will impose painful choices on the Colombians. Moreover, as noted above, USAID/OTI assistance to the consolidation program is scheduled to terminate in 2010. The critical question is whether Colombia will be able to compensate for the declining levels of U.S. assistance with national funds.[69]

---

[68] Discussions with U.S. and Colombian officials, Bogotá, March 2009.

[69] Discussions with U.S. and Colombian officials, Bogotá, March 2009.

PX716

## What Capabilities Does the United States Need to Have or Need to Develop?

The United States is not engaged in kinetic operations in Colombia. Its indirect approach to Colombia focuses on building capabilities through equipment transfers, logistical support, and training of Colombian personnel. The capabilities that the United States needs, therefore, reside in the area of building partnership capacity (BPC). These capabilities must to be closely integrated with the Colombian government's counterinsurgency strategy to fill gaps in Colombian capabilities. On the military side, major potential gaps are in maintenance of rotary wing and fixed wing aircraft; support and training for riverine operations; communications and intelligence; institutional transformation, including the Colombian military justice system, and military education.[70] However, as the COIN effort moves into the consolidation phase, the United States will have to build greater civilian capabilities to support the shift that is foreseen in the Colombian strategic plan from a military to a civilian focus.

---

[70] Discussions with U.S. and Colombian officials, Bogotá, April 2009.

PX716

# Counterinsurgency Transition Case Study: El Salvador

**Map of El Salvador**



SOURCE: CIA World Factbook.

**RAND** *MG1111/2-4.1*

## Introduction

When war broke out in El Salvador in 1981, it was readily interpreted as another front in the global confrontation between capitalism and communism. Sponsored by the Soviet Union and Cuba, the leftist rhetoric of the Farabundi Marti National Liberation Front raised the specter of a communist takeover in Central America. To the U.S. administration, this outcome was unacceptable: Having lost Nicaragua

PX716

to the Sandinistas in 1979, President Ronald Reagan feared that without U.S. intervention, "new Cubas will arise from the ruins of today's conflicts."[1] The language was of "drawing a line" over El Salvador by helping the government counter the rebel threat.

Although El Salvador's conflict fitted nicely within the Cold War narrative, its roots were deeper and related to the country's long-running bifurcation of power and wealth. While under Spanish colonial control, a small percentage of the population was elevated by the Spanish crown to act as stewards of its lands. This system engendered a rich-poor divide between a small Salvadoran elite and a large population living in extreme poverty, which persisted beyond El Salvador's independence from Spain in 1839. By the late 1920s, El Salvador's middle class had all but disappeared. At this point, economic decline, combined with political marginalization, prompted many rural poor to mobilize and in 1930 the Communist Party of El Salvador (PCS) was formed. When President Arturo Araujo allowed the PCS to participate in the coming elections, he was overthrown in a military coup sponsored by the landed elite. Their theft of the ensuing election prompted an uprising, spearheaded by Agustín Farabundo Martí. The revolt was swiftly crushed by the security forces, which in a few weeks killed between 10,000 and 40,000 people. These events, since referred to as *la Matanza*, have strongly informed El Salvador's politics.

The inequalities persisted into the period preceding the insurgency and provided the social base of the insurgent movements. During this period, beginning in the 1960s, however, there was considerable social change. Urban society became more complex with the development of industrial labor and a modern middle class of technicians, managers, and intellectuals. New parties and organizations—the most important of which was the Christian Democratic Party—sought to represent the interests of the urban sectors. By contrast, the traditional mechanisms of social control remained largely intact in the countryside.

The 1977 presidential election was a critical turning point. The Christian Democratic–led opposition nominated a retired military

---

[1]  "Transcript of President's Address on Caribbean Aid Program," *New York Times*, February 25, 1982, p. 14.

PX716

officer in the hope that he would be acceptable to the military and the elite. The outgoing administration, however, imposed the election of its candidate, a former minister of defense. The outcome provoked a crisis of legitimacy, at a time when the country was facing a campaign of terrorism by emerging Marxist revolutionary organizations and an uncertain international environment because of the Sandinista take-over in Nicaragua in 1979.

This history forms the backdrop to the emergence of the Far-abundi Marti National Liberation Front (FMLN), named after the leader of the 1932 uprising. Formed in 1980, the FMLN comprised five leftist groups seeking to trigger a popular uprising to reverse "decades of suffering [and] more than 50 years of military dictatorship."[2] The origin of the Salvadoran guerrillas can be traced to splits within the PCS in the late 1960s. PCS Secretary-General Cayetano Carpio broke with the party in 1969 and established the Popular Liberation Forces (FPL), which pursued a strategy of Vietnamese-style people's war. The People's Revolutionary Army (ERP) originated in a breakaway fac-tion of the FPL and derived its inspiration from Che Guevara's theo-ries of guerrilla warfare. A breakaway faction of the ERP established the Armed Forces of National Resistance (FARN). In the late 1970s these groups carried out a campaign of terrorism (the most notable attack being the kidnapping and assassination of Foreign Minister Mauricio Borgonovo in 1977), combined with attacks on small police and National Guard units. In 1980 the armed Marxist organizations were integrated, under Cuban auspices, into a unified military com-mand with headquarters in Managua, Nicaragua, to direct the coming armed struggle. The insurgents had sanctuaries in the *bolsones*—disputed border areas between El Salvador and Honduras—and across the Gulf of Fonseca in Nicaragua.

The response of the authorities and the paramilitary groups of the right to the challenge of the radical left was to step up the counterter-ror operations, which extended to political activists who were seeking to organize urban and rural workers. The most spectacular assassina-

---

[2] "FMLN: Call for a General Offensive (January 1981)," in Robert Leiken and Barry Rubin, eds., *The Central American Crisis Reader*, New York: Summit Books, 1987, p. 421.

PX716

tion was that of Archbishop Oscar Arnulfo Romero of San Salvador in March 1980, killed while he was conducting Mass. The murder is believed to have been ordered by Major Roberto D'Aubuisson, who later founded the right-wing political party Alianza Republicana Nacionalista or National Republican Alliance (ARENA). As the Kissinger Commission on Central America noted, the common denominator of these methods was the systematic use of mass reprisals and selective killings and torture to dissuade the civil population from participating in the insurgency or from providing any help to the insurgents. The methods, the Commission stated, magnified congressional pressures against U.S. military assistance to El Salvador, which in turn made more difficult the pursuit of an enlightened counterinsurgency effort.[3]

In the early years of the conflict, there were an estimated 6,000 front-line guerrilla fighters and a slightly larger number organized in militias and support units. Over time, the latter forces were increasingly well armed and involved in operations with the front-line forces. By the mid-1980s the Salvadoran armed forces grew to about 37,000 men.[4] The FMLN launched a 'final offensive' on January 10, 1981. Although the offensive failed to overthrow the government, it established the FMLN as a credible force. And it prompted the United States to provide El Salvador with increased military aid and advice, lest the country succumb to the same fate as Nicaragua.

The stage for a prolonged civil war was thus set. Seeking to assist the El Salvadoran government, the Unite States provided support to its ineffective and brutal military and pushed socioeconomic reforms intended to address the root causes of the conflict. U.S. leverage was low because the U.S. Congress limited the American military presence in El Salvador to 55 advisers, who were furthermore barred from accompanying the armed forces of El Salvador (ESAF) on combat operations. U.S. attempts at nonmilitary reforms also progressed slowly: El Salvador adopted a new constitution in 1983 and held general elections in 1984, in which José Napoleón Duarte from the center-right Chris-

---

[3]  *Report of the National Bipartisan Commission on Central America* (Kissinger Commission), January 1984, pp. 95–96.

[4]  *Report of the National Bipartisan Commission on Central America,* p. 98.

PX716

tian Democrats was elected president, but the right wing control over the country's legislative, judiciary, and military drastically limited the scope for change.

## Strategy (Pre-Transition)

By the mid-1980s, the conflict had reached a stalemate: The ESAF had prevented the government from being toppled, but the government was incapable of defeating the FMLN, which continued to disrupt the nation's economy and stability through sporadic attacks, economic vandalism, and sabotage. These actions undermined ESAF morale and strained the economy, but they did not threaten the government's survival.

The stalemate was unsatisfactory to all sides, but not sufficiently so to force a change in approach. The FMLN posed a considerable threat to the Duarte government, but the government and its American patrons were convinced of the incumbent's advantage over the guerrillas. Within the Reagan administration, frustration mounted over its lack of leverage and over the congressional skepticism at what was after all a commitment of $1.5 million per day. Nonetheless, attrition was deemed preferable to changing course, if only to deny the FMLN a chance at all-out victory.[5] The new constitution, the 1984 elections, and the ESAF's gradual professionalization undermined the FMLN's appeal and influence, yet the group still controlled one-third of the countryside and elected to keep fighting, perhaps to sap U.S. resolve and work toward victory on its terms.[6]

In short, none of the parties felt sufficiently threatened to compromise. In the first peace talks, held in La Palma, Chalatenango, in 1984, the government refused to discuss reforms to the constitution,

---

[5]  Todd Greentree, *Crossroads of Intervention: Insurgency and Counterinsurgency Lessons in Central America*, Westport, Conn., & London: Praeger Security International, 2008, p. 155.

[6]  Colonel Lyman C. Duryea, former U.S. Defense Attaché in El Salvador, cited in Max G. Manwaring and Court Prisk, eds., *El Salvador at War: An Oral History of Conflict from the 1979 Insurrection to the Present*, Washington, D.C.: National Defense University Press, 1988, p. 377.

PX716

something that FMLN's far-reaching socioeconomic reforms would clearly require. Duarte's precondition was presented as his own, but was also dictated to him by the overbearing military.[7] The impasse was one reason that a later U.S. Central Intelligence Agency (CIA) report described Duarte's second call for talks in June 1986 as "intended primarily as a dramatic public relations gesture."[8]

In the first half of the 1980s, the conflict was characterized by a cyclical pattern in which the initiative swung between government and guerrilla forces. But in the second half of the decade, the politico-military balance shifted in favor of the government as the result of a combination of guerrilla weaknesses and government strengths. The main guerrilla weaknesses were the following:

- *Lack of mass support.* The FMLN and its political front, the FDR, never enjoyed majority support among the population. Lack of mass support was manifested in the failure of several "final offensives" (1981, 1982, 1989) to provoke a mass uprising as anticipated by the FMLN. The guerrillas' strategy of systematic attacks on the country's infrastructure also cost them popular support.
- *Lack of political legitimacy.* The guerrillas were weakened politically by a sustained democratic process that brought to power a government with credible democratic credentials, led by José Napoleón Duarte's Christian Democratic Party.
- *Disunity.* Although the various guerrilla forces were formally unified in the FMLN, each retained its separate identity, doctrine, and area of operations. Moreover, suspicions and rivalries among the groups' leaders continued and sometimes turned deadly.
- *Inability to prevent U.S. assistance to the Salvadoran government.* Until the signing of the peace agreement in 1992, FMLN supporters and sympathizers mounted a campaign in the United States and Europe to bring about the end of U.S. and interna-

---

[7]   Manwaring and Prisk, eds., *El Salvador at War*, p. 377.

[8]   U.S. Central Intelligence Agency, Directorate of Intelligence, "El Salvador's Insurgents: Resurrecting an Urban Political Strategy," An Intelligence Assessment, Washington, D.C.: Central Intelligence Agency, September 1986, p. 11.

PX716

tional support of the Salvadoran government—a campaign facilitated by death squad activities.

- *Reliance on outside support.* One of the strengths of the insurgency—Cuban and Nicaraguan support—became a liability when that support declined as a result of changes in the international environment after the collapse of the Soviet Union and the end of Soviet assistance to Cuba and Nicaragua. The Sandinista government of Nicaragua also came under additional pressure because of U.S. support of the Nicaraguan resistance (which some U.S. officials presented as reciprocal treatment for the Sandinistas for their support of the Salvadoran insurgency).[9]

The strengths of the government side were in some respect the obverse of the guerrillas' weaknesses. The main strengths of the Salvadoran government during the civil conflict were the following:

- *Political legitimacy.* In the 1980s El Salvador began a democratic experiment with a series of free elections (constitutional assembly and legislative elections in 1982, 1985, 1988 and 1991; and presidential elections in 1984 and 1989) that delivered a government that had legitimacy and broad popular support.
- *Duarte's leadership.* As leader of the Christian Democratic opposition to the pre-1979 military regime Duarte had great personal credibility. His leadership was instrumental in keeping El Salvador on a democratic track, curbing excesses by the security forces, and maintaining international support for El Salvador.
- *International support.* U.S. and international support was critical to the survival of the Salvadoran government. Despite the international campaign, international support for the Salvadoran government increased significantly during the conflict.
- *Restructuring of Salvadoran military and security forces.* At the onset of the insurgency the Salvadoran armed forces were a barracks-

---

[9] Angel Rabasa, Lesley Anne Warner, Peter Chalk, Ivan Khilko, and Paraag Shukla, *Money in the Bank—Lessons Learned from Past Counterinsurgency (COIN) Operations: RAND Counterinsurgency Study—Paper 4*, Santa Monica, Calif.: RAND Corporation, OP-185-OSD, 2007, pp. 42–47.

PX716

bound, defensively minded organization with severe deficiencies in command and control, tactical intelligence, tactical mobility, and logistics. The U.S. security assistance program was designed to address these deficiencies and transform the Salvadoran armed forces' strategy, doctrine, training, and equipment, with a minimum of direct U.S. involvement. In formerly guerrilla-held areas, the government implemented a civic action program that consisted of rebuilding the social and economic infrastructure and training civil defense units to protect key targets and free the military to engage in offensive operations.[10]

Negotiations were again attempted in January 1989, when the FMLN offered to join the government in exchange for a postponement of the presidential elections in March. Duarte initially rejected the proposal but, encouraged by the United States, he reconsidered his position. The rebels elaborated on their offer: They would support the mainstream leftist party, Democratic Convergence, in the election, provided the election was postponed to September. They also wanted the army to be reduced to its prewar level, the police to be demilitarized, and the perpetrators of abuses to be punished; in return, FMLN dropped its demand for transitional power-sharing and for integration into the army. The efforts came to naught, as Duarte dismissed the six-month postponement of the election as unconstitutional and insisted on a ceasefire prior to talks.

While this effort fared no better than previous attempts, the context was different, signaling a first step in El Salvador's transition. Most critical was the change in U.S. leadership. The FMLN had predicted that "no matter what kind of administration follows [Reagan's], the tendency will be to diminish United States support to the government"; they therefore waited until Reagan was out of office to make their proposal.[11] In a sense, their analysis was correct, because President

---

[10]  Rabasa et al., *Money in the Bank.*

[11]  Guillermo M. Ungo, President of the Revolutionary Democratic Front, as cited in Manwaring and Prisk, eds., *El Salvador at War*, p. 476. See also William Branigin, "Salvadoran Rebels Amplify Cease-Fire Offer," *Washington Post*, February 21, 1989.

PX716

George H. W. Bush quickly changed tack in El Salvador. Two weeks into his administration, Vice President Dan Quayle traveled to San Salvador to voice his tentative support for the rebels' peace offer. Later that month, the State Department backtracked on its opposition to talks and instead urged a negotiated settlement.[12] In March, Guillermo Ungo, then president of the Revolutionary Democratic Front (FDR), an FMLN component organization, traveled to Washington, D.C., for talks.

One reason for America's changed stance was the developments in the Soviet Union. The drawdown of the Cold War signaled that aid to El Salvador would be reduced. U.S. intelligence reports also suggested that the Kremlin was pressuring the FMLN "to curtail military activities and seek a negotiated settlement."[13] The changing strategic landscape eroded the ideological lens through which the U.S. had viewed the El Salvadoran conflict and placed in doubt the need for total victory. Instead, the priority for Bush was to find an acceptable conclusion to its commitment in El Salvador, one that would end the conflict, allow for a U.S. withdrawal, but nonetheless safeguard the country's democracy. This outcome would require negotiations with FMLN.

Despite these propitious circumstances, the prospect of negotiations appeared much weaker following the March 1989 elections, in which the Christian Democrats lost to ARENA, a right-wing party close to the land-owning elite and military. The new president, Alfredo Cristiani, sought to reassure his friends in Washington, D.C. and his local constituents with promises of respecting human rights and of pursuing negotiations, but it was difficult to persuade the U.S. Congress, particularly given the recent increase in death-squad activity. It was feared that Cristiani would be unable to control (or would become a front for) the more radical elements within his party.

---

[12] See Rita Beamish, "Quayle Tells Salvadoran Military that Aid Depends on Rights Efforts," *Associated Press*, February 3, 1989; Jim Anderson, "State Department Shifts on El Salvador," *Associated Press*, February 27, 1989.

[13] U.S. Central Intelligence Agency, Directorate of Intelligence, "El Salvador: The FMLN After the November 1989 Offensive," Washington, D.C.: Central Intelligence Agency, January 26, 1990, p. 3.

PX716

In the end, Cristiani proved a more potent negotiator than his predecessor, as his political loyalties gave him more room for maneuver. For the initial five months of his administration, however, the situation in El Salvador did not change. In September 1989, the FMLN presented the government with a peace offer and proposed fundamental reforms to the armed forces, judiciary, and the agrarian system.[14] Despite some promising confidence-building measures, neither side was ready to make major concessions. "We are flexible," a FMLN spokesman said, "but they are making a mistake if they think we are negotiating from weakness." The government, meanwhile, dismissed FMLN as "a small reality [that] cannot oblige the government to change the republic's constitutional system."[15]

## The Transition Period

The turning point came with the FMLN's second "final offensive," launched on November 11, 1989, in which the rebels entered the capital and made some territorial gains before gradually being repelled to the city's outskirts.[16] The offensive and its associated events turned the balance of power in El Salvador into a "mutually hurting stalemate."[17] The position of weakness that both sides had denied was mutually exposed: Neither side could hold out for a better outcome than a negotiated solution.

For the rebels, the two sought-after effects of its offensive—a government surrender or negotiations on the FMLN's terms—had not

---

[14] Philip Bennet, "Salvador Rebels Say Peace Plan Would Give US a Low-Cost Exit," *Boston Globe*, September 15, 1989.

[15] See Douglas Tweedale, "Little Hope Seen for Quick End to Salvadoran Civil War," *United Press International*, October 16, 1989; Douglas Grant Mine, "Military Command Rejects Rebel Purge Demand as 'Ridiculous," *Associated Press*, October 20, 1989.

[16] For the chronology and aftermath of the final offensive, see U.S. Central Intelligence Agency, "El Savaldor: The FMLN After the November 1989 Offensive."

[17] Cynthia J. Arnson, "El Salvador and Colombia: Lessons of the Peace Process," in Margarita S. Studemeister, ed., *El Salvador: Implementation of the Peace Accords*, Peaceworks No. 38, Washington, D.C.: United States Institute of Peace, January 2001, p. 41.

PX716

materialized; and a massive popular uprising did not appear likely.[18] Moreover, the FMLN's fighting power had been reduced and aid from the Soviet Union was drying up. The El Salvador government could have capitalized on all of this, had it not been for three developments. First, the offensive punctured the belief that the rebels were no longer capable of major offensives. The FMLN was certainly weakened,[19] but it was no spent force.[20] Second, during the counteroffensive, the ESAF's Atlacatl Battalion, an elite U.S.-trained unit, killed six Jesuit priests and two housekeepers. The act gained immediate media notoriety and inflamed an already heated debate in the U.S. Congress about U.S. support of the ESAF and the regime more generally. Henceforth, securing military aid would become far more politically difficult.[21] Third, the FMLN's infiltration of San Salvador's wealthier suburbs convinced many within the private sector that a negotiated solution was now necessary; others were disturbed by the overly autonomous military and wanted to cut it down to size.[22]

El Salvador thus embarked on a two-year-long process of negotiations, starting with initial overtures to the United Nations in late 1989 and ending with the signing of a peace agreement in Chapultepec Castle. The two sides met first in April 1990 in Geneva and then in Caracas to sequence the talks: first negotiations, then a ceasefire (an important concession by the government). Talks then stalled over

---

[18] See Mark Levine, "Peacemaking in El Salvador," in Michael W. Doyle, Ian Johnstone, and Robert C. Orr, eds., *Keeping the Peace: Multidimensional UN Operations in Cambodia and El Salvador,* Cambridge: Cambridge University Press, 1997, p. 229, fn. 8.

[19] A 1989 CIA analysis of FMLN shows that they had "lost 15 to 19 percent of their force over the last two years, [that] their base areas are less secure, and [that] their attacks on military targets have been less effective." U.S. Central Intelligence Agency, Directorate of Intelligence, "El Salvador: Government and Insurgency Prospects," Special National Intelligence Estimate, Washington, D.C.: Central Intelligence Agency, February 1989, p. iii.

[20] Rumors that the FMLN were acquiring surface-to-air missiles also informed the ensuing shift in government policy.

[21] Terry L. Karl, "El Salvador's Negotiated Revolution," *Foreign Affairs*, Vol. 71, No. 2, Spring 1992, p. 153.

[22] David Holiday and William Stanley, "Building the Peace: Preliminary Lessons from El Salvador," *Journal of International Affairs*, Vol. 46, No. 2, Winter 1993, p. 3.

PX716

reforms to the armed forces but were kept afloat by a number of smaller summits. Álvaro de Soto, the UN secretary-general's special adviser, organized a meeting in San José, Costa Rica, at which the two sides committed themselves to minimum human-rights standards and agreed to the deployment of a UN human-rights verification mission. In April 1991, the National Assembly voted to modify various clauses in the constitution, limiting the domestic role of the armed forces and of military courts, establishing a national police force under the Ministry of Interior and creating a "Truth Commission" to investigate wartime human-rights abuses.

A package of proposals put forward by de Soto at the New York summit of September 1991 addressed the main outstanding issues: The rebels were barred from integration within the army but could participate in the new police force, while the government would implement long-neglected agrarian reforms and submit its soldiers to an "Ad Hoc Commission" to review their human-rights records and competence. Finally a broad-based National Commission for the Consolidation of Peace (COPAZ) was created to oversee the implementation of the peace agreements.

The signing of the treaty to end the war on January 16, 1992 set in motion a carefully defined schedule. On February 1, the ceasefire would begin; five days thereafter both sides would abandon their military positions. Over the next month, the FMLN would concentrate its units in 15 sites, after which its demobilization and integration into the police force could begin. The ESAF, meanwhile, would be placed in 62 sites, dismantle its paramilitary forces, and transfer internal-security duties to the new police force. Terry Lynn Karl argues that a hallmark of a successful negotiation is that "both sides believe they have won."[23] In the case of El Salvador, this was precisely the case because all sides achieved results through negotiations that would have been largely unattainable through war. Cristiani secured the demobilization and disarmament of the FMLN yet maintained control of the government (pending elections). Moreover, the FMLN's exclusion from the army represented a security guarantee should the ceasefire unravel. To Cris-

---

[23] Karl, "El Salvador's Negotiated Revolution," p. 160.

tiani, a former businessman, peace also signified an overdue opportunity to liberalize El Salvador's '"broken economy," a higher priority for his administration than pursuing an unlikely military victory.[24] The FMLN, meanwhile, achieved almost all of the aims set out in its previous overtures: The government had agreed to constitutional changes, the army would be purged, and FMLN leaders were free to enter party politics. Although the FMLN did not secure an interim place within the government, the establishment of COPAZ would give it a say over the implementation of the peace accords.[25] Finally, the United States would be able to extricate itself from El Salvador without undermining El Salvador's democracy. In a circuitous manner, the final outcome promised to meet the four objectives that Reagan had identified during the conflict: democracy, development, dialogue, and defense.[26]

The antagonism that went into the negotiations—between the FMLN and the government; between the government and the ESAF; between the Bush administration and the FMLN, and between the White House and Congress—makes their outcome all the more astonishing. Beyond seeking to end the conflict if possible, there was no joint strategy, no unity of purpose, among the negotiating partners. Instead, levels of trust were low and there were instances in which a return to war appeared likely. Against this backdrop, a number of factors helped sustain the negotiations.

**Domestic Factors**

The "hurting stalemate" mentioned above was the sine qua non of the peace agreements. Added to this factor was the specific role played by the political leadership on either side. Cristiani was well placed to make the compromises necessary for peace because the military trusted him not to give anything away but trusted him when concessions nonetheless had to be made. He also participated personally in the negotiations and was willing to trade concessions with the FMLN. By the end of

---

[24] Levine, "Peacemaking in El Salvador," pp. 229–230.

[25] Karl, "El Salvador's Negotiated Revolution," p. 160.

[26] Ronald Reagan, "Central America: Defending Our United Interests," Department of State, 1984, p. 4.

PX716

the process, he had earned the respect of UN diplomats for "his states-manship and courage in leading a recalcitrant military down the path of peace, which was in many ways against its institutional interests."[27]

Like Cristiani, the FMLN's leadership kept its more radical factions in check. It also sought to improve its relations with the United States, particularly following the change of U.S. administrations. In February 1989, the FMLN announced a halt to attacks on U.S. personnel (barring advisers embedded with the ESAF). It also sent a letter to President Bush prior to his election, advocating a negotiated settlement. When FMLN fighters overtook the Sheraton Hotel in the capital as part of its final offensive, it opted not to confront the U.S. military personnel staying there but let them escape unharmed. To suggest any sort of rapprochement would be excessive, and several incidents greatly strained relations; nonetheless, the overtures established a degree of confidence that would later aid negotiations.

Two other domestic contextual factors fueled the talks. First, polls in the late 1980s showed that 83 percent of the population "supported an end to the war through negotiated settlement."[28] Once the initial steps toward peace had been taken, public pressure for a settlement deterred both sides from abandoning the negotiations. Second, political space had opened up, enabling grassroots and civil-society organizations to build alliances with small business associations and other centrist forces. A reduction in state violence had also granted greater latitude to the left, leading to the return of exiled politicians and the participation of Democratic Convergence in the 1989 elections.[29] This progress was quashed following FMLN's final offensive, but the bridges that had been established would later underpin the negotiations.

---

[27]  Levine, "Peacemaking in El Salvador," pp. 246–247.

[28]  Charles T. Call, "Assessing El Salvador's Transition from Civil War to Peace," in Stephen John Stedman, Donald Rothchild, and Elizabeth Cousens, eds., *Ending Civil Wars: the Implementation of Peace Agreements*, Boulder, Colo.: Lynne Rienner, 2002, p. 387.

[29]  William Deane Stanley, "El Salvador: State-Building Before and After Democratisation, 1980–95," *Third World Quarterly*, Vol. 27, No. 1, 2006, p. 106.

PX716

**The United States' Role**

The Bush administration's shift in focus from defeating the FMLN to pursuing a negotiated solution was critical to achieving an agreement. As noted, Bush was eager to leave El Salvador, but he also wanted to ensure the survival of its young democracy and the elimination of armed threats from the right and the left. These aims would require careful diplomacy and leverage, an element conspicuously absent from earlier U.S. dealings with El Salvador.

The new U.S. approach centered on the reduction of military aid to the ESAF, through which the Bush administration signaled America's changed objectives and deterred a resumption of war. The move was risky: It could have led to increased abuses from an unrestrained and embittered military or emboldened the FMLN to capitalize on the United States' "losing heart." Yet despite a significant reduction in aid (see Figure 4.2), neither of these eventualities occurred. There are several reasons for this, three of which relate to the new U.S. approach.

First, Congress introduced a condition on aid that tied future allocations to the Salvadoran government's respect for human rights and its negotiations with the FMLN. The conditionality cut both ways, in that any transgression by the FMLN would trigger the restoration of U.S. assistance to the government, which—while not always helpful to the negotiations[30]—did provide for an even-handed system of sticks and carrots. The conditions for aid had more credibility than those stated throughout the 1980s, given the Bush administration's readiness to abandon its partner should its efforts be found lacking. In contrast, the imperative of defeating the rebels during the 1980s had provided the ESAF with almost unlimited leeway.[31]

Second, the U.S. government managed to reduce aid without alienating Cristiani or undercutting his domestic credibility. As one

---

[30] According to T. E. Karl, the restoration of aid following the FMLN's downing of a U.S. helicopter in 1991 emboldened the ESAF to take more forceful action against the FMLN, which threatened ongoing negotiations. See Karl, "El Salvador's Negotiated Revolution," p. 157.

[31] See Benjamin C. Schwarz, *American Counterinsurgency Doctrine and El Salvador: The Frustrations of Reform and the Illusions of Nation Building,* Santa Monica, Calif.: RAND Corporation, R-4042-USDP, 1991.

PX716

American diplomat put it: "If we use public blackmail . . . that robs foreign leaders of dignity. We don't want Cristiani to look like a U.S. puppet."[32] It was therefore fortuitous that the reduction in military aid was mandated by the U.S. Congress and not the White House. Throughout the peace process, White House officials would lobby Congress for continued assistance to El Salvador and reassure Cristiani of their support. At the same time, Congress insisted on progress in the negotiations and gradually cut aid. This "good cop/bad cop" approach allowed for a continued partnership between the White House and Cristiani in which both could curse, but not easily circumvent, the demands of Congress. Indeed, some analysts suggested that while "administration officials do not say so publicly . . . they find Congressional pressure useful."[33] More generally, it was decided that economic assistance to El Salvador would continue to flow at a healthy rate, whereas military aid was all but eliminated; this helped ensure the government's economic viability yet made the ESAF appreciate the necessity of negotiations (see Figure 4.1).

Third, in marked contrast with the previous administration, the Bush administration entered office with a positive view of the UN and its role in conflict resolution. In February 1990, Secretary of State James Baker wrote a joint letter with his Soviet counterpart, urging the UN to assume a mediating role in El Salvador's negotiations. The overt support for the UN gave it the authority and legitimacy needed during the talks. The United States was also happy to defer to various multilateral efforts to secure peace, which ultimately proved invaluable. This is not to say that the United States delegated the task of peacebuilding to the international community: A year into the negotiations, when levels of trust were higher and momentum had amassed, the United States began to play a greater role, meeting with FMLN leaders and sending senior U.S. officials to put pressure on the government.[34]

---

[32] U.S. Foreign Service officer, cited in Robert Pear, "Congress Is As Skeptical As Ever on Salvador Aid," *New York Times*, January 14, 1990.

[33] U.S. Foreign Service officer, cited in Pear, "Congress Is As Skeptical As Ever."

[34] Greentree, *Crossroads of Intervention,* p. 155.

PX716



**Figure 4.1**
**U.S. Economic and Military Aid to El Salvador, 1988–1993 (in constant 2007 U.S. $ millions)**



At the operational level, U.S. advisors in El Salvador adapted their work to facilitate the transition to peace. In 1990, the U.S. Brigade Operational Planning and Assistance Training Teams (OPATT) were given the added mission of monitoring and reporting suspected human-rights violations.[35] In coordination with the UN, U.S. advisors also became increasingly "concerned with civic action, psychological operations and garrison operations and the development of peacetime unit training management systems."[36] These shifts complemented the OPATTs' general contribution in professionalizing ESAF brigades and reducing the number of Army abuses. While progress here had always been slow, the net result was beneficial and the achievement lauded

---

[35] Cecil E. Bailey, "OPATT: The U.S. Army SF Advisers in El Salvador," *Special Warfare*, December 2004, p. 22.

[36] Memorandum for Director, Security Training Management Office, Fort Bragg, N.C., Subject: Training Assistance Evaluation, El Salvador ETSS (OPATT), April 24, 1991.

PX716

even by FMLN, which asked for the advisers to remain following the peace agreement.[37]

### The Role of the International Community

At several instances, the personal involvement of UN Secretary-General Pérez de Cuéllar and his envoys was instrumental in overcoming obstacles that might otherwise have wrecked the peace process. UN mediators persuaded the FMLN to drop its demand to be included in a transitional government.[38] The secretary-general was also central in securing the San José agreement on human rights, first in proposing the agreement (as a means of keeping stalled negotiations afloat) and then in convincing Cristiani to agree to the human-rights monitors.[39] UN representatives were also responsible for the Ad Hoc Commission. The FMLN had long insisted on the abolishment of the military, Cristiani favored a self-administered cleanup, and the Ad Hoc Commission was a compromise solution proposed by the UN to which both parties eventually agreed and which later proved to be "remarkably effective."[40] Here and elsewhere, the direct involvement of senior-level UN officials raised the costs of appearing obstructionist or of abandoning the peace talks.

The UN's second major contribution to securing a peace agreement lay in its deployment of the UN Observer Mission in El Salvador (ONUSAL). Upon the request of the government and the FMLN, the 101-strong ONUSAL was established in July 1991 with a mandate to monitor compliance with the human-rights commitments agreed to at San José.[41] The mission had three immediate effects: Human-

---

[37]  See Levine, "Peacemaking in El Salvador," pp. 251–252.

[38]  Levine, "Peacemaking in El Salvador," p. 236.

[39]  Levine, "Peacemaking in El Salvador," p. 235.

[40]  Ian Johnstone, "Rights and Reconciliation in El Salvador," and David H. McCormick, "From Peacekeeping to Peacebuilding: Restructuring Military and Police Institutions in El Salvador," both in Doyle, Johnstone, and Orr, eds., *Keeping the Peace,* pp. 316 and 294.

[41]  See United Nations Security Council Resolution 693, May 20, 1991.

PX716

rights abuses declined;[42] the level of violence subsided, particularly in the cities; and the mission acted as a confidence-building measure between the two sides.[43] With the ceasefire, ONUSAL's mandate grew "to include the verification and monitoring of the implementation of all the agreements" between the two parties.[44] Its personnel were consolidated in a Human Rights Division, and a new Military Division and Police Division were formed to manage the mission's added duties.

Underpinning the UN's work was a web of bilateral and multilateral efforts to liaise between the negotiating sides and pressure each to make difficult compromises. Most significant were the "Four Friends" of the process: Mexico, Venezuela, Colombia, and Panama (later replaced by Spain). The Friends positioned themselves as subordinate to the UN secretary-general, which ensured unity of action, but they took the initiative to lean heavily on either side, if necessary. In this regard, the membership of the group was propitious: While none of the Friends was aligned to either party, Mexico and Spain enjoyed closer ties to the FMLN, whereas Colombia and Venezuela were more sympathetic to the government because of their experience with combating insurgencies.[45] The regional nature of the Friends brought three added advantages. First, their involvement signaled a regional climate that was conductive to peace. Second, the composition of the group ensured interventions that were sensitive to El Salvador's history and culture. Third, the Friends' participation obviated participation by the Organization of American States and the UN Security Council, both U.S.-dominated institutions and therefore likely to raise fears of bias or American interventionism.[46]

---

[42] Holiday and Stanley emphasize ONUSAL's ability to "enter any military facility without prior notice" as critical to its 'dissuasive' or 'preventative' impact. See Holiday and Stanley, "Building the Peace," p. 7.

[43] Adapted from testimony of UN official, as cited in Holiday and Stanley, "Building the Peace."

[44] United Nations Security Council Resolution 729, January 14, 1992.

[45] Levine, "Peacemaking in El Salvador," p. 250, n. 92.

[46] Levine, "Peacemaking in El Salvador," pp. 250–251.

PX716

## Managing the Transition

The final agreement, signed at Chapultepec, Mexico, in January 1992, was a remarkable achievement. Yet despite the two years of negotiations, it was only the beginning of El Salvador's transition. Much would now depend on whether the commitments made were respected, the root causes of the war could be satisfactorily addressed, and new sources of instability and unforeseen challenges would also be adequately tackled.

### Ceasefire and Demobilization

Perhaps the most fundamental success of El Salvador's transition to peace is that the ceasefire held, despite real moments of tension. In this sense, El Salvador truly did move from war to peace and, 20 years on, the transition could be characterized as a "success story" on this count alone.

This success was far from preordained. When the peace agreement was only weeks old, the military defaulted on the demobilization of the National Guard and Treasury Police; meanwhile, the ARENA-dominated legislature passed a law that extended the lives of these two controversial units. Further provoked by the government's security operations to evict FMLN supporters from land occupied since the ceasefire, the FMLN suspended its own concentration of forces, citing logistical reasons.

As it did during the negotiations, the UN intervened effectively. Under-Secretary Marrack Goulding traveled to El Salvador and persuaded the government to desist from the land-seizure operations and rescind the new law. Also, ONUSAL, together with other UN agencies, addressed the logistical burdens that had hindered FMLN cantonment.[47] Then and in general, the UN was critical in assessing compliance with prior commitments, maintaining open channels of communications, and securing renewed agreements.

Following the concentration of forces, the UN deployed observers to monitor both sides. The National Guard and Treasury Police were officially disbanded in March 1992, other civil defense units were

---

[47] Call, "Assessing El Salvador's Transition," pp. 393–394.

PX716

dismantled in June, and the government adopted an accelerated demobilization program by which the ESAF had shrunk by 54.4 percent by April 1993 (though this related also to the many  "ghost soldiers" on the army's payroll).

Although the FMLN needed to disarm and demobilize in order to transform into a political party, the maintenance of arms was its only source of leverage, without which it was entirely dependent on UN pressure to force government compliance. Partly for this reason, the FMLN delayed its demobilization by two months until December 1992. However, this hedging prompted the government to stall on the dismantling of its rapid-reaction forces, whose dissolution occurred only after the FMLN had completed its own demobilization. This staggered implementation signaled both a lack of trust between the two sides and an ability to make progress through incremental exchanges of ever more significant concessions.

FMLN disarmament proved more controversial, with both the government and the ESAF alleging foul play. The ONUSAL Military Department's decision to declare the FMLN's disarmament complete, on December 14, 1992, was probably pragmatic rather than empirical: ONUSAL certified what it must have known were incomplete FMLN inventories, thereby allowing the peace process to proceed, and gambled that any future arms discoveries would be less damaging than an early insistence on full compliance. As David McCormick notes, "In retrospect this decision appears justified. It is not clear that alternative actions would have had more desirable outcomes."[48] When, six months later, an FMLN weapons cache was discovered in Nicaragua, ONUSAL's credibility was undermined; yet, by intervening personally and swiftly, the secretary-general was able to push the FMLN to declare and destroy its remaining 120 weapons caches. By that point, given the FMLN's own loss of face domestically and internationally, the infraction was less consequential than it might have been earlier: The government used the incident as a bargaining tool in its dealings with the UN but did not reverse its previous concessions.

---

[48] McCormick, "From Peacekeeping to Peacebuilding," pp. 287–288.

PX716

The demobilization was helped by the flexibility of the implementation phase. Delays, deliberate or otherwise, led to "recalendarization" agreements where the two sides committed to new timelines and addressed the cause of the holdup. Overseen by the UN, the recalendarizations limited the disruptive impact of delays and sustained confidence that agreed-to action would be taken. It was, for example, through such an agreement in June 1992 that the government's reluctance to dismantle its internal security forces was addressed.

Yet there was an important limit to the flexibility, which also aided demobilization. Per El Salvador's constitution, elections were to be held in 1994, and the FMLN's participation in the elections was fundamental to peace. To partake, the FMLN first needed to have undergone its transformation into a political party, which added pressure on its leadership to disarm and demobilize with enough time left to prepare an electoral campaign. This pressure forced the FMLN to maintain the pace of its demobilization and rely more heavily on the UN as a guarantor of government compliance.

## Public Security and Security-Sector Reform

As part of the peace accords, El Salvador implemented fundamental reforms to its security sector, restricting the military's role to territorial defense against external threats and establishing a new civilian police. Although these two broad objectives were eventually met, security-sector reform was undermined by the ESAF's initial reluctance to abandon its internal security functions and status, and by the difficulties in providing public security during this transitional period. While neither factor resulted in a resumption of full-scale war, both would significantly mar El Salvador's transition to peace and its longer-term evolution.

## ESAF Reform

Given the army's long-standing history of repression and role in society, security-sector reform in El Salvador was a deeply political as well as technical task. To assist with the process, approximately 40 U.S. advisers remained in El Salvador throughout 1993, deploying throughout the ESAF in four- to five-person teams. The U.S. military also helped

PX716

create the ESAF training and doctrine command (CODEM), reform the Military College, and create a School of High Strategic Studies, which opened in September 1993 to offer instruction to senior civilian and military officials.[49] In parallel, ONUSAL's military and human-rights divisions assisted the ESAF with the internalization of its new doctrine.

These efforts notwithstanding, ESAF reforms encountered several problems, many of which have since been attributed to ONUSAL's limited oversight of the process. First, the dismantling of the Treasury Police and National Guard, which the government said had occurred in March 1992, actually entailed their wholesale inclusion, under different names, in ESAF. Second, the army maintained some of its prior functions: Particularly after 1993 and following a dramatic increase in crime, it was called on to conduct patrols and other domestic operations. Third, the defense ministry's intelligence section remained focused on internal rather than external threats; the ESAF retained control over the recruitment and training of civilian intelligence operatives; and the new State Intelligence Office (OIE) came to be heavily staffed by former military intelligence personnel, some of whom were later implicated in various human-rights abuses.[50]

Demobilizing soldiers presented a different set of problems. Because of funding constraints and significant logistical requirements, the government was unable to provide many of the demobilizing soldiers the payouts promised in the accords: Charles Call notes that "over two years after the accords were signed, only 6,000 of 18,000 ex-soldiers had received their severance pay."[51] A related problem concerned the weapons of the demobilizing soldiers, many of which went missing and were not recovered. By February 1995, the minister of defense acknowledged that "approximately 300,000 weapons, 'intended for military use,' had found their way into civilian hands."[52]

---

[49] McCormick, "From Peacekeeping to Peacebuilding," p. 297.

[50] Call, "Assessing El Salvador's Transition," p. 399.

[51] Call, "Assessing El Salvador's Transition," p. 396.

[52] As cited in McCormick, "From Peacekeeping to Peacebuilding," p. 295.

PX716

Armed and militarily trained, many disgruntled former combatants turned to crime as a means of self-enrichment, which would become a significant problem for the new police force.

**Police Reform**

An early decision in the transformation of the security sector was whether to retrain the old police or establish a new force. Given the distrust and abuses of the National Police (PN), it was agreed that a new National Civilian Police (PNC) would be formed, and that the majority of its officers (60 percent) would be civilian recruits. In terms of starting anew, this was a natural choice, yet it proved problematic in ensuring security during the transition to peace.

The establishment of a new police force requires time and resources and calls for an interim strategy for the provision of public security. In El Salvador, the shift from old to new security forces was further complicated by the deeply political nature of the transition: The ESAF deliberately obstructed the police reforms by delaying or otherwise disrupting the transfer of premises to the new force. Such action, along with funding shortages, impeded PNC recruitment and training and made the need for functioning interim public-security arrangements all the more acute.[53]

Regrettably, these arrangements proved largely inadequate. For example, the Auxiliary Transitory Police (PAT) deployed to former FMLN-controlled territories was composed of PNC cadets with minimal training; although overseen by ONUSAL, they were "woefully unprepared and underequipped to perform this mission."[54] Elsewhere, UN police monitors accompanied the patrols of the old police force. Yet as McCormick notes, "the PN was composed of soldiers, not professional policemen, who lacked enthusiasm for a job that they would soon lose, and harbored resentment for the UN observers whom they blamed for their predicament."[55] During the transition, human-rights abuses, arbitrary detention, and levels of corruption all increased.

---

[53]  McCormick, "From Peacekeeping to Peacebuilding," p. 301.

[54]  McCormick, "From Peacekeeping to Peacebuilding," pp. 288–289, fn. 20.

[55]  McCormick, "From Peacekeeping to Peacebuilding," p. 289.

PX716

Where ONUSAL advisers were present, they were effective, yet with fewer than 400 police observers for a 6,000-strong police force, many of whom were also devoted to the standing up of the PNC, there were clear limits to the UN's oversight.

By 1993, the police academy was up and running and the PNC was becoming fully operational. Where deployed, the PNC were professional and effective; however, the institution faced new threats. First, the government and the ESAF inserted trusted units and personnel into the force, compromising its integrity and standards. The government appointed as operations director a military officer who brought with him staff from the military and terminated a PNC agreement with ONUSAL for technical and logistical support.[56] The government also transferred more than 1,000 former soldiers into the PN as a means of integrating them into the PNC. Similarly, two entire units, the Special Investigative Unit and the Anti-Narcotics Executive Unit, were transferred into the PNC in 1993. The FMLN had agreed to their inclusion subject to screening and retraining, yet these conditions were not fulfilled. Once in the new force, members of these units were implicated in various crimes and cover-ups.

The most fundamental threat to the PNC was its inability to control the rising levels of violent crime, caused in part by the security gap created during its own establishment. The demobilization of both the FMLN and the ESAF, along with the dismantling of other security forces, had "effectively cut the coercive forces available for deployment from some 60,000 to 6,000 in only a few weeks."[57] Given the inadequate compensation given to ex-combatants, a difficult economic climate, and the lack of a fully developed police force, many unemployed, embittered and militarily trained young men gravitated toward crime as a means of making a living or settling scores. Violent crime quickly became and remained a most urgent concern; in 1995 there

---

[56]  Call, "Assessing El Salvador's Transition," pp. 401–402.

[57]  Call, "Assessing El Salvador's Transition," pp. 399–400.

PX716

were an estimated 8,500 murders, more than the average annual death toll during the war (6,250).[58]

This widespread insecurity undermined the PNC in several ways. First, the PNC's inability to counter crime encouraged the government to lean on armed units that should have been dismantled or given new roles under the accords. It was the rise in insecurity along the highways that prompted the government to send the army to conduct patrols. Similarly, the crime wave delayed the dismantling of the PN.

Second, the PNC's standards of recruitment and training were compromised by the acute need to grow and deploy the force. This dilution of standards fueled corruption within the force. Moreover, the fact that the shift to a more "civilian" force coincided with a dramatic rise in crime served to discredit the standards and norms promoted by ONUSAL and the international community.[59]

Under the administration of Armando Calderón Sol, elected in 1994, many of the PNC's problems were addressed: The old police force was dismantled, the PNC was able to deploy throughout the country and develop the remainder of its specialized agencies, the operations director was replaced, and a technical agreement with ONUSAL was restored.[60] Yet many of the old issues left permanent marks: Accusations of human-rights abuses, corruption, and incompetence have continued, as has El Salvador's acute problem with crime. Therefore, while PNC was celebrated as an achievement by the international community, the domestic reputation of the force has suffered. More broadly, the dramatic rise in crime and insecurity since the war remains the most serious and fundamental problem in El Salvador's transition to peace.

---

[58] Philippe Le Billon, with Joanna Macrae, Nick Leader, and Roger East, *The Political Economy of War: What Relief Agencies Need to Know*, Humanitarian Practice Network Paper 33, London: Overseas Development Institute, 2000, p. 4.

[59] Margaret Popkin, "Building the Rule of Law in El Salvador," in Studemeister, ed., *El Salvador: Implementation of the Peace Accords*, p. 17,

[60] McCormick, "From Peacekeeping to Peacebuilding," p. 303.

**Human Rights, Truth and Reconciliation**

After a conflict such as El Salvador's, marked by its "harmful climate of impunity," it is often important to address society's need to deal with the past, either by punishing those guilty of wrongdoings or by reconciling former enemies to build a brighter future.[61] In El Salvador, both sides agreed to a purge of the ESAF based on the findings of the Ad Hoc Commission and to a "Truth Commission" to investigate wartime human-rights abuses. Truth and reconciliation were therefore integral to the peace being formed. However, this area is often inflammatory. A delicate balance must be struck between uncovering the past and moving forward, and there is a risk that finger-pointing by outsiders may provoke a backlash and imperil progress being made on other fronts.

When the Ad Hoc Commission's confidential report was issued on September 23, 1992, it recommended the discharging of 103 officers, including most of the ESAF's high command, along with the minister and vice minister of defense. The government delayed implementing these recommendations, the scope of which had not been expected. In securing full compliance with the report, Secretary-General Boutros Boutros-Ghali blended pragmatism with pressure. While acquiescing with various delays, he dispatched UN envoys to agree to new timetables and thereby achieved a slow but gradual process of implementation. He was helped by a U.S. announcement in February 1993 that $11 million worth of military aid would be suspended unless the recommendations were all applied.[62] The next month, six months after the report's release, Cristiani submitted a plan for full compliance, which was duly executed.[63] Despite the delays, this "constituted an unprecedented civilian review of the military."[64]

---

[61] Sentence drawn from 1989 U.S. Department of State report on human rights, as cited in Pear, "Congress Is As Skeptical As Ever."

[62] Levine, "Peacemaking in El Salvador," p. 252, fn. 96.

[63] This episode is recounted in McCormick, "From Peacekeeping to Peacebuilding," pp. 292–293.

[64] Popkin, "Building the Rule of Law in El Salvador," p. 11.

PX716

The implementation of the Ad Hoc Commission's recommendations was helped by the March 1993 release of the Truth Commission's report, which implicated some of the same officers, including the defense minister. Because of time constraints, the Commission only investigated a number of particularly egregious abuses, for which its definitive findings provided closure. The Commission also made other recommendations, the bulk of which implicated the judiciary, but these were largely ignored.[65] Cristiani protested that the Commission had unnecessarily dug into the past and exceeded its authority by including the judiciary; he proclaimed an amnesty prior to the report's release to prevent the prosecution of those it had named.[66] The FMLN had its own concerns because the report's citing of several guerrilla leaders by name would bar them from assuming government posts. The FLMN's vow to implement the recommendations only after the government had done the same led to stasis.

Margaret Popkin makes the point that temporary commissions, such as the Truth Commission, "should facilitate a longer-term societal process, not become a substitute for it."[67] In the end, the Truth Commission did neither. Its short time span, limited scope, and inability to force compliance made it at best a promising starting point for the catharsis it had meant to engender.[68] But the truth and reconciliation process never took off after the report's release: No prosecutions, reparations, official reports, or investigations into wartime abuses ever emerged. Nor, significantly, did the population express a strong desire for such action; in general, they suggested that "both sides inevitably commit terrible abuses in wars, and that the best thing to do is bury the past and make changes to make sure it cannot be repeated."[69]

---

[65] See Johnstone, "Rights and Reconciliation in El Salvador," pp. 319–320.

[66] The amnesty excluded those already cited in the Ad Hoc commission. See Popkin, "Building the Rule of Law in El Salvador," p. 12.

[67] Popkin, "Building the Rule of Law in El Salvador," p. 12.

[68] "Central America: UN to Verify 1994 Elections in El Salvador," *UN Chronicles,* Vol. 30, No. 2, June 1993, p. 26.

[69] Popkin, "Building the Rule of Law in El Salvador," p. 14.

PX716

The dilemma presented to the UN was whether to insist on compliance with emerging human-rights norms or to acquiesce to the silence on past abuses. The risk lay either in antagonizing the government or abandoning the efforts of those who did want to address the conflict's legacy. In this case, the international community did not insist. The United States, the principal donor to the justice sector, expressed no dismay at the amnesty law and the secretary-general, beyond noting his concern, yielded to government preferences.

The degree to which these partial efforts at truth and reconciliation have marred El Salvador's transition to peace is debatable. On moral grounds, a more just outcome may have been desired. Nonetheless, if the local population sees digging up of the past as hurtful and unnecessary, the insistence on such action by international actors can do more harm than good. In El Salvador, the fact that the military was behind the vast majority of abuses (95 percent of them, according to the Truth Commission),[70] and the need to keep the military on board (while simultaneously downsizing, reforming and purging it) may also have contributed to the amnesty and to its acceptance by the international community.

The effect of such pragmatism was to stymie future efforts at truth and reconciliation. In 2000, the Salvadoran Supreme Court did finally challenge its predecessor's finding that the amnesty was "not subject to its constitutional control," but it saw nothing unconstitutional with the amnesty per se.[71] More critically, Herrera and Nelson describe how, as late as 2003, government officials still asserted that various high-profile wartime crimes remained "under investigation," even though

---

[70] The Truth Commission found the ESAF responsible for 85 percent of the abuses; death squads, for 10 percent; and FMLN for the remaining 5 percent. See United Nations Commission on the Truth for El Salvador, *From Madness to Hope: The 12-Year War in El Salvador*, S/25500, New York: United Nations, April 1, 1993, p. 43. As Cynthia Arnson notes, "[T]he death squads in El Salvador were deeply rooted in official security bodies." See Cynthia J. Arnson, "Window on the Past: A Declassified History of Death Squads in El Salvador," in B. B. Campbell and A. D. Brenner, eds., *Death Squads in Global Perspective: Murder with Deniability*, New York: St. Martin's Press, 2000, p. 110.

[71] Popkin, "Building the Rule of Law in El Salvador," p. 14.

PX716

the Truth Commission had effectively established accountability.[72] Similarly, attempts to revisit the 1981 El Mozote massacre, in which at least 1,000 civilians were killed, or to establish the facts behind wartime disappearances have, with few exceptions, gone nowhere.

### Addressing the Factors Contributing to the Insurgency

For the transition to peace to be sustained, it is necessary to address the factors that contributed to the insurgency, to prevent them from giving rise to renewed conflict. In this instance, there were three areas to consider: combating El Salvador's climate of impunity; expanding political participation; and reintegrating formerly excluded communities into the productive life of the country.

**Ending the Climate of Impunity.** The climate of impunity in prewar El Salvador enabled the repressive enforcement of the status quo, which in its denial of peaceful avenues for change, ultimately gave rise to the insurgency. To correct this system, the Chapultepec Accords ended the *fuero militar*, or military jurisdiction for government forces; installed an inspector general to oversee the security forces; and empowered the legislature to remove PNC and OIE directors for human-rights violations.[73] Security-sector reform was also part of this process, as was ONUSAL's human-rights instruction to the country's police and magistrates.[74] Together, these and other measures contributed to a dramatic improvement in human rights between 1991 and 1995.[75]

To sustain the progress being made, the secretary-general proposed the Joint Group for the Investigation of Politically Motivated Armed Groups in 1993. Composed of UN and government representatives, this group was mandated to investigate the activities of illegal armed groups since Chapultepec and the surge in political killings seen in 1993. It found that illegal armed groups were still active and, in

---

[72] Major M. Chris Herrera and Major Michael G. Nelson, "Salvadoran Reconciliation," *Military Review*, Vol. 88, No. 4, July–August 2008, p. 24.

[73] Call, "Assessing El Salvador's Transition," p. 406.

[74] McCormick, "From Peacekeeping to Peacebuilding," pp. 290–291.

[75] For statistics, see Charles T. Call, "Democratisation, War and State-Building: Constructing the Rule of Law in El Salvador," *Journal of Latin American Studies*, Vol. 35, 2003, p. 846.

some cases, protected by the security forces. As a more general finding, the report stated that the justice system had "continued to provide the margin of impunity these structures require" and recommended various reforms to the PNC and judiciary.[76] The Joint Group's existence and ability to publish its findings were significant, and the investigation itself served to curb the rise in political violence.[77] Even so, most of its recommendations were ignored and virtually no action was taken against those cited in the report.

The fate of the Joint Group highlighted a fundamental problem with UN efforts to institutionalize a human-rights regime in El Salvador: While the UN was quite successful in imposing human-rights mechanisms, it was less able to encourage local ownership over such efforts. As an example, the peace accords had created a National Human Rights Advocate's Office to act as a host nation version of ONUSAL's human-rights division, but lack of political interest and support meant the new office struggled to get off the ground. ONUSAL and international assistance rescued the new entity from an early demise and helped it establish a nationwide presence. Yet despite a surge of activity under a new and notably effective director, the end of her term in 1998 left the organization once again floundering.[78]

UN efforts to reform the judiciary, a bulwark of El Salvador's climate of impunity, also confronted a lack of local interest and will. The judiciary suffered from three main problems: corruption, politicization, and the centralization of power at the Supreme Court.[79] Reforms had been agreed to in the Chapultepec agreement, but their implementation lagged, partly because the terms were vague and partly because the

---

[76] Johnstone, "Rights and Reconciliation in El Salvador," pp. 323–324.

[77] Joaquín M. Chávez, "Perspectives on Demobilisation, Reintegration and Weapons Control in the El Salvador Peace Process," in Centre for Humanitarian Dialogue, *Reflections on Guns, Fighters and Armed Violence in Peace Processes*, Vol. 1, Geneva, Switzerland: HD Centre, 2008, p. 15.

[78] Call, "Assessing El Salvador's Transition," p. 407; Popkin, "Building the Rule of Law in El Salvador," pp. 14–15.

[79] Stanley, "El Salvador: State-Building Before and After Democratisation," p. 105. See also Johnstone, "Rights and Reconciliation in El Salvador," pp. 332–333.

PX716

Supreme Court opposed them and considered itself above the agree-
ments struck between the FMLN and the executive. ONUSAL's efforts
to force change were imaginative, multifaceted, and often valuable, but
achieving institutional reform proved beyond its capacity. Even after
the 1994 elections, when a new Supreme Court and legislative assem-
bly were formed, progress in this field was slow; a 1998 poll ranked the
Supreme Court as the institution least capable of defending human
rights and, years later, the judiciary remained "weak, inefficient, anti-
quated, overly partisan, and subject to corruption."[80]

Nevertheless, the climate of impunity that had caused and char-
acterized El Salvador's war was no longer in effect. Profound problems
continued to mark its human-rights regime and judiciary, but—due
to the changed political atmosphere in El Salvador and to the other
reforms implemented as part of its transition to peace—there has been
no deliberate attempt to exploit the weaknesses of its institutions to
commit human-rights abuses with impunity.

**Electoral Reform.** The absence of democratic political space was a
fundamental cause of El Salvador's civil war. For this reason, the peace
accords proposed various reforms to produce a more open democratic
system. In 1993, a new electoral code was enacted, creating institutions
to ensure fair elections. At the government's behest, ONUSAL formed
an Electoral Division to monitor the coming 1994 elections.[81]

The deep problems with El Salvador's electoral system could not
be entirely fixed in time for the 1994 elections. Part of the problem lay
with the new Supreme Electoral Tribunal (TSE), which did not ade-
quately address the issue of voter registration, and for whose inadequa-
cies ONUSAL's Electoral Division could only partially compensate.[82]
An ONUSAL survey of August 1993 found that 27 percent of El Sal-
vador's voting population was still not registered and, at the elections,

---

[80]  Call, "Constructing the Rule of Law," pp. 858–859.

[81]  Ricardo Córdova Macías, "Demilitarizing and Democratizing Salvadoran Politics," in
Studemeister, ed., *El Salvador: Implementation of the Peace Accords,* p. 29.

[82]  Call, "Assessing El Salvador's Transition," p. 409.

PX716

an estimated 300,000 people intending to vote were unable to do so, representing 20 percent of the electorate.[83]

Despite these significant shortcomings, the 1994 elections were sufficiently fair to be celebrated. They also confirmed the FMLN's transformation into a political party, meaning that "for the first time in the contemporary history of El Salvador, the political parties contesting an election reflected the nation's entire spectrum."[84] Furthermore, the FMLN was able to establish itself as the main opposition party only two years after the cessation of hostilities.

In spite of efforts by the administration of Armando Calderón, problems with the electoral system persisted, primarily because the legislative assembly refused to approve several much-needed reforms. Nonetheless, El Salvador has held several elections since 1992 without major irregularities. In the latest presidential contest in 2009, the FMLN defeated ARENA by 2.6 percent of the vote, indicating the very real possibility of change through democratic means. Indeed, El Salvador's democracy constitutes one of the more successful outcomes of its transition to peace.

**Land Reform and Reintegration.** In addition to reconciling the political elites of the two parties, a perceived requirement for sustained peace was the reintegration into society of former combatants, their base, dependents, and other war-affected populations. These groups were to be given a stake in El Salvador's future through the National Reconstruction Plan (NRP), a five-year effort unveiled by the government in 1992. The NRP involved infrastructure repair in war-damaged areas, poverty reduction, the reintegration of former combatants, and a land-transfer program benefiting ex-combatants and war-affected civilians.

The NRP's results were uneven. While many quantitative targets for reintegration and employment were met (often with heavy foreign assistance, particularly from the United States, the circumstances facing the program's beneficiaries did not improve much, if at all. Throughout the 1990s, almost half of surveyed former combat-

---

[83] Johnstone, "Rights and Reconciliation in El Salvador," p. 329.

[84] Macías, "Demilitarizing and Democratizing," p. 29.

ants were pessimistic about the future and believed that conditions had worsened since the end of the war.[85] In part, this was due to the inadequacies of the program and its implementation, whose logistical and resource requirements were significant. However, even those successfully "reintegrated" through the NRP necessarily "returned to the relatively low-level of productivity and economic integration that typifies their neighbors"—in other words, "to say that the demobilized have been reinserted or inserted in productive life does not imply any great economic success."[86]

An underlying reason for the NRP's mixed results was the persistence of El Salvador's economic disparities. Although it was a root cause of El Salvador's war, the socioeconomic imbalance between rich and poor was not fully addressed in the peace accords. Subsequent financial reforms also did little to address the problem. A convinced neo-liberal, Cristiani hoped that liberalizing the country's economy opportunities for employment and wealth generation would help lift the whole of society out of war. By means of ambitious neo-liberal economic policies, Cristiani oversaw an impressive growth in GDP, which increased threefold between 1986 and 1994.[87] However, these gains did not address the country's socioeconomic imbalance. Instead, El Salvador remained toward the bottom of the UN's Human Development Index in regional terms.[88] Between 1989 and 2004, poverty levels actually rose from 47 percent to 51 percent; by 2008, "the income of the richest 10% of the population [was] 47 times higher than that of the poorest 10%," with 25 percent of the population looking to emi-

---

[85] For a summary of these surveys, see U.S. Agency for International Development, *Assistance to the Transition from War to Peace: Evaluation of the USAID/El Salvador's Special Strategic Objective*, Project No. 519-0394, Washington, D.C., 1996, p. 7.

[86] USAID, *Assistance to the Transition*, p. 7.

[87] In this endeavor, Cristiani was helped by U.S. nonmilitary aid and by the remittances sent by Salvadorans living in the United States, which amounted to $1 billion per year in 1993 and 1994. See Call, "Assessing El Salvador's Transition," p. 411.

[88] Call, "Assessing El Salvador's Transition," p. 411.

PX716

gration as a necessary means of finding work.[89] In such a context, reintegration into civilian life, even if well implemented, was not a very attractive prospect.

The land-reform program implemented throughout the 1990s was another means by which the imbalances alluded to above were to be addressed. While the Chapultepec accord did not foresee a redistribution of land, it did envisage that "access to productive activities" would help give former combatants and civilians a stake in peace.[90] To that end, the government provided low-interest loans for land purchases, agricultural training, and technical assistance along with other forms of help.

Despite the centrality of the land issue, time-constraints during the peace negotiations meant the final accords were vague as to how the land was to be transferred.[91] From then on, any ambiguity in the accords turned political, whereas more detailed provisions became obstacles rather than aids in implementation. In both cases, the logistical and resource requirements of the endeavor, the challenge of turning former combatants into farmers, and the deeply political nature of this process, ensured slow and difficult progress.

Graciana del Castillo describes the many technical, political, and logistical impediments to the land transfers, which in general would proceed slowly, reach an impasse, require senior-level mediation by the UN, and then advance slightly only to confront another obstacle downstream.[92] The Chapultepec agreement had stipulated that the legalization of land tenure in former conflict zones would be completed by July 31, 1992, but it took until late 1995 for just 85 percent of potential beneficiaries to receive title to land. Of those, only 34 percent had their title filed with the national land registry, which, as del Castillo notes, meant

---

[89] Clare Ribando Seelke, *El Salvador: Political, Economic, and Social Conditions and U.S. Relations,* CRS Report for Congress, RS21655, Washington, D.C.: Congressional Research Service, updated November 18, 2008, p. 3.

[90] Graciana del Castillo, "The Arms-for-Land Deal in El Salvador," in Doyle, Johnstone, and Orr, eds., *Keeping the Peace,* p. 342.

[91] Chávez, "Perspectives on Demobilisation, Reintegration and Weapons Control," p. 15.

[92] See del Castillo, "The Arms-for-Land Deal in El Salvador," pp. 349–357.

PX716

the land-transfer program had actually processed less than 30 percent of potential beneficiaries.[93] As with the NRP, even those who were successfully processed faced difficulties because many were unable to pay back the government-provided loans or sustain themselves on their acquired land.[94] Helped by USAID, the government passed various laws to forgive debt, but given the declining importance of the agricultural sector in El Salvador and the difficulties of many to access credit and technical assistance, land reforms became an inadequate means of addressing social inequality.[95]

Reintegration, land transfers, and economic reforms were all intended to address the root causes of the conflict. While success in these endeavors has been at best uneven, war has not resumed. Even so, the failure to do better has contributed to frustration and the rise of new sources of instability. Indeed, as a USAID assessment of the NRP concluded in 1996, the "further disintegration of the Salvadoran society, with associated internal problems of violent crime and destruction of property, and the external problems of uncontrolled migration, will be the price to pay for inadequate attention to the needs of this population."[96]

## Conclusions

### A Successful Transition?

Through a UN-mediated peace process, rivals who had fought a bloody, decade-long war met at the negotiating table and agreed to difficult and important concessions, all while respecting the agreed-to ceasefire. The accords, in T. L. Karl's words, represented a "negotiated revolution" in that they promised to address the causes of the conflict:

---

[93] del Castillo, "The Arms-for-Land Deal," p. 356. As del Castillo explains, unregistered lands could not be sold, meaning that the beneficiaries of these lands had "incurred a debt without having the possibility of selling the asset should they desire to do so or were forced to by failing to service their debt."

[94] Macías, "Demilitarizing and Democratizing," p. 28.

[95] Chávez, "Perspectives on Demobilisation, Reintegration and Weapons Control," p. 15.

[96] USAID, *Assistance to the Transition*, p. 10.

PX716

the armed repression, authoritarianism and human-rights abuses, the social inequalities and the militarization of society.

The maintenance of the ceasefire since then is an accomplishment for El Salvador and for the international community. The implementation of reforms, meanwhile, has been uneven. The development of democracy, the reform of the ESAF and the security-sector in general all count as relative successes, while reforms to more fundamental aspects of the state—its judiciary, the economy and the land-reforms program—suffered delays and a lack of political will. In many cases, change required more time than anticipated; in others, the continued existence of entrenched norms and a lack of economic and political support has prevented change. Social inequalities persisted after the signing of the peace agreement. Richard Tardanico's study of social inequalities and basic infrastructure in post-civil war San Salvador states that San Salvador's poor (estimated at some 30 percent of households at the beginning of the 21st century) face "lack of housing finance; settlement in ravines vulnerable to earthquakes, floods and landslides; property tenure insecurity; overcrowded housing; serious air, land and water pollution; absent or woefully deficient utilities and health programs; and chaotic public transportation."[97]

Beyond the implementation of agreed-on reforms, the most fundamental problem in El Salvador's complete transition from war to peace was the failure to provide public security following the cessation of hostilities. A second major problem was the government's reintegration strategy, which failed to provide for the thousands of former combatants and dependents who were demobilized as part of the peace process or required particular care. Neither of these problems resulted in a resumption of war, yet they did contribute to a crime wave that continues to affect El Salvador today. This rampant criminality cannot be seen as a mere footnote to an otherwise successful transition because it has resulted in a level of violence comparable to the war itself. The gangs formed since 1992 have also become increasingly involved in

[97] Richard Tardanico, "Post-Civil War San Salvador: Social Inequalities of Household and Basic Infrastructure in a Central American City," *Journal of Development Studies*, Vol. 44, No. 1, 2008, pp. 127–152.

PX716

human trafficking, drug trafficking, and kidnapping, threatening El Salvador's stability.[98]

Just as seriously, widespread insecurity has tarnished El Salvador's political transformation; in a survey in 1999, 55 percent of respondents cited crime as a justification "for the toppling of the democracy."[99] Such action against the government has not materialized, yet crime has encouraged vigilantism and produced a mass-scale subcontracting of security to private actors. The government's own crime-reduction strategies are also problematic: The deployment of military anti-gang units prompted charges of brutality by the armed forces and was a reversal on one of the peace process's key accomplishments: the demilitarization of the provision of public order.[100] Meanwhile, widespread criminality has also compounded the other inadequacies of El Salvador's transition by overloading the judiciary and the PNC and eroding El Salvador's patience with human rights and due process.[101] While the crime wave has also added impetus to further reform of El Salvador's institutions, such as the judiciary and security forces, initiatives arising from these pressures have been condemned by some as representing a return to the repression typical of earlier times.[102]

Underlying the crime wave was the failure to address the social and economic imbalance that once provided FMLN with a promising recruitment base. In part, this failure relates to a lacuna in the accords, of which only 10 percent was devoted to socioeconomic reforms.[103] Accordingly, some observers have faulted the peace accord for reconciling two upper-middle class elites while excluding the El Salvadoran

---

[98]  Seelke, *El Salvador: Political, Economic, and Social Conditions,* p. 4.

[99]  Call, "Constructing the Rule of Law," p. 828.

[100] Mo Hume, "El Salvador: The Limits of a Violent Peace," in Michael Pugh, Neil Cooper, and Mandy Turner, eds., *Critical Perspectives on War-transformed Economies*, Basingstoke: Palgrave, 2008, pp. 327–328.

[101] Popkin, "Building the Rule of Law," p. 17.

[102] Hume, "El Salvador: The Limits of a Violent Peace," pp. 327–328. See also "El Salvador: Terrorism Law Misused Against Protesters," *Human Rights Watch*, July 30, 2007.

[103] Call, "Assessing El Salvador's Transition," p. 389.

PX716

people.[104] It is, however, difficult to see how the accords could have accommodated demands more ambitious than already included; given the combustible atmosphere in which the agreement was made, not much more could have been hoped for than the creation of an open and demilitarized political system that at least offered the opportunity for the required socioeconomic changes to be made over the long term.[105] More than the accords themselves, it is the subsequent failure to see these changes through that represents, in Call's words "the mugging of a success story."[106]

## Lessons Learned

El Salvador offers several lessons for future efforts to transition from war to peace. First, the case study illustrates once again that any rigid distinctions between "war" and "peace" do not accurately reflect the continuities that persist across these supposedly distinct phases. As Mats Berdal notes, "the formal end of armed conflict, especially if reached through a negotiated settlement, rarely entails a clean break from past patterns of violence, nor does it mean that the grievances which gave rise to conflict in the first instance have been entirely removed."[107]

One important lesson is that restraint of militias or paramilitary formations and the imposition of discipline on the military is essential to reaching a negotiated solution. Militias or paramilitary units supported by the military but operating without effective supervision by local authorities tend to extend insurgencies and undermine support for the government.

Second, the El Salvador case study illustrates the contributions that the UN, and the international community more broadly, can

---

[104] See Hume, "El Salvador: The Limits of a Violent Peace," p. 320.

[105] Stanley, "El Salvador: State-Building Before and After Democratisation," p. 109.

[106] Charles T. Call, "El Salvador: The Mugging of a Success Story," in Charles T. Call, ed., *Constructing Justice and Security After War*, Washington, D.C.: United States Institute of Peace Press, 2007.

[107] Mats Berdal, "Consolidating Peace in the Aftermath of War: Reflections on 'Post-Conflict Peace-Building' from Bosnia to Iraq," in John Andreas Olsen, ed., *On New Wars*, Oslo: Norwegian Institute for Defence Studies, 2007, p. 121.

PX716

make to the processes of peacemaking, peacekeeping, and peacebuilding. The efforts of the UN, in particular, and of the United States and its regional partners were manifold and wholly indispensable to the final agreement and to the implementation of subsequent reforms. Coordination among these actors was a force multiplier. It helped the UN muster the authority and leverage needed for the multifaceted responsibilities it chose to undertake.

Third, international assistance, no matter how well designed, can never carry a country from war to peace but must form part of a local political process. In El Salvador, the transition required a favorable alignment of international, regional, and domestic circumstances in the late 1980s. In the words of de Soto, the negotiations took place "almost in laboratory conditions."[108] Absent these conditions, the same actions by outsiders would have brought entirely different results.

Fourth, peace-building is a long-term process likely to encounter setbacks and delays. The peace negotiations in El Salvador lasted for two years; implementation dragged on for many more. It was therefore critical that ONUSAL maintained a presence until 1995, and was then replaced by various follow-on missions and finally by the UN's specialized agencies. Similarly, the transition benefited from the willingness of the United States to sustain its investment in peace beyond the conclusion of the 1992 agreement.

Fifth, the long duration of peace-building demands a mandate and skill set that can be adapted to suit the host nation's evolving requirements. In El Salvador, there was an initial, urgent need for public security that was not adequately met. Later in the transition, the mission required technical skills: judicial experts, human rights lawyers, and specialists in agrarian reform. Overall, these endeavors call for an ability to strengthen and complement the host nation wherever it is weak.

Sixth, while the role of the international community in securing peace is important, there are definite limits to what international assistance can bring. In El Salvador, the initial negotiations to end the war

---

[108]As cited in Nicole Ball and Tammy Halevy, eds., *Making Peace Work: The Role of the International Development Community*, Overseas Development Institute, Washington, D.C.: Johns Hopkins University Press, 1996, p. 12.

presented a fruitful opportunity for deep-rooted reforms. After this point, imposing change from outside became more difficult, as evidenced by the struggles throughout the 1990s to reform the judiciary.

Finally, the international community must be careful not to engender a dependence on external institutions and initiative. Ultimately, whether internationally sponsored reforms sink or swim will be up to local institutions. Counterintuitively, in seeking to ensure local compliance, the guaranteed and sustained commitment of outside actors can be counterproductive because the host nation is never required to take responsibility for the evolution of its own institutions. As the United States found in El Salvador, in these cases the threat of withdrawal can produce better results than continued assistance.

PX716

# The Tuareg Insurgency in Mali, 2006–2009

**Map of Mali**



SOURCE: CIA World Factbook.

**RAND** *MG1111/2-5.1*

## Introduction

### Background: Mali's North-South Divide

One of the largest countries in Africa, Mali is also one of the poorest, ranking 173rd out of 177 in the United Nations Development Programme's (UNDP) human development index.[1] Geographically, eth-

---

[1]    Based on 2005 data. UNDP (United Nations Development Programme), *Human Development Report 2007/2008*, New York, 2007, p. 232.

PX716

nically, linguistically, and even economically, Mali is broadly divided in two. The south of the country, where the capital city, Bamako, is located, has a subtropical climate, most of the country's farming and economic activities, and 80 percent of the population (mostly of Mande ethnicity). The north, which comprises the regions of Timbuktu, Gao, and Kidal, belongs to the Sahelian belt and, further north, to the Sahara.

The four main ethnic groups living in the north are broadly divided between nomadic (Tuaregs and Arabs) and sedentary (Songhai and Fula) people. The former have increasingly sedentarized over the past decades, both as a result of the modernization policy of the Malian government in the 1960s, which promoted farming over herding, and the severe droughts of the 1970s and 1980s that decimated the herds of cattle, sheep, and goats on which the nomads depended for their subsistence.[2] Increasing desertification and overgrazing have represented additional challenges to the nomads' traditional lifestyle.[3] In addition to these episodic hardships, northern Mali has remained less developed, in terms of infrastructure, than the rest of the country.[4] Until 1985, for instance, there was no tarmac road between Gao and Mopti, the next-largest town further south.[5]

This lack of infrastructure, as well as the sheer size of the country, contributes to further isolating a northern region that has long been politically remote from the south. Travelling by road from Bamako to Gao takes an estimated 35 hours; 4–5 days is a realistic travel time to

---

[2]   Baz Lecocq, "Unemployed Intellectuals in the Sahara: The Teshumara Nationalist Movement and the Revolutions in Tuareg Society," *International Review of Social History*, Vol. 49, Supplement S12, December 2004, p. 89; David Gutelius, "Islam in Northern Mali and the War on Terror," *Journal of Contemporary African Studies*, Vol. 25, No. 1, January 2007, p. 61.

[3]   Ann Hershkowitz, "The Tuareg in Mali and Niger: The Role of Desertification in Violent Conflict," ICE Case Study No. 151, The Inventory of Conflict and Environment (ICE), Washington, D.C.: American University, 2005.

[4]   Kalifa Keita, *Conflict and Conflict Resolution in the Sahel: The Tuareg Insurgency in Mali*, Strategic Studies Institute Report, Carlisle, Pa.: United States Army War College, 1998, p. 6.

[5]   Robin-Edward Poulton and Ibrahim Ag Youssouf, *A Peace of Timbuktu: Democratic Governance, Development and African Peacemaking,* Geneva: UNIDIR (United Nations Institute for Disarmament Research), 1998, p. 31.

PX716

reach Kidal.[6] An airline with unreliable and sporadic schedules connects Bamako to Timbuktu, the only city in the north with an airport. Because of this isolation, civil servants and technicians posted to the northern regions have often been reluctant to take their posts or never come at all, reinforcing the lack of economic and social services in these regions and the northern populations' feeling of living on the margins.[7]

As a consequence, the populations of northern Mali have historically been closer to the populations of southern Algeria or western Niger than to the rest of Mali. Relative socioeconomic deprivation and the distance from the capital have led the northern populations to establish their own economic networks. Northern Malians commonly procure basic consumer goods across the border from neighboring Algeria rather than obtaining them from Bamako.[8] This is even more so for goods that are subsidized in Algeria—and thus cheaper than their Malian equivalents—such as fuel, sugar, couscous, and milk. Informal trade in the region also includes higher-value "goods," such as cigarettes, weapons, drugs, and migrants from sub-Saharan Africa. Trans-Saharan routes have been used over centuries and are still to this day largely unregulated due to the remoteness of these areas and the inhospitality of the terrain for police and customs patrols. A sharp increase in smuggling activities can be traced to the droughts of the 1970s and 1980s, which forced pastoralist nomads to find other means of subsistence. Cross-Sahara smuggling routes were used extensively during the Tuareg rebellion of 1990–1996, providing the rebels with weapons, fuel, and vehicles. Recently, narcotics—especially cocaine

---

[6]  Macartan Humphreys and Habaye Ag Mohamed, "Senegal and Mali," in Paul Collier and Nicholas Sambanis, eds., *Understanding Civil War Africa: Africa Evidence and Analysis,* Volume 1: *Africa,* Washington, D.C.: The World Bank, 2005, p. 267.

[7]  Poulton and Ag Youssouf, *A Peace of Timbuktu,* p. 29.

[8]  Baz Lecocq and Paul Schrijver, "The War on Terror in a Haze of Dust: Potholes and Pitfalls on the Saharan Front," *Journal of Contemporary African Studies*, Vol. 25, No. 1, 2007, p. 159.

from South America—have been an increasing share of the cargos that are transported across the desert toward Europe.[9]

## A History of Contestation

The northern regions' relative isolation carries political implications. The north has long been considered a nest of dissent and separatism; the Tuaregs, in particular, have a history of contesting against the Malian state.[10] Indeed, long before Mali gained independence from France, the Tuareg north had a difficult relationship with the southern part of the country due to its isolation and the region's cultural ties to the other regions of the Sahara. Since its independence from France in 1960, Mali has experienced three Tuareg-led rebellions:[11] in 1962–1964, 1990–1996, and 2006–2009.[12] This track record of rebellions is critical to understanding current events in northern Mali because the key actors and the claims for which they fight tend to recur from one rebellion to the next.

In 1962, the Tuaregs, feeling excluded from the government of newly independent Mali and oppressed by its modernization policy that clashed with their traditional lifestyle, initiated a rebellion, which

---

[9]   2004 seems to have been the turning point for drug trafficking in Africa. According to the United Nations Office on Drugs and Crime (UNODC), the amount of cocaine seized in Africa jumped from 266 kg in 2003 to 1,788 kilograms the following year. In 2007, this figure reached 6,458 kg. See UNODC (United Nations Office on Drugs and Crime), *Drug Trafficking as a Security Threat in West Africa,* November 2008, p. 8.

[10]   For a detailed history and sociology of Malian Tuaregs and in particular the Kel Adagh tribal confederation, see Pierre Bouilley, *Les Touaregs Kel Adagh*, Paris: Karthala, 1999.

[11]   Although the words "rebellion" and "insurgency" have both been used in the media to describe Tuareg uprisings against the Malian state, "rebellion" is the one that was used almost exclusively by the participants themselves—whether on the rebels or the government side. The word "rebellion" is accordingly used most often in this chapter (phone interview with former MPA member and expert on North Mali, August 17, 2009; phone interview with Malian military official, August 18, 2009).

[12]   There were also Tuareg uprisings during the French colonization period, most notably in 1894 and 1916. Both were severely repressed by the authorities (Humphreys and Ag Mohamed, "Senegal and Mali," p. 254). Historically, Kidal has always been the epicenter of these contestation movements (Panapress, "Mali: La rebellion touarègue dans le Nord vue de Tripoli," May 21, 2008).

PX716

was brutally repressed by the Malian authorities. An estimated 1,000 Tuaregs were killed, and many fled the country toward Algeria and Libya, while the central government in Bamako put the three regions of Timubuktu, Gao, and Kidal under military administration.[13] The decades that followed saw a reinforcement of the political marginalization of Tuaregs and Arabs, with an administration and an army made up almost exclusively of Songhai.[14]

The second rebellion, which is also the most important one in terms of duration and number of actors involved, started in 1990. It was driven mainly by economic factors: The droughts of the 1970s and 1980s had impoverished and socially marginalized many Tuaregs, whose frustration was compounded by the fact that little of the drought relief funds handed to the Malian government ever reached them, due to high levels of corruption in the administration.[15] A number of Tuaregs who had migrated to Libya in the 1970s came back to Mali after the sharp decline in oil prices in the mid-1980s cost them their jobs. In June 1990, a small group of Tuaregs from the MPLA (Popular Movement for the Liberation of Azawad[16]) attacked a military outpost in Menaka (near the border with Niger), killing soldiers and capturing weapons.[17]

The Malian government, following its blueprint of the 1960s rebellion, declared a state of emergency in the northern region and responded to the Menaka attack with repressive measures against civilians—Tuaregs and Arabs alike. As a result, numerous Tuaregs, who previously had had little interest in politics and armed action, decided to join the rebellion. The Arab communities created their own armed

---

[13] Keita, *Conflict and Conflict Resolution*, pp. 10–11; Lecocq, "Unemployed Intellectuals," p. 89; Chérif Ouazani, "Priorité à la médiation," *Jeune Afrique,* September 10, 2008.

[14] Humphreys and Ag Mohamed, "Senegal and Mali," p. 274.

[15] Lecocq, "Unemployed Intellectuals," p. 89; Gutelius, "Islam in Northern Mali," p. 61.

[16] *Azawad* is the Tuareg-populated region that spans across northern Mali, southern Algeria, and northwestern Niger.

[17] Humphreys and Ag Mohamed, "Senegal and Mali," p. 247.

PX716

émovement, the FIAA (Arab Islamic Front of Azawad), which emerged out of the MPLA.[18]

Facing simultaneously a Turaeg-Arab rebellion in the north, whose first military actions were rather successful,[19] and an increasing movement for democratization in the south, Malian president Moussa Traoré, who had been presiding over a military dictatorship since overthrowing President Modibo Keïta in a coup in 1968, decided to accept Algeria's offer to serve as a mediator.[20] The Tamanrasset Peace Treaty of January 6, 1991, between the Malian government, the MPA, and the FIAA stipulated that the Malian army would reduce its presence in the north. It also gave more administrative and political powers to local actors and promised that sizable funds would be funneled to the north for development programs.[21]

The peace, however, was short-lived: Some elements of the army were hostile to the terms of the accord, which they saw as too favorable to the north, and continued to carry out attacks and abuses against the civilian population. Tuaregs and Arabs soon became equally unsatisfied with the accord, which was not implemented for lack of funding and failed to translate into any concrete improvement of their situation. The MPA split and gave rise to two new groups, the Popular Liberation Front of Azawad (FPLA) and the Azawad Liberation Revolutionary Army (ARLA).[22]

---

[18] The remainder of the MPLA became the MPA (Popular Movement for Azawad). See Poulton and Ag Youssouf, *A Peace of Timbuktu,* p. 56–57.

[19] Humphreys and Ag Mohamed note that "Militarily, […] the MPLA turned out to be strong. In one battle at Tuxemene in September 1990, the movement defeated the army with up to 200 troops lost on the government side. […] By the end of the year, the *maquis* comprised an estimated 3,000 fighters." ("Senegal and Mali," pp. 255–256.)

[20] Keita, *Conflict and Conflict Resolution*, p. 16. Traoré was deposed in a coup in late March 1991, and its democratic successors proved more prone to providing the Tuaregs with political reforms.

[21] Government of Mali, MPA and FIAA, "Communiqué de presse et texte des Accords de paix signés à Tamanghasset," January 6, 1991.

[22] Humphreys and Ag Mohamed, "Senegal and Mali," p. 257. FPLA is the "Front Populaire pour la Libération de l'Azawad" and ARLA is the "Armée Révolutionnaire pour la Libération de l'Azawad."

PX716

On April 11, 1992, all parties eventually signed a "National Pact" whose provisions differed little from those of the Tamanrasset accord but this time included a timetable for implementation. [23] Its two major problems, however, were lack of funding to support its implementation and the fact that sedentary populations were not consulted and felt excluded from the accord.[24] Violence resumed once again, and this time included inter-ethnic violence between the Tuareg groups and the Arab FIAA, as well as between the Tuareg and Arab groups on one side and the Patriotic Movement of the Ganda Koy—a self-defense militia created by the Songhai and Fula population—on the other.[25] The conflict eventually petered out around 1995: the FIAA was militarily defeated by the army and the Tuareg groups, the ARLA disappeared when most of its members decided to join the MPA and the FPLA, and the FPLA decided to start negotiating with the Ganda Koy.[26] On March 27, 1996, in Timbuktu, 3,000 weapons were publicly burned in a ceremony known as the Flame of Peace. Close to 12,000 former Tuareg rebels were integrated into the Malian armed forces or the administration.[27]

When Tuaregs took up arms again in 2006, many elements of the new insurgency were reminiscent of the 1990s rebellion. To a large extent, the main actors involved were the same, and the claims for which they fought had barely changed since the signing of the National Pact. The rebellion covered three years, from 2006 to 2009, but is best understood as comprising two main phases interrupted by almost a year of respite. During the first phase, from May to July 2006, a Tuareg

---

[23] Government of Mali, "Pacte national conclu entre le gouvernement de la République du Mali et les mouvements et fronts unifiés de l'Azawad consacrant le statut particulier du Nord Mali," April 11, 1992.

[24] Humphreys and Ag Mohamed, "Senegal and Mali," p. 258.

[25] Humphreys and Ag Mohamed, "Senegal and Mali," p. 258. *Ganda Koy* means "the masters of the land" in Songhai. For more on the Ganda Koy, see Poulton and Ag Youssouf, *A Peace of Timbuktu,* pp. 71–72.

[26] Humphreys and Ag Mohamed, "Senegal and Mali," p. 260.

[27] IRIN (Integrated Regional Information Networks), "Mali-Niger: Insecurity Persists Despite Militia Leader's Arrest," September 29, 2008.

PX716

group, the May 23, 2006, Democratic Alliance for Change (Alliance Démocratique du 23 mai pour le Changement or ADC), started nego-tiating with the government almost immediately after its first attacks and signed a peace agreement under the mediation of Algeria within three months. Less than a year later, a splinter group from the ADC, the Niger-Mali Tuareg Alliance (ATNM), resumed fighting. The ending of this second phase came in February 2009 when the ATNM incurred major losses, the group split, and its leader fled the country.

## Phase 1: The ADC Rebellion, May–July 2006

### Introduction: Brief History of the Conflict Leading Up to the Period of Transition

On May 23, 2006, 150 Tuareg officers and soldiers billeted in the mili-tary posts of Kidal and Menaka deserted their bases with their weapons and army vehicles.[28] The Menaka garrison was a highly symbolic place to attack, for that is where the 1990 rebellion started. This event had been preceded, a few months earlier, by the desertion of a well-known figure of the 1990s rebellion, Lieutenant-Colonel Hassan Fagaga, who left his military post in Bamako and retreated to the area north of Kidal with a few men he had recruited.[29]

The deserters called themselves the May 23, 2006 Democratic Alliance for Change (ADC) and quickly let the Malian government know what their demands were: an increased level of autonomy for the northern regions and a more equitable distribution of national resources in order to contribute to the development of the north. Such claims were almost exactly identical to those brought during the 1990s

---

[28] RFI (Radio France Internationale), "Les Touaregs rebelles veulent négocier," May 24, 2006. For a detailed account of the Kidal attack by Hassan Fagaga, see Mustapha Benfodil, "Interview of Hassan Fagaga: 'Il faut un statut particulier pour Kidal,'" *El Watan* (Algiers), June 24, 2007, p. 6.

[29] Zaïre Djaouane, "Les insurgés attendent une médiation étrangère," Afrik.com, May 29, 2006; Evariste Ouédraogo, "Désertion du colonel Fagaga de l'armée malienne: Ne réveillez pas la rébellion qui dort!" *L'Observateur Paalga* (Ouagadougou), February 21, 2006; Benfo-dil, "Interview of Hassan Fagaga."

PX716

Tuareg rebellion; they were fueled by a feeling of frustration borne out of the perceived delays in the implementation of the 1992 National Pact.[30] The main figures of the ADC were Tuaregs who had taken part in the 1990s rebellion. The ADC leader, Iyad Ag Ghaly, was the former leader of the MPA, and his military chief, Fagaga, had been a key member of the same group.[31]

**Strategy (Pre-Transition)**

**Incumbent.** For the Malian government, the history of successive rebellions and how they had been dealt with by previous leaders represented a considerable learning opportunity. Accordingly, the government's counterinsurgency strategy benefited from the lessons of what had worked and what had failed ten years earlier. The main lesson the Malian government had learned in the 1990s was that a repressive policy against the civilian population bred support for the rebellion rather than deterring it. But when the government agreed to negotiate and came up with a peace accord, civilians tended to withdraw their support to the rebels.[32] Another lesson from the 1990s was that, with the wrong strategy, the conflict could quickly intensify and spread to other categories of the population besides the Tuaregs.

These considerations may explain why, after the initial attacks, the immediate reaction of the Malian government followed two lines: appeasement and containment. President Amadou Toumani Touré called for dialogue with the mutineers; he also asked the population to stay calm and to not confuse the rebels with the rest of the Tuareg community.[33] Army spokesman Colonel Abdoulaye Coulibaly made

---

[30] *Jane's World Insurgency and Terrorism*, "Malian Tuareg Groups," August 12, 2009.

[31] *Jane's,* "Malian Tuareg Groups."

[32] Lecocq, "Unemployed Intellectuals," p. 107. Or, as a military official put it: "We found out in the 1990s that a military solution is never final. It is the political solution that is most durable" (interview with Malian military official, August 18, 2009).

[33] "Déclaration à Diéma du Président Amadou Toumani Touré sur la situation à Kidal," quoted in Mohamed Sacko, "Attaques rebelles à Kidal : l'armée sécurise la zone," web site of the Ministry for Expatriate Malians and African Integration (*ministère des Maliens de l'extérieur et de l'intégration africaine*), May 23, 2006. President Touré's crisis management

clear that the army would not reiterate the mistakes of the 1990s and publicly stated that "The Malian army, who perfectly controls the situation in Kidal and the surrounding areas, did not allow itself to be caught in the rebels' trap. They thought that the regular forces would react indiscriminately against Tuaregs and incite other [Tuaregs] integrated [in the army] to leave the ranks to join the rebellion. Obviously, this plan did not work. . . . Currently we can say that the Malian army has the city of Kidal and its surrounding areas completely safe without harming anyone."[34] Beyond appeasement and containment, however, President Touré also prepared for the worst by sending additional troops from Bamako, Mopti, and Gao toward Kidal.[35]

**Insurgent.** The main request of the ADC was the implementation of the 1992 National Pact that had not, ten years later, been fully carried out.[36] In particular, they wanted a lesser presence of the army in the north and more development funds.[37] Some of the soldiers who had deserted also accused the army, into which they had been integrated as a result of the peace accord, of discriminating against them—limiting their professional advancement and even the supplies to which they had access.[38]

The ADC, to a large extent, followed the same containment policy as the government. They did not attempt to rally other Tuaregs (such as those living in Niger) or other nomadic populations (such

---

was also very much in line with his leadership style, which is centered on negotiation and coalition-building.

[34]  Sacko, "Attaques rebelles à Kidal."

[35]  RFI, "Les Touaregs rebelles."

[36]  Lecocq and Schrijver, "The War on Terror in a Haze of Dust," p. 155.

[37]  Abdoulaye Tamboura, "Le MNJ et la crise d'identité des sociétés touarègues," in "Crises touarègues au Niger et au Mali," roundtable organized by IFRI (Institut Français de Relations Internationales), November 27, 2007.

[38]  Chahana Takiou, "Situation dans la région de Kidal: une paix à consolider!" *L'Indépendant* (Bamako), February 19, 2009. The populations of the north harbor contradictory feelings toward the army.

PX716

as the Arabs) to their cause.[39] There was no consideration, either, of attempting to collaborate with the Mali-based cells of al Qaeda in the Islamic Maghreb (AQIM), which has represented a new actor in the region since the rebellion of the 1990s. At its highest, the ADC had up to 1,000 members,[40] but they were generally restricted to the Ifoghas tribe, which is mostly present in the Kidal region; other tribes and regions remained largely outside of the rebellion.[41] Within a few days, the ADC requested negotiations with the government.

**External Powers Supporting Belligerents.** *Algeria.* Algeria has long been, and remains, a key actor in northern Mali. The geographic proximity between northern Mali and southern Algeria and the porosity of the border have resulted in their respective populations engaging in frequent exchanges and trade relationships. Algeria has had a sustained record of diplomatic involvement in the disputes that arose between the Malian Tuaregs and Bamako. Both the 1991 Tamanrasset agreement and the 1992 National Pact were negotiated under its auspices.

In May–July 2006, when Algeria was called to act as a mediator between the Malian government and the ADC, it reportedly put two conditions to its involvement: a commitment from the ADC not to involve other Tuaregs in the dispute, in particular those from Niger, and a pledge that the ADC would not seek autonomy or independence.[42] The interests of the Algerian government were therefore perfectly in line with those of the Malian government: to contain the crisis and to avoid disintegration of the state in the region.

---

[39] Iyad Ag Ghaly apparently considered that the rebellion was an internal issue that should be confined to Malian Tuaregs (phone interview with Fihouroun Maiga, former Ganda Koy combatant and expert on North Mali, September 1, 2009).

[40] *Jane's,* "Malian Tuareg Groups."

[41] Tamboura, "Le MNJ et la crise d'identité des sociétés touarègues"; phone interview with Malian journalist, August 14, 2009. This alignment of rebel groups with tribal confederations is not unusual. During the 1990s rebellion, the MPLA was largely composed of Kel Adagh, while the FPLA drew support from the Chemenammas tribe (Humphreys and Ag Mohamed, "Senegal and Mali," p. 282).

[42] Ouazani, "Priorité à la médiation."

**The GSPC.** One reason why the crisis in northern Mali received more international attention than it had in the 1990s is the emergence of a new local actor: the Salafist Group for Preaching and Combat (GSPC) and its Saharan cells. The GSPC is a splinter group of the Armed Islamic Group (GIA), a radical Islamist group that was particularly active during the Algerian civil war of the 1990s. The GSPC pledged allegiance to Al Qaeda and renamed itself Al Qaeda in the Islamic Maghreb (AQIM) in January 2007. Among the emirs of the GSPC, some are more ideologues and others more opportunistic; overall, it is often difficult to distinguish between Muslim fundamentalists and traffickers, the two categories largely overlapping.[43] The activities of the GSPC in the Sahara came to public attention in 2003 when one of its emirs, Abderrazak el-Para, kidnapped 32 European tourists and reportedly reaped a € 5 million ransom for their release.

After more than ten years sharing the same territory, GSPC/AQIM members and local nomadic tribes (mainly Arabs, but also Tuaregs) have developed business and, in some cases, family relationships, especially in the Timbuktu region.[44] Not only do the two groups occasionally compete for the control of smuggling networks, but the activities of the GSPC/AQIM—such as the kidnapping of Westerners—also risk attracting unwanted local and international attention on the informal trade that still represents the basic livelihood of many families in the region.[45] Tuaregs have also complained that the GSPC/AQIM represents a risk to their communities—imposing a much more fundamentalist approach to religion and an ideology that differs radically from their traditional way of life.[46]

---

[43] *Jane's Intelligence Digest*, "Mali Peace Accord Could Counter AQMI's Reach," March 2, 2009.

[44] Ali Lmrabet, "Mali: Al-Qaida veut séduire les Touaregs," *Courrier International* (originally published in *El Mundo*, Madrid), October 9, 2008; phone interview with Malian journalist, August 14, 2009.

[45] Anneli Botha, *Terrorism in the Maghreb: The Transnationalisation of Domestic Terrorism*, ISS monograph No. 144, June 2008, p. 195; *Jane's Intelligence Digest*, "Mali Peace Accord."

[46] *Jane's Intelligence Digest*, "Mali Peace Accord."

PX716

The ADC publicly denied having any link with the GSPC.[47] Eglasse Ag Idar, a spokesman for the ADC, also denied that the Tuaregs were in any way receptive to GSPC ideas, stating instead that "Our Democratic Alliance handles security in the region and we chase out those who are not from there, that's the position we've taken to control the zone."[48] The two groups clashed militarily on at least two occasions. A leader of the GSPC was reportedly killed and three Tuaregs were wounded in a firefight that took place northwest of Kidal on September 19, 2006.[49] This was followed a month later by a revenge attack from the GSPC in which nine Tuaregs were killed, several of them injured, and two taken prisoners.[50] According to one media source, the clashes happened in retaliation for the GSPC's trying to recruit Tuaregs.[51]

**The Transition Period**

Unlike past Tuareg insurgencies, the conflict ignited by the ADC moved very quickly toward a resolution.

For the government, it was clear that the rebels were not interested in protracted fighting. The ADC asked for negotiations immediately after the Kidal and Menaka incidents, and it did not engage in further attacks after that.[52] This suggests either that the group did not have much of a military plan or that its objective was to put pressure on the government to advance a political agenda rather than to achieve military victories. In an interview he gave almost a year later, Fagaga confirmed this point: "If we had wanted war for war itself, we would have repeated our attacks and locked all ways toward dialogue—which

---

[47] "Démenti pour toute connexion de notre mouvement avec le GSPC," *Azawad-Union* blog, June 9, 2006.

[48] *Reuters*, "Mali Tuaregs Say Algerian Militant Killed in Clash," October 1, 2006.

[49] *Reuters*, "Mali Tuaregs."

[50] *Reuters*, "Algerian Militants Ambush Malian Tuaregs, Kill 9," October 24, 2006.

[51] *Reuters*, "Algerian Militants Ambush Malian Tuaregs."

[52] Phone interview with Fihouroun Maiga, former Ganda Koy combatant and expert on North Mali, August 11, 2009.

PX716

we did not. We thought of this attack [in Kidal and Menaka on May 23, 2006] as a warning."[53]

The ADC, however, refused to speak directly with the Malian government, which it distrusted, and expressly requested a foreign mediator. Fagaga told a journalist that "there were four candidates: the United States, France, Libya, and Algeria."[54] The Malian government chose Algeria, which became the lead mediator in the crisis.[55]

**Managing the Transition**

With negotiations under way, the conflict seemed circumscribed. Abdelkrim Ghrieb, Algerian ambassador to Mali, helped the two parties (represented by Minister of Territorial Administration General Kafougouna Koné for the Malian government and Iyad ag Ghaly for the ADC) reach a peace agreement, which was signed in Algiers on July 4, 2006.

The Algiers Accord granted the Tuaregs more development funds, with Bamako pledging to funnel $2 million to the north for that purpose.[56] It specified a list of infrastructure projects that would be built in the region. It also recognized the specificity of the northern regions and promised a quickening of the devolution of power toward local institutions. The rebels who had deserted were allowed back into the army, which would largely evacuate the north. In exchange, the Tuaregs pledged not to seek political autonomy, and reintegrated rebels would return the weapons they had seized from the Malian security forces.[57]

The Algiers Accord provided for the reintegration of ADC ex-combatants not just into the Malian army but also within the Special Units, where they would be mixed with Malian soldiers. These units,

---

[53] Hassan Fagaga, quoted in Benfodil, "Interview of Hassan Fagaga." Author's translation.

[54] Hassan Fagaga quoted in Benfodil, "Interview of Hassan Fagaga."

[55] Benfodil, "Interview of Hassan Fagaga."

[56] IRIN, "Mali: Civil Society Cautiously Optimistic About Prisoner Release," September 10, 2008; Chérif Ouazani, "Priorité à la médiation."

[57] BBC, "Tuareg rebels in Mali Peace Deal," June 30, 2006; Government of Mali, "Accord d'Alger pour la restauration de la paix, de la sécurité et du développement dans la région de Kidal," July 4, 2006.

PX716

to be "composed essentially of elements originating from nomadic regions," included many former combatants and were tasked with basic security and patrolling roles in the north.[58] More than 400 new recruits were planned to join these Special Units, which were put under the commandment of Hassan Fagaga.

The brief rebellion of 2006 was a winning game for both the government and the ADC. Bamako solved a crisis that could have turned into a civil conflict within a matter of weeks, and secured its prime interest: the preservation of the country's territorial integrity, with the ADC renouncing any claim to political autonomy. President Touré gained direct political benefits from his appeasement strategy: support from Tuareg leaders in the presidential elections that took place on April 29, 2007, allowed him to win with a large majority.[59] The Tuaregs successfully brought to the government's attention the problems they were facing in the north and, more generally, their frustration that most of the provisions of the 1992 National Pact had not been implemented. They quickly obtained the negotiations they asked for, and their main grievances were addressed in the Algiers Accord.

The leaders of the rebellion were either reintegrated into the army or given prominent positions. Ag Ghaly and Bahanga became members of the *Haut Conseil aux collectivités* (the Malian senate).[60] In 2007, Ag Ghaly was appointed Consul of Mali in Saudi Arabia, and his deputy Amada Ag Bibi was elected a representative to Mali's National Assembly.[61]

For a few months, the crisis seemed resolved. On March 8, 2007, the weapons of more than 2,000 former combatants were collected,

---

[58]  Government of Mali "Accord d'Alger," Chapter III, § 4. AFP, "Joint Malian-Tuareg Commission to Prepare New Round of Talks," August 20, 2008; *Jeune Afrique*, "Le casse-tête des unités spéciales," February 23, 2009.

[59]  Tiemoko Diallo, "Tuareg Rebels Attack Police Post in Northeast Mali," *Reuters*, May 11, 2007.

[60]  *El Watan* (Algiers), "Les rebelles touareg attaquent Tinzaouatène," September 14–15, 2007, p. 12.

[61]  Panapress, "Mali: La Rebellion"; *Jane's Intelligence Digest,* "Mali Peace Accord."

PX716

and their owners were billeted in Kidal.[62] Two weeks later, a large donor meeting (the "Forum de Kidal," planned for in the Algiers Accord) took place, with the objective of gathering international contributions to fund a $1.1 million, ten-year development plan for the region.[63]

Overall, Bamako transitioned out of the counterinsurgency by pursuing a number of measures that were all aimed at promoting national reconciliation. The government

- addressed the grievances of the ADC by granting its two main requests (a lesser military presence in the north and a larger share of national financial resources)
- built confidence within the northern communities by refraining from forcible disarmament
- increased the role of local actors in securing the north
- integrated the rebel leaders into the national political apparatus
- quickly followed through on some of its most essential promises, such as making resources available for the development of the northern regions.

In exchange, the Malian government obtained the promise that Malian territorial integrity would not be challenged by the ADC. The situation reverted to normal, but this peaceful transition lasted only a few months. What the government could not prevent was a schism in the ADC and the emergence of an unyielding minority that denounced the Algiers Accord and took up arms again.

---

[62] Chérif Ouazani, "Rebellion au Nord du Mali: Les dessous d'une attaque," *Jeune Afrique*, May 20, 2007.

[63] Ouazani, "Rebellion au Nord du Mali." See Conclusions et recommandations du forum de kidal pour le developpement des régions nord du Mali, Kidal, les 23 et 24 mars 2007.

PX716

## Phase 2: The ATNM Rebellion (May 2007–February 2009)

### Introduction: Brief History of the Conflict Leading Up to the Period of Transition

The peace was short-lived. Bahanga had only half-heartedly accepted the Algiers Accord and, less than a year later, founded a new group, the Niger-Mali Tuareg Alliance, and attacked a Malian security post in Tin-Zaouatène, near the Algerian border, on May 11, 2007. This attack was deadlier for the rebels than for their victims, because eight men out of the ten who were killed belonged to their ranks, but it marked the beginning of a new insurgency. On August 26, 2007, another ATNM attack in the Tedjeret region resulted in the kidnapping of 60 soldiers.[64]

Unlike the ADC, the ATNM reportedly had links with trafficking networks active in the region,[65] as well as with the Niger's Movement for Justice (MNJ), a Tuareg group involved in a rebellion against the government of Nigerien President Mamadou Tandja. The Tin-Zaouatène attack of May 2007 was reportedly conducted with the help of Nigerien Tuaregs.[66] It is unclear whether this alliance was born out of commitment to a pan-Tuareg ideology or if it was mainly opportunistic and represented a way for Bahanga to make up for his lack of manpower.[67] The latter interpretation is more consistent with the fact that, overall, only a small fraction of the MNJ fought alongside Bahanga, and only for a short period of time.

### Strategy (Pre-Transition)

**Incumbent.** Initially, the strategy of the Malian government was very similar to the one it had pursued with the ADC. This strategy was fourfold: (1) to isolate the rebels and avoid contagion; (2) to avoid antagonizing neutral Tuaregs; (3) to pursue a diplomatic track with the

---

[64] *El Watan*, "Qui est Ibrahim Bahanga?" September 14–15, 2007, p. 12; BBC, "Mali Boosts Army to Fight Tuareg," September 18, 2007.

[65] *Jane's World Insurgency and Terrorism*, "Malian Tuareg Groups."

[66] Diallo, "Tuareg Rebels Attack Police Post."

[67] Ouazani, "Rebellion au Nord du Mali."

PX716

help of Algeria and Libya; and (4) to keep a low level of military pressure on the insurgents.

The government attempted to separate those members of the ADC who supported the Algiers Accord from Bahanga's followers.[68] Its attitude toward Bahanga was very different from what it had been toward the ADC. From the very beginning, the government presented Bahanga as a drug smuggler and a bandit, claiming that he did not have any legitimacy speaking for the Tuaregs.[69] A ministry of defense spokesman called members of the ATNM terrorists rather than rebels.[70] After the Nampala attack of December 2008 (see below) Malian authorities described those responsible as "an armed gang linked to drug traffickers."[71] One interpretation of Bahanga's rationale for fighting was that he was trying to get the army to withdraw from the Tin-Zaouatène area, a move that would allow him to carry out smuggling activities undisturbed. Rather than acting for the common good of the Tuareg people, Bahanga was accused of trying to secure a sanctuary for his business interests[72]—an interpretation supported by several Malian and Western sources.[73]

---

[68] AFP, "Mali: 'Pas de trêve' dans les combats contre le group rebelle d'Ag Bahanga," February 3, 2009.

[69] IRIN, "Mali: Indignation Dominates Reaction as Attacks in North Escalate," August 31, 2007. ADC members were first called "deserters" and then "rebels" by the Malian government, but never (at least publicly) "bandits" (phone interview with former MPA member and expert on North Mali, August 17, 2009).

[70] Voice of America, "Analyst Says Mali Troop Buildup Raises Risk for Renewed Violence," October 22, 2007.

[71] Quoted in BBC, "Tuareg Rebels Raid Mali Army Base," December 20, 2008.

[72] BBC, "Mali Boosts Army to fight Tuareg." Army Chief of Staff Colonel Gabriel Poudiougou described the conflict as "part of a battle for control over lucrative smuggling routes across the Sahara for goods such as cigarettes. 'It is a struggle of interests between traffickers, that's how it has to be understood'" (Colonel Poudiougou, quoted in *Reuters*, "Interview—Mali Counts on Negotiation, Not Force with Rebels," November 17, 2006).

[73] *Jane's Intelligence Digest*, **"Mali Peace Accord"; phone interview with a Malian journalist**, August 14, 2009; see also interview of Head of United Nations Office on Drugs and Crime (UNODC) bureau in West and Central Africa Antonio Mazzitelli in Pascal Fletcher, "Interview—West Africa Is Crime, Terrorism 'Black Hole'—UN Expert," *Reuters*, January 13, 2008.

PX716

In what appears as another attempt to discredit the rebels, the Malian government accused the ATNM of having links with AQIM and of having participated in the kidnapping of four Western tourists in January 2009.[74] Bahanga formally denied the claim and described his group's relations with AQIM as one of "war" in an interview to Algerian newspaper *El Khabar*, stating that "their cause is not ours."[75]

The Malian government's effort at attempting to isolate Bahanga within the Tuareg community paid off. Malian army spokesman Colonel Abdoulaye Coulibaly told Reuters that members of the ADC were helping soldiers hunt down those who had attacked the Tin-Zaouatène post.[76] The ADC, in fact, had publicly condemned the May 2007 attack. Moderate Tuaregs not only helped militarily, but also diplomatically. In September 2007, Tuareg elders undertook to negotiate with Bahanga on behalf the Malian government.[77]

Avoiding a spread of the crisis also required that other ethnic or political groups be kept out of the fighting. This became a pressing issue for the Malian government when a Fula and Songhai militia group, the Ganda Izo (meaning "the sons of the land" in Sorhaï), emerged in 2008 in the Gao area.[78] Presented by its instigators as a self-defense movement against cattle raiding and acts of violence committed by Tuaregs, the Ganda Izo was the natural successor of the Ganda Koy movement that had taken part in the 1990s rebellion on the side of the government.[79] Contrary to the Ganda Koy, however, the Ganda Izo was not well-structured, and probably never counted more than

---

[74] *El Watan*, "Des rebelles touaregs pénètrent en Algérie," February 7, 2009.

[75] *El Khabar* (Algiers), "Brahim Ag Bahanga: 'Le Gouvernement malien n'a fait aucune concession,'" July 26, 2008.

[76] Diallo, "Tuareg Rebels Attack Police Post."

[77] BBC, "Mali Boosts Army to fight Tuareg."

[78] "Ganda-Izo" can also be found with the spelling "Gandaiso."

[79] Abdoulaye Diakité, "Conflit intercommunautaire à Ansongo: Que veut réellement le leader du mouvement 'Gandaïso'?" *L'Indicateur Renouveau* (Bamako), June 26, 2009.

PX716

100 members.[80] The Malian army did not back or arm the Ganda Izo, unlike what it had done with the Ganda Koy in the 1990s.[81]

The Malian government started negotiating promptly with the ATNM, but its mediation effort differed in one major way from the one it had pursued with the ADC: Bamako never intended to sign an "encore Algiers Accord" with the ATNM. The existing Algiers Accord had already raised much criticism from the army and the population in the south, who thought that too many concessions had been made to the rebels while the full application of the National Pact could have sufficed.[82] The government's objective was to get Bahanga to cease the fighting but without making any additional concessions in exchange. Combined with a military strategy that remained largely defensive— no effort was made, for instance, to attack the logistics base of the ATNM—this policy effectively gave Bahanga the initiative. His sudden stepping down was the only way the conflict would stop, but the government offered him no incentive—whether carrot or stick—to do so.[83]

**Insurgent.** Sources differ on how many combatants the ATNM could claim, with estimates ranging from 100 to 1,000.[84] Bahanga himself claimed to have 3,000 Malian Tuaregs following him.[85] The ATNM's tactics consisted in taking civilian and military hostages, as well as conducting attacks against military posts.

Ibrahim Bahanga's motivations for reverting to military action after the Algiers Accord are unclear. To the Malian newspaper *L'Indépendant* he claimed that the way the Algiers Accord was applied

---

[80] Tiemoko Diallo, "Niger Arrests Mali Militia Leader After Killings," *Reuters*, September 27, 2008; phone interview with a Malian journalist, August 14, 2009.

[81] See, for instance, Keita, *Conflict and Conflict Resolution,* p. 20.

[82] Phone interview with Malian military official, August 18, 2009.

[83] Phone interview with Malian military official, August 18, 2009.

[84] *Jane's World Insurgency and Terrorism,* "Malian Tuareg Groups"; phone interview with Malian journalist, August 14, 2009; phone interview with Fihouroun Maiga, former Ganda Koy combatant and expert on North Mali, August 11, 2009.

[85] *El Khabar* (Algiers), "Brahim Ag Bahanga: 'Le gouvernement malien n'a fait aucune concession.'"

PX716

was "not normal," arguing that there was a "reinforcement of the military deployment in the area, security posts were created, and houses were searched."[86] The deployment of military units in the north may have been perceived as an infringement on the Algiers Accords, which provided for a reduction of the military presence in the northern regions.[87] ATNM spokesperson Hama Ag Sidahmed also cited the lack of implementation of the Algiers Accord as the reason why Tuaregs were taking up arms again, adding that the ATNM's objectives were to get the governments of Mali and Niger to "accept" that "Tuareg regions obtain a complete autonomy that takes into account all [their] particularities."[88]

The ATNM's requests differed little from the ADC's, except that its main focus was the complete evacuation of the northern regions by the army. The Malian government refused to give in to the ATNM's demands, arguing that this would create a no-law zone and allow all trafficking activities, in particular drug trafficking, to prosper in that region.[89]

Like the ADC before it, the ATNM quickly asked for negotiations. In September 2007, ATNM spokesman Ag Sidahmed claimed that the 2006 Algiers peace process had been concluded "too fast" and that the provisions of the accord had either not been implemented or were changed unilaterally by the Malian government; accordingly, the ATNM requested new negotiations.[90] At the same time, repeated attacks against military posts and convoys suggest that the group was

---

[86] Ibrahim Bahanga in *L'Indépendant*, August 30, 2007 (quoted in *El Watan*, "Pourquoi les troubles ont repris?" September 14–15, 2007). Author's translation.

[87] Panapress, "Mali: La Rebellion."

[88] Naima Chekchak, "La Nouvelle Alliance Touareg du Niger et du Mali (ATNM)," Occitan-Touareg blog, September 9, 2007.

[89] AFP, "Crise au Nord-Mali," December, 28, 2008. A 750-kg shipment of cocaine was intercepted by the Malian police near the northern town of Tin-Zaouatène in January 2008, after a firefight with the traffickers (*Reuters*, "Mali Seizes 750 kg Cocaine After Saharan Gunfight," January 3, 2008).

[90] Chekchak, "La Nouvelle Alliance Touareg du Niger et du Mali (ATNM)."

PX716

also trying to put the Malian government under military pressure to gain leverage in future negotiations.

**External Powers Supporting the Belligerents.** Algeria returned to its mediating role when the new rebellion broke out, and was at one point replaced in this effort by Libya. Other key external actors during the ATNM rebellion were Niger and, to a lesser extent, the United States.

*Algeria.* The second phase of the rebellion was marked by a series of negotiations leading to truces that were quickly broken. After the attacks of July 2007, the ATNM and the Malian army agreed on August 31 to a ceasefire after a mediation in which Iyad Ag Ghaly took part.[91] The ATNM pledged to cease attacks and kidnappings.[92] This ceasefire was broken two weeks later, when the ATNM attacked a Malian army position near Tin-Zaouatène. In early September 2007, Algeria was asked officially by the Malian government to become once again the lead mediator in the crisis. New talks, again mediated by moderate Tuaregs and Algeria, led in mid-September 2007 to a new truce.[93]

Algeria suspended its mediation efforts for a few weeks in early 2008, reportedly in reaction to the arrival of Libya in the negotiations, and to critics in the Malian media accusing President Abdelaziz Bouteflika of not making sufficient efforts to help obtain the release of hostages, some of whom were thought to be on Algerian soil.[94] Algeria, however, agreed to resume its efforts in May, after Libya's failure to secure a longer-lasting truce than Algeria and a particularly murderous attack on Abeïbara, where ten soldiers lost their lives. Violence resumed again in December 2008, when members of the ATNM attacked an army post in Nampala.[95]

---

[91] *El Watan* (Algiers)*,* "Les troubles dans le nord du Mali en 2007," September 14–15, 2007.

[92] *El Watan*, "Les rebelles touareg."

[93]  BBC, "Mali's Tuareg Rebels Agree Truce," September 19, 2007.

[94] Ouazani, "Priorité à la médiation"; *El Watan*, "Crise malienne: l'Algérie reprend la médiation," May 25, 2008; phone interview with Fihouroun Maiga, former Ganda Koy combatant and expert on North Mali, August 11, 2009.

[95] BBC, "Tuareg Rebels Raid Mali Army Base."

PX716

*Libya.* Libya represents the other major powerbroker in the region, along with Algeria. Like Mali, Algeria, and Niger, Libya has a Tuareg population that is mostly located in the southwestern corner of the country. Libya's leader Mu'ammar Qadhafi has long presented himself as a defender of the Tuareg cause. During the 1970s and 1980s, many Tuaregs migrated to Libya, mainly for economic reasons. Qadhafi also promised Tuaregs—in Mali and elsewhere—to help them in their fight against their respective central governments.[96] Many young Tuaregs benefited from Libyan military training, and first used their skills in Qadhafi's expeditionary corps (the "Islamic Legion") before putting them at use in their own country.[97] Many of the actors in the rebellion of the 1990s returned from Libya with experience of sustained fighting gained with the Legion, including in Lebanon and Chad.[98] During the Tuareg rebellion of the 1990s, Qadhafi was present at the negotiation table—along with Algeria and Niger—after President Traoré eventually decided to search for a mediated solution. The Libyan leader famously showed up to the meeting wearing the traditional Tuareg dress.[99] Qadhafi's involvement with the Tuareg cause has allowed him to become a central actor in the Sahelian region.[100] Libya's interest in North Mali is also evidenced by its opening of a consulate in Kidal in early 2006, which it closed only a few months later in an effort to back its official claim that Tripoli had no involvement in the rebellion.[101]

---

[96] Humphreys and Ag Mohamed, "Senegal and Mali," p. 255.

[97] Other Tuaregs were incorporated in Libya's regular army (Keita, *Conflict and Conflict Resolution,* p. 13).

[98] Humphreys and Ag Mohamed, "Senegal and Mali," p. 255.

[99] Tor A. Benjaminsen, "Does Supply-Induced Scarcity Drive Violent Conflicts in the African Sahel? The Case of the Tuareg Rebellion in North Mali," *Journal of Peace Research*, Vol. 45, No. 6, 2008, p. 830.

[100] Libya's influence in Northern Mali is also important on the religious front: the Libyan World Islamic Call Society (WICS) occupies an important place in the region alongside other missionary Muslim movements such as the Da'wa (backed by Saudi Arabia) and the Da'wa al-Tabligh (backed by Pakistan). On this point, see Gutelius, "Islam in Northern Mali," p. 72, n. 7.

[101] Sacko, "Attaques rebelles à Kidal." This claim was backed later by Bahanga himself, who claimed that the sole source of weapons procurement for his group was their attacks against

Libya was nevertheless involved diplomatically, becoming lead mediator in early 2008. On April 2, a truce was signed in Tripoli.[102] The ATNM promised to release more than 30 prisoners,[103] and the Malian government agreed to reduce its military presence in the north.[104] Libya also promised to provide some development assistance to the region.[105]

**Niger.** Niger's Tuareg issue is, to a large extent, very similar to Mali's. Niger's northern regions are home to Tuareg communities who have taken part in several armed rebellions over the past decades, including a large-scale one in the 1990s that was concluded by a peace agreement mediated by Burkina Faso and whose provisions mirrored closely what the Malian Tuaregs had achieved through the Tamanrasset Accord and the National Pact. 2007 saw a resurgence of Tuareg unrest in Niger.[106] In February, a Tuareg group calling itself the Niger Movement for Justice, led by Aghaly ag Alambo, launched an attack against the town of Iferouane, near Agadez (460 miles northeast of the capital Niamey). As in Mali, Tuaregs complained that their region was underdeveloped in comparison to the rest of Niger and called for a better redistribution of the country's revenue—especially the part

---

Malian troops and bases—suggesting that Libya had not provided military support to the group (*El Khabar*, "Brahim Ag Bahanga.")

[102] Panapress, "Mali: La Rebellion."

[103] BBC, "Mali Tuareg Rebels in Peace Pact," April 4, 2008.

[104] BBC, "Tuareg Rebels in Deadly Mali Raid," May 22, 2008.

[105] BBC, "Tuareg Rebels in Deadly Mali Raid"; B. Daou, "Bahanga attaque le Camp militaire d'Abeibara et exige l'ouverture du dialogue," *Le Républicain* (Bamako), May 22, 2008. The ADC, which had been at peace with the Malian government since the Algiers accord, is said to have taken part in the Abeibara attack along with the ATNM. Both attacks were perceived by Tuaregs as retaliation for the killing of Barka Ag Cheikh and Mohamed Ag Moussa. Many Tuaregs outside of Bahanga's group felt that it was their duty to avenge their deaths (phone interview with Malian journalist, August 14, 2009; phone interview with former MPA member and expert on North Mali, August 17, 2009). This reversal of the ADC's support for the government (albeit unofficial, and probably not permanent) illustrates the volatility of the situation in the area.

[106] It is, however, unclear whether the 2006 Tuareg rebellion in Mali—and its relative success for the insurgents—influenced Nigerien Tuaregs' decision to resort to arms in early 2007.

PX716

derived from the exploitation of Niger's uranium resources, which are located in Tuareg-populated areas.[107] The governments dealt very differently with their respective internal crises. Nigerien President Mamadou Tandja chose an exclusively military response, calling the rebels a band of bandits and smugglers. Not only did this fail to crush the movement, it also led a number of soldiers to desert their posts and join the MNJ.[108]

In terms of the tactics employed by the ATNM, the involvement of Nigerien Tuaregs may help explain the use of antipersonnel and anti-vehicle mines in the rebellion. They represented a novelty in Mali, having been used neither during the Tuareg rebellion of the 1990s nor during the ADC's rebellion of 2006.[109] The MNJ, however, was known to use them routinely on the other side of the Mali-Niger border.[110]

The Nigerien connection dwindled rather quickly, and the MNJ soon denied being involved in the ATNM's activities.[111] A few months later, in an interview in the Algerian newspaper *El Khabar,* Bahanga denied that his group included any Nigerien (or Algerian) Tuareg.[112] It is unclear whether this was a pragmatic response to the disengagement of Nigerien elements from the Malian theater or whether it represented a change of strategy on the part of Bahanga, who realized that his movement would have more appeal if it focused on Mali and gave up on pan-Tuareg claims. In any case, both groups are unlikely to have ever held serious pan-Tuareg claims,[113] and the links between Malian and Nigerian Tuaregs should not be overstated. They are better described as occasional and temporary alliances rather than a deep-

---

[107] STRATFOR, "Niger: A Rebel Threat to the Uranium Sector," February 1, 2008.

[108] David Zounmenou, "Niger: Making Sense of the New Tuareg Rebellion," *ISS Today*, Institute for Security Studies (Pretoria), July 27, 2007.

[109] IRIN, "Mali: Indignation Dominates Reaction as Attacks in North Escalate."

[110] IRIN, "Mali: Indignation Dominates Reaction as Attacks in North Escalate."

[111] IRIN, "Mali: Indignation Dominates Reaction as Attacks in North Escalate."

[112] *El Khabar*, "Brahim Ag Bahanga."

[113] Zounmenou, "Niger: Making Sense of the New Tuareg Rebellion"; *Jane's World Insurgency and Terrorism*, "Nigerien Tuareg Groups," September 23, 2008.

PX716

rooted partnership. The two groups' concerted action may have been limited to providing each other with logistical support and a rear base when the situation was becoming a little too hazardous on either side of the border, or to move hostages around.[114]

On August 22, 2007, the governments of Mali and Niger agreed to grant each other a "right of hot pursuit" on their respective territories and to create joint patrols.[115]

***The United States.*** The 1998 terrorist attacks against the U.S. embassies in Kenya and Tanzania led the United States to reevaluate the relevance of Africa for American national security. The events of 9/11 and a concern that some areas in Africa might be providing sanctuaries for terrorist groups heightened this change of perception. The 2006 National Security Strategy stated that "our security depends upon partnering with Africans to strengthen fragile and failing states and bring ungoverned areas under the control of effective democracies."[116] The Saharan-Sahel belt—Northern Mali in particular—fit well the "ungoverned area" definition, for it combines weak control from central governments and porous borders. The area also has a history of smuggling and political instability, a large presence of small arms, and evidence of a radical Islamist group (GSPC/AQMI) taking root in the area. All these elements explain why the United States has paid increasing attention to this region over the past decade. Not everyone agrees with the inclusion of northern Mali in the "ungoverned area" category, however. Baz Lecocq and Paul Schrijver, for instance, contend that Tuareg leaders and the Malian government have a solid and long-held arrangement according to which the former are unofficially in charge of governing and policing the area. This system already existed during the colonial period and has continued since.[117]

---

[114] Phone interview with a Malian journalist, August 14, 2009.

[115] *El Watan*, "Les troubles dans le nord."

[116] USNSC (United States National Security Council), *The National Security Strategy of the United States of America*, March 2006, p. 37.

[117] Lecocq and Schrijver, "The War on Terror in a Haze of Dust," p. 156–157. According to these authors, "The position of tribal leader grew to become that of a fully-fledged colonial civil servant with its own rank, career path and salary scale, responsible for justice, safety,

The Pan-Sahel Initiative (PSI) announced by Washington in late 2002 provided training and assistance to the armed forces of Mauritania, Mali, Niger, and Chad, with the objective of making them more capable of patrolling and securing their respective territories. In 2005, the PSI became the Trans-Saharan Counterterrorism Partnership (TSCTP) and was extended to Algeria, Morocco, Tunisia, Nigeria, and Senegal. The Flintlock joint military exercise of June 2005 brought together up to 1,000 U.S. military personnel and participants from Algeria, Chad, Mauritania, Mali, Niger and Senegal.[118] Since the early days of U.S. involvement in the region, Northern Mali has been considered an area of priority, absorbing more than half of PSI funds.[119] Such assistance has been welcomed by Malian authorities: In 2006, the Army Chief of Staff stated that "Mali by itself can't sort out terrorism and Mali is only a link in the chain in the global fight with world terrorism. Our weakness is we have a big territory that we can't control with our very limited means, and for that we need partners like the United States, France and others."[120]

When the Bahanga rebellion broke out in 2007, the United States used some of the assets it had deployed in the context of the TSCTP to assist the Malian government in its fight against the rebels.[121] This discreet assistance was brought to public attention when an American C-130 supplying an isolated military outpost near Tin-Zaouatène was shot at by the ATNM on September 12, 2007. This aircraft was in Mali to be used in the Flintlock exercise that had taken place a few weeks earlier.[122] The United States downplayed its involvement, noting about the resupplying plane that "U.S forces were in a position to assist,

---

taxes and education. […] In 1961 this civil service status given to clan leaders was formally revoked. But, like the French before them, the Malian authorities quickly discovered that direct rule without tribal leaders was not possible.

[118] EUCOM (United States European Command), "Exercise Flintlock 05 Under Way in Africa," June 9, 2005. This exercise was repeated in 2007 and 2009.

[119] Lecocq and Schrijver, "The War on Terror in a Haze of Dust," p. 144.

[120] *Reuters*, "Interview—Mali Counts on Negotiation."

[121] BBC, "Mali Boosts Army to Fight Tuareg."

[122] *El Watan*, "Les rebelles touareg."

PX716

as they had just completed the [Operation] Flintlock exercise, so they conducted the re-supply mission."[123]

### The Transition Period

The Nampala attack of December 2008 was the turning point of the conflict, and it led to a radical change in the Malian government's strategy. On December 20, the ATNM attacked a military garrison located in Nampala, near the Mauritanian border, 300 miles north of Bamako. The attack was the deadliest since the June 2, 2007, attack against an army convoy near Tin-Zaouatène.[124] Nine soldiers were killed, along with 11 rebels, and several soldiers were taken hostage.[125] The high number of casualties in the Nampala attack provoked outrage within the ranks of the army, where an increasing number of soldiers and officers were criticizing the appeasement policy of the government and called for forceful retaliation for the lives lost at Nampala.[126] The Nampala attack also confirmed, after the Diabaly attack of May 2008 (only 150 miles away from Bamako), that the crisis threatened to spill outside of the three northern regions.[127] Finally, Nampala may also have been a turning point because it marked the end of a five-month ceasefire and suggested that the seemingly endless cycle of negotiations/truces/resumption of violence would continue unless the ATNM was eliminated for good.

Bamako decided that it was time retake the initiative. It abandoned, at least temporarily, the diplomatic track and opted for a more-

---

[123]Captain Darrick Lee, EUCOM Public Affairs Officer, quoted in Dulue Mbachu, "US Tactics in Africa Could Lead to a Self-Fulfilling Prophecy of a Desert War," *ISN Security Watch*, International Relations and Security Network at ETH Zurich, November 7, 2007.

[124]Christophe Boisbouvier, "ATT entre en guerre," *Jeune Afrique*, January 27, 2009; AFP, "Mali: Brève 'offensive' de l'armée contre des rebelles touareg dans le nord," January 2, 2009.

[125]BBC, "Tuareg Rebels in Deadly Mali Raid."

[126]Phone interview with Fihouroun Maiga, former Ganda Koy combatant and expert on North Mali, August 11, 2009; phone interview with Malian journalist, August 14, 2009.

[127]*Reuters*, "Nouvelles attaques des rebelles touaregs," May 7, 2008.

offensive military approach.[128] On December 22, President Touré publicly stated, "Enough is enough. We cannot keep on suffering, counting our dead and looking for peace,"[129] and followed the same line in his speech of New Year's eve 2008: "While reaffirming its commitment to pursue the implementation of the Algiers accord, our country cannot tolerate acts of violence such as the attack perpetrated against Nampala by armed bandits with links to narcotraffickers."[130] As a first step, he sent additional troops to the north. The military effort was led by Colonel Mohamed Ould Meidou (an Arab from Timbuktu who was the military commander—*Chef de Zone*—of Mopti), and Colonel El Hadj Gamou, a Tuareg who was the military commander of Gao.[131] The forces deployed were reinforced with civilians, who formed militias and provided the Malian army with logistic logistic and combat support. These civilians were young (mostly in the 18–22 year-old range). Their precise number is not known; estimates vary between 200 and 600. They included Arabs (mostly from the Timbuktu region) and Tuaregs (mostly from the Kidal and Gao regions).[132] Chosen for their knowledge of the terrain, they were officially referred to as "guides" who helped the army along desert trails, but they were armed and took part in the fighting.

---

[128]BBC, "Tuareg Rebel Base Is 'Destroyed,'" January 21, 2009; Boisbouvier, "ATT entre en guerre."

[129]President Touré, quoted in Boisbouvier, "ATT entre en guerre." Author's translation.

[130]Government of Mali, "Discours à la Nation, December de Son Excellence Monsieur Amadou Toumani Touré, Président de la République, Chef de l'Etat," December 31, 2008. Author's translation.

[131]AFP, "Mali: Brève 'offensive'"; phone interview with Malian journalist, August 14, 2009.

[132]Boisbouvier, "ATT entre en guerre"; *Le Malien* (Bamako), "Région de Kidal: Les Colonels Gamou et Meidou aux Trousses de Bahanga," January 19, 2009; phone interview with a Malian journalist, August 14, 2009; phone interview with Fihouroun Maiga, former Ganda Koy combatant and expert on North Mali, September 1, 2009. The acknowledgement that Arabs should be involved more deeply in the resolution of the crisis came from the fact that in order to reach Diabaly and Nampala, Bahanga and his men had to go through the Timbuktu region, which is largely populated by Arab communities (phone interview with a Malian military official, August 18, 2009).

PX716

The endgame for the ATNM was marked by two fateful—and linked—trends: the progressive implosion of the group and a succession of military defeats. On January 4, 2009, Fagaga and 300 other combatants left the ATNM with their arms.[133] Another smaller group of 35 combatants left the group a few weeks later.[134] After a January 1, 2009, series of grenade attacks by the ATNM against Tuareg officials, the government-backed forces quickly retaliated by launching offensives against the ATNM bases.[135] They first targeted a base in the Aguelhoc area (near the Algerian border) and killed 20 ATNM members, arresting eight more.[136] On January 22, the Malian army took over a rear base of the ATNM at Tin Essalek, near the Nigerien border.[137] During the firefight, 31 ATNM members were killed.[138]

This intensification of military pressure led Bahanga to ask for a ceasefire on February 1, to which a Malian official replied that there would be "no truce."[139] The Malian ministry of defense declared that the army would keep on chasing the "Bahanga gang," and would ignore the request for a ceasefire sent by "armed bandits."[140] Bamako's new no-negotiation policy was again reaffirmed when it sent the army farther than ever in the northeast corner of the country.[141] With the

---

[133] Chérif Ouazani, "Ibrahim Ag Bahanga," *Jeune Afrique*, January 27, 2009.

[134] AFP, "Des rebelles Touareg acceptent les propositions de Bamako pour la paix," February 5, 2009.

[135] AFP, "Mali: Brève 'offensive' de l'armée."

[136] *Jane's World Insurgency and Terrorism*, "Malian Tuareg Groups."

[137] Ouazani, "Ibrahim Ag Bahanga."

[138] According to Malian authorities. See *El Watan*, "Ag Bahanga demande à réintégrer l'accord d'Alger," February 4, 2009; AFP, "Mali: 'Pas de trêve' dans les combats."

[139] Malian Ministry of Defense official quoted in AFP, **"Mali: 'Pas de trêve' dans les combats."** This represented a quick and complete reversal for Bahanga, who on January 25 was telling Algerian newspaper *El Khabar* that "Today our position is clear: our only alternative is to respond [to the Malian army's January 22 attack] and armed war" (quoted in *El Watan*, "Ag Bahanga demande à réintégrer").

[140] Official from the Malian Ministry of Defense, quoted in AFP, "Mali: 'Pas de trêve.'"

[141] AFP, "Mali: 'Pas de trêve.'"

PX716

Malian government refusing dialogue, Bahanga appealed to Algeria for a negotiation and a ceasefire, to no avail.

By February 6, according to Malian military authorities, all ATNM bases had fallen. Bahanga and a few of his men fled the country. Libya admitted to hosting him "for humanitarian reasons," in the words of a Libyan diplomat who added that "[Bahanga] has agreed in writing not to conduct politics or anything else. We have informed our Malian brothers" that Bahanga "has not come here to negotiate."[142]

**Managing the Transition**

With the ATNM de facto disbanded and its leader on the run, Bamako had to address the issue of the group's former combatants. The disarmament process proved particularly thorny. The disarmament ceremony had to be postponed for several weeks until a decision was made on whether the former rebels should be allowed to enter the city with their weapons or whether the weapons should be collected first. It was ultimately decided that only those who would be integrated in the Tuareg/Army Special Units would be allowed to keep their weapons in the city, while others were to hand their arms to the Algerian mediator.[143] On February 17, 2009, the disarmament ceremony eventually took place in Kidal under the auspices of Algeria, with the participation of 578 former rebels, both from the ADC and the ATNM. In addition to arms and ammunition, two vehicles were returned to the Malian army.[144] Four hundred former rebels were billeted in Kidal.[145]

Algeria remained engaged in northern Mali after the crisis was resolved. It pledged to provide development funds for the region and to contribute, along with the Malian government, to the initial budget of €1.5 million devoted to the reintegration of former combatants. Algeria also announced it would be building infrastructure in the region,

---

[142]Libyan diplomat quoted in AFP, "Mali Rebel Leader Takes Refuge in Libya: Diplomat," February 23, 2009.

[143]AFP, "Des rebelles Touareg acceptent. "

[144]Tiemoko Diallo, "Nearly 600 Malian Rebels Disarm in North," *Reuters*, February 17, 2009.

[145]Phone interview with a Malian military official, August 18, 2009.

PX716

including a professional training center and clinics.[146] It also provided for the logistics, training, and equipment of the Special Units tasked with patrolling the northern areas. [147]

There is, however, a concern that development efforts may not suffice to mitigate the risks of conflict resurgence. Although the lack of development and, more generally, the poverty of northern Mali is largely claimed by the Tuaregs to be the reason why they occasionally turn to violent action, political claims are also extremely important, and a number of Tuaregs do want, ultimately, an autonomous territory.

Such autonomy is not necessarily perceived, however, as a short-term goal, which may explain why the ADC renounced it relatively easily: most of the group's members believe in autonomy in the longer term, if only because it makes more strategic sense to develop communications, infrastructures, and education with funds from the Malian state *before* attempting to break away.[148] In a June 2007 interview to an Algerian newspaper, Hassan Fagaga clearly explained why independence—or even too strong a decentralization—was not in the interests of the north: "Decentralization means that for everything related to the commune, the *cercle*,[149] and the region, each governs alone by drawing on its own resources. The fact is that our region has no wealth. We have no human or natural resources. We do not even have fiscal revenues. This region is poor, arid, and thirsty. Asking a commune like Tinza-ouatine (Algeria-Malian border) to live on its farming resources and its taxes is like sentencing it to death."[150] It is extremely difficult to assess

---

[146]AFP, "Nord du Mali: lancement d'un programme de réinsertion de 10.000 jeunes," July 25, 2009.

[147] *Jeune Afrique*, "Le casse-tête des unités spéciales,"

[148]Phone interview with former MPA member and expert on North Mali, August 17, 2009.

[149]The *cercle* is an intermediary administrative division in Mali. The Gao and Kidal regions have four *cercles* each. The Timbuktu region has five.

[150]Hassan Fagaga, quoted in Benfodil, "Interview of Hassan Fagaga." According to Kalifa Keita, concerns about the sustainability of an independent north have been present since before decolonization: "According to Bakara Diallo, governor of Gao in the 1960s, some French colonial officials apparently tried to pressure the Tuaregs to fight for an independent Tuareg homeland, although this met with less than universal enthusiasm among the nomads. The Tuareg leaders consented at the time to be part of the new Republic of Mali."

PX716

what percentage of the Tuareg population shares this ambition of an autonomous state, but this political claim, whether widespread or not, is most likely to remain a thorn in the side of the Malian government.

Algeria also pursued its role as mediator between the Malian government and the Tuaregs on the modalities of implementation of the Algiers accord. The Follow-up Committee (*Comité de suivi*) of the accord met for the first time in Bamako on July 18, 2009.[151] The meeting's agenda went beyond the Algiers accord and tackled security issues in general, including the presence of AQIM cells in northern Mali.[152]

Bamako had been reluctant to intervene against AQIM, probably for fear of igniting more troubles in the North with Arab and maybe Tuareg populations, and because of its lack of ability to take action in a region that is difficult to patrol and control. There was no immediate reason to do so, either: AQIM, which attacked numerous military and official targets in Algeria and Mauritania, always refrained from doing the same in Mali.[153] Mali's stance changed in early May 2009, when Bamako sent three combat units from Kidal to hunt down what was described as a convoy of armed men—although it was unclear, at the time, whether they were members of AQIM or simple traffickers.[154]

Mali's forceful stance toward AQIM had important implications for the north. Tuareg representatives had tried to convince the Malian

---

(Keita, *Conflict and Conflict Resolution,* p. 37, n. 27). The French project of Common Organization of the Saharan Regions (*Organisation Commune des Régions du Sahara*, or OCRS) was, however, taken up again by a number of Tuaregs during the 1962 rebellion (Humphreys and Ag Mohamed, "Senegal and Mali," p. 292, n. 37).

[151] AFP, "Mali/Touareg: Réunion à Bamako pour relancer le processus de paix," July 19, 2009. This committee, set up by the Algiers Accord, includes three representatives from the Malian government, three from the ADC, and three from Algeria (Mustapha Benfodil, "Les réserves de l'ex-rébellion et le satisfecit du general Diagouraga," *El Watan* (Algiers), July 4, 2007, p. 10).

[152] N'Tji Diarra, "Face à la menace Al Quaïda . . . l'armée malienne et les ex rebelles touaregs font cause commune," *Aurore* (Bamako), July 20, 2009.

[153] There are, however, unconfirmed reports that the GSPC had planned to blow up the American Embassy in Bamako some time before 2002 (Lecocq and Schrijver, "The War on Terror in a Haze of Dust," p. 152).

[154] Tiemoko Diallo, "Mali Pursues al Qaeda Suspects in North," *Reuters*, May 9, 2009; AFP, "Mali Announces Joint Operations Against Al-Qaeda," July 21, 2009.

PX716

government that they could take care of the AQIM threat, and that they ran a higher chance than the army of doing so thanks to their knowledge of the terrain and their experience in guerrilla tactics.[155] The Malian government held back for a few weeks but reversed its position following mediation by the Algerian ambassador to Mali. The July 18 meeting of the *Comité de Suivi* resulted in the Malian government agreeing to officially enroll the help of Tuaregs against AQIM. This commitment was reaffirmed on August 2 during a "reconciliation" meeting that included all three major northern communities—Arab, Tuareg, and Songhai.[156]

Overall, the Malian government's strategy for transitioning out of the insurgency was largely similar to the one it followed after the ADC insurgency; Bamako

- Increased development funds (with the help of Algeria);
- Disarmed former combatants and integrated some of them in Special Units;
- Increased the role of locals in the securing of the north and the elimination of AQIM, along with the Malian army.

It is still too early to assess whether the transition can be hailed as a success. On September 15, 2009, the United Nations lowered its threat assessment level for Kidal,[157] but tensions between communities remain. In June 2009, six Tuaregs were murdered in Ansongo, the former base of the Ganda Izo movement, arousing suspicions that Ganda Izo sympathizers may have been involved.[158]

---

[155] *Jane's Intelligence Weekly*, "Mali's Tuareg Tribesmen Join Fight Against Al-Qaeda," July 21, 2009; phone interview with former MPA member and expert on North Mali, July 17, 2009.

[156] AFP, "North Mali Rivals Meet to Back Anti-Qaeda Fight," August 2, 2009.

[157] Ouazani, "Le retour du chef rebelle," *Jeune Afrique*, September 28, 2009.

[158] Toure Sambi and Chahana Takiou, "Six Touaregs assassinés à Ansongo: La Signature du Mouvement armé 'Gandaïso,'" *Info-Matin* (Bamako), June 17, 2009.

## Conclusions

A number of factors must be taken into consideration to appreciate the degree of threat that the Tuareg insurgency of 2006–2009 represented for Mali.

First, it is important to note that the government was not, at any point, seriously threatened by the ADC or the ATNM. It is unclear whether the rebels ever considered taking the fight to Bamako. The ATNM leadership apparently toyed with the idea (which acted as a strong incentive for the young recruits in the group) but were discouraged to do so.[159] From the point of view of the army, this was not a realistic threat: the group had no sufficient means and no supporters in the south.[160] Overall, it may be precisely because President Touré knew that his power was not directly threatened that he could afford a protracted policy of mediation with the ATNM in spite of the numerous truce violations.

Secondly, one important characteristic of the Tuareg community is its deep division according to castes and tribes. Unless the Malian state makes a major mistake that will somehow antagonize all Tuaregs and unite them against Bamako, as happened in the 1990s, it is likely that the rebel movements will always find it difficult to rally large numbers of supporters. And it is equally likely that the government will always be able to play one Tuareg community (or tribe) against the other. The division of the Tuareg community explains why the ADC asked for negotiations immediately after launching their movement, and never represented a real threat.

Considering that the 2006–2009 rebellion was the third one of its kind since Mali's independence, it is difficult to be overly hopeful that there will never be a fourth one. The last rebellion was caused, in large part, by the frustration of the population in the northern regions regarding the delays in the implementation of the National Pact signed ten years earlier. The Algiers accord of 2006 will be judged on how it is implemented by the Malian government. New delays or obstacles may

---

[159] Phone interview with former MPA member and expert on North Mali, August 17, 2009.

[160] Phone interview with a Malian military official, August 18, 2009.

PX716

re-ignite the situation at any time. An even more pessimistic view holds that claims for an independent, or autonomous, Tuareg state that would cover the three northern regions of Mali (as well as, possibly, Tuareg-populated regions in Algeria, Niger and Libya) are deep-rooted and likely to resurge in the coming years whether or not the government delivers on its promises to provide better development to the north. Another issue is the number of weapons handed in during the various collection initiatives that took place after the Algiers Accord; this number does not come close to the account of those that were stolen in Kidal and Menaka. Most of the weapons that were used during the insurgency are most likely still in circulation.[161] The reasons for keeping a working weapon in this region are many, but it is likely that many people involved in the rebellion doubt that the crisis has been solved for good, and they keep arms "just in case," as appears to have been true after the 1996 Flame of Peace.

An important issue is the fact that few insurgent weapons were collected. A number of the young men who enrolled voluntarily in the militias will benefit from the socio-economic reinsertion program put in place by the Algiers Accord for young ex-combatants and unemployed people.[162] This program will benefit former combatants and noncombatants alike, so as not to favor those who took up arms. However, because it is not specific to ex-combatants, it does not involve any disarmament initiative. The young members of these militias are therefore likely to still have the weapons with which they fought the ATNM in early 2009.

Nonetheless, there are grounds for hope. Mali seems to have been learning from its past mistakes. Most of the pitfalls in which it had fallen in the 1990s and which had resulted in turning the Tuareg rebellion into a protracted conflict that included, at some point, inter-ethnic violence (after the emergence of the Ghanda Koy), were avoided in

---

[161] Phone interview with former MPA member and expert on North Mali, June 6, 2009; phone interview with a Malian journalist, August 14, 2009.

[162] RFI, "Lancement d'un programme de réinsertion de 10.000 jeunes," July 26, 2009; phone interview with Fihouroun Maiga, former Ganda Koy combatant and expert on North Mali, September 1, 2009.

PX716

2006–2009. In addition, the Malian government resorted to a number of strategies that may provide useful lessons for counterinsurgencies beyond the specific case of Mali.

The winning strategy of the Malian government against the ADC was to focus on finding a political solution to the crisis while keeping a low degree of military pressure. It pursued the same strategy against the ATNM, but with sustained military action once it became clear that Bahanga's rebellion, rather than losing momentum, was extending geographically and becoming more intense. This change of strategy was also a reaction to popular and army dissent in the face of the mounting casualties on the government side. Although the first phase of the strategy may appear far from optimal (it seems that mediation was pursued only to give Bahanga a face-saving way to surrender, and that the government had no intention of making any concession beyond what it had already granted in the Algiers Accord), it did play the role of showing all Malians, including Tuaregs, that the government had tried everything before resorting to more powerful means. Overall, the government also managed to circumscribe the rebellion to a limited number of Tuaregs, and to keep other communities (especially the Fula and Songhai) out of the fight. By choosing a defensive rather than offensive stance, and protecting the population (by clearing mined areas, for instance) rather than going after the group's bases, the Malian army has followed a classic population-centric approach that has proven successful in preventing the insurgents from widening their support base. Bamako's restraint paid off—a lesson that may be applicable to other theaters of conflict.

Studying the post-counterinsurgency transition in Mali also provides useful lessons in the subtle art of political and military decentralization. Northern Mali, because of its geographic isolation, has a long history of self-reliance that began in the colonial era with the French delegating much of the central state's political power to tribal leaders. The current Malian government has adopted a position whereby it has a limited presence and impact in the area, and only intervenes when serious political and military issues such as a rebellion arise, in which case it co-opts local actors to help it get rid of the threat. It followed this strategy first with the ADC, then with the ATNM.

PX716

U.S. policymakers should explore how existing traditional hierarchies, such as those that are clan and tribe-based, can be utilized to promote security and enforce order. Providing security to their constituents is often the most important task such traditional leaders undertake, and it is their ability to do so successfully that makes them legitimate in the eyes of their community. To a large extent, therefore, clan leaders and the state share a similar interest in enforcing civil order.

Arguably, this method has its limits, as the number of locals who can be co-opted by the government must represent a critical mass—or, at least, a majority compared to those willing to follow the rebellion. In the 1990s, co-opting Tuareg tribal leaders against the rebel groups did not prove sufficient.[163] This, however, can be partly blamed on the adoption of a repressive policy that rallied to the rebellion large numbers of previously non politicized Tuaregs and Arabs.[164] In the light of the subsequent resolution of the crisis, and the successful experience of 2006–2009, Bamako is unlikely to revert to such a policy.

After its successful counterinsurgency effort, the Malian government has continued to rely on local actors for security and the maintenance of order in the north. In a way, the Malian government is currently re-applying the method that proved successful in chasing and ultimately defeating Bahanga: co-opting members of the local population who know the terrain and guerrilla tactics much better than the Malian regular army. The development of Special Units composed mainly of Tuaregs has had three main benefits: providing former combatants with a legitimate occupation, reducing the army's footprint in an area where it was not welcomed, and reducing the army desertion rates, which were due, in part, to the reluctance of integrated northerners to be deployed in the south of the country.

---

[163] Tribal chiefs saw rebel leaders as direct competitors for power in the Tuareg community and accordingly denounced them publicly as "bandits and traitors"; the chief of the Kel Adagh tribal confederation was even kidnapped in March 1994 by the ARLA, and subsequently formed his own small self-defense militia. See Lecocq, "Unemployed Intellectuals in the Sahara," p. 106–107.

[164] Inter-Tuareg fighting was also part of the reason why the conflict lasted as long as it did. The Malian government's actions had only limited impact on these internal disputes.

PX716

Ironically, the transition was much aided by the emergence of AQIM as a common enemy for the government and the Tuaregs. Although AQIM had been present for years in the region, increased pressure from Algeria and AQIM's first targeting of a Malian official resulted in this threat being taken more seriously than it had been in years. This gave the Tuaregs, who have a good knowledge of the terrain, some leverage in their dealing with the government; it also gave the government an incentive to hasten the deployment of the Special Units.

It is too early to tell whether this strategy will pay off and rid Mali of AQIM cells, but if it proves successful it may provide a model for delegating local policing to local actors, rather than relying on a central government that is often perceived as unwelcome and barely legitimate in some areas. Bamako pragmatically came to the realization that, of the two issues it faces in the north—AQIM and Tuareg separatism—at least the first may be solvable. Making the Tuaregs part of the solution, furthermore, may give these communities the political and social recognition they have been longing for. Scrutiny should be paid to how the government will manage this small devolution of its powers, and how it will impact on the Tuareg separatist movement. Although the latter is unlikely to disappear in the near future, Bamako's strategy may contribute to withholding it for a time.

PX716

# The Transition in Al-Anbar, Iraq

**Map of Iraq**



SOURCE: CIA World Factbook.
**RAND** *MG1111/2-6.1*

## Introduction

Insurgent activity was widely reported throughout Iraq in the period of interest to this case study, 2003 to 2008. However, there was no single "insurgency" in the country. Instead, following the invasion by the U.S.-led coalition forces (CF), various groups sought to repulse the coalition and reject the governing institutions it supported. These groups had different agendas—from restoring Saddam Hussein's regime to estab-

PX716

lishing an Islamic caliphate. Some of them more resembled criminal gangs than insurgents but nonetheless posed a threat to CF objectives.

The insurgent environment varied from place to place in Iraq, depending on the groups that dominated or fought for control of local areas and their objectives. Similarly, there has been uneven reporting on the course of insurgency and counterinsurgency activities across Iraq.

Al-Anbar is a noteworthy case study for several reasons. First, it was considered one of the most violent regions of Iraq. Many American soldiers and Iraqi civilians lost their lives in a conflagration that spiraled into prolonged insurgency. Yet the reversal of conditions in Anbar was about as dramatic as the violence itself. Understanding how this change evolved merits attention. Second, U.S. strategies in Anbar provide models and lessons for COIN operations in other theaters, such as Afghanistan. More pragmatically, participants on all sides of the conflict in Anbar have been documented and widely reported on, and veterans of the U.S. campaign there agreed to share their experiences during the conflict. Finally, a period of transition from COIN to stability operations (SO), which occurred between 2005 and 2008, is discernable in the case of Anbar.

For the purposes of this case study, we considered the COIN and SO elements of CF operations in Anbar in the context of definitions offered by the United States government. In this regard, counterinsurgency is a blend of civilian and military efforts designed to contain simultaneously insurgency and its root causes.[1] Counterinsurgency involves the political, military, paramilitary, economic, psychological, and civic actions taken by a government to defeat an insurgency. An *insurgency* itself is defined as an organized movement aimed at the overthrow of a constituted government through the use of subversion and armed conflict.[2] Joint military doctrine defines *stability operations* as

---

[1]    U.S. Government Interagency Counterinsurgency Initiative, *U.S. Government Counterinsurgency Guide*, Washington, D.C.: U.S. Government Printing Office, January 2009.

[2]    U.S. Department of the Army, Headquarters, Field Manual 3-0, *Operations,* February 2008.

PX716

> . . . various military missions, tasks, and activities conducted out-
> side the United States in coordination with other instruments
> of national power to maintain or reestablish a safe and secure
> environment, provide essential governmental services, emergency
> infrastructure reconstruction, and humanitarian relief.[3]

In Iraq, the incumbent central government in Baghdad was sup-
ported by an intervening actor, the U.S.-led coalition. As we describe
further below, the insurgency in al-Anbar specifically was an amalgam
of sometimes competing groups. COIN and SO methods involved an
array of military operations that were combined with reconstruction
and stability initiatives designed to secure the province and to support
political reform and long-term recovery efforts.

## A Brief History of the Conflict in Al-Anbar Province

Al-Anbar province was once the cradle of a brutal Sunni insurgency
that mired the Sunni-dominated province in violence and spread to
other parts of Iraq. Many observers believe that insurgent forces were
stronger in Anbar than in any other area in Iraq. This perception earned
the province the dubious distinction of being the most lethal region in
the country.

Al-Anbar became intractable following the 2003 fall of Saddam
Hussein and the subsequent occupation by U.S. and other coalition
forces. The city of Ramadi was especially dangerous; the area of opera-
tions in Ramadi averaged over three times more attacks per capita than
any other Iraqi region.[4] Indeed, insurgents enjoyed almost complete
freedom of movement throughout the city and dominated most of its
vital institutions. Ease of mobility also allowed insurgents to deploy
complex improvised explosive devices, further contributing to Anbar's
isolation. By fall 2008, more than 1,000 U.S. military personnel had

---

[3]   U.S. Department of Defense, Joint Chiefs of Staff, Joint Publication 3-0, *Joint Operations*,
September 2006, p. iv; U.S. Department of the Army, Field Manual 3-0.

[4]   Major Niel Smith, U.S. Army and Colonel Sean McFarland, U.S. Army, "Anbar Awak-
ens: the Tipping Point," *Military Review*, March–April 2008.

PX716

died in Anbar, amounting to a quarter of the total American death toll in Iraq.[5]

The insurgency in Anbar occurred against a backdrop of complex external and internal factors. The insurgency itself, though predominantly Sunni, was far from monolithic. It comprised nationalists, Ba'athists and former regime elements, Salafi-jihadi Islamists, and foreign fighters. With dozens of groups and organizations, the face of the insurgency constantly shifted as various actors and individuals moved in and out of threat groups.

Tribes with a long history of revolt added to the potent mix in Anbar. Indeed, in some respects, U.S. and other coalition forces faced an insurgency that was based on pre-established networks defined by kinship, loyalty, and self-interest.[6] Anbar was also vulnerable to the influence of external actors, which contributed to the prolonged violence. The province, home to a population of 1.2 million,[7] is bordered by three countries that either served as major transit points for foreign fighters seeking to join the insurgency in Anbar and throughout Iraq or were major centers of recruitment for insurgents and other oppositionists.

The devastation wrought by the insurgency in Anbar was significant. The city of Fallujah was almost completely razed, and entire neighborhoods in Ramadi were severely damaged.[8] Moreover, the municipal and provincial governments, local security forces, and infrastructure barely functioned and in some cases even ceased to exist.

Significant coalition battles in Fallujah during 2004[9] to purge the province of Sunni rebels were largely unsuccessful and only tem-

---

[5]   Dexter Filkins, "U.S. Hands Off Pacified Anbar, Once Heart of Iraq Insurgency," *New York Times*, September 2, 2008.

[6]   Senior Analyst/All Source Fusion Officer, 1-MEF, 2005–2006, interview by authors, Arlington, Virginia, July 26, 2009.

[7]   United Nations, "Population Projection 2003," Office of Coordination for Humanitarian Affairs, Baghdad, Iraq, 2008.

[8]   Smith, "Anbar Awakens."

[9]   These were known as Operation Valiant Resolve and Operation Phantom Fury in April 2004 and November 2004, respectively.

PX716

porarily suppressed insurgents who eventually reclaimed the area. The second battle, in particular, would eventually be seen as one of the most hard-fought and destructive of Operation Iraqi Freedom. Thereafter, insurgents made the city of Ramadi their power base (see Figure 6.1).

By 2005 the al Qaeda in Iraq (AQI) group dominated the insurgent landscape. The Anbari public, hardened against coalition forces and their tactics,[10] turned their support toward the insurgents.

**Figure 6.1**
**Map of Iraq Featuring Al-Anbar Province**



SOURCE: Central Intelligence Agency.
RAND *MG1111/2-6.2*

---

[10] Many mosques, homes, and infrastructure were destroyed as a result of U.S.-insurgent fighting. Some 200,000 Anbaris were internally displaced in Iraq.

It was not until late-2006 that the United States would make a third push to re-establish control in Anbar. By this time, the 2004 experience in Fallujah, along with national Iraqi elections in January 2005, led some tribal leaders to determine that "the political process might hold more benefit than continued fighting."[11] This notion was reinforced as AQI's intentions vis-à-vis Anbar became evident. Upon its arrival the group had portrayed itself as an ally in the Anbari tribes' fight against the CF "occupation" of Iraq. By 2005, however, AQI was clearly attempting to subvert traditional governance structures in order to establish a pan-Islamic, fundamentalist theocracy. Moreover, AQI had begun to compete "for control of revenue sources—such as banditry and smuggling—that had long been the province of the tribes."[12]

The U.S. experiences in Fallujah prompted the development of a revamped counterinsurgency strategy, which later facilitated the transition from COIN to stability operations. Below we describe the foundations, key determinants, and select components of the transition from COIN to SO in Anbar, as well as some capability gaps identified during the process. Our account is based largely on the writings of and/or interviews with U.S. military personnel who operated in Anbar before and during the transition period. These individuals were in positions that enabled them to initiate and sustain the process of transitioning from COIN to SO in Anbar, arguably one of the most important achievements by coalition forces during Operation Iraqi Freedom.

## Pre-Transition Strategy, 2005–2006

For the purposes of this study, we consider the 2005–2006 timeframe to be the pre-transition period in Anbar Province. During this period, Multi-National Force–West[13] (MNF-W, also referred to hereafter as "the Command") began to implement a new strategy to arm Anbari

---

[11] Austin Long, "The Anbar Awakening," *Survival,* Vol. 50, No. 2, April–May 2008, p. 77.

[12] Long, "The Anbar Awakening," p. 77.

[13] MNF-W comprised a U.S. Marine Expeditionary Force, which commanded subordinate U.S. Army and Coalition Force units.

PX716

tribes and secure the local population. We begin our assessment of the pre-transition period with a description of insurgent strategies and conclude with observations on the insurgents' external supporters.

### Insurgent Strategies in the Pre-Transition Period

The goals of the AQI-led Sunni insurgency were multifold from 2005 to 2006. These generally reflected the belligerents' aims throughout their campaign against incumbent Iraqi government and the coalition. They included the establishment of an Islamic caliphate in Iraq, with Ramadi as the capital, and the defeat of U.S. forces on Iraqi soil.

Insurgents launched indiscriminate attacks against coalition forces, various Iraqi government organizations, and Shi'a civilians to foment inter-sectarian violence and fuel perceptions that Iraq's governing institutions were incapable of securing and controlling the country. Members of the Shi'a-led, central government in Baghdad, the Iraqi security forces, Kurds, and coalition forces were AQI's main targets. AQI's strategy also extended to the execution of attacks against infrastructure vital to the Iraqi economy.[14]

In Anbar, AQI's efforts to control the province saw the group's role shift from collaborator to oppressor, committing acts of extortion against Iraqi merchants and laborers, and intimidating the population and local law enforcement. AQI's reach also extended to control of the fuel market. Each month, the province was scheduled to receive roughly 80,000 gallons of subsidized gasoline. AQI, instead, diverted those deliveries to Jordan and Syria, resulting in a profit of $10,000 per shipment for the insurgents.[15] Meanwhile, the centuries-old tribal structure in Anbar collapsed, as sheikhs were murdered or co-opted by AQI or fled the area.

Despite group promulgations to bring Islamic law to Iraq starting with Anbar, AQI did not initially strictly enforce or even itself adhere to religious tenets in the province. In fact, they functioned more

---

[14] Institute for the Study of War, Commentaries: "Intercepted Document Discusses AQI Strategy," April 27, 2008.

[15] Bing West and Owen West, "Iraq's Real 'Civil War,'" *The Wall Street Journal*, April 5, 2007.

like a criminal group than an exemplary Islamic organization.[16] AQI relied on patronage to gain the cooperation of local sheikhs, and was arguably in a better position to do so, given its advantage of wealth vis-à-vis that of other local actors. AQI insurgents also permitted the expansion of smuggling in the province, which served the interests of tribes already engaged in such activity. However, the reservoir of goodwill between AQI and community notables and sheikhs ran dry by 2006, after AQI began to harshly punish those who used tobacco, alcohol, or pornography. In addition, AQI began to assassinate prominent Anbari sheikhs who opposed them. This combined with AQI extortion—which diminished economic gain for tribes engaged in similar activity—and tribal opposition to AQI ideology galvanized local tribes into resisting the group.

Critics of AQI and the Sunni insurgency point to a number of missteps and weaknesses that led to its eventual displacement from Anbar. First, AQI never controlled enough territory to establish an Islamic state in Iraq and could not provide enough security for such an entity. Second, Sunni leadership was not involved in the decision to form an Islamic state and thus withheld their support. Third, AQI maintained that "improving conditions of the people is less important than the conditions of their religion,"[17] which led to harsh tactics and intimidation that alienated the Sunni population. Insurgents went too far in their indiscriminant use of force and coercion against ordinary Anbaris. Moreover, the criminality, harassment, and assassination of tribal and community leaders turned local elites once loyal to the insurgency into forces of resistance.

### External Powers Supporting the Anbar Insurgents

The involvement of external actors contributed to the complexity of the insurgent environment and prolonged the conflict in Anbar. While some countries intervened directly, others were involved more indirectly.

---

16   West and West, "Iraq's Real 'Civil War.'"

17   West and West, "Iraq's Real 'Civil War.'"

**Syria.** In Anbar, Syria emerged as a key supporter of belligerents and thus contributed to sustained violence in the province. Although Syria had only minimum capacity to broadly effect developments in Iraq, its position both as a source of and throughway for foreign fighters, combined with Syrians' linkages to Iraq's exile community made Syria a source of destabilization and ongoing violence. Syria's interests in Iraq were based on calculations of how events in the country would influence domestic conditions and Syria's regional standing.

During the pre-transition period in question, Syria's goals included promoting the establishment of an Iraq that was stable yet sufficiently weak, so that Damascus could continue to influence events in the country without inducing harm to its own security interests. Syria did not want an Iraq that was strong enough to militarily confront Syria to the extent of challenging its regional position or posing a security threat regionally. Syria did, however, want sufficient ability to influence Iraq in order to strengthen its hand with the United States, Iran, and other regional actors. To this end, Syria relied on two primary strategies which influenced events in Anbar, and by extension Iraq.

First, parts of Syria's 360-mile border with Iraq served as a main thoroughfare for foreign fighters seeking to join the insurgency. This was a major means through which Syria was a destabilizing force in Iraq. According to U.S. military officials, 70 percent of the 60 to 80 foreign fighters entering Iraq each month did so via Syria.[18] Though leadership in Damascus did not admit to actively encouraging passage of individuals, the constant and heavy traffic of foreign fighters confirmed suspicions that Damascus was providing at least passive support to the insurgency.

Syria and its local communities also enjoyed long-standing linkages to Iraqi exile groups and numerous tribes in Iraq. Syria maintained deep ties to Ba'athists and former regime elements in Iraq.[19] Such relations extended to tribes as well. Historically, transnational

---

[18]  Steven Simon, "Won't You Be My Neighbor: Syria, Iraq and the Changing Strategic Context in the Middle East," Working Paper, United States Institute of Peace, March 2009.

[19]  Some of these individuals are wanted for war crimes. Izzat Ibrahim al-Douri and Mohammed Younis Ahmed are well-known Ba'athists believed to still reside in Syria.

PX716

links between tribal groups in Syria and Iraq have cemented relations through marriage and lineage. Some of these actors were intransigent and hostile to the Shi'a-led central government in Baghdad. Others were hostile to coalition forces. Whatever their predilection, Syria skillfully used these groups to advocate on the behalf of Syrian interests. For example, members of the Association of Muslim Ulama—a group with strong ties to Syria and led by Harith al-Dari—joined Syria in its opposition to the U.S. presence in Iraq.[20]

**Saudi Arabia.** By comparison, Saudi Arabia's role in influencing events in Anbar was more indirect. Saudi was a source country for Salafi-jihadi recruits that would later join the insurgency. Some 45 percent of insurgents are believed to have been from Saudi, perhaps the largest supplier of insurgents in Iraq. Of that number, half arrived as suicide bombers.[21] Saudi nationals are thought to have executed more suicide bombings than any other nationality,[22] thus underscoring Saudi's role as a source of recruits, and the part this dynamic played in augmenting the ranks of the insurgency in the pre-transition period.

Despite its role as a source of recruits for the insurgency in Anbar and elsewhere in Iraq, Riyadh was acutely aware that militants hostile to the Saudi regime could flow into the kingdom and pose a serious threat to its government. Therefore, preventing an influx of militants from Iraq as well as a flow of jihadists from Saudi figured prominently among leadership goals.

Even when sectarian strife was at a peak, Saudi leadership eschewed interventionist strategies that included funding and equipping Sunni insurgents. This is not to say that there were not discussions about such tactics. Indeed, Saudi leadership paid close attention to violence against its co-religionists. However, Saudi lacked possession of a structure analogous to Iran's lethal al-Quds force and, importantly, did not enjoy well-established links to Sunni militias. Instead, the regime opted to support a host of Sunni political actors, such as

---

[20] Senior Analyst/All Source Fusion Officer, interview, July 26, 2009.

[21] Ned Parker, "The Conflict in Iraq: The Saudi Role in Insurgency," *Los Angeles Times*, July 15, 2007.

[22] Ned Parker, "The Conflict in Iraq."

PX716

members of Tawafiq, the Iraqi Islamic Party and, like Syria, backed Harith al-Dhari of the Association of Muslim scholars, widely known for his anti-coalition vitriol.

**Jordan.** Turning to Anbar's second neighbor to the West, Jordan, like Saudi, was host to a significant portion of foreign fighters. Fighters were recruited in Jordan and eventually made their way to Anbar and other parts of Iraq. This corps of recruits contributed to bolstering the insurgency in the pre-transition period, 2005 to 2006.

In addition, Jordan—as well as Syria and the United Arab Emirates—became host to a large, wealthy Sunni Anbari expatriate community that fled Iraq after 2003. The exodus of middle-class professionals, technocrats, and the wealthy business class severely stifled economic growth and development in Anbar and throughout the country. An unstable security situation and rampant corruption, symptoms of the general absence of rule of law, were an unfavorable mix for establishing a viable economic and business environment in Anbar.

The loss of the middle-class base and investment opportunity in Anbar was by no means in and of itself a condition that supported the insurgency in Anbar. However, the effect that the losses had on a persistently crippled economy did benefit militants because the Anbari populace blamed coalition forces for abysmal economic circumstances in the province. The insurgents provided services and economic opportunities that traditional actors could not and at the same time exploited popular resentment toward the U.S.-led coalition.

A Jordanian strategy that was more positive in its impact during the pre-transition period involved using its Sunni Iraqi expatriate community to encourage Iraqi Sunnis residing in both countries to engage in Iraq's political process through participation in the 2005 elections. Sunni endorsement of the process was central to creating an alternative to the insurgency in Anbar and elsewhere Iraq.

Otherwise, like Saudi, Jordan's engagement did not include provision of military support to regular or to alternative groups in Iraq.[23] Nor did Jordan send members of its own security forces.

---

[23] Scott Lasensky, "Jordan and Iraq: Between Cooperation and Crisis," United States Institute of Peace, Special Report 178, December 2006.

PX716

Having described the external setting, we now turn to the transition period of 2006 to 2008. This timeframe is characterized by a discernable shift in the direction of the Anbar campaign. However, some of the foundations for that change were laid during the early phases of OIF.

## Counterinsurgency and Transition, 2006–2008

Our research indicates that a transition from COIN to stability operations in al-Anbar province can be identified. Although the U.S. Marine Corps (USMC) personnel we interviewed did not indicate that an actual "transition" concept existed in USMC doctrine during the 2006–2008 timeframe, some did agree that the term is applicable to what they more generally described as a shift in emphasis during the Anbar campaign. More specifically, the shift was from lines of operation focused on kinetic COIN activity (e.g., aimed at establishing security during 2005–2006), to lines of operation focused more on development (e.g., reconstruction and economic investment during 2007–2008). COIN activity continued through the period to suppress insurgent elements and other threats to stability, but commanders increasingly focused on matters of economics, politics, and sustainable governance. Indeed, a clear indicator of the transition was commanders' diversion of resources (e.g., manpower and intelligence collection assets) from COIN activities to stability and reconstruction.

### The Transition in Anbar: Contributing Factors

Many environmental factors contributed to the transition in Anbar, but it was arguably the confluence of four local factors that helped set the stage for a transition from COIN. These factors included AQI's violent tactics, harsh population control measures, and severe "shadow" governance; the decisions of key Iraqi tribes and groups' to collaborate in forceful opposition to AQI the same year; increasing numbers of adequately trained Iraqi Security Forces (ISF); and the revamped strategy and approach widely adopted by U.S. military forces by 2006. This strategy sharply contrasted Multi-National Force–West

PX716

(MNF-W) actions with those of AQI and gradually won the trust and confidence of the Anbari populace.

Regional factors also contributed to the transition in Anbar. Specifically, neighboring Syria and Saudi Arabia both saw the specter of instability in Iraq on the doorstep of their own countries. For Saudi Arabia, this would become a catalyst for their support of the tribal Awakening movement.

As mentioned above, the al-Saud regime was deeply concerned about the reemergence of AQI in Saudi Arabia because of the long-standing linkages that existed between AQI and the militant organization's counterpart, al Qaeda on the Arabian Peninsula (AQP). AQP was responsible for a number of anti-regime activities in Saudi during 2003 to 2007.

From the Saudi perspective, the situation in Iraq, particularly from 2005 through 2006, could replicate the country's 1980 experience, when mujahideen returned from Afghanistan with both enhanced combat skills and an ideological dedication to toppling "apostate" regimes. If renewed, this dynamic could threaten the ruling family by initiating a cycle of disorder that would produce more terrorists whose operations could become increasingly more threatening to the regime and, in turn, attract still more terrorists.[24]

The prospect of such an outcome, first, provided an incentive for Saudi security cooperation with the United States. Second, Saudi leadership understood that support for the U.S.-backed Awakening movement provided an effective means of defeating al Qaeda. Like the United States, the Saudis saw the movement as instrumental for creating a bulwark against jihadism at home. However, Saudi support, mostly through the provision of funding for arms, was cautious. The regime was wary of growing tribalism. Empowering local Anbari tribes might encourage the tribes' compatriots in Saudi to advocate for more power and influence. This being the case, the future integration of the Awakening fighters into formal Iraqi security structures was important to Riyadh.

---

[24] Joseph McMillan, "Saudi Arabia and Iraq: Oil, Religion and an Enduring Rivalry," United States Institute of Peace, Special Report 157, January 2006.

PX716

For Damascus, concerns about the export of militant jihadism to Syria eventually caused its leadership to stem the flow of foreign fighters to Iraq. Following the beginning of Operation Iraqi Freedom (OIF), Syrian leaders had seemed to passively support terrorism and the insurgency by allowing fighters passage into Iraq through Western Syria, some of them going to Anbar. However, the rapidly deteriorating security situation in Iraq during 2006 and 2007 produced circumstances that were alarming for Damascus.

In this regard, a key Syrian concern centered on the potential development of Kurdish separatism in northern Iraq and its possible influence on Syria's own Kurdish population.[25] Indeed, Syria's Kurds, totaling 10 percent of the population, were already growing restive in the northeast and major cities like Damascus.[26]

Also, any continuation of activities that sustained the insurgency threatened to put Syria in a more direct confrontation with Islamists. Several events offered warning signs. Al Qaeda–backed militants attacked a diplomatic enclave[27] in Damascus, killing four in April 2004.[28] In 2006, Syrian intelligence thwarted an attack on the U.S. embassy.[29] Al Qaeda had also spoken of opening a new front in Syria.

Thus, the stream of jihadists entering Iraq via Syria was beginning to prove detrimental to Syrian interests. The attacks were a "wakeup call" that fighters returning to Syria posed a security threat at home. In addition, Syria began to feel the strain of some 1.5 million Iraqi refugees fleeing the violence in Iraq. The country could no longer with-

---

[25] Mona Yacoubian, United States Institute of Peace, interview by authors, Washington, D.C., July 26, 2009.

[26] In March 2004, dozens of Kurds were killed or wounded in al-Qamishli after days of protests also left many injured. Such confrontations, once rare, have become more common and have raised Syrian government concerns about security in Kurdish areas and escalation in the confrontation. See Radwan Ziadeh, "The Kurds in Syria: Fueling Separatist Movements in the Region?" United States Institute of Peace, Special Report 220, April 2009.

[27] The attack, in the Rawda district, was near the British, Canadian, and Iranian embassies.

[28] Ewen MacAskil, "Syria Blames al-Qaida-linked Group for Attacks," *The Guardian*, April 29, 2004.

[29] Megan Stack, "Syrians Foil Strike on US Embassy," *Los Angeles Times*, September 13, 2006.

PX716

stand the economic and political challenges of the refugee crisis facing it, a crisis that it had helped to provoke.[30]

In the section entitled "Setting the Stage for and Managing the Transition," we describe key events related to some of the local factors that contributed to the transition from COIN in Anbar province and we focus on select components of the U.S. approach that are now credited with enabling, launching, and sustaining the transition. However, the U.S. military made a number of attempts to secure Anbar and regain the initiative from AQI before it identified a successful approach. Before offering a detailed discussion of the local factors that contributed to the transition in Anbar province, we provide a few examples of those attempts and assess the external actors' understanding of the evolving conflict.

**False Starts and Missed Opportunities on the Road to Transition**

Anbar would eventually be recognized as the birthplace of the U.S. "tribal engagement" initiative, a type of "indirect, irregular warfare" strategy that led to a counterinsurgency alliance between coalition forces and most of the tribes in the province.[31] Indeed, U.S. Special Operations Forces and personnel from other U.S. agencies had made contact with some tribes in western Iraq as early as 2003, during the invasion.[32] Over time, certain tribal engagements evolved into efforts to recruit local national fighters and attach them to CF units, and thereafter to transition the fighters to the ISF.

In April 2005, U.S. Marines began reporting, and it was later confirmed, that local nationals were attacking AQI forces in the Husaybah-Al Qaim region along the Syrian border in western Anbar.[33] The

---

[30] Most of Syria's refugees are concentrated in Damascus, with some also in Aleppo. Although Syria absorbed diverse refugees, most are thought to be Sunni. Compared to Jordan, and other host-states, Syria had a larger proportion of impoverished refugees.

[31] Thomas R. Searle, "Tribal Engagement in Anbar Province: The Critical Role of Special Operations Forces," *Joint Forces Quarterly*, No. 50, 3rd Quarter, 2008, p. 65.

[32] Searle, "Tribal Engagement," p. 63.

[33] U.S. Marine Corps, 2D Marines Division Public Affairs Office, "Operation Steel Curtain Update," September 8, 2005.

PX716

attackers were from the powerful Albu Mahal and Albu Nimr tribes, which had formed the "Hamza Battalion" of some 400 to 1,000 fighters to take on AQI.[34]

The Hamza Battalion was destroyed by AQI in August 2005.[35] However, around the same time, MNF-W began recruiting members of Albu Mahal and other tribes to serve as scouts and intelligence collectors. The scouts were dubbed the "Desert Protectors."[36] Their first action came in November 2005, when MNF-W and Iraqi Army (IA) soldiers, who were by this time some 15,000 strong in the province, launched "Operation Steel Curtain." This undertaking was intended to "destroy the al Qaeda in Iraq terrorists operating throughout the al Qaim region."[37]

Although the Desert Protector program was a promising early example of CF teaming with indigenous forces to fight AQI, it was short-lived. The program had been authorized by Multi-National Corps-Iraq but with the anticipation that local nationals joining the Protectors would ultimately transition to the Iraqi Army. Transitioning the Protectors to the IA would decrease the chance that the force might evolve into a competing militia that could challenge the provincial government. However, CF authorities apparently did not understand the limits of tribal members' willingness to contribute to securing Iraq. The Albu Mahal and participants from other tribes wanted to serve near their homes; joining the IA could mean deployments anywhere in Iraq.[38]

The Desert Protector program unraveled when many of the local Iraqi participants quit rather than join the Iraqi Army. Some Protectors

---

[34] Long, "The Anbar Awakening," p. 79; Carter Malkasian, "Local Opposition to Al Qaeda in Iraq," Center for Naval Analyses, slide presentation, February 12, 2009.

[35] Malkasian, "Local Opposition to Al Qaeda."

[36] Searle, "Tribal Engagement," pp. 64–65; and Malkasian, "Local Opposition to Al Qaeda."

[37] U.S. Marine Corps, 2D Marines Division Public Affairs Office, "Operation Steel Curtain Update," November 8, 2005.

[38] Searle, "Tribal Engagement," p. 65.

PX716

did, however, later join Iraqi Police organizations in their local areas.[39] Moreover, following Operation Steel Curtain, the MNF-W and IA improved coordination with the Albu Mahal and effectively partnered with the tribe to provide security in al Qaim.[40]

MNF-W continued to experiment with tribal engagement in late 2005. A notable success came in December when nationalist insurgent groups actually collaborated with coalition forces to provide security during national elections. In the relatively secure environment, Anbar Sunnis turned out in force to cast their votes.[41] During the same period, however, the coalition missed an opportunity to attempt an alliance with the Al Anbar People's Council, a coalition of Sunni sheikhs and nationalist groups that had formed to fight AQI.[42]

In the wake of the 2005 election process, insurgent violence dropped in al Anbar. According to one account, some MNF-W planners had thought an anticipated reinforcement—one replacement brigade, two additional battalions, and a few hundred IA soldiers to join the MNF-W—could build on the positive momentum generated during the elections and assist in any collaboration with the Council. However, the reinforcing units were, in the end, not forthcoming. Some senior MNF-W leaders also continued to have reservations about collaborating with tribal organizations to provide security.[43] Meanwhile, AQI wasted no time in attacking its potential rival. By February 2006, AQI had assassinated the top leadership of the Anbar People's Council and the organization had collapsed. Violence in the province increased dramatically thereafter.[44] From this experience, the Command learned the necessity of protecting the leaders of organizations that might align themselves with the coalition.

---

[39] Searle, "Tribal Engagement," p. 65.

[40] Long, "The Anbar Awakening," p. 79.

[41] Ellen Knickmeyer and Jonathan Finer, "Iraqi Vote Draws Big Turnout of Sunnis," *Washington Post*, December 16, 2005, p. A1.

[42] Smith, "Anbar Awakens," p. 42.

[43] Senior Analyst/All Source Fusion Officer, 1-MEF, 2005–2006, interview by authors, Arlington, Virginia, June 8, 2009.

[44] Senior Analyst/All Source Fusion Officer, interview, June 8, 2009.

PX716

**External Actors' Understanding of the Changing Conflict Dynamics**

Syria, Saudi Arabia, and Jordan saw the decline in violence in Anbar as beneficial to their domestic interests, the most important of which was internal stability. For its part, Syria believed that the changing conflict dynamics presented avenues of opportunity. For example, Syria's ability to influence the dynamics in Iraq strengthened its hand with the United States and regional actors on various regional issues. This meant that Damascus could exploit its ties with the United States and Iran to strengthen its regional position politically and economically.

On the economic front, stability in Anbar and Iraq would allow for increased agricultural trade and potentially renewed access to the Kirkuk-Banias pipeline, which had been destroyed during the 2003 invasion and rendered inoperable. Syria anticipated benefits from potential access to Iraq's hydrocarbon sector, its railway lines and other infrastructure, and general trade opportunities as well.[45]

The Saudis, meanwhile, interpreted the drop in violence as an opportunity to further support the integration of Awakening members into the Iraqi security forces. This effort decreased the likelihood that Anbar would fall again to the insurgency.

## Setting the Stage for and Managing the Transition

By early-2006 the United States and the Iraqi government were still struggling to get the insurgency under control and move toward stability. U.S. forces were still learning nuances of the area and COIN techniques and tactics were still being perfected.

MNF-W set the stage for the transition to stability operations in Anbar by implementing a new COIN strategy developed over time by planners at the Command. The new strategy enabled MNF-W to increasingly suppress insurgents operating in the province, which in turn enabled the Command to focus on mentoring and oversight initiatives aimed at returning governance to Anbaris. A concerted effort

---

[45] Mona Yacoubian, United States Institute of Peace, interview by authors, Washington, D.C., July 26, 2009.

by MNF-W planners to better understand Anbar's dynamic society underpinned the MNF-W approach.

**Transition Process Components**

In 2004, MNF-W undertook two major operations to secure Fallujah, a large population center in Anbar. The operations were kinetic, aimed primarily at killing and capturing terrorists and insurgents, and featured a largely conventional assault on enemy forces in the city. While many enemy fighters were captured or killed, the Command was not able to assert control of Fallujah during the period, and local national civilians suffered as a result of the infrastructure damage that occurred during the fighting. USMC leaders realized in late 2005 or early 2006 that they needed new methods, not only for the application of military power to the COIN campaign in al Anbar, but also for a better understanding of Anbar's dynamic society. The latter capability would help ensure that military and other instruments of power could be effectively applied to secure the province and to advance its recovery.

**Understanding the Al-Anbar Operational Environment.** The Command's experience in Anbar through 2005 had demonstrated that a focus on targeting terrorists and insurgents would not ultimately wrest provincial areas from enemy control. Indeed, by 2005, threat groups—of which AQI was the most dominant—controlled, intimidated, or otherwise influenced large segments of the Anbari populace. Insurgent groups depended on the support or at least acquiescence of local citizens to maintain their freedom of movement and ability to attack coalition forces. The USMC determined that it would have to divide the insurgents from the populace. To do that, the Marine Corps needed a more detailed understanding of Anbari society. This reasoning prompted the First Marine Expeditionary Force (IMEF) to establish the Economic and Political Intelligence Cell (EPIC) in March 2006.

The new EPIC was initially called the Political Intelligence Cell. It was meant to fill a gap in the USMC's understanding of political power players in Anbar, including the complex relationships among various individuals and organizations, the political/tribal leadership dynamic, and the hierarchy of sheikhs in the province, among other

PX716

issues. The organization's portfolio quickly expanded beyond the political focus, however, to include economic intelligence and analysis because economic activity (e.g., legal commerce, barter, black marketing, and money laundering) was understood to be inextricably linked to Anbar's political construct. EPIC analysts also tracked the activities, interests, and relationships of Sunni business leaders (and others in the "leadership diaspora") living in Jordan and Syria.[46]

The USMC had no professional track for training analysts in the skills required to support the EPIC mission. To fill the gap, the USMC brought in specialists from the Reserves to augment the staff.

In 2006, the EPIC increased MNF-W decisionmakers' understanding of commerce (both legal and illegal) in Anbar and the key players in the province. The EPIC team identified, for example, the tribal interests in key business entities as well entities serving as fronts for insurgent groups. The EPIC tracked Syrian military intelligence funding of insurgent and organized crime groups in Anbar. It also revealed the extent of the insurgents' control of black market fuel products. This type of knowledge enabled MNF-W to invest its reconstruction funds in a manner that would advance its objectives for the province while denying or disrupting insurgent financing.[47]

The 2006 EPIC staff was "focused on the enemy"; that is, the cell supported commanders' ability to identify insurgents, criminals, and other threat groups. The cell helped commanders understand the threats that the enemy posed to MNF-W's political and economic lines of operation in Anbar, as well as how to counter those threats. The EPIC's 2006 focus reflected the Command's concentration on establishing security.[48] However, by 2007, MNF-W commanders' requests for information were indicative of the transition away from COIN and the increasing focus on reconstruction and development. For example, the requests sought assessments of commodity supplies and prices, as

---

[46] EPIC Officer in Charge (USMC) 2006, email interview by authors on the subject "Your EPIC and JPEC Experience," July 22, 2009.

[47] EPIC Officer in Charge (USMC), 2006.

[48] EPIC Officer in Charge (USMC), 2006.

PX716

well as the political affiliations and allegiances of all types of power players.[49]

Another major MNF-W innovation and contributor to understanding the Anbar environment was the Joint Prosecution and Exploitation Center (JPEC), established under the IMEF intelligence section (the G2) in June 2006. The JPEC was launched to fill a key capability gap: The USMC's lack of a process to support law enforcement (LE) in Anbar and its lack of personnel with certain LE skills.

Law enforcement skills and police intelligence techniques can be employed during irregular warfare to understand the insurgent and criminal elements threatening host nation stability, as well as their interaction and collaboration. The Command's LE shortfall made it difficult to develop such understanding vis-à-vis Anbar.

MNF-W tactical units typically did not have the policing skills or intelligence capacity needed to conduct evidence collection and investigations and to process detainees. Therefore, when units captured a suspected criminal or insurgent, they were unable to develop a case file that could prove their suspicions to the Combined Review and Release Board (i.e., Task Force 134) or at the Criminal Courts of Iraq; hence, detainees were released back into the civilian population to repeat their crimes and/or attacks. In addition, tactical units typically could not effectively exploit (e.g., through interrogation) the detainees they had in custody to generate new information on the suspects' activities and associates. This capability gap inhibited the units' ability to achieve counterinsurgency objectives in their areas of operation. Finally, MNF-W's process shortfall meant that it could not track detainees as they moved through the detention and judicial systems.[50]

Detainees understood the MNF-W detention process. They knew they would likely be released quickly if they refused to provide evidence during interrogations.[51] Moreover, the Command's ineffective

---

[49] EPIC Officer in Charge (USMC), 2007, interview by RAND researchers, January 11, 2008.

[50] JPEC Officer in Charge (USMC), 2006, interview by authors, July 27, 2009, Alexandria, Virginia.

[51] JPEC Officer in Charge (USMC), 2006, interview.

PX716

detention process meant that Iraqis who collaborated with CF to send an insurgent to jail would face the accused on the street in the near term. Such circumstances undermined CF efforts to gain the trust of Anbari citizens and acquire tips on insurgent activities.

USMC senior intelligence officers recognized in early 2006 that much of the information and capability needed to provide effective support to law enforcement was already controlled by the Command or available to it. Different organizations with key information, however, focused on their specific missions and did not share their data or findings with other organizations having a need to know. Marine Corps intelligence officers, therefore, sought to organize the disparate LE-related elements into an effective organization and system for law enforcement support .[52] The JPEC they founded employed military and civilian experts, including reservist police officers. The JPEC supported efforts to disrupt criminal and terror networks by performing the all-source intelligence analysis required to track and target network members. It conducted crime scene investigations and criminal case management to support the prosecution and incarceration of captured insurgents and criminals. It also organized the training of coalition and Iraqi forces in case management and crime scene investigation (also known as tactical or sensitive site exploitation, which included such essential functions as taking photographs and finger printing suspects).[53]

According to one of the organization's key architects, the JPEC quickly made an impact on the Anbar operational environment. Criminals and insurgents were effectively prosecuted or held as security threats; intelligence-driven operations increased and detainee recidivism had dropped significantly by fall 2006.[54]

---

[52] These elements included, for example, the MNF-W's forensics laboratory and "Detainee Tracker" system; document exploitation teams; information from USMC radio battalions that exploited insurgent equipment such as cell phones; forensics data from the Biometrics Automated Tool Set and the Combined Explosives Exploitation Cell; Reserve and Federal agency law enforcement officials; judge advocates general with specific training in Iraqi rule of law; and liaison officers positioned at Task Force 134 and Iraq's criminal courts.

[53] JPEC Officer in Charge (USMC) 2006, interview.

[54] JPEC Officer in Charge (USMC) 2006, interview.

PX716

Because it contributed to the disruption of threat networks, the JPEC contributed to MNF-W's security-focused mission in 2006. Over time, the JPEC's ability to promote the rule of law in Anbar Province—by training the ISF in LE tasks and by supporting the development of Iraq's judicial system—enabled the JPEC to be a significant contributor to the Command's transition from COIN to stability operations in Anbar.

MNF-W's improved understanding of the Anbar operational environment came at a critical time. In Ramadi, Sheikh Sattar al-Rishawi of the Albu Risha tribe initiated a campaign against al Qaeda in September 2006.[55] Sheikh Sattar had founded the Sahawat Al Anbar (Anbar Awakening Council), which eventually grew to include 42 tribes. Having learned from earlier attempts to work with indigenous Iraqi forces, U.S. military forces moved quickly to help protect Anbar Awakening Council leaders and support its operations. By October 2006, MNF-W was working with local leaders to arm and organize the irregular forces (frequently know as "the Sons of Iraq") that were joining the Awakening movement.[56] The fact that tribal leaders supported this effort was of vital importance, because their approval was critical to legitimizing the developing of local forces to supplement the national Iraqi army and police. Young men in Anbar were now encouraged and supported to join the growing security forces. The support of tribal leaders also contributed to the discipline of the local forces, since those locally recruited units were intended to be the protectors of their own people.

The CF-Awakening collaboration would ultimately overwhelm AQI forces, help return governance to local and provincial authorities throughout most of Anbar, and enable many Sunni irregulars in the Awakening movement to later join the ISF, a key component in the transition from COIN to stability operations. Indeed, with support from new organizations, such as the EPIC and JPEC, MNF-W planners achieved an increasingly sophisticated understanding of Anbari society, which enabled coalition forces to influence the environment

---

[55] Long, "The Anbar Awakening," p. 80.

[56] Renny McPherson, "Operations in Anbar Province, Iraq," unpublished RAND research.

PX716

in a way that supported MNF-W objectives for the province. Such understanding allowed the Command to sustain and propel the transition process that had been made possible by the security initiatives launched in 2006.

**MNF-W's Revamped Counterinsurgency Strategy, 2006.** MNF-W had learned from experience that there were limits to its ability to influence Anbar's development via direct action, at least with the resources it had available. As part of the new approach it adopted in 2006, MNF-W sought to achieve more of its objectives by working with and through Iraqis and local institutions. This was the approach adopted to engage the Awakening movement, as described briefly above.

MNF-W's broader effort in 2006 could be described as the establishment of an environment of trust in Anbar province. The Command would first build trust between its forces and the Anbari populace and then employ mentoring and oversight to generate trust between the Anbaris and themselves.

MNF-W sought to build this relationship of trust by making population security a top priority. To accomplish this, the Command deployed tactical units to live among the people of Anbar and keep them secure. Foot patrols were extensively used to establish contact and relationships with local Iraqis. This approach contrasted with earlier efforts, in which Marines and soldiers lived on huge MNF-W bases and typically patrolled in vehicles.[57]

During this period (mid to late 2006), many Anbaris were growing weary of AQI's violent tactics and harsh approach to governance. When they understood that the coalition forces now living in their neighborhoods would be there around the clock to protect them, they started providing tips on AQI activities.[58] This human intelligence greatly facilitated MNF-W efforts to target or otherwise engage insurgents and secure the province. The importance of AQI's heavy-handed approach toward the local population cannot be overemphasized. The fact that AQI was terrorizing much of the population caused many Anbaris to turn against them and was of decisive importance to the

---

[57]   McPherson, "Operations in Anbar Province."

[58]   McPherson, "Operations in Anbar Province."

efforts of the coalition and the government of Iraq to stabilize Anbar. Perhaps more than any other factor, including the attempts of the coalition and Iraqi security forces to bring order to the region, this error by AQI created an environment where the population turned against the insurgents.

Over time, MNF-W's increasingly sophisticated understanding of the insurgent landscape and Anbar more generally, collaboration with indigenous Iraqi forces (e.g., the Awakening fighters), and efforts to secure the Anbari population created an environment in which Iraqi military and police forces could progressively take the lead in maintaining provincial security.

**Mentoring and Oversight to Foster Governance and Recovery in Anbar, 2007–2008.** As part of the security component of its transition process, MNF-W had made a concerted effort to train and equip Iraqi Army and police forces and to recruit local nationals (including former insurgents) into the police and IA ranks. MNF-W was careful to work closely with local leaders in its recruitment efforts. In addition to generating personnel for the security forces, working with local leaders helped shift the balance of power and influence away from groups such as AQI—which had offered jobs and money to local Anbaris—and back toward traditional leaders, the sheikhs. The sheikhs who had collaborated with MNF-W's recruitment drive delivered thousands of jobs to the local population, an effort that contributed to the restoration of the sheikhs' traditional power.[59]

MNF-W's security force recruitment effort had gained significant momentum by late 2006, as large numbers of former insurgents and other local nationals joined local Iraqi police units in the province.[60] Some tribes took high-profile roles in the ISF:

> The Albu Mahal were allowed to effectively take over the Iraqi Army brigade in their region, while the Albu Risha came to dom-

---

[59] West and West, "Iraq's Real 'Civil War.'"

[60] Citing Marine Corps History Division sources, McPherson notes that there were just 2,000 police in all of Anbar at the beginning of 2006. By late 2006, the number had increased to 8,500. McPherson, "Operations in Anbar Province."

PX716

inate the Ramadi Police. The Iraqi government delegated significant authority to both tribes, along with the Albu Nimr around Hit.[61]

The willingness of local nationals, especially former insurgents, to join government security forces could be seen as a key indicator that MNF-W was turning the tide against the insurgency and was positioned to begin the transition from a COIN focus to one of stability operations and reconstruction. However, it seems likely that the perception of the AQI threat shared by MNF-W, tribal elements and governing institutions in Anbar, and the central government in Baghdad, contributed to early successes in transitioning irregular fighters to the ISF. But by 2008, it was clear that efforts to transition irregulars were encountering significant difficulties.

Developing the ISF's swelling ranks into a professional force was another key component of MNF-W's early transition effort. In fact, MNF-W had initiated both military and police training programs before the Awakening period. Military Transition Teams (MiTTs) were established to provide "day-to-day tactical training on urban combat, cordon and search, checkpoint procedures, and the intelligence cycle" to the Iraqi Army.[62] The MiTTs trained all echelons of the two Iraqi Army divisions stationed in Anbar.

Over time, MNF-W drew down and changed the structure of its MiTT program. The Command gradually decreased the number of U.S. trainers assigned to Iraqi units. It also decreased the rank of MiTT leaders from colonel to lieutenant colonel. These actions had the effect of forcing the developing Iraqi Army units to operate more independently while also clearly establishing that Iraqi general officers were in command.[63]

---

[61] Long, "The Anbar Awakening," p. 81.

[62] McPherson, "Operations in Anbar Province."

[63] Major General John Kelly, the IMEF/MNF-W commander in 2008, has explained that Iraqi general officers treated U.S. colonels as peers and at times deferred decisions to their U.S. colleagues as a result. When lieutenant colonels led the MiTTs, Iraqi generals were clearly the senior officers in charge of the Iraqi Army divisions. Major General John Kelly,

As MNF-W transitioned from COIN to stability operations, it shifted its relationship with the ISF in Anbar. Early in the mentoring process, MNF-W forces led with the ISF in support. The ISF progressively took the lead as its ranks and proficiency increased, while the MNF-W transitioned to a supporting role. The ISF later achieved the capability to operate independently. Thereafter, in April 2008 and with MNF-W consent, the ISF took over primary responsibility for maintaining security in Anbar.

As Iraq security forces, both local and national, became more competent, U.S. forces increasingly assumed the role of trainers, mentors, and enablers who provided key capabilities that the Iraqi security forces lacked. For example, while the indigenous Iraqi security forces had, of course, a much better ability to interact with the local population, they lacked sophisticated technical intelligence and surveillance capabilities. As the numbers and level of competence of the Iraqi police and military units increased, U.S. forces assisted them with training and equipment and provided them with technical intelligence that was an extremely useful supplement to the human intelligence they generated from interacting with the population.

In September 2008, MNF-W formally transferred security responsibility to the ISF.[64] It could be argued that once MNF-W had transferred security responsibilities to the ISF and was able to achieve a sustained focus on stability and reconstruction, it had achieved the transition from COIN.

MNF-W senior leaders were conscious of the need to prove to Anbaris that life was steadily improving. Moreover, MNF-W realized that, in the long run, peace and stability would be more likely and sustainable if Anbaris had confidence in their own government. In other words, there needed to be an atmosphere of trust and confidence, not only between the coalition forces and the people of Anbar but also between the people and their homegrown governing authorities and between competing groups in the province. Promoting this atmo-

---

"Reflections of a Returning Commanding General on Counterinsurgency in Iraq," presentation at the RAND Corporation, April 24, 2009, Arlington, Virginia.

[64] Filkins, "U.S. Hands Off Pacified Anbar."

sphere was another key component of the transition process MNF-W pursued.

The ISF's increasing proficiency afforded MNF-W the opportunity to take some high-profile initiatives aimed at improving Anbaris' quality of life and sense of sovereignty. For example, as security improved, MNF-W took steps to reduce the visibility of the coalition forces and the burdens they imposed on average Iraqis. In 2008 MNF-W ordered U.S. military supply convoys to operate overnight (between 9 PM and 5 AM) to reduce traffic congestion. Signs on MNF-W vehicles warning Iraqis to stay back or be shot were replaced with new signs instructing Iraqi vehicles to proceed and pass when signaled by MNF-W personnel. This had the effect of starting to change the population's perceptions: Rather than being thought of as foreign occupiers, coalition forces began to be recognized, along with the increasingly numerous Iraqi police and military, as being there to help the people. For example, coalition forces shared the road with Iraqis instead of taking it over. The Command also removed many checkpoints from major roads in the province; others were transferred to ISF control. Finally, in perhaps the most dramatic signal that the "occupation" was ending and life might get back to normal in the province, MNF-W began closing major operating bases in 2008. According to one senior leader, the closing of the USMC's huge Camp Fallujah base, in particular, had a major, positive impact on Anbaris' perception of the occupation.[65]

In another effort to improve conditions for Anbaris, MNF-W made numerous reconstruction investments in Anbar, starting well before the 2006 strategy change. MNF-W undertook small initiatives that could be completed by local contractors. Examples included general cleanup and trash collection and the painting of mosques before the beginning of Ramadan.[66] Many early investments in Anbar's recovery were made via the Commander's Emergency Response Program (CERP), which allowed coalition military commanders to pro-

---

[65] Kelly, "Reflections."

[66] Department of Defense civilian member of Al Anbar Provincial Reconstruction Team, May 2007 to April 2008, interview by authors, Arlington, Virginia, May 13, 2009; and Senior USMC intelligence officer, interview by authors, Arlington, Virginia, July 14, 2009.

PX716

vide funds to "respond rapidly to urgent humanitarian, relief, and reconstruction needs in their geographic areas of responsibility."[67] The CERP funds were provided directly to local nationals while local government officials were kept "informed of progress."[68]

MNF-W's early investments, however, too often failed to have a lasting, positive impact. Before the Command had achieved a detailed understanding of the Anbar environment, it sponsored some projects that were not useful to the local people, and it often paid contractors who failed to deliver promised work, such as the construction of a new building. MNF-W contracting officers did not speak the local language and did not understand the Anbari business environment well enough to evaluate who they were funding or the likelihood that contracted projects would be completed as agreed.[69] There were even cases of MNF-W funds being diverted from aid projects to the insurgency. According to one USMC intelligence officer,

> We discovered early on that MNF was routinely giving money to insurgent front companies for reconstruction contracts that, in turn, went to fill those insurgents' war chests.[70]

The MNF-W came to understand that many local Iraqi contractors viewed the CF as a temporary phenomenon; thus, there was no need to adhere to contracts because the relationship was short term. Some Iraqis sought only to bilk as much money as possible from MNF-W project managers.[71] These experiences led MNF-W to shift from funding Iraqis directly and coordinating with governing authorities to fund-

---

[67] Lieutenant Colonel Leonard J. DeFrancisci, "Money as a Force Multiplier in COIN," *Military Review*, May–June 2008, p. 179.

[68] DeFrancisci, "Money," p. 183.

[69] Senior Analyst/All Source Fusion Officer, interview, June 8, 2009.

[70] EPIC Officer in Charge (USMC) 2006, interview. As we indicated earlier, the EPIC reportedly made a significant impact by helping MNF-W commanders and project managers identify insurgent front companies.

[71] For example, one USMC officer and Anbar veteran related how Marines discovered that some Iraqis contracted by MNF-W to paint buildings actually mixed their paint with so much water that it peeled off the structures not long after the work was completed.

PX716

ing projects via governing institutions. Although this approach did not eliminate waste and fraud, it did increase the chance that funded projects would be completed as envisioned and also strengthened the legitimacy of government institutions. This is because local Iraqis understood the business environment they operated in. They understood what level of graft and corruption was to be expected in the course of business activity versus what was excessive and a threat to their business endeavors. Moreover, local contractors understood that governing institutions, their new supervisors, might be in place for the long term. In such cases, local national contractors had incentives to deliver work of adequate quality and meet the terms of their agreements, lest they damage potentially enduring business relationships and be denied opportunities for additional contracts.[72]

Improved contracting was just one element of a larger MNF-W effort to improve money flows into Anbar, convince Anbaris to invest in their own recovery, and, at the same time, reinforce the governing institutions that could contribute to stability. Once again, establishing an atmosphere of trust and confidence and providing mentoring and oversight were essential to the larger effort. Indeed, as one Anbar veteran explained to us, "capitalism requires confidence." In this regard, the Marines we interviewed indicated that they sought to position the Command as something of an honest broker between the various competing elements in Anbar society. In contrast to previous approaches wherein direct action was typically used to influence developments in Anbar, during the transition period of 2007–2008 the Command sought to use mentoring and oversight to create an environment in which the Iraqis would see the benefit of cooperating among themselves and with MNF-W in order to advance Anbar's recovery. The Command developed several governance and business processes and forums to reinforce this effort; some were established as early as 2005 but only came to fruition once the security environment had substantially improved after 2006.[73]

---

[72]  Senior Analyst/All Source Fusion Officer, interview, June 8, 2009.

[73]  Senior Analyst/All Source Fusion Officer interview, June 8, 2009.

PX716

Regarding governance, the Marines we interviewed for this case study indicated that MNF-W pursued (perhaps unofficially) a two-track approach. On the one hand, MNF-W undertook initiatives aimed at establishing the provincial government's legitimacy and authority. On the other hand, MNF-W would, as appropriate, work through, or even help establish, traditional governance institutions to stabilize and secure the province. As one senior USMC officer who led engagement efforts explained to us, his goal was to foster "governance" that worked for Iraqis, not necessarily "government" as it is typically envisioned by Americans.[74]

With respect to traditional institutions such as tribal councils, MNF-W used them to establish what one Marine described as an "arc of conversation" among various Iraqi groups and between Iraqis and the MNF-W. For example, MNF-W promoted development of a "Sheikh Shura" where local leaders could meet routinely to discuss issues and resolve disputes. MNF-W felt this initiative had succeeded when the sheikhs started meeting on their own without MNF-W participation.[75]

As they pursued the participation of traditional institutions in recovery efforts, MNF-W officials sought to retain "distance and equanimity" in their dealings with local Anbari leaders. The Command had learned from experience not to pick leaders for the people of Anbar. Such leaders had power because of their relationship to the coalition instead of an indigenous constituency; thus, they might be identified as illegitimate "fake sheikhs" by the populace and perhaps be toppled when their CF benefactors had departed. Instead, MNF-W engagement officials treated every Anbari leader as a potentially useful relationship. They were also careful not to marginalize leaders whose power had declined, understanding that it could take only a few disgruntled sheikhs to disrupt progress toward Anbar's recovery and return to normalcy.[76]

As another part of the governance component of its transition process, MNF-W maintained oversight to ensure that Iraq's central

---

[74] Senior USMC intelligence officer, interview.

[75] Senior USMC intelligence officer, interview.

[76] Senior USMC intelligence officer, interview.

PX716

government in Baghdad honored its financial commitments to Anbar province. This effort sought to ensure, for example, that Anbaris who joined the ISF or other government-sanctioned security units stationed in the province were paid for their service.[77] Delivering routine pay for Anbaris who worked for security services was critical to proving the central government's effectiveness. The pay was important to the provincial economy as well and vital for keeping military-age males out of the insurgency and engaged in legitimate work. Nevertheless, the Shi'a-dominated central government often required coaxing from senior CF leaders to meet its obligations to Anbar, a province dominated by Sunnis, including insurgents who had fought central government forces prior to the Awakening movement.

By 2007, reporting by a veteran observer indicated that MNF-W had succeeded in proving its good faith, at least to some tribal elements in Anbar:

> The tribes openly acknowledge that it has been the personal behavior, strength of arms and persistence of the American forces that convinced them to join the fight. "The American coalition is the only thing," Sheik Abureeshah of Ramadi said, "that makes the Iraqi government give anything to Anbar."[78]

Regarding reconstruction projects, MNF-W accepted the view in time that projects were more likely to be successful if host nation government institutions served as the conduit for funding, rather than the Command or other U.S. government agencies, whose presence was considered temporary by Iraqi contractors. MNF-W also understood that funding projects and creating jobs via government channels had the effect of strengthening the legitimacy and authority of the provincial government, a development that was judged essential to Anbar's long-term stability. That being the case, MNF-W's mentoring process included working with provincial government authorities to manage funds from various sources (e.g., from Iraq's central government and

---

[77]  Senior USMC intelligence officer, interview.

[78]  West and West, "Iraq's Real 'Civil War.'"

PX716

U.S. and international donors) and to develop a contracting process that the Anbari business community would recognize as transparent and fairly administered. Once Anbaris shifted from petitioning the MNF-W for contracts and instead routinely approached their government for business, MNF-W officials understood that they had achieved a key step in the transition to stability.[79] (See Figure 6.2.)

MNF-W leaders knew that Iraqi government and international sources would not be able to fully finance Anbar's recovery. Therefore, one of the Command's major goals was to foster what a USMC officer later called a "homegrown recovery" in Anbar; that is, to create an environment in which Anbaris at home and those living abroad would

**Figure 6.2**
**Launching and Advancing the Transition in Anbar Province**

**Successful CF Initiatives and Approaches**
- Implemented programs to ensure quality of life improvements for indigenous population
- Supported leader selections by the populace
- Empowered local national leaders to supplant insurgents
- Facilitated recruitment of local nationals for ISF service
- Transitioned security operations to the ISF
- Fostered governance that worked for local nationals
- Helped restore popular confidence in provincial government
- Acted as honest broker to facilitate local national collaboration for recovery
- Helped establish business processes and forums designed to sustain recovery
- Fostered development of governmental processes designed to support long-term recovery
- Convinced local nationals and expatriates to invest in the recovery of their homeland
- Developed rule of law support programs that advanced the development of indigenous police, judicial, and detention systems

**CF Shortfalls**
- Had insufficient long-term programs and resources for insurgent demobilization and reintegration
- Misunderstood economic environment, leading to diversion of some reconstruction funding to insurgents during early years of campaign
- Failed to supply sufficient resources for recovery programs
- Inadequate rule of law support during early years of campaign
- Lacked capacity for training local national police during early years of campaign
- Lacked civil-military affairs capacity
- Lacked civilian expertise needed to support long-term recovery programs

RAND *MG1111/2-6.3*

---

[79] Senior Analyst/All Source Fusion Officer, interview, June 8, 2009.

PX716

invest in the province's reconstruction and development. Not only would this approach generate more funds for recovery efforts, it would also give many native Anbaris, some of whom were quite influential, a stake in the recovery effort and its outcome. MNF-W therefore facilitated a number of business forums designed, among other things, to inform Anbaris of the improved climate and processes for investment in the province. A USMC officer was stationed at the U.S. embassy in Amman and charged with engaging the wealthy Anbaris who had fled to Jordan and elsewhere after the 2003 invasion. By 2008, many powerful sheikhs who had fled abroad had agreed to return to Anbar.[80]

MNF-W forces did not undertake the transition from COIN alone. Between 2006 and 2008, Iraqi forces and authorities played an increasingly important role in the endeavor. As described above, thousands of Anbaris participated in various training programs offered by coalition forces and designed to improve security and governance in the province. The government of Iraq authorized the hiring of thousands of police officers and, at times grudgingly, supported efforts to integrate some of the Sons of Iraq into the ISF. In March 2007, Prime Minister Maliki visited Anbar and voiced support for the tribal leaders who were battling AQI.[81]

According to accounts provided by Iraqi authorities, a concerted effort to reestablish police control in key areas of the province began in 2006.[82] This move later proved vital to the transition. Iraqis rebuilt police stations destroyed by AQI fighters and hired thousands of police recruits, sending many of them to Jordan for training as part of a U.S.-sponsored program.[83] Iraqi police were among the first to fight in the

---

[80] Senior Analyst/All Source Fusion Officer, interview, June 8, 2009; Senior USMC intelligence officer, interview.

[81] Kirk Semple, "Iraq Premier Meets Leaders in Area Torn by Insurgency," *New York Times*, March 14, 2007.

[82] Colonel Gary W. Montgomery and Chief Warrant Officer-4 Timothy S. McWilliams, eds., "Interview 12: Major General Tariq Yusif Mohammad al-Thiyabi, Provincial Director of Police, Al-Anbar Province," in *Al-Anbar Awakening Volume II: Iraqi Perspectives. From Insurgency to Counterinsurgency in Iraq, 2004–2009*, Quantico, Va.: Marine Corps University Press, 2009, pp. 186–188.

[83] Montgomery and McWilliams, "Interview 12," pp. 184 and 192.

battles that would suppress AQI in Ramadi.[84] In March 2007, some 500 Iraqi police deployed to clear insurgents from part of the city.[85]

Intelligence collection was a key contribution to the transition, according to Iraqi authorities. With MNF-W support, Iraqi police established intelligence organizations throughout Anbar.[86] Clandestine intelligence collection operations conducted by the police supported MNF-W and ISF operations.[87] And the engagement of local nationals by the Iraqi Army and police yielded vital information on insurgent, improvised explosive device (IED), and weapon cache locations.[88]

## Signs the Coalition Forces Were "Winning"

AQI's objective in Anbar was to establish a pan-Islamic, fundamentalist theocracy, which it referred to as the Islamic State of Iraq. After initially portraying itself as a partner in the people of Anbar's resistance to occupation, the AQI moved to dominate all aspects of Anbar society and usurp the power of the traditional authorities that had provided governance in the province. AQI had arguably succeeded in its goals, by and large, by 2005.

As described above, MNF-W developed a new strategy for securing Anbar at about the same time many Anbaris had become disillusioned with or violently hostile to AQI's attempt to develop a new

---

[84] Montgomery and McWilliams, "Interview 12," p. 191.

[85] Kimberly Kagan, "The Anbar Awakening: Displacing al Qaeda from Its Stronghold in Western Iraq," *Iraq Report*, August 21, 2006–March 30, 2007, p. 12.

[86] Colonel Gary W. Montgomery and Chief Warrant Officer-4 Timothy S. McWilliams, eds., "Interview 13: Staff Brigadier General (Pilot) Nuri al-Din Abd al-Karim Mukhlif al-Fahadawi, Head, Directorate General of Intelligence and Security, Al-Anbar Province and Colonel Said Muhammed Muad al-Fahadawi, Director General, Iraqi Special Weapons and Tactics," in *Al-Anbar Awakening Volume II: Iraqi Perspectives. From Insurgency to Counterinsurgency in Iraq, 200–2009*, Quantico, Va.: Marine Corps University Press, 2009, p. 208.

[87] Montgomery and McWilliams, "Interview 13," p. 206.

[88] Montgomery and McWilliams, "Interview 13," p. 206; Colonel Gary W. Montgomery and Chief Warrant Officer-4 Timothy S. McWilliams, eds., "Interview 14: Staff Major General Abdullah Mohammad Badir al-Jaburi, Commanding General, 7th Iraqi Army Division," in *Al-Anbar Awakening Volume II: Iraqi Perspectives. From Insurgency to Counterinsurgency in Iraq, 2004–2009*, Quantico, Va.: Marine Corps University Press, 2009, p. 216; Kagan, "The Anbar Awakening," p. 9.

PX716

kind of society in the province. Veterans of the Anbar campaign told us that by 2008, it was clear that the Command had largely routed the insurgent group and gained the trust and support of many Anbaris. Officials we interviewed pointed to numerous indicators that suggested the Command's approach was working and the transition from COIN was under way.

One obvious sign that coalition forces were "winning" in Anbar was the dramatic decline in levels of violence between 2006 and 2008. Indeed, as indicated in Figure 6.3, the declining trend in attacks was already notable by summer 2007. MNF-W officials also pointed to tribal leaders' and other insurgents' defection from AQI and their decision to join the irregular forces attacking AQI.[89] Another clear sign that the transition was under way was the Anbaris' decision to move from

**Figure 6.3**
**Anbar Attack Trend, June 2006 to August 2007**



SOURCE: GEN David H. Petraeus, Commander, Multi-National Force-Iraq, "Charts to Accompany the Testimony of GEN. David H. Petraeus," September 10–11, 2007.
**RAND** *MG1111/2-6.4*

---

[89]  Senior Analyst/All Source Fusion Officer, interview, June 8, 2009.

PX716

irregular organizations and join the government-sanctioned ISF, which had expanded to some 37,000 personnel by September 2008.[90]

The overall decrease in violence in Anbar and the shift in allegiances, at least at the popular level, may have also been attributed to significant improvement in economic conditions in the province. According to surveys of Anbari households conducted by the United Nations Development Programme and RAND during 2006 and 2008, respectively, [91] the standard of living of households rose on a number of key measures. Importantly, the survey findings indicated that incomes in Anbar, for example, rose sharply between 2007 and June 2008.

Over time, Anbaris also derived a greater proportion of income from labor, rather than from other economic activity. This is further evidence of greater availability of jobs and increased income among most households. As Anbaris saw greater economic opportunity, fewer were drawn to AQI and the insurgency.

Beyond joining MNF-W in the fight against AQI, Anbari citizens offered still other measures of the Command's success. Once a relatively trusting relationship had been established between coalition forces and Anbari citizens, the latter began to inform on AQI, tipping CF personnel off to the locations of AQI fighters and threats such as IEDs. Local Iraqis voluntarily joined MNF-W efforts to clean up provincial towns, increasing numbers of shops opened, and there were more people on the street in the evenings; all signs that the Command was turning the tide against AQI.[92]

---

[90] Ian Black, "U.S. Hands Back Control of Anbar to Iraqi Forces," *The Guardian*, September 2, 2008.

[91] The RAND findings are based on face-to-face interviews with 1,200 Anbari heads of households ages 18 years and older during May 28 to June 10, 2008. The survey relies on random probability techniques for sample selection. Results can be generalized over the entire population of the Al-Anbar province within a margin of error of +/– 3.7 percent. Local Anbari interviewers were trained over a period of four days after supervisors received separate training conducted by RAND experts.

[92] Department of Defense civilian member of Al Anbar PRT, interview; and USMC captain, task force company commander, Ramadi, March to June 2007, interview by RAND researchers, January 14, 2008.

PX716

MNF-W officials believed that average Iraqis were beginning to feel the effects of the transition from COIN because the number of damage claims presented to the Command declined.[93] Iraqis who did approach MNF-W for assistance increasingly asked not for security but instead for food, education, and public health aid.[94]

During the 2007–2008 transition period, tribal governance organizations reemerged and reasserted their authority after having been largely suppressed by AQI.[95] Local leaders began routine meetings to manage issues and resolve disputes (e.g., in the Sheikh Shura), all without prompting from MNF-W.[96] Anbaris increasingly approached their provincial government for business development and contracts, whereas before the transition period they had come to MNF-W seeking contracts. Business transactions increasingly took place within agreed institutional frameworks, and expatriate elites returned to Anbar from Jordan and elsewhere.[97]

Major General John F. Kelly, MNF-W commander, pointed to what he perceived to be a key indicator of Anbaris' restored faith in their governance and future: voter registration. According to Kelly, nearly 100 percent of Anbaris registered to vote in August 2008. Moreover, during the January 2009 provincial election, Anbar was experiencing enough stability that MNF-W felt no need to deploy forces to secure polling places.[98] Finally, a senior MNF-W official who assisted with election preparations told us he knew that Anbar had turned the corner when provincial Governor Mamoon Sami Rashid started per-

---

[93] Department of Defense civilian member of Al Anbar PRT, interview.

[94] Kelly, "Reflections."

[95] Senior Analyst/All Source Fusion Officer, interview, June 8, 2009.

[96] Senior USMC intelligence officer, interview.

[97] Senior Analyst/All Source Fusion Officer, interview, June 8, 2009; Senior USMC intelligence officer, interview.

[98] MNF-W deployed just 100 Marines during the election. The small force provided security to United Nations election monitors, at their request. Kelly, "Reflections."

PX716

sonally promoting the election procedures agreed to by his government and the coalition.[99]

### The Transition Outcome in Al-Anbar

By the end of 2008, Anbar was still undergoing the transition from COIN to enduring stability. Although the province had achieved a significant measure of stability, a RAND study of the period indicated that Anbar's stability "seemed hopeful, but fragile" and "all the more uncertain in the face of imminent U.S. withdrawals." Although it maintained a "weak foothold in some areas" of Anbar, the AQI group was largely suppressed by 2008.[100]

As indicated above, Anbar's relative security served as the foundation for significant gains in the standard of living. Surveys administered by RAND during summer 2008, for example, indicated that although Anbaris did not feel broadly affluent, half of them described themselves as relatively comfortable, and they maintained a guarded optimism that circumstances would improve.

Other opinion poll findings among the broader Iraqi population were suggestive of a growing sentiment that security conditions in the country were, likewise, improving.[101] For example, a substantially larger percentage of Iraqis in 2008 rated conditions in their neighborhoods or villages as "good" overall (62 percent). In August 2007, considerably fewer (43 percent) had the same assessment. Asked about their views of security in the country as a whole, more than twice as many concluded that the security situation had "become better" (36 percent), a marked improvement from summer 2007 (11 percent). Most attributed progress to Iraqi institutions, including the Iraqi government (30 percent), Iraqi Army (13 percent), and the Iraqi police (11 percent). Public views of local government performance were consistent with

---

[99]  Senior USMC intelligence officer, interview.

[100] James B. Bruce and Jeffrey Martini, *Whither Al-Anbar Province: Five Scenarios for 2009–2011,* Santa Monica, Calif.: RAND Corporation, OP-278-USMC, 2010, pp. 1, 6.

[101] Survey results are from polls conducted nationwide by KA Research and D3 Systems of Virginia among 2,228 Iraqi adult citizens aged 18 and older during August 2007 and February 2008. The margin of error for these polls is 2.5 percentage points.

PX716

these positive evaluations. In spring 2008, 46 percent believed their local government was performing generally well, a slight improvement from August 2007, when 39 percent felt the same way.

## Major Gaps in Transition Capabilities

MNF-W faced numerous challenges in its effort to secure Anbar province and to develop an effective transition from COIN to the stability and reconstruction operations required to ensure Anbar's ultimate recovery. MNF-W officials interviewed for this case study indicated that U.S. Marines and soldiers pursued extensive experimentation on the ground as they struggled to find an effective formula for COIN in Anbar during 2005–2006.

A fundamental capability gap the Command dealt with during the 2005–2006 period (and earlier) was its inability to understand Anbar's dynamic society at the level of detail required to effectively influence key actors in that society and events in the province. MNF-W personnel pursued several innovations to fill that gap. Temporary constructs, including the EPIC and JPEC described earlier, were organized during the fight to generate assessments of Anbar's operational environment or key elements of it. Products from these organizations, as well as increasingly sophisticated analytical methods employed by MNF-W staff in other organizations,[102] enabled the Command's decisionmakers to develop and pursue the COIN and reconstruction strategies that largely stabilized the province by 2008.

Over the longer term, however, it remains to be seen whether the EPIC and JPEC constructs, and advanced analytical methods more generally, can be both disseminated to all Service components that might require such capabilities and institutionalized in some way to support future COIN and stability operations. Baring effective institutionalization or some other approach that makes the EPIC/JPEC-

---

[102]A senior aide to the MNF-W commander explained to us that he advanced MNF-W analytical methods by using a Complex Adaptive Systems construct to enable holistic analysis of Anbari society. This approach enabled him to understand the key players and interrelationships among business, political, and tribal elites and former members of the Saddam Hussein regime. Senior USMC intelligence officer, interview, 2008.

type capability available, the U.S. could face gaps in its ability to assess operational environments in the future.

Anbar veterans in the Marine Corps explained in personal interviews that support for "rule of law" programs and institutions was a significant capability gap during part of the Anbar campaign. The development of "rule of law intelligence" (e.g., intelligence needed to support development of arrest warrants) was vital to the transition from COIN. The JPEC was established to generate this type of intelligence and to train forces to support the targeting and prosecution of insurgents, terrorists, and criminals.

The JPEC filled a critical capability gap, at least temporarily. Nonetheless, one USMC expert advised us that gaps remain in the dissemination of standard operating procedures for support to law enforcement during COIN and stability operations. He recommended that a field manual be developed to codify procedures as well as standards for training. The manual would provide general guidance that could be tailored by commanders to specific host country environments. This veteran also recommended that the Department of Defense (DoD) evaluate for possible wider adoption the "Detainee Tracker" database system. This database was invented by Marines to manage detainee case files and related information, including forensic evidence from the Biometrics Automated Tool Set. It was critical to ensuring incarceration of Iraqis who threatened stability and security in Anbar and more generally to supporting rule of law development in the province.

Major General Kelly said that during his 2008 command of MNF-W the United U.S. government failed to supply sufficient monetary resources for Anbar's reconstruction. As a result, MNF-W was unable to fully make good on its commitment to Anbaris who supported the security and recovery efforts. According to Kelly, had the U.S. government supplied adequate reconstruction funds, it could have held Anbar up as a model for security and recovery, an example that other Iraqi provinces could follow.

PX716

Kelly remarked that as late as 2008 the USMC lacked sufficient civil-military affairs expertise. As a stopgap, he trained some of his artillery battalions for the civil-military affairs mission.[103]

As noted earlier, a senior aide to Kelly told us the USMC had no "professional track" to train intelligence officers for political and economic intelligence analysis. MNF-W supplemented its staff by calling up reservists who had acquired relevant expertise as part of the civilian workforce in the United States. The aide said Marines in Anbar also lacked the capability to train the Iraqi police to "protect and serve" Anbari communities, rather than focus solely on relatively kinetic security operations.[104]

Marines we interviewed indicated that the most stubborn gap they faced was one they could not control: the lack of U.S. government civilian agency capacity to support Anbar's recovery. For example, in 2006, a single Department of State (DoS) official was posted to Anbar.[105] A major improvement in civilian capacity was attempted in 2007 when the first provincial reconstruction team (PRT) deployed to Anbar. The PRT concept was developed jointly by DoS and DoD to deliver vital civilian expertise and leadership for reconstruction efforts in Afghanistan and Iraq.

Transitioning key authorities and responsibilities from MNF-W military elements to the civilian-led PRT could be seen as a shift in focus from COIN to stability operations and thus as an indicator of the transition from COIN. However, according to a member of the 2007 PRT in Anbar (a DoD civilian), the initial PRT effort fell short of expectations. According to this official, the "volume and depth" of DoS and USAID expertise on the PRT was inadequate, given the tasks envisioned for the team. In addition, doctrine for PRT operations was not established; thus, PRT staff established key processes and procedures for PRT operations via trial and error. Finally, DoD and DoS had not settled critical issues, such as who would pay for PRT opera-

---

[103] Kelly, "Reflections."

[104] Kelly, "Reflections."

[105] McPherson, "Operations in Anbar Province."

PX716

tions.[106] These and other shortfalls undermined the PRT's ability to operate to its envisioned capability in 2007.

A senior MNF-W official told us that as late as 2008 the PRT "in theory" had primary responsibility for political engagement in the province; in reality, however, MNF-W military elements still carried the load for political operations.[107] Major General Kelly further confirmed that in 2008 the U.S. government was still largely unable to supply civil servants with the expertise MNF-W needed during the transition from COIN. Kelly compensated by calling up USMC reservists who had the requisite skills. Similarly, from universities in the United States, Kelly recruited civilian specialists in fields such as agriculture and veterinary medicine.[108] A senior advisor to Kelly expressed his view that, generally speaking, the U.S. government needs to develop a cadre of civilians who know how to conceptualize an objective future for a host country, develop a plan to achieve the objective, and then influence the operational environment in the host country so as to achieve the U.S. goals.[109]

Finally, the United States faced serious challenges in its effort to work with Iraq's central government to foster complete integration of the Sons of Iraq (the Iraqi fighters generated by the Awakening movement) into Iraqi military and civilian institutions. This shortfall was widely recognized by 2008; the integration issue has the potential to remain a challenge in Anbar for the foreseeable future, particularly after the agreed U.S. withdrawal in 2011.

It remains to be seen whether Iraq's Shi'a-dominated government will support the integration process amid lingering mistrust of Sunni Iraqis and deep political divisions over how to manage the integration. A number of more specific issues have also arisen to impede the integration process. These issues are largely beyond U.S. control, but they nevertheless have significant bearing on security gains in Anbar.

---

[106] Department of Defense civilian member of Al Anbar PRT, interview.

[107] Senior USMC intelligence officer, interview.

[108] Kelly, "Reflections."

[109] Senior USMC intelligence officer, interview.

In this regard, only a small percentage of Anbar Awakening members have been absorbed into security and civilian bodies. The Iraqi government claimed to take responsibility for some 51,000 Awakening members based in Iraq in October 2008, with expectations that it would take responsibility for the entire group in 2009. Regardless, some members have complained of not receiving pay in a timely fashion or of not receiving sufficient pay for work completed. In response, Sunni Awakening members have launched protests by staging "walkoffs" that have left security checkpoints unmanned.

In 2009, Iraq's oil revenues fell and its unemployment rate increased. Iraq's economic downturn may have genuinely constrained the central government's ability to pay the salaries of the Sons of Iraq (SoI), or it may have been used as an excuse not to compensate the SoI. In the meantime, according to one expert, civilian institutions in Iraq have become so bloated with bureaucrats that it is impossible to absorb more individuals.[110]

Iraq's central government has demonstrated its resistance to SoI integration by denying some members promised immunity from prosecution. Other members have been detained indefinitely. Awakening leaders, in particular, have been targeted by security forces, ostensibly to prevent consolidation of the entities' power or at a minimum the reconsolidation of power among Awakening leaders. They have been charged with being associated with al Qaeda and of engaging in acts of terrorism.

## Conclusions

This chapter's findings are based on numerous interviews with or other accounts offered by participants in CF operations in Anbar province; their experience on the ground covers the period 2003 to 2008. These experts were in general agreement as to the challenges and capability gaps that confronted MNF-W ground forces. Their experiences in Iraq further point to the kinds of capabilities the United States must develop in its civilian and military organizations, or in a host nation

---

[110] Telephone interview with RAND expert, August 12, 2009, Washington, D.C.

partner, in order to transition from COIN to stability operations, and perhaps even to a condition of normalcy for the host country.

For U.S. forces, the essential capability underlying all others is the ability to understand the host nation operational environment. This understanding must be of sufficient detail to permit U.S. forces to effectively influence the environment in a manner that will support their objectives for COIN, stability and reconstruction, and so forth.

The United States needs a cadre of experts, preferably civilians, who can provide the needed depth to support COIN and related types of operations, as well as the transition from COIN. This cadre should be capable of providing the full suite of skills needed for COIN and reconstruction tasks—for example, cultural knowledge, governance, trade, policing, economics, agriculture, industry, medicine, and business processes. Table 6.1 indicates how MNF-W's roles and missions emphasis shifted as the Command moved from a focus on COIN (roughly during the 2005–2006 period) to supporting long-term recovery and reconstruction efforts (roughly 2007–2008).

**Table 6.1**
**MNF-W Roles and Missions Emphasis During COIN and Recovery Periods**

| COIN Focus Period | Recovery Focus Period |
| --- | --- |
| Place intelligence emphasis on targeting insurgents | Collect intelligence on economics, politics, governance, and to support rule of law |
| Lead COIN operations | Overwatch to support ISF |
| Recruit local national fighters to support MNF-W | Support integration of local national fighters in ISF |
| Conduct business and give contracts to local nationals | Support government role in local commerce |
| Conduct high-visibility patrols | Reduce forces and close operating bases |
| Enforce travel restrictions to support security | Accommodate transit by local nationals |
| Actively shape environment | Promote autonomous local national collaboration to shape environment |

PX716

U.S. forces should understand the key players in a host country society and their interrelationships. U.S. analysts should understand the players in a host country environment well enough that they will be familiar with leaders picked by the host country populace. U.S. forces should avoid picking leaders for the populace. Otherwise the United States risks picking leaders who will be seen as illegitimate, thereby impeding the development of governance in the host country.

U.S. forces need to further develop techniques and procedures for establishing trust with a host country populace. As MNF-W proved in Anbar, this trust is a key building block in the foundation that first supports successful COIN and later supports transition activities.

MNF-W veterans agree that financial flows were critical to Anbar's recovery and to maintaining stability in the province. This experience suggests that U.S. forces need the capability to understand the legal and illegal economic system in a host country and the sources of finance, both within and outside the country.

U.S. forces should also understand when to work through and reinforce host country government institutions to achieve objectives, and when to utilize traditional governance entities (the tribes, in Anbar's case). Similarly, U.S. forces should be able to work with both government-sanctioned and irregular forces that can contribute to security and stability in a host country. Such efforts require careful coordination. The United States should also consider the development of techniques and procedures that can facilitate future efforts to demobilize irregular forces and reintegrate them into host country military and civilian institutions.

Effective mentoring of security forces can enable the United States to transfer primary responsibility for security to host country forces. Shifting this burden can permit the United States to focus its resources on activities, such as reconstruction, that support the transition from COIN and ultimately, the redeployment of U.S. forces from the host nation. U.S. forces therefore need the capability to train host country security forces. This may in some circumstances include retraining host country police forces to "protect and serve" their communities rather than to act as paramilitary forces designed to defend the host country regime. Similarly, the United States should help host nations promote

PX716

the rule of law, an essential element in the transition from COIN. This requires development of not only police forces but also the supporting judicial and detention systems in the host nation.

The United States should help the host nation develop an environment that will attract financial investment. Establishing security is the first step in this process.

Beyond security matters, U.S. analysts can help a host country understand the foreign and domestic financial flows that are vital to its economic development. The United States can also assist host country efforts to develop financial and contracting processes that offer a level playing field and the transparency required to attract foreign and domestic investment in the host country economy.

PX716

# Afghanistan

**Map of Afghanistan**



SOURCE: CIA World Factbook.
**RAND** *MG1111/2-7.1*

## Introduction

The inclusion of Afghanistan in a study of transition from successful counterinsurgency to stability operations may be unconventional. Certainly, counterinsurgency in Afghanistan has yet to succeed, much less transition successfully to stabilization. This chapter provides back-

PX716

ground for the current situation and examines the reasons that there has not yet been a successful transition from COIN to stability.

Following the Taliban's refusal to turn over Osama bin Laden for his role in the 9/11 terrorist attacks, the United States launched Operation Enduring Freedom (OEF) with the intention of destroying al Qaeda and its Taliban shield and support structure and preventing continued use of the territory as a safe haven for terrorist activity.[1] On October 7, U.S. and British forces, with the aid of Afghanistan's internal anti-Taliban rebels (the Northern Alliance), began a military campaign against the Taliban to "disrupt the use of Afghanistan as a terrorist base of operations and to attack the military capability of the Taliban regime."[2] In December 2001, after less than three months of fighting, Taliban leaders surrendered the organization's final territory in Afghanistan. For the next several months, U.S. troops, in combination with a multinational coalition and increasing numbers of Afghan forces, launched a series of offensive operations into the southern and eastern provinces of the country in an attempt to remove the remaining presence of Taliban and al Qaeda and establish conditions necessary for stability and reconstruction activities. By early 2002, the Taliban appeared to have been shattered and there was no sign that an insurgency was imminent.

International and local focus then shifted to rebuilding the Afghan nation. At the UN-directed Bonn Conference in 2001, Afghan political factions established a timetable for the creation of a representative and freely elected government.[3] As part of the agreement, the International Security Assistance Force (ISAF), a multistate coalition, was created to provide security and support to the fledgling Afghan government in Kabul. Months later, the United States and other nations met

---

[1]   Sean Maloney, "Afghanistan: From Here to Eternity?" *Parameters*, Spring 2004, p. 15.

[2]   Department of State, Office of the Historian, "The United States and the Global Coalition Against Terrorism, September 2001–December 2003," June 2004. George W. Bush, Speech of President Bush Announcing U.S. Attacks in Afghanistan, *PBS Transcript,* October 7, 2001.

[3]   Ministry of Foreign Affairs of Japan, "United Nations Talks on Afghanistan," December 6, 2001.

PX716

to outline the requirements for Afghanistan's security sector reform. The UK agreed to lead the counternarcotics effort; Italy offered to run the judiciary; the United States volunteered to train the Afghan military and border security service; Germany pledged to train the police force; and Japan agreed to direct the disarmament, demobilization and reintegration of former combatants.[4]

The clearing campaigns of 2002 and 2003 largely resulted in the Taliban, al Qaeda, and other foreign jihadists resettling in nearby Pakistan, where they were able to rest and regroup. Despite lingering militant activity in the region, U.S. Secretary of Defense Donald Rumsfeld and Afghan president Hamid Karzai had declared the end of major OEF combat operations by late 2003; in 2004, several commanders claimed the military campaign and associated reconstruction efforts had succeeded against the Taliban.[5] Attention turned to ensuring political stability and enhancing the capacity of indigenous Afghan forces to establish their own security.

From mid-2002 onward, the Taliban, reinforced by al Qaeda militants, began to reconstitute themselves. Although attempts to destabilize both presidential and parliamentary elections in the fall of 2004 and 2005 were thwarted, the trajectory of insurgent violence was steeply upward. By 2006, the Taliban's overall ability to cause violence on Afghan territory had increased by 400 percent since their defeat in 2001.[6] Throughout 2006, coalition and ANA forces deployed to disrupt insurgents' activities, deny them sanctuary, and prevent their ability to regain strength. Despite high numbers of casualties, the Taliban often resisted in a more coordinated manner than anticipated. Campaigns undertaken by the forces from the United States and the North Atlantic Treaty Organization (NATO), which had assumed command

---

[4]  U.S. Government Accountability Office, *Afghanistan Security: Efforts to Establish Army and Police Have Made Progress, but Future Plans Need to Be Better Defined,* Report to the Committee on International Relations, House of Representatives, Washington, D.C.: U.S. Government Accountability Office, GAO-05-575, June 2005, p. 5.

[5]  Kenneth Katzman, *Afghanistan: Current Issues and U.S. Policy*, Congressional Research Service, Report RL30588, December 3, 2002, pp. 7, 23.

[6]  RAND Database of Worldwide Terrorism Incidents, May 20, 2011.

PX716

of ISAF, could not permanently quell the insurgency; attacks continued and intensified in regions where stability and reconstruction operations were slated to commence.

**Key Domestic, International, and Transnational Actors**

Following the overthrow of the Taliban government, the United States supported the new government and deployed thousands of troops, mainly fulfilling counterterrorism roles in support of OEF, to Afghanistan in order to eradicate insurgent activity as well as to help the political authority exercise and extend its authority.

In addition to brokering dialogue among international and domestic Afghan parties to facilitate agreement on an interim and more permanent Afghan government, the UN, through the Security Council, created the International Security Assistance Force in January 2002. A series of Security Council resolutions also guided NATO's takeover of ISAF and approved its expansion beyond Kabul. Additionally, the UN established the UN Assistance Mission in Afghanistan (UNAMA) to direct and integrate humanitarian, relief, recovery, and reconstruction activities in support of the Bonn Agreement.[7] NATO expanded the stabilization force's presence in a series of stages to the northern (October 2004), western (September 2005), southern (July 2006), and eastern (October 2006) regions of the country.

A new constitution, followed by presidential and parliamentary elections in 2004 and 2005, established the Government of the Islamic Republic of Afghanistan (GIRoA). GIRoA selected the ministers to direct and build up the leadership capacity of the Afghanistan National Security Forces (ANSF). One problem that plagued the Afghan government from its earliest days was the lack of capacity and knowledge of effective government process. In their early days, for example, ministries consisted of a few repatriated senior Afghans with almost no employees.

---

[7]   United Nations, *Agreement on Provisional Arrangement in Afghanistan Pending the Reestablishment of Permanent Government Institutions* ("Bonn Agreement"), December 2001, Annex II; UN Security Council Resolution 1401, 2002; United Nations Assistance Mission in Afghanistan (UNAMA), web site.

PX716

Following the dispersal of the Taliban in 2001, a mixed group of insurgents launched a concerted effort to oust the Afghan government and coerce the withdrawal of U.S. and coalition forces from Afghanistan. Opposition groups included, but were not limited to, the Taliban, Hezb-i-Islami, the Haqqani network, and foreign fighters. This chapter focuses predominantly on the Taliban for three reasons. First, when accurately defined, true Taliban loyalists do have an agenda of state disruption, as well as the ability to compel more transient Taliban sympathizers or intimidated populations to act upon that goal. Second, the Taliban is the only group with a real ability to contest the state. Not only did the Taliban hold power in Afghanistan from 1996 to 2001, it also maintains a shadow government with provincial- and district-level officials and its own justice system. Finally, the Taliban threat is numerically superior to other threats, both in terms of foot soldiers involved and attacks believed to be perpetrated.

After losing bases in Afghanistan as a result of OEF, the international al Qaeda organization took up residency in Pakistan, where it relied on its extensive support network to regroup and rearm. While efforts to rebuild and stabilize Afghanistan were starting, assistance from al Qaeda and other jihadist networks was enabling the Taliban and other opposition groups to rebuild, amplify, and sustain their operations against coalition forces and the Afghan population.

According to RAND's Seth Jones, "Every successful insurgency in Afghanistan since 1979 enjoyed a sanctuary in Pakistan and assistance from individuals within the Pakistan government, such as the Inter-Services Intelligence Directorate (ISI)."[8] From Pakistan, opposition groups were able to transport operatives and supplies, recruit and train fighters, and launch and direct operations.

---

[8]  Seth G. Jones, *Counterinsurgency in Afghanistan, RAND Counterinsurgency Study— Volume 4*, Santa Monica, Calif.: RAND Corporation, MG-595-OSD, 2008.

PX716

## Stabilization Attempt

### Incumbent Strategy

At its topmost level, coalition strategy has always espoused three basic lines of operation: security, development, and governance.

**Security.** After OEF ousted the Taliban from power, the United States, UN, NATO, and indigenous political factions collaborated to create a national government, with power initially concentrated in Kabul and subsequently extending its influence and control outward. Coalition forces conducted operations with several missions—mainly peacekeeping and to a lesser extent, counterinsurgency—while assisting the reconstruction effort as the government built up the capacity to independently rule and provide stability.

*United States.* The U.S. military contribution began with OEF, a counterterrorism campaign aimed at seeking and destroying Taliban and al Qaeda strongholds in Afghanistan. Upon entering the country, Special Operations Forces (SOF) and CIA operatives blended with members of the Northern Alliance to collect intelligence and support the joint American-British air campaign. The Taliban relinquished its territory in Afghanistan within a few months, possibly more quickly than anticipated.[9] As the focus of the U.S. government turned to planning for an additional conflict in Iraq, debates ensued regarding the most advisable way to stabilize Afghanistan. Some believed an international peacekeeping force deployed throughout the country was imperative to ensuring long-term security; others argued that a continued counterterrorism role superseded the need for the United States to participate in nation-building. They preferred to restrict the peacekeeping mission to Kabul, as part of ISAF's remit.[10]

The United States concluded that the latter strategy, known as a "light footprint," was most favorable, given its current and pending warfighting commitments. In 2002, the United States deployed three conventional brigades consisting of soldiers, airmen, helicopter

---

[9]    Maloney, "Afghanistan: From Here to Eternity?" p. 7.

[10]    Seth G. Jones, *In the Graveyard of Empires*, New York: W.W. Norton & Company, 2009, p. 112.

assault crews, and close air support to Afghanistan. These forces did not serve a direct peacekeeping function; they mainly acted in parallel with the international peacekeeping effort to conduct counterterrorism operations—tracking and engaging Taliban and al Qaeda insurgents. This continued counterterrorism strategy was partly based on historical precedent—the U.S. government wanted to prevent the large-scale resistance that was experienced by the Soviets in the 1980s; it also "ultimately believed that small numbers of ground troops and airpower, working with Afghan forces, would be sufficient to establish security."[11]

The effect of the initial so-called "light footprint" approach cannot be overstated. By mid-2002, the United States had no more than 8,000 military personnel in Afghanistan; this in a country of some 30 million people whose government and security forces had been shattered the year before. The decisions of 2002 meant that for roughly three years the number of troops (U.S. and later NATO) in Afghanistan would remain low. The low number of troops meant that the ISAF had limited ability to provide security in the region around Kabul. There was very limited ability to provide security elsewhere in the country, except for a modest presence in some of the larger Afghan cities. This inability to properly secure the country was a key factor in the increase in lawlessness and the return of the Taliban.

In 2002 and 2003, as the United States devoted ever more resources to prepare for and wage war in Iraq, equipment and personnel critical to the counterterrorism effort in Afghanistan dwindled, inhibiting the ability to sustain the transition to stability operations. The U.S. failure to properly resource the effort in Afghanistan, however, was not due solely to the demands of the invasion of Iraq. The United States took the same approach to Iraq in 2003. The problem was not limited resources but opposition to conducting stability operations. The focus of U.S. forces remained the same, with the Pentagon continuing to "view the situation in Afghanistan as one of counterterrorism, not counterinsurgency, and conduct operations accordingly."[12]

---

[11] Jones, *In the Graveyard,* p. 117.

[12] Thomas H. Johnson, "On the Edge of the Big Muddy: The Taliban Resurgence in Afghanistan," *China and Eurasia Forum Quarterly*, Vol. 5, No. 2, 2007, p. 97.

PX716

In late 2003, the newly designated U.S. ambassador to Afghanistan worked with the commander of U.S. forces to cement an updated, broad U.S. military strategy for its presence in the country. By focusing on the demilitarization of the militias, and weakening the warlords, the strategy proposed a shift from counterterrorism operations to nation-building and COIN.[13] As a result of this new strategy, two regional command centers were established in the south and east of the country, with one brigade assigned an area of operations spanning the territory. U.S. troops were tasked with securing and protecting the population and providing a military presence more integrated with civilians. This new strategy "recast U.S. and other coalition units to fight COIN instead of counterterrorism missions."[14] However, the small number of U.S. troops in Afghanistan in 2002–2004 made it impossible to provide security for the population outside a few major cities.

*UN/ISAF/NATO.* The notion of a multistate peacekeeping force was developed during the Bonn negotiations as a way to protect the interim government in Kabul and enable reconstruction and stabilization operations, with the understanding that the responsibility to provide security to the nation rested ultimately with the new government, when it could build up an army and a police force. ISAF was officially established in December 2001 to "assist in the maintenance of security in Kabul and its surrounding areas" and "could, as appropriate, be progressively expanded to other urban centers and other areas."[15] Details concerning force size, mission, possible expansion or withdrawal timelines were not mentioned.

The United Kingdom led the multistate effort to negotiate ISAF's duties with Afghan parties, resulting in a Military Technical Agreement (MTA) that "formalized the understanding between the stabilization force and local forces regarding roles and missions, expectations, size of the forces, rules of engagement and other aspects of an international

---

[13] Jones, *In the Graveyard*, p. 141.

[14] Jones, *In the Graveyard*, p. 142.

[15] UN, "Bonn Agreement," Annex I.

PX716

force's presence in a region."[16] The ISAF mission outlined in the MTA was broad: "[T]o assist in the maintenance of the security" in Kabul and its environs, the "area of responsibility."[17] The agreement also listed a nonspecific set of probable tasks "relating to assisting the Interim Government in achieving stability in Kabul by means of creating a security force."[18] References to humanitarian assistance, expansion beyond Kabul, and withdrawal of militias in Kabul (a criterion promised at Bonn) were absent.

As pressure mounted on the Afghan interim administration to expand ISAF, U.S. officials relented. Turkey maintained the force's original strategy when it took control of ISAF in mid-2002; ISAF continued to assist in the development of Afghan security forces and structures while supporting the reconstruction effort. Although ISAF could "conduct local and small-scale relief efforts in its area of operations, the force was not equipped, nor did it have the mandate, for large-scale policing or humanitarian aid operations."[19] After assuming command of ISAF from Turkey, Germany made some clarifications to the MTA. When assisting in the maintenance of security in Kabul, ISAF was now required to "liaise with political, social and religious leaders to ensure that religious, ethnic and cultural sensitivities in Afghanistan are appropriately respected within ISAF operations."[20]

NATO agreed to take over ISAF command in mid-2003. Despite pressure from Karzai and the UN, before the takeover NATO Secretary-General Lord Robertson insisted that an extension of the mission beyond the capital was "not on the table."[21] However, a few

---

[16] Sean Maloney, "The International Security Assistance Force: The Origins of a Stabilization Force," *Canadian Military Journal,* Summer 2003, p. 7.

[17] "Military Technical Agreement Between the International Security Assistance Force and the Interim Administration of Afghanistan ('Interim Administration')," December 31, 2001.

[18] Maloney, "The International Security Assistance Force," p. 7.

[19] Maloney, "The International Security Assistance Force," p. 9.

[20] Maloney, "The International Security Assistance Force," p. 9.

[21] Annalisa Monaco, "NATO Takes Stock and Keeps Looking Out of Area," *NATO Notes,* in Gerrard Quille, ed., Vol. 5, No. 6a, Centre for European Security and Disarmament, June 6, 2003.

PX716

months into NATO's tenure, the UN Security Council unanimously approved a resolution authorizing the peacekeeping force to send troops anywhere in the country. This decision was attributed to several factors. First, the security situation had worsened: NGOs, UN personnel, and others were reporting a rise in armed attacks on humanitarian workers in the Afghan provinces. Second, NATO's prospective ability to lead and recruit more troops from coalition members elicited confidence from donor countries. U.S. Ambassador John Negroponte, then UN Security Council president, explained that the "U.S. had proceeded cautiously . . . about expanding ISAF because of a lack of countries willing to contribute troops for such a mission. 'Now NATO has taken this force over and there is a willingness, at least to a limited extent, to undertake missions outside of Kabul. And in that context we were willing to support such a resolution.'"[22] Third, the resolution was considered critical to disarming factional militias and ensuring safe presidential and parliamentary elections.[23]

ISAF incrementally expanded its presence by assuming command of efforts presided over by provincial reconstruction teams (PRTs), the primary instrument through which international aid had supported reconstruction projects. By December 2005, the force had extended to the north, the west, and partially the south of Afghanistan, when defense ministers met to revise ISAF's operational plan. Building on ISAF's increased footprint, which now included Regional Area Commands, larger forces and supporting elements were donated to ISAF in anticipation of the more operationally challenging environments in the south and east of the country. Critically, the revised operational plan "outlined clear arrangements for enhanced coordination and deconfliction between ISAF's stabilization mission and OEF counter-terrorism mission."[24] This plan created new command arrangements between ISAF and Combined Forces Command Afghanistan,

---

[22] Ron Synovitz, "Afghanistan: Kabul Welcomes UN Resolution on Expanded ISAF, But Many Questions Unanswered," Radio Free Europe, October 2003.

[23] Synovitz, "Afghanistan."

[24] North Atlantic Treaty Organization, "Revised Operational Plan for NATO's Expanded Mission in Afghanistan," n.d.

PX716

enabling closer coordination and reducing overlap between the two organizations' operations.[25] ISAF and OEF continued to have separate mandates and missions; ISAF was a stabilization and security force while OEF served a counterterrorism role.[26] Having no stabilization expertise outside of Europe, NATO was ill-prepared to take on the stabilization and security mission.

*GIRoA: Internal Reforms and Security Forces.* Afghanistan does not have a history of strong central government. This reality has certainly had a major impact on the ability of the post-2001 government in Kabul. The centuries-long tradition of weak central government compared to strong alliances to tribes and armed local leaders ("warlords") undermines the ability of the central government in Kabul to exercise authority and to make policies that have national relevance. Additionally, Afghanistan is a very poor country, with the third-lowest per capita gross domestic product in the world. Therefore, the resources available to the government are at best modest, which in turns limits the government's ability to develop programs that have significant meaning for the average person's life, particularly if that person lives far from a major city where the government's influence is greatest. Corruption and a massive narcotics underground economy further constrain the government's ability to make needed reforms.

Afghanistan's indigenous security forces were in need of rehabilitation when the U.S.-backed Karzai administration took power. Various regional, ethnic, and private militias had replaced the professional Afghan army after it disintegrated in 1992, and had since wielded substantial control throughout their associated territories. After the Taliban fell, commanders of the various militias tried to further their independent aims at the expense of the elected government. One such militia leader, Mohammed Qasim Fahim, leveraged the assistance his forces had given U.S. troops during the initial OEF campaign to secure his post as Karzai's defense minister. He subsequently refused to disarm his forces in Kabul, a criterion set forth in the Bonn Agreement,

---

[25] North Atlantic Treaty Organization, "International Security Assistance Force: Chronology," n.d.

[26] North Atlantic Treaty Organization, "Revised Operational Plan."

contending that his private militia would form the core of the future Afghan National Army (ANA).[27] Fighting between rival militias and inertia to demobilize hampered progress of building the ANA.

The Afghan National Police (ANP) had similarly atrophied over the course of two decades. To help the Afghan government rebuild its security sector so that it could eventually provide essential safety services to its people, in April 2002 the United States and other donor nations outlined a five-pillar agenda for Afghanistan's security sector reform. The United States pledged to train the Afghan military and border security service, and Germany agreed to train the police force.

The new ANA was to be ethnically balanced, voluntary, and made up of 70,000 individuals. Command posts were designated for Kabul and other strategic locations. Although defense planners did not set a deadline for the completion of the army, U.S. and Afghan officials collaborated to develop an ANA force structure that included 43,000 ground combat troops based in Kabul and four other cities; 21,000 support staff organized in four sustaining commands (recruiting, education and training, acquisition and logistics, and communications and intelligence); 3,000 Ministry of Defense and general staff personnel; and 3,000 air staff to provide secure transportation for the president of Afghanistan.[28] The missions slated for the ANA were to "include providing security for Afghanistan's new central government and political process, replacing all other military forces in Afghanistan, and combating terrorists in cooperation with coalition and peacekeeping forces."[29]

As lead donor, the United States oversaw the development of the ANA force structure, decision processes, and garrisons; provided equipment; and constructed command facilities. Although recruitment and training programs made progress and accelerated, combat troops were regularly underequipped and unsupported following the completion of their training.

---

[27]  Ron Synovitz, "Afghanistan: Two Years Later, Taliban's Sudden Withdrawal from Kabul Still Affecting Transition," November 12, 2003.

[28]  GAO, *Afghanistan Security,*  p. 6.

[29]  GAO, *Afghanistan Security.*

The new ANP was to be a multiethnic, sustainable, and countrywide 62,000-member professional police service that extended throughout the provinces and districts outside of Kabul to enhance security and reinforce the rule of law.[30] No deadline was established for completion of this force. Since the United States does not have an in-house capability to train domestic security providers, the U.S. State Department contracted with DynCorp Aerospace Technology to train and equip the police, advise the Ministry of Interior, and provide infrastructure assistance, including constructing several police training centers. The Pentagon also provided infrastructure and equipment to police in border regions. In addition, Germany established a training program for police officers at the Kabul Police Academy.

The effort to rebuild the Afghan security forces was inadequate in the 2002–2006 period, particularly in the case of the police. Initial efforts at rebuilding and reforming the Afghan security forces were overly biased toward the Army, with far less emphasis on the ANP. This was a significant error. Historically, the police have been a critical component in combating insurgents. In many ways the police represent the first line of defense against insurgents because they are closely connected to the population—usually much more so than the military. Additionally, Afghanistan was (and still is) beset with lawlessness and lack of government presence and control. Had more early emphasis been placed on improving the numbers and capabilities of the ANP, it may have been more difficult for the Taliban to regenerate in the southern and eastern parts of the country.

**Development and Governance.** While development and governance have typically been viewed as separate lines of operation in Afghanistan, in practice, good governance has been considered a prerequisite for effective development, and development projects were seen as a way of selling the population on the proposed government. Therefore, in describing Afghan and international strategies in this area, we have chosen to combine the two.

Afghanistan's initial governance plan was the Bonn Agreement of December 2001. The principal part of that document deals with

---

[30] GAO, *Afghanistan Security*, p. 8.

PX716

governing authority and the power-sharing agreement necessary prior to the first election. UN assistance was to consist of several types of tasks, including peacekeeping in the city of Kabul, assisting as necessary in the setup of the government in Kabul, assisting with reconstruction and development, and reintegrating militia fighters into the Afghan military force. At this conference, the size of the Afghan Army was set at 50,000 and the police set at 62,000.[31]

The Bonn Agreement must be understood as the direct consequence of the combat operations that had been and were still taking place. Rather than settle the major issues of the time, the Bonn Agreement set forth a process that was in theory to lead to settlement. A rush to legitimacy meant that the players to the agreement were hand-picked by the UN, rather than representative of the people. The UN representative to the talks, Lakhdar Brahimi, supposedly stated frequently, "no one would remember how unrepresentative the meeting had been if the participants managed to fashion a process that would lead to a legitimate and representative government."[32] The principal players in the discussion of Afghanistan's future were the commanders of the Northern Alliance—warlords and tribal leaders who had opposed the Taliban—and elite Afghan expatriates, particularly the royalist faction of former monarch Zahir Shah.

Having established a process that was intended to install a representative government, the parties next turned to reconstruction of the impoverished and war-ravaged country. One of the earliest actions taken with respect to a strategy for development in Afghanistan was the request for a quick-turnaround needs assessment for the country by the World Bank, the UNDP, and the Asian Development Bank (ADB). This needs assessment was followed by a multitude of conferences, assessments, and groups. The next major conference in the Bonn Process was the Tokyo International Conference on Reconstruction

---

[31] *United States Plan for Sustaining the Afghanistan National Security Forces*, Report to Congress in accordance with the 2008 National Defense Authorization Act (Section 1231, Public Law 110-181), June 2008, p. 5.

[32] Barnett R. Rubin, "Crafting a Constitution for Afghanistan," *Journal of Democracy*, Vol. 15, No. 3, July 2004, p. 3.

Assistance to Afghanistan, held January 21–22, 2002, where donors made pledges of aid to meet the needs assessment's $2.1 billion high estimate for first-year reconstruction costs, and a total of $5.2 billion over an unspecified time frame.[33]

During this period, the interim government of Afghanistan wrote and began circulating a National Development Framework, intended to provide a basis for budgeting actions and donor commitments. This paper emphasized the need for Afghan ownership of development, citizen participation, and a development program nested in rule of law and public accountability.[34] This approach was ratified in principle in the UN General Assembly Report, "The Situation in Afghanistan and Its Implications for International Peace And Security," which explained this desire to empower the Afghan government as the logic for the "light footprint" approach.[35]

Strategies for governance in Afghanistan have experienced a rhetorical, if not wholly realized, shift in Afghanistan since 2001. The Bonn process, which focused on the national level, was given mixed reviews. Development documents, such as the National Development Framework, hedged their bets by advocating both a capable national government and direct engagement of the masses in the processes of reconstruction.

By 2003 it was already becoming clear, particularly to aid workers, that the security situation had deteriorated to the point where the provinces had become fairly lawless. There were a number of calls for a focus on subnational governance, inspired by popular reaction to the consolidating but corrupt government and by the expansion of NATO, which had brought international forces face to face with provincial

---

[33] Peter Marsden, "Afghanistan: The Reconstruction Process," *International Affairs*, Vol. 79, No. 1, January 2003, p. 94.

[34] Interim Government of Afghanistan, "National Development Framework" (Draft, version 2), Institute for State Effectiveness, April 2002, pp. 5–6.

[35] United Nations General Assembly, *Report of the Secretary-General on the Situation in Afghanistan and its Implications for International Peace and Security*, Document A/56/875–S/2002/278, para. 98, March 18, 2002.

PX716

realities.[36] Ironically, emphasizing the provincial and district level in some cases resulted in greater direct international involvement, as in the case of the governor of Helmand being replaced at the reported insistence of the British.

The deteriorating security situation in 2003–2005 helped undermine the value and effectiveness of economic aid. While a considerable amount of U.S. and other foreign aid funding was arriving, in many cases it was not effectively used. The poor security situation in the southern and eastern parts of the country, lack of capacity of the Afghan government (whether in Kabul or the local jurisdictions) to manage the funds, and widespread corruption all undermined the reconstruction effort.

### Anti-Coalition Militant Strategy

Essentially, the insurgent strategy was to break the political will of the United States and its coalition partners, coerce the withdrawal of their forces, and oust the foreign-backed government from Afghanistan.

From September 2001 to March 2002, the insurgents conducted defensive operations in response to coalition efforts to overthrow the Taliban and to conduct follow-on missions and stability operations. By April 2002, they were regrouping and began to orchestrate a series of offensive operations. Taliban forces deployed in larger numbers over time, especially in such southern provinces as Helmand; however, the guerrillas deployed in smaller units as well. This indicates that the Taliban were progressively able to operate more freely in the south and resist detection by Afghan or coalition forces.[37]

In 2004, the targeting focus of opposition groups seemed to shift from hard targets, such as coalition forces, to soft targets, such as

---

[36] See, for example, Afghan Research and Evaluation Unit, "Assessing Subnational Administration in Afghanistan: Early Observations and Recommendations for Action," Working Draft, March 13, 2003, p. 5; Isobelle Jaques, "Afghanistan: Beyond Bonn," report based on Wilton Park Conference, WPS05/28, May 12–14, 2005, on "Afghanistan: Beyond Bonn," pp. 21–22; Sarah Lister and Andrew Wilder, "Strengthening Subnational Administration In Afghanistan: Technical Reform or State-Building?" *Public Administration and Development*, Vol. 25, 2005, pp. 39–48.

[37] Jones, *Counterinsurgency in Afghanistan,* p. 51.

PX716

Afghan police and personnel reportedly collaborating with the Afghan government or coalition forces. Experts contend that the larger, more viable fighting force that the Taliban faced over time made softer targets more attractive.[38] This targeting strategy helped to discredit those who worked with coalition forces, contributed to the defeat of reconstruction efforts, and forced the evacuation of coalition forces.[39]

The insurgents primarily utilized asymmetric tactics, which included yielding the population centers to U.S. and Afghan forces, operating from rural areas, and distributing propaganda to the local population and opposition forces.[40] They also relied on violence and intimidation to prevent NGOs and aid workers from delivering on reconstruction and humanitarian promises.[41] As the insurgent campaign mounted, jihadist rhetoric and tactics, such as suicide bombings, as well as insurgent methods borrowed from the Iraq war, such as IED attacks, were increasingly used.[42]

The Taliban also received assistance from external actors. They utilized ties to al Qaeda and other jihadist networks to rebuild, sustain, and amplify their operations against coalition forces and the Afghan population. Al Qaeda assisted opposition groups at the tactical, operational, and strategic levels and provided impetus for the use of suicide attacks and sophisticated IEDs.[43] Furthermore, some al Qaeda members blended with Taliban units and shared tactics from operations in Iraq and Chechnya.[44]

In line with the Pakistani government's past involvement with various Afghan opposition groups, members of the ISI and other gov-

---

[38]  Seth G. Jones, "Averting Failure in Afghanistan," *Survival,* Vol. 48, No. 1, Spring 2006, p. 113.

[39]  Joseph Collins, "Planning Lessons from Iraq and Afghanistan," *Joint Force Quarterly*, No. 41, 2nd Quarter, 2006, p. 11.

[40]  Jones, *Counterinsurgency in Afghanistan,* p. 50.

[41]  Johnson, "On the Edge of the Big Muddy," p. 105.

[42]  Jones, *Counterinsurgency in Afghanistan,* pp. 62–63.

[43]  Jones, *Counterinsurgency in Afghanistan,* pp. 62–63.

[44]  Jones, *Counterinsurgency in Afghanistan,* p. 66.

PX716

ernment agencies provided two main types of assistance to the Taliban. The first form of assistance was resources—medical aid, training, intelligence, financial assistance, arms, ammunition, supplies, and logistics (in crossing the border). The second was the freedom to operate; after insurgents lost their Afghanistan base, they found a reliable, fertile, safe haven from which to recruit, train, fundraise, transport supplies, and stage operations. The adjacency to Pakistan of critical Afghan border towns had serious implications for the Taliban.

Many of the Taliban's strategies vis-à-vis development and governance have been negative: sabotaging development projects, intimidating the population to deter participation in government, and more. But The Taliban have taken some positive actions. One example is the Taliban justice system, an effort by the movement to dispense low-cost, sharia-compliant justice in the villages.[45] Taliban judges run circuits through the country to provide this convenience, in stark contrast to the slow and centralized Afghan courts. And while the country's nascent justice system is seen as corrupt, religious judges are not.

As the Taliban's strategy matures, it has begun to establish a shadow government, with governors and severe penalties for corruption and inefficiency. While the population may live in fear of the Taliban, it also provides a measure of stability and predictability. Imran Gul, a Pakistani NGO worker, believes the Taliban's appeal is in providing "peace, income, a sense of purpose, a social network."[46] These efforts represent an emerging strategy to out-administer the GIRoA, rather than simply disrupt its influence.

### External Powers

**Al Qaeda.** Al Qaeda aimed to spread extremist global ideology to Afghanistan and Pakistan. It utilized its substantial financial resources, influence, and tactics learned in past experiences to act as a force multiplier for the Taliban regime in return for permission to

---

[45] Soraya Sarhaddi Nelson, "Taliban Courts Filling Justice Vacuum In Afghanistan," *NPR Morning Edition*, December 16, 2008.

[46] David Montero, "Why the Taliban Appeal to Pakistani Youth," *Christian Science Monitor*, June 16, 2006.

PX716

train operatives and plan operations on Afghan soil.[47] The organization did have a different point of focus than the Taliban—while most of the opposition groups remained focused on Afghanistan, al Qaeda and its affiliates remained committed to fighting the United States and its global allies, including the Pakistani administration and presence in the Federally Administered Tribal Areas.[48]

**Pakistan.** For two decades, Pakistan has sought to extend its influence in Afghanistan, at times through the support of various armed groups, including the Taliban.[49] Pakistan's interest in Afghanistan has stemmed from its need to protect its territorial integrity on the western flank. The Durand Line, which forms the border between the two countries, is a colonial artifact and creates an artificial division between tribes that are themselves not friendly to the Pakistani nation. Following the September 2001 terrorist attacks, the United States needed support in the region and enlisted Pakistan as an ally in the war on terror. It was believed that Pakistani forces could address the situation in the North-West Frontier and Baluchistan provinces, areas from which insurgents have staged offensive operations in Afghanistan in the past. Early efforts by President Pervez Musharraf to curb militant groups, enforce order, and reform the radical madrassas that had served as extremist recruiting centers at first appeared successful; unprecedented counterterrorism campaigns were conducted by thousands of Pakistani regular and paramilitary troops deployed to the country's border region.[50] Although these operations were somewhat effective against al Qaeda and non-Pakistani militants, they did not accomplished much toward containing the Taliban.[51]

---

[47] Jones, *Counterinsurgency in Afghanistan.*

[48] Johnson, "On the Edge of the Big Muddy," p. 118.

[49] Barnett R. Rubin and Andrea Armstrong, "Regional Issues in the Reconstruction of Afghanistan," *World Policy Journal*, Spring 2003, p. 31.

[50] K. Alan Kronstadt and Kenneth Katzman, *Islamic Militancy in the Pakistan-Afghanistan Border Region and US Policy Relations*, Congressional Research Service Report, RL34763, November 21, 2008, p. 5.

[51] Ali A. Jalali, "The Future of Afghanistan," *Parameters*, Spring 2006, p. 8.

PX716

Although top U.S. officials praised Pakistan for its cooperation, doubts regarding Islamabad's core interests persisted. Pakistan's mixed record on battling Islamist extremism included a tolerance of Taliban elements operating from its territory.[52] The Taliban continued to control training camps, staging areas, recruiting centers, and safe havens in Pakistan. The significant portion of the Afghan insurgency's political and military leadership living in the border regions benefited from technical and operational assistance provided by transnational extremists also located there, as well as ethnic and political support from Pakistan's Pashtun population.[53]

Some attributed Pakistan's lack of decisiveness in containing the Taliban to political unrest in the country, claiming it had forced Islamabad to scale back its operations against the militants. However, reports continued to indicate that elements of Pakistan's major intelligence agency and military forces were aiding the Taliban and other extremist forces as a matter of policy; such support may even have included the provision of training and fire support for Taliban offensives.[54] State backing of the Afghan insurgency was suggested to have both ideological and geostrategic motivations; some in the Pakistani government may have sympathized with the jihad against U.S. and other Western forces; others may have wished to preserve a Pakistani foothold in Afghanistan.[55]

Pakistan's ineffectuality against insurgents using its territory as a sanctuary in which to regroup and expand their influence across borders has directly contributed to the instability in Afghanistan and continues to be the primary external barrier to defeating the insurgents in Afghanistan.

**Iran.** Despite harsh rhetoric between Washington and Tehran, Iran's policy toward Afghanistan—funding reconstruction projects, providing aid to various warlords—did not change as result of the "axis

---

[52] Kronstadt and Katzman, *Islamic Militancy*, p. 6.

[53]  Jones, "Averting Failure in Afghanistan," p. 121.

[54] Kronstadt and Katzman, *Islamic Militancy,* p. 7; Rubin and Armstrong, "Regional Issues," p. 33.

[55]  Jones, "Averting Failure in Afghanistan," p. 121.

of evil speech" or the Ahmadinejad presidency.[56] However, Iran has viewed its involvement in Afghanistan as a hedge against a possible deterioration of U.S.-Iranian relations.[57] There was some evidence that individuals from the Iranian government provided arms and training to Taliban commanders and other insurgents, and several experts have speculated that Iran harbored members of al Qaeda. But these claims have been denied by both the Iranian and Afghan governments, and Iran's historically poor relations with the Taliban support this repudiation.[58] In any case, if there was Iranian support for opposition groups in Afghanistan during this time period, it was insignificant compared with that provided by the other external state and nonstate actions mentioned thus far.

**Strengths and Weaknesses of the Initial Stabilization Attempt**

In the wake of the apparent banishment of the Taliban, the international community's primary concerns were adjudicating between warlords and crafting the advanced institutions of a modern state. The anti-Taliban faction that had helped to achieve victory had become fractious; each warlord and militia leader sought Kabul as a feather in his cap. With many thousands of militia forces underemployed, fostering a neutral government in Kabul seemed a productive objective. For their part, Afghan expatriates supported the use of the 1964 constitution of King Zahir Shah's reign as an interim constitution, but that document treated Afghanistan as though it were a cohesive state, which it plainly was not. The mismatch among the foundational documents of the republic, the preoccupations of international parties, and the competition between the factions in the government proved disastrous in terms of creating strong beginnings for the Afghan rehabilitation effort.

---

[56] Mohsen M. Milani, "Iran's Policy Toward Afghanistan," *Middle East Journal*, Volume 60, No. 2, Spring 2006.

[57] Milani, "Iran's Policy Toward Afghanistan"; Jones, *Counterinsurgency in Afghanistan*, p. 60.

[58] Milani, "Iran's Policy Toward Afghanistan"; Douglas Jehl and Eric Schmitt, "U.S. Suggests a Qaeda Cell in Iran Directed Saudi Bombings," *New York Times*, May 21, 2003; Rubin and Armstrong, "Regional Issues."

PX716

Reviewing the multilateral needs assessment, it is obviously naïve in places—resting on rapid growth and "modernism" and relying on the Afghan government budget to set guiding principles for recovery.[59] This, despite the fact that surging economic growth and a government capable of setting such budget priorities were far from assured. The capacity-building and community involvement strategies envisioned by the document certainly never came to pass, but they may have been buried under a hodgepodge of suggested "immediate actions" that ranged from establishing a police force to providing limbs for the disabled, creating a civil air traffic control system, and appointing gender advisors.[60] One major mistaken assumption was that there would be a distinction between the end of combat operations and the beginning of reconstruction, but in practice the former coexisted with, rather than gave way to, the latter. There was no distinct post-conflict phase.

While the focus on Kabul and on Afghanistan's expatriate, often technocratic, elite may have seemed reasonable at the time, it reflected a deep misunderstanding of power structure in the country. This misapprehension resulted in a sense of disillusionment about the capabilities of Afghanistan's government, and was one of the reasons that the Afghan government was largely circumvented in the delivery of assistance.

Had donor nations used their funding authorities to develop sustainable programs for the bulk of the population, the negative effects of short-circuiting the legitimate government might have been mitigated. Instead, a great deal of focus was given to the process of delivery on pledges, which was complicated by the different budgetary cycles of the partners and a multitude of funding vehicles. While the international community concentrated on meeting these initial pledges, it didn't allocate them for projects according to the vision of the multilaterals' needs assessment. Nor did donor nations subscribe to the strategic plan for Afghanistan drafted by the interim government in early

---

[59] Asian Development Bank, United Nations Development Programme, World Bank, "Afghanistan: Preliminary Needs Assessment for Recovery and Reconstruction," January 2002, pp. 3–5.

[60] Asian Development Bank, Appendix: Immediate Actions, p. 56.

PX716

2002; instead, the bulk of aid, some 60 peercent, went to humanitarian activities rather than the reconstruction projects recommended in strategy documents.[61] This was due to a continuing drought and the higher than expected numbers of returning refugees. While the money was nobly given, it was no substitute for long-term reconstruction aid. What money did go to reconstruction efforts was predominantly spent on education, support for internally displaced people and support to refugee return, rather than on programs that would develop institutions more broadly.[62] As mentioned earlier, much of the aid that was provided was lost due to corruption and the inability of the Afghan government—and the coalition—to adequately manage those resources.

The interim government's strategy seems to have been flawed in a number of respects. First, the constitution and government established during the Loya Jirga process favored centralized authority, rather than a parliamentary system or one with more distributed authority. Though the early government was derived from factions handpicked by the U.S. and other coalition members, the two-stage Bonn process did nothing to increase the representative nature of the government or move it from the path of heavy centralization. Instead, it was a contest of wills between Pashtuns and other factions, and between resident and expatriate elites.

The second major weakness of the government strategy was the lack of bureaucratic capacity in the ministries and in sub-national positions. When the government was reestablished, ministries were created on paper and quickly staffed with former bureaucrats from previous regimes. Those who were brought back in were typically senior officials, while the rank-and-file positions were either unfilled or staffed with those who had no capacity.[63] Although the National Development Framework specifies a need for capacity-building assistance, it presumed a fully capable state in the goals it laid out, namely a state that would

---

[61] Marsden, "Afghanistan: The Reconstruction Process," p. 94.

[62] Marsden, "Afghanistan: The Reconstruction Process," p. 94.

[63] Author interview with M. Ashraf Haidari, August 25, 2009.

PX716

> Provide security, invest in human capital, and articulate and implement a social policy focused on assistance to the vulnerable and excluded and the elimination of poverty. [The government] must create an enabling environment for the activities of the private sector, make effective use of aid to attract trade and investment, and put the economy on a sustainable path to growth.[64]

With respect to governance at the provincial level and below, Afghanistan's premier think tank has said simply, "subnational state-building in Afghanistan has been characterized by a lack of a subnational governance policy."[65]

## Defining Victory

One of the most serious problems with the international effort in Afghanistan was the almost total lack of criteria for defining victory in the context of this study—establishing lasting stability. In the areas of governance and development, no attainable vision for a viable state was ever arrived at. In a 2005 campaign plan, Combined Forces Command-Afghanistan defined its endstate as

- Moderate, stable and representative, though understanding that Afghans will not copy U.S.-style institutions
- Representative of all responsible elements in Afghanistan and formed through the political participation of the Afghan people
- Capable of effectively controlling and governing its territory
- Capable of implementing policies to stimulate economic development
- Willing to contribute to a continuing partnership with the U.S.-led coalition in the global war on terror.[66]

---

[64] Interim Government of Afghanistan, "National Development Framework," p. 14.

[65] Martine van Bijlert, "Between Discipline and Discretion: Polices Surrounding Senior Subnational Appointments," Afghanistan Research And Evaluation Unit Briefing Paper Series, May 2009, p. 6.

[66] Combined Forces Command–Afghanistan, "Campaign Plan Briefing in Support of Operation Enduring Freedom," unpublished briefing, October 5, 2005, p. 16.

Such an explicit statement of U.S. objectives is rare, most documents have simply tended to speak about indefinitely continuing lines of operation. But this document still lacks qualifications: what constitutes representative? How much of the population needs to be involved to be representative? How effectively does it have to control its territory? Is this country more like Switzerland, or Bangladesh?

## Reasons the Initial Attempt to Transition Toward Stability Failed

### Factors That Resulted in Failure

In this section, we move from symptoms to disease, aggregating the various apparent weaknesses of the coalition effort to attempt to understand at a higher level why these failures occurred. In assessing the recent history of the country it becomes clear that any perceptions of stability were illusory. The plan put forward by coalition partners in the wake of the Taliban's ouster collapsed from within, encouraged along by insurgents who capitalized on disarray.

When the Taliban regime collapsed in late 2001 and early 2002, it appeared that the main objectives of Operation Enduring Freedom had been achieved. Indeed during much of 2002 it appeared that there would not be an insurgency. It appears that the U.S. and its coalition partners believed that with relatively limited effort stability would return to a still-poor Afghanistan.

By late 2002, however, it was clear that the Taliban was returning and starting to threaten the new, still very weak, U.S.-backed government in Kabul. The assumptions of a swift move to stability in Afghanistan were shown to have been overly optimistic. By mid-2003 an increasingly serious insurgency was underway.[67]

That U.S. and coalition forces will eventually achieve a transition from insurgency to stability is not a foregone conclusion. The initial mission for ISAF forces was certainly conceived as a stabilization mission, committing ISAF forces to conduct all five of what the

---

[67] Jones, *Counterinsurgency in Afghanistan*, pp. 27–32.

PX716

U.S. considers to be the key tasks of stabilization: establish civil security, establish civil control, restore essential services, provide support to governance, and provide support to infrastructure and economic development.[68]

Operation Enduring Freedom was conducting counterinsurgency operations at least as early as 2005, although the strategy is attributed to 2003.[69] The ISAF mission in its initial stages was conducted entirely at the national level, with forces stationed only in Kabul. While still in a dangerous environment, there were neither offensive nor defensive operations conducted. The decision to expand ISAF's mandate throughout Afghanistan likely had more to do with the counterinsurgency in Iraq and the need to fully resource the conflict there than with any desire to conduct counterinsurgency in the Afghan hinterland.[70] Nevertheless, that expansion did involve both offensive and defensive operations in addition to the stabilization tasks already in the mandate.

The failure to transition toward stability occurred because of three major oversights in the coalition approach. These oversights are interlocking and reinforcing, and some operational level evidence of instability may have multiple strategic antecedents.

**Inappropriate Strategy.** In the case of Afghanistan, strategic-level decisions were made to use a "light footprint," but although the avowed reason to do so was to empower the Afghan people to take charge of their futures, realistically much of the choice was driven by the desire of the international community for a labor and resource lean approach.[71]

In the absence of a robust stabilization strategy, the focus of the conflict devolved to operations, where each operational authority was

---

[68] U.S. Department of the Army, Headquarters, Field Manual 3-07, *Stability Operations*, October 2008, p. 2-5; United Nations Security Council, "Letter Dated 5 December 2001 from the Secretary-General Addressed to the President of the Security Council," S/2001/1154, December 5, 2001.

[69] Combined Forces Command–Afghanistan, "Campaign Plan Briefing," p. 5.

[70] See, for example, Amin Tarzi, "Afghanistan: NATO Expansion Demands Common Approach," *Radio Free Europe/Radio Liberty*, October 6, 2006.

[71] Simon Chesterman, "Walking Softly in Afghanistan: The Future of UN State-Building," *Survival*, Vol. 44, No. 3, Autumn 2002, pp. 37–46.

PX716

left to its own devices. Performance was patchy across the country, with many military commanders focused on direct action, rather than population-centric measures. This is true for both the initial, special forces-led effort and the expanded conventional U.S. and NATO role: seeking to engage the enemy, rather than the population in an attempt to stamp out Taliban and al Qaeda members.

The proclivity for direct action had an analog in development. While the international community paid lip service to the idea of the Afghan-led development strategy, what money was turned into actual projects went directly to international actors, rather than to the Afghans. Having thus bypassed any strategic plans for aid, the money went primarily for quick impact projects (QIP), CERP funds, and other quick fixes. These programs have generally failed in their goal to increase support for a pro-government and coalition status quo. As USAID's Office of Transition Initiatives (USAID/OTI), the U.S. government's premier organization for the conduct of aid in emergency situations, found in its 2005 report:

> There is no evidence that relationships between citizens or between citizens and local authorities have been significantly affected by attempts to promote participatory democratic processes in local project selection, implementation, and monitoring. Afghan communities have a long tradition of local control by landowners and strongmen that are not easily affected by governmental service provision. This is especially true if projects remain focused on quick-impact infrastructure, in which traditional elites can easily speak for the community as a whole.[72]

Rather, development professionals have found that

> The tactical deployment of aid risks undermining the higher policy goal of state-building, overstates the transformative potential of

---

[72] Social Impact, Inc., "U.S.AID/OTI Afghanistan Program Final Evaluation," prepared for the Office of Transition Initiatives, Bureau for Democracy, Conflict, and Humanitarian Assistance, United States Agency for International Development, August 15, 2005, pp. 9–10.

PX716

development, and fails to appreciate the processes through which legitimacy is constructed in the Afghan context.[73]

Similarly, governance-related assistance below the national level generally fell to military commanders in the field to execute. One hotly debated decision was the replacement of the governor of Helmand in 2006 just as the British were taking charge of the NATO mission there. The national government blamed the British forces for insisting on the governor's removal on grounds of corruption, an act that ultimately had a critically destabilizing effect on the province's security.[74]

There was also no way to clearly gauge progress. Although we can measure performance—schools opened, wells dug—we cannot measure effects and where those effects put us on the path to an end-state. Even today, this type of benchmarking is not common, as a recent article by a British commander in Afghanistan noted: "ISAF should be measuring the success of a PRT in terms of what it had achieved for its province, not in accomplishments or milestones for the PRT itself."[75]

**Poor Understanding of Power Dynamics in the Population.** Many of the failures of the stabilization strategy can be attributed to a misapprehension of the complexities of Afghanistan. This failure extends from the top of the bureaucratic structure to the smallest village, and accounts for why many coalition efforts produced unexpected results.

At the national level, coalition forces failed to understand the power plays between high-level players in Kabul; the divisions among technocrats, Pashtun royalists, and minority warlords; and the bargaining mechanisms between them. Overestimating the capability and stability of the national government produced the disillusionment that was compounded by a misunderstanding of the balance between center and periphery in power relations that is now well documented. Coalition forces coped by assuming greater authority and responsibil-

---

[73] Jonathan Goodhand and Mark Sedra, "Who Owns the Peace? Aid, Reconstruction, and Peacebuilding in Afghanistan," *Disasters, Early View,* March 27, 2009.

[74] van Bijlert, "Between Discipline and Discretion," p. 6.

[75] Ian Westerman, "Pacifying Afghanistan," *RUSI Journal,* Vol. 153, No. 5, October 2008, p. 19.

ity and cutting out the Afghan government at all levels, while simultaneously trying to build the idea of a legitimate nation-state by putting an "Afghan face" on coalition efforts. But Afghans are acutely aware of who really authorizes and executes the work, no matter which entity is given credit for it. As one Afghan shura member said, "We know the PRT people from their uniforms. If they come and visit a project it means that the project is funded by the PRT."[76] A Kabul-based journalist added,

> The PRT built a bridge in Mohammad Agha district, Logar province and people refrained from using it until a group of religious elders were organized to go and preach to the community that using the bridge built by the PRT is not a sin.[77]

Unable to predict how Afghans would respond to any of their efforts and unsure who was friend or foe, foreign personnel made decisions about employment of force or funds based on beliefs about what ought to work, rather than real experience. This further explains the persistence of quick-impact development projects, despite evidence that they failed to secure support for the legitimate government. Even today, funding for this type of project outstrips other sources of funding.[78]

Similarly, coalition forces failed to correctly gauge the level of resistance that they would face in the hinterland. They believed that most Afghans saw the Taliban regime as bad, and therefore thought they would encounter few difficulties in rooting out remaining militants. But as a recent report of the British government concluded, "Most analysts believe that the initial UK strategy failed primarily because of a

---

[76] Sippi Azarbaijani-Moghaddam, Mirwais Wardak, Idrees Zaman, and Annabel Taylor, "Afghan Hearts, Afghan Minds: Exploring Afghan Perceptions of Civil-Military Relations," research conducted for the European Network of NGOs in Afghanistan (ENNA) and the British and Irish Agencies Afghanistan Group (BAAG), 2008, p. 39.

[77] Azarbaijani-Moghaddam et al., "Afghan Hearts, Afghan Minds," p. 38.

[78] Budget of the United States Government, Fiscal Year 2010. See Commander's Emergency Response Program (CERP) funds relative to other funds.

PX716

lack of manpower, and a poor understanding of the local situation and the level of resistance that would emerge."[79]

**Lack of a Sustained Focus.** A third overarching cause of failure of the stabilization effort was the lack of sustained focus on Afghanistan. As described throughout this case study, officials in charge of the UN and U.S. efforts said that a more robust presence was "not necessary and not possible."[80] The first of these has already been dealt with in the preceding section, but the idea that resourcing the stabilization campaign was impossible referred to the lack of political will to focus on Afghanistan. The UN was already involved in Bosnia, Kosovo, Sierra Leone, the Democratic Republic of the Congo, and Burundi, and the United States was already looking forward to getting Saddam Hussein out of Iraq.[81] So the international community set in motion the establishment of an underdeveloped  government in Kabul and then promptly turned its attention to other things.

## Recommended Strategy for the Future

The first requirement for stabilization is security, and the first task in any transition will be to sustain whatever level of security has been achieved. Coalition partners, particularly the United States, have devoted considerable attention and resources to achieving an acceptable level of safety and security for the Afghan people. Of the three lines of operation, security is frequently viewed as an enabler for development and governance directives; a relatively stable security environment increases the chances that such projects can gain sufficient

---

[79] United Kingdom, House of Commons Foreign Affairs Committee, "Global Security: Afghanistan and Pakistan," Eighth Report of Session 2008–09, July 21, 2009, p. 86. According to an expert's view, while efforts at promoting local development upset local power balances and met with resistance, the real deficiency was not to complement the top-down effort to build national level governance capacity with a complementary effort to strengthen local, largely informal institutions. (Comment by Ambassador James Dobbins, May 2011.)

[80] Lakhdar Brahimi, quoted in Chesterman, "Walking Softly in Afghanistan," p. 38.

[81] Marina Ottaway, "Nation Building," *Foreign Policy*, No. 132, September–October 2002, p. 20.

momentum. After OEF drove the Taliban and al Qaeda from their strongholds in the southern and eastern provinces, it appeared that the counterterrorism focus of operations had succeeded, but it is now clear that these initial victories were only temporary. When the Taliban returned to Afghanistan, regrouped and restocked by supporters from neighboring Pakistan, an insufficiently resourced international presence and underdeveloped indigenous security institutions yielded little for the insurgency to contend with.

At the outset, donor nations placed a great deal of emphasis on the creation of the Afghan National Security Forces, a priority that was not misplaced even if it was poorly executed upon. At present, the mechanisms for creating the army and police are fairly well developed; there are regional training centers and an increasing emphasis on mentoring and partnering. But making these forces effective will require a further increase in resources, with emphasis on ministerial-level capacity development, and a further extension of mentoring and partnership to ensure that all police and army units are capably tasked and executing operations to the best of their ability. This will require additional troops to ensure that ANSF have daily partners, not simply partners for major combat operations.

Despite its shortcomings, the ANA is increasingly viewed as a source of stability in the country and can handle some major aspects of operations. Although efforts to rehabilitate the ANP have not met with the same measure of success, a credible and capable police force is at least as important as an effective army. Consequently the same, if not greater, effort must be made to ensure ANP advancement. One possible avenue for improvement could be an effort to reform the doctrine and mission of the police to ensure that mission, training and tasking are all aligned.

At the very least, the missions of the different components of the ANSF should be better defined. There is no current rationale behind the range of operations to which the ANP is assigned; this results in an overlap with ANA directives, for which the police have not been trained or equipped. Appropriate mission statements for the ANA and ANP must be defined in order to distinguish the strategic and operational focus for each line of the country's defense. This includes defin-

PX716

ing which forces contribute to which campaigns in what capacity—infantry versus COIN, defensive versus offensive clearing operations, among others.

The ANP mentor system is in need of improvement. Mentoring is critical to the success of the ANP reconstitution effort because it allows trainers to build on classroom instruction and provide a more systematic basis for evaluating performance.[82] As lead donor nation for the ANP, the United States could encourage vested interest on the part of the Afghans by developing Afghan-to-Afghan mentoring teams. Such a mechanism would offer a different approach from the current one of using an outside contractor, one that binds the indigenous police force more closely to their fellow countrymen. This would also prevent the problem of indefinite mentoring: Although the mentoring program is supposed to be term limited, in reality mentored units rarely "graduate" from that status.[83]

The advent of new, even more local, programs such as the Afghan Public Protection Force (APPF), involve applying concepts of village-based defense to problems of security. In parts of the country, the village-level citizens' defense force is an indigenous concept and ISAF efforts to that point are likely to succeed. But rather than take from this the lesson that the APPF should be applied more broadly, we should instead derive the principle that understanding local definitions of security is key to propagating a belief of security. In some locations, the ANP may fulfill this role most closely, and in others it may be that as-yet-unknown methods should prevail.

Finally, calls for larger contributions of manpower and resources can be focused on ways to increase the chances of achieving the "clear-hold-build" objective. The current coalition basing structure does not disperse forces far enough into the parts of the country where the insurgency originated: rural areas. The United States should rethink its basing structure to increase its presence in these areas. This would likely require a reduced dependence on logistics and supply. The ANA has an opportunity to play a key role in such deployments. U.S. and

---

[82]  GAO, *Afghanistan Security*, pp. 24–25.

[83]  Author interview, COL Thomas Staton, October 6, 2009.

coalition forces could share more bases with the ANA and transfer the majority or the entirety of the responsibility for logistics and supply to those who know the country best.

**Rethink Development.** To be successful in a development strategy, we must rethink the proposition that charitable gifts of infrastructure are a viable means to placate the population. Certain projects work but others do not, and we need to invest research into finding out why. Programs that are firmly rooted in the local context, that constructively address their impact on local power structures, that are truly Afghan—not merely with an "Afghan face"—are more likely to succeed. These programs should also be paired with a comprehensive monitoring and evaluation framework to assess success project by project, rather than the unhelpful national-level metrics currently favored. National indicators tell us virtually nothing about the strategic-level effects of our stabilization policies.

**Understand the Population Better.** If poor understanding of the population is part of the problem, then the solution must necessarily entail developing a means to better understand the various communities of interest. Modern counterinsurgency theory and practice are predicated on gaining the support of the people for the counterinsurgency effort, yet we have a poor understanding of what the Afghan people actually need or desire.

From the American and European point of view, government institutions exist to identify and meet the needs and desires of the people. This makes it difficult for us to understand an environment that is resistant to institutions, such as Afghanistan. We have no institutional mechanism for systematically gaining an understanding of the people's needs and desires, and our efforts to build such a mechanism have been frustrated at every turn by that very same poor understanding. This conundrum exists broadly across the security, development, and governance spheres. The tools we attempt to employ to break through this "fog of COIN," such as public opinion surveys or key leader engagements, often say more about our own beliefs than they do about those of the Afghans. For example, after a brief introduction to the overall security section, The Asia Foundation's most recent countrywide survey presents the results of a series of questions based on the

PX716

level of fear for one's personal safety felt by the population.[84] Not only does the survey not ask who the respondents are afraid of, it assumes that security itself is defined best by the frequency of fears for personal safety. But this may not be accurate. When journalist James Holland asked why villagers would support a regime that made them fear for their personal safety, he reported,

> The Taliban may operate an extremely harsh sharia-based rule of law, heavily dependent on intimidation and violence, but . . . under the Taliban, a person could leave his wallet on a wall in Musa Qala and find it there two days later.[85]

Other factors, such as the level of predictability of the environment or the provision of higher-paying jobs may be more important to the people's sense of well-being.

So how can we understand how to ask the right questions? One possibility is to construct a phased process of social science research. Ethnography and other tools of cultural anthropology are increasingly used by the government through programs such as the Human Terrain System, but these efforts usually end with normative recommendations to service members—the advisory "angel on the shoulder." Perhaps it would be more constructive to use ethnographic knowledge to inform later-stage data collection efforts, such as public opinion polls, to increase the accuracy of our metrics.[86] Such a structured field research process could result in more accurate diagnosis of local attitudes.

**Maintain a Sustained Commitment.** Above all, the effort to create a durable transition from counterinsurgency to stability operations in Afghanistan rests on the sustained commitment of U.S. and coalition forces. Rather than indulge in the strategic narcolepsy that has defined U.S. intervention in Afghanistan for the past 30 years, we must exhibit a sustained interest in that country's future. The depth of Afghani-

---

[84] Ruth Rennie, Sudhindra Sharma, and Pawan Kumar Sen, *Afghanistan in 2008: A Survey of the Afghan People,* The Asia Foundation, 2008, p. 29.

[85] James Holland, "Dispatches: Musa Qala, Afghanistan," *Granta*, April 15, 2008.

[86] Author interview, Andrea Jackson, October 13, 2009.

PX716

stan's instability demonstrated in this case study will require significant presence, resources, and attention at the strategic and policy level to remediate. If there is a key lesson to be gleaned from both the U.S. experience in Afghanistan during the time of the Soviet invasion and the "false dawn" of the immediate rout of the Taliban in 2002, it is that losing interest in Afghanistan before the transition to stability has been solidly achieved creates unpredictable and dangerous results.

In summary, it can be said that the situation in Afghanistan is, as of this writing, still in the counterinsurgency stage, and that a transition to protracted stability has not yet taken place. Indeed, as we pointed out earlier in the chapter, the "transition" that took place in Afghanistan was the move from early stability efforts toward COIN, which is the phase that is still under way today. The suggested shifts in U.S. and Afghan government policy listed above could contribute to an eventual move back toward stability.

PX716

# Conclusion

This volume has examined a number of different insurgencies to determine what was required to end them and to transition to more stable conditions. In some of the cases included in this study, there was considerable American involvement (Iraq, Afghanistan); in others, U.S. participation was limited (Colombia, El Salvador). In the Philippines, the United States has assisted the government, but not specifically in suppressing the NPA, while in the case of Mali there was no American involvement of consequence.

In some of the examples we studied, the government conducting the counterinsurgency campaign developed effective and appropriate policies and techniques to transition from insurgency into sustained normalcy. In other cases, there was only partial success, and in the case of Afghanistan the insurgency is clearly not yet at the point of reaching a transition (indeed, some argue that the anti-Taliban coalition is struggling merely to maintain the present situation). In all these varied situations, we have seen examples of both effective and ineffective policies and techniques, as governments attempted to defeat the insurgency and move toward stability. Therefore, U.S. policymakers and COIN practitioners have much to learn from these experiences.

It should be noted that there were some similarities in the cases but also important differences. It is thus difficult to assess whether a more "military" or more "economic/political" approach was the most significant reason why a particular insurgency started to transition toward stability. It is, however, safe to say that in each case an approach

PX716

was needed that balanced security needs as against important reforms in other areas.

## Overarching Insights

There were important differences in each of the cases that we examined. They range from small insurgencies with little U.S. participation (Mali) to major conflicts where the United States has been deeply involved (Iraq and Afghanistan). Other cases are in the middle of the spectrum in terms of size, complexity, and the level of American participation. As we examined what appeared to work and what did not in the six cases included in the study, all or a majority of them seemed to have several important factors in common.

*Successfully transitioning from COIN to relative stability requires an interagency approach.* As insurgencies start to transition toward stability, there is a reduction in violence and a gradual increase in normal economic and political activity. Interagency cooperation is needed during all phases of an insurgency. During the transition period, this need may be particularly important, as the primary responsibility moves away from the military toward the police and as economic development and political reforms take effect and are refined.

Although the military is best suited for providing protection and security while the insurgency is at its worst, the military is usually not the optimal agency, to say the least, to ensure that political and economic reforms are properly executed. Multiple agencies, both within the incumbent government and from the third party nation(s) that are helping to combat the insurgency, must work together during the critical transition period to ensure that economic and political reforms are implemented in order to prevent a reignition of the insurgency.

In the case of Colombia, the 2004 creation of the Center for Coordinated Integrated Action (CCAI) was a key step in integrating the overall efforts of the Colombian government (military, police, political, and economic) to consolidate gains made in the COIN effort against the FARC. Placing the CCAI at the cabinet level ensured participation and awareness of the Colombian president and his key advisors. Next,

the CCAI empowered representatives at the state level to coordinate security, economic development, and political reforms. Although this concept was not without problems, it has been instrumental in accelerating the reestablishment of Colombian government authority in an ever-growing portion of the country. With the FARC already showing signs of weakness by the early part of the decade, this coordinated, intragovernmental approach has proved to be very effective. Today, it appears that Colombia is well along in the process of transitioning from a decades-long COIN campaign to relative stability in most of the country.

Similarly, in the Philippines the government adopted (as of 2006) an "all of government" approach to counterinsurgency. While most people agree that the NPA was not completely defeated by the end of 2010, there is general consensus that the government has made significant gains over the communist movement and that the influence of the NPA will continue to diminish over the next several years—so long as the Philippine government can continue the present level of effort. Overall, the Peace and Order Councils that coordinate the government's approach to the insurgency at the national, regional, provincial, city, and lower levels of government have proved effective in rationalizing the overall strategy and operations on the security and civil reform fronts. The POCs brought together all the key government agencies that were critical to the counterinsurgency effort.

In other cases, increased cooperation between the security and political/economic COIN efforts paid off, even though a formal high-level interagency coordinating body was not created. In El Salvador, the initial approach to dealing with the insurgents was overly biased toward direct military action. While this certainly resulted in insurgent casualties, military and police actions alone were not enough to undermine the support that the insurgents enjoyed within significant portions of the population. Once El Salvador adopted a more balanced approach, maintaining military pressure on the insurgents while simultaneously placing much greater emphasis on political and economic reform, the support for the insurgents declined. This required a coordinated, interagency approach by the governments.

PX716

In contrast, in Iraq and Afghanistan there was a distinct lack of a unified interagency effort for the first several years of conflict. In both cases, the Department of Defense had to perform most of the security and reconstruction tasks. DoD was not well suited for the reconstruction mission, since it lacked significant recent experience in nation-building (or rebuilding) and the reform of civil institutions. The initial U.S.-led COIN effort suffered badly in both countries as a result. To this day, U.S. involvement in Afghanistan still lacks adequate interagency coordination at the cabinet level. For example, even though the United States has been involved in Afghanistan for over eight years, the percentage of nonmilitary personnel in the PRTs that are so critical to capacity-building remains small, and military personnel are still performing most development tasks despite their relative lack of training and expertise in that area. It should be noted that from roughly 2002 to 2005, the United States was not really conducting a counterinsurgency operation in the classic sense of the term. Rather, it was engaging in a counterterrorism effort using the limited number of troops that were available during those years and initially trying to stabilize the country.

*It is important to develop an in-depth understanding of the participants in the insurgency, including what issues are driving a portion of the population into the hands of the insurgents.* This appears to be, in general, easier for the local government and its security forces than for external actors. For example, in the case of Iraq's Anbar province, it took U.S. forces several years to develop sufficient knowledge of the key local personalities, economy, power hierarchies, and tribal structures. Additionally, in both Afghanistan and Iraq it took considerable time—years—for the United States and other outside forces to develop a good understanding of the real needs of the local population. This resulted in many well-intentioned, but inappropriate, aid programs that were of marginal benefit to the local population. Unfortunately, developing in-depth knowledge of the local situation took years because of an almost total prewar lack of familiarity on the part of the Americans.

Perhaps one of the most important factors in understanding the nature of an insurgency is the need to recognize that the movement has a degree of popular support, even though support for the insurgents

might be limited, in some cases, to a small portion of the population. Often, armed forces see the insurgency as a strictly military "target set" and limit their approach to locating and destroying or capturing the insurgents. For the insurgency to be truly defeated, militaries—both those of the local country as well as any foreign forces that are there to assist—must recognize that the insurgency arose for a reason and that a multifaceted approach is almost always required to overcome it.

The Anbar case provides an excellent contrast of the difference between a situation when foreign forces understand the local issues and when they do not. As Chapter Six makes clear, for the first several years of the U.S. occupation of Anbar province there was far more emphasis placed on direct military operations than on identifying the underlying causes of Sunni resentment and the needs of the population. Once the approach to COIN changed, which occurred roughly at the same time that the Iraqi branch of al Qaeda was making major miscalculations in its dealings with the local population, the level of violence dropped significantly.

Once U.S. forces in Anbar had developed a better understanding of the local political, security, and economic issues, they could focus their efforts in a much more appropriate way. Trust started to build between the Americans and the local population, who began to view the U.S. forces as being on their side and able to help them. Once the relationship between U.S. forces and the population had developed—due to better understanding of the local environment on the part of the Americans—the process of starting the transition from COIN to a more peaceful and stable situation really began.

Government officials and security forces of the nation being threatened by the insurgency should have an advantage over foreign forces—after all, it is their country. While this theoretical advantage appears obvious, even the military and police of the country in question can badly misinterpret the nature of the insurgency and the needs of the local population. For years, the indigenous governments of the Philippines and their security forces were oblivious to the grievances of their own populations. When the government and its military and police are seen as "not getting it" by disaffected elements of the population, increased support for the insurgents is almost inevitable.

PX716

Once participants in the counterinsurgency (in the local government as well as that of any external participants such as the United States) become well versed in the issues that the insurgency is attempting to exploit, the key personalities involved, and the grievances and needs of the local population, meaningful efforts at reform become possible. For example, in the Philippines special operations teams were particularly useful in helping to ensure that nonkinetic measures were meaningful and relevant: The people in the conflict areas came to understand that they themselves had a direct stake in the effort to move toward stability. However, the longer the process of learning the nature of the insurgency takes, the greater the risk that support for the insurgents will increase, possibly to unmanageable levels.

Mali represents a case where the government apparently correctly determined what the key issues were and acted accordingly, albeit within its limited resources. Because the essence of the insurgency was determined rather quickly, appropriate actions could be taken to prevent the insurgency from becoming a major threat.

*There is a clear need to manage the demobilization of the various militia groups, which may number many thousands of armed men.* Reintegration of fighters into society is a key requirement for ending lawlessness and widespread violence. In many insurgencies, militias fight alongside regular government forces. In some cases, these militias are sponsored by the government; in others, such as Colombia, they develop and operate independently. In yet other cases, they might respond to local powerholders. Counterinsurgency theory has long stressed the contribution of militias and other self-defense forces. Geraint Hughes and Christian Tripodi usefully distinguish between what they term "home guards," locally recruited forces that provide static defense at the village or neighborhood level, and militias, larger forces aligned with the state that are typically raised from within an indigenous ethnic or tribal grouping.[1] These forces can serve a number of important purposes. At the most basic level, what Frank Kitson

---

[1]   Geraint Hughes and Christian Tripodi, "Anatomy of a Surrogate: Historical Precedents and Implications for Contemporary Counter-Insurgency and Counter-Terrorism*," Small Wars & Insurgencies,* Vol. 20, No. 1, March 2009, p. 4.

PX716

terms "auxiliary forces" can carry out "less skilled functions, particularly those related to guarding."[2] Counterinsurgency is a manpower-intensive activity. Ideally, the employment of what Hughes and Tripodi term "surrogates" frees up the police and military forces for offensive operations—in other words, these irregulars function as force-multipliers. But militias and other self-defense forces can serve broader political and operational objectives as well. Members of locally based forces will necessarily have an intimate knowledge of local conditions that surpasses that of government security forces. Individuals recruited into auxiliaries become less available as a recruitment pool for insurgents and thus help deny a critical resource to the armed opposition. Moreover, participation in surrogate forces can reinforce a population's sense of common cause against the insurgency and, in so doing, foster popular allegiance to the incumbent government.

All the cases we examined reinforce the claims of counterinsurgency theory regarding the contribution of local self-defense forces. In these cases, auxiliaries helped to "tip" the conflict in favor of the counterinsurgents and, in so doing, paved the way for significant transitions.

At the same time, these cases suggest some major pitfalls regarding the employment of self-defense forces for counterinsurgency purposes. The first-order challenge involves questions of command and control. Auxiliaries operate in an administrative and political shadow zone. Some are organized, trained, equipped and paid by the state, while others (typically militias) are essentially self-organizing and self-sustaining. Although the intention behind the use of auxiliaries for counterinsurgency is to build popular allegiance to the state, this goal is not always achieved. Accountability remains a major challenge. Given the fluid nature of allegiance, and the often vague command-and-control arrangements, surrogate forces can commit serious human rights abuses with virtual impunity. In addition to the human cost, such abuses can create major political problems for the incumbent power and for any external power that is supporting the incumbent government.

---

[2]  Frank Kitson, *Bunch of Five*, London: Faber & Faber Ltd., 1977, p. 295.

If militia groups that have developed during the insurgency are not properly managed during the transition phase, serious problems can arise. In the case of El Salvador, for example, although a political settlement was reached with the insurgents to bring about transition to "normalcy," tens of thousands of former combatants were not properly dealt with in terms of postwar employment, including possible integration into the security forces. Therefore, although the insurgency ended, lawlessness and violent criminal activity rose dramatically, to the point that more people were dying due to violent crime in the years immediately after the end of the insurgency than were being killed during the actual COIN effort.

In the Philippines, the growth of militia groups over a period of several decades has complicated the government's efforts to transition from COIN to stability. In large part, this has been due to human rights abuses—overt war crimes in some cases—on the part of poorly supervised militia groups.

Anbar province is a current, and very important, example of this issue. The Sons of Iraq, the local Sunni self-defense forces that arose to defend communities against al Qaeda extremists, were a key element in moving the province from a difficult insurgency to transition. For several years, the U.S. military paid the wages of thousands of SoI fighters. Today, however, it appears that the Iraqi government in Baghdad is much less concerned with managing the SoI. Already there have been indications that disillusioned, unemployed—and armed—SoI fighters are becoming increasingly restless, possibly to the point of armed opposition to the Baghdad regime.

Colombia provides a good example of the management of militia groups as an insurgency starts to transition into the end game and stability. For years, self-defense groups popularly known as paramilitaries were responsible for murders and other criminal activity in the name of opposing the FARC. The excessive, heavy-handed, tactics of these groups obstructed the Colombian government's effort to reestablish its authority in conflict zones and—because of accusations that these units operated in collaboration with sectors of the Colombian military—complicated the Bogota government's relationship with its allies. The Uribe government devoted considerable attention to disarm-

PX716

ing these groups and providing alternative means of making a living to former members.

The handling of former militia members is related but distinct from the general challenges of disarmament, demobilization, and reintegration of former combatants, which are discussed in more detail in the first volume of this study. The overall number of combatants must be drastically reduced (for budgetary reasons, if no other); in most cases, some of the insurgents will have to be integrated into the official security establishment (assuming the war did not end in a clear-cut victory). The important point is that, as an insurgency transitions toward stability, there is a clear need to manage the demobilization and reintegration of all of these groups, which are composed mostly of young men who all too often have no other skills than carrying a weapon— whether they did it on behalf of the government or the insurgents.

*Gaining cooperation from nearby nations to end or minimize support for the insurgents is essential.* Numerous studies of counterinsurgency have noted that if an insurgent group is receiving aid and sanctuary from a nation or nations adjacent to the country threatened by the insurgency, the COIN effort will be far more difficult, if not impossible. The cases we examined in this study reinforce that viewpoint. To facilitate the transition from COIN to a more stable situation, some degree of cooperation from adjacent countries is necessary. In some cases, the cooperation of nearby states could be as simple as their neutrality (including denial of sanctuary for the insurgents); in other cases, more overt assistance from nearby nations might be required, such as helping to monitor border areas, sharing the burden of dealing with refugees, denying political legitimacy to the insurgency, or providing economic assistance to the neighbor that is in the process of transition.

In Mali and Iraq, gaining the cooperation of neighboring nations was key to defeating the insurgents and starting the transition process. In Mali's case, obtaining cooperation from Algeria was critical, not only in preventing insurgents from using southern Algeria as a sanctuary, but also as a mediator and facilitator of the peace process.

Iraq is an even better example. Once Syria, Jordan, and Saudi Arabia recognized that a destabilized, possibly radicalized, Iraq was certainly not in their best interests, they began to crack down on

PX716

insurgent activity emanating from within their borders. When combined with the serious missteps by al Qaeda in Anbar province and the improved COIN techniques that the U.S. forces were employing (notably, the improved understanding of the situation in Anbar; see the section above on developing an in-depth understanding of the participants in the insurgency), this was a decisive step in transitioning from a difficult counterinsurgency situation toward stability.

In the Philippines, the inability of the insurgents to obtain foreign sanctuary is certainly aiding the transition efforts of the government. Geography helps—the Philippines is a group of islands with no common land border with another nation. So, while the insurgents can try to hide and find sanctuary within remote areas of the Philippines, they do not have the ability to run across a border to avoid pursuit by government forces. Now that the entire Philippine government is conducting the COIN effort in a more integrated, interagency manner, the decreasing ability to find an internal sanctuary within the country is hurting the NPA.

On the other hand, in Colombia the single most important factor in the potential resurgence of the much-weakened FARC is its ability to use Venezuela as a sanctuary and source of support. As the chapter on Colombia made clear, there is no doubt that the Chavez government in Venezuela has provided considerable assistance to the FARC, including sanctuary. As the Colombian government strives to transition toward a sustainable peace and normalcy, the situation could deteriorate— again—if the FARC is able to regroup and rebuild inside Venezuela and possibly Ecuador. Despite occasional pronouncements from President Chavez that his government is not supporting the FARC, the evidence is overwhelming that the Venezuelans are indeed helping the leftist insurgents. Should that support continue, the Colombian government's COIN transition efforts could be gravely undermined.

Afghanistan provides an even starker case. As with the Russian experience in the 1980s, the present Afghan government and the coalition that is helping it are at somewhat of a loss as to what to do about the insurgent sanctuary in Pakistan. In the northwest provinces of Pakistan the Taliban (and al Qaeda) enjoy considerable support among the population. For various reasons, the Afghan government

PX716

and the coalition are unwilling to take dramatic action either to close the border between Afghanistan and Pakistan (which would probably be an impossible task given the terrain and the sheer length of the border) or to attack insurgent strong points inside the Federally Administered Tribal Areas (FATA) other than occasional strikes by armed unmanned aerial vehicles. As of this writing in late 2009, the Pakistani government is starting to take a more direct approach toward the extremists in FATA. It remains to be seen how effective this effort will be and how long it will last.

Until and unless some solution for the Taliban's sanctuary inside northwest Pakistan can be devised, it is highly unlikely that the level of violence in southern Afghanistan will be reduced to the point that a meaningful transition effort can get under way. It is clear that at the present time the situation in eastern and southern Afghanistan is far from transitioning from COIN to lower intensity stability operations.

*There must be sufficient resources and time for meaningful transition efforts.* This issue came up in most of the cases. Even if the security portion of the COIN effort is doing well (i.e., the host nation's army and police have scored major successes against the insurgents and are generally able to protect the local population), the effort to transition from COIN to a more stable situation could still last years and require considerable resources. If resources are lacking or are used ineffectively to adequately address economic, political, and other nonsecurity issues and convince the disaffected elements in society to side with the government, the attempt to transition from COIN could be compromised.

Several examples came out in the case studies. In Anbar province, resources for development projects were insufficient for several years. Most people were impoverished and had little prospect for a better future. This situation, of course, contributed to support for the insurgents. Once the U.S. and Iraqi governments reprioritized their countrywide efforts and began to use their resources in Anbar more effectively, the economic situation of the local population started to improve and, together with improvements in the security situation and major errors by al Qaeda, contributed to the transition to stability.

PX716

In El Salvador, there was an initial lack of resources to make the economic improvements needed to convince the people that the government was taking actions to better their lives. The steps taken by the government were initially half-hearted due to resistance from the wealthy classes (for example, opposition to land reform) and lack of resources to make meaningful reforms.

The Philippines has, unfortunately, a long history of insurgencies ever since the last few years of Spanish rule in the late 19th century. In the post-independence period, from 1946 to today, the Philippine government has on several occasions thought that it had defeated the insurgents (who where usually communists, although some in the south were Muslim separatists). Although The Philippine Army, constabulary, and police have on several occasions gravely weakened the insurgents to the point that the insurgency appeared to be broken, the inability to sustain meaningful economic and political reforms has always provided a breeding ground for the eventual restart of the insurgency. While political corruption has been a large contributor to the inability to fully suppress insurgency in the Philippines, the lack of resources to institute, manage, and sustain needed economic reforms has been a major reason why insurgency has flared back over the decades. Today the Philippine government is hopeful that it can finally defeat the communist insurgency through an integrated intragovernmental effort. Whether this results in only short-term success, as has been the case in past insurgencies in the Philippines, or lasting stability will depend to a large extent on whether the Filipinos can muster the resources to sustain long-term reforms.

Importantly, the need for sufficient resources (and time) during the transition to stability also means that there must be a proper allocation and correct use of those resources. Every case in this study includes glaring examples of misapplication of resources, waste through corruption, and well-intended projects that were often the wrong thing in the wrong place. As was highlighted above, there is a critical need to develop an in-depth understanding of the insurgency and the needs and wants of the local population. This is related directly to the requirement to properly and judiciously apply resources, over time, to

PX716

change the conditions of the population, thus correcting problems that may have been key to the rise of the insurgency in the first place.

## Insights and Implications for U.S. Policy in Iraq, Afghanistan, and Beyond

The issues raised in the previous section can apply to the host nation, other countries (such as the United States or the UK) that are attempting to assist the host nation's COIN effort, or both. There are, however, some insights derived from the cases that apply primarily to "external participants," such as the United States. Ideally, a counterinsurgency effort should be overwhelmingly in the control of the host nation that is threatened by the insurgency. Although other countries can offer important help, it is ultimately the effectiveness and legitimacy of their own governments that will cause the local population to side either with that government—or with the insurgents. In situations where the host nation's government and its security forces are so weak that considerable direct involvement by foreign forces is needed, the goal should be to strengthen the COIN capacity of the host nation as rapidly as possible and pass most of the effort to it as soon as it is capable of performing adequately.

That said, there are some issues that primarily apply to "outside" parties—such as the United States. Several of these are highlighted below.

### Intelligence Support to the Host Nation

In several of the cases, intelligence support to the host nation was a key capability provided by outside external powers. In the broadest terms, modes of intelligence collection fall into two categories: Technical intelligence collection includes the interception of electronic communications, telemetry from missile tests, and electromagnetic emanations from military equipment such as radar transmitters (known collectively as signals intelligence, or SIGINT) and the gathering of photographic imagery. Human intelligence collection (HUMINT) is, in essence, the use of agents by an intelligence organization to col-

lect information. As demonstrated in the cases of El Salvador, Iraq, Afghanistan, and Colombia, the United States provided important technical intelligence to host nation governments and their security forces that often gave them significant advantages over the insurgents. This can, of course, help improve the security situation, thus facilitating the transition from COIN to a more stable, less violent situation.

In general terms, HUMINT should be an area where the host nation's security forces have an advantage over foreign forces—at least in theory. The incumbent's security forces are, after all, operating among their own people, and it seems unlikely that foreign forces would ever be able to develop the same degree of knowledge and detailed cultural insights as the local forces will. That said, it is certainly the case that in many instances the incumbent power badly misreads the nature, scope, and motivations of armed opposition groups. Typically, insurgents (particularly in the early stages of a given conflict) are dismissed as mere "bandits," "criminals," or "terrorists." This may make good sense at the political level, since labeling the armed opposition as something other than criminal may provide them with a measure of legitimacy.[3] But such labeling is seldom the result of a prudent political calculation. More often, it reflects a profound lack of understanding of the insurgent challenge. Indeed, the emergence of a full-blown insurgency is in part a product of the incumbent's inability and unwillingness to understand and take appropriate steps to thwart its growth and development.[4] This appears to have been the case in Iraq in 2003–2004, when the incumbent regime (effectively the United States, in this instance) branded the insurgents as mere malcontents and Baathist "dead-enders."[5] Paradoxically, some of the most threatened regimes are often in a state of self-denial. Acknowledging the full scope of an insurgent challenge would

---

[3]  For more on this point, see Philip Deery, "The Terminology of Terrorism: Malaya, 1948–52," *Journal of Southeast Asian Studies*, Vol. 34, No. 2, June 2003, pp. 231–247.

[4]  For more on thwarting "proto-insurgencies," see Daniel Byman, *Understanding Proto-Insurgencies*, *RAND Counterinsurgency Study, Paper 3*, Santa Monica, Calif.: RAND Corporation, OP-178-OSD, 2007, particularly pp. 21–30.

[5]  See for example, remarks delivered by Secretary of Defense Donald H. Rumsfeld, Veterans of Foreign Wars, San Antonio, Tex., Monday, August 25, 2003.

PX716

be a tacit (or perhaps even explicit) acknowledgment that the regime in question is facing a profound crisis that it is unable or unwilling to prevent, and for which it may be deemed responsible. Such an admission could further erode whatever standing and legitimacy the incumbent regime possessed.

This all suggests that threatened "host nations" may not always be the most competent or reliable intelligence partners. The U.S. government is likely to be tempted to rely heavily on intelligence provided by the so-called "liaison services" of threatened regimes. Politically, such reliance can help reinforce the notion that the threatened government is a full counterinsurgency partner; in economic terms, depending on the host nation for intelligence on the insurgency is likely to be far cheaper than mounting "unilateral" U.S. collection operations. But for the reasons suggested above, such dependency can have potentially dangerous consequences for U.S. policy. Of course, the United States can ill-afford to ignore intelligence provided by a supported government. However, such intelligence (as with any intelligence provided by another government) must be evaluated and considered along with other sources of information, including unilateral U.S. sources.

**Managing Militias Toward the End Game**

American policymakers must be alert to the challenges surrounding the use of militia forces. Self-defense units "clearly need support, or else the guerrillas will overwhelm them one village at a time," as Anthony James Jones concludes.[6] But in many instances, host nations underequip, undertrain, and underpay—and fail to protect—auxiliary forces such as militia groups. The incumbent government is often reluctant to provide modern arms to villagers, fearing that such weapons will "bleed out" and find their way into insurgent hands. Conventional military forces typically view self-defense militia forces with disdain and as a distraction from the "real business" of fighting guerrillas. Conventional forces also tend to regard militias as potential "little soldiers" and as low-cost light infantrymen who should be deployed to

---

[6]  Anthony James Jones, *Resisting Rebellion; The History and Politics of Counterinsurgency,* Lexington, Ky.: The University Press of Kentucky, 2004, p. 121.

PX716

fight insurgents rather than guard villages.[7] Recognizing their potential utility as a counterinsurgency instrument, insurgents will typically make major efforts to infiltrate and otherwise disrupt auxiliary units. Insurgents are often successful in this regard—and this success serves to reinforce suspicions that surrogate forces are unreliable.

In addition to understanding how self-defense forces can be neglected and misused by the host nation, US policymakers need to ask three questions before beginning any program of support to militias and home guards: (1) How will these forces contribute to broader political and military objectives? (2) How will they be organized, trained, equipped, and resourced, and by whom? (3) As the insurgency starts to transition toward stability, what is the "end game" plan for militia groups (i.e. will they be integrated into the host nation's police and military, will they be "paid off" with money or jobs, etc). The answers to these questions are not usually self-evident early in an insurgency. Local conditions, culture, resources, and the nature of the insurgency should play a major part in determining the roles, missions, and functions of the auxiliaries. These factors should also shape the program for raising, training, and sustaining these forces.

U.S. policymakers need to consider how such forces might upset local power balances in ways that undercut wider counterinsurgency objectives. For example, "[i]n states whose societies are divided by ethnic, racial, tribal or confessional strife, the use of surrogates from one particular group . . . can exacerbate internal tensions and encourage civil war," as Hughes and Tripodi have observed.[8] Iraq and Afghanistan clearly fit these criteria, and so any program of support to auxiliary forces in those countries should be carefully crafted to avoid aggravating communal tensions and grievances. Finally, the issue of the post-conflict role of self-defense forces (if any) requires careful consideration, ideally during early stages of planning and execution. As cases such as El Salvador demonstrate, the failure to properly plan and implement

---

[7]   William Rosenau, *"Low-Cost Trigger Pullers": The Politics of Policing in the Context of Contemporary "State Building" and Counterinsurgency,* Santa Monica, Calif.: RAND Corporation, WR-620-USCA, 2008, pp. 9–13.

[8]   Hughes and Tripodi, "Anatomy of a Surrogate," p. 25.

PX716

disarmament, demobilization, and reintegration (DDR) can undercut the prospects for long-term peace and security. Given the prominent role played by auxiliaries in many counterinsurgency campaigns, it is essential that these forces be included in any comprehensive program of DDR.

**Providing the Resources and Management Structure for a Protracted Transition Phase**

In all of the cases that had either successfully transitioned from COIN to stability (El Salvador) or were apparently well along in that process (Colombia, Iraq, the Philippines), the transition period lasted for years. The local government's resources might be greatly strained following a multiyear COIN effort. For the transition period to be truly successful, economic, political, and other reforms will usually need to be carried through to completion. A considerable portion of these resources might have to come from the external power(s) that were assisting the incumbent government during the COIN phase.

Not only is the sheer level of resources an issue, the management of their delivery is also critical for the external power. As COIN transitions toward stability, there will probably be a change in roles and responsibility between, for example, the Department of Defense and the Department of State as the long-term assistance effort to ensure success unfolds. Volume I of this study examines this issue in greater detail, but we highlight it here because it became apparent in some of the cases we examined.

For the United States, the implications are clear. As an insurgency begins to transition to stability, U.S. policymakers should understand that despite the fact that an important corner has been turned in combating the insurgency, the transition period could last for years. The country that the United States has been helping might be gravely weakened by the time the transition phase begins. Therefore, there could be a need for continuing assistance for a considerable amount of time into the future.

PX716

# Indicators of Transition

What are the key indicators that an insurgency is transitioning toward stability? Four broad categories of metrics seem particularly appropriate: (1) popular perceptions of security; (2) insurgent operations; (3) economics; and (4) intelligence.

1. Popular perceptions of security
   – Increasingly favorable views on personal safety and on the government's capabilities to protect the population
   – Growing rates of security force enlistment (and reenlistment)
   – Increasing local political engagement, e.g., participation in city councils, political parties, provision of public services
   – Growing numbers of returnees to conflict area
   – Rates of return to the country by the political and economic elite (particularly significant).
2. Insurgent operations
   – A significant drop in "open" opertions—e.g., public displays, posters and other propaganda, overt recruitment
   – Diminishing control of the population by insurgents
   – Shrinking scale of operations—e.g., cell-size rather than battalion-size
   – Types of operations—e.g., growing frequency of attacks on "soft" civilian targets versus "hard" security force targets
   – Fewer areas under insurgent control
   – Improved ratio of government-initiated attacks, as opposed to insurgent control of operational tempo.

PX716

3. Economics
   – Growth of private-sector investment. Ultimately this indicator may be more significant than GDP or public-sector spending, because individuals are risking their own funds
   – Commercial economic activity, e.g., new housing, shops
   – Intercity commerce. Are business owners (and drivers) willing to travel over significant distances? Are people willing to travel to markets?
4. Intelligence
   – More high-quality, actionable intelligence provided by the local population, e.g., information on activities of the insurgent underground, IEDs, weapons caches.

PX716

# References

NOTE: All CIA World Factbook maps may be found at
https://www.cia.gov/library/publications/the-world-factbook/

## Summary and Chapter One

Byman, Daniel, *Understanding Proto-Insurgencies*, *RAND Counterinsurgency Study–Paper 3,* Santa Monica, Calif.: RAND Corporation, OP-178-OSD, 2007. As of May 25, 2011:
http://www.rand.org/pubs/occasional_papers/OP178.html

Connable, Ben, and Martin Libicki, *How Insurgencies End*, Santa Monica, Calif.: RAND Corporation, MG-965-MCIA, 2010. As of May 25, 2011:
http://www.rand.org/pubs/monographs/MG965.html

Deery, Philip, "The Terminology of Terrorism: Malaya, 1948–52," *Journal of Southeast Asian Studies,* Vol. 34, No. 2, June 2003, pp. 231–247.

Gompert, David C., John Gordon, Adam Grissom, David R. Frelinger, Seth G. Jones, Martin C. Libicki, Edward O'Connell, Brooke Stearns Lawson, and Robert E. Hunter, *War by Other Means: Building Complete and Balanced Capabilities for Counterinsurgency, Final Report,* Santa Monica, Calif.: RAND Corporation, MG-595/2-OSD, 2008. As of May 10, 2011:
http://www.rand.org/pubs/monographs/MG595z2.html

Hughes, Geraint, and Christian Tripodi, "Anatomy of a Surrogate: Historical Precedents and Implications for Contemporary Counter-Insurgency and Counter-Terrorism," *Small Wars & Insurgencies,* Vol. 20, No. 1, 2009, pp. 1–35.

Jones, Anthony James, *Resisting Rebellion: The History and Politics of Counterinsurgency*, Lexington, Ky.: The University Press of Kentucky, 2004.

PX716

Rosenau, William, *"Low-Cost Trigger Pullers": The Politics of Policing in the Context of Contemporary "State Building" and Counterinsurgency*, Santa Monica, Calif.: RAND Corporation, WR-620-USCA, 2008. As of August 2, 2011:
http://www.rand.org/pubs/working_papers/WR620.html

Rumsfeld, Donald H., Remarks as Delivered to the Veterans of Foreign Wars, San Antonio, Tex., Monday, August 25, 2003. As of May 25, 2011:
http://www.defenselink.mil/speeches/speech.aspx?speechid=513

## Chapter Two

"25 Years of the New People's Army," *Liberation International*, March/April 1994. As of May 28, 2011:
http://www.hartford-hwp.com/archives/54a/072.html

Abaya, Antonio, "Jose Maria Stalin," *Manila Standard Today*, July 6, 2006. As of March 4, 2008:
http://www.manilastandardtoday.com/?page=antoniobaya_julu06_2006

AIM TeaM Energy Center, "The Bridging Leadership Fellows Program," n.d. As of July 25, 2011:
http://blfellows.wordpress.com/about/

Armed Conflict Events Database, "The Huk Rebellion in the Philippines 1946–1954," December 16, 2000. As of April 6, 2009:
http://www.onwar.com/aced/data/papa/philippines1946.htm

Banalaoi, Rommel, "Identity Politics and Philippine National Security in an Age of Terror," unpublished paper provided to author, June 2009.

———, "CAFGU, CVOs and Vigilante Groups in the Philippines," paper prepared for the South-South Network (SSN) Philippine Armed Groups Political Mapping Research Project, 2006.

Bautista, Manuel, *The Hukbalahap Movement in the Philippines, 1942–1952*, Los Angeles: University of California, 1952.

Bayron, Heda, "Philippine Military Corruption Trial Starts," newsVOA.com, November 16, 2004. As of May 31, 2011:
http://www.globalsecurity.org/military/library/news/2004/11/mil-041116-277ba4fc.htm

Briefing Paper, J3, AFP, 2007.

Camacho, Agnes, Zenaida Marco, P. Puzon, and Yasmin Patrice Ortiga, *Children and Youth in Organized Armed Violence in the Philippines: Contextualisation, Personal Histories and Policy Options*, Quezon City: UP Center for Integrative and Development Studies, 2003.

PX716

Clowney, Robert, "Airmen Spread Goodwill During Balikatan 2009," U.S. Air Force, April 29, 2009. As of November 11, 2009: http://www.af.mil/news/story.asp?id=123146849

Conde, Carlos, "Corruption Troubles Philippine Military," *International Herald Tribune,* May 26, 2005.

*Consideration of Reports Submitted by States Parties Under Article 40 of the Covenant: The Philippines,* Geneva: United Nations Covenant on Civil and Political Rights (CCPR), August 2002.

Cruz, Bayani, "Qadhaffi Aids NPA, MNLF," *Manila Times,* June 16, 1987.

"Current NPA's Strength Down to Lowest Level Since the '80s," *Philippine Star,* June 28, 2009.

Davis, Anthony, "NPA Rebels Complicate Manila's Counterinsurgency Strategy," *Jane's Intelligence Review*, June 2003.

Fowler, Mike, "Philippine Counterinsurgency Strategy: Then and Now," *Small Wars Journal*, January 18, 2011. As of May 28, 2011: http://smallwarsjournal.com/blog/journal/docs-temp/651-fowler.pdf

Gloria, Glenda, "War Without End: The Military Is Treading on Dangerous Ground with Its Counterinsurgency Experiments," Newsbreak, December 2007/February 2008.

Greenberg, Laurence, *The Hukbalahap Insurrection: A Case Study of a Successful Anti-Insurgency Operation in the Philippines, 1946–1955,* Washington, D.C.: U.S. Army Center of Military History, Analysis Branch, 1987. As of April 5, 2009: http://www.history.army.mil/books/coldwar/huk/huk-fm.htm

Handel, Michael, *Masters of War: Classical Strategic Thought*, London: Frank Cass, 2003.

Immigration and Refugee Board of Canada, "Philippines: Reports of Extortion and Kidnapping of Civilians by the New People's Army (NPA) or Other Armed Groups; State Response to Extortion and Kidnapping; Extent of Recruitment Efforts by the NPA (2003–2006)," October 18, 2006. As of March 5, 2008: http://www.cisr-irb.gc.ca/en/research/rir/?action=record.viewrec&gotorec=450593

International Crisis Group, "The Philippines: Counter-Insurgency vs. Counter-Terrorism in Mindanao," Asia Briefing No. 152, May 14, 2008.

Jubelag, John Paul, "Insurgents Blast 2 TransCo Towers," *Philippine Star*, May 31, 2008.

Kessler, Richard J., *Repression and Rebellion in the Philippines*, New Haven, Conn.: Yale University Press, 1989.

Leifer, Michael, *Dictionary of the Modern Politics of Southeast Asia,* London: Routledge, 1996.

PX716

Macdonald, Douglas J., "Ethical and Moral Issues in Intelligence Reform: The Philippines," in Thomas Bruneau and Steven C. Boraz, eds., *Reforming Intelligence: Obstacles to Democratic Control and Effectiveness,* Austin, Tex.: University of Texas Press, 2007.

Marks, Thomas, *Maoist Insurgency Since Vietnam,* London: Frank Cass, 1996.

McDougall, Derek, *Studies in International Relations: The Asian-Pacific, the Superpowers, Australia,* Melbourne: Edward Arnold, 1991.

Office of the Assistant Chief of Staff for Operations, *CAFGU Primer,* Makati City: Headquarters of the Philippine Army, 2006.

Patajo, Noel, "An Alternative Approach to Counterinsurgency," *Air Force Review,* Vol. 6, No. 3, October 2006.

Philippine Human Rights Information Center (PHIC), *The Militarization of the Philippine Society: CAFGUs Against Human Rights*, Quezon City: PHIC, 1993.

"Philippines: Communists Say Guerrillas Have Not Been Dismantled," *Adnkronos International,* January 8, 2009.

Quisumbing, Purificacion, *Beijing-Manila Détente: Major Issues*, Quezon City: University of the Philippines Law and Foreign Service Institute, 1983.

Ramos, Fidel V., *The Continuing Revolution*, Manila, 2001.

"RP, US Announce Balikatan Exercises 2009 in Bicol," philstar.com, January 8, 2009. As of November 11, 2009:
http://www.philstar.com/Article.aspx?ArticleId=430107

Republic of the Philippines, Office of the Presidential Advisor on the Peace Process, CPP-NPA-NDF, October 24, 2007. As of March 5, 2008:
http://www.opapp.gov.ph/index.php?option=com_content&task=blogcategory&id=23&Itemid=107

Rosie, George, *The Directory of International Terrorism*, Edinburgh: Mainstream Publishing, 1986.

Sarmiento, Rene, "The Legality of Vigilante Groups," paper prepared for the Eight House Annual Convention of the Integrated Bar of the Philippines. Manila: Hilton Hotel, June 7, 1987.

Schmitt, Eric, "Gains Seen in Asian Terror Fight," *New York Times,* June 9, 2008.

Strikar, Jem, "NPA Attacks CAFGU Patrol Base in Malaybalay City," *Mindanao Magazine,* April 1, 2009. As of April 08, 2009:
http://mindanao.com/blog/2009/04/mnpa-attacks-cafgu-patrol-base-in-malaybalay-city/

"Transco Towers Bombed, Half of Mindanao in Darkness," *Philippine Daily Inquirer*, May 31, 2008.

PX716

Villanueva, Marichu, "Palace Announces RP-CPP Peace Talks Resume in Oslo February 10–13," *Philippine Star,* February 6, 2004. As of May 31, 2001: http://www.newsflash.org/2003/05/hl/hl019815.htm

Wurfel, David, *Filipino Politics: Development and Decay*, Ithaca, N.Y.: Cornell University Press, 1988.

———, "Government Responses to Armed Communism and Secessionist Rebellion in the Philippines," in Chandran Jeshurun, ed., *Governments and Rebellions in Southeast Asia*, Singapore: Institute for Southeast Asia Studies, 1985.

## Chapter Three

Bannon, Ian, and Paul Collier, eds., *Natural Resources and Violent Conflict: Options and Actions*, The World Bank, 2003.

Burgess, Mark, "Globalizing Terrorism: The FARC-IRA Connection," CDI Terrorism Project, June 5, 2002.  As of June 1, 2011: http://www.cdi.org/terrorism/farc-ira.cfm

Centro de Coordinación de Acción Integral (CCAI), "Plan de Consolidación Integral de la Macarena," Bogotá, August 2008.

Colitt, Raymond, "Brazil, Colombia Agree on Anti-Drug Border Defense," *Reuters,* March 12, 2009. As of June 1, 2011: http://www.reuters.com/article/AIRDEF/idUSN1253576420090312

"Contactos de Chávez y Correa con las Farc no se limitan a los que figuran en computador de Reyes," *Cambio,* Bogotá, August 9, 2009. As of May 31, 2011: http://www.opinionynoticias.com/noticiasinternacionales/998

De Shazo, Peter, Phillip McLean, and Johanna Mendelson Forman, "Colombia's Plan de Consolidación Integral de la Macarena: An Assessment," Washington, D.C.: Center for Strategic and International Studies (CSIS), June 2009.

Echandía Castillo, Camilo, *El Conflicto Armado y las Manifestaciones de la Violencia en las Regiones de Colombia*, Bogotá: Presidencia de la República, Oficina del Alto Comisionado para la Paz, 2000.

"El conflicto colombiano: Expansión de sus protagonistas hacia las fronteras," *Revista Arcanos*, No. 10. As of May 31, 2011: http://www.nuevoarcoiris.org.co/local/infogeneral1003.htm

Farah, Douglas, "What the FARC Papers Show Us About Latin American Terrorism," NEFA Foundation, April 1, 2008. As of June 1, 2011: http://www.nefafoundation.org

PX716

Glüsing, Jens, "How Hugo Chavez Courted FARC," *Spiegel Online International,* June 4, 2008. As of June 1, 2011:
http://www.spiegel.de/international/world/0,1518,557736,00.html

González Posso, Camilo, "Negotiations with the FARC," Conciliation Resources, 2004. As of Juune 1, 2011:
http://www.c-r.org/our-work/accord/colombia/negotiations-farc.php

IKV Pax Christi, "Kidnapping Is a Booming Business," July 2008. As of May 31, 2011:
http://www.eisf.eu/resources/item.asp?d=4208

Martin-Ortega, Olga, "Human Rights, Demobilisation and the Paramilitaries: The Ley de Justicia y Paz in Colombia," Paper Prepared for the Annual Convention of the International Studies Association, San Francisco, March 26–29, 2008. As of June 1, 2011:
http://www.allacademic.com//meta/p_mla_apa_research_citation/2/5/3/1/0/pages253100/p253100-1.php

Maullin, Richard, *Soldiers, Guerrillas, and Politics in Colombia*, Santa Monica, Calif.: RAND Corporation, R-0630-ARPA, 1971. As of June 1, 2001:
http://www.rand.org/pubs/reports/R0630.html

Moreno Castro, Giovanni, "El conflicto colombiano: Expansión de sus protagonistas hacia las fronteras," *Revista Arcanos*, No. 10. As of May 31, 2011:
http://www.nuevoarcoiris.org.co/local/infogeneral1003.htm

Oquist, Paul, *Conflict and Politics in Colombia,* New York: Academic Press, 1980.

Pardo, Rafael, *La Historia de Las Guerras,* Bogotá, 2004.

"Pastrana Desconoce Cómo Marchar Hacia Adelante," *El Tiempo,* Bogotá, March 1, 1999. As of May 31, 2011:
http://www.eltiempo.com/archivo/documento/MAM-865867

Rabasa, Angel, and Peter Chalk, *Colombian Labyrinth: The Synergy of Drugs and Insurgency and Its Implications for Regional Stability,* Santa Monica, Calif.: RAND Corporation, MR-1339-AF, 2001. As of June 1, 2011:
http://www.rand.org/pubs/monograph_reports/MR1339/

Rabasa, Angel, Lesley Anne Warner, Peter Chalk, Ivan Khilko, and Paraag Shukla, *Money in the Bank—Lessons Learned from Past Counterinsurgency (COIN) Operations: RAND Counterinsurgency Study—Paper 4*, Santa Monica, Calif.: RAND Corporation, OP-185-OSD, 2007. As of May 31, 2011:
http://www.rand.org/pubs/occasional_papers/OP185.html

Rangel Suárez, Alfredo, *Colombia, Guerra en el Fin de Siglo,* Bogotá: TM Editores, 1998.

Republic of Colombia, Acción Social, "Contemporary Anti-Terrorism: The Colombian Experience," briefing, April 1, 2009.

PX716

———, Acción Social web site. As of June 1, 2011:
http://www.accionsocial.gov.co/portal/default.aspx

———, Ministry of National Defense, "PCSD: Policy for the Consolidation of Democratic Security," 2007.

———, "Todos los municipios del país tienen Policía," February 13, 2004.

República de Colombia, Presidencia, Centro de Coordinación de Acción Integral (CCAI) Briefing, Sustainable Consolidation, 2009.

Rico, Maite, "Turbulencias en la región andina," *El Pais* (Madrid), August 3, 2009. As of June 1, 2001:
http://www.elpais.com/articulo/internacional/Turbulencias/region/andina/elpepiint/20090803elpepiint_4/Tes

Romero, Simon, "Venezuela Still Aids Colombia Rebels, New Material Shows," *New York Times*, August 3, 2009. As of July 27, 2011:
http://www.nytimes.com/2009/08/03/world/americas/03venez.html

"Santos' Approval Rating at 86%," *Colombia Reports*, February 8, 2011. As of June 1, 2001:
http://colombiareports.com/colombia-news/news/14168-santos-approval-rating-at-86.html

"Santos Congratulates Armed Forces on Death of 'Mono Jojoy,'" *Colombia Reports*, September 23, 2010. As of June 1, 2011:
http://colombiareports.com/colombia-news/news/12003-santos-congratules-armed-forces-on-mono-jojoy-death.html

Silva, José Adán, "Ejército manipulado," *El Nuevo Diario* (Managua), November 9, 2008. As of May 31, 2011:
http://www.elnuevodiario.com.ni/nacionales/15619

Torres, Juan Carlos, *Operación Jaque: La Verdadera Historia,* Bogotá: Planeta, 2009.

"Tirofijo está muerto," *Semana* (Colombia), May 24, 2008. As of July 27, 2011:
http://www.semana.com/wf_InfoArticulo.aspx?idArt=112103

Torres, Juan Carlos, Operación Jaque: La Verdadera Historia, Bogotá: Planeta, 2009.

U.S. Department of the Treasury, "Treasury Targets Venezuelan Government Officials Supporting the FARC," HP-1132, September 12, 2008. As of June 1, 2011:
http://www.hispanictips.com/2008/09/17/treasury-targets-venezuelan-government-officials-supporting-the-farc/

PX716

U.S. Government Accountability Office (GAO), "Plan Colombia: Drug Reduction Goals Were Not Fully Met, but Security Has Improved; U.S. Agencies Need More Detailed Plans for Reducing Assistance," GAO-09-71 October 6, 2008. As of June 1, 2011:
http://www.gao.gov/products/GAO-09-71

USAID/OTI Colombia Field Report, October–December 2008. As of June 1, 2011:
pdf.usaid.gov/pdf_docs/PDACM540.pdf

## Chapter Four

Anderson, Jim, "State Department Shifts on El Salvador," *Associated Press*, February 27, 1989.

Arnson, Cynthia J., "El Salvador and Colombia: Lessons of the Peace Process," in Margarita S. Studemeister, ed., *El Salvador: Implementation of the Peace Accords*, Peaceworks No. 38, Washington, D.C.: United States Institute of Peace, January 2001.

———, "Window on the Past: A Declassified History of Death Squads in El Salvador," in B. B. Campbell and A. D. Brenner, eds., *Death Squads in Global Perspective: Murder with Deniability*, New York: St. Martin's Press, 2000.

Bailey, Cecil E., "OPATT: The U.S. Army SF Advisers in El Salvador," *Special Warfare*, December 2004.

Ball, Nicole, and Tammy Halevy, eds., *Making Peace Work: The Role of the International Development Community*, Overseas Development Institute, Washington, D.C.: Johns Hopkins University Press, 1996.

Beamish, Rita, "Quayle Tells Salvadoran Military that Aid Depends on Rights Efforts," *Associated Press*, February 3, 1989.

Bennet, Philip, "Salvador Rebels Say Peace Plan Would Give US a Low-Cost Exit," *Boston Globe*, September 15, 1989.

Berdal, Mats, "Consolidating Peace in the Aftermath of War: Reflections on 'Post-Conflict Peace-Building' from Bosnia to Iraq," in John Andreas Olsen, ed., *On New Wars*, Oslo: Norwegian Institute for Defence Studies, 2007.

Branigin, William, "Salvadoran Rebels Amplify Cease-Fire Offer," *Washington Post*, February 21, 1989.

Call, Charles T., "Assessing El Salvador's Transition from Civil War to Peace," in Stephen John Stedman, Donald Rothchild, and Elizabeth Cousens, eds., *Ending Civil Wars: the Implementation of Peace Agreements*, Boulder, Colo.: Lynne Rienner, 2002.

———, "Democratisation, War and State-Building: Constructing the Rule of Law in El Salvador," *Journal of Latin American Studies*, Vol. 35, 2003.

———, "El Salvador: The Mugging of a Success Story," in Charles T. Call, ed., *Constructing Justice and Security After War*, Washington, D.C.: United States Institute of Peace Press, 2007.

Chávez, Joaquín M., "Perspectives on Demobilisation, Reintegration and Weapons Control in the El Salvador Peace Process," in Centre for Humanitarian Dialogue, *Reflections on Guns, Fighters and Armed Violence in Peace Processes*, Vol. 1, Geneva, Switzerland: HD Centre, 2008.

"Central America: UN to Verify 1994 Elections in El Salvador," *UN Chronicles,* Vol. 30, No. 2, June 1993.

del Castillo, Graciana, "The Arms-for-Land Deal in El Salvador," in Michael W. Doyle, Ian Johnstone, and Robert C. Orr, eds., *Keeping the Peace: Multidimensional UN Operations in Cambodia and El Salvador*, Cambridge: Cambridge University Press, 1997.

"El Salvador: Terrorism Law Misused Against Protesters," *Human Rights Watch*, July 30, 2007.

"FMLN: Call for a General Offensive (January 1981)," in Robert Leiken and Barry Rubin, eds., *The Central American Crisis Reader*, New York: Summit Books, 1987.

Greentree, Todd, *Crossroads of Intervention: Insurgency and Counterinsurgency Lessons in Central America*, Westport, Conn., & London: Praeger Security International, 2008.

Herrera, Major M. Chris, and Major Michael G. Nelson, "Salvadoran Reconciliation," *Military Review*, Vol. 88, No. 4, July–August 2008.

Holiday, David, and William Stanley, "Building the Peace: Preliminary Lessons from El Salvador," *Journal of International Affairs*, Vol. 46, No. 2, Winter 1993.

Hume, Mo, "El Salvador: The Limits of a Violent Peace," in Michael Pugh, Neil Cooper, and Mandy Turner, eds., *Critical Perspectives on War-transformed Economies,* Basingstoke: Palgrave, 2008.

Johnstone, Ian, "Rights and Reconciliation in El Salvador," in Michael W. Doyle, Ian Johnstone, and Robert C. Orr, eds., *Keeping the Peace: Multidimensional UN Operations in Cambodia and El Salvador*, Cambridge: Cambridge University Press, 1997.

Karl, Terry L., "El Salvador's Negotiated Revolution," *Foreign Affairs*, Vol. 71, No. 2, Spring 1992.

Le Billon, Philippe, with Joanna Macrae, Nick Leader, and Roger East, *The Political Economy of War: What Relief Agencies Need to Know*, Humanitarian Practice Network Paper 33, London: Overseas Development Institute, 2000.

PX716

Leiken, Robert, and Barry Rubin, eds., *The Central American Crisis Reader*, New York: Summit Books, 1987.

Levine, Mark, "Peacemaking in El Salvador," in Michael W. Doyle, Ian Johnstone, and Robert C. Orr, eds., *Keeping the Peace: Multidimensional UN Operations in Cambodia and El Salvador*, Cambridge: Cambridge University Press, 1997.

Macías, Ricardo Córdova, "Demilitarizing and Democratizing Salvadoran Politics," in Margarita S. Studemeister, ed., *El Salvador: Implementation of the Peace Accords*, Peaceworks No. 38, Washington, D.C.: United States Institute of Peace, January 2001.

Manwaring, Max G., and Court Prisk, eds., *El Salvador at War: An Oral History of Conflict from the 1979 Insurrection to the Present*, Washington, D.C.: National Defense University Press, 1988.

McCormick, David H., "From Peacekeeping to Peacebuilding: Restructuring Military and Police Institutions in El Salvador," in Michael W. Doyle, Ian Johnstone, and Robert C. Orr, eds., *Keeping the Peace: Multidimensional UN Operations in Cambodia and El Salvador*, Cambridge: Cambridge University Press, 1997.

Memorandum for Director, Security Training Management Office, Fort Bragg, N.C., Subject: Training Assistance Evaluation, El Salvador ETSS (OPATT), April 24, 1991.

Mine, Douglas Grant, "Military Command Rejects Rebel Purge Demand as 'Ridiculous,'" *Associated Press*, October 20, 1989.

Pear, Robert, "Congress Is As Skeptical As Ever on Salvador Aid," *New York Times*, January 14, 1990. As of June 1, 2011:
http://www.nytimes.com/1990/01/14/weekinreview/the-world-congress-is-as-skeptical-as-ever-on-salvador-aid.html

Popkin, Margaret, "Building the Rule of Law in El Salvador," in Margarita S. Studemeister, ed., *El Salvador: Implementation of the Peace Accords*, Peaceworks No. 38, Washington, D.C.: United States Institute of Peace, January 2001.

Rabasa, Angel, Lesley Anne Warner, Peter Chalk, Ivan Khilko, and Paraag Shukla, *Money in the Bank—Lessons Learned from Past Counterinsurgency (COIN) Operations: RAND Counterinsurgency Study—Paper 4*, Santa Monica, Calif.: RAND Corporation, OP-185-OSD, 2007. As of May 31, 2011:
http://www.rand.org/pubs/occasional_papers/OP185.html

Reagan, Ronald, "Central America: Defending Our United Interests," Department of State, 1984.

*Report of the National Bipartisan Commission on Central America* (Kissinger Commission), January 1984.

Schwarz, Benjamin C., *American Counterinsurgency Doctrine and El Salvador: The Frustrations of Reform and the Illusions of Nation Building,* Santa Monica, Calif.:

RAND Corporation, R-4042-USDP, 1991. As of June 1, 2011: http://www.rand.org/pubs/reports/R4042/

Seelke, Clare Ribando, *El Salvador: Political, Economic, and Social Conditions and U.S. Relations*, CRS Report for Congress, RS21655, Washington, D.C.: Congressional Research Service, updated November 18, 2008. As of June 1, 2011: http://www.fas.org/sgp/crs/row/RS21655.pdf

Stanley, William Deane, "El Salvador: State-Building Before and After Democratisation, 1980–95," *Third World Quarterly*, Vol. 27, No. 1, 2006.

Studemeister, Margarita S., ed., *El Salvador: Implementation of the Peace Accords*, Peaceworks No. 38, Washington, D.C.: United States Institute of Peace, January 2001.

Tardanico, Richard, "Post-Civil War San Salvador: Social Inequalities of Household and Basic Infrastructure in a Central American City," *Journal of Development Studies,* Vol. 44, No. 1, 2008.

"Transcript of President's Address on Caribbean Aid Program," *New York Times*, February 25, 1982, p. 14.

Tweedale, Douglas, "Little Hope Seen for Quick End to Salvadoran Civil War," *United Press International*, October 16, 1989.

U.S. Agency for International Development, *Assistance to the Transition from War to Peace: Evaluation of the USAID/El Salvador's Special Strategic Objective,* Project No. 519-0394, Washington D.C., 1996.

U.S. Central Intelligence Agency, Directorate of Intelligence, "El Salvador: Government and Insurgency Prospects," Special National Intelligence Estimate, Washington, D.C., February 1989.

———, "El Salvador: The FMLN After the November 1989 Offensive," Washington, D.C., January 26, 1990.

———, "El Salvador's Insurgents: Resurrecting an Urban Political Strategy," An Intelligence Assessment, Washington, D.C., September 1986.

United Nations Commission on the Truth for El Salvador, *From Madness to Hope: The 12-Year War in El Salvador*, S/25500, New York: United Nations, April 1, 1993.

United Nations Security Council Resolution 693, May 20, 1991.

United Nations Security Council Resolution 729, January 14, 1992.

PX716

## Chapter Five

AFP (*Agence France-Presse*), "Joint Malian-Tuareg Commission to Prepare New Round of Talks," August 20, 2008.

———, "Crise au Nord-Mali," December, 28, 2008.

———, "Mali: Brève 'offensive' de l'armée contre des rebelles touareg dans le nord," January 2, 2009.

———, "Mali: 'Pas de trêve' dans les combats contre le group rebelle d'Ag Bahanga," February 3, 2009.

——— "Des rebelles Touareg acceptent les propositions de Bamako pour la paix," February 5, 2009.

———, "Mali Rebel Leader Takes Refuge in Libya: Diplomat," February 23, 2009.

———, "Mali/Touareg: Réunion à Bamako pour relancer le processus de paix," July 19, 2009.

———, "Mali Announces Joint Operations Against Al-Qaeda," July 21, 2009.

———, "Nord du Mali: lancement d'un programme de réinsertion de 10.000 jeunes," July 25, 2009.

———, "North Mali Rivals Meet to Back Anti-Qaeda Fight," August 2, 2009.

BBC (British Broadcasting Corporation), "Tuareg Rebels in Mali Peace Deal," June 30, 2006.

———, "Mali Boosts Army to Fight Tuareg," September 18, 2007.

———, "Mali's Tuareg Rebels Agree Truce," September 19, 2007.

———, "Mali Tuareg Rebels in Peace Pact," April 4, 2008.

———, "Tuareg Rebels in Deadly Mali Raid," May 22, 2008.

———, "Tuareg Rebels Raid Mali Army Base," December 20, 2008.

———, "Tuareg Rebel Base Is 'Destroyed,'" January 21, 2009.

Benfodil, Mustapha, "Interview of Hassan Fagaga: 'Il faut un statut particulier pour Kidal,'" *El Watan* (Algiers), June 24, 2007.

———, "Les réserves de l'ex-rébellion et le satisfecit du general Diagouraga," *El Watan* (Algiers), July 4, 2007.

PX716

Benjaminsen, Tor A., "Does Supply-Induced Scarcity Drive Violent Conflicts in the African Sahel? The Case of the Tuareg Rebellion in North Mali," *Journal of Peace Research*, Vol. 45, No. 6, 2008.

Boisbouvier Christophe, "ATT entre en guerre," *Jeune Afrique*, January 27, 2009.

Botha, Anneli, *Terrorism in the Maghreb: The Transnationalisation of Domestic Terrorism*, ISS monograph No. 144, June 2008.

Bouilley, Pierre, *Les Touaregs Kel Adagh,* Paris: Karthala, 1999.

Chekchak, Naima, "La Nouvelle Alliance Touareg du Niger et du Mali (ATNM)," Occitan-Touareg blog, September 9, 2007. As of July 5, 2011:
http://occitan-touareg.over-blog.com/article-7101324.html

Conclusions et recommandations du forum de kidal pour le developpement des régions nord du Mali, Kidal, les 23 et 24 mars 2007. As of June 15, 2001:
http://www.kidal.info/docs/RecommandationsForumKidal.pdf

Daou, B., "Bahanga attaque le camp militaire d'Abeibara et exige l'ouverture du dialogue," *Le Républicain* (Bamako), May 22, 2008.

———, "Tension Peulh-Touareg: Ansongo à feu et à sang," *Le Républicain* (Bamako), July 31, 2009.

"Démenti pour toute connexion de notre mouvement avec le GSPC," Azawad-Union blog, June 9, 2006. As of June 15, 2001:
http://azawad-union.blogspot.com/2006_06_01_archive.html

Diakité, Abdoulaye, "Conflit intercommunautaire à Ansongo: Que Veut Réellement le leader du movement 'Gandaïso'?" *L'Indicateur Renouveau* (Bamako), June 26, 2009.

Diallo, Tiemoko, "Tuareg Rebels Attack Police Post in Northeast Mali," *Reuters,* May 11, 2007.

———, "Niger Arrests Mali Militia Leader After Killings," *Reuters*, September 27, 2008.

———, "Nearly 600 Malian Rebels Disarm in North," *Reuters*, February 17, 2009.

———, "Mali Pursues al Qaeda Suspects in North," *Reuters*, May 9, 2009.

Diarra, N'Tji, "Face à la menace Al Quaïda . . . l'armée malienne et les ex rebelles touaregs font cause commune," *Aurore* (Bamako), July 20, 2009.

Djaouane, Zaïre, "Les insurgés attendent une médiation etrangère," Afrik.com, May 29, 2006.

*El Khabar* (Algiers), "Brahim Ag Bahanga: 'Le gouvernement malien n'a fait aucune concession,'" July 26, 2008.

PX716

*El Watan* (Algiers), "Les rebelles touareg attaquent Tinzaouatène," September 14–15, 2007.

———, "Qui est Ibrahim Bahanga?" September 14–15, 2007.

———, "Les troubles dans le nord du Mali en 2007," September 14–15, 2007.

———, "Pourquoi les troubles ont repris?" September 14–15, 2007.

———, "Crise malienne: l'Algérie reprend la médiation," May 25, 2008.

———, "Ag Bahanga demande à réintégrer l'accord d'Alger," February 4, 2009.

———, "Des rebelles touaregs pénètrent en Algérie," February 7, 2009.

EUCOM (United States European Command), "Exercise Flintlock 05 Under Way in Africa," June 9, 2005.

Fletcher, Pascal, "Interview—West Africa Is Crime, Terrorism 'Black Hole'—UN Expert," *Reuters*, January 13, 2008.

Government of Mali, "Pacte national conclu entre le gouvernement de la République du Mali et les mouvements et fronts unifiés de l'Azawad consacrant le statut particulier du Nord Mali," April 11, 1992.

———, "Accord d'Alger pour la restructuration de la paix, de la sécurité et du développement dans la région de Kidal," July 4, 2006.

———, "Discours à la nation de son excellence Monsieur Amadou Toumani Touré, Président de la République, Chef de l'Etat," December 31, 2008.

———, MPA and FIAA, "Communiqué de presse et texte des Accords de paix signés à Tamanghasset," January 6, 1991.

Gutelius, David, "Islam in Northern Mali and the War on Terror," *Journal of Contemporary African Studies*, Vol. 25, No. 1, January 2007.

Hershkowitz, Ann, "The Tuareg in Mali and Niger: The Role of Desertification in Violent Conflict," ICE Case Study No. 151, The Inventory of Conflict and Environment (ICE), American University, Washington, D.C., 2005.

Humphreys, Macartan, and Habaye Ag Mohamed, "Senegal and Mali," in Paul Collier and Nicholas Sambanis, eds., *Understanding Civil War Africa: Africa Evidence and Analysis.* Volume 1: *Africa*, Washington, D.C.: The World Bank, 2005.

IRIN (Integrated Regional Information Networks), "Mali: Indignation Dominates Reaction as Attacks in North Escalate," August 31, 2007.

———, "Mali: Civil Society Cautiously Optimistic About Prisoner Release," September 10, 2008.

PX716

———, "Mali-Niger: Insecurity Persists Despite Militia Leader's Arrest," September 29, 2008.

*Jane's Intelligence Digest*, "Mali Peace Accord Could Counter AQMI's Reach," March 2, 2009.

*Jane's Intelligence Weekly*, "Mali's Tuareg Tribesmen Join Fight Against Al-Qaeda," July 21, 2009.

*Jane's World Insurgency and Terrorism*, "Nigerien Tuareg Groups," September 23, 2008.

———, "Malian Tuareg Groups," August 12, 2009.

*Jeune Afrique*, "Le casse-tête des unités spéciales," February 23, 2009.

Keita, Kalifa, *Conflict and Conflict Resolution in the Sahel: The Tuareg Insurgency in Mali*, Strategic Studies Institute Report, Carlisle, Pa.: United States Army War College, 1998.

Lecocq, Baz, "Unemployed Intellectuals in the Sahara: The Teshumara Nationalist Movement and the Revolutions in Tuareg Society," *International Review of Social History,* Vol. 49, Supplement S12, December 2004.

Lecocq, Baz, and Paul Schrijver, "The War on Terror in a Haze of Dust: Potholes and Pitfalls on the Saharan Front," *Journal of Contemporary African Studies*, Vol. 25, No. 1, 2007.

*Le Malien* (Bamako), "Région de Kidal: Les Colonels Gamou et Meidou aux Trousses de Bahanga," January 19, 2009.

Lmrabet, Ali, "Mali: Al-Qaida veut séduire les Touaregs," *Courrier International* (originally published in *El Mundo*, Madrid), October 9, 2008.

Mbachu, Dulue, "US Tactics in Africa Could Lead to a Self-Fulfilling Prophecy of a Desert War," *ISN Security Watch,* International Relations and Security Network at ETH Zurich, November 7, 2007.

Ouazani, Chérif, "Rebellion au Nord du Mali: Les dessous d'une attaque," *Jeune Afrique*, May 20, 2007.

———, "Priorité à la médiation," *Jeune Afrique*, September 10, 2008.

———, "Questions sur une rançon," *Jeune Afrique*, November 19, 2008.

———, "Ibrahim Ag Bahanga," *Jeune Afrique*, January 27, 2009.

———, "Le retour du chef rebelle," *Jeune Afrique,* September 28, 2009.

Ouédraogo, Evariste, "Désertion du colonel Fagaga de l'armée malienne: Ne réveillez pas la rebellion qui dort!" *L'Observateur Paalga* (Ouagadougou), February 21, 2006.

Panapress, "Mali: La Rebellion touarègue dans le Nord vue de Tripoli," May 21, 2008.

Poulton, Robin-Edward, and Ibrahim Ag Youssouf, *A Peace of Timbuktu: Democratic Governance, Development and African Peacemaking*, Geneva: UNIDIR (United Nations Institute for Disarmament Research), 1998.

*Reuters,* "Mali Tuaregs Say Algerian Militant Killed in Clash," October 1, 2006.

———, "Algerian Militants Ambush Malian Tuaregs, Kill 9," October 24, 2006.

———, "Interview—Mali Counts on Negotiation, Not Force with Rebels," November 17, 2006.

———, "Mali Seizes 750 kg Cocaine After Saharan Gunfight," January 3, 2008.

———, "Nouvelles attaques des rebelles touaregs," May 7, 2008.

RFI (*Radio France Internationale*), "Les Touaregs rebelles veulent négocier," May 24, 2006.

———, "Lancement d'un programme de réinsertion de 10.000 jeunes," July 26, 2009.

Sacko, Mohamed, "Attaques rebelles à Kidal: l'armée sécurise la zone," web site of the Ministry for Expatriate Malians and African Integration (*ministère des Maliens de l'extérieur et de l'intégration africaine*), May 23, 2006.

Sambi, Toure, and Chahana Takiou, "Six Touaregs assassinés à Ansongo: La Signature du Mouvement armé 'Gandaïso,'" *Info-Matin* (Bamako), June 17, 2009.

STRATFOR (Strategic Forecasting, Inc.), "Niger: A Rebel Threat to the Uranium Sector," February 1, 2008.

Takiou, Chahana, "Situation dans la région de Kidal: Une paix à consolider!" L'Indépendant (Bamako), February 19, 2009.

Tamboura, Abdoulaye, "Le MNJ et la crise d'identité des sociétés touarègues," in "Crises touarègues au Niger et au Mali," roundtable organized by the IFRI (Institut Français de Relations Internationales), November 27, 2007.

UNDP (United Nations Development Programme), *Human Development Report 2007/2008,* New York: UNDP, 2007.

UNODC (United Nations Office on Drugs and Crime), *Drug Trafficking as a Security Threat in West Africa*, November 2008.

U.S. National Security Council, *The National Security Strategy of the United States of America*, March 2006.

Voice of America, "Analyst Says Mali Troop Buildup Raises Risk for Renewed Violence," October 22, 2007.

PX716

Zounmenou, David, "Niger: Making Sense of the New Tuareg Rebellion," *ISS Today,* Institute for Security Studies (Pretoria), July 27, 2007. As of June 6, 2011:
http://www.iss.co.za/pgcontent.php?UID=8415

## Chapter Six

Black, Ian, "U.S. Hands Back Control of Anbar to Iraqi Forces," *The Guardian*, September 2, 2008. As of January 15, 2010:
http://www.guardian.co.uk/world/2008/sep/02/iraq.usforeignpolicy

Bruce, James B., and Jeffrey Martini, *Whither Al-Anbar Province: Five Scenarios for 2009–2011,* Santa Monica, Calif.: RAND Corporation, OP-278-USMC, 2010. As of June 6, 2011:
http://www.rand.org/pubs/occasional_papers/OP278.html

DeFrancisci, Lieutenant Colonel Leonard J., "Money As a Force Multiplier in COIN," *Military Review*, May–June 2008.

Filkins, Dexter, "U.S. Hands Off Pacified Anbar, Once Heart of Iraq Insurgency," *New York Times*, September 2, 2008.

Institute for the Study of War, Commentaries: "Intercepted Document Discusses AQI Strategy," April 27, 2008. As of June 16, 2010:
http://www.understandingwar.org/commentary/intercepted-document-discusses-aqi%27s-strategy

Kagan, Kimberly, "The Anbar Awakening: Displacing al Qaeda from Its Stronghold in Western Iraq," *Iraq Report*, August 21, 2006–March 30, 2007.

Kelly, Major General John F., "Reflections of a Returning Commanding General on Counterinsurgency in Iraq," presentation at the RAND Corporation, April 24, 2009, Arlington, Virginia.

Knickmeyer, Ellen, and Jonathan Finer, "Iraqi Vote Draws Big Turnout of Sunnis," *Washington Post*, December 16, 2005, p. A1. As of July 2009:
http://www.washingtonpost.com/wp-dyn/content/article/2005/12/15/AR2005121500228.html

Lasensky, Scott, "Jordan and Iraq: Between Cooperation and Crisis," United States Institute of Peace, Special Report 178, December 2006.

Long, Austin, "The Anbar Awakening," *Survival*, Vol. 50, No. 2, April–May 2008.

MacAskil, Ewen, "Syria Blames al-Qaida-linked Group for Attacks," *The Guardian*, April 29, 2004.

Malkasian, Carter, "Local Opposition to Al Qaeda in Iraq," Center for Naval Analyses, slide presentation, February 12, 2009. As of July 24, 2009:
http://www.ndu.edu/CTNSP/Stab_Ops/12Feb%20Malkasian

PX716

McMillan, Joseph, "Saudi Arabia and Iraq: Oil, Religion and an Enduring Rivalry," United States Institute of Peace, Special Report 157, January 2006.

Montgomery, Colonel Gary W., and Chief Warrant Officer-4 Timothy S. McWilliams, eds., "Interview 12: Major General Tariq Yusif Mohammad al-Thiyabi, Provincial Director of Police, Al-Anbar Province," in *Al-Anbar Awakening Volume II: Iraqi Perspectives. From Insurgency to Counterinsurgency in Iraq, 2004–2009*, Quantico, Va.: Marine Corps University Press, 2009.

———, "Interview 13: Staff Brigadier General (Pilot) Nuri al-Din Abd al-Karim Mukhlif al-Fahadawi, Head, Directorate General of Intelligence and Security, Al-Anbar Province and Colonel Said Muhammed Muad al-Fahadawi, Director General, Iraqi Special Weapons and Tactics," in *Al-Anbar Awakening Volume II: Iraqi Perspectives. From Insurgency to Counterinsurgency in Iraq, 2004–2009*, Quantico, Va.: Marine Corps University Press, 2009.

———, "Interview 14: Staff Major General Abdullah Mohammad Badir al-Jaburi, Commanding General, 7th Iraqi Army Division," in *Al-Anbar Awakening Volume II: Iraqi Perspectives. From Insurgency to Counterinsurgency in Iraq, 2004–2009,* Quantico, Va.: Marine Corps University Press, 2009.

Parker, Ned, "The Conflict in Iraq: The Saudi Role in Insurgency," *Los Angeles Times*, July 15, 2007. As of July 27,2011: http://articles.latimes.com/2007/jul/15/world/fg-saudi15

Petraeus, GEN David H., Commander, Multi-National Force–Iraq, "Charts to Accompany the Testimony of GEN. David H. Petraeus," September 10–11, 2007.

Searle, Thomas R., "Tribal Engagement in Anbar Province: The Critical Role of Special Operations Forces," *Joint Forces Quarterly*, No. 50, 3rd Quarter, 2008.

Semple, Kirk, "Iraq Premier Meets Leaders in Area Torn by Insurgency," *New York Times*, March 14, 2007.

Simon, Steven, "Won't You Be My Neighbor: Syria, Iraq and the Changing Strategic Context in the Middle East," Working Paper, United States Institute of Peace, March 2009. As of July 27, 2011: http://www.usip.org

Smith, Major Niel, U.S. Army, and Colonel Sean MacFarland, U.S. Army, "Anbar Awakens: The Tipping Point," *Military Review*, March–April 2008.

Stack, Megan, "Syrians Foil Strike on US Embassy," *Los Angeles Times*, September 13, 2006.

United Nations, "Population Projection 2003," Office of Coordination for Humanitarian Affairs, Baghdad, Iraq 2008.

U.S. Department of the Army, Headquarters, Field Manual 3-0, *Operations,* February 2008.

PX716

U.S. Department of Defense, Joint Chiefs of Staff, Joint Publication 3-0, *Joint Operations*, September 2006.

U.S. Government Interagency Counterinsurgency Initiative, *U.S. Government Counterinsurgency Guide*, Washington, D.C.: U.S. Government Printing Office, January 2009.

U.S. Marine Corps, 2D Marines Division Public Affairs Office, "Operation Steel Curtain Update," September 8, 2005.

———, "Operation Steel Curtain Update," November 8, 2005.

West, Bing, and Owen West, "Iraq's Real 'Civil War,'" *Wall Street Journal*, April 5, 2007.

Ziadeh, Radwan, "The Kurds in Syria: Fueling Separatist Movements in the Region?" United States Institute of Peace, Special Report 220, April 2009. As of June 16, 2011:
http://www.usip.org/files/resources/kurdsinsyria.pdf

## Chapter Seven

Afghanistan Research and Evaluation Unit, "Assessing Subnational Administration in Afghanistan: Early Observations And Recommendations for Action," Working Draft, March 13, 2003. As of June 21, 2011:
http://reliefweb.int/node/126073

Asian Development Bank, United Nations Development Programme, World Bank, "Afghanistan: Preliminary Needs Assessment for Recovery and Reconstruction," January 2002.

Azarbaijani-Moghaddam, Sippi, Mirwais Wardak, Idrees Zaman, and Annabel Taylor, "Afghan Hearts, Afghan Minds: Exploring Afghan Perceptions of Civil-Military Relations," research conducted for the European Network of NGOs in Afghanistan (ENNA) and the British and Irish Agencies Afghanistan Group (BAAG), 2008.

Budget of the United States Government, Fiscal Year 2010. As of June 21, 2011:
http://www.gpoaccess.gov/usbudget/fy10/index.html

Bush, George W., Speech of President Bush Announcing U.S. Attacks in Afghanistan, *PBS Transcript*, October 7, 2001, As of June 21, 2011:
http://www.pbs.org/newshour/terrorism/combating/bush_10-7.html

Chesterman, Simon, "Walking Softly in Afghanistan: The Future of UN State-Building," *Survival*, Vol. 44, No. 3, Autumn 2002.

Collins, Joseph, "Planning Lessons from Iraq and Afghanistan," *Joint Force Quarterly*, No. 41, 2nd Quarter, 2006.

PX716

Combined Forces Command–Afghanistan, "Campaign Plan Briefing in Support of Operation Enduring Freedom," unpublished briefing, October 5, 2005.

Department of State, Office of the Historian, "The United States and the Global Coalition Against Terrorism, September 2001–December 2003," June 2004.

Goodhand, Jonathan, and Mark Sedra, "Who Owns the Peace? Aid, Reconstruction, and Peacebuilding in Afghanistan*," Disasters, Early View* (Articles online in advance of print), March 27, 2009. As of June 12, 2011: http://www3.interscience.wiley.com/journal/122289352/ abstract?CRETRY=1&SRETRY=0

Holland, James, "Dispatches: Musa Qala, Afghanistan," *Granta*, April 15, 2008. As of June 21, 2011: http://www.granta.com/Online-Only/Letter-From-Musa-Qala-Afghanistan

Interim Government of Afghanistan, "National Development Framework" (Draft, version 2), Institute for State Effectiveness, April 2002. As of June 21, 2011: http://www.effectivestates.org/resources.htm

Jalali, Ali A., "The Future of Afghanistan," *Parameters*, Spring 2006.

Jaques, Isobelle, "Afghanistan: Beyond Bonn," Report based on Wilton Park Conference, WPS05/28, May 12–14, 2005, on "Afghanistan: Beyond Bonn."

Jehl, Douglas, and Eric Schmitt, "U.S. Suggests a Qaeda Cell in Iran Directed Saudi Bombings," *New York Times*, May 21, 2003

Johnson, Thomas H., "On the Edge of the Big Muddy: The Taliban Resurgence in Afghanistan," *China and Eurasia Forum Quarterly*, Vol. 5, No. 2, 2007.

Jones, Seth G., "Averting Failure in Afghanistan," *Survival,* Vol. 48, No. 1, Spring 2006.

———, *Counterinsurgency in Afghanistan, RAND Counterinsurgency Study— Volume 4*, Santa Monica, Calif.: RAND Corporation, MG-595-OSD, 2008. As of June 21, 2011: http://www.rand.org/pubs/monographs/MG595.html

———, *In the Graveyard of Empires,* New York: W.W. Norton & Company, 2009.

Katzman, Kenneth, *Afghanistan: Current Issues and U.S. Policy*, Congressional Research Service Report RL30588, December 3, 2002.

Kronstadt, K. Alan, and Kenneth Katzman, *Islamic Militancy in the Pakistan- Afghanistan Border Region and US Policy Relations*, Congressional Research Service Report, RL34763, November 21, 2008.

Lister, Sarah, and Andrew Wilder, "Strengthening Subnational Administration in Afghanistan: Technical Reform or State-Building?" *Public Administration and Development*, Vol. 25, 2005.

Maloney, Sean, "Afghanistan: From Here to Eternity?" *Parameters,* Spring 2004.

PX716

———, "The International Security Assistance Force: The Origins of a Stabilization Force," *Canadian Military Journal*, Summer 2003.

Marsden, Peter, "Afghanistan: The Reconstruction Process," *International Affairs*, Vol. 79, No. 1, Janary 2003.

Milani, Mohsen M., "Iran's Policy Towards Afghanistan," *Middle East Journal*, Vol. 60, No. 2, Spring 2006.

"Military Technical Agreement Between the International Security Assistance Force and the Interim Administration of Afghanistan ('Interim Administration')," December 31, 2001. As of June 22, 2011:
http://www.operations.mod.uk/isafmta.doc

Ministry of Foreign Affairs of Japan, "United Nations Talks on Afghanistan," December 6, 2001. As of June 21, 2011:
http://www.mofa.go.jp/region/middle_e/afghanistan/untalk0112.html

Monaco, Annalisa, "NATO Takes Stock and Keeps Looking Out of Area," *NATO Notes,* in Gerrard Quille, ed., Vol. 5, No. 6a, Centre for European Security and Disarmament, June 6, 2003. As of June 21, 2011:
http://www.isis-europe.org/pdf/2008_artrel_133_2003_archives_13_nato_notes_v5n6a.pdf

Montero, David, "Why the Taliban Appeal to Pakistani Youth," *Christian Science Monitor*, June 16, 2006.

Nelson, Soraya Sarhaddi, "Taliban Courts Filling Justice Vacuum In Afghanistan," *NPR Morning Edition*, December 16, 2008. As of June 21, 2011:
http://www.npr.org/templates/story/story.php?storyId=98261034

North Atlantic Treaty Organization, "International Security Assistance Force: Chronology," n.d. As of June 21, 2011:
http://isaf-live.webdrivenhq.com/en/chrono.html

———, "Revised Operational Plan for NATO's Expanded Mission in Afghanistan," n.d. As of June 21, 2011:
http://www.nato.int/issues/afghanistan_stage3/index.html

Ottaway, Marina, "Nation Building," *Foreign Policy*, No. 132, September–October 2002.

RAND Database of Worldwide Terrorism Incidents, May 20, 2011. As of June 21, 2011:
http://www.rand.org/nsrd/projects/terrorism-incidents.html

Rennie, Ruth, Sudhindra Sharma, and Pawan Kumar Sen, *Afghanistan in 2008: A Survey of the Afghan People,* The Asia Foundation, 2008. As of June 21, 2001:
http://www.asiafoundation.org/resources/pdfs/Afghanistanin2008.pdf

Rubin, Barnett, "Crafting a Constitution for Afghanistan," *Journal of Democracy,* Vol. 15, No. 3, July 2004.

Rubin, Barnett R., and Andrea Armstrong, "Regional Issues in the Reconstruction of Afghanistan," *World Policy Journal,* Spring 2003.

Social Impact, Inc., "U.S.AID/OTI Afghanistan Program Final Evaluation," Prepared for the Office of Transition Initiatives, Bureau for Democracy, Conflict, and Humanitarian Assistance, United States Agency for International Development, August 15, 2005.

Synovitz, Ron, "Afghanistan: Kabul Welcomes UN Resolution on Expanded ISAF, But Many Questions Unanswered," Radio Free Europe, October 2003. As of June 21, 2011:
http://www.globalsecurity.org/military/library/news/2003/10/mil-031014-rferl-165539.htm

———, "Afghanistan: Two Years Later, Taliban's Sudden Withdrawal from Kabul Still Affecting Transition," November 12, 2003. As of June 21, 2011:
http://www.globalsecurity.org/military/library/news/2003/11/mil-031112-rferl-184106.htm

Tarzi, Amin, "Afghanistan: NATO Expansion Demands Common Approach," *Radio Free Europe/Radio Liberty*, October 6, 2006. As of June 21, 2011:
http://www.rferl.org/content/article/1071849.html

U.S. Government Accountability Office, *Afghanistan Security: Efforts to Establish Army and Police Have Made Progress, but Future Plans Need to Be Better Defined,* Report to the Committee on International Relations, House of Representatives, Washington, D.C.: U.S. Government Accountability Office, GAO-05-575, June 2005.

United Kingdom, House of Commons Foreign Affairs Committee, "Global Security: Afghanistan and Pakistan," Eighth Report of Session 2008–09, July 21, 2009. As of June 21, 2011:
http://www.publications.parliament.uk/pa/cm200809/cmselect/cmfaff/302/30202.htm

United Nations, *Agreement on Provisional Arrangement in Afghanistan Pending the Reestablishment of Permanent Government Institutions* ("Bonn Agreement")*, December 2001.

United Nations General Assembly, *Report of the Secretary-General on the Situation in Afghanistan and its Implications for International Peace and Security*, Document A/56/875–S/2002/278, March 18, 2002. As of June 17, 2011:
http://www.mineaction.org/docs/2097268.asp

United Nations Assistance Mission in Afghanistan (UNAMA), web site. As of July 27, 2011:
http://unama.unmissions.org/Default.aspx?tabid=1743

United Nations Security Council, "Letter Dated 5 December 2001 from the Secretary-General Addressed to the President of the Security Council," S/2001/1154, December 5, 2001. As of June 21, 2011:

PX716

http://daccess-ods.un.org/TMP/1657016.87335968.html

United Nations Security Council Resolution 1401, 2002. As of June 17, 2011: http://daccess-ods.un.org/TMP/7261214.25628662.html

*United States Plan for Sustaining the Afghanistan National Security Forces,* Report to Congress in accordance with the 2008 National Defense Authorization Act (Section 1231, Public Law 110-181), June 2008. As of June 21, 2011: http://www.defense.gov/pubs/pdfs/Report_Final_SecDef_04_26_10.pdf

U.S. Department of the Army, Headquarters, Field Manual 3-0, *Operations,* February 2008.

———, Field Manual 3-07, S*tability Operations*, October 2008.

van Bijlert, Martine, "Between Discipline and Discretion: Polices Surrounding Senior Subnational Appointments," Afghanistan Research And Evaluation Unit Briefing Paper Series, May 2009.

Westerman, Ian, "Pacifying Afghanistan," *RUSI Journal,* Vol. 153, No. 5, October 2008.

## Chapter Eight

Byman, Daniel, *Understanding Proto-Insurgencies*, *RAND Counterinsurgency Study– Paper 3,* Santa Monica, Calif.: RAND Corporation, OP-178-OSD, 2007. As of May 25, 2011: http://www.rand.org/pubs/occasional_papers/OP178.html

Deery, Philip, "The Terminology of Terrorism: Malaya, 1948–52," *Journal of Southeast Asian Studies*, Vol. 34, No. 2, June 2003.

Hughes, Geraint, and Christian Tripodi, "Anatomy of a Surrogate: Historical Precedents and Implications for Contemporary Counter-Insurgency and Counter-Terrorism*," Small Wars & Insurgencies,* Vol. 20, No. 1, March 2009.

Kitson, Frank, *Bunch of Five*, London: Faber & Faber Ltd., 1977.

Jones, Anthony James, *Resisting Rebellion; The History and Politics of Counterinsurgency*, Lexington, Ky.: The University Press of Kentucky, 2004.

Rosenau, William, *"Low-Cost Trigger Pullers": The Politics of Policing in the Context of Contemporary "State Building" and Counterinsurgency*, Santa Monica, Calif.: RAND Corporation, WR-620-USCA, 2008. As of August 2, 2011: http://www.rand.org/pubs/working_papers/WR620.html

Rumsfeld, Donald H., Remarks as delivered to the Veterans of Foreign Wars, y San Antonio, Tex., Monday, August 25, 2003. As of June 21, 2011: http://www.defense.gov/Speeches/Speech.aspx?SpeechID=513

PX716

PX717



# Foundations of
# the Islamic State

## Management, Money, and Terror in Iraq, 2005–2010

Patrick B. Johnston, Jacob N. Shapiro,

Howard J. Shatz, Benjamin Bahney, Danielle F. Jung,

Patrick K. Ryan, Jonathan Wallace



PX717

For more information on this publication, visit www.rand.org/t/RR1192

Library of Congress Cataloging-in-Publication Data is available for this publication.
ISBN: 978-0-8330-9178-9

Published by the RAND Corporation, Santa Monica, Calif.
© Copyright 2016 RAND Corporation
RAND® is a registered trademark.

Limited Print and Electronic Distribution Rights

This document and trademark(s) contained herein are protected by law. This representation of RAND intellectual property is provided for noncommercial use only. Unauthorized posting of this publication online is prohibited. Permission is given to duplicate this document for personal use only, as long as it is unaltered and complete. Permission is required from RAND to reproduce, or reuse in another form, any of its research documents for commercial use. For information on reprint and linking permissions, please visit www.rand.org/pubs/permissions.html.

The RAND Corporation is a research organization that develops solutions to public policy challenges to help make communities throughout the world safer and more secure, healthier and more prosperous. RAND is nonprofit, nonpartisan, and committed to the public interest.

RAND's publications do not necessarily reflect the opinions of its research clients and sponsors.

Support RAND
Make a tax-deductible charitable contribution at
www.rand.org/giving/contribute

www.rand.org

PX717

# Preface

The group calling itself the Islamic State constitutes a dangerous challenge to numerous Middle Eastern countries and a terrorist threat to Western Europe and the United States. The level of danger might be new, but the group is not. The Islamic State is the successor organization to al-Qaʿida in Iraq (AQI) and subsequently the Islamic State of Iraq (ISI), and it has continued AQI's organizational, management, and financial practices. The fact that coalition forces, led by the United States; Awakening forces, reflecting the people of Iraq; and official security forces of the government of Iraq once successfully degraded the group suggests that it can be stopped again.

This report presents an analysis of foundations of the Islamic State, as reflected in more than 140 documents prepared by AQI and ISI. It represents the most comprehensive portrait available of the group, based on the group's own records. ISI organized itself for statehood as early as 2006. It used a bureaucratic management model based on that of core al-Qaʿida but replicated the model at different geographic levels. It also carefully demarcated the administrative boundaries of its jurisdiction. ISI paid its personnel a wage that would draw true believers rather than opportunists; trained and allocated its membership with an eye toward group effectiveness; raised revenues locally through diversified sources; and was able to maintain itself, albeit at much reduced strength, in the face of a withering counterterrorism and counterinsurgency strategy put in place by its opponents, starting in late 2006.

This report is a joint effort among the RAND Corporation, the Empirical Studies of Conflict Project at Princeton University, and the Combating Terrorism Center (CTC) at West Point. The CTC

PX717

arranged for the declassification and release of most of the documents used for this research and has posted on its website the documents on which this report is based, making them available to all researchers. These documents and more can be found at https://www.ctc.usma.edu/isil-resources.

This research was sponsored by the Defense Advanced Research Projects Agency and conducted within the International Security and Defense Policy Center of the RAND National Defense Research Institute, a federally funded research and development center sponsored by the Office of the Secretary of Defense, the Joint Staff, the Unified Combatant Commands, the Navy, the Marine Corps, the defense agencies, and the defense Intelligence Community. Additional partners and funders are listed in the acknowledgments.

For more information on the RAND International Security and Defense Policy Center, see www.rand.org/nsrd/ndri/centers/isdp or contact the director (contact information is provided on the web page).

PX717

# Contents

**Preface** ................................................................ iii
**Figures and Tables** .................................................. ix
**Summary** ............................................................ xiii
**Acknowledgments** ................................................ xxix

CHAPTER ONE

**Introduction** .......................................................... 1
The Group's Own Words ............................................... 4
Continuity ................................................................ 5
The Plan of This Report ............................................... 6

CHAPTER TWO

**The Islamic State of Iraq and the Iraq War** ................... 11
The Iraq War ............................................................ 12
The Operational Environment ....................................... 26
Conclusion .............................................................. 46

CHAPTER THREE

**The Organizational Economics of Insurgency and Terrorism** .......... 49
Management ............................................................. 53
Revenue .................................................................. 60
Compensation ........................................................... 62
Conclusion .............................................................. 66

PX717

**CHAPTER FOUR**
**Organizing Insurgency and Terrorism in Iraq**............................67
Terrorist Organizations as Networks and Hierarchies...................... 68
ISI's Organizational Blueprint...................................................71
The Geography of ISI Militancy ...............................................83
Conclusion................................................................... 102

**CHAPTER FIVE**
**Foreign Fighters, Human Capital, and Terrorism in Iraq** ............. 105
Data on ISI Human Capital.................................................. 109
ISI Human Capital: Foreign Fighters Versus Iraqi Members.............. 113
Human Capital and Terrorism: Comparing Iraqi and Foreign ISI
     Operatives.............................................................. 119
Findings and Implications ................................................... 129

**CHAPTER SIX**
**Islamic State of Iraq Compensation**........................................ 131
Compensation Data........................................................... 132
ISI Compensation Rules ..................................................... 134
Reimbursements.............................................................. 145
Conclusion................................................................... 150

**CHAPTER SEVEN**
**The Fates of Terrorists: Tracking Militants' "Career Paths"** ......... 153
Documents and Data.......................................................... 154
Summary Characteristics of ISI Personnel in Mosul in 2007 and
     2009 ................................................................... 157
Tracking Militants over Time  .............................................. 157
Militant Mortality and Turnover ........................................... 160
Militants' Career Paths: Personnel Mobility, Promotions, and
     Lateral Transfers....................................................... 162
Compensation Trends over Time ............................................ 165
The Curious Case of ISI's "Unknowns" in Mosul.......................... 170
Conclusion................................................................... 181

PX717

**CHAPTER EIGHT**
**Assessing the Islamic State of Iraq's Finances: The Governorate
   Dimension** .............................................................. 185
Data on AQI and ISI Financing ............................................ 187
ISI Provincial and Sector Revenues ....................................... 189
AQI Revenues in Anbar Governorate ...................................... 190
ISI Revenues in Ninewa .................................................... 195
Internal Financing Strategy ................................................ 204
ISI Expenditures and Funding of Subsidiary Units ........................ 207
ISI Revenues and Expenditures in Other Locations and Periods ......... 217
Conclusion ................................................................. 225

**CHAPTER NINE**
**Assessing the Islamic State of Iraq's Finances: Central Activities
   and Financial Control** ................................................ 227
Transfers to and from the ISI Treasury .................................... 227
Financial Management Within ISI .......................................... 234
Conclusion ................................................................. 247

**CHAPTER TEN**
**Conclusions and Implications** .............................................. 249
Key Findings ............................................................... 253
Implications and Recommendations for Analysis .......................... 259
Implications and Recommendations for Policy ............................. 261

**APPENDIXES**
**A. Captured Documents: Description, Methodology, and
   Analysis** ............................................................... 277
**B. Research on Covert and Clandestine Organizations** ................. 289
**C. Compensation Documents List** ....................................... 291

**Abbreviations** .............................................................. 295
**References** ................................................................ 297

PX717

# Figures and Tables

## Figures

2.1. Nationwide Levels of Violent Attacks, 2004 to 2008 ........... 18
2.2. Trends in Combat Violence, by Governorate, 2005 to 2008 ... 21
2.3. The Coalition's Assessments of ISI Strength .................... 24
2.4. Trends in Combat Violence in Anbar, 2005 to 2008 .......... 34
2.5. Trends in Combat Violence in Diyala, 2005 to 2008 .......... 36
2.6. Trends in Combat Violence in Salah al-Din, 2005 to 2008 .... 37
2.7. Trends in Combat Violence in Ninewa, 2005 to 2008 ........ 42
2.8. Coalition Forces Reported High-Value Targeting
     Operations Against ISI, 2007 to 2008 ......................... 44
4.1. Al-Qa'ida's Organizational Structure ........................... 74
4.2. ISI's Provincial Organizational Chart for Anbar
     Governorate ..................................................... 76
4.3. ISI's Provincial Organizational Chart for the
     Administrative Committee for Anbar Governorate, Late
     2006 or Early 2007 .............................................. 77
4.4. ISI's Sector-Level Organizational Chart for the Western
     Sector, Anbar Governorate ...................................... 78
4.5. ISI's Sector-Level Organizational Chart for the
     Administrative Committee, Western Sector, Anbar
     Governorate ..................................................... 79
4.6. Proposed Reorganization of Financial Administration,
     Fall 2008 ....................................................... 80
4.7. ISI Sector-Level Map, as of 2007 ............................... 91
4.8. Estimated ISI Sectors in Anbar, 2005 to 2006 ................. 93
5.1. ISI's Records of Skills, Country of Origin, and
     Experience ...................................................... 111

PX717

5.2.   Sources of Foreign Fighters........................................ 114
6.1.   Implied Base Salary Versus Total Payments .................... 141
6.2.   Examples of Reimbursements from Diyala..................... 146
6.3.   Expenses Documented from Anbar ............................. 147
6.4.   Correspondence Documenting Expenditures in Ninewa
       over Several Weeks, 2008 ....................................... 148
6.5.   Request to Regimental Administration for
       Reimbursement, Diyala ......................................... 149
7.1.   2009 Personnel Roster Document Break, English
       Translation and Arabic Original................................ 172
8.1.   Sources of Revenue in Anbar Governorate, June 2005
       Through May 2006................................................ 191
8.2.   Composition of Revenue, June 2006 Through November
       2006............................................................... 192
8.3.   AQI's Weekly Revenue in Anbar Governorate, June 2005
       Through October 2006 .......................................... 194
8.4.   AQI's Monthly Revenue in Anbar Governorate, by Type,
       June 2005 Through October 2006 .............................. 196
8.5.   Sources of Revenue in Ninewa Governorate, Late August
       2008 Through January 2009..................................... 197
8.6.   ISI's Weekly Revenue in Ninewa Governorate, August
       2008 Through January 2009..................................... 201
8.7.   ISI Monthly Revenue in Ninewa Governorate, by Type...... 202
8.8.   Weekly Changes in ISI Total Revenue in Mosul, Top
       Two Categories, August 29, 2008, Through January 29,
       2009............................................................... 205
8.9.   Total Revenue and Expenditures in Anbar and Ninewa
       Governorates ................................................... 207
8.10.  Composition of Expenditures by AQI in Anbar
       Governorate, May 2005 Through October 2006.............. 209
8.11.  AQI's Weekly Expenditures in Anbar Governorate, June
       2005 Through October 2006 .................................... 212
8.12.  AQI's Anbar Expenditures over Time, June 2005
       Through October 2006 .......................................... 213
8.13.  Composition of Expenditures by ISI in Ninewa
       Governorate, August 2008 Through January 2009 .......... 214
8.14.  ISI's Weekly Expenditures in Ninewa Governorate,
       August 2008 Through January 2009............................ 216

PX717

8.15.   ISI's Monthly Expenditures in Ninewa Governorate,
        August 2008 Through January 2009............................ 218
9.1.    Original Financial Document Seized from Abu
        Qaswarah, Original and English Translation ................. 230
9.2.    ISI Receipt and Expense-Report Forms......................... 239
9.3.    ISI Reimbursement Chit for Medical Care..................... 240
9.4.    AQI Anbar Governorate Revenue Graph, June 2005
        Through January 2006.......................................... 242
9.5.    AQI Anbar Governorate Revenue Graph, Winter and
        Spring 2006 ................................................... 243
9.6.    AQI Anbar Governorate Revenue Graph, Summer and
        Fall 2006...................................................... 244
9.7.    ISI Administrator Spreadsheet, September 2007 ............. 246
9.8.    ISI Administrator Spreadsheet, 2009........................... 247
A.1.    Number of Declassified Documents, by Year ................. 282
A.2.    Number of Declassified Documents, by Subject............... 283
A.3.    Number of Documents, by Governorate....................... 284
A.4.    Example of Salary Data for ISI Personnel ..................... 285
A.5.    Example of Detailed Documentation of ISI Personnel........ 287

## Tables

2.1.    Characteristics of Local ISI Operating Environments,
        2005 to 2010 ................................................... 27
2.2.    Coalition High-Value Targeting Operations Against ISI,
        2007 to 2008 ................................................... 45
4.1.    Core Al-Qaʿida's and ISI's (AQI's) Organizational
        Structures...................................................... 82
4.2.    The Geographic Organization of ISI Sectors, as of 2008 ...... 86
4.3.    ISI's Filled Sector Leadership and Administrative
        Positions, as of 2008........................................... 97
4.4.    Sectors with Different Numbers of Positions Filled ............ 98
5.1.    ISI Members, by Country, in Our Data ........................ 116
5.2.    Correlations Between Foreign Status, Training, and
        Education...................................................... 119
5.3.    Differences in Formal Education Among ISI Members....... 120
5.4.    Foreign Status and Allocation to Suicide and Operational
        Roles.......................................................... 122

PX717

5.5.    Foreign Status, Training, and Battle Experience .............. 123
5.6.    Foreign Status and Weapon Experience. ....................... 123
5.7.    Determinants of Training ...................................... 124
5.8.    Foreign Status and Job-Position Data .......................... 127
5.9.    Foreign Status and Active Locations ........................... 128
5.10.   Correlates of Number of Active Locations. ..................... 129
6.1.    Compensation Data, by Governorate and Year ................ 133
6.2.    Monthly Compensation and Violence, by Governorate ....... 143
7.1.    ISI Roster Statistics, September 2007 and January 2009 ..... 157
7.2.    ISI Family Structure and Compensation, 2007 and 2009 .... 158
7.3.    Results of Methodologies Used to Match ISI Personnel,
        2007 and 2009 ................................................. 159
7.4.    ISI Personnel Mortality in Mosul, 2007 and 2009 ........... 162
7.5.    ISI Compensation in Mosul, 2007 and 2009 ................. 166
7.6.    Compensation Increases from 2007 to 2009, Promoted
        Versus Lateral Mobility ........................................ 168
7.7.    T-Test of Differences in Means of Marital Status,
        Operational Versus Nonoperational Members ................ 175
7.8.    T-Test of Differences in Means of Number of Wives,
        Operational Versus Nonoperational Members ................ 176
7.9.    Difference in Estimated Number of Children, by Group ..... 176
8.1.    Ninewa Revenue, by Type, August 2008 Through January
        2009 ........................................................... 200
8.2.    ISI's Baghdad Income and Expenses, Mid-February
        Through Mid-March 2007 ...................................... 219
8.3.    ISI's Baghdad Income, by Source, March 2007 ............... 220
8.4.    Baghdad Expenses, by Source, March 2007 .................. 221
8.5.    Al-Jazirah Sector Revenues and Expenditures, February
        2010 ........................................................... 222
8.6.    ISI's Revenue Sources from al-Jazirah Sector, February
        2010 ........................................................... 223
8.7.    ISI's Expenditure in al-Jazirah Sector, by Type, February
        2010 ........................................................... 224
9.1.    ISI's Revenues from Sector Transfers, from Document
        Seized from Abu Qaswarah in October 2008 ................. 231
9.2.    ISI's Net Financial Transfers to the Governorates, from
        Document Seized from Abu Qaswarah in October 2008 ... 232
A.1.    Number of Declassified Documents, by Group ............... 281
C.1.    Number of Salary Payments, by Document ................... 291

PX717

# Summary

The group calling itself the Islamic State, which is based primarily in Iraq and Syria, presents a grave threat to the people and countries throughout the Middle East and a growing threat to nations outside that region. Despite the apparent surprise of the group's stunning take-over of Mosul, Iraq's second-largest city, in June 2014, the Islamic State is not new. Rather, the Islamic State is the successor of al-Qaʻida in Iraq (AQI) and the Islamic State of Iraq (ISI), which the United States, coalition partners, the government of Iraq, and the people of Iraq have fought since the coalition invasion of Iraq.

This report examines foundations of the Islamic State. Research was substantially completed in 2014, with selected updates in 2015. The report presents a comprehensive examination of the organization, territorial designs, management, personnel policies, and finances of AQI and ISI. The report draws from an examination of more than 140 recently declassified ISI documents, which are now available in their original and translated forms on the website of the Combating Ter-rorism Center (CTC) at West Point (www.ctc.usma.edu/isil-resources). The report also presents recommendations applicable to countering the Islamic State.

## The Group's Own Words

Understanding clandestine organizations is difficult because they go to great lengths to shield their activities. However, running such an organization, especially one with the ambitions of the Islamic State,

PX717

requires a great deal of control and information, and that requires paperwork. Within the documents generated by the organization itself is highly detailed information about strategy, payrolls, personnel, revenues, and expenses—information that can be used not only to gain a greater understanding of the group but also to understand its weak points and thereby to combat it.

This study presents an analysis of a large number of Islamic State–related documents, one of the largest sets of such documents ever declassified at one time. The documents were declassified for this study by the United States Special Operations Command and released to the CTC. In an accompanying report, released in December 2014, the CTC published a guide to the source documents.[1]

A team of research assistants working at RAND and for the Empirical Studies of Conflict Project at Princeton University used these documents to develop multiple tabular data sets for quantitative analysis, as well as a geographic data set, including

- boundaries of proposed district-level "sectors" in Iraq that formed subnational jurisdictions in ISI
- individual-level data on the country of origin and qualifications of 499 ISI members who entered the country in 2004–2005, including 393 foreign members and 106 Iraqis
- individual-level data on member status and unit assignments for 1,149 active members and 1,159 who were killed or captured by coalition and Iraqi forces; these data were derived from what appear to be near-complete personnel records maintained by ISI administrative emirs in Ninewa governorate in late 2007 and early 2009
- individual-level salary data on 9,271 salary payments in various locations from 2005 to 2009
- transaction-level expenditure and revenue records for Anbar governorate in 2005–2006 and Ninewa governorate in 2008–2009,

---

[1]   Danielle F. Jung, Pat Ryan, Jacob N. Shapiro, Jon Wallace, and Pat Ryan, *Managing a Transnational Insurgency: The Islamic State of Iraq's "Paper Trail," 2005–2010*, Occasional Paper Series, Harmony Program, West Point, N.Y.: Combating Terrorism Center, West Point, December 15, 2014.

as well as several other locations and for the group as a whole for other short periods.

Although neither fully representative nor complete, these records paint a clear picture of ISI practices and standard operating procedures.

## Relevance to Today

An analysis of the Islamic State predecessor groups is more than a historical recounting. It provides significant understanding of how ISI evolved into the present-day Islamic State. As with any organization, certain characteristics concerning how the organization is run are slow to change, including organizational culture, personnel policies, and administrative structure. Understanding the starting point is thus valuable for understanding the Islamic State. One would not expect Islamic State leadership to adopt an entirely new mode of organization upon moving into Syria and then expanding its territorial control in Iraq. Under the old model, which relied primarily on guerrilla warfare and terrorist tactics, the organization fought quite well against the U.S. and Iraqi armies and the Iraqi population for more than four years, from 2004 to 2008; maintained its internal cohesion and plotted its comeback during subsequent years of reduced activity, through 2012; and then claimed jurisdiction over Syria, as well as Iraq, with its April 2013 declaration of itself as the Islamic State of Iraq and al-Sham (ISIS; also known as the Islamic State of Iraq and Syria or the Islamic State of Iraq and the Levant [ISIL]), the immediate predecessor of the Islamic State. It makes little sense to expect the Islamic State to abandon the organizational principles that sustained it for more than a decade. Many senior Islamic State leaders were prominent in ISI, including the Islamic State leader Abu Bakr al-Baghdadi. He served on the group's governing council, known as the *shura* council, before succeeding the ISI emir Abu Umar al-Baghdadi in May 2010, after the emir's death in a U.S. airstrike. Abu Bakr al-Baghdadi appears in an ISI personnel roster, which was captured in northern Iraq in 2009, under his previous nom de guerre, Abu Duʻa. A separate document, seized in a 2008

raid against ISI's number three, Abu Qaswarah, lists Abu Du'a as the top ISI leader in Mosul, the group's most important stronghold.

Several other prominent Islamic State leaders also appear in the same personnel records. Numerous recent news reports on the Islamic State illustrate how it has retained many of the same organizational structures, principles, and procedures. The Islamic State's current status in Sunni areas of Iraq, Syria, and other countries in many ways reflects the achievement of the long-held goals present in its internal documents, public statements, and press releases throughout the 2005–2010 period we examine.

## Key Findings

ISI leadership consciously designed the organization not just to fight but also to build an Islamic state governed by the laws dictated by its strict Salafi-jihadi Islamist ideology. ISI was a vertically integrated organization with a central management structure and functional bureaus. It sought to replicate these structures at multiple lower geographic levels across territory. Each geographic unit that the organization controlled had substantial autonomy to pursue the group's strategic objectives in its jurisdiction but was required to send frequent reports to the group's leadership detailing operational activities, personnel matters, finances, and equipment. The central organization used these reports to inform decisions and provide strategic guidance to the varied elements of ISI.

Within this structure,

- In its original form as AQI, ISI adopted a bureaucratic model that looked remarkably similar to the ideal structure al-Qa'ida operatives described, but ISI replicated that structure at local levels to implement broad organizational control.
- By 2008, ISI had subdivided Iraq into specific sectors but was struggling to fill its design at the subnational level with personnel; roughly 30 percent of its sectors lacked the desired administrative personnel.

PX717

- ISI allocated human capital rationally, with the suicide-bomber corps dominated by foreigners (who were more likely than Iraqis to be fanatical believers in the group's religious ideology) and with intelligence and security personnel (where local knowledge was critical) dominated by its Iraqi members. However, the majority of foreign fighters were not suicide bombers. ISI vetted the foreigners upon their entering Iraq and had them fill specific tactical and administrative roles as well.
- The salaries and other compensation ISI paid to its members appear to have been designed for an environment where labor was plentiful and the organization needed to recruit loyal members and screen out opportunists. Yet even with such a screening process in place, its leadership faced substantial challenges managing trust within its ranks.
- ISI's monthly payroll consistently consumed the largest single portion of its revenues.
- There was significant personnel mobility within ISI. Turnover was high, and the group frequently reassigned members to different military units or back-office positions on an as-needed basis.
- ISI fundraising aimed to raise money locally, largely from criminal activities but also partly from activities that resembled state action, such as taxation. As with the present-day Islamic State, ISI demonstrated sophisticated financial management, efficiently reallocating money within governorates and throughout Iraq to support organizational objectives.
- ISI leadership sought substantial oversight of the group's finances and put in place detailed record-keeping requirements for tracking and auditing purposes.

## Implications and Policy Recommendations

As noted above, the findings about ISI from 2005 to 2010 are relevant to combating the group today. Media reporting and analytic studies about the Islamic State indicate that the group's methods, organization, and intent have exhibited great continuity. In addition, many of

the current leaders and members have been with the group since its early days in Iraq. The implications of this study can be broken down into two categories: methodology and policy. We first start with methodology implications and then move on to policy implications.

**Implications for Methodology**

The main methodological finding for analysts and scholars of terrorist and insurgent organizations is simple: Systematic study of militant groups' internal records and media is necessary to gain the fullest possible understanding of how and why such groups as the Islamic State pose the threat they do. Greater collaboration between government analysts and social science researchers—including subject-matter experts, experts on methodology and theory, and linguists—on documents and media obtained from militant groups, and jihadist militant groups in particular, can be extremely productive for developing a richly grounded framework for understanding these organizations' strategies, finances, and behavior. Government analysts can gain from a strong conceptual framework—ideally supported by systematic and data-driven quantitative and qualitative analysis—with which to interpret and contextualize real-time information as they receive it. This is particularly true for developing useful ways of thinking about such groups as ISI, where strategic questions are of great importance and for which analysts may lack sufficient background knowledge and a clearly detailed intelligence picture. Social scientists, in turn, are likely to benefit from gaining detailed subject-matter knowledge based on primary sources of data that government analysts often use, as well as greater insight into how decisions get made, how operations are planned, and the rationales given to justify key decisions and actions at all levels of the policy and implementation cycles.

Increasing the priority of document exploitation can be an extremely valuable adjunct to other forms of collection and analysis on militant groups. Systematic document exploitation may be undervalued. An organization's internal documents may provide a rich portrait of how it works and what its weaknesses and strengths are while remaining sensitive to its complexity and internal heterogeneity. Document exploitation can also identify important nodes and techniques

PX717

of internal communications and transactions, as well as higher-level insight into an organization's plans and strategies. In the case of ISI, the documents show quite clearly an organization intent on building an Islamic state based on internal coherence and administrative capacity, even as it struggled to sustain itself militarily as the campaign against it escalated.

The usefulness of document exploitation should not be surprising. Societies have long understood the value of archives, and the operational value of documentation is substantial, albeit short-lived. To be maximally useful, however, document collections need to be analyzed on a large scale, so that the representativeness of documents is more discernible. Scholars need to be able to assess, with a reasonable amount of confidence, whether any given document is normal or a unique outlier and how that should affect their assessments and conclusions. Understanding the distribution of documents, as in the probability distribution, would shed light on how common are such documents as large-scale financial spreadsheets, personnel rosters, and reimbursement notes. Without knowledge of such a distribution, analysts cannot definitively conclude that the findings from a document analysis apply to the group as a whole over a long period or only to the specific faction of the group that generated those documents at the time they were generated. In addition, these collections need to include systematic tagging with relevant metadata to enable analysts to employ thoughtful sampling strategies and methodological approaches to maximize the data's analytical value for priority knowledge requirements.

There are substantial challenges to achieving these goals. Maintaining large-scale document collections is expensive, and consistently recording metadata at the collection point entails practical challenges in high-intensity operational environments. These challenges, however, are predictable, and, given the long-run value of understanding insurgent and terrorist organizations, future collection efforts should keep in mind these twin imperatives.

Systematic document exploitation also needs people with multiple skills. We have found that to get the most out of any document set, it is valuable to have practiced intelligence analysts, social scientists, trans-

PX717

lators, and military personnel with battlefield experience. This argues for carefully building analytic teams for document exploitation.

**Implications for Policy**

Any strategy against the Islamic State will require multiple lines of effort. Here we describe how our findings about AQI and ISI relate to four issues: organization and territorial control, countering the Islamic State's fighters, compensation policies, and financial policies.

### *Organization and Territorial Control*

ISI's organization mirrored that of traditional, legitimate states and organizations in many respects, even if the group's ideas about territory and statehood, the rights of citizenship, and the provision of public goods were quite different from those of legitimate states. The combination of cognitive constraints on leadership, high turnover from warfighting, efforts to establish state-like services, and problems within the organization regarding the translation of management intent to member operations—the organization's agency problems—all point to great value to the organization in having formalized organizational structures and substantial amounts of paperwork and record-keeping. This could well apply to any nonstate group striving to establish a state. In the case of the Islamic State, the persistence of such structures—and their likely extension to affiliates in Libya, Egypt, Afghanistan, and elsewhere—creates substantial vulnerabilities.

In particular, the resulting documents create vulnerabilities as soon as a group faces an enemy whose military forces cannot be excluded from its territory. These documents reveal the group's size, its specific personnel, its sources of revenue, and its overall strategy—all information useful for combating it. Thus, when the Islamic State, or any similarly sized group, faces a highly competent military force, all the things it does to organize well become a vulnerability.

Exploiting the intelligence vulnerabilities of such an actor as the Islamic State requires substantial effort to fuse intelligence collection and analysis with counterterrorism and counterinsurgency operations. U.S.-led coalition forces were able to do this successfully from 2006 to 2011, most notably U.S. and British special operations task forces.

The commitment of resources to countering AQI and ISI was significant, however, compared with intelligence efforts against most terrorist organizations. An effective operational capability that is conducted by the current Iraqi security forces, and, in particular, Iraqi special operations forces, will require significant capacity-building on the analytical side, as well as substantial support from other parts of the U.S. government interagency community. Specific capabilities include financial investigations, which would be supported by the U.S. Department of Treasury and other parts of U.S. and coalition intelligence agencies. Criminal investigative capacity will also be necessary to counter Islamic State criminal-like activities, which provide a revenue stream and help the Islamic State control the Iraqi population in areas where it operates. Support from the U.S. Federal Bureau of Investigation and the U.S. Drug Enforcement Administration, or similar agencies from other countries, to the Iraqi government could help a great deal. On the intelligence-collection side, the vulnerability that stems from running a highly bureaucratic state suggests that when members of the group are targeted for capture, emphasis should not only be put on the leadership but also on personnel who maintain and store records, such as administrative emirs.

As with any state, the Islamic State has specific leaders. The history of operations against ISI shows that targeting leaders of its functional areas is one effective aspect of combating the group. In addition, the very threat of targeting at any level pushes the group underground and makes coordinating actions more difficult. However, the group's records show that it establishes a deep bench of personnel, so that attacking individual leaders alone will not lead to the Islamic State's destruction. Therefore, any counterpersonnel strategy should focus on eliminating entire layers of high-level and midlevel managers, such as an administrative emir and his administrative committee.

### Countering the Islamic State's Fighters

Just as its predecessor did, the Islamic State draws its personnel from a diverse array of nationalities. Although no one, except, perhaps, the Islamic State's top leaders, has a precise estimate of the group's size, Islamic State membership has been estimated at anywhere from 9,000

PX717

to 200,000 throughout 2014 and 2015. In September 2014, a Central Intelligence Agency spokesperson said that the group had an estimated 20,000 to 31,500 fighters, and that about 15,000 foreign fighters from 80 countries, including 2,000 Westerners, had gone to Syria.[2] By early 2015, the U.S. intelligence community estimated that 20,000 foreign fighters from 90 countries have flowed into Syria since 2011, and more than 3,400 fighters from Western countries have gone to Syria and Iraq.[3] Many have joined the Islamic State.

Since 2012, the operating environment and the mission for ISI have dramatically changed, and it has rebalanced its activities to more-traditional military operations, using small arms, artillery, and maneuver in numbers. Under the new scale of operations, Iraqi and Syrian recruits appear to be playing an active role in planning and leading military operations because the Iraqi members are more educated and have more experience with traditional military affairs from their time in Saddam Hussein's military. Even with this reliance on local members, characteristic of other periods during the group's history, the Islamic State has a continuing need and use for foreigners. Furthermore, the combination of an ideological commitment to the pursuit of an Islamic caliphate and the group's sophisticated information operations—designed to attract young Muslims worldwide— suggests that the Islamic State will continue to attract foreign fighters.

The Islamic State's use of foreigners is a grave concern to Western policymakers and security services. Assuming that the Islamic State has continued to train foreigners in the manner that ISI did, it has probably developed a group of trained and hardened foreign fighters with unconventional skills that the Islamic State could direct against countries across and outside the Middle East. Therefore, greater effort will need to be dedicated to stopping the flow of foreign fighters. Exist-

---

[2]   Eyder Peralta, "CIA Doubles Its Estimate of Islamic State Fighters in Iraq and Syria," NPR.org, September 11, 2014; Mario Trujillo, "CIA: ISIS Has 20,000 to 31,500 Fighters," *The Hill*, September 11, 2014; Jim Sciutto, Jamie Crawford, and Chelsea J. Carter, "ISIS Can 'Muster' Between 20,000 and 31,500 Fighters, CIA Says," CNN.com, September 12, 2014.

[3]   James R. Clapper, "Opening Statement to Worldwide Threat Assessment Hearing," Senate Armed Services Committee, Washington, D.C.: Office of the Director of National Intelligence, February 26, 2015.

PX717

ing efforts are clearly not working well: Foreign fighters are still flowing into Iraq and Syria at alarming rates, and the Islamic State has been linked to terrorist attacks in multiple countries outside the region. A European returnee from the Islamic State's operations in Syria was a key organizer of the attacks in Paris in November 2015.[4] Several enhanced efforts are needed. The first is enhancing border controls in transit countries—Turkey, most especially. The second is more effectively scrutinizing potential members from source countries. For liberal democracies, this will require difficult considerations about the trade-offs involved in balancing security concerns and the protection of civil liberties. Limiting the number of people who travel to the territory of the Islamic State also means stopping people from getting firsthand training and becoming integrated directly into fighter facilitation networks. Both of these efforts will be enhanced by a third effort: greater information-sharing among intelligence and law-enforcement organizations, both within and across countries. Here again, civil liberties requirements and values will need to be honored. However, it is likely that more sharing can take place because of various stovepipes among agencies that have not been fully overcome.

### Taking Advantage of Compensation Policies

One of the biggest unknowns about the current structure of the Islamic State is how well it compensates its members. Reports on Islamic State compensation are frequently contradictory, and it is often difficult to validate or invalidate the reliability of the sources on which these reports are based. For example, numerous reports in the months after the group conquered Mosul indicated that the Islamic State paid salaries ranging from $400 to $1,000 per month. If true, this would be a dramatic break from the group's previous practices. However, evidence broadcast by the BBC in 2015 suggests that, in actuality, as with other practices, compensation has remained pretty much the same as it was under ISI. Salaries cited include $65 per month for a local fighter, an additional $43 for a wife, and $22 for each child, with foreign fighters

---

[4] Andrew Higgins and Kimiko de Freytas-Tamuranov, "Paris Attacks Suspect Killed in Shootout Had Plotted Terror for 11 Months," *New York Times*, November 19, 2015.

receiving not a wage but food and housing. These sums are in line with what fighters received in Anbar in 2005 to 2006 and Mosul in 2008, adjusting somewhat for inflation.

This suggests that many fighters are not necessarily living well, and that the group is largely able to maintain morale through appeals to ideology, through victories, and through intimidation. When ISI was under great pressure, it missed or delayed salary payments. We recognize that there is great uncertainty at this point regarding salaries, but if we are right, this fact also suggests that causing a cutoff of salaries could harm morale, as could demonstrations that some leaders are receiving bonuses or are living extravagantly, ignoring Islamic State rules and ideology. This argues for a more active counterfinance strategy.

### Countering Finances

As it did throughout the period of 2005 to 2010, the Islamic State today raises money through what can be characterized largely as criminal activities. Money-raising activities include oil-smuggling, sales of stolen goods, extortion, taxation, sales of looted antiquities, kidnapping for ransom, and even for a time taking a cut of the money that the Iraqi government sent to its employees in Islamic State territory. Donations appear to constitute only a small portion of revenues. And that is the key point: What has characterized the group throughout its history and what appears to characterize the group today is that it places a premium on local fundraising because that gives it maximum control. Local fundraising also allows the group to look more like a state. The group's taxation activities, including road tolls and export and import taxes, resemble what any state might do.

The Islamic State's internal fundraising capabilities mean that halting financial flows will likely remain challenging. But there are steps that the United States and coalition partners can take. Oil-smuggling has been dealt a blow by the coalition's destruction of oil infrastructure and the recapture of some oil fields, but it still brings in considerable revenue. In addition, the Islamic State controls other resources, including gas fields and phosphate mines.

PX717

Moving resources—such as oil, refined oil products, phosphates, or even antiquities—requires intermediaries and transport. To broaden the fight against such revenues, the coalition will need to identify the intermediaries and end purchasers and either target them or sanction them and their financial institutions. It is unlikely that the Islamic State is using formal financial institutions, but somewhere along the sales chain, a formal financial institution might be involved. Sanctioning intermediaries would mean blocking their access to the formal financial system and requiring formal financial institutions not to deal with them. Sanctioning a formal financial institution will cut that institution off from the international financial system. Such sanctions have been effective in the past, and, in this case, the United States should cast a wider net.

As for transport, oil, in particular, must move by trucks from Islamic State territory. These trucks will load at an oil field and, for larger trucks, will have to take specific roads. Given the amount of money the Islamic State is reportedly raising from oil sales, the coalition should elevate efforts to interdict oil transport. This could involve destroying loading points; destroying road entrances to oil fields or loading points; destroying the trucks themselves; or sending a very strong signal, backed with action, that driving an oil truck would be an extraordinarily risky occupation.

Finally, it may be the case that politicians or government officials—even of the anti–Islamic State coalition—are complicit in the oil trade. Any oil truck leaving Islamic State territory must pass through checkpoints or border crossings and should be noticed or recorded. Further investigation into how such trucks are able to get through checkpoints is merited, and the coalition should further address official complicity in the trade.

There may be little that the coalition can do regarding other Islamic State funding sources, or, in some cases, stopping such sources could have consequences that are negative for the counter–Islamic State effort. For example, the Islamic State's siphoning of potentially hundreds of millions of dollars per year from the salaries that the Iraqi government paid to its idled employees in Islamic State territory put the government in a bind. Ending payments to employees effec-

tively cut off money to the Islamic State. But that also contributed to a humanitarian problem, and it could have given the Islamic State a propaganda victory. The group could tell the largely Sunni recipients that the largely Shia government in Baghdad is abandoning them and that the Islamic State is their only alternative. Should the Iraqi government continue the payments, it would thereby fund the Islamic State's war effort. Likewise, short of conquering the territory that the Islamic State now holds, halting the group's taxation schemes would be extremely challenging.

**Political Reconciliation as the Final Requirement**

Local and regional military forces are taking the fight directly to the Islamic State. But these forces will need to become more effective if they are to defeat it. There is some question as to whether they could become effective enough to defeat the Islamic State even if Iraq receives substantially more foreign military assistance. As a result, there have been calls for the United States to provide resources to extragovernmental forces by going around the Iraqi government, as well as calls for the commitment of U.S. ground forces. Even if the effectiveness of Iraqi security forces increases, however, military action may be necessary but insufficient to defeat the Islamic State.

Any successful effort to defeat the Islamic State will need to involve a political accommodation in which Sunni communities feel that they have a reasonably secure future in both Iraq and Syria. The Islamic State draws support, or at least grudging acceptance, from aggrieved Sunnis in both countries. In some ways, the Islamic State is testing the limits to which any government can rule with brutality and without some degree of popular support. Discontent and rebellion have been met with extreme brutality, such as when the Islamic State massacred about 600 members of the Albu Nimr tribe in Anbar governorate, Iraq, in October 2014. But this resistance has continued in a variety of forms, including a clandestine assassination campaign against Islamic State personnel in Mosul in the summer of 2015. These Islamic State opponents will need to be essential in any effort to defeat the Islamic State and to ensure that the group does not reemerge as it did in 2013 and 2014. Historically, the group raised money in ways that created

PX717

friction with local Sunni elites. Moreover, the way it managed human resources and finances reflected an organization that lacked internal cohesion and did not fully trust its operatives. This suggests that external support for the group can be peeled off and that the group is subject to some degree of internal fracture. Although there is little chance that the Sunnis in Iraq, in particular, can ever return to the political dominance they enjoyed before the U.S.-led coalition invasion of 2003, some measure of political accommodation will be necessary to turn the Sunnis against the Islamic State. Without doing so, defeating the group will remain a distant goal.

All of this suggests that defeating the Islamic State will require persistence. One of the as yet unanswered questions is the staying power of the Islamic State. What happens if the Islamic State maintains its current level of threat and level of territorial control for several years, if not longer? A related question is whether the Islamic State is financially sustainable if current battle conditions are sustained indefinitely. So far, every indication suggests that it is: Just one year after declaring the caliphate, the Islamic State had more fighters and more territory, and the group may well have enough money to sustain its operations for years. Despite this, the record of counter-ISI operations from 2006 through 2010 shows that military action and political accommodation can work together to degrade the group substantially, if not defeat it. It is incumbent on regional leaders—with international help—to make that possible.

PX717

# Acknowledgments

The authors thank Christopher White, formerly of the Defense Advanced Research Projects Agency (DARPA), for sponsoring this research, having the vision to support research on Iraq when few others were interested, and providing valuable comments throughout the process. Wade Shen of DARPA provided valuable support toward the end of the project and saw the research through to completion, and David Bringle of DARPA provided guidance throughout the entire project. We thank the Project Harmony Team at the Combating Terrorism Center at the United States Military Academy, in particular LTC Bryan Price, Don Rassler, and Gabriel Koehler-Derrick. Our data were developed with support from the Empirical Studies of Conflict Project at Princeton University, where Kristen Seith provided outstanding support with a range of funding and human resource issues. We gratefully acknowledge financial support from the Air Force Office of Scientific Research under Award FA9550-09-1-0314 and the Army Research Office under Award W911NF-11-1-0036. We also gratefully acknowledge an in-kind donation of software and technical assistance from Palantir Technologies and technical assistance from Praescient Analytics.

   We benefited from tremendous research and technical assistance at various points from Brendan Zegers at Palantir Technologies and Ryan Drzyzga, Dan Potocki, and Brett Velicovich, all currently or formerly at Prascient Technologies. At RAND, we received valuable guidance and input from Radha Iyengar and Barbara Sude and research assistance and analysis from (in alphabetical order) Kyle Bartrem, Amalavoyal Chari, Kevin Feeney, Corey Gannon, Kevin Jiang, Madeline Magnuson,

PX717

Jeffrey Martini, Blake Mobley, McKenzie O'Brien, Phillip Padilla, Eric Robinson, Omar al-Shahery, Robert Stewart, Chris Tucker, and Jonathan Welch. A number of colleagues and professional associates provided outstanding feedback on various matters, including Eli Berman, Colin Clarke, Kris Doucette, Joseph Felter, Seth Jones, Adam Meirowitz, Olga Oliver, Kris Ramsay, Jack Riley, Chad Serena, Gary Shiffman, and David Siegel. We particularly thank Dan Byman, Keith Crane, and Brian Fishman for insightful reviews that vastly improved the report and its relevance to both policymakers and researchers.

At the RAND Corporation, Matthew Byrd managed the publication of this report, and Rebecca Fowler edited it, dramatically improving its accuracy, internal consistency, and overall quality. Tanya Maiboroda designed the cover.

Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the authors and do not necessarily reflect the views of any people or other organizations.

PX717

# Introduction

Although U.S. and allied coalition forces easily overthrew the government of Saddam Hussein in Iraq in 2003, a vicious insurgency soon developed, and the most vicious insurgent was a Sunni Muslim Jordanian named Abu Mus'ab al-Zarqawi. He aimed not only to expel the Americans and exterminate Shia Muslims—the majority of the Iraqi population—but to do this with the goal of establishing a Sunni Islamic government and spreading it into neighboring countries.[1]

Al-Zarqawi did not to live to see the results—an American attack killed him in the summer of 2006. But in October of that year, his group, the Base of Jihad in the Land of the Two Rivers, better known as al-Qa'ida in Iraq (AQI), led its allies in declaring a new entity, the Islamic State of Iraq (ISI).[2] Fewer than three months later, in early January 2007, the group's media wing released a document titled *Informing the People About the Birth of the Islamic State of Iraq*.[3] In it, the author drew parallels between the new ISI and the proto-state estab-

---

[1] "The Al-Zarqawi Beliefs: 'Allah Has Permitted Us to Repay Them in Kind,'" *Irish Times*, September 24, 2004; Abu Mus'ab al-Zarqawi, "Zarqawi Letter: February 2004 Coalition Provisional Authority English Translation of Terrorist Musab al Zarqawi Letter Obtained by United States Government in Iraq," U.S. Department of State, 2004.

[2] "The Base of Jihad" is a literal translation of the official full name of al-Qa'ida, Qa'idat al-Jihad, adopted after the 2001 merger of al-Qa'ida and the Egyptian Islamic Jihad Group. Note that the Iraqi group (AQI) sometimes used an alternate name, al-Qa'ida Organization in the Land of the Two Rivers. Both formal AQI names avoided the use of the name Iraq.

[3] Our description of this book and its contents draws from Brian Fishman, *Fourth Generation Governance—Sheikh Tamimi Defends the Islamic State of Iraq*, West Point, N.Y.: Combating Terrorism Center, West Point, March 23, 2007.

PX717

lished by the Muslim prophet Muhammad when he fled from Mecca to Medina in the seventh century. These parallels immediately emphasized that the group was authentically Muslim, without the accretion of interpretation and innovation that the group claimed had crept into Islam since the religion's founding.

The author emphasized that ISI was different from a modern state: Its territory would not be well defined but would extend anywhere it could hold by force of arms, and all people within that territory would swear allegiance to the emir, the leader. The group might not provide the same services as a modern state, but it would improve both the religious and worldly conditions of its citizens, with specific services, including judicial processes, dispute resolution, collection of the Islamically required charity (*zakat*), the freeing of prisoners, and support for families of people killed in the group's service.[4]

The world now faces a seemingly new foe: the Islamic State, a violent group that rules territory in Iraq and Syria and has affiliates in territories that it has declared to be its provinces, or *wilayat*, around the greater Middle East. The group has displaced hundreds of thousands of people, enslaved others, beheaded still others, and claims to be the reestablishment of the Islamic caliphate grounded in early Islamic history.[5]

There is a clear line of descent from the AQI of 2004–2006, to the ISI of 2006–2013, to today's Islamic State. ISI was routed from most of Iraq by a combination of coalition forces, led by the United States, under the command of Multi-National Force–Iraq (MNF-I); local Sunni militias; and Iraqi security forces (ISF), particularly Iraqi Army units, from mid-2006 through early 2009. The group withdrew into a limited terrorist campaign in northern Iraq and maintained a supporting network in the Mosul area of Ninewa governorate that resembled a ruthlessly violent and effective organized-crime syndicate.

---

[4]   Fishman, 2007, p. 7.

[5]   As explained more fully below, the Islamic State is also referred to as ISIS, for the Islamic State of Iraq and al-Sham or the Islamic State of Iraq and Syria; ISIL, for the Islamic State of Iraq and the Levant; or Daesh or Da'ish, an abbreviation of the Arabic for both names, al-Dawla al-Islamiyya fi al-'Iraq wa al-Sham. We refer to the group as the Islamic State, for ease of exposition and to reflect its expansive goals. In accordance with the rest of the world, we do not recognize it as an actual state, although it does conduct a variety of statelike activities.

As ISI developed this infrastructure, the United States was winnowing its military presence in Iraq in preparation for a full withdrawal in December 2011. Meanwhile, a bloody civil war in Syria broke out and divided much of the population and the armed groups, which formed along sectarian lines.

Leaders in ISI quietly sent fighters into Syria in 2011 to fight covertly under the alias of Jabhat al-Nusrah. Differences of opinion over strategy, tactics, and goals led to a split with the Jabhat al-Nusrah leadership, and ISI, in April 2013, began fighting directly under its own banner in Syria and changed its name to the Islamic State in Iraq and al-Sham (ISIS, also known as the Islamic State of Iraq and Syria, or the Islamic State of Iraq and the Levant [ISIL]). Following extensive anti-government protests in Iraq's Anbar governorate, from January 2013 to December 2013, which were met by an aggressive Iraqi government response, ISIL expanded in Iraq in force with the support of some local political organizations—including many of the same tribal organizations that had fought against it in 2006—and quickly overwhelmed Iraqi Army outposts in Fallujah and other cities. In June 2014, following the retreat of the Iraqi Army from Mosul and the group's conquest of that city, the group renamed itself the Islamic State and proclaimed a caliphate with the Islamic State leader Abu Bakr al-Baghdadi as the caliph of all Muslims.[6]

This report presents a comprehensive overview of the predecessors of the Islamic State, AQI and ISI, from 2005 to 2010, analyzing their organization and mechanisms of territorial control, their human capital policies, their compensation practices and career paths, and their financial practices. Research was substantially completed in 2014, with selected updates made in 2015.

There are two notable aspects to this report: an analysis of the group's internal documents and a historical recounting that reveals enormous detail relevant to the group of today.

---

[6]   For a useful overview, see Cole Bunzel, *From Paper State to Caliphate: The Ideology of the Islamic State*, Washington, D.C.: Brookings Institution, U.S. Relations with the Islamic World, Center for Middle East Public Policy, Analysis Paper No. 19, March 2015.

PX717

## The Group's Own Words

First, the report provides an analysis of the Islamic State predecessors, based on more than 140 of their own internal documents, captured and found throughout Iraq.[7] Documents captured by U.S. and Iraqi forces during the Iraq War offer a unique opportunity to understand the organization. These documents went into the U.S. Department of Defense's Harmony database. For this report, we identified useful documents and worked with the Combating Terrorism Center (CTC) at West Point to declassify them, providing a window into how ISI organized, operated, and financed itself. CTC has posted documents on its Harmony Program website, making them available to analysts and researchers worldwide.[8] In addition, a CTC report presents an overview of what the documents reveal about ISI.[9]

For example, the documents show that even as early as the 2005 to 2006 period, the group was highly organized and bureaucratic. It also expected members to take religious obligation seriously. But during this period, when the Islamic State was still largely clandestine, it valued a lower profile, as this document captured in western Anbar governorate shows:

> In the name of God the merciful and the compassionate
>
> Some instructions to the beloved brothers, we expect compliance with it, those who fail will be held accountable.

---

[7]   We have chosen to use the translations produced by linguists supporting U.S. and coalition forces during the Iraq war—even when these translations are sometimes difficult to fully understand—for two reasons. First, it will give the reader a sense of what U.S. analysts had to work with to understand AQI and ISI during the war. Second, many of the documents were hard to comprehend in the original language, and in some cases it would be difficult to improve on even a spotty translation.

[8]   These documents are accessible online. See "ISIL, Syria and Iraq Resources," database of declassified documents, Combating Terrorism Center, 2015.

[9]   Danielle F. Jung, Jacob N. Shapiro, Jon Wallace, and Pat Ryan, *Managing a Transnational Insurgency: The Islamic State in Iraq's "Paper Trail," 2005–2010*, West Point, N.Y.: Combating Terrorism Center, West Point, 2014.

PX717

1- All problems should be addressed to the Amir according to the chronology; problems should not be discussed in public in front of people.

2- Speed limit in villages should be 50; while in public roads should not exceed 120.[10]

3- Vehicle driver is the person in charge in terms of cleaning and maintenance.

4- Emphasis on group prayer and remembrance [morning and evening] and to follow the norms for the cause of victory.

5- Sleeping after dawn's prayer is strictly forbidden, this period should be utilized to recite the Quran and remembrance and then to start their work.

6- Security procedure should be followed; weapons must be concealed and should not be exposed in public, appearance in public place for no reason is forbidden.[11]

## Continuity

The second notable aspect is that our analysis of the Islamic State's predecessor groups is more than a historical recounting. This report provides enormous detail on the group of today. As with any organization, certain characteristics concerning how the organization is run are likely very slow to change, including organizational culture, personnel policies, and administrative structure. Understanding the starting point is thus valuable for understanding the Islamic State. One would not expect the leadership to adopt an entirely new mode of organization upon moving into Syria and then expanding in Iraq. Under the old model, the organization fought quite well against the U.S. and Iraqi armies and the Iraqi population for more than four years (from

---

[10]  Presumably, this was in terms of kilometers per hour.

[11]  Harmony document MNFA-2007-000566; see "ISIL, Syria and Iraq Resources," 2015.

2004 to 2008), maintained its internal cohesion and plotted its come-back during subsequent years of reduced activity (through 2012), and then claimed jurisdiction over Syria and Iraq as the group declared itself ISIS (in April 2013). It makes little sense to expect the group to suddenly abandon a model that had served it so well.

Many Islamic State leaders were prominent in ISI, including the Islamic State leader Abu Bakr al-Baghdadi, who took over ISI in May 2010, after serving on the group's governing council, known as the *shura* council. We believe that al-Baghdadi also appears in a personnel-tracking spreadsheet from Mosul in 2009 under his previous nom de guerre, Abu Du'a, and was listed in another document as the emir, or top leader, of ISI's Mosul sector, which was then, as now, its most important sector in Iraq. Five other prominent Islamic State leaders also appear in the same tracking sheet: Abu Louay, also known as Abu Ali and Abdul Wahid Khutnayer Ahma; Abu Mohamed, also known as Bashar Ismail al-Hamdani; Abu Nabil, also known as Wissam Abed Zaid al-Zubeidi; Abu Abdul Salem, also known as Abu Mohammed al-Sweidawi; and Abu Maysara, also known as Ahmed Abdul Kader al-Jazza.[12]

## The Plan of This Report

This report uses a sample of more than 140 documents from AQI and its successor, ISI, from 2005 to 2010, to study five aspects of the militant organization:

1. organization, territorial aspirations, and management
2. human capital
3. compensation
4. career paths
5. financing.

---

[12]  Harmony document NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

PX717

The lessons we draw have both practical and academic implications. On the policy side, the Islamic State is one of the largest current threats to stability in the Middle East. A great deal of evidence suggests that the Islamic State shares most of the management practices and organizational techniques of AQI and ISI.[13] The report thus provides valuable insights to policymakers tasked with constructing strategies to counter the Islamic State and to analysts seeking to understand the conditions under which the Islamic State might achieve its goals.

On the academic side, the Islamic State and its predecessor organizations are one example of an increasingly important class of militant organization: those that exploit disorder within one country to advance territorial goals supported by transnational personnel or resource flows. By outlining the organizational challenges these groups faced and solutions they adopted, this report helps delineate the conditions under which they can operate and survive.

We show that ISI was a vertically integrated organization that followed what is known in the management literature as an "*M*-form" (multidivisional form) hierarchy, in which a central management structure with functional bureaus is replicated at multiple lower geographic levels.[14] In organizations of this type, each geographic unit has substantial autonomy, and differences between them—such as adjudicating disputes over resources—are handled by the central organization.[15]

---

[13] Gregor Aisch, Joe Burgess, C. J. Chivers, Alicia Parlapiano, Sergio Peçanha, Archie Tse, Derek Watkins, and Karen Yourish, "How ISIS Works," *New York Times*, September 15, 2014; Patrick B. Johnston and Benjamin Bahney, "Hitting ISIS Where It Hurts: Disrupt ISIS's Cash Flow in Iraq," *New York Times*, August 13, 2014b; and Hannah Allam, "Records Show How Iraqi Extremists Withstood U.S. Anti-Terror Efforts," *McClatchy News*, June 23, 2014.

[14] For more on the *M*-forms, see Alfred D. Chandler, *Strategy and Structure: Chapters in the History of the American Industrial Enterprise*, Cambridge, Mass.: MIT Press, 1969; and Oliver E. Williamson, *Markets and Hierarchies: Analysis and Antitrust Implications*, New York: Free Press, 1975. An example of these organizational models applied to insurgent groups is Patrick B. Johnston, "The Geography of Insurgent Organization and Its Consequences for Civil Wars: Evidence from Liberia and Sierra Leone," *Security Studies*, Vol. 17, No. 1, 2008.

[15] Bahney, Shatz, et al. provide a view of AQI's management practices in Anbar governorate in 2007 (Benjamin Bahney, Howard J. Shatz, Carroll Ganier, Renny McPherson,

Within this structure,

- In its original form as AQI, ISI adopted a bureaucratic model that looked remarkably similar to the ideal structure al-Qaʿida operatives described, but ISI replicated that structure at local levels to implement broad organizational control.
- By 2008, ISI had subdivided Iraq into specific sectors but was struggling to fill its design at the subnational level with personnel; roughly 30 percent of its sectors lacked the desired administrative personnel.
- ISI allocated human capital rationally, with the suicide-bomber corps dominated by foreigners (who were more likely than Iraqis to be fanatical believers in the group's religious ideology) and with intelligence and security personnel (where local knowledge was critical) dominated by its Iraqi members. However, the majority of foreign fighters were not suicide bombers. ISI vetted the foreigners upon entering Iraq and had them fill specific tactical and administrative roles as well.
- The salaries and other compensation ISI paid to its members appear to have been designed for an environment where labor was plentiful and the organization needed to recruit loyal members and screen out opportunists. Yet even with such a screening process in place, its leadership faced substantial challenges managing trust within its ranks.
- ISI's monthly payroll consistently consumed the largest single portion of its revenues.
- There was significant personnel mobility within ISI. Turnover was high, and the group frequently reassigned members to different military units or back-office positions on an as-needed basis.

---

and Barbara Sude, *An Economic Analysis of the Financial Records of al-Qaʿida in Iraq*, Santa Monica, Calif.: RAND Corporation, MG-1026-OSD, 2010). Shapiro analyzes a sample of documents from one part of AQI, with a focus on highlighting the group's managerial practices. See Jacob N. Shapiro, *The Terrorist's Dilemma: Managing Violent Covert Organizations*, Princeton, N.J.: Princeton University Press, 2013.

PX717

- ISI fundraising aimed to raise money locally, largely from criminal activities but also partly from activities that resembled state action, such as taxation. As with the present-day Islamic State, ISI demonstrated sophisticated financial management, efficiently reallocating money within governorates and throughout Iraq to support organizational objectives.
- ISI leadership sought substantial oversight of the group's finances and put in place detailed record-keeping requirements for tracking and auditing purposes.

The remainder of this report proceeds as follows: Chapter Two provides an overview of the insurgent environment in Iraq from 2005 to 2010, with a particular focus on conditions in the governorates for which we have ISI documents. Chapter Three offers an overview of the organizational economics of insurgency and terrorism, discussing the management challenges for ISI and laying out expectations for what we will see in subsequent chapters. Chapter Four shows how ISI was organized and shares details of its plans for a state within the territory of Iraq. Chapter Five outlines the human capital of ISI members. The chapter provides strong evidence that ISI members were drawn from populations with outside opportunities for work; a lack of options for employment was not the reason members joined. Chapter Six analyzes ISI's compensation practices, with a view toward assessing relations between management and operatives. Chapter Seven tracks the career trajectories of a subset of ISI members and builds on Chapter Six by showing how compensation for specific members changed over time. Chapter Eight assesses ISI financing practices at the governorate and subgovernorate levels, mostly in Anbar governorate, from 2005 to 2006, and in Ninewa governorate, from 2008 to 2009. Chapter Nine expands on the treatment of finances by discussing the organization's general treasury at the top level and reallocation across governorates, as well as specific financial control practices. Chapter Ten concludes with implications for policymakers responsible for combating terrorist and insurgent groups, including the group calling itself the Islamic State, which now controls parts of Syria and Iraq, as well as for analysts of terrorism and insurgency. Appendix A discusses the challenges of

PX717

analyzing captured documents, known as document exploitation, and the specific documents used in this report. Appendix B provides two examples of other research efforts on covert and clandestine organizations. Appendix C provides the list of documents from which we drew salary data.

PX717

# The Islamic State of Iraq and the Iraq War

The Salafi-jihadi organization ISI evolved from AQI, officially formed by al-Zarqawi in October 2004. ISI was Salafi in that it adhered to an ideological strain in Sunni Islam that seeks to emulate, as purer, the thinking and practices of the prophet Muhammad and the earliest generations of Muslims. It was jihadi in that it believed that violent struggle against non-Muslims and Muslims it judged to be apostate is an important religious duty. Although ISI originated as one of many Sunni insurgent groups operating throughout Iraq in the wake of the invasion by coalition forces in March 2003, the group rapidly increased its capability and influence from 2004 through 2005 and emerged as the dominant insurgent organization operating in the country by early 2006. Composed of both foreign fighters and local Iraqis, ISI had a relatively hierarchical command structure, complex and bureaucratic administrative processes, and diverse sources of funding.

The group actually went by two subtly different names: the Islamic State *of* Iraq and the Islamic State *in* Iraq. The *of Iraq* group was meant to be a haven for Iraq's Sunnis as the Kurdish population in the northeast achieved greater autonomy and the Shia population in the center and south solidified control in territories where it held the majority. The *in Iraq* group was meant to serve as a state for all Muslims (or at least those considered Muslims by the group's leaders, which would exclude the Shia), regardless of modern borders: "On balance, the Islamic ele-

PX717

ment prevailed over the Iraqi in the group's propaganda, even though the Islamic State of Iraq remained the more official name."[1]

This chapter provides the background and context for our analysis of ISI. The chapter begins by reviewing the broad trends in the conflict: putting the formation of the Iraqi insurgency in context, highlighting the rise of ISI, and outlining the formation of the anti-ISI Awakening movement. We discuss the relevant socioeconomic conditions in Iraq, which affected ISI's organizational structure and financing activities. The chapter concludes with a detailed examination of the operational environment in the four governorates for which we have substantive documents and data—Anbar, Diyala, Salah al-Din, and Ninewa. This discussion focuses on variations across time and space that help to put our data in context by explaining the operational constraints the group was under throughout the course of the conflict.

Throughout this chapter, we refer to the group as ISI for purposes of clarity, although we occasionally refer to the group as AQI for events before the time it became ISI, if we believe that would improve clarity. It is important to note that the group's original core of foreign fighters and leadership came from al-Zarqawi's group Jama'at al-Tawhid wal-Jihad, which was formed in Jordan in the late 1990s. ISI operated under several different names during the course of its insurgency in Iraq, such as Jama'at al-Tawhid wal-Jihad, AQI, and the Mujahidin Shura Council (MSC).

## The Iraq War

After the United States and its partners that composed the coalition forces invaded Iraq in March 2003 and deposed Saddam Hussein's government in April, a power vacuum rapidly emerged. Several analysts assert that this created a "security dilemma" dynamic, which pitted three groups loosely aligned around ethnosectarian identities

---

[1]  This paragraph is drawn from Bunzel, 2015. The final quotation is from p. 18. Throughout this report, we refer to the group as the Islamic State *of* Iraq because when the group's names appear on the documents we use, it usually appears as Dawlah al-'Iraq al-Islamiyya, or Islamic State of Iraq.

against each other to achieve political control—Sunni Arabs, Shia Arabs, and Kurds.[2] The Sunnis, who ultimately lost the most in the wake of the coalition invasion, came to form the core of an insurgency that included an "amalgam of former Baathists, nationalists, Salafi jihadists, and criminals."[3] Although Sunnis represented a minority in terms of Iraq's population, they had enjoyed near-exclusive political control for decades.[4] U.S.-led decisions to disband the Iraqi Army, enact far-reaching laws barring members of Saddam Hussein's Ba'ath party from participation in the military or government (known as de-Ba'athification), and reshape Iraq's government as a democracy overturned this system, giving the majority Shia population the dominant position in the national government.[5] In addition, the Kurdish minority was given an increased role in the political process, gaining status as the "kingmaker" at the national level and solidifying its de facto autonomy in much of northern Iraq.[6]

A multitude of Sunni insurgent groups, including ISI, rapidly took advantage of the Sunni population's political dispossession to mobilize large portions of the Sunni population against the coalition forces and the Iraqi government. Some commentators have described the early period of the insurgency in 2004 and 2005 as a "composite insurgency" that had no discernible leadership.[7] These militant groups

---

[2]  For more on the security dilemma, see Barry Posen, "The Security Dilemma and Ethnic Conflict," *Survival*, Vol. 35, No. 1, Spring 1993. See also James Fearon, "Iraq's Civil War," *Foreign Affairs*, Vol. 86, No. 2, March/April 2007; and Chaim Kaufmann, "A Security Dilemma: Ethnic Partitioning in Iraq," *Harvard International Review*, Vol. 28, No. 4, 2007.

[3]  Bahney, Shatz, et al., 2010.

[4]  Michael Eisenstadt and Jeffrey White, *Assessing Iraq's Sunni Arab Insurgency*, Washington, D.C.: Washington Institute for Near East Policy, Policy Focus No. 50, December 2005.

[5]  See Dale C. Kuehl, *Unfinished Business: The Sons of Iraq and Political Reconciliation*, Carlisle, Pa.: U.S. Army War College, Strategy Research Paper, March 2010; and M. J. Kirdar, *Al Qaeda in Iraq*, Washington, D.C.: Center for Strategic and International Studies, AQAM Futures Project Case Study Series, June 2011.

[6]  Kuehl, 2010.

[7]  Eisenstadt and White, 2005; and Seth Jones and Martin Libicki, *How Terrorist Groups End: Lessons for Countering al Qa'ida*, Santa Monica, Calif.: RAND Corporation, MG-741-1-RC, 2008.

PX717

built their interactions on a "loose network of deep-seated familial, tribal, and local loyalties."[8] However, over the course of the first two years, the Saddam loyalists rapidly lost influence and more-extreme, Salafi-jihadist elements of the insurgency began to assert greater control. The broader movement came to be dominated by a few large Salafi groups, especially ISI.[9]

The predecessor to ISI, AQI, was officially formed in October 2004, when Abu Mus'ab al-Zarqawi aligned his group, Jama'at al-Tawhid wal-Jihad, with the larger al-Qa'ida movement.[10] Jama'at al-Tawhid wal-Jihad originated in Jordan during the late 1990s and then grew significantly in Afghanistan, under the supervision of al-Zarqawi and the funding of Usama Bin Ladin.[11] The group was composed largely of recruits from the greater Levant countries, including Jordan, Lebanon, Syria, and the Palestinian territories. It grew to nearly 3,000 members under al-Zarqawi, before the October 2001 U.S. airstrikes in Afghanistan in response to the 9/11 attacks.[12] After the U.S. invasion of Afghanistan, al-Zarqawi relocated to Iran and then moved again to Syria, Lebanon, and, ultimately, northern Iraq, where he formed an alliance with the Kurdish Islamist group Ansar al-Islam.[13] While in Iraq, however, al-Zarqawi traveled frequently throughout the Sunni Triangle area around Baghdad, deepening his network, recruiting fighters, and establishing bases.[14] Al-Zarqawi's expansion of his weapon- and fighter-smuggling networks made him the default conduit for most, if not all, foreign fighters flowing into Iraq in anticipation of the U.S.-led

---

[8]  Bahney, Shatz, et al., 2010, p. 13.

[9]  International Crisis Group, *In Their Own Words: Reading the Iraqi Insurgency*, Amman, Middle East Report No. 50, 2006.

[10]  Kirdar, 2011.

[11]  Kirdar, 2011.

[12]  Mary Anne Weaver, "The Short, Violent Life of Abu Musab al-Zarqawi," *The Atlantic*, July/August 2006.

[13]  Gary Gambill, "Abu Musab al-Zarqawi: A Biographical Sketch," *Jamestown Terrorism Monitor*, Vol. 2, No. 24, December 2004; and Weaver, 2006.

[14]  Weaver, 2006.

PX717

invasion. In essence, he became the default emir of Islamist militants in Iraq.[15]

After the coalition invasion, AQI rapidly emerged as the most capable and ruthless militant group operating in Iraq. As Brian Fishman wrote, "AQI was brutal and imperious, but its successful attacks against U.S. forces, Shia militias, and the Iraqi government were useful. Zarqawi's attacks . . . were welcomed by other Sunni insurgents."[16] Al-Zarqawi directed a bloody campaign aimed at weakening coalition forces; deterring Iraqi cooperation through attacks on military, government, and tribal leaders who worked with coalition forces; achieving a psychological effect through high-profile spectacular attacks, kidnappings, and beheadings; and fomenting sectarian conflict through a deliberate campaign that targeted Shia across Iraq.[17] Using this multipronged strategy, AQI grafted its movement to the rising Sunni insurgency, mobilizing large portions of the Sunni population to support AQI's cause and prosecuting a violent campaign against coalition forces and ISF.

AQI initially centered its activities in Anbar governorate, an expansive area in the western Iraqi desert and home to a majority-Sunni population with a long history of resistance to central government control. Al-Zarqawi based the group in Fallujah, a major city nestled along the Euphrates River Valley, which also served as one of the main routes for AQI's expanding foreign-fighter facilitation network. The group quickly took control of the city through a violent campaign of attacks and intimidation, pushing aside the tribal sheiks who traditionally ruled throughout the governorate, and maintained a sanctuary in the city until coalition forces launched a major operation to clear it in November and December 2004.[18] After the loss of Fallujah, the group headquartered its Anbar operations near the provincial

---

[15] Gambill, 2004.

[16] Brian Fishman, *Dysfunction and Decline: Lessons Learned from Inside al-Qa'ida in Iraq*, Harmony Project, West Point, N.Y.: Combating Terrorism Center, March 16, 2009, p. 2.

[17] Kirdar, 2011.

[18] Bing West, *No True Glory: A Frontline Account of the Battle for Fallujah*, New York: Bantam Dell, 2005.

capital of Ramadi. One of the primary sets of financial documents ana-lyzed in this report was captured in nearby Julaybah, a town just east of Ramadi. These records provide a snapshot of the group's internal communications and record keeping from June 2005 through October 2006.[19]

Despite friction with the local Sunni population and other insur-gent groups, AQI maintained significant operational capability in Anbar, and much of the rest of Iraq, throughout 2006. In parallel to the group's consolidation in Anbar, it established military and admin-istrative structures in each of the country's Sunni-controlled governor-ates and Baghdad, the national capital and Iraq's most populous city.

Although this report does not focus on ISI's activities in Baghdad specifically, the capital city clearly played a key role in the Iraq war and the Sunni insurgency. Home to an ethnically mixed population of more than 7 million, and the clear center of national-level politics, AQI early on recognized Baghdad as critical to its overall success, and it focused increasing attention on the city and its surrounding subur-ban "belts," beginning in 2005.[20]

In February 2006, AQI conducted one of its most success-ful attacks of the entire conflict, targeting the symbolic al-Askari Shrine in Samarra, the third-holiest religious site in Shia Islam.[21] As al-Zarqawi intended, this attack ignited a wave of sectarian violence across the country, especially in Baghdad. Within weeks of the bomb-ing, an escalating cycle of tit-for-tat sectarian murders and attacks had engulfed the country, making all-out civil war between Sunni and Shia groups increasingly likely.[22] This sectarian violence continued to

---

[19] The data include three transactions from November 1, 2006, and one transaction from November 2, 2006.

[20] For more on ISI's strategy and operations in and around Baghdad, see Jennifer Griffin, "Zarqawi Map Aided Successes Against Iraqi Insurgency," *Fox News*, November 21, 2007; and Michael Duffy and Mark Kukis, "The Surge at Year One," *Time*, January 31, 2008.

[21] Carter Malkasian, "Counterinsurgency in Iraq: May 2003–January 2007," in Daniel Marston and Carter Malkasian, eds., *Counterinsurgency in Modern Warfare*, New York: Osprey Publishing, 2008. For more on the al-Askari Shrine, see "History of the Shrine of Imam Ali Al-Naqi and Imam Hasan Al-Askari," Al-Islam.org, n.d.

[22] Fearon, 2007.

PX717

escalate throughout 2006 and into early 2007, especially in mixed parts of Iraq, such as Baghdad and Diyala governorate, often prompting Sunni groups in these areas to turn to ISI for protection against such Shia militias as Jaysh al-Mahdi.

In Anbar, however, which was largely unaffected by the growing sectarian violence, opposition to AQI mounted in 2006, as the group increasingly targeted Sunni tribal leaders and rivals.[23] In June 2006, al-Zarqawi was killed by a coalition airstrike, and his successor, Abu Ayyub al-Masri, an Egyptian national also known as Abu Hamza al-Muhajir, moved to strengthen AQI's position by laying claim to territory in the guise of a new emirate under an Iraqi leader, something al-Zarqawi had wanted. In October 2006, al-Masri declared the establishment of the Islamic State of Iraq, with Hamid Dawud Khalil al-Zawi, also known as Abu Umar al-Baghdadi, as emir and al-Masri acting as minister of war.[24]

Even after the death of al-Zarqawi, ISI maintained the ability to conduct violent attacks in much of Anbar and across most other parts of Iraq throughout 2006. Although the group's popular support was beginning to erode in Anbar, ISI still enjoyed de facto control in the predominately Sunni governorates to the north and west of Baghdad, largely because of the ongoing sectarian violence in Baghdad, Diyala, and Salah al-Din, as well as the failure of coalition forces and ISF to effectively weaken the group. Nationwide, violent attacks continued to grow during 2006 and into the first half of 2007, illustrating ISI's continued ability to project violence across much of the country (Figure 2.1).

Beginning in late 2006, however, an interrelated set of changes on the ground in Iraq began to turn the tide against ISI. First, the formation of the Sunni Awakening movement in Anbar began to rapidly undercut ISI's support in the governorate, especially in Ramadi. Building on previous tribal attempts to realign with coalition forces against ISI, there was finally a breakthrough with the formation of a coalition

---

[23] Fishman, 2009.

[24] Christopher M. Blanchard, *Al Qaeda: Statements and Evolving Ideology*, Washington, D.C.: Congressional Research Service, updated July 2007.

PX717

**Figure 2.1**
**Nationwide Levels of Violent Attacks, 2004 to 2008**



SOURCE: David Petraeus, MNF-I commander briefing to Congress, Washington, D.C., April 8, 2008a.
NOTE: IEDs = improvised explosive devices.
RAND RR1192-2.1

PX717

of 17 tribal sheiks into the Sahwat al-Anbar (the Anbar Awakening) in September of 2006.[25] Throughout late 2006 and early 2007, this group partnered effectively with the coalition unit based in Ramadi (1st Brigade, 1st Armored Division), led by COL Sean MacFarland, to reestablish security in the city and aggressively target ISI.[26] As the Awakening forces proved effective against ISI, they were successfully integrated into the formal ISF structure, serving as Iraqi Police forces and eventually receiving pay from the Iraqi government.[27] Based on the initial success in Ramadi, other tribal groups across Anbar began to join the burgeoning Awakening movement, dramatically undercutting ISI's popular support and operational capability across the governorate.

Second, coalition leaders finally acknowledged that their previous strategy in Iraq was not working, and the George W. Bush administration ordered a "new way forward."[28] Building on the initial successes seen in Anbar, and in a significant reversal of previous coalition strategies, this new plan provided additional U.S. combat forces and "put a premium on protecting the Iraqi population[,] . . . on the theory that improved security would provide Iraqi political leaders with the breathing space they needed to try political reconciliation."[29] The strategy, popularly known as the "surge," also placed heavy emphasis on integrating this population-centric counterinsurgency campaign with continued "counter-terror operations against Al-Qaida and insurgent organizations."[30]

In response to increased pressure in Anbar governorate, primarily because of the effects of additional coalition surge forces and the growing Awakening movement, ISI was forced to shift its base of operations from Anbar to the north and east, primarily into Diyala, Salah al-Din,

---

[25] Austin Long, "The Anbar Awakening," *Survival*, Vol. 50, No. 2, April–May 2008.

[26] Niel Smith and Sean MacFarland, "Anbar Awakens: The Tipping Point," *Military Review*, March–April 2008.

[27] N. Smith and MacFarland, 2008.

[28] White House, "Fact Sheet: The New Way Forward in Iraq," January 2007.

[29] George W. Bush, "Transcript: President Bush Addresses Nation on Iraq War," January 10, 2007.

[30] White House, 2007.

PX717

and Ninewa governorates.[31] While Anbar enjoyed the beginning of a steady decline in violent activity in late 2006, there were corresponding increases in attacks in these other governorates as ISI sought to gain control and influence through militant activity against coalition forces and ISF, as well as other tribal and militant groups that resisted ISI's incursion (Figure 2.2). Although each of these areas had some preexisting Sunni insurgent activity, the level and intensity of violence increased significantly as ISI shifted greater attention and resources to Diyala and Salah al-Din in late 2006, and then subsequently to Ninewa and Mosul in late 2007.

Throughout 2006, ISI significantly stepped up violent attacks across Diyala governorate, targeting the Shia minority to stoke sectarian tensions and aggressively coercing other Sunni tribal and militant groups in an effort to consolidate control. By the end of the year, ISI controlled or exerted influence over most of Diyala. The group gained strength throughout early 2007, aided by a complete failure of the Diyala provincial government to function, limited coalition presence, and a largely ineffective ISF organization. Reports from spring of 2007 indicated that ISI had taken de facto control of the capital city of Baqubah and "entrenched itself across the southern portion of the province."[32] The documents from Diyala that we analyze in this report were captured by coalition forces during the summer of 2007 and provide valuable insight into ISI's structure, administrative processes, and financing operations in the governorate near the peak of the group's capability and influence there.

During the same period, ISI made significant gains in neighboring Salah al-Din governorate, a majority Sunni governorate with longstanding insurgent activity against both coalition forces and ISF. With several pockets of Shia-controlled territory (such as in Balad and Ad Dujayl), Salah al-Din had some of the same potential for sectarian conflict as Diyala and faced the similar challenges of ineffective provincial-

---

[31]   Stephen Biddle, Jeffrey A. Friedman, and Jacob N. Shapiro, "Testing the Surge: Why Did Violence Decline in Iraq in 2007?" *International Security*, Vol. 37, No. 1, 2012.

[32]   Eric Hamilton, "Expanding Security in Diyala," Institute for the Study of War, August 2008b.

PX717

**Figure 2.2**
**Trends in Combat Violence, by Governorate, 2005 to 2008**



SOURCE: MNF-I SIGACTS III Database (Empirical Studies of Conflict Project, "ESOC Iraq Civil War Dataset (Version 3)," Princeton, N.J.: Princeton University, n.d.).
NOTES: Governorates shown are those with substantial financial data. The vertical lines mark the start of the surge. SIGACT = significant activity.
**RAND** *RR1192-2.2*

PX717

level governance, weak and unmotivated ISF, and too few coalition forces to effectively control the large expanse of territory. ISI established safe-haven zones north of the Tigris River that allowed for the free flow of weapons and fighters between Anbar, Diyala, and Ninewa.[33] Additionally, ISI stepped up its militant operations across the governorate, conducting the spectacular attack against the al-Askari Shrine in the governorate's capital city of Samarra in February 2006, which ignited a national wave of sectarian violence, as well as several other complex suicide attacks against ISF and coalition forces in urban areas and Highway 1, the critical, primary line of communication for coalition forces north of Baghdad.[34] In this report, we analyze a set of detailed ISI personnel records captured in Salah al-Din in July 2007, at the peak of ISI's control of the governorate. These records shed light on the group's composition, capabilities, and administrative procedures.

As ISI continued to increase violent attacks and consolidate control over territory in Diyala and Salah al-Din, signs of friction between the group and the local populations began to emerge, just as they had previously in Anbar. By the spring of 2007, several Sunni militant groups in Diyala had begun to fight back against ISI, led initially by fighters from the 1920s Revolution Brigades.[35] In July 2007, one of the first organized anti-ISI groups, the Baqubah Guardians, emerged in Diyala.[36] Similar events were unfolding in Salah al-Din as well, with several tribal groups turning against ISI and partnering with coalition elements in an alliance of convenience. In Duluiyah, previously a hotbed of the Sunni insurgency in Salah al-Din, leaders from the Jabouri tribe aligned with coalition forces in May 2007 and quickly

---

[33]  Kimberly Kagan, "The Battle for Diyala," Iraq Report IV, *The Weekly Standard*, 2007a.

[34]  Richard A. Oppel Jr., "Iraq Reports Capture of Senior Al Qaeda Figure," *New York Times*, September 3, 2006.

[35]  John Ward Anderson and Salih Dehima, "Offensive Targets Al-Qaeda In Iraq," *Washington Post*, July 20, 2007. For more on the 1920s Revolution Brigades, see Martha Crenshaw, "1920s Revolution Brigades," Mapping Militant Organizations, Stanford University Center of International Security and Cooperation, 2010.

[36]  "Al-Qaeda in Iraq," *Jane's World Insurgency and Terrorism*, October 2013, p. 7.

began to turn the tide against ISI.[37] As various grassroots anti-ISI groups began to form across the country, following in the footsteps of the Anbar Awakening, coalition leaders pushed the Iraqi government to create an official reconciliation program and to integrate these elements into ISF, resulting in the formation of the Sons of Iraq (SOI) program.[38] By the end of 2007, there were more than 91,000 Iraqis, mostly Sunnis, who had officially joined the program.[39] The combination of this anti-ISI Awakening movement and the coalition surge operations severely degraded ISI, denying it sanctuary in most of Iraq (Figure 2.3). ISI suffered dramatic losses across the country from late 2006 through early 2008.

Under growing pressure from coalition forces, ISF, and SOI elements across most of Iraq, ISI was forced to retreat further north, to Ninewa governorate, which had always played a key role in the Sunni insurgency as a transit point for foreign fighters and as a major source of ISI financing.[40] Located astride the Arab-Kurd sectarian fault line and home to many former regime leaders, Ninewa's complex ethno-sectarian dynamics allowed ISI to maintain significant Sunni popular support and develop de facto control over much of the governorate, including Iraq's second-largest city, Mosul, by late 2007.[41] During the final months of 2007, violent attacks were higher in Ninewa than in any other governorate. Al-Masri, the ISI leader, was reportedly based in or around Mosul, along with most of the group's other top leaders, including Abu Qaswarah, also known as Mohamed Moumou, ISI's

---

[37] Bill Roggio, "Iraq Report: The Salahadin Awakening Forms," *The Long War Journal*, May 21, 2007b.

[38] Kuehl, 2010.

[39] David Petraeus, *Report to Congress on the Situation in Iraq: Testimony Before the Senate Armed Services Committee*, Washington, D.C., April 8–9, 2008b.

[40] Michael R. Gordon, "Pushed Out of Baghdad Area, Insurgents Seek Hub in North," *New York Times*, December 5, 2007.

[41] Michael Knights, "Al-Qa'ida in Iraq: Lessons from the Mosul Security Operation," *CTC Sentinel*, Vol. 1, No. 7, June 2008a.

PX717

**Figure 2.3**
**The Coalition's Assessments of ISI Strength**



December 2006

March 2008

SOURCE: Petraeus, 2008a.

RAND *RR1192-2.3*

PX717

third in command in 2008 and the day-to-day operational leader for the entire ISI.[42]

With very limited coalition presence in the governorate and an ineffective ISF, the situation continued to deteriorate in Mosul during early 2008. By March, between one-half and two-thirds of all attacks in Iraq occurred in Ninewa, primarily centered in Mosul.[43] Recognizing this dynamic, coalition forces sent additional forces to Ninewa in early 2008 and began to reverse ISI's gains, capturing or killing a multitude of ISI senior leaders throughout mid and late 2008 and significantly degrading the group's operational capacity.[44] Several of the key documents analyzed in this report were captured by coalition forces during these operations against ISI in Mosul. For example, coalition forces captured Yasin Sabah Salih Jubayyir, ISI's security emir for northern Iraq, in December 2007, and they recovered documents containing a full roster of all ISI members in the region.[45] As coalition forces exploited these documents, they were able to both better understand ISI's organization and conduct follow-on operations against other top leaders. By early 2009, primarily because of increasingly effective joint counterterrorism operations, ISI was severely weakened in Ninewa, although the group maintained limited finance, media, and military capabilities throughout the governorate.

By the end of 2010, ISI survived principally in northern Iraq but retained a capability to conduct spectacular attacks across much of the country.[46] The group carried out several vehicle-borne explosive strikes against targets across the country in the second half of 2009 and in the first half of 2010. Despite the deaths of ISI's two top leaders, al-Masri and al-Baghdadi, in a joint U.S. and Iraqi raid in April 2010 in the

---

[42] Gordon, 2007. For more background on Abu Qaswarah, see Ernesto Londono, "No. 2 Leader of Al-Qaeda in Iraq Killed," *Washington Post*, October 16, 2008.

[43] Greg Smith, operational briefing, Multi-National Force–Iraq, March 2, 2008.

[44] Eric Hamilton, "The Fight for Mosul," Iraq Report VIII, *The Weekly Standard*, 2008c.

[45] MNF-I, "Coalition Forces Target Foreign Terrorist Facilitators, 11 Detained," press release A071213a, December 13, 2007c.

[46] Bahney, Shatz, et al., 2010.

PX717

Tikrit area, the group was able to continue operations, name new leaders, and launch a new campaign against ISF.[47]

## The Operational Environment

Having traced the key events of the Iraq war related to ISI, we now turn to an examination of the unique conditions driving the insurgency in the four governorates for which we have substantive data. While there were many important similarities across the operational environments in Anbar, Diyala, Salah al-Din, and Ninewa, there were also notable differences. Our analysis of both quantitative data on attacks, as captured by the MNF-I SIGACTS III Database,[48] and qualitative data captured with ISI leaders confirms that there was a large degree of heterogeneity in ISI's operational environment across both time and space.[49] It is vital to understand these variations to effectively analyze the broader trends of ISI's evolution, explain why ISI operated differently in each governorate, and place each of the captured documents we analyze in this study in context.

Table 2.1 provides an overview of the key differences between the operating environments in the four governorates across four factors: (1) geographic and demographic conditions, (2) the legitimacy and capacity of the Iraqi government and ISF, (3) ISI's capability and

---

[47] Michael Roddy, "Qaeda Confirms Deaths of Leaders in Iraq: Statement," Reuters, April 25, 2010; Aseel Kami and Michael Christie, "Al Qaeda's Iraq Network Replaces Slain Leaders," Reuters, May 16, 2010; Liz Sly, "Top Two Al-Qaeda in Iraq Leaders Are Dead, Officials Say," *Los Angeles Times*, April 20, 2010.

[48] Empirical Studies of Conflict Project, n.d.

[49] Unclassified SIGACTS data, drawn from the MNF-I SIGACTS III Database, were provided to the Empirical Studies of Conflict (ESOC) Project in 2008 and 2009. These data provide the location, date, time, and type of attack incidents but do not include any information pertaining to the coalition units involved, coalition casualties, or battle damage incurred. We filtered the data to remove the attacks we identified as being directed at civilians or other insurgent groups, leaving us with a sample of 168,730 attack incidents.

PX717

**Table 2.1**
**Characteristics of Local ISI Operating Environments, 2005 to 2010**

| Location | Geographic and Demographic Conditions | Legitimacy and Capacity of Iraqi Government and ISF | ISI Capability and Popular Support | Economic Situation and ISI Financing |
|---|---|---|---|---|
| Anbar | • Predominately Sunni Arab (approximately 90 percent)<br>• Robust tribal structure, history of "resistance"<br>• Euphrates River Valley serves as foreign-fighter hub | • Weak provincial government<br>• National government illegitimate<br>• Shia Iraqi Army not legitimate; Iraqi Police intimidated | • Original ISI base<br>• ISI consolidates control, despite tribal opposition (2004–2005)<br>• SOI severely degrades ISI (2006–2007) | • Historical smuggling economy<br>• AQI finance operations severely weakened post-SOI |
| Diyala | • Mixed population (60 percent Sunni, 20 percent Shia, 20 percent Kurd)<br>• Ethnosectarian tensions<br>• Complex terrain facilitates safe haven | • Minority Shia control; ineffective provincial government<br>• Sectarian ISF exacerbate tension | • Diverse mix of militant actors<br>• ISI consolidates control (2006–2007)<br>• Rise of SOI undercuts ISI | • Major agricultural center<br>• ISI has limited financing capacity in region |
| Salah al-Din | • Mostly Sunni (approximately 70 percent), some Shia (approximately 15 percent)<br>• Legitimate tribal system<br>• Transit hub for both coalition forces and ISI | • Limited provincial governance capacity<br>• Most ISF underresourced and intimidated | • Significant popular support for Sunni resistance<br>• ISI maintains strong influence until SOI forms (late 2007) | • Primarily agricultural economy<br>• ISI fails to collect significant revenue from Salah al-Din, operates at a loss |
| Ninewa | • Arab-Kurd fault line (60 percent Sunni Arab, 30 percent Kurd)<br>• Heavy population of former regime leaders<br>• Strategic hub for smuggling fighters, weapons, money | • Minority Kurds control provincial government<br>• Kurdish and Shia ISF seen as illegitimate<br>• Sunni Arab Iraqi Police heavily intimidated | • ISI maintains significant support throughout<br>• ISI enjoys de facto control (2007–2008)<br>• Coalition forces heavily target ISI (late 2008) | • Major national trade hub<br>• Primary financing center for ISI, especially by early 2007<br>• Extensive racketeering and protection scams |

SOURCE: ESOC ethnicity data set (Empirical Studies of Conflict Project, n.d.).

PX717

popular support, and (4) the economic situation and ISI's finance operations.[50]

In the remainder of this section, we expand on these differences to help explain corresponding variations across time and space in ISI's organizational structure, mobilization strategies, financing operations, and military capabilities from governorate to governorate.

## ISI and the Awakening in Anbar Governorate, 2005 to 2006

From the beginning of the Sunni insurgency in Iraq, Anbar governorate played a critical role. With a predominately Sunni population and a long history of opposition to central-government control from Baghdad, the region was ideal for ISI to establish a foothold and develop a safe haven from which to operate and expand the group. Given the strong position of leading tribal sheiks in the region and their control of critical trade routes through the desert, the Iraqi government consistently struggled to assert control in the governorate. According to David Kilcullen, the tribes in Anbar constituted a "competing power center for the formal institutions of the Iraqi state and form a parallel hierarchy that overlaps the structures and political allegiances of formal government at every level."[51] Even during the days of Saddam Hussein's rule, weaknesses in his internal position forced him to cede increasing amounts of power to tribal leaders to maintain their support, especially during the Iran-Iraq War (1980–1988) and after the 1991 Gulf War.[52]

After the coalition invasion in 2003, the central government's control and legitimacy in Anbar continued to decline. The majority of Anbar's Sunni residents felt increasingly disenfranchised, resulting in growing resentment and extremely low voter turnout (reportedly as low as 2 percent) for the country's first parliamentary and provincial

---

[50] These criteria were partially drawn from the Manwaring paradigm, which was developed to assess the likelihood of success of a particular counterinsurgency campaign. For more, see Max G. Manwaring and John T. Fishel, "Insurgency and Counter-Insurgency: Toward a New Analytical Approach," *Small Wars & Insurgencies*, Vol. 3, No. 3, 1992.

[51] David J. Kilcullen, "Field Notes on Iraq's Tribal Revolt Against Al-Qa'ida," *CTC Sentinel*, Vol. 1, No. 11, 2008.

[52] Long, 2008.

elections in January 2005, which the Sunnis formally boycotted.[53] At the provincial level, there was no effective formal governance structure and very limited provision of basic public services, with the majority of Anbar citizens seeing the growing Sunni insurgency as the most legitimate force on the ground. As jihadist forces, led by ISI, began to gain greater control throughout 2004 and into early 2005, more-moderate tribal leaders were pushed aside or assassinated, creating an escalating cycle of violence and instability.

In addition, the U.S. decision to disband the Iraqi Army after the 2003 invasion reinforced the significant power vacuum in Anbar. For the most part, the formal ISF in the governorate were ineffective and seen as illegitimate by the local population. Since the reconstituted Iraqi Army was viewed as a Shia-dominated force, it was unable to earn the trust of the Anbar people and thus was largely ineffective in conducting counterinsurgency operations.[54] The local Iraqi Police were poorly equipped and trained, and they struggled to fill their ranks, largely because of intimidation by ISI and other Sunni militant groups.[55]

Throughout 2004, al-Zarqawi and his group successfully established operational capability in Anbar and ratcheted up the level of violence, primarily focused on Fallujah. In October 2004, he formally pledged allegiance to al-Qaʻida and formed AQI, basing the group in Fallujah and taking de facto control of most of the city. In April, with Operation Vigilant Resolve, and again in November 2004, with Operational Phantom Fury, coalition forces conducted major clearance operations in Fallujah, which temporarily pushed ISI from the city, but also resulted in significant deaths of civilians and damage to property, alienating most of the local population.[56] Capitalizing on this local resentment and anger toward coalition forces in the wake of

---

[53] Liam Anderson and Gareth Stansfield, "The Implications for Federalism in Iraq: Toward a Five-Region Model," *Publius*, Vol. 35, No. 3, 2005.

[54] Alfred B. Connable, interview, in Timothy S. McWilliams and Kurtis P. Wheeler, eds., *Al Anbar Awakening: Volume I, American Perspectives—U.S. Marines and Counterinsurgency in Iraq, 2004–2009*, Quantico, Va.: Marine Corps University Press, 2009.

[55] Long, 2008.

[56] West, 2005.

PX717

these heavy-handed operations, ISI continued to consolidate control and influence across Anbar governorate throughout 2005, focusing on high-profile and coordinated suicide attacks, targeting ISF, coalition forces, and any local leaders who refused to support ISI's control of the governorate.

Despite their growing operational success and effective consolidation of much of the Sunni insurgency, al-Zarqawi and ISI were the targets of criticism within Anbar from fairly early on, primarily centered on the fact that they were a foreign element unrepresentative of Sunni or Iraqi national aspirations.[57] According to Fishman, "Zarqawi's strategy was fundamentally designed to assert control over Sunni groups and replace tribal loyalty and Iraqi nationalism with an ideological commitment to Salafi-jihadist goals."[58] Thus, it was clear almost from the start that there would be significant tension between local Sunni leaders and ISI that would have to be carefully managed if ISI was to be successful. However, al-Zarqawi and his cadre of key lieutenants either failed to realize this or chose to ignore it.

From 2004 through early 2006, there were four significant attempts by Sunni tribes in Anbar to "realign" with coalition forces against the increasingly repressive ISI.[59] Although each of these attempts failed, primarily because of ISI's extremely aggressive response each time, they clearly signaled a growing divide between ISI and the local population. ISI's strategy and actions also caused tension and disagreement with several of the other prominent Sunni jihadist groups across the country. As early as 2003, reports began to emerge of infighting between the groups. Beginning that year, fighters from the 1920 Revolution Brigades, one of Iraq's more prominent Sunni insurgent groups, had complained to al-Zarqawi directly about murderous attacks on Iraqi civilians. Another telling example was an incident in Taji, located in Salah al-Din governorate, in 2005: AQI fighters gunned down two members

---

[57]  Bahney, Shatz, et al., 2010.

[58]  Fishman, 2009.

[59]  Biddle, Friedman, and Shapiro, 2012.

PX717

of Jaysh al-Islami, also known as the Islamic Army in Iraq, another important Sunni insurgent group, after an ideological dispute.[60]

In a 2005 letter, al-Qaʿida's then–deputy leader Ayman al-Zawahiri underscored to al-Zarqawi the need to accommodate the local population to retain the critical public support necessary to establish a territorial foothold for an emirate.[61] In an effort to demonstrate a semblance of unity, in January 2006, AQI declared the formation of the MSC, nominally an umbrella of Iraqi Sunni jihadist groups, with AQI as a member.[62] However, the MSC was part of a transitional phase intended to foster an Islamic state in Iraq—a goal al-Zarqawi shared with al-Qaʿida's senior leadership. At least three core al-Qaʿida senior leaders—Sayf al-ʿAdl, al-Zawahiri, and ʿAtiyyat Allah al-Libi—wrote al-Zarqawi between 2004 and his death in June 2006, encouraging him to establish an Islamic state in Iraq.[63] Al-Zarqawi himself referred to the MSC as "the starting point for an Islamic state," and, in April 2006, less than two months before he was killed by a U.S. airstrike, al-Zarqawi revealed his intention to declare an Islamic state "within the next three months."[64] Core al-Qaʿida's leadership in Pakistan continued to support the Islamic state project after al-Zarqawi's death. In al-Zawahiri's eulogy of al-Zarqawi, he reiterated his support for an Islamic state in Iraq. Al-Zawahiri wrote, "Know that the community of Islam has put its hopes on you, and that it is necessary for you to establish the Islamic State in Iraq, then to make your way toward captive Jerusalem and restore the caliphate."[65]

---

[60] Sabrina Tavernise and Dexter Filkins, "Local Insurgents Tell of Clashes with Al Qaeda's Forces in Iraq," *New York Times*, January 12, 2006. For more on Jaysh al-Islami, see Daniel Cassman, "Islamic Army in Iraq," Mapping Militant Organizations, Stanford University Center of International Security and Cooperation, 2010.

[61] Office of the Director of National Intelligence, "Letter from al-Zawahiri to al-Zarqawi," news release No. 2-05, October 11, 2005.

[62] Brian Fishman, "After Zarqawi: The Dilemmas and Future of Al Qaeda in Iraq," *The Washington Quarterly*, Vol. 29, No. 4, 2006, p. 26.

[63] Bunzel, 2015, pp. 15–16.

[64] Bunzel, 2015, p. 16.

[65] Bunzel, 2015, p. 16.

PX717

Foreshadowing its envisioned role in the Islamic state, after establishing the MSC but before declaring ISI, AQI continued to assert itself as the dominant jihadist organization both in the MSC and in all of Iraq. Having blunted the tribes' initial resistance efforts, AQI enjoyed significant control throughout early 2006 and was considered by coalition forces the "dominant organization of influence in Anbar province, surpassing the nationalist insurgents, the Government of Iraq, and [coalition forces] in its ability to control the day-to-day life of the average Sunni."[66]

This dynamic began to change beginning in late summer of 2006. In September 2006, a coalition of 17 tribal sheiks, led by Sheik Sattar Abu Risha, announced the formation of the Anbar Awakening.[67] Sattar was a relatively minor sheikh who engaged in smuggling and highway robbery. He first tried to organize the tribes against AQI in 2005 because the group had moved in on his business interests.[68] As the 2006 Awakening movement began to gain traction throughout Anbar, starting primarily in Ramadi, there were significant synergistic effects with the coalition change of strategy.[69] Coalition forces adopted a more population-centric counterinsurgency doctrine, with a greater focus on protecting the population from ISI. With the renewed focus on protecting the Iraqi population and the surge of additional combat forces into Anbar in early 2007, coalition forces finally had sufficient capacity and resources to protect the tribes willing to fight against ISI. As more and more local Anbar citizens joined ISF, they were aligned with coalition units that were able to protect them and eventually operated jointly to effectively target AQI across the governorate. Once again, AQI launched a violent counterattack against the Awakening during late 2006 and into 2007, but this time it was much less effective. ISI focused attacks on the tribes and ISF, but they successfully held together in the face of this pressure.

---

[66] Connable, 2009.

[67] Bahney, Shatz, et al., 2010.

[68] Long, 2008.

[69] Biddle, Friedman, and Shapiro, 2012.

On October 12, 2006, just one month after the start of the Awakening movement, AQI declared the formation of the Islamic State of Iraq. Based in the provincial capital of Ramadi, ISI outlined a strategy to address broad sectarian political grievances among Sunnis in Iraq—including Sunni tribes and other Sunni militant groups in Anbar governorate—under the banner of its Salafi-jihadist ideology.[70] Numerous influential voices of the global jihadist movement celebrated ISI's declaration, while others lamented it. But within Iraq, the timing of the ISI declaration was poor: AQI's strict sharia law and brutal violent enforcement of it had already alienated Anbar's Sunni population. Among most Sunni, the declaration of the Islamic state tended to exacerbate rather than repair existing tensions. As the Awakening movement continued to gain momentum throughout 2007, ISI's popular support and legitimacy continued to decline. Awakening forces, partnered with coalition forces, engaged in a fierce campaign that targeted key nodes up and down the ISI hierarchy and denied it safe haven through most of the governorate, including in key cities closest to Baghdad, Ramadi, and Fallujah. Overall violence in the governorate decreased dramatically (Figure 2.4).

**ISI Sanctuary in Diyala and Salah al-Din Governorates, 2006 to 2007**

Throughout 2006, Sunni tribal groups and coalition forces increasingly challenged ISI across Anbar, resulting in a much less permissive environment for the group. At the same time, and partly in response to this growing pressure, ISI began to relocate many of its personnel to the east, with a particular focus on the Diyala and Salah al-Din governorates. This shift accelerated in early 2007 because of the Awakening and the coalition surge. Given Diyala's contentious ethnosectarian dynamics and largely ineffective local government, the region offered an excellent opportunity for ISI to reestablish safe haven. Although Diyala directly borders Baghdad, the Iraqi government had struggled to maintain effective control of the governorate since 2004.[71] After the Sunni Arab boycott of the January 2005 national and provincial elec-

---

[70] Fishman, 2007.

[71] Kagan, 2007a.

**Figure 2.4**
**Trends in Combat Violence in Anbar, 2005 to 2008**



SOURCE: MNF-I SIGACTS III Database (Empirical Studies of Conflict Project, n.d.).
NOTE: The vertical line marks the start of the surge.
RAND RR1192-2.4

tions, the minority Shia attained a disproportionate role in provincial politics—earning control of the provincial council, appointing a Shia governor, and creating a Shia-led and primarily Shia-manned police force.[72] These sectarian tensions were only exacerbated in the wake of ISI's February 2006 bombing of the al-Askari Shrine in Samarra (in Salah al-Din governorate), resulting in increased Sunni-Shia fighting across the governorate and intense sectarian cleansing by both Shia police forces and Sunni militant groups throughout 2006–2007.

With the provincial council paralyzed by sectarian battles for political control and the Shia-dominated ISF seen as largely illegitimate, the local government in Diyala enjoyed very little popular support. Beginning in September 2006, the local government was no longer able to distribute food to Diyala's population; by October, it

---

[72] Michael Knights, "Pursuing Al-Qa'ida into Diyala Province," *CTC Sentinel*, Vol. 1, No. 9, August 2008b, pp. 4–7.

PX717

could no longer distribute fuel.[73] Also in October, the Diyala provincial government ceased meeting and effectively ceded control of the governorate to militant groups fighting for influence. By the end of the year, the provincial government had spent only 2 percent of its 2006 capital investment budget.[74] ISI capitalized on this political and security vacuum to establish greater control in the governorate. In many areas in late 2006, ISI successfully evicted the Shia police forces, which were understaffed and not locally recruited.[75] By the end of 2006, ISI—not the government of Iraq—controlled Baqubah, the provincial capital, and much of the rest of the governorate.[76] Violent incidents were steadily mounting (Figure 2.5).

A similar dynamic was playing out in neighboring Salah al-Din governorate, as ISI increasingly shifted fighters, funding, and resources to the predominately Sunni governorate. Located directly north of Baghdad and straddling the Tigris River, Salah al-Din had a long history as a center of Sunni resistance after the coalition invasion in 2003. Site of Saddam's birth city of Tikrit, the important Baiji oil refinery, and the al-Askari Shrine, the governorate was a logical place for ISI to reassert itself. Given its central location between Anbar (to the west), Baghdad (to the south), and Diyala (to the east), Salah al-Din was an ideal transit hub for ISI leaders and fighters, and it offered significant opportunity for safe haven in the large, ungoverned desert areas northeast of the Tigris River and southwest of Highway 1. The majority-Sunni population had little tolerance for the Shia-controlled central government, and there was significant popular support for the insurgency, which ISI was able to effectively capitalize on as it shifted focus to the governorate. With an ineffective and largely illegitimate provincial government and weak ISF, of which many members were Shia or Kurds deployed from other parts of Iraq, ISI was able to make rapid gains across the governorate.

---

[73] Kimberly Kagan, "Securing Diyala," Iraq Report VII, *The Weekly Standard*, 2007b.

[74] Kagan, 2007b.

[75] Knights, 2008b.

[76] Kagan, 2007b; and Kagan, "Expanding Security in Diyala," Iraq Report X, *The Weekly Standard*, 2008.

**Figure 2.5**
**Trends in Combat Violence in Diyala, 2005 to 2008**



SOURCE: MNF-I SIGACTS III Database (Empirical Studies of Conflict Project, n.d.).
NOTE: The vertical line marks the start of the surge.
RAND *RR1192-2.5*

As ISI leadership shifted focus to Salah al-Din, there was an increase in overall attacks throughout 2006 and a series of complex, spectacular attacks conducted by foreign fighters who were being sent into the governorate (Figure 2.6).[77] For example, the February 2006 bombing of the al-Askari Shrine was conducted by an ISI cell that was led by an Iraqi ISI commander and included several foreign fighters, including a Tunisian who was later captured by coalition forces.[78] This attack was followed by a series of bold assaults on ISF checkpoints and government buildings, primarily conducted by cells of ISI foreign fighters. By mid-2006, Salah al-Din was the second most violent gov-

---

[77] Jacob N. Shapiro, Eli Berman, Luke N. Condra, and Joseph H. Felter, "Empirical Study of Conflict Project's Iraq War Dataset (ESOC-I)," Version 3, Empirical Studies of Conflict Project, Princeton, N.J.: Princeton University, 2014.

[78] Pierre Bairin and Mohammed Tawfeeq, "Military: Mastermind of Samarra Mosque Bombing Killed," CNN.com, August 6, 2007.

**Figure 2.6**
**Trends in Combat Violence in Salah al-Din, 2005 to 2008**



SOURCE: MNF-I SIGACTS III Database (Empirical Studies of Conflict Project, n.d.).
NOTE: The vertical line marks the start of the surge.
RAND *RR1192-2.6*

ernorate in Iraq (behind Anbar), and ISI continued to enjoy significant popular support.[79]

By the end of 2006, ISI controlled or exerted influence over much of Salah al-Din. Mirroring the effective strategy employed in Diyala, ISI also attempted to stoke sectarian violence in Salah al-Din, conducting a series of kidnappings and murders of Shia workers from the majority-Shia town of Balad in October 2006. After the bodies were discovered, there were several days of riots and sectarian violence.[80] Throughout early 2007, violent attacks continued to mount across the governorate, mirroring the spike occurring in Diyala, as ISI increasingly asserted itself against rival Sunni militant groups, ISF, and coalition forces. Although the temporal patterns of violence in Diyala and

---

[79] Shapiro et al., 2014.

[80] MNF-I, "IA, CF Units Clear Jabouri Peninsula of Terrorists," press release 20070217-12, Multi-National Division–North Public Affairs Office, February 17, 2007a.

PX717

Salah al-Din were similar, Salah al-Din experienced higher levels of violence. From February 2004 through February 2009, coalition forces recorded more than 21,000 total SIGACTS and 10,000 IED attacks in Salah al-Din, while they reported 14,800 total SIGACTS and more than 7,000 IED attacks in Diyala.[81]

Beginning in early 2007, however, coalition forces attempted to build on the successes of the Anbar Awakening movement and engage more directly with Sunni tribal leaders and more-moderate Sunni militant groups throughout Diyala and Salah al-Din. In parallel, coalition forces launched a series of large-scale security and clearance operations in both areas during the summer of 2007 to regain control. In Diyala, this strategy showed rapid results; the influx of approximately 10,000 coalition forces troops, as part of Operation Arrowhead Ripper, combined with deliberate tribal engagement and reconciliation efforts, began to pay off in the summer of 2007, resulting in reduced violence and the formation of the Baqubah Guardians in July.[82] These initial events paved the way for a broader reconciliation effort in Diyala, culminating in a meeting in August 2007, where 18 leading sheiks swore and signed a reconciliation agreement.[83] Several weeks later, more than 100 tribal leaders from the Diyala River Valley met and swore to "cooperate and support each other in fighting terrorism in [their] tribes."[84] Between December 2007 and May 2008, SOI membership in Diyala grew to almost 10,000.[85]

Similar efforts were under way in Salah al-Din, where coalition forces increased the number of forces operating in the governorate to pressure ISI and better support the nascent SOI groups. By mid-2007, there were reports of Sunni tribes joining forces with local Iraqi Police

[81] SIGACTS data are from Shapiro et al., 2014.

[82] Kagan, 2008; and Kagan, 2007b.

[83] MNF-I, "Tribal Leaders Continue Reconciliation Efforts Across Diyala," press release, Multi-National Division–North Public Affairs Office, August 4, 2007b.

[84] Kagan, 2007b.

[85] Kirky Rider, "Fierce Thrasher Helps Displaced Families Return Home," *The Desert Raider*, Vol. 1, No. 10, 2008.

elements to fight against ISI in Duluiyah, a former ISI stronghold.[86] In May, several tribal leaders met in Taji, a key city at the southern end of Salah al-Din governorate, and announced the establishment of an alliance among several tribes to combat ISI in their area. Throughout the rest of the year, several more groups were formed across the governorate, including in Balad, Samarra, Tarmiyah, and Baiji, resulting in reduced operational capacity for ISI and a dramatic decrease in violent attacks. Just as the Awakening had dramatic effects in Anbar, the SOI programs in Diyala and Salah al-Din helped to drive ISI from sanctuaries, free coalition forces and ISF combat power to pursue enemy fighters, and offer short-term employment to jump-start local economies.[87]

### ISI Strategic Retreat to Ninewa Governorate, 2007 to 2010

With ISI under significant pressure in Anbar, Diyala, and Salah al-Din, the group began to shift its center of gravity to northern Iraq. Beginning in 2007, most of ISI's senior leaders and much of its operational capacity shifted to Ninewa governorate, which had always been a stronghold of the Sunni insurgency and served as a strategic hub for the group's finance and foreign-fighter facilitation activities.[88] Mosul rapidly became the de facto headquarters of the remnants of ISI throughout 2007. The governorate's complex ethnosectarian dynamics enabled ISI to retain support there even in the face of the spreading SOI movement in most other parts of Iraq.[89] In addition, Mosul's close proximity to one of the primary routes for smuggling fighters and equipment into Iraq from Syria enabled ISI to maintain consistent access to critical military resources.[90] With a limited coalition presence in the governorate and a provincial government viewed as illegitimate by the majority

---

[86] Roggio, 2007b.

[87]  Multi-National Division–North Public Affairs, "Operation Raider Reaper Concludes with Tribal Reconciliation," December 31, 2007.

[88]  Brian Fishman, "Redefining the Islamic State: The Fall and Rise of Al-Qaeda in Iraq," New America Foundation, August 2011.

[89]  Knights, 2008a.

[90]  Fishman, 2011.

PX717

Sunni population, Ninewa was the best option for ISI to attempt to reassert itself.

Because of Ninewa's ethnosectarian mix, there had been a long-standing political struggle in the governorate. The divide between Arabs and Kurds in Ninewa had been a problem since the fall of Saddam's regime, when Kurdish Peshmerga forces attempted to enter Mosul after Iraqi Army forces were defeated by coalition forces.[91] Although coalition leaders were able to negotiate a delicate truce, ethnic tensions remained high from that point forward. Despite the fact that the Kurds represent a minority in Mosul and in the governorate, they were able to secure control of the provincial government because of the Sunni Arab boycott of the 2005 parliamentary and provincial elections. Once in control of the governorship and the provincial council, the Kurds continued to alienate the majority-Sunni Arab population, failing to deliver basic services or security to the governorate's Arab areas.[92] With both the national and provincial governments viewed as illegitimate by the Sunni population, ISI stepped into this void and began to assert itself across the governorate.

The disposition of ISF in Ninewa further reinforced the friction between Arabs and Kurds. On the eastern edge of the governorate, the Kurdistan Regional Government maintained a highly trained military element, the Peshmerga, which it had used in the past to surge into cities as it determined necessary.[93] This occurred in Mosul in November 2004, after several hundred insurgents stormed police stations across the city, forcing almost all of Mosul's 5,000 police officers to flee and cede control of the city to the militants.[94] In the wake of the attack, Kurdistan security forces pushed into the eastern half of Mosul, and

---

[91] Sam Dagher, "Fractures in Iraq City as Kurds and Baghdad Vie," *New York Times*, October 28, 2008b.

[92] Sam Dagher, "Tensions Stoked Between Iraqi Kurds and Sunnis," *New York Times*, May 18, 2009.

[93] Dagher, 2008b.

[94] Edward Wong, "Insurgents Attack Fiercely in North, Storming Police Stations in Mosul," *New York Times*, November 12, 2004.

never left.[95] Although the units were formally integrated into the official ISF command structure, they were still viewed by the city's Sunni residents as Peshmerga. In the city's western half, most of the ISF units were Shia-led and also viewed as illegitimate. Despite many attempts to bolster the capacity of the Iraqi Police in the city, through better training and recruiting drives, the force had proven completely ineffective against ISI and other Sunni groups.[96]

As coalition operations cleared ISI-controlled areas in Anbar, Baghdad, Diyala, and Salah al-Din from late 2005 through 2007, the group was pushed further north along the Tigris River Valley, toward Mosul. By November 2007, it was clear that ISI had migrated further north, where attacks were higher than anywhere else in the country (Figure 2.7).[97] During this time, al-Masri, the ISI leader, is known to have transited Mosul twice.[98] ISI's operational leader, Abu Qaswarah, was based in Mosul. He directed nationwide operations for the group from a safe house in the city's northwest quadrant, until he was killed by coalition forces in October 2008.[99]

By fall 2007, ISI had dramatically increased its violent attacks in Ninewa governorate. There, in contrast to other parts of the country, reported militant incidents increased to 662 in November 2007 and peaked at 762 in December, remaining above 700 in January and March 2008 (710 and 708, respectively). They began to drop off in spring 2008.[100] One particularly horrific ISI attack in late January 2008 killed or wounded more than 300 Iraqis and flattened an entire

---

[95] Thanassis Cambanis, "In Mosul, Kurdish Militia Helps Keep Order," *Boston Globe*, November 18, 2004.

[96] Anthony Cordesman, *Iraqi Security Forces: A Strategy for Success*, Westport, Conn.: Praeger Security International, 2006.

[97] Mark Hertling, Department of Defense news briefing, video teleconference from Iraq, November 19, 2007.

[98] Gordon, 2007.

[99] Bill Roggio, "Al Qaeda in Iraq's Second in Command Was Swedish Citizen," *The Long War Journal*, October 16, 2008.

[100] Shapiro et al., 2014.

PX717

**Figure 2.7**
**Trends in Combat Violence in Ninewa, 2005 to 2008**



SOURCE: MNF-I SIGACTS III Database (Empirical Studies of Conflict Project, n.d.).
NOTE: The vertical line marks the start of the surge.
RAND *RR1192-2.7*

neighborhood.[101] The following day, the Ninewa provincial police chief was killed, by a suicide bomber, while inspecting the carnage.[102] ISI still enjoyed popular support among much of Mosul's Sunni population, and the group's supply line of fighters and weapons from Syria remained intact.

Starting in early 2008, however, coalition forces began to adjust and sent reinforcements to Ninewa to put more pressure on ISI. The coalition's attempts to stand up an SOI presence in the governorate were never very successful, in large part because of long-standing tensions between the Kurds and key Sunni Arab tribal leaders. In contrast, coalition forces were able to slowly bolster ISF capacity through joint

---

[101] Sam Dagher, "Al Qaeda Goes North: Police Chief Killed in Mosul," *Christian Science Monitor*, January 25, 2008a.

[102] Dagher, 2008a.

operations and ratchet up the pressure on ISI leadership through a deliberate counterterrorism targeting campaign across the governorate.[103]

According to coalition press briefings, 161 ISI leaders were killed or detained between January 2005 and May 2006 (primarily in Anbar, which was the group's headquarters at the time).[104] As part of the surge, coalition forces dramatically increased the pace of these counterterrorism operations throughout 2007 and 2008—especially in Diyala, Salah al-Din, and Ninewa—which put significant pressure on the entire ISI network and degraded its operational capability.[105] During the period from April 2007 through May 2008, coalition forces conducted 396 targeted operations against ISI leaders.[106] During this period, the frequency of counterterrorism operations, all focused against top ISI leadership targets, increased at a steady pace, from 13 events in May 2007 to a peak of 53 events in March 2008 (Figure 2.8).

Informed by a more comprehensive and nuanced understanding of ISI, coalition targeting operations became increasingly effective and precise.[107] As Table 2.2 shows, operations were focused on ISI leaders, military and security personnel, and support personnel and were conducted primarily outside the capital city of Baghdad.

---

[103]Eric Hamilton, "The Fight for Mosul: March 2003–March 2008," Institute for the Study of War, April 2008a.

[104]Rick Lynch, weekly press briefing, Multi-National Force–Iraq, May 4, 2006.

[105]Patrick Ryan, *The Efficacy of Leadership Targeting Against Al Qaeda in Iraq*, master's research project, Washington, D.C.: Georgetown University, May 2013.

[106]Every month during that period, MNF-I leadership released a detailed "operational update" brief that captured key statistics related to coalition leadership's targeting efforts against ISI. For each month, the brief outlined the total number of targeting events against the group, along with several valuable details related to each event, including target name, target hierarchy level, target functional role, targeting event location, targeting method, and target nationality. For more, see Ryan, 2013.

[107]Christopher Lamb and Evan Munsing, *Secret Weapon: High-Value Target Teams as an Organizational Innovation*, Washington, D.C.: Institute for National Strategic Studies, National Defense University, Strategic Perspectives 4, 2011.

PX717

**Figure 2.8**
**Coalition Forces Reported High-Value Targeting Operations Against ISI,**
**2007 to 2008**



SOURCE: Ryan Leadership Targeting Database 2013 (Ryan, 2013), based on monthly
MNF-I press briefings.
**RAND** *RR1192-2.8*

By late 2008, largely attributable to these coalition counterter-
rorism operations, ISI's operational capacity in Ninewa governorate, as
well as the rest of Iraq, was severely disrupted, and violent attack levels
were much lower. In addition, the election of a Sunni Arab governor
and a Sunni-controlled provincial council in January 2009 helped to
reduce some of the popular support for ISI among Ninewa's Sunni
population, who saw a glimmer of hope for a more representative gov-
ernment for the first time since the coalition invasion.[108] Despite this

---

[108]Campbell Robertson and Stephen Farrell, "Iraqi Sunnis Turn to Politics and Renew
Strength," *New York Times*, April 17, 2009.

PX717

**Table 2.2**
**Coalition High-Value Targeting Operations Against ISI, 2007 to 2008**

| Month | All Positions | Outside Baghdad | All Locations | | |
|---|---|---|---|---|---|
| | | | Emirs | Military and Security | Support |
| May 2007 | 13 | 13 | 4 | 3 | 6 |
| June 2007 | 13 | 10 | 3 | 7 | 3 |
| July 2007 | 18 | 9 | 2 | 5 | 11 |
| August 2007 | 25 | 22 | 4 | 4 | 1 |
| September 2007 | 29 | 22 | 7 | 8 | 13 |
| October 2007 | 43 | 30 | 3 | 5 | 28 |
| November 2007 | 40 | 36 | 6 | 6 | 23 |
| December 2007 | 51 | 48 | 8 | 12 | 23 |
| January 2008 | 35 | 30 | 8 | 10 | 12 |
| February 2008 | 26 | 24 | 8 | 8 | 9 |
| March 2008 | 53 | 49 | 4 | 5 | 0 |
| April 2008 | 50 | 47 | 1 | 2 | 3 |

SOURCES: Ryan Leadership Targeting Database 2013 (Ryan, 2013), based on monthly MNF-I press briefings.

NOTES: The category "emir" refers to people classified as emirs. The category "military and security" refers to people assigned to military, intelligence, or security roles. The category "support" refers to people in administrative, media, facilitator, and sharia roles.

progress, ISI retained operational capacity in Ninewa throughout 2009 and continued to conduct media and financing operations within the governorate. In a prescient statement, the U.S. spokesperson in Iraq, MG David Perkins, explained ISI's maneuver in early 2009: "For [ISI] to win, they have to take Baghdad. To survive, they have to hold on to

PX717

Mosul."[109] By 2010, ISI had been pushed out of Baghdad and much of the rest of Iraq, but it had held enough of Mosul to survive.[110]

## Conclusion

This chapter highlights the fact that ISI fought different wars in different parts of Iraq. Each area presented unique dynamics. No single region represents the entirety of the war at any point in time.

The analysis in this chapter has two implications for interpreting our data:

1. Most of our documents come from a period when ISI was under tremendous pressure. It had lost its local allies in most places and was facing a seasoned U.S. and coalition military assisted by increasingly capable Iraqi forces.
2. ISI's ongoing use of documents in such settings reflects the high value it put on record keeping and using bureaucratic tools to achieve control over the organization.

In some ways, the situation in Syria and Iraq today is much easier operationally for the Islamic State than the period under study was for ISI. We would therefore expect even more record keeping and organizational formality, given the easier security situation.

The historical record in this chapter also highlights the elements that were needed to combat ISI. Coalition forces alone could not counter the group, nor could local tribal forces, nor could ISF alone. Instead, it took all three forces working together to bring the group near defeat. The population turned against the group and actively fought back. An improved ISF working in concert with local forces and coalition forces improved the counter-ISI effort. And a new coali-

---

[109] Tim Cocks, "U.S. Says Troops May Have to Stay in Iraq's Mosul," Reuters, May 1, 2009.

[110] Fishman, 2011; and Rod Nordland, "Exceptions to Iraq Deadline Are Proposed," *New York Times*, April 27, 2009.

PX717

tion strategy proved effective in bringing these elements together. By 2010, what remained was for the Iraqi government to continue building the professionalism of ISF, for it to work toward the further inclusion of Iraq's Sunnis in governance, for it to continue to pacify Mosul and build trust among the local population, and for coalition forces to continue to work closely with the Iraqi government, ISF, and the population to seal these gains. Unfortunately, none of this took place.

PX717

# The Organizational Economics of Insurgency and Terrorism

The imperatives of ISI's goals, including committing terrorist acts, combating coalition forces, engaging in an insurgency, killing Shia, and establishing a new Islamic state, required it to maintain detailed records, even though doing so elevated the risk it faced from its opponents. This chapter analyzes ISI's core organizational tasks and operational environment from the perspective of organizational economics. Fitting ISI's activities into this perspective can provide not only a greater understanding of its activities but also insights into when lessons learned from studying ISI can be applied and when they cannot.

ISI faced many of the same managerial challenges as less violent organizations, but it did so in a uniquely challenging operational environment. The nature of that environment created strong pressures for hierarchy and paperwork, revealing that ISI's administrative practices were often quite mundane.

Insurgent organizations such as ISI need to complete a range of tasks in a particularly challenging environment. First, and perhaps foremost, they need to manage the production of violence. This entails various subtasks. These include making sure that violence is used in ways that advance the group's political goals, because hitting the wrong targets in the wrong way can be damaging to the cause, and making the most of its resources, a task that requires both minimizing the misallocation of group funds and tracking where money is being spent so

PX717

that it can be reallocated when necessary.[1] Second, insurgent organizations need to bring in revenue to fund ongoing operations. Third, they need to pay their members.

Each of these tasks has an analogue in nonviolent organizations.[2] Business firms manage the production of key outputs to maximize an objective, usually profit. In standard firms, this task involves setting production quotas within each market, ensuring a certain level of quality, distributing the proceeds from sales to various production and research and development units, and auditing employees to prevent graft and corruption. For ISI, managing production meant setting up a structure to help ensure that the right kinds of violence were employed within each area at the right intensity, given local political conditions, as well as organizing finances in such a manner that leaders could reallocate resources and monitor unit commanders' spending.

But business firms are not a suitable analogue for the ways in which insurgent groups raise revenues. Whereas businesses can raise money by selling goods and services, insurgent groups' main product—political violence—is not readily marketable. What they can do is raise money in the same ways that charities, organized-crime groups, and even states do. Like charities, they can publicize the work they do and then solicit contributions from individuals and governments sympathetic to their goals. Like organized-crime groups, they can exploit their relative advantage in producing violence to run protection rackets, extort, and steal goods for resale.[3] Like states, they can tax business activity and the population and fine people for violations of whatever legal code they put

---

[1]  For evidence on the issue of hitting the right targets, see Luke N. Condra and Jacob N. Shapiro, "Who Takes the Blame? The Strategic Effects of Collateral Damage," *American Journal of Political Science*, Vol. 56, No. 1, 2012. For a broader discussion of the phenomenon, see Shapiro, 2013.

[2]  For the similarities between organized crime and state-building, see Charles Tilly, "War Making and State Making as Organized Crime," in Peter B. Evans, Dietrich Rueschemeyer, and Theda Skocpol, eds., *Bringing the State Back In*, Cambridge, UK: Cambridge University Press, 1985.

[3]  Ahmad Salama, "Kidnapping and Construction: Al-Qaeda Turns to Big Business, Mafia Style," *Niqash*, April 6, 2011; "Iraqis' 'Cruel Dilemma': Pay Qaeda Tax or Pay the Price," Agence France-Presse, September 14, 2011.

PX717

into effect. Insurgent groups can also run businesses that sell normal goods, like both charities and organized crime groups, although the extent to which AQI or ISI did so in Iraq is unclear.

On the expenditures side, all firms set their compensation and employment policies to balance multiple objectives. Firms need to attract the right talent, motivate their employees to work hard, maintain morale and a sense of equity within their workforces, and send signals about how workers should allocate their time. In labor markets in which there are large numbers of employers and potential workers, all of this has to happen in such a manner that workers' compensation matches the marginal product of their labor, at least in expectation.[4] ISI also had to achieve multiple objectives with its compensation policy, including

- attracting talented people to work in a high-risk environment
- screening for skills and unobservable human capital
- motivating employees to work hard and take risks
- maintaining morale.

Insurgent organizations such as ISI face a unique environment in many ways. Most important, their leaders and middle managers are continually targeted by government forces and other nongovernmental opponents. Unlike most organizations, ISI therefore had to deal with frequent death or capture of its middle- and upper-level ranks. ISI was also fairly heterogeneous, at least compared with other insurgent groups in Iraq, with many members flowing in from dozens of countries.[5] ISI could not rely, to the same extent, on preestablished social networks to ensure the trustworthiness of personnel and communicate a shared understanding of current conditions. Compared with nonviolent organizations, the group also faced an unusually heavy cost for

---

[4]   Such markets with large numbers of buyers and sellers are referred to in the social science literature as "thick." In labor markets, this means high levels of supply and demand from multiple employers.

[5]   See Chapter Five of this report, as well as Joseph Felter and Brian Fishman, *Al-Qa'ida's Foreign Fighters in Iraq: A First Look at the Sinjar Records*, West Point, N.Y.: Combating Terrorism Center, West Point, 2007.

maintaining records. Every document could potentially be captured by counterinsurgents and provide leads that would enable the targeting of workers, managers, and supply depots.

Critically, these environmental conditions pushed in opposite directions in terms of management practices. Frequent unplanned turnover and a diverse membership meant that it was hard for the leadership team to maintain a picture of what was going on in the organization without writing a great deal. The act of committing organizational matters to written files, however, was effectively a tax on future operating potential, because it increased the probability of security breaches in all future periods. The group resolved this trade-off in a particular way, and the documents we analyze are the result of that. The simple fact that the group's choice involved a fair amount of record keeping, albeit less than one would see in the typical business firm, is a critical piece of evidence about just how hard it is to manage an insurgency and establish parallel governance structures.

ISI leaders fully recognized the desirability of monitoring members. One of our documents, a letter from As'ad recommending Anas, also known as Abu 'Abdallah, for a position as a high-level ISI administrator, indicates that one of the key initiatives that Anas would propose upon becoming an administrator was a full ISI census, to be undertaken by ISI administrators.[6] Presumably, such a census would collect and store detailed, personally identifying information about ISI operatives at all levels of the organization, which could be used against ISI by hostile intelligence and security services. It is unclear whether Anas or any other ISI administrator ever conducted the envisioned census, but the decision to undertake an organizationwide census would have required ISI's leaders to accept significant operational security risks in exchange for better situational awareness through more-granular information about the composition of their organization.

In the next section, we discuss insurgent management challenges. Following that, we outline how rebel groups finance operations. We then discuss the issues an insurgent compensation scheme must address. Each section begins by describing the tasks for the organiza-

---

[6]   Harmony document NMEC-2009-634370; see "ISIL, Syria and Iraq Resources," 2015.

tion in that domain, then outlines the specifics of the task environment in Iraq, and finishes by describing what we should expect in that domain, given those specifics.

## Management

### Tasks

ISI had three basic managerial tasks in Iraq:

- control group members' use of violence
- maximize the value of group resources
- develop management capacity across diverse territories.

The first of these tasks may seem surprising given ISI's reputation; this was the group, after all, that pioneered the beheading video with the 2004 murder of the American contractor Nicholas Berg. Yet the group actually had frequent political problems stemming from members' excessive violence, both against civilian targets and against other militant groups. Excessive violence against civilians played a large role in motivating the Anbar Awakening and clearly concerned ISI leaders.[7] In fact, there is a February 2006 letter that appears to be from a member of the group's *shura* council to a commander in Ramadi, Abu Usamah; the letter directed the commander: "Stop the killing of people unless they are spying, military, or police officers. . . . [F]ind a secure method because if we continue using the same method, people will start fighting us in the streets."[8] Conflicts with local indigenous insurgent groups, such as Ansar al-Sunnah and the Islamic Army in Iraq, were often stoked by the unsanctioned actions of local fighters, similar to the dynamics reportedly underlying gang

---

[7]  For richer discussions of the role of excess violence by ISI in stoking the Awakening, see Shapiro, 2013, Chapter Four; and Biddle, Friedman, and Shapiro, 2012.

[8]  Harmony document IZ-060316-02; see "ISIL, Syria and Iraq Resources," 2015. The letter is unsigned but was found with a situation report to that member, noting limitations on the killing of Sunni police and asking permission to kill eight individuals.

wars in Chicago.[9] These conflicts distracted ISI from its core task of fighting the Iraqi government and coalition forces and helped turn local sentiment against the group.

The second task—to maximize the value of group resources—required controlling graft and corruption, as well as allocating people and money to the locations where they could do the most good. The extent to which the group allocated resources over space changed dramatically through the course of the war. In 2005 and early 2006, the group was making a great deal of money in Anbar governorate, the seat of its power at that time. Anbar's leaders then reallocated some of this money throughout Iraq, including to Mosul, the border sections, and Basra.[10] But by late 2008, the ISI organization had all but collapsed, and most of its members had retreated to northern Iraq, so what revenue there was in Mosul was basically what was available for the entire organization. This dynamic substantially simplified the allocation problem. What did not change over time was the extent of disagreements and conflicts over how money was being spent. Throughout its history, ISI had problems with operatives who did not want to work as hard as leaders would like, who spent money in ways more-senior leaders found wasteful, and who had to deal with other organizations that did not share the group's priorities.[11]

The third task of developing management capacity across territory and bureaucracies was a necessary step toward forming a state. This task entailed little in the way of managerial complications but did require building the structures that could eventually manage territory, including raising revenue, providing some modicum of governance, and organizing local personnel.

---

[9]   On conflicts between ISI and other groups, see, for example, the internal correspondence about the Battle of Amariyah, first documented in Fishman, 2009, pp. 10–20. On costly conflicts between gangs initiated by unsanctioned actions, see Steven D. Levitt and Sudhir Alladi Venkatesh, "An Economic Analysis of a Drug-Selling Gang's Finances," *Quarterly Journal of Economics*, Vol. 115, No. 3, 2000.

[10]   This process is documented in detail in Bahney, Shatz, et al., 2010.

[11]   See Shapiro, 2013, Chapter Four, for more details.

Both controlling violence and managing group finances entailed a broad range of what economists and political scientists call *agency problems*. As a general matter, agency problems arise when three conditions exist: (1) one person, the principal, needs to delegate certain actions or decisions to another person, the agent (e.g., an individual hiring an accountant to do her taxes or voters electing politicians to write laws); (2) the principal cannot perfectly monitor the agent or punish him with certainty when he does not perform (e.g., when it is costly for a general contractor to verify all the work done by a subcontractor on a building site); and (3) the preferences of the principal and agent are not aligned (e.g., a worker does not derive the same value from putting effort into a task as her boss).[12]

In managing these agency problems, ISI faced trade-offs between hierarchy and decentralized control. Hierarchical structures can help manage a broad range of internal coordination challenges, and vertical integration can be useful for addressing a range of inefficiencies that arise when transactions have to take place without complete and enforceable contracts.[13] These benefits are why most business firms operate with a great deal of vertical structure rather than relying completely on internal markets and relational contracts.[14] These benefits are also why insurgent groups need hierarchy.[15] Many inputs into the

---

[12] David M. Kreps, *A Course in Microeconomic Theory*, Princeton, N.J.: Princeton University Press, 1990b. Chapters Sixteen and Seventeen provide an excellent general summary of agency theory.

[13] On coordination problems, see Gary J. Miller, *Managerial Dilemmas: The Political Economy of Hierarchy*, New York: Cambridge University Press, 1992. Gibbons integrates various perspectives on the theoretical value of vertical integration, differentiating between those focusing on the value of ex ante incentives and those more interested in ex post governance; see Robert Gibbons, "Four Formal(izable) Theories of the Firm?" *Journal of Economic Behavior and Organization*, Vol. 58, No. 2, 2005.

[14] For a review of the theoretical and empirical literatures on vertical integration, see Timothy Bresnahan and Jonathan Levin, "Vertical Integration and Market Structure," in Robert Gibbons and David J. Roberts, eds., *Handbook of Organizational Economics*, Princeton, N.J.: Princeton University Press, 2012.

[15] For analyses of the varying levels of hierarchy and internal discord in insurgent and terrorist groups, see Jeremy Weinstein, *Inside Rebellion: The Politics of Insurgent Violence*, Cambridge, UK: Cambridge University Press, 2007; Jacob N. Shapiro, "Terrorist Organizations'

production of insurgent activity are hard to measure—for example, how much should a cell in Sinjar compensate a smuggler for bringing someone with unknown skills across the Syrian border—and there is no system to enforce contracts.[16] There are, of course, solutions to such problems that do not involve forming large organizations, but almost all rely on some combination of repeated interactions and reputation, both of which are hard to maintain in the context of an insurgency, where there is a premium on secrecy and where counterinsurgent activity makes it hard to build enduring relationships.[17]

Decentralized control also has potential advantages in insurgencies.[18] The less hierarchy, the less paperwork and documentation there is for counterinsurgents to capture and exploit for intelligence purposes. But delegation can also help operations in some circumstances. When agents have better knowledge than their principals about the task at hand, or about how actions relate to outcomes, the principals may be better off delegating to an agent than completing the task alone, even if the agent's preferences differ substantially.[19] Delegation is most obviously advantageous when success depends on situational information that can be known only to those close to the action. When a decision has to be made about when to launch a truck-bomb attack at

---

Vulnerabilities and Inefficiencies," in Harold Trinkunas and Jeanne K. Giraldo, eds., *Terrorist Financing in Comparative Perspective*, Stanford, Calif.: Stanford University Press, 2007; Jacob N. Shapiro and David A. Siegel, "Underfunding in Terrorist Organizations," *International Studies Quarterly*, Vol. 51, No. 2, 2007; and Shapiro, 2013. For a related perspective, drawing mostly on the sociology literature on institutions, see Scott Helfstein, "Governance of Terror: New Institutionalism and the Evolution of Terrorist Organizations," *Public Administration Review*, Vol. 69, No. 4, 2009.

[16] Allowing the smuggler to take a substantial portion of the person's money as compensation is probably not ideal, though it did happen sometimes. See Brian Fishman, ed., *Bombers, Bank Accounts, and Bleedout: Al-Qa'ida's Road in and out of Iraq*, West Point, N.Y.: Combating Terrorism Center, West Point, 2008, pp. 48–49.

[17] There is a large literature on how individuals coordinate activity in the absence of legally enforceable contracts. For a good summary, see Avinash K. Dixit, *Lawlessness and Economics: Alternative Modes of Governance*, Princeton, N.J.: Princeton University Press, 2007.

[18] This section substantially mirrors the discussion of delegation in Shapiro, 2013.

[19] Jonathan Bendor and Adam Meirowitz, "Spatial Models of Delegation," *American Political Science Review*, Vol. 98, No. 2, 2004.

the entrance to a military base, for example, giving authority to the unit commander whose fighters have been observing the base can offer a significant advantage and minimize the need for communication with higher management. Similarly, allowing multiple unit commanders to coordinate around loosely stated objectives can enable coordinated attacks that would be too complex for any one commander to manage.[20]

**Environment**

Three conditions are particularly relevant for understanding the management environment for ISI. First, as with all firms, its managers were cognitively constrained. The problem was likely worse for ISI, because its political goal of radically restructuring society once the existing government was defeated would surely have limited its appeal to the kinds of people with management experience. Sunnis who developed organizational skills through success in business or government in Iraq before the war had many organizations they could join, none of which proposed changes similar to those ISI proposed. However, some jihadists had these skills, either naturally, through previous work, or through learning them in the field, and the fact that strong managers emerged is one reason ISI proved to be an adaptive organization.

Second, coalition forces and ISF were targeting ISI senior and midlevel leaders and key facilitators aggressively. The coalition's targeting campaign was especially aggressive from early 2006 through mid-2010. The targeting campaign forced such top leaders as al-Zarqawi, Abu Umar al-Baghdadi, and al-Masri to ensure their own security by limiting their direct contact with their organization's activities and delegating important functions of the organization to a bureaucracy of midlevel leaders. Nonetheless, the targeting campaign removed hundreds of leaders beneath the very top tier. This campaign might have caused the incapacity of ISI to regenerate new midlevel leadership and a rank-and-file cadre over time, trends that appear to have been significant in Mosul between 2007 and 2009, as well as in Anbar in 2006. In

---

[20] Sean J. A. Edwards, *Swarming on the Battlefield: Past, Present, and Future*, Santa Monica, Calif.: RAND Corporation, MR-1100-OSD, 2000.

Anbar, AQI documents containing a sample of 251 members suggest that roughly one-third might have been killed. Members faced roughly a 17-percent chance of violent death in a year—a mortality rate 50 times higher than that of the civilian population of Anbar.[21] The degradation of AQI and ISI grew over time. In one later tracking spreadsheet of ISI members in Mosul in the fall of 2007, 526 of 1,318 members were listed as having been killed or captured, more than 40 percent of the recorded membership.[22]

Third, ISI brought together an extremely heterogeneous group of members. Many rebel groups have used preexisting social ties to mitigate agency problems. This can happen through screening or participation in prerevolutionary political activities,[23] using community social pressure to increase the costs of shirking,[24] and relying on previously established norms to coordinate group expectations.[25] Few of these strategies were available to ISI. The group had to rapidly integrate personnel from dozens of countries and was moving into areas where it often had little local history and few local ties. The traditional managerial tools employed by "sons of the soil"–style rebellions simply were not available to ISI.

## Expectations

The analysis above leads to several concrete expectations that we will carry forward into the chapters that follow. First, ISI should have done

---

[21]  See Bahney, Shatz, et al., 2010.

[22]  Harmony document NMEC-2008-614686; see "ISIL, Syria and Iraq Resources," 2015.

[23]  See Eli Berman, *Radical, Religious, and Violent: The New Economics of Terrorism*, Cambridge, Mass.: MIT Press, 2009, for a complete discussion of why religious groups have a relative advantage in exploiting preexisting social networks to manage agency problems. The core argument is that groups' ability to screen recruits and credibly threaten members' families for defections provides an advantage in maintaining discipline within groups.

[24]  For a discussion of the many reasons why ethnic groups are relatively better at punishing deviant behavior by their own members, see James Fearon and David D. Laitin, "Explaining Interethnic Cooperation," *American Political Science Review*, Vol. 90, No. 4, 1996.

[25]  This is similar to the role envisioned for corporate culture in David M. Kreps, "Corporate Culture and Economic Theory," in James Alt and Kenneth Shepsle, eds., *Rational Perspectives on Political Science*, Cambridge, UK: Cambridge University Press, 1990a.

PX717

a good deal to monitor what its operatives were doing day to day. Some of this can be accomplished by establishing hierarchical structures in which people have limited spans of control, essentially what firms do when they have to bring together heterogeneous groups of employees. But a substantial amount of control would have to be accomplished by having members document their activities. We should therefore expect to see regular situation reports, as well as reporting on financial expenditures.[26] One common way organizations manage financial risk is to cover members' expenses, after the fact, through a reimbursement system. As we will see in Chapter Nine, this is exactly what ISI did. It appears that members would incur expenses on behalf of the group, pay them out of their own funds, and then request reimbursement.

Second, ISI should have produced substantial paper records, especially as it became larger and needed to manage complex operations. We should also expect the group to take measures to track its operatives' experiences. One of the benefits of size, after all, is the ability to allocate people to places where they will be most productive. But figuring out who will do best where requires knowing which of your members have the proper experience, training, and background. If leaders do not personally know all their fighters, which is not feasible in any modestly sized organization, then building that knowledge requires a database of personnel qualifications. As we will see in Chapters Five through Seven, ISI did just that.[27]

---

[26] ISI kept spreadsheets to track spending and income, often at the unit level, for most of its existence. On expenditures specifically, see, e.g., Harmony documents MNFA-2007-000564, MNFA-2007-000566, MNFA-2007-000572, MNFA-2007-000573, NMEC-2007-632533, NMEC-2009-634443, NMEC-2009-634921, NMEC-2010-183085, and MNFV-2007-000370; see "ISIL, Syria and Iraq Resources," 2015. On the revenue side, see Harmony documents NMEC-2007-633700, NMEC-2009-600865, NMEC-2009-634444, NMEC-2009-634823, NMEC-2009-634838, NMEC-2010-175522, NMEC-2010-177375, and NMEC-2010-177378; see "ISIL, Syria and Iraq Resources," 2015.

[27] The Provisional Irish Republican Army (IRA) in Belfast considered collecting such information in 1973 to "select the best men for the squads." Gerry Bradley and Brian Feeney, *Insider: Gerry Bradley's Life in the IRA*, Dublin: O'Brien Press, 2009, p. 160.

PX717

## Revenue

### Task

The basic revenue-generation task for ISI was quite simple: Bring in financial and material resources to enable the group's military and political activities. What made this task challenging is that many options for raising money in Iraq during the war entailed smuggling, kidnapping, extortion, and other criminal activities that often set ISI at odds with local tribes, preexisting local militias, and criminal organizations.[28]

Historically, insurgent organizations have raised money through a variety of means. Both the Provisional IRA and Loyalist paramilitary organizations in Northern Ireland, for example, raised money through a combination of overseas fundraising, armed robbery, protection rackets, and membership dues from the Loyalist side.[29] Palestinian militants raised money through taxing their constituents in the Palestinian diaspora, raising funds from sympathetic governments, and engaging in criminal schemes, as did the Tamil nationalist Liberation Tigers of Tamil Eelam.[30]

### Environment

Fundraising opportunities for ISI varied dramatically across Iraq and over time. The basic environment was one with a functioning but hobbled economy that had massive levels of grey- and black-market activity. The performance of the economy also varied hugely across

---

[28] This process is well documented in Long, 2008.

[29] On Provisional IRA fundraising, see John Horgan and Max Taylor, "The Provisional Irish Republican Army: Command and Functional Structure," *Terrorism and Political Violence*, Vol. 9, No. 3, 1997, p. 21; and John Horgan and Max Taylor, "Playing the Green Card: Financing the Provisional IRA—Part 2," *Terrorism and Political Violence*, Vol. 15, No. 2, 2003. On Loyalist paramilitary fundraising, see Andrew Silke, "In Defense of the Realm: Financing Loyalist Terrorism in Northern Ireland—Part One: Extortion and Blackmail," *Studies in Conflict and Terrorism*, Vol. 21, No. 4, 1998; and Andrew Silke, "Drink, Drugs, and Rock'n'Roll: Financing Loyalist Terrorism in Northern Ireland—Part Two," *Studies in Conflict and Terrorism*, Vol. 23, No. 2, 2000.

[30] For a good summary of Palestine Liberation Organization fundraising activities in the pre-Oslo period, see James Adams, *The Financing of Terror*, New York: Simon and Schuster, 1986.

the country. The 2007 Iraq Household Socio-Economic Survey reports unemployment in the four governorates where our documents were found, ranging from a low of 7.6 percent in Salah al-Din to a high of 20.4 percent in Diyala. Household income ranged from a low of 474,300 Iraqi dinars per month in Diyala to 795,600 Iraqi dinars per month in Salah al-Din. And household expenditures showed a similar range. Within-governorate variance in economic performance was high as well, with the World Food Program's Iraq Food Security and Vulnerability Analysis 2007 survey reporting rates of stunting and chronic malnutrition by district that varied from 20.8 percent to 56.6 percent in Anbar and 17.2 percent to 56.0 percent in Ninewa.[31]

**Expectations**

Given the historical record of insurgent groups tapping all available sources of money, we expect that ISI documents will confirm the qualitative evidence that the group utilized a broad range of funding sources,[32] including

- kidnapping
- black-market oil sales
- vehicle and antiquities theft
- extortion.

---

[31] Central Organization for Statistics and Information Technology, Kurdistan Region Statistics Organization, and World Bank, *Iraq Household Socio-Economic Survey: IHSES—2007*, Baghdad, 2008; see Table 5-4, Table 9-2, and Table 8-2 and pp. 92 and 182. Central Organization for Statistics and Information Technology, Kurdistan Region Statistics Office, Nutrition Research Institute (Ministry of Health), and United Nations World Food Programme Iraq Country Office, *Comprehensive Food Security and Vulnerability Analysis (CFSVA): Iraq*, Rome: United Nations World Food Programme, 2008.

[32] Phil Williams, *Criminals, Militias, and Insurgents*, Strategic Studies Institute Monograph 930, Carlisle, Pa.: U.S. Army War College, 2009.

PX717

## Compensation

### Task

All firms set their compensation and employment policies to balance multiple objectives. Firms need to attract the right talent, motivate their employees to work hard, maintain morale and a sense of equity within their workforces, and send signals about how workers should allocate their time. In labor markets with many potential employers and employees, all of this has to happen in such a manner that workers' compensation matches the marginal product of their labor, at least in expectation.

There is a massive literature on the functions of compensation systems in normal organizations. Literatures relevant to our study cover (1) using wages to screen for high-quality workers, (2) providing incentives for workers to take on risky or unpleasant jobs, and (3) providing wages for people who find that the reward of doing the job outweighs potential wages or the value that the employer puts on doing the job. The literature on using wages for screening starts from the observation that when the quality of workers is unobservable, low-quality workers have an incentive to seek high-wage jobs.[33] Drawing on this insight and the literature that followed it, research shows that when insurgent groups use the promise of high wages to attract recruits, they end up bringing in large numbers of opportunistic joiners who are hard to discipline and often abuse noncombatants.[34] Screening mechanisms to avoid such problems, known as *adverse selection*, include incentive schemes (such as piecework),[35] requiring costly investments in education as a precondition for employment,[36] participation in costly ritual

---

[33] George Akerlof, "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," *The Quarterly Journal of Economics*, Vol. 84, No. 3, August 1970.

[34] Weinstein, 2007.

[35] Edward P. Lazear, "Personnel Economics: Past Lessons and Future Directions: Presidential Address to the Society of Labor Economists, San Francisco, May 1, 1998," *Journal of Labor Economics*, Vol. 17, No. 2, 1999.

[36] On education as screening in traditional jobs, see A. Michael Spence, "The Learning Curve and Competition," *Bell Journal of Economics*, Vol. 12, No. 1, 1981. On costly investment in religious or ideological knowledge as a way to screen to militant groups, see Berman,

activity,[37] and low entry-level wages that will be attractive only to mission-oriented individuals.[38]

When it comes to creating incentives for workers to take on risky jobs, the literature has largely focused on the role of what are called *compensating wage differentials*. This literature considers the wage paid to workers as a function of (1) the worker's marginal productivity and (2) the attributes of the job, typically expressed through the notion of riskiness or dirtiness. Inducing workers to undertake risky or dirty jobs is thought to require a wage premium, although recent evidence suggests there is a substantial population that has a preference for risky work, and thus the wage premium for high-risk jobs is much lower than the statistical value of life would suggest it should be.[39]

Another literature studies the motivation for performance among government bureaucrats. This literature starts from the observation that the financial reward for performance in many jobs is modest, but the intrinsic rewards for exerting effort are quite high. In such settings, there are obvious benefits to self-selection (e.g., lower wage requirements) but also costs to select people with strong intrinsic motivations, including a bias toward doing the job over optimizing financial efficiency (e.g., social workers might not watch budgets as closely as elected officials would like, because they are focused on serving the poor).[40] And, indeed, recent empirical work confirms that, just as the theoretical literature would expect, more–pro-social workers exert higher effort on pro-social tasks at the same wage level, and when wages are

---

[37] Berman, 2009.

[38] George Baker, Michael Gibbs, and Bengt Holmstrom, "The Internal Economics of the Firm: Evidence from Personnel Data," *The Quarterly Journal of Economics*, Vol. 109, No. 4, November 1994.

[39] Kurt J. Lavetti, "The Estimation of Compensating Differentials and Preferences for Occupational Fatality Risk," unpublished manuscript, Ohio State University, 2012.

[40] For a good review and theoretical model showing the policy bias that can result from self-selection, see Candice Prendergast, "The Motivation and Bias of Bureaucrats," *American Economic Review*, Vol. 97, No. 1.

2009; and Shapiro, 2013, especially Chapter Six, which discusses problems that Marxist terrorists groups had using this screening strategy.

increased, less pro-social individuals will consider pro-social jobs.[41] This is consistent with earlier work on rebel groups, which showed that those groups attracting fighters through paying good wages and offering opportunities for plunder also attract more-abusive fighters.[42]

Just like any other firm, ISI faced this trade-off between bringing in mission-oriented people who would work for relatively little and using wages to attract workers. More broadly, ISI had to achieve multiple objectives with its compensation policy, including

- attracting talented people to work in a high-risk environment
- screening for skills and unobservable human capital
- motivating employees to work hard and take risks
- maintaining morale.

**Environment**

There were three facts about ISI's operational environment that set it apart. First, the group did not have a particularly easy environment for using wages to attract members. Compared with violent organizations operating in largely dysfunctional economic environments (al-Shabaab in Somalia or ethnic militias in the Central African Republic), ISI faced a relatively less challenging economic environment. Although economic conditions during the war were far from ideal, the rates of intense want and deprivation were low, on average. This was in part because the Iraqi government had a long-standing policy of providing every household with monthly rations from the country's public food-distribution system. And although unemployment rates were high in some places, on average they were comparable with those of many developing economies.[43]

---

[41] Sheheryar Banuri and Philip Keefer, "Intrinsic Motivation, Effort and the Call to Public Service," Policy Research Working Paper 6729, World Bank, 2013.

[42] Weinstein, 2007.

[43] Central Organization for Statistics and Information Technology, Kurdistan Region Statistics Organization, and World Bank, 2007; and Central Organization for Statistics and Information Technology, Kurdistan Region Statistics Office, Nutrition Research Institute (Ministry of Health), and United Nations World Food Programme Iraq Country Office, 2008.

Second, the group did not appear to have a hard time attracting fighters. ISI documents suggest that, for some of the war, the group had more fighters than it used.[44] Put in terms of the literature on public-sector wages, there were many intrinsically motivated types in ISI's labor pool. Because of the coalition's intelligence activities and the opportunism of many potential fighters, however, there were also a substantial number of "bad" types. Here *bad* refers to people who would readily give up information if captured or who would take advantage of positions of authority to skim funds.

Finally, when it came to the managerial functions of the wage plan, ISI faced a difficult environment. As noted, ISI had a heterogeneous set of employees, many of whom had little experience working together. ISI also had to deal with frequent managerial turnover because of coalition targeting. Furthermore, working for the group, even as a regular member, was extremely risky. Achieving the group's mission therefore required that managers, who did not have much time to form bonds of trust, be able to motivate their fighters to engage in extremely risky activities.

**Expectations**

Given the combination of screening and motivational challenges ISI faced, we expect its compensation scheme to have several traits. First, the wage structure should be relatively flat to encourage a sense of equity among members. Second, since the group did not have a hard time finding fighters, wages should be used as a screening mechanism. Uncommitted individuals posed security risks for the group, and there was a glut of willing fighters, so there was no reason for the group to pay market wages. Third, the wage structure should have some flexibility to accommodate members who have larger financial commitments. Fourth, the compensation scheme should have some elements that serve to build trust by requiring leaders to make credible future commit-

---

[44] See, for example, Harmony document NMEC-2008-612449 ("ISIL, Syria and Iraq Resources," 2015), in which the writer lamented that foreigners who came to be suicide bombers were not being used, and, as a result, the prospective suicide bomber has "an impotent mental status and disappointment, his qualification will decrease and disappear because of depression and lack of help."

ments of resources whenever they ask members to take on extremely risky duties in the present.[45] The compensation scheme should send a credible signal, in other words, that leaders value their members' lives and will only spend them to good purpose.

## Conclusion

In handling its managerial challenges, ISI faced two key environmental conditions. First, it had a diverse workforce, with varied views and levels of motivation, that often disagreed on how to spend money and how to use violence. Second, ISI had to deal with frequent, unplanned leadership turnover because of intense coalition counterinsurgency operations. Given these conditions, the organizational economics literature leads to several clear predictions.

ISI should not have to offer high wages to attract talent, but the workers it does attract at low wages will often want to overproduce or pad their wages through graft. Those agency problems create a need to track workers' expenditures and provide opportunities for management to identify and correct misbehavior. Additionally, with frequent turnover, there will be a need to maintain organizational memory.

Therefore, the group will need to employ a great deal of formal record keeping. Furthermore, with the high turnover and need to motivate risky action, ISI should employ compensation practices that create credible signals by leaders that they are using their fighters wisely, given the high risk of death or, in the case of voluntary suicide bombers, the desire to have a death that has a large effect.

As we will see in subsequent chapters, each of these expectations is borne out. ISI, it turns out, faced the same challenges as many legitimate organizations, and therefore the perspectives used to understand these organizations can be applied to an analysis of ISI.

---

[45] Such commitments are known in the economics and political science literature as *time-consistent*.

PX717

# Organizing Insurgency and Terrorism in Iraq

Three organizational issues have sparked debate among terrorism experts and scholars in recent years. These are (1) the organization and structure of terrorist or militant groups, (2) the functions performed by such groups and the organizational structures that enable the performance of these functions, and (3) how militants manage the territory they occupy. We term these issues *rebel governance.*

This chapter examines these organizational issues. The documents we analyze allow us to report how the militants themselves viewed these issues. Analysts, policymakers, and scholars have devoted significant attention to each issue. However, militants' internal documents offer unique insights.

Three key findings emerge. First, ISI designed its organization as a hierarchy in which each level practiced considerable top-down control over subordinates who administered a bureaucratic organization with strict standard operating procedures. ISI, in late 2008, was a standard multidivisional hierarchy, commonly known as an "*M*-form," in which a central management structure with functional bureaus is replicated at multiple lower geographic levels.[1] Second, ISI's chosen organizational structure at the central level and within regional units was almost identical to that espoused by Usama Bin Ladin's al-Qaʻida in the late 1990s. Third, although ISI had a clear geographic strategy for the territory in Iraq it sought to control, by late 2008, its ability to administer territory was more limited than its ambitions. By that time, the group simply

---

[1]   Chandler, 1969; Bahney, Shatz et al., 2010.

PX717

was unable to fill out its organization chart at the mid to senior levels of management. Unfortunately, the documents released for this report are insufficiently complete to let us determine exactly why we see these patterns. There are at least two explanations for each of these facts, which are consistent with the data; we lay them out below.

What is clear is that ISI had a centralized hierarchy composed of multiple levels that drove the day-to-day operations of the group. The degree of organizational similarity, known by organization scholars as *isomorphism*, between ISI and al-Qaʿida makes sense from the perspective offered in Chapter Three, which discussed how bureaucracy and formal hierarchy can help militant groups perform key functions for both war fighting and state building.

This chapter proceeds as follows: We first briefly outline debates about how terrorist groups have organized. We then describe how ISI was organized and how much this organization mimics the structure that core al-Qaʿida sought to establish during its peak years in Afghanistan. This section also outlines two possible explanations for the remarkable similarity between al-Qaʿida's ideal structure and what ISI sought to establish. The next section discusses ISI's geographic strategy and highlights its inability to fill positions by late 2008.

## Terrorist Organizations as Networks and Hierarchies

Since the early 2000s, terrorism analysis discussing group structures has focused on two ideal types: networks and hierarchies.[2] Networks are self-organized and self-enrolling. Sets of actors or nodes connected through ties, which are often social or informal, form the bulk of most networks. The origins and structure of terrorist networks make them fluid and resilient, according to terrorism analysts. Members of these

---

[2]    Much of the foundation of this debate comes from the organizational economics literature. See, for example, Chandler, 1969; Williamson, 1975; Miller, 1992; and Grahame Thompson, *Between Hierarchies and Markets*, New York: Oxford University Press, 2003. For applications of ideas from the organizational economics literature to a wide range of political organizations, see Alexander Cooley, *Logics of Hierarchy: Problems of Organization in Empires, States, and Military Occupations*, Ithaca, N.Y.: Cornell University Press, 2005.

PX717

networks often come from a variety of locations. Compact pockets of terrorists then congeal around a central idea but largely operate independently. People can form cells without meeting in person (e.g., over the Internet). Terrorist networks use intermediaries to keep cells isolated from each other but in communication with leadership. Intermediaries enmesh cells in the organization but keep them at arm's length from its vulnerable nodes. This offers operational-security advantages. No node should have evidence that could compromise the organization as a whole. Networked organizations thus should be difficult for security services to detect and dismantle.[3]

A counterargument is that networks are vulnerable by design. In this view, networks are poorly organized for effective counterintelligence practices because they are relatively easy to detect but hard to dismantle. They therefore struggle to operate clandestinely and must replace nodes that security forces neutralize. New members must be recruited to replace these nodes and perform additional tasks as a networked organization attempts to expand its influence. Recruiting is largely decentralized in networks, and these decentralized decisionmaking structures make it difficult for a group's leaders to screen recruits to their preferred satisfaction, which can lead to operational-security lapses that cause networks to unravel. Yet nabbing a cell, or even a key node, is unlikely to do as much damage to a networked group's security as targeting key members of hierarchical organizations, so networked groups are often simultaneously weak relative to their state adversaries but resilient to their adversaries' countermeasures.[4]

Hierarchical terrorist organizations are more akin to conventional armies or guerrilla movements. They use unconventional battlefield tactics, but their organization centralizes authority from the top down.[5] Sophisticated organizations have hierarchies that include

---

[3]  Jessica Stern and Amit Modi, "Producing Terror: Organizational Dynamics of Survival," in Thomas Biersteker and Sue Eckert, eds., *Countering Financing of Terrorism,* New York: Routledge, 2008, pp. 27–28.

[4]  The authors thank Daniel Byman for suggesting this trade-off.

[5]  For examples of this phenomenon and a theoretical logic underpinning it, see Shapiro, 2013, pp. 15–18.

PX717

different functional areas and that delegate decisionmaking. As with multidivisional firms, hierarchical organizations maintain governance over multifaceted activities to realize economies of scale and ensure that people lower down the hierarchy do what leaders expect them to do. Most use standard operating procedures and written rules to mitigate the challenges such complexity poses. Hierarchy also provides certain operational advantages, allowing groups to plan and execute complex attacks and to deconflict other operational activities.[6]

Most organizations fall somewhere between these two ideal types, but the lines of debate in the terrorism literature have been organized around which ideal best describes al-Qaʻida and like-minded groups; is it akin to a "leaderless jihad," or are leaders and bureaucracy central to the execution of its plans and strategy?[7] The answers are relevant for understanding the group's capabilities and its vulnerabilities.[8] For example, if terrorist groups require substantial hierarchy to operate at scale, then terrorism could be self-limiting, particularly if the government makes a strong effort to contest territory and exploit inefficiencies and vulnerabilities in these terrorist groups' organizational structures and bureaucracies, including record keeping and other intelligence that can be gleaned and used to dismantle the groups.[9] As soon as groups get big, the necessities of managing a large workforce require a good deal of communications and record keeping. That, in turn, means that

---

[6]   Candace Jones, William S. Hesterly, and Stephen P. Borgatti, "A General Theory of Network Governance," *The Academy of Management Review*, Vol. 22, No. 4, October 1997, p. 923. Also see Rohan Gunaratna and Aviv Oreg, "Al Qaeda's Organizational Structure and Its Evolution," *Studies in Conflict & Terrorism*, Vol. 33, No. 12, 2010, p. 1045.

[7]   See, for example, Bruce Hoffman, "The Myth of Grass-Roots Terrorism: Why Osama Bin Laden Still Matters," *Foreign Affairs*, Vol. 87, No. 3, July/August 2008; Marc Sageman and Bruce Hoffman, "The Reality of Grass-Roots Terrorism [with Reply]," *Foreign Affairs*, Vol. 87, No. 4, July/August 2008; and Peter Neumann, Ryan Evans, and Raffaello Pantucci, "Locating Al Qaeda's Center of Gravity: The Role of Middle Managers," *Studies in Conflict & Terrorism*, Vol. 34, No. 11, 2011.

[8]   James J. F. Forest, Jarret Brachman, and Joseph Felter, *Harmony and Disharmony: Exploiting al-Qaʻida's Organizational Vulnerabilities*, West Point, N.Y.: Combating Terrorism Center, West Point, 2006.

[9]   On this point, see Jacob N. Shapiro, "108 Terrorist Memoirs, Analyzed," *Boston Globe*, January 19, 2014.

PX717

the groups begin producing a large signal—essentially a trail of paper and data that governments can detect and follow.

This concept has most often been applied to classic terrorist groups. The issue becomes more complex with a group such as ISI, then, and the Islamic State, now, because the group is not simply a terrorist group; it is also an insurgent group and a proto-government and in fact draws advantages from territorial control. Therefore, fully understanding not only the advantages but also the limitations of such a group having a substantial hierarchy would help combat it and groups like it.

## ISI's Organizational Blueprint

Our ISI documents suggest that the group was a hierarchical, functionally differentiated organization, unlike the transnational jihadi movement often characterized as being organized around ad hoc personal networks.[10] To understand why, it is helpful to begin with a brief discussion of how core al-Qaʿida sought to organize.

### Al-Qaʿida's Organizational Model

Some scholars have described al-Qaʿida as a flat transnational network.[11] This network consists of a core group and a largely autonomous set of franchises and cells in Algeria, Iraq (at one time), Somalia, Yemen, and elsewhere. To achieve a global reach, al-Qaʿida's leadership has relinquished control and delegates responsibility to its operatives. These operatives are diffuse and self-organizing. Marc Sageman, who provided the first rigorous treatment of what he termed the *global Salafi jihad*, wrote in 2004:

---

[10] Marc Sageman, *Leaderless Jihad: Terror Networks in the Twenty-First Century*, Philadelphia: University of Pennsylvania Press, 2008.

[11] Marc Sageman, *Understanding Terror Networks*, Philadelphia: University of Pennsylvania Press, 2004; and James A. Piazza, "Is Islamist Terrorism More Dangerous? An Empirical Study of Group Ideology, Organization, and Goal Structure," *Terrorism and Political Violence*, Vol. 21, No. 1, January 2009, pp. 66–67. For exceptions, see Shapiro, 2013; and Leah Farrall, "How Al Qaeda Works: What the Organization's Subsidiaries Say About Its Strength," *Foreign Affairs*, Vol. 90, No. 2, March/April 2011.

PX717

> Participants in the global jihad are not atomized individuals but actors linked to each other through complex webs of direct or mediated exchanges. . . . A group of people can be viewed as a network, a collection of nodes connected through links. Some nodes are more popular and are attached to more links, connecting them to other more isolated nodes. These more connected nodes, called hubs, are important components of a terrorist network. . . . One significant aspect of a small-word topology is its suggestion of a spontaneous process of self-organization rather than intentional construction from above. . . . [A lack of] a comprehensive recruitment drive left the global jihad at the mercy of self-recruits, establishing clusters of mujahedin who built upon preexisting linkages to the jihad. This "natural" growth of the jihad took place within particular social niches that were susceptible to its message.[12]

This view was held by some after the U.S. invasion of Afghanistan in 2001, as analysts and researchers tried to make sense of al-Qaʿida.[13] Al-Qaʿida's persistence following the deaths of many leaders—including Usama Bin Ladin in May 2011—provided some support to the view that hierarchy was not central to how the group worked day to day in the period after 9/11.[14]

As Islamist terrorist organizations flourished in Iraq and elsewhere, and as an increasingly large sample of al-Qaʿida's internal documents became publicly available, it became apparent that core al-Qaʿida, during its peak from the late 1990s to late 2001, and similar groups operating elsewhere were actually highly organized. A broad range of documentary evidence indicates that al-Qaʿida leaders designed the organization to have a well-institutionalized, hierarchical

---

[12] Sageman, 2004, pp. 137–139.

[13] Bill Braniff and Assaf Moghadam, "Towards Global Jihadism: Al-Qaeda's Strategic, Ideological and Structural Adaptations Since 9/11," *Perspectives on Terrorism*, Vol. 5, No. 2, May 2011.

[14] Jason Burke, *Al-Qaeda: The True Story of Radical Islam*, London: I.B. Tauris, 2004; Bruce Hoffman, "The Changing Face of Al Qaeda and the Global War on Terrorism," *Studies in Conflict & Terrorism*, Vol. 27, No. 6, 2004, pp. 551–552.

PX717

structure.[15] The extent to which that structure was realized is unclear, but the intent is quite well documented. Al-Qaʿida's organizational design was first described in the testimony of an al-Qaʿida defector and further illustrated in al-Qaʿida documents captured by U.S. forces in Afghanistan.[16] These documents revealed that Bin Ladin had designed al-Qaʿida to be a bureaucratic organization that could be managed and audited, much like a business.

In his court testimony in February 2001, Jamal al-Fadl, a former al-Qaʿida operative, described al-Qaʿida's structure as akin to a "pyramid." According to al-Fadl, this hierarchical structure had an "emir" (Bin Ladin) as the organization's top leader, who was supported directly by a deputy and a secretary. The emir was to be responsible for all aspects of the organization, including operational, strategic, and tactical planning, as well as logistical and organizational planning. Al-Qaʿida's organizational charter specified that the emir should approve an annual "work plan," approve an annual budget, and be responsible for amending plans or budgets as necessary. In terms of managing al-Qaʿida's human capital, the emir was to be responsible for overseeing nominations, promotions, and appointments to all senior positions within the organization, based on guidance from the *shura* council—an advisory board—and committee heads (Figure 4.1).[17]

The emir's deputy was to have qualities that closely resembled those of the leader, but with fewer authorities. His duties were to depend on what the emir would entrust to him. The documents reveal that the emir's secretary should be appointed by him and be respon-

---

[15] We are not the first to have observed this pattern of hierarchy. Several other analysts have observed that al-Qaʾida is primarily a hierarchical organization. Gunaratna and Oreg, 2010, for example, write that "since its establishment, Al Qaeda has evolved into a strict and clear-cut hierarchical structure organization," and that "this formal infrastructure is the main factor which enabled Al Qaeda to adapt and overcome the setbacks it suffered from the Global War on Terrorism led by the United States that erupted following 9/11 and the subsequent invasion of Afghanistan in October 2001."

[16] See Jamal al-Fadl, testimony in *United States v. Usama bin Laden*, No. S(7) 98 Cr. 1023 (S.D. N.Y.), February 6, 2001; see also Harmony document AFGP-2002-000080; see "Harmony Program," database of declassified documents, Combating Terrorism Center, 2015.

[17] See al-Fadl, 2001.

**Figure 4.1**
**Al-Qaʻida's Organizational Structure**



SOURCE: Derived from National Commission on Terrorist Attacks upon the
United States, "Overview of the Enemy," Staff Statement No. 15, 2004.
RAND *RR1192-4.1*

sible for such duties as organizing the emir's appointments, external relations, and work schedule. The secretary, the documents indicate, should accompany the emir wherever he goes.[18]

Supporting the emir was a *shura* council composed of individuals appointed by the emir, based on their suitability for al-Qaʻida's various needs. The next tier beneath this advisory council consisted of various committees, which were responsible for administering the organization's day-to-day activities in key functional areas. The functional areas listed in al-Qaʻida's original charter included a military committee, a political committee, a financial committee, a security committee, an

---

[18] Gunaratna and Oreg, 2010. It is not clear whether the secretary position is currently occupied. A previous personal secretary, Wadih El Hage, was arrested in Arlington, Texas, in 1998 and is currently serving a life sentence is a U.S. federal prison (Russ Buettner, "Resentenced to Life in Prison, Terrorist Plans to Appeal," *New York Times*, April 23, 2013). A successor as personal secretary, Nasir al-Wuhayshi, became the leader of al-Qaʻida in the Arabian Peninsula, in Yemen, and presumably was killed by a U.S. drone strike in June 2015 (Kareem Shaheen, "US Drone Strike Kills Yemen al-Qaida Leader Nasir al-Wuhayshi," *Guardian*, June 16, 2015; "Nasir al-Wuhayshi: From Bin Laden Aide to AQAP Chief," *VOA News*, June 16, 2015).

PX717

intelligence committee, and a committee in charge of media affairs and propaganda.[19]

The foreign purchases committee was responsible for acquiring weapons, explosives, and technical equipment. The sharia and political committee was responsible for reviewing Islamic law—sharia—and adjudicating whether certain actions would comply with its dictates. A religious emir might also act more generally as a spiritual adviser to al-Qaʿida's senior leadership.[20] The committee's political responsibilities involved spreading political awareness within an al-Qaʿida emirate (and to Muslims more generally). The main objective of this committee was to develop and train a like-minded, disciplined, political cadre within an al-Qaʿida target area to reflect the group's objectives, in accord with sharia, as interpreted by the sharia emir. As a result, the sharia emir had a lot of power in determining what is permissible under law in an al-Qaʿida–controlled area.[21]

The finance (or administrative) committee was tasked with accounting for the group's financial records and business and fundraising activities, as well as with overseeing the organization's personnel. These responsibilities generally include maintaining documentation of all of the organization's members and their dependents, overseeing the payroll, and formulating general financial-policy initiatives to be considered for implementation. The security committee was tasked with providing personal security and protective services for senior leaders, preventing information leaks, and conducting other counterintelligence tasks, including screening recruits for enemy infiltrators penetrating the organization. The military committee was tasked with

---

[19] Harmony document AFGP-2002-000080; see "Harmony Program," 2015. The intelligence committee is referred to in the English translation of the document as the "surveillance committee." See also al-Fadl, 2001, p. 56.

[20] Al-Zarqawi famously used Sheikh Abd al-Rahman, his spiritual advisor, as a close aide and a member of his inner circle. Ultimately, al-Rahman's signature of movement helped lead U.S. forces to al-Zarqawi's hideout for the airstrike that resulted in al-Zarqawi's death. See Richard A. Oppel Jr. and Mark Mazetti, "Hunt Ends with Pair of 500-Lb. Bombs," *New York Times*, June 8, 2006.

[21] This point was reiterated during interviews with U.S. special operations forces, conducted in May 2013 in Arlington, Virginia.

PX717

al-Qaʻida's operational and other military activities. Its responsibilities included the mental and physical preparation of members for combat through military training. It was responsible for fighters' combat skills and technical skills relevant to military functions, as well as for instilling discipline in the organization's military personnel, based on the group's interpretation of the Qurʻan. The information committee served as the organization's propaganda arm. The committee disseminated information regarding jihadist ideology to the population and other relevant targets, such as other local jihadist militant outfits. It also produced videos, printed materials, and online content as part of al-Qaʻida's messaging strategy.[22]

## ISI's Organizational Model

ISI's governorate-level structure for Anbar in 2006 was well articulated in a set of documents seized by a local militia cooperating with coalition forces in Anbar governorate in March 2007. The documents depicted a provincial administrative structure nearly identical to that of core al-Qaʻida (Figure 4.2). The provincial organization of ISI, then still known as AQI, looked very similar to that of core al-Qaʻida and

**Figure 4.2**
**ISI's Provincial Organizational Chart for Anbar Governorate**



SOURCE: Harmony document NMEC-2007-632298; see "ISIL, Syria and Iraq Resources," 2015.
**RAND** *RR1192-4.2*

---

[22] National Commission on Terrorist Attacks upon the United States, 2004; and Gunaratna and Oreg, 2010.

PX717

included a legal committee (sharia), a military committee, an administrative committee, a security committee, and a media committee.[23]

One difference to note is that the translation of the captured organization chart shown in Figure 4.2 does not indicate that Anbar governorate had a separate foreign purchases committee. Another difference is the absence of a provincial-level deputy, secretary, and advisory council. This might indicate that provincial-level emirs were not expected to preside over high-level decisionmaking and strategy to the degree that core al-Qaʻida's leadership did. Note too that, at the provincial level, ISI broke down its administrative functions a bit further than core al-Qaʻida envisioned, as seen in Figure 4.3, which is from the same document and shows the functional areas reporting to the provincial

**Figure 4.3**
**ISI's Provincial Organizational Chart for the Administrative**
**Committee for Anbar Governorate, Late 2006 or Early 2007**



SOURCE: Harmony document NMEC-2007-632298; see "ISIL, Syria and Iraq Resources," 2015.
**RAND** *RR1192-4.3*

---

[23] Figure 4.2 shows an administrative committee, which, based on our reading of the ISI documents captured from several of the group's administrative emirs, served in the capacity as the financial committee depicted in the core al-Qaʻida organizational chart shown in Figure 4.1. See Chapter Five for more information on the financial information captured from ISI administrative emirs. Moreover, Figure 4.2 displays a media committee, which was the functional equivalent of the information committee shown in the core al-Qaʻida organization chart in Figure 4.1 and the propaganda emir function in the ISI sector-level organization chart displayed in Figure 4.4.

PX717

administrative committee. That further division could make sense, because ISI in 2006 was a much larger organization than al-Qaʿida in the 1990s, and their administered territories were different. Therefore, ISI might have required a more specialized committee structure.

Turning to lower levels of administration, al-Qaʿida's organizational blueprint persisted down to the sector level—ISI's lowest-level administrative unit, also called *districts* and similar to Iraqi districts, a geographic level lower than the provincial or governorate level. Figures 4.4 and 4.5 display organization charts found in two different places in early 2007; both figures provide the same picture of ISI's sector-level organization in Anbar governorate.[24]

As Figures 4.4 and 4.5 show, ISI's sector organization had the same core emirs as the higher organizations. Unlike those levels, how-

**Figure 4.4**
**ISI's Sector-Level Organizational Chart for the Western Sector, Anbar Governorate**



SOURCE: Harmony document MNFA-2007-000566; see "ISIL, Syria and Iraq Resources," 2015.

RAND RR1192-4.4

---

[24] Harmony document MNFA-2007-000566 was captured in Tuzliyah in January 2007. Harmony document NMEC-2007-632298 was captured in Julayba in March 2007. These towns are approximately 80 miles apart, by road, along the Euphrates River. See "ISIL, Syria and Iraq Resources," 2015.

PX717

**Figure 4.5**
**ISI's Sector-Level Organizational Chart for the Administrative Committee, Western Sector, Anbar Governorate**



The Structure that Belongs to the Administrative Executive in the Sector, Structure number (2)

SOURCE: Harmony document MNFA-2007-000566; see "ISIL, Syria and Iraq Resources," 2015.

**RAND** *RR1192-4.5*

ever, the sector-level charts also included a medical emir. One plausible explanation for the presence of a medical emir in the sector-level organization, but not in the higher-level al-Qaʻida organizations, was that ISI's local operational units needed to treat wounded combatants more often.

Over time, ISI found that the structure described above provided insufficient checks on managerial challenges. Between August and October 2008, two senior ISI administrative emirs—Abu Wahab and Abu Qaswarah—were captured or killed. This appears to have provided the impetus for an organizational reform that deepened the group's bureaucracy by separating revenue-collection activities from disbursements and management. In a letter accompanying a report on financial activities, an ISI manager named Asʻad recommended an

PX717

individual for administrative duties and suggested that the financial organization be expanded in two steps (Figure 4.6).[25]

As As'ad noted, this new structure "makes the issue of monitoring the Treasury easier and makes the Administration of Finance dis-

**Figure 4.6**
**Proposed Reorganization of Financial Administration, Fall 2008**



Course of action on the structure for my organization of the administration, and in order to clarify, it is in the figure below.



SOURCE: Harmony document NMEC-2009-636065; see "ISIL, Syria and Iraq Resources," 2015.
**RAND** *RR1192-4.6*

---

[25]  Harmony documents NMEC-2009-636065, NMEC-2009-636153, and NMEC-2009-634370; see "ISIL, Syria and Iraq Resources," 2015.

tinct from the Taxation of Treasury [*sic*], and the Administration of Taxation distinct from the Administration of Finance, and this issue is important to minimize the problem of embezzlement and fraud, first, and second, [to allow] the Finance Administrator to secure the mission and operations from destruction of the Sunni at the hands of the enemy."[26] In this new setup, the taxation administrator would be responsible for raising money, and the treasury administrator responsible for spending it. The memo suggests that at least one member of ISI found that grouping all finance-related activities under one authority created opportunities for both graft and security failures. Finding corruption and skimming in a militant group, where midlevel operatives are hard to supervise, should not be surprising.[27] As'ad's preferred solution was to add another layer to the hierarchy, suggesting that the theoretical benefits of hierarchy have some basis in reality.

**Why ISI Looked So Similar to Al-Qa'ida**

A simple comparison of al-Qa'ida's and ISI's organization charts shows a large degree of similarity in how the organizations were structured, from the highest levels to the lowest. Some analysis has claimed that al-Qa'ida's affiliate groups bear little resemblance to al-Qa'ida central, and that such groups tend to ally themselves with core al-Qa'ida to capitalize on al-Qa'ida's "brand," prestige, and material support but otherwise operate as independent, autonomous organizations.[28] Although it is true that core al-Qa'ida had little direct oversight of ISI's day-to-day operations, ISI's internal documents provide strong evidence that it adopted core al-Qa'ida's hierarchical and highly bureaucratic organizational design. There is no evidence that ISI had any intention of deviating from these structures. In fact, the only deviation it planned was to

---

[26] Harmony document NMEC-2009-636153 (translation); see "ISIL, Syria and Iraq Resources," 2015.

[27] Shapiro and Siegel, 2007.

[28] For variants of this arguments, see Angel Rabasa, Peter Chalk, Kim Cragin, Sara A. Daly, Heather S. Gregg, Theodore W. Karasik, Kevin A. O'Brien, and William Rosenau, *Beyond al-Qaeda: Part 1, The Global Jihadist Movement*, Santa Monica, Calif.: Rand Corporation, MG-429-AF, 2002, pp. 3–4; Sageman, 2011; and Barak Mendelsohn, "Al-Qaeda's Franchising Strategy," *Survival*, Vol. 53, No. 3, 2011.

PX717

add a layer of bureaucracy to improve the oversight of administrative and financial activities.

Table 4.1 compares the organizational structures of core al-Qaʿida and ISI, based on translated versions of documents captured from each group, in Afghanistan and Iraq, respectively. The structures of these organizations were nearly identical at each functional level.

That both groups had hierarchical structures is not at all surprising, given the benefits of hierarchy (discussed in Chapter Three). What is surprising is that the specific functional areas they chose would be so similar. There are two likely explanations for this similarity. The first is that al-Qaʿida consciously and successfully pushed a specific model down to its affiliate organizations. The second is that this method of organizing formed a focal point for the early leaders of AQI, which eventually became ISI. Many of those individuals had spent time with core al-Qaʿida previously, receiving training and religious indoctrination in Afghanistan, Yemen, and other countries in which al-Qaʿida operates. Although ISI's organization vastly eclipsed al-Qaʿida in scale, and ISI's leadership disagreed ideologically with core al-Qaʿida in several respects, it is nonetheless likely that ISI's leadership looked to al-

**Table 4.1**
**Core Al-Qaʿida's and ISI's (AQI's) Organizational Structures**

| Core Al-Qaʿida | Governorate-Level AQI | District-Level AQI |
|---|---|---|
| Emir | Emir | Emir |
|    Secretary |    Sector emirs |    Military emir |
| Deputy | Committees |    Security emir |
| Advisory council |    Military |    Administrative emir |
| Committees |    Administrative |    Legal (sharia) emir |
|    Military |    Security |    Media (propaganda) emir |
|    Political |    Legal (sharia) |    Medical emir |
|    Administration and |    Media | |
|    finance | | |
|    Security | | |
|    Intelligence | | |
|    Media | | |

SOURCES: Harmony document AFGP-2002-000080 (see "Harmony Program," 2015); and Harmony documents NMEC-2007-632298 and MNFA-2007-000566 (see "ISIL, Syria and Iraq Resources," 2015).

NOTE: All three levels were hierarchical and functionally differentiated.

PX717

Qa'ida's experience as their primary guide for building a new jihadist organization.

## The Geography of ISI Militancy

This section analyzes how ISI organized over space. After laying out the theoretical reasons to expect ISI to try to implement a structure with well-defined geographic subunits, we discuss the specifics of ISI's sector organization in late 2008. We then provide direct evidence that the group was having trouble filling out its organization chart and discuss reasons why that would be the case.

### Literature on the Relationship Between Geography and Insurgency

Relatively little insurgency or terrorism analysis focuses on how militant groups organize themselves geographically or how the geography of militant organizations may influence their collective ability to operate effectively, based on top-down command and control. One study that does explicitly address geography extends the organizational-economics literature on firms to suggest that more–geographically dispersed groups are more likely to encounter serious principal-agent problems. In these situations, geographic dispersion reduces the oversight of upper-level leadership (the principal), so the members of field units or cells (agents) operate with limited supervision. These less supervised units could be more likely to engage in parochial practices and tactics that limit group cohesiveness and effectiveness.[29] In the case of ISI, such practices would have involved skimming money intended for operations, engaging in politically counterproductive brutality, and feuding with other insurgents. An implication of this analysis is that we should expect groups with territorial ambitions to stake out and attempt to staff clear geographic divisions so that they can set up the structures necessary to manage their agency problems.

Our ISI documents suggest that the group tried to do just that. It had a distinct geographic strategy aimed at capturing specific, geo-

---

[29] Johnston, 2008.

graphically demarcated territories and establishing ISI subemirates within them, based on the organizational form and bureaucratic structures described above. The documents also suggest, however, that the group lacked the capacity to administer these territories. By late 2008, ISI was struggling to fill out its organization chart.

**Data and Background**

Documents seized during a raid that killed ISI's number-three leader, Abu Qaswarah, in Mosul on October 5, 2008, provide considerable insight into ISI's strategy of geographic organization, an important aspect of its objective to build an Islamic state in Iraq. The information in the documents is novel, since it lays bare the architecture ISI used to organize and govern across different types of geographic spaces. The documents describe how ISI defined a sector, the group's smallest general administrative unit, what the typical components of a sector should be, and how sectors should be demarcated geographically, as well as the extent to which the group had managed to fill sector leadership and top bureaucratic positions. In short, the documents illustrate how ISI leaders wanted their administration to function across space, and the documents show where the group both succeeded and failed to establish and consolidate bureaucratic structures.

**How ISI Sought to Organize Geographically**

The sector—roughly akin to Iraqi districts, the third-level administrative unit in Iraq—was the fundamental unit of geographic organization addressed in the documents captured in the Abu Qaswarah raid. It appears that ISI used rational calculations to demarcate its sectors. Sector boundaries were based on strategic calculations about the local conflict environment and geographic characteristics. ISI defined a sector as "an establishment identified by a certain number that is regulated by administrative regulations and has either natural or artificial geographical borders."[30] Although the available documents indicate that ISI had changed, or planned to change, most of the sector names

---

[30] *Report of the Borders of the Sectors*, NMEC-2009-602145, captured and declassified ISI document, Harmony Database, Washington, D.C.: U.S. Department of Defense, 2009.

PX717

to reflect its Islamist ideology, they do not mention religious factors as an influence in decisionmaking regarding ISI's geographic expanse and organization.[31]

ISI sectors required certain components: "individuals, weapons and vehicles, (a reasonably hospitable) social reality, and (a reasonably favorable) geographical spot."[32] The main considerations in selecting geographic areas to become sectors, and in demarcating these areas' boundaries, were (1) the availability of an adequate quantity of personnel, (2) the presence of a subdistrict center, (3) the presence of "strategic locations" and "essential considerations" for the group, and (4) the presence of (natural or artificial) geographical dividers.[33] Further, "insignificant groups" would be required to either join a nearby sector or, if they preferred to remain independent, work on developing their organization and administrative capacity to the level of a sector.[34]

Table 4.2 reproduces the ISI document defining the group's 31 sector boundaries as of 2008. The document's original ISI author made various annotations regarding the sectors, noting in particular where the group had cells operating far outside the desired sector borders. The author wanted to attach most of these cells to existing sectors, consistent with the "doctrine" described above. However, some of these cells were allowed to remain independent in practice.[35] One such sector, called al-Birr and al-Taqwa, was located in Anbar governorate, south of Fallujah. ISI leadership decided to bring all units in al-Birr and al-Taqwa under the administration of the al-Ramadi sector. Al-Birr and al-Taqwa units operating outside these boundaries were to be consid-

---

[31] *Report of the Borders of the Sectors*, 2009.

[32] *Report of the Borders of the Sectors*, 2009. This is consistent with cross-national literature on insurgencies; this literature suggests that they are likely to emerge where geographic and social conditions are favorable to them. James D. Fearon and David D. Laitin, "Ethnicity, Insurgency, and Civil War," *American Political Science Review*, Vol. 97, No. 1, 2003.

[33] Subdistricts are the fourth level of geographic subdivision in Iraq, below the nation, governorates (provinces), and districts.

[34] *Report of the Borders of the Sectors*, 2009.

[35] *Report of the Borders of the Sectors*, 2009.

ered "independent battalions and companies till (al-Birr and al-Taqwa) is completed as a sector."[36]

**Table 4.2**
**The Geographic Organization of ISI Sectors, as of 2008**

| Serial Number | Sector Name | Sector Borders | ISI Comments |
|---|---|---|---|
| 1 | Mosul | West toward Rabi'ah, south to al-Qiyarah (internal) side, north is Dahuk, and east is the border of al-Mosul city | To be divided into two sectors in accordance with the requirements |
| 2 | Left Sharqat | From the borders of al-Qiyarah north of the left coast to the south of al-Zab side, east of al-Zab river and west of Dijlah river | |
| 3 | Right Sharqat | From the borders of al-Qiyarah subdistrict north of the right coast to al-Sharqat district inside the borders of the south of Baiji district and east of Dijlah river | |
| 4 | al-Huwayjah | From the center of al-Huwayjah toward the south of al-Fatah area, west of al-'Abbasi subdistrict to Dijlah river toward the east of Kirkuk city and north of al-Dibs district | (To be divided into two sectors in accordance with the requirements) |
| 5 | Tikrit | From al-Fatah and the borders of Baiji district from the north and the city center of Tikrit, the south of the borders of Makishifah subdistrict, south of the center and al-Dur city, east of the divider of the district of al-Tuz, Kirkuk, and west of the highway outside the city of Tikrit | Work on establishing a sector in Baiji |
| 6 | Samarra' | From the north of the city center of Samarra' to al-Dur city, and from the side of Baghdad road to Makishifah Dijlah sub district and to the divider of the south of al-Therthar and the border of al-Dulu'iyyah sub district | Work on having two sectors (Samarra' and al-Mu'tasam) |

---

[36] *Report of the Borders of the Sectors*, 2009.

PX717

**Table 4.2—Continued**

| Serial Number | Sector Name | Sector Borders | ISI Comments |
|---|---|---|---|
| 7 | al-Dulu'iyyah | Inside the borders of al-Dulu'iyyah sub district to the borders of the north of al-Mu'tasam sub district, and east of al-'Azim river, and both west and south of Dijlah river | |
| 8 | al-Ishaqi | From the borders of Samarra' intersecting from the north with al-Therthar to the border of Balad station toward al-Dulu'iyyah new bridge from the east (inside) and toward the entrances of Balad city and west of al-Rewashed area and oil road | (An order came from the city to divide it into two sectors to solve the present problems, and the order is being executed) |
| 9 | al-Mazary (Western Yethrib) | The station road and bridge of al-Dulu'iyyah inside from the north, and west from the station of Balad (outside) and Baghdad road to al-'Ani mosque (inside) west, to the headquarters of National Guard, beginning of Yathrub sub district from the east | A military sector, work on establishing it as a complete sector |
| 10 | Yethrib | West from the beginning of the sub district center to al-'Ani mosque outside the road of Baghdad, west of al-Mosul toward al-Bakr headquarters inside, south and north of the border of Dijlah river | |
| 11 | al-'Azim | North from the divider of al-Tuz, Kirkuk toward Hamrin mountain and Kirkuk, Baghdad road, east of Jalula', Qurrah Tabah, and Dali 'Abbas, south of al-Dujmah and al-Nay and west of al-'Azim river | Work on making it two sectors |
| 12 | al-Tarmiyyah | From north of al-'Bayji, Baghdad al-Mosul road from the west, Dijlah river from the east, and Dhira' Dijlah from the south | |
| 13 | al-Taji | From north of al-Dajil, Baghdad road from the east, al-Naba'i from west, and Dhira' Dijlah from the south | |

PX717

**Table 4.2—Continued**

| Serial Number | Sector Name | Sector Borders | ISI Comments |
|---|---|---|---|
| 14 | al-Karmah | From Sab' al-Bur toward Ibrahim Bin-'Ali, al-Karmah, al-Saqlawiyyah from the west, and adjacent to Dhira' Dijlah from the north | Verify a sufficient quantity for the sector after separating Sa'd battalion |
| 15 | Abu Ghraib | From Abu-Gharib in south, Baghdad al-Ramadi old road to al-Fallujah, north of al-Ghazaliyyah highway road to al-'Ayayshah and al-Haswah from the west | Add the groups that are part of al-Birr and al-Taqwa to the nearby sectors (in al-Zaydan) |
| 16 | al-Fallujah | al-Fallujah and its western suburbs | Add the groups of al-Birr and al-Taqwa that are available amongst the sector |
| 17 | al-Birr and al-Taqwa | From al-Zaydan toward 'Amiriyyah al-Fallujah in the west, and al-'Uwaysat area from the south | The remainder sectors from al-Birr-wa-al-Taqwa will be independent battalions and companies till it is completed as a sector |
| 18 | Jarf al-Sakhr | From the east is the border of Euphrates river, from the south al-Masib area, from the north of 'Amiriyyah al-Fallujah area (al-'Uwaysat) and from the west the desert of al-Ramadi—Karbala | |
| 19 | Baghdad | Inside the border of Baghdad city | Has a special system |
| 20 | Diyala | Inside Ba'qubah city and al-Muqdadayah from the east | Will be two sectors (Ba'qubah and al-Muqdadayah) |
| 21 | West of Dijlah | To al-Qa'id river from the south, Dijlah river from the east, Hillah Baghdad road from the border of Baghdad sector in the north and highway from the west | |

PX717

**Table 4.2—Continued**

| Serial Number | Sector Name | Sector Borders | ISI Comments |
|---|---|---|---|
| 22 | al-Dayrah | From the north al-Qa'id river to the east of Dijlah river, west of Baghdad road and al-Hillah highway to the border of Jablah sub district on the south | Establish a sector in al-Dayrah and separate it from al-Gharir ('Umar bin 'Abd-al-'Aziz) |
| 23 | al-Rashid subdistrict | From the west Baghdad road Old Hillah, from the north and the east Baghdad road highway Hillah and from the south al-Mazra'ah road | |
| 24 | East of al-Latifiyah | From the north al-Mazra'ah road, Baghdad road al-Hillah highway from the east, Baghdad road Old Hilah from the west and Jablah project from the south | (Special exception due to the conditions of area) |
| 25 | Jablah Suwayrah | From the east Dijlah river, Baghdad al-Hillah highway [TC: Quick] from the west, Muyalahah road – al-Haq village from the north and to al-Hillah city from the south | |
| 26 | al-Radwanayah | From the east Baghdad Old al-Hillah, from the south al-Yusifiyyah river, from the west Euphrates river, and from the north to the borders of Baghdad and Abu-Gharib sectors | Divide it into two sectors |
| 27 | al-Mahmudiyyah | al-Yusifiyyah river from the north, Baghdad – Old Hillah from the east, al-Latifiyyah river from the south and Euphrates river from the west | |
| 28 | West of al-Latifiyyah | al-Latifiyyah river from the north, Baghdad – Old Hillah from the east, al-Latifiyyah river from the south, Euphrates river from the west and Alexandria sub district from the south | |
| 29 | Southern Cities | Diyala river from the north, Dijlah river from the west, al-Nahrawan from the east, and the districts of the cities (inside) from south | |

PX717

**Table 4.2—Continued**

| Serial Number | Sector Name | Sector Borders | ISI Comments |
|---|---|---|---|
| 30 | Northern Cities | The districts of the cities (inside) in north, Baghdad – al-Kut from the east, al-Hafriyyah sub district from south, and Dijlah river from the west | |
| 31 | al-Ramadi | From the east of Fallujah to the city center of al-Ramadi and al-Ratbah. West toward Rawah and 'Anah areas | Will be a new and independent battalion and make part of Rawah and 'Anah |

SOURCE: *Report of the Borders of the Sectors*, 2009.

NOTES: This table is a verbatim reprinting of the Harmony document's official English translation. The brackets appear in that version. TC = translator comment. In the Arabic version of the document, the column heading that appears in English as "serial number" is the Arabic letter *ta*, the equivalent of a *T* in English. This likely is an abbreviation for *tarqim* (numbering).

To visualize the boundaries described in Table 4.2, Figure 4.7 shows the ISI sectors overlaid on maps of Iraqi governorates. (The first map is of the entire country, and the second map is of the smaller sectors in the center of the country.)

As Table 4.2 and Figure 4.7 show, ISI listed 31 sectors in its documentation of the group's geography. The territory covered by these sectors was substantial, ranging as far south as Hamzah and Shamiya districts in Diwaniyah governorate (previously known as Qadisiyah governorate); as far west as Rutbah in western Anbar governorate, a strategic location on the Amman-Baghdad road and on the Mosul-Haifa oil pipeline; as far east as Mazra'ah, in the oil-rich Khanaqin district of Diyala governorate, near the Iranian border, in which there are sizable Kurdish and Shia populations that had been targeted by ISI; and as far north as Duhok, the predominantly Kurdish capital city of Iraq's northernmost governorate, also called Duhok. Perhaps more interesting, Duhok is located in northern Iraq's semiautonomous Kurdistan Region, indicating that ISI envisioned or even forged a presence within at least certain parts of Iraqi Kurdistan.

PX717

**Figure 4.7**
**ISI Sector-Level Map, as of 2007**



PX717

**Figure 4.7—Continued**



SOURCES: Harmony Document NMEC-2009-602125 (see ISIL, Syria and Iraq
Resources," 2015); *Report of the Borders of the Sectors*, 2009.
NOTES: Names in gray are those of Iraqi governorates. Names in purple are those of
ISI sectors. Although these documents were undated, they were captured from ISI's
number-three leader in late 2008, and were thus likely to be at least a fairly
up-to-date approximation of the group's geographic organization at that time,
which was well after the surge and other factors had substantially cut into ISI's overall
capacity. Those factors explain why the geography of ISI in Anbar entails much larger
sectors than that which existed when the group was at its peak strength there in 2005
and 2006, when it had six sectors.

**RAND** *RR1192-4.7b*

PX717

ISI's boundaries were dynamic. Figure 4.8 shows the estimated ISI sectors for Anbar governorate in 2005–2006. At the time, ISI's strength in Anbar was substantial, and the group used many more subdivisions. Whereas the group had two sectors in Anbar in 2008, it had six in 2005–2006. ISI's geographic organization shifted in accordance with the group's fortunes.

**Figure 4.8**
**Estimated ISI Sectors in Anbar, 2005 to 2006**



SOURCE: Bahney, Shatz et al., 2010, which drew from Harmony batches MA7029-5 and Ala Daham Hanush.
NOTES: The figure shows the authors' assessments of ISI's six sector divisions of Anbar governorate. These include Rutbah, Gharbiyah, Awsat, Ta'mim, Ramadi, and Fallujah and belts. These divisions are similar to the official Iraqi administrative divisions of Anbar governorate.
**RAND** *RR1192-4.8*

PX717

**ISI Administration Across Space**

In addition to defining sectors, the documents provide more information about ISI's plans for renaming certain sectors, as well as fields containing the names of four specific sector positions:

- sector emir
- sharia (or legal) emir
- military emir
- media emir.[37]

These documents offer substantial insight into three important organizational issues on which there is no extant analysis of al-Qaʿida or an al-Qaʿida–affiliated group, such as ISI, based on internal documents.

The first organizational issue is the strategic logic that underlay ISI's geographic organization. In 2008, the year in which the documents were captured and likely the year in which they were written, ISI was under heavy pressure because of aggressive and persistent counterterrorism operations conducted by coalition and Iraqi forces.

The second organizational issue is the preferences of top ISI leaders regarding how they planned to optimize their organization in the future. The leadership's aims, elaborated in the documents, can be fruitfully compared with the set of baseline conditions around which ISI had organized itself in 2008. Given the baseline conditions that ISI faced in 2008, the plans reveal what ISI's aims as an organization were and what ISI's leadership believed was possible under these conditions.

The third organizational issue concerns the group's ability to fill key local leadership and administrative positions across the sector-level subunits that made up much or all of the de facto state that ISI was working to establish. Despite ISI leadership's apparent strong preference to have a systematic, hierarchical organization at the local, provincial, and national levels, the group appears to have failed to find the personnel to fill key positions and replenish the large-scale losses it suffered from counterterrorism operations. This human capital constraint is slightly different from the one normally addressed in the literature on

---

[37]  Harmony document NMEC-2009-602125; see "ISIL, Syria and Iraq Resources," 2015.

insurgency. Rather than being constrained by the supply of low-skilled fighters, these documents suggest that ISI was constrained in some way by the scarcity of middle managers.

### ISI's Preferred Administration Within an Islamic State

Numerous entries in the comments field of the document reproduced in Table 4.2 show that ISI leadership wanted to divide a significant proportion of its sectors into multiple sectors. Although it is not explicitly stated in the available documents, the simplest and most compelling hypothesis for this pattern is that ISI leaders sought to increase the group's direct control over valued territories whose sizes, as delineated by the boundaries described in Table 4.2, were too expansive for the group's sector-level administrators to oversee. The resulting lack of administrative capability could hinder ISI's ability to exercise control over its designated sectors, and thus open the door for other insurgent groups or tribal militias to seize control of ISI sectors.

Poor administrative capacity might also have affected ISI leadership's ability to maintain a high level of control over the group's internal affairs, including the detection and punishment of corruption, disloyalty, or other acts of insubordination from below.[38] By carving large sectors into multiple smaller ones and implementing new sector-level administrative structures in each newly designated smaller sector, ISI would be better equipped to avert these threats and establish or consolidate tighter control across the Islamic emirate sought by ISI leadership.

### Who Governs, and Where? ISI's Lack of Local Administrators

It is clear that ISI had well-laid-out plans to construct hierarchical and highly bureaucratic organizational structures to administer various components of an Islamic state at the national, provincial, and district (or sector) levels. But how successful was the group at establishing and maintaining these structures? Measuring administrative capac-

---

[38] On geographic obstacles to oversight in insurgent organizations, see Johnston, 2008; and Francisco Gutiérrez Sanín and Antonio Giustozzi; "Networks and Armies: Structuring Rebellion in Colombia and Afghanistan," *Studies in Conflict & Terrorism*, Vol. 33, No. 9, 2010. In the traditional management literature, the issues that arise when managers have excessively large numbers of subordinates to supervise are often discussed in terms of setting the appropriate *span of control*.

PX717

ity is notoriously difficult. A variety of measures, for example, have been constructed to gauge the governance capacity of nation-states, but scholars disagree over the concepts and data that underlie many of the indexes and variables.[39] Assessing the administrative capacity of militant groups is an even more daunting task. Little information and almost no quantitative data are available.

One way of gleaning insight into this issue is by examining an organization's ability to fill key positions that are laid out in its organization chart. An organization that can fill key leadership and administrative positions will be more likely to have the capacity to carry out administrative and bureaucratic tasks than one that cannot. To be sure, being able to fill key positions within an organization is not necessarily synonymous with being able to carry out these functions, but an organization that lacks the human capital at the top level is unlikely to be able to organize and conduct the full scope of the functions it seeks to execute or to build the institutions it needs to impose and consolidate control over particular geographic areas.

ISI's documents show that it had difficulty filling the four key positions for each sector. Of the 31 sectors listed, 30 also listed the status of appointments to the four specified positions. Of 120 total positions listed for the 30 sectors, ISI had filled only 46, as of the writing of the document (Table 4.3).

ISI listed a leader (sector emir) as present in only 18 of the 30 sectors for which these data were recorded. This finding is striking, as 40 percent of ISI's local subsidiaries lacked the presence of a leader. This is particularly important not only because the number of unfilled sector leader positions is high but also because, as shown earlier in this chapter, sector emirs play an important role beyond leadership,

---

[39] For a variety of applications using different measures of institutional or governance capacity, see Stephen Knack and Philip Keefer, "Institutions and Economic Performance: Cross-Country Tests Using Alternative Institutional Measures," *Economics and Politics*, Vol. 7, No. 3, 1995; Daron Acemoglu, Simon Johnson, and James A. Robinson, "The Colonial Origins of Comparative Development: An Empirical Investigation," *American Economic Review*, Vol. 91, No. 5, 2001; Cullen S. Hendrix, "Measuring State Capacity: Theoretical and Empirical Implications for the Study of Civil Conflict," *Journal of Peace Research*, Vol. 47, No. 3, May 2010; James D. Fearon, *Governance and Civil War Onset*, Washington, D.C.: World Bank, World Development Report Background Paper, August 2011.

PX717

**Table 4.3**
**ISI's Filled Sector Leadership and Administrative Positions, as of 2008**

| Type | Number Filled | Share Filled (%) |
|------|:-------------:|:----------------:|
| Sector emir | 18 | 60 |
| Sharia emir | 11 | 37 |
| Military emir | 17 | 56 |
| Media emir | 0 | 0 |
| All | 46 | 38 |

SOURCE: Harmony document NMEC-2009-602125; see "ISIL, Syria and Iraq Resources," 2015.

NOTES: For each type of leader, the calculations made were based on the 30 total sectors that were listed in the documents captured in the Abu Qaswarah raid and that had data on leadership. The grand total of 38 percent (of all available sector-level positions filled) is inclusive of media emir positions, of which none was recorded as filled. Excluding media emir positions from this calculation, 51 percent of ISI sector, sharia, and military emir positions were filled.

decisionmaking, and general sector oversight—they are responsible for transmitting information from their sectors up the chain of command to higher-level provincial leaders. For the 12 sectors for which the sector emir position was not filled, it is unclear how, if at all, detailed reports were submitted to ISI higher-ups, or who, if anyone, oversaw operations and administered remaining ISI structures on the ground.

As noted, the documents indicated that no sectors had filled the position of media emir. As a result, ISI failed to fill all of the four key positions listed in the document in all of the 30 sectors for which data were available (Table 4.4). Nine of the 30 ISI sectors (30 percent) for which data were recorded, however, had filled each of the three remaining positions.[40] These sectors are Mosul, Left Sharqat, al-Dulu'iyyah (also spelled *Duluiyah*), al-Ishaq, al-Mazary (West Yethrib), al-Tarmiyah, al-Taji, Abu Ghraib, and Jarf al-Sakhr. Seven of these nine sectors appear to have been located north of Baghdad, where ISI was able to maintain a physical presence and organizational infrastructure in the wake of increased pressure from coalition forces

---

[40] No information was available for one sector, al-Birr and al-Taqwa.

PX717

**Table 4.4**
**Sectors with Different Numbers of Positions Filled**

| Total Number of Positions Filled | Number of Sectors | Share of Sectors (%) |
|---|---|---|
| 4 | 0 | 0 |
| 3 | 9 | 30 |
| 2 | 7 | 23 |
| 1 | 5 | 17 |
| 0 | 9 | 30 |
| Overall | 30 | 100 |

SOURCE: Harmony document NMEC-2009-602125; see "ISIL, Syria and Iraq Resources," 2015.

and ISF. Abu Ghraib and Jarf al-Sakhr, both west of Baghdad, were the only two mostly administered sectors that were not located north of Baghdad—the areas to which ISI increasingly moved its base after 2006 because of coalition and Iraqi counterinsurgency and counterterrorism operations. In seven sectors, ISI filled two of the four positions, and in five sectors, ISI filled one of the four key positions. Four of the five had a sector emir only, with no other ISI official listed.[41]

Perhaps most striking about the sector-position data is that in nine sectors, ISI was unable to fill any of the four positions, meaning that nearly one-third of ISI sectors lacked not only a top sector leader but also any leaders to administer key functions. These sectors include Baghdad, Diyala, West of Dijlah, al-Dayrah, al-Rashid subdistrict, Jablah Suwayrah, Southern Cities, Northern Cities, and Ramadi.

The size of the sector in terms of population appears to bear little relationship to whether ISI was able to fill the positions. If we construct an additive index indicating the number of positions filled (which ranges from 0 to 3), the bivariate correlation between that index and the sector population is weakly negative if we include the two largest

---

[41] The other sector that had only one ISI official was al-Karmah. Al-Karmah's only listed ISI official, Abu Ahmad, was listed as the sector's military emir (Harmony document NMEC-2009-602125; see "ISIL, Syria and Iraq Resources," 2015).

PX717

sectors (which had no positions filled) and weakly positive if we exclude those sectors.

The geography of these sectors is revealing: seven were in or around Baghdad; two were in Anbar governorate, in western Iraq; and one was in Diyala governorate. In each location, coalition-led surge or SOI operations had cleared ISI from its former sanctuaries, from late 2006 through early 2008, most notably in Anbar governorate, Baghdad and its surrounding belts, and Diyala governorate.[42]

Previous analysis of coalition and ISF operations indicated that ISI had been routed in its previous strongholds.[43] Indeed, in January 2008, LTG Raymond Odierno commented: "Al Qaeda has been pushed out of urban centers like Baghdad, Ramadi, Fallujah and Baqubah, and forced into isolated rural areas. Many of their top leaders have been eliminated, and finding qualified replacements is increasingly difficult for them."[44] The captured documents provide another source of information that clearly corroborates Odierno's assessment. This information is valuable, because systematically analyzing militants' own internal documents can help analysts overcome some of the ambiguity of observed violence, such as the attacks documented in the MNF-I SIGACTS III Database.[45] This ambiguity, in isolation, makes it difficult to discern militants' strategic choices to reallocate or constrain violence from observer effects stemming from troop deployments or from genuine reductions in the capacity to perpetrate attacks. The documentary evidence helps remedy this potential shortcoming of other available data sources by demonstrating that not only did coalition forces and Iraqi operations significantly reduce violence in areas previously under ISI control but that it was unlikely that the decline in violence was an artifact of ISI leadership opting to constrain violence in these areas. Instead, it appears that, as an organization, ISI no longer had a significant presence in these areas, and its capacity to perpetrate

---

[42] Hamilton, 2008b, p. 3.

[43] Hamilton, 2008a, pp. 2–3.

[44] Raymond Odierno, "DoD News Briefing with Lt. Gen. Odierno from Iraq," January 18, 2008.

[45] Empirical Studies of Conflict Project, n.d.

violence diminished as these areas were secured under coalition and Iraqi control.

### ISI's Efficiency Across Space

Although the available data do not permit a thorough analysis of how ISI's operational efficiency varied across space, we gain a preliminary understanding by looking at the simple relationship between administrative positions filled and the production of violence. ISI more precisely produced violence relative to the population in areas where it had more positions filled in its administrative apparatus.

Assuming that ISI's attacks were roughly proportional with overall combat violence, the variation in the production of violence across the 31 ISI sectors during 2008 was very large.[46] The group's three most productive sectors had between 13.7 and 30.4 combat incidents per 1,000 residents in 2008. The next most productive sector had only 4.7 combat incidents per 1,000. ISI sectors in Anbar were the least productive during this period—not surprisingly, given that the group had been largely routed from that governorate by late 2007.

There are some differences in ISI attack rates depending on the proportion of administrative positions filled, but it is unclear whether those differences highlight the importance of filling administrative positions for producing violence or the fact that, during this period, the ISI hierarchy was encouraging its fighters to lay low. If we look at average rates of combat, effective ISI administration seems to have played a restraining role on the group's production of violence. In the nine sectors in which no leadership positions were filled, the average number of combat incidents per 1,000 residents was 4.8. In the 12 sectors where one or two positions were filled, it was 4.3, and in the nine with three positions filled, it was 2.4.

If, however, we look at the ability of ISI to produce levels of combat commensurate with an area's population, a different picture emerges.

---

[46] This is a potentially flawed assumption, but there are no unclassified data on insurgent attacks in Iraq that provide the precise geolocation required to attribute them to the ISI sectors we have identified and that attribute attacks to specific groups. Since anecdotal accounts attribute much of the combat outside the south in 2008 to fighting against ISI, we believe that the assumption is a reasonable starting point.

PX717

Once we drop the two sectors that covered areas with populations of more than 2 million people (Baghdad and the Northern Cities), then the bivariate correlation between the count of combat incidents and a sector's civilian population is 0.63 in places with no administrative positions filled, 0.38 in sectors with one or two positions filled, and 0.88 in sectors in which ISI filled all positions.

### ISI's Services Within Its Territories

In Chapters Eight and Nine, we discuss, in detail, how AQI and ISI made and spent their money. However, we preview the findings here because they are relevant to a key question that follows from ISI's lack of administrative capacity, as demonstrated earlier in this chapter. Specifically, did the group provide services, as a normal government would?

Overall, we see that neither AQI in Anbar nor ISI in Ninewa spent much of its budget on social services. In Anbar governorate, the AQI administrator's records show that the group spent the vast majority of its revenue on operational expenses—transfers from the AQI Anbar governorate level to local sectors on an as-needed basis. Costs that the AQI administrator categorized as "administrative" were the second-largest expenditure category in the Anbar database, but administrative expenses amounted to less than one-fifth the amount that AQI spent on sector transfers. The Anbar administrator also included a category of expenses called "support," which included expenditures made on various types of social support. The Anbar administrator's records show that AQI spent 10–15 percent of AQI's budget on services.[47]

AQI's declaration of an Islamic state (of Iraq) did not increase the group's spending on social services. To preview our findings in Chapter Eight concerning how ISI in Ninewa governorate spent its money in late 2008 to early 2009, only a tiny fraction was spent on social services. During this period, ISI in Ninewa spent vastly more money to pay its own personnel than on anything else. Military-related purchases made up about 10 percent of its budget. ISI spent very little on social services—funding disbursed for the group's medical committee, for example, made up less than 1 percent of ISI's total spending during

---

[47]  For a detailed breakdown of AQI and ISI income and expenses, see Chapter Eight.

the period. No other expenditure categories that would seem to represent spending on social services appear in the group's financial records.

An important question is whether ISI's successor group, the Islamic State, operates differently. Specifically, does the Islamic State provide services, unlike its forerunners studied in this report? Overall, ISI simply was unable or unwilling to allocate much of its budget to service provision. Although we do not have high-quality primary-source data to assess this proposition, it appears that, as of early 2015, the Islamic State's newfound riches enabled it to provide better quality and more services in areas firmly under its control, such as Raqqa, Syria. As of the summer of 2015, the Islamic State appeared to be offering a variety of services in Mosul and throughout its territories.[48] This suggests that the group's goals for a state extended well beyond marking internal boundaries and appointing officials. Rather, this suggests that had ISI not been severely damaged starting in 2006, it too would have built more-complex institutions for administering a territory and population.

## Conclusion

We present three key findings about the group's organization. First, ISI's internal organizational structures much more closely resembled a hierarchy than a network. This finding is important but not revelatory: Previous research based on captured ISI documents had reached a similar conclusion, although based on a narrower set of evidence.[49]

Second, ISI's internal organization appears to closely mirror that of core al-Qa'ida, dating back to the pre-9/11 period in Afghanistan.[50] There are two possible explanations for this. The first is a path-dependence argument: Al-Qa'ida's affiliates and successors are

---

[48] Ben Hubbard, "Offering Services, ISIS Digs Deeper in Seized Territories," *New York Times*, June 16, 2015a; Nour Malas, "Iraqi City of Mosul Transformed a Year After Islamic State Capture," *Wall Street Journal*, June 9, 2015.

[49] Bahney, Shatz, et al., 2010.

[50] National Commission on Terrorist Attacks Upon the United States, 2004.

not nearly as adaptive and dynamic as many have argued.[51] Rather, ISI adopted organizational structures used by al-Qaʻida's core because that was how the people who set up the groups were indoctrinated and trained during the 1990s and the first part of the 21st century. The second explanation for the similarities between how ISI and core al-Qaʻida sought to organize is a functional one: the exigencies of managing a territorially oriented insurgency mean that any rebels with territorial ambitions will naturally gravitate to the kind of hierarchical structure that ISI used. Under this view, the coincidence in naming conventions between ISI and al-Qaʻida may reflect shared ideological origins, but their structural similarities reflect similar managerial challenges and operational environments.

This degree of similarity is striking. It suggests that al-Qaʻida–affiliated groups will tend to adopt organizational structures and standard operating procedures that are similar to those of core al-Qaʻida because they have been taught doctrine that includes the basic al-Qaʻida structure.[52] Although affiliated groups' internal organizational structures reveal nothing about their intent to strike at "far enemy" countries, such as the United States and the United Kingdom, they do have implications for developing strategies to counter these groups. Al-Qaʻida's internal organizational structures and standard operating procedures are well-known. The United States and its allies will not need to start from scratch in devising countermeasures aimed at dismantling

---

[51]  For example, see Hoffman, 2004; Christopher M. Blanchard, *Al Qaeda: Statements and Evolving Ideology*, Washington, D.C.: Congressional Research Service, November 2004; and Assaf Moghadam, "How Al Qaeda Innovates," *Security Studies*, Vol. 22, No. 3, 2013. See also Rabasa et al., 2002; and Seth G. Jones, *A Persistent Threat: The Evolution of al Qaʻida and Other Salafi Jihadists*, Santa Monica, Calif.: RAND Corporation, RR-637-OSD, 2014.

[52]  For example, many of the themes that al-Qaʻida in the Islamic Maghreb (AQIM) leaders discussed in documents uncovered by the then–Associated Press reporter Rukmini Callimachi also appeared in al-Qaʻida documents from Somalia and Afghanistan, as well as in AQI and ISI documents from Iraq. Callimachi writes about AQIM's detailed financial reporting requirements, as well as challenges managing relationships with locals, reigning in overly enthusiastic operatives, and making sure organizational resources are well spent. See Callimachi's series "The Al Qaeda Papers," published between January 22, 2013, and December 29, 2013 (the Pulitzer Prizes website hosts PDFs of ten of these articles).

PX717

new affiliate groups when they emerge or existing groups when they are resurgent.[53]

Third, regarding the geography of ISI's organization, ISI appeared to use straightforward logic to define the local areas it wanted as constituent parts of a larger emirate. The geographic factors that ISI used might provide useful guidance for security forces tasked with disrupting and dismantling other insurgent and terrorist organizations that seek control over a given area of operations.

Although ISI had specific territorial ambitions and governance goals over its defined jurisdictions, the group failed to fill a large proportion of the positions necessary to establish and consolidate local, sector-level subsidiaries. As the group's reemergence and takeover of Fallujah, Ramadi, and Mosul in 2014 demonstrate, ISI was down but never completely out. Nonetheless, its failure to administer a large proportion of its Islamic state implies that ISI, and possibly other al-Qaʻida affiliates, may be vulnerable to systematic human-capital deficits. Recruiting low-level fighters to a war that represents a popular cause among a substantial proportion of the local, national, and regional populations can be relatively easy. Maintaining a strong cadre of skilled, trusted leaders is difficult for covert organizations under attack. Recruiting middle managers will be difficult in the long run for any group that fails to win some measure of popular support.

---

[53] See, for example, Brett McGurk, "Al-Qaeda's Resurgence in Iraq: A Threat to U.S. Interests," testimony to the House Foreign Affairs Committee, February 5, 2014.

PX717

# Foreign Fighters, Human Capital, and Terrorism in Iraq

Like any organization, ISI needed workers with specific skills to achieve its objectives. In some cases, it found these skills among the domestic labor pool in Iraq. In others, it imported foreign fighters who possessed sought-after skills. Foreign jihadists traveled from many countries to join the insurgency in Iraq.[1] This chapter analyzes the "human capital" of ISI members, and specifically how ISI managed its human capital. A number of documents—in particular, two sets of documents captured in 2007 in Salah al-Din and Anbar governorates—provide significant new details about the demographics, skills, education, and other attributes of a large set of ISI members. At the time of our research, the data analyzed here were unique among the hundreds of ISI document collections we have reviewed. They reveal how ISI administrative officials methodically collected, organized, and stored information on demographics and skills about a subset of the group's members to match capabilities with the group's requirements. An ISI administrative emir likely collected and stored this information to help fill the specific and dynamic human-capital needs of his organization, which was experiencing rapid personnel attrition at the time, from arrests and raids. As we discuss in Chapter Seven, we believe that many of the members in these 2007 data—at least those who survived—are still active in ISIL.

---

[1] The foreigners here fit a broad definition of the term *foreign fighter*. Namely, a foreign fighter is a "non-citizen of a state experiencing civil conflict who arrives from an external state to join an insurgency" (David Malet, "Foreign Fighter Mobilization and Persistence in a Global Context," *Terrorism and Political Violence*, Vol. 27., No. 3, 2015).

PX717

These data are unlikely to be atypical. In mid-2014, high-ranking Iraqi security officials indicated that the Islamic State kept analogous data on its members' skills and operational roles.[2] More recently, a new study of leaked Islamic State internal documents from 2013 and 2014 suggests that the group is currently keeping similar data on its members. As with our study, the new study similarly concluded that the group was keeping these data to scout for specific types of talent within its ranks.[3]

ISI faced unique personnel and human-capital challenges during the period we consider here. Prior RAND analysis showed that a sample of individuals in ISI faced a very high degree of occupational risk in 2006, with high annual violent mortality rates of more than 17 percent, and that risk increased dramatically in subsequent years.[4] Furthermore, ISI needed a continuous inflow of committed individuals to Iraq to support its signature tactic—suicide attacks—which ISI and broader al-Qaʻida referred to as *martyrdom operations*.[5] Based on the group's varied requirements, ISI needed steady inflows of various types of human capital to maintain the group's high operational tempo and to efficiently operate its administrative apparatus. Specifically, the group required both highly motivated operatives willing to sacrifice their lives in suicide operations and operatives with the varied skill sets required to ensure that the organization could function according to plan and remain resilient in the face of the pressure from coalition and Iraqi counterinsurgency and counterterrorism operations.

Our analysis of the documents supports three key hypotheses about ISI's labor pool. The first is that ISI's foreign labor force was diverse. The second is that foreign jihadists' skills tended to be distinct from skills more common among native Iraqi jihadists. The third

---

[2]  "World's Richest Terror Army," reported by Peter Taylor, *This World*, BBC Two, April 22, 2015.

[3]  Brian Dodwell, Daniel Milton, and Don Rassler, *The Caliphate's Global Workforce: An Inside Look at the Islamic State's Foreign Fighter Paper Trail*, West Point, N.Y.: Combating Terrorism Center, West Point, April 18, 2016.

[4]  Bahney, Shatz, et al., 2010; Fishman, 2008.

[5]  Felter and Fishman, 2007.

PX717

is that ISI invested in human-capital development in ways that were responsive to its needs for specific skills among its workforce.

With respect to the first hypothesis, ISI foreigners can be easily divided into two groups: (1) a largely unskilled group that showed up without prior experience and (2) experienced terrorist operatives. These skilled operatives contributed a variety of knowledge and expertise to ISI and were likely placed into specific positions based on human-resources data that ISI collected on hundreds of foreign volunteers. The unskilled operatives were typically routed into either suicide-bombing operations or training.

With respect to Iraqi fighters, the information gathered by ISI suggests that Iraqis were also recruited and placed based on specialized skill sets. Those skills were different from those of the foreigners, however. Iraqi national recruits were more likely to have had traditional military skills and training in small-arms tactics.

Our evidence on the third hypothesis follows from the way foreign fighters were prepared if they were designated to operations other than suicide attacks. In contrast to other studies, we find evidence that ISI used foreign labor much more expansively than just for suicide operations.[6] ISI trained foreign individuals to execute a range of operations and was using foreign labor primarily for nonsuicide operations prior to 2008.[7]

Such training was part of ISI's organizational culture, going back to training camps that AQI's first leader, Abu Mus'ab al-Zarqawi, set up outside Herat, Afghanistan, in early 2000 for his original organization, Jund al-Sham;[8] these camps have continued through the present day in various locations in Iraq and Syria.[9] Accounts vary about how

---

[6] For an exemplar of earlier work, see Mohammed Hafez, *Suicide Bombers in Iraq: The Strategy and Ideology of Martyrdom*, Washington, D.C.: United States Institute of Peace, 2007.

[7] Brian Fishman, "The Islamic State: A Persistent Threat," prepared testimony to the House Armed Services Committee, July 29, 2014.

[8] Weaver, 2006.

[9] John Reynolds, "French Airstrikes Target ISIS Training Camps in Raqqah," *Guardian*, November 16, 2015; Hassan Hassan, "The Secret World of ISIS Training Camps—Ruled by

PX717

ISI managed training during the war in Iraq. One detailed investigation into ISI training found that the group faced severe challenges in training its foreign recruits in Iraq during the height of the coalition involvement and resorted to training foreigners either in larger camps in Syria or in small safe houses inside Iraqi cities.[10] This report is consistent with others claiming that ISI commonly trained foreign operatives in rural eastern Syria.[11] Other reports from the period, however, document instances where ISI set up large camps in Iraqi towns under its control.[12]

Regardless of where training occurred, it is clear that ISI invested in its people. And the group appears to have allocated training dollars in a rational manner. According to the documents we analyze, ISI disproportionally trained foreign fighters over Iraqis. That difference is consistent with compensating for the foreigners' relative lack of military experience.

Of course, using non-Iraqi labor exposed the group to significant operational risks. Foreigners in Iraq were more likely to be detected as terrorists by the local population and by security forces, since they could easily be identified unless they were hidden in a back-office job or sheltered away in a safe house.[13] This dilemma raises an important

---

Sacred Texts and the Sword," *Guardian*, January 24, 2015; Duraid Adnan and Tim Arango, "Suicide Bomb Trainer in Iraq Accidentally Blows Up His Class," *New York Times*, February 10, 2014; Brett McGurk, "Iraq at a Crossroads: Options for U.S. Policy," statement for the record, Senate Foreign Relations Committee hearing, July 24, 2014; Bill Roggio, "Islamic State Touts Training Camp in Northern Iraq," *The Long War Journal*, July 22, 2014; Human Rights Council, *Report of the Independent International Commission of Inquiry on the Syrian Arab Republic*, Geneva: United Nations General Assembly, A/HRC/27/60, August 13, 2014; and "Gun Safety, Self Defense, and Road Marches—Finding an ISIS Training Camp," *Bellingcat*, August 22, 2014.

[10] Truls Hallberg Tønnessen, "Training on a Battlefield: Iraq as a Training Ground for Global Jihadis," *Terrorism and Political Violence*, Vol. 20, No. 4, 2008.

[11] Bill Roggio, "Iraq Attacks and the Syria Connection," *The Long War Journal*, August 29, 2009.

[12] Mike Few, "The Break Point: AQIZ Establishes the ISI in Zaganiyah," *Small Wars Journal*, April 17, 2008.

[13] Fishman, 2009; Brian Fishman, "Syria Proving More Fertile Than Iraq to al-Qa'ida's Operations," *CTC Sentinel*, November 26, 2013.

PX717

general question for understanding such terrorist organizations as ISI: Why recruit foreign Islamists who pose security risks and are likely to further exacerbate relations with the local population? The answer must be that, once trained, the additional labor added value, even considering risks.

In the remainder of this chapter, we first discuss the data we have on ISI human capital. Second, we report our analysis of differences in how foreign and Iraqi ISI members recruited and assigned personnel. We conclude by discussing potential implications of these findings for the current U.S.-led coalition campaign against the Islamic State.

## Data on ISI Human Capital

Our data on ISI's human capital come primarily from two sets of records captured in Anbar and Salah al-Din governorates in 2007.[14] The Salah al-Din data contain entries for 82 fighters, all of whom were Iraqi in origin. The data captured in Anbar contain entries for 417 fighters, primarily foreign fighters. Many of the foreign fighters have a date of entry into Iraq. All fighters with a date recorded entered Iraq in 2004 and 2005. Taken together, we have 393 foreign fighters and 106 Iraqi fighters, a total of 499 unique personnel records detailing attributes that ISI tracked. Entries for fighters detail demographic information, education, combat and other skills, and training. Although the record keepers did not track all attributes for each fighter, the combined records give us insight into the needs and priorities that ISI had in managing its human capital. The data provide insight into how ISI managed a diverse workforce during a period in which the group was being routed militarily and thus needed to manage the constant personnel turnover that resulted from the high rate at which ISI members were captured and killed.

---

[14] The full set of documents used in analysis here includes Harmony documents MNFT-2007-005315, MNFT-2007-005316, MNFT-2007-005318, MNFT-2007-005319, NMEC-2007-633795, and NMEC-2007-634059; see "ISIL, Syria and Iraq Resources," 2015.

PX717

The personnel records shown in Figure 5.1 come from documents captured in Anbar governorate in March 2007. This particular document shows how ISI tracked battle experience and locations where the members were active. The documents resemble the advice that the al-Qaʿida leaders Usama Bin Ladin and Ayman al-Zawahiri sent to ISI leaders in a letter in March 2008, which was intercepted by U.S. forces:

> a. The sheikh [Bin Ladin]—may God preserve him—advises you to set up a department in the bureau for the affairs of the muja-hideen in the Islamic State of Iraq, part of its duties would be the following:[15]

> (1) To look for hidden capabilities among the brothers who have joined the [Islamic] State and activate them, by gathering detailed questionnaires from each member in which he would clarify his age, health condition, experience, level of education and the com-mendations he has received, the areas where he excels, and so on, and what ideas he has to develop the work and support the Jihad, and what advice he has for the [Islamic] State and its lead-ers, bearing in mind the various security aspects to safeguard the information for the safety of the brothers. Also, only nicknames are to be used in identifying them.

> (2) To develop the expertise of the brothers in the various required fields through the available capabilities and accessible means.

> (3) To identify the gaps in required expertise in terms of quality and quantity.

> b. Seek to appoint some qualified brothers to set up a higher legal council and form a higher sharia court for the Muslims in gen-eral, including the mujahideen, which would not follow the State or any of the groups, and whose task is to rule in disputes by applying the provisions of Sharia, so that justice would prevail and security would settle and disputes would disappear.

---

[15] *Mujahideen* is the plural for *mujahid*, which means "one who engages in jihad." Al-Qaʿida and ISI often referred to their members as *mujahideen*.

PX717

**Figure 5.1**
**ISI's Records of Skills, Country of Origin, and Experience**

| | Previous Missions | | | Previous Tours | | | Location Series | | | | Security Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Types | Location | Date | Assignment | Type | Duration | Date | 1 | 2 | 3 | 4 | |
| Battels | Baghdad - Abughraib - Rawah- Al-'Ubaydi | | | Estensive Engagement Course | | | | | | | wanted |
| Battels | Al-'Ubaydi-Al-M'adid | | | Informatory | | | | | | | very good |
| Battle | Haditha | | | | | | | | | | good |
| Administrative | Haditha | | | | | | | | | | |
| Battles | Al-Khisah - Haditha | | | Engagement - Mines | | | | | | | |
| Administration | Hadithah | | | | | | | | | | |
| | | | | | | | | | | | |
| Rawa clashes | | | | Penetrations / IED courses | 15 days | | Rawa/ 9 months | | | | Wanted |
| Attack checkpoints and Military base/ Heet ambush/ Attack | //Abu-Gharib | | | various military courses/ al-Ma'adid course | 2 months/ 1 week | | Rawa/Ana | Heet | Baghdad | al-'Ubydi | |

SOURCE: Harmony document NMEC-2007-634059-1; see "ISIL, Syria and Iraq Resources," 2015.

RAND RR1192-5.1

PX717

c. Advancing the strong and faithful in general wardships and important jobs, and training the others in finance and the like.

d. As for what concerns external support, the brothers in the State must include in their communiqués the required needs and expertise and to specify their quantities. We in turn will confirm in our communiqués what you have requested.[16]

Given that the documents predate this letter from al-Qaʿida, it is possible that ISI had previously received this guidance or had arrived at the idea independently. Our documents suggest that ISI tried this system in a limited fashion, and it might have determined that either the system did not fit its needs or was too risky to document identifying information about its members.

We emphasize that these data are a nonrandom selection of records, and the record keeper documented attributes of ISI members inconsistently within—as well as across—the documents. Consequently, there are limits to our analysis, and we have chosen to present a conservative description of the population in the records.[17]

---

[16] Bill Roggio, Daveed Gartenstein-Ross, and Tony Badran, "Intercepted Letters from al-Qaeda Leaders Shed Light on State of Network in Iraq," *The Long War Journal*, September 12, 2008.

[17] When the record keeper listed attributes for some but not for others, we assume that the member with the blank record did not possess those attributes. For instance, it is possible that an individual not listed as desiring suicide may in fact have later volunteered for a suicide mission. Because we are able to observe only where ISI recorded actual data, it is difficult to determine whether missing data entries are either meant to be recorded as 0 or whether the data are simply missing. Wherever possible, we note these issues and identify from which document the records came, as record keepers were more consistent in tracking similar characteristics within their own document than different record keepers were across documents. Although these entries span several years of record keeping on human capital, we do not see repeated entries and cannot disentangle updated entries—if there are any—from the documents. This has the added analytical disadvantage of not allowing for claims about how ISI leadership chose to develop and manage its human capital over time and in response to changing operating conditions because of the presence of coalition forces.

## ISI Human Capital: Foreign Fighters Versus Iraqi Members

Among the 499 members listed in the documents were 393 foreign fighters and 106 Iraqis. We compare these two groups to weigh possible explanations for why ISI imported foreign fighters. These explanations include (1) ISI faced a shortage of members who were both true believers—Salafi jihadists of the al-Qaʻida ilk—and local Iraqis, who could continually replenish the ranks of the group's fighters and military leadership; (2) ISI experienced continuous shortages in skilled technical positions in its ranks, which it needed to replenish with skilled or trained foreigners; and (3) ISI needed a continuous flow of ideologically committed foreign fighters to use for its trademark suicide bombings.

Our documents show that ISI drew its foreign fighters from a variety of countries, with the largest group coming from Arabian Peninsula countries and the second largest group coming from North Africa (Figure 5.2 and Table 5.1). In Figure 5.2, the map in Panel B is derived from the well-known "Sinjar documents," a cache of insurgent records found in Sinjar, Iraq, in September 2007. The Sinjar documents contained significant details about foreign fighters, much of which is consistent with the information that was recorded in the documents that were declassified for this study. The Sinjar documents accounted for foreign fighters who entered Iraq from August 2006 through August 2007.[18] Many of these recruits came from North Africa and even Western Europe, in addition to a large number of entrants from the Arabian Peninsula. The map in Panel A illustrates our data, showing members who entered in 2004 and 2005, earlier in the insurgency. In contrast to the Sinjar collection, the new documents analyzed for this study show a somewhat different picture, suggesting that the types of ISI foreign-fighter flows might have varied over time, as circumstances on the ground changed. For example, our data suggest that, in this earlier period, a much larger percentage of ISI members from neighboring countries flowed into Iraq, and there were more fighters from Tunisia.

---

[18] Fishman, 2008.

**Figure 5.2**
**Sources of Foreign Fighters**
**Panel A: Fighters Entering in 2004 and 2005**



RAND *RR1192-5.2a*

PX717

**Figure 5.2—Continued**
**Panel B: Fighters Entering in 2006 and 2007 (the Sinjar documents)**



SOURCES: Harmony documents NMEC-2007-633795 and NMEC-2007-634059 (see "ISIL, Syria and Iraq Resources," 2015) and Sinjar documents, as listed in Felter and Fishman, 2007.
**RAND** *RR1192-5.2b*

PX717

**Table 5.1**
**ISI Members, by Country, in Our Data**

| Country | Number of ISI Members | Share (%) | Rank |
|---|---|---|---|
| Saudi Arabia | 149 | 30.3 | 1 |
| Iraq | 106 | 21.5 | 2 |
| Syria | 61 | 12.4 | 3 |
| Tunisia | 48 | 9.8 | 4 |
| Yemen | 45 | 9.2 | 5 |
| Algeria | 26 | 5.3 | 6 |
| Libya | 14 | 2.9 | 7 |
| Sudan | 10 | 2.0 | 8 |
| Jordan | 8 | 1.6 | 9 |
| Kuwait | 5 | 1.0 | 10 |
| Lebanon | 5 | 1.0 | 10 |
| Morocco | 5 | 1.0 | 10 |
| Chad | 3 | 0.6 | 13 |
| Palestinian territories | 2 | 0.4 | 14 |
| Somalia | 2 | 0.4 | 14 |
| Belgium | 1 | 0.2 | 16 |
| Cherkessia | 1 | 0.2 | 16 |
| Dagestan | 1 | 0.2 | 16 |
| Total | 492 | 100.0 | |

SOURCES: Harmony documents MNFT-2007-005315, MNFT-2007-005316, MNFT-2007-00531 MNFT-2007-005318, MNFT-2007-005319, NMEC-2007-633795, and NMEC-2007-634059; see "ISIL, Syria and Iraq Resources," 2015.
NOTE: The individuals of unknown, but presumed Iraqi, origin are not included.

PX717

As a general matter, foreign fighters tended to be more tied ideologically to the transnational Salafi-jihadi ideology that characterizes the current Islamic State than our sample of Iraqi members. Foreign individuals and groups traveled far and gave up much to fight with ISI. This dynamic created a well-known schism within ISI.[19] "Imperious" foreigners had a sense of superiority, but locals sensed that the foreigners could not do anything for themselves, had little understanding of the local culture or dialect, and created security risks for the group. One study judged that foreign labor was a key to both ISI's lethality from 2005 to 2007 and its decline post-2007, as Sunni tribal groups rose up against it in the Awakening.[20] Perhaps as a result of this, as ISI came under greater pressure, local ISI leaders tended to tuck foreigners away and either not use them or misuse them. A strategist writing in late 2007 or 2008 noted:

> The moment the Mujahid enters the land of Jihad [in this case, Iraq], he will be faced with a series of transitions, particularly those who enter into al-Anbar, and who are selected to go to the western region. . . . At the beginning of their arrival, they are placed in a dreary, peculiar desert and forced to live with rough Arabs who probably never prayed to Allah but who are only hospitable because the guests are also Arabs. The new brother will stay at this peculiar location until he reaches one of the guest houses of the brothers where he will be shocked with the realities of the lack of work and idleness at the camps in the desert where people are idle for several months. . . . Additionally, this person is not able to meet his immediate Emir during which he witnesses the problems of the military brothers. His operation has been postponed for months while he lives in a violent atmosphere of the fighter brothers and their issues because of their inactivity. He lives without having a military Emir to lead them and conduct their operations inside the cities. After a month of waiting and being discharged from his faith, the suicide bomber will be notified that his mission is coming soon with God's will and

---

[19] Fishman, 2009.

[20] Fishman, 2009.

PX717

with God's permission, relief is coming. The brother's hope will be refreshed, but he starts hearing stories and episodes of previous suicide bombers who carried out their attacks in the air or against walls. He hears also that the brothers will be sending him to an easy target that can be dealt with by a security or military operation. One of the brothers will inform the suicide bomber that the target will be against two police cars or one of the apostate leaders; as result, his morale will deteriorate as he was hoping to cause huge damage to the apostate group, and devilish thoughts and depression crawls to his heart. . . . The brother decides to transfer from suicide bomber to fighter, but his request will be rejected by some Emirs, as it is considered the State's decision, they have no authority to transfer him to a fighter. The suicide bomber then returns to his country or he will be obliged to accept the status quo and choose any target on which to execute.[21]

ISI later judged that the political backlash against its foreign identity was so severe that, in 2008, the group decided to no longer accept foreign recruits.[22]

We consider a number of personnel characteristics in the remainder of this chapter and how they are correlated with foreign or Iraqi origin (Table 5.2). There is a strong relationship between foreign members and training, which may reflect a resource-allocation decision by ISI to train the relatively inexperienced and uneducated foreigners in fighting skills, or for people to seek training with the intent of joining ISI. This interpretation is supported by the observation that foreigners were much less likely to have battle experience or formal education. Across the sample, there is a weak relationship between records of having received training and noncombat skills. These correlations emphasize that the key dimension along which many other differences fall is the Iraqi–foreign fighter difference, which we examine in more detail in the following pages.

---

[21]  Harmony document NMEC-2008-612449; see "ISIL, Syria and Iraq Resources," 2015.

[22]  Fishman, 2009.

**Table 5.2**
**Correlations Between Foreign Status, Training, and Education**

|  | Foreign Member | Any Training Recorded | Combat Skills Recorded | Noncombat Skills Recorded | Formal Education Recorded | Any Battle Experience Recorded |
|---|---|---|---|---|---|---|
| **Foreign Member** | 1.000 |  |  |  |  |  |
| **Any Training Recorded** | 0.3202 | 1.000 |  |  |  |  |
| **Combat Skills Recorded** | −0.0240 | 0.0693 | 1.000 |  |  |  |
| **Noncombat Skills Recorded** | 0.0652 | 0.1101 | −0.0336 | 1.000 |  |  |
| **Formal Education Recorded** | −0.4071 | 0.0611 | 0.0712 | 0.0725 | 1.000 |  |
| **Any Battle Experience Recorded** | −0.5332 | −0.0773 | 0.0273 | −0.0173 | 0.2589 | 1.000 |

## Human Capital and Terrorism: Comparing Iraqi and Foreign ISI Operatives

In general, ISI's foreign fighters were less educated and less skilled than Iraqi fighters. They were more likely to be placed in traditional terrorist roles—suicide bombings and irregular attacks—than in more-traditional military roles. In some cases, perhaps because they tended to be more ideologically committed, they were placed in key military leadership roles.

### Education

Foreign ISI members were much less likely to be educated than Iraqi ISI members. This finding is highly significant, with a likelihood of being random at less than 1 percent ($p < 0.01$). ISI recorded whether its members were "formally" educated. We believe that formal education likely means education beyond primary school, since the vast majority

PX717

of Arabs of fighting age are literate and received primary education.[23] Although it is difficult to interpret these data, because we cannot determine the group's definition of formal education, it seems clear that ISI found its foreign members to be poorly educated, compared with the Iraqis. Only roughly one in 13 foreigners were listed with some formal education, while nearly half of Iraqis were (Table 5.3).

**Dying to Win?**

Previous studies have found that most ISI suicide operations from 2005 to 2007 were conducted by foreign recruits. The Sinjar documents contain records on 389 foreigners who designated their work in Iraq. Of these, more than 50 percent—217 of the 389—were recruited into suicide-bomber roles.[24] Almost all of the remainder were listed with "military" roles, while only a handful (six total) were listed in the legal, media, or medical departments. The Sinjar documents showed that recruits from different countries had vastly different predilections—although the vast majority of Libyans, Moroccans, and Syrians were suicide bombers, the majority of Algerians were listed as fighters. Another study of ISI documents found that foreigners were kept separate from Iraqis—possibly because of the security risk

**Table 5.3**
**Differences in Formal Education Among ISI Members**

| Type | Total | Number with Formal Education Recorded | Share (%) |
|------|-------|---------------------------------------|-----------|
| Iraqis | 106 | 46 | 43.4 |
| Foreigners | 393 | 30 | 7.6 |
| Total | 499 | 76 | 15.2 |

SOURCES: Harmony documents MNFT-2007-005315, MNFT-2007-005316, MNFT-2007-005318, MNFT-2007-005319, NMEC-2007-633795, and NMEC-2007-634059; see "ISIL, Syria and Iraq Resources," 2015.

---

[23] Education for All Global Monitoring Report, *Regional Fact Sheet: Education in the Arab States*, Paris: UNESCO, January 2013.

[24] Felter and Fishman, 2007; see their appendix for a list of studies on this topic.

PX717

that foreigners constituted—and many wavered in their desire for suicide after lingering for some time in Iraq. Some also tried to switch to being regular fighters, despite having "little training."[25] Abu Qaswarah reportedly killed some foreigners who lost their nerve to commit a suicide attack and asked to return to their home countries.[26]

Our data show 40 people listed with "desires martyrdom" under the field "skills." ISI leadership apparently viewed recruits' desire to commit a suicide attack—or lack thereof—as information worth including in incoming members' personnel files. ISI did not record any other data about these individuals beyond their countries of origin.[27] In contrast, the group collected a substantial amount of data about its foreign-fighter recruits who were not suicide bombers, including age, education, types of skills, and operational experience. Other ISI document sets from this period similarly distinguish prospective suicide bombers and foreign fighters and suggest that, once a foreigner submits to being a suicide bomber, it is very difficult to convert to being a fighter.[28]

None of the 40 suicide bombers in our documents is Iraqi, which supports previous studies showing that ISI mostly used foreign suicide bombers (Table 5.4). This could reflect either a lack of Iraqi volunteers for the role or a preference on the part of ISI to save Iraqis for other roles. Similarly, only two out of the 61 Syrians were listed as suicide bombers, indicating that ISI treated Syrians more like locals, despite the fact that Syrians looked, demographically, like foreigners. We also infer that ISI had a standard way of managing suicide bombers because it consistently recorded only willingness to be a suicide bomber and country of origin for this subset of members. ISI did not provide would-be suicide bombers with training; only one of the 40 individuals listed as a would-be suicide bomber is also listed as having been trained. That 2.5-percent training rate is vastly lower than the

---

[25] Fishman, 2009.

[26] MNF-I, "Al-Qa'ida in Iraq's Number Two Leader Killed," press release, October 15, 2008.

[27] In one case, it was recorded that a single individual received operational training.

[28] Harmony document NMEC-2008-612449; see "ISIL, Syria and Iraq Resources," 2015.

PX717

**Table 5.4**
**Foreign Status and Allocation to Suicide and Operational Roles**

| Type | Total | Suicide Bomber | Operational Role | Share That Were Suicide Bombers (%) |
|---|---|---|---|---|
| Iraqis | 106 | 0 | 106 | 0.0 |
| Foreigners | 393 | 40 | 353 | 10.2 |
| Total | 499 | 40 | 459 | 8.0 |

SOURCES: Harmony documents MNFT-2007-005315, MNFT-2007-005316, MNFT-2007-005318, MNFT-2007-005319, NMEC-2007-633795, and NMEC-2007-634059; see "ISIL, Syria and Iraq Resources," 2015.

34 percent of non–suicide bombers who were trained. This finding is statistically significant at the 0.001-percent level. The group simply did not invest resources in adding human capital to those designated for suicide bombings.

Because only 10 percent of the foreigners listed in our new ISI data were designated as would-be suicide bombers, potentially up to 90 percent of ISI's foreign workers were employed within the organization in non–suicide attacker roles. This means that, in these data, most ISI members, both Iraqi and foreign, took long-term positions in the group.

**Battlefield Experience and Training for Terrorism**

Iraqi ISI members were much more likely to have had some battlefield experience than were foreign fighters. An ISI document from this period stated that "most of the fighters in Iraq are well trained, experienced, professionals with high qualifications," suggesting that the foreign-origin members were more in need of training (Table 5.5).[29]

Other elements of our data also support this idea. For instance, Iraqis' weapon experience was broader and more varied than foreigners' (Table 5.6).

The combination of greater weapon and battlefield experience among Iraqis suggests that combat or weapon experience was not a

---

[29] Harmony document NMEC-2008-612449; see "ISIL, Syria and Iraq Resources," 2015.

**Table 5.5**
**Foreign Status, Training, and Battle Experience**

| Type | Total | Training | | Battle Experience | |
|------|-------|----------|----------|-------------------|----------|
| | | Number | Share (%) | Number | Share (%) |
| Iraqis | 106 | 3 | 2.8 | 94 | 88.7 |
| Foreigners | 393 | 154 | 39.2 | 99 | 25.2 |
| Total | 499 | 157 | 31.5 | 193 | 38.7 |

SOURCES: Harmony documents MNFT-2007-005315, MNFT-2007-005316, MNFT-2007-005318, MNFT-2007-005319, NMEC-2007-633795, and NMEC-2007-634059; see "ISIL, Syria and Iraq Resources," 2015.

**Table 5.6**
**Foreign Status and Weapon Experience**

| Type | Total Members | Weapons | | Machine Guns | | Rifles | |
|------|---------------|---------|---------|--------------|---------|--------|---------|
| | | Average per Member[a] | Members with Expertise | Members with Expertise | Share (%) | Members with Expertise | Share (%) |
| Iraqis | 106 | 1.1 | 87 | 18 | 17.0 | 47 | 44.3 |
| Foreigners | 393 | 0.5 | 105 | 27 | 6.9 | 45 | 11.5 |
| Total | 499 | 0.6 | 192 | 45 | 9.0 | 92 | 18.4 |

SOURCES: Harmony documents MNFT-2007-005315, MNFT-2007-005316, MNFT-2007-005318, MNFT-2007-005319, NMEC-2007-633795, and NMEC-2007-634059; see "ISIL, Syria and Iraq Resources," 2015.

[a] "Average per Member" is the average number of weapons with which a member has expertise. The results show that, on average, Iraqi members had expertise with more weapons than did foreign members.

motivating factor for importing foreign labor. These findings are also consistent with previous research, which found that Iraqis brought traditional military skills, while foreigners brought more-unconventional skills.

We see this pattern repeated when we examine the training that ISI afforded Iraqi and foreign members, compared with the battle experience those members had (Table 5.5). Foreigners were more likely to be trained, while Iraqis were much more likely to have battle experi-

PX717

ence. However, even though foreigners might have presented unique operational risks, they clearly brought skills for certain types of operations, since ISI appears to have been putting its foreign operatives into operational roles.

Even though foreigners were less educated, it appears that ISI valued education. Holding all else equal, ISI was much more likely to train foreign and educated recruits (Table 5.7). It may also be the case that the more educated disproportionately sought training—meaning that the causality ran the reverse direction. However, as noted above,

**Table 5.7**
**Determinants of Training**

| Determinants | (1)<br>Logit Model | (2)<br>Conditional Fixed-Effects<br>Logit Model |
|---|---|---|
| Foreign fighter | 5.09***<br>(1.50) | 1.51**<br>(0.66) |
| Formal education | 2.42*<br>(0.99) | 3.85***<br>(1.03) |
| Battle experience | 0.42<br>(0.77) | 0.50*<br>(0.25) |
| Combat skills | 0.60***<br>(0.05) | 0.64<br>(0.44) |
| Noncombat skills | 0.12<br>(0.24) | −0.03<br>(0.28) |
| Constant | −6.44<br>(1.09) | |
| Observations | 460 | 377 |
| Pseudo R-squared | 0.195 | 0.108 |

SOURCES: Harmony documents NMEC-2007- 633795 and NMEC-2007-634059 for all models; MNFT-2007-005315, MNFT-2007-005316, MNFT-2007-005319, and MNFT-2007-005318 only included in model 1; unable to estimate model 2 with these records; see "ISIL, Syria and Iraq Resources," 2015.

NOTES: The dependent variable for both models is dichotomous, indicating whether the fighter had any documented training. Model 1 clusters standard errors on the document. Model 2 is a conditional fixed-effects logit estimation with document fixed effects. Standard errors are in parentheses. *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$.

PX717

there is evidence that ISI's decision to train an individual was purposeful and intentional.

If ISI desired members with education and battle experience, why did it accept so many uneducated and inexperienced foreigners? First, it was perhaps easier to train foreigners in groups before they arrived in Iraq, out of reach of direct coalition military operations. It was also likely much easier to train foreigners before they arrived in Iraq than it would have been to later transport Iraqis out of the country for training. Sending Iraqis out of the country for training would have required the extra risk of crossing the border twice—once to get out of Iraq for training and a second crossing to get back into Iraq to fight. Some of the document entries note that foreigners had a "full course in Yemen," including details of the training.[30] This also suggests that either ISI had training camps in countries further afield than Iraq and Syria or ISI accepted training from other jihadist groups, such as other al-Qaʿida affiliates.

Second, it is possible that ISI desired foreigners over Iraqis despite the educational and experience advantages that Iraqis presented. Foreigners incurred large travel costs to get to Iraq, thereby demonstrating their commitment to jihad. Further, during this period, coalition forces had payment incentives available for informing on terrorist operations, so it is possible that, for security reasons, ISI wanted committed jihadists planning and executing military operations.[31]

Third, it is possible that there were more foreigners who wanted to join ISI at this point than there were Iraqis, and it may be that ISI wanted to train the foreigners who had only a minimal skill set. Most of the Iraqis might have joined earlier in the conflict and were therefore already battle-hardened, so they needed less training.

---

[30] Harmony document NMEC-2007-633795; see "ISIL, Syria and Iraq Resources," 2015.

[31] On incentives, see Multi-National Corps–Iraq, *Money as a Weapons System (MAAWS)*, MNC-I CJ8 SOP, January 2009, p. 12 and Appendix E. This possibility follows from theories presented in Eli Berman and David D. Laitin, "Religion, Terrorism, and Public Goods: Testing the Club Goods Model," *Journal of Public Economics*, Vol. 92, 2008; as well as Eli Berman, Jacob N. Shapiro, and Joseph H. Felter, "Can Hearts and Minds Be Bought? The Economics of Counterinsurgency in Iraq," *Journal of Political Economy*, Vol. 119, No. 4, 2001.

Fourth, as we note below, security jobs were given solely to Iraqis, perhaps because ISI wanted locals—who also were more likely to be educated—to run its security operations. From our analysis of the documents and from secondary sources, we know that security positions conducted surveillance, reconnaissance, counterintelligence, and detainee operations.[32] Although regular military operations almost certainly entailed exposure to the population, perhaps the security cadre required much more exposure, thereby making Iraqis more desirable for security operations because they had local knowledge and language skills. ISI perhaps then mostly trained foreigners to do military operations, where they were less exposed to detection and generally needed less knowledge about the local environment.

## Working for the State

Other ISI captured documents state that there are four basic job functions within the organization: legal (sharia), administrative, security, and military.[33] The documents we discussed in Chapter Four also highlight the importance of the group's media functions.

In our documents that list the skills of ISI members, ISI split out media positions, suicide bombers, and irregular fighting skills as separate domains of expertise. ISI disproportionately placed members with formal education—who were predominantly Iraqi—in security positions. Almost one in four of the Iraqi members were in security, whereas no foreigners were. Even if ISI determined that locals were better suited for security functions because of their knowledge of the local environment, their native language capabilities, and their higher educational status, it is also possible that ISI believed that Iraqis were also not as well suited for unconventional terrorist operations as foreigners.

ISI administrators' records were not as comprehensive for foreigners as they were for Iraqis, making it harder to ascertain what specific roles foreigners played within ISI (Table 5.8). The administrators were

---

[32]  Mohammed Hafez, "Suicide Terrorism in Iraq: A Preliminary Assessment of the Quantitative Data and Documentary Evidence," *Studies in Conflict and Terrorism*, Vol. 29, No. 6, 2006; and Fishman, 2009.

[33]  Harmony document NMEC-2008-612449; see "ISIL, Syria and Iraq Resources," 2015.

**Table 5.8**
**Foreign Status and Job-Position Data**

| Position | Iraqi Fighter | Foreign Fighter | Total | Share of All Fighters (%) |
|---|---|---|---|---|
| Administration | 10 | 7 | 17 | 3.4 |
| Suicide bomber | 0 | 40 | 40 | 8.0 |
| Irregular | 0 | 5 | 5 | 1.0 |
| Other | 6 | 0 | 6 | 1.2 |
| Security | 23 | 0 | 23 | 4.6 |
| Soldier | 60 | 92 | 152 | 30.5 |
| Total | 99 | 144 | 243 | 48.7 |
| Share of each category with occupation listed (%) | 93.4 | 36.6 | | |

SOURCES: Harmony documents MNFT-2007-005315, MNFT-2007-005316, MNFT-2007-005318, MNFT-2007-005319, NMEC-2007-633795, and NMEC-2007-634059; see "ISIL, Syria and Iraq Resources," 2015.

NOTE: Only 243 fighters, or 48.7 percent of the total, had job status listed. Another had "detainee" listed under job category, and we do not include that person in this table.

almost three times more likely to list the positions of their Iraqi members than the foreign ones. In addition, almost two-thirds of the foreign members with a listed role were recorded as having a traditional military position ("soldier" in the documents). Accordingly, it is possible that ISI saw foreigners as a resource it could train with a standard, minimum skill set that would qualify them for military roles in the group and that foreigners were more expendable.

**Mobility**

Most ISI members tended to stay in one location, but a large share served in two or more locations (Table 5.9).[34] In multiple locations in

---

[34] The maximum number of locations where a member was recorded as active was eight.

**Table 5.9**
**Foreign Status and Active Locations**

| Active Locations | Iraqis | | Foreigners | |
|---|---|---|---|---|
| | Number | Share, If Known (%) | Number | Share, If Known (%) |
| Unknown locations | 15 | | 331 | |
| 1 location known | 63 | 69 | 26 | 42 |
| 2–4 locations known | 26 | 29 | 26 | 42 |
| 5 or more locations known | 2 | 2 | 10 | 16 |
| Total known | 91 | 100 | 62 | 100 |

SOURCES: Harmony documents MNFT-2007-005315, MNFT-2007-005316, MNFT-2007-005318, MNFT-2007-005319, NMEC-2007-633795, and NMEC-2007-634059; see "ISIL, Syria and Iraq Resources," 2015.

Iraq, the group made use of a set of trained Iraqi members with combat skills. In general, we find that Iraqi members were slightly less mobile than foreign members, but this finding appears to be driven by other factors that are correlated with foreignness, rather than foreign status itself. As noted above, foreigners stood out in Iraqi society, and by presenting a security risk, they were less likely to be moved unless they had specific skills needed in an area or unless there was a specific task to be accomplished, such as a suicide bombing.

Statistical analysis provides clearer explanation for mobility trends (Table 5.10). Although the raw data indicate that foreign fighters served in more locations, the difference with Iraqi members was not statistically significant once other factors were taken into account. In addition, noncombat skills are statistically related to lower mobility regardless of other factors (see models 3 and 7 in Table 5.10). In this light, ISI might have developed a cadre of back-office workers with specific skills—such as clerics, administrators, and media officials—who generally stayed in one place. Overall, the relationships between skills and mobility show that ISI used military skills and training quite flexibly across locations, and other skills and training much less so.

PX717

**Table 5.10**
**Correlates of Number of Active Locations**

| Variable | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|
| Training | 1.005*<br>(0.39) | | | | 0.842<br>(0.48) | 1.084**<br>(0.38) | 0.905<br>(0.47) |
| Combat<br>skills | | 0.450<br>(0.55) | | | | 0.658<br>(0.54) | 0.619<br>(0.52) |
| Noncombat<br>skills | | | −0.823**<br>(0.26) | | | | −0.678*<br>(0.28) |
| Foreign | | | | 0.765*<br>(0.34) | 0.345<br>(0.41) | | 0.124<br>(0.39) |
| Constant | 1.018 | 0.227 | 1.612 | 1.021 | 1.105 | 0.321 | 1.094 |
| N | 153 | 153 | 153 | 153 | 153 | 153 | 153 |
| R-squared | 0.180 | 0.132 | 0.169 | 0.155 | 0.185 | 0.194 | 0.225 |

NOTES: The dependent variable for each of these models is the number of active locations. All models are ordinary least squares estimates, with document (record keeper) controlled for. The sample includes only non–suicide bombers and those with at least one known location. Robust standard errors are in parentheses.
*** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$.

## Findings and Implications

Although ISI focused its operations on local targets in Iraq (and, as the Islamic State, more recently, in Iraq and Syria), the group has long depended on the recruitment of foreign labor for its human capital. Our findings show that ISI used foreign and domestic labor supplies in distinct ways. ISI employed and trained foreigners for violence. It needed both trained recruits and suicide volunteers for terrorist-style operations, and foreign operatives largely ended up as trained fighters or as suicide bombers. It is possible that ISI put foreigners in specific key military positions because foreigners were more ideologically aligned with ISI than the Iraqis were, as they had given up much more to join the fight. But ISI used Iraqis with skills, battle experience, and training more flexibly across locations than other types of personnel.

Foreign jihadists in ISI tended to have a different profile from Iraqis. Foreigners were not as well educated as Iraqi recruits, but they

PX717

were more likely to have previous training in low-intensity combat. Perhaps as a result, ISI leadership continued recruiting foreigners in 2006 and 2007, despite the distinct operational and strategic risks that foreigners presented. The group did not start turning away foreigners until it shifted to a more covert terrorist posture from 2008 to 2011.

PX717

# Islamic State of Iraq Compensation

Participating in insurgency is almost always physically risky, raising questions about what motivates people to do so.[1] Political economy theories of crime, insurgency, and rebellion suggest some opportunity-cost constraint, so the net value of participation must be at least as good as the next-best option.[2] That net value may contain a component that has nothing to do with money, such as soothing personal grievance or gaining prestige, but it also contains monetary rewards.[3] Sometimes these rewards are implicit: the ability, usually of middle managers, to take advantage of one's position to skim funds or tax civilians.[4] Typically, however, the monetary rewards are explicit: Wages are paid, as in other jobs. How those wages vary has implications for counterinsurgency policies and provides evidence regarding the agency problems that the compensation scheme is designed to solve.

In this chapter, we analyze ISI compensation practices using qualitative and quantitative data. On the qualitative side, we discuss a document captured in January 2007, outside Tuzliyah, in Anbar governorate, "Rules for Social Assistance." On the quantitative side, we developed data on 9,271 payments to ISI members recorded in 87 dif-

---

[1] This chapter draws from Benjamin W. Bahney, Radha K. Iyengar, Patrick B. Johnston, Danielle F. Jung, Jacob N. Shapiro, and Howard J. Shatz, "Insurgent Compensation: Evidence from Iraq," *American Economic Review*, Vol. 103, No. 3, 2013.

[2] See, e.g., Ethan Bueno de Mesquita, "Rebel Tactics," *Journal of Political Economy*, Vol. 121, No. 2, 2013.

[3] Such a component would be termed *nonpecunia*ry in the academic literature.

[4] Weinstein, 2007; Shapiro and Siegel, 2007.

PX717

ferent documents.[5] Using these data, we analyze the level of ISI compensation, how payments to members were divided between salary payments and rental assistance, and how salaries varied with family composition and over time and space. Taken as a whole, the answers to these questions provide valuable insight into the capacity of ISI, the motivations of its fighters, and the managerial challenges the group faced.

This chapter is divided into four main sections. We first summarize our data on ISI compensation. We then provide a detailed analysis of ISI salary payments. Following that, we discuss expense reimbursements. We conclude by reviewing what the apparent compensation scheme tells us about ISI's organizational structure and challenges. In the next chapter, we further trace changes in ISI compensation over time for a specific set of fighters in two periods.

## Compensation Data

Our compensation data are drawn from 9,271 records pertaining to at least 3,757 individuals, the number of unique war aliases, known in Arabic as *kunyas*, in the data. These records come from 87 documents listing ISI members. These documents typically list individuals by unit and describe their current status (active versus killed or detained); marital status; number of children or overall dependents; and payments of various kinds, including a monthly stipend (typically translated as *bail*) and the amount paid to members who required funding for accommodations or to run safe houses (typically translated as *rent*). Some of the documents record lists of individuals along with their assets—weapons and cars, for example—but do not specify payments.

The number of personnel listed per document varies widely. Some documents were used by small-unit commanders to report to sector administrators and thus contain relatively few individuals. Other documents were used by administrative emirs to track payments to personnel across multiple units. The median number of personnel per

---

[5]   Appendix C provides the full breakdown of payments recorded by document.

document is 31, the mean is 107, and the two largest documents each record more than 1,000 salary payments, with 13 more documents listing between 200 and 590 payments. When documents were in Excel spreadsheets, we had the original and translated versions declassified whenever possible. There is a large amount of contextual information in these spreadsheets. Some of the administrators employed the Excel comment feature a good deal, as well as macros and links to other spreadsheets. For handwritten and PDF source documents, our coding team transcribed the salary payments.

Geographically, our sample is concentrated in Ninewa (3,615 payments), Anbar (2,917 payments), and Diyala (2,193 payments), with a smaller numbers from Salah al-Din (546 payments). Table 6.1 shows the distribution of payments by governorate and year. Twenty-three of the documents list a single amount of compensation paid to each individual. Eleven documents disaggregate payments into a base rate and additional payments for food (groceries or a ration card), accommodations (rent), or other expenses (translated as *assistance*, which could have also been rent). In ISI's compensation scheme, salary payments were to continue to the families of those killed or captured.[6] Eleven

**Table 6.1**
**Compensation Data, by Governorate and Year**

| Governorate | Number of Payments | | | |
| | 2006 | 2007 | 2008 | Total |
| --- | --- | --- | --- | --- |
| Anbar | 1,263 | 1,588 | 66 | 2,917 |
| Diyala | 0 | 2,193 | 0 | 2,193 |
| Ninewa | 39 | 3,072 | 504 | 3,615 |
| Salah al-Din | 159 | 387 | 0 | 546 |
| Total | 1,461 | 7,240 | 570 | 9,271 |

NOTE: A complete list of the documents used in the construction of these data is in Appendix C.

---

[6]   As we show in Chapter Seven, ISI did not always make good on this promise.

PX717

documents clearly record fighters' status, and in these only 57 percent of the payments went to active fighters.

Nearly all documents also track family structure—marital status most commonly, but also the number of children per fighter. Although the Mosul administrator, in Ninewa, used unique identification numbers for fighters to track them across documents, others recorded only names, making it hard to distinguish repeated payments from those to different fighters sharing a name.

We also analyze compensation against the risk that members bore. To do so, we combine the compensation data with data on conflict intensity, including combat incidents recorded in the MNF-I SIGACTS III Database and with data on civilian casualties from Iraq Body Count, a database that tracks civilian deaths in Iraq using press reports.[7]

## ISI Compensation Rules

To reiterate the point made in Chapter Three: All firms set their compensation and employment policies to balance multiple objectives. Firms need to attract the right talent, motivate their employees to work hard, maintain morale and a sense of equity within their workforces, and send signals about how workers should allocate their time. In labor markets with plentiful employers and potential employees, all of this has to happen in such a manner that workers' compensation matches the marginal product of their labor, at least in expectation.

Like a standard firm, ISI had to achieve multiple objectives with its compensation policy, including

- attract talented people to work in a high-risk environment
- screen for skills and unobservable human capital
- motivate employees to work hard and take risks
- maintain morale.

---

[7] Empirical Studies of Conflict Project, n.d. The Iraq Body Count project can be found at www.iraqbodycount.org.

To meet these objectives, ISI appears to have mandated a flat salary structure. The "Rules for Social Assistance," found in Anbar in January 2007, listed the monthly base salary for a fighter as 60,000 Iraqi dinars, about $41 in nominal terms at then-current exchange rates.[8] The document specified that fighters get an additional 30,000 Iraqi dinars for each child and that wages continue if a fighter is killed or captured.[9] Such payments could serve several purposes. They might be seen as providing insurance if fighters believed that they would be paid as long as the organization survived and if they expected that it would remain viable. Even if neither belief was present, continuing payments upon death can help leaders signal that they will spend fighters' lives carefully by accepting a loss in future operating revenue when fighters are killed. That function does not require that the payments actually be made in perpetuity; it only requires that they be made for some time after a person has been killed.

These "rules" reveal a clear interest in establishing standardized salary guidelines that account clearly for what will happen in a range of contingencies, while abiding by norms of equity in the distribution of funds. Below we provide the translated rules; the formatting is replicated as much as possible to provide a feel for the original. It is not clear what distinction is made between "fighters" and "Members of the Organization."

Rule of Social Assistance.

Singles:

1- The ration for single fighter is 60,000 [dinars]

2- The ration for single fighter with dependents as follows

---

[8]    Harmony document MNFA-2007-000566; see "ISIL, Syria and Iraq Resources," 2015.

[9]    The Provisional IRA made similar payments to the families of captured fighters, an expense that put the group under considerable pressure over time, as salaries to prisoners' families came to consume a large portion of the organization's budget. See James M. Glover, *Northern Ireland: Future Terrorist Trends*, London: UK Ministry of Defence, 1978.

PX717

A – Fighter himself 60,000

B – His parents 30,000

C – Single sister 30,000

D – His brother under 15 30,000

3- Material assistance to a single fighter when getting married is $500.00 to [$]1,000.00 based on Al-Anbar Amir assessment, based on his financial situation, his work, and reputation, also should be based on the recommendation of his supervisor.

4- When a fighter dies, $500.00 should be paid to his family through Amir of Al-Anbar according to the priority and order #.

5- His salary should be stopped if he has no dependents

Married.

1- Ration of married individual is 60,000

2- His wife 30,000

3- Son and daughter 30,000 if she is not married also the son should be under 15

4- If he is the only one in his family they should be paid as follows

His parents 30,000

Unmarried sister 30,000

His brothers under 15 30,000

3- Assistance for the sick should be assessed by the Amir himself

PX717

Families of the martyrs, detainees and the wounded.

1- The same amount a martyr gets when he was alive, should be given to his family which is 60,000 and everyone dependent on him 30,000, that includes parents, a brother under 15 or unmarried sister.

2- Detainee families, the same amount when he was not captured and which is 60,000 and each individual he was responsible for, 30,000 for the parents and a brother under 15 and unmarried sister.

3- The wounded, they should have what the fighter's family gets, also, they should be paid for their treatment.

Employees and the forced out:

Employee who gets paid a salary above the assessed assistance that he gets, will not be paid, he will be paid a difference in case his pay is less than the assistance, example, if the assistance is 200,000 and his pay is 150,000 he will be paid the difference of 50,000.

The forced out:

1- He will be paid a house rent in the area where he settles and the matter will be in the hand of the Amir exclusively.

2- The rent will be the median of the area

3- Amir of the sector will be responsible over them and their living conditions.

Rules of the Social Assistance for the members of the Organization.

PX717

1- A martyr with sons under 15 for males, however, for the females until they get married they will get 30,000 Dinar. In case the parents and his brothers under 15 are dependent on him, each one will get 30,000 Dinar and unmarried sisters will get 30,000 each.

2- In case one of the group member becomes a martyr $500.00 will be paid to his relatives through the Amir of Al-Anbar, names will be submitted and will be paid according to the priority.

3- Guardian of the individuals will be directly responsible for the family of the martyr and he should follow their living and health matters.

4- If a brother becomes a martyr and he was single, his pay should be stopped.

5- If a brother is employed and he has a salary more or equal to the dues that he gets he will not be paid, if the salary is less than his dues, the difference should be paid.

6- A brother who lives in a rented house, his rent should be paid based on the rent median.

7- Each working brother should be paid the sum of 60,000 Dinar, and if he has dependents each should get 30,000, provided that males should be under 15 and the females are not married.

8- If a brother is completely devoted to jihad, assistance should be paid to his family if they depend on him.

9- Wounded brothers should be paid the cost of their treatment after submitting it to the area guardian.

10- A detained brother will have the same dues as mentioned above

11- A brother who moves from town to town should be rented a house based on the median of rent with furniture if he does not have one and should be the property of the group.

PX717

12- A brother who is willing to get married should get between $500.00 to $1,000.00 according to his work, reputation and obedience, and recommendation of his boss.

Remarks:

Family of the martyr or a detainee or a wounded or temporarily handicap due to his wounds, will consider if his wife is the one running the house she will be paid her husband's salary 60,000 Dinar, if she is with her relatives her husband's money will be stopped [60,000] Dinar be it the wife or the family.[10]

The extent to which these "rules" were followed outside Anbar and in other periods is an open question. In documents for other locations, the implicit formula was changed to 75,000 Iraqi dinars per fighter and either 25,000 or 10,000 Iraqi dinars per dependent. For example, in Mosul in 2007, fighters appeared to have been paid 75,000 Iraqi dinars for themselves, 25,000 per wife, and then 10,000 for dependent children and women.[11] What is clear is that the rules evince a strong concern with equitable compensation and with making the standards clear and replicable. This focus makes sense in an environment where turnover was high (as we will discuss in Chapter Seven), opportunities for corruption were rampant, and the group had to maintain a strong sense of shared mission.

Regardless of the purpose of the continuation of payment upon death, the base salary of 60,000 Iraqi dinars per month appears to be

---

[10]  Harmony document MNFA-2007-000566; see "ISIL, Syria and Iraq Resources," 2015. Put more plainly, this instruction says that if a member is killed in action, detained, or wounded, then if the wife is running the household, she will get her husband's full salary. But if she goes to live with other family members, the salary will stop.

[11]  Harmony document NMEC-2008-614685; see "ISIL, Syria and Iraq Resources," 2015. The "total workers" tab of this roster and payroll spreadsheet lists 768 people with specific salary figures. Of these, without imputing values when there are obvious errors, 476, or 62.0 percent, earned a salary exactly equal to the 75,000/25,000/10,000 formula. In some cases, the spreadsheet had "M" or "provider" or other nonnumerical entries in columns for dependent children or women. When we converted these to 0, 521, or 67.8 percent, earned a salary exactly equal to the 75,000/25,000/10,000 formula.

quite low by Iraqi standards. Based on a 2004 listing of job openings, the following monthly salaries were described as low: approximately 220,000 Iraqi dinars for an experienced bricklayer; 73,000 Iraqi dinars at the low end for an unskilled worker in plastic-bag production, vending, and metalworking shops; and 146,000 Iraqi dinars at the high end for an unskilled worker in those same venues, or $150, $50, and $100, respectively.[12] In the nationally representative 2007 Iraq Household Socio-Economic Survey of 18,144 households, the average wage among men who reported earning wages from employment was 357,000 Iraqi dinars per month. For illiterate men, it was 319,000 Iraqi dinars, and even those unemployed at the time of their interviews reported earning 178,000 Iraqi dinars per month during the previous 12 months.[13] An ISI member would need nine dependents to approach the average 2007 monthly wages reported by illiterate wage earners.

Furthermore, these salaries are strikingly low considering the risks that ISI fighters accepted. Bahney and coauthors found that, in Anbar in 2005 and 2006, the mortality risk for AQI fighters was more than 47 times that for men ages 18 to 48 populationwide.[14] In the 21 documents specifically recording the status of those receiving payment, 49 percent of payments went to members who had been killed and detainees. As we will see in Chapter Eight, the apparent turnover from 2007 to 2009 in Ninewa was greater than 50 percent annually. Although we cannot tell how many of these people were voluntary departures versus deaths, these numbers surely reflect the fact that being in ISI was an extremely dangerous job.

For such low wages to be paid for such a risky job, ISI members must have received a substantial portion of their compensation through the value they placed on being part of the group. This ideological com-

---

[12] Craig Davis, "Reinserting Labor into the Iraqi Ministry of Labor and Social Affairs," *Monthly Labor Review*, Vol. 128, No. 6, 2005. When these dollar figures are translated to 2006 values, adjusting for the high Iraqi inflation that persisted in 2005 and 2006, they are equivalent to $310, $100, and $200, respectively.

[13] Central Organization for Statistics and Information Technology, Kurdistan Region Statistics Organization, and World Bank, 2008, Tables 9-10 and 9-11.

[14] Bahney, Shatz, et al., 2010.

pensation was apparently quite large, since even the most-optimistic estimates based on these data place the median total monthly payments within the group at about 120,000 Iraqi dinars per month.[15]

Beyond base salary, nonsalary payments to members could be quite substantial, largely because of the payments categorized as rent or assistance (Figure 6.1). Of the 5,951 ISI members for whom we have information on salary and other payments, many received total payments well above the implied monthly salary in the "Rules for Social Assistance." As one can see, the payments do not cluster on the $y = x$ line (green line) in Figure 6.1, which plots monthly salary implied by the rules against total payments. Rather, the vast majority of members received compensation above and beyond what the "Rules for Social

**Figure 6.1**
**Implied Base Salary Versus Total Payments**



SOURCE: Authors' calculations based on data contained in documents listed in Appendix C.
NOTE: For this figure, we dropped 55 payments above 600,000 Iraqi dinars per month, the 99th percentile of the payment distribution.
**RAND** *RR1192-6.1*

---

[15] This figure is based on 5,946 payments, dropping outliers beyond four standard deviations but including rental-assistance payments.

Assistance" would imply. In fact, regressing total payments on implied base salary explains only 10 percent of the variance in total payments.

Salaries and total payments differed by region, with additional payments for rent varying most dramatically. On average, most of the payments were through salary. Among the 2,200 payments listed in 25 documents that distinguish clearly between salary and rental or assistance payments (80 percent of which were from Ninewa), the average proportion of total payments devoted to rent was 19 percent, but this varied widely, with a standard deviation of 26 percent.

Payments beyond salary were a substantial portion of total payments for the highly compensated. Among those receiving more than 330,000 Iraqi dinars per month (the 90th percentile of total payments, for the sample, that clearly separated salary and rent), the average additional payment for rent or assistance was 212,000 Iraqi dinars per month, almost 51 percent greater than the median total payment within the overall subsample.

This pattern suggests that one way the group might have paid select personnel higher wages without violating its egalitarian compensation norms was to allow these personnel a large monthly housing allowance—some of which for such things as rent on safe houses and some as an implicit salary, similar to how expense allowances enable corporate executives to enjoy perks above and beyond their notional salaries. Alternatively, the allowance could have reflected true rental assistance to members who had been displaced in the fighting between ISI and coalition forces, ISF, and Awakening forces.

The most surprising pattern in the data is that average compensation did not differ in the expected way by levels of violence. Typical models of wages suggest that, holding labor supply constant, we should see more-productive workers earning more and those facing higher risk earning more, the latter known as a *compensating differential*. Neither appears to have clearly been the case in Iraq (Table 6.2). Mean and median total payments were relatively similar in Anbar and Ninewa, while ISI fighters in Diyala were paid substantially less. What is surprising is that those operating in the least-violent governorate (Ninewa), employing the lowest-risk attack portfolio, made almost as much as those in the most violent, highest-risk governorate.

PX717

**Table 6.2**
**Monthly Compensation and Violence, by Governorate**

| Panel A. Personnel | | | | | |
|---|---|---|---|---|---|
| | | Total Payments (dinars per month) | | Proportion Married (%) | Children per Member |
| Governorate | Members | Mean | Median | | |
| Anbar | 1,985 | 157,507 | 140,000 | 64.8 | 0.81 |
| Diyala | 1,235 | 102,466 | 100,000 | 66.2 | 1.23 |
| Ninewa | 2,094 | 175,082 | 150,000 | 74.7 | 0.85 |
| Salah al-Din | 384 | 105,525 | 110,000 | 63.5 | 1.21 |

| Panel B. Violence in Governorates, and Years with Salary Data | | | | | |
|---|---|---|---|---|---|
| Governorate (years) | Total Combat Incidents | Combat Incidents per Month | Combat Incidents per 1,000 | Civilian Casualties per 1,000 | Riskiness of Attack Portfolio |
| Anbar (2005–2006) | 20,324 | 847 | 19.0 | 2.3 | 0.53 |
| Diyala (2007) | 6,143 | 512 | 5.0 | 2.7 | 0.63 |
| Ninewa (2007–2008) | 11,675 | 486 | 5.1 | 1.7 | 0.60 |
| Salah al-Din (2006–2007) | 9,701 | 404 | 16.0 | 3.2 | 0.56 |

SOURCES: Compensation figures from author calculations. Combat incidents and civilian casualties from Condra and Shapiro, 2012.

NOTES: Compensation figures exclude outliers where total payments were above the 99th percentile. The number of dependents was not recorded for all members. Riskiness is defined as the proportion of attacks that are not indirect fire or IED attacks, the two kinds that can be conducted without exposing fighters to immediate risk of counterattack.

These salary figures suggest that there was little monetary compensation for risk in ISI. To compare across governorates, we can simply take the monthly median payment and divide by the average number of combat incidents per month. The median payment in Anbar came to approximately 165 Iraqi dinars per incident of violence, compared with 195 Iraqi dinars in Diyala, 308 Iraqi dinars in Ninewa, and 272 Iraqi

PX717

dinars in Salah al-Din. In our sample, the total payment per attack was higher in areas with *lower* levels of overall and per-capita combat violence. Indeed, there is a negative correlation between payments and combat at the governorate level, after controlling for marital status and allowing a mean shift for observations that cannot be located in a specific district.

Some of the apparent homogeneity of wages may be due to aggregation to the governorate level. Trends in violence varied quite a bit across smaller geographic units. We see some variation in pay across subunits in these data.[16] Within the 37 identifiable subunits that had 20 or more fighters, median monthly payments were 110,000 Iraqi dinars, in line with provincial averages, but across these subunits, they ranged from 50,000 to 390,000 Iraqi dinars. These differences were not fully explained by family structure, although family structure played an important role. The average rate of married personnel was 64 percent across subunits, but it ranged from 30 percent to 90 percent. The percentage married is positively correlated with median total payments within units and accounts for 36 percent of the variance in median total payments. Overall, there is little strong evidence within the payment data for compensating differentials.

It may be the case that differences in labor supply explain some of this result. Qualitatively, the war was going much more poorly for ISI in Ninewa in 2007 and 2008 than it was in Anbar in early 2006. Over the course of 2007, ISI was pushed out of Anbar almost entirely and shifted to Ninewa, where it rapidly lost ground throughout 2008. That might have made it harder for the group to recruit fighters. No one, after all, wants to be on the losing side in an insurgency. If that were the case, then the group would have had to increase compensation to maintain its forces. This would have been a subtle break with the goal of providing low wages to attract more-devoted members, but even the later amounts were not large. The apparent lack of compensation for risk may therefore simply reflect the fact that ISI had a harder time recruiting fighters later in the war and, as any firm facing a personnel shortage might do, it increased compensation in response. Alterna-

---

[16] For variations in violence, see Biddle, Friedman, and Shapiro, 2012.

PX717

tively, it could be that later in the war, Ninewa had large numbers of displaced fighters from Anbar, Diyala, and Salah al-Din and therefore had higher rent obligations.

## Reimbursements

One of the more interesting aspects of the ISI payments to fighters was that members were apparently expected to incur expenses on behalf of the organization for which they would later be reimbursed. The document collection includes several large ledgers recording payments for ad hoc expenses, and many of the salary-reporting documents submitted by cell leaders to higher authorities included both fighter rosters and records of expenses. We further discuss in Chapter Nine the implications for the organization of the reimbursement system. In the remainder of this chapter, we provide examples of how reimbursements formed a part of overall payments to members.

ISI documents reveal a close attention to how money was spent and to whom it was distributed. Although some of the line items are rather vague, it is clear that reimbursements to individuals, as well as units, were carefully tracked and documented. Figure 6.2 shows a sample of reimbursements from Diyala. Disbursements were made for standard payroll and vague expenses (e.g., miscellaneous expenses in item 4), as well as specific expenses, such as for the purchase of a motor or fuel containers (items 6 and 7), or 20,000 Iraqi dinars for an injured fighter (item 9).

Expense sheets from Anbar reveal similar reimbursements (Figure 6.3). Reimbursements included guesthouse expenses, as well as expenses for cars, repairs to houses, and the value of a refrigerator for one group. Reimbursements to individuals for such expenses as "booby traps" are also common in the documentation. Although it is unclear what the limits of reimbursable expenses were, those granted were carefully documented, specifying the amount, name, and purpose.

Correspondence from Ninewa indicates the care, and timeliness, that ISI leadership expected (Figure 6.4). In this correspondence, presumably a cover letter to the documented expenses (and income), the

PX717

**Figure 6.2**
**Examples of Reimbursements from Diyala**

**In the name of God the Merciful and Compassionate**
**The Iraqi Islamic State**
**Diyala Province**
**List of Disbursements**

| | Name | Platoon Name | Details |
|---|---|---|---|
| 1 | Abu Dhikra | A S Platoon | 200,000 Dinars Miscellaneous For Abu Haydar |
| 2 | Abu Sayder | Admin Section | 47,000 Fuel |
| 3 | Abu Ishaq | Al-'Askar Platoon | 100,000 |
| 4 | Abu Waqas | Mortar Platoon | 70,000 Misc. |
| 5 | 227 | Al-'Askar Platoon | Abu Zayyad's Disbursements |
| 6 | Abu 'Abdulla Al-Jareh | Al-'Askar Platoon | 55,000 Purchase of Motor |
| 7 | Abu Haydar | Admin Section | Fuel Containers |
| 8 | Abu Faleh | Amer Sariya | 100,000 |
| 9 | Abu 'Abdulla | Injured | 20,000 |
| 10 | Samir | Admin [UNK-2] | 5,000 |



SOURCE: Harmony document MNFV-2007-000345; see "ISIL, Syria and Iraq Resources," 2015.
NOTE: *UNK-2* is a translator's mark meaning *unknown*.
RAND *RR1192-6.2*

PX717

**Figure 6.3**
**Expenses Documented from Anbar**

| Amount | $ | Recipient | Date | Committee - Sector - Division |
|---|---|---|---|---|
| | | | | Al Anbar Expenses |
| 337,837 | $ | Firas | 23-Jun-05 | Reparations for the Al Qa'im and Al Karabilah houses |
| 20,270 | $ | Abu-'Azzam | 23-Jun | Ar Rutbah |
| 2,027 | $ | Abu-Ahmad Nizar | 25-Jun | al-Ma'adid guest house expenses |
| 10,135 | $ | Abu-Sulayman | 30-Jun | Al Anbar Emir |
| 69,324 | $ | Jarrah | 22-Jun | Ar Ramadi, in the hands of Hamid al-'Ubaydi |
| 20,270 | $ | Dhanun | 28-Jun | Rawah |
| 15,540 | $ | Firas | 22-Jun | Purchasing two cars |
| 2,000 | $ | Hisham | 28-Jun | Baghdad Expense |
| 40,000 | $ | Abu-Hammam | 1-Jul | Hadithah |
| 15,000 | $ | Abu-Shihab Ahmad Subar | 1-Jul | Kirkuk, by orders from Abu-Sulayman |
| | | | | |
| 15,000 | $ | Abu-'Abbas | 19-Aug | Al Qa'im expenses |
| 1,500 | $ | 'Azzam | 19-Aug | Security |
| 10,000 | $ | Abu-Sa'id | 21-Aug | Media |
| 6,750 | $ | Hajji Mut'ab | 21-Aug | Aid for Hajji Hammad's house- attacks in al-Ma'adid |
| 6,750 | $ | Hajji Hammad | 22-Aug | Aid for Hajji Hammad's house- attacks in al-Ma'adid |
| 10,000 | $ | Abu-Wa'il | 22-Aug | Weapons |
| 200 | $ | Abu-Tibah | 22-Aug | Aid to add on the expenses of Rawah |
| 200 | $ | Spoils of war group | 22-Aug | Aid and expenses |
| 5,000 | $ | Islamic Judges | 22-Aug | Abu-Muhammad al-Maghribi |
| 4,200 | $ | Abu-Yasir | 23-Aug | Booby traps |
| 5,500 | $ | Firas | 24-Aug | Value of a Toyota Sedan |
| 5,800 | $ | Abu-Yasir | 26-Aug | Booby traps |
| 65 | $ | Abu-al-Harith | 26-Aug | Expenses |
| 200 | $ | Abu-Tibah | 27-Aug | Rawah group, value of a refregirator |
| 200 | $ | Abu-'Abdallah | 27-Aug | Hadithah, spoils of war |
| 200 | $ | Abu-Tibah | 29-Aug | Abu-Khattab's expenses |
| 8,500 | $ | Abu-Tibah | 30-Aug | Building for Rawah group |

SOURCE: Harmony document NMEC-2007-633541; see "ISIL, Syria and Iraq Resources," 2015.
RAND *RR1192-6.3*

author asks for permission to move to filing administrative reports of this type from a weekly to twice-monthly schedule.

Although many of the reimbursements were to individuals for their expenses, transfers and reimbursements within the organization were also closely documented. Figure 6.5 shows correspondence from a platoon to its regimental administration in Diyala, asking for reimbursement for the provisions for a guest fighter. The request is signed by four officials, at platoon, regimental, and section levels. The four-signature procedure appears to have been fairly standard. Forms allowing for travel, for medical-expense approval, and for separation from the group contain similar sets of signatures.

PX717

**Figure 6.4**
**Correspondence Documenting Expenditures in Ninewa over Several Weeks, 2008**



As for the finance administrator [TC: Possibly Administration], this department is also a future developmental step, God willing, with the goal of which is to first protect the funds and safeguard the issue of the amounts of money received and disbursed. However, this is currently a supplementary and insignificant issue.

- This is in regards to the administrative operation that I will follow, God willing. Moreover, as for the coordination or organization administrator, this brother has been present since the period of brother Wahab. He is a good and skillful brother with an average experience in administrative organization, such as computer programs, preparation of records, projects, and good ideas for the administration. Brother Anas, who is an immigrant [TC: Foreign or Arab mujahid] brother of whom we now nickname as (Abu-'Abdallah). This brother requested a meeting with you regarding some important issues related to the organization of the administration, statistical issue, and so forth. So please arrange an appointment for him, may Allah reward you with blessings.

- I will attach for you with this report a review of the expenditures and revenues which I have received and spent during the period of 28 AUG through 16 SEP 2008.

- As for the administrative report, please let it be bi-monthly [Every two weeks] instead of weekly, because I deem it appropriate for the administration because of the lack of rapid developments of the other systems [TC: Organizations/departments]. I will inform you about the significant matters and every progress/development within the month, God's willing.

- This is what I have for now, and may God reward you with blessings.

Peace

Your beloved brother
As'ad
17 SEP 2008

SOURCE: Harmony document NMEC 2009 634370; see "ISIL, Syria and Iraq Resources," 2015.
NOTE: TC = translator comment.
**RAND** *RR1192-6.4*

**Figure 6.5**
**Request to Regimental Administration for Reimbursement, Diyala**



In the Name of the Merciful and Compassionate God
The Islamic State of Iraq
Diyala Province

From: Abu Dajana Platoon Administration
To:  Khaled Ben Al-Walid Regimental Administration

We wish to inform you that Brother 'Amar is a guest at our platoon.  Please issue his
provisions for this month.

s/Platoon Administration, Abu Wisam
s/Platoon Commander, Abu [U/I-1]
s/Regimental Administration, Abu Saydar
s/Section Commander, Abu Khatiya

SOURCE: Harmony document MNFV-2007-000389; see "ISIL, Syria and Iraq
Resources," 2015.
NOTE: *U/I-1* is a translator's mark meaning unknown.
**RAND** *RR1192-6.5*

PX717

## Conclusion

In a typical labor market, compensation rewards employees for what they do for the firm. In the case of insurgent groups, this would entail compensation for risks taken on behalf of the group, as well as productivity, and would lead one to expect that fighters operating in places with more combat would receive higher wages. That was manifestly not the case for ISI. So how should we understand the observed wage structure?

One possibility is that labor supply was just much tighter in Ninewa and Diyala than it was in Anbar in 2006. The group had to pay roughly 17 percent more per attack in Diyala than in Anbar and fully 84 percent more in Ninewa than Anbar. This explanation certainly makes sense given qualitative accounts of the war, wherein the Awakening made it much harder for ISI fighters to operate and legitimized parallel militias that were competing for recruits. The differences in labor supply cannot, however, explain the fact that ISI's monthly wages were much lower than what even illiterate Iraqis reported making.

A second possibility is that ISI used wages as a screening mechanism in an environment where uncommitted individuals posed security risks for the group and where there was a glut of willing fighters. For wages to screen effectively while still allowing the group to operate, ISI would have to set them high enough so that members could survive and support their families but low enough that only sufficiently committed individuals would accept. That members were expected to bear some expenses in hopes of getting reimbursed might also have served a managerial purpose: If operatives performed poorly, reimbursements could be withheld.

A third possibility could pertain to ISI's desire to create a population that viewed it as a state, rather than an insurgent or terrorist group. The marginal increase in wages for being married and having children makes sense as a way of embedding the group in local communities, consistent with a view of insurgency as a form of armed state-building.[17]

---

[17] Johnston, 2008.

PX717

This still leaves the issue of payments to the families of killed and captured members. For ISI, these payments guaranteed that legacy costs would rise inexorably over time. Perhaps such payments served to buttress low salaries by providing implicit life insurance, although it seems unlikely that the organization's guarantee of lifetime payments would be completely credible given the range of groups competing for power and, therefore, ISI's expected longevity, should it be eclipsed by other groups. An alternative theory is that ISI leaders needed to signal something about their type to potential operatives. These payments could serve to build member loyalty and trust by showing that leaders were willing to spend resources on fighters' families instead of allocating those resources to attacks.

Our results raise two questions. First, how did ISI retain Iraqi talent in the presence of competing insurgent groups when it paid such low wages? We can only speculate: Talented people might have expected rapid promotion or might have placed a high value on life insurance; ISI's ideology and organizational strengths might have made it the best jihadi organization, regardless of salary levels; or ISI might have enforced a no-exit policy for Iraqis (Felter and Fishman showed that foreign fighters could go home[18]). However, the documents suggest that a number of individuals did voluntarily leave the group, and the "Rules of Social Assistance" explicitly provide for that possibility.

Second, and more important, if insurgents are not paid market wages, then how should we think about opportunity-cost constraints? Such constraints are critical in almost all economic models of conflict, but compensation practices by the most prominent insurgent group in the largest recent war suggest that they were not critical.

---

[18]  Felter and Fishman, 2007.

PX717

PX717

# The Fates of Terrorists: Tracking Militants' "Career Paths"

From the time of the surge through the end of the period we analyze, ISI was under aggressive, persistent counterterrorism pressure in Iraq and had to adapt continuously. Adaptation included reorganizing after the loss of key personnel, resulting in career paths that were established in a highly fluid context. Outside of anecdotes, terrorism analysts have not systematically addressed career dynamics within terrorist organizations. Relevant dimensions include (1) the level of personnel turnover experienced over time, (2) mobility by individual members between positions, and (3) changes in compensation rates for existing members over time. Uncovering trends, patterns, and anomalies along each dimension can illuminate how militant organizations adapt to changing operational conditions, as well as the internal requirements for managing their personnel.

This chapter analyzes personnel movements in ISI using documents that cover two different periods. Both document sets were captured from the senior ISI administrator who accounted for ISI personnel in and around the city of Mosul in the northern Iraqi governorate of Ninewa. The first set of documents was current as of September 2007. The second set was current as of January 2009.

Comparing documents from the same organization in the same location at different times allows an evaluation of how ISI and its personnel fared over time, how the group adapted its organization and human-resources policies, and how the career arcs of individual ISI personnel changed as the organization experienced major battlefield

PX717

setbacks that led to significant personnel turnover. It also allows us to build on our analysis of compensation by seeing how compensation adjusted over time.

These two sets of documents also help us understand ISI's evolution in Mosul during a particularly important period of the Iraq war. Between 2007 and 2009, the war's course underwent a dramatic reversal, as we described in Chapter Two. During this period, successful raids by coalition and Iraqi special operations forces, which targeted ISI's leadership; facilitator networks; and midlevel bureaucrats put ISI under heavy pressure. ISI's rank and file was degraded at the same time through resistance to ISI rule by Sunni Awakening militias, many of which included people who had fought with ISI, and by U.S. counterinsurgency operations that reversed ISI's territorial gains and reestablished Iraqi control in Anbar, Baghdad, Diyala, and Salah al-Din. Documentation of ISI's organization, personnel, and behavior during this period offers a unique opportunity to examine how the Islamic State's predecessor adapted to these events and offers lessons about how the Islamic State might react to similar stresses.

This chapter first provides background on our data on ISI personnel movements. We then discuss the group's workforce in Mosul in 2007 and 2009, analyze mortality and turnover within the group across that period, and assess how ISI personnel moved geographically from 2007 to 2009. We also examine the case of the "unknowns," a fighter designation that could imply an attempt by ISI bookkeepers to balance the twin challenges of managerial record keeping and organizational secrecy, or it perhaps reflects graft through the creation of ghost employees. We conclude by discussing what the career paths of ISI personnel tell us about the organization.

## Documents and Data

To understand career paths within ISI, we analyzed two sets of documents captured by coalition forces in the northern Iraq governorate of Ninewa, of which three documents in particular provide relatively complete records of the group's personnel in the area, roughly

PX717

18 months apart.[1] In total, these documents provide information on 1,149 fighters who were alive and active at the time the documents were written and 1,159 fighters who were dead or imprisoned at the time the documents were written. The two sets of documents allow us to identify common ISI personnel listed in both sets, indicating that they were on ISI's Mosul payroll in both periods. Using temporal variation in the data on each matched individual, we can assess the extent to which experienced personnel received increased compensation and enjoyed upward mobility in the organization.

The first set, from which we drew two key documents, was captured from the files of an ISI member named Khalid, who was associated with ISI's Mosul media office, in a raid near Mosul in early 2008 by conventional forces from the 3rd Squadron of the 3rd Armored Cavalry Regiment (3-3 ACR) of the U.S. Army. We refer to this collection of documents as the Abu Hareth documents because he was the administrative emir for the group in Mosul at the time.[2] This data set contains information on ISI members in Ninewa governorate through late 2007.

The second set of documents, from which we drew one key document, was captured in February 2009 from a Ninewa administrative emir named Ahmed Zayd, who was a successor to Abu Hareth.[3] This data set contains information on ISI members in Ninewa governorate during Ahmed Zayd's tenure as administrative emir, from August 2008 through January 2009.[4]

---

[1]  The three Harmony documents are NMEC-2008-614685, NMEC-2008-614686, and NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015. NMEC-2008-614685 and NMEC-2008-614686 are from the Abu Hareth documents; NMEC-2009-633789 is from the Ahmed Zayd collection.

[2]  Within the Harmony system, these documents are referred to as 3-3 TXFR 12.

[3]  There were several other administrative emirs between Abu Hareth and Ahmed Zayd, including a certain Abu Wahab, who held the position for much of 2008. Ahmed Zayd was also known as Abu Zayd.

[4]  Our rationale for this judgment is that the other key documents seized in the February 2009 raid contained daily financial information on ISI activities from late August 2008 through the end of January 2009.

PX717

Each document contains two types of information. The first is individual-level information on ISI personnel, including unit assignments, the amount of compensation, and the number of dependents. Importantly, the administrator assigned each person in these documents a serial number, which served as a unique identifier when combined with individuals' names. That identifier presumably enabled ISI administrators to track personnel accurately, which would have been otherwise difficult to do based on the "name" field alone in payroll documents, because many ISI personnel shared the same *kunya*, or nom de guerre. This tracking system would have allowed ISI leaders better oversight and control of their organization. It would allow them to audit the personnel reports submitted by midlevel leaders—those who formed the bureaucratic core of the group and were responsible for disbursing and accounting for the group's money. This is particularly important because payroll accounted for the largest share of the organization's costs. These costs included payments to killed and captured members' dependents—a nontrivial cost that, unlike spending on weapons and active personnel, brought no tangible productivity return for the organization. In the earlier set of documents, ISI used a five-digit serial number. By the time of the later set of documents, the group had switched to a system that assigned each member a new, four-digit serial number.

Second, each document contains a report that aggregates the individual-level personnel data. In the case of the 2009 document, the aggregate report lists more fighters than the section with individual-level personnel data. We believe that these aggregate reports were intended to inform ISI's leadership to support personnel and human-resources decisionmaking. Examples of decisions that ISI's leadership likely needed to address include how to deal with imbalances or inadequacies in personnel across units and whether the group's salary and overall compensation practices required revision in response to changing circumstances on the ground that were straining the organization.

PX717

## Summary Characteristics of ISI Personnel in Mosul in 2007 and 2009

The most striking fact about ISI's personnel records in the 2009 versus 2007 data is that ISI in Mosul appears to have had fewer than half as many active fighters in January 2009 as it did in September 2007 (Table 7.1). The Mosul administrator's records included 792 active personnel as of September 2007 and only 357 active personnel as of January 2009. Although these rosters account only for Mosul and not ISI nationwide, Mosul was ISI's main operational center in 2009, meaning that the relative drop understates the change in the group's fortunes.

ISI fighters received substantially more compensation, on average, in 2009, both in terms of base salary and funding for accommodations and expenses (Table 7.2). As will be discussed in the next chapter, base salary was in large part determined by family size, and so the rise in base salary could have been due to an increase in the number of dependents for which each member was responsible.

## Tracking Militants over Time

We track ISI members over time, as well as changes in ISI itself, in several ways. The first is to simply assume that these documents are inclusive. If the documents are inclusive, then the size of ISI in Mosul fell by roughly 60 percent from 2007 to 2009, a number consistent

**Table 7.1**
**ISI Roster Statistics, September 2007 and January 2009**

| Date | Active | Deceased or Detained | Total | Share Active (%) |
|---|---|---|---|---|
| September 2007 | 792 | 526 | 1,318 | 60.1 |
| January 2009 | 357 | 633 | 990 | 36.1 |

SOURCES: The 2007 data come from Harmony document NMEC-2008-614685; the 2009 data come from Harmony document NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

NOTE: The 2009 data come specifically from the aggregate statistics shown on p. 28 of Harmony document NMEC-2009-633789.

PX717

**Table 7.2**
**ISI Family Structure and Compensation, 2007 and 2009**

| Variable | Total | 2007 | 2009 | Difference |
|---|---|---|---|---|
| Family structure | | | | |
| Number of members (with compensation recorded) | 1,822 | 1,318 | 504 | –814 |
| Share married | 72.5% | 71.0% | 76.2% | 5.2 percentage points |
| Share with children | 55.8% | 53.7% | 61.1% | 7.4 percentage points |
| Average monthly compensation, per member | | | | |
| Base salary (Iraqi dinars) | 124,627 | 117,018 | 144,359 | 27,341 |
| Total payments (base + "rent"; Iraqi dinars) | 175,821 | 159,695 | 216,875 | 57,180 |

SOURCES: Harmony documents NMEC-2008-614685 and NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

NOTES: Salary and rent figures are in nominal Iraqi dinars. Base salary is not inclusive of funds paid to some ISI members for accommodations. Total payments are inclusive of both base salary and any funding for accommodations. Calculations in this table include only fighters with salary recorded.

with qualitative accounts of coalition forces effectively targeting the group. The second is to match ISI personnel between payroll documents, either based on ISI-assigned serial numbers or other features, such as family structure, and ask how the personnel fared. Among the personnel listed, some in the later records had only five-digit numbers, some had only four-digit numbers, and some had both. We used the five-digit numbers.

We used two methods for the second approach—matching ISI personnel listed in the group's 2007 Mosul payrolls to personnel listed in the group's 2009 Mosul payroll. The first method—doing a simple database "join" operation on the 2007 and 2009 payroll tables' serial-

PX717

number field—is the simplest but also the crudest technique. This method yielded 244 matches between the 1,327 personnel listed on the 2007 roster and the 504 individuals listed on the payroll in 2009 (48.4 percent of the 2009 total).[5] The second method improves on that relatively crude approach by assigning two analysts to independently confirm or reject each of the matches using other entity-resolution approaches.[6]

The two methods used to match ISI personnel over time resulted in different numbers of matches (Table 7.3). Of the 244 matches obtained from combining the 2007 and 2009 payroll tables based on individuals' five-digit numeric identifier alone, 124 also matched on other available information associated with each individual in the payroll files (name, marital status, number of wives, and number of children).

**Table 7.3**
**Results of Methodologies Used to Match ISI Personnel, 2007 and 2009**

| Method | Matches | Percentage Matched |
|---|---|---|
| Automated join | 244 | 48.4 |
| Human entity resolution | 124 | 24.6 |
| Difference | 120 | 23.8 percentage points |

SOURCES: Harmony documents NMEC-2008-614685 and NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

NOTES: The number and percentage of matches are out of the 990 militants listed in ISI's January 2009 Mosul payrolls. The key used for the automated database join was the five-digit serial number assigned by ISI administrators to uniquely identify members. The entity-resolution procedures used ISI-assigned serial numbers and additional individual-level information to further refine the matched sample.

---

[5]   We have previously reported 1,318 personnel for this roster. However, nine were listed as "deleted," and we have excluded them from all totals except this one.

[6]   To execute the second method, one analyst used entity-resolution tools available in the Palantir Gotham analysis software platform. The other analyst resolved the serial number matches manually using other information in the payroll documents about the group of individuals who had the same serial number in both sets of documents. These entity-resolution efforts were conducted independently to prevent intercoder bias. A senior researcher then examined both sets of matches, which were nearly identical, and adjudicated the remaining discrepancies.

PX717

## Militant Mortality and Turnover

ISI members faced high mortality rates throughout the course of the Iraq war. One of the key findings from our documents is that when the group faced pressure, it appeared to renege on its promise to continue payments to families of killed members. Our documents do not allow us to say whether this was a temporary response or a permanent response.

We assess attrition rates in ISI from 2007 to 2009 two different ways. First, we calculate turnover as the share of personnel recorded in one period who are not present in the next period. That turnover will reflect some combination of mortality because of enemy action and voluntary turnover (e.g., people leaving Iraq or getting injured and going home). Second, in documents tracking salary payments, we look at the share of payments to dead or imprisoned members.

Using the first approach yields extremely high attrition estimates. Of 792 active ISI operatives on the payroll in Mosul in 2007, only 124 can be matched to the 2009 data. Assuming 18 months in between these data sources provides an estimated departure rate of 71 percent per year, a massive rate for any organization, and one that suggests that ISI's promises that it would continue to pay martyr payments in perpetuity was false; many of the killed fighters whose families were listed as receiving payments in 2007 were missing from the rolls in 2009.[7] Another way to benchmark changes in the group is to assess how many of its units changed. The 2007 documents listed 62 specific units. Only eight of those appeared in the 2009 documents, a retention rate at the unit level of 13 percent. That number is consistent with massive losses, although it could also have resulted from reorganization and renaming.

Taking the second approach to examining the proportion of salary going to killed or captured fighters shows that ISI in Ninewa experienced a dramatic shift in its overall personnel, mortality rates, and unit composition from September 2007 to January 2009. ISI's September 2007 personnel rosters for Mosul listed 1,318 members on the organi-

---

[7]  The implied attrition rates would be even higher if we assumed only a year between the reports.

zation's payroll. Not everyone on the payroll, however, was active in the group. Of the 1,318 entries, 792 (60.1 percent) were listed as active, while 526 (39.9 percent) were reported as having been either detained or killed. The 2009 personnel rosters indicate that ISI's numbers in Mosul governorate had shrunk over time, and the ratio of captured and killed to active members increased significantly. ISI's 2009 Mosul payroll records contain aggregated information on 990 ISI personnel, broken down into two groups: fighters and deceased. According to the document, the fighter group consisted of 357 members, while 633 were deceased.

To highlight the extent to which high mortality rates and ISI's policy of supporting dependents of its deceased members were affecting the group's finances, the administrator included a table illustrating the disproportionate and growing amount of the group's payroll being devoted to supporting families of deceased members, as opposed to active members.[8] Given that ISI spent almost all of the revenues it generated on a month-to-month basis, these payouts suggest that ISI's compensation policy constrained its ability to recruit and pay new members without having to stop payments to deceased members' dependents. Common approaches that firms take to reduce such legacy costs would have been quite difficult for ISI. Reducing the group's equivalent of pension liabilities by recruiting new members and stopping payments to former fighters' families could not have been popular. The pressures on payroll generated by the killing and capture of members thus represent a notable vulnerability for groups with similar compensation plans, such as core al-Qa'ida, several of its non-Iraqi affiliates, and the Provisional IRA, historically.

Regardless of how ISI dealt with these costs, and we will see evidence that it did so by falling short on its commitments, the share of deceased members on the payroll was much higher in 2009 than in 2007 (Table 7.4), increasing from 40 percent to 64 percent. Even if the Mosul documents are not exhaustive of all members, the increased *relative* mortality rate meant that the group would have had relatively less for its routine operating costs, as well as for collecting intelligence; con-

---

[8]   Harmony document NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

**Table 7.4**
**ISI Personnel Mortality in Mosul, 2007 and 2009**

| Category | 2007 | Percentage of 2007 Total | 2009 | Percentage of 2009 Total |
|---|---|---|---|---|
| Number of personnel | 1,318 | | 990 | |
| Active personnel | 792 | 60.1 | 357 | 36.1 |
| Deceased or detained personnel | 526 | 39.9 | 633 | 63.9 |
| Number of units | 24 | | 14 | |

NOTES: The Mosul 2007 calculations are based on units listed in the "All Workers" worksheet of NMEC-2008-614686. The Mosul 2009 calculations are based on the units listed on p. 28 of NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

ducting surveillance; administering sharia law; and conducting attacks on coalition forces, ISF targets, local Shia and Christian civilians, and Sunnis viewed as disloyal to the group.

## Militants' Career Paths: Personnel Mobility, Promotions, and Lateral Transfers

As with employees of firms, governments, and other types of legitimate organizations, members of militant organizations are promoted, demoted, fired, or moved laterally to perform new functions or to support an organization's efforts in a different geographic region as circumstances or priorities change. Because militant organizations are secretive by nature, the extent to which such changes occur, and what they look like in practice, has, in large measure, remained a mystery to analysts and policymakers, despite other advances in analysis of how terrorist groups function and operate as organizations.[9]

---

[9] Sun-Ki Chai, "An Organizational Economics Approach to Anti-Government Violence," *Comparative Politics*, Vol. 26, No. 1, October 1993, pp. 101–105; Weinstein, 2007, pp. 27–60; Johnston, 2008, pp. 107–112; Aaron Zelinsky and Martin Shubik, "Terrorist Groups as Business Firms: A New Typological Framework," *Terrorism and Political Violence*, Vol. 21, No. 2 March 2009; Shapiro, 2013, pp. 1–21, 249–251.

PX717

## Personnel Mobility

Analysis of the sample of the 124 ISI members who could be identi-
fied with high confidence (in the group's September 2007 and January
2009 payrolls) suggests a great deal of mobility within the group. Of
these members, 96, or more than three-quarters (77 percent), who had
been on payroll in September 2007, were in a different unit in 2009.

Such personnel mobility represents a puzzle: Why would ISI reas-
sign such a large proportion of its personnel to different units? Doing
so clearly violates the principle of strict compartmentalization used by
ideal type cell-based organizations. In such groups, only one individual
connects each cell to the larger group, minimizing what cell members
know about other cells to reduce the risk of information being lost to
the government should one or more cell members be apprehended. ISI
seems to never have tried to implement such a structure—and if it did,
we have found little evidence of it.

Rather, the group seemed to value tracking its members. In the
2007 payroll documents, for example, the administrator made numer-
ous notes about individuals who were transferred from one unit
to another. Some transfers were made after the leadership of a unit
expressed a need for additional manpower to support his unit's opera-
tions. In the cases of these transfers, there was a trade-off between
operational security and practical operational requirements, and the
latter won out. Some transfers, however, were made at the request of
individual ISI members because of their personal preferences or needs.
For example, the administrator noted several cases in which members
requested to be transferred to a specific unit, often so that the militant
would be closer to his family or hometown.

Such transfers were made in the context of an organization facing
high attrition. It therefore seems likely that many transfers were made
based on organizational exigencies and the need to adapt. This would
not have been all bad. To the extent that these changes were promo-
tions, promoting operatives with extensive experience would help
maintain continuity and enable the organization to capitalize on their
knowledge.

PX717

## Promotions

To identify militants who moved upward within ISI's hierarchy between 2007 and 2009, we separate ISI units listed in the 2007 documents and the 2009 documents into "field" units (those we think were tasked with day-to-day fighting or other tactical field-level activities) and "nonfield" units (which we believe managed and led ISI). We made these assessments based on the structures described in Chapter Four. Field units were typically named after individuals, perhaps their leaders. Nonfield units were typically named according to their bureaucratic function. An example of a field unit that appears in both sets of documents is a unit referred to as Fayyad. An example of a nonfield unit that appears in the 2009 documents is the Media Battalion.

Among the 124 ISI members who could be identified in both the 2007 and 2009 documents, there were 23 people (18.5 percent) who, according to this criterion, were promoted from a field unit to a nonfield unit. If we calculate ISI promotion rates using only the universe of fighters who changed units between 2007 and 2009, about one-quarter (24 percent) of militants who survived had been promoted, by 2009, to nonfield positions.[10] Of course, the fact that only 124 of 1,318 operatives in 2007 show up in the 2009 data, with high confidence, suggests massive attrition, greater than 90 percent over 18 months.

## Lateral Transfers

There are numerous examples in the documents of what appear to be lateral personnel transfers. The rationale for some of these transfers is briefly explained in notes contained in the administrative emir Abu Hareth's master spreadsheets. The notes indicate that many lateral transfers were made to provide manpower to bolster the capabilities of certain units as circumstances on the ground, and units' attendant requirements, changed.[11]

---

[10]   For these calculations, we simply add the people who moved from field to nonfield (23), for the total 124 members and the 96 members who had a different unit in 2009 than 2007.

[11]   See, for example, notes inserted into the administrative emir Abu Hareth's Excel spreadsheets. Good examples can be found in Harmony documents NMEC-2008-614685 and NMEC-2008-614686; see "ISIL, Syria and Iraq Resources," 2015.

PX717

Unfortunately, information in the available documents does not allow us to discern whether any ISI members were promoted to the highest levels of the group—ISI's top leadership—which, by design, were separate from the midlevel core that oversaw the group's day-to-day operations. Nonetheless, snapshots taken over time of ISI's human resources suggest that the organization was far from static. On the contrary, external forces might have forced fairly dynamic personnel practices to compensate for losses within the midlevel bureaucratic corps.

## Compensation Trends over Time

ISI followed a flat compensation structure. However, ISI did not follow its written guidelines to the letter, and the salary formula appears to have changed over time, although still remaining flat. Salaries and total payments differed by region, with reimbursable expenses varying more, as would be expected given differential economic conditions. The payroll records from Mosul indicate that, for individuals for whom data are available in both years, total payment levels tended to increase. So too, however, did the average number of dependents associated with ISI members, at least partially explaining this result.

To parse the differences in more detail, we disaggregate the total amount that ISI personnel received each month into two categories: salary and supplemental. These categories appear separately in the documents, and are usually (but not always) translated from the original Arabic as *bail* and *rent*. *Bail* corresponds with *salary*, as we use it here; *rent* corresponds with our use of *supplemental*.[12]

### Differences in Compensation from September 2007 to January 2009

The average total monthly payments made to the 124 ISI members for whom data were available in both periods increased from 155,806

---

[12] Indeed, both the documents and interviews with subject-matter experts indicate that funds disbursed to ISI members for "rent" were often used for accommodations, which were frequently needed by ISI members who did not own a home in Iraq. Presumably, this was the case for most of ISI's foreign fighters, as well as for fighters who had been displaced from their home governorates.

PX717

to 189,323 Iraqi dinars (Table 7.5). This 22-percent increase in total payments is similar to the core inflation rate of 23.8 percent, reported by the Central Bank of Iraq, over the same period.[13] Table 7.5 also breaks down changes in ISI member payments over time by the type of payments these members received. The average difference between the base-salary payments ISI paid its members in January 2009 and September 2007 was 13,032 Iraqi dinars. Supplemental payments rose more, to 20,484 Iraqi dinars over the period, on average. How large were these increases in U.S. dollars? We converted these amounts at an exchange rate of 1,193 Iraqi dinars per dollar, the average exchange rate in 2008, according to Central Bank of Iraq in 2010.[14] Using this conversion rate, the changes in ISI payments from 2007 to 2009 represent

**Table 7.5**
**ISI Compensation in Mosul, 2007 and 2009 (Iraqi dinars)**

| Period | Total Payments (mean) | Salary (mean) | Salary (median) | Dependents (mean) |
|---|---|---|---|---|
| 2007 | 155,806 | 116,048 | 110,000 | 2.3 |
| 2009 | 189,323 | 129,081 | 125,000 | 2.6 |
| Difference | 33,516 | 13,033 | 15,000 | 0.3 |
| Percentage increase | 21.5 | 11.2 | 13.6 | 13.0 |

SOURCES: Harmony documents NMEC-2008-614685, NMEC-2008-614686, and NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015; Central Bank of Iraq, 2007–2009.

NOTES: Values are in Iraqi dinars. Data are from the payroll records of the 124 ISI personnel who appear in both the late 2007 and early 2009 sets of captured documents. Consumer price index inflation from 2007 to 2009 was 23.8 percent.

---

[13] Central Bank of Iraq, *Key Financial Indicators*, Baghdad, updated regularly between September 2007 and January 2009.

[14] This is consistent with other conversions from Iraqi dinars to U.S. dollars in previous studies of AQI's captured documents. See those performed in Bahney, Shatz, et al., 2010, p. 26.

PX717

increases in base salary of $10.92 and supplemental income of $17.17, for an average monthly increase of $28.09.[15]

Although ISI paid its members more, on average, in 2009 than in 2007, not all ISI members for whom we had data received more. Most did—74 of the 124, or about 60 percent—but 25 of the 124 (about 20 percent) had their pay lowered between 2007 and 2009. Part of the explanation for these declines appears to have been a change in family structure. Individuals whose pay was cut reported fewer dependents in 2009 than in 2007, which would explain why their pay had been reduced. On average, these fighters lost about 0.8 dependents between 2007 and 2009. Those losses would account for a reduction in salary of about 24,000 Iraqi dinars. However, the 25 members who lost money lost an average of 87,600 Iraqi dinars per month.[16] In contrast, individuals whom ISI paid the same monthly salary in 2009 as it had in 2007 had no median change in dependents—exactly what would be expected based on the standard operating procedures ISI laid out in its "Rules for Social Assistance" document.[17] Given that changes in associated dependents do not fully explain the pay decreases that 20 percent of our sample suffered, we suspect that the group decided to dock the pay of certain individuals, perhaps because of performance problems or personal indiscretions, or because the group found its budget for personnel compensation squeezed. Consistent with evidence from Chapter Six, this suggests ISI might have become less rigid over time about its flat compensation structure.

### Did Promotions Come with Raises?

The ISI payroll data suggest that ISI members who moved from field units into units that had greater administrative responsibility tended

---

[15] It is important to note that these are within-individual increases, which are not dependent on cross-sectional variation across different individuals over time, since these individuals might have different personal characteristics, skills and levels and types of experience, or numbers of dependents. As a result, we are confident that these increases capture real changes in the compensation paid to AQI personnel.

[16] Individuals who had received raises since 2007 reported a median increase in dependents of one dependent.

[17] Harmony document MNFA-2007-000566; see "ISIL, Syria and Iraq Resources," 2015.

to receive increased payments, but not at a higher rate than those who moved laterally to other field units within ISI (Table 7.6).

In fact, ISI members who moved laterally saw their total payments increase at a higher rate than those who were promoted. This result cannot be explained by the increase in dependents. For those who moved laterally, their dependents did not increase, on average, from

**Table 7.6**
**Compensation Increases from 2007 to 2009, Promoted Versus Lateral Mobility (thousands of Iraqi dinars)**

| Promoted Versus Lateral Move | Compensation Variable | Mean | Standard Deviation | Median | Min. | Max. |
|---|---|---|---|---|---|---|
| Lateral move (N = 73) | 2007 salary | 110 | 32 | 110 | 75 | 250 |
| | 2007 total payments | 146 | 76 | 120 | 75 | 375 |
| | 2009 salary | 127 | 51 | 125 | 0 | 250 |
| | 2009 total payments | 188 | 100 | 175 | 0 | 450 |
| | Difference (total payments between 2009 and 2007) | 42 | 24 | 55 | −75 | 75 |
| Promoted (N = 23) | 2007 salary | 121 | 62 | 110 | 75 | 370 |
| | 2007 total payments | 166 | 84 | 130 | 75 | 370 |
| | 2009 salary | 104 | 69 | 125 | 0 | 225 |
| | 2009 total payments | 180 | 121 | 150 | 0 | 400 |
| | Difference (total payments between 2009 and 2007) | 14 | 37 | 20 | −75 | 30 |

SOURCES: Harmony documents NMEC-2008-614685, NMEC-2008-614686, and NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

NOTES: Values are in thousands of Iraqi dinars. The table reflects the authors' calculations of the 124 ISI personnel in Mosul, tracked from the group's September 2007 payrolls to its January 2009 payrolls. An additional 28 fighters out of the 124 stayed in the same group, and therefore were neither promoted nor moved laterally.

2007 to 2009, staying at an average of two dependents per member for the 73 nonpromoted fighters we could track. The promoted fighters saw their average dependent count increase from 2.34 in 2007 to 3.00 in 2009. ISI members who moved laterally saw their average total payments beat the rate of inflation, while those who were promoted saw their total payments lag behind inflation by about 25,000 Iraqi dinars.[18]

Several dynamics could explain these shifts. Perhaps the increased pressure of coalition forces and ISF required ISI bureaucrats to increase pay to those in more-dangerous positions to keep the group's fighting force as strong as possible in difficult circumstances. This would be a reversal of long-standing payment policy, but in a difficult operating environment, it is not hard to envision a shift to retain the necessary fighters and maintain relevance against an advancing foe. An alternative possibility is that more people in field units had been displaced from other areas to Mosul, which would be consistent with the fact that the increase came mostly in nonsalary compensation.

As mentioned in Chapter Three, the political economy theory on compensation shows us that wages for people taking on risky jobs usually come with a premium for the inherently dangerous nature of this work. ISI could have added this premium for the field members to keep its fighting force robust in the face of a tougher operating environment. This behavior would have differed from ISI's expressed policies and the average pattern in the full compensation data but would be closer to the payment procedures of other clandestine groups, at least anecdotally.[19]

---

[18] This estimate was calculated by multiplying the average amount of compensation paid to ISI members in 2007 with ISI members for both sets by 1.238 (the consumer price index inflation rate between 2007 and 2009); we then compared that result with the actual compensation recorded for 2009.

[19] Adams, 1986, for example, discussed how, in the 1980s, Palestinian groups that offered their operatives a riskier life with fewer opportunities for corruption had to pay higher salaries.

PX717

## The Curious Case of ISI's "Unknowns" in Mosul

The 2007 payroll and personnel document identified 1,318 ISI members. In this document, the administrator separated personnel by unit and their status as active, deceased, or detained. Organizing the document in this way makes sense: Administrative emirs were responsible for maintaining personnel records for each unit, keeping track of ISI personnel who were killed or captured, and calculating the grand total of compensation to be paid to each unit based on compensation guidelines.

Keeping records by fighter status also allowed the administrator to perform another important function: producing brief statistical reports for ISI leadership on overall and unit-level attrition. Units suffering from disproportionately high attrition rates were at risk of either having to abandon controlled or contested areas because of low capacity or being defeated militarily by coalition forces and ISF. Since administrative emirs were the only element in the ISI organization with full knowledge of the status of all units operating in their areas of responsibility, ISI leadership had a strong incentive to require such reporting from its administrators to make well-informed decisions about how to allocate money and manpower. Such reporting would have been particularly important in and around the city of Mosul, which was ISI's last stronghold during the first insurgency. By late 2007, and even more so in late 2008 and early 2009, ISI had no good alternative to the Mosul area should the group be dislodged from northern Iraq. Coalition forces and ISF, along with local SOI Sunni militia, had cleared ISI from Baghdad, Anbar, and most of Diyala and Salah al-Din, leaving ISI without a Sunni population center inside Iraq where it could relocate and reconstitute its forces.

As noted, the organization experienced a sharp decline in membership in Mosul between 2007 and 2009, and a higher proportion of members on ISI's roster is listed as killed. In addition to the sharp decline in the number of operational ISI personnel, the 2009 personnel roster reveals another interesting pattern. After the first 357 individuals—the same number listed as being "active fighters" in the summary report at the end of the document—the standard format of

the personnel roster abruptly changes. After the administrator compiled the roster and compensation information about members of ISI Mosul's "support" unit, he sketched a wide, gray band across the document, which he labeled "all unknown." He then inserted a page break and used a fresh set of row numbers, beginning at 1, to distinguish the 138 subsequent entries (Figure 7.1). An additional nine personnel are vaguely listed as assigned to units with nondescript names, including "work location unknown," "special cases," and "outside Mosul."[20]

Why were these individuals accounted for separately from the rest of the group, and why would the rest of the group be considered operational while the remaining members were not listed that way? At least three possibilities are plausible.

The first is that this group consisted of new fighters. They all have new four-digit serial numbers and not the old five-digit ones, suggesting that they might have joined the group after it stopped assigning five-digit numerical identifiers in its files. This does not explain, however, why these members would not have unit assignments. Thus, it seems unlikely that the individuals listed in ISI's personnel roster were new personnel who simply had not received a unit assignment yet, particularly because they all appear to have already been on the group's monthly payroll.

A second possibility is that ISI administrators had actually lost track of these individuals. It is possible that constraints made communications between certain field personnel and ISI administrators too dangerous or difficult to conduct. Without regular status reports from the field, ISI administrators with little knowledge of the situations or activities of these individuals and units might categorize their status as unknown. Yet if this were the case, we would expect some individuals among currently the "unknown" to have both types of serial numbers in their entries, as well as for their units to be listed. After all, this kind of information could be helpful in coordinating cross-ISI efforts to locate and support units and personnel whose status was unknown. Thus, it is unlikely that the individuals listed separately from ISI's

---

[20] Harmony document NMEC-2009-633789 Trans, pp. 18–19; see "ISIL, Syria and Iraq Resources," 2015.

PX717

### Figure 7.1
### 2009 Personnel Roster Document Break, English Translation and Arabic Original

**Panel A**

| Number | Number Q | Name and Surname | Marital Status | Children | Spouses | Works | Rent |
|---|---|---|---|---|---|---|---|
| | | Support | | | | | |
| 1538 | 11371 | Baha' | Married | - | 1 | 100 | 100 |
| 1539 | 11090 | Abu-Anwar | Married | - | 1 | 100 | - |
| 1540 | 11317 | Sa'id | Married | 4 | 1 | 200 | 85 |
| 1541 | 11083 | Sha'lan | Married | 2 | 1 | 150 | - |
| 1542 | 11305 | Nabil | Married | 1 | 1 | 125 | 250 |
| 1543 | 11523 | Abu-'Abdallah | Married | 4 | 1 | 200 | 60 |
| 1549 | 11152 | Sayf-al-Din | Single | - | - | 75 | - |
| 1550 | 11142 | Hamid | Married | 3 | 1 | 175 | - |
| 1552 | 11110 | 'Abbas | Married | - | 1 | 100 | 60 |
| | | | | | | 1,225 | 555 |

All Unknown

| | Number | Surname | Marital Status | Number of Spouses | Number of Children | Support Quan | Sal | Rent | Remarks | Residence |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1003 | Abu-Hudhayfah Na'im | M | 1 | 3 | | 175 | 100 | | |
| 2 | 1005 | Abu-Nabil al-Suwaydi | M | 1 | 8 | | 300 | - | | Outside Mosul |
| 3 | 1006 | 'Abd-Abu-'Abd-al-Rahman | M | 1 | 5 | | 225 | 100 | | |
| 4 | 1007 | Family of Majid | M | 1 | 2 | | 150 | - | | Outside Mosul |

**Panel B**

سند

| الايجار | يعمل | الزوجات | الاطفال | الزوجية | الاسم والكنية | الرقم ق | الرقم |
|---|---|---|---|---|---|---|---|
| 100 | 100 | 1 | - | متزوج | بهاء | 11371 | 1538 |
| - | 100 | 1 | - | متزوج | ابو انور | 11090 | 1539 |
| 85 | 200 | 1 | 4 | متزوج | سعيد | 11317 | 1540 |
| - | 150 | 1 | 2 | متزوج | شعلان | 11083 | 1541 |
| 250 | 125 | 1 | 1 | متزوج | نبيل | 11305 | 1542 |
| 60 | 200 | 1 | 4 | متزوج | ابو عبدالله | 11523 | 1543 |
| - | 75 | - | - | اعزب | سيف الدين | 11152 | 1549 |
| - | 175 | 1 | 3 | متزوج | حامد | 11142 | 1550 |
| 60 | 100 | 1 | - | متزوج | عباس | 11110 | 1552 |
| 555 | 1,225 | | | | | | |

سند

| الايجار | يعمل | الزوجات | الاطفال | الزوجية | الاسم والكنية | الرقم ق | الرقم |
|---|---|---|---|---|---|---|---|
| 100 | 100 | 1 | - | متزوج | بهاء | 11371 | 1538 |
| - | 100 | 1 | - | متزوج | ابو انور | 11090 | 1539 |
| 85 | 200 | 1 | 4 | متزوج | سعيد | 11317 | 1540 |
| - | 150 | 1 | 2 | متزوج | شعلان | 11083 | 1541 |
| 250 | 125 | 1 | 1 | متزوج | نبيل | 11305 | 1542 |
| 60 | 200 | 1 | 4 | متزوج | ابو عبدالله | 11523 | 1543 |
| - | 75 | - | - | اعزب | سيف الدين | 11152 | 1549 |
| - | 175 | 1 | 3 | متزوج | حامد | 11142 | 1550 |
| 60 | 100 | 1 | - | متزوج | عباس | 11110 | 1552 |
| 555 | 1,225 | | | | | | |

جميعهم مجهولين

| المسكن | ملاحظة | الايجار | النفقة | عدد الاطفال | عدد الزوجات | حالة الاجتماعية | الكنية | الرقم | |
|---|---|---|---|---|---|---|---|---|---|
| خارج الموصل | | 100 | 175 | 3 | 1 | م | ابو حذيفة نعيم | 1003 | 1 |
| خارج الموصل | | - | 300 | 8 | 1 | م | ابو نبيل السويدي | 1005 | 2 |
| | | 100 | 225 | 5 | 1 | م | عبد ابو عبد الرحمن | 1006 | 3 |
| خارج الموصل | | - | 150 | 2 | 1 | م | عائشة ماجد | 1007 | 4 |

SOURCES: Panel A shows Harmony document NMEC-2009-633789 Trans., p. 20; Panel B shows Harmony document NMEC-2009-633789 Orig., p. 34; see "ISIL, Syria and Iraq Resources," 2015.
NOTES: *Works* is *salary*, and *rent* is *supplemental*, as discussed above. *Number Q* is the 5-digit serial number.
RAND *RR1192-7.1*

PX717

active personnel had gone missing or were unaccounted by the group's administrators.

A third possibility is that these personnel consisted at least partly of mid- and senior-level ISI leadership and that these leaders were accounted for separately from those in lower-level operational positions in the field to attempt to preserve their security.[21]

At least five patterns in the documents we examine are consistent with patterns one would expect to see if the document broke out senior personnel differently. These patterns merit explication, because they bear strongly on how to interpret the links between some of these individuals and reporting on the Islamic State leadership.

### Pattern 1: Names on the List Correspond with Those of Known ISI Senior Leaders

The first pattern that is consistent with the 2009 roster being split into operational and leadership elements involves war aliases. The *kunyas* of numerous individuals listed among the group with suppressed five-digit serial numbers and unit information are the same as those used by known ISI mid- and senior-tier leaders. Several of the most interesting are Abu Zayd (a name by which Ahmed Zayd was also known; he maintained the group's records examined here); Muhammad Abu Ayyub (a possible variant of ISI leader Abu Ayyub al-Masri); Qahtan Abu 'Abd al-Rahman; Abu Sarah (a known alias of ISI number three Abu Qaswarah); and Abu Du'a (an alias of the current Islamic State leader, Abu Bakr al-Baghdadi). Experts on the Islamic State have identified other *kunyas* consistent with lower-level ISI leaders.[22]

---

[21] In strictly compartmented organizations, the senior leadership of the organization communicates with subordinates only through "cutouts" and other indirect channels for operational security in the face of a capable intelligence adversary.

[22] Possible name matches include Abu Ali (number 1,023, and possibly the administrative emir who paid transferees from Anbar to Mosul); Abu Bakr (number 1,090, and possibly Hajji Bakr, the now-deceased military emir of ISI); Abu Ridwan (number 1,166, and possibly Abu Radwan, a.k.a. Abu Mahdi, who was the deputy wali of northern Iraq after Abu Qaswarah was killed); Abu Nabil (number 1,080, and possibly Abu Nabil, a.k.a. Wissam Abed Zaid; see Hisham al-Hashimi and Telegraph Interactive Team, "Revealed: The Islamic State 'Cabinet,' from Finance Minister to Suicide Bomb Deployer," *Telegraph*, July 9, 2014);

Because the listed names are aliases, it is impossible to verify that these individuals were in fact senior ISI leaders. However, the preponderance of them in a single document that appears to have been prepared expressly with certain individuals' security in mind remains striking. Such patterns cannot definitively prove that the correlation between the predictions and observed values is correct in any given case. What these patterns can do is provide a method for assessing whether available evidence can confirm the *plausibility* of the operational-security hypothesis. The more cases in which candidate factors correlate with defined outcomes of interest (in the predicted direction), the more plausible the explanation.

### Pattern 2: Individuals in the "Unknown" Group Were Likely More Senior

A second pattern in the document—consistent with the leadership hypothesis concerning the individuals listed separately from the group's operational elements or fighters—is found in indirect measures that are reasonable proxies for members' levels of seniority. More-senior individuals should be more likely to be married, have more wives, and have more children (if married). These factors would not indicate that these individuals are necessarily senior leaders, but it would be another pattern consistent with the hypothesis that the administrator's separate list consisted of senior leaders.

The data contained in the 2009 personnel roster are consistent with these patterns. The nonoperational ISI members listed separately in ISI Mosul's 2009 payroll and personnel document were more likely to be married than others in the group (Table 7.7). They were 10 percent more likely to be married than members listed among the group's operational fighters—85 percent of the individuals in the former list for whom data were available were listed as married, whereas only 75 percent of the individuals in the latter list were married, according to the document.

---

Abu Muhannad al-Suwaydawi (no number provided, but possibly Abu Abdel Salem, a.k.a. Abu Mohammad al-Sweidawi; see al-Hashimi and Telegraph Interactive Team, 2014).

PX717

**Table 7.7**
**T-Test of Differences in Means of Marital Status, Operational Versus Nonoperational Members**

| Group | N | Mean | Standard Error | Standard Deviation |
|---|---|---|---|---|
| Operational | 361 | 0.75 | 0.02 | 0.44 |
| Nonoperational | 136 | 0.85 | 0.03 | 0.36 |
| Combined | 497 | 0.77 | 0.02 | 0.42 |
| Difference between operational and nonoperational | 225 | −0.10** | 0.04 | |

SOURCE: Harmony document NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

NOTES: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. The $p$-value of the difference in marital status between the two groups is 0.017, indicating that the difference in means is statistically significant at the 5-percent level.

These individuals also had more wives (Table 7.8). The mean *count* of wives of the individuals in the nonoperational cases group was 0.12 higher than for operational fighters, 0.91 versus 0.79. There are several reasons why more-senior members could be more likely to be married. First, marital status in Iraq could correlate strongly with ability, which also correlates with promotion. Second, those who reach senior ranks may be older, and thus more likely to have gotten married through a simple cohort effect. Third, there was substantial anecdotal reporting of forced marriages to ISI members, so these extra spouses may represent additional compensation to senior leaders. Regardless of the reason, the greater number of wives suggests that members listed separately are more senior in the group.

Another piece of evidence is that the nonoperational "special group" had more children, on average, than did the operational fighter group, conditional on each member's marital status (Table 7.9). Table 7.9 shows the results of two statistical tests in which the relationship between number of children and group is explored.

Both models tell a similar story. The model shown in column 1 indicates that ISI members in the nonoperational group had an average

**Table 7.8**
**T-Test of Differences in Means of Number of Wives, Operational Versus Nonoperational Members**

| Group | N | Mean | Standard Error | Standard Deviation |
|---|---|---|---|---|
| Operational | 357 | 0.79 | 0.027 | 0.51 |
| Nonoperational | 136 | 0.91 | 0.047 | 0.46 |
| Combined | 493 | 0.82 | 0.022 | 0.50 |
| Difference between operational and nonoperational | 221 | −0.12** | 0.05 | |

SOURCE: Harmony document NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

NOTES: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. The $p$-value of the difference in marital status between the two groups is 0.013, indicating that the difference in means is statistically significant at the 5-percent level.

**Table 7.9**
**Difference in Estimated Number of Children, by Group**

| Group | (1) | (2) |
|---|---|---|
| Nonoperational group | 1.24 (0.278) | 0.48 (0.097) |
| Married | 2.48 (0.168) | 2.57 (0.537) |
| Constant | −0.03 (0.099) | −1.70 (0.523) |
| Observations | 497 | 497 |
| R-squared | 0.228 | |

SOURCE: Authors' calculations based on Harmony document NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

NOTES: Column 1 shows the results of an ordinary least squares regression. Column 2 shows the results of a Poisson regression. Robust standard errors are in parentheses. The $p$-values are statistically significant at the 1-percent level.

of 1.24 more children than did operational fighters. The model shown in column 2 estimates that the nonoperational group averaged 1.08 more children than the operational group (based on a transformation of the Poisson regression coefficient). Both estimates were statistically significant at conventional levels, meaning that the results are likely not random.[23]

The evidence suggests that the nonoperational group was likely more senior, by virtue of the family characteristics of its members. These personnel were more likely to be married, were likely to have more wives than operational fighters, and were likely to have more children. We next add one more layer of evidence to suggest that the unlisted, nonoperational ISI personnel consisted largely of ISI leadership; to do this, we examine the tribal and family names of individuals listed among personnel in the nonoperational group.

## Pattern 3: Family Names of ISI Members in the "Unknown" Group Consist of a Cross-Section of Iraqi Names, Not Just Names Common to Mosul

The third pattern evident in the document is the presence of a significant number of tribal (and subtribal or family) names that are not traditionally affiliated with the Mosul area. If this group of individuals were in fact part of ISI's mid- and senior-level leadership, we would expect that they would represent a fairly broad swath of the Iraqi population, with a particular focus on the areas where ISI had had a presence, such as Anbar governorate. ISI was forced to shift its base of operations to northern Iraq because of the combined pressure from coalition forces and ISF on the group elsewhere; consequently, many of the group's leaders would have been displaced from their previous safe havens. Based on the predominance of "nonlocal" tribal names represented in the "unknown" group, we can say with a high degree of confidence that this group does in fact represent a population that was not native to Mosul or Ninewa governorate. Although this does not

---

[23] In column 2, the results of a Poisson regression, we interpret the coefficient for the nonoperational group as a marginal effect—the interpretation most similar to the interpretation of the coefficient in the ordinary least squares regression of column 1.

PX717

necessarily mean that the group was composed of more-senior leaders, it is relatively unlikely that ISI would dedicate significant effort to relocate, protect, and pay lower-level members of the group.

Of the 138 individuals listed in the "unknown" section of the 2009 Mosul roster, there were 21 with an included tribal affiliation of some sort. The remainder of the individuals listed in this section had only a *kunya*, which does not allow us to assess their tribal or family affiliations. However, of the 21 individuals listed in the "unknown" section who did have a listed tribal affiliation, virtually all of them represented a tribe or clan that was not traditionally based in or around Mosul. For example, the most-listed tribal affiliation was with the Albu Issa tribe (marked as al-Issawi in the document), which is the dominant Sunni Arab tribe in an area about 80 kilometers south of Fallujah, in the western governorate of Anbar.[24]

With the majority of the tribal affiliations representing locations other than Ninewa governorate—primarily Anbar, Salah al-Din, Baghdad, and Diyala—it is likely that this group of unknowns represented an important group of ISI leaders that the group wanted to protect by relocating to the Mosul area, which at the time was the only place where the group could guarantee relative safety. Of course, there are always other possible explanations for the unknowns. It could be that they represent a secret merger with another organization, such as the Sunni-Sufi insurgent group Jaish Rijal al-Tariqa al-Naqshbandiya, or that their identities were being deliberately protected because they were members of a defecting faction from another Sunni insurgent organization. It could also have been possible that the unknowns were across the border in Syria and could not be easily accounted for by ISI's administrators in northern Iraq.[25] However, there is no evidence in the personnel rosters to suggest that the unknowns were new members from other groups or that they had moved outside the country. Indeed,

---

[24] See Lin Todd, W. Patrick Lang Jr., R. Alan King, Andrea V. Jackson, Montgomery McFate, Ahmed S. Hashim, and Jeremy S. Harrington, *Iraq Tribal Study—Al-Anbar Governorate: The Albu Fahd Tribe, the Albu Mahal Tribe and the Albu Issa Tribe*, Arlington, Va.: Global Resources Group and Global Risk, 2006.

[25] We thank Brian Fishman for suggesting these alternative hypotheses.

PX717

ISI began sending fighters of this number into Syria only after the Syrian civil war began in 2011.[26]

If, in fact, the "unknowns" represent ISI leadership, this has several important implications for our understanding of ISI's organization and strategic priorities. First, the existence of this group of unknowns who needed to be relocated confirms the fact that ISI no longer felt safe and secure enough in its previous strongholds to continue to keep these leaders based in those areas. Second, the fact that the majority of these unknowns who did list tribal affiliations were from Anbar highlights the continued importance to the group of the governorate, which was ISI's original base of operations. Third, although we cannot be completely sure that this group of unknowns represents key ISI leadership, the fact that ISI was willing to commit significant financial and administrative resources to relocating and protecting this group confirms that the group must have held some level of operational or symbolic significance within ISI.

**Pattern 4: There Are Discrepancies in Recording Personally Identifying Information**

The fourth pattern is the relative dearth of information on these separately recorded individuals. A clandestine organization—such as ISI—would likely attempt to improve its operational security by minimizing the intelligence signatures that its operatives could leave (at least where such signatures might be found). Known intelligence breaches, such as the one that occurred with the coalition's seizure in 2008 of the 2007 Abu Hareth documents, often lead organizations to take actions intended to limit the potential damage caused by the compromised information. One such action would be to redact information from group records produced after intelligence was compromised. One obvious type of information that could compromise a group would be personally identifying information about the identities of group members. The 2007 documents linked a five-digit numeric identifier to more than 1,200 ISI members. As noted, in the period between the seizure

---

[26] Noman Benotman and Roisin Blake, *Jabhat al-Nusra: A Strategic Briefing*, London: Quilliam Foundation, January 2013, p. 2.

PX717

of the Abu Hareth documents on ISI in Mosul and the seizure of similar ISI documents in 2009, ISI switched to a system that assigned each member a four-digit identifier.

For the personnel entries at the end of the document, not only did ISI not list a five-digit serial number but it did not even include a column for these members' five-digit serial numbers. This is consistent with a security precaution that would not allow these members to be linked to earlier records and, consequently, for an overtime intelligence picture to be developed about these members, which might reveal their roles in the organization. This would be more likely for members in the mid- and upper-level leadership ranks, who did have access to or knowledge of information that could compromise large parts of the organization. This is one reason to surmise that these individuals were members of ISI leadership.

**Pattern 5: There Are Discrepancies in Recording Unit Information**
Finally, no unit information was associated with the entries of the individuals in the second group, who were not counted among the group's fighters. Rather than listing unit information, many of the entries simply mention that the individual was "outside Mosul." There are no directly comparable entries in the 2007 document. It is unlikely that these were regular fighters who had been displaced from other governorates, because ISI likely would have attached them to units and used them for its operations. A more likely hypothesis is that these entries were intended to designate that key individuals had left Mosul and were hiding out in ISI safe houses in areas outside the city proper. This pattern does not seem to have been uncommon for AQI and ISI leaders with special security concerns. For example, the AQI leader al-Zarqawi and the ISI leaders Abu Umar al-Baghdadi and Abu Ayyub al-Masri were found hidden in safe houses located away from population centers, in Diyala and Salah al-Din governorates, respectively.[27] However, the information in the documents cannot independently confirm this

---

[27] Stanley McChrystal, *My Share of the Task: A Memoir*, New York: Portfolio/Penguin, 2013, p. 228; and Hamza Obeid, "Governor of Baghdad in al-Qaeda Organization Reveals Details About It," *Islamic Times*, June 6, 2010.

PX717

hypothesis, because these individuals might have had other responsibilities or reasons for being located outside Mosul, despite being on the Mosul administrator's payroll.[28]

## Conclusion

Our analysis of personnel records and career paths yields six key findings. The first is that ISI in Mosul experienced massive turnover and attrition between 2007 and 2009. Using our most generous matching approach across documents, we find that less than 22 percent of those present in the 2007 payroll show up in 2009 (although they make up a fair proportion of the 2009 members), and the proportion of members on the payroll who were dead or in prison increased substantially.

The second key finding is that the manpower available to ISI in Mosul in 2009 appears to have decreased significantly from the manpower that was available to the group in 2007. In other words, recruitment did not keep up with attrition. Although this finding could be an artifact of the particular documents that were recovered, it is also consistent with the general trend of ISI's broader decline and weakening during this period.

The third key finding is that ISI personnel who survived across the two periods were highly mobile within the organization. Ninety-six of the 124 members whom we were able to track across documents with high confidence changed units (77 percent). The high rate of personnel mobility within an organization that required cohesion, bureaucratic administration, and secrecy is surprising. It is less surprising, however, in light of the significant turnover during this period of ISI personnel at all levels of the organization. This turnover was because of aggressive coalition forces and ISF counterterrorism operations, the Awakening, and the surge, which resulted in ISI losing control of strongholds in and around Baghdad and in Anbar and Diyala governorates but

---

[28] The Mosul administrator might have been the de facto ISI administrator for northern Iraq. The bulk of his entries were from the group's operational center in Mosul, but other entries could be from outside Mosul.

maintaining a last major holdout in Ninewa governorate. Such turn-over appears to have resulted in an ISI organization that had no better choice than to constantly reassign its personnel to adapt to the changing circumstances on the ground and the new challenges it confronted, despite the likely costs attendant in doing so.

Fourth, we find a general increase in total payments to members over time, which roughly match the core inflation rate. These increases were not in salary payments, which lagged inflation, but came in the form of payments for expenses and changes in ISI members' number of dependents, which other studies have shown to help predict ISI's compensation rates.[29] Several of the militants who received the largest increases in payments, independent of any increase in their number of dependents, are recorded as having moved to units listed under such names as "work location unknown." It is possible that these members were elevated to leadership or other top-tier status within the group and hence given raises and better "cover" unit assignments to hide their real status and locations for operational security purposes, intended to protect the group's senior leadership.

Fifth, we find that those ISI members who were promoted from field positions to bureaucratic positions did receive pay increases from their 2007 salaries, but those increases lagged behind those received by members who moved laterally to other field units. Possible explanations for this include that the fighters who moved to field units were facing a more difficult operating environment than those who fought in 2007, that they had greater responsibilities in 2009, and that they were displaced from other areas and so were less likely to own their own homes. To help maintain a strong fighting force, compensation might have increased for those who had the riskiest positions.

Sixth, we find evidence in the January 2009 documents that is consistent with an ISI effort to omit identifying information about a group of mid- or senior-level leaders by sanitizing such information in the group's own documents. The group had experienced significant intelligence losses from past seizures of similar documentation and had good reasons to seek to protect such information while still having

---

[29] Bahney, Iyengar, et al., 2013.

PX717

sufficient data to account for the personnel who were on its current payroll.

These findings have implications for broader U.S. counterterrorism efforts against not only the Islamic State but also al-Qaʿida and similar groups worldwide. Al-Qaʿida's and ISI's survival and growth in the wake of persistent organizational upheavals indicate that well-organized terrorists can survive the intense pressures placed on them by counterterrorist forces. But it is not clear whether the costs and challenges of effectively adapting such organizations internally might affect their ability to pose a significant threat outside the Middle East and North Africa.

PX717

# Assessing the Islamic State of Iraq's Finances: The Governorate Dimension

ISI was a complex organization—a terrorist group, an insurgent group, and, in its own planning, a proto-state. Any one of these activities—terrorism, insurgency, state-building—would take money. All three of them required enormous amounts of cash.

In this chapter, we discuss how ISI managed its finances at the governorate level and below. In the next chapter, we discuss higher levels of finance, as well as methods of financial control. Our analysis in this chapter is based on three large data sets relating to the finances of AQI in Anbar governorate in 2005 and 2006 and ISI in Ninewa governorate in 2008 and 2009. We also have two small data snapshots of ISI's finances in two other locations for short periods—Baghdad in 2007 and al-Jazirah (the western desert region between the Tigris and Euphrates rivers) in 2010. The Ninewa, Baghdad, and al-Jazirah analysis extends previous RAND research about AQI's financial activities in Anbar governorate during parts of 2005 and 2006.[1] Together, these data allow us to analyze the evolution of ISI's financing.

The most important finding is that the group raised most of its revenues locally, and did so, in part, for strategic reasons. In an undated letter from an official of the Mosul state of ISI to a select group of "sheikhs"—most likely Abu Ayyub al-Masri and Abu Umar al-Baghdadi, from whom the documents were captured in April 2010—the official explained, as part of a broader discussion of ISI

---

[1] Bahney, Shatz, et al., 2010.

PX717

strategy and operations, where ISI's money was coming from. The official listed the source of ISI's income as the following:

> First: A percentage of the contracts and projects that are conducted within the State, and that is done by calling the contractors or the executers of these projects. The percentages range between 8 to 10 percent, and sometimes it reaches 5 percent from the value of the profits of each project knowing that these projects will benefit the general public, and it shouldn't benefit the infidel apostates.

> Second: From the Gas Stations named in the administrator's (of the ISI) terminology as (*al-Bayadat*) which are Propane, Kerosene and Gas.

> Third: From the transportation offices that transports merchandise inside and outside the country

> Fourth: The flour factories and the factories of construction materials.

> Fifth: The fines from some individuals who committed violations of the Islamic Shari'ah that don't require killing or beheading.

> Sixth: Some donations from generous Muslims even if it was small.

> Seventh: Some collected from the directorates of the apostate government such as the municipality, education and so forth.[2]

Similar sources of revenue were prominent in the documents back to 2006 and appear to have remained important to ISI throughout 2010. Press reports detail extortion by ISI as a major source of revenue throughout 2010 and 2011 in Ninewa governorate, suggesting that the

---

[2]   Harmony document NMEC-2010-186331 Trans, p. 2; see "ISIL, Syria and Iraq Resources," 2015. Donations from wealthy individuals appear to have been a minor part of the ISI funding stream.

group developed an enduring revenue-generating infrastructure, similar to the one detailed here.[3]

This chapter lays out what we know about ISI's revenue generation. We first provide background on the financial data. We then move to revenues in Anbar and Ninewa governorates and then expenses in both governorates. We conclude with a brief discussion of finances in two other areas of Iraq.

## Data on AQI and ISI Financing

Our analysis of AQI's finances in Anbar governorate is based on two sets of documents relating to the administration of AQI in Anbar governorate in 2005 through 2006. The first set of documents is referred to as the "Travelstar" documents. Awakening forces found these when they raided the residence of Ala Daham Hanush in Julaybah, Iraq, on March 15, 2007. The hard drive of Hanush's computer contained the documentation of AQI's provincial administration of Anbar governorate from mid-2005 through the end of 2006. This unit of the organization reviewed and regulated the activities of AQI in its different geographic sectors within Anbar governorate and provided money to these sectors when they needed financing. The master financial ledgers formed the basis of our analysis; these are aggregates of many of the 1,200 files in the collection.

The second set of documents was found in a ditch in the town of Tuzliyah in western Anbar in January 2007 by a U.S. Marine Corps unit that was patrolling the area. This set of nine documents contained financial records for AQI in Anbar's "western" sector, from September 2006 through mid-December 2006, including payrolls, records of equipment and supply purchases, and the flow of funds into and out of the sector. This western sector reported to the governorate administration of Anbar. Both document sets show interaction between these two

---

[3]  "Iraq: Al-Qaeda Extorting Businesses in Mosul," *Asharq al-Awsat*, September 9, 2010; "Al Qaeda in Iraq Tightening Economic Grip on Mosul," *Albawaba Business*, May 3, 2011; "In Iraq's Mosul, Pay Qaeda Tax or Pay the Price," *Middle East Online*, September 15, 2011.

distinct levels of AQI command, including financial transfers, memoranda, and military and administrative reporting.

Our analysis of ISI's finances in Ninewa derives from a set of documents captured by coalition forces in a February 2009 raid that resulted in the detention of an ISI administrative emir operating in Ninewa—Ahmed Zayd.[4] Data from these documents allow us to extend earlier RAND research on AQI's financial activities in Anbar governorate during parts of 2005 and 2006 and cover a key period in the Iraq war, in general, and the Islamic State's history, in particular (2008 and early 2009).

Among the documents captured from Ahmed Zayd were two master ledgers—one tracking income and one tracking expenditures—containing transaction-level detail on ISI's financial activities in the Mosul area. We exploit this detail to document patterns in ISI's financial transactions, revenues and revenue sources, and aggregate expenditures and what it was spending its money on.[5] We built our data set from the transaction-level observations recorded in the documents. When dollar figures were used, we used the figures in the document. When dinar figures were used, we converted them to dollars at market exchange rates. Our totals by category and time period are different from the totals recorded in the documents. We do not have further information to explain these differences.

---

[4]  It is possible that Ahmed Zayd was ISI's administrative emir not only for Mosul but also for all Ninewa governorate or greater northern Iraq. We are unable to discern from the available documents the full expanse of Ahmed Zayd's jurisdiction. By the point when the documents were captured, Mosul was the epicenter of ISI's financial activities, making it comparable to the documents examined in this report from AQI's stronghold in Anbar governorate.

[5]  One notable difference in the document collections from Anbar and Ninewa is the length of time covered by transaction-level information. The Anbar data span a longer period than the Ninewa data. The Anbar documents include detailed financial data beginning on June 22, 2005, and ending on November 2, 2006, a total of 498 days, or approximately 16 months. The Ninewa documents include detailed financial data from August 26, 2008, through January 29, 2009, a total of 157 days, or about five months. Together, the two time-series data span a total of 655 days, or roughly 21 months. We have data covering 16.33 months for Anbar and 5.15 for Ninewa. We use these more-precise measures to compute monthly statistics.

We have a limited set of documents from two other locations. These locations are the al-Jazirah sector of Ninewa governorate and Baghdad. Although these documents cover only very short periods, they allow us to learn more about ISI's financial activities elsewhere.

## ISI Provincial and Sector Revenues

ISI's leadership focused on raising revenue locally. The sources of income that senior leaders were quoted as seeking appear to have been the main sources of income for the group, according to data captured from AQI and ISI in Anbar and Ninewa governorates. The group's records of its income and expenses typically came from its administrative emirs. In Anbar, the governorate revenues were tallied on two different master sheets in the document collection. The first corresponds to the administrative period of Firas (June 2005 to May 2006), and the second corresponds to the administrative period of 'Imad (May 2006 through October 2006).[6] As in earlier RAND research, we analyze these two periods separately because of a difference in the administrators' accounting; the first broke out individual revenue transactions by their detailed descriptions, whereas the second used only the broad categories spoils and sales, donations, and transfers from the sectors.[7]

In Ninewa, provincial revenues were tallied on a single master sheet. The sheet corresponds to Ahmed Zayd's administration of the governorate from August 2008 through January 2009. Ahmed Zayd disaggregated individual revenue transactions into four broad categories: contracting work, oil, real estate, and spoils. Other revenue-generating activities were filed as miscellaneous.

---

[6] The data include three transactions from November 1, 2006, and one from November 2, 2006.

[7] Bahney, Shatz, et al., 2010, pp. 34–36.

PX717

## AQI Revenues in Anbar Governorate

The Anbar governorate administration collected revenue mostly from sales of stolen commercial goods and did not collect much revenue from black-market fuel sales, large-scale extortion, or direct taxation of the population. We present a more detailed profile of revenue collection in two periods.

### AQI Revenues in Anbar Governorate, June 2005 Through May 2006

From June 2005 to May 2006, AQI's Anbar administration raised nearly $4.5 million, or roughly $373,000 per month. The group obtained roughly $2.3 million—more than 51 percent of its revenue—from selling what appear to be stolen goods, most of which were highly valuable capital items, such as construction equipment, generators, and electrical cables (Figure 8.1).[8] In contrast to what has been suggested in much news reporting, the data do not support the claim that the group was largely financed by selling stolen oil or refined oil products, such as gasoline, since the revenue garnered from oil and these products appears to be small in the context of total group revenues at this level of administration (note that revenues from oil and refined oil products are not shown separately in Figure 8.1 but are instead a small portion of the stolen-goods entry in the figure).[9] However, it is also entirely possible that revenues from oil and refined oil products were included in one of the many Anbar AQI sectors for which we do not have data, or in the ledgers of the national AQI administration, which had a number of purported ministries and claimed to have a specific oil minister.[10]

---

[8]   We assume that these goods were all stolen, as in some cases they are explicitly denoted as "booty" and in others they simply appear on the group's balance sheets without any record of payment for them. It is also possible that goods that simply appear on the books were donated in Iraq or donated abroad.

[9]   Richard A. Oppel, "Iraq's Insurgency Runs on Stolen Oil Profits," *New York Times*, March 16, 2008; Lennox Samuels, "Al Qaeda Nostra," *Newsweek*, web exclusive, May 21, 2008b.

[10]  "Al-Furqan Media Wing Declares the Members of the Cabinet of the Islamic State of Iraq," Al-Furqan Media Wing, April 19, 2007; also see Evan F. Kohlmann, *State of the Sunni Insurgency in Iraq: August 2007*, New York: The NEFA Foundation, 2007; "Oil Smuggler

**Figure 8.1**
**Sources of Revenue in Anbar Governorate, June 2005 Through May 2006**



SOURCE: Harmony batch Ala Daham Hanush; see "ISIL, Syria and Iraq
Resources," 2015.
NOTES: These amounts ran through late May, when a new governorate administrator
took over. Percentages do not sum to 100 because of rounding.
RAND RR1192-8.1

AQI's Anbar governorate administration also collected a substantial amount of revenue that was raised by the sectors and transferred to the center, constituting approximately 21 percent of the governorate administration's total revenues. This indicates that each sector had its own revenue-generating activities, and it appears that the sectors with excess cash on hand were expected to pass funds up to the governorate administrator.

Car sales and spoils each constituted between 10 and 12 percent of the Anbar provincial revenues. Spoils are the goods and other property taken with violence from those whom AQI designated as infidels and as apostates by the group's Islamic law section. We believe that these people encompass the Iraqi Shia population, other religious

and Al Qaida Supplier Arrested in Bayji," *Al Mashriq Newspaper*, November 22, 2007; and P. Williams, 2009.

PX717

minorities, and Iraqis associated with the Iraqi government. Explicit donations accounted for only about 5 percent of total revenues.

**AQI Revenues in Anbar Governorate, June Through November 2006**

From June to November 2006, the governorate administrative unit dramatically increased its revenues, making $4.3 million over the period, or $860,000 per month (Figure 8.2). The group realized this dramatic uptick in revenue—from $373,000 a month to $860,000—through an increase in all revenue streams except transfers from sectors, which declined substantially. Revenue from spoils and from sales (both cars and stolen goods) increased disproportionately. Spoils and sales increased from 73 percent of revenues in the earlier period to 93 percent in the later period, whereas transfers from sectors decreased as a share of total revenues.

The financing of the western sector was similar to that of Anbar governorate as a whole. In the western sector, AQI funded itself

**Figure 8.2**
**Composition of Revenue, June 2006 Through November 2006**



SOURCE: Harmony batch ALA DAHAM HANUSH; see "ISIL, Syria and Iraq Resources," 2015.
NOTE: These amounts actually started in late May, when a new provincial administrator took over.
**RAND** *RR1192-8.2*

PX717

through the sale of cars and lesser-valued commercial goods. The western group focused on taking spoils and booty from those whom the group deemed to be infidels and apostates, following AQI ideology in strict, exploitative terms. As noted, spoils are taken with violence. In contrast, booty includes the goods and other property taken from people without a fight.

The AQI financing model can be characterized as local, religiously radical, and politically destabilizing. It encompassed vigorous independence (specifically, focusing on local financing), exploitation based on radical religious beliefs, sensitivity to the perception of the average Sunni, and an explicit attempt to subvert the power of a number of key tribes. Another noteworthy aspect of AQI's revenue activity was the demarcation of revenues being collected by "spoils groups." This notation may indicate that AQI had specifically designated units for extortion and theft.[11] Even though AQI viewed the taking of spoils as entirely legitimate, this activity was clearly extortion or theft undertaken by either this activity was clearly extortion or theft undertaken by either AQI members or criminal elements that were co-opted by AQI and, as noted in press reporting, was perceived as such by much of the population.

Revenues were commonly generated by units that were directly administered by the sectors, although large revenue streams seemed to pass directly to the Anbar administration. This could mean that the Anbar administrator had business assets that operated within the sectors or that sector assets were passed up to the governorate administration by rule. Although we do not know which of these occurred, it seems likely that sector-based groups passed large revenue streams to the governorate administration, because the higher administrative unit had clear bureaucratic precedence in many other ways.

Although AQI in Anbar generated an average of $138,600 in weekly revenue, the group's weekly take fluctuated, and it could not

---

[11] There is historical precedent for specialized revenue-generation units. A "Staff Report" captured in 1977 detailed reorganization plans for the Provisional IRA. The report advocated forming specialized units, including one that would conduct robberies to raise group funds. The report is reproduced in Tim Pat Coogan, *I.R.A.*, 5th ed., London: HarperCollins, 2000.

PX717

count on a consistent weekly funding stream (Figure 8.3). In mid-November 2005, the administrator had reported weekly revenues amounting to only $150. However, in the following week, he reported revenues of well above $100,000, which demonstrates the dramatic short-term fluctuations in AQI's revenues.

Income booms came more often than busts for AQI in Anbar. AQI recorded more than $700,000 in weekly revenues twice during the 15-plus months covered by the records and more than $580,000 in two additional weeks. Overall, AQI Anbar's median weekly revenue was $97,740, demonstrating that the group was able to consistently raise substantial funds, despite the occasional short-lived dry spells. The rate at which AQI was able to raise funds increased substantially over time. From June 2005 to December 2005, AQI's median weekly

**Figure 8.3**
**AQI's Weekly Revenue in Anbar Governorate, June 2005 Through October 2006**



SOURCES: Harmony documents NMEC-2007-633809 and NMEC-2007-633893-HT; see "ISIL, Syria and Iraq Resources," 2015.
NOTE: The data include one observation of $64,770 from November 1, 2006.
**RAND** *RR1192-8.3*

PX717

revenue was $56,900. From January 2006 to December 2006, the group reported median weekly revenues of $102,960.[12]

If we look at our data broken down into three roughly equal periods—the first from mid-June 2005 through the end of December 2005, the second from January 2006 to May 2006, and the third from June 2006 to October 2006—AQI was able to raise progressively more money as time passed, from a median weekly rate of $56,900 from June 2005 to December 2005, to $73,983 from January 2006 to May 2006, and to $150,898 from June 2006 to October 2006.

**Changes in Revenue-Generating Activities over Time**

Stolen goods played a prominent role in AQI's revenue-generating activities in Anbar throughout the period for which we have data (Figure 8.4). In June 2005, most provincial revenues came from sector transfers, and these continued to be important in mid to late 2006. However, throughout the period, stolen goods were far more important. This is clear in the period when Firas was administrative emir, through May 2006; he categorized stolen goods separately. 'Imad, whose first full month was June 2006, wrapped stolen-goods revenues into a more general category of "looting and sales section." It is unlikely that spoils alone would have jumped that much between the 12 months from June 2005 to May 2006 and the five months from June 2006 to October 2006 (which includes one observation of $64,770 from November 1, 2006), so most of the revenue in that category must have been from sales of stolen goods.

## ISI Revenues in Ninewa

From late August 2008 through January 2009, AQI's Ninewa administration, including the key city of Mosul, recorded $4,820,090 in revenues, or roughly $964,000 per month. The group obtained about $1.87 million—almost 39 percent of its revenue—from oil-related

---

[12] The weekly means for these periods were $107,743 and $154,385, respectively. The means are influenced by outlier observations, so they differ from the median calculations.

PX717

**Figure 8.4**
**AQI's Monthly Revenue in Anbar Governorate, by Type, June 2005 Through October 2006**



SOURCES: Harmony documents NMEC-2007-633809 and NMEC-2007-633893-HT; see "ISIL, Syria and Iraq Resources," 2015.
NOTES: There is a break in the series between May 2006 and June 2006. Starting in June, no proceeds of stolen goods were recorded. Such sales continued, but they were wrapped into a new "looting and sales" category by the new administrative emir. Data for October 2006 include one observation from November 1, 2006.
RAND RR1192-8.4

PX717

activities, such as gas stations and fuel-trucking companies that it set up in Ninewa governorate and elsewhere (Figure 8.5).[13] In many cases, these gas stations were likely fake, set up to gain rights to fuel shipments.[14] The group also exploited the Mosul area's ripe smuggling environment to resell hijacked fuels, including gasoline, cooking gas, and diesel.[15]

ISI became more involved in other organized criminal activities in Mosul as well. The group's second-largest revenue source from August 2008 to January 2009 was contracting work—the extortion of contracted projects in and around Mosul—from which it brought in $1.83 million over the five-month period (37.9 percent of its revenue during that time). These schemes involved extorting hundreds of thou-

**Figure 8.5**
**Sources of Revenue in Ninewa Governorate, Late August 2008 Through January 2009**



SOURCE: Harmony document NMEC-2009-634823; see "ISIL, Syria and Iraq Resources," 2015.
**RAND** *RR1192-8.5*

---

[13] P. Williams, 2009, pp. 231–232.

[14] P. Williams, 2009.

[15] Knights, 2008a, p. 3.

sands of dollars from businesses in the area, including soft-drink man-
ufacturers, mobile-phone companies, and flour and cement factories.
In real estate, ISI reportedly stole some 26 ledgers containing the deeds
to almost $90 million worth of property and resold at least some of it.[16]

ISI intimidated or co-opted firms under contract to conduct
reconstruction activities in the Mosul area, typically demanding 10
to 20 percent of a contract's value, in exchange for protection. The
transactions recorded in Ahmed Zayd's ledgers show a diverse criminal
enterprise. For example, on September 3, 2008, ISI recorded a $50,000
credit obtained through the extortion of a firm under contract to pave
local roads. On the same day, ISI recorded another credit of almost
$100,000, which was obtained through the extortion of a contractor
implementing a water project in western Mosul. A little more than a
week later, on September 12, Ahmed Zayd recorded ISI's largest "con-
tracting work" windfall in the five-month period—a $160,000 pay-
ment from a mobile-phone operator in Iraq.[17] Interestingly, Ahmed
Zayd's notes indicate that the mobile-phone company still had a bal-
ance of $40,000, suggesting that the company paid ISI $200,000 per
month to operate in northern Iraq. Consistent with this hypothesis,
Ahmed Zayd's records show two $100,000 payments from the com-
pany the following month, on October 9 and 12. The company made
the latter payment exactly one month to the day after its $160,000
payment, providing further evidence that the company paid ISI a large
standard fee each month to continue operating in the region.[18]

---

[16] Knights, 2008a, p. 3. It remains unclear precisely when, or for how much, ISI resold the
deeds. From September 2008 to January 2009, ISI's Mosul administrator attributed only
$134,361 of ISI revenues to real estate. However, it is possible that he categorized some of
this revenue as "spoils" or "miscellaneous."

[17] Harmony document NMEC-2009-634823; see "ISIL, Syria and Iraq Resources," 2015.

[18] Over time, relations between the mobile company and ISI became strained. By February
2009, ISI accused the company, Asiacell, of cooperating with the United States to collect
technical intelligence that threatened to compromise ISI operatives and activities. By March,
ISI's media wing issued a printed declaration that read: "After taking this to our legislative
group, we have decided to apply the rule of Allah to them. We will kill whoever works for
them, and we will strike their offices and towers" (Daniel W. Smith, "Asiacell Targetted by
'Islamic State of Iraq': Attacks/Claims of Government Surveillance Target Popular Mobile

In exploiting Ninewa's contracting environment, ISI did not always act alone. Documents seized from the compound of the ISI's two top leaders, Abu Ayyub al-Masri and Abu Umar al-Baghdadi, reveal instances of high-dollar collusion between ISI and certain Iraqi government officials.

One instance was a scheme that involved two senior ISI operatives identified by their pseudonyms, Abu Ahmad and Abu Layth, who established good relations with numerous Iraqi government officials, including a high-level provincial official, a senior Iraqi government official, and the office director of another senior Iraqi government official. According to the documents, these officials agreed to deal with ISI and to provide assistance to the group, on the condition that this assistance would benefit Mosul. For example, ISI positioned itself to exploit contracts for various construction projects in and around Mosul. Abu Layth was appointed as a representative and deputy for one of the senior governing officials in the chairmanship of a governing council for the reconstruction of Mosul. Abu Ahmad was appointed to Ninewa's mail and communications directorate. Under the auspices of the directorate, he initiated a project to erect a building, which would have provided ISI with 4.9 billion Iraqi dinars skimmed from the contract.[19] Documents also contain a list of a number of large projects with costs varying from 8 billion Iraqi dinars to 40 billion Iraqi dinars, which could have provided an opportunity for ISI to secure its funding.

The large-scale extraction of revenue from the country's oil and contracting industries marked a significant change from AQI's revenue-generating activities in Anbar, as did the group's revenue stream from real estate, which yielded about $134,000, or 2.8 percent of its total recorded revenue from Ninewa (Table 8.1).

As in Anbar, spoils remained a lucrative source of revenue for ISI in Ninewa, bringing in more than $950,000. And as in Anbar, where

---

Company," *Iraq Slogger*, March 23, 2009). Smith's article includes a link to the ISI declaration (in Arabic).

[19]  Harmony document NMEC-2010-186334; see "ISIL, Syria and Iraq Resources," 2015. For a discussion about what this might mean for the fight against the Islamic State, see Benjamin Bahney, Patrick B. Johnston, and Patrick Ryan, "The Enemy You Know and the Ally You Don't," *Foreign Policy*, June 23, 2015.

**Table 8.1**
**Ninewa Revenue, by Type, August 2008 Through January 2009**

| Category | Total Revenue (U.S. $) | Share of Revenue (%) |
|---|---|---|
| Contracting work | 1,826,544 | 37.9 |
| Miscellaneous | 41,464 | 0.9 |
| Oil | 1,866,593 | 38.7 |
| Real estate | 134,362 | 2.8 |
| Spoils | 951,128 | 19.7 |
| Total | 4,820,090 | 100.0 |

SOURCE: Harmony document NMEC-2009-634823; see "ISIL, Syria and Iraq Resources," 2015.

NOTE: The data run from August 29, 2008, to January 29, 2009.

donations accounted for only 5 percent of AQI's total revenues, donations still composed a very small portion of ISI's revenues, according to an ISI official in Mosul, writing later in the war. As Table 8.1 shows, donations were not significant enough to be coded as a separate revenue category.[20] Other Ninewa revenue-generating transactions, labeled "miscellaneous," amounted to the lowest amount of any of the categories defined by ISI, at $41,464—less than 1 percent of ISI's total revenue from August 2008 through January 2009.

As in the Anbar documents, the ISI Mosul documents reveal that the group's week-to-week revenues fluctuated considerably. ISI Mosul's average weekly revenue was almost $210,000 (Figure 8.6). However, on average, ISI Mosul brought in more money at the beginning of the period that the records cover, and less over time. ISI Mosul's revenues dropped from $1.31 million in September 2008 ($1.51 million including the end of August) to only $506,000 in November 2008 and $572,000 in December 2008, before sharply increasing to $1.32 million in January 2009, the last month included in the documents. The Mosul administrator recorded one transaction for more than $652,000

---

[20] Harmony document NMEC-2009-634823 Trans; see "ISIL, Syria and Iraq Resources," 2015.

**Figure 8.6
ISI's Weekly Revenue in Ninewa Governorate, August 2008 Through
January 2009**



SOURCE: Harmony document NMEC-2009-634823; see "ISIL, Syria and Iraq
Resources," 2015.
NOTES: We calculated weeks as starting on Saturday and ending on Friday. The first
week starts on August 23, 2008, but has revenue only for August 29. The last week
starts on January 24, 2009, and has revenue through January 29, 2009.
RAND *RR1192-8.6*

on January 1, 2009, which was attributed to "spoils from al-Ayman."[21]
This is by far the largest revenue-generating transaction recorded by
ISI in either set of documents. The next-largest revenue transaction
recorded was for $160,000, on September 12, 2008, categorized under
contracting work and described as "revenues from Asia."[22] If the out-

---

[21] *Al-Ayman* denotes *West*, indicating that the spoils had been looted from western Mosul
(Harmony document NMEC-2009-634823 Trans; see "ISIL, Syria and Iraq Resources,"
2015).

[22] Harmony document NMEC-2009-634823 Trans; see "ISIL, Syria and Iraq Resources,"
2015. These revenues were likely from the Asiacell mobile-phone company, which ISI was

lier transaction for $652,000 is removed, ISI Mosul's January revenue would have amounted to $665,323, which would have been well below the revenue generated in both September and October 2008.

The bulk of ISI's monthly revenue came from the oil sector and extorting local contract work (Figure 8.7). These dominant positions remained fairly constant over the five months the documents cover, with the exception of January 2009, when revenues from spoils composed a substantially larger share of AQI's revenues than they had during the previous months, largely because of the $652,000 looted in western Mosul in early January.

One important trend is the declining share of ISI's Ninewa revenues obtained from extorting contractors. Contractor extortion was

**Figure 8.7**
**ISI Monthly Revenue in Ninewa Governorate, by Type**



SOURCE: Harmony document NMEC-2009-634823); see "ISIL, Syria and Iraq Resources," 2015.
NOTE: September 2008 includes $181,000 from August 29, 2008, through August 31, 2008.
RAND RR1192-8.7

known to extort. See, for example, Jamal al-Badrani and Jim Loney, "Asiacell Building Bombed in Iraq City of Mosul," Reuters, February 3, 2012.

the largest source of ISI revenue in September 2008 (49.8 percent, but 44.8 percent if $181,000 in total revenue from the end of August is included) but diminished significantly from October 2008 (41.5 percent) through January 2009 (18.9 percent). This decline—from almost $662,000 in September ($676,000 including the end of August) to $249,000 in January—amounted to a 62-percent decrease in revenue from extorting contractors (63 percent including the end of August). The decrease in ISI contracting revenue was notably steep in October and November 2008, after the ISI deputy Abu Qaswarah was killed. Revenues from extorting contracted projects dropped from September to October by more than $280,000, a 43-percent decrease in the month of Abu Qaswarah's death and a 68-percent decrease from September to November. Abu Qaswarah was known as one of ISI's savviest operatives at financing and administration, and he was ISI's top leader in northern Iraq at the time of his death.[23] August 2009 correspondence from a high-level ISI operative to Abu Ayyub al-Masri and Abu Umar al-Baghdadi revealed that Abu Qaswarah's previous deputy, who assumed some of his duties after Abu Qaswarah was killed, had hatched a plot to infiltrate the Iraqi government to divert funding from it to ISI, suggesting that while Abu Qaswarah's death might have had a relatively short-lived impact on ISI's fundraising activities, his replacement was able to successfully facilitate complex, risky schemes that had lucrative payoffs.[24]

As with its revenue from extorting contracted projects in the Mosul area, ISI's oil-related revenue declined between September 2008 and January 2009, from a peak of more than a half-million dollars in October to $321,000 in January. ISI's oil revenue fluctuated notably over time. Its reported oil revenue in September 2008—the first

---

[23] "AQI's Swedish emir," *Jane's Terrorism and Security Monitor*, October 27, 2008. See Abu Umar al-Baghdadi, "Eulogy for the Martyr, Abu Qaswarah al Maghribi," English translation, October 2008.

[24] The letter seized from al-Masri and al-Baghdadi's hideout was dated August 7, 2009—more than ten months after Abu Qaswarah was killed—explaining how Abu Qaswarah's deputy had instructed the author's group to infiltrate the Iraqi government administratively to direct some of the financial and economic decisions toward the interest of the Islamic State (Harmony document NMEC-2010-186334; see "ISIL, Syria and Iraq Resources," 2015).

full month for which we have data—was $371,000 ($497,000 including the end of August). Its October oil revenues spiked to more than $532,000, but then decreased 59 percent by December, to approximately $218,000, before increasing in January 2009 to $321,000, a 13-percent decrease from ISI's September oil revenue.

ISI's capture of spoils-related revenue fluctuated even more dramatically. In September 2008, Ahmed Zayd recorded just under $235,000 in spoils revenue, followed by three months with almost none.[25] In January, he recorded more than $715,000 in spoils revenue—more than twice that of ISI's next-largest source that month, oil, and almost $150,000 more than oil and contractor extortion combined, its normal top-two revenue categories.[26]

ISI's revenues did not grow linearly (Figure 8.8). Rather, the revenues fluctuated dramatically week to week. Revenues also fluctuated day to day, although the differences were not dramatic, and there was no obvious collection day.

## Internal Financing Strategy

One of our most notable findings about ISI's fundraising in both Anbar and Ninewa governorates is a nonfinding: There is no evidence in any of the documents we analyze that private donors or foreign states played any meaningful role in financing ISI. This fact is borne out not only in the group's actual financial records. Documents out-

---

[25] Ahmed Zayd reported $1,389 in spoils revenue in October 2008 and none in November and December (Harmony document NMEC-2009-634823; see "ISIL, Syria and Iraq Resources," 2015).

[26] Nearly all of ISI's January 2009 spoils revenue was received in a single transaction, dated January 1, 2009, in which the ISI administrator recorded a credit of 939,000,000 Iraqi dinars (approximately $652,000 at 2009 exchange rates), attributed to "security," for "spoils from al-Ayman" (western Mosul). Incidentally, January 1, 2009, was the same day that the Iraqi government assumed formal control from the United States of Baghdad's Green Zone. There is no evidence in the document suggesting that the two events were related. It is more likely that these spoils were obtained in violence targeting the local Christian and Shia populations in the run-up to the January 31, 2009, governorate elections. See Timothy Williams, "Attacks Occur as Iraq Takes Control of Key Sites," *New York Times*, January 1, 2009.

**Figure 8.8**
**Weekly Changes in ISI Total Revenue in Mosul, Top Two Categories, August 29, 2008, Through January 29, 2009**



| Revenue Type | Average Weekly Revenue (U.S. $) | Weekly Trend |
|---|---|---|
| Contracting work | 70,308 | |
| Oil | 81,156 | |

SOURCE: Harmony document NMEC-2009-634823; see "ISIL, Syria and Iraq Resources," 2015.
NOTES: The third column presents data points showing the change in revenue from week to week, starting from August 29, 2008, through January 29, 2009. The first week runs from August 23, 2008, through August 29, 2008, but includes data from only August 29, 2008. The last week runs from January 24, 2009, through January 30, 2009, but has data ending on January 29, 2009.
RAND RR1192-8.8

lining the group's strategy and recording "lessons learned" make clear that remaining financially self-sufficient was part of the group's strategy to remain resilient in the face of the challenges it had encountered and anticipated facing in the future. ISI strategists emphasized self-financing as a way to remain independent from the political whims of foreign patrons, who, in other cases, had stopped sending money to other jihadist groups, leaving them vulnerable to military attacks and internal collapse.

In a lengthy assessment of ISI economic strengths and weaknesses, one of the group's strategic thinkers wrote:

> The second economical issue that I would like to mention is to rely on only one source of financing and having in the same time a bad management of financing. We have noticed that many of the groups like the Lebanese Allat Group and the Islamic Army in Iraq base their financing on some countries represented by some well-known political or religious figures. These individuals

PX717

are properly guided by the intelligence services of that country, which finances these groups for malicious political reasons which usually end by infiltrating these fighting groups and imposing conditions and restrictions on their leaders leading to its destruction. Pay close attention to this issue and be aware of the proverb "Make your dog hungry and he will follow you."[27]

The document's author then went on, however, to emphasize the importance of the group's management of funds, suggesting a rationale for a pattern of ISI's reimbursement of its members' expenses instead of providing funds up-front for anticipated expenses, suggesting that ISI leaders and administrators recognized potential limitations in their fundraising strategy:

The third economical issue is bad economic management especially when there are many demands from the fighters for money from the Emirs and ignoring any efforts for self-sufficiency. Brothers start asking for many unnecessary things like soda beverages, clothes and many other things that the brother wouldn't think about buying it if the money had to come from his pocket. In addition, these bargains are usually neglected and thrown here and there.[28]

We examine this strategy of reimbursement in the next chapter.

ISI was not alone among jihadi groups in recognizing the value of internal fundraising. In a lessons-learned document about the Muslim Brotherhood violence and uprising in Syria from 1976 to 1982, the writer notes:

The inside field commanders may have been the 1st. to think of a strategic plan, but their fatal mistake was their dependence on the outside for financing, resources and support; this got things out of their control and [will] lead to their destruction.[29]

---

[27] Harmony document NMEC-2008-612449, "Analysis of the State of ISI," n.d., p. 23.

[28] Harmony document NMEC-2008-612449, "Analysis of the State of ISI," n.d., p. 23.

[29] Harmony document AFGP-2002-600080; see "ISIL, Syria and Iraq Resources," 2015.

This document, recovered in Afghanistan, was attributed to the Syrian jihadist Abu Mus'ab al-Suri, an al-Qa'ida strategist.[30]

## ISI Expenditures and Funding of Subsidiary Units

AQI in Anbar and ISI in Ninewa spent nearly as much money as they made (Figure 8.9). The overall amounts for Anbar are higher than Ninewa because of the longer time for which revenue and expenditures data were available (16 months for Anbar, five months for Ninewa). Even though the group collected slightly more money than it spent in both governorates, clearly neither AQI in Anbar nor ISI in Ninewa was able to amass a substantial funding surplus, as the Islamic State has reportedly been able to do in Iraq and Syria from 2013 to 2014.[31]

**Figure 8.9**
**Total Revenue and Expenditures in Anbar and Ninewa Governorates**



NOTES: The Anbar data span from June 2005 to October 2006 (but include three transactions from November 1, 2006, and one from November 2, 2006). The Ninewa data cover September 2008 through January 2009.
**RAND** *RR1192-8.9*

---

[30]  Forest, Brachman, and Felter, 2006, p. 25.

[31]  See, e.g., Johnston and Bahney, 2014b.

PX717

A comparison of the Anbar and Ninewa provincial emirs' documents shows an organization adapting in the face of pressure. In Anbar, spending at the level of the governorate administrator was focused on operational expenses, consistent with a desire to maintain a high operational tempo and a well-articulated organization. The Tuzliyah documents from the western sector of Anbar show that sectors maintained personnel rosters and distributed payroll. In Ninewa, in late 2008 and 2009, in contrast, such nonmilitary costs as payroll and medical costs appear to have been centralized at the governorate level and consumed the bulk of the group's budget, consistent with a group retreating in the face of more than two years of intense pressure by coalition forces, ISF, and Awakening forces and accumulating legacy costs over time. This section outlines the differences between Anbar and Ninewa in more detail.

**Anbar Governorate**

AQI's Anbar administrator funded a multitude of affiliated units; in particular, he sent more than 50 percent of his funds to the six subsidiary sector-level administrators (Figure 8.10). The governorate administrative section used 11 percent of total spending to fund administrative operations. In comparison, direct military activities—constituting an attached military battalion and a military procurement section—received only 10 percent of the group's spending. An entity called the General Treasury received 9 percent of total revenue. The General Treasury might have been a shared fund for AQI's senior leaders or al-Qaʻida outside Iraq.[32] We discuss this further in the next chapter. Returning to Anbar expenses, interestingly, payroll and medical expenses constituted only 5 percent of spending at the governorate level, while the other administrative subsections, such as legal and mail,

---

[32] The Anbar AQI documents we examined give no further clues as to the purpose of the General Treasury. However, more information may exist in the document set. On possible payments to al-Qaʻida's core leadership in Pakistan, see Ayman al-Zawahiri's July 2005 letter to al-Zarqawi, in which al-Zawahiri writes that he heard about AQI's interest in sending funding to support al-Qaʻida in Pakistan. Office of the Director of National Intelligence, 2005.

PX717

**Figure 8.10**
**Composition of Expenditures by AQI in Anbar Governorate, May 2005 Through October 2006**



SOURCE: Harmony batch ALA DAHAM HANUSH; see "ISIL, Syria and Iraq Resources," 2015.
NOTE: Expenses also include two transactions on November 1, 2006, and one on November 2, 2006.
RAND RR1192-8.10

received less than 1 percent of the total budget.[33] This suggests a lean central administration with extensive delegation to sector authorities.

The sectors that were farthest from the western border and simultaneously most central to AQI's operations, Fallujah and Ramadi, received the most in net money transfers. The group generated most of its revenues away from the cities where it focused its operations. This geographic separation could be explained by illicit trade and large-scale theft being most profitable in rural areas along smuggling routes or by a strategic decision to keep its unpopular revenue-generating operations away from the scrutiny of most of the Anbar public.

---

[33]  Bahney, Shatz, et al., 2010, pp. 39–43.

The governorate administration functioned as both a unit of financial oversight and financial facilitation, enabling high levels of operational tempo across large geographic areas by sharing revenue streams. The governorate administration did so by moving funding from sectors that raised more revenue relative to their expenses to those that raised less, as well as managing large revenue streams that otherwise might not have been contributed to a shared pool.

By analyzing the funding flows to the sectors, we find that the monthly transfers to the different sectors largely rose and fell in unison, again with the exception of Ramadi and Fallujah. As revenues increased after May 2006, nonsector spending increased disproportionately. Such an increase may indicate that the administrative emir preferred to send excess funding to units that he directly controlled, which might have increased his power relative to the sectors or relative to other governorate administrators. This increase appears in the Anbar-level funding to military, administration, and payrolls, as opposed to financial flows to sectors for the sectors to distribute.

The administrator exhibited a strong, consistent preference to move money rather than hold it. He sent extremely large amounts on the same day he received them, usually to the governorate administrative units, the local military wing, or the General Treasury. The Anbar administrator kept only between $25,000 and $250,000 in cash on hand throughout the period, and he transferred large excess revenues to the General Treasury. The Anbar administrative emir transferred a net sum of $390,000 to the General Treasury over the entire period, which leads us to believe that Anbar was a net contributor to AQI nationally or perhaps to al-Qaʿida central during this period. The fact that the Anbar administrative emir transferred funds to such far-flung places as Mosul, the border sections, and Basra bolsters the argument that Anbar was a highly profitable locale for AQI.

The data allow us to analyze AQI at the peak of its power in Anbar in mid-2006 and during its change to ISI. The administrative emir added the sectors of Rutbah, Taʿmim, and Fallujah in May 2006, when the group's revenue streams were markedly increasing, adding to the extant sectors of Ramadi, Awsat, and Gharbiyah. The documents also show the reaction of the administration to the adversity it faced

PX717

when the Awakening organized and attacked AQI in Ramadi in late September and early October 2006. During this period, the governorate administration provided increased funding to the Ramadi sector, where coalition forces were also conducting intensive military operations against AQI. On October 16, 2006, the administrator eliminated the Ta'mim, Fallujah, and Rutbah sectors from his ledgers and renumbered those that remained. The three eliminated sectors provided less than 5 percent of the provincial administration's revenues over the period. Accordingly, we believe that this action indicates a choice by the administrative leaders to consolidate the areas being funded by AQI's higher leaders because of the intense fighting taking place against Awakening forces. This type of strategic decisionmaking by AQI's administration would have been possible only through a managed, hierarchical organization. However, it is also the case that AQI leaders established ISI on October 15, 2006, and this might have been accompanied by administrative changes mandated by ISI's senior leaders. It cannot be discerned from the available data whether the change in the sectors was due to fighting Awakening forces or new rules stemming from the creation of ISI.

**Temporal Trends in AQI Expenditures**

AQI's weekly expenditures followed a fairly steady longer-term trend from mid-2005 through late 2006, although with short-term volatility (Figure 8.11). Spending spiked in spring 2006, then declined to roughly its previous level, before increasing again markedly in July and August 2006 before declining again in fall 2006. Despite this decline, however, spending leveled out at a higher weekly rate than that at which the group had spent its money in 2005.

Over this time, AQI's overall spending fluctuated, and so did the types of goods and services on which it spent money (Figure 8.12). Transfers to sectors within Anbar governorate always constituted a large portion of provincial expenditures. Beyond those, from June through October 2005, the group spent more on military-related expenditures than on any other category of expense, except for sector transfers. Over time, AQI began spending proportionally more on support functions and transfers and less on military-related items. From November 2005

PX717

**Figure 8.11**
**AQI's Weekly Expenditures in Anbar Governorate, June 2005 Through**
**October 2006**



SOURCES: Harmony documents NMEC-2007-633809 and NMEC-2007-633893-HT; see
"ISIL, Syria and Iraq Resources," 2015.
NOTE: Expenses also include two transactions on November 1, 2006, and one
on November 2, 2006.
**RAND** *RR1192-8.11*

through October 2006, administrative expenses outstripped military
in eight of the 12 months. When AQI's expenditures increased dra-
matically in July and August 2006 to a combined total of $2.5 million
in those two months, more than $1 million of those expenditures were
transfers to subsidiary units in its local Anbar sectors and $550,000 was
to the General Treasury, likely AQI leadership. Military expenditures
were also higher those months, outstripping administrative expenses
and hitting a peak of $156,000 in August 2006.

**Ninewa Governorate**

In Ninewa, by contrast, there was little evidence that the governorate
administrative emir funded sector-level subsidiary units in the same
fashion as the Anbar administrator. The Ninewa administrator spent,

**Figure 8.12**
**AQI's Anbar Expenditures over Time, June 2005 Through October 2006**



SOURCES: Harmony documents NMEC-2007-633809 and NMEC-2007-633893-HT; see
"ISIL, Syria and Iraq Resources," 2015.
NOTE: October 2006 expenses include two transactions on November 1, 2006, and
one on November 2, 2006, totaling $41,000.
**RAND** *RR1192-8.12*

PX717

by far, the largest percentage on "allowances and leases," at 38.5 percent (Figure 8.13). This spending was to compensate ISI members and provide for their families, as well as for disbursements to certain members to rent a home or apartment if they did not own one or otherwise have accommodations, and, in some cases, to operate safe houses that provided accommodations and cover to ISI operatives. This might have put considerable pressure on central administration to aggressively fundraise.[34]

**Figure 8.13**
**Composition of Expenditures by ISI in Ninewa Governorate, August 2008 Through January 2009**



SOURCE: Harmony document NMEC-2009-634921; see "ISIL, Syria and Iraq Resources," 2015.
NOTES: "Al-Khums" is a one-fifth tax. Recent evidence suggests it is specifically a tax on war booty. See Andrew Keller, "Documenting ISIL's Antiquities Trafficking: The Looting and Destruction of Iraqi and Syrian Cultural Heritage; What We Know and What Can Be Done," remarks at the Metropolitan Museum of Art, New York, U.S. Department of State, September 29, 2015.
**RAND** *RR1192-8.13*

---

[34]  Meeting payroll was also a challenge for the Ulster Volunteer Forces in Northern Ireland. See Henry McDonald and Jim Cusack, *UDA: Inside the Heart of Loyalist Terror*, Dublin: Penguin Ireland, 2004, pp. 189, 230–232.

In Ninewa, ISI's spending on compensation was nearly four times greater than the amount the group paid for its second-largest specific expenditure type, military expenses. The third-largest specific expense type was the detainee committee, which might have involved payments to the families of detained ISI members or expenditures for other detainee-related issues, such as legal fees or bribes to government officials within the Iraqi legal system to attain favorable outcomes for ISI detainees. These findings stand in stark contrast to the Anbar findings, which revealed that, in 2005–2006, AQI in Anbar at the governorate level spent only 5 percent of its budget on payrolls and medical expenses, with the sectors handling these expenses.

Weapon purchases constituted the fourth-largest specific expenditure in Ninewa, at 4.6 percent of total expenditures. If combined with military spending, this would mean that ISI in Ninewa was actually spending about 15 percent of its budget for military-specific purposes.[35] ISI spent almost none of its budget—0.6 percent—for media purposes. The lack of ISI investment in media is consistent with a key finding of Chapter Four—that AQI had filled none of the "media emir" positions in its 30 sectors, for which we have available data, as of 2008.[36]

As with AQI in Anbar, ISI in Ninewa invested little in courts, or, as this is translated in the declassified documents, in sharia. Courts made up less than 1 percent of AQI's budget in Anbar. In Ninewa, sharia constituted only 2.2 percent of ISI's budget.

Militant groups in many settings provide dispute-adjudication services, which entail little fixed infrastructure. However, many groups provide more. Given ISI's goal of running a state, the fact that the group provided legal services raises the question of why it did not use service provision as part of an effort to win popular support, a strategy that such groups as Hezbollah and the Liberation Tigers of Tamil Eelam used to great effect.[37] One hypothesis consistent with this broad

---

[35] It is unclear what *governor* and *industrialization* referred to, but ISI indicated that it spent 3.6 and 2.9 percent of its budget in Ninewa in these areas, respectively.

[36] Harmony document NMEC-2009-602125; see "ISIL, Syria and Iraq Resources," 2015.

[37] Shawn Teresa Flanigan, "Nonprofit Service Provision by Insurgent Organizations: The Cases of Hizballah and the Tamil Tigers," *Studies in Conflict and Terrorism*, Vol. 31, No. 6, 2008.

pattern is that robust service provision might not be a feasible insurgent strategy when counterinsurgents can use force throughout the contested territory. For service provision to work, it has to be recognized by the public to be coming from the insurgent organization, which necessarily makes it is easy for counterinsurgents to identify and target it.

ISI's weekly expenditures in Ninewa fluctuated considerably, from only $250 in its worst week to nearly $500,000 (Figure 8.14). As before, we consider a week to run from Saturday through Friday, starting on August 23, 2008. Even though these expenditures dipped considerably in certain periods—the weeks of November 22 to 28, December 6 to 12, and December 20 to 26, for example—the ISI rate of expenditures was nonetheless steadier than in the earlier period, indicating the possibility that ISI's finances had stabilized by the later

**Figure 8.14**
**ISI's Weekly Expenditures in Ninewa Governorate, August 2008 Through January 2009**



SOURCE: Harmony document NMEC-2009-634921; see "ISIL, Syria and Iraq Resources," 2015.
RAND *RR1192-8.14*

PX717

period, possibly because of a more standardized set of tactics, techniques, and procedures for the revenue sources targeted by ISI.

The nature of ISI Mosul's expenditures varied over time, but less so than it had in Anbar governorate (Figure 8.15). From September 2008 through January 2009, payroll (allowances and leases) expenses were ISI's predominant costs. The contrast to Anbar might reflect a degree of centralization that the group carried out in the face of coalition forces, ISF, and Awakening pressure. Although payroll costs became ISI's main type of spending in Ninewa—a pattern that persisted during the period the documents cover—the share of its budget spent on those and all other types of expenses varied from month to month. The pattern of payroll expenditures provides further evidence that ISI missed or delayed such payments when it was under pressure. Those monthly payments ranged between $184,000 and $478,000 (excluding expenditures for August 2008), a variation too large to be accounted for by changes in the number of personnel.

## ISI Revenues and Expenditures in Other Locations and Periods

The captured documents also contained revenue and expense reports from other locations and periods. Although these reports were not as thoroughly documented or as extensive as the revenue and expense reports from Anbar and Ninewa, they allow us to compare ISI activities in other locations in Iraq where the security environment and local economies differed. These reports provide a fuller picture of ISI's financial clout, or lack thereof, that is at least somewhat more representative of a cross-section of provincial ISI groups. We provide overviews from the documents of ISI's overall revenues and expenditures, as well as how it was making and spending the money, in Baghdad in March 2007 and in al-Jazirah sector in Ninewa governorate in February 2010.

### Baghdad, Mid-February 2007 Through Mid-March 2007

From February 24, 2007, through March 13, 2007, Baghdad reported an income of $197,310 and expenditures amounting to $253,358

PX717

**Figure 8.15**
**ISI's Monthly Expenditures in Ninewa Governorate, August 2008 Through
January 2009**



SOURCE: Harmony document NMEC-2009-634921; see "ISIL, Syria and Iraq
Resources," 2015.

PX717

(Table 8.2). Let us briefly assume that these revenue and expenditure rates would have remained constant to extrapolate comparison to Anbar and Mosul. If this were the case, ISI's Baghdad subsidiary would have earned just under $395,000 for a full month and spent just over $507,000. This deficit is notable for several reasons. First, unlike Anbar and Mosul—where ISI was strongest—ISI in Baghdad failed to balance its revenues and expenditures. In this short window, ISI spent about $56,000 more than it generated in revenue, meaning that it is possible that the group lost $100,000 or more in Baghdad that month. These estimates are not definitive—the revenue and expenditures from this reporting period might not be representative of ISI Baghdad's normal finances, especially since, as we showed regarding revenues in Anbar and Ninewa, ISI revenues were highly volatile. Still, this report was compiled during a period when the U.S. troop surge was under way and ISI was struggling to remain a viable player in the fight for Baghdad. It is thus possible that ISI was able to balance its expenditures with commensurate revenues only in areas firmly under its control and was not able to do so in areas where its presence was sporadic and its control was inconsistent or largely lacking.

Was ISI's Baghdad group making its money from sources similar to those tapped in Anbar or Mosul? The answer is maybe. By far, the largest revenue source in the document was listed as "Baghdad province" (*wilaya Baghdad* in the original; Table 8.3). It is unclear whether

**Table 8.2**
**ISI's Baghdad Income and Expenses, Mid-February Through Mid-March 2007**

| Type | Time Span | Days | Total (U.S. $) | Daily Mean (U.S. $) |
|---|---|---|---|---|
| Expense | February 24, 2007, to March 13, 2007 | 18 | 253,358 | 14,903 |
| Revenue | February 24, 2007, to March 11, 2007 | 16 | 197,310 | 13,154 |
| | Balance | | −56,048 | −1,749 |

SOURCE: Harmony document NMEC-2010-198595 Orig; see "ISIL, Syria and Iraq Resources," 2015.

NOTES: Revenue includes $11,435 dated February 24, 2007, but noted as rollover since February 19, 2007. All dates in the original are Hijra calendar dates.

PX717

**Table 8.3**
**ISI's Baghdad Income, by Source, March 2007**

| Revenue Source | Total (U.S. $) | Share (%) |
|---|---|---|
| Baghdad province | 167,100 | 84.7 |
| Charity | 6,300 | 3.2 |
| Rollover | 23,910 | 12.1 |
| Total | 197,310 | 100.0 |

SOURCE: Harmony document NMEC-2010-198595 Orig; see "ISIL, Syria and Iraq Resources," 2015.

this refers to spoils gained from looting money or goods from Shias in Baghdad during the broader Sunni-Shia sectarian conflict that was still simmering in March 2007 or from other revenues generated within Baghdad, such as the type of extortion that was a leading revenue source for ISI in Mosul a year later.

What is clear is that, unlike AQI in Anbar and ISI in Mosul, the group had few other reliable sources of income. "Rollover," its second-largest revenue source, made up only 12 percent of ISI's Baghdad revenue and does not represent new funding; rather, it is previous revenue unspent. Given the losses seen during the February 2007 through March 2007 reporting period, it appears that ISI Baghdad could not rely on a surplus of funding each month. Charity is the only other source of revenue listed in the ISI Baghdad report. It is unclear whether these funds came from local or international charities. But the point is largely moot, as charitable contributions made up only $6,300 of the group's almost $200,000 of income—roughly 3 percent.

ISI's Baghdad group spent money on a variety of things, ranging from ammunition, to sheep, to vehicles, to suicide bombers (Table 8.4). Aside from ammunition, arms spending also probably included other weapons or materiel, given that the total two-week ammunition expense was $70,000 and accounted for more than a quarter of the group's spending. The largest expense category was labeled "needs of the district," which was probably mostly or entirely payroll costs for ISI's Baghdad organization, as the percentage of expenditures is com-

PX717

**Table 8.4**
**Baghdad Expenses, by Source, March 2007**

| Expense Type | Total (U.S. $) | Share (%) |
|---|---|---|
| Needs of the district | 116,000 | 45.8 |
| Ammunition | 70,000 | 27.6 |
| 1/5 of governorate | 30,000 | 11.8 |
| None listed | 11,000 | 4.3 |
| Bonds of brothers + POW and martyrs | 8,198 | 3.2 |
| Purchase of a pickup | 6,300 | 2.5 |
| Media needs of the district | 4,000 | 1.6 |
| Friendly fire compensation | 2,500 | 1.0 |
| Purchase of sheep | 2,100 | 0.8 |
| 1/5 of charity | 1,260 | 0.5 |
| Expenses of brothers | 1,000 | 0.4 |
| Unit martyrs | 1,000 | 0.4 |
| Total | 253,358 | 99.9 |

SOURCE: Harmony document NMEC-2010-198595 Orig; see "ISIL, Syria and Iraq Resources," 2015.

NOTES: The "Share" column does not sum to 100 because of rounding. POW = prisoner of war.

parable to the approximately 40 percent of the Mosul budget that was spent on personnel costs.

It is unlikely that "needs of the district" costs were being spent on social services: According to the ISI sector leadership roster captured from Abu Qaswarah in 2008, it is possible that, by March 2007, ISI Baghdad had no established sector leadership or administrators in the area. As the document seized from Abu Qaswarah's residence shows, this was the case by 2008.[38] This would have meant that there was no official who could determine how to allocate social spending. Another

---

[38] Harmony document NMEC-2009-602125; see "ISIL, Syria and Iraq Resources," 2015.

possibility is that funds recorded as "needs of the districts" referred to the type of sector transfers seen in the Anbar ledgers.

Another noteworthy category among the expenses is "1/5 of governorate." As we discuss in the next chapter, ISI units across Iraq sent one-fifth of their revenues, known as the *khums*, to a central treasury, likely the General Treasury discussed earlier. Combined with the Anbar documents from 2005–2006 and evidence in the next chapter from late 2008, it appears that this was standard procedure throughout the life of the organization.

## Al-Jazirah Sector, February 2010

Another area covered by our documents is ISI al-Jazirah sector's revenue and expenses. Unlike the Baghdad document, the al-Jazirah document appears to cover the entire month of February 2010. As in Baghdad, al-Jazirah sector was in the red during the month covered by our document, spending almost $35,000 more than it generated in revenue (Table 8.5). The sector ran a deficit of 10 percent of revenues.

The al-Jazirah sector administrator categorized revenues into five types: revenue from the economic security, revenue from the military, donations from Muslims and fines, revenue through Abu 'Uthman, and revenue from cars (Table 8.6). The first was, by far, ISI's largest revenue source in al-Jazirah, composing 72.0 percent of the group's revenue, and might have represented protection rackets or other forms of extortion the group actively practiced. Its next-largest revenue source, composing only 12.2 percent of the group's revenue, was revenue from the military.

**Table 8.5**
**Al-Jazirah Sector Revenues and Expenditures, February 2010**

| Type | Total (U.S. $) | Share of Cash Flow (%) |
| --- | --- | --- |
| Revenue | 328,100 | 47.5 |
| Expenditures | 362,400 | 52.5 |
| Balance | −34,300 | 5.0 |

SOURCE: Harmony document NMEC-2010-175522; see "ISIL, Syria and Iraq Resources," 2015.

PX717

**Table 8.6**
**ISI's Revenue Sources from al-Jazirah Sector, February 2010**

| Revenue Source | Amount (U.S. $) | Share (%) |
| --- | --- | --- |
| Revenue from economic security | 236,100 | 72.0 |
| Revenue from the military | 40,000 | 12.2 |
| Donations from Muslims and fines | 34,500 | 10.5 |
| Revenue through Abu 'Uthman | 10,000 | 3.0 |
| Revenue from cars | 7,500 | 2.3 |
| Total | 328,100 | 100.0 |

SOURCE: Harmony document NMEC-2010-175522; see "ISIL, Syria and Iraq Resources," 2015.

As with the Baghdad document, we cannot discern whether donations from Muslims consisted of donations from local Iraqis or from foreign donors. Regardless, the share of al-Jazirah's income from donations was relatively small, at 10.5 percent, and that category also included fines, which likely were judgments for violations of Islamic law.

The al-Jazirah sector spent five times more on compensation (called "financial sponsorship" in the document) and rent than on any other expense category (Table 8.7). The sector spent almost twice as much buying or maintaining vehicles than it did on military expenses, suggesting that the group either had logistics challenges or that its military presence in the sector was small and thus did not require a large budget.

Tellingly, ISI's al-Jazirah group spent almost nothing on assistance (service provision to the population). Nearly all of its money went to the organization's operating costs, not service provision or warfighting, suggesting that investing in the organization was either necessary for its survival or that the group had little interest in delivering services to the population in its sector of ISI.

PX717

**Table 8.7**
**ISI's Expenditure in al-Jazirah Sector, by Type, February 2010**

| Expense Type | Amount (U.S. $) | Share (%) |
|---|---|---|
| Financial sponsorship and rent | 237,700 | 65.6 |
| Vehicle expense | 46,000 | 12.7 |
| Military expense | 24,000 | 6.6 |
| Detainee expense | 20,800 | 5.7 |
| Purchasing a house for Abu Dijanah | 10,000 | 2.8 |
| Security expense | 6,800 | 1.9 |
| Marriage expense for the sector | 4,900 | 1.4 |
| Deported personnel expense | 2,200 | 0.6 |
| Purchasing a shop | 1,700 | 0.5 |
| Purchasing house furniture | 1,700 | 0.5 |
| Medical expense and doctors' fees | 1,500 | 0.4 |
| Media expense | 1,300 | 0.4 |
| Martyr's bonus | 1,000 | 0.3 |
| Purchasing food | 800 | 0.2 |
| Assistance | 600 | 0.2 |
| Debt payment | 600 | 0.2 |
| Expense for Abu 'Uthman | 400 | 0.1 |
| Purchasing supplies for the shop | 400 | 0.1 |
| Total | 362,400 | 100.2 |

SOURCE: Harmony document NMEC-2010-175522; see "ISIL, Syria and Iraq Resources," 2015.

NOTE: The "Share" column does not sum to 100 because of rounding.

## Conclusion

ISI had a sophisticated, diversified fundraising operation that relied almost entirely on raising money from within its operating territory. The group purposely avoided seeking outside donations, so that it could retain autonomy. This fundraising took place throughout the organization, at the governorate level and, below that, at the sector level. Each level sent a certain amount upward, but each level also appeared to retain most of what it raised.

ISI's revenue-generating activities in its formative years in Anbar governorate closely resembled that of petty criminality, including significant revenues generated from sales of stolen goods. In its new stronghold of Mosul, the group made money from new sources, particularly theft and extortion from the local oil sector and contract-based projects that were vulnerable to the group's influence. ISI's revenue-generating activities in Mosul in 2008 and 2009 closely resembled activities commonly used by organized-crime syndicates.

ISI at the sector and governorate levels did not maintain a surplus. Expenditures closely matched revenues. As an organization bent on creating a state, this could have been a conscious decision to expand as rapidly as possible when strong to keep itself intact for future battles to come when it was weak.

Spending focused on organization maintenance and operations. Maintenance included payrolls, rent, safe houses, and medical expenses. Operations included all expenditures related to military and security, as well as media. Despite ISI's goal of becoming a functioning state—the *Islamic state*—it appears that ISI spent very little on social services for the communities in which it operated. This might have been because it could not successfully raise enough money to do so, in part because its fatality and capture rate put pressure on its payrolls. Or it might have been because providing such services would have forced it to take a public posture, exposing it to counterinsurgent and counterterror operations.

PX717

# Assessing the Islamic State of Iraq's Finances: Central Activities and Financial Control

ISI faced three major financial issues, aside from raising money and determining how to spend it. The first was how to fund the central administration. The second was how to reallocate money across geographic areas. In 2005–2006, AQI in Anbar was highly successful at raising money and sent money to the AQI central administration. It is highly likely that, during that same period, AQI in other governorates was less successful and needed financial help to achieve the organization's goals. Certainly, ISI reallocated money from governorates where fundraising was successful to governorates that were less successful. The third issue was that ISI faced the problem of financial control. It needed to ensure that its members were using money to achieve the group's goals and were not stealing money to enrich themselves.

We cover these issues in this chapter. We discuss evidence regarding a central treasury and ISI reallocation efforts, and we discuss issues of financial control and what they meant for the organization.

## Transfers to and from the ISI Treasury

As early as 2005–2006, AQI had in place systems for reallocating funding within the organization. The Anbar administrative emir recorded

PX717

transferring money to Mosul and the border sections, and even a small amount to Basra, along with noting transfers to the General Treasury.[1]

Documents seized from the ISI senior leader Abu Qaswarah, in an operation in October 2008, provide greater insight into how ISI leaders internally reallocated funding to and from its highest levels to manage its revenues centrally and to match them with operational priorities and the operating costs its units incurred. Governorate-level ISI branches sent one-fifth of their revenues to the organization's top-level leadership. In practice, it appears that these payments were sent to, and reallocated by, Abu Qaswarah, or that Abu Qaswarah at least had knowledge of these financial transfers.[2]

Of the revenue ISI generated from its governorate-level subsidiaries, those from Baghdad, Mosul, and the al-Jazirah sector (recorded as *al-Jazeera* in the published translations of the documents) were, by far, the largest. These areas were the only subsidiaries able to contribute substantial funds in 2008. Redistribution of funding appears to have gone to areas where ISI presence was the weakest and was under severe threat because of the Sunni Awakening and counterinsurgency tactics by coalition and Iraqi forces.

**Content of the Documents**

The financial documents seized from Abu Qaswarah's compound provide a unique and revealing glimpse into ISI's financial health in 2008. Much is known about the decline in attacks conducted by ISI and other militant groups across key governorates during and after the U.S. troop surge of 2007, but little corresponding information has been hitherto available concerning the financial status of ISI across the Iraqi governorates, nor has there been information on the proportion of ISI revenues from its various subsidiaries operating nationwide or how ISI spent money on these subsidiaries.

The documents detail a list of ISI's revenue-generating activities and expenditures, over one month. The primary financial document

---

[1]   Bahney, Shatz, et al., 2010, pp. 34, 42–43.

[2]   For more on Abu Qaswarah, see "AQI's Swedish Emir," 2008; and Harmony document NMEC-2009-602764; see "ISIL, Syria and Iraq Resources," 2015.

we analyze was not dated but was likely composed sometime in 2008, prior to Abu Qaswarah's death that October.

The documents were structured differently from the ones captured from Ala Daham Hanush in Anbar and Ahmed Zayd in Ninewa, both governorate-level administrative emirs who were responsible for maintaining detailed master financial ledgers that documented ISI's revenues and expenses in their areas of responsibility, down to the transaction level. The financial documents seized from Abu Qaswarah's compound appear to be summary reports of ISI's national-level revenues and expenditures (Figure 9.1). It is for this reason that the financial documents seized from Abu Qaswarah's compound are of special interest.[3]

Abu Qaswarah held ISI's financial documents that, analogous to the Anbar transfers to and from sectors, contained information on major ISI governorate-level subsidiaries in Iraq, from which ISI received and sent money, as well as other group revenues and expenses.

**The One-Fifth Transfers**

Mosul was the largest source of ISI funding from the "one-fifth" transfer of any area listed, transferring $170,000 to ISI leadership. Of the revenue-generating transfers in the Abu Qaswarah document, funding from Mosul constituted 40 percent of incoming funds to ISI. The Abu Qaswarah document also indicates that ISI's Baghdad sector transferred 4.5 kilograms of gold, in addition to $2,500 in cash, to ISI's senior leadership as its "one-fifth." We estimate the value of the transferred gold to be $138,400, suggesting that the total size of Baghdad's one-fifth transfer was approximately $140,900, or 33 percent of the revenue ISI generated from sector transfers.[4] It is not clear whether Baghdad transferred one-fifth of the gold it had or whether it used the gold to pay its one-fifth and retained the cash. An argument for

---

[3]  Harmony document NMEC-2009-602764; see "ISIL, Syria and Iraq Resources," 2015.

[4]  Since the document is undated but was likely drafted in 2008, we base this estimate on the average daily price of gold in 2008, $871.91 per ounce, multiplied by the number of ounces of gold transferred from Baghdad to AQI leadership, 158.7 (at 35.3 ounces per kilogram), for a total of approximately $138,400. Data on daily gold prices were obtained from the USAGOLD website (www.usagold.com).

**Figure 9.1**
**Original Financial Document Seized from Abu Qaswarah,**
**Original and English Translation**

Panel A



Panel B

| Sources of Incoming Revenues | | Issuing [export] Sources | |
|---|---|---|---|
| Source | Amount | Issued to | |
| 'Ashraf | 600,000 USD | Abu-Sawsan | 45,000 USD |
| One fifth of al-Jazeera | 100,000 USD | Herbalist | 15,000 USD |
| One fifth of al-Mosul | 100,000 USD | Baghdad | 180,000 USD |
| Cement | 90,000 USD | Al-Anbar | 170,000 USD |
| One fifth of J [SATTS]of al-Mosul | 40,000USD | Diyala | 120,000 USD |
| One fifth of al-Basrah | 2,300 USD | Salah al-Din | 120,000 USD |
| One fifth of al-Basrah | 800 USD | Media | 110,000 USD |
| One fifth of Baghdad | 4 kilograms of Gold | House | 50,000 USD |
| One fifth of Baghdad | 2,500 USD | Materials | 30,000 USD |
| One fifth of Baghdad | 0.5 kilograms of Gold | Syria | 5000 USD |
| | | Al-Basra | 40,000 USD |
| One fifth of al-Mosul | 30,000 USD | Donations | 300 USD |
| One fifth | 10,200 USD | Kirkuk | 20,000 USD |
| One fifth of Salah | 300 USD | Detonators | 10,000 USD |
| Booty money [TC: Possibly also money from sheep sold] | 5,400 USD | Private Vehicle | 10,000 USD |
| | | Kirkuk | 10,200 USD |
| | | Abu-Nashwan | 5,000 USD |

SOURCES: Harmony documents NMEC-2009-602764-ELC, p. 7, and
NMEC-2009-602764-HT; see "ISIL, Syria and Iraq Resources," 2015.
NOTES: TC = translator comment. *SATTS* likely means Standard Arabic
Technical Transliteration System. In the original Arabic document, the
letter *jim*, which sounds like a *J*, appears between the Arabic words for
*one-fifth* and *Mosul*. *J* likely stands for *janoub* (south).

the latter is that, because of its value, gold is difficult to use in day-to-day transactions, whereas cash is far more useful. Al-Jazirah sector's $100,000 (about 24 percent of the total sector transfers to ISI) was next in order of size. Somewhat surprisingly, at least in the document seized from Abu Qaswarah, no other subnational ISI group sent much money to the group's core national leadership. Basra, Salah al-Din, and another sector, the name of which was omitted from the document, all made "one-fifth" transfers of less than $11,000 (Table 9.1).

Assuming that the sector transfers recorded in the document were exhaustive of all sector transfers for the reporting period and that each sector actually sent one-fifth of its total revenue from the period to ISI's senior leadership, we estimate that ISI's sectors brought in a total revenue of more than $2.1 million.[5]

Beyond transfers, the documents reinforce the importance of taxing the oil trade. The largest single source of ISI's revenue recorded in the captured document is $600,000, from an entity referred to only

**Table 9.1**
**ISI's Revenues from Sector Transfers, from Document Seized from Abu Qaswarah in October 2008**

| Location | Total (U.S. $) | Share of Total Transfer Revenue (%) |
|---|---|---|
| Al-Jazirah | 100,000 | 23.6 |
| Baghdad | 140,900 | 33.2 |
| Basra | 3,100 | 0.7 |
| Mosul | 170,000 | 40.0 |
| Salah al-Din | 300 | 0.1 |
| Unidentified location | 10,200 | 2.4 |
| Total | 424,500 | 100.0 |

SOURCE: Harmony document NMEC-2009-602764; see "ISIL, Syria and Iraq Resources," 2015.

---

[5] Multiplying the total reported one-fifth transfers by five gives a total of $2,118,000.

as 'Ashraf. Abu Ashraf was a pseudonym for Abu Ibrahim, ISI's oil minister, a senior position.

**Reallocation from the Center**

As the Anbar governorate administrators had done vis-à-vis Anbar's sector-level subsidiaries, it appears that ISI's national-level leadership collected payments from governorate-level ISI subsidiaries and reallocated these funds by pushing them back to the governorate ISI subsidiaries as necessary. ISI leadership sent the largest transfers to the areas in which the Awakening and the surge had the greatest effects—Anbar governorate and Baghdad, which received $170,000 and $180,000, respectively (Table 9.2). At the same time, ISI in Anbar and Baghdad apparently failed to generate sufficient revenue during this period to match those amounts in their obligatory 20-percent income tax payments made up the chain of command. According to Abu Qaswarah's

**Table 9.2**
**ISI's Net Financial Transfers to the Governorates, from Document Seized from Abu Qaswarah in October 2008**

| Location | Transfers to (U.S. $) | Revenues from (U.S. $) | Difference |
|---|---|---|---|
| Al-Jazirah | | 100,000 | 100,000 |
| Anbar | 170,000 | | −170,000 |
| Baghdad | 180,000 | 137,500 | −42,500 |
| Basra | 40,000 | 3,100 | −36,900 |
| Diyala | 120,000 | | −120,000 |
| Kirkuk | 32,200 | | −32,0200 |
| Mosul | | 170,000 | 170,000 |
| Salah al-Din | 120,000 | 300 | −119,700 |
| Syria | 5,000 | | −5,000 |
| Unidentified location | | 10,200 | 10,200 |
| Total | 667,200 | 421,100 | −246,100 |

SOURCE: Harmony document NMEC-2009-602764; see "ISIL, Syria and Iraq Resources," 2015.

PX717

records, ISI in Anbar is not listed as transferring any money to ISI senior leadership, while ISI in Baghdad transferred $137,500 to ISI's top leadership, or $40,000 less than it received in top-down transfers per Abu Qaswarah's records.

Other governorates fared no better. ISI's Diyala administration had been severely degraded in mid and late 2007 by tribal revolts by local Awakening groups and intense counterinsurgency operations that fanned out from Baghdad north to Diyala on the heels of the coalition's successful stabilization of Baghdad following the surge.[6] At risk of losing another stronghold to coalition and Iraqi forces, ISI's leadership sent $120,000 to ISI in Diyala to stem the tide. There is no record of ISI's Diyala branch transferring any funds to ISI leadership as a one-fifth payment, likely because it was forced to expend many of its resources on fighting instead of pursuing the revenue-generating activities it enjoyed previously.[7] The financial dynamic in Salah al-Din governorate was similar, with ISI's leadership transferring $120,000 there and receiving only a token $300 payment back from the group. The Abu Qaswarah documents also show that ISI leadership went in the red to support its governorate-level subsidiaries in Basra and Kirkuk, although to a lesser degree than in the aforementioned governorates.

Strikingly, Mosul was the only area that transferred more money to ISI's top level than it received—and it did so by a wide margin. ISI leadership received $170,000 in transfers from Mosul during the period that our documents cover and transferred no funds to ISI in Mosul. The relatively large amount of funds that ISI leadership received from Mosul, combined with its relatively good security and the group's prospects for continued economic extraction there, suggest that, by 2008, ISI viewed Mosul as its last secure, sustainable stronghold in Iraq.

---

[6]   See, for example, Kagan, 2007b. See also Bill Roggio, "The Diyala Salvation Front," *The Long War Journal*, May 10, 2007a.

[7]   In Diyala, AQI reportedly engaged in widespread auto theft and kidnap-for-ransom operations to fund its operations, as well as smuggling. Lennox Samuels, "Al Qaeda in Iraq Ramps Up Its Racketeering," *Newsweek*, May 20, 2008a.

## Financial Management Within ISI

ISI appeared to manage its money carefully. The group demanded extensive reporting on expenses from lower levels in ways that ensured that money was spent properly but that added risk to the group's operations. ISI administrators occasionally produced summary financial reports that could prove useful for creating greater situational awareness among ISI's midlevel and senior decisionmakers. This kind of behavior in a covert group is consistent with leaders worrying about the financial probity of their underlings. There is some direct evidence that such concerns were warranted.

### ISI Expenses

ISI appears to have kept a very close eye on expenses. This is consistent with an organization that faced challenges managing its finances and making sure that all goods and services charged to the group were actually used to its benefit.

There are three ways that any organization can handle expenses. First, it can provide a sum of money to its members for any expenses they might have and not require further reporting. This is similar to a travel per diem given by many businesses. Second, the organization can provide a sum of money but require reporting of how it is spent. Third, it can have the member or employee incur the expense and then file for a reimbursement. The last two carry greater risks to a clandestine organization; ISI appears to have used these two methods.

At times, the group appears to have provided members with reimbursements for expenses incurred on behalf of the organization. At other times, it merely recorded disbursements in large spreadsheets and then required follow-up reporting about how the distributed funds were spent.[8] Requiring postspending reports and using reimbursements to cover expenses both require additional communications. If the group had sufficient funds, it would be safer to simply transfer fixed fees to fighters and managers that would be more than adequate to meet their

---

[8]   Examples can be found in Harmony documents NMEC-2008-614685 and NMEC-2008-614686; see "ISIL, Syria and Iraq Resources," 2015.

PX717

expected operational needs. This requires only one transaction, sending money for expenses in a given period, which needs to happen anyway to pay the operative's salary.

However, it looks as if individuals either (1) requested funds, which the administrator then distributed, after which the recipient reported back, or (2) incurred small-scale expenses on behalf of the group and then requested to be paid back. Either method would triple the number of transactions required. For specific budgeting ahead of time, the unit had to report up the chain what it wanted to spend money on, then the money was sent down, and then a report was sent back up about the expenditures. For reimbursements, the operative had to send his request for payment up and receive a separate payment back. Both methods entail a total of three transactions. Since each transaction has some marginal risk, these reporting methods make sense only from the perspective that the group faced a tight-enough budget constraint that it could not afford to simply pad operatives' salaries with the amount of costs they were expected to incur.

The evidence for careful expense tracking shows up in documents we analyzed. Often, such evidence appears either as entries in a notebook or as specific notes detailing expenses. For example, a notebook found in January 2007, among the Tuzliyah documents, regarding activities in the western sector of Anbar, contains AQI expense accounts, distributions of payments, and handwritten annotated lists that were used as daily reports and personnel lists.[9] This notebook records a wide variety of expenditures, including:

- $50.00 to Abu Hajir to buy a Thurya (satellite phone) card on November 20, 2006
- 35,000 Iraqi dinars to Abu 'Abbas for "expenses car rent" on an unspecified date
- $90 to the Abu Haydar (Logistics) unit for "tires for Nissan," $100 to that unit for "oil valves," and 87,000 Iraqi dinars for that unit to purchase "3 batteries 12 Volts with the acid."

---

[9]  Harmony document MNFA-2007-000564; see "ISIL, Syria and Iraq Resources," 2015.

Such documentation of small-scale expenses is pervasive in AQI and ISI expense reports. Other documents in the declassified collections we analyzed contained short narrative entries regarding expenses and were submitted up the hierarchy to the group's leadership, as we found when we discovered that ISI leaders Abu Ayyub al-Masri and Abu Umar al-Baghdadi were in possession of copies of the Anbar revenue and expense reports we analyzed in Chapter Eight.

The use of such short narrative entries, as opposed to a rigid selection from a given list of categories, suggests that ISI opted to collect itemized accounts of its members' expenses on behalf of the organization, as opposed to providing operatives with general per diem payments. For example, one handwritten note from a Tuzliyah document includes a range of such short narrative entries. One of these entries consisted of the following, written by Abu 'Abdallah al-Hubli:

> I received sum of ($1900) from Brother Abu Shad through Brother Abu Walid, on Shawal 23rd 1427. I gave to Amir of naval boats Abu Umar sum of ($200) on Shawal 23rd 1427. Abu Tahah Amir of fuels, I gave Abu Zarifah $400 to buy a boat + 100 dollars his expenses.[10]

A note in which Abu Walid wrote to Abu Yunis, detailing the distribution of money to individuals, was even more detailed:

> To my generous brother Abu Yunis may God preserve him, peace of God and his blessings.
>
> These are some of the works that I have accomplished in the sector before the appointments of Brother Abu Jihad as Al-Shamyiah administrator:
>
>  Two weeks ago I received $1,300 from Abu Shahd and used it as follows.
>
> 1- Two weeks ago I received $1300 from Abu Shahd and used it as follows.

---

[10]  Harmony document MNFA-2007-000566; see "ISIL, Syria and Iraq Resources," 2015.

1[*sic*] - I handed over to Abu Hajir $600.00 he is the chief of Al-Sadrin company.

2- I gave Brother Abu Haydar Al-Salmani $100.00 expenses for his family

. . .

Then I received from you in Al-Ma'adid $2,500 and it was spent as following

1- I gave to brother Taha $500, a loan that the group owed him

2- $100 to Abu 'Abdullah the Amir of Al-Safra'

3- $100 to Abu Dajanah the Amir of Al-Sadiq Company

4- $200 for Abu Hasan Fahd from 'Ana group

5- $100 expenses for Abu Husayn and Abu Taha because his house is a guest house.

6- $100 Abu Usama, Maintenance and movement

7- $200 for Abu Khalid to buy a barrels for storage

8- $100 for Abu Muhammad Al-Ma'adidi, public relation

9- $100 for Abu Shahd

10- $1,000 I hand it to Abu Jihad the Administrator.

Such detailed documentation of expenses was not unique to that area of Anbar in late 2006 and perhaps through early 2007. An expenditure tracking spreadsheet from 2008, for an unspecified location, records payments in Iraqi dinars and U.S. dollars (one column for each) and includes such items as:

PX717

- $5,000 "Handed over by Mu la Salim as the remainder of the Equipment debts" to Abu Ali al-Afari on September 4.
- $5,950 to Ahmad, "the purchasing manager," for the purchase of "5 pistols for Baghdad" and $7,400 more to him for "the purchase of 6 more" on September 15.
- $400 to "Prepare and install Siplit air-conditioner" to Muhammad on September 22.[11]

What is unclear is whether the listed payments were made ahead of the expenses being incurred or afterward.

For some expenses, it seems clear that the group provided upfront payments and then tracked spending. One nicely formatted memo from the Borders Emirate of the Mujahidin Shura Council (MSC; basically, the ISI unit responsible for the area around Sinjar in late 2006 or early 2007) came complete with a bordered cover page featuring the MSC logo.[12] The memo listed various administrative requirements for Border Emirate personnel; for example: "For every amount paid out of the Muslim people funds, the recipient is required to provide two signatures, in his own handwriting, one for receiving the money and another one to show how the money was spent."[13] The document then helpfully provided templates for the forms to be maintained when receiving funds and then when reporting about their expenditure (Figure 9.2).

Such reporting requirements were apparently followed in the Borders Emirate. Multiple documents report expenses at the unit level or record payments to specific individuals.[14]

A few documents included in our collection suggest that the reimbursement model was also used. One administrative spreadsheet covering expenses in Anbar governorate from January 31, 2006, to

---

[11] Harmony document NMEC-2009-634443; see "ISIL, Syria and Iraq Resources," 2015.

[12] Harmony document NMEC-2007-657926; see "ISIL, Syria and Iraq Resources," 2015.

[13] Translation from Fishman, 2008, p. 72, which quotes Harmony document NMEC-2007-657926 (see "ISIL, Syria and Iraq Resources," 2015).

[14] Harmony documents NMEC-2007-657980, NMEC-2007-647974, and NMEC-2007-657977; see "ISIL, Syria and Iraq Resources," 2015.

PX717

**Figure 9.2**
**ISI Receipt and Expense-Report Forms**

A Receipt

The brother ………… Place of work ……………………….. Section belongs to
T brother …………… The amount of ……………………….. USD
Day …………….. Date ………………………….

Recipient brother ……………..        Administrator …………………….
Signature ………………………        Signature …………………………….

Expense Report

I, ………………… work at …………………… and section belong to …………..
Brother …………………. Provide this detailed report about the finds I received from
brother ………………………. For the amount of ……………… USD
Day ……………………….. Date ……………………… ?

| Serial | Supplies | Amount USD | Remarks |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |

Amount Received ……………………. USD
Amount Spent …………………………USD
Remaining Balance ……………………USD

Alias: ……………
Signature: …………….

SOURCE: Harmony document NMEC-2007-657945; see "ISIL, Syria and Iraq
Resources," 2015.
NOTE: *T brother* is a quick translation of *The brother*.
**RAND** *RR1192-9.2*

October 20, 2006, includes line items, such as 6,400 Iraqi dinars for
"reimbursement pay to Abu Abd Al Kadir" on April 9, and 4,270 Iraqi
dinars to Imad for "expenses of the Administrative Committee" on
June 3.[15] A document tracking a range of expenses incurred by the
Borders Emirate in early 2007 included 20,000 Iraqi dinars for a "busi-

---

[15] Harmony document NMEC-2007-631844; see "ISIL, Syria and Iraq Resources," 2015.

ness expense to Abu 'Ubaydah" and 45,000 Iraqi dinars paid to Abu Ahmad for a "clutch plate."[16]

In some cases, documentation could include simple handwritten notes, such as one for the Umar Ibn Alkhattab Platoon, which requested reimbursement from a sector administrator for 120,000 Iraqi dinars for medical expenses (Figure 9.3).[17] It was for the medical needs of the platoon commander Abu Haytham's family, according to the note, and was signed by four individuals, including the sector commander, Abu Khitbah. Another note similarly requested the payment of 40,000 Iraqi dinars for the family medical expenses of Abu Yas and

**Figure 9.3**
**ISI Reimbursement Chit for Medical Care**



SOURCE: Harmony document MNFV-2007-000468; see "ISIL, Syria and Iraq Resources," 2015.
RAND RR1192-9.3

---

[16]  Harmony document NMEC-2007-657731; see "ISIL, Syria and Iraq Resources," 2015.

[17]  Harmony document MNFV-2007-000468; see "ISIL, Syria and Iraq Resources," 2015.

PX717

was signed by the platoon commander and administrator, as well as the sector commander and sector administrator.[18] Although we have relatively few such documents in our collection, a collection that was selected to include as many large spreadsheets as possible, these expense notes are not unusual. In fact, they are likely voluminous, given the disparate information that administrators collected from individual members or their unit leaders to accurately document revenues and expenses for their entire jurisdictions, including military, intelligence and security, and media units.

Overall, the amount of attention to tracking expenses in ISI strongly suggests that the group faced both substantial revenue constraints and difficulties with operatives using group resources for personal benefit. Otherwise, such record keeping simply does not make sense.[19] For example, even though we noted that ISI's average monthly revenues in and around Mosul in 2008 and early 2009 were substantially higher than they were in Anbar governorate earlier in the war, the group's fiscal constraints were similar because its expenses were roughly equivalent to its revenues, suggesting a need to minimize payments to avoid deficits that would limit its ability to pay active fighters and finance attacks critical to its military campaign. Such minimization of expenditures required an extensive book-keeping apparatus, which is evident in the way that ISI operatives recorded and reported expenses to administrative officials.

## Midlevel Tracking Spreadsheets and Economies of Scale

A final revealing fact about ISI's financial-management practices is that the group periodically produced roll-up reports and statistics on its spending. Such documents are not particularly useful for solving the problems faced by management regarding getting their subordinates to fulfill management's goals.[20] These documents do, however, provide higher-level senior leaders with information on the group's progress.

---

[18]  Harmony document MNFV-2007-000481; see "ISIL, Syria and Iraq Resources," 2015.

[19]  See Shapiro, 2013, Chapter Two, for a full discussion of this point.

[20]  As noted, this is known in the technical social science literature as an *agency problem*.

PX717

Such information is provided in a number of forms. For example, a document recording expenses and revenues in Anbar governorate from June 22, 2005, to January 30, 2006, includes graphs summarizing revenue and expenditures (Figure 9.4).[21]

This sheet was not unique. Two other documents had similar graphs; one records revenues and expenditures from January 30, 2006, to May 19, 2006, on two lengthy spreadsheets, and the other records revenues and expenses from May 19, 2006, to October 19, 2006 (Figures 9.5 and 9.6).[22]

**Figure 9.4**
**AQI Anbar Governorate Revenue Graph, June 2005 Through January 2006**



SOURCE: Harmony document NMEC-2007-633541 Orig; see "ISIL, Syria and Iraq Resources," 2015.
RAND *RR1192-9.4*

---

[21] Harmony document NMEC-2007-633541; see "ISIL, Syria and Iraq Resources," 2015.

[22] Harmony documents NMEC-2007-633919 and NMEC-2007-633700, respectively; see "ISIL, Syria and Iraq Resources," 2015. Harmony document NMEC-2007-633893 has similar plots; see "ISIL, Syria and Iraq Resources," 2015.

**Figure 9.5**
**AQI Anbar Governorate Revenue Graph, Winter and Spring 2006**



SOURCE: Harmony document NMEC-2007-633919 Orig; see "ISIL, Syria and Iraq Resources," 2015.
**RAND** *RR1192-9.5*

Although the presence of time-series bar charts showing revenues and expenditures might have been unique to the AQI administrators in Anbar in 2005–2007, the general principle of providing occasional roll-up reports was pervasive and continued through ISI's history. In 2010, for example, one document reported specific monthly revenues and then recorded salaries by category.[23] One of the largest salary spreadsheets from Mosul recorded individual payments by unit and then calculated various statistics. In it, the administrator recorded payments to 357 active fighters; then calculated overall spending by unit, the number of fighters and dependents per unit, and the number of dead fighters' families still being paid; and finally calculated some statistics on his overall payroll.[24]

---

[23]  Harmony document NMEC-2010-175522; see "ISIL, Syria and Iraq Resources," 2015.

[24]  Harmony document NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

**Figure 9.6**
**AQI Anbar Governorate Revenue Graph, Summer and Fall 2006**



SOURCE: Harmony document NMEC-2007-633700 Orig; see "ISIL, Syria and Iraq Resources," 2015.

**RAND** *RR1192-9.6*

These documents reinforce our earlier point that the standard cognitive constraints that compel all senior managers to seek summary statistics about their organizations apply to ISI leaders, and likely to the leaders of other large terrorist organizations as well. The group's leaders worked hard to conduct jihad in a rational, efficient manner and therefore sought the kinds of inputs that any high-quality manager would.

**Ghost Employees**

In light of the security pressure that ISI was under from 2006 to 2009, the expenditure tracking and the use of roll-up reports suggest an organization whose management was strongly motivated to track spending. If those tools were working perfectly to deter potential graft, there would be no evidence of it in the documents. Although there is indeed little direct evidence of graft in the documents we examine, there is some.

PX717

A 41-sheet administrative tracking spreadsheet captured in early 2008 provides some evidence (Figure 9.7).[25] The document, which appears to be from September 2007, records the amounts paid in salaries and expenses to 26 different subunits, and the spreadsheet contains some roll-up reports of expenses and total personnel, which aggregated everyone from the unit-level reports, and a few miscellaneous items. Figure 9.7 shows the serial numbers, *kunyas*, family status, and payments made to 57 active fighters (under an orange banner) and the families of 33 dead members (under a green banner) for a unit called Fayyad. This sheet is notable because of the documentation on the upper right. Translated into English, the text reads, roughly, "Abu-Nasir had these names, he deleted them, we do not if they were real or fake ones."[26] None of the serial numbers for those individuals show up in the "Total Workers" sheet, suggesting that payments were no longer made to them. This was odd because had they been killed in battle, their families should have continued to draw salaries, per the group's rules, and these individuals should have been recorded under a green banner. Our interpretation is that the unit leader suspected Abu Nasir of listing ghost employees to pad his payroll and reported this up his chain of command.

More-direct evidence of the use of ghost employees comes from Ahmed Zayd's spreadsheets, which were captured in February 2009. At the bottom of a spreadsheet listing all the members in various units, Ahmed Zayd reports the number of active fighters, the number of deceased fighters, and dependents in each category (Figure 9.8).[27] His 633 deceased fighters had 1,478 children and 489 widows. His 357 active fighters had 661 children and 278 wives. Simple division shows that the average deceased fighter had 2.33 children and 0.77 wives. His active fighters had 1.85 children and 0.78 wives. Overall, deceased fighters had 3.10 dependents, on average, while active

---

[25] Harmony document NMEC-2008-614685; see "ISIL, Syria and Iraq Resources," 2015. Note that a second version of this spreadsheet, with 39 sheets, exists as NMEC-2008-614686; see "ISIL, Syria and Iraq Resources," 2015.

[26] Harmony document NMEC-2008-614685; see "ISIL, Syria and Iraq Resources," 2015.

[27] Harmony document NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.

PX717

**Figure 9.7**
**ISI Administrator Spreadsheet, September 2007**



SOURCE: Harmony document NMEC-2008-614685; see "ISIL, Syria and Iraq Resources," 2015.

PX717

**Figure 9.8**
**ISI Administrator Spreadsheet, 2009**

| عدد زوجات الراحلين | عدد اطفال الراحلين | الراحلين | عدد الزوجات | عدد الاطفال | القوة القتالية | الكتيبة \القسم |
|---|---|---|---|---|---|---|
|  |  |  | 8 | 18 | 10 | تصنيع الالكتروني |
|  |  |  | 23 | 57 | 21 | الكتيبة الادارية |
|  |  |  | 14 | 33 | 13 | سرية التمويل |
|  |  |  | 6 | 14 | 6 | سرية الراحلين |
|  |  |  | 6 | 25 | 7 | سرية ادارية |
|  |  |  | 17 | 29 | 36 | اتيبة أبو ميسرة الغريب الاعلامية |
|  |  |  | 0 | 0 | 2 | سرية اعلامية مستقلة |
|  |  |  | 10 | 26 | 14 | اتيبة الشيخ ابو يحي الليبي الشرعية |
|  |  |  | 66 | 152 | 88 | اتيبة أبو طلحة الحمداني فك الله أسره |
|  |  |  | 11 | 14 | 12 | اتيبة التفخيخ |
|  |  |  | 16 | 61 | 20 | اتيبة التصنيع العسكري |
|  |  |  | 45 | 109 | 64 | اتيبة الشيخ أبو عبدالله الكردي رحمةالله |
|  |  |  | 51 | 110 | 59 | اتيبة الشيخ أبو مصعب الزرقاوي رحمةالله |
|  |  |  | 5 | 13 | 5 | سرية المشاجب الصحراوية )محمود حديد ( |
| 489 | 1478 | 633 | 0 | 0 | 0 | الجند الراحلين |
| 489 | 1478 | 633 | 278 | 661 | 357 | الاجمالي |

SOURCE: Harmony document NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.
**RAND** *RR1192-9.8*

fighters had only 2.63. Deceased fighters, in other words, had 18 percent more dependents, on average.[28] This would be consistent with unit leaders padding their payrolls by reporting additional dependents for deceased fighters, which would have been easier to get away with than padding the payroll for active fighters who could be directly asked about their families.

## Conclusion

ISI's financial practices reinforce the idea that it was a hierarchical, bureaucratic organization. Governorate and local subsidiaries transmitted 20 percent of their revenues upward. These revenues were then reallocated from high-level headquarters, to both the governorate and the national levels. Such reallocations are important because they are a potential factor in explaining AQI's and ISI's resilience to the intense

---

[28] We do not have enough underlying data to determine whether this is a statistically significant difference.

PX717

military pressures they faced at various times and in various areas. Such infusions of resources might have enabled subsidiary AQI and ISI units to avoid complete annihilation or disintegration. As evidence of the vitalizing effect of such transfers, previous research on the effect of transfers to AQI sectors in Anbar governorate showed that these transfers were associated with increases in the rate of AQI attacks in recipient areas for up to the next four weeks.[29]

The group tasked its administrators with financial reporting semi-monthly or monthly, which provided information that might have informed these reallocation decisions. We do not have access to documents from the period after the current leader, Abu Bakr al-Baghdadi, assumed control over ISI and its successor, ISIS. However, the organization's continued use of such calculated financial practices would have been a sound means to develop its capabilities to conduct persistent violent campaigns in Syria and Iraq, as al-Baghdadi's organization has done especially effectively in 2013 and 2014.

---

[29] Bahney, Shatz, et al., 2010, pp. 57–71.

# Conclusions and Implications

The Islamic State as of 2016 represented a deadly challenge to the people of the Middle East and to governments throughout the region, as well as to other countries worldwide. This organization did not arise out of nowhere. The group, which had roots in Jordan dating back to the early 1990s, has been active in Iraq since 2002. Since around 2004, the group's fundamental characteristics have apparently changed very little, as this chapter shows using more-recent information (through 2015). This means that findings about the group dating from 2005 to 2010 can help develop the strategy and methods to combat it in 2015. Its fundamental characteristics that exhibit great continuity include a desire to establish an Islamic state based on the group's vision of early Islam,[1] the use of indiscriminate violence against Shia civilians,[2] the desire to kill those they consider to be apostates or those from unprotected religions, and the view that violent jihad is necessary.[3]

In many ways, the group has fulfilled this vision, exemplified by its rule over a territory the size of Great Britain, the massacre of 1,700 Shia at Camp Speicher in June 2014,[4] and the establishment of slave

---

[1]  Fishman, 2007; Bunzel, 2015.

[2]  Al-Zarqawi, 2004.

[3]  Pascale Combelles Siegel, "Islamic State of Iraq Commemorates Its Two-Year Anniversary," *CTC Sentinel*, Vol. 1, No. 11, October 2008; Bunzel, 2015.

[4]  Tim Arango, "Escaping Death in Northern Iraq: Video Feature: Surviving an ISIS Massacre," *New York Times*, September 3, 2014; Wassim Bassem, "IS Massacre Leaves Families of Victims Stunned," trans. Sahar Ghoussoub, *Iraq Pulse*, Al-Monitor, August 28, 2014.

PX717

markets, where girls from the Yazidi religion, viewed by the Islamic State as a form of devil worship, are sold for sex.[5]

Even where there seems to be dramatic change, there has been continuity. The Islamic State has unleashed a sophisticated propaganda campaign, across multiple platforms, including video, print, and social media. The analyst Charlie Winter has written that this propaganda "has generated a comprehensive brand . . . composed of six non-discrete narratives—brutality, mercy, victimhood, war, belonging and utopianism." Of these, new recruits are most drawn to the utopianism.[6] In the realm of social media, analysts found that in the last quarter of 2014, Islamic State supporters used at least 46,000 Twitter accounts, with 20 percent selecting English as their primary language.[7] As noted in Chapter Four, AQI's early organizational blueprint included media operations, and media emirs were counted as an essential position in the subnational divisions of ISI in 2008, although none of those positions was filled.

Because of the continuity of the group's goals and methods, understanding its past can help design policies and actions to limit its future.[8] This report provides a comprehensive examination of the finances, organization, personnel policies, and management of ISI, the predecessor of today's Islamic State. Working with more than 140 recently declassified ISI documents, including personnel tracking spreadsheets, expense reports, and financial logs, we analyzed

---

[5]   Patrick Osgood and Rawaz Tahir, "Iraq's Yezidi Minority Faces Massacre," *Iraq Oil Report*, August 6, 2014; Nick Squires, "Yazidi Girl Tells of Horrific Ordeal as ISIL Sex Slave," *Telegraph*, September 7, 2014.

[6]   Charlie Winter, *The Virtual "Caliphate": Understanding Islamic State's Propaganda Strategy*, London: Quilliam Foundation, 2015, p. 6.

[7]   J. M. Berger and Jonathon Morgan, *The ISIS Twitter Census: Defining and Describing the Population of ISIS Supporters on Twitter*, Washington, D.C.: Brookings Institution, U.S. Relations with the Islamic World, Analysis Paper No. 20, March 2015.

[8]   See Michael Weiss and Hassan Hassan, *ISIS: Inside the Army of Terror*, New York: Regan Arts, 2015, which presents the group's background and a strong account of its recent activities.

PX717

- plans for geographic organization and state-building in northern and western Iraq
- individual-level data on the country of origin and practical qualifications of more than 499 ISI members in 2007–2008, including 393 foreign members and 106 Iraqis
- individual-level data on member status and unit assignments for 1,149 active members and 1,159 dead or imprisoned members derived from what appear to be near-complete personnel records maintained by ISI administrative emirs in Ninewa governorate in late 2007 and early 2009
- individual-level salary data on 9,271 salary payments in Anbar, Diyala, Ninewa, and Salah al-Din governorates from 2005 to 2009
- transaction-level expenditure and income records for Anbar governorate in 2005–2006, Ninewa governorate in 2008–2009, and, more modestly, two other locations.

Although neither representative nor fully exhaustive, these records paint the clearest picture available in the open-source literature of how ISI developed and implemented many of the same organizational strategies, methods, and procedures that typify how the Islamic State now operates and finances itself on a grand scale.

ISI designed its organization to be a top-down multidivisional hierarchy, in which a central management structure with functional bureaus was to be replicated at multiple lower geographic levels, as conditions permitted. As in most organizations of this type, each geographic unit had substantial autonomy, while issues requiring coordination between units—such as the allocation of resources, both human and financial—were handled by the central organization. Although this structure is associated with the unprecedented successes of the Islamic State, it does have certain inherent weaknesses and vulnerabilities that constrained and undermined ISI. The group raised money in ways that created friction with local economic elites. Moreover, the way that the group managed human resources and finances reflected an organization that lacked internal cohesion and did not fully trust its operatives. At the same time, the group created durable manage-

PX717

ment institutions that enabled it to survive massive personnel losses, high turnover of senior leadership, and an ideological break in forming ISI. After multiple failures of the Iraqi government, Middle Eastern countries, and the international community regarding policy toward Syria, as well as of the United States, coalition partners, and Iranian policymakers and operatives regarding influence over Iraqi government policies and decisionmaking, these institutions enabled the group to resurge. They put it in a position to expand its operations and capture large swaths of Syria, declare the Islamic State in Iraq and al-Sham, accelerate operations in Sunni areas of Anbar and Ninewa governorates, and ultimately to declare the Islamic State caliphate in territory spanning the Iraqi-Syrian border.

ISI applied an organizational structure that was originated by al-Qaʻida. Where al-Qaʻida built an organization focused on setting up branches around the world, ISI used this model to set up subnational jurisdictions throughout Iraq. ISI applied the model with great emphasis on controlling territory, contiguous, if possible; farming the local economy for revenue; and spreading its control and operations outward by violently applying a simple yet effective template for state-building that involved specific organizational and ideological principles and tactics, techniques, and procedures for administering territory after it had been infiltrated and subverted or overrun. From 2006 through 2010, coordinated action by the United States and coalition forces, as well as the Iraqi government, military, police forces, tribal elements, and intelligence agencies, degraded this structure, but the system was able to survive at lower levels of activity and reemerge when political and security conditions changed. This may have been due, in part, to ISI's strategic use of human capital. ISI appeared to assign roles inside the organization based on skills and beliefs. For example, foreigners were more likely than Iraqis to be true believers in ISI's ideology, and so foreigners dominated the suicide-bomber corps. In contrast, Iraqis had better local knowledge and could mix more easily with the population, and so they dominated security roles. In the remainder of this chapter, we review our key findings and discuss the implications, both for methods and policy.

PX717

## Key Findings

Studying ISI's documents provides evidence on several aspects of how one particular jihadist militant organization worked and highlights its ultimate limitations. To the extent one believes that ISI faced a set of organizational imperatives and challenges common to terrorism and insurgency, and that the Islamic State today faces the same challenges while increasing its global influence by expanding across many Muslim countries, analysis of ISI also provides possible ideas about how other jihadist groups may try to organize and finance themselves under the Islamic State's banner. The lessons from examining the group's history are also useful for setting expectations about the strengths and vulnerabilities of the Islamic State and its ability to combat its opponents, designing a coordinated and effective campaign against it, and understanding why it might be able to survive such an effort and sustain itself into the future, albeit perhaps at a lower level of threat.

### Militant Organization Structures and Management Practices

Four facts about militant management stand out in our analysis. First, this report reinforces the idea that rebel and insurgent organizations need hierarchical governance to operate at scale. Both AQI's and ISI's organizational structures resembled those designed by al-Qaʻida in the 1990s, when al-Qaʻida was engaged in training jihadis to export Salafi-jihadist militancy to establish Islamic emirates in far-flung parts of the Muslim world. As of 2008, ISI had articulated its governance of Iraq in great detail, subdividing the country into sectors, defining governing positions for each of those sectors, and recording which positions were filled. As of 2015, the most-authoritative reporting on the Islamic State suggested that these basic structures have remained largely the same. The group's managerial responsibilities and structures have remained almost identical despite many changes on the battlefield, although the Islamic State appears to have added more bureaucratic subsidiaries to exploit opportunities and deal with requirements associated with the expanded territory it controls. The Islamic State might have lacked the ability to reorganize when its original blueprint failed, or the hierarchical structures we observe might have remained intact because of their

PX717

robustness and suitability to the Islamic State's aims and objectives. The latter argument appears far more likely to be correct, given how adaptive the Islamic State and its predecessors have proved in tactical proficiency and operational planning and execution.

Second, rationally managing human resources in these settings, although challenging, was a characteristic of ISI. Examples include its use of foreign fighters versus Iraqi personnel and its use of tracking spreadsheets that listed personnel qualifications and a bit about their operational histories. We also found evidence of substantial mobility over space and between units. There appeared to be limits, however. We found no documents reporting centrally directed efforts to allocate members to specific jobs. Given the systematic way that financial matters were recorded, this gap is surprising. It suggests that personnel allocations were made at lower levels, or in a more ad hoc manner, based on members' relationships with specific emirs or on members' general reputations.

Third, some of the unexpected aspects of the groups' compensation and financial schemes—its low salaries, for example—were potentially useful for managing agency problems. In particular, having salary structures that emphasized equity and making payments to the families of killed or detained militants makes sense from the perspective of managing internal agency problems. These are the problems leaders face in getting their followers to carry out orders when the leaders do not have complete control over followers' actions. Policies regarding expense reporting make sense from the same perspective. Although creating a paper trail and courier networks exposed the group to great risk of exposure, those practices also gave leadership greater control. And, as we showed in Chapter Nine, there is some direct evidence of corruption in ISI.

Fourth, although ISI's management and information reporting requirements appeared quite systematic for an ostensibly covert militant organization, they pale in contrast with those of even modestly capable state militaries and other government bureaucracies. For all of ISI's attempts to document its human resources, finances, attack and military operations, and other facets of its organizational activities, such reporting occurred in piecemeal fashion, with a proliferation of

PX717

nonstandard formats for reporting, even during periods when administrative officials were trying to enforce common standards.

All of this makes sense from an organizational theory perspective. Even highly effective militant organizations face substantial management challenges. These organizations recruit a diverse workforce willing to violate all manner of behavioral norms, particularly if employing foreign fighters, and have to operate under challenging conditions with limited oversight. In such conditions, it is hardly surprising that these groups have a great deal of trouble making sure members behave as the organizations want at all times. Our documents clearly show that AQI and ISI were no different, and there is no reason to believe that the Islamic State is either.

But as the long-run history of the predecessors of the Islamic State shows, one should not mistake those challenges for an inability to endure and regenerate. The group took enormous losses from 2006 to 2010 but was able to maintain its command and control structures, send trained members and leaders into a neighboring country twice—once as Jabhat al-Nusrah and once under its own command—and return to take control of large swathes of territory from western Iraq to eastern Syria.

## Insurgent and Terrorist Financing

The most important lesson from ISI's revenue-raising practices is that insurgent groups do not need external backers if they can tax the economy. As of mid-2015, the Islamic State reportedly generated more than $1 million per day in extortion and taxation, about $1.3 million per day from oil smuggling and other means of farming the oil sector, and additional revenues from kidnapping for ransom, antiquities smuggling, and bank heists.[9] Oil had at one point generated $1 million, and even up to $3 million, per day in revenue, and the Islamic State has been described since its reemergence as the richest terrorist group

---

[9]   Sarah Almukhtar, "ISIS Finances Are Strong," *New York Times*, May 19, 2015; Michael R. Gordon and Eric Schmitt, "U.S. Steps Up Its Attacks on ISIS-Controlled Oil Fields in Syria," *New York Times,* November 12, 2015.

PX717

on the planet.[10] Faced with an accelerated effort to attack its oil assets starting in late 2015, the Islamic State was still reportedly earning as much as $1 million per day from oil assets in April 2016.[11] Neither AQI nor ISI generated revenue on this scale during the period in our documents. According to the AQI and ISI ledgers analyzed for this study, AQI in Anbar governorate generated an average of $18,000 per day from June 2005 through October 2006 (including one revenue transaction on November 1, 2006). ISI in the Mosul area of Ninewa governorate generated an average of about $31,000 a day—a 72-percent increase over time. These are governorate revenues, but even so, it is highly unlikely that additional revenues from other governorates would have amounted to the total the group is taking in today. For the group as a whole before 2010, oil smuggling might have netted ISI $200 million annually—almost $550,000 per day—with $50,000 to $100,000 per day coming from operations related to the Baiji refinery in early 2008.[12]

These daily revenues were far lower than the current estimates of the Islamic State's daily revenues in mid-2015. This should not be surprising; ISI controlled far less territory and thus had fewer opportunities to tax or directly take over crude oil production and refineries, as it reportedly has done in Syria; to sell oil and gas to the Syrian regime and others throughout Syria; or to demand a cut from intermediary black-market actors that smuggle oil through northern Iraq and into Turkey.[13] By 2008, however, profits from involvement in Iraq's black-market oil sector were already one of ISI's top two sources of revenue.

---

[10] Johnston and Bahney, 2014c; Vivienne Walt, "How Guns and Oil Net ISIS $1 Million a Day," *Fortune*, June 24, 2014; Howard J. Shatz, "How ISIS Funds Its Reign of Terror," *New York Daily News*, September 8, 2014a; and Howard J. Shatz, "To Defeat the Islamic State, Follow the Money," *Politico Magazine*, September 10, 2014b.

[11] Benoit Faucon and Margaret Coker, "The Rise and Deadly Fall of Islamic State's Oil Tycoon," *Wall Street Journal*, April 24, 2016.

[12] Ayman Oghanna, "Corruption Stemmed at Beiji Refinery—But for How Long?" *Iraq Oil Report*, posted by Alice Fordham, February 16, 2010; Oppel, 2008.

[13] See, e.g., David E. Sanger and Julie Hirschfeld Davis, "Struggling to Starve ISIS of Oil Revenue, U.S. Seeks Assistance from Turkey," *New York Times*, September 13, 2014; Erika Solomon, Guy Chazan, and Sam Jones, "ISIS Inc.: How Oil Fuels the Jihadi Terrorists,"

The group's transition from relying on petty crime, to more sophisticated mafia-style protection rackets, to direct involvement in oil production and smuggling reflects the organization's gradual improvement in revenue collection.

Access to funding is important to the Islamic State—militant groups that become significant threats to U.S. national security are those that both establish safe havens in which operations and attack planning can be conducted freely and have the resources necessary to finance external operations. Historically, terrorist groups have pursued these prerequisites through external state sponsorship—for example, the Taliban provided al-Qaʻida under Usama Bin Ladin with a safe haven in Afghanistan after Bin Ladin was forced to leave Sudan in the mid-1990s. Al-Qaʻida raised money from foreign donors, among other sources.

ISI and its successor, the Islamic State, are different. In the case of ISI, the group explicitly noted that gaining external backers imposes substantial liabilities and gives the backers leverage over the organization.[14] It and the Islamic State rely largely on taxing economic activity in areas they control, or at least where they can pose a serious threat of violence against those being taxed. As the group's survival from 2010 to 2012 shows, such revenue generation can clearly happen in a sustainable way, even in the presence of a substantial counterterrorist campaign. But ramping up taxes to high levels can only happen when militants have a substantial measure of control in an area and can operate with relative impunity, as the Islamic State has had in northern Iraq between June 2014 and mid-2015. Such taxation cannot be conducted without revealing an organization's forces to outside observers. It can also not be done without the organization interacting with the community. At minimum, the people being taxed will know something about the organization, and the organization's tax collectors must expose

---

*Financial Times*, October 14, 2015; and Erika Solomon and Ahmed Mhidi, "ISIS Inc.: Syria's 'Mafia-Style' Gas Deals with Jihadis," *Financial Times*, October 15, 2015.

[14] See, e.g., Harmony document NMEC-2008-612449, "Analysis of the State of ISI," a declassified captured document about ISI's "lessons learned" (from both its own and other Islamic militant organizations).

PX717

themselves. This therefore opens up the organization to counteraction by an adversary with the ability to act in the group's territory, as many states with effective air power and special operations forces can do.

## Compensation and Participation in Militant Organizations

ISI had a well-developed payroll system with clearly defined salaries. This should not seem odd. Even the most dedicated jihadis need to make a living. In the context of a violent insurgency where large numbers of fighters need to be recruited, people with families and other financial obligations are a valuable labor source, both because any group that cannot recruit them has a smaller labor pool to draw from and because success in marriage markets correlates with human capital in most places.

But ISI did not pay competitive wages. Nonmonetary compensation must therefore have been a big part of the overall package for ISI fighters. In fact, pay was often lower in places with higher levels of fighting and during periods when combat was more intense. This suggests two possibilities: either (1) the group's members have negative risk premiums (so that martyrdom risk is an amenity) or (2) there were substantially more people willing to fight for the group in 2006, when the war was going relatively well, than in 2008, when it was not, and therefore their risk-adjusted pay had to be higher later in the war.

All of this poses a challenge for traditional opportunity-cost models of conflict. In such settings as this one, improvements and declines in the legitimate economy might be immaterial to the population being recruited. The information in these documents can therefore help make sense of the positive relationship between employment and violence observed in Iraq.[15]

---

[15] Eli Berman, Michael Callen, Joseph H. Felter, and Jacob N. Shapiro, "Do Working Men Rebel? Insurgency and Unemployment in Afghanistan, Iraq, and the Philippines," *Journal of Conflict Resolution*, Vol. 55, No. 4, 2011.

PX717

## Implications and Recommendations for Analysis

The implications of this study can be broken down into two categories: methodology and policy. We first address the methodology issues and then close with policy implications. The methodological considerations are simple: More systematic study of captured documents and media is necessary to gain the fullest possible understanding of the threat that groups such as the Islamic State actually pose. There is a gap in both the policy and academic analytic cycle—neither group combines in-depth analysis with the kind of theoretical sophistication that lets one draw broader lessons. We have made some progress on this score, but much more could be done. There are substantial limitations on what can be achieved analytically and inferentially in a study such as this because of the limited availability of documents, as described in Appendix A.

Greater collaboration between government analysts and social science researchers—including subject-matter experts, experts on methodology and theory, and linguists—on documents and media that have been obtained from militant groups (jihadist militant groups in particular) could be extremely productive. Government analysts can gain from a better conceptual framework—ideally one supported by systematic analysis of data—with which to interpret and contextualize real-time, tactical information as they receive it. This is particularly true for threat groups such as ISI, where strategic questions are of great importance and for which analysts may lack substantial background knowledge and a good intelligence picture of the details and actors in play on the ground[16] or knowledge of advanced methodologies.

Systematic document exploitation can provide a valuable adjunct to other forms of collection and analysis about militant groups. Document exploitation may be undervalued, as exemplified by the closure of the Conflict Records Research Center, a document repository at the National Defense University.[17]

---

[16] The massive focus on the group from 2005 to 2010 was not sustained after the U.S. withdrawal from Iraq.

[17] Michael R. Gordon, "Archive of Captured Enemy Documents Closes," *New York Times*, June 21, 2015; Mark Stout, "Understand Our Wars and Enemies? Nah . . ." *War on the Rocks*, August 21, 2013.

PX717

Documents can provide a portrait of how the organization works and what its weaknesses and strengths are. They can identify important nodes of communication. They can identify the organization's plans and its strategy—in the case of ISI, the documents show clearly an organization intent on state-building. The usefulness of document exploitation should not be surprising. Societies have long understood the value of archives, and the operational value of documentation is substantial, albeit short-lived.

To be maximally useful, however, such document collections need to be

- large scale, so that the representativeness of documents is discernible[18] (scholars need to be able to assess whether any given document is normal or a unique outlier)
- well documented, since high-quality metadata enable thoughtful sampling strategies and the efficient selection of documents for closer inspections.

There are substantial challenges to achieving these goals. Maintaining large-scale document collections is expensive, and consistently recording metadata at the collection point entails practical challenges in high-intensity operational environments. These challenges, however, are predictable, and, given the long-run value of understanding insurgent and terrorist organizations, future collection efforts should keep in mind these twin imperatives.

Systematic document exploitation also needs people with multiple skills. We have found that to get the most out of any document set, it is valuable to have practiced intelligence analysts, social scientists, translators, and military personnel with battlefield experience. This argues for carefully building analytic teams for document exploitation.

---

[18]  Technically, we would want to know the distribution of documents, as in the probability distribution. This would shed light on how common are such documents as large-scale financial spreadsheets, personnel rosters, and reimbursement notes. Without knowledge of such a distribution, we cannot definitively conclude that the findings from a document analysis apply to the group as a whole over a long period or only to the specific faction of the group that generated those documents at the time they were generated.

PX717

## Implications and Recommendations for Policy

In spite of the Sunni Awakening movement in 2006, the U.S. troop surge in 2007, and a campaign of highly refined U.S., coalition, and Iraqi counterterrorism operations that badly damaged ISI, the group was strong enough to persist. A successful strategy against the Islamic State will comprise many elements. Militarily, these elements will include direct action against the group; training, advising, and assisting troops involved in the fight; and providing arms, intelligence, and other support. Socially, deradicalization efforts are needed, not only in Iraq and Syria but throughout the world.

A full understanding of the group's traditional goals, management methods, human resource policies, and financial practices, as analyzed in this report, can also inform a counter–Islamic State strategy. In fact, such an understanding can point out vulnerabilities and avenues for eroding the group's power and influence.

### Organization and Territorial Control

ISI's organization mirrored that of traditional, legitimate states and organizations in many respects, even though the group's ideas about statehood, the rights of citizenship, and the provision of public goods were quite different from those of legitimate states. The reasons why are simple: This is the most effective way to organize collectively across a large area of strategic importance. Such structures also signaled to enemies and allies that the group looked like a state. And, most important, establishing a state was a goal, one that has been approximately realized.

By 2008, ISI had articulated 31 specific geographic subdivisions of its Islamic State of Iraq, building on previous pronouncements of founding an Islamic state. By 2015, the Islamic State had declared 33 *wilayat*, or provinces, throughout the greater Middle East, including ten in Iraq, seven in Syria, two spanning the border of Iraq and

PX717

Syria, six in Yemen, three in Libya, and one each in Saudi Arabia, Algeria, Egypt, Afghanistan-Pakistan, and Nigeria.[19]

The combination of cognitive constraints on leadership, high turnover from warfighting, efforts to establish state-like services, and problems within the organization regarding the translation of management intent to member operations—the organization's agency problems—all point to great value in having formalized organizational structures and substantial amounts of paperwork and record keeping. This could well apply to any nonstate group striving to establish a state. In the case of the Islamic State, the persistence of such structures—and their likely extension to affiliates in Libya, Egypt, Afghanistan, and elsewhere—creates substantial vulnerabilities.

In particular, the resulting documents create a vulnerability as soon as groups face an enemy whose military forces cannot be excluded from their territory. These documents can show a group's size, its specific personnel, its sources of revenue, and its overall strategy—all information useful for combating it. Thus, when the Islamic State, or any similarly sized group, faces a highly competent military force, all the things it does to organize well become a major vulnerability. As we have shown, the group's records are particularly rich. A short organizational instruction from 2007, or earlier, doubled as an instruction for generating documents. The main responsibilities of the finance department were to

1. Open and Maintain a Register for the incoming documents

2. Open and Maintain a Register for the outgoing documents

3. Incoming status report with the Daily situations

4. Outgoing status report with list of monthly miscellaneous expenses.[20]

---

[19] Aaron Zelin, "The Islamic State's Model," *Monkey Cage*, *Washington Post*, January 28, 2015a; Aaron Zelin, "Full List of the 33-Officially-Claimed Wilayat of the Islamic State as of Today," Twitter, June 20, 2015b.

[20] Harmony document MNFT-2007-005313; see "ISIL, Syria and Iraq Resources," 2015.

The main responsibilities of the soldiers department were to

1. Tally the number of active, non-active fighters, captures and martyrs who pledged their life for the cause only plus sectors miscellaneous expenses

2. Following up the fighters rental expenses

3. Following up the Fighters marriage Issues

4. Following up the pledges of the new comers (fighters)

5. Daily status report about any changes in the fighters situation such as number captured, killed, injured, marriage.[21]

For the intelligence vulnerabilities of an actor such as the Islamic State to be exploited, there must be commensurate efforts in intelligence collection, analysis, counterterrorism, and counterinsurgency. U.S.-led coalition forces were able to do this successfully, most notably by task forces of U.S. and British special operations forces. The commitment of resources to countering AQI and ISI was significant, however, compared with most intelligence efforts. For a similar intelligence and operational capability to be established by ISF, and in particular, Iraqi special operations forces, will require significant capacity-building on the analytical side, as well as substantial support from other parts of the U.S. government interagency community. Specific capabilities necessary include financial investigations, which would be supported by the U.S. Department of Treasury. They also include street-level investigative capacity necessary to counter criminal-like activities by the Islamic State, which provide a revenue stream and help it control the Iraqi population in areas where it operates. Support from the U.S. Federal Bureau of Investigation and the U.S. Drug Enforcement Administration, or similar agencies from other countries, to the Iraqi government could help a great deal. On the collection side, the vulnerability that stems from running a highly bureaucratic state suggests

---

[21]  Harmony document MNFT-2007-005313; see "ISIL, Syria and Iraq Resources," 2015.

PX717

that when members of the group are targeted for capture, emphasis should be put not only on the leadership but on personnel who maintain and store records, such as administrative emirs.

As with any state, the Islamic State has specific leaders. The history of operations against ISI shows that leader targeting is one effective aspect of combating the group. First, it removes competent people, potentially leading to a pause in operations or to less effective operations as the group finds replacements. Second, it damages morale, especially when a particularly charismatic leader is targeted. ISI's contracting revenue fell steeply in October and November 2008, after the ISI deputy Abu Qaswarah was killed. Morale was also damaged.

Also, the very threat of targeting at any level pushes the group underground and makes it more difficult to coordinate actions. It can also breed fear. An ISI strategist writing in late 2007 or early 2008 noted the effects of U.S. and coalition targeting operations on group morale, cohesion, and operations:

> These kinds of Emirs started setting fear in the hearts of Mujahidin [person who performs jihad, in this case an ISI member] through their description of American airdrops [insertion of troops by air], their air superiority and armored vehicles and Hummers, and that we are lacking the effective weapon for confronting them, to include that we are outnumbered and they are better equipped. As soon as the brother Mujahid hears these words about the Americans, fear starts creeping into his heart, as if the Americans were on foot, and one begins comforting himself with the idea of the Americans definitely pulling out and no one else being left except the apostates [the Shia and the Iraqi government and its institutions] who they will extract from their roots.[22]

Eliminating leaders has two problems. First, it can backfire by paving the way for more-effective leaders. The 2010 U.S. and Iraqi raid that killed Abu Ayyub al-Masri and Abu Umar al-Baghdadi cleared the way for Abu Bakr al-Baghdadi to take the reins of the group, and he is the current leader. This is a problem that cannot be solved, and

---

[22] Harmony document NMEC-2008-612449; see "ISIL, Syria and Iraq Resources," 2015.

PX717

we suggest that, in general, the benefits of eliminating leadership have outweighed the risks.

Second, the group's records show that it establishes a deep bench of personnel, so that attacking individual leaders will not destroy the group. Organizational charts from Anbar and Mosul at different periods show committee structures, and ISI reallocated people across units and into back-office functions when needed. Therefore, any counter-personnel strategy must strive to eliminate entire layers of high-level and midlevel managers, such as an administrative emir and his administrative committee.

### Countering the Islamic State's Fighters

Just as its predecessor did, the Islamic State draws its personnel from a diverse array of nationalities. Although no one, except, perhaps, the group's leaders, knows its membership numbers, membership has been estimated at anywhere from 9,000 to 200,000 throughout 2014 and 2015.[23] In September 2014, a Central Intelligence Agency spokesperson said that the group had an estimated 20,000 to 31,500 fighters and that about 15,000 foreign fighters from 80 countries, including 2,000 Westerners, had gone to Syria.[24] By early 2015, the U.S. intelligence community estimated that 20,000 foreign fighters from 90 countries have flowed into Syria since 2011, and more than 3,400 fighters from Western countries have gone to Syria or Iraq.[25] Many have joined the Islamic State. Not only do they tend to be the most ideologically committed but they also represent a threat to their own countries should

---

[23] Daveed Gartenstein-Ross, "How Many Fighters Does the Islamic State Really Have?" *War on the Rocks*, February 9, 2015.

[24] Eyder Peralta, "CIA Doubles Its Estimate of Islamic State Fighters in Iraq and Syria," NPR.org, September 11, 2014; Mario Trujillo, "CIA: ISIS Has 20,000 to 31,500 Fighters," *The Hill*, September 11, 2014; Jim Sciutto, Jamie Crawford, and Chelsea J. Carter, "ISIS Can 'Muster' Between 20,000 and 31,500 Fighters, CIA Says," CNN.com, September 12, 2014; Michael Walsh, "ISIS Can Muster 20,000 to 31,500 Fighters, Triple Previous Estimates: CIA," *New York Daily News*, September 12, 2014.

[25] James R. Clapper, "Opening Statement to Worldwide Threat Assessment Hearing," Senate Armed Services Committee, Washington, D.C.: Office of the Director of National Intelligence, February 26, 2015.

PX717

they try to return home. During the period of our documents, ISI was placing people into jobs and giving them training in an apparently intentional manner. ISI was also using them rationally. Iraqis, who had local knowledge and could blend into their communities, were the primary staff members of security functions—running counterintelligence operations, handling street-level financial activities, and protecting leadership. In contrast, foreigners, more likely to be true believers, were the primary fodder for the suicide-bomber corps. However, most foreigners held regular jobs in ISI, working in military roles and conducting terrorist operations.

Since 2012, the operating environment and mission for ISI have dramatically changed, and it has rebalanced its activities to more-traditional military operations using small arms, artillery, and maneuver in numbers. Under the new scale of operations, Iraqi and Syrian recruits appear to be playing an active role in planning and leading military operations, because the Iraqi members, especially, are more educated and have more experience with traditional military affairs from their time in Saddam Hussein's military.

Even with this reliance on local members, characteristic of other periods during the group's history, the group has a continuing need and use for foreigners. For example, the group has been advertising as far as North Africa for skilled oil field technicians.[26] And it is thought that it has been recruiting chemical weapons specialists.[27]

Furthermore, the Islamic State's ideology and its outward image are based on Salafi jihadism, in the vein of what some scholars have called a *foreign-fighter ideology*. This ideology is based on the idea that an existential external threat faces the Muslim nation—in this case, the coalition force and the Shia-dominated government of Iraq—and that Islamic law demands that all Muslims fight back militarily.[28] In

---

[26] John C. K. Daly, "Operation Inherent Resolve: The War Against Islamic State's Oil Network," *Terrorism Monitor*, Vol. 13, No. 1, January 9, 2015.

[27] Jane Norman, "Islamic State Recruiting 'Highly Trained Professionals' to Manufacture Chemical Weapons, Julie Bishop Warns," *ABC (Australia)*, June 6, 2015.

[28] Thomas Hegghammer, "The Rise of Muslim Foreign Fighters," *International Security*, Vol. 35, No. 3, Winter 2010–2011.

PX717

this light, the Islamic State has long had a natural tension between the skills and ideology of the local Iraqi (and now Syrian) members and the foreign fighters who have joined the fight from abroad.

The use of foreigners should raise great concern to policymakers. Contrary to reports that ISI groomed the vast majority of its foreigner fighters for suicide operations in the pre-2010 period, it trained a large share of the foreign fighters who traveled to Iraq in the arts of unconventional military operations, bomb-making, and IED attacks. Assuming that the Islamic State has continued to train foreigners in the manner we see in these documents, the organization has developed a group of trained and hardened foreign fighters with unconventional skills that could be directed against other countries. As other scholars have pointed out, a majority of transnational terrorist operatives to date began their careers as foreign-fighter volunteers, and most transnational jihadist groups are by-products of foreign-fighter mobilizations.[29] An obvious concern for Western policymakers is that Muslims are traveling from North America and Europe to Iraq and Syria to join the Islamic State in far greater numbers than were ever conceivable in the 2005–2010 period. Returned travelers pose a serious threat in terms of conducting attacks and spreading the ideology and methods of jihad in an attempt to radicalize elements of the predominantly moderate Muslim populations of these countries. These travelers also pose a continued threat, because of intelligence gaps concerning the Islamic State's radicalization and recruitment of Western citizens and the ability of Western citizens to travel to and from their home countries with few legal restrictions.

As of 2015, the Islamic State is training jihadist fighters—as many as two-thirds of them foreign—in camps it has established in Iraq and Syria at roughly ten times the rate ISI was able to. Available reporting indicates that, at times, ISI had as few as four (or possibly even fewer) training camps in Iraq. By November 2014, 46 jihadist training camps,

---

[29] See Mohammed Hafez, "Jihad After Iraq: Lessons from the Arab Afghans," *Studies in Conflict and Terrorism*, Vol. 32, No. 2, February 2009, p. 77; Thomas Hegghammer, *Jihad in Saudi Arabia: Violence in Pan-Islamism Since 1979*, Cambridge, UK: Cambridge University Press, 2010.

PX717

the majority attached to the Islamic State, had been identified in Iraq and Syria.[30] We found that foreigners were more likely to have received jihadist training than were Iraqis during the ISI era. One of the causes likely was the difficulty of training ISI members inside Iraq at the time. Training is almost certainly easier to conduct at present in Iraq and especially in Syria.

Therefore, greater effort will need to be dedicated to stopping the flow of foreign fighters. This has already started but is clearly not working well, because foreign fighters are still flowing in. Several enhanced efforts are needed. The first is enhancing border controls in transit countries—Turkey, most especially. This may require greater technical assistance and further negotiations by partner countries, the United States, and North Atlantic Treaty Organization allies in Europe. Whatever benefit Islamic State action against Syrian President Bashar al-Assad brings to Turkey, the group may represent a serious future threat to Turkey itself. After all, Assad did little to stem the flow of foreign fighters through Syria to Iraq and, consequently, ISI in the 2000s, and his population is paying for that policy today.

The second effort is greater scrutiny of potential members from sending countries. For some countries, this will require a careful balancing between security needs and civil liberty requirements. Stopping people from arriving at the territory of the Islamic State also means stopping people from being trained and increasing the ability to learn about fighter-facilitation networks.

Both of these efforts will be enhanced by a third: greater information sharing among intelligence and law-enforcement organizations, both within and across countries. Here again, civil liberty requirements and values will need to be honored. However, it is likely that more sharing can take place because of various stovepipes among agencies that have not been fully overcome.

In the wake of the Lebanon and Paris attacks in November 2015, it is now clear that the Islamic State has dedicated real resources to foreign targets, including in the West. The Islamic State appeared to

---

[30] Bill Roggio and Caleb Weiss, "More Jihadist Training Camps Identified in Iraq and Syria," *The Long War Journal*, November 23, 2014.

PX717

shift its posture against the West after the coalition intervened in the Iraq conflict, as signified by the group spokesperson Muhammad al-Adnani's speech in September 2014, in which he called for Muslims to strike at coalition targets—military or civilian—wherever they are found. He also specifically alluded to the group "drawing and dragging" America into a ground war.[31] Subsequent to this speech, a number of Islamic State–linked attacks occurred in coalition countries—including Canada, Belgium, France, and Australia. Al-Adnani released another speech in January 2015 lauding these attacks and encouraging more.[32] French authorities have indicated that Islamic State militants began organizing in Europe 11 months before the Paris attacks, suggesting that the attacks were authorized shortly after al-Adnani's speech sometime around January 2015.[33]

The Islamic State has long dedicated significant resources to training foreign fighters for combat. If it decides to deploy more of these fighters against coalition countries to deflect battlefield losses in Iraq and Syria, for example, it could be a challenge for policymakers not to escalate their military commitment against the group, leading to a difficult quandary: A significant foreign intervention could be the most militarily effective action against the group, but it could also further exacerbate the conflict by empowering the foreign-fighter ideology, mandating a defensive jihad against an external threat to the Muslim nation.

**Taking Advantage of Compensation Policies**

One of the biggest unknowns about the current structure of the Islamic State is how well it compensates its members. Numerous reports published in the months after the group conquered Mosul indicated sala-

---

[31]  Abu Mohammad al-Adnani, "Indeed Your Lord Is Ever Watchful," Al-Furqan Media Productions, September 22, 2014.

[32]  Abu Mohammad al-Adnani, "Die in Your Rage!" Al-Furqan Media Productions, January 2015.

[33]  Andrew Higgins and Kimiko de Freytas-Tamuranov, "Paris Attacks Suspect Killed in Shootout Had Plotted Terror for 11 Months," *New York Times*, November 19, 2015.

PX717

ries ranging from $400 to $1,000 per month.[34] If true, this would be a dramatic break from the group's previous practices. However, new evidence has arrived that suggests that, in actuality, as with other practices, compensation practices have remained similar for more than a decade.

In an interview with the BBC in 2015, a captured senior member said that of the group's 50,000 core fighters, an "Iraqi fighter would be paid $65 [a month]. If married an additional $43 [and] for each child $22." A foreign fighter would not receive a wage, but would be "given food and housing, not money."[35] Further evidence has appeared suggesting that the Islamic State has been paying fighters "$50 a month, with an additional $50 for each wife, $35 for each child, $50 for each sex slave, $35 for each child of a sex slave, $50 for each dependent parent, and $35 each for other dependents."[36] These sums are in line with what fighters received in Anbar in 2005 to 2006 and Mosul in 2008, perhaps adjusting for inflation. There are other constants. Just as a fighter in Anbar governorate in 2005 to 2006 was to receive between $500 and $1,000 upon getting married,[37] indications are that fighters getting married in 2015 receive $500 to $1,500.[38] Again, this is close to previous practice.

Even with a flat salary structure, there was some uncertainty in our documents as to whether fighters were receiving additional amounts as rewards for performance. The prevailing pattern is that, for most fight-

---

[34] "Islamic State Group Sets Out First Budget, Worth $2bn," *Al-Araby al-Jadeed*, January 4, 2015; Sarah Birke, "How ISIS Rules," *The New York Review of Books*, December 9, 2014; Yaroslav Trofimov, "In Islamic State Stronghold of Raqqa, Foreign Fighters Dominate," *Wall Street Journal*, February 4, 2015; "ISIS Pays Foreign Fighters $1,000 a Month: Jordan King," *NBC News*, September 22, 2014.

[35] Heather Saul, "Senior ISIS Leader Gives Televised Interview Revealing Exactly How Group Amassed Its Fortune," *Independent*, April 22, 2015.

[36] Aymenn al-Tamimi, "A Caliphate Under Strain: The Documentary Evidence," *CTC Sentinel*, Vol. 9, No. 4, April 2016, p. 3.

[37] Harmony document MNFA-2007-000566; see "ISIL, Syria and Iraq Resources," 2015.

[38] Sarah El Deeb, "For an IS Fighter, a Paid Honeymoon in the Caliphate's Heart," Associated Press, May 26, 2015.

PX717

ers, individual salaries were, and likely still are, very low and are not adjusted for performance or risk.

This suggests that many fighters are not necessarily living well and that the group is largely able to maintain morale through appeals to ideology, through victories, and through intimidation. Conflicting reporting on the salaries paid by the Islamic State to its members means that we cannot disconfirm the possibility that, after its resurgence, the Islamic State adopted a substantial policy change on compensation. If we are right, however, this fact also suggests that causing a cutoff of salaries could harm morale within, and support for, the Islamic State for a failure to deliver on promises made to recruits. This could be even more damaging if combined with evidence that some leaders were embezzling money that could have been used to deliver on promises to support families of Islamic State members who were killed or detained and unable to receive support directly from the group.

Analysis of multiple sets of ISI master financial ledgers reveals that ISI did miss or delay salary payments to its members, usually during periods of aggressive and multifaceted operations to degrade the group's senior and midlevel leadership and to push the group out of territories where it had previously enjoyed strong control.

**Countering Finances**

Today, as it did from 2005 to 2010, the Islamic State raises money through what can be largely characterized as criminal activities.[39] These include oil sales and smuggling, sales of stolen goods, extortion, taxation, sales of looted antiquities, kidnapping for ransom, and even, for a time, taking a cut of the money Iraq sends to its employees in Islamic State territory.[40] Donations, as before, appear to constitute only a small portion of revenues. And that is the key point: What has characterized the group throughout its history and what appears to characterize the

---

[39] Shatz, 2014a.

[40] Financial Action Task Force, "Financing of the Terrorist Organisation Islamic State of Iraq and the Levant (ISIL)," February 2015. Iraq is reported to have cut off salary payments as of summer 2015, although this might have been only for Ninewa governorate, and not for Anbar governorate (Mirren Gidda, "ISIS Is Facing a Cash Crunch in the Caliphate," *Newsweek*, September 23, 2015).

group today is that it places a premium on local fundraising because that gives it maximum control. Fundraising also allows the group to look more like a state. Its taxation activities, including road tolls and export and import taxes, resemble what any state might do.

This means that control of territory will play an important role for the coalition, as will working with local and regional partners to develop better financial intelligence on the Islamic State. Short of territorial control—and even with territorial control—local fundraising means that halting financial flows will remain a challenge. But there are steps the coalition can take.[41]

Oil sales have been dealt a blow by the coalition's destruction of oil infrastructure and the recapture of some oil fields, but it still brings in considerable revenue. In addition, the Islamic State controls other resources, including gas fields and, as of May 2015, two Syrian phosphate mines.[42]

We note that the Islamic State might not be capitalizing directly from all the resources it owns. Even if it is not selling them, control of resources allows it to cut off funds that its enemies might have earned, primarily the legitimate government in Iraq or the Assad regime in Syria. Furthermore, control of resources allows the Islamic State to punish its enemies. In June 2015, an Islamic State embargo of fuel to rebel-held areas of Syria caused severe fuel shortages, harming hospitals, stopping ambulances from operating, and closing bakeries.[43] Even if the coalition cannot return resource flows and revenues to where they are most needed or to their rightful owners, there is still great value in stopping their use for revenue raising by the Islamic State.

Moving resources, such as oil, refined oil products, phosphates, and even antiquities, requires intermediaries and transport. To broaden

---

[41] Patrick B. Johnston, "Countering ISIL's Financing," testimony before the Committee on Financial Services, U.S. House of Representatives, Santa Monica, Calif.: RAND Corporation, CT-419, 2014.

[42] Ruth Sherlock, "ISIL Seizes Syrian Regime's Lucrative Phosphate Mines," *Telegraph*, May 27, 2015.

[43] Ben Hubbard, "ISIS-Imposed Fuel Embargo Threatens Syria's Medical Centers," *New York Times*, June 18, 2015b.

PX717

the fight against the Islamic State's revenues, the coalition will need to identify the intermediaries and end purchasers and either target them or sanction them and their financial institutions. It is unlikely that the Islamic State is using formal financial institutions. Therefore, greater efforts against informal financial institutions and other means of transferring cash may need to be taken.[44] But somewhere along the sales chain, a formal financial institution may be involved. Sanctioning an intermediary would mean blocking access to the formal financial system and requiring formal financial institutions not to deal with this intermediary. Sanctioning a formal financial institution will cut that institution off from the international financial system. Such sanctions have been effective in the past, and in this case, a wider net should be cast.

As for transport, oil, in particular, must move by trucks from Islamic State territory. These trucks will load at an oil field and, for larger trucks, will take specific roads. Given the amount of money the Islamic State is reportedly raising from oil sales, the coalition should elevate efforts to interdict oil transport. This could involve destroying loading points, destroying road entrances to oil fields or loading points, destroying the trucks themselves, or sending a very strong signal, backed with action, that driving an oil truck would be an extraordinarily risky occupation.

Finally, it might be the case that politicians or government officials, even of the anti–Islamic State coalition, are complicit in the oil trade. Any oil truck leaving the Islamic State territory must pass through checkpoints or border crossings and should be noticed or recorded. Further investigation into how such trucks are able to get through checkpoints is merited, and official complicity in this should be addressed.

There may be little that the coalition can do regarding other Islamic State funding sources, and stopping such sources could actually be counterproductive. For example, the fact that the group had been siphoning potentially hundreds of millions of dollars per year from the

---

[44] Patrick B. Johnston and Benjamin Bahney, "Opinion: Hit the Islamic State's Pocketbook," *Newsday*, October 5, 2014c.

salaries that the Iraqi government was paying its idled employees in Islamic State territory put the government in a bind. It could end payments to employees, effectively cutting off money to the Islamic State. But not only would that create a humanitarian problem, it would give the Islamic State a propaganda victory. The group could tell the largely Sunni recipients that the largely Shia government in Baghdad is abandoning them and that the Islamic State is their only protection. Or the Iraqi government could continue the payments and thereby fund the Islamic State's war effort.[45] In fact, the salary cutoff in Ninewa governorate has caused hardship.[46] Likewise, short of conquering territory that the Islamic State now holds, halting the group's taxation schemes will be difficult.

**Politics and Patience**

Local and regional military forces are now taking the fight directly to the Islamic State. But these forces certainly will need to be more effective to defeat the group, suggesting a strong role for a U.S. or allied advise-and-assist mission and for the provision of intelligence support.[47] Even with that help, there is some question as to whether the forces will ever be effective enough. As a result, there have been some calls for the commitment of U.S. ground troops.[48] Even if the effectiveness of local troops is increased, military action is necessary but not sufficient to defeat and destroy the Islamic State.

Any successful effort to destroy the group will involve political accommodation in which Sunni communities feel that they have a future in both Iraq and Syria. The Islamic State draws support, or at least grudging acceptance, from aggrieved Sunnis in both countries. In some ways, the Islamic State is testing the limits to which any gov-

---

[45] Howard J. Shatz, "Iraq Is Bankrolling ISIL," *Politico Magazine*, May 24, 2015.

[46] Isabel Coles, "Despair, Hardship as Iraq Cuts Off Wages in Islamic State Cities," Reuters, October 2, 2015.

[47] Patrick Johnston and Benjamin Bahney, "Obama's Iraq Dilemma," *U.S. News and World Report*, June 17, 2014a.

[48] David E. Johnson, "Fighting the 'Islamic State': The Case for U.S. Ground Forces," special commentary, *Parameters,* Vol. 45, No. 1, Spring 2015.

ernment can rule without some degree of popular support. Discontent and rebellion have been met with extreme brutality, such as when the Islamic State massacred about 600 members of the Albu Nimr tribe in Anbar governorate, Iraq, in October 2014.[49] But this resistance has continued in a variety of forms, including a clandestine assassination campaign against Islamic State personnel in Mosul in the summer of 2015.[50] Although it will be difficult to find fissures inside the group, capitalizing on any that do exist will be essential in any effort to defeat the Islamic State and to ensure that the group does not reemerge as it did in 2013 and 2014.[51] Although there is little chance that the Sunnis in Iraq, in particular, can ever return to the political dominance they enjoyed until the U.S.-led coalition invasion of 2003, some measure of political accommodation will be necessary to turn the Sunnis against the Islamic State.

Defeating the Islamic State will also require persistence. One of the as yet unanswered questions is the staying power of the Islamic State. A related question is whether it is financially sustainable under current battle conditions. So far, the group has given every indication that it is: Just one year after declaring the caliphate, it had more fighters and more territory and remained well financed; although it has lost territory since then, it may well have enough money to sustain its operations for years. Despite this, the record of counter-ISI operations from 2006 through 2010 shows that military action and political accommodation can work together to degrade the group, if not defeat it. Yet such gains can be extremely fragile and may require a longer-term commitment if they are to be sustained; this can be accomplished through investments that minimize the risk of a catastrophic reversal, such as that of the Islamic State of Iraq evolving into the Islamic State. It is incumbent on host-nation and regional leaders—with international help, if necessary—to ensure that long-term commitment.

---

[49] Alice Fordham, "Despite a Massacre by ISIS, an Iraqi Tribe Vows to Fight Back," *Morning Edition*, NPR, November 20, 2014.

[50] "Mosul Insurgents Challenge Islamic State Occupiers," *Iraq Oil Report*, July 22, 2015.

[51] Benjamin Bahney and Patrick Johnston, "Who Runs the Islamic State Group?" *U.S. News and World Report*, May 22, 2015.

PX717

# Captured Documents: Description, Methodology, and Analysis

This report is built around an analysis of more than 140 captured documents. Analyzing captured documents entails a number of methodological challenges. First, there are the sampling challenges involved in using the U.S. Department of Defense's Harmony database, the source of our documents. Second, there are the interpretive challenges that accompany any original source material. This appendix discusses each in turn. This discussion will help provide greater context for our findings and any uncertainties regarding them, and can serve as the basis for improving document exploitation methodology in the future.

## Sampling Challenges

All of our source documents were drawn from the Harmony database. The database contains more than 1 million documents captured by U.S. and allied forces during operations in Afghanistan, Iraq, and elsewhere. Roughly a quarter of these documents have been fully translated, and all are accompanied by metadata of varying quality, covering the circumstances of capture and nature of the documents. The documents run the gamut from strategic policy studies, to accounting reports, to membership lists, to technical training manuals, to draft ideological screeds, to letters between family members.

Using the Harmony data to develop a broad understanding of ISI's finances and managerial practices poses two different sampling

PX717

challenges. The first challenge is inherent to the database. Documents do not enter the database through a random sampling process. Rather, the documents in the larger database represent those documents whose custodians were either unlucky (e.g., they were arrested at a checkpoint or had their houses raided while in possession of key documents) or insufficiently careful (e.g., they buried USB drives, holding key documents, along with explosives that were found by an explosive ordnance disposal team). The documents in Harmony regarding ISI therefore might not be representative of all ISI documents produced in Iraq.

The second challenge is sampling the Harmony database in a systematic manner. One method we tried was to search via keyword in the metadata, but, unfortunately, the metadata accompanying the documents are not consistent or complete in terms of group designations, the level of detail provided in various fields, or the classification of documents by subject. We therefore searched the database for financial documents using snowball sampling on search terms found in particularly informative documents. Given this process, the documents we analyze do not represent a random sample of all ISI documents captured in Iraq from 2005 to 2010, much less a random sample of all ISI managerial documents produced during this period.

As with most archival research, the team tried to ensure that the documents used were representative of the broader data. Although we found it impossible to follow a formal sampling approach, the team, collectively, has significant experience and expertise working with the Harmony database and researching the conflicts in Iraq and ISI, and therefore has substantial expertise from which to judge the representativeness of the documents we used. Skeptical readers might adjust their confidence in our findings accordingly.

## Interpretive Challenges

In addition to sampling challenges, analyzing these documents presents a number of interpretive challenges. The first is that the translations of many of the Harmony documents were done quickly, in settings where getting information out rapidly for intelligence and operational pur-

PX717

poses took priority over complete accuracy. Wherever possible, we have tried to verify translations and ensure that mistranslations of subtle nuances do not drive our interpretation of documents. The translation issue should not be too concerning, however, because we focus almost entirely on the substantive content of the documents and on quantitative data developed from them.

The second interpretive challenge is that many of the documents do not include clear indications of the time and place they refer to or the context in which they were produced. This is particularly true for handwritten ledgers found at the small-unit level. The vast majority of the documents can be classified to the governorate and year level of aggregation, but classification below that level is often impossible. For many of the correspondence documents, full context is hard to parse. We often see one side of a conversation that is carried out with shorthand references to past events and have to infer the meaning from context and other declassified documents, such as the ones available through the CTC's Harmony Program.[1]

The third interpretive challenge is that the source documents often have errors. Salary fields, for example, are inconsistently entered by different ISI subunits. Sometimes ISI administrators broke down payments into salaries and reimbursables, and sometimes they failed to do so. Handwritten documents often contained illegible portions, and transcription errors are common in the source documents (adding extra zeros and the like). These kinds of errors are understandable. Presumably, few people joined ISI because of their penchant for impeccable paperwork. However, the errors at least partly obscure the relationship between what is recorded in the documents and what happened on the ground.

The fourth and final interpretive challenge is that the authors of the source documents often sought to obscure their activities, from adversaries, and sometimes from their own superiors. For the former, authors employed code words and ambiguous terms to refer to various activities. For the latter, we see the reporting net of the group's

---

[1]   These documents from the Harmony Program are available on the CTC's website (see www.ctc.usma.edu/programs-resources/harmony-program).

internal agency problems. For example, when a unit leader reported that a given fighter has six children, we cannot be certain whether that fighter actually had six children or whether he had fewer, allowing the unit leader a possible opportunity to pocket the extra allowances. The administrative emirs responsible for reporting such information could not always sort out such problems without further investigation, and there is some evidence that unit commanders took advantage of opportunities to exploit these principal-agent dilemmas. There is thus an unknown amount of measurement error in the documented data when it comes to such things as family structure, which may be correlated with unobserved factors—for example, how well an administrator knows the units operating in his territory.

Despite these challenges, the U.S. Department of Defense's Harmony data are a uniquely rich source of information on ISI and similar groups. Ours is the most extensive and transparent effort yet to use these data to understand the finances and management of ISI. We hope that other scholars will build on the rich data we analyze through their own work with the source documents.

## Documents and Data Sources

The data for this report were developed through a unique collaboration between the CTC (at West Point), the ESOC Project at Princeton, and the RAND Corporation. A team at RAND searched the Department of Defense's Harmony database for financial and organizational documents, as well as for militant correspondence and memorandums that provided context for the financial and organizational documents. The RAND team passed the documents it identified to the CTC, which worked with U.S. Special Operations Command to declassify them. Various data were then generated from the documents by the ESOC and RAND teams, including geospatial boundaries for ISI units and transaction-level records of salaries.

## Declassified Documents by Group, Topic, Year, and Governorate

A total of 158 documents were declassified for use in the present study. We focus on the 143 documents pertaining to ISI (Table A.1 and Figures A.1, A.2, and A.3). In addition to variation across time and space, the documents varied significantly in density. On average, each document contained 12 pages. Some were as short as one page, and one contained 468 pages.

## Violent Incident Data

Our data on the intensity of conflict come from incident-level information on 193,264 SIGACT reports by coalition forces. These reports capture a wide variety of information about "executed enemy attacks targeted against coalition, ISF, civilians, Iraqi infrastructure and government organizations" occurring between February 4, 2004, and February 24, 2009.[2] Unclassified data drawn from the MNF-I SIGACTS

**Table A.1**
**Number of Declassified Documents, by Group**

| Group | Documents |
|-------|-----------|
| ISI | 143 |
| Badr Corps | 2 |
| Jaish al-Mahdi | 10 |
| Jaish Rijal al-Tariqa al-Naqshbandiya | 3 |
| Total | 158 |

NOTES: ISI is the Sunni group we analyze in this document. The Badr Corps is a Shia group associated with the Islamic Supreme Council of Iraq (formerly the Supreme Council for Islamic Revolution in Iraq), a political party. Jaish al-Mahdi is a Shia group associated with political leader Muqtada al-Sadr. And Jaish Rijal al-Tariqa al-Naqshbandiya is a Sunni group at least loosely associated with the Naqshbandi Sufi order.

---

[2]  U.S. Department of Defense, *Measuring Stability and Security in Iraq,* Report to Congress in Accordance with the Department of Defense Appropriations Act 2008 (Section 9010, Public Law 109-289), Washington, D.C., June 2008. See also U.S. Government Accountability Office, *Military Operations: The Department of Defense's Use of Solatia and Condolence Payments in Iraq and Afghanistan*, Report to Congressional Requesters, Washington, D.C., GAO-07-699, May 2007.

**Figure A.1**
**Number of Declassified Documents, by Year**



NOTES: Each bar represents the total number of documents that were specifically dated during the year shown on the *x*-axis. For a number of documents, we can infer the year in which they were produced from context—for example, by names of unit commanders, signature blocks, and other references embedded in the documents. In addition, year refers to the year of the date listed on a given document or our best estimate of the year in which it was produced. Year does not refer to the year the document was declassified.
**RAND** *RR1192-A.1*

III Database were provided to the ESOC project in 2008 and 2009.[3] These data provide the location, date, time, and type of attack incidents but do not include any information pertaining to the coalition units involved, coalition casualties, or battle damage incurred. We filtered the data to remove the attacks we identified as being directed at civilians or other insurgent groups, leaving us with a sample of 168,730 attack incidents.[4] Depending on level of analysis, we aggregated these

---

[3]    Empirical Studies of Conflict Project, n.d.

[4]    We filter the attack data to focus on combat incidents, because they are systematically reported. Records of other kinds of violence suffer from various unknown reporting biases— for example, coalition forces would be more likely to produce SIGACT reports of militant attacks on civilians near major transit routes than in sparsely populated parts of Iraq, where the coalition had a smaller presence. In contrast, coalition forces were far more likely to

PX717

**Figure A.2**
**Number of Declassified Documents, by Subject**



NOTES: Each bar represents the number of the 158 declassified documents categorized according to the topics on the *x*-axis.
**RAND** *RR1192-A.2*

events yearly at the level of the governorate and the ISI-designated geographic unit.

It is useful to normalize measures of conflict by population density in some circumstances. We estimated the population of different areas using the fine-grained population data from LandScan, aggregated to the governorate or ISI unit level.[5]

## Constructed Data Sources

Drawing on the captured documents, we created data files on salary payments, personnel, and unit boundaries.

---

report significant activities in the areas in which they operated. We thank Lee Ewing for his suggestion to filter the SIGACT data to account for such reporting discrepancies.

[5]   Oak Ridge National Laboratory, "LandScan," web page, undated.

PX717

**Figure A.3**
**Number of Documents, by Governorate**



NOTE: Bars represent the total number of documents attributed to insurgent units located in the governorates shown on the *x*-axis.
RAND *RR1192-A.3*

## Salaries and Personnel

Salary data were compiled from numerous ISI documents that contained membership lists and information on each member's ISI unit, status (active versus killed or detained), marital status, number of children or overall dependents, and monthly salary and rent. These files limited the need for ISI to keep both payroll files of benefits to its members and a separate membership census, particularly when the group began to standardize its use of an assigned number that would uniquely identify each member. An example of information from such a document is shown in Figure A.4. We discuss these salary data extensively in Chapter Six, in which we examine the economics of ISI compensation practices.

In some documents, additional information on individual members was given. At times, this information was detailed. Some documents contain full-paragraph descriptions of certain militants who were joining or had joined the group. This level of documentation on certain members was made independent of the payroll lists, sometimes

PX717

**Figure A.4**
**Example of Salary Data for ISI Personnel**

| | Number | Alias | Marital Status | Number of Wives | Number of Children | Number of Dependents | Support | Rent | Comments | Residence |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1003 | Abu-Hudhayfah Na'im | Married | 1 | 3 | | 175 | 100 | | |
| 2 | 1005 | Abu-Nabil al-Suwaydi | Married | 1 | 8 | | 300 | | | Outside Mosul |
| | | | | | | | | | | |
| 39 | 1065 | Doctor Khalaf | Married | 1 | 5 | | 225 | 250 | Receives from Mosul | |
| 40 | 1068 | Abu-Da'wah | Single | | 5 | | 200 | | | Outside Mosul |
| 41 | 1069 | Umm-Anas | Married | 1 | 6 | | 250 | | | |
| 42 | 1073 | 'Ali Abu-Ibrahim | Married | 1 | 4 | | 200 | 125 | Does not have rent | |
| 43 | 1075 | Abu-Karam | Married | 1 | 5 | | 225 | 125 | Does not have rent | |
| | | | | | | | | | | |
| 55 | 1093 | Basir | Married | 1 | 8 | | 300 | 300 | | |
| 56 | 1094 | 'Ali | Married | 1 | 2 | | 150 | 300 | | |
| 57 | 1095 | 'Abbud | Married | 1 | 2 | | 150 | | | |
| 58 | 1096 | Lu'ay | Married | 1 | 2 | | 150 | 250 | | Outside Mosul |
| 59 | 1097 | Maher | Single | | | | 75 | 300 | Single | |
| | | | | | | | | | | |
| 72 | 1125 | Abu-'Ammar Husam | Married | 1 | | | 100 | 125 | Does not have rent | |
| 73 | 1142 | Family of Thamir | Married | 1 | 2 | | 150 | | | Outside Mosul |
| 74 | 1143 | Family of 'Amir | Married | 1 | 3 | | 175 | | | Outside Mosul |
| 75 | 1101 | Abu-'Amshah | Married | 1 | | | 100 | 150 | | |
| | | | | | | | | | | |
| 84 | 1131 | Abu-Du'a' | Married | 1 | 4 | | 200 | | | |
| | | | | | | | | | | |
| 86 | 1135 | Abu-Shahad | Married | 1 | 1 | | 125 | 125 | Does not have rent | |
| 87 | 1136 | Samir | Single | | 9 | | 300 | 150 | | |
| 88 | 1137 | Abu-Layth | Married | 1 | 6 | | 250 | 150 | | |
| 89 | 1139 | Abu-Yasin | Married | 1 | 2 | | 150 | 150 | | |
| 90 | 1140 | Abu-Mukhallis | Married | 1 | 1 | | 125 | 100 | | |
| 91 | 1145 | 'Adil Abu-'Umar | Married | 1 | 1 | | 125 | 230 | Does not have rent | |

SOURCE: Derived from Harmony document NMEC-2009-633789; see "ISIL, Syria and Iraq Resources," 2015.
NOTES: This document was discussed in Chapter Seven. The document was captured in February 2009 from a Ninewa administrative emir named Ahmed Zayd and most likely contains information from August 2008 through January 2009, his tenure in that position. It appears that the monthly salary ("Support") formula for members at this time and place was 75,000 Iraqi dinars per member, plus 25,000 per wife and 25,000 per child. No members listed had any dependents recorded. According to an earlier document, MNFA-2007-000566, dependents would have included parents, single sisters, and brothers under age 15. We assess as extremely likely that the Abu-Du'a appearing in line 84, number 1131, is Abu Bakr al-Baghdadi, the leader of the Islamic State.

RAND *RR1192-A.4*

PX717

in separate documents that read more like intelligence assessments of the backgrounds of key new recruits to the group or possibly existing al-Qaʿida members traveling to Iraq to join and support the group. Figure A.5 provides an example of a document in tabular format that contains more-detailed information on 17 ISI members, who were perhaps key individuals in the organization or the members of a certain cell. As an example, only three militants from the table are shown. But the remaining entries in the table were made in similar format and levels of detail. We examine such documents and data in detail in Chapter Five, which focuses on ISI's "human capital," particularly among the foreign fighters on whom the group appears to have collected the most-detailed information, as well as a set of more than 80 Iraqi ISI members on whom similar information was collected.

### Unit Boundaries

Finally, we constructed a geospatial data set of ISI sectors, or district boundaries, based on a document seized in a raid on the compound of ISI senior leader Abu Qaswarah. The document contains a description of the boundaries delineating 31 ISI sectors. Within ISI, sectors were an administrative level beneath the governorate level. They reported up the administrative chain of command to ISI officials responsible for overseeing all ISI sector-level subsidiaries.

Based on the document's description of ISI sector boundaries, we consulted with numerous subject-matter experts to overlay ISI's sector boundaries onto a standard shapefile map of Iraq, creating a spatial-polygon data set of ISI sectors. We then assigned other data on sector leadership and administration of ISI sectors to the spatial-polygon data set (referred to as a *spatial polygon dataframe* in R, the language in which we programmed the map), as well as other geospatial data of interest, including data from the MNF-I SIGACTS III database. We filtered the SIGACTS to a data set that included SIGACTS in 2008—the year the ISI sector-boundary document was most likely generated—and we joined the georeferenced SIGACTS as points on the ISI sector map to assess the extent to which ISI conducted attacks across its declared sectors, both unconditionally and conditional on its leadership and administrative presence in these areas. These data are described at length in Chapter Four.

PX717

**Figure A.5**
**Example of Detailed Documentation of ISI Personnel**

| No | Full name | Code | Alias | Date | Address | Passport | Skills | Guest house | Destination | Notes |
|----|-----------|------|-------|------|---------|----------|--------|-------------|-------------|-------|
| 1 | [Redacted] | ت غ\1<br><br>Tunis | Abu-'Abdallah | 2004/04/07 | [Redacted] | used with authorization | Fighter from Fallujah | Al-Himmah | | Strained left leg muscle in Fallujah-Pledged allegiance |
| 2 | [Redacted] | اس2<br>Syria | Abu-Khattab al-Basuni | 2004/11/05 | [Redacted] | Abu-Mazin | Administration experience - Training camp graduate | Al-Himmah | | |
| 3 | [Redacted] | اس3<br>Syria | Abu-'Abdallah | 2004/11/05 | [Redacted] | Abu-Mazin | Turkish language-Training camp graduate | Al-Himmah | | |

SOURCE: Harmony document NMEC-2007-633795; see "ISIL, Syria and Iraq Resources," 2015.
RAND *RR1192-A.5*

PX717

# Research on Covert and Clandestine Organizations

The literature drawing from primary data sources on individual and organizational changes in covert and clandestine organizations is limited, in large part because source information is difficult to obtain. The literature that exists focuses largely on street gangs rather than insurgent or terrorist organizations. Two studies have been able to track gang members over time to assess the economic and social fates of gang members in various ways.

In the first study, an economist and a sociologist collected data on 105 of 118 residents of one high-rise housing-project building in Chicago, retrospectively reconstructing in 2000 the economic and social histories of young men who spent their adolescence in the housing project during the early 1990s. The researchers carried out this reconstruction through the use of community contacts and self-reporting by many of the men who lived in the building, most of whom were then in their late twenties or early thirties. This approach enabled the researchers to study and compare the career paths of gang members and non–gang members from the building over nearly a decade. The researchers found in their follow-up survey that one-quarter of those in their sample were not employed in the legitimate sector and that those who reported income brought in 20 percent from illegal sources. They also found that the returns to education were quite large in the legiti-

PX717

mate sector. Physical strength was an important determinant of illegal income.[1]

A separate study focuses on the selection of youth into Brazilian favela (lower-income neighborhoods, or slums) drug-selling gangs, the occupational structure of favelas, and the typical "careers" of their members.[2] The researchers show, from a sample of Brazilian gang members surveyed in 2004, that gang members earned on average $300 per month, or about 23 percent more than other youth from the favelas, and typically worked more than ten hours a day. There were large risks associated with these jobs: More than half of those interviewed had participated in armed confrontations with rival gangs, and roughly two-thirds had participated in gunfights with the police. At the end of the two-year study period, 20 percent of the initial sample had died. Job characteristics varied according to occupation within the gang. For example, the risks were even larger for more-elite members in the drug-trafficking hierarchy. Members at the top of this hierarchy earned 90 percent more than members in entry-level occupations. They were, however, also 10 percentage points more likely to die within two years.[3]

No extant study drawing on primary sources has spanned the breadth and depth of a clandestine militant organization to the same extent as this one. This study should serve as a useful point of departure for further studies of ISI in its current incarnation as the Islamic State, or of other militant organizations.

---

[1]   Steven D. Levitt and Sudhir Alladi Venkatesh, "Growing Up in the Projects: The Economic Lives of a Cohort of Men Who Came of Age in Chicago Public Housing," *American Economic Review*, Vol. 91, No. 2, May 2001.

[2]   Leandro Carvalho and Rodrigo Reis Soares, *Living on the Edge: Youth Entry, Career and Exit in Drug-Selling Gangs*, Discussion Paper Series, Bonn: Institute for the Study of Labor, January 2013.

[3]   Carvalho and Soares, 2013, pp. 2–3.

PX717

# Compensation Documents List

Chapter Six explores the compensation patterns of ISI members, drawing data on 9,271 payments from 87 documents. Table C.1 provides the complete list of source documents.

**Table C.1**
**Number of Salary Payments, by Document**

| Document Number | Payments | Governorate |
|---|---|---|
| NMEC-2008-614685 | 1,327 | Ninewa |
| NMEC-2008-614687 | 1,070 | Ninewa |
| MNFV-2007-000322 | 590 | Diyala |
| NMEC-2009-633789 | 504 | Ninewa |
| NMEC-2008-614561 | 480 | Ninewa |
| NMEC-2008-617456 | 466 | Anbar |
| MNFV-2007-000378 | 368 | Anbar |
| JDECB-2008-002857 | 360 | Salah al-Din |
| NMEC-2007-633679 | 345 | Anbar |
| NMEC-2008-614563 | 332 | Anbar |
| NMEC-2008-614447 | 316 | Anbar |
| MNFA-2007-000562 | 275 | Anbar |
| MNFV-2007-000331 | 238 | Diyala |
| MNFV-2007-000379 | 235 | Diyala |

PX717

**Table C.1—Continued**

| Document Number | Payments | Governorate |
|---|---|---|
| MNFV-2007-000325 | 152 | Diyala |
| MNFV-2007-000327 | 152 | Diyala |
| MNFV-2007-000326 | 133 | Diyala |
| NMEC-2008-614562 | 118 | Anbar |
| MNFV-2007-000373 | 98 | Diyala |
| MNFV-2007-000328 | 97 | Diyala |
| NMEC-2007-632101 | 83 | Anbar |
| NMEC-2007-631819 | 75 | Anbar |
| NMEC-2007-000326 | 71 | Anbar |
| MNFV-2007-000330 | 67 | Diyala |
| MNFF-2008-002536 | 66 | Anbar |
| NMEC-2007-631687 | 62 | Anbar |
| MNFV-2007-000323 | 61 | Diyala |
| INFZ-2006-00012 | 59 | Salah al-Din |
| MNFV-2007-000332 | 56 | Diyala |
| MNFV-2007-000333 | 55 | Diyala |
| MNFT-2007-005311 | 52 | Salah al-Din |
| MNFT-2007-005312 | 48 | Salah al-Din |
| NMEC-2007-631494 | 48 | Anbar |
| NMEC-2007-658070 | 39 | Ninewa |
| NMEC-2008-614650 | 37 | Ninewa |
| NMEC-2007-631954 | 34 | Anbar |
| NMEC-2007-632448 | 33 | Anbar |
| NMEC-2007-657683 | 32 | Ninewa |
| NMEC-2007-657775 | 32 | Ninewa |
| NMEC-2007-657850 | 32 | Ninewa |

PX717

**Table C.1—Continued**

| Document Number | Payments | Governorate |
|---|---|---|
| NMEC-2007-657921 | 32 | Ninewa |
| NMEC-2007-657927 | 32 | Ninewa |
| NMEC-2008-614338 | 32 | Anbar |
| NMEC-2007-631750 | 31 | Anbar |
| MNFF-2008-002537 | 30 | Anbar |
| MNFV-2007-000344 | 28 | Diyala |
| NMEC-2008-614625 | 27 | Salah al-Din |
| NMEC-2008-614405 | 24 | Anbar |
| NMEC-2008-614422 | 24 | Anbar |
| NMEC-2007-632520 | 22 | Anbar |
| NMEC-2007-633559 | 21 | Anbar |
| MNFV-2007-000364 | 20 | Diyala |
| MNFV-2007-000484 | 20 | Diyala |
| MNFV-2007-000413 | 18 | Diyala |
| MNFV-2007-000336 | 16 | Diyala |
| NMEC-2008-614354 | 14 | Anbar |
| MNFV-2007-000324 | 13 | Diyala |
| MNFV-2007-000397 | 13 | Diyala |
| MNFV-2007-000414 | 13 | Diyala |
| MNFV-2007-000485 | 13 | Diyala |
| MNFV-2007-000478 | 12 | Diyala |
| MNFV-2007-000376 | 11 | Diyala |
| NMEC-2008-614545 | 11 | Anbar |
| MNFV-2007-000370 | 10 | Diyala |
| MNFV-2007-000438 | 10 | Diyala |
| NMEC-2008-614368 | 10 | Anbar |

PX717

**Table C.1—Continued**

| Document Number | Payments | Governorate |
| --- | --- | --- |
| MNFV-2007-000418 | 6 | Diyala |
| MNFV-2007-000435 | 6 | Diyala |
| MNFV-2007-000389 | 5 | Diyala |
| MNFV-2007-000424 | 5 | Diyala |
| MNFV-2007-000433 | 5 | Diyala |
| MNFV-2007-000481 | 5 | Diyala |
| MNFV-2007-000402 | 4 | Diyala |
| MNFV-2007-000428 | 4 | Diyala |
| MNFV-2007-000468 | 4 | Diyala |
| NMEC-2007-631571 | 4 | Anbar |
| MNFV-2007-000430 | 3 | Diyala |
| MNFV-2007-000459 | 3 | Diyala |
| MNFV-2007-000383 | 2 | Diyala |
| MNFV-2007-000422 | 2 | Diyala |
| MNFV-2007-000429 | 2 | Diyala |
| MNFV-2007-000461 | 1 | Diyala |
| MNFV-2007-000462 | 1 | Diyala |
| MNFV-2007-000463 | 1 | Diyala |
| MNFV-2007-000464 | 1 | Diyala |
| MNFV-2007-000465 | 1 | Diyala |
| MNFV-2007-000466 | 1 | Diyala |

PX717

# Abbreviations

| | |
|---|---|
| AQI | al-Qaʻida in Iraq |
| CTC | Combating Terrorism Center |
| ESOC | Empirical Studies of Conflict |
| IED | improvised explosive device |
| IRA | Irish Republican Army |
| ISF | Iraqi security forces |
| ISI | Islamic State of Iraq |
| ISIL | Islamic State in Iraq and the Levant |
| ISIS | Islamic State in Iraq and al-Sham |
| MNF-I | Multi-National Force–Iraq |
| MSC | Mujahidin Shura Council |
| SIGACT | significant activity |
| SOI | Sons of Iraq |

PX717

# References

Acemoglu, Daron, Simon Johnson, and James A. Robinson, "The Colonial Origins of Comparative Development: An Empirical Investigation," *American Economic Review*, Vol. 91, No. 5, 2001, pp. 1369–1401.

Adams, James, *The Financing of Terror*, New York: Simon and Schuster, 1986.

Adnan, Duraid, and Tim Arango, "Suicide Bomb Trainer in Iraq Accidentally Blows Up His Class," *New York Times*, February 10, 2014. As of June 17, 2015: http://www.nytimes.com/2014/02/11/world/middleeast/suicide-bomb-instructor-accidentally-kills-iraqi-pupils.html

al-Adnani, Abu Mohammad, "Indeed Your Lord Is Ever Watchful," speech, Al-Furqan Media Productions, September 22, 2014.

———, "Die in Your Rage!" Al-Furqan Media Productions, January 2015. As of May 2, 2015: https://pietervanostaeyen.files.wordpress.com/2015/01/al-adnani-say-die-in-your-rage.pdf

Aisch, Gregor, Joe Burgess, C. J. Chivers, Alicia Parlapiano, Sergio Peçanha, Archie Tse, Derek Watkins, and Karen Yourish, "How ISIS Works," *New York Times*, September 15, 2014.

Akerlof, George, "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," *The Quarterly Journal of Economics*, Vol. 84, No. 3, August 1970, pp. 88–500.

"Al-Furqan Media Wing Declares the Members of the Cabinet of the Islamic State of Iraq," Al-Furqan Media Wing, April 19, 2007.

Allam, Hannah, "Records Show How Iraqi Extremists Withstood U.S. Anti-Terror Efforts," *McClatchy News*, June 23, 2014.

AlMukhtar, Sarah, "ISIS Finances Are Strong," *New York Times*, May 19, 2015. As of May 19, 2015: http://www.nytimes.com/interactive/2015/05/19/world/middleeast/isis-finances.html

"Al-Qaeda in Iraq," *Jane's World Insurgency and Terrorism*, October 2013.

PX717

"Al Qaeda in Iraq Tightening Economic Grip on Mosul," *Albawaba Business*, May 3, 2011.

Anderson, John Ward, and Salih Dehima, "Offensive Targets Al-Qaeda in Iraq," *Washington Post*, July 20, 2007.

Anderson, Liam, and Gareth Stansfield, "The Implications for Federalism in Iraq: Toward a Five-Region Model," *Publius*, Vol. 35, No. 3, 2005, pp. 359–382.

"AQI's Swedish Emir," *Jane's Terrorism and Security Monitor*, October 27, 2008.

Arango, Tim, "Escaping Death in Northern Iraq: Video Feature: Surviving an ISIS Massacre," *New York Times*, September 3, 2014. As of June 28, 2015: http://www.nytimes.com/2014/09/04/world/middleeast/surviving-isis-massacre-iraq-video.html?_r=0

al-Badrani, Jamal, and Jim Loney, "Asiacell Building Bombed in Iraq City of Mosul," Reuters, February 3, 2012. As of June 11, 2014: http://in.reuters.com/article/2012/02/03/iraq-violence-asiacell-idINL5E8D32PK20120203

al-Baghdadi, Abu Umar, "Eulogy for the Martyr, Abu Qaswarah al Maghribi," English translation, October 2008. As of January 21, 2016: https://archive.org/stream/EulogyForTheMartyrAbuQaswaraAlMaghribi/Eulogy%20for%20the%20Martyr,%20Abu%20Qaswara%20al-Maghribi_djvu.txt

Bahney, Benjamin W., Radha K. Iyengar, Patrick B. Johnston, Danielle F. Jung, Jacob N. Shapiro, and Howard J. Shatz, "Insurgent Compensation: Evidence from Iraq," *American Economic Review*, Vol. 103, No. 3, 2013, pp. 518–522.

Bahney, Benjamin, and Patrick Johnston, "Who Runs the Islamic State Group?" *U.S. News and World Report*, May 22, 2015.

Bahney, Benjamin, Patrick B. Johnston, and Patrick Ryan, "The Enemy You Know and the Ally You Don't," *Foreign Policy*, June 23, 2015.

Bahney, Benjamin, Howard J. Shatz, Carroll Ganier, Renny McPherson, and Barbara Sude, *An Economic Analysis of the Financial Records of al-Qaʾida in Iraq*, Santa Monica, Calif.: RAND Corporation, MG-1026-OSD, 2010. As of August 22, 2015: http://www.rand.org/pubs/monographs/MG1026

Bairin, Pierre, and Mohammed Tawfeeq, "Military: Mastermind of Samarra Mosque Bombing Killed," CNN.com, August 6, 2007. As of August 22, 2015: http://www.cnn.com/2007/WORLD/meast/08/05/iraq.main

Baker, George, Michael Gibbs, and Bengt Holmstrom, "The Internal Economics of the Firm: Evidence from Personnel Data," *The Quarterly Journal of Economics*, Vol. 109, No. 4, November 1994, pp. 881–919.

PX717

Banuri, Sheheryar, and Philip Keefer, "Intrinsic Motivation, Effort and the Call to Public Service," Policy Research Working Paper 6729, World Bank, 2013. As of November 20, 2015:
http://www-wds.worldbank.org/external/default/WDSContentServer/WDSP/IB/2013/12/19/000158349_20131219132546/Rendered/PDF/WPS6729.pdf

Bassem, Wassim, "IS Massacre Leaves Families of Victims Stunned," trans. Sahar Ghoussoub, *Iraq Pulse*, Al-Monitor, August 28, 2014. As of June 28, 2015:
http://www.al-monitor.com/pulse/originals/2014/08/iraq-saladin-spiker-base-massacre-islamic-state.html#

Bendor, Jonathan, and Adam Meirowitz, "Spatial Models of Delegation," *American Political Science Review*, Vol. 98, No. 2, 2004, pp. 293–310.

Benotman, Noman, and Roisin Blake, *Jabhat al-Nusra: A Strategic Briefing*, London: Quilliam Foundation, January 2013. As of September 8, 2015:
http://www.quilliamfoundation.org/wp/wp-content/uploads/publications/free/jabhat-al-nusra-a-strategic-briefing.pdf

Berger, J. M., and Jonathon Morgan, *The ISIS Twitter Census: Defining and Describing the Population of ISIS Supporters on Twitter*, Washington, D.C.: Brookings Institution, U.S. Relations with the Islamic World, Analysis Paper No. 20, March 2015.

Berman, Eli, *Radical, Religious, and Violent: The New Economics of Terrorism*, Cambridge, Mass.: MIT Press, 2009.

Berman, Eli, Michael Callen, Joseph H. Felter, and Jacob N. Shapiro, "Do Working Men Rebel? Insurgency and Unemployment in Afghanistan, Iraq, and the Philippines," *Journal of Conflict Resolution*, Vol. 55, No. 4, 2011, pp. 496–528.

Berman, Eli, and David D. Laitin, "Religion, Terrorism, and Public Goods: Testing the Club Goods Model," *Journal of Public Economics*, Vol. 92, 2008, pp. 1942–1967.

Berman, Eli, Jacob N. Shapiro, and Joseph H. Felter, "Can Hearts and Minds Be Bought? The Economics of Counterinsurgency in Iraq," *Journal of Political Economy*, Vol. 119, No. 4, 2011, pp. 766–819.

Biddle, Stephen, Jeffrey A. Friedman, and Jacob N. Shapiro, "Testing the Surge: Why Did Violence Decline in Iraq in 2007?" *International Security*, Vol. 37, No. 1, 2012, pp. 7–40.

Birke, Sarah, "How ISIS Rules," *The New York Review of Books*, December 9, 2014. As of August 23, 2015:
http://www.nybooks.com/blogs/nyrblog/2014/dec/09/how-isis-rules/

Blanchard, Christopher M., *Al Qaeda: Statements and Evolving Ideology*, Washington, D.C.: Congressional Research Service, November 2004.

———, *Al Qaeda: Statements and Evolving Ideology*, Washington, D.C.: Congressional Research Service, updated July 2007.

PX717

Bradley, Gerry, and Brian Feeney, *Insider: Gerry Bradley's Life in the IRA*, Dublin: The O'Brien Press, 2009.

Braniff, Bill, and Assaf Moghadam, "Towards Global Jihadism: Al-Qaeda's Strategic, Ideological and Structural Adaptations Since 9/11," *Perspectives on Terrorism*, Vol. 5, No. 2, May 2011, pp. 36–49.

Bresnahan, Timothy, and Jonathan Levin, "Vertical Integration and Market Structure," in Robert Gibbons and David J. Roberts, eds., *Handbook of Organizational Economics*, Princeton, N.J.: Princeton University Press, 2012.

Bueno de Mesquita, Ethan, "Rebel Tactics," *Journal of Political Economy*, Vol. 121, No. 2, 2013, pp. 323–357.

Buettner, Russ, "Resentenced to Life in Prison, Terrorist Plans to Appeal," *New York Times*, April 23, 2013. As of June 16, 2015:
http://www.nytimes.com/2013/04/24/nyregion/
resentenced-to-life-in-prison-wadih-el-hage-plans-to-appeal.html

Bunzel, Cole, *From Paper State to Caliphate: The Ideology of the Islamic State*, Washington, D.C.: Brookings Institution, U.S. Relations with the Islamic World, Center for Middle East Public Policy, Analysis Paper No. 19, March 2015. As of June 28, 2015:
http://www.brookings.edu/~/media/research/files/papers/2015/03/
ideology-of-islamic-state-bunzel/the-ideology-of-the-islamic-state.pdf

Burke, Jason, *Al-Qaeda: The True Story of Radical Islam*, London: I.B. Tauris, 2004.

Bush, George W., "Transcript: President Bush Addresses Nation on Iraq War," January 10, 2007. As of November 20, 2015:
http://www.washingtonpost.com/wp-dyn/content/article/2007/01/10/
AR2007011002208.html

Cambanis, Thanassis, "In Mosul, Kurdish Militia Helps Keep Order," *Boston Globe*, November 18, 2004.

Carvalho, Leandro, and Rodrigo Reis Soares, *Living on the Edge: Youth Entry, Career and Exit in Drug-Selling Gangs*, Discussion Paper Series, Bonn: Institute for the Study of Labor, January 2013.

Cassman, Daniel, "Islamic Army in Iraq," Mapping Militant Organizations, Stanford University Center of International Security and Cooperation, 2010.

Central Bank of Iraq, *Key Financial Indicators*, Baghdad, updated regularly between September 2007 and January 2009. As of December 21, 2015:
http://www.cbi.iq/index.php?pid=Statistics

PX717

Central Organization for Statistics and Information Technology, Kurdistan Region Statistics Office, Nutrition Research Institute (Ministry of Health), and United Nations World Food Programme Iraq Country Office, *Comprehensive Food Security & Vulnerability Analysis (CFSVA): Iraq*, Rome: United Nations World Food Programme, 2008.

Central Organization for Statistics and Information Technology, Kurdistan Region Statistics Organization, and World Bank, *Iraq Household Socio-Economic Survey: IHSES—2007*, Baghdad, 2008. As of November 29, 2011: http://go.worldbank.org/GMS95L4VH0

Chai, Sun-Ki, "An Organizational Economics Approach to Anti-Government Violence," *Comparative Politics*, Vol. 26, No. 1, October 1993, pp. 99–110.

Chandler, Alfred D., *Strategy and Structure: Chapters in the History of the American Industrial Enterprise*, Cambridge, Mass.: MIT Press, 1969.

Clapper, James R., "Opening Statement to Worldwide Threat Assessment Hearing," Senate Armed Services Committee, Washington, D.C.: Office of the Director of National Intelligence, February 26, 2015. As of July 20, 2015: http://www.dni.gov/files/documents/2015%20WWTA%20As%20Delivered%20DNI%20Oral%20Statement.pdf

Cocks, Tim, "U.S. Says Troops May Have to Stay in Iraq's Mosul," Reuters, May 1, 2009.

Coles, Isabel, "Despair, Hardship as Iraq Cuts Off Wages in Islamic State Cities," Reuters, October 2, 2015.

Combelles Siegel, Pascale, "Islamic State of Iraq Commemorates Its Two-Year Anniversary," *CTC Sentinel*, Vol. 1, No. 11, October 2008, pp. 5–7. As of August 23, 2015: https://www.ctc.usma.edu/posts/islamic-state-of-iraq-commemorates-its-two-year-anniversary

Condra, Luke N., and Jacob N. Shapiro, "Who Takes the Blame? The Strategic Effects of Collateral Damage," *American Journal of Political Science*, Vol. 56, No. 1, 2012, pp. 167–187.

Connable, Alfred B., interview, in Timothy S. McWilliams and Kurtis P. Wheeler, eds., *Al Anbar Awakening: Volume I, American Perspectives—U.S. Marines and Counterinsurgency in Iraq, 2004–2009*, Quantico, Va.: Marine Corps University Press, 2009, pp. 120–137.

Coogan, Tim Pat, *The I.R.A.*, 5th ed., London: HarperCollins, 2000.

Cooley, Alexander, *Logics of Hierarchy: Problems of Organization in Empires, States, and Military Occupations*, Ithaca, N.Y.: Cornell University Press, 2005.

Cordesman, Anthony, *Iraqi Security Forces: A Strategy for Success*, Westport, Conn.: Praeger Security International, 2006.

PX717

Crenshaw, Martha, "1920s Revolution Brigades," Mapping Militant Organizations, Stanford University Center of International Security and Cooperation, 2010.

Dagher, Sam, "Al Qaeda Goes North: Police Chief Killed in Mosul," *Christian Science Monitor*, January 25, 2008a.

———, "Fractures in Iraq City as Kurds and Baghdad Vie," *New York Times*, October 28, 2008b.

———, "Tensions Stoked Between Iraqi Kurds and Sunnis," *New York Times*, May 18, 2009.

Daly, John C. K., "Operation Inherent Resolve: The War Against Islamic State's Oil Network," *Terrorism Monitor*, Vol. 13, No. 1, January 9, 2015. As of June 29, 2015:
http://www.jamestown.org/programs/tm/single/
?tx_ttnews%5Btt_news%5D=43381&cHash=
ecee37e41dbbe3745cfda06ecec08d5f#.VZGKiPlViko

Davis, Craig, "Reinserting Labor into the Iraqi Ministry of Labor and Social Affairs," *Monthly Labor Review*, Vol. 128, No. 6, 2005, pp. 53–61.

Dixit, Avinash K., *Lawlessness and Economics: Alternative Modes of Governance*, Princeton, N.J.: Princeton University Press, 2007.

Dodwell, Brian, Daniel Milton, and Don Rassler, *The Caliphate's Global Workforce: An Inside Look at the Islamic State's Foreign Fighter Paper Trail*, West Point, N.Y.: Combating Terrorism Center, West Point, April 18, 2016. As of May 2, 2016:
https://www.ctc.usma.edu/posts/the-caliphates-global-workforce-an-inside-look-at-the-islamic-states-foreign-fighter-paper-trail

Duffy, Michael, and Mark Kukis, "The Surge at Year One," *Time*, January 31, 2008.

Education for All Global Monitoring Report, *Regional Fact Sheet: Education in the Arab States*, Paris: UNESCO, January 2013.

Edwards, Sean J. A., *Swarming on the Battlefield: Past, Present, and Future*, Santa Monica, Calif.: RAND Corporation, MR-1100-OSD, 2000. As of August 23, 2015:
http://www.rand.org/pubs/monograph_reports/MR1100

Eisenstadt, Michael, and Jeffrey White, *Assessing Iraq's Sunni Arab Insurgency*, Washington, D.C.: Washington Institute for Near East Policy, Policy Focus No. 50, December 2005.

El Deeb, Sarah, "For an IS Fighter, a Paid Honeymoon in the Caliphate's Heart," Associated Press, May 26, 2015.

PX717

Empirical Studies of Conflict Project, "ESOC Iraq Civil War Dataset (Version 3)," Princeton, N.J.: Princeton University, n.d. As of January 21, 2016: https://esoc.princeton.edu/files/esoc-iraq-civil-war-dataset-version-3

al-Fadl, Jamal, testimony in *United States v. Usama bin Laden*, No. S(7) 98 Cr. 1023 (S.D. N.Y.), February 6, 2001.

Farrall, Leah, "How Al Qaeda Works: What the Organization's Subsidiaries Say About Its Strength," *Foreign Affairs*, Vol. 90, No. 2, March/April 2011.

Faucon, Benoit, and Margaret Coker, "The Rise and Deadly Fall of Islamic State's Oil Tycoon," *Wall Street Journal*, April 24, 2016. As of May 2, 2016: http://www.wsj.com/articles/the-rise-and-deadly-fall-of-islamic-states-oil-tycoon-1461522313

Fearon, James D., "Iraq's Civil War," *Foreign Affairs*, Vol. 86, No. 2, March/April 2007, pp. 2–13.

———, *Governance and Civil War Onset*, Washington, D.C.: World Bank, World Development Report Background Paper, August 2011.

Fearon, James, and David D. Laitin, "Explaining Interethnic Cooperation," *American Political Science Review*, Vol. 90, No. 4, 1996, pp. 715–735.

———, "Ethnicity, Insurgency, and Civil War," *American Political Science Review*, Vol. 97, No. 1, 2003, pp. 75–90.

Felter, Joseph, and Brian Fishman, *Al-Qaʿida's Foreign Fighters in Iraq: A First Look at the Sinjar Records*, West Point, N.Y.: Combating Terrorism Center, West Point, 2007.

Few, Mike, "The Break Point: AQIZ Establishes the ISI in Zaganiyah," *Small Wars Journal*, April 17, 2008.

Financial Action Task Force, "Financing of the Terrorist Organisation Islamic State of Iraq and the Levant (ISIL)," February 2015. As of August 25, 2015: http://www.fatf-gafi.org/topics/methodsandtrends/documents/financing-of-terrorist-organisation-isil.html

Fishman, Brian, "After Zarqawi: The Dilemmas and Future of Al Qaeda in Iraq," *The Washington Quarterly*, Vol. 29, No. 4, 2006, pp. 19–32.

———, *Fourth Generation Governance—Sheikh Tamimi Defends the Islamic State in Iraq*, West Point, N.Y.: Combating Terrorism Center, West Point, May 23, 2007. As of August 25, 2015: https://www.ctc.usma.edu/posts/fourth-generation-governance-sheikh-tamimi-defends-the-islamic-state-of-iraq

———, ed., *Bombers, Bank Accounts, and Bleedout: Al-Qaʿida's Road in and out of Iraq*, West Point, N.Y.: Combating Terrorism Center, West Point, 2008.

———, *Dysfunction and Decline: Lessons Learned from Inside al-Qa`ida in Iraq*, Harmony Project, West Point, N.Y.: Combating Terrorism Center, West Point, March 16, 2009.

———, "Redefining the Islamic State: The Fall and Rise of Al-Qaeda in Iraq," New America Foundation, August 2011. As of August 25, 2015: https://www.newamerica.org/international-security/redefining-the-islamic-state/

———, "Syria Proving More Fertile Than Iraq to al-Qa'ida's Operations," *CTC Sentinel*, November 26, 2013.

———, "The Islamic State: A Persistent Threat," prepared testimony to the House Armed Services Committee, July 29, 2014. As of August 25, 2015: https://www.newamerica.org/downloads/IS_testimony_islamic_state.pdf

Flanigan, Shawn Teresa, "Nonprofit Service Provision by Insurgent Organizations: The Cases of Hizballah and the Tamil Tigers," *Studies in Conflict and Terrorism*, Vol. 31, No. 6, 2008, pp. 499–519.

Fordham, Alice, "Despite a Massacre by ISIS, an Iraqi Tribe Vows to Fight Back," *Morning Edition*, NPR, November 20, 2014. As of July 28, 2015: http://www.npr.org/sections/parallels/2014/11/20/364942169/despite-a-massacre-by-isis-an-iraqi-tribe-vows-to-fight-back

Forest, James J. F., Jarret Brachman, and Joseph Felter, *Harmony and Disharmony: Exploiting al-Qa'ida's Organizational Vulnerabilities*, West Point, N.Y.: Combating Terrorism Center, West Point, 2006.

Gambill, Gary, "Abu Musab al-Zarqawi: A Biographical Sketch," *Jamestown Terrorism Monitor*, Vol. 2, No. 24, December 2004. As of August 25, 2015: http://www.jamestown.org/single/?tx_ttnews[tt_news]=27304#.Vdzx0SSyPWY

Gartenstein-Ross, Daveed, "How Many Fighters Does the Islamic State Really Have?" *War on the Rocks*, February 9, 2015. As of June 29, 2015: http://warontherocks.com/2015/02/how-many-fighters-does-the-islamic-state-really-have/

Gibbons, Robert, "Four Formal(izable) Theories of the Firm?" *Journal of Economic Behavior and Organization*, Vol. 58, No. 2, 2005, pp. 200–245.

Gidda, Mirren, "ISIS Is Facing a Cash Crunch in the Caliphate," *Newsweek*, September 23, 2015. As of November 20, 2015: http://europe.newsweek.com/isis-are-facing-cash-crunch-caliphate-333422

Glover, James M., *Northern Ireland: Future Terrorist Trends*, London: UK Ministry of Defence, 1978.

Gordon, Michael R., "Pushed Out of Baghdad Area, Insurgents Seek Hub in North," *New York Times*, December 5, 2007.

PX717

———, "Archive of Captured Enemy Documents Closes," *New York Times*, June 21, 2015. As of June 28, 2015:
http://www.nytimes.com/2015/06/22/world/middleeast/
archive-of-captured-terrorist-qaeda-hussein-documents-shuts-down.html

Gordon, Michael R., and Eric Schmitt, "U.S. Steps Up Its Attacks on ISIS-Controlled Oil Fields in Syria," *New York Times,* November 12, 2015.

Griffin, Jennifer, "Zarqawi Map Aided Successes Against Iraqi Insurgency," *Fox News*, November 21, 2007.

Gunaratna, Rohan, and Aviv Oreg, "Al Qaeda's Organizational Structure and Its Evolution," *Studies in Conflict & Terrorism*, Vol. 33, No. 12, 2010, pp. 1043–1073.

"Gun Safety, Self Defense, and Road Marches—Finding an ISIS Training Camp," *Bellingcat*, August 22, 2014. As of June 17, 2015:
https://www.bellingcat.com/resources/case-studies/2014/08/22/
gun-safety-self-defense-and-road-marches-finding-an-isis-training-camp/

Gutiérrez Sanín, Francisco, and Antonio Giustozzi, "Networks and Armies: Structuring Rebellion in Colombia and Afghanistan," *Studies in Conflict & Terrorism*, Vol. 33, No. 9, 2010, pp. 836–853.

Hafez, Mohammed, "Suicide Terrorism in Iraq: A Preliminary Assessment of the Quantitative Data and Documentary Evidence," *Studies in Conflict and Terrorism*, Vol. 29, No. 6, 2006, pp. 591–619.

———, *Suicide Bombers in Iraq: The Strategy and Ideology of Martyrdom*, Washington, D.C.: United States Institute of Peace, 2007.

———, "Jihad After Iraq: Lessons from the Arab Afghans," *Studies in Conflict and Terrorism*, Vol. 32, No. 2, February 2009, pp. 73–94.

Hamilton, Eric, "The Fight for Mosul: March 2003–March 2008," Institute for the Study of War, April 2008a.

———, "Expanding Security in Diyala," Institute for the Study of War, August 2008b.

———, "The Fight for Mosul," Iraq Report VIII, *The Weekly Standard*, 2008c.

"Harmony Program," database of declassified documents, Combating Terrorism Center, 2015. As of November 20, 2015:
https://www.ctc.usma.edu/programs-resources/harmony-program

al-Hashimi, Hisham, and Telegraph Interactive Team, "Revealed: The Islamic State 'Cabinet,' from Finance Minister to Suicide Bomb Deployer," *Telegraph*, July 9, 2014. As of June 29, 2015:
http://www.telegraph.co.uk/news/worldnews/middleeast/iraq/10956193/Revealed-the-Islamic-State-cabinet-from-finance-minister-to-suicide-bomb-deployer.html

PX717

Hassan, Hassan, "The Secret World of ISIS Training Camps—Ruled by Sacred Texts and the Sword," *Guardian*, January 24, 2015. As of June 17, 2015: http://www.theguardian.com/world/2015/jan/25/inside-isis-training-camps

Hegghammer, Thomas, *Jihad in Saudi Arabia: Violence in Pan-Islamism Since 1979*, Cambridge, UK: Cambridge University Press, 2010.

———, "The Rise of Muslim Foreign Fighters," *International Security*, Vol. 35, No. 3, Winter 2010–2011, pp. 53–94.

Helfstein, Scott, "Governance of Terror: New Institutionalism and the Evolution of Terrorist Organizations," *Public Administration Review*, Vol. 69, No. 4, 2009, pp. 727–739.

Hendrix, Cullen S., "Measuring State Capacity: Theoretical and Empirical Implications for the Study of Civil Conflict," *Journal of Peace Research*, Vol. 47, No. 3, May 2010, pp. 273–285.

Hertling, Mark, U.S. Department of Defense news briefing, video teleconference from Iraq, November 19, 2007. As of November 20, 2015: http://www.globalsecurity.org/military/library/news/2007/11/mil-071119-dod01.htm

Higgins, Andrew, and Kimiko de Freytas-Tamuranov, "Paris Attacks Suspect Killed in Shootout Had Plotted Terror for 11 Months," *New York Times*, November 19, 2015.

"History of the Shrine of Imam Ali Al-Naqi and Imam Hasan Al-Askari," Al-Islam.org, n.d. As of August 18, 2014: http://www.al-islam.org/history-shrines/history-shrine-imam-ali-al-naqi-imam-hasan-al-askari-peace-be-upon-them

Hoffman, Bruce, "The Changing Face of Al Qaeda and the Global War on Terrorism," *Studies in Conflict & Terrorism*, Vol. 27, No. 6, 2004, pp. 549–560.

———, "The Myth of Grass-Roots Terrorism: Why Osama Bin Laden Still Matters," *Foreign Affairs*, Vol. 87, No. 3, July/August 2008.

Horgan, John, and Max Taylor, "The Provisional Irish Republican Army: Command and Functional Structure," *Terrorism and Political Violence*, Vol. 9, No. 3, 1997, pp. 1–32.

———, "Playing the Green Card: Financing the Provisional IRA—Part 2," *Terrorism and Political Violence*, Vol. 15, No. 2, 2003, pp. 1–60.

Hubbard, Ben, "Offering Services, ISIS Digs Deeper in Seized Territories," *New York Times*, June 16, 2015a.

———, "ISIS-Imposed Fuel Embargo Threatens Syria's Medical Centers," *New York Times*, June 18, 2015b. As of June 29, 2015: http://www.nytimes.com/2015/06/19/world/middleeast/isis-imposed-fuel-embargo-threatens-syrias-medical-centers.html?_r=0

PX717

Human Rights Council, *Report of the Independent International Commission of Inquiry on the Syrian Arab Republic*, Geneva: United Nations General Assembly, A/HRC/27/60, August 13, 2014. As of June 17, 2015:
http://www.ohchr.org/Documents/HRBodies/
HRCouncil/CoISyria/A.HRC.27.60_Eng.pdf

"In Iraq's Mosul, Pay Qaeda Tax or Pay the Price," *Middle East Online*, September 15, 2011.

International Crisis Group, *In Their Own Words: Reading the Iraqi Insurgency*, Amman, Middle East Report No. 50, 2006.

"Iraq: Al-Qaeda Extorting Businesses in Mosul," *Asharq al-Awsat*, September 9, 2010.

"Iraqis' 'Cruel Dilemma': Pay Qaeda Tax or Pay the Price," Agence France-Presse, September 14, 2011.

"ISIL, Syria and Iraq Resources," database of declassified documents, Combating Terrorism Center, 2015. As of September 2, 2015:
https://www.ctc.usma.edu/isil-resources
[These documents are contained within the broader "Harmony Program," database of declassified documents, Combating Terrorism Center, 2015. As of January 5, 2016:
https://www.ctc.usma.edu/programs-resources/harmony-program]

"ISIS Pays Foreign Fighters $1,000 a Month: Jordan King," *NBC News*, September 22, 2014. As of June 29, 2015:
http://www.nbcnews.com/storyline/isis-terror/
isis-pays-foreign-fighters-1-000-month-jordan-king-n209026

"Islamic State Group Sets Out First Budget, Worth $2bn," *Al-Araby al-Jadeed*, January 4, 2015. As of August 25, 2015:
http://www.alaraby.co.uk/english/news/2015/1/4/
islamic-state-group-sets-out-first-budget-worth-2bn

Johnson, David E., "Fighting the 'Islamic State': The Case for U.S. Ground Forces," special commentary, *Parameters*, Vol. 45, No. 1, Spring 2015, pp. 7–17.

Johnston, Patrick B., "The Geography of Insurgent Organization and Its Consequences for Civil Wars: Evidence from Liberia and Sierra Leone," *Security Studies*, Vol. 17, No. 1, 2008, pp. 107–137.

———, "Countering ISIL's Financing," testimony before the Committee on Financial Services, U.S. House of Representatives, Santa Monica, Calif.: RAND Corporation, CT-419, 2014. As of August 25, 2015:
http://www.rand.org/pubs/testimonies/CT419

Johnston, Patrick, and Benjamin Bahney, "Obama's Iraq Dilemma," *U.S. News and World Report*, June 17, 2014a.

PX717

———, "Hitting ISIS Where It Hurts: Disrupt ISIS's Cash Flow in Iraq," *New York Times*, August 13, 2014b.

———, "Opinion: Hit the Islamic State's Pocketbook," *Newsday*, October 5, 2014c.

Jones, Candace, William S. Hesterly, and Stephen P. Borgatti, "A General Theory of Network Governance," *The Academy of Management Review*, Vol. 22, No. 4, October 1997, pp. 911–945.

Jones, Seth G., *A Persistent Threat: The Evolution of al Qaʿida and Other Salafi Jihadists*, Santa Monica, Calif.: RAND Corporation, RR-637-OSD, 2014. As of August 25, 2015:
http://www.rand.org/pubs/research_reports/RR637

Jones, Seth G., and Martin Libicki, *How Terrorist Groups End: Lessons for Countering al Qaʿida*, Santa Monica, Calif.: RAND Corporation, MG-741-1-RC, 2008. As of August 25, 2015:
http://www.rand.org/pubs/monographs/MG741-1

Jung, Danielle F., Jacob N. Shapiro, Jon Wallace, and Pat Ryan, *Managing a Transnational Insurgency: The Islamic State of Iraq's "Paper Trail," 2005–2010*, Occasional Paper Series, Harmony Program, West Point, N.Y.: Combating Terrorism Center, West Point, December 15, 2014. As of August 25, 2015:
https://www.ctc.usma.edu/posts/managing-a-transnational-insurgency-the-islamic-state-of-iraqs-paper-trail-2005-2010

Kagan, Kimberly, "The Battle for Diyala," Iraq Report IV, *The Weekly Standard*, 2007a.

———, "Securing Diyala," Iraq Report VII, *The Weekly Standard*, 2007b.

———, "Expanding Security in Diyala," Iraq Report X, *The Weekly Standard*, 2008.

Kami, Aseel, and Michael Christie, "Al Qaeda's Iraq Network Replaces Slain Leaders," Reuters, May 16, 2010.

Kaufmann, Chaim, "A Security Dilemma: Ethnic Partitioning in Iraq," *Harvard International Review*, Vol. 28, No. 4, 2007, pp. 44–63.

Keller, Andrew, "Documenting ISIL's Antiquities Trafficking: The Looting and Destruction of Iraqi and Syrian Cultural Heritage; What We Know and What Can Be Done," remarks at the Metropolitan Museum of Art, New York, U.S. Department of State, September 29, 2015. As of December 28, 2015:
http://www.state.gov/e/eb/rls/rm/2015/247610.htm

Kilcullen, David J., "Field Notes on Iraq's Tribal Revolt Against Al-Qaʿida," *CTC Sentinel*, Vol. 1, No. 11, 2008, pp. 1–5.

Kirdar, M. J., *Al Qaeda in Iraq*, Washington, D.C.: Center for Strategic and International Studies, AQAM Futures Project Case Study Series, June 2011.

PX717

Knack, Stephen, and Philip Keefer, "Institutions and Economic Performance: Cross-Country Tests Using Alternative Institutional Measures," *Economics and Politics*, Vol. 7, No. 3, 1995, pp. 207–227.

Knights, Michael, "Al-Qaʻida in Iraq: Lessons from the Mosul Security Operation," *CTC Sentinel*, Vol. 1, No. 7, June 2008a.

———, "Pursuing Al-Qaʻida into Diyala Province," *CTC Sentinel*, Vol. 1, No. 9, August 2008b.

Kohlmann, Evan F., *State of the Sunni Insurgency in Iraq: August 2007*, New York: The NEFA Foundation, 2007.

Kreps, David M., "Corporate Culture and Economic Theory," in James Alt and Kenneth Shepsle, eds., *Rational Perspectives on Political Science*, Cambridge, UK: Cambridge University Press, 1990a, pp. 90–143.

———, *A Course in Microeconomic Theory*, Princeton, N.J.: Princeton University Press, 1990b.

Kuehl, Dale C., *Unfinished Business: The Sons of Iraq and Political Reconciliation*, Carlisle, Pa.: U.S. Army War College, Strategy Research Paper, March 2010.

Lamb, Christopher, and Evan Munsing, *Secret Weapon: High-Value Target Teams as an Organizational Innovation*, Washington, D.C.: Institute for National Strategic Studies, National Defense University, Strategic Perspectives 4, 2011.

Lavetti, Kurt J., "The Estimation of Compensating Differentials and Preferences for Occupational Fatality Risk," unpublished manuscript, Ohio State University, 2012.

Lazear, Edward P., "Personnel Economics: Past Lessons and Future Directions: Presidential Address to the Society of Labor Economists, San Francisco, May 1, 1998," *Journal of Labor Economics*, Vol. 17, No. 2, 1999, pp. 199–236.

Levitt, Steven D., and Sudhir Alladi Venkatesh, "An Economic Analysis of a Drug-Selling Gang's Finances," *Quarterly Journal of Economics*, Vol. 115, No. 3, 2000, pp. 755–788.

———, "Growing Up in the Projects: The Economic Lives of a Cohort of Men Who Came of Age in Chicago Public Housing," *American Economic Review*, Vol. 91, No. 2, May 2001, pp. 79–84.

Londono, Ernesto, "No. 2 Leader of Al-Qaeda in Iraq Killed," *Washington Post*, October 16, 2008.

Long, Austin, "The Anbar Awakening," *Survival*, Vol. 50, No. 2, April–May 2008, pp. 67–94.

Lynch, Rick, weekly press briefing, Multi-National Force–Iraq, May 4, 2006.

Malas, Nour, "Iraqi City of Mosul Transformed a Year After Islamic State Capture," *Wall Street Journal*, June 9, 2015.

PX717

Malet, David, "Foreign Fighter Mobilization and Persistence in a Global Context," *Terrorism and Political Violence*, Vol. 27., No. 3, 2015, pp. 454–473.

Malkasian, Carter, "Counterinsurgency in Iraq: May 2003–January 2007," in Daniel Marston and Carter Malkasian, eds., *Counterinsurgency in Modern Warfare*, New York: Osprey Publishing, 2008, pp. 241–258.

Manwaring, Max G., and John T. Fishel, "Insurgency and Counter-Insurgency: Toward a New Analytical Approach," *Small Wars & Insurgencies*, Vol. 3, No. 3, 1992, pp. 272–310.

McChrystal, Stanley, *My Share of the Task: A Memoir*, New York: Portfolio/ Penguin, 2013.

McDonald, Henry, and Jim Cusack, *UDA: Inside the Heart of Loyalist Terror*, Dublin: Penguin Ireland, 2004.

McGurk, Brett, "Al-Qaeda's Resurgence in Iraq: A Threat to U.S. Interests," testimony to the House Foreign Affairs Committee, February 5, 2014. As of April 7, 2014:
http://www.state.gov/p/nea/rls/rm/221274.htm

———, "Iraq at a Crossroads: Options for U.S. Policy," statement for the record, Senate Foreign Relations Committee hearing, July 24, 2014. As of June 17, 2015:
http://www.foreign.senate.gov/imo/media/doc/ McGurk%20Testimony%20072414-Final%20Version%20REVISED.pdf

Mendelsohn, Barak, "Al-Qaeda's Franchising Strategy," *Survival*, Vol. 53, No. 3, 2011, pp. 41–46.

Miller, Gary J., *Managerial Dilemmas: The Political Economy of Hierarchy*, New York: Cambridge University Press, 1992.

MNF-I—*See* Multi-National Force–Iraq.

Moghadam, Assaf, "How Al Qaeda Innovates," *Security Studies*, Vol. 22, No. 3, 2013, pp. 466–497.

"Mosul Insurgents Challenge Islamic State Occupiers," *Iraq Oil Report*, July 22, 2015.

Multi-National Corps–Iraq, *Money as a Weapons System (MAAWS)*, MNC-I CJ8 SOP, January 2009. As of August 26, 2015:
http://publicintelligence.net/money-as-a-weapon-system-maaws/

Multi-National Division–North Public Affairs, "Operation Raider Reaper Concludes with Tribal Reconciliation," Army.mil, December 31, 2007. As of November 20, 2015:
http://www.army.mil/article/6808/ Operation_Raider_Reaper_Concludes_With_Tribal_Reconciliation/

PX717

Multi-National Force–Iraq, "IA, CF Units Clear Jabouri Peninsula of Terrorists," press release 20070217-12, Multi-National Division–North Public Affairs Office, February 17, 2007a.

———, "Tribal Leaders Continue Reconciliation Efforts Across Diyala," press release, Multi-National Division–North Public Affairs Office, August 4, 2007b.

———, "Coalition Forces Target Foreign Terrorist Facilitators, 11 Detained," press release A071213a, December 13, 2007c.

———, "Al-Qaʻida in Iraqʼs Number Two Leader Killed," press release, October 15, 2008.

"Nasir al-Wuhayshi: From Bin Laden Aide to AQAP Chief," *VOA News*, June 16, 2015. As of June 16, 2015:
http://www.voanews.com/content/
nasir-al-wuhayshi-rose-from-bin-laden-aide-to-aqap-chief/2824280.html

National Commission on Terrorist Attacks upon the United States, "Overview of the Enemy," Staff Statement No. 15, 2004. As of August 26, 2015:
http://govinfo.library.unt.edu/911/staff_statements/staff_statement_15.pdf

Neumann, Peter, Ryan Evans, and Raffaello Pantucci, "Locating Al Qaedaʼs Center of Gravity: The Role of Middle Managers," *Studies in Conflict & Terrorism*, Vol. 34, No. 11, 2011, pp. 825–842.

Nordland, Rod, "Exceptions to Iraq Deadline Are Proposed," *New York Times*, April 27, 2009.

Norman, Jane, "Islamic State Recruiting 'Highly Trained Professionals' to Manufacture Chemical Weapons, Julie Bishop Warns," *ABC (Australia)*, June 6, 2015. As of June 29, 2015:
http://www.abc.net.au/news/2015-06-06/
is-recruiting-professionals-to-make-chemical-weapons-bishop/6527020

Oak Ridge National Laboratory, "LandScan," web page, undated. As of November 20, 2015:
http://web.ornl.gov/sci/landscan/

Obeid, Hamza, "Governor of Baghdad in al-Qaeda Organization Reveals Details About It," *Islamic Times*, June 6, 2010. As of August 21, 2014:
http://www.islamtimes.org/vdcenf8w.jh8fwik1bj.html

Odierno, Raymond, "DoD News Briefing with Lt. Gen. Odierno from Iraq," January 18, 2008.

Office of the Director of National Intelligence, "Letter from al-Zawahiri to al-Zarqawi," news release No. 2-05, October 11, 2005. As of June 2, 2014:
https://www.ctc.usma.edu/posts/zawahiris-letter-to-zarqawi-english-translation-2

Oghanna, Ayman, "Corruption Stemmed at Beiji Refinery—But for How Long?" *Iraq Oil Report*, posted by Alice Fordham, February 16, 2010.

PX717

"Oil Smuggler and Al Qaida Supplier Arrested in Bayji," *Al Mashriq Newspaper*, November 22, 2007.

Oppel, Richard A., Jr., "Iraq Reports Capture of Senior Al Qaeda Figure," *New York Times*, September 3, 2006. As of November 20, 2015: http://www.nytimes.com/2006/09/03/world/middleeast/03cnd-iraq.html

———, "Iraq's Insurgency Runs on Stolen Oil Profits," *New York Times*, March 16, 2008.

Oppel, Richard A., Jr., and Mark Mazetti, "Hunt Ends with Pair of 500-Lb. Bombs," *New York Times*, June 8, 2006. As of June 29, 2014: http://www.nytimes.com/2006/06/08/world/middleeast/08cnd-raid.html

Osgood, Patrick, and Rawaz Tahir, "Iraq's Yezidi Minority Faces Massacre," *Iraq Oil Report*, August 6, 2014.

Peralta, Eyder, "CIA Doubles Its Estimate of Islamic State Fighters in Iraq and Syria," NPR.org, September 11, 2014. As of July 28, 2015: http://www.npr.org/sections/thetwo-way/2014/09/11/347796283/cia-doubles-its-estimate-of-islamic-state-fighters-in-iraq-and-syria

Petraeus, David, MNF-I commander briefing to Congress, Washington, D.C., April 8, 2008a.

———, *Report to Congress on the Situation in Iraq: Testimony Before the Senate Armed Services Committee*, Washington, D.C., April 8–9, 2008b.

Piazza, James A., "Is Islamist Terrorism More Dangerous? An Empirical Study of Group Ideology, Organization, and Goal Structure," *Terrorism and Political Violence*, Vol. 21, No. 1, January 2009, pp. 62–88.

Posen, Barry, "The Security Dilemma and Ethnic Conflict," *Survival*, Vol. 35, No. 1, Spring 1993, pp. 27–47.

Prendergast, Candice, "The Motivation and Bias of Bureaucrats," *American Economic Review*, Vol. 97, No. 1, 2007, pp. 180–196.

Rabasa, Angel, Peter Chalk, Kim Cragin, Sara A. Daly, Heather S. Gregg, Theodore W. Karasik, Kevin A. O'Brien, and William Rosenau, *Beyond al-Qaeda: Part 1, The Global Jihadist Movement*, Santa Monica, Calif.: RAND Corporation, MG-429-AF, 2002. As of August 26, 2015: http://www.rand.org/pubs/monographs/MG429.html

*Report of the Borders of the Sectors*, NMEC-2009-602145, captured and declassified ISI document, Harmony Database, Washington, D.C.: U.S. Department of Defense, 2009.

Reynolds, John, "French Airstrikes Target ISIS Training Camps in Raqqah," *Guardian*, November 16, 2015.

Rider, Kirky, "Fierce Thrasher Helps Displaced Families Return Home," *The Desert Raider*, Vol. 1, No. 10, 2008, pp. 4–5.

PX717

Robertson, Campbell, and Stephen Farrell, "Iraqi Sunnis Turn to Politics and Renew Strength," *New York Times*, April 17, 2009.

Roddy, Michael, "Qaeda Confirms Deaths of Leaders in Iraq: Statement," Reuters, April 25, 2010.

Roggio, Bill, "The Diyala Salvation Front," *The Long War Journal*, May 10, 2007a.

———, "Iraq Report: The Salahadin Awakening Forms," *The Long War Journal*, May 21, 2007b.

———, "Al Qaeda in Iraq's Second in Command Was Swedish Citizen," *The Long War Journal*, October 16, 2008.

———, "Iraq Attacks and the Syria Connection," *The Long War Journal*, August 29, 2009.

———, "Islamic State Touts Training Camp in Northern Iraq," *The Long War Journal*, July 22, 2014.

Roggio, Bill, Daveed Gartenstein-Ross, and Tony Badran, "Intercepted Letters from al-Qaeda Leaders Shed Light on State of Network in Iraq," *The Long War Journal*, September 12, 2008.

Roggio, Bill, and Caleb Weiss, "More Jihadist Training Camps Identified in Iraq and Syria," *The Long War Journal*, November 23, 2014. As of January 8, 2016: http://www.longwarjournal.org/archives/2014/11/more_jihadist_traini.php

Ryan, Patrick, *The Efficacy of Leadership Targeting Against Al Qaeda in Iraq*, master's research project, Washington, D.C.: Georgetown University, May 2013.

Sageman, Marc, *Understanding Terror Networks*, Philadelphia: University of Pennsylvania Press, 2004.

———, *Leaderless Jihad: Terror Networks in the Twenty-First Century*, Philadelphia: University of Pennsylvania Press, 2008.

Sageman, Marc, and Bruce Hoffman, "The Reality of Grass-Roots Terrorism [with Reply]," *Foreign Affairs*, Vol. 87, No. 4, July/August 2008, pp. 163–166.

Salama, Ahmad, "Kidnapping and Construction: Al-Qaeda Turns to Big Business, Mafia Style," *Niqash*, April 6, 2011.

Samuels, Lennox, "Al Qaeda in Iraq Ramps Up Its Racketeering," *Newsweek*, May 20, 2008a. As of June 3, 2014: http://www.newsweek.com/al-qaeda-iraq-ramps-its-racketeering-89733

———, "Al Qaeda Nostra," *Newsweek*, web exclusive, May 21, 2008b.

Sanger, David E., and Julie Hirschfeld Davis, "Struggling to Starve ISIS of Oil Revenue, U.S. Seeks Assistance from Turkey," *New York Times*, September 13, 2014.

PX717

Saul, Heather, "Senior ISIS Leader Gives Televised Interview Revealing Exactly How Group Amassed Its Fortune," *Independent*, April 22, 2015. As of June 29, 2015:
http://www.independent.co.uk/news/world/middle-east/
senior-isis-leader-gives-televised-interview-revealing-exactly-how-group-amassed-its-fortune-10196045.html

Sciutto, Jim, Jamie Crawford, and Chelsea J. Carter, "ISIS Can 'Muster' Between 20,000 and 31,500 Fighters, CIA Says," CNN.com, September 12, 2014. As of July 28, 2015:
http://www.cnn.com/2014/09/11/world/meast/isis-syria-iraq/

Shaheen, Kareem, "US Drone Strike Kills Yemen al-Qaida Leader Nasir al-Wuhayshi," *Guardian*, June 16, 2015.

Shapiro, Jacob N., "Terrorist Organizations' Vulnerabilities and Inefficiencies," in Harold Trinkunas and Jeanne K. Giraldo, eds., *Terrorist Financing in Comparative Perspective*, Stanford, Calif.: Stanford University Press, 2007.

———, *The Terrorist's Dilemma: Managing Violent Covert Organizations*, Princeton, N.J.: Princeton University Press, 2013.

———, "108 Terrorist Memoirs, Analyzed," *Boston Globe*, January 19, 2014.

Shapiro, Jacob N., Eli Berman, Luke N. Condra, and Joseph H. Felter, "Empirical Study of Conflict Project's Iraq War Dataset (ESOC-I)," Version 3, Empirical Studies of Conflict Project, Princeton, N.J.: Princeton University, 2014.

Shapiro, Jacob N., and David A. Siegel, "Underfunding in Terrorist Organizations," *International Studies Quarterly*, Vol. 51, No. 2, 2007, pp. 405–429.

Shatz, Howard J., "How ISIS Funds Its Reign of Terror," *New York Daily News*, September 8, 2014a.

———, "To Defeat the Islamic State, Follow the Money," *Politico Magazine*, September 10, 2014b.

———, "Iraq Is Bankrolling ISIL," *Politico Magazine*, May 24, 2015.

Sherlock, Ruth, "ISIL Seizes Syrian Regime's Lucrative Phosphate Mines," *Telegraph*, May 27, 2015. As of May 28, 2015:
http://www.telegraph.co.uk/news/worldnews/middleeast/syria/11633289/
IsilseizesSyrianregimeslucrativephosphatemines.html

Silke, Andrew, "In Defense of the Realm: Financing Loyalist Terrorism in Northern Ireland—Part One: Extortion and Blackmail," *Studies in Conflict and Terrorism*, Vol. 21, No. 4, 1998, pp. 331–361.

———, "Drink, Drugs, and Rock'n'Roll: Financing Loyalist Terrorism in Northern Ireland—Part Two," *Studies in Conflict and Terrorism*, Vol. 23, No. 2, 2000, pp. 107–127.

Sly, Liz, "Top Two Al-Qaeda in Iraq Leaders Are Dead, Officials Say," *Los Angeles Times*, April 20, 2010.

Smith, Daniel W., "Asiacell Targeted by 'Islamic State of Iraq': Attacks/Claims of Government Surveillance Target Popular Mobile Company," *Iraq Slogger*, March 23, 2009. As of September 28, 2014:
http://iraqslogger.powweb.com/index.php/post/7349/
AsiaCell_Targetted_by_Islamic_State_of_Iraq

Smith, Greg, operational briefing, Multi-National Force–Iraq, March 2, 2008.

Smith, Niel, and Sean MacFarland, "Anbar Awakens: The Tipping Point," *Military Review*, March–April 2008, pp. 41–52.

Solomon, Erika, Guy Chazan, and Sam Jones, "ISIS Inc.: How Oil Fuels the Jihadi Terrorists," *Financial Times*, October 14, 2015.

Solomon, Erika, and Ahmed Mhidi, "ISIS Inc.: Syria's 'Mafia-Style' Gas Deals with Jihadis," *Financial Times*, October 15, 2015.

Spence, A. Michael, "The Learning Curve and Competition," *Bell Journal of Economics*, Vol. 12, No. 1, 1981, pp. 49–70.

Squires, Nick, "Yazidi Girl Tells of Horrific Ordeal as ISIL Sex Slave," *Telegraph*, September 7, 2014.

Stern, Jessica, and Amit Modi, "Producing Terror: Organizational Dynamics of Survival," in Thomas Biersteker and Sue Eckert, eds., *Countering Financing of Terrorism*, New York: Routledge, 2008, pp. 19–46.

Stout, Mark, "Understand Our Wars and Enemies? Nah . . ." *War on the Rocks*, August 21, 2013. As of June 28, 2015:
http://warontherocks.com/2013/08/understand-our-wars-and-enemies-nah/

al-Tamimi, Aymenn, "A Caliphate Under Strain: The Documentary Evidence," CTC Sentinel, Vol. 9, No. 4, April 2016. As of May 2, 2016:
https://www.ctc.usma.edu/posts/
a-caliphate-under-strain-the-documentary-evidence

Tavernise, Sabrina, and Dexter Filkins, "Local Insurgents Tell of Clashes with Al Qaeda's Forces in Iraq," *New York Times*, January 12, 2006.

Thompson, Grahame, *Between Hierarchies and Markets*, New York: Oxford University Press, 2003.

Tilly, Charles, "War Making and State Making as Organized Crime," in Peter B. Evans, Dietrich Rueschemeyer, and Theda Skocpol, eds., *Bringing the State Back In*, Cambridge, UK: Cambridge University Press, 1985, pp. 169–191.

Todd, Lin, W. Patrick Lang, Jr., R. Alan King, Andrea V. Jackson, Montgomery McFate, Ahmed S. Hashim, and Jeremy S. Harrington, *Iraq Tribal Study— Al-Anbar Governorate: The Albu Fahd Tribe, the Albu Mahal Tribe and the Albu Issa Tribe*, Arlington, Va.: Global Resources Group and Global Risk, 2006. As of November 20, 2015:
http://www.comw.org/warreport/fulltext/0709todd.pdf

Tønnessen, Truls Hallberg, "Training on a Battlefield: Iraq as a Training Ground for Global Jihadis," *Terrorism and Political Violence*, Vol. 20, No. 4, 2008, pp. 543–562.

Trofimov, Yaroslav, "In Islamic State Stronghold of Raqqa, Foreign Fighters Dominate," *Wall Street Journal*, February 4, 2015.

Trujillo, Mario, "CIA: ISIS Has 20,000 to 31,500 Fighters," *The Hill*, September 11, 2014. As of July 28, 2015:
http://thehill.com/policy/217514-cia-isis-made-of-20000-to-31500-fighters

U.S. Department of Defense, *Measuring Stability and Security in Iraq*, Report to Congress in Accordance with the Department of Defense Appropriations Act 2008 (Section 9010, Public Law 109-289), Washington, D.C., June 2008.

U.S. Government Accountability Office, *Military Operations: The Department of Defense's Use of Solatia and Condolence Payments in Iraq and Afghanistan*, Report to Congressional Requesters, Washington, D.C., GAO-07-699, May 2007.

Walsh, Michael, "ISIS Can Muster 20,000 to 31,500 Fighters, Triple Previous Estimates: CIA," *New York Daily News*, September 12, 2014.

Walt, Vivienne, "How Guns and Oil Net ISIS $1 Million a Day," *Fortune*, June 24, 2014. As of October 5, 2014:
http://fortune.com/2014/07/24/isis-guns-oil/

Weaver, Mary Anne, "The Short, Violent Life of Abu Musab al-Zarqawi," *The Atlantic*, July/August 2006.

Weinstein, Jeremy, *Inside Rebellion: The Politics of Insurgent Violence*, Cambridge, UK: Cambridge University Press, 2007.

Weiss, Michael, and Hassan Hassan, *ISIS: Inside the Army of Terror*, New York: Regan Arts, 2015.

West, Bing, *No True Glory: A Frontline Account of the Battle for Fallujah*, New York: Bantam Dell, 2005.

White House, "Fact Sheet: The New Way Forward in Iraq," January 2007.

Williams, Phil, *Criminals, Militias, and Insurgents: Organized Crime in Iraq*, Strategic Studies Institute Monograph 930, Carlisle, Penn.: Strategic Studies Institute, U.S. Army War College, 2009.

PX717

Williams, Timothy, "Attacks Occur as Iraq Takes Control of Key Sites," *New York Times*, January 1, 2009. As of July 14, 2014:
http://www.nytimes.com/2009/01/02/world/middleeast/02iraq.html?_r=0

Williamson, Oliver E., *Markets and Hierarchies: Analysis and Antitrust Implications*, New York: Free Press, 1975.

Winter, Charlie, *The Virtual "Caliphate": Understanding Islamic State's Propaganda Strategy*, London: Quilliam Foundation, 2015.

Wong, Edward, "Insurgents Attack Fiercely in North, Storming Police Stations in Mosul," *New York Times*, November 12, 2004.

"World's Richest Terror Army," reported by Peter Taylor, *This World*, BBC Two, April 22, 2015.

al-Zarqawi, Abu Mus'ab, "Zarqawi Letter: February 2004 Coalition Provisional Authority English Translation of Terrorist Musab al Zarqawi Letter Obtained by United States Government in Iraq," U.S. Department of State, 2004. [Also available as "Letter from Abu Musab al-Zarqawi to Osama bin Laden," Council on Foreign Relations, February 1, 2004.] As of June 25, 2015:
http://2001-2009.state.gov/p/nea/rls/31694.htm

"The Al-Zarqawi Beliefs: 'Allah Has Permitted Us to Repay Them in Kind,'" *Irish Times*, September 24, 2004. As of June 25, 2015:
http://www.irishtimes.com/news/
the-al-zarqawi-beliefs-allah-has-permitted-us-to-repay-them-in-kind-1.1158951

Zelin, Aaron, "The Islamic State's Model," *Monkey Cage*, *Washington Post*, January 28, 2015a. As of June 29, 2015:
http://www.washingtonpost.com/blogs/monkey-cage/wp/2015/01/28/
the-islamic-states-model/

———, "Full List of the 33-Officially-Claimed Wilayat of the Islamic State as of Today," Twitter, June 20, 2015b. As of June 29, 2015:
https://twitter.com/azelin/status/612299140735856641

Zelinsky, Aaron, and Martin Shubik, "Terrorist Groups as Business Firms: A New Typological Framework," *Terrorism and Political Violence*, Vol. 21, No. 2, March 2009, pp. 327–336.

This report draws from more than 140 recently declassified documents to present a comprehensive examination of the organization, territorial designs, management, personnel policies, and finances of the Islamic State of Iraq (ISI) and al-Qa'ida in Iraq (AQI), both predecessors of the Islamic State. These records paint a clear picture of ISI practices and standard operating procedures. Leadership consciously designed the organization not just to fight but also to build an Islamic state governed by the laws dictated by its strict Islamist ideology.

An analysis of the Islamic State predecessor groups is more than a historical recounting. The lessons from examining the group's history are useful for setting expectations about the strengths and vulnerabilities of the Islamic State and its ability to combat its opponents, designing a coordinated and effective campaign against it, and understanding why it might be able to survive such an effort and sustain itself in the future, albeit perhaps at a lower level of threat. Defeating the Islamic State will require persistence. The record of counter-ISI operations from 2006 through 2010 shows that military action and political accommodation can work together to degrade the group substantially, if not defeat it.



RAND | NATIONAL DEFENSE RESEARCH INSTITUTE

**www.rand.org**

$49.50

ISBN-10 0-8330-9178-6
ISBN-13 978-0-8330-9178-9

54950



RR-1192-DARPA

9 780833 091789

PX717