PX1107

**DECLARATION OF**

**SALVADOR BELTRAN-SOTO**

I, Salvador Beltran-Soto, declare and state under penalty of perjury that the following statements are true and correct:

a.  I have personal knowledge of the facts and information contained in this statement.

b.  I am a naturalized citizen of the United States, born in Mexico on ████████████ and granted United States Citizenship on February 10, 2000.

c.  I enlisted in the United States Army in May of 1996. I first deployed to Iraq in April 2003 as part of the initial combat phase. That deployment ended in September 2003.  Then in January 2004 I received orders to deploy to Iraq again with my unit. During both deployments in Iraq my rank was Sergeant (SGT)/E-5 and my MOS was 11 Bravo Infantry.

d.  I was assigned to U.S. Army, A Company, 2nd Battalion, 5th Cavalry Regiment, 1st Cavalry Division at Camp Eagle, northeast outskirts of Sadr City, Baghdad.

e.  We arrived in Baghdad on April 1, 2004. Our mission was to assist in maintaining and rebuilding the infrastructure of Baghdad immediately following the invasion as well as general peacekeeping.

f.  In the evening of April 3, 2004, I was out on area reconnaissance in a group of four vehicles, familiarizing ourselves with the area we would be working in. We came across 300-400 Iraqi fighting-age men marching in a military formation, some wearing green bandanas with white Islamic calligraphy similar to what Hezbollah wears in Southern Lebanon. To me, it was obvious they were members of a militia. We knew that the militias were supposed to be disbanded, however here they were. Later on in the patrol, we came across a few elderly men. My platoon leader, First Lieutenant (1LT) Cannon got out of the vehicle to talk to them, build relations with the locals, to "reach hearts and minds."  While he was talking to them several men came and surrounded him. Based on my experience from my first tour in Iraq, I knew it was a serious situation and told my gunner to get in place in the turret with the machine gun and my other soldiers to scan the surrounding area. I then got out of the vehicle to provide backup to 1LT Cannon and got between him and the men. The group of men grew larger fast, and there were soon 50+ of them, and they began shouting what we basically understood to be the equivalent of "Occupiers go home."  I was advising the 1LT that we had to leave, it was too much and the crowd was too big. However the decision was up to him. After the 1LT was satisfied with the interaction with the elders, we loaded up and left the scene. I thought this was a tell-tale sign that something was brewing, and I told the Lieutenant that this needed to be reported up the chain of command.

g.  The next day, on April 4, 2004, I was out on patrol in Sadr City on the North West Side. We were on foot and looking for a school, but I don't recall our exact objective for finding it. We came across a building that had a large portrait of Ayatollah Khamenei, the Supreme Leader of Iran, on the wall. People started throwing rocks at us and again calling us "Occupiers." We had Bradley Fighting Vehicles there in support of us, and once they rolled up the crowd

PX1107

began to disperse. Once dispersed, we loaded up and returned to Camp Eagle. I didn't pay much attention to it at the time, but looking back it is clear to me now that this was a sign that Iran exerted enormous influence on the local population in the area and that it supported the insurgents that operated there.

h.  Later that day, after we had returned to Camp Eagle, I was in the line for food when one of my team members came running up and said that we were being sent out as Quick Reaction Force ("QRF"). A patrol was pinned down and needed extraction. We ran to the Bradley armored vehicles, but were told to switch to Light Mobility Transport Vehicles (LMTV) that had less armor, and an exposed cargo area. I objected, but I was overruled by a senior NCO.

i.  I was the senior member in the rear of my vehicle and positioned everyone where they needed to be; I was behind the cab. As we left, I could see there was black smoke in the distance. The streets were empty besides the convoy when suddenly we started receiving small arms fire. I began shooting at anything that was a threat. The major avenue we were on was blocked, which forced us to turn right. I realized that they were funneling us into a kill zone.

j.  We were being overwhelmed by fire but pressed on to find the pinned down soldiers. Suddenly I saw someone about to throw a pipe bomb at us from a balcony. Instinctively I aimed and fired, and then realized it was a very young man. My shots hit him, but he managed to throw it anyway. The pipe bomb landed about four feet away from me and exploded. Shrapnel blew into my face and the machine gun was damaged to the point it was useless. Someone told me I was injured and to stay down in the middle of the vehicle. I heard several of the other soldiers were hit as well. I dragged another solider, Garza, to the middle of the vehicle and started rendering first aid to him when I was shot in the back. Luckily, I was wearing my body armor, and the round did not penetrate it.

k.  I ignored the pain and picked up Garza's weapon. I started returning fire and was shot several more times. Most of the bullets hit my body armor, but one round hit me in the knee. Due to receiving multiple shots, my body armor broke, snapping inward when it was supposed to snap outward. I told my men to keep firing even though the commander's Humvee in front of us had been hit. I saw that Sergeant Tim had severe injuries, so I helped administer first aid to him. Due to the constant heavy fire and injuries our unit had already sustained we were not able to press forward anymore. They forced us to retreat to base while another QRF went out to try to reach the pinned down unit.

l.  Back at base I had my face stitched up and shrapnel removed from my gum line and back of my mouth, as well as the gunshot wound to my leg treated. Unfortunately, we lost several soldiers, including Garza who I had tried to save.

m.  I received a Purple Heart for the injuries I sustained that day.

n.  Following the attack I started to have a hard time falling asleep, and when I did sleep, I had nightmares. I was having difficulty concentrating, and I became very angry with the locals. I was placed on hold from further missions and sent to the combat stress team. Despite rest, thoughts of the ambush continued to haunt me, and I remained on mission hold. I started to

PX1107

lose interest in life back home, and at the same time I wanted to get back out there and help my unit, however I was still on mission hold.

o.   I was sent again to the combat stress team, and then was medevac'd to Landstuhl. I had mixed about being out of Iraq, as the stress became overwhelming, but I felt guilty about leaving my unit. I was diagnosed with Acute Stress Disorder and placed on Zoloft and Trazodone.

p.   From Landstuhl I was transferred back to Fort Hood in the U.S. to continue treatment. I was diagnosed with PTSD and started regular therapy sessions. The doctors also continued my medications, but I didn't like them much because they made me groggy.

q.   I returned from Iraq a vastly different person than when I was first deployed. I felt numb and detached from others. I was easily startled and hyper-vigilant about my surroundings. I did not re-enlist when my contract with the military expired in 2005. If not for the trauma that happened in Iraq, I would have stayed in the military. Before that ambush, I was considering changing from enlisted to an officer (called "going Green to Gold"), but after that I just couldn't do it. The military was everything to me, and I lost that piece of myself. Since leaving the military I've had suicidal thoughts, night terrors and I sometimes wake up crying. I especially struggle with nightmares and flashbacks around April 4 each year.

r.   At the time of my deployment, I was married to Maria Beltran. After my return, my PTSD and the changes in my personality and behavior caused significant strain on our marriage, and we ended up getting divorced in 2012.

s.   I was also diagnosed with a traumatic brain injury, hearing loss and tinnitus, as well as chronic pain in my left knee, which suffered a gunshot wound during the attack.

t.   The Department of Veterans Affairs reviewed my medical records and in its most recent ratings decision determined that I was 80% disabled.

u.   I continue to struggle with my PTSD, but my job as a long-haul truck driver makes it difficult to get treatment. I also cannot take any of the medications as they make me groggy, which would make me unable to drive as well. I try my best to stay disciplined, and continue to follow the Army Code of Conduct and NCO Creed. I have found ways to cope that allow me to at least function and provide for my family. However there have been several occasions where I could not handle it and had to seek help.

v.   As part of my statement I am providing the following documentary materials attached as Exhibits 1 through 8:

  1.   Exhibit 1 is a true and authentic copy of my certificate of naturalization. I have personal knowledge of the source or creation of this Exhibit because it was issued to me by the United States. (Fis_Beltran-SotoS_CP_00000241).

  2.   Exhibit 2 is a true and authentic copy of the license and certificate of marriage between me and my ex-wife, Maria Beltran. I have personal knowledge of the

PX1107

source or creation of this Exhibit because it was issued to me by the state of California.                                    (Fis_Beltran-SotoS_CP_00000002).

3.  Exhibit 3 is a true and authentic copy of the divorce judgment between me and my ex-wife, Maria Beltran. I have personal knowledge of the source or creation of this Exhibit because it was issued to me by the Superior Court of California, County of San Diego. (Fis_Beltran-SotoS_CP_00000003–07).

4.  Exhibit 4 is a true and authentic photograph of my unity on the day we were deploying to Iraq, waiting for the bus. . At the front of the photograph are my friends Arsiaga and Garza, who both died during the attack. The soldier directly behind Arsiaga on the left is me. I have personal knowledge of the source or creation of this Exhibit because I was present when the photo was taken by a member of my unit, and it accurately reflects the moment it depicts. (Fis_Beltran-SotoS_CP_00000283).

5.  Exhibit 4 is a collection of six true and authentic photographs showing me, my squad/company, and my vehicle, from my service in Iraq and Kuwait. I have personal knowledge of the source or creation of this Exhibit because they were taken by Army personnel or other soldiers and given to me, and they accurately reflect the scenes they depict. (Fis_Beltran-SotoS_CP_00000008–12).

6.  Exhibit 5 is a true and authentic copy of the orders awarding me a Purple Heart for wounds I received as a result of the April 4, 2004 attack. I have personal knowledge of the source or creation of this Exhibit because it was issued to me by military officials. (Fis_Beltran-SotoS_CP_00000016).

7.  Exhibit 6 is a true and authentic copy of the orders awarding me a Combat Infantry Badge for participating in combat operations under hostile enemy fire on April 4, 2004. I have personal knowledge of the source or creation of this Exhibit because it was issued to me by military officials. (Fis_Beltran-SotoS_CP_00000245).

8.  Exhibit 7 is a true and authentic copy of a letter from the VA certifying that I am receiving service-connected disability compensation at 80%. I have personal knowledge of the source or creation of this Exhibit because I received it from the VA in the mail at my residence. (Fis_Beltran-SotoS_CP_00000248–260).

I declare and state under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on: Aug 25, 2022

Signature: _Salvador Beltran-Soto (Aug 25, 2022 14:02 PDT)_

---

Declaration SALVADOR BELTRAN-SOTO (April 4, 2004 Attack)                              Page 4

PX1107

# 2022 08 25 Draft Declaration for Beltran-Soto - FINAL FOR SIGNATURE

Final Audit Report                                                         2022-08-25

| | |
|---|---|
| Created: | 2022-08-25 |
| By: | Mathew Langenberg ▓▓▓▓▓▓▓▓ |
| Status: | Signed |
| Transaction ID: | ▓▓▓▓▓▓▓▓▓▓▓▓ |

## "2022 08 25 Draft Declaration for Beltran-Soto - FINAL FOR SIGNATURE" History

📑 Document created by Mathew Langenberg ▓▓▓▓▓▓▓▓▓▓
   2022-08-25 - 3:12:05 PM GMT- ▓▓▓▓▓▓

📧 Document emailed to ▓▓▓▓▓▓▓▓▓▓ for signature
   2022-08-25 - 3:12:43 PM GMT

📑 Email viewed by ▓▓▓▓▓▓▓▓▓▓
   2022-08-25 - 3:17:50 PM GMT- IP address: 104.28.111.40

✍ Signer ▓▓▓▓▓▓▓▓▓▓ entered name at signing as Salvador Beltran-Soto
   2022-08-25 - 9:02:31 PM GMT- IP address: 189.173.170.86

✍ Document e-signed by Salvador Beltran-Soto ▓▓▓▓▓▓▓▓
   Signature Date: 2022-08-25 - 9:02:32 PM GMT - Time Source: server- ▓▓▓▓▓

✅ Agreement completed.
   2022-08-25 - 9:02:32 PM GMT

**Adobe Acrobat Sign**

PX1107

# EXHIBIT A

PX1107

THE UNITED STATES OF AMERICA

CERTIFICATE OF

No.

NATURALIZATION

INS Registration No.

Personal description of holder as of date of naturalization:

Date of birth:

Sex:   MALE

Height:   5 feet   06 inches

Marital status:   MARRIED

Country of former nationality:

MEXICO



I certify that the description given is true, and that the photograph affixed hereto is a likeness of me.

Salvador Soto Beltran
(Complete and true signature of holder)

Be it known that, pursuant to an application filed with the Attorney General

at:   SAN DIEGO, CA

The Attorney General having found that:

SALVADOR SOTO BELTRAN

then residing in the United States, intends to reside in the United States when so required by the Naturalization Laws of the United States, and had in all other respects complied with the applicable provisions of such naturalization laws and was entitled to be admitted to citizenship, such person having taken the oath of allegiance in a ceremony conducted by the

U.S. DISTRICT COURT
FOR THE U S

at:   SAN DIEGO, CA   on:
FEBRUARY 10TH, 2000

that such person is admitted as a citizen of the United States of America.

IT IS PUNISHABLE BY U. S. LAW TO COPY, PRINT OR PHOTOGRAPH THIS CERTIFICATE, WITHOUT LAWFUL AUTHORITY.

Doris Meissner
Commissioner of Immigration and Naturalization

DEPARTMENT OF JUSTICE

FORM N-550 REV. 6-91

Flg_Beltran-SotoS_CP_00000241

PX1107

# EXHIBIT B

PX1107

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO
### GREGORY J. SMITH
### ASSESSOR/RECORDER/COUNTY CLERK

## LICENSE AND CERTIFICATE OF MARRIAGE    4-99-37  001175

MUST BE LEGIBLE–MAKE NO ERASURES, WHITEOUTS, OR OTHER ALTERATIONS

| | STATE FILE NUMBER | | | LOCAL REGISTRATION NUMBER |
|---|---|---|---|---|

**0626**

| | | | | | |
|---|---|---|---|---|---|
| **GROOM PERSONAL DATA** | 1A. NAME OF GROOM–FIRST (GIVEN) SALVADOR | 1B. MIDDLE | 1C. LAST (FAMILY) BELTRAN SOTO | | 2. DATE OF BIRTH–MONTH, DAY, YEAR |
| | 3A. RESIDENCE–STREET AND NUMBER ▓▓▓ | 3B. CITY ▓▓▓ | 3C. ZIP CODE ▓▓ | 3D. COUNTY–OUTSIDE CALIFORNIA ENTER STATE SAN DIEGO | 4. STATE OF BIRTH MX |
| | 5. MAILING ADDRESS–IF DIFFERENT --- | 6. NUMBER OF PREVIOUS MARRIAGES 00 | 7A. LAST MARRIAGE ENDED BY: ☐ DEATH ☐ DISSOLUTION ☐ ANNULMENT | | 7B. DATE–MONTH, DAY, YEAR --/--/---- |
| | 8A. USUAL OCCUPATION INFANTRY | 8B. USUAL KIND OF BUSINESS OR INDUSTRY US ARMY | | | 9. EDUCATION–YEARS COMPLETED 12 |
| | 10A. FULL NAME OF FATHER SALVADOR BELTRAN PENA | 10B. STATE OF BIRTH MX | 10C. FULL MAIDEN NAME OF MOTHER RAMONA SOTO LERMA | | 11B. STATE OF BIRTH MX |

| | | | | | |
|---|---|---|---|---|---|
| **BRIDE PERSONAL DATA** | 12A. NAME OF BRIDE–FIRST (GIVEN) MARIA | 12B. MIDDLE | 12C. CURRENT, LAST (FAMILY) PARTIDA MONTANO | 12D. MAIDEN LAST (FAMILY) IF DIFFERENT FROM 12C. | 13. DATE OF BIRTH– |
| | 14A. RESIDENCE–STREET AND NUMBER ▓▓▓ | 14B. CITY ▓▓▓ | 14C. ZIP CODE ▓▓ | 14D. COUNTY–OUTSIDE CALIFORNIA ENTER STATE SAN DIEGO | 15. STATE OF BIRTH MX |
| | 16. MAILING ADDRESS–IF DIFFERENT --- | 17. NUMBER OF PREVIOUS MARRIAGES 00 | 18A. LAST MARRIAGE ENDED BY: ☐ DEATH ☐ DISSOLUTION ☐ ANNULMENT | | 18B. DATE– MONTH, DAY, YEAR --/--/---- |
| | 19A. USUAL OCCUPATION HOMEMAKER | 19B. USUAL KIND OF BUSINESS OR INDUSTRY OWN HOME | | | 20. EDUCATION–YEARS COMPLETED 12 |
| | 21A. FULL NAME OF FATHER SECUNDINO PARTIDA MEDINA | 21B. STATE OF BIRTH MX | 22A. FULL MAIDEN NAME OF MOTHER ALBINA MONTANO RAMOS | | 22B. STATE OF BIRTH MX |

**AFFIDAVIT** — WE, THE UNDERSIGNED, AN UNMARRIED MAN AND UNMARRIED WOMAN, STATE THAT THE FOREGOING INFORMATION IS CORRECT AND TRUE TO THE BEST OF OUR KNOWLEDGE AND BELIEF, THAT NO LEGAL OBJECTION TO THE MARRIAGE NOR TO THE ISSUANCE OF A LICENSE IS KNOWN TO US, AND HEREBY APPLY FOR A LICENSE AND A CERTIFICATE OF MARRIAGE.

| 23. SIGNATURE OF GROOM | 24. SIGNATURE OF BRIDE |
|---|---|
| *(signature)* | *(signature)* MARIA MIRTA ELIA PARTIDA |

AUTHORIZATION AND LICENSE IS HEREBY GIVEN TO ANY PERSON DULY AUTHORIZED BY THE LAWS OF THE STATE OF CALIFORNIA TO PERFORM A MARRIAGE CEREMONY WITHIN THE STATE OF CALIFORNIA TO SOLEMNIZE THE MARRIAGE OF THE ABOVE NAMED PERSONS, PROVIDED THAT THE TERMS OF THIS LICENSE ARE OK S.E.

| | | | | |
|---|---|---|---|---|
| **LICENSE TO MARRY** | 25A. ISSUE DATE MONTH, DAY, YEAR 02/12/1999 | 25B. LICENSE EXPIRES AFTER MONTH, DAY, YEAR 05/13/1999 | 25C. LICENSE NUMBER | 25D. COUNTY OF ISSUE SAN DIEGO |
| | | | 25E. NAME OF COUNTY CLERK GREGORY J SMITH | 25F. SIGNATURE OF DEPUTY CLERK (IF APPLICABLE) BY ▶ GLADYS SOTO  DEPUTY |

| | | | |
|---|---|---|---|
| **WITNESS(ES) (ONE REQUIRED)** | 26A. SIGNATURE OF WITNESS *(signature)* Anilia Hernandez | 26B. ADDRESS–STREET AND NUMBER ▓▓▓ | 26C. CITY, STATE AND ZIP CODE |
| | 27A. SIGNATURE OF WITNESS *(signature)* | 27B. ADDRESS–STREET AND NUMBER ▓▓▓ | 27C. CITY, STATE AND ZIP CODE |

| | | | |
|---|---|---|---|
| **CERTIFICATION OF PERSON SOLEMNIZING MARRIAGE** | 28. I HEREBY CERTIFY THAT THE ABOVE NAMED BRIDE AND GROOM WERE JOINED BY ME IN MARRIAGE IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA | 29A. SIGNATURE OF PERSON SOLEMNIZING MARRIAGE *(signature)* | 29B. RELIGIOUS DENOMINATION OR CLERGY |
| | ON **02** DAY **12** YEAR 19 **99** | 29C. NAME OF PERSON SOLEMNIZING MARRIAGE (TYPE OR PRINT) GLADYS SOTO | 29D. OFFICIAL TITLE DEPUTY MARRIAGE COMMISSIONER |
| | AT CHULA VISTA    SAN DIEGO    CALIFORNIA | 29E. MAILING ADDRESS PO BOX 121750 SAN DIEGO CA | 29F. ZIP CODE 92112-1750 |

| | | | |
|---|---|---|---|
| **LOCAL REGISTRAR OF MARRIAGES (COUNTY RECORDER)** | 30A. SIGNATURE OF LOCAL REGISTRAR ▶ GREGORY J. SMITH, Recorder/County Clerk | 30B. SIGNATURE OF DEPUTY (IF APPLICABLE) BY ▶ *(signature)*   DEPUTY | 31. DATE ACCEPTED FOR REGISTRATION 02/18/1999 |

This is a true and exact reproduction of the document officially registered and placed on file in the office of the San Diego County Recorder/Clerk.

*(signature)* G. J. Smith

April 1, 2005

Gregory J. Smith
Assessor/Recorder/County Clerk

This copy is not valid unless prepared on an engraved border
displaying date, seal and signature of the Recorder/Clerk.

*001479429*

Fis_Beltran-SotoS_CP_00000002

PX1107

# EXHIBIT ☐

PX1107

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State    umber, and address):*

Maria Beltran

▮▮▮▮▮▮▮▮▮▮▮▮▮

E-MAIL ADDRESS *(Optional):*                          FAX NO.*(Optional):*

ATTORNEY FOR *(Name):*

FOR COURT USE ONLY

F I L E D
Clerk of the Superior Court

SEP 09 2011

R. CAZARES

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   SAN DIEGO
STREET ADDRESS: 500 Third Avenue
MAILING ADDRESS: Same
CITY AND ZIP CODE: Chula Vista, CA  91910
BRANCH NAME: South County Division

PETITIONER: MARIA BELTRAN

RESPONDENT: SALVADOR BELTRAN-SOTO

REQUEST TO ENTER DEFAULT

CASE NUMBER:
▮▮▮▮▮▮▮

1. **To the clerk:** Please enter the default of the respondent who has failed to respond to the petition.

2. A completed *Income and Expense Declaration* (form FL-150) or *Financial Statement (Simplified)* (form FL-155)
   ☐ is attached      ☑ is not attached.
   A completed *Property Declaration* (form FL-160)   ☐ is attached   ☑ is not attached
   because *(check at least one of the following):*
   (a) ☐ there have been no changes since the previous filing.
   (b) ☐ the issues subject to disposition by the court in this proceeding are the subject of a written agreement.
   (c) ☑ there are no issues of child, spousal, or partner support or attorney fees and costs subject to determination by the court.
   (d) ☐ the petition does not request money, property, costs, or attorney fees. (Fam. Code, §2330.5.)
   (e) ☑ there are no issues of division of community property.
   (f) ☐ this is an action to establish parental relationship.

