# PX1307

# DECLARATION OF

# HARRY "BUTCH" DREANY

I, Harry "Butch" Dreany, declare under penalty of perjury that the following statements are true and correct:

a. I have personal knowledge of the facts and information contained in this Declaration.

b. I enlisted in the U.S. Marine Corps while attending college in 1992. I entered the Marine Corps through the enlistment process at Paris Island, SC. In 1995 I graduated from Randolph-Macon College with a Bachelor of Arts in Political Science. In 2001, I completed my Bachelor of Science in Physics from the University of Mary Washington. After completing my Bachelor's degree, I was stationed at Charlie Company, 4th Combat Engineer Battalion in Lynchburg, Virginia and my rank was Staff Sergeant (E-6). I later completed my Master of Science in Systems Engineering in 2006 from George Mason University and my Master of Arts in National Security and Strategic Studies / Irregular Warfare in 2010. In 2018, I earned my Doctor of Philosophy (Ph.D.) in Systems Engineering from The George Washington University.

c. In August, 2004, I deployed to Iraq along with my unit, 2nd Platoon, Charlie Company, 4th Combat Engineer Battalion. We were attached to the 1st Battalion 23rd Marines and stationed at Haditha Dam near Haditha, Iraq. Captain Jonathan Kuniholm was my Platoon Commander and I was the Platoon Sergeant under Captain Kuniholm. I returned from Iraq on 12 March 2005 and continue to serve in the U.S. Marines Corps Reserves as a Master Sergeant (E8). In my civilian job, I am currently working as the Artificial Intelligence Development Lead for the Marine Corps Warfighting Lab.

d. In Iraq my rank was Staff Sergeant (E6), Combat Engineer, MOS 1371, and I was the Platoon Sergeant. Our platoon commander was Captain Kuniholm with the rank of Captain (O3); his specialty was Engineering Officer, MOS 1302.

As a Combat Engineer at the rank of Master Sergeant, I have attended numerous in-depth training courses that included using and investigating incidents where an explosion occurred. I have also had extensive experience using explosives during my career.
Courses attended that covered tactical site survey exploitation:

-Basic Combat Engineer School
-Marine Combat Training
-Joint Engineer Operations Course
-Counter-Improvised Explosive Device (C-IED) Training and Capabilities Course
-1st Combat Engineer Battalion Sapper Leaders' Course
-Counter Improvised Explosive Device Defeat the Device (C-IED DtD) Training Course

Site exploitation, also called Tactical Site Exploitation or Sensitive Site Exploitation (SSE), is a military term used by the United States to describe "collecting information, material, and persons from a designated location and analyzing them to answer information requirements, facilitate subsequent operations, or support criminal prosecution."

Prior to January 1, 2005, I had participated in site exploitation training to investigate enemy attacks where explosives were used and determine what had happened. Training included examining craters or other physical damage created by the munitions to include analyzing the damage to architecture, infrastructure, vehicles and other equipment. Training also included investigation to determine the munitions used including whether they were command detonated, victim initiated, or remotely detonated. We were also trained to interview and question witnesses and detained individuals to determine what happened, their possible involvement, and the origin of those involved including determining whether these individuals were locals or foreign fighters. We were also trained to be situationally aware by observing people, vehicles, buildings, etc. in the area as related to the attack in order to identify irregularities. This also included observing and investigating vehicles not common to the area, etc.

I routinely used this training throughout my service in Iraq, including at and during the time of the attack at issue in this matter. During my time in Iraq I used my training to personally assess over 100 weapons caches, including some caches in the Haditha area of operation that contained Explosively Formed Penetrators (EFPs).

e. On January 1, 2005, the Small Craft Company had been patrolling the Euphrates and clearing the area down to "Muj Island" which was approximately 8 kilometers south of Haditha Dam. They were patrolling south of the Dam with a new shallow-draft, Small Unit Riverine Craft.

