# PX2403

## DECLARATION OF LARRY DIAZ CABRAL, JR.

I, Larry Diaz Cabral Jr., declare and state under penalty of perjury that the following statements are true and correct:

a.  I have personal knowledge of the facts and information contained in this Declaration.

b.  I was born on ▉Redacted▉ in Loma Linda, California to Larry and Connie Cabral. Growing up in Loma Linda, I had a typical southern California childhood, including participating in several different types of sports. I played football, baseball, ran track and was a member of the wrestling team. I was awarded a wrestling scholarship in high school that allowed me to take some general education courses at our local junior college. Like most kids I graduated high school at 18 and had big plans for when I started college, but I soon found that junior college wasn't the route I wanted to take so I started working for a medical supply company delivering medical supplies. When I was 23, I decided to join the Army.

c.  I enlisted in the United States Army in February of 1993. I was sent to Fort Jackson, South Carolina for Basic Combat Training (BCT), followed by Fort Gordon, Georgia for Advanced Individual Training (AIT). My first duty station after completing AIT was Baumholder Army Base, Germany. While stationed at Baumholder I was part of a NATO led Implementation Force in Bosnia. My next duty station was in Hawaii, followed by Fort Drum, New York where I was part of the 291st Aviation Blackhawk Unit serving as the Communications Non-Commissioned Officer (NCO).  Just prior to be deployed in 2006 I was stationed at Fort Gordon again training enlisted personnel in my MOS,  25U- Signal Support Systems Specialist. During this time I volunteered to deploy to train members of the Iraqi Army. 25 soldiers from Fort Gordon were chosen for this deployment, but once we got to pre-deployment training at Fort Hood, Texas we were split up and I did not know anyone in my new unit.  I was deployed to Iraq in  January  2006, and initially assigned to Baghdad International Airport (BIAP), in support of Operation Iraqi Freedom (OIF).  While in Iraq I was promoted to Sergeant First Class (SFC)/E7.

d.  I was assigned to the 1st Brigade, 6th Iraqi Army Division, Military Transition Team, deployed to Forward Operating Base (FOB) Justice in the Kadhimiyah neighborhood of Baghdad, Iraq on the Tigress River. I was initially told that I would be part of a team training Iraqi Nationals, mostly Iraqi Colonels and Lieutenants, in my MOS. Ultimately though it turned into a driving mission for the Brigade Commander, Colonel (COL) Thomas Felts at FOB Justice. Originally (COL) Felts would ride with his Iraqi counterparts; however that changed for security reasons and he instead would take his own vehicle and follow the Iraqi convoys. I would drive COL Felts to Camp Liberty three times per week for supplies, to do spot checks on his own of Iraqi

PX2403

checkpoints, to watch Iraqi teams do raids and to different meetings he would take part in. This continued throughout the summer.

FOB Justice consisted of soldiers from the 10th Mountain Division out of Fort Drum, New York and soldiers from the 4th Infantry Division who would rotate out from Camp Liberty and our guys. I was always the driver in COL Felts' vehicle, and SFC Yodder was always the gunner, with the exception of November 14, 2006.

e.   On November 14, 2006 I was tasked with transporting the Brigade Commander, COL Felts, to and from a Change of Command meeting at Camp Liberty because the 4th Infantry Division was getting ready to leave and then they would have their usual morning meeting.. We left FOB Justice at around 0900 or 1000 to drive the roughly 30 minutes to Camp Liberty for the meeting.

Enroute to Camp Liberty we came upon an unmanned checkpoint, which was the responsibility of the Iraqi Army. COL Felts was angry and annoyed that the checkpoint was unmanned so  when we arrived at Camp Liberty he made a phone call to an Iraqi Army officer to inquire about why the checkpoint was unmanned and advise that he get his men out to the checkpoints. Myself and several other members of our team stayed at Camp Liberty while COL Felts was in his meetings; during this time we rested, talked on our cell phones which only worked while at Camp Liberty, and picked up anything we needed from the post-exchange (PX). We also took this opportunity to pick up some vehicle parts and eat at the dining hall. Around 2100 or 2130, well after it had gotten dark out,  myself and SFC Yoder convinced COL Felts that we needed to start heading back to FOB Justice. SFC Yodder and I went to the Tactical Operations Center (TOC) to obtain intel that would help us plan our  route back to FOB Justice. The route we picked had already been swept for mines and IED's and was considered a "safe" route to return on, however as we loaded up, COL Felts advised us that he wanted to take a different route back to FOB Justice because he wanted to inspect another checkpoint on the way back to ensure that it was manned. The route that COL Felts wanted to travel was on Route Phone Card. During this trip we had a convoy that consisted of 3 vehicles, I was the driver in an up-armored Humvee that was in the number 1 position in the convoy.   My vehicle held COL Felts who was in the passenger seat, CPL Justin Garcia who was in the gunners turret , and an Iraqi interpreter named George who was sitting directly behind COL Felts. CPL Garcia was the gunner in COL Felts' Humvee that night despite the fact that it was always SFC Yodder because CPL Garcia was not skilled at using the weapon mounted on the top of the #2 Humvee.

f.   As we approached on of the  checkpoints that COL Felts wanted to inspect, we passed under a bridge;  at the time we heard a single gunshot somewhere off in the distance. Radio traffic was going back and forth between the three Humvees to try to identify

PX2403

where the shot had come from. We approached a checkpoint, which was also unmanned at the time, that had a different set up than any of the other checkpoints we had driven through while in theater. Most of the checkpoints had a serpentine that flowed left, right and then exited to the left, however this particular checkpoints serpentine flowed right, left and then exited to the right. As we approached this checkpoint we noticed an Iraqi Humvee in the distance with its lights off driving slowly down the road. Just as we were exiting the checkpoint an EFP detonated and penetrated our vehicle. I felt the force and heat of the blast and also observed a large fireball in the front, off to the right of our vehicle. The force of the blast slammed my head into the window, and my side and arms were hit with shrapnel.  I was initially dazed, but knew I had to get us out of the kill zone, so I slammed my foot on the gas in an attempt to put distance between us and the explosive device.  The Humvee lurched forward, smacking my head against the back of the seat, then suddenly stopped as the engine block was too damaged to move any further.

With my Humvee disabled, the other two Humvee's pulled up to provide security while we assessed the damage and attempted to get moving again. It was at this time that I noticed  COL Felts was slumped over in the front seat and SPC Garcia had slid down the gun hatch into the back seat of the Humvee. During this time SFC Yodder , CPT Brinker and LTC Payne pulled up next to us to assess the situation and render aid to  COL Felts. When I looked back at George he was covered in blood from head to toe, and the best way I can describe it is that he looked like a scene from the movie Carrie. LTC Payne came around to my side of the Humvee to check my injuries and assist me with SPC Garcia. I exited the Humvee and pulled SPC Garcia from the back seat of the Humvee to try and assess his injuries. Almost immediately a group of 3 Bradley Fighting Vehicles appeared on scene and provided security. Myself and SPC Mark Stauber, a medic tried to resuscitate SPC Garcia but our attempts were unsuccessful and he died in my arms. LTC Payne began to take charge of the scene because he knew that we needed to get out of that location as quickly as possible. He ordered the Bradley's team to load the bodies of COL Felts and SPC Garcia and  to take our interpreter George and return to Camp Liberty. LTC Payne then ordered us to continue on to FOB Justice. We hooked a tow strap from my vehicle to SFC Yoder's Humvee and began to drive back to FOB Justice. I had to grip the steering wheel very tightly in order to maintain control of the vehicle because it had been badly damaged.

We called for the Quick Reaction Force (QRF) from FOB Justice but they were unable to assist us. We later learned that one of the larger vehicles assigned to the QRF team had broken down in the vehicle staging area and had blocked all other vehicles from entering or leaving FOB Justice.

g.   When we arrived back to the American military gate of FOB Justice I observed a crowd of people waiting outside the first gate as we approached. I was taken to the

PX2403

aid station where my wounds were cleaned and I was monitored overnight. I had severe nerve damage in both my arms from trying to steer the vehicle back to FOB Justice from the attack site, along with shrapnel wounds in my right buttocks, arm and chest. Both of my arms were in bandages for several days after the attack. I found out the next morning that COL Felts and SPC Garcia had both died in the attack. I never saw our interpreter George again.

Members of my unit removed the radio systems out of the Humvee and SFC Yoder took pictures of the damage that had been done by the EFP. After I was released from the aid station, a chaplain and psychologist were flown into FOB Justice in order to provide services for those of us affected by the attack. After I was released from the aid station I went to inspect the damage done to our Humvee and began to pull things out of the vehicle, that still remained, that could be salvaged in order to place them into my new vehicle for future missions. I still had two months remaining on my deployment so I was assigned to drive another officer on the same route that I had driven COL Felts. I felt that the new mission I was assigned to, which was the same as the old mission, was senseless and a waste of time. I became angry, especially since I had only dealt with radios one time while I had been in Iraq.

h. This attack has profoundly affected me, not only physically but mentally and emotionally as well. Physically the attack is what ultimately led to my discharge from the military in 2013 because I was unable to perform basic physical assessments due to the constant pain in my lower back. I was also unable to run.  It has also affected mentally and emotionally as well; I am angry, suffer from anxiety which led to trouble in my marriage, and have a hard time discussing or thinking about COL Felts and SPC Garcia. I was married for 12 years prior to my deployment and this attack put a strain on my relationship with my wife and my step daughter, because I struggled with my new physical limitations but also with the trauma of this attack. One of the biggest challenges I faced after this was trying to explain the realities of combat to the young guys who served under me. After years of treatment and talking with a psychiatrist I have been able to repair the relationship with my wife and step-daughter that I am immensely proud of, and who also serves her country.

i. The VA  rated me at 100% combined disability. Since returning home in 2007, I have continued to receive medical and psychiatric treatment through the VA.

j. For the wounds I received in the November 14, 2006 attack, I was awarded a Purple Heart for exceptionally valorous heroism during the operations that day; I was also awarded an Army Commendation Medal with "Valor" Device.

k.  As Part of my Statement I am providing documentary materials attached as Exhibit A through K:

1.  Exhibit A is a true and authentic copy of my birth certificate. I have personal knowledge of the source or creation of this Exhibit because it was issued to me by the State of California.

2.  Exhibit B is a true and authentic copy of the certified abstract of marriage between me and my wife, Bernice. I have personal knowledge of the source or creation of this Exhibit because it was issued to me by the State of California.

3.  Exhibit C is a true and authentic copy of my VA Disability Rating Decision, dated January 31, 2014. I have personal knowledge of the source or creation of this Exhibit because I received it from the VA in the mail at my residence.

4.  Exhibit D is a true and authentic copy of a letter from the VA certifying that I am receiving service-connected disability compensation at 100%. I have personal knowledge of the source or creation of this Exhibit because I received it from the VA in the mail at my residence.

5.  Exhibit E is a true and authentic copy of the Purple Heart I was awarded for wounds I received as a result of the November 14, 2006 attack. I have personal knowledge of the source or creation of this Exhibit because it was issued to me by military officials.

6.  Exhibit F is a true and authentic copy of the Army Commendation Medal with "Valor" Device I was awarded for exceptionally valorous heroism for my actions during the November 14, 2006 attack. I have personal knowledge of the source or creation of this Exhibit because it was issued to me by military officials.

7.  Exhibit G is a true and authentic copy of sworn statements by three fellow soldiers, PFC David Palmer, SPC Mathew Rapier, and SPC Mark Stauber, regarding the night of the EFP attack, November 14, 2006. I have personal knowledge of the source or creation of this Exhibit because it was provided to me by military officials as part of my Purple Heart and Army Commendation Medal.

8.  Exhibit H is a true and authentic copy of a sworn statement by SFC John Yoder regarding the November 14, 2006 attack. I have personal knowledge of the source or creation of this Exhibit because it was provided to me by military officials as part of my Purple Heart and Army Commendation.

PX2403

9.  Exhibit I is a true and authentic copy of a sworn statement by CPT Lee Brinker regarding the November 14, 2006 attack. I have personal knowledge of the source or creation of this Exhibit because it was provided to me by military officials as part of my Purple Heart and Army Commendation.

10. Exhibit J is a true and authentic copy of my medical records from MyHealtheVet. I have personal knowledge of the source or creation of this Exhibit because I downloaded it from my MyHealtheVet account.

11. Exhibit K is a collection of 50 true and authentic photographs showing the EFP damage to my Humvee and uniform. The Humvee did not have that damage prior to the attack. I have personal knowledge of the source or creation of this Exhibit because the photographs were taken by myself and SFC Yoder which he then gave to me after the attack.

