## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ESTATE OF CHRISTOPHER BROOK FISHBECK, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) ) | **Civil Action No. 1:18-cv-2248-CRC** |
| **v.** | ) ) | |
| **THE ISLAMIC REPUBLIC OF IRAN, et al.,** | ) ) | |
| **Defendants** | ) ) | |

## PLAINTIFFS' MEMORANDUM OF LAW REGARDING
## ACTS OF EXTRA JUDICIAL KILLING UNDER 28 U.S.C. § 1605A

## Table of Contents

I.    ARGUMENT AND AUTHORITIES                                                    1

    A.    The Controlling Rules of Statutory Interpretation ....................................1

    B.    Non-Fatal Terrorist Attacks Constitute Acts of Extrajudicial Killings
        Intended To Be Actionable Under § 1605A ............................................2

    C.    *Force II* Misapplied Portions of the TVPA Not Specifically
        Incorporated into to the FSIA ...............................................................10

    D.    Section 1605A's Material Support Element Provides an Additional
        Basis for Plaintiffs' Claims...................................................................12

    E.    This Case Involves Significantly Different Facts & Allegations Than
        Those at Issue in *Force II* and Justify a Different Result. ....................18

II.   CONCLUSION                                                                   19

## Table of Authorities

**Cases**

*Abramski v. United States*,
   573 U.S. 169 (2014) ............................................................................................ 16

*AFSCME Iowa Council 61 v. Iowa Pub. Emp't Relations Bd.*,
   846 N.W.2d 873 (Iowa 2014) ............................................................................ 14

*Applera Corp. v. MJ Research Inc.*,
   292 F. Supp. 2d 348 (D. Conn. 2003) ................................................................ 13

*Biden v. Texas*,
   142 S. Ct. 2528 (2022) .................................................................................... 2, 15

*Boniface v. Viliena*,
   338 F. Supp. 3d 50 (D. Mass. 2018) .................................................................. 10

*Cabrera v. Islamic Republic of Iran*,
   2022 WL 2817730 (D.D.C. July 19, 2022) ...................................................... 5, 9

*Cohen v. Islamic Republic of Iran*,
   238 F. Supp. 3d 71 (D.D.C. 2017) ....................................................................... 9

*Doe v. Bin Laden*,
   663 F.3d 64 (2d Cir. 2011) ................................................................................... 6

*Doe v. Constant*,
   354 F. App'x 543 (2d Cir. 2009) ........................................................................ 10

*Donnelly Commodities Inc. v. BNSF Ry. Co.*,
   34 F.4th 1 (D.C. Cir. 2022) ................................................................... 1, 16, 18

*Flanagan v. Islamic Republic of Iran*,
   190 F. Supp. 3d 138 (D.D.C. 2016) .................................................................... 11

Force v. Islamic Republic of Iran (*Force I*),
   464 F. Supp. 3d 323 (D.D.C. 2020) ............................................................. Passim

*Force v. Islamic Republic of Iran (Force III*,
   2022 WL 2452606 (D.D.C. July 5, 2022) ................................................... Passim

*Fritz v. Islamic Republic of Iran*,
   320 F. Supp. 3d 48 (D.D.C. 2018) ....................................................................... 5

*Genus Med. Techs. LLC v. FDA*,
   994 F.3d 631 (D.C. Cir. 2021) .............................................................................. 1

*Gill v. Islamic Republic of Iran*,
   249 F. Supp. 3d 88 (D.D.C. 2017) ................................................................... 9, 10

*Guedes v. BATFE*,
   45 F.4th 306 (D.C. Cir. Aug. 9, 2022) ............................................................... 17

*Gundy v. United States*,
   139 S. Ct. 2116 (2019) ........................................................................................ 15

*Han Kim v. Democratic People's Republic of Korea*,
   774 F.3d 1044 (D.C. Cir. 2014) ............................................................................ 7

*Jane W. v. Thomas*,
   560 F. Supp. 3d 855 (E.D. Pa. 2021) .................................................................. 10

*Karcher v. Islamic Republic of Iran*,

396 F. Supp. 3d 12 (D.D.C. 2019)........................................................................... 5, 7, 9, 10
*Lee v. Islamic Republic of Iran,*
   518 F. Supp. 3d 475 (D.D.C. 2021)...................................................................... 9
*Leibovitch v. Islamic Republic of Iran,*
   697 F.3d 561 (7th Cir. 2012) ............................................................................... 7
*Loughrin v. United States,*
   573 U.S. 351, 134 S. Ct. 2384, 189 L. Ed. 2d 411 (2014)................................... 3
*Morissette v. United States,*
   342 U.S. 246 (1952) ........................................................................................... 17
*Neder v. United States,*
   527 U.S. 1 (1999) ................................................................................................. 3
*Niz-Chavez v. Garland,*
   141 S. Ct. 1474 (2021)......................................................................................... 2
*Owens v. Republic of Sudan,*
   864 F.3d 751, 776 (2017)……………….…................................................10, 11
*Pennington v. Islamic Republic of Iran,*
   2021 WL 2592910 (D.D.C. June 24, 2021)...................................................... 5, 9
*Republic of Iraq v. Beaty,*
   556 U.S. 848 (2009) ............................................................................................. 7
*Roberts v. Islamic Republic of Iran,*
   581 F. Supp. 3d 152 (D.D.C. 2022).............................................................. passim
*Sissel v. United States HHS,*
   799 F.3d 1035 (D.C. Cir. 2015) ......................................................................... 13
*Skinner- Smith v. Sec'y of HHS,*
   141 Fed. Cl. 348 (2018) ..................................................................................... 14
*State v. Stewart,*
   386 P.3d 688 (Or. App. 2016) ............................................................................ 14
*Torres v. Lynch,*
   578 U.S. 452 (2016) ........................................................................................... 16
*United States v. Mohammad,*
   2017 WL 2365247 (N.D. Ohio May 31, 2017) ................................................. 16
*United States v. Stewart,*
   590 F.3d 93 (2d Cir. 2009) ................................................................................. 16
*Util. Air Regulatory Group v. E.P.A.,*
   573 U.S. 302 (2014) ........................................................................................... 13
*Van Beneden v. Al-Sanusi,*
   709 F.3d 1165 (D.C. Cir. 2013).......................................................................... 6
*Warfaa v. Ali,*
   33 F. Supp. 3d 653 (E.D. Va. 2014) .................................................................. 10
*Williams v. Taylor,*
   529 U.S. 362 (2000) ................................................................................... 2, 3, 4

