```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     ESTATE OF CHRISTOPHER BROOK
       FISHBECK, et al.,
 4                                   CA No:  1:18-cv-02248-CRC
                   Plaintiffs,
 5                                   Washington, D.C.
                                     Wednesday, September 14, 2022
 6     vs.                           9:42 a.m.

 7     ISLAMIC REPUBLIC OF IRAN, et al.,

 8                  Defendants.
       - - - - - - - - - - - - - - - x
 9

10     _____

11            TRANSCRIPT OF EVIDENTIARY HEARING - DAY 3
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
12                  UNITED STATES DISTRICT JUDGE
       _____

13     APPEARANCES:

14     For the Plaintiffs:      DAVID TESELLE, ESQ.
                                BURG SIMPSON ELDREGDE HERSH
15                              JARDINE PC
                                40 Inverness Drive East
16                              Englewood, CO 80112
                                (303) 792-5595
17                              dteselle@burgsimpson.com

18                              CHAD E. IHRIG, ESQ.
                                NIX PATTERSON, LLP
19                              8701 Bee Cave Road
                                Building 1, Suite 500
20                              Austin, TX 78746

21     For the Defendant:       (No one appeared for defendants)

22
       Court Reporter:          Lisa A. Moreira, RDR, CRR
23                              Official Court Reporter
                                U.S. Courthouse, Room 6718
24                              333 Constitution Avenue, NW
                                Washington, DC  20001
25                              (202) 354-3187
```

```
 1                    I N D E X

 2

 3     WITNESS                                          PAGE

 4     STEVE NUNEZ
            (By Mr. Teselle)...................................  ^
 5
       NICHOLAS SIEWERT
 6          (By Mr. Teselle)...................................  ^

 7     PAUL E. HAINES
            (By Mr. Teselle)...................................  ^
 8
       LARRY DIAZ CABRAL, JR.
 9          (By Mr. Teselle)...................................  ^

10     JOEL TAVERA
            (By Mr. Teselle)...................................  ^
11
       MICHAEL PREGENT
12          (By Mr. Teselle)...................................  ^

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2           THE COURTROOM DEPUTY:  Your Honor, we're on the
 3   record for Civil Case 18-2248, Estate of Christopher Brook
 4   Fishbeck et al. vs. Islamic Republic of Iran.
 5           THE COURT:  All right.  The floor is yours.
 6           MR. TESELLE:  Thank you.  Good morning, Your
 7   Honor; David Teselle from Burg Simpson in Denver, Colorado.
 8   In lieu of introducing the same people that were here
 9   before, I will introduce you to two people who were not in
10   the courtroom before or at least have not been introduced:
11   Matthew Langenberg, who is an attorney from my office.
12           THE COURT:  Good morning.
13           MR. TESELLE:  And also Carla Freeman, who is a
14   paralegal from my office.
15           THE COURT:  Good morning, Ms. Freeman.
16           MR. TESELLE:  Thank you.
17           THE COURT:  All right.  At the end of the day
18   yesterday I believe Mr. Paulos or Mr. Tor invited the Court
19   to ask any additional questions it might have.  Is Mr. Ihrig
20   in court today?
21           MR. PAULOS:  He headed home last night, Your
22   Honor.
23           THE COURT:  I did have a couple of questions about
24   a point that he made regarding class certification, and it
25   relates to the ascertainability criteria, which may or may
```

1    not be a part of Rule 23, but he noted that it might be

2    difficult to ascertain individual victims, military or

3    civilian or family members, due to redactions, and I

4    wondered whether he could provide me or someone might be

5    able to provide me more information on a database called the

6    Armed Forces Medical Examiner System, and why that database

7    would not be a viable means for at least someone, after a

8    class or hypothetical class were certified, to query and to

9    obtain information about victims and then to piece together

10   identities based on that and, perhaps, you know, after

11   action reports and incident reports and, you know, other

12   readily available material.

13           So I don't need an answer now, but at the break or

14   at the lunch hour, you know, perhaps if you could just put a

15   little bit more flesh on the bones regarding the concerns

16   about, you know, the manageability of locating particular

17   victims.

18           MR. PAULOS:  Certainly, Your Honor.  We will.

19           THE COURT:  Okay.  Thank you.

20           MR. TESELLE:  Okay.  Thank you.

21           Your Honor, today is the third day of the

22   bellwether proceeding process.  I'd like to start with just

23   a short overview of what we will present today and who you

24   will hear from and then move directly into the testimony.

25           THE COURT:  Great.

1          MR. TESELLE:  Today we will have all live

2     witnesses.  We will present the last five of the attacks.

3     We will present Mr. Steven Nunez regarding a VBIED car bomb

4     attack in April of 2005.  Second, we will present a witness

5     on behalf of Taylor Prazynski.  Mr. Prazynski was killed in

6     action.  His father John is in the courtroom here today.

7          THE COURT:  Welcome, sir.

8          MR. TESELLE:  The third witness will be Sergeant

9     Paul Haines regarding an IED attack on June 4, 2006.  The

10    fourth will be Larry Cabral regarding an EFP attack in

11    November of 2006, and then finally, in terms of the fact

12    witnesses, will be Joel Tavera regarding a rocket attack

13    that hit his Suburban in March of 2008.

14          Your Honor, I've given you -- it's been placed on

15    your desk.  We've put all of the exhibits that will be used

16    today in one binder with tabs just to orient you.  There's a

17    tab for each of the individual plaintiffs, and then at the

18    end is the expert report that's been admitted PX1003 on

19    behalf of Michael Pregent.  Mr. Pregent will then testify as

20    the military intelligence expert, and that will be our last

21    witness of the bellwether process as to the attributions of

22    the attacks.

23          THE COURT:  Great.

24          MR. TESELLE:  If I may, Your Honor, I have copies

25    of the exhibits for the witness as well, if I can put them

```
1    up so we don't have to do that.
2              THE COURT:  Yes.
3              MR. TESELLE:  And if there are no other questions
4    or preliminary matters to address, I'd like to start with
5    the witnesses.
6              THE COURT:  The floor is yours.
7              MR. TESELLE:  Okay.  Thank you.
8              I'd like to call Staff Sergeant Steven Nunez,
9    please.
10             THE COURT:  Good morning, sir.  If you could
11   remain standing, and raise your right hand to be sworn by
12   the courtroom deputy.
13                  STEVEN NUNEZ, Sworn
14                   DIRECT EXAMINATION
15   BY MR. TESELLE:
16   Q.  Good morning, Mr. Nunez.
17   A.  Good morning.
18   Q.  You are a plaintiff in this lawsuit, correct?
19   A.  Yes, sir.
20   Q.  And you understand that you're here to talk about an
21   attack and injuries that you sustained from that attack in
22   Iraq on April 5th of 2005, correct?
23   A.  Yes, sir.
24   Q.  Where are you from?
25   A.  I'm from Temecula, California.
```

1    Q.  Where did you grow up?

2    A.  I grew up all over San Gabriel Valley.

3    Q.  Where do you live now?

4    A.  I live in Temecula, California.

5    Q.  Family?  Wife?  Kids?

6    A.  Married.  I've been married for 22 years.  I've got

7    three kids; two daughters and a son.

8    Q.  Ages?

9    A.  15, 13, and 11.

10   Q.  Now, you were an active member of the armed services in

11   Iraq, correct?

12   A.  Yes, sir.

13   Q.  When did you join the military?

14   A.  I actually joined the U.S. Army back in November of

15   1990.

16   Q.  Okay.  And when were you deployed to Iraq?

17   A.  So I was a member of the California Army National Guard

18   at the time.  We had deployed -- we got activated back in

19   2004, and we deployed to Iraq in 2005.

20   Q.  And where were you based?

21   A.  We were based in FOB Falcon, which is just south of

22   Baghdad.

23           MR. TESELLE:  If I may approach the demonstrative,

24   Your Honor?

25   Q.  If I -- this is a map of Baghdad.  I believe you've had

1    a chance to look at one of these?

2    A.  Yes, sir.

3    Q.  Were you based in this area of Baghdad?

4    A.  So right at the intersection just south of Al-Rashid.

5    Q.  Right here roughly?

6    A.  A little towards the road.  Right there.

7    Q.  Okay.  You were here.  And we'll talk about it shortly,

8    but the Al-Dora district where the attack occurred was in

9    this area, correct?

10   A.  Yes, sir.

11   Q.  What was your battalion's general mission in Iraq?

12   A.  So the mission when we got in there was basically to

13   conduct security patrols in the neighborhood, in that area

14   that Dave pointed out, just east of what was Route Sonic,

15   which is that road that goes up towards the airport towards

16   the capital.  So we had everything from that intersection

17   where Al-Rashid is at all the way to that first north route

18   that goes into the peninsula.

19   Q.  And when you were doing patrols, can you describe for

20   the Court what you mean by that.  What did that entail?

21   A.  So that's -- being a very urban area, basically like

22   where are we are today, we had a mix of different

23   neighborhoods, very compact, they urban.  So depending on

24   where you were at in there, you had farmland stuff, some

25   rural stuff, up to huge mansions, very opulent kind of

1    places.  It just depended on what part of town you were in.

2           So we broke it down into different area --

3    different neighborhood.  They call them mahallahs.  We were

4    basically conducting a mission to go out on patrol.  We did

5    day patrols.  We did afternoon patrols.  We did night

6    patrols.  On this particular day they were doing an early

7    morning patrol.  We were -- basically picked out a

8    neighborhood that we hadn't been into yet and just -- pick a

9    neighborhood, proceed in there, start kind of -- drive

10   through there.  If we saw any kind of graffiti or anything

11   unusual we'd get out, dismount, and investigate it.

12          So that morning that was a mission like that.  We

13   did have a water -- a power plant that we had folks

14   stationed at 24/7, so that was usually the first stop.  We'd

15   go in there and check in, see how everybody's doing, and

16   we'd go into the neighborhoods from there.

17          So the mission that morning was we were checking

18   water facilities.  So we went up to the water plant, checked

19   with the staffers to see how things were going.  We were

20   actually proceeding through the Christian neighborhood

21   towards the river --

22          THE COURT:  Sir, move a little closer to the

23   microphone.

24          THE WITNESS:  A little closer to the -- I'm sorry.

25   And if I start talking too fast --

```
 1              THE COURT REPORTER:  You're talking too fast.

 2   Q.  Why don't I ask a couple of questions to get you back to

 3   where you were at.

 4              THE COURT:  We have plenty of time.

 5   Q.  No rush.  We're going to get through it today.

 6   A.  Yes.

 7   Q.  So thank you for describing the typical work that you do

 8   when you're doing the patrols.

 9              How many vehicles typically in a convoy?

10   A.  So we would have four gun trucks.  We'd have two squads.

11   We had -- well, one squad would be driving and going in.

12   The other one would be a dismount element.  So we had, what,

13   16 folks.

14   Q.  And the date of this attack was April 5th of 2005?

15   A.  Yes, sir.

16   Q.  Okay.  On that day -- tell me what the mission was on

17   that specific day.

18   A.  So, again, we were doing our presence patrol, security

19   patrol.  We were going to go check on the water facilities

20   in our sector, kind of get a status on them, see how they

21   were doing, see if they needed anything.

22   Q.  How many vehicles were in that convoy?

23   A.  We had four.

24   Q.  And what vehicle -- what number vehicle was yours?

25   A.  I was the platoon sergeant at the time so I was the tail
```

1   gunner, so I was Truck No. 4.

2   Q.  Okay.  So you were the tail --

3   A.  Uh-huh.

4   Q.  -- of the convoy?

5   A.  Uh-huh.

6   Q.  And if you can describe for the Court, who was in your

7   vehicle and in what locations were they?

8   A.  Okay.  So I had -- there was five of us in the trucks.

9   So I had -- Specialist Caudillo was my driver, so he was

10  basically on my left.  I had -- Specialist Watkins was my

11  gunner.  He was would be in between us in the gun hatch.  I

12  was in passenger seat up front in the truck commander's

13  position.  I had the platoon medic in my vehicle behind the

14  driver, and I had one of my team leaders, Sergeant Moran

15  sitting behind me, in the passenger seat behind me.

16  Q.  So you were the truck commander that day, right?

17  A.  Yes, sir.

18  Q.  Was this an up-armored vehicle that you were in?

19  A.  So it was a Humvee.  It was kind of the vehicle they had

20  before they came out with the 1114, the up-armored ones.  So

21  these were 1026 hatchbacks with armored plates that they

22  welded onto the vehicles.

23  Q.  What was your rank on the date of April 5, 2005?

24  A.  I was a staff sergeant.

25  Q.  And what was your MOS?

```
 1    A.  11 Bravo.

 2    Q.  Okay.

 3    A.  So that infantry.

 4    Q.  Now, tell me about what time did you leave the base that

 5    morning?

 6    A.  Between 5:30 and 6:00.

 7    Q.  Okay. Tell me about the patrols that leads up to the

 8    attack.

 9    A.  Okay.  So, again, we left FOB Falcon, went up the main

10    road, which was Route Irish.  Got up to the Route Sonics,

11    which is the road going east/west just north of where it

12    says Al-Rashid.  We went ahead and hung a right.

13    Q.  Sir --

14    A.  Yes, sir.  Went up to the power plant, which is just

15    north of the Al-Dora marketplace area.  Checked in --

16    checked in the with the guys that were working there, see if

17    they had any activity that night.  They said it was pretty

18    quiet.

19              So I hung out there for a little bit, got some

20    Intel from them.  And then we went out into the neighborhood

21    immediately east of there, which is the Christian

22    neighborhood.

23              Went through there.  Everything looked calm,

24    quiet.  Looked like it usually did.  Checked out some water

25    facilities up in the river, in that area right there.
```

1    Walked around, checked that out, took some pictures.

2           And then we proceeded through the neighborhood,

3    which, while we were doing so, we came across a house that

4    we had previously been in before, found some graffiti on it.

5    So we went in and investigated, found some weapons in there.

6           So as the patrol was going through, everybody was

7    driving through the neighborhood, I did happen to see -- to

8    my left I saw two individuals running through houses with

9    their faces covered up.  And I wanted to tell the guys to

10   stop so we could see what was going on and follow up, but my

11   guys -- you know, it was a detail truck so the guys were

12   going so I said I'll worry about it later.

13           Proceeded --

14   Q.  What did that mean to you, if you saw two individuals

15   with their face covered up, based upon your prior

16   experience?

17   A.  So based on my experience from what I had seen in town

18   and being there a few months, most folks would have, you

19   know, head wraps on, their heads covered.  But you could see

20   their faces.  The only ones that I would see down there that

21   would have their faces covered would be like the shepherds

22   out there that are out there working the fields with their

23   herds of goats or whatever that they're doing out there.

24           These particular individuals had their faces

25   covered, and they were running away.  So usually, if you saw

1  someone with their faces covered, they're doing something

2  they're not supposed to.

3          So that really had bells going off in my head;

4  that, hey, these guys are running away from something.  We

5  should probably investigate.  But my patrol was already

6  picking up speed so we had to catch up, so I was like I'll

7  have to worry about that later.

8  Q.  Okay.  So what happened next?

9  A.  So we proceeded down, again going east along the roads,

10  came down that north/south road and got on Sonics and hung a

11  right.  And there's an area there.  It's kind of a mix of

12  open fields.  There's a tech -- like a tech university there

13  that's -- we'd been in there before, worked a couple of

14  neighborhoods in the prior.  And then there's a nursery just

15  west of there, and it goes in another area of more houses

16  and stuff.

17  Q.  So trees and shrubberies and things like that when we're

18  talking about --

19  A.  So the notion is that what you were picking up on the

20  nursery here, palm trees, plants, trees, you know, stuff in

21  pots and that kind of stuff, so just like you'd have a

22  nursery here.

23  Q.  Okay.

24  A.  We had previously run into IEDs in that -- or right

25  across from that vicinity so there was usually a stack of

1     rocks right out front, which we kind of -- I figured they

2     used that as a marker to kind of figure out your speed when

3     you came to it, when they could pop it.  So that was a known

4     IED location from previous patrols.

5            So we came up there.  As we're working to it my

6     lead truck found the water facility we were looking for,

7     so I got up on the radio, hey, we found the location, and

8     they came to a stop.

9            So we were pretty spread out.  We probably --

10    Q.  Can you -- I think it's important just so that we have a

11    picture of the scene --

12    A.  Yes.

13    Q.  -- when we talk through this.  I think it's helpful.

14           Typically, when you would stop, you wouldn't --

15    all four vehicles wouldn't stop bumper to bumper, correct?

16    A.  No.

17    Q.  Okay.  Can you describe the distance in between and why

18    you would do that for safety purposes.

19    A.  So this is between vehicles, when we would stop, go to a

20    location it would be you'd see -- the front of my vehicle

21    would be right here.  Next vehicle would probably be about

22    the double doors over there.  So we'd have enough space in

23    there in case anything blew up it wouldn't take out both

24    vehicles.

25    Q.  Okay.

1    A.  And I'd still have visual eyes set up so we'd watch each

2    other and have the security that way.

3    Q.  So at that point in time the four vehicles in the

4    convoy, the four trucks, are at a stop?

5    A.  Yes.

6    Q.  Anything unusual at that point?

7    A.  So as we were moving our way up, got a radio call about

8    a blue Chevy Caprice parked on the side of the road in front

9    of the nursery.  I already had two vehicles that by the time

10   we came to a stop had gone by it.  So the third truck had

11   just passed it when we stopped, so it was in between --

12   Q.  Truck 3 and Truck 4.

13   A.  -- my truck -- yes, and my truck, which was Truck 4.

14            So they had creeped by it and gone past it, and we

15   hadn't gotten to it yet so we were -- we were kind of

16   keeping -- I was watching it.  My gunner was covering our

17   rear security because we were stopped.

18   Q.  Okay.  What happened next?

19   A.  So once that -- I got a call that, hey, they find the

20   site.  I'm like, hey, we need to tighten up.  We're too

21   spread out.  So let's consolidate, push forward, and -- so

22   we can all connect up there.

23            So I headed toward -- my vehicle started pushing

24   through, and as we came up to the vehicle, started watching

25   the vehicle.

 1    Q.  So the vehicle's alone, right?

 2    A.  So the blue vehicle is parked on the side of the road.

 3    It's running.  The windows are blacked out, and there's no

 4    one in it.  I'm like, that's kind of odd.  Based on the

 5    intelligence we were getting, that was signs that this could

 6    be a potential car bomb.

 7         So we started to look at the suspension on it, see

 8    if it looked weighed down, which it didn't look any more

 9    than usual because they tend to put a lot of stuff in their

10    vehicles.

11         So we start creeping up on it.  I'm looking at the

12    rear-view -- or looking at the back windows that are blacked

13    out.  See it's a taxicab.  It's running.  Look in the

14    driver's seat.  There's no one in it.  I was like, all

15    right.  Hold on.

16         I was about to look into my window, looking into

17    it.  I was about to open the door and get out and

18    investigate, and then the hairs on the back of my neck start

19    standing up.  I'm like, all right, nope.

20         Let go of the handle, tell my driver to hit the

21    gas, and went to grab my gunner to pull him down, and that's

22    when it went off.

23         MR. TESELLE:  Can you pull up...

24    Q.  Now, when the blast happened, you were in the passenger

25    seat.  How far away from the Caprice were you?

1    A.   Okay.  Microphone.  It was right there.

2    Q.   But for you, you had armor.  The armored part of the

3    vehicle was right in the door next to you, correct?

4    A.   Yes.  So if you can see from the picture there, I had --

5    Q.   I was going to ask you.  Is this the picture of your

6    vehicle immediately after the event?

7    A.   Yes.

8    Q.   Okay.  And can you -- so describe what we're looking at

9    for the Court and for the record.

10   A.   So this is the end result of what my truck ended up at

11   after the VBIED went off.  It picked us up -- picked us up

12   and turned us about a quarter turn.

13   Q.   Okay.  And is that -- are we looking at the passenger

14   side door?

15   A.   That door, that first door, that front door, that's the

16   door I came out of.

17   Q.   And after the explosion you lifted the area.  You land

18   there.  What do you remember happening next?

19   A.   So what I do remember was seeing -- and before the car

20   exploded, I do remember seeing a flash going from my left to

21   my right to the car, and then up it went.  And the first

22   thought was that was just like the video that they showed us

23   in Kuwait.  And then next thing you know, I'm looking at the

24   field.  Previously I was looking at the road.

25            I'm looking at the field that is just this way of

1    this picture, so we have the -- I'm looking at the nursery,

2    and I feel like I'm in a recliner, because, if you can tell

3    from the picture here, that actually snapped the frame in

4    half, so we were leaning up in there.

5              I came to, and I'm like we're going to get

6    ambushed.  The TTPs at the time and the attacks that we were

7    seeing out there was -- the insurgents would hit you with an

8    IED or a car bomb, and then they would ambush you.  So that

9    was the first thing that came into my mind.  I said I've got

10   to get up for security.

11             As I came to, I looked over to my right or my left

12   and see my gunner is down, and immediately I'm thinking my

13   buddy's mom is going to kill me because her son's dead in my

14   car.  And then I realized that he was in the vehicle ahead

15   of me, and that's Watkins.

16             I look at my driver.  He got up, got out of the

17   vehicle, turned the vehicle off and fell out, and then I

18   went to open the door.  It wouldn't open so I had to pop it

19   a couple of times with my arm.  And in the meantime my whole

20   right side felt like it was on fire.  I think it was a flash

21   burn from the explosion.

22             I get out -- wrench my back, get out.  Both my

23   ankles are -- feel like they're broken because they're

24   burning.  Get out.  Look around.  I can see a crowd of folks

25   on the road behind us looking at us, and then I see a guy in

1    the nursery right across the street digging.

2             So I'm like, all right.  I grab my guys, get them

3    out of the vehicle, put them behind the vehicle, and then I

4    start moving over across the street to set up security to

5    secure the area while my -- the other vehicles ahead were

6    coming to us.

7             As I'm going to the street, I see my guys are

8    coming to -- some of the other vehicles are coming back to

9    us.  So I'm like, okay, they've got my wounded.  I'll go set

10   up security and take a knee.

11            And I'm watching this guy that's digging a hole.

12   He never -- I was waiting for him to put his head up to see

13   if he was going to, you know, watch us, which he never did,

14   so I put my rifle down.

15            And by that point my guys had already come back

16   and were working on my guys, so I just went back to the

17   truck -- to this Humvee, and I just sat down and let my guys

18   take care of the rest of it.

19            By this point, the other three vehicles, the

20   dismounts --

21            THE COURT REPORTER:  I'm sorry, what?

22   Q.  Slow down.

23   A.  The dismounts from the other vehicles that were ahead of

24   us --

25            THE COURT REPORTER:  Other...?

```
1              THE WITNESS:  Other vehicles.

2    A.  -- had come to us and set up security.

3    Q.  Now, was anyone in your vehicle killed in the attack?

4    A.  So my gunner, Watkins, he was killed on the spot.

5    Q.  So was he up and out of the vehicle?

6              When you talked about reaching up, is that who you

7    were reaching for at the time?

8    A.  Yes, sir.  He was up in the hatch looking at the vehicle

9    and then looking at the crowd behind us.

10   Q.  Now, talk about -- were you injured in the attack?

11   A.  I was.

12   Q.  Okay.  And were the other individuals injured in the

13   attack?

14   A.  So the way I was positioned, since I was turning, I

15   ended up breaking my right foot.  My driver and the two

16   sergeants behind me, from the knees down, they had to get --

17   basically massive wounds, ended up having to get all of

18   those reconstructed on both legs.

19   Q.  And is that -- basically what you described was you were

20   lifted off the ground and then slammed back down?

21   A.  Uh-huh.

22   Q.  And that's when the lower extremities came into play?

23   A.  Yes.  Based on the injuries, the blast -- the force of

24   the blast went through the floorboards.  It came up from

25   underneath.
```

```
 1    Q.  Okay.  Did you also -- you've been diagnosed with a

 2    traumatic brain injury?

 3    A.  They didn't know what it was at the time, but when I got

 4    my evaluation, yes.  I was evaluated and...

 5    Q.  Okay.  You were -- after this attack and after the

 6    injuries you sustained, you were taken back to the States,

 7    correct, because of the injuries?

 8    A.  Yes.

 9    Q.  Can you tell the Court what you wanted to do the next

10    day after the attack before you were -- before they sent you

11    home.

12    A.  So after this happened I got put in a cast and returned

13    back to the barracks.  The rest of my partners in my vehicle

14    got medevac'd to Germany and the States.  So I ended up

15    going back to the barracks that afternoon after this

16    happened.

17              Next, one of my roommates told me they was going

18    back out to this location to go find out what happened and

19    go talk to somebody, so I'm like, "All right.  Well, good.

20    Tell the vehicles I'm coming down."

21              I was on my crutches in my cast, had all my stuff

22    on, was hobbling down the stairs, getting ready to go on

23    patrol when my first sergeant stopped me on my way down.

24    He's like, "Where are you going?"

25              I said, "I'm going to patrol."
```

1          He said, "No, you're not."

2          I'm like, "Yeah, I am.  These gays hurt my friends

3     and killed my buddy.  I'm going to go out there."

4          He's like, "Look, genius, how am I going to

5     explain it to your wife that if you get hit and get killed

6     in another attack out there that you're in the driver's seat

7     in a cast?"

8          I was like, "You've got a good point."

9          He said, "Go upstairs.  Let them handle it."

10          "All right, First Sergeant."  And I went upstairs.

11     Q.  Now, Mr. Nunez, were you able to bring home a piece of

12     the shrapnel of what hit you from the car bomb?

13     A.  I was.  When I came back from the hospital, my compadres

14     that secured the area provided me with that piece of the 122

15     rocket that was in the trunk of the vehicle that got us.

16          MR. TESELLE:  May I approach, Your Honor?

17          THE COURT:  Sure.

18     Q.  Is this what -- was this what you brought along with

19     you?

20     A.  Yes.

21     Q.  Can you show that to the Court, if the Court wants to

22     handle it.

23          So what is that, so the Court knows what he's

24     dealing with?

25     A.  That is the remnants of a 122-millimeter artillery

```
 1    shell.  There were four of these in the trunk of the vehicle
 2    that blew up next to us.
 3    Q.  In terms of the traumatic brain injury, can you describe
 4    for the Court the type of issues that you've been dealing
 5    with in terms of either memory or headaches and things like
 6    that.
 7    A.  So I was diagnosed with TBI.  I have short-term memory
 8    loss.  I can't remember anything.  If I don't write it down,
 9    I'm not going to remember anything.  Anger issues.  Sinus
10    headaches.  PTSD.
11    Q.  Okay.
12    A.  My feet on my left -- on my right foot, I can't be on a
13    ladder.  I can't do construction work anymore.  I have to
14    have insoles in my shoes otherwise it aches.  When it gets
15    cold or starts raining, it aches a lot, so that's something
16    I'm still dealing with.
17            As far as anger issues and PTSD and stuff
18    resulting from this experience; you know, didn't really
19    address it until a couple of years ago so it seems like I'm
20    starting to work on those issues resulting from this.
21    Q.  Did you receive a Purple Heart as a result of this
22    attack?
23    A.  I did.
24    Q.  Did you receive other commendations as well?
25    A.  I got a CIB.  I got this one right here out of that one.
```

1   Q.  Okay.  Now, did you know -- did you have any idea of

2   the -- who the insurgents were who attacked you on the day?

3   A.  So in the area we were operating in previously to us

4   coming into the area in '05, '04 you had the Mahdi Army.  It

5   was -- Al-Sadr's religious militia was very active in the

6   area.  You had Sadr City in that vicinity over there.

7           So the area that we were working, that

8   neighborhood, that whole district was a known Mahdi Army hot

9   spot, and so that's why -- we were advised by the unit we

10  relieved right away just keep an eye out for anybody green.

11  Green headdress or any kind of green bandanas on, those are

12  the Mahdi folks.  So if you see those guys, something's

13  about to happen.

14  Q.  Now, you had done two other tours, correct?

15  A.  After this one I did.

16  Q.  Okay.  Tell me about -- in your third tour where were

17  you located?

18  A.  Well, my first tour was in two parts, so do you want me

19  to talk about that --

20  Q.  Yes, please.

21  A.  Okay.  So that's who we were dealing with up to the

22  point that I got hit and medevac'd out.

23           When I returned in July, after I healed up, I

24  wanted to go back.  They could have sent me home, but I --

25  my buddies were there, and I didn't want to leave them

1   hanging, so I wanted to get back to my guys and bring them

2   home.

3          So I redeployed back, hooked up with my unit.  By

4   this point we moved south so all that east/west road where

5   it says Al-Rashid, we were working on that farmland just out

6   to the edge of the river, to the east of the Tigris.

