UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ESTATE OF CHRISTOPHER BROOK FISHBECK, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No. 1:18-cv-2248-CRC** |
| **v.** ) | |
| ) | |
| **THE ISLAMIC REPUBLIC OF IRAN, et al.,** ) | |
| ) | |
| **Defendants** ) | |

**[PROPOSED]**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING THE BELLWETHER ATTACKS**

The following Findings of Fact and Conclusions of Law address Defendants' liability for 15 terrorist attacks that occurred in Iraq. These attacks, referred to by Plaintiffs and the Court as "bellwether" attacks, were the subject of an evidentiary hearing on September 12-14, 2022. Plaintiffs selected the 15 bellwether attacks based upon their representativeness of the 438 attacks at issue in this case. *See* ECF No. 92. The following Findings and Conclusions are based on the uncontested evidence presented by Plaintiffs against Defendants, who are in default and have never appeared in this lawsuit.

**FINDINGS OF FACT**

I.      **Nature of the Case**

1.  This lawsuit, brought under the terrorism exception of the Foreign Sovereign Immunity Act, 28 U.S.C. § 1605A, arises out of terrorist attacks perpetrated in Iraq between 2003 and 2011 that killed and injured members of the U.S. armed forces. *See generally* Second Amended Complaint (SAC), ECF No. 100.

2.  Plaintiffs are American servicemembers and contractors who were killed or injured in those attacks and their family members. *Id.*

3.  Defendants are The Islamic Republic of Iran and five of its constituent agencies or instrumentalities, namely, The Islamic Revolutionary Guard Corps (IRGC), Iranian Ministry of Intelligence and Security, Bank Markazi Jomhouri Islami Iran, Bank Melli Iran, and the National Iranian Oil Company. *Id.*

4.  After major combat operations in Iraq ended in May 2003, and U.S. peacekeeping operations commenced under United Nations mandate, Iran increased its flow of support and resources to terrorist groups in Iraq to target U.S. and other Coalition peacekeeping forces. *Id.*, ¶¶ 332-345.

5.  Iran provided this support through its paramilitary force, the Islamic Revolutionary Guard Corps (IRGC), the IRGC's special operations branch, the Qods Force, Iran's terrorism proxy Hezbollah, and Iran's Ministry of Intelligence and Security (MOIS). *Id.*, ¶¶ 4, 5, 11-12, 31, 41, 45, 47, 51, 54, 56, 58-91, 111, 114, 161, 169, 176, 179-221, 234-235, 253, 271, 275, 315, 323.

6.  Iran cultivated and supported multiple groups simultaneously and across sectarian divides. *Id.*, ¶¶ 4, 5, 12, 56, 234-235, 253, 271, 275.

7.  Iran supported Sunni terrorist groups Al Qaeda and Ansar al Islam by providing early funding and training to help the groups' formation and growth. Iran also provided these groups with critical safe haven and operational support within Iran while they focused on attacking victims in Iraq. *Id.*, ¶¶ 5, 149-150, 201, 237-317.

8. Iran also created and supported Shia terrorist groups in Iraq—called Special Groups by the U.S. military—to sow division amongst the Iraqi populace and disrupt the fledgling Iraqi democracy. *Id.*, ¶¶ 4, 176, 234, 318-341.

9. Iran funded its terror campaign in Iraq with the knowledge and assistance of its co-Defendants. Together, Defendants laundered more than $100 million in assets for the benefit of Hezbollah and the IRGC, who in turn used the funds to direct, train, arm, supply, and fund Shia and Sunni terrorist groups in Iraq. *Id.*, ¶¶ 94-96, 110-118, 121, 136, 139, 405-452.

10. In other similar cases, this Court (and those in other federal districts) have found Iran and its co-Defendants liable for terrorist attacks committed by Shia and Sunni groups in Iraq, Israel, Afghanistan, and the United States. *See, e.g., Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (finding Iran liable for Shia militia attacks in Iraq in 2007); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 14 (D.D.C. 2019) (finding Iran liable for Shia militia EFP and rocket attacks in Iraq from 2004 to 2011); *Hake v. Bank Markazi Jomhouri Islami Iran*, No. CV 17-114 (TJK), 2022 WL 4130837, at *1 (D.D.C. Sept. 12, 2022) (finding Defendants Bank Markazi, Bank Melli Iran, and the National Iranian Oil Company liable for EFP attacks against U.S. servicemembers in Iraq that were committed by the Special Groups); *Neiberger v. Islamic Republic of Iran*, No. 1:16-cv-02193-EGS, Dkt. Nos. 86 & 92 (D.D.C. Sept. 8 and 29, 2022) (finding Iran liable for non-EFP attacks committed by Special Groups, as well as AQI and the Zarqawi Organization, against U.S. Servicemembers in Iraq); *Henkin v. Islamic Republic of Iran*, No. 1:18-CV-1273-RCL, 2021 WL 2914036, (D.D.C. July 12, 2021) (finding Iran, including Banks

Melli and Markazi, liable for a terrorist attack in Israel)[1]; *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2022 WL 2817730, at *41 (D.D.C. July 19, 2022) (finding Iran liable for supporting IED, Complex, Indirect fire and other types of attacks committed by al Qaeda and the Taliban against U.S. servicemembers in Afghanistan); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020) (finding Iran liable for rocket attacks, stabbings, and shootings in Israel from 2008 to 2016); *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) (finding Iran liable for materially supporting Al Qaeda in dual U.S. Embassy bombings in Kenya and Tanzania in 1998); *Alshaar v. Islamic Republic of Iran*, No. 1:15-cv-2343- GAYLES (March 18, 2020) (finding Iran liable for an IED attack in 2005 in Iraq); *In re Terrorist Attacks on Sept. 11*, 2001, No. 03 MDL 1570 (GBD), 2011 WL 13244047, at *1 (S.D.N.Y. Dec. 22, 2011) (finding Iran liable for materially supporting Al Qaeda for the 9/11 attacks).

## II.    <u>Procedural History</u>

11. Plaintiffs commenced this case on September 27, 2018. ECF No. 1.

12. The Court previously ruled that service of process has been effectuated on all Defendants. ECF No. 55.

13. Defendants never appeared in or responded to this lawsuit, and the Clerk of Court entered default as to them all. ECF Nos., 32, 33, 34, and 38.

---

[1] *See also* ECF No. 91, Plaintiffs Notice of Supplemental Authority, identifying *Henkin*, as well *Pennington v. Islamic Republic of Iran*, No. 19-cv-796, 2021 U.S. Dist. LEXIS 117666 (D.D.C. June 24, 2021) (Boasberg, J.), in which the court considered and relied upon testimony provided by one of the same experts proffered in this matter, Michael Pregent (*Pennington*, p. 8), in finding Iran liable for EFP attacks in Iraq, and stating that "the link between Iran and the attacks [is] clear." *Pennington*, at 1.

14. On September 3, 2021, Plaintiffs submitted a proposed case management plan. ECF No. 69. On November 19, 2021, the Court entered a case management order implementing that plan. ECF No. 75.

15. Pursuant to the case management order, the following has occurred:

   a. On March 15, 2022, Plaintiffs filed a motion regarding subject matter jurisdiction with supporting evidence. ECF No. 81.

   b. On May 2, 2022, Plaintiffs filed a motion regarding Defendants' material support for certain terrorist organizations—namely, the Badr Organization, Jaysh al Mahdi and the Promise Day Brigade, Asa'Ib Ahl al-Haq, Kata'ib Hizballah, the Sheibani Network, Al Qaeda, Al Qaeda in Iraq, and Ansar al Islam. ECF No. 84.

   c. On September 12-14, 2022, the Court held an evidentiary hearing during which Plaintiffs presented evidence regarding 15 bellwether attacks. The Court heard testimony of Plaintiffs injured in those attacks and the testimony of three expert witnesses and received evidence. The primary purpose of the hearing was to establish attribution—*i.e.*, that the bellwether attacks were committed by one of the terrorist groups identified in the preceding paragraph. ECF No. 84.

## III.   Evidentiary Standard

16. In a case under the Foreign Sovereign Immunities Act (FSIA), when a defendant fails to appear, default judgment is not automatic, and the claimant must establish "his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).

17. Considering Congress's purpose in enacting the FSIA's terrorism exception—to "compensate the victims of terrorism" and "punish foreign states who have committed or sponsored such acts"—as well as the "difficulty in obtaining firsthand evidence and

eyewitness testimony" "from an absent and likely hostile sovereign," courts are afforded great latitude and flexibility in determining the type and quantum of evidence necessary to enter default judgment against a foreign sovereign. *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 336 (D.D.C. 2020).

18. "In default-judgment cases involving terrorism, courts should liberally construe the Federal Rules of Evidence to ensure that state sponsors of terrorism cannot effectively immunize themselves by killing their victims, intimidating witnesses, and refusing to appear in court." *Cabrera*, 2022 WL 2817730, at *5.

19. In a default proceeding under the FSIA, "a factual finding is not deemed clearly erroneous if there is an adequate basis in the record for inferring that the district court...was satisfied with the evidence submitted." *Owens*, 864 F.3d at 785.

20. "The courts are granted broad discretion to determine what degree and kind of evidence is satisfactory." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019) *citing Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014); *Owens*, 864 F.3d at 785 ("District courts have "an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism.").

21. Indeed, the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Han Kim*, 774 F.3d at 1047. *See also Maalouf*, 923 F.3d at 1114.

22. The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is lenient." *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs*, et al., 892 F.3d 348, 356 (D.C. Cir. 2018).

23. Therefore, "the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 128 (D.D.C. 2019). *See also Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 134 (D.D.C. 2021) ("In a FSIA default proceeding, a court can find that the evidence presented is satisfactory when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding.").

24. A district court retains discretion "to determine precisely how much and what kinds of evidence the plaintiff must provide" to establish her claim or right to relief. *Han Kim*, 774 F.3d at 1047.

25. With respect to expert testimony, it is "not only entirely proper, but often sufficient, and even indispensable in terrorism cases "because firsthand evidence of terrorist activities is difficult, if not impossible to obtain." *Fritz*, 320 F. Supp. 3d at 57.

26. Expert testimony has special importance in FSIA default cases because "[t]he types of records or direct evidence available in civil litigation are unlikely to be available in FSIA cases—particularly when, as here, plaintiffs have no access to discovery." *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016).

27. Moreover, "an expert is not limited to relying on admissible evidence in forming his opinion," since "experts don't characteristically base their expert judgments on legally admissible evidence." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 704 (7th Cir. 2008). The Federal Rules of Evidence expressly provide that expert opinions are admissible even if based on inadmissible facts or data, provided they are the kind of facts and data "experts in the particular field would reasonably rely on." *See* Fed.R.Evid. 703.

28. In addition, courts may receive and consider declarations or affidavits in lieu of live testimony. *See Lonnquist v. Islamic Republic of Iran*, No. 17-cv-1630 (JDB) (D.D.C. Feb. 11, 2020), ECF No. 38; R. & R. at 2, *Chogo v. Republic of Sudan*, No. 15-cv-951 (JDB) (D.D.C. Oct. 10, 2019), ECF No. 41. *See also* 28 U.S.C. § 1746 (declarations have same legal effect as affidavits).

29. "[N]umerous evidentiary sources" can support a default judgment. *Rimkus v. Islamic Repub. of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).

30. A "court may take judicial notice of related proceedings and records in cases before the same court." *Id.*

31. Federal Rule of Evidence 201 authorizes a court to "judicially notice" facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

32. Rule 201 is used frequently to judicially notice factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 11 (D.D.C. 2018), "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017). This avoids "the formality of having that evidence reproduced." *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012). *See also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation").

## IV.   Exhibits Admitted by the Court

### a.   *Motion Regarding Subject Matter Jurisdiction*

33. In support of their Motion for Order Regarding Subject Matter Jurisdiction, Plaintiffs submitted declarations and documents showing, pursuant to 28 U.S.C. § 1605A(a)(2)(A)(ii), that Plaintiffs were U.S. nationals or members of the U.S. armed forces at the time of the subject terror attacks.[2] *See* ECF Nos. 81, 82, and 94.

34. In addition, Plaintiffs submitted a summary spreadsheet, pursuant to Fed.R.Evid. 1006, identifying for each plaintiff his/her status at the time of the attack (U.S. national vs. member of the U.S. armed forces) and the evidence in support of that status (birth record, passport, DD214, etc.). *See* ECF Nos. 81-2 and 94-1.

35. The Court now admits in evidence the exhibits Plaintiffs submitted in support of their Motion for Order Regarding Subject Matter Jurisdiction: ECF No. 82, 82-1, 82-2, 82-3, 82-4, 82-5, 82-6, 82-7, 82-8, 82-9, as well as the summary spreadsheet, ECF No. 81-2.

36. The Court hereby finds that the Plaintiffs identified in the summary spreadsheet, ECF No. 81-2, were, at the time of the terrorist attacks upon which they have brought their claims in this lawsuit, nationals of United States or members of the U.S. armed forces.

### b. Motion Regarding Defendants' Material Support for the Subject Terrorist Organizations

37. On May 2, 2022, Plaintiffs filed their Motion for Order Regarding Defendants' Material Support for the Subject Terrorist Organizations, along with supporting evidence. *See* ECF Nos. 83, 84, 85.[3]

---

[2] On September 6, 2022, Plaintiffs supplemented the record for their Motion Regarding Subject Matter Jurisdiction. *See* ECF No. 94, 94-1, and 95.

[3] On May 17, 2022, Plaintiffs filed Notice of Errata to the Motion for Order Regarding Defendants' Material Support for the Subject Terrorist Organizations, making limited typographical corrections to citations, quotations, and formatting. *See* ECF Nos. 86 and 86-1.

38. The purpose of that motion and the accompanying evidence was for Plaintiffs to establish that: (1) Defendants provided material support, as that term is used in 28 U.S.C. §1605A(a)(1), to specific Sunni and Shia terrorist groups operating in Iraq during the relevant time period of 2003-2011; (2) Defendants' provision of material support to these specific Sunni and Shia terrorist groups was essential to the groups' operating capacity; (3) and terrorist attacks involving these groups in Iraq during the relevant time period of 2003-2011 were reasonably foreseeable and a natural consequence of that support. *See* ECF No. 69, Pages, 16-17 (explaining the purpose of said motion).

39. The exhibits Plaintiffs submitted in support of their Motion for Order Regarding Defendants' Material Support for the Subject Terrorist Organizations are identified in the Amended Exhibit List. ECF No. 85.

40. The exhibits listed on ECF No. 85 include:

    a) Reports and declarations of several expert witnesses, including:

        i. Patrick Clawson, Ph.D.;

        ii. Matthew Levitt, Ph.D.;

        iii. Peter Piatetsky;

        iv. Daveed Gartenstein-Ross, Ph.D., J.D.; and

        v. Michael Rubin, Ph.D.

    b) Official government documents, including from the Federal Register, U.S. Department of State, and U.S. Department of Treasury;

    c) Scholarly books, articles, and other reliable publications; and

    d) Military documents.

    **c. *September 2022 Bellwether Hearing***

41. Prior to the bellwether hearing, Plaintiffs submitted additional exhibits, ECF Nos. 97 through 97-22 and 98 through 98-3, which include the following:

   a. Declarations, submitted pursuant to 28 U.S.C. § 1746, of Plaintiffs and other eyewitnesses to the bellwether attacks;

   b. Expert reports and declarations of Daveed Gartenstein-Ross, M. Lee Walters, and Michael Pregent;

   c. Public records, including death certificates and autopsy reports;

   d. Court records;

   e. Medical records;

   f. Military records;

   g. Official military documents, including official, attack-specific documents from CENTCOM, such as operations reports, improvised explosive device reports, significant activity (SIGACT) reports, story boards, and photographs;

   h. U.S. Department of Defense news releases, press statements, unclassified briefings, and official historical publications—all formally issued and published by the Department of Defense and available on its government websites and in its archives;

   i. Official, de-classified memorandums from the Multi-National Force – Iraq; and

   j. Official, declassified Multi-National Corps-Iraq documents produced and released by CENTCOM, including Command Briefings, Area Assessment, Orders, Detainee Reports, Criminal Investigation Reports, Targeting Packages, Tactical Assessments, and Interrogation Reports.

42. The foregoing exhibits are identified on the spreadsheet titled Plaintiffs' Amended Exhibit List, ECF No. 99.

43. That Amended Exhibit List also identifies the exhibits Plaintiffs filed on May 2 in support of their Motion for Order Regarding Defendants' Material Support for the Subject Terrorist Organizations, along with supporting documentary evidence.

44. At the start of the bellwether hearing, the Court admitted all of the exhibits identified on that Amended Exhibit List. Day Tr. 1, p. 5 (admitting all the documents identified on the Amended Exhibit List, ECF No. 99).

45. Plaintiff also presented during the bellwether hearing additional exhibits, including Plaintiff Fact Sheet Declarations. Those additional exhibits are identified on the spreadsheet ECF No. 104.

46. The Court now admits in evidence all the exhibits presented to the Court during the bellwether hearing as well as the exhibits identified on spreadsheet ECF No. 104.

## V.   **Plaintiff Fact Sheets**

47. Plaintiffs proposed the use of Plaintiff Fact Sheets to assist the Court in managing and organizing the evidence submitted by each plaintiff or the legal representative thereof. *See* ECF Nos. 69 at 17; and 74 at 3.

48. "Use of plaintiff fact sheets has been endorsed by the federal judiciary in complex multi-plaintiff cases as a way of streamlining the presentation of evidence." ECF No. 69 at 17 (citing *Man. For Comp. Litig.*, 4th Ed., Fed. Jud. Ctr. (2004) at 436, §22.83 (discussing plaintiff facts sheets used successfully in mass action litigation)).

49. The proposed Plaintiff Fact Sheet is a standardized form comprising six sections and over 30 questions and fields for information. The Plaintiff Fact Sheet PFS is to be completed by

plaintiffs with the assistance of counsel and intended to organize factual information and evidence specifically applicable to a particular plaintiff and his/her claims. As designed, plaintiffs execute and certify, under 28 U.S.C. § 1746, the content of their Plaintiff Fact Sheet. Each Plaintiff Fact Sheet contains an exhibit list and citations to materials on the docket applicable to and supporting the factual summary provided in the Plaintiff Fact Sheet.

50. At the bellwether hearing, the Court admitted into evidence the Plaintiff Fact Sheets prepared for the bellwether Plaintiffs.

51. Going forward, the Court shall permit Plaintiffs to submit Plaintiff Fact Sheets in lieu of live testimony for purposes of both liability and damages determinations.

## VI.   Expert Witness Reports, Declarations, and Testimony Accepted by the Court

52. As noted, Plaintiffs have presented, and the Court has admitted in evidence, the written expert reports and declarations of: Patrick Clawson, Ph.D.; Matthew Levitt, Ph.D.; Peter Piatestky; Daveed Gartenstein-Ross, Ph.D., J.D.; Michael Rubin, Ph.D.; M. Lee Walters; and Michael Pregent.

53. In addition, during the bellwether hearing, the Court heard live testimony of three of those experts: Daveed Gartenstein-Ross, M. Lee Walters, and Michael Pregent.

54. The Court will now summarize the experts' qualifications and methodology under Fed.R.Evid. 702.

### a.  Daveed Gartenstein-Ross, Ph.D., J.D.

55. Dr. Daveed Gartenstein-Ross is the Chief Executive Officer of Valens Global, a non-resident fellow at the Foundation for Defense of Democracies, and an associate fellow at

the International Centre for Counter-Terrorism – The Hague. Day 1 Tr., 115:14-15; PX4, Declaration of Dr. Daveed Gartenstein-Ross, p. 3.

56. Dr. Gartenstein-Ross has taught at both the undergraduate and graduate levels at universities through the United States and Canada and has been retained by the United States government to serve as an expert in the areas of violent non-state actors, such as Shia and Sunni militants, and terrorism more generally. *Id.*, 121:16-20, 122:6-18.

57. Dr. Gartenstein-Ross applies a specific methodology when examining violent non-state actors. *Id.*, 123:16-22. As he explained to the Court, he uses a comparative analysis method that involves identifying relevant primary sources and cross-comparing them against scholarly literature and secondary sources in order to determine consistency across sources and to ascertain the facts of the matter. *Id.*, 123:18-22. Dr. Gartenstein-Ross also combines the above comparative analysis method with another, unique method using seven factors for evaluating VNSAs. *Id.*, 123:23-124:5.

58. As part of his methodology, Dr. Gartenstein-Ross undertakes efforts to authenticate statements made by terrorist groups or their members, including using external and internal validation. *Id.*, 124:14-17.

59. Dr. Gartenstein-Ross regularly uses the above authentication method in his work, and it is generally accepted in the field of counterterrorism study and research. *Id.*, 125:12-17. This method allows Dr. Gartenstein-Ross to determine which VNSAs were responsible for a specific event. *Id.*, 125:18-22.

60. When determining attack attribution, Dr. Gartenstein-Ross analyzes: whether there is a claim of responsibility; the credibility of any claim of responsibility using official documents, such as U.S. government documents; the geography of the attack, including if

a militant group has operational dominance in the area of the attack; the tactics, techniques, and procedures employed in the attack; and which group may have had motive to carry out the attack. *Id.*, 126:1-17.

61. The above methodology, which he used in this case, is generally accepted in the field of counterterrorism research and was used by him in other cases in which he was qualified as an expert. *Id.*, 126:18-127:3.

62. His work in this case includes expert analysis covering three areas. First, he provided a report detailing Iraqi Shia terrorist organizations and their support from Iran. *See* PX4. Second, he provided a report detailing Sunni terrorist organizations in Iraq and their support from Iran. *See* PX5. Third, he analyzed bellwether attacks 1 through 5 and provided his conclusions attributing those attacks to specific terrorist groups that were supported by Iran, as detailed in a written "attribution" report. *See* PX1000, Expert Report/Decl. of Dr. Gartenstein-Ross.

63. At the bellwether hearing, the Court ruled that Dr. Gartenstein-Ross "is hereby qualified to provide expert testimony in the general areas of violent non-state actors and terrorism generally as well as" "the Islamic Republic of Iran's historical use of violent non-state actors as proxy sources including Hezbollah and Al-Qaeda," "the emergence and evolution of Sunni violent non-state actors in Iraq including Iran's material support to such groups including Ansar al-Islam, also known as Ansar al-Sunnah, the Zarqawi organization, also known as Al-Qaeda in Iraq, Jaysh al Mahdi and its related organizations generally known as the special groups that include Promised Day Brigade, Asa'ib al-Haq and Kata'ib Hizballah, the Badr Corps, and the Sheibani Network." Day 1 Tr., 129:11-130:10.

**b.  Colonel M. Lee Walters (U.S. Army, Ret.)**

15

64. M. Lee Walters currently works with the Defense Threat Reduction Agency, a contractor that supports the U.S. government in detecting and deterring enemy weapons of mass destruction and emerging threats. Day 2 Tr., 319:21-320:3.

65. Prior to his work as a contractor, Mr. Lee served in the U.S. Army for 27 years. He was commissioned an officer after graduating from West Point in 1988 and retired from the military as a Colonel. *Id.*, 320:16-321:1.

66. He had three deployments to Iraq, first in 2003-2004 as an exchange officer and company commander in a battalion with the British Army, second in 2005-2006 as a battalion commander in the 101st Airborne division, and third in 2008-2009 as a field team leader in Baghdad. *Id.*, 324:10-24.

67. Mr. Walters did a two-year tour with the Joint IED Defeat Organization (JIEDDO), supervising and working closely with intelligence analysts in determining assessing the enemy networks operating in Iraq and Afghanistan. During that tour, he worked as the deputy for the intelligence section with a team of up to 14 intelligence analysts. His team studied the enemy situation and the enemy networks that were attacking the Coalition Forces and developed "intelligence products that would go to support units in Iraq and Afghanistan to help them understand the enemy networks." *Id.*, 322:23-324:9, 325:4-14.

68. During this tour, Mr. Walters and his team "would take a look at a network in an area," "get information from that unit, and then they would build out the rest of that picture of what that network is to identify what was the larger group. Was it JAM [Jaysh al-Mahdi]? Was it Al-Qaeda?  And then more accurately what were the networks, the facilitators, the bomb makers, the leaders that would help that unit really identify the vulnerabilities of that

network and avoid the strengths of that network before they conducted operations." *Id.*,
326:1-9.

69.  Mr. Walters explained the methodology he used in the field to perform military intelligence
analysis and how he applied that methodology to his work on this case. *Id.*, 326:10-329:6,
332:3-6.

70.  Similar to his work in the field, Mr. Walters assembled for this case a team of experienced
military intelligence specialists that includes Ronald Evans[4] and David Sulzer.[5] The

---

[4] Ronald Evans is a retired U.S. Army Chief Warrant Officer 4 with an M.S. in Strategic
Intelligence from the Joint Military Intelligence College. He has 36 years of experience in military
intelligence, including 23 years as U.S. Army Military Intelligence Officer and 13 years serving
as a Senior Intelligence Analyst for JIEDDO and DTRA.  He served multiple tours in Afghanistan
(2005) and Iraq (2007, 2008-2009, 2010-2011), supporting counterterrorism, counterinsurgency
operations, Special Operations Forces, and counter-improvised explosive device operations. He
served as Chief of Interrogation and Exploitation Operations in Iraq in a Joint Task Force targeting
high value individuals, during which his primary mission included targeting threat elements of
Iranian malign influence. His other work in Iraq included tours with Task Force Troy and the C-
IED Operations Integration Center, where his focus was on improvised-threat activity and the
threat networks behind those activities.

[5] David Sultzer is a retired Chief Warrant Officer 3 in U.S. Army with 32 years of military
intelligence experience, including as an active Duty Human Intelligence Warrant Officer, and as
the Human Intelligence Exploitation Support Team Lead for JIEDDO. As a Strategic Debriefer in
Iraq, he performed intelligence collection for the U.S. government, liaison operations with local
security forces, and joint operations with the FBI and U.S. State Department and conducted
interrogations of high-level officials. He also conducted interrogations of high-value individuals
associated with al Qaeda attacks. He served as a Managing Operations Officer at Guantanamo
Bay, responsible for operational oversight for all detainees captured in Afghanistan, including
associates of al-Qaeda and foreign fighters. He deployed to Iraq in 2008 as a civilian contractor
for JIEDDO working with Task Force Troy, exploiting IED related information from multiple
high-value individuals associated with terrorist attacks against U.S. and Coalition personnel. He
has extensive knowledge on IED material and weapons and those who use them and logistical and
financial support the groups at issue in this case.

.

17

Walters Team worked together to assess the information related to the bellwether attacks and reached a consensus on the final conclusions provided in their jointly written reports.

71. For this case, the Walters Team's assignment was to provide expert analysis and testimony regarding "the evolution of Iranian support to Shia militia groups, Iranian and IRGC Qods Force support to Shia militia groups, and Sunni Al-Qaeda groups in attacks against U.S. forces and coalition forces that resulted in their wounding or death." *Id.*, 321:3-7.

72. For purposes of the bellwether hearing, the Walters Team was assigned five of the 15 bellwether attacks. They looked at the available evidence regarding each attack and then, applying standard military intelligence methodology, rendered attribution opinions to determine which terrorist organizations likely committed those attacks and whether they were supported by Iran. *Id.*, 321:8-11.

73. The expert analyses of those five attacks are detailed in the written reports and declarations jointly submitted by the Walters Team: PX1620 for bellwether attack 6; PX1705 for bellwether attack 7; PX1822 for bellwether attack 8; PX1909 for bellwether attack 9; and PX2015 for bellwether attack 10. *Id.*, 321:15-19.

74. As set forth in those reports, the Walters Team analyzed, and reached their expert conclusions based on, critical features of the attacks, including: the location of the attacks; the timing of the attacks; the weapons used in the attacks; and the tactics, techniques, and procedures  (TTPs) used to commit the attack. *Id.*, 332:7-333:7.

75. In addition, the Walters Team reviewed specific attribution determinations made by the U.S. military, intelligence reports related to the attacks, and other publicly available reporting from military sources. This included intelligence reporting from three-star and four-star headquarters intelligence sections, significant activity (SIGACT) reports

18

published by U.S. Central Command (CENTCOM), and Department of Defense press briefings presented by three-star and four-star headquarters leaders, who would share information and intelligence with the public about the enemy. They also looked at other reliable sources, including scholarly articles and books published by the U.S. Army War College and the Institute for the Study of War. *Id.*, 333:8-335:3.

76. The sources and information the Walters Team relied on for their work in this case are the kinds of fact and data military intelligence experts consider to be reliable. *Id.*, 335:4-10.

77. The Court finds the Walters Team's written reports to be thorough, detailed, and well-reasoned.

78. The reports are all organized in a similar fashion. Each begins with an overview of the area where the attack occurred and a review of the ethnic and demographic makeup of the area around the time of the subject attack, as well as the insurgent threat groups operating in the area. The report then summarizes the TTPs of those threat groups. Next, the report describes the Iranian support for the insurgent groups in that area. After this overview, the report dives into the subject attack, focusing on the critical evidence that sheds light on which group likely committed the attack and the support the group received from Iran during the timeframe of the attack. *Id.*, 337:10-339:17.

79. At the bellwether hearing, the Court ruled that Mr. Walters is qualified to provide expert testimony in the areas of "military intelligence and specifically with respect to providing attribution opinions for terrorist attacks that occurred in Iraq between 2003 and 2011 as

well as evaluating Iran's material support for the groups that committed those attacks."[6]
Day 2 Tr., 336:22-337:4.

### c. *Michael Pregent*

80. Michael Pregent is a senior fellow at the Hudson Institute, a think tank in Washington, D.C.
His focus is on Middle East security, specifically Sunni and Shia terrorism. Day 3 Tr.,
545:13-25.

81. He is also a lecturer at the National Defense University and contributed to a two-volume
study about the U.S. military's presence in Iraq from 2003-2011 and Iran's malign
influence in Iraq. *Id.*, 546:1-18.

82. Prior to his current work, Mr. Pregent served in the U.S. Army for 20 years, where he
became a commissioned officer and was ultimately promoted to Captain. *Id.*, 547:3-548:14.

83. Mr. Pregent deployed multiple times during his military career, first to Iraq during Desert
Storm, then to Afghanistan, and then to Iraq in 2005, where he was an embedded advisor.
*Id.*, 547:14-17, 548:15-21.

84. In 2006, Mr. Pregent retired from the military and joined the Defense Intelligence Agency
as a subject matter expert on the Iraqi military. He was sent by General Petraeus and
Colonel McMaster to embed with the Iraqi Government as a political advisor and collect
intel on Iran's malign influence in Iraq. He continued in that role from 2006-2010. *Id.*,
548:23-551:9.

---

[6] Mr. Walters explained he is not testifying on behalf of the U.S. government or the Defense
Threat Reduction Agency and is not disclosing or relying on classified information he obtained
during his military service. Day 2 Tr., 320:4-7, 322:10-16.

85. As part of his work in Iraq, Mr. Pregent provided intelligence assessments directly to General Petraeus. His work included determining whether Iran and its proxies were involved in attacks on the ground. *Id.*, 553:22-554:16.

86. Mr. Pregent explained the methodology he used when making intelligence assessments for the U.S. military to make attack attributions. He applied that same methodology to his work in this case. *Id.*, 556:23-559:22, 560:15-561:4.

