**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**ESTATE OF CHRISTOPHER BROOK FISHBECK, et al.**,

Plaintiffs,

v.

**THE ISLAMIC REPUBLIC OF IRAN, et al.**,

Defendants.

Case No. 18-cv-2248 (CRC)

## MEMORANDUM OPINION AND ORDER

This case is brought by or on behalf of members of the U.S. military who were killed or injured in attacks during operations in Iraq from 2003 to 2011.  Plaintiffs, who number over 1400, bring claims against Iran and various of its instrumentalities, who they allege provided funding, weapons, and logistical support to the terrorist organizations and militia groups responsible for the attacks.  Plaintiffs assert jurisdiction under the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), which abrogates the sovereign immunity of foreign states that have been designed by the U.S. government as sponsors of terrorism and, as relevant here, provide "material support" for extrajudicial killings.  28 U.S.C. § 1605A.  As in many similar actions against Iran, no defendant has appeared.

Presently before the Court is plaintiffs' motion for a default judgment as to defendants' liability for fifteen of the over 400 attacks described in plaintiffs' Second Amended Complaint. These representative "bellwether" attacks were the subject of extensive evidentiary submissions and a three-day hearing in September 2022.  During the hearings, Plaintiffs presented the testimony of servicemembers who survived the attacks, as well as three expert witnesses who linked Iran to the groups suspected of carrying them out.

I.      **Background**

A.      Threshold Issues

To hold defendants liable in default under the FSIA's terrorism exception, the Court must

find that it has personal and subject matter jurisdiction over them and that the plaintiffs have

established their right to relief "by evidence satisfactory to the court."  Bathiard v. Islamic

Republic of Iran, No. 16-CV-1549 (CRC), 2019 WL 3412983, at *2 (D.D.C. July 29, 2019)

(quoting 28 U.S.C. §1608(e)).  The FSIA provides for personal jurisdiction where service has

been properly made under 28 U.S.C. § 1608.  Republic of Sudan v. Harrison, 139 S. Ct. 1048,

1054 (2019).  The Court has previously found that the defendants were properly served.  Op. &

Order, ECF No. 55.

As for subject matter jurisdiction, the Court has jurisdiction over suits where (1) "money

damages are sought" (2) "against a foreign state for" (3) "personal injury or death that" (4) "was

caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the

provision of material support or resources for such an act[.]"  28 U.S.C. § 1605A(a)(1); see

Pennington v. Islamic Republic of Iran, No. 19-CV-796 (JEB), 2021 WL 2592910, at *2 (D.D.C.

June 24, 2021).  The statute additionally requires that: (1) the defendant be a designated state

sponsor of terrorism; and (2) that the "claimant or the victim" in the case was "a national of the

United States," "a member of the armed forces," or "otherwise an employee of the Government

of the United States," when the act happened.  28 U.S.C. § 1605A(a)(2)(A)(i)–(ii).

Many of these criteria can be resolved easily.  First, the plaintiffs only seek monetary

damages, and no other form of relief, against Iran, its instrumentalities, and subdivisions for

personal injury or death.  Second Am. Compl. at 756–58; see 28 U.S.C. 1605(A)(c) ("[D]amages

may include economic damages, solatium, pain and suffering, and punitive damages").  Second,

the Court has held that Iran was designated a state sponsor of terrorism at the time of each attack

and when the suit was filed, and that the claimants or victims were, at the time of the relevant attack, U.S. nationals, members of the U.S. armed forces, or qualifying employees or contractors of the U.S. government.[1]  See Op. & Order, ECF No. 126.  Third, the Court has already found the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups which bolstered their ability to foreseeably commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 to 2011.[2]  Order, ECF No. 127 (finding that Iran, the IRGC, and the MOIS provided material support to the subject terrorist groups); Op. & Order, ECF No. 136 (finding that Bank Markazi and Bank Melli provided material support to the subject terrorist groups).  Accordingly, all that remains is for the Court to determine whether each bellwether attack was committed by a terrorist group that received material support from the defendants.

---

[1] The Court's ruling was limited to plaintiffs that had submitted evidence of their status as U.S. nationals or members of the U.S. armed services when the relevant attack occurred. Accordingly, plaintiffs that have not yet submitted evidence of their status must do so before being eligible for default judgment.

[2] Each alleged bellwether attack was an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because each attack resulted in at least one death.  See 28 U.S.C. § 1605(A); Burks v. Islamic Republic of Iran, No. 16-cv-1102 (CRC), ECF No. 65 at *17–21 (D.D.C. Sept. 30, 2022) (holding that the FSIA's terrorism exception does not apply to "an act of extrajudicial killing" that does not result in a death); Force v. Islamic Republic of Iran, 610 F. Supp. 3d 216, 222 (D.D.C. 2022) ("[T]he state-sponsored terrorism exception to the FSIA's grant of foreign sovereign immunity does not include attempted extrajudicial killings when no one is, in fact, killed in the attack."); but see Cabrera v. Islamic Republic of Iran, No. 18-cv-2065 (JDB), 2023 WL 1975091, at *1 (D.D.C. Jan. 27, 2023) ("[T]he terrorism exception to foreign sovereign immunity under the FSIA, § 1605A(a)(1), does encompass injuries occurring in nonfatal attacks, so long as those injuries are the foreseeable result of a defendant nation's material support for acts of extrajudicial killing." (emphasis in original)).

B.    <u>Relevant Context</u>

Before turning to the fifteen bellwether attacks, the Court offers a few overarching observations concerning the scope of this case.  This Court is no stranger to cases seeking justice for U.S. servicemembers killed or injured in attacks carried out by Iran and its proxies.  Since Congress's adoption of the terrorism exception to the FSIA in 1996, surviving servicemembers and their families have filed scores of cases in this District against Iranian defendants, securing judgments totaling billions.  The earliest of these cases focused on isolated terrorist attacks by known Iranian-backed terrorist groups.  <u>See, e.g.</u>, <u>Peterson v. Islamic Republic of Iran</u>, No. 01-CV-2094 (RCL), 264 F. Supp. 2d 46 (D.D.C. 2003) (suing Iran for Hezbollah's 1983 bombing of U.S. Marine barracks in Beirut, Lebanon); <u>Salazar v. Islamic Republic of Iran</u>, No. 02-CV-558 (JDB), 370 F. Supp. 2d 105 (D.D.C. 2005) (suing Iran for Hezbollah's 1983 bombing of U.S. Embassy in Lebanon).  Over time, they expanded to include multiple attacks using specific weaponry or methods linked directly to Iran.  <u>See, e.g.</u>, <u>Fritz v. Islamic Republic of Iran</u>, No. 15-CV-456 (RDM), 320 F. Supp. 3d 48 (D.D.C. 2018) (suing Iran for two kidnappings of U.S. servicemembers in Iraq); <u>Karcher v. Islamic Republic of Iran</u>, No. 16-CV-232 (CKK), 396 F. Supp. 3d 12, 25–26 (D.D.C. 2019) (suing Iran and its instrumentalities for 92 attacks, the vast majority of which involved explosively formed penetrators developed by Iran); <u>Burks v. Islamic Republic of Iran</u>, No. 16-CV-1102 (CRC), 2023 WL 4838382 (D.D.C. July 28, 2023) (suing Iran and its instrumentalities for attacks involving explosively formed penetrators developed by Iran).

