```
                   IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
     - - - - - - - - - - - - - - - x
     ESTATE OF CHRISTOPHER BROOK
     FISHBECK, et al.,
                                          CA No:   1:18-cv-02248-CRC
                 Plaintiffs,
                                          Washington, D.C.
                                          Wednesday, August 30, 2023
     vs.                                  2:01 p.m.

     ISLAMIC REPUBLIC OF IRAN, et al.,

                 Defendants.
     - - - - - - - - - - - - - - - x
     _____

                      TRANSCRIPT OF MOTION HEARING
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                      UNITED STATES DISTRICT JUDGE
     _____

     APPEARANCES:

     For the Plaintiffs:       CHRISTOPHER GUS PAULOS, ESQ.
                               LEVIN PAPANTONIO, THOMAS, MITCHELL
                               RAFFERTY & PROCTOR, P.A.
                               316 South Baylen Street
                               Suite 600
                               Pensacola, FL 32502
                               (850) 435-7067
                               cpaulos@levinlaw.com

                               JEREMY A. TOR, ESQ.
                               SPANGENBERG, SHIBLEY & LIBER
                               1001 Lakeside Avenue, East
                               Suite 1700
                               Cleveland, OH 44114
                               (216) 696-3232
                               jtor@spanglaw.com

                               CHAD E. IHRIG, ESQ.
                               NIX PATTERSON, LLP
                               8701 Bee Cave Road
                               Building 1, Suite 500
                               Austin, TX 78746

     (CONTINUED ON NEXT PAGE)
```

```
1    APPEARANCES (CONTINUED)

2    For the Defendant:        (No one appeared for defendants)

3

4    Court Reporter:           Lisa A. Moreira, RDR, CRR
                               Official Court Reporter
5                              U.S. Courthouse, Room 6718
                               333 Constitution Avenue, NW
6                              Washington, DC  20001
                               (202) 354-3187
7
```

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, we are on the
 3    record for Civil Case 18-2248, Estate of Christopher Brook
 4    Fishbeck, et al. vs. Islamic Republic of Iran, et al.
 5            Counsel, please identify yourselves for the
 6    record.
 7            MR. IHRIG:  Good afternoon, Your Honor; Chad Ihrig
 8    for the plaintiffs, and I'm here with my co-counsel Jeremy
 9    Tor and Mr. Paulos.
10            THE COURT:  Okay.  Good to see you, Mr. Ihrig.
11            Good to see you, gentlemen.  Welcome back to
12    Washington.
13            Just for the record, there's no representative
14    from the defendants here.
15            So thanks for coming up.  I've reviewed the motion
16    to appoint the special masters and to implement the
17    administrative plan.  I've read the CVs of the original five
18    proposed special masters, also the sixth that was withdrawn,
19    Admiral Hutson, as well as the two replacements for Admiral
20    Hutson.  They all appear very highly qualified, and so I am
21    prepared to appoint all six.
22            Just for the record, Judge Herndon, Mr. Besser,
23    Mr. Borden; is that correct?
24            MR. IHRIG:  Yes, Your Honor.
25            THE COURT:  Judge Swanson, Judge Kuder.
```

1    "Cut-ter"?
2           MR. IHRIG:  "Koo-der."
3           THE COURT:  Kuder, and Captain McCarthy.  And
4    please thank Admiral Hutson for his willingness to serve,
5    and I hope that he is doing okay.
6           MR. IHRIG:  Absolutely.
7           THE COURT:  But as I was reviewing the resume of
8    those seven proposed special masters and thinking about the
9    three expert witnesses that you all put up at the bellwether
10   hearing, it occurred to me that they all had something in
11   common.  And what do you think that is, Mr. Ihrig?
12          MR. IHRIG:  I honestly do not know right now.
13          THE COURT:  Well, one thing they all have in
14   common is that they're all white, and they're all men.  And
15   I know that "diversity" and "inclusion" are unpopular words
16   in some quarters these days, but I just wondered whether
17   that occurred to any of you folks as you were preparing your
18   list.
