UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESTATE OF CHRISTOPHER BROOK FISHBECK, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:18-cv-2248-CRC |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

REPORT AND RECOMMENDATION
REGARDING LEGAL STANDARDS AND DAMAGES FRAMEWORKS

I.      Introduction

In this case, over 1400 plaintiffs bring claims against Iran and its alleged instrumentalities under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, seeking damages resulting from death or injury caused to U.S. military members in over 400 terrorist attacks during operations in Iraq from 2003 to 2011.[1]  Following a three-day evidentiary hearing on plaintiffs' motion for default judgment, the Court entered an order finding Iran liable for providing "material support" for 12 of the 15 bellwether terrorist attacks. Order, ECF No. 137 (August 18, 2023).[2] After issuing this liability finding, the Court appointed several Special Masters "[t]o consider and make recommendations to the Court related to damages, including compensatory, economic, solatium, pain and suffering, and punitive damages," as well

---

[1] See Plaintiffs' Second Amended Complaint, ECF No. 100 (September 6, 2022).

[2] The Court also found all but one of Iran's codefendants liable: the Islamic Revolutionary Guard Corps; Iranian Ministry of Intelligence and Security; Bank Markazi; and Bank Melli. See ECF No. 137, p. 3; ECF No. 136; and ECF No. 127. The one defendant that the Court has not yet found liable is the National Iranian Oil Company ("NIOC"). ECF No. 137, p. 3. However, the Court invited Plaintiffs to provide supplementary evidence to prove NIOC's liability. ECF No. 136, p. 7. Plaintiffs intend to do so, but that has no impact on damages.

as "pre and post-judgment interest." ECF No. 145, p. 2. The Court further ordered the Special

Masters to "file their damages report for the Plaintiffs harmed in an attack within sixty (60) days

after Plaintiffs submit the damages evidence for those Plaintiffs." *Id.*

Plaintiffs have submitted to the Special Masters the damages evidence for the Plaintiffs

harmed in the 12 bellwether attacks for which Iran is liable. Plaintiffs also submitted to the

Special Masters briefs on compensatory and punitive damages, as well as the recoverability of

prejudgment and post-judgment interest. Plaintiffs contend the damages law and damages

frameworks, as well as the law on prejudgment and post-judgment interest set forth in their

briefs, should apply to *all* Plaintiffs in this case, not only the bellwether Plaintiffs.

In order to conserve judicial resources, and to minimize needless repetition and redundant

efforts on the part of all Special Masters in this case, the undersigned Special Masters submit this

report and recommendation ("R&R") setting forth the legal standards applicable across all R&Rs

relating to compensatory damages, punitive damages, prejudgment interest, and post-judgment

interest. It is the intention of the undersigned that the legal standards discussed herein will be

explicitly incorporated by reference by all Special Masters in the case as they submit their

damages recommendations. The Special Masters respectfully offer this approach in the

expectation that it will create efficiencies by relieving the Court of the task of reading repeated

similar expositions of the applicable law on damages each time it reviews a damages R&R

submitted by a Special Master.

## II.     Legal Standards and Frameworks Regarding Damages

FSIA provides a private right of action against state sponsors of terrorism for plaintiffs

who are United States nationals, members of the armed forces, government employees, or

contractors (or their legal representatives) "for personal injury or death caused by" acts including

extrajudicial killing and hostage taking, or the provision of material support for such acts. 28 U.S.C. § 1605A(c). Although FSIA provides a private right of action, it does not provide guidance on the substantive bases for determining liability regarding a plaintiff's entitlement to damages. *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F.Supp.3d 107, 137 (D.C. Cir. 2018). In the absence of such guidance, the Court relies on well-established principles of common law. *See id.* at 137-138.

Upon obtaining default judgment in a Section 1605A action, a plaintiff may recover damages by showing "the projected consequences are reasonably certain (i.e., more likely than not) to occur." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003)); 28 U.S.C. § 1605A(c). A plaintiff must prove the amount of damages "by a reasonable estimate." *Fraenkel*, 892 F.3d at 353 (quoting *Hill*, 328 F.3d at 684). Damages available under FSIA include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Individuals who survive an attack can recover for their pain and suffering and economic loss caused by their injuries. *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 83 (D.D.C. 2010). For individuals who did not survive the attack, their estates can recover: (1) economic loss stemming from the wrongful death; and (2) compensation for pain and suffering the decedent endured before his or her death. *Id.*; *Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25, 53 (D.D.C. 2007). Family members of victims "can recover solatium [damages] for their emotional injury." *Valore*, 700 F.Supp.2d at 83. All plaintiffs can recover punitive damages. *Id.*

### 1. Compensatory Damages

#### a. Economic Loss

As noted, direct victims, or their estates, may recover economic losses resulting from their injuries. FSIA "provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic*, 167 F.Supp.3d 22, 48 (D.D.C. 2016) (citing 28 U.S.C. § 1605A(c)). Victims can prove economic loss damages by submitting a forensic economist's expert report that is "based on reasonable assumptions about the plaintiff's likely earnings if she had survived, including the length of time she would have worked and received retirement benefits." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 402 (D.D.C. 2015) (citation omitted).

