UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESTATE OF CHRISTOPHER BROOK FISHBECK, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ). ). | Civil Action No. 1:18-cv-2248-CRC |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | ) ) | Special Master J. Daniel McCarthy |
| Defendants, | ) ) ) | |
| This Document Relates to Plaintiffs: Jacob Davis; Ryan Saurs; Estate of Michael Egan; Jeffrey A. Murtha; Ralph Swartz; Estate of Christopher B. Fishbeck; Walter Liman Thomas; Hilton Jerome Germany; David Christofer Boyle; Tyman Coleman; and Christian Rodriguez | ) ) ) ) ) ) ) ) ) | |

REPORT AND RECOMMENDATION

WAVE 1: NON-BELLWETHER ATTACK NOS. 16, 21, 24, & 35

LIABILITY

## I.    INTRODUCTION[1]

This report and recommendation is offered to assist the Court in adjudication of civil claims brought by over 1400 plaintiffs related to over 400 attacks for which the Defendants materially supported terror groups that targeted U. S. Service personnel, among others, between 2003 through 2011, in Iraq. To address the breadth and complexity of the case, the Court implemented a case

---

[1] As provided by Section IV of the Administrative Plan for Non-Bellwether Liability Determinations (see ECF No. 14o, at 3), Sections I & II of this Report & Recommendation were by Special Masters Ronald Swanson and J. Daniel McCarthy. This coordination was done to ensure common understanding of the Court's prior work and rulings, and to ensure consistency of interpretation and application of the evidentiary standards and analytical framework established by the Court in adjudicating the issues of liability for the Bellwether Attacks.

management plan structured in "phases" to address threshold jurisdictional and evidentiary issues common to all claims, spearheaded by the Court's scrutiny of fifteen representative "bellwether" attacks during an extensive three-day hearing in September 2022. ECF No. 75. On August 18, 2023, the Court entered an order finding five Defendants liable for twelve of the bellwether attacks. ECF No. 137.

On August 30, 2023, the Court entered an order implementing the Administrative Plan governing "further proceedings as to review of evidence and determination of the defendants' liability for non-bellwether attacks at issue in the case." ECF No. 140 at 1 ("Administrative Plan"). The Court supplemented the Administrative Plan on September 28, 2023 to add special masters and included the responsibility to make recommendations on damages-related issues. ECF No. 145. On December 15, 2023, I was assigned to "consider the remaining issues related to Defendants' liability for providing material support to the groups responsible for committing" non-bellwether Attacks #16, #21, #24 and #35. ECF No.140. This Report and Recommendation analyzes each of these attacks, respectively.

The Court's Administrative Plan specifically directs Special Masters to make or recommend findings of fact on the following:

a. The terrorist group(s) involved in the commission of the attack;

b. The personal injuries or deaths that occurred from the attack; and

c. The relationship of the victims of the attack to the respective plaintiff.

Using the Court's prior orders and analytical framework, Special Masters shall also make or recommend conclusions of law on the following:

a.  The attack involved a group(s) that received material support from Defendants:

b. The attack involved a requisite act or acts listed in 28 USC 1605A(a)(1); and

c. Defendant's provision of material support was a proximate cause of the attack.

To address these issues, the Court granted authority to exercise all powers provided by the Federal Rule of Civil Procedure 53(c) including but not limited to compelling production of evidence and receiving testimony by declaration or affidavits in place of live testimony, "as this Court did in the bellwether hearing."  ECF No. 140, citing 28 USC 1746; and *Owens* 864 F.3d at 785. Special Masters may liberally construe the Federal Rules of Evidence and consider "evidence that might not be admissible in a trial, because the Court is not required to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Id*. Special Masters are

required to "assess defendants' liability and applicable law…guided by the provisions of 28 USC 1065A, this Court's prior findings of fact and conclusion of law, any further orders the Court may enter, and other relevant precedent," and "to proceed with all reasonable diligence." ECF Nos. 140 and 145, citing Fed. R. Civ. P. 53(b)(2).

I have reviewed the docketed materials and prior orders identified in Section V of the Administrative Plan, including the Court's opinions and orders on Defendants' liability for providing material support to specific terrorist groups, and Defendants' liability for the Bellwether Attacks (ECF Nos. 127, 137 and 148), and the transcripts of the evidentiary hearing.

On December 15, 2023 I received evidence, including witness declarations, government records, Plaintiff's Fact Sheet, expert reports, and other documents necessary for analyzing the liability issues and making recommendations on Defendant's liability for providing material support to the terror groups that are believed to have committed Wave 1 Attacks #16, #21, #24 and #35. As the Court did when determining liability for the bellwether attacks, I closely scrutinized the Plaintiff's evidence, including (1) the reports and declarations of the plaintiff's experts; (2) the declarations of the surviving victims of each attack; (3) documentary evidence from various government sources; (4) the proposed findings of fact and law offered in plaintiff's motion for default judgment, and (5) the cases cited by the Court (and others) finding liability (or not) to Iran and the relevant instrumentalities for its involvement in terrorism. ECF 137, at 7-8 (setting forth the Court's approach to determining liability for the bellwether attacks.)

Finally, I have strictly adhered to the Court's established "general approach to liability determinations" and the evidentiary standard endorsed by the Court in the Bellwether process to reach the factual findings and legal conclusions below. See *Id.*, at 6-8.

