**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ESTATE OF CHRISTOPHER BROOK FISHBECK, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:18-cv-2248-CRC |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | ) ) | Special Master Jaime Dodge |
| Defendants | ) ) ) | |
| This Document Relates To: ESTATE OF AUBREY DALE BELL, LA'DARIUS BERNARD EZELL, TIFFANY NICOLE EZELL, KYSER EZELL, D'ZUNDRIA  EZELL, PHILANDRIA EZELL, ROXIE BELL, TROY JAMES TUSCHEL, ESTATE OF MATTHEW CHARLES HENDERSON, OWEN L. HENDERSON, JAIMIE K. EGGE, JAMES THOMAS OLSON, RONNY PORTA, RENE EVA PORTA, FELIX A. PORTA & NATALI PORTA | ) ) ) ) ) ) ) ) ) ) ) ) | |

**REPORT AND RECOMMENDATION CONCERNING LIABILITY**

**WAVE 1 - ATTACK NOS. 1, 5, 7, AND 32**

---

## I.    INTRODUCTION

This case is comprised of over 1400 plaintiffs alleging that Iran and various of its instrumentalities provided funding, weapons, and logistical support to the terrorist organizations and militia groups that they allege are responsible for the over 400 attacks described in plaintiffs' Second Amended Complaint. On August 18, 2023, this Court issued a Memorandum Opinion and Order ("Liability Order") in response to plaintiffs' motion for default judgment in fifteen of these attacks. ECF 137. The Liability Order not only resolved the cases before it, but also was intended

1

to serve as a bellwether for the remaining plaintiffs' claims. Id. at 1. Adopting the framework set forth in the Liability Order and incorporating its legal standards and analysis herein by reference as the law of the case, the undersigned relies upon the discussion therein to the extent portions thereof relate to the assessment of liability in this Report and Recommendation to avoid burdening the Court with duplicative assessments of law.

Thereafter, on September 28, 2023, the Court appointed me to serve as a Special Master in this case. Order, ECF No. 145.[1]  Pursuant to the Court's Administrative Plan, the Special Master is to make or recommend findings of fact on: (1) the terrorist group(s) involved in the commission of the attack; (2) the personal injuries or deaths that occurred from the attack; and (3) the relationship of the victims of the attack to the respective plaintiffs. In addition, the Special Master is to make or recommend conclusions of law on whether: (1) the attack involved a group(s) that received material support from Defendants; (2) the attack involved a requisite act listed in 28 U.S.C § 1605A(a)(l); and (3) Defendant's provision of material support was a proximate cause of the attack. See Liability Order, ECF 137 at 2.

The undersigned respectfully submits this Report and Recommendation to assist in the Court's entry of judgment for liability related to:  Attack #1 (Sgt. Aubrey Bell and Sgt. Troy James Tuschel; Attack #5 (Cpl. Matthew Henderson); Attack #7 (PFC James Olson); and Attack # 32 (LCpl. Ronny Porta).

## II.    FRAMEWORK FOR ASSESSING LIABILITY

As set forth above, this Court has previously determined a number of threshold issues in this case. Specifically, the Court has already determined that: (1) it has personal jurisdiction over

---

[1] The Court has appointed nine Special masters, under Fed. R. Civ. P. 53 and 28 U.S.C. § 1605A(e), to assist with determining 1) whether defendants are liable for "non-bellwether" terrorist attacks, and 2) the amount of damages owed to plaintiffs whose claims arise from the terrorist attacks in this case. *See id*.

the defendants; see Liability Order, ECF 137 at 2 (citing Op. & Order, ECF 55 at 10); (2) the Islamic Republic of Iran was designated a state sponsor of terrorism in 1984, and has maintained said designation to this day (see Op. & Order, ECF No. 126, at 3-4); (3) all Plaintiffs are U.S. Nationals, members of the U.S. armed forces, or U.S. government contractors (see id., at 5-7); (4) Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security each provided material support (as defined by 28 U.S.C. § 1605A(a)(1)) to (a) the Shia terrorist groups the Badr Corps, Jaysh al-Mahdi, the Promised Day Brigade, Asa'Ib ahl al Haq, Kata'ib Hizballah, and the Sheibani Network, and also to the Sunni terrorist groups Al Qaeda, Al Qaeda in Iraq (AQI), and Ansar al Islam during the relevant time period of 2003-2011 (Order, ECF No. 127, at 2; see also Order, ECF No. 136, at 1-2 (extending same findings to Bank Markazi and Bank Melli)); and (5) the provision of this material support provided by these specific Defendants to these specific terrorist groups "was essential to the groups' operating capacity, and terrorist attacks involving these groups in Iraq during the relevant time period of 2003-2011, were reasonably foreseeable and a natural consequence of that material support." See Order, ECF 127, at 2; Op. & Order, ECF No. 136, at 1-2.

