**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ESTATE OF CHRISTOPHER BROOK FISHBECK, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| | ) | **Civil Action No. 1:18-cv-2248-CRC** |
| **v.** | ) ) | **Special Master Ronald V. Swanson** |
| **THE ISLAMIC REPUBLIC OF IRAN, et al.,** | ) ) | |
| **Defendants** | ) ) | |
| **This Document Relates to Plaintiffs:** | ) ) | |
| **Jonathan Cuney; George L. Cuney; Amanda Cuney Lopez; Juan Rubio; Jason Schauble; Estate of John David Fry; Malia Michelle Fry; CL Fry; Kathryn Michelle Fry, Gideon David Fry; Charles Wilburn Fry; Melissa Inman; Laura Beth Pricer; Jace Alric Badia; & Kylee Ray Badia** | ) ) ) ) ) ) ) ) ) ) ) ) | |

**REPORT AND RECOMMENDATION**

**WAVE 1 – ATTACKS**

**NO. 12, 13, 14, 27, & 31**

**LIABILITY**

I.      **INTRODUCTION**[1]

This report and recommendation is offered to assist the Court in the adjudication of civil claims brought by over 1400 plaintiffs related to over 400 attacks in Iraq that targeted US Servicemembers (and others) from 2003 through 2011. To address the breadth and complexity of the case, the Court implemented a case management plan structured in "phases" intended to address threshold jurisdictional and evidentiary issues common to all claims and culminating in the Court's scrutiny of fifteen representative "bellwether" attacks during an extensive three-day hearing in September 2022. ECF No. 75. On August 18, 2023, the Court entered an order finding five (of the six) Defendants liable for twelve (of fifteen) bellwether attacks. ECF No. 137.

On August 30, 2023, the Court entered an order implementing the administrative plan governing "further proceedings as to the review of evidence and determination of the defendants' liability for non-bellwether attacks at issue in this case." ECF No. 140, at 1 ("Administrative Plan"). The Court supplemented the Administrative Plan on September 28, 2023, to add special masters and include the determination of damages-related issues within our duties. See ECF No. 145. On December 15, 2023, I was assigned to "consider the remaining issues related to Defendants' liability for providing material support to the groups responsible for committing" non-bellwether Attack #12. See ECF No. 140, at § III.

The Court's Administrative Plans specifically directs:

> The Special Master shall make or recommend findings of fact on the
> following:

---

[1]As provided by Section IV of the Administrative Plan for Non-Bellwether Liability Determinations (*see* ECF No. 14o, at 3), Sections I & II of this Report & Recommendation were by Special Masters Ronald Swanson and J. Daniel McCarthy. This coordination was done to ensure common understanding of the Court's prior work and rulings, and to ensure consistency of interpretation and application of the evidentiary standards and analytical framework established by the Court in adjudicating the issues of liability for the Bellwether Attacks.

    a.   The terrorist group(s) involved in the commission of the attack.

    b.   The personal injuries or deaths that occurred from the attack; and

    c.   The relationship of the victims of the attack to the respective plaintiffs.

Using the Court's prior orders and analytical framework, the Special Master shall then make or recommend conclusions of law on the following:

    a.   The attack involved a group(s) that received material support from Defendants.

    b.   The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l ); and

    c.   Defendant's provision of material support was a proximate cause of the attack.

To address these issues, the Court granted me the authority to exercise all powers provided by Federal Rule of Civil Procedure 53(c), including but not limited to compelling production of evidence and receiving testimony by declaration or affidavits in place of live testimony, "as this Court did in the bellwether hearing." *See* ECF No. 140, citing 28 USC § 1746; and *Owens*, 864 F.3d at 785. I may liberally construe the Federal Rules of Evidence and consider "evidence that might not be admissible in a trial, because the Court is not required to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Id*. I am required to "assess defendants' liability and the applicable law … guided by the provisions of 28 USC § 1605A, this Court's prior findings of fact and conclusions of law, any further orders this Court may enter, and other relevant precedent," and "to proceed with all reasonable diligence." ECF Nos. 140 and 145, citing Fed. R. Civ. P. 53(b)(2).

I have reviewed the docketed materials and prior orders identified in Section V of the Administrative Plan, including the Court's opinions and orders on Defendants' liability for providing material support to specific terrorist groups, and Defendants' liability for the Bellwether Attacks (ECF Nos. 127, 137 & 148), and the transcript of the evidentiary hearing.

On December 15, 2023, I received evidence, including witness declarations, government records, a Plaintiff's Fact Sheet, expert reports, and other documents necessary for analyzing the remaining liability issues and my determination of the Defendants' liability for providing material support to the group that committed non-Bellwether **Attacks #12, 13, 14, 27, and 31**.

As the Court did in determining liability for the bellwether attacks, I closely scrutinized the Plaintiffs' evidence, including (1) the reports and declarations of plaintiffs' experts; (2) the declarations of the surviving victims of the five listed attacks; (3) documentary evidence from various government sources; (4) the proposed findings of fact and law offered in plaintiffs' motion for default judgment, and (5) the cases cited by this Court (and others) finding liability (or not) to Iran and the relevant instrumentalities for its involvement in terrorism. See ECF No. 137, at 7-8 (setting forth the Court's approach to determining liability for the bellwether attacks).

Finally, I submit that I have strictly adhered to the Court's established "general approach to liability determinations" and the evidentiary standard endorsed by the Court in the Bellwether process to reach the factual findings and legal conclusions below. *See* id., at 6-8.

## II.        INCORPORATION OF THE COURT'S PRIOR FINDINGS

Before my appointment, the Court found that service of process was properly effected on the defendants under §1608 of the FSIA. *See* ECF No. 55. The Court then reviewed the evidence and found it had subject matter jurisdiction over the claims brought under §1605A, the FSIA's terrorism exemption to sovereign immunity. *See* ECF Nos. 126, 127, and 136. When doing so, the Court established:

> 1. Plaintiffs only seek monetary damages and no other form of relief against Iran, its instrumentalities, and subdivisions for personal injury or death. (ECF No. 137, at 3-4, citing Second Am. Compl. at 756–58; and 28 U.S.C. 1605(A)(c));

2. Iran was designated a state sponsor of terrorism at the time of each attack and when the suit was filed. (See Op. & Order, E.C.F. No. 126);

3. Claimants or victims were, at the time of the relevant attack, US nationals, members of the US armed forces, or qualifying employees or contractors of the US government. (Id.);[2]

4. The FSIA's terrorism exception applies to each defendant, except NIOC, for providing material support to the subject terrorist groups. (Op. & Order, E.C.F. No. 127; Op. & Order, E.C.F. No. 136);

5. Defendants' material support to the subject terrorist groups bolstered their ability to foreseeably commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 to 2011. (Id.).

