IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF CHRISTOPHER BROOK FISHBECK, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | ) ) ) ) |
| Defendants. | ) ) ) |
| This Document Relates To: CARLOS GOMEZ PEREZ, SAMANTHA IZAGUIRRE-GOMEZ, J.C.I.,A MINOR CHILD, MOHAMAD KAMAL AKHTAR, JENNIFER AKHTAR, TAYLOR AKHTARSAMIRA FATHY, PERVEZ AKHTAR,   JAMES ALAN BELL, LINDA S. BELL, DAVID CRAIG, JON G. BELL, CHRISTOPHER JOHN SHIMA, CHRISTINA LOUISE SHIMA, & A.G.S., A MINOR CHILD | ) ) ) ) ) ) ) ) ) ) ) |

Case No. 18-cv-2248 (CRC)

Special Master Angela D. Gupta

**REPORT AND RECOMMENDATION REGARDING
DEFENDANTS' LIABILITY FOR WAVE 1 ATTACKS 4, 6, 9 & 34**

In this case, over 1400 plaintiffs bring claims against Iran and its alleged instrumentalities under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, seeking damages resulting from death or injury caused to U.S. military members in over 400 terrorist attacks during operations in Iraq from 2003 to 2011.[1]  The Cout has found defendants

---

[1] See Plaintiffs' Second Amended Complaint (Doc. 100).  Defendants in the case include: Islamic Republic of Iran ("Iran"), Islamic Revolutionary Guard Corps ("IRGC"), Iranian Ministry of Intelligence & Security ("MOIS"), Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran ("Bank Melli"), and National Iranian Oil Company ("NIOC").  See id.  The Court has found sufficient evidence demonstrating that all defendants, except NIOC, provided "material support" to various terrorist groups within the meaning of 28 U.S.C. § 1605A(a)(1).  See Order at 2 (Doc. 127) (Iran, IRGC, and MOIS); Memorandum Opinion And Order at 2-7 (Doc. 136)

liable for providing "material support" for 12 of 15 bellwether terrorist attacks. Order at 2 (Doc. 127). Memorandum Opinion And Order at 8-28 (Doc. 137). Subsequently, the Court appointed several Special Masters, including the undersigned, to, *inter alia,* assist the Court with determining liability for claims related to non-bellwether attacks in the case. Order Appointing Special Masters For Non-Bellwether Liability & Damages Phase at 1 (Doc. 145). This report and recommendation addresses defendants' liability for Attacks 4, 6, 9, and 34 in the Wave 1 ("W1") submissions. For reasons set forth below, the undersigned recommends the Court enter an order holding defendants liable for the attacks.

I. **Legal Standards**

In assessing liability, the undersigned is guided by (1) the provisions of 28 U.S.C. § 1605A; (2) this Court's prior findings of fact, conclusions of law, and other relevant orders; and (3) other relevant precedent. See Order Implementing Administrative Plan For Non-Bellwether Liability Determinations ("Administrative Order") at 2 (Doc. 140). The Court has already found the defendants were properly served and the criteria for establishing subject matter jurisdiction have been met. See Memorandum Opinion and Order at 2-3 (Doc. 137).[2] Accordingly, the undersigned focuses her analysis on whether each attack was committed by a terrorist group that received material support from the defendants. See id. at 3 ("all that remains is for the Court to determine whether each bellwether attack was committed by a terrorist group that received material support from the defendants").

II. **Analysis**

---

(Bank Markazi and Bank Melli). The Court invited plaintiffs to supplement their evidence regarding NIOC. Memorandum Opinion And Order at 7 (Doc. 136).

[2] The undersigned notes that any plaintiffs who have not yet submitted evidence of their status as a U.S. national or member of the armed forces must do so to be eligible for default judgment. Id. at 3 n.1 (Doc. 137).

