**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ESTATE OF CHRISTOPHER BROOK FISHBECK, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) | **Civil Action No. 1:18-cv-2248-CRC** |
| **THE ISLAMIC REPUBLIC OF IRAN, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |
| | ) | **Special Master John P. Kuder** |
| **This Document Applies to Plaintiffs:** | ) ) | |
| **PHILLIP CHRISTOPHER BAILEY; TIMOTHY BAILEY; CHARLES MNTER ESTATE OF THOMAS OLIVER KEELING; KRISTEN ANN KELLY SUROVY; ERIN LYNN KEELING KURINCIC; ROBERT JAMES BERRY; ESTATE OF BRAD DUANE SQUIRES; DONNA SQUIRES; JODIE DENNISON; CHAD SQUIRES; ESTATE OF DERRICK JOSHUA COTHRAN; ELENA MARTINEZ COTHRAN; VICTORIA F. COTHRAN; THEODORE MICHAEL COTHRAN, SR.; ANTOINETTE COTHRAN HEBERT; THEODORE MICHAEL COTHRAN, JR.; ROBERT STEVENS BAUGHN; AND KARLY ANN BAUGHN.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

**SPECIAL MASTER REPORT AND RECOMMENDATIONS**

**WAVE NO. 1 – LIABILITY**

**NON-BELLWETHER ATTACKS**

**NUMBERS 8, 19, 28 & 33**

I.    **PREAMBLE TO REPORT AND RECOMMENDATIONS**

In accordance with the Administrative Plan (Doc. No. 140, 4-5), and in preparing this Report and Recommendation regarding the above-captioned matter, the undersigned Special Master has reviewed and considered in their entirety all items of evidence presented by Plaintiffs' counsel. [1]

## II.    INCORPORATION OF THE COURT'S PRIOR RULINGS ON LIABILITY

As directed by the order appointing Special Masters to determine the issue of liability, the undersigned incorporates by reference the District Court's prior rulings relative to that essential element.[2] This report, therefore, places primary emphasis on the issues of extra-judicial killing and attribution for this attack, with a particular and detailed analysis of attribution.

## III.    THE ATTACKS

### A.  No. 8 — August 15, 2004, SVBIED Attack in Fallujah, Iraq

On August 15, 2004, Plaintiff Lance Corporal Bailey was serving in Iraq at FOB Abu Ghraib west of Baghdad in the Al Anbar Province. (PX3709, J. Kruger Decl., para. f). He and his unit were tasked with performing route clearance, searches of homes in the area for insurgents,

---

[1] It should be noted, however, if the undersigned found or interpreted the evidence, phraseology, or emphasis on a particular issue or fact differently from that of Plaintiffs' counsel, that different finding or interpretation has been appropriately noted and modified, and the latter of the two prevails.

[2] Service of process upon all Defendants was properly effectuated. (ECF No. 55, at 10). The Islamic Republic of Iran was, at all relevant times, a designated State Sponsor of Terrorism. (ECF No. 126, 3-4); Each direct attack victim is a U.S. National, member of the U.S. armed forces, or a U.S. government contractor. (Id., 6-7). Except for NIOC, the defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Iranian Ministry of Intelligence and Security, Bank Markazi, and Bank Melli Iran each provided material support (as defined by 28 U.S.C. § 1605A(a)(1)) to the Sunni terrorist groups: Al Qaeda, Al Qaeda in Iraq, and Ansar al Islam during the relevant time period of 2003-2011. (*See* ECF Nos. 127 and 136; and ECF No. 137, at 3). The provision of this material support by these specific Defendants to these specific Sunni terrorist groups "was essential to the groups' operating capacity" and attacks involving these Sunni terrorist groups in Iraq during the relevant time period were "reasonably foreseeable and a natural consequence of that material support." (Id.)

2

and as on this day, manning security checkpoints. (Id.) At approximately 3:00pm, Bailey's squad had just started their shift at Tactical Control Point on a paved road south of Fallujah when a civilian vehicle stopped at the checkpoint. Bailey's men began to interact with the driver, who became uncooperative, stepped on the accelerator and detonated a vehicle-borne improvised explosive device (VBIED) approximately 15 feet from the bunker in which Bailey was located. (PX3710, Expert Report of M. Lee Walters, R. Evans, and D. Sultzer, p.1 ("Expert Report"); and PX3700, Ops Report, p. 1 ("3/1 Marines Reports a VB IED [vehicle-borne improvised explosive device] attack on TCP-8… 1 EKIA in the VBIED."); PX3709, J. Kruger Decl., para. g-i.). Immediately following the explosion, the checkpoint came under small arms and machine gun fire, and "a group of 10 or so insurgents continue[d] the attack with small arms and RPGs" targeting the vehicles evacuating the Marines' casualties. (Id., paras, j-m).

The attack killed at two Marine and severely injured Plaintiff Lance Corporal Bailey. (PX3700, Ops Report, p. 1; and PX3709, J. Kruger Decl., paras. g-i.)

Based upon the evidence, discussed below, the undersigned finds that Al Qaeda in Iraq (AQI) [3] committed this attack.

### i. Direct Victim & Solatium Claimants

Direct Victim, Plaintiff Phillip Christopher Bailey is a United States citizen and United States Marine Lance Corporal who served in excess of three years of active service. (PX3711, Bailey Plaintiff Fact Sheet, Sec. II (4), (6), & (8) ("PFS"); and ECF No. 81-2, at 39). Plaintiffs

---

[3] "Al Qaeda in Iraq" (AQI) was an iteration of the Sunni militant group referred to as the Zarqawi organization, named after its founding leader, Abu Musab al-Zarqawi. (PX5, Gartenstein-Ross Sunni Group Decl., p. 13). Although the Zarqawi organization underwent various name changes over the years, at every step it remained essentially the same. (Id.) Accordingly, when discussing the Zarqawi organization and/or Iraq-based al Qaeda elements, this Report & Recommendation is discussing the same terrorist organization and the name "Al Qaeda in Iraq (AQI") is used for consistency, clarity, and ease of reference. (See id.)

