UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF CHRISTOPHER ) <br> BROOK FISHBECK, et al., ) <br>  ) <br> **Plaintiffs,** ) <br>  ) <br> v. ) <br>  ) <br> THE ISLAMIC REPUBLIC OF IRAN, et al., ) <br>  ) <br> **Defendants** ) <br>  ) <br> **This Document Relates To:** ) <br> **ESTATE OF MERLIN GERMAN, ARIEL** ) <br> **GERMAN, LOURDES GERMAN, COLLEN** ) <br> **MATTHEW WEST, CARLA** ) <br> **WEST, TIM WEST, BRENDEN WEST,** ) <br> **ALLISON WEST-SOUTHERN, KIERA** ) <br> **PAUL, MIKE SWEENEY, BRUCE LEONARD** ) <br> **MORROW, BRUCE, LEONARD MORROW** ) <br> **JR., GEMINI NICHOLE** ) <br> **WARDZINSKI-MORROW, ESTATE OF** ) <br> **BRYAN LUCKEY, CATHERINE MAKIMAY** ) <br> **LUCKEY, PAULA HUTTON LUCKEY,** ) <br> **PATRICK BRYAN LUCKEY, JOSHUA C.** ) <br> **LUCKEY, MATTHEW LUCKEY** ) | Civil Action No. 1:18-cv-2248-CRC <br><br> Special Master Ellen L. Koblitz |

**REPORT AND RECOMMENDATION**
**WAVE NO. 1 – LIABILITY**
**NON-BELLWETHER ATTACKS NOS. 15, 17, 26, 30**

I. **INTRODUCTION**

On October 15, 2023, the Court appointed me as Special Master in this case. For the purpose of establishing liability for these attacks, the District Court has already found that: 1) service of process upon all Defendants was properly effectuated (*see* ECF No. 55, at 10); 2) the

Islamic Republic of Iran was, at all times since 1984, a designated state sponsor of terrorism (see ECF No. 126, at 3-4); 3) all Plaintiffs are U.S. Nationals, members of the U.S. armed forces, or U.S. government contractors (*see id.*, at 6-7); 4) Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security, Bank Markazi, and Bank Melli Iran each provided material support, (as defined by 28 U.S.C. § 1605A(a)(1),) to the Sunni terrorist groups Al Qaeda, Al Qaeda in Iraq (AQI), and Ansar al Islam during the relevant time period of 2003-2011 (ECF No. 137, at 3. *See also* ECF Nos. 127 and 136); and 5) the provision of this material support provided by these specific Defendants to these specific Sunni terrorist groups "was essential to the groups' operating capacity, and terrorist attacks involving these groups in Iraq during 2003-2011, were reasonably foreseeable and a natural consequence of that material support" (*see* ECF Nos. 127, at 2; and 136, at 7). Prior to making my recommendations, I reviewed the evidence regarding whether the four attacks listed above resulted in an extrajudicial killing and whether the attacks were reasonably attributed to one of the previously identified terrorist groups.

### A. Attack No. 15: **Plaintiff Merlin German (Deceased)**

#### i. *February 22, 2005 – IED Attack near Ramadi, Al Anbar Province, Iraq*

On February 22, 2005, United States Marine Sergeant Merlin German was severely injured in an IED attack in Al Anbar Province and died more than three years later, after enduring innumerable medical procedures, due to the extensive burns he suffered in the attack. PX 4501, PX4505. On the day of the attack, Sgt. German and his unit were on a mission to do route reconnaissance of roads between Jordan and Baghdad in preparation for the transport of an oversized generator. Approximately one mile from base, the unit spotted a suspicious package along the roadway. Sgt. German's vehicle was instructed to inspect the package. When the vehicle approached and stopped, an IED exploded into the left rear door. PX4508 ¶ f. Sgt. German was located in the gunner turret when the explosion occurred and was directly hit by the blast and the

burning diesel fuel that engulfed his body in flames. *Id.*, ¶ h. Cpl. Antonio Mendoza, who was located in the rear seat of the High Mobility Multipurpose Wheeled Vehicle (HMMWV), also sustained serious burns and other injuries during the attack, which resulted in his death several months later. *Id.* As a direct result of the injuries he sustained in the February 22, 2005 IED attack, Sgt. German died on April 11, 2008.

