**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ESTATE OF CHRISTOPHER BROOK** | ) | |
| **FISHBECK, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 18-cv-2248 (CRC)** |
| **v.** | ) | |
| | ) | **Special Master J. Daniel McCarthy** |
| **THE ISLAMIC REPUBLIC OF IRAN,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **This Document Relates To:** | ) | |
| | ) | |
| **ESTATE OF JAMES D. BLANKENBECKER;** | ) | |
| **LINNIE A. BLAKENBECLER;** | ) | |
| **AMANDA M. VILLALOBOS;** | ) | |
| **JOSEPH A. MORALES;** | ) | |
| **JESSICA M. SCADUTO;** | ) | |
| **RONALD A. EATON; ERNESTO SIERRA;** | ) | |
| **MARIA C. SIERRA; KRISTINA L. SIERRA;** | ) | |
| **CASSANDRA SIERRA;** | ) | |
| **ESTATE OF JUSTIN VASQUEZ;** | ) | |
| **RILEY N. VASQUEZ;** | ) | |
| **JENNIFER L. AREBALO;** | ) | |
| **JANNEKE L. EIKENBERG;** | ) | |
| **ESTATE OF JEREMY S. JONES;** | ) | |
| **JENNIFER L. JONES; ANTHONY J. JONES;** | ) | |
| **M.A.J. (A MINOR); DIANE K. JONES;** | ) | |
| **JOSEPH S. JONES; ABBI M. CARRETO;** | ) | |
| **DANIEL COWART; SARA EARLS-COWART;** | ) | |
| **CLIFFORD COWART; THERESA COWART;** | ) | |
| **ALYSSA ROSE COWART, AUGUST** | ) | |
| **SYLVIA COWART F/K/A AVALON** | ) | |
| **SYLVIA COWART.** | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**
**WAVE 2: NON-BELLWETHER ATTACK NOS. 36, 38, 46, 57, & 61**
**LIABILITY**

## I.   INTRODUCTION [1]

This Report and Recommendation is offered to assist the Court in adjudication of civil claims brought by over 1400 plaintiffs related to over 400 attacks for which the Defendants materially supported terror groups that targeted U.S. Service personnel, among others, between 2003 through 2011, in Iraq. To address the breadth and complexity of the case, the Court implemented a case management plan structured in "phases" to address threshold jurisdictional and evidentiary issues common to all claims, spearheaded by the Court's scrutiny of fifteen representative "bellwether" attacks during an extensive three-day hearing in September 2022. ECF No. 75. On August 18, 2023, the Court entered an order finding five Defendants liable for twelve of the bellwether attacks. ECF No. 137.

On August 30, 2023, the Court entered an order implementing the Administrative Plan governing "further proceedings as to review of evidence and determination of the defendants' liability for non-bellwether attacks at issue in the case." ECF No. 140 at 1 ("Administrative Plan"). The Court supplemented the Administrative Plan on September 28, 2023 to add special masters and included the responsibility to make recommendations on damages-related issues. ECF No. 145. On February 14, 2024, I was assigned to "consider the remaining issues related to Defendants' liability for providing material support to the groups responsible for committing" non-bellwether Attacks #36, #38, #46, #57 and #61. See ECF No. 140. This Report and Recommendation analyzes each of these attacks respectively.

---

[1] As provided by Section IV of the Administrative Plan for Non-Bellwether Liability Determinations (see ECF No. 14o, at 3), Sections I & II of this Report & Recommendation were by Special Masters Ronald Swanson and J. Daniel McCarthy. This coordination was done to ensure common understanding of the Court's prior work and rulings, and to ensure consistency of interpretation and application of the evidentiary standards and analytical framework established by the Court in adjudicating the issues of liability for the Bellwether Attacks.

The Court's Administrative Plan specifically directs Special Masters to make or recommend findings of fact on the following:

1. The terrorist group(s) involved in the commission of the attack;
2. The personal injuries or deaths that occurred from the attack; and
3. The relationship of the victims of the attack to the respective plaintiff.

Using the Court's prior orders and analytical framework, Special Masters shall also make or recommend conclusions of law on the following:

4. The attack involved a group(s) that received material support from Defendants:
5. The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(1); and
6. Defendant's provision of material support was a proximate cause of the attack.

ECF No. 140, at § III.

To address these issues, the Court granted authority to exercise all powers provided by the Federal Rule of Civil Procedure 53(c) including but not limited to compelling production of evidence and receiving testimony by declaration or affidavits in place of live testimony, "as this Court did in the bellwether hearing." ECF No. 140, citing 28 USC 1746; and *Owens* 864 F.3d at 785. Special Masters may liberally construe the Federal Rules of Evidence and consider "evidence that might not be admissible in a trial, because the Court is not required to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." (Id.) Special Masters are required to "assess defendants' liability and applicable law…guided by the provisions of 28 USC 1065A, this Court's prior findings of fact and conclusion of law, any further orders the Court may enter, and other relevant precedent," and "to proceed with all reasonable diligence." ECF Nos. 140 and 145, citing Fed. R. Civ. P. 53(b)(2).

I have reviewed the docketed materials and prior orders identified in Section V of the Administrative Plan, including the Court's opinions and orders on Defendants' liability for providing material support to specific terrorist groups, and Defendants' liability for the Bellwether Attacks (ECF Nos. 127, 137 and 148), and the transcripts of the evidentiary hearing.

On December 15, 2023 I received evidence, including witness declarations, government records, Plaintiff's Fact Sheet, expert reports, and other documents necessary for analyzing the liability issues and making recommendations on Defendant's liability for providing material support to the terror groups that are believed to have committed Wave 1 Attacks #16, #21, #24 and #35. As the Court did when determining liability for the bellwether attacks, I closely scrutinized the Plaintiff's evidence, including (1) the reports and declarations of the plaintiff's experts; (2) the declarations of the surviving victims of each attack; (3) documentary evidence from various government sources; (4) the proposed findings of fact and law offered in plaintiff's motion for default judgment, and (5) the cases cited by the Court (and others) finding liability (or not) to Iran and the relevant instrumentalities for its involvement in terrorism. ECF 137, at 7-8 (setting forth the Court's approach to determining liability for the bellwether attacks.)

Finally, I have strictly adhered to the Court's established "general approach to liability determinations" and the evidentiary standard endorsed by the Court in the Bellwether process to reach the factual findings and legal conclusions below. (See id. at 6-8).

## II.    INCORPORATION OF THE COURT'S PRIOR FINDINGS

Before appointing special masters, this Court found that service of process upon the defendants was proper under Section 1608 of the FSIA. The Court then reviewed the evidence and found it also had subject matter jurisdiction over claims brought under Section 1605A, the FSIA's state-sponsored terrorism exception to sovereign immunity. See ECF Nos. 126, 127 and 136. When deciding so, the Court concluded:

- Plaintiff only seeks monetary damages and no other form of relief against Iran, its instrumentalities, and subdivisions for personal injury or death. (ECF No. 137, at 3-4, citing Second Am. Compl., at 750-758; and 28 USC 1605(A)(c);

- Iran was designated a state sponsor of terrorism at the time of each attack and when the lawsuit was filed (see Op. & Order, ECF No. 126);

- Claimants or victims were, at the time of the relevant attack, U.S. nationals, members of the U.S. Armed Forces, or qualifying employees or contractors of the U.S. Government (id.);[2]

- The FSIA terrorism exception applies to each defendant, except NIOC, for providing material support to the subject terrorist groups. (Op & Order, ECF No. 127; Op & Order ECF No. 136); and

- Defendants' material support to the subject terrorist groups, bolstered their ability to commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 – 2011. (Id.)

