# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ESTATE OF CHRISTOPHER BROOK FISHBECK, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:18-cv-2248-CRC |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | ) ) | Special Master Ronald V. Swanson |
| Defendants | ) ) | |
| This Document Relates to Plaintiffs: | ) ) | |
| CARL OLIVER; JADE LOREN OLIVER; ESTATE OF BRUCE TERRANCE DURR; LAURA NANITRA WEATHERSBY; PEGGIE ANNE JONES; DAWN MONESICA TRAXLER; WALTER RAY SMITH SR.; ROSIE SMITH; WALTER RAY SMITH JR; JOSS PURDON; SHAWNA PURDON; AUSTIN PURDON; JACOB PURDON; JACOB MILLER; RACHEL AMBER MILLER; LAFONDA MILLER; LYLE MILLER; ZACHARY MILLER; BERNABE MONTEJANO; FAITH MONTEJANO; SARAH MONTEJANO HUMPHREY TERRY LAMONT FLEMING; ESTATE OF IDA LEE FLEMING; ELAINE F. FLEMING; AYRON L. BENNET; KEVIN SNOW; ADRIENNE SNOW; JASMYNE ARQUIETT; N.A.P. SNOW; & G.L.A. SNOW | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

## REPORT AND RECOMMENDATION

## WAVE 2

## ATTACKS NOS. 37, 45, 48, 62, 64

## LIABILITY

## I.   INTRODUCTION [1]

This report and recommendation is offered to assist the Court in the adjudication of civil claims brought by over 1400 plaintiffs related to over 400 attacks in Iraq that targeted US Servicemembers (and others) from 2003 through 2011. To address the breadth and complexity of the case, the Court implemented a case management plan structured in "phases" intended to address threshold jurisdictional and evidentiary issues common to all claims and culminating in the Court's scrutiny of fifteen representative "bellwether" attacks during an extensive three-day hearing in September 2022. ECF Doc. 75. On August 18, 2023, the Court entered an order finding five (of the six) Defendants liable for twelve (of fifteen) bellwether attacks. ECF Doc. 137.

On August 30, 2023, the Court entered an order implementing the administrative plan governing "further proceedings as to the review of evidence and determination of the defendants' liability for non-bellwether attacks at issue in this case." ECF Doc. 140, at 1 ("Administrative Plan"). The Court supplemented the Administrative Plan on September 28, 2023, to add special masters and include the determination of damages-related issues within our duties. See ECF Doc. 145. On December 15, 2023, I was assigned to "consider the remaining issues related to Defendants' liability for providing material support to the groups responsible for committing" non-bellwether Attack #12. See ECF Doc. 140, at § III.

The Court's Administrative Plans specifically directs:

> The Special Master shall make or recommend findings of fact on the following:

---

[1] As provided by Section IV of the Administrative Plan for Non-Bellwether Liability Determinations (See ECF Doc. 140, at 3), Sections I & II of this Report & Recommendation were by Special Masters Ronald Swanson and J. Daniel McCarthy. This coordination was done to ensure common understanding of the Court's prior work and rulings, and to ensure consistency of interpretation and application of the evidentiary standards and analytical framework established by the Court in adjudicating the issues of liability for the Bellwether Attacks.

    a.   The terrorist group(s) involved in the commission of the attack.

    b.   The personal injuries or deaths that occurred from the attack; and

    c.   The relationship of the victims of the attack to the respective plaintiffs.

Using the Court's prior orders and analytical framework, the Special Master shall then make or recommend conclusions of law on the following:

    a.   The attack involved a group(s) that received material support from Defendants.

    b.   The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l ); and

    c.   Defendant's provision of material support was a proximate cause of the attack.

To address these issues, the Court granted me the authority to exercise all powers provided by Federal Rule of Civil Procedure 53(c), including but not limited to compelling production of evidence and receiving testimony by declaration or affidavits in place of live testimony, "as this Court did in the bellwether hearing." See ECF Doc. 140, citing 28 USC § 1746; and Owens, 864 F.3d at 785. I may liberally construe the Federal Rules of Evidence and consider "evidence that might not be admissible in a trial, because the Court is not required to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." Id. I am required to "assess defendants' liability and the applicable law … guided by the provisions of 28 USC § 1605A, this Court's prior findings of fact and conclusions of law, any further orders this Court may enter, and other relevant precedent," and "to proceed with all reasonable diligence." ECF Docs. 140 and 145, citing Fed. R. Civ. P. 53(b)(2).

I have reviewed the docketed materials and prior orders identified in Section V of the Administrative Plan, including the Court's opinions and orders on Defendants' liability for providing material support to specific terrorist groups, and Defendants' liability for the Bellwether Attacks (ECF Docs. 127, 137 & 148), and the transcript of the evidentiary hearing.

On February 13, 2024, I received evidence, including witness declarations, government records, Plaintiff's Fact Sheets, expert reports, and other documents necessary for analyzing the remaining liability issues and my determination of the Defendants' liability for providing material support to the group that committed **non-Bellwether Attacks Nos. 37, 45, 48, 62, & 64**.

As the Court did in determining liability for the bellwether attacks, I closely scrutinized the Plaintiffs' evidence, including (1) the reports and declarations of plaintiffs' experts; (2) the declarations of the surviving victims of the five listed attacks; (3) documentary evidence from various government sources; (4) the proposed findings of fact and law offered in plaintiffs' motion for default judgment, and (5) the cases cited by this Court (and others) finding liability (or not) to Iran and the relevant instrumentalities for its involvement in terrorism. See ECF Doc. 137, at 7-8 (setting forth the Court's approach to determining liability for the bellwether attacks).

Finally, I submit that I have strictly adhered to the Court's established "general approach to liability determinations" and the evidentiary standard endorsed by the Court in the Bellwether process to reach the factual findings and legal conclusions below. See id., at 6-8.

## II.    INCORPORATION OF THE COURT'S PRIOR FINDINGS

Before my appointment, the Court found that service of process was properly effected on the defendants under §1608 of the FSIA. ECF Doc. 55. The Court then reviewed the evidence and found it had subject matter jurisdiction over the claims brought under §1605A, the FSIA's terrorism exemption to sovereign immunity. See ECF Docs. 126, 127, and 136. When doing so, the Court established:

> 1.  Plaintiffs only seek monetary damages and no other form of relief against Iran, its instrumentalities, and subdivisions for personal injury or death. ECF Doc. 137, at 3-4 (citing Second Am. Compl. at 756–58; and 28 U.S.C. § 1605(A)(c));

2. Iran was designated a state sponsor of terrorism at the time of each attack and when the suit was filed. Op. & Order, ECF Doc. 126;

3. Claimants or victims were, at the time of the relevant attack, US nationals, members of the US armed forces, or qualifying employees or contractors of the US government. Id.;[2]

4. The FSIA's terrorism exception applies to each defendant, except NIOC, for providing material support to the subject terrorist groups. Op. & Order, CF Doc. 127; Op. & Order, ECF Doc. 136; and

5. Defendants' material support to the subject terrorist groups bolstered their ability to foreseeably commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 to 2011. Id.

Accordingly, I incorporate these prior findings and orders by reference here for the five listed Attacks (Attacks # 37, 45, 48, 62, and 64) which present the same threshold factual and legal issues of Defendants' material support for the subject terrorist groups and theories of liability underlying Plaintiffs' claims. Below, I make the requisite findings and conclusions remaining on liability, which are necessary to assure the Court whether the specific plaintiffs whose claims arise from the five listed attacks "have established their right to relief by evidence satisfactory to the court." See BW Order, at 2-3 (citing Bathiard v. Islamic Republic of Iran, No. 16-CV-1549 (CRC), 2019 WL 3412983, at *2 (DDC July 29, 2019) (quoting 28 USC §1608(e))).

---

[2] The Court's ruling related to §1605A's standing or "status" requirement was limited to those plaintiffs who provided the Court with proof of the status that the relevant "claimant or victim was, at the time of the act, a U.S. national, member of the U.S. armed forces, or qualifying employee or contractor of the U.S. government." See 28 U.S.C. § 1605A(a)(2)(A)(ii). Therefore, in reviewing the evidence, the application of this ruling to a particular attack or plaintiff will be confirmed, or further determined for the Court.

