## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ESTATE OF CHRISTOPHER BROOK FISHBECK, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No. 1:18-cv-2248-CRC** |
| **v.** | ) | |
| | ) | **Special Master Michael J. Borden** |
| **THE ISLAMIC REPUBLIC OF IRAN, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |
| **This Document Relates To:** | ) | |
| ESTATE OF JEREMY JAMES FISCHER, | ) | |
| SARAH A. WATTIER, ESTATE OF LARRY | ) | |
| ALLAN STILWELL, RYAN C. STILWELL, | ) | |
| RACHEL L. VERA, JIMMY STILWELL, | ) | |
| RYAN PATRICK VALLERY, MICHELLE | ) | |
| RENOWDEN, PATRICK VALLERY, SANDRA | ) | |
| VALLERY & WILLIAM LEE NESTOR, | ) | |

### REPORT AND RECOMMENDATION REGARDING
### DEFENDANTS' LIABILITY FOR WAVE 1 ATTACKS 39, 50, 54

In this case, over 1400 plaintiffs bring claims against Iran and its alleged instrumentalities under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, seeking damages resulting from death or injury caused to United States servicemembers in over 400 terrorist attacks during operations in Iraq from 2003 to 20011.[1]  The Court has found defendants liable for providing "material support" for 12 of 15 bellwether terrorist attacks.  Order

---

[1] See Plaintiffs' Second Amended Complaint (Doc. 100). Defendants in the case include: Islamic Republic of Iran ("Iran"), Islamic Revolutionary Guard Corps ("IRGC"), Iranian Ministry of Intelligence & Security ("MOIS"), Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran ("Bank Melli"), and National Iranian Oil Company ("NIOC"). See id. The Court has found sufficient evidence demonstrating that all defendants, except NIOC, provided "material support" to various terrorist groups within the meaning of 28 U.S.C. § 1605A(a)(1). See Order at 2 (Doc. 127) (Iran, IRG, and MOIS); Memorandum Opinion and Order at 2-7 (Doc. 136) (Bank Markazi and Bank Melli). The Court invited plaintiffs to supplement their evidence regarding NIOC. Memorandum Opinion and Order at 7 (Doc. 136).

at 2 (Doc. 127). <u>Memorandum Opinion and Order</u> at 8-28 (Doc. 137). Subsequently, the Court appointed several Special Masters, including the undersigned, to, *inter alia*, assist the Court with determining liability for claims related to non-bellwether attacks in the case. <u>Order Appointing Special Masters for Non-Bellwether Liability & Damages Phase</u> at 1 (Doc. 145). This report and recommendation addresses defendants' liability for Attacks 39, 50, and 54 in the Wave 2 submissions. For reasons set forth below, the undersigned recommends the Court enter an order holding defendants liable for those attacks.

## I.  Legal Standards

In assessing liability, the undersigned is guided by (1) the provisions of 28 U.S.C. §1605A; (2) this Court's prior findings of fact, conclusions of law, and other relevant orders; and (3) other relevant precedent. <u>See</u> <u>Order Implementing Administrative Plan for Non-Bellwether Liability Determinations</u> ("<u>Administrative Order</u>") at 2 (Doc. 140). The Court has already found the defendants were properly served and the criteria for establishing subject matter jurisdiction have been met. <u>See</u> <u>Memorandum Opinion and Order</u> at 2-3 (Doc. 137). Accordingly, the undersigned focuses his analysis on whether each attack was committed by a terrorist group that received material support from the defendants. <u>See</u> <u>id.</u> at 3 ("all that remains is for the Court to determine whether each bellwether attack was committed by a terrorist group that received material support from the defendants"). The Court has previously found that the defendants provided material support to the two terrorist groups alleged to have carried out the attacks addressed in this report and recommendation. *See* <u>Order</u> at 2 (Doc. 127).[2]

---

[2] Plaintiffs allege Attacks 39 was carried out by Ansar al Islam, and Attacks 50 and 54  were carried out by Al Qaeda in Iraq. The Court has found defendants provided material support to both of these terrorist groups.

II.     **Analysis**

A.  <u>**Wave 2 Attack 39: July 11, 2004 attack in Salah ad-Din Province, Iraq**</u>

On July 11, 2004, Plaintiff Sergeant Jeremy J. Fischer was killed in a complex ambush attack involving an improvised explosive device ("IED") and small arms fire near Samarra in the Salah ad-Din Province. Sgt. Fischer was driving a High Mobility Multipurpose Wheeled Vehicle (Humvee), which was the third vehicle in a twenty-vehicle convoy traveling in Salah ad-Din Province from Balad to Tikrit along main supply route ("MSR") Tampa.  (Attack Brief for Attack 39 at 1).

