IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF CHRISTOPHER BROOK FISHBECK, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | ) ) ) |
| Defendants. | ) ) ) ) |
| This Document Relates To: JARED WHITE, CHRISTOPHER LEE OLSEN, GWILYM NEWMAN | ) ) ) ) ) |

Case No. 18-cv-2248 (CRC)

Special Master Angela D. Gupta

**REPORT AND RECOMMENDATION REGARDING
DEFENDANTS' LIABILITY FOR WAVE 2 ATTACKS 41, 47 & 60**

In this case, over 1400 Plaintiffs assert claims against Iran and its alleged instrumentalities under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, seeking damages resulting from death or injury to U.S. military members in more than 400 terrorist attacks during operations in Iraq from 2003 to 2011. Plaintiffs' Second Amended Complaint (Doc. #100).[1] With respect to 12 of 15 bellwether terrorist attacks, the Court has found Defendants liable for providing "material support" under 28 U.S.C. § 1605A. Memorandum Opinion And Order at 8-28 (Doc. #137). Subsequently, the Court appointed nine Special Masters,

---

[1] Defendants in the case include Islamic Republic of Iran ("Iran"), Islamic Revolutionary Guard Corps ("IRGC"), Iranian Ministry of Intelligence & Security ("MOIS"), Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran ("Bank Melli"), and National Iranian Oil Company ("NIOC"). Id.

including the undersigned, to assist with, among other things, determining liability for claims related to the non-bellwether attacks. <u>Order Appointing Special Masters For Non-Bellwether Liability & Damages Phase</u> at 1 (Doc. #145). This report and recommendation addresses the issue of liability for Attacks 41, 47, and 60 in Plaintiffs' Wave 2 ("W2") submissions. For reasons set forth below, the undersigned recommends that the Court enter an order holding Defendants liable for each of the attacks.

I. **Legal Standards**

In assessing liability, the undersigned is guided by: (1) the provisions of 28 U.S.C. § 1605A; (2) the Court's prior findings of fact, conclusions of law, and other relevant orders; and (3) other relevant precedent. <u>See</u> <u>Order Implementing Administrative Plan For Non-Bellwether Liability Determinations</u> at 2 (Doc. #140). The Court has already found that Defendants were properly served and the criteria for establishing subject matter jurisdiction have been met. <u>Memorandum Opinion and Order</u> at 2-3 (Doc. #137).[2] Additionally, the Court has found that Defendants provided material support "to various Shia and Sunni terrorist groups, that said support was essential to the operational capacity of those groups, and that attacks perpetrated by those groups in Iraq from 2003 to 2011 were the reasonably foreseeable and natural consequence of those defendants' material support."[3] <u>Memorandum Opinion And Order</u> at 1 (Doc. #136) (citing

---

[2] The undersigned notes that any plaintiffs who have not submitted evidence of their status as a U.S. national or member of the armed forces must do so to be eligible for default judgment. <u>Id.</u> at 3 n.1 (Doc. #137).

[3] More specifically, the Court found that, during the relevant time period of 2003 to 2001, all Defendants, except NIOC, provided "material support" to: (1) the Shia terrorist groups the Badr Corps, Jaysh al-Mahdi, the Promised Day Brigade, Asa'Ib ahl al Haq, Kata'ib Hizballah, and the Sheibani Network; and (2) the Sunni terrorist groups Al Qaeda, Al Qaeda in Iraq, and Ansar al Islam. <u>Order</u> at 2 (Doc. #127) (finding that Iran, IRGC, and MOIS provided material support to the subject terrorist groups); <u>Memorandum Opinion And Order</u> at 2-7 (Doc. #136) (finding that Bank Markazi and Bank Melli provided material support to the subject terrorist groups). The Court

2

Order (Doc. #127)).  Accordingly, the undersigned focuses her analysis on whether each attack was committed by a terrorist group that received material support from Defendants.  See id. at 3.

## II.  Analysis

### A.  W2 Attack 41: Direct-Fire Attack on August 6, 2004

On August 6, 2004, U.S. Army Corporal (CPL) Jared White was injured – and one of his fellow soldiers was killed – in a rocket-propelled grenade (RPG) attack in the town of Al Shula in north Baghdad, Iraq.[4]  Declaration of Jared Ray White ¶ f (PX8001); see also Ops Report (PX8000).  CPL White was stationed at Camp Blackjack in western Baghdad, where his missions included high-value-target apprehension, counter improvised explosive device (IED) operations, and intelligence gathering.  Declaration of Jared Ray White ¶¶ d, e (PX8001).  The location of the attack, i.e., the town of Al Shula, had been a hotbed of insurgent activity for weeks, and CPL White's team was tasked with making the area safe and free from insurgents.  Id. ¶ f.

