## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESTATE OF CHRISTOPHER BROOK FISHBECK, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:18-cv-2248-CRC |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | ) ) | Special Master Jaime Dodge |
| Defendants | ) ) | |
| This Document Relates To: ESTATE OF AUBREY DALE BELL, LA'DARIUS BERNARD EZELL, TIFFANY NICOLE EZELL, KYSER EZELL, D'ZUNDRIA EZELL, PHILANDRIA EZELL, ROXIE BELL, TROY JAMES TUSCHEL, ESTATE OF MATTHEW CHARLES HENDERSON, OWEN L. HENDERSON, JAIMIE K. EGGE, JAMES THOMAS OLSON, RONNY PORTA, RENE EVA PORTA, FELIX A. PORTA & NATALI PORTA | ) ) ) ) ) ) ) ) ) ) ) ) ) | |

## REPORT AND RECOMMENDATION CONCERNING LIABILITY
## WAVE 2 - ATTACK NOS. 42, 51, 59, and 63

---

### I.    INTRODUCTION

This case is comprised of over 1400 plaintiffs alleging that Iran and various of its instrumentalities provided funding, weapons, and logistical support to the terrorist organizations and militia groups that they allege are responsible for the over 400 attacks described in plaintiffs' Second Amended Complaint. ECF 100. On August 18, 2023, this Court issued a Memorandum Opinion and Order ("Liability Order") in response to plaintiffs' motion for default judgment in

1

fifteen of these attacks. ECF 137. The Liability Order not only resolved the cases before it, but also was intended to serve as a bellwether for the remaining plaintiffs' claims. Id. at 1. Adopting the framework set forth in the Liability Order and incorporating its legal standards and analysis herein by reference as the law of the case, the undersigned relies upon the discussion therein to the extent portions thereof relate to the assessment of liability in this Report and Recommendation to avoid burdening the Court with duplicative assessments of law.

Thereafter, on September 28, 2023, the Court appointed me to serve as a Special Master in this case. Order, ECF No. 145.[1] Pursuant to the Court's Administrative Plan, the Special Master is to make or recommend findings of fact on: (1) the terrorist group(s) involved in the commission of the attack; (2) the personal injuries or deaths that occurred from the attack; and (3) the relationship of the victims of the attack to the respective plaintiffs. In addition, the Special Master is to make or recommend conclusions of law on whether: (1) the attack involved a group(s) that received material support from Defendants; (2) the attack involved a requisite act listed in 28 U.S.C § 1605A(a)(l); and (3) Defendant's provision of material support was a proximate cause of the attack. See Liability Order, ECF 137 at 2.

The undersigned respectfully submits this Report and Recommendation to assist in the Court's entry of judgment for liability related to: Attack #42 (LCpl. Abraham Simpson and LCpl. Danny Tram); Attack #51 (PFC Timothy Seamans); Attack #59 (SPC Alba Tanner); and Attack #63 (SPC Cody Grater).

## II.   FRAMEWORK FOR ASSESSING LIABILITY

---

[1] The Court has appointed nine Special masters, under Fed. R. Civ. P. 53 and 28 U.S.C. § 1605A(e), to assist with determining 1) whether defendants are liable for "non-bellwether" terrorist attacks, and 2) the amount of damages owed to plaintiffs whose claims arise from the terrorist attacks in this case. See id.

As set forth above, this Court has previously determined a number of threshold issues in this case. Specifically, the Court has already determined that: (1) it has personal jurisdiction over the defendants; see Liability Order, ECF 137 at 2 (citing Op. & Order, ECF 55 at 10); (2) the Islamic Republic of Iran was designated a state sponsor of terrorism in 1984, and has maintained said designation to this day (see Op. & Order, ECF 126, at 3-4); (3) all Plaintiffs are U.S. Nationals, members of the U.S. armed forces, or U.S. government contractors (see id., at 5-7); (4) Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security each provided material support (as defined by 28 U.S.C. § 1605A(a)(1)) to (a) the Shia terrorist groups the Badr Corps, Jaysh al-Mahdi, the Promised Day Brigade, Asa'Ib ahl al Haq, Kata'ib Hizballah, and the Sheibani Network, and also to the Sunni terrorist groups Al Qaeda, Al Qaeda in Iraq (AQI), and Ansar al Islam during the relevant time period of 2003-2011 (Order, ECF 127, at 2; see also Order, ECF 136, at 1-2 (extending same findings to Bank Markazi and Bank Melli)); and (5) the provision of this material support provided by these specific Defendants to these specific terrorist groups "was essential to the groups' operating capacity, and terrorist attacks involving these groups in Iraq during the relevant time period of 2003-2011, were reasonably foreseeable and a natural consequence of that material support." See Order, ECF 127, at 2; Op. & Order, ECF 136, at 1-2.

