UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF CHRISTOPHER BROOK FISHBECK, et al., ) ) ) Plaintiffs, ) ) v. ) ) THE ISLAMIC REPUBLIC OF IRAN, et al., ) ) Defendants ) ) This Document Relates To: ) MATTHEW PAUL SCHAFFER, LUCIA A. ) SCHAFFER, AMY JO FINNEGAN, ) RICHARD CRAWFORD, ) EDWARD B. JOHNSON, JAMES N. ) GRISSOM, TERRY STEWARD, ) ESTATE OF SASCHA GRENNER-CASE ) | Civil Action No. 1:18-cv-2248-CRC<br><br>Special Master Ellen L. Koblitz |

REPORT AND RECOMMENDATION
WAVE NO. 2 – LIABILITY
NON-BELLWETHER ATTACKS NOS. 43, 49, 53

I. **INTRODUCTION**

On October 15, 2023, the Court appointed me as a Special Master in this case. For the purpose of establishing liability for these attacks, the District Court has already found that: 1) service of process upon all Defendants was properly effectuated (*see* ECF No. 55, at 10); 2) the Islamic Republic of Iran was, at all times since 1984, a designated state sponsor of terrorism (*see* ECF No. 126, at 3-4); 3) all Plaintiffs are U.S. Nationals, members of the U.S. armed forces, or U.S. government contractors (*see id.*, at 6-7); 4) Defendants the Islamic Republic of Iran, Islamic Revolutionary Guard Corps, Iranian Ministry of Intelligence & Security, Bank Markazi, and Bank

Melli Iran each provided material support, (as defined by 28 U.S.C. § 1605A(a)(1),) to the Sunni terrorist groups Al Qaeda, Al Qaeda in Iraq (AQI), and Ansar al Islam, also known as Ansar al-Sunna (AAS) during the relevant time period of 2003-2011 (ECF No. 137, at 3, 13; *see also* ECF Nos. 127 and 136); and 5) the provision of this material support provided by these specific Defendants to these specific Sunni terrorist groups "was essential to the groups' operating capacity, and terrorist attacks involving these groups in Iraq during 2003-2011, were reasonably foreseeable and a natural consequence of that material support" *See* ECF Nos. 127, at 2; and 136, at 7). Prior to making my recommendations, I reviewed the evidence regarding whether the three attacks listed above resulted in an extrajudicial killing and whether the attacks were reasonably attributed to one of the previously identified terrorist groups.

### A. Attack No. 43: Plaintiffs Matthew Schaffer and Richard Crawford

#### i. January 13, 2005 – Attack in Mosul

On January 13, 2005, U.S. Army Sergeant Matthew Schaffer and Private First-Class Richard Crawford were wounded by an IED and gunfire when they were attacked while on patrol in central Mosul. *See* Plaintiffs' SAC, ECF No. 100, at ¶¶ 3610-3626; *see also* PX8409, Schaffer Fact Sheet; PX8305, Crawford Fact Sheet. SGT Schaffer and PFC Crawford were assigned to Headquarters and Headquarters Company, 3rd Battalion, 21st Infantry Regiment in Mosul, Nineveh Province. On the day of the attack, they were on patrol in a four-vehicle convoy when an IED exploded in the median of the road. PX8410, Expert Witness Report of Daveed Gartenstein-Ross ("DGR Report").[1] After the explosion, they came under fire from the enemy. PX8400, Decl.

---

[1] Col. M. Lee Walters and Michael P. Pregent, when it "considered numerous factors including: (1) whether the tactics, methods, or weapons used in the attack could be linked to the groups Iran supported; (2) whether the attack occurred in an area operationally controlled by one of the subject terrorist groups Iran supported; (3) whether an expert credibly opined that the attack was committed by an Iran-backed terrorist group; and (4) any other indicia that one of the subject

M Schaffer, ¶ d. The attack killed one servicemember, SGT Brian Mack, and wounded SGT Schaffer and PFC Crawford. PX8300, Decl. of R. Crawford, ¶¶ k, l. Both SGT Schaffer and PFC Crawford received the Purple Heart for injuries received during this attack. PX8404, Purple Heart (Schaffer); PX8302, Purple Heart (Crawford).

