# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESTATE OF CHRISTOPHER BROOK FISHBECK, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 1:18-cv-2248-CRC |
| THE ISLAMIC REPUBLIC OF IRAN, et al, | ) ) ) | |
| Defendants. | ) ) | |
| This Document Applies to Plaintiffs: | ) ) | Special Master John P. Kuder |
| BRIAN RUDOLPH: BENJAMIN JENSEN: WALLACE CASEY NELSON; HANNAH ROSE NELSON; D.J.N. (minor child); RAYMOND H. JAMES; ESTATE OF BRANDON SCHUCK; GAVIN SCOTT SCHUCK; MEGAN BETH CASH; ESTATE OF NICHOLAS MICHAEL LATONA; & SHAWN M. DURNEN. | ) ) ) ) ) ) ) ) ) ) | |

## SPECIAL MASTER REPORT AND RECOMMENDATIONS
## WAVE NO. 2 – LIABILITY
## NON-BELLWETHER ATTACKS
## NUMBERS 44, 52, 55, 56 & 65

## I.    PREAMBLE TO REPORT AND RECOMMENDATIONS

In accordance with the Court's Administrative Plan (Doc. No. 140, at 4-5), and in preparing this Report and Recommendation regarding the above-captioned matter, the undersigned Special Master has reviewed and considered in their entirety all items of evidence proffered by Plaintiffs[1]

---

[1]It should be noted, however, if the undersigned found or interpreted the evidence, phraseology, or emphasis on a particular issue or fact differently from that of Plaintiffs' counsel, that different finding or interpretation has been appropriately noted and modified, and the latter of the two prevails.

and has recommended findings of fact as to: (a) the terrorist group involved in the commission of the attack; (b) the personal injuries or deaths that occurred from the attack; and, (c) the relationship of the victims of the attack to the respective plaintiffs. Id. Additionally, the undersigned has made or recommended conclusions of law as to whether: (a) the attack involved a group that received material support from Defendants; (b) the attack involved an act listed in 28 USC § 1605A(a)(1); and (c) whether Defendants' provision of material support was a proximate cause of the attack. Id.

## II.    INCORPORATION OF THE COURT'S PRIOR RULINGS ON LIABILITY

As directed by the order appointing Special Masters to determine the issue of liability, the undersigned incorporates by reference herein the District Court's prior rulings relative to all essential elements in making the liability determination.[2] This report, therefore, places primary emphasis on the issues of extra-judicial killing and attribution for these attacks, with a particular and detailed analysis of attribution.

## III.    THE ATTACKS

### A.    No. 44 — January 28, 2005, IED Attack in Dora, Baghdad, Iraq

On January 28, 2005, Plaintiff Brian Rudolph was serving as a Corporal (E-4) when an Improvised Explosive Device ("IED") exploded and injured him. The attack occurred in the Dora

---

[2] Service of process upon all Defendants was properly effectuated. ECF No. 55, at 10. The Islamic Republic of Iran was, at all relevant times, a designated State Sponsor of Terrorism (ECF No. 126, 3-4); and each direct attack victim is a U.S. national, member of the U.S. armed forces, or a U.S. government contractor. Id., 6-7. Except for NIOC, the defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Iranian Ministry of Intelligence and Security, Bank Markazi, and Bank Melli Iran each provided material support (as defined by 28 USC § 1605A(a)(1)) to the Sunni terrorist groups: Al Qaeda, Al Qaeda in Iraq, and Ansar al Islam during the relevant time period of 2003-2011. See ECF Nos. 127 and 136; and ECF No. 137, at 3. The provision of this material support by these specific Defendants to these specific Sunni terrorist groups "was essential to the groups' operating capacity" and attacks involving these Sunni terrorist groups in Iraq during the relevant time period were "reasonably foreseeable and a natural consequence of that material support." Id

neighborhood, an established Sunni enclave of the east Rashid District in Baghdad. PX8515, Rudolph Fact Sheet ("PFS"), at Sec. II (4), (6-8); PX8502, IED Report (providing the precise "MGRS" location); PX8550, Report & Decl. of Michael Pregent, pp. 1-2 ("Pregent Rpt.") At the time, CPL Rudolph was manning the gun turret of the second vehicle, an unarmored HMMWV, in a three-vehicle convoy. Id.; PX8501, Decl. of B. Rudolph, para. i. The first vehicle in the convoy began having equipment malfunctions so CPL Rudolph's vehicle took the lead. Id. After driving a short distance, an IED exploded, striking the second HMMWV and killing one solider. Id. CPL Rudolph was hit by the concussion blast forces of the explosion and suffered a Traumatic Brain Injury and Post Traumatic Stress Disorder. See PX8501, Decl. of B. Rudolph, paras. j-p; PX8515, Rudolph PFS, p. 6 (citing PX8504, VA Exam. (Apr. 15, 2016); PX8505, SD Neuro. Note (Oct. 6, 2008); and PX8507, Psych. Note (Sept. 30, 2016).

Based upon the evidence (discussed further below), the undersigned finds that Plaintiffs have sufficiently established that this attack was committed by Al Qaeda in Iraq (AQI).

### i. Direct Victim and Solatium Claimants.

Plaintiff Brian Rudolph, is a United States citizen, and was serving with the United States Army 1st Cavalry Division when he was injured in Attack No. 44. PX8500, Ops Report; PX8501, Decl. of B. Rudolph, paras. a-e. CPL Rudolph brings a claim for the personal injuries he sustained during the attack. See ECF No. 100, 2nd Amend. Compl. ("SAC"), at paras. 3579-3585.

There are no solatium claimants. See id.

### ii. Extrajudicial Killings and Personal Injuries.

Attack No.44 injured two U.S. soldiers (including CPL Rudolph) and killed the squad leader, SSG Joseph Rodriguez. PX8500, Ops Report, p. 1 ("1X US KIA, 2X US WIA"); see also PX8515, PFS, at Sec. IV. The concussive blast of the IED caused a brain injury and PTSD to Rudolph. See

PX8505, Medical Report (overview of head injury); PX8515, PFS, at Sec. I, "Summary" (citing ECF

No. 100, SAC, at paras. 3579-3585); PX8550, Pregent Rpt., at pp. 1-3; PX8501, Decl. of B. Rudolph,

paras. i-p; and PX8502, IED Report.

Therefore, I find this attack involved an extrajudicial killing that resulted in personal injuries

to the Plaintiff. I further conclude that the terrorism exception to Defendants' sovereign immunity

applies to the claims brought by the Plaintiff arising from this attack. See 28 USC § 1605A(a)(1);

Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024); see also PX8515,

PFS, at Sec. IV.

### iii. Attribution.

Plaintiff's expert, Michael Pregent, attributes this attack to AQI. See PX8550, Pregent Rpt.,

p. 1. AQI's involvement in this attack is supported by declarations and contemporaneous military

records. See e.g., PX8550, Pregent Rpt.; PX8501, Decl. of CPL B. Rudolph; PX8500, OPS Report,

and PX8502, IED Report. Mr. Pregent reached his conclusions to a reasonable degree of military

intelligence certainty. Id. This conclusion is based on the following factors: 1) Geography and timing;

2) TTPs; and 3) contemporaneous military records, including reporting of insurgent activities in the

area. See PX8550, Pregent Rpt., pp. 1-3.

"The area in which this attack occurred was, on this date, was in an area where AQI

maintained a clear intelligence picture of U.S. operations, freedom of movement, and operational

dominance." Id., p. 1. The evidence establishes that Dora was a Sunni-majority area, and a well-

established stronghold of AQI. Id., p. 2. Mr. Pregent's research revealed a significant number of

SVBIED and VBIED attacks in the immediate vicinity of this attack. Id. Notably, only a few weeks

before Attack No. 44, Coalition forces discovered a VBIED factory less than ¼ mile from the location

of the attack that injured CPL Rudolph. Id. Moreover, Coalition forces identified an AQI command

cell operating in Dora that was comprised of the leaders of smaller cells in the area responsible for conducting attacks in Dora. Id. Other reporting from this period identified a Dora mosque being used as an "AQI safe house." Id. Based on his review, Mr. Pregent concluded that AQI's activity in the area shows that it had established Dora as a zone of support and permissive environment "where it could successfully safe house foreign fighters and protect key AQI leaders who could communicate with AQI senior leadership in Iran and oversee AQI's efforts in Baghdad and throughout Iraq." Id., pp. 2-3.

With regard to the specific tactics used in this attack, Mr. Pregent concluded that IED was remoted-detonated because the IED successfully targeted the middle vehicle in the convoy, whereas the first vehicle would have triggered a pressure plate IED. Id., p. 2. To successfully command-detonate the IED required those committing the attack to have "a clear intelligence picture of U.S. operations, freedom of movement, and operational dominance." Id., p. 1. AQI possessed these perquisites in Dora at the time of Attack No. 44. Id., p. 3.

Further, Mr. Pregent searched for and compared available reports of other insurgent groups in Dora during the same period. He found an "absence of specific TTPs or other information" indicating that Shia Militia were conducting attacks against Coalition forces in Dora, and the "scattering of reports" related to other groups he did find "pale in comparison to the number of reports of Sunni group activity" in Dora. Id.

