UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**ESTATE OF CHRISTOPHER BROOK FISHBECK**, *et al.*,

                    Plaintiffs,

          v.

**ISLAMIC REPUBLIC OF IRAN**, *et al.*,

                    Defendants.

Case No. 18-cv-2248 (CRC)

## MEMORANDUM OPINION
### (Public Version of ECF 387)

I.  BACKGROUND ......................................................................................................................... 3

II. LEGAL STANDARDS ............................................................................................................. 7

A.  JURISDICTION AND LIABILITY ............................................................................................. 7

B.  DAMAGES ................................................................................................................................ 8

III. ANALYSIS................................................................................................................................ 9

A.  JURISDICTION AND LIABILITY ............................................................................................. 9

1.  ATTACKS 1, 3–9, 11–19, 21–28, 30–39, 41–52, 54–65 ......................................................... 9

2.  ATTACK 10 ............................................................................................................................. 12

3.  ATTACK 20 ............................................................................................................................. 12

4.  ATTACK 40 ............................................................................................................................. 13

5.  ATTACK 53 ............................................................................................................................. 13

6.  HM3 JUAN MARTINEZ RUBIO ............................................................................................ 14

B.  DAMAGES .............................................................................................................................. 15

1. COMPENSATORY DAMAGES ................................................................................. 15

2. DECEASED PLAINTIFFS .................................................................................... 15

3. SURVIVING PLAINTIFFS ................................................................................... 28

4. PUNITIVE DAMAGES ....................................................................................... 51

5. INTEREST ................................................................................................. 54

**IV. CONCLUSION**................................................................................................**55**

The more than 1400 plaintiffs in this case seek damages due to the death or injury of members of the U.S. armed forces in attacks in Iraq between 2003 and 2011. Under the Foreign Sovereign Immunities Act ("FSIA"), a foreign state designated by the U.S. government as a sponsor of terrorism that provides "material support" for extrajudicial killing is subject to the jurisdiction of the courts of the United States. See 28 U.S.C. § 1605A. Pursuant to this statute, the plaintiffs here bring claims against the Islamic Republic of Iran ("Iran") and a number of its agents, whom they allege provided funding, weapons, and logistical support to the terrorist organizations and militia groups responsible for the attacks at issue. As is the norm in these cases, Iran and its agents have failed to appear, despite being served with process.

The plaintiffs previously selected fifteen representative "bellwether" attacks for this Court's determination of liability. See ECF No. 137. After finding personal and subject matter jurisdiction over all but one of the defendants and entering default judgment holding those defendants liable for twelve of the bellwether attacks, the Court appointed nine special masters to provide (1) liability recommendations for those bellwethers and (2) liability and damages assessments for the remaining attacks. See ECF Nos. 139, 145. In its most recent ruling in this case, the Court awarded damages to the plaintiffs with claims arising from the twelve bellwether attacks for which it had entered default judgment. See ECF No. 267. In this ruling, the Court

turns to the next batch of attacks: the 63[1] non-bellwether wave 1 and wave 2 attacks, which gave rise to the claims of 24 estates of servicemembers or contractors killed in these attacks, 58 servicemembers or contractors injured in these attacks, and 189 family members of individuals killed or injured in these attacks (271 plaintiffs in total). ECF No. 375 at 1.

Now before the Court is the plaintiffs' motion to adopt the special masters' reports and recommendations of liability and damages determinations for the 63 wave 1 and wave 2 attacks. ECF No. 375 at 1–2. For the reasons laid out below, the Court will adopt in part the special masters' findings and recommendations as to liability and damages for the wave 1 and wave 2 attacks and enter final judgment as to those plaintiffs and families it found entitled to relief. The Court will reserve judgment on the remaining tranches of attacks. The Court will deny the motion to adopt without prejudice as to claims related to several attacks discussed below for which the Court has requested additional information.

## I.    Background

The Court will begin with a brief procedural overview of this case.

The Court previously found personal and subject matter jurisdiction over all but one of the defendants. ECF No. 126 at 7; ECF No. 137 at 2–3, 28. It then entered default judgments holding those defendants liable for twelve of the bellwether attacks because (1) the defendants provided material support to Sunni and Shia terrorist groups or militias in Iraq between 2003 and 2011 and (2) the groups committed twelve of the bellwether attacks. ECF No. 127 at 1–2 (finding that Iran, the Islamic Revolutionary Guard Corps ("the IRGC"), and the Iranian Ministry of Intelligence & Security ("the MOIS") provided material support to the subject groups); ECF

---

[1]  Plaintiffs reference 64 non-bellwether attacks and have submitted reports labelled up to 65, but the actual number of attack reports is 63.

No. 136 at 7 (finding that Bank Markazi Jomhouri Islami Iran ("Bank Markazi") and Bank Melli Iran ("Bank Melli") provided material support to the subject groups); ECF No. 137 at 7–27 (finding that twelve of the bellwether attacks were committed by the subject groups). The Court awarded damages to the bellwether plaintiffs whose claims arose from those twelve attacks while reserving judgment on the remaining attacks. ECF No. 267 at 2.

The Court also issued an order laying out an administrative plan to "govern further proceedings as to the review of evidence and determination of the defendants' liability for non-bellwether attacks at issue in this case[.]" See ECF No. 140 at 1. The Court instructed the special masters to review (a) "the terrorist group(s) involved in the commission of the attack;" (b) "the personal injuries or deaths that occurred from the attack;" and (c) "the relationship of the victims of the attack to the respective plaintiffs." Id. at 2. The special masters were then to make conclusions of law on whether (a) "the attack involved a group(s) that received material support from Defendants;" (b) "the attack involved a requisite act or acts listed in 28 U.S.C §1605(A)(a)(1);" and (c) "Defendant's provision of material support was a proximate cause of the attack." Id. Later, the Court instructed the special masters to make revised findings on damages consistent with the Court's June 5, 2024, opinion. ECF No. 267 at 30–31. Now before the Court is the plaintiffs' motion to adopt the liability and damages findings of the special masters as to the wave 1 and wave 2 plaintiffs and enter final default judgment as to these plaintiffs. The 63 wave 1 and wave 2 attacks at issue are:

1. Wave 1 Attack #1: October 27, 2003, Improvised Explosive Device ("IED") Attacks in Baghdad, Iraq.

2. Wave 1 Attack #3: April 7, 2004, Complex IED Attack near Fallujah, Iraq.

3. Wave 1 Attack #4: April 26, 2004, Complex Attack in Fallujah, Iraq.

4. Wave 1 Attack #5: May 26, 2004, IED Attack in Hit, Iraq.

5. Wave 1 Attack #6: July 15, 2004, Complex IED Attack in Haditha, Iraq.

6. Wave 1 Attack #7: July 20, 2004, Complex IED Attack in Al Karmah, Iraq.

7. Wave 1 Attack #8: August 15, 2004, Complex IED Attack in Fallujah, Iraq.

8. Wave 1 Attack #9: November 9, 2004, Complex Attack in Fallujah, Iraq

9. Wave 1 Attack #10: November 2004, Complex Attacks in Fallujah, Iraq.

10. Wave 1 Attack #11: November 15, 2004, Suicide Vehicle-Borne IED ("SVBIED") Attack near Ramadi, Iraq.

11. Wave 1 Attack #12: December 12, 2004, Complex Attack in Fallujah, Iraq.

12. Wave 1 Attack #13: January 1, 2005, Complex IED Attack in Haditha, Iraq.

13. Wave 1 Attack #14: January 3, 2005, Complex Attack in Amiriyah, Iraq.

14. Wave 1 Attack #15: February 22, 2005, IED Attack near Ramadi, Iraq.

15. Wave 1 Attack #16: April 26, 2005, IED Attack in Hit, Iraq.

16. Wave 1 Attack #17: May 8, 2005, Complex Attack in Al Qa'im District, Iraq.

17. Wave 1 Attack #18: May 9, 2005, IED Attack near Ar Radwaniyah, Iraq.

18. Wave 1 Attack #19: June 9, 2005, IED Attack near Haditha, Iraq.

19. Wave 1 Attack #20: June 16, 2005, Complex IED Attack in Ramadi, Iraq.

20. Wave 1 Attack #21: July 9, 2005, Complex IED Attack in Tal Afar, Iraq.

21. Wave 1 Attack #22: August 1, 2005, IED Attacks in Hit, Iraq.

22. Wave 1 Attack #23: August 25, 2005, IED Attack in Al Qa'im, Iraq.

23. Wave 1 Attack #24: September 19, 2005, Complex IED Attack in Ramadi, Iraq.

24. Wave 1 Attack #25: September 27, 2005, Sniper Attack in Ramadi, Iraq.

25. Wave 1 Attack #26: October 27, 2005, IED Attack in Ramadi, Iraq.

26. Wave 1 Attack #27: March 8, 2006, IED Attack near Habbaniyah, Iraq.

27. Wave 1 Attack #28: April 15, 2006, IED Attack in Saqlawiyah, Iraq.

28. Wave 1 Attack #30: June 29, 2006, Sniper Attack in Mosul, Iraq.

29. Wave 1 Attack #31: November 11, 2006, IED Attack in Ramadi, Iraq.

30. Wave 1 Attack #32: May 5, 2007, IED Attack in Khalidiyah, Iraq.

31. Wave 1 Attack #33: August 5, 2007, Complex Attack in Baghdad, Iraq.

32. Wave 1 Attack #34: April 5, 2005, IED Attack in Baghdad, Iraq.

33. Wave 1 Attack #35: June 6, 2011, IRAM Attack in Baghdad, Iraq.

34. Wave 2 Attack #36: October 1, 2003, Rocket-Propelled Grenade ("RPG") Attack in
    Salah ad-Din Province, Iraq.

35. Wave 2 Attack #37: June 4, 2004, Complex Attack in Sadr City, Iraq.

36. Wave 2 Attack #38: June 16, 2004, Rocket Attack near Balad, Iraq.

37. Wave 2 Attack #39: July 11, 2004, Complex IED Attack in Salah ad-Din Province,
    Iraq.

38. Wave 2 Attack #40: July 21, 2004, IED Attack in Salah ad-Din Province, Iraq.

39. Wave 2 Attack #41: August 6, 2004, Direct-Fire Attack in Al-Shula, Iraq.

40. Wave 2 Attack #42: November 9, 2004, Complex Attack in Fallujah, Iraq.

41. Wave 2 Attack #43: January 13, 2005, Complex IED Attack in Mosul, Iraq.

42. Wave 2 Attack #44: January 28, 2005, IED Attack in Baghdad, Iraq.

43. Wave 2 Attack #45: March 12, 2005, Complex IED Attack near Baghdad, Iraq.

44. Wave 2 Attack #46: June 5, 2005, Complex IED Attack in Baghdad, Iraq.

45. Wave 2 Attack #47: July 16, 2005, IED Attack near Kirkuk, Iraq.

46. Wave 2 Attack #48: July 24, 2005, Complex IED Attack in Khalidiyah, Iraq.

47. Wave 2 Attack #49: August 9, 2005, SVBIED Attack in Baghdad, Iraq.

48. Wave 2 Attack #50: August 12, 2005, Complex IED Attack near Khalidiyah, Iraq.

49. Wave 2 Attack #51: August 18, 2005, IED Attack in Samarra, Iraq.

50. Wave 2 Attack #52: September 4, 2005, Complex SVBIED Attack in Hit, Iraq.

51. Wave 2 Attack #53: September 20, 2005, Complex Attack in Salah ad-Din Province, Iraq.

52. Wave 2 Attack #54: October 15, 2005, Complex IED Attack in Ramadi, Iraq.

53. Wave 2 Attack #55: November 19, 2005, IED Attack near Baiji, Iraq.

54. Wave 2 Attack #56: February 6, 2006, Complex IED Attack in Khan al-Baghdadi, Iraq.

55. Wave 2 Attack #57: June 27, 2006, IED Attack in Jurf Al-Sakhar, Iraq.

56. Wave 2 Attack #58: August 18, 2006, EFP Attack in Baghdad, Iraq.

57. Wave 2 Attack #59: August 27, 2006, Complex IED Attack in Hit, Iraq.

58. Wave 2 Attack #60: April 12, 2007, Sniper Attack in Tarmiyah, Iraq.

59. Wave 2 Attack #61: May 13, 2007, Suicide Attack near Samarra, Iraq.

60. Wave 2 Attack #62: May 14, 2007, Complex IED Attack in Baghdad, Iraq.

61. Wave 2 Attack #63: July 29, 2007, RPG Attack in Sadr City, Iraq.

62. Wave 2 Attack #64: October 10, 2007, Rocket Attack in Baghdad, Iraq.

63. Wave 2 Attack #65: February 15, 2009, EFP Attack in Maysan Province, Iraq.[2]

## II.  Legal Standards

### A.  Jurisdiction and Liability

To hold defendants liable in default under the FSIA's terrorism exception, the Court must find that it has personal and subject matter jurisdiction over them and that the plaintiffs have established their right to relief "by evidence satisfactory to the court." Bathiard v. Islamic Republic of Iran, No. 16-cv-1549 (CRC), 2019 WL 3412983, at *2 (D.D.C. July 29, 2019)

---

[2] The plaintiffs do not appear to have submitted reports as to Attacks 2 and 29.

