UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ESTATE OF CHRISTOPHER BROOK FISHBECK, et al.,**  )<br><br>                    Plaintiffs,  )<br>                                      )<br>        v.                            )<br>                                      )<br>**THE ISLAMIC REPUBLIC OF IRAN, et al.,**  )<br>                                      )<br>                    Defendants  ) | Civil Action No. 1:18-cv-2248-CRC |

[PROPOSED]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING BELLWETHER ATTACKS 11, 13 AND 15

### I. Procedural Background

1. This case is brought by or on behalf of members of the U.S. military who were killed or injured in attacks during operations in Iraq from 2003 to 2011. Plaintiffs, who number over 1400, bring claims against Iran and various of its instrumentalities, who they allege provided funding, weapons, and logistical support to the terrorist organizations and militia groups responsible for the attacks. Plaintiffs assert jurisdiction under the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), which abrogates the sovereign immunity of foreign states that have been designed by the U.S. government as sponsors of terrorism and, as relevant here, provide "material support" for extrajudicial killings. 28 U.S.C. § 1605A. As in many similar actions against Iran, no defendant has appeared.

2. On September 12-14, 2022, the Court held an evidentiary hearing during which Plaintiffs presented evidence regarding 15 Bellwether attacks. The Court heard testimony from

Plaintiffs injured in those attacks, as well as testimony from expert witnesses and received evidence. Following the hearing, Plaintiff submitted a Motion for Default Judgment as to Liability (Dkt. No. 115).

3. On August 18, 2023, the Court entered a Memorandum Opinion and Order (Dkt. No. 137) wherein it made several findings. With regard to threshold issues, the Court had already found that Plaintiffs had properly served Defendants (Dkt. No. 55). The Court then found that Plaintiffs had satisfied subject matter jurisdiction under 28 U.S.C. § 1605A(a)(1) and 28 U.S.C. § 1605A(a)(2)(A)(i)–(ii). In particular, 1) The Plaintiffs sought only money damages; 2) That Iran was designated a state sponsor of terrorism at the time of each attack and at the time suit was filed; 3) At the time of the attack all of the claimants or victims were U.S. Nationals, members of the U.S. Armed Forces, or qualifying employees or contractors of the U.S. Government. (Dkt No. 137 at p. 2-3; See Op. & Order, ECF No. 126). Finally, the Court had previously found that the Foreign Sovereign Immunity Act's (FSIA) terrorism exception applicable to each Defendant except the National Iranian Oil Company. (Dkt No. 137 at p. 3; See Dkt Nos. 127 and 136). (Hereinafter "Defendants" refers to all named Defendants with the exception of the National Iranian Oil Company).

4. The Court found that Plaintiffs had submitted evidence satisfactory to the Court that 12 of the 15 Bellwether attacks were committed by a terrorism group receiving material support from the Defendants. However, the Court could not find the same for Bellwether attacks 11, 13, and 15 on the evidence submitted. (Dkt. No. 137, p. 21-22, 23-25, 27). As such, it denied the Motion for Default Judgment as to those three attacks and invited the Plaintiffs to supplement. (Dkt. No. 137, p. 28).

5. On November 11, 2024, Plaintiffs submitted additional evidence and briefing on Bellwether attacks 11, 13 and 15 (Dkt. No. 271). Expert Michael Pregent also submitted a supplemental report. (Dkt. No. 272).

6. On September 10, 2025, this Court found the supplemental evidence sufficient as to Bellwether attacks 11, 13, and 15, and granted the Motion for Default Judgment as to all three, finding Defendants liable for the injuries to Plaintiffs as a result of their respective attacks. (Dkt. No. 393). This memorandum follows to explain the Court's reasoning.

## II. Bellwether Attack 11

7. Staff Sergeant Steven Nunez was injured on April 5, 2005, when a Vehicle-Borne IED (VBIED) detonated next to his High Mobility Multi-Wheeled Vehicle (HMMWV) in the Dora neighborhood of Baghdad. (Dkt. No. 137 at 21). A member of Nunez's patrol was killed in the attack. (Dkt. No. 115-1, ¶ 486). Plaintiffs' expert attributed the attack to Al-Qaeda in Iraq (AQI). (Dkt. No. 137 at 21). The Court however found that Plaintiffs had not sufficiently addressed whether the attack could have been committed by another group, that the attack required operational dominance given the lack of a secondary blast or ambush, and that no evidence had been submitted showing the attack was technologically sophisticated enough for the Court to rule out other actors. (Dkt. No. 137 at 21).

