**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ESTATE OF CHRISTOPHER BROOK FISHBECK, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE ISLAMIC REPUBLIC OF IRAN, et al.,**<br><br>**Defendants.**<br><br>**This Document Relates To:**<br>**DANIEL WILLIAM BARRON,**<br>**SEAN PATRICK REED** | **Case No. 18-cv-2248 (CRC)**<br><br>**Special Master Angela D. Gupta** |

**REPORT AND RECOMMENDATION REGARDING**
**DEFENDANTS' LIABILITY FOR WAVE 4 ATTACKS 115 & 117**

In this case, over 1400 Plaintiffs assert claims against Iran and its alleged instrumentalities under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, seeking damages resulting from death or injury to U.S. military members in more than 400 terrorist attacks during operations in Iraq from 2003 to 2011. Plaintiffs' Second Amended Complaint (Doc. #100).[1] With respect to 12 of 15 bellwether terrorist attacks, the Court has found Defendants liable for providing "material support" under 28 U.S.C. § 1605A. Memorandum Opinion & Order at 8-28 (Doc. #137). Subsequently, the Court appointed nine Special Masters, including the undersigned, to assist with, among other things, determining liability for claims

[1] Defendants in the case include Islamic Republic of Iran ("Iran"), Islamic Revolutionary Guard Corps ("IRGC"), Iranian Ministry of Intelligence & Security ("MOIS"), Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran ("Bank Melli"), and National Iranian Oil Company ("NIOC"). Id.

related to the non-bellwether attacks. Order Appointing Special Masters for Non-Bellwether Liability & Damages Phase at 1 (Doc. #145). This report and recommendation addresses the issue of liability for Attacks 115 and 117 in Plaintiffs' Wave 4 ("W4") submissions. For reasons set forth below, the undersigned recommends that the Court enter an order holding Defendants liable for both attacks.

## I. Legal Standards

In assessing liability, the undersigned is guided by: (1) the provisions of 28 U.S.C. § 1605A; (2) the Court's prior findings of fact, conclusions of law, and other relevant orders; and (3) other relevant precedent. See Order Implementing Administrative Plan for Non-Bellwether Liability Determinations at 2 (Doc. #140). The Court has already found that Defendants were properly served and the criteria for establishing subject matter jurisdiction have been met. Memorandum Opinion & Order at 2-3 (Doc. #137).[2] Additionally, the Court has found that Defendants provided material support "to various Shia and Sunni terrorist groups, that said support was essential to the operational capacity of those groups, and that attacks perpetrated by those groups in Iraq from 2003 to 2011 were the reasonably foreseeable and natural consequence of those defendants' material support."[3] Memorandum Opinion & Order at 1 (Doc. #136) (citing

---

[2] The undersigned notes that any plaintiffs who have not submitted evidence of their status as a U.S. national or member of the armed forces must do so to be eligible for default judgment. Id. at 3 n.1 (Doc. #137).

[3] More specifically, the Court found that, during the relevant time period of 2003 to 2011, all Defendants, except NIOC, provided "material support" to: (1) the Shia terrorist groups of the Badr Corps, Jaysh al-Mahdi, the Promised Day Brigade, Asa'Ib ahl al Haq, Kata'ib Hizballah, and the Sheibani Network; and (2) the Sunni terrorist groups of Al Qaeda, Al Qaeda in Iraq ("AQI"), and Ansar al Islam ("AAI"). Order at 2 (Doc. #127) (finding that Iran, IRGC, and MOIS provided material support to the subject terrorist groups); Memorandum Opinion & Order at 2-7 (Doc. #136) (finding that Bank Markazi and Bank Melli provided material support to the subject terrorist groups). The Court invited plaintiffs to supplement their evidence regarding NIOC. Memorandum Opinion & Order at 7 (Doc. #136).

Order (Doc. #127)). Accordingly, the undersigned focuses her analysis on whether the subject attacks were committed by a terrorist group that received material support from Defendants.[4] See id. at 3.