Date: 9/8/11

Maria Beltran                              ▶ *Maria Beltran*
(TYPE OR PRINT NAME)                          (SIGNATURE OF [ATTORNEY FOR] PETITIONER)

3. Declaration
   a. ☐ No mailing is required because service was by publication or posting and the address of the respondent remains unknown.
   b. ☑ A copy of this *Request to Enter Default*, including any attachments and an envelope with sufficient postage, was
      provided to the court clerk, with the envelope addressed as follows *(address of the respondent's attorney or, if none,
      the respondent's last known address):*

      Salvador Beltran Soto
      ▮▮▮▮▮▮▮▮▮▮▮

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 9/8/11

Maria Beltran                              ▶ *Maria Beltran*
(TYPE OR PRINT NAME)                          (SIGNATURE OF DECLARANT)

FOR COURT USE ONLY
☑ *Request to Enter Default* mailed to the respondent or the respondent's attorney on *(date):*   OCT 25 2011
☑ Default entered as requested on *(date):*   SEP 09 2011
☐ Default not entered. Reason:

Clerk, by _____ , Deputy

R. CAZAREZ

Form Adopted for Mandatory Use
Judicial Council of California
FL-165 [Rev. January 1, 2005]          

REQUEST TO ENTER DEFAULT
(Family Law-Uniform Parentage)

Code of Civil Procedure, §§ 585, 587;
Family Code, § 2335.5
www.courtinfo.ca.gov

Fis_Beltran-SotoS_CP_00000003

PX1107

| CASE NAME (Last name, first name of each party): | CASE NUMBER: |
|---|---|
| BELTRAN, MARIA and SALVADOR (SOTO) | ███████████ |

4. **Memorandum of costs**

   a. ☑ Costs and disbursements are waived.

   b. Costs and disbursements are listed as follows:

     (1) ☐ Clerk's fees ............................................................................ $ _____

     (2) ☐ Process server's fees ............................................................ $ _____

     (3) ☐ Other (specify): ..................................................................... $ _____

                                                            $ _____

                                                            $ _____

     TOTAL ....................................................................................... $      0.00

   c. I am the attorney, agent, or party who claims these costs. To the best of my knowledge and belief, the foregoing items of cost are correct and have been necessarily incurred in this cause or proceeding.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: *9-18-11*

Maria Beltran              ▶ *Maria Beltran*
(TYPE OR PRINT NAME)                         (SIGNATURE OF DECLARANT)

5. **Declaration of nonmilitary status.** The respondent is not in the military service of the United States as defined in section 511 et seq. of the Servicemembers Civil Relief Act (50 U.S.C. Appen. § 501 et seq.), and is not entitled to the benefits of such act.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: *9/8-11*

Maria Beltran              ▶ *Maria Beltran*
(TYPE OR PRINT NAME)                         (SIGNATURE OF DECLARANT)

**REQUEST TO ENTER DEFAULT**
(Family Law–Uniform Parentage)

Fis_Beltran-SotoS_CP_00000004

Martin Dean's
**ESSENTIAL FORMS™**

PX1107

FL-190

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Maria Beltran ████████████████ E-MAIL ADDRESS *(Optional):* FAX NO.*(Optional)* ATTORNEY FOR *(Name):* | **FILED** SAN DIEGO SUPERIOR COURT OCT 2 5 2011 CLERK OF THE SUPERIOR COURT BY _____ R. CAZAREZ |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF    SAN DIEGO
STREET ADDRESS: 500 Third Avenue
MAILING ADDRESS: Same
CITY AND ZIP CODE: Chula Vista, CA 91910
BRANCH NAME: South County Division

PETITIONER: MARIA BELTRAN

RESPONDENT: SALVADOR BELTRAN-SOTO

| NOTICE OF ENTRY OF JUDGMENT | CASE NUMBER: ████████ |
|---|---|

You are notified that the following judgment was entered on *(date)* :    OCT 2 5 2011
1. ☑ Dissolution
2. ☐ Dissolution - status only
3. ☐ Dissolution - reserving jurisdiction over termination of marital status or domestic partnership
4. ☐ Legal separation
5. ☐ Nullity
6. ☐ Parent-child relationship
7. ☐ Judgment on reserved issues
8. ☐ Other *(specify)* :

Date:    OCT 2 5 2011

Clerk, by _____ **R. CAZAREZ** _____, Deputy

-NOTICE TO ATTORNEY OF RECORD OR PARTY WITHOUT ATTORNEY-

Under the provisions of Code of Civil Procedure section 1952, if no appeal is filed the court may order the exhibits destroyed or otherwise disposed of after 60 days from the expiration of the appeal time.

| STATEMENT IN THIS BOX APPLIES ONLY TO JUDGMENT OF DISSOLUTION    FEB 05 2012 Effective date of termination of marital or domestic partnership status *(specify)* : **WARNING:** Neither party may remarry or enter into a new domestic partnership until the effective date of the termination of marital or domestic partnership status, as shown in this box. |
|---|

**CLERK'S CERTIFICATE OF MAILING**

I certify that I am not a party to this cause and that a true copy of the *Notice of Entry of Judgment* was mailed first class, postage fully prepaid, in a sealed envelope addressed as shown below, and that the notice was mailed    OCT 2 5 2011
at *(place):*   Chula Vista   , California, on *(date)* :

Date:    OCT 2 5 2011    Clerk, by _____ **R. CAZAREZ** _____, Deputy

| ┌ Name and address of petitioner or petitioner's attorney ─ | ┌ Name and address of respondent or respondent's attorney ─ |
|---|---|
| **MARIA BELTRAN** ████████████████ | **SALVADOR BELTRAN-SOTO** ████████████████ |

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
FL-190 [Rev. January 1, 2005]

**NOTICE OF ENTRY OF JUDGMENT**
**(Family Law-Uniform Parentage-Custody and Support)**

Family Code, §§ 2338, 7636, 7637
www.courtinfo.ca.gov

Martin Dean's
ESSENTIAL FORMS

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State   umber, and address):

Maria Beltran

TE                                          FAX NO.(Optional):
E-                          (            ):
ATTORNEY FOR (Name):

**FOR COURT USE ONLY**

**FILED**
SAN DIEGO SUPERIOR COURT

OCT 25 2011

CLERK OF THE SUPERIOR COURT
BY _____ R. CAZAREZ

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   **SAN DIEGO**
STREET ADDRESS: **500 Third Avenue**
MAILING ADDRESS: **Same**
CITY AND ZIP CODE: **Chula Vista, CA  91910**
BRANCH NAME: **South County Division**

MARRIAGE OF
PETITIONER: **MARIA BELTRAN**

RESPONDENT: **SALVADOR BELTRAN-SOTO**

**JUDGMENT**

☑ DISSOLUTION   ☐ LEGAL SEPARATION   ☐ NULLITY
☐ Status only
☐ Reserving jurisdiction over termination of
   marital or domestic partnership status
☐ Judgment on reserved issues
Date marital or domestic partnership status ends:

FEB 05 2012

CASE NUMBER:

**RECEIVED**

SEP 09 2011

1. ☐ This judgment ☐ contains personal conduct restraining orders ☐ modifies existing restraining orders.
   The restraining orders are contained on page(s) _____ of the attachment. They expire on (date):

2. This proceeding was heard as follows: ☑ Default or uncontested ☑ By declaration under Family Code section 2336
   ☐ Contested
   a. Date:   OCT 25 2011             Dept.: 12              Room:
   b. Judicial officer (name):   RODERICK W. SHELTON                    ☐ Temporary judge
   c. ☐ Petitioner present in court          ☐ Attorney present in court (name):
   d. ☐ Respondent present in court        ☐ Attorney present in court (name):
   e. ☐ Claimant present in court (name):
   f. ☐ Other (specify name):                                 ☐ Attorney present in court (name):

3. The court acquired jurisdiction of the respondent on (date): **August 4, 2011**
   a. ☑ The respondent was served with process.
   b. ☐ The respondent appeared.

**THE COURT ORDERS, GOOD CAUSE APPEARING**

4. a. ☑ Judgment of dissolution is entered. Marital or domestic partnership status is terminated and the parties are restored to the
      status of single persons.   FEB 05 2012
      (1) ☑ on (specify date):
      (2) ☐ on a date to be determined on noticed motion of either party or on stipulation.
   b. ☐ Judgment of legal separation is entered.
   c. ☐ Judgment of nullity is entered. The parties are declared to be single persons on the ground of (specify):

   d. ☐ This judgment will be entered nunc pro tunc as of (date):
   e. ☐ Judgment on reserved issues.
   f. ☐ The ☐ petitioner's ☐ respondent's former name is restored (specify):
   g. ☐ Jurisdiction is reserved over all other issues, and all present orders remain in effect except as provided below.
   h. ☐ This judgment contains provisions for child support or family support. Each party must complete and file with the court a
      *Child Support Case Registry Form* (form FL-191) within 10 days of the date of this judgment. The parents must notify the
      court of any change in the information submitted within 10 days of the change, by filing an updated form. The *Notice
      of Rights and Responsibilities-Health Care Costs and Reimbursement Procedures and Information Sheet on Changing a
      Child Support Order* (form FL-192) is attached.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
FL-180 [Rev. January 1, 2007]

*Martin Dean's*
**ESSENTIAL FORMS™**

**JUDGMENT**
**(Family Law)**

Family Code, §§ 2024, 2340,
2343, 2346
www.courtinfo.ca.gov

**PX1107**

FL-180

| CASE NAME (Last name, first name of each party): | CASE NUMBER: |
|---|---|
| BELTRAN, MARIA and SALVADOR (SOTO) | ▮ |

4. (Cont'd.)

i. ☐ A settlement agreement between the parties is attached.

j. ☐ A written stipulation for judgment between the parties is attached.

k. ☐ The children of this marriage or domestic partnership.

   (1) ☐ The children of this marriage or domestic partnership are:
   
   Name                                                    Birthdate

   (2) ☐ Parentage is established for children of this relationship born prior to the marriage or domestic partnership.

l. ☐ Child custody and visitation are ordered as set forth in the attached

   (1) ☐ settlement agreement, stipulation for judgment, or other written agreement.
   (2) ☐ Child Custody and Visitation Order Attachment (form FL-341).
   (3) ☐ Stipulation and Order for Custody and/or Visitation of Children (form FL-355).
   (4) ☐ other (specify):

m. ☐ Child support is ordered as set forth in the attached

   (1) ☐ settlement agreement, stipulation for judgment, or other written agreement.
   (2) ☐ Child Support Information and Order Attachment (form FL-342).
   (3) ☐ Stipulation to Establish or Modify Child Support and Order (form FL-350).
   (4) ☐ other (specify):

n. ☑ Spousal or partner support is ordered as set forth in the attached

   (1) ☐ settlement agreement, stipulation for judgment, or other written agreement.
   (2) ☐ Spousal, Partner, or Family Support Order Attachment (form FL-343).
   (3) ☑ other (specify): **The court terminates jurisdiction to award spousal support to both parties of this marriage.**

   **NOTICE:** It is the goal of this state that each party will make reasonable good faith efforts to become self-supporting as provided for in Family Code section 4320. The failure to make reasonable good faith efforts may be one of the factors considered by the court as a basis for modifying or terminating spousal or partner support.

o. ☑ Property division is ordered as set forth in the attached

   (1) ☐ settlement agreement, stipulation for judgment, or other written agreement.
   (2) ☐ Property Order Attachment to Judgment (form FL-345).
   (3) ☑ other (specify): **There are no assets, no debts, and no pension or retirement benefits to be divided**

p. ☐ Other (specify):

Each attachment to this judgment is incorporated into this judgment, and the parties are ordered to comply with each attachment's provisions.

Jurisdiction is reserved to make other orders necessary to carry out this judgment.

Date: OCT 25 2011

5. Number of pages attached: _____

*Roderick W. Shelton*

JUDICIAL OFFICER   FREDERICK W. SHELTON

☐ SIGNATURE FOLLOWS LAST ATTACHMENT

**NOTICE**

Dissolution or legal separation may automatically cancel the rights of a spouse or domestic partner under the other spouse's or domestic partner's will, trust, retirement plan, power of attorney, pay-on-death bank account, transfer-on-death vehicle registration, survivorship rights to any property owned in joint tenancy, and any other similar thing. It does not automatically cancel the rights of a spouse or domestic partner as beneficiary of the other spouse's or domestic partner's life insurance policy. You should review these matters, as well as any credit cards, other credit accounts, insurance policies, retirement plans, and credit reports, to determine whether they should be changed or whether you should take any other actions.

A debt or obligation may be assigned to one party as part of the dissolution of property and debts, but if that party does not pay the debt or obligation, the creditor may be able to collect from the other party.

An earnings assignment may be issued without additional proof if child, family, partner, or spousal support is ordered.

Any party required to pay support must pay interest on overdue amounts at the "legal rate," which is currently 10 percent.

PX1107

# EXHIBIT ☐

PX1107



# EXHIBIT E

PX1107



Fis_Beltran-SotoS_CP_00000008

PX1107



Fis_Beltran-SotoS_CP_00000009

PX1107



Fis_Beltran-SotoS_CP_000000010

PX1107



Fis_Beltran-SotoS_CP_00000011

PX1107



Fis_Beltran-SotoS_CP_00000012

PX1107



PX1107

# EXHIBIT ☐

PX1107

_ - I

**DEPARTMENT OF THE ARMY**
**Headquarters, First Cavalry Division**
**APO AE 09344**

PERMANENT ORDERS # 105-19                                          14 April 2004

BELTRAN, SALVADOR,                   SGT, Alpha Company, 2ND Battalion, 5TH Cavalry Regiment
(WAGPAA) 1ST Cavalry Division,

Announcement is made of the following award:

Award: Purple Heart
Date(s) or period of service: 4 April 2004
Authority: AR 600-8-22, paragraph 2-8, COMCFLCC message DTG 031122Z APR 03 and
COMCFLCC Memorandum, Subject: Delegation of Army Awards Approval Authority dated 6 April
2003.
Reason: For wounds received as a result of enemy of hostile actions.
Format: 320

FOR THE COMMANDER:

**(b) (6)**
⟋ LTC ⌀S
AcofS, G1

DISTRIBUTION:
1-INDIVIDUAL
1-UNIT
1-USAEREC
1-FILE

PX1107

# EXHIBIT ☐

PX1107



**DEPARTMENT OF THE ARMY**
Headquarters, 1st Brigade Combat Team
APO AE 09373



PERMANENT ORDERS 110-08                                      19 April 2004

BARTON, ████████████ 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
BASDEN, ████████ 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
BELTRAN, SALVADOR 7124 SGT 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
BOLDING, ████████ 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
BOOKOUT, ████████ 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
BROWN, ████████ 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
BRYAN, ████████ 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
BUNE, ████████ 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
BUTLER, ████████████ 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
CALDERON, ████████ 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
CAMBRA, ████████ 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04
CASON, AHMED A. ████ SPC 2-5 CAV, 1ST CAVALRY DIVISION FT. HOOD, TX 76544 04 APR 04

Announcement is made of the following award:

Award: Combat Infantry Badge
Date(s) or period of service. See Standard Name Line
Authority: AR 600-8-22, paragraph 8-6 COMCFLCC Message DTO 031122Z APR 03 and
COMCFLCC Memorandum, Subject: Delegation of Army Wartime Awards Approval Auth dated 6
April 2003
Reason: For participating in combat operations under enemy hostile fire to secure Iraq in support of
OPERATION IRAQI FREEDOM.
Format: 320

OFFICIAL:

ROBERT B. ABRAMS
Colonel, Armor
Commanding

DISTRIBUTION:
INDIVIDUAL (1)
UNIT (1)
USAEREC (1)
FILE (1)

Fis_Beltran-SotoS_CP_00000245

PX1107

# EXHIBIT H

PX1107



**Department Of Veterans Affairs**
**5000 Wissahickon Avenue**
**P.O. Box 8079**
**Philadelphia, PA 19101**

June 16, 2015

SALVADOR BELTRANSOTO


In Reply Refer To:

BELTRANSOTO S

To Whom It May Concern:

The official records of the Department of Veterans Affairs verify that Salvador Beltransoto is rated at 80% for a service-connected disability.

## Do You Have Questions or Need Assistance?

If you have any questions, you may contact us by telephone, e-mail, or letter.

| If you | Here is what to do. |
|---|---|
| Telephone | For Compensation, call us at 1-800-827-1000. If you use a Telecommunications Device for the Deaf (TDD), the number is 711. For Pension, call us at 1-877-294-6380. |
| Use the Internet | Send electronic inquiries through the Internet at https://iris.va.gov. |
| Write | Put your full name and VA file number on the letter.  Please send all correspondence to the address below: Department Of Veteran Affairs Evidence Intake Center PO BOX 4444 Janesville, WI 53547-4444 Toll Free FAX: 1-844-822-5246   Local FAX: 608-373-6690 |

With sincere regard for the Veteran's service,

*Gary Hodge*

Gary Hodge
National Call Center Manager

To email us visit https://iris.va.gov

Fis_Beltran-SotoS_CP_00000248

PX1107



**DEPARTMENT OF VETERANS AFFAIRS**

October 14, 2014

SALVADOR BELTRANSOTO

In reply, refer to:

Salvador Beltransoto

Dear Salvador Beltransoto:

We made a decision on your claim for benefits.

This letter tells you about your entitlement amount, payment start date, and what we decided. It includes the evidence used and reasons for our decision. We have also included information about what to do if you disagree with our decision and who to contact if you have questions or need assistance.

## Payment Summary

Your monthly entitlement amount is shown below:

| Monthly Entitlement Amount | Payment Start Date | Reason |
|---|---|---|
|  | Jan 1, 2014 | Original Award |

We are currently paying you as a single Veteran with no dependents.

## You Can Expect Payment

Generally, payments begin the first day of the month following the effective date. When applicable, a retroactive payment, minus any withholdings, will be issued. Thereafter, payment will be made at the beginning of each month for the prior month. For example, benefits due for May are paid on or about June 1.

We noticed that you did not provide us with your banking information to allow your federal benefits to be sent directly to your bank. The Department of Treasury has mandated that all recurring federal benefits be administered through either Electronic Funds Transfer (EFT) or Direct Express® Debit MasterCard®. If you do not provide your banking information to have

Fis_Beltran-SotoS_CP_00000249

PX1107

Page 2

File Number ███████
BELTRANSOTO, SALVADOR

your benefits electronically transferred to your bank, the Treasury Department will contact you
directly to determine your preferred payment method.

- To have your federal benefits electronically transferred to your designated financial
  institution (e.g. bank) call VA at 1-800-827-1000 with your banking information or go online
  to http://www.ebenefits.va.gov.
- To have your federal benefits issued through Direct Express® Debit MasterCard® issued by
  Comerica Bank call 1-888-213-1625 to enroll in the program.

## What We Decided

We made the following decision(s) regarding your claimed issue(s):

| Issue/Contention | Percent (%) Assigned | Effective Date |
|---|---|---|
| degenerative joint disease, right knee | 10% | Dec 10, 2013 |
| **Explanation** | | |

- We have assigned a 10 percent evaluation for your degenerative joint disease, right knee based on: • Painful motion of the knee (38 CFR §4.59 allows consideration of functional loss due to painful motion to be rated to at least the minimum compensable rating for a particular joint. Since you demonstrate painful motion of the knee, the minimum compensable evaluation of 10 percent is assigned) .
- The provisions of 38 CFR §4.40 and §4.45 concerning functional loss due to pain, fatigue, weakness, or lack of endurance, incoordination, and flare-ups, as cited in DeLuca v. Brown and Mitchell v. Shinseki, have been considered and applied under 38 CFR §4.59.
- A higher evaluation of 20 percent is not warranted unless the evidence shows: • Limitation of flexion of 16 to 30 degrees.

| Issue/Contention | Percent (%) Assigned | Effective Date |
|---|---|---|
| sensorineural hearing loss left ear | 0% | Dec 10, 2013 |
| **Explanation** | | |

- We have granted your claim for hearing loss, left ear.
- Service connection is warranted because your hearing loss has been related to combat noise exposure. Evidence from Combat Infantry Badge show that you engaged in combat with the enemy.
- Your VA examiner opined that it is at least as likely as not that your left ear hearing loss is due to military noise exposure.
- VA examination findings show the left ear with 100 percent discrimination. Decibel (dB) loss at the puretone threshold of 500 Hertz (Hz) is 25 with a 15 dB loss at 1000 Hz, a 10 dB

PX1107

Page 3

File Number: ▓▓▓▓▓▓
BELTRANSOTO, SALVADOR

| Explanation |
|---|
| loss at 2000 Hz, a 25 dB loss at 3000 Hz, and a 40 dB loss at 4000 Hz. The average decibel loss is 23 in the left ear.<br>• An evaluation of 0 percent is assigned because your left ear has a speech discrimination of 100 with an average decibel loss of 23. The evaluation for hearing loss is based on objective testing. Higher evaluations are assigned for more severe hearing impairment. |

| Issue/Contention | Percent (%) Assigned | Effective Date |
|---|---|---|
| degenerative joint disease, left knee status post gun shot wound to medial aspect of left knee | 10% | Dec 10, 2013 |

| Explanation |
|---|
| • We have assigned a 10 percent evaluation for your degenerative joint disease, left knee based on: • Painful motion of the knee (38 CFR §4.59 allows consideration of functional loss due to painful motion to be rated to at least the minimum compensable rating for a particular joint. Since you demonstrate painful motion of the knee, the minimum compensable evaluation of 10 percent is assigned) .<br>• The provisions of 38 CFR §4.40 and §4.45 concerning functional loss due to pain, fatigue, weakness, or lack of endurance, incoordination, and flare-ups, as cited in DeLuca v. Brown and Mitchell v. Shinseki, have been considered and applied under 38 CFR §4.59.<br>• A higher evaluation of 20 percent is not warranted unless the evidence shows: • Limitation of flexion of 16 to 30 degrees. |

| Issue/Contention | Percent (%) Assigned | Effective Date |
|---|---|---|
| post traumatic stress disorder | 70% | Dec 10, 2013 |

| Explanation |
|---|
| • We have assigned a 70 percent evaluation for your post traumatic stress disorder based on: • Impaired impulse control • Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood • Disturbances of motivation and mood • Impaired judgment • Circumstantial speech • Panic attacks (less than weekly) • Chronic sleep impairment • Anxiety • Suspiciousness • Depressed mood .<br>• The overall evidentiary record shows that the severity of your disability most closely approximates the criteria for a 70 percent disability evaluation.<br>• A higher evaluation of 100 percent is not warranted unless the evidence shows total occupational and social impairment, due to such symptoms as:• gross impairment in thought processes or communication• persistent delusions or hallucinations• grossly inappropriate behavior• persistent danger of hurting self or others• intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene)• disorientation to time or place• memory loss for names of close relatives, own occupation, or own name. |