In the late morning Captain Kuniholm had been meeting with Platoon Commander Lt. Andrew Thomas. During the meeting, it was learned that Lt. Thomas's patrol had been attacked by small arms fire near the Western shore of the Euphrates River south of Haditha Dam. The patrol asked for a Quick Reaction Force (QRF) to assist in countering

the small arms fire.  I understand that Lt. Thomas asked Captain Kuniholm to go along, so he jumped in the boat to assist.

The next thing I recall is that we received a "9 line" radio call requesting a medevac of personnel including Captain Kuniholm.  Eventually, Captain Kuniholm was returned to Haditha Dam, but, because of his serious injuries, I was not able to speak with him.

Because of my specialized training, and my rank and role within the unit, I was given Captain Kuniholm's gear including his weapon, body armor and clothes to examine and assess.

f. I used my aforementioned training and experience in site surveying to inspect and analyze the damage to Captain Kuniholm's gear. In my experience in investigating explosives and attack scenes, I concluded that the explosives used in the olive oil can IED were indicative of a high-grade "fast" explosive which would cause cutting damage and life threatening injuries.  Comparing the type of explosive to TNT with an REF (relative effectiveness factor) of 1.0, a cutting charge explosive would have an REF closer to 1.34.  The manner in which the rifle and Captain Kuniholm's arm was cut, and the significant damage to the rifle and ceramic body armor plates, indicated use of a very fast explosive.  Also, metal shards, shrapnel, bolts, screws, that were likely packed into the IED would cut and seriously damage whatever was struck and this further supported that the IED used a fast explosive.

Additionally, it is my opinion that the IED used in this attack was more likely than not to have been assembled and positioned by terrorists with a higher level of sophistication than the local Iraqi's known to be operating in the area.  I base my opinion on the following factors:

1. The IED was pre-packed and concealed in a container (the olive oil can) which suggests a higher level of sophistication, as opposed to repurposing old left over ordnance;
2. The IED had been packed with debris shrapnel which was targeted toward the area they would hit;
3. In my experience in this area, very crude roadside bombs were used more by amateurs and often missed their intended targets when detonated from afar;
4. It was known by us at the time that, after the battle of Fallujah in late 2004, al Qaeda-aligned foreign jihadis had entered the Haditha area bringing with them sophisticated tactics, techniques, and procedures;
5. The small arms fire, prior to the IED attack, was intended to lure the Marines directly in to the area of the IED and ambush/kill zone; and

6. Those who are more sophisticated in building IEDs or other complex explosive munitions, such as the one used against Captain Kuniholm, understand how to build them for maximum lethality, including how to pack the explosives, how to use high-grade explosives with boosters/initiating/blasting caps, and how to position the IED and coordinate its detonation via command;

Although I was not present at the time of the attack, after personally inspecting the clothing, the weapon, the body armor, and being aware of the injuries to Captain Kuniholm and the death of Lance Corporal Brian Parrello; as well as my knowledge of the attack gathered after the fact, it is my opinion that the IED more likely than not involved high-speed professional grade explosive material, and was command-detonated by a highly sophisticated group of individuals once the Marines had been lured into the kill zone with small arms fire.

g. Although I was not able to talk to Captain Kuniholm after the attack and before he was medevac'd out, from what I personally observed, I understood that he had serious injuries including a significant severing injury to his right arm which resulted in his arm later being amputated. He also suffered injuries to his left hand and shrapnel injuries to his right side and blast injuries from the explosion of the IED.

h. While I did not personally know any of the others killed or wounded in the attack, I understood that Corpsman Second Class Juan Rubio was also seriously injured at the same time and in the same attack as Captain Kuniholm,

i. As Part of my Declaration I am providing a photograph attached as Exhibit A, which is a true and authentic copy of a photograph depicting me with Captain Kuniholm and our platoon while we were deployed to Iraq. I have personal knowledge of the source or creation of Exhibit A because I was in the photograph and was provided a copy of the photograph by one of my military buddies.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on this 6TH day of August, 2020.

Signature: _Harry H Dreany_

Statement of Harry 'Butch' Dreany (1/1/2005 attack)

Page 4