I declare and state under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on this 12th day of August, 2022.   Signature: _____

---

Declaration of Larry Diaz Cabral Jr.                                                      Page 6

# EXHIBIT A

PX2403



STATE OF CALIFORNIA
CERTIFICATION OF VITAL RECORD

# County of San Bernardino
## DIVISION OF VITAL RECORDS
222 WEST HOSPITALITY LANE, SAN BERNARDINO, CALIFORNIA 92415-0022

**CERTIFICATE OF LIVE BIRTH** 3600 9362 BOOK 490 PAGE 100
STATE OF CALIFORNIA—DEPARTMENT OF PUBLIC HEALTH   LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER

| | 1A. NAME OF CHILD—FIRST NAME | 1B. MIDDLE NAME | 1C. LAST NAME | |
|---|---|---|---|---|
| CHILD | LARRY | DIAZ | CABRAL | JR. |
| | 2 SEX | 3A. THIS BIRTH. SINGLE TWIN OR TRIPLET | 3B. IF TWIN OR TRIPLET, THIS CHILD BORN 1ST. 2ND 3RD? | 4A. DATE OF BIRTH—MONTH. DAY. YEAR | 4B. HOUR |
| | MALE | SINGLE | | Redacted | 3.20 a.m |

| | 5A. PLACE OF BIRTH—NAME OF HOSPITAL | 5B. STREET ADDRESS (STREET. AND NUMBER. OR LOCATION) | 5C. INSIDE CITY CORPORATE LIMITS (SPECIFY YES OR NO) |
|---|---|---|---|
| PLACE OF BIRTH | LOMA LINDA UNIVERSITY HOSPITAL | 11234 ANDERSON STREET | NO |
| | 5C. CITY OR TOWN | 5C. COUNTY | |
| | LOMA LINDA | SAN BERNARDINO | |

| | 6A. MAIDEN NAME OF MOTHER—FIRST NAME | 6B. MIDDLE NAME | 6C. LAST NAME (MAIDEN SURNAME) | 7. BIRTHPLACE (STATE OR FOREIGN COUNTRY) |
|---|---|---|---|---|
| MOTHER OF CHILD | CONSUELO | SOLTERO | DIAZ | CALIFORNIA |
| | 8. AGE OF MOTHER (AT TIME OF THIS BIRTH) | 9. COLOR OR RACE OF MOTHER | 10A. RESIDENCE OF MOTHER—STREET ADDRESS (STREET AND NUMBER. RURAL. ADDRESS OR LOCATION) | 10A. INSIDE CITY CORPORATE LIMITS (SPECIFY YES OR NO) |
| | 22 YEARS | CAUCASIAN | Redacted | YES |
| | 10B. RESIDENCE OF MOTHER—CITY OR TOWN | 10C. RESIDENCE OF MOTHER—COUNTY | 10D. RESIDENCE OF MOTHER—STATE |
| | REDLANDS | SAN BERNARDINO | CALIFORNIA |

| | 11A. NAME OF FATHER—FIRST NAME | 11B. MIDDLE NAME | 11C. LAST NAME | 12. BIRTHPLACE (STATE OR FOREIGN COUNTRY) |
|---|---|---|---|---|
| FATHER OF CHILD | LARRY | BARRIOS | CABRAL | CALIFORNIA |
| | 13. AGE OF FATHER (AT TIME OF THIS BIRTH) | 14. COLOR OR RACE OF FATHER | 15A. PRESENT OR LAST OCCUPATION | 15B. KIND OF INDUSTRY OR BUSINESS |
| | 20 YEARS | CAUCASIAN | ELECTRICIANS HELPER | CITY OF REDLANDS |

| | 16A. PARENT OR OTHER INFORMANT—SIGNATURE (IF OTHER THAN PARENT. SPECIFY) | 16B. DATE REVIEWED AND SIGNED BY INFORMANT |
|---|---|---|
| INFORMANT CERTIFICATION | *Larry B. Cajiga* | 10-2-69 |
| | 17A. PHYSICIAN OR PERSON WHO ATTENDED BIRTH—SIGNATURE—DEGREE OR TITLE | 17B. DATE SIGNED BY PHYSICIAN/OTHER ATTENDANT |
| ATTENDANTS CERTIFICATION | *Cullen K Johnson MD* | 10/1/69 |
| | 17C. ADDRESS | 17D. PHYSICIAN'S CALIFORNIA LICENSE NUMBER |
| | 37 EAST VINE STREET, REDLANDS | A 16555 |

| | 19. LOCAL REGISTRAR—SIGNATURE | 20. DATE ACCEPTED FOR REGISTRATION BY LOCAL REGISTRAR |
|---|---|---|
| LOCAL REGISTRAR | ▶ *MT Cox and MD* | 10-21-69 |

MAR 2 8 2000

595741

*Larry Walker*
LARRY WALKER
Auditor/Controller-Recorder

This copy not valid unless prepared on engraved border displaying seal and signature of Recorder.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

PX2403

# EXHIBIT B

PX2403



STATE OF CALIFORNIA

# County of San Bernardino
### CERTIFIED ABSTRACT OF MARRIAGE

This is to certify that this document is a true abstract of the official record filed with the County Auditor-Recorder.

**GROOM: LARRY DIAZ CABRAL JR.**
    **BIRTH DATE:** Redacted
**BRIDE: BERNICE SEPULVEDA**
    **MAIDEN NAME: QUINTERO**
    **BIRTH DATE:** Redacted

**DATE OF MARRIAGE: SEPTEMBER 18, 1993**

**COUNTY OF ISSUE: SAN BERNARDINO**

**FILED: SEPTEMBER 23, 1993   ISSUED: NOVEMBER 3, 1993**
**LOCAL REG. NBR.: 1993-004621-0**

ERROL J. MACKZUM
Auditor-Recorder

069187

# EXHIBIT C

PX2403



## DEPARTMENT OF VETERANS AFFAIRS
**Department of Veterans Affairs**
**Paperless Delivery of Veterans Benefits**
**P.O. Box 58067**
**Salt Lake City, UT 84158-8067**

### LARRY D. CABRAL, JR

**VA File Number**
Redacted

**Represented By:**
**DISABLED AMERICAN VETERANS**

**Rating Decision**
**January 31, 2014**

### INTRODUCTION

The records reflect that you are a Veteran of the Gulf War Era. You served in the Army from February 5, 1993 to February 28, 2013. You filed an original disability claim that was received on September 6, 2012. Based on a review of the evidence listed below, we have made the following decision(s) on your claim. We grant service connection for a disease or disability that began in military service or was caused by some event or experience in service. In respect to all service-connected disabilities, a review of the evidence does not show that your claim warrants submission for special consideration.

### DECISION

1. Service connection for obstructive sleep apnea is granted with an evaluation of 50 percent effective March 1, 2013.

2. Service connection for posttraumatic stress disorder with depressive disorder, not otherwise specified and residuals of traumatic brain injury is granted with an evaluation of 50 percent effective March 1, 2013.

LARRY D. CABRAL, JR
Redacted
Page 2 of 17

3. Service connection for post-concussion headaches is granted with an evaluation of 30 percent effective March 1, 2013.

4. Service connection for right knee degenerative joint disease with patellofemoral pain syndrome is granted with an evaluation of 10 percent effective March 1, 2013.

5. Service connection for left shoulder impingement repair is granted with an evaluation of 10 percent effective March 1, 2013.

6. Service connection for cervical spine degenerative disc disease with strain is granted with an evaluation of 10 percent effective March 1, 2013.

7. Service connection for lumbosacral degenerative joint and disc disease is granted with an evaluation of 10 percent effective March 1, 2013.

8. Service connection for right carpal tunnel syndrome is granted with an evaluation of 10 percent effective March 1, 2013.

9. Service connection for left carpal tunnel syndrome is granted with an evaluation of 10 percent effective March 1, 2013.

10. Service connection for bilateral feet plantar faciitis is granted with an evaluation of 0 percent effective March 1, 2013.

11. Service connection for status post rutpured left pectoral muscle is granted with an evaluation of 0 percent effective March 1, 2013.

12. Service connection for bilateral hearing loss is granted with an evaluation of 0 percent effective March 1, 2013.

13. Service connection for hypertension is granted with an evaluation of 0 percent effective March 1, 2013.

14. Service connection for scar, left shoulder is granted with an evaluation of 0 percent effective March 1, 2013.

15. Service connection for bilateral hand psoriasis with eczema is granted with an evaluation of 0 percent effective March 1, 2013.

PX2403

16. Service connection for post herpatic neuralgia of the right frontal and lower face is granted with an evaluation of 0 percent effective March 1, 2013.

17. Service connection for tinnitus is denied.

18. Service connection for abnormal ekg is denied.

## EVIDENCE

- Service treatment records from February 5, 1993 to February 28, 2013
- VA Form 21-526c Veteran's Pre-Discharge Compensation Claim, received September 6, 2012
- Veterans Claims Assistance Act (VCAA) Letter with notice response, dated September 6, 2012
- VA examinations, dated September 7, 2012, October 4, 2012, November 15, 2012, and November 26, 2012

## REASONS FOR DECISION

### 1. Service connection for obstructive sleep apnea.

Service connection for obstructive sleep apnea has been established as directly related to military service.

An evaluation of 50 percent is assigned from March 1, 2013.

We have assigned a 50 percent evaluation for your obstructive sleep apnea based on:
  • Requires use of breathing assistance device such as continuous airway pressure (CPAP) machine

A higher evaluation of 100 percent is not warranted unless the evidence shows :
  • Carbon dioxide retention; or,
  • Chronic respiratory failure; or,
  • Cor pulmonale; or,
  • Tracheostomy required.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

Fis_Cabral PSR 000008909

## 2.  Service connection for posttraumatic stress disorder with depressive disorder, not otherwise specified and residuals of traumatic brain injury.

Service connection for posttraumatic stress disorder with depressive disorder, not otherwise specified and residuals of traumatic brain injury has been established as directly related to military service.  You claimed this condition as ptsd, adjustment disorder, anxiety, depression, memory lapse or loss, post concussion syndrome on your pre-discharge application. Your service treatment records showed a history of exposure to an improvised explosive device (IED) blast in 2006 and treatment for the residual effects as well as mental health treatment.

During your examination, you outlined a history of exposure to an IED blast in November of 2006. You reported feeling dazed after the blast with headache, dizziness, and imbalance. You reported current symptoms of headaches, sleep disturbances, memory impairment, decreased attention and concentration, speech difficulties, mood swings, anxiety, hearing problems, and irritability. The examiner noted that you scored 28 out of 30 on the Montreal Cognitive Assessment and also have a diagnosis of posttraumatic stress disorder with depressive disorder, not otherwise specified. The examiner offered a diagnosis of residuals of mild traumatic brain injury, secondary to the IED blast exposure with post-concussion syndrome.

When there are manifestations of cognitive impairment and comorbid mental disorders that cannot be clearly separated, a single evaluation under whichever set of diagnostic criteria allows the better assessment of overall impaired functioning due to both conditions, will be assigned. Mental disorders cannot be separately evaluated, as this would constitute pyramiding. Symptomatology attributed to traumatic brain injury in this case could not be disassociated from the posttraumatic stress disorder with depressive disorder, not otherwise specified.  Reference VA TBI Examination dated, November 15, 2012, wherein the examiner stated the symptoms overlap and could not be separately assessed.  Certain TBI residuals may be separately evaluated such as tinnitus, migraine headaches, or other neurological deficiencies.  However, when there are co-existing mental conditions which cannot be separated by a medical professional, then an adjudicator cannot provide separate evaluations for the disorders, as it clearly is not within our expertise.

We have assigned a 50 percent evaluation for your posttraumatic stress disorder with depressive disorder, not otherwise specified and traumatic brain injury based on:
 • Occupational and social impairment with reduced reliability and productivity
 • Disturbances of motivation and mood

Your Global Assessment of Function (GAF) score is 55. A range of 51-60 indicates moderate symptoms; or any moderate difficulty in social, occupational, or school functioning.

The overall evidentiary record shows that the severity of your disability most closely approximates the criteria for a 50 percent disability evaluation.

The rating schedule contains ten important facets of TBI related to cognitive impairment and subjective symptoms. It provides criteria for levels of impairment for each facet, as appropriate, ranging from 0 to 3, and a 5th level, the highest level of impairment, labeled "total." However, not every facet has every level of severity. The Consciousness facet, for example, does not provide for an impairment level other than "total," since any level of impaired consciousness would be totally disabling. A 100 percent evaluation will be assigned if "total" is the level of evaluation for one or more facets. If no facet is evaluated as "total," the overall percentage evaluation will be assigned based on the level of the highest facet as follows: 0 = 0 percent; 1 = 10 percent; 2 = 40 percent; and 3 = 70 percent. For example, a 70 percent evaluation will be assigned if 3 is the highest level of evaluation for any facet.

A level of severity of "1" has been assigned for your memory, attention, concentration, executive functions facet based on:
• A complaint of mild loss of memory (such as having difficulty following a conversation, recalling recent conversations, remembering names of new acquaintances, or finding words, or often misplacing items), attention, concentration, or executive functions, but without objective evidence on testing.

A level of severity of "0" has been assigned for your judgment facet based on:
• Normal.

A level of severity of "0" has been assigned for your social interaction facet based on:
• Social interaction is routinely appropriate.

A level of severity of "0" has been assigned for your orientation facet based on:
• Always oriented to person, time, place, and situation.

A level of severity of "0" has been assigned for your motor activity facet (with intact motor and sensory system) based on:
• Motor activity normal.

A level of severity of "0" has been assigned for your visual spatial orientation facet based on:
• Normal.

A level of severity of "1" has been assigned for your subjective symptoms facet based on:
• Three or more subjective symptoms that mildly interfere with work; instrumental activities of daily living; or work, family, or other close relationships. Examples of findings that might be

PX2403

LARRY D. CABRAL, JR
Redacted
Page 6 of 17

seen at this level of impairment are: intermittent dizziness, daily mild to moderate headaches, tinnitus, frequent insomnia, hypersensitivity to sound, hypersensitivity to light.

A level of severity of "2" has been assigned for your neurobehavioral effects facet based on:

• One or more neurobehavioral effects that frequently interfere with workplace interaction, social interaction, or both but do not preclude them.

A level of severity of "0" has been assigned for your communication facet based on:

• Able to communicate by spoken and written language (expressive communication), and to comprehend spoken and written language.

An overall 40 percent evaluation is assigned for your traumatic brain injury based on the highest level of severity of "2."

A higher evaluation of 70 percent is not warranted unless there is occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as:

• Suicidal ideation; obsessional rituals which interfere with routine activities;

• Speech intermittently illogical, obscure, or irrelevant;

• Near-continuous panic or depression affecting the ability to function independently, appropriately and effectively;   .

• Impaired impulse control (such as unprovoked irritability with periods of violence);

• Spatial disorientation;

• Neglect of personal appearance and hygiene;

• Difficulty in adapting to stressful circumstances (including work or a worklike setting);

• Inability to establish and maintain effective relationships.