**Statutes**

1 U.S.C. § 1........................................................................................................ 15, 16
18 U.S.C. §§ 2339A and 2339B ................................................................... 15, 16, 17

28 U.S.C. § 1350 (note) ................................................................................................ 11
28 U.S.C. § 1605(a)(7) .................................................................................................... 7
28 U.S.C. § 1605A ................................................................................................... Passim
28 U.S.C. § 1605A(c) ........................................................................................... 2, 6, 13
28 U.S.C. § 1605A(h)(3) ............................................................................................... 16
28 U.S.C. § 1605A(a)(1) .......................................................................................... Passim
Pub. L. No. 104-132, § 221(a), 110 .............................................................................. 7

**Other Authorities**

154 Cong. Rec. H257 ...................................................................................................... 7
154 Cong. Rec. H258 ...................................................................................................... 6
154 Cong. Rec. S54 ........................................................................................................ 7
H.R. Rep. No. 104-383 ................................................................................................... 7
Restatement (Second) of Torts § 2 (1965) ............................................................... 4, 15
Restatement (Second) of Torts § 47 ............................................................................... 4

**Plaintiffs' Master Exhibits**

PX1 – Report & Declaration of Dr. Patrick Clawson ...................................................... 9

PX6 – Report & Declaration of Dr. Michael Rubin ....................................................... 9

PX212 – Brian Fishman and Joseph Felter, *Iranian Strategy in Iraq: Politics and "Other
   Means,"* (West Point, NY: Combating Terrorism Center at West Point, 2008) ....................... 9

PX382 – Congressional Testimony of Brig. Gen. Anthony Tata (U.S. Army, ret.) before the
   House Committee on Homeland Security (Jan. 15, 2020) ....................................................... 9

On September 12, 2022, the Court asked Plaintiffs to provide this memorandum of law addressing whether, under § 1605A of the Foreign Sovereign Immunities Act (the terrorism exception), the phrase "act of extrajudicial killing" encompasses terrorist attacks that do not result in any deaths. Based on the following, Plaintiffs respectfully submit that non-fatal terrorist attacks are "acts of extrajudicial killing" within the terrorism exception, and can provide a basis for civil claims brought under § 1605A.

## I.   ARGUMENT AND AUTHORITIES

This brief is intended to provide the Court with an assessment of the recent decision in *Force v. Islamic Republic of Iran*, No. 16-cv-1468 (RDM), 2022 WL 2452606 (D.D.C. July 5, 2022) ("*Force II*"). In *Force II*, the court departed from well-established interpretations of the phrase "act of extrajudicial killing," in ruling that *only* terrorist attacks involving a *consummated* extrajudicial killing can support a claim under § 1605A. *Id*. at 8. In doing so, the court in *Force II* also reconsidered its own decision reached earlier in the same case, and acknowledged the seemingly unjust results of its novel interpretation of § 1605A. *Id*. at 19-20; *see also* Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323 (D.D.C. 2020) ("*Force I*"). As discussed below, *Force II* did not properly consider the full text of the applicable statute, resulting in a misinterpretation and misapplication of the statute. Moreover, the facts of *Force II* are distinguishable from the facts presented in this case. As such, Plaintiffs respectfully submit that this Court should not follow *Force II*.

### A.   THE CONTROLLING RULES OF STATUTORY INTERPRETATION

To interpret statutes, "court[s] begin[] 'with the language of the statute itself' and, if necessary, 'may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history.'" *Donnelly Commodities Inc. v. BNSF Ry. Co. (In re Rail Freight Fuel Surcharge Antitrust Litig.)*, 34 F.4th 1, 9 (D.C. Cir. 2022) (quoting *Genus Med.*

*Techs. LLC v. FDA*, 994 F.3d 631, 637 (D.C. Cir. 2021)).  Courts "normally seek[] to afford the law's terms their ordinary meaning at the time Congress adopted them."  *Niz-Chavez v. Garland,* 141 S. Ct. 1474, 1480 (2021).  Courts must also "'give effect, if possible, to *every* clause and word of [the] statute.'" *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (emphasis added).

### B.    Non-Fatal Terrorist Attacks Constitute Acts of Extrajudicial Killings Intended To Be Actionable Under § 1605A

Of primary relevance in assessing this issue is § 1605A(a)(1), which  states:

> A foreign state shall not be immune . . . in any case . . . in which money damages are sought against a foreign state for ***personal injury or*** death that was caused by ***an act of*** . . . extrajudicial killing . . . or the provision of material support or resources for such an act. . . .

28 U.S.C. § 1605A (a)(1) (emphasis added).  Additionally, the FSIA provides a private right of action against state sponsors of terrorism "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(c).

Notwithstanding this language, the recent decision in *Force II* held that only terrorist attacks involving a *fully-realized death* meets the meaning of *"*extrajudicial killing,*"* and provides the only basis for such a claim under § 1605A. However, in reaching this conclusion, the *Force II* opinion fails  to give effect to all of § 1605A's terms and disregards the statute's remedial purpose and  legislative history.