7          So the folks we were dealing with over there in

8   that vicinity, when I got back, intelligence saying we were

9   dealing with Sunni -- or an the Anwar [sic] Al-Sunnah, the

10  Al-Sunnah group, which was the Horhjeb --

11          THE COURT REPORTER:  Spell that, please.

12          THE WITNESS:  Which one?

13          THE COURT REPORTER:  Horhjeb.

14          THE WITNESS:  Horhjeb, H-O-R-H-G -- J-E-B.

15  A.   That was actually attached to an armored company, so we

16  were working just east of there.  My organic company was

17  working there, so I didn't really work that area much.

18          But it was the Al -- the Al-Jiburi tribe is very

19  active in that area, which I come to find out later.  In a

20  book that I gave to Dave to reference -- I think it's called

21  *Fiasco* -- they talk about this tribe as being one of the

22  most organized insurgent groups in the area.  We were

23  dealing directly with those guys for the later half of my

24  deployment, from July up until we redeployed to the States

25  in February.  It was at that time that EFPs started

1    appearing on the scene and started arriving all over the

2    place, so that was a new nuance that occurred while we were

3    there.

4               And as those started to appear on the scene, we

5    were curious, like where are these coming from because this

6    is -- this is a lot more sophisticated than what they've

7    been doing previously.  Before we got there, it was Coke

8    cans, artillery shells.  They put them in dogs or bodies or

9    put them along the guardrails along the highways.  While we

10   were there, they kind of improved.  They were doing -- they

11   tied multiples together and doubled them up and put them in

12   vehicles and that kind of stuff.

13              So these were showing -- these shaped charges were

14   showing up out of nowhere, so we're like, where are these

15   coming from?  This is kind of out of the realm.  And we'd

16   heard that, you know, they've been seen.  They're getting

17   training from somebody.  So when these things started

18   appearing we started researching -- our intelligence started

19   researching, and we started getting videos of stuff that was

20   coming on -- Hezbollah was doing in Lebanon to the Israelis

21   where they'd use these on tanks.

22              So once we got our hands on those, we were like

23   okay --

24              THE COURT:  Slow down just a little bit.

25              THE WITNESS:  Okay.

 1              THE COURT:  I know this is a foreign context, but

 2      just to let you know, we need to get everything down for the

 3      record.

 4              THE WITNESS:  Okay.  All right.

 5      Q.  Now -- I'm sorry.

 6              THE COURT:  And maybe we can lead him a little

 7      bit?

 8              MR. TESELLE:  Yes, I will.  Thank you.

 9              THE COURT:  Go ahead.

10      Q.  At some point in time during your tours, did you come

11      across actual Iranian nationals that you had actually

12      captured?

13      A.  On my third trip I did.

14      Q.  Okay.  Can you describe for the Court that experience.

15      A.  Yes.  So that experience was on -- my third deployment

16      was in '07/'08.  We were actually doing a team operations

17      mission that go around working in Baghdad.  One of the

18      missions that I had was a -- we had a mission to do a

19      detainee swap to the Iranian embassy, and we had two Iranian

20      prisoners that we were doing a -- dropping off as an

21      exchange for two American prisoners that they had.  So that

22      confirmed, in our minds, those of us that were on our OIF3

23      deployment that were with me on the OIF7 deployment, that,

24      yeah, these guys were definitely engaged in what was going

25      on with all the insurgency groups in the area.

1    Q.  Now, did you prepare -- if you look at the book --

2    there's two books there, and the one on top is Binder 1.  It

3    has tabs, and the first tab has your name on it, and it's

4    highlighted in orange so you can see it.

5            And if you look at the first tab that says

6    "Plaintiff Fact Sheet," PX2110, do you see that?

7    A.  Yes.

8    Q.  Did you provide the information that is contained in

9    this fact sheet, sir?

10   A.  Yes, sir.

11   Q.  And you've reviewed this for its accuracy?

12   A.  Yes, sir.

13   Q.  And is it accurate and complete?

14   A.  Yes, sir.

15   Q.  And did you actually sign this fact sheet on Page 9?

16   You can take a look.

17   A.  Yes, sir.

18   Q.  And this contains all of the attack information

19   regarding your attack as well as the injuries that you

20   suffered as a result, correct?

21   A.  Yes, sir.

22   Q.  Did you also prepare a declaration in this case about

23   what -- the attack and the injuries that you suffered?

24   A.  I did.

25   Q.  If you look at PX2102, sir.  Is that the declaration

1     that you prepared?

2     A.  Yes, sir.

3     Q.  And is that true and accurate, to the best of your

4     knowledge?

5     A.  Yes, it is.

6     Q.  And you executed that as well, correct?

7     A.  Yes, sir.

8     Q.  Mr. Nunez, is there anything else that you want the

9     Court to know today about the attack or what you went

10    through?

11    A.  You know, this happened back in '05.  Still working my

12    way through it and dealing with issues resulting from this

13    attack.  I actually did have an opportunity to meet up with

14    my medic that was in the attack with me behind the driver's

15    seat while I was here last two days.  I was actually able to

16    get his thoughts and his recollection of what actually

17    happened, so I know for both of us it was good to get that

18    out and share that.

19          For those of us that went through this, you know,

20    it's still kind of a -- it's getting easier with time, but

21    it's still there and still seeing a lot of ramifications

22    with it.  So I know for me this is kind of a good way to

23    kind of close that book and move on and make sure that the

24    guys -- entities that were behind the attacks that killed 18

25    of my friends in my deployments get dealt with and my

```
 1    friends get their due.

 2              MR. TESELLE:  Thank you, sir.

 3              THE COURT:  Thank you for your testimony,

 4    Mr. Nunez.  What do you do now?

 5              THE WITNESS:  I'm actually an emergency manager

 6    over at Southern California Edison, for the power company.

 7              THE COURT:  Or I should say what do you do now

 8    other than being a dad?

 9              THE WITNESS:  I train -- I train emergency

10    operations staff when bad things happen.

11              THE COURT:  All right.

12              MR. TESELLE:  Thank you, Your Honor.

13              THE COURT:  I don't have any further questions.

14    Thank you very much for your testimony.  You're excused, and

15    have a safe trip home.

16              THE WITNESS:  Thank you, sir.

17              MR. TESELLE:  Your Honor, our next witness that we

18    call is Mr. Nicholas Siewert.

19              THE COURT:  Good morning, sir.  Please stand up,

20    raise your right hand and be sworn.

21                        NICHOLAS SIEWERT, Sworn

22                          DIRECT EXAMINATION

23    BY MR. TESELLE:

24    Q.  Good morning.

25    A.  Good morning, sir.
```

1    Q.  Can you please state your current address.

2    A.  26239 Ayersville Pleasant Bend Road, Defiance, Ohio.

3    Q.  And you were a member of the armed services who served

4    in Iraq, correct?

5    A.  Yes, sir.

6    Q.  And you understand that you are not a plaintiff in this

7    action, correct?

8    A.  Yes, sir.

9    Q.  You're not?

10   A.  That's correct.

11   Q.  And you understand that you're here to testify regarding

12   the attack on a Taylor Prazynski, correct?

13   A.  Correct.

14   Q.  How did you know Taylor Prazynski?

15   A.  I joined the Marine Corps after high school.  I was

16   assigned to Third Batallion, Eighth Marines.  I met Taylor

17   in January of 2005.

18   Q.  Okay.  And were you deployed to Iraq with Taylor

19   Prazynski?

20   A.  Yes, sir.

21   Q.  When were you deployed?

22   A.  Mid -- early to mid-January of 2005.

23   Q.  Okay.  So you met him in Camp Lejeune in late 2005?

24   A.  Early 2005.  When I got to Third Battalion, Eighth

25   Marines, it was December of 2004.  Our battalion commander

 1    came to us and said, "Hey, we're going to Fallujah.  You

 2    have ten days."

 3              So they sent us home for our family.  We came

 4    back, and I met my unit the day before we traveled out of

 5    country.

 6    Q.  Where were you stationed in Iraq?

 7    A.  Camp Fallujah.

 8    Q.  Okay.  And along with Taylor Prazynski, correct?

 9    A.  Yes, sir.

10    Q.  And what was the battalion's mission?

11    A.  Our initial mission when we first got to camp Fallujah

12    was to help provide security for the ongoing election that

13    was happening there at the cement factory.

14              After the elections had completed, we did a lot of

15    weapons caches, a lot of security patrols.  In the evenings

16    we would do a lot of hard hits and a lot of soft hits on --

17    outside of actually the city of Fallujah.

18    Q.  Okay.  And who were you dealing with in Fallujah in

19    terms of the insurgents that you were --

20    A.  We were told Al-Zarqawi was our main individual in the

21    area.  We had a list of gray targets and black targets that

22    we believed that were IED makers, mortarmen.  They were all

23    supporting the terrorist actions.

24    Q.  Okay.  And was part of your mission for the battalion

25    was to try to track down Al-Zarqawi?

1    A.   Yes, sir.  At RAO of the Camp Fallujah area, the OP4,

2    of -- the four platoons of Lima Company made it a priority.

3    We really believed he was operating in our area.

4    Q.   Okay.  So you were -- in early 2005 you were at Camp

5    Fallujah.  At some point in time did the -- was the decision

6    made to move further out from Camp Fallujah and establish a

7    FOB?

8    A.   From the beginning of the employment, we always pushed

9    outside of Camp Fallujah.  We were out in -- Karmah was a

10   little town out there right away that we were at.  We called

11   it Camp Karmah.  It was just a house we had taken over for a

12   few weeks, set up some house surveillance, and then we

13   pushed even farther out to OP4 at about April or May of

14   2005.

15   Q.   Now, can you describe Outpost 4 for the Court.

16   A.   Outpost 4 was -- I believe it was an old -- I'd call it

17   a warehouse now.  It's just an open building.  It had two

18   bays in it that were big enough to fit about two platoons of

19   Marines.  We were on one side.  On the other side was -- we

20   had the Iraqi Army with us.

21        There was a fence all the way -- it was a concrete

22   wall, not a fence, a concrete all the way around OP4.  And

23   then we were more out of the outside -- in the countryside

24   of Karmah, Iraq.

25   Q.   Okay.  So there was -- there was a -- was there a wall

 1    around the outside?

 2    A.  Yes, sir.

 3    Q.  And was it a tall wall?

 4    A.  Yes.  I would say over eight-foot tall wall.  The top of

 5    our building -- it was a very high building we were in.  We

 6    had security on top of the building.  And when we were

 7    sitting in front of the building and security in a seven-ton

 8    you couldn't see over that wall.  You had to look down more

 9    of the avenues of approach.

10    Q.  Okay.  And then between the wall and the entrance to

11    Outpost 4 and the barracks, about how far was that?  How

12    wide was that?

13    A.  About the width of a two-way highway.

14    Q.  Okay.

15    A.  We could get Humvees in and Humvees out at about the

16    same time.

17    Q.  What was the date of the attack on Taylor Prazynski, if

18    you recall?

19    A.  May 9, 2005.

20    Q.  Okay.  What was your rank on that day?

21    A.  I was a lance corporal.

22    Q.  And what was your MOS?

23    A.  0331, machine gunner.

24    Q.  Okay.  What was your mission on that day?

25    A.  That morning I really -- I believe I got off post that

1    morning, and I had a little bit of rest time.  We would

2    rotate between patrols, post and downtime within a 24-hour

3    period.  It was about eight, eight, and eight.  So it was

4    eight hours patrol, eight hours of sleep, eight hours of

5    post.

6              I believe I had just got off post that morning.  I

7    was laying down to relax, and then we got a call that

8    afternoon that there was an IED out on the S curve.

9    Q.  And what's the S curve?  Can you describe that.

10   A.  Just south of our -- north of our OP4 there was a very

11   sharp curve in the road.  We called it the S curve because

12   we had to slow down to about five to ten miles an hour to

13   get through it.  It was a very known hot spot for IEDs.  We

14   had a -- Lance Corporal Postal from our unit passed away at

15   that intersection while we were establishing OP4.

16             There was a house there that we set up security on

17   to try to catch people dropping the IEDs.  At that point

18   they would -- they had the floors hollowed out so they would

19   just drive on by and kick it out the bottom of their floors

20   as they were driving, and they wouldn't even have to get out

21   of their vehicle at that time.

22             So it was a daily, if not multitime of day, that

23   there were IEDs on that intersection or that S curve.

24   Q.  Was Taylor Prazynski on that mission that day with you?

25   A.  No, sir.  He was in the seven-ton providing security at

1   the post with Marcus Mahdee.

2   Q.  Okay.  I'll represent to you the person in that

3   picture -- it's in the plaintiff fact sheet -- is Taylor

4   Prazynski.  Is this the seven-ton that you were referring

5   to?

6   A.  Yes, sir.

7   Q.  Okay.  And was he back, then, at Op -- at, excuse me --

8   at Outpost 4 providing security at the outpost?

9   A.  Yes, sir.  This seven-ton was focused on -- orientated

10  towards the entrance of OP4.  When we -- there was a two-man

11  post.  There would be one person in it sitting down and

12  another person either in that machine gun ring at the top of

13  the Humvee or the top of the seven-ton, or sometimes he

14  would operate also -- kneel more lower in there.  And that

15  was orientated to provide security to anyone in and out of

16  our building.

17  Q.  And was he there along with another person providing

18  security?

19  A.  Yes.  Marcus Mahdee was in the seven-ton with him.

20  Q.  Okay.  Tell me about -- so you were out clearing the IED

21  at the S curve that you were describing with your crew.

22  Tell me about what you recall about what happened next.

23  A.  My team -- at that time we would kind of break down into

24  like four- or five-man teams just because it was easier

25  operating than taking two or three Humvees out.  It was

1    faster.  It was more efficient.

2            Me and three other individuals, we ran down to the

3    S curve to meet the combat engineers while they -- they

4    would come out and they would detonate these IEDs in a

5    professional way.  You know, at that time we weren't

6    equipped to do anything of that nature.

7            When they set these -- the explosives up for

8    detonation, they'll come across the mics and say, "Hey, five

9    minutes until detonation," and then they'll count down.

10   They'll be like 60 seconds, 30 seconds.  And at ten seconds

11   I started counting in my head, ten, night, eight.

12           And there was an explosion at eight, and there was

13   a bomb in front of us that exploded.  OP4 had been mortared,

14   and they were calling for QRF over our system, our radio

15   system, for a medevac out to OP4.

16   Q.  What's QRF?

17   A.  QRF is your Quick Reaction Force.

18           THE WITNESS:  Sorry, one second.

19           THE COURT:  No, take your time.

20           (Pause)

21   A.  By the time the call came in on the radio, the IED in

22   front of us had exploded.  We turned around, and we hauled

23   butt.  We hauled as fast as we could back to OP4.

24           When we got back to OP4, we could tell there was

25   an attack.  At that moment we weren't exactly sure what the

1   attack was.  There was injured Iraqi Army individuals laying

2   on the ground.

3           We went into OP4, and Marcus and Taylor were

4   laying on the floor.  Both heavily injured.  Taylor's flak

5   jacket was open.  His cammis had been cut off.

6           Our corpsman was up working more on his head and

7   neck area.  You could see there was some severe trauma

8   there.

9           There were individuals -- I can't remember who --

10  were applying tourniquets onto his legs, and I jumped in to

11  start helping at his midsection.

12          We provided the most aid we could, and we got him

13  loaded up in the Humvees and medevac'd out of the OP4 at

14  that moment.

15  Q.  Were they helicoptered out or did they --

16  A.  No, sir.  They were put in a humvee.  Our air support at

17  that time was very choppy.  We didn't know if it was coming

18  or if it was going.  We didn't even know if they could even

19  get in, so loading up in the Humvees was the safest and most

20  effective route.

21  Q.  Was this the first time that OP4 had been mortared?

22  A.  No, sir.  From about the time we set up our outpost

23  there we got mortared daily.  It wasn't just mortars.

24  Depended on the day.  Some days -- there was tall grass

25  behind.  Some days they would throw a couple of RPGs over

1    the top grass, tall grass, then followed by some mortars.

2    Some days there would be an IED in front of the building and

3    then maybe some mortars.  But through the time they had

4    walked the mortars from in front of OP4 into I call it the

5    area right in front of our front door, behind this Humvee.

6            There was a cow pasture out in front of OP4.  It

7    wasn't ours.  It was on the other side of the road.  And the

8    very first day we got mortared, the only thing that happened

9    was some cows got killed.  And they walked that in about 15

10   yards over the days.

11           Sometimes they'd completely overshoot the

12   building.  Sometimes it was just off, but never to an

13   attack -- a pinpoint accuracy like that day of May 9th.

14   Q.  I was going to ask you, when you got back, did you

15   actually see the craters or where the mortars had been

16   hitting that day as opposed to other days?

17   A.  Yes, sir.  They hit -- I would call it it was like a

18   courtyard area.  It's still an area where we would spent

19   time.  There were Hesco barriers there, so there were some

20   safe.

21           That day, after everything had calmed down, they

22   shot a back azimuth out of the mortars.  They hit the

23   ground, and they determined that -- they gave us a pretty

24   good area of where they believed those mortars came from.

25   Q.  What is your understanding of what happened -- how the

1    attack occurred?

2    A.   My understanding is they -- some gentlemen with a

3    mortar -- I think it was a 120 mortar, an 80-millimeter

4    mortar -- they would do a mobile set-up, drop a few mortars,

5    and then get in the vehicle and hightail it out of there as

6    quick as they could.

7    Q.   Okay.  There are other declarations that are being

8    provided, but in terms of the size of that wall -- in terms

9    of providing security, did -- was it your experience that

10   you would have to actually get out of the vehicle, if you

11   wanted to see over the wall, and get on top of your vehicle

12   instead of staying within the vehicle?

13   A.   Correct.

14   Q.   Okay.

15   A.   The Humvee was more -- the seven-ton was more orientated

16   at the front gate.  We had two -- three posts on top of the

17   building, and they would provide security to -- over that

18   wall if there was anything on the road.

19            The seven-ton was more of just a last defense

20   for -- we had a lot of, you know, IEDs/VBIEDs in that area.

21   If someone was going to try to drive their car in through

22   that gate, they would be able to at least slow them down

23   there at that point.

24   Q.   Okay.  Did you -- subsequent to the attack, were you

25   part of the, for lack of a better word, investigation team

1    that went out to find out how this happened?

2    A.  I'm not real good with math.  I think I'm a pretty

3    educated individual, but this back azimuth thing doesn't

4    make sense to me.

5           In my mind, it's like throwing a football.  If I

6    tossed you a football, someone can tell me how it came back

7    to me, you know, that angle and that distance.

8    Q.  Okay.

9    A.  That night there were some pretty intelligent

10   individuals that gave us an idea of where it was at, and

11   then the next morning of May 10th --

12   Q.  You mean -- just to be clear, so someone would come in,

13   the intelligence did a calculation that would actually be

14   able to look at the -- look at where the mortar landed, what

15   the impact was, and be able to calculate where it had come

16   from.  Correct?

17   A.  Yes, sir.

18          THE COURT:  I'm sorry, did you refer to that as a

19   back attcha?

20          THE WITNESS:  Back azimuth.

21          THE COURT:  Back azimuth, okay.

22          THE WITNESS:  So they would shoot that with

23   that -- the degree of --

24          THE COURT:  Understood.

25   Q.  And -- so they told you or they let you and your team

1    know where, generally, they thought the attack had come

2    from, correct?

3    A.   Yes, sir.

4    Q.   And then what did you do next?

5    A.   On May 10th, the next morning, I was up on post on the

6    roof.  Corporal Bednar, who was my squad leader, came up

7    that morning and said, "Hey, we're going to put a small team

8    together and go back out to this area where we think they

9    are and see if they're going to show up again today."

10            That was early morning, so that -- not too much

11   longer after that I got down to the -- got down into our

12   barracks, and we loaded up.  We didn't take a ton of stuff.

13   We got a little bit of food, a little bit of water.  We got

14   our weapons and our weapons checks, and we headed out via

15   foot that morning towards the area that we thought that the

16   mortars had came from.

17   Q.   And what did you find when you investigated?

18   A.   So it was -- I don't know the exact distance.  It was

19   about -- I feel like it was about a five-minute-mile walk.

20   We left in the morning.  We got there around dinnertime.  I

21   remember it was just about five, six o'clock.

22            We were just outside of radio range in that area.

23   There was five of us in the group.  Two of them stayed just

24   a little south off -- because where we got up to was a

25   river -- a creek.  Back home I would say it was a creek.  It

1    was a river.  We thought it was in the vicinity of that, so

2    two of the members of the five-man team stayed back a hair

3    to try to look over our back 180.

4             We got up.  We got positioned around a mound where

5    there was some woods off to our right, the creek in front of

6    us, and then an open field directly on the other side of the

7    creek.

8             We got in.  We got positioned.  You know, we made

9    sure we were looking all over, 180 degrees trying to get a

10   good security out there.

11            And we laid behind that berm for a little while.

12   I can't tell you exactly the amount of time.  But we were

13   getting hungry, and I remember Corporal Bednar saying,

14   "Maybe it's time we turn around and head back so we get back

15   before it's super dark."  And at that moment I remember

16   reaching up over the berm, and there was a car on the other

17   side of the river in the field with four military-age males

18   in it.  Two proceeded to get out of the car.

19            And that's when I yelled back down, and I was

20   said, "Corporal, Corporal, they're there."

21            He said some explicit words, and he looked over,

22   and he said, "They are."

23            And we were elated.  We didn't believe it would

24   happen.

25            But when watching them, two of the males jumped

 1    out, and they got out with their AK-47s.  Two, then, moved

 2    to the end of the vehicle, and they removed a mortar plate

 3    and a mortar tube.  They were setting up the mortars, and at

 4    the moment there was a gentleman reaching in the back seat

 5    of the car pulling out some mortars.

 6              When we saw the two individuals with the AK-47s

 7    and we saw the mortars there, we engaged all four men,

 8    terrorists.

 9              The two Marines that were left behind us, they

10    came running up.  We laid down good suppressive fire.

11              We got across that river where we bound up

12    over, and two of the individuals were left there dead, and

13    then two individuals ran into -- it's not a town.  I don't

14    say it's a village.  Back in the cornfields of Ohio, we've

15    got -- we have a company of houses like on a country road,

16    and that's where those individuals ran into.  So we bound up

17    as well.

18              We called for our QRF, and they came in on the

19    trucks, and we went into the town looking for these two

20    individuals that were still alive.

21    Q.  Okay.  And when you -- did you talk to the townspeople

22    when you got there?

23    A.  We did.  I remember vividly there was a lady in a

24    kitchen cooking -- she was holding a chicken she was about

25    to cook.  She was in tears.  She was balling.  She swore up

1     and down they were not Iraqi.  They were not from there.

2     They were not local.

3              At that moment, when you have a room full of

4     Marines pointing guns at you, I don't believe she had any

5     reason to lie to us.  I think she was just a terrified

6     mother trying to cook dinner for her family, and she wanted

7     us out of her house.

8     Q.  And, in fact, you and your team took the license plate

9     off of the vehicle that they had driven to that location.

10    A.  Yes, sir.

11    Q.  And it was not a local license plate.

12    A.  Correct.  That license plate was brought back to the

13    States, and it was give to Taylor's father, John Prazynski.

14    We told John the story of that day.  We wanted him to know

15    that these individuals wouldn't do that to another American

16    son, daughter.  And John has that license plate still.

17             And John's time, with the license plate and

18    talking about his son, he has talked to someone that was

19    actually in Iraq, and one of the first words that individual

20    said was, "Well, this isn't an Iraqi plate."  So we gave

21    them -- those were plates for nonresidents.  Basically in

22    Ohio I would think like a temporary type tag.

23    Q.  Okay.  Did you prepare a declaration basically

24    summarizing the testimony you gave here today?

25    A.  Yes, sir.

1    Q.  Can you look at the notebook in front of you.  The

2    tabs -- the second orange tab is Prazynski, and I'm looking

3    behind that at PX2203.

4    A.  2203, gotcha.

5    Q.  Take a look at that.  Is that the declaration that you

6    prepared, sir?

7    A.  It is, sir.

8    Q.  And you signed that declaration?

9    A.  Yes, sir.

10   Q.  And is this true and correct to the best of your

11   knowledge?

12   A.  Yes, sir.

13   Q.  Is there anything else that you'd like to share with the

14   Court, either regarding the attack or the effect this has

15   had on you?

16   A.  I met Taylor in May of '05 -- in January of '05.  I knew

17   the young man for four months, and he was truly my best

18   friend.  I'm 37 now, and there are still days -- it's not

19   days, it's every day.  Taylor is still a part of my life.

20           My youngest son's named after Taylor.  John's

21   family and Taylor's family are huge blessings in my life.

22   It's not very often you can find a best friend and someone

23   that's really close to you, but to know you met someone in

24   that short a time who has impacted your life that heavily.

25           It's truly an honor to be here today.  I

1    appreciate your time.  I appreciate you guys so much for

2    what you're doing.  And if this can do anything to help one

3    American saved, one father to not feel like John has felt,

4    one mother to not feel like Carol has felt, to me, you guys

5    are doing awesome.

6              So thank you from the bottom of my heart.

7              THE COURT:  All right.

8              MR. TESELLE:  I have no more questions for

9    Mr. Siewert, Your Honor.

10             THE COURT:  Thank you very much, Mr. Siewert.  I

11   appreciate your testimony.  You're excused.  Have a good

12   trip home.

13             THE WITNESS:  Thank you.

14             THE COURT:  And do you have some young guests in

15   the courtroom?

16             THE WITNESS:  Yes.  My son and daughter are back

17   here.

18             THE COURT:  Come back to the mic.  Who are these

19   young people?

20             THE WITNESS:  So the young man on the right is my

21   son; that's Jackson Taylor.  And the young lady on the left

22   is Addison Kay.

23             THE COURT:  Okay.  Welcome, folks.

24             All right.  Have a good trip home.

25             THE WITNESS:  Thank you, sir.

1          THE COURT:  Why don't we break for about 15 or 20

2     minutes, and then we'll resume.

3               (Recess taken)

4          THE COURT:  All right.

5          MR. TESELLE:  Housekeeping before we start.  We

6     got ahold of Mr. Ihrig during the break.  He has something

7     this morning, but at 1:00 in the afternoon your time, our

8     time, he can Zoom in, if you would like that to happen.

9          THE COURT:  Sure.  Why don't we do it at the

10     beginning of the --

11          MR. TESELLE:  The afternoon?

12          THE COURT:  -- afternoon session.

13          Who's next?

14          MR. TESELLE:  Before -- just a housekeeping to

15     clean up on Mr. Prazynski.  I wanted -- for the record,

16     there are two other declarations that are provided.  PX2202

17     is the declaration of Brian Jenkins, who was the commander

18     who was there that day on site and on the base.

19          And also we have provided a declaration, PX2204,

20     of John Prazynski, Taylor's father.  He also is the one who

21     executed the plaintiff fact sheet, which is PX2212.  And if

22     the Court has any questions for him, he's happy to do that.

23     Otherwise we'll move on to the next witness.

24          THE COURT:  Okay.  Let's move on.

25          MR. TESELLE:  Okay.  Thank you.

```
 1            Your Honor, I'd like to call Mr. Paul Haines to

 2     the stand.

 3            THE COURT:  All right.  Good morning, sir.

 4            THE WITNESS:  Good morning, sir.

 5            THE COURT:  All right.  If you could raise your

 6     right hand.

 7                      PAUL E. HAINES, Sworn

 8                        DIRECT EXAMINATION

 9     BY MR. TESELLE:

10     Q.  Good morning.

11     A.  Good morning, sir.

12     Q.  Can you please state your full.

13     A.  Full name is Paul Eric Haines.

14     Q.  Do you go by "Eric"?

15     A.  Yes, sir.

16     Q.  Where do you live?

17     A.  I live just outside of Fort Hood, Texas, in Killeen.

18     Q.  And where did you grow up?

19     A.  I grew up in Northeast Texas, about three hours away

20     from Fort Hood, so just down the road.

21     Q.  Family?

22     A.  I'm sorry?

23     Q.  Family?  Wife?  Kids?

24     A.  Yes.  I'm married.  Been married it will be 25 years

25     this April.  I have a 23-year-old son and a 16-year-old
```

 1    daughter.

 2    Q.  Now, you are a plaintiff in this action, correct?

 3    A.  Yes, sir.

 4    Q.  And you served in the military in Iraq?

 5    A.  Yes, sir.

 6    Q.  Okay.  Thank you.

 7            When did you join the military?

 8    A.  I joined the military -- in October of 1994 is when I

 9    went to basic training, and then was stationed in Fort Hood,

10    Texas, my first duty station.

11    Q.  What branch?

12    A.  The United States Army.

13    Q.  And you actually served several tours of duty before

14    serving in Iraq?

15    A.  Yes, sir.  I went to Bosnia.  I went to Kuwait for

16    intrinsic action, and a couple of other subsequent small

17    deployments along the way.