87. As part of his methodology, Mr. Pregent looked at the date of the attack, geographic location, munitions used, and the tactics, techniques and procedures of the attacker. He reviewed attack-specific and area-specific government records. He then reviewed publicly available data of other terrorist activity in the area, including caches, high value targets, foreign fighter flow, and other factors that would indicate which group had dominance in that particular area. Based on that information, he was able to draw conclusions about which group was responsible for a given attack. *Id.*, 557:1-558:12, 558:19-559:4, 559:12-22, 560:21-561:4, 599:18-19.

88. Mr. Pregent was asked to apply the above methodology to five of the 15 bellwether attacks and provide his expert opinion regarding the terrorist group responsible for each attack and whether Iranian's support to said group was essential to the group's ability to carry out such an attack. *Id.*, 555:25-556:3.

89. His expert analysis of those five attacks is detailed in his written report and declaration, PX1003. *Id.*, 555:25-556:6.

90. Mr. Pregent's reports include maps of the locations of each attack and depicts the specific terrorist activities occurring in that location at the time to graphically show his intelligence

assessment. Mr. Pregent created the same types of maps as part of his military intelligence duties in Iraq. *Id.*, 559:5-22.

91. Mr. Pregent identified the sources he used in creating the maps in this case as Significant Activity Reports generated by the U.S. military, and they are the same types of documents he would review in making his attack attributions as an intelligence advisor in the field. *Id.*, 557:17-558:18.

92. At the bellwether hearing, the Court ruled that Mr. Pregent is "an expert in the areas of military intelligence and intelligence gathering and Iran's malign influence through proxies in Iraq as well as attack attributions in Iraq." Day 3 Tr., 556:11-16.

      ***d. Patrick Clawson, Ph.D.***

93. Dr. Clawson is the Director of Research at the Washington Institute for Near East Policy, where he directs the Iran Security Initiative. PX1, Declaration/Report of Patrick Clawson, Ph.D.

94. Dr. Clawson has been qualified as an expert in other cases relating to Iran's role in supporting terrorism. PX1, p. 84. *See, e.g., Hake*, 2022 WL 4130837, at *10 (relying on Dr. Clawson's opinions in finding Defendants Bank Markazi, Bank Melli Iran, and NIOC liable for supporting EFP attacks in Iraq).

95. In this case, Dr. Clawson, in his written report and declaration, offers experts opinions about the structure and internal operations of the Iranian state and state control over various agencies and departments within the Iranian government and economy. He identifies Iran's interests and objectives and discusses how Iran seeks to achieve these by supporting terrorists who attack Americans, providing background information describing each of Iran's co-Defendant's role within Iran's terrorism infrastructure and how each is owned

and/or controlled by the state. *See* PX1; ECF No. 39-2, Declaration of Patrick Clawson, Ph.D (March 25, 2020) (discussing agency/instrumentality status of Defendants Bank Markazi, Bank Melli and NIOC).

96. Dr. Clawson also provides a historical overview of Iran's attempts to exert external influence through terrorism and how Iran's past support for terrorism was prologue to its campaign of malign influence to affect the success and outcome of rebuilding Iraq after the fall of Saddam Hussein's regime in 2003. PX1, ¶¶59-64.

97. He also offers expert opinions about Al Qaeda and Al Qaeda in Iraq and Iran's provision of material support to those groups for operations against Americans in Iraq. *Id.*, ¶¶77-85

98. He offers expert opinions on the following additional topics: (1) Iran's objectives in supporting terrorism and why Iran works with extremist groups; (2) the use of Iranian political subdivisions, including IRGC, IRGC-QF, and MOIS, to support terrorism in Iraq; (3) the critical role Iran's instrumentalities Bank Markazi and Bank Melli play in financing of terrorism; (4) Iranian agencies connected to terrorism, including the National Iranian Oil Company; and (5) Iran's use of its co-Defendants to provide material support to terrorists in Iraq. *Id.*

99. The Court finds Mr. Clawson to be an expert in the aforementioned areas.

### e.   *Matthew Levitt, Ph.D.*

100.    Matthew Levitt, Ph.D., is the Director of the Reinhard Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy. PX2, Declaration/Report of Matthew Levitt, Ph.D.

101.    He previously served as Deputy Assistant Secretary for Intelligence and Analysis at the U.S. Treasury Department, where he focused on terrorism and financial intelligence

branch and acted as deputy chief of the Office of Intelligence and Analysis. *Id.*

102.     He also served as a State Department counterterrorism advisor to the special envoy for Middle East regional security. *Id.*

103.     Dr. Levitt has authored a leading scholarly book on Hezbollah and has been qualified as an expert in both civil and criminal terrorism cases. *Id.*; *Cohen*, 238 F.Supp.3d at 71.

104.     For this case, Dr. Levitt offers expert opinions about Iran's material support for terrorism, including its use of the IRGC-QF working with its longtime proxy Hezbollah to finance, train, supply, and arm terrorist groups in Iraq. In addition, he explains how Iran moved weapons, fighters, and money into and out of Iraq, and used Iraq-based terrorist groups to commit attacks targeting Coalition Forces. PX2.

105.     Dr. Levitt opines in detail on the following topics: (1) Iran's interest in Iraq and use of Foreign Terrorist Organizations, including Hezbollah and other terrorist groups, as proxies; (2) Iran's support of Hezbollah; (3) Hezbollah's role in Iraq as a proxy of Iran; (4) Hezbollah's relationships with and training of Jaysh al-Mahdi and the Special Groups in Iraq; and (5) Iran's strategic goals in Iraq post-2003, including Iran's agents and instrumentalities and their presence and roles in Iraq, Iran's terrorist proxies in Iraq, and Iran's material support of Hezbollah and other terrorist groups in Iraq. *Id.*

106.     The Court finds Dr. Levitt to be an expert in the aforementioned areas.

### f.  *Peter Piatestky*

107.     Peter Medvedev Piatetsky is the Chief Financial Officer of Castellum.AI, a technology company that enables deep-dive research into global sanctions and compliance data. He obtained a Master of Professional Studies in Persian from the University of

Maryland, College Park, a preeminent graduate program on Iran in the United States. PX3, Declaration/Report of Peter Piatetsky.

108.    He worked as a civilian contractor in Afghanistan providing intelligence reports and briefings before moving to the U.S. Treasury Department as a sanctions investigator. From 2013-2015 he served as the Treasury Department's Lead Analyst on Europe, Russia, and the former Soviet Union. In 2015, he became a Policy Advisor for Iran in the Treasury's Office of Terrorist Financing and Financial Crimes and later also the representative to the Financial Action Task Force of Bahrain. *Id.*

109.    Starting in 2018 he was the Compliance Supervisor at Woori Bank in New York, where he provided advice on trade, banking, and credit matters related to Iran and North Korea before co-founding Castellum.AI in 2019. He has also served as an adjunct professor at American University. *Id.*

110.    Mr. Piatetsky offers expert opinions on how Iran and the IRGC utilized banks and companies owned by the government of Iran to provide funding to terrorists in Iraq. Specifically, he explains how Iran and its government-owned entities used deceptive banking practices to obscure their role in transactions, bypass sanctions, and move U.S. dollars internationally to terrorist groups. He further explains how those same practices were used to supply illicit materials to terrorist groups. Mr. Piatetsky also explains the process by which countries and entities are designated by the United States as sponsors of terrorism. He explains that the timing of a designation does not mean that that country/entity just started sponsoring terrorism. Rather, the designation confirms that the country/entity has been engaged in sponsoring terrorism for an extended period of time. Finally, Mr. Piatetsky provides detailed analysis of sampled transactions to show how Iran

and its government-owned entities utilized the U.S. and international financial system to provide money to terrorist groups. *Id.*

111.     The Court finds Mr. Piatetsky to be an expert in the aforementioned areas.

### g. *Michael Rubin, Ph.D.*

112.     Michael Rubin, Ph.D., is a Resident Scholar at The American Enterprise Institute and a Senior Editor of the Middle East Quarterly. He served as a Political Adviser to the Coalition Provisional Authority in Baghdad from 2003-2004 and was country advisor for Iraq and Iran in the Office of the Secretary of Defense at the Department of Defense from 2002-2004. PX6, Declaration/Report of Michael Rubin, Ph.D.

113.     Dr. Rubin has authored several books and dozens of scholarly articles about Iran and has briefed over 100 military units before deployment to the Middle East from 2004 to the present. *Id.*

114.     Dr. Rubin has traveled through Iran and Iraq and met face-to-face with, and interviewed, many members and leaders of militant groups operating in Iraq. *Id.*

115.     Dr. Rubin offers expert opinions and analysis about Iran's operational support of Al Qaeda, Ansar al-Islam, Hezbollah, Jaysh al-Mahdi, and the Special Groups; Iran's funding and training of terrorist groups targeting Americans. Dr. Rubin provides an overview of Iran's support of Sunni terror groups, the underlying purposes and goals of such support, and the distinct characteristics of Iran's support to these groups. He then focuses on Iran's support of specific Sunni groups in Iraq, including these groups' unique histories, backgrounds, and areas of operation, as well as the impact Iran's support had on these groups' ability to exist and operate effectively. Dr. Rubin is also an expert in Iran's support for Shia groups in Iraq, including Jaysh al-Mahdi and the Special Groups, and The

Badr Corps. Dr. Rubin explains the various methods and types of Iranian material support received by Sunni terrorist groups in Iraq, including training, safe haven, funding, and logistical support. *Id.*

116.     The Court finds Dr. Rubin to be an expert in the aforementioned areas.

## VII.     Elements of Plaintiffs' Claims

117.     Plaintiffs' claims against Defendants are brought under the state-sponsored terrorism exception to the jurisdictional immunity of a foreign state.  The FSIA provides the jurisdictional exception and a private right of action against a foreign state for a "personal injury or death that was caused by" an "act of" "extrajudicial killing," or the "the provision of material support or resources for such an act, if the act or provision of support or resources is engaged in by an official, employee, or agent of such foreign state while acting in the scope of his or her office." *See* 28 U.S.C. §§ 1605A(a)(1) (the exception); and 1605(a)(c) (the private right of action). "There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity.'" *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 169 (D.D.C. 2022) (quoting *Fritz*, 320 F. Supp. 3d at 86–87). The private right of action under § 1605A(c) is available to U.S. nationals, members of the U.S. armed forces, employees of the U.S. government, and U.S. contractors acting within the scope of their employment. *Id.*

118.     For the exception to apply, Plaintiffs must first establish two threshold elements. First, the foreign state (here, Iran) must have been designated a state sponsor of terrorism at the time the act of extrajudicial killing occurred or was attempted and at the time the lawsuit was filed. 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Second, Plaintiffs must have been U.S.

nationals, members of the U.S. armed forces, or U.S. government employees or contractors at the time of the attack. 28 U.S.C. § 1605A(a)(2)(A)(iii).

119.    Plaintiffs presented evidence regarding those two threshold elements in their Motion for Order Regarding Subject Matter Jurisdiction and the accompanying exhibits. *See* ECF Nos. 81 and 82. The Court will now summarize that evidence.

   *a.   Iran's Designation as a State Sponsor of Terrorism*

120.    The terror attacks giving rise to Plaintiffs' claims in this lawsuit occurred between 2003 and 2011. *See* ECF No. 100, Section VI.

121.    Iran was designated as a state sponsor of terrorism in 1984. *See* "Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran," 49 Fed. Reg. 2,836 (Jan. 23, 1984). Iran has remained designated as a state sponsor of terrorism to this day. *See* U.S. Dep't of State, State Sponsors of Terrorism, available at https://www.state.gov/j/ct/list/c14151.htm (last visited Nov. 11, 2022); *Coombs v. Islamic Republic of Iran*, No. CV 19-3363 (RDM), 2022 WL 715189, at *15 (D.D.C. Nov. 7, 2022) (finding that Iran has been a designated state sponsor of terrorism since 1984).

122.    Iran's designation as a state sponsor of terrorism from 1984 to the present is a judicially noticeable fact under Fed.R.Evid. 201 because it "is not subject to reasonable dispute" and "is generally known within the trial court's territorial jurisdiction." *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) ("[A] court clearly may judicially notice its findings of facts and conclusions of law in related cases."); *Coombs*, 2022 WL 715189, at *15 (relying on the same above-cited information from the Federal Register and Department of State to find that Iran has been a designated state sponsor of terrorism from 1984 to the present day).

123.     This "longstanding designation of Iran as a state sponsor of terrorism is sufficient to satisfy the designation requirement" under the FSIA. *Coombs*, 2022 WL 715189, at *15; 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

124.     The state-sponsor terrorism designation is applicable to all six defendants in this case: The Islamic Republic of Iran; Iranian Revolutionary Guard Corps; Iranian Ministry of Intelligence and Security; Bank Markazi Jomhouri Islami Iran; Bank Melli Iran; and National Iranian Oil Company.

125.     Under the FSIA, the definition of "foreign state" includes the foreign state itself as well as "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a).

126.     As this Court previously ruled, Iran, IRGC, and MOIS are "foreign state[s] or political subdivision[s]" under § 1608(a) while Bank Markazi, Bank Melli, and NIOC are "agenc[ies] or instrumentalit[ies]" of Iran under § 1608(b). ECF No. 55, pages 2–3.

127.     Consequently, the designation of Iran as a state sponsor of terrorism is sufficient to satisfy the designation requirement as to all defendants. *See Hake*, 2022 WL 4130837, at *14.

### b.   *Plaintiffs' Statuses as U.S. Nationals or Members of the U.S. Armed Forces*

128.     As noted above at paragraph 36, the Court finds the Plaintiffs identified in the summary spreadsheet, ECF No. 81-2, were, at the time of the terrorist attacks upon which they have brought their claims in this lawsuit, nationals of United States or members of the U.S. armed forces, thus satisfying 28 U.S.C. § 1605A(a)(2)(A)(iii).

### c.   *Liability Elements*

129.     To establish liability under the terrorism exception, Plaintiffs must prove there was "personal injury or death that was caused by" "the provision of material support or resources for" an "act of…extrajudicial killing," and that the material support or resources were provided by Iran's officials, employees, or agents "while acting in the scope of" their "office, employment, or agency." 28 U.S.C. 1605A(a)(1). *See Roberts*, 581 F. Supp. 3d at 169.

130.     These elements are elaborated below in the Conclusions of Law section.

131.     The Court will now set forth its findings pertinent to the liability elements. The Court will begin by reviewing the evidence of Defendants' material support for the subject terrorist organizations. Next, the Court will address the evidence pertinent to each bellwether attack, including evidence that those attacks were committed by the subject terrorist organizations with Defendants' material support.

## VIII.  **Defendants' Material Support for the Subject Terrorist Organizations**

### a.  *Iran's Campaign of International Terrorism*

132.     Following the end of major combat operations in Iraq in May 2003, Iran increased its flow of material support to terrorist groups in Iraq targeting U.S. and other Coalition Forces.[7]

133.     Since that time, Iran has supported both Sunni and Shia insurgent groups in Iraq as they targeted Coalition Forces, Iraqi security forces, and the Iraqi government itself.[8]

---

[7]  Declaration & Expert Report on Sunni Militant Groups of Daveed Gartenstein-Ross ("Gartenstein-Ross Sunni Decl."), PX5, p. 65; Declaration & Expert Report of Michael Rubin ("Rubin Decl."), PX6, ¶ 142; Declaration and Expert Report of Peter Medvedev Piatetsky ("Piatetsky Decl.), PX3, ¶ 28.

[8]  Declaration and Expert Report on Shia Militant Groups of Dr. Daveed Gartenstein-Ross ("Gartenstein-Ross Shia Decl."), PX4, pp. 2, 43 (*citing* PX356); Gartenstein-Ross Sunni Decl., p. 65; Rubin Decl., ¶¶ 202-205; Piatetsky Decl., ¶ 303.

134.     Iran has backed opposing parties and movements to secure its interests.[9]

135.     As the U.S. government has stated, Iran "remains the world's leading state sponsor of terrorism, and provides assistance to al Qaeda, the Taliban, Hezbollah, Hamas, and other terrorist networks."[10]

136.     From at least 2003 through 2011, Iran continually provided material support to terrorist groups in Iraq. This material support included funding, weapons, training, safe haven, transportation, intelligence, expert advice, and assistance in attack planning.[11]

137.     These weapons included: advanced rockets; small arms; automatic weapons; RPGs; 60mm-120mm mortars; 107-mm, 122-mm and 240-mm rockets; advanced large-caliber sniper rifles; improvised explosive devices (IEDs), including explosively-formed penetrators (EFPs); and improvised rocket assisted munitions (IRAMs).[12]

138.     The training Iran provides its terror proxy groups included: (1) a basic paramilitary skills and weapons course, which provided introductory training on mortars, improvised explosive devices, and firearms; (2) an advanced paramilitary course that provided training in advanced operations and tactics; and (3) a master-trainer course to create a subset of fighters that could take these combat skills and teach them to Iraqis locally.[13] To advance

---

[9] Declaration and Expert Report of Dr. Matthew Levitt ("Levitt Decl."), PX2, ¶ 25.

[10] PX137, "Remarks by President Trump on Iran Strategy," The White House (October 13, 2017).

[11] PX2, Levitt Decl., ¶¶ 5, 176; Gartenstein-Ross Shia Decl., PX4, pp. 2, 45-46; PX5, Gartenstein-Ross Sunni Decl., p. 65.

[12] PX205, "Country Reports on Terrorism, 2009," U.S. State Department, August 2010, p. 193; Levitt Decl., ¶¶104-110.

[13] PX2, Levitt Decl., ¶ 142-143; Gartenstein-Ross Shia Decl., p. 36 (*citing* PX203, U.S. Department of State, Country Reports on Terrorism 2007 (April 2008)).

in the training program, Iraqi recruits made multiple trips to Iran or camps in Lebanon maintained by Hezbollah.[14]

139.    As shown below, Iran's material support solidified an operational nexus amongst a number of the terrorist organizations, including: al Qaeda; the Zarqawi Organization/al Qaeda in Iraq; Ansar al Islam/Ansar al Sunna; Hezbollah; the Badr Organization/Badr Corps; and Jaysh al-Mahdi and its splinter cells known as "Special Groups" (including the Promised Day Brigades, Kata'ib Hezbollah, Asa'ib Al Haq, and the Sheibani Network).

    *b.   Iran's Terrorism Network*

140.    With the assistance of the National Iranian Oil Company (NIOC), Bank Melli, and Bank Markazi, Iran provided the above-referenced terrorist groups material support primarily through the Islamic Revolutionary Guard Corps (IRGC), the IRGC-Qods Force (IRGC-QF), Ministry of Intelligence and Security (MOIS), and Iran's Lebanon-based terror proxy, Hezbollah. These entities worked directly and indirectly with the terrorist groups that perpetrated terror attacks in Iraq.[15]

141.    "Iranian government ministries are responsible for carrying out the policies of the Iranian government, and the Iranian government's policies include state support for terrorism. Although much of that state support is done through clandestine means, the government ministries have also been involved in state support for terrorism, generally,

---

[14] PX2, Levitt. Decl., ¶¶ 143-147 (*citing* PX346, U.S. Congress, Senate Committee on Armed Services, The Situation in Iraq and Progress by the Government of Iraq in Meeting Benchmarks and Achieving Reconciliation: Hearing before the Committee on Armed Services, 110th Cong., 2d sess., April 8-10, 2008, Statements of Gen. David H. Petraeus and Ambassador Ryan Crocker).
[15] PX1, Clawson Decl., ¶¶ 163-169; PX5, Gartenstein-Ross Sunni Decl., p. 65; PX6, Rubin Decl., ¶¶ 199, 202-204; PX3, Piatetsky Decl., ¶ 143.

and in support for al Qaeda and Hezbollah, in particular." *In re Terrorist Attacks on Sept. 11*, 2001, 2011 WL 13244047, at *7.

> i.  *IRGC*

142.    The IRGC is accountable exclusively to Iran's Supreme Leader.[16] The IRGC defines itself "as an instrument of the Supreme Leader, to whom IRGC cadres pledge their unflinching loyalty."[17]

143.    IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror.[18]

144.    "While the Iranian armed forces would 'protect the borders of Iran,' the IRGC with its 'parallel' military structure was tasked with 'protect[ing] the [Islamic] revolution.'" *Karcher*, 396 F. Supp. 3d at 22.

145.    The IRGC has played a critical role in exporting the principles of the Iranian Revolution by using local groups as proxies for the ideals of the Islamic Republic of Iran. *Fritz v. Islamic Republic of Iran*, 320 F. Supp.3d 48, 58-59 (D.D.C. Aug. 2, 2018); *see also Roberts v. Islamic Republic of Iran*, 581 F. Supp.3d 152, 160 (D.D.C. Jan. 24, 2022).

146.    The IRGC is the primary driver of Iran's terror activities. *See Cabrera*, 2022 WL 2817730, *19.

147.    The U.S. State Department recognizes that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft."[19]

---

[16] PX1, Clawson Decl., ¶ 87; Rubin Decl., ¶46.
[17] PX3, Piatetsky Decl., ¶ 26.
[18] PX34, U.S. Treasury Department Press Notification, Notification of designation of the IRGC for providing support to the IRGC-QF (Oct. 13, 2017).
[19] PX80, "Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization," The White House (April 8, 2019) (emphasis added).

148.     "A subsidiary of the IRGC—the Qods Force, or IRGC-QF—is responsible for its international operations, including training Muslim groups to support the revolution through insurgency and terrorism." *Id.* Following the 2003 U.S. deployment of troops in Iraq, "the IRGC-QF was the main Iranian organization supporting and directing those in Iraq attacking Americans."[20]

149.     "The Quds Force was responsible for cultivating proxies in other countries and did so with its proxy Lebanese Hezbollah… The Quds Force is part of the IRGC, which is, in turn, an arm of the Islamic Republic of Iran." *Fritz*, 320 F. Supp. 3d at 85; *see also Karcher*, 396 F. Supp. 3d at 55 (same).

150.     Major General Qassem Soleimani, who commanded the IRGC-QF, reported directly to Iran's Supreme Leader and was responsible for IRGC-QF operations in Iraq.[21] "[Soleimani's] subordinate Ramazan Corps managed the effort in Iraq, with three subcommands responsible for the northern, central, and southern sectors, respectively. Two to three regional offices operated out of each sector. Hundreds of agents were involved, not least Iranian ambassador to Iraq Hassan Kazemi Ghomi, who served as an undercover Quds Force officer. The consulate in Basrah functioned as a similar hub of covert activity for Soleimani"[22]

151.     In early 2008, IRGC-QF Brigadier General Ahmed Foruzandeh was designated by the U.S. Treasury Department, which identified him as the Commanding Officer of the

---

[20] PX3, Piatetsky Decl., ¶ 28.
[21] *Id.*, p. 28 (quoting PX242).
[22] PX242.

Ramazan Corps and noted that he "leads terrorist operations against Coalition Forces and Iraqi Security Forces, and directs assassinations of Iraqi figures."[23]

152.     In Iraq, the IRGC-QF's role within Iran's terrorism apparatus has been to establish, train, and support a network of cells in Iraq, the aim of which has been to assassinate key leaders, support death squads, and distribute highly lethal weapons for use against American forces and Iraqi citizens.[24]

153.     To that end, the IRGC-QF developed a distribution channel for the terrorism network to transfer weapons (including mortars, rockets, sniper rifles, roadside bombs, bullets, and rocket propelled grenades) through the Mehran and Ilam regions in Iran to the Diyala and Maysan provinces in Iraq.[25] Similarly, using the northwestern border between Iraq and Syria, the IRGC-QF and MOIS established supply routes for arms and equipment to Sunni terrorist groups, including a network of ratlines and safe houses through which Sunni foreign fighters, travelling across Iran to and from Afghanistan and elsewhere, could infiltrate and exfiltrate Iraq.[26]

---

[23] PX67, Press Release, U.S. Dep't of Treasury, Treasury Designates Individuals, Entity Fueling Iraqi Insurgency (Jan. 9, 2008).

[24] Levitt Decl., ¶¶ 98 (*citing* PX663, James Glanz, "U.S. Says Arms Link Iranians to Iraqi Shiites," The New York Times, February 12, 2007), 141 (*quoting* PX665, Jim Garamone, "Iran Arming, Training, Directing Terror Groups in Iraq, U.S. Official Says," American Forces Press Service, July 2, 2007); Gartenstein-Ross Shia Decl., p. 34 (*quoting* PX202, U.S. Department of State, Country Reports on Terrorism 2006 (April 30, 2007)).

[25] PX4, Gartenstein-Ross Shia Decl., pp. 29-30.

[26] Rubin Decl., ¶ 160 (*citing* PX503, "Review of the re-listing of Ansar al-Sunna, JeM, LeJ, EIJ, IAA, AAA and IMU as terrorist organisations," Parliamentary Joint Committee on Intelligence and Security, June 2007, Canberra); and Gartenstein-Ross Sunni Decl., pp. 35, 41-42, 57-59 (*quoting* PX130, U.S. Department of Treasury Press Release, Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point (July 28, 2011); PX127, U.S. Department of Treasury Press Release, Treasury Further Exposes Iran-Based Al-Qa'ida Network (October 18, 2012)).

154.    The fact that "the IRGC-QF spearheaded a closely coordinated campaign to equip the Shi'a militia for proxy warfare" "is well attested to in U.S. Government documents." *Karcher*, 396 F.Supp.3d at 24.

        *ii.   National Iranian Oil Company (NIOC)*

155.    Iran controls vast oil and gas reserves, including "the world's third-largest and second-largest reserve holder of oil and natural gas, respectively"[27] These reserves, which are worth hundreds of billions of dollars,[28] and typically priced in U.S. dollars,[29] are central to Iran's economy. *See United States v. Atilla*, No. 15-cr-867 (RMB), 2018 WL 791348, at *35-36 (S.D.N.Y. Feb. 7, 2018) ("[T]he Iranian economy is primarily petroleum based. The petroleum industry is predominantly U.S. dollar based. In order for the Iranian economy to function, it, therefore, must conduct a lot of its business in U.S. dollars.").[30]

156.    The NIOC is entirely owned by the government of Iran[31] and was designated as a Specially Designated National in 2008.[32]

157.    The NIOC is an affiliate of the IRGC and controls nearly all of Iran's oil.[33]

158.    As the U.S. Treasury Department has stated: "NIOC, which is owned by the Government of Iran through the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran."[34]

---

[27] PX262 – *Country Analysis Executive Summary: Iran,* U.S. Dep't of Energy (2021).
[28] *Id.*
[29] PX3, Piatetsky Decl., ¶ 55 (*citing* Lan Cao, *Currency Wars and the Erosion of Dollar Hegemony*, 38(1) MICH. J. INT'L L. 57, 67 (2016)).
[30] PX1, Clawson Decl., ¶ 53.
[31] *Id.*, ¶¶ 25, 161 (*citing* PX125), 169, 217; *see also* PX125, Press Release, U.S. Dep't of Treasury, Treasury Submits Report To Congress On NIOC And NITC (Sept. 24, 2012).
[32] PX1, Clawson, ¶ 167 (*quoting* PX59).
[33] PX6, Rubin Decl., ¶¶ 50-51.
[34] *Id.*

159.      NIOC is used by Iran for vital support for its illicit activities, including funding terrorism.[35]

160.      Though at times NIOC has directly provided support to terrorist groups carrying out attacks in Iraq, its more common role has been to support the IRGC-QF and other Iranian institutions in financing terrorism.[36]

161.      Iran has diverted significant revenues generated by NIOC to its other agencies for use in supporting Iran's terrorist proxies in the region, particularly Iraq.[37]

162.      The NIOC has functioned within Iran's terrorism network in several important ways. First, it has served as the primary source of dollar-denominated currency that was critical to Iran for directly financing its terrorist operations in Iraq.[38] Second, it has provided logistical support and cover for IRGC and MOIS operatives in areas in which NIOC and other NIOC-affiliated front companies pretended to operate legitimate oil exploration and production, particularly in Iraq.[39] NIOC has used its own helicopters to conduct surveillance on key smuggling routes through oil fields in eastern Iraq, as well as U.S. bases in the area.[40]

163.      NIOC's leadership includes key IRGC commanders who oversee the IRGC's direct work on behalf of and within NIOC, including guarding NIOC operations, overseeing

---

[35] PX1, Clawson Decl., ¶ 169.

[36] *Id.*, ¶ 25.

[37] *Id.*, ¶ 169.

[38] PX3, Iran required undetectable access to and use of U.S.-dollar denominated currency to support its terrorist proxies in Iraq because dollar-denominated currency was more widely accepted, more easily transferrable, less prone to fluctuations in value, and less easily traceable back to Iran. *See* Piatetsky Decl., ¶ 267.

[39] PX6, Rubin Decl., ¶¶ 21, 50, 53, 202; PX1, Clawson Decl., ¶¶ 163-164.

[40] PX1, Clawson Decl., ¶ 163.

contracts to lay the pipelines, operating the tankers, running refineries, and conducting exploration and exploitation of Iran's onshore and offshore oil and gas fields.[41]

164.    In 1995, Under Secretary of State Peter Tarnoff testified before the Senate that "a straight-line links Iran's oil income and its ability to sponsor terrorism, build weapons of mass destruction, and acquire sophisticated armaments."[42]

165.    In 1996, Congress directly linked Iran's revenues from its export sales of crude oil to the regime's ability to materially support international terrorism, acquire nuclear weapons and develop ballistic missile delivery systems.[43]

166.    NIOC's critical role in Iran's support for terror is to provide a consistent and clandestine source of funds channeled to Iran's terrorist proxies.[44] As stated by former Treasury Secretary Steven Mnuchin, "Treasury's action against [NIOC] makes it explicitly clear that those purchasing Iranian oil are directly supporting Iran's militant and terrorist arm, the IRGC-Qods Force."[45]

167.    The Treasury Department has stated, "[t]he crude oil and condensate sold by this IRGC-QF network originates with the [NIOC]."[46]  The vast sums NIOC generates in oil sales and taxes were the principal source of the revenue used by the Iranian government to fund terrorist activities.[47]

---

[41] PX6, Rubin Decl., ¶¶ 49-52.

[42] PX3, Piatetsky Decl., ¶ 63 (*citing* PX407, Iran Oil Sanctions Act of 1996, HR Rep 104-523, pt. 1, 104th Cong, 2d Sess. (1996)).

[43] PX3, Piatetsky Decl., ¶ 64 (*citing* Iran and Libya Sanctions Act of 1996).

[44] PX1, Clawson Decl., ¶¶ 166-69.

[45] *Id.*, ¶ 165.

[46] *Id.*, ¶ 165. PX63, U.S. Department of the Treasury, Press Center, *Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC-QF and Terror Proxies*, September 4, 2019.

[47] PX1, Clawson Decl., ¶¶ 166, 169; PX3, Piatetsky Decl., ¶ 109.

168.     The Southern District of New York District Court has identified NIOC as an agency

of Iran that materially supports terrorism. *See In re Terrorist Attacks on Sept. 11, 2001*,

2011 WL 13244047, at \*8 ("[T]he National Iranian Oil Company is owned, controlled, and

managed by the Government of Iran. A large cash flow of money was funneled to terrorist

organizations through the NIOC.").