This suit is part of a trend of active cases seeking a much broader extension of liability.  <u>See</u> <u>Hake v. Bank Markazi</u>, No. 17-CV-114, ECF No. 121 at 2 (suing Bank Markazi, Bank Melli, and NIOC for 154 attacks); <u>Holladay v. Islamic Republic of Iran</u>, No. 17-CV-915 (RDM), 406 F. Supp. 3d 55, 58 (D.D.C. 2019) (43 attacks); <u>Estate of Robert Hartwick v. Islamic Republic of Iran</u>, No. 18-CV-1612 (CKK), ECF 114 at 1 (341 attacks).  This case may be the

broadest yet.  According to the complaint and the evidence presented at the bellwether hearing, the over 400 attacks here span the entire period of the U.S. military's presence in Iraq, from the initial invasion in 2003 to the ultimate withdrawal of forces in 2011.  The attacks took place in virtually every part of Iraq and were perpetrated by a wide range of insurgent groups, both known and unknown.  Some of these groups were comprised of Shia Muslims, the dominant sect in Iran; others consisted of Sunni Muslims, Iran's ostensible rivals.  Still others may have included former Iraqi soldiers who later fell in with a Sunni- or Shia-aligned militia.  And the attacks followed no common pattern:  They involved different weapons, tactics, and levels of sophistication and planning.  The only apparent common theme is that the U.S. military was targeted and, according to plaintiffs, Iran somehow supported the militia groups responsible for the attacks.

The Court inquired about the sweep of plaintiffs' theory early on in the case and was assured by counsel that after an extensive "presuit investigation" involving expert review of a range of factors regarding each attack, plaintiffs had a good faith basis to link Iran to the responsible groups.  See Trial Tr. at 197, ECF No. 109.  That may well be so.  Yet, the Court emerged from the bellwether hearings with the impression that plaintiffs' theory of liability would encompass virtually any organized attack against the U.S. military during the entirety of its presence in Iraq.  The Court pressed one of plaintiffs' experts, Michael Pregent, on this point at the hearing:

> The Court:  [J]ust so I'm clear, every attack [on U.S. service members or contractors] that occurred after the fall of Baghdad is linked to material support provided by Iran[?]
>
> The Witness:  Yes.
>
> The Court:  True statement?
>
> The Witness:  It is a true statement, but it's more nuanced than . . . . It would be those factors that I'm looking for.  Did they benefit from foreign fighter

flow?  Did they benefit from a permissive environment?  Did they benefit
from an incapable Iraqi security force that Iran put in place?

. . .

So I would say yes, but I would be able to tell you why.

Trial Tr. at 152, ECF No. 109.

In other words, at least according to one expert, virtually every organized attack by insurgent groups during the U.S. occupation of Iraq has some attribute—including the "permissive environment" in which insurgency groups operated—that links Iran to the attack.  If that is indeed plaintiffs' view of the case, the Court struggles to discern any meaningful limiting principle—Iran would be liable to the present plaintiffs, and any future ones, for almost any coordinated attack anywhere in the country during the eight-year period of military operations.

It is against that backdrop that the Court has carefully reviewed plaintiffs' evidence regarding each of the fifteen bellwether attacks and considered whether that evidence is "satisfactory to the court" to establish liability in the context of a default proceeding.  See 28 U.S.C. §1608(e).  As explained below, the Court finds the evidence satisfactory for twelve of the attacks and finds it lacking for three others.  In reaching these findings, the Court is mindful that its ruling forecloses potential recovery for some soldiers who experienced horrible deaths and injuries.  For that reason and others, plaintiffs are welcome to supplement their evidence in a renewed motion for default judgment.  At the end of the day, however, the Court must (and will) apply the prevailing standards for determining liability, even if some grievous harms may go uncompensated.

## II.      Evidentiary Standard

In assessing the merits of a default claim under the FSIA, "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory."  Maalouf v. Islamic Republic of Iran, 923 F.3d 1095, 1114 (D.C. Cir. 2019) (citing Han Kim v. Democratic People's

<u>Republic of Korea</u>, 774 F.3d 1044, 1047 (D.C. Cir. 2014)).  "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign."  <u>Owens IV</u>, 864 F.3d at 785; <u>see also</u> <u>Fraenkel v. Islamic Republic of Iran</u>, 892 F.3d 348, 353 (D.C. Cir. 2018) ("[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." (quotation omitted)); <u>Sotloff v. Syrian Arab Republic</u>, 525 F. Supp. 3d 121, 134 (D.D.C. 2021) ("In a FSIA default proceeding, a court can find that the evidence presented is satisfactory when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." (quotation omitted)).  Placing considerable weight on the testimony of credible experts is "not only entirely proper, but often sufficient, and even indispensable in terrorism cases because firsthand evidence of terrorist activities is difficult, if not impossible to obtain[.]"  <u>Fritz v. Islamic Republic of Iran</u>, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (quotations and citations omitted).

### III.    Analysis

#### A.    General Approach to Liability Determinations

In evaluating whether each bellwether attack was committed by a terrorist group that received support from the defendants, the Court has considered numerous factors including: (1) whether the tactics, methods, or weapons used in the attack could be linked to the groups Iran supported; (2) whether the attack occurred in an area operationally controlled by one of the subject terrorist groups Iran supported; (3) whether an expert credibly opined that the attack was committed by an Iran-backed terrorist group; and (4) any other indicia that one of the subject terrorist groups was responsible for the attack.  In reaching these determinations, the Court has reviewed the considerable evidence submitted by the plaintiffs, including: (1) the reports, declarations, and testimony of plaintiffs' experts; (2) the testimony and declarations of the

surviving victims of the bellwether attacks; (3) documentary evidence from various government sources; (4) the proposed findings of fact and law offered in plaintiffs' motion for default judgment, and (5) other cases assigning liability to Iran and the relevant instrumentalities for its involvement in terrorism. [3]   The Court reached the following determinations without the benefit of opposing evidence from the defendants, who have deliberately chosen not to present a defense in this matter.