19          MR. IHRIG:  I mean, we --
20          THE COURT:  I would just be interested in hearing
21   your reactions to that.
22          You know, I'm not going to dictate who it is you
23   recommend.  I'm certainly not going to reject any qualified
24   candidates based on the racial or gender make-up of the
25   group as a whole.  I don't think that's my role.  I am

1   authorized to make my own appointments, as I understand it,
2   but I doubt that I will do that here either.
3            But I do think the issue merits some discussion.
4   You know, clearly you all are footing the bill for your
5   experts and for the special masters, but ultimately, you
6   know, you will likely recoup that compensation from taxpayer
7   funds.  Some of your clients are certainly women and people
8   of color, so I don't think it's an inappropriate
9   conversation to have.
10           I'm also not the first to raise this issue.  I
11  know some judges have raised it in the context of, you know,
12  lead class counsel and lead MDL counsel in plaintiffs'
13  cases.  I believe DOJ has at one point issued some guidance
14  in this area regarding the appointment of corporate
15  monitors.
16           So I think it's a legitimate conversation to have,
17  and I just wondered whether that has occurred to you all and
18  just to get your reaction.
19           MR. IHRIG:  Thank you for bringing that up.  I
20  think the selection of the special masters that we presented
21  to the Court was simply a function of individuals who have
22  served in a special master capacity in the past, at least
23  for most of these individuals.
24           I can tell you in all candor that we never had a
25  conversation one way or another about women, men or women of

1   color, anything like that.  Like none of that just factored
2   into it.
3           And that's our fault.  That should have.
4           THE COURT:  I think your colleague may want to add
5   something.
6           Step right up.  Come to the mic.
7           MR. PAULOS:  Good to see you, Your Honor;
8   Christopher Paulos.  It's nice to be back.
9           THE COURT:  Good to see you.
10          MR. PAULOS:  I was involved in the selection
11  process, at least when we tried to locate special masters,
12  and we kind of put our feelers out there through judges in
13  our local area to help us find it.  I agree 100 percent that
14  we are -- and welcome the opportunity to include more
15  special masters and make our panel more diverse.
16          And we had candidates from all walks.  It was a
17  matter of availability.  Some just were so busy.  Some
18  people didn't call us back.
19          But it wasn't lost on us to -- it wasn't
20  intentional in terms of our selection, but we did have a lot
21  of factors in terms of availability and interest in working
22  the case or other conflicts.  And we'll certainly, if the
23  Court is inclined to have us do that, continue to search.
24          One of the things we might end up discussing with
25  you today is the number of special masters and where they

| | |
|---|---|
| 1 | will be serving and what component of the case and part |
| 2 | of the admin plan, and I would not be shocked if we had to |
| 3 | come -- actually add additional special masters. |
| 4 | And so I read you loud and clear, and we fully |
| 5 | support making the panel more diverse, if that's what the |
| 6 | Court would want. |
| 7 | THE COURT:  Well, you know, that is up to you.  I |
| 8 | did want to talk about whether seven is sufficient given the |
| 9 | number of attacks, but, you know, to the extent you would |
| 10 | like to recommend additional special masters, I will |
| 11 | consider their qualifications as I have the ones that we |
| 12 | will ultimately appoint. |
| 13 | And, you know, I don't doubt that you may have |
| 14 | contacted other people, but this is the end result, right? |
| 15 | MR. PAULOS:  Of course. |
| 16 | THE COURT:  I'm not suggesting in the least that |
| 17 | anyone is making, you know, conscious decisions to exclude |
| 18 | folks from consideration, but the effect is often the same, |
| 19 | right? |
| 20 | And you hear discussions about systematic sexism |
| 21 | and racism and institutional sexism and racism.  And I'm not |
| 22 | here to have, you know, a broader social debate about those |
| 23 | things, but, you know, I was in private practice for 17 |
| 24 | years, and I saw the referral networks.  And I saw who got |
| 25 | recommended for expert appointments and other appointments |

1   like that, and sometimes, you know, unconsciously this is
2   the result that you get.