#### b. Pain and Suffering

As the Court has previously acknowledged, "assessing damages for pain and suffering is an imperfect science as no amount of money can properly compensate a victim for the suffering he or she endures during and after an attack." *Cohen v. Islamic Republic of Iran*, 268 F.Supp.3d 19, 24 (D.D.C. 2017).  In the interest of fairness, courts in this District apply standardized frameworks for awarding pain and suffering damages to "ensure that individuals with similar injuries receive similar awards." *Valore*, 700 F.Supp.2d at 84 (quoting *Peterson*, 515 F.Supp.2d at 54); *see also Cabrera v. Islamic Republic of Iran*, 2022 WL 2817730, at *43 (D.D.C. July 19, 2022) (noting the "primary consideration is to ensure that individuals with similar injuries receive similar awards").

### i. Victims Who Survived the Attack

As discussed below, for servicemembers who survived a terrorist attack in Iraq, courts have primarily applied the following damages frameworks: (1) the *Peterson* framework; (2) the *Schooley* framework; and (3) the explosively formed penetrator ("EFP") framework, which was recently adopted in *Lee v. Islamic Republic of Iran*, No. 19-CV-00830 (APM), 2023 WL 7458370 (D.D.C. October 16, 2023). One size does not fit all, and the appropriate framework for one victim may not be suitable for another. The determination of which damages framework to apply requires consideration of the individual circumstances of each attack and each claimant.

### 1. The *Peterson* Framework

The original damages framework has come to be known as the *Peterson* (or sometimes *Peterson II*) framework. *See Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25 (D.D.C. 2007).[3] Under this framework, the pain and suffering "baseline award for surviving direct terrorist attack victims is $5 million." *Cabrera*, 2022 WL 2817730, at *43 (D.D.C. July 19, 2022). However, "in more severe instances of physical and psychological pain," an upward departure from this baseline is warranted. *Id.* (quoting *Valore,* 700 F.Supp.2d at 84). Courts should "be mindful of the need to assess each plaintiff's injuries individually, as well as the need to ensure that individuals with similar injuries—even between cases—receive similar awards." *Id.* (quoting *Peterson*, 515 F.Supp.2d at 54) (quotations omitted).

Accordingly, courts have departed upward to a range of $7.5 to $12 million "where the victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead, as was one soldier who was placed

---

[3] The *Peterson* court blended the frameworks set forth in *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006) and *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40 (D.D.C. 2006). This "blended" framework is known as the *Peterson* framework and is sometimes referred to as the *Peterson II* framework.

in a body bag and buried alive in a morgue for four days until someone heard him moaning in pain." *Valore,* 700 F.Supp.2d at 84. Similarly, courts have departed downward to $1.5 to $3 million "where the victim suffers severe emotional injury accompanied by relatively minor or no physical injuries." *Sheikh v. Republic of Sudan*, 485 F.Supp.3d 255, 268 (D.D.C. 2020).

Applying the *Peterson* framework with its downward and upward departures, courts in this District have issued the following pain and suffering damages awards:

- $1.5 million to a victim who witnessed a "mushroom cloud" and "felt the ground moving" and did not suffer any physical injury in the attack but suffered severe emotional injuries, including post-traumatic stress disorder, as a result of the attack. *Bland v. Islamic Republic of Iran*, 831 F.Supp.2d 150, 155 (D.D.C. 2011).
- $2 million to a victim who was 150 yards away when the explosion occurred and suffered lacerations to his thigh and rib cage and suffered a severe psychological and emotional toll. *Id.* at 156.
- $2 million to a victim who was minimally injured from small arms fire occurring just after the initial bomb explosion, experienced resulting nerve pain and foot numbness, and suffered lasting and severe psychological problems from the attack. *Peterson*, 515 F.Supp.2d at 55.
- $3 million to a victim who suffered lacerations to the back of his head and back injuries and experienced resulting chronic back pain and headaches as a result of the attack, in addition to lasting and severe psychological problems. *Id.*
- $3 million to a victim who suffered injuries in the back, arm, and head from being hit with shrapnel from the attack and who also suffered lasting and severe psychological problems. *Id.* at 54.
- $4.5 million to a victim who was sleeping when he was buried by the blast and suffered a head injury, a hole in his eardrum, and a broken foot (resulting in lifelong pain in his foot), along with severe psychological problems. *Bland*, 831 F.Supp.2d at 155-156.
- $5 million to a victim who suffered a compound fracture of his right leg, injuries to the toes on his left foot, wounds and scars from shrapnel, and lasting and severe psychological harm. *Peterson*, 515 F.Supp.2d at 54.
- $5 million to a victim who suffered a broken jaw, severe flesh wounds and scars on his arms, legs, and face, a loss of teeth, and lasting and severe psychological harm. *Id.*
- $5 million to a victim who suffered a shoulder injury and still suffers from neck, shoulder, and back pain to this day, and who also suffered lasting and severe psychological problems, including problems with alcohol abuse. *Id.* at 55.