## II.   INCORPORATION OF THE COURT'S PRIOR FINDINGS

Before appointing special masters this Court found that service of process was properly effectuated on the defendant under Section 1608 of the FSIA. The Court then reviewed the evidence and found it also had subject matter jurisdiction over claims brought under U.S.C. 1605A, the FSIA terrorism exception to sovereign immunity. ECF No. 126, 127 and 136. When doing so, the Court concluded:

1. Plaintiff only seeks monetary damages and no other form of relief against Iran, its instrumentalities, and subdivisions for personal injury or death. (ECF No. 137, at 3-4, citing Second Am. Compl. At 750-758; and 28 USC 1605(A)(c);

2. Iran was designated a state sponsor of terrorism at the time of each attack and when the lawsuit was filed (See Op. & Order, ECF No. 126);

3. Claimants or victims were, at the time of the relevant attack, US nationals, members of the US Armed Forces, or qualifying employees or contractors of the US Government. (Id.);[2]

4. The FSIA terrorism exception applies to each defendant, except NIOC, for providing material support to the subject terrorist groups. (Op & Order, ECF No. 127; Op & Order ECF No. 136); and

5. Defendants' material support to the subject terrorist groups, bolstered their ability to commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 – 2011. (Id.)

## III. WAVE 1 ATTACK #16 – APRIL 26, 2005 HIGH MOBILITY MULTI-WHEELED VEHICLE ATTACK IN HIT, IRAQ

A. **FACTS**. On April 26, 2005, Lance Corporal Jacob Davis, U S Marine Corps (hereinafter "LCpl Davis") was serving with K Company, 3rd Battalion, 25th Marines, 2nd Regimental Combat Team, 2nd Marine Division in Hit, Al Anbar Province. (PX4602, Para c-i). LCpl David was a trained rifleman and machine gunner assigned on that day to perform radioman duties in a high mobility multi wheeled vehicle (here-in-after "HMMWV"). (Id.) He was a rear seat passenger in the HMMWV, with five other Marines in the vehicle. (Id.) The HMMWV had Level Three Up-Armor, and LCPL David was wearing the new Kevlar helmet, flak jacket with two SAPI plates, ballistic goggles, throat and groin protector. (PX4605, Para 39).

LCpl David's HMMWV was approximately 16 kilometers southeast of Hit, Iraq when his vehicle was directed to investigate activity on a nearby hill. (Id**.**) LCpl David's unit was ascending the hill when this vehicle was struck by an improvised explosive device ("IED"). (Id**.**) The blast ejected LCpl David from his vehicle, launching him 70 to 80 feet in the air. (Id.) LCpl Davis was knocked unconscious for a period immediately following the explosion, before awaking to "shooting and screaming." (Id.) LCpl. David suffered

---

[2] The Court's ruling related to §1605A's standing or "status" requirement was limited to those plaintiffs who provided the Court with proof of the status that the relevant "claimant or victim was, at the time of the act, a U.S. national, member of the U.S. armed forces, or qualifying employee or contractor of the U.S. government." See 28 U.S.C. § 1605A(a)(2)(A)(ii). Therefore, in reviewing the evidence, the application of this ruling to a particular attack or plaintiff will be confirmed ,or further determined for the Court.

multiple open fractures to his right leg and ankle from the blast. (Id.)   LCpl David was bandaged at the scene and needed a breathing tube. (PX4602, Para h). The attack killed the Marine seated next to LCpl Davis (Corporal Tremblay, USMC) and wounded the other 4 Marines in the vehicle. (Id.)

A sandstorm in the area made medevac by air impossible, and since LCpl David's radio was destroyed in the blast, the squad leader had to run 1-2 miles to alert his unit that their HMMVW had been hit by an IED with one Marine killed. (Id.)

**B. PLAINTIFF'S EVIDENCE IS SUFFICIENT TO ATTRIBUTE WAVE 1 ATTACK #16 TO AQI/AAS.** The first input the Court directs Special Masters to make is a fact-based recommendation as to the identity of the terrorist group involved in the attack. To assist in that determination, Plaintiff submitted an Expert Witness report focused on identifying the terror group responsible for Wave 1 Attack #16. (PX4603). The report is authored by Dr. Daveed Gartenstein-Ross, CEO, Valens Global. (Id.)  Dr. Gartenstein-Ross concluded after thorough analysis that either the Zarqawi organization/al-Qaeda in Iraq (AQI), or Ansar-al-Sunna (AAS) groups conducted the attack, or elements of both groups acting in concert. (Id.)  For reasons set out below, it is recommended the Court accept his expert opinion on attribution as factually correct.

Dr. Gartenstein-Ross's conclusion is based on multiple factors including the geographic location and time period of this attack, as well as the tactics, techniques, and procedures employed in this attack. (Id.) The April 26, 2005 attack occurred during a time when AAS and AQI "showed a level of cooperation not seen elsewhere in Iraq extending down to street level joint operations in the Hit-Haditha corridor. Together, the two groups provided one another with enhanced early warning against Coalition raids, assisted in the movement of fighters, and contributed to the other's ability to mass." (Id, page 3.)

Dr. Gartenstein-Ross reports that in early 2005, AQI had built a significant operational presence in Hit, Iraq. By February 2005, AQI became increasingly influential in the city, having allied with local Ba'athist leader Izzat Ibrahim al-Duri, with whom AQI maintained

tactical cooperation. (Id.) Notably, U.S. Central Command (here-in-after "CENTCOM") opined in their "*Study of the Insurgency in Anbar Province, Iraq*" that "Ansar al-Sunna (AAS) relocated from Ramadi to Hit" following Coalition raids in Ramadi during Operation River Blitz, placing AAS in Hit by March 2005. (Id, page 4.)  AQI assisted the recently established AAS and reestablished an area of operational dominance in Hit. (Id.)