The Court therefore determined that because many of the criteria for subject matter jurisdiction were easily resolved, see Liability Order, ECF 137 at 2, "all that remains is for the Court to determine whether each…attack was committed by a terrorist group that received material support from the defendants." Id. at 3. The Court then set forth the evidentiary standards for default claims under the FSIA (id. at 6-7) and its approach to liability determinations (id. at 6-7), which are incorporated by reference here.

## III.    LIABILITY FINDINGS & RECOMMENDATIONS

In evaluating whether each bellwether attack was committed by a terrorist group that received support from the defendants, the undersigned Special Master has considered numerous factors, including: (1) whether the tactics, methods, or weapons used in the attack could be linked to the groups Iran supported; (2) whether the attack occurred in an area operationally controlled by one of the terrorist groups Iran supported; (3) whether an expert credibly opined that the attack was committed by an Iran-backed terrorist group; and (4) any other indicia that one of the subject terrorist groups was responsible for the attack. The Special Master has reviewed the evidence, including reports, declarations, and expert reports submitted by the plaintiffs; however, the determinations outlined below have been made without the benefit of opposing evidence from the defendants, who (as this Court previously noted in its Liability Order) have deliberately chosen not to present a defense in this matter.

### A.  Attack # 1:  Sgt. Aubrey Bell (deceased) & Sgt. Troy Tuschel

#### 1.  October 27, 2003 - VBIED Attacks in Baghdad, Iraq

Attack on Al Bayaa Police Station. On October 27, 2003, Sgt. Aubrey Bell was conducting a patrol around the Al Bayaa Police Station in Baghdad, when it was hit by a large explosion. PX2603, CID Report at 13; PX2606, Ross Decl. ¶ j, k. Sgt. Bell was gravely injured and, despite immediate life-saving efforts, died at the 28th Combat Support Hospital. PX2603, CID Report at 6-7, 24. The blast which killed Sgt. Bell was determined to have originated from a VBIED, detonated adjacent to the Police Station. Id. at 8. The vehicle was completely destroyed, such that no evidence could be obtained from it. Id. at 7.

An Iraqi officer provided a detailed description of the vehicle and the driver, and the events surrounding the explosion.[2]  He reported that the vehicle was painted to look like an Iraqi Police truck and the driver was dressed as an Iraqi policeman. Id. at 26. The officer observed that as the vehicle approached the front gate, the driver shot a suppressed weapon at the gate guard, then the vehicle approached the Police Station at a high rate of speed, before exploding. Id.

Attack on Al Sha'ab Police Station. At approximately the same time, Sgt. Troy Tuschel was entering the Al Sha'ab Police Station, also in Baghdad, after receiving orders to meet with the police chief. PX2700, Tuschel Decl. ¶¶ e, f. After entering the police station, Sgt. Tuschel heard gunfire, then a massive explosion. Id. He was knocked unconscious in the blast, suffering injuries for which he would later receive the Purple Heart. Id. at ¶¶ g, j. The blast was determined to have originated from a VBIED, with several daisy-chained 155 mortar rounds in the trunk; this explosion left a blast crater 35 feet in diameter and 15 feet deep, as well as destroying a third of the police station. Id. at ¶ f. Ultimately it was determined that 32 Iraqi civilians and police had been killed in the explosion, in addition to the 8 US troops that were wounded. Id.

Other Attacks. These two attacks were part of a coordinated series of VBIED attacks across Baghdad on October 27, 2003, which targeted five Iraqi police stations and one Red Cross facility. The attack was described as a "coordinated assault that spread mayhem across the city."  PX2625, Expert Rep. of Gartenstein-Ross at 7 (hereinafter "Expert Rep. 1").

---

[2] Some witnesses who saw the explosion reported that the Iraqi police/ guard had mistaken the truck as being a part of the construction crew that had been working at the police station for several months. Id. at 11.