Accordingly, I incorporate these prior findings and orders by reference here for the five listed Attacks (Attack #12, 13, 14, 27, and 31) which presents the same threshold factual and legal issues of Defendants' material support for the subject terrorist groups and theories of liability underlying Plaintiff's claims. Below, I make the requisite findings and conclusions remaining on liability, which are necessary to assure the Court whether the specific plaintiffs whose claims arise from the five listed attacks "have established their right to relief by evidence satisfactory to the court." *See* BW Order, at 2-3 citing *Bathiard v. Islamic Republic of Iran*, No. 16-CV-1549 (CRC), 2019 WL 3412983, at *2 (DDC July 29, 2019) (quoting 28 USC §1608(e)).

---

[2] The Court's ruling related to §1605A's standing or "status" requirement was limited to those plaintiffs who provided the Court with proof of the status that the relevant "claimant or victim was, at the time of the act, a U.S. national, member of the U.S. armed forces, or qualifying employee or contractor of the U.S. government." See 28 U.S.C. § 1605A(a)(2)(A)(ii). Therefore, in reviewing the evidence, the application of this ruling to a particular attack or plaintiff will be confirmed, or further determined for the Court.

III.      ASSESSMENT OF EVIDENCE & LIABILITY – Attack Nos 12, 13, 14, 27, & 31

  A.  <u>ATTACK #12 December 12, 2004 – Complex Attack in Fallujah, Iraq</u>

  **1. Plaintiff's evidence is sufficient to attribute non-Bellwether Attack #12 to AQI.**

Plaintiff Corporal (Cpl) Jonathan Cuney was injured during a complex attack against his dismounted patrol while conducting clearing operations in "the last segment of northern Fallujah east of Phase Line Bill" on December 12, 2004. The attack involved a heavily armed group of terrorists using sophisticated small unit tactics to "lull troops into complacency prior to an ambush by strategically leaving specific buildings empty." Equipped with modern combat gear, the terrorists ambushed Cuney's unit with small arms and grenades, killing several Marines as they entered the buildings and using the upper levels from which to drop hand grenades and fire RPGs upon those Marines, including Cpl Cuney, who attempted to assist or recover their downed comrades. The attack resulted in the killing of at least four US soldiers and the wounding of 11 others.

Plaintiffs' expert Dr. Daveed Gartenstein-Ross attributed the attack to Al Qaeda in Iraq (aka the Zarqawi organization) based upon the specific geographic location, date, and tactics, techniques, and procedures used. PX4209, p. 4. Specifically, the expert explained that AQI was "the central militant force" in the battle for Fallujah in late 2004. Expert Report, at 4 ("Put simply, AQI possessed area of operation dominance in Fallujah at the time of [the attack]."). The evidence shows the high degree of sophistication and skill of Cuney's attackers, including their extraordinary lethal use of multiple military-grade weapons to ambush a more significant Marine force supported by armored vehicles and aircraft. PX4207 DoN, I-MEF Situation Report, p. 10. An official military report of the attack describes the Marines as being "unable to dislodge the attackers after several hours" and resorting to dropping Guided-Bomb Units (GBUs) on the

buildings used by the attackers, and later found to be an "enemy stronghold." Id. "It was not until December 13 that the block was free of enemy fighters. The Marines had killed thirty insurgents who were wearing green uniforms, assault vests, and pistol belts, had clean weapons, and were eating from food stores." PX596, New Dawn: The Battle for Fallujah.

These complex tactics and skills used in this attack are corroborated in a declassified military study of the battle for Fallujah in December 2004. See PX901, at p. 20 (detailing the distinct increase in insurgent sophistication at that time). Plaintiff Cuney, as his unit's "threat weapons NCO," specialized in identifying and understanding enemy weapons and threats encountered by his unit in Fallujah. PX4206. Cpl Cuney testifies to personally examining weapons recovered from the terrorists who committed the December 12 attack, which included "Kalashnikov rifles (7.62x39), Iranian G-3 Copies (7.62x51), Iranian MP-5 Copies (9x19), Iranian and Romanian Grenades (F-1 & RGD-5), as well as PKM's (7.62x54) [machine guns] and RPG-7's (73mm)." PX4206, para. l. Cpl Cuney further reports that, based on his training and expertise, he "identified the arsenal markings on these firearms and photographed them… and determined these weapons to be of Iranian origin due to their arsenal markings." Id. The plaintiffs' expert concludes that AQI "possessed and routinely employed the weapons used in this attack (PX4209, at 5), and due to the dominance of AQI in Fallujah at that time, "these weapons were likely AQI's." Id., at. 6. Evidence points to the source of these weapons (and the training necessary to use them effectively) as being "foreign fighters and trainers in the area" and it being "common to find material on enemy combatants that was in Farsi… [and] encounter equipment and arms of Iranian origin amongst these Farsi materials." PX4206, para. m.

Finding these conclusions credible, <u>I recommend the Court find there is sufficient evidence to attribute Attack #12 to AQI.</u>

2.  **Attack #12: The personal injuries or deaths that occurred from the attack.**

The attack caused the death of four U.S. Marines. PX4200, at 2 (SigAct "KIA = 4").

During the attack, the blast and shrapnel of a hand grenade struck Cpl Cuney, injuring his left leg

and foot. The blast knocked him unconscious. When he regained consciousness, he was stunned,

in pain, burning, and had pain in his head and ears. He received medical care at the Base Aid

Station. Id., ¶ j. Cpl Cuney was awarded the Purple Heart for the injuries caused by the

December 12, 2004 attack committed by AQI. PX4201l PX4206, at Ex. D. He has been

diagnosed and treated for nerve damage, Traumatic Brain Injury (TBI) and concussion, PTSD,

anxiety, and depression. The Department of Veteran Affairs rated him 100% Permanent and

Total Disabled. *See* PX4213, PX4212, PX4201.

3.  **Attack #12: The relationship of the victims of the attack to the respective plaintiffs.**

Plaintiff Jonathan Cuney is a United States citizen and United States Marine Corporal (Cpl)

who served four years of active service. PX4210, Cuney Plaintiff Fact Sheet, Sec. II(4), (6), (8);

ECF No. 81-2, p. 34. Cpl Cuney received an Honorable Discharge from the United States Marine

Corps in May 2006 after four years of service. PX4202. Id.

Plaintiffs George L. Cuney (father) and Amanda Cuney Lopez (sister) are US Nationals

and immediate family members of Cpl. Cuney. See PX4215, George Cuney Decl PX4214,

Amanda Decl. They bring claims for emotional suffering and solatium arising from the physical

injuries Cpl. Cuney suffered in this attack. ECF No. 100, ¶¶ 3759-3768; PX4210, Sec. II (1).