A. **W1 Attack 4: April 26, 2004 Attack in Fallujah**

On April 26, 2004, Plaintiff Corporal (Cpl.) Carlos Gomez Perez was injured in a violent and coordinated attack against his platoon in the Jolan neighborhood of north Fallujah in the Anbar Province of Iraq. Gomez Perez Declaration ¶¶ k-v (PX3301).[3] His fellow Marine, Lance Corporal (L.Cpl.) Aaron Cole Austin, suffered fatal injuries in the attack. Id. ¶ u. In the early morning on April 26, their platoon secured two houses to observe enemy activity and search for a sniper who had pinned them with fire the previous day. Id. ¶¶ k-m (PX3301). Around 11:00 a.m., a large enemy force ambushed the platoon from three different directions – employing a high volume of rocket-propelled grenades and machine gun fire – wounding many Marines who were on the rooftop. Expert Report re: W1 Attack 4 at 2, 9 (PX3308);[4] Silver Star Medal Citation to Cpl. Gomez Perez (PX3301, Ex. 3). The enemy successfully reached the perimeter of the building where Cpl. Gomez Perez was defending and engaged Marines on the rooftop with lethal and accurate fires. Gomez Perez Declaration ¶¶ k-m (PX3301). Cpl. Gomez Perez went to help others on the rooftop and suffered gunshots to his cheek and shoulder. Id. ¶¶ o-v. Cpl. Gomez Perez observed that it was "clear" they were fighting against foreigners and insurgents using foreign weapons because their tracer ammo was white (instead of red if it had come from Saddam-era stockpiles), and "their weapons were better and more powerful than what they could have gotten from the old stockpiles." Id. ¶ j (PX3301).

---

[3] The Court has found Cpl. Gomez Perez was a U.S. National and/or member of the U.S. armed forces at the time of the attack. See Opinion and Order at 7 (Doc. 120); Fed. R. Evid. 1006 Summary at 43 (Doc. 81-2).

[4] To establish liability for W1 Attack 4, plaintiffs submit an expert report prepared by Col. Mark Lee Walters, U.S. Army Ret.; CW4 Ronald Evans, U.S. Army Ret.; and CW3 David Sultzer, U.S. Army Ret. See Expert Report re: W1 Attack 4 at 2, 9 (PX3308). In determining liability for the bellwether attacks, the Court previously relied on submissions by these same experts. See Memorandum Opinion and Order at 8 n.3 (Doc. 137). Accordingly, the undersigned finds the experts are qualified to offer opinions regarding attribution of responsibility for W1 Attack 4.

Plaintiffs' experts attribute the April 26, 2004 attack to an enemy cell associated with Abu Masab al-Zarqawi's Jamat al-Tawhid wa-Jihad ("JTJ") operating within the city of Fallujah in the al Anbar Province of Iraq.[5]  Expert Report re: W1 Attack 4 at 2 (PX3308).  In support of this conclusion, the experts state that, at the time of the attack, the entire province, and particularly Fallujah, was a known stronghold and permissive environment for JTJ and its associated networks, including Ansar al Sunna ("AAS").  Id. at 2, 11; West, Bing, *No True Glory; A Frontline Account of the Battle for Fallujah* (PX3306) (describing the Jolan neighborhood in Fallujah as "the lair of the arch-terrorist Zarqawi").[6]  Plaintiffs' experts opine that the hallmarks of WI Attack 4 – including the sophistication of the assault from three directions, employing multiple weapon systems, and utilizing "protected spaces" to violently attack the platoon – further indicate that Zarqawi was likely behind the attack.  Expert Report re: W1 Attack 4 at 11 (PX3308) (in the early days of the conflict, AQI had a mature network, whereas "other insurgent groups were still gaining experience and developing tactics, techniques, and procedures") ("Zarqawi differed from many of his fellow Sunni leaders in that he believed in striking the coalition whenever possible") (quotations and citations omitted).  Additionally, the experts conclude that Cpl. Gomez Perez's statement that the attack involved foreign fighters using foreign-made weapons also suggests the insurgents were likely affiliated with AQ.  Expert Report re: W1 Attack 4 at 4 (PX3308).

---

[5] The experts state that Zarqawi had strong ties to Al Qaeda ("AQ") and his organization, JTJ, has been known by many names and adopted the moniker of al-Qaeda in Iraq ("AQI") in October 2004.  See Expert Report re: W1 Attack 4 at 2 n.1 (PX3308); *see also* Insurgent Group Profile: AQI at 1-2 (PX937) (in the late 1990s, Zarqawi ran an AQ training camp in Afghanistan; in 2001, he fled Afghanistan; in June of 2003, Zarqawi's network emerged in Iraq under the name JTJ).

[6] According to plaintiffs' experts, Bing West, as former Special Assistant to the Secretary of Defense and Secretary for International Security, "had unparalleled access to senior policy makers, senior offices, and Marines . . . [who] had insights into the enemy situation [the] Marines were facing on the day of the attack."  Expert Report at 9 (PX3308).