Timothy Bailey and Charles Jason Minter are immediate family members of Phillip Bailey bringing solatium claims for emotional pain and suffering related to the August 15, 2004 attack and the physical injuries to Phillip Bailey. (See id., Sec. II (1); ECF No. 100, 2nd Amend. Comp., at ¶¶ 4383-4392l; and ECF No. 81-2, at 39 (summarizing Exhibit 371 submitted to prove status and relationship); and ECF No, 126, at 5-7 (order on status)).

### ii.   Extrajudicial Killings & Personal Injuries

The SVBIED attack killed two Marines and severely injured several others, including Phillip Bailey. (See PX3703, P. Bailey Casualty Report (15-16 Aug. 2004) (Lance Corporal Bailey "seriously injured" sustaining "shrapnel wounds to the face" and "ruptured eardrums from an explosion."); PX3700, Ops Report ("KIA: 1"); and PX3709, Decl. J. Kruger, para. k ("LANCE CORPORAL Perez died moments after we got to him. Lance Corporal Fernando Hannon died at the hospital as a result of his injuries"); and PX3711, PFS Sec. V). I conclude that the attack involved an "extrajudicial killing" as required by the FSIA's terrorism exception. *See* 28 USC § 1605(A); *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), ECF No. 65 at *17–21 (DDC Sept. 30, 2022); and *Force v. Islamic Republic of Iran*, 610 F. Supp. 3d 216, 222 (D.D.C. 2022).

### iii.   Attribution

Plaintiffs' experts Colonel Mark Lee Walters, US Army Ret. CW4 Ronald Evans, US Army Ret., and CW3 David Sultzer, US Army Ret., attribute this attack to AQI. These experts jointly prepared a detailed report and, based on a military intelligence methodology, reached collective conclusions within a reasonable degree of certainty. (See PX3710, Expert Report). The undersigned finds these experts' conclusions to be credible. AQI's likely involvement is further corroborated by contemporaneous government reports and historical records, as well as other credible evidence related to this attack. For example, Corporal Johnny Kruger, a Marine Squad Leader present during the attack with knowledge of the insurgents and their tactics in the area at

the time, provided a declaration stating, "The people in my platoon to include myself and the higher command concluded that the insurgents in this attack were Al Qaeda based on the use of the complexity of the attack and using VBIED along with their clothing which was white robs [sic] with black ski masks." PX3709, Decl. of Cpl. Johnny Kruger, para. n).

Drawing from the evidence deemed most credible, I make the following factual findings upon which I base the legal conclusions herein:

1) In 2003, Abu Musab Zarqawi built a significant network in Iraq, and shortly after this attack, officially changed its name to Al Qaeda in Iraq (AQI). Zarqawi and his network used Fallujah as their base of operations, and used extraordinary violence to strengthen its network and expand its influence. At the time of this attack, Zarqawi's organization dominated the insurgent groups and possessed "freedom of movement" throughout the city and across Al Anbar Province, despite the presence of Coalition and Iraqi Security Forces. (See PX3710, Expert Report citing PX743, DoD Press Briefing with Rumsfeld and Gen. Myers, Sept. 7, 2004).

2) In Iraq, the use of vehicle-borne improvised explosive devices ("VBIED") detonated by suicidal terrorists ("SVBIED") was a unique and hallmark "tactic, technique, and procedure" (TTP) of groups related to or led by Zarqawi, which included Al Qaeda in Iraq (AQI). (See PX3710, Expert Report, p. 9; see also PX937, Insurgent Group Profile: Al Qaeda in Iraq (AQI), Multi-National Corps – Iraq Study, May 2, 2007). The evidence shows that attack involved at least ten men who planned and coordinated the attack against a well-defended Coalition security checkpoint. (See PX3710, Expert Report citing PX3709, Decl. of J. Kruger (detailing how a large group of men had spent several minutes assessing the checkpoint from a distance just prior to the attack.) This informed the experts' conclusion that the perpetrators of the attack could move about the area freely enough to surveil, plan, and position themselves for the attack against a military checkpoint. (Id.) This technique was associated with the dominant group in the area at the time, AQI. (See PX932, p. 2 (Declassified assessment of AQI's tactics "characterized by meticulous planning and pre-operational surveillance and intelligence gathering" to "overcome force protection measures or target construction."))

3) The group understood the Marine Rules of Engagement (ROE) since during their initial reconnaissance to assess the Traffic Control Point (TCP), they stopped at a distance where the Marines would not engage or approach to determine their intentions. This gave the enemy an opportunity to identify the Marine TCP vulnerability from which to attack the SVBIED. (PX3710, Expert Report, p. 10).

4) The Plaintiffs' experts also analyzed the weapons used in the attack, credibly finding that the use of SVBIED followed by small arms fire and RPGs further supports attributing this attack to Zarqawi/AQI. (PX3710, Expert Report, pp. 7-10). Plaintiffs submitted evidence that the group had access to the types of weapons used in the attack, and specifically, that SVBIEDs were a signature TTP of the Zarqawi organization/AQI at the time. (See e.g., PX990, 1st Cavalry Division ACE Daily INTSUM, 23 September 2004; and PX322, PX743, PX375, and PX376 (various DOD Press Briefings discussing Zarqawi/AQI in Fallujah, operational control, and tactics, specifically AQI's weapons and use of VBIEDs).