### ii.     *Al-Qaeda in Iraq committed the attack*

With a reasonable degree of certainty, Plaintiff's expert attributed the attack to AQI based on the location and timing of the attack and the tactics and weapons used. PX4512, Expert Report of M. Lee Walters, Ron Evans, and David Sultzer. The experts, previously relied on by this Court,[1] explained that the city of Ramadi "was a critical urban area" for AQI after the fall of Fallujah and that, because of a ceasefire ordered by other Sunni Rejectionist Elements (SREs) toward Coalition forces at the time, the attack against Sgt. German and his unit was likely committed by AQI. *Id.*, p. 10. After the Battle of Fallujah, insurgents who survived resettled in the city of Ramadi, an area of perceived Coalition weakness and Abu Musab Zarqawi was able to use his funding to hire away young men from other more secular groups so that most of the AQI fighters were men who had previously served as military or security personnel, creating a determined, well-resourced, and well-trained organization capable of complex attacks such as the one that injured, and ultimately killed, Sgt. German. *Id.,* pp. 11-12.

Further, it was a known tactic of AQI to attract first responder Coalition forces to an area

---

[1] In ECF No. 137, at 8 fn. 3, this Court relied on Plaintiffs' expert Col. M. Lee Walters, as well as expert Michael P. Pregent, when it "considered numerous factors including: (1) whether the tactics, methods, or weapons used in the attack could be linked to the groups Iran supported; (2) whether the attack occurred in an area operationally controlled by one of the subject terrorist groups Iran supported; (3) <u>whether an expert credibly opined that the attack was committed by an Iran-backed terrorist group</u>; and (4) any other indicia that one of the subject terrorist groups was responsible for the attack." (Emphasis added.)

and then detonate an IED to increase casualties and confusion. *Id.* When Sgt. German's unit arrived to investigate a possible IED, the IED was detonated via a remote-control device. *Id.* Plaintiff's expert determined it was reasonable to conclude that the enemy combatants were awaiting Sgt. German's unit based upon the accuracy and volume of the attack. *Id.* The attack was well-orchestrated and complex and the perpetrators of the attack, AQI, benefitted from a permissive environment for their activities. *Id.*, p. 14. Plaintiff's expert concluded that AQI trained on these types of tactics and procedures during their stay in Iran in 2001. *Id.* As a result, Iran provided AQI "with a cohesive command and leadership structure, funding network, religious/recruitment guidance, operational authority, and support to the AQ affiliates operating in Iraq."

AQI's "successful execution of this well-coordinated, complex attack was likely a result of the material support that AQI received from Iran through the Iranian Ministry of Intelligence (MOIS) and the Iranian Islamic Revolutionary Guard Corps (IRGC) and IRGC-Qods Force." *Id.*, p. 2.

Plaintiff Sgt. Merlin German, a United States citizen, served over four years of active service. PX4513, German Plaintiff Fact Sheet, Sec. II(4), (6), (7), (8); ECF No. 81-2, p. 32. He was serving as a Field Artillery Cannoneer on the date of the attack. *Id.*, Sec. II(7). He was the son of solatium victim Plaintiff Lourdes German and the brother of solatium victim Plaintiff Ariel German. PX4513, Sec. II(1).

I recommend that the Court find that Sergeant German's death was caused by the extensive burns throughout his body he suffered in this attack. PX4513, Sec. V. This attack thus involved an extrajudicial killing, a requisite act under 28 U.S.C § 1605A(a)(l) for the terrorism exception to the jurisdictional immunity of a foreign state to apply. I also recommend that the Court find that

the attack was committed by Al Qaeda in Iraq, which received material support from Defendants, and this support was a proximate cause of this attack.