## III. ATTACK #36—OCTOBER 1, 2003 ROCKET PROPELLED GRENADE ATTACK IN SALAH AD-DIN, IRAQ

**FACTS**: On October 1, 2003, Command Sergeant Major James D. Blankenbecler U.S. Army ("CSM Blankenbecler") was part of a high mobility multi-wheeled vehicle ("HMMWV") convoy traveling from a U.S. base in Taji, Iraq to Forward Operating Base ("FOB") Warhorse near the town of Samarra in the Salahaddin Provence of Iraq. (PX7406, Army CID Report; PX7450, WES Rpt.) While the convoy was enroute it was ambushed with RPGs from the side of the highway at the convoy. (Id.) CSM Blackenbecler, a passenger in the rear vehicle of the convoy, was hit directly by the RPG. (Id.) The convoy was traveling at *60 – 65 mph* when hit. (Id.) Attempts were made to revive CSM Blankenbecler, but his injuries were severe and included: multiple fractures to the pelvis, a large complex exit wound to his left thigh, and multiple metallic fragments recovered from his pelvis and upper thigh. CSM Blankenbecler died from his injuries. (Id.)

---

[2] The Court's ruling related to §1605A's standing or "status" requirement was limited to those plaintiffs who provided the Court with proof of the status that the relevant "claimant or victim was, at the time of the act, a U.S. national, member of the U.S. armed forces, or qualifying employee or contractor of the U.S. government." See 28 U.S.C. § 1605A(a)(2)(A)(ii). Therefore, in reviewing the evidence, the application of this ruling to a particular attack or plaintiff will be confirmed, or further determined for the Court.

1. **PLAINTIFFS' EVIDENCE IS SUFFICIENT TO ATTRIBUTE ATTACK #36 TO AAI/AAS**

Plaintiffs have submitted evidence, including an expert analysis of Attack #36 conducted by COL Walters, USA (Ret.); CW4 Evans, USA (Ret.); and CW3 Sultzer, USA (Ret.) These experts reviewed the available evidence, eyewitness accounts, and other general information about operations conducted in the area, before concluding with reasonable degree of certainty that this attack was conducted by an Ansar al Islam (AAI) cell operating in the area. (PX7450, WES Rpt., p. 2). The experts' conclusion is based on the geographic location of the attack; the timing, sophistication, and coordination required to perform such an attack; the weapons proficiency necessary to hit a fast moving convoy; the signature weapon utilized (RPGs); and other unique factors involved in the tactics, techniques, and procedures used. (See id., at p. 8).

First, the geographic location and time support that the Sunni terrorist group AAI committed this attack. Beginning on August 7, 2003 (a few months before this attack), U.S. military leaders expressed concern over AAI and their increasing attacks after AAI rocketed the Jordanian Embassy in Baghdad, killing several people. (Id., at p. 7). This attack was important, as it highlighted that AAI had spread from its base in the Kurdish region of northern Iraq to the south and west of the country. AAI was known to consolidate and organize in an area of Iraq called the Sunni Triangle, which enveloped the town of Samarra. Terrorist attacks against U.S. forces near the town of Samarra were frequently associated with AAI. Samarra likely served as a safehaven and key hub for AAI and other terrorist networks, given its location between Tikrit and Baghdad. (Id. at p. 5-7). Samarra is where the murder of CSM Blankenbecler occurred. (See PX7406, Army CID Report, at p. 18 ("we were about 500 meters south of the [Samarra] bridge crossing the Tigress [sic] River when I heard an explosion[.]")

Second, the tactics, techniques, and procedures ("TTPs") used in this attack further support that AAI is responsible for it. This attack demonstrated highly sophisticated tactics and techniques frequently associated with AAI. Based on the U.S. Army Criminal Investigation Command, the attack was setup along a main road before a bridge creating a choke point for traffic, the insurgents fired at the lead vehicle of the convoy to stop/slow the movement of the other vehicles and allowing a large window of time for enemy forces to destroy more HMMWVs and kill U.S. soldiers in the convoy. (Id.) The skill necessary to target and successfully hit a vehicle traveling at high speeds with RPGs fired from the side of the road at night indicates significant training, planning, and preparation for the attack. (Id.) (sworn statement of witness stating that the convoy left Taji at 18:10hrs, it was driving 60-70 mph to "beat the darkness," and the attack occurred "45 minutes after we left Taji."); *cf* Id., at p. 12 ("1920hrs"). A witness reported to investigators that, prior to the blasts, someone in the convoy "saw a white pick-up truck sitting off to the distance in a field, flashing its lights as we drove by." (Id., p. 15). The AAI terror cell fired 4-5 RPG rounds at the convoy with at least one round making a direct strike near battery box (the center) of the last vehicle, where CSM Blankenbecler was riding. (Id., p. 14). Moreover, the attackers were able to escape the area before Coalition Forces could locate/capture them, suggesting they carefully planned the ambush and evasive maneuvers from the scene. (PX7450, WES Rpt., p. 4-5).

Plaintiffs' experts further found that the Defendants were providing significant support to AAI at the time of Attack #36. During this period, Iran was encouraging attacks on U.S. Forces engaged in vehicle convoys as part of Iran's larger strategic goals. Iran supported AAI (and other groups) in Iraq by providing training, weapons, and save havens for insurgents. (Id., p. 8; see also PX5, DGR Report Sunni Groups, p. 27-42). Further, following a near-total defeat by Coalition Forces in March 2003, AAI escaped to camps inside Iran, to reorganize and eventually re-infiltrate

cities in Iraq later that year. By allowing AAI to reconsolidate its power and train in Iran, Iran guaranteed the survival of AAI, allowing it to regenerate and return to Iraq and continue attacking U.S. Coalition Forces. (Id.).

The conclusions of plaintiffs' experts are corroborated by multiple contemporaneous media and government reports. For example, exhibit PX666, an article published in the journal *The Middle Easter Quarterly* reported, "Months before the Iraq war of 2003, *The New Yorker*, *Christian Science Monitor*, and the *New York Times* reported on Ansar al Islam." (PX666, "Ansar al-Islam: Back in Iraq," *The Middle East Qrtly*, Winter 2004, p. 41-50). U.S. Officials considered AAI a primary threat prior to the entry of the Coalition into Iraq and concentrated its early 2003 security operations on neutralizing the group. (Id.) However, the group was able to seek shelter in Iran and regroup. (Id.) By August 2003, U.S. Officials were reporting that the group was working with al Qaeda to infiltrate Iraq and was involved in attacks against U.S. forces in Fallujah, Tikrit, and Baghdad, and reported that Ansar al-Islam and al-Qaida were working cooperatively. (Id.; see also PX416, DOD Press Briefing (30 Dec. 2003); PX328, DOD Press Briefing (26 Feb. 2004); PX415, "Life Behind Enemy Lines," *Time* (Dec. 15, 2003).