### III.    ASSESSMENT OF EVIDENCE & LIABILITY – WAVE 2 ATTACKS

#### A.    Attack # 37: June 4, 2004, Complex Attack in Sadr City, Iraq

#### 1.    Plaintiffs' evidence is sufficient to attribute non-Bellwether Attack # 37 to JAM.

On June 4, 2004, Sergeant Carl Oliver was injured during a complex attack while escorting a heavily armored convoy en route to an Iraqi Police Station in Sadr City, Iraq. PX7550, Expert Report of Daveed Gartenstein-Ross, p.1. Oliver elected to be the driver of the HMMWV and had only driven about 5-6 blocks from Camp Cuervo before being targeted by a man standing on the side of the road with an RPG. PX7501, Carl Oliver Decl., ¶¶ e-f. The RPG was fired about 25 feet from the vehicle. The RPG detonated upon impacting the vehicle, causing it to flip on its side and catch on fire. Id., ¶ f.

An Infantry platoon on patrol nearby saw the explosion and responded to the scene. PX7550, p. 2-4. As it approached the burning HMMWV, a crowd was gathering, and Sgt Oliver and his unit (though injured) were trying to secure the area. PX7501; ¶ f. Suddenly, a secondary explosion (from a "daisy-chained IED") engulfed the area, sending ball bearings tearing through the scene. PX7509, ¶ g.

Five of the soldiers died in the attack. See PX7500, Ops Report ("KIA: 5"); and PX7510 - PX7514 (profiles from Military Times Honor the Fallen for C. Duffy, F. Carvill, E. McCrae J. Eyerly, and J. Linden). After the second blast, SGT Oliver recalls being "treated on-scene by medics" and "placed in another HMMWV for medevac to Camp Cuervo,: he lost consciousness again en route. See PX7501, Carl Oliver Decl., ¶ f.

Plaintiff's expert, Dr. Daveed Gartenstein-Ross, reviewed the evidence for this attack and concluded that, more likely than not, JAM committed it. PX7550, DGR Rept., p. 4. JAM's operational dominance in the area at the time (id., pp 4-7) coupled with specific tactics, techniques,

and procedures (TTPs) specifically associated with that group support attribution for this attack. Id., pp. 7-9. Additionally, JAM possessed a clear motive for committing the attack. Id., p. 10.

The first indicator of JAM's culpability for this attack was its area of operations dominance in Sadr City, the location of this attack. The Sadr City district of Baghdad was JAM's favored stronghold in 2004. Id. Sadr City was the home of JAM founder and leader Muqtada al-Sadr. A district of Baghdad, also called al-Thawra, is a Shia enclave and "was informally renamed Sadr City in 1997" in honor of Muqtada's father. PX679. Muqtada established the JAM militia in June 2003. PX593. In 2004, Muqtada used JAM to confront coalition forces. PX679. U.S. military reporting supports the expert's assessment of the area where this attack occurred. A declassified intelligence summary from the Sadr City area specifically identifies the Habibiya neighborhood where JAM kept individuals whom the group had kidnapped. This report indicates continuous JAM presence in the neighborhood and connection to Iran following June 4, 2004, and reported the "identifications and actions of Jaysh Al Mahdi leaders and members who are living in the al Habibiya sector, Sadr City," also noting the presence of "Iranian informant[s]" for JAM, and numerous JAM leaders and members throughout the neighborhood. See PX882, MNF-I, "3.5(c) Insurgent leaders and members in Sadr City, Iraq (U)," (Nov. 24, 2007), p. 2-4.

Moreover, official military histories established that this attack "occurred during an extended engagement referred to as the 'Siege of Sadr City.'" PX7550, p. 7, citing PX592, Battlefield Chronicles: The Siege of Sadr City," U.S. Marine Corps; and PX241, The U.S. Army in the Iraq War Vol. 1., pp. 283-286. This "siege" began on April 4, when a Charlie Platoon lost eight Soldiers from 1st Brigade, 1st Cavalry Division were killed or wounded. See id.; cf. ECF Doc. 137, at 8-9 (this Court analyzed Bellwether Attack No. 1, "The Black Sunday Attack," and found the Defendants liable for that attack that occurred one month earlier in the same area as this

attack). After the Black Sunday Attack on April 4, 2004, JAM waged continuous attacks on Coalition Forces for 80 consecutive days, during the time that this attack occurred. PX241, U.S. Army In Iraq, Vol. 1. This attack occurred during increasing tensions in Sadr City, and JAM's attacks increased immensely throughout the summer of 2004. See PX7505, "U.S. Troops Killed, Hurt in Sadr City," Al Jazeera, Jun. 5, 2004 (discussing this attack that wounded Plaintiff Carol Oliver).

The next factor Dr. Gartenstein-Ross considered was the complexity of the TTPs used in this attack, further supporting that JAM is most likely the responsible group. Dr. Gartenstein-Ross states, "The array of weapons and sequential targeting used in the attack demonstrates that the attack involved large-scale and coordinated fighting." PX7550, DGR Rpt., p. 9-10,

The evidence, in sum, establishes that this was a complex attack that was initiated by an RPG fired directly at a heavily armored moving convoy of U.S. soldiers, the timing of which was coordinated to disable or slow the convoy in an area laden with IEDs in advance. The attackers then waited to initiate a second stage of the attack until a larger responding force arrived, increasing the lethal potential of their efforts. See PX7500, Ops Report; PX7519, IED Report; PX7509; and PX7501, Carl Oliver Decl., ¶¶ e-g. An attack of this sophistication and complexity requires planning, training, intelligence gathering, and access to the men and material willing and sufficiently supplied/armed to commit it and successfully cause casualties. See PX7550, p. 7-9. According to the expert, with its dominance over Sadr City, JAM was most capable of performing the high degree of operational planning necessary to carry out this attack with its level of complexity. See PX7550, p. 7-9.

Official military publications corroborate this assessment of JAM's TTPs and capabilities; for example, JAM used "burning roadblocks" and large obstacles as TTPs for their attacks. Id., pp.

10-11; See also PX586, Captain John C. Moore, Sadr City: The Armor Pure Assault in Urban Terrain, (Army Combined Arms Center, Army & Marine Counter Insurgency Center (COIN), November-December 2004).

Additionally, the perpetrators would need access to various weapons and materials and training in their use. The evidence shows that JAM had access to these resources in Sadr City during this time. For example, A declassified intelligence summary describes the arrival of RPGs (the weapon type used to initiate this attack) into Iraq from Iran. Specifically, it reports the flow of weapons into Sadr City (the location of this attack) and the role of Defendant Iran in facilitating weapons movement and financial support to JAM in Sadr City near the time of this attack. See PX880, DAILY INTSUM 23 Sept. 2004, p. 7.

JAM's activities at the time of this attack demonstrate that it could launch complex attacks such as the one that injured Carl Oliver. JAM's prowess with RPGs and attacking convoys was shown in the April 4, 2004, Black Sunday attack. And again on August 5, 2004, when JAM attacked an Iraqi police station in Najaf with "heavy machine guns, RPGs, mortars and small arms." Id at 9. Additionally, on August 7, 2004, the Associated Press released a video of JAM fighters in Sadr City holding "RPGs and assault rifles." Id. JAM's ability to conduct a wide range of attacks was further evidenced in October 2004, when JAM fighters in Sadr City participated in a disarming effort and turned in weapons for compensation.

According to Al Jazeera, weapons that were turned in included "machine guns, TNT paste, landmines and other explosives" as well as "RPGs, rusty mortars and artillery shells, anti-tank landmines and assault rifles." Id at 8.

In support of the attribution of this attack to JAM, Dr. Gartenstein-Ross points to the clear motive JAM had for committing it. See PX7550, p. 9. JAM's anti-American sentiment erupted in

sustained violence on April 4, 2004, and continued against Coalition Forces in Sadr City during the time of this attack. Id. JAM was highly motivated to attack Coalition convoys and any responding Coalition forces within its stronghold during this time, just as it did on June 4, 2004, when it attacked SGT Oliver's convoy. Id. Plaintiffs' evidence includes a second declassified daily intelligence summary dated September 8, 2004, compiled by the 1st Cavalry Division and Control Element operating in Sadr City. Their report describes the role of the defendants in JAM's mobilization against Coalition forces in Iraq, particularly in Baghdad and southern Iraq at the time of this attack:

> The Iranian influence is developing into one of the primary challenges to Iraqi and MNF [Multi-National Force] authority over the coming months leading up to the Jan 05 Iraqi elections. ***The IRGC and its surrogate organizations along with the MOIS established an extensive network for clandestine activity, smuggling of weapons and fighters along with financial support to radical Shia groups in both the Baghdad AOR*** and southern Iraq. Their long-term goals were to vie for political and religious. control of southern Iraq along with maintaining Iraq in a very tenuous situation so as to not draw U.S. attention towards Iran. ***To accomplish this goal Iran continued to covertly sponsor more militant Shia groups such as Muqtada's Militia***, 15 Sha'ban, Iraqi Hezbollah and the Dawa Party.