During the early afternoon hours, while driving about six kilometers south of Forward Operating Base Brassfield-Mora, the convoy was ambushed, and Sgt. Fischer's Humvee was struck on the right front side by an IED. (PX7800 – Ops Report at 00000511; PX 7801 – U.S. Army Law Enforcement Report at 000019). The entire convoy then came under small arms fire and returned fire for some time. The IED blast was so powerful it destroyed Sgt. Fischer's Humvee, killing Sgt. Fischer and another servicemember in the front passenger seat, and injuring two others seated in the rear. (PX7801 – Fischer Army Law Enforcement Report, p. 000019). Sgt. Fischer died from the multiple penetrating and perforating shrapnel wounds to his chest and spine he sustained in the blast. (PX7802 – Fischer Autopsy Report p. 00000002).

Plaintiffs' experts attributed the attack to Ansar al Islam ("AAI"). (PX7816 – Expert Witness Report and Declaration of Col. Mark Lee Walters, CW4 Ronald Evans, and CW3 David Sultzer ("WES Attack 39 Expert Report") at 2). The experts' conclusion is based on the tactics, techniques, and procedures ("TTPs") employed in the attack, as well as the geographic location and time period of the attack. The experts cite "<u>The U.S. Army in the Iraq War, Volume 1</u>," (PX241

– U.S. Army Report) which chronicled the movement of AAI to the Sunni Triangle in late 2003 after AAI had been routed from Northern Iraq earlier that year. (PX7816 – WES Attack 39 Expert Report at 6). Balad and Samarra are in the heart of the Sunni Triangle.

The experts further opined that the sophisticated nature of the attack supported their attribution of the attack to AAI. *Id.* at 9. They pointed out that the attackers had to be well-trained to successfully attack a large convoy moving at a high rate of speed on a major highway. *Id.* They also noted that the IED attack was followed up by small arms fire as was typical of an AAI attack. *Id.* More specifically, the experts focused on the fact that the IED was detonated just at the time when Sgt. Fischer's Humvee – one of the smallest vehicles in the convoy – was passing. *Id.* Finally, the experts noted that the attackers were "able to escape without loss, indicating that they had rehearsed the plan and could move about the area with impunity." *Id.* at 8.

The undersigned is satisfied that there is sufficient evidence to support the experts' conclusion, based on the geographic location of the attack, its sophistication, and the TTPs employed, that Attack 39 was carried out by AAI, which received material support from the defendants. (Order, at 2, Doc. 127). For these reasons, the undersigned recommends the Court hold the defendants liable for Attack 39.

**B. Wave 2, Attack 50: August 12, 2005 near Khalidiyah, Iraq**

On August 12, 2005, Plaintiff Larry Stillwell, a U.S. civilian contractor was killed in a complex IED attack along MSR Michigan near the town of Khalidiyah, a few miles east of Ramadi in Al Anbar Province. (PX9301 – Ops Report; PX9302 – Autopsy Report; PX 9310 – Expert Report). At the time of the attack, Stillwell was working as a contractor for Kellogg, Brown, and Root ("KBR"), providing transportation support to the Coalition Forces. (PX9304 – Army Memorandum re KBR Contractor Identification). On August 11, Stillwell was assigned to a

convoy of eleven civilian trucks, supported by four military tanks. (PX9306 – "Mission to Camp Corregidor," National Public Radio Article by David Meridith, May 26, 2006). Their mission was to transport prefabricated buildings from Camp Al Taqaddum in Northwest Baghdad to Camp Corregidor in Ramadi. *Id.* En route to Camp Corregidor, four IEDs detonated in their path, causing some damage but injuring no one, and the convoy reached its destination safely. *Id.*

Around 1:30 p.m. the next day, August 12, 2005, the convoy left Camp Corregidor to begin the return journey to Camp al Taqaddum. *Id.* When traveling about 6.5 kilometers northwest of Khalidiyah, about 12 kilometers from Camp Corregidor, a series of IEDs struck vehicles in the convoy, and, as personnel dismounted to assist the victims of the explosion, the entire convoy came under small arms fire and rocket propelled grenades from north of the road. *Id.* The Coalition Forces returned fire, destroying two enemy vehicles and killing 5 insurgents. *Id.* The second of the IEDs struck Stillwell's flatbed truck, killing him. *Id.* Stillwell's autopsy report found that he was decapitated at the level of the first cervical vertebra. (PX9302 – Autopsy Report).

Plaintiff's experts attributed the attack to Al-Qaeda in Iraq ("AQI") based on the location and timing of the attack, and the tactics and weapons used. (PX9310 – Expert Report of Col. Mark Lee Walters, CW4 Ron Evans, and CW3 David Sultzer ("WES Attack 50 Expert Report") at 9). The experts cited a Department of Defense briefing indicating that Ramadi and its surrounding towns served as a base of attack for AQI. *Id.* at 6. The experts also pointed to the TPP used in the attack as strongly suggesting AQI as the perpetrator. *Id.* at  8-10. Specifically, the experts noted that AQI was using similar tactics in other attacks, namely the detonation of an IED followed by RPG and small arms fire attacks on first responders. *Id*. at 6. The experts explained that, based on their experience, "a successful execution of this type of IED attack, immediately followed by

small-arms and RPG fires required discipline, training, and synchronization which was a hallmark of al-Qaeda in Iraq (AQI) at that time." *Id.* at 10.