On the afternoon of August 6, 2004, CPL White and another soldier posted themselves atop the roof of a building to provide overwatch.  Id.  Their job was to spot and engage insurgents while patrol teams would search and clear buildings and houses on foot when dismounted from their Humvees.  Id.  The mission went well for about half an hour, until the town erupted in gunfire.  Id.  CPL White and the other soldier were engaging the enemy from their rooftop position while approximately 40-50 insurgents, about 30-50 meters away, were shooting at every U.S. military

---

invited plaintiffs to supplement their evidence regarding NIOC.  Memorandum Opinion And Order at 7 (Doc. #136).

[4] The Court has found CPL Jared Ray White was a U.S. National and/or member of the U.S. armed forces at the time of the attack.  Opinion and Order at 7 (Doc. #126); Fed. R. Evid. 1006 Summary at 53 (Doc. #81-2).  CPL White was also injured in an attack on August 26, 2004.  Declaration of Jared Ray White ¶ g (PX8001).  However, Plaintiffs do not seek a liability determination with regard to the August 26 attack at this time.

vehicle they could see. Id. About fifteen minutes later, a squad of U.S. soldiers came under fire on the street below. Id. The squad had been traveling in a Humvee when an RPG hit the ground and exploded directly in front them, causing the Humvee to flip on its side and pin the gunner, Specialist (SPC) Joshua Bunch, on the ground. Id. CPL White and the soldier jumped from the roof and ran to the wreck, while also returning fire at the insurgents Id. They helped pull soldiers from the Humvee and engaged enemy targets, who were located about 40 meters away. Id. SPC Bunch was trapped under the vehicle and having difficulty breathing. Id. CPL White held his hand and tried to comfort him while other soldiers attached a winch to another vehicle and flipped the Humvee upright. Id. SPC Bunch stopped breathing and CPL White administered CPR. Id. Unfortunately, SPC Bunch did not survive. Id.

As a result of the attack, CPL White incurred physical injuries to his knees and ankles when he jumped from the roof. Id. Additionally, CPL White suffered emotional distress, including depression and an overall sense of guilt over the loss of SPC Bunch. Id.

On September 20, 2004, CPL White received the Army Commendation Medal for his "meritorious valor during intense combat operations against Mahdi's Army" in the battle on August 6, 2004. Ex. G to Declaration of Jared Ray White (PX8001).

Plaintiffs' expert opines that the August 6, 2004 attack was conducted by the Shia terrorist group of Jaysh al Mahdi (JAM).[5] Declaration & Expert Witness Report of Michael P. Pregent re: CPL White (PX 8009).[6] The expert forms this opinion based on the location of the attack, the

---

[5] As noted, the Court has found that, during the relevant time period, Defendants provided material support to JAM within the meaning of 28 U.S.C. § 1605A(a)(1). Order at 2 (Doc. #127).

[6] Plaintiffs submit expert reports prepared by Michael P. Pregent to attribute responsibility for W2 Attacks 41, 47, and 60. In determining liability for the bellwether attacks, the Court relied on submissions by this same expert. See Memorandum Opinion and Order at 8 n.3 (Doc. #137).

4

munitions and tactics utilized, and the fact that JAM had primacy and control of the territory at the time.  Id.  The expert states that during the relevant time frame, the area in which the attack occurred (i.e. the Al Shula neighborhood of Kadhimiya district of Baghdad) was predominantly Shia, which would have made it significantly easier for JAM to maintain overall operational dominance.  Id. at 2.  The expert also states that the neighborhood is nearby to Sunni areas, making it ripe for sectarian violence.  Id.  In reviewing terror group activities occurring in the area in 2004 and 2005, the expert determined that civilians and Iraqi police were frequently targeted in Vehicle-Born IED (VBIED) attacks, a signature AQ/AQI weapon, to stoke sectarian violence.  Id.  However, these attacks were conducted near high-speed avenues that would have allowed for quick ingress/egress, suggesting that AQ/AQI did not have primacy and control of the area.  Id.  The expert states that reports near the time of the subject attack show a large increase in small-arms fire and RPG attacks against Coalition Forces – without the use of VBIEDs – which would require operational dominance, overwatch, and military training consistent with JAM's primacy and control at the time.  The expert further points out that his conclusion is buttressed by the Army's Commendation Medal that recognized CPL White for his valor during combat operations against "Mahdi's Army," which translates to Jaysh al-Mahdi (JAM).  Id. at 3.

Upon careful review of the facts and supporting evidence, the undersigned finds the expert's conclusions to be credible and concludes there is sufficient evidence to attribute the August 6, 2004 attack to JAM, which received material support from Defendants.  Accordingly, the undersigned recommends that the Court enter an order holding Defendants liable for W2 Attack 41.

---

Accordingly, the undersigned finds he is qualified to offer opinions regarding attribution of responsibility for these W2 attacks.