The Court therefore determined that because many of the criteria for subject matter jurisdiction were easily resolved, see Liability Order, ECF 137 at 2, "all that remains is for the Court to determine whether each…attack was committed by a terrorist group that received material support from the defendants." Id. at 3. The Court then set forth the evidentiary standards for default claims under the FSIA (id. at 6-7) and its approach to liability determinations (id. at 6-7), which are incorporated by reference here.

### III.    LIABILITY FINDINGS & RECOMMENDATIONS

In evaluating whether each bellwether attack was committed by a terrorist group that received support from the defendants, the undersigned Special Master has considered numerous factors, including: (1) whether the tactics, methods, or weapons used in the attack could be linked to the groups Iran supported; (2) whether the attack occurred in an area operationally controlled by one of the terrorist groups Iran supported; (3) whether an expert credibly opined that the attack was committed by an Iran-backed terrorist group; and (4) any other indicia that one of the subject terrorist groups was responsible for the attack. The Special Master has reviewed the evidence, including reports, declarations, and expert reports submitted by the plaintiffs; however, the determinations outlined below have been made without the benefit of opposing evidence from the defendants, who (as this Court previously noted in its Liability Order) have deliberately chosen not to present a defense in this matter.

### A.  Attack # 42: LCpl. Abraham Simpson (deceased) and LCpl. Danny Tram

#### 1.    November 9, 2004 – Complex Attack in Fallujah, Iraq

On November 9, 2004, I/3/1, K/3/1, and the 3/1 Weapons Company were conducting clearing operations in Fallujah. PX8250, Expert Report of Daveed Gartenstein-Ross (hereinafter "GR Exp. Rep.") at 2. Marines from I/3/1 (including LCpl. Danny Tram) and K/3/1 (including LCpl. Scott Vieira) were clearing houses and neighborhoods. See PX8210, Decl. of Scott Viera at ¶¶ 6-7. At the same time, Marines from the 3/1 Weapons Company (including LCpl. Abraham Simpson) were setting up mortars in the cleared areas, to launch at identified targets within Fallujah. Id. At approximately 12:10, all three groups of Marines were simultaneously attacked with rocket-propelled grenades (RPGs), 82mm mortar fire, sniper fire, and small arms fire. Id. The Marines recalled being ambushed initially by:

a few insurgents with AK47's, RPK's and Rocket Propelled Grenades… [which] stopped our movement forward and left one of our Humvees in the intersection taking fire….[Then] we got a call that another group of Marines had been ambushed and needed support [so a group of us] started making our way over to where the Marines were ambushed..… [but] having taken a wrong turn, [we] were ambushed from multiple sides of the street….In the process, a Marine was hit with shrapnel from an RPG and injured.  We eventually fought our way out…and were able to continue moving forward.  As we began moving forward, we began taking even more mortar fire at almost every intersection.  This all occurred over the course of approximately two hours.[2]

LCpl. Abraham Simpson was killed by severe shrapnel injuries, for which he posthumously received a Purple Heart. See PX8204, Autopsy Report of Abraham Simpson at 2; PX8206, Purple Heart Award.  LCpl. Tram was "seriously injured" and treated by the Surgical/Shock Trauma Platoon for wounds sustained to his leg and back. See PX8104, Casualty Report – Danny Tram at 1-2.

Plaintiffs' expert attributed the attack to Al Qaeda in Iraq ("AQI") based on: (1) the geographic location and timing of the attack, and (2) the tactics and weapons used. See PX8250, GR Exp. Rep.[3]

With respect to geographic timing and location, Fallujah was one of JTJ/AQI's major strongholds and, "AQI was the central insurgent force in both [the First and Second Battle of Fallujah] fights. In March 2004, AQI killed four American contractors in Fallujah, prompting the First Battle of Fallujah to eliminate these insurgents. The Second Battle of Fallujah (a/k/a Operation Phantom Fury) "was focused [specifically] on the challenges posed by the Zarqawi organization, which was [then] known as al-Qaeda in Iraq (AQI)." Id. at 3. Quantico highlighted

---

[2] This account from the Declaration of Scott Vieira (PX8210 at 1-2) is provided here in excerpted form to clarify (beyond the summaries provided in plaintiffs' brief and expert report) the nature of the attack.  In particular, the expert puts weight upon the complex nature of the attack as "overwhelmingly" requiring AQI's involvement.  It is therefore helpful to clarify more precisely the duration, scope, and magnitude of participation in the attack, as a foundation to the analysis that follows.

[3] Plaintiffs' expert, Daveed Gartenstein-Ross has already been accepted by this Court as an expert in this case; I concur in this assessment as applied to this Attack.

in a report commissioned by the Marines that "fewer than 500 civilians [were believed to remain] alongside 3,000 to 4,500 insurgents…[and] another 1,000 or so insurgents were operating in the entire Fallujah-Ramadi corridor." Id. at 3-4.