PFC Crawford received shrapnel and burn injuries and a traumatic brain injury, resulting in cognitive loss, as well as post-traumatic stress disorder (PTSD), anxiety, and a depressive disorder. PX8300, Decl. of R. Crawford, ¶ i. SGT Schaffer sustained shrapnel injuries, nerve damage, and an exacerbated wrist injury from a gunshot wound, as well as a concussion, which resulted in PTSD, exacerbated sleep apnea, and migraine headaches. PX8400, Decl. of M. Schaffer, ¶ e.

    ii. **Either AQI, AAS, or elements of both groups operating in purposeful coordination committed this attack.**

It is clear the attack on January 13, 2005, was committed by either the Zarqawi organization AQI or AAS operating in purposeful coordination because of the a) location and time of the attack, and b) tactics, techniques and procedures (TTPs) used in the attack.

As 2005 began, both AAS and AQI had the operational dominance in Mosul to commit this complex attack, with both groups described as "entrenched". PX8410, DGR Report, at p. 4. AAS continued to conduct attacks on U.S. forces in Mosul, including an attack on Forward Operating Base Marez on December 21, 2004, and a large assault on Combat Outpost Tampa on December 29, 2004. *Id.* In addition, "[t]he city's Sunni Arab population tolerated and even supported AQI and other insurgents and Mosul developed into a hub for AQI." *Id.*

---

terrorist groups was responsible for the attack." (Emphasis added.)[1] In ECF No. 137, at 8 fn. 3, this Court relied on Plaintiffs' expert Daveed Gartenstein-Ross.

AQI and AAS were also closely cooperating with each other in early 2005. *Id.* at p. 3. In December 2004, U.S. forces were conducting clearing operations in Mosul, transferring reinforcements to the area, providing a motive for these groups to work together. *Id.,* at 4. According to a Central Command report about the insurgency in Anbar Province, by April 2005 "AQI and Ansar al-Sunna showed a level of cooperation not seen elsewhere in Iraq extending down to street level joint operations in the Hit-Haditha corridor. Together, the two groups provided one another with enhanced early warning against Coalition raids, assisted in the movement of fighters and contributed to the other's ability to mass." *Id.* Both AQI and AAS possessed joint area of operations dominance in the area when this attack occurred, and both were motivated to conduct the attack. *Id.,* at p. 7.

At the time of the attack, both AQI and AAS routinely used IEDs and small arms fire to target Coalition Forces. Both groups also issued claims of responsibility for IED attacks. AQI claimed responsibility for two IED bombings in Mosul in June 2005. *Id.* at p. 6. AAS employed "how to" training videos featuring roadside IEDs, demonstrating the standardized use of explosives by the organization. *Id.* at p. 5.

The vast majority of IED attacks were unsuccessful. PX11, Expert Report of Col. B. Ray Fitzgerald[2], pp. 6-8. In order for an IED to actually cause casualties, it required training, planning, security and preparation to ensure it was "in the right place, at the right time, in the right way, at the exact aim point – and detonated at exactly the right time." *Id*. Further, IEDs had to be capable of evading counter-IED measures that were added to vehicles. The fact this IED

---

[2] Plaintiffs retained B. Ray Fitzgerald as an expert on "Iran's support for Shia-related terrorist groups in Iraq and the threats encountered by Coalition Forces from such groups" including from IEDs. He served thirty years of active duty and has extensive terrorism experience at a high level of expertise.

was successful speaks to a level of sophistication that would have only been available through an Iranian-supported terrorist group such as AQI or AAS.