Having reviewed the available evidence, the undersigned finds Mr. Pregent's attribution of this attack to AQI's to be credible and supported by contemporaneous government reports and historical records, as well as other reliable indicia. Id. The sources relied upon and cited by Mr. Pregent are similar to those that Courts have permitted experts to consider in FSIA terrorism matters

involving attacks in Iraq and Afghanistan.[3] The undersigned, therefore, finds the conclusions of Mr.

Pregent well founded and helpful in ascribing attribution to AQI.

### iv. Summary of Findings and Recommendations.

In addition to the expert analysis of Mr. Pregent, Plaintiffs' evidence provides additional

independent indicia of the AQI's involvement in this attack. The undersigned has analyzed Plaintiff's

evidence and assessed the respective credibility, accuracy and reliability of the materials proffered,

and found the following facts established by government reports, historical records, and items of

particular probative value in this instance:

1. Dora was historically a Sunni-majority area and well known as an AQI
   stronghold. PX775, Patrick Guaghen, Institute for the Study of War
   Backgrounder #15, at p. 2 (describing the Dora neighborhood as an AQI
   stronghold prior to 2007 and stating that access through Dora was limited
   due to the strength of AQI in that area); see also PX640, Eric Hamilton,
   Institute for the Study of War Backgrounder #21, at p. 1 (AQI's strongholds
   in Baghdad were Dora and Ghaziliyah).[4]

2. VBIEDs were a signature TTP of AQI. PX731, Kimberly Kagan, *The
   Surge: A Military History*, (2009), at p 5. The day prior to Attack No. 44,
   an outpost manned by CPL Rudolph's unit had been hit by a VBIED

---

[3] See. E.g., ECF No. 137, Bellwether Liability Order (discussing the types of evidence used to
establish facts and resolve issues related to liability for the bellwether attacks in this case). In
preparing his reports for the attacks in Wave No. 2, Mr. Pregent reviewed numerous military and
intelligence reports of significant activities that occurred in the area and over the period that Attack
No. 44 occurred. Mr. Pregent states in his report, "I have had the opportunity in this case and others
to review the information found in the Iraq War Logs against SigAct productions from the U.S.
Government pursuant to FOIAs and Subpoenas, and the information contained within has been
identical. It is my professional opinion that the information from the Iraq War Logs are accurate
reproductions of SigActs produced by the U.S. Military. I have also testified to same, and my
conclusions have previously been accepted by the Court." See Roth v. Iran, 651 F. Supp. 3d 65
(D.D.C. Jan. 17, 2023). In addition, the Court in Cabrera v. Iran permitted the experts to use and rely
upon War Logs information. See D.D.C. Docket No. 19-3835, Minute Order (September, 17, 2021).

[4] PX775, Patrick Guaghen, Institute for the Study of War Backgrounder #15, see p. 2 (describing
Dora) as a "former" AQI stronghold as of 2007, but also stating that access through Dora was limited
due to the strength of AQI there; see also PX640, Eric Hamilton, Institute for the Study of War
Backgrounder #21, at p. 1 (stating that AQI's strongholds in Baghdad were Dora and Ghazilyah).

indicating AQI was actively targeting the unit at the time. <u>See</u> PX8501, Decl. of B. Rudolph, para. i.

3. In a Department of Defense press briefing, Colonel Ricky Gibbs of the 4th Brigade First Infantry Division explained that individual neighborhoods became safe havens for certain extremists and weapons routes. He described "pockets of Sunni neighborhoods and pockets of Shia neighborhoods." PX307, DOD Press Briefing, (25 May 07). These neighborhood-level distinctions suggest that AQI and JAM's operations against Coalition Forces did not overlap. COL Gibbs's statement also points to AQI as the most likely perpetrator of an IED attack in the Dora area, such as the one that injured CPL Rudolph. He made this clear when asked about which group carried out the greatest number of IED attacks, and to whom local weapon caches belonged. COL Gibbs responded by stating: "In my area they are predominantly al-Qaeda." <u>Id.</u>

4. The TTPs used in the attack, specifically, the use of a remote-detonated IED that was timed to target the middle vehicle and did so successfully (and lethally) further supports the conclusion that the attack was committed by a highly-skilled and trained group, which in Dora at the time, was AQI. PX8500, Ops Report.

In accordance with the Court's prior rulings, the undersigned has assessed the expert witness report, as well as other evidence establishing the date, location, tactics, injuries, and AQI's claim of responsibility for the attack.  In sum, this evidence satisfies the undersigned, and I find the Plaintiff has sufficiently established that Attack No. 44—the January 28, 2005 IED attack in Dora, Iraq— resulted in an extrajudicial killing, caused personal injuries to Plaintiff Brian Rudolph, and is attributable to AQI. The Court has found that Defendants' provision of material support to AQI was essential to AQI's operating capacity and attacks involving AQI in Iraq at the time of Attack No. 44 were reasonably foreseeable and a natural consequence of Defendants' material support <u>See</u> ECF Docs. 127; 136; and 137, at 3. Thus, Defendants' provision of material support to AQI was a proximate cause of Attack No. 44.

Therefore, I recommend the Court enter judgment finding Defendants the Islamic Republic of Iran, IRGC, MOIS, Bank Melli Iran, and Bank Markazi liable for Attack No. 44.

**B.      No. 52 — September 4, 2005, Complex SVBIED Attack in Hit, Al Anbar, Iraq**

On September 4, 2005, U.S. Marine Corps Lance Corporal (LCpl) Benjamin Jensen was serving in Hit, Al Anbar, Iraq. PX9540, Decl. of B. Jensen (January 9, 2024), para. i. At approximately 10:45 a.m., LCpl Jensen's unit was resting at their base after a patrol when they came under small arms fire from "an unknown number of [military-age males] occupying (2) vehicles." PX9506, Ops Report (4 Sept. 2005), p. 1. Minutes later, their base came under fire from multiple RPGs, additional small arms, followed by a suicide vehicle-borne improvised explosive device (SVBIED), which destroyed the barriers surrounding the base. Id. A second SVBIED quickly followed the first one, knocking LCpl Jensen unconscious. Id.; PX9540, Decl. of B. Jensen, paras. i-k; PX9550, Expert Report of Dr. Daveed Gartenstein-Ross, PhD. ("DGR Rpt."). See also PX9507, Bill Roggio, "*On the Offensive in Ramadi-Long War Journal,*" (7 Dec. 2005). The second SVBIED was massive. The blast knocked LCpl Jensen unconscious for approximately 45-60 seconds. LCpl Jensen continued to fall in and out of consciousness as his unit engaged the enemy. Id. PX9540, Decl. of B. Jensen, para. k.

*i.Direct Victim and Solatium Claimants.*

Plaintiff Benjamin Jensen is a United States citizen and was a member of the United States Marine Corps when he was injured in Attack No. 52. See PX9505, Casualty Report, p. 1. Benjamin Jensen brings claims for injuries sustained during the subject attack. See ECF Doc. 100, SAC, at paras 2909-2915. There are no solatium claimants. Id.

*ii.  Extrajudicial Killings and Personal Injuries.*

The attack wounded 32 coalition forces and killed 8 civilians and 2 Iraqi Army soldiers. See PX9506, Ops Report, p. 2. The explosion of the second SVBIED rendered LCpl Jensen unconscious for approximately 45-60 seconds, and he continued to be dazed and unable to function while his

fellow Marines defended their base against the complex attack. PX9540, Decl. of B. Jensen, para. k. He was diagnosed with concussive blast injuries and PTSD as a result of the attack. Id., paras. o-v (discussing long term effects of injuries); PX9505, Casualty Report, p. 1.

Therefore, I find this attack involved an extrajudicial killing that resulted in personal injuries to the Plaintiff. I further conclude that the terrorism exception to Defendants' sovereign immunity applies to the claims brought by the Plaintiff arising from this attack. See 28 USC § 1605A(a)(1); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024); see also PX9500, Jenson PFS, at Sec. V (citing relevant medical and VA records).

### iii. Attribution.

Plaintiff's expert, Dr. Daveed Gartenstein-Ross, attributes the attack to either the al-Qaeda in Iraq (AQI, aka the Zarqawi Organization), Ansar al-Sunna (AAS),[5] or elements of both groups operating in purposeful coordination. See PX9550, DGR Rpt. Iran provided support to both groups, and by 2006, U.S. and foreign government reports, characterized AAS and AQI as "interconnected," "related," and "affiliated." Id., p. 2 (citing PX498, Operational Guidance Note – Iraq (Jan. 2006). As such, Dr. Gartenstein-Ross states, "questions about which of the two groups was more likely to

---

[5] The terrorist group al-Qaeda in Iraq ("AQI") is also referred to the Zarqawi Organization is commonly called. The group has gone through several name changes, including Jamaat al-Tawhid wal-Jihad ("JTJ"), Tawhid wal Jihad ("TWJ"), the Mujahedin Shura Council ("MSC"), the Islamic State of Iraq ("ISI"), the Islamic State of Iraq and al-Sham ("ISIS"), and present goes by the "Islamic State." See PX5, Declaration & Report of Dr. Daveed Gartenstein-Ross, Sunni Militant Groups, ("Gartenstein-Ross Sunni Decl."), at pp. 13-14. Despite undergoing various name changes and expanding its capabilities during the relevant period, the Zarqawi Organization maintained significant organizational and operational continuity. Id., at pp. 19-21. The undersigned has adopted the name used by the experts for the particular attack being discusses except when quotes from sources or historical context necessitate using one AQI's other names. Similarly, Ansar al-Islam ("AAI" or "AI") altered its name to Ansar Al-Sunna ("AAS") in late 2003. Id. at 37. Thus, while some militants continued to identify as part of AAI despite adopting and operating under the sobriquet AAS, AAI and AAS are the same organization. For consistency, the undersigned uses the name applied by the experts for a specific attack, except when quoting or context require otherwise.

have carried out this attack are immaterial to my assessment of Iran's culpability for the attack." Id. Thus, plaintiffs' expert evaluated "the probability that either group committed the attack rather than measuring the likelihood of AQI or AAS's responsibility against one another." Id.