(Cooper, J.) (quoting 28 U.S.C. §1608(e)).  The FSIA provides for personal jurisdiction where service has been properly made under 28 U.S.C. § 1608.  Republic of Sudan v. Harrison, 587 U.S. 1, 4 (2019).

As for subject matter jurisdiction, the Court may hear suits where (1) "money damages are sought" (2) "against a foreign state for" (3) "personal injury or death that" (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act[.]"  28 U.S.C. § 1605A(a)(1); see Pennington v. Islamic Republic of Iran, No. 19-cv-796 (JEB), 2021 WL 2592910, at *2 (D.D.C. June 24, 2021).  The statute additionally requires that (1) the defendant be a designated state sponsor of terrorism and (2) the "claimant or the victim" in the case was "a national of the United States," "a member of the armed forces," "otherwise an employee of the Government of the United States" or "an individual performing a contract awarded by the United States Government" when the act happened.  28 U.S.C. § 1605A(a)(2)(A)(i)–(ii).

B.  Damages

The plaintiffs in this case request both compensatory and punitive damages stemming from the wave 1 and 2 attacks.  See ECF No. 375.  Under the governing standards, direct victims "who survived an attack may recover damages for their pain and suffering[;] . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages."  Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d 24, 37 (D.D.C. 2012) (citing Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 82–83 (D.D.C. 2010)).  To establish damages, plaintiffs "must prove the amount of the damages by a reasonable estimate consistent with th[e] [D.C. Circuit's] application of the American rule on damages."  Hill v. Republic of Iraq, 328 F.3d 680, 681 (D.C. Cir. 2003) (quotation marks omitted).  "In determining the reasonable

estimate, courts may look to expert testimony and prior awards for comparable injury." Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 82 (D.D.C. 2017) (quotation marks omitted).

## III. Analysis

### A. Jurisdiction and Liability

The Court previously found that the defendants were properly served. See ECF No. 55 at 1. Therefore, it must now determine (1) whether it has subject matter jurisdiction over the wave 1 and wave 2 plaintiffs' claims and (2) whether those plaintiffs have established their right to relief. It concludes that, with some exceptions, the wave 1 and wave 2 plaintiffs have made this showing. The Court will therefore largely grant their motion for final default judgment. It will deny the motion without prejudice as to Attacks 10, 20, 40, 53 and as to plaintiff Juan Martinez Rubio because, on the current record, it cannot find defendants liable for those attacks or Rubio's injuries.[3]

#### 1. Attacks 1, 3–9, 11–19, 21–28, 30–39, 41–52, 54–65

First, the Court has subject matter jurisdiction over the claims arising from Attacks 1, 3–9, 11–28, 30–39, and 41–65. The plaintiffs whose claims arise from those attacks seek (1) "money damages," and no other form of relief, against (2) "a foreign state" (Iran, its instrumentalities, and subdivisions) for (3) "personal injury or death," which they allege (4) "was caused" by an (5) "extrajudicial killing" for which defendants provided "material support[.]" 28 U.S.C. § 1605A(a)(1); see also id. § 1605(A)(c) ("[D]amages may include economic damages, solatium, pain and suffering, and punitive damages"); ECF 100 at 756–58. And the Court previously held that Iran was a state sponsor of terrorism at the time of each attack and when the

---

[3] The Court will also not grant the motion as to plaintiffs Jayme Boyle, Carl West, Scott J. West, and Ayron Bennett because they cannot recover in this action for reasons explained infra Part III.B.3.b.

suit was filed and that many (though not all) of the plaintiffs were U.S.-national members of the armed forces, or their relatives. See ECF No. 126 at 6–7; ECF 100 at 756–58.

Next, Plaintiffs have established their entitlement to relief with "evidence satisfactory to the court" that the attacks in which they or their family members were injured or killed were committed by terrorist organizations or militias that received material support from the defendants. Bathiard, 2019 WL 3412983, at *2 (quoting 28 U.S.C. §1608(e)). This conclusion is based in part on the Court's findings in its prior opinion on the bellwethers. The Court previously held that Sunni terrorist organizations—Al Qaeda, Al Qaeda in Iraq, and Ansar al-Islam—as well as Shia terrorist organizations—the Badr Corps, Jaysh al Mahdi, the Promised Day Brigade, Asa'ib Ahl al Haq, Kata'ib Hizballah, and the Sheibani Network—conducted attacks in Iraq between 2003 and 2011. ECF No. 127 at 2; ECF No. 137 at 8–27. The Court also concluded that defendants Iran, the IRGC, the MOIS, Bank Melli and Bank Markazi provided material support to these organizations during this time period. ECF No. 127 at 2; ECF No. 136 at 3–6. Specifically, Iran, the IRGC, and the MOIS provided support to Sunni and Shia terror organizations and militias that was "essential to the groups' operating capacity." ECF No. 127 at 2; see also id. at 1 n.1 (discussing cases that found Iran liable for terrorist attacks in Iraq). And Bank Melli and Bank Markazi transferred funds to "provide[] funding and financial services to the IRGC and other entities within Iran's terrorist network[.]" ECF No. 136 at 3.

From these findings, the Court concluded that Iran and its agents supported and funded a network of terrorist organizations and militias in Iraq between 2003 and 2011, and that these organizations committed the bellwether attacks. This finding was consistent with other cases from this district holding Iran liable for attacks against U.S. personnel in Iraq during a similar time period. See, e.g., Swinney v. Islamic Republic of Iran, No. 1:20-cv-2316 (ACR), 2025 WL

1547694, at *3–6 (D.D.C. May 30, 2025); Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12, 23–25 (D.D.C. 2019); Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 59–64 (D.D.C. 2018); Lee v. Islamic Republic of Iran, 518 F. Supp. 3d 475, 482–84 (D.D.C. 2021); Frost v. Islamic Republic of Iran, 383 F. Supp. 3d 33, 38–42 (D.D.C. 2019).

Plaintiffs selected the bellwether attacks "based upon their representativeness of all 438 attacks at issue in this case." ECF No. 92 at 1. Accordingly, the Court determines its findings as to the bellwether attacks are, for the most part, "representative" of the claims at issue here. ECF No. 137 at 1. This approach is consistent with that taken by other courts in this district when finding liability for attacks in FSIA cases where liability as to other attacks has previously been found. See Cabrera v. Islamic Republic of Iran, No. 18-cv-2065 (JDB), 2024 WL 864092, at *2–3 (D.D.C. Feb. 29, 2024); Valore, 700 F. Supp 2d at 75; Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 72 (D.D.C. 2010). While the specifics of the individual attacks may vary, the conclusion that Iran and its agents are responsible for supporting a terrorist network, and that this network committed the attacks in question, is largely uncontroverted on the record before the Court.

Accordingly, in light of the Court's previous findings, the detailed factual record prepared by the special masters, and the practice of other courts in this district, the Court concludes that the defendants were responsible for most of the attacks giving rise to the claims of the wave 1 and wave 2 plaintiffs. It will therefore enter final default judgment for those plaintiffs, with the following exceptions that hew to the Court's oft-expressed reluctance to assign responsibility to Iran for virtually any attack on U.S. soldiers in Iraq.

2. *Attack 10*

The Court will not adopt the special masters' liability determinations for Attack 10 because the plaintiffs whose claims arise from the attack have not established the Court's subject matter jurisdiction over these claims. The special master indicated that Al-Qaeda in Iraq was responsible for Attack 10, in which SSgt. Terry McElwain and Cpl. Garrett Marsh were injured but did not establish any extrajudicial killing as part of this attack. ECF No. 195 at 2–3. But "plaintiffs . . . must establish that there was an actual completed killing at some point" to establish subject matter jurisdiction under the FSIA. Strauss v. Islamic Republic of Iran, No. 22-cv-00052 (RCL), 2024 WL 2499922, at *1 (D.D.C. Mar. 28, 2024) (citing Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061 (D.C. Cir. 2024)). The special master's statement that Attack 10 was a part of the Second Battle of Fallujah is insufficient to establish that there was an "extrajudicial killing" during this attack sufficient to bring any resulting claims within the scope of the FSIA. ECF No. 195 at 2. Accordingly, the Court will deny without prejudice Plaintiffs' motion to adopt the special masters' liability recommendations for Attack 10.

3. *Attack 20*

The Court will also reject the special master's liability findings as to Attack 20 because it cannot pinpoint Al-Qaeda as the perpetrator of this attack.[4] Three aspects of this attack report stand in the way of a liability finding. The report notes that Al-Qaeda "was the dominant

---

[4] In assessing the sufficiency of liability reports, the Court will use the factors that it has in the past. Those factors include, but are not limited to: "(1) whether the tactics, methods, or weapons used in the attack could be linked to the groups Iran supported; (2) whether the attack occurred in an area operationally controlled by one of the subject terrorist groups Iran supported; (3) whether an expert credibly opined that the attack was committed by an Iran-backed terrorist group; and (4) any other indicia that one of the subject terrorist groups was responsible for the attack." ECF No. 137 at 7.

insurgent actor in the area," citing to one of the Court's previous opinions. ECF No. 174 at 3–4. But the frame of reference is too large, and it is hard to credit the notion that Al-Qaeda was the controlling force in a massive area like Anbar Province. The second problem is the assertion that an IED is a signature Al-Qaeda tactic. Id. at 3. Other groups and individuals obviously employed IEDs, which were ubiquitous in Iraq. Finally, the special master's suggestion that other groups ordered a ceasefire in the province, leaving only Al-Qaeda, is useful evidence, but lacks sufficient details to rule out other groups or individual attackers. Id. at 4. The Court will deny without prejudice Plaintiffs' motion as to Attack 20 and will not adopt the liability recommendations.

    4.  *Attack 40*

    Likewise, the evidence before the Court is insufficient to establish whether Attack 40 was committed in an area that was "operationally controlled" by the subject Iran-supported terrorist groups or militias. See ECF No. 199 at 3–4. Therefore, on the current record, the Court cannot conclude that Attack 40 was caused by the defendants or the groups they funded. It will therefore also deny without prejudice Plaintiffs' motion to adopt liability findings for this attack.

    5.  *Attack 53*

    The Court also lacks evidence to establish whether Attack 53 was committed by Al-Qaeda or another Iran-backed armed group. See ECF No. 206 at 10. The special master details that Attack 53 was committed by Al-Qaeda because of the rapid coordination involved in the attack and Al-Qaeda's subsequent usage of a large IED in the town where the attack occurred. Id. There are several problems with this analysis. First, the report appears to suggest that the town of Balad and the entire Tigris River were under the control of Al-Qaeda, an attribution that is much too general to attach liability to. Moreover, the mere fact that an Al-Qaeda attack took

place in Balad "nine days after this attack" is insufficient to establish a pattern showing "operational dominance." Id. The report also specifies that this attack was committed by "a highly trained cell," but the mere fact that this attack was well-coordinated cannot be sufficient to attribute tactics to Al-Qaeda. Id. On the present record, the Court cannot agree that Al-Qaeda committed Attack 53 and therefore that the attack was supported by Iran. Again, the Court will deny without prejudice the motion to adopt liability for this attack.