8. In his supplementary report, expert Michael Pregent again attributed the attack on Nunez to AQI. Specifically, Plaintiffs' expert provided additional evidence that AQI was the primary actor in the Dora neighborhood based upon the number of VBIED attacks, the lack of reporting on other groups, as well as a report of an AQI command-and-control cell in the area. (Pregent Supplement Report, ¶¶ 28, 30, 32 citing to PX2111 SigAct Inventory

for BW Attack #11 (Under seal)). Plaintiffs' expert also opined that the VBIED likely targeted Nunez's patrol, as it was not near a market or crowded area to foment sectarian violence. Further, that it was likely command detonated, as it did not explode until Nunez's vehicle was next to it which would require overwatch, and pointed toward an organized terror group such as AQI. (Dkt No. 272 Pregent Supplement Report, ¶ 29). Plaintiffs Expert additionally stated that follow-on attacks, such as with small arms fire, were typically done when insurgents believed they would not be captured or killed and that the other factors were more determinative for Nunez's attack. (Dkt No. 272 Pregent Supplement Report, ¶ 32).

9. Plaintiffs further provided evidence that VBIEDs were most commonly associated with AQI, as well as evidence around the time of the attack that AQI claimed responsibility for, or involvement in, at least 75% of the VBIED attacks in Iraq. (PX431 0978. MNFI Chronology Master Document, p. 3; See Dkt. No. 271 Supplemental Bellwether Brief, pp. 6-9).

10. Based on the newly provided evidence of AQI's presence in the area, the use of a weapon commonly associated with AQI, and combined with the lack of evidence of another group's involvement, the Court finds, in the absence of any contrary evidence, that its concerns have been addressed, and the evidence satisfactory that Bellwether attack 11 was committed by AQI, which received material support from the defendants, and holds Defendants liable for the attack.

### III. Bellwether Attack 13

11. Sergeant Paul Haines was injured on June 4, 2006, when an IED struck his tank in the Salah al Din province of Iraq. (Dkt. No. 137 at 23). Two soldiers in Haines attack were killed as a result. (Dkt. No. 115-1, ¶ 520). Plaintiffs' expert attributed the attack to AQI.

4

(Dkt. No. 137 at 24). The Court found that while the IED that struck Sergeant Haines' tank was quite large, Plaintiffs had not proven that operational dominance or sophisticated training were necessary to bury and detonate it, and whether other groups operating in the region were capable of executing the attack. The Plaintiffs also submitted an investigation report which appeared to identify the group involved, but that group was redacted. (Dkt. No. 137 at 23-25).[1]

12. Expert Michael Pregent again provided additional evidence in support of his conclusion that AQI committed the attack. In particular, the expert stated that AQI sought to control the Taji/Tarmiyah area where the attack occurred in 2006 as part of its "Baghdad Belts" strategy. (See PX241 The U.S. Army in the Iraq War Vol I, p. 149; Dkt. No. 271 Pregent Supplemental Report, ¶¶ 34-37). A map published by the U.S. military depicting AQI's presence at the end of 2006 showed AQI concentrations in the area of the attack. (PX242 The U.S. Army in the Iraq War Vol II, at p. 57 Dkt. No. 271 Pregent Supplemental Report, ¶¶ 37-38). The expert also analyzed other groups and found one other prominent group operating in the area that maintained close ties to AQI, and likely would have been working in connection with AQI. (Pregent Supplemental Report, ¶¶ 50-51, citing to PX242 U.S. Army in the Iraq War Vol. II, pp. 172-173).

13. The Expert further opined that the tactics, techniques, and procedures of the attack matched those in use by AQI, and how the planning, placement, and detonation of the IED demonstrated the attack was conducted by a well-funded and trained group. (Pregent Supplemental Report, ¶ 38-42, Dkt. No. 271 Supplemental Bellwether Brief, p. 31). Specifically, that the investigative reports showed the insurgents had been observing

---

[1] Plaintiffs report attempting to get a copy of the AR-15 with the group name unredacted but being unable to obtain it. See Dkt. No. 271 Supplemental Bellwether Brief, p. 25.