The Court's analytical framework considers: (1) whether the tactics, methods, or weapons used can be linked to a supported group; (2) whether a supported group operationally controlled the area; (3) whether a qualified expert credibly attributed the attack; and (4) any other indicia of responsibility. Memorandum Opinion & Order at 7-8 (Doc. #137). The Administrative Plan also directs findings regarding the responsible group, the injuries or deaths caused by the attack, and the relationship of the victims to the Plaintiffs, followed by conclusions regarding material support, a qualifying act under 28 U.S.C. § 1605A(a)(1), and proximate cause. Order Implementing Administrative Plan for Non-Bellwether Liability Determinations at 2 (Doc. #140).

## II. Analysis

### A. W4 Attack 115: IED Attack near Trebil on May 15, 2005

On May 15, 2005, U.S. Marine Corporal (Cpl.) Daniel William Barron was on patrol with his unit to establish an observation post and conduct overwatch for a resupply convoy's exit from their forward operating base (FOB) located in the city of Trebil, Iraq. Declaration of Daniel William Barron ("Barron Declaration") ¶ f (PX16509).[5] The patrol unit traveled in a three-vehicle

[4] In doing so, the undersigned also notes that both attacks involved "extrajudicial killings," thus conferring the Court with subject matter jurisdiction under 28 U.S.C. § 1605A(a)(1). Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1060-66 (D.C. Cir. 2024). The evidence shows deliberate, targeted IED attacks: W4 Attack 115 involved a command-detonated IED aimed at a specific Coalition vehicle and resulted in the death of Marine Staff Sergeant (SSgt.) Faoa L. Apineru; W4 Attack 117 involved multiple command-armed IEDs emplaced to strike Coalition vehicles and resulted in the deaths of Army Corporal (Cpl.) Jaron D. Holliday, Sergeant (Sgt.) Dustin Wakeman, and Cpl. Jason LeFleur. As discussed below, Barron and Reed are the surviving servicemembers injured in the respective attacks and are the named Plaintiffs to whom this report relates.

[5] The Court has found that, at the time of the attack, Cpl. Barron was a member of the U.S. Armed Forces. Opinion & Order at 7 (Doc. #126); Fed. R. Evid. 1006 Summary at 28 (Doc. #81-2).

formation, with Cpl. Barron riding in the third vehicle. Id. The first two vehicles were seven-ton trucks. Id. The third vehicle was a high-backed Humvee with bench seating. Id. LCpl. Timothy Maguire drove the Humvee with Staff Sergeant (SSgt.) Faoa L. Apineru riding in the front passenger seat. Id. Cpl. Barron rode behind the driver. Id. Also seated in the back were Hospital Corpsman Third Class (HM3) Stephen McCloskey, LCpl. Ryan Henderson, and (fnu) Jenkins. Id.

About 30 minutes after departing from the FOB, the three vehicles were traveling south on MSR Michigan (a major road that had been closed off to civilian traffic) when an IED detonated on the left-hand side of the road, about four (4) feet from the driver's side door of the Humvee. Id. ¶ g. The Humvee came to a stop.[6] Id. Cpl. Barron tried to stand but collapsed, because his Achilles tendon had been severed by shrapnel. Id. Cpl. Barron lifted himself toward the cab of the vehicle and grabbed a radio to call for help. Id. He saw that both the driver (LCpl. Maguire) and front seat passenger (SSgt. Apineru) had been injured and were snoring as if they had been knocked unconscious. Id.

The contemporaneous operations report corroborates that an IED struck the patrol about four kilometers northeast of Camp Trebil and caused six Coalition casualties, including two urgent casualties. Ops Report at 1 (PX16500).

Cpl. Barron sustained significant shrapnel wounds to his left shoulder and left thigh. Barron Declaration ¶ i. Additionally, shrapnel pierced a hole through his left foot and lacerated his right Achilles tendon. Id. Cpl. Barron immediately began self-aid while simultaneously calling for an air-lift medical evacuation. Id. Cpl. Barron was then given first aid by his battle buddies, who re-bandaged his serious wounds to control the bleeding. Id. When help arrived, Cpl. Barron was

[6] The explosion rendered the Humvee a total loss; it punctured all four tires, damaged the armor plates on the vehicle, cracked the bullet-proof windshield, and caused numerous holes throughout the flooring of the vehicle. Id. ¶ h.

evacuated by helicopter for immediate care and then transported to a hospital in Iraq, where surgery was performed. Id. ¶ j. Cpl. Barron was then flown to Landstuhl Regional Medical Center, where he underwent additional medical procedures, before returning to the United States, where he continued treatment and rehabilitation for his injuries. Id. Cpl. Barron spent the next ten (10) months recovering before returning to his unit. Id. Cpl. Barron was awarded the Purple Heart for the injuries he suffered in the attack. Id. Cpl. Barron deployed once more in 2007 and continued his service with the Marines until 2022, when he retired with the rank of Master Sergeant. Id.