Fis_Beltran-SotoS_CP_00000251

PX1107

Page 4

File Number: ████████████

BELTRANSOTO, SALVADOR

| Explanation |
|---|
| • Since there is a likelihood of improvement, the assigned evaluation is not considered permanent and is subject to a future review examination. |

| Issue/Contention | Percent (%) Assigned | Effective Date |
|---|---|---|
| scar, chin | 0% | Dec 10, 2013 |

| Explanation |
|---|
| • #1: A scar, located on your head, face, or neck, measures an estimated 0.02 in² (0.1 cm²). The scar is neither hyperpigmented nor hypopigmented. The evidence shows the scar is smooth on palpation. The texture of the scar is normal. The scar's underlying soft tissue is intact. The scar's skin is soft and flexible. The scar is not adherent to underlying tissue. The scar is not painful. The scar is stable. |
| • We have assigned a noncompensable evaluation for your scar, chin based on: • zero characteristics of disfigurement |
| • Note: In every instance where the schedule does not provide a zero percent evaluation for a diagnostic code, a zero percent evaluation shall be assigned when the requirements for a compensable evaluation are not met. {38 CFR §4.31} |
| • The eight characteristics of disfigurement, for purposes of evaluation under 38 CFR  §4.118 are: scar 5 or more inches 13 or more cm) in length; scar at least one-quarter inch 0.6 cm) wide at widest part; surface contour of scar elevated or depressed on palpation; scar adherent to underlying tissue; skin hypo- or hyper-pigmented in an area exceeding six square inches 39 cm² skin texture abnormal irregular, atrophic, shiny, scaly, etc.) in an area exceeding six square inches 39 cm² underlying soft tissue missing in an area exceeding six square inches 39 cm² and, skin indurated and inflexible in an area exceeding six square inches 39 cm²) The characteristics) of disfigurement may be caused by one scar or by multiple scars; the characteristics) required to assign a particular evaluation need not be caused by a single scar in order to assign that evaluation. A characteristic of disfigurement, even if present in more than one scar, is only counted once for evaluation purposes. |
| • An additional, separate compensable evaluation under Diagnostic Code 7804 is not warranted unless there is at least one scar that is painful or unstable. |
| • A higher evaluation of 10 percent is not warranted unless the evidence shows one characteristic of disfigurement. |

| Issue/Contention | Percent (%) Assigned | Effective Date |
|---|---|---|
| scar, left leg residual of gunshot wound | 0% | Dec 10, 2013 |

| Explanation |
|---|
| • #1: A scar, located on your left lower extremity, measures 1.2 in² (7.6 cm²) and is superficial and linear. The scar is neither painful nor unstable. |
| • We have assigned a noncompensable evaluation for your scar, left leg residual of gunshot wound based on: • One or more linear scars |

Fis_Beltran-SotoS_CP_00000252

PX1107

Page 5

File Number: ▮▮▮▮▮▮
BELTRANSOTO, SALVADOR

| Explanation |
|---|
| • Note: In every instance where the schedule does not provide a zero percent evaluation for a diagnostic code, a zero percent evaluation shall be assigned when the requirements for a compensable evaluation are not met. {38 CFR §4.31}<br>• An additional, separate compensable evaluation under Diagnostic Code 7804 is not warranted unless there is at least one scar that is painful or unstable.<br>• A higher evaluation is not warranted unless scars are considered disabling because of limitation of function of the affected part. |

| Issue/Contention | Percent (%) Assigned | Effective Date |
|---|---|---|
| traumatic brain injury | 10% | Dec 10, 2013 |
| Explanation | | |
| • The rating schedule contains ten important facets of TBI related to cognitive impairment and subjective symptoms. It provides criteria for levels of impairment for each facet, as appropriate, ranging from 0 to 3, and a 5th level, the highest level of impairment, labeled "total." However, not every facet has every level of severity. The Consciousness facet, for example, does not provide for an impairment level other than "total" since any level of impaired consciousness would be totally disabling. A 100 percent evaluation will be assigned if "total" is the level of evaluation for one or more facets. If no facet is evaluated as "total," the overall percentage evaluation will be assigned based on the level of the highest facet as follows: 0 = noncompensable; 1 = 10 percent; 2 = 40 percent; and 3 = 70 percent. For example, a 70 percent evaluation will be assigned if 3 is the highest level of evaluation for any facet.<br>• A level of severity of " 1" has been assigned for your Memory, Attention, Concentration, Executive Functions Facet based on: •A complaint of mild loss of memory (such as having difficulty following a conversation, recalling recent conversations, remembering names of new acquaintances, or finding words, or often misplacing items), attention, concentration, or executive functions, but without objective evidence on testing<br>• A level of severity of " 0" has been assigned for your Judgment Facet based on: •Normal<br>• A level of severity of " 0" has been assigned for your Social Interaction based on: •Social interaction is routinely appropriate<br>• A level of severity of " 0" has been assigned for your Orientation Facet based on: •Always oriented to person, time, place, and situation<br>• A level of severity of " 0" has been assigned for your Motor Activity (with intact motor and sensory system) based on: •Motor activity normal<br>• A level of severity of " 0" has been assigned for your Visual Spatial Orientation based on: •Normal<br>• A level of severity of " 1" has been assigned for your Subjective Symptoms based on: •Three or more subjective symptoms that mildly interfere with work; instrumental activities of daily living; or work, family, or other close relationships. Examples of findings that might be seen at this level of impairment are: intermittent dizziness, daily mild to moderate headaches, tinnitus, frequent insomnia, hypersensitivity to sound, hypersensitivity to light<br>• A level of severity of " 0" has been assigned for your Neurobehavioral Effects based on: •One or more neurobehavioral effects that do not interfere with workplace interaction |

Fis_Beltran-SotoS_CP_00000253

PX1107

Page 6

File Number: █████████
BELTRANSOTO, SALVADOR

| Explanation |
| --- |
| or social interaction. Examples of neurobehavioral effects are: Irritability, impulsivity, unpredictability, lack of motivation, verbal aggression, physical aggression, belligerence, apathy, lack of empathy, moodiness, lack of cooperation, inflexibility, and impaired awareness of disability. Any of these effects may range from slight to severe, although verbal and physical aggression are likely to have a more serious impact on workplace interaction and social interaction than some of the other effects |
| • A level of severity of " 0" has been assigned for your Communication based on: •Able to communicate either by spoken and written language (expressive communication), and to comprehend spoken and written language |
| • An overall 10 percent evaluation is assigned for your traumatic brain injury based on the highest level of severity of " 1". |
| • A higher evaluation of 40 percent is not warranted unless the evidence shows: • Inability to communicate either by spoken language, written language, or both, more than occasionally but less than half of the time, or to comprehend spoken language, written language, or both, more than occasionally but less than half of the time. Can generally communicate complex ideas; or, • Moderately impaired judgment. For complex or unfamiliar decisions, usually unable to identify, understand, and weigh the alternatives, understand the consequences of choices, and make a reasonable decision, although has little difficulty with simple decisions; or, • Objective evidence on testing of mild impairment of memory, attention, concentration, or executive functions resulting in mild functional impairment; or, • Motor activity mildly decreased or with moderate slowing due to apraxia; or, • One or more neurobehavioral effects that frequently interfere with workplace interaction, social interaction, or both but do not preclude them; or, • Occasionally disoriented to two of the four aspects (person, time, place, situation) of orientation or often disoriented to one aspect of orientation; or, • Social interaction is frequently inappropriate; or, • Three or more subjective symptoms that moderately interfere with work; instrumental activities of daily living; or work, family, or other close relationships. Examples of findings that might be seen at this level of impairment are: marked fatigability, blurred or double vision, headaches requiring rest periods during most days; or, • Moderately impaired. Usually gets lost in unfamiliar surroundings, has difficulty reading maps, following directions, and judging distance. Has difficulty using assistive devices such as GPS (global positioning system). |

| Issue/Contention | Percent (%) Assigned | Effective Date |
| --- | --- | --- |
| tinnitus | 10% | Dec 10, 2013 |
| Explanation | | |
| • We have assigned a 10 percent evaluation for your tinnitus based on: • Recurrent tinnitus . | | |
| • A single evaluation for recurrent tinnitus is assigned whether the sound is perceived in one ear, both ears, or in the head. | | |
| • This is the highest evaluation allowed under the law for this condition. | | |

Fis_Beltran-SotoS_CP_00000254

PX1107

Page 7

File Number: ▮▮▮▮▮▮▮▮
BELTRANSOTO, SALVADOR

| Issue/Contention | Percent (%) Assigned | Effective Date |
|---|---|---|
| migraine headaches | 0% | Dec 10, 2013 |

| Explanation |
|---|

- Service connection for migraine headaches has been established as related to the service-connected disability of traumatic brain injury.
- We have assigned a noncompensable evaluation for your migraine headaches based on: • A diagnosed disability with no compensable symptoms
- A higher evaluation of 10 percent is not warranted unless there are characteristic prostrating attacks averaging one in 2 months over last several months.

| Issue/Contention |
|---|

Right Ear sensorineural hearing loss right ear

| Explanation |
|---|

- Service connection may not be established for disability due to impaired hearing unless the auditory threshold in any of the frequencies 500, 1000, 2000, 3000 or 4000 Hertz is 40 decibels or greater; or the auditory thresholds for at least three of the frequencies 500, 1000, 2000, 3000 or 4000 Hertz are 26 decibels or greater; or speech recognition scores using the Maryland CNC Test are less than 94 percent.In this case, the evidence of record does not show audiometric findings which meet the criteria for a grant of service connection for defective hearing.
- Service connection for hearing loss, right ear is denied because your right ear hearing is normal.
- Service connection may not be established for disability due to impaired hearing unless the auditory threshold in any of the frequencies 500, 1000, 2000, 3000 or 4000 Hertz is 40 decibels or greater; or the auditory thresholds for at least three of the frequencies 500, 1000, 2000, 3000 or 4000 Hertz are 26 decibels or greater; or speech recognition scores using the Maryland CNC Test are less than 94 percent. (38 CFR 3.385).
- There are no audiometric findings in your service treatment records that meet the above requirements for your right ear.
- You have in-service acoustic trauma, but service connection for your left ear based on military noise exposure alone cannot be granted. For service connection to be considered there must first be a showing of actual hearing loss in your left ear for VA purposes.
- VA examination findings show the right ear with 100 percent discrimination. Decibel (dB) loss at the puretone threshold of 500 Hertz (Hz), with a 15 dB loss at 1000 Hz, a 15 dB loss at 2000 Hz, a 30 dB loss at 3000 Hz, and a 30 dB loss at 4000 Hz. The average decibel loss is 23 in the right ear.
- Your examiner provided an opinion that linked your right ear hearing loss to in-service acoustic trauma, but service connection cannot be granted as your right ear hearing does not meet the above definition of hearing loss for VA purposes. Your VA examination does not show right ear hearing loss for VA purposes.

| Issue/Contention |
|---|

low back pain

Fis_Beltran-SotoS_CP_00000255

PX1107

Page 8

File Number ████████
BELTRANSOTO, SALVADOR

| Explanation |
|---|
| • Service connection for low back pain is denied since this condition neither occurred in nor was caused by service.<br>• Your service treatment records do not contain complaints, treatment, or diagnosis for this condition. We received your medical evidence which discusses the symptoms of your medical condition. We did not find a link between your medical condition and military service. |

| Issue/Contention |
|---|
| cervical condition |

| Explanation |
|---|
| • Service connection for cervical condition is denied since this condition neither occurred in nor was caused by service.<br>• The evidence does not show a current diagnosed disability. While your service treatment records reflect complaints, treatment, or a diagnosis similar to that claimed, the medical evidence supports the conclusion that a persistent disability was not present in service. |

Your overall or combined rating is 80%.

**Note**: The percentages assigned for each of your conditions may not always add up to your combined rating evaluation. We do not add the individual percentages of each condition to determine your combined rating. Instead, we use a combined rating table that considers the effect from the most serious to the least serious conditions.

## Are You Entitled to Additional Benefits?

Did you know you may be eligible for a VA guaranteed mortgage with no down payment (potentially exempt from a funding fee depending on your rating)? For more information about this benefit, or to determine and print your Loan Guaranty Certificate of Eligibility, please visit the eBenefits website at http://www.ebenefits.va.gov.

If you served overseas in support of a combat operation you may be eligible for mental health counseling at no cost to you at the Veteran's Resource Center. For more information on this benefit please visit https://www.myhealth.va.gov/mhv-portal-web/.

The VA provides Blind Rehabilitation services to eligible blind, low vision, or visually impaired Veterans to help them regain their independence and quality of life. The veteran's blindness, low vision, or vision impairment does NOT have to be related or caused by military service. If you need help with your vision loss, please contact your nearest Visual Impairment Services Team Coordinator (VIST) at the eye clinic at your nearest VA Medical Center. For more information, go to www.va.gov/blindrehab/.

Fis_Beltran-SotoS_CP_00000256

PX1107

Page 9

File Number: ▮▮▮▮▮▮▮
BELTRANSOTO, SALVADOR

You may be eligible for medical care by the VA health care system for any service-connected disability. You may apply for medical care or treatment at the nearest medical facility. If you apply in person, present a copy of this letter to the Patient Registration/Eligibility Section. If you apply by writing a letter, include your VA file number and a copy of this letter.

If you receive care at a VA medical facility, **please call our Health Benefits Call Center at 1-877-222-VETS (8387) or notify your local VA Medical Center** of this change in your compensation benefits. This may reduce or eliminate your co-payments for your VA-provided medical care. You may also be eligible for a refund based on this decision. Information regarding VA health care eligibility and co-payments is available at our website http://www.va.gov/healtheligibility.

You may be eligible for a clothing allowance or more than one clothing allowance because of your service-connected disability(ies). If you would like to apply for this benefit, please call us at 1-800-827-1000 or download VA Form 10-8678, *Application for Annual Clothing Allowance*, at http://www.va.gov/vaforms.

You should contact your state office of Veterans' affairs for information on any tax, license, or fee-related benefits for which you may be eligible as a Veteran (or surviving dependent of a Veteran). State offices of Veterans' affairs are available at http://www.va.gov/statedva.htm.

Some Veterans may be entitled to VA dental treatment. For additional information, contact your nearest VA Medical Center or outpatient clinic.

A monthly educational assistance allowance is payable to certain Veterans. If you need help with your VA education benefits, you can call toll-free 1-888-442-4551 or visit the VA national education website at http://www.gibill.va.gov.

You **may** be eligible for reimbursement for beneficial travel mileage for previous VA medical appointments due to your newly granted service-connected conditions. You must make a request for such reimbursement **within 30 days of this letter** by contacting the Enrollment office at your Medical Center and providing a copy of this letter.

You may be eligible for VA life insurance benefits. Call the Insurance toll free number, 1-800-669-8477, or visit the Insurance website, http://www.insurance.va.gov, for further information.

You may be able to receive vocational rehabilitation employment services. For more information on this benefit please visit http://www.vba.va.gov/bln/vre/ or call us at 1-800-827-1000.

Your combined evaluation is 30 percent or more disabling; therefore, you may be eligible for additional benefits based on dependency. We may be able to pay you retroactive benefits

Fis_Beltran-SotoS_CP_00000257

PX1107

Page 10

File Number: 
BELTRANSOTO, SALVADOR

for your dependents if you submit your dependency claim within a year from the date of this letter. If you wish to notify us of your dependents, please do so through eBenefits, an electronic resource in a self-service environment. Use of these resources often helps us serve you faster! Just visit www.eBenefits.va.gov to enroll and submit your dependency information.

## Conditions That Affect Your Right to Payments

Your award of disability compensation is subject to future adjustment upon receipt of evidence showing any change in the degree of disability.

Your payments may also be affected by any of the following circumstances which you must promptly call to our attention.

- Reentrance into active service.
- Receipt of uniformed service retirement pay, unless your retirement pay has been reduced because of award of disability compensation.
- Receipt of benefits from the Office of Federal Employees Compensation.
- Receipt of active duty or drill pay as a reservist or member of the Federally recognized National Guard.

If you have a disability rating of 30% or more, you must promptly advise us of any change in the status of your dependents.

If your award includes special monthly compensation due to the need for aid and attendance, this additional allowance is generally subject to reduction from the first day of the second calendar month of admission to hospitalization, nursing home or domiciliary care at VA expense.

Benefits will be reduced upon incarceration in a Federal, State, or local penal institution in excess of 60 days for conviction of a felony. The amount not payable may be apportioned to a spouse, dependent children or parents.

Monthly payments of your award may be stopped if you fail to furnish evidence as requested, fail to cooperate or submit to a VA examination when requested, or if you furnish VA, or cause to be furnished, any false or fraudulent evidence. Information submitted is subject to verification through computer matching programs with other agencies.

The law provides severe penalties, which include fine, imprisonment, or both, for the fraudulent acceptance of any payment to which you are not entitled.

PX1107



Page 11

File Number: ███████
BELTRANSOTO, SALVADOR

**Note**: Compensation payments are exempt from claims of creditors. With certain exceptions, the payments are not assignable and are not subject to attachment, levy, or seizure except as to claims of the United States.

### IMPORTANT

Please notify VA *immediately* if there is a change in any condition affecting your right to continued payments. Failure to notify us of these changes immediately may result in a debt that you will have to repay.

## Evidence Considered

In making our decision, we considered:

- VA compensation exams received by us on August 29, 2014
- VA form 21-526EZ received by us on December 10, 2013
- Service treatment and personnel records
- VA medical records from Loma Linda Medical Center received by us on September 10, 2014

## What You Should Do If You Disagree With Our Decision

If you do not agree with our decision, please download and complete VA Form 21-0958, *Notice of Disagreement*. You can download the form at http://www.va.gov/vaforms or you can call us at 1-800-827-1000. You have *one year from the date of this letter to appeal the decision*. The enclosed VA Form 4107, *"Your Rights to Appeal Our Decision,"* explains your right to appeal.

## What is eBenefits?

eBenefits provides electronic resources in a self-service environment to Servicemembers, Veterans, and their families. Use of these resources often helps us serve you faster!  Through the eBenefits website you can:

- Submit claims for benefits and/or upload documents directly to the VA
- Request to add or change your dependents
- Update your contact and direct deposit information and view payment history
- Request a Veterans Service Officer to represent you
- Track the status of your claim or appeal
- Obtain verification of military service, civil service preference, or VA benefits
- And much more!

Enrolling in eBenefits is easy. Just visit www.eBenefits.va.gov for more information. If you submit a claim in the future, consider filing through eBenefits. Filing electronically, especially if you participate in our fully developed claim program, may result in a faster decision than if you submit your claim through the mail.

Fis_Beltran-SotoS_CP_00000259

**PX1107**



Page 12

File Number: ▮▮▮▮▮▮
BELTRANSOTO, SALVADOR

## If You Have Questions or Need Assistance

If you have any questions or need assistance with this claim, you may contact us by telephone, e-mail, or letter.

| If you | Here is what to do. |
|---|---|
| Telephone | Call us at 1-800-827-1000. If you use a Telecommunications Device for the Deaf (TDD), the Federal number is 711. |
| Use the Internet | Send electronic inquiries through the Internet at https://iris.va.gov. |
| Write | VA now uses a centralized mail system. For all written communications, put your full name and VA file number on the letter. Please mail or fax all written correspondence to the appropriate address listed on the attached *Where to Send Your Written Correspondence* chart, below. |

In all cases, be sure to refer to your VA file number ▮▮▮▮▮▮

If you are looking for general information about benefits and eligibility, you should visit our web site at http://www.va.gov, or search the Frequently Asked Questions (FAQs) at http://iris.va.gov.

We sent a copy of this letter to MILITARY ORDER OF THE PURPLE HEART, who you have appointed as your representative. If you have questions or need assistance, you can also contact your representative.