A higher evaluation of 70 percent is not warranted for your traumatic brain injury unless there is:

• Objective evidence on testing of moderate impairment of memory, attention, concentration, or executive functions resulting in moderate functional impairment under the memory, attention, concentration, executive functions facet;

• Moderately severely impaired judgment. For even routine and familiar decisions, occasionally unable to identify, understand, and weigh the alternatives, understand the consequences of choices, and make a reasonable decision under the judgment facet;

• Social interaction is inappropriate most or all of the time under the social interaction facet;

• Often disoriented to two or more of the four aspects (person, time, place, situation) of orientation under the orientation facet;

• Motor activity moderately decreased due to apraxia under the motor activity facet (with intact motor and sensory system);

PX2403

LARRY D. CABRAL, JR
Redacted
Page 7 of 17

• Moderately severely impaired. Getting lost even in familiar surroundings, unable to use assistive devices such as GPS (global positioning system) under the visual spatial orientation facet;

• One or more neurobehavioral effects that interfere with or preclude workplace interaction, social interaction, or both on most days or that occasionally require supervision for safety of self or others under the neurobehavioral effects facet;

• Inability to communicate either by spoken language, written language, or both, at least half of the time but not all of the time, or to comprehend spoken language, written language, or both, at least half of the time but not all of the time. May rely on gestures or other alternative modes of communication. Able to communicate basic needs under the communication facet.

Additionally, a higher evaluation of 100 percent is not warranted unless there is:

• Persistently altered state of consciousness, such as vegetative state, minimally responsive state, coma under the consciousness facet.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 3. Service connection for post-concussion headaches.

Service connection for post-concussion headaches has been established as directly related to military service.

An evaluation of 30 percent is assigned from March 1, 2013.

We have assigned a 30 percent evaluation for your headache syndrome based on:

• Characteristic prostrating attacks occurring on an average once a month over last several months

A higher evaluation of 50 percent is not warranted unless the evidence shows the condition is very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability.

This disability is not specifically listed in the rating schedule; therefore, it is rated analogous to a disability in which not only the functions affected, but anatomical localization and symptoms, are closely related.

PX2403

LARRY D. CABRAL, JR
Redacted
Page 8 of 17

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 4. Service connection for right knee degenerative joint disease with patellofemoral pain syndrome.

Service connection for right knee degenerative joint disease with patellofemoral pain syndrome has been established as directly related to military service.

An evaluation of 10 percent is assigned from March 1, 2013.

We have assigned a 10 percent evaluation for your right knee condition based on:
• Painful motion of the knee (38 CFR §4.59 allows consideration of functional loss due to painful motion to be rated to at least the minimum compensable rating for a particular joint. Since you demonstrate painful motion of the knee, the minimum compensable evaluation of 10 percent is assigned)

Additional symptom(s) include:
• X-ray evidence of degenerative arthritis

The provisions of 38 CFR §§4.40 and 4.45 concerning functional loss due to pain, fatigue, weakness, or lack of endurance, incoordination, and flare-ups, as cited in DeLuca v. Brown, 8 Vet. App. 202 (1995), have been considered and applied under 38 CFR §4.59.

A higher evaluation of 20 percent is not warranted unless the evidence shows :
• Limitation of flexion of 16 to 30 degrees.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 5. Service connection for left shoulder impingement repair.

Service connection for left shoulder impingement repair has been established as directly related to military service.

An evaluation of 10 percent is assigned from March 1, 2013.

We have assigned a 10 percent evaluation for your left shoulder impingement based on:

PX2403

• Painful motion of the shoulder. (38 CFR §4.59 allows consideration of functional loss due to painful motion to be rated to at least the minimum compensable rating for a particular joint. Since you demonstrate painful motion of the arm at the shoulder, the minimum compensable evaluation of 10 percent is assigned)

Additional symptom(s) include:
• limited motion of the arm above shoulder level

The provisions of 38 CFR §§4.40 and 4.45 concerning functional loss due to pain, fatigue, weakness, or lack of endurance, incoordination, and flare-ups, as cited in DeLuca v. Brown, 8 Vet. App. 202 (1995), have been considered and applied under 38 CFR §4.59.

A higher evaluation of 20 percent is not warranted unless the evidence shows :
• limited motion of the arm at shoulder level.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

#### 6. Service connection for cervical spine degenerative disc disease with strain.

Service connection for cervical spine degenerative disc disease with strain has been established as directly related to military service.

A 10 percent evaluation is assigned from March 1, 2013.

We have assigned a 10 percent evaluation for your cervical spine condition based on:
• Combined range of motion of the cervical spine greater than 170 degrees but not greater than 335 degrees
• Forward flexion of the cervical spine greater than 30 degrees but not greater than 40 degrees

Additional symptom(s) include:
• Painful motion upon examination

The provisions of 38 CFR §§4.40 and 4.45 concerning functional loss due to pain, fatigue, weakness, or lack of endurance, incoordination, and flare-ups, as cited in DeLuca v. Brown, 8 Vet. App. 202 (1995), have been considered and are not warranted.

A higher evaluation of 20 percent is not warranted unless the evidence shows forward flexion of the cervical spine greater than 15 degrees but not greater than 30 degrees; or, the combined range

LARRY D. CABRAL, JR
Redacted
Page 10 of 17

of motion of the cervical spine not greater than 170 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 7.  Service connection for lumbosacral degenerative joint and disc disease.

Service connection for lumbosacral degenerative joint and disc disease has been established as directly related to military service.

A 10 percent evaluation is assigned from March 1, 2013.

We have assigned a 10 percent evaluation for your lumbosacral spine condition based on:
  • Combined range of motion of the thoracolumbar spine greater than 120 degrees but not greater than 235 degrees
  • Forward flexion of the thoracolumbar spine greater than 60 degrees but not greater than 85 degrees
  • Localized Tenderness not resulting in abnormal gait or abnormal spinal contour

Additional symptom(s) include:
  • Painful motion upon examination

The provisions of 38 CFR §§4.40 and 4.45 concerning functional loss due to pain, fatigue, weakness, or lack of endurance, incoordination, and flare-ups, as cited in DeLuca v. Brown, 8 Vet. App. 202 (1995), have been considered and applied under 38 CFR §4.59.

A higher evaluation of 20 percent is not warranted unless the evidence shows forward flexion of the thoracolumbar spine greater than 30 degrees but not greater than 60 degrees; or, the combined range of motion of the thoracolumbar spine not greater than 120 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

PX2403

### 8. Service connection for right carpal tunnel syndrome.

Service connection for right carpal tunnel syndrome has been established as directly related to military service.

An evaluation of 10 percent is assigned from March 1, 2013.

We have assigned a 10 percent evaluation for your right carpal tunnel syndrome based on:
• mild incomplete paralysis of the major extremity

A higher evaluation of 30 percent is not warranted unless the evidence shows nerve damage is moderate.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 9. Service connection for left carpal tunnel syndrome.

Service connection for left carpal tunnel syndrome has been established as directly related to military service.

An evaluation of 10 percent is assigned from March 1, 2013.

We have assigned a 10 percent evaluation for your left carpal tunnel syndrome based on:
• mild incomplete paralysis of the minor extremity

A higher evaluation of 20 percent is not warranted unless the evidence shows nerve damage is moderate.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 10. Service connection for bilateral feet plantar faciitis.

Service connection for bilateral feet plantar faciitis has been established as directly related to military service.

A noncompensable evaluation is assigned from March 1, 2013.

LARRY D. CABRAL, JR
Redacted
Page 12 of 17

We have assigned a noncompensable evaluation for your plantar fasciitis based on:
• Bilateral involvement

A higher evaluation of 10 percent is not warranted unless there are moderate symptoms; weight-bearing line over or medial to great toe, inward bowing of the tendo achillis, pain on manipulation and use of the feet, bilateral or unilateral.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 11. Service connection for status post rutpured left pectoral muscle.

Service connection for status post rutpured left pectoral muscle has been established as directly related to military service.

A noncompensable evaluation is assigned from March 1, 2013.

We have assigned a noncompensable evaluation for your rutpured muscle left pectoral based on:
• A muscle group III injury evaluated as slight which affects elevation and abduction of arm to level of shoulder and act with the pectoralis major II (costosternal) and latissimus in forward and backward swing of arm

A muscle injury is considered slight when one of the following is found
• Type of injury consists of a simple wound of muscle without debridement or infection.
• Service department record of superficial wound with brief treatment and return to duty. Healing with good functional results. No cardinal signs or symptoms of muscle disability (loss of power, weakness, lowered threshold of fatigue, fatigue-pain, impairment of coordination and uncertainty of movement.)
• Objective findings show minimal scar. No evidence of fascial defect, atrophy, or impaired tonus. No impairment of function or metallic fragments retained in muscle tissue.

A higher evaluation of 20 percent is not warranted unless the evidence shows the functional loss is rated as moderate.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.


## 12. Service connection for bilateral hearing loss.

We have granted your claim for bilateral hearing loss.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

Service connection is warranted because your service treatment records show that your hearing loss began in-service.

VA examination findings show the left ear with 100 percent discrimination. Decibel (dB) loss at the puretone threshold of 500 Hertz (Hz) is 15 with a 20 dB loss at 1000 Hz, a 35 dB loss at 2000 Hz, a 50 dB loss at 3000 Hz, and a 35 dB loss at 4000 Hz. The average decibel loss is 35 in the left ear. The right ear shows a speech discrimination of 100 percent. Decibel (dB) loss at the puretone threshold of 500 Hertz (Hz) is 20 with a 25 dB loss at 1000 Hz, a 35 dB loss at 2000 Hz, a 50 dB loss at 3000 Hz, and a 35 dB loss at 4000 Hz. The average decibel loss is 36 in the right ear.

An evaluation of 0 percent is assigned because your right ear has a speech discrimination of 100 with an average decibel loss of 36 and your left ear has a speech discrimination of 100 with an average decibel loss of 35. The evaluation for hearing loss is based on objective testing. Higher evaluations are assigned for more severe hearing impairment.

## 13. Service connection for hypertension.

Service connection for hypertension has been established as directly related to military service.

A noncompensable evaluation is assigned from March 1, 2013.

We have assigned a noncompensable evaluation for your hypertension based on:
• A diagnosed disability with no compensable symptoms

Note: In every instance where the schedule does not provide a zero percent evaluation for a diagnostic code, a zero percent evaluation shall be assigned when the requirements for a compensable evaluation are not met. {38 CFR §4.31}

A higher evaluation of 10 percent is not warranted unless the evidence shows :
• A history of diastolic pressure predominantly 100 or more and there is a requirement for continuous medication for control; or,

PX2403

LARRY D. CABRAL, JR
Redacted
Page 14 of 17

• Diastolic pressure predominantly 100 or more; or,
• Systolic pressure predominantly 160 or more.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 14. Service connection for scar, left shoulder.

Service connection for scar, left shoulder has been established as directly related to military service.

A noncompensable evaluation is assigned from March 1, 2013.

#1: A surgical scar, located on your left upper extremity, measures 0.4 in² (2.6 cm²) and is superficial and linear. The scar is neither painful nor unstable.

We have assigned a noncompensable evaluation for your scars, left shoulder based on:
• One or more linear scars

Note: In every instance where the schedule does not provide a zero percent evaluation for a diagnostic code, a zero percent evaluation shall be assigned when the requirements for a compensable evaluation are not met. {38 CFR §4.31}

An additional, separate compensable evaluation under Diagnostic Code 7804 is not warranted unless there is at least one scar that is painful or unstable.

A higher evaluation is not warranted unless scars are considered disabling because of limitation of function of the affected part.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 15. Service connection for bilateral hand psoriasis with eczema.

Service connection for bilateral hand psoriasis with eczema has been established as directly related to military service.

PX2403

A noncompensable evaluation is assigned from March 1, 2013.

We have assigned a noncompensable evaluation for your psoriasis with eczema based on:
• A diagnosed disability with no compensable symptoms

A higher evaluation of 10 percent is not warranted unless there is:
• At least 5 percent, but less than 20 percent, of the entire body affected; or,
• At least 5 percent, but less than 20 percent, of the exposed areas of the body affected; or,
• Intermittent systemic therapy such as corticosteroids or other immunosuppressive drugs
required for a total duration of less than six weeks during the past 12-month period

Note: Systemic Therapy must consist of corticosteroids or other immunosuppressive drugs

Corticosteroids are anti-inflammatory drugs that are synthetic derivatives of the natural steroid, cortisol, which is produced by the adrenal glands. They are called "systemic" steroids if taken by mouth or given by injection as opposed to topical corticosteroids, which are applied directly to the skin. Corticosteroids that are applied topically are not considered systemic for VA purposes.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 16. Service connection for post herpatic neuralgia of the right frontal and lower face.

Service connection for post herpatic neuralgia of the right frontal and lower face has been established as directly related to military service. This condition was claimed on your pre-discharge application as shingles; however, there was no objective evidence of this condition found by examination, only the residual neuralgia.

A noncompensable evaluation is assigned from March 1, 2013.

We have assigned a noncompensable evaluation for your post-herpatic neuralgia based on:
• mild incomplete paralysis

Note: In every instance where the schedule does not provide a zero percent evaluation for a diagnostic code, a zero percent evaluation shall be assigned when the requirements for a compensable evaluation are not met. {38 CFR #4.31}

A higher evaluation of 10 percent is not warranted unless the evidence shows nerve damage is moderate.

LARRY D. CABRAL, JR
Redacted
Page 16 of 17

This disability is not specifically listed in the rating schedule; therefore, it is rated analogous to a disability in which not only the functions affected, but anatomical localization and symptoms, are closely related.

The effective date of this grant is March 1, 2013. Service connection has been established from the day after your discharge from active duty. When a claim of service connection is received within one year of discharge from active duty, the effective date is the day after discharge.

### 17. Service connection for tinnitus.

Service connection may be granted for a disability which began in military service or was caused by some event or experience in service. Service connection for tinnitus is denied because the medical evidence of record fails to show that this disability has been clinically diagnosed.

During your examination, you denied the presence of tinnitus. The examiner offered no diagnosis for this condition; therefore, the evidence does not show a current diagnosed disability.