First, Congress specifically intended to provide a private cause of action "for personal injury ***or*** death . . . caused by an act of . . . extrajudicial killing." 28 U.S.C. § 1605A(c) (emphasis added). Inclusion of the word "or" makes clear that recovery under § 1605A is not dependent upon death.  Requiring a consummated killing would render the phrase "personal injury or" superfluous

in the statute. The well-settled, common law definition of "personal injury" is not synonymous with death. *See Neder v. United States,* 527 U.S. 1, 23 (1999) (providing the rule of statutory interpretation that, when Congress does not explicitly define a term, "the well-settled meaning of the common-law terms" apply). Indeed, "personal injury" includes "any harm caused to a person, such as a broken bone, a cut, or a bruise . . . [and] [a]ny invasion of a personal right, including mental suffering and false imprisonment." *Black's Law Dictionary* (11th ed. 2019).

Second, Congress's use of the term "act" results in the same conclusion — that a death need not actually occur for injured victims to recover. As recently found in *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152 (D.D.C. 2022) (Lamberth, J.), the statute's causal phrase, "caused by an act of . . . extrajudicial killing," does not require an extrajudicial killing. As *Roberts* emphasized, § 1605A does not demand an "extrajudicial killing;" rather, the statute requires proof that a terrorist state engaged in or provided material assistance for "'*act[s] of* … extrajudicial killing.'" *See id.*, at 169-170 (quoting 28 U.S.C. § 1605A(a)(1) (alteration in original, emphasis added)).  The court explained:

> And it is a "cardinal principle" of statutory interpretation that "courts 'must give effect, if possible, to every clause and word of a statute,' *Loughrin v. United States*, 573 U.S. 351, 358, 134 S. Ct. 2384, 189 L. Ed. 2d 411 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 404, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)), suggesting that the "act of" language inserted in § 1605A(a)(1) is significant.  The term "act of" could be read multiple ways.  An "act" could refer to "a thing done" or a specific "deed." *Act, New Oxford English Dictionary* (2d ed. 2005).  But an "act" might also refer to "[t]he process of doing" something. *Act, Oxford English Dictionary* (2d ed. 1989); *accord Act, Merriam-Webster's Collegiate Dictionary* (10th ed. 2005) (defining "act" as both "the doing of a thing" and "the process of doing").  Plausibly read, § 1605A(a)(1) could encompass (1) the specific deed of an extrajudicial killing or (2) the process of committing an extrajudicial killing.  But the process of committing an extrajudicial killing does not imply that death results—meaning that an *attempted* extrajudicial killing could constitute an "act of extrajudicial killing."

*Id*. (emphasis in original).

The longstanding definition of the word "act" as used within traditional tort principles, "includes only the external manifestation of the actor's will. It does not include any of the effects of such manifestation, no matter how direct, immediate, and intended." Restatement (Second) of Torts § 2 (1965).[1]

Similarly, "act" is broadly defined in Black's Law Dictionary as "the *process* of doing or performing; an occurrence that results from a person's will being exerted in the external world." *Black's Law Dictionary* (11th ed. 2019) (emphasis added). Black's further provides that an "act" is the "external manifestation of [an] actor's will and does not include any of its results, even the most direct, immediate, and intended." *Id.*, citing Restatement (Second) Torts § 2 (1965). Further, an "act" is also defined as "anything done, being done, or to be done." https://www.dictionary.com/browse/act. To confirm its past, present, and future tenses, an "act" means a "decree or edict" as well as "the process of doing." *Id*. As such, the traditional application of the term "act" in tort law has been broadly construed. "When it is said, however, that an act is one of the essential conditions of liability, we use the term in the *widest sense of which it is capable*." *Jurisprudence* 367, John Salmond (Glanville L. Williams ed., 10th ed. 1947)) (emphasis added).

By including the phrase "by an act of" into § 1605A, Congress authorized a claim for personal injury caused by the "process" of an extrajudicial killing, an extrajudicial killing "to be

---

[1] In *Force I*, the court quoted the Restatement (Second) of Torts § 47 in concluding that it lacked jurisdiction to hear the plaintiff's claim because "the direct victim of such an attack must, at a minimum, face 'imminent apprehension,' of the 'intended harmful . . . contact,' [b]ecause 'the destruction of the [plaintiff's] home' did not qualify as an 'extrajudicial killing." *See Force* II, at 5 (internal citations omitted). However, in *Force II*, the court did not consider the definition of the word "Act" provided by § 2 of the same Restatement in analyzing the statutory language of § 1605A. Comment C of § 2 further elucidates the meaning of the term "act" stating, "[…] if the actor, having pointed a pistol at another, pulls the trigger, the act is the pulling of the trigger and not the impingement of the bullet upon the other's person."

done," and a "decree or edict" for an extrajudicial killing. That is what the express language "personal injury … that was caused *by an act of* … extrajudicial killing" means. 28 U.S.C. § 1605A(a)(1) (emphasis added). As applicable here, Iran materially supported terrorist attacks that were "external manifestations of [Iran's] will" to kill American service men and women.[2] Because Iran unquestionably intended to kill American service men and women, the fact that it was unsuccessful in actually achieving its goal in a particular terrorist attack does not insulate it from liability for personal injuries that resulted from the attack. If Congress intended for liability under 28 U.S.C. § 1605A to only apply when a state sponsor of terror successfully killed its victims, it could have said so in a clear fashion — it did not.

Thus, "act" is not and should not be limited to a completed or successful deed — the term encompasses the process of doing, the attempt to commit an extrajudicial killing. Even if inclusion of "act" creates some ambiguity, other tools of statutory interpretation, as well as Congress' intent, support a broad reading of § 1605A.