18    Q.  Okay.  Now, what I want to focus on here today is your

19    deployment in Iraq and the injuries you suffered there.  Is

20    that fair?

21    A.  Yes, sir.

22    Q.  Okay.  When were you deployed to Iraq?

23    A.  The first deployment to Iraq was in 2003 for OIF1.  I

24    was assigned to the 4th Infantry Division, 166 armored.  And

25    we ended up in more central Iraq, north of Baghdad in the

```
 1    Samarra area.

 2    Q.  And what was your rank?

 3    A.  I was a Sergeant E5.

 4    Q.  And what was your MOS?

 5    A.  I was a 19 Kilo armor crewman on the M1A1 Abrams battle

 6    tank at that time.

 7    Q.  Okay.  So you basically drove tanks?

 8    A.  I was a gunner on the tank at the time.

 9    Q.  What was your battalion's mission in Iraq?

10    A.  2003 or 2006?

11    Q.  Good point.  Why don't we talk about first in 2003?

12    A.  2003, we were mostly focused on the high-value

13    targets -- (interruption) and a phone that wants to answer

14    me when I'm not talking -- the deck of cards that everybody

15    heard about on the news all the time.  We were working on

16    getting all the Saddam loyalists, the back party officials,

17    and the ongoing search for Saddam at that time.

18    Q.  And if we look at this map, do you see this map,

19    Mr. Haines?

20    A.  Yes, sir.

21    Q.  What region were you in --

22    A.  I was in Samarra.  You can see it there just east of the

23    lake.

24    Q.  Just remember that you have to wait for me to finish my

25    question --
```

```
1    A.  Oh, sorry.  I apologize.

2    Q.  She's trying to take down what you say.

3    A.  Yes, sir.

4    Q.  So in -- the Samarra area is this area?

5    A.  Yes, sir.

6    Q.  And so that was 2003.  And you were searching for Saddam

7    Hussein?

8    A.  Saddam and any of his loyalists, the Saddam fadeyeen

9    they called them.

10   Q.  Did you catch him?

11   A.  We did catch him.  December 2003 Operation Red Dawn.

12   my brigade pulled him out of his little spider hole there

13   north -- or south of Mosul, north of where we were at.

14   Q.  So he was captured in December of 2003?

15   A.  Yes, sir.

16   Q.  Okay.  And that was on your first tour of duty.  And

17   then you returned again in 2006, correct?

18   A.  Yes, sir.

19        THE COURT:  I'm sorry, I've got to ask.  Were you

20   there when he was caught?

21        THE WITNESS:  Yes.  We were on the -- we were

22   cordoned security on the perimeter.  I could see from

23   probably, I don't know, a hundred meters from where I was

24   standing when they pulled him out of the hole.  It was a

25   pretty momentous occasion.
```

1    Q.  Pretty proud of that, right?

2    A.  Yes, sir.

3    Q.  And then in 2006 you returned to Iraq?

4    A.  Yes, sir.

5    Q.  Okay.  Same rank and MOS at that time?

6    A.  Yes, sir.

7    Q.  Where were you based the second time?

8    A.  The second time we were -- we moved into Iraq on the

9    first of January, New Year's Day, and we were at Camp Taji.

10   North of Baghdad again, but not quite as far.  Yes.

11   Q.  This area?

12   A.  Yes, sir, right in that area.  And a much larger base

13   than anything that we had dealt with in our first

14   deployment.  We also had a lot more assets, which was a plus

15   in that area.

16   Q.  What was your battalion's mission on the 2006

17   deployment?

18   A.  The ongoing mission was to secure the area and kill or

19   capture any of the insurgency that was operating in the

20   area, and also to train the Iraqi military to take over our

21   area of responsibility when we left.

22   Q.  Did you have a sense of the combat readiness or the lack

23   of combat readiness of Iraqis that you were training?

24   A.  The Iraqi Army was -- I don't want to say they were

25   incompetent.  They were uninterested in doing their jobs.

1     They did -- they were there for a paycheck, and they did not

2     want to do anything that could jeopardize their lives in any

3     way.

4     Q.  Including those that you were there to train?

5     A.  Yes, sir.

6     Q.  Okay.  So what was your -- within the battalion, what

7     was your specific mission with your group?

8     A.  My platoon was attached to an infantry company.  We were

9     attached to Alpha Company, 166 is their armor element, and

10    we were responsible for security at the Karkh Water

11    Treatment Plant, which provided purified water for about 75

12    percent of the country.  And we were also responsible for

13    training an Iraqi Army, armored brigade, to assume that same

14    mission whenever we left.

15    Q.  And so let's talk specifically about the date of the

16    attack.  Do you remember the date of the attack?

17    A.  I have a vague recollection.

18    Q.  Okay.  Was it June 4, 2006?

19    A.  It was June 4, 2006, yes.

20    Q.  Let's orient the Court about what your specific mission

21    was that day and what the convoy was that you were involved

22    in?

23    A.  Okay.  So we had recently had some changes in our

24    mission.  We had split responsibility for security in that

25    area into -- with the Iraqi Army.  They had the nighttime,

```
 1    12 hours in the night, and we had 12 hours of daylight.
 2            So we would rotate one tank section or one
 3    infantry section, which would be -- for a tank it would be
 4    two tanks, four crewmen per tank.  And for Bradleys it would
 5    be two Bradleys, the Bradley crew plus their dismounts,
 6    which would be usually four to six dismounts per vehicle.
 7    And we were going out to relieve the Bradley tank or Bradley
 8    section and assume security for that side of the Karkh Water
 9    Treatment Plant, the access point and the road leading up to
10    it.
11    Q.  Mr. Haines, at that point in time leading up to June
12    4th, was the road on the way to the water treatment plant
13    under construction or reconstruction?
14    A.  Well, the road was -- it was a hard ball asphalt paved
15    road with canals on either side of it.  That road there was
16    no construction on, but on the -- I believe -- I believe it
17    was the north side of the road they were -- there was a
18    construction crew that was putting in a water main from the
19    water treatment plant to a local village of Mushada to
20    provide purified water for that village.
21            We had been providing security for that
22    construction team for the duration of their work while they
23    were out there.
24    Q.  And based upon the change that you talked about, the
25    recent change in security, you would be providing security
```

1    during the daytime?

2    A.  Yes, sir.

3    Q.  But the Iraqi forces would be relied upon for -- at

4    night, correct?

5    A.  Yes, sir.  That is correct.

6    Q.  So tell me what -- tell me, what time did you leave the

7    base on January 4th?

8    A.  We left --

9    Q.  Excuse me, June 4th.

10   A.  We left in the evening.  Our normal procedure, we would

11   leave the evening before so we could go there, and we could

12   get our vehicles parked, maintenance done, put them to bed

13   and set up a guard rotation with our soldiers for radio

14   watch and also to guard the vehicles because we very much

15   did not trust the Iraqi military forces.  They had been

16   known to steal stuff off vehicles or try to abscond with

17   stuff and get caught in the middle of it.  And of course it

18   was an ongoing battle, really, to see who could keep track

19   of their stuff and who doesn't.

20          So we left Taji about 5:00 p.m. that afternoon and

21   headed out to go there and get set up for the following day

22   for our mission during the daytime.

23   Q.  A couple of questions.

24          First of all, in your tank who -- can you describe

25   for the Court who was sitting where and what were their

1    roles?

2    A.  I was -- for this mission I was in the gunner seat.  Our

3    platoon leader, Lieutenant Sanders, was in the tank

4    commander's position in the hatch up at the top of the

5    turret.  Our platoon medic, Sergeant Gionet, was in the

6    loader's position manning an M240 machine gun, and he was

7    also -- he would provide security to our rear while he was

8    standing there, make sure nobody was coming up behind us as

9    we were traveling.

10            And then my driver was Specialist Mark Boomhower.

11   He was --

12            THE COURT:  One more time?

13            THE WITNESS:  I'm sorry?

14            THE COURT REPORTER:  What was the name again?

15            THE WITNESS:  Mark Boomhower, B-O-O-M-H-O-W-E-R.

16            THE COURT REPORTER:  Thank you.

17   A.  He was in the driver's position that was down in the

18   hull, the lowest position in the tank closest to the ground.

19   Q.  Now, when you left -- it was 5:00 p.m., you said, when

20   you --

21   A.  Yes, sir, approximately.

22   Q.  And how many tanks were in the convoy?

23   A.   Two tanks.  We had a battalion SOP that required a

24   certain number of vehicles to leave the wire just as a

25   precaution against ambush along the way.

1          With tanks being tanks, that requirement was only

2     two vehicles.  Everybody else had to run at least four.

3     Q.  Were you in the lead vehicle or the rear vehicle?

4     A.  I was in the trail vehicle.

5     Q.  When you left and you started on your return trip, did

6     you come across Iraqi security forces?

7     A.  When we went to make the turn to go on to Route Causeway

8     or the Canal Road there by the Karkh Water Treatment Plant,

9     there was an Iraqi tank parked just to the left of that T

10     intersection.  Buttoned up, nobody visible.  That was an

11     unusual occurrence because they didn't normally have a

12     vehicle parked there, especially when we were just relieving

13     the infantry platoon that had been out there doing the job.

14          So that was reported up to higher, and

15     unfortunately, after the events that happened, I don't know

16     whatever happened with that situation.

17     Q.  Did you learn whether there were actually Iraqis there

18     and they were in the tank?

19     A.  They were in the tank.  They were -- they evidently were

20     supposed to be out there pulling security.  They got -- they

21     parked their tank there and promptly buttoned up all the

22     hatches and went to sleep.

23     Q.  Now, before we talk about what happened when you turned

24     down the Causeway, you had been in Iraq in 2003, and you had

25     been there again.  Were IEDs an uncommon occurrence for

```
 1    tanks?

 2    A.  No, sir.  During the first deployment, I don't know how

 3    many IEDs we got hit with.  They were ineffective.  The most

 4    damage they ever did to my vehicle personally was they blew

 5    the lid off my cooler one time.

 6    Q.  Okay.

 7    A.  It was very irritating.  I just bought it that day.

 8            So they were very low tech and very ineffective

 9    against our vehicles.  They did have some effect against

10    light-wheeled vehicles that were unarmored.

11    Q.  So you passed the Iraqi tank that is buttoned up, and

12    you turn down the Causeway.  What happens next?

13    A.  Our standard procedures for moving on any road, unless

14    we were performing a specific mission on that road, was to

15    go as fast as we could, and that helped with a couple of

16    different things.

17            One, it didn't allow any snipers to get shots at

18    us.  The guys that were standing up outside of the turret.

19    And if they did shoot at us, there was a very, very low

20    probability of hitting anybody.

21            And then, also, it made it more difficult for

22    remote-detonated IEDs to be used effectively.

23    Q.  How fast can those tanks go?

24    A.  It depends on the vehicle.  The one I had would do 55 to

25    60 miles an hour top speed, and for a 70-ton vehicle, that's
```

```
1    pretty --

2    Q.  You said seventy-ton?

3    A.  Yes, sir.

4    Q.  Okay.  So you turn down the road.  You're accelerating

5    following the tank in front of you.  How much distance

6    between you and --

7    A.  We tried to keep at least 100 meters.  Normally we refer

8    to it as dust interval, because tanks tracks kick up a lot

9    of dust, and Iraq is a very dusty place.  And if there's

10   dust in between you and the vehicle in front of you, it

11   makes it very hard to observe your surroundings and keep

12   good situational awareness.

13          So we would keep at least 100 -- normally 100, 150

14   meters between vehicles.  That way we could see what was

15   going on around us.

16   Q.  What happened next?

17   A.  My wing man, which is Sergeant Sherman in the first

18   tank, went past the farmhouse that was on that road -- that

19   was on that road to the left of the canal, and as he went

20   past that house he felt the explosion.  And then his loader,

21   who had been looking behind him, hit him in the shoulder and

22   started screaming "IED."

23          They immediately stopped, looked for a place to

24   turn around.  Tanks were really wide.  A tank is normally

25   about one and a half of a normal American lane wide.  These
```

1    roads were two lane for Iraqi vehicles, so about a lane and

2    a half wide for American vehicles.  And we would normally

3    try not to tear the road up.  Pivots during a seventy-ton

4    vehicle, track vehicle, will rip up asphalt quickly.

5    However, in that situation he looked back and saw the dust

6    cloud from the explosion, couldn't see my vehicle at that

7    time, so he immediately had his driver spin and haul butt

8    back to where we were.

9           By that time the dust had started to clear, and he

10   said that the tank was sitting on the road crooked at a

11   stop, and there was a huge -- evidence of a huge explosion

12   behind the vehicle.

13   Q.  What's your understanding of what happened, the

14   explosion that you described?

15   A.  What I know now, the IED had been implanted underneath

16   the asphalt.  The people who put it in had dug in from the

17   side of the canal underneath the road and had planted a

18   really, really big IED.

19          It was -- from the blast analysis that EOD did,

20   they said  it have three 120-millimeter shells, three 155-

21   millimeter artillery shells, approximately 1,500 to 2,000

22   pounds of plastic explosives, and a triple stack antitank

23   mine with a remote command wire going to the IED.

24   Q.  Mr. Haines, can you look on your screen there.

25   A.  Yes, sir.

1    Q.  Can you describe what we're looking at?

2    A.  That is the crater that was left after the IED

3    detonated.

4    Q.  Okay.  What is your understanding of what happened --

5    after the IED detonated, what that did to your tank?

6    A.  Well, as we were moving, as I said, as quickly as we

7    could down the road, the forward momentum of the vehicle,

8    when it was hit, was enough that even though -- as you can

9    see from the picture that the blast area was quite large,

10   that the tank was blown up into the air, and our forward

11   momentum carried us far enough forward that we landed

12   outside of the crater on the road.

13           I learned later from a friend that happened to be

14   in the same area, he was at the front gate of the Karkh

15   Water Treatment Plant, that when he heard the blast, he ran

16   outside to look, and he saw my tank going through the air

17   above the tree.  And he immediately got on the radio that

18   it -- those people were already calling it up and reporting

19   the strike.

20   Q.  What happened -- do your understand -- and you learned

21   this from talking to people that were there?

22   A.  Yes, sir.  I've talked to everybody from the guys that

23   were in the vehicle in front of me, the guys that were on

24   security at the Karkh Water Treatment Plant front gate, as

25   well as the crew chief and the pilots of the medevac bird

1    that carried me out.

2    Q.   What happened inside the tank?

3    A.   The blast wave -- well, the blast was perfectly timed.

4    It -- when the IED went off, about a fourth or a third of

5    the tank was over the explosive.

6         The shock wave from the blast did more damage than

7    anything.  It came up through the tank, luckily behind my

8    driver.  He had moderate injuries, but not anything serious.

9         I took the brunt of the blast to the left side of

10   my body, as well as being slammed against the gunner's

11   primary site.

12        The shock wave caused massive trauma to Gio and

13   Lt, to their lower extremities, their legs.  Both -- if they

14   would have lived, they both would have lost both of their

15   legs.

16   Q.   So Sergeant Gionet and Lieutenant Ryan Sanders both died

17   in the blast?

18   A.   Yes, sir, they did.  They died of injuries subsequent to

19   the blast.

20   Q.   Do you -- from talking to him -- was it your driver?

21   Since the incident, did he relay to you what happened to you

22   and what you said when it happened and what you looked like?

23   A.   He -- it knocked him out initially.  He regained

24   consciousness rather quickly.  He said that when he regained

25   consciousness he could hear me yelling at him over the

1     intercom in our helmets, and he answered, and I started

2     trying to talk to him.  He said he couldn't understand me.

3            So I -- he said he could understand when I said

4     hold on, and then he heard me clear my throat and spit, and

5     then talked to him and he said it was like just like I was

6     talking to him normally, and we started communicating trying

7     to figure out how -- he was trapped in the driver's hole,

8     couldn't get the hatch open.  And he said after he was able

9     to get out of the driver's hatch, and he got down in the

10    turret and saw me, he could not comprehend how in the world

11    I was either talking or was able to clear my throat and spit

12    because the left half of my face was on my chest, and he

13    could see, you know, my upper and lower jaw were both

14    shattered, and most of my teeth were knocked out.

15    Q.  So he was able to get out of the tank.

16    A.  Yes.

17    Q.  Were you still trapped inside the tank?

18    A.  I was trapped in the tank due to the gunner's seat.  It

19    was rather cramped quarters anyway, and I'm a pretty big

20    guy.  The seat bent up slightly, and it ended up taking them

21    almost an hour to get me out of the vehicle after the blast.

22    Q.  So that we're clear, and then we'll get back to it, but

23    can you describe for the Court if you suffered any broken

24    bones.  And start at the top and take your way down.

25    A.  Okay.  Yes, that's normally -- when people ask me what

1    injuries I have, that's normally what I do because it's the

2    easiest way to remember.

3            I had a severe TBI.  It was a closed head skull

4    fracture.  My left orbital socket was shattered.  I lost the

5    vision in my left eye, subsequently had to have my left eye

6    removed.  Shattered both cheekbones.  Shattered both upper

7    and lower jaw, both collar bones broken, multiple ribs

8    broken, 12 vertebra shattered in my back.  My left hip was

9    shattered.  My pelvis was shattered.  And every bone in my

10   extremities was broken.

11           And I had a punctured lung from the broken ribs

12   and internal bleeding in my pelvic area from the shattered

13   pelvis.  And multiple other injuries from impacting the GPS,

14   and I had lots of cuts to my hands and stuff like that.

15   Q.  Were you in a coma at that point?

16   A.  I was actually conscious at that point.  I don't

17   remember any of it.  I did not lose consciousness until I

18   was on the helicopter for medevac, and that was over an

19   hour -- like an hour and a half later.

20   Q.  Okay.  Can you briefly summarize for the Court, then,

21   your understanding of what your medical history was from

22   that point forward.

23   A.  They were extremely worried about getting me out of the

24   tank without causing further injury.  The problem was, as I

25   mentioned, I was a pretty big guy.  I was 6'3', 250 pounds,

1    in a very cramped, confined area, and they were trying to

2    lift me out without causing further injury.

3            They were finally able to remove the seat back

4    from the gunner's position, and then they got a cargo strap

5    up underneath my shoulders, around my arm, and were able to

6    lift me out.  By that time they had a medevac chopper

7    in-bound.

8            And I learned later that also by that time Gionet

9    and Lt had both passed already.  My driver was with them

10   both when they died.  He held their hands and was with them

11   the whole time.

12           Excuse me.

13           THE COURT:  Take your time.

14   A.  When they got me on the chopper, they had -- were trying

15   to stabilize me and localize where the bleeding was, et

16   cetera.

17           (Interruption) Let me turn that off.  Sorry about

18   that.

19           They said I lost consciousness, and my heart

20   stopped beating.  I had to be resuscitated three times on

21   the flight to Baghdad.  And then after that it was -- all I

22   know about it now is from when I talked to the doctors that

23   treated me months later.

24   Q.  Were you in a coma then?

25   A.  I was in a coma, yes.

1    Q.  For how long?

2    A.  A little over a month.

3    Q.  What do you remember about coming to?

4    A.  Evidently, from what my wife says, they woke me up or

5    allowed me to wake up a couple of times, and I woke up very

6    violent so they artificially induced a coma to keep me quiet

7    and immobile so I didn't cause any further injury to myself.

8         At that time they weren't able to work on my back

9    because I had swelling really bad.  Compartmentalization

10   syndrome.  And they couldn't get clear pictures of my back

11   because of the swelling, and so they were trying to keep me

12   as immobile as possible so I didn't cause any more injury

13   because they -- at the time they believed they were going to

14   have to put rods in my back to stabilize the spine.

15        I woke up.  It was like right before the Fourth of

16   July.  I believe it was like the 2nd or 3rd, and it was in

17   the morning early, like 6:00, 6:30 in the morning, and the

18   nurse had just come in to check my vitals and to check my

19   medications, and I woke up to somebody leaning over me in a

20   semi-dark room, and I sat up, and I grabbed her by the arm

21   and scared her to death.  I felt bad about it, but I just

22   basically asked her who the hell she was, where was I, and

23   what the hell happened.

24        And about that time my dad walked through the

25   door, which really threw me for a loop.  I hadn't seen him

1    in probably two years.  And that -- like I said, that threw

2    me for a loop, and he said, "Oh, hey, you're awake.  Why

3    don't you do me a favor and lay back down before you hurt

4    yourself."

5            And about that time the pain hit, and -- I think

6    it was just a shot of adrenaline that had got me that far.

7    And I fell back into the bed, and from there I learned what

8    had happened and pretty much -- I can pretty much remember

9    everything from that point.

10   Q.  What did you learn about your crew members?

11   A.  Well, my dad said you were hit by an IED.  It was a big

12   one.  And I'm just thinking because I knew I was through

13   something -- I'd been, you know, at about that point over

14   100 missions for that deployment.  I'd done I don't know how

15   many missions the first deployment, and I hadn't had

16   anything serious.  And I got injured a couple of weeks

17   before the IED by a similar incident, but it was a much

18   smaller IED, and I just had some shrapnel wounds.

19           But I knew the odds were I was going to get hit

20   bad.  You know, you keep doing the same thing over and over

21   again, eventually something bad's going to happen.

22           So my first question was, "Who died?"

23           And he said, "Well, what makes you think somebody

24   died?"

25           I said, "Well, if I'm in the hospital and I'm hurt

1    this bad seated where I was in the vehicle, somebody died."

2    And I was just -- I was scared to death that it was Boomer

3    because I just promised his wife a few months before that I

4    was going to make sure I brought him back.

5             And he told me that it was the LT and Gio.  And I

6    felt terrible about it, but I was just so relieved that it

7    wasn't Mark.  And still at the same time very upset that two

8    of my guys were gone, and there wasn't nothing I could do

9    about it.  I was very, very, very mad, and I didn't know

10   exactly what happened.  I was hearing from people that had

11   heard it secondhand that, yes, this is what they told us.

12   This is what they told us happened.

13            And I know that things get mistranslated,

14   especially military to civilian.  Military has its own

15   language.  It has its own vocabulary.  And so I didn't know

16   it at the time, but the doctor that was my primary care doc,

17   he was the neurology -- the neurologist, he -- when he found

18   out I was awake and he talked to me that he contacted my

19   company commander in Iraq to let him know I was awake.

20            And they called I think it was within a day or two

21   after I woke up.  He called, got on the phone with me, and

22   what he could tell me, you know, with op sec being -- with

23   operational security being what it was, he told me without

24   compromising anything.

25            And then, of course, now everybody that I talked

1    to -- I got to talk -- I got to talk to Boomhower.  I got to

2    talk to my platoon sergeant.  I got to talk to a couple of

3    my really good friends that were there.

4          You know, I consider these guys my brothers.  You

5    know, this group had -- this was not a new group of guys.

6    You know, we'd been through a lot together.

7          And they told me as much as they could so I could

8    get a good picture of what had happened.  They also told me

9    that they had gotten enough actionable intelligence from

10   that strike from the people in the area that they were able

11   to send out operations against the people that did it, and

12   they were able to kill or capture every one of them.

13   Q.  Mr. Haines --

14   A.  Sir.

15   Q.  -- did you become aware at some point that there was a

16   military investigation into the incident as well?

17   A.  Yes, sir.  Yes.  As with every serious incident in the

18   United States Army, there's always an investigation.

19   Q.  If we can look at -- I'm sorry.

20   A.  Sorry.  Go ahead.

21          MR. TESELLE:  If we can look at PX2313, please.

22   Q.  What is your understanding as to -- do you see what

23   we're looking at here?

24   A.  Yes, sir.

25   Q.  It shows approximately 400 meters of command wire and a

 1    tree seat found in a palm tree and copper wire.  Is this

 2    part of that investigation that was done into your incident?

 3    A.  Yes, sir.  That was the command wire that was found by

 4    EOD when they come up to do their blast analysis, along with

 5    the tree seat that was used by the trigger man on the IED.

 6              MR. TESELLE:  Can we look at PX2314.

 7    Q.  Do you recognize this diagram?

 8    A.  Very much so.

 9    Q.  Can you kind of describe what this is showing?  It's

10    got -- just to orient, you have the roadway where the tank

11    is located.  That's your convoy, correct?

12    A.  Yes, sir.

13    Q.  And then there's a red -- excuse me, there's a red mark

14    on the far right side in the palm trees, which was the --

15    indicated as the tree seat?

16    A.  Yes, sir.

17    Q.  And then a command wire path.

18    A.  Yes, sir.

19    Q.  Can you describe your understanding of what was set up

20    and how they carried out this attack.

21    A.  Yes, sir.  We had recently been briefed on several IED

22    strikes that had grown in complexity quite a bit over the

23    last few months.  We knew that they were using offset

24    observers, and then they were using aiming points to

25    establish a trigger time.

1              As I said, we would move fast down the road to try

2       to disrupt their ability to trip that IED fast enough to hit

3       the tank, but they had been trained how to use landmarks at

4       aiming points so when the tank went past this point at this

5       rate of speed, you need to pull the trigger on it then so

6       that the blast will hit the vehicle.

7              Because of that, the probability of being hit by a

8       command-detonated IED had increased, and we were seeing more

9       strikes that were successful against vehicles like mine.

10   Q.  And so what we're seeing here is -- the individual was

11      in the tree seat actually watching?

12   A.  Yes, sir.

13   Q.  And then actually carried out the attack as they saw you

14      go by?

15   A.  Yes, sir.  And that put them -- as you said, it's 400

16      meters of command wire, so he had the ability to be almost

17      out of our focus area for somebody that would be a threat.

18      A single dismounted person with no visible weapon would not

19      be viewed as a threat.

20              If we saw -- were able to see him in the tree

21      line -- we probably wouldn't naked eye, and with the thermal

22      sight on the tank, he would just show up as a hot spot, just

23      a single hot spot in the tree, in the tree line itself.  We

24      wouldn't -- and most likely would not be able to tell that

25      he was actually in a tree.  He would just show up as a spot

1    that we see in the tree line.

2    Q.  Now, Mr. Haines, did you actually prepare a declaration

3    about this incident and your injuries?

4    A.  Yes, sir, I did.

5    Q.  There is a notebook in front of you.  We've used an

6    orange tab or an orange highlighting.

7    A.  Yes, sir.

8    Q.  Yours is the third in that first book, and then I'm

9    looking actually at PX2303.

10   A.  PX...?

11   Q.  2303.

12   A.  Yes, sir.

13   Q.  Okay.  Is this your declaration?

14   A.  This is.

15   Q.  And you signed this declaration, correct?

16   A.  Yes, sir, I did.

17   Q.  And did you review it for accuracy, and is it accurate?

18   A.  I did, sir.

19   Q.  And did you also contribute the information for a

20   plaintiff fact sheet summarizing all the pertinent

21   information regarding your attack and your injuries?

22   A.  Yes, sir, I did.

23   Q.  If you look at the first tab after your highlighted tab,

24   it says PX2315.

25   A.  23 --

 1    Q.  So it's right after the tab.  It's -- it actually says

 2    "Plaintiff Fact Sheet."

 3    A.  I got it, plaintiff fact sheet.

 4    Q.  Okay.

 5    A.  Yes, sir.

 6    Q.  And is this -- and take a look at it.  Is this the

 7    plaintiff fact sheet that you provided the information on

 8    and signed?

 9    A.  Yes, sir, it is.

10    Q.  And is all of this information that you've included true

11    and accurate?

12    A.  Yes, sir, it is, to the best of my knowledge.

13    Q.  Sir, just a couple final questions.  If you can, for the

14    Court, can you tell the Court how this incident has affected

15    your life.

16    A.  This, as I said before, was not an unexpected event.  I

17    was not surprised that I was hurt because it's the nature of

18    the job.  It did have a major impact on my life.

19          My daughter was born a month and a half before I

20    got hurt.  I went home on leave and then was able to be

21    there whenever she was born.  So the next time I saw her was

22    at the hospital in Walter Reed, and it was a couple of

23    months later.

24          She hasn't known me any different than the way I

25    am today.  She doesn't really remember me being in the Army

1      because I retired when she was 4.

2              My son was seven years old whenever I got hurt, so

3      he very much knows the difference between dad then and dad

4      now.  As I said, he's 23 now, and it has greatly affected

5      him.

6              Before I got hurt, I planned on making the

7      military a career anyway.  I'd already been in the Army for

8      over a decade.  And then my subsequent plans after

9      retirement, I was going to be a state trooper in Texas.

10     Evidently they don't let one-eyed guys be state troopers in

11     Texas so those plans had to change.

12             The TBI probably had the most effect upon me.  I

13     was a little vain about my memory before.  I had an almost

14     photographic memory when it came to reading things.  I could

15     read something once and remember it forever, and that went

16     away after I got hurt.  My short-term memory is a day-to-day

17     struggle.