      *iii.  Bank Melli*

169.     Bank Melli Iran was founded in 1928 as Iran's first domestically owned

commercial bank. Its name means "National Bank of Iran." Bank Melli is central to the

Iranian government's banking needs.[48]

170.     Working with Iran's other agents (namely, Bank Markazi, IRGC, NIOC, and other

IRGC and MOIS front companies), Bank Melli has facilitated the flow of U.S. dollars from

Iran's oil revenues to Iran's terrorist proxies by providing financial services directly to the

IRGC-QF to be dispensed to the militia groups in Iraq.[49] In doing so, Bank Melli has helped

advance the policies and goals of the Iranian government, including its goals regarding

terrorist activities targeting the United States in Iraq.[50]

171.     Bank Melli has long been used by the IRGC and IRGC-QF to provide support to

---

[48] PX1, Clawson Decl. ¶¶ 24, 123 (*quoting* PX801, 2014/15 Annual Report of Bank Melli Iran, Chapter 29, "Capital," p. 70).
[49] PX3, Piatetsky Decl., ¶¶ 96-99 (*quoting* PX36, U.S. Department of Treasury Press Release, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism (October 25, 2007); PX51, U.S. Department of Treasury Press Release, U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime As Part of Unprecedented U.S. Economic Pressure Campaign (November 5, 2018); PX122, U.S. Department of Treasury Press Release, Fact Sheet: Treasury Strengthens Preventative Measures Against Iran (November 6, 2008); Rubin Decl., ¶¶ 60-63 (*quoting* PX36; PX51; PX217, U.S. Department of State, Subject: Information on Bank Melli for Italy, S Consideration in EU Discussions on Autonomous Sanctions (March 8, 2007); PX405, Finding That the Islamic Republic of Iran Is a Jurisdiction of Primary Money Laundering Concern, 76 Fed. Reg. 72756 (Nov. 25, 2011).
[50] PX1, Clawson Decl., ¶ 127.

terrorist groups.[51]

172.     The Treasury Department has identified Bank Melli as an entity that provides crucial banking services to the IRGC-QF to enrich and support its terrorist agenda.[52]

173.     In 2007, when the Treasury Department designated Bank Melli for its support for terrorism, the Department stated, "[f]rom 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force."[53]

174.     Over the years, including in 2018, the U.S. government continued to document Bank Melli's support for Iran's terrorism campaign: "Bank Melli is being designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF."[54]

The Treasury Department further stated:

> As of 2018, the equivalent of billions of dollars in funds have flowed through IRGC-QF controlled accounts at Bank Melli. Bank Melli has acted as a conduit for payments to the IRGC-QF. The IRGC-QF has used Bank Melli to dispense funds to Iraqi Shia militant groups, and Bank Melli's presence in Iraq was part of this scheme. Since the mid-2000s, Bank Melli increasingly provided services to Iranian military-related entities as they became further involved in all aspects of the Iranian economy. Bank Melli has enabled the IRGC and its affiliates to move funds inside and outside of Iran…[55]

---

[51] *Id.*, ¶ 24.; PX6, Rubin Decl., ¶¶ 60-61 (*quoting* PX36, U.S. Department of Treasury Press Release, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism (October 25, 2007); PX51, U.S. Department of Treasury Press Release, U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime As Part of Unprecedented U.S. Economic Pressure Campaign (November 5, 2018); PX217, U.S. Department of State, Subject: Information on Bank Melli for Italy, S Consideration in EU Discussions on Autonomous Sanctions (March 8, 2007)), 72.

[52] PX2, Levitt Decl., ¶¶ 73-78; PX3, Piatetsky Decl., fn. 69.

[53] PX3, Piatetsky Decl., ¶ 96 (*citing* PX36, Press Release, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, U.S. Dep't of the Treasury (Oct. 25, 2007)).

[54] *Id.,* ¶ 98.

[55] *Id., Piatetsky, ¶ 98.*

175.     The banking expert Mr. Piatestky has concluded that Bank Melli, and its co-Defendants, purposefully used deceptive trade and finance practices to illicitly circumvent U.S. banking laws and counterterrorism financing regulations. They "did so in order to finance their established network of agents and proxies used by them to sponsor acts of terrorism. The Defendants' access to and use of the international financial system permitted them to knowingly provide material support to [among others] The Islamic Revolutionary Guard Corps-Qods Force…" In turn, the groups "used this support from the Defendants [including Bank Melli Iran] to commit attacks against Americans in Iraq. The support provided by the Defendants was critical to their ability to function and survive, as well as significantly enhanced their operational abilities."[56]

### iv.  Bank Markazi

176.     Bank Markazi, also known as the Central Bank of Iran, acts at the direction of Iran, pursuant to Iran's policies.[57] Under Iran's Monetary and Banking Law, Bank Markazi is "wholly owned by the Government."[58] The Iranian government exercises tight control over Bank Markazi and gives it direct orders.[59] By law and in practice, Bank Markazi is the Iranian government's banker.[60] Government revenue is deposited in Bank Markazi and government expenditures are carried out through Bank Markazi.[61]

177.     The Iranian government's funding for MOIS and IRGC flows through Bank Markazi.[62]

---

[56] *Id.*, ¶ 303.
[57] PX1, Clawson Decl., ¶ 100; PX6, Rubin Decl., ¶ 60.
[58] PX1, Clawson Decl., ¶ 101.
[59] *Id.*, ¶ 102.
[60] *Id.*, ¶ 103.
[61] *Id.*
[62] *Id.*

178.     Through these transactions, Iran has long used Bank Markazi (including during the years 2003 through 2011) to transfer millions of dollars to terrorist groups, including those targeting Americans in Iraq.[63]

179.     Bank Markazi has been designated a Specially Designated Global Terrorist for its continuous and significant role in supporting Iran's efforts to commit terrorism and specifically for "provid[ing] billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah."[64]

*v.  Ministry of Intelligence and Security (MOIS)*

180.     MOIS is Iran's foreign and domestic intelligence service and a principal organization Iran has used to carry out its terrorist support activities.[65], [66]

181.     Iran routinely uses MOIS to facilitate terrorist attacks.[67]

182.     The Treasury Department has designated MOIS and subjected it to economic sanctions under Executive Orders 13224, 13553, and 13572.[68]

183.     The Treasury Department has stated, "MOIS provides financial, material, or technological support for, or financial or other services to Hizballah… MOIS also provided money and weapons to [AQI], a terrorist group designated under E.O. 13224, and negotiated prisoner releases of AQI operatives."[69]

---

[63] *Id.*, ¶¶ 23, 103; PX3, Piatetsky Decl., ¶¶ 73, 89.
[64] PX48, U.S. Department of Treasury Press Release, Treasury Sanctions Iran's Central Bank and National Development Fund (September 20, 2019).
[65] *Id.*
[66] PX1, Clawson Decl. ¶ 95.
[67] *Id.*, ¶ 98.
[68] PX1, Clawson Decl., ¶ 94.
[69] PX68, U.S. Department of Treasury Press Release, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (February 16, 2012).

184.     Even before the United States' involvement in Iraq in 2003, MOIS and the IRGC were working with Sunni terrorist groups, including core al Qaeda and Ansar al-Islam personnel, and laying the groundwork with them and with IRGC-trained militia leaders for a broad-based terror campaign against the United States.[70]

185.     MOIS is the primary agency through which the Iranian government has exercised operational control over Hezbollah. *Peterson v. Islamic Republic of Iran*, 264 F. Supp.2d, 46, 53 (D.D.C. May 30, 2003). MOIS has also acted as a conduit through which Iran has provided funds and weapons to Hezbollah. *Id.*

         *vi.   Hezbollah*

186.     Hezbollah, a Shia Islamist militant group based in Lebanon, is one of the world's longest lasting and lethal terrorist groups and is considered "Iran's main terrorist ally." *Karcher*, 396 F. Supp. 3d at 23).[71]

187.     Iran, through the IRGC and MOIS, was responsible for creating Hezbollah in 1983.[72] Iran assisted Hezbollah's formation by dispatching 1,500 IRGC officers to help the fledgling organization.[73] MOIS began training Hezbollah, and the IRGC began providing operational advice to Hezbollah's military wing.[74]

188.     Iran's close partnership with Hezbollah has endured since the militant group's founding. The Court in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003), found: "It is clear that the formation and emergence of Hezbollah as a major

---

[70] PX6, Rubin Decl., ¶ 196.
[71] PX283, Annual Threat Assessment of the U.S. Director of National Intelligence for the Senate Select Comm. on Intelligence (Feb. 2, 2006), at 13.
[72] PX2, Levitt Decl., ¶¶ 31, 42-43, 47-53, 111.
[73] *Id.*, ¶ 47.
[74] PX4, Gartenstein-Ross Shia Decl., p. 12.

terrorist organization is due to the government of Iran. Hezbollah presently receives extensive financial and military technical support from Iran, which funds and supports terrorist activities."

189.     Iran and Hezbollah maintain a close relationship and "Hezbollah has been Iran's proxy" since 1985 and "Iran provides Hezbollah with as much as $700 million to $1 billion per year" in the form of money, training, intelligence, and weapons." *Fritz v. Islamic Republic of Iran*, 320 F. Supp.3d 48, 58 (D.D.C. Aug. 2, 2018). "Iran and Hezbollah have a deep relationship that involves not just shared interests, but [a] shared ideology and shared goals." *Id.*, at 61 (alteration in original).

190.     "In exchange for Hezbollah's unwavering dedication to Iran and its revolutionary aims, Iran bankrolled, armed, and trained Hezbollah." *Roberts v. Islamic Republic of Iran*, 581 F. Supp.3d 152, 160 (D.D.C. Jan. 24, 2022).

191.     Hezbollah's longevity and lethality is due to the continuous support of the IRGC and MOIS, and Iran has sought to duplicate this "success" with other groups, especially in Iraq.[75]

192.     As Iran's primary external terrorist proxy, Hezbollah has played a central role in Iran's use of international terrorism by acting at Iran's direction while allowing Iran to maintain a degree of plausible deniability.[76]

193.     Through the IRGC and MOIS, Iran has trained, funded, and helped run Hezbollah's operations.[77] In 2014, General Amir Ali Hajizadeh, head of the IRGC Aerospace Force,

---

[75] PX2, Levitt Decl., ¶¶ 31, 49, 53; PX6, Rubin Decl., ¶ 55; PX4, Gartenstein-Ross Shia Decl.,  pp. 14, 19, 32, 34.
[76] PX2, Levitt Decl., ¶ 111.
[77] PX4, Gartenstein-Ross Shia Decl., p. 12.

explained that "the IRGC and Hezbollah are a single apparatus joined together."[78]

194.    Hezbollah has been designated by the United States as a Specially Designated Terrorist, a Specially Designated Global Terrorist, and a Foreign Terrorist Organization.[79]

195.    With Iran's patronage, Hezbollah has expanded its involvement with other militant groups, working in close coordination with Iran to achieve Iran's goal of "exporting the revolution" by routinely attacking western targets in the Middle East.[80] By October 2003, at Iran's direction and with its support, Hezbollah had begun to establish a resistance movement in Iraq to conduct mass casualty attacks."[81] To do so, Hezbollah and Iran began moving fighters across the porous Syrian/Iraqi border.[82]

196.    Iran sought to inject battle-hardened foreign fighters into Iraq that would attack American interests there and worked with Hezbollah to establish ratlines into Syria that foreign fighters could transit safely. These foreign fighters included both Sunnis and Shias.[83]

197.    By January 2004, approximately 800 Hezbollah operatives were on the ground in Iraq, including assassination teams, agents, and clerics that infiltrated post-war Iraq at Iran's behest.[84]

198.    In 2004, U.S. and British Intelligence reporting confirmed that weapons from Iran

---

[78] PX3, Piatetsky Decl., ¶ 30 (*quoting* PX209, U.S. Department of State Bureau of Counterterrorism, "Country Reports on Terrorism 2014," (June 2015), p. 286).

[79] PX81, Notice Prohibiting Transactions with Terrorists Who Threaten To Disrupt the Middle East Peace Process, E.O. 12947, 62 Fed. Reg. 5079-80 (January 23, 1995); Levitt Decl., ¶ 63, Fn. 79; PX412, U.S. Department of State, Designation of Foreign Terrorist Organizations – Public Notice No. 2612, 62 Fed. Reg. 5260-61 (October 8. 1997); PX61.

[80] PX2, Levitt Decl., ¶¶ 47-53.

[81] PX2, Levitt Decl., ¶ 118.

[82] *Id.*, ¶ 119.

[83] *Id.*

[84] *Id.*, ¶ 118.

were being used by insurgent groups in Iraq, and, in particular, sophisticated roadside bombs that later became known as explosively-formed penetrators (EFPs), which had been developed by Hezbollah and Iran in Lebanon for use against Israeli Defense Forces.[85]

199.    In 2006 and 2007, Coalition Forces in Iraq detained multiple members of Hezbollah, who were determined to have participated in the planning and commission of attacks against U.S. forces or were found with documents detailing Iran's and Hezbollah's work with and support for terrorist groups in Iraq.[86]

200.    Hezbollah has wielded significant influence over Special Group leadership, including personally leading the Special Groups during critical times or during specific attacks.[87] Special Groups were modeled after Hezbollah and had deep personal ties to Hezbollah's leaders.[88] Hezbollah used its close relationship with the Special Groups to authorize and incite the Special Groups to organize a terror campaign that would inflict "mass casualties" against Americans in Iraq.[89]

201.    During his interrogation, Qais Khazali, former member of Jaysh al-Mahdi and founder of Asa'ib Al Haq, confirmed that Hezbollah had a command-and-control relationship with the Special Groups.[90] He also confirmed that "[a]nything the Iranians asked of Hezbollah they would get as they considered Hezbollah a product of the IRGC."[91] Qais Khazali also confirmed that Hezbollah played an authoritative role in Iraq, "where its

---

[85] PX4, Gartenstein-Ross Shia Decl., pp. 29-30 (*citing* PX959); PX2, Levitt Decl., ¶ 101 (*citing* PX670, PX684).

[86] PX2. Levitt. Decl., ¶¶ 87-96 (*citing* PX680, PX696, PX637, PX611, PX663), 100 (*citing* PX670, PX684), 102-103 (*citing* PX634, PX612), 163-174 (PX964, PX300, PX42, PX42, PX939, PX40).

[87] Levitt Decl., ¶¶ 151-162 (*citing* PX505, PX519, PX22, PX374, PX942).

[88] *Id.*, ¶¶ 124, 130, 162.

[89] *Id.*, ¶ 118.

[90] *Id.*, ¶ 163.

[91] PX979, *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 59 (April 22, 2007).

vast experience and knowledge is being brought to bear in an advisory capacity. Access to [Hezbollah] advisors is possible through the IRGC by using proper channels."[92]

202.       Iran and Hezbollah have provided training for terrorists, including the Special Groups, at IRGC bases inside Iran.[93] Qais Khazali personally received training at the IRGC Imam Khomeini base in Iran.[94] Hezbollah trained the Special Groups in the use of weapons and tactics that were, not only designed specifically to target Americans in Iraq, but also used successfully by the Special Groups to perpetrate such terrorist attacks.[95]

203.       Hezbollah provided basic training intended to give new Special Group recruits a broad overview of terrorist attack tactics and weapons use, as well as specific training in the use of pistols, AK-47s, machine guns, and sniper rifles.[96]

204.       In addition, Hezbollah provided the Special Groups with intense training regarding the use, creation, manufacture, and deployment of improvised explosive devices, EFPs, rocket launchers, anti-aircraft missiles, mortars, and anti-tank missiles.[97]

205.       By October 2008, Iraqi forces had discovered EFP assembly factories throughout Iraq, in Jaysh al-Mahdi and Special Group strongholds.[98]

206.       Hezbollah's extensive capabilities are a result of the widespread support the group receives from Iran and its co-Defendants in the form of financial assistance, weapons,

---

[92] PX977, *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 28 (April 5, 2007).
[93] PX2, Levitt Decl., ¶¶ 136-146.
[94] *Id.*, ¶ 163.
[95] *Id.*, ¶¶ 136-150 (*citing* PX371, PX964).
[96] *Id.,* ¶¶ 104-110 (*citing* PX205, PX620, PX928, PX281), 136-150 (*citing* PX371, PX964).
[97] *Id.,* ¶¶ 110-112; 114-115; 122-123; 124-126; 133-150.
[98] PX242, Joel D. Rayburn et al. eds., *The U.S. Army in the Iraq War Volume 2*, (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 222-224; PX713 - DVIDS - Images - *CLC Tip Leads Coalition Troops to EFP Factory* [Image 5 of 5]; Michael R. Gordon & Gen. Bernard E. Trainor, The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama (1st ed. 2012), pp. 151-157.

training, intelligence, and more.[99]

  *c. Defendants' Material Support of Shia Militias in Iraq*

207.  Between 2003 and 2011, Defendants provided material support to the following Shia militia groups: The Badr Organization/Badr Corps; and Jaysh al-Mahdi (JAM) and its splinter cells known as "Special Groups," including the Promised Day Brigades, Kata'ib Hezbollah (KH), Asa'ib Al Haq (AAH), and The Sheibani Network.

208.  The evidence of that material support is detailed in Plaintiffs' Memorandum in Support of their Motion for Order Regarding Defendants Material Support for the Subject Terrorist Organizations (ECF No. 84-1, pages 43-79) and is supported by the exhibits attached to said Memorandum, which (as noted) have been admitted in evidence.

209.  The Court now provides the following summary of Defendants' material support to the foregoing Shia militia groups between 2003 and 2011, which includes: 1) safe haven; 2) transportation and travel facilitation; 3) false documentation; 4) lodging; 5) facilities; 6) weapons; 7) explosives; 8) personnel; 9) smuggling services; 10) money; 10) financial services; and 11) expert advice and assistance.

210.  As the expert Dr. Clawson concludes, "Iran has provided material support to a wide array of groups willing to attack U.S. interests. Some of those groups are largely controlled by Iran, especially Lebanon's Hezbollah and many (but not all) of the Iraqi Shia militias… The Islamic Republic of Iran's material support to terrorism targeting Americans has been with the objectives of reducing U.S. presence and influence in the Middle East and U.S. influence around the world."[100] This support was the "official policy of the Iranian

---

[99] PX2, Levitt Decl., ¶ 64.
[100] PX1, Clawson Decl., ¶ 63

government."[101] Iran implemented its policy to support terrorist groups in Iraq through its agents, instrumentalities and political subdivisions—namely, co-Defendants IRGC, MOIS, NIOC, Bank Melli, and Bank Markazi.[102]

211.    The expert Dr. Mathew Levitt concludes, "Iraqi Shia militias, including JAM, and so-called Special Groups like AAH, Kata'ib Hezbollah and Promised Day Brigades, were provided active guidance, training, intelligence, and financial and material support by Iran through its IRGC and its proxy Lebanese Hezbollah."[103] Iran, through Hezbollah, began these efforts as early as 2003.[104] Iran's material support was used to conduct "thousands of attacks on U.S. and coalition forces… between 2004 and 2011 by Iraqi Shia militias with the IRGC's and Lebanese Hezbollah's active logistical support."[105]

212.    The expert Dr. Gartenstein-Ross similarly concludes that, historically, Iran, through "MOIS provided training to Hizballah, and IRGC provided 'operational advice' to Hizballah… The IRGC's Qods Force directly managed its relationship with Hizballah" in Iraq.[106] "The Hizballah-Iran partnership largely pioneered Iran's use of proxy forces to conduct terrorist attacks against U.S. troops" in Iraq, which "follow[ed] the 2003 U.S. invasion."[107] Iran's "planning for this support seemingly began in 2002" and "was not a haphazard, post-invasion response. It was planned and approved at the highest levels of the Iranian government."[108] This is evidenced by Iran's Supreme Leader Ayatollah Ali

---

[101] PX1, Clawson Decl., ¶¶ 22, 99, 213-214.
[102] *Id.,* ¶¶ 86-90 (IRGC); ¶¶ 95-99 (MOIS); ¶¶ 107-122 (Markazi); ¶¶ 155-160(Melli); ¶¶ 163-169 (NIOC).
[103] PX2, Levitt Decl., ¶ 176.
[104] *Id.,* ¶¶ 104, 115, 118-119,
[105] *Id.,* ¶¶ 5, 176.
[106] PX4, Gartenstein-Ross Shia Decl., pp. 12-13.
[107] *Id.,* p. 12.
[108] *Id.,* p. 26.

Khamenei and his war council creating policies related to Iran's anticipation of U.S.-led regime change in Iraq, as well as pre-2003 Iraqi intelligence reporting of Iran's "dual-tracked" strategy of "public support for some organizations in post-Saddam Iraq (such as the Islamic Supreme Council of Iraq, the Badr Organization, and the Dawa political party) and covertly backing others."[109]

213.     Dr. Gartenstein-Ross explains how Iran implemented this strategy through its use of Hezbollah and other terrorist proxies in Iraq to "further its interests." To do so, Iran provided substantial and lethal material support to Shia militia groups in Iraq, in the form of weapons, training, financing, safe haven, and assistance in planning attacks. Iran intended for this support to help kill and injure U.S. service members and civil servants. By harming U.S. personnel, Iran aimed to further a series of foreign policy objectives, including dissuading the U.S. from invading Iran, weakening U.S. forces in Iraq, and allowing Iran to heavily influence Iraqi politics.[110]

214.     Dr. Gartenstein-Ross further explains how Iran leveraged Hezbollah's "extensive experience with guerilla, insurgent, and general paramilitary activities" to organize and train Iraq terror groups to maximize their lethal effectiveness against U.S. forces.[111] Iran was deeply involved in providing this material support for JAM and the Special Groups, which was provided directly through agencies "of the Iranian state like the Quds Force and MOIS, and also by non-state proxies like Lebanese Hizballah."[112]

---

[109] *Id.,* p. 26.
[110] PX4, Gartenstein-Ross Shia Decl., pp. 25-26, 44.
[111] *Id.,* pp. 28, 39, 42.
[112] *Id.,* pp. 26-27.

215.    Dr. Gartenstein-Ross identifies the material support Iran gave to the Shia militia

groups relevant to this case as follows:

a.  **Weapons**—Iran provided Iranian-produced advanced rockets (e.g. 107mm,

120mm, and 240mm), sniper rifles, automatic weapons, and mortars, RPGs, EFPs,

IEDs, IRAMS, small arms, ammunition, and military grade explosive materials."[113]

b.  **Smuggling routes and services**—Iran created "a sophisticated transport network

to supply these weapons to militants in Iraq."[114] This network involved Iranian

agents who distributed them "to individuals who wanted to attack coalition

forces."[115]

c.  **Travel facilitation and safe haven**—Iran provided the groups, particularly their

senior leadership, the ability "to launch attacks against U.S. forces in Iraq with little

fear of being killed or captured," and "likely emboldened these leaders to conduct

more aggressive attacks[,]" and "gave these leaders the ability to more closely

coordinate with Iran." This material support also included a network of safe houses

where militants were introduced to others and guided safely across the Iran/Iraq

border.[116]

d.  **Expert knowledge, assistance and training** occurred in Iraq, Iran, and Lebanon.

Training these groups to attack Americans was a matter of "official Iranian state

---

[113] PX4, p. 46; PX2, Levitt Decl., ¶¶ 104-111; Day 1 Tr., 133:6-134:11; 220:6-15; Day 2 Tr., 382:2-383:18 (discussing PX321).
[114] PX4, p. 33; PX2, Levitt Decl., ¶¶ 98-99; 120-122.
[115] PX4, p. 29; Day 1 Tr., 220:6-15; Day 2 Tr., 358:10-359:5 (discussing PX333); Day 2 Tr., 381:8-381:1; Day 3 Tr., 574:12-576:22.
[116] PX4, pp. 37, 40; PX2, Levitt Decl., ¶¶ 119; 127; 139; 149; 152; Day 1 Tr., 133:6-134:11; 220:6-15.

policy."[117] This training was part of a "robust training programming" that was "both comprehensive and strategic," spanning "rudimentary" to "high-level" topics, running the "gamut of skill sets: including: weapons, explosives, bomb-making, intelligence, assassinations."[118] In providing this training, Iran advised and armed these groups with expert knowledge that "would spread like wildfire among militant groups."[119] This training, expert advice, and assistance "equipped the Special Groups and other Shia militias with more effective capabilities,"[120] the impact of which was "significant and highly lethal[,]"[121] and directly affected the "sophistication" of the tactics, techniques, and procedures employed by the Shia groups, which in turn had an "an obvious operational impact" on U.S. forces.[122]

e. **Financing** from Iran was substantial and directed to an "array of Shia militias in Iraq" and "it is clear" that this financial support "was specifically designed to encourage and facilitate attacks on Coalition forces, such as those at issue in this case."[123]

216.     Dr. Gartenstein-Ross summarizes the overall effect of the foregoing material support and concludes: Given the nature, duration, and magnitude of Iranian material support to these specific Shia militant groups, Iran's assistance was essential to the

---

[117] PX4, p. 35.
[118] PX4, pp. 37, 40.
[119] PX4, p. 34.
[120] PX4, p. 39; Day 2 Tr., 343:10-24;
[121] PX4, p. 33.
[122] PX4, p. 32, 34, 39; PX2, Levitt Decl., ¶¶ 30; 33; 93; 126; 136-150; Day 1 Tr., 133:6-134:11; 220:6-15; 381:8-382:1.
[123] PX4, p. 21, 45; PX2, Levitt Decl., ¶¶ 72; 76; 110(e); 134; 141; 148.

formation, growth, and survival of these organizations, and significantly increased their capabilities to commit attacks in Iraq between 2003 to 2011.[124]

217.     Iran's material support for Shia terrorist groups has been identified by federal courts:

a.   Iran, through the IRGC Quds Force, sought "[to] turn ... Shia militia extremists into a Hezbollah-like force to serve its interests and fight a proxy war against the Iraqi state and coalition forces in Iraq." *Fritz v. Islamic Republic of Iran*, 320 F. Supp.3d 48, 62 (D.D.C. Aug. 2, 2018) (internal citations omitted). This effort to use proxies in Iraq was part of a "deliberate policy to inflict casualties on U.S. forces" that was "approved by the [S]upreme [L]eader" of Iran and was "executed very covertly ... by the Q[u]ds [F]orce." *Id.* (alterations in original, internal citations omitted). Iranian support, in the form of funding, weapons, and training, was critical to the support of the Shi'a Special Groups, which would have otherwise been under able to conduct terrorist attacks in Iraq. *Id.*

b.   The IRGC and Quds Force spearheaded a closely coordinated campaign to equip the Shi'a militia for proxy warfare in Iraq. *Karcher v. Islamic Republic of Iran*, 396 F. Supp.3d 12, 24 (D.D.C. July 5, 2022).

c.   Beginning in 2004, Special Groups, with enhanced capabilities to attack American and coalition forces, received their training, weapons, and operational direction directly from the IRGC and Hezbollah. *Karcher v. Islamic Republic of Iran*, 396 F. Supp.3d 12, 24 (D.D.C. July 5, 2022) (internal citations omitted).

---

[124] PX4, p. 46.

d.  Iran provided its proxies with training, weapons, and financial support and, through Hezbollah, brought operatives into Iran for training and smuggling weapons across the border into Iraq. *Lee v. Islamic Republic of Iran*, 518 F. Supp.3d 475, 483 (D.D.C. Feb. 1, 2021).

### d.  *Defendants' Material Support of Sunni Terrorist Groups in Iraq*

218.  In addition to providing substantial and material support to Shia militia groups, Defendants have for decades provided material support to Sunni terrorist groups that shared the goal of killing Americans, including the Foreign Terrorist Organizations al Qaeda (AQ) and al Qaeda in Iraq (AQI) and Ansar al Islam (AAI), also known as Ansar al Sunnah (AAS).

219.  Iran's support to Sunni terror groups in Iraq is a result of pragmatic decision-making by Iran. Although Iran (a Shia country) is ideologically at odds with Sunni groups, they share the common goal of attacking U.S. interests and expelling the U.S. from the region.[125]

220.  The U.S. District Court for the Southern District of New York recognized Iran's willingness to bridge the Sunni-Shia divide in its decision evaluating Iran's support to AQ and finding Iran liable, on the basis of that support (albeit indirect), for the 9/11 attacks. *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD), 2011 WL 13244047, *11-12 (S.D.N.Y. Dec. 22, 2011).

221.  Defendants' material support for AAI dates back to the Iran-Iraq war in the 1980s, while their support for AQ generally (and later AQI) began in the 1990s. The material

---

[125] PX282, *The 9/11 Commission Report*, at pp. 61; PX5, Gartenstein-Ross Sunni Decl., pp. 42-46.

support included Defendants providing money, weapons, training, expert advice, safe

passage, and safe haven. This is the same type of material support and resources Iran

provided AQ, which AQ used to commit terrorist attacks against Americans, including the

U.S. embassy bombings in Kenya and Tanzania, the October 2000 suicide bombing attack

on the USS Cole, and the 9/11 attacks. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d

128 (D.D.C. 2011); *Flanagan*, 87 F. Supp. 3d 93; *In re Terrorist Attacks on Sept. 11, 2001*,

No. 03 MDL 1570 (GBD), 2011 WL 13244047 (S.D.N.Y. Dec. 22, 2011).

222.      The evidence of Defendants' material support for the AQ/AQI and AAI is detailed

in Plaintiffs' Memorandum in Support of their Motion for Order Regarding Defendants

Material Support for the Subject Terrorist Organizations (ECF No. 84-1, pages 79-123)

and is supported by the exhibits attached to said Memorandum, which (as noted) have been

admitted in evidence.

223.      The Court now provides the following summary of Defendants' material support to

the aforementioned Sunni groups between 2003 and 2011.

> i.   *Al Qaeda (AQ)*

224.      Prior to 2003, there existed an "informal understanding between Iran and al-Qaeda

that they would coordinate politically and militarily to confront the United States" and, in

furtherance of this agreement, "Iran made considerable use of Hizballah as a conduit for

channeling covert support to al-Qaeda."[126]

225.      The "al-Qaeda-Hizballah relationship, stretching from 1992 through at least 2001,

spanned multiple Iranian political administrations."[127] Along with Hezbollah, "[m]uch of

---

[126] PX5, Gartenstein-Ross Sunni Decl., p. 43.

[127] *Id.*, p. 46.

Iran's support for al-Qaeda was rendered through its Ministry of Intelligence and Security (MOIS) and the IRGC."[128] With this material support, "Iran played a causal role [in AQ]… attacks" including by providing training, arming, tactical expertise, travel facilitation, safe haven to AQ.[129]

226.     AQ and its operatives used Iran as a "preferred route…as Tehran instructed its border guards not to stamp the passports of these operatives, effectively cloaking their movements. Among other things, neglecting to stamp the passports was an attempt by Iran to disguise its support for al-Qaeda."[130]

227.     Iran's support for AQ continued following the 9/11 attacks.[131] At that time, AQ "[f]ighters in the first wave fleeing Afghanistan were detained but then deported to countries of their choice after being documented, with Iran issuing some of them special traveling papers to facilitate their exit."[132]

228.     Iran "provided al-Qaeda operatives with wide latitude in carrying out their roles for the militant organization" while safely within Iranian borders.[133]

229.     By 2003, MOIS and the IRGC-Q were "deeply involved in supporting al Qaeda."[134] This included Iran continuing to allow recruits and senior leaders alike "access guest houses operated by Tehran" which "also directly supported the operations of al-Qaeda leaders and facilitators[.]"[135] Iran's support for AQ, particularly its provision of safe have,

---

[128] *Id.,* p. 45.
[129] *Id.,* pp. 44-46.
[130] *Id.,* p. 46.
[131] *Id.*
[132] *Id.,* pp. 46-47.
[133] *Id.,* p. 53.
[134] *Id.,* p. 50.
[135] *Id.,* p. 52.

was later revealed to be the result of "an alliance with al-Qaeda to move money and recruits from the Persian Gulf to the group's leadership in Afghanistan, Pakistan, and Iraq, with these personnel and assets moving through Iran."[136]

230.    "The anti-American alliance between Iran and Al Qaeda is well-developed," and "early training by Iranian proxies, such as Hezbollah, and Iran's logistical support were critical to the group's early development and evolution."[137]

231.    "In subsequent years, senior Al Qaeda leaders remained under Iranian protection. Iran has provided refuge to 'hundreds' Al Qaeda members and the family members of core leaders like Bin Laden."[138]

232.    "Al Qaeda's extensive administrative network in Iran and its multiple liaisons with Iranian authorities belie the notion that Iranian authorities are unaware of the group's actions,"[139] and "[i]n providing support to Al Qaeda and Hezbollah, the IRGC, including the IRGC Qods division, is acting as an official agency whose activities are tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives."[140]

233.    "In short, behind Bin Laden, Iran was Al Qaeda's longest and most generous supporter. Senior Al Qaeda leaders both before and after Bin Laden's death, considered Iran to be a crucial supporter of its efforts to target American personnel in Iraq."[141]

---

[136] *Id.*, p. 53.
[137] PX6, Rubin Decl., ¶¶ 91, 105.
[138] *Id.*, ¶ 54.
[139] *Id.*, ¶ 59.
[140] *Id.*, ¶ 47.
[141] *Id.*, ¶ 61.