<strong>B.      Bellwether Attack # 1: April 4, 2004 Attack in Sadr City</strong>

Plaintiffs Sgt. Salvador Beltran-Soto, Sgt. Richard Foster, Spc. Alexander Bryant, Pvt. Anthony Ferris, and Sgt. Franklin Doss were injured during a complex ambush on April 4, 2004 in the Sadr City area of Baghdad, Iraq that killed seven American servicemembers and wounded at least fifty more.  Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ECF No. 115-1 ("Bellwether Brief") ¶¶ 259–83.  The attack was perpetrated by a large number of combatants embedded within the city who used small arms, rocket propelled grenades ("RPGs"), and improvised explosive devices ("IEDs") to attack several convoys of U.S. troops.  Id.  The assailants used sophisticated ambush tactics, including blocking routes to funnel the soldiers into "a kill zone."  See id. ¶ 276.

Plaintiffs' expert attributed the attack to Jaysh al-Mahdi ("JAM"), one of the groups that received material support from the defendants.  PX. 1000 ("GR Attrib. Rep.") at 5–8 ("[I]t is highly likely that JAM committed this complex attack[.]").  In support of his conclusion, plaintiffs' expert asserted that "the Sadr City neighborhood of Baghdad was a JAM stronghold in

---

[3] Plaintiffs relied on three experts to attribute liability for the bellwether attacks.  Daveed Gartenstein-Ross was responsible for the first five attacks, Col. M. Lee Walters was responsible for the next five attacks, and Michael Pregent was responsible for the final five attacks.  For ease of reading, the Court uses the term "plaintiffs' expert" to refer to whichever expert addressed the relevant attack.

2004." Id. at 6.  He also explained that "[a]ll relevant expert accounts of [the attack] conclude that JAM was driving the events on the ground."  Id. at 7.  Given the largescale nature of the attack, it is credible that only a group with operational control of the area could be responsible. Further, the expert explained how JAM was motivated to strike against U.S. forces due to their counter-insurgency activity in the area and how the sophisticated ambush tactics and weapons used were consistent with attacks perpetrated by JAM.  See id. at 7–8; Trial Tr. at 216–220, ECF No. 106.  Finding these conclusions credible, the Court is satisfied that there is sufficient evidence to attribute the first bellwether attack to JAM, which received material support from the defendants, and holds the defendants liable for the attack.

C.      Bellwether Attack # 2: November 13–14, 2004 Attack in Fallujah

Plaintiff Cpl. Dale Burger was killed and Plaintiffs Sgt. Shane Housmans, HM Samuel Williams, Cpl. Joe Sanchez, and LCpl. Curtis Mighaccio were injured during a complex attack in the Queens neighborhood of Fallujah, Iraq on November 13 and 14, 2004.  Bellwether Brief ¶¶ 296–307.  The attack involved two separate ambushes against the plaintiffs when they entered houses to retrieve wounded Marines.  Id.  In the first instance, terrorists detonated a bomb after luring responding Marines into a booby-trapped house.  Id. ¶¶ 298–99.  The resulting explosion injured several of the plaintiffs and killed one Marine.  Id.  In the second instance, which occurred the following day in the same area of Fallujah, enemy combatants baited the same plaintiffs into a house to retrieve a wounded Marine before ambushing them with gunfire and grenades.  Id. ¶¶ 300–01.  The back-to-back attacks resulted in the deaths of at least three Marines, including Cpl. Burger, and injuries to the several other plaintiffs.  Id. ¶¶ 296–307.

Plaintiffs' expert attributed the attack to Al Qaeda in Iraq ("AQI") based on the location and timing of the attack and the tactics and weapons used.  Id. ¶¶ 308–18; GR Attrib. Rep. at 12–14.  Specifically, the expert explained that AQI was "the central insurgent force" in the battle for

Fallujah in 2004.  GR Attrib. Rep. at 12–13 ("Put simply, AQI possessed area of operation dominance in Fallujah at the time of [the attack].").  The expert also noted that (1) the sophistication of the coordinated attacks, (2) the use of weapons commonly used by AQI, such as grenades, PKM machine guns, and explosives, and (3) the specific tactic of using wounded U.S. service members as "bait" for ambushes were consistent with AQI being responsible for the attack.  See id. at 14; Trial Tr. at 152, 155, ECF No. 106.

Finding these conclusions credible, the Court is satisfied that there is sufficient evidence to attribute the second bellwether attack to AQI, which received material support from the defendants, and holds the defendants liable for the attack.

### D.    Bellwether Attack # 3: January 26, 2005 IED Attack in Haqlaniyah

Plaintiff Cpl. Jonathan Bowling was killed and Plaintiffs HM Juan Rubio and HM Andrew Rothman were injured during a complex attack in the village of Haqlaniyah near Haditha, Iraq on January 26, 2005.  Bellwether Brief ¶¶ 319–27.  Plaintiffs were part of a twelve-vehicle convoy of U.S. forces tasked with raiding a collection of buildings for weapons caches and high value targets.  Id. ¶ 322.  The intelligence for the mission was erroneous and the convoy was ambushed on its return to base.  Id. ¶¶ 322–24.  The convoy was immobilized by an explosion and received heavy coordinated fire, including RPGs, from inside homes, on rooftops, and from the nearby mosque.  Id. ¶¶ 323–24.

Plaintiffs' expert attributed the attack to AQI based on the location and timing of the attack, the sophistication of the tactics and methods used, and AQI's motivation for the attack.  Id. ¶¶ 328–41; GR Attrib. Rep. at 16–22.  Evidence supports that AQI had operational control of the region at the time that the attack occurred.  See PX. 900 at 15 (declassified military intelligence report documenting the control of Haqlaniyah mosques by AQI leaders at the time of the attack); see also GR. Attrib. Rep. at 17 ("AQI became the dominant insurgent group in

Haditha after . . . November and December 2004."). Further, plaintiffs' expert asserted that no other insurgency groups had a significant presence in the region. GR. Attrib. Rep. at 18–19 ("The conclusion I draw based on AQI's dominance in Haditha at the time of the attack is further underscored by other insurgent groups' lack of significant presence in the city."); Trial Tr. at 170, ECF No. 106 ("[I]n this province, Anbar province, Shia groups did not claim responsibility for a single attack over the course of [2005] while AQI claimed responsibility credibly and authentically for 43 attacks."). As for tactics, the coordinated nature of the largescale attack, which involved an estimated 75–100 fighters, and the insurgents' sophisticated ability to lure the convoy with false intelligence, track the fast-moving convoy through the region, and immobilize the convoy in a kill zone are all consistent with the capabilities of AQI, the "most dominant, best-resourced" terrorist group in that region at that time. GR. Attrib. Rep. at 19–20. Lastly, AQI would have been motivated to execute such a large-scale attack to protect their operational control of the region in response to the success of recent counter-AQI operations, such as securing weapon caches in the area. See id. at 20–21.