3           MR. PAULOS:  Exactly.
4           THE COURT:  And you have to be deliberate in
5   thinking about that and not just simply recommending the
6   first folks who return your calls or not making some, you
7   know, deliberate and conscious efforts to identify qualified
8   candidates from all walks of life.
9           And this is not an overly technical exercise that
10  we're talking about here.  It's applying evidence to the law
11  or applying the law to the evidence and a set of facts
12  against an evidentiary standard based on a framework that
13  the Court has laid out.  All right?  So while these folks
14  are imminently qualified to do that, lots of other folks are
15  as well.
16          MR. PAULOS:  Absolutely.  I agree 100 percent,
17  Your Honor, and I would like the opportunity to make our
18  panel more diverse and include some additional people.
19          THE COURT:  Okay.
20          MR. PAULOS:  I think we'll get into the reasons
21  why I think we might need more.
22          THE COURT:  All right. Well, I'll put the ball in
23  your court on that issue.
24          It's also -- I want to be very clear.  It's not to
25  criticize you folks at all.  You all have handled this case

1    professionally.  The materials have been timely and well
2    prepared, and the case has been organized and well presented
3    from my perspective.
4             I've obviously not agreed with everything that you
5    all have put forth, but that's my job.  Right?
6             But hopefully you will, you know, remember this
7    conversation as you confront decisions like this going
8    forward, not only in this case but perhaps others as well.
9             MR. PAULOS:  Absolutely.
10            THE COURT:  Okay.
11            All right.  I read the administrative plan.  It
12   all makes sense to me.  This was modeled off of a plan that
13   Judge Bates adopted; is that correct?
14            MR. PAULOS:  So we looked at several of the
15   special master administrative plans.  I think we might have
16   filed our administrative plan with regard to liability
17   findings of facts before Judge Bates entered his.
18            But in terms of the mechanics of it on the damages
19   side and the handling of bellwether tranches, that's -- you
20   know, we tried to work that into it because we thought that
21   sounded like a very kind of methodical and routine way to
22   handle things, particularly the size of this case.
23            Last night I was looking at some of the most
24   recent docket activity in cases like *Cabrera*, and it does
25   look like they've added additional special masters, and

1       that's one of the reasons why I was going to talk to you
2       about doing that today because we have, I believe, more
3       attacks in that case, and they felt it necessary to include
4       additional people.
5               And they've made some changes in terms of how
6       they're assigning attacks to certain special masters,
7       basically accounting for if something happens, if somebody
8       has a family issue and can't make the deadline for them, so
9       that they can kind of interchangeably tackle some of the
10      issues.
11              THE COURT:  Okay.  Sort of the thing that probably
12      affects my life the most is, you know, how often I will be
13      getting these proposed findings and whether they will be
14      organized in a way so that they're not just coming in, you
15      know, piecemeal over the transom.  It would be nice to do it
16      in a way where like attacks or like plaintiffs are grouped
17      in some way, and that there's some rationality to it and
18      some sort of pacing to it so that we're not just getting
19      them seriatim.
20              MR. PAULOS:  Yes, Your Honor.  The way we were
21      thinking of doing it now -- and I was looking at actually
22      the case management schedule and then the administrative
23      proposal; that we tried to kind of have it dovetail or at
24      least, you know, track what was originally in Your Honor's
25      case management order.

1                At the present time, I believe 120 days from the
2     bellwether -- eventually the bellwether order we are
3     supposed to propose our first tranche or wave of cases.  I
4     believe that falls on a Saturday, so we're targeting
5     December 15th for that 120-day period.
6                The case management schedule has us proposing
7     special masters 30 days from August 18th for the issue of
8     damages.  We did not include that in this administrative
9     plan because the case management schedule already had that
10    included in it, so we didn't want to come off as
11    presumptuous --
12               THE COURT:  Right.
13               MR. PAULOS:  -- and disrupt your plan.
14               My thinking is that what we'll do is amend the
15    administrative plan to include a component of damages, and
16    we think, in terms of efficiencies, that special masters who
17    are looking at a particular file for the liability question
18    and that evidence would -- if the Court is inclined to adopt
19    their report and recommendation on liability, that that same
20    special master would handle the question of damages so that
21    there's not a kind of relearning of the case or the issues
22    and who's involved.