- $5 million to a victim who suffered soft tissue damage to the chest and sternum area, flash burns, lingering back problems, internal maladies, and physical scarring as well as lasting and severe psychological problems. *Id.* at 56.
- $7 million to a victim who suffered a shrapnel wound to the forehead that destroyed the middle part of his nose, cuts to the head and back, and a perforated eardrum, as well as lasting and severe psychological problems. *Id.* at 55
- $7 million to a victim who suffered two broken eardrums, skin lacerations, burned skin, and knee damage from the attack, as well as lasting and severe psychological problems. *Id.* at 56.
- $7.5 million to a victim who suffered a broken femur, hand, and pelvis bone and was covered in cuts and bruises from the attack, whose left foot was turned completely backwards, and who also suffered lasting and severe psychological problems. *Id.*
- $7.5 million to a victim who suffered the loss of sight in one eye, a perforated right eardrum resulting in some hearing loss, shrapnel injury to the back of his right thigh, and lasting and severe psychological problems. *Id.* at 54.
- $8 million to a victim who suffered skull fractures, brain bruising, various broken bones in his leg, an exposed Achilles tendon, and lasting and severe psychological problems. *Id.* at 55.
- $8 million to a victim who suffered an eye injury, a perforated left ear drum, broken ribs, various shrapnel wounds, burning of the lining of his lungs, and lasting and severe psychological problems. *Id.*
- $9 million to a victim who suffered a skull fracture, a shattered cheekbone, eyebrow, and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on his arms and back, and internal bleeding, as well as lasting and severe psychological problems. *Id.* at 56.
- $12 million to a victim who suffered severe injuries including a broken neck, which resulted in permanent quadriplegia, and lasting and severe psychological problems. *Id.* at 55.
- $12 million to a plaintiff with permanent and debilitating injuries, including complete deafness and blindness in one eye. *Mousa v. Islamic Republic of Iran*, 238 F.Supp.2d 1, 12-13 (D.D.C. 2001).

## 2. The *Schooley* Framework

An alternative damages framework was set forth in *Schooley v. Islamic Republic of Iran*, No. 17-1376 (BAH), 2019 WL 2717888 (D.D.C. Jun. 27, 2019). Recognizing that "[a]warding damages for pain and suffering is inherently difficult in any context," the judge applied "an objective metric for determining the relative degree of injury suffered by each service member

plaintiff by using the VA disability rating." *Id.* at * 74. As the court explained, "[t]he VA disability rating constitutes a specialized agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.* This "approach treats mental and physical injuries as equally capable of causing disability, and therefore equally deserving of compensatory damages," and may be "preferable to discounting a damage award merely because a service member suffered 'only' mental, but not physical, injuries." *Id; cf. Valore*, 700 F.Supp.2d at 85 (reducing a service member's damages because he lacked severe physical injuries, even though he "suffered severe emotional injuries"). The "VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides a relatively objective measure of comparative injuries among" servicemembers. *Schooley*, 2019 WL 2717888, at *74.

The *Schooley* court thus created the following damages rubric: Servicemembers rated by the VA as up to 30% disabled—whether due to mental or physical injuries, or a combination of both—receive an award of $5 million each. Servicemembers rated 40 to 60% disabled receive an award of $6 million each. Servicemembers rated 70 to 100% disabled receive an award of $7 million each. *See id. at *75.*

The *Schooley* model has been applied in several terrorism cases that are comparable to the present case with respect to theories of liability, damages, and cohort of victims. *See Gration v. Islamic Republic of Iran*, No. 21-CV-1859 (BAH), 2023 WL 5221955, at *31 (D.D.C. Aug. 15, 2023) (Khobar Towers victims); *Roth v. Islamic Republic of Iran*, No. 1:19-CV-02179-TNM, 2023 WL 3203032, at *3 (D.D.C. May 2, 2023) (servicepersons injured or killed in Afghanistan and Iraq); *Christie v. Islamic Republic of Iran*, No. 19-1289 (BAH), 2020 WL 3606273 (D.D.C.

Jul. 2, 2020) (Khobar Towers victims); *Aceto v. Islamic Republic of Iran*, No. 19-464 (BAH),
2020 WL 619925 (D.D.C. Feb. 7, 2020) (Khobar Towers victims).

To determine which portion of a servicemember's VA disability rating was caused by the
attack at issue, courts rely on the uncontroverted assertions contained in the sworn written
testimony of the servicemember himself or herself. *See, e.g., Aceto*, 2020 WL 619925 at *19
(relying on a plaintiff's assertion that 60% of his 70% disability rating was caused by the attack
and another plaintiff's assertion that 50% of his 80% disability rating was attributable to the
attack); *Gration*, 2023 WL 5221955, at *3-32 (plaintiffs averring their injuries resulted from
Khobar towers bombing received damages corresponding to 100% of their VA rating).

### 3.  Damages Framework for EFP Attacks

The third framework applies to victims of EFP attacks. The court in *Lee v. Islamic
Republic of Iran* adopted this "modified damages framework," which essentially provides
uniform upward departures, to account for the "aggravating circumstances" of EFP attacks.  *Lee*,
2023 WL 7458370, at *2 (D.D.C. October 16, 2023) ("The proposed framework is consistent
with, and an appropriate enhancement to, the *Peterson II* and *Valore* framework."). EFP—short
for "explosively formed penetrator"—is a "uniquely lethal weapon" that is "designed to defeat
armor." *Lee*, 2023 WL 1100711, at *4. EFPs are "made with a precision manufactured concave
copper disk liner and high-energy explosive packed behind the liner." *Id.* They "travel at high
speeds and can pierce through several inches of military-grade armor like a fist through a wall."
*Id.* They "create a massive blast overpressure, capable of blowing the doors and turrets from
vehicles close to the device," and "the heat and force of the penetrator can shatter a vehicle's
armor and materials inward," propelling "razor-sharp shards of Teflon and steel ripping through
the interior compartment." *Id.* The "heat generated by EFPs is powerful enough to ignite engine

fuel and set vehicles ablaze." *Id.* EFPs are a "signature weapon used by Iranian-backed militias." *Id.* at *27.

As the *Lee* court noted, there are "major differences between injuries resulting from EFP attacks and other types of explosive warfare." *Lee,* 2023 WL 7458370, at *2. The court went on to explain why those differences warrant an enhanced damages framework for EFP attacks.