The aforementioned CENTCOM study states that by April 2005, "the intermittent Coalition presence in towns like Hit and Haditha led to some communities being trapped in a vicious cycle of insurgent domination through murder and intimidation, the Coalition asserting presence, and insurgents reentering the community to reassert influence following Coalition departure." (Id.)   By May 2005, AQI and AAS had established themselves as "the dominant group[s] in the Hit-Haditha corridor," with local groups often "operating under the umbrella" of AQI or AAS. In this month, CENTCOM's report details, "Hit was subjected to an intense murder and intimidation campaign by Ansar al-Sunna." (Id.) AQI and AAS activity in Hit continued long after the attack on LCpl David, and Coalition forces continued to launch operations targeting the groups throughout 2005 with little success. (Id.)

The tactics, techniques, and procedures (TTPs) utilized in this attack further reinforce the conclusion AQI/AAS were responsible for the attack. The weapon used in this attack was an IED. (PX4602, Para f.)   At the time of the attack, IEDs were a commonly associated with AQI. (PX4603, Page 5.)  At the onset of the Second Battle of Fallujah in November 2004, it was noted that insurgent forces had "set mines and IEDs … for the impending battle." (*Id*.)  As a result, U S Forces spent weeks clearing IEDs placed throughout the city. AQI's use of IEDs continued through the first half of 2005, with a July 2005 CENTCOM Threat Assessment indicating that AQI regularly used IEDs to target Coalition forces throughout Iraq, including in western Anbar Province. (Id.)

Likewise, IEDs were a common TTP for AAS. According to the National Counterterrorism Center's "*Report on Incidents of Terrorism 2005*", AAS claimed responsibility for a number of IED attacks against Coalition forces in 2005. (Id.) This includes an AAS claim

for the May 8, 2005 IED attack on a British contractor convoy in Hit, which illustrates AAS's capability to conduct IED attacks around the same general time and location as Wave 1 Attack #16. (Id.)

Furthermore, Coalition forces discovered that AQI and AAS had the ability to manufacture, transport, and conduct IED attacks throughout Anbar Province soon after this attack. By August 2005, CENTCOM's "*Study of the Insurgency in Anbar Province, Iraq"* states that AQI and AAS militants targeted in Operation Quick Strike "had been able to use Haditha as a base to manufacture IEDs…for use in cities along the Euphrates all the way to Baghdad." (Id.)

Dr. Gartenstein-Ross, confirms that Iran provided significant material support to AQI and AAS, and bore a direct connection to AQI and AAS's operations in at least four ways: (1) Iran supported AQI elements in Anbar Province where this attack occurred; (2) Iran provided support to AQI before, during, and after this attack in multiple ways; (3) Iran consistently bolstered AAS as a fighting and terrorist force; and (4) Iran provided weapons to both AQI and AAS. *(*Id. at pp. 5-6.)

In addition to the strong cumulative evidence cited above, it is also noted this Court found the same actor, AQI, responsible for an attack in Ramadi only days earlier in Bellwether Attack #4. (ECF No. 137, at 11 – 13.)  A look at a map of Iraq shows that Hit and Ramadi are adjacent cities in central Iraq. This Court found credible that "At the time of the attack, AQI was the dominant insurgent actor in the area and had conducted other attacks, including rocket and mortar attacks, in the area." (Id. At 12.)

A review of Dr. Gartenstein's background confirms he has the training, experience and scholarship necessary to provide an expert opinion on terrorist activities in Iraq at the time of Wave 1 Attack #16. He is a specialist in jihadist movements, including undertaking detailed research into Al-Qaeda, as well as being an adjunct Professor at Georgetown and an Associate Fellow at International Centre for Counter-terrorism – The Hague. He is also

a Senior Fellow, Foundation for Defense of Democracies. He is the author of 21 books and monographs, and published widely in *The New York Times,* and *The Washington Post.*

The Department of Justice has used Dr. Gartenstein-Ross as an expert in Islamic terrorist cases, and Federal Courts have admitted his testimony as an expert because of his unique background and extensive academic credentials, and noted "the fact the United States Government uses him for training in these areas," and "his prior work as an expert in other contexts sufficiently qualified him as an expert." *U.S. v Young* No. 18-4138 (4th Cir 2019, p.12).

Based on the evidence submitted, I recommend the Court conclude this attack was committed by AQI/AAS.

C.  **RESULTING DEATH/INJURY RESULTING FROM WAVE 1 ATTACK #16.** The Court directs Special Masters to include a factual finding regarding personal injuries or deaths resulting from the attack in question. Plaintiff, LCpl David was severely injured by the IED blast, which hurled him 70 – 80 feet in the air, knocked him unconscious, and caused multiple bone fractures. This blast also killed another passenger in the HMMWV, Corporal Tremblay, USMC, and wounded the other four passengers.

D.  **RELATIONSHIP OF THE VICTIMS OF THE ATTACK TO THE PLAINTIFF.** The only Plaintiff with a claim before this Court from Wave 1 Attack #16 is the direct victim, LCpl Davis.

E.  **THE TERRORIST GROUP(S) THAT COMMITTED WAVE 1 ATTACK #16: AQI/AAS RECEIVED MATERIAL SUPPORT FROM THE DEFENDANT.** Based on the evidence submitted for this attack, and the Court's prior orders, I recommend the Court conclude as a matter of law that Defendant provided material support for this attack. (ECF Nos 127 and 136.)