### 2.   Attack was an Operation of JTJ and /or Ansar al-Sunna, Both of Which Received Material Support from Defendants

Attribution to JTJ. At the time of this attack, Abu Musab al-Zarqawi's organization was known as Jamaat al-Tawhid wal-Jihad ("JTJ"); it later changed its name to al-Qaeda in Iraq. Id. at 4. As set forth below, the plaintiffs' expert asserted that JTJ was responsible for a series of similar suicide and VBIED attacks on coalition forces and Iraqi forces with whom they were working, including a number of attacks in Baghdad in the months (and even days) surrounding the attack at issue.[3]

In designating JTJ as a foreign terrorist organization, the Department of State attributed targeted bombings in cities across Iraq, including Baghdad, to the group. Id. at 5. The designation specifically noted that it "was responsible for the [August 19, 2003] UN headquarters bombing in Baghdad which killed U.N. Special Representative of the Secretary General for Iraq"—indeed Zarqawi claimed responsibility for the attack. Id. The expert asserted that use of suicide and VBIED attacks aligned with the specific tactics, techniques and procedures ("TTPs") "that JTJ employed in the fall of 2003. Suicide bombings, particularly targeted suicide bombings that were designed to inflict mass casualties, were a signature attack type used by the Zarqawi organization…JTJ favored the use of suicide and car bombs" and used these in a series of "spectacular attacks" in August of 2003, including the August 7 attack on the Jordanian Embassy in Baghdad, and the August 19 attack on the UN headquarters in Baghdad, which killed 22 people" – only two months before the VBIED attacks in Baghdad at issue here. Id. at 7; see also id. at 6 (noting Zarqawi claimed responsibility for a number of these VBIED attacks and a total of twenty-five suicide bombings altogether by JTJ in Iraq in 2003).

---

[3] Plaintiffs' expert, Daveed Gartenstein-Ross has already been accepted by this Court as an expert in this case; I concur in this assessment as applied to this Attack.

The expert further noted that the motive, target, and TTPs of the attacks matched other attacks conducted by JTJ at that time. The "coordinated series of VBIED attacks across Baghdad on October 27, 2003 targeted, in part, Iraqi police for their role as Coalition force 'collaborators.'" Id. at 7. This aligned, in the expert's opinion, with a broader series of attacks carried out by JTJ in the fall of 2003. Id. The US State Department's 2004 Country Report on Terrorism noted that JTJ claimed responsibility for the October 23, 2003 "massacre of 49 unarmed…Iraqi National Guard Recruits"—which occurred only four days before the attacks at issue here. Id. at 6. The expert also concluded the attack was consistent with JTJ's "claimed responsibility for several attacks on Iraqi and Coalition forces in Baghdad in October of 2003, which also involved 'targeted bombings'." Id. at 7. Other attacks for which Zarqawi claimed responsibility involved attacks on coalition forces, including attacking American forces in the Al-Khaldiya Bridge, American intelligence in the Al-Shahine Hotel, and the CIA and then-deputy defense secretary Wolfowitz in the Al-Rashid Hotel, as well as other attacks on coalition forces. Id. at 5, 6. These attacks included VBIED attacks (such as the Al-Shahine Hotel attack, which killed six). Id.

Attribution to AAS. In contrast to Zarqawi's JTJ and al-Qaeda, Ansar al-Sunna ("AAS") (also known, at times, as Ansar al-Islam or AAI), "did not immediately claim credit for suicide attacks it perpetrated, making it more difficult for the coalition to link attacks directly to the group." Id. at 8. Nevertheless, in the expert's opinion, "AAS was the likely perpetrator of several suicide bombings in October 2003, including a SVBIED attack on a police station in Baghdad. In other words, AAS also executed attacks with similar TTPs, targeting similar groups as the October 27, 2003 attacks." Id. Lending further support to his view, the expert noted that in October 2003, the Pentagon's Director for Operations of the Joint Staff "identified elimination of AAS as 'the No. 1 security priority.'" Id. at 6.

Potential for Coordinated Attack By JTJ and AAS. Evidence was presented by the expert that both JTJ and AAS had the capacity to conduct an SVBIED attack in Baghdad on a police/Coalition target, as evidenced by their respective attacks in October 2003. However, the possibility that the two groups worked together to coordinate the attacks must be considered, given: (1) the scale, complexity, coordination and sophistication of simultaneous attacks on six locations, (2) the complimentary assets, skills, and capacities each of the two organizations had within Baghdad at the time of the attack, (3) active collaboration between JTJ and AAS in the weeks leading up to the attack, which generated an increased level of sophistication in suicide attacks in the area, and (4) the inclusion of this attack in the broader "Ramadan Offensive" wave of attacks in 2003, in which both JTJ and AAS were amongst the militant groups who "marked the Ramadan holiday with a series of attacks targeting the coalition military and the fledging Iraqi security forces." Id. at 5 (internal alterations omitted) (noting that the October 27, 2003 attacks were part of the Ramadan Offensive).