4.  **Attack #12: The attack involved AQI, a group that received material support from Defendants.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed

above, I conclude that this attack involved Al Qaeda in Iraq. Defendants the Islamic Republic of

Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank

Melli Iran, and Bank Markazi "provided material support, as that term is used in 28 USC § 1605A(a)(1), to… Al Qaeda in Iraq… during the relevant time period of 2003-2011." *See* ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to Al Qaeda in Iraq (aka the Zarqawi organization) between 2003 and 2011; *see also* ECF No. 137, at 3; "the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups[.]").

5. **Attack #12: The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l ).**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because each attack resulted in at least one death. *See* 28 USC § 1605(A); *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), ECF No. 65 at *17–21 (DDC Sept. 30, 2022); and *Force v. Islamic Republic of Iran*, 610 F. Supp. 3d 216, 222 (D.D.C. 2022).

6. **Attack #12: Defendant's provision of material support was a proximate cause of the attack.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that the material support by Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi to AQI was essential to the groups' operating capacity and terrorist attacks involving AQI in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. Therefore, the Defendants' provision of material support to AQI was a proximate cause of the December 12, 2004, complex attack in Fallujah, Iraq, that personally injured Cpl. Cuney.

B. **ATTACK # 13 January 1, 2005 – Complex Attack in Hadith, IRAQ**

1. **Attack #13: Plaintiff's evidence is sufficient to attribute non-Bellwether Attack #13 to AQI.**

On January 1, 2005, U.S. Navy Petty Officer Third Class (HN3) Juan Rubio was injured in an attack in the city of Haditha, which is in the Al Anbar Province. PX4300, Rubio Decl. Plaintiff Juan Rubio is a United States citizen and former United States Navy Hospital Corpsman who served almost nine years of active service. PX4300, Rubio Decl.

He was serving as a United States Navy Hospital Corpsman on the date of this attack. Id., Sec. II (7). Juan Rubio received an Honorable Discharge from the United States Navy on 9 October 2008, after almost nine years of service. PX4300.

HN3 Rubio had enlisted in the United States Navy in 1999 and trained as a Navy Corpsman. While on active duty but after the 9/11 attacks in The United States, HN3 Rubio volunteered for assignment as a Navy Corpsman with U.S. Marine Corps combat units. PX4300. Subsequently, HN3 Rubio was deployed to Iraq, as a Navy Corpsman, for a Marine Corps Small Craft Company, in December 2004. He was stationed at the Haditha Dam on the Euphrates River. Id., para. c. His unit's mission was to provide security around the dam, as well as the river to the south and the lake to the north. Id., para. d.

HN3 Rubio was off duty on the day of the attack but when he learned that a small craft company had been ambushed while patrolling south of the dam, HM3 Rubio volunteered to go and assist in the search for the insurgents near Muj Island, an insurgent stronghold 8 kilometers south of the dam. Id., para. e; PX4305, Expert Report & Declaration of Dr. Daveed Gartenstein-Ross (Attack 13), p. 1. HN3 Rubio and his team were initially traveling in a boat and then pulled ashore about 800 meters north of the initial ambush site. Id., para. f. They moved south toward an old water-pumping station. PX4300, para. e. A sergeant noticed bloody drag marks (likely from an insurgent) and a body that appeared to have been dragged away from the river. Id. The team

spread out in a tactical formation and headed south. Id. When they passed a short wall, Captain (Capt) Jonathan Kuniholm saw a five-gallon olive oil can on the wall. Id. Capt Kuniholm warned the team, "those are the kind of cans the enemy has been using for IEDs." Id. Moments later, an IED in or near the can was remotely detonated. Id.

The explosion hurled the body of Lance Corporal Brian Parrello, a Marine, into HN3 Rubio; they both flew back into a wall. Id., para. g. The impact knocked Rubio unconscious for a short time. Id. When he came to, his ears were ringing and his wrist, elbow, and legs were hurting. Id. When his vision cleared, he realized the dirt was being kicked up by enemy fire and they were in the middle of a firefight of small arms and rocket propelled grenades (RPGs). Id. An RPG slammed into the wall right above HN3 Rubio, sending shrapnel down on his head and under his helmet. Id.

HN3 Rubio and others loaded the wounded into boats to return to Haditha Dam. Id., para. i. HN3 Rubio and, later, Army medics worked frantically to save LCpl Parello, but he died from his injuries. Id. Rubio medically retired from the U.S. Navy in October 2008. PX1330. Prior to his medical retirement, HN3 Rubio was awarded the Silver Star for heroism for the "conspicuous gallantry against the enemy" during the attack. Id., Ex. D.

An article from the Navy News Service describes the attack and HN3 Rubio's heroic involvement:

> "[A] well-emplaced and determined enemy ambushed Rubio and members of his team along the Euphrates River in a complex attack. As Rubio and an assault element swept through the ambush site, insurgents detonated an improvised explosive device. Rocket-propelled grenades and machine gun and small-arms fire followed immediately after the explosion, wounding three Marines.
>
> Realizing the severity of the Marines' wounds, and bleeding profusely from his own, Rubio low-crawled across open terrain, exposing himself to enemy fire to provide triage. Simultaneously taking care of three urgent surgical casualties, Rubio

*coached his fellow Marines who were assisting other casualties as incoming enemy fire intensified.*

*After stabilizing the wounded for casualty evacuation, Rubio directed the platoon to provide covering fire as he and several Marines began moving the casualties towards safety.*

*Without regard for his own life, he once again exposed himself to the heavy and accurate enemy fire, moving the Marines from the ambush site to the shoreline."* Id.

The Zarqawi organization has undergone several name changes since the group's inception in 1993. In October 2004, the Zarqawi Organization underwent one such change when the group formally pledged baya (allegiance) to al-Qaeda, changing its name to Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (al- Qaeda in Iraq). As this attack occurred after the name change, this attribution will refer to the group as AQI. id. p.3

Plaintif's expert attributed the attack to Al Qaeda in Iraq (AQI). PX4305, Expert Report & Declaration of Dr. Daveed Gartenstein-Ross (Attack 13), p. 2. His conclusion is supported both by AQI's regional dominance at the time of the attack as well as the tactics, techniques, and procedures used to carry out the attack. Id.