Upon careful review of the facts and supporting evidence, the undersigned finds the experts' conclusions to be credible and concludes there is sufficient evidence to attribute the April 26, 2004 attack to AQI, which received material support from defendants. Accordingly, the undersigned recommends that the Court enter an order holding defendants liable for W1 Attack 4.

B. **W1 Attack 6: July 15, 2004 Attack in Haditha**

On July 15, 2004, Plaintiff Sergeant (Sgt.) Mohammad Akhtar was injured in a coordinated attack involving two vehicle-borne improvised explosive devices ("IEDs") that struck the Haditha Police Station and Iraqi National Guard ("ING") Base in the city of Haditha in the Al Anbar Province of Iraq. Akhtar Declaration ¶¶ d-g (PX3501).[7] When the first explosion occurred, Sgt. Akhtar was in the Haditha Police Station. Akhtar Declaration ¶ e (PX3501). According to the Operations (Ops) report, the driver of a blue opal truck loaded with explosives "jumped out of the vehicle and let the truck coast until it exploded approximately 20 [meters] from the outer wall of the police station," resulting in a "significant amount of collateral damage to buildings surrounding the blast site." Ops Report at 1 (PX3505). About 15 minutes later, a second explosion occurred when a Mercedes car struck the ING Base. *Id.*; Akhtar Declaration ¶ e (PX3501). The blasts killed four ING members and 10 civilians, and wounded two U.S. servicemembers (including Sgt. Akhtar) and three ING members. Ops Report at 1 (PX3505).

Plaintiffs' expert attributes the July 15, 2004 attack to the Zarqawi organization/Jamaat al-Tawhid wa-l-Jihad (JTJ) based on: (1) the location and time period of the attack; and (2) the tactics, techniques, and procedures ("TTPs") used in the attack. Expert Report re: W1 Attack 6 at 2-5

---

[7] The Court has found Sgt. Akhtar was a U.S. National and/or member of the U.S. armed forces at the time of the attack. See Opinion and Order at 7 (Doc. 120); Fed. R. Evid. 1006 Summary at 41 (Doc. 81-2).

(PX3500).[8]  More specifically, with respect to the location and timing of the attack, the expert states the following:  In the summer of 2004, the security scene in Haditha underwent significant changes when Coalition forces were shifted to Fallujah following the First Battle of Fallujah.  Id. at 3.  Haditha's Iraqi police forces became overwhelmed by militant groups, and "[c]haos and violence continued throughout 2004 as the insurgents gained strength and exploited [the situation]." Id. (citation omitted).  During this time, JTJ emerged as a significant influence in the city to which local insurgent groups subordinated and, "by late 2004, AQI had complete control over the city." Id. at 3 (citation omitted).  Additionally, the expert finds that the fact this attack involved vehicle-borne IEDs indicates that JTJ was responsible. *Id.* at 4.  In support of this conclusion, the expert report cites numerous examples of vehicle-borne IED attacks in other Iraq locations in 2004 that were attributed to JTJ.  Id. at 4 (citing various vehicle-borne IED attacks by JTJ in Baghdad, Fallujah, Baquba, Abu Ghraib, and Sumarra).

Standing alone, it is a close question whether the factors cited by plaintiffs' expert are sufficient to prove that JTJ was responsible for the July 15, 2004 attack.  Plaintiffs' expert does not explain whether, at the time of the attack, other any groups operating in Haditha had the capabilities to conduct such an attack.  However, the expert opinion is bolstered by the declaration of Sgt. Akhtar, who states that he learned from intelligence that Zarqawi insurgents were responsible for the attack.  Akhtar Declaration ¶ i (PX3501).  Reviewing the evidence collectively,

---

[8] To establish liability for W1 Attack 6, plaintiffs submit an expert report prepared by Dr. Daveed Gartenstein-Ross.  The Court has previously relied on Dr. Gartenstein-Ross's expert submissions in determining liability for the bellwether attacks.  See Memorandum Opinion and Order at 8 n.3 (Doc. 137).  Accordingly, the undersigned finds he is qualified to express opinions regarding attribution of responsibility for W1 Attack 6.  As with the other experts, Dr. Gartenstein-Ross notes the Zarqawi organization has undergone several name changes and, in October 2004, formerly pledged it allegiance to al-Qaeda and became known as, *inter alia*, al-Qaeda in Iraq (AQI).  Expert Report re: W1 Attack 6 at 2 (PX3500).

6

the undersigned finds the record is sufficient to conclude the attack was perpetuated by JTJ, *i.e.* a Sunni militant group that received material support from defendants. Accordingly, the undersigned recommends that the Court enter an order holding defendants liable for W1 Attack 6.