5) The attackers immediately followed the SVBIED explosion with a secondary attack from another position with small arms and RPGs; a sophisticated multi-staged tactic requiring coordination, discipline, and pre-acquired knowledge or insight into the Coalition forces capabilities and defensive responses. (See PX3710, p. 10.)

The experts concluded that 1-5 above were signature TTPs of AQI in the Al Anbar area at the time of this attack; these conclusions shared by official government/military historical publications. (*See* PX370, U.S. Army Center of Military History, "Interview of Brig. General John R. Allen, Deputy Commanding General Multi-National Force-West." June 27, 2007.)

Corporal Kruger's declaration established that he and Bailey's Marine troop was briefed on Al Qaeda, and it was the dominant insurgent group in the area at the time of their deployment, and that the Marines concluded that the group committed the August 15, 2004 SVBIED attack. As a Squad Leader present during the attack and who personally observed the tactics used against his men, I find Corporal Kruger's statement and assessment credible. (PX3709, para. m).

Consistent with the Court's prior rulings, the expert witnesses considered and credibly assessed the timing and location of the attack, the tactics, techniques and procedures used in the attack to reach their conclusions. In addition, Plaintiffs' evidence provides other indicia of the Zarqawi Organization/AQI's culpability for this attack. In particular, this included  advanced planning and skilled use of a SVBIED to initiate the attack and then use small unit tactics and military-grade weapons (i.e. RPGs) to successfully "overcome the Marine's force protection

measures (HESCO barriers) and cause significant casualties." (See PX3710, Expert Report, p. 8; PX3709, Decl. J. Kruger, paras. l-m; PX3700, OPS Report; and PX3703, P. Bailey Casualty Report (15-16 Aug. 2004).). Finally, the evidence provides that the Marine unit involved in the attack, as well as its higher command, "concluded that the insurgents in this attack were Al Qaeda" (PX3709, para. n). In sum, this evidence satisfies the undersigned, and I find that Plaintiffs have sufficiently established that Zarqawi Organization/AQI committed this attack.

### 6)      Findings & Recommendations

The Court has already determined that Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi's provision of material support to AQI was essential to the group's operating capacity and terrorist attacks involving AQI in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. (See ECF Nos. 127, 136; and 137, at 3). Therefore, having attributed the attack to AQI, the undersigned concludes that the Defendants' provision of material support to AQI was a proximate cause of the August 15, 2004, VBIED attack in Fallujah, Iraq, that involved an extrajudicial killing and caused personal injuries to Plaintiffs Lance Corporal Bailey and his family members.

It is therefore my recommendation that the Court find Defendants the Islamic Republic of Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran liable for non-bellwether Attack No. 8.

### B.  No. 19 — June 9, 2005, IED Attack near Haditha, Iraq

On June 9, 2005, U.S. Marine Corps Lance Corporal (Lance Corporal) Thomas Keeling and Corporal Brad Squires were killed in an IED attack 1.5 kilometers west of Haditha, in the Al Anbar Province of Iraq.  (PX490, Expert Report of Dr. Gartenstein-Ross.) ("Expert Report")

At the time of the attack, Lance Corporal Keeling and Corporal Squires were serving with Weapons Company, 3rd Battalion, 25th Marine Regiment, 4th Marine Division in Haditha. Their unit was tasked with conducting a raid of a suspected IED/VBIED "factory" in the area. (PX4906, Decl. J. Kochmit, para. f.)  Lance Corporal Keeling was the driver of a HMMWV in the convoy headed to the objective and Corporal Squires was a passenger in the same vehicle.  (Id., para. g.) As the convoy progressed forward, an Abrams tank at the front of the convoy was hit by an IED, causing the soldiers in the tank to evacuate. (Id. para. h-j; and PX5001, Squires Casualty Report.) The convoy stopped to search the nearby houses for insurgents. As they were conducting searches, Lance Corporal Keeling's and Corporal Squires' HMMWV was hit by an IED, killing them both along with several other servicemen.  (PX4903, Keeling Casualty Report; PX5001, Squires Casualty Report; and PX4906, Decl. J. Kochmit, para. i-j).

Based upon the evidence, discussed below, the undersigned finds that Plaintiffs have sufficiently established that this attack was committed by one or both Iranian-supported Sunni terrorist groups Al Qaeda in Iraq (AQI) and Ansar al-Sunna (AAS).

### i.  Direct Victim & Solatium Claimants

Plaintiff Thomas Oliver Keeling was a United States citizen and a United States Marine Lance Corporal. (PX3711, Keeling Plaintiff Fact Sheet, Sec. II (4), (6 - 8); and ECF No. 81-2, at 39.)  Plaintiffs Sharon Therese Berry, brings claims on behalf of the Estate of Thomas Keeling for is injury death, and, as his mother, she asserts a solatium claim. Plaintiffs Kristen Ann Keeling Surovy, Erin Lynn Keeling Kurincic and Robert James Berry are family members of Thomas Oliver Keeling, and have brought solatium claims for emotional pain and suffering related to the attack and the physical injuries to Keeling. (See ECF No. 100, 2nd Amend. Comp., at ¶¶3186-3196.

Brad Duane Squires (deceased) was a United States citizen and a United States Marine Corporal. (Id.) Plaintiffs Donna Squires – mother; Jodie Dennison – sister; Chad Squires – brother. (id.) are family members of Brad Squires and they have brought solatium claims for emotional pain and suffering related to the attack and the physical injuries to Squires. There is no claim asserted by an estate. (See ECF No. 100, 2nd Amend. Comp., ¶¶ 3177-3185; ECF No. 81-2, at 27 (summarizing Exhibit 259 submitted as proof of status/relationship); and ECF No. No. 126, at 5-7 (order on status)).