### B. Attack No. 17: Plaintiff Collen West

#### i. *May 8, 2005 – Complex Attack in al Qaim, Al Anbar Province, Iraq*

On May 8, 2005, U.S. Marine Corps Lance Corporal Collen West was injured in an attack in the al Qaim district of the Al Anbar Province. West Decl., para. f. SSgt. Anthony Goodwin was killed in the attack. PX4700 Ex. G. At the time, LCpl. West's unit was stationed at Camp Haditha near the Haditha Dam, northwest of Baghdad. *Id.* at para. d. His unit's mission entailed conducting house-to-house searches for weapons. *Id.* at para. e. They also looked for IED-making materials and large weapons caches and attempted to locate high-value targets in the area. *Id.*; PX4709, Balla Decl., para. d.

On the day of the attack, LCpl. West's unit was traveling a few hours north of the Haditha Dam in a large convoy of over fifty vehicles as part of Operation Matador. PX4700, para. f and Ex. G. As the convoy approached New Ubaydi, a town in the al Qaim district near the Syrian border, it came under machine gun and rocket propelled grenade (RPG) fire. *Id.*, para. f and Ex. G, Summary of Award Submission for Goodwin. According to the official Bronze Star recommendation for SSgt. Goodwin, the machine gun fire was steady and accurate, indicating a well-trained group of insurgents. *Id.* at Ex. G. The team entered the town to clear it of the insurgents. *Id.* They started in the morning at one end of town and began to clear the houses one by one. *Id.* at para. f. The town was a hotbed of insurgent activity. *Id.* Later in the day, the Marines came to a house at the end of a road. *Id.* They knocked on the front door, but there was no answer. *Id.* One member of the team kicked the door, but it would not budge. *Id.* As he kicked the door again, insurgents began shooting with machine guns and RPGs from inside the house. *Id.* at para.

f. and Ex. G. LCpl. West was struck by bullets in both legs. *Id.* at para. f. The enemy was equipped with advanced weapons, including a PKM machine gun, an AK47, and an RPG. *Id.* at Ex. G. Other Marines entered the house, and armor-piercing rounds erupted from a hidden enemy bunker beneath the floor. *Id.* at Ex. G. The enemy was ultimately destroyed by air support. *Id.* Two Marines and two insurgents died in the attack. *Id.* at para. f and Ex. G; PX4709, para. f.

      **ii.**    *Al-Qaeda in Iraq committed the attack*

Plaintiff's expert, Michael P. Pregent, attributed the attack to AQI with a reasonable degree of certainty. PX4713, Expert Report of Pregent, p. 1. The expert's conclusion is based on the advanced munitions and tactics used, the location of the attack, and the fact that AQI had primary control of the territory at the time. *Id.* The conclusion is further supported by information and data related to other terrorist activities in the area around the same timeframe. *Id.*

The attack was carried out by well-armed and well-trained insurgents, as evidenced by the use of an RPG, advanced machine guns expertly deployed, and an enemy bunker beneath the floor of the residence. *Id.* This supports the conclusion that the attack was carried out by a group such as AQI, that had received strong material support, including weapons and training. *Id.*, pp. 2-3.

The location of the attack also supports the conclusion that AQI committed the attack, which occurred in the al Qaim district of the Al Anbar province near the border with Syria. *Id.* at p. 2. The area was a main artery for the flow of foreign fighters into Iraq, particularly in early 2005. *Id.* The border was where foreign fighters crossed from Syria into Iraq through ratlines established by the IRGC and the MOIS. *Id.* The flow of fighters also allowed Iran to smuggle munitions into Iraq along established lines from Syria through al Qaim along the Euphrates River. *Id.*

Following the Second Battle of Fallujah in late 2004, members of AQI established a base in Al Qaim. *Id.* Coalition Forces began Operation Matador with the very purpose of clearing AQI

from the region and establishing a crossing point in al Qaim at New Ubaydi. *Id.*