In addition to above, during the three weeks following this attack, AAI posted claims of responsibility on its official webpage for at least six attacks involving similar TTPs in the same area, including one describing an attack similar to (if not the same) the attack on CSM Blankenbecler's convoy. (See PX7407, Translated AAI CoRs (Oct. 2003), at p. 22-23; see also, PX7450, WES Rpt., p. 7-8).

After reviewing the evidence and materials submitted, I find the evidence compelling and the experts' conclusions credible and well supported. I recommend the Court conclude that AAS/AAI committed Attack #36.

2.   **PERSONAL INJURIES/DEATHS THAT OCCURRED FROM ATTACK #36**

CSM Blankenbecler's autopsy report says "This 40-year-old male active duty U.S. Army died of a ballistic wound of the pelvis, causing extensive soft tissue destruction, including the loss of the major vascular structures of the pelvis and comminuted fractures of the pelvis and bilateral femurs. (PX7404, p. 2). The manner of death is a homicide." (Id.). CSM Blankenbecler was the highest-ranking enlisted Soldier killed in Iraq. He had only been in Iraq for 18 days prior to his murder. (PX7400, Blankenbecler Fact Sheet, p. 2). Other Army personnel were injured in the attack. (See PX7406, Army CID Report, at p. 14).

3.   **RELATIONSHIP OF THE VICTIMS OF ATTACK #36 TO THE PLAINTIFFS**

The direct victim of Wave 2 Attack #36 is CSM Blankenbecler (deceased) whose estate and legal representative Linnie Alma Blankenbecler are plaintiffs. Mrs. Blankenbecler brings claims individually as a spouse as well as on behalf of her late husband's estate (and all heirs thereof). Other family member plaintiffs include CSM Blankenbecler's daughter Amanda Marie Villalbos, his son Joseph Alexander Morales, and his daughter Jessica Marie Scaduto. (See ECF No. 100, 2nd Amend. Compl., at ¶¶ 5493-5503). All are U.S. nationals. (See ECF No. 81-2, at p. 50 summarizing Ex. 470 (proof of military service/nationality of "The James David Blankenbecler Family.")

4.   **ATTACK #36 INVOLVED AAI/AAS, A TERROR GROUP RECEIVING MATERIAL SUPPORT FROM THE DEFENDANTS**

The Court "has already found the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups which bolstered their ability to foreseeably commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 to 2011." ECF No. 137, at 3; see also ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to Ansar al Islam between 2003 and 2011 and "that

terrorist attacks involving these groups in Iraq during the relevant time period of 2003-2011 were reasonably foreseeable and a natural consequence of that material support.")

## 5. ATTACK #36 INVOLVED REQUISITE ACT LISTED IN 28 USC §1605A(a)(1)

Based on the evidence of the killing of CSM Blackenbecler in this attack, and the Court's prior orders, I recommend the Court conclude this attack included an act of "extrajudicial killing". (See 28 USC § 1605(A); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024)).

## 6. DEFENDANTS PROVISION OF MATERIAL SUPPORT WAS A PROXIMATE CAUSE OF ATTACK #36

This Court has already determined that Defendants Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran provided material support to AAI between 2003–2011, and this support was the proximate cause for the attacks conducted by AAI in Iraq during that time. (See ECF No. 127; ECF No. 136). Plaintiffs have sufficiently established that AAI committed this attack and, therefore, Defendants Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran are liable.

## IV. ATTACK #38—JUNE 16, 2004 ROCKET ATTACK ON POST EXCHANGE AT LSA ANACONDA, BALAD, IRAQ

**FACTS**: Sergeant First Class Ernesto Sierra ("SFC Sierra") and Specialist Ronald A. Eaton ("SPC Eaton") were assigned to units supporting Multi-National Division North. On June 16, 2004, SFC Sierra and SPC Eaton separately visited the PX on LSA Anaconda near Balad, Iraq in the Salah ad Din Province (sometimes spelled Saladin). At approximately 5:30 pm local time, when the PX was full of patrons stopping by the store after work, terrorists fired several rockets into the PX, killing three soldiers and injuring twenty-three others. (PX7703, Decl. of Ernesto Sierra, ¶¶ h-I; see also PX7700, Ops Report (16 Jun. 2004). The store immediately filled with

smoke and the smell of gunpowder as shoppers struggled to get out. (Id.) A large hole was blown

into the front wall of the PX. All of the windows were shattered, and part of the roof caved in. (Id.)

One of the rockets landed where SFC Sierra and SPC Eaton were standing, causing injuries

to both. SFC Sierra suffered a Traumatic Brain Injury (TBI) and Post Traumatic Stress Disorder

(PTSD) as a result of the attack. (PX7703, Decl. of Ernesto Sierra, ¶¶ l-n). SPC Eaton was knocked

approximately 5-10 feet forward from the blast to the ground. He received wounds to his liver,

heart, right arm, knee, and lower back along with a TBI and PTSD. (PX7601, Decl. of R. Eaton,

at ¶ l); PX7607, Purple Heart (Eaton)). SPC Eaton was immediately evacuated to the Combat

Support Hospital in Balad. Later he was evacuated to Landstuhl Medical Center in Germany, and

then to Walter Reed Military Medical Center for follow-up surgeries. (PX7601, Decl. of R. Eaton,

¶¶ h-m).

An investigation into the attack revealed that the rockets fired against LSA Anaconda and

the PX were 107mm rockets and 127mm rockets. (PX7602, Ops Report). Following the attack, the

local artillery unit conducted a counter-fire mission against the likely point of origin for the rocket

attack. (PX7603, IDF Report, at p. 1). Additionally, a U. S. armor unit sent a patrol to that area

where they detained eight local nationals that tested positive for explosives. (Id.)

## 1. PLAINTIFFS' EVIDENCE IS SUFFICIENT TO ATTRIBUTE ATTACK #38 TO AQI/AAI

Plaintiffs' experts have attributed the attack to Abu Musab al-Zarqawi's Jamat al-Tawhid

wa'al Jihad (JTJ/AQI)) or Ansar al Islam (AAI). **(**PX7650, WES Report).[3] Both groups were

---

[3] It is important to note that Zarqawi's organization was known by several names over the course of U.S. involvement in Iraq, but now is commonly referred to as al-Qaeda in Iraq (AQI). It is generally accepted that the origin of Jamat-al-Tawhid wa'al Jihad (JTJ) started at the beginning of 2004 until October 2004, when they adopted the AQI moniker. For purposes of this attack, occurring in the middle of the name transition, Zarqawi's organization will be referred to as JTJ/AQI.

receiving support from Defendants and operating in the area at the time of the attack. (<u>Id</u>.) The experts' conclusion is based on and supported by the geographic location, time period of the attack, and the tactics, techniques, and procedures used. (<u>Id.</u>, at p. 9-10)

First, the geographic location and time period supports that this attack was committed by JTJ/AQI or AAI. At the time of the attack, elements of both JTJ/AQI and AAI had moved into the Salah ad-Din Province following their losses to Coalition forces in late 2003. (Id.) Military intelligence reports and press briefings establish that throughout 2003 and 2004, JTJ/AQI and AAI often worked in concert with each other, conducting attacks against Coalition forces near Balad. <u>See, e.g.</u>, PX418, MNC-I C2X, Initial Intelligence Report (IIR) 161558Z (December 2004). Further, around four months after this attack, intelligence revealed that Zarqawi held a meeting in Balad. (Id.) This meeting also supports that the area of Balad was considered a safe haven by Zarqawi, and the terrorist groups he led, as he was comfortable traveling throughout the area. (PX7650, WES Report, at p.7).