PX881, DAILY INTSUM, 8 Sept. 2004, p. 3.

Considering the location, timing, tactics, and motive, Dr Gartenstein-Ross concludes that Jaysh al-Mahdi (JAM) likely committed this complex attack. Id. p.4.

I find this conclusion credible and supported by the available evidence, and recommend the Court find sufficient evidence to attribute Attack #37 to JAM.

**2. The personal injuries or deaths that occurred from the attack.**

Plaintiff Sgt. Carl Oliver suffered concussive blast injuries, including numerous shrapnel wounds and permanent injuries to his back and hand. He was later diagnosed with a Traumatic Brain Injury and Post Traumatic Stress Disorder. PX7501, Carl Oliver Decl., ¶¶ j-k. He was

awarded the Purple Heart for his injuries from the attack. PX7517, Purple Heart Award (4 Jun. 2004), see also PX7518, Press Release New Jersey Veterans Affairs (9 Dec. 2004).

The following US Servicemembers were killed in the attack:

1. U.S. Army 1st Lieutenant Erik S. McCrae. See PX7512.

2. U.S. Army Specialist Justin W. Linden. See PX7514.

3. U.S. Army Sergeant (SGT) Frank T. Carvill. See PX7501, PX7511.

4. U.S. Army SPC Christopher M. Duffy. See PX7501, PX 7510.

5. U.S. Army Sergeant (SGT) Justin L. Eyerly. See PX 7513.

**3. The relationship of the victims of the attack to the respective plaintiffs.**

Plaintiff Sgt, Carl Oliver, a surviving victim of the attack, was, at the time of the attack, a U.S. Army Sergeant, and a U.S. citizen. See PX7516, Form DD214.

Plaintiff Loren Oliver, the daughter of Sgt. Oliver, brings claims for solatium, mental anguish, and emotional pain and suffering related to the attack and the personal injuries suffered by her father. See ECF Doc.100, 2nd Amend. Compl., at ¶¶ 4675-4683; and PX7530, § II(1). She is a U.S. National. See ECF Doc. 81-2, at 42, summarizing Ex. 398 (birth records for plaintiffs in "The Carl Oliver Family.")

**4. The attack involved JAM, a group that received material support from Defendants.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved the Shia terrorist group JAM. Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi "provided material support, as that term is used in 28 USC § 1605A(a)(1), to the Shia terrorist group… ***Jaysh al-Mahdi*** [JAM]… during the relevant time period of 2003-2011." See ECF Docs. 127 and 136 (finding that all defendants, except NIOC,

provided material support to JAM between 2003 and 2011; see also ECF Doc. 137, at 3; "the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups[.]").

**5.   The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l).**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude and recommend the Court find that this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because the attack resulted in at least one death. See 28 USC § 1605(A); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024).

**6.   Defendant's provision of material support was a proximate cause of the attack.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that the material support by Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi to JAM was essential to the group's operating capacity, and terrorist attacks involving JAM in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. Therefore, the Defendants' provision of material support to JAM was a proximate cause of Attack # 37—the June 4, 2004 Complex attack in Sadr City, Iraq, that personally injured Plaintiff Carl William Oliver.

**B.   ATTACK # 45: March 12, 2005, Complex IED Attack South of Bagdad, Iraq**

**1.   Plaintiff's evidence is sufficient to attribute non-Bellwether Attack #45 to AQI.**

Plaintiff Bruce T. Durr, a U.S. Citizen, was working as a security contractor in Iraq on March 12, 2005, when he was killed by an IED. See PX8600, Durr fact Sheet; ECF Doc. 81-2, at 31 summarizing Ex. 289 (evidence submitted for "The Bruce Terrence Durr Family").

At the time of his death, Mr. Durr was riding as a passenger in the lead armored-vehicle of a convoy that was on its way from Baghdad International Airport to the village of Hillah in Babil, Iraq. The convoy was moving through an area now referred to as the "Triangle of Death" due to the volume of lethal terrorist attacks in the area encompassing the cities of Yusufiyah, Mahmudiyah (near where Mr. Durr's attack occurred), and Latifiyah, Iraq. PX8650, Expert Report of Walters, Evans and Sultzer, p. 5-6 (WES Rpt.")

After initial explosion from the IED, the convoy was attacked with small arms fire until it was able to clear the kill zone and return to Baghdad. PX8605, Ops Report. An Explosive Ordnance Detachment (EOD) team returned to the site of the attack and conducted post-blast analysis where they confirmed that the enemy attacked the convoy with a remote control (RC) IED consisting of three projectiles (likely 122mm mortars) hidden behind several sandbags. See Id.; and PX8650, WES Rpt. The EOD unit concluded the enemy used sandbags that had been left behind on adjacent Iraqi Army checkpoints farther down the road. Id.

The official Autopsy Report states that Mr. Durr "died of shrapnel wound to the head due to an improvised explosive device…manner of death is homicide." PX860.

Plaintiff's experts, Colonel Mark Lee Walters, US Army (ret.**)**, CW4 Ronald Evans, US Army (ret.), and CW3 David Sultzer, US Army (ret.) attribute Attack #45 to al Qaeda in Iraq (AQI)**.** PX8650**,** WES Rpt., p. 8-9. The experts' conclusion is based on and supported by the geographic location, time of the attack, and the tactics, techniques, and procedures used. Id. First, the geographic location and time period supports that this attack was committed by AQI. AQI's presence in the "Triangle of Death" is strongly supported by contemporaneous reporting by the U.S military reporting. After AQI's losses during Operation AL FAJR (Second Battle of Fallujah) in late 2004, AQI sought to re-establish their network throughout the al Anbar

region and Northern Babil Province. <u>See</u> PX937, Insurgent Group Profile: Al Qaeda In Iraq (AQI), Multi-National Corps–Iraq (MNC-I) Study, (May 2, 2007). AQI dominated the city of Mahmudiyah (6 kilometers south of where Mr. Durr's convoy was attacked) from 2004 through 2006. <u>See</u> PX669, "Backgrounder #1: Al Qaeda in Iraq Attacks on Bridges," Institute for the Study of War. June 10, 2007, p. 1-2. AQI "also controlled the triangle of territory west and north of Mahmudiyah, between the Euphrates River and Highway 8." <u>Id.</u> The roads in this area allowed AQI to move fighters, supplies, and weapons from Fallujah to Mahmudiyah and into portions of Baghdad. <u>Id.</u> Seeking to protect its critical nodes and lines of communication in the region, AQI maintained a significant presence throughout the rural region of southern Baghdad and northern Babil. WES Rpt., p. 8-9. In September 2004, the 1st Cavalry Division Intelligence Cell published an intelligence summary describing the enemy situation in the northern Babil province, near the ambush location, call it a "safe haven and transit point for fighters into Baghdad and Fallujah cities, as well as staging attacks against MNF convoys." <u>See</u> PX880, DAILY INTSUM 23 Sept. 2004, p. 6.

Second, the tactics, techniques, and procedures used in this attack further support attributing this attack to AQI. This attack, which included small arms fire (SAF) and the successful use of remote-controlled IED against a moving armored convoy demonstrates the highly sophisticated coordination, tactics and techniques frequently associated with AQI. Combined Joint Task Force 7 published a "Red Cell" report in February 2004 describing AQI's network operatives as "skilled at complex attacks…network has also demonstrated capabilities not normally associated with Former Regime Elements, to include large-scale directional charging and mixing of explosive compositions to overcome force protection measures or target construction. These attacks, moreover, have been characterized by meticulous planning and pre-operational

surveillance and intelligence gathering." <u>See</u> PX932, CJTF-7 Red Cell: A Red Cell Political Military Assessment, "Future Al-Qaida and Zarqawi Network Operations in Iraq," (3 Feb 2004), p. 2. Plaintiffs' military intelligence experts summarize the TTPs stating, "This skill was evident in the operation where the cell was able to target and successfully strike a vehicle traveling at a high rate of speed on a major roadway. It is likely the enemy studied the Coalition Force procedures over time and saw an opportunity to "ambush" the security force with a remote controlled IED (RCIED) at the right time to destroy the armored vehicle and kill two passengers, including Mr. Durr." WES Rpt., p. 7-8.