Given the location of the attack in an AQI stronghold, the use of complex TPP resembling that used in other attacks perpetrated by AQI, and credible attribution by the experts, the undersigned is satisfied that there is sufficient evidence to attribute Attack 50 to AQI, which received material support from the defendants. (Order at 2 Doc. 127). The undersigned therefore recommends the Court hold the defendants liable for the attack.

### C.  Wave 2, Attack 54: October 15, 2005 – IED attack in Ramadi, al Anbar Governorate, Iraq

On October 15, 2005, Specialist Richard Hardy was killed, and Sergeant Ryan Vallery, Sergeant Nessim Fournier, and Sergeant William Nestor were injured in a complex attack involving an IED and small arms fire near the town of al-Sufia, approximately 8 kilometers east of Ramadi in al Anbar Province. (Attack Brief for Attack No. 54 at 1; PX9910 – Ops Report at 2). At the time of the attack, their platoon was conducting security patrols around local polling stations during the Iraqi election. (PX9910 – Ops Report at 2).

While on patrol, the platoon turned a corner and noticed that the neighborhood they had entered was uncharacteristically quiet – devoid of activity and people. (PX9901 – Declaration of Ryan Patrick Vallery at 2). Within moments, an IED detonated, completely destroying the Bradley Fighting Vehicle carrying Spc. Hardy. *Id.* The explosion was so large, its percussive effect was felt two to three miles away. *Id.* Sgt. Vallery, who was in a different Bradley Vehicle, reported that the team had to wait approximately six hours for a recovery mission to reach them. *Id.* While awaiting their rescue, Sgt. Vallery and his colleagues watched as Spc. Hardy's Bradley Vehicle, and the ordinance within, incinerated: "During this time, we sat in our vehicle and watched our

fellow soldiers and friends burn, while small arms rounds, 25mm main gun rounds, and TOW missiles cooked off in our proximity." *Id.* Another IED detonated during the long wait for rescue, but it did not cause any further damage or injuries. *Id.*

Plaintiffs' experts attributed the attack to AQI. (PX9950 – Expert witness Report and Declaration of Col. Mark Lee Walters, CW4 Ronald Evans, and CW3 David Sultzer ("WES Attack 54 Expert Report") at 11-12). The experts based their conclusion on the geographic location of the attack, the TTPs employed, and the sophistication of the attack. *Id.* at 11.

Specifically, the experts reviewed and presented ample evidence demonstrating AQI's presence in al Anbar and around Ramadi. *Id.* at 8-9. In addition, they relied on a report by the Combined Joint Task Force 7, which explained that AQI was skilled at attacks "characterized by meticulous planning and pre-operational surveillance and intelligence gathering." (*Id.* at 9-10, quoting PX932 – CJTF-7 Red Cell: A Red Cell Political Military Assessment, "Future Al-Qaida and Zarqawi Network Operations in Iraq," 3 Feb 2004.) The experts noted that Attack 54 was consistent with this level of sophistication, as it involved not only the awareness of where Coalition troops would be patrolling, but also the undetected planting of a remotely activated IED and the evacuation of the area in advance of the attack. (PX9950 – WES Attack 54 at 11-12). Finally, they pointed out that the TTPs – ambush, remote controlled IEDs, and small arms fire – were typical of AQI. (*Id.* at 10, 12; PX9910 – Ops Report at 2).

The undersigned finds this evidence credible and is satisfied that AQI is responsible for Attack 54 based on the time and place of the attack, its sophistication, and the TPPs used. As AQI received material support from the defendants (Order at 2, Doc. 127), the undersigned recommends that the Court hold the defendants liable for Attack 54.

### III.     Conclusion

Based on the foregoing analysis, the undersigned recommends that the Court enter an order holding defendants liable for Wave 2 Attacks 39, 50, and 54.

### <u>REVIEW BY DISTRICT COURT</u>

Pursuant to this Court's orders governing special masters and implementing the administrative plan for this case (Doc. Nos. 139, 140, and 145), plaintiffs may file an objection to, or motion to modify/adopt, a finding, report, or recommendation by a Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide *de novo* all objections to findings of fact or conclusions of law made or recommended by the Special Master. The Court shall set aside a ruling by the Special master on a procedural matter only for an abuse of discretion. *See* Fed. R. Civ. P. Rule 53(f)(3), (4), and (5).

Dated: April 15, 2024                                  Respectfully Submitted,

                                                       */s/ Michael J. Borden*
                                                       Michael J. Borden
                                                       Special Master