### B. W2 Attack 47: Command-Detonated IED Attack on July 16, 2005

On July 16, 2005, Sergeant (SGT) Christopher Olsen was injured in an IED attack that killed his fellow soldier, Sergeant First Class (SFC) Ronald Wood.[7] SGT Olsen was the driver of the lead vehicle in a military convoy comprised of seven armored Humvees. Declaration of Christopher Lee Olsen ¶ h (PX8800). SFC Wood, the convoy commander, was seated in the front right position, and Specialist (SPC) Erick Lund was in the gunner position. Id. That morning, the convoy drove from Tikrit to the Battalion Headquarters at Kirkuk Air Base so that SGT Olsen could re-enlist and the unit could pick up their mail and meet with other soldiers who were stationed there. Id. The attack occurred on the return trip to Tikrit, around 3:30 p.m., as the convoy was driving south on the Kirkuk-Tikrit Road in a rural area surrounded by farmland. Id. ¶ i. The road was newly paved with one narrow lane in each direction, making it just wide enough for two cars to pass. Id. ¶ i. There was very little traffic, so the convoy was driving down the middle of the road to minimize the possibility of an IED strike from either side. Id. ¶ i. The convoy had been driving for approximately 40 minutes and was about 20 minutes south of Kirkuk, with no indications of a threat, when suddenly the lead Humvee was hit by simultaneous explosions on both sides of the vehicle. Id. ¶ j.

Pieces of shrapnel hit SGT Olsen in his midback and left thigh causing him to thrust forward and hit his face and right shoulder, losing consciousness for about three minutes. Id. ¶ j. When SGT Olsen awoke, he saw that SPC Lund was badly hurt, SFC Wood appeared dead, and their Humvee was engulfed in flames. Id. ¶ j. Other soldiers in the convoy extracted them from the burning vehicle and obtained medical care for SGT Olsen and SPC Lund.

---

[7] The Court has found that SGT Christopher Lee Olsen was a U.S. National and/or member of the U.S. armed forces at the time of the attack. Opinion and Order at 7 (Doc. #126); Fed. R. Evid. 1006 Summary at 27 (Doc. #81-2).

SGT Olsen later learned more details of the attack from his "battle buddies" who had learned the results of a post-blast assessment performed by an explosive ordinance disposal team at the attack site. Id. ¶ m. More specifically, SGT Olsen learned the following information: Two IEDs were used, located on each side of the road, parallel to each other. Id. On SGT Olsen's side of the road, the IED was constructed of two 155 mm howitzer rounds which caused an explosion that peppered the driver's door with holes from shrapnel and left a crater about 7-8 feet wide and 3-4 feet deep. Id. ¶¶ m, n. On the other side of the road, the IED was constructed of rocket propellant that ignited in the blast and covered the Humvee, catching it on fire. Id. ¶ m. The Humvee "was like shredded cheese and burned to a crisp" and "totally destroyed." Id. ¶ n; see also Exhibit I thereto (photo of damaged Humvee).

Based on the location, the munitions and advanced tactics utilized, and the group that had primacy and control of the territory at the time, Plaintiffs' expert opines that the Sunni terrorist group Al Qaeda in Iraq (AQI) is responsible for planning, committing, and/or authorizing the July 16, 2005 attack.[8] Declaration & Expert Witness Report of Michael P. Pregent re: SGT Olsen (PX 8808). In reaching this conclusion, the expert created several maps showing Iran-supported terror group activities occurring within a 25-mile radius of the attack area between 2004 and 2006. Based on reports of the tactics utilized in these attacks, such as suicide attacks, suicide vehicle-borne IEDs, and vehicle-borne IEDs, the expert concluded the area was highly saturated with AQI

---

[8] As noted, the Court has found that, during the relevant time period of 2003-2011, Defendants provided material support to AQI within the meaning of 28 U.S.C. § 1605A(a)(1). Order at 2 (Doc. #127). Plaintiffs' expert states it is also possible that the attack was committed by the Sunni terrorist group Ansar al Sunna/Ansar al Isla (AAS/AAI), which worked closely with AQI and used the same tactics, techniques and procedures as AQI. See Declaration & Expert Witness Report of Michael P. Pregent re: SGT Olsen at 1 n.1 (PX 8808). Because the Court has found that Defendants provided material support to both groups, see Order at 2 (Doc. #127), the possibility that AAS/AAI may have committed the attack does not alter the undersigned's recommendation that Defendants should be held liable for the attack.

members who were well-supplied with Iranian munitions and well-trained in their use.[9] Further, the expert cited reports of AQI, or groups under the leadership of Zarqawi (the head of AQI), conducting attacks and confirming their presence in the area. By contrast, the expert found only a small number of Sunni-related activities, making it "highly unlikely" that JAM would have been capable of conducting an IED attack of this complexity, especially in an area located so far away from any population center. Id. at 3.