By November 2004, the city was nominally controlled by a coalition of insurgent groups known as the Fallujah Mujahideen Shura, which was in turn controlled by AQI, which contributed the "bulk of fighters and resources." Id. at 4-5. In particular, the US Government identified Abu Musab al-Zarqawi's deputy Umar Hadid "as the head of the Fallujah Mujahideen Shura's military wing." Id. at 5. AQI possessed such operational dominance in Fallujah in November 2004 that AQI fighters were responsible for the majority of anti-Coalition attacks, and further contributed material support to the other insurgent groups in the city—leading the expert to conclude that AQI was "overwhelmingly likely to be behind…attacks like the one at issue here." Id. at 5.

With respect to TTPs, the expert likewise concluded that a complex attack involving mortars, sniper fire, and small arms fire, was a second indicator that AQI was responsible for the attack. Specifically, throughout 2004, AQI-led insurgents had repeatedly attacked Coalition forces with machine guns, grenades, mortars, and explosives. Id. at 4-5.  In addition, the "array of weapons used in the attack demonstrates that the attack involved large-scale and coordinated fighting…characteristic of AQI's operations in Fallujah at the time." Id. at 5-6. CENTCOM noted that as early as the First Battle of Fallujah cells were already demonstrating a clear command and control structure—including in some cases chain of command, written orders, observation points and scouts. Id. AQI's Fallujah-based operations continued to grow in sophistication throughout 2004. By November 2004, when these attacks occurred, CENTCOM's report indicated that 3/1 (Simpson's unit) found "numerous computers, documents…training videos providing instruction

in the use of small arms, grenades, map reading and range and direction finding for mortar and rocket employment." Id. at 6.

### 2.   Conclusion and Recommendation

A number of indicia were presented that AQI was responsible for the coordinated attacks of November 9, 2004, including: (1) the use of simultaneous rocket-propelled grenades, mortar fire, sniper and small arms fire – weapons known to be possessed by AQI (and on which AQI was actively training its members with instructional videos confiscated the same month in Fallujah, by one of the units involved in the attack) (see id.); (2) the simultaneous attack on different Marine units in different locations was a signature tactic commonly employed by AQI (see PX8250, GR Exp. Rep. at 3-4); (3) the size/ complexity and duration of the attack, which included "extended engagement capabilities, multiple weapons employed, and coordinated nature of fighting…are representative of AQI's TTPs in Fallujah in fall 2004" (see id.); (4) the attack occurred in an area dominated by AQI, against units that were specifically tasked with driving AQI out of Fallujah (see id. at 2) as part of Operation Phantom Fury at the time they were attacked, providing a motive for the attack; and (5) during Operation Phantom Fury, AQI fighters were responsible for the majority of anti-Coalition attacks—and also had practical control over the Fallujah Mujahideen Shura coalition of Fallujah's insurgent groups, to which it contributed "the bulk of fighters and resources"—such that the location and timing made AQI "overwhelmingly likely to be behind complex attacks like the one at issue here." Id. at 4.

Against this backdrop, the expert concluded it was "more likely than not that AQI planned, committed, and/or authorized the November 9, 2004 attack; and that Iran's support was critical to the survival of AQI, significantly increased its capabilities, and substantially contributed to this attack." PX8250, GR Attrib. Rep. at 7. Finding these conclusions credible, the undersigned Special

Master is satisfied that there is sufficient evidence to attribute the forty-second attack to AQI, which received material support from the defendants, and recommends the Court hold defendants liable for the attack.

### B.  Attack # 51: PFC Timothy Seamans (deceased)

#### 1.  August 18, 2005 – Attack in Samarra

Private First-Class Timothy Seamans was killed when a large IED exploded, destroying the Humvee in which he was traveling. See PX9409, Ops Report. Seamans was the driver of the third vehicle in a convoy that was escorting an Explosive Ordinance Disposal (EOD) team. PX9409, Decl. of Zachary Burd, ¶ 4.  The EOD team had finished its clearance of a reported IED in Samarra, and the convoy began to return to base. Id. The convoy was driving along a narrow road, with berms on both sides, when Seaman's Humvee was destroyed by a large IED—killing all of the US servicemembers inside. Id. The Ops report indicated that the IED consisted of at least 3 155mm rounds on top of 75 57mm rockets, which were placed on top of an old cache and set in a way that would direct the blast upwards. See PX9419, Attrib. Rep. & Decl. of Michael Pregent at 3 (citing PX9404, Ops Report) ("Pregent Rep."). The Ops report assessment indicated that the IED was detonated by Senao base station (a wireless phone used by insurgents to remotely detonate IEDs). Id.