**B. Attack No. 49: Plaintiffs Edward B. Johnson and James N. Grissom**

  **i. August 9, 2005 –Attack in Al Rasheed Neighborhood, Rusafa District, Baghdad**

First Lieutenant (1LT) Edward B. Johnson served as a Platoon Leader with B Battery, 1st Battalion, 76th Field Artillery Regiment in support of the Multi-National Division Baghdad and LTC James N Grissom served as an advisor with the Civilian Police Assistance Training Team (CPATT) for the Iraqi Ministry of Interior. *See* PX9203, Expert Witness Report of M. Lee Walters Ron Evans, & David Sultzer, p. 2 ("WES Rpt.). On August 9, 2005, 1LT Johnson was leading his platoon during a convoy movement through central Baghdad in the Rusafa District to escort LTC Grissom and his CPATT back to Victory Base Complex after completing a site survey at the Baghdad Police College in Rusafa District. *Id.* As the patrol was approaching the busy traffic circle in the Al Rasheed neighborhood, the lead HMMWV gunner engaged a Daewoo Prince station wagon that was driving directly into their formation. *Id.* Without stopping, the station wagon then detonated against the same vehicle of the convoy, killing the gunner, and injuring the other two passengers. *Id.* The vehicle borne IED (VBIED) contained 100-150kgs of explosives and destroyed fourteen civilian vehicles, killed three civilians, and injured fifty-six others. *Id.*

At least one U.S. servicemember was killed and five others injured, including 1LTC Johnson and LTC Grissom. *Id.,* p. 2, 6-7; *see also*, PX9202, Decl. of Edward B. Johnson, ¶¶ 7-13. 1LT Johnson experienced a concussion, back and shoulder injury, nerve damage to his left leg, tinnitus, and PTSD. *Id.*, ¶¶ 8-10. LTC Grissom experienced tinnitus, hearing loss, and PTSD. *See* PX9213, Decl. of James Grissom, ¶¶ 6-8; *see also* PX9204, VA Review Decision (5 Feb. 2008).

### ii.     AQI Committed the August 9, 2005 Suicide VBIED (SVBIED) Attack

Plaintiffs' experts attributed the August 9, 2005, SVBIED attack that injured Plaintiffs to an AQI cell operating in the vicinity of the al-Rasheed Neighborhood in the Rusafa District of Baghdad, Iraq. *See* PX9203, WES Rpt., p. 2.  AQI enjoyed a permissive environment in this neighborhood in August 2005, which afforded them the opportunity to conduct lethal attacks against U.S. and Iraqi Security Forces. *Id.*  AQI's objective was to kill and maim Iraqi citizens and Coalition forces to coerce the withdrawal of U.S. and Coalition forces from Iraq and regain Sunni dominance of the country to establish an Islamic caliphate. *Id.* The successful execution of this violent, complex attack was likely a result of the material support that AQI received from Iran through the Iranian Ministry of Intelligence (MOIS) and the Iranian Islamic Revolutionary Guard Corps (IRGC) and IRGC-Qods Force. *Id.* Plaintiffs' experts' conclusions are based on the geographic location and when this attack occurred, as well as the TTPs employed in this attack. *Id.* at pp. 3-12.

The attack occurred in the vicinity of the al-Rasheed Neighborhood in the Rusafa District of Baghdad, Iraq. *Id.* at p. 2. Three months before the SVBIED attack against 1LT Johnson and LTC Grissom's convoy, a Department of Defense press briefing addressed the increase in suicide bombings in Iraq. *Id.*, p. 5. During this briefing, LTG Conway confirmed an increase in VBIED and SVBIEDs over the previous two weeks and suggested that these attacks were likely perpetrated by foreign fighters recruited by Zarqawi and AQI. *Id.* at p. 6.

In 2005, during 1LT Johnson and LTC Grissom's deployment, the AQI-sponsored Rusafa car-bomb network enjoyed considerable success attacking military and civilian targets. *Id.* In addition to the geographic location of this attack, the TTPs used in this attack lead to the conclusion that AQI was responsible for this attack. In 2007, the Multi-National Corps-Iraq Intelligence section published a comprehensive profile of AQI describing its origins, history, strategy, and

tactics since its inception in 2003. *Id.,* at 9. The report highlights Zarqawi's employment of suicide attacks against civilian and military targets. *Id.* One of his deputies, Sami Mohammed Ali Said al-Ja'af, was an explosives expert who was believed to be responsible for thirty-two car bombings before he was captured in 2005. He confessed to building 75% of all VBIEDS used in Iraq. *Id.* Zarqawi's operatives were very adept at designing, building, and employing SVBIEDs and VBIEDs to strike a vast array of targets, killing people. *Id.,* at 9-10.