Dr. Gartenstein-Ross's conclusion is based on and supported by the geographic location, the time period of the attack, the tactics used, and the fact that AQI credibly claimed responsibility for the attack. Id., p. 8.

The geographic location and date of the attack supports the conclusion that the AQI and/or AAS is responsible for the attack. Id. At the time of the attack, AAS and AQI worked closely with one another within the town of Hit. Located along the Euphrates River, Hit is the southernmost city in "the Haditha-Hit corridor." Id. AAS and AQI had a strong presence in the corridor through late 2005, when this attack occurred. Further, AQI and AAS had a dominating influence over the communities in the Haditha-Hit corridor as detailed in U.S. intelligence reports. Id., at pp. 4-7. AQI and AAS showed a level of cooperation not seen elsewhere in Iraq, extending down to street-level, to joint operations in the Haditha-Hit corridor. Id. Together, the two groups provided one another with enhanced early warning against Coalition raids, assisted in the movement of insurgents, and contributed to the other's ability to mass fighters and launch attacks. PX900, "Anbar Insurgency Grows, Strengthens, Elections (2005)," *Study of the Insurgency in Anbar Province* (CENTCOM, June 13, 2007), at p. 46 ("Anbar Study"). In December 2004, the Haditha-Hit corridor became an AQI safe haven. Id., p. 2; see also PX737, *The Awakening, Al Anbar Province, Area of Operations Denver, Hadithah–Hit Corridor* (Vol. III-B); and PX271, U.S. Marines in Iraq 2004-2005*, Into The Fray,* p. 33.

By the time of this attack, AAS and AQI completely dominated the area. PX1091, U.S. Marine Corps, "*Enemy Situation and Assessment*," (Aug. 5, 2005). According to documents

published by the U.S. Army War College, Hit fell to AQI by April of 2005, and thereafter AQI controlled the city's government and established sharia courts. PX241, The U.S. Army in the Iraq War Vol. 1 (Jan. 7, 2019). Further, AQI and AAS had access to the variety of resources in the city of Hit that the perpetrators required in order to construct VBIEDs, as well as factions of suicide bombers, as were used in Attack No. 52. PX9550, DGR Rpt., pp. 3-4.

The tactics, techniques, and procedures also support the conclusion that AQI and/or AAS is responsible for this attack. Id., at p. 4. This complex attack involved the use of small arms, RPGs, indirect fire, and two SVBIEDs, which establishes that the attack was coordinated by a group of trained insurgents with familiarity and control over the area in which the attack occurred. Id. pg. 9. The coordination displayed in this attack indicates a high-degree of operational planning only available to a group maintaining control or dominance in the city. Id.

Prior to this attack, AQI had escalated its use of suicide bombers within Iraq, to maximize Coalition casualties. Further, AAS and AQI used the Anbar Province as a base to manufacture IED's and VBIEDS used in the Haditha-Hit corridor. PX900, Anbar Study, at pp. 83, 99. AQI was also known to use caches and use large numbers of RPGs, rockets, and small arms fire attacks during this period in the area. PX9550, DGR Rpt., at p. 5 (citing PX9507, B. Roggio, "On the Offensive in Ramadi," *Long War Journal* (Dec. 7, 2005).

The tactics, techniques and procedures used in this attack against LCpl Jensen's unit demonstrate skilled training and organization that exemplify the joint operations of AQI and AAI in Hit on the date of this attack. Id., p. 5.

On September 6, 2005, ***AQI claimed responsibility for Attack No. 52***. AQI's claim accurately described the attack and identified the specific AQI cell that conducted it—the al-Bara'a bin Malik Suicidal Brigade. Dr. Gartenstein-Ross assessed the reliability and authenticity of this

claim of responsibility, and found it credible. <u>See</u> PX9550, DGR Rpt., pp. 5-6.[6]

### iv. *Summary of Findings and Recommendations.*

Drawing from the evidence deemed most credible, I make the following factual findings upon which I base the conclusions herein:

1. In December 2004, the Haditha-Hit corridor became a safe haven for AQI and AAS. By the time of this attack in 2005, AQI and AAS were closely affiliated and operationally interconnected, and shared dominance in the area. Hit was an AQI and AAS stronghold in which these groups maintained shared the operational resources and capability necessary to plan and successfully commit Attack No. 52. <u>See</u> PX9550, DGR Rpt.; PX271, U.S. Marines in Iraq 2004-2005, *Into The Fray*, p. 33.

2. Attack No. 52, was committed by either one or both groups working together.

3. Iran supported both AQI and AAS before, during and after the time of the attack that injured LCpl Jensen. At the time of this attack, Iran provided support to AQI with Iranian weapons that were sent to the Anbar province to aid AQI's attacks on coalition forces. Additionally, Iran supported and enabled AAS's use of complex IEDs as reflected by American intelligence sources, by supplying AAS with materials used to construct IEDs. Finally, Iran supported AQI in maintaining its dominance of the Haditha-Hit corridor. PX8550, DGR Rpt, pp. 8-9 (citing PX199, U.S. Dpt. of State, Country Reports on Terrorism 2004 (Apr.27, 2005); PX1088; E. Hunt, "Zarqawi's 'Total War' on Iraqi Shiites Exposes a Divide Among Sunni Jihadists," Washington Inst. for Near E. Plcy. (Nov. 15, 2005); and PX634, D. Filkins, "The Shadow Commander," The New Yorker, September 23, 2013).

4. AQI credibly claimed responsibility for Attack No. 52. <u>Id.</u>, at pp. 5-6. LCpl Jensen incurred multiple injuries, including PTSD, as a direct and proximate result of the attack.

In accordance with the Court's prior rulings, the undersigned has assessed the expert witness report, as well as other evidence establishing the date, location, tactics, injuries, and AQI's claim of responsibility for the attack. In sum, this evidence satisfies the undersigned, and I find the Plaintiff

---

[6] This Court has previously found Dr. Gartenstein-Ross qualified to assess and authenticate claims of responsibility published or issued by terrorist groups at issue in this case. <u>See</u> Bellwether Hearing Trans. (Sep. 12, 2022), at 124:11-125:17; 129:11-130:11.

has sufficiently established that Attack No. 52—the September 4, 2005 SVBIED attack in Hit, Iraq—resulted in an extrajudicial killing, caused personal injuries to Plaintiff Benjamin Jensen, and is attributable to AQI and/or AAS. The Court has found that Defendants' provision of material support to AQI and to AAS was essential to these groups' operational capabilities, and that attacks involving these groups in Iraq at the time of Attack No. 52 were reasonably foreseeable and a natural consequence of Defendants' material support. See ECF Nos. 127; 136; and 137, at 3. Thus, Defendants' provision of material support to AQI and/or AAS was a proximate cause of Attack No. 52.

Therefore, I recommend the Court enter judgment finding Defendants the Islamic Republic of Iran, IRGC, MOIS, Bank Melli Iran, and Bank Markazi liable for Attack No. 52.

### C.    No. 55 — November 19, 2005, IED Attack near Baiji, Salah ad Din, Iraq

On November 19, 2005, Plaintiff Sergeant Wallace Casey Nelson was injured by an IED while conducting a mounted patrol along a main highway ("Route Tampa') near the town of Baiji, in the Salah ad Din Province of Iraq. See ECF Dkt. No. 100, SAC, at paras. 2541-2545; PX10022, Ops Report (19 Nov. 2005); PX10021, IED Report (19 Nov. 2005). The patrol was returning to base using the same route as it had when it departed. PX10040, Decl. of G. Jugovich, para. j. As the convoy travelled down the highway, an IED exploded and struck a vehicle in the middle of the column. See PX10000, Decl. of Wallace Nelson, at para. h. The explosion caused the vehicle's fuel tank to catch fire, and it was quickly engulfed in flames. Id. Other members of the patrol tried unsuccessfully to extract Specialist Michael Idanan from the burning vehicle but could not do so before he was consumed and killed by the fire. Id., paras h-k. SGT Nelson witnessed Spc. Idanan burn to death while being helpless to save him. Id. The patrol then provided security to the burned Humvee, while awaiting for assistance to arrive. Id.