    *6. HM3 Juan Martinez Rubio*

Finally, the Court will deny without prejudice the motion as to defendants' liability for HM3 Juan Martinez Rubio's injuries. While HM3 Rubio's claim arises from Attack 13, the special master's report on Rubio gives no indication that he suffered from injuries specific to that attack. ECF No. 289 at 3–6. This is notable because Rubio was also injured in Bellwether Attack 3. Id. at 4–5. Since, on the evidence before the Court, it is impossible to attribute Rubio's injuries to Attack 13 rather than Attack 3, the Court will deny without prejudice the motion to adopt the recommendation as to liability for Attack 13.

* * *

In sum, the Court will deny the motion without prejudice as to Attacks 10, 20, 40, 53 and Plaintiff Juan Martinez Rubio. The plaintiffs whose claims arise from Attacks 10, 20, 40, 53, and HM3 Rubio are welcome to renew their motions, curing the identified deficiencies in their evidentiary showing. It will grant the remaining plaintiffs' motion for default judgment, with the exception, for reasons explained below, of plaintiffs Jayme Boyle, Carl West, Scott J. West, and Ayron Bennett. It will also await revised economic damages calculations for GySgt. John David Fry and Ssgt. Ryan Christopher Saurs before awarding them default judgment.

B. Damages

Having found defendants liable for most of these attacks, the Court will turn to assessing plaintiffs' claims for damages arising from them.

    *1. Compensatory Damages*

The FSIA provides for three forms of compensatory damages: pain and suffering, solatium, and economic damages. 28 U.S.C. § 1605A(c). As this Court has previously recognized in assessing damages, "the process of assessing pain and suffering is an imperfect science, as no amount of money can properly compensate a victim and his family for their suffering during and after a terrorist attack." Bathiard v. Islamic Republic of Iran, No. 16-cv-1549 (CRC), 2020 WL 1975672, at *3 (D.D.C. Apr. 24, 2020); see also Goldstein v. Islamic Republic of Iran, 383 F. Supp. 3d 15, 19 (D.D.C. 2019) (Cooper, J.); Cohen v. Islamic Republic of Iran, 268 F. Supp. 3d 19, 24 (D.D.C. 2017) (Cooper, J.), abrogated on other grounds by Goldstein, 383 F. Supp. 3d at 24. "In the interest of fairness, however, courts strive to maintain consistency of awards as between the specific plaintiffs and among plaintiffs in comparable situations." Cohen, 268 F. Supp. 3d at 24. Because awards traditionally vary based on the death or injuries of the victim, the Court will first assess claims brought by the estates of deceased plaintiffs and their families before turning to those advanced by surviving plaintiffs and their families. As it has in the past, the Court will largely adhere to the framework established in Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 51–52 (D.D.C. 2007), abrogated on other grounds by Mohammadi v. Islamic Republic of Iran, 782 F.3d 9, 15 (D.C. Cir. 2015).

    *2. Deceased Plaintiffs*

        a. Pain and Suffering

Twenty-four plaintiffs died as a result of the wave 1 and wave 2 attacks. When it comes to pain and suffering damages, plaintiffs killed in terror attacks cannot recover if their death was instantaneous. Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 402 (D.D.C. 2015). But "[w]hen the victim endured extreme pain and suffering for a period of several hours or less, courts in these cases have rather uniformly awarded $1 million[,]" adjusting upward for long-duration pain and downward when the victim survived for a brief period. Peterson, 515 F. Supp. 2d at 53. Consistent with these principles, the Court adopts the recommendations of the special masters to award $0 in pain and suffering to the Estates of Aubrey Bell, Matthew Henderson, Patrick Marc Rapicault, Thomas Keeling, Michael Egan, Jason Benford, John David Fry, Bryan Luckey, Christopher Fishbeck, Jeremy Fischer, Abraham Simpson, Bruce Terrance Durr, Justin Vasquez, Larry Stilwell, Timothy Seamans, Brandon Schuck, Jeremy Jones, Brenton Gray, and Gwilym J. Newman, who never regained consciousness or died instantaneously; $500,000 to the Estate of James Blankenbecler, who suffered pelvic wounds, but survived for only a period of "minutes"; $1 million to the Estate of Cody Clark Grater, who consciously survived for at least forty-three minutes; and $7.5 million to the Estate of Merlin German, who survived following his attack for a period of three years. ECF No. 275 at 4 (Bell); ECF No. 276 at 15 (Henderson); ECF No. 280 at 6 (Rapicault); ECF No. 295 at 17–18 (Keeling); ECF No. 286 at 9 (Egan); ECF No. 292 at 4-5 (Benford); ECF No. 293 at 4 (Fry); ECF No. 279 at 15 (Luckey); ECF No. 298 at 9 (Fishbeck); ECF No. 339 at 4 (Fischer); ECF No. 340 at 6 (Simpson); ECF No. 329 at 4 (Durr); ECF No. 330 at 7 (Vasquez); ECF No. 342 at 4 (Stilwell); ECF No. 343 at 2 (Seamans); ECF No. 337 at 39 (Schuck); ECF No. 332 at 7 (Jones); ECF No. 345 at 2 (Gray); ECF No. 333 at 4 (Newman); ECF No. 325 at 7 (Blankenbecler); ECF No. 347 at 3-4 (Grater); ECF No. 279 at 2 (German).

The Court will decline, however, to adopt the recommendation of the special master for Derrick Joshua Cothran.

    i.    LCpl. Derrick Joshua Cothran

LCpl. Cothran was traveling in a vehicle when it was struck by an IED and died of blast and thermal injuries. ECF No. 295 at 32–33. The medical examiner found that Cothran was likely breathing for some time after this initial attack. Id. at 33. While the Court credits the medical examiner's report that Cothran was still alive immediately after the blast, the Court must deny pain and suffering damages where "the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his or her death." Roth, 78 F. Supp. 3d at 402 (citing Est. of Botvin v. Islamic Republic of Iran, 873 F. Supp. 2d 232, 244 (D.D.C. 2012)); see also Worley v. Islamic Republic of Iran, 177 F. Supp. 3d 283, 286 (D.D.C. 2016) (noting that the plaintiff must provide evidence "tending to show an attack resulted in the fatal but noninstantaneous injury of a victim and that the victim was conscious thereafter"). Even if the injury did not cause instantaneous death, the report presents no evidence showing that Cothran was conscious after the explosion. Therefore, the Court finds an award of pain and suffering damages unsupported by the record.

    b.  Solatium

Distinct from pain and suffering damages, solatium awards are intended to compensate family members of the victim for "the mental anguish, bereavement and grief that those with a close personal relationship to a [victim] experience[.]" Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). "Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish." Roth, 78 F. Supp. 3d at 403.

Courts must adhere to the "strict meaning" of family in assessing who may recover in FSIA actions. Est. of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 28 (D.D.C. 2009). Relatives who do not fall within this "strict meaning" but who "resided in the same household" as the victim and are the "functional equivalent" of immediate family members may sometimes recover. Bettis v. Islamic Republic of Iran, 315 F.3d 325, 337 (D.C. Cir. 2003) (citation omitted) (emphasis omitted). Accordingly, as it has in the past, the Court adopts the special masters' findings that step-parents and step-siblings are the functional equivalents of immediate family members and can therefore recover. See ECF No. 267 at 8–9. But it will also apply its previous conclusion that "nieces, nephews, uncles, [and] aunts . . . may not collect solatium damages under FSIA[.]" Davis, 882 F. Supp. 2d at 15; Bettis, 315 F.3d at 333 ("[N]ieces and nephews cannot recover damages . . . because they are not members of . . . [the] immediate family.").

"For relatives of victims killed by terrorist attacks, courts begin with 'a framework in which spouses of deceased victims were awarded approximately $8 million, while parents received $5 million and siblings received $2.5 million.'" Bathiard, 2020 WL 1975672, at *5 (quoting Anderson v. Islamic Republic of Iran, 839 F. Supp. 2d 263, 266 (D.D.C. 2012)). "Courts in this district have differed somewhat on the proper amount awarded to children of victims." Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, 94 (D.D.C. 2014) (comparing cases), aff'd in part, vacated in part on other grounds sub nom. Owens v. Republic of Sudan, 864 F.3d 751, 825 (D.C. Cir. 2017), vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan, 590 U.S. 418, 431 (2020). As it has in the past, the Court adopts the same baseline for children and parents. See Bathiard, 2020 WL 1975672, at *5; see also Mwila v. Islamic Republic of Iran, 33 F. Supp. 3d 36, 45 (D.D.C. 2014) ("[C]hildren who lose parents are likely to suffer as much as parents who lose children."). "[T]estimony proving a close emotional

relationship will usually be sufficient to sustain an award of solatium damages." Roth, 78 F. Supp. 3d at 403. The Court concurs with the special masters that each plaintiff who is an immediate family member of one of the deceased plaintiffs has established his or her entitlement to solatium damages.

It will proceed to consider the damages recommendations by category of family member.

       i.    Spouses

Turning first to the spouses, the Court will adopt the special masters' recommended award as to the following:

- $8 million baseline award for Philandria Ezell, Vera Rapicault, Jaimie Egge, Maria K. Egan, Catherine Luckey, Linnie Alma Blankenbecler, Sarah A. Wattier, Riley Nicole Vasquez, Courtnay Scott Gray, Samantha Lynn Newman Tjaden;

- $9 million dollar upward-departure award for Kimberly Ann Benford; and

- $10 million dollar upward-departure award for Jennifer Laura Jones.

The Court declines to adopt the recommended upward-departure awards for Megan Beth Cash and Malia Michelle Fry; the Court will instead award them the baseline $8 million.

The Court writes separately on cases it believes merit further explanation or where it has deviated from the special masters' recommendations.

      a)  Philandria Ezell

The Court adopts Special Master Jamie Dodge's finding that Sgt. Bell's common-law spouse, Philandria Ezell, is an immediate family member. Ezell lived with Sgt. Bell for a decade prior to his death, and he assisted in raising her children. ECF No. 275 at 9. This qualifies Sgt. Bell to be "viewed as the functional equivalent[]" of Ezell's spouse. See Bettis, 315 F.3d at 337; Valore, 700 F. Supp. 2d 52 at 79–80 (finding that non-adoptive step-parents with close relationships were immediate family). Moreover, the Court is compelled by the Department of

Veterans Affairs ("VA's") determination that Ezell was entitled to receive spousal survivor benefits as Sgt. Bell's common law spouse. ECF No. 275 at 10. Accordingly, the Court will adopt the finding and grant Philandria Ezell the spousal baseline award of $8 million.

        b) Megan Beth Cash

The Court declines to adopt Special Master John Kuder's recommendation of a $9 million award for Megan Beth Cash. Special Master Kuder predicates his recommendation of an increased award on the ground that she suffers ████████████████████, hopelessness, inability to cope, and extreme grief." ECF No. 337 at 37. While the Court recognizes the great personal loss that Cash has suffered, these serious conditions are "less severe than those [conditions] found to warrant a significant damages enhancement on their own." Braun, 228 F. Supp. 3d at 86. Upward departures tend to be based upon conditions like nervous breakdowns, self-destructive behavior, or being a twin. See Cabrera v. Islamic Republic of Iran, No. 19-cv-3835, 2024 WL 864092, at *5 (D.D.C. Feb. 29, 2024) (awarding a 10% upward variance for the twin of a deceased victim); Valore, 700 F. Supp 2d at 86 (awarding upward variances for alcohol abuse and breakdowns requiring hospitalization). Furthermore, while ████████████ ███████████████████████, the record does not establish that ████████████ █ the level of "self-destructive behavior" previously found to show "acute suffering warranting an upward departure[.]" Murphy, 740 F. Supp. 2d at 79. Therefore, the Court will award Megan Beth Cash the $8 million spousal baseline instead.

        c) Malia Michelle Fry

The Court also declines to adopt the upward deviation recommended for Malia Michelle Fry, spouse of Gunnery Seargent John David Fry. Special Master Ronald Swanson recommends a damage award of $9.6 million, a 20% upward departure from the baseline. ECF No. 293 at 17.