5

Coalition Forces patrols. (Pregent Supplemental Report, ¶ 39-41). In addition, that the trigger man was 400 yards away so that he would be just out of small arms range, and that triggering the device from that distance to hit an accelerating target required training. (Pregent Supplemental Report, ¶ 42). The Expert also concluded that the IED was built specifically to target a tank and would have required funding and training in order to build and emplace. (Pregent Supplemental Report, ¶ 42). Finally, AQI had an interest in disrupting operations at the Karkh Water Treatment Facility where Haines' tank was heading to provide security, as demonstrated by their theft of chlorine tanks which were used in an attack in October of that year (Pregent Supplemental Report, ¶ 44; Dkt. No. 271 Supplemental Bellwether Brief, pp. 31-32).

14. The expert concluded those factors, along with the location and date, made it likely that AQI committed the attack. (Pregent Supplemental Report, ¶ 53).

15. The Court is satisfied, absent any contrary evidence, this attack can be attributed to AQI based upon this additional evidence, which received material support from the defendants, and holds defendants liable for the attack.

## IV. **Bellwether Attack 15**

16. Specialist Joel Tavera was injured on March 12, 2008, when his vehicle was struck by a 122-mm rocket on Camp Adder in the Dhi Qar province of Iraq. (Dkt. No 115-1, ¶ 551). The attack killed three soldiers in Tavera's vehicle. (Dkt. No. 115-1, ¶ 551). Plaintiff's expert attributed the attack to Shia Special Groups. (Dkt. No. 137 at p. 27). The Court found that Plaintiffs had submitted evidence generally that Shia militia groups were operating in the area, but not sufficient evidence to link the actual attack to a group benefiting from support from Defendants. (Dkt. No. 137 at p. 27).

17. Expert Michael Pregent provided additional evidence, including an Ops Report and an Indirect Fire Report, which were not available to him at the time of the Bellwether hearing. (Pregent Supplemental Report, ¶ 54). The reports showed that four rockets hit the base and were launched from 17.5km away. The expert concluded the attackers were well trained and knew the layout of the base, as three of the rockets hit in close proximity to important areas of the base during busy times. (Pregent Supplemental Report, ¶¶ 56-57, citing to PX2515 Ops Report for 12 March 2008). Two IEDs were also found at the launch location, intended to cause additional casualties to the responders. (PX2515 Ops Report for 12 March 2008; Pregent Supplemental Report, ¶ 58).

18. The expert further opined that the distance the rockets travelled confirmed that 122mm rockets were used. (Pregent Supplemental Report, ¶ 58, citing to PX494 Small Army Survey, Rogue Rocketeers: Artillery Rockets and Armed Groups (July 2014), p. 16-17). Evidence was submitted that 122mm rockets were being smuggled into Iraq at that time, along with a statement from General Michael Mullen one month after the attack that the mortars and rockets being found were coming from Iran. (See PX852 Richard Iron, The Charge of the Knights, 158:1, RUSI J., (2013), pp. 55-58; and PX443 News Briefing with JCOS Chairman Adm. Michal Mullen, April 2, 2008). The expert further stated that it would require a well-funded group, such as Jaysh al Mahdi or the Shia Special Groups, to acquire the large 122mm rockets as well as two IEDs. (Pregent Supplemental Report, ¶ 58).

19. Additional evidence was also submitted regarding the presence and strength of Iranian-supported groups. First, Expert Pregent stated that the focus of The Surge operations in southern Iraq in that time frame was specifically to disrupt IRGC-QF Special Groups and

7

their supply routes. (Pregent Supplemental Report, ¶ 59). Reporting also showed that Highway 8, which ran past Camp Adder, had become increasingly important as a smuggling route for Special Groups to support operations in Baghdad, and was vital to JAM/SG operations. (Pregent Supplemental Report, ¶ 60). JAM/SG were responsible for protecting the smuggling routes and would conduct attacks along the route to enable movement of men and munitions toward Baghdad. (Pregent Supplemental Report, ¶ 61). In addition, searches for groups other than JAM/SG in that area yielded no significant results. (Pregent Supplemental Report, ¶ 62).

20. Absent any contrary proof, this evidence is sufficient to attribute the attack to Shia Special Groups, who received material support from the defendants, and the Court holds Defendants liable for the attack.

CHRISTOPHER R. COOPER
United States District Judge

Date: 12/12/25