The official casualty report classifies the incident as hostile and confirms that Cpl. Barron sustained shrapnel wounds to his left shoulder, left anterior chest wall, left thigh, right foot, and right Achilles tendon and required medical evacuation. Casualty Report (PX16501).

The other passengers in the Humvee also sustained significant injuries. Barron Declaration ¶ k. LCpl. Maguire lost his right arm and suffered a traumatic brain injury ("TBI") and other shrapnel injuries. Id. LCpl. Henderson sustained a tibia and fibula compound fracture. Id. HM3 McCloskey suffered shrapnel wounds to his legs and forearms, causing extensive nerve damage in all extremities. Id. SSgt. Apineru suffered from a TBI and other shrapnel wounds. Id. On July 2, 2007, more than two years after the attack, SSgt. Apineru died from complications of the injuries he sustained in the attack. Id.; SSgt. Apineru, Military Times (PX16502); see also SSgt. Apineru, Iraq/Afghanistan War Heroes (PX16503) (both reporting that a subsequent opinion by the Armed Forces Institute of Pathology determined that his death resulted from injuries sustained in Iraq).[7]

[7] The record does not include the underlying Armed Forces Institute of Pathology opinion. Barron nevertheless states under penalty of perjury that the Institute determined SSgt. Apineru died from complications of the injuries sustained in the attack, and two casualty publications report the same subsequent determination. Barron Declaration ¶¶ k, n (PX16509); SSgt. Apineru, Military Times (PX16502); SSgt. Apineru, Iraq/Afghanistan War Heroes (PX16503).

Plaintiffs' experts have concluded with a reasonable degree of certainty that the May 15, 2005 attack was executed by al-Qaeda in Iraq ("AQI") operating in the vicinity of Trebil in the Al Anbar Province of Iraq.[8] Expert Witness Report & Declaration at 2 (PX16510).[9] More specifically, the experts note that Trebil is located in the far western corner of the Al Anbar Province, near the Jordanian border, which was a main crossing point for foreign fighters coming into Iraq. Id. at 7-11. In particular, the area was a popular transit point for AQI and its leader, Abu Musab al-Zarqawi. Id. Further, the road on which the attack occurred (i.e., MSR Michigan, also known as Highway 10) was a popular route for foreign fighters coming into Iraq and critical to enemy lines of communication. Id. In reaching their conclusion, the experts looked to press briefings and other publications indicating that, in the relevant time frame of 2005, AQI maintained control and influence along this major road to facilitate the movement of foreign fighters, weapons, and equipment from Jordan into Iraq. Id. (citations omitted).

Additionally, the experts found the sophistication and success of the attack indicate that an AQI cell was responsible. In particular, the experts point to a one-minute video (filmed by the enemy attackers), which demonstrates that the enemy watched the first two vehicles pass by at a high rate of speed before detonating the IED precisely when the third vehicle came into view. Id. at 5; see also IED video of May 15, 2005 attack (PX16506). The experts observed that the video shows that "the enemy had a clear view of the ambush point and specifically targeted the third

[8] As noted, the Court has found that, during the relevant time period, Defendants provided material support to AQI within the meaning of 28 U.S.C. § 1605A(a)(1). Order at 2 (Doc. #127).

[9] To establish liability for W4 Attack 115, plaintiffs submit an expert report prepared by Col. Mark Lee Walters, U.S. Army Ret.; CW4 Ronald Evans, U.S. Army Ret.; and CW3 David Sultzer, U.S. Army Ret. In determining liability for the bellwether attacks, the Court relied on submissions by these same experts. See Memorandum Opinion & Order at 8 n.3 (Doc. #137). Accordingly, the undersigned finds the experts are qualified to offer opinions regarding attribution of responsibility for this attack.