Thank you for your service,

## Regional Office Director

Enclosure(s):      VA Form 4107
                   Where to Send Your Written Correspondence

cc: MILITARY ORDER OF THE PURPLE HEART

PX1108

# DECLARATION OF

# Alexander Rodriguez Bryant

I, Alexander Rodriguez Bryant declare, certify, verify, and state under penalty of perjury that the following statements are true and correct:

a. I have personal knowledge of the facts and information contained in this statement.

b. I am a citizen of the United States and was born in Columbia, South Carolina on ███████████

c. **RANK AND POSITIONS:** 1 enlisted in the United States Army on February 18, 1998 and served honorably until July 17, 2005. In Iraq, my rank was SPC (E4) at the time of the attack; my specialty (MOS) and my position was 11 Bravo (11B), Infantryman.

d. **UNIT:** 1 was assigned to C CO, 2 nd BN, 5 th CAV.

e. **GENERAL DESCRIPTION OF MISSION:** Our mission in Iraq was to provide security and help people open different businesses during the war in Sadr City, Baghdad neighborhoods.

f. **MISSION/TASK OF TEAM/UNIT AT TIME OF ATTACK:** On April 4, we were relaxing and unpacking at Camp War Eagle when we received a warning from our Tactical Operations Center to assist 2-5 CAV of the 1st Calvary Division. They had been pinned down within Sadr City under heavy fire and attack.

g. **LOCATION OF CLIENT:** We were located on Route Gold.

h. **DESCRIPTION OF THE ATTACK:** On April 4, 2004, in Sadr City, Iraq, 1 was involved in an incident referred to today as "Black Sunday." At approximately 5pm on the evening of the 4th, a warning came from our Tactical Operations Center that the 1 Platoon, Charlie Company, 2-5 CAV of the 1st Calvary Division (a platoon within my company) had been pinned down within Sadr City under heavy fire. The insurgents staged an ambush, and the platoon was in desperate need of assistance. My platoon, 2nd Platoon, Charlie Company, 2-5 CAV was going to be the lead element in the rescue effort of the pinned down platoon. We had about 30-40 vehicles in our convoy. My vehicle was a Bradley and was first in line. I was the driver of the vehicle, and the others with me were Sgt. Johnny Williams (gunner in turret) and Sgt First Class Gordon (Commander of Bradley located at the top of the

vehicle). As we left our FOB (Forward Operating Base), Camp War Eagle, in a column of four vehicles, we came under heavy fire. The insurgents unloaded their AK-47s on us from alleys and rooftops, while others attacked with rocket-propelled grenades. As I was driving the Bradley, I could clearly see each shot, and how it impacted the enemy fighters. I guided the Bradley through the dense streets of Sadr City, avoiding multiple pre-planned enemy ambushes, man-made obstacles and improvised explosive devices. The Bradley took more than 12 direct RPG hits, as well as impacts from over 15 IEDs. We stayed on course driving through the streets and over concrete barriers, dead bodies, burning trash, rubble and junk heaps. We did all this while dealing with the torrent of gunfire coming from both sides of the street. The enemy never ceased fire, even while women and children ran for safety.  We were forced to return fire. At one point, an insurgent began firing at my Bradley from the middle of the road. I had no choice but to run him over with the vehicle as he continued to fire as we approached him. Finally, we received word over the radio that we were close to the pinned down platoon. As we pulled up, I could see two off my fellow soldiers lying against the side of a HMMWV (Humvee) with blood-soaked pant legs and tourniquets strapped around their thighs. Others were cradling their wounded arms or sides, crying for help, and swaying with the loss of blood. The wounded were loaded into the four Bradley's as well as could be managed. SGT Yihjyh Chen, a solider in my company who had been killed in action, was draped carefully across the hood of a HMM WV because there was no other way to transport him. Once all the wounded soldiers were secure, we evacuated them back to Camp War Eagle. During the evacuation process, the assault from AK-47s and RPGs remained ferocious. Once back at Camp War Eagle, we were able to take full stock of all our fellow soldiers, both KIA and wounded. Among the KIA was one of my close friends by the name of SPC Ahmad Cason, who had been shot in the stomach. The entire next morning at the aid station we had to sift through piles of bloody boots, helmets, uniforms, and body armor belonging to the dead and wounded. This attack is still burned into my memory and something that I have not been able to recover from since it occurred. This was the bloodiest day I had to encounter and losing so many fellow soldiers.

i. **EFFECT OF THE WEAPON/ATTACK:** The RPGs, IEDs and gunfire caused damage to my vehicle. The Bradley had dents around the entire truck.

j. **PRIMARY CLIENT'S INJURIES:** As a result of the attack, I experienced head injury due to the tank explosion, migraine headaches, tinnitus, depression, anxiety and chronic PTSD. I also struggle with nightmares, anger issues, hypervigilance and survivors' guilt. I was first treated on May 24, 2004, at FOB War Eagle for headaches and given medication. I went for treatment prior to this date but was only given pain reliever. According to my medical records on April 18, 2018, through May 29, 2018, I completed a 6-week inpatient

stay for intensive and comprehensive treatment for PTSD. The experience of this day and witnessing the carnage will forever be in my mind.

k. **DISABILITY:** I have been awarded 100% VA disability. An evaluation of PTSD with depression and anxiety (also claimed as psychiatric condition with memory loss and sleep disorder) at 70% was granted by the VA. Migraine headaches were evaluated and granted by the VA at 30% and tinnitus at 10%.

l. **CLIENT'S MEDICAL CARE AND EVACUATION(S):** 1 was first treated on May 24, 2004, at FOB War Eagle for headaches and was given medication. I went prior to this date but was only given pain reliever.

m. **OTHER PERSON KILLED:** SPC  Cason was killed in action.

n. **OTHER PERSON KILLED:** SGT Yihjyn Chen was killed in action.

o. **EVIDENCE:** The weapons used in the attack against us were RPGs, IEDs and AK-47s.

p. **UNITED STATES PROPERTY DAMAGES:** The Bradley vehicle was damaged by the weapons used in the attack.

q. **EFFECT ON THE CLIENT AND HIS FAMILIY:** This attack has affected me emotionally. The experience of that day and witnessing carnage will forever be in my mind.

r. **AUTHENTICATION OF PHOTOS/DOCUMENTS/EVIDENCE:** As Part of my Statement, I am providing documentary materials attached as Exhibit A through D.
   a. Exhibit A attached to this Statement is a true and authentic copy of Certificate of Live Birth.
   b. Exhibit B attached to this Statement is a true and authentic copy of my summary of benefits received from the Department of Veteran Affairs. I have personal knowledge of the source of this Exhibit because it is addressed to me.
   c. Exhibit C attached to this Statement is a true and authentic copy of my Certificate of Achievement for successful completion of the Posttraumatic Stress Disorder Residential Rehabilitation Treatment Program. I have personal knowledge of the source of this Exhibit because it was presented to me during a ceremony on May 29, 2018.
   d. Exhibit D attached to this Statement is a true and authentic copy of my Recommendation for Award (ARCOM). I have personal knowledge of the source

of this Exhibit because it is from my military records at the Department of the
Veteran Affairs.

I declare, certify, verify, and state under penalty of perjury under the laws of the United States of
America that the foregoing statements are true and correct.

Executed on this _____8___ day of _August_.____2022_____

Signature _Alexander Bryant_____

SignNow e-signature ID: ████████
08/08/2022 17:54:14 UTC

Statement of Alexander R. Bryant

PX1108

# Exhibit A

PX1108



MSG STEVEN J. FOLLMANN
U.S. ARMY SENIOR GUIDANCE COUNSELOR
CERTIFIED TRUE COPY OF ORIGINAL

SEP 16 1992

A TRUE COPY OF THE RECORD ON FILE
IN THE OFFICE OF VITAL RECORDS AND
PUBLIC HEALTH STATISTICS S.C. DEPT. OF
HEALTH AND ENVIRONMENTAL CONTROL

DIRECTOR

STATE OF SOUTH CAROLINA
DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL
CERTIFICATE OF LIVE BIRTH

139-

BIRTH NUMBER

| CHILD—NAME | FIRST | MIDDLE | LAST | SEX | HOUR |
| --- | --- | --- | --- | --- | --- |
| 1. | Alexander | Rodriguez | Bryant | 3Male | 3b 8-12A |

HOSPITAL—NAME (If not in hospital, give street and number) | CITY, TOWN OR LOCATION OF BIRTH | COUNTY OF BIRTH
4a. Richland Memorial Hospital | 4b. | 4c. Richland

DATE SIGNED (mo., day, yr.) | NAME AND TITLE OF ATTENDANT AT BIRTH IF OTHER THAN CERTIFIER (Type or print)
5b. 12-26-78 | 5c. Thomas Traylor M.D.

CERTIFIER—NAME AND TITLE (Type or print) | MAILING ADDRESS (Street or R.F.D., No., City or Town, State, Zip)
5a. | 3301 Harden St f, Cola S.C.

REGISTRAR | DATE RECEIVED BY REGISTRAR (mo., day, yr.)
6a. Shirley Johnson Maddick Record Clerk | 6b. December 27, 1978

7a. S.C. | 7b. 79 | 7c. S.C.
STATE OF BIRTH (If not in U.S.A., name country) | INSIDE CITY LIMITS 8c. Yes

MOTHER—MAIDEN NAME | FIRST | MIDDLE | LAST
8a. | Gloria | Ann | Bryant

STREET AND NUMBER OF RESIDENCE
8d.

RESIDENCE—STATE | COUNTY | CITY, TOWN OR LOCATION
9a. S.C. | 9b. Barnwell | 9c.

MOTHER'S MAILING ADDRESS—If same as above, enter Zip Code only

FATHER—NAME | FIRST | MIDDLE | LAST
10a.

PX1108

# Exhibit B

PX1108



**DEPARTMENT OF VETERANS AFFAIRS**
**810 Vermont Ave NW**
**Washington, D.C. 20420**

September 05, 2018

Alexander R Bryant
13308 Hunting Birds
Ln
Charlotte, NC 28278

In Reply Refer to:
xxx-xx-4786
27/eBenefits

Dear Mr. Bryant:

This letter is a summary of benefits you currently receive from the Department of Veterans Affairs (VA). We are
providing this letter to disabled Veterans to use in applying for benefits such as state or local property or vehicle tax
relief, civil service preference, to obtain housing entitlements, free or reduced state park annual memberships, or
any other program or entitlement in which verification of VA benefits is required. Please safeguard this important
document. This letter is considered an official record of your VA entitlement.

Our records contain the following information:

## Personal Claim Information

Your VA claim number is: xxx-xx-4786

You are the Veteran.

## Military Information

Your most recent, verified periods of service (up to three) include:

| Branch of Service | Character of Service | Entered Active Duty | Released/Discharged |
|---|---|---|---|
| Army | Honorable | February 15, 1998 | July 17, 2005 |

(There may be additional periods of service not listed above.)

## VA Benefit Information

| | |
|---|---|
| You have one or more service-connected disabilities: | Yes |
| Your combined service-connected evaluation is: | 100% |
| Your current monthly award amount is: | ▮▮▮▮▮ |
| The effective date of the last change to your current award was: | June 01, 2018 |
| You are considered to be totally and permanently disabled due solely to your service-connected disabilities: | Yes |
| The effective date of when you became totally and permanently disabled due to your service-connected disabilities: | April 27, 2018 |
| You are in receipt of special monthly compensation due to the type and severity of your service-connected disabilities: | Yes |

You should contact your state or local office of Veterans' affairs for information on any tax, license, or fee-related
benefits for which you may be eligible. State offices of Veterans' affairs are available at
http://www.va.gov/statedva.htm.

## How You Can Contact Us

PX1108

Exhibit C

PX1108

# Certificate of Achievement

Presented to

## Alexander Bryant

For Successful Completion of the

*Posttraumatic Stress Disorder*

*Residential Rehabilitation Treatment Program*

W.G. (Bill) Hefner VA Medical Center, Salisbury, NC

This 29 day of May in the year 2018

---
Brandon Bryan, PsyD

---
Megan Freese, PhD

---
Thomas Brown, MD, JD

---
Ted Moretz, PhD

---
Christi Blake, PA-C

---
Amanda Vaughn, LCSW

PX1108

# Exhibit D

PX1108

**RECOMMENDATION FOR AWARD**
For use of this form, see AR 600-8-22; the proponent agency is ODCSPER

For valor/heroism/wartime and all awards higher than MSM, refer to special instructions in Chapter 3, AR 600-8-22.

| 1. TO | 2. FROM | 3. DATE |
|---|---|---|
| CDR, 1ST BDE, 1ST CAV DIV | CDR, C CO, 2ND BN, 5TH CAV, 1ST CAV DIV | 15 APR 04 |

**PART I - SOLDIER DATA**

| 4. NAME | 5. RANK | 6. SSN |
|---|---|---|
| BRYANT, ALEXANDER | SPC | |

| 7. ORGANIZATION | 8. PREVIOUS AWARDS |
|---|---|
| C CO, 2ND BN, 5TH CAV, 1ST CAV DIV | NONE |

| 9. BRANCH OF SERVICE | 10. RECOMMENDED AWARD | 11. PERIOD OF AWARD |||
|---|---|---|---|
| | ARCOM | a. FROM 12 MAR 04 | b. TO 22 MAR 05 |

| 12. REASON FOR AWARD | | 13. POSTHUMOUS | |
|---|---|---|---|
| 12a. INDICATE ACH, SVC, PCS, ETS, OR RET | 12b. INTERIM AWARD  YES  [X] NO | | |
| SVC | IF YES, STATE AWARD GIVEN | YES [ ] | NO [X] |

**PART II - RECOMMENDER DATA**

| 14. NAME | 15. ADDRESS |
|---|---|
| NICHOLAS AULETTA | C CO, 2ND BN, 5TH CAV, 1ST CAV DIV |

| 16. TITLE/POSITION | 17. RANK | UNIT # 90026 |
|---|---|---|
| PLATOON LEADER | | |

| 18. RELATIONSHIP TO AWARDEE | 19. SIGNATURE |
|---|---|
| PLATOON LEADER | |

**PART III - JUSTIFICATION AND CITATION DATA** *(Use specific bullet examples of meritorious acts or service)*

20. ACHIEVEMENTS

ACHIEVEMENT #1
While deployed to Baghdad in support of Operation Iraqi Freedom II, SPC Bryant contributed significantly to his unit's success by his dedication to duty and commitment to excellence. His performance during combat operations was outstanding, and by operating his Bradley Fighting Vehicle to a high standard he ensured the success of each mission. For over 365 days, he remained battle-focused and vigilant in an extremely hostile environment, and conducted himself honorably despite the dangers and hardships.

ACHIEVEMENT #2
SPC Bryant has distinguished himself through his meritorious service while serving as a Bradley Fighting Vehicle gunner during operations within Sadr City. SPC Bryant has served as a gunner on over 100 combat patrols, 50 movement to contacts, and 30 cordon and searches. SPC Bryant has also served as a M1114 gunner on an additional 20 cordon and searches. SPC Bryant has displayed his versatility through his exemplary actions while both dismounted and as a Bradley Fighting Vehicle gunner.

ACHIEVEMENT #3
On 4 April 2004, SPC Bryant was the driver for the lead Bradley Fighting Vehicle in a convoy attempting to rescue First Platoon, C Co, who was pinned down by enemy fire. SPC Bryant fearlessly guided his Bradley through multiple pre-planned enemy ambush positions, all the while skillfully maneuvering the Bradley around man-made obstacles and improvised explosive devices. During his Bradley's push through the dense streets of Sadr City, SPC Bryant's Bradley took over 12 direct RPG hits, as well as impacts from over 15 IEDs.

ACHIEVEMENT #4

21. PROPOSED CITATION
FOR MERITORIOUS SERVICE DURING COMBAT OPERATIONS WHILE ASSIGNED TO THE IRONHORSE BRIGADE COMBAT TEAM IN BAGHDAD, IRAQ. HIS SELFLESS SERVICE SECURED AMERICA'S FREEDOM BY ENSURING THE SUCCESS OF OPERATION IRAQI FREEDOM II. HIS ACTIONS ARE IN THE FINEST TRADITION OF MILITARY SERVICE, AND BRING GREAT CREDIT UPON HIMSELF AND THE U.S. ARMY.

DA FORM 638, NOV 94            REPLACES DA FORM 638-1           USAPPC V6.00

PX1108

PX1109

**DECLARATION OF**

**ANTHONY JOHN FERRIS**


I, Anthony John Ferris declare and state under penalty of perjury that the following statements are true and correct:

a.  I have personal knowledge of the facts and information contained in this Declaration.

b.  I was born on ████████████, in Amherst, New York and I am a U.S. Citizen.

c.  I joined the United States Army on August 30, 2001, in Buffalo, New York.  Prior to deploying to Iraq, I was assigned to 2nd Platoon, C Company, 2nd Battalion, 5th Cavalry Regiment, 1st Cavalry Division at Fort Hood, Texas.

d.  In March 2004, we initially deployed to Kuwait which was being used as a staging area prior to entering Iraq. We then entered Iraq we were stationed at Camp War Eagle just northeast of Sadr City, Baghdad Governate, Iraq. My rank was Specialist (SPC/E-4); my specialty was Army Infantryman (11B) and my position was a grenadier.

e.  Our mission in Iraq was to provide security for various units rebuilding the infrastructure in and around Sadr City. We also performed humanitarian missions giving out food and water to the Iraqi citizens and helping them open their schools.

f.  On April 4, 2004, 1st Platoon from C Company was providing security for sewage trucks inside Sadr City.  My platoon, 2nd Platoon, was one of the designated Quick Reaction Force (QRF) and our mission was to assist any units that came under enemy fire. The QRF consisted of approximately 36 soldiers in 7-8 HMMWVs.  None of the vehicles were armored. We were in full battle gear and ready to depart at a moments' notice.  I was the driver of the second to the last vehicle.  Sergeant (SGT) Morris was our team leader and he was in the front passenger position with other soldiers for security as passengers.  SGT Newell was in the last vehicle with other soldiers.  In addition to the QRF, the remainder of the battalion had been on patrols earlier that day.  That afternoon, we got a call to assist 1st Platoon who were under attack from small arms fire and Rocket Propelled Grenades (RPGs).  We immediately departed Camp War Eagle and turned onto Route (RTE) "Aeros" heading south. We drove to the intersection of Route Copper and then turned right. Route Cooper was a main road into Sadr city and was the most direct route to 1st Platoon.  As soon as our lead vehicles turned right onto Route Copper, we came under heavy small arms

The signed document can be validated at https://app.vinesign.com/Verify

PX1109

(AK-47) fire. The fire was coming from inside the buildings along the route and from the rooftops. As the convoy continued, the small arms fire intensified and we were attacked with RPG's and hand grenades. This appeared to be a planned ambush by the insurgents. The vehicle behind me, with SGT Newell, was disabled and I saw him and his team dismount and run inside a nearby building.  As the firing continued, I turned my vehicle around to assist them, but as soon as I did this, I was told by SGT Morris to turn back around and push through the ambush, which I did. We drove forward through intense enemy fire to a major intersection and set up a Casualty Collection Point (CCP). All of the vehicles in the convoy were disabled except for mine and a Light Medium Tactical Vehicle (LMTV). Although my HMMWV received heavy damage from small arms fire, it still functioned. The LMTV was positioned at the CCP and was operable, despite having at least one flat tire.  We began to load these two vehicles with as many casualties as we could and I remember loading over 10 wounded soldiers into the LMTV. 1st Sergeant (1SG) Casey Carson got in my vehicle with me and we led the LMTV back down the same route we came from, again through the ambush site and enemy fire, to Camp War Eagle.

g.   When we got back to Camp War Eagle, I cleaned out my vehicle of spent shell casings and loaded it up with ammunition to take back to the units fighting in the city.  Because there was confusion on which units were engaged in battle, the Tactical Operations Center (TOC) closed the camp not allowing anyone to leave.  They did this in order to reorganize our forces to re-engage the enemy. I then began to help with administering medical aid to the wounded soldiers.

h.   It was apparent to me that the ambush was well planned and organized. In addition to the small arms fire, RPG's and hand grenades, the enemy was throwing refrigerators and other large objects off of the rooftops in order to block our vehicles. They also set car tires on fire to create smoke and confusion.  The insurgent fighters operated as if they were aware of our plans to change over forces at the camp and coordinated their attack to take advantage of this change. The insurgents worked in small groups and wore make-shift uniforms of black clothing and green headbands. These fighters had better weapons and better tactics than what we had previously encountered. They were not dressed like the normal insurgent fighters we encountered in Iraq and their tactics were more organized. The day of this attack would later be referred to as "Black Sunday" because of the number of U.S casualties sustained.

i.   It has been documented that the Jaysh Al-Mahdi (JAM) Army was responsible for the ambush on April 4, 2004, and that they were the prominent insurgent force in Sadr City.

j.   The night of the attack, after everyone returned to Camp War Eagle, no one talked much and it was difficult to sleep.  The next day, our unit pushed back into Sadr City and

PX1109

conducted sustained combat operations for the next 80 days. This was when I started experiencing symptoms of Post-Traumatic Stress Disorder (PTSD) and Traumatic Brain Injury (TBI).

k.  In late 2004, while still in Iraq, I received some treatment for PTSD in Baghdad.  I spent approximately 5 days there and was then sent back to my unit. In December 2004 I was honorably discharged and re-enlisted in the Army. I remained in Iraq until March 2005. After leaving Iraq, I returned to Fort Hood but, I had difficulty adjusting to my new unit, and life in general. Stateside life did not make sense to me.  My first wife and I divorced shortly after I returned and I moved back into the barracks. Because I was in line for promotion to SGT and my combat experience, I was assigned to 3rd Battalion, 8th Cavalry Regiment (3/8). The battalion was getting ready to deploy to Iraq. The unit had numerous ████████████ and ███████████████ that I was supposed to help fix. During this time, I was ████████████████████████████████████████████████████████. I had nightmares and thought everyone was wrong.  I was homeless for about 2 years and found it hard finding a job that matched my skills.  I tried working at McDonalds but quit the same day. I also tried working a construction job, but the sound of the pneumatic tools reminded me of small arms fire in Iraq. I sought treatment with the Veterans Administration (VA), but was initially denied because of my OTH.  From here, my life got worse. Because of the problems with my unit and my increased difficulty in adjusting to life stateside, I was discharged from the Army ██████████████████████████. In 2008, I was re-evaluated, and the VA started to treat my PTSD. Since then, I have been receiving mental health treatment.  I have been going to weekly sessions and was doing better until recently. Lately, I have had difficulty sleeping in my bedroom where there is a sliding glass door. I feel exposed and in fear of an unknown attacker. As a result of this and loss of sleep, I started hearing voices. I continue to receive mental health treatment. On the positive side, I am married to my third wife and working on my master's degree in Psychology.

l.  Approximately two years ago, an x-ray was taken by the VA of my left shoulder, revealing a small piece of shrapnel under the skin that sometimes becomes irritated and infected. This shrapnel injury was sustained in the April 4, 2004 attack.

m.  As Part of my Declaration, I am providing documentary materials attached as Exhibit A through B

1.  **Exhibit A** attached to this Declaration is a true and authentic copy of a photograph of my platoon (2nd) in 2004. I have personal knowledge of the creation of this Exhibit because I was present when the photograph was taken and I am depicted in the photograph.

2. **Exhibit B** attached to this Declaration is a true and authentic copy of my Certificate of Release or Discharge from Active Duty (DD FORM-214). I have personal knowledge of the source of this Exhibit because it was obtained from my military records provided by the National Personnel Records Center.

I declare and state under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on _____08/19/2022_____

Signature: _____

PX1109

# EXHIBIT A

PX1109



PX1109

# EXHIBIT B

PX1109

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) | | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NUMBER |
|---|---|---|---|
| FERRIS, ANTHONY JOHN | | ARMY/RA | |

| 4a. GRADE, RATE OR RANK | b. PAY GRADE | 5. DATE OF BIRTH (YYYYMMDD) | 6. RESERVE OBLIGATION TERMINATION DATE (YYYYMMDD) |
|---|---|---|---|
| PV1 | E01 | | 00000000 |

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|
| BUFFALO, NEW YORK | |

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | b. STATION WHERE SEPARATED |
|---|---|
| 030008ARCAV CO B FC | FORT HOOD, TX 76544-5056 |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE | NONE |
|---|---|---|
| N/A | AMOUNT: $400,000.00 | |

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) | 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|---|
| 11B1O INFANTRYMAN - 4 YRS 6 MOS//NOTHING FOLLOWS | a. DATE ENTERED AD THIS PERIOD | 2001 | 08 | 30 |
| | b. SEPARATION DATE THIS PERIOD | 2006 | 08 | 09 |
| | c. NET ACTIVE SERVICE THIS PERIOD | 0004 | 05 | 09 |
| | d. TOTAL PRIOR ACTIVE SERVICE | 0000 | 00 | 00 |
| | e. TOTAL PRIOR INACTIVE SERVICE | 0000 | 00 | 00 |
| | f. FOREIGN SERVICE | 0001 | 00 | 04 |
| | g. SEA SERVICE | 0000 | 00 | 00 |
| | h. EFFECTIVE DATE OF PAY GRADE | 2006 | 07 | 28 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) | 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed) |
|---|---|
| ARMY COMMENDATION MEDAL//ARMY GOOD CONDUCT MEDAL//NATIONAL DEFENSE SERVICE MEDAL//GLOBAL WAR ON TERRORISM EXPEDITIONARY MEDAL//GLOBAL WAR ON TERRORISM SERVICE MEDAL//ARMY SERVICE RIBBON//COMBAT INFANTRYMAN BADGE//NOTHING FOLLOWS | NONE//NOTHING FOLLOWS |

| 15a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | | YES | X | NO |
|---|---|---|---|---|
| b. HIGH SCHOOL GRADUATE OR EQUIVALENT | X | YES | | NO |

| 16. DAYS ACCRUED LEAVE PAID NA | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | YES | NO X |
|---|---|---|---|

18. REMARKS
CONTINUOUS HONORABLE ACTIVE SERVICE: 20010830-20041223//IMMEDIATE REENLISTMENTS THIS PERIOD
-- 20030905-20041223, 20041224-20060810//SERVED IN A DESIGNATED IMMINENT DANGER PAY AREA//
SERVICE IN IRAQ 20030315-20040319//MEMBER HAS COMPLETED FIRST FULL TERM OF SERVICE//BLOCK 29:
UNDER ■); ■■■■■: 20051121-20051210; 20060103-20060602; 20060608-20060613;
20060616-20060620; ■■■■; ■■■■■ 972: 20060622-20060727//NOTHING FOLLOWS

The information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program.