We have considered the following evidence in our decision:
Service treatment records from February 5, 1993 to February 28, 2013
VA examinations, dated September 7, 2012

### 18. Service connection for abnormal ekg.

Service connection may be granted for a disability which began in military service or was caused by some event or experience in service. Service connection for abnormal ekg is denied because the medical evidence of record fails to show that this disability has been clinically diagnosed.

During your examination, you reported having an abnormal EKG in the past; however, your most recent EKG was within normal limits. You denied any chest pains, shortness of breath, or other cardiac symptoms. The examiner did not offer a diagnosis as there were no abnormalities of an EKG at this time.

While your service treatment records reflect complaints, treatment, or a diagnosis similar to that claimed, the medical evidence supports the conclusion that a persistent disability was not present in service. Please note that an abnormal EKG is not considered an actual disabling condition for VA purposes. The evidence does not show a disability for which compensation may be established. Compensation is payable for a disease or injury which causes a disabling physical or mental limitation.

LARRY D. CABRAL, JR
Redacted
Page 17 of 17

We have considered the following evidence in our decision:
Service treatment records from February 5, 1993 to February 28, 2013
VA examinations, dated October 4, 2012

**REFERENCES:**

Title 38 of the Code of Federal Regulations, Pensions, Bonuses and Veterans' Relief contains
the regulations of the Department of Veterans Affairs which govern entitlement to all veteran
benefits. For additional information regarding applicable laws and regulations, please consult
your local library, or visit us at our web site, www.va.gov.

# EXHIBIT D

PX2403



**DEPARTMENT OF VETERANS AFFAIRS**
**BENEFITS DELIVERY AT DISCHARGE**
**PO Box 581400**
**Salt Lake City Utah 84158**

FEB 0 4 2014

LARRY D CABRAL JR

Redacted

In Reply Refer To: 341/2121/CS101
Redacted
CABRAL JR, L D

Dear Mr. Cabral, Jr:

Your claim was processed by the Benefits Delivery at Discharge (BDD) unit in Salt Lake City, Utah. After completion of this claim, the office in the state in which you reside will maintain permanent jurisdiction of your electronic claims folder for administrative purposes. All future claims should be submitted to that office.

We made a decision on your claim for service connected compensation received on September 6, 2012.

This letter tells you about your entitlement amount and payment start date and what we decided. It includes a copy of our rating decision that gives the evidence used and reasons for our decision. We have also included information about additional benefits, what to do if you disagree with our decision, and who to contact if you have questions or need assistance.

## Your Award Amount and Payment Start Date

Your monthly entitlement amount is shown below:

| Total VA Benefit | Amount Withheld | Amount Paid | Effective Date | Reason For Change |
|---|---|---|---|---|
| $1,830.00 | $1,648.00 | $182.00 | Apr 1, 2013 | Original Award |
| 1,857.76 | 1,656.00 | 201.76 | Dec 1, 2013 | Retired Pay Adjustment, Cost of Living Adjustment |
| 1,857.34 | 1,656.00 | 201.34 | Jan 1, 2014 | Cost of Living Adjustment |
| 1,857.34 | 0.00 | 1,857.34 | Feb 1, 2014 | Retired Pay Adjustment |

We are paying you as a veteran with one dependent. Your payment includes an additional amount for your spouse, Bernice. *Let us know right away if there is any change in your marital status (for example, death, divorce, annulment).*

We couldn't pay for your stepchildren, Stephanie or Michelle, because they are over the age of 23 and no longer eligible to be considered dependents by VA standards.



PX2403

2

Redacted

Cabral Jr, L D

## You Can Expect Payment

Your payment begins the first day of the month following your effective date. You will receive a payment covering the initial amount due under this award, minus any withholdings. Thereafter, payment will be made at the beginning of each month for the prior month. For example, benefits due for May are paid on or about June 1.

**Your payment will be directed to the financial institution and account number that you specified. To confirm when your payment was deposited, please contact that financial institution.**

> ***If this account is no longer open,***
> please notify us immediately.

## We Have Withheld Benefits

You are not allowed to receive full military retired pay and full VA compensation at the same time. The following will provide an explanation of how this works:

- ***If your VA compensation is less than your retired pay,*** you will receive compensation payments. The military service department will pay you the difference between your compensation and your retired pay.
- ***If your VA compensation is greater than your retired pay,*** we will pay you compensation, and you will not receive retired pay.

For now, we must withhold part of your compensation until February 1, 2014. We must do this to prevent a double payment. By working together with the military service department, we will make sure you get your full combined payment.

*Important Information:  VA compensation isn't taxable.  Please contact the Internal Revenue Service for tax information.*

## Concurrent Receipt of VA Compensation and Military Retired Pay

You may be eligible for full or partial concurrent receipt of VA compensation and military retired pay under the Combat-Related Special Compensation (CRSC) and/or Concurrent Retired and Disability Pay (CRDP) programs. Your retired pay center (RPC) has been notified of this award of VA compensation. If your RPC determines the withholdings from your VA compensation should be retroactively adjusted due to CRSC/CRDP eligibility; VA will be notified and will adjust your VA compensation accordingly.

PX2403

3

Redacted
Cabral Jr, L D

More information on CRSC and CRDP can be found at the following web site:
http://www.dfas.mil/dfas/retiredmilitary/disability/payment.html, or by calling your RPC as
shown below:

- Defense Finance and Accounting Service (DFAS): 1-800-321-1080
- United States Coast Guard: 1-800-772-8724
- Public Health Service: 1-800-638-8744

## What We Decided

We determined that the following conditions were related to your military service, so service
connection has been granted:

| Medical Description | Percent (%) Assigned | Effective Date |
|---|---|---|
| Obstructive sleep apnea | 50% | Mar 1, 2013 |
| Posttraumatic stress disorder with depressive disorder, not otherwise specified and residuals of traumatic brain injury | 50% | Mar 1, 2013 |
| Post-concussion headaches | 30% | Mar 1, 2013 |
| Left shoulder impingement repair | 10% | Mar 1, 2013 |
| Cervical spine degenerative disc disease with strain | 10% | Mar 1, 2013 |
| Lumbosacral degenerative joint and disc disease | 10% | Mar 1, 2013 |
| Right knee degenerative joint disease with patellofemoral pain syndrome | 10% | Mar 1, 2013 |
| Left carpal tunnel syndrome | 10% | Mar 1, 2013 |
| Right carpal tunnel syndrome | 10% | Mar 1, 2013 |
| Bilateral feet plantar faciitis | 0% | Mar 1, 2013 |
| Status post rutpured left pectoral muscle | 0% | Mar 1, 2013 |
| Bilateral hearing loss | 0% | Mar 1, 2013 |
| Hypertension | 0% | Mar 1, 2013 |
| Scar, left shoulder | 0% | Mar 1, 2013 |
| Bilateral hand psoriasis with eczema | 0% | Mar 1, 2013 |
| Post herpatic neuralgia of the right frontal and lower face | 0% | Mar 1, 2013 |

We determined that the following conditions were not related to your military service, so
service connection couldn't be granted:

| Medical Description |
|---|
| Tinnitus |
| Abnormal ekg |

4

Redacted
Cabral Jr, L D

*Your overall or combined rating is 90%.* We do not add the individual percentages of each
condition to determine your combined rating. We use a combined rating table that considers
the effect from the most serious to the least serious conditions.

We have enclosed a copy of your Rating Decision for your review. It provides a detailed
explanation of our decision, the evidence considered, and the reasons for our decision. Your
Rating Decision and this letter constitute our decision based on your claim received on
September 6, 2012. It represents all claims we understood to be specifically made, implied, or
inferred in that claim.

We enclosed a VA Form 21-8764, *Disability Compensation Award Attachment-Important
Information*, which explains certain factors concerning your benefits.

## What Additional Evidence Did We Use To Decide Your Claim?

In addition to the evidence listed in the attached rating, the following evidence was used in
making our decision on your claim:

- VA Form 21-686c, *Declaration of Status of Dependents,* received July 8, 2012.
- VA Form 21-0820c, *Report of Defense Finance & Accounting Service (DFAS),* which
  documents telephone contact with a VA representative on January 31, 2014 in which we
  verified that amount of your military retired pay.

## Are You Entitled to Additional Benefits?

You may be eligible for government life insurance if you

- were released from active duty after April 25, 1951,
- are in good health (except for any service connected conditions), and
- apply within two years of this notification of your disability rating.

If you are totally disabled, you may be eligible to have your government life insurance
premiums waived. The Insurance is called Service-Disabled Veterans Insurance (S-DVI), and
you should receive a package within two weeks. This package will contain information about
the insurance and an application. If you do not receive an S-DVI package, please contact the
Insurance Center to request additional information. Call the Insurance toll free number,
1-800-669-8477, or visit the Insurance web site, **http://www.insurance.va.gov**, for further
information about Service-Disabled Veterans Insurance.

You may be eligible for medical care by the VA health care system for any service connected
disability. You may apply for medical care or treatment at the nearest medical facility. If you
apply in person, present a copy of this letter to the Patient Registration/Eligibility Section. If
you apply by writing a letter, include your VA file number and a copy of this letter.

5


Cabral Jr, L D

---

REDUCE OR ELIMINATE
YOUR MEDICAL CO-PAYMENTS

If you receive care at a VA medical facility, **please call our Health Benefits Call Center at 1-877-222-VETS (8387) or notify your local VA medical center** of this change in your compensation benefits. This rating decision may reduce or eliminate your co-payments for your VA-provided medical care. You may also be eligible for a refund based on this rating decision. Information regarding VA health care eligibility and co-payments is available at our website **www.va.gov/healtheligibility**.

---

You should contact your State office of veteran's affairs for information on any tax, license, or fee-related benefits for which you may be eligible as a veteran (or surviving dependent of a veteran). State offices of veteran's affairs are available at http://www.va.gov/statedva.htm.

You may be able to receive vocational rehabilitation employment services. The enclosed VA Form 28-8890, *Important Information about Vocational Rehabilitation Benefits*, explains this benefit completely. To apply for this benefit, complete and return the enclosed VA Form 28-1900, *Disabled Veterans Application for Vocational Rehabilitation*.

Your combined evaluation is 30 percent or more disabling; therefore, you may be eligible for additional benefits based on dependency. If you wish to submit a claim for dependents, please complete and return the attached VA Form 21-686c, *Declaration of Status of Dependents*. Please fill out every blank on the form. We may be able to pay you retroactive benefits for your dependents if you submit the VA Form 21-686c, *Declaration of Status of Dependents* or report dependents within a year from the date of this letter.

## Important Information

VA has a Gulf War Information Center, at 1-800-PGW-VETS (1-800-749-8387). You may contact this toll-free helpline for the latest information on issues which concern Gulf War veterans.

You can call the VA Medical Center and ask to be placed on the Gulf War Health Registry. The Veteran's Health Administration of VA has a special program for Gulf War veterans concerned about exposure to environmental hazards. The program includes a thorough medical examination.

PX2403

6

Redacted

Cabral Jr, L D

## What You Should Do If You Disagree With Our Decision

If you do not agree with our decision, please download and complete VA Form 21-0958, *Notice of Disagreement*. You can download the form at http://www.va.gov/vaforms or you can call us at 1-800-827-1000. You have *one year from the date of this letter to appeal the decision*. The enclosed VA Form 4107, *Your Rights to Appeal Our Decision*, explains your right to appeal.

## What Is eBenefits?

eBenefits provides electronic resources in a self-service environment to service members, Veterans, and their families. Through the eBenefits website you can:

- Track the status of your claim or appeal
- View your payment history
- Obtain verification of your military service, civil service preference, or VA benefits
- Receive a copy of your military discharge documents, and
- Manage your VA life insurance policy

Enrolling in eBenefits is easy. Just visit www.eBenefits.va.gov for more information on this joint Department of Defense and VA service.

## If You Have Questions or Need Assistance

If you have any questions, you may contact us by telephone, e-mail, or letter.

| If you | Here is what to do. |
|---|---|
| Telephone | Call us at 1-800-827-1000. If you use a Telecommunications Device for the Deaf (TDD), the Federal number is 711. |
| Use the Internet | Send electronic inquiries through the Internet at https://iris.va.gov. |
| Write | Put your full name and VA file number on the letter. Please send all correspondence to the address at the top of this letter. |

In all cases, be sure to refer to your **VA eFolder number 559 69 5015**.

If you are looking for general information about benefits and eligibility, you should visit our website at https://www.va.gov, or search the Frequently Asked Questions (FAQs) at https://iris.va.gov.

Fis_Cabrall_SR_00002959

PX2403

7

**Redacted**

Cabral Jr, L D

We sent a copy of this letter to your representative, **Disabled American Veterans**, whom you can also contact if you have questions or need assistance.

Sincerely yours,

*K. Albers*

K. Albers
Veterans Service Center Manager

Enclosures:    Rating Decision
               VA Form 21-8764
               VA Form 28-1900
               VA Form 28-8890
               VA Form 21-686c
               VA Form 4107

cc:  DAV



**DEPARTMENT OF VETERANS AFFAIRS**
**VA Regional Office**
One Veterans Plaza
701 Clay Avenue
Waco TX 76799



February 13, 2014

In Reply Refer To: 349/216B

LARRY D CABRAL



Redacted

CABRAL, Larry Diaz

Dear Mr. Cabral:

This letter is a summary of benefits you currently receive from the Department of Veterans Affairs (VA). We are providing this letter to disabled Veterans to use in applying for benefits such as state or local property or vehicle tax relief, civil service preference, to obtain housing entitlements, free or reduced state park annual memberships, or any other program or entitlement in which verification of VA benefits is required. Please safeguard this important document. This letter is considered an official record of your VA entitlement.

Our records contain the following information:

## Personal Claim Information

Your VA claim number is: Redacted
You are the Veteran.