Many courts have examined the language in § 1605A when assessing attacks that involve what has routinely been called "attempted extrajudicial killing". *See e.g.*, *Force I*, at 9-10.[3] In

---

[2] Iran's plans and intent to support terrorist groups in Iraq to kill (and severely injure) Americans in Iraq is substantiated by Iran's admissions, and those of the groups it supported who committed the attacks. *See, e.g.*, Plaintiffs' Memorandum in Support of Motions Regarding Defendants' Material Support for the Subject Terrorist Organizations (ECF 84-1), at pp. 16, 60, and 96-97 (discussing statements made by Iran, including issuing *Fatwas* directing the killing of Americans in Iraq, as well as statements made by senior leaders of terrorist organizations supported by Iran and deemed responsible for terrorist attacks against Americans in Iraq and Afghanistan. *See also*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 92 (D.D.C. 2018); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 59 (D.D.C. 2019); *Pennington v. Islamic Republic of Iran*, No. CV 19-796 (JEB), 2021 WL 2592910, at 4 (D.D.C. June 24, 2021); and *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2022 WL 2817730, at 36 (D.D.C. July 19, 2022). Moreover, the weapons used against Plaintiffs can only lead to the logical conclusion that the intent was to kill the victims.

[3] Plaintiffs note that *Force II* dedicates significant effort in comparing various statutes for attempted crimes to the statutory language for extrajudicial killings at issue. However, this comparison is apples to oranges. The relative degrees of scienter within criminal violations, as

*Roberts*, the court examined § 1605A's language, purpose, and legislative history to resolve any potential ambiguity. *Id.* at 169-170. Through this analysis, the court in *Roberts* concluded that § 1605A's remedial purpose, Congress's intent in enacting the statute, and the D.C. Circuit's mandate to interpret the statute broadly in favor of terrorism victims all support construing the phrase "an act of … extrajudicial killing" in favor of imposing liability for attempted killings. *Id.* ("[i]n light of this ambiguity, the Court will interpret § 1605A(a)(1) broadly" to include attempts).

The analysis of *Roberts* is congruent with the D.C. Circuit's analysis of a different provision of § 1605A in *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 (D.C. Cir. 2013), which considered whether two attacks should be deemed part of the same "act or incident" under § 1605A. *See Roberts*, at 170. As *Van Beneden* held, § 1605A's legislative history "reflect[s] Congress's judgment that 'American citizens who have been aggrieved by any state sponsor of terrorism . . . deserve every possible means of redress available to them.'" 709 F.3d at 1167 n.4 (quoting 154 Cong. Rec. H258 (daily ed. Jan. 16, 2008) (statement of Rep. McHugh)); *see also, e.g., Roberts*, at 1703 (§ 1605A reflects Congress's intent to "lighten the jurisdictional burdens borne by victims of terrorism seeking judicial redress"). *Van Beneden* therefore concluded that, given the FSIA's "text and purpose, we interpret its ambiguities flexibly and capaciously." 709 F.3d at 1167; *accord, e.g., Doe v. Bin Laden*, 663 F.3d 64, 70 (2d Cir. 2011) ("The text, history, and purpose of [§ 1605A] make clear that the statute does not counsel a narrow reading."); *Force II*, at 12 ("As the D.C. Circuit has explained, '[c]oncerned with victims' inability to obtain redress in terrorism cases,' Congress 'enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices' and 'to prevent [them] from escaping

---

well as the impact that establishing specific conduct necessary to qualify as an "attempt" versus a fully consummated crime has on charging and sentencing in criminal prosecutions, does not provide a compelling comparison for civil tort claims such as those contemplated § 1605A.

liability for their sins.'") (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014)).

Additional details of § 1605A's legislative history, and the prior version of the section of FSIA it replaced — 28 U.S.C. § 1605(a)(7) — support the conclusion that Congress intended for courts to interpret § 1605A broadly and include claims for attempted extrajudicial killings.[4] Congress enacted the terrorism exception to punish, deter, and provide justice for all personally injured victims of terrorism, not just attacks that, whether through happenstance, actually achieve the death of at least one person. *See, e.g., Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 563 (7th Cir. 2012) (Congress adopted § 1605(a)(7), "to 'deter terrorism' directed at United States citizens and supported by foreign sovereigns as well as to 'provide justice' for victims of terrorist acts") (citing Pub. L. No. 104-132, § 221(a), 110 Stat. at 1214).[5] § 1605A's sponsors expressly highlighted the statute's broad deterrence and retribution objectives. *E.g.,* National Defense Authorization Act For Fiscal Year 2008 ("2008 NDAA"), 154 Cong. Rec. S54 (daily ed. Jan. 22, 2008) ("I believe this legislation is essential to providing justice to those who have suffered at the hands of terrorists and is an important tool designed to deter future state-sponsored terrorism.") (statement of legislation sponsor, Sen. Lautenberg); 2008 NDAA, 154 Cong. Rec. H257 (daily ed.

---

[4] Courts frequently look to the legislative history of the repealed § 1605(a)(7) to assist in interpreting its successor, § 1605A. *See, e.g., Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 57 (D.D.C. 2019) ("The relevant language of this exception did not change materially when the exception was transferred from Section 1605(a)(7) to the new Section 1605A(a)(1), so the original legislative history remains applicable.").

[5] *See also, e.g., Republic of Iraq v. Beaty,* 556 U.S. 848, 859 (2009) (§ 1605(a)(7) "was intended as a sanction, to punish and deter undesirable conduct"); H.R. Rep. No. 104-383, at 62 (1995) ("the Committee has determined that allowing suits in the federal courts against countries responsible for terrorist acts … is warranted" because Iran and other terrorist states "consider terrorism a legitimate instrument of achieving their foreign policy goals" and "have become better at hiding their material support for their surrogates"); *id.* (emphasizing the need to "give American citizens an important economic and financial weapon against these outlaw states"); *id.* at 37 (Congress enacted § 1605(a)(7) "to deter terrorist acts and to punish those who engage in terrorism").

Jan. 16, 2008) (statement of Rep. Saxton noting that § 1605A "ensure[s] terrorism victims have the legal redress against state sponsors of terrorism" and emphasizing that "it's something that is near and dear to many of our hearts, and some of us worked very closely with Members of the other body, in particular Senator Lautenberg, over several years to bring the language that we had in the original bill to the attention of the House and inclusion in the NDAA bill").