18             Most people look at me and they see, hey, he lost

19     an eye.  Yes, lost an eye.  That is the easiest thing --

20     easiest injury I had to get past.  Yes, I lost depth

21     perception and I had to figure out how to judge depth

22     perception especially up close, and as we see how many times

23     I've bumped the microphone so far it's an ongoing thing.

24             I dealt with, you know, some PTSD issues and some

25     depression issues early on, but all I had to think about is

1    there's two guys that don't have -- you know, I would gripe

2    and complain about all the stupid crap I had to do, all the

3    appointments I had to go to, and all the stuff I couldn't do

4    anymore, and -- but two guys that don't have that option.

5          They gave up their tomorrows to ensure that we all

6    have tomorrow.  They don't have the option to be there with

7    their kids.

8          Gio, I met his daughter, the daughter he never

9    knew he had.  And I've gotten to be close with his mom and

10   his family, his brother and sister, and I got to meet his

11   daughter.  She's a little bit younger than my daughter.  He

12   never even knew he had a daughter.

13         And I get up every day and do the best that I can

14   do to keep going because I owe them that.  I owe them my

15   best efforts because they don't have that opportunity

16   anymore.  They don't have that chance.  And I'm not going to

17   squander their sacrifice, nor will I let them be forgotten.

18   They deserve much better than that.

19         And that philosophy will guide me for the rest of

20   my life.  That will be my mission for the rest of my life.

21         MR. TESELLE:  No more questions, Your Honor.

22         THE COURT:  All right.

23         All right.  Mr. Haines, thank you very much for

24   your testimony.  You're excused.

25         THE WITNESS:  Thank you, sir.

```
 1                    THE COURT:  Have a safe trip home.

 2                    THE WITNESS:  Yes, sir.

 3                    THE COURT:  Is that a Cowboys star over your head

 4        in the photo?

 5                    THE WITNESS:  No, sir, not -- we're rebuilding.

 6        We're hopefully going to have a team this year that makes it

 7        past the first round of the playoffs.

 8                    THE COURT:  Not a good start the other night.

 9                    MR. TESELLE:  Your Honor, the next witness is

10        Larry Cabral.

11                    THE COURT:  Good morning, sir.

12                    THE WITNESS:  Hello, Your Honor.  How are you?

13                    THE COURT:  Step right up, please, and raise your

14        right hand.

15                        LARRY DIAZ CABRAL, JR., Sworn

16                             DIRECT EXAMINATION

17        BY MR. TESELLE:

18        Q.  Good morning.

19        A.  Good morning.

20        Q.  Can you please state your full name for the record.

21        A.  My name is Larry Diaz Cabral, Jr.

22        Q.  And where are you from?

23        A.  I am from Redlands, California.

24        Q.  Did you grow up there?

25        A.  I grew up there, went to high school, wrestled with my
```

```
1    high school, and played football for them.

2    Q.  Do you have family there?

3    A.  I still have family there, yes; my mother, my father, my

4    brother, and sister.

5    Q.  Now, you're a plaintiff in this action.  You understand?

6    A.  Yes.

7    Q.  And we're here to talk about an attack and injuries you

8    sustained while serving in Iraq.

9    A.  That's correct.

10   Q.  Okay.  When did you join the military?

11   A.  I joined the military in 1993, February 1993.

12   Q.  And what branch?

13   A.  U.S. Army.

14   Q.  When were you deployed to Iraq?

15   A.  I was deployed to Iraq in January of 2006.

16   Q.  And what was your rank when you were deployed?

17   A.  When I deployed, I was a staff sergeant.

18   Q.  And what was your MOS?

19   A.  My MOS was 25 uniform, signal support system specialist.

20   Q.  What did you understand that your responsibilities were

21   going to be when you were deployed to Iraq?

22   A.  Well, I was an instructor for my MOS at the time, and

23   they were looking for volunteers to train the Iraqi Army on

24   regular systems to go to Iraq.  So there were about 25 of us

25   from the schoolhouse, instructors, that volunteered to go.
```

1  Q.  And that's what you expected to be doing in Iraq,

2  correct?

3  A.  That's what I expected to be doing, correct.

4  Q.  But you were asking or drafted to do what?

5  A.  Well, we knew that the mission was to be a military

6  transition team there to assist the Iraqi Army to be able to

7  take over their own country.  Didn't have to teach them

8  anything about radios, but we did a lot of driving.  We did

9  a lot of driving around Baghdad.

10  Q.  In fact, you were the driver for Colonel Felts, his

11  personal driver?

12  A.  That's correct.  I was his personal driver for the head

13  commander and for our all whole military transition team.

14  Q.  So you were in Baghdad, correct?

15  A.  That's correct.

16  Q.  Can you let the Court know where you were based in

17  Baghdad.

18  A.  I was in Baghdad, FOB Justice, and it was in the city of

19  Kadhimiya.

20  Q.  And tell me about FOB Justice in Kadhimiya and who was

21  stationed there.

22  A.  FOB Justice was separated by different installations.

23  The outer portion was the Iraqi Army, and we also had -- the

24  Iraqi police were there.

25          And internally within there we had the U.S. base,

1    which was FOB Justice, where we lived, and it was separated

2    by walls and barriers and so forth.

3              THE COURT:  And "FOB" is forward operating base?

4              THE WITNESS:  Forward operating base, that's

5    correct.

6    Q.  And was part of the mission at FOB Justice to train

7    those Iraqi --

8    A.  The mission was to originally, but we later learned, as

9    we were doing our training, that we were going to be a

10   transition team.  We were going to be assisting them

11   basically to prepare them to take over their own country

12   because we were preparing to leave at that time in 2006.

13   Q.  Okay.  Let's talk about November 14, 2006.

14   A.  Yes.

15   Q.  That was the day of your attack, correct?

16   A.  That's correct.  That's the date of my attack.

17   Q.  What was the mission on that day for you?

18   A.  The mission for that day was -- the first cavalry

19   division for Texas, Fort Hood, Texas, was leaving, and there

20   was a change of commands and the 4th ID took over.  So the

21   commander, the general that was occupying the battle space,

22   wanted all commanders to attend a meeting at Camp Liberty,

23   which was the main installation.

24   Q.  Where was Camp Liberty?

25   A.  Camp Liberty was south of where we were, about 30

1   minutes away.

2   Q.  And you were going to be the driver for that --

3   A.  Correct.  We were going to drive Colonel Felts down

4   there, and it was the time for us to get a little bit of R&R

5   for ourselves.  It was a large installation.  It wasn't, you

6   know, really small like what we were living in, and they had

7   a larger PX there, which is the post exchange, and a larger

8   dining facility.

9   Q.  So you wouldn't have to actually be attending the

10  meeting.  You were driving back and forth, and then you had

11  time off in between?

12  A.  That's correct.  So we had time to work on our vehicles

13  and everything.

14  Q.  So what time did you leave FOB Liberty?

15  A.  We left at 9:00 in the morning.  Between 9:00 and 9:30

16  we were already set up, and we left.

17  Q.  Tell me about the events on your way out of FOB Liberty

18  and to the event.

19  A.  So we left FOB Liberty by way of Kadhimiya, and we

20  occupied the western part of Baghdad and the eastern part,

21  so we took a western route.  And prior to, the Iraqi Army

22  were switching areas.  The battalions were switching areas.

23  They occupied all the checkpoints, and we were there to make

24  sure they were doing their job.  We would -- you know, each

25  battalion had their own commander and team that would manage

1    that.  And we went through the first checkpoint, and it was

2    not occupied.

3    Q.  So the checkpoints were supposed -- just to be clear for

4    the record, the checkpoints were to be occupied, and the

5    security provided by the Iraqi Army.  Right?

6    A.  That's correct.

7    Q.  And when you left to go on the mission, you encountered

8    the first checkpoint, and no one was there?

9    A.  And no one was there.

10   Q.  Okay.  And what happened?  And what did Colonel Felts --

11   A.  Well, we proceeded, and when we arrived at Camp Liberty

12   Colonel Felts called back to the U.S. commanders to find out

13   what happened, why they weren't being occupied, and to make

14   sure that they met with them and make sure that the

15   checkpoints were going to be taken care of and occupied and

16   the move took place by the end of the day.

17   Q.  So anything eventful during the day?  Did you get R&R at

18   that point?

19   A.  Yes, we just -- some R&R, made phone calls, played video

20   games, slept.

21   Q.  And then what -- and then what time was it when it was

22   time for the return trip?

23   A.  Well, it was a very long day waiting around, and it was

24   approximately 11:00 p.m. when we finally left.  And myself

25   and Matt knew that we could always walk into a technical

1    operations center to get route clearances, to find out which

2    routes had already been cleared of mines or IEDs and what

3    was safe to go back.  And that was the briefing that we

4    prepared before we left.

5    Q.  Did you take that route?

6    A.  We did not.  We did not.  Colonel Felts wanted to take

7    the eastern route back up to make sure that those

8    checkpoints were occupied and that the change had moved --

9    the change had taken place.

10   Q.  So the reason was he wanted to make sure that other

11   checkpoints were being occupied because of what had happened

12   that morning, correct?

13   A.  Correct.

14   Q.  When you left, can you describe for the record where the

15   individuals inside your vehicle were seated, and let us know

16   what kind of vehicle you were driving.

17   A.  I was driving an up-armored Humvee.  I was a driver.

18   The front passenger was Colonel Felts.  Behind Colonel Felts

19   was our interpreter named George, and Specialist Garcia was

20   the gunner.

21   Q.  So it's 11:00 p.m., and you leave for the return trip.

22   Tell us what happens and how it proceeds.

23   A.  We make our way down the route.  We first checked --

24   also we made a radio call just to kind of see, "Hey, has

25   this been cleared?  We're going to change our route."

```
 1              And we did get a clearance to go.  And we
 2    monitored on our blue force tracker, which showed us what
 3    was checked and where the enemy was and where blue forces
 4    were at the time.
 5    Q.  So is this -- it becomes -- we're going to see pictures
 6    in a little bit.
 7              THE COURT:  Sorry, what are blue forces?
 8              MR. TESELLE:  Yes, I was just going to ask that.
 9              THE WITNESS:  Pardon?
10              THE COURT:  What are blue forces?
11              THE WITNESS:  Blue forces are the U.S. forces, our
12    side.
13              THE COURT:  The good guys.
14              THE WITNESS:  The good guys.
15    Q.  So is the blue force tracker, is that kind of like a
16    computer screen?
17    A.  It's a monitor screen that we track a map, and it just
18    has a GPS update and tracks us where we go real time.
19    Q.  So it has kind of a map, but also it shows where your
20    forces are?
21    A.  Correct.
22    Q.  Okay.  So you leave, and you start this route that has
23    now been approved, and you go forward.  What happens?
24    A.  We're moving forward, and we're driving a few miles into
25    it because we had headsets, and the gunners were out of the
```

1    vehicle so we can hear sometimes loud noises.  But then over

2    the intercom system we heard a single gunshot.

3    Q.  Is that unusual at that time of night?

4    A.  At that time of night it is only because it's curfew

5    already.  No one should be out on the roads.  And so we took

6    it as a sign, well, keep your eyes open and see if anything,

7    you know, fishy is going on.

8             And, you know, Colonel Felts said, you know, let's

9    proceed, and we continued on.

10   Q.  Tell me about the convoy.  We didn't talk about that and

11   which vehicle you were.  So how many vehicles were there on

12   this trip back?

13   A.  I was left with three vehicles, and I was always the

14   lead vehicle.

15   Q.  And what happened next?

16   A.  We continued to go through -- we entered under a small

17   bridge, and when we came out from under the bridge I had

18   noticed and one of the other drivers had noticed that there

19   was an Iraqi Humvee vehicle driving further off on a smaller

20   road, like a dirt road, and had their lights -- their lights

21   were turned off.  But you could clearly see from the dim

22   lights that it was one of their vehicles.

23   Q.  Again, was that unusual for --

24   A.  That was unusual, yes.

25   Q.  So what happened?  Were any changes made, or did you

1    proceed at that point?

2    A.  We proceeded.  We started just to talk amongst ourselves

3    in the vehicle and find out, you know, well, maybe they're

4    doing some movement right now, okay.  We'll find out more

5    when we get back.  Colonel Felts is thinking in his head,

6    well, maybe they're still moving and transitioning over the

7    battle space; the Iraqi Army, that is.

8            And so we proceeded, and we approached one of the

9    checkpoints.  Again, it was not occupied.  It was empty.

10   Q.  And was there anything unusual about this checkpoint

11   beyond the fact that it was unoccupied?

12   A.  The barriers -- we called them Jersey barriers, the

13   concrete barriers -- were set up differently.  We normally

14   had them set up where we had two closer to the curb and one

15   away from the curb so we didn't have to drive so close to

16   it.  These were opposite.  So the first drive -- the first

17   turn in was closer to the curb.

18   Q.  It's making --

19   A.  From right to left.

20   Q.  -- it farther over to the curbside?

21   A.  Yes.

22   Q.  So you're the lead vehicle.  And did you -- Colonel

23   Felts said proceed?

24   A.  Colonel Felts said proceed.  There was no action there.

25           We just proceeded, and I took the turn from the

1   right side to the left and made that right turn around the

2   barrier, and that's when I felt the explosion.

3   Q.  What happened next?  Can you describe what you recall.

4   A.  The initial impact threw my head to the side, and I hit

5   the window.  A very large fire ball -- that's what I can

6   vividly remember, is just a large fire ball -- in front of

7   me, and during all our training was if you encounter an IED

8   or any kind of explosion, to step on the gas and get as far

9   away from the kill zone as we could.

10  Q.  So is that what you did?

11  A.  I did.

12  Q.  What happened?

13  A.  The vehicle didn't make it too far.

14  Q.  It was inoperable at that point.

15  A.  It was inoperable, yes.

16  Q.  What do you recall happening next?

17  A.  The first thing I noticed is I saw that the doors were

18  blown open on the right side, passenger and rear door, front

19  and rear doors.  Colonel Felts was slumped over in his seat,

20  and Corporal Garcia or Specialist Garcia was slunked down in

21  the gunner's hatch.

22          And George, the interpreter, was shaking

23  vigorously.  And -- I couldn't hear anything at that point,

24  but he -- I don't know if he was yelling or not, but he was

25  covered in blood from head to toe.

1    Q.  How many slugs were you hit with?  Do you know?

2    A.  At that time I didn't know, but after -- the next day,

3    when we took a look at the vehicle, we were hit with four,

4    an array of four EFPs.

5    Q.  And where did they hit?

6    A.  The first one hit the engine, went through the engine

7    block.  That's what disabled the vehicle.

8            The second one, as you can see in this photo, is

9    where Colonel Felts was.  The diameter on the outside of the

10   door is probably about one to two inches, and this is what

11   the impact did.

12   Q.  I'm making a -- can you see the circle that I just put

13   on the screen?

14   A.  Yes.

15   Q.  Can you describe what that is so that --

16   A.  That is -- that is what that copper plate does once it

17   penetrates the armor.

18   Q.  Okay.

19   A.  And they were designed to penetrate armored vehicles.

20   Q.  And is it your understanding that that hit Colonel

21   Felts?

22   A.  That hit Colonel Felts.  I didn't know the severity at

23   the time, but I understand it went through his -- into his

24   body and severed his arm.

25   Q.  Okay.

```
 1   A.  The second or the third one hit the door jamb behind the

 2   driver.

 3   Q.  Right.

 4   A.  I'm sorry.

 5   Q.  I'm just -- I'm letting you look at the pictures that

 6   you -- as we look at these photos -- and you've already had

 7   your declaration admitted, but these are photographs either

 8   you took or you compiled; is that correct?

 9   A.  That's correct.

10   Q.  Okay.  And these are representative of the vehicle, this

11   one here, shortly after the attack, correct?

12   A.  Yes, shortly after the attack, when we returned back to

13   our home base.

14            MR. TESELLE:  Let's look at this for now.  My

15   fault.

16            For the Court's benefit, there's a number of

17   pictures that are provided that aren't Bates-stamped.

18   That's what's making it a little difficult, but we have

19   these tabbed.

20   Q.  Okay.  Now, I've put up another picture now.  It's kind

21   of difficult.  Can you orient us inside the vehicle.  And

22   what am I looking at in the middle of the vehicle?

23   A.  The seat that you see on the bottom right, that's

24   Colonel Felts's seat.

25   Q.  So that's the front passenger seat facing the
```

1    windshield, correct?

2    A.  That's correct.

3    Q.  Okay.  Go ahead.

4    A.  And the screen that you see there is the blue force

5    tracker screen.  That was the monitor.

6            Now, from looking at it, you can see the

7    trajectory kind of went upward because it went up towards

8    the monitor.  I would be sitting on the left -- to the left

9    of it, and that's in the direction where my head was at.

10   Q.  Okay.  And so the monitor was hit with one of the slugs,

11   correct?

12   A.  That's correct.

13   Q.  And you would have been seated right behind that

14   monitor?

15   A.  I would have been seated right behind.

16   Q.  And it deflected.  Do you know where it deflected out?

17   A.  It deflected behind because my seat that I was driving

18   or sitting in had holes, burn marks, on the backside of it

19   from the right rear frame across the back, and it hit the

20   door behind me.

21           And then there was shrapnel that came off of that

22   that hit me.  Mostly my vest, but I did -- some of it did

23   penetrate my uniform.

24   Q.  So you said you -- when the blast hit, you hit your

25   head.  Do you know if you were unconscious at that point?

1    A.  I was not unconscious.  I was still conscious.

2    Q.  And then were there also other physical injuries that

3    you suffered?

4    A.  Physical injuries came later, but I did -- I strained my

5    arms.  That was in the recovery.  But nothing -- nothing

6    else -- my adrenaline was really going at this time.  I

7    couldn't feel it.

8    Q.  What do you remember happening next?

9    A.  What I remember happened is George, the interpreter,

10   exited the vehicle, and at that very same time the other two

11   vehicles moved into position to provide security left and

12   right, which is our training.  That was what they were

13   supposed to do.

14           The medics got out of the vehicles.  We had two

15   medics at the time, and -- one in the second and the third

16   vehicle, and they started to assess one with Colonel Felts

17   and one with Corporal Garcia.

18           I had pulled Garcia out from the gunner's hatch to

19   bring him down to try to work on him and see what his

20   injuries were.

21   Q.  So you, at that point in time, were helping the others

22   that were injured, correct?

23   A.  That's correct.

24   Q.  Okay.  Now, when you said that you floored it or you hit

25   the gas to go, why did you hit the gas?

1    A.  Well, I hit the gas to get out of the kill zone.  That

2    was what we were trained to do.  Try to get as far away from

3    the blast and whichever vehicle was hit, then we would

4    provide security.

5    Q.  But the vehicle was really inoperable at that point.

6    A.  It was inoperable, correct.

7    Q.  But even though it was inoperable, what did you have to

8    do after the seriously wounded were removed from the scene?

9    A.  Okay.  So after we -- I had pulled Garcia out of the

10   vehicle.  There was a platoon of Stryker vehicles that came

11   behind us that were just out doing a patrol.  They also had

12   medics with them, and the medics assisted with ours.

13          One of them came to help me, and he had said that

14   Garcia was gone at that time.  He wasn't breathing anymore.

15   And so they started -- they brought the litters out, and

16   they took Colonel Felts, Garcia, and George to the hospital.

17          So at that point Lieutenant Colonel Payne had

18   taken over the scene and our team and had informed that the

19   QRF, the Quick Reactionary Force, had a disabled vehicle

20   that broke down, and they couldn't come to get us, so we had

21   to self-recover.

22   Q.  And self-recovery, what did you have to do?

23   A.  We had straps that were tied up to our vehicles, and so

24   I had to put the strap -- hook it up to the now lead

25   vehicle, and I had to sit in the seat with four flat tires

1    and a disabled engine and steer that vehicle.

2    Q.  And how long did it take to get back to the base?

3    A.  It took us longer than normal.  I would say anywhere

4    between 45 minutes to an hour just to get back.

5    Q.  And what was happening to the vehicle while you were

6    trying --

7    A.  It was very difficult to steer.  It's a heavy vehicle to

8    begin with, and when all the tires are flat, it's running on

9    metal rims, and it was uncontrollable.  So I had to pull

10   left -- there was no power steering, so I had to pull left

11   to keep it to the right or vice versa, and we still had to

12   go through other barriers and checkpoints.

13         When we finally made it to the last one in

14   Kadhimiya, we entered FOB Justice, but we couldn't get into

15   the U.S. side because that vehicle was disabled right there.

16   And so we had to walk in from there.

17         At this point they had taken me straight to the

18   aid station to assess my injuries.  And some of these photos

19   were taken by our team members with the cameras that we

20   always carry so...

21         MR. TESELLE:  There was one photo that we were

22   looking for before.

23   Q.  These are all from PX2403.  Can you show -- you were

24   talking about the slug that went through the door jamb.  Do

25   you see that in the picture?

 1   A.  I do.

 2   Q.  Can you circle it on the picture, just for the record.

 3   A.  Pardon?

 4   Q.  Can you indicate on the picture.

 5   A.  It's in between the two doors.  There's a large hole

 6   down near the bottom there.  That's where the seat belts

 7   were for the front driver.  And George would be sitting

 8   right there in that seat.

 9   Q.  And then one more picture that I'd like to look at.  Can

10   you describe what we're looking at here.

11   A.  That is a piece of copper that was reflected off the

12   blue force tracker, and it hit me right about where my

13   throat is and never went all the way through.

14   Q.  So is this your arm --

15   A.  That's my vest, yes.

16   Q.  Your vest?

17   A.  My armored plates are behind it.

18   Q.  And that's a piece of copper there in the middle, is

19   what --

20   A.  Correct.

21   Q.  Did you subsequently find out that Colonel Felts also

22   passed?

23   A.  I did.  Once I was in the aid station, it was announced

24   that they both died on arrival.

25   Q.  And was he -- was he -- what was he -- what did people

 1    feel about him at the base?

 2    A.  Well, all our commanders -- we actually started

 3    gathering in November of 2005.  That's when our teams met.

 4    And we had to do training prior to leaving, so we got to

 5    know each other really well.

 6            Colonel Felts wasn't one of those strict

 7    commanders.  He was a very nice, outgoing commander, and

 8    every morning I'd wake up and meet him up for breakfast, and

 9    we'd have breakfast together because we tried to stay

10    together as a team.  So everyone on the team enjoyed

11    speaking with him one on one, had conversations.

12            He was very outgoing, liked to play music.  He had

13    a guitar that one of our team members bought, and he'd sit

14    there and play the guitar.  So even the other team members

15    or battalions, their commanders, all enjoyed spending time

16    with him.

17            But it was really hard.  It was really hard for

18    everybody to hear that he was gone.

19            So one of them was Major Perrick, and he was -- he

20    kind of took his seat after he passed when we started

21    continuing our mission.

22    Q.  Did you receive a Purple Heart as a result of this

23    attack?

24    A.  I did.  I received a Purple Heart and Army commendation

25    with a V device of valor.

1    Q.  And what does it mean to have an Army commendation with

2    valor.  What does the "valor" mean?

3    A.  Well, the valor was for my actions after I reacted as I

4    was supposed to.  I don't know the exact wording that they

5    put in it, but I know that it was recommended a Bronze Star,

6    but it was downgraded to the Army commendation medal.

7    Q.  And you prepared a declaration of your experience in

8    this attack, correct?

9    A.  I did as well, yes.

10   Q.  If you look at Binder No. 2, I believe -- and it's --

11   I'm looking at PX2403.

12   A.  Let me close this up, sir.  PX2403.

13   Q.  Okay.  Take a look at this.  Is this your declaration?

14   A.  It is.

15   Q.  Is that your signature on the declaration on Page 6?

16   A.  It is.

17   Q.  And is all the information that is in this declaration

18   true and correct, to the best of your knowledge?

19   A.  It is.

20   Q.  Did you also provide information that was inputted on a

21   plaintiff fact sheet?

22   A.  I --

23   Q.  Go ahead.

24   A.  I did, yes.

25   Q.  Okay.  If you look at the first tab of the notebook

```
 1    there, PX2417 --

 2    A.  Okay, yes.

 3    Q.  So 2417, is that your fact sheet, and is that your

 4    signature on Page 12?

 5    A.  Sorry, I didn't bring my glasses up here with me.  I

 6    lost my track.

 7             Yes, it is.

 8    Q.  Okay.  And everything in this fact sheet -- you've

 9    reviewed this, and it's true and correct, to the best of

10    your knowledge?

11    A.  I have, and yes, it is.

12    Q.  Mr. Cabral, can you tell the Court how this attack has

13    affected you.

14    A.  Well, the psychological portion of it was dealing with

15    survivor's remorse for most of it and anxiety and anger

16    issues.  I almost lost my wife, or, you know, my marriage

17    was dissolving as well, and -- but the internal pains from

18    the -- the physical pain that I had where my arms -- I had

19    to have two surgeries on my elbows because the ulna nerve

20    here was affected, and I couldn't close or grip, you know,

21    anything very good.  I kept dropping a lot of stuff.

22             The TBI that I had, the headaches, it's just -- it

23    became and it still is a problem with the headaches.

24             So loss of hearing, and it's just -- it's been a

25    struggle.  I know this happened in 2006, but it's still been
```

1    a struggle.

2    Q.  Do you have any survivor's guilt as a result of this?

3    A.  I do, and that's been the topic with my counselor.  I

4    still see a psychiatrist monthly, and I still think about it

5    so...

6              MR. TESELLE:  I have no more questions for this

7    witness, Your Honor.

8              THE COURT:  All right.  Thank you very much for

9    your testimony.  You still live in Redlands?

10             THE WITNESS:  No, sir.  I live in San Antonio now.

11   I retired.  My wife is from there.

12             THE COURT:  What keeps you busy?

13             THE WITNESS:  I work for the Defense Health

14   Agency.  I'm an IT help desk technician; so rather than

15   doing anything physical now, it's more online.

16             THE COURT:  Got it.  All right.  Well, safe

17   travels home.  Good luck to you.

18             THE WITNESS:  Thank you, sir.

19             THE COURT:  All right.

20             MR. TESELLE:  Should we proceed, or is now a

21   time --

22             THE COURT:  What's your pleasure?  We're at about

23   12:15, we can get in 15 minutes, or we can break?