234.    As this Court recently noted, Iran shares a close relationship with al-Qaeda, and Iran has been described by Osama bin Laden as al-Qaeda's main artery for funds, personnel, and communications. *See Cabrera*, 2022 WL 2817730, at *21.

235.    The experts Dr. Rubin and Dr. Gartenstein-Ross identify a multitude ways Iran and its co-Defendants provided material support Iran gave to AQ:

    a.  **Expert knowledge, assistance, and training**—Iran provided early training of AQ operatives to conduct mass casualty bombings and other related skills to shape al-Qaeda's future capacity to carry out attacks.[142]

    b.  **Safe haven**—For two decades, Tehran has been providing sanctuary and refuge to al-Qaeda operatives. After 9/11, this safe haven allowed AQ senior leadership to avoid capture and provided the organization with an opportunity to regroup and to develop its ideological underpinnings and strategic plans.[143]

    c.  **Smuggling routes and services**—For AQ, Iran served as a critical transit point for moving funds, weapons, supplies, and personnel.[144]

    d.  **Travel facilitation**—Iranian provided travel facilitation and assistance to AQ members that often made a difference in helping AQ expand its influence into new countries. This also helped AQ move operatives avoid arrest, and when preparing large-scale attacks around the world.[145]

---

[142] PX5, Gartenstein-Ross Sunni Decl., pp. 57; PX6, Rubin Decl., ¶¶ 91, 100, 104, 146, 158-159, 173-176.

[143] PX5, Gartenstein-Ross Sunni Decl., pp. 48-50, 57, 59-60; PX6, Rubin Decl., ¶¶ 116.

[144] PX5, Gartenstein-Ross Sunni Decl., pp. 45-46, 52, 57, 65; PX6, Rubin Decl., ¶¶ 113, 150, 160.

[145] PX5, Gartenstein-Ross Sunni Decl., pp. 45-46, 52, 57-58, 65; PX6, Rubin Decl., ¶¶ 91, 100, 102, 117-119, 175, 199, 200.

e. **Financial and infrastructure**—Iran provided financial and infrastructure assistance to AQ, including banking and electronic communications, to help AQ maintain organizational continuity, direct its regional affiliates, distribute resources and funds, establish new bases, and plan, authorize and carry out attacks.[146]

236.    Dr. Gartenstein-Ross explains these categories of material support were "critical to the survival and growth" of AQ; prevented the capture or killing of its members, is "connected to the group's ability to obtain, assemble, and/or utilize the weapons and munitions that they employed in Iraq, including rockets, mortars, improvised explosive devices, small arms, and other equipment and material vital to their operations;" and "significantly enhanced" and "significantly increased" AQ's ability to conduct operations in Iraq.[147]

237.    Dr. Rubin concludes that, without Iran's support, AQ would have been much weaker, more isolated, and unable to sustain operations or even grow or expand its operations into and throughout Iraq.[148] Iran's support to AQ was vital to the group's ability to sustain itself after 2002 and facilitated the evolution of Zarqawi, an AQ affiliate who went on to become the founding Emir of al Qaeda in Iraq (discussed below).[149]

238.    Dr. Rubin deems Iran's support essential to AQ's cooperation, leadership structure, organizational infrastructure, financial solvency, recruitment and growth, and for its ability to plan, commit, and authorize terror attacks against American servicemen, contractors,

---

[146] PX5, Gartenstein-Ross Sunni Decl., pp. 58; PX6, Rubin Decl., ¶¶ 117-118, 151-153, 202, 204.
[147] PX5, Gartenstein-Ross Sunni Decl., pp. 57-58, 64-65.
[148] PX6, Rubin Decl., ¶ 200.
[149] *Id.,* ¶ 201.

and civilians.[150] In short, without Iran's significant support, AQ would not have been the potent lethal threat it posed in Iraq from 2003 through 2011.[151]

*ii. Zarqawi Organization and Al Qaeda in Iraq (AQI)*

239.    Al Qaeda in Iraq (AQI), designated as a Foreign Terrorist Organization in December 2004, was an iteration of the Sunni militant group sometimes referred to as the Zarqawi Organization, known as such because of its founding leader, Abu Musab al-Zarqawi.[152] The current iteration is the Islamic State, known commonly as ISIS.[153] Although the Zarqawi organization underwent various name changes over the years, at every step, the organization has remained essentially the same.[154]

240.    Dr. Gartenstein-Ross concludes, "Iran had contact with AQI and was willing to provide financial and logistical assistance specifically for its campaign of violence in Iraq between 2003 and 2011."[155] This included permitting AQI to build camps and use safe houses within or near its territory, and that "Iran's permissiveness was an explicit and deliberate policy."[156] From its camps and bases within Iran, the AQI would "send forged passports, money and operational orders across the Middle East to Turkey and even into Europe, thus transforming Iran into a critical hub for [the] fast growing militant network."[157]

---

[150] *Id.,* ¶ 204.
[151] *Id.,* ¶ 205.
[152] PX5, Gartenstein-Ross Sunni Decl., p. 13; Day 1 Tr., 145:18-147:1 (discussing PX937).
[153] PX5, Gartenstein-Ross Sunni Decl., p. 13.
[154] *Id.*
[155] *Id.,* pp. 63.
[156] *Id.,* pp. 58-60.
[157] *Id.,* p. 60.

241.     Moreover, AQI's "[c]ommunications were channeled by satellite, cell and land phones, and handled through middlemen with the IRGC's support."[158]

242.     Iran funneled the AQI's weapons and mines to its strongholds in Iraq and permitted continuous use of its territory by the group's members for transit, as well as refuge at safe houses in Iran.[159]

243.     As it was willing to do for its parent organization, AQ, Iran "harbored facilitators with links to AQI" within its borders and refused to detain or disrupt their efforts.[160]

244.      If and when Iran did ever detain AQI members, MOIS would "provide intermediary services to help secure the release of its imprisoned operatives."[161]

245.     MOIS also provided money and weaponry to AQI, and Iran would arm AQI and "facilitat[e] movement of its fighters across the Middle East and South Asia" with the apparent intent 'to deter the United States, in order for it not to give its entire attention to Iran.'"[162]

246.     This Court has found that Iran's pragmatism led it to provide AQI with funding, weapons, and the facilitation of movement of its fighters across the region to confront and oppose a common enemy—the United States. *Neiberger v. Islamic Republic of Iran*, No. 16-2193-EGS, Report & Recommendation of Magistrate Judge, Doc. 86, pp. 14 (D.D.C. Sep. 8, 2022), *adopted by Neiberger v. Islamic Republic of Iran*, No. 16-2193-EGS, Doc. 92 (D.D.C. Sep. 29, 2022).

---

[158] *Id.*
[159] *Id.*
[160] *Id.*
[161] *Id.*, p. 61.
[162] *Id.*

247.     Dr. Rubin and Dr. Gartenstein-Ross detail the various types of material support

Defendants provided AQI:

a.  **Weapons**—Iran, through IRGC-QF and MOIS, provided AQI rockets, mortars,

improvised explosive devices, small arms, and other military grade weapons

systems. AQI also received downstream support from Iran through its cooperation

with the Special Groups, including weapons and personnel provided by Muqtada al

Sadr/JAM during times and in locations where Coalition operations were

specifically trying to dismantle the group. [163]

b.  **Financing & financial services**—MOIS, with the help of IRGC-QF front

companies, helped launder money and goods to finance and supply AQI cells in

Iraq with IED components and to pay AQI's debts.[164] Iran permitted AQ senior

leaders to establish a financial facilitation network that used Iranian banking and

financial infrastructure through which AQ was able to fundraise and distribute

money effectively and at critical times when AQ's ability to do so had been nearly

extinguished in the years after 9/11. In return, AQ agreed to refrain from attacking

Iran.[165]

c.  **Safe Haven**—Iran provided bases and camps to important AQI leaders, enabling

them individuals to carry out tasks and duties for AQI from within Iranian

borders.[166] From its safe haven in Iran, AQ senior leaders communicated and

---

[163]Day 1 Tr., 153:18-155:4; 156:16-158:14 (discussing PX715); 158:15-159:7 (discussing
PX937); PX5, Gartenstein-Ross Sunni Decl., pp. 63-65; PX6, Rubin Decl., ¶¶ 143, 146, 152
[164] PX5, Gartenstein-Ross Sunni Decl., pp. 61, 64; PX6, Rubin Decl., ¶¶ 152, 186.
[165] Day 1 Tr., 348:16-22; 349:16-350:11 (discussing PX275); 350:12-351:13 (discussing
PX128); Day 5 Tr., 562:14-563:8
[166] PX5, Gartenstein-Ross Sunni Decl., pp. 61-64; PX6 Rubin Decl., ¶¶ 152, 176, 179, 182.

advised Zarqawi and AQI on strategy and operations. AQI also benefitted from the AQ's financial facilitation network in Iran and complied with AQ's agreement to refrain from attacks against Iran in return.[167]

d. **Smuggling routes and services** were established and maintained by Iran into northern Iraq from Syria and Iran. These routes were used to move fighters, weapons, and funds from Iran into Iraq.[168] These routes permitted AQI to supply and pay its fighters in greater amounts and more consistently then others, and helped AQI grow in size and dominance in its areas of operation.[169]

e. **Travel facilitation**—With Iran's assistance, AQI leaders, facilitators, and fighters expanded the organization's size and reach by moving foreign fighters through the region, and into and out of Iraq.[170] This allowed AQI to replace and regroup its fighters after setbacks with new recruits and enlist battle-tested fighters from outside Iraq to fill AQI's ranks.[171]

f. **Intermediary services**—MOIS provided negotiations and mediations between AQI and Iran when its members were be detained, and also facilitated their release.[172] Iran, using MOIS, also negotiated with Syria to allow the use of its border as a primary ingress/egress point into western Iraq for AQ/AQI foreign

---

[167] PX5, Gartenstein-Ross Sunni Decl., pp. 54-55; Day 1 Tr., 222:1-223:7; Day 2 Tr., 348:12-16; 350:3-11; 351:14-20; Day 3 Tr., 562:14-563-8.
[168] PX5, Gartenstein-Ross Sunni Decl., pp. 60-61, 63-64; PX6, Rubin Decl., ¶¶ 152; 184; 186.
[169] Day 1 Tr., 153:18-155:4; 159:20-25; 176:6-25; Day 3 Tr., 575:6-576:8.
[170] PX5, Gartenstein-Ross Sunni Decl., pp. 60, 64; PX6, Rubin Decl., ¶¶150, 176-177, 175, 179.
[171] Day 1 Tr., 176:6-18; Day 2 Tr., 373:1-11 (discussing PX1803); Day 5 Tr., 562:14-563:8; 586:5-9; 588:6-12.
[172] PX5, Gartenstein-Ross Sunni Decl., pp. 61, 64.

fighters, as well as use Syrian territory as a staging area for the MOIS-maintained

smuggling routes that ran from Syria into Anbar province and further into Iraq.[173]

248.     Dr. Gartenstein-Ross concludes that these categories of material support, "helped

the Zarqawi organization to become a lethal and formidable insurgent force."[174] Moreover,

"Iranian material support was critical for the Zarqawi organization to function as an

insurgent group in Iraq… [and] the Zarqawi organization required weapons, money, safe

haven, popular support, and senior leader guidance. Tehran ultimately either provided or

otherwise empowered the Zarqawi organization to obtain all of these various needs."[175]

249.     Dr. Gartenstein-Ross also confirms that this support: was "critical to the survival

and growth" of the Zarqawi Organization/AQI; prevented the capture or killing of its

members, is "connected to these groups' ability to obtain, assemble, and/or utilize the

weapons and munitions that they employed in Iraq, including rockets, mortars, improvised

explosive devices, small arms, and other equipment and material vital to their operations;"

and    "significantly    enhanced"    and    "significantly    increased"    the    Zarqawi

Organization/AQI's ability to conduct operations in Iraq.[176]

250.     Dr. Rubin likewise concludes: "the Iranian regime worked directly and indirectly

with the founding members and leaders of Al Qaeda in Iraq, and facilitated the group's

operations which targeted, wounded, and killed U.S. forces in Iraq. Al Qaeda in Iraq simply

would not have been able to maintain its existence, pace or the lethality of its attacks absent

this Iranian assistance."[177]

---

[173] Day 1. Tr., 139:19-140:3; 151:13-152:7; Day 3 Tr., 573:17-576:8 (discussing PX275).
[174] PX5, Gartenstein-Ross Sunni Decl., p. 63.
[175] *Id.*
[176] *Id.,* pp. 63-64.
[177] PX6, Rubin Decl., ¶¶ 178, 190-195.

251.     Dr. Rubin explains that, without Iran's support, AQI would have been much weaker, more isolated, and unable to sustain operations in Iraq.[178] Iran's material support to the Zarqawi Organization/AQI was significant and continuous and afforded AQI the means to grow its operations, expand its influence and operational capacities, and increase its lethal effectiveness and sophistication as a violent extremist organization.[179] Iran's support to the AQI was essential to its cooperation, leadership structure, organizational infrastructure, financial solvency, recruitment and growth, and ability to plan, commit, and authorize sophisticated terror attacks against American servicemen, contractors, and civilians.[180]

### iii.   Ansar al Islam (AAI), also known as Ansar al Sunna (AAS)

252.     Ansar al Islam (AAI), also known as Ansar al Sunna (AAS), is a Sunni terrorist organization that emerged from a conglomeration of several smaller Kurdish Sunni extremist groups based in Iraq's Kurdistan region.[181]

253.     The group has been designated a Foreign Terrorist Organization since March 2004.[182]

254.     As the U.S. Treasury Department explained in 2003, "AAI came into being with the blessing of bin Laden after its leaders visited al-Qa'ida in Afghanistan in 2000 and 2001. Bin Laden provided AAI with an estimated $300,000 to $600,000 in seed money."[183]

---

[178] *Id.,* ¶ 200.
[179] *Id.,* ¶ 199.
[180] *Id.,* ¶ 204.
[181] PX5, Gartenstein-Ross Sunni Decl. p. 27.
[182] PX22, United States Department of State, Foreign Terrorist Organizations.
[183] PX39, Treasury Department Statement Regarding Designation of Ansar al-Islam (Feb. 20, 2003).

According to former high-ranking members of AAI, bin Laden regularly provided the group with installments of $10,000 via courier from 2001 to 2003.[184]

255.     In late 2003, the AAI leadership announced the establishment of Ansar al-Sunna as the group's national organization.[185] Following the announcement, attacks conducted by AAI members were claimed under the name Ansar al-Sunna, as the two groups became essentially one and the same within Iraq.[186]

256.     Defendants' material support to AAI/AAS spanning 2003 through 2011 is evidenced by Dr. Michael Rubin's and Dr. Daveed Gartenstein-Ross's expert declarations. *See* PX 5 and 6. They discuss and identify the following categories of material support Defendants provided to AAI/AAS during the relevant time period:

a.  **Operational support**—Iran provided military supplies to AAI/AAS and served as a transit point for the group's militants.[187]

b.  **Safe haven**—Iran provided safe haven to AAI/AAS members, and the IRGC facilitated the escape of its leaders and provided refuge for them inside Iran in 2003, ensuring the survival of AAI/AAS as a coherent organization. Iran's provision of safe haven to AAI/AAS continued for years. Iran arranged a quid pro quo with AAI/AAS in 2008 in which AAI/AAS fought alongside members of the IRGC for continued safe haven in Iran. This bolstered the full range of its capabilities, and enhanced AAI/AAS's ability to conduct operations in Iraq.[188]

---

[184] PX5, Gartenstein-Ross Sunni Decl., p. 31.
[185] *Id.*, p. 36.
[186] *Id.*
[187] PX5, Gartenstein-Ross Sunni Decl., pp. 30-32, 41; PX6, Rubin Decl., ¶¶ 160-162; 168; 170-172.
[188] PX5, Gartenstein-Ross Sunni Decl., pp. 31, 33, 41-42; PX6, Rubin Decl., ¶¶ 168.

c. **Travel facilitation and smuggling routes and services**—Iran provided travel facilitation to AAI/AAS in multiple ways, allowing fighters to pass through the Iran-Iraq border, providing them with fake identification cards, and coordinating the movement of AAI/AAS fighters with local smugglers, thus enabling AAI/AAS to smuggle goods, money, and personnel to its areas of operation in Iraq.[189]

d. **Personnel and financing**—Iran not only allowed AAI/AAS fighters to regroup and return to Iran in late 2003-2004, it also actively aided AAI/AAS's recruitment during a period of the group's weakness in 2006, when Iran paid AAI/AAS members monthly salaries of $1,500, which bolstered AAI/AAS's operations in Iraq.[190]

e. **Training and Expert Assistance**—Iran trained hundreds of AAI/AAS inside Iran on tactics, techniques, and procedures, including suicide bombings, sniper attacks, assassinations, and general subversion against U.S. forces in Iraq. Iran also provided AAI/AAS training and knowledge of IEDs to the group when it was specifically seeking to improve its IED effectiveness and sophistication.[191]

257. Having reviewed the available evidence in this case, Dr. Gartenstein-Ross concludes that Defendants' material support was: "critical to AAI/AAS's survival and growth as an organization;" "bolstered" its ability to move freely, access money, weapons and supplies; increased and replenished its ranks; prevented the capture or killing of its members, "connected to these groups' ability to obtain, assemble, and/or utilize the weapons and munitions that they employed in Iraq, including rockets, mortars, improvised

---

[189] PX5, Gartenstein-Ross Sunni Decl., pp. 28, 33, 35, 42; PX6, Rubin Decl., ¶¶ 160-162.
[190] PX5, Gartenstein-Ross Sunni Decl., pp. 34-36, 40, 42; PX6, Rubin Decl., ¶¶ 169.
[191] PX670, at p. 7; PX1000, at p. 29; PX5, pp. 40-42.

explosive devices, small arms, and other equipment and material vital to their operations;" and  "significantly enhanced" and "significantly increased" AAI/AAS's ability to conduct operations in Iraq.[192]

258.     Dr. Rubin, for his part, likewise concludes that: safe haven in Iran allowed AAI/AAS to re-group and re-emerge in Iraq to effectively attack Coalition forces for years afterwards;[193] Iranian ties with AAI/AAS were not passive but rather Iranian officials facilitated and supported the AAI/AAS's attacks on U.S. personnel;[194] the IRGC-QF and AAI/AAS maintained an operational relationship;[195] prior to 2003, IRGC and MOIS were cooperating with AAI to lay the groundwork for a terror campaign against the United States;[196] without Iran's support AAI/AAS would have been much weaker, more isolated, and unable to sustain operations or even grow or expand its operations into and throughout Iraq;[197] IRGC and MOIS's support to AAI/AAS included the provision of safe-haven, travel facilitation, logistics, funding, weapons, specialized training, expert assistance and intelligence, not only in Baghdad, but also in predominantly Sunni governorates; IRGC's and MOIS's support to AAI/AAS was significant and continuous and afforded AAI/AAS the means to sustain and grow its operations, expand its influence and operational capacities, and increase its lethal effectiveness and sophistication as a violent extremist organization;[198] Iran's support to AAI/AAS was essential to its cooperation, leadership structure, organizational infrastructure, financial solvency, recruitment and growth, and for

---

[192] PX5, Gartenstein-Ross Sunni Decl., pp. 41-42, 64-65.
[193] PX6, Rubin Decl., ¶ 101.
[194] *Id.*, ¶ 164.
[195] *Id.*, ¶ 170-172.
[196] *Id.*, ¶ 196.
[197] *Id.*, ¶ 200.
[198] *Id.*, ¶ 199.

its ability to plan, commit, and authorize sophisticated terror attacks against American servicemen, contractors, and civilians;[199] and without Iran's significant support, AAI/AAS would not have been the potent lethal threat that it posed in Iraq from 2003 through 2011.[200]

## IX.   The Bellwether Attacks

### a.   Attack # 1: Plaintiffs Salvador Beltran-Soto, Richard Foster, Alexander Bryant, Anthony Ferris, and Franklin Doss

#### i.   *April 4, 2004 ("Black Sunday") – Complex Attack in Sadr City*

259.    On April 4, 2004, Sgt. Salvador Beltran-Soto, Sgt. Richard Foster, Spc. Alexander Bryant, Pvt. Anthony Ferris, and Sgt. Franklin Doss were injured in a large-scale complex attack in the Sadr City area of Baghdad. ECF No. 100, ¶¶ 4985-5046; PX1167, Beltran-Soto Fact Sheet; PX1168, Bryant Fact Sheet; PX1169, Doss Fact Sheet; PX1170, Ferris Fact Sheet.[201]

260.    These Plaintiffs were members of A, B, and C Companies, 2nd Battalion, 5th Cavalry Regiment, 1st Cavalry Division, of the United States Army ("2/5"). The Battalion "was stationed at Camp War Eagle, which was located one kilometer to the northeast of Sadr City." PX1104, Volesky Decl., para. g.[202]

---

[199] *Id.*, ¶ 204.

[200] *Id.*, ¶ 205.

[201] This day on which this attack occurred is known widely as "Black Sunday." It has been the subject of military studies and media portrayals, including the 2007 book authored by Martha Raddatz, ABC News' Chief Global Affairs Correspondent, entitled "The Long Road Home: A Story of War and Family," and the eponymous National Geographic television mini-series released in November 2017. The Modern War Institute at West Point also produced a podcast examining the events of the day. *See* "The Spear – The Three-Block War in Sadr City," produced by Timothy Heck (July 19, 2021).

[202] At the time of the attack, Declarant Lieutenant General Gary Volesky (U.S. Army ret.), was a Lieutenant Colonel in command of 2nd Battalion, 5th Cavalry Regiment, 1st Cavalry Division.

261.     Initially, the mission was to provide Humanitarian Assistance to the predominantly

Shia residents of Sadr City and Coalition Forces believed that the Shia, who made up most

of the population in Sadr City, were supportive of the U.S. efforts in Iraq. *Id.*, para. f. The

full force of the 2/5 Battalion arrived at Camp War Eagle on April 1, 2004, and intelligence

showed an unexpected increase in Shia animosity toward U.S. forces. *Id.*, para. h.

262.     On March 28, 2004, the Coalition Provisional Authority of Iraq ordered a 60-day

closure of the newspaper Al-Hawza, on charges of inciting violence against the Coalition.

On April 3, Coalition forces detained Mustafa Yaqoubi, a member of the Sadr organization.

These two incidents kicked off widespread protests throughout Sadr City, and Mahdi Army

"military parades. *Id.*, para. j.

263.     In Sadr City on the evening of April 3, 2004, Beltran-Soto participated in a

reconnaissance patrol during which he came across 300-400 Iraqi men marching in military

formation. "Some were wearing green bandanas with white Islamic calligraphy similar to

what Hezbollah wears in Southern Lebanon. To me, it was obvious they were members of

a militia." PX1107, Beltran-Soto Decl., para. f; Day 1 Tr., 95:24-96:21.

264.     Beltran-Soto was a member of patrols conducted on April 4, 2022 in Sadr City,

leaving Camp War Eagle in the morning and patrolling Sadr City on foot. During this

patrol, Beltran-Soto came across a large portrait of Ayatollah Khamenei, the Supreme

Leader of Iran, covering the side of a building.  Shortly after, the patrol started to get

harassed by groups of locals, who yelled and threw rocks. The patrol had to use armored

vehicles to disperse the crowd, and then returned to Camp War Eagle. Day 1 Tr., 95:1-20;

PX1107, Beltran-Soto Decl., para. g.

265.    Another of the 2/5's patrols that day involved 1st Platoon from C Company, which was assigned to escort sewage trucks through Sadr City. Drivers refused to go into the neighborhood without an escort due to threats and intimidation by those loyal to Muqtada al-Sadr. PX1104, Volesky Decl., para. k.

266.    At approximately 1700 hours, 1st Platoon reported that they were at the Mohsen Mosque in Sadr City, where their platoon had seen armed men outside the courtyard of the compound and had confiscated their weapons. *Id.*, para. l. After advising 1st Platoon to return the weapons in accordance with current Coalition Provisional Authority rules, Lt. Col. Volesky advised 1st Platoon to pass by the Sadr Bureau and report back on its observations. *Id.*

267.    At approximately 1800 hours, 1st Platoon reported that they were being attacked and that a sergeant had been shot and was critically wounded. *Id.*[203] The platoon tried to break contact and moved further into Sadr City. When two of their vehicles were disabled by the intense incoming fire, the platoon was forced to take cover and advised to remain in place until a rescue force could reach them. *Id.* "They reported being attacked by insurgents all around them, including from the rooftops, with small arms fire (SAF), Rocket Propelled Grenades (RPGs), pipe bombs, Molotov cocktails, and Improvised Explosive Devices (IEDs)." *Id.*; Day 1 Tr., 216:1-217:4; PX1000, pp. 4-5.

268.    Soon after 1st Platoon reported that it was under attack and pinned down, reports came in that groups of insurgents were attacking police stations throughout Sadr City. *Id.*, para. m. Initial reporting indicated that five Iraqi police stations were overrun by armed insurgents identified as Mahdi Army. PX1100, April 4, 2004 Ops Report, p. 1. Lt. Col.

---

[203] Sergeant Eddie Chen (KIA).

Volesky ordered A and C Companies to assemble rescue teams and begin moving to 1st Platoon's position. PX1104, Volesky Decl., para. m.

269.        Plaintiff Doss was a member of the first rescue team to depart Camp War Eagle led by 1st Lt. Dan Hines. PX1106, Doss Decl., para. f. Their two-vehicle team entered Sadr City and began to take fire from every direction encountering small arms, rocket propelled grenades, and large caliber mounted-machine gun fire *Id.* "The tires of our Humvee were shot out and we were riding on the rims for most of the time. The windshield of our Humvee was also shot out by small arms fire. I was hit by burning shrapnel and I suffered multiple shrapnel wounds to my face and arms. We were unable to reach the trapped platoon and were pinned down for some time before reversing course." *Id.*

270.        The first rescue team was unsuccessful in reaching the 1st Platoon due to mounting injuries and heavy insurgent contact along the route into Sadr City. PX1104, Volesky Decl., para. n. The team was reassigned to re-take a government building and secure the surrounding area as part of the greater effort to re-take the city. *Id.* The next convoy to leave was led by Captain Troy Denomy who was the C Company Commander." PX1104, Volesky Decl., para. n.

271.        Plaintiffs Bryant and Ferris were part of this second convoy led by Cpt. Denomy, and both drove vehicles into Sadr City to rescue the trapped platoon. PX1108, Bryant Decl., paras. d, h; PX1109, Ferris Decl., paras c, f.

272.        Ferris and Bryant drove in the convoy and encountered heavy small arms (AK-47) fire coming from inside buildings along the route and from the rooftops. As the convoy continued, the small arms fire intensified and the convoy was attacked with rocket

propelled grenades and hand grenades. PX1109, Ferris Decl., para. f; PX1108, Bryant Decl., para. h.

273.     Bryant's Bradley took more than 12 direct RPG hits, as well as impacts from over 15 IEDs and a "torrent of gunfire coming from both sides of the street." PX1108, Bryant Decl., para. h.

274.     Lt. Col. Volesky went with C Company into Sadr City and travelled the same route as Cpt. Denomy's convoy. "All of our elements that were moving toward [1st Platoon] were in constant, heavy contact with large groups of insurgents on the streets, in buildings and on the rooftops that overlooked the major routes flowing through the city. The number of insurgents and intensity of the contact was extraordinary. This was the only time in my military career that I found it necessary to expend my entire initial supply of rifle ammunition." PX1104, Volesky Decl., para. o.

275.     Approximately 10-15 minutes behind Lt. Col. Volesky and Cpt. Denomy, a fourth convoy led by A Company Commander, Captain George Lewis, entered Sadr City and began to take heavy fire. PX1004, Volesky Decl., para. p.

276.     Beltran-Soto, now a member of this fourth convoy, rode in the open back of an LMTV vehicle. He testified that, "[t]he major avenue we were on was blocked, which forced us to turn right. I realized that they were funneling us into a kill zone." PX1107, Beltran-Soto Decl., para. i. "[A]t the moment they were just decimating us. They had us where they wanted us. They corralled us." Day 1 Tr., 105:20-24. "[A] pipe bomb landed about four feet away from me and exploded. Shrapnel blew into my face and… I was shot in the back… and was shot several more times. Most of the bullets hit my body armor, but one round hit me in the knee. Due to receiving multiple shots, my body armor broke[.]"

PX1107, Beltran-Soto Decl., paras. j, k.; PX 1105, Peter Baah Decl., para. g. Most of the soldiers in Beltran-Soto's vehicle were either wounded or killed in action. *Id.*

277.   All four of 2/5's convoys having been attacked and forced out of Sadr City, a fifth attempt to rescue the trapped platoon was initiated, this time supported by the 2-37 Armor Company. As the tank company moved towards the location of 1st Platoon it was attacked by men dressed in police uniforms, one of which killed a member of the tank company. PX1104, Volesky Decl., para. q. Finally, The 2-37 Armor Company was able to reach the trapped platoon, collect their dead and wounded, and returned them to Camp War Eagle, *Id.*, para. r.

278.   The April 4, 2004, attack on 1st Platoon, and the various ambushes of the rescue convoys that attempted to enter Sadr City, lasted approximately 8 hours. During that time, the 2/5 suffered seven killed in action and fifty-three wounded in action. *Id.*, para. t.

279.   During the attack on April 4, 2002, Doss suffered from shrapnel and burn wounds to his head, face, and neck. PX1106, Doss Decl., paras. f, h-j. He was diagnosed and received treatment for traumatic brain injury, post-traumatic stress disorder, anxiety, and depression; PX1169, Doss Fact Sheet, § V.1-5.

280.   Bryant suffers from concussive blast injuries and was diagnosed and treated for traumatic brain injury, migraine headaches, tinnitus, post-traumatic stress disorder, panic disorder, depressive disorder, and affective disorder. PX1108, Decl., paras. j-l; PX1168, Bryant Fact Sheet, § V.1-5

281.   Ferris suffers from shrapnel and concussive blast injuries, and was diagnosed and treated for traumatic brain injury, headaches, migraines, chronic pain, tinnitus, post-traumatic stress disorder, anxiety, depression, and has struggled with drug/alcohol

dependence and homelessness. PX1109, Anthony Ferris Decl., paras. k-l; PX1170, Ferris Fact Sheet, § V.1-5.