Finding these conclusions credible, the Court is satisfied that there is sufficient evidence to attribute the third bellwether attack to AQI, which received material support from the defendants, and holds the defendants liable for the attack.

E.    Bellwether Attack # 4: April 16, 2005 Indirect Fire Attack at Camp Ramadi

Plaintiffs Spc. Randy Stevens and Sgt. Tromaine K. Toy were killed and Plaintiffs Spc. Jose Jauregui and Sgt. Robert Briggs were injured during an indirect fire attack ("IDF") on Camp

Ramadi in the Al-Anbar Province of Iraq on April 16, 2005.[4]  Bellwether Brief ¶¶ 342–52.

Plaintiffs were serving at Camp Ramadi when the base was attacked by artillery fire from two

120-mm mortars and two 107-mm rockets.  Id. ¶¶ 342, 345.  A witness and action report from

the attack indicate that the rockets and mortars were fired from the Tamim District near Camp

Ramadi.  See PX 1403 (Jacobus Decl.) ¶ h; Bellwether Brief ¶ 352.  A Marine unit reported that

the mortar team escaped to a local mosque, but the team was never located.  PX. 1400, at 1.

Plaintiffs' expert attributed the attack to AQI based on the location and timing of the

attack and the tactics and methods used.  Bellwether Brief ¶¶ 353–60; GR Attrib. Rep. at 23–26.

At the time of the attack, AQI was the dominant insurgent actor in the area and had conducted

other attacks, including rocket and mortar attacks, in the area.  See Bellwether Brief ¶¶ 355–56;

PX. 900 at 40–42 (declassified military intelligence report documenting that AQI-affiliated

groups in Ramadi "emerged as the primary threat to the Coalition in the city" in April 2005); see

also PX. 983 at 1 (multinational intelligence report dated April 30, 2006 noting that "AQI's high

degree of control over Ramadi serves to attract an increasing number of members of the former

Regime[.]").  Further, evidence supports that the "the less dominant insurgents in the city[] had

declared a ceasefire from April 15 to April 17 [which] underscores the likelihood that Al Qaeda

in Iraq was the perpetrator of the IDF attack on Camp Ramadi on April 16, 2005."  Bellwether

Brief ¶ 355 (citing PX. 900 at 47).  As for tactics, plaintiffs' expert noted that AQI had used

similar munitions before and had claimed responsibility for multiple mortar attacks in the spring

of 2005.  GR. Attrib. Rep. at 25.

---

[4] Sgt. Briggs survived the attack but subsequently died from blast-related injuries in 2011.  PX 1473 at 1; PX 1458 at 2 (St. Briggs's autopsy report, which indicates that "complications of blast injuries" was the cause of death).

Finding these conclusions credible, the Court is satisfied that there is sufficient evidence to attribute the fourth bellwether attack to AQI, which received material support from the defendants, and holds the defendants liable for the attack.

F.      Bellwether Attack # 5: April 9, 2008 IED Attack in the Golden Hills

Plaintiff TSgt. Anthony Capra was killed by an IED attack in the Golden Hills area of Iraq on April 9, 2008.  Bellwether Brief ¶¶ 361–65.  Plaintiff Capra was serving as an Explosive Ordinance Disposal specialist when he was killed while attempting to defuse an unexploded IED. Id. ¶¶ 362–63.  According to an Air Force specialist who conducted a post-blast analysis of the site, the IED was "very sophisticated" and included anti-tampering components.  Trial Tr. at 206–07, ECF No. 106.

Plaintiffs' expert determined that Ansar al-Islam ("AAI," also known as Ansar al-Sunna) was likely responsible for the attack based on the location and timing of the attack, the tactics used, and AAI's motive in perpetrating the attack.[5]  Trial Tr. at 208–09; GR. Attrib. Rep. at 27–30.  Specifically, AAI enjoyed a "safe haven" in the Golden Hills at the time of the attack, had claimed responsibility for other IED attacks in the surrounding area, and benefited from the attack's disruption to counter-AAI operations.  See Trial Tr. at 209; GR. Attrib. Rep. at 27–29; PX. 1500 at 1 (operations report noting that recent IED attacks had "continued to disrupt the recent [coalition force's] success in securing the area and denying the ansar al-Sunna cell sanctuary in the southern Golden Hills.").  Moreover, a military intelligence report indicated that an IED cell associated with AAI was most likely responsible for the attack.  See Trial Tr. at 209, ECF No. 106; PX. 1518 (SIGACT report).

---

[5] While the expert testified that it was possible that AQI was responsible, the defendants would still be liable because they provided material support to both groups.  See Trial Tr. at 208–09, ECF No. 106; Bellwether Brief ¶ 369.

Given the sophistication of the attack, the location of the attack in an AAI safe haven, and a credible attribution by both plaintiffs' expert and a military report, the Court is satisfied that there is sufficient evidence to attribute the fifth bellwether attack to AAI, which received material support from the defendants, and holds the defendants liable for the attack.

G.      Bellwether Attack # 6: February 19, 2005 Suicide Attack in Baghdad

Plaintiff 1LT. Adam Malson was killed and Plaintiff Spc. Joshua Coy was injured during a personnel-borne IED attack near a mosque in the Kadhimiya District of Baghdad on February 19, 2005.  Bellwether Brief ¶¶ 374–88.  The attack occurred on Asura, a major religious holiday for the Shia sect of Islam, and thousands of Shia pilgrims had traveled to the mosque.  Id. ¶ 377. Plaintiffs were responding to wounded civilians from an initial suicide bombing when a second suicide bombing occurred.  Id. ¶¶ 378–88

Plaintiffs' expert attributed the attack to AQI due to the timing and nature of the attack. PX. 1620 at 7.  Specifically, the targeting of a Shia community at a mosque on a religious holiday and the use of suicide bombers are both consistent with AQI's tactics and motives.  Id. Further, the Kadhimiya District of Baghdad was "a known stronghold for AQI," id. at 16, where AQI "was the dominant Sunni organization at the time," Trial Tr. at 343–344.  In further support of AQI's culpability, plaintiffs' battalion commander submitted a sworn declaration indicating that AQI was likely responsible for the attack.  See, e.g., PX. 1601 (Spiszer Decl.) ¶ r (noting that the attack was likely committed by a Sunni group, that AQI was the "dominant Sunni terrorist group," and that the "tactics, techniques and procedures used in this attack match those of AQI at the time").