23               So what we're thinking is prior to December 15th,
24    that we would make our first damages submission for the
25    bellwether attacks that the Court has found liability on so

1    that the special masters would start there.
2              At the time December 15th rolls around, we would
3    ask the special masters to be done, if they can be, with
4    their report and recommendation on damages for the
5    bellwethers, and we would pass them the first wave of
6    liability attacks.  And then we would want to give them the
7    next wave within 60 days where they would then turn over to
8    the Court the reports and recommendations on that first
9    wave.
10             One of the things that we're cognizant of is
11   obviously the Court has to have time to review the reports
12   and recommendations, ask questions or obtain what it may
13   need to fully evaluate it and make its decision on adopting
14   or modifying the reports and recommendations.  So we're
15   trying to time it so that the special masters will continue
16   to work and they're not waiting around for us to give them
17   something; that we're giving them things timely.  And while
18   the Court is considering certain -- the waves that they've
19   looked at before, they're working on either a damages wave
20   or another liability wave until we await your ruling on
21   whatever report and recommendation is before you.
22             THE COURT:  And so do you anticipate that I will
23   get the report and recommendations on a wave basis or --
24             MR. PAULOS:  Our anticipation is that every 60
25   days they would be completing a wave, whether it will be

1  damages or liability, and handing that over to the Court,
2  and we would be giving them a new set of attacks to review.
3            THE COURT:  Okay.  And the sets will be related in
4  some way, I take it.
5            MR. PAULOS:  So that's the other thing that we
6  wanted to talk to you about, is if the Court would like it
7  done that way, whether it be by, you know, year or attack or
8  attack type, TTP, geography, whatever it may be.  We are
9  cognizant of the extrajudicial killing issue that I believe
10 is now at the D.C. Circuit in a case -- I mispronounce it
11 all the time; I believe it's *Borochov* -- that is being -- I
12 think it's been briefed and is being argued.
13           THE COURT:  Oh, I see.  So the bellwethers all
14 involved deaths, but some of the other attacks did not.
15           MR. PAULOS:  And so what we would want to do, if
16 the Court is inclined to allow us to, is to actually focus
17 on those attacks that we have that involve extrajudicial
18 killing while we wait and see what the D.C. Circuit does.
19           THE COURT:  That makes sense to me.
20           MR. PAULOS:  There's only some minor wrinkle to
21 that thinking, and that is that right now the DOD is
22 producing documents in a -- I don't want to say sporadic,
23 because they're basically going from the top of our subpoena
24 to the bottom.  We originally, after the bellwether hearing,
25 asked them to focus on the extrajudicial killing attacks at

1   the time, and we were told that they wouldn't do that; not
2   because they had a problem with it, just they had already
3   started doing the attacks.
4            I believe they're sufficiently through that
5   review, that if we went back to the DOD we may get them to
6   agree to it.
7            THE COURT:  How far down your list are they?
8            MR. PAULOS:  I believe we have now received a
9   response on the first I want to say maybe 150 attacks.  We
10  do have -- 50 of those do involve extrajudicial killings
11  that we have established from prior -- from the production
12  that's been given to us.  But we are still continuing to
13  investigate and finding victims that -- and establishing
14  that there were killings in others, and that number is going
15  up almost on a daily basis.
16           But I do think that the first three waves that we
17  could present to the Court would include extrajudicial
18  killings.  That way we're not asking Your Honor to make a
19  decision or the special masters to make a decision that can
20  be different from whatever the D.C. Circuit does.
21           THE COURT:  And that case is scheduled for
22  argument now, or no?
23           MR. PAULOS:  Next month.
24           THE COURT:  Next month.  So they'll get to it
25  within eight months or so.

1                    MR. PAULOS:  Exactly.
2                    And so I'd like an opportunity to talk to the DOD.
3     I obviously don't want to put words in their mouth and say
4     that we can do something and then have them tell us that we
5     are not.  And if Your Honor would allow us to update the
6     Court in about a week or two, whenever I can get ahold of
7     the DOD?