> The particularly high velocity at which EFPs travel is unparalleled. The focused nature of an EFP blast creates more intense blast waves, which especially in a vehicle, reflect off of objects and cause significant "brisance" and greater destruction for those who are proximate to these blast waves. The resulting injuries are more complex than those caused by other explosives, because they include novel medical issues like traumatic amputations and heterotopic ossification, are polytraumatic in nature, often require numerous surgeries and lengthy hospital stays, and are resistant to healing and prolonged in nature, such as the impact of shrapnel embedded in the body, which can cause persistent infections. The impact of the attack can cause neurological and psychological issues, including TBI, post-traumatic stress disorder (PTSD), and major depressive disorder (MDD).

*Id.*

The *Lee* court adopted the following enhanced damages framework for EFP victims:

| Category | Characteristic Injuries | Damages |
|---|---|---|
| 1 | Psychological injuries (without traumatic brain injury "TBI" diagnosis/severe shrapnel/fractures/orthopedic injuries/polytrauma) | Baseline: $2 million<br>Range: $1.5-$8 million |
| 2 | Mild TBI with psychological injuries (without severe shrapnel/fractures/orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $5 million<br>Range: $3-7 million |
| 3 | Mild TBI with psychological injuries (with severe shrapnel/fractures/orthopedic injuries) | Baseline: $7 million<br>Range: $4-10 million |
| 4 | Mild TBI with psychological injuries (with polytrauma/traumatic amputations) | Baseline: $15 million<br>Range: $10-20 million |
| 5 | Moderate/severe TBI (without severe shrapnel/fractures/orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $20 million<br>Range: $15-25 million |
| 6 | Moderate/severe TBI (with severe shrapnel/fractures/orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $30 million<br>Range: $25-50 million |

*Id.*

## ii. Deceased Victims Who Initially Survived the Attack

For victims who initially survived an attack and then died, courts have typically awarded $1 million to the decedent's estate when the victim endured extreme pain and suffering for several hours or less. *See Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25, 53 (D.D.C. 2007); *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 71 (D.D.C. 2006); *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, 8 (D.D.C. 2000). When the period of pain and suffering was longer than a few hours, the award increases; conversely, when the period of suffering was shorter, the award decreases. *Id.* Applying that framework, courts in this District have issued the following damages awards:

- $1.5 million for pain and suffering endured over a 15-hour period, during which the victim was repeatedly beaten before eventually being shot. Of these amounts, $500,000 was compensation for the 15-hour period of beating, while $1 million was compensation for the several minutes of suffering he experienced after being shot, but before he died. *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).
- $7 million for a victim who was alive for seven days after the attack. *Peterson*, 515 F.Supp.2d at 53.
- $7.5 million for a victim who was alive and conscious for nearly eight days after the attack. *Id.*
- $10 million for pain and suffering experienced for seven weeks following an attack, during which the victim remained hospitalized and in extreme pain and at the conclusion of which he died. *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 23 (D.D.C. 2002).

## c. Solatium

Solatium damages are meant to compensate family members for the emotional suffering they experienced—including "mental anguish, bereavement, and grief"—as a result of the direct victim's harm. *Valore*, 700 F.Supp.2d at 85. Courts in this District have embraced a "presumption that family members in direct lineal relationship suffer compensable mental anguish[,] . . . and

testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Lee v. Islamic Republic of Iran*, 2023 WL 4891534, at *1 (D.D.C. June 29, 2023) (quoting *Kaplan v. Hezbollah*, 213 F.Supp.3d 27, 38 (D.D.C. 2018).

Courts in this District have followed a framework based upon principles set out in *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 at 299 (D.D.C. 2008). Under this framework, "[s]pouses typically receive greater damage awards than parents, who, in turn, receive greater awards than siblings," while "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Heiser*, 466 F.Supp.2d at 269. Half-siblings are generally treated as full siblings. *Valore*, 700 F.Supp.2d at 79-80; *Peterson*, 515 F.Supp.2d at 52. In addition, "[c]ourts in this Circuit award[] damages under the FSIA to stepparents and stepsiblings" provided these relatives "resided in the same household as the victim" or were the victims' legal guardians. *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003); *Valore*, 700 F.Supp.2d at 79. Likewise, individuals who are the "functional equivalent of immediate family members" are entitled to solatium awards. *Id.* (quoting *Bettis*, 315 F.3d at 337); *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7, 15 (D.D.C. 2012).

Whether a solatium plaintiff is the functional equivalent of an immediate family member is a case-specific factual inquiry. Courts in this District have found solatium victims who are not legally or biologically related can be sufficiently close to the direct victim to satisfy the "functional equivalent" test when the solatium victim shared the same financial, emotional, and social relationship as a spouse, mother, father, sibling or child of the direct victim. *See e.g., Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2023 WL 3496303, at *2 (D.D.C. May 16, 2023); *Fritz v. Islamic Republic of Iran*, 324 F.Supp.3d 54, 62-63 (D.D.C. 2018) (citing

*Valore*, 700 F.Supp.2d at 80, *Estate of Heiser v. Islamic Republic of Iran*, 659 F.Supp.2d 20, 29

(D.D.C. 2009) ("*Heiser II*"), and *Bettis*, 315 F.3d at 337).

As recently summarized in *Lee*, courts have adopted baseline awards for solatium

damages. *Lee*, 2023 WL 4891534, at *2 (D.D.C. June 29, 2023); *see also Heiser,* 466 F.Supp.2d

at 299.