F.  **WAVE 1 ATTACK #16 INVOLVED A REQUISITE ACT LISTED IN 28 U.S.C. 1605 A(A)(1).** Based on the evidence submitted for this attack and the Court's prior orders, I

recommend the Court conclude as a matter of law that this IED attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because it resulted in the death of Corporal Tremblay, USMC a passenger seated next to LCpl David in the HMMWV.

G. **DEFENDANTS PROVISION OF MATERIAL SUPPORT WAS A PROXIMATE CAUSE OF WAVE 1 ATTACK #16.** Based on the evidence submitted for this attack and the Court's prior orders, I recommend the Court conclude as a matter of law that the material support provided by the Defendant was a proximate cause of this attack. Therefore, the Defendants are liable for this attack

## IV. WAVE 1 ATTACK #21 JULY 9, 2005 - SMALL ARMS FIRE AND COORDINATED IED ATTACKS IN TAL FAR, IRAQ

**FACTS**. Plaintiff, Staff Sergeant Ryan Saurs, U S Army (hereinafter "SSG Saurs") was assigned to 3rd Platoon, 2nd Squadron, 3rd Armored Cavalry Regiment serving in Iraq. (PX5201, para d.) His unit was embedded with an Iraqi Army Unit and operated out of Forward Operating Base ("FOB") Sykes at Tal Afar airfield. (Id.) His unit was equipped with M2 Bradley Infantry Fighting Vehicles (BFV) and used these vehicles to move to and from operations. (Id.)  On July 9, 2005, SSG Saur's platoon was assigned to conduct a raid at a local school in Tal Afar, Nineveh Province, Iraq. (PX5201, para f, g, h and i.)

Upon arrival at the school, SSG Saurs' unit entered the school to clear it. (Id.) As they entered, they were immediately attacked with small arms fire and hand grenades. (Id.) SSG Saurs had grenades going off all around him, exposing him to shrapnel and other debris flying in the air around him. (Id.)  The assault went on for several hours and when an M113 armored vehicle arrived to help, it was struck by an IED, causing further casualties. (Id.) While returning to base, SSG Saur's vehicle was also struck by an IED, knocking him unconscious. (Id.)  Other passengers in the vehicle, PFC Eric Woods and SPC Hoby Bradfield, Jr., were killed by the IED blast. (CNN Report of U S Casualties for Iraq July 2005.) The facts above show Wave 1 Attack #21 consists of multiple attacks conducted throughout July 9, 2005.

**A. PLAINTIFF'S EVIDENCE IS SUFFICIENT TO ATTRIBUTE WAVE 1 ATTACK #21 TO AQI.** Plaintiffs have included an Expert Report and Declaration prepared by Colonel Mark Walters, USA (Ret.), CW4 Ronald Evans, USA (Ret.) and CW3 David Sultzer, USA (Ret.). (PX5208.) These experts reviewed all available evidence, eyewitness accounts, equipment captured during the attack to include Suicide vest and RPG rounds, and other general information about operations conducted in the area, before concluding with reasonable degree of certainty that Wave 1 Attack #21 was conducted by AQI. (PX5208, page 3.)

The experts' conclusion is based on several factors such as the geographic location, time period of the attack, and the tactics and techniques employed in the attack. (Id.) First, as to geographic location, AQI and other Sunni extremist organizations were known to be operating within Tal Afar and conducted attacks against U S Forces as part of their strategy to regain Sunni Dominance in Iraq. (Id. page 3.) Further, AQI's location in Tal Afar was central in the transporting of foreign fighters arriving from Syria and was also a base of operations in northern Iraq. (Id. page 6.)

AQI maintained a strong presence in Tal Afar, successfully pursuing Sunni factions into working with them. (Id.) Tal Afar is positioned along routes that lead from Mosul into Syria. (PX5209.) AQI wanted to move freely through Tal Afar and Nineveh so they could access sources of external support in Syria. (Id.). AQI waged brutal and murderous campaign amongst the people of Tal Afar. (Id.) AQIs significant presence and strategic interest in Tal Afar is outlined in "*Tal Afar 2005: Laying the Counterinsurgency Groundwork*" by Maj Jay Baker. (PX 5210.)

AQI besieged Iraq police stations and forced terrified residents to flee the city or retreat into tribal compounds. (Id.) By November 2004, Tal Afar had replaced Fallujah as center of the insurgency. (Id.) SGT Saur's unit, the 3rd Armored Cavalry Regiment, took on the responsibility to support Iraq forces in trying to remove the counterinsurgency. (Id.) The

Battle for Tal Afar intensified in May through July 2005, and included this attack. (Id.) Significant intelligence from locals, coupled with regular attacks by AQI, made clear that AQI was the Iran proxy group carrying out the terrorist attacks. (Id.)

Second, the tactics, techniques, and procedures also support that AQI was responsible for this attack. After the attack, further investigation uncovered a suicide vest and several RPG rounds of ammunition in a building. (Id. page 4.) Suicide tactics were unique signatures of AQI. (Id.)

Additionally, the sophisticated planning around this attack leave little doubt AQI was responsible. The use of hand grenades and small arms fire were common tactics, and AQI was able to provide stiff resistance to the overwhelming combat power of SSG's Saurs' unit because they received significant combat training and support. (Id. page 8-9.) Moreover, AQI was able to identify SSG Saurs' unit likely route back to base, and planted an IED so that they would hit it. (Id.)  The fact that this was an attack against several armed US troops and convoys of armored vehicles, both at the school and during their return to base, supports and confirms the conclusion that AQI committed this attack. (Id.)