In 2003, the US Treasury designated AAS a terrorist organization, specifically highlighting the "close association" AAS had with al-Zarqawi, "whose network has established a poison and explosives training camp in the northeastern area of Iraq that is controlled by [AAS]." Id. at 4 (citing PX39, US Department of the Treasury, "Treasury Department Statement Regarding the Designation of Ansar al-Islam," Feb. 20, 2003). Multiple reports during this time-period described joint operations by these two organizations. See id. at 4, 8.

The "new relationship and ideological affinity" between AAS and al-Qaeda/JTJ gave rise to an "increase in complex suicide attacks across Iraq associated with the "Zarqawi-Ansar alliance' in 2004." Id. at 8. This collaboration led to an "increasing level of sophistication with which JTJ and AAS planned and executed suicide attacks in the late 2003 to early 2004 timeframe." Id. The

expert noted that the VBIED attack on the Red Cross facility (one of the concurrent attacks in Baghdad on October 27, 2003) was one of the examples used by the Association of the United States Army's Institute of Land Warfare in describing this new phase of suicide attacks linked to the Zarqawi-Ansar alliance. Id. at 8-9. The expert likewise concluded that "[t]he coordinated, near-simultaneous series of VBIED attacks on October 27, 2003…were indicative of the level of complexity, sophistication, and high operational tempo that JTJ and AAS were building in late 2003." Id. at 9. The expert asserted that the new collaboration between JTJ and AAS permitted increasingly sophisticated suicide attacks, and the October 27, 2003 attacks had these hallmarks— it was a complex, coordinated and highly sophisticated attack—further indicating to the expert that it was a JTJ and AAS TTP. See id. at 8.

Overall Conclusion of the Expert. The expert thus concluded that when looking at the timing and location, as well as the tactics, techniques and procedures, "JTJ and AAS's demonstrated attacks in Baghdad during this time period – particularly that targeted Coalition and Iraqi security forces, employed SVBIEDs, or both – as well as the increasingly sophisticated coordinated attacks they were executing at this time indicate that JTJ and/or AAS was likely responsible for this attack." Id. at 9.

He further asserted that Iran provided material support to AAS and JTJ. In particular, he noted the support for AAS in the form of military training, supplies, working with smugglers, facilitating escape and medical treatment, providing fake identification cards for AAI/AAS members, and facilitating travel to execute specific attacks on coalition forces. Id. In addition, he also indicated that Iran was known to provide weapons to both JTJ and AAS. Id.

As such, the expert concluded that JTJ and AAS were both active and collaborated together in Baghdad during the period when this attack (which exhibited TTPs commonly associated with

both groups) occurred, and both were motivated to conduct the attack. Id. at 9-10. Therefore, he concluded that, more likely than not: "JTJ and/or AAS (possibly in coordination) planned, committed, and/or authorized this attack; and Iran's support was critical to the survival of JTJ and AAS, significantly increased their capabilities, and substantially contributed to this attack." Id. at 10.

### 3. Conclusion and Recommendation

The magnitude of the October 23, 2003 attacks and its position in the broader context of other attacks by JTJ and AAS, together with the US Army's Institute of Land Warfare's identification of the coordinated Red Cross VBIED attack as an example of the JTJ/AAS alliance, lead the undersigned Special Master to find this conclusion credible, and to find that there is sufficient evidence to attribute this bellwether attack to JTJ and/or AAS, each of which this Court has previously held received material support from the defendants. As detailed above, this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because the attack resulted in at least one death—in this case, the death of Sgt. Bell at Al-Bayaa, and ten Iraqi civilians and two Iraqi police officers at Al Sha'ab. See 28 U.S.C § 1605(A). I therefore recommend that the Court find that there is sufficient evidence that the attacks which killed Sgt. Bell and Sgt. Tuschel were the result of defendants' material support for JTJ and AAS, and to find defendants liable for the injuries they sustained.

### B. Attack # 5:  Cpl. Matthew Henderson (deceased)

#### 1. May 26, 2004 – IED Attack in Hit, Al Anbar Province

Cpl. Matthew Henderson was deployed to the city of Hit, in the Al Anbar Province. PX3400 (Martin Decl.) at ¶ b; PX3406 (Pers. Award Rec.). The unit's mission was to "identify and exploit opportunities to split al Qaeda elements from nationalist strands of the insurgency."