At the time of the attack, the city of Haditha had operational importance to AQI, serving as a major cross-border hub between Syria and Iraq and a transit center for insurgents. Id., pp. 2-4. A report from the Institute for Defense Analyses documented AQI's presence in Haditha in the fall of 2004, noting that "Al Qaeda was flowing forces from Syria and other places into Iraq, and of course, the meeting place for both was Haditha. It's the first place where you really can blend into a large urban area." PX635, Knarr et al., Al Sahawa—The Awakening Volume III-B: Al Anbar Province, Area of Operations Denver, Hadithah–Hit Corridor, p. 23. The report also documented the high number of AQI fighters who were present in Haditha, either transiting

through the city or there to facilitate local operations. PX4305, p. 3. Moreover, after the Second Battle of Fallujah ended in December 2004, a number of AQI fighters fled to the Hit-Haditha Corridor. Id. Indeed, by late 2004, "AQI had complete control over the city" of Haditha. PX635, Knarr, p. 23.

In particular, Muj Island, where the subject attack occurred, was a noted destination for AQI fighters:

> *Al Qaeda in Iraq and all of the anti-Iraqi forces had suffered a major defeat in Fallujah, but the insurgency in Anbar Province was not over; the fight just shifted to the Anbar countryside. Those insurgents not killed or captured scattered to the winds. Some went to Ramadi, and others to Hit, Karmah, Habbaniyah, and to Haditha—and especially Muj Island.*

PX596, Lowry, New Dawn: The Battles for Fallujah, p. 358.

In fact, the Euphrates River, in which Muj Island is located, was uniquely valuable to AQI, as explained in U.S. CENTCOM's Study of the Insurgency in Anbra Province, Iraq: "AQI used boats to transport fighters, weapons, and supplies along the Euphrates River." PX898, "Chapter Six: AQI Dominates the Insurgency (2006)," in Study of the Insurgency in Anbar Province, Iraq, (CENTCOM, June 13, 2007), p. 171. The Institute for Defense Analyses likewise reported that al Qaim, the border town where the Euphrates enters Iraq, "was important to AQI" "because of its location on the Iraqi border and along the Euphrates River" and was critical for the transportation of "resources that fueled the insurgency." PX635, Knarr, p. 8. AQI's presence in Muj Island is explained not only by the fact that it served as a refuge following the group's defeat in the Second Battle of Fallujah, but also by the importance that AQI attributed to the Euphrates River and the supply lines that the group maintained via the river. PX4306 p 4.

In early 2005, AQI still had a significant operational presence in Haditha. PX4305, p. 4. In fact, Coalition Forces captured several AQI leaders in Haditha during that timeframe. Id. AQI's regional dominance at the time of the attack on HM3 Rubio's unit supports the conclusion that AQI committed that attack. Id., p. 5.

The TTPS used in the attack also confirms it was committed by AQI. This complex attack involved the use of small arms fire, an RPG, and an IED. IEDs were a common TTP associated with AQI. Id. The majority of IEDs used during the Second Battle of Fallujah in 2004 were placed by AQI insurgents, and AQI continued using IEDs against Coalition Forces through the first half of 2005. Id. In addition, as the military learned during Operation Al Fajr, which lasted through the end of 2004 (right before the attack), AQI had access to the specific weapons used in the attack. Id. During that Operation, AQI frequently attacked Coalition Forces with RPGs and small arms fire. Id., p. 6. Following the Operation, many AQI fighters fled to the Hit-Haditha Corridor, bringing with them their small arms, RPGs, and IED know-how. Id.

Staff Sergeant Harry Dreary, a sergeant serving in Capt Kuniholm's unit, offered a similar assessment: *"It was known by us at the time that, after the battle of Fallujah in late 2004, al Qaeda-aligned foreign jihadis had entered the Haditha area bringing with them sophisticated tactics, techniques, and procedures."* PX1307 Dreany Declaration, p. 3. Capt Kuniholm describes the sophistication of the subject attack as follows:

> *[T]he attack…was a sophisticated ambush planned to take advantage of the Marines 'expected response to what otherwise would have been a haphazard attack. Instead, the attack included a lookout in the nearby mosque minaret, a command-detonated attack-initiating IED composed of plastic explosive and improvised anti-personnel features and wireless control, followed by an L-shaped ambush using mutual support of coordinated units on different sides of the clearing where the initial small arms fire and IED were located. These mutually supporting units used a combination of small arms, including machine guns and rocket propelled grenades.*

14

PX4306, Kuniholm Declaration, p. 4.

The platoon sergeant, who had received extensive military training on investigating blast scenes, concluded that "the explosives used in the olive oil can IED were indicative of a high-grade 'fast 'explosive which would cause cutting damage and life-threatening injuries." PX1307, p. 3. The L-shaped ambush that followed the IED detonation is further evidence of a coordinated, complex attack. Id. As Plaintiff's expert explains, this "is a degree of sophistication displayed by a dominant, well-resourced group, which in this area at the time, was AQI." PX4305, p. 7. Furthermore, AQI, claimed responsibility for attacks around this area and time involving similar TTPs, as documented by Plaintiff's expert in his report. See Id. In short, all this evidence provides "strong evidence of AQI's responsibility for this attack." Id. <u>I recommend the Court find there is sufficient evidence to attribute Attack 13 to AQI.</u>

### 2. Attack #13: The personal injuries or deaths that occurred.

<u>The attack caused the death of one United States Marine</u>, <u>LCpl Parello</u>. PX4300. The explosion hurled the body of Lance Corporal Brian Parrello, a Marine, into HN3 Rubio; they both flew back into a wall. Id., para. g. The impact knocked Rubio unconscious for a short time. Id. When he came to, his ears were ringing and his wrist, elbow, and legs were hurting. Id. When his vision cleared, he realized the dirt was being kicked up by enemy fire and they were slammed into the wall right above HN3 Rubio, sending shrapnel down on his head and under his helmet. Id. the middle of a firefight of small arms and rocket propelled grenades (RPGs). Id.

### 3. Attack #13: The relationship of the victim of the attack to the respective plaintiffs.

<u>Plaintiff Juan Rubio is a United States citizen</u> and former United States Navy Corpsman. On January 1, 2005, U.S. Navy Petty Officer Third Class (HN3) Juan Rubio was injured in an

attack in the city of Haditha, which is in the Al Anbar Province, Iraq. PX4300, Rubio Decl. He was serving as a United States Navy Hospital Corpsman on the date of this attack. Id., Sec. II (7). Juan Rubio received an Honorable Discharge from the United States Navy on 9 October 2008, after almost nine years of service. PX4300.

### 4. Attack #13: The attack involved AQI, a group that received material support from Defendants.

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved Al Qaeda in Iraq. Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi "provided material support, as that term is used in 28 USC § 1605A(a)(1), to… Al Qaeda in Iraq… during the relevant time period of 2003-2011." See ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to Al Qaeda in Iraq (aka the Zarqawi organization) between 2003 and 2011; see also ECF No. 137, at 3; "the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups[.]").