   C. **W1 Attack 9: November 9, 2004 Attack in Fallujah**

On November 9, 2004, Plaintiff Lance Corporal (L.Cpl.) James Bell was injured in complex attack that killed another member of his platoon, Sergeant (Sgt.) David Caruso. Bell Declaration ¶ f (PX3800).[9] For several days, the platoon had been engaged in active combat operations to drive insurgents back into the center of Fallujah in preparation for the Second Battle of Fallujah. Id. The platoon was comprised of 5 teams, with L.Cpl. Bell in Team 2 and Sgt. Caruso in Team 1. OPSUM 4-29, Ex. G to Bell Declaration (PX3800). On the morning of November 9, Team 3 moved to infiltrate the community center on the west side of the street from the Al Hadra Mosque, which was a regimental objective. Id. They cleared the building and set up position to support another company's movement south when "all hell broke loose" and Team 3 began taking fire from the Al Hadra Mosque to the east and from other enemy positions to the west and south. Id. Thereafter, the platoon's other teams, including Team 2, moved in for reinforcement. Id. The Operations Summary describes the scene as follows:

> Enemy were moving around from position to position. Many of the windows of southern buildings oriented [north] appeared to have sandbags in them. We observed mortars, [rocket-propelled grenades ("RPGs")], machineguns and AK-47s firing at our position.

Id. When the enemy fire appeared to die down, the teams planned to bound one by one to another position approximately 100 meters away with a better view. Id. Team 1 went first, and when it

---

[9] The Court has found L.Cpl. Bell was a U.S. National and/or member of the U.S. armed forces at the time of the attack. See Opinion and Order at 7 (Doc. 120); Fed. R. Evid. 1006 Summary at 34 (Doc. 81-2). L.Cpl. Bell was also injured in an attack on December 9, 2004; however, plaintiffs do not seek a liability determination with regard to the December 9 attack at this time.

was about half-way across the lot, it was ambushed by a significant amount of fire that killed Sgt. Caruso.  Id.  As Team 1 pushed into another building for cover, Teams 2 and 5 opened fire to suppress new enemy positions that had unmasked to the north, east, and south.  Id.  At that time, L.Cpl. Bell was exposed on the roof of a building, laying down suppressive fire.  Bell Declaration ¶ f (PX3800).  As an Army M113 Armored Personnel Carrier came down the road to pick up Sgt. Caruso's body, it received fire and began firing its MK 19 Automatic Grenade Launcher, and a grenade struck the wall approximately four feet from L.Cpl. Bell's head, knocking him out and injuring him with shrapnel.  Id.; OPSUM 4-29, Ex. G to Bell Declaration (PX3800).

Plaintiffs' expert attributes the November 9, 2004 attack to the Zarqawi organization/AQI based on (1) the geographic location and time period of the attack; and (2) the TTPs demonstrated in the attack.  Expert Report re: W1 Attack 9 at 4-8 (PX3812).[10]  As to time period and location, the expert states that, in 2004 and particularly with respect to the First and Second Battles of Fallujah, AQI was the "central insurgent force" that "dominated the array of insurgent groups active there."  Id. at 5-6.  The expert further notes that the Al-Hadra Mosque, *i.e.* the target of the Coalition forces' approach, had become the headquarters for the local AQI emir Sheikh Abdullah Janabi – and the mosque was ultimately found to be holding an extensive cache of weapons, indicating it was a key building for AQI at the time of the attack.  Id. at 6.  Additionally, with respect to TTPs, the expert states: "The perpetrators conducted a complex attack that used RPGs and mortars in addition to heavy and small arms fire."  Id. at 6-7.  The expert opines that AQI possessed the array of weapons used in the attack, and that the sustained, large-scale nature of

---

[10] To establish liability for W1 Attack 9, plaintiffs submit an expert report prepared by Dr. Daveed Gartenstein-Ross.  For reasons stated with respect to WI Attack 6, the undersigned finds Dr. Gartenstein-Ross is qualified to offer opinions regarding attribution of responsibility for W1 Attack 9.

coordinated fighting was characteristic of operations commonly employed by AQI at the time. Id. at 7.

Upon careful review of the facts and supporting evidentiary record, the undersigned finds the expert's conclusions to be credible and concludes there is sufficient evidence to attribute the November 9, 2004 attack to AQI, which received material support from defendants. Accordingly, the undersigned recommends that the Court enter an order holding defendants liable for W1 Attack 9.