### ii.  Extrajudicial Killings & Personal Injuries

The attack killed five U.S., Marines, including Lance Corporal Keeling and Corporal Squires. (See PX4902 & PX4903, Keeling Casualty Reports; PX4904; Keeling Med. Exam. Autopsy Report; and PX5000 & PX5001, Squires Casualty Reports). Therefore, I find this attack involved an extrajudicial killing that resulted in personal injuries to the Plaintiffs. I further conclude that the terrorism exception to Defendants' sovereign immunity applies to the claims brought by these Plaintiffs that arise from this attack. *See* 28 U.S.C § 1605A(a)(l); *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), ECF No. 65 at *17–21 (DDC Sept. 30, 2022); and *Force v. Islamic Republic of Iran*, 610 F. Supp. 3d 216, 222 (D.D.C. 2022).

### iii.  Attribution

Plaintiffs' expert, Dr. Daveed Gartenstein-Ross, reviewed the evidence for this attack and attributed the attack to two Iranian-supported Sunni terrorist organizations in Iraq. (PX4905, p. 3, Expert Report.) Specifically, the expert opines that either al-Qaeda in Iraq (AQI) or Ansar al-Sunna (AAS) committed the attack, but that the attack could also have been the work of elements of both groups operating in coordination with one another. (Id.). In reaching this conclusion, Dr. Gartenstein-Ross looked at 1) the geographic region where the attack took place, 2) the tactics,

techniques and procedures (TTPs) utilized in the attack; and 3) the motivation behind the attack. (Id.) In addition to the expert report, Plaintiffs submitted evidence in the form of witness declarations, official government reports and historical documents that further support the conclusion that Iranian-supported group was involved in this attack.

Thus, despite the expert's difficulty in determining exactly which of the two groups (AQI or AAS) committed this attack, the evidence submitted is substantial and credible. In particular theevidence which helps shed light on the close relationship between AQI and AAS is the official U.S. Army history of its time spent in Iraq, which details the groups overlapping origin stories. This includes early support and guidance from al-Qaeda senior leadership, including Usama bin Laden, as well as the groups training together and sharing tactical knowledge in training camps in Afghanistan and Iran. (See PX241, The U.S. Army in The Iraq War, Vol. 1, at pp. 46-49, 154-155, 174-176, 293). The common bond and early alliance between Ansar al-Islam and Zarqawi's group "would become the core of al-Qaeda in Iraq." (Id., p. 48).

In relation to the location of this attack, other official government reports found that, by April 2005, "in western Anbar, AQI and Ansar al-Sunna showed a level of cooperation not seen elsewhere in Iraq extending down to street level joint operations in the Hit-Haditha corridor." (PX900, Study of the Insurgency in Anbar Province, Iraq (CENTCOM, June 13, 2007), Ch. 5, p. 46.) As the expert points to, this once-classified study shows that AQI and its allies exerted dominance in Haditha and Haqlaniyah by sending large number of their fighters into Haditha to conduct a murderous intimidation and coercion campaign against the local populace. (Id., p. 43-44). To stem AQI and AAS control of the area, Coalition forces launched Operation New Market on May 24, 2005, which confirmed the groups "resilience" in the area at the time of IED attack that killed Lance Corporal Keeling and Corporal Squires on June 9, 2005. After New Market and

the deaths of Keeling and Squires, AQI and AAS entrenchment and control of Haditha/Haqlaniyah area would require the Coalition to conduct several additional successive large-scale operations specifically targeting these two groups who were working together to maintain an "important base" and "operational center" for their aligned organizations. (PX4905, pp. 3-4. Expert Report (describing the successive operations and the intended targets, AQI and AAS.)

With regard to TTPs, Dr. Gartenstein-Ross noted that IEDs were a specific TTP associated with both AQI and AAS in this area at the time, and he provides several examples of the groups' caching and effective use of IEDs targeting U.S. soldiers near the location of the attack, including at least one with a credible claim of responsibility by AAS. (Id., p. 4.) The expert's assessment is supported by an Institute for Defense Analyses report describing Haditha as "controlled" by AQI and AAS in August 2005, and detailing the Coalition response to the "extensive" IED threat in the area in mid-to-late 2005. (See PX737, pp. 24-25, (Al Sahawa—The Awakening Volume III-B: (IDA May 2016)). In addition, CENTCOM's *Study of the Insurgency in the Anbar Province* records that AQI and AAS were using Haditha as a base to manufactured IEDs and VBIEDs. (PX900, Ch. 5, p. 99 (CENTCOM, June 13, 2007)). These government histories and reports align with the information contained in the declaration of Lance Corporal Jared Kochmit who, present in the area at the time of the attack, recalls that, "we were tasked with attacking an IED factory in Haqlaniyah where they were making vehicle-born IEDs that were being used in suicide attacks." (PX4906, Decl. J. Kochmit, para. f.) The evidence provided establishes that Keeling, Squires and Kochmit were assisting in the mission to capture the IED factory when the Marines were hit by multiple highly-sophisticated IEDs that avoided being detected by a unit specifically sweeping for them, as well as, successfully disable the Marines' large armored vehicles. (Id.) These IEDs were also so lethally effective that the Marines halted their attempt to take the objective. (Id., paras. g-

n (describing the IED he heard kill his friends as the largest he ever encountered, and discussing the discovery of a specific brand of cell phone "base stations" in the area, as well as in a home near the location of this attack and that it "was most likely where the insurgent watched us from and detonated the IED that killed Keeling, Squires, [and others]."); see also PX4901, Ops Report, p. 1 (describing the series of IEDs and mine strikes that the unit suffered that day).