Plaintiff's expert, as part of his analysis, created several maps to show the activities of Iranian-supported Sunni terror groups (like AQI) near the location and during the time of the attack. PX4713, p. 2. The maps support the conclusion that the area was highly saturated with AQI members. *Id.* In fact, SigAct reports show significant AQI activity in the area before and after the May 8 attack on LCpl. West's team. *Id.* Of note, the reports document a factory dedicated to manufacturing vehicle-borne IEDs (VBIEDs). *Id.* VBIED attacks were considered a "signature" AQI attack. *Id.*, n. 11. The ability to maintain a production facility for VBIEDs shows that AQI was receiving a steady supply of munitions, had primacy and control of the area, and enjoyed a permissive environment from which they could launch lethal attacks. *Id.*, pp. 2-3. Coalition Forces also found numerous caches, particularly near the border and extending into New Ubaydi. *Id.*, p. 3.

Plaintiff's expert was also able to exclude Shia militia groups as the likely culprit. He did this by performing a search of all available SigAct reports for Shia-related terms around the area of the attack from 2004 through 2009. *Id.* The search returned no results. *Id.* The absence of Shia militia activity confirms AQI had primacy and control of the area at the time of the May 8, 2005, attack, making AQI the most likely group to have carried out the attack. *Id.*

I recommend that the Court find that LCpl. West's injuries were caused by the injuries he suffered in this attack. PX4513, Sec. V. This attack involved an extrajudicial killing, of SSgt. Anthony Goodwin, a requisite act under 28 U.S.C § 1605A(a)(l) for the terrorism exception to the jurisdictional immunity of a foreign state to apply. I recommend that the Court find that the attack was committed by Al Qaeda in Iraq, which received material support from Defendants, and this support was a proximate cause of this attack.

### C. Attack No. 26: Plaintiff Bruce Morrow

#### i. *October 27, 2005 – IED attack in Ramadi, al Anbar Province, Iraq*

On October 27, 2005, Sgt. Bruce Morrow was injured in an IED attack in the city of Ramadi. He was serving as Military Police on the date of the attack. *Id.,* Sec. II (7). Plaintiff Morrow is the father of solatium victims Plaintiffs Bruce Morrow Jr., Gemini Wardzinski-Morrow, and Robert Wardzinski-Morrow. PX5917, Sec. II(1).Sgt. Morrow's unit was providing convoy security to the Explosive Ordnance Disposal (EOD) team as they conducted their counter-IED missions on October 27, 2005. PX5900, B. Morrow Decl., ¶ e. On the day of the attack, Sgt. Morrow was a part of a four to five HMMWV convoy providing security to the EOD team. There was a total of eight to nine vehicles between both teams. Sgt. Morrow was the driver of his team's HMMWV. *Id.,* ¶ f. The convoy was moving along a back street in Ramadi. A separate EOD team was conducting searches in the adjacent area. After Sgt. Morrow was informed that the team needed to leave the area due to the large number of IEDs present, he turned his vehicle around to head back. *Id.*, ¶ g. Sgt. Morrow suddenly felt like his legs were on fire. An IED had detonated beneath Sgt. Morrow's HMMWV. The vehicle had been flipped onto the passenger side. Sgt. Morrow was able to escape out the driver's side, sliding down the top of the HMMWV. *Id.,* ¶ g. SSgt. Danny Lightner was killed immediately from the initial blast. *Id.,* ¶ k. Sgt. Morrow suffered shrapnel injuries to his left leg, his spine was crushed, he had a brain hemorrhage and a perforated eardrum. *Id.*, ¶¶ g, n.

#### ii. *Al-Qaeda in Iraq Committed the Attack*

With a reasonable degree of certainty, Plaintiffs' expert attributed the attack to AQI based on the location and timing of the attack and the tactics and weapons used. PX5908, Expert Report of M. Lee Walters, Ron Evans, and David Sultzer.