Second, the tactics, target selection, techniques, and procedures used in this attack further support that JTJ/AQI and/or AAI was responsible. (<u>Id.</u>) This attack demonstrated highly sophisticated tactics and techniques frequently associated with Zarqawi's organizations (JTJ/AQI) and AAI. (<u>Id.</u>, p. 9) Not only was training and weapon familiarity needed to carry out a rocket attack from ten kilometers away, but funding was also necessary for the cost of weaponry used. (<u>Id.</u>) The target selected, the PX during optimal store crowding, was designed to shock and intimidate U.S. Forces knowing they could be attacked on base while performing routine functions. (<u>Id.</u>)

Six months before the rocket attack at the PX at LSA Anaconda, Coalition forces conducted a raid against a suspected IED manufacturer near Samarra (about 35 miles away from Balad),

where a large cache of weapons, bomb materials and al Qaeda literature was found. Further, the attack on SFC Sierra and SPC Eaton mirrored other attacks in the area that used rockets fired from distant locations and guerilla hit-and-run type tactics to avoid capture. (PX416, DOD Press Briefing (30 Dec. 2003).

Furthermore, Plaintiffs expert finds that Iran supported JTJ/AQI and AAI in the attack against SFC Sierra and SPC Eaton. (Id., at p. 9-10). At the time of this attack, Iran provided support to Zarqawi and AAI as attacks such as this were part of Iran's larger strategic goals in supporting insurgent groups in Iraq by providing training, weapons, and save havens for insurgents. Further, it is known that in late 2003 following an initial attack and defeat by Coalition Forces, AAI withdrew to camps inside Iran, to reorganize and eventually re-occupy cities in Iraq. By allowing AAI to reconsolidate its power in Iran, Iran aided in the survival of AAI and Zarqawi's organizations to ultimately continue attacking U.S. Coalition Forces. (Id., p. 8-10).

*The U.S. Army in the Iraq War, Volume I* (PX241*)* also described the area where this attack occurred as a hub for AAI and AQI. (Id., p. 174). This official history further described the nature of attacks against U.S. Forces in Salah ad-Din and which match the type and tactics of Attack #38. (Id., p. 177). In this case the PX at LSA Anaconda was attacked by rockets launched from 10 kilometers, a display of significant skill, planning and TTPs associated with AQI/AAI in the area at the time. (PX7650, WES Rpt., p. 7-8).

After reviewing the evidence and materials submitted, I find the evidence compelling and the experts' conclusions credible and well supported. I recommend the Court conclude that an Iranian-supported terrorist group (AQI and/or AAS/AAI) committed Attack #36.

2.  **PERSONAL INJURIES/DEATHS THAT OCCURRED FROM ATTACK #38.**

The rocket attack on the PX at LSA Anaconda killed three U.S. Army personnel: Major Paul Syverson; SPC Jeremy Dimaranan; and SGT Arthur Mastrapa. (See GlobalSecurity.org listing of U.S. Casualties in Iraq June 2004). The attack also wounded twenty-nine others including SFC Sierra and SPC Eaton (See PX7602, Ops Report ("US KIA; 27 US WIA AND 2 NEU INJ").

3.  **RELATIONSHIP OF THE VICTIMS OF ATTACK #38 TO THE PLAINTIFFS**

The plaintiffs include SFC Sierra and SPC Eaton, the direct victims of the attack. (See ECF No. 100, 2nd Amend. Compl., at ¶¶ 4650-4667). Additional plaintiffs include the immediate family members of SFC Sierra – Maria C Sierra (spouse); Kristina L Sierra (daughter); and Cassandra Sierra (daughter). (Id., ¶¶ 4664-4667). All are U.S. nationals. (See ECF No. 81-2, at p. 42 summarizing Ex. 396 (proof of military service/nationality of "The Ernesto Sierra Family"); and p. 41-41 summarizing Ex. 395 (proof of nationality for "Ronald Allen Eaton.")

4.  **ATTACK #38 INVOLVED AQI/AAI, TERROR GROUPS RECEIVING MATERIAL SUPPORT FROM THE DEFENDANTS**

The Court "has already found the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups which bolstered their ability to foreseeably commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 to 2011." ECF No. 137, at 3; see also ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to al Qaeda and al Qaeda in Iraq (aka the Zarqawi organization) and Ansar al Islam between 2003 and 2011 and "that terrorist attacks involving these groups in Iraq during the relevant time period of 2003-2011 were reasonably foreseeable and a natural consequence of that material support.")

**5.   ATTACK #38 INVOLVED REQUISITE ACT LISTED IN 28 USC §1605A(a)(1)**

Based on the evidence submitted for this attack, which included three deaths resulting from the attack on the PX at LSA Anaconda, and the Court's prior orders, I recommend the Court conclude this attack included an act of "extrajudicial killing". (See 28 USC § 1605(A); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024)).

**6.   DEFENDANTS PROVISION OF MATERIAL SUPPORT TO AQI WAS A PROXIMATE CAUSE OF THE ATTACK**

This Court has already determined that Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran provided material support to AQI and AAI between 2003–2011, and this support was the proximate cause for the attacks conducted by AQI and AAI during that time. (See ECF No. 127; ECF No. 136). Plaintiff has sufficiently established that AQI and/or AAI committed this attack and, therefore, Defendants Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran are liable.

**V.   ATTACK #46—JUNE 5, 2005 COMPLEX IED ATTACK IN EAST RASHEED BAGHDAD, IRAQ**

**FACTS**: On June 5, 2005, Staff Sergeant Justin Vasquez ("SSG Vasquez") was serving as a Squad Leader with L Troop, 3rd Squadron, 3rd Cavalry Regiment (L/3/3 CR) in support of Multi-National Division Baghdad. He was leading a convoy traveling along a route in southern Baghdad in an up-armored M1114 HMMWV along with other Light Medium Tactical Vehicles ("LMTV"). (PX8750, WES Rpt., p.1; and PX8715, Vasquez Plaintiff Fact Sheet). Their mission included meeting with local Iraqi leaders. The attack began when two IEDs (one of which was a "VBIED") struck a convoy returning from a meeting with local Iraq leaders. (PX8709, Decl. of F. Adams, ¶ f). This caused the convoy to stop movement. (Id.) SSG Vasquez and his crew responded to provide security for immobilized convoy. (Id., ¶ g). Upon arrival, SSG Vasquez and his team exited their vehicle and began to clear the area. (Id.) As they moved through the scene, the attackers

remotely triggered a third IED, killing SSG Vasquez and two other soldiers. (Id.; see also PX8700, Ops Report (5 Jun. 2005). Two personnel died at the scene, including SSG Vasquez. (Id., and PX8709, Decl. F. Adams, ¶ h). Their wounds were described as "horrific" by eyewitness and team Leader Capt Adams. (Id.)