Consistent with this assessment is that of expert Col. Ray Fitzgerald, who reports that the vast majority of IED attacks were unsuccessful. <u>See</u> PX11, Expert Report of Col. B. Ray Fitzgerald, p. 6. For an IED to cause casualties it required training, planning, security and preparation to ensure it was "in the right place, at the right time, in the right way, at the exact aim point – and detonated at exactly the right time." <u>Id.</u> The fact this IED was successful speaks to a level of sophistication that would have only been available through a group such as AQI. <u>Id.</u>, p. 5-7.

After analyzing the location, timing, tactics, Plaintiffs' experts jointly conclude that AQI likely committed this complex attack. WES Rpt., p. 8-10.

Having reviewed the available evidence, I find this conclusion credible and supported, and I recommend the Court find sufficient evidence to attribute Attack #45 to AQI.

**2.  The personal injuries or deaths that occurred from the attack.**

The attack killed two civilian contractors, including Plaintiff Bruce T. Durr and another member of Mr. Durr's team. Three other civilians were wounded. <u>See</u> PX8605, Ops Report, p. 2 ("2 CIV KILLED, 3 CIV INJ").

**3.   The relationship of the victim of the attack to the respective plaintiffs.**

The Plaintiffs relevant to this attack are Laura Nanitra Weathersby, the sister of Mr. Durr and the legal representative of the estate, bringing claims individually and on behalf of her brother's estate (and all heirs thereof); Peggie Anne Jones (sister); Dawn Monesica Traxler (sister); Walter Ray Smith, Sr., (stepparent, deceased, represented by Rosie Smith); and Walter Ray Smith, Jr., (stepsibling). The family member plaintiffs assert claims for solatium, mental anguish, and emotional pain and suffering related to the attack and the personal injuries suffered by Bruce T Durr. All plaintiffs are U.S. Nationals. See ECF Doc.100, 2nd Amend. Compl., at ¶¶ 3474-3485; and ECF Doc. 81-2, at 31 summarizing Ex. 289 (evidence submitted for "The Bruce Terrence Durr Family").

**4.   The attack involved AQI, a group that received material support from Defendants.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved Al Qaeda in Iraq (AQI). Defendants, the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi "provided material support, as that term is used in 28 USC § 1605A(a)(1), to… Al Qaeda in Iraq [AQI]… during the relevant time period of 2003-2011." See ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to Al Qaeda in Iraq (aka the Zarqawi organization) between 2003 and 2011; see also ECF Doc.137, at 3; "the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups."

**5.   The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l).**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude and recommend the Court find that this attack involved an act of "extrajudicial

killing" within the scope of the terrorism exception to the FSIA because the attack resulted in at least one death. See 28 USC § 1605(A); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024).

**6.  Defendant's provision of material support was a proximate cause of the attack.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that the material support provided by Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi to AQI was essential to the group's operating capacity and terrorist attacks involving AQI in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. Therefore, the Defendants' provision of material support to AQI was a proximate cause of Attack #45—the March 12, 2005 Complex IED attack that caused the death of Bruce Terrance Durr.

**C.  Attack #48: July 24, 2005 – Complex IED Attack in Khalidiyah, Al Anbar Province**

**1.  Plaintiff's evidence is sufficient to attribute non-Bellwether Attack #48 to AQI.**

On July 24, 2005, U.S. Marine Corps Staff Sergeant (SSgt) Jose Purdon, Lance Corporal (LCpl) Jacob Miller, and U.S. Navy Hospital Corpsman 3rd Class (HM3) Bernabe Montejano were serving with Marine Wing Support Squadron (MWSS) 371, Marine Wing Group Squadron 37, 3rd Marine Air Wing Platoon at Forward Operating Base (FOB) Al Taqqadum (TQ) Airbase in Al Anbar Province. See PX9001, Decl. of Joss Purdon, ¶¶ 3, 7; PX8903, Decl. of Bernabe Montejano, ¶¶ 3-4. HM3 Montejano's EOD unit was tasked with detecting and clearing IEDs, and SSgt Purdon and LCpl Miller's platoon provided security for the EOD unit. See PX9001, Decl. of Joss Purdon, ¶ 5; PX8903, Decl. of Bernabe Montejano, ¶ 5; and PX9101, Decl. of Jacob Miller, ¶ i.

On the morning of July 24, 2005, MWSS 371 was notified that another unit had been attacked by an IED in vicinity of a mosque in nearby Khalidiyah, Al Anbar Province. See PX9001, Decl. of Joss Purdon, ¶¶ 3, 7; PX8903, Decl. of Bernabe Montejano, ¶¶ 6-7; PX9101, Decl. of Jacob Miller, ¶ k.

SSgt Purdon and LCpl Miller's platoon was assigned to provide security for the EOD team (including HM3 Montejano) responding to the explosion. Id. The EOD team and platoon departed FOB TQ in a convoy of five high mobility multi-wheeled vehicles (HMMWVs, colloquially referred to as Humvees) and one Mine-Resistant Ambush Protected (MRAP) vehicle. Id. at ¶ 6; see also, PX9001 (Decl. of Joss Purdon), ¶ k; PX9101 (Decl. of Jacob Miller), ¶ j. According to HM3 Montejano:

> When we arrived, we started setting up our positions. One of the other Humvee vehicles was sent up towards the [mosque] to get a better vantage point. I remained down below and dismounted my vehicle. When the vehicle by the mosque was in position, they were shown where the IED was located. The EOD team then sent the robot out to assess and destroy the IED. Suddenly, the vehicle on the hill near the mosque was blown up by another IED that had been missed. I was still positioned on the main road with the rest of the vehicles from our convoy when I received a call that they needed me, the hospital corpsman...I personally tended to LCPL Miller who had sustained shrapnel injuries to his hand, and another injured servicemember who had sustained shrapnel injuries to his leg. I then proceeded to walk down the hill assisting one of the injured servicemembers. When I heard my Humvee coming up behind me. I reached out so they would notice me and not run me over. The next thing I remember, I was waking up on the ground looking at the sky. Another IED had detonated under my Humvee, and the          explosion threw me thirty feet from where I was walking and knocked me unconscious.

PX8903, Decl. of Bernabe Montejano, ¶ 7.

As described by LCpl. Miller, "All of a sudden, there was an explosion to my right. The turret shielded me, but my right hand was exposed, and I got hit with shrapnel. I believe SSgt. Purdon was outside, to the left of the vehicle, and was also injured in the blast." PX9101

(Decl. of Jacob Miller), LCpl. Miller then stated, "I dropped down out of the turret and the radio guy was freaking out. I had to try to calm him down so he could let the other vehicles know what was happening and call it in to base. I started trying to wrap my hand myself. The Corpsman vehicle came up, and Doc Montejano started rendering aid to my hand. His vehicle was positioning itself when they ran over a double-stacked tank mine. The explosion knocked both me and Doc Montejano unconscious." Id.

Following the second blast, the unit collected the injured into a vehicle that had sustained minimal damage and drove them to FOB TQ for medical treatment. PX900, Decl. of Joss Purdon. Explosive Ordinance Disposal remained at the scene to conduct Post Blast Analysis that determined that IED consisted of a double stacked anti-tank mine. PX8903, Decl. of Bernabe Montejano.

Plaintiffs' expert attributed the July 24, 2005, IED attack that injured Plaintiffs to the al-Qaeda in Iraq (AQI). PX8950, DGR Rpt., p. 3. The expert's conclusion is based on the geographic location and time of this attack, as well as the tactics, techniques, and procedures ("TTPs") employed in this attack. Id. at pp. 3-7.