Upon reviewing descriptions of the subject attack, the expert found the insurgents likely knew that the convoy would be returning down the same road later in the day and executed a well-organized and well-planned attack that was tailored with two types of IEDs, from both sides of the road, to ensure that the convoy would likely be struck no matter which side of the road it travelled down. Id. The expert states the attack was designed to have one IED "cripple the vehicle" and the other IED "ignite an accelerant" to engulf the vehicle in flames. Id. at 2. The expert opines that the attack would have required overwatch to ensure that that the IEDs were command-detonated to explode at the precise time when the lead Hummer approached the kill zone. Id. The expert points out that the insurgents were able to successfully track the convoy without being seen, despite being in a rural area with less cover, which indicates that the group had primacy control of the area. Id.

Upon careful review of the facts and supporting evidentiary record, the undersigned finds the expert's conclusions to be credible and concludes there is sufficient evidence to attribute the July 16, 2005 attack to AQI, which received material support from Defendants. Accordingly, the

---

[9] According to the expert, the reports show that large caches of IED-making materials, along with numerous arms and ammunition, were found in Kirkuk and along the route that the convoy took, demonstrating that insurgents in the area were receiving a steady supply of munitions. Id. at 3.

undersigned recommends that the Court enter an order holding Defendants liable for W2 Attack 47.

### C. W2 Attack 60: Sniper Attack on April 12, 2007

On April 12, 2007, Army First Lieutenant (1LT) Gwilym J. Newman was killed in a sniper attack in Tarmiyah, in the Salah al Din province in Iraq.[10] Ops Report (PX10512); Declaration & Expert Witness Report of Michael P. Pregent re: 1LT Newman (PX 10514).  1LT Newman was on a dismounted patrol when he received a single gunshot to the head from an elevated position in the southwest direction.  Id.; see also Autopsy Report (PX10500)  The surrounding areas were searched, but the sniper was not found.  Id.

Plaintiffs' expert attributes the attack to AQI based on the location, the munitions and advanced tactics utilized, and the fact that AQI had primacy and control of the territory at the time. Declaration & Expert Witness Report of Michael P. Pregent re: 1LT Newman (PX 10514). According to the expert, the Tarmiyah area in the Salah al Din province was strategically important to AQI to move fighters and weapons into Iraq and control the surrounding areas of Baghdad.  Id. The expert further opines that the "expert skill required to perform a head shot from a distance indicates a specialty AQI sought when requesting skilled foreign fighters with sniper training [to] enter Iraq and serve with AQI."  Id. at 1.  The expert states that, six weeks after 1LT Newman was shot, there was another sniper attack only 200 meters away that resulted in the death of another soldier, which "strongly indicates" that AQI brought in a foreign fighter sniper who was conducting attacks for AQI.  Id. at 2-3.  The expert created maps to compare other attacks within a two-mile radius of the area from 2006 to 2008 and found it was "highly-saturated with AQI

---

[10] The Court has found that 1LT Gwilym Joseph Newman was a U.S. National and/or member of the U.S. armed forces at the time of the attack.  Opinion and Order at 7 (Doc. #120); Fed. R. Evid. 1006 Summary at 11 (Doc. #81-2).

9

members who were well supplied with Iranian munitions and well trained in their use." Id. at 2. In support of this opinion, the experts cites reports showing significant AQI activity using AQI tactics like suicide attacks and vehicle-borne IEDs. Id. For example, less than two months before the subject attack, Coalition Forces received information that AQI was planning an attack with 180 fighters in Tarmiyah. Id. Six days after the subject attack, an AQI IED-triggerman was apprehended only 400 meters aways from where 1LT Newman was shot. Id. By contrast, there were only three reports of Shia activity and only two reports of EFPs during this timeframe, suggesting it is "highly unlikely" that another group committed the attack. Id. at 3.

Reviewing the facts and evidence collectively and without the benefit of contrary evidence, the undersigned finds sufficient support to conclude the April 12, 2007 attack was perpetrated by AQI, which received material support from Defendants. Accordingly, the undersigned recommends that the Court enter an order holding Defendants liable for W2 Attack 60.

### III. Conclusion

Based on the foregoing analysis, the undersigned recommends that the Court enter an order holding defendants liable for W2 Attacks 41, 47, and 60.

### REVIEW BY DISTRICT COURT

Pursuant to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Nos. 139, 140, and 145), plaintiffs may file an objection to, or motion to modify/adopt, a finding, report, or recommendation by Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide *de novo* all objections to findings of fact or conclusions of law made or recommended by the Special Master.

The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. See Fed. R. Civ. P. Rule 53(f)(3), (4), and (5).

Dated: April 15, 2024                                            Respectfully Submitted,

                                                                                      */s/ Angela D. Gupta*
                                                                                      Angela D. Gupta
                                                                                      Special Master