Plaintiff's expert[4] attributed the attack to Al-Qaeda in Iraq (AQI), concluding to a reasonable degree of military intelligence certainty that the attack that killed PFC Seamans was planned, committed and/or authorized by AQ/AQI given the location of the attack, the munitions and tactics utilized, and the group's primacy and control of the territory in which it occurred (including but not limited to an assessment of terrorist attacks occurring at or near the time and

---

[4] Plaintiffs' expert, Michael Pregent has already been accepted by this Court as an expert in this case; I concur in this assessment as applied to this Attack.

8

location of the attack at issue). <u>See</u> PX9419, Pregent Rep., at 2.  The expert cited a number of specifics about the attack, which led him to the conclusion that AQI committed or permitted the attack; these are reviewed below.

First, the attack itself required the perpetrator to have a number of assets, the combination of which indicated AQI involvement to the expert. (1) The perpetrator needed to have access to and ability to construct the sizable and powerful IED—likely comprised of 3 155mm rounds on top of 75 57mm rockets—which was then skillfully placed in a manner to direct the blast upwards. <u>See</u> PX9419, Pregent Rep. at 1-2; <u>see also</u> PX9404, Ops Report. (2) The perpetrator also needed to have not only the Sensao technology for the remote attack, but a permissive environment and overwatch position from which they could observe the convoy and trigger the IED at the right time to not simply hit whichever vehicle hit a trigger, but to specifically trigger it at the time that would ensure maximum damage (here, to hit the third vehicle).  <u>Id.</u> (3) Finally, the use of bait to get the convoy into the right position, combined with the other components of the attack, "demonstrate a sophisticated attack that would have required a high degree of training and precision." <u>See</u> <u>id.</u> at 3. Col. Ray Fitzgerald's expert report[5] supplements this conclusion, explaining that the vast majority of IED attacks are unsuccessful because proper detonation requires a unique combination of "training, planning, security, and preparation to ensure it was 'in the right place, at the right time, in the right way, at the exact aim point—and detonated at exactly the right time'" while successfully evading the vehicles' counter-IED measures. <u>See</u> PX11, Expert Rep. of Col. Fitzgerald, at 6.  Taken together, the combination of munitions and tactics required to successfully

---

[5] Having reviewed the credentials, methodology, and report of Colonel Fitzgerald, I find that he is qualified to serve as an expert on the identified topics of (1) Iran's support for Shia-related terrorist groups in Iraq and the threats encountered by Coalition Forces from such groups, including the threats from IEDs, EFPs, IRAMs, rockets, mortars and other weapons used against US forces, and (2) the methodology by which Coalition Forces gathered intelligence and determined the extent of the malign Iranian influence in Iraq.

orchestrate this attack indicated to the expert that AQI was more likely than not the perpetrator of the attack. <u>See</u> Pregent Rep. at 2.

Second, the location of the attack in Samarra—a Sunni-majority city, strategically important for AQI and under its control—contributed to the expert's conclusion that AQI was responsible for the attack. In October 2004, the Coalition Forces conducted Operation Baton Rouge (a/k/a the Battle of Samarra) "to attempt to clear the city of AQI's influence" but "AQI quickly re-established [its dominance] and resumed regular attacks on CF." <u>Id.</u> at 3. In the six months leading up to the attack at issue, the SigAct reports showed multiple "VBIEDs, at least 22 caches filled with munitions and IED making materials, and suicide bombers. The large number of caches [indicated to the expert] that AQI was well entrenched and consistently supplied. The VBIED attacks were also complex, involving multiple VBIEDs, or a suicide bomber and VBIED, along with small arms fire." <u>Id.</u> at 4. Moreover, a High Value Target had been captured in the area, followed by another bomb maker the following month, and then another HVT, only two weeks before the attack – suggesting to the expert that "it is very possible the attack was retaliatory for capturing the HVT." <u>Id.</u> The Samarra location thus provided AQI with motive for the attack, the requisite overwatch opportunities given its dominance in the city, and established means—as demonstrated by the "regular attacks" including both signature AQI TTPs, as well as specific SBVIED/VBIED attacks in the area. This led the expert to conclude that "this was an area highly-saturated with AQI members who were well supplied with Iranian munitions and well trained in their use." <u>Id.</u> at 4.

Third, in contrast to the substantial Sunni/AQI activity in the area, the expert noted only three SigActs by Shia militia groups, and only minimal other activities—"confirm[ing]" to the expert that "AQI was the dominant group in Samarra at the relevant time." <u>Id.</u> Collectively, this

demonstrated to the expert "to a reasonable degree of certainty that AQI had primacy and control of the area, and also was the group that committed the attack." Id. at 4.

The expert further concluded that Iran, the IRGC and MOIS provided material support to Sunni terrorist groups in Iraq including AQI, which "was essential to AQI's primacy, control and operations in and around Samarra before and after 18 August 2005. Without the funding, safe haven, safe passage, training and other critical support from Iran, AQ would have been substantially weaker, far less sophisticated, unorganized, and lack the means to conduct sustained violent operations against Coalition Forces in Iraq, including the 18 August 2005 attack that killed PFC Timothy Seamans." Id. at 4-5.