The paper "Future Al-Qaida and Zarqawi Network Operations in Iraq," (3 Feb 2004), written by the Combined Joint Task Force 7, provides an analysis of Al Qaeda in Iraq's goals, objectives, and methods to assist subordinate leaders with a better understanding of the group. *Id.,* at 10. The paper describes AQI's network operatives as "skilled at complex attacks…[whose] network has also demonstrated capabilities not normally associated with Former Regime Elements, to include large-scale directional charging and mixing of explosive compositions to overcome force protection measures or target construction. These attacks, moreover, have been characterized by meticulous planning and pre-operational surveillance and intelligence gathering." *Id.* The paper highlights the mature nature of this network, particularly in the early days of the conflict, as other insurgent groups were still gaining experience and developing TTPs. *Id.*

After a review of the available information, Plaintiffs' experts concluded, with a reasonable degree of certainty, that the August 9, 2005, SVBIED attack that killed one soldier and injured five others, including 1LT Edward B. Johnson and LTC James Grissom, was executed by an AQI cell operating in the vicinity of the al-Rasheed Neighborhood of Rusafa District, Baghdad, Iraq. *Id.,* at 11.  AQI's objective was to defeat and force the withdrawal of U.S. and Coalition forces from Iraq. *Id.* The tactics, coordination, precision, and intensity of the attack demonstrate strong proficiency

by the insurgent cell demonstrating a high likelihood of material support from Iran through the IRGC and MOIS. *Id*.

Beginning in 2003, Abu Musab Zarqawi built a significant network that later became AQI, initially using Fallujah as his base of operations and expanding to other major urban areas including Baghdad's Rusafa District. *Id.* The employment of VBIEDs and SVBIEDs were hallmark TTPs of AQI. *Id.,* at 12; *see also* Fissler *v. Islamic Republic of Iran*, No. CV 18-3122 (CKK), 2022 WL 4464873, at *3 (D.D.C. Sept. 26, 2022) (VBIED attacks are "a hallmark of Iranian involvement; Iranian proxies have committed substantially similar attacks across the Middle East. Such assaults require extensive funding, explosive materials, technical acumen, and coordination.").

The attacker's ability to easily target and detonate next to the HMMWV convoy in a crowded street demonstrates that he was well-trained. *Id.* It is reasonable to conclude that this SVBIED attack was part of the wider AQI Rusafa car-bomb network that conducted numerous violent and lethal attacks throughout late 2005 to 2007. *Id.*

While Zarqawi and his successors from the Mujahedeen Shura Council were deployed forward in Iraq, several al-Qaeda Senior Leaders remained in state-provided safe havens throughout Iran, which provided AQI with a cohesive command and leadership structure, funding network, religious/recruitment guidance, operational authority, and support. *Id.* This attack was intended, in part, to protect this network and its supply lines and lines of communication critical to sustaining AQI from al Anbar and into critical nodes in Baghdad, including Mansour District. *Id.*

Plaintiffs' expert opined that, more likely than not, (1) AQI planned, committed, and/or authorized the August 9, 2005, attack at issue; and (2) Iran's support was critical to the survival of AQI, significantly increased its capabilities, and substantially contributed to this attack. *Id.*

### C. Attack #53: Terry Steward and Estate of Sascha Grenner-Case

#### i. September 20, 2005 – attack in the Salah Ad Din province

On September 20, 2005, U.S. civilian contractor Sascha Grenner-Case was killed, and U.S. civilian contractor Terry Steward was injured in a terrorist attack committed by AQI in the Salah Ad Din province in Iraq. PX9605, Expert Report of Michael P. Pregent, p. 1.