13

Immediately after the attack, members of the unit observed a man running from the scene but were not able to engage him. PX10040, Decl.of G. Jugovich, para. j. The Ops Report and IED Report state that a helicopter observing the scene from above spotted this man (or another) "taking a picture of the incident and running into a nearby house." PX10022, p. 1; and PX10021, p. 1. A Quick Reaction Force ("QRF") was dispatched to enter and clear the house. Id.

Eyewitness, Pfc. Gale I Jugovich II, provided a declaration stating that they had been "informed that Al Qaeda was operating in the area of Baiji," and after the attack their Lieutenant informed the unit that, "the weapon used in the attack was an IED in the form of 2 anti-tank mines and 100-gallon tank of propane." PX10040, at paras. m-o.

### i. Direct Victim and Solatium Claimants.

Plaintiff Wallace Casey Nelson is a United States citizen and a member of the U.S. Army when he was personally injured as result of Attack No. 55. See ECF No. 100, SAC, ¶¶ 2541-2545; see also PX10042, Nelson PFS, at Sec. V (citing PX10018, VA Disability Letter; PX10015, VA Disability Rating; and PX10028, Focused Exam.).

The family member plaintiffs of SGT Nelson include Hannah Rose Nelson (daughter); D.J.N. (a minor child when the case was filed, and SGT Nelson's son); and Raymond H. James, (brother). ECF No. 100, SAC, ¶¶ 2541-2545. All are U.S. nationals. ECF No. 81-2, at p. 20 (summarizing Exhibit 186 containing their respective military service/birth records).

### ii. Extrajudicial Killings and Personal Injuries.

Attack No. 55 killed one, and wounded four U.S. Service members. PX10021, IED Report ("1X US KIA, 4 X US WIA"). SGT Nelson was diagnosed with PTSD causing persistent behavioral health issues, including 1) survivors' guilt, depression, anxiety, hypervigilance, insomnia, exaggerated startle response, and nightmares. See PX10074; Expert Report of Dr. Rael Strous, at pp.

17-19 (PTSD Injury Report); PX10018, VA Disability Letter; PX10015, VA Disability Rating; and PX10028, Focused Exam; PX10000, Decl. of W. Nelson, paras. j-m.[7]

Therefore, I find this attack involved an extrajudicial killing that resulted in personal injuries to the Plaintiff. I further conclude that the terrorism exception to Defendants' sovereign immunity applies to the claims brought by the Plaintiff arising from this attack. See 28 USC § 1605A(a)(1); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024); see also PX10042, Nelson PFS, at Sec. V (citing relevant medical and VA records).

### iii. Attribution.

Plaintiff's expert, Michael Pregent, attributes this attack to AQI. See PX8550, Pregent Rpt., p. 1. AQI's involvement in this attack is supported by declarations and contemporaneous military records. PX10041, Pregent Rpt., p. 3; PX10040, Decl.of G. Jugovich; PX10021, IED Report; and PX10022, OPS Report. Mr. Pregent reached his conclusions to a reasonable degree of military intelligence certainty. Id. This conclusion is based on the following factors: 1) Geography and timing; 2) TTPs; and 3) contemporaneous military records, including reporting of insurgent activities in the area. PX10041, Pregent Rpt., pp. 1-3.

Baiji is located along the Tigris River, as it flows south from Mosul toward Baghdad. Mr. Pregent finds that the Tigris River was a key corridor of foreign fighter flowing through IRGC/MOIS and Syrian Intelligence ratlines from Syria into Iraq. Id. Mr. Pregent's research (and the maps he provides to illustrate it) show a marked line of foreign fighter and smuggling activity, as reported in coalition significant activity reports and publicly available (i.e. news media) reports, through Baiji along Route Tampa, the road upon which this attack occurred. See, e.g., id. at pp. 8, 11 (Map Nos. 5

---

[7] cf ECF No. 148, Order (finding Bellwether plaintiff suffering from PTSD after participating in recovery efforts had stated a valid claim under the FSIA).

& 6, showing reports of "foreign fighter flow"). Multiple sources corroborate Mr. Pregent's opinion on the movement of foreign fighters along this route, which establishes that Iran used this route to smuggle munitions and other forms of material support into Iraq along these established lines from Syria to Mosul, and along the Tigris to Baghdad. See PX241, U.S. Army in Iraq Vol. 1. at p. 510; PX639, "*March 2003–March 2008: The Fight for Mosul*," Institute for the Study of War, pp. 2, 18. Thus, Mr. Pregent's conclusion on this point is corroborated by the Army's published official history and other scholarly reporting. Id., see also PX10041, Pregent Rpt., p. 2. Mr. Pregent concluded that in November 2005, Baiji was highly saturated with AQI insurgents who were vigilant, well supplied with Iranian munitions and well trained in their use. Id.

Mr. Pregent's assessment of the Baiji area as saturation point for AQI and its use as a corridor foreign fighter flow is corroborated by the declaration provided by eyewitness PFC Gale Ivian Jugovich, in which he states:

> We were told that Al Qaeda was operating in the area. We were constantly determining the ethnicity and citizenship of foreign fighters that we encountered, and many were from other countries. We encountered fighters from Chechnya, Syria, Serbia, and Iran. We know Chechnya, Syria, Serbia, and Iran. We know this because we found the ID's and passports on the bodies of dead fighters.

PX100040, Decl. of G. Jugovich, para. o.

Mr. Pregent further assessed the various insurgent groups reported to have been operating in the area finding AQI to be the most widely reported group. Id. In addition, Mr. Pregent reviewed reports of attacks in the area and found that most prolific tactics in the area at the time were of the type most associated with AQI (e.g. suicide attacks, VBIEDS, and SBVIED). PX10041, Pregent Rpt., p. 2.

Consequently, Mr. Pregent concluded that it is highly likely that an AQI cell had observed the patrol's movement pattern, knew the patrol would return along the same route, and emplaced the

IED based upon the intelligence the cell had collected. In order to do this required a high degree of skill and operational control of the area, and the resources and training to configure the ambush. Id., at p. 3. In addition, the Ops Report states that a person was observed taking pictures of the incident and then running into a nearby house. PX10022, at p.1. This supports the intelligence gathering activities that Mr. Pregent discusses in his analysis of the attack and the requisite skills it required. Mr. Pregent also provides that, "Iran was known to pay Sunni and Shia groups for proof of successful attacks through pictures and video." Id., at p. 2. Government sources support this as well. See PX67, Press Release, "Treasury Designates Individuals, Entity Fueling Iraqi Insurgency," (Jan. 9, 2008).

Of the materials relied upon for Mr. Pregent for this opinion of this attack, one particular item supporting attribution to AQI stands out—a November 20, 2005, "Threat Report" that originated from Coalition forces in Baiji and cleared for release to all Iraqi and MNF-I Forces. Broadcast the day after Attack No. 55, this report specifically warned of AQI cell in Baiji that had met to plan emplacement locations of multiple IEDs along the main roads throughout area. The report further announced that this cell was "the same AQIZ cell… responsible for the November 19, 2005 IED attack that killed U.S. forces" on the main road in the industrial area of Baiji, and the leader of the cell had been spotted leaving the scene immediately after the detonation. PX10041, Pregent Rpt. at p. 2 (citing "SigAct Ctrl. No. 68729"). [8] Having reviewed this source, I find it credibly describes the threat conditions in Baiji and identifies AQI as most likely responsible for Attack No. 55.

Further, Mr. Pregent considered government reports of other insurgent groups in the Baiji area. He found *only two* reports of Shia militia activity between 2004 and 2009, including an "ambush

---

[8] The undersigned requested and received this item from Mr. Pregent's reliance materials and has confirmed that Mr. Pregent's discussion of its contents is accurate and logically relevant to his analysis and opinion for Attack No. 55.

threat" report dated December 31, 2006, warning that JAM was working **with AQI** to plan complex ambushes on Coalition forces in the area. Id.

Having reviewed the available evidence, the undersigned finds Mr. Pregent's attribution of this attack to AQI's to be credible and supported by contemporaneous government reports and historical records, as well as other reliable indicia. Id. The undersigned, therefore, finds the conclusions of Mr. Pregent well founded and convincing in ascribing attribution to AQI.

### iv. Summary of Findings and Recommendations.

Drawing from the evidence deemed most credible, I make the followings factual findings upon which I base the conclusions herein:

1. Baiji was located along a key corridor used by Defendants to facilitate the movement of foreign fighters, money and weapons into Iraq for use by AQI and other Iranian-supported groups to attack Coalition forces. PX241, U.S. Army in Iraq Vol. 1, at p. 510; PX639, *The Fight for Mosul*, ISW, at pp. 2, 18; PX100040, Decl. of G. Jugovich, para. o.

2. The attack that occurred on November 19, 2005 along Route Tampa, near Baiji, Iraq, required a high-degree of training, knowledge and freedom of movement to obtain an accurate intelligence picture of U.S. patrol patterns and times of operations in the area. In November 2005, the primary group possessing theses requisite characteristics Baiji was AQI.

3. AQI also possessed the necessary skill and capability to act on this intelligence and to plan, emplace and successfully carry out the IED attack on a heavily trafficked highway (MSR Tampa) against a fast moving Coalition convoy.