Malia ███████████████████ and continues to struggle with the anguish of GySgt. Fry's death. Id. As the Court has previously noted, however, these conditions are "less severe than those [conditions] found to warrant a significant damages enhancement on their own." Braun, 228 F. Supp. 3d at 86. Nor did Fry's medical conditions cause her to be hospitalized. Cf. Baker v. Socialist People's Libyan Arab Jamahirya, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (awarding upward departures for solatium claims when plaintiffs were hospitalized); Valore, 700 F. Supp 2d at 86 (same). Accordingly, the Court will adopt the baseline award of $8 million for Fry.

        ii.    Parents

Next, the parents. The Court will adopt the special masters' recommended award as to the following:

- $5 million baseline award for Roxie Bell, Owen Henderson, Nicole Rapicault Mario-Mantian, Sharon Berry, Robert James Berry, Charles Wilburn Fry, Elena Martinez Cothran, Theodore Michael Cothran, Patrick Luckey, Paula Luckey, Toni Kay Attanasio, Gary Fishbeck, Ana M Gomez, Maria Luz Simpson, James Simpson, David Robert Seamans, Monica June Seamans, the Estate of Joseph Scott Jones, Diane Kathleen Jones, Christine Ann Curtis[5], Anita Diane Lewis, and the Estate of Walter Ray Smith, Sr; and

- $4.125 million award for Lourdes German.

It will decline the $6 million upward-departure award for Donna Marie Squires and instead award her the baseline $5 million.

Again, the Court writes separately to explain cases that merit further elaboration.

---

[5] Curtis was not a United States citizen at the time of the attack. However, because she later became a citizen, she has a cause of action over which the Court may exercise jurisdiction under §1605(A)(c). See Est. of Fouty v. Syrian Arab Republic, 743 F. Supp. 3d 118, 160 (D.D.C. 2024) (discussing cases and statutes that allow similarly situated plaintiffs to recover).

a) Donna Marie Squires

Special Master John Kuder recommends a damage award of $6 million for Plaintiff Donna Marie Squires. Since the death of her son, Cpl. Brad Squires, ████████████ ████████████████████ suffers from "anxiety, hopelessness, and sleep deprivation." ECF No. 295 at 26. As the Court has noted, however, these conditions alone do not warrant an upward departure from the baseline. See Braun 228 F. Supp. 3d at 86; Murphy, 740 F. Supp. 2d at 79. These medical conditions did not involve hospitalization and more closely fit within the baseline compensatory damages framework designed to address cases of "mental anguish, bereavement and grief[.]" Belkin, 667 F. Supp. 2d at 22. As such, the Court will decline this recommendation and award Squires the baseline $5 million instead.

b) Lourdes German

Special Master Ellen Koblitz recommended a solatium award of $4.125 million for Lourdes German, which the Court will adopt. ECF No. 279 at 6. Ordinarily, parents of deceased plaintiffs receive $5 million in damages, whereas parents of children who survive for some time after their initial injuries receive an intermediate award of $3.75 million. ECF No. 267 at 14. Because Merlin German survived for a period after his attack, the presumptive award for Ms. German would be $3.75 million. But the special master has recommended a 10% upward departure in light of Ms. German's role as a nurse to her son. ECF No. 279 at 5. The Court will credit her experience as a full-time caretaker for her son during the course of more than one hundred medical procedures. ECF No. 279 at 4–5; see also Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43, 57-58 (D.D.C. 2009) (granting an upward departure from the baseline, partially because the plaintiff's parent served as a full-time nurse). Therefore, the Court will award Lourdes German $4.125 million in solatium damages.

iii.    Children

Third, children. The Court will adopt the special masters' recommended awards as to the following:

- $5 million baseline award for Jacob Alan Benford, Kathryn Michelle Fry, Gideon David Fry, Amanda Marie Villalobos, Joseph Alexander Morales, Rachel L. Vera, Ryan C. Stilwell, Anthony John Jones, Mackenzie Ann Jones, Cayden S. Gray, Samantha Egan, La'Darius Bernard Ezell, Tiffany Nicole Ezell, Kyser Ezell, and D'zundria Ezell;

- $4 million downward-departure award for Gavin Scott Schuck and Gwilym Alexander Newman;

- $5.5 million upward-departure award for Lane Alan Benford, and Jessica Marie Scaduto; and

- $5.75 million upward-departure award for C.L. Fry.

The Court will again explain certain conclusions.

a)    Ezell Family Children

As the Court recognized earlier, Philandria Ezell was the common-law wife of deceased Plaintiff Sgt. Aubrey Bell. The Court now finds that Philandria Ezell's children, La'Darius Bernard Ezell, Tiffany Nicole Ezell, Kyser Ezell, and D'zundria Ezell, all qualify as common-law children of Sgt. Bell. The Court agrees with the findings of the VA, which assessed them survivor benefits following Sgt. Bell's death. ECF No. 275 at 10. Accordingly, the Court adopts the recommendation of Special Master Jamie Dodge in awarding the each of the Ezell children the baseline award of $5 million.

b)    Samantha Egan

Special Master J. Daniel McCarthy recommended a damage award of $5.5 million for Samantha Egan, daughter of Sgt. Michael Egan. ECF No. 286 at 17. Samantha was three years old when she last saw her father. Id. "Children who are toddlers at the time of their parent's

death may still recover the full $5 million baseline solatium award." Bathiard, 2020 WL
1975672, at *6 (discussing cases in which toddlers with memories of their parents were granted
full solatium awards). Here, Samantha Egan meets this bar, as she has direct memories of her
father, such as one involving a stuffed animal that Sgt. Egan gave to her. ECF No. 286 at 14.
However, Special Master McCarthy recommends an upward departure, which is not warranted in
this case. ███████████████████████████████████████

███████████ Id. at 15. ██████████████████████████████████

███████████████████████    ████████████████████████ But while
"[d]ifferences in children's relative levels of awareness at the time" of their relative's injury do
not push awards down, upwards departures in such circumstances go beyond what is appropriate
to compensate these plaintiffs. Schooley v. Islamic Republic of Iran, 2019 WL 2717888, at *78
(D.D.C. 2019). Accordingly, the Court will decline to adopt the 10% upward departure
recommended by Special Master McCarthy and instead award $5 million to Samantha Egan.

     iv.    Siblings

    Finally, siblings. The Court will adopt the special masters' recommended awards as to
the following:

- $2.5 million baseline award for Melissa Inman, Laura Beth Pricer, Antoinette
Cothran Hebert, Theodore Michael Cothran Jr., Matthew Luckey, Joshua Luckey,
Randi Martz, Rene Gutel, David Simpson, Paul Simpson, Laura Nanitra
Weathersby, Peggie Anne Jones, Dawn Monesica Traxler, Walter Ray Smith Jr,
Jennifer Lynn Arebalo, Janneke Leann Eikenberg, Jimmy Stilwell, Ashley Marie
Knapp, Abbi Jo Miranda Carreto, Brittany Marie Greene, Patrick D. Newman,
and Erin Lynn Keeling Kurincic;

- $1.875 million award for Ariel German;

- $3 million upward-departure award for Kristen Ann Keeling Surovy;

- $2.875 million upward-departure award for Chad Squires; and

- $2.75 million upward-departure award for Walter Ray Smith, Jr.

The Court will decline the special masters' upward-departure recommendation for Jodie Marie Dennison and instead award her the $2.5 million baseline.

a) Jodie Marie Dennison

Special Master John Kuder recommended a damage award of $2.875 million to Jodie Marie Dennison, as the sister of Cpl. Brad Squires. ECF No. 295 at 28–29. Dennison and Cpl. Squires enjoyed a "close sibling relationship" and were in frequent contact during his deployment. Id. at 27. Special Master Kuder based his recommended 15% upward departure from the $2.5 million baseline on the unique circumstances surrounding the recovery of Cpl. Squires' body. Id. at 28. While the Court recognizes the trauma inherent to this experience, it is not aware of any case law establishing that a *delay* in recovering a body or body parts is a sufficient basis for an upward departure (or an intentional infliction of emotional distress claim). Cf. Sheikh v. Republic of Sudan, 485 F. Supp. 3d 255, 271 (2020) (seeing body parts or a loved one's body can be a sufficient basis for an enhanced award). Instead, Dennison's injuries fall into the more typical "mental anguish, bereavement and grief[,]" so the baseline award of $2.5 million is appropriate here. Belkin, 667 F. Supp. 2d at 22.

c. Economic Damages

Moving on to economic damages, "Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." Thuneibat v. Syrian Arab Republic, 167 F. Supp. 3d 22, 48 (D.D.C. 2016). "Such damages may be proven by the submission of a forensic economist's expert report." Roth, 78 F. Supp. 3d at 402 (citing Belkin, 667 F. Supp. 2d at 24). "In considering an award for lost future earnings, the Court shall take account of the

reasonableness and foundation of the assumptions relied upon by the expert." Id. (citing Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)).  In this case, the special masters have recommended an award of economic damages for each of the deceased plaintiffs based on expert reports of their lost future earnings.

As to the amount of damages, the Court adopts the following awards:

- Estate of Matthew Henderson ($2,494,569);
- Estate of Merlin German ($661,998);
- Estate of Thomas Oliver Keeling ($2,342,166);
- Estate of Michael Egan ($1,472,100);
- Estate of Jason Benford ($2,543,877);
- Estate of Derrick Joshua Cothran ($2,524,581);
- Estate of Bryan Luckey ($3,296,595);
- Estate of James David Blankenbecler ($1,476,469);
- Estate of Abraham Simpson ($2,448,564);
- Estate of Bruce Terrance Durr ($473,426);
- Estate of Justin Lee Vasquez ($2,858,931);
- Estate of Larry Stilwell ($251,169);
- Estate of Timothy James Seamans ($1,624,076);
- Estate of Brandon Scott Schuck ($2,665,458);
- Estate of Brenton Thomas Gray ($2,697,229);
- Estate of Gwilym J. Newman ($3,813,793);
- Estate of Cody Clark Grater ($1,204,541);
- Estate of Aubrey Bell ($1,498,767);

- Estate of Patrick Marc Rapicault ($4,498,634);

- Estate of Christopher Brook Fishbeck ($2,402,982);

- Estate of Jeremy Fischer ($2,617,223); and

- Estate of Jeremy Jones ($2,464,781).

The Court writes further to explain the awards for household services, as well as why it declined to adopt the recommended economic damages award for the Estate of John David Fry.

### i.    Household Services

For the Estates of SSgt. Justin Lee Vasquez, SSgt. Jason Benford, Cpl. Matthew Henderson, Sgt. Aubrey Bell, Cpt. Patrick Rapicault, Spc. Christopher Fishbeck, Sgt. Jeremy Fischer, and Sgt. Jeremy Jones, the special masters recommended awards for household services. The Court's previous opinion recognized that a plaintiff may recover for the value of lost household services when the deceased had been taking care of a child or spouse before his or her death. ECF No. 267 at 15–16. Given that all the aforementioned plaintiffs were married, and some had children (SSgt. Benford, Sgt. Bell, and Cpl. Jones), the Court is comfortable awarding their estates economic damages for the lost value of their household services.

### ii.    Estate of John David Fry

Special Master Ronald Swanson recommended an economic damage award of $4,269,988 for the Estate of John David Fry. ECF No. 293 at 11. This calculation was predicated on the hypothesis that Fry would have worked as an Federal Bureau of Investigation ("FBI") special agent until at least age 67. Id. at 10–11. But the Court has no evidence that GySgt. Fry ever worked as an FBI special agent or even would have done so. While the special master asserts that GySgt. Fry had an offer from the FBI, he provides no basis for the Court to credit that Fry would have worked at the Bureau as a special agent. Id. Indeed, the record

suggests Fry could not have been an FBI special agent because special agents need a college degree, which Fry lacked. Special Agent FAQ, FBI, 2 https://fbijobs.gov/sites/default/files/2023-03/Special_Agent_FAQ.pdf. And the FBI's mandatory retirement rules generally require an individual to retire by age 57, although GySgt. Fry may have been eligible for a waiver. Id. at 1. The Court cannot accept damage calculations that are based on unsupported assumptions, and it otherwise lacks sufficient information to award Fry economic damages. Therefore, the Court must decline Special Master Swanson's recommendation. The Court would entertain a revised economic damage award for GySgt. Fry.