[vehicle] in the formation." Expert Witness Report & Declaration at 5 (PX16510). Additionally, the video shows that "the vehicles were traveling at a high rate of speed," and "the enemy ambush element was stationed at a significant distance from their target." Id.

The experts further point to the following facts to support their conclusion: (1) although MSR Michigan was closed off to civilian traffic and people, the enemy cell was able to infiltrate into the road, emplace the large IED, and command-detonate the IED without detection; (2) IEDs were among the weapons of choice for AQI and its associated networks; (3) AQI network operatives were particularly skilled at meticulous planning, pre-operational surveillance, and complex attacks; (4) AQI cells enjoyed a permissive environment and considerable freedom of movement in the area and were able to operate with impunity; and (5) the attacker was well-trained and able to easily target and "aim" the IED to create the maximum damage and casualties to the third armored vehicle while it was traveling in formation at a high rate of speed. Id. at 4, 7, 10-11.

Although the official operations report does not identify the responsible group and IEDs were not unique to AQI, the attribution does not rest on the weapon alone. The attack-specific video, the precise command detonation against the third vehicle, the cell's ability to emplace a large device on a closed road near the base, and the source-supported evidence of AQI's control of the Trebil corridor collectively distinguish this attack from one attributed merely by geography or a generic tactic.

Upon careful review of the facts and supporting evidentiary record, the undersigned finds the experts' conclusions to be credible and concludes there is sufficient evidence to attribute the May 15, 2005 attack to AQI, which received material support from Defendants. The deliberate command-detonation caused personal injuries to Plaintiff Cpl. Barron, the surviving servicemember and direct victim, and ultimately caused SSgt. Apineru's death. Because the Court

has found that attacks committed by the supported groups were a reasonably foreseeable and natural consequence of Defendants' material support, that support was a proximate cause of the attack and resulting injuries and death. Accordingly, the undersigned recommends that the Court enter an order holding Defendants liable for W4 Attack 115.

### B. W4 Attack 117: Complex IED Attack near Hawr Rajab on August 4, 2007

On August 4, 2007, U.S. Army Sergeant (Sgt.) Sean Patrick Reed was injured in a complex IED attack that killed three of his fellow soldiers. Declaration of Sean Patrick Reed ("Reed Declaration") ¶¶ e-g (PX16718).[10] Sgt. Reed was stationed at FOB Falcon and assigned to the security force for the Battalion Commander, Colonel Mark Odom. Id. ¶ d. Whenever Colonel Odom traveled outside of FOB Falcon, including the day of the attack, Sgt. Reed served as the gunner on the Colonel's Humvee. Id. ¶ e. On the day of the attack, Colonel Odom was traveling outside the FOB to check on a damaged Humvee (the "first-damaged Humvee") that had been hit by an IED as it crossed over a portable bridge.[11] Id.

As the Colonel's Humvee traveled along Route Buick, it ran over a remote-controlled pressure-plate IED that was buried along the road, not far from the location of the first IED attack. Id. ¶ f. The blast flipped the Colonel's Humvee upside down, pinning Sgt. Reed underneath. Id. Sgt. Reed became disoriented and may have lost consciousness. Id. When he came to, Sgt. Reed realized that part of his left pinky was crushed and amputated, half of his right ear had been ripped off, and he had lacerations from shrapnel throughout his body. Id. The wrecker that had been

[10] The Court has found that, at the time of the attack, Sgt. Reed was a member of the U.S. Armed Forces. Opinion & Order at 7 (Doc. #126); Fed. R. Evid. 1006 Summary at 8 (Doc. #81-2).

[11] The portable bridge had been brought in to cover a large rut that insurgents had blown in the route that U.S. forces had been using to travel from town to town along Route Buick. Id. ¶ e. A Route Clearance Platoon (RCP) unit had gone out and cleared the road (not finding any IEDs), but they were attacked by small arms fire. Id. ¶ e. Another patrol then went out and, as they crossed over the bridge, they were hit by an IED; the damaged Humvee ended up in a ditch. Id.

recovering the first-damaged Humvee responded and lifted the Colonel's Humvee off Sgt. Reed. Id. A third Humvee (the "Security Humvee") also responded and provided security while Sgt. Reed was recovered, loaded onto a stretcher, and placed in the back of a fourth Humvee to be driven to the landing zone for a medevac. Id.