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code) | b. NEAREST RELATIVE (Name and address – include ZIP Code) |
|---|---|
| | |

| 20. MEMBER REQUESTS COPY 6 BE SENT TO | CO | DIRECTOR OF VETERANS AFFAIRS | X | YES | | NO |
|---|---|---|---|---|---|---|

| 21. SIGNATURE OF MEMBER BEING SEPARATED | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) |
|---|---|
| | BRUCE JEFFERSON, GS07, LEAD TECH, TRANS CEN |

### SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only)

| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Include upgrades) |
|---|---|
| DISCHARGE | UNDER OTHER THAN HONORABLE CONDITIONS |

| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENTRY CODE |
|---|---|---|
| AR 635-200, CHAP ■) | KFS | |

| 28. NARRATIVE REASON FOR SEPARATION |
|---|
| ■■■■■■■ |

| 29. DATES OF TIME LOST DURING THIS PERIOD (YYYYMMDD) | 30. MEMBER REQUESTS COPY 4 (Initials) |
|---|---|
| SEE BLOCK 18 | 1985 |

**DD FORM 214-AUTOMATED, FEB 2000**   PREVIOUS EDITION IS OBSOLETE. GENERATED BY TRANSPROC   SERVICE-2



**Vinesign**

### ✓ Verification Complete
The document has been officially verified.

| | |
|---|---|
| **Document Status** | ✓ Signed & Verified |
| **Document Name** | Declaration of Anthony J Ferris (4-4-2004) with Exhibits A-B |
| **Sender Name** | Jessica Berberich |
| **Document Key** | ▇▇▇▇▇▇▇▇▇▇▇ |

**Recipient 1**
Anthony Ferris
▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇

Order 1

**IP Address**
▇▇▇▇

**Signature**

## Document History

| Activity | Date & Time | Recipient | Activity Details |
|---|---|---|---|
| ✓ **Document Completed**  〔Matching Hash〕 | 08/19/2022 19:48 UTC | Anthony Ferris | Signed by Anthony Ferris ▇▇▇▇▇<br>**Blockchain Block** ▇▇▇▇▇▇▇▇<br>**Document Hash** ▇▇▇▇▇▇▇▇▇▇▇▇<br>**Timestamp** 08/19/2022 19:48 UTC |
| 👁 Document Viewed | 08/19/2022 19:48 UTC | Anthony Ferris | Viewed by Anthony Ferris ▇▇▇▇▇ |
| ✈ Document Sent | 08/19/2022 19:42 UTC | Anthony Ferris | Sent out via email to Anthony Ferris ▇▇▇▇▇▇ |
| ✈ Document Sent | 08/19/2022 19:42 UTC | Anthony Ferris | Sent out via text to Anthony Ferris ▇▇▇▇ |
| 📄 Document Created | 08/19/2022 19:42 UTC | | Created by Jessica Berberich ▇▇▇▇▇ |

PX1109

PX1200

Declassified by MG Patrick D. Frank
USCENTCOM Chief of Staff
Declassified on: 29 Apr 2022
Privacy Act Protective Order applies

# Ops Report

WebTAS

Wednesday, 23 February 2022

## Ops Report

| | |
|---|---|
| Date Occurred(L) | Nov 14 2004 17:11:00 |
| is Closed | TRUE |
| Summary | AT 1711C, 3/1 REPORTS INDIA CO HAS TROOPS IN CONTACT IN SW FALLUJAH (38S LB 8687 8863). IN RESULT OF THIS ENGAGEMENT, 3/1 HAD (2) URGENT CASUALTIES, (3) PRIORITY CASUALTIES AND (1) KIA. |
| Suicide Count | 0 |
| is Effective Explosive Hazard | FALSE |
| Blown In Place | FALSE |
| Year Occurred | 2004 |
| Month Occurred | November |
| Day Occurred | 14 |
| Event Type | Friendly Action |
| Event Category | Attack |
| Event MOA | Small Arms |
| Primary Country | IRAQ |
| Primary RC | MNF-W |
| Primary District | |
| Primary Province | Anbar |
| was Suicide | FALSE |
| Tracking Number | MEF LNO-49900154 |
| Attack On | None Selected |
| Unit Activity | NONE SELECTED |
| Title | 3/1 MAR ENGAGEMENT IN SW FALLUJAH: 5X CF WIA, 1X CF KIA |
| Association Count | 1 |
| BDA Friendly KIA | 1 |
| BDA Friendly WIA | 5 |
| BDA Friendly Casualties | 6 |
| BDA Friendly ABD | 0 |
| BDA Civilian KIA | 0 |
| BDA Civilian WIA | 0 |
| BDA Civilian | 0 |

USCENTCOM MDR 22-0054
Approved for Release to OGC- Confidential Privacy Act Protective Order Applies
04/28/22 001
FISHBECK
CENTCOM_00000114

PX1200

## Ops Report

| | |
|---|---|
| Casualties | |
| BDA Civilian ABD | 0 |
| BDA Host Nation KIA | 0 |
| BDA Host Nation WIA | 0 |
| BDA Host Nation Casualties | 0 |
| BDA Host Nation ABD | 0 |
| BDA Enemy KIA | 0 |
| BDA Enemy WIA | 0 |
| BDA Enemy Casualties | 0 |
| BDA Enemy Detained | 0 |
| City | Fallujah |
| Classification | ~~SECRET~~ |
| Classification Releasability Mark | ~~REL TO USA, EGY, FIN, KWT, IRKS, NATO~~ |
| CIDNE Folder | 3.5c   iteReportView.cfm?module=operations&reporttype=sigact&re portkey=98658C8A-6C51-42D8-A7CF-4287396AB343&entity=report |
| Date Occurred Excel UK | 14/11/2004 |
| Date Occurred Excel US | 11/14/2004 |
| Date Posted(Z) | Nov 14 2004 22:35:04 |
| Date Updated(Z) | Nov 14 2004 22:35:04 |
| FOB | UNKNOWN |
| Latitude | 33.3308911389 |
| Longitude | 43.784441998 |
| MGRS | 38SLB86878863 |
| MOA Count | 1 |
| Originating System | Not Provided |
| Originator Group | UNKNOWN |
| Originator Name | UNKNOWN |
| Originator Unit | ADMIN |
| Precedence | ROUTINE |
| Report Key | 98658C8A-6C51-42D8-A7CF-4287396AB343 |
| Reporting Unit | Not Provided |
| Route | UNKNOWN |
| Type Of Unit | None Selected |

Page 2 of 4

PX1200

## Ops Report

| | |
|---|---|
| Unit Name | Not provided |
| Updated By Group | UNKNOWN |
| Updated By Name | UNKNOWN |
| Updated By Unit | ADMIN |
| Vehicle Convoy Count | 0 |
| Vehicle Convoy Speed | 0 |
| Vehicle Convoy Speed Measure | MPH |
| Vehicle Distance Between | 0 |
| Vehicle Nearest ECM To IED | 0 |
| Vehicle Nearest ECM To Vehicle Struck | 0 |
| Vehicle Other Counter Measures | N/A |
| Vehicle Summary | Not Provided |
| was Complex Attack | FALSE |
| was Coordinated Attack | FALSE |
| was Counter Attack | FALSE |
| was ABP Involved | FALSE |
| was ANA Involved | FALSE |
| was ANP Involved | FALSE |
| was ANSF Involved | FALSE |
| was ISAF Involved | FALSE |
| was INS Involved | FALSE |
| was Medevac Requested | FALSE |

### SIGACT Location

| AO | City | Classification | Releasability | Coordinate | Country | (More not shown) |
|---|---|---|---|---|---|---|
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| | Fallujah | SECRET | REL TO USA, EGY, FIN, KWT, IRKS, NATO | | IRAQ | (More not shown) |

### MOA

| Mode Of Attack | Mode Of Attack Key | Event Type | Event Category |
|---|---|---|---|
| Small Arms | D2B03014-F8CE-4DBE-8B45- | Friendly Action | Attack |

USCENTCOM MDR 22-0054
Approved for Release to OGC- Confidential Privacy Act Protective Order Applies

04/28/22 003
FISHBECK
CENTCOM_00000116

PX1200

## Ops Report

EC7169399543

### Events1

| Event Category | Event Key | Event Type | Intended Outcome | Suicide | Hit Or Miss | |
|---|---|---|---|---|---|---|
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| Attack | 46CFA23F-D1F8-4C2C-9A97-F2FB2BEF8961 | Friendly Action | | | | (More not shown) |

### Association

| CIDNE Folder | is Published | Confidence | Classification | Classification Releasability Mark | DTG Posted | |
|---|---|---|---|---|---|---|
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| Link to Analysis CIDNE Report | 1 | Confirmed | ~~SECRET~~ | ~~REL TO USA, FVEY~~ | Dec 05 2014 17:57:08 | (More not shown) |

13 Empty Attributes

Battlespace Lead, Call Sign, Date Occurred(Z), ISAF Tracking Number, Incident Reported By, Originating Nation, Originating Network, Originating Site, Primary AO, Primary AOR, Primary Region, Reintegratees Count, Report Table By

Associated Org, CCIR, CIDNE Media, Casualty, Chemicals Found, Drugs Found, Equipment Found, Events Subordinate, IDF Details, Ops Capture, SIGACT Item, SIGACT Method Found, SIGACT Remark, SIGACT Requirements, Suspect, Target, Units, Vehicle

## Relationships

(None)

## Attachments

(None)

USCENTCOM MDR 22-0054

Approved for Release to OGC- Confidential Privacy Act Protective Order Applies

04/28/22 004
FISHBECK
CENTCOM_00000117

PX1200

PX1201



**U.S. Department of Defense**
Office of the Assistant Secretary of Defense (Public Affairs)

# News Release

On the Web:
https://web.archive.org/web/20050112005055/http://www.defenselink.mil/releases/2004/nr20041116-1541.html
Media contact: Marine Corps Public Affairs - (703) 614-4309

Public contact:
http://www.dod.mil/faq/comment.html
or +1 (703) 428-0711 +1

**IMMEDIATE RELEASE**

**No. 1169-04**
**November 16, 2004**

### DoD Identifies Marine Casualties

The Department of Defense announced today the death of two Marines who were supporting Operation Iraqi Freedom.

Cpl. Dale A. Burger Jr., 21, of Bel Air, Md.

Cpl. Andres H. Perez, 21, of Santa Cruz, Calif.

Both Marines died Nov. 14 as result of enemy action in Al Anbar Province, Iraq. They both were assigned to 3rd Battalion, 1st Marine Regiment, 1st Marine Division, I Marine Expeditionary Force, Marine Corps Base Camp Pendleton, Calif.

For further information contact the Marine Corps Base Camp Pendleton Public Affairs Office at (760) 725-5044.

**PX1201**

PX1202

DocuSign Envelope ID: ██████████████

## DECLARATION OF RANDY B. LAKE

I, Randy B. Lake declare and state under penalty of perjury that the following statements are true and correct:

a.   I have personal knowledge of the facts and information contained in this Declaration.

b.   I have known the plaintiffs Shane Kevin Housmans, Samuel Williams, Joe Sanchez Jr. and Curtis Joseph Mighaccio approximately since June 2003. We were assigned to 2nd Platoon, India Company, 3rd Battalion, 1st Marine Regiment, 1st Marine Division at Camp Pendleton, California.

c.   I was deployed to Iraq twice. My first tour was in 2004 and my second tour was in 2005.

d.   In January 2004, I was deployed to Iraq and was stationed with the 2nd Platoon, India Company, 3rd Battalion, 1st Marine Regiment, 1st Marine Division at Forward Operating Base (FOB) Abu Ghraib, Baghdad Governate, Iraq.

e.   In Iraq my rank was Lance Corporal (LCpl. E-3) and my position was fireteam member. Shane Kevin Housmans had the rank of Staff Sergeant (SSgt. E-6) and his position was as the Platoon Sergeant. Samuel Williams had the rank of Hospital Corpsman 3rd Class (HM3. E-4) and his position was platoon Corpsman. Joe Sanchez Jr. had the rank of Lance Corporal (LCpl. E-3) and his position was as a fireteam member. Curtis Joseph Mighaccio had the rank of Private First Class (PFC. E-2) and his position was as a fireteam member.

f.   In 2004, our mission in Iraq was to provide security and conduct ground operations to take back control of areas occupied by insurgents.

g.   During the month of November 2004, we participated in Operation Phantom Fury in and around the City of Al-Fallujah. This was a large-scale operation to secure the city by eliminating the insurgents occupying Fallujah.  The operation was commonly known as the "Second Battle of Fallujah."

h.   On November 13, 2004, we were on foot patrol conducting house-to-house clearing operations in the Queens area in Fallujah, Iraq. A known area for Al Qaeda in Iraq (AQI) insurgents.

i.   During the November 13, 2004, operation we began to clear one particular house.  Myself and several other Marines went inside while other platoon members stayed outside to provide security.  I was first to enter the house followed by LCpl. Justin McLeese and Cpl.

PX1202

DocuSign Envelope ID: ■■■■■■■■■■■■■■

Andrew Douglas.  As soon as we entered the house, we received small arms fire from within.  LCpl. McLeese was shot several times and went down.  We returned fire. As the firefight continued, the insurgents tossed hand grenades into our room, but none of them exploded.  While evaluating the situation, I noticed several doors in the room.  One of them led to the kitchen and appeared to have wires on it indicating it was booby-trapped with explosives. I notified the other Marines and then located LCpl. McLeese in an attempt to get him out of the house for medical aid.  As other Marines covered me and returned fire, I began dragging LCpl. McLeese towards the front metal door of the house. As we got close to the door there was a huge explosion.  The explosion knocked me into the door. The door broke off its hinges and I landed outside the house on top of the door. The door also landed on top of SSgt. Housmans as well. After regaining my bearings, I looked around for LCpl. McLeese and eventually found him outside of the house.  The explosion had killed LCpl. McLeese. His body was cut in half with his upper torso blown outside. HM3 Williams went to render aid on LCpl. McLeese, but HM3 Williams realized there was nothing that he could do for him.  Several Marines received shrapnel wounds from the explosion.  A Quick Reaction Force (QRF) from our Company arrived and evacuated the wounded to Taqaddum Air Base, approximately 15 miles away, for treatment.  I do not remember where or if they received further treatment.  The house was completely destroyed by the blast.  I believe that at some time during the firefight, the insurgents escaped from the house and command detonated an Improvised Explosive Device (IED) that they had previously placed there as a booby-trap.

j.   On November 14, 2004, my platoon and I were involved in another attack where Marines that killed and injured Marines.  This attack occurred in the Queens area in Fallujah, Iraq.

k.   On November 14, 2004, our platoon was clearing buildings and completing the mission from the prior day. We received information that 3rd Platoon was pinned down by insurgents inside a house.  Our platoon responded to assist them.  I made entry with Cpl. Dale Burger Jr. who was the first to enter.  As soon as he entered the house, he was shot in the head and went down.  Another Marine helped me pull Cpl. Burger out of the house to get him medical aid.  A corpsman, possibly HM3 Williams, began to administer aid and I went back to the fight. Eventually we were able to get all of the Marines out of the house at which time the house was knocked down by friendly tank fire.  HM3 Williams continued to administer aid to Cpl. Burger until a QRF arrived and medevac'd him out by vehicle. I do not know the extent of his treatment, but I was later told that Cpl. Burger died.  Cpl. Andres Perez was also killed in the attack.

l.   In 2005, I was again deployed to Iraq with the 2nd Platoon, India Company, 3rd Battalion, 1st Marine Regiment, 1st Marine Division. Our mission was to provide security and conduct ground operations to take back control of areas occupied by insurgents.

PX1202

DocuSign Envelope ID: ▮▮▮▮▮▮▮▮▮▮▮▮

m. On November 8, 2005, I was part of a Marine force providing security for an Army Psychological Operations (PSYOPS) Unit operating in the area of the City of Haqlaniyah, Al-Anbar Province, Iraq. We were in a five-vehicle convoy composed of HMMVWs. I was the driver of the first vehicle, Sgt. Dominic Franco was the front seat passenger, and LCpl. Christian Wright was the gunner. Cpl. Joe Sanchez was in the last vehicle in the convoy. As we approached an area known as the "S curve," Sgt. Franco noticed something suspicious in the road and had me stop the vehicle. He exited and walked to area approximately 30-40 meters away where there was a pile of rocks. As he was kicking some rocks, he noticed something suspicious and began to back away towards our vehicle. As Sgt. Franco was coming back, there was a loud explosion. Sgt. Franco was hit in the back by the blast and thrown to the ground. I ran to Sgt. Franco and pulled him back to our vehicle. Cpl. Sanchez arrived and we administered first aid to Sgt. Franco. Sgt. Franco suffered a concussion and other injuries as a result of the explosion and was evacuated by the QRF assigned to our operation. I do not know the extent of his treatment or where he was taken. The vehicle sustained minor shrapnel damage. The explosion came from an IED that had been placed in the road. I believe it was command detonated after Sgt. Franco discovered some wires and started to move away from it.

n. As Part of my Declaration, I am providing documentary materials attached as Exhibit A through Exhibit C.

1. Exhibit A is a true and correct copy of a photograph of me, Shane Housmans, Joe Sanchez, Samuel Williams and other Marines at the gravesite of Cpl. Dale Berger Jr. I have personal knowledge of the source or creation of this Exhibit because I was present when it was taken.

2. Exhibit B is a true and correct copy of a photograph of me, Dominic Franco and an Iraqi soldier/interpreter in Iraq. I have personal knowledge of the source or creation of this Exhibit because I was present when it was taken.

I declare and state under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on this _8/3/2022_____ day of August, 2022.

DocuSigned by:

Signature: _Randy Lake_____

PX1202

# EXHIBIT A

PX1202



# EXHIBIT B

PX1202



PX1202

PX1203

DocuSign Envelope ID: ████████████████████

## **DECLARATION OF**

## **Shane Kevin Housmans**

I, Shane Kevin Housmans, declare and state under penalty of perjury that the following statements are true and correct:

   a.  I have personal knowledge of the facts and information contained in this statement.

   b.  I am a citizen of the United States and was born in Colorado Springs, Colorado on ████████████████, to Paul Housmans and Vickie Housmans.

   c.  I graduated in 1990 from Ellison High School in Killen, TX where I was active in football. After high school I got married on June 24, 2001 to my wife, Nicole Housmans. I graduated in 2014 from Texas State University with a bachelor's degree in criminal justice.

   d.  In January of 1996 I joined the Marines and earned the MOS 0311 Infantry Rifleman. Upon graduation from the School of Infantry, I was assigned to Lima Co., 3rd Battalion, 7th Marines. I served with L/3/7 from 1996-2000. In March of 2000 I went to Drill Instructor School at Marine Recruit Depot San Diego, California. I served as a Drill Instructor from 2000-2003. Upon my completion of DI Duty, I was assigned to India Co., 3rd Battalion, 1st Marines. While assigned to I/3/1, I was deployed to Iraq twice, June 2004 to January 2005 and September 2005 to March 2006.

   e.  During my career in the Marines, I served two tours in Iraq (1st tour 6/2004 – 1/2005, 2nd tour 9/2005 – 3/2006). In August 2007, I was at the end of my service and was honorably discharged at the rank of Gunnery Sargent (E-7). After my discharge, I began to work in law enforcement with the Austin Police Department in Austin, Texas where I still work present day.

   f.  On November 13, 2004 my platoon and I were in the Queens neighborhood of Fallujah, Iraq.

   g.  My mission on November 13, 2004 with my platoon was to provide house to house back clearing for security.

   h.  On the morning of November 13, 2004, my platoon and I were providing back clearing in houses that other companies had already gone through. My platoon and I started going from house to house and ended up at a particular house where three Marines entered and seven stayed outside. I stayed outside. I assumed that the terrorists inside the house determined that they didn't have a chance and detonated the IED along with whatever else they had inside the house. When the IED was detonated it killed LCpl. Justin McLeese and injured 13 Marines. Following the explosion, I was hit with a door that LCpl. Lake was on top of causing me to be pinned under the door. I was briefly knocked out and woke up to

DocuSign Envelope ID: ███████████████████

other Marines calling my name. I remember seeing LCpl. McLeese's body torn in half. Some of the Marines injuries consisted of burns and shrapnel injuries. A couple were temporarily blinded. I had no physical injuries but had a severe headache, dizziness, and ringing in my ears. I got myself together and got back up to continue our mission.

i.   From the November 13, 2004 attack I sustained a headache, dizziness, and ringing in both of my ears. When I returned home from this tour, I was diagnosed with a TBI and concussion.

j.   LCpl. Justin McLeese was killed in the November 13, 2004 attack. I saw him torn in half from the explosion. I am not aware on how his body was recovered and evacuated out.

k.   LCpl. Randy Lake sustained injuries during the November 13, 2004 attack. I am not aware of the extent of his injuries or medical treatment following the attack.

l.   My mission on November 14, 2004 was to provide security patrol and continue house to house clearing from the previous day.

m.   On November 14, 2004, my platoon and I were in the Queens neighborhood of Fallujah, Iraq.

n.   On November 14, 2004, in the early evening, I continued my mission of house clearing from the previous day. We were a couple blocks ahead on this day of where we were the previous day. My platoon was the 'main effort' that day doing house clearing. Cpl. Dale Burger was my squad leader and he had heard that a couple Marines were being held up in one of the houses in the Queens neighborhood. Cpl. Burger gathered a few Marines from different platoons to go and rescue the Marines that were being held up in the house. When Cpl. Burger got into the house there was a machine gun directly aimed at the door and he was shot in the head. He did not die immediately. LCpl. Curtis Mighaccio and another Marine went into the house and pulled Cpl. Burger to cover immediately. I was not present when Cpl. Burger entered the house. A fire fight continued, and we were able to get the rest of the Marines out. Cpl. Andres Perez, from another platoon and one of the Marines in the house, was also killed in this attack. Later that evening, I found out from my First Sergeant that Cpl. Burger died. I did not have any physical injuries from this attack. I was not evacuated out.

o.   I sustained a headache, dizziness, ringing in both of my ears, TBI, and a concussion that was later diagnosed. A medical exam was done by a medic on November 14, 2004 and was given ibuprofen. During this time after the attack, I was experiencing a lot of anger. I was more concerned about the other Marines that were there and their wellbeing.