## Military Information

Your character(s) of discharge and service date(s) include:
Honorable, Army, Feb 5, 1993 - Feb 28, 2013
(You may have additional periods of service not listed above)

## VA Benefits Information

Service-connected disability: YES
Your combined service-connected evaluation is: 90 percent
This rating was in effect: April 1, 2013
Your current monthly award amount is: $1,857.34
Are you entitled to a higher level of disability due to being unemployable: NO
Are you considered to be totally and permanently disabled due to your service-connected disabilities: NO
Are you service-connected for loss of or loss of use of a limb, or are you totally blind in or missing at least one eye: NO



Fis_CabralLSR/09000063

PX2403

2

**Redacted**

Cabral, Larry Diaz

Have you received a Specially Adapted Housing (SAH) and/or Special Home Adaptation (SHA) grant:  NO

You should contact your state or local office of veterans' affairs for information on any tax, license, or fee-related benefits for which you may be eligible.  State offices of veterans' affairs are available at http://www.va.gov/statedva.htm.

If you have any questions about this letter or need additional verification of VA benefits, please call us at 1-800-827-1000.  If you use a Telecommunications Device for the Deaf (TDD), the number is 1-800-829-4833.  Send electronic inquiries through the Internet at https://iris.va.gov.

Sincerely yours,

*Pandi S. Van Houten*

PANDI S. VAN HOUTEN
Veterans Service Center Manager

Email us at: https://iris.va.gov

PX2403



**DEPARTMENT OF VETERANS AFFAIRS**
810 Vermont Ave NW
Washington, D.C. 20420

February 19, 2017

Larry Diaz Cabral


In Reply Refer to:
xxx-xx-5015
27/eBenefits

Dear Mr. Cabral:

This letter certifies that Larry Diaz Cabral is receiving service-connected disability compensation from the Department of Veterans Affairs.

The current benefit paid is as follows:

| | |
|---|---|
| **Gross Benefit Amount** | $3,181.65 |
| **Net Amount Paid** | $3,181.65 |
| **Effective Date** | December 1, 2016 |
| **Combined Evaluation** | 100 percent |

**How You Can Contact Us**

• If you need general information about benefits and eligibility, please visit us at https://www.ebenefits.va.gov or http://www.va.gov.
• Call us at 1-800-827-1000. If you use a Telecommunications Device for the Deaf (TDD), the number is 1-800-829-4833.
• Ask a question on the Internet at https://iris.va.gov.

Sincerely,

Robert T. Reynolds, Director
Benefits Assistance Service

# EXHIBIT E

PX2403



# THE UNITED STATES OF AMERICA

TO ALL WHO SHALL SEE THESE PRESENTS, GREETING:

THIS IS TO CERTIFY THAT
THE PRESIDENT OF THE UNITED STATES OF AMERICA
HAS AWARDED THE

## PURPLE HEART   Redacted

ESTABLISHED BY GENERAL GEORGE WASHINGTON
AT NEWBURGH, NEW YORK, AUGUST 7, 1782
TO

**SEARGENT FIRST CLASS LARRY D. CABRAL JR.**

UNITED STATES ARMY
FOR WOUNDS RECEIVED
IN ACTION
ON 14 NOVEMBER 2006
GIVEN UNDER MY HAND IN THE CITY OF WASHINGTON

THIS 15ᵀᴴ DAY OF DECEMBER 2006

**DANA J. H. PITTARD**
Brigadier General, USA
Commanding
PO 349-015, 15 DECEMBER 2006

A FORM 1780-10 (7x11) JAN 2005

SECRETARY OF THE ARMY

Fis_CabralLJSR_00000007
PX2403

# EXHIBIT F

PX2403



# DEPARTMENT OF THE ARMY

THIS IS TO CERTIFY THAT THE SECRETARY OF THE ARMY HAS AWARDED

## THE ARMY COMMENDATION MEDAL

WITH "VALOR" DEVICE

**Redacted**

TO          SERGEANT FIRST CLASS LARRY D. CABRAL JR., UNITED STATES ARMY
1ST BRIGADE, MILITARY TRANSITION TEAM
6TH IRAQI ARMY DIVISION

FOR      EXCEPTIONALLY VALOROUS HEROISM AS A MILITARY TRANSITION TEAM SIGNAL NCOIC AND DRIVER IN SUPPORT OF OPERATION IRAQI FREEDOM. SFC CABRAL'S HEROIC ACTIONS AND DEDICATION TO DUTY DURING COMBAT OPERATIONS CONTRIBUTED TO THE OVERWHELMING SUCCESS OF THE MULTI-NATIONAL CORPS MISSION. HIS BRAVERY IS IN KEEPING WITH THE FINEST TRADITIONS OF MILITARY SERVICE AND REFLECT DISTINCT CREDIT UPON HIMSELF, IRAQ ASSISTANCE GROUP, MULTI-NATIONAL CORPS-IRAQ, AND THE UNITED STATES ARMY.

FROM: 14 NOVEMBER 2006 TO 15 NOVEMBER 2006

THIS 17TH DAY OF DECEMBER 2006

PO 351-033, 17 DECEMBER 2006
Commander, IAG
Baghdad, Iraq

DANA J. H. PITTARD
Brigadier General, USA
Commanding

DA FORM 4980-14, NOV 97

# EXHIBIT G

PX2403

Pfc   Palmer David,

      The night of 14 Nov. 2006 1-6 Bde MTT had hit an EFP about 2300 to 2330.  I was the driver of victor 3... We were driving back to FOB Justice from FOB Liberty when we encountered an EFP.  After we had heard the blast we had thought that we might have missed us so we could just drive threw it... We I proceeded to drive threw the smoke, that is when I noticed that we have been hit (victor 1) so we had followed or ttp of the convoy.  When the doc proceeded to check on the casualties we had thought that there was only one the interpreter George.  It was about one or two mikes later that I had noticed that they were pulling out more casualties so then I waited to see what was going on when I called up to SFC Yoder and I had asked him if he had a casualty report on my fellow comrades. That is when SFC Yoder had told me that he did not know what was going on yet.  My job as the driver was to stay in the truck and keep radio comms with all the other victors that were not hit by the blast.

SPC. Rapier, Mathew, <span style="background:black;color:white;">Redacted</span>

      On or around 2300 on the night of 14 Nov. 2006 1-6 BDE MITT got struck by an EFP.  I was the M 240B gunner on victor 3.  We were enroute back to FOB Justice from FOB Liberty, when we encountered the EFP on Route Phone card. I was pulling security to the rear when I saw a flash and heard the explosion.  I had thought that it missed us and detonated to our rear.  We drove through the kill zone as much as we could and provided security for victor 1 ( the vehicle that got hit).  SPC Stauber got out and started assessing the casualties.  We only thought that we had one the interpreter named George.  We later found out that we had two more SPC Garcia and COL Felts.  I continued to pull security to our nine o clock, when I saw Strykers from the 1Bde 72 IN pull up to assist.  They evacuated the casualties to the CSH.  At that time victor 2 hasty recovered victor 1 and we returned to FOB Justice.

SPC Stauber Mark M.

      On the 14. Nov 2006 at approximately 2300 the first vehicle of 1-6 BDE MITT got struck by an EFP. I was sitting in the 3rd and last vehicle of the convoy, when where moving from FOB Liberty back to FOB Justice driving on Phonecard. I heard a loud explosion, thinking at first it was behind us, as it seemed this was where the noise was coming from. The next thing I heard was that the Interpreter was hit. We where trying to set up a perimeter so I could dismount and take care of the casualty I knew of a Stryker pulled up to the right of our vehicle. More Stryker's pulled up and secured the perimeter around us. At this time the Interpreter had walked up and was disoriently walking in circles losing a lot of blood while doing so until he laid down. When the perimeter was finally secured so I could leave the vehicle I ran to the Interpreter and started administering medical aid. I noticed that a medic had dismounted one of the Stryker's and ran by me; I didn't know why because at this time I was still thinking that

PX2403

the Interpreter was our only casualty. When I was done administering aid to the Interpreter and the other soldiers put him into one of the Strykers, which where from the 1Bde 72IN, I looked to where the other medic had run to. I notice SPC Garcia laying motionless on the floor as I ran up to him and tried to get a reaction from him I was ordered back into our vehicle by MAJ Parracks, while the soldiers of 1Bde 72IN put him in one of their Strykers and left for the Cash. On the Way back we took the lead as the second vehicle pulled our first vehicle, which was completely disabled, into FOB Justice. Only later I heard that we had a third casualty, which must have been already loaded in a Stryker at the time I found SPC Garcia as I didn't see the third casualty which was COL Felts.

PX2403

# EXHIBIT H

PX2403

## SWORN STATEMENT
For use of this form, see AR 190-45; the proponent agency is PMG.

### PRIVACY ACT STATEMENT

| | |
|---|---|
| **AUTHORITY:** | Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| **PRINCIPAL PURPOSE:** | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| **ROUTINE USES:** | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| **DISCLOSURE:** | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *(YYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Camp Justice, Baghdad, Iraq | 2006/11/16 | | |
| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | | 7. GRADE/STATUS |
| YODER, JOHN M. | Redacted | | E7/SFC |
| 8. ORGANIZATION OR ADDRESS | | | |
| 1st BDE, 6th IA DIV MTT | | | |

9.

I, SFC Yoder, John M. _____ , WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On the night of Nov 14th, the 1-6 BDE MTT was returning to Camp Justice from Camp Liberty. Return route was exit Liberty's ECP 3, East on Michigan/Cardinals, then North on Phonecard, to North Senators, and East on N. Cubs to FOB Justice. The BDE MTT Team was traveling in a three vehicle convoy. Lead vehicle was SFC Cabral (driver), COL Felts (TC), SPC Garcia (gunner), and George (Interpreter). Second vehicle was CPT Brinker (driver), LTC Payne (TC), SFC Yoder (gunner). Third vehicle was PFC Palmer (driver), MAJ Parrack (TC), PFC Stauber (medic), and PFC Rapier (gunner). The team was traveling North on Phonecard, we passed under the Huskies overpass, and were slowly going through a series of small concrete barricades set up in a staggered formation. We knew this used to be an IA TCP but it was unmanned at that time. All vehicles had already noticed that the streets were also deserted.

Trucks one and two had just cleared the barricades (truck three was almost cleared of the barricades) when I saw and heard an IED hit our lead truck (time was approximately 2330hrs). The second and third trucks drove to the left of the lead vehicle in order to create a "safety pocket" where to assist with any injuries. I saw George, our Interpreter, walking out of the vehicle and coming into the driver's door. At that time I saw that SFC Cabral was conscious and alert. He told me his vehicle was disabled and he could not extract it from the kill zone. Within the next 60 seconds, a 4-vehicle Striker patrol out of the 172nd INF, came from out South and used their vehicles and dismounted personnel to further secure our convoy, creating a 360 degree perimeter around our three vehicles. LTC Payne called the area as "secured" and that allowed our dismounts (LTC Payne, MAJ Parrack and SFC Cabral) and our combat medic (PFC Stauber) to assist the lead vehicle. LTC Payne returned to our truck and told CPT Brinker to call for MedEvac and QRF. Immediately, CPT Brinker contacted Raven Base and requested MedEvac & QRF at the scene.

I could see LTC Payne, MAJ Parrack and SFC Cabral assisting our medic, PFC Stauber, provide medical care for COL Felts, SPC Garcia and George. During this time, while first aid was being given to our injured soldiers, PFC Rapier established his fields of fire and scanned his sector for any signs of a triggerman, cameraman, or possible insurgents. PFC Palmer was in charge of keeping internal communications open between our trucks. CPT Brinker maintained contact with Raven Base, asking numerous times for status/location of our QRF, while I (SFC Yoder) scanned my sector for possible triggerman, cameraman or possible insurgents. Neither gunner established PID.

LTC Payne returned to our vehicle and told CPT Brinker to call off the MedEvac since the Striker patrol volunteered to transport our injured soldiers to the CSH. CPT Brinker did so and, once the Strikers had departed the scene, LTC Payne hooked up the disabled vehicle to our vehicle's tow strap and proceeded to self-recover ourselves out of the kill zone. CPT Brinker again contacted Raven Base and continued asking for QRF to at least meet us enroute to FOB Justice. QRF was never deployed, regardless of multiple radio requests. The BDE MTT team self-recovered ourselves into FOB Justice.

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 3 PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE BE INDICATED.

**DA FORM 2823, DEC 1998**      DA FORM 2823, JUL 72, IS OBSOLETE      APD PE v1.01

Fis_Cabral PX2403

STATEMENT OF _SFC. J.M. Yoder_ TAKEN AT _FOB Justice_ DATED _16 Nov 06_

9. STATEMENT *(Continued)*

**AFFIDAVIT**

I, _SFC J.M. Yoder_ , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT
WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE _2_ . I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE
BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE
CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT
THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

*(Signature of Person Making Statement)*

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to
administer oaths, this _____ day of _____ , ____

at _____

_____

ORGANIZATION OR ADDRESS

*(Signature of Person Administering Oath)*

_____

*(Typed Name of Person Administering Oath)*

ORGANIZATION OR ADDRESS

*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT

PAGE 1 OF 2 PAGES

*PAGE 3, DA FORM 2823, DEC 1998*

APD PE v1.01

Fis_CabralL CR 00000021
PX2403

# EXHIBIT I

PX2403

## SWORN STATEMENT
For use of this form, see AR 190-45; the proponent agency is PMG.

### PRIVACY ACT STATEMENT

| | |
|---|---|
| **AUTHORITY:** | Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| **PRINCIPAL PURPOSE:** | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| **ROUTINE USES:** | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| **DISCLOSURE:** | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *(YYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| FOB Justice, Baghdad, Iraq | 2006/11/16 | 11:45 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| BRINKER, LEE ANDREW | Redacted | CPT(P) |

**8. ORGANIZATION OR ADDRESS**

1st BDE, 6th DIV (IA) MTT, IAG, FOB Justice, Baghdad, Iraq

**9.**

I, Lee Andrew Brinker , WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On the night of 14 November, 2006, our 3-M1114 march element was enroute from an ISF Cell meeting at Camp Liberty back to our base of operations, FOB Justice. At approximately 23:15, while traveling northbound on Route Phonecard in southern Hurriyah, the lead vehicle was struck by an IED. We took immediate action as we'd trained and rehearsed, securing the site and ensuring no further danger in the immediate vicinity and assessing the casualties. I reported the contact to the Justice Operations Center and maintained communications throughout subsequent MEDEVAC and vehicle recovery operations. LTC William Payne, TC of truck 2, which I was driving, and MAJ James Parrack, TC of truck 3, initially identified two of the casualties as urgent surgical and I radioed the Justice Operations Center for a MEDEVAC request. On further assessment of our wounded interpreter, George, our medic, PFC Stauber identified him as requiring MEDEVAC, as well, bringing the number of identified wounded to three. A short time after the attack, a platoon of Stryker vehicles arrived and aided in both securing the site and assisting the casualties.