*Force II*'s extraordinarily narrowing interpretation of § 1605A that requires a consummated killing in each attack undermines those fundamental statutory objectives, and would provide absurd results wholly inconsistent with the reality of terrorism and how it is committed. Under *Force II*, plaintiffs who suffer relatively minor injuries as a byproduct of a fatal attack successfully targeting others — for example, an individual who suffers purely psychological trauma, or a flesh wound arising from a ricocheting bullet directed at a victim hundreds of feet away, or an individual who suffers a TBI as a result of an IED or an EFP — would possess a viable claim. But soldiers paralyzed and horribly disfigured in a terrorist attack specifically targeting *them*, and designed and conducted for the specific purpose of killing *them,* would have no claim if, through the heroics of their fellow soldiers or wonders of modern medicine and equipment, none of them died during the attack. That illogical, inequitable result neither accords with the statute's plain words nor promotes the deterrence and retribution objectives Congress sought to advance.[6]

*Force II* is an outlier in its conclusions. Many cases are similar to *Roberts* in concluding that attempted extrajudicial killings suffice to support liability under § 1605A. In fact, virtually every court that has considered the issue has concluded § 1605A's text, context, and history

---

[6] Moreover, the logic of *Force II* would struggle to deal with the all-to-common practice of suicide attacks. There, at least one death surely occurs, but how will the victims fare under a *Force II* application of the law? Will courts now have to conduct trials-within-trials to establish whether the death of a suicide attacker was an extrajudicial killing, or that the attacker too was a victim of terrorist organization and the spells of radicalization they cast? Such a result surely was not intended by Congress.

support that statutory construction. *See, e.g., Cabrera v. Republic*, No. CV 18-2065 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022) (Bates, J.) ("[E]ven where an attack killed no one—*i.e.*, where it caused only physical injuries—the terrorism exception continues to apply. Although '[t]he text of § 1605A(a)(1) does not expressly address attempts to commit acts' such as extrajudicial killing, courts in this District have concluded that injuries 'resulting from "deliberated" attempts to kill fall within the scope' of the terrorism exception.") (citation omitted); *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021) (Mehta, J.) ("Section 1605A(a)(1) and the court's mandate to construe ambiguities in the FSIA broadly permits the court to exercise jurisdiction where a designated state supplies material resources in an attempt to commit an extrajudicial killing."); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019) (Kollar-Kotelly, J.) (given § 1605A's legislative history and the D.C. Circuit's instruction to interpret the statute broadly, "injuries resulting from 'deliberated' attempts to kill fall within the scope of Section 1605A(a)(1)" and "[d]eploying an EFP represents a 'deliberated' attempt to kill someone"); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 98 (D.D.C. 2017) (Walton, J.).[7]

In departing from all of these decisions, Plaintiffs respectfully submit that *Force II* failed to recognize the significance of Congress's use of the phrase "*act of* … extrajudicial killing." Unlike *Roberts* and others, *Force II* found no ambiguity arising from that language. *See Force II,* at 12. This conflicts not only with the weight of authority, but also an earlier opinion in the *Force*

---

[7] Courts have also repeatedly held that plaintiffs who suffered non-fatal injuries may assert § 1605A claims related to attacks that killed other individuals. *See, e.g., Pennington v. Islamic Republic of Iran*, No. CV 19-796 (JEB), 2021 WL 2592910, at 9 (D.D.C. June 24, 2021) (Boasburg, J.); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) (Cooper, J.) ("It is not necessary, however, for one of the plaintiffs to have died in the attack in order for the state-sponsor-of-terrorism exception to apply…Because Hamas's decision to bomb a busload of civilians was deliberate, unauthorized, and resulted in the death of 23 people, it qualifies as an 'extrajudicial killing.'").

case where the court had previously found § 1605A ambiguous and held the statute permits recovery for attempted extrajudicial killings. *See, e.g., Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 360 (D.D.C. 2020) ("*Force I*") ("[T]he Court is also persuaded that the waiver of sovereign immunity includes attempted extrajudicial killings that result in serious physical injuries, even if no one is killed in the attack."). While the court in *Force II* acknowledged its total about-face on the issue, at a minimum, the shift in the *Force* rulings add credence to the findings of other courts that the "act of … extrajudicial killing" requirement is ambiguous.

### C.   *FORCE II* MISAPPLIED PORTIONS OF THE TVPA NOT SPECIFICALLY INCORPORATED INTO TO THE FSIA

Plaintiffs further respectfully submit that another basis for this Court to discount the rationale is *Force II's* misplaced reliance on the Torture Victim Protection Act. As *Force II* correctly notes, § 1605A adopts the definition of "extrajudicial killing" set forth in Section 3(a) of the Torture Victim Protection Act ("TVPA"). *Force II*, at 9-10. But *Force II* based its holding that attempted extrajudicial killings cannot support § 1605A claims on *other* TVPA provisions *not incorporated in* § 1605A. *Id.* at 16-17.