24             MR. TESELLE:  Just doing him once would be best so

25   maybe if we take the break here.

```
1              One more before we go.  1:30 or later for Chad

2        Ihrig is his timing.

3              THE COURT:  All right.  Why don't we break now,

4        reconvene at 1:30, speak with Mr. Ihrig, and then move on to

5        the next witness.

6              MR. TESELLE:  Thank you, Your Honor.

7              THE COURT:  All right.  We're adjourned.

8                    (Lunch recess taken)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              A F T E R N O O N   S E S S I O N

2              MR. TESELLE:  I believe Mr. Ihrig is available and

3     on Zoom, if you're ready to proceed with him.

4              MR. IHRIG:  Good afternoon, Your Honor.

5              THE COURT:  Good afternoon.  You didn't think I

6     was going to let you get away that easily, did you?

7              MR. IHRIG:  You know, I'm very happy that I'm able

8     to be here.  I had another hearing that I had to be at this

9     morning.

10             THE COURT:  I'm glad you brought a tie to work.

11             MR. IHRIG:  Well, don't ask to see me from the

12    waist down.

13             THE COURT:  All right.  Well, I assume my

14    questions were conveyed to you.

15             MR. IHRIG:  I mean, at least the general topic

16    was.

17             So let me start with what I have since learned

18    about AFSCME.  Basically where we stand is one of our staff

19    spoke with a representative of AFSCME, and we were able to

20    determine the following.

21             AFSCME is able to identify victims of EFP attacks

22    who were killed in the attacks; however, it's unable to

23    identify those who were injured and not killed.  So that's

24    part one.

25             Part two is AFSCME is also able to identify the

1    next of kin.  And next of kin -- you know, I have to look

2    this up as we do sometimes -- is defined as a person's

3    closest living family member.  So what I believe to be true

4    is that AFSCME's documents are not going to identify all of

5    the family members or the solatium claimants that are

6    associated with every victim who was killed in an EFP

7    attack.

8                 AFSCME --

9                 THE COURT:  But if you can identify the next of

10   kin, that gives you a pretty good start, right?

11                MR. IHRIG:  It would absolutely give you a start.

12   You know, I can tell you, from personal experience in this

13   litigation, not all of these plaintiffs are in communication

14   with one another.  Some are estranged.  And I'm going to get

15   to that in a little bit, but please interrupt me if you have

16   any questions.

17                THE COURT:  No, go ahead.

18                MR. IHRIG:  AFSCME is also able to provide autopsy

19   reports, but the representative at AFSCME advised us that

20   those are not readily available reports, and neither are the

21   identification of injured people being readily available.

22   So the issue that AFSCME would have is that they would have

23   to pull some number of persons off of a task that they're

24   already working on to put this together.  Again, not an

25   insurmountable task, but definitely a heavily burdensome

1    task.

2          THE COURT:  You may not know this, but who would

3    have authority to request a query from the database?

4          MR. IHRIG:  It would have to be subpoenaed, is

5    what we were told.  And just from dealing with the FOIA

6    requests that we've dealt with, I'm pretty confident it

7    would require a court order as well.

8          Again, those aren't insurmountable things, but

9    those are steps that have to be taken.

10          THE COURT:  Okay.

11          MR. IHRIG:  So that's what we know about AFSCME.

12          Now, let's talk about -- I think it's important to

13    understand how what I've learned actually applies in the

14    context of going forward in any class action, you know, that

15    might -- the Court might be entertaining or any court might

16    be entertaining.  As I mentioned earlier, the AFSCME

17    database, although it's going to identify the victim of

18    someone that is killed in an EFP attack and the next of kin

19    of that person, it's not going to tell you whether the

20    family member or solatium claimant is or was estranged from

21    the primary tagged victim, and that goes to the damages

22    issue.

23          If, you know, for example, Sergeant, you know,

24    Johnson is killed in an EFP attack, and he has three

25    children ages, you know, 18, 15, and 13, and the 18-year-old

1    has not spoken to Sergeant Johnson in years, including the

2    time in which the attack occurred, that particular plaintiff

3    is not entitled to any damages under the FSIA, and so I

4    think it necessarily requires a pretty heavy burden on the

5    Court to evaluate each of these individuals.  You can't -- I

6    don't think a court can just look at, okay, these are the

7    people that are involved, and we're going to apply these

8    presumptive damages.  You've got to look deeper than just

9    the identification of the individuals.

10              Again, AFSCME is not going to address the extent

11   of injuries that are, you know, caused to these family

12   members, and that's another factor the Court has to take

13   into consideration when assessing damages.  So even applying

14   the presumptive numbers, which, again, I'm all for, you

15   know, the Court still has to undertake an individualized

16   inquiry to determine the extent of injuries that each

17   plaintiff has and whether to do an upward or downward

18   adjustment of those presumptive awards.

19              I'm trying to go through this just succinctly.

20   I've got my notes in front of me, Judge.

21              And then -- okay, there remains the issue of the

22   standing of family members.  So in our case, for example,

23   you granted us leave to file an amended complaint, and part

24   of the reason we're filing an amended complaint is because

25   since we initiated this litigation we've come to learn that

1       some of our solatium claimants were not citizens of the

2       United States either at the time of the attack itself or

3       perhaps presently, but at the time is when you've got to

4       look under the FSIA.  And so no information in the AFSCME

5       database is going to be able to identify that for you, and

6       each of these class members is going to have to provide some

7       kind of evidence at some point that they actually have

8       standing to even be a member of the class.

9              And, again --

10             THE COURT:  Right, but isn't that true in any

11      class action?  I mean, if the class were defined as

12      citizens, service members, contractors, et cetera, and then

13      certified, there would be an administrator appointed to

14      accept potential claims and to make those determinations to

15      the satisfaction of the Court, right?

16             MR. IHRIG:  There would be.  And, again, that's

17      not an insurmountable task.  It's just, when you add all

18      these things together and all these layers, in my opinion,

19      it really goes against class treatment of these cases.

20             And, Your Honor, one of the biggest reasons why I

21      think this goes against class treatment is just look to the

22      amount of damages that are involved in these cases.  Class

23      actions were developed primarily, not exclusively, to deal

24      with substantially similar conduct by a defendant that

25      affected all of the class members in the same way in

```
1    typically small amounts.  Small amounts being the key part
2    there because an individual claimant couldn't hire an
3    attorney, and it wouldn't be worth them to represent
4    themselves pro se even giving the filing costs of, you know,
5    for example, maybe somebody -- you know, it's -- I'm trying
6    to think of a quick example here, but, you know, where the
7    claim at issue might be $100 or less or even $1,000 or less.
8    These are substantially large claims.
9             THE COURT:  Well, are you talking about the gross
10   claim or the pro rata claim after submission to the
11   compensation fund?  Does the argument apply to both?
12            MR. IHRIG:  I think it absolutely applies to both,
13   but I'm talking right now about the pro rata, the individual
14   damages.
15            You know, even taking -- and I don't remember the
16   numbers off the top of my head, but I know they're generally
17   correct.  The presumptive values, you know, for somebody who
18   was killed in an attack, for example, are $8 million, and
19   then family members, you know, from there I think go to six,
20   four, two, one, and down to $500,000 depending on continuity
21   to the plaintiff, extent of injuries to the particular
22   family member, et cetera.
23            So these are not --
24            THE COURT:  But what is the current -- I mean, I
25   don't know the answer to this, but what's the current pro
```

1      rata claim on a -- on one of those awards?

2              MR. IHRIG:  I'm going to defer, if it's okay,

3      Judge --

4              THE COURT:  Is it five cents on the dollar?  Is it

5      20 cents on the dollar?

6              Mr. Paulos may have some information on that.

7      We're inviting him to the podium.

8              MR. PAULOS:  I apologize to my colleague.  I know

9      you can't see me.

10             So I think my latest review of the Victims Terror

11     Fund is what you're referring to; is that right, Your Honor?

12             THE COURT:  Yes.

13             MR. PAULOS:  So so far there's been three payments

14     to claimants that have had claims in the fund since about

15     2016.  The first year the percentage of the claimant paid

16     out in the first payment was 13 percent.  I believe the

17     second payment was somewhere between 6 and 8 percent.  A

18     third payment was just hovering over 3 percent.  There has

19     not been a payment since, but the way that it works is that

20     your claim will remain in the fund until you reach a cap,

21     which they cap an individual at I believe it's $25 million

22     and a family at $30 million.

23             THE COURT:  I understand.

24             MR. PAULOS:  And then depending on collateral

25     sources and things that you report to the fund, you may be

1    actually paused while people catch up.  So the potential for

2    recovery is, from the claims, still significant.  To go to

3    your original question, it's still a significant amount.

4    It's the time frame in which it's paid out.

5            THE COURT:  Okay.  And there's future potential

6    for asset seizures to be contributed to the fund?

7            MR. PAULOS:  There's absolutely the potential for

8    the fund to continue to be funded.  It sunsets in 2039, and,

9    Your Honor may know that there are certain types of civil

10   and criminal penalties that statutorily are paid to the fund

11   to keep it funded, depending on what -- what triggers those

12   penalties or the crimes that they're being assessed for.

13           So the funds will be around for a while.

14   Claimants that have their claims in that fund will be in

15   that until they achieve a certain amount of percentage of

16   their true award.  But also those claimants can still seek

17   assets and pursue other sources on their judgments as well.

18           So, I mean, I haven't even thought about this at

19   this point, but how does a class seek assets and how do you

20   then distribute those assets amongst the class?  That's a

21   whole other, I think, not -- I have just thought about it.

22           THE COURT:  So, Mr. Ihrig, your point is that

23   individual claimants have an incentive to pursue individual

24   actions, and so one of the purposes of class treatment is

25   not present as a result.

```
 1                MR. IHRIG:  Yes, sir.

 2                THE COURT:  Okay.

 3                MR. IHRIG:  Yes, and I thought about this further,

 4     too.  Even if the Court were to make this an opt-in class as

 5     opposed to an opt-out class, I think all that really does is

 6     turn the class action mechanism on its head and provide an

 7     improper way for class action attorneys to solicit clients.

 8                We have, for example, a website that's up and, you

 9     know, I think we pay, you know, monthly to have it sent out,

10     you know, via the Internet, via Google searches and things

11     like that to where it will pop up on people's Facebook pages

12     and something like that.  And if someone wants to

13     participate in these litigations, there's a means for them

14     to do that.  It is not through the class action mechanism.

15                And, you know, again, Judge, this is not a typical

16     class action where you have a defendant like Google or

17     Johnson & Johnson that has unlimited funds available.

18     There's a limited pot available to these individual

19     claimants.  You've heard from -- I don't know how many

20     you've heard from this morning, but as of yesterday you've

21     heard from ten individual victims, I believe, and they've

22     invested time.  They've invested, frankly, I mean, a huge

23     amount of emotional expense in this litigation, and to

24     deprive -- I mean, what would potentially happen in an opt-

25     in class is a number of, you know, potentially unidentified
```

1    individuals will be placed in ahead of all of these other

2    people who have filed individual claims at the fund and

3    could potentially deplete the fund for those individual

4    claimants.

5            So going back to the numbers, though, you know, on

6    a $2 million damage award -- and I think I heard Mr. Paulos

7    indicate that 3 percent was the lowest amount paid out in

8    one particular year -- that's still $60,000.  That's plenty

9    incentive for any plaintiff attorney to file a lawsuit and

10   pursue it should they choose to do that.  And that's just a

11   3 percent payment, you know, that's going to be paid out

12   year over year.

13           So my true belief is -- and, again, I'll reiterate

14   what I told you yesterday -- we looked at doing this as a

15   class action initially, and we very quickly dismissed that

16   idea for the various reasons, you know, not the least of

17   which is the manageability of doing this as a class for the

18   Court and frankly for the attorneys.

19           THE COURT:  Well, where you stand on this issue

20   may depend on where you sit, I suppose.

21           MR. IHRIG:  Absolutely.  No question.

22           THE COURT:  We talked a little bit about

23   superiority yesterday, and, you know, one thought occurred

24   to me.  One of the benefits of a class action would be to

25   achieve some economies of scale, so one question -- and you

1    folks may not know the answer to this, but, you know, how

2    many more EFP plaintiffs may there be out there who have

3    not -- who would be interested in pursuing litigation but

4    have not done so yet?  I mean, if it's a handful, then, you

5    know, perhaps the class wouldn't be that large, and you

6    don't achieve economies of scale.  But if it's a lot, then

7    perhaps, you know, that would recommend class treatment.

8             MR. IHRIG:  What we know is between 2005 and 2011

9    there were 1,057 EFP attacks.  I believe that means that

10   there's 1,057 individuals that were killed in EFP attacks.

11   So let me just state I'm not 100 percent certain there, but

12   either way, I don't know how many EFP attacks we currently

13   are presenting.  Mr. Paulos may have that number in his

14   head.  And I don't know how many other EFP attacks have been

15   brought on an individual basis.  So whatever that number is,

16   you know, subtracted from 1,057 I think would be the number

17   of remaining EFP victims --

18             THE COURT:  Got it.

19             MR. IHRIG:  -- out there, but I don't know how

20   many family members that would include.

21             THE COURT:  All right.  That's all I had.  Thank

22   you for making time.

23             MR. IHRIG:  Absolutely.  If you have any other

24   questions, I'm happy to make myself available.

25             THE COURT:  Okay.  All right.

1              MR. TESELLE:  Okay, Your Honor --

2              THE COURT:  Okay.

3              MR. TESELLE:  -- we're ready to proceed.  We call

4       to the stand Joel Tavera.

5              THE COURT:  Good to meet you, sir.  I'm Judge

6       Cooper.

7              THE WITNESS:  Hey there, Your Honor.

8              THE COURT:  I'm doing just fine.  How are you

9       feeling today?

10             THE WITNESS:  I'm blessed.

11             THE COURT:  All right.  If you could raise your

12      right hand and be sworn by the courtroom deputy, please.

13             (Witness sworn)

14             THE COURT:  The microphone is right in front of

15      you.  Just make sure --

16             THE WITNESS:  Where is it at?  Can you hear me

17      now?

18             THE COURT:  That's perfect.

19             THE WITNESS:  Sorry about that.  I can barely hear

20      you ma'am.  Blast injury.  But I heard what you said.  The

21      whole perjury thing, I've heard that before so I vaguely

22      heard what you were saying, but I do.  I do.

23             THE COURT:  Okay.  So you're testifying under oath

24      this afternoon.

25             THE WITNESS:  Yes, yes.

```
 1              THE COURT:  All right.  Very well.

 2              Please proceed.

 3                      JOEL TAVERA, Sworn

 4                      DIRECT EXAMINATION

 5   BY MR. TESELLE:

 6   Q.  Good afternoon.  Can you please state your full name for

 7   the record.

 8   A.  Joel Tavera.

 9   Q.  And just for the Court's benefit, can you identify who

10   helped you up to the stand today.

11   A.  That would be my father, Jose L. Tavera.

12   Q.  Where do you come from?

13   A.  Sir, I was born in Flushing, New York, but I was raised

14   in the great state of North Carolina.

15   Q.  Okay.  And where do you live now?

16   A.  I live in Tampa, Florida.  Also known as purgatory.

17   Q.  And do you live with family there?

18   A.  Yes, sir.  They live with me.

19   Q.  Okay.  You understand that you're a plaintiff in this

20   lawsuit, correct?

21   A.  Yes, sir.  I'm fully aware.

22   Q.  And we're here talking about an attack and injuries you

23   suffered while serving in Iraq, correct?

24   A.  Yes, sir.

25   Q.  Okay.  I'm going to ask you a couple of background
```

1    questions, and then I'm going to ask you about that attack,

2    if that's okay.

3    A.   No problems.

4    Q.   When did you join the U.S. military?

5    A.   I joined the military in March of 2006, and I left for

6    basic training May 30th of 2006.

7    Q.   Which branch?

8    A.   United States Army.

9    Q.   Were you then ultimately sent to Iraq?

10   A.   No, sir.  Got training in Fort Benning, Georgia, until

11   about the end of the summer where I was stationed in

12   Augusta, Georgia, for advanced individual training.

13             I stayed there through December earning my

14   identifier, 25 Uniform Signal Support Specialist, and off to

15   my duty station by the following February to Fort Eustis,

16   Virginia.

17   Q.   Before we go into the details, did you help prepare a

18   declaration regarding this case?

19   A.   Yes, sir, I did.

20   Q.   And did you -- through having it read to you, did you

21   review that declaration for accuracy?

22   A.   Yes, sir.  It's true, what was done; yes, sir.

23   Q.   And did you or your father sign that declaration?

24   A.   Yes, it was signed.  Yes.

25   Q.   Are you also -- did you also participate in the

1    preparation of a plaintiff fact sheet?

2    A.  Yes.  Yes, sir.

3    Q.  And did you review that again through it being read to

4    you to make sure it was accurate?

5    A.  Yes, sir.  Thoroughly did.

6    Q.  Now, when were you deployed to Iraq?

7    A.  I was deployed in October of 2007.

8    Q.  What was your rank?

9    A.  I was E3, Private First Class.

10   Q.  And what was your MOS?

11   A.  25 Uniform.

12   Q.  Where were you -- where were you based when you were in

13   Iraq?

14   A.  I was based out of Naziriyah until about December time,

15   where I was promoted to the rank of E4 specialist; then I

16   moved on to Camp Delta, which was off the Tigris River.

17   Q.  Okay.

18   A.  And I moved back to COP 9, which was a little further

19   southeast or southwest where I was at prior to.  So I kind

20   of moved around Iraq a little bit.

21   Q.  Now, in March of 2008, that's when the attack occurred,

22   correct?

23   A.  Yes, sir, that morning of March 12th, 2008.

24   Q.  Were you based at a camp there?

25   A.  I was actually in Nasiriyah.

1   Q.  Okay.  Now, on the date of the attack, what was the

2   platoon's mission at that time?

3   A.  It was a volunteer mission.  Some people were voluntold.

4   I volunteered two days out from leaving to come back home

5   from my two-week break for R&R.

6           The mission was to head out the base, go collect

7   and to guard and to watch the local internationals that were

8   working, preferably to guard them, to escort them, and to

9   get them from Point A to Point B and make sure that they

10  were not injured and that we kept everything secure because

11  you never know who you can trust overseas.

12  Q.  Okay.  So you weren't supposed to be on that mission

13  that day?

14  A.  No, sir.

15  Q.  You were replacing someone else?

16  A.  Yes, a lazy soldier.

17  Q.  Were you in a single vehicle or in a convoy?

18  A.  No convoy.  Single vehicle.  Up-armored suburban.

19  Q.  And can you describe for the Court where you were in the

20  Suburban and where the others were.

21  A.  I was in the back far right in the middle seats.  I was

22  only -- the two front -- the passenger and the -- the driver

23  and the passenger in the front, and then one row in the

24  middle for three people.

25  Q.  Okay.

1    A.  Bradley was the driver; Samten was in front of me;

2    Jackson was beside me; and then Lloyd was on the far left

3    side.  I was on the far left side of the truck.

4    Q.  And was this on Camp Adder?

5    A.  Camp Adder, yes, sir.

6    Q.  What time of day was it?

7    A.  It was morning time.  I remember not catching -- not

8    able to catch one of the trains on the shuttles to get to

9    the checkpoint -- not the checkpoint, to the point where I

10   was supposed to meet up with those guys because I had no

11   idea who was in charge, and come to find out it was somebody

12   I knew.  I knew two other people in the truck.

13           And we -- they waited.  I got there, asked what

14   was going on.  I volunteered for the duty so I had no idea

15   really what was going to happen.

16   Q.  Okay.  So describe for me -- you all entered the

17   vehicle, and you head out for this protection mission for

18   the individuals you described.  What happened next?

19   A.  We started moving slowly because on the base you can't

20   go no more than 20 kilometers per hour because it's very

21   slow.  I noticed, as we were rolling slowly, the vehicle

22   shook.  It felt like a -- something had rocked the vehicle,

23   an explosion.  I didn't know if it was actually an explosion

24   or if it was something normal because normally -- that was a

25   Tuesday morning.  Normally it was Wednesdays we had

1    incoming.

2         And I didn't think anything of it.  We started

3    rolling.

4    Q.  Let's -- before you go on, let's talk about that.  So

5    were there regular rocket attacks that would --

6    A.  Yes.

7    Q.  -- that were at the base?

8    A.  American Idol night.  Apparently they hated Simon.  I

9    don't know what it was all about.  With all due respect.

10   I'm not being judged, but seriously, it seemed like that.

11   Q.  But as you were proceeding on the base toward -- to exit

12   the base, correct?

13   A.  Yes.  I had -- first I felt very uneasy because I kept

14   on hearing whistling, and I've heard that incoming before.

15   Too close for comfort.

16        And that day I heard a whistling.  I had no idea

17   what was happening.  We were rolling slowly, and I kind

18   of -- I lost my seat belt.  I took the seat belt off, and I

19   started fidgeting with my door because I just had a feeling

20   like something was going to happen.  Not underneath me, but

21   above me, so...

22   Q.  And then what happened?

23   A.  Huh?

24   Q.  And then what happened next?

25   A.  It was probably about a minute, minute and a half later,

1    I felt extreme heat and a massive explosion.  I think the

2    other -- is that photo in here somewhere?

3              MR. TESELLE:  Can we pull up the --

4    A.  No?

5    Q.  Yes.

6    A.  The truck.

7              The explosion happened, and thankfully I unlatched

8    the door so I had a way out.

9              The other solder had a way out as well.  I don't

10   know how he got out.  He had no idea I was on the other side

11   of the truck.  He walked away from it.

12             I didn't.  I was on fire.

13   Q.  Go ahead.

14   A.  I don't remember.  It felt like getting blind-sided or

15   getting sacked, like playing football in high school.  It

16   sucks.  You never know when it's going to come.

17   Q.  So you were on fire when you were out of the vehicle?

18   A.  Yes, apparently I was.  I couldn't remember much.  It

19   just -- I felt winded.  My wind was knocked out of me.

20             Yes, it was -- I didn't know how bad it was.  I

21   had no idea.

22   Q.  Did three of the others that were in the vehicle, Dustin

23   Jackson, Juantrea Bradley and Tenzin Sentena [sic], did they

24   die in the attack?

25   A.  Tenzin Sentena?  Do you mean Samten?

1    Q.  No, I said Dustin Jackson.

2    A.  Yes, he was next to me.

3    Q.  Juantrea Bradley?

4    A.  Bradley, yes, he was the driver.

5    Q.  And Tenzin Sentena?

6    A.  Yes, Sentena, yes.

7    Q.  And they all died in the attack?

8    A.  Yes, they did.  They were burned to death.

9    Q.  Do you have an understanding today, based upon what

10   you've learned, as to what happened to you that day?

11   A.  Yes, sir, I do.  I just remember speaking to not the

12   first person on site, the second person on site that came to

13   take control.  They pulled me away from the truck because I

14   could hear rounds clicking off so I was being attacked, and

15   rounds were just popping off, popping off, popping off, and

16   I was dazed and confused.

17          That captain at the time, he was speaking to me

18   trying to keep me awake, and then he was looking for a spot

19   to give me an IV.  And he gave me an IV in my arm and

20   applied a tourniquet to my right foot -- my right leg

21   because my right foot was blown off with the shrapnel.  I

22   had shrapnel to my left foot.  I currently still suffer from

23   a hammertoe on my left foot.  I almost lost my left leg as

24   well.

25          He kept me awake long enough to get an IV situated

1    and pulled away from the vehicle that was on fire, and once

2    everything was under control, I went into a coma, self-

3    induced.

4    Q.  Did you ever learn what type of munition hit your

5    vehicle?

6    A.  Later?

7    Q.  Yes.

8    A.  With all the intel?  I don't want to thank Snowden for

9    anything, WikiLeaks.

10        It was a 122 rocket.  I don't know where it came

11   from, but you guys apparently have a good idea with all the

12   intel the government tried to seal.

13   Q.  Now, you lost your lower right leg, correct?

14   A.  Yes, sir.  Yes, sir.

15   Q.  Were you also blinded in the -- in that attack?

16   A.  Yes.  My eye was blown out with the blast, and the other

17   eye was fried like an egg.

18   Q.  Okay.  Can you briefly describe for the Court the

19   medical treatment that you've gone through as a result of

20   the attack.

21   A.  Oh, man.  I have a high pain tolerance, but this just

22   sucked.  I had over 120 surgeries.  The majority in the

23   beginning were all skin grafts, things just to keep me

24   alive.  Then I woke up 31 days later depressed thinking I

25   could see because I was hiked up on Dilaudid, morphine, and

1    everything else on God's great earth you can give a soldier

2    or to someone who's been burned over 60 percent, 65 percent

3    to not feel any pain.

4            I swore up and down I could see until it was

5    explained that I was blind.  You have no vision.  You have

6    no eyes, no nothing.

7            I had phantom pains.  I thought I had my leg.  I

8    kept on reaching, and I didn't have my leg.  I was like oh,

9    shit.

10           It was a dark time in my life.  One I don't like

11   to tap back into that often.

12   Q.  But you -- what do you do today in terms of service that

13   you perform for the military?

14   A.  Motivational speaking; churches, small groups, schools,

15   businesses.

16           I love the military.  I love still being

17   connected.  I detach myself as much as possible, but I'm

18   still remembered in the military as that really wounded

19   soldier that didn't let adversity stand in his way.

20           I'm trying to live my life, but I'm hindered by a

21   lot.  Twelve days before my 21st birthday, and everything

22   was taken from me.

23   Q.  How has this affected your life?

24   A.  I was very -- I still am very dependent on family,

25   friends.  Obviously I'm not independent.  My father's here

1    with me.  I got a lot of things going on in life.

2             Internally, I'm okay.  I mean, I'm very blessed.

3    I'm walking.  I'm talking.

4             I wasn't speaking.  I couldn't put two words

5    together to remember what had happened moments prior to, but

6    thankfully my long-term memory wasn't affected.  Just my

7    short-term.

8    Q.  Have you gone through therapy to help you walk and talk

9    again?

10   A.  Yes, sir.  Two hours of speech therapy on the daily for

11   almost 17 months to get to where I'm at now.

12   Q.  How about physical therapy?

13   A.  Oh, that was -- with all due respect, I've got bad words

14   to say about that.  That was like a physical terrorist.

15            You know, with the contractions I still can't

16   fully extend my left elbow because of my injury so it's

17   quite -- I mean, I learned to deal.

18            I'm missing my fingertips on my left hand.  My

19   hand was burnt to the bone.  I wish they had just cut it

20   off, but they managed to reconstruct it.

21   Q.  Are you able to golf again?

22   A.  What?

23   Q.  Are you able to golf again?

24   A.  Golf?  I have picked that up actually after the injury.

25   Blind -- the Blind Golfers Association.  They taught me how

```
 1        to golf.  It's all muscle memory.

 2                It's hit or miss.  I do some things here and

 3        there.  I was trying things out.  Tandem sky diving, the

 4        golfing.  Bowling sometimes; recreational stuff.

 5                I love traveling.  That's -- hunting.  I learned I

 6        could get back outdoors.  That's been the fun part.  Fishing

 7        has been fun, fresh water and salt water, so -- but that's

 8        kind of been the thing.

 9                You can't really do all the things at certain

10        times of the year, and Florida is hot year-round so I feel

11        like that's my purgatory.

12                I try not to be there as often as I am, but I was

13        blessed with a beautiful, mortgage-free home, and I'm just

14        kind of sticking it out until I figure out my next place.

15        Q.  Do you have anything else that you want the Court to

16        know either about your injuries or about your feelings about

17        what happened to you?

18        A.  Yes.  I don't know.  The most important years of my

19        life, like between 21-ish and -- actually, I'm 35 now.