282.    Beltran-Soto suffered from a gunshot wound to his left knee, shrapnel wounds to his face, thigh and back, and concussive blast injuries, was diagnosed with and received treatment for traumatic brain injury, degenerative joint disease in his left knee, post-traumatic stress disorder, depression, anxiety, hearing loss, and tinnitus. Day 1 Tr., 109:1-17, 110:14-111:17; PX1107, Salvador Beltran-Soto Decl., paras. l-u; PX1167, Beltran-Soto Fact Sheet, § V.1-5; PX1105, Peter Baah Decl., para. g.

283.    Foster was part of one of the rescue teams attempting to reach the 1st Platoon.  He came under intense small arms and rocket propelled grenade fire and witnessed as his fellow soldiers were killed or severely wounded.  He was diagnosed with and received treatment for post-traumatic stress disorder, depression, anxiety, and has struggled with alcohol dependence, survivor's guilt, and suicidal thoughts. PX1174, Expert Report and Declaration by Dr. Rael Strous, MD.[204]

*i.   Jaysh al-Mahdi Committed the Attack*

284.    Jaysh al-Mahdi (JAM) committed this attack. Day 1 Tr., 215:3-4; PX1100, April 4, 2004 Ops Report, p. 1; PX1101, U.S. Central Command Background Briefing (April 5, 2004), p. 2; PX1167, Beltran-Soto Fact Sheet, § IV; PX1168, Bryant Fact Sheet; PX1169, § IV, Doss Fact Sheet; PX1170, § IV, Ferris Fact Sheet, § IV; PX1000, Expert Report and Declaration of Dr. Daveed Gartenstein-Ross, p. 5.

285.    This conclusion is supported by a number of facts and factors, including: (1) the location of the attack; (2) the date of the attack; (3) the tactics, techniques, and procedures

---

[204] Plaintiffs will file a motion to supplement the record with PX1174.

(TTPs) used to carry out the attack; and (4) JAM's motive for committing the attack. Id, pp. 5-7; Day 1 Tr., 215:5-7.

286.     As for the location, "the Sadr City neighborhood of Baghdad was a JAM stronghold in 2004." PX1000, p. 6; Day 1 Tr., 219:1-4.

287.     JAM's protests not only placed a large amount of its members in the location of the attack at the time it occurred, but demonstrated its motives for conducting the attack at that time. First, JAM's attacks against U.S forces on April 4, 2004 were coordinated responses to several earlier events in the preceding weeks, including coalition forces' pursuit of arrest warrants for JAM members, the closure of the al-Hawza al-Natiqa newspaper offices, and the arrest of a top JAM lieutenant, Mustafa al-Yacoubi. PX1000, pp. 5-6. The attack on 1st Platoon, and the convoys sent to rescue it, were part of JAM's offensive in Sadr City. Day 1 Tr., 216:1-219:18.

288.     The TTPs used in this attack also support that it was committed by JAM. The insurgent groups that attacked the 2/5's convoys used small arms, RPGs, IEDs, mortars, and rockets. The insurgents demonstrated a broad knowledge of bomb making, were highly adaptable, and were able to construct and successfully deploy various types of IEDs, and used spotters to coordinate the attack. PX1104, Volesky Decl., para u. "This demonstrated a distinct difference in the sophistication and complexity of the insurgent tactics we had prepared for, and what we would later experience during our tour of duty." Doss Decl., para. g. "The insurgents worked in small groups and wore make-shift uniforms of black clothing and green headbands. These fighters had better weapons and better tactics than what we had previously encountered. They were not dressed like the normal insurgent fighters we encountered in Iraq and their tactics were more organized." Ferris Decl., para.

h. The sheer number of fighters and the intensity of the attack was extraordinary. PX1104, Volesky Decl., para. o.

289.    In concluding that these TTPs were indicative of JAM, Dr. Daveed Gartenstein-Ross assessed that the attack involved (1) a complex ambush with multiple simultaneous attackers; (2) a mass attack using small arms, rocket propelled grenades, and IEDs; and (3), a salvo that was part of a broader mobilization or part of a broader campaign being conducted by JAM at the time. Day 1 Tr., 219:22-220:5.

290.    JAM's capability to commit this attack, as part of its coordination of simultaneous attacks against U.S. forces throughout Iraq that day, required it to have operational dominance in Sadr City, as well as a significant amount of high-grade weapons, skilled fighters, and funding. Iran's material support to Muqtada al-Sadr and JAM, including its provision of funding, training, and weapons substantially contributed to JAM's ability to conduct this attack. Iran's multilayered support for JAM, including funding, helped ensure that it had dominance and control of Sadr City at the time of the attack. Day 1 Tr., 220:16-221:2.

291.    Iran was providing substantial support to al-Sadr and JAM starting in June 2003, and by April 2004, Iran was "Muqtada al-Sadr's 'principal supporter… U.S. intelligence officials tracked reported movements of Iranian money and arms to forces loyal to Sadr.'" PX4, Dr. Daveed Gartenstein-Ross, Expert Witness Report & Declaration on Shia Militant Groups, pp. 26-27, 41 (quoting PX227-COIC Information Paper: Overview of Jaysh al-Mahdi Financial Flow (Aug. 5, 2007)). Iran was JAM's single largest source of funding, providing two-thirds of its annual operating budget. By the beginning of 2004, al-Sadr had established an Economic Committee to ensure that JAM cells throughout Iraq received

sufficient funding for operations. PX227, p. 3. Moreover, Mustafa Yacoubi, the individual

detained on April 3, 2004, "reportedly oversees the JAM financial distribution office...

[and] was responsible for disbursing funds to JAM and the Special Groups. The Special

Groups used this financing to conduct attacks against CF [coalition forces]." PX4, p. 41-

41; PX227, pp. 1, 3.

292.     By the time of this attack, Iran, with the assistance of its long-time proxy Hezbollah,

had been training large numbers of JAM fighters to attack Coalition forces in Iraq for nearly

a year. PX4, p. 27; PX2, Dr. Mathew Levitt Expert Report and Declaration, paras. 111-

116; 136-150. This training included sniper operations, explosives, small unit tactics,

ambushes, and IED emplacement. PX2, para. 124, 141-142, 161. JAM employed its

training in these TTPs on April 4, 2004. PX1104, Volesky Decl., para u; PX1000 p.8. The

training provided by Iran increased JAM's ability to conduct sophisticated complex attacks

like that on April 4, 2004, including "the ability to amass an attack of this scale." Day 1

Tr., 221:9-14; PX1000, p. 8. Moreover, "the training that Iran provided to JAM was

connected to the success of these attacks. Iran provided training on key weapons employed

in this attack, including RPGs and IEDs, which are not simple to utilize. Iranian training

increased JAM's chances of success in this attack." PX1000, p. 8.

293.     Along with this training, Iran also provided weapons to JAM, including to its

fighters in Sadr City at the time of this attack. *Id.* During its tour at Camp War Eagle,

Plaintiffs' Battalion conducted several weapons "buy-back" programs, including one in

early 2004 during which it came across one of the first identified Explosively Formed

Penetrators (EFP), and would actively seek out weapons caches. PX1104, Volesky Decl.,

para v. "Besides the buy-back programs, we would actively seek out weapons caches and

find a whole gambit of various types of munitions of Iranian origin. On one occasion, we found two houses that were filled with munitions that took several days to be empty. The presence of the EFP was a clear indication to me that Iran was involved with providing support to the Shia Militias including weapons, as well as training in tactics, and assistance in smuggling lethal aid into Iraq." *Id.*

294.     The amount and type of weapons used in the attack were not readily obtainable absent support from Iran. PX1000, p.8; Day 1 Tr., 221:6-8.

295.     Iran's multifaceted support for JAM "enhanced the operational capacity, the ability to carry out a complex simultaneous attack such as this one." Day 1 Tr., 221:3-5. In sum, JAM owed its success and its ability to carry out these well-coordinated attacks on April 4, 2004, to the material support provided by Iran through the Iranian Ministry of Intelligence & Security, the Iranian Islamic Revolutionary Guard Corps, and the Qods Force. Day 1 Tr., 220:6:221:14; PX1000, p.8; PX4, pp. 45-46.

   b.   **Attack # 2: Plaintiffs Estate of Dale Burger, Samuel Williams, Shane Housmans, Joe Sanchez, and Curtis Mighaccio**

   i.   *November 13-14, 2004 – Complex Attack in Fallujah*

296.     On November 13-14, 2004, Plaintiff Cpl. Dale Burger was killed, and Plaintiffs Sgt. Shane Housmans, HM Samuel Williams, Cpl. Joe Sanchez, Jr., and LCpl. Curtis Mighaccio were injured in back-to-back complex attacks while clearing houses along the same block in the Queens neighborhood of Fallujah, Iraq. ECF No. 100, SAC ¶¶ 3871-3917; PX1247, Housmans Fact Sheet; PX1248, Sanchez Fact Sheet; PX1249, Williams Fact Sheet; PX1250, Estate of Dale Burger Fact Sheet.

297.     Plaintiffs were members of 2nd Platoon, I ("India") Company, 3rd Battalion, 1st Marine Regiment, 1st Marine Division. India Company was conducting operations in

support of Operation al Fajr (also known as Operation Phantom Fury), which was specifically intended to clear al Qaeda in Iraq from Fallujah, and capture or kill its leader, Abu Musab al-Zarqawi. Day 1 Tr., 24:23-25:5; 143:16-21; PX1205, Williams Decl., para g; PX1000, Expert Report and Declaration of Dr. Daveed Gartenstein-Ross, p. 13.

298. On November 13, Housmans, Sanchez, and Williams were assisting with clearing a house when it was engulfed in a "huge explosion." Day 1 Tr., 27:4-17. The explosion blew a steel door off the house, striking Housmans and throwing him 10-15 feet backwards. Id. The blast ripped one of their fellow soldiers in half,[205] and caused burns and temporary blindness to others nearby. Day 1 Tr., 45:14-47:19; PX1202, Lake Decl., para. i; PX1204, Sanchez Decl., paras. f-g; PX1205, Williams Decl., para. h; PX1203, Housmans Decl., paras. h-i.

299. Prior to the explosion, insurgents inside the house waited for the Marines to enter before engaging them with small arms fire, wounding several Marines. The house had been booby-trapped to explode when more Marines, including Plaintiffs, entered to retrieve and assist the wounded soldiers. Day 1 Tr., 25:5-27:2; PX1202, Lake Decl., para. i. The explosion caused blast injuries to Housmans, Sanchez, and Williams, and killed Lance Corporal Justin McLeese. Day 1 Tr., 27:14-17; 46:1-47:12; PX1202, Lake Decl., para. i; PX1204, Sanchez Decl., paras. f-g.

300. Less than 24 hours later, on November 14, 2nd Platoon was still trying to clear houses on the same block. That afternoon, 2nd Platoon received word that members of 3rd Platoon[206] had attempted entry into another house and were immediately met with

---

[205] Lance Corporal Justin McLeese (KIA).
[206] Lance Corporal Andres Perez (KIA).

automatic weapons fire and hand grenades. A wounded soldier and others were now trapped inside the house. Day 1 Tr., 29:4-19; 31:8-12; 48:2-49:18; PX1202, Lake Decl., paras. j-k.  Burger, who that same day had volunteered to return to the unit despite being wounded and eligible to return to the United States, assembled a team to go and assist 3rd Platoon. This team included LCpl. Randy Lake, and Plaintiffs Mighaccio[207] and Williams. Day 1 Tr., 30:17-31:7; PX1205, Williams Decl., para k.

301.     When they arrived at the house where 3rd Platoon was pinned down, Burger and others assembled outside with Burger first in line to enter to the house. As Burger entered the house, he was shot in the head. Day 1 Tr., 31:13-22; PX1202, Lake Decl., para. k. Although shot, Burger was still alive and inside the house. *Id*. Eventually, the other Marines, including Lake and Mighaccio pulled both LCpl. Perez and Burger from the house, at which point Williams attempted to provide lifesaving medical treatment to them. Day 1 Tr., 31:23-25; PX1202, Lake Decl. para. k; PX1203 Housmans Decl., para. n.

302.     Williams determined that Perez was dead. PX1205, Williams Decl., para. k. Williams then observed that, although Burger "had a gunshot wound to the middle of his forehead, he was still breathing. When [Williams] took off his helmet to treat Burger, his eyes started to bulge significantly." *Id*. Williams "bandaged and secured the injury as best [he] could," and told Burger that he needed a cricothyrotomy… a hole in his throat to assist with his breathing[.]" Day 1 Tr., 50:1-9.

---

[207] Plaintiff Shane Housmans testified Corporal Burger assembled a team that included a Marine who "at that time it was Lance Corporal Olson -- he has since just changed his last name[…]". This is Plaintiff Curtis Mighaccio, who at the time of the attack went by the last name of "Olson." *See* ECF 81, Sealed Exhibit 331-From DD214 for "Curtis Olson" and identifying the nearest relative as his father, Martin Mighaccio.

303.     Burger was medevac'd by ground but died several hours later from his wounds. Day 1 Tr., 32:1-3; 49:13-50:22; PX1205, Williams Decl., para. k; PX1250 Estate of Dale Burger Fact Sheet, § V.1, citing PX1223-Form 1330 Report of Casualty.

304.     As a result of the attacks on November 13-14, 2004, Housmans has been diagnosed and received treatment for traumatic brain injury, post-traumatic stress disorder, and tinnitus. Day 1 Tr., 34:23-35-23; PX1247, Housmans Fact Sheet, § V.1-5; PX1251, Expert Report & Declaration by Dr. Rael Strous, MD.

305.     Williams was hit by concussive blast forces resulting in loss of consciousness and has been diagnosed and received treatment for post-traumatic stress disorder and major depressive disorder. Day 1 Tr., 53-13-54:7; PX1249, Williams Fact Sheet, § V.1-2; 4-5.

306.     Sanchez, Jr. was hit by concussive blast forces, and has been diagnosed and received treatment for traumatic brain injury, post-traumatic stress disorder, hearing loss, and tinnitus. PX1204, Sanchez Decl., para. l; PX1248 Sanchez Fact Sheet, § V.1-5.

307.     Mighaccio was hit by concussive blast forces and has been diagnosed and received treatment for traumatic brain injury, post-traumatic stress disorder, hearing loss, and tinnitus. PX1203 Housmans Decl., para. r; Day 1 Tr., 29:17-19.

### ii. Al Qaeda/Al Qaeda in Iraq Committed the Attack

308.     Al Qaeda/Al Qaeda in Iraq (AQ/AQI) committed this attack. Day 1 Tr., 24:23-25:4; 45:5-9; 141:18-19; PX1000, §III; PX1250, Estate of Dale Burger Fact Sheet, § IV.1-5.

309.     This conclusion is supported by a number of facts and factors, including: (1) the location of the attack; (2) the date of the attack; and (3) the tactics, techniques, and procedures (TTPs) used to carry out the attack.

310.     The location, Fallujah, Iraq, was an important stronghold and key center of operations for Abu Musab al-Zarqawi and AQI, and at the time of the attack, the Zarqawi Organization dominated Fallujah. Day 1 Tr., 147:5-24. In October 2004, Zarqawi publicly "pledged beyat, or allegiance to Al-Qaeda, and changed the name of his organization to Al-Qaeda in Iraq. At that point, the funds and resources available to the Zarqawi organization increased. It was working to establish itself as a dominant insurgent organization, and being able to control Fallujah and also to use Fallujah to project its power into other parts of Iraq was an important part of its strategy." *Id*., 144:11-24.

311.     Moreover, Al-Qaeda in Iraq controlled insurgent activity in Fallujah through dominance of the 2004 Fallujah Mujahideen Shura council, established to facilitate cooperation and coordination of insurgent activities in the area. *Id*., 147:17-148:2; 158:18-159:15, discussing PX937, p.14. The Al-Qaeda in Iraq -dominated Fallujah Shura Council included members of Iranian-supported Shia insurgent groups associated with Jaysh al-Mahdi (JAM), and whose presence on the council "shed light on the reciprocal tactical cooperation between Sadr and the Sunni insurgents, who supplied each other with arms and provisions, despite the animosity between them." *Id*.; PX1000, p. 15.

312.     As for the tactics, techniques, and procedures (TTPs), three specific characteristics of these attacks support attributing them to Al-Qaeda in Iraq. First, the attacks involved coordinated fighting at scale, meaning the attacks were part of a larger sustained coordination of specific complex tactics throughout a vast area of operations and among multiple teams of fighters that were highly capable of organizing against the much larger and sophisticated U.S. military-led force. Day 1 Tr., 152:8-12. At the time of the attacks, Al-Qaeda in Iraq was the only sufficiently sophisticated and dominant group in Fallujah

with such capabilities. PX1000, p. 14. Second, the attack involved skillful use of weapons and munitions of the type consistently used by Al-Qaeda in Iraq at scale in Fallujah, specifically, RPK and PKM automatic weapons, hand grenades, and sophisticated Improvised Explosive Devices. Day 1 Tr., 152:13-15; 154:22-155:4; PX1000, p. 14. Third, the attack included a specific TTP used by Al-Qaeda in Iraq in Fallujah at the time – the luring of members of the U.S. military into buildings using other members of the U.S. military or allied forces as bait to draw others in." Day 1 Tr., 152:16-20.

313.    Furthermore, the individuals who committed the attacks on November 13-14 demonstrated exceptionally well developed "unit cohesion" through their discipline in planning and successfully conducting complex ambush attacks from close-quartered fixed positions. The attackers prepared their positions with pre-emplaced IEDs and then lured the intended victims inside these positions which were in kill zone of their own IEDs. This extreme unit cohesion and battle discipline was indicative of well-trained AQI fighters in Fallujah at this time. Day 1 Tr., 155:14-156:9; PX1000, p. 14, citing PX284.

314.    The capability of Al-Qaeda in Iraq to coordinate attacks against Coalition Forces in Fallujah and at scale during Operation al Fajr required AQI to have consistent and reliable sources of high-grade weapons, skilled fighters, and sufficient funding, all of which Iran supplied to Al-Qaeda in Iraq.

315.    First, Iran facilitated the flow of weaponry and personnel to Al-Qaeda in Iraq in the Fallujah area. The weapons used in the attacks were not readily obtainable absent the MOIS-brokered ratlines coming through Syria, including the amount and type of automatic weapons and high-grade explosive materials. Day 1 Tr., 159:16-25. Al-Qaeda in Iraq also used these ratlines to bolster and replenish its ranks with skilled foreign fighters,

specifically in Fallujah in 2004. Day 1 Tr., 151:13-152:7; PX1000, p. 14. Iran, through the IRGC and its Shia proxy Jaysh al-Mahdi, also provided weapons directly to Al-Qaeda in Iraq fighters in Fallujah at the time of these attacks. Day 1 Tr., 156:16-159:15; PX1000, pp. 13-15; PX900, p.118 (discussing AQI and JAM's cooperation despite sectarian animosity, including fighting together during Operation al Fajr).

316.     Second, Iran assisted Al-Qaeda in Iraq with the training necessary to increase the coordination of its fighters, and Al-Qaeda in Iraq was able to improve its coordination and expand its reach from Fallujah to other areas in Iraq during the time of these attacks. Day 1 Tr., 160:1-6; 161:5-8.

317.     Third, Iran's support increased Al-Qaeda in Iraq's ability to be able to sustain a large number of fighters for an extended period, including providing food and money to its fighters in Fallujah at the time of these attacks. Day 1 Tr., *Id*., 151:3-12; 160:7-14; PX1000, p. 15.

318.     In sum, Al-Qaeda in Iraq owed its success and its ability to carry out these well-coordinated attacks to the material support provided by Iran through the Iranian Ministry of Intelligence & Security, the Iranian Islamic Revolutionary Guard Corps, and the Qods Force. Day 1 Tr., 160:24-161:8; PX1000, p. 15.

    c.   **Attack # 3: Plaintiffs Estate of Jonathan Bowling, Andrew Rothman, and Juan Rubio**

        i.   *January 26, 2005 – IED Attack in Haqlaniyah*

319.     On January 26, 2005, Cpl. Jonathan Bowling was killed, and Corpsmen Juan Rubio and Andrew Rothman were injured, in a large complex attack in the village of Haqlaniyah, near Haditha, Iraq. ECF No. 100, SAC ¶¶ 3586-3590, 3596-3599, 3603-3606; PX1350,

Bowling Fact Sheet; PX1351 Rothman Fact Sheet; PX1352 Rubio Fact Sheet; PX1306, Rothman Decl.; PX1305, Rubio Decl., para. g.

320.      Bowling, Rothman, and Rubio were members of various U.S. military units stationed at the Haditha Dam on the Euphrates River in the Anbar province of Iraq to provide security and humanitarian aid to Iraqi locals. PX1306, Rothman Decl., para. e; PX1305, Rubio Decl., para. d; Day 1 Tr., 60:9-11, 15-21.

321.      Juan Rubio was a member of a Small Craft Company patrolling the Euphrates and Tigris rivers and learned that terrorists were using the river to distribute military grade weapons throughout Iraq. Day 1 Tr., 59:17-60:8. These weapons would enter Iraq from Syria, and then moved down the Euphrates River into the Haditha area. Rubio's unit discovered "[s]urface to air [missiles], anti-aircraft machine guns, RPKs, AK-47s, grenades, 50 cal. anti-aircraft rounds, mortars, mortar tubes, [and [detonation] cord." *Id.*, 60:15-61:15.  In December 2004, his unit captured four large caches in one day that were buried in a manner allowing them to be quickly and easily accessed by those for whom they were intended. *Id.*, 62:17-63:19. These weapons were carefully wrapped in plastic, and some were in "pristine condition." *Id.*, 62:20-66:4, describing PX1305, Rubio Decl., Exhibits D-G, & J. The last cache that day was discovered in the yard of a residence located approximately 50 yards from the location of the attack that occurred on January 26, 2005. *Id.*, 66:7-9.

322.      On January 26, 2005, Bowling, Rubio, and Rothman were part of a 12-vehicle convoy tasked with an early morning raid of four buildings in Haqlaniyah, based on intelligence of the presence of weapons and high value targets. Day 1 Tr., 66:25-67:14; PX1000, p. 16. Later, U.S. forces assessed this intelligence to be false, provided to lure

U.S. forces into the complex ambush that followed. Day 1 Tr., 70:21-71:6; 165:22-16:16; PX1305, Rubio Decl., para. f.

323.     After searching all four buildings and finding them empty, the convoy began the return drive to the Haditha Dam. Day 1 Tr., 68:20-25. Shortly after departing, one of the lead vehicles in the convoy was hit by an explosion and disabled, causing the convoy to stop. *Id*.; PX1306, Rothman Decl., para. f. The convoy was then hit with heavy fire coming from multiple directions and vantage points, including from inside homes and along rooftops, as well as the village mosque. PX1306, para f; Day 1 Tr., 165:22-167:1.

324.     During the attack, a rocket propelled grenade hit Rubio's vehicle and the explosion threw him out of the vehicle and knocked him unconscious. Day 1 Tr., 69:6-70:20. Once he regained his senses, he began to return fire. *Id*. Mr. Rubio saw that the attackers were communicating between their positions and coordinating the attack on the convoy – directing fire from multiple directions-in front and behind, as well as from the rooftops and the ground. *Id*. Rubio's vehicle managed to push through the ambush and get to a casualty collection point, where he assessed and treated the wounded as best he could. *Id*.

325.     Rubio then assessed his own injuries, which included shrapnel wounds on the right side of his body, injuries to his back and knee, a concussion, and bullet graze to his hip. *Id*., 72:18-23. Rubio was also later diagnosed and treated for post-traumatic stress disorder, traumatic brain injuries, anxiety disorders, hearing loss and tinnitus. *Id*., 75:4-5, 166:11-12; PX1352, Juan Rubio Fact Sheet, § V.1-5.

326.     Rothman was riding in a different vehicle in the convoy, an Amphibious Assault Vehicle (AAV) that had stopped when the first explosion occurred. PX1306, Rothman Decl., para. f. Unable to move forward, the vehicle dropped its ramp and Rothman and his

fellow Marines deployed on foot, returning fire against the attackers. *Id*. A rocket propelled grenade struck approximately 30 feet from Rothman, hitting his thigh with shrapnel. *Id*.; Day 1 Tr., 166:18-21. As soon as they were able, Rothman and his fellow Marines loaded back into the vehicle, and pushed through the ambush and back to the Haditha Dam where he received treatment for his wounds. PX1306, Rothman Decl., para. f. Rothman was later diagnosed and treated for post-traumatic stress disorder, adjustment disorder with anxiety and depressed mood, hearing loss and tinnitus, PX1351 Rothman Fact Sheet, § V.1-5.

327.     Bowling was riding in the open back of another vehicle in the convoy. *Id*., 166:22-167:1. As Bowling's vehicle was moving down the roadway, it came under small arms fire and was hit by an RPG fired from the mosque. PX1000, p. 16. Bowling was struck by gunfire in his hands and head.  PX1350, Estate of Jonathan Bowling Fact Sheet, § IV. He was medevac'd by helicopter once back at Haditha Dam, but succumbed to his wounds in flight. *Id.*

### ii.  Al Qaeda/Al Qaeda in Iraq Committed the Attack

328.     Al Qaeda/Al Qaeda in Iraq (AQ/AQI) committed this attack. Day 1 Tr., 164:23-24; PX1622, Bowling Fact Sheet, III.1; Rothman Fact Sheet, IV.1; Rubio Fact Sheet, IV.1; PX1000, Expert Report and Declaration, pp. 16-22.

329.     This conclusion is supported by a number of facts and factors, including: (1) the location of the attack; (2) the date of the attack, (3) the tactics, techniques, and procedures (TTPs) used to carry out the attack, and (4) Al Qaeda in Iraq's motive for the attack. PX1000, p. 22; Day 1 Tr., 165:1-2.

330.     Regarding the location and date, in late 2004 and early 2005, Al Qaeda in Iraq "possessed operational dominance" in the Haditha area where the attack occurred. Day 1

Tr., 167:3-25. U.S. personnel with direct operational knowledge of the area in January 2005 corroborate Al Qaeda in Iraq's presence and dominance in this area at this time. Day 1 Tr., 168:15-18; PX1307, Dreany Decl., para. 4(f). Juan Rubio's testimony describing the TTPs used against him during the attack is consistent with this sudden increase in the insurgents' tactical sophistication in Haditha at the time. Day 1 Tr., 72:1-11.

331.     Rubio's commanding officers, "believed that it was a group of Al-Qaeda… involved in that night's attack and other attacks prior to the 26th." *Id*., 73:9-22.

332.     Declassified U.S. military documents also show that, through its dominance in the area in early 2005, Al Qaeda in Iraq quickly established a training camp in Haditha to train replacements for those killed in Fallujah, and used Haditha "to largely replace Fallujah and Ramadi as the final waypoint for foreign fighters bound for Baghdad." *Id*., 169:11-170:6, (discussing PX900).

333.     The group that committed that January 26, 2005 attack in Haqlaniyah against Bowling, Rubio and Rothman used the minaret of Haqlaniya Mosque as a primary firing position and it was from this location that the RPG and small arms fire that struck and killed Jonathan Bowling originated. *Id*. In a declassified historical report, the U.S. military concluded that multiple Al Qaeda in Iraq senior leaders were present in Haditha at the time of the attack and controlled the mosques in the area. *See* PX900.

334.     Finally, in 2005, Al Qaeda in Iraq credibly claimed responsibility for 43 other attacks in the Haditha area, further demonstrating the group's operational dominance at the time and in the same area where this attack occurred. Day 1 Tr., 170: 12-9, 20-21; PX1000, pp. 19-20.

335.    The TTPs used in this attack demonstrate a well-trained and sufficiently supplied group of attackers capable of planning and successfully committing a complex attack, at night, and involving up to 100 fighters who targeted a large, fast moving armored U.S. military convoy. Al Qaeda in Iraq's attribution for this attack is supported by the following TTPs: the size of the attacking force (approximately 70-100); the ability to deploy spotters in the area; access to and use of multiple locations within the village; the ability to coordinate a large-scale attack across these locations; the use of false intelligence and empty houses as decoys; and the ability to successfully use an IED to immobilize the convoy in a precise location to initiate the attack. *Id.*, 172:9-173:21. These TTPs are consistent with other attacks in the same area and time period committed by Al Qaeda in Iraq, and an attack involving the successful application of all of the above-listed TTPs could only have been carried out by a "group that had area of operations dominance" in Haqlaniyah at the time (i.e. Al Qaeda in Iraq). *Id.* 173:4-12.

336.    Al Qaeda in Iraq's commission of this attack is supported further by Al Qaeda in Iraq's strategic and ideological motives for committing it at that time. U.S. and coalition forces were specifically engaged in anti-Al Qaeda in Iraq operations at the time in Haditha given its strategic significance to Al Qaeda in Iraq. *Id.*, 174:4-6; PX1000, p. 20. Specifically, Haditha "sat along a crucial Al Qaeda in Iraq supply route" and was a critical waypoint along the MOIS-brokered smuggling routes from Syria into Iraq that Al Qaeda in Iraq used to move weapons, money, and fighters into the Anbar province and further into Baghdad. Day 1 Tr., 174:4-175:14; 170:3-6. At the time, "if [Al Qaeda in Iraq lost] Haditha, then it has a significant effect on their flow of supplies in the country." *Id.*, 174:14-16. Rubio's testimony about his experience patrolling the Euphrates River north and south

of the Haditha Dam as well as his description of the nearby weapons caches fully accords with Al Qaeda in Iraq's use of the area for staging and distributing military grade weapons and supplies. *Id.* 60:15-61:15; 62:20-66:4.

337.     The capability of Al Qaeda in Iraq to establish its dominance in the Haditha area in early 2005, and to coordinate attacks against U.S. military convoys like the attack on January 26, 2005, required it to have consistent and reliable sources of high-grade weapons, a sufficient number of skilled fighters, and sufficient funding. Iran's support to Al Qaeda in Iraq substantially assisted the group in meeting these requirements.

338.     Iran's financial and logistical support for Al Qaeda in Iraq greatly assisted the group at this specific time because it had just suffered significant setbacks in Fallujah but it was still able to reconstitute quickly and establish its dominance over the local populace and other groups in nearby Haditha. *Id.*, 177:1-7.

339.     This logistical support included Iran's facilitation of the flow of weaponry and personnel to Al Qaeda in Iraq in the Haditha area. The amount, variety, and type of weapons used in the attack (e.g., IEDs, RPKs, RPGs, etc.) were not readily obtainable absent the MOIS-brokered ratlines coming through Syria. *Id.*, 159:21-25. Al Qaeda in Iraq also used these same routes to bolster and replenish its ranks with skilled foreign fighters, specifically in Haditha in early 2005 after Al Qaeda in Iraq's significant losses following Operation al Fajr in Fallujah in late 2004. Day 1 Tr., 151:13-152:7; PX1000, p. 17.