While it is questionable whether this evidence would be sufficient to carry the day in a contested proceeding, the Court is satisfied that there is sufficient evidence to attribute the sixth

14

bellwether attack to AQI, which received material support from the defendants, and holds the defendants liable for the attack.

    H.  <u>Bellwether Attack # 7: September 17, 2006 EFP Attack in Baghdad</u>

   Plaintiff Spc. Endi Herrera was injured by an explosively formed penetrator ("EFP") attack in the Adhamiya District of Baghdad on September 17, 2006.  Bellwether Brief ¶¶ 397–413.  Herrera was patrolling in a convoy when his vehicle was hit with a large explosion that knocked him unconscious and killed at least one fellow soldier.  Id. ¶¶ 399–405.  Herrera testified that the shrapnel embedded in his equipment from the attack was copper, which is an indicator that the explosive was an EFP.  Trial Tr. at 298, ECF No. 107; <u>see</u> Bellwether Brief ¶ 411.

   Plaintiffs' expert attributes the EFP attack to Shia militia groups backed by Iran.  PX. 1705 at 23–24; <u>see</u> Bellwether Brief ¶¶ 414–424.  While the expert did not specify which Shia militia group perpetrated the attack, he noted that "[t]he use of the EFP was reserved for use by Iranian-backed Shia Militant Groups with direct support from Islamic Revolutionary Guard Corps (IRGC)-Qods Force and Hezbollah[.]"  <u>Id.</u> at 24; <u>see</u> Trial Tr. at 357, ECF No. 107 ("The use of an explosively formed penetrator, EFP, was very unique and only given to Shia militia groups from Iran.").  At the evidentiary hearing, Herrera testified that he learned from military intelligence that the Shia militia Jaysh al Mahdi ("JAM") was responsible for the attack.  Trial Tr. at 299.  Herrera also testified that his unit had captured Iranian operatives that were teaching JAM members how to build EFPs.  <u>Id.</u> at 299–300.

   The connection between EFP attacks and Iranian support has been well documented.  <u>See, e.g.</u>, PX. 333 (Multi-National Force Press Briefing) at 6 ("[T]he EFP technology and EFP munitions are clearly coming from Iran."); PX. 336 (Multi-National Force Press Briefing) at 3 (regarding EFP attacks, "[w]e know that the explosively formed projectiles, penetrators, are

manufactured in Iran" and "[i]t's clear that Iranians are involved, and it's clear that materials from Iran are involved" (quotation omitted)).  And both this Court and others in this District have held Iran responsible for other EFP attacks in Iraq.  See, e.g., Burks v. Islamic Republic of Iran, No. 16-CV-1102 (CRC), ECF No. 65 at *14 (D.D.C. Sept. 30, 2023) ("Iran's material support included the manufacture and provision of EFPs and their components, as well as training on how to construct and use EFPs, to Iranian-backed groups in Iraq."); Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12, 30, 56 (D.D.C. 2019) ("Under Plaintiffs' theory—corroborated by the Court's foregoing analysis—identification of the weapon as an EFP all but necessitates the inference that Iran was responsible." (emphasis omitted)); Lee v. Islamic Republic of Iran, No. 19-CV-00830 (APM), 2023 WL 1100711, at *30 (D.D.C. Jan. 30, 2023) ("The U.S. military has successfully traced EFP devices that circumvented the United States' counter-EFP measures to Iran.").  Accordingly, the Court is satisfied that the EFP attack on Plaintiff Herrera was the result of defendants' material support for Shia terrorist groups in Iraq and finds defendants liable for the injuries he sustained.

I.    Bellwether Attack # 8: February 22, 2007 IED Attack in Ramadi

Plaintiff Ssg. Joshua Hager was killed and Plaintiff Sfc. Raleigh Heekin, III was injured during a series of pressure-plate IED detonations in Ramadi on February 22, 2007.  Bellwether Brief ¶¶ 425–33.  While convoying back to base, Hager's vehicle hit a pressure-plate IED which killed him.  Id. at 426.  Upon arriving at the site of the first blast, Heekin's vehicle hit a second pressure-plate IED which knocked him unconscious and killed several other service members. Id.  ¶¶ 430–33.

Both plaintiffs' expert and the battalion commander at the scene of the attack attributed the IEDs to AQI due to the location and nature of the attack.  See PX. 1822 ("Attack 8 Rep.") at 9–22; PX. 1803 (Ferry Decl.) ¶ 33 (plaintiffs' battalion commander asserted that "[t]he IEDs

used [for the attack] were assembled and emplaced by members of Al Qaeda in Iraq" which was "the dominant terror group in the area").  Specifically, plaintiffs' expert noted that AQI was known for operating in the area at the time of the attack, and that the sophistication of the IEDs indicated that "a highly trained and highly resourced organization" was responsible.  Trial Tr. at 368–70 (testifying that the size of the blasts, sophistication of the design, and ability to plant the IEDs without targeting civilians were indicia of AQI's culpability for the attack); see Attack 8 Rep. at 21–22.  In further support of AQI's culpability, Heekin testified that his unit captured the "one main IED maker in that area," who was found to be an operative of AQI.  Trial Tr. at 308– 09, ECF No. 107.

   Upon review of that evidence, the Court is satisfied that there is sufficient grounds to attribute the eighth bellwether attack to AQI, which received material support from the defendants, and holds the defendants liable for the attack.

      J.     Bellwether Attack # 9: March 23, 2008 Rocket Attack into the Green Zone

Plaintiff Spc. Ryan Trimble was injured during a rocket attack launched from Sadr City into the Green Zone of Baghdad on March 23, 2008.  Bellwether Brief ¶¶ 444–53.  The attack involved several 107-mm rockets landing in Camp Travis.  Id. ¶ 444.