8                    We did let them know of the bellwether order and
9     that we wanted to speak with them, but because of its seal
10    we didn't share it with them yet and so --
11                   THE COURT:  Have we unsealed that yet?
12                   MR. PAULOS:  We filed a notice of no redactions.
13    We did not ask the Court to maintain any redactions on it so
14    we think it can be unsealed, although there's no order --
15                   THE COURT:  We will do that.
16                   MR. PAULOS:  Okay.
17                   THE COURT:  I had another question.  I know I
18    invited you to supplement the record with a handful of
19    bellwether attacks.
20                   Do you intend to do that; and if so, will that
21    come directly to me, or will we have one of the special
22    masters take it on in the first instance?  What's your
23    intent?
24                   MR. PAULOS:  Our intent is to do whatever you
25    would like us to do, Your Honor.  But what our thinking was,

1    when we received the order --
2            THE COURT: And do you need to hear from the DOD
3    on those issues before you supplement?
4            MR. PAULOS: That's one of the issues that we
5    wanted to speak to them about because we did not have DOD
6    documents on some of those attacks that we had asked for.
7    We do believe they exist.
8            So we'd like to unredact some things that I think
9    Your Honor mentioned in the order, and we do believe that we
10   can supplement that based on the guidance that the Court
11   gave us with the order. And so our plan is to supplement
12   those attacks.
13           We're presently going to be meeting with the
14   experts, and we are also meeting with our experts and
15   reassessing some additional information that we've collected
16   over the course of the case related to NIOC. So I'd like to
17   be able to update the Court with maybe some proposed dates
18   for when those supplementations would be submitted.
19           We can submit them to the special masters, if you
20   would like, or have Your Honor review it.
21           THE COURT: It probably makes sense just to come
22   straight back here since we're familiar with those attacks.
23   Right?
24           MR. PAULOS: And Your Honor understands what you
25   were looking for and what might not have been provided or

```
1    included in what we previously submitted.  And I think in
2    terms of the function of the bellwether order with the Court
3    having found some attacks sufficiently proven, other attacks
4    not, it provides great guidance for the special masters, but
5    also you already are aware of what those attacks did have
6    and did not have and may see what you're looking for
7    immediately.
8            THE COURT:  Okay.
9            All right.  So should I just go ahead and grant
10   the proposed appointment order and the proposed
11   administrative plan?  Nothing that we've talked about today
12   will affect any amendments to either of those at this point.
13           MR. PAULOS:  Yes, I believe you could go ahead and
14   grant the motion that's been -- that's before Your Honor,
15   and then we would file an amended or supplementary just to
16   deal with the issue of damages and the discussion of the
17   sources of payment that are there.
18           THE COURT:  Anything else?
19           MR. IHRIG:  One thing, Your Honor.
20           THE COURT:  Come to the mic.
21           MR. IHRIG:  Yes, sir.
22           You granted us leave to supplement for one of the
23   plaintiffs, Robert McCormick, by I believe this Friday.  We
24   would just ask for a two-week extension of that.
25           THE COURT:  That's fine.
```

1           MR. IHRIG:  Thank you.
2           THE COURT:  All right.  Well, I'm sorry -- I hope
3  I didn't drag you up here for nothing from your perspective,
4  but it's good to see you, gentlemen, and it's lovely in D.C.
5  this week so enjoy your stay.
6           MR. IHRIG:  Thank you.
7           MR. TOR:  Thank you, Your Honor.
8           THE COURT:  We're adjourned.
9                (Whereupon the hearing was
10                  concluded at 2:21 p.m.)
11
12           **CERTIFICATE OF OFFICIAL COURT REPORTER**
13
14           I, LISA A. MOREIRA, RDR, CRR, do hereby
15  certify that the above and foregoing constitutes a true and
16  accurate transcript of my stenographic notes and is a full,
17  true and complete transcript of the proceedings to the best
18  of my ability.
19      Dated this 19th day of September, 2023.
20
21
                                /s/Lisa A. Moreira, RDR, CRR
22                              Official Court Reporter
                                United States Courthouse
23                              Room 6718
                                333 Constitution Avenue, NW
24                              Washington, DC 20001
25