Family members of deceased victims typically receive:

- $8 million for spouses.
- $5 million for parents and children.[4]
- $2.5 million for siblings.

*See Lee,* 2023 WL 4891534, at *2 (citations omitted).

Family members of surviving victims receive half of the amounts awarded to family

members of deceased victims (i.e., $4 million for spouses, $2.5 million for parents and children,

and $1.25 million for siblings). *See id.*

These numbers "are not set in stone," and an upward departure from the baseline may be

warranted in cases "with aggravating circumstances." *Valore*, 700 F.Supp.2d at 85. "A court's job

in a solatium case is to account for various facts and circumstances and to use those factors to

arrive at an appropriate numerical expression of total pain and grief—encapsulated in the

solatium award." *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 25 (D.D.C. 2011).

Upward departures may be warranted based on: "an especially close relationship between the

[claimant and the deceased or injured victim], particularly in comparison to the normal

interaction to be expected given the familial relationship; medical proof of severe pain, grief or

---

[4] Courts in this District have not been perfectly consistent in their awards of solatium damages to children of victims. *See Lee*, 2023 WL 4891534 at *2, n.2 (reviewing cases and finding that some courts award children of deceased victims $5 million and others award $3 million). The *Lee* court determined that "a $5 million solatium award is the appropriate baseline for children of deceased victims, as established in *Heiser*." *Id.*; s*ee Heiser*, 466 F.Supp.2d at 318; *see also Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25, 51 (D.D.C 2007) ("Parents of victims typically receive awards similar in amount to those awarded to children of the victim.").

suffering [by] the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Id.* at 26-27. Any departures "are generally small relative to the award specified by the developed framework, absent circumstances that appreciably worsen a claimant's pain and suffering, such as cases involving torture or kidnapping." *Id.* at 27 (quotations and citations omitted).

In accordance with these standards, the following upward departures have been issued with respect to solatium damages:

- 20% upward departure for children of a deceased father where the children suffered "extreme depression and repeated suicidal ideation" and "whose ability to live a normal childhood and pursue a traditional education was especially disrupted by the emotion harms." *Cabrera*, 2023 WL 3496303, at *10 (D.D.C. May 16, 2023)
- 25% upward departure for the spouse of a surviving victim "[i]n recognition of the particularly brutal suffering [she] endured and the years spent at the hospital caring for her husband, all of which [] resulted in significant negative impacts on her relationship with her own children." *Id.* at *9.
- 25% increase for a sister of a surviving victim because "her emotional suffering [stood] out as particularly devastating," as she "suffered several nervous breakdowns, at least one of which required hospitalization, from which she [] never fully recovered." *Valore*, 700 F.Supp.2d at 86.
- 25% upward departure for the sister of a deceased victim because "she became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain." *Id.*
- 25% upward departure for siblings who "turned to self-destructive behavior" and "battled depression" after the loss of their sister. *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F.Supp.2d 48, 83 (D.D.C. 2011).
- 25% upward departure for younger siblings \because their development was impaired by the victim's death. *Thuneibat*, 167 F.Supp.3d at 52-53.
- 25% upward departure because the decedent was the center of the family and plaintiffs submitted medical evidence relating to their emotional distress. *Flanagan v. Islamic Republic of Iran*, 87 F.Supp.3d 93, 118 (D.D.C. 2015).
- 50% upward deviation because the minor plaintiff was forced to go into hiding with armed guards after his grandfather's death. *Oveissi*, 768 F.Supp.2d at 30.

14

### 2. Punitive Damages

Punitive damages—which are expressly allowed under 28 U.S.C. § 1605A(c)(4)[5]—serve to "punish outrageous behavior and deter such outrageous conduct in the future." *Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 879 F.Supp.2d 44, 56 (D.D.C. 2012). In deciding whether to award punitive damages, courts look to the following four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Selig v. Islamic Republic of Iran*, 573 F.Supp.3d 40, 75 (D.D.C. 2021) (citation omitted). "Courts have found these factors satisfied when a defendant has provided material support to a terrorist organization in carrying out an act of terrorism." *Bernhardt v. Islamic Republic of Iran*, No. CV 18-2739 (TJK), 2023 WL 2598677, at *17 (D.D.C. Mar. 22, 2023) (involving Iran's support for al Qaeda by providing safe haven and mobility to its leaders and the core pipeline through which al Qaeda moved money, facilitators, and operatives).

As discussed below, the Special Masters find that factors one, three, and four are satisfied in each of bellwether attacks in which liability has been established and, presumptively, in any other attack in this case where liability is found. However, the second factor will require individualized consideration regarding the nature and extent of harm that defendants caused or intended to cause to plaintiffs in each attack.