Based on the evidence submitted, I recommend that the Court conclude this attack was committed by AQI.

B.  **PERSONAL INJURIES OR DEATHS THAT OCCURRED FROM WAVE 1 ATTACK #21.** The only Plaintiff from Wave 1 Attack #21 filing a claim before this Court is SSG Saurs, a direct victim of the attack. The estates of those military personnel killed in this attack, PFC Eric Woods and SPC Hoby Bradfield, Jr., are not claimants in this action.

C. **RELATIONSHIP OF THE VICTIMS OF WAVE 1 ATTACK #21 TO THE PLAINTIFF.** The plaintiff in this case, SSG Saurs, is the sole claimant in this action.

**D. WAVE 1 ATTACK #21 INVOLVED AQI A GROUP THAT RECEIVED MATERIAL SUPPORT FROM DEFENDANT.** Based on the evidence submitted for this attack and the Court's prior orders, I recommend the Court conclude AQI received material support from Defendant. The Court has previously concluded that Iran provided such material support, as that term is used in 28 U.S.C. 1605(a)(1), during the relevant time period 2003 – 2011. (ECF Nos. 127 and 136.)

**E. WAVE 1 ATTACK #21 INVOLVED A REQUISITE ACT LISTED IN 28 U.S.C. 1605A (A)(1).** Based on the evidence submitted for this attack and Court's prior orders I recommend the Court conclude this attack included an act of "extrajudicial killing." Army personnel PFC Woods and SPC Bradfield were killed in Wave 1 Attack #21.

**F. DEFENDANTS PROVISION OF MATERIAL SUPPORT TO AQI WAS A PROXIMATE CAUSE OF THE ATTACK**. The Court has already determined that Iran provided material support to AQI between 2003 and 2011, and this support was the proximate cause for attacks committed by AQI in Iraq during that time. (*See* ECF No. 127; ECF No. 136.)

I recommend the Court conclude that the evidentiary standard required for assigning liability has been established and enter an order holding Defendant liable for Wave 1 Attack #21.

## V. WAVE 1 ATTACK #24 SEPTEMBER 19, 2005 – COMPLEX MULTI-INTEGRATED IED AND SMALL ARMS ATTACK IN RAMADI, IRAQ

**A. FACTS**. On September 19, 2005, Plaintiffs' Army Sergeant Michael Egan (SGT Egan) was killed, and Army Staff Sergeant Jeffery A. Murtha (SSG Murtha) and National Guard Specialist Ralph Swartz (SPC Swartz) were injured, in a complex, multi integrated explosive device (IED) and small arms attack in the city of Ramadi in Al Anbar Province. (PX5704, PX5503, PX5600; PX5502, PX5503). Their mission on that day was to provide route and house clearance operations around south Ramadi, from the Euphrates River to Husaybah. (Id.) In Ramadi, the focus was on the neighborhood of Al Tamim, in south Ramadi, which was an Al-Qaeda in Iraq (AQI) stronghold. (Id.)

On the morning of this attack, SGT Egan returned to FOB Ramadi at about 6:00am after a 36-hour mission to conduct surveillance and gather intelligence. (PX5503, para e.) Upon returning, SGT Egan volunteered to go on a roving patrol. (Id.) The roving patrol went out with two HMMWVs from Red Platoon and one from Green Platoon to look for insurgents and perform reconnaissance on sniper hideouts in the Al Tamim area. (PX5600, para. G.) The HMMWVs from the Red Platoon took the lead. SGT Egan was in the third trailing HMMWV. While conducting patrol along Route Jones, the Green Patrol observed a group of MAMs (military-aged men) on the railroad tracks 400 meters NW of the Patrol. (PX5700, page 1.) As the second Red Patrol vehicle stopped to investigate, an IED in the middle of the road exploded and killed the occupants of the Green Patrol HMMWV, including SGT Egan. (Id.) Also killed were 1st Lt Mark Dooley, and SPC William Fernandez. (PX5503, para e.)  The remaining two HMMWVs began to receive small arms fire from the houses around them. (PX5600, para. i.)

Upon learning of the attack on the HMMWVs, SSG Murtha went out with a Quick Reaction Force (QRF) to assist his comrades and search for the terrorists who conducted the attack. (PX5700, page 1; PX5503, para e; PX5502, para g.) SSG Murtha was friends with SGT Egan and the other soldiers killed in the HMMWV explosion. (Id.) The QRF went to the scene of the attack in two HMMWVs. (PX5502, para. i.) SGT Murtha was a passenger in the second vehicle. As they approached the scene, the first HMMWV was hit by an IED. (Id.) The blast disabled the first HMMWV, and simultaneously knocked the second HMMWV which SGT Mutha was in into the air. (Id.) SGT Murtha's vehicle was still operable following the blast, so it was used to attempt to tow the disabled HMMWV. (Id.) While attempting the tow, another IED detonated and disabled the second HMMWV. (Id.) SSG Murtha was knocked unconscious by this explosion for a short period of time. (Id.) He sustained a TBI, tinnitus, and injuries to his neck, back, foot, and ankle. (Id.) The HMMWV crew managed to re-establish radio contact, get control of the scene, and call for assistance. (Id.)