Br. at 1 (citing PX635 at 33). Cpl. Henderson was specifically tasked with counter-IED work, in which his team would patrol in Humvees to identify IEDs and land mines; if located, the bomb squad would be contacted to disarm or detonate the ordinance. PX3400 (Martin Decl.) at ¶¶ c, d. On May 26, 2004, Cpl. Henderson pulled to the side of the road in Hit, at which time Cpl. Henderson and two other marines exited the vehicles to conduct an IED sweep and look for any wires leading to a remote detonator. Id. at ¶ d. One of those marines identified a wire, at which time an IED detonated killing Cpl. Henderson and the two others. Id. Another member of the unit saw a vehicle take off across the field and concluded that this was the triggerman. Id. at ¶ e. The remaining unit members then traced the IED wires to a nearby graveyard. Id.

According to the autopsy report, Cpl. Henderson died as a result of blast injuries to the head, torso and extremities. PX3407 (Autopsy Rpt.) at 2, 4. Cpls. Nicholas and Codner were also killed as a result of the attack. PX3400 (Martin Decl.) at ¶ d. Cpl. Henderson was posthumously awarded the Purple Heart for the wounds received in the attack. PX3405 (Purple Heart Cert.).

### 2. Attack was Committed by JTJ, Which Received Material Support from Defendants

Plaintiff's expert attributed the attack to the al-Qaeda affiliated Zarqawi organization, known at the time of the attack as Jamaat al-Tawid wal-Jihad ("JTJ"). PX3411, Expert Report of Gartenstein-Ross, at 2 (hereinafter "Expert Rep. 5").[4]  The expert's conclusion that JTJ is more likely than not responsible for this attack is based upon (1) the location and time-period of the attack, and (2) the tactics, techniques and procedures used.

Location & Time Period. Cpl. Henderson's unit was specifically deployed to Hit in February 2004 to "split al Qaeda elements from nationalist strands of the insurgency."  PX 3411,

---

[4] Plaintiffs' expert, Daveed Gartenstein-Ross has already been accepted by this Court as an expert in this case; I concur in this assessment as applied to this Attack.

Expert Rep 5 at 3. As 2004 progressed, JTJ nevertheless "became increasingly prominent in Hit" and a "major player in the insurgency" leading CENTCOM to describe the Hit-Haditha Corridor as one of JTJ's major areas of operation in 2004. Id.

JTJ's increased prominence in Hit coincided with JTJ becoming an increasingly prominent force in Fallujah and across the broader Al Anbar Province in spring of 2004. Id. By May 1, 2004, US forces had withdrawn from Fallujah, only 58 miles east of Hit. Id. By July 2004 (in a briefing notably entitled "Optimized Zarqawi Network in Fallujah"), CENTCOM described Fallujah as "a safe haven for the best organized, most effective terror network in Iraq." Id.

The expert asserted that as JTJ became increasingly prominent, Hit became an important city for the group, serving as a key stop on JTJ's "critical pipeline for 'foreign fighters, money, and other resources'". Id. (citing the Institute for Defense Analyses' report on the Hit-Haditha corridor). The expert thus concluded that JTJ had both a significant interest and a significant presence in Hit at the specific time of the attack – which occurred on May 26, 2004. Id. at 4. And, conversely, Cpl. Henderson's unit was assigned specifically to press on al Qaeda elements in Hit— Zarqawi's JTJ.[5] Id. at 3.

Tactics, Techniques & Procedures. The expert also relied upon the nature of the attack, as an indication that JTJ was responsible. Id. at 4. The US State Department noted that JTJ's goal in 2004 was to expel the coalition forces through a campaign including bombings, assassinations,

---

[5] As discussed supra, the name of Zarqawi's organization has shifted during the times relevant to this litigation, including but not limited to, Al Qaeda in Iraq ("AQI"), the Zarqawi organization, and Jamaat al-Tawid wal-Jihad ("JTJ"). At the time of the attack, the organization was known as JTJ and thus this term is preferred, although the expert does at times use the Zarqawi organization or al Qaeda elements as synonyms for this organization in his report. See Henderson Brief at 1-2; see also PX3411, Expert Report at 3, 5 (citing a source referring to AQI, as a synonym for JTJ; using a source referring to the Zarqawi network as a synonym for JTJ; equating funding to JTJ as enabling Zarqawi's organization); Trial Tr. at 146-147, ECF No. 106 (discussing AQI and JTJ being the same group).

and intimation. Id. CENTCOM further noted that JTJ insurgents specifically targeted coalition forces with IEDs during the First Battle of Fallujah—only weeks before the attack at issue. Id. The expert noted that with JTJ's growth in the area following the First Battle of Fallujah, JTJ continued to employ IEDs to target coalition forces, and by October of 2004, JTJ had established significant stockpiles of IEDs. Id. (citing a Quantico report noting identification of more than 300 well-constructed defensive positions, many of which had been interlaced with IEDs, as well as daisy-chained IEDs along the streets of Fallujah). In addition, by the end of 2004, coalition forces had discovered a large number of IED caches, 24 facilities for manufacturing IEDs and two facilities for manufacturing VBIEDs, in Fallujah, which was by then dominated by JTJ. Id. The I Marine Expeditionary Force identified a late May spike in IED attacks against coalition forces, undertaken to derail local participation in governmental processes being supported by coalition forces—an effort the expert identifies as consistent with JTJ's organizational goals. Id.