### 5. Attack #13: The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l ).

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because each attack resulted in at least one death. *See* 28 USC § 1605(A); *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), ECF No. 65 at *17–21 (DDC Sept. 30, 2022); and *Force v. Islamic Republic of Iran*, 610 F. Supp. 3d 216, 222 (D.D.C. 2022).

### 6. Attack #13: Defendant's provision of material support was a proximate cause of the attack.

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that the material support by Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi to AQI was essential to the groups' operating capacity and terrorist attacks involving AQI in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. Therefore, the Defendants' provision of material support to AQI was a proximate cause of the January 1, 2005, Complex Attack in Hadith, IRAQ that personally injured HN3 Juan Rubio.

## C. Attack #14: January 3, 2005 – Attack in Amiriyah, Iraq

Plaintiff Jason Schauble is a United States citizen and former United States Marine Officer who served over eight years of active service. PX4417 Plaintiff Fact Sheet. He received an Honorable Discharge from the United States Marine Corps in 2006. PX4403 At the time of his discharge from military service, among numerous awards and decorations authorized, Capt Schauble had been awarded a Silver Star Medal, a Bronze Star Medal, a Purple Heart Medal, and the Combat Action Ribbon. Id.

On January 3, 2005, Capt Jason Schauble was wounded during a firefight in Amiriyah, southeast of Fallujah. See Plaintiffs 'SAC, ECF Dkt. No. 100, at ¶¶3682-3688; PX 4417, Schauble Fact Sheet. Capt. Schauble was serving as a Platoon Commander of 4th Platoon, 2nd Force Reconnaissance Company, 1st Marine Division, I Marine Expeditionary Force operating in the al Anbar Province. PX4400 Expert Report of Walter, Evans, Sultzer. He was leading his platoon to capture a High Value Target (HVT) when they assaulted a house in Amiriyah, southeast of Fallujah. His platoon pursued the enemy into a house and was immediately met with heavy small arms fire and fragmentation grenades from the barricaded enemy, killing one of his Marines.

To rescue a fellow Marine, Capt Schauble entered the barricaded room and engaged the enemy, killing two. During the firefight, Capt Schauble was shot in the arm and seriously wounded by enemy fire. *Id.* The rest of his team continued the assault, killing five more insurgents, and his unit cleared its objective. Ultimately, fixed winged aircraft from the Marine Air Wing destroyed the enemy structure with laser guided GBU-12 bombs. Once the area was secured, Capt Schauble was evacuated by helicopter to the nearest medical treatment facility where he received care for his gunshot wounds. *Id.* For his actions, Capt Schauble was awarded the Purple Heart and the Silver Star. PX 4417, Schauble Fact Sheet at ¶ II.12.

His Silver Star Award Citation reads, in part:

> *"For conspicuous gallantry and intrepidity in action against the enemy while serving as Platoon Commander…on 3 January 2005. While conducting a limited-scale raid on a High Value Target deep inside insurgent controlled territory, his assault element came under intense fire from small arms and hand grenades. As they entered and attempted to gain a foothold in the farmhouse, one Marine was killed. Learning a Marine was killed, and the assault had stalled, Captain Schauble moved forward to the barricaded position. He immediately assessed the situation and determined the Marines were in danger. With no regard for his personal safety, he threw a flash bang and entered the darkened second room. Moving to the far wall, he engaged multiple insurgents and attempted to recover the dead Marine. The insurgents focused on Captain Schauble and engaged him at a distance of less than six feet. Moving deeper into the room, he killed two insurgents before being seriously wounded himself…..though seriously wounded, he held his position until all insurgents were eliminated, risking his life to protect his Marines…"*

PX4406.

### 1. Attack #14: Plaintiff's evidence is sufficient to attribute non-Bellwether Attack #14 to AQI.

Al-Qaeda in Iraq (AQI) was responsible for the attack because *a.* it was operating in a permissive environment in Amiriyah at the time and the attack, and *b.* the attack featured tactics techniques and procedures used by AQI. AQI operated in a permissive environment in Amiriyah during January 2005 allowing freedom of movement to conduct complex attacks on Coalition Forces.

During January 2005, AQI was known to be throughout the rural areas of Al Anbar based on multiple reports. PX4400 Expert Report of Walter, Evans, Sultzer at p. 9-10. Towns like Amiriyah were important locations from which to facilitate AQI movement of men, weapons, and equipment across Al Anbar Province and into Baghdad, particularly following the Second Battle of Fallujah. Id. at 10. Furthermore, the Coalition forces operating in the province did not have the ability to hold and maintain these towns, thus AQI enjoyed considerable freedom of movement throughout the area of operation. Id.

In fact, Zarqawi launched a high-profile attack from Amiriyah into Abu Ghraib less than three months after Capt Schauble's assault. Id, see also PX900, Study of the Insurgency in Anbar Province, Iraq – Chapter Five, Anbar: Insurgency Grows, Strengthens, Elections (2005). The fact that the building was deliberately barricaded prior to Capt Schauble's unit assault supports the conclusion that the perpetrators of the attack benefitted from a permissive environment for their illicit activities and operated with impunity in the immediate area of the attack. The attack used tactics, techniques and procedures associated with AQI. The TTPs employed in this attack indicate that AQI more likely than not committed the January 3, 2005 attack. PX4400 Expert Report of Walter, Evans, Sultzer p.9. The Expert Report further states:

> *We conclude with a reasonable degree of certainty that the January 3, 2005, ambush of Capt Jason P. Schauble's platoon by a well-defended enemy equipped with small arms fire (SAF) weapons and fragmentation grenades was executed by an al-Qaeda in Iraq (AQI) cell attempting to protect one of their High Value members. This ambush resulted in seriously wounding Capt Schauble and his Platoon Sergeant, GySgt McDermott and killing one of his Non-Commissioned Officers (NCO). At the time of the attack, AQI maintained a significant presence throughout Al Anbar province, where it sought to protect critical nodes and lines of communication in the region. Ultimately, AQI's objective with these attacks was to defeat and force the withdrawal of U.S. and Coalition forces from Iraq. The coordination, precision, and initial success of the defensive "stronghold" position demonstrated strong proficiency by the insurgent cell such that it is reasonable to conclude that the initial success of this operation was directly impacted by the*

*material support from Iran through the Iranian Islamic Revolutionary Guards Corps and Ministry of Intelligence and Security.*"

Id.