D. **W1 Attack 34: April 5, 2005 Attack in Baghdad**

On April 5, 2005, Plaintiff Specialist (SPC) Christopher Shima was injured in a vehicle-borne IED attack in the Ameriya neighborhood in the Mansour District of Baghdad, Iraq. At the time of the attack, SPC Shima was riding in the gunner's hatch of a Humvee that was leading a three-vehicle convoy charged with transporting Sergeant First Class (SFC) Smith from Camp Liberty to the Green Zone and another location to gather intelligence. Shima Declaration ¶ f (PX6702).[11] Around 7:00 or 8:00 a.m., the convoy set off on its journey, following another convoy of M113 track vehicles leaving Camp Liberty at the same time. Id. ¶ g. As they reached about a quarter of a mile outside of Camp Liberty, SPC Shima observed that the area, which was typically robust with many people, was unusually quiet and there were not many vehicles on the road. Id. ¶ h. As they passed a car on the side of the road, it suddenly exploded between SPC Shima's Humvee and the M113 in front of it. Id. ¶ i. SPC Shima was the most exposed member of the Humvee crew, and he was blown backwards against the steel turret, injuring his head, arm, and knees. The blast narrowly missed the side of the Humvee and hit a civilian truck that was traveling

---

[11] The Court has found L.Cpl. Bell was a U.S. National and/or member of the U.S. armed forces at the time of the attack. See Opinion and Order at 7 (Doc. 120); Fed. R. Evid. 1006 Summary at 30 (Doc. 81-2).

to the side of the Humvee, killing one civilian and wounding two civilians. Id. ¶¶ j, k; Ops Report (PX6707). Following the attack, SPC Shima's patrol attempted to continue its mission but ultimately returned to base after receiving enemy fire from AK 47s and observing another suspicious vehicle on the side of the road. Id. ¶ l.

Plaintiff's experts attribute responsibility for WI Attack 34 to AQI based on the geographic location, time period, and TTPs employed in the attack. See Expert Report re: W1 Attack 34 at 1, 8-9 (PX6706).[12] First, with regard to the geographic location and time frame, the experts state that, at the time of the attack in April 2005, AQI enjoyed a permissive environment in the Ameriya Neighborhood, which was Sunni dominated and allowed AQI the opportunity to conduct attacks against U.S. troops. Id. at 5-6. Second, the experts opine that the TTPs of the attack also support the conclusion that AQI is responsible. Id. at 5-9. More specifically, the experts state that vehicle-borne IEDs were a "unique and hallmark" and "signature weapon" employed by AQI. Id. at 8-9. The experts further opine that the attack against SPC Shima appeared to be well organized and planned, which further supports AQI's involvement. Id. at 9. The experts specifically cite the timing and precision of attack, i.e. the fact that the vehicle-borne IED detonated between Shima's Humvee (in the lead) and the trail of the other M113 convoy, which indicates the attacker was likely targeting the less-protected Humvee vehicle for a better chance of destroying and/or damaging the Coalition vehicle/crew. Id. at 4.

Reviewing the facts and evidence collectively and without the benefit of contrary evidence from defendants, the undersigned finds sufficient support to conclude the April 5, 2005 attack was

---

[12] To establish liability for W1 Attack 34, plaintiffs submit an expert report prepared by Col. Mark Lee Walters, CW4 Ronald Evans, and CW3 David Sultzer. See Expert Report re: WI Attack 34 (PX6706). For reasons stated with respect to WI Attack 4, the undersigned finds these experts are qualified to opine as to attribution of responsibility for W1 Attack 34.

10

perpetrated by AQI, which received material support from defendants. Accordingly, the undersigned recommends that the Court enter an order holding defendants liable for W1 Attack 34.

### III. Conclusion

Based on the foregoing analysis, the undersigned recommends that the Court enter an order holding defendants liable for WI Attacks 4, 6, 9, and 34.

### REVIEW BY DISTRICT COURT

Pursuant to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Nos. 139, 140, and 145), plaintiffs may file an objection to, or motion to modify/adopt, a finding, report, or recommendation by Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide *de novo* all objections to findings of fact or conclusions of law made or recommended by the Special Master. The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. *See* Fed. R. Civ. P. Rule 53(f)(3), (4), and (5).

Dated: February 13, 2024          Respectfully Submitted,

                                  */s/ Angela D. Gupta*
                                  Angela D. Gupta
                                  Special Master