Dr. Gartenstein-Ross opined that the above examples demonstrated that AQI and AAS worked together to have a dominant presence in the location, as well as shared access to the materials and tactical capability to conduct attacks such as the one that killed Lance Corporal Keeling and Corporal Squires. (PX4905. pp. 4-5).   He further assessed that AQI and AAS were motivated to protect an important operational hub used to build and distribute IEDs, which was threatened by the raid undertaken by the Marines on June 9, 2005. I find that Dr. Gartenstein-Ross' conclusion that either one of the groups, or both groups together, committed this attack, to be detailed and credible, and supported by the evidence submitted by Plaintiffs. Due to Iran's support to both groups, any further discerning between the groups' respective involvement in the attack is unnecessary, and immaterial in the ultimate determination of Defendants' liability. In sum, the evidence satisfies the undersigned, and I find that Plaintiffs have sufficiently established, at a minimum, that at least one of the relevant Iranian-supported groups, AQI or AAS, committed this attack.

### iv.  Findings & Recommendations

The Court has already determined that Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi's provision of material support to AQI and AAS was essential to these groups' operating capacities and terrorist attacks involving either AQI or AAS in Iraq from 2003 through

2011 and were a reasonably foreseeable and a natural consequence of that material support. (See ECF Nos. 127, 136; and 137, at 3). Therefore, having attributed the attack to AQI and/or AAS, the undersigned concludes that the Defendants' provision of material support to either group was a proximate cause of the June 9, 2005, IED attack near Haditha, Iraq, that involved an extrajudicial killing and caused personal injuries to Plaintiff Lance Corporal Keeling and Corporal Squires and their family members.

It is therefore my recommendation that the Court find Defendants the Islamic Republic of Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran liable for non-bellwether Attack No. 19.

### C.  No. 28 — April 15, 2006, IED Attack in Saqlawiyah, Iraq

On April 15, 2006, Lance Corporal Derrick Joshua Cothran, Corporal Pablo V. Mayorga, Lance Corporal Justin D. Sims, and Private First Class Ryan G. Winslow were killed near Saqlawiyah, a town approximately 20 minutes Northwest of Fallujah, Iraq after their HMMWV struck Improvised Explosive Device (IED). On the date of the attack, Lance Corporal Cothran's vehicle took a road often traveled by the platoon, and when it neared a fork in the road, it hit a large IED, killing all four service members. (PX6102, Certificate of Death); (PX6103, DD Form 1300 Report of Casualty); and (PX6106, Declaration of Matthew Chandler).

### i.  Direct Victim & Solatium Claimants

Lance Corporal Derrick Joshua Cothran (decedent) was a United States citizen and United States Marine Lance Corporal, and a direct victim of this attack. (PX6100, Cothran PFS.) His mother, Elena Martinez Cothran, brings claims for solatium, and as the legal representative of the estate, arising from the personal injuries and wrong death of her son. (PX6110, Letters Testamentary.) Plaintiffs Victoria F. Cothran, Theodore Michael Cothran. Sr., Antoinette Cothran Hebert, and Theodore Michael Cothran, Jr. are family members of Lance Corporal Cothran,

bringing claims for solatium, mental anguish, and emotional pain and suffering. (*See* ECF No. 100, 2ⁿᵈ Amend. Compl., ¶¶ 1582-1592;  ECF No. 81-2, at 18 (summarizing Exhibit 260 submitted as proof of status/relationship); and ECF No.126, at 5-7 (order on status)).

### ii.  Extrajudicial Killings & Personal Injuries

This attack involved the death and extrajudicial killing of four service members, including that of Lance Corporal Cothran. I find this attack involved an extrajudicial killing that resulted in personal injuries to the Plaintiffs. I further conclude that the terrorism exception to Defendants' sovereign immunity applies to the claims brought by these Plaintiffs that arise from this attack. *See Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), ECF No. 65 at *17–21 (DDC Sept. 30, 2022); and *Force v. Islamic Republic of Iran*, 610 F. Supp. 3d 216, 222 (D.D.C. 2022).

### iii.  Attribution

Plaintiffs' expert, Michael P. Pregent, attributes this attack to AQI. (PX6107, p. 1 (Expert Report of Michael P. Pregent) ("Expert Report").  Mr. Pregent's conclusions are based upon the location and date of the attack, the specific TTPs employed in the attack, and the motives for AQI in committing it. Mr. Pregent is a former intelligence officer in the United States Army, having served in Iraq and Afghanistan, including as an embedded advisor to the Iraqi Government. For this attack, he prepared a detailed report using the same military intelligence methodology utilized in his professional work advising the commanding officers of MNF-I, including General David Petraeus and H.R. McMaster. (PX6107, Expert Report). Applying his expertise, Mr. Pregent's reached his conclusions to a reasonable degree of military intelligence certainty. (Id.) The undersigned finds Mr. Pregent's determination of AQI's likely involvement credible, and supported corroborated by contemporaneous government reports and historical records, as well as other credible evidence related to this attack. (Id., p. 1.)

First, Mr. Pregent concludes that the geographic location of the attack supports the conclusion that AQI is responsible. The attack occurred in Saqlawiyah northwest of Fallujah, Iraq, and along the main highway in the Anbar Province, and a primary smuggling route used by the IRGC and MOIS to transport weapons and foreign fighters into and across Iraq. (Id., p.  2) According to Mr. Pregent, this area was strategically important to AQI's "Baghdad Belt" strategy that allowed it to use the pre-dominant Sunni areas in Anbar as a staging area for necessary supplies and personnel for its operations throughout Iraq. (Id.) Mr. Pregent's assessment is corroborated by the declassified CENTCOM's 2007 *Study of the Anbar Insurgency*, showing that, as AQI's foothold in Fallujah was challenged, the group relied more on areas surrounding Fallujah for its operations, and was still able to "exert considerable influence over the populations" outlying Fallujah, and specifically, that of Saqlawiyah. (PX898, *Study of the Insurgency in the Anbar Province*, Ch. 6: *AQI Dominates the Insurgency,* p. 127 (CENTCOM, June 13, 2007)). AQI's Saqlawiyah cell was comprised of foreign fighters and was large enough to form their own groups and conduct independent operations without the assistance of locals." (Id., 6). These AQI fighters and their facilitators who lived in the city did not wish to attract Coalition attention, and conducted attacks in the surrounding areas. (Id.) Another AQI cell just west of Saqlawiyah engaged in kidnappings and murders. (Id.) This area was especially critical to AQI for its access to a nearby ferry crossing used to move the group's kidnapping victims, weapons, and fighters up and down the Euphrates. (Id., p. 168.) By 2006, AQI completely infiltrated the police in Saqlawiyah, where the Police Chief provided false identification cards to AQI fighters. (Id., p. 42.) The AQI cell in this area was responsible for the group's mortar, IED, and VBIED attacks, assassinations, vehicle theft, fuel smuggling, and money laundering activities in the area. (Id., p. 187.) By the summer of 2006, the area in which the attack occurred had become a primary "venue for attack" for AQI and