"At the time of the attack, AQI maintained a significant presence throughout Al Anbar province and particularly in the Ramadi area, where it sought to protect critical nodes and lines of communication in the region." *Id.,* p. 13. AQI had turned Ramadi "into a battleground" following the fall of Fallujah in 2004 and Coalition forces did not make progress in the fight against AQI until "at least nine months" following the attack on Morrow's platoon, indicating AQI was responsible for the attack. *Id.,* p. 8. AQI's presence, strength, and capabilities in Ramadi were further reinforced by AQI's tenuous partnership with other SREs. Id., p. 9. However, as the partnership failed over the summer of 2005, AQI remained the dominant organization in Ramadi and most likely responsible for the October 2005 attack on Morrow's convoy. *Id.*

Additionally, the tactics, techniques, and procedures used by AQI further support the expert's conclusion that AQI was responsible for this attack. This IED attack was "well planned and expertly executed." *Id.*, p. 13. AQI was aware the Coalition forces were using the route for combat operations and spent time observing the Coalition forces' meticulous route clearance operations. *Id*. AQI was then able to place a large and lethal IED along this same route – an IED so large that it overturned a more than five-ton armored vehicle onto its side. *Id.* Plaintiff's expert concluded that the "successful execution of this type of IED required discipline, training, and synchronization, which was a hallmark of [AQI]" at the time of the attack. *Id.* The expert concluded that Iran provided financial, material, technological, and other support services to AQI. *Id.,* p. 14. Iran provided AQI with a "cohesive command and leadership structure, funding network, religious/recruitment guidance, operational authority, and support to the AQ affiliates operating in Iraq." *Id.*

I recommend that the Court find that LCpl. West's injuries were caused by the injuries he suffered in this attack. PX4513, Sec. V. This attack involved an extrajudicial killing, of SSgt.

Danny Lightner, a requisite act under 28 U.S.C § 1605A(a)(l) for the terrorism exception to the jurisdictional immunity of a foreign state to apply. I recommend that the Court find that the attack was committed by Al Qaeda in Iraq, which received material support from Defendants, and this support was a proximate cause of this attack.

### C. Attack No. 30: Plaintiff Bryan Luckey (Deceased)

#### i. June 29, 2006 – Sniper Attack in Mosul, Nineveh Province, Iraq

On June 29, 2006, U.S. Army Sergeant Bryan Luckey was shot in the head and killed by a sniper in Mosul, Iraq. PX6305, Autopsy Report; PX6302, Ops Report; PX6300, Hill Decl. That day, Sgt. Luckey was out on patrol with his squad. PX6300, paras. b, d. Their mission was route clearance, which involved looking for IEDs and then calling the bomb squad to disarm or detonate the ordnances. *Id.* at para. c. On the morning of the attack, a sniper shot at but missed Sgt. Luckey's convoy. *Id.* at para. d. The convoy returned to base to refuel then headed back out for afternoon patrol. *Id.* They were patrolling Route Tampa, and after finishing their clearing mission, they began to head back to Forward Operating Base (FOB) Marez. *Id.* They were approximately 1.5 miles from base, heading south, traveling about 40 miles an hour in a Stryker vehicle when they saw a large wedding party pass by heading north. *Id.* The squad leader told his men to keep alert. *Id.* A shot rang out. *Id.* It sounded identical to the sniper shot earlier in the day. *Id.* The bullet penetrated Sgt. Luckey's helmet. *Id.*; PX6305.

#### ii. Al-Qaeda in Iraq committed the attack

Plaintiff's expert attributed the attack to AQI with a reasonable degree of certainty. PX6312, Expert Report of Pregent, p. 1. The expert's conclusion is based on the advanced munitions and tactics used, the location of the attack, and the fact that AQI had primary control of the territory at the time. *Id.* The conclusion is further supported by information and data related to

other terrorist activities in the area around the same timeframe. *Id.*

This attack occurred against the backdrop of one of the worst terrorist attacks against Coalition Forces, which occurred at FOB Marez (the same base at which Sgt. Luckey was stationed), on December 21, 2004. *Id.* The FOB Marez attack was perpetrated by the Sunni terrorist organization Ansar al Sunna (aka Ansar al Islam). *Id.* That organization was hit hard by Operation Viking Hammer, and, as a consequence, AQI remained the dominant force and threat to Coalition Forces in Mosul. *Id.*; PX241, U.S. Army in Iraq, Vol. 1, p. 95.