Following three IED detonations in sequence, Iraqi Army Soldiers observed several military aged males, assessed to be responsible for the attacks, run into a nearby Sunni Mosque known to be a friendly refuge for terrorists. (PX8700, Ops Report). These terrorists likely planned this attack knowing they could use the mosque to further their escape opportunity, and that U.S. Forces would be hesitant to enter the mosque. (Id.; and PX8706, WES Rpt., p. 2-4). The unit commander requested permission to enter the mosque, but by the time they entered the mosque enemy forces were not on site. (Id.) SSG Vasquez cause of death was a result of the blunt force trauma from the IED attack against his vehicle. (PX8701, Autopsy Report). SSG Vasquez was posthumously awarded the Purple Heart and the Bronze Star for his actions on that day (PX8705, Purple Heart; PX8706, Bronze Star).

## 1.   PLAINTIFFS' EVIDENCE IS SUFFICIENT TO ATTRIBUTE ATTACK #46 TO AQI

Plaintiff submitted evidence including an expert analysis of Attack #46 conducted by COL Walters, USA (Ret.); CW4 Evans, USA (Ret.); and CW3 Sultzer, USA (Ret.). These experts reviewed all available evidence, eyewitness accounts, and other general information about operations conducted in the area, before concluding with reasonable degree of certainty that this attack was conducted by an al-Qaeda in Iraq (AQI) cell operating in the area. (PX8750, WES Rpt., p. 8-10). The experts' conclusion is based on and supported by the geographic location, time period of the attack, and the tactics, techniques, and procedures used.

The experts found that the attack that killed SSG Vasquez occurred near Mahmudiyah, an area that the U.S. military considered a "safe haven and transit point" for Zarqawi's fighters to move into Baghdad and Fallujah, as well as "staging attacks against MNF convoys." (PX880, 1st Cav. Div. ACE Daily INTSUM, (23 Sept. 04). Similarly, a report from the Institute of the Study of War concluded that the area in which this attack occurred was "controlled" by AQI. (PX669, "Backgrounder #1: Al Qaeda in Iraq Attacks on Bridges," Iraq Report, ISW (June 10, 2007), p. 1-2. I find it is reasonable to conclude that AQI associated cells conducted Attack #46 to protect this region in order to facilitate the movement of fighters, weapons, and equipment into Baghdad City from the north. (See PX8750, WES Rpt., p. 5).

The TTPs used in this attack also indicate that a dominant group skilled in sophisticated ambush tactics committed it. The experts found that:

> This skill was highlighted in the operation where SSG Vasquez's convoy was ambushed with three IEDs. The enemy cell initiated the first two IEDs against the slower, less secure LMTVs, causing the convoy to stop. Once SSG Vasquez moved forward in his armored M1114 HMMWV, the cell detonated the third IED, effectively killing and injuring the other members, including SSG Vasquez. Next, the enemy cell fled to a nearby Sunni Mosque for protection, knowing that the Coalition Force would not enter without getting permission – thus, giving the enemy time to escape and avoid capture.

(WES Rpt., p. 8)

Supporting this conclusion is another declassified intelligence report that describes AQI's operatives as "skilled at complex attacks... to include large-scale directional charging and mixing of explosive compositions to overcome force protection measures or target construction. These attacks, moreover, have been characterized by meticulous planning and pre-operational surveillance and intelligence gathering." (See PX932, CJTF-7 Red Cell: A Red Cell Political Military Assessment, "Future Al-Qaida and Zarqawi Network Operations in Iraq," (3 Feb 2004). Attack #46 seems to typify this sophisticated type of multi-stage attack against Coalition Forces.

16

This attack required the attackers to have knowledge of convoy routes, coalition response procedures, as well as the operational discipline to surveil the scene and wait to trigger the third IED by remote control when SSG Vasquez and his comrades were most likely to be killed. (WES Rpt., p. 9). Thus, these experts conclude an Al-Qaeda in Iraq (AQI) cell operating in the rural southern area of the Baghdad Governorate, Iraq, committed Attack #46.

After reviewing the evidence and materials submitted, I find the evidence compelling and the experts' conclusions credible and well supported. I recommend the Court conclude that AQI committed Attack #46.

### 2.   PERSONAL INJURIES/DEATHS OCCURRING FROM ATTACK #46

This multiple-staged complex IED attack killed three U.S. Army personnel including SSG Vasquez; SPC Poelman; and PFC Ulbrich. (PX8709, Decl. F. Adams, ¶ h; see also PX8700, Ops Report ("3X US KIA")).

### 3.   RELATIONSHIP OF THE VICTIMS OF ATTACK #46 TO THE PLAINTIFFS

The direct victim of Wave 2 Attack #46 is Justin Lee Vasquez (deceased) whose estate and legal representative Riley Nicole Vasquez are plaintiffs. (See ECF No. 100, 2nd Amend. Compl., at ¶¶ 3208-3217). Mrs. Vasquez brings claims individually as a spouse as well as on behalf of her late husband's estate (and all heirs thereof). (Id.) Other family member plaintiffs include SSG Vasquez's siblings, Jennifer L. Arebalo and Janneke L. Eikenberg. (Id.) All Vasquez family members are U.S. Nationals. (See ECF No. 81-2, at p. 28 summarizing Ex. 262 (proof of military service/nationality of "The Justin lee Vasquez Family.")

### 4.   ATTACK #46 INVOLVED AQI, A TERROR GROUP RECEIVING MATERIAL SUPPORT FROM THE DEFENDANTS

The Court "has already found the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups which bolstered their

ability to foreseeably commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 to 2011." ECF No. 137, at 3; see also ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to al Qaeda and al Qaeda in Iraq (aka the Zarqawi organization) between 2003 and 2011 and "that terrorist attacks involving these groups in Iraq during the relevant time period of 2003-2011 were reasonably foreseeable and a natural consequence of that material support.")

### 5.   ATTACK #46 INVOLVED REQUISITE ACT LISTED IN 28 USC §1605A(a)(1)

Based on the evidence submitted for this attack, and the Court's prior orders, I recommend the Court conclude this attack included an act of "extrajudicial killing." This IED attack killed three U.S. Army personnel. (See 28 USC § 1605(A); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024)).

### 6.   DEFENDANTS PROVISION OF MATERIAL SUPPORT WAS A PROXIMATE CAUSE OF THE ATTACK

This Court has already determined that Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran provided material support to AQI between 2003–2011, and this support was the proximate cause for the attacks conducted by AQI in Iraq during that time. (See ECF No. 127; ECF No. 136). Plaintiffs have sufficiently established that AQI committed this attack and, therefore, Defendants Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran are liable.

## VI.  ATTACK #57—JUNE 27, 2006 IED ATTACK IN JURF AL-SAKHAR, IRAQ

**FACTS:** On June 27, 2006, Specialist Jeremy Jones ("SPC Jones") was killed while on a dismounted patrol near Jurf al-Sahkar when he stepped on a pressure-plate and triggered an IED. (PX10223, Ops Report (26 Jun. 2006); PX10221, Jones Fact Sheet). Prior to the explosion, the patrol was investigating terrorist activity on foot and was walking off the road when it came to a canal that diverted the patrol back onto the road. SPC Jones was second in line for the patrol as it

used the road to cross the canal when he stepped on a concealed pressure plate IED buried in the middle of the road. (PX10223, IED Report (27 Jun. 2006), p. 1-2). The explosion killed him instantly. (Id.; PX10203, Casualty Report). SPC Jones posthumously received the Purple Heart and the Bronze Star for this attack. (PX10202, Purple Heart; PX10215, Bronze Star).