The location and date of this attack are the first indicators pointing to AQI's responsibility for this attack. The attack occurred in Khalidiya, Al Anbar Province on July 24, 2005. Id., p. 4. At the time of the attack, AQI had established a significant operational presence in Khalidiya. Id. According to *U.S. Marines in Iraq*, a monograph published by the United States Marine Corps, Coalition Operations River Bridge and River Blitz targeted AQI fighters "along the Euphrates River by interdicting 'rat lines' between the cities of Ramadi, Hit, Haditha, and Husaybah, isolating and discrediting insurgents, and controlling 'access into and out of

Ramadi." PX271, U.S. Marines In Iraq, 2004 – 2005 Into The Fray (United States Marine Corps, 2011), p. 24. These supply line would have included Khalidiya, which lies just 19 kilometers east of Ramadi. Id. While Coalition forces were able to displace insurgent fighters from the Khalidiya area temporarily, militant groups quickly returned to cleared areas after operations concluded. PX8950, DGR Rpt., p. 4.

AQI presence in Khalidiya continued in the summer of 2005. Id. According U.S. Central Command (CENTCOM)'s authoritative report of the insurgency on Al Anbar Province, Operation Matador, which targeted AQI fighters in western Al Anbar Province in May 2005, "coincided with another period of insurgent reconstitution in eastern Anbar," including Khalidiya. PX900, Anbar Insurgency Grows, Strengthens, Elections (2005), pp. 50, 53. The report details that during this time, "AQI fighters were able to move through the area [Khalidiya and Habbaniyah], bribing Iraqi security forces into allowing them to move uninhibited through the area, attacking Coalition and Iraqi convoys in coordination with the Islamic Army of Iraq." Id. As the summer progressed, AQI continued operations in Khalidiya and nearby Ramadi. Id. On July 9, 2005, Coalition forces captured AQI senior lieutenant Khamis Abdul-Fahdawi, known as Abu Seba, in a raid in Ramadi. PX765,"Car Bombings Target Troops in Iraq," Denver Post, July 15, 2005; PX766, "Suspected Leaders of al Qaeda in Iraq Captured," CNN, July 14, 2005.

In Khalidiya and Habbaniyah, the insurgents stepped up their intimidation campaign to limit local cooperation with the Coalition and Iraqi security forces. These operations were financed by Amir Mubarak Atrouz, the brother of Thamir Mubarak Atrouz, a Zarqawi lieutenant. AQI activity in and around Khalidiyah continued long after this July 24, 2005, attack, and the city served as a "safe haven" for AQI through November 2005. PX900, Anbar Insurgency Grows, Strengthens, Elections (2005), p. 115; PX8950, DGR Rpt., p. 5. In November 2005, the Marine

Corps reported that Operation Numur, aka Operation Tigers, had captured Imad Salih al-Fahdawi in Ramadi. PX767, United States Marine Corps, "Ramadi Offensive Nets Suspected Insurgents/U.S. Marine Killed in Combat West of Baghdad," November 27, 2005. Fahdawi was a member of AQI who "was involved in attacks against government officials and imams." Id. The capture of AQI leadership in area Khalidiya further demonstrates AQI's operational presence. DGR Rpt., p. 5.

In addition to the location of this attack, the TTPs used in this attack leads to the conclusion that AQI was responsible. For example, at the time of these attacks, IEDs were also a common TTP of AQI in Al Anbar Province. Id., p. 6. At the onset of Operation Al Fajr in November 2004, Coalition forces noted that the AQI-dominated insurgent forces had "set mines and IEDs … for the impending battle" throughout Fallujah. Id. Coalition forces spent weeks clearing IEDs placed throughout the city. PX901, "Chapter Four: The Insurgency Grows and Fights Pitched Battles (2004)," p. 45. AQI's use of IEDs in the province continued throughout 2005. Id. "Raid after raid eliminated IED factories and killed or captured al-Qaeda in Iraq senior leaders." PX241, The U.S. Army in the Iraq War Vol.1, p. 498-499. A July 2005 CENTCOM Threat Assessment indicates that [AQI] will maintain focus on MNF [Coalition forces], ISF (Iraqi security forces), and the Iraqi populace believed to be supporting the Coalition." PX896, C2 Plans Threat Assessment" (July 2, 2005), p. 18. Further, in November 2005, Coalition forces captured large AQI caches of IEDs and IED materials in nearby Ramadi. PX767 "Ramadi Offensive Nets Suspected Insurgents," CNN, November 27, 2005.

Further cementing the expert's conclusion is the dominance and control AQI exerted over other insurgent groups in the area at this time. PX8950, DGR Rpt., at 5. At the time of the attack, Ansar al-Sunnah (AAS), the Islamic Army of Iraq (IAI), and the 1920 Revolution Brigade (1920

RB) also operated in Khalidiya. <u>Id.</u> AAS and AQI were closely allied at the time. <u>Id.</u> AQI and Ansar al-Sunna fighters in Ramadi answered to Abu Salam, a Fallujah native and subordinate of Zarqawi and AQI's al Anbar emir, Abu Yahya. <u>Id.</u> As AQI held more strength and influence than both IAI and 1920 RB at the time of this attack, and AQI financially and operationally supported 1920 RB and IAI. <u>Id.</u>, p. 5. Therefore, Ramadi-area attacks executed by fighters from these groups at the time were under the control and beholden to AQI. <u>Id.</u> Furthermore, as both AQI and AAS received material support from Iran, had the attack presented the question about which of the two groups was more likely to have carried out this attack, it would be immaterial to the question of Iran's culpability for the attack. <u>Id.</u>

In summary, Plaintiffs' expert conclusion is derived from his background, education, training and experience, as well as the substantial evidence presented, that, more likely than not, (1) AQI planned, committed, and/or authorized the July 24, 2005 attack at issue; and (2) Iran's support was critical to the survival of AQI, significantly increased its capabilities, and substantially contributed to this attack. <u>Id.</u>

Having reviewed the available evidence, I find this conclusion credible and supported, and I recommend the Court find sufficient evidence to attribute Attack #48 to AQI.

**2. The personal injuries or deaths that occurred from the attack.**

The attack resulted in the death of MSG Kenneth hunt was killed. PX8903**,** Decl. of Bernabe Montejano., ¶ 12.

Plaintiff HM3 Montejano suffered TBI, shrapnel wounds to his legs, tinnitus, and PTSD. <u>Id.</u>, ¶ 11.

Plaintiff SSgt Purdon sustained "PTSD, [a] Traumatic Brain Injury (TBI), tinnitus, lumbar spine sprain, tension headaches, [and] left calf and groin shrapnel injuries" from the blasts. See PX9003, Purple Heart; PX9001, Decl. of Joss Purdon, ¶ 10.

Plaintiff LCPL Miller's suffered severe shrapnel injuries to his right hand, TBI and PTSD. See PX9105, Purple Heart.

As a medic at the scene and who treated the wound, HM3 Monetejano identified seven other servicemembers who suffered shrapnel injuries in the attack – LCpl Ryan Benally, LCpl Richard Stevens, LCpl Brandon DeWeese, LCpl Erik Estlund, LCpl Wesley Clark, LCpl David Anglin Jr., and LCpl Ruben Salgado. See PX8903, Decl. of Bernabe Montejano, ¶ 13

### 3.   The relationship of the victim of the attack to the respective plaintiffs.

Plaintiff SSgt. Joss Purdon is a surviving direct victim of this attack, a member of the military and a U.S. national. His family member plaintiffs include Shawna Purdon (spouse), Austin Purdon (son), and Jacob Purdon (son) are solatium victims. See ECF Doc.100, 2nd Amend. Compl., at ¶¶ 3102-3112; and ECF Doc. 81-2, at 27 summarizing Ex. 252 (evidence submitted for "The Joss Wade Purdon Family").

Plaintiff Jacob Miller is a surviving direct victim of this attack, a member of the military and a U.S. national. His family member plaintiffs include Rachel Amber Miller (spouse), Lafonda Miller (mother), Lyle Miller (father), and Zachary Miller (brother). See id., at ¶¶ 3123-3134; and ECF Doc. 81-2, at 27 summarizing Ex. 254 (evidence submitted for "The Jacob Andrew Miller Family").

Bernabe Montejano is a surviving direct victim of this attack, a member of the military and a U.S. national. His family member plaintiffs include Faith Montejano (mother) and Sarah

Humphrey (sister) are solatium victims. See id., at ¶¶ 3113-3122; and ECF Doc. 81-2, at 27 summarizing Ex. 253 (evidence submitted for "The Bernabe Carrell Montejano Family").

The direct victim plaintiffs assert claims for personal injury as a result of the attack, and the family member plaintiffs assert claims for solatium, mental anguish, and emotional pain and suffering related to the attack and the personal injuries suffered by their direct victim family member.