### 2.  Conclusion and Recommendation

The undersigned Special Master finds the expert's conclusion credible, and, as such, is satisfied that there is sufficient evidence to attribute this attack to AQI, which this Court has previously held received material support from the defendants. As detailed above, this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because the attack resulted in at least one death—in this case PFC Timothy Seamans and his companions. See 28 U.S.C § 1605(A). I therefore recommend that the Court find that there is sufficient evidence to attribute the fifty-first attack to AQI, which received material support from the defendants, and thus to hold defendants liable for the attack.

### C.  Attack # 59: SPC Alba Tanner

### 1.  August 27, 2006 – IED Attack in Hit

On August 27, 2006, SPC Alba Tanner's HMMWV was hit by a massive IED, which destroyed the HMMWV, killing Sgt. David Almazan and wounding SPC Tanner and SSG Joseph Core. See PX10404, Decl. of Alba Tanner, ¶¶ 3-6. Tanner was serving as the gunner in the third

vehicle of a four-vehicle convoy, as part of his unit's mission to carry out route clearance patrols, security missions, and serve as a Quick Reaction Force. Id. at 5. At 14:25, an IED struck SPC Tanner's vehicle, peeling open the roof and leaving the front end of the HMMWV pointing straight upwards in the air. See PX10413, Decl. Hector C. Vivieca ¶¶ f-h; PX10405, Ops. Report.

SPC Tanner and Sgt. Almazan were both thrown from the vehicle, while SSG Core remained trapped in the vehicle. See PX10405, Ops. Report at 1; PX10413, Decl. Hector C. Vivieca at ¶ g; PX10414, IED Report at 2. SPC Tanner was found unconscious and assessed as urgent surgical; he was therefore medevac'd to Al Asad airbase while the remaining convoy members attempted to assist the others. See PX10405, Ops. Report at 1. The HMMWV's driver, Sgt. Almazan's dismembered torso was eventually found 60-70 yards from the blast, as the unit followed a trigger wire. PX10413, Decl. Hector C. Vivieca at ¶ g. As the unit continued to work, they began taking small arms fire; then the QRF arrived to assist, and it too came under small arms fire. See PX10405, Ops. Report at 1-2. An Engineer unit was sent to recover the vehicle, but it too came under small arms fire from nearby buildings, such that they needed to again clear and secure the area. Id. Ultimately, an Explosive Ordinance Team was able to conduct a Post Blast Analysis and determine that the IED consisted of 2 Acetylene tanks packed with 200lbs of PE4 (military grade plastic explosive) and 3-4 unknown projectiles with a victim actuated or command wire initiation system, which had created a crater 12 feet long, 9 feet wide, and 7 feet deep. See PX10414, IED Report, p. 2.

A month later, SPC Tanner would awaken from a medically induced coma, with a collapsed lung, fractured jaw, nerve damage, a TBI and PTSD, as well as multiple shrapnel injuries. See PX10404, Decl. of Alba Tanner ¶ 10; see also PX10406, Purple Heart Award.

2. **Attack was Committed by AQI and/or AAS, Which Received Material Support from Defendants**

According to CENTCOM's Study of the Insurgency in Anbar Province, AQI and Ansar al-Sunna (AAS) [6] have had an unparalleled level of cooperation in the Hit-Haditha corridor, extending down to even street-level joint operations. See PX900, Study of the Insurgency in Anbar Province (CENTCOM, June 13, 2007) at 46. This relationship was acknowledged by the US State Department as early as 2004 and continued beyond 2007 – thus bookending the 2006 attack here. See, e.g., PX39, US Dept. of State, Press Statement, "Foreign Terrorist Organizations: Designation of Ansar al-Islam (AI)" (March 22, 2004); PX923, "Anbar Insurgency-the Seeds Are Planted" in Study of the Insurgency in Anbar Province, Iraq (CENTCOM, June 13, 2007), at 4-5. The plaintiffs' expert[7] testified that the two groups often engaged in joint training, funding, and joint operations and methodology—and together, AAS and AQI dominated Hit, before, during and after the attack at issue. PX10450, GR Exp. Rep. at 5, see also id. at 3, 4; PX900, "Anbar Insurgency Grows, Strengthens, Elections (2005), *in* Study of the Insurgency in Anbar Province, Iraq (CENTCOM) (June 13, 2007) at 46 (noting that in western Anbar, "the two groups provided one another with enhanced early warning against Coalition raids, assisted in the movement of fighters, and contributed to the other's ability to mass.").