On September 20, 2005, Steward and Grenner-Case were taking a delivery from LSA Anaconda/Balad Air Base to FOB McKenzie. *Id.* The trucking convoy left around 10 a.m. with eleven trucks accompanied by five gun trucks. PX9600, Decl. of Terry Steward, ¶ e. The gun trucks were unfamiliar with the route. *Id.*

The number 8 truck was hit by an IED and began taking small arms fire. *Id.* Steward's truck (number 2) was then also hit by gunfire. *Id.* ¶¶ e-g. Steward was shot in the femoral artery, femoral vein, profunda femoral artery, right hip, right leg joint, and other places on his body. *Id.*, ¶ f. The convoy commander got into Steward's truck and drove it out of the kill-zone. *Id.* Steward was then airlifted to Balad Air Base for medical treatment. *Id.*, ¶ h.

During the attack, a group of armed men with what looked like AK-47's pulled Grenner-Case from his truck and shot him in the head, killing him. PX9700, Wheeler Decl. ¶ g; PX9701, Grenner-Case Death Certificate. The autopsy report shows that the "immediately fatal injury was a ballistic wound to the head with entrance wound on the chin and the exit would through the back of the head." PX9702, Grenner-Case Autopsy Report, at p. 5. Steward was severely injured in the

attack and continues to suffer from permanent and severe injuries, including nerve damage, thirty-five inches of scars on his body, and intense, sporadic pain. *Id.* ¶¶ j-k.

      ii.    **AQI committed the attack**

Plaintiff's expert attributed the attack to AQI. PX9605, Expert Report of Michael P. Pregent, p. 1. This conclusion is based on several factors. First, AQI was known to be operating in the area at the time of the attack. *Id.* The Tigris River was a "key corridor of foreign fighter flow through IRGC/MOIS and Syrian Intelligence ratlines." *Id.* Balad was a town that saw "frequent AQI violence" including a large VBIED that occurred nine days after this attack. *Id.*, at 2.

Second, the attack was a well-coordinated attack that was quickly planned as the convoy drove down the wrong street. There could not have been advance knowledge of the convoy traveling down that route, but the terrorists were capable of successfully emplacing and detonating the IED in a very short period of time, as well as set up and coordinate small arms fire. Evidence for this attack includes ten minutes of video footage which shows the tactics used against the convoy. *Id.* at 2. Based on the tactics displayed, the expert concluded, "This denotes a highly trained AQI cell, capable of rapidly emplacing an IED ambush with overwatch." *Id.*, at 2. This "was an area highly saturated with AQI members who were well supplied with Iranian munitions and well trained in their use." *Id.* Numerous caches were found in the area before and after the attack, several containing Iranian money as well as the types of weapons known to be supplied by Iranian. *Id.* Pregent confirmed that there were no reports of Shia militia in the area and was able to rule out Shia militia as being responsible for the attack. *Id.*

## II.   <u>CONCLUSION</u>

The Court "has already found the FSIA's terrorism exception applicable to each defendant, except NIOC, for providing material support to the subject terrorist groups which bolstered their

ability to foreseeably commit acts of extrajudicial killing against American servicemembers in Iraq from 2003 to 2011." ECF No. 137, at 3; *see also* ECF Nos. 127 and 136. If the Court accepts my recommendations, and finds that AQI or AAS committed these three attacks, each of which involved an extrajudicial killing resulting in personal injuries or death of the Plaintiffs, Defendants Iran, IRGC, MOIS, Iran, Bank Markazi, and Bank Melli Iran are liable.

### III.  REVIEW BY THE DISTRICT COURT

According to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Nos. No. 139, 140, and 145), Plaintiffs may file an objection to, or motion to modify/adopt, a finding, report, or recommendation by Special Master within twenty-one calendar days of the date it was electronically filed. The Court shall decide de novo all objections to findings of fact or conclusions of law made or recommended by the Special Master. The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. See Fed. R. Civ. P. Rule 53(f)(3). (4), and (5).

April 15, 2024                                        Respectfully submitted,

                                                      Ellen L. Koblitz
                                                      Special Master