4. Coalition forces assessed and warned of a sophisticated AQI IED cell operating in Baiji at the time of this attack and attributed this attack to that specific AQI cell. PX10041, Pregent Rpt. at p. 2.

In accordance with the Court's prior rulings, the undersigned has assessed the expert witness report, as well as other evidence establishing the date, location, tactics, injuries, and other indicia of AQI's responsibility for the attack. In sum, this evidence satisfies the undersigned, and I find the Plaintiff has sufficiently established that Attack No. 55—the November 19, 2005 IED attack in Baiji,

Iraq—resulted in an extrajudicial killing, caused personal injuries to Plaintiff Wallace Casey Nelson, and is attributable to AQI. The Court has found that Defendants' provision of material support to AQI was essential to AQI's operating capacity and that attacks involving AQI in Iraq at the time of Attack No. 55 were reasonably foreseeable and a natural consequence of Defendants' material support. <u>See</u> ECF Nos. 127; 136; and 137, at 3. Thus, Defendants' provision of material support to AQI was a proximate cause of Attack No. 55.

Therefore, I recommend the Court enter judgment finding Defendants the Islamic Republic of Iran, IRGC, MOIS, Bank Melli Iran, and Bank Markazi liable for Attack No. 55.

### D.     No. 56 — February 6, 2006, Complex IED Attack in Khan al-Baghdadi, Al Anbar, Iraq

On February 6, 2006, U.S. Marine Corps Corporal (CPL) Brandon Schuck (plaintiff decedent) and Private First Class (PFC) Nicholas Latona were serving as part of a route security patrol in Khan al-Baghdadi in Al Anbar Province, Iraq. PX10119, Schuck PFS, at Secs. I & II; PX10112, SigAct Report, p. 1. Cpl Schuck and PFC Latona were traveling in a 4-vehicle convoy from Rawa to Al Asad, Al Anbar Province. PX10103, Decl. N. Latona, para. 6. PFC Latona was the front passenger of the third HMMWV and Cpl Schuck was the rear passenger of the fourth HMMWV. <u>Id.</u>

At approximately 6:45pm, the convoy was traveling on Main Supply Route (MSR) Bronze when an IED exploded directly underneath Cpl Schuck's position in the vehicle. <u>Id.</u>; and PX10100, Ops Report, p. 1. The HMMWV was quickly engulfed in flames, preventing other members in the unit from extracting him and providing aid to him. <u>Id.</u> After the explosion, the convoy came under small arms fire. <u>Id.</u>; PX10104, Declaration & Expert Report of Dr. Daveed Gartenstein-Ross, PhD., p. 2 ("DGR Rpt."). Cpl Schuck died of blast injuries and burn injuries sustained in the explosion.

PX10101, Autopsy Report, p. 4. He was posthumously awarded a Purple Heart for the wounds received during the attack. PX10102, Purple Heart.

Once the area was secure, an Explosive Ordinance Demolition team responded to the scene. PX10100, Ops Report, p.1. The EOD post-blast analysis found that the IED consisted of "double stacked mines… emplaced inches off the road in a puddle of standing water." PX10100, Ops Report, p. 1.

### i. Direct Victim and Solatium Claimants.

Plaintiff Brandon Scott Schuck was a United States citizen and a member of the United States Marine Corps when killed by Attack No. 56. See PX10119, Schuck PFS, Sec. I; PX10106, Form DD1300 (6 Feb. 2006); and PX10109, Cert. of Death Overseas.

The Estate of Brandon Scott Schuck and its legal representative, Megan Beth Cash, are plaintiffs. Ms. Cash brings claims individually as a spouse as well as on behalf of her late husband's estate (and all heirs thereof). See ECF No. 100, SAC, at ¶¶ 2397-2405. Their son, Gavin Scott Schuck, also brings a claim for solatium damages arising from the death of his father. Id. All are U.S. nationals. ECF No. 81-2, at p. 20 (summarizing Exhibit 186 containing their respective military service/birth records).

### ii. Extrajudicial Killings and Personal Injuries.

The attack killed Plaintiff's decedent CPL Brandon Scott Schuck and wounded at least two other Marines. PX10100, Ops Report, p. 1. ("The attack resulted in (1) FKIA and (1) priority FWIA.")

Therefore, I find this attack involved the extrajudicial killing of CPL Brandon Scott Schuck. I further conclude that the terrorism exception to Defendants' sovereign immunity applies to the

claims brought by the Schuck Family Plaintiffs arising from this attack. See 28 USC § 1605A(a)(1); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024).

### iii. Attribution.

Plaintiffs' expert, Dr. Daveed Gartenstein-Ross, PhD, attributes the February 6, 2006 complex attack that killed CPL Schuck to either AQI (aka "MSC"), Ansar al-Sunna (AAS), or elements of both groups operating in purposeful coordination. PX10104, DGR Rpt., pp. 2-4.[9] Iran provided support to both groups, and by 2006, U.S. and foreign government reports, characterized AAS and AQI as "interconnected," "related," and "affiliated." Id., p. 2 (citing PX498, Operational Guidance Note – Iraq (Jan. 2006). As such, Dr. Gartenstein-Ross states, "questions about which of the two groups was more likely to have carried out this attack are immaterial to my assessment of Iran's culpability for the attack." Id. p. 3. Thus, plaintiffs' expert evaluated "the probability that either group committed the attack rather than measuring the likelihood of AQI or AAS's responsibility against one another." Id.

Dr. Gartenstein-Ross's conclusion is based on and supported by the geographic location, the time period of the attack, the tactics used, and the fact that AQI/AAS possessed a particular motive for attacks against Coalition forces in Khan al Baghdadi at the time this attack occurred. Id., p. 8. Plaintiffs' expert concluded that the location and period of this attack are significant indicators affixing responsibility to AAS and AQI. Id., p. 4. Attack No. 56 occurred in Khan al Baghdadi, a

---

[9] The Ansar al-Sunna organization was formally known as Ansar al-Islam. Since the group's founding in 2001, its members and cells have used either name and sources use it interchangeably. Id., p. 3. For this attack, the group is referred to by Dr. Gartenstein-Ross as Ansar al-Sunna (AAS), which is the name most commonly used at the time of this attack. Id. Additionally, the Zarqawi organization underwent multiple name changes since its inception in 1993. Id. Dr. Gartenstein-Ross notes that in January 2006, AQI shifted towards the name Mujahedin Shura Council (MSC) but refers to this group as AQI in his report for this attack. Id. The undersigned uses the same names used by the expert for consistency herein, however some cited sources may use other variant titles/names.

village located along the Haditha-Hit Corridor, in Al Anbar Province. Id. AQI and AAS work together to be the dominant terrorist threat in the corridor before, during, and after this attack occurred. PX10104, DGR Rpt., p. 4.

At the time of the attack in earl 2006, the close operational relationship between AQI and AAS, and their control of the corridor was firmly established. Id. AQI and AAS held profound influence over the communities in the Haditha-Hit corridor as detailed in U.S. intelligence reports. Id., at pp. 4-7. The level of cooperation in this area between AQI and AAS was not seen elsewhere in Iraq, and included "street-level, joint operations in the Haditha-Hit corridor." Id. Together, the two groups provided one another with enhanced early warning against Coalition raids, assisted in the movement of insurgents, and contributed to the other's ability to mass fighters and launch attacks. PX900, Anbar Study, at p. 46 ("Anbar Study"). The groups' grip on the area began December 2004, when they moved into the Haditha-Hit corridor for safe haven as Coalition forces pushed them from Fallujah with Operation al Fajr. Id., p. 2; see also PX737, *The Awakening, Al Anbar Province, Area of Operations Denver, Hadithah–Hit Corridor* (Vol. III-B); and PX271, U.S. Marines in Iraq 2004-2005*, Into The Fray*, p. 33.[10]

After losing their grip on Fallujah, the insurgents fled to surrounding areas and continued to use Haditha as a base to manufacture IEDs and VBIEDs for use in cities along the Euphrates all the way to Baghdad. In August 2005, Coalition forces launched Operation Quick Strike targeting AQI

---

[10] Operation al Fajr is also known as "the Second Battle of Fallujah," the primary objective of which was to locate and neutralize AQI and its associated groups that had established the city as its primary base and capital of the "caliphate" it sought to establish. See Bellwether Hearing Trans. (Sep. 12, 2022), at 143:16-148:2 (discussing PX937, MCFI Study A-Insurgent Group Profile: Al Qaeda in Iraq (AQI), (May 2, 2007); see also PX682, Op-20 Operation Al Fajr: A Study in Army and Marine Corps Joint Operations (Kansas: Combat Studies Institute Press, 2006), p. 10 ("Iraq. By mid-summer 2004, Fallujah was totally controlled by insurgents and foreign fighters.) Other Attacks presented in this case occurred in Fallujah during Operation al Fajr and attributed to AQI. See, e.g., Bellwether Attack No. 2, and Wave 1 Attacks No. 9 and No. 12.

and AAS fighters in Haditha, however, "many Haditha insurgents were in fact based in outlying towns such as Dulab, Jubbah, and Baghdadi along the Euphrates, which meant the Coalition operations missed them entirely." PX900, Anbar Study, pp. 98-99.