      *3.  Surviving Plaintiffs*

         a.  <u>Pain and Suffering Damages</u>

     The remaining plaintiffs at issue are 55 servicemember and contractor plaintiffs who survived the attacks with injuries, as well as their families. These plaintiffs' injuries span widely from those with no physical injuries at all to those with debilitating conditions. For plaintiffs who survive an attack with "substantial injuries," the baseline award is $5 million. Bathiard, 2020 WL 1975672, at *3 (quoting Wultz, 864 F. Supp. 2d at 37–38). That baseline includes injuries such as "vision impairment, many broken bones, severe shrapnel wounds or burns, lengthy hospital stays . . . and permanent injuries." Schertzman Cohen v. Islamic Republic of Iran, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *6 (D.D.C. July 11, 2019) (quoting Wamai, 60 F. Supp. 3d at 92–93). "The $5 million award baseline may be adjusted up or down 'based on the nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment.'" Bathiard, 2020 WL 1975672, at *3 (quoting Goldstein, 383 F. Supp. 3d at 19). For "plaintiffs who did not suffer severe physical injuries . . . downward departures to a range of $1.5 million to $3 million are appropriate." Wamai, 60 F. Supp. 3d at

92. "A more permanent injury or impairment, by contrast, might warrant a larger award of $7–12 million." Cohen, 268 F. Supp. 3d at 24 (citing Wultz, 864 F. Supp. 2d at 38); see also Schertzman Cohen, 2019 WL 3037868, at *6.

As it has in the past, the Court will apply the Peterson framework, which distinguishes between severe and relatively minor physical injuries. See 515 F. Supp. 2d at 53–54 (awarding $5 million to a plaintiff who "suffered a broken jaw, severe flesh wounds and scars on his arms, legs and face, a loss of teeth, and lasting and severe psychological harm as a result of the attack" but $3 million to a plaintiff who "suffered injuries in the back, arm and head from being hit with shrapnel from the attack" in addition to "lasting and severe psychological problems"). The Court will also rely on the Wamai framework, which, similarly animated by the "need to maintain uniformity" across injuries that "span a broad range," identified six general categories of physical injuries across a range of severity, while reserving the $5 million Peterson baseline for those individuals with "severe physical injuries." 60 F. Supp. 3d at 91–93; see also Schertzman Cohen, 2019 WL 3037868, at *6 (adopting this framework). Each category "assume[s] severe psychological injuries." Schertzman Cohen, 2019 WL 3037868, at *6.

    i.    Category 1

Category 1 plaintiffs are those who "suffered little physical injury—or none at all—but have claims based on severe emotional injuries because they were at the scene [of the attacks] or because they were involved in the extensive recovery efforts immediately thereafter." Wamai, 60 F. Supp. 3d at 92. Accordingly, for these plaintiffs, courts adjust the baseline award to $1.5 million. Id.; Schertzman Cohen, 2019 WL 3037868, at *6.

The special masters have grouped eight plaintiffs in Category 1: GySgt. Daniel James Griego, LCpl. Tyler David Neumeister, Spc. Christian Phillips Rodriguez, Pfc. Walter Leman

Thomas, Spc. Tymon L. Coleman, Sgt. Ryan Patrick Vallery, Sgt. Wallace Casey Nelson III, and Shawn Michael Durnen. See ECF No. 296 at 23 ("[T]he attack caused GySgt. Griego severe and enduring psychological and emotional injuries, but no physical injuries."); ECF No. 296 at 36 ("LCpl. Neumeister's psychological and emotional injuries are severe, but he did not suffer physical injuries in the attack."); ECF No. 298 at 30 ("[There is no] documentation of physical injuries to [Spc.] Rodriguez, [but he] experienced ███████████████████" (internal quotations removed)); ECF No. 298 at 38 ("[Spc.] Coleman suffered little to no physical injuries from the attack, but suffered severe psychological injuries[.]"); ECF No. 298 at 37 ("[Pfc.] Thomas suffered little to no physical injuries from the attack, but has suffered severe psychological injuries[.]"); ECF No. 344 at 5 ("Sgt. Vallery was diagnosed with [post-traumatic stress disorder (PTSD)] as a result of the attack . . . . The record does not indicate that Sgt. Vallery suffered any physical injury in the attack."); ECF No. 337 at 20 ("[Sgt. Nelson] lack[ed] . . . physical injury [but had] severe psychiatric injuries."); ECF No. 337 at 42 ("Mr. Durnen suffers from PTSD as well as a loss of hearing."). For GySgt. Griego, LCpl. Neumeister, Spcs. Rodriguez, Coleman, and Durnen, and Pfc. Thomas, the Court accepts the special masters' recommendation of a $1.5 million award. For Sgts. Vallery and Nelson, the Court adopts the special masters' recommended pain and suffering awards of $1.575 million and $1.975 million, respectively.

       ii.    Category 2

The second category, with an adjusted baseline award of $2 million, is for those victims who suffered relatively modest physical injuries, "such as lacerations and contusions caused by shrapnel[,] accompanied by severe emotional injuries." Wamai, 60 F. Supp. 3d at 92. The special masters recommended the baseline Category 2 award for two of the plaintiffs: Cpl. Jared

Ray White and HM3 Juan Martinez Rubio.  See ECF No. 354 at 18; ECF No. 289 at 7.  The

Court finds Category 2 appropriate for Cpl. White and adopts the recommendation of $2 million

for him.  See ECF No. 354 at 8–9 ("Cpl. White sustained injuries [that] resulted in partial

disability ratings . . . . [and] significant psychological injuries.").  It will not, however, adopt the

special master's recommendation as to HM3 Rubio for reasons explained supra Part III.A.4.

       iii.    Category 3

     Category 3 plaintiffs "suffered more serious physical injuries, such as broken bones, head

trauma, some hearing or vision impairment, or impotence," along with their psychological

injuries.  Wamai, 60 F. Supp. 3d at 92.  Courts traditionally award $2.5 million to Category 3

plaintiffs.  See id.  The special masters placed the following plaintiffs in Category 3:  HMCS

Blair Ellis Dell; Sgt. Michael Anthony Mendoza; Sgt. Mohamad Kamal Akhtar; LCpl. James

Bell; LCpl. Daniel Foster; SSgt. Jeffery Alan Murtha; Sgt. Ralph Edward Swartz II; Pfc. David

C. Boyle; Cpl. Danny Tram; Pfc. Richard Alan Crawford; Cpl. Brian Lee Rudolph; LCpl.

Benjamin Robert Jensen; and Sgt. Kevin Daniel Snow.  See ECF No. 296 at 11 ("[HMCS] Dell

suffered significant hearing loss, PTSD, traumatic brain injury (TBI), as well as a broken

ankle."); ECF No. 296 at 31 ("[Sgt. Mendoza suffered] TBI, a perforated eardrum, and severe

emotional and psychological distress[.]"); ECF No. 283 at 9 ("Sgt. Akhtar . . . suffered shrapnel

wounds . . . . TBI . . . as well as PTSD[.]); ECF No. 300 at 7 ("[LCpl.] Bell sustained a deep

shrapnel wound . . . with permanent scarring and continued pain and discomfort[.]"); ECF No.

281 at 7 ("LCpl. Foster suffered TBI with associated migraines and tinnitus, as well as severe

emotional and psychological injuries associated with PTSD."); ECF No. 286 at 22 ("[Ssg.]

Murtha suffered TBI, PTSD, and injuries to his neck, back, shoulder, foot and ankle."); ECF No.

286 at 24 ("[Sgt.] Swartz . . . suffer[ed] from headaches, vertigo, concussion, and shrapnel

wounds to his face [and] was subsequently diagnosed with PTSD and TBI[.]"); ECF No. 298 at
19 ("[Pfc.] Boyle sustained the following physical and psychological injuries: [TBI], severe
migraines, [PTSD], and tinnitus."); ECF No. 340 at 5 ("[Cpl.] Tram suffered shrapnel wounds to
his right leg and lower back, concussion and TBI, as well as PTSD, ██████████ and
memory loss."); ECF No. 338 at 2 ("[Pfc.] Crawford sustained injuries including shrapnel and
burn injuries, and a traumatic brain injury[.]"); ECF No. 337 at 6 (Cpl. Rudolph suffered from
"traumatic brain injury and post-traumatic stress disorder"); ECF No. 337 at 10 ("[LCpl.] Jensen
sustained multiple injuries, including a grade III concussion, lower back injury, TBI and severe
PTSD[.]"); ECF No. 336 at 4 (Sgt. Snow "suffered concussive blast injuries including shrapnel
wounds to his right lower leg and head trauma resulting in loss of consciousness.").

 And the special masters accordingly recommended the baseline Category 3 award of $2.5
million for all of these plaintiffs, excepting SSgt. Murtha, for whom they recommended an
increased $2.75 million award. The Court will adopt the special masters' award
recommendations as to all these plaintiffs except LCpl. Daniel Joel Foster.

  a) LCpl. Daniel Joel Foster

 Special Master Michael J. Borden found LCpl. Daniel Joel Foster's injuries consistent
with Wamai Category 3 and proposed an award of $2.5 million for him. ECF No. 281 at 7–8.
LCpl. Foster hit his head on the steering wheel of his vehicle and was left dazed and concussed.
Id. at 4, 6. The Court finds these injuries better align with the conditions laid out in Wamai
Category 2. Compare Wamai, 60 F.Supp. 3d at 90–92 (discussing Category 3 as containing
"more serious physical injuries, such as broken bones, [or] head trauma"), with ECF No. 267
(assessing Wamai Category 2 plaintiffs as having "relatively modest physical injuries"). The
Court sees Foster as distinct from the other Category 3 plaintiffs, who generally have injuries on

top of their head trauma, including shrapnel wounds.  Therefore, the Court will decline to adopt Special Master Borden's recommendation and will instead award LCpl. Foster $2 million.

       iv.    Category 4

For plaintiffs "'with even more serious injuries,' such as 'spinal injuries not resulting in paralysis, more serious shrapnel injuries, head trauma, or serious hearing impairment,'" courts have awarded $3 million.  Schertzman Cohen, 2019 WL 3037868, at *6 (quoting Wamai, 60 F. Supp. 3d at 92).  The special masters' recommended Category 4 servicemember plaintiffs are: Pfc. Anthony Lee Miele, LCpl. Collen Matthew West, LCpl. Donnell Drail Nelson, SSgt. Ryan Christopher Saurs, Sgt. Bruce Leonard Morrow Sr., Spc. Christopher John Shima, Sgt. Carl W. Oliver, Sfc. Ernesto Sierra, HM3 Bernabe Carrell Montejano.  See ECF No. 296 at 33 ("[Pfc.] Miele suffered . . . . a gunshot wound to his left lateral thigh with knee strain, shrapnel wounds, tinnitus, and TBI."); ECF No. 279 at 7 ("[LCpl.] West suffered gunshot wounds to his right femur and left thigh, leading to complex femur fractures and shrapnel fragments in his legs, a flesh-wound crater on his upper left shoulder blade, a collapsed lung, and left ulnar nerve damage[.]"); ECF No. 297 at 5 ("LCpl. Nelson suffered a compressed spinal fracture to his eighth and ninth thoracic vertebrae, shrapnel injuries to his left shoulder, PTSD, and a traumatic brain injury[.]"); ECF No. 285 at 7 (stating that SSgt. Saurs suffers from "TBI and significant migraine headaches," "shrapnel wounds," and "significant neck and spine pain"); ECF No. 279 at 11 ("[Sgt. Morrow suffered] a brain hemorrhage, a crushed spine, and shrapnel injuries . . . . Morrow was also diagnosed with PTSD and suffered lasting pain[.]"); ECF No. 301 at 13 ("[Spc.] Shima sustained a broken arm that significantly diminished the strength in his left arm; severe injury to both knees that resulted in chronic pain and permanent limited physical mobility/functioning; and a TBI," as well as PTSD.); ECF No. 326 at 7 (Sgt. Oliver sustained:

"concussive blast injury with loss of consciousness; shrapnel wounds to hips and right hand with fractured thumb; injury to lumbar spine with intervertebral disc disease, TBI with headaches and memory loss; tinnitus and bilateral hearing loss; degenerative joint disease of the left hip due to retained shrapnel associated with scar, and residual symptoms of shrapnel wounds; as well as chronic PTSD[.]"). The special masters proposed the Category 4 baseline award of $3 million for these plaintiffs. The Court adopts these recommendations, with the exception of Plaintiffs Sfc. Ernesto Sierra and HM3 Bernabe Montejano.