The official IED and operations reports corroborate the strike and identify a device containing approximately 150 pounds of homemade explosives with a pressure device. IED Report at 1-4 (PX16700); Ops Report at 1-5 (PX16701).

In the Security Humvee were three soldiers from Sgt. Reed's battalion: Army Cpl. Jaron D. Holliday, Sgt. Dustin Wakeman, and Cpl. Jason LeFleur. Reed Declaration ¶ f. As Sgt. Reed was being driven away in the fourth Humvee, he heard a loud explosion and felt the blast of another IED detonating. Id. ¶ g. At the same time, as the security Humvee was backing away from the scene, it was hit by another remotely detonated IED that had been buried on the opposite side of the road from where the blast of Colonel Odom's Humvee occurred. Id. The second blast happened approximately 45 to 60 minutes after the first blast and killed the occupants of the Security Humvee (i.e., Cpl. Holliday, Sgt. Wakeman, and Cpl. LeFleur). Id.; see also Cpl. Holliday, Military Times (PX16702); Sgt. Wakeman, Military Times (PX16703); Cpl. LeFleur, Iraq/Afghanistan War Heroes (PX16704).

Sgt. Reed was taken to a combat support hospital in the Green Zone in Baghdad, where he was treated for a partial left fifth-digit amputation, right-hand weakness, injuries to his right lower-leg and ankle, and lacerations and wounds to his face and left ear. Id. ¶ h. He was then sent to Landstuhl, Germany, for additional medical care before returning to Fort Richardson, Alaska, where he continued medical treatment and recovery. Id. Sgt. Reed received the Purple Heart for the injuries he suffered in the attack. Id. In 2008, Sgt. Reed was able to return to full duty. Id. ¶ i.

From January 2009 to January 2010, Sgt. Reed deployed once more to Afghanistan. Id. In April 2010, his service in the Army ended, and he transitioned out of the Army Reserves on July 26, 2011. Id.

Plaintiffs' expert has concluded to a reasonable degree of military intelligence certainty that the August 4, 2007 attack was executed by al-Qaeda in Iraq ("AQI"). See Declaration & Expert Witness Report of Michael P. Pregent [regarding] Sean Reed – 4 August 2007 Attack (PX16719).[12] Specifically, the expert cites the following facts gathered from military history publications: The attack occurred just outside of Hawr Rajab, a primarily Sunni town located just south of Baghdad on the western side of the Tigris River. Id. at 2 (citations omitted). In the time period immediately before the attack (i.e., from mid-June to mid-July, 2007), Coalition Forces had conducted a series of operations called "Marine Torch 1" to disrupt and displace a large AQI command and control network in Arab Jabour, a town located a couple of miles to the northeast of Hawr Rajab. Id. As a result of the operations, AQI insurgents fled from Arab Jabour into Hawr Rajab. Id. The residents of Hawr Rajab quickly grew tired of AQI's presence and, by mid-July, two local sheiks had contacted the Coalition Forces to form a security alliance to expel AQI from Hawr Rajab. Id. On the day of the attack, Coalition Forces, including Sgt. Reed's unit, were conducting a joint mission with the sheiks to deliver supplies and conduct psychological operations in Hawr Rajab. Id. The sheiks and their men were supposed to provide intelligence on whether IEDs had been laid on the road, and whether any active AQI fighters were spotted in town. Id. Over the course of the day,

[12] To attribute responsibility for W4 Attack 117, Plaintiffs submit an expert report prepared by Michael P. Pregent. In determining liability for the bellwether attacks, the Court relied on submissions by this same expert. See Memorandum Opinion & Order at 8 n.3 (Doc. #137). Accordingly, the undersigned finds the expert is qualified to offer opinions regarding attribution of responsibility for this attack.

the Coalition Forces encountered a total of seven command-activated, pressure-plate IEDs that had been buried in the only road leading into and out of Hawr Rajab. Id.