DocuSign Envelope ID: ████████████

p.  Cpl Andres Perez was killed in this attack. He was found dead in the house by my battle buddies. I do not have any personal knowledge as to how his body was evacuated out.

q.  Our squad leader Cpl. Dale Burger was killed in this attack. He was evacuated out of the house by other Marines. He was then evacuated out by medics to receive life sustaining medical care. He later passed away at the hospital that he received medical attention at.

r.  SSgt Terry McElwain, Sgt Tom Love, and LCpl Curtis Mighaccio, were all injured in this attack. I do not have any additional knowledge about the medical treatment they received.

s.  The weapon(s) used in the attack against us were grenades and small arms fire that came from within the house when we were doing our mission.

t.  This attack has deeply affected not only me, but also my family and the relationship I have with them. I have experienced and continue to experience inconsistent and restless sleep, critical thoughts, anxiety, depression, and trouble controlling my temper. I suffered and I am still suffering from extreme emotional and physical pain because of this attack. While I was not in the immediate area, I have dreams often about Burger getting shot in the head. I get headaches all the time and there is ringing in my ears all day every day. Ever since the attack my memory has been horrible, it has caused for me to forget long time coworkers' names to causing lots of arguments in my house. I can remember things prior to my tours in Iraq, however everything afterwards I have a difficult time recalling. I have a difficult time recalling how I ended up at certain destinations after driving. This then causes me to have anxiety attacks nearly each week. This attack has caused a great amount of strain on my relationship with my oldest daughter, Cadence Housmans. She has gotten the blunt end of all my anger that was caused by my time in the military. I feel that I have a better relationship with my other daughters than with her, due to the fact she had to endure a greater part of her life with my time in the military. This attack has also caused a huge amount of strain on my marriage. My wife did not want me to be deployed again. After my deployment my wife said I was not the same person as I was before. She did not want me to go on another deployment and ultimately to end my service in the Marines. All of these things have put a strain on my relationship with my family, and it causes more frustration for me.

As Part of my Statement I am providing documentary materials attached as Exhibit A through C.

  a.  Exhibit A attached to this Statement is a true and authentic copy of my Birth Certificate issued in the State of Colorado. I have personal knowledge of the source or creation of this Exhibit because it was provided to me by my parents.

  b.  Exhibit B attached to this Statement is a true and authentic copy of my military DD214, Certificate of Release or Discharge from Active Duty. I have personal

DocuSign Envelope ID: ███████████████████

knowledge of the source or creation of this Exhibit because it was provided to me by the Marine Corps.

c. Exhibit C attached to this Statement is a true and authentic copy of my VA disability rating decision issued by the Department of Veterans Affairs. I have personal knowledge of the source or creation of this Exhibit because it was provided through the Department of Veterans Affairs.

I declare and state under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on this ____15st____ day of _____August_____, ____2022____.

Signature: _____

PX1203

# EXHIBIT A

PX1203

DocuSign Envelope ID: ▮▮▮▮▮▮



**CERTIFICATION OF VITAL RECORD**

# STATE OF COLORADO
COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT
HOLD TO LIGHT TO VIEW WATERMARK

STATE FILE NUMBER ▮▮▮

DATE FILED
NOVEMBER ▮▮▮

NAME OF REGISTRANT
SHANE KEVIN HOUSMANS

DATE AND TIME OF BIRTH
▮▮▮ 10:03 A.M.

SEX
MALE

CITY OF BIRTH
COLORADO SPRINGS

COUNTY OF BIRTH
EL PASO

MOTHER'S MAIDEN NAME
VICKIE LEE DONATHAN

FATHER'S NAME
PAUL ERNEST HOUSMANS

MOTHER'S PLACE OF BIRTH
CALIFORNIA

FATHER'S PLACE OF BIRTH
MASSACHUSETTS

MOTHER'S AGE
25

FATHER'S AGE
27

THIS IS A TRUE CERTIFICATION OF NAME AND BIRTH FACTS AS RECORDED IN THIS OFFICE.

DATE ISSUED
APRIL 27, 2006

*Ronald S Hyman*
RONALD S. HYMAN
STATE REGISTRAR

Do not accept unless prepared on security paper with engraved border displaying the Colorado state seal and signature of the Registrar. PENALTY BY LAW, Section 25-2-118, Colorado Revised Statutes, 1982, if any person alters, uses, attempts to use or furnishes to another for deceptive use any vital statistics record. NOT VALID IF PHOTOCOPIED.

REV 07/03

American Bank Note Company  **ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE**

PX1203

# EXHIBIT B

PX1203

CAUTION: NOT TO BE USED FOR
PURPOSES

THIS IS AN IMPORTANT RECORD.
SAF___ARD IT.

ANY ALTERATIONS IN SHADED AREAS
RENDER FORM VOID

DocuSign Envelope ID: |

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) HOUSMANS Shane Kevin | 2. DEPARTMENT, COMPONENT AND BRANCH USMC-11 | 3. SOCIAL SECURITY NUMBER |
|---|---|---|

| 4a. GRADE, RATE OR RANK GySgt | b. PAY GRADE E-7 | 5. DATE OF BIRTH (YYYYMMDD) | 6. RESERVE OBLIGATION TERMINATION DATE (YYYYMMDD) 00000000 |
|---|---|---|---|

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY San Antonio MEPS San Antonio, TX 78218 | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND HqBn 1stMarDiv, Campen, CA 92055 | b. STATION WHERE SEPARATED HqBn 1stMarDiv, Campen, CA 92055 |
|---|---|

| 9. COMMAND TO WHICH TRANSFERRED N/A | 10. SGLI COVERAGE AMOUNT: $ 400,000.00 | NONE |
|---|---|---|

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) 0369 - Infantry Unit Leader (11 years, 2 months) 8511 - Drill Instructor | 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|---|
| | a. DATE ENTERED AD THIS PERIOD | 1996 | 01 | 08 |
| | b. SEPARATION DATE THIS PERIOD | 2007 | 08 | 22 |
| | c. NET ACTIVE SERVICE THIS PERIOD | 11 | 07 | 15 |
| | d. TOTAL PRIOR ACTIVE SERVICE | 00 | 00 | 00 |
| | e. TOTAL PRIOR INACTIVE SERVICE | 00 | 06 | 17 |
| | f. FOREIGN SERVICE | 01 | 01 | 05 |
| | g. SEA SERVICE | 00 | 02 | 10 |
| | h. EFFECTIVE DATE OF PAY GRADE | 2007 | 01 | 01 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) Navy and Marine Corps Commendation Medal, Navy and Marine Corps Achievement Medal (3), Marine Corps Good Conduct Medal (3), Combat Action Ribbon, Army Achievement Medal, Iraq Campaign Medal, Sea Service Deployment Ribbon (4), Global War on Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, continued in block 18. | 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed) Helicopter Rope Suspension (03wks-Jul/06), Airborne (03wks-May/03), SNCO Career (08wks-May/03), SNCO Advanced Nonresident (03), Platoon Sergeant (08wks-Jun/02), Infantry Platoon Sergeant (08wks-Jun/02), Martial Arts Instructor Course (03wks-Oct/00), SNCO Career Nonresident (00), Drill Instructor (12wks-Jun/00), continued in block 18. |
|---|---|

| 15a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | | YES X | NO |
|---|---|---|---|
| b. HIGH SCHOOL GRADUATE OR EQUIVALENT | | X YES | NO |

| 16. DAYS ACCRUED LEAVE PAID  0.0/0.0 | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | YES | NO X |
|---|---|---|---|

| 18. REMARKS Good Conduct Medal Commences: 200050108 Block 13 continued:  Marine Corps Drill Instructor Ribbon, National Defense Service Medal, Navy Unit Commendation, Letter of Appreciation (2), Certificate of Appreciation, Certificate of Commendation (3), Rifle Sharpshooter Badge, Pistol Marksman Badge Block 14 continued:  Squad Leaders (07wks-Jun/98), Sergeants (06wks-Apr/99), Infantry Squad Leader (04wks-Jan/98), Corporals Leadership (03wks-Mar/98), Rifleman (03wks-Jun/96), Basic Infantryman (04wks-May/96), Recruit Training (13wks-Mar/96) Member participated in Operations Iraqi Freedom 5-7 and Iraqi Freedom 2-2 Member contributed $1,800.00 to the Montgomery G.I Bill |
|---|

| | DIS | 2007180825 |
|---|---|---|
| | | 2 PGS |

This information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program.

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code) | b. NEAREST RELATIVE (Name and address - include ZIP Code) |
|---|---|

| 20. MEMBER REQUESTS COPY 6 BE SENT TO   TX | DIRECTOR OF VETERANS AFFAIRS | X YES | NO |
|---|---|---|---|

| 21. SIGNATURE OF MEMBER BEING SEPARATED | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) G. GUZMAN GYSGT PERSONNEL CHIEF USMC |
|---|---|

| SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only) | |
|---|---|
| 23. TYPE OF SEPARATION Discharged | 24. CHARACTER OF SERVICE (Include upgrades) Honorable |

| 25. SEPARATION AUTHORITY MARCORSEPMAN. PAR 1005 | 26. SEPARATION CODE KBK1 | 27. REENTRY CODE RE-1A |
|---|---|---|

| 28. NARRATIVE REASON FOR SEPARATION   COMPLETION OF REQUIRED ACTIVE SERVICE |
|---|

| 29. DATES OF TIME LOST DURING THIS PERIOD (YYYYMMDD) None | 30. MEMBER REQUESTS COPY 4 (Initials) SKH |
|---|---|

**DD FORM 214, FEB 2000**
PREVIOUS EDITION IS OBSOLETE.
MEMBER - 4

PX1203

# EXHIBIT C

PX1203

DocuSign Envelope ID:



**DEPARTMENT OF VETERANS AFFAIRS**
**810 Vermont Ave NW**
**Washington, D.C. 20420**

March 14, 2021

Shane Kevin Housmans                                                      In Reply Refer to:

                                                      

Dear Mr. Housmans:

This letter certifies that Shane Kevin Housmans is receiving service-connected disability compensation from the Department of Veterans Affairs.

The current benefit paid is as follows:

**Gross Benefit Amount**          ███████

**Net Amount Paid**               ███████

**Effective Date**                December 1, 2020

**Combined Evaluation**           100 percent

## How You Can Contact Us

- If you need general information about benefits and eligibility, please visit us at https://www.ebenefits.va.gov or http://www.va.gov.

- Call us at 1-800-827-1000. If you use a Telecommunications Device for the Deaf (TDD), the number is 1-800-829-4833.

- Ask a question on the Internet at https://iris.custhelp.va.gov.

Sincerely,

Chief JfBanks

PX1203

PX1204

DocuSign Envelope ID: 6C2AFF5C-191A-4416-8A65-197F720869D7

## DECLARATION OF JOE SANCHEZ JR.

I, Joe Sanchez Jr., declare and state under penalty of perjury that the following statements are true and correct:

a.  I have personal knowledge of the facts and information contained in this Declaration.

b.  I was born on ███████, in Odessa, Texas and I am a U.S. Citizen.

c.  In Iraq, my rank was Lance Corporal (LCpl. E-3) and Corporal (Cpl. E-4); my specialty was Infantry Marine (0311); and my position was Fireteam Leader. I was assigned to 2nd Platoon, India Company, 3rd Battalion, 1st Marine Regiment, 1st Marine Division. Members of the platoon included Marine Staff Sergeant (SSgt. E-6) Shane Housmans, Lance Corporal (LCpl. E-3) Randy Lake, LCpl. Curtis Maghaccio, and Navy Corpsman 2nd Class (HM2) Samuel Williams.

d.  Our overall mission in November 2004 was to provide security and conduct ground operations to regain control of areas occupied by insurgents.

e.  During November of 2004, we participated in Operation Phantom Fury in and around the City of Al-Fallujah, Al-Anbar Governate, Iraq. This was a large-scale operation to secure the city and eliminate the insurgents occupying Fallujah. During this operation, we were based on the north side of the city at the Fallujah Train Station. The operation was commonly known as the "Second Battle of Fallujah."

f.  On November 13, 2004, we were on foot patrol conducting house-to-house clearing operations in an area commonly known as "Queens" in Al-Fallujah. This was a known area for Al Qaeda in Iraq (AQI) insurgents.

g.  During the operation, my platoon moved through the city with tanks and a team from 1st Force Reconnaissance (Recon) when we encountered about ten insurgents inside a house. During the ensuing firefight, a Marine was wounded by a fragmentation grenade and was ground medevac'd to the train station. We then continued to push forward through the city and came upon another house to clear. LCpl. Justin McLeese and two other Marines formed an entry team and prepared to enter the front side of the house.  LCpl. Randy Lake, SSgt. Shane Housmans, and other Marines were positioned by the front door. I was at the rear of the house with some Marines from our platoon and some 1st Force Recon Marines. As soon as LCpl. McLeese and the other Marines entered the house, they started receiving small arms fire from insurgents.  LCpl. McLeese returned fire, but was shot in the chest. Prior to entering the house to assist LCpl. McLeese, LCpl. Lake noticed some wires and an explosive device by a door inside. As LCpl. Lake and other Marines were entering the

PX1204

DocuSign Envelope ID: 6C2AFF5C-191A-4416-8A65-197F720869D7

house, there was a large explosion.  Everyone was knocked to the ground and several Marines were wounded.  After regaining my bearings, I looked around for any casualties. It was then that I saw LCpl. McLeese.  The explosion killed LCpl. McLeese, cutting his body in half, with his upper torso blown outside into a courtyard. HM3 Williams went to help him but realized there was nothing that he could do.  HM3 Williams then began treating the other wounded Marines. All of the wounded were ground medevac'd to the train station except SSgt. Housmans who refused treatment.  I do not specifically know where everyone went from there. However, some Marines were medevac'd to Landstuhl Regional Medical Center in Germany and some were medevac'd to the United States. I believe the house was completely destroyed by an Improvised Explosive Device (IED) that the insurgents had placed there. After the attack I noticed there was an oily residue on everyone.  The next day, we passed by the house and saw remnants of large barrels in the debris.

h.  On the following day, November 14, 2004, we were involved in another attack where Marines were killed and wounded.  This attack was in the same "Queens" area in Fallujah, Iraq.

i.  As our platoon prepared for the day's operation, Cpl. Dale Burger Jr. returned to our platoon.  He had been wounded a couple of days prior and was not required to return to the platoon immediately, however due to the casualties we took the previous day, he volunteered to return. While we were clearing buildings, we received information that 3rd Platoon was pinned down inside a house by insurgents and that Cpl. Andres Perez had been wounded. Our platoon responded and Cpl. Burger quickly formed an entry team with LCpl. Lake and other Marines. Cpl. Burger was the first to enter, and immediately upon entry he was shot in the face and went down. As the firefight continued inside, an insurgent kept "bunkering" into a corner making it difficult to shoot him.  During this time, LCpl. Lake and another Marine pulled Cpl. Burger out of the house and HM3 Williams began to render aid to him. Once we were able to get all of the Marines out of the house, we blew it up. HM3 Williams continued to administer aid to Cpl. Burger until he was ground medevac'd to the train station. I do not know the extent of his treatment, but I was later informed that Cpl. Burger died.  Cpl. Perez was also killed during the attack.

j.  In 2005, I deployed to Iraq again with the 2nd Platoon, India Company, 3rd Battalion, 1st Marine Regiment.  My rank was Cpl. and I was later promoted to Sgt.  As part of Operation River Gate, we operated around the Cities of Haditha and Haqlaniyah, Al-Anbar Governate, Iraq.  This was also a known AQI area and was close to the Syrian border.

PX1204

DocuSign Envelope ID: 6C2AFF5C-191A-4416-8A65-197F720869D7

k. On November 8, 2005, we were providing security for a U.S. Army Psychological Operations (PSYOPS) Unit operating in the area of Haqlaniyah. The PSYOPS Unit was using loudspeakers to broadcast information about the upcoming Iraqi elections. We initially started out on foot through the marketplace, but then began a motorized patrol. We were in a four-vehicle convoy composed of HMMWVs. The driver of the first vehicle was LCpl. Randy Lake. with Sgt. Dominic Franco, our squad leader, as the front seat passenger. Inside the second vehicle were other Marines for security. The PSYOPS Unit was in the third vehicle, and I was in the fourth and final vehicle in the convoy. As we drove down a road commonly referred to as "IED Alley," Sgt. Franco noticed something suspicious in the road and stopped his vehicle. He exited and walked to an area approximately thirty to forty meters away to where there was a pile of rocks. At this point, LCpl. Lake called me forward to assist Sgt. Franco. As Sgt. Franco was kicking some rocks, he noticed wires and a battery in the ground indicating there was an IED close by. When he turned to move away from it, there was a loud explosion that created a lot of dust. I was knocked to the ground. As I got to my feet, I saw LCpl. Lake dragging Sgt. Franco towards me. I assisted him with getting Sgt. Franco back to the lead vehicle. Sgt. Franco was knocked unconscious from the explosion and I started to administer first aid. I then began to radio for assistance and a medevac. Initially we had trouble establishing radio contact with higher headquarters, but we were eventually able to get a QRF to respond. Sgt. Franco was ground medevac'd to an area by the Haditha Dam from which we were operating. Sgt. Franco suffered a concussion and other injuries as a result of the explosion. I do not know the extent of his treatment or where he was taken. The explosion came from an IED that was placed in the road. It appeared to have been command detonated after Sgt. Franco discovered the wire and battery and started to move away. There were no other injuries from this explosion. The lead vehicle had minor shrapnel damage but the other vehicles were not damaged.

l. These attacks, plus many more just like them, affected me greatly. I have been, and am currently, being evaluated for Traumatic Brain Injury (TBI). I also have Post Traumatic Stress (PTS), however I can cope with it most of the time. There are times when it is difficult to deal with, especially when helping other service members with their PTS and those that are contemplating suicide. When I was first discharged from the Marine Corps, I was angry. I became over cautious to the point where I pushed all my friends away and went into seclusion. I could not make friends because I did not trust anyone, so I instead buried myself in my work. On July 18, 2012, I attempted suicide with a handgun but, for an unknown reason, the firing pin was broken. Although I am still dealing with PTS and TBI, I have learned to live and enjoy my wife and children.

PX1204

DocuSign Envelope ID: 6C2AFF5C-191A-4416-8A65-197F720869D7

I declare and state under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on this ___8/8/2022_____ day of August, 2022.

Signature: _____

PX1204

PX1205

DocuSign Envelope ID: ██████████████████

## DECLARATION OF SAMUEL WILLIAMS

I, Samuel Williams declare and state under penalty of perjury that the following statements are true and correct:

a.  I have personal knowledge of the facts and information contained in this Declaration.

   I am a naturalized citizen of the United States, born in Bacolod, Philippines on ████, and granted United States Citizenship on June 15, 1986.

b.  In Iraq, my rank was Hospital Corpsman 3rd Class (HM3) then a promotion to Hospital Corpsman 2nd Class (HM2) on my third tour; my specialty was Field Medical Technician (8404) and my position was platoon corpsman.

c.  I served three tours in Iraq in 2003, 2004, and 2006.

d.  During my first tour in Iraq in June 2003, I was assigned as the company corpsman to Bravo Company, 1st Battalion, 1st Marine Regiment (Bravo 1/1), 13th Marine Expeditionary Unit (MEU) initially operating out of the City of Basra, Basra Governate. Our mission was to conduct port security operations in and around the port city of Basra. Approximately March 2004, I returned to Camp Pendleton with Bravo 1/1. After a short period of leave immediately following our return, I volunteered for and was assigned to the 3rd Battalion, 1st Marine Regiment, 1st Marine Division at Camp Pendleton, California. They were preparing to deploy to Iraq and needed corpsmen.

e.  On or about June 2004, I was deployed to Iraq on my second tour and was stationed with the 2nd Platoon, India Company, 3rd Battalion, 1st Marine Regiment, 1st Marine Division at Forward Operating Base (FOB) Abu Ghraib, Baghdad Governate, Iraq.

f.  Our mission during my 2004 tour in Iraq was to conduct ground combat/security operations in and around the City of Fallujah to gain control of areas occupied by insurgents.

g.  During November 2004, we participated in Operation Phantom Fury in Fallujah. This was a large-scale operation to secure the city, which was a known area for Al Qaeda in Iraq (AQI) insurgents. Based in FOB Abu Ghraib we were bivouacked at the Fallujah Train Station, on the north side of the city, for most of the operation.

h.  On November 13, 2004, during the late morning or early afternoon, my platoon and I were on foot patrol conducting house-to-house clearing operations in an area commonly known as "Queens" in Fallujah. We had just crossed "Route Elizabeth" when we received small

PX1205

DocuSign Envelope ID: ███████████████████

arms fire and I heard someone yelling "corpsman up, corpsman up" at the front of our platoon. "Corpsman up" meant someone was wounded and needed immediate medical treatment. While moving forward, I passed LCpl. Mighaccio who told me to "keep going" towards the front of the platoon where the wounded Marines were inside a house. When I made it to the house, I began to enter but saw numerous unexploded and foreign made hand grenades on the floor. Someone from behind pulled me back out so we could form another entry team. We started to re-enter then there was a large explosion. Everyone was knocked to the ground and numerous Marines were wounded. I was briefly knocked out and woke up to people calling my name. When I became more coherent, I started to treat several Marines. I specifically remember treating Sgt. Harrison, Sgt. Green and Cpl. Vara for inhalation burns and injuries to their eyes. All of them were having difficulty breathing and could not see. They had to be led out of the area by other Marines. I then began to look for LCpl. McLeese. He was the Marine I was initially called forward for. When I found him he was dead. His body was cut in half, with his upper torso blown outside. The wounded Marines were medevac'd to Al-Asad, Air Base for further treatment. I do not know the extent of their treatment. I believe Sgt. Harrison, Sgt. Green and Cpl. Vara were eventually flown to Landstuhl, Germany for further treatment. Due to the number of wounded Marines I treated, my camouflage uniform was soaked in blood and I had to get a new one.

i. After the attack, my platoon regrouped and returned to our bivouac at the train station. Everyone was very emotional and crying due to LCpl. McLeese's death and the injuries the other Marines sustained.

j. On November 14, 2004, my platoon and I continued our house-to-house clearing mission from the prior day.

k. On November 14, 2004, in the late afternoon, my platoon was conducting house clearing operations when we received information that members of 3rd platoon were trapped inside a house. As they were clearing a house, they came under small arms fire from insurgents inside. Cpl. Andres Perez had been killed and our platoon responded to assist them. When we reached the house, Cpl. Dale Burger Jr. formed an entry team and entered the house. Immediately upon entry, Cpl. Burger was shot in the forehead. We were able to pull Cpl. Perez out of the house and I began to treat him, but realized he was dead. His wounds were significant and it appeared he had been partially blown up by a hand grenade. There was nothing I could do for him. LCpl. Jackson then dragged Cpl. Burger to me for help. Cpl. Burger had a gunshot wound to the middle of his forehead, but he was still breathing. When I took off his helmet to treat him his eyes started to bulge significantly. I stabilized him as best as was possible. He was then medevac'd by ground to the Battalion Aid Station (BAS) located at the train station. The company corpsman later told us that Cpl. Burger had died.