The lead vehicle was completely disabled in the attack and all four tires has been blown. The Truck Commander, COL Thomas Felts, and the truck's gunner, SPC Justin Garcia, were both ciritcally injured in the attack. On assessment of the casualties, LTC Payne, MAJ Parrack and PFC Stauber identified that SPC Garcia had numerous wounds and did not have a pulse and COL Felts had severe bleeding in several locations and an amputation of his right arm between the elbow and shoulder. Both of the severely wounded casualties were inconscious; I do not know if COL Felts had a weak pulse or none at that time. The vehicle's driver, SFC Larry Cabral, sustained minor injuries to his face, right arm, and back, as a result of shrapnel from the attack.

The Styker unit that assisted us at the scene took all of the casualties and ground evacuated them to the CSH in the Green Zone. COL Felts and SPC Garcia were pronounced KIA and George underwent some surgery. George has since been evacuated to Landstuhl Regional Medical Center for further treatment and return to his home.

Despite his injuries, SFC Cabral stayed with his vehicle and steered it the remainder of the way back to FOB Justice, steering and braking the 12,000 lb vehicle for over a half hour with 4 flat tires.

NOTHING FOLLOWS



| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 4 OF 2 PAGES |
|---|---|---|

*ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE BE INDICATED.*

**DA FORM 2823, DEC 1998**    DA FORM 2823, JUL 72, IS OBSOLETE    APD PE v1.01

STATEMENT OF _CPT LEE A. BRINKER_   TAKEN AT _11:45_   DATED _16 NOV 06_

9. STATEMENT   *(Continued)*

**AFFIDAVIT**

I, _CPT LEE ANDREW BRINKER_ , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE _2_ . I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_(Signature of Person Making Statement)_

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _____ day of _____, _____ at _____

_____
ORGANIZATION OR ADDRESS

_(Signature of Person Administering Oath)_

_____
_(Typed Name of Person Administering Oath)_

_____
ORGANIZATION OR ADDRESS

_(Authority To Administer Oaths)_

INITIALS OF PERSON MAKING STATEMENT

PAGE _2_ OF _2_ PAGES

PAGE 3, DA FORM 2823, DEC 1998

APD PE v1.01

Fis_CabralL_CR_00000023
PX2403

# EXHIBIT J

PX2403

# Rated Disabilities

| Disability | Rating | Decision | Related To | Effective Date |
|---|---|---|---|---|
| post-herpetic neuralgia of the right frontal and lower face | 0% | Service Connected | | 03/01/2013 |
| tinnitus | | Not Service Connected | Predischarge Exam | |
| left shoulder impingement repair (claimed as left arm bursitis) | 20% | Service Connected | Predischarge Exam | 09/28/2015 |
| right carpal tunnel syndrome | 10% | Service Connected | Predischarge Exam | 12/01/2015 |
| hypertension | 0% | Service Connected | Predischarge Exam | 03/01/2013 |
| erectile dysfunction | 0% | Service Connected | | 03/01/2013 |
| cervical spine degenerative disc disease with strain | 10% | Service Connected | Predischarge Exam | 03/01/2013 |

Fis_Cabrall_SR_00002-03

PX2403

| Disability | Rating | Decision | Related To | Effective Date |
|---|---|---|---|---|
| other specified trauma and stressor-related disorder with residuals of TBI (previously rated as posttraumatic stress disorder with depressive disorder, not otherwise specified and residuals of traumatic brain injury, DC 8045-9411) | 50% | Service Connected | Predischarge Exam<br><br>PTSD - Combat | 03/13/2017 |
| right knee degenerative joint disease with patellofemoral pain syndrome | 10% | Service Connected | Predischarge Exam | 03/01/2013 |
| abnormal ekg | | Not Service Connected | Predischarge Exam | |
| status post rutpured left pectoral muscle | 0% | Service Connected | Predischarge Exam | 03/01/2013 |
| right wrist scar, status post carpal tunnel release surgery | 0% | Service Connected | | 09/17/2015 |
| scar, left shoulder | 0% | Service Connected | Predischarge Exam | 03/01/2013 |
| bilateral hearing loss | 0% | Service Connected | Predischarge Exam | 03/01/2013 |

Fis_CabralLCSR 00002-89

PX2403

| Disability | Rating | Decision | Related To | Effective Date |
|---|---|---|---|---|
| left carpal tunnel syndrome | 10% | Service Connected | Predischarge Exam | 03/01/2013 |
| lumbosacral degenerative joint and disc disease (also claimed as low back) | 10% | Service Connected | Predischarge Exam | 02/01/2015 |
| radiculopathy of the right sciatic nerve | 20% | Service Connected | | 09/28/2015 |
| lumbosacral scar, status post surgery | 0% | Service Connected | | 12/03/2014 |
| post-concussion headaches | 30% | Service Connected | Predischarge Exam | 03/01/2013 |
| obstructive sleep apnea | 50% | Service Connected | Predischarge Exam | 03/01/2013 |
| bilateral feet plantar faciitis | 0% | Service Connected | Predischarge Exam | 03/01/2013 |
| bilateral hand psoriasis with eczema | 0% | Service Connected | Predischarge Exam | 03/01/2013 |

Fis_CaballLCR 00002-00

PX2403

# EXHIBIT K

PX2403





PX2403





SLING

PX2403



PX2403













Fis_CabralL_CR_0002325

PX2403



PX2403



Fis_CabralL_CR_00002327
PX2403



PX2403



Fis_CabralL_CR_00002329

PX2403



Fis_CabralLCR-00002320

PX2403



Fis_CabralLCR 00002331

PX2403



Fis_CabralL_CR_00002332

PX2403



Fis_CabralL_CR_00002333

PX2403



Fis_CabralLCR 00002331

PX2403



Fis_CabralL_CR_00002335

PX2403





Fis_CabralL_CR_00002337

PX2403



Fis_CabralLOR_00002333

PX2403



PX2403





Fis_CabralL_CR_00002341

PX2403



Fis_CabralLCR 00002342

PX2403





Fis_CabralL_CR_0002344

PX2403



Fis_CabralL CR 00002345

PX2403



Fis_CabralL_SR_00002345

PX2403



Fis_CabralL CR 0002347

PX2403



Fis_CabralLCR 00002343

PX2403



Fis_CabralL_CR_00002349

PX2403



Fis_CabralL_CR_0002350

PX2403



PX2403

PX2403



PX2403

PX2403



PX2403



PX2403



PX2403



PX2403



PX2404

**DECLARATION OF**

**ROBERT LEE MCCORMICK**

I, Robert Lee McCormick declare and state under penalty of perjury that the following statements are true and correct:

a.  I have personal knowledge of the facts and information contained in this Declaration.

b.  I was born on ██████████ in Lafayette, Louisiana to Sheila Ann Carder McCormick and Timothy Alvin McCormick. I have a twin brother, Thomas Alvin McCormick, and an older brother, Timothy William McCormick.  I grew up in a happy family.  My father was a truck driver.  I was the first one in my family to attend college.

c.  I graduated high school in 1992 from Brusly High School in Brusly, Louisiana.  I was involved in the United States Army ROTC while attending Southeastern Louisiana University from August 1992 through May 1996.   During my 3rd year in ROTC, Southeastern Louisiana discontinued their ROTC program so I finished my ROTC training at Louisiana State University in Baton Rouge. I completed my Bachelor of Arts with a major in Criminal Justice and a minor in Military Science at Southeastern Louisiana University in May 1996.  I then attended Webster University, St. Louis, MO from 1997 through 1999, earning my Masters of Art degree in Management & Public Administration.

d.  On May 16, 1996, when I graduated from the University, I was also commissioned into the U.S. Army as a Second Lieutenant (2LT, O1).  I initially reported to Airborne School for parachute training at Ft. Benning, Georgia, later attending Air Defense Artillery Officer Basic Course at Ft. Bliss, Texas. I deployed to Iraq twice from May 2003 to July 2003 and from January 2006 through February 2007.  I also returned to Iraq for about a month in May / June 2009 as an adviser on a Counter-Rocket Artillery Mortar mission.  I also deployed to Afghanistan from May 2011 through May 2012.  I retired from the Army after 20 years of service on May 31, 2016, with a rank of Lieutenant Colonel (LTC, O5).

e.  During my second deployment in January 2006 through February 2007, I was assigned to the 3rd Battalion, 1st. Brigade 6th Division Iraqi Army Assistance Group-6 IAG (Iraqi Assistance Group) Brigade, Military Transition Team / MiTT, the first MiTT team to be in the area.  Initially when first deployed my rank was Captain (CPT, O3), but in April 2006, Colonel (COL, O6) Thomas Felts promoted me to Major (MAJ, O4).  We deployed to Camp Justice, a joint Iraqi-U.S. military base, in the Kahdimiyah District in northwest Baghdad.  Camp Justice was approximately 10 acres with a wall around it, which housed the U.S. military assigned to the area.    We were a small U.S. military unit in the middle

of the largest Iraqi battalion of approximately 1200 Iraqi's.  Over 400 Iraqi guards alone guarded the Imam Kadhim Shrine which was located in the Kadhamiyah neighborhood. The shrine was a pilgrimage site for the Shi'ite community.

f.  The Multi-National Brigade in Northwest Iraq under the Multi-National Corps – Iraq was the first MiTT team to be in the area.  The Brigade MiTT was a special U.S. unit consisting of 30 to 35 senior officers and non-commissioned officers with approximately 15 support personnel. The MiTT team was broken down into 8 or 9 man teams to cover the Iraqi battalion.  COL Felts held command responsibility over all of the U.S. Brigade MiTT teams.   My U.S. battalion's overall responsibility was providing mentorship to the operations officers and executive officers within the 1,215 man Iraqi Light Infantry Battalion supporting the coalition's Multi-National Brigade in Northwest Iraq under the Multi-National Corps – Iraq.  During operations, we provided mentoring on all operational, training, and administrative staff functions as the U.S. Battalion trained and conducted operations to include independent counter insurgency operations.   During combat operations or missions, we were responsible for enabling support to call in U.S. air support or field artillery from U.S. troops as necessary. My position was the Operations Officer & Executive Officer, and advisor to that Iraqi battalion – NW Baghdad.

g.  On November 14, 2006, in the evening while returning from operations that night, COL Felts was riding in an Armored HMMVW along with others.  There were three HMMVW's driving together.  They were returning from Camp Liberty to Camp Justice and were passing through an unmanned check point in the Kahdimiyah District between Baghdad International Airport (BIAP) and Camp Justice.   There were cement barriers approximately five feet high and ten feet long in the area where the attack occurred.  An Explosively Formed Penetrator (EFP) detonated, killing Colonel Felts. The EFP penetrated the HMMVW, melting the armor plating and penetrating the Colonel's body armor.

h.  My MiTT team and I were at Camp Justice listening to radio communications when a report came through that the team escorting COL Felts had been hit by an EFP.  We were listening to everything as it happened and heard that COL Felts had been killed and others including the gunner, Specialist (SPC, E4) Justin Garcia, and an Iraqi interpreter "George," were seriously injured. As I listened to the radio traffic I was overwhelmed with feelings of helplessness due to my inability to assist in assisting the unit under attack and recovering COL. Felts and the others.  I quickly decided that we would prepare our vehicles and go to assist.  We had to gather our team, get equipment together, and get 3 vehicles fully manned. We also had to secure an interpreter.  We conducted a quick briefing before we headed out. Since this was not a regular Forward Operating Base (FOB), there was no Quick Reaction Force (QRF); there was only another MiTT team to assist.   We knew from radio communications that they had been hit by an EFP, but we didn't know the extent of the

damage.   At approximately 2300 hours, our MiTT team departed and met up with the returning members of our unit at the main gate of Forward Operating Base Justice as they were coming back from where they had been attacked.  We escorted them back into to the base and into our unit's area within the base.  When we returned to our area, everyone was distraught and devastated by the attack and the tragic death of COL Felts and the others.

i.   At that point, I oversaw the initial assessment and inspection of the destroyed HMMVW. During this inspection, I observed that the Blue Force Tracker System, which was an electronic computer installed between the driver and truck commander, was completely blown apart.  The EFP had melted the metal armor of the HMMVW, penetrated the door, shattered the windows, penetrated the ballistic armor around the gunner's turret, and the radio tracker system. The damage caused by EFP going through the HMMVW had completely eviscerated the bodies of the vehicle occupants. As I inspected and secured items from the vehicle, I observed large amounts of blood, flesh, body fluids and tissue all over the HMMVW. The remains of the victims coated the electronic systems that I was responsible for removing and securing from the destroyed vehicle.  I remember standing with Staff Sergeant (SSGT, E6) Richard Brumfield looking at the destroyed HMMVW and visualizing the EFP as it struck the vehicle and shattered the bodies of COL Felts and the others.  The carnage I observed within the vehicle while performing the inspection and retrieval of equipment corresponded with the catastrophic injuries to COL Felts and to his driver, SFC Larry Cabral, that were reported to me by the men who had helped to evacuate Col Felts' body.