First, *Force II's* conclusion that the TVPA bars claims based upon attempted extrajudicial killings reflects a minority view.[8] More importantly, as the D.C. Circuit held in *Owens v. Republic of Sudan*, "When one statute, such as the FSIA, incorporates a definition from another statute (here

---

[8] *See, e.g., Jane W. v. Thomas*, 560 F. Supp. 3d 855, 881 (E.D. Pa. 2021) ("Courts have interpreted the TVPA to allow liability for attempted extrajudicial killings, 'even if no one died as a result of [the] attempt.'") (quoting *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017)); *Boniface v. Viliena*, 338 F. Supp. 3d 50, 67-68 (D. Mass. 2018) ("Defendant has not demonstrated that Plaintiffs' TVPA claim for attempted extrajudicial killing should be dismissed."); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 665-66 (E.D. Va. 2014) (denying defendant's motion to dismiss TVPA claim arising from an attempted extrajudicial killing), *aff'd*, 811 F.3d 653 (4th Cir. 2016); *Doe v. Constant*, Case No. 1:04-cv-10108-SHS, Dkt. 71, (S.D.N.Y. Oct. 24, 2006) (finding defendant liable for torture and attempted extrajudicial killing under the TVPA), *aff'd*, *Doe v. Constant*, 354 F. App'x 543, 544 (2d Cir. 2009).

the TVPA) it imports only the specified definition and not the broader purpose of the statute from which it comes." *Owens*, 864 F.3d 751, 776 (2017), *vacated on other grounds; Opati v. Republic of Sudan*, 140 S. Ct. 1601 (May 18, 2020).  As a result, the D.C. Circuit rejected Sudan's argument that the FSIA incorporated the TVPA's requirement that a "state actor" must commit the extrajudicial killing.  *Id.* at 775.

Second, in contrast to § 1605A, the TVPA imposes liability only where a defendant "subjects an individual to extrajudicial killing," *i.e.*, the TVPA lacks the critical "act of" language upon which *Roberts* properly turned. 28 U.S.C. § 1350 (note). *Owens* therefore demonstrates that *Force II* erred by superimposing TVPA requirements other than the definition of "extrajudicial killing" upon § 1605A, which contains very different liability requirements. *See also, e.g., Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 164 (D.D.C. 2016) ("And there is no indication that when Congress imported the definition of 'extrajudicial killing' from section 3 of the TVPA into the FSIA, it similarly meant to carry over the state-actor limitation from section 2.").

*Force II*'s reliance upon extraneous TVPA text also disregarded the two statutes' significant differences in scope and purpose.  § 1605A narrowly seeks to deter and punish the misconduct of a handful of designated state sponsors of terrorism, whereas, the TVPA applies to all state actors. The narrow focus of § 1605A has helped courts recognize that § 1605A addresses a broader scope of improper conduct than the TVPA. *See Owens*, 864 F.3d at 776 ("[T]he different purposes of the TVPA and the FSIA are plain on the face of those statutes.  The TVPA targets individual state officials for their personal misconduct in office, while the terrorism exception to the FSIA targets sovereign nations in an effort to deter them from engaging, either directly or indirectly, in terrorist acts."); *Flanagan*, 190 F. Supp. 3d at 165 (restrictions upon the TVPA's

scope do not apply to § 1605A, which "is limited solely to those foreign states that are 'designated as a state sponsor *of terrorism*'") (emphasis in original).

Here, Iran and its co-defendants implemented a long-term, concerted terrorism campaign to kill as many U.S. military personnel as possible by supporting an array of designated terrorist organizations whose goal of killing Americans in Iraq was aligned with Iran's.[9] The killing of U.S. service members in large numbers was essential to Iran's plot to cause the U.S. and its allies to abandon efforts to promote a peaceful, democratic Iraq. By design, there was a direct correlation between the success of Iran in achieving its goal of expelling the United States from Iraq and the amount of carnage wrought by Iran's terrorist proxies operating there. Interpreting the phrase "act of" as "'[t]he process of doing'" something, as *Roberts* did, Plaintiffs' injuries therefore arose from "acts of … extrajudicial killing," *i.e.,* the attacks being acute events within the campaign by which Iran intended to kill American soldiers using a large number of well-trained and well-armed terrorist proxies to break the United States' collective will to continue its mission in Iraq. While some attacks in this case do not involve a death, these attacks were nonetheless part of the process undertaken by Iran and its proxies to externally manifest their intent to cause the extrajudicial killings of many Americans in Iraq, and which Iran did in fact cause.[10]

## D.    SECTION 1605A'S MATERIAL SUPPORT ELEMENT PROVIDES AN ADDITIONAL BASIS FOR PLAINTIFFS' CLAIMS

FSIA's scope is even broader still. The FSIA explicitly authorizes a claim:

---

[9] *See* PX1 – Report & Declaration of Dr. Patrick Clawson, at paras. 209-213; PX6 – Report & Declaration of Dr. Michael Rubin, at paras. 54-57; and PX212 - Brian Fishman and Joseph Felter, *Iranian Strategy in Iraq: Politics and "Other Means,"* (West Point, NY: Combating Terrorism Center at West Point, 2008), at pp. 9, 12-13, 45, 51-54.

[10] *See* PX382 - Congressional Testimony of Brig. Gen. Anthony Tata (U.S. Army, ret.) before the House Committee on Homeland Security (Jan. 15, 2020) ("The Department of Defense reports that, at least, 602 brave Americans were killed by Soleimani's lethal IEDs. While accurate, that number is misleading. For every casualty there are historically ten-fold wounded. The math then suggests that Soleimani killed and wounded over 6,500 American servicemen and women.")

for personal injury … that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, **or the provision of material support or resources for such an act** ….

28 U.S.C. § 1605A(a)(1). The phrase "for such an act," a modifying prepositional phrase, refers to an act of either (a) torture, (b) extrajudicial killing, (c) aircraft sabotage, (d) hostage taking, or the final option—(e) provision of material support or resources. Clearly, Congress authorized a claim for personal injury ***by an act of*** (a), (b), (c), (d), ***or*** (e). In essence, the addition of (e) – "provision of material support or resources for such an act" – should be read in context and in light of the overall statutory language of this provision. *Id.*; *see also Util. Air Regulatory Group v. E.P.A.,* 573 U.S. 302, 320 (2014) (The "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'").

Congress's decision to strip sovereign immunity when a designated state sponsor of terrorism provides "material support or resources *for*" an "*act* of … extrajudicial killing" supplies an alternative basis for concluding § 1605A supports a claim for personal injuries arising from non-lethal terrorist attacks. 28 U.S.C. § 1605A(a)(1) (emphasis added); *see also id.* at § 1605A(c) (providing a claim "for personal injury or death caused by acts described in subsection (a)(1)").