20                So it's not been an easy road.  Lots of

21        depression.  Lots of crazy healthcare providers, from

22        hospital to hospital to hospital; from Brooke Army Medical

23        Center to the Polytrauma in Tampa, Florida, to Walter Reed/

24        Bethesda back to a burn unit, Wilford Hall in San Antonio on

25        the Air Force base.  Just every which way.
```

1          And I don't know.  There's a kind of sea of

2     emotions kind of coming across right now.  I don't really

3     know how to explain it.  I just feel like this is a really

4     crappy situation, but I'm making the best of it.

5          MR. TESELLE:  Thank you for your time, and thank

6     you for your service, sir.

7          THE WITNESS:  Thank you for having me.

8          THE COURT:  I don't have any further questions.

9     You know, some folks refer to Washington as purgatory, so

10    Tampa may not be so bad.

11         THE WITNESS:  That is your choice.  I don't have a

12    choice there.  Your Honor, mine wasn't a choice.

13         THE COURT:  All right.  So dad, you can come back

14    up.

15         MR. JOSE TAVERA:  Yes, sir.

16         THE WITNESS:  Are we finished?

17         THE COURT:  We are finished.  You are excused.

18    Have a safe trip home.

19         THE WITNESS:  Thank you, Your Honor.

20         THE COURT:  And good luck to you.

21         THE WITNESS:  Thank you.

22         MR. TESELLE:  Your Honor, that's the last of the

23    bellwether plaintiff witnesses.  The last witness that we

24    call will be expert Michael Pregent.

25         THE COURT:  Step right up, sir.  You've been here,

1    so you know the drill.  Please raise your right hand.

2                        MICHAEL PREGENT, Sworn

3                        DIRECT EXAMINATION

4    BY MR. TESELLE:

5    Q.  Can you please state your full name for the record.

6    A.  Michael Pregent.

7    Q.  If you look at Binder No. 2 that's in front of you, the

8    last tab, PX1003.

9    A.  Yes.

10   Q.  Is that your expert report that you prepared for this

11   case?

12   A.  Yes, it is.

13   Q.  Let me ask you, what is your current job?

14   A.  I'm a senior fellow at the Hudson Institute here in

15   Washington, D.C.

16   Q.  What's the Hudson Institute?

17   A.  It is a think tank, and in my particular role I focus on

18   Sunni and Shia terrorism.

19   Q.  Okay.

20   A.  Middle East security.

21   Q.  And what do you do in that role at the Hudson Institute?

22   A.  I travel through the region, talk to other experts,

23   testify in front of Congress, do things like this; provide

24   expert witness testimony based on the experience I had when

25   I was in the military and as an intelligence officer.

1    Q.  Do you also teach?

2    A.  I'm an expert lecturer at the National Defense

3    University, but as far as a teaching role, no.

4    Q.  Okay.  But in terms of your being a lecturer at the

5    National Defense University, what topics do you typically

6    speak on?

7    A.  Iranian terrorism.  At the National Defense University I

8    mainly spoke about ISIS, the roots of ISIS and why ISIS was

9    allowed to go into Iraq and Syria, and there was an Iran

10   component to that.

11   Q.  Were you a contributor -- a recognized contributor to

12   the U.S. Army in Iraq war treatises that were created?

13   A.  Yes.  General Odierno commissioned a report --

14   commissioned a study on the Iraq War, and it was conducted

15   at the National Defense University, and I was one of the

16   expert contributors specifically on Iran's malign influence

17   in Iraq, and our assessment at the end was there was one

18   victor in Iraq, and it was Iran.

19   Q.  Okay.  Well, there's really three areas that I'd like to

20   cover with you today.  First I'd like to talk a little bit

21   about your backgrounds and qualifications focusing on your

22   prior experience; second, I want to ask you about the

23   methodology that you employed here and how that came from

24   your work history; and then discuss the specific five attack

25   attributions that you've been asked to look at.  Is that

1    fair?

2    A.  Yes.

3    Q.  Okay.  Let's talk about your history in the U.S.

4    military.  Are you a member of the military?

5    A.  Yes, I was.

6    Q.  Okay.  And U.S. Army?

7    A.  U.S. Army.

8    Q.  Okay.  Tell me about your career in the U.S. Army and

9    what your focus was.

10   A.  Well, I joined in 1986 because my dad said, "Get out of

11   house at 18, and I'm not paying for college," so I joined

12   the military.  In 86 I learned Arabic in Monterey,

13   California, so I became an intelligence soldier after I

14   learned Arabic.  I went to the 101st Airborne Division, and

15   then after that went to Desert Storm and basically decided

16   to -- do you want me to go through the military history,

17   what I did?

18   Q.  Yes, please.

19   A.  All right.  So I decided to get -- you know, to

20   transition out of the military, and the only way you could

21   do that is if you went -- they called it Green to Gold.  I

22   had no intention of being a careerist.  I wanted to get out,

23   but I couldn't get out because I was in a highly qualified

24   MOS where I spoke Arabic, had a Top Secret clearance.  It

25   was right after Desert Storm so the only way to get out was

1    to go Green to Gold, to become an officer.  So I went to

2    Indiana University, took the Arabic credits, and transferred

3    it there.

4              THE WITNESS:  Do you want me to slow down a little

5    bit?

6              THE COURT REPORTER:  I'd love it.

7              THE WITNESS:  Sorry about that.

8    A.  And at the end of that I decided I wanted to pursue a

9    military career.

10             You know, I got commissioned as an officer in '95,

11   went back to the 101st as a lieutenant in the same platoon I

12   was enlisted in, and then spent my captain years in the 82nd

13   Airborne Division, and that's when 9/11 happened.

14             And 9/11 happened.  I went to Afghanistan; served

15   as a company commander.  In 2002 to 2003, returned from

16   Afghanistan and then started mobilizing, getting ready to go

17   to Iraq, you know, after the invasion.

18             In 2005, I was an embedded advisor with the

19   Kurdish mission in Mosul where their main focus was

20   Al-Qaeda.

21             THE WITNESS:  Mosul, Iraq; M-O-S-U-L.

22   A.  And I served there for a year, and at the end of that

23   that was 20 years in the military, that whole stint there.

24   So I joined the Defense Intelligence Agency as a subject

25   matter expert on the Iraqi military.

1           And that was at the height of the Iraq War.  This

2      is 2006.  Iraq's falling apart.

3           You know, I served -- in 2005/2006 in the

4      military, but in 2006 to 2010 I served as an intelligence

5      officer, and that allowed me to basically embed with the

6      Iraqi security forces and the intel apparatus, and my

7      mission was to expose the Iranian influence within these

8      organizations.

9      Q.  I was going to ask you that.  Did you have a specific

10     focus in terms of what your role was in intelligence --

11     A.  Right.

12     Q.  -- working first for the military and then moving over

13     to the Defense Intelligence Agency?

14     A.  Right.  It was an accidental entry into this world.  I

15     was basically sitting in Baghdad wearing a T-shirt, and

16     somebody walked up and said, "Hey, I have a meeting with

17     Dr. Basamma," who happened to be a sectarian actor in Prime

18     Minister Maliki's government, and I was -- the person found

19     out I was the expert on Dr. Basamma, so I -- he goes, I have

20     a meeting with her in 30 minutes, can you go:

21          And I said, "Sure."  But I had a beard on.  I had

22     a T-shirt, and I was wearing cargo pants so I looked like a

23     personal -- a PSD guy, personal security detachment.  I

24     didn't look like an intelligence officer.  So that actually

25     won me favor with this office so -- it was called the Office

1    of the Commander in Chief, and it was basically Iran's

2    command and control structure that they had put in place in

3    the Iraqi government.

4          So I go in and meet people that I knew from

5    intelligence reports that were killing -- ordering the

6    disappearance of Sunni males, charismatic officers, and I'm

7    working with a General McMaster at the time, and he's a

8    colonel, and I'm working for General Petraeus, and I tell

9    them, "I've got this meeting with Dr. Bassama.  She wants me

10   to go there every day."

11         And they said, "Go."

12         And I said, "She thinks I'm this low, dumb

13   American who speaks Arabic," because I could understand 80

14   percent of it, but I used it to my benefit by basically

15   sounding like somebody who just learned the language.

16         And General Petraeus and McMaster said, "Go in

17   there and find out all you can, and let them think you're

18   that dumb American."  Because I literally heard them say in

19   front of me, "It's great to have Mike in here because we can

20   do all this stuff, and he's in here so it makes it look like

21   he's okay with it."

22         And that's kind of what allowed me to stay in Iraq

23   the next four years as a binary request from Generals

24   Odierno and Petraeus to continue to work Iran malign

25   influence because I had an inside view.

1    Q.  And, in fact, your title was Special Matter Expert on

2    Malign Iranian Influence in Iraq; isn't that correct?

3    A.  That was my -- that was -- that's in my resume.  My

4    title for the Iraqi government was -- I was at a cover, so I

5    was a political advisor.  And I was actually an intel

6    officer that was in there collecting on them.  But I was

7    just the dumb American that got assigned to them that they

8    could take advantage of.

9    Q.  You also provided services -- and I think you were kind

10   of talking a little bit about this -- for CENTCOM during

11   that period from 2006 forward.  Can you describe for the

12   Court the work you were doing there.

13   A.  Well, so after Iraq -- so from 2006 to 2010 I'm working

14   in Iraq specifically either in country or at the Pentagon.

15   And then after that I go to CENTCOM where we were looking at

16   the beginnings of ISIS, the beginning of instability, and

17   we're looking at the Arab Spring where Osama bin Laden is

18   worried and Zawahir, the Al-Qaeda leader that was recently

19   killed in Kabul, were worried that too many Al-Qaeda

20   fighters were leaving Afghanistan and going to Syria, and

21   they were trying to keep them from going.

22          When I was in Iraq, we worked the same dynamic

23   where Al-Qaeda was trying to get foreign fighters from Syria

24   to go into Iraq.

25          Now, we had foreign fighters from Afghanistan,

1    Al-Qaeda members, leaving the country to go to Syria because

2    they could actually succeed there.  And what I mean by that

3    is they were in Afghanistan, and they seen an American yet

4    they were being killed in drone strikes so their complaint

5    in signals intercept was I'm here in Afghanistan to kill

6    Americans, but I haven't seen one yet because every time I

7    turn my phone on there's a drone strike.  So they wanted to

8    go into a more permissive environment, and that was Syria.

9         So I worked the Abbottabad sensitive site

10    exploitation when Osama bin Laden was killed.  We were able

11    to look at everything, and in that we started to discover

12    the Al-Qaeda/Iran connection that we just didn't have that

13    insight into at the time.  And a lot of that's been

14    declassified now.

15         And then we were able to go back and trace that

16    relationship all the way back to 1993 when Al-Qaeda sought

17    to increase its lethality by asking the Islamic Republic of

18    Iran, its revolutionary guard corps, to help it.  And the

19    suggestion was that you need to meet Mugniyah, Lebanese

20    Hezbollah's operational commander --

21         THE COURT:  Could you spell that for the court

22    reporter.

23         THE WITNESS:  It's M-U-G-N-I-Y-A-H.  Wait, M-U-G-H-

24    N-I-Y-A-H.

25         THE COURT:  Thank you.

1    A.  So we started to see this -- it just made sense that --

2    it didn't make sense at the time because we're basically

3    unravelling Al-Qaeda.  When we get the sensitive side

4    exploitation in Abbottabad, we're able to see these

5    long-term relationships.

6              So when CIA got the hard drives in the Abbottabad

7    raid, they looked for it for imminent attacks, imminent

8    threats.  So that was their focus.

9              The National Security Agency looked at it so they

10   could exploit the networks.

11             We looked at it so we could understand Al-Qaeda

12   and its relationships, and we saw deep ties between the

13   IRGC, the Islamic Revolutionary Guard Corps, and Al-Qaeda

14   senior leadership.

15   Q.  So to be clear, were you part of the group that was

16   asked to review the documents that were seized from Osama

17   bin Laden's compound?

18   A.  Yes.

19   Q.  And is that what you're referring to?

20   A.  Yes.

21   Q.  As part of your -- again, talking about your background

22   and your qualifications, as part of your history in Iraq,

23   did you provide intelligence assessments to the national

24   intelligence community, to the multinational force, and also

25   to the Iraqi government?

```
 1    A.  I did.

 2    Q.  And in doing that, would you have to assess what attacks

 3    Iran and its proxies were involved in from time to time on

 4    the ground?

 5    A.  Yes.

 6    Q.  Can you describe what types of briefings you would

 7    have -- typically have to give to General Petraeus and to

 8    McMaster and others when you were on the ground.

 9    A.  We started noticing that there was a shadow chain of

10    command in the Iraqi military, so there was the official

11    chain of command that we were working with and advising, yet

12    they were trusted members of the Iraqi military that were

13    aligned with Shia political parties tied to Iran that were

14    basically conducting operations outside of the knowledge of

15    the U.S.

16            So we -- these are the phase where we would find

17    56 dead bodies every day on a corner with their hands zip-

18    tied behind their backs with drill marks on their body, the

19    torture part, and then the execution, the single gunshot in

20    the back of the head.  And it was this shadow military and

21    intelligence network that was basically targeting Sunni

22    military jamels [sic].

23            So what we would do is we would go meet with these

24    individuals, and we'd have dinner with them.  We'd drink

25    with them in order to get them to tell us what was going on.
```

1          And we started learning that they were actually

2     proud of this.  They were actually proud of targeting Sunnis

3     and making these terrorists disappear because everyone was a

4     terrorist, is what they would tell us.  Everybody's a

5     Ba'athist.  Everybody is a collaborator.

6     Q.  Have you been accepted as an expert in military

7     intelligence and attack attribution previously?

8     A.  Yes, I have.

9     Q.  Okay.  Were you an expert accepted in the *Karcher* case?

10    A.  Yes.

11    Q.  The *Hake* case?

12    A.  Yes.

13    Q.  The *Martinez* case?

14    A.  Yes.

15    Q.  The *Hamen* case?

16    A.  Yes.

17    Q.  And all of those you were experts on military

18    intelligence and attack attribution; isn't that correct?

19    A.  Attack attributions based on my knowledge of terrain,

20    the area of operation, the years -- each year you could

21    basically map what a Shia militant group or a Sunni militant

22    group was able to do based on their capabilities and the --

23    and their level of primacy in the area.

24    Q.  Now, at our request did you provide an expert report

25    both looking at Iran's influence with proxies generally, and

1    then as to attack attributions for five specific attacks?

2    A.  Yes.

3    Q.  Okay.  And is that what is in front of you as

4    Exhibit 1003?

5    A.  Yes, it is.

6    Q.  Okay.  And did you give all the opinions in that report

7    to a reasonable degree of military and professional

8    certainty?

9    A.  Yes.

10           MR. TESELLE:  Your Honor, I move the Court to

11   accept Mr. Michael Pregent as an expert in the areas of

12   military intelligence and intelligence gathering and Iran's

13   malign influence through proxies in Iraq as well as attack

14   attributions in Iraq.

15           THE COURT:  So moved.

16           MR. TESELLE:  Thank you.

17   Q.  So let's turn to your methodology --

18   A.  Sure.

19   Q.  -- that you employed.  Can you -- now, you've worked in

20   intelligence for how long?

21   A.  32 years.

22   Q.  Okay.  And is there a -- basically an accepted

23   methodology as to how to assess attacks and attribute those

24   attacks to groups?

25   A.  There is.  I look for the area of the attack, where it

1    took place, the timeline.  I'm able to look at the tactical

2    operational and strategic goals of, you know, both the U.S.

3    and our enemies and be able to look at an area of operation

4    and then start diving into it.

5            You know, this area of operation, I can tell you

6    who operated there, whether it would be a Shia militia or an

7    Al-Qaeda affiliate, and then in that I start looking for

8    indicators, things that I need to see in order to shore up

9    my attribution.

10   Q.  You look at the location of the attack?

11   A.  Location of the attack, things that are present.  The

12   benefit that I have is I'm no longer an intelligence

13   officer, and I don't care if I ever have a security

14   clearance again because I find it very limiting in where I

15   can go and travel.

16           So I can look at reports in WikiLeaks.  I can look

17   at the SIGACTS.  And as an intelligence professional with a

18   32-year history, I can look at a WikiLeaks report and say,

19   yeah, that's an official American document.  That's what we

20   use.  That's what it looks like.  And I can look at the

21   number of high-value targets in the area, weapons, caches,

22   foreign fighter flow, and basically be able to provide

23   attribution based on those factors present.

24   Q.  Did you look at SIGACTs in this case?

25   A.  Yes.

1    Q.  And can you describe what that is and why you would

2    review those.

3    A.  So a SIGACT -- significant activity -- is an event that

4    registers in a Sunni database, which is a military database

5    that, you know, most intelligence soldiers and officers, you

6    know, put in place so we can have a historical record of

7    what happened.  And those SIGACTs will tell you whether

8    there was a mortar strike, an IED, an VBIED, any of the

9    reports indicating the capture of a high-value target, an

10   Al-Qaeda individual or a militia member.  And also you can

11   look at what the U.S. mission was.

12        And I had the benefit of being in Iraq from 2006

13   to 2010, actually 2005 to 2010, so I was very aware of what

14   we were doing, what Iran was doing, what its proxies were

15   doing, what Al-Qaeda was doing, and be able to see it, you

16   know, in that space, in that -- the place where the attack

17   took place.

18   Q.  Is it typical, when assessing an attack, to look at

19   other attacks, similar attacks, that occurred before and

20   after at that location?

21   A.  Yes.

22   Q.  Is it also typical for someone doing attack attribution

23   to look at other indicators of a group's activity in that

24   area?

25   A.  Yes.  There are signature attacks.

1    Q.   Okay.  Did you do that -- is that something you relied

2    on in doing your analysis in this case?

3    A.   Yes.

4    Q.   Okay.  And, in fact, were the -- were all of the

5    available data through SIGACTs, through other documents,

6    through available materials, were those then provided to you

7    to be able to assess and analyze as part of your report?

8    A.   Yes, they were.  Both -- I could read the report and I

9    could also see them visually in graphics that we had created

10   that would denote specific activities.

11   Q.   And one of the things that was able to be done when

12   compiling all that data was you were able, then, to create

13   maps that would show activity through a certain time period

14   from before and after an attack, correct?

15   A.   My role as an intelligence officer was to be able to try

16   to convince a general officer within two minutes that

17   something had happened.  So I wanted to graphically depict

18   these attacks and be able to shore them up by showing fact-

19   based SIGACTs and be able to graphically represent them and

20   ideally put a picture together so a commander would be able

21   to see what the intelligence picture showed.

22   Q.   If we can look at -- just -- as overview, so we know

23   what we're going to be looking at today, you then would

24   include those maps as part of your expert report in --

25   that's been presented to the Court in PX1003, correct?

```
 1    A.  Yes.  We were able to go into a lot of detail in this
 2    report.
 3    Q.  So if we look at Page 56, for example --
 4    A.  Volume II?
 5    Q.  I'm sorry, yes, it's still in your report, PX1003.
 6    A.  Okay.  56?
 7    Q.  Yes.
 8    A.  Okay.
 9    Q.  For example, if we look at Map No. 1 here, here's a map
10    that's showing Iran's support of Sunni terror group activity
11    south of Fallujah.  Is that something that you would
12    typically review and assess as part of your analysis?
13    A.  Yes.
14    Q.  Okay.  And just to show the types of maps before we get
15    into the individuals, if you look to the next page, the
16    foreign fighter flow that's going through.  And what's being
17    shown here would be data points based upon SIGACTs, ops
18    reports, other materials that are readily available or have
19    been made available to the public?
20    A.  Yes.  I would look for four indicators or four fact-
21    based categories to be able to assign attribution.  In this
22    case, this is a foreign fighter flow graphic, which shows
23    foreign fighters moving in from Syria.  And what's important
24    about that is this was a coordinated event with Hezbollah,
25    with the Assad regime in Syria, and the Islamic
```

1    Revolutionary Guard Corps with the goal of providing Al-

2    Qaeda a secure permissive environment to continue to

3    replenish its ranks in order to attack Americans.

4    Q.  Okay.  Before we get -- before we get into these, I have

5    a couple of questions that have come up in the first two

6    days, and I want you to have a chance to respond to them.

7    A.  Sure.

8    Q.  The first is the question of why Iran would supply

9    munitions and bombs and missiles to Sunni groups who would

10   then kill Shia groups where Iran is a Shia country.  Can you

11   talk about that, and what was learned over time from it

12   being in Iraq?

13   A.  Right.  We were perplexed by this dynamic.  We believed

14   that sectarianism was a principal position; that if you were

15   Shia, there's no way you would work with Sunnis.  And every

16   time an Al-Qaeda car bomb would go through a Shia checkpoint

17   to target a Shia government, entity, or building, that whole

18   argument was deconstructed.  Sectarianism was not principal.

19   It could be bought for 200 bucks for somebody to look the

20   other way.

21        Now, let's go to the 30,000 foot view of Iraq and

22   why Iran would do this.  When we first invaded Afghanistan,

23   Iran actually reached out to the Bush Administration and

24   wanted to help it with Al-Qaeda, and we knew -- to gain

25   leverage.  I don't know how sincere it was, but there was

1    communications.

2              When we went into Iraq, Iran all of a sudden felt

3    surrounded.  You had U.S. forces in Afghanistan on the east

4    side of the country, and then you had U.S. forces in Iraq.

5    So Iran simply thought they were next.

6              At that time we started to see Iran support the

7    Taliban with lethal aid, and that's when he unleashed

8    Zarqawi in 2003 into Iraq with a specific goal of targeting

9    Americans.  And those are things we have source now by U.S.

10   Treasuries.  There are sanctions based on that.

11             And that information, again, was learned over

12   time, but that's what had happened.

13   Q.  What did we learn, if you can tell the Court, about the

14   relationship between the Iran, the Ayatollah, and Al-Qaeda

15   and Osama bin Laden at the highest levels during this time

16   period that we didn't know at the time that we've learned

17   since?

18   A.  So what we learned when we looked at the Abbottabad

19   sensitive side exploitation, we had Osama bin Laden saying

20   Iran was hands off.  Do not mess with the regime.  Do not

21   mess with Iran.  Because they were actually safeguarding the

22   passage of Al-Qaeda members into Afghanistan from Iran, and

23   they also, at the time, were protecting Osama bin Laden's

24   wife and his son.

25             And the next leader of Al-Qaeda is most likely one

1   of the Al-Qaeda members that Iran continues to harbor to

2   this day and has been sanctioned for.  So, again, we're able

3   to learn what was going on in 2003 based on what we found

4   out in 2010 with the Abbottabad raid.

5          So we learned that there's this relationship

6   between Osama bin Laden, you know, senior levels of the

7   Islamic Revolutionary Guard Corps and Lebanese Hezbollah.

8          And this goes back to the 1993.  This is where

9   Al-Qaeda starts learning how to use car bombs, how to use

10  IEDs, you know, because Hezbollah was basically employing

11  these tactics against Israel.  And Hezbollah was the

12  interface between Arab forces and Iran because, again, the

13  Persians -- not everybody speaks Arabic.  Qasem Soleimani

14  did, but Esmail Qaani, the new leader of the Islamic

15  Revolutionary Guard Corps-Qods Force, doesn't.  So Lebanese

16  Hezbollah was always the interface, and, again, common

17  enemies; Israel, the United States.

18         So we see this relationship building, and then we

19  learn that Zarqawi is in Iran in 2003 receiving training

20  from the Islamic Revolutionary Guard Corps, and then

21  basically told to go into Iraq, and we'll help you, we'll

22  give you weapons, we'll give you money, and we'll give you a

23  permissive environment to kill Americans.

24         And we fast forward to the Golden Mosque bombing,

25  and this is where we're all perplexed.  Why would Iran give

1    Al-Qaeda or supply Al-Qaeda with weapons and arms to kill,

2    you know, Shia?  To destroy the Golden Mosque?  That's when

3    senior Al-Qaeda leadership and senior leadership within the

4    Islamic Revolutionary Guard and the MOIS said Zarqawi is a

5    problem.  Osama bin Laden, through the Abbottabad documents,

6    told Zarqawi to stop killing Sunnis, do not incite a

7    sectarian war with the Shia.

8              And, you know, the Golden Mosque bombing happened

9    in January of I want to say '05 or '06 --

10   Q.  2006?

11   A.  -- '06, January -- February of '06, and Zarqawi's killed

12   four months later.  And in that time you have the famous

13   video of Zarqawi not being able to clear a machine gun, so

14   he doesn't look like a fighter to the Mujahideen anymore, to

15   the Al-Qaeda fighters.  He now looks like somebody who

16   doesn't know how to operate a simple AK-47 because he can't

17   clear a jam, and that was leaked by people who wanted to see

18   Zarqawi go.

19             Now, we don't know that Al-Qaeda did that, but we

20   do know that Osama bin Laden, Zawahiri, and the

21   Revolutionary Guard Corps officers that allowed Zarqawi this

22   permissive environment before the Golden Mosque bombing now

23   saw him as a problem, now saw him as somebody that needed to

24   go.  And that's -- that was always the sticking point.  But

25   in a grand strategic scheme, Iran wanted to bloody Americans

1     and Sunnis that they didn't care about.

2              And let me just fast-forward to the ISIS invasion

3     real quick.

4              ISIS was able to hold Mosul, was able to hold

5     Fallujah, and was able to take Ramadi.  And the Iraqi

6     government didn't care.  They basically let Mosul sit under

7     ISIS control for two and a half years.

8              It's what they did during the Iraq War.  It's what

9     they did during the time that our -- from 2005 to 2008.

10    They didn't care about these areas.  And in that, they were

11    happy to supply Al-Qaeda with weapons with a permissive

12    environment with foreign fighters because it fixed the

13    Americans in Anbar.

14             Anbar was the most dangerous province in Iraq

15    until the surge in 2007 and 2008.  Prior to that you

16    couldn't control it.  And the plaintiffs that we have that

17    have suffered attacks in Anbar -- Anbar was built to fail by

18    the Iraqi government at the time -- to this day, one backed

19    by Iran and one, you know, heavily dominated by political

20    parties tied directly to Iran.

21             And it was by design to keep Americans focused in

22    Anbar and Ninawa province while Iran and its proxies

23    continued to gain primacy in the Iraqi security forces, take

24    over the Iraqi intelligence apparatus, decide who its next

25    prime minister was going to be, basically saturate and

 1    dominate Iraqi political intelligence and military.

 2              And the economic portfolios all fell under Iran,

 3    and this is when Soleimani tells Petraeus in a letter, "I

 4    decide what happens in Iran.  I decide who the prime

 5    minister is.  I am the ambassador."

 6              And also at the same time this is where Petraeus

 7    says:  It is Iran that is killing more Americans either by

 8    proxy or directly through its militia proxies.  And when I

 9    say "by proxy," I mean by supporting Al-Qaeda and other

10    groups.

11    Q.  And all of that is summarized in more detail in your

12    report, correct?

13    A.  It is.  And I know I'm talking a lot about this, but

14    there's just -- that's the part that even perplexed us, and

15    then we just realized that at the end of the day everything

16    that happened that was negative, any time a Shia population

17    center was hit, any time a Shia religious mosque was hit,

18    they'd benefit Iran over the long term because Iran could

19    always say, "That's why you need us here.  Because the

20    Americans aren't protecting you.  You need us here."  And

21    you saw the primacy that Iran gained during the ISIS

22    campaign.

23    Q.  Okay.  The other question I wanted to address, before we

24    got into the attacks, was the involvement of the former

25    regime elements --

```
1     A.  Yes.

2     Q.  -- and if they -- if they were involved in terror

3     attacks; and if so, what time frame was that?

4     A.  So I've dealt with this issue in other cases where we've

5     had plaintiffs that say I was attacked in Mosul in March of

6     2003, in April of 2003.  In one case before we even invaded

7     there was a special operator who was attacked in Mosul, and

8     I had to tell the legal team that these clients can't be

9     part of this suit because they encountered Ba'athists.  They

10    encountered Saddam's Republican Guard.

11              After the fall, of course, they're called former

12    regime elements.  At the time they were actually Saddam's

13    military, and I worked reconciliation issues.  So part of my

14    job or part of my -- you know, my focus was how do we deal

15    with Sunni groups and how do we curb Iran's influence?  How

16    do we, you know, make it less effective?  And part of that

17    was engaging former regime elements.