340.     Iran assisted Al Qaeda in Iraq with the training necessary to increase the sophistication and coordination of its fighters. Day 1 Tr., 177:11-17. The attack on January 26, 2005, epitomized the high-degree of sophistication and coordination amongst a large group of well-supplied attackers using the tactical advantage of the permissive environment

available only to a group with operational dominance in the area (e.g. the ability to use a local mosque as a firing position from which to successfully target a moving convoy, and the incredible skill required to hit a fast moving vehicle at an extreme distance with an RPG with lethal effect). *Id*.

341.      In sum, Al Qaeda in Iraq owed its success and its ability to carry out these well-coordinated attacks to the material support provided by Iran through the Iranian Ministry of Intelligence & Security, the Iranian Islamic Revolutionary Guard Corps, and the Qods Force. Day 1 Tr., 160:24-161:8; PX1000, pp. 21-22.

   d. **Attack # 4: Plaintiffs Estate of Robert William Briggs, Estate of Randy Lee Stevens, Estate of Tromaine K. Toy, and Jose Jauregui**

      i. *April 16, 2005 – Indirect Fire on Camp Ramadi*

342.      On April 16, 2005, Sgt. Tromaine Toy, Spc. Randy Stevens, Spc. Jose Jauregui, and Sgt. Robert Briggs were serving at Camp Ramadi in the Al-Anbar Province, Iraq. ECF Doc. 100, SAC, ¶¶ 3341-3384; PX1000, Dr. Daveed Gartenstein-Ross Expert Report and Declaration, pp. 22-23; PX1470 Jauregui Fact Sheet; PX1471 Toy Fact Sheet; PX1472 Stevens Fact Sheet; PX 1473 Briggs Fact Sheet.

343.      Plaintiffs Toy, Stevens, and Jauregui were members of a crew conducting artillery counter-fire operations, which used radar to detect the points of origin and flight paths of rockets and mortars fired at the camp. They also assisted with security, patrolling for insurgents and IEDs, and conducting raids. PX1405, Jauregui Decl., para. e

344.      Plaintiff Robert Briggs was serving in an engineer battalion tasked with operating heavy equipment, reinforcing barriers and obstacles, improving road systems, improving drainage, among other duties. PX1403 Jacobus Decl., p. f.

345.     In the evening of April 16, Jauregui, Toy, and Stevens were crewing a Paladin Self-Propelled Howitzer. Stevens shouldn't have been there that night but he had volunteered to take another soldier's shift that day. Day 1 Tr., 82: 20-22; PX1000, p. 23; PX1405 Fant Decl., paras. g, a [sic]. At around 8:00pm, Jauregui, Toy, and Stevens had just finished dinner when Camp Ramadi came under indirect fire involving two 120mm mortars and two 107mm rockets. Day 1 Tr., 83:2-8, 83:12-18, 181:6-9; PX1000, p. 23, 25; PX1403 Jacobs Decl., para. h

346.     Jauregui and the others recognized the incoming fire as it began to hit the base and heard over the radio that they had been directed to return fire at the point of origin. They ran to the Paladin, with Jauregui getting to the gun first and crawling inside the hatch. Day 1 Tr., 83:9-14. 84:2-5.

347.     As Jauregui stood up inside the Paladin, it took a direct hit from a 107mm rocket and "was encompassed by tremendous fire and explosions from within the Paladin" which prevented responders from getting close and rescuing the soldiers in or near the Paladin. PX1405 Fant Decl., para. I; Day 1 Tr., 83:14-18. It was unsafe to approach the Paladin as it burned and artillery rounds continued exploding for approximately twelve hours. PX1000, p. 23; PX1405 Fant Decl., para. i.

348.     Tromaine Toy and Randy Stevens were killed in the attack.[208] PX1000, p. 23; PX1471 Toy Fact Sheet, VI.1; PX1472 Stevens Fact Sheet, VI.1.

349.     Jauregui survived the rocket hit on the Paladin, however, he suffered significant injuries, including third-degree burns to over 75% of his body, the loss of both of his ears,

---

[208] Sergeant Anthony L. Lozada, Jr. was serving as the Gunner for the Paladin with Plaintiffs Toy, Stevens, and Jauregui on April 16, 2005. The rocket blast also killed him when he was hit by the gun emplacement. Neither his estate nor his family are presently plaintiffs in this case.

and amputation of all digits and thumb on his left hand, among other injuries. PX1470, Jauregui Fact Sheet, V.1; PX1405 Fant Decl., para. g. He was conscious during the explosion and resulting fire, and, once he was able to extinguish the flames on his body, ran for help into the night in search of aid. Day 1 Tr., 84:24-86:18.

350.    At the same time that night, Briggs was in a housing area of Camp Ramadi that was struck by the 120mm mortar rounds. PX 1473 Briggs Fact Sheet, IV.4.

351.    Briggs sustained a "gruesome" open head injury, lost a significant amount of blood, had an eye hanging from its socket, and his skin was "peppered with shrapnel." PX1403, Jacobus Decl., para. j. Briggs "was conscious and in a great deal of pain… asking those around him not to let him die." *Id*. Ultimately, Briggs was determined to be suffering a brain bleed, traumatic brain injury, loss of his right eye, paralysis of his left arm and leg, among other injuries. PX1000, p. 23; PX 1473 Briggs Fact Sheet, VI.1. Briggs later died from his blast-related injuries suffered in this attack. PX1000, p. 23; PX 1473 Briggs Fact Sheet, VI.1.

352.    The points of origin for the rockets and mortars were assessed to have been the Tamim District/Neighborhood southeast of Camp Ramadi, and the rockets were fired from the back of a cement truck, and the mortar tubes transported to the launch site in Tamim using motorcycles. Jacobus Decl., paras. r, s. Shortly after the attack, a Marine unit reported seeing a mortar team firing and then displacing into a local mosque. PX1400, April 16, 2005 Ops Report. Iraq Security Forces searched the mosque and were unable to locate the suspect. *Id.*

   ii.   *Al Qaeda/Al Qaeda in Iraq Committed the Attack*

353.       Al Qaeda/Al Qaeda in Iraq committed this attack. Day 1 Tr., 179:2-4; PX1000, p. 23; PX1470, Jauregui Fact Sheet, IV.1; PX 1473 Briggs Fact Sheet, V.1; PX1471 Toy Fact Sheet, V.1; PX1472 Stevens Fact Sheet, V.1.

354.       This conclusion is supported by a number of factors, including: (1) the location of the attack; (2) the date of the attack; and (3) the tactics, techniques, and procedures (TTPs) used to carry out the attack.

355.       April 2005 was a turning point for Al Qaeda in Iraq as it tried to reassert itself in Iraq. In early 2005, Coalition Forces conducted Operations River Blitz and River Bridge, targeting insurgent groups in Anbar province. Iran's array of support for Al Qaeda in Iraq permitted it to expand, while other insurgent groups were defeated, negotiated, or laid down their arms. Al Qaeda in Iraq swelled its numbers and strengthened its position during the spring of 2005, by absorbing other groups that risked destruction or were drawn in by v's abilities and uncompromising approach. Day 1 Tr., 183:10-184:3; PX1000, pp. 23-24. This influx of resources allowed Al Qaeda in Iraq to maintain and expand its operational capabilities, and conduct mass casualty attacks, such as the attack on Camp Ramadi on April 16, 2005. *Id*. Al Qaeda in Iraq established itself as the dominant insurgent actor in the Anbar Province, including Ramadi, where the U.S. military assessed that Al Qaeda in Iraq -affiliated cells were "the primary threat to the Coalition in the city" at the time of this attack. *Id*.; 185:17-186:15, discussing PX900, p. 41-42. The fact that the then-recently-depleted Ramadi Shura Council, which controlled the less dominant insurgents in the city, had declared a ceasefire from April 15 to April 17, underscores the likelihood that Al Qaeda in Iraq was the perpetrator of the IDF attack on Camp Ramadi on April 16, 2005. PX900, p. 47.

356.     Further, at the time of the attack, Al Qaeda in Iraq frequently claimed responsibility for attacks in this area. Day 1 Tr., 189:18-22. In fact, Al Qaeda in Iraq carried out a complex attack against the Abu Ghraib prison on April 2, 2005, two weeks before the Camp Ramadi attack. PX1000, p. 24. Notably, the Abu Ghraib attack included rockets and mortar fire, among other tactics, parallel to the attack on Camp Ramadi. PX1000, p. 24. Al Qaeda in Iraq then continued to escalate its attacks throughout Iraq in April 2005, including an April 11, 2005 attack against Camp Gannon, also in the Al-Anbar Province, demonstrating Al Qaeda in Iraq's commitment to attacking U.S. forces. *Id*. The nature of the Camp Ramadi attack indicates that the dominant insurgent group in the area – here, Al Qaeda in Iraq – would be more likely to carry out an attack of this nature. Day 1 Tr., 190:2-3, 190:2-3.

357.     Additionally, Al Qaeda in Iraq typically employed the TTPs used in this attack, at this time and in this area of its operations, as well as the specific type of rockets used in this attack. *Id*., 182:5-7; 189:7-17. Colonel Todd Jacobus, commander of the 224th Engineer Battalion and nearby at the time of the attack, stated that the mortars and rockets used in the present attack were similar to munitions used in other attacks in the area. PX1000, p. 25, discussing PX1403, Jacobus Decl. Al Qaeda in Iraq continually demonstrated its ability to attack coalition forces with rockets and mortar fire throughout its April 2005 surge of attacks. PX1000, p. 25. In fact, Al Qaeda in Iraq credibly claimed responsibility for multiple mortar attacks throughout the spring of 2005, including several attacks against coalition forces, demonstrating Al Qaeda in Iraq's unique ability to sustain its efforts to launch attacks similar to the April 16, 2005 attack on Camp Ramadi, while other groups in the area had been reduced by Coalition operations at the time or been absorbed by Al Qaeda in Iraq in order to survive. *Id*.

358.     The multiple points of origin, use of motorcycles and a dump truck in launching

the rounds, and use of a mosque to evade capture, further support attributing this attack to

Al Qaeda in Iraq. These tactics required coordination, freedom of movement, and mobility

only achievable by a dominant insurgent group with sufficient local control and "degree of

ability to blend into the urban area," for instance, "melting into a local mosque in the area"

and thereby evading capture despite being detected and pursued. Day 1 Tr., 189:9-190:6

(Al Qaeda in Iraq was well-known to use dump trucks in their attacks in Ramadi, including

the notorious vehicle-borne improvised explosive devices attack on OP Hotel on August

23, 2005 (*see* ECF No. 100, SAC ¶¶ 2963-3004)).

359.     Iran's material support to Al Qaeda in Iraq is reasonably connected to this attack.

First, Al Qaeda in Iraq's ability to move mortars and rockets into this particular area of Iraq

likely required use of the MOIS-brokered supply lines through the Syrian border, which

substantially assisted a consistent flow of Iran's support to Al Qaeda in Iraq at the time.

These supply lines assisted Al Qaeda in Iraq with maintaining and gaining dominance in

areas of Anbar, and specifically Ramadi in early 2005, by helping Al Qaeda in Iraq swell

its ranks and sufficiently supply those who joined Al Qaeda in Iraq as it grew. *Id*. 190:14-

191:2. Second, Al Qaeda in Iraq was receiving multilayered support from Iran at this time,

which included 107mm rockets, which are specifically indicative of Iranian supply and

support. *Id*., 191:3-6; PX1000, pp.25-26.

360.     In sum, Al Qaeda in Iraq owed its success and its ability to carry out these well-

coordinated attacks to the material support provided by Iran through the Iranian Ministry

of Intelligence & Security, the Iranian Islamic Revolutionary Guard Corps, and the Qods

Force. PX1000, p. 26.

e.  **Attack # 5: Plaintiff Estate of Anthony Capra, Jr.**

    i.  *April 9, 2008 – IED Attack in Golden Hills, Salah al-Din Province*

361.     On April 9, 2008, Technical Sergeant Anthony Capra, Jr. was killed by a highly

sophisticated anti-tampering IED in the Golden Hills, Salah al-Din Province on Iraq. ECF

Doc. 100, SAC ¶¶ 1074-1078; PX1517, Capra Fact Sheet, II, VI.1; PX1501, Boisselle

Decl., para. i.

362.     Capra was serving as a member of an Explosive Ordinance Disposal Unit based at

FOB Paliwoda in Balad, Salad Governorate, Iraq. PX1501, Boisselle Decl., paras. e-f.

Capra responded with his Explosive Ordinance Disposal Unit to a report of an IED blast

and possible secondary unexploded IED nearby. PX1000, Dr. Daveed Gartenstein-Ross

Expert Report and Declaration, p. 27; PX1517 Capra Fact Sheet, II.

363.     Staff Sergeant Brian Boisselle served with Capra in the Explosive Ordinance

Disposal Team. Day 1 Tr., 205:6-10; PX1501, Boisselle Decl., paras. d, f. On April 9,

2008, Boisselle's team was returning to base from an assignment along MSR Dover when

the team was notified that Capra had been killed while attempting to defuse the unexploded

IED in the Golden Hills area. Day 1 Tr., 205:15-19; PX1501, Boisselle Decl., para. h.

364.     Boisselle requested to conduct a post-blast analysis of the site. Day 1 Tr., 205:20-

21, PX1501, Boisselle Decl., para. i. Upon arrival at the detonation site, Boisselle saw that

the amount of damage was indicative of an atypical IED. Day 1 Tr., 205:25. Boisselle

stated that, while it normally takes 20 to 30 minutes to conduct a post-blast analysis, he

needed approximately one hour to identify the types of munitions used in the blast due to

the amount of extra explosives present. PX1501, Boisselle Decl., para. i. Boisselle's post-

blast analysis found that, the lack of a trigger mechanism, the size of the crater, and the

anti-tampering component designed to defeat disarming methods, was indicative of a very sophisticated IED. Day 1 Tr., 206:17-25; PX1501 Boisselle Decl., para. j.

365.　　Capra likely died instantly from the force of the blast, but the impact of the blast on his body was considerable and traumatic. PX1501 Boisselle Decl., para. l; PX1515, Final Autopsy Report for A. Capra, Jr.

### ii. Ansar al-Islam/Ansar al-Sunnah Committed the Attack

366.　　Ansar al-Islam/Ansar al-Sunna committed this attack. Day 1 Tr., 208:15-16, 213:25-214:3; PX1517, Capra Fact Sheet, V.1; PX1000, p. 3.

367.　　This conclusion is supported by a number of facts and factors, including: (1) the geographic location and time period of the attack; (2) the tactics, techniques, and procedures (TTPs), and (3) the motives possessed by Ansar al-Islam/Ansar al-Sunnah. Day 1 Tr., 202: 9-10; PX1000, p. 27.

368.　　Regarding location, the attack occurred in the Golden Hills area, which, at the time of the attack, was known as an Ansar al-Islam/Ansar al-Sunnah safe haven. Day 1 Tr., 209:16-17; PX1518, Attack Storyboard (referring to area as a "known enemy sanctuary.") When this attack occurred, Ansar al-Islam/Ansar al-Sunnah was a significant terrorist threat, especially in provinces bordering Salah al-Din, where this attack took place. PX1000, p. 27. In fact, Ansar al-Islam/Ansar al-Sunnah had credibly claimed responsibility for a number of attacks in Salah al-Din Province before and after the attack that killed Capra, including (1) an attack on an American convoy using an explosive package; (2) an attack involving firing mortar shells at an American base, which the group released video of in 2008; (3) a missile attack on an American base; and (4) the bombing of an American Humvee. PX1000, pp. 27-28. Further, at the time of the attack, coalition forces were in the

process of trying to deprive Ansar al-Islam/Ansar al-Sunnah safe haven in the Golden Hills area and an IED cell associated with Ansar al-Islam/Ansar al-Sunnah was working to thwart coalition efforts. Day 1 Tr., 209:17-22; PX1500, April 9, 2008 Attack Ops Report.

369.     Other potential perpetrators were ruled out because the geographic location of the Golden Hills area was more conducive to Sunni militant violence versus Shia militant groups. Day 1 Tr., 208:5-7; PX1000, p. 28. Additionally, while Al Qaeda/Al Qaeda in Iraq also committed attacks in Salah al-Din, by late 2007, Al Qaeda in Iraq's operational capacity in the Salah al-Din region had been greatly reduced. PX1000, p. 28. While it is likely that Ansar al-Islam/Ansar al-Sunnah committed the attack, even if AQI were responsible and/or involved, Iran remains culpable because both Ansar al-Islam/Ansar al-Sunnah and Al Qaeda in Iraq were known to collaborate, the outer organizational boundaries of Ansar al-Islam/Ansar al-Sunnah and AQI were in the process of combining, and Iran provided significant material support to both Ansar al-Islam/Ansar al-Sunnah and AQI. *Id.*

370.     Finally, the post-blast analysis and investigation into the attack identified the specific IED network operating in the area at the time, including the specific individuals leading the group, who "continued to disrupt recent [Coalition Forces] success in securing the area and denying the Ansar al-Sunna cell sanctuary in the southern Golden Hills." PX1500. This investigation determined that this Ansar al-Islam/Ansar al-Sunnah IED cell operating in Golden Hills at the time was "most likely responsible for the targeting of dismounted patrols, attempting to deter further interdiction by security forces in a known enemy sanctuary." PX1518, Attack Storyboard.

371.     The TTPs employed in this attack indicate that Ansar al-Islam/Ansar al-Sunnah more likely than not committed the April 9, 2008 attack. PX 1000, p. 102. As detailed above, only a few months prior to the attack at issue, Ansar al-Islam/Ansar al-Sunnah claimed responsibility for multiple attacks that incorporated similar types of explosives. *Id*. The sophistication of the IED, specifically the design to defeat U.S. countermeasures and disposal, the additional explosives rigged to the IED, and its successful triggering despite being handled by a well-trained specialist, indicates Ansar al-Islam/Ansar al-Sunnah was responsible for the attack that killed Capra. Day 1 Tr., 207:1-17.

372.     Iran's material support to Ansar al-Islam/Ansar al-Sunnah contributed to this attack because it was uniquely reliant on Iranian support during the period of the April 9, 2008 attack. Day 1 Tr., 210:25-211:5-6. Iran consistently provided support to Ansar al-Islam/Ansar al-Sunnah both before and during the time of the attack, facilitated the type of sophisticated IED attack at issue by aiding in the construction of IEDs and monetary support, including facilitating recruitment of members and providing a monthly salary to recruited insurgents who joined Ansar al-Islam/Ansar al-Sunnah. *Id*., 211:12-25, 212:24-213:14; PX5, p. 40. In February 2007, U.S. intelligence units in Iraq reported that, in Salah al-Din, where this attack occurred, individuals were offered up to $1,000 for the placement of IEDs. PX985, p. 123.  Iran also provided safe haven to Ansar al-Islam/Ansar al-Sunnah before and during the attack that was critical to the group's survival, growth, funding, and sophistication. PX100, pp. 29-30; PX5, pp. 39-42. Numerous sources reported that Ansar al-Islam/Ansar al-Sunnah members were trained by Iran for various attacks against U.S. forces in Iraq, and specifically that Iran was aiding Ansar al-Islam/Ansar al-Sunnah on how to build and set up IEDs while Ansar al-Islam/Ansar al-Sunnah was actively attempting to

improve its IED effectiveness and sophistication. Day Tr., 213:5-10, (discussing PX670, *The Iraq Report* (May 2006 to August 20, 2007), p. 7.)

373.  In sum, Ansar al-Islam/Ansar al-Sunnah owed its existence, and its success and ability to carry out this sophisticated IED attack on April 9, 2008, to the material support provided by Iran through the Iranian Ministry of Intelligence & Security, Iranian Islamic Revolutionary Guard Corps, and the Qods Force. *Id.*, PX1000, pp. 29-30.

### f.  Attack # 6: Plaintiffs Joshua Dale Coy and Estate of Adam Michael Malson

#### i.  *February 19, 2005 – Suicide Attack in Baghdad*

374.  On February 19, 2005, U.S. Army First Lieutenant Adam Malson was killed and Specialist Joshua Coy was injured in a personnel-borne IED attack (aka, a suicide bomber) near a mosque in the Kadhimiya District of Baghdad. ECF No. 100, SAC, ¶¶ 3554-3571; PX1622, Coy Fact Sheet; PX1612, Coy Decl.; PX1600, Ops Report.

375.  On that day, Malson and Coy's unit was providing security patrol when they heard a call over the radio that some Iraqi soldiers had been attacked by mortars and were at the local Kadhimiya hospital; the unit proceeded to the hospital to check on the casualties. Day 2 Tr., 283:25-284:22.

376.  The unit was at the hospital for about 20 minutes when they started getting calls over the radio that there was another attack down the road at the mosque; the unit proceeded to the area of that attack. *Id.*, 285:3-15.

377.  That day was Ashura, a major religious holiday for the Shia sect of Islam, and thousands of Shia pilgrims from all over the country had traveled by bus to the mosque to celebrate the holiday. *Id.*, 289:25-290:5, 341:20-22, 343:5-8.

378.     The unit had received information over the radio that there were suicide bombings and small arms fire near the mosque. *Id.*, 286:12-13.

379.     When they arrived, they saw "multiple casualties laying on the ground," "a bus that was on fire," and "multiple Iraqi police vehicles that were on fire." *Id.*, 286:14-17.

380.     Once the unit arrived, however, "the attacks ceased" and "[i]t got quiet." *Id.*, 286:18-19.

381.     They dismounted the vehicle to check on the civilians. *Id.*, 296:20-21.

382.     Malson and the interpreter went to assist a female local national trapped in a car on fire. PX1622, Coy Fact Sheet, III.4; Day 2 Tr. 286:20-25.

383.     Coy went to assist an old man holding a child that had been terribly injured by the first suicide bomber. PX1622, Coy Fact Sheet, III.5; Day 2 Tr., 287:1-3.

384.     Coy realized he did not have his first aid kit, so he ran back to his vehicle. *Id.*, 287:4-10.

385.     When he got to the vehicle, a second suicide bomb detonated about 20 meters from the vehicle; Coy saw "saw a flash" and was "knocked unconscious." PX1612, Coy Decl., ¶ h; Day 2 Tr., 287:10-15.

386.     Coy received shrapnel wounds—specifically, a ball bearing went "from left to right under my thumb and c[a]me out under my pinky. Another ball bearing hit me in my thumb, thumb joint, and was actually fused there, and a ball bearing actually hit me in my leg." *Id.*, 288:4-9.

387.     Coy required surgery to remove the shrapnel and relieve the swelling. PX1622, Coy Fact Sheet, V.1.

388.     Malson and the interpreter were both killed in the explosion. Day 2 Tr., 289:9-16.

### ii.  *Al Qaeda/Al Qaeda in Iraq Committed the Attack*

389.     Al Qaeda/Al Qaeda in Iraq committed this attack. *Id.*, 290:10-12; 343:9-11; PX1622, Coy Fact Sheet, IV.1; PX1620, Expert Report/Decl., pp. 6-7.

390.     This conclusion is supported by several facts and factors, including: (1) the location of the attack; (2) the date of the attack; and (3) the tactics, techniques, and procedures (TTPs) used to carry out the attack.

391.     As for the location, the attack occurred in a Sunni neighborhood where Al Qaeda had "freedom of movement and a permissive environment from which to launch attacks;" indeed, Al Qaeda was the dominant Sunni organization in that area at that time. Day 2 Tr., 290:7-9, 343:1-4, 344:5-7.

392.     Moreover, the attack occurred near a Shia mosque on a major Shia holiday (Ashura). Military intelligent expert M. Lee Walters explained: "Knowing that there would be thousands of Shia pilgrims that go to the mosque during Ashura to celebrate, that served as a prime location from which to attack." *Id.*, 343:5-8.

393.     As for the TTPs, Al Qaeda in Iraq "was the only organization that would employ suicide bombers," "so that was a specific tactic that Al Qaeda was known for." *Id.*, 344:8-15.

394.     Furthermore, the complexity of the attack—"blowing up a suicide bomber" near the mosque, anticipating there would be a response, and waiting for that response—is "a hallmark of Al Qaeda in terms of" demonstrating "their discipline in planning," knowing they could "perform a high profile attack against U.S. forces in attacking that response force." *Id.*, 344:20-345:4.

395.     The battalion commander, in his sworn declaration, confirmed the attack was likely committed by Al Qaeda in Iraq based on the following information: the attack was "a complex attack that was well coordinated"; "the insurgents planned to kill Shia pilgrims and then attack and kill the responding coalition forces while rendering aide to the wounded and killed"; "they demonstrated tactical discipline and waited until the time was right;" Al Qaeda in Iraq was the "dominant Sunni terrorist group" in the area; and the attack displayed tactics, techniques, and procedures unique to that group. PX1601, Spiszer Decl., ¶¶ l, n, r.

396.     Al Qaeda in Iraq owed its success and its ability to carry out this well-coordinated attack to the material support provided by Iran through the Iranian MOIS, the IRGC, and the IRGC-Qods Force. Day 2 Tr., 348:4-352:16; PX1620, Expert Report/Decl., pp. 6-7, 16-17.

### g.   Attack # 7: Plaintiff Endi Cisneros Herrera

#### i.   *September 17, 2006 – EFP in Baghdad*

397.     On September 17, 2006, U.S. Army Specialist Endi Herrera was injured by an explosively formed penetrator (EFP) in the Adhamiya District of Baghdad. ECF 100, SAC at ¶¶ 2019-2025; PX1706, Herrera Fact Sheet; PX1701, Herrera Decl.; PX1700, Ops Report; Day 2 Tr., 352:23-353:3.

398.     Herrera was on active duty as a specialist in the U.S. Army and was part of the "quick reaction force" in the Sadr City area of Baghdad. Day 2 Tr., 292:1-15, 292:2-9.

399.     On the day of the attack, Herrera was in a Stryker vehicle, which was part of a four-vehicle convoy. *Id.*, 294:5-8.

400.     His unit received a call about another platoon getting hit by mortars, so his unit moved to the area of the attack to assist. *Id.*, 294:18-23.

401.     Herrera was in gunner position in the rear vehicle of the convoy. *Id.*, 294:24-25.

402.     The convoy slowed down to turn onto Route Copper when they were hit by an explosion that knocked Herrera back and rendered him unconscious; he woke up choking on smoke. *Id.*, 295:1-5

403.     As he came to, he noticed his ballistic shield window had been shattered and he "was getting shot at"; he returned fire but "couldn't see much because the smoke was just burning my eyes." *Id.*, 295:6-12, 296:2-5.

404.     He communicated with other vehicles using a red flag to signal "no communications, vehicle is down, and we've got casualties." *Id.*, 295:13-21.

405.      He assessed his crew for injuries and "noticed that Sergeant Davis, our medic, was killed in the initial blast." *Id.*, 296:6-16.

406.     At the time, Herrera did not appreciate the extent of his injuries, but as soon as he "stepped out of the Stryker with my right leg, I couldn't bring pressure, and I just collapsed. I had taken some shrapnel to my right knee." *Id.*, 296:19-25.

407.     Herrera sustained severe injuries to his back and left arm; as a result, he later had to undergo surgery on his left arm and four back surgeries. *Id.* 296:1-8.

408.     The type of weapon used in the attack was an explosively formed penetrator (EFP). *Id.*, 296:16-21.

409.     The fact that the weapon was an EFP has been confirmed in multiple ways.

410.     Prior to this attack, Herrera had seen other vehicles hit by EFPs, and the damage his Stryker sustained was consistent with that prior EFP-caused damage. *Id.*, 296:22-24.

411.     Moreover, shrapnel from the explosion lodged in Herrera's magazine pouch attached to the left side of his vest, and a post-attack investigation confirmed the shrapnel is copper—the very type of material used to manufacture EFPs. *Id.*, 298:13-22.

412.     Herrera's platoon leader confirmed his convoy "got hit with six EFPs daisy-chained together," as did the military intelligence person in Herrera's vehicle. *Id.*, 298:3-13.

413.     The Ops Report of this attack identified the weapon as a "shaped charge," and EFPs are shaped charges. *Id.*, 354:4-20; PX1700, Ops Report.

            *ii.   Shia Militia Groups Committed the Attack*

414.     This attack was executed by Shia militia groups aligned with and supported by Iran. Day 2 Tr., 352: 16-20; PX1705, Expert Report/Decl.

415.     The attack occurred in an area where "Shia militia groups would have free range and freedom of movement and a permissive environment from which to conduct attacks." Day 2 Tr., 356:5-23.

416     The use of an EFP "was very unique and only given to Shia militia groups from Iran. So that was a telltale TTP attack method by Shia." *Id.*, 357:3-7.

417.     Moreover, as explained by military intelligence expert M. Lee Walters, "that fact that they hit the last vehicle in the convey" "demonstrates some discipline in that they wouldn't try to hit the first vehicle because then there would be a friendly force available to respond. If you hit the last vehicle, there's a chance that the other vehicles will move out of the area of the attack and be less likely to be able to respond." *Id.*, 357:8-15.

418.     Official government reports establish Iran's involvement and support for EFP attacks in Iraq. *Id.*, 357:18-21.

419.     During a press briefing given by Major General Caldwell representing the Multi-National Force Iraq, which was the four-star headquarters in Iraq, General Caldwell explained that EFPs are manufactured in Iran, "[i]t's clear that Iranians are involved, and it's clear that materials from Iran are involved." *Id.*, 357:22-358:9; PX336, Press Briefing.

420.     During another press briefing, in June 2007, Major General Lynch, who commanded the division south of Baghdad known as MNG-Center, stated: "And the EFP technology and EFP munitions are clearly coming from Iran." PX333, Press Briefing; Day 2 Tr., 358:14-24.

421.     Information obtained through interrogations of Qayis Khazali, a leader of one of the Shia militia groups in Iraq, provided information connecting "Iran and Shia militia groups as well as the technology that was being transferred from Iran to Shia militia groups." This confirms Iran's support for Shia militia groups operating in Iraq during around this timeframe. *Id.*, 359:6-22.

422.     By April 2006, EFPs had proliferated throughout the Iranian-supported Shia militia groups. *Id.*, 360:17-22.

423.     In fact, Herrera's unit had "done a raid on a safe house" and had encountered Shia militia insurgents "as well as some Iranian officers who were there helping them create EFPs;" specifically, the Iranian officers "were showing them how to build those EFPs." *Id.*, 299:21-25, 300:7-11.

424.     Military intelligence expert Mr. Walters determined that "the attack was conducted by a Shia militia group with an EFP" "that was provided by Iran to conduct the attack" and the insurgents "received training" from Iran "in order to accomplish the attack." *Id.*, 361:2-18.

### h. Attack # 8: Plaintiffs Raleigh James Heekin, III, and Estate of Joshua Ryan Hager

#### i. February 22, 2007 – Pressure Plate IEDs in Ramadi

425.     On February 22, 2007, multiple pressure-plate-activated IEDs exploded in Ramadi, killing U.S. Army Staff Sergeant Joshua Hager and injuring Sergeant First Class Raleigh Heekin. ECF No. 100, SAC at ¶¶ 1738-1758; PX1824, Heekin Fact Sheet; PX1804, Heekin Decl.; PX1800, Ops Report; PX1801, Storyboard.

426.     That night, Hager's vehicle was in a convoy heading back to base when it hit a pressure-plate IED. When "the weight of the vehicle hit the contacts, it was enough weight that it caused the explosion to happen underneath his vehicle." Hager was in the front passenger seat of the vehicle, and he was killed in the explosion. Day 2 Tr., 367:1-16.

427.     Heekin was with his platoon when they heard the explosion and then received "a broken radio signal from the battalion commander's convoy saying that they had ten urgent surgical wounded." *Id.*, 305:2-6.