As an initial matter, it is not readily apparent from the record evidence that this attack resulted in a death, which would mean the attack may not fall within the FSIA's terrorism exception.  See Burks v. Islamic Republic of Iran, No. 16-CV-1102 (CRC), ECF No. 65 at *17– 21 (D.D.C. Sept. 30, 2022) (holding that the FSIA's terrorism exception does not apply to "an act of extrajudicial killing" that does not result in a death); Force v. Islamic Republic of Iran, 610 F. Supp. 3d 216, 222 (D.D.C. 2022) ("[T]he state-sponsored terrorism exception to the FSIA's grant of foreign sovereign immunity does not include attempted extrajudicial killings when no one is, in fact, killed in the attack."); but see Cabrera v. Islamic Republic of Iran, No. 18-CV-

2065 (JDB), 2023 WL 1975091, at *1 (D.D.C. Jan. 27, 2023) ("[T]he terrorism exception to

foreign sovereign immunity under the FSIA, § 1605A(a)(1), <u>does</u> encompass injuries occurring

in nonfatal attacks, so long as those injuries are the foreseeable result of a defendant nation's

material support for acts of extrajudicial killing." (emphasis in original)).   Trimble recalled that

"there was a civilian contractor killed that day."   Trial Tr. at 316, ECF No. 107; Bellwether Brief

¶ 453; <u>see also</u> PX. 1908 (Arleque Decl.) ¶ g (witness declaring that "I remember one individual

died of wounds, but not sure of the date. It must have been in that same time frame").   But

neither the operations report nor the indirect fire report submitted as evidence indicate any

fatalities from the attack.   <u>See</u> PX. 1900 at 2 (ops report indicating no KIA); PX. 1901 at 2

(indirect fire report indicating same).   Independently, however, the Court has found and takes

judicial notice of a newspaper article reporting the death of a U.S. contractor from a rocket attack

targeting the Green Zone on March 23, 2008.   Easter Attack on Green Zone Killed U.S. Civilian,

The Denver Post (Mar. 25, 2008), https://perma.cc/A8K2-JU7J.   The Court therefore has

satisfactory evidence before it that the attack resulted in a fatality.

     Attribution for the attack is a close question.   Plaintiffs' expert generally attributed the

attack to an Iran-backed Shia militia group, such as JAM, Asa'ib Ahl Al-Haq ("AAH"), or

Kata'ib Hezbollah ("KH"), and opined that "it is likely that the cell that attacked SPC Trimble

was a cell from [JAM]."[6]  PX. 1909 at 3–4, 8, 17.   The expert's assessment relies mainly on two

factors: (1) the rockets came from Sadr City, which was a known stronghold for Shia militia

groups, and (2) the responsible group must have been "well trained and had quality weapons" in

---

[6] The Court has previously held that the defendants provided material support to JAM,
Asa'ib Ahl Al-Haq ("AAH"), and Kata'ib Hezbollah ("KH").   <u>See</u> Op. & Order at 2, ECF No.
127; Op. & Order, ECF No. 136 (finding that Bank Markazi and Bank Melli provided material
support to the subject terrorist groups).

order to hit the target at a distance of over seven kilometers with unguided munitions.  Id. at 17; see Trial Tr. at 380–81.  But plaintiffs' expert does not explain whether other groups not affiliated with Iran were operating in Sadr City or had the capabilities to conduct such an attack. Casting further doubt, the expert testified that JAM had "established a no fire or cease fire" in 2008 but "couldn't control all the Shia militia groups so other Shia militia groups continued to conduct attacks."  Trial Tr. at 380, ECF No. 107.  On its own, the expert's assessment does not convince the Court that JAM or another Iran-backed militia was responsible for the attack.

Press briefings by the U.S. military surrounding the attack lend further support to the theory that an Iran-backed militia group was responsible, however.  A few weeks before the attack, a military briefing described the seizure of large caches of weapons in Iraq, including 107-mm rockets like the kind used in the attack, that originated from Iran.  PX. 321 at 3 ("The [seized] C-4 and 107-mm rockets were assessed to have been produced in Iran sometime in 2007.").  And about a week after the attack, another press briefing referenced the "indirect fire attacks fueled by Iranian-backed special groups criminals that targeted the Baghdad neighborhoods and the International Zone."  PX. 392 at 2.

Reviewing the evidence and testimony collectively and without the benefit of contrary evidence from defendants, the Court finds sufficient support to conclude that the attack was perpetuated by a Shia militia group that received material support from the defendants. Although a close call, the sophistication of the rocket attack, its origin from an area widely recognized as a stronghold of Iranian-backed militias, and the government press statements linking similar munitions and attacks to Iran are sufficient to satisfy the Court in this default context.

K.      Bellwether Attack # 10:  April 21, 2008 IED in Salah ad Din Province

Plaintiff Sgt. Adam Kohlhaas was killed by a pressure-plate IED in the Salah ad Din

Province of Iraq on April 21, 2008.  Bellwether Brief ¶¶ 467–70.  Kohlhaas and his platoon were

conducting operations to defeat Al Qaeda when their mine-resistant, ambush-protected vehicle

suffered an IED strike with such force that the 14-ton vehicle flipped over, killing Kohlhaas and

a fellow platoon member.  Id. ¶¶ 468–70.

Plaintiffs' expert attributed the attack to AQI due to its activity in the region and the

sophisticated nature of the explosive device.  PX. 2015 at 11–12, 20; Trial Tr. at 388, ECF No.

107 ("[I]t's reasonable to assess that Al-Qaeda was in that area and could operate in the area and

bury those IEDs[.]"); Trial Tr. at 389, ECF No. 107 ("[The IED was] ideally located and buried

to create the most maximum effect.  So it demonstrates training.  It demonstrates understanding

of tactics and understanding of U.S. operations[.]").  Kohlhaas's patrol leader, 1Lt. Michael

Behenna, also attested that AQI was operating in the area and that he had reviewed two

intelligence reports that attributed the attack to AQI.  PX. 2001 (Behenna Decl.) ¶¶ h, o ("Al

Qaeda (AQ) and/or Al Qaeda in Iraq (AQI) were a dominant insurgent force in our area.").

Lastly, a declassified official memorandum from then Lt. Gen. Lloyd Austin indicated that AQI

conducted an IED attack in the same area the day prior to the attack on Kohlhaas's patrol.

Behenna Decl., Ex. C at 1 ("On 20 April 2008, [AQI] conducted an improvised explosive device

attack on the Coalition Forces convoy in the vicinity of Salam Village, Salah ad Din Province,

Iraq.")

Given the size and sophistication of the blast, AQI's known activity in the region

including the use of IEDs, and the attributions to AQI by plaintiffs' expert and the intelligence

reports attested to by Behenna, the Court finds satisfactory evidence to attribute the tenth

bellwether attack to AQI, which received material support from the defendants, and holds the defendants liable for the attack.

L.    Bellwether Attack # 11:  April 5, 2005 Vehicle-borne IED in Baghdad

Plaintiff Ssg. Steve Nunez was injured by a vehicle-borne IED attack in the Dora neighborhood of Baghdad on April 5, 2005.  Bellwether Brief ¶¶ 485–92.  As Nunez's convoy approached a parked car that was left running with the windows blacked out, the car detonated, injuring Nunez and killing a member of his patrol.  Id.  The blast was caused by four 122-mm artillery rounds stashed in the trunk of the vehicle.  PX 2102 (Nunez Decl.) ¶ k.