In finding Defendants liable for the bellwether attacks, the Court found that Defendants provided substantial material support and resources to nine terrorist organizations operating throughout Iraq from 2003 through 2011, and that terrorist attacks involving these groups were

---

[5] In 2008, Congress amended FSIA to allow the recovery of punitive damages. The Supreme Court has found the amendment applies retroactively to past conduct. *Opati v. Republic of Sudan*, 140 S.Ct. 1601, 1608-1609 (2020).

foreseeable and a natural consequence of that support.[6] Specifically, the evidence showed that Defendants provided the organizations with essential material support to carry out terrorist attacks in Iraq including: funding, weapons, training, guidance, safe haven, transportation, intelligence, and expert advice; and assistance in tactics, techniques, procedures, and attack planning.[7] The evidence further showed that, to provide this breadth of support continuously, over an extended period of time and throughout the entire country of Iraq, Iran converted its state-run agencies and divisions into a network for terrorism, in particular, the IRGC, which "actively participate[d] in, finance[d], and promote[d] terrorism as a tool of statecraft."[8]

Certainly, the character of Defendants' acts in their extensive, wide-spread support of terrorist attacks justifies a significant award of punitive damages under the first factor. *See, e.g., Acosta v. Islamic Republic of Iran*, 574 F.Supp.2d 15 (D.D.C. 2008) ("[T]his Court has no doubt that Iran's intention, in supporting terrorist groups . . . is to create maximum harm through terrorist acts."); *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258, 278 (D.D.C. 2003) (The "demonstrated policy" of Iran and its instrumentalities in "encouraging, supporting and directing a campaign of deadly terrorism is evidence of the monstrous character of the bombing that inflicted maximum pain and suffering on innocent people."). Acts of terrorism, by their very definition, are

---

[6] *See* Order, ECF Doc. No. 127 at 2 (March 27, 2023) (finding Defendants The Islamic Republic of Iran ("Iran"), The Islamic Revolutionary Guard Corps ("IRGC"), and Iranian Ministry of Intelligence & Security ("MOIS") provided material support to Shia terrorist groups (the Badr Corps, Jaysh al-Mahdi, the Promised Day Brigade, Asa'Ib ahl al Haq, Kata'ib Hizballah, and the Sheibani Network) and Sunni terrorist groups (Al Qaeda, Al Qaeda in Iraq, and Ansar al Islam)); Memorandum and Order, ECF Doc. No. 136 at 1 (August 18, 2023) (finding Defendants Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran ("Bank Melli") provided material support to IRGC and other entities in Iran's terrorist network operating in Iraq). To date, the Court has not made such a finding with respect to Defendant NIOC.

[7] *See, e.g.*, PX2, Levitt Decl., ¶¶ 5, 176; Gartenstein-Ross Shia Decl., PX4, pp. 2, 45-46; PX5, Gartenstein-Ross Sunni Decl., p. 65.

[8] PX80, "Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization," The White House (April 8, 2019).

"extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience." *Heiser II*, 659 F.Supp.2d at 29-30.

Further, the need for deterrence and wealth of defendants plainly support an award of punitive damages under the third and fourth factors. "There is a need for deterrence because, time and again, courts in this District have been confronted with families shattered by Iran-backed terrorists." *Selig*, 573 F.Supp.3d at 75; *see also Flanagan v. Islamic Republic of Iran*, 87 F.Supp.3d 93, 119 (D.D.C. 2015) ("the need to deter these defendants from committing future terrorist acts is great") (collecting cases); *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F.Supp.3d 107, 148 (D.D.D. 2018) ("Punitive damages are warranted where defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization and murder of American citizens and others.") (quotations and citations omitted). Moreover, "Iran's significant wealth supports an award of punitive damages." *Bernhardt*, 2023 WL 2598677, at *17 (citing information indicating Iran's 2021 GDP was $359.71 billion).

Accordingly, courts routinely impose substantial punitive damages awards against Iran for its unabashed support of terrorist attacks. *See, e.g., Valore*, 700 F.Supp.2d at 89 (awarding $1 billion in punitive damages against Iran); *Acosta*, 574 F.Supp.2d at 31 (awarding $300 million in punitive damages against Iran); *Bernhardt*, 2023 WL 2598677, at *18 (awarding over $200 million in punitive damages against Iran). Where evidence has not been presented relating to the country's actual expenditures on terrorist activities, courts often calculate punitive damages based on a multiplier of compensatory damages awarded in the case. *See, e.g., Roth v. Syrian Arab Republic*, No. 14-cv-1946, 2018 WL 4680270, at *17 (D.D.C. Sept. 28, 2018); *Harrison v. Sudan*, 882 F.Supp.2d. 23, 50 (D.D.C. 2012); *Selig,* 573 F.Supp.3d at 77.

Courts in this District have utilized at least four methods for calculating punitive damages in FSIA terrorism cases. The first approach is to "multiply the foreign state's annual expenditures on terrorism by a factor of between three and five." *Selig*, 573 F.Supp.3d at 75 (quotations and citation omitted). This approach is commonly used in mass-casualty events. *See Taitt v. Islamic Republic of Iran*, --- F.Supp.3d ---, 2023 WL 2536518, at *23 (citation omitted); *Valore*, 700 F.Supp.2d at 89 (involving a suicide bombing of Marine barracks in Beirut that killed 241 American service men and women; applying a multiplier of five to determine punitive damages based on Iran's expenditure of $200 million in direct cash assistance to Hezbollah in 2008).

Under the second approach, courts award a fixed sum of $150 million in punitive damages to the family of a decedent. *See Selig*, 573 F.Supp.3d at 76 (citing cases). This approach follows the Supreme Court's guidance that a penalty should be "reasonably predictable in its severity, so that … [a] bad man can look ahead with some ability to know what the stakes are in choosing one course of action or another." *Id.* (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008)).