SPC Swartz was part of the second QRF squad that went to the scene in a HMMWV to investigate where the initial Red/Green Patrol had been ambushed. (PX5600, para. m; PX5712.) When they were approximately 150 meters from the Red/Green Platoon, they were hit with by the fourth IED in this coordinated attack. (Id.) The blast knocked SPC Swartz unconscious for less than a minute. (Id.) He suffered a TBI from the blast. (Id.) The vehicle was badly damaged but not disabled, and the squad continued to drive through the blast and was able to reach the Red/Green Platoon. (Id.)  They cordoned off the area to protect the platoons from the small arms fire. (Id.)  They then began collecting the bodies and body parts. (Id.) They were not able to recover SGT Dooley's body parts from the attack site. (Id.) It took almost an hour to finish picking up the remains before they were able to return to base. (Id.)

B.  **PLAINTIFF'S EVIDENCE IS SUFFICIENT TO ATTRIBUTE WAVE 1 ATTACK #24 TO AQI.** Plaintiffs have included an Expert Report and Declaration prepared by Colonel Mark Walters, USA (Ret.), CW4 Ronald Evans, USA (Ret.) and CW3 David Sultzer, USA (Ret.). (PX5712.)  These experts reviewed all available evidence, eye-witness accounts, and general information before concluding with reasonable certainty that Wave 1 was conducted by AQI. (PX5712, page 2.) AQI's objective with this coordinated attack was to kill and maim Iraqi citizens and Coalition Forces, and the successful execution of this well-coordinated and complex attack was likely the result of the material support AQI received from the Defendants. (Id.) In addition to the opinion of these experts, SPC Swartz declaration includes independent insight that "it was determined after the attack that AQI was the organization behind the attack. AQI was the primary insurgent force in the Ramadi area." (PX5600, para r.)

As background, after the Second Battle of Fallujah months earlier AQI had to relocate to other areas in Iraq, including Ramadi. (PX5712, page 15.)  AQI was able to develop a stronghold in Ramadi and engaged in attacks on Coalition Forces throughout 2005. (Id.) Plaintiff's experts' conclusion is based on numerous factors which all point at AQI as the terrorist group responsible for Wave 1 Attack #24. (Id.) These factors include: 1) the tactics involved which consisted of a coordinated attack with triggermen on scene to detonate five

remote-controlled IEDs at different times and locations as U S Forces responded to each IED attack, 2) sophisticated techniques involving discipline, training and the synchronization necessary to execute a staged attack common to AQI operations in the Ramadi area in 2005, and 3) the type of signature IED weapons which AQI had positioned and exploded in Ramadi and surrounding areas. (PX5712, page 8.)

Plaintiff's experts elaborate further: "The complex attack in which SGT Egan was killed and SSG Murtha and SPC Swartz were injured was well orchestrated. The enemy successfully employed multiple IEDs in a neighborhood that would be difficult for Coalition Forces to maneuver. Using the terrain to their advantage, the AQI cell was able to strike the patrol and its follow-on response forces with lethal precision. The enemy knew the U.S. forces would send a Quick Reaction Force (QRF) to rescue their patrol and followed by an EOD team to investigate the IED blast, so they carefully planted IEDs to strike these secondary response vehicles with lethal effects." (PX5712, page 14.) The Court has already determined that Iran and its codefendants provided material support to AQI between 2003 and 2011 and found those defendants liable for attacks committed by AQI in Iraq during that time. (*See* ECF No. 127; ECF No. 136.) The evidence supporting the conclusion AQI conducted this attack is credible, clear and leaves little doubt about their responsibility for Wave 1 Attack #24.

Based on the evidence submitted, I recommend the Court conclude this attack was committed by AQI.

**C.  PERSONNAL INJURIES OR DEATHS OCCURING FROM WAVE 1 ATTACK #24.** This attack resulted in the IED death of SGT Egan and two other Army personnel; SSG Murtha survived two IED attacks with significant injuries; and SPC Swartz also survived an IED attack with significant injuries. A total of four IEDs were exploded in this attack.

**D. RELATIONSHIP OF THE VICTIMS OF WAVE 1 ATTACK #24 TO THE RESPECTIVE PLAINTIFFS.** All Plaintiffs from this attack were U S Nationals serving

on active duty in the U S Army, and directly killed or injured by the four IED explosions.

E. **WAVE 1 ATTACK #24 INVOLVED AQI, A TERROR GROUP RECEIVING MATERIAL SUPPORT FROM THE DEFENDANT**. Based on the evidence submitted for this attack and the Court's prior orders, I recommend the Court conclude this attack was performed by AQI. The Court has previously concluded that Iran provided material support to AQI, as that term is used in 28 U.S.C. 1605(a)(1), during 2003 – 2011. (ECF Nos. 127 and 136.) Therefore, Defendants are liable for this attack.

F. **WAVE 1 ATTACK #24 INVOLVED A REQUISITE ACT LISTED IN 28 U.S.C. 1605A(A)(1)**. Based on the evidence submitted for this attack and Court's prior orders I recommend the Court conclude this attack included an act of "extrajudicial killing."  SGT Egan was killed in Wave 1 Attack #21. Also killed were U. S. Army personnel 1st Lt Mark Dooley, and SPC William Fernandez. (PX5503, para e.)

G. **DEFENDANTS PROVISION OF MATERIAL SUPPORT WAS A PROXIMATE CAUSE OF THE ATTACK**. The Court has already determined that Iran provided material support to AQI between 2003 and 2011 and found Defendants actions were the proximate cause for attacks committed by AQI in Iraq from 2003 - 2008. (*See* ECF No. 127; ECF No. 136.)