The expert relied upon "JTJ's growing prominence in the Fallujah area in summer 2004, their previous local employment of IEDs, the large quantities of IEDs amassed by the end of the summer, and their continued intent to target Coalition forces with explosives" to conclude that "JTJ possessed an operational presence in Hit during the period when this attack occurred and was motivated to conduct the attack" and "[t]he attack exhibited TTPs commonly associated with JTJ." Id. at 5. The expert thus concluded that it was "more likely than not:  JTJ planned, committed, and/or authorized this attack; and Iran's support was critical to the survival of JTJ, significantly increased its capabilities, and substantially contributed to this attack." Id. The expert also noted that Iran provided JTJ with funding, weapons and logistical support – support that he concluded was "critical to the survival of JTJ, significantly increased its capabilities, and substantially contributed to this attack." Id.

### 3.   Conclusion and Recommendation

With particular attention to the specific mandate of Cpl. Henderson's team as buttressing the expert's overall analysis of JTJ's capabilities and its similar attacks in the same area shortly before and after this attack (amongst the other factors set forth by the expert in support of his conclusion), the undersigned Special Master finds this conclusion credible. As such, the undersigned is satisfied that there is sufficient evidence to attribute this bellwether attack to JTJ, which this Court has previously held received material support from the defendants. As detailed above, this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because the attack resulted in at least one death—in this case the deaths of three US marines, including Cpl. Henderson. *See* 28 U.S.C § 1605(A). I therefore recommend that the Court find that there is sufficient evidence to attribute the fifth bellwether attack to JTJ, which received material support from the defendants, and thus to hold defendants liable for the attack.

### C.  Attack # 7:  PFC James Olson

### 1.   July 20, 2004 – VBIED Attack in Al Anbar Province

PFC James Olson was assigned to the 3rd Battalion, 1st Marine Regiment, India Company, and stationed in his platoon's Firm Base in a local schoolhouse on the edge of Al-Karmah, Iraq. PX3601, Olson Decl. at ¶ 3. On July 20, 2004, PFC Olson and PFC Kenny Fisher were sitting on the second level of the schoolhouse, when a terrorist parked a Toyota near the Firm Base and began firing air to air rockets from a rack on top of the vehicle, toward the Firm Base, before fleeing. Id. at ¶ 7. PFC Olson set up a cordon around the abandoned vehicle while waiting for the EOD team to arrive. Id. When the EOD team arrived several hours later and approached the vehicle, it detonated. Id. The explosion killed Staff Sergeant Michael Clark. Id. at ¶ 11. PFC Olson survived

the attack, but suffered post-traumatic headaches with TBI, various shrapnel wounds associated with loss of muscle, tinnitus, hearing loss, and anxiety disorder among other injuries. Id. at ¶ 9.

## 2. Attack was Committed by Al Qaida, Which Received Material Support from Defendants

Plaintiff's expert concluded to a reasonable degree of certainty that this attack was planned, committed and/or authorized by Al-Qaeda (AQ). [6] He based this conclusion upon the area in which the attack occurred, AQ's primacy and control of that area at the time of the attack, and the munitions and tactics utilized.

The attack occurred in Karma, east of Fallujah. PX3601, Decl. Olson at ¶ 5-7. Karma and the surrounding areas were part of the Baghdad Belt strategy, in which Zarqawi sought to control the supply lines in and out of Baghdad. PX3603 (Pregent Expert Report) at 2 (hereinafter "Expert Rep. 7"). To do so, "AQ terrorized local farmers around Karma and used violence and intimidation to take control of rural farms that resisted AQ's presence in the area," in order to ensure a permissive operational environment. Id. During late 2004 and early 2005, a number of High Value Targets were captured in the immediate area, including one who was involved in the execution of Iraqi citizens who cooperated with coalition forces. Id. at 3.