It was clear the attackers were prepared for Capt Schauble's platoon's assault and mounted a fierce defense from a prepared position to prevent the platoon from achieving its objective. PX4401 CJTF-7 Red Cell: A Red Cell Political Military Assessment, "Future Al-Qaida and Zarqawi Network Operations in Iraq," 3 Feb 2004. AQI's network operatives are described as "skilled at complex attacks…network has also demonstrated capabilities not normally associated with Former Regime Elements, to include large-scale directional charging and mixing of explosive compositions to overcome force protection measures or target construction. These attacks, moreover, have been characterized by meticulous planning and pre-operational surveillance and intelligence gathering." Id.; see also PX932, CJTF-7 Red Cell: A Red Cell Political Military Assessment, "Future Al-Qaida and Zarqawi Network Operations in Iraq," 3 Feb 2004, at p. 2.

This skill was highlighted in the operation where Capt Schauble's platoon was deliberately drawn into a building against a well-armed and protected enemy. *Id*. It is likely the enemy studied the Marines tactics from the First and Second Battles of Fallujah and saw an opportunity to "ambush" the Coalition forces during the confusion of combat in a darkened room/building. PX4400 Expert Report of Walter, Evans, Sultzer p. 8. The enemy's initial successful defense against Capt Schauble's unit attack was well organized by employing well aimed small arms fire against a patrol from a "strong point" position to maximize casualties and protect an enemy cell leader. When the platoon entered the building, they were immediately met by a barricaded enemy placing accurate fires, resulting in the death of the first officer who entered the room. The successful execution of these types of attacks required discipline, training, and synchronization which was a hallmark of Al-Qaeda in Iraq (AQI) at that time.

### 2. Attack #14: The personal injuries or deaths that occurred.

This ambush resulted in seriously wounding Capt Schauble and his Platoon Sergeant, GySgt McDermott, and killing one of his US Marine Corps Non-Commissioned Officers (NCO).

### 3. Attack #14: The relationship of the victim of the attack to the respective plaintiffs.

Plaintiff Jason Schauble is a United States citizen and former United States Marine Corps Officer. On 3 January 2005, Jason Schauble was wounded during a firefight in Amiriyah, southeast of Fallujah, Iraq. See Plaintiffs 'SAC, ECF Dkt. No. 100, at ¶¶3682-3688; PX 4417, He was serving as a United States Marine Corps Officer on the date of this attack. Id., Sec. II (7).

### 4. Attack #14: The attack involved AQI, a group that received material support from Defendants.

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved Al Qaeda in Iraq. Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi "provided material support, as that term is used in 28 USC § 1605A(a)(1), to… Al Qaeda in Iraq… during the relevant time period of 2003-2011." See ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to Al Qaeda in Iraq (aka the Zarqawi organization) between 2003 and 2011; see also ECF No. 137, at 3; "the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups[.]").

### 5. Attack #14: The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l ).

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because each attack resulted in at least one death. *See* 28 USC §

1605(A); *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), ECF No. 65 at *17–21 (DDC Sept. 30, 2022); and *Force v. Islamic Republic of Iran*, 610 F. Supp. 3d 216, 222 (D.D.C. 2022).

### 6. Attack #14: Defendant's provision of material support was a proximate cause of the attack.

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that the material support by Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi to AQI was essential to the groups' operating capacity and terrorist attacks involving AQI in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. Therefore, the Defendants' provision of material support to AQI was a proximate cause of the January 3, 2005 – Attack in Amiriyah, Iraq.

### D. Attack #27: March 8, 2006 – Attack near Habbaniyah, Iraq

#### 1. Attack # 27: Plaintiff's evidence is sufficient to attribute non-Bellwether Attack #27 to AQI.

John David Fry was born in Waco, Texas, on 30 October 1977, and was a U.S. Citizen. PX6003, Report of Casualty. On March 8, 2006, Gunnery Sergeant John David Fry was a member of an explosive ordinance disposal (EOD) team based at Camp Al Taqaddum, Iraq. PX6008, Incident report. Gunnery Sergeant Fry was the EOD team leader on that date and his unit was providing EOD support for an operational Marine Corps task force. Id. At approximately 2200 (10pm) local time, March 7, 2006, the task force began a mechanical route clearance in the vicinity of Habbaniyah, Iraq. Shortly thereafter, an area off the main road was marked and identified as containing a possible improvised explosive device (PIED). An initial detonation occurred at the site with no casualties. At that point, the area was declared safe to dismount motor vehicles and Gunnery Sergeant Fry went forward of the task force Marines to clear three other "PIEDs" that

had been identified. From the other PIEDs, Fry identified wires leading off the road. To ensure the safety of his unit, Gunnery Sergeant Fry took steps to ensure these wires were no longer connected to a power source. At approximately 0125 local time on March 8, 2006, a detonation occurred having been caused from a secreted and undetected power source. id. Gunnery Sergeant (GySgt) Fry was a Staff Sergeant at the time of the attack. He was posthumously promoted to Gunnery Sergeant.

John David Fry was instantly killed while searching for and seeking to dismantle explosive devices in the Al Anbar Province, west of Habbaniyah and near Khaladiyah, Iraq. When he believed an IED was disarmed, he approached it and picked it up. The IED was still attached to a trigger causing it to explode in his hand and killing him. PX6002, Casualty Report; PX6003, DD Form 1300 Report of Casualty; PX6004, Armed Forces Medical Examiner Final Autopsy Report; PX6008, Incident Report. GySgt Fry was survived by his wife, son, two daughters, father, and two sisters, all of whom are listed as plaintiffs. PX6000.

Plaintiff's expert attributed the attack to Al Qaeda in Iraq (aka the Zarqawi organization) (AQI). PX6007, Expert Report of Walters, Evans, and Sultzer *p. 1*. The experts' conclusion is based on the geographic location, period of the attack, and the tactics and techniques employed in the attack. Id. p. 1. The conclusion is supported by the history of AQI in the Al Anbar Province and the use of large and lethal IEDs in well-trafficked areas by AQI. The experts reported:

> "*The nature of the threat environment in early 2006 enabled AQI to operate relatively freely throughout the Euphrates River Valley, near Ramadi and conduct attacks against U.S., Coalition, and Iraqi Security Force (ISF) targets throughout Al Anbar Province. These lethal attacks were designed to protect their lines of communication into Baghdad and eventually force the withdrawal of Coalition forces from Iraq and re-establish Sunni dominance in the country. Ultimately, AQI's objective with these attacks was to kill and maim Iraqi citizens and Coalition forces in order to coerce the withdrawal of U.S. and Coalition forces from Iraq.*" Id. p. 1.