"served as a center for AQI's arms caches, as well as perceived area of safe harbor for some of the most prominent members of the group's leadership." (Id., p. 127.) The importance of the area in which the April 15 attack occurred is punctuated by the fact that, less than one month after the attack on May 4, Zarqawi called together AQI's leadership to a meeting "held at Lake Thar Thar because AMZ considered it a secure location and facilitated his rapid access to Ramadi, Khalidiyah, *Saqlawiyah*, Fallujah, and east into Salahaddin province." (Id., pp. 67-68.)  Around the same time, hearing rumors of a "FAJR-style operation against Ramadi, AQI mid and high-level leaders left the city en masse for safe havens at the southern end of Lake Thar Thar." (Id., pp. 72-73.) Thus, routes and roads through Saqlawiyah were critical to AQI's ability to move into and out of this safe haven. In September 2006, Coalition forces discovered shooting ranges and meeting places in the areas northwest of Saqlawiyah and to the south of Lake Thar Thar, concluding that the area had been used by AQI leadership to train foreign fighters. (Id., p. 164).

Second, the TTPs used in this attack also support the conclusion that AQI committed it. (PX6107, p. 2 (Expert Report.)) The attack involved a massive and lethally effective IED placed along a major point of egress for AQI fighters, munitions, and leadership and reach into areas considered safe havens and training locations for the group. (Id.) Thus, making it credible that AQI placed the IED to protect areas critical to the group's operations and strategies. Mr. Pregent notes that the use of a fork in the road is significant, as it indicates that AQI was familiar with the routes taken by U.S. soldiers and it is likely that AQI observed patterns in the movement of U.S. soldiers. (Id.) AQI's ability to conduct the necessary surveillance, and to avoid detection while emplacing a large IED to lethally target a U.S. military vehicle on a main supply route, is supported by the group's dominance of the area. (Id.) AQI controlled the local police force in the area, and according to CENTCOM "the entire Iraqi Highway Patrol had been compromised by the insurgency and was

actively working with AQI." (PX898, *Study of the Insurgency in the Anbar Province*, Ch. 6: *AQI Dominates the Insurgency*, p. 43 (CENTCOM, June 13, 2007).

Finally, Mr. Pregent provides a comprehensive assessment of the trends shown by reports of insurgent and Coalition activity in the area, which confirmed AQI's dominance and TTPs. These events were logged in military significant activity reports and other historical geospatial data of events in Iraq, the vast majority of those events reported surrounding the location and time of this attack were of TTPs most commonly associated with AQI and its affiliates, specifically, VBIEDs, suicide attacks, and other complex or large-scale attacks against U.S. military targets. The events also indicate caching, smuggling, foreign fighters, and the influence of Iranian support (Id., pp. 2, 4-14.); which is supported by CENTCOM's de-classified *Study of the Insurgency in Anbar Province*, Iraq (see e.g., Ch. 5, p. (documenting AQI's signature use of VBIEDs along the Al Qiam/Abu Ghraib corridor, following established smuggling routes along the Euphrates,)

Consistent with the Court's prior rulings, the expert witnesses considered and credibly assessed the timing and location of the attack, the tactics, techniques and procedures used in the attack to reach his conclusions. In addition, Mr. Pregent's attribution is derived from substantial evidence from multiple sources and is supported by additional evidence submitted by Plaintiffs (See g., Id. p. 3-4; PX898; PX900; PX731; PX995; and PX241). I find the opinion to be detailed, reliable and supported by the weight of credible evidence. In sum, this evidence satisfies the undersigned, and I find that Plaintiffs have sufficiently established that AQI committed the attack that killed Lance Corporal Cothran on April 15, 2006.

### iv.   Findings & Recommendations

The Court has already determined that Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security, Bank Melli Iran, and

Bank Markazi's provision of material support to AQI was essential to these group's operating capacity and terrorist attacks involving AQI in Iraq from 2003 through 2011 and were reasonably foreseeable and a natural consequence of that material support. (See ECF Nos. 127, 136; and 137, at 3). Therefore, having attributed the attack to AQI, the undersigned concludes that the Defendants' provision of material support to either group was a proximate cause of the April 15, 2006, IED attack in Fallujah, Iraq, that involved an extrajudicial killing and caused personal injuries and the death of Plaintiff Lance Corporal Derrick Joshua Cothran and his family members.

It is therefore my recommendation that the Court find Defendants the Islamic Republic of Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran liable for non-bellwether Attack No. 28.