Mosul is located along the path foreign fighters travelled from Syria into Iraq along ratlines established by Iranian forces. PX6312, p. 3. Those ratlines allowed Iran to smuggle munitions into Iraq and through Mosul. *Id.*, pp. 2-3. Mosul was of such importance to a later iteration of AQI—namely, the Islamic State of Iraq—that Mosul was used as the organization's headquarters. *Id.*, p. 3.

As part of his analysis, Plaintiff's expert reviewed the available event data and created several maps to show Iranian-supported Sunni terror group activities within a two-mile radius of the attack and between 2005 and 2007. *Id.* He also evaluated and mapped the reports of signature AQI attacks, such as suicide attacks and VBIED attacks, within the same zone. *Id.* These maps support the conclusion that the area was highly saturated with AQI members. SigAct reports around the time of attack include significant AQI activity in the area before and after the June 29, 2006 attack on Sgt. Luckey. *Id.* There were also reports of VBIED factories within the area. *Id.* The ability to maintain multiple production facilities strongly indicates AQI's steady receipt of munitions, its control of the area, and a permissive environment within which it could commit attacks. *Id.*

Further evidence of AQI's strong presence in Mosul is that fact that the AQI Emir for Al Qa'im was hiding from Coalition Forces in Mosul. *Id.* Emirs were among the highest-ranking leaders of AQI and would not have hid in Mosul unless AQI had a permissive environment such that they felt it was safe to stay there. *Id.*

A report from August 24, 2006 states that Coalition Forces arrested a sniper who was wanted for shooting a U.S. soldier; the sniper was captured less than a mile from the attack in question. *Id.*, p. 4. Given the timing and proximity to the attack, it is likely that he was the individual who shot and killed Sgt. Luckey. *Id.*

Finally, the expert was able to exclude Shia militants as likely culprits by performing a search of all available SigActs for Shia-related terms around the area of the attack from 2004 through 2009 as well as for Explosively Formed Penetrators (EFPs), a signature Shia weapon. *Id.* The search returned one result for Shia-related terms, but the report was not actually related to Shia-militia activity. *Id.* There were six total references to EFPs, with four of them in 2008. *Id.* The general absence of Shia militia activity and signature Shia weapons confirms the expert's conclusion that AQI likely carried out the June 29, 2006 attack.

I recommend that the Court find that's this attack involved an extrajudicial killing, of U.S. Army Sergeant Bryan Luckey, a requisite act under 28 U.S.C § 1605A(a)(l) for the terrorism exception to the jurisdictional immunity of a foreign state to apply. I recommend that the Court find that the attack was committed by Al Qaeda in Iraq, which received material support from Defendants, and this support was a proximate cause of this attack.

## II. CONCLUSION

The Court "has already found the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups which bolstered their

ability to foreseeably commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 to 2011." ECF No. 137, at 3. *See also* ECF Nos. 127 and 136. If the Court accepts my recommendations, and finds that AQI committed these four attacks, each of which involved an extrajudicial killing resulting in personal injuries or death of the Plaintiffs, Defendants Iran, IRGC, MOIS, Iran, Bank Markazi, and Bank Melli Iran are liable.

### III. REVIEW BY THE DISTRICT COURT

According to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Nos. No. 139, 140, and 145), Plaintiffs may file an objection to, or motion to modify/adopt, a finding, report, or recommendation by Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide de novo all objections to findings of fact or conclusions of law made or recommended by the Special Master. The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. See Fed. R. Civ. P. Rule 53(f)(3). (4), and (5).

February 23, 2024                                   Respectfully submitted,

*/s/ Koblitz*

Ellen L. Koblitz
Special Master