### 1.   PLAINTIFFS' EVIDENCE IS SUFFICIENT TO ATTRIBUTE ATTACK #57 TO AQI

Plaintiffs' submitted evidence, including an expert analysis of Attack #57 conducted and submitted by Michael Pregent USA (Ret). (See PX10220, Pregent Rpt.). This expert reviewed all available evidence, eyewitness accounts, and other general information about operations conducted in the area, before concluding with reasonable degree of certainty that AQI conducted this attack. (Id., p. 4) The expert's conclusion that AQI was involved is driven by the facts that the area in which it occurred was dominated by AQI at the time, and the attack involved a specific type of IED used by AQI in the area at the time. (Id.)

Mr. Pregent reached his expert conclusion based upon multiple sources that support his findings. First, the U.S. Army Center of Military History published a map showing areas where AQI had primacy and control as of December 2006. The map clearly shows the location of this attack within AQI's control. (See PX241, US Army In Iraq Vol. 1, at p. 579-580).

Additionally, Mr. Pregent considered open source event reporting and intelligence assessments for an area encompassing Jurf al-Sahkar for 2006. These sources establish that al-Sahkar was "saturated with AQI members who were well supplied with Iranian munitions and well trained in their use." (PX10220, Pregent Rpt., p. 2). Jurf al-Sahkar is a town located near the Euphrates River to the South of Baghdad. "This area was part of the Sunni 'Triangle of Death' in the Babil province, called that because of the intense fighting against" (Id., p. 2 citing PX669, AQI*#1: Al Qaeda in Iraq Attacks on Bridges*," Iraq Report, ISW (June 10, 2007).

U.S. intelligence has also established that Jurf al-Sahkar was an AQI stronghold from 2006 up to and including 2014, when the Islamic State of Iraq (ISIS, the eventual successor to AQI) was occupying it as a strategic location. (PX1020, ISIS in the Southwest Baghdad Belts, ISW (2014)). This is supported by available SigAct reporting from around the area and time of the attack. This includes reports of numerous caches with IED-making materials, suicide vests, and one with 2000 CDs labeled "How to Kill Americans." (PX10220, Pregent Rpt., p. 3). Caches discovered before and after the attack contained a pressure plate triggering mechanisms, like that used in the attack which killed SPC Jones. (Id.) During the same period that these caches were being uncovered there were multiple reports of attacks using hallmark AQI TTPs, including suicide attacks, SVBIED, and VBIEDs, as well as reporting of the detentions of known AQI members, including at least one AQI leader in Jurf al-Sahkar. (Id.; see also PX731, The Surge: A Military History (2009), at p 5). Eleven days before Attack #57, on June 16, 2006, AQI killed three U.S. soldiers at a vehicle checkpoint in the area near the Euphrates River. Two of their bodies were recovered mutilated and booby-trapped just several miles north of the location of Attack #57. AQI's newly minted leader, Abu Ayyub al-Masri announced that he killed the soldiers himself. (PX10220, Pregent Report, p. 3, citing CNN Report, "US Soldiers' bodies mutilated, booby-trapped," (21 Jun, 2006)). Finally, intelligence reporting describing AQI's movement of weapons through the area noted that AQI used little security for its supply lines in this area as the group considered the area a safehaven. (Id.)

Mr. Pregent also conducted a comparative search analysis of reports related to potential Shia-militia activity in the area, which revealed no reports in Jurf al-Sahkar, and found only three reports over three years (2005-2007) of Shia militia activity in Musayib, a different town on the edge of Triangle of Death for which Shia and Sunni groups contested control. (Id.) This lack of

additional reporting further supports AQI's operational dominance and control of Jurf al-Sahkar on June 27, 2006.

As for TTPs, the munitions and advance tactics employed in this attack also support the conclusion that AQI committed Attack #57. (PX10220, Pregent Rpt., p. 3) Specifically, this attack utilized a 75mm artillery round in conjunction with a "pressure-plate" triggering mechanism, a type of IED associated with AQI in this area at the time. (Id., p. 1-2). For an IED of this type to be undetected, they are emplaced and concealed so that its victim is unaware of its existence, and who then triggers it when the person or vehicle hits the plate. (Id.) The amount of pressure needed to trigger the IED can be changed based on the target they want to hit. For example, it may be set to a very heavy weight to make sure that it only triggers when a heavy military vehicle goes across it. The plaintiffs' expert, the use of this kind of IED in Attack #57 indicates that AQI had a clear U.S. intelligence picture, and the attack was carefully planned and executed. (Id.) The fact that this pressure plate was emplaced "in the middle of road" and set so that it could also be triggered by the weight of a person, required actionable knowledge of the use of dismounted patrols. Extensive planning would have been required to bury the IED while it was calibrated to the pressure, permitting detonation for foot traffic and in a position that would increase the likelihood of contact with a foot patrol as it diverted to cross the canal. (Id.)

In further support of the complexity and requisite training involved with this attack, Plaintiffs' evidence also included an expert report prepared by COL B. Ray Fitzgerald, USA (Ret). (See PX11, Rpt. & Decl. of Col. B. Ray Fitzgerald (Ret)). This is my first review of the report prepared by this expert. His report provides an overview of the U.S. military's experience in Iraq, specifically, the threats of IEDs, EFPs, IRAMs rockets, mortars, and other weapons used against U.S. forces; and the methodology by which Coalition Forces gathered intelligence and determined

the extent of the malign Iranian influence in Iraq. (Id., p. 1). The report provides the details of COL Fitzgerald's extensive credentials and experience, which I find ample to qualify him as an expert in the areas upon which he offers his opinions. (See Fed. R. Evid. 702). COL Fitzgerald retired from the Army after a thirty-year career; was appointed by the U.S. Department of State to the Senior Executive Service; and performed duties in Iraq and Afghanistan as strategic advisor to Joint Special Operations Command (JSOC) leaders General McChrystal and Admiral McRaven. He has significant expertise in the use of IEDs in Iraq. (Id., p 1-3).

COL Fitzgerald's report provides data from Iraq that shows that the vast majority of IED attacks were unsuccessful. (PX11, Fitzgerald Rpt., p.6-7). According to COL Fitzgerald, for an IED to be effective (i.e. "cause casualties"), it required training, planning, security and preparation to ensure it was properly emplaced "in the right place, at the right time, in the right way, at the exact aim point – and detonated at exactly the right time." (Id.) Further, IEDs had to be capable of evading counter-IED measures that were taken by Coalition forces. (Id.) The fact this IED was successful speaks to a level of sophistication that would have only been available through an Iranian-supported terrorist group such as AQI. (PX10220, Pregent Rpt., p. 4)

After reviewing the evidence and materials submitted, I find the evidence compelling and the experts' conclusions credible and well supported. I recommend the Court conclude that AQI committed Attack #57.