**4.   The attack involved AQI, a group that received material support from Defendants.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved Al Qaeda in Iraq (AQI). Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi "provided material support, as that term is used in 28 USC § 1605A(a)(1), to… Al Qaeda in Iraq… during the relevant time period of 2003-2011." See ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to Al Qaeda in Iraq (aka the Zarqawi organization) between 2003 and 2011; see also ECF Doc.137, at 3; "the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups[.]").

**5.   The attack involved a requisite act or acts listed in 28 USC § 1605A(a) (l).**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because each attack resulted in at least one death. See 28 USC § 1605(A); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024.

**6. Defendant's provision of material support was a proximate cause of the attack.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that the material support by Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi to AQI was essential to the group's operating capacity and terrorist attacks involving AQI in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. Therefore, the Defendants' provision of material support to AQI was a proximate cause of Attack # 48—the July 24, 2005, Complex IED attack in Khalidiyah, Al Anbar Province, Iraq, that personally injured the Plaintiffs.

### D. Attack #62: May 14, 2007, Complex Attack in the Adhamiyah neighborhood of Bagdad, Iraq

**1. Plaintiff's evidence is sufficient to attribute non-Bellwether Attack #62 to the Zarqawi Organization (aka AQI/ISI)**

On May 14, 2007, U.S. Army Sergeant (SGT) Terry Fleming was serving with the 1st Infantry Division in the Adhamiyah neighborhood of Baghdad, Iraq. He is a U.S. citizen. PX10725, Fleming Plaintiff Fact Sheet, Sec. II. (4), (6 - 8); ECF Doc. 81-2, Ex. 97. His unit mission was to assist the Iraqi Army and provide security to the Adhamiyah neighborhood and surrounding areas. On the day of this attack, SGT Fleming's unit was patrolling the neighborhood with around twenty-five personnel and four up-armored High Mobility Multipurpose Wheeled Vehicles (HMMWVs). SGT Fleming was riding in the back seat of the third vehicle in the convoy. PX10750, DGR Rpt, p. 1, citing PX10700, IED Report, and PX17018, Ops Report.

At approximately 14:00 hours, SGT Fleming's vehicle hit an improvised explosive device (IED), blowing the HMMWV into the air and igniting it, along with SGT Fleming and three of his fellow servicemembers. The driver of SGT Fleming's vehicle, Specialist (SPC) Andrew Catterton, said the "IED that went off was part of an ambush," and that following the blast, "insurgents

descend[ed] on our position with automatic rifles and rocket-propelled grenades (RPGs)." PX10712, Dec. A. Catterton, ¶ 7. After SGT Fleming escaped the vehicle, Staff Sergeant (SSG) Octavio Nunez tackled him to try to extinguish the fire still engulfing SGT Fleming. SGT Fleming remained alight until Private First Class (PFC) Omar Avila, carried him to safety and put out the flames during ongoing enemy small arms fire. Id. The attack killed two U.S. soldiers and severely wounded SGT Fleming. PX10750, DGR Rpt, p. 3.

A Weapons Intelligence Team (WIT) returned to the site to investigate, and found a cell phone and battery in the blast seat. The WIT Report for the attack states:

The WIT further assessed that:

> The buried IED was a planned and complex attack on CF [Coalition forces]. CF patrol this route approximately once a day. AIF [anti-Iraqi forces] involved in this incident were expecting CF to eventually patrol the route. This route was part of a sewage project and the road was not paved. The sewage project and the unpaved road provided AIF with an opportunity to easily bury and conceal the IED. The small arms fire that followed after the attack demonstrated the ability of AIF to organize a successful attack against CF. ***Recent intelligence suggest an Al-Qaida Iraq (AQIZ) group is operating in this AO [area of operations] located in Adhamiyah, Baghdad, Iraq.*** It was reported that a small group of unidentified men were disguised as city workers wearing orange jumpsuits digging a hole to be used to bury an IED.

PX10700, IED Report, p. 4

SGT Fleming later learned that two of his fellow servicemembers, Specialist (SPC) Nicholas Hartge and SSG Juan Campos, died because of the attack. PX10706, Decl. Terry Fleming, ¶ 8. SGT Fleming incurred severe injuries in the attack, including third and fourth-degree burns covering eighty-five percent of his body, nerve damage, and the loss of most of his fingers. Id., ¶ 12. SGT Fleming was awarded a Purple Heart for his wounds. PX10704, Purple Heart.

Dr. Daveed Gartenstein-Ross provided an expert report and review of Attack # 62. See PX10750, DGR Rpt. Having reviewed the evidence for this complex IED attack, including

declassified investigation reports and witness statements, Dr. Gartenstein-Ross concluded, "ISI very likely committed this complex attack." Id., p. 3.[3] This attribution is based on the location and timing, and the tactics, techniques, and procedures used, as corroborated by authoritative sources, official government histories, military reporting, and witness declarations. See, e.g., PX10700, IED Report (May 14, 2007); PX966, MNC-I BUA Intel Daily Slides–May 07 (15 May 2007); PX706, Iraq Situation Report, ISW (February 7, 2008); PX10715, Department of Justice, press release, "Syrian National Convicted for Conspiring to Kill American Soldiers in Iraq," (March 17, 2018,).

In relation the location and period of the attack, Plaintiffs' expert cites declassified MNC-I reporting that determined complex coordinated attacks – like the one that wounded SGT Fleming – were routinely planned and employed by ISI in and around Baghdad in May 2007. PX10750, p. 5, citing PX966, MNC-I BUA Intel Daily Slides, May 15, 2007; and PX770, Roggio, FDD, "Improving Security: Baghdad's Adhamiyah Neighborhood." At the time of this attack, Adhamiyah was an AQI/ISI stronghold. PX604, ISW, "Baghdad City."

The Adhamiyah neighborhood is in eastern Baghdad along the Tigris River and is one of the few areas in east Baghdad where its resident population is predominantly Sunni. Id. In early 2006, Shia militias began launching attacks into Adhamiyah, consequently forcing the local population to rely on AQI/ISI (a Sunni group) for protection from Shia militia groups. Id. As a result, Adhamiyah became an AQI/ISI enclave in late 2006. Id. In response, Coalition Forces carried out operations in the neighborhood in February 2007, focused on clearing the area of

---

[3] Dr. Gartenstein-Ross attributes this attack to "the Zarqawi organization (as the Islamic State of Iraq, or 'ISI.'" See PX10750, p. 3 (explaining the group's name change from AQI to ISI). As this attack took place after the group's name change, Dr. Gartenstein-Ross' report refers to the group as "ISI," noting, however, that some sources "may refer to ISI by its former names (MSC, AQI, or JTJ).

AQI/ISI. Id. the Weapons Intelligence Team (WIT) investigating this attack reported that, "***recent intelligence suggests an al-Qaida (AQIZ) [aka ISI] group is operating in this AO located in Adhamiyah, Baghdad, Iraq***." PX10700, IED Report (May 14, 2007), p. 4. (Emphasis added.)

The tactics, techniques, and procedures used in the attack further confirm that ISI was responsible. Specifically, a complex attack consisting of an IED and small arms fire. Id. The IED that targeted SGT Fleming's unit was command detonated, using a sophisticated remote-controlled cell phone trigger interface, requiring an operator who has undetected overwatch or visualization of the target. Id., p. 4. Investigators surmised that the telephone poles along the route acted as "aiming points" for the triggerman to time the command detonation to hit the convoy. PX10700, IED Report, p. 1. Additionally, Small arms attacks similarly require proximity to targets, cover, concealment, and freedom of movement/familiarity amongst the populace. PX10750, DGR Rpt., p 4. ISI's local dominance of this area at the time indicates that ISI fighters within their Sunni enclave of Adhamiyah likely served as the triggermen and shooters in this attack. Id. These tactics were typical of ISI attacks during this period. Id., p. 6: See also PX770, Roggio, "Improving Security: Baghdad's Adhamiyah Neighborhood," Sept. 2007.

Moreover, the IED was buried in a roadway undergoing construction at the time. PX10700, p. 1. This attack was the third using this TTP in that specific area that resulted in the death of U.S. soldiers. Id. The WIT EOD Report states, "A small group of unidentified men were disguised as city workers wearing orange jumpsuits digging a hole used to bury an IED." Declassified MNC-I Battle Update Assessment ("BUA") intelligence slides dated May 15, 2007, report that AQI was using such TTPS and indicate the group "had local access to official material like vehicles and uniforms and employed them in attack execution." PX10750, p. 3, citing PX966, MNC-I BUA

Intel Daily Slides–May 07 (15 May 2007); PX706, Iraq Situation Report, ISW (February 7, 2008), p. 28.