In 2005, AAI's operations became further integrated with those of AQI, two components of which are particularly salient to the IED attack in Hit at issue here.  First, the two groups entered

---

[6] As the Court is aware from prior filings in this litigation, Ansar-al-Sunna has undergone several name changes, including Jund al-Islam (the initial name in 2001), and subsequently Ansar-al-Islam; because it was known as Ansar al-Sunna (AAS) at the time of the attack at issue, that name is used here.  Likewise, the name of Zarqawi's organization has shifted during the times relevant to this litigation, including but not limited to, Al Qaeda in Iraq ("AQI"), the Zarqawi organization, and Jamaat al-Tawid wal-Jihad. At the time of the attack, the organization was known as AQI and thus this term is preferred here.  Cf. PX10450, GR Exp. Rep. at 2-3.

[7] Plaintiffs' expert, Daveed Gartenstein-Ross has already been accepted by this Court as an expert in this case; I concur in this assessment as applied to this Attack.

a formalized agreement, including *inter alia* that AAS would seek AQI's approval for any attack it sought to carry out in Hit. PX10450, GR Exp. Rep. at 3, 4. Second, following the merger of AQI and AAS, a subgroup comprised of financiers and IED facilitators from AQI and AAS had begun offering compensation for IED placement and were active in the area of this attack. Id. at 5.

The expert dedicates substantial discussion to the degree to which AQI/AAS prevented not only Coalition movement, but dominated the local population, through a murder and intimidation campaign, which included beheadings, the collapse of civil government, and the abolition of social order in favor of the totalitarian theocracy AQI/AAS promoted—such that the groups "owned the roads". See id. at 4-5. The IED's detonation against the third vehicle required attackers to be able to stay in position to observe the convoy and detonate it at precisely the right time—another indication that this was an AQI/AAS attack, as the groups were the best positioned to surveil the route, bury the large IED in a public road, positioning a lookout to determine the precise moment to detonate, and then escaping undetected and unreported. PX10450, Exp. Rep. at pp. 5-6. And after the IED blast, many episodes of small arms fire occurred—a tactic used by both AAS and AQI in the area.

A further factor relevant to identifying the likely perpetrator was that the IED used here was highly sophisticated and displayed significant expert knowledge, access to and skill to assemble the components, and the ability to place, conceal and detonate the IED—which was placed along two established Coalition routes. PX10414, IED Report at 1-2. Notably, the acetylene tanks were a signature TTP of AQI according to the US military. See, e.g., PX778, Center on Contemporary Conflict Report 2012 at 64-65, 68; PX10415, US Marine Corps Center for Lessons Learned (Oct. 2005 Newsletter) at 5; cf. PX779, US Air Force Handbook 10-2401, Vehicle Bomb Mitigation Guide (Sept. 2006). Moreover, the IED was lethally effective, notwithstanding that the

armored convoy was using a variety of anti-IED countermeasures.  See PX10414, IED Report, at 1-2.

Finally, there was a particular motive for AQI to undertake these attacks. AQI had lost its foreign fighter and cross-border networks in early 2006, and was motivated to increase its presence in other areas, like Hit, to compensate for this loss. See PX898, "AQI Dominates the Insurgency (2006)," in Study of the Insurgency in Anbar Province, Iraq (CENTCOM, June 13, 2007), at 39. AQI's efforts particularly focused on thwarting Coalition efforts to establish a police force in Hit, during this time. Id. at 52, 97. In addition, AQI sought to attract more media attention to Hit, by increasing the number of attacks in the city. Id. at 127. Finally, the AQI leadership was also seeking to disrupt Coalition supply lines in the Haditha corridor – which attacks on Hit would aid. Id.

Taken together, the expert concluded to a reasonable degree of certainty that AQI and/or AAS committed the attack on Tanner's unit. He further concluded that Iran provided material support to these terrorist groups, which was essential to their ability to conduct the attack. Without the funding, safe haven, safe passage, training and other critical support from Iran, AQI and/or AAS would have been substantially weaker, far less sophisticated, unorganized, and lack the means to conduct sustained violent operations against coalition forces in Iraq, including the IED attack that wounded SPC Tanner.

### 3.  Conclusion and Recommendation

There is sufficient basis to find the expert's conclusion credible. In particular, evidence was presented that AQI/AAS were actively orchestrating IED attacks in the area through a new subgroup specifically tasked with IED attacks.  This focus resulted in frequent IED attacks in and near Hit during this time frame.  This pattern was consistent with the motive identified—that AQI had tasked members with launching more attacks in Hit at this particular time to prevent

establishment of a police force and compensate for the loss of al-Qaim networks.  Moreover, the significant magnitude of this particular IED, the use of acetylene tanks (a TTP of AQI), the intelligence information required not only for its placement but also to overcome the anti-IED countermeasures it was using, and the successive rounds of attack on personnel attempting to aid the wounded and recover the vehicle (identified by CENTCOM as a TTP of AQI, modeled after its attacks in Ramadi and Fallujah), further support the expert's conclusion that AQI/AAS were responsible for the attack.