Consequently, by the time of this attack, AAS and AQI completely dominated the area. PX1091, U.S. Marine Corps, "*Enemy Situation and Assessment*," (Aug. 5, 2005). The depth of AQI/AAS' dominance reached into the political and social fabric of the Haditha-Hit Corridor, and is to the undersigned, some of the most compelling evidence for attributing the attack to one or both of these terrorist groups. The U.S. Army's official history of its operations in Iraq describes the period between January and February 2006 as time when local governments along the corridor (e.g. Haditha, Haqlaniyah, and Barwana) were "thoroughly penetrated by AQI and Ansar al-Sunna AAS insurgents, who used their positions ... to undermine Coalition attempts to ameliorate the situation in their towns." PX898, "*AQI Dominates the Insurgency (2006)*" Anbar Study, at p. 8. In Barwana and Haqlaniyah, high-level government officials were often high-ranking members of AQI or AAS. Id. For example, the mayors of both cities were members of both AQI and AAS, and used their political influence to "promote their extremist agendas." Id. Through their control of these offices, AQI and AAS achieved "relatively uninterrupted dominance in the cities located along the Haditha-Hit corridor" and where attack No. 56 occurred. PX10104, DGR Rpt., p. 5.

Dr. Gartenstein-Ross considered the tactics, techniques, and procedures used in Attack No. 56, and determined that these further pointed to AQI and/or AAS as the likely perpetrator(s). First, this was a complex IED attack that involved complex tactics, specifically, the use of two military grade anti-tank mines assembled in a "stacked" design intended to multiply the detonation potential and explosive power, as well as make defusing or moving the IED more difficult (and deadly). PX427, IEDs in Iraq: Effects & Countermeasures, Congressional Research Service (1. Feb. 2006).

Moreover, use of military grade mines allowed concealment of the IED in standing water "inches off the side of the road" along established coalition route. PX10100, Ops Report, p. 1. Mines, unlike IEDs triggered by radio or electrical signals/currents, are ideal for placement in water. This attack also demonstrated tactical sophistication and planning to increase the target potential of the IED because concealing the IED "inches off" the road accounted for both coalition foot patrols and coalition vehicles with wider wheelbases. Id.; see also PX426, IED Indicators & Ground Sign Awareness, Geneva Intrntl. Ctr. Hum. Demining (GICHD), at p. 47; PX425, DVIDS, "EHAT Trains Iraqi Police Forces," at p. 3.

AQI and AAS possessed the type of weapons used in this attack, and deployed cells specialized in their use. "Iranian mines and weapons were funneled to Zarqawi's terrorists in Fallujah and elsewhere throughout Sunni dominated Anbar province." PX715; Bill Roggio, "Iran and al Qaeda in Iraq," Long War Journal, (6 Jan. 2007). In January 2006, it was reported that weapons caches in nearby Ramadi contained "multiple mortars and artillery rounds ranging from 105 mm-155 mm, mortar fuses, rockets, rocket propelled grenades, several kegs of gun powder, a Draganov sniper rifle, small arms rifles and ammunition, hand grenades, ***anti-personal mines***, blasting caps and bomb-making equipment." PX729, B. Roggio, "Ramadi Operations Continue," Long War Journal (4 Jan. 2006).

Both AQI and AAS frequently carried out IED attacks in the Haditha-Hit corridor around the time of the attack that killed CPL Schuck, and did so jointly or in coordination with each other Id. In early 2006, AQI (then going by "MSC") composed a plan for an organizational reboot that included increasing the production of IEDs and the number of IED attacks in this specific area of al Anbar. PX10104, DGR Rpt., p. 6. Additionally, once AQI and AAS merged their operations in the area, members from both organizations formed subgroups that specialized in IED attacks. Id.; PX898,

Anbar Study, pp. 7, 39, 98. These groups were vertically integrated to include financiers, bomb makers, trainers, and IED facilitators who coordinated attacks against Coalition forces paying $200 for emplacing IEDs. Id. AQI/AAS' specialized groups were further discussed on February 19, 2006, in an interview with Colonel Stephen W. Davis, the commander Regimental Combat Team 2, 2nd Marine Division, whose area of operations included the Haditha-Hit corridor that confirmed the existence of:

> al Qaeda 'hit squads' – small teams of 6 to 12 foreign fighters, well armed, well trained in small squad tactics. They have new weapons, body armor, often wear suicide vests and have lots of money – in American dollars. They are accompanied by Iraqi 'scouts' – locals with knowledge of the region and often act as the driver. Their mission is to stir up trouble, put civilians in the crossfire and evoke a [sic] over-reaction from Coalition forces.

PX849, B. Roggio, "An Interview with Col. Davis," Long War Journal (19 Feb. 2006). The U.S. military's study of the insurgency in al Anbar confirmed that:

> cooperation between Ansar al-Sunna and AQI cells (with often interchangeable membership) intensified throughout February and March [2006]. Joint AQI and Ansar al-Sunna forces carried out kidnappings, vehicle theft, propaganda and ***IED attacks in Baghdadi***, overseen at times by REDACTED (an AQI leader) and at other times by REDACTED (an Ansar al-Sunna leader).

PX898, Anbar Study, p. 25.

With their dominance of the area and steady supply of weapons, AQI/AAS's would continue their joint campaign of IED attacks and terror throughout the Haditha-Hit corridor throughout 2006. PX737, *The Awakening, Al Anbar Province, Area of Operations Denver, Hadithah–Hit Corridor* (Vol. III-B), p. 39.

Finally, behind AQI/AAS's attacks in Khan al Baghdadi was the particular motive the groups shared at the time of this attack: their plan to assassinate members of the Albu-Nimr Tribe and disrupt communications in Haditha, Khan al-Baghdadi and Hit. PX10104, DGR Report, p. 4. The groups

targeted the members of this tribe who were working in conjunction with the Iraqi government and Coalition forces, and AQI/AAS worked to sever their ability to communicate. Id. (citing AQI and Ansar al-Sunna members targeted the Baghdadi police leadership through kidnappings, and offered $200 per month for information about the local police force working with Coalition forces, and $1,000 for specific locations where they could be targeted. AQI and AAS's motive for their anti-coalition operations in Khan al-Baghdadi is exemplified by the $100,000 bounty the groups offered for the killing of Baghdadi police chief working with the Coalition to rid the town of the groups. PX898, Anbar Study, p. 36; PX760 Bill Roggio, "The Heat in Hit," Long War Journal (18 Feb. 2006);

Having reviewed the available evidence, the undersigned finds Dr. Gartenstein-Ross's attribution of this attack to AQI and/or AAS to be credible and supported by contemporaneous government reports and historical records, as well as other reliable indicia. Id. The undersigned, therefore, finds the conclusions of Plaintiffs' expert well founded and compelling in ascribing attribution to AQI and/or AAS.

### iv. Summary of Findings and Recommendations.

Drawing from the evidence deemed most credible, I make the following factual findings upon which I base the conclusions and recommendation herein:

1. AQI and AAS were working in joint and were operating in purposeful coordination in the area that included the village of Khan al-Baghdadi, al Anbar, Iraq—the location of Attack No. 56. PX10104, DGR Rpt., pp. 3-5.

2. AQI/AAS maintained control of the area surrounding Khan al-Baghdadi, and had the corresponding ability to conduct complex attacks. Id.; and PX737, *The Awakening, Al Anbar Province, Area of Operations Denver, Hadithah–Hit Corridor* (Vol. III-B), p. 39.

3. Attack No. 56 tactic, techniques, and procedures involving complex IED tactics and small arms, are of the type possessed and used by AQI/ASS in Khan al Baghdadi on this date, and that were used to kill Plaintiff CPL Brandon Scott Schuck. Id.

4. AQI/AAS were highly motivated to commit attacks in Khan al-Baghdadi in February 2006. <u>Id.</u>

5. Iran supported both AQI and AAS before, during and after the time of the attack that killed CPL Schuck. At the time of this attack, Iran provided support to AQI with Iranian weapons that were sent to the Anbar province to aid AQI's attacks on coalition forces. Additionally, Iran supported and enabled AAS's use of complex IEDs as reflected by American intelligence sources, by supplying AAS with materials used to construct IEDs. Finally, Iran supported AQI in maintaining its dominance of the Haditha-Hit corridor. PX199, U.S. Dpt. of State, Country Reports on Terrorism 2004 (Apr.27, 2005); PX1088; E. Hunt, "Zarqawi's 'Total War' on Iraqi Shiites Exposes a Divide Among Sunni Jihadists," Washington Inst. for Near E. Plcy. (Nov. 15, 2005); and PX634, D. Filkins, "The Shadow Commander," The New Yorker, September 23, 2013).

6. Additionally, in his expert report for Attack No. 52 (Section III(B) above) which occurred in the same area (the Haditha-Hit corridor) five months prior to this attack, Dr. Daveed Gartenstein-Ross' assessment of the geography and the period of that attack is in harmony with his analysis and opinions here for Attack No. 56, as is his attribution to AQI/AAS. *cf* PX9550, DGR Report (Attack No. 52), *in toto*. I find the confluence and consistency of both reports demonstrates the probative integrity and reliability of evidence used in assigning attribution to AQI and/or AAS, acting individually or in concert, to commit Attack No. 56.