a) Sfc. Ernesto Sierra

The Court declines to adopt the recommendation of Special Master J. Daniel McCarthy as to Sfc. Ernesto Sierra. "[Sfc.] Sierra suffered physical injuries resulting in hearing loss, tinnitus, post-concussive migraines, [TBI], and [PTSD]." ECF No. 327 at 6. However, since nearly every other Category 4 plaintiff in this action had either shrapnel wounds or broken bones, and the record does not establish whether Sfc. Sierra suffered similar injuries, the Court finds a Category 4 award inappropriate. Instead, Sierra's injuries are closer to those of bellwether Plaintiff GySgt. Housmans and wave 1 and 2 plaintiff LCpl. Foster, who both suffered less catastrophic injuries involving TBI, concussions, and other head trauma. ECF No. 267 at 20; ECF No. 281 at 4–7. The Court will therefore award Sfc. Sierra a Category 3 award of $2.5 million in pain and suffering damages.

b) HM3 Bernabe Carrell Montejano

Special Master Ronald Swanson proposed an upward departure from the Category 4 baseline to $3.9 million for Plaintiff HM3 Bernabe Carrell Montejano. "HM3 Montejano sustained . . . TBI with cognitive impairment and chronic migraines with photophobia, shrapnel injuries to his legs, chronic pain in his legs and back, severe hearing loss with tinnitus, and

severe PTSD, ████████████████████████████████████" ECF No. 341 at

15. While the special master recognized that Category 3 "arguably capture[s] the severity of the

shrapnel wounds experienced by HM3 Montejano," he placed HM3 Montejano in Category 4 on

the basis that Category 3 does not capture HM3 Montejano's "mixture and permanency of

physical injuries[.]" Id. at 19. While the Court is sympathetic to HM3 Montejano's protracted

suffering, the Wamai categories "all assume severe psychological injuries" and related

symptoms. Schertzman Cohen, 2019 WL 3037868, at *6 (citing Wamai, 60 F. Supp. 3d at 92–

93). Since Montejano's injuries more closely map onto the physical injury contours of Category

3, the Court will treat him as a Category 3 plaintiff. Still, the Court agrees with the conclusion of

Special Master Swanson that a substantial upward departure is warranted in light of HM3

Montejano's severe PTSD, ██████████████████ over a period of more than a

decade. ECF No. 341 at 13–19. As such, the Court adopts an award of $3.125 million, a 25%

upward departure from the $2.5 million Category 3 baseline.

     v.    Category 5

     The baseline award of $5 million applies to those servicemembers whose injuries

"involv[e] some mix of serious hearing or vision impairment, many broken bones, severe

shrapnel wounds or burns, lengthy hospital stays, serious spinal or head trauma, and permanent

injuries." Wamai, 60 F. Supp. 3d at 92–93. The special masters recommended placing the

following plaintiffs in this category: Sgt. Troy James Tuschel, Cpl. Carlos Gomez Perez, Pfc.

James Olson, LCpl. Phillip Christopher Bailey, Cpl. Jonathan Cuney, Cpt. Jason Peter Schauble,

LCpl. Jacob P. David, Cpt. Robert Steven Baughn, Spc. Hilton Germany, Spc. Ronald Allen

Eaton, Sgt. Matthew Paul Schaffer, Sgt. Christopher Lee Olsen, SSgt. Joss Wade Purdon, LCpl.

Jacob Andrew Miller, and 1Lt. Edward B. Johnson, Jr.

The Court will adopt the special masters' recommendation of the $5 million <u>Peterson</u>

baseline award for the following servicemembers.

- Sgt. Tuschel, who suffered wounds as a result of a car bombing, which knocked him unconscious, left him with chronic headaches, embedded glass shards in his eye, and broke his nose. ECF No. 275 at 16–17.

- Cpl. Perez, who was injured when he was shot in the shoulder and cheek, requiring two surgeries, and endures persistent physical limitations due to the injury's nature. ECF No. 282 at 4–8. He also suffered from "debilitating PTSD." <u>Id.</u> at 7.

- Pfc. Olson, who suffered injuries as a result of a car bombing, including loss of part of his left leg and ankle, right thigh, TBI, and other shrapnel wounds. ECF No. 277 at 3.

- LCpl. Bailey, who was attacked in a car bombing, which led to severe shrapnel wounds, ruptured eardrums, tinnitus, TBI, and PTSD. ECF No. 295 at 7–9.

- Cpl. Cuney, who was wounded in an attack when he was hit by a grenade, left unconscious with shrapnel wounds, and TBI, and is forced to use a cane. ECF No. 288 at 3–8.

- Cpt. Schauble, who was shot at close range in the arm and chest, attacks which led to "eight extensive surgeries," nerve paralysis, medicine-induced narcolepsy, and significant pain. ECF No. 290 at 4–6.

- LCpl. David, who was hit by an IED that threw him 70 to 80 feet in the air, and led to open fractures, trauma, and breathing difficulties. ECF No. 284 at 5.

- Cpt. Baughn, who was injured when his vehicle was hit by an RPG, which rendered him unconscious and left him with hearing loss, partial vision loss, and burns, among other injuries. ECF No. 295 at 40–41.

- Spc. Eaton, who was injured in a rocket attack, which led to PTSD, hearing loss, TBI, and numerous shrapnel wounds. ECF No. 327 at 6–9. Spc. Eaton later spent three months in the hospital, had multiple surgeries following this attack, and continues to suffer from his wounds. <u>Id.</u>

- Sgt. Olsen, who suffered wounds due to an IED attack, which sent multiple shards of shrapnel through his body. ECF No. 331 at 4–8. Olsen endured multiple surgeries, █████████████████████████, and continues to have difficulty standing. <u>Id.</u>

- SSgt. Purdon, who fell victim to an IED attack, leading to PTSD, TBI, shrapnel injuries, and enduring and "debilitating" migraines. ECF No. 341 at 5–10.

- LCpl. Miller, who was injured in an IED attack, which "nearly severed" his right hand, knocked him unconscious, and led to multiple surgeries. ECF No. 341 at 19–23.

- 1Lt. Johnson, Jr., who was wounded in a car bombing, which left him with a concussion, back injuries, nerve damage, and PTSD. ECF No. 338 at 9–13. Johnson is forced to walk with a cane as a result of these injuries. Id.

The Court declines to adopt the Special Master's recommendations as to the following plaintiffs.

### a) Spc. Hilton Germany

The Court declines to adopt Special Master J. Daniel McCarthy's recommendation as to Spc. Hilton Germany. The special master found that Germany's injuries fell into Wamai Category 5 and recommended the $5 million baseline. ECF No. 298 at 28–29. The Category 5 baseline award, however, is reserved for those plaintiffs who experience "some mix of serious hearing or vision impairment, many broken bones, severe shrapnel wounds or burns, lengthy hospital stays, serious spinal or head trauma, and permanent injuries." Wamai, 60 F. Supp. 3d at 92–93. As described, Spc. Germany's injuries do not comport with the Category 5 baseline and more closely resemble Category 3, which covers "serious physical injuries, such as broken bones, head trauma, some hearing or vision impairment[.]" Id. at 92. Indeed, the special master conceded that Germany's "severe physical injuries," namely his vision and hearing impairment and TBI sustained as a result of a rocket attack, resembled that of Category 3 victim Pfc. Boyle. ECF No. 298 at 28. And the Court finds Spc. Germany's injuries similar to those of other Category 3 plaintiffs' injuries, since a characteristic of that class is TBI and related health effects. Therefore, the Court declines to adopt the $5 million baseline for Spc. Germany and instead will award him the Category 3 award of $2.5 million.

b) Sgt. Matthew Paul Schaffer

The Court also declines to adopt Special Master Ellen Koblitz's recommendation of Category 5 damages for Sgt. Matthew Paul Schaffer. Sgt. Schaffer was shot in a complex IED attack, which knocked him unconscious and left him with a concussion, shrapnel injuries, and nerve damage. ECF No. 338 at 5–7. But the report indicates that at least part of Sgt. Schaffer's PTSD and 100% VA disability rating are attributed to separate attacks. Id. Further, the record does not indicate a lengthy hospital stay for this attack, and the Court cannot parse the source of Schaffer's psychological injuries. Id. The Court finds that Category 4 is a better fit for the injuries attributable to this attack alone. See Wamai, 60 F. Supp. 3d. at 92 (describing Category 4 as "more serious shrapnel injuries, [or] head trauma"). The Court will therefore place Sgt. Schaffer in Category 4 and award him $3 million in pain and suffering damages.

vi.    Category 6

Category 6 applies exclusively to those soldiers "who suffered even more grievous wounds such as lost eyes, extreme burns, severe skull fractures, brain damage, ruptured lungs, or endured months of recovery in hospitals[.]" Wamai, 60 F. Supp. 3d at 93. For those plaintiffs, "upward departures to $7.5 million are in order." Id.; see also Cohen, 268 F. Supp. 3d at 24 ("A more permanent injury or impairment, by contrast, might warrant a larger award of $7–12 million." (citing Wultz, 864 F. Supp. 2d at 38)).

Several plaintiffs fall into this category. First, Sfc. Daniel Dennis Ibach was injured in an IED explosion, which left him unable to breathe with skull fractures, numerous other injuries, and recurring seizures over the last twenty years. ECF No. 291 at 4–10. The Court accordingly adopts Special Master Swanson's recommendation of a Category 6 designation and a $7 million award, finding that Ibach's permanent injuries warrant this larger award. Id.

Second, LCpl. Ronny Porta was severely wounded in an IED attack, which burned more than 60% of his body, caused amputations and 129 surgeries, and led to the inability to close his eyes and the loss of taste and smell, among other injuries. ECF No. 278 at 2–4. As a result, Special Master Jamie Dodge has recommended an award of $12 million at the upper end of the Category 6 range. Id. at 10–11. The Court agrees with this assessment, finding that LCpl. Porta's injuries are "more permanent." Cohen, 268 F. Supp. 3d at 24 (citing Wultz, 864 F. Supp. 2d at 38).

Third, Sgt. Daniel Euzeb Cowart was injured in a suicide bombing, where he tackled the bomber to save his comrades. ECF No. 334 at 7. Sgt. Cowart was knocked unconscious and suffered many fractures; he has endured more than 20 surgeries, including amputations, ████████████████, and been confined to a wheelchair. Id. at 7–13. Special Master J. Daniel McCarthy has recommended a Category 6 damage award of $10 million for this attack, which the Court finds appropriate and will adopt. Id.

Fourth, Sgt. Terry Lamont Fleming was wounded in a complex IED attack, which burned 85% of his body, leading to nerve damage, the loss of digits, more than a hundred surgeries, and more than three years in hospitals recovering. ECF No. 335 at 3–8. In light of these injuries, Special Master Swanson recommends an award of $12 million, which the Court finds reasonable and will adopt. Id. at 10.

Finally, Pfc. Jace Aldric Badia was critically wounded in an IED attack, which led to a leg amputation, multiple broken bones, TBI, three years in Army hospitals, and 107 different surgeries. ECF No. 294 at 3–7. Due to these injuries, Special Master Swanson recommends an award of $12 million, which the Court will adopt. Id. at 9.

The Court will not, however, adopt the special masters' recommendations as to Sgt. Alba Ryan Tanner.

a) Sgt. Alba Tanner

Sgt. Tanner was a victim of an IED explosion, which knocked him unconscious and led to head wounds, shrapnel injuries, many surgeries over a six-week period, and a year in the hospital. ECF No. 346 at 2–7. The Court agrees with Special Master Dodge that these injuries were sufficient to place Sgt. Tanner within Category 6. Id. at 8. Special Master Dodge recommended a damage award of $7.5 million. Id. But the Court finds that the level of Sgt. Tanner's injuries mirror those of Sfc. Ibach. "In the interest of fairness . . . courts strive to maintain consistency of awards[.]" Cohen, 268 F. Supp. 3d at 24. Accordingly, the Court will decline Special Master Dodge's $7.5 million recommendation and instead adopt a $7 million award for Sgt. Tanner.

b. Solatium

The Court adopts the special masters' recommendations to award solatium damages to the immediate family members of the injured servicemembers, as well as their step-parents and step-siblings as functional equivalents.