The expert opines that AQI frequently retaliated when local leaders began cooperating with Coalition Forces. Id. at 2. He states that the fact it was a joint mission with the sheiks, along with the high volume of IEDs emplaced, indicates the attack was intended as a message from AQI to the sheiks and locals. Id. The expert further opines that some of the sheiks' men must have sided with AQI (or been threatened by AQI) and provided AQI with intelligence about the mission and route – which the expert states was unfortunately a common occurrence when Coalition Forces teamed up with local forces. Id.

Additionally, the expert points to the sophistication of the attack as evidence that it was committed by AQI. He notes that, prior to the attack, a route clearance team had cleared the route, which signals either a very fast IED emplacement or an extremely well-concealed IED, both of which indicate the advanced training and knowledge associated with AQI. Id. at 3. The expert further notes that the IEDs were pressure-plated with command-wire activation, which allowed the insurgents to arm the IEDs only when their intended targets were about to pass over them. Id. The expert states that the insurgents apparently allowed the convoy to reach Hawr Rajab before arming more of the IEDs, knowing that Coalition Forces would have to traverse back over the same road once they started to be struck by the IEDs, thus ensuring additional casualties and demonstrating advance planning and training, as well as a clear intelligence picture of the Coalition Force operations. Id.

Finally, the expert states that his review of event data in the relevant time, including maps that he created of terrorist attacks within a 1.5 mile radius of the attack area in 2007, further supports his conclusion that the area was highly-saturated with AQI members and that, around this

time period, pressure-activated IEDs emerged as a frequent TTP that was likely brought in by the AQI members who fled Arab Jabour for Hawr Rajab. Id. The expert concludes that AQI had primacy and control of the area and most likely was the group that committed the August 4, 2007 attack. Id. at 4.

Importantly, the expert also considered competing perpetrators. His search found no relevant former-regime, loyalist, or Ba'athist activity and identified only three EFP reports associated with Shia activity in the far northern portion of the search area, within Baghdad's Rashid district. Id. at 3-4. He explained that those reports did not indicate Shia influence extending south to Hawr Rajab, and that the only report containing the term "JAM" was a false positive referring to a weapon malfunction. Id. at 4. This analysis, together with Hawr Rajab's Sunni character and the contemporaneous evidence of AQI's displacement into the town, supports the AQI attribution.

Although pressure-plate IEDs were not unique to AQI, the expert did not rely on that tactic in isolation. He also considered the time and location, AQI's recent influx into Hawr Rajab, the series of command-armed devices on the town's only access road, the speed or concealment required after route clearance, the attackers' intelligence regarding Coalition movements, and the absence of evidence supporting competing groups.

Upon careful review of the facts and supporting evidentiary record, the undersigned finds the expert's conclusions to be credible and concludes there is sufficient evidence to attribute the August 4, 2007 attack to AQI, which received material support from Defendants. The deliberately planned series of IED strikes caused personal injuries to Plaintiff Sgt. Reed, the surviving servicemember and direct victim, and caused the deaths of Cpl. Holliday, Sgt. Wakeman, and Cpl. LeFleur. Because the Court has found that attacks committed by the supported groups were a reasonably foreseeable and natural consequence of Defendants' material support, that support was

a proximate cause of the attack and resulting injuries and deaths. Accordingly, the undersigned recommends that the Court enter an order holding Defendants liable for W4 Attack 117.

## III. Conclusion

Based on the foregoing analysis, the undersigned recommends that the Court enter an order holding Defendants liable for Wave No. 4 Attacks 115 and 117.

## REVIEW BY DISTRICT COURT

Pursuant to this Court's orders governing special masters and implementing the administrative plan for this case (ECF Nos. 139, 140, and 145), plaintiffs may file an objection to, or a motion to modify/adopt, a finding, report, or recommendation by a Special Master within twenty-one (21) calendar days of the date it was electronically filed. The Court shall decide *de novo* all objections to findings of fact or conclusions of law made or recommended by the Special Master. The Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion. See Fed. R. Civ. P. Rule 53(f)(3), (4), and (5).

Dated: September 21, 2026.

Respectfully Submitted,

/s/ *Angela D. Gupta*
Angela D. Gupta
Special Master