PX1205

DocuSign Envelope ID: █████████████████

I also treated another "Recon" Marine who had a significant wound to his arm. After we got all of the Marines out of the house, we destroyed it by small arms, grenades and a D9 Bulldozer. During this time, there were so many medevac helicopters landing and taking off from the train station area to transport the wounded. Due to the limited landing area, helicopters had to do a racetrack pattern until there was space available to land. I knew Cpl. Burger well. Three days prior to him being killed, he received shrapnel wounds and was being treated for them at Camp Fallujah. He was a "short timer" and was not supposed to have completed the deployment with us. Cpl. Burger signed his extension papers on his hospital bed and returned to us as soon as he was medically cleared. After the attacks we were devastated because of those killed and wounded over the past two days.

l. I first noticed symptoms of Post-Traumatic Stress (PTS) after the attack on November 13, 2004. I became hypervigilant, had difficulty sleeping, felt anxious, and became withdrawn. After the second attack on November 14, 2004, my symptoms became more prevalent. Although I had these symptoms, I deployed for a third time because I felt it was my duty. The units were short-handed and needed corpsmen. Once I returned from my third deployment, the symptoms became worse to the point that I was antisocial, had memory loss, and could not be in crowds. In October 2013, the symptoms progressed to a point that I knew I needed help and sought professional mental health counseling. I have been receiving treatment through the Veterans Administration (VA).

I declare and state under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on this 8/4/2022 _____ day of August, 2022.



Signature: _____

PX1205

PX1206



**UNITED STATES MARINE CORPS**
I MARINE EXPEDITIONARY FORCE
U S  MARINE CORPS FORCES, PACIFIC
BOX 555300
CAMP PENDLETON, CA 92055-5300



JAN 3 1 2006

FIRST ENDORSEMENT on Comdr, MARCENT ltr 1650 ADJ of 23 Dec 05

From    Commanding General, I Marine Expeditionary Force
To      Corporal Dale A  Burger Jr ▮▮▮▮▮▮▮▮/0311 USMC
Via     Commanding General, 1st Marine Division

Subj    AWARDING OF THE PURPLE HEART MEDAL ICO CORPORAL
        DALE A  BURGER JR

1    Enclosure (1) is forwarded in recognition of your heroic
service

K F Moore

K  F  MOORE
By direction

2

OMPF COPY

Fis_BurgerD_MR_00000139

PX1206

PERSONAL AWARD RECOMMENDATION

## FOR OFFICIAL USE ONLY (FOUO)

PRIVACY ACT STATEMENT
The Privacy Act Statement for information on this form is contained in NAVMC Form 11000, Privacy Act Statement for Marine Corps Personnel and Pay Records.

| FROM ADDRESS:<br>Battalion Adjutant<br>3d Bn 1st Mar<br>1st MarDiv CamPen | | TO (*Awarding Authority*) ADDRESS (UIC/RUC):<br>SECNAV |
|---|---|---|
| | | 14. EXP OF ACTIVE DUTY<br>20041114 |
| COMMAND POC: | PHONE NUMBER:<br>DVNT 3605-205 | IF RETIREMENT, NUMBER OF YEARS: |
| 1. SOCIAL SECURITY NUMBER | 2. DESIG/NEC/MOS<br>0311 | 15. EST. DATE OF DETACHMENT<br>20050317 |
| 3. NAME (*Last, First, Middle*)<br><br>BURGER JR, DALE A | | ○ RETIREMENT    ○ TERMINAL LEAVE<br>○ TRANSFER    ● IMPACT AWARD |
| 4. COMPONENT (USMC, USMCR, etc.)<br>USMC | 16. NEW DUTY STATION (*Home address if separation anticipated*) | |
| 5. GRADE/RATE<br>CPL | 17. UNIT AT TIME OF ACTION/SERVICE:<br>Co I, 3d Bn, 1st Mar | 18. DUTY ASSIGNMENT<br>RIFLEMAN |
| 6. WARFARE DESIGNATOR | 7. UIC/RUC: | 19. PREVIOUS PERSONAL DECORATIONS AND PERIOD RECOGNIZED (exclude Purple Heart and Combat Action Ribbon) |
| 8. RECOMMENDED AWARD:<br>BV | 9. SPECIFIC ACHIEVEMENT (Impact Award)<br>Yes | NA - 12/10/03 to 12/10/03 |

| 10. ☐ HEROIC | ☒ HEROIC POSTHUMOUS | ☐ MIA |
|---|---|---|
| ☐ MERITORIOUS | ☐ MERITORIOUS POSTHUMOUS | |

| 11. NUMBER OF AWARD OF RECOMMENDED MEDAL<br>1 | 20. PERSONAL AWARDS RECOMMENDED NOT YET APPROVED<br>None |
|---|---|
| 12. ACTION DATE/MERITORIOUS PERIOD<br>20041109-20041114 | 21. OTHER PERSONNEL BEING RECOMMENDED FOR SAME ACTION<br>None |
| 13. GEOGRAPHIC AREA OF ACTION/SERVICE<br>OCONUS | |

*22. I certify the facts contained in the summary of action are: known to me*

| NAME, GRADE, TITLE OF ORIGINATOR<br><br>Michael S. Beames, 1stLt, Battalion Adjutant | SIGNATURE<br>*Michael S Beames*<br>1st Lt, Adjutant, 3d Bn, 1st Mar, 1stMarDiv | DATE<br><br>12/17/2004 |
|---|---|---|

23. FORWARDING ENDORSEMENTS BY VIA ADDRESSEE(S). *(Attach additional sheets only as necessary)*

| VIA COMMAND<br>(to be completed by originator) | REC AWD | COMBAT "V" | SIGNATURE, GRADE | DATE FWD |
|---|---|---|---|---|
| 1 CO, 3d Bn, 1st Mar | BV | YES | *Willard A Buhl*<br>LtCol, Commanding Officer, 3d Battalion, 1st Marines | 18 Dec 2004 |
| 2 CO, RCT 1 | BV | YES | *Michael A Shupp*<br>COL, Commanding Officer, 1st Marines | 12/20/2004<br>02:56:44 AM |
| 3 CG, 1st MarDiv | SS | NO | *Richard Natonski*<br>MajGen, CG, 1st Marine Division | 02/11/2005<br>01:37:44 PM |
| 4 CG, I MEF | SS | NO | | |
| 5 DCG, MARCENT | NX | NO | | |
| 6 CG, MARCENT | SS | NO | | |

24. TO BE COMPLETED BY AWARDING AUTHORITY

| DISPOSITION OF BASIC RECOMMENDATION | COMBAT "V" | EXTRAORDINARY HEROISM RECOMMENDED | SIGNATURE, GRADE, TITLE | DATE |
|---|---|---|---|---|
| | | NO | *SECNAV APPROVED* | 01/23/2006 |

Fis_BurgerD_MR_00000140

PX1206

## Summary of Action

Service member receiving IDP.  The Combat Distinguishing Device is authorized.

While serving as Team Leader, 2d Squad, 2d platoon, Company I, 3d Battalion, 1st Marines, Regimental Combat Team 1, 1st Marine Division during combat operations on 9 November, 10 November and 14 November 2004 in support Operation PHANTOM FURY.  Corporal Burger's heroic actions while conducting deliberate house to house clearing operations, and attempting to save the lives of his brother Marines, are deserving of the Silver Star Medal.  Corporal Burger was in receipt of IDP during this period.

On 9 November, Corporal Burger's platoon was tasked with clearing south past Jolan Park towards company objective Alpha.  Along Phase Line Elizabeth, the platoon's advance was slowed by intense enemy sniper, machine gun, and rocket fire.  Vehicular traffic was also difficult because of the rubble, debris, and downed power lines in the road.  The Combined Anti-Armor Team section supporting the platoon quickly took two urgent casualties as a result of sniper fire from the five and six-story buildings along the street.  Shortly thereafter, Corporal Burger's squad leader was knocked unconscious by the concussion from a rocket-propelled grenade.  Ensuring his brother Marine was stabilized, Corporal Burger immediately assumed the responsibilities of squad leader under enemy fire, and realized the platoon's attack was losing momentum.  Corporal Burger quickly directed his fire teams to establish overwatch positions in the tall buildings that had already been cleared.  Once his teams were set in place, Corporal Burger personally led a fire team to a rooftop and accurately suppressed enemy sniper positions, enabling adjacent units to regain the initiative.  Corporal Burger then directed an assaultman to fire a SMAW rocket at an enemy strongpoint, destroying the fortified position.  Corporal Burger then focused his attention on the building to his direct east, where insurgents were still engaging Marines who were pinned down behind vehicles in the middle of the street.  Repeatedly exposing himself to enemy fire, Corporal Burger employed his M203 grenade launcher and two AT-4 rockets, eliminating enemy insurgents operating in the buildings adjacent to the street.  Throughout this action, Corporal Burger's individual gallant and unselfish acts undoubtedly saved the lives of the Marines pinned down on the street below, and allowed not only his platoon, but also the entire company to continue with the attack.

On 10 November 2004, Corporal Burger's platoon was tasked with attacking to clear the north side of Phase Line Elizabeth, west to the Brooklyn Bridge.  Corporal Burger's squad, again designated as the main effort, was tasked with seizing company objective Golf.  Corporal Burger led his squad, systematically clearing all buildings and structures in the platoon sector, destroying enemy weapons and equipment that were found during the clearing mission.  By reducing all enemy fortified positions, Corporal Burger denied the insurgents the ability to engage his squad with enemy fire.  During the attack towards the objective, Corporal Burger identified key terrain held by an enemy force.  He directed two thermo-baric SMAW rounds at the insurgent's stronghold, destroying the building.  Quickly seizing the initiative, Corporal Burger personally led his squad into the final assault on the company objective.  After establishing overwatch positions on the rooftop, Corporal Burger engaged additional enemy positions and targets of opportunity with his M203 grenade launcher.  During the engagement, he received a fragmentation wound and was evacuated as a priority casualty.

Ignoring the serious wound that sent him back to the Battalion Aid Station for two full days, Corporal Burger bravely volunteered to rejoin his platoon on the battlefield on 13 November.  On 14 November, Corporal Burger's squad was tasked with clearing south along the west side of Phase Line Henry from Phase Line Isabel to the 88 Northing.  This sector, controlled by numerous international terrorists, was one of the most heavily defended areas in Fallujah.  As Corporal Burger's squad advanced south, the squads and platoons mutually supported each other and remained mutually supporting across the company's frontage.  Suddenly, Marines

PX1206

from an adjacent platoon, located on Corporal Burger's right flank, came under heavy enemy fire from nine insurgents barricaded inside a house. Three Marines from the adjacent platoon were seriously wounded, one fatally, after attempting to make entry and clear the structure. Two of the wounded Marines remained trapped inside the house occupied by insurgents. Once Corporal Burger became aware of the situation and realized his fellow Marines were in need of support, he unhesitatingly moved to recover the trapped Marines and kill the enemy. With no other support immediately available, Corporal Burger courageously assaulted the building with just one other Marine. With visibility reduced due to the thick black smoke filling the room, he entered the house knowing the danger involved. In his initial attempt to reach his fellow Marines, intense PKM machine gun fire, fragmentation grenades, and secondary explosions erupted again from inside the house. Hearing the cries of pain, Corporal Burger suppressed the doorway, entered the building, and moved to the left side of the room. An intense and heavy volume of enemy fire, combined with multiple grenades, caused him to crouch along the wall. As he moved closer to the wounded Marines, multiple explosions occurred around him. He aggressively returned fire at the numerous insurgents barricaded in the back room. While fearlessly engaging the enemy and simultaneously calling out to the wounded Marines, Corporal Burger was shot by one of the insurgents and fell to the ground, mortally wounded.

Corporal Burger's selfless actions, exceptional tactical proficiency and steadfast leadership throughout the assault on Fallujah undoubtedly saved Marines' lives, resulted in numerous insurgents killed, and ultimately ensured his Company's mission accomplishment. Much of Company I's success in battle was greatly assisted by Corporal Burger's selfless acts of heroism and loyalty to his brother Marines. He gallantly gave his life attempting to kill the enemy and save the lives of fellow Marines. Due to Corporal Burger's fearless devotion to duty and heroic acts under fire, he is strongly recommended for the Silver Star Medal.

From:  1st Lieutenant Burgess, 2nd Platoon, Company I, 3d Battalion, 1st Marines
To:    Commanding Officer, Company I, 3d Battalion, 1st Marines

SUBJ:  ACTIONS OF CORPORAL BURGER MERITING SILVER STAR AS WITNESSED BY 1STLT BURGESS

███████████

1. This is the statement regarding actions of Corporal Burger during offensive combat operations in support of Operation Al Fajr in Fallujah, Iraq.  This was observed by 1st Lieutenant Jared W. Burgess 

2. On 9 November, 2nd Platoon was pinned down on PL Elizabeth by enemy small arms, mortar and RPG fire coming from multiple-story buildings paralleling the street. Corporal Burger's squad leader was wounded from the concussion of an RPG that impacted near his position. After ensuring his squad leader was safely extracted to the casualty evacuation vehicles, Corporal Burger assumed command of the squad and directed his teams to establish observation posts on the rooftop of an adjacent structure. Next, Corporal Burger personally led a team to a position of over watch on the south side of PL Elizabeth oriented to the east. After observing enemy dismounts five-hundred meters from his position running into a mosque, Corporal Burger directed an Assaultman to engage the position with a High-Explosive rocket. Next, Corporal Burger engaged enemy snipers with his M203 grenade launcher to the east of his position. Corporal Burger requested more ammunition due to the heavy volume of fire he was delivering against the enemy. Finally, Corporal Burger employed two AT-4 rockets against

PX1206

enemy fortified positions in a large apartment complex. This was observed from the middle of the street on PL Elizabeth.

3. On 10 November Corporal Burger led his squad west on PL Elizabeth conducting systematic searches of each building on the north side of the road. Prior to reaching the platoon's objective, a two-story mosque, Corporal Burger and the remainder of his squad seized key terrain in a three-story building. Next, Corporal Burger directed two Shoulder-Fired Multipurpose Assault Weapon (SMAW) rockets onto target, destroying the enemy's fortified position. Once the objective was reduced, Corporal Burger led the charge with the remainder of his squad, securing the mosque. He then assigned sectors of fire to his team, establishing a security perimeter on the second level of the mosque. Later, while suppressing enemy positions with is M203 grenade launcher from the rooftop of the platoon's strongpoint location, Corporal Burger was hit with shrapnel in the arm. He was evacuated that night to the forward Battalion Aid Station for further medical treatment. These events were observed while traveling with Corporal Burger's squad during the movement west towards the platoon's objective.

4. On 14 November, Corporal Burger's squad had secured a building and established a security perimeter, going firm until the rest of the platoon came on line with his position. Marines from 3d Platoon on Corporal Burger's right flank came under heavy resistance from multiple insurgents barricaded inside a two-story house. Realizing his fellow Marines were in need of support, Corporal Burger moved to the adjacent structure and assessed the situation. One Marine had been shot in the face, and another shot in the arm, and another Marine mortally wounded while trying to clear the target house. The objective building was filled with smoke from several explosions and enemy fragmentation grenades, extremely reducing visibility. Knowing several armed enemy personnel occupied the house, Corporal Burger, with one other Marine, made entry through the front door attempting to recover a Marine from 3d Platoon who had not exited the building. Corporal Burger hooked a left, providing security on the staircase the led to the second level. Receiving a heavy volume of automatic gunfire from insurgents inside the building, Corporal Burger was shot once in the forehead. He was immediately pulled out of the building and the corpsman on scene began applying critical first aid.

Jared W. Burgess

1st Lieutenant / USMC

From: Corporal Jackson, 2nd Platoon, Company I, 3d Battalion, 1st Marines
To:   Commanding Officer, Company I, 3d Battalion, 1st Marines

SUBJ: ACTIONS OF CORPORAL BURGER MERITING SILVER STAR AS WITNESSED BY CORPORAL JACKSON

1. This is the statement regarding actions of Corporal Burger during offensive combat operations in support of Operation Al Fajr in Fallujah, Iraq. This was observed by Corporal Sammie D. Jackson ████████████

2. On 14 November, Corporal Burger's squad was tasked with providing security for the Explosive Ordnance Disposal team while they destroyed weapons caches that were discovered by the other two platoons. The entire squad had made entry and secured a building on the right flanks of our platoon's sector. We were holding firm at that location when gunfire erupted from a building one-hundred fifty meters to our direct west. As soon as Corporal Burger realized that Marines from 3d Platoon were in trouble, he asked for a team to go with him and move to the building where the automatic fire was taking place. Myself, Corporal Burger, and two other Marines made our way to that location and into the courtyard surrounding the house. We learned that a total of three Marines were trapped inside the house known to be occupied by several armed insurgents. Sergeant Pennel, a squad leader from 3d Platoon, went inside the building and assisted a Marine who had been shot in the face to safety. Another Marine came running out of a side door, shot in the arm. One Marine was not accounted for, and Corporal Burger along with Sergeant Pennel decided to make entry and attempt to locate him. Several secondary explosions and enemy grenades made restricted visibility inside the target house. When there was a lull in the firing, Corporal Burger followed behind Sergeant Pennel into the building, and was immediately shot in the head by an enemy insurgent. Myself and two other Marines immediately pulled Corporal Burger out of the room, and a corpsman began applying critical first aid. These events were witnessed while traveling with Corporal Burger to the enemy strongpoint occupied by multiple armed insurgents.

Sammie D. Jackson

Corporal / USMC

PX1206

## Citation

### BV approved as SS by SECNAV APPROVED on 01/23/2006

For conspicuous gallantry and intrepidity in action against the enemy while serving as Squad Leader, Company I, 3d Battalion, 1st Marine Regiment, Regimental Combat Team 1, 1st Marine Division, I Marine Expeditionary Force from 9 to 14 November 2004, in support of Operation IRAQI FREEDOM II. When, during an intense firefight, his squad leader was knocked unconscious by the concussion from a rocket-propelled grenade, Corporal Burger immediately assumed the squad leader's responsibilities. Realizing the platoon's attack was losing momentum, he quickly directed his fire teams to establish positions in nearby buildings. Displaying heroic leadership and tactical proficiency, he personally led a team to a rooftop and neutralized several enemy sniper positions with accurate fire, enabling the Platoon to regain critical momentum. Despite withering enemy fire and with total disregard for his personal safety, Corporal Burger employed his M203 grenade launcher and two AT-4 rockets, eliminating enemy insurgents operating in adjacent buildings. Leading the squad in an assault against a large group of insurgents occupying a building, he was seriously wounded and evacuated. Disregarding his wounds, he volunteered to return to the Platoon three days later. During an ensuing firefight, Corporal Burger encountered three severely wounded Marines inside a house where numerous insurgents were barricaded behind fortified positions. Again disregarding his own safety, and under heavy enemy fire, he charged into the house to recover his fellow Marines. While valiantly returning fire and calling for the wounded Marines, he received enemy fire and fell mortally wounded. By his bold leadership, wise judgment, and complete dedication to duty, Corporal Burger reflected great credit upon himself and upheld the highest traditions of the Marine Corps and the United States Naval Service.