j.   Soon after the attack, I learned that a Stryker patrol that was close by came to the attack site and assisted with securing the attack scene.  The Stryker unit evacuated COL Felts, SPC Garcia, and the Iraqi interpreter, George, to the Combat Support Hospital (CSH) in the Green Zone.  The others hooked up the destroyed HMMVW to a tow strap and headed toward Camp Justice.   The driver, SFC Larry Cabral sustained severe injuries, but survived.  The gunner SPC Justin Garcia was also killed in the attack.  The manner in which COL Felts and the others were killed was so horrific that all of us were traumatized.

k.   SFC Cabral, also a member of our MiTT Team, was driving the HMMVW at the time of the attack that included COL Felts, SPC Garcia, and George, one of our interpreters.  SFC Cabral sustained injuries to his side and both arms from shrapnel, as well as injuries to his forearms and wrists after the attack trying to recover the vehicle from the scene of the attack.  Due to my rank and position I received reports and briefing on the attack, including from the EOD team that investigated the attack, and who determined that the HMMVW was hit by a multiple-array EFP emplaced on a concrete jersey barrier and aimed to penetrate the armor and enter the passenger compartment the HMMVW. The EFP hit up high on the HMMVW near the front right side door / window panel.

l. During my time in Iraq as the Operations Officer & Executive Officer, I worked directly with COL Felts. COL Felts had on several occasion gone on operations outside the wire. Due the security situation, I advised COL Felts that he should not leave base and should remain at Camp Justice due to his importance to our mission. I specifically asked COL Felts on several occasions to not leave the base and to remain at the command post. In the aftermath of the attack and COL Felts' death, I was wrought with guilt and regret for not having done more to press this issue with him, and felt that I could have prevented his death.

m. I was so upset and angry and felt certain that some of our Iraqi units were involved in the attack. After his death and the death of the others in the attack, our MiTT teams had to live through the consequences. Although we knew that the Iraqi's we were assisting were involved in the attack and the deaths, we had to stay there and act as if nothing had happened. I felt like this was how we were going to die as well.

n. Based on my experience and personal knowledge of the insurgents operating in the area, and the methods used to attack and kill COL Felts and injure the others, I believe the group responsible for the attack was Jaysh al-Mahdi, led by Muqtada al-Sadr at that time. This is supported by information known to me at the time of the attack, as well as additional information I obtained afterwards. Throughout our tour, we were aware that our Iraqi military unit included JAM members who were trying to stop Shia Iraqis from being killed. We had to take specific measures to limit access to weapons and information to the Iraqi units knowing it would be provided to JAM. Many of the Iraqi soldiers were loyal to Muqtada al-Sadr and we were actively trying to ferret out JAM members from the brigade we were training and were trying to get Shia militia influencers out of our Iraqi brigade. The attack against COL Felts used established TTPs associated with JAM, as we had seen JAM utilize the same TTPs before in this area.

o. I was very close with COL Felts and was severely traumatized by his tragic and traumatic death in this attack. He was commander; however, I worked with him on a daily basis – talking and meeting with him usually 15 or more times a day. We spent multiple hours a day meeting, planning, and talking. He personally picked me to train the brigade and was a close mentor and friend. Even before deploying to Iraq, we talked about tactics, deployments, etc. We had been in Iraq for 10 months with none of our team being killed and COL Felts was the first one of our team killed. The catastrophic manner in which he was murdered was shocking. Because of the especially violent death of COL Felts in this attack, I immediately developed anxiety, depression, nightmares, hyper vigilance, insomnia, and difficulty sleeping, which was later diagnosed as PTSD. The Army brought counselors and chaplains in to talk to those who had been involved or witnessed the

horrendous aftermath of this attack.  However, we were expected to and continued performing our jobs and our mission in Iraq and were back working with the Iraqis immediately.  We knew that in order to successfully target and assassinate a high-ranking officer like COL Felts, this attack was an "inside job" assisted by some of the Iraqi's we were overseeing.  Because of COL Felts' death, we immediately focused on increased security measures and were on high alert due to distrust of the Iraqi's and the fear of future attacks.  I went to counseling about three days after COL Felts' death in the attack to report my PTSD symptoms.  When I returned home from Iraq, I was so angry for years.  Because of my PTSD symptoms, I decided to end my military career early, retiring at 20 years on May 31, 2016, instead of remaining in the Army for the 30 years as I had previously planned.  I continue to experience symptoms of PTSD.  I remain hyper vigilant and cannot go out in crowds or eat in a restaurant without sitting facing the door.  I live my life on alert all times.  I have difficulty sleeping and became emotionally detached from family and friends.  My PTSD symptoms caused severe strain on my close relationships, and resulted in my divorce from my first wife.

p.  The weapon used in the attack against our unit and that killed COL Felts and injured Larry Cabral was an EFP.  I am personally aware that Iran provided weapons to JAM, included EFPs, and trained the Iraqi Shia militia on how to set up and assemble the materials used to make and detonate EFP's. The damage and carnage I observed to the armored HMVVW was consistent with that caused by an EFP.

q.  As Part of my Declaration, I am providing documentary materials attached as Exhibit A through B.

   a.  Exhibit A is a copy of a photograph taken of on April 1, 2006 when COL Felts promoted SFC Cabral and me.  I have personal knowledge of the source or creation of this Exhibit because I was present when the photograph was taken and participated in the promotion ceremony. This exhibit is a fair and accurate representation of the ceremony when I was promoted to Major.

   b.  Exhibit B is a copy of an official military photograph taken of me in May 2013 by a Department of the Army professional photographer after I was promoted to Lieutenant Colonel.  I have personal knowledge of the source or creation of this Exhibit because the photograph was taken of me by the Army at Fort Polk, Leesville, Louisiana. This exhibit is a fair and accurate representation of a military photograph when I was promoted to Lieutenant Colonel.

I declare and state under penalty of perjury under the laws of the **United States** of America that the foregoing statements are true and correct.

Executed <u>08/12/2022                         </u>.

Signature: <u>                                </u>

PX2404

# EXHIBIT A

PX2404



04/01/2006
PX2404

# EXHIBIT B

PX2404

13 05 24
LTC, AD



PX2404

PX2405

**DECLARATION OF**

**RICHARD BRUMFIELD**

I, Richard Brumfield declare and state under penalty of perjury that the following statements are true and correct:

a.   I have personal knowledge of the facts and information contained in this Declaration.

b.   I was born on Redacted in Zachary, LA.

c.   I enlisted in the U.S. Army in 1996 as a Personnel Specialist (75H), and served for 23 years until I retired in December of 2018. I originally entered the Army as an enlisted person and rose to the rank of Sergeant First Class (SFC, E-7), at the time of the attack in Iraq. I later achieved the rank of Chief Warrant Officer and retired as a WO3 in 2018.

d.   I was assigned to the 3rd Battalion, 1-6 IA Brigade, Military Transition Team / MiTT, the first team to be in the area.  My rank was Sergeant First Class (SFC) at the time of attack. We were deployed to Camp Justice in the Kahdimiyah District, northwest Baghdad, Iraq as part of a military transition team (MiTT). We were assigned to Iraqi personnel with the same job as us, we instructed them as part of the transition, and then later observed what they had learned.

e.   I met Captain (CPT, O3) Robert McCormick and later SFC Larry Cabral in or around November of 2005 at Fort Hood as part of our pre-deployment training. I quickly became good friends with CPT McCormick, as we were both family men and had similar interests. While in Kuwait before making it into country in Iraq, McCormick gained the nickname of "Captain America" because of his infectious personality. McCormick would always find ways to engage with his troops and was a natural leader.

f.   Our unit's overall responsibility was to mentor Iraqi troops in the Multi-National Brigade in Northwest Iraq as part of a Multi-national Corps - Iraq.  This included mentoring on all operational, training, and administrative staff functions as the Battalion trained and conducted operations.

g.   On November 14, 2006, sometime during the nighttime hours, Colonel (COL, O6) Thomas Felts, the Brigade Commander, was riding in an Armored HMMVW along with others and they were passing through an unmanned check point in Kahdimiyah between Baghdad International Airport (BIAP) and Camp Justice.  An EFP detonated killing Colonel Felts. We were at Camp Justice and were monitoring the radio via the Tactical Operations Center

PX2405

(TOC) when we heard a lot of commotion or confusion and heard that an IED or EFP had hit one of our team. We met the returning convoy and at the gates of the U.S. military portion of FOB Justice and escorted them the rest of the way back to the TOC. We learned that COL Felt had suffered catastrophic injuries resulting in his death. COL Felt's men were distraught by his death. The gunner of the HMMVW, SPC Justin Garcia was also killed because of the blast. The driver, SFC Larry Cabral, sustained injuries as a result of the explosion. A nearby Stryker team responded to the blast site, provided security, and evacuated COL Felts, SPC Garcia, and an interpreter named George to the Combat Support Hospital (CSH) in the Green Zone. CPT McCormick and I observed the horrific damage to the HMMVW and could see that the EFP had penetrated the HMMVW, melting the armor plating.

h.  SFC Larry Cabral, also a member of the MiTT Team, was driving the HMMVW at the time of the attack, which included COL Felts, a gunner, SPC Garcia, and an interpreter. I only saw SFC Cabral briefly after the attack site that night. I learned later that SFC Cabral sustained injuries to his side and both arms from shrapnel as well as injuries to his forearms and wrists.

i.  As part of my daily duties I participated in intelligence briefings and during one of those briefings after the attack we were told that they were hit by an EFP and after looking at the damage to the HMMVW, I concluded that it was an EFP attack.

j.  After the attack, we were highly encouraged not to go outside the wire and I believe we did not deploy outside the wire for several days to try to cope with what had taken place. After the attack, CPT McCormick or "Rob" was not the same person that I knew prior to the attack. CPT McCormick became subdued, seemed to lose focus, and at times seemed to question why we were there. You could see a sense of defeat in his eyes after this attack. Even after returning from deployment and going our separate ways, CPT McCormick and I have remained close. Occasionally, we still talk about the day of the attack. Mostly, we talk by phone and occasionally visit each other when I return to Louisiana. Just like Rob, I also suffer from and was diagnosed with PTSD, in part as a result of this attack. Although, Rob has not been his normal self since the attack, he and I are very close and Rob has been "that guy" that I can always talk with when I need support and someone to listen.

k.  As Part of my Declaration, I am providing documentary materials attached as Exhibit A through D.

    1.  Exhibit A attached to this Declaration is a true and authentic copy of a photograph of CPT Robert McCormick and myself along with our team, taken while we were deployed to Iraq. I have personal knowledge of the source or creation of this Exhibit because I was present when the photograph was taken and I am depicted in

PX2405

the photograph. The photograph was given to me before we returned home from Iraq. The photograph fairly and accurately depicts our team while deployed to Iraq.

2. Exhibit B attached to this Declaration is a true and authentic copy of a photograph of CPT Robert McCormick and me along with CPT Nazario, while we were deployed to Iraq.   I have personal knowledge of the source or creation of this Exhibit because I was present when the photograph was taken and I am depicted in the photograph. The photograph was given to me before we returned home from Iraq. The photograph fairly and accurately depicts me, CPT McCormick, and CPT Nazario while deployed to Iraq.

3. Exhibit C attached to this Declaration is a true and authentic copy of a photograph of myself on patrol while deployed in Iraq. I have personal knowledge of the source or creation of this Exhibit because I was present when the photograph was taken and I am depicted in the photograph. The photograph was given to me before we returned home from Iraq.   The photograph fairly and accurately depicts me on patrol while deployed to Iraq.

4. Exhibit D attached to this Declaration is a true and authentic copy of a current photograph of myself. I have personal knowledge of the source or creation of this Exhibit because I am the one depicted in the photograph. The photograph fairly and accurately depicts me since retiring from the military.


I declare and state under penalty of perjury under the laws of the **United States** of America that the foregoing statements are true and correct.

Executed on ___08/17/2022_____.


Signature:_____

PX2405

# EXHIBIT A

PX2405



PX2405

# EXHIBIT B

PX2405



PX2405

# EXHIBIT C

PX2405



PX2405

# EXHIBIT D

PX2405



PX2405

PX2406

# SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is PMG.

## PRIVACY ACT STATEMENT

| | |
|---|---|
| **AUTHORITY:** | Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)* . |
| **PRINCIPAL PURPOSE:** | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| **ROUTINE USES:** | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| **DISCLOSURE:** | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *(YYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Camp Justice, Baghdad, Iraq | 2006/11/16 | | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| YODER, JOHN M. | Redacted | E7/SFC |

**6. ORGANIZATION OR ADDRESS**
1st BDE, 6th IA DIV MTT

9.

I, SFC Yoder, John M. , WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On the night of Nov 14th, the 1-6 BDE MTT was returning to Camp Justice from Camp Liberty. Return route was exit Liberty's ECP 3, East on Michigan/Cardinals, then North on Phonecard, to North Senators, and East on N. Cubs to FOB Justice. The BDE MTT Team was traveling in a three vehicle convoy. Lead vehicle was SFC Cabral (driver), COL Felts (TC), SPC Garcia (gunner), and George (Interpreter). Second vehicle was CPT Brinker (driver), LTC Payne (TC), SFC Yoder (gunner). Third vehicle was PFC Palmer (driver), MAJ Parrack (TC), PFC Stauber (medic), and PFC Rapier (gunner). The team was traveling North on Phonecard, we passed under the Huskies overpass, and were slowly going through a series of small concrete barricades set up in a staggered formation. We knew this used to be an IA TCP but it was unmanned at that time. All vehicles had already noticed that the streets were also deserted.

Trucks one and two had just cleared the barricades (truck three was almost cleared of the barricades) when I saw and heard an IED hit our lead truck (time was approximately 2330hrs). The second and third trucks drove to the left of the lead vehicle in order to create a "safety pocket" where to assist with any injuries. I saw George, our Interpreter, walking out of the vehicle and coming into the driver's door. At that time I saw that SFC Cabral was conscious and alert. He told me his vehicle was disabled and he could not extract it from the kill zone. Within the next 60 seconds, a 4-vehicle Striker patrol out of the 172nd INF, came from out South and used their vehicles and dismounted personnel to further secure our convoy, creating a 360 degree perimeter around our three vehicles. LTC Payne called the area as "secured" and that allowed our dismounts (LTC Payne, MAJ Parrack and SFC Cabral) and our combat medic (PFC Stauber) to exit vehicles and assist the lead vehicle. LTC Payne returned to our truck and told CPT Brinker to call for MedEvac and QRF. Immediately, CPT Brinker contacted Raven Base and requested MedEvac & QRF at the scene.