The use of the word "for" is a critical factor in broadening the scope of § 1605A "material support" liability. Courts routinely look to dictionary definitions where the Constitution, statutes, or agreements use the word "for" in defining legal requirements. *See, e.g., Sissel v. United States HHS*, 799 F.3d 1035, 1043 (D.C. Cir. 2015) ("The Clause's critical word for this analysis is 'for.' The word 'for' in this context means 'with the purpose or object of.' *See Webster's Third New International Dictionary of the English Language* 886 (1981); *see also* Samuel Johnson, *A Dictionary of the English Language* 353 (10th ed. 1792) (defining the word 'for' as meaning, among other things, 'with intention of')."); *Applera Corp. v. MJ Research Inc.*, 292 F. Supp. 2d

348, 363 (D. Conn. 2003) ("The word 'for' is defined as 'with the aim or purpose of; suitable to; appropriate for.'") (quoting *Webster's New World Dictionary of the American Language* 544 (2d ed. 1984)).[11]

As those cases suggest, dictionary definitions provide that "for" is "used as a function word to indicate purpose" or "used as a function word to indicate an intended goal." *Merriam- Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/for; *accord, e.g., Macmillan Dictionary*, https://www.macmillandictionary.com/us/dictionary/american/for ("intended to help or benefit someone/something"). Legal dictionaries' definitions of "for" also emphasize the purpose or intent of the party undertaking the relevant action. *See, e.g., Skinner- Smith v. Sec'y of HHS*, 141 Fed. Cl. 348, 370 (2018) ("The plain meaning of the word 'for,' as defined by dictionaries contemporaneous to the passage of the Vaccine Act is to indicate 'purpose.'") (citing, *inter alia, A Dictionary of Modern Legal Use* 78 (defining "for" as a "general-purpose causal" conjunction)).

Congruent with these definitions, § 1605A's "material support" element hinges upon the purpose or intention of the terrorist state that provided the actionable assistance, not whether the defendant succeeded in producing the desired extrajudicial killing. Thus, a terrorist state provides "material support or resources *for*" an "*act of*" extrajudicial killing whenever that nation intends for its assistance to further the objective of killing.

This interpretation sensibly aligns with Congress' desire to punish material support that caused personal injury irrespective of when the terrorist state provided the assistance or whether it

---

[11] *Accord, e.g., AFSCME Iowa Council 61 v. Iowa Pub. Emp't Relations Bd.*, 846 N.W.2d 873, 877 (Iowa 2014) ("In the court's mind, this hinges upon the word 'for,' which is defined in this context as a function word used to indicate purpose or an intended goal.") (citing *Merriam-Webster's Collegiate Dictionary* 454 (10th ed. 2001)); *State v. Stewart*, 386 P.3d 688, 693 (Or. App. 2016) ("The word 'for,' as relevant here, is defined as 'in order to bring about or further'; 'with the purpose or object of'; 'in order to obtain . . . or gain'; or 'so as to secure as a result.'") (quoting *Webster's Dictionary* at 886).

achieved the desired deadly effect.[12] In stark contrast, *Force II's* interpretation imposes an additional requirement that Congress did not adopt (*i.e.*, a consummated killing) and shifts the statute's focus from the defendant's intent when it provided the material support to the fortuity of whether such conduct ultimately produced the desired result. *cf.* Comment C Restatement (Second) Torts § 2, *supra* at n.1.

Thus, the interpretive rules Plaintiffs provide above further support declining *Force II's* more restrictive interpretation of § 1605A's material support element.  Plaintiffs' reading comports with § 1605A's plain meaning by giving effect to Congress's choice of the word "for," as opposed to alternative language that would have made clear that only a consummated killing can support liability.  *See, e.g., Biden v. Texas*, 142 S. Ct. at 2539; *see also Roberts,* at 170.  Moreover, § 1605A's context and statutory history all favor adopting a more permissive interpretation of the statute.  *See Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) ("And beyond context and structure, the Court often looks to 'history [and] purpose' to divine the meaning of language.") (citation omitted).

Applying the interpretive principle of 1 U.S.C. § 1 further supports such a conclusion. Under § 1, "In determining the meaning of any Act of Congress, unless the context indicates otherwise—words importing the singular include and apply to several persons, parties, or things."

---

[12] *See, e.g.,* Aiding Terrorists: An Examination of the Material Support Statute:  Hearing Before the S. Comm. on the Judiciary, 108th Cong. 6 (2004) ("The chronology of a terrorist plot, I think, is best understood as a continuum from idea to planning to preparation to execution and attack, and the material support statutes enable us to strike earlier and earlier on that continuum.  We would much rather catch a terrorist with his hands on a check than on a bomb.") (testimony of then-Assistant Attorney General Christopher A. Wray concerning proposed amendments to 18 U.S.C. §§ 2339A and 2339B); *id.* at 11 (material support statutes are a "vital component" of law enforcement's efforts "to neutralize persons who occupy positions within the terrorist organizational structure but are also at a distance from the actual terrorist attacks themselves") (testimony of Gary M. Bald, Assistant Director, Counterterrorism Division, FBI).

§ 1605A eliminates sovereign immunity when a terrorist state engages in "act[s] of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such … act[s]." 28 U.S.C. § 1605A(a)(1). Such a language clarifies that the material support addressed in § 1605A can include long-term activity intended to cause multiple extrajudicial killings — like the deaths Iran sought to produce by designing and implementing its complex terrorist campaign in Iraq. Employing 1 U.S.C. § 1 to read § 1605A's references to "act[s]" in the plural thus advances Congress's intention of deterring and punishing terrorism by avoiding a statutory construction improperly focused on the vagaries of single attacks. *See, e.g., Donnelly*, 34 F.4th at 10 (relying upon § 1 in concluding that "the statute's use of the singular phrase 'an interline movement' should be interpreted to include multiple movements.").