18              So we wanted there to be this entity out there of

19    former secular Ba'athists that we could work with because

20    they weren't the jihadists.  They weren't Al-Qaeda.  And

21    Zarqawi had brutalized the former regime element members.

22    He had killed former commanders.

23              So there was this former regime element called

24    Jaysh Rijal -- and this is a terrible.  I'm not going to do

25    this to you.  I'm just going to say JRTM.
```

1          JRTM was a former regime element entity that

2    was -- was more myth than an actual force, and we had

3    several of its members in detention in Karper (ph).  And I

4    met with one of them whose name is Najim Al-Hajeri, and he

5    was a 10th Hammurabi Division commander.

6          THE WITNESS:  I can spell any of these, if you

7    want me to.

8    A.  Republican guard, and, you know, we had him.  We talked

9    to him about this stuff, and he wanted to inflate their

10   capability.  They just didn't exist the way where we could

11   attribute attacks to them.

12          At the time, if you were a former regime element,

13   in 2004, you join an Al-Qaeda affiliate and conducted

14   attacks.  In 2003, you could operate because there was no,

15   you know -- by summer of 2003 Zarqawi was in effect.  But

16   prior to that you basically had to operate as somebody that

17   was upset that the United States invaded.

18   Q.  Through your report --

19          THE COURT:  Let me -- before we get to the

20   attacks.

21          So you've been here this week.  We've heard about

22   many different attacks in different parts of the country.

23   Some by Sunni groups, some by Shia groups using different

24   types of munitions and tactics.  Some in the city, some in

25   the country.  You've just said that the FRE elements were

1    not sophisticated enough to carry off these attacks.

2            THE WITNESS:  Right.

3            THE COURT:  Are there any attacks after the fall

4    that you would not attribute to Iran?

5            THE WITNESS:  I just want to clarify something,

6    Your Honor.  So the former regime elements were very

7    capable, but they didn't operate as former regime elements.

8    They joined Al-Qaeda.  So when we saw ISIS roll into

9    Mosul and that capability that they showed, those were the

10   former --

11           THE COURT:  Maybe they were sophisticated enough,

12   but they were not independently operated.

13           THE WITNESS:  We were looking for that group, Your

14   Honor.  We believed that if we actually could come across a

15   Ba'athist element, then we could reconcile with them.

16           In my capacity as an intelligence officer, I met

17   with these individuals in northern Iraq, and they basically

18   told us, "Empower us, and we'll help you defeat Al-Qaeda and

19   the militias."  But, of course, we wouldn't because that

20   would be -- we would be undermining our DeBa'athification,

21   you know, act that we put in place where we basically

22   disenfranchised Sunni military jamels and Sunni technocrats

23   across the country.

24           So we were looking to attribute these attacks to

25   JRTM, which would be that former regime element.  It just

1    never materialized.  It didn't even show up during the ISIS

2    campaign.

3             THE COURT:  So fine.  So back to my question.

4             THE WITNESS:  Yes, sir.

5             THE COURT:  You couldn't attribute any attacks to

6    FREs, and the attacks that we have talked about seem to take

7    every conceivable form and every part of the country.

8             THE WITNESS:  Yes.

9             THE COURT:  Are there any attacks post-fall that

10   you would not attribute to Iran or to groups supported by

11   Iran?

12            THE WITNESS:  In the 2005 to 2008 period where

13   these clients we're talking about, I would not be able to

14   attribute any of those to the FRE, and I would attribute

15   them to Iranian lethal aid, yes.

16            THE COURT:  Okay.  So let me ask my question one

17   more time.

18            THE WITNESS:  Yes.

19            THE COURT:  Are there any attacks that you would

20   not attribute to Iran ultimately?

21            THE WITNESS:  I have to answer it this way.

22            THE COURT:  Okay.

23            THE WITNESS:  I can attribute it to Al-Qaeda

24   foreign terrorist organization that benefited from Iran's

25   lethal aid and permissive environment.  That's how I would

1     answer that.

2          So I would have to say -- I would attribute them

3     to Iranian lethal aid to a foreign terrorist organization,

4     whether it be Lebanese Hezbollah or Al-Qaeda.

5          THE COURT:  So just so I'm clear, every attack

6     that occurred after the fall of Baghdad is linked to

7     material support provided by Iran?  Every attack of U.S.

8     service members or contractors after the fall can be traced

9     to groups receiving material support from Iran?

10          THE WITNESS:  Yes.

11          THE COURT:  True statement?

12          THE WITNESS:  It is a true statement, but it's

13     more nuanced than -- my answer than just a yes.  It would be

14     those factors that I'm looking for.  Did they benefit from

15     foreign fighter flow?  Did they benefit from a permissive

16     environment?  Did they benefit from an incapable Iraqi

17     security force that Iran put in place?

18          THE COURT:  Okay.

19          THE WITNESS:  So I would say yes, but I would be

20     able to tell you why.

21          THE COURT:  Understood.

22          All right.  Continue, Counsel.

23     BY MR. TESELLE:

24     Q.  Just to be clear on the follow-up, you've only looked in

25     this case at the five attacks that --

1    A.  Yes.  Those cases, yes.

2    Q.  I'd like to turn to the PowerPoint which takes the

3    report and puts it into some demonstrative form so that we

4    can talk about things.

5         You talked about location being an important part

6    of your determination.  Where was -- and let's start with

7    the Iranian support zone to AQI.  Can you talk about this

8    area and why that is considered to be an AQI zone?

9    A.  Well, it's a Sunni zone, so it's basically where the

10   Sunni population of Iraq lives and the Kurdish population in

11   the northeast, and these are areas that, absent oil

12   reserves, absent infrastructure, Iran simply wasn't

13   interested in occupying, so in that case they wanted to fix

14   the U.S. forces.

15        So at the beginning of the invasion of Iraq, Assad

16   and Syria releases all of his Sunni insurgent terrorists

17   with the direction to his intelligence services to push them

18   into Iraq.

19        Iran does the same thing, pushes them into Iraq.

20   Pushes them into these Sunni zones to take on American

21   forces.

22        At the same time, Iran moves 10,000 militia men

23   called the Badr Corps into Iraq from Iran.  These are the

24   militia men that fought against Saddam during the Iraq/Iraq

25   War.  They're trained by the Revolutionary Guard Corps.

1   They're Iran's premier proxy in Iraq.  They basically fill

2   the ranks of the Iraqi security forces, the ministry of

3   defense, the ministry of interior, the brigade commanders

4   and the division commanders in the areas that Iran cared

5   about were all Badr Corps commanders.  In the area

6   highlighted, they didn't care who commanded those units with

7   the exception of the first Iraqi Army division, which was in

8   Taji, and it's directly tied to one of our plaintiff's

9   cases.

10          So this was a zone that was easy.  Iran simply,

11  along with his clients, stayed in Syria released its prison

12  population into Iraq with the goal to go kill Americans, and

13  here you had established lethal aid routes where they could

14  pump in weapons.

15  Q.  If we can show the foreign fighter routes that were

16  talked about -- you talked about earlier and it's been

17  talked about earlier this week.

18          Can you talk about these routes and what the

19  importance of them were during this time period.

20  A.  So as they enter Iraq from Syria, it's a coordinated --

21  it's where you see Hezbollah and Al-Qaeda and the Assad

22  intelligence apparatus coordinate to ensure that anyone who

23  enters Syria as a jihadist is observed, is routed, is pushed

24  into Iraq to take on Americans.

25          They weren't allowed to come back.  And if they

1    did come back, they knew who they were, and they went to

2    these camps, and then they went back into Iraq again.  So

3    this is basically that facilitation route that starts to

4    take place in 2003.

5              The Iran into Iraq from the northeast corner,

6    that's basically where Zarqawi moves in and starts working

7    with Tawid Wal-Jihad law and Ansar al-Sunnah, two groups

8    that basically Zarqawi turned into the Islamic state of

9    Iraq.

10   Q.  And now let's take those off and let's look at the Shia

11   zone event points.

12             And if you could pick up the smuggling route,

13   which would --

14   A.  So the key thing about Iraq is, this is what Iran was

15   interested in.  This is where the oil is.  All these

16   highlighted areas, this is where the oil is.  This is where

17   the majority Shia population is.  And in those areas where

18   it's a mix of Shia and Kurds in northern Iraq, there in that

19   shaded zone where the 2 is.  Is that a 2 or is that a lake?

20   This is where Iran wanted to make sure that the Iraqi Army

21   commanders were under their umbrella, under their thumb.

22             So every Iraqi Army division commander in this

23   area was a Badr Corps member, was tied to Iran, and this

24   allowed a permissive environment for not only the Shia

25   militias, but in most cases, when Al-Qaeda conducted an

1    attack, there was an Iraqi Army unit there that didn't do

2    anything about it, and a lot of this was by design.  The

3    strategic goal of Iran in these shaded areas was to gain

4    primacy, was to establish these -- these weapons smuggling

5    routes so they could provide lethal aid to their militias to

6    take on the Americans, and they could provide lesser lethal

7    aid -- what I mean by that is non-EFP lethal aid -- to the

8    Sunni insurgency for Al-Qaeda to attack Americans.

9    Q.  And the smuggling routes that you're talking about in

10   this permissive environment --

11              MR. TESELLE:  If we can pull up the middle one for

12   the --

13   Q.  -- these come from -- all of this come from military

14   assessments that were done?

15   A.  Right.

16   Q.  Showing the different routes that you've plotted,

17   correct?

18   A.  Right.  So IT basically shows established supply routes

19   for weapons throughout Iraq to include up to the north, and

20   this was a -- these were controlled routes.  These were

21   places where a lot of our American forces were attacked

22   because their mission was to stop the flow of lethal aid,

23   Iranian lethal aid to the insurgency.

24              As you can see, those routes in northern Iraq are

25   going through Sunni areas, and these are established Iranian

1    weapons smuggling routes, and they're going through Sunni

2    areas, and they're going through Shia/Sunni mixed areas and

3    two provinces Salah ad-Din and Diyala province, two areas

4    that were key to Iran.

5    Q.  Let's see if we can show this.  And when we're talking

6    about -- I'll stay here at the podium.  When we're talking

7    about the smuggling routes, what is being smuggled from Iran

8    into Iraq?

9    A.  So as we increase our defensive capabilities, our up-

10   armored capabilities, our IED defeat technology, we start to

11   see an increase in capabilities for the insurgency, in the

12   case of EFPs, in the case of advanced triggers systems, in

13   the case of, you know, sophisticated weapons to basically go

14   against our upgraded armor, our upgraded defenses.  And we

15   were always playing catch-up because when we were introduced

16   to the EFP and other weapons systems, we could always tie

17   that increased lethal aid to Iran because it was basically

18   using these smuggling routes.

19   Q.  Let's talk -- let's turn to the five attacks that you

20   were asked to look at --

21   A.  Right.

22   Q.  -- here and to provide attack attributions.  Did you

23   review each of these five attacks?

24   A.  Yes, I did.

25   Q.  Okay.  And you were here in the courtroom when each of

1    the five plaintiffs or representatives --

2    A.  Yes, I was.

3    Q.  -- testified.

4           If we look first at Page 45 of your report.  Pages

5    45 through 52, is that your attack attribution analysis for

6    the Steven Nunez attack --

7    A.  Yes.

8    Q.  -- on April 5, 2005?

9    A.  Yes.

10   Q.  Okay.  And this was the car bomb in the Dora

11   neighborhood, correct?

12   A.  Yes.

13   Q.  Okay.  If you can walk us through your analysis and your

14   conclusion as to why you came -- that this was an AQI attack

15   supported by Iran?

16   A.  So the first thing I looked at was the tactic, suicide

17   vehicle-borne IED or car bomb.  So it wasn't a suicide car

18   bomb, it was a car bomb.  That is an Al-Qaeda tactic.

19          Then I look at the area --

20   Q.  You said a signature.  Can you describe that.

21   A.  A tactic that Al-Qaeda used -- so EFP is associated with

22   Shia militias.  Suicide attacks are normally associated with

23   Al-Qaeda.

24          In this case, a car bomb in an area that Al-

25   Qaeda's operating in -- and the way you find that out is by

1    looking at the SIGACTs, all the Al-Qaeda activity, and the

2    other IEDs and car bombs.  You can see a pattern of Al-Qaeda

3    activity.  And in this case it's an area that's on a

4    sectarian fault line between, you know, a Shia controlled

5    area and a Sunni controlled area with a predominantly Shia/

6    Iraqi military force, again, not doing its job, not going

7    after Al-Qaeda.

8            And so I look at the area of operation.  I look at

9    the tactic.  I look at the SIGACTs where -- you know, the

10   activity, the high-value targets that were captured in that

11   area, and then we'll go and look at mortar strikes and

12   rocket strikes and see the level of activity and the weapons

13   caches.

14           And it just paints an intelligence picture on 5

15   April 2005, looking to the left of it, 90 days to a year,

16   and to the right of it, and to being able to see an entity

17   that had primacy there.

18   Q.  Talk about how the Dora neighborhood factored into your

19   analysis.

20   A.  Well, at the time, if this attack were to happen in

21   2007, I would say this was a Shia militia attack, but then

22   again it would have been an IED or an EFP.

23           But in 2005, this is a struggle between control of

24   Baghdad.  And in this case the militias are doing -- the

25   Shia militias are doing ethnic cleansing throughout the

1    city.  They're trying to change the demographics of Baghdad,

2    and this is a place where, if you fixed the U.S., if you get

3    them to focus on an area you really don't care about at the

4    moment, it basically keeps the U.S. focused here.

5            And in 2005 we're basically being told by the

6    Iraqi government you are not to go after Shia militias.  You

7    can only go after Al-Qaeda.  So the Shia militias are able

8    to do whatever they want, and the U.S. is focused on Al-

9    Qaeda, but the Iraqi military isn't focused on Al-Qaeda.

10   Q.  You also took into consideration the fact that it was a

11   VBIED or a car bomb.

12   A.  Right.

13   Q.  And how is that significant in your conclusion?

14   A.  Well, it shows that -- you know, in order to put a car

15   bomb in place and to have it there and to have it on a known

16   route, it just means that Al-Qaeda's operating the area.

17   They have eyes on.  They've established a pattern of U.S.

18   military activity, and it's positioned in a place that, you

19   know, you would hope somebody would say something about it.

20           You know, we saw this a lot with IED implacement.

21   You know, Al-Qaeda being able to dig a hole and do something

22   and then have an Iraqi Army unit not, you know, reporting it

23   or looking the other way.

24           In this case, you know, a car bomb is a little

25   easier to put in place.  You put it in place.  You leave it

1     there.  But it's on a set route, and it was a tactic that

2     Al-Qaeda perfected during the Iraq War.

3              They knew our high-traffic areas, they knew our

4     patterns, and they were able to put these car bombs in

5     places that would have the most effect on the U.S. patrol.

6     Q.  And so as part of, then, your mapping analysis and your

7     review of the available data, did you look at the other

8     vehicle-born IEDs or car bombs that were carried out in that

9     same area during that same time frame?

10    A.  Yes.  And to expand on that, we do a search of Al-Qaeda

11    activity in the area, and then I'll ask -- I want to see

12    what the Shia activity is in the area, and you'll see maybe

13    four or five SIGACTs, and then everything else was Al-Qaeda.

14             So in this case it's overwhelming SIGACTs tied to

15    Al-Qaeda activity that allows you to make a -- you know, a

16    military intelligence attribution that Al-Qaeda's

17    responsible for this attack based on its ability to conduct

18    attacks, numerous attacks, in this area.  It has primacy in

19    this area, and it's an Al-Qaeda tactic.

20    Q.  Okay.  And then you also have a number of maps that are

21    attached to your report.  For example, let's look at Map No.

22    1, which is Page 47.

23    A.  Yes.

24    Q.  Okay.  And the white dots are a little bit difficult to

25    see, but if you look at the legend, can you describe what

1    we're showing here.

2    A.  So this would be the Iran supported Sunni terror group

3    activity in the East Rashid District of Baghdad, and it's

4    just -- the white denotes Al-Qaeda activity.

5            SIGACTs basically attributed the activity, the

6    significant activity, to Al-Qaeda.

7    Q.  So during this 2004 to 2006 time frame, these are --

8    this is reflecting military documents showing that Al-Qaeda

9    is actually operating in that area, correct?

10   A.  Yes.

11   Q.  And then let's look at Map No. 2.  I'm not going to look

12   at all of them, but on Page 48.  The weapons cache seized.

13   Why is that -- we haven't gone into any detail about that

14   yet.  Why are weapon caches -- what are they, and why are

15   they important?

16   A.  So most IED attacks and car bomb attacks are trying to

17   protect the cache, the weapons cache, and in these caches

18   you'll have AK-47s, you have RPGs, you'll have rockets and

19   mortars, and you'll also have artillery shells for IEDs.

20   But this shows numerous caches in this -- in the Dora area

21   over this time period, but these are the only ones we found.

22   So our find rate is probably less than 30 percent, so

23   there's more.

24           And these IED attacks are designed to keep the

25   Americans from getting close to a high-value target that

1    could be in a safe house in this area or finding a cache

2    that could have a -- you know, a different or more

3    sophisticated weapon in it.

4    Q.  And if we look at Page 52, Map No. 6, this is a

5    different map in terms of showing some locations.  Can you

6    describe what's being shown there and why that's

7    significant.

8    A.  So this is a location of Al-Qaeda safe havens or, you

9    know, safe houses within this neighborhood, and you can see

10   two prominent mosques.  You know, the Iskan Al Sha'ab Mosque

11   and, you know, other properties here.

12            So this shows that not only was this Dora

13   neighborhood a place where they felt comfortable enough

14   putting in weapons caches, they felt comfortable putting in

15   safe houses, and had enough of a permissive environment to

16   put in IEDs, to put in car bombs, to hurt the Americans.

17   They weren't worried about not being able to conduct

18   activities here.  They felt comfortable enough to be able to

19   use it as a place where they could harbor high-value

20   targets.

21   Q.  And is there a significance of the mosque itself?

22   A.  In what sense?

23   Q.  In terms of your -- coming to your conclusion that this

24   area was an Al-Qaeda-controlled --

25   A.  Well, I mean, it's a Sunni mosque, and, you know, we

1    tried to monitor the mosques because a lot of times the

2    imams would put out jihadist type messages about the illegal

3    occupation of Iraq by U.S. forces and putting out these

4    messages.

5            But just the proximity of the mosque to these safe

6    houses and other indicators of high-value targets being

7    harbored there as many -- I mean, the reason it's on this

8    map.

9    Q.  Do you have a conclusion and an opinion as to whether

10   the attack on Steven Nunez, the car bomb on April 5, 2005,

11   was the result of an Al-Qaeda attack with support from Iran

12   and its affiliates?

13   A.  You know, just based on when the attack took place, you

14   know, Al-Qaeda had already established a permissive

15   environment in this area.  Over time the security forces

16   that were assigned to secure this area of Iraq weren't

17   interested.  I mean, just -- the Iraqi security forces

18   assigned to protect this area of Baghdad weren't interested

19   in doing so.

20           Again, at this time -- in 2005, when General

21   Petraeus leaves Iraq, the make-up of the Iraqi security

22   forces in Baghdad is split.  It's 55 percent Shia, 45

23   percent Sunni.  By the time General Petraeus comes back in

24   2006, it's 95 percent Shia, and the units in Iraq were all

25   Shia units, the sixth and ninth Iraqi Army divisions and the

1    first and second national police divisions, and they had no

2    interest in fighting in these Sunni areas.  They were happy

3    to bomb it.  They were happy to tell the Americans to bomb

4    it.  But as far as keeping Al-Qaeda from operating in this

5    area, they had no interest.

6    Q.  Okay.  And so do you have an opinion as to whether Al-

7    Qaeda carried out this attack with --

8    A.  Al-Qaeda carried out this attack because they were able

9    to take advantage of a permissive environment that was

10   established.  They were able to use foreign fighters to

11   replenish ranks.  They were able to use weapons from these

12   caches that were along these Iranian weapons supply routes,

13   and they had the luxury of dealing with a security force

14   that was predominantly Shia that was tied to the Iranian --

15   to the Iraqi political parties tied to Iran that weren't

16   interested in protecting this area.  It was a permissive

17   environment.

18            So if you --

19            THE COURT:  Mr. Pregent, if counsel asks you a

20   yes-or-no question --

21            THE WITNESS:  Oh, was that a yes-or-no question?

22            THE COURT:  -- it will expedite things --

23            THE WITNESS:  Oh, okay.  I --

24            THE COURT:  -- if you answer yes or no.  If he

25   would like you to elaborate, I'm sure he will ask you to do

1   so.  Okay?

2           THE WITNESS:  Okay.

3   Q.  And is that opinion that you've given to a reasonable

4   degree of certainty in your area of expertise?

5   A.  Yes.

6   Q.  Let's turn to the next attack, the May 9th attack, the

7   mortar attack on Taylor Prazynski.

8           Did you -- if we look at Page 53 of your report

9   through 63 --

10  A.  Right.

11  Q.  -- is that your attack attribution report specific to

12  Taylor Prazynski?

13  A.  Yes.

14  Q.  Okay.  And did you have an opinion as to what group

15  perpetrated the mortar attack on May 9, 2005, when Taylor

16  Prazynski was killed?

17  A.  Al-Qaeda in Iraq.

18  Q.  Let's talk about that one and how you came to that

19  conclusion.

20          This attack is in Karmah, and you said you start

21  with the location when you make your assessment.  What is

22  important about the fact that this is in Karmah?

23  A.  Well, if you zoom out, Karmah is between Fallujah and

24  Abu Ghraib, Iraq.  So it is -- it is basically a -- it's the

25  Sunni entry into Baghdad along the Baghdad belts.

1              It was a key foreign fighter facilitation route.

2       It was a route Al-Qaeda used to move in car bomb components

3       and IEDs into Baghdad, and it was a place where the United

4       States Marine Corps was focused on the Sunni insurgency,

5       specifically Al-Qaeda in Iraq and its affiliates.

6       Q.  So was this a Sunni controlled area?

7       A.  Yes.

8       Q.  Sunni permissive environment?

9       A.  Yes.

10      Q.  And that would be Al-Qaeda of Iraq at that point?

11      A.  Yes.

12      Q.  Now, was -- you heard the testimony earlier today

13      about -- that they were chasing Zarqawi in this area.

14      A.  Yes.

15      Q.  You heard that?

16      A.  I did.

17      Q.  Can you talk a little bit about Zarqawi, his formation

18      of Al-Qaeda in Iraq, and whether he was operating in this

19      area during that time frame.

20      A.  Yes.  So, you know, we talked about when Zarqawi enters

21      Iraq in 2003.  This is where -- in Fallujah and Ramadi and

22      Anbar province where the majority of Al-Qaeda attacks were

23      against the U.S. service members.  This is where Zarqawi

24      felt most comfortable.  He could go in and out.  He could go

25      up north to Mosul.  It was a permissive environment.

1          But this is a place where the seventh Iraqi Army

2     division at the time was ineffective, combat ineffective.

3     Two of the brigades inside of this division were basically

4     Shia youth from Sadr City and Baghdad or what we would call

5     Jaysh al Mahdi affiliated militia men that wore the Iraqi

6     uniform.  They had no interest, again, in fighting Al-Qaeda

7     there.  And the Sunnis there were terrified of Al-Qaeda that

8     were in the Iraqi Army.

9          So when you talked to Marines and you asked them

10    about the combat effectiveness of the seventh Iraqi Army

11    division, they would say that it was not combat effective.

12    Q.  Was -- go ahead.

13    A.  And, again, this province was red, and red means the

14    most dangerous province in Iraq from 2003 until 2008.  It

15    was a very permissive environment for Al-Qaeda.

16    Q.  Did this attack occur on one of the foreign fighter flow

17    routes?

18    A.  Yes; and lethal aid routes, yes.

19    Q.  And how did the testimony that Mr. Siewert gave today

20    about their investigation and who they found and their

21    interview of the townspeople, how did that affect your

22    opinion, if at all?

23    A.  Well, one of the -- again, when we asked for SIGACTs,

24    you know, tell me about the high-value targets.  Were there

25    any foreign fighters captured?  Were there any passports

1    captured?

2          What was unique to this attack was the follow-on

3    raid where the local townspeople said that the attackers

4    were not Iraqi.  Well, that means they were foreign

5    fighters, so that means they came in from Syria.  That means

6    they utilized the foreign fighter facilitation network that

7    Hezbollah, Assad, and Islamic Revolutionary Guard Corps put

8    in place.

9    Q.  How did the -- did you find -- if you look at this

10   slide, this talks about the point of origin of the mortar

11   fire and the accurate fire.  How did that fact, that it was

12   an accurate mortar fire attack, play into your opinion?

13   A.  So this is where we could go into the former regime

14   elements.  Who was capable of conducting these mortar

15   attacks?  They joined Al-Qaeda.  They joined the Al-Qaeda

16   affiliates, and this expertise at this point in 2005 could

17   be taught.

18         In this case, there was such a permissive

19   environment that they already had the aiming points and they

20   were able to drop a base plate, go to the base plate, set up

21   the mortar system, put it within two-thirds effective range

22   of the target, meaning they were experts.  They knew the

23   capabilities of their weapons system.  They knew that they

24   could hit their target, and they could bring accurate fires

25   on the objective.  And they were able to do that.

1           And what was -- what was missing in the testimony

2      earlier was the fact that the Q36 radar picked up the mortar

3      attack and did counter fire battery, which means the radar

4      picks up the mortar attack and then fires.

5           This unit that conducted this attack was so

6      skilled that they had already displaced by the time U.S.

7      rounds were coming back in on the location.  That shows

8      advanced capabilities.  That shows training.  And that

9      basic -- that definitely shows Al-Qaeda attribution in this

10     attack.

11     Q.  Did you also perform the mapping process for the

12     Prazynski attack?

13     A.  Yes, I did.

14     Q.  If we look at Map No. 1, please.

15           THE COURT:  Counsel, this may be a good time to --

16           MR. TESELLE:  Oh, is this a good time for a break?

17           THE COURT:  Why don't we take about a 20-minute

18     break and maybe see if we can streamline the remainder of

19     the presentation, okay?

20           MR. TESELLE:  Absolutely.

21           THE COURT:  All right.

22           THE WITNESS:  I promise to recognize those yes-or-

23     no questions.

24           (Recess taken)

25           MR. TESELLE:  Mr. Pregent, you can come back up.

1          THE COURT:  You can have a seat.

2          THE WITNESS:  Thanks.

3          MR. TESELLE:  Thank you.

4     BY MR. TESELLE:

5     Q.  Mr. Pregent, the Court was asking you some questions

6     earlier, specifically a question about whether you would

7     attribute all of the attacks that were carried out in Iraq

8     to Iran during a certain time period.

9          It was unclear to me what your final testimony

10    was, and are you referring only to the five attacks you

11    looked at or every attack that occurred in the country

12    during that time frame?

13    A.  Every attack I've looked at I looked for criteria, and

14    if those criteria are there, then I can make an attribution,

15    so I can only assess the attacks I've looked at.

16         Of course there are attacks that have fallen off

17    based on the fact that I couldn't make an attribution.  I

18    couldn't tie it to something.  So other clients have fallen

19    off in other cases.

20         But where I have put an attribution in a report is

21    because those factors were present where I could make that

22    link to Iranian lethal aid to a supported group.

23    Q.  And to be clear, the only five attacks that you've

24    looked at in this case are the five attacks that you've

25    given expert attribution reports for; isn't that correct?

1    A.  Yes.

2    Q.  Okay.  Let's turn back -- and just to be clear, the

3    summary of the basis of your opinions and the citations to

4    the records and the SIGACTs and the different information,

5    that's all in your report that's already in the record,

6    correct?

7    A.  Yes.

8    Q.  Okay.  So we're getting short on time so I'm going to

9    try to move through this more rapidly, but let's tie up the

10   Prazynski attack.

11          Based upon the assessment of the factors that you

12   consider when doing a military intelligence assessment, did

13   you come to an opinion as to who carried out the attack that

14   killed Taylor Prazynski?

15   A.  Al-Qaeda in Iraq.

16   Q.  Okay.  And did you have an opinion as to whether that

17   was supported by Hezbollah, Iran, and its affiliated

18   entities?

19   A.  So four criteria were present.  Foreign fighter flow was

20   on one of those routes.  It was on a lethal aid route, a

21   supply route.  There were weapons caches with Iranian

22   weapons in the area.  Not the specific area where the attack

23   was, but in that area, that key area between Abu Ghraib,

24   Fallujah and Ramadi, where Karmah is.  And then the tactic

25   itself ties to Al-Qaeda, and I felt that the criteria had

1    been met.

2    Q.  And did you give that opinion to a reasonable degree of

3    certainty in your expertise?

4    A.  Yes.

5    Q.  Okay.  Let's turn to the third attack, the Haines attack

6    that occurred on June 4, 2006.  This was the IED --

7            MR. TESELLE:  Can we go to the summary of it.

8    Thank you.

9    Q.  Did you look at this attack, and were you here for the

10   testimony of Paul Haines earlier today?

11   A.  Yes, I was.

12   Q.  Okay.  Can you please give me an overview and a summary

13   of your analysis as it was applied to this attack so that

14   you could come to a conclusion as to who carried out the

15   attack.

16   A.  It was a sophisticated IED attack just based on the

17   explosion itself, the ability to actually put this type of

18   IED underneath, you know, an established route that

19   Americans had established a routine of going through.

20           It was also in an area where Al-Qaeda had safe

21   houses.  It's also in the area where three days after this

22   attack Zarqawi was killed.  And it's an area that, again,

23   Al-Qaeda in Iraq had a permissive environment.  It was an

24   area where there were weapons caches, there was foreign

25   fighter flow, and there was -- again, on one of these

 1    established lethal aid smuggling routes that the Islamic

 2    Revolutionary Guard Corps and the MOIS were using.

 3    Q.  And if we look at Page 67.  Now, Pages 67 through 72,

 4    those are the maps that you prepared regarding the Haines

 5    attack, correct?

 6    A.  Yes.

 7    Q.  And if we look at Map 1, what is that showing us?

 8    A.  Al-Qaeda activity in the area.  In this case, we have an

 9    IED explosion.

10    Q.  And this is --

11    A.  And then we have SIGACTs that show Al-Qaeda activity.

12    Q.  And that's in a 3.5 mile radius from the attack

13    location?

14    A.  Yes.

15    Q.  And it also is from 2005 to 2007, the year before to the

16    year after; is that right?

17    A.  Yes.

18    Q.  Okay.  If we look at Map No. 2, Page 68, what is that

19    showing us?

20    A.  So we're seeing the weapons caches that were seized by

21    U.S. forces in this area.  This was an area that was

22    continuously replenished with weapons to allow Al-Qaeda to

23    have that lethality against the U.S. forces present.

24          Again, this is -- probably represents about 30

25    percent of the caches that were actually in the area.

1    Q.  And who is supplying these caches?

2    A.  Again, it's on one of these established Iranian

3    smuggling routes.  They're able to move weapons freely in,

4    and they're not -- they're not kept from the Sunni

5    insurgency.  Sunni insurgency knows where they are.

6              So Iran would be the answer, the IRGC and MOIS.

7    Q.  If we look at Map No. 3, Page 69.

8    A.  Sure.

9    Q.  This one shows -- you're showing high-value targets,

10   insurgents, and foreign fighter activity.

11             Can you tell -- what are you showing here, and

12   what's the importance of it?

13   A.  Well, it shows that it's a key area where Al-Qaeda can

14   count on being able to move fighters in and out of this

15   area.  This is also, again, where Zarqawi felt comfortable

16   enough to bed down, to use as a safe house, an area where he

17   felt he could have a safe harbor.

18   Q.  And then in Map No. 4, what are we looking at there?

19   A.  We're looking at specific tactics and techniques that

20   Al-Qaeda used.  In this case we see suicide -- vehicle

21   suicide bomb, vehicle IEDs, SVBIEDs.  You see vehicle-borne

22   IEDs and a suicide bombing activity over this time period.

23             So it basically establishes an Al-Qaeda footprint

24   in this area.

25   Q.  Okay.  Looking at your report, if I look at the body of