428.     Heekin's unit "linked up with our overwatch convoy that was already on the road, and we moved to the location of the blast in order to medevac any casualties." *Id.*, 305:13-17.

429.     The convoy had three vehicles; Heekin's was in the second vehicle. *Id.*, 305:21-25.

430.     When they got to the area of the first blast, they "lost communications with the lead vehicle." Heekin "ducked down inside of the vehicle to fiddle with the radios to get them working." He "got them working, and then I popped back up, and I noticed that we had driven past the lead vehicle of the convoy for the colonel." *Id.*, 306:3-11.

431.    When Heekin noticed that, he told his driver to stop, and they tried to turn the vehicle around. As the vehicle was turning, the inside back end of the vehicle "hit a pressure plate, which blew up through the bottom of the vehicle." *Id.*, 306:12-21.

432.    The blast itself knocked Heekin unconscious, and he took shrapnel to the back of his left knee and his left calf, which necessitated 23 separate surgeries. *Id.*, 307:14-21, 308:1-3.

433.    The medic in Heekin's vehicle died immediately. He "was cut in half," and his "upper torso was launched out of the top hatch of the vehicle." The "driver was alive for several hours on site and then died later the next morning." *Id.*, 308:6-17.

*ii.   Al Qaeda/Al Qaeda in Iraq Committed the Attack*

434.    The multiple pressure-plate IED attack was committed by Al Qaeda in Iraq. PX1824, Heekin Fact Sheet, IV.1; PX1804, Heekin Declaration; PX1803, Ferry Declaration; PX1822, Expert Report/Decl., pp. 9-10.

435.    In fact, Heekin and Hager's battalion's mission at the time of the attack was to control the eastern side of the city of Ramadi and to prevent passage of Al Qaeda through the area. Day 2 Tr., 304:5-8.

436.    During that time period, "Al Qaeda in Iraq had claimed Ramadi as their capital. *Id.*, 304:19-20.

437.    For several months, including the time period of the attack, the battalion was "in constant fire fights every day" typically with Al Qaeda in Iraq insurgents. *Id.*, 308:10-18.

438.    Heekin was "told by my company commander and by several of the intelligence personnel within the battalion that there was one main IED maker in that area that was responsible for most of the IEDs that we were seeing. He was later captured by my unit"

along with his IED materials. The IED maker was connected to Al Qaeda in Iraq and was considered an Al Qaeda in Ira operative. *Id.*, 308:21-309:9.

439.     According to military intelligence M. Lee Walters, "the location, the TTP, [and] the type of weapon" confirm the attack was perpetrated by Al Qaeda in Iraq. *Id.*, 368:5-9.

440.     Mr. Walters explains: "So by the fact that…the enemy was able to bury two IEDs in the right spot where a coalition would be arriving and create the kind of damage that it did to particularly the armored vehicle suggests that it was a highly trained and highly resourced organization. Given that Al Qaeda was dominant in the area, that's where we draw our conclusion" that the attack was committed by Al Qaeda. *Id.*, 369:23-370:3.

441.     The battalion commander, in his sworn declaration, confirms that "Ramadi was a major AQI sanctuary and stronghold" and that the insurgents "had been well-trained and possessed expert knowledge in the use of improvised explosive devices." PX1803, ¶¶ 9-10.

442.     The battalion commander further explains that "[w]e found many caches in the area that contained weapons and IEDs which were determined to be of Iranian origin and production. The weapons were determined to be recently manufactured based on their condition and markings." *Id.*, ¶ 11.

443.     Mr. Walters determined that Iran's support for Al Qaeda increased the group's operating capacity thus allowing it to carry out attacks like the one that killed Hager and injured Heekin, and the group's successful execution of this well-coordinated attack was likely a result of the material support that Al Qaeda/AQI received from Iran through the MOIS and the IRGC-Qods Force. Day 2 Tr., 376:4-8; PX1822, Expert Report/Decl., pp. 9, 21-22.

**i.   Attack # 9: Plaintiff Philip Ryan Trimble**

*i.   March 23, 2008 - Rockets Launched from Sadr City into the Green Zone*

444.     On March 23, 2008, Easter Sunday, several 107 mm rockets were launched from Sadr City into the Green Zone in Baghdad, killing a civilian and wounding several others, including U.S. Army Specialist Philip Trimble. ECF No. 100, SAC at ¶¶ 1114-1128; PX1910, Trimble Fact Sheet; PX1907, Trimble Decl.; PX1900, Ops Report; PX1909, Expert Report/Decl.

445.     Trimble was stationed at Camp Travis across the street from the U.S. Embassy annex in the Green Zone of Baghdad. Day 2 Tr., 313:9-21.

446.     Trimble had been there for about seven months, and during that time there were very few attacks in that area in the Green Zone; that all changed on Easter Sunday 2008, which marked the beginning of a near-daily barrage of rocket attacks. *Id.*, 313:22-314:11.

447.     At the time of the subject attack, Trimble was at Camp Travis, having just finished a mission and getting cleaned up in his barracks. *Id.*, 314:15-20.

448.     He was taking a shower when the alarms started going off, so he made his way to the bunker. *Id.*

449.     When he got outside, a rocket hit nearby, sending him flying back and knocking him unconscious. *Id.*, 314:22-315:16.

450.     A friend of his got Trimble to his feet, and they made their way to the bunker, where Trimble received first aid. *Id.*, 315:11-25.

451.     Trimble was hit in the leg with a piece of shrapnel that had to be removed by a doctor. *Id.*, 316:1-5.

452.      In addition, as a result of the attack, Trimble suffered a traumatic brain injury, has tinnitus, and has severe PTSD. *Id.*, 316:3-6.

453.      Multiple others were injured, and one civilian contractor was killed by the barrage of rockets fired at the Green Zone that Easter Sunday. *Id.*, 316:7-11.

i.   *Shia Militia Groups Committed the Attack*

454.      The rockets fired at the Green Zone that Easter Sunday were 107 mm rockets. *Id.*, 377:4-13.

455.      According to the official indirect fire report, the rocket fire originated from Sadr City, as determined by the munition warning system, which uses radar to locate the point of origin of the rockets. *Id.*, 377:23-25, 379:4-23; PX1901, IDF Report.

456.      At the time, Sadr City "was a Shia-dominated neighborhood and, therefore, provided freedom of movement really for Shia militia groups." Day 2 Tr., 380:2-4.

457.      Military intelligence expert M. Lee Walters analyzed the available information and concluded that "Iran had been providing support to the Shia militia groups likely responsible for this attack." *Id.*, 381:4-7; PX1909, Expert Report/Decl., pp. 8-9. His conclusion was supported by a number of official government reports and statements.

458.      For instance, a sergeant working at the U.S. Embassy for the Office of Regional Affairs "reported in a statement that it was an Iranian-supported attack from the special groups" that committed what "was oftentimes called the Easter Sunday bombings, rocket attack." Day 2 Tr., 381:10-16.

459.      General Petraeus, in 2007, testified before Congress connecting Iranian training and funding to Shia militia groups that allowed them to commit this kind of attack. *Id.*, 381:17-20.

460.     General Bergner, Department of Defense spokesman in Iraq, pointed out in July 2007 the IRGC was "specifically responsible for training these Shia militia groups" in using "these weapons systems." *Id.*, 381:21-382:1.

461.     Less than three weeks before the Easter Sunday attack, the Department of Defense gave a press briefing describing a large cache of weapons, which included 107mm rockets, that were assessed to have been produced in Iran sometime in 2007. PX321, DOD News Briefing; Day 2 Tr., 382:3-12.

462.     Three days after the subject attack, General Bergner outlined the threats against the Green Zone by militias firing 107mm rockets, and he directly connected those rocket attacks to IRGC Qods Force-backed Special Groups. PX345, DOD Press Conference; PX1909, Expert Report/Decl., p. 11.

463.     A week after the attack, General Bergner reinforced the point he made days before: "This violence included indirect fire attacks fueled by Iranian-backed special group criminals that targeted the Baghdad neighborhoods and the International Zone." PX392, DOD Press Conference.

464.     Indeed, Trimble and others were given a briefing by their platoon leader and company XO, who said the rockets were coming from Sadr City, which was controlled at the time by Shia militia groups. *Id.*, 316:12-23.

465.     Trimble also attended multiple briefing, both before and after this attack, about Iran, and it was understood "that Iran was providing money and weapons and training" to Shia militia groups in the area. *Id.*, 317:3-10.

466.     The foregoing information—along with other evidence set forth in their report and declaration—led Mr. Walters to conclude that the Easter Sunday attack was likely carried

out by Shia militia groups with Iran's support, including training, weapons, and funding. *Id.*, 384:25-385:3; PX1909, Expert Report/Decl., pp. 17-18.

**j.   Attack # 10: Plaintiff Estate of Adam J. Kohlhaas**

*i.   April 21, 2008 – Pressure-Plate IED in Salah ad Din Province*

467.     On April 21, 2008, in the Salah ad Din Province, Sergeant Adam Kohlhaas was killed when his vehicle was struck by a pressure-plate IED. ECF No. 100, SAC at ¶¶ 1065-1074; PX2016, Kohlhaas Fact Sheet; PX2001, Behenna Decl.; PX2000, Ops Report; PX2015, Expert Report/Decl.

468.     His platoon was conducting clearing operations in the region to defeat Al Qaeda. Day 2 Tr., 385:23-386:386:1.

469.     He was in a mine-resistant ambush-protected vehicle (MRAP)—a type of vehicle designed in response to, and to maximize the protection against, IEDs. Such a vehicle weighs between 14 and 18 tons. *Id.*, 386:1-14.

470.     The vehicle "drove over a pressure plate IED," which was buried underground, "and the force of the IED was so strong it literally flipped the vehicle onto its side. The force of the impact killed Sergeant Kohlhaas and another member of the platoon." *Id.*, 386:15-21; PX2000, Ops Report.

*ii.   Al Qaeda/Al Qaeda in Iraq Committed the Attack*

471.     The IED was likely placed by Al Qaeda/Al Qaeda in Iraq.

472.     According to the Ops Report, this was the "second IED on this route [the road to travel to Salam Village] this month and the fourth in the past two months." The "local populace near the scene of the incident claim that they never travel this road for fear of the explosives that are buried or hidden." *Id.*

473.        This area was dominated by Al Qaeda in Iraq at that time. Day 2 Tr., 388:4-23.

474.        Indeed, Al Qaeda "was able to operate with some impunity" in a "semipermissive

environment." "So given the fact that it was in that area of Salah ad-Din and along the

Euphrates River, and it was a key route to get to Baghdad, it's reasonable to assess that Al

Qaeda was in that area and could operate in the area and bury those IEDs." *Id.*

475.        The well-respected journalist Bill Roggio, in his reporting, "specifically talked"

about the fact that this was an area of Iraq where the U.S. "still had the Al-Qaeda issue that

they had to deal with." *Id.*, 388:24-389:5.

476.        The TTPs further support the conclusion that Al Qaeda committed the attack:

"[T]he enemy was able to, one, emplace IEDs and not have them found but, secondly, find

an IED large enough to create the kind of damage it did to this MRAP, this 14-ton vehicle."

*Id.*, 389:6-13.

477.        According to the military intelligence expert Mr. Walters, the IED was "delivered

and ideally located and buried to create the most maximum effect. So it demonstrates

training. It demonstrates understanding of tactics and understanding of U.S. operations and

U.S. capabilities." *Id.*, 389:14-19.

478.        Furthermore supporting the conclusion that Al Qaeda committed the attack is the

sworn declaration of the platoon leader. PX2001, Behenna Decl.

479.        He was leading the patrol at the time of the attack and was actually present during

the attack against his unit that killed Kohlhaas. Day 2 Tr., 389:20-390:2.

480.        The platoon leader would have "understood the enemy threat," which was Al

Qaeda. *Id.*, 390:3-9.

481.     In his declaration, he stated, "It was well known by my battalion chain of command, the battalion intel personnel, and all within the battalion, to include my platoon, that Al Qaeda and/or Al Qaeda in Iraq were the dominant insurgent force in our area." *Id.*, 390:10-14; PX2001, Behenna Decl., ¶ o.

482.     The platoon leader in fact possessed "two intelligence reports that attribute the attack that killed Kohlhaas to AQ/AQI." *Id.*

483.     An official memorandum from the commanding general of the Multi-National Corps of Iraq "provided a detailed description of Al Qaeda in Iraq activities in the same exact area the day before the attack that killed Sergeant Kohlhaas." Day 2 Tr., 390:25-391:12.

484.     The foregoing, as well as additional information detailed in Mr. Walters' expert report and declaration, confirm the attack was likely carried out by AQ/AQI with the support the group had been receiving from Iran. *Id.*, 391:16-19; PX2015, Report/Declaration, pp. 11-21.

### k.   Attack # 11: Plaintiff Steve Nunez

#### i.  *April 5, 2005 – VBIED in Baghdad*

485.     On April 5, 2005, Staff Sergeant Steve Nunez was injured in a vehicle-borne IED attack (VBIED) in the Dora neighborhood of Baghdad. The VBIED also killed Corporal Glen Watkins. ECF No. 100, SAC at ¶¶ 3392-3400; PX2110, Nunez Fact sheet; PX2102, Nunez Decl.

486.     On the day of the attack, Nunez was the truck commander in a Humvee at the tail of a four-vehicle convoy conducting patrols in Dora and checking water facilities. Day 3 Tr., 429:10-430:20, 431:12-25.

117

487.     The convoy located the water facility they were looking for, which was across the street from a tree nursery. Nunez received a call over the radio that there was a blue Chevy Caprice on the side of the road in front of the nursery. *Id.*, 433:13-434:12, 435:10-14.

488.     When Nunez's vehicle approached the Chevy Caprice, it was running, the windows were blacked out, and nobody appeared to be inside. *Id.*, 435:23-436:15.

489.     Nunez was about to investigate the vehicle when he sensed something was not right. He told the driver of his vehicle to hit the gas and tried to pull Corporal Watkins down from the gunner's hatch when the VBIED detonated. *Id.*, 436:21-437:2.

490.     The explosion threw Nunez's vehicle and snapped the frame in half. Nunez was temporarily knocked out. *Id.*, 437:13-438:9.

491.     Nunez checked on his soldiers and saw that Watkins was dead. Despite being dazed and injured, Nunez helped the other soldiers out of the Humvee and positioned them behind it. The rest of the convoy returned to Nunez's position and provided security and aid. *Id.*, 438:16-440:7.

492.     As a result of the attack, Nunez suffered a broken foot, and was medevacked to the United States for treatment. He was later diagnosed with a traumatic brain injury and PTSD. He received a Purple Heart for his injuries. *Id.*, 440:17-441:17, 443:8-444:3; PX2102, Nunez Decl., ¶¶ h, i, n.

### ii.   *Al Qaeda/Al Qaeda in Iraq Committed the Attack*

493.     Al Qaeda/Al Qaeda in Iraq (AQ/AQI) committed this attack. Day 3 Tr. 577:17-578:21; PX2102, Nunez Decl., ¶ l; PX1003, Pregent Expert Report/Decl., pp. 45-52.

494.     To analyze this attack, expert Michael Pregent created several maps, based on Significant Activity (SIGACT) reports, to show the terror group activities, weapons caches,

high value targets, foreign fighter and insurgent activities, tactics techniques and procedures (TTPs), and other significant data points around the time and date of the attack in question. Day 3 Tr., 578:3-21; PX1003, Pregent Expert Report/Decl., pp. 45-52.

495.     The maps, which are included in Mr. Pregent's report, show that AQ/AQI had a permissive environment and was the dominant and controlling group in the Dora Neighborhood on and around April 5, 2005. *Id.*, pp. 47-52.

496.     Specifically, the mapping data shows significant AQ/AQI activity in the area from the year before to the year after the attack; a significant number of weapons caches seized; and multiple reports of foreign fighter presence in the area, a signature of AQ/AQI. Day 3 Tr., 580:11-582:8; PX1003, Pregent Expert Report/Decl., pp. 47-51

497.     Perhaps most persuasively, a significant number of suicide bomb and vehicle borne improvised explosive devices, another signature of AQ/AQI attacks, were reported during this same time period. Also of importance is the close proximity of the Iskan Al Sha'ab Mosque, a known AQ/AQI safe haven, as well reports of an AQI command cell that was operating in Dora. This demonstrates that AQ/AQI had primacy and control such that it felt Dora was a secure place for them to hide weapons and harbor top AQ/AQI leaders. Day 3 Tr., 577:17-578:7, 579:15-580:7, 582:9-25; PX1003, Pregent Expert Report/Decl., pp. 46. 50, 52.

498.     The Dora neighborhood had a majority Sunni population on the date of the attack, which would have allowed AQ/AQI's to operate freely. The SIGACT reports and corresponding maps confirm AQ/AQI had primacy and control, allowing them freedom of movement and a permissive environment in which to conduct attacks. Day 3 Tr., 578:3-579:24, 580:11-24, 584:10-21; PX1003, Pregent Expert Report/Decl., pp. 45-52.

499.     AQ/AQI owed its success and ability to carry out this attack to the material support

provided by Iran through the Iranian MOIS, IRGC, and IRGC-Qods Force. Day 3 Tr.,

581:7-9, 583:13-585:9, PX1003, Pregent Expert Report/Decl., pp. 20-27, 45-52.

**l.   Attack # 12: Plaintiff Estate of Taylor Prazynski**

*i.   May 9, 2005 – Precision Mortar Fire in Karma, Al Anbar Province*

500.     On May 9, 2005, Lance Corporal Taylor Prazynski was stationed at Forward

Operating Base OP4 outside of Fallujah in the Al Anbar Province of Iraq. His unit's

mission was to provide security and hunt down terrorists, including Al-Zarqawi, who was

believed to be in the area at the time. ECF No. 100, SAC at ¶¶ 3246-3256; PX212,

Prazynski Fact Sheet; PX2203, Siewert Decl.; PX2202, Jenkins Decl.

501.     Prazynski and Lance Corporal Marcus Mahdee were providing security for OP4 in

a 7-ton truck facing the entrance. Day 3 Tr., 456:5-25, 460:13-461:4; PX2202, Jenkins

Decl., ¶¶ f & g; PX2203, Siewert Decl., ¶ f.

502.     While they were providing security, OP4 began to receive mortar rounds. Prazynski

and Mahdee attempted get to the building at OP4 for better cover. The distance between

their truck and the building was fairly small, just big enough to get Humvees in and out.

Despite the small area, while Prazynski and Mahdee were attempting to change cover, a

mortar struck right next to them, sending shrapnel up inside their flak vests. Day 3 Tr.,

454:16-22, 459:2-460:1; PX2202, Jenkins Decl., ¶ g & h; PX2203, Siewert Decl. ¶ f & i.

503.     Both Prazynski and Mahdee died as a result of their wounds. PX2202, Jenkins

Decl., ¶ g.; PX2203, Siewert Decl., ¶ h.; PX2205, Report of Casualty for Taylor Prazynski.

504.     The mortar fire that struck OP4 and killed Prazynski and Mahdee was described by

witnesses as very accurate, with every round striking within the small area between the

truck and the building at OP4. Day 3 Tr., 459:17-460:1; PX2202, Jenkins Decl., ¶ h; PX2203, Siewert Decl., ¶ i.

505.     The day after the attack, Lance Corporal Nick Siewert was part of a team that went to track down the point of origin of the mortar fire, using back-azimuth calculations from the mortar craters, to find the terrorists who committed the attack. The team was able to locate the origin site, and they waited to catch the terrorists. After waiting for some time, a car arrived carrying four military-age men. Two of the men got out with AK-47s and began to set up a mortar plate and tubes. When the team saw the weapons, they engaged the men, killing two while the other two ran into nearby houses. Day 3 Tr., 461:5-464:23.

506.     The team called for a Quick Reaction Force to assist them. Once it arrived, the team entered the houses. The locals told them the two individuals who had escaped were not Iraqi but instead foreigners. The foreigners had removed the license plates from the car. The team was later told by someone with knowledge that the plates were for non-residents. *Id.*, 464:24-466:3.

### ii.   Al Qaeda/Al Qaeda in Iraq Committed the Attack

507.     Al Qaeda/Al Qaeda (AQ/AQI) in Iraq committed this attack. Day 3 Tr., 585:10-21; PX1003, Pregent Expert Report/Decl., pp. 53-63.

508.     To analyze this attack, expert Michael Pregent reviewed SIGACT reports of terrorist activity at and around the area and date of the attack, and created maps demonstrating his findings. Day 3 Tr., 591:12-19; PX1003, Pregent Expert Report/Decl., pp. 56-63.

509.     The maps show AQ/AQI had a permissive environment and was the dominant and controlling group in Al Anbar Province on and around May 9, 2005. *Id.*, pp. 53-63.

510.     The mapping data shows significant AQ/AQI activity in the area from the year before to the year after the attack; a significant number of high value targets captured; numerous weapons caches; and reports of foreign fighters in the area, a signature of AQ/AQI. Day 3 Tr., 585:22-586:9; PX1003, Pregent Report/Decl., pp. 56-62.

511.     Importantly, OP4 was situated directly along one of the key foreign fighter facilitation routes that AQ/AQI used to keep a fresh flow of terrorists into Baghdad. Furthermore, the area was part of Al-Zarqawi's "Baghdad Belt" strategy to exert influence on Baghdad and maintain a steady supply of weapons and fighters. Day 3 Tr., 585:22-586:9; PX1003, Pregent Report/Decl., pp. 53-54, 57.

512.     According to Lance Corporal Siewert, one of their unit's top priorities was capturing Al-Zarqawi, a top AQ/AQI leader, who was reported to be operating in the area. Mr. Pregent confirmed that Al-Zarqawi operated frequently out of Al Anbar province and specifically Fallujah. It was there that Al-Zarqawi felt most comfortable and could come and go as needed. The area was a permissive environment for AQ/AQI, enabling them to conduct attacks, such as the one that killed Prazynski and Mahdee. Day 3 Tr., 452:24-453:9, 586:21-587:4; PX1003, Pregent Report/Decl., pp. 53-63.

513.     Mapping data also demonstrates a significant number of suicide bomb and vehicle borne improvised explosive devices—an AQ/AQI signature attack. *Id.*, 54, 60.

514.     Regarding the individuals who carried out the attack, the follow-on mission that found the terrorist is further proof of AQI's involvement. The townspeople questioned specifically stated that the individuals were not Iraqi. Instead they were foreign fighters, most likely from Syria, that used the foreign fighter facilitation routes that Hezbollah and the IRGC established and ran directly adjacent to OP4. Day 3 Tr., 588:6-12.

515.     The TTPs of the attack itself also indicate that highly trained individuals committed it. The mortar fire was very accurate, with all of the rounds falling within the same small area. Furthermore, a Q36 radar picked up the mortar fire and performed counter-battery fire, which the terrorists were able to evade. The level of skill required to successfully conduct the attack and then avoid counter-battery indicates it was carried out by highly trained AQ/AQI terrorists. *Id.*, 588:22-589:14; PX1003 Pregent Report/Decl., pp. 53-55.

516.     Al Qaeda in Iraq owed its success and the ability to carry out this well-coordinated attack to the material support provided by Iran through the Iranian MOIS, IRGC, and IRGC-Qods Force. Day 3 Tr., 591:12-592:8; PX1003, Pregent Expert Report/Decl., pp. 20-27, 53-63.

   **m.  Attack # 13: Plaintiff Paul Eric Haines**

   *i.   June 4, 2006 – IED in Salah al Din Province*

517.     On June 4, 2006, Sergeant Paul Haines was injured when an IED struck his tank while en route to a water treatment plant in the Salah al Din province of Iraq. ECF No. 100, SAC at ¶¶ 2182-2192; PX2303, Haines Decl.; PX2304, Sherman Decl.; PX2315, Haines Fact Sheet.

518.     Haines was the second tank in a two-tank convoy on the way to relieve a U.S. Army infantry unit at the water treatment facility and provide security there. The convoy travelled south on Main Supply Route 1 and then turned onto Route Causeway. As they approached the intersection, Staff Sergeant Avion Sherman in the lead tank noticed an Iraqi Army tank blocking the road. He was about to instruct them to move when the Iraqi tank got out of the way and move to the side of the road, which believed to be unusual since the Iraqi Army didn't normally keep vehicles there. Day 3 Tr., 474:12-475:16, 478:11-19; PX2303,

Haines Decl. paras f & g; PX2304, Sherman Decl., ¶¶ f, g, h.; PX2035, AR-15 Investigation, exhibit p. 9.

519.     Haines' tank was speeding back up when it was hit by a large IED that had been emplaced under the road. The IED was so powerful that it launched the tank into the air. Day 3 Tr., 479:17-480:18, 481:19-24, 482:19-25; PX2312, Photograph of blast seat; PX2305, AR-15 Investigation, exhibit p. 16, 63.

520.     The explosion severely wounded Haines. He sustained bone fractures and the loss of his left eye. The explosion also killed two soldiers in his tank. Day 3 Tr., 483:15-25, 485:3-487:20, PX2304 Sherman Decl., ¶ i.

521.     An investigation following the explosion found 400 meters of command wire that traveled up into a nearby palm tree to a rope tree seat. The trigger man had used an aiming point to time the detonation of the IED and make sure Haines' tank was directly over it. During the investigation, several local national workers were detained, who informed the investigators the terrorists had used a van to prevent anyone from seeing them as they dug under the road and emplaced the IED. The investigators also suspected that the individuals in the Iraqi Army tank may have had additional information or been complicit. PX2305, AR-15 Investigation, exhibit p. 16, 63; PX2312, Photograph of blast seat; PX2313, Photograph of tree seat and command wire; PX2314, diagram of scene of attack.

### ii.   Al Qaeda/Al Qaeda in Iraq Committed the Attack

522.     Al Qaeda/Al Qaeda in Iraq (AQ/AQI) committed this attack. Day 3 Tr., 592:16-593:6; PX1003, Pregent Expert Report/Decl., pp. 64-72.

523.     To analyze this attack, expert Michael Pregent reviewed SIGACT reports of terrorist activity at and around the area and date of the attack, and created maps

demonstrating his findings. Day 3 Tr., 592:16-593:10; PX1003, Pregent Expert Report/Decl., pp. 64-72.

524.     The maps show that AQ/AQI had a permissive environment and was the dominant and controlling group in the area around that time. *Id.*, 67-71.

525.     The mapping data shows significant AQ/AQI activity in the area from the year before to the year after the attack, with a particularly high number of attacks involving suicide bombs and vehicle borne improved explosive devices. In addition, a significant number of weapons caches were seized and there were multiple reports of foreign fighter presence in the area, a signature of AQ/AQI. Day 3 Tr., 593:11-595:3; PX1003, Pregent Expert Report/Decl.,, pp. 67-71.

526.     The location is also highly important, as only three days after the subject attack, Al-Zarqawi himself was killed in a nearby town. His presence indicates he felt the ability to move freely, signifying AQ/AQI primacy and a permissive environment. Day 3 Tr., 592:24-593:6, 594:17-21, 596:5-21; PX1003, Pregent Expert Report/Decl., p. 64.

527.     Furthermore, the attack occurred in the Salah al Din province near Tarmiyah and Taji. Both cities were part of Al-Zarqawi's "Baghdad Belt" strategy to exert influence on Baghdad and maintain a steady supply of weapons and fighters. Day 3 Tr. 598:5-12; PX1003, Pregent Expert Report/Decl., pp. 64-66.

528.     Of additional importance, the attack fell along an established lethal aid smuggling route for both the IRGC and MOIS. Day 3 Tr., 592:13-593:6.

529.     Finally, the TTPs also evidence AQ/AQI involvement. The IED that injured Haines was sophisticated enough to destroy a tank that was capable of handling regular IEDs. Haines testified that they had encountered IEDs previously and the worst that had happened

was the lid to his cooler was blown off. Otherwise the tanks were extremely difficult to defeat, and it would have required advanced knowledge to create the IED that destroyed Haines' tank. *Id.*, 479:4-11, 592:20-23, 597:3-17.

530.     AQ/AQI owed its success and its ability to carry out this well-coordinated attack to the material support provided by Iran through the Iranian MOIS, IRGC, and IRGC-Qods Force. Day 3 Tr., 598:13-599:5.

### n. Attack # 14: Plaintiffs Larry Diaz Cabral, Jr., and Robert Lee McCormick

#### i. *November 14, 2006 – EFP in Khadhimiya, Baghdad*

531.     On November 14, 2006, Sergeant First Class Cabral and Major Robert McCormick suffered injuries as a result of an EFP attack in the Kadhimiya District of Baghdad. ECF No. 100, SAC at ¶¶ 1909-1915; PX2403, Cabral Decl.; PX2404, McCormick Decl.; PX2417, Cabral Fact Sheet; PX2418, McCormick Fact Sheet.

532.     That morning Cabral set out in a Humvee with Colonel Felts to drive Felts from FOB Justice to Camp Liberty for a meeting with other commanders. Day 3 Tr., 500:23-501:4; PX2403, Cabral Decl. ¶ e.

533.     While en route to Camp Liberty, they passed through an unmanned checkpoint that was supposed to be the responsibility of the Iraqi Army. Felts was angry, and once at Camp Liberty he called the Iraqi Army officer in charge. Day 3 Tr., 502:13-22; PX2403 Cabral Decl. ¶ e.

534.     They left Camp Liberty to return to FOB Justice at about 11:00 p.m., and Felts decided to take a different route back because he wanted to check on another Iraqi Army checkpoint and make sure it was manned. Day 3 Tr., 503:4-19; PX2403 Cabral Decl. ¶ e.

535.    Cabral checked that the route was clear first over the radio and then proceeded. While they were driving, they heard a gunshot, which put them on edge, as it was after curfew. Later they noticed an Iraqi Humvee driving on a smaller road. It had its lights turned off, which they also found unusual. Day 3 Tr., 504:2-10, 505:3-13, 505:21-506:5. PX2403, Cabral Decl. ¶ e, f.

536.    The convoy approached the checkpoint, which was unmanned. It also had a different setup than any of the other checkpoints. Instead of the barriers being in a serpentine pattern that flowed left, right, left, it was the opposite. Felts instructed Cabral to proceed, so he did. Day 3 Tr., 506:14-507:8; PX2403, Cabral Decl. ¶ f.

537.    As Cabral was rounding the second barrier, the EFP exploded, penetrating the vehicle, injuring Cabral and killing Felts as well as Specialist Justin Garcia, who was in the gunner's position. Cabral attempted drive fast out of the kill zone, but the vehicle only lurched forward and then became inoperable. Day 3 Tr., 507:5-508:2, 515:2-5; PX2403, Cabral Decl. ¶ g; PX2404, McCormick Decl. ¶ h.

538.    A Quick Reaction Force was called, but one of the vehicles broke down and blocked their exit from FOB Justice. Without a tow available, they used straps to tie Cabral's Humvee to another vehicle, which then towed them. However, Cabral had to sit in the destroyed Humvee and steer it back to FOB Justice. All of the tires were flat, and it had no power steering since the engine had been destroyed. They had to go through other barriers and checkpoints, and it took almost an hour to get back to base. Day 3 Tr., 512:23-513:22. PX2403, Cabral Decl. ¶ f.

539.     Once at FOB Justice, McCormick met the convoy as it entered the base and escorted them in. He then began the initial assessment of the destroyed Humvee. There was flesh and blood all over the Humvee. PX2404, McCormick Decl. ¶¶ h, i.