Plaintiffs' expert attributed the attack to AQI because of "the location of the attack, the munitions and tactics utilized, and the group that had primacy and control of the territory in which it occurred at the time."  PX. 1003 ("MP's Attrib. Rep.") at Nunez 1.[7]  Specifically, Plaintiffs' expert noted that the Dora neighborhood was "an established AQI permissive environment within which AQI maintained freedom of movement and operational dominance" and that AQI would be motivated to attack U.S. troops in the area in order to protect its interests. Id.  In reaching his conclusion, the expert referenced reports of other AQI activity in the area, including vehicle-borne IEDs and the use of 122-mm artillery rounds, id., but no such reports were provided as exhibits for the Court's review.  Similarly, the expert explained that a mosque in the area was a known AQI safehouse, id. at Nunez 2, but no exhibits were provided to corroborate this statement.

The current record does not satisfy the Court that AQI is responsible for the attack.  Even crediting the expert's conclusions that AQI was the primary insurgency group operating in the

---

[7] Michael Pregent's expert report does not include page numbers for the section attributing each bellwether attack.  For clarity, the Court will identify its citations by the name of the lead plaintiff for the relevant attack and will restart the page count for each attack.

Dora neighborhood at the time of the attack, he does not discuss the likelihood of other groups operating in the area and perpetrating the attack. Nor have plaintiffs shown that perpetrating this vehicle-borne IED required operational control, particularly given the absence of a secondary blast or subsequent coordinated ambush. Further, there is no evidence that this attack, like some others, was technologically sophisticated or tactically advanced, making it difficult for the Court to rule out other bad actors that operated in Iraq without backing by Iran. Lastly, the current record does not include any government sources to corroborate the attribution.

Given these evidentiary shortcomings, entering default on this attack would extend liability to any attack perpetrated in an area in which an Iran-backed terrorist group had recently operated. That is too thin a reed to support judgment, even in the context of default. Again, plaintiffs may supplement the record with additional evidence to support finding that AQI was responsible for the attack.

      M.      Bellwether Attack # 12: May 9, 2005 Mortar Fire at U.S. Base in Al Anbar Province

Plaintiff LCpl. Taylor Prazynski was killed by mortar fire directed at the base where he was stationed in the Al Anbar Province of Iraq on May 9, 2005. Bellwether Brief ¶¶ 500–06. The mortar fire was described as "very accurate, with every round striking within [a] small area[.]" Id. ¶ 504. The following day, a team of Coalition forces tracked down the mortar team, killing two combatants and chasing two others from the area. Id. ¶¶ 505–06. Witnesses reported that the fleeing combatants "were not Iraqi but instead foreigners." Id. ¶ 506; PX. 2203 (Siewert Decl.) ¶ j.

Plaintiffs' expert attributed the attack to AQI because AQI had "operational dominance" in the area, the attack required "specialized training and a high degree of sophistication distinctly associated with the well-supported AQI cells in Al Anbar [Province,]" and "attacks in this area

against [Coalition Forces] were nearly all committed by AQI and its affiliates."  MP's Attrib. Rep. at Prazynski 1.  In particular, the sophistication of the attack, which required training to successfully target the camp with accurate fire and then evade the return fire from Coalition Forces, lends further support for crediting AQI.  Id.  The expert also emphasized AQI's heavy presence in the area, including the frequency of AQI attacks and its reliance on supply lines.  Id. at Prazynski 1–2.  According to plaintiffs, the presence of foreign fighters further supports the theory that Iran-backed militants were involved in the attack.  Bellwether Brief ¶ 514.

While somewhat of a close call, the Court finds sufficient evidence to hold AQI responsible for the attack because it occurred in an area of heavy AQI activity, the perpetrators were sophisticated, highly trained, and capable of successfully attacking and evading counter-attack, and there is evidence to suggest that foreign fighters participated in the attack.  While such evidence might not satisfy the standards of a contested hearing, the Court is satisfied that AQI is responsible for the attack and holds the defendants liable.

N.      Bellwether Attack # 13:  June 4, 2006 IED in Salah al Din Province

Plaintiff Sgt. Paul Haines was injured when an IED struck his tank while on patrol in the Salah al Din province of Iraq on June 4, 2006.  Bellwether Brief ¶¶ 517–21.  The IED "was so powerful that it launched the tank into the air, injuring Haines and killing two other soldiers.  Id. ¶¶ 519–20.  An investigation of the blast site found "400 meters of command wire that traveled up into a nearby palm tree to a rope tree seat."  Id. ¶ 521.  Witnesses interviewed as part of the investigation indicated that "the terrorists had used a van to prevent anyone from seeing them as they dug under the road and emplaced the IED."  Id.  In his declaration, Haines asserted that an AQI cell paid a local construction crew to implant and detonate the IED.  PX. 2303 (Haines Decl.) ¶ j.  In support of his declaration, Haines submitted a partially-redacted investigation report from the incident.  Haines Decl., Ex. A.  Although the cell responsible for the attack

appears to be identified in the report, that information is redacted from the version submitted to the Court.  Id. at 11.

Plaintiffs' expert attributed the attack to AQI based on "the location of the attack, the munitions and tactics utilized, and the group that had primacy and control of the territory in which it occurred at the time."  MP's Attrib. Rep. at Haines 1.  The expert determined that AQI "maintained freedom of movement and operational dominance" in the area.  Id.  In support of that conclusion, the expert referenced the arrest of a high value target involved in making IEDs less than a mile from the attack in February 2006 and weapon caches discovered nearby in March 2006, but did not explain how either incident was related to AQI or Iran.  Id.  Further, the expert explained that three days after the attack, AQI's leader was killed approximately 20 kilometers away, which, he suggests, is evidence of AQI's control in the area.  Id.  Lastly, the expert noted the presence of AQI supply lines in the region.  Id. at Haines 1–2.