The third approach is to multiply the total amount of compensatory damages by a factor of between one and five. *Selig*, 573 F.Supp.3d at 76. Under this approach, courts choose the value of the multiplier based on the severity and reprehensibility of the attack. *Id.* (citations omitted).  Some courts have found the "usual" practice in state-sponsored terrorism cases is to adopt a multiplier of three. *Taitt*, 2023 WL 2536518, at *23 (quoting *Roth v. Syrian Arab Republic*, 2018 WL 4680270, at *17); *see also, e.g., Ben-Yishai v. Syrian Arab Republic*, --- F.Supp.3d ---, 2022 WL 17250344, at *15 (D.D.C. Nov. 28, 2022); *Gill v. Islamic Republic of Iran*, 249 F.Supp.3d 88, 106 (D.D.C. 2017) (using a multiplier of three where the court found "no exceptional circumstances").

Under the fourth approach, courts award punitive damages in an amount equal to compensatory damages. *See Selig*, 573 F.Supp.3d at 76-77 (finding a 1:1 ratio meets the objectives

of punitive damages and embodies due process principles of fairness and consistency) (citations omitted).[9]

Here, the undersigned Special Masters recommend that the Court utilize the third approach with a multiplier of two, that is, to apply a 2:1 ratio of punitive to compensatory damages for each plaintiff. This approach would be more conservative than what some courts describe as the "usual" practice in state-sponsored terrorism cases of using a 3:1 ratio of punitive to compensatory damages. *Taitt*, 2023 WL 2536518, at *24 (citation and quotations omitted). Moreover, applying a 2:1 ratio would mirror the Anti-Terrorism Act, which allows victims of international terrorism to "recover threefold the damages he or she sustains." 28 U.S.C. § 2333(a). Further, punitive damages, along with prejudgment and post-judgment interest, are not recoverable from the U.S. Victims of State Sponsor Terrorism Fund, thus leaving plaintiffs with only "creditor rights" against the defendants for outstanding awards in these categories. 34 U.S.C. § 20144(c), (d)(5)(B) and (j)(3) (allowing recovery from the Fund for "compensatory damages," which does not include "prejudgment or post-judgment interest or punitive damages").

Thus, under the circumstances of this case, the undersigned conclude that applying a 2:1 ratio of punitive to compensatory damages would appropriately serve the goals of punishment and deterrence, while also providing consistency and fairness in the damages awarded to the multitude of plaintiffs in the case. *See, e.g., Cohen,* 268 F.Supp.3d at 28 (applying a multiple of

---

[9] *Selig* involved FSIA claims by the estates and family members of three individuals who were killed in two separate Iranian-supported terrorist attacks on hotels in Afghanistan. In determining punitive damages, the *Selig* court declined to use a multiple of compensatory damages, finding only a "minority" of judges had followed the third approach. *Selig*, 573 F.Supp.3d at 76. However, the court also noted the plaintiffs in *Selig* did not ask it to use the third approach. *Id.* The court concluded that an award of punitive damages equal to the amount of compensatory damages awarded in the case—$68,022,627—was commensurate with the character of the defendants' acts. *Id.* at 77. In so doing, the court noted the case was "not like those involving hundreds of decedents murdered in a bombing." *Id.*

two times compensatory damages to determine amount of punitive damages where defendants funded the group responsible for terrorist attack).[10]

## III.    Prejudgment Interest

Plaintiffs ask the Court to award prejudgment interest on compensatory damages for both economic loss (e.g., lost wages) and nonpecuniary loss (i.e., pain and suffering and solatium). Whether to award prejudgment interest, as well as how to compute that interest, rests within the Court's discretion, subject to equitable considerations. *See Goldstein v. Islamic Republic of Iran*, 383 F. Supp. 3d 15, 24 (D.D.C. 2019) (citation omitted); *Oveissi II*, 879 F.Supp.2d at 58-59 (citations omitted). "The purpose of such awards is to compensate the plaintiff for any delay in payment resulting from the litigation." *Fritz*, 324 F.Supp.3d at 63 (quoting *Oldham v. Korean Air Lines Co.,* 127 F.3d 43, 54 (D.C. Cir. 1997)). Thus, "[p]rejudgment interest is an element of complete compensation." *Fritz*, 324 F.Supp.3d at 63 (quotations and citations omitted).

Courts in this District are divided on the issue of whether to award prejudgment interest on nonpecuniary damages (i.e., damages for pain and suffering and solatium) in FSIA cases. Some courts—including this Court—have found that an award of prejudgment interest is not appropriate because the FSIA damages frameworks already take into account "the long-lasting, ongoing nature of the victims' injuries in determining an appropriate compensatory award." *Goldstein,* 383 F. Supp. 3d at 24; *see also Oveissi II*, 879 F.Supp.2d at 59 (collecting cases where prejudgment interest on nonpecuniary damages was denied). Other courts, however, have

---

[10] As discussed below, the undersigned recommend an award of prejudgment interest only for past economic losses that have not already been adjusted to account for the passage time.  In those limited instances, the undersigned recommend that the Court apply the punitive damages multiplier *after* incorporating prejudgment interest in the economic damages award. *See Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 42 (D.D.C. 2022) (applying the punitive-damages multiplier after completing the prejudgment interest calculation because "prejudgment interest is necessary to provide complete recompense for Plaintiffs' compensatory damages"); *Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2022 WL 1567358 at *6 (D.D.C. May 18, 2022) (same).

awarded prejudgment interest based on the rationale that damages for nonpecuniary pain and suffering and solatium "are calculated without reference to the time elapsed" and are, therefore, "best viewed as fixed at the time of loss." *Fritz*, 324 F.Supp.3d at 64 (quotations and citations omitted).[11]