VI. **WAVE 1 ATTACK #35 JUNE 6, 2011 – IRAM ATTACK ON BARRACKS AT FOB LOYALTY IN BAGHDAD, IRAQ**

A. **FACTS.** On June 2011, U.S. Army personnel were stationed at FOB Loyalty located on the outskirts of Sadr City in the Nissan District of Baghdad, Iraq. (PX7003, Para 1.) Next to this base was an Iraqi Federal Police Compound. (Id.) The primary mission of those assigned to FOB Loyalty was to advise and assist Iraqi Police and provide a Quick Reaction Force capability for immediate employment when necessary. (Id.) The two areas taken together were commonly referred to as JSS Loyalty. (Id.)

On the morning of June 6, 2011, those not otherwise on duty were sleeping at JSS Liberty in makeshift barracks. These barracks were a series of containerized metal housing units prefabricated into living quarters. (Id.) Suddenly and without warning the barracks were attacked by rocket-fire, creating large explosions which occurred throughout the barracks. Ten explosions were reported from seven rockets launched at the barracks. (PX6801.) Six U.S. military personnel were killed; sixteen were injured. (Id.) The explosive devices used in this terrorist attack were improvised rocket-assisted munitions referred to as an IRAM. (Id.) The photographs of the barracks show the buildings were destroyed by the explosion and resulting fire. (PX6800.)

IRAMs are rocket-launched IEDs. They are made from large metal canisters (usually propane tanks) packed with hundreds of pounds of scrap metal and explosives and powered by 107mm rockets. (PX6806.) IRAMs are most often fired by remote control from the back of trucks, sometimes in close succession. (Id.) IRAM attacks, unlike roadside bombings and conventional mortars, have the potential to kill scores of soldiers at once. (Id.)

**B. PERSONAL INJURIES AND DEATHS THAT OCCURRED FROM WAVE 1 ATTACK #35 AND RELATIONSHIP OF VICTIMS IN THE ATTACK TO RESPECTIVE PLAINTIFFS.** Private First Class (PFC) Christopher B. Fishbeck, a United States citizen and member of the U. S. Army, was present in the barracks and killed in the attack. (PX6814.) PFC Fishbeck was serving as a Field Artillery Specialist when killed. The Estate of PFC Fishbeck and five immediate family members assert claims related to this attack.

PFC Walter Leman Thomas, a United States citizen and member of the U.S. Army, was present in the barracks and injured in the attack. (PX7100.) PFC Thomas was serving as a cannon crewmember. (Id.)  He also asserts a claim related to this attack.

PFC Hilton Jerome Germany: a United States Citizen and member of the U.S. Army, was present in the barracks and injured in the attack. (PX7200.) PFC Germany was serving as

a Chemical, Biological, Radiological, and Nuclear Scientist. (Id.)  He also asserts a claim related to the attack.

PFC David Christofer Boyle, a U S Citizen and member of the U.S. Army, was present in the barracks and injured in the attack. (PX7300.) PFC Boyle was serving as a Headquarters Cannoneer. (Id.) PFC Boyle asserts a claim for his injuries with related solatium claims filed by four immediate family members.

Specialist (SPC) Tymon Coleman, a U S Citizen and member of the United States Army was present in the barracks and injured in the attack. (PX7001.) SPC Coleman was serving as a Unit Supply Specialist. He has asserted a claim for his injuries with related solatium claims from two immediate family members.

SPC Christian Rodriguez, a U S Citizen and member of the United States Army, was also present in the barracks and injured in the attack. (PX6916.) SPC Rodriguez was serving as a 13B Canon Crewmember when he was injured. (PX6902.) He has also asserted a claim for his injuries.

**C.   PLAINTIFF'S EVIDENCE IS SUFFICIENT TO ATTRIBUTE WAVE 1 ATTACK #35 TO KAT'AIB HEZBOLLAH (KH).** In assessing whether credible evidence shows Defendant provided material support to the terrorists who committed this deadly IRAM attack, the Court can be guided by *Lee v. Islamic Republic of Iran*, 656 F. Supp. 3d 11, 49 (D.D.C. 2023) which reviewed this exact attack, as well as surrounding facts, before determining that "Iran, acting through its proxies, was responsible for the June 6, 2011 IRAM attack on U S forces." PFC Fishbeck's widow was a Plaintiff in that case. The *Lee* Court relied on the expert analysis and conclusions of Col Kevin Lutz, U S Army, (Ret.) (hereinafter "Col Lutz").

Plaintiffs in this case have similarly offered, and relied on, the findings of Col Lutz. (PX6806.)  Col Lutz's Report concluded that the terrorist attack that killed PFC Fishbeck and injured the other Plaintiffs identified above involved the use of an IRAM explosive

device supplied by the Islamic Revolutionary Guard Corps (IRGC) and fired into the JSS Liberty barracks by Kata'ib Hizballah (KH).

**D.** **JUDICIAL NOTICE OF** *Lee*. Plaintiff's evidence sufficiently identifies KH as the terrorist group which conducted this IRAM attack. However, in this instance the Court has an even better source to base its findings on. This Court can take judicial notice of the mirror-image analysis made in *Lee* relative to Wave 1 Attack #35. Under Federal Rule of Evidence 201, this Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

Under this Rule, the Court may take judicial notice on its own or take such notice if a party requests it and the Court is supplied with the necessary information. Fed. R. Evid. 201(c). Taking judicial notice of previously entered findings of fact and conclusions of law have been followed in other cases like this one, *i.e.,* where a court entered findings of fact and conclusions of law and subsequently considered those same findings in a later-filed case arising out of the same factual scenario. *See Prevatt v. Islamic Republic of Iran*, 421 F.Supp.2d. 152, 155 (D.D.C. 2006); *Hake v. Bank Markazi Jomhouri Islami Iran*, No. CV 17-114 (TJK), 2022 WL 4130837, at *1; Fn. 1 (D.D.C. Sept. 12, 2022); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59-60 (D.D.C. 2010).