In 2004, coalition forces attempted to expel AQ from Karma, as part of the first and second battles of Fallujah. Id. at 2. During the First Battle of Fallujah in April 2004, AQ increased their attacks on coalition forces in Karma in an effort to stretch coalition forces thin. Id. Then, following the Second Battle of Fallujah in the fall of 2004, Karma remained a city where AQ members fled, which the expert opined reflected Karma's role as "a safe haven, and a place where they had

---

[6] Plaintiffs' expert, Michael Pregent has already been accepted by this Court as an expert in this case; I concur in this assessment as applied to this Attack.

primacy and control." Id. The attack at issue occurred in July 2004, during this time-period of increased conflict with and presence of AQ in Karma.

The expert also relied upon the pattern of terror-related activity in the immediate area surrounding the attack. Specifically, he mapped attacks occurring within 2 miles of the attack, reports of other TTPs (suicide attacks, SBVIEDs and VBIEDs) in this zone, which informed his conclusion this area was "highly saturated with AQ members who were well supplied with Iranian munitions and well trained in their use." Id. at 2-3 (mapping at 5-12). He noted that while a number of caches of munitions were found in the 2004-2006 timeframe, indicating a steady supply of munitions to AQ, one cache found three months after the attack contained a guidebook on making IEDs. Id. This reinforced his conclusion that "well-established AQ tactics, techniques and procedures were used throughout the area surrounding the attack and are indicative of a well-supplied and coordinated group capable of successfully establishing a continual permissive environment in which [AQ] could lethally operate. Id.

In contrast, the expert found no Shia-militia activity in the immediate area, and only two entries for explosively formed penetrators, both of which did not occur until 2007—a number of years after the attack at issue. Id. This buttressed both his conclusion that AQ had primacy and control of the area in which the attack occurred, and, in turn, that AQ was responsible for this specific attack given the lack of Shia activity in the area. Id.

Taken together, the expert concluded to a reasonable degree of certainty that AQ had primacy and control of the area of Olson's attack, and was the group that committed the attack. Id. at 3-4. He further concluded that Iran, the IRGC and MOIS provided material support to Sunni terrorist groups in Iraq including AQ, which "was essential to AQ's primacy, control and operations in and around Fallujah and al-Karma before and after 20 July 2004. Id. at 4. Without

the funding, safe haven, safe passage, training and other critical support from Iran, AQ would have been substantially weaker, far less sophisticated, unorganized, and lack the means to conduct sustained violent operations against coalition forces in Iraq, including the … VBIED attack that wounded PFC James Olson." Id.

### 3. Conclusion and Recommendation

Finding this conclusion credible, the undersigned Special Master is satisfied that there is sufficient evidence to attribute this bellwether attack to AQ, which this Court has previously held received material support from the defendants. Among other factors, the operational dominance of AQ in Karma in the specific time period in which the attack occurred, combined with the sophistication and requirements of the attack (including but not limited to the use of air to air missiles in the initial attack, the ability of those responsible to maintain their position until the optimal time for the second detonation to cause maximum casualties, and the existence of the secondary detonation which coincided with Sunni use of TTPs, including VBIED and SVBIED strikes in the specific area of the Olson attack both before and after July 2004), provide sufficient evidentiary support for the expert's conclusion that AQ carried out this attack and in turn to attribute this attack to AQ. In addition, with the dominance of AQ in Karma, the expert noted the lack of any significant similar attacks by other terrorist groups, which further buttressed the expert's conclusion.

As detailed above, this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because the attack resulted in at least one death—that of Staff Sergeant Michael Clark. *See* 28 U.S.C § 1605(A). I therefore recommend that the Court find that there is sufficient evidence to attribute the seventh bellwether attack to AQ, which received material support from the defendants, and thus to hold defendants liable for the attack.

### D.  Attack # 32:  LCpl. Ronny Porta

#### 1.  May 5, 2007 – IED Attack in Khalidiyah, Al Anbar Province

On May 5, 2007, LCpl. Ronny Porta was deployed to Iraq, where he served as a Motor Vehicle Operator. PX6505 (Porta Decl.) ¶ d, f. He was driving the second vehicle in a convoy of four armored HMMWV's on a logistics resupply mission. Id. at ¶ e-f. His vehicle drove over an IED that detonated under his vehicle. Id. This occurred while the convoy was near the Haditha Triad, in the Haditha-Hit corridor along the Euphrates river. PX6506 (Decl. & Expert Report – Pregent) at 1-2 (hereinafter "Expert Rep. 32"); see also PX 6500 (SIGACT Report). Two marines—MSgt. Mack and Cpl. Palmer—were killed in the resulting blast (see PX6505 (Porta Decl.) ¶ f-g), which was so powerful it completely destroyed the up-armored HMMWV that Porta was driving. PX6506 (Expert Rep. 32) at 1; see also PX6505 (Porta Decl.).