The geographic location and time frame of the attack supports the notion that AQI is responsible. At the time of the attack, many of the Al Anbar cities, including Habbaniyah acted as hubs for the road network of AQI that was used to transport foreign fighters entering Iraq from Syria. Id. p. 6. It was further found that the Habbaniyah Airfield, which was near the attack on GySgt Fry, contained many weapons that were likely sources for IEDs for AQI. Id. p. 6. Additionally, indicative of the group's presence and control of the area at the time, shortly after GySgt Fry's attack, AQI held a meeting near Khaladiyah to discuss its vision of AQI's future. Id. P. 7.

Second, the tactics, techniques, and procedures also support that AQI is responsible for this attack. The IED attack was well planned and expertly executed as it was likely AQI was aware that US troops cleared routes they often traveled. Id. p. 10. Further, the fact that AQI was able to place the IED in a well-trafficked route without being caught supports the conclusion that this was not a randomly placed IED, but one that targeted US troops. Id. p. 11. Because of AQIs strong presence in Khaladiyah, it was known that AQI would travel in groups to plant IEDs, and they would even give local business owners advanced notice when they planned to place IEDs or planned IED attacks. Id. p. 7.

The expert report specifically concluded:

> "*The IED attack in which SSgt Fry was killed was well planned and expertly executed. The AQI cell was likely aware that Coalition forces were using the route for movement based on observing their meticulous route clearance operations. Nonetheless, the enemy was still able to emplace IEDs along the same route that SSgt Fry's patrol was clearing. Likewise, the enemy sought to eliminate the highly trained EOD teams by emplacing complicated IEDs in their path. Despite, SSgt Fry's expertise, the cell was able to successfully remotely detonate the IED, killing him and wounding another EOD technician. In our personal experience, a successful execution of this type of IED attack required discipline, training, and synchronization which was a hallmark of Al-Qaeda in Iraq (AQI) at that time.*"

Id. p.12.

Finding these conclusions credible, <u>I recommend the Court find there is sufficient evidence to attribute Attack #27 to AQI.</u>

**2.  Attack #27: The personal injuries or deaths that occurred from the attack.**

Gunnery Sergeant John David Fry, a United States Marine was killed in this attack. PX6000. Solatium victims include Malia Michelle Fry, wife of John David Fry, CL Fry, son of John David Fry, Kathryn Michelle Fry, daughter of John David Fry, Gideon David Fry, son of John David Fry, Charles Wilburn Fry, father of John David Fry and Melissa Inman, sister of John David Fry.

**3.  Attack #27: The relationship of the victims of the attack to the respective plaintiffs.**

Plaintiffs are the estate of John David Fry, and immediate family members of John David Fry. All family members of John David Fry are US Nationals. John David Fry was a U.S. citizen. They bring claims for emotional suffering and solatium arising from the death of John David Fry that was caused by this attack. PX6000.

**4.  Attack #27: The attack involved AQI, a group that received material support from Defendants.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, <u>I conclude that this attack involved Al Qaeda in Iraq</u>. Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi "provided material support, as that term is used in 28 USC § 1605A(a)(1), to… Al Qaeda in Iraq… during the relevant time period of 2003-2011." *See* ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to Al Qaeda in Iraq (aka the Zarqawi organization) between 2003 and 2011; *see also* ECF No. 137, at 3; "the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups[.]").

5. **Attack #27: The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l)**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because each attack resulted in at least one death. *See* 28 USC § 1605(A); *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), ECF No. 65 at *17–21 (DDC Sept. 30, 2022); and *Force v. Islamic Republic of Iran*, 610 F. Supp. 3d 216, 222 (D.D.C. 2022).

6. **Attack #27: Defendant's provision of material support was a proximate cause of the attack.**

Based on the evidence submitted for this attack and the Court's prior orders as detailed above, I conclude that the material support by Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi to AQI was essential to the groups' operating capacity and terrorist attacks involving AQI in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. Therefore, the Defendants' provision of material support to AQI was a proximate cause of the March 8, 2006– attack near Habbaniyah, Iraq that caused the death of Gunnery Sergeant John David Fry, USMC. Attack #27.

E. **Attack #31 November 11, 2006 – Ramadi, Iraq**

1. **Attack #31: Plaintiff's evidence is sufficient to attribute non-Bellwether Attack 31 to AQI.**

On November 11, 2006, Private First Class (PFC) Jace Alric Badia was the driver of an M-2 Bradley infantry fighting vehicle conducting a route clearance in the city of Ramadi, in the Al Anbar Province of Iraq. PX6402 Declaration of Jace Alric Badia; PX6404 Expert Report of Walter, Evans, Sultzer. Prior to this mission, PFC Badia received a "tip" from a local source of an Improvised Explosive Device (IED) that was buried nearby. PX6402 Declaration of Jace Alric Badia. While driving, PFC Badia's vehicle crossed directly over the IED, and it detonated below

26

PFC Badia's seat. PX6402 Declaration of Jace Alric Badia. After the IED detonated, they were engaged by small arms fire (SAF). PX6402 Declaration of Jace Alric Badia. The Explosive Ordinance Disposal (EOD) team that arrived to conduct a post-blast analysis of the IED was hit with a second IED, killing three Marines. PX6408 Supplemental Declaration of Jace Alric Badia; PX6409 Fallen Times Articles for KIAs on November 11, 2006.

As a result of the explosion, PFC Badia sustained multiple injuries, including, *inter alia*, above-knee amputation of his left leg, multiple fractures to his right leg and foot, a fractured right arm, a Traumatic brain injury and PTSD. PX6402 Declaration of Jace Alric Badia, PX6403 VA Disability Rating.

Badia describes the attack as follows:

> *"On November 11, 2006, we were in a convoy out on route clearance in Ramadi. I was the driver of an M-2 Bradley, Michael Tarango was in the gunner's position and Donald Gaylor was in the truck commander seat. We received intel from a local source of a roadside bomb within a 6-grid coordinate. We got to the grid coordinates provided and did a standoff of about 50 meters and waited for another 20 minutes before we started moving forward. We had only moved about 10 feet when suddenly an IED detonated underneath my vehicle, almost directly under my seat. The whole vehicle was thrown into the air. After we crashed back down, I tried to hit the gas to get us out of the kill zone, but my right foot was dangling and only attached by skin. I then tried to use my left leg but realized that it was missing entirely. I then used my rifle to hit the gas pedal, but the vehicle didn't move. I tried to see if the vehicle would go in reverse, but when I tried to shift gears, I realized my right arm was broken. I heard someone yelling into the radio asking if we were all alive, I responded that I was extremely injured. I was instructed to pull myself to the back of the vehicle into the cabin where I was met by Gaylor. We started to receive gunfire, and my commander returned fire with his M-4 through the hatch while the second vehicle provided covering fire for the medic with its 25mm autocannon.*

PX6402.