### D.  No. 33 — August 5, 2007, Complex Attack in Nissan District, Baghdad

On August 5, 2007, Plaintiff Robert Stevens Baughn was ambushed by a complex attack involving Rocket Propelled Grenades (RPG) and small arms fire (SAF) in the Nissan District, Baghdad. (See ECF No. 100, 2nd Amend Compl., ¶¶ 1312- 1318; PX6613, Baughn PFS.)  Captain Baughn served as a Platoon Leader with 1st Battalion, 8th Cavalry Regiment (1-8 CAV), 2nd Brigade Combat Team (BCT), 1st Cavalry Division in support of the Multi-National Division Baghdad (MND-B).

On August 5, 2007, Captain Baughn was leading his platoon during a combat patrol in the Al-Shuhada south neighborhood of Baghdad's Nissan District. (PX6612, Expert Report of M. Lee Walters, R. Evans, and D. Sultzer, p.1 ("Expert Report"). His platoon consisted of three HMMWVs and one M2 Bradley Fighting Vehicle, which he was occupying. (Id.) During the patrol, he and his other two crewmembers were aboard the Bradley and providing security overwatch for his dismounted troops as they moved from house to house in the neighborhood. (Id.) While in this overwatch position, a rocket-propelled grenade (RPG) was fired directly into the rear hull of his

Bradley. The RPG successfully penetrated the thick armor of the 34-ton vehicle, causing it to explode and lift into the air. (Id.) The shrapnel of the RPG and the blast effect mortally wounded the Bradley driver and left Captain Baughn and another crew member with severe wounds.

The enemy followed-up the initial RPG strike with small arms fire against Baughn's platoon as they were attempting to evacuate the wounded soldiers. Eventually, Captain Baughn and his platoon were able to secure the area, extract the wounded, and return to base where the members of the crew received medical treatment. (Id.) Baughn was awarded the Purple Heart and the Combat Infantry Badge for his actions on this day. (PX6613, Baughn PFS; PX6604, Purple Heart Award; PX6605, Combat Infantry Badge).

As discussed below, the attack in which Captain Baughn was injured was committed by a Shia Militia Group (SMG) (e.g., Jaysh al-Mahdi, PDB, KH, AAH) which received material support from Defendants. This attack resulted in personal injuries and an extrajudicial killing, a requisite act for application of the terrorism exception to the jurisdictional immunity of a foreign state under 28 U.S.C. § 1605A(a)(l). Based upon the evidence, as discussed further herein, the undersigned finds that SMG committed this attack.

### i. Direct Victim & Solatium Claimants

Plaintiff Robert Steven Baughn is a United States citizen and a Captain in the United States Army. (PX6613, Baughn PFS, Sec. II (4), (6), (8); and ECF No. 81-2, at 8).  Plaintiff Karly Ann Baughn, formerly known as Karly Ann Kay, is the wife of Captain Robert Steven Baughn and has brought a solatium claim for emotional pain and suffering related to the attack and the physical and psychological injuries to Baughn. (Id.; see also ECF No. 100, 2nd Amend. Comp., at ¶¶1312 – 1320).

### ii. Attribution

The undersigned finds the evidence submitted for this attack sufficient to attribute this attack to an Iranian-supported Shia Militia Group (SMG). Plaintiffs' expert Witness Report and Declarations prepared by Colonel Mark Lee Walters, US Army Ret., CW4 Ronald Evans, US Army Ret., and CW3 David Sultzer are detailed and based on military intelligence that falls within a reasonable degree of certainty. (PX6612, Expert Report). The undersigned finds these experts' conclusions to be credible, corroborated by contemporaneous government reports and historical records, as well as other credible evidence related to this attack. Pulling from the evidence deemed most credible, I make the following factual findings upon which I base the legal conclusions herein:

1) At the time of this attack, the 9 Nissan (or New Baghdad) was a known stronghold of Iranian-supported Shia militia groups (SMG). (PX320, DOD Press Briefing with Major General Joseph Fil, Commanding General, Multi-National Division-Baghdad (September 21, 2007.); (PX1049 Institute for the Study of War (ISW), Map of Special Groups Activity in Iraq (September 30, 2008); (PX604, ISW: Baghdad City); (PX6000, Decl. Cpt. Baughn);

2) An Iranian-supplied RPG-29 was most likely the weapon used in the attack that penetrated the M2 Bradley Fighting Vehicle (BFV), killing the driver and injuring the other crew members, including Captain Baughn. This is supported by credible government reports of the SMG using this weapon against Coalition armored vehicles in east Baghdad. It is also supported by the evidence showing the force and destructive power achieved by the RGP used in this attack, as well as the lethal results. (PX777. Totten, Michael J., "The Future of Iraq, Part 1," (May 12, 2009); (PX6614, p. 1 (Jane's Intelligence Review, Terrorism & Insurgency); (PX6000, Decl. Cpt. Baughn); (PX6612, pp.5-6 (Expert Report)); and (PX776 Woody, Christopher; Business Insider; June 10, 2017);

3) To successfully execute this attack, those who committed it needed to be well trained and prepared to attack an armored M2 BFV with an RPG-29 from a vantage point overwatching the vehicle to achieve maximum damage and injuries/death. Those who committed the attack specifically targeted the M2 BFV in such a way to us the high-end weapon system to successfully penetrate the vehicle's thick armor. (PX6612, pp. 10-11 (Expert Report); (PX6614, p. 1 (Jane's Intelligence Review, Terrorism & Insurgency) (PX6000, Decl. Cpt. Baughn);

4) The attackers immediately followed the RPG explosion with a secondary attack from another position with small arms; a sophisticated multi-staged tactic requiring coordination, discipline, and pre-acquired knowledge or insight into the Coalition forces' capabilities and defensive responses. (PX6000, Decl. Cpt. Baughn); (PX6612, p. 11 (Expert Report));

5) In the 9 Nissan area at the time of this attack, Nos. 1-4 above were signature TTPs of SMG. (PX6614, p. 1 (Jane's Intelligence Review, Terrorism & Insurgency); PX6612, p. 11 (Expert Report))