## 2. PERSONAL INJURIES/DEATHS OCCURRING FROM ATTACK #57

This IED attack killed SPC Jones "instantly." (PX10222, IED Report, p. 1)

## 3. RELATIONSHIP OF THE VICTIMS OF ATTACK #57 TO THE PLAINTIFFS

The direct victim of Wave 2 Attack #57 is SPC Jeremy Scott Jones (deceased) whose estate and legal representative Jennifer Laura Jones are plaintiffs. Mrs. Jones brings claims individually

as a spouse as well as on behalf of her late husband's estate (and all heirs thereof). Other family member plaintiffs include SPC Jones' children Anthony John Jones and M.A.J. (minor child); his parents Joseph Scott Jones and Diane Kathleen Jones; and his sister Abbi Miranda Carreto (f/k/a Abbi Jo Jones). All are U.S. Nationals. (See ECF No. 100, 2nd Amend. Compl., at ¶¶ 5493-5503). All are U.S. nationals. (See ECF No. 81-2, at p. 17 summarizing Ex. 161 (proof of military service/nationality of "The Jeremy Scott Jones Family.")

### 4. ATTACK #57 INVOLVED AQI, A TERROR GROUP RECEIVING MATERIAL SUPPORT FROM THE DEFENDANTS

The Court "has already found the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups which bolstered their ability to foreseeably commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 to 2011." ECF No. 137, at 3; see also ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to al Qaeda and al Qaeda in Iraq (aka the Zarqawi organization) between 2003 and 2011 and "that terrorist attacks involving these groups in Iraq during the relevant time period of 2003-2011 were reasonably foreseeable and a natural consequence of that material support.")

### 5. ATTACK #57 INVOLVED REQUISITE ACT LISTED IN 28 USC §1605(A)(a)(1)

Based on the evidence submitted for this attack, and the Court's prior orders, I recommend the Court conclude this attack included an act of "extrajudicial killing". The IED attack killed SPC Jones, an active duty member of the U.S. Army. (See 28 USC § 1605(A); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024)).

23

**6. DEFENDANTS' PROVISION OF MATERIAL SUPPORT WAS A PROXIMATE CAUSE OF ATTACK #57**

This Court has already determined that Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran provided material support to AQI between 2003–2011, and this support was the proximate cause for the attacks conducted by AQI in Iraq during that time. (See ECF No. 127; ECF No. 136). Plaintiffs have sufficiently established that AQI committed this attack and, therefore, Defendants Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran are liable.

**VII. ATTACK #61—MAY 13, 2007 SUICIDE ATTACK NEAR SAMARRA, IRAQ**

**FACTS:** Sargent Daniel Cowart ("SGT Cowart") was a trained gunner assigned to the 82nd Airborne Division in Baghdad, stationed at FOB Brassfield Mora located ten miles north of Samarra, Iraq. (See PX10615, Cowart Fact Sheet). Their mission was to serve as a Quick Reaction Force (QRF) in the area. On the morning of May 13, 2007, SGT Cowart was traveling in a convoy of four vehicles: an M-1 tank and three HMMWVs. (PX10600, WES Rpt., p.2; see also PX10605, Ops Report (13 May 2007)). The tank was in the lead and SGT Cowart was driving the second vehicle. (Id.) While traveling on the Main Supply Route returning to FOB Brassfield Mora, they encountered another U.S. Army unit conducting a routine clearance mission. (Id.) The U.S. Forces used their vehicles to create a "snap" checkpoint for Iraqi civilian vehicles in the area. 1st Lt Bacevich, SGT Cowart, two other U.S. Army personnel, and an interpreter began checking Iraqi vehicles to determine if there were terrorists in the area. (Id.) While searching vehicles, SGT Cowart noticed a white vehicle that stood out from the rest two because it "was a newer model sedan but was a right-hand drive vehicle not typically found in Iraq." (PX10600, Decl. of D. Cowart, ¶ f). SGT Cowart also noticed that the two occupants, both military-aged men, were not responding to the interpreter's instruction. (Id.)

When instructed to get out of the vehicle the driver attempted to run. (Id.). SGT Cowart attempted to subdue the driver and a struggle ensued. Suddenly "everything went black" for SGT Cowart as the terrorist detonated a suicide vest which killed the wearer of the vest and 1LT Bacevich. (Id., ¶ g). SGT Cowart was knocked unconscious by the blast, which amputated his left leg, shattered his right leg from hip to ankle, ruptured his eardrums, and caused significant burning to his exposed skin. (Id., ¶ i). SGT Cowart was awarded the Nation's second highest award for valor, the Distinguished Service Cross (DSC), for his actions in stopping the suicide bomber. (PX10650, WES Rpt., p. 6). "It was only through SGT Cowart's quick response that the suicide bomber was not able to kill more U.S. Soldiers when he intentionally detonated the concealed explosive vest." (Id.).

Following the suicide vest attack a search of the insurgent vehicle found additional munitions, fragmentary grenades, machine guns, AK-47 rifles, and other contraband. (PX10650, p. 5).

1. **PLAINTIFFS' EVIDENCE IS SUFFICIENT TO ATTRIBUTE ATTACK #61 TO AQI**

Plaintiffs submitted evidence, including an expert analysis of Attack #61 conducted and submitted by COL Walters, USA Ret; CW4 Evans, USA Ret; and CW3 Sultzer, USA Ret. (See PX10650, WES Rpt.). These experts reviewed all available evidence, eyewitness accounts, military contents, explosives, weapons stored in the vehicle used by the suicide bomber, and other general information about operations conducted in the area, before concluding with reasonable degree of certainty that this attack was conducted by an AQI cell operating in the area. (Id., p. 8-9). The expert's conclusion is based on and supported by the geographic location, timing of the attack, and the tactics, techniques, and procedures used.

On January 9, 2008, Major General (MG) Kevin Bergner and MG Mark Hertling, Commander of Multi-National Division-North (MND-N) conducted a news briefing to provide an operation update. MG Hertling commanded the Division that was responsible for the area where SGT Cowart's unit was attacked. MG Hertling outlined the successes his Division had recently achieved against AQI during Operation Iron Harvest. These operations included attacking key AQI strongholds in areas like Salah ad-Din Province where they had recently captured who was responsible for IED and VBIED attacks throughout Iraq. According to Hertling, his forces sought to deny AQI safe havens in the Salah ad-Din area in order to deny their ability to conduct attacks in Baghdad and other key cities. (PX399 DOD News Briefing (8 Jan. 2008)). Naturally, AQI sought to protect these sanctuaries and attacked U.S. and coalition forces in and around these sites like SGT Cowart's unit. (PX10650, WES Rpt, p.5).

This is corroborated by the official history of the U.S. Army in Iraq that describes the disposition of AQI across the country in 2007, specifically, that AQI still possessed freedom of movement in northern Iraq, with concentrations in certain areas like Samarra in the same location as the suicide attack that injured SGT Cowart in May 2007. (PX242, The U.S. Army in the Iraq War, Vol. 2, at p. 294). On April 8, 2008, General David Petraeus, Commander, Multi-National Force-Iraq (MNF-I) testified before the U.S. Senate Armed Services Committee and during which showed a comparison of AQI concentrations from December 2006 and March 2008, showing that AQI still maintained strongholds in areas along the Tigris River north of Baghdad. (PX346, Gen. D. Petraeus, Cmndr. MNF-I, Testimony before the U.S. Sen. Armed Srvcs. Comm., (April 8, 2008)). This area included the region of Salah al-Din province where SGT Cowart's patrol was attacked, indicating the likelihood that AQI had the freedom of maneuver to conduct Attack #61, which also displayed one of AQI's signature TTPs. (PX10650, WES Rpt., p. 6-8).