The attack's sophistication and complexity were noteworthy to the WIT Team investigating the attack, reporting that small arms fire following the initial IED demonstrated a group's ability "to organize a successful attack against CF." PX10700, p. 1. After investigating the attack, the WIT Team concluded the "sect" responsible for the attack was "Sunni" (id., at 3), and identified a specific "AQIZ" cell known to be operating in the area.

Finally, further supporting Dr. Gartenstein-Ross' attribution to ISI, and his conclusion that the attack was supported by Iran, is Plaintiff Terry Fleming's declaration that provides:

> It was some years later when I was notified by the Department of Justice that Ahmad Ibrahim Al-Ahmad, a Syrian national, (also known as Ahmed Alahmedalabdaloklah), Ahmed Hassan Parhan, Ahmad Ibrahim, Ahmad Ebrahim, and Ahmed Hassan Parhan (also known as Ahmad Ibrahim Al-Ahmad) had been investigated and determine to provide weapons that were used against the coalition and my unit specifically. Those weapons identified as Iranian manufactured/supplied IED and RPG's as evident from operational data, including but not limited to, the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized. The United States Department of Justice and District of Arizona convicted and sentenced Ahmad Ibrahim Al-Ahmad on March 16, 2018.

PX10706, Decl. of Terry Fleming, ¶ 11.

Plaintiffs' expert conclusion is derived from his background, education, training and experience, as well as the substantial evidence presented, that is very likely that the Zarqawi Organization ("ISI") planned, committed, and/or authorized the May 14, 2007 attack at issue; and (2) Iran's support was critical to the survival of the Zarqawi Organization (ISI), significantly increased its capabilities, and substantially contributed to this attack. PX10750, DGR Rpt., p. 7-8.

Having scrutinized the available evidence, I find this conclusion credible and supported, and I recommend the Court find sufficient evidence to attribute Attack # 62 to the Zarqawi Organization (aka AQI and ISI).

**2. The personal injuries or deaths that occurred from the attack.**

The attack killed two U.S. soldiers, Specialist Nicholas Hartge and SSgt Juan Campos and severely wounded SGT Fleming, including third and fourth-degree burns covering eighty-five percent of his body, nerve damage, and the loss of most of his fingers. See PX10712, Decl. A. Catterton, ¶ 7; PX17018, Ops Report.

**3. The relationship of the victims of the attack to the respective plaintiffs.**

Terry Fleming brings claims for the personal injuries he sustained during the attack. ECF Doc. 100, 2nd Amend. Compl., ¶¶ 1541-1547. Plaintiffs the Estate of Ida Lee Fleming, Elaine F. Fleming, and Ayron L. Bennet are family members of SGT Fleming asserting claims for solatium, mental anguish, and emotional pain and suffering related to the attack and the personal injuries suffered by Terry Fleming. See ECF Doc. 1, Compl., at ¶¶ 1591-1594; and PX10750, Sec. II(1). They are all U.S. Nationals. See ECF Doc. 1, Compl. at ¶¶ 1591-1593.

Plaintiff Terry Fleming suffered personal injuries sustained during the attack. Plaintiffs the Estate of Ida Lee Fleming, Elaine F. Fleming, and Ayron L. Bennet are family members of SGT Fleming asserting claims for solatium, mental anguish, and emotional pain and suffering related to the attack and the personal injuries suffered by Terry Fleming. Id.

**4. The attack involved AQI, a group that received material support from Defendants.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved the Zarqawi Organization (ala Al Qaeda in Iraq, aka the Islamic State of Iraq). Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi "provided material support, as that term is used in 28 USC § 1605A(a)(1), to… Al Qaeda in Iraq… during the relevant time period of 2003-2011." See ECF Nos. 127 and 136 (finding that all

defendants, except NIOC, provided material support to Al Qaeda in Iraq (aka the Zarqawi organization) between 2003 and 2011; See also ECF Doc.137, at 3; "the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups[.]").

**5. The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l).**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because each attack resulted in at least one death. See 28 USC § 1605(A); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024).

**6. Defendant's provision of material support was a proximate cause of the attack.**

Based on the evidence submitted for this attack and the Court's prior orders as detailed above, I conclude that the material support by Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi to the Zarqawi Organization/AQI was essential to the groups' operating capacity and terrorist attacks involving the Zarqawi Organization /AQI in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. Therefore, the Defendants' provision of material support to the Zarqawi Organization /AQI was a proximate cause of Attack # 64—the May 14, 2007, Complex IED attack in the Adhamiyah neighborhood of Bagdad, Iraq, that personally injured Plaintiff Terry Fleming.

**E. Non-Bellwether Attack # 64 – October 10, 2007, Rocket Attack on FOB Liberty in Baghdad, Iraq**

**1. Plaintiff's evidence is sufficient to attribute non-Bellwether Attack 64 to A Shia Militia Group (e.g., Jaysh al-Mahdi, PDB, KH, AAH).**

Plaintiff Sergeant (Sgt) Kevin Snow is a United States citizen and, at the time of Attack # 64 on October 10, 2007, a member of the United States Army. PX10915, Snow Plaintiff Fact

Sheet, § II (4), (6 - 8); ECF Doc.81-2, Ex. 62. On that date, Sergeant Snow was injured in a rocket attack at FOB Liberty in Baghdad, Iraq. PX10950, Expert Report of M. Lee Walters, Ron Evans, and David Sultzer, p.1 ("WES Rpt."). Sgt Snow was standing in line outside the Camp Liberty dining facility (DFAC) when a 107mm rocket landed on his location and other areas on Camp Victory. PX10900, K. Snow Decl., ¶ g. The rocket attack resulted in the death of two soldiers and wounded approximately forty others. Id.; PX10916, Ops Report ("2 CF KIA 37 CF WIA").

Sgt Snow was about 5 meters from the point of impact (POI) of one of the rockets and suffered concussive blast injuries, including loss of consciousness. PX10900, ¶ g. Initially treated for a ruptured eardrum, doctors later diagnosed him with Traumatic Brain Injury and Post-Traumatic Stress Disorder, among other injuries. Id., ¶ h, j-l. Due to being hit by rocket fire during the October 10, 2007, attack, Sgt Snow received the Combat Action Badge and was awarded the Purple Heart for his injuries. PX10901, CAB (10 Oct. 2007); PX10903, Purple Heart (10 Oct. 2007).

Plaintiffs' experts attribute this attack to a Shia Militia Group ("SMG") (e.g., Jaysh al-Mahdi, PDB, KH, AAH). PX10950, p. 1. This expert conclusion is based on the tactics, techniques, and procedures used in the attack, notably the weapons used and the sophistication of the tactics. In addition, the location from which the rockets were launched, the date/timing of the attack, and the known motives of the SMG further support attributing this attack to the Iranian-supported and Hezbollah-trained SMGs. PX10950, WES Rpt., p. 13-14. The official "Sect Responsibility Assessment" supports this conclusion, concluding that the group responsible was "Shia." PX10916, Ops Report, p.1.

Most notably here is that the attack involved *Iranian-supplied 107mm rockets*. EOD Investigators confirmed the rocket type after post-blast forensic analysis of the craters and rocket debris recovered at the points of impact (POI). PX10950, WES Rpt., p. 4, citing PX10916, Ops Report (confirming "POI 3" to be the "impact at Division DFAC" which crater analysis assessed to "107mm rocket."); See also PX10900, Kevin Snow Decl., ¶ I (corroborating results of EOD investigation with his knowledge from briefings after the attack). Investigators also concluded that an SMG cell launched seven "Iranian 107mm rockets" from four locations in the Amil neighborhood of Baghdad's West Rasheed District. PX10916, Ops Report; PX10917, IED Report, pp. 1-2, (providing results of the Point of Origin ("POO") investigation conducted by a Weapons Intelligence Team ("WIT") (discussing the large number of rocket launchers and paraphernalia recovered at the launch site in an established SMG area of operation.)