The level of control identified by the expert in this attack is more significant than that typically alleged in other attacks, and thus warrants underscoring, given that the value of primacy varies substantially across the attacks in this litigation (and may be minimal in some attacks).  At the time of this attack, AQI/AAS had collapsed the then-existing civil government and social order, replacing them with its own structures, and was now "dominating" the population.  AQI extended its dominance to terrorist activities, as demonstrated by the requirement that even AAS seek its approval for any attack it planned to carry out in Hit.  The features of this particular attack—which required substantial time on the ground not only in preparing for and deploying the attack as the convoy passed, but also through the repeated rounds of fire that occurred in numerous successive waves after the detonation—provide further indicia of AQI support for the attack, in light of the evidence that AQI/AAS not only dominated the population in the area but also "owned the roads" in Hit at the time of the attack.   This likelihood of involvement becomes particularly strong when the dominance is combined with the use of specific AQI/AAS TTPs detailed above—and conversely, the likelihood another unaffiliated actor would encroach on AQI/AAS territory without their approval but utilizing their own TTPs appears more remote.

The undersigned Special Master is therefore satisfied that there is sufficient evidence to attribute this bellwether attack to AQI and/or AAS, which this Court has previously held received material support from the defendants. As detailed above, this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because the attack resulted in at least one death—that of Sgt. David Almazan. See 28 U.S.C § 1605(A). I therefore recommend that the Court find that there is sufficient evidence to attribute the fifty-ninth attack to AQI and/or AAS, which received material support from the defendants, and thus to hold defendants liable for the attack.

### D.  Attack # 63: Spc. Cody Grater (Deceased)

#### 1.  July 29, 2007 – IED Attack in Sadr City

Plaintiff PFC Cody Grater was on guard duty on a rooftop position at Combat Outpost Callahan, when he was killed by an RPG attack. See PX10850, Exp. Rep. Michael Pregent at 1. Grater and PFC Mark Cataldo were stationed in "[g]uard post six, [which] provided protective overwatch of [the] main gate and served as an early warning outlook into the surrounding neighborhood." See PX10815, Mark Cataldo Decl., ¶¶ f-m. Cataldo observed a red tracer coming toward the post, but neither man had time to react before the RPG exploded. See id. The RPG had been fired from a concealed position, at a distance far enough away to permit Cataldo to momentarily see the RPG prior to its detonation. Id. When Cataldo regained consciousness from the impact, he saw Grater sitting in an awkward position trying to speak. Id. Grater was eventually able to say "I can't breathe" and Cataldo saw that the nose cone of the RPG had directly struck Grater's torso and penetrated his chest. Id. Despite evacuation for medical treatment, Grater later died due to a "perforating blast fragmentation injury to his torso." See id. at ¶ I; PX10902, Autopsy Report.

## 2.  Attack was Committed by JAM, Which Received Material Support from Defendants

Plaintiffs' expert attributed the attack to Jaysh al Mahdi (JAM), based upon: (1) the location, date, munitions and tactics used to commit the attack, (2) JAM's primacy and control of the territory at the time, given the nature of the attack, and (3) official government reports of terrorist activity and other related activity near the location and time of the attack.[8] See Pregent Decl. & Exp. Rep. at 1 (hereinafter "Pregent Rep.").

Specifically, the expert noted that in this mid-to-late 2006 timeframe, there was substantial Shia/Sunni sectarian violence occurring. Id. at 2. The Sha'ab neighborhood where the attack occurred "was an important area for JAM and became even more critical to the group's operations as sectarian violence…increased in mid-to-late 2006" because control of this area (adjacent to the Shia-dominated Sadr City area as well as Sunni neighborhoods) provided it a "prime area for SG/JAM to launch attacks." See id. The US Army specifically noted Sadar City and Sha'ab as a place where "Shia militiamen found safe havens from which to launch raids against Sunni enclaves throughout the city." See PX242, US Army in Iraq, Vol. II, p.101; see also PX10850, Pregent Rep. at 2. Thus, JAM had complete freedom of movement between Sha'ab and the group's established stronghold in Sadr City. Id.

The expert further opined that only a dominant group could maintain the unimpeded lines of movement necessary to conduct this operation—thus JAM's primacy and control over the area demonstrated its responsibility for the attack. Id. at 2. In his assessment, the expert noted that the attack required a cell to have eyes on the target, awareness of the US operations in the area, intelligence, and advanced training of both the cell and the triggerman, in order to conduct this

---

[8] Plaintiffs' expert, Michael Pregent has already been accepted by this Court as an expert in this case; I concur in this assessment as applied to this Attack.

operation. PX10850, Pregent Rep. at 1-2. In addition, the insurgent needed to be comfortable enough in the area to monitor the outpost and then escape after the attack without being captured (ostensibly by either the Coalition Forces or locals, if this were perpetrated by a Sunni rather than Shia group, given the sectarian violence at that time). Id. This further suggested to the expert that the perpetrator would be from a dominant group, which possessed not only control within the vicinity at the time of the attack, but also the sophistication to obtain an accurate intelligence picture and to conduct the high degree of planning necessary to attack an outpost and then to escape undetected.  Id. at 1-2. In addition, the expert noted that coalition forces reported significant JAM activities in the immediate vicinity, and that JAM was very active in the immediate timeframe of the attack—and that this activity specifically included rocket attacks, like the one at issue. Id. at 2. This combination of factors formed the basis for the expert's opinion that JAM was responsible for the attack.

The expert also investigated the possibility of a Sunni group having launched the attack. However, the expert rejected this hypothesis given that the Army Canal road seemed to function as a barrier for the Sunni's, beyond which few attacks occurred. Id. Moreover, those few attacks that did occur were mainly suicide and vehicle bombings targeting Shia civilians or Iraqi Police. Id. The expert thus concluded that the Sunni attacks in this area were: (1) consistent with sectarian violence, not attacks on Coalition Forces, and (2) were distinguishable in their method, which focused on suicide and car bombings rather than RPG attacks.  This focus contrasted with JAM's use of rocket attacks and JAM's motive for the attacking Coalition Forces, given the Coalition's recent detention and targeting of HVTs in the area, reinforcing the expert's conclusion that JAM was the responsible group.

Turning to the TTPs, a number of features suggested to the expert that the responsible party must have had the support of Iran and Hezbollah. First, the attack occurred in broad daylight, against a fixed US military installation specifically designed to detect and prevent attacks, with alert and active trained soldiers actively monitoring for threats. See PX10815, Mark Cataldo Decl., ¶¶ d-h. The attacker needed to maintain the element of surprise notwithstanding the elevated target, demonstrating that the attacker possessed the skill, training, and knowledge to use cover and concealment, surveil the post, select a firing position, operate a shoulder-fired weapon system with deadly accuracy from a significant distance, and … avoid detection and evade capture notwithstanding the proximity to the base and the use of UAVs to search the surrounding area. See PX10850, Pregent Rep. at 1-2; PX10815, Mark Cataldo Decl. at ¶¶ d-f, h-n; PX10800, Ops Report. This indicated the group was highly motivated and well-trained, had substantial support and freedom of movement in the immediate vicinity, was specifically aware of US operations in the area, and had reliable intelligence combined with advanced planning. PX10850, Pregent Rep. at 1-2. For the expert, the high degree of planning, significant training, and accurate intelligence required were all consistent with JAM's TTPS in the area at the time—indeed, JAM had been conducting other rocket attacks in the area at the time. Id. at 2-3.

As a result, the expert concluded "to a reasonable degree of certainty that JAM had primacy and control of the area of Grater's attack…and was the group that committed the attack." See id. at 3.  He further concluded to a reasonable degree of certainty that "Iran, the IRGC and MOIS provided material support to Shia terrorist groups in Iraq including JAM, and this material support was essential to JAM's primacy, control and operations in and around Sha'ab before and after 29 July 2007. Without the funding, safe haven, safe passage, training and other critical support from Iran, JAM would have been substantially weaker, far less sophisticated, unorganized and lack the

means to conduct sustained violent operations against the Coalition Forces in Iraq, including the 29 July 2007 attack that killed PFC Cody Grater." Id. at 3.

### 3.   Conclusion and Recommendation

Finding this conclusion credible in light of the evidence put forward affirmatively demonstrating that JAM uniquely possessed all of the capacities necessary to successfully complete this attack—and buttressed by the lack of other similar attacks against coalition forces in the area by other groups during the relevant timeframe—the undersigned Special Master is satisfied that there is sufficient evidence to attribute this attack to JAM, which this Court has previously held received material support from the defendants. As detailed above, this attack involved an act of "extrajudicial killing" within the scope of the terrorism exception to the FSIA because the attack resulted in at least one death—in this case the death of PFC Cody Grater. See 28 U.S.C § 1605(A). I therefore recommend that the Court find that there is sufficient evidence to attribute the sixty-third attack to JAM, which received material support from the defendants, and thus to hold defendants liable for the attack.

## IV. REVIEW BY THE DISTRICT COURT

Pursuant to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Nos. No. 139, 140, and 145), Plaintiffs may file an objection to, or motion to modify/adopt, a finding, report, or recommendation by the Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide *de novo* all objections to findings of fact or conclusions of law made or recommended by the Special

Master. The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. <u>See</u> Fed. R. Civ. P. Rule 53(f)(3), (4), and (5).


Date: April 15, 2024                                     Respectfully submitted,

<u>/s/ Jaime L. Dodge</u>

Jaime Dodge
Special Master