In accordance with the Court's prior rulings, the undersigned has assessed the expert witness report, as well as other evidence establishing the date, location, tactics, injuries, and AQI/AAS's motive for the attack. In sum, this evidence satisfies the undersigned, and I find the Plaintiff has sufficiently established that Attack No. 56—the February, 6, 2006 Complex IED attack Khan al-Baghdadi, Iraq—resulted in an extrajudicial killing of Plaintiff Brandon Scott Schuck, and is attributable to AQI and/or AAS. The Court has found that Defendants' provision of material support to AQI and to AAS was essential to these groups' operational capabilities, and that attacks involving these groups in Iraq at the time of Attack No. 56 were reasonably foreseeable and a natural consequence of Defendants' material support. <u>See</u> ECF Nos. 127; 136; and 137, at 3. Thus,

Defendants' provision of material support to AQI and/or AAS was a proximate cause of Attack No. 56.

Therefore, I recommend the Court enter judgment finding Defendants the Islamic Republic of Iran, IRGC, MOIS, Bank Melli Iran, and Bank Markazi liable for Attack No. 56.

### E.      No. 65 — February 15, 2009, EFP Attack in Maysan Province, Iraq

Plaintiff Army Specialist (SPC) Shawn M. Durnen was injured on February 15, 2009, in an Explosively Formed Penetrator ("EFP") attack near the Iraq-Iran border in the Maysan Province of southern Iraq. PX11015, Durnen Plaintiff Fact Sheet ("PFS"), at Sec. II (4), (6-8); PX11000, IED Report (providing the precise "MGRS" location); PX11050, Report & Decl. of COL M. Lee Walters (ret.), CW4 R. Evans (ret.), & CW3 D. Sultzer, at pp. 2-6 ("WES Rpt.") At the time, SPC Durnen was the Gunner in a Mine Resistant Ambush Protected vehicle ("MRAP"), traveling on "Route Quebec"  in a six-vehicle convoy from Contingency Operating Base (COB) Adder to the Iraq-Iran border in the Maysan region to deliver supplies. PX11000, IED Report, p.1; PX11011, Ops Report, pp. 1-4; and PX11001, Decl. of S. Durnen, paras. h-k. SPC Durnen's MRAP was the fourth of six vehicles in the convoy when, after passing an Iraqi Police checkpoint, an EFP detonated and hit the third vehicle. Id. Immediately following that first detonation, two other EFPs struck the fifth and sixth vehicles in the convoy. Id.

The blast wave of the first EFP enveloped SPC Durnen's vehicle, and as the Gunner he was fully exposed to the concussive forces  that violently knocked him from the turret to the floor of the vehicle. Id. The other two EFPs then targeted the successive vehicles in the convoy, disabling them, and again engulfing SPC Duren's vehicle in the massive shockwaves of the second and third EFPs. Id.

Once the area was secure and casualties were evacuated, an Explosive Ordinance Team (EOD) and a Weapons Intelligence Team (WIT) conducted a thorough post-blast analysis and concluded that the convoy was struck by three daisy-chained EFPs placed on the west side of the route. PX11000, IED Report, pp. 2-4; and PX11050, WES Rpt., pp. 2-6.

As a result of the EFP attack, one soldier was killed and several others were wounded. See PX11011, Ops Report, p. 2 ("3xEFP Strike, 1xKIA, 2xWIA"). SPC Durnen suffered concussive blast injuries from the three explosions surrounding his vehicle, and later diagnosed with hearing loss, tinnitus, and post-traumatic stress disorder (PTSD). See PX11015, Durnen PFS, at Sec. V.

### i. Direct Victim and Solatium Claimants.

Plaintiff Shawn M. Durnen is a United States citizen and was a member of the U.S. Army when he was injured in the February 15, 2009 EFP attack in Maysan, Iraq. See ECF No. 81-2, at p. 4, summarizing Exhibit 37 (SPC Durnen's DD Form 214). SPC Durnen brings claims for his injuries sustained during Attack No. 65. See ECF No. 100, SAC, at paras. 958-964.

There are no solatium claimants. Id.

### ii. Extrajudicial Killings and Personal Injuries.

The attack wounded several U.S. Army soldiers including Plaintiff SPC Durnen, and killed Staff Sergeant (SSG) John D. Diamond. PX11011, Ops Report, p. 2; see also PX11008, All Plaintiffs Represented by John Driscoll v. the Islamic Republic of Iran, No. 1:20-cv-00622-EGS-ZMF (DDC), Report and Recommendation (Jun. 37, 2023) ("Driscoll"), adopted by Order at ECF No. 42 (Jul. 13, 2023) (finding Iran liable under the FSIA for other victims' claims arising from Attack No. 65).

Attack No. 65 caused SPC Durnen to suffer hearing loss, tinnitus, PTSD, short term lapses of memory, loss of balance, random vertigo, dizziness, sensitivity to bright light, insomnia, and sleep apnea. See PX11001, Decl. of S. Durnen, paras. k-o.; and PX11015, Durnen PFS, at Sec. V (citing

PX11040, Dept. of VA Records; PX1105, Dept. of VA Records (diagnoses of PTSD, insomnia, and adjustment disorder with anxiety).

Therefore, I find this attack involved an extrajudicial killing that resulted in personal injuries to the Plaintiff. I further conclude that the terrorism exception to Defendants' sovereign immunity applies to the claims brought by the Plaintiff arising from this attack. See 28 USC § 1605A(a)(1); Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061-1064 (D.C. Cir. 2024); see also PX11015, Durnen PFS, at Sec. V (citing relevant medical records).

### iii. Attribution.

Plaintiff's evidence includes an expert report jointly prepared by Colonel M. Lee Walters, Chief Warrant Officer 4 Ronald Evans (ret.), and Chief Warrant Officer 3 David Sultzer (ret.). See PX11050, WES Rpt. These experts offer their opinions and conclusions to "a reasonable degree of military intelligence certainty." Id., p. 11. After reviewing the evidence and materials pertaining to Attack No. 65, these experts reach the unanimous conclusion that Attack No. 65 was committed by an Iranian-sponsored Shia militia group using an "an Iranian-manufactured Explosively Formed Projectile (EFP)." PX11050, WES Rpt., p. 10. In addition, the experts determined:

> The precision and intensity of the attack demonstrates the highly-sophisticated TTPs of JAM and other Shia Militia Groups (SMGs) which were directly related to the training and material support provided to SMGs by Iran through its terrorist proxies, the Iranian Islamic Revolutionary Guard Corps (IRGC)-Qods Force and Hezbollah.

Id.

These conclusions are based on the following factors: 1) timing and location; 2) tactics, techniques, and procedures; and 3) contemporaneous military records, including reporting of intelligence reporting relevant to Attack No. 65 and the activities of anti-coalition groups in the area. Id., pp. 10-11.

The location of Attack No. 65 was mere miles from the Iranian border, near the town of Qalat Salih. See id., pp. 3-4 (Map Nos. 1-3), PX11011, at p. 4. The experts found this area to be the primary route for Iranian weapons smuggling in to the Maysan Province, and particularly for EFPs used by the Shia Militia Groups (i.e. Badr Corps, Jaysh al-Mahdi (JAM,), the Promised Day Brigade (PDB), Asa'Ib ahl al Haq (AAH), Kata'ib Hizballah (KH), and the Sheibani Network (SN)). The experts' conclusions on the geography for this attack, and its strategic importance to the terror groups supported by Defendants, is supported by numerous government and military records. See, e.g., id., at pp. 4-10 ("List of Documents Reviewed" identifying and discussing multiple intelligence reports and press briefings).

Notably, on July 12, 2008 (approximately seven months prior to this attack) Major General Michael Oates, Commanding General of Multi-National Division-Central, provided a Threat Briefing for this specific area of operations. In the briefing, Maj. Gen. Oates confirmed that the area was a major hub of lethal aid from Iran and a known location for Shia Militia Group operations. PX892, MND-Central Threat Briefing (12 July 2008). Based on the evidence submitted, the experts reasonably conclude that Shia Militia cells sought to protect these lines of communication and supplies from interdiction by Coalition forces. PX11050, WES Rpt., at p. 8.

The EOD Team's post-blast analysis (PX11000) details the TTPs demonstrated in Attack No. 65, which are further confirmed by the Ops Report from the attack. PX11011. Both reports provide a detailed timeline of events surrounding the EFP attack, as well as a comprehensive set of chronological findings compiled by the on-scene investigation and follow-along intelligence collection efforts. This included the detention and interrogation of the suspected "triggerman" who was captured immediately following the attack. PX1101, Ops Report, pp. 2-3. The investigative

findings highlighted the sophistication of tactics used by the EFP triggerman to ensure a successful attack. PX11050, WES Rpt., pp. 4-6. Including the following:

1. The EFPs were "command" detonated from a point of origin (POO) approximately 1 kilometer north and 300 kilometers west of the blast site. The trigger man was well concealed and had an unimpeded view of the site where he initiated the blast. PX11011, Ops Report, CITE;

2. The three EFPs were each approximately10-12" in diameter/circumference and contained 40 lbs. of net explosive weight (NEW); moreover, they were wired together ("daisy chained") to detonate near and simultaneously against the fast-moving convoy. Additionally, EOD investigators recovered the copper slug fragments, a hallmark of Iranian-manufactured EFPs. Id.

3. The EOD investigators concluded that the EFPS were "extremely well designed."

Based on the IED Report's conclusions related to the design, placement, triggering methods, and the lethal effect of the command-wire detonated 12-inch copper EFPs used in this attack, the Weapons Intelligence Team ("WIT") further concluded that "the triggerman must have carefully accounted for the distance from his location to the points of impact and also for the elevation to ensure he successfully hit the vehicles in the convoy, likely targeting the gunners (like SPC Durnen) who were most exposed to any blast." PX11050. WES Rpt., pp. 5-6 (citing PX1100, pp. 2-3, and PX11011, pp, 2-3). Based on the fact he had to bury over 1 kilometer of command wire, the triggerman required a significant amount knowledge about Coalition convoy routes and IED-countermeasures, as well as a substantial amount of time to emplace the EFPs, which he likely did at night and well-advance of connecting the large EFPs to the wires. Id.

Having reviewed the available evidence, the undersigned finds plaintiff's experts' attribution of this attack to Iranian-supported Shia Militia Groups to be credible and supported by contemporaneous government reports and historical records, as well as other reliable indicia. Id. The undersigned, therefore, finds the conclusions of the experts well founded and compelling in ascribing attribution to the Shai Militia Groups.

### iv. Judicial Notice

Plaintiff has requested the Court to take judicial notice of the evidence and findings from another matter in this District, <u>All Plaintiffs Represented by John Driscoll v. the Islamic Republic of Iran</u>, No. 1:20-cv-00622-EGS-ZMF (DDC 2020).[11]

Under Federal Rule of Evidence 201, the Court may take judicial notice on its own or must take such notice if a party requests it and the Court is supplied with the necessary information. Fed. R. Evid. 201(c). However, in rendering default judgment against defendants in FSIA cases, a court is "required to, and should, find facts and make legal conclusions anew." <u>Karcher v. Islamic Republic of Iran</u>, No. CV 16-232 (CKK), 2018 WL 10742324, at *3 (D.D.C. Nov. 28, 2018) (granting motion for judicial notice of facts in <u>Fritz v. Islamic Republic of Iran</u>, 320 F. Supp. 3d 48 (D.D.C. 2018) (Moss, R.) for the same attack at issue in <u>Karcher</u>),

I find that judicial notice of the findings and evidence from <u>Driscoll</u> is appropriate here because:

1. In this matter, Plaintiff Durnen is similarly situated to his co-victims in Driscoll, in that the Plaintiffs in both actions were injured or killed or are family members of those who were injured or killed in the February 15, 2009, explosively formed projectile (EFP) attack. <u>See</u> PX11007, <u>Driscoll</u> Rpt. & Recomm., pp. 8-9, n. 6.

2. Defendant, the Islamic Republic of Iran, is the same defendant named in <u>Driscoll</u>. <u>Id</u>., at 1;

3. Defendant Iran defaulted in <u>Driscoll</u> and did not make an appearance. Id.

---

[11] The undersigned has reviewed Plaintiffs' Exhibits PX11107 (<u>Driscoll</u> ECF No. 41, Report & Recommendation of Magistrate Judge Zia M. Faruqui (June 27, 2023); PX11008 (<u>Driscoll</u> ECF No. 42, Hon. E.G. Sullivan's July 13, 2023, Order adopting magistrate's recommendation); and PX1109 (<u>Driscoll</u> ECF No. 45, Plaintiffs' Motion for Default Judgment); and PX11006 (<u>Driscoll</u> ECF No. 30-2, Expert Report of Michael Pregent).

4. Iran has also defaulted in this action, and no counsel has appeared on its behalf or otherwise contacted the Plaintiffs' counsel. See ECF No. 17, Clerk's Entry of Default (Dec. 29, 2020);

5. The issue of Iran's liability in this matter is the same as was before the Court in the Driscoll matter, and accordingly, a Court in this district has already heard the evidence and found Iran liable for the February 15, 2009, EFP attack that caused injuries to Plaintiff Durnen in this case;

6. In Driscoll, the Court received evidence from the plaintiffs, including the expert testimony and report of Michael Pregent, whom the court found sufficiently qualified to provide expert opinion evidence. PX11007, Driscoll Rpt. & Recomm., p. 7, n. 5);

7. Driscoll's default judgment against Iran for the February 15, 2009, EFP attack was based on "evidence satisfactory to the court." 28 USC 1608(e). That same evidence is now available to the undersigned and this Court to make independent findings of fact and law. Therefore, judicial notice allows the undersigned and the Court to efficiently consider the evidence when making the remaining factual and legal findings for the attack in this case. [No.65].

Therefore, the undersigned has reviewed and has taken judicial notice of the Driscoll case, however, all findings and conclusions herein are made anew, on the totality of the evidence submitted by the plaintiff in this case, and made independently of the findings and conclusions in Driscoll. The findings, conclusions and recommendations herein are, however, consistent with those made in Driscoll, and based upon a *much more* robust evidentiary record.

### v. Summary of Findings and Recommendations.

After reviewing plaintiff's evidence, I make the following factual findings and conclusions of law, which I base on my independent review and assessment of the materials proffered in this case:

1. Attack No. 65 that occurred on February 15, 2009 in the Maysan Province of Iraq that killed SSG Diamond and injured others including Plaintiff Shawn Durnen, was an EFP attack.

2. Two years before the EFP attack against SPC Durnen's convoy, senior officials shared with the press the details regarding the support that Iran and the IRGC was providing the Iraqi Shia Militia Group to include the EFP

technology and training. These DOD press briefings highlighted the evidence and nature of this relationship that was fostered over the years. PX336, DOD Press Briefing, February 14, 2007. Major General William Caldwell, MNF-I Spokesman, and Major Marty Webber, EOD Expert, quoting the Chairman of the Joint Chiefs of Staff (CJCS), General Peter Pace: "We know that the explosively formed projectiles, penetrators, are manufactured in Iran," and "It is clear that Iranians are involved and it's clear the materials from Iran are involved." Id.

3.  At the time of the attack, Maysan Province was a known safe haven for SMG forces that sought to deny U.S. and Coalition forces access to the province and ultimately destabilized the peace process and forced the withdrawal of all U.S. and Coalition forces from Iraq. PX11050, WES Rpt., pp. 8-11.

4.  The precision and intensity of the attack demonstrates the highly sophisticated TTPs of JAM and other Shia Militia Groups (SMGs) which were directly related to the training and material support provided to SMGs by Iran through its terrorist proxies, including, the Iranian Islamic Revolutionary Guard Corps (IRGC)-Qods Force and Hezbollah. Further, given the intelligence reporting at the time, it is reasonable to assess that the IED employed against SPC Durnen's convoy was an Iranian-manufactured explosively formed projectile (EFP). Id.

5.  The connection between Iran and EFPs is so strong that Courts in this district have found that the "identification of the weapon as an EFP all but necessitates the inference that Iran was responsible," and "absent any indication that any of these EFPs was not backed by Iran, the Court shall find that Iran was indeed the provider of the EFP(s)." Karcher v. Iran, 396 F.Supp.3d at 30 (original emphasis). See also Fissler v. Iran, 2022 WL 4464873 at *2 (same); Pennington v. Iran, 2021 WL 2592910 at *4 (same); Karcher v. Iran, 2021 WL 133507 at *12 ("Karcher II") (same).

In accordance with the Court's prior rulings, the undersigned has assessed the expert witness' report, as well as other evidence establishing the date, location, tactics, injuries, and other evidence providing additional indicia of Shia Militia Group involvement with Attack No. 65. In sum, this evidence satisfies the undersigned, and I find the Plaintiff has sufficiently established that Attack No. 65—the February 15, 2009 EFP attack in Maysan, Iraq—resulted in an extrajudicial killing, caused personal injuries to Plaintiff Shawn Durnen, and is attributable to the Iranian-supported Shia Militia Groups. The Court has found that Defendants' provision of material support to these Shia Militia

Groups was essential to their operational capacity and attacks involving these groups in Iraq at the time of Attack No. 65 were reasonably foreseeable and a natural consequence of Defendants' material support <u>See</u> ECF Docs. 127; 136; and 137, at 3. Thus, Defendants' provision of material support to AQI was a proximate cause of Attack No. 65.

Therefore, I recommend the Court enter judgment finding Defendants the Islamic Republic of Iran, IRGC, MOIS, Bank Melli Iran, and Bank Markazi liable for Attack No. 65.

## IV.    REVIEW BY THE DISTRICT COURT

Pursuant to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Nos. No. 139, 140, and 145), Plaintiffs may file an objection to, or motion to modify/adopt, a finding, report, or recommendation by the Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide *de novo* all objections to findings of fact or conclusions of law made or recommended by the Special Master. The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. <u>See</u> Fed. R. Civ. P. Rule 53(f)(3), (4), and (5).


Date: April 23, 2024                    Respectfully Submitted,

                        <u>*/s/ John P. Kuder*</u>
                        **HON**. **JOHN P**. **KUDER (RET**.)
                        **SPECIAL MASTER**