"For relatives of victims physically injured by terrorist attacks, courts have applied a framework whereby awards are valued at half of the awards to family members of the deceased—$4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively." Goldstein, 383 F. Supp. 3d at 21–22 (emphasis omitted) (quoting Kaplan v. Hezbollah, 213 F. Supp. 3d 27, 38 (D.D.C 2017)); see also Wamai, 60 F. Supp. 3d at 95 (adopting a $2.5 million award for children of injured victims). While solatium awards may be adjusted up or down based on the circumstances, "solatium awards for relatives of victims

should be proportionate to the pain-and-suffering awards to the victims themselves." Goldstein,

383 F. Supp. 3d at 22 (citing Cohen, 268 F. Supp. 3d at 26).  Where courts depart from the

baseline pain and suffering award for direct victims, a proportionate adjustment to their relatives'

solatium damages is generally appropriate.  See, e.g., Davis v. Islamic Republic of Iran, 882 F.

Supp. 2d 7, 16 (D.D.C. 2012); Bathiard, 2020 WL 1975672, at *5.  Therefore, where the special

masters did not highlight factors warranting a departure, the Court will scale family member

awards based on the servicemember's award: 30% of the Goldstein award for plaintiffs whose

relatives suffered Category 1 injuries; 40% for Category 2; 50% for Category 3; 60% for

Category 4; and 100% for Categories 5 and 6.

Generally, courts consider the "'nature of the relationship' between the claimant and the

victim" as well as the "severity and duration of the pain suffered by the family member" in

calculating solatium awards.  Oveissi v. Islamic Republic of Iran, 768 F. Supp. 2d 16, 25–26

(D.D.C. 2011) (quoting Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 75 (D.D.C.

2006)).  Weighing these factors, the special masters have recommended upward departures for

several plaintiffs.  The Court adopts the findings of the special masters as to the vast majority of

plaintiffs here and below will explain the recommendations it will decline.

    i.    Category 1

Family members of Category 1 plaintiffs receive 30% of the baseline, which means that

siblings receive $375,000, children and parents receive $750,000, and spouses receive $1.2

million.  The special masters recommended Category 1 damage awards for family members Fred

Griego, Cynthia Leonard, Priscilla Stevens, Noah James Griego, Elyse Fink, Shoshone Nadene

Boudreau, Kimberlee Morgan Hinkley, C.D.R., T.L.C., Astra Carlisa Coleman, Sandra Vallery,

Patrick Vallery, Michelle Lynn Renowden, Hannah Rose Nelson, David Jon Nelson, and

Raymond Henry James.  Further, Special Master Michael Borden recommended an upward departure of 20% for Plaintiff Amy Griego, to $1.44 million.  ECF No. 296 at 25.  The Court adopts these recommendations in full.

#### ii.    Category 2

Family members of Category 2 plaintiffs receive 40% of the baseline, which means that siblings receive $500,000, children and parents $1 million, and spouses $1.6 million.  The following family members will receive this award: Clinton R. White, Tina Scates, and Brenna Crosley.

#### iii.    Category 3

Family members of Category 3 plaintiffs receive 50% of the baseline, which means that siblings are awarded $625,000, children and parents $1.25 million, and spouses $2 million.  The following family members will receive this award: Candus Angel Dell, Valerie Jade Dell, Kelly Mendoza, Pervez Akhtar, Estate of Samira Fathy, Jennifer Lee Akhtar, Taylor Lee Akhtar, Linda Bell, Brittany M. Swartz, Victoria M. Swartz, Leatha M. Swartz, Ralph E. Swartz, Lydia Yeager, Robert Swartz, Kathey Kidd, Adrienne Snow, Jasmyne Arquiett, Nicholas Allen Paul Snow, and Gregory Leonard Anthony Snow.

The Court's determinations as to S.M.M., Gary Craig, Jennifer Lee Akhtar, and Jayme Boyle are explained below.

#### a)  S.M.M.

The Court agrees with the recommendation of Special Master Michael J. Borden that plaintiff S.M.M cannot receive damages, as he was born following the attack that injured his father, Sgt. Michael Anthony Mendoza.  ECF No. 296 at 33; Wamai, 60 F. Supp. 3d at 96

("[C]hildren born following terrorist attacks are not entitled to damages[.]").  As such, the Court must decline to award S.M.M. any damages here.

>    b)  Gary Craig

Special Master Angela Gupta recommended a revised award of $625,000 for Gary Craig, birth father of LCpl. James Bell, because Craig had not met LCpl. Bell until 2012, nearly eight years after Bell suffered his initial injuries.  ECF No. 300 at 9–10.  The special master suggests that Craig is entitled to recover in part, despite not knowing Bell at the time he was injured, because Craig has suffered "shock, distress, and agony" as a result of learning of Bell's injuries. Id. at 9.  The Court agrees that some recovery is appropriate and therefore adopts the special master's recommendation.

>    c)  Jennifer Lee Akhtar

Special Master Angela Gupta proposed an award of $2 million for Plaintiff Jennifer Lee Akhtar.  Though Akhtar divorced her husband roughly four years after the attack at issue, ECF No. 283 at 12–14, divorce need not diminish a plaintiff's award.  See Spencer v. Islamic Republic of Iran, 71 F. Supp. 3d 23, 29 (D.D.C. 2014); Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 44 (D.D.C. 2018) ("Divorce does not warrant a downward deviation, particularly where the after-effects of the attack were a primary cause of the divorce.").  Accordingly, the Court will accept the recommendation of Special Master Gupta.

>    d)  Jayme Boyle

The Court will decline to adopt the special master's recommendation of an award to Jayme Boyle.  Jayme Boyle is the uncle of Pfc. David C. Boyle.  ECF No. 298 at 24.  Special Master J. Daniel McCarthy recommended that he receive a $1.25 million award as the "functional equivalent" of a parent.  Id. at 24–26.

As noted, uncles generally cannot recover under the FSIA. The special master opined that Boyle had gone beyond "uncle status," in teaching his nephew to fish, supporting Pfc. Boyle's business, and purchasing a computer for Pfc. Boyle. Id. While Boyle and Pfc. Boyle enjoyed a close relationship over many years and Boyle assisted his nephew's recovery, a "close relationship . . . falls far short of what [the FSIA] requires." Valore, 700 F. Supp 2d at 79 (quoting Bettis, 315 F.3d at 337) (internal quotation marks omitted). As such, Boyle cannot be considered the "functional equivalent" of a parent and may not recover in this action. The Court accordingly declines the special master's award of $1.25 million in damages, finds that Mr. Boyle cannot recover in this action, and will his dismiss his claims.

### iv.    Category 4

Family members of Category 4 plaintiffs receive 60% of the baseline damages, which means that siblings receive $750,000, children and parents $1.5 million, and spouses $2.4 million. The Court will adopt these awards as to Tim West, Carla West, Allison West, Brenden West, Bruce Leonard Morrow Jr., Gemini Wardzinski-Morrow, Robert Wardzinski-Morrow, Christina Louise Shima, Alexander George Shima, Jade Loren Oliver, Maria Criselda Sierra, Kristina Lee Sierra, and Cassandra Sierra.

The Court declines to adopt in full the recommendations as to Faith Montejano, Sarah M. Humphrey, Maria Criselda Sierra, Kristina Lee Sierra, and Cassandra Sierra.

### a)  Faith Montejano & Sarah Montejano Humphrey

Based on the award granted to Plaintiff HM3 Bernabe Carrell Montejano, Special Master Swanson recommended Category 4 solatium awards of $1.65 million for Faith Montejano and $750,000 for Sarah M. Humphrey. ECF No. 341 at 42–44. Because the Court has revised the award for HM3 Montejano, it will correspondingly revise the awards for his family members.

The Court will award Faith Montejano $1.375 million, accounting for the default Category 3 award, as well as Special Master Swanson's recommended upward enhancement of 10%. The Court will award Sarah Humphrey $625,000.

> b) Sierra Family

Because the Court has revised the award for Plaintiff Spc. Ernesto Sierra to $2.5 million, the Court will correspondingly adjust the awards given to his family members Maria Criselda Sierra, Kristina Lee Sierra, and Cassandra Sierra. The Court will award the commensurate $1.25 million award to Kristina and Cassandra and $2 million to Maria.

> v.    Categories 5 and 6

Family members of Category 5 and 6 plaintiffs receive baseline damages, which means that siblings receive $1.25 million, children and parents receive $2.5 million, and spouses receive $4 million. See Goldstein, 383 F. Supp. 3d at 21–22; see also Wamai, 60 F. Supp. 3d at 95. The Court will award baseline damages to Samantha Izaguirre-Gomez, Jose Carlos Izaguirre-Gomez, Timothy Bruce Bailey, Charles Jason Minter, George Cuney, Dennis Burnell Ibach, Kylee Ray Badia, Lucia Ann Schaffer, Amy Jo Finnegan, Stacie Lee Olsen, Austin Purdon, Rachel Amber Miller, LaFonda Kay Miller, Lyle Owen Miller, and Zachary Brian Miller.

The Court will also adopt the special masters' upward recommendations for the following plaintiffs:

- Shawna Purdon ($4.4 million);

- Jacob Purdon ($3.125 million);

- Rene Porta ($3.125 million);

- Felix Porta ($3.125 million);

- Natali Porta ($1.562.5 million);

- Barbara Ann West ($3.125 million);

- Tiffany Tanner Pines ($1.562.5 million);

- Sarah Earls-Cowart ($5 million);

- Alyssa Cowart ($3.125 million);

- August Cowart ($3.125 million);

- Theresa Cowart ($3 million); and

- Clifford Cowart ($3 million).

The Court's determinations for Amanda Cuney Lopez, Karly Ann Baughn, Lucia A. Schaffer, Amy Jo Finnegan, Felix Porta, Ayron L. Bennett, Scott West, and Carl J. West are expressed below.

### a)  Amanda Cuney Lopez

Special Master Ronald Swanson proposed a 10% upward departure for Amanda Lopez, whose claims derives from the injuries of her brother, Cpl. Jonathan Cuney. ECF No. 288 at 14–15.  He based this departure on the uniquely close relationship the two siblings had ████████. <u>Id.</u> at 15.  But the report does not provide specifics on the pair's "uniquely close" relationship, nor do Lopez's conditions rise to the level of hospitalization or self-destructive actions required for upward departure. Therefore, the Court will decline to adopt the special master's recommendation and instead award Lopez the base award of $1.25 million.

### b)  Karly Ann Baughn

Special Master John P. Kuder recommended a 25% upward enhancement to $5 million for Karly Ann Baughn, spouse of Cpt. Robert Stevens Baughn. ECF No. 295 at 45.  In the years since Cpt. Baughn's injuries, Ms. Baughn has sacrificed her career to care for her husband and

experienced "extreme exhaustion" and "debilitating [gastrointestinal] issues[.]" Id. at 44. While the Court finds a departure warranted, it will award a more modest enhancement of 10% for an award of $4.4 million. ECF No. 267 at 13 (finding upward enhancements "are usually relatively small" (quoting Murphy, 740 F. Supp. 2d at 79)).

c) Family of Sgt. Matthew Paul Schaffer

Special Master Ellen Koblitz recommended that Lucia A. Schaffer and Amy Jo Finnegan, family members of Sgt. Matthew Paul Schaffer, receive Category 5 awards. ECF No. 338 at 8–9. Since the Court has revised Sgt. Schaffer's award, the Court will likewise adjust the awards of his family. Lucia Schaffer will receive the Category 4 award for a parent of $1.5 million, while Amy Finnegan will receive the Category 4 award for a sibling of $750,000.

d) Felix Porta

In order to recover under FSIA's terrorism exception, plaintiffs must be United States citizens,[6] which Felix Porta, parent of LCpl. Ronny Porta, is not. See 28 U.S.C. § 1605A(c); ECF No. 278 at 15–18. However, courts generally "apply District of Columbia law to the claims of any plaintiffs for whom jurisdiction is proper, but who lack a federal cause of action under the FSIA." Cohen v. Islamic Republic of Iran, 238 F. Supp. 3d 71, 86 (D.D.C 2017) (quoting Wamai, 60 F. Supp. 3d at 89–90 (citing Owens v. Islamic Republic, 826 F. Supp. 2d 128, 153–57 (D.D.C. 2011)).[7] To prove an IIED claim in lieu of an FSIA claim, plaintiffs must show "(1) extreme and outrageous conduct on the part of the defendant which, (2) either intentionally or recklessly, (3) causes the plaintiff severe emotional distress." Id. (citing Larijani v. Georgetown

_____

[6] Or a member of another category not relevant here.

[7] And jurisdiction is proper here despite Mr. Porta's non-citizenship because the terrorism exception abrogates sovereign immunity where the "claimant or the victim" of a qualifying attack is a U.S. citizen, and LCpl. Porta is a citizen. 28 U.S.C. § 1605A(a)(2)(ii).

Univ., 791 A.2d 41, 44 (D.C. 2002)).  Since terror attacks are "extreme and outrageous and intended to cause the highest degree of emotional distress," and because Porta has demonstrated severe emotional distress, the Court can and will award damages in the amount of $3.125 million.  Belkin, 667 F. Supp. 2d at 22; see also Valore, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim.").

       e)  Ayron Bennett

Special Master Ronald Swanson recommended an award of $1.25 million to Ayron L. Bennett, nephew of Sgt. Terry L. Fleming.  ECF No. 335 at 18–20.  Special Master Swanson's report described Bennett and Fleming's relationship as akin to that of brothers, in part due to the fact that they spent summers living together at their grandmother's house.  Id.  However, this does not establish that Ayron and Terry were members of the same immediate household, nor that they had any legal obligations to each other.  See Bettis, 315 F.3d at 337 ("To define 'immediate family' to embrace nieces and nephews who do not live in the immediate household or have any legal obligation to the victim would stretch the term too far.").  Bennett and Fleming's "close relationship" is insufficient to support recovery.  Valore, 700 F. Supp. 2d at 79. The Court must decline the special master's award of $1.25 million in damages, instead finding that Bennett cannot recover in this action, and therefore his claims will be dismissed.

       f)  Carl West & Scott J. West

Special Master Jamie Dodge proposed an award of $1.25 million each to Carl and Scott West, the uncles of Sfc. Alba Tanner.  ECF No. 346 at 18, 20.  But, as noted, courts must adhere to the "strict meaning" of family in assessing who may recover in FSIA actions, and uncles do not meet this standard.  Est. of Heiser, 659 F. Supp. 2d at 28; Davis, 882 F. Supp. 2d at 15;

Bettis, 315 F.3d at 333.  The Court therefore must decline Special Master Jamie Dodge's recommendation and dismiss their claims.

    c.   Economic Damages

"Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." Thuneibat, 167 F. Supp. 3d at 48. "Such damages may be proven by the submission of a forensic economist's expert report." Roth, 78 F. Supp. 3d at 402 (citing Belkin, 667 F. Supp. 2d at 24). "In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert." Id. (citing Reed, 845 F. Supp. 2d at 214). In this case, the special masters have recommended an award of economic damages for each of the surviving servicemembers based on expert reports of their lost future earnings.

The special masters have recommended awards of economic loss damages to 21 surviving servicemembers:

- LCpl. Tyler David Neumeister ($4,031,270);
- Pfc. James Thomas Olson ($3,390,561);
- LCpl. Phillip Christopher Bailey ($2,280,286);
- Sgt. Ralph Edward Swartz II ($3,085,614);
- LCpl. Ronny Porta ($3,116,716);
- Spc. Christopher John Shima ($3,638,558);
- Spc. Christian Phillips Rodriguez ($4,042,507);
- Sgt. Carl W. Oliver ($1,904,263);
- Spc. Ronald Allen Eaton ($3,417,483);

- Sfc. Ernesto Sierra ($2,083,623);

- Cpl. Jared Ray White ($1,605,938);

- Pfc. Richard Alan Crawford ($3,528,866);

- HM3 Bernabe Carrell Montejano ($2,674,363);

- Sgt. Wallace Casey Nelson III ($2,681,366);

- Sfc. Alba Ryan Tanner ($3,594,895); and

- Spc. Daniel Cowart ($3,818,534).

The Court adopts their findings and recommendations.

    i.   Household Services Awards

The Court will not, however, adopt the awards as to Sgt. Terry Lamont Fleming ($4,072,447) and SSgt. Ryan Christopher Saurs ($3,107,942) because there was insufficient evidence for them to receive a "household services" award. As noted, the Court will allow household services awards over the life of the servicemember only when plaintiffs have children, parents, or a spouse that they are supporting and can show or infer which services they would have provided. ECF No. 267 at 15–17.

For Sgt. Terry Lamont Fleming, the special master proposed a $4,072,447 award, including the value of household services. ECF No. 335 at 14–16. However, the report gives no indication that Sgt. Fleming was supporting a child, spouse, or parent before the attack in which he was injured. Id. As such, the Court will reject that portion of the award. For SSgt. Ryan Christopher Saurs, the special master proposed a similar award of household services as part of his $3,107,942 in economic damages. ECF No. 285 at 11. Again, the Court cannot find any indications that SSgt. Saurs meets the criteria for such an award. Id. The Court is unable to accept these recommendations since it does not understand the assumptions behind these

50

calculations. For SSgt. Saurs, the Court will await a revised calculation before awarding him economic damages. For Sgt. Fleming, the special master provided the amount of household services, and the Court will subtract the proposed sum of $205,256 from Sgt. Fleming's overall award.

### 4. Punitive Damages

Section 1605A of the FSIA authorizes punitive damages to be assessed against foreign state sponsors of terrorism. 28 U.S.C. § 1605A(c). "Courts calculate punitive damages by considering the following four factors: '(l) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'" Cohen, 268 F. Supp. 3d at 27 (quoting Wamai, 60 F. Supp. 3d at 96–97); see also Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 32 (D.D.C. 1998) (establishing standards). The awarding of punitive damages in FSIA cases is up to the discretion of the trial court. See Abedinigalangashy v. Gov't of the Islamic Republic of Iran, No. 23-cv-1105 (JEB), 2024 WL 4227133, at *11 (D.D.C. Sept. 18, 2024). Here, the special masters found all four punitive damages factors satisfied for each of the plaintiffs and have recommended a punitive damages award of double the compensatory damages. The Court agreed that a punitive damages award of two times compensatory damages was appropriate for the first tranche of bellwether attacks in the case. ECF No. 267 at 29. That hewed to previous awards by the Court in cases where the defendants, as here, "did not directly carry out the attack, but funded" the organizations that did. Id. Upon further reflection, however, the Court will depart from its previous findings and decline to award Plaintiffs punitive damages.

This change of course has nothing to do with the nature of the attacks or the harms suffered by the plaintiffs. Iran's conduct, no matter how diffuse and indirect, remains

reprehensible. And the injuries suffered by the present Plaintiffs are as grievous as those that came before.

Rather, the Court reaches this result after coming to the view that a further award of punitive damages—on top of the staggering damages awards already imposed against Iran over the last 27 years in this and other terrorism-exception cases—would be highly unlikely to deter the Iranian government and its proxies from engaging in similar conduct. See Flatow v. Islamic Republic of Iran, 999 F. Supp. 1 (D.D.C. 1998). Courts in this district have highlighted the need for deterring Iran's terror campaign. See Colvin v. Syrian Arab Republic, 363 F. Supp. 3d 141, 163 (D.D.C. 2019) ("the need for deterrence for terrorist attacks is high."); see also Flanagan v. Islamic Republic of Iran, 87 F. Supp. 3d 93, 120 (D.D.C. 2015). But "caution is required when punitive damages have been previously awarded against the same defendant for the same conduct." Est. of Doe v. Islamic Republic of Iran, 943 F. Supp. 2d 180, 190 (D.D.C 2013) (citing Murphy, 740 F. Supp. 2d at 81). As of 2015, Iran had been assessed more than $30 billion in punitives.[8] That number is greater today. For its part, this Court has already awarded over $655 million in punitives for attacks on U.S. soldiers during the Iraq War in this case alone, with more than 1,000 plaintiffs still in the queue. ECF No. 244 at 3–6. Since punitives are not intended to compensate, but rather to deter and punish, it seems unlikely that billions more in further awards for that same acts would have any additional effect on Iran's behavior. See Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 56 (D.D.C. 2012); see also Abedinigalangashy v. Gov't of the Islamic Republic of Iran, No. 23-cv-1105 (JEB), 2024 WL

---

[8] Orde Kittrie, Iran Still Owes $53 Billion in Unpaid U.S. Court Judgments to American Victims of Iranian Terrorism, Found. Def. Democracies (May 6, 2016), https://www.fdd.org/analysis/2016/05/06/iran-still-owes-53-billion-in-unpaid-u-s-court-judgments-to-american-victims-of-iranian-terrorism

4227133, at *11 (noting that large awards have had little to no effect on Iran, may even redound against U.S. interests, and collecting cases); see also All Plaintiffs Represented by Driscoll v. Islamic Republic of Iran, No. 20-cv-622-ZMF, 2024 WL 4188508, at *4 (D.D.C. Sept. 13, 2024) (citation omitted) (noting that a large punitives award against Iran would be "useless"). The marginal deterrent effect of further punitive awards in this context has almost certainly reached the vanishing point.

This is especially true given the nature of Iran's conduct in this case. Plaintiffs' claims arise out of foreign policy and military decisions made by both the United States and Iran. The U.S. occupation of Iraq following Operation Iraqi Freedom set off a still-ongoing period of insurgency and sectarian violence. As the evidence in this case demonstrates, Iran stepped into this power vacuum and sought to assert its influence by materially supporting various militias and insurgent groups opposed to U.S. occupying forces. To be sure, Iran can be called to account for these actions under the FSIA's terrorism exemption. But from its perspective, Iran doubtless views its conduct as furthering its national interests in response to a military occupation of a neighboring country by an all-powerful foreign adversary. Additional punitive damages awards are even more unlikely to affect decisions motivated by these sorts of geo-political and national-security considerations.

The need for punitives might still arise in cases involving more targeted acts of terrorism by Iran. For example, this Court recently awarded a total of $56,711,812 in punitive damages to an elderly American couple and an acquaintance who were abducted and tortured for suspected spying while visiting family members in Iran. Ghodstinat v. Islamic Republic of Iran, No. 23-cv-3175-CRC, 2025 WL 2222768, at *12 (D.D.C. Aug. 5, 2025); see also Abedini v. Islamic Republic of Iran, 422 F. Supp. 3d 118, 126–27, 142 (D.D.C. 2019) (awarding punitives to a U.S.

resident who was abducted and then tortured in Iranian prison); <u>Moradi v. Islamic Republic of Iran</u>, 77 F. Supp. 3d 57, 60–61, 73 (D.D.C. 2015) (awarding punitives to a U.S. citizen who was abducted and then tortured in Iranian prison); <u>Hekmati v. Islamic Republic of Iran</u>, 278 F. Supp. 3d 145, 150–154, 167 (D.D.C. 2017)) (same). Punitive awards cause the relevant decisionmakers to think twice before resorting to terrorist tactics in these types of individualized scenarios.

The Court's calculus might be different if declining to award punitives would serve to reduce the present Plaintiffs' compensatory awards relative to those of plaintiffs who have already received damages judgments against Iran. But it does not. The U.S. Victims of State Sponsored Terrorism Fund—the only presently available source of compensation for Iranian terrorism victims—does not provide payments for punitive damages awards. <u>See</u> 34 U.S.C. § 20144(c)(2). And the Court is otherwise satisfied that the compensatory awards in this case are fair and generally consistent with similar cases.

At bottom, the Court is unconvinced that another award of enormous punitive damages would have its intended effect on Iran's conduct. It might even be counter-productive. The Court therefore will decline to award further punitive damages in this case.

### 5. Interest

The Court "continues to believe that prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation." <u>Goldstein,</u> 383 F. Supp. 3d at 24. Though the Court will not award prejudgment interest, the Court will award post-judgment interest as specified by the federal post-judgment interest statute. <u>See</u> 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.").

### IV.  Conclusion

For the foregoing reasons, the Court will, in a separate Order accompanying this memorandum opinion, grant in part and deny in part Plaintiffs' [ECF No. 375] Amended Motion to Adopt Liability and Damages Reports and Recommendations for Wave 1 and Wave 2 Attacks and for Entry of Final Default Judgment.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>August 8, 2025</u>