PX1219



## STATE OF MARYLAND
## LETTERS OF ADMINISTRATION

ESTATE NO. ▮▮▮▮▮▮

I certify that administration of the Estate of

**DALE A. BURGER JR**

was granted on the _____7th_____ day of _____SEPTEMBER, 2007_____ ,

to _____MARTINA  BURGER_____

as personal representative(s) and the appointment is in effect

this   1st   day of   AUGUST     2018   ,

☐ Will probated_____
            (date)

☑ Intestate estate

_____
DEREK HOPKINS
**Register of Wills for**

HARFORD COUNTY

**VALID ONLY IF SEALED WITH THE SEAL OF THE COURT OR THE REGISTER**

RW1120                                                                     ROWNET
                                                                          11/2009

Fis_BurgerD_E_00000001

PX1219

PX1224

**CERTIFICATE OF DEATH (OVERSEAS)**
Acte de décès (D'Outre-Mer)

| NAME OF DECEASED (Last, First, Middle) Nom du décédé (Nom et prénoms) | | GRADE  Grade | BRANCH OF SERVICE  Arme | SOCIAL SECURITY NUMBER  Numéro de l'Assurance Sociale |
|---|---|---|---|---|
| Burger, Jr., Dale, A | | E-4 | Marines | |

| ORGANIZATION  Organisation | NATION (e.g., United States) Pays | DATE OF BIRTH  Date de naissance | SEX Sexe |
|---|---|---|---|
| I Company, 3DBN, 1ST MAR, RCT-1, 1ST MARDIV Camp Pendleton. CA 92055 | USA | | ☑ MALE Masculin ☐ FEMALE Féminin |

| RACE Race | | MARITAL STATUS  Etat Civil | | RELIGION  Culte | |
|---|---|---|---|---|---|
| ✗ CAUCASOID  Caucasique | | ✗ SINGLE  Célibataire | DIVORCED Divorcé | PROTESTANT Protestant | OTHER (Specify) Autre (Spécifier) |
| NEGROID  Negroïde | | MARRIED  Marié | | CATHOLIC Catholique | ✗ No Preference |
| OTHER (Specify) Autre (Spécifier) | | WIDOWED  Veut | SEPARATED Separé | JEWISH  Juif | |

| NAME OF NEXT OF KIN  Nom du plus proche parent | RELATIONSHIP TO DECEASED  Parenté du décédé avec le susdit |
|---|---|
| Martina C. Burger | Mother |

| STREET ADDRESS  Domicile à (Rue) | CITY OR TOWN AND STATE  (incl. du ZIP Code)  Ville (Code postal compris) |
|---|---|
| | |

**MEDICAL STATEMENT**  Déclaration médicale

| CAUSE OF DEATH (Enter only once cause per line) Cause du décès (N'indiquer qu'une cause par ligne) | | INTERVAL BETWEEN ONSET AND DEATH Intervalle entre l'attaque et le décès |
|---|---|---|
| DISEASE OR CONDITION DIRECTLY LEADING TO DEATH[1] Maladie ou condition directement responsable de la mort | Gunshot wound of the head | Immediate |
| ANTECEDENT CAUSES  Symptômes précurseurs de la mort | MORBID CONDITION, IF ANY, LEADING TO PRIMARY CAUSE Condition morbide, s'il y a lieu, menant à la cause primaire | |
| | UNDERLYING CAUSE, IF ANY, GIVING RISE TO PRIMARY CAUSE Raison fondamentale, s'il y a lieu, ayant suscité la cause primaire | |

OTHER SIGNIFICANT CONDITIONS[2]
Autres conditions significatives[2]

| MODE OF DEATH Condition de décès | AUTOPSY PERFORMED  Autopsie effectuée  ☑ YES  Oui   ☐ NO  Non | | CIRCUMSTANCES SURROUNDING DEATH DUE TO EXTERNAL CAUSES Circonstances de la mort suscitées par des causes extérieures |
|---|---|---|---|
| | MAJOR FINDINGS OF AUTOPSY  Conclusions principales de l'autopsie | | Mode of Death: Pending |
| NATURAL Mort naturelle | | | |
| ACCIDENT Mort accidentelle | | | |
| SUICIDE Suicide | NAME OF PATHOLOGIST  Nom du pathologiste Michael E. Smith, MAJ, MC, USA | | |
| HOMICIDE Homicide | SIGNATURE  Signature | DATE  Date 18 Nov 2004 | AVIATION ACCIDENT  Accident à Avion ☐ YES  Oui   ☑ NO  Non |

| DATE OF DEATH (Hour, day, month, year) Date de décès (l'heure, le jour, le mois, l'année) | PLACE OF DEATH  Lieu de décès |
|---|---|
| 1649, 14 Nov 2004 | Fallujah, Iraq |

I HAVE VIEWED THE REMAINS OF THE DECEASED AND DEATH OCCURRED AT THE TIME INDICATED AND FROM THE CAUSES AS STATED ABOVE.
J'ai examiné les restes mortels du dé furtait je conclus que le décès est survenu à l'heure indiquée et à la suite des causes énumérées ci-dessus.

| NAME OF MEDICAL OFFICER  Nom du médecin militaire ou du médecin sanitaire | TITLE OR DEGREE  Titre ou diplôme |
|---|---|
| Michael E. Smith | Deputy Medical Examiner |

| GRADE  Grade | INSTALLATION OR ADDRESS  Installation ou adresse | SIGNATURE |
|---|---|---|
| MAJ | Dover AFB, DE 19902 | |
| DATE  Date  22 Nov 2004 | SIGNATURE  Signature | |

CERTIFIED TO BE A TRUE COPY
T. Nichols  CDR  16 DEC 2004
Signature  Date
DEPARTMENT OF THE NAVY
BUREAU OF MEDICINE AND SURGERY
MILITARY MEDICAL SUPPORT OFFICE
P.O. BOX 886999
GREAT LAKES, IL 60088-6999

[1] State disease, injury or complication which caused death, but not mode of dying such as heart failure, etc.
[2] State conditions contributing to the death, but not related to the disease or condition causing death.
[1] Préciser la nature de la maladie, de la blessure ou de la complication qui a contribué à la mort, mais non le mode de mourir telle que la défaillance cardiaque, etc.
[2] Préciser la condition qui a contribué à la mort, mais n'ayant aucun rapport avec la maladie ou la condition qui a provoqué la mort.

DD FORM 2064   REPLACES DA FORM 3565, 1 JAN 72 AND DA FORM 3565-R(FAS), 26 SEP 72
1 APR 77

PX1227

Home / Awards / DALE BURGER



# Dale Alan Burger

**DATE OF BIRTH:** ▇▇▇▇
**PLACE OF BIRTH:**
Baltimore, Maryland
**HOME OF RECORD:**
Bel Air, Maryland

Dale Burger's father served as a Marine in Vietnam, earning a Purple Heart. He died only months beofre his son in 2004, and the two are buried side-by-site at Arlington National Cemetery. Before his heroic actions in Iraq, during a training exercise in mountain warfare, several comrades became hypothermic. Corporal Burger was awarded the Navy and Marine Corps Achievement Medal for selflessly using his own body heat to raise the temperatures of his fellow Marines, an action that resulted in Corporal Burger requiring subsequent medical attention for hypothermia.

## AWARDS BY DATE OF ACTION:

`1 of 1`

# Silver Star

AWARDED FOR ACTIONS DURING Global War on Terror

Service: Marine Corps

Battalion: 3d Battalion

Division: 1st Marine Division, I MEF

GENERAL ORDERS:

CITATION:

The President of the United States of America takes pride in presenting the Silver Star (Posthumously) to Corporal Dale Allen Burger, Jr., United States Marine Corps, for conspicuous gallantry and intrepidity in action against the enemy while serving as Squad Leader, Company I, Third Battalion, First Marine Regiment, Regimental Combat Team 1, FIRST MARINE DIVISION, I Marine Expeditionary Force, in support of Operation IRAQI FREEDOM II from 9 to 14 November 2004. During an intense firefight, Corporal Burger's squad leader was knocked unconscious and suffered a concussion from a rocket-propelled grenade. Realizing the platoon's attack was losing momentum, Corporal Burger immediately assumed the squad leader's responsibilities and quickly directed his fire teams to establish positions in nearby buildings. Displaying heroic leadership and tactical proficiency, he personally led a team to a rooftop and neutralized several enemy sniper positions with accurate fire, enabling the Platoon to regain critical momentum. Despite withering enemy fire and with total disregard for his personal safety, Corporal Burger employed his M-203 grenade launcher and two AT-4 rockets, eliminating enemy insurgents operating in adjacent buildings. Leading the squad in an assault against

PX1227

a large group of insurgents occupying a building, he was seriously wounded and evacuated. Disregarding his wounds, he volunteered to return to the Platoon three days later. During an ensuing firefight, Corporal Burger encountered three severely wounded Marines inside a house where numerous insurgents were barricaded behind fortified positions. Again disregarding his own safety, and under heavy enemy fire, he charged into the house to recover his fellow Marines. While valiantly returning fire and calling for the wounded Marines, he received enemy fire and fell mortally wounded. By his bold leadership, wise judgment, and complete dedication to duty, Corporal Burger reflected great credit upon himself and upheld the highest traditions of the Marine Corps and the United States Naval Service.

SEE MORE RECIPENTS OF THIS AWARD

« »

Back to Recipient List

Silver Star

Sightline Media Group © 2022

Contact · Terms · Privacy

PX1227

PX1300

Declassified by MG Patrick D. Frank
USCENTCOM Chief of Staff
Declassified on: 29 Apr 2022
Privacy Act Protective Order applies

# Ops Report


WebTAS

Wednesday, 23 February 2022

## Ops Report

| | |
|---|---|
| Date Occurred(L) | Jan 26 2005 03:00:00 |
| is Closed | TRUE |
| Summary | AT 0300C, 1/23 MAR AND USSF CONDUCTED LIMITED SCALE RAIDS IN HAQLANIYAH AND HADITHA. MAP 4 AND DRAGOON BLUE COMPLETED ACTIONS ON THEIR OBJECTIVE (38S KC 57119 75807) AT 0310C AND BEGAN THEIR EGRESS WHEN MAP 4 WAS ATTACKED BY AN IED IVO 38S KC 56863 75636) AT 0315C. THEY BEGAN TO RECEIVE SAF, RPK, AND RPG FIRE FROM THE MOSQUE (38S KC 57037 75810), THE BRIDGE (38S KC 56969 75460), A HOUSE (38S KC 57028 75667), AND A RIDGE (38S KC 56823 75784) IMMEDIATELY AFTER THE IED DETONATED. THE IED STRUCK A ⌷ 1.4(g) ⌷. THEY RETURNED FIRE WITH 25MM, 50 CAL, M240G, AND 5.56MM (BDA UNKNOWN) AND BROKE CONTACT TO EVACUATE THE CASUALTIES. METTLE 75 (C-130 GUNSHIP) WAS WAS REDIRECTED AT 0310C, PRIOR TO THE ENEMY AMBUSH. ALL CASUALTIES GROUND MEDEVAC TO HADITHA DAM AND AIR MEDEVAC TO AL ASAD AT 0444C. WHILE ENROUTE TO 31ST CSH, (2) URGENT SURGICAL WIA DOW.  WHILE ENROUTE TO HADITHA TO PROSECUTE (2) TARGETS (38S KC 58420 80940, 38S KC 58290 80650), THEY OBSERVED SEVERAL VEHICLES AND INDIVIDUALS THAT APPEARED TO BE SETTING UP AN AMBUSH ON RIVER ROAD IVO 38S KC 58419 76972 AT 0422C AND METTLE 75, WHO HAD BEEN REDIRECTED BACK ON STATION, ENGAGED WITH 40MM, REDUCING THE TARGET. AT THE TARGETS IN HADITHA, 1 AIF DETAINED AND TRANSPORTED TO AL ASAD DETFAC FOR PROCESSING. CASUALTY TOTALS ARE (4) US KIA AND AND (5) US WIA. |
| Suicide Count | 0 |
| is Effective Explosive Hazard | FALSE |
| Blown In Place | FALSE |
| Year Occurred | 2005 |
| Month Occurred | January |
| Day Occurred | 26 |
| Event Type | Explosive Hazard |
| Event Category | IED Explosion |
| Event MOA | Improvised Explosive Device (IED) |
| Primary Country | IRAQ |
| Primary RC | MNF-W |
| Primary District | |
| Primary Province | Anbar |
| was Suicide | FALSE |
| Tracking Number | MEF LNO-74399551 |
| Attack On | None Selected |

Page 1 of 4

USCENTCOM MDR 22-0054
Approved for Release to OGC- Confidential Privacy Act Protective Order Applies
04/28/22 001
FISHBECK
CENTCOM_00000118

PX1300

## Ops Report

| | |
|---|---|
| Unit Activity | NONE SELECTED |
| Title | IED ATTK ON 1/23MAR DURING RAID IVO HADITHAH: 4X CF KIA, 5X CF WIA, 1X DET |
| Association Count | 2 |
| BDA Friendly KIA | 4 |
| BDA Friendly WIA | 5 |
| BDA Friendly Casualties | 9 |
| BDA Friendly ABD | 0 |
| BDA Civilian KIA | 0 |
| BDA Civilian WIA | 0 |
| BDA Civilian Casualties | 0 |
| BDA Civilian ABD | 0 |
| BDA Host Nation KIA | 0 |
| BDA Host Nation WIA | 0 |
| BDA Host Nation Casualties | 0 |
| BDA Host Nation ABD | 0 |
| BDA Enemy KIA | 0 |
| BDA Enemy WIA | 0 |
| BDA Enemy Casualties | 0 |
| BDA Enemy Detained | 1 |
| City | Hadithah |
| Classification | ~~SECRET~~ |
| Classification Releasability Mark | ~~REL TO USA, EGY, FIN, KWT, IRKS, NATO~~ |
| CIDNE Folder | 3.5c  LiteReportView.cfm?module=operations&reporttype=sigact&reportkey=E6E1A265-C682-4F48-B4C1-90B650DDBD64&entity=report |
| Date Occurred Excel UK | 26/01/2005 |
| Date Occurred Excel US | 01/26/2005 |
| Date Posted(Z) | Jan 26 2005 07:26:03 |
| Date Updated(Z) | Jan 26 2005 07:26:03 |
| FOB | UNKNOWN |
| Latitude | 34.0911764603 |
| Longitude | 42.3650904621 |
| MGRS | 38SKC569754 |

Page 2 of 4

Approved for Release to OGC- Confidential Privacy Act Protective Order Applies

04/28/22 002
FISHBECK
CENTCOM_00000119

PX1300

## Ops Report

| | |
|---|---|
| MOA Count | 1 |
| Originating System | Not Provided |
| Originator Group | UNKNOWN |
| Originator Name | UNKNOWN |
| Originator Unit | ADMIN |
| Precedence | ROUTINE |
| Report Key | E6E1A265-C682-4F48-B4C1-90B650DDBD64 |
| Reporting Unit | Not Provided |
| Route | ASR Phoenix |
| Type Of Unit | None Selected |
| Unit Name | Not provided |
| Updated By Group | UNKNOWN |
| Updated By Name | UNKNOWN |
| Updated By Unit | ADMIN |
| Vehicle Convoy Count | 0 |
| Vehicle Convoy Speed | 0 |
| Vehicle Convoy Speed Measure | MPH |
| Vehicle Distance Between | 0 |
| Vehicle Nearest ECM To IED | 0 |
| Vehicle Nearest ECM To Vehicle Struck | 0 |
| Vehicle Other Counter Measures | N/A |
| Vehicle Summary | Not Provided |
| was Complex Attack | FALSE |
| was Coordinated Attack | FALSE |
| was Counter Attack | FALSE |
| was ABP Involved | FALSE |
| was ANA Involved | FALSE |
| was ANP Involved | FALSE |
| was ANSF Involved | FALSE |
| was ISAF Involved | FALSE |
| was INS Involved | FALSE |
| was Medevac Requested | FALSE |

USCENTCOM MDR 22-0054
Approved for Release to OGC- Confidential Privacy Act Protective Order Applies

04/28/22 003
FISHBECK
CENTCOM_00000120

PX1300

## Ops Report

### SIGACT Location

| AO | City | Classification | Releasability | Coordinate | Country | (More not shown) |
|---|---|---|---|---|---|---|
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| | Hadithah | SECRET | REL TO USA, EGY, FIN, KWT, IRKS, NATO | | IRAQ | (More not shown) |

### MOA

| Mode Of Attack | | Mode Of Attack Key | Event Type | | Event Category |
|---|---|---|---|---|---|
| Improvised Explosive Device (IED) | | 18933456-0BD2-4C47-B58F-C50341780C93 | Explosive Hazard | | IED Explosion |

### Events1

| Event Category | Event Key | Event Type | Intended Outcome | Suicide | Hit Or Miss | (More not shown) |
|---|---|---|---|---|---|---|
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| IED Explosion | C156F809-A30A-45C0-A036-871BBB3BAD84 | Explosive Hazard | | | | (More not shown) |

### Association

| CIDNE Folder | is Published | Confidence | Classification | Classification Releasability Mark | DTG Posted | (More not shown) |
|---|---|---|---|---|---|---|
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| Link to Analysis CIDNE Report | 1 | Confirmed | SECRET | REL TO USA, FVEY | Dec 05 2014 17:57:08 | (More not shown) |
| | | | | | | (More not shown) |
| Link to Exploitation CIDNE Report | 1 | Confirmed | SECRET | REL TO USA, FVEY | Jan 26 2005 07:26:03 | (More not shown) |

13 Empty Attributes

Battlespace Lead, Call Sign, Date Occurred(Z), ISAF Tracking Number, Incident Reported By, Originating Nation, Originating Network, Originating Site, Primary AO, Primary AOR, Primary Region, Reintegratees Count, To, Reported By, Associated Org, CCIR, CIDNE Media, Casualty, Chemicals Found, Drugs Found, Equipment Found, Events Subordinate, IDF Details, Ops Capture, SIGACT Item, SIGACT Method Found, SIGACT Remark, SIGACT Requirements, Suspect, Target, Units, Vehicle

## Relationships

(None)

## Attachments

(None)

USCENTCOM MDR 22-0054
Approved for Release to OGC- Confidential Privacy Act Protective Order Applies

04/28/22 004
FISHBECK
CENTCOM_00000121

PX1300

PX1301

Redacted Document Approved for Release to FOIA# DON-USMC-2019-011393
Report Source: Not Provided by ADMIN

| SIGACT Report Theater: ROAR | |
|---|---|

**** SIGACT CLOSED ****

| | | | |
|---|---|---|---|
| **Title:** | IED ATTK ON 1/23MAR DURING RAID IVO HADITHAH: 4X CF KIA, 5X CF WIA, 1X DET | | |
| **Tracking Number:** | MEF LNO-74399551 | **Report Precedence:** | ROUTINE |
| **Classification:** | SECRET DECLASSIFIED | **Releasability:** | REL TO USA, EGY, FIN, KWT, IRKS, NATO |
| **Reporting Unit Name:** | Not Provided | **Report Source:** | Coalition |
| **Report URL:** | http://cidneconus centcom smil mil/LiteReportView cfm?module=operations&reporttype=SIGACT&reportkey=E6E1A265-C682-4F48-B4C1-90B650DDBD64 | | |

| SPOT Report | |
|---|---|

| | | | |
|---|---|---|---|
| **Unit Name Involved:** | Not provided | **Call Sign:** | Not Reported |
| **Type Of Involved Unit:** | None Selected | **Involved Unit Activity:** | NONE SELECTED |
| **Incident Reported By:** | Not Reported | **Battlespace Lead:** | Not Reported |
| **Tip Reported By:** | Not Reported | | |
| **DTG Of Incident (Zulu Time):** | 2005-01-26 03:00 | **DTG Updated (Zulu Time):** | 2005-01-26 07:26 |

| Location | |
|---|---|

(S//REL TO USA, EGY, FIN, KWT, IRKS, NATO)

| | | | |
|---|---|---|---|
| **MGRS:** | 38S KC569754 | | ☐ Coords Unknown |
| **AOR:** | Not Reported | **Province:** | Anbar |
| **Region:** | Not Reported | **District:** | Not Reported |
| **Country:** | IRAQ | **City:** | Hadithah |
| | | **Village:** | Not Reported |

| Events | |
|---|---|

(S//REL TO USA, EGY, FIN, KWT, IRKS, NATO)

| | | | |
|---|---|---|---|
| **Environment Type:** | Not Reported | | |
| **Event Type:** | Explosive Hazard | **Modes Of Attack:** | Improvised Explosive Device (IED) |
| **Event Category:** | IED Explosion | | |
| **Primary:** | Yes | | |
| **Actions Taken:** | Not Reported | **Suicide?:** | No |
| | | **How Device Was Found:** | |

| | | | | | |
|---|---|---|---|---|---|
| **Coordinated Attack:** | No | **Complex Attack:** | No | **Counter Attack:** | No | **MEDEVAC Requested:** | No |

| Associated Organizations | |
|---|---|

| SIGACT Summary | |
|---|---|

**Summary:** (S//REL TO USA, EGY, FIN, KWT, IRKS, NATO) AT 0300C, 1/23 MAR AND USSF CONDUCTED LIMITED SCALE RAIDS IN

PX1301

Redacted Document Approved for Release to FOIA# DON-USMC-2019-011393



HAQLANIYAH AND HADITHA  MAP 4 AND DRAGOON BLUE COMPLETED ACTIONS ON THEIR OBJECTIVE (38S KC 57119 75807) AT 0310C AND BEGAN THEIR EGRESS WHEN MAP 4 WAS ATTACKED BY AN IED IVO 38S KC 56863 75636) AT 0315C  THEY BEGAN TO RECEIVE SAF, RPK, AND RPG FIRE FROM THE MOSQUE (38S KC 57037 75810), THE BRIDGE (38S KC 56969 75460), A HOUSE (38S KC 57028 75667), AND A RIDGE (38S KC 56823 75784) IMMEDIATELY AFTER THE IED DETONATED  THE IED STRUCK A HIGH-BACK HMMWV RESULTING IN MINOR DAMAGE  THEY RETURNED FIRE WITH 25MM, 50 CAL, M240G, AND 5 56MM (BDA UNKNOWN) AND BROKE CONTACT TO EVACUATE THE CASUALTIES  METTLE 75 (C-130 [REDACTED]) WAS WAS REDIRECTED AT 0310C, PRIOR TO THE ENEMY AMBUSH  ALL CASUALTIES GROUND MEDEVAC TO HADITHA DAM AND AIR MEDEVAC TO AL ASAD AT 0444C  WHILE ENROUTE TO 31ST CSH, (2) URGENT SURGICAL WIA DOW  WHILE ENROUTE TO HADITHA TO PROSECUTE (2) TARGETS (38S KC 58420 80940, 38S KC 58290 80650), THEY OBSERVED SEVERAL VEHICLES AND INDIVIDUALS THAT APPEARED TO BE SETTING UP AN AMBUSH ON RIVER ROAD IVO 38S KC 58419 76972 AT 0422C AND METTLE 75, WHO HAD BEEN REDIRECTED BACK ON STATION, ENGAGED WITH 40MM, REDUCING THE TARGET  AT THE TARGETS IN HADITHA, 1 AIF DETAINED AND TRANSPORTED TO AL ASAD DETFAC FOR PROCESSING  CASUALTY TOTALS ARE (4) US KIA AND AND (5) US WIA

| Enemy | | | Blue Forces | | | CIV-NGO-ASG | | | Host Nation | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KIA | WIA | DET | KIA | WIA | ABD | KIA | WIA | ABD | KIA | WIA | ABD |
| 0 | 0 | 1 | 4 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Requirements

Capture Details

Casualty Details

Target(s) of Attack

DRUGREP Details                                                                Show

Evidence Report Details

Declassified By: C. E. Mundy III, CMDR, Per CCR 380-14 & MARCENTO 5513.1B; Date: 20201116

Approved for Release

PX1301