I could see LTC Payne, MAJ Parrack and SFC Cabral assisting our medic, PFC Stauber, provide medical care for COL Felts, SPC Garcia and George. During this time, while first aid was being given to our injured soldiers, PFC Rapier established his fields of fire and scanned his sector for any signs of a triggerman, cameraman, or possible insurgents. PFC Palmer was in charge of keeping internal communications open between our trucks. CPT Brinker maintained contact with Raven Base, asking numerous times for status/location of our QRF, while I (SFC Yoder) scanned my sector for possible triggerman, cameraman or possible insurgents. Neither gunner established PID.

LTC Payne returned to our vehicle and told CPT Brinker to call off the MedEvac since the Striker patrol volunteered to transport our injured soldiers to the CSH. CPT Brinker did so and, once the Strikers had departed the scene, LTC Payne hooked up the disabled vehicle to our vehicle's tow strap and proceeded to self-recover ourselves out of the kill zone. CPT Brinker again contacted Raven Base and continued asking for QRF to at least meet us enroute to FOB Justice. QRF was never deployed, regardless of multiple radio requests. The BDE MTT team self-recovered ourselves into FOB Justice.

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 2 PAGES |
|---|---|---|

*ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE BE INDICATED.*

**DA FORM 2823, DEC 1998**      DA FORM 2823, JUL 72, IS OBSOLETE

PX2406

STATEMENT OF _SFC J.M. Yoder_   TAKEN AT _FOB Justice_   DATED _16 Nov 06_

9. STATEMENT   *(Continued)*

**AFFIDAVIT**

I, _SFC J.M. Yoder_ , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE _2_ . I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

*(Signature of Person Making Statement)*

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _____ day of _____ , _____ at _____

_____

_____

ORGANIZATION OR ADDRESS

*(Signature of Person Administering Oath)*

_____

*(Typed Name of Person Administering Oath)*

ORGANIZATION OR ADDRESS

*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT

PAGE _1_ OF _2_ PAGES

PX2406

# PX2407

# SWORN STATEMENT
For use of this form, see AR 190-45; the proponent agency is PMG.

## PRIVACY ACT STATEMENT

| | |
|---|---|
| **AUTHORITY:** | Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943  *(SSN)* . |
| **PRINCIPAL PURPOSE:** | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| **ROUTINE USES:** | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| **DISCLOSURE:** | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *(YYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| FOB Justice, Baghdad, Iraq | 2006/11/16 | 11:45 | |
| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | | 7. GRADE/STATUS |
| BRINKER, LEE ANDREW | Redacted | | CPT(P) |

8. ORGANIZATION OR ADDRESS

1st BDE, 6th DIV (IA) MTT, IAG, FOB Justice, Baghdad, Iraq

9.

I, Lee Andrew Brinker _____ , WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On the night of 14 November, 2006, our 3-M1114 march element was enroute from an ISF Cell meeting at Camp Liberty back to our base of operations, FOB Justice. At approximately 23:15, while traveling northbound on Route Phonecard in southern Hurriyah, the lead vehicle was struck by an IED. We took immediate action as we'd trained and rehearsed, securing the site and ensuring no further danger in the immediate vicinity and assessing the casualties. I reported the contact to the Justice Operations Center and maintained communications throughout subsequent MEDEVAC and vehicle recovery operations. LTC William Payne, TC of truck 2, which I was driving, and MAJ James Parrack, TC of truck 3, initially identified two of the casualties as urgent surgical and I radioed the Justice Operations Center for a MEDEVAC request. On further assessment of our wounded interpreter, George, our medic, PFC Stauber identified him as requiring MEDEVAC, as well, bringing the number of identified wounded to three. A short time after the attack, a platoon of Stryker vehicles arrived and aided in both securing the site and assisting the casualties.

The lead vehicle was completely disabled in the attack and all four tires has been blown. The Truck Commander, COL Thomas Felts, and the truck's gunner, SPC Justin Garcia, were both ciritcally injured in the attack. On assessment of the casualties, LTC Payne, MAJ Parrack and PFC Stauber identified that SPC Garcia had numerous wounds and did not have a pulse and COL Felts had severe bleeding in several locations and an amputation of his right arm between the elbow and shoulder. Both of the severely wounded casualties were inconscious; I do not know if COL Felts had a weak pulse or none at that time. The vehicle's driver, SFC Larry Cabral, sustained minor injuries to his face, right arm, and back, as a result of shrapnel from the attack.

The Styker unit that assisted us at the scene took all of the casualties and ground evacuated them to the CSH in the Green Zone. COL Felts and SPC Garcia were pronounced KIA and George underwent some surgery. George has since been evacuated to Landstuhl Regional Medical Center for further treatment and return to his home.

Despite his injuries, SFC Cabral stayed with his vehicle and steered it the remainder of the way back to FOB Justice, steering and braking the 12,000 lb vehicle for over a half hour with 4 flat tires.

**NOTHING FOLLOWS**

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 4 OF       PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE BE INDICATED.

**DA FORM 2823, DEC 1998**            DA FORM 2823, JUL 72, IS OBSOLETE            PX2407            APD PE v1.01

STATEMENT OF _CPT LEE A. BRINKER_   TAKEN AT _11:45_   DATED _16 NOV 06_

9. STATEMENT   *(Continued)*

**AFFIDAVIT**

I, _CPT LEE ANDREW BRINKER_ , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE _2_ . I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_(Signature of Person Making Statement)_

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _____ day of _____ , _____
at _____

_____
ORGANIZATION OR ADDRESS

_(Signature of Person Administering Oath)_

_____
ORGANIZATION OR ADDRESS

_(Typed Name of Person Administering Oath)_

_(Authority To Administer Oaths)_

INITIALS OF PERSON MAKING STATEMENT

PAGE ____ OF ____ PAGES

PX2407

APD PE v1.01

PX2413

# IED Report



WebTAS

Wednesday, 27 April 2022

Declassified by MG David S. Doyle
USCENTCOM Chief of Staff
Declassified on: 29 August 2022
Privacy Act Protective Order applies

## IED Report

| | |
|---|---|
| Aiming Point Details | N/A |
| Analysis | N/A |
| CF CIV ABD | 0 |
| CF CIV KIA | 0 |
| CF CIV WIA | 0 |
| Call Sign | |
| Civilian Activity | None Selected |
| Civilian KIA | 0 |
| Civilian WIA | 0 |
| Classification | ~~SECRET~~ |
| Classification Releasability Mark | ~~NOFORN~~ |
| Coalition KIA | 0 |
| Coalition WIA | 0 |
| Date Discovered | Nov 14 2006 20:15:00 |
| Date Posted | Nov 14 2006 22:13:40 |
| Date Posted Zulu | Nov 14 2006 22:13:40 |
| Date Updated | Dec 02 2006 09:19:00 |
| Date Updated Zulu | Dec 02 2006 09:19:00 |
| Display Date Zulu | Nov 14 2006 20:15:00 |
| Display Icon | _images/report/operations/event_ied_exp_lg.gif |
| Display Summary | AT 2315C, IN KADHIMIYA (ZONE 28) IVO 38SMB 37985 90650, 1/1/6 IA MITT |

IED TYPE:

KIA: (W/BR#):

WIA (W/BR#):

EQUIPMENT BDA:

ENEMY BDA:

ENEMY DETAINEE:

CREW SYSTEM:

CENTCOM_0000309

FISHBECK

USCENTCOM MDR 22-0089
Approved for Release to OGC- Confidential Privacy Act Protective Order Applies
08/30/22 001

PX2413

IED Report

ORDER OF MOVEMENT:

OTHER IED DEFEAT EQUIP:

FRAG DOOR KIT INSTALLED:

COMPOSITION:

142315: 1/1/6 MITT TEAM (RAVEN) REPORTED GETTING HIT BY AN IED ALONG ROUTE ROCKIES (MB 378905).  3 x US WIA (2 x URGENT/SURGICAL, 1 x UNK). MEDEVAC REQUESTED.

142325: RAVEN ELE. IS EVACING CAUSUALTIES BY GROUND TO THE IZ.

142340: QRF DISPATCHED WITH RECOVERY ASSETS.

142355: RAVEN 3  REPORTED RETURNING TO FOB JUSTICE.

172d RPTS:
142330NOV06: 2-1 IN RPTS THAT 1/1/6 IA MITT STRUCK AN IED VIC MB 37985 90650 RESULTING IN 2 X US WIA, 1 X US KIA, AND 1 X DESTROYED [ 1.4g ], A/52D AT DISCOVERED THE UNIT AT THE IED SITE.  A/52D AT GROUND EVACED 3 X US CAS TO THE 28TH CSH.  1/1/6 IA MITT SELF RECOVERED THE DESTROYED [ 1.4g ] BACK TO FOB JUSTICE.

MTF

SUMMARY:

1 X IED STRIKE
2 X US KIA [ 3.5c ]  1 X US WIA(CIV)
1 X VEH DESTROYED

OPENN/A

| Display Title | (IED) N/A : Explosion |
|---|---|
| EOD Team | N/A |
| FPD is MGRS | 1 |
| Firing Point Details | Not Provided |
| GMT Delta | -240 |
| Host Nation KIA | 0 |
| Host Nation WIA | 0 |
| IED Event | Explosion |
| IsTear Line | 0 |
| Last Time Route Cleared | N/A |
| Light Conditions | None Selected |
| MGRS | 38SMB3798590650 |
| Marking Details | N/A |

USCENTCOM MDR 22-0089
Approved for Release to OGC- Confidential Privacy Act Protective Order Applies
08/30/22 002

CENTCOM_0000310

FISHBECK

PX2413

## IED Report

| | |
|---|---|
| Originating Site | ROARREP |
| Originating System | CIDNE |
| Originator Group | UNKNOWN |
| Originator Name | 3.5c |
| Originator Unit | |
| PSA is MGRS | 1 |
| Publish Level | 0 |
| Reference Point | None Selected |
| Releasable Data Classification | UNCLASSIFIED |
| Releasable Data Classification Releasability Mark | FOR OFFICIAL USE ONLY |
| Report Key | E2DB155A-8B2B-40C9-9FAE-BADB26E277E4 |
| Report Type | IED |
| Reporting Unit | MND-B |
| RoutePatrol Interval | None Selected |
| SSA is MGRS | 1 |
| Site Marked | None Selected |
| Theater Filter | ROAR |
| Title | IED EXPLOSION ATTK ON IVO KADHIMIYA (ZONE 28) (ROUTE UNKNOWN): 2 CF KIA 1 CIV WIA |
| Tracking Number | IED-2006-319-010506-0120 |
| Updated By Group | TF Troy |
| Updated By Name | 3.5c |
| Updated By Unit | |
| WIT Team | None Selected |
| Weather | None Selected |
| CIDNE Folder | 3.5c   LiteReportView.cfm?module=Exploitation&reporttype=IED&reportkey=E2DB155A-8B2B-40C9-9FAE-BADB26E277E4&entity=report |

### Association

| CIDNE Folder | is Published | Confidence | Classifica ion | Classification Releasability Mark | DTG Posted | (More not shown) |
|---|---|---|---|---|---|---|
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| Link to Operations CIDNE Report | 1 | Confirmed | SECRET | REL TO USA, FVEY | Nov 14 2006 22:13:40 | (More not shown) |

FISHBECK
CENTCOM_0000311

Page 3 of 4

PX2413

## IED Report

**IED Report Render Main**

| Classification | Classifica ion Alias | Classification Caveat | Classifica ion Code Word | Classification Declassify On | Classifica ion Domain | (More not shown) |
|---|---|---|---|---|---|---|
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| SECRET | | | | | | (More not shown) |

**IED Report Device**

| Ac ion Taken | Casualties | Caused Casualties | Classifica ion | Classification Alias | Classifica ion Caveat | (More not shown) |
|---|---|---|---|---|---|---|
| | | | | | | (More not shown) |
| | | | | | | (More not shown) |
| | | 1 | SECRET | | | (More not shown) |

55 Empty Attributes

Classification Caveat, Classification DeclassifyOn, Classification Domain, Date Discovered Zulu, Date Ini ia l Published, Date Initial Published Zulu, EOD FOB Departure, EOD FOB Departure Zulu, EOD Mission Complete, EOD Mission Complete Zulu, EOD Mission DTG, EOD Notification DTG, EOD Report Complete, EOD Report Some Arrival, EOD FOB Some Arrival, EOD FOB Some Arrival, EOD FOB Some Arrival Zulu, EOD Report Some Arrival Zulu, Engineer Type, Equipment Number, Equipment Re Type, Safet ID Report FPD La itude, FPD Longitude, Firing Point Details MGRS, Latitude, Longitude, Narrative, Originating Major Command, IED Network FSA Latitude, PSA Longitude, Primary Safe Area MGRS, SSA La itude, SSA Longitude, Safe Area MGRS, Secondary Safe Area MGRS, Service Affiliation, Sigact Report Key, Sigact Tracking Number, Team Leader Comments, Tear Line Classification, Tear Line Contact, Tear Line Releasability, Tear Line Source Report Date Updated, Tear Line Source Report Key, WIT Analysis, WIT Comments, WIT DTG Arrival, WIT DTG ArrivalZulu, WIT DTG Departure, WIT DTG FOB Departure, WIT DTG Mission Complete, WIT DTG Notification, WIT DTG Report Complete, WIT Evidence

## Relationships

(None)

## Attachments

(None)

FISHBECK
CENTCOM_0000312

USCENTCOM MDR 22-0089          08/30/22 004
Approved for Release to OGC- Confidential Privacy Act Protective Order Applies

PX2413