Congress's use of material support statutes to punish and deter terrorism, and the specific context within which such statutes arose, also supports Plaintiffs' interpretation of § 1605A. *See, e.g., Torres v. Lynch*, 578 U.S. 452, 459 (2016) ("[W]e must, as usual, 'interpret the relevant words not in a vacuum, but with reference to the statutory context.'") (Quoting *Abramski v. United States*, 573 U.S. 169, 179 (2014)). Here, 28 U.S.C. § 1605A(h)(3) incorporates by reference the definition of "material support or resources" set forth in 18 U.S.C. § 2339A. The latter statute criminalizes material support for terrorism, irrespective of whether that conduct produces the desired result. *See, e.g., United States v. Stewart*, 590 F.3d 93, 119 (2d Cir. 2009) (knowingly providing aid to terrorists suffices to support a criminal conviction under § 2339A); *United States v. Mohammad, No. 3:15-CR-358, 2017 WL 2365247, at 1 (N.D. Ohio May 31, 2017)* ("By its elements, § 2339A criminalizes material support given 'in preparation for' the object offense—clearly, the object offense need not even have been completed yet, let alone proven as an element of the material support offense.").

Congress adopted § 1605A in 2008, and at the time knew that § 2339A made providing material support to terrorists a criminal offense subject to up to 15 years in prison without regard for whether that conduct caused any injury. § 1605A's specific incorporation of § 2339A's definition of material support, indicates that the courts' pre-existing interpretation of the criminal offense supports the conclusion that Congress did not intend § 1605A to require a successful extrajudicial killing. *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."); *Guedes v. BATFE*, 45 F.4th 306 (D.C. Cir. Aug. 9, 2022) at *13, (pre-existing case law provided guidance regarding whether regulation reasonably interpreted statute).

The usual interpretation of § 1605A in cases such as *Roberts*, and which Plaintiffs here submit is correct, addresses the hypothetical policy concerns expressed in *Force II* related to meaningfully limiting victims' ability to establish claims against terrorist states. Plaintiffs already must prove "personal injury or death" "caused by" conduct intended to result in "torture, extrajudicial killing, aircraft sabotage, [or] hostage taking." The statute thus already requires conduct designed to achieve particularly egregious results (extrajudicial killings), a high level of scienter (intent), and proximate causation. *Force I* also emphasized traditional tort principles appropriately limit plaintiffs' ability to assert "stretching-it claims" like those both *Force* opinions rejected. *See Force I,* 464 F. Supp. 3d at 363 (emphasizing that the *Restatement (Second) of Torts* does not permit recovery where "no one suffered physical injuries and no one was even placed in imminent apprehension of physical harm").

### E.   THIS CASE INVOLVES SIGNIFICANTLY DIFFERENT FACTS & ALLEGATIONS THAN THOSE AT ISSUE IN *FORCE II* AND JUSTIFY A DIFFERENT RESULT.

It is also significant that the court's departure from its prior opinion in *Force I* opinion was motivated by a concern for imposing liability without meaningful limits that this case does not implicate. *Force II* arose from a renewed motion for a default judgment filed by a plaintiff whose home was struck — *while no one was home* — *by* a rocket that Hamas fired into Israel. *Force II,* No.1:16-cv-01468-RDM, 2022 WL 2452606 (D.D.C. July 5, 2022), at 3-7. The plaintiff, who was not at the home at the time (and was not in the zone of danger) and did not know that her home had been struck by a rocket until after the attack, claimed only psychological injuries from seeing damage to the home. *Id.* at 5-6. On their face, the allegations supporting the claims arising from an "act of extrajudicial killing" in the form of the specific rocket attack at issue in *Force* established that the plaintiff (1) was not at the home when the attack occurred; (2) did not know the rocket struck her home until after the attack, and (3) did not perceive anyone get killed or physically injured in the attack; (4) was not related to anyone who claimed physical injuries from the attack; and (5) was not seeking *solatium* damages flowing from any personal injury suffered from the attack. In other words, the claim at issue in *Force II* is less like a claim involving an act resulting in personal injury or death, as contemplated by the FSIA, and more akin to a claim for emotional distress due to property damage which is not contemplated under § 1605A.

In sharp contrast to *Force II*, here, Iran targeted U.S. and Coalition soldiers with various forms of lethal weapons and tactics, and all Plaintiffs suffered serious injuries from the attacks because they were present at the time of the attacks at issue. The fact that each attack may not have resulted in the death of a plaintiff or other person does not mean those plaintiffs did not suffer personally injury or that the attacks were not external manifestations of Iran's intent to kill Plaintiffs and others in those terrorist attacks.

The claims in this case, unlike those in *Force II*, do not require the Court to potentially expand the scope of liability beyond what the FSIA contemplates, nor do they require the Court to depart from what other courts have routinely found to be within the scope of the statutory language and intent of 28 U.S.C. § 1605A.

## II.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that this Court should not apply the restrictive definition of "act of extrajudicial killing" first announced in *Force II*, and instead remain consistent with the text, history, and purpose of 28 U.S.C. § 1605A, as well as the preponderance of federal court decisions on the issue. To do so, the Court should find that "act of extrajudicial killing" encompasses attempted extrajudicial killings that result in personal injury, and not just deaths.

Dated: September 21, 2022.

Respectfully submitted,

By: */s/ Christopher G. Paulos*
Christopher G. Paulos
DC Bar No. 1615782
**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR, BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.**
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: (850) 435-7067
Email: cpaulos@levinlaw.com

Jeremy A. Tor (*Pro Hac Vice*)
Ohio Bar No. 0091151
**SPANGENBERG, SHIBLEY & LIBER LLP**
1001 Lakeside Ave., East, Suite 1700
Cleveland, Ohio 44114
Telephone: 216-696-3232
Email: jtor@spanglaw.co

*Counsel for Plaintiffs*