```
 1    the report, did you find it significant that in February of
 2    2006 a high-value target involved in IEDs was arrested less
 3    than a mile from that attack?
 4    A.  Yes.
 5    Q.  Why?
 6    A.  Well, because he was associated with Al-Qaeda, and he
 7    was -- is this the foreign passports?  I'm sorry.
 8    Q.  No.  I'm just looking at -- I'm looking at your --
 9    the --
10    A.  Because I'm looking at a graphic here.  Which graphic?
11    Q.  I'm sorry, in the body -- I'm moving back to the body of
12    your report and going through on Page 1, second full
13    paragraph.
14    A.  This basically, again, shows that Al-Qaeda was
15    comfortable enough allowing high-value targets to move
16    through this area with foreign fighters, weapons caches,
17    and, again, this is the area where Zarqawi felt comfortable
18    enough, you know.
19    Q.  Then there was a SIGACT reporting that there was another
20    cache containing the copper wire which could be used as
21    command wire which was used --
22    A.  Right.  Those indicators are present a lot in these
23    caches.  The command detonated copper wire, the munitions,
24    advanced triggers systems, those are often found in caches,
25    and this is an area where those items were found.
```

1    Q.  Now, you already noted that Zarqawi was killed just

2    three days later very close to this location?

3    A.  Yes.

4    Q.  And you said that was significant?

5         MR. TESELLE:  If you can pull up...

6    A.  So we see the attack on Paul Haines on June 4, 2006.

7    We've already established that this is Al-Qaeda -- an area

8    where Al-Qaeda felt comfortable to operate in.  We've seen

9    the number of caches, and we've seen what's in these caches,

10   which include IED components and advanced triggers systems.

11        And then on June 7th, you know, three days later,

12   Zarqawi is killed in this area, and this is also four months

13   after the Golden Mosque bombing.  This is four months after

14   the event where Zarqawi blows up the mosque and senior

15   Iranian leadership and Osama bin Laden and Zawahiri believe

16   that Zarqawi has crossed the line.

17   Q.  And you note on here the known AIF crossing point.  What

18   does "AIF" stand for?

19   A.  It should be -- it should say Al-Qaeda in Iraq, foreign

20   fighter flow.

21   Q.  Foreign fighter?

22   A.  Yes.

23   Q.  And if we look at your report, just to move things

24   along, you say -- after the Zarqawi, you say, "In addition,

25   credible reporting indicates that a foreign fighter high-

1    value target was captured crossing the Tigris at Tarmiyah,

2    and was in possession of a laptop containing tactical

3    information on coalition forces vehicles."

4    A.  Yes.

5    Q.  Can you tell us about that.

6    A.  So this basically shows that Al-Qaeda was looking at new

7    tactics/techniques to defeat increased American capability

8    to defend its troops with an up-armored capability.

9              So it shows a level of sophistication of Al-Qaeda

10   where you have -- you have members looking and studying

11   American upgraded technology and armor -- armor upgrades and

12   trying to find a defeat capability.

13   Q.  Okay.

14   A.  And part of that --

15   Q.  Sorry.

16   A.  Go ahead.  Go ahead.

17   Q.  And this is -- to remind -- this is the Haines attack,

18   which is the tank --

19   A.  Yes.

20   Q.  -- that suffered the explosion.

21             And then finally, there was another AQI leader,

22   Abu Ghazwan was also killed in this area?

23   A.  Yes.

24   Q.  Can you talk about that and why that's important.

25   A.  Another high-value target that's killed in an area where

1    he felt comfortable enough to be found.

2            So when an Al-Qaeda leader is comfortable, they

3    tend to not pay too much attention to their operational

4    security.  This is a place where both, you know, this Al-

5    Qaeda leader and Zarqawi were killed because they just felt

6    comfortable in this area because it was a permissive

7    environment for them.

8    Q.  Did you come to a conclusion and an opinion as to which

9    group carried out the attack on Paul Haines's tank on June

10   4, 2006?

11   A.  Al-Qaeda in Iraq.

12   Q.  And did you come to a conclusion as to whether they were

13   provided material support by Iran and its affiliated

14   entities?

15   A.  Yes.  So it's not directly provided.  It's put out there

16   for them to use.  It's a permissive environment.  And,

17   again, I look at those indicators.

18           Was this along a known IRGC Qods Force MOIS

19   smuggling route facilitated by Hezbollah?  Were there caches

20   present with Iranian weapons?  Was this an area where Al-

21   Qaeda operated so I can attribute it to an FTO, foreign

22   terrorist organization?  And those factors were present.

23   Q.  And those opinions are given to a reasonable degree of

24   certainty in your area of expertise, correct?

25   A.  Yes.

1    Q.  All right.  Let's move on to the next attack, the Cabral

2    attack.  This is the up-armored Humvee that was returning to

3    FOB Justice at the time, and you were here for the testimony

4    on that.

5            Did you review that attack as well?

6    A.  I did.

7    Q.  And is your opinion concerning the Cabral attack

8    contained on Pages 73 through 82 of your report?

9    A.  Yes.

10   Q.  Okay.  Did you come to a conclusion -- why don't you

11   take me through and summarize for the Court your analysis --

12   A.  Right.

13   Q.  -- on the four factors and how you came to a conclusion.

14   A.  So it doesn't have to be four factors.  It can be as

15   many factors that are present.

16           But in this case you have an area where Shia

17   militias operated.  You had, you know, the special groups

18   that were operating in this area.  You have a tactic, the

19   EFP, and you have all the other factors present.  You have

20   IRGC support.  The militia group that actually carried out

21   the attack was funded, directed, trained by the IRGC and

22   Lebanese Hezbollah, so that's present.

23           Here you also have an added dynamic in that I was

24   aware of this attack in 2006 because we worked this attack.

25   Colonel Felts was pushing General Giraud, who was the first

1   brigade commander, to go after militias, and General

2   Petraeus believed that this was a directed attack against

3   Colonel Felts by the Badr Corps, which is an -- Iran's

4   premier proxy, and the tactic used was an EFP.  And in the

5   testimony earlier we heard that there was an Iraqi vehicle

6   that was out in the distance with its lights off.

7          We had intelligence at the time -- I was working

8   this when I was at the Defense Intelligence Agency -- that

9   showed that General Giraud was actually involved in this

10  attack, allowed it to happen, and was able to have his

11  militia men that were in the Iraqi Army to basically

12  identify the vehicle that Colonel Felts was in.  So this

13  was, to us, an example of what Badr Corps could do when they

14  wore the uniform of the Iraqi military.

15  Q.  Is the fact that the TTP for this attack was an EFP, is

16  that significant to --

17  A.  It is a signature weapon, and, if you look at the date,

18  2006, this is a signature tactic used by Asa'ib Ahl al-Haq

19  or League of the Righteousness, which was an IRGC-Qods Force

20  and Lebanese Hezbollah created, directed, funded, and

21  trained entity to carry out EFP attacks against Americans.

22  At this point we were attributed it to Shia special groups

23  because that encompasses AH Badr Corps and Kata'ib

24  Hizballah.

25  Q.  And as part of your analysis, did you look at other EFP

1    attacks that were carried out by the Shia special groups in

2    that same location?

3    A.   Yes.  And there were numerous, and they were focused on

4    a key area of that route that the U.S. used quite a bit.  It

5    was on a sectarian fault line in Baghdad, and you can see

6    the numerous EFP attacks in the area.

7    Q.   And is your opinion that the Shia special groups carried

8    out this attack with Iranian support, is that given to a

9    reasonable degree of certainty in your area of expertise?

10   A.   Absolutely.  The group that carried out this attack was

11   created, trained, funded, and directed by the IRGC/Qods

12   Force directly.

13   Q.   Okay.  Let's turn, then, to the Tavera attack that

14   occurred on March 12, 2008.  Did you do an analysis on this

15   attack?

16   A.   I did, and, again, this is one of those attacks where

17   you look at the area where the attack took place.  It's in a

18   Shia area in southern Iraq.  It's in an area that is

19   controlled by or that where militias created, funded,

20   directed, and trained by the IRGC-Qods Force operate.

21           And if we could go back to the smuggling routes.

22   Q.   Sure.

23   A.   It goes right through this area of Nasiriyah.

24           And if you look at the map and the attack that

25   took place, the mission of that U.S. unit was to stop -- to

1    interdict the lethal aid flow to militias in Iraq.  So this

2    is a rocket attack against a base that exists solely to curb

3    Iranian influence in this area and to deal with the militia

4    problem.  And the militias that were operating in this area

5    were created, funded, directed, and trained by the IRGC-Qods

6    Force and Lebanese Hezbollah.

7    Q.  And is that and the other supporting information and

8    evidence for your conclusion contained in the report on Page

9    73 of your report?

10   A.  Yes.

11   Q.  Okay.  And if we look at the Map No. 1 to the Cabral --

12   excuse me, I apologize.  What I meant was contained on Page

13   83 of your report.

14   A.  We had the smuggling routes map there.

15   Q.  Okay.  And you then had -- you did your own mapping as

16   well to look at the actual activity of the Shia groups.  If

17   you look at Map 1, that's showing the group's activities in

18   the area, ten-mile radius from the location, correct?

19   A.  Yes, and what we also do is we look at Al-Qaeda activity

20   in the area, see if there's any SIGACTs that come up to show

21   Al-Qaeda activity.

22           In this case there isn't.  It's all Shia activity.

23   Q.  Okay.

24   A.  So it's -- it's a Shia-controlled area where the

25   militias had primacy and the militias exist because Iran and

1    Hezbollah created them.

2    Q.  And Map No. 2, that's showing -- now that's a zoom-out

3    of what we showed on the PowerPoint slide of all of the EFP

4    activity in that general area in that ten-mile radius?

5    A.  Absolutely.  And if you were to overlay these EFP

6    attacks on those smuggling routes, it just paints an

7    intelligence picture of the goal of those militias, which

8    was to protect those smuggling routes.

9    Q.  And, again, if we look at Map No. 7, that's a

10   combination of all of the events, the high-value targets,

11   all of the activity linked to the Shia special groups in

12   that area, correct?

13   A.  Yes.

14   Q.  And so your opinion as to the Tavera attack, that was

15   given to a reasonable degree of certainty in your area of

16   expertise, sir?

17   A.  Absolutely.

18           MR. TESELLE:  Your Honor, may I have one moment?

19           THE COURT:  Sure.

20           (Pause)

21           MR. TESELLE:  Your Honor, I have no more questions

22   for this witness, unless the Court does.

23           THE COURT:  All right.  Thank you very much for

24   your testimony.

25           THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  You're excused.

2          You're local, right?  So you don't have to go far.

3          THE WITNESS:  I'm local.

4          THE COURT:  All right.

5          MR. TESELLE:  Your Honor, in terms of witnesses,

6     that concludes the presentation.

7          THE COURT:  All right.

8          MR. TESELLE:  We have certain things such as the

9     plaintiff fact sheets over the past three days and a couple

10    of declarations that were resigned.  I don't know how the

11    Court wants to address those or if we should submit those

12    separately to complete the record.

13         THE COURT:  I'm sorry, I don't have all the fact

14    sheets?

15         MR. TESELLE:  The fact sheets were actually

16    presented and confirmed here in court.  All of the other

17    documents -- I may be missing one or two; I'll let somebody

18    else tell me.  All of the other documents were preadmitted

19    by Your Honor.

20         THE COURT:  Yes.

21         MR. TESELLE:  It's just the additional documents

22    that were presented during the hearing.

23         THE COURT:  Okay.  I suppose the easiest thing

24    would be for you all to file those under an order for

25    admission, and we'll just admit it just so that there's a

 1    record.  Okay?

 2                MR. TESELLE:  Okay.  Thank you, Your Honor.  I'll

 3    turn it over to Mr. Paulos.

 4                THE COURT:  Okay.

 5                MR. PAULOS:  To kind of pick up where Mr. Teselle

 6    left off, Your Honor, the fact sheets we identified as

 7    filing under seal because of some of the health information

 8    and citations to the health records.

 9                THE COURT:  That's fine.

10                MR. PAULOS:  So we have a thumb drive with

11    documents that are intended to fix or replace bad PDFs that

12    were provided to the Court earlier, but also to provide

13    documents that the Court didn't have that we used during the

14    hearing, and then -- as well as the fact sheets.

15                So we have that thumb drive, and I believe the

16    version of the fact sheets that we have on there are the

17    sealed versions so they're not redacted.  And we can file

18    redacted versions, if Your Honor would like, but we can work

19    with your chambers to make sure we do it.

20                THE COURT:  Lauren, what would you suggest?  Do

21    you want to just take the thumb drive now --

22                THE COURTROOM DEPUTY:  Yes.

23                THE COURT:  -- and then file -- I just want to

24    make sure that there's a record of the exhibit numbers that

25    are admitted.

1    MR. PAULOS:  Yes, we can certainly update the

2    exhibit list and identify when things were used and what

3    submission to the Court they belong to.

4         THE COURT:  However you want to do it, just so

5    that there's a record of what was admitted identified by

6    exhibit number.

7         MR. PAULOS:  All right.  Your Honor, plaintiffs'

8    evidence demonstrates that Iran used its state structure to

9    develop a lethal network that employs terrorism as a primary

10   tool to accomplish its goals, and Iran has adopted this

11   strategy specifically to use terrorist organizations and

12   proxies throughout the Middle East to attack and kill

13   Americans, and the strategy has been approved by Iran's

14   highest leader.  It is also implemented through Iran's

15   official policies and its state craft.

16        Iran's terrorist network used to kill Americans

17   involved specific groups and streams of support.  The types

18   of support are based on Iran's goals and its relationships

19   with these specific groups.

20        Iran designed and prepared this terrorist network

21   to be activated right when the United States entered Iraq in

22   2003, and once Saddam's regime had been toppled its

23   terrorism network went to work solely maligning its

24   influence throughout Iraq, and it created discourse and

25   chaos to create a fledgling democracy from taking route

1       there and flourishing there.

2               Iran could have chosen a different path.  It could

3       have used diplomacy.  It could have used its foreign policy.

4       It could have followed established international laws

5       procedures, and it could have participated in the political

6       process and rebuilding of Iraq in ways that its goals and

7       interests were considered without resorting to violence, and

8       Iran could have been here in this courtroom during this

9       proceeding.

10              Yet Iran did none of that.  Instead, it has used

11      terrorism and used its state agencies to pour money,

12      weapons, and personnel into the groups that you've heard

13      about this week with which it shared the common goal:  Death

14      to America.

15              It allowed terrorist groups who it knew were

16      intent on killing Americans who had been actively killing

17      Americans in Afghanistan and even well before 9/11 to seek

18      refuge within its borders, provided safe haven within its

19      territories, and Iran permitted and facilitated their

20      financing, training, movement, and recruitment.  And not

21      only did Iran's support to these groups increase their

22      lethality and effectiveness, but it ensured the long-term

23      survival of the groups, and it protected their core

24      leadership at critical times when these groups could have

25      been or otherwise would have been unable to maintain their

1   operations or were close to being destroyed.

2          Iran chose to embrace them and encourage their

3   violence, and Iran saw the conflict in Iraq as an

4   opportunity to export its revolution which, by design,

5   requires the killing of Americans.

6          Plaintiffs' claims are based on acts causing

7   injuries and deaths, the ultimate and foreseeable result of

8   Iran's efforts and the design of its terrorism network, and

9   Iraq became a violent playground for Iran and its terrorist

10  proxies during a time at which the Iraqi people and its new

11  government were at its most vulnerable and divisive phase of

12  building their country.

13         So to summarize each bellwether case and attack,

14  the facts now establish, by the evidence submitted on behalf

15  of 33 injured, directly injured, plaintiffs that you've

16  heard were involved in the attacks, including 20 nonparty

17  witnesses and 11 expert reports, the following:

18         Bellwether Attacks Nos. 1, 7, 9, 14, and 15 were

19  committed by Iranian supported Shia militia, and Bellwether

20  Attacks Nos. 2, 3, 4, 6, 8, 10, 11, 12, and 13 were

21  committed by Al-Qaeda and Al-Qaeda in Iraq, and Bellwether

22  Attack No. 5 was committed by Ansar al-Sunnah, also known as

23  Ansar al-Islam.

24         Now, we certainly understand that the fact that

25  the last three days have added yet to an even more -- even

1    more to a significant amount of information that we've put

2    before the Court and for the Court's review, and so we have

3    listened to your questions this week, and we wanted to kind

4    of show you how we have tried to distill this information so

5    that it's much more easily accessible and available to the

6    Court.

7            The first of which is what we call our kind of

8    main liability brief or what's entitled "Memorandum in

9    Support of Motion Regarding Defendant's Material Support For

10   the Subject Terrorist Organizations," and it's ECF Document

11   No. 84-1.

12           But what this report was intended to do was, prior

13   to the hearing, to provide the Court with the evidence

14   including the expert reports that we, in our group, called

15   the global expert reports to show how Iran supported these

16   terrorist groups during the time frame generally and

17   throughout the course of that time frame.

18           And, for example, at Page 40 of the document we

19   summarize defendant's material support of Shia militias in

20   Iraq, and then at Page 100 we provide a summary of the

21   defendants material reports to the Zarqawi organization and

22   AQI.

23           And then one thing I did want to point out to the

24   Court, because we have not discussed those defendants here

25   at this hearing because this is the attribution hearing.  We

1    were talking about the groups responsible.  But we do

2    provide the evidence and the expert testimony summarized at

3    Page 121 of defendant's NOIC, Bank Melli Iran, and Bank

4    Markazi, and just this week a case -- an order was issued in

5    the *Hake* case that involves those defendants finding them

6    liable for EFP and.

7              THE COURT:  Whose case is that?  Whose case is

8    that?

9              MR. PAULOS:  *Hake*.

10             THE COURT:  Which judge.

11             MR. PAULOS:  I want to say Judge Kelly, but I

12   might be wrong.  I'd have to double-check.

13             THE COURT:  I'll find it.

14             MR. PAULOS:  But it just came out this week, so we

15   can certainly provide Your Honor with the document or the

16   order that's been issued and the information for it.

17             And so we've got this brief, and I believe that

18   our findings of fact and conclusions of law motion that

19   we'll be filing -- yes, it's Judge Kelly, Your Honor -- will

20   refer back to this where appropriate.

21             What we've also done for Your Honor is, again,

22   we've provided what we are referring to as global expert

23   reports, and those are the reports of Patrick Clawson,

24   Matthew Levitt, Michael Rubin, and Daveed Gartenstein-Ross,

25   of course, provided his global reports as well as Peter

1    Piatetsky, and some of Your Honor's questions this week have

2    focused on some of what we considered to be the bigger

3    picture, the broader picture.  What was Iran's strategy?

4    Why would it do certain things?  How did that -- how did

5    that play into Iran's intent, their knowledge, and the like?

6    And so reports, again, are available to Your Honor.  We will

7    cite back to them in our findings -- motions for findings of

8    fact and conclusions of law.

9         I did want just to -- as an example, on some of

10   these issues the discussion of why would Iran support Sunni

11   groups, why -- what was the motive for that?  I point the

12   Court to Michael Rubin's report at Page 36.  There's an

13   entire section entitled "Iran's Willingness to Cross-

14   Cultural and Sectarian Divides in Order to Exploit the

15   Revolution and Wage Jihad on the West."

16        And the same topic is addressed by Dr. Clawson at

17   Paragraphs 77 through 85; Mr. Piatetsky, Paragraphs 214

18   through 226; and Dr. Gartenstein-Ross at Pages 61 to 62.  So

19   we will kind of take the feedback we've gotten from the

20   Court from the questions from the bench this week and work

21   those into our upcoming motion, and we'll refer back to,

22   again, kind of generally what we call the global reports.

23        We've also -- as Your Honor knows, I have used the

24   plaintiff fact sheet, and my hope and intent for part of

25   this hearing was that the Court would see the utility of

1      that document and how it can be used to summarize the facts

2      underpinning a specific plaintiff's or families' claims.

3              And what we've done there, and we haven't talked

4      about it during the hearing with the witnesses, but for the

5      Court, what we've done -- and if you'll pull up PX1167, this

6      is the fact sheet for Mr. Beltran-Soto, but there are

7      sections in that Section 4, which is evidence of Iranian

8      material support for the attack, and there we've given

9      information related to the specific group that has been

10     attributed to the attack and cite to the specific expert

11     that provides that attribution as well as the section of

12     their attribution report, and then we've provided the report

13     with the exhibits that refer to the terrorist designations

14     that we touched a little bit on in terms of the Treasury

15     information, and we also identified the types of material

16     support and refer back to our global kind of general

17     memorandum in support of our motion for material support to

18     these groups, but also back to the expert reports.

19             And then in terms of identifying the reasonable

20     connection of the material support for the attack, we also

21     refer back to the global expert reports that discuss that

22     group and the streams of material support.

23             So this is just, again, just hoping to be able to

24     focus your attention to specific exhibits and specific

25     reports for any given attack so that you don't -- you and

1    your court staff don't find yourself, you know, sifting

2    through a bunch of documents not knowing exactly what attack

3    they should be considered for.

4              So we've now come to a close of Stage 3, Part 1,

5    and we're moving on to Stage 3, Part 2, and that's when we

6    will submit our brief to Your Honor.  I do understand that

7    we have our brief on the extrajudicial killing issue due I

8    believe it's Wednesday next week, and we will get that to

9    you.

10             So I also would invite the Court to ask us

11   questions that you might have along the way.  We're happy to

12   answer them, continue to answer them, as they arise, and we

13   will also likely file a supplemental submission for evidence

14   to put onto the record.  An example of this is just today I

15   received a declaration from Lieutenant General Gary Volesky

16   that had to go through the general's headquarters and DOD,

17   the request process.  I got it this morning, and that's

18   related to the April 4, 2004, attack.  He was the commanding

19   officer on the ground there.  And I have some compelling

20   written testimony in it.  And so as we obtain that

21   information, we will provide a supplemental submission to

22   the Court.  We certainly won't inundate you with every piece

23   of paper that we get, but the DOD is still responding to

24   some of these requests for us.  And if it -- we believe, you

25   know, it is necessary, we'll submit it to the Court when we

1    have attained it in a way that makes sense and is efficient.

2              So last, I would just like to express our sincere

3    gratitude and our clients' sincere gratitude for the Court's

4    time, the hard work of the Court's staff, and the

5    opportunity to be here in person before you, so it's been

6    our privilege to present this information to you this week,

7    and thank you.

8              THE COURT:  Okay.  Thank you.

9              Just a couple of observations.  You know, I

10   appreciate the level of preparation and organization that

11   went into all the presentations.  I thought the fact sheets

12   were extremely helpful.  I was following along with each

13   witness.

14             It's always good to hear from live witnesses.

15   They paint a picture that oftentimes does not jump off the

16   page even in vivid situations like these.

17             You know, I think it was one of the early status

18   conferences -- it may have been you, it may have been Mr.

19   Tor -- and I expressed -- and "concern" may not be the right

20   word, but observed whether there was a limiting principle to

21   these cases, right?  And was it the plaintiffs' position

22   that virtually every, you know, tragedy that occurred during

23   our military operations in Iraq would subject -- were

24   actionable under the Foreign Sovereign Immunities Act.  And

25   I believe you assured me that that was not the case, and I

1    think you reiterated that at the beginning of this

2    proceeding, that you have selected these cases very

3    carefully and some were -- these weren't just your best

4    cases, but it was a range of cases.

5         But, you know, having sat through, you know, three

6    days of expert testimony -- and it's certainly the case with

7    Mr. Pregent today, you know -- it seems to me or I'm having

8    a difficult time locating a limiting principle.  And I guess

9    my question is, you know, do you agree that every U.S.

10   service member or contractor's death or injury after the

11   fall of Baghdad in the -- what was it? -- the spring of

12   2003, you know, setting aside accidents and friendly fire,

13   were attributable to Iran?

14        MR. PAULOS:  No, that's not our position.

15        THE COURT:  And so what is the limiting principle?

16   And, you know, that may be true, right?  But if it is true,

17   I wonder why you folks aren't embracing that and why, you

18   know, the overall message seems to be, no, you know, it's

19   just these particular criteria that the experts have applied

20   and the particular signatures.  But when you add all of

21   those things up, it seems to me that a box is checked for

22   virtually every conceivable attack that is not friendly fire

23   or an accident.

24        MR. PAULOS:  So, well, I think what we've seen

25   today --

1          THE COURT:  Maybe there is some guy with a Sprite

2     can, right?  But other than that --

3          MR. PAULOS:  So, Your Honor, I think what we've

4     presented to the Court obviously are cases that we did an

5     enormous amount of investigation in.

6          THE COURT:  Absolutely.  Absolutely.

7          MR. PAULOS:  So we wouldn't waste the Court's time

8     with a case that we didn't think we could prove.

9          So the contours of our case are related to the

10     specific groups that are identified in our case and in our

11     complaint, and those are the specific Shia and Sunni groups

12     that we've identified.

13          Our cases that we have filed, we have done our

14     obligation to do a presuit investigation, and we certainly

15     don't have all of the evidence, so that's why we've sought

16     discovery in order to confirm.

17          There have been cases that we have filed thinking,

18     based on what's publicly available, that that is a case that

19     appears to check the boxes of a criteria that an expert can

20     look at and, if we get discovery, can fill in some more of

21     those boxes that have not been able to be attributed to Iran

22     because we don't have access to the information necessary to

23     do that.

24          There certainly were many attacks in Iraq that the

25     identifier -- the group identity is unknown.  The TTPs, the

1     geography are in such a way that not -- a group that's most

2     likely to be responsible cannot be determined.  There's

3     certainly criminal organizations and criminal acts of

4     violence that occur.

5           I believe -- and it was me that stood before you,

6     and I took it as you being concerned, and we certainly

7     understood your question about trying to see what the

8     limiting principle was.

9           THE COURT:  And it is what it is.  I mean, if you

10    can meet the elements and link however many attacks you can

11    to Iran, then, you know, it is what it is.

12          MR. PAULOS:  But I also -- from the Court standing

13    in the Court's shoes, I can see the concern with, you know,

14    opening the floodgates or having to sift through a bunch of

15    cases that at the end of the day don't meet the Court's

16    threshold and its gate-keeping requirements.

17          THE COURT:  And perhaps it's -- you know, the only

18    ones I'm seeing are the ones that you have developed proof

19    for, and so it feels somewhat like *res ipsa loquitur*.  If

20    there was an attack, then necessarily Iran funded it because

21    there's so many different identifiers or tactics or regions

22    or groups or motivations that check the box.

23          MR. PAULOS:  There are areas in Iraq where that

24    certainly is true.  If something violent against a coalition

25    force unit or personnel took place, there's a high

1   likelihood that that was done by a group that was supported

2   by Iran.  And so there are areas in Iraq where through that

3   entire time frame those areas were totally controlled, if

4   not by Iran itself, by its proxy.

5          THE COURT:  So that gets you up to a pretty high

6   percentage of all the attacks.

7          MR. PAULOS:  Not so much.  I mean, I think if -- I

8   think if you look at even the coalition forces assessment,

9   like the map that you saw from December 2006 in that there's

10  various iterations of that Al-Qaeda foreign fighter and

11  financial flow that looks like the red veins going through

12  Iraq that Dr. Gart --

13         THE COURT:  So can you give me an example of an

14  attack or a category of attacks where, you know, the

15  military has determined Iran was not responsible or Iranian

16  proxy groups were not responsible?

17         MR. PAULOS:  Well, certainly.  I think in some of

18  the mapping data that Mr. Pregent uses to create those maps

19  and SIGACT reports, there's attributions to criminal

20  organizations that are not, as far as we know, associated

21  with Iran.  There's also an attack that is using what are

22  called leftover remnants of war, and so the use of that

23  munition in a way that's not particularized or particularly

24  sophisticated or if it's an area where there is such

25  sectarian overlap that there were multiple active groups

1     that are just as likely or as responsible, then there's --

2     the number I gave you before is the DOD has said about 25, I

3     think -- I don't want to -- approximately 25 percent of all

4     casualties in Iraq can be tied to Iran or Iranian-affiliated

5     groups.

6              THE COURT:  And what's the source of that

7     statistic?

8              MR. PAULOS:  I'll have to get it for you, but it

9     is a DOD document and statement.  I'm not sure if it's a

10    press release that we have, but I can get it for you quite

11    quickly.  And it may very well be on our exhibit list, so I

12    can give you that.  But that's the number I gave you when we

13    had our original conversation.

14             And my experience, in looking at these cases and

15    working with our experts, you know, we've -- in talking to

16    clients and developing the facts of their case, we have a

17    significant decline rate of folks that we think we can help

18    and connect those attacks to the defendants that we've sued.

19             THE COURT:  All right.  That's helpful.

20             Thank you, folks.  Good trip home, and we'll hear

21    from you next week on the act of the extrajudicial killing

22    question, and then accept whatever supplemental filings you

23    want to give me, and then your findings of fact and

24    conclusions of law are due in two months.

25             MR. PAULOS:  45 days.

1          THE COURT:  All right.  If you need a little extra

2     time, just let me know.

3          MR. PAULOS:  We'll let you know.  Thank you very

4     much.

5          THE COURT:  All right.  We're adjourned, and take

6     care.

7                    (Whereupon the hearing was

8                     concluded at 4:29 p.m.)

9

10          **CERTIFICATE OF OFFICIAL COURT REPORTER**

11

12          I, LISA A. MOREIRA, RDR, CRR, do hereby

13     certify that the above and foregoing constitutes a true and

14     accurate transcript of my stenographic notes and is a full,

15     true and complete transcript of the proceedings to the best

16     of my ability.

17        Dated this ^  day of September, 2022.

18

19                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
20                              United States Courthouse
                                Room 6718
21                              333 Constitution Avenue, NW
22                              Washington, DC 20001

23

24

25