540.     McCormick was severely traumatized by both the death of Felts and observing parts of his body still in the Humvee. McCormick had been particularly close with Felts and considered him a close friend and mentor. Felts had personally selected McCormick to train the brigade. He also experienced extreme guilt and regret, as he had asked Felts not to leave the base for his security and believed if he had been more insistent then he could have prevented Felts' death. McCormick went for counseling three days after Felts' death, and later was diagnosed with PTSD due to the incident. *Id.*, ¶¶ i, l, m, o.

541.     Cabral was awarded a Purple Heart for the injuries he suffered as a result of the attack. Later he was also awarded an Army Commendation Medal with "V" device for Valor in recognition of his actions taken that day following the attack. Day 3 Tr., 516:3-12; Cabral Decl., ¶ j.

### ii.   *Shia Special Groups Committed the Attack*

542.     Shia Special Groups, in concert with Hezbollah, committed this attack. Day 3 Tr., 599:14-601:16; PX1003, Pregent Expert Report/Decl., pp. 73-82.; PX2404, McCormick Decl. ¶¶ n, p.

543.     To analyze this attack, expert Michael Pregent reviewed SIGACT reports of terrorist activity at and around the area and date of the attack, and created maps demonstrating his findings. Day 3 Tr., 599:6-13; PX1003, Pregent Expert Report/Decl., pp. 76-82.

544.     The maps show Shia Special Groups had a permissive environment and were the dominant and controlling terrorists in the Khadhimiya district. *Id.*, pp. 74-75, 82.

545.     Specifically, the mapping data shows: significant Shia Special Groups activity from the year before to the year after the attack; a significant number of weapons caches seized; reports of high value targets in the area; and numerous EFP attacks, a signature weapon of the Shia Special Groups supplied by Iran. Day 3 Tr., 599:14-601:16; PX1003, Pregent Expert Report/Decl., pp. 73-74, 76-78, 80.

546.     In fact, there was another EFP attack just hours prior and less than a mile from the attack that hit Cabral's Humvee. Five days later there was another EFP attack again less than a mile from where Cabral's Humvee was hit. Day 3 Tr., 599:14-601:16; PX1003, Pregent Expert Report/Decl., pp. 73-74, 76, 77.

547.     Most importantly, the attack on Cabral was carried out using an EFP, which when combined with the location and time provides clear evidence that Hezbollah in concert with Shia Special Groups committed the attack. Day 3 Tr., 600:2-601:3; PX1003, Pregent Expert Report/Decl., pp. 73-82; PX2404, McCormick Decl., ¶¶ n, p.

548.     Moreover, Mr. Pregent testified that he investigated this attack while in Iraq and determined it was an EFP, and that the Iraqi Army was complicit in helping arrange the attack and most likely acted through the Badr Corps, one of the Shia Special Groups. Day 3 Tr., 600:2-18.

549.     The TTPs also point to well-equipped and well-trained Shia Special Groups. In particular, Cabral's convoy took an unplanned route, after dark, and was hit as it went through an unmanned Iraqi Army checkpoint. The ability to track and then attack Cabral's

convoy in those conditions is evidence of area overwatch, and significant infiltration of the Iraqi Army by Shia Special Groups. PX1003, Pregent Expert Report/Decl., pp. 73-75.

550.     Hezbollah and the Shia Special Groups owed their success and ability to carry out this well-coordinated attack to the material support provided by Iran through the Iranian MOIS, IRGC, and IRGC-Qods Force. Day 3 Tr., 599:14-601:16; PX1003, Pregent Expert Report/Decl., pp. 73-75.

### o. Attack # 15: Plaintiff Joel Tavera

#### i. March 12, 2008 – Rocket Attack in Dhi Qar Province

551.     On March 12, 2008, Specialist Joel Tavera was severely injured when his armored suburban took a direct hit from a 122-mm rocket. The attack also resulted in the deaths of Specialist Dustin Jackson, Staff Sergeant Juantrea Bradley, and Private First Class Tenzin Samten. ECF No. 100, SAC at ¶¶ 1129-1138; PX 2504, Tavera Decl., PX2514, Tavera Fact Sheet; PX2506, Lombardo Decl.; PX2505, Lloyd Decl.

552.     On that day, Tavera was stationed at Camp Adder outside of Nasiriyah in the Dhi Qar province of Iraq. Day 3 Tr., 534:21-25, 536:4-5; PX2504, Tavera Decl., ¶ e; PX2514, Tavera Fact Sheet, § III.

553.     In the early morning, a team was tasked with escorting local workers and guarding them. Tavera volunteered to take the place of a soldier who did not want to go. They set out towards the checkpoint to exit from Camp Adder in an up-armored Suburban. Day 3 Tr., 535:1-18; PX2504, Tavera Decl., ¶ g, h; PX2505, Lloyd Decl., ¶ g.

554.     Tavera felt the vehicle shake, as if there was an explosion nearby. He didn't think anything of it at the time. Day 3 Tr., 536:16-537:3.

555.     As they were driving, Tavera suddenly felt that something was about to happen. He took off his seatbelt and cracked the door a bit. Suddenly a 122-mm rocket struck their vehicle. Tavera felt extreme heat and a massive explosion. He was ejected from the vehicle due to his seatbelt being unbuckled and the door open. *Id.*, 537:11-538:11; PX2504, Tavera Decl., paras h, i.

556.     Captain Kevin Lombardo, who was in a vehicle behind Tavera's on a separate mission, saw the attack and ran to provide aid. When he got there, Tavera was on fire and severely wounded. He saw that Tavera's right foot was mangled, his bone exposed, his left eye gone, and his right eye was blown inwards. Part of Tavera's skull was missing, his left hand was contorted into a claw, and he had numerous burns. PX2506, Lombardo Decl., ¶¶ h, i, j.

557.     As a result of the attack, Tavera lost both eyes, his right foot, portions of his left hand, and had burns over 65% of his body, among other injuries. He has had to endure over 120 operations since the attack. Day 3 Tr., 540:13-541:11; PX2504, Tavera Decl., ¶¶ l, m, n; PX2514, Tavera Fact Sheet, § V.

### ii.  Shia Special Groups Committed the Attack

558.     The attack was committed by Hezbollah acting in concert with Shia Special Groups. Day 3 Tr., 601:17-602:10, 603:18-21; PX1003, Pregent Expert Report/Decl., pp. 83-93.

559.     To analyze this attack, expert Michael Pregent reviewed SIGACT reports of terrorist activity at and around the area and date of the attack, and created maps demonstrating his findings. Day 3 Tr., 601:17-20; PX1003, Pregent Expert Report/Decl., pp. 86-93.

560.     The maps show that Shia Special Groups had a permissive environment and were the dominant and controlling terrorists in the Dhi Qar Province. *Id*., pp. 85, 93.

561.     Specifically, the mapping data shows significant Shia Special Groups activity from the year before to the year after the attack; a significant number of weapons caches seized; reports of high value targets in the area; and numerous EFP attacks, a signature weapon of the Shia Special Groups supplied by Iran. Day 3 Tr., 602:19-603:5; PX1003, Pregent Expert Report/Decl., pp. 83-86.

562.     An intelligence assessment from March 31, 2008, document Iranian smuggling routes running directly through Nasiriyah. As explained by Mr. Pregent, Shia Special Groups would have had an interest in attacking US forces in order to protect those routes. It should be noted that intelligence assessment was made only 19 days after the attack on Tavera. Day 3 Tr., 601:17-602:10; PX1003, Pregent Expert Report/Decl., pp. 83-84.

563.     Furthermore, Mr. Pregent testified that Camp Adder was a base that was there specifically to curb the flow of Iranian weapons and influence, as well as deal with the Shia militias in the area. Day 3 Tr., 602:3-10.

564.     The mapping data evidences that the Shia Special Groups had primacy in the area and maintained freedom of movement and operational dominance. This permissive environment allowed them the ability to conduct attacks such as the one that injured Tavera and resulted in the deaths of several soldiers. *Id*., 602:19-5; PX1003, Pregent Expert Report/Decl., pp. 83-86.

565.     Hezbollah and the Shia Special Groups owed their success and ability to carry out this well-coordinated attack to the material support provided by Iran through the Iranian

MOIS, IRGC, and IRGC-Qods Force. Day 3 Tr., 601:17-602:10, 603:18-21; PX1003, Pregent Expert Report/Decl., pp. 83-85.

## CONCLUSIONS OF LAW

### X.    Personal Jurisdiction

566.    A federal district court has personal jurisdiction over a foreign state where service has been made under the FSIA. *See* 28 U.S.C. § 1330(b) ("[P]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction…where service has been made under section 1608 of this title."); *Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 175–76 (D.D.C. 2019).

567.    This Court has already ruled that service of process has been perfected on all Defendants in this case, thus the Court has personal jurisdiction over them. ECF No. 55.

### XI.    Subject Matter Jurisdiction and Liability for § 1605A(c) Claims

568.    Plaintiffs assert claims against Defendants under 28 U.S.C § 1605(A)(c) for Defendants' providing material support to the acts of extrajudicial killing that resulted in personal injuries and deaths.

569.    Plaintiffs consist of individuals who were injured or killed in the attacks (*i.e.*, direct victims of the attacks) and family members of those victims (*i.e.*, solatium claimants).

570.    Federal "district courts" "have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief *in personam* with respect to which the foreign state is not entitled to immunity" under the FSIA. 28 U.S.C. § 1330(a).

571.    Here, Plaintiffs requested a non-jury trial. *See* ECF No. 100, at ¶¶ 15-18. Plaintiffs' causes of action seek *in personam* relief against Defendants, in the form of compensatory

and punitive damages, interest, and attorneys' fees from each Defendant. *See id*.; ¶¶ 18; 34; 5711-5716; 5721-5724; 5729-5732; and paras. a-g at pp. 756-758.

572.     The pertinent sovereign immunity exception for this case is the state-sponsored terrorism exception under 28 U.S.C. § 1605A.

573.     For this exception to apply, two threshold requirements must be met. First, the foreign state must have been designated a state sponsor of terrorism at the time the lawsuit was filed and at the time the act of extrajudicial killing occurred. 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Second, the victims of the attack must have been U.S. nationals, members of the U.S. armed forces, or U.S. government employees or contractors at the time of the terrorist act. 28 U.S.C. § 1605A(a)(2)(A)(iii).

574.     The first requirement has been satisfied as to all the Defendants in this case. *See supra* Section VII.A.

575.     Similarly, the Court has already determined that claimants or victims of the attacks were, at the time of the attacks, U.S. nationals, members of the U.S armed forces, or employees or contractors of the U.S government. *See supra* Section VII.b. This includes the Plaintiffs who were direct victims of the bellwether attacks:

    a.   Salvador Beltran-Soto;

    b.   Richard Foster;

    c.   Alexander Bryant;

    d.   Anthony Ferris;

    e.   Franklin Doss;

    f.   Estate of Dale Burger;

    g.   Joe Sanchez, Jr.;

h.  Curtis Mighaccio;

i.  Samuel Williams,;

j.  Shane Housmans;

k.  Estate of Jonathan Bowling;

l.  Juan Rubio;

m.  Andrew Rothman;

n.  Estate of Tromaine Toy;

o.  Estate of Randy Stevens

p.  Estate of Robert Briggs;

q.  Jose Jauregui.

r.  Estate of Anthony L. Capra, Jr.

s.  Joshua Dale Coy;

t.  Estate of Adam Michael Malson;

u.  Endi Cisneros Herrera;

v.  Raleigh James Heekin, III;

w.  Estate of Joshua Ryan Hager;

x.  Philip Ryan Trimble;

y.  Estate of Adam J. Kohlhaas;

z.  Steve Nunez;

aa. Estate of Taylor Prazynski;

bb. Paul Eric Haines;

cc. Larry Diaz Cabral Jr.;

dd. Robert Lee McCormick; and

ee. Joel Tavera.

576.     Accordingly, the Court now turns to the remaining jurisdictional questions, addressing whether Plaintiffs injuries and deaths were "caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act" by an "official, employee, or agent of" Iran. 28 U.S.C. § 1605A(a)(1). *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 78 (D.D.C. 2018). For the reasons explained below, the Court concludes as follows: (1) the bellwether attacks constituted acts of "extrajudicial killing"; (2) Iranian officials and their agents provided "material support or resources" for these acts within the meaning of 18 U.S.C. § 2339A; and (3) Iran's provision of material support caused the injuries and deaths of the victims and claimants in the bellwether attacks. Plaintiffs' claims therefore fall within the state-sponsored terrorism exception of 28 U.S.C. § 1605A(a)(1).

    *i. "Act of extrajudicial killing"*

577.     In defining "extrajudicial killing," the FSIA looks to the Torture Victim Protection Act of 1991 ("TVPA"). 28 U.S.C. § 1065A(h)(7). The TVPA defines the "extrajudicial killing" to mean "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73. The D.C. Circuit has explained this definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770.

578.     "A deliberated killing is simply one undertaken with careful consideration, not on a sudden impulse." *Force v. Islamic Republic of Iran,* 464 F. Supp. 3d 323, 363 (D.D.C.

2020). The sophistication of an attack and the planning required to carry it out—e.g., "with intelligence gathering, by selecting the site; with logistics, by purchasing the [weapon]; [or] operationally by training to commit the attack"—are indicative of deliberation. *See Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2020 WL 7042842, at *12 (D.D.C. Nov. 30, 2020).

579.     The evidence Plaintiffs have offered satisfies this requirement. The autopsy, casualty, and death reports for those killed in the bellwether attacks show they sustained homicidal wounds, including blast injuries, and gunshots to the head and body at close range. Other characteristics of the attacks indicate deliberation, prior planning, and sophistication. The attacks involved complex and dastardly tactics intended to maximize lethality, including using false intelligence to lure the victims into the "kill zone," wounding soldiers in order to instigate a response that would provide the attackers with more victims to attack, creating barriers or blocking escape routes, targeting living quarters, using booby traps and sophisticated anti-tampering IED devices, enlisting suicide bombers, attacking during religious holidays and in densely crowded public spaces or high-traffic areas, and using churches and mosques as locations from which to launch the attacks.

580.     As detailed above in the Courts factual findings, Plaintiffs' experts offer evidence that each attack was carried out by a terrorist organization. Moreover, none of the groups to which the attacks are attributed have denied their responsibility for the attacks. Day 1 Tr., 223:15-224:19. The autopsy reports and death certificates for Plaintiffs who were killed further establish that the manner of death was "homicide." *See* PX1257; PX1316; PX1427; PX1439; PX1446; PX1458; PX1504; PX1515; PX1604; PX1610; PX1806; PX1812; PX2005; PX2206; PX2207. Casualty reports for the dead and wounded in these

attacks also characterize the actions against Plaintiffs as "hostile." *See* PX1233; PX1430; PX1445; PX1504; PX1514; PX1603; PX1802; PX2004; PX2205l. This evidence is sufficient for the Court to conclude that none of these attacks were authorized by a previous judgment from a regularly constituted court. *See Schwartz*, 2020 WL 7042842, at *12.

581.    Courts considering attacks involving the same groups, weapons, and tactics as those involved in the bellwether attacks have found those attacks to meet the definition of extrajudicial killing. For example:

    a.    *EFP attacks*: "[T]he thought and consideration required to conduct an EFP attack are hallmarks of deliberation." *Roberts*, 2022 WL 203540, at *13. The necessary sophistication and expertise required to detonate EFPs "[i]s beyond the capacity of individuals with basic training in IED construction." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 484 (D.D.C. 2021). EFPs require emplacement before use, concealment from detection, remote surveillance of the target, and denotation as the target approaches. *See Lee*, 518 F. Supp. 3d, at 484–85. "Planning an EFP's location and constructing a means to trigger the device require forethought, and an EFP therefore cannot be detonated on a sudden impulse." *Lee*, 518 F. Supp. 3d at 492. *Karcher*, 396 F. Supp. 3d at 56 ("By virtue of this deadly weapon's design, its delivery to Shi'a militia proxies, and its effective deployment against U.S. military vehicles, the Court finds that the intended extrajudicial killings were deliberate.").

    b.    *Non-EFP IEDs & Bombings*: Attacks involving the intentional detonation of explosive material are sufficiently "willful and deliberate" to meet the definition of an extrajudicial killing. *See Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 124 (D.D.C. 2007). Attacks in Iraq involving IEDs and other explosive

munitions have been found to be "prototypical extrajudicial killings." *Neiberge*r, No. 1:16-cv-02193-EGS, ECF No. 86, at 7-8. Court's consider facts about the construction, emplacement, concealment and triggering of IEDs, as well as the target selected, in finding the careful consideration required to meet the definition of the act. When defendants resort to the "use of terroristic violence [they] act[] contrary to, not in conformity with, those guarantees recognized as indispensable by civilized people." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 74 (D.D.C. 2010) *see also Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018)

   c.   *Rocket/Mortar Attacks*: A rocket or mortar attack constitutes a deliberated killing. *See e.g., Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 159 (D.D.C. 2019); *Force*, 464 F. Supp. 3d at 361; *Neiberger*, No. 1:16-cv-02193-EGS, ECF No. 86, at 8-9; *and Cabrera*, 2022 WL 2817730, at *24).

   d.   *Complex Attacks*: A complex attack, in which the perpetrators use a combination of TTPs evinces a degree of forethought, planning and training. Attacks involving ambush, diversion or provoking an expected response require a high degree skill and sophistication, purpose. As do large-scale attacks on government installations. *See e.g., Schwartz*, 2020 WL 7042842, at *12; *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 150 (D.D.C. 2011); *and W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 126 (D.D.C. 2019).

582.    This Court finds that the bellwether attacks meet the requisite definition of "deliberated."

583.     Moreover, Plaintiffs have submitted evidence proving that each of the 15 bellwether attacks involved at least one death.

584.     Accordingly, Plaintiffs have established that the bellwether attacks meet the definition of "extrajudicial killing." 28 U.S.C. § 1605A(a)(1).

　　　　*ii. "Provision of material support"*

585.     To satisfy the "material support" element, the plaintiff must prove that the attack was "caused by provision of material support to" the terrorist group that carried out the attack. *Force*, 464 F. Supp. 3d at 371.

586.     The FSIA adopts the definition of "material support or resources" found in 18 U.S.C. § 2339A. *See* 28 U.S.C. § 1605A(h)(3). As applied here, material support or resources consist of:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

587.     Examples of such material support in FSIA terrorism cases include weapons, weapons technology, training, intelligence, money, travel facilitation, and safe haven to terrorist groups. *See, e.g.*, *Karcher*, 396 F. Supp. 3d at 54 ( Iran provided material support for terrorist groups in the form of training, weapons, and weapons technology); *Cabrera*, 2022 WL 2817730, at *11 (Iran provided material support to various terrorist organizations via training, weapons, financial support, and safe haven); *Neiberger*, No. 1:16-cv-02193-EGS, ECF No. 86, 11-15 (Iran liable for providing material support to Shi'a terrorist

groups, including JAM and Special Groups, in the form of financing, weapons, training, and safe haven); *Hake*, 2022 WL 4130837, at *11 (ruling plaintiffs had offered enough proof of Iran's material support in the form of training, weapons, and financial support to enter a default judgment); *Henkin*, 2021 WL 2914036, at *2 (holding Iran's material support of financial resources, training, and weapons supported a finding of Iran's liability to plaintiffs); *Fritz*, 320 F. Supp. 3d at 86 (finding Iran's provision of material support to terrorist organization via training, financing, was the proximate cause of plaintiffs' injuries); *Force*, 464 F. Supp. 3d at 365 (ruling Iran provided material support to terrorist organizations in the form of money, weapons, and training); and *In re Terrorist Attacks on Sept. 11, 2001.*, 2011 WL 13244047, at *16 (determining Iran's essential material support for al-Qaeda by offering safe haven in Iran to al-Qaeda leaders and operatives directly caused the September 11, 2001 terrorist attacks).[209]

### iii. Causation

588.    Causation does not require proof that the defendant "specifically knew of or intended its support to cause" the particular attack in question. *Owens*, 864 F.3d at 798; *Force*, 464 F. Supp. 3d at 368. And it does not require proof that the defendant's material support was a "but for" cause of the attack. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004); *Force*, 464 F. Supp. 3d at 368. Nor does it require evidence that the defendant's material support was traceable or "tied to each

---

[209] Plaintiffs have shown that Iran and its co-Defendants provided material support at the direction of Iranian officials or agents acting within the scope of their "office, employment, or agency." 28 U.S.C. § 1605A(a)(1). *See supra* Findings of Fact, paras. 150-151, and 213. *see also Fritz*, 320 F. Supp. 3d at 85 ("Iran's Quds Force was responsible for cultivating proxies in other countries and did so with both the Lebanese Hezbollah and AAH…The Quds Force is part of the IRGC, which is, in turn, an arm of the Islamic Republic of Iran. Those findings are sufficient to satisfy the scope of office requirement" under 28 U.S.C. § 1605A(a)(1)); *Karcher*, 396 F. Supp. 3d at 55 (same).

of the attacks that caused [the plaintiffs'] injuries." *Kilburn*, 376 F.3d at 1130; *Force*, 464 F. Supp. 3d at 368. Such a "nexus" is not necessary because certain material support—such as funds, arms, and other support for terrorist organizations—are "fungible, and the FSIA could hardly be interpreted to condition Plaintiffs' recovery on [a terrorist organization's] careful bookkeeping." *Kilburn*, 376 F.3d at 1130; *Force*, 464 F. Supp. 3d at 368. Rather, the FSIA requires a "showing of proximate cause," which is satisfied where the plaintiffs show "some reasonable connection between the" defendant's conduct and "the damage which the plaintiff has suffered." *Kilburn*, 376 F.3d at 1128; *Force*, 464 F. Supp. 3d at 368.

589.     Rather, the causation element requires a plaintiff to show two things:

a.   First, the defendant's material support was a "substantial factor in the sequence of events that led to the plaintiff's injury." *Kilburn*, 376 F.3d at 1128; *Force*, 464 F. Supp. 3d at 368; *Fritz*, 320 F. Supp. 3d at 85.

b.   Second, the injury was "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Kilburn*, 376 F.3d at 1128; *Force*, 464 F. Supp. 3d at 368; *Fritz*, 320 F. Supp. 3d at 85.

590.     All that is required to satisfy the "substantial factor" test is evidence that a defendant's aid to the terrorist organization "was essential to" the organization's "operating capacity and that, without [the defendant's] backing," the organization "would be substantially weakened." *Force*, 464 F. Supp. 3d at 368. Thus, for example, in *Force*, the Court "found that, during the years leading up to and surrounding the attacks at issue, Iran provided tens—if not hundreds—of millions of dollars' worth of currency to Hamas and PIJ" and "also provided substantial operational capacity to both groups, including rockets and other weapons, weapons technology, and training of operatives." *Id.* at 364-365. Even

though the plaintiffs in that case had "not offered evidence that" this "support was tied to each of the attacks that caused their injuries," the Court still found that "Iran's support to both PIJ and Hamas was a substantial factor in the eight attacks that caused the Plaintiff's injuries." *Id.* at 368.

591.    Thus, the "substantial factor" test can be met in this case by evidence showing Iran provided material support to the terrorist organization that committed the attack in the time period leading up to and surrounding the attack and that this material support was essential to the organization's operating capacity.

592.    The second component of the proximate cause element requires evidence that the terrorist attacks were "reasonably foreseeable" or a "natural consequence" of Defendants' material support. *Owens*, 864 F.3d at 794; *Force*, 464 F. Supp. 3d at 368. While this depends to a certain extent on the nature and degree of support Defendants provided, it is established by evidence of Defendants' active encouragement of terrorism and widespread support for terrorist groups, which serve as proxies for Iran's geopolitical strategy of fomenting terrorism throughout the Middle East. *See Id.* at 337-338, 369. Indeed, Courts have had little difficulty finding that a reasonably foreseeable consequence of supporting a terrorist organization is terrorism—even when the support is not expressly earmarked for terrorism. *See Kilburn*, 376 F.3d at 1127-1130 (finding that Sudan's "general awareness of the group's terrorist aims" satisfies the proximate cause element of a FSIA terrorism claim); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008) (affirming liability for donors to terrorist organizations whose donations were made for non-terrorism purposes: "Anyone who knowingly contributes to the nonviolent wing of an

organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities.").

593.     Based on the findings of fact above, the Court reaches the following conclusions of law:

    a.  Defendants provided material support, as that term is used in 28 U.S.C. § 1605A(a)(1), to the Shia terrorist groups the Badr Corps, Jaysh al-Mahdi, the Promised Day Brigade, Asa'Ib ahl al Haq, Kata'ib Hizballah, and the Sheibani Network during the relevant time period of 2003-2011.

    b.  Defendants' provision of said material support to the above-mentioned Shia terrorist groups was essential to the groups' operating capacity and terrorist attacks were reasonably foreseeable and a natural consequence of that material support.

    c.  Defendants provided material support, as that term is used in 28 U.S.C. § 1605A(a)(1), to the Sunni terrorist groups the Al Qaeda and Al Qaeda in Iraq and Ansar al Islam during the relevant time period of 2003-2011.

    d.  Defendants' provision of said material support to the above-mentioned Sunni terrorist groups was essential to the groups' operating capacity and terrorist attacks were reasonably foreseeable and a natural consequence of that material support.

    e.  The bellwether attacks were committed by one or more of the aforementioned groups.

    f.  *"Personal injury or death"*

594.     The final liability element requires evidence that the subject terrorist acts caused "personal injury or death." 28 U.S.C. § 1605A(a)(1); *Force*, 464 F. Supp. 3d at 359.

595.     This "personal injury" element of course applies to individuals who suffered harmful physical contact in the terrorist attack (*e.g.*, concussion/brain injury, laceration, bone fracture). It also applies to individuals who were not present at the scene of the attack but witnessed the aftermath, including body parts, and as a result experienced severe emotional distress.

596.     In *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL 3354720 (Aug. 12, 2022), Iran was held liable for the bombing of the Khobar Towers apartment complex in Saudi Arabia, which housed U.S. military personal. Seven servicemember plaintiffs "were not present at Khobar Towers during the attack and consequently do not allege harmful physical contact from the explosion" but "developed PTSD in the wake of the bombing." *Id.* at *46. Some of those plaintiffs were several miles away from the attack and did not witness the explosion but nevertheless "suffered severe emotional and psychological distress as a result of the attack." *Id.* at 47. The court found Iran liable under the FSIA to those plaintiffs for causing severe emotional distress. *Id.*

597.     This "personal injury" element has been met with respect to the direct-victim Plaintiffs injured in the bellwether attacks, including those who suffered severe emotional distress as a result of the attack.[210] Those individuals are identified in paragraph 575 above.

598.     The FSIA also encompasses claims—known as solatium claims—by family members of those injured or killed. 28 U.S.C. § 1605A(c); *Force*, 464 F. Supp. 3d at 359. These claims, which are meant to redress psychological and emotional harm, are

---

[210] Plaintiff Robert McCormick did not suffer harmful physical contact from an attack but did experience severe psychological trauma by witnessing the body parts of his fellow soldiers in the immediate aftermath of an attack. *See* paragraphs 539-540 above. Thus, like the seven plaintiffs mentioned above in *Ackley*, he satisfies the "personal injury" element under the FSIA.

considered claims for personal injury under the statute. *Id.* at 359; *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54–55 (D.D.C. 2012).

599.     The solatium claims will be addressed by the Special Masters appointed by the Court to hear damages pursuant to 28 U.S.C. § 1605A(e). *See* ECF No. 75.

## XII.   **Defendants' Liability**

600.     Defendants The Islamic Republic of Iran, The Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence and Security, Bank Markazi Jomhouri Islami Iran, Bank Melli Iran, and the National Iranian Oil Company (hereafter, "Defendants") provided material support for bellwether attack # 1 and are jointly and severally liable to Plaintiffs Salvador Beltran-Soto, Richard Dewayne Foster, Alexander Rodriguez Bryant, Anthony Ferris, and Franklin Doss under 28 U.S.C. § 1605A(c).

601.     Defendants provided material support for bellwether attack # 2 and are jointly and severally liable to Plaintiffs Estate of Dale Alan Burger, Jr., Samuel Williams, Shane Kevin Housmans, Joe Sanchez, Jr., and Curtis Joseph Mighaccio under 28 U.S.C. § 1605A(c).

602.     Defendants provided material support for bellwether attack # 3 and are jointly and severally liable to Plaintiffs Estate of Jonathan Williams Bowling, Andrew Howard Rothman, and Juan Martinez Rubio under 28 U.S.C. § 1605A(c).

603.     Defendants provided material support for bellwether attack # 4 and are jointly and severally liable to Plaintiffs Estate of Robert William Briggs, Estate of Randy Lee Stevens, Estate of Tromaine K. Toy, and Jose Miguel Jauregui under 28 U.S.C. § 1605A(c).

604.     Defendants provided material support for bellwether attack # 5 and are jointly and severally liable to Plaintiff Estate of Anthony Capra, Jr., under 28 U.S.C. § 1605A(c).

605.     Defendants provided material support for bellwether attack # 6 and are jointly and severally liable to Plaintiffs Joshua Dale Coy and Estate of Adam Michael Malson under 28 U.S.C. § 1605A(c).

606.     Defendants provided material support for bellwether attack # 7 and are jointly and severally liable to Plaintiff Endi Cisneros Herrera under 28 U.S.C. § 1605A(c).

607.     Defendants provided material support for bellwether attack # 8 and are jointly and severally liable to Plaintiffs Raleigh James Heekin, III, and Estate of Joshua Ryan Hager under 28 U.S.C. § 1605A(c).

608.     Defendants provided material support for bellwether attack # 9 and are jointly and severally liable to Plaintiff Philip Ryan Trimble under 28 U.S.C. § 1605A(c).

609.     Defendants provided material support for bellwether attack # 10 and are jointly and severally liable to Plaintiff Estate of Adam J. Kohlhaas under 28 U.S.C. § 1605A(c).

610.     Defendants provided material support for bellwether attack # 11 and are jointly and severally liable to Plaintiff Steve Nunez under 28 U.S.C. § 1605A(c).

611.     Defendants provided material support for bellwether attack # 12 and are jointly and severally liable to Plaintiff Estate of Taylor Prazynski under 28 U.S.C. § 1605A(c).

612.     Defendants provided material support for bellwether attack # 13 and are jointly and severally liable to Plaintiff Paul Eric Haines under 28 U.S.C. § 1605A(c).

613.     Defendants provided material support for bellwether attack # 14 and are jointly and severally liable to Plaintiffs Larry Diaz Cabral, Jr., and Robert Lee McCormick under 28 U.S.C. § 1605A(c).

614.     Defendants provided material support for bellwether attack # 15 and are jointly and severally liable to Plaintiff Joel Tavera under 28 U.S.C. § 1605A(c).

### XIII.   <u>Further Orders</u>

615.      The findings of fact and conclusions of law set forth herein shall be applied by the

Special Masters appointed in this lawsuit to make liability recommendations for the non-

bellwether attacks, as contemplated by the case management plan. ECF No. 75.

616.      The findings of fact and conclusions of law set forth herein shall be applied by the

Special Masters appointed to hear damages for the bellwether Plaintiffs.

617.      Pursuant to the case management plan, Plaintiffs are hereby ordered to file a

motion for the appointment of Special Masters to hear damages for the bellwether

Plaintiffs pursuant to 28 U.S.C. § 1605A(e).

SIGNED this _____ day of _____, _____

_____
CHRISTOPHER R. COOPER
UNITED STATES DISTRICT JUDGE