On the current record, the Court is not satisfied that AQI is responsible for the attack. Many of the anecdotes relied on by plaintiffs' expert to support AQI's presence in the region are either unclear as to AQI's involvement or too remote to meaningfully suggest that AQI was responsible for the attack.[8]  Moreover, it is not clear to the Court that operational dominance and sophisticated training were necessary to bury and detonate the IED that injured Haines. Admittedly, the IED was large enough to lift a tank into the air, which suggests that the cell responsible was well-equipped.  But it is unclear whether other groups operating in the region

---

[8]  Plaintiffs' expert also submitted maps summarizing the frequency of various events in the area for the year before and after the attack in question, such as "Iran-supported Sunni Terror Group Activity," "Weapons Caches Seized," or "High Value Targets/Insurgents & Foreign Fighter Activity."  See, e.g., MP's Attrib. Rep. at Haines 4–9.  The Court does not find such maps particularly helpful in attributing the relevant attacks to a specific group, in part because of the limited and ambiguous information they convey.  Moreover, the maps lack any citations or supporting evidence for the Court to corroborate the expert's findings.

possessed the capacity to execute a similar attack, an issue on which the expert does not opine.

Further, as far as the Court can tell, plaintiffs have not offered any government sources

indicating that AQI was responsible for the attack.  Plaintiffs are welcome to supplement the

record with additional evidence, including additional evidence of U.S. government attribution, to

assist the Court in determining liability for this attack.

> O.      Bellwether Attack # 14:  November 14, 2006 EFP in Khadhimiya, Baghdad

Plaintiff Sfc. Larry Diaz Cabral, Jr. was injured by an EFP attack in the Kadhimiya

district of Baghdad on November 14, 2006.  Bellwether Brief ¶¶ 531–41.  While returning to

base on an unplanned route, Cabral's Humvee passed through an unmanned Iraqi Army

checkpoint.  Id. ¶¶ 534–36.  As they passed the checkpoint, an EFP detonated, injuring Cabral

and killing two other soldiers.  Id. ¶ 537.  Upon returning to base, Plaintiff Maj. Robert

McCormick met the convoy and "was severely traumatized by both the death of [one of the

soldiers] and observing parts of his body still in the Humvee."  Id. ¶¶ 539–40 ("McCormick had

been particularly close with [one of the deceased soldiers] and considered him a close friend and

mentor.").

Plaintiffs' expert attributed the EFP attack to Shia militia groups with support from Iran

through Hezbollah.  MP Attrib. Rep. at Cabral 1.  In particular, the expert noted that the area

surrounding the attack was an "established [Shia militia] enclave" and that the sophistication of

the attack, which involved tracking a U.S. patrol through an unplanned route, suggest a well-

supported and trained terror cell.  Id.  Further, this Court has already detailed the evidence and

legal support for the strong inference of Iran's connection to EFP attacks.  See supra III.H.

Given the nature of the attack and its location, and the absence of any evidence to the contrary,

the Court is satisfied that an Iran-supported Shia militia was responsible for the attack and holds defendants liable.

That said, the Court questions whether Major McCormick has suffered a "personal injury" within the scope of the FSIA.  While claims for intentional infliction of emotional distress caused by the physical injury or death of another are permitted under the FSIA, such claims are usually limited to immediate family of the killed or injured.  See Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 359 (D.D.C. 2020) ("[T]he statute is understood to encompass claims by family members of those injured or killed for the distress caused by their relative's injuries."); Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 54–55 (D.D.C. 2012) (noting that a plaintiff "need not be present at the place of outrageous conduct [to bring an intentional infliction of emotional distress claim for terrorism under the FSIA], but must be a member of the victim's immediate family." (internal quotation omitted)); Est. of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 27–28 (D.D.C. 2009) (discussing the "immediate-family test" for a FSIA claim against Iran).  In support of McCormick's claim, plaintiffs reference Ackley v. Islamic Republic of Iran, where Iran was held liable to "seven service-member plaintiffs who were not on site [when the attack occurred] for intentional infliction of emotional distress[.]"  No. 20-CV-621 (BAH), 2022 WL 3354720, at *47, *51 (D.D.C. Aug. 12, 2022).  But the court in Ackley did not explain its reasoning for holding that the absent service members had viable intentional infliction of emotional distress claims under the FSIA even though they were neither present for the attack nor immediate family members of those injured.  (And of course there was no opposition briefing.)  Accordingly, the Court will withhold judgment on whether McCormick can raise such a claim until it has the benefit of any supplemental briefing plaintiffs may wish to offer on this issue.

P.     Bellwether Attack # 15:  March 12, 2008 Rocket Attack in Dhi Qar
       Province

Finally, plaintiff Spc. Joel Tavera was injured when his military vehicle was struck by a

122-mm rocket in the Dhi Qar province of Iraq on March 12, 2008.  Bellwether Brief ¶¶ 551–57.

The blast from the rocket ejected him from the vehicle and killed three other soldiers.  Id.

Plaintiffs' expert attributed the attack to Shia militia groups operating in concert with

Hezbollah.  MP Attrib. Rep. at Tavera 1.  The expert determined that the Shia militia members

had "operational dominance of the Dhi Qar Province."  Id.  The expert also noted that the region

was a critical smuggling route for Iranian weapons and that the Shia militias would have been

motivated to attack Coalition Forces in the area to protect those routes.  Id. at Tavera 1–2.

The current record evidence does not satisfy the Court that an Iran-backed Shia militia

group is responsible for the attack.  While the plaintiffs have submitted evidence that the Shia

militias operated in the area, they have not provided evidence to link the actual attack to a group

benefiting from Iran's support.  Further, plaintiffs offer no corroborating evidence of government

attribution, or analysis of tactics and methods of the attack to satisfy the Court of defendants'

liability.  To conclude otherwise would extend liability to any attacks perpetrated in an area

where Iran-backed groups exist.  The Court therefore declines to enter default judgment on this

attack.

**IV.     Unsealing the Opinion**

Because many of plaintiffs' exhibits were sealed, the Court has filed this opinion under

seal.  The Court will issue an unsealed version of the opinion after giving plaintiffs an

opportunity to indicate any portions of the opinion that, in their view, should remain under seal.

Plaintiffs shall notify the Court of any suggested redactions by August 25, 2023.

### V.      Conclusions

Accordingly, it is hereby

**ORDERED** that plaintiffs' [115] Motion for Default Judgment as to Liability is GRANTED in part and DENIED in part.  The Court finds defendants liable for Bellwether attacks # 1–10, 12, and 14.  On the current record, the Court cannot find defendants liable for bellwether attacks # 11, 13, and 15.  The Court reserves judgment as to whether Plaintiff Robert McCormick can raise an intentional infliction of emotional distress claim for an attack he did not witness on an individual who is not in his immediate family and requests supplemental briefing from the plaintiffs on the issue by September 1, 2023.  It is further

**ORDERED** that plaintiffs will submit a notice as to whether any portion of the opinion should remain sealed by August 25, 2023.

**SO ORDERED.**

CHRISTOPHER R. COOPER
United States District Judge

Date:   August 18, 2023