Although the contra decisions are also "well-reasoned," *Goldstein,* 383 F. Supp. 3d at 24, the undersigned expect the Court will follow its own precedent. *See id.* (the Court "continues to believe that prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation"); *Bathiard v. Islamic Republic of Iran*, No. 16-cv-1549 (CRC), 2020 WL 1975672, at *8 (D.D.C. April 24, 2020) (the Court "continues to conclude that prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation"); *Cohen v. Islamic Republic of Iran*, 268 F.Supp.3d 19, 27 n.2 (D.D.C. 2017) (declining to consider plaintiffs' request for prejudgment interest that did not appear in the complaint; noting that, in any event, prejudgment interest was likely unwarranted because nonpecuniary damages, such as solatium damages, are "designed to be fully compensatory") (quotations and citation omitted). Accordingly, the undersigned do not recommend that the Court award prejudgment interest on nonpecuniary damages in this case.

As to damages for economic loss, the undersigned recommend an award of prejudgment interest in limited circumstances. As this Court noted in *Bathiard, w*here economic losses awarded to victims or their estates have already been adjusted to present value, "a separate award of prejudgment interest would be duplicative." *Bathiard*, 2020 WL 1975672, at *8 (quoting *Thuneibat*, 167 F.Supp.3d at 54). However, where an economic expert report has not adjusted

---

[11] *See also, e.g., Christie v. Islamic Republic of Iran*, No. CV 19-1289 (BAH), 2020 WL 3606273, at *19-20 (D.D.C. July 2, 2020) (stating "the general practice [in FSIA bombing cases] has been to award prejudgment interest"); *Kinyua v. Republic of Sudan*, 466 F.Supp.3d 1, 12 (D.D.C. 2020) (awarding prejudgment interest on awards for pain and suffering and solatium).

projected lost earnings to present value, an award including prejudgment interest would be appropriate to account for the time value of money. *See Bathiard*, 2020 WL 1975672, at *8 (citations omitted). Therefore, the undersigned recommend that prejudgment interest be awarded on damages for past economic loss (e.g., lost wages), but only if the economic loss figures have *not* already been adjusted to reflect the passage of time. *See id.* at *8-9 (applying the prime rate to account for the time value of money where the economic expert report did not adjust the projected lost earnings to present value).

Where prejudgment interest is warranted, the appropriate measure is calculated using the prime rate—"the rate banks charge for short-term unsecured loans to creditworthy customers" — for each year. *Fritz*, 324 F.Supp.3d at 64 n.2 (citations omitted). In *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252 (D.D.C. 2014), the court explained the formula for calculating prejudgment interest as follows:

> To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1999 (8%) and added that amount to $1.00, yielding $1.08. Then, the Court took that amount and multiplied it by the prime rate in 2000 (9.23%) and added that amount to $1.08, yielding $1.17968. Continuing this iterative process through 2014 yields a multiplier of 2.26185.

*Id.* at 262 n.6. The *Owens* court clarified that it "calculated the multiplier using the Federal Reserve's data for the *average* annual prime rate in each year between 1998 [the year of the subject attack] and 2014 [the year of the court's decision]." *Id.* at n. 8 (emphasis added).

Applying that formula to the attacks at issue in this lawsuit, which took place between years 2003 and 2011, yields the following multiplier:

- For 2003 attacks = 2.58
- For 2004 attacks = 2.48
- For 2005 attacks = 2.37
- For 2006 attacks = 2.23
- For 2007 attacks = 2.06
- For 2008 attacks = 1.92

- For 2009 attacks = 1.83
- For 2010 attacks = 1.77
- For 2011 attacks = 1.72

A spreadsheet showing the math that leads to these multipliers is attached as Exhibit A.[12]

## IV.    Post-judgment Interest

Post-judgment interest is mandatory under the federal post-judgment interest statute. *See* 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."); *Selig*, 573 F.Supp.3d at 78 ("an award of post-judgment interest under this statute is mandatory, not discretionary."). Such interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield[.]" 28 U.S.C. § 1961(a). The statute also provides that "[i]nterest shall be computed daily to the date of payment ... and shall be compounded annually." *Id.*, § 1961(b).

## V.    Conclusion

The foregoing exposition of applicable legal standards has guided the bellwether damages recommendations being submitted concurrently by the Special Masters, and will be incorporated in future Damages R&Rs in this case, subject, of course, to any guidance by the Court.

Dated: January 16, 2023                          Respectfully Submitted,


*/s/ Michael J. Bordan*                          */s/ Angela D.  Gupta*
Michael J. Borden                                Angela D. Gupta
Special Master                                   Special Master

---

[12] To illustrate application of the multiplier, if the attack occurred in 2003 (which has a multiplier of 2.58) and the unadjusted past economic loss is $1 million, then the total award for past economic loss would be $2,580,000 (2.58 x $1 million = $2,580,000).

_/s/ David R. Herndon_
Hon. David R. Herndon (Ret.)
Special Master

_/s/ John P. Kuder_
Hon. John P. Kuder (Ret.)
Special Master

_/s/ Jaime Dodge_
Jaime Dodge
Special Master

_/s/ Matthew E. D. Besser_
Matthew E. D. Besser
Special Master

_/s/ Ellen Koblitz_
Hon. Ellen Koblitz (Ret.)
Special Master

_/s/ Ronald V. Swanson_
Hon. Ronald V. Swanson (Ret.)
Special Master

_/s/ Daniel McCarthy_
Cpt. J. Daniel McCarthy (Ret.)
Special Master