A Court in this District described the efficacy of the use of judicial notice in FSIA cases: "The proper approach is one that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation...without necessitating the formality of having the evidence reproduced." *Oveissi v. Islamic Republic of Iran*, 879 F.Supp. 2d 44, 49 (D.D.C. 2012). "Because of the multiplicity of FSIA-related litigation, courts in this District have frequently taken judicial notice of earlier, related proceedings." *Oveissi*, 879 F. Supp. 2d at 49. While taking judicial notice of these opinions does not conclusively establish attribution, "FSIA does not require this Court to relitigate issues that have already been settled' in previous decisions. Instead, the Court may review evidence considered in

an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 60 (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).

Specific language from Lee (with citations omitted) is so precisely germane to this review it is quoted below:

> Around 5:35 a.m. on June 6, 2011, seven explosives were launched from a cargo truck that was used as a mobile launch platform against JSS Loyalty in eastern Baghdad. Two of the explosives failed to detonate, two impacted near the launcher outside JSS Loyalty, and the remaining three detonated near housing units in JSS Loyalty causing a fire that destroyed 30 of the units and damaged 28 units. The two recovered devices had explosive weights of 52.3 and 75.2 pounds. *Id.* The attack killed six U.S. servicemembers, including PFC Fishbeck.

The court finds sufficient evidence in the record to conclude that the attack was the result of an IRAM. The SIGACT Report adds that this attack "matches similar TTPS to the (16) IRAM attacks assessed to be conducted by KH between 2007 and 2010," and concludes that "[d]ue to the nature of this attack, this event was coordinated by a [KH] Element, likely based out of Sadr City." Importantly, "KH claimed and posted videos of both [of] the…attacks."

Taking judicial notice of *Lee*, does not relieve the Court of its responsibility to conduct an independent assessment of liability. Nevertheless, it is very strong confirmation that KH conducted this attack as Plaintiff's evidence suggests. The Memorandum Opinion and Order, containing findings of fact and conclusions of law, entered in *Lee,* is incorporated by reference (PX6812.)  The *Lee* court agrees with Plaintiffs' expert that Iran, acting through its proxies, was responsible for the June 6, 2011 IRAM attack on U.S. Forces.

Based on the above, I recommend the Court conclude this attack was committed by KH.

## E.   WAVE 1 ATTACK #35 WAS CONDUCTED BY KH, A GROUP THAT RECEIVED MATERIAL SUPPORT FROM THE DEFENDANT. This Court has

already found the FSIA's terrorism exception applicable to Defendant for providing material support to KH which bolstered their ability to foreseeably commit acts of extrajudicial killing against American service members in Iraq from 2003 to 2011. (ECF No. 137, at 3; *see also* ECF Nos. 127 and 136.)

F. **WAVE 1 ATTACK #35 INVOLVED A REQUISITE ACT LISTED IN 28 U.S.C. 1605(A)(A)(1)**. Six U.S. Army personnel were killed in this attack including PFC Christopher Fishbeck; sixteen U S Army personnel were also injured.

G. **DEFENDANTS PROVISION OF MATERIAL SUPPORT WAS A PROXIMATE CAUSE OF WAVE 1 ATTACK #35.** The Court has already determined that Iran and its codefendants provided material support to KH between 2003 and 2011, which was the proximate cause for attacks committed by AQI in Iraq during that time. *See* ECF No. 127; ECF No. 136.

VII.   **CONCLUSION AND RECOMMENDATION**. I recommend the Court find that the totality of evidence of record consisting in part of credible and well-sourced expert reports analyzing the sophistication of multi-prong attacks and corresponding tactics, techniques and procedures; use of signature IED and IRAM weapons; military combat and intelligence reports confirming AQI, AAS and KH as the terrorist groups involved; captured equipment; eyewitness accounts; terrorist claims of responsibility; congruence of timing of other similar attacks by the same group in the same area; and in one instance a prior judicial ruling confirming attribution for the same attack; submitted for Wave 1 Attacks #16, #21, #24, and #35, individually proves, factually and legally, that each  attack was committed by the terrorist groups identified as: AQI, AAS and KH.  Taken together these attacks included a dozen extrajudicial killings and the use of seven IEDs and seven IRAMs. It is well establish by fact and Court orders that Defendant provided material support to each of these groups during the period 2003 – 2011, which therefore, were a proximate cause for each of these attacks.

**VIII.** **REVIEW BY THE DISTRICT COURT.** According to this Court's orders governing special masters and implementing the Administrative Plan for this case (ECF No 139, 140 and 145), Plaintiff's may file an objection to, or motion to modify or adopt a finding, report, or recommendation by a special master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide de novo all objections to findings of fact and/or conclusions of law made or recommended by the special master. The Court shall set aside a ruling by a special master on a procedural matter only for an abuse of discretion. Fed. R. Civ. P. Rule 53(f)(3), (4) and (5).

Dated:  February 13, 2024                          Respectfully submitted,

                                                   */s/ J. Daniel McCarthy*
                                                   J. Daniel McCarthy
                                                   Special Master