LCpl. Porta was knocked unconscious by the explosion, but upon regaining consciousness, he crawled out of the vehicle. PX6505 (Porta Decl.) ¶ g. LCpl. Porta's skin was melting on his body, causing fellow Marines to douse him with a fire extinguisher and provide immediate medical aid to him (including the remains of his right arm). Id. at ¶ g-h. He was then evacuated to the Combat Support Hospital at Al Asad Airbase, then airlifted to Landstuhl Regional Medical Center in Germany. LCpl. Porta's injuries were treated as he remained on a ventilator, eventually stabilizing enough to be transported to Brooke Army Medical Center in San Antonio, Texas for further treatment of his extensive burns and amputations. Id. at ¶ l.

#### 2.  Attack was Committed by Al Qaida in Iraq, Which Received Material Support from Defendants

Plaintiffs' expert attributed the attack to AQI based on the location and timing of the attack, given his affirmative opinion that AQI had primacy in the area and the presence of similar VBIED

attacks in the area by AQI, combined with reports of AQI members placing numerous IEDs in the area only the prior week—a view he buttressed with the lack of attacks by any other group.[7]  See PX6506 (Expert Rep. 32) at 1 (mapping at 6-14).

Specifically, Pregent identified "Haditha and the surrounding rural areas surrounding it [as] critical points along a key corridor of foreign fighter flow…[which] also permitted Iran to smuggle munitions and other forms of material support into Iraq along the established lines from Syria…through the Haditha Triad where they were distributed or continued toward Fallujah and Baghdad."  Id. at 2. In 2004, when Al Qaeda lost the Second Battle of Fallujah, its members fled into surrounding areas including the Haditha-Hit corridor, and despite the Anbar Awakening, coalition forces were still "constantly battling AQI in and around the Haditha area in 2007."  Id.

An intelligence summary in February 2007 noted that AQI activity was expected to increase in the area. Id. at 2-3. Only a month and a half before the attack, a high-ranking AQI emir was detained by coalition forces in the area. Id. at 3. Additionally, a VBIED was found which had the same construction as a previous one, indicating that a bombmaker was active in the area for a sustained period of time that year. Id. Building on this foundation, the expert asserted that AQI maintained primacy in the area, with no attacks in the area from 2004-2009 attributed to Shia activity, nor any uses of their signature EFPs in the area. Id. Conversely, the expert relied on multiple reports of AQI activity, notably including VBIED/SVBIED attacks, in the area both before and after the May 5, 2007 attack on LCpl. Porta's convoy. Id. Moreover, there were "two reports of AQI members placing 'numerous' IEDs in the area" only seven days before the attack. Id.

---

[7] Plaintiffs' expert, Michael Pregent has already been accepted by this Court as an expert in this case; I concur in this assessment as applied to this Attack.

As a result, the expert concluded "to a reasonable degree of certainty that AQI had primacy and control of the area of Porta's attack on [5] May 2007, and was the group that committed the attack." Id. at 3. The expert further concluded that Iran, the IRGC and MOIS provided material support that was "essential to AQI's primacy, control and operations in and around the Haditha-Hit corridor" without which "AQI would have been substantially weaker, far less sophisticated, unorganized and lack the means to conduct sustained violent operations against coalition forces in Iraq, including the 5 May 2007 attack." Id. at 3-4.

### 3. Conclusion and Recommendation

Finding this conclusion credible in light of the evidence put forward affirmatively demonstrating AQI's pattern of similar IED and VBIED attacks and dominance in the area, combined with the witness reports of AQI placing numerous IEDs in the area shortly before the attack, and the lack of any other similar attacks in the area by any other groups during the relevant timeframe, the undersigned Special Master is satisfied that there is sufficient evidence to attribute this bellwether attack to AQI, which this Court has previously held received material support from the defendants. As detailed above, this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because the attack resulted in at least one death—in this case the deaths of two US marines. See 28 U.S.C § 1605(A). I therefore recommend that the Court find that there is sufficient evidence to attribute the thirty-second bellwether attack to AQI, which received material support from the defendants, and thus to hold defendants liable for the attack.

## IV. REVIEW BY THE DISTRICT COURT

Pursuant to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Nos. No. 139, 140, and 145), Plaintiffs may file an objection

to, or motion to modify/adopt, a finding, report, or recommendation by Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide *de novo* all objections to findings of fact or conclusions of law made or recommended by the Special Master. The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. See Fed. R. Civ. P. Rule 53(f)(3), (4), and (5).

Date: February 13, 2024                                   Respectfully submitted,

                                                          /s/ Jaime L. Dodge

                                                          Jaime Dodge
                                                          Special Master