Plaintif's expert attributed the attack to Al Qaeda in Iraq (AQI). PX6404 Expert Report of Walter, Evans, Sultzer, p. 1. The expert's conclusion is based on the geographic location, time of the attack, and the tactics and techniques employed in the attack. PX6404 Expert Report of Walter,

Evans, Sultzer. The conclusion is supported by the history of AQI in the Al Anbar Province, the use of large and lethal IEDs in well-trafficked areas, and photographs from November 11, 2006. Id.

First, the geographic location and time frame of the attack supports the notion that AQI is responsible. At the time of the attack, intelligence collection indicated that AQI had strong presence in Ramadi, as many AQI leaders relocated to Ramadi after the 2nd Battle of Fallujah by the Spring of 2006. Id. pp. 8 and 14. This presence is further evidenced by several other attacks perpetrated against US forces and within Ramadi both before and after PFC Badia's attack. Id. pp. 5-6. Lastly, based on intelligence sources, AQI was known to be operating around Ramadi and in the Al Anbar Province during the time of the attack. Id. p. 14.

LTC Ferry, the Commander of Task Force 1-9 Infantry in East Ramadi beginning in October 2006 (one month prior to PFC Badia's attack), confirmed through his unit's intelligence collection and that of other sophisticated intelligence resources, that his area of operations served as a "major Al Qaeda in Iraq (AQI) sanctuary and stronghold where the group transitioned foreign fighters, equipment, supplies, and cash coming primarily from Syria into the Anbar province, through Ramadi and then into Baghdad." Id., p. 5.

Second, the tactics, techniques, and procedures also support that AQI is responsible for this attack. The IED attack of PFC Badia was one of many in Ramadi. Id. ps. 5-6. The use of both a large IED coupled with small arms fire suggests that the enemy was well-trained and equipped with lethal weapons. Id p. 14. Additionally, because this attack appeared to be an ambush (given the false "tip" provided by a local source) by enemy forces suggests that AQI committed the attack. At the time of the attack, AQI was trained to use IED's and small arms against US forces, as evidenced by the accuracy of the placement of the IEDs on well-traveled roads in Ramadi. Id pp.

5-6, 10,14. Other servicemen were also involved in similar IED attacks in Ramadi, confirming that AQI's operations appeared to be well coordinated and they possessed expert knowledge in the use of IEDs. Id, p. 5. <u>I conclude and recommend the Court find the level of sophistication manifested by the attack preparation supports the conclusion that this was an AQI orchestrated attack.</u>

Plaintiff's expert found that Iran supported AQI in the attack that injured PFC Badia. Iran provided significant material support to AQI as evidenced by intelligence and historic research. Id pp. 8-9. Specifically, the use of sophisticated IEDs as the weapons in this matter and the fact that the attack was well-coordinated supports the notion that Iran provided funding and resources to AQI. Id p. 8-9, 13-14. A month prior to PFC Badia's attack, IEDs that were recovered in Ramadi were determined to be of Iranian origin and production based on markings on the IED itself. Id p. 6.

### 2. Attack #31: The personal injuries or deaths that occurred from the attack.

While driving, PFC Badia's vehicle crossed directly over the IED, and it detonated below PFC Badia's seat. PX6402 Declaration of Jace Alric Badia. The Explosive Ordinance Disposal (EOD) team that arrived to conduct a post-blast analysis of the IED was hit with a second IED, killing three Marines. PX6408 Supplemental Declaration of Jace Alric Badia; PX6409 Fallen Times Articles for KIAs on November 11, 2006. As a result of the explosion, PFC Badia sustained multiple injuries, including, *inter alia,* above-knee amputation of his left leg, multiple fractures to his right leg and foot, a fractured right arm, a Traumatic brain injury and PTSD. PX6402 Declaration of Jace Alric Badia, PX6403 VA Disability Rating.

### 3. Attack # 31: The relationship of the victims of the attack to the respective plaintiffs.

Plaintiffs are Jace Alric Badia, and his daughter Kylee Ray Badia. They are US

Nationals. They bring claims for personal injury and emotional suffering and solatium arising

from the personal injuries to Jace Badia caused by this attack.

### 4. Attack #31: The attack involved AQI, a group that received material support from Defendants.

Based on the evidence submitted for this attack and the Court's prior orders, as detailed

above, I conclude that this attack involved Al Qaeda in Iraq. Defendants the Islamic Republic of

Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank

Melli Iran, and Bank Markazi "provided material support, as that term is used in 28 USC §

1605A(a)(1), to… Al Qaeda in Iraq… during the relevant time period of 2003-2011." *See* ECF

Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to Al Qaeda

in Iraq (aka the Zarqawi organization) between 2003 and 2011; *see also* ECF No. 137, at 3; "the

FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material

support to the subject terrorist groups[.]").

### 5. Attack 31: The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l).

Based on the evidence submitted for this attack and the Court's prior orders, as detailed

above, I conclude that this attack involved an act of "extrajudicial killing" within the scope of the

terrorism exception to the FSIA because each attack resulted in at least one death. *See* 28 USC §

1605(A); *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), ECF No. 65 at \*17–21 (DDC

Sept. 30, 2022); and *Force v. Islamic Republic of Iran*, 610 F. Supp. 3d 216, 222 (D.D.C. 2022).

### 6. Attack 31: Defendant's provision of material support was a proximate cause of the attack.

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that the material support provided by Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi to AQI was essential to the groups' operating capacity and terrorist attacks involving AQI in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. Therefore, the Defendants' provision of material support to AQI was a proximate cause of the March 8, 2006– attack near Habbaniyah, Iraq that caused injury to Jace Alric Badia. Attack #31.

## IV. CONCLUSION AND RECOMMENDATION

I find the evidence submitted for non-Bellwether Attacks #12, 13, 14, 27, and 31 credible and sufficient to attribute each of those attacks to Al Qaeda in Iraq, which received material support from the defendants. This material support was a proximate cause of an extrajudicial killing within the scope of 28 USC § 1605A and resulted in personal injuries to the Plaintiffs, all US Nationals, whose claims arose from this attack. I recommend the Court hold Defendants Iran, IRGC, MOIS, Bank Melli Iran, and Bank Markazi liable for the attack.

## V. REVIEW BY THE DISTRICT COURT

According to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Nos. No. 139, 140, and 145), Plaintiffs may file an objection to, or motion to modify/adopt, a finding, report, or recommendation by Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide de novo all objections to findings of fact or conclusions of law made or recommended by the Special Master. The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. See Fed. R. Civ. P. Rule 53(f)(3). (4), and (5).

Date: February 13, 2024                          Respectfully Submitted,

                                                 **_s/ Ronald V Swanson_**
                                                 HON. RONALD V. SWANSON (RET.)
                                                 SPECIAL MASTER

.