6) Shortly after Captain Baughn's attack, his Division Commander, MG Fil provided a Press briefing outlining the increased attacks against U.S. forces throughout Baghdad, and specifically in the New Baghdad area (the same area as Captain Baughn's attack). Coalition forces determined that those committing attacks like that involving Captain Baugh, were armed and funded by the IRGC-Qods Force, and were continuing to conduct these attacks. (DOD Press Briefing, September 21, 2007. Major General Joseph Fil, Commanding General, MND-B.) (PX6612, p. 11 (Expert Report)); and

7) Attacks by Iranian-supported groups in Iraq were part of Iran's larger strategic goals in supporting the Shia militia groups in Iraq, and their joint campaign to destabilize the peace process and force the withdrawal of all U.S. and coalition forces from Iraq. (PX320, DOD Press Briefing with Major General Joseph Fil, Commanding General, Multi-National Division-Baghdad (September 21, 2007.)); (PX356, DOD Press Briefing with Brig. Gen. Kevin Bergner, MNF-I Spokesman (July 2, 2007.) and (PX326, DOD Press Briefing with Brigadier General Kevin Bergner, Spokesman, Multi-National Force-Iraq (July 18, 2007.));

Consistent with the Court's prior rulings, the expert witnesses considered and credibly assessed the timing and location of the attack, the tactics, techniques and procedures used in the attack to reach their conclusions. In addition, Plaintiffs' evidence provides other indicia of a SMG's culpability for this attack. This included the use of RPG 29 weapons to attack coalition armored vehicles and successfully penetrate their armor, in the area and near the same time as this attack. Additionally, official DOD press releases described similar attacks attributed to SMG that were conducted in the same period and location of the attack on Captain Baughn's platoon. (See e.g., PX320, DOD Press Briefing with Major General Joseph Fil (September 21, 2007); and PX1049, ISW Map & Summary of MNF-I Press Releases regarding Special Groups activities in

Baghdad between 2007-2008.) Given the known concentration of JAM/Special Group forces operating in and around Nissan District at the time, it is reasonable to conclude the same JAM/SMGs initiated the complex attack against Captain Baughn's unit in the same area and at the same time. Therefore, the undersigned finds that the evidence proffered by Plaintiffs establishes that an Iranian-supported Shia Militia Group (SMG) was responsible for this attack because SMGs were operating in their stronghold of Baghdad's Nissan District at the time of the attack. The attack featured tactics, techniques, and procedures (TTPs) used by SMGs, including a specific type of munition Iran provided to Iranian-supported SMGs.

In sum, this evidence satisfies the undersigned, and I find that Plaintiffs have sufficiently established that an Iranian-supported Shia Militia Group committed this attack.

### iii. Findings & Recommendations

The Court has already determined that Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi's provision of material support to the SMGs was essential to these group's operating capacities and terrorist attacks involving SMGs in Iraq from 2003 through 2011 and were reasonably foreseeable and a natural consequence of that material support. (See ECF Nos. 127, 136; and 137, at 3). Therefore, having attributed the attack to the SMGs the undersigned concludes that the Defendants' provision of material support to the SMGs was a proximate cause of the August 5, 2007, complex attack that involved an extrajudicial killing and caused personal injuries and the death Plaintiffs Captain Robert Stevens Baughn and his family members.

It is therefore my recommendation that the Court find that Defendants the Islamic Republic of Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran are liable for non-bellwether Attack No.33.

## IV.   SUMMARY OF FINDINGS AND RECOMMENDATIONS

Pursuant to the Court's administrative orders and directives governing the Special Masters, applicable precedent, and the evidentiary and analytical standards set forth in the Court's "General Approach to Liability Determinations" (see ECF No. 137), the undersigned has carefully reviewed and weighed the evidence submitted by Plaintiffs bringing claims based upon Non-bellwether Attacks Nos. 8, 19, 28, and 33. The following findings of fact and conclusions of law are provided to the Court:

1. At least one of the Subject Terrorist Groups previously identified in the Court's Orders Defendants' material support (ECF Nos. 126 &127) was involved in each of Non-bellwether Attacks 8, 19, 28, and 33;

2. Non-bellwether Attacks 8, 19, 28, and 33 resulted in personal injuries and/or deaths to the plaintiffs as detailed above;

3. Each Plaintiff bringing claims based upon Non-bellwether Attacks 8, 19, 28, and 33 is either a direct victim of the attack or a family member thereof;

4. Each Plaintiff bringing claims based upon Non-bellwether Attacks 8, 19, 28, and 33 has sufficiently established their or the related victim's status under 28 U.S.C. § 1605A(a)(2)(A)(i)–(ii);

5. Non-bellwether Attacks 8, 19, 28, and 33 each involved a requisite act or acts listed in 28 U.S.C § 1605A(a)(l );

6. Defendants' material support to the Subject Terrorist Groups was a proximate cause of Non-bellwether Attacks 8, 19, 28, and 33.

Therefore, the undersigned concludes these Plaintiffs "have established their right to relief by evidence satisfactory to the court," and respectfully recommend that the District Court enter a judgment finding Defendants liable for Non-Bellwether Attacks No. 8, 19, 28, and 33.

## V.   REVIEW BY THE DISTRICT COURT

Pursuant to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Nos. No. 139, 140, and 145), Plaintiff's may file an

objection to, or motion to modify/adopt, a finding, report, or recommendation by Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide *de novo* all objections to findings of fact or conclusions of law made or recommended by the Special Master. The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. *See* Fed. R. Civ. P. Rule 53(f)(3), (4), and (5).


Date: February 23, 2024                    Respectfully Submitted,

                                           */s/ John P. Kuder*
                                           **HON. JOHN P. KUDER (RET.)**
                                           **SPECIAL MASTER**