26

This signature TTP of AQI was the use of a suicide bomber. In a declassified May 2007 Battlefield Update Assessment (BUA), the Multi-National Corps-Iraq Intelligence section published a slide that listed recent examples in northern Iraq where AAS and AQI conducted joint, complex attacks involving "SVESTs, SVBIEDs, and VBIEDs" that indicated Ansar al-Sunna and AQI operations. (PX966, MNC-I BUA Slide Deck, May 2007, at Slide 17). The use of suicide bombers were high-profile type attacks that were unique to AAS and AQ. (PX10650, WES Rpt., p. 6). Similarly, in a now-declassified May 2007 report entitled "Insurgent Group Profile – Al Qaeda In Iraq," the Multi-National Corps Iraq Intelligence section published a detailed paper describing the history, strategy, tactics, and status of AQI in 2007, stating "suicide bombings" were an "integral tactic in its war against the coalition, which reflected the group's obsession with martyrdom." (PX937, MNC-I Insurgent Group Profile: Al Qaeda In Iraq (AQI) (2 May 2007), p. 5)).

After reviewing the evidence and materials submitted, I find the evidence compelling and the experts' conclusions credible and well supported. I recommend the Court conclude that AQI committed Attack #61.

**2.  PERSONAL INJURIES/DEATHS OCCURRING FROM ATTACK #61**

This suicide bomber killed 1LT Bacevich, and injured SPC Cowart. (PX10605, Ops Report, p. 1 ("1 X US DOW")).

**3.  RELATIONSHIP OF THE VICTIMS OF ATTACK #61 TO THE PLAINTIFFS**

SGT Daniel Euzeb Cowart is a plaintiff and a direct victim of Wave 2 Attack #61. Additional plaintiffs include family members of SGT Cowart: Sara Earls-Cowart (spouse); Alyssa Rose Cowart (child); August Sylvia Cowart f/k/a Avalon Sylvia Cowart( child); Clifford Cowart (parent); Theresa Cowart; (parent). (See ECF No. 100, 2nd Amend. Compl., at ¶¶ 1548-1560). All

are U.S. Nationals. (See ECF No. 81-2, at p. 11 summarizing Ex. 98 (proof of military service "Daniel Euzeb Cowart"); and ECF No. 94-1, at p. 1 summarizing Ex. 494 (proof of nationality "The Daniel Euzeb Cowart Family.")

### 4. ATTACK #61 INVOLVED AQI, A TERROR GROUP RECEIVING MATERIAL SUPPORT FROM THE DEFENDANTS

The Court "has already found the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups which bolstered their ability to foreseeably commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 to 2011." ECF No. 137, at 3; see also ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to al Qaeda and al Qaeda in Iraq (aka the Zarqawi organization) between 2003 and 2011 and "that terrorist attacks involving these groups in Iraq during the relevant time period of 2003-2011 were reasonably foreseeable and a natural consequence of that material support."

### 5. ATTACK #61 INVOLVED REQUISITE ACT LISTED IN 28 USC §1605(A)(a)(1)

Based on the evidence submitted for this attack, and the Court's prior orders, I recommend the Court conclude this attack included an act of "extrajudicial killing". The suicide bomber attack killed 1LT Bacevich and severely injured SGT Cowart, both active duty members of the U.S. Army. (See 28 USC § 1605(A); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024)).

### 6. DEFENDANTS' PROVISION OF MATERIAL SUPPORT WAS A PROXIMATE CAUSE OF ATTACK #61

This Court has already determined that Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran provided material support to AQI between 2003–2011, and this support was the proximate cause for the attacks conducted by AQI in Iraq during that time. (See ECF No. 127; ECF No. 136).

Plaintiffs have sufficiently established that AQI committed this attack and, therefore, Defendants Iran, IRGC, MOIS, Bank Markazi, and Bank Melli Iran are liable.

## VIII.   CONCLUSION AND RECOMMENDATION

I recommend the Court find that the documented evidence of record, which includes eyewitness accounts, captured personnel and military equipment, use of signature weapons, sophisticated multi-stage synchronized tactics, terrorist group claims of responsibility, and the detailed recommendations of experts who analyzed all factors involved in each attack, provides strong and credible proof that Defendant is liable for providing material support to proxy terrorist groups (in this case AAI and AQI) that conducted Wave 2 Attacks #36, #38, #47, #56 and #61. These attacks by taken together killed nine U.S. military personnel, and injured hundreds, through coordinated multi-stage attacks using RPGs, IEDs, Suicide Vests, rockets, and small-arms fire. These attacks were performed using signature weapons and tactics of AAI and AQI, supported by the Defendant through funding, training and supplies. This support for the terrorist groups were the proximate cause of these attacks, which occurred on public roads, a PX, and strategically placed explosives employed in areas designed to bring the greatest horror, death and injury.

These selected Wave 2 Attacks were not a matter of a lucky strike performed by a lone wolf terrorist, amateur provocateurs with a grudge, or religious zealots intent on attracting attention. Rather each attack involved trained and resourced killers with the specific intent to use detailed planning, training, sophisticated weapons and precise execution to kill U. S. Forces through acts of terror. In Attack #36, AAI terrorists were able to score a direct hit on a very senior leader traveling in the last vehicle of a convoy traveling at high speeds. In Attack #38, AQI was able to hit the PX entrance at LSA Anaconda from ten kilometers away with a coordinated rocket attack at a time when the PX was conducting prime business. In Attack 46, AQI was able to coordinate a multi-stage IED attack, which included a second IED detonation designed to destroy

responding forces. Attack #57 was another coordinated IED explosion performed by AQI. Attack #61 was a suicide bomber in a vehicle heavily loaded with additional weapons and explosives. Most of these attacks were intended to be much larger in scope but were thwarted through the valor and heroism of U.S. military personnel that sacrificed their own life and limbs to protect the lives of others. Citations from the award of the Distinguished Service Cross, Silver Star, and Bronze Star are evident throughout the records of these attacks and make the point quite clearly that but for the heroism of those identified the terrorist acts included in these specific attacks would have killed and injured far more than they did.

## IX.  REVIEW BY THE DISTRICT COURT

According to this Court's orders governing special masters and implementing the Administrative Plan for this case (ECF No 139, 140 and 145), Plaintiff's may file an objection to, or motion to modify or adopt a finding, report, or recommendation by a special master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide de novo all objections to findings of fact and/or conclusions of law made or recommended by the special master. The Court shall set aside a ruling by a special master on a procedural matter only for an abuse of discretion. Fed. R. Civ. P. R. 53(f)(3), (4) and (5).

Dated: April 15, 2024                      Respectfully submitted,

                                            _/s/ J. Daniel McCarthy—_
                                            J. Daniel McCarthy
                                            Special Master