The attack used sophisticated TTPs supporting the conclusion that SMG committed it. For example, Investigators at the launch site recovered three "improvised timer delay firing devices." Id. These devices required knowledge to construct and successfully use, and let the attackers emplace and aim the rockets, then delay their launch, allowing them time to evade capture and avoid CF counterbattery fire responses, which would target POO sites upon detection of the launch. See PX10950, WES Rpt, p. 13-14. Additionally, as evidenced by the large number of casualties, the attack successfully targeted active areas on the base, indicating that the SMG had access to information/intelligence and the skill to hit their targets accurately despite using "Improvised Rocket Launchers." Id., (reporting that investigators recovered "15x IRL" at the point of origin); and PX10917, IED Report, p. 1-2. This attack involved "accurate and lethal" rocket fire demonstrating the highly sophisticated tactics, techniques, and procedures

associated with SMGs and "specifically related to their training, funding, and weapons supplied by Iran." Id.

According to the experts, at the time of the attack, the West Rasheed District, particularly the launch location for this attack, was an established stronghold for SMG, who used the area repeatedly to launch Iranian 107mm rockets against the Victory Base Complex. PX10950, WES Rpt., p. 13. The official history of the U.S. Army in Iraq, as well as multiple published studies of the events in Baghdad covering the time of this attack, support this conclusion. PX242, U.S. Army in the Iraq War, Vol. 2, p. 273-277 (Shia Militia Groups aka "Special Groups" conducted indirect fire attacks against the Victory Base Compound (VBC) during the Sadr cease-fire.); PX650, ("Special Groups in southern Baghdad [i.e., West Rasheed District] have launched numerous indirect rocket and mortar attacks…on Coalition bases in the southern part of the capital"); PX812, Columbia University Gulf 200 Project (study showing the POO location of the rockets to be in the center of a Shia-dominated enclave in Baghdad in 2007); and PX1049 (Map of Special Group Activity in Iraq, October 2007 showing operations by and against Shia Special Groups surrounding the POO site that month).

During the fall of 2007, Iranian-backed Shia Militia Groups (e.g., AAH, KH) possessed relative freedom of movement in Shia-dominated neighborhoods throughout Baghdad, including Amil (the POO for this attack), from which to conduct attacks against Victory Base Complex (VBC). The published official history of the U.S. Army in Iraq confirms that despite al-Sadr's direction to JAM to cease attacks against Coalition Forces (CF), the other Iranian-backed Shia "Special Groups" ignored al-Sadr's direction and conducted attacks against CF throughout Baghdad in October 2007. PX242, U.S. Army in the Iraq War, Vol. 2, p. 276-277. Whereas AQI had lost its support zones inside Baghdad and was nearly defeated in their outside belts, the SMG

operating in Baghdad (i.e., the "Special Groups" such as AAH) took advantage of the opportunities to attacks against Coalition and Iraqi Security Forces, to include indirect fire attacks against static bases in Baghdad like the Victory Base Compound where the October 10, 2007, rocket attack occurred. PX10950, WES Rpt., p 11-12.

On October 12, 2007, the Columbus Dispatch, a hometown newspaper of SPC Samuel Pearson, one of the two soldiers killed in the rocket attack on October 10, reported that American Commander Gen. David Petraeus "said the military had strong leads about who was behind the attack in which Pearson died." PX10909, Columbus Dispatch (Oct. 12, 2007). Three days later, CNN reported that the military had captured the "Camp Victory Suspect" and "three other known associates" were captured hiding within the Iraqi Ministry of Agriculture compound in Baghdad's Rusifiya district. PX10907, CNN (Oct. 15, 2007). The military public announced that it had "detained all of the leadership and key operatives of the indirect fire cell that attacked Victory Base last week." Id. At the time, Iranian-supported Shia militia groups, specifically the Badr Corps and Jaysh al-Mahdi, had "heavily infiltrated" key Iraqi government agencies, and Sadrist ministers aligned with Iran held "control [of] several important portfolios, including Health, Agriculture, and Transportation and had significant control over the Interior Ministry." See PX1096, Iraq Report (Feb. 10 – Mar. 5, 2007). The capture of cell leaders hiding within the compound of the Iraqi Ministry of Agriculture further supports the finding that the cell that committed this attack belonged to the Iranian-supported SMG.

After analyzing the location, timing, tactics, Plaintiffs' experts jointly conclude that SMG likely committed this complex attack. WES Rpt., p. 8-10.

Having reviewed the available evidence, I find this conclusion credible and supported, and I recommend the Court find sufficient evidence to attribute Attack #45 to SMG.

**2. The personal injuries or deaths that occurred from the attack.**

The rocket attack resulted in the death of two soldiers and wounded approximately forty others. Id.; PX10916, Ops Report ("2 CF KIA 37 CF WIA"). Sgt Snow suffered concussive blast injuries, including loss of consciousness. PX10900, Decl. of Kevin Snow, ¶ g. Initially treated for a ruptured eardrum, doctors later diagnosed him with Traumatic Brain Injury and Post-Traumatic Stress Disorder, among other injuries. Id., ¶ h, j-l.

**3. The relationship of the victims of the attack to the respective plaintiffs.**

Kevin Snow brings claims for the personal injuries he sustained during the attack. See ECF Doc.100, 2ⁿᵈ Amend. Compl., ¶¶ 1221-1227. Plaintiffs Adrienne Snow, Jasmyne Arquiett, N.A.P. Snow, and G.L.A. Snow are family members of Kevin Snow asserting claims for solatium, mental anguish, and emotional pain and suffering related to the attack and the personal injuries suffered by Sgt Snow. See id., ¶¶ 1228-1232; and PX10915, § II (1). All are U.S. Nationals. See ECF Doc.81-2, at 7, summarizing Ex. 62 (proof of status for plaintiffs in "The Kevin Daniel Snow Family.")

**4. The attack involved a Shia Militia Group that received material support from Defendants.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved a Shia Militia Group (i.e., Jaysh al-Mahdi, PDB, KH, AAH). Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, and Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi "provided material support, as that term is used in 28 USC § 1605A(a)(1), to the Shia terrorist groups the Badr Corps, Jaysh al-Mahdi, the Promised Day Brigade, Asa'Ib ahl al Haq, Kata'ib Hizballah, and the Sheibani Network during the relevant time period of 2003-2011." See ECF Nos. 127 and 136 (finding that all defendants, except NIOC, provided material support to the Shia terrorist groups between 2003

and 2011; See also ECF Doc.137, at 3; "the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups[.]").

**5.   The attack involved a requisite act or acts listed in 28 USC § 1605A(a)(l).**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because each attack resulted in at least one death. See 28 USC § 1605(A); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024.

**6.   Defendant's provision of material support was a proximate cause of the attack.**

Based on the evidence submitted for this attack and the Court's prior orders, as detailed above, I conclude that the material support provided by Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security, Bank Melli Iran, and Bank Markazi to the Shia terrorist groups was essential to the groups' operating capacity and terrorist attacks involving the Shia terrorist groups in Iraq from 2003 through 2011 were reasonably foreseeable and a natural consequence of that material support. Therefore, the Defendants' provision of material support to the responsible Shia terrorist groups (e.g., Jaysh al-Mahdi, PDB, KH, AAH) was a proximate cause of the non-bellwether Attack # 64—the October 10, 2007, Rocket attack on FOB Liberty that personally injured Plaintiff Kevin Snow.

**IV.   CONCLUSION AND RECOMMENDATION**

I find the evidence submitted for non-Bellwether Attacks # 37, 45, 48, 62, and 64 credible and sufficient to attribute each of those attacks to the named terrorist groups, which received material support from the defendants. This material support was a proximate cause of an extrajudicial killing within the scope of 28 USC § 1605A and resulted the personal injuries or deaths of U.S. Servicemembers, contractors, or nationals, upon which Plaintiffs' claims are based.

I recommend the Court hold Defendants Iran, IRGC, MOIS, Bank Melli Iran, and Bank Markazi liable for Attacks # 37, 45, 48, 62, and 64.

## V.     REVIEW BY THE DISTRICT COURT

According to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Docs. 139, 140, and 145), Plaintiffs may file an objection to, or motion to modify/adopt, a finding, report, or recommendation by the Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide de novo all objections to findings of fact or conclusions of law made or recommended by the Special Master. The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. See Fed. R. Civ. P. R. 53(f)(3), (4) and (5).

Date: April 15, 2024                                           Respectfully Submitted,

*s/ Ronald V Swanson*
HON. RONALD V